UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J. MICHAEL CHARLES; MAURICE W.   )   CIVIL ACTION NO. 05-702(SLR)
WARD, JR.; and JOSEPH I. FINK, JR., on behalf  )
of themselves and all others similarly situated,   )
                                    )
             Plaintiffs,        )
                                      )
             v.               )
                                      )   CLASS ACTION
PEPCO HOLDINGS, INC; CONECTIV, and    )
PEPCO HOLDINGS RETIREMENT PLAN,    )
                                      )
             Defendants.     )
                                      )

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

CHIMICLES & TIKELLIS LLP
Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
Robert R. Davis (#4536)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
302-656-2500 (telephone)
302-656-9053 (fax)

and

James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

December 16, 2005            Attorneys for Plaintiffs

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

NATURE AND STAGE OF THE PROCEEDING............................................................. 1

SUMMARY OF ARGUMENT ........................................................................................... 1

STATEMENT OF FACTS................................................................................................... 3

ARGUMENT ....................................................................................................................... 6

DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED ......................................... 6

A.     The Conectiv Cash Balance Sub-Plan Violates ERISA's Accrual
Requirements. ..................................................................................................... 7

B.     The Conectiv Cash Balance Sub-Plan Violates Section 204(b)(1)(G) of
ERISA................................................................................................................ 15

C.     The Conectiv Cash Balance Sub-Plan Violates Section 204(b)(1)(H) of
ERISA................................................................................................................ 20

        1.     "Any Age" Means Any Age................................................................... 20

        2.     The Rate of Benefit Accrual Should be Measured by Accrued
Benefits ................................................................................................. 24

        3.     The Rate of Benefit Accrual Under the Plan Decreases
With Age................................................................................................ 28

D.     Conectiv Violated Section 204(h) of ERISA...................................................... 29

        1.     Conectiv Did Not Provide Sufficient Information ............................... 30

        2.     Conectiv Did Not Provide Timely Notice............................................ 31

E.     Plaintiffs' Claims are Not Barred By the Statute of Limitations...................... 32

        1.     Count I is Timely................................................................................... 37

        2.     Counts II and III are Timely ................................................................. 37

3.      Count IV is Timely ............................................................................... 38

CONCLUSION ............................................................................................................................. 40

# TABLE OF CITATIONS

**Cases** **Page**

*Alessi v. Raybestos–Manhattan, Inc.,*
451 U.S. 504 (1981) ............................................................................................................... 18

*A.W. v. Jersey City Pub. Sch.,*
341 F.3d 234 (3d Cir. 2003) ............................................................................................... 23

*Admin. Comm. of the Wal-Mart Stores, Inc. Health and Welfare Plan v. Soles,*
336 F.3d 780 (8th Cir. 2003) ............................................................................................. 35

*Anderson v. Resolution Trust Corp.,*
66 F.3d 956 (8th Cir. 1995) ............................................................................................... 29

*Bamba v. Riley,*
366 F.3d 195 (3d Cir. 2004) ............................................................................................... 23

*Berger v. Xerox Corp. Retirement Income Guarantee Plan,*
338 F.3d 755 (7th Cir. 2003) ............................................................................................. 13

*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,*
331 U.S. 519 (1947) ............................................................................................................. 23

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3d Cir. 1997) ............................................................................................... 7

*Cada v. Baxter Healthcare Corp.,*
920 F.2d 446 (7th Cir.1990) ............................................................................................... 35

*Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan,*
201 F.3d 44 (2d Cir.1999) ................................................................................................... 36

*In re Cendant Corp. Derivative Action Litig.,*
189 F.R.D. 117 (D.N.J. 1999) .............................................................................................. 7

*Conley v. Gibson,*
355 U.S. 41 (1957) ........................................................................................................... 7, 11

*Connors v. Consolidation Coal Co.,*
866 F.2d 599 (3d Cir. 1989) ............................................................................................... 33

*Connors v. Hallmark & Son Coal Co.,*
935 F.2d 336 (D.D.C. 1991) ............................................................................................... 35

*Cooper v. The IBM Personal Pension Plan,*
  274 F. Supp. 2d 1010 (S.D. Ill. 2003) ..............................................................................21, 25, 28

*Cotter v. Eastern Conf. of Teamsters Retirement Plan,*
  898 F.2d 424 (4th Cir. 1990) ........................................................................................................35

*Daill v. Sheet Metal Workers' Local 73 Pension Fund,*
  100 F.3d 62 (7th Cir.1996) ......................................................................................................35, 36

*DeWitt v. Penn-Del Directory Corp.,*
  872 F. Supp. 126 (D.Del. 1994) ..................................................................................................33

*DelCostello v. Int'l Bhd. of Teamsters,*
  462 U.S. 151 (1983) .......................................................................................................................33

*DiCioccio v. Duquesne Light Co.,*
  911 F. Supp. 880 (W.D. Pa. 1995) .........................................................................................18, 19

*Dixon v. Anderson,*
  928 F.2d 212 (6th Cir. 1991) ........................................................................................................35

*In re Donald J. Trump Casino Sec. Litig.,*
  7 F.3d 357 (3d Cir. 1993) ................................................................................................................7

*Eaton v. Onan Corp.,*
  117 F. Supp. 2d 812 (S.D. Ind. 2000) ...........................................................................11, 22, 23, 26

*Engers v. AT&T Corp.,*
  2001 U.S. Dist. LEXIS 25889 (D.N.J. June 6, 2001) ..................................................................22

*Epright v. Envtl. Resources Management, Inc. Health and Welfare Plan,*
  81 F.3d 335 (3d Cir. 1996) ............................................................................................................39

*Esden v. Bank of Boston,*
  229 F.3d 154 (2d Cir. 2000) ...............................................................................................8, 13, 27

*Gluck v. Unisys Corp.,*
  960 F.2d 1168 (3d Cir. 1992) ........................................................................................................33

*In re Gulf Pension Litig.,*
  764 F. Supp. 1149 (S.D. Tex. 1991), *aff'd,* 36 F.3d 1308 (5th Cir. 1994) ...............................27, 28

*Henglein v. Colt Indust. Operating Corp.,*
  260 F.3d 201 (3d Cir.2001) ...........................................................................................................36

*Herm v. Stafford,*
  663 F.2d 669 (6th Cir. 1981) .................................................................................................. 35

*Herron v. Herron,*
  255 F.2d 589 (5th Cir. 1958) .................................................................................................. 33

*Holmberg v. Armbrecht,*
  327 U.S. 392 (1946) ......................................................................................................... 34-35

*Hoover v. Cumberland, Maryland Area Teamsters Pension Fund,*
  756 F.2d 977 (3d Cir. 1985) ............................................................................................... 1, 8

*Keystone Ins. Co. v. Houghton,*
  863 F.2d 1125 (3d Cir.1988) .................................................................................................. 35

*Klehr v. A.O. Smith Corp.,*
  521 U.S. 179 (1997) ............................................................................................................... 35

*Kodes v. Warren Corp.,*
  24 F. Supp. 2d 93 (D. Mass. 1998) ....................................................................................... 39

*Laurenzano v. Blue Cross and Blue Shield of Mass., Inc. Retirement Income Trust,*
  134 F. Supp. 2d 189 (D. Mass.2001) ..................................................................................... 34

*Meagher v. Int'l Assoc. of Machinists and Aerospace Workers*
*Pension Plan,*
  856 F.2d 1418 (9th Cir. 1988) ............................................................................................... 34

*Miles v. New York State Teamsters Conf. Pension and Retirement Fund*
*Employee Pension Benefit Plan,*
  698 F.2d 593 (2d Cir. 1983) ............................................................................................ 36, 38

*Morse v. Lower Merion School Dist.,*
  132 F.3d 902 (3d Cir. 1997) .................................................................................................. 32

*Northern California Retail Clerks Unions and Food Employees Joint Pension*
*Trust Fund v. Jumbo Markets, Inc.,*
  906 F.2d 1371 (9th Cir. 1990) ............................................................................................... 35

*Oshiver v. Levin, Fishbein, Sedran & Berman,*
  38 F.3d 1380 (3d Cir. 1994) .................................................................................................... 7

*Paine Webber Inc. v. Faragalli,*
  61 F.3d 1063 (3d Cir. 1995) .................................................................................................. 35

*Pennsylvania Dep't of Corrections v. Yeskey,*
  524 U.S. 206 (1998) ............................................................................................................... 23

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,*
  998 F.2d 1192 (3d Cir. 1993) ............................................................................................. 7

*Ratzlaf v. United States,*
  510 U.S. 135 (1994) ......................................................................................................... 24

*Robinson v. Johnson,*
  313 F.3d 128 (3d Cir. 2002) ............................................................................................. 33

*Romero v. Allstate Corp.,*
  404 F.3d 212 (3d Cir. 2005) ........................................................................... 34, 37, 38, 39

*Ross v. Hotel Employees and Restaurant Employees Int'l Union,*
  266 F.3d 236 (3d Cir. 2001) ............................................................................................. 24

*Sandoval v. Reno,*
  166 F.3d 225 (3d Cir. 1999) ............................................................................................. 23

*Scott v. Admin. Comm. of the Allstate Agents Pension Plan,*
  113 F.3d 1193 (11th Cir. 1997) ....................................................................................... 30

*Swierkiewicz v. Sorema N.A.,*
  534 U.S. 506 (2002) ......................................................................................................... 10

*Tanzillo v. Local Union 617, Int'l Bhd. of Teamsters,*
  769 F.2d 140 (3d Cir.1985) .............................................................................................. 36

*Tax Analysts v. I.R.S.,*
  350 F.3d 100 (D.C. Cir. 2003) ......................................................................................... 14

*Tootle v. ARINC, Inc.,*
  222 F.R.D. 88 (D. Md. 2004) ............................................................................... 22, 23, 27

*Tracinda Corp. v. DaimlerChrysler AG,*
  197 F. Supp. 2d 42 (D. Del. 2002) ..................................................................................... 7

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,*
  140 F.3d 478 (3d Cir. 1998) ............................................................................................... 7

*Union Pacific R.R. Co. v. Beckham,*
  138 F.3d 325 (11th Cir. 1998) .................................................................................... 35, 36

*Wells v. Gannett Retirement Plan,*
  385 F. Supp. 2d 1101 (D. Colo. 2005) ............................................................................. 21

*In re Westinghouse Sec. Litig.,*
  90 F.3d 696 (3d Cir. 1996) ................................................................................................. 7

*White v. Jacobs Eng'g Group Long Term Disability Benefit Plan,*
   896 F.2d 344 (9th Cir. 1989) ............................................................................... 39

## Statutes and Legislative History

26 U.S.C. § 401(a)(2) ........................................................................................ 19

26 U.S.C. § 401(a)(8) ........................................................................................ 19

26 U.S.C. § 401(a)(13)(A) .................................................................................. 20

26 U.S.C. § 401(a)(14) ...................................................................................... 20

26 U.S.C. § 401(a)(15)(A) .................................................................................. 18

26 U.S.C. § 411(a) ............................................................................................ 20

26 U.S.C. § 411(a)(7)(A) .................................................................................... 27

26 U.S.C. § 411(a)(11)(A) .................................................................................. 20

26 U.S.C. § 411(a)(11)(D) .................................................................................. 20

26 U.S.C. § 411(b)(1)(H) .................................................................................... 26

29 U.S.C. § 1002(23) .......................................................................... 2, 8, 16, 17, 38

29 U.S.C. § 1002(23)(A) .................................................................................... 27

29 U.S.C. § 1002(23)(B) .................................................................................... 27

29 U.S.C. § 1053(a) .......................................................................................... 19

29 U.S.C. § 1053(e)(4) ...................................................................................... 19

29 U.S.C. § 1054(b)(1)(A) .......................................................................... 1, 8, 9, 37

29 U.S.C. § 1054(b)(1)(B) ...................................................................... 1, 8, 9, 15, 37

29 U.S.C. § 1054(b)(1)(C) ........................................................................ 1, 8, 10, 37

29 U.S.C. § 1054(b)(1)(G) ...................................................................... 1, 2, 16, 37

29 U.S.C. § 1054(b)(1)(H) .......................................................................... 1, 2, 37

29 U.S.C. § 1054(b)(1)(H)(i) ............................................................................... 20

29 U.S.C. § 1054(b)(1)(H)(iii) ............................................................................................ 22

29 U.S.C. § 1054(b)(1)(H)(v) ........................................................................................ 26, 28

29 U.S.C. § 1054(b)(2)(A) ............................................................................................... 27

29 U.S.C. § 1054(c)(3) ...................................................................................................... 8

29 U.S.C. § 1054(h) ...................................................................................... 1, 3, 24, 29, 30

29 U.S.C. § 1054(h)(1) ..................................................................................................... 29

29 U.S.C. § 1054(h)(9) ..................................................................................................... 26

29 U.S.C. § 1055(a) .......................................................................................................... 19

29 U.S.C. § 1056(a) .......................................................................................................... 19

Omnibus Budget Reconciliation Act of 1986,
  Pub. L. No. 99-509, 100 Stat. 1874 (1986) .................................................................. 20

H.R. Conf. Rep. No. 1012, 99th Cong., 2d Sess. (1986), *reprinted in* 1986
  U.S.C.C.A.N. 3868 ........................................................................................................ 24

10 Del. C. § 8106 ......................................................................................................... 33, 36

<u>Rules and Regulations</u>

Fed. R. Civ. P. 8(c) ........................................................................................................... 33

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 32

26 C.F.R. § 1.401(a)(4)-3(f)(3) ......................................................................................... 26

26 C.F.R. § 1.401(*l*)-1(b) ................................................................................................. 16

26 C.F.R. § 1.411(a)-4(a) .................................................................................................. 18

26 C.F.R. § 1.411(b)-1(b)(1)(iii), Example 1 ................................................................... 14

26 C.F.R. § 1.411(b)-1(b)(1)(iii), Example 3 ................................................................... 15

26 C.F.R. § 1.411(d)-6 (A-5)(1999) ................................................................................. 29

26 C.F.R. § 54.4980F-1, Q &A 11(a)(2) .......................................................................... 30

*Income Taxes; Continued Accruals Beyond Normal Retirement Age*, 53 Fed. Reg. 11,876 (Apr. 11, 1988)................................................................................................21

*Notice of Significant Reduction in the Rate of Future Benefit Accrual*, 60 Fed. Reg. 64,320 (Dec. 15, 1995) ........................................................................................ 24-25

*Notice of Significant Reduction in the Rate of Future Benefit Accrual*, 63 Fed. Reg. 68,678 (Dec. 14, 1998) ................................................................................................25

*Solicitation for Comments*, 64 Fed. Reg. 56,578 (Oct. 20, 1999).............................................14, 21

*Reductions of Accruals and Allocations Because of the Attainment of Any Age; Application of Nondiscrimination Cross–Testing Rules to Cash Balance Plans*, 67 Fed. Reg. 76,123 (Dec. 11, 2002)....................................................................................14

I.R.S. Notice 96-8, 1996-1 C. B. 359, 1996 WL 17901 (Feb. 5, 1996)................................................................. 12-13, 14, 17

I.R.S. Announcement 2003-1, 2003-1 C.B. 281, 2002 WL 31747446 (January 13, 2003) .....................................................................14

I.R.S. Announcement 2004-57, 2004 WL 1330416 (July 6, 2004) ........................................... 14, 22

<u>Other Authorities</u>

Stephen R. Bruce, *Pension Claims, Rights and Obligations* (2d ed. 1993) ..................................2, 10

Edward Zelinsky, *The Cash Balance Controversy*, 19 VA. TAX. REV. 683 (2000) ...................................................................................... 28

## NATURE AND STAGE OF THE PROCEEDING

On September 26, 2005, plaintiffs filed their complaint in this action. (D.I. 1).

Plaintiffs Charles, Ward and Fink, participants in the Conectiv Cash Balance Sub-Plan, are

asserting four claims for relief. First, they assert that the Conectiv Cash Balance Sub-Plan

violates the minimum accrual requirements of Section 204(b) of ERISA, 29 U.S.C. §

1054(b)(1)(A),(B),(C). Second, plaintiffs assert that the plan violates Section 204(b)(1)(G)

of ERISA, 29 U.S.C. § 1054(b)(1)(G), because it permits the accrued benefit of a

participant to be reduced in subsequent years. Third, they assert that the plan violates

Section 204(b)(1)(H) of ERISA, 29 U.S.C. § 1054(b)(1)(H), because the rate at which a

participant accrues benefits under the plan is reduced as the participant's age increases.

Fourth, plaintiffs assert that defendant Conectiv violated Section 204(h) of ERISA, 29

U.S.C. § 1054(h), because it failed to give the requisite notice concerning the amendment

of the predecessor plans. Plaintiffs seek broad injunctive and declaratory relief, as well as

an award of attorneys' fees and costs.

On November 16, 2005, defendants filed a motion to dismiss plaintiffs' complaint

for failure to state a claim. (D.I. 11). Plaintiffs submit this brief in opposition to that

motion.

## SUMMARY OF ARGUMENT

1.      The Conectiv Cash Balance Sub-Plan is a defined benefit plan under

ERISA. A defined benefit plan "must accrue benefits for each active employee at a

minimal accrual rate set by statute." *Hoover v. Cumberland, Maryland Area Teamsters

Pension Fund,* 756 F.2d 977, 982 n.10 (3d Cir. 1985). These minimum accrual

requirements, which are set forth in Section 204 (b)(1)(A), (B), (C) of ERISA, 29 U.S.C. §

1054(b)(1)(A), (B), (C),  consist of three alternative tests, known as the 3 percent method,

the 133 1/3 percent method, and the fractional rule. *See generally* Stephen R. Bruce, *Pension Claims, Rights and Obligations,* 116 (2d ed. 1993).  The Conectiv Cash Balance Sub-Plan violates these standards as it has permitted participants to suffer negative accruals in certain years and because the rate at which a participant accrues benefits in a plan year exceeds 133 1/3 percent of the rate for a prior plan year.

    2.     Under a defined benefit plan, the employee's accrued benefit is defined as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23).  Section 204(b)(1)(G) provides that a plan will not satisfy ERISA's accrual standards if a participant's "accrued benefit is reduced on account of any increase in his age or service."  29 U.S.C. § 1054(b)(1)(G).  When plaintiffs' account balances under the plan are converted to an age sixty-five annuity, it becomes apparent that their accrued benefit decreased after they rendered additional years of service, in violation of Section 204(b)(1)(G) of ERISA, 29 U.S.C. § 1054(b)(1)(G).

    3.     Section 204(b)(1)(H) provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age."  29 U.S.C. § 1054(b)(1)(H).  "Any age" means precisely that; as a consequence, by its terms, this provision offers protection despite the fact that the plaintiffs have not reached normal retirement age.  The natural construction of the term "rate of benefit accrual" is as a measurement of changes in the accrued benefit of a participant.  Under the Conectiv Cash Balance Sub-Plan, the rate of benefit accrual decreases with age, in violation of Section 204(b)(1)(H) of ERISA, 29 U.S.C. § 1054(b)(1)(H).

4.      Section 204(h) of ERISA requires prior notice to participants of any amendments to a plan which "provide for a significant reduction in the rate of future benefit accrual." 29 U.S.C. § 1054(h). The materials issued in connection with the adoption of the Conectiv Cash Balance Sub-Plan failed to notify participants that they may suffer adverse effects of the plan amendment. Moreover, the notification provided was untimely as a matter of law.

5.      Plaintiffs' claims were timely filed within the three-year limitations period. The Third Circuit has rejected defendants' position that the date of accrual of claims is the effective date of the plan amendment, in the context of certain types of ERISA non-fiduciary duty claims. Applying the formulation that ERISA non-fiduciary duty claim accrue after a claim for benefits due under an ERISA plan has been made and formally denied, the limitations period would begin to run after the plaintiffs retire. As the plaintiffs have not yet retired, the complaint was timely filed within the three year limitations period proscribed by 10 Del. C. § 8106. Under limited circumstances, courts have held that an ERISA non-fiduciary claim may accrue before a formal application is made or before benefits are formally denied, if there has been a clear repudiation of the benefits. Applying the "clear repudiation" standard, the complaint was timely filed.

## STATEMENT OF FACTS

This action involves the conversion of a traditional defined benefit pension plan to a cash balance plan, which is a different form of defined benefit plan. This conversion became effective January 1, 1999, when the plaintiffs were placed into Conectiv's Cash Balance Sub-Plan. (D.I. 1 ¶ 1). Conectiv's Cash Balance Sub-Plan presents the amount of a participant's retirement benefits by reference to a hypothetical account balance, instead of the traditional annuity.

3

Prior to 1998, Atlantic City Electric Company ("Atlantic City Electric") and Delmarva Power & Light Company ("Delmarva") were independent companies, each of which maintained its own defined benefit pension plan, the Atlantic City Electric Company Retirement Plan ("Atlantic City Plan") and the Delmarva Power & Light Company Retirement Plan ("the Delmarva Plan"). (D.I. 1 ¶ 17). On March 1, 1998, Atlantic City Electric and Delmarva became wholly owned subsidiaries of Conectiv. (D.I. 1 ¶ 17). Conectiv determined that it wished to create a single defined benefit pension plan out of the two predecessor plans. On December 30, 1998, the Delmarva Plan merged into the Atlantic City Plan, and the surviving Atlantic City Plan was renamed as the Conectiv Retirement Plan. (D.I. 1 ¶ 18).

Conectiv also decided to switch the basic form of the plan for its management employees from a final pay plan to a cash balance plan. (D.I. 1 ¶ 19). In a cash balance plan, each participant has a hypothetical account which is purely for bookkeeping purposes. (D.I. 1 ¶ 20). No specific assets are allocated to any particular participant's "account," and the value of the "account" does not fluctuate in response to gains and losses recognized on plan assets. (D.I. 1 ¶ 20). Each year, the plan's sponsor in a cash balance plan adjusts the participant's account with various credits based upon the formula set forth in the plan document. (D.I. 1 ¶ 20). Typically, these credits reflect some factor based on earnings along with an interest credit, which is usually derived from the thirty year Treasury rate. (D.I. 1 ¶ 20).

Conectiv did not alter the benefits structure for its unionized employees; instead it created sub-plans for them, known as the ACE Sub-Plan and the Delmarva Sub-Plan. (D.I. 1 ¶ 21). Unless they qualified for the ACE Sub-Plan or the Delmarva Sub-Plan, participants who were covered by the Atlantic City Plan or the Delmarva Plan were placed

in the Cash-Balance Sub-Plan as of January 1, 1999. (D.I. 1 ¶ 21). Conectiv also decided

that it would grandfather certain of the management employees who were participants in

the Atlantic City Plan and the Delmarva Plan. Participants in these plans were

grandfathered if, as of December 31, 1998, they had attained age fifty or completed at least

twenty years of service calculated under the terms of the predecessor plan. (D.I. 1 ¶ 22).

Employees qualifying for a grandfathered benefit would then have their retirement benefits

calculated under the terms of the predecessor plan provided that they terminated

employment on or before December 31, 2008. (D.I. 1 ¶ 22). The plaintiffs did not qualify

for grandfathered benefits as they did not meet the requisite age and service requirements.

(D.I. 1 ¶ 23).

Prior to the effective date of the Conectiv Cash Balance Sub-Plan, in the Spring and

in December of 1998, Conectiv issued two brochures concerning the pension plan

conversion. (D.I. 1 ¶¶ 30-34). Significantly, neither publication informed the participants

that they may suffer adverse effects due to the change. Instead, these materials emphasized

the benefits of the new arrangement, and indicated that the plan was designed to protect

the interests of older workers through grandfathering. (D.I. 1 ¶¶ 33-34).

From January 1, 1999 through the present, each of the plaintiffs has been a

participant in the Cash Balance Sub-Plan of the Conectiv Retirement Plan, currently the

Pepco Holdings Retirement Plan.[1] (D.I. 1 ¶ 24). The pension benefits that they have

accrued since that date have been governed by the formula under that plan, which has

---

[1]    On August 1, 2002, Conectiv became a wholly-owned subsidiary of Pepco
Holdings. (D.I. 1 ¶ 29). Thereafter, Pepco Holdings merged the Pepco General
Retirement Plan (a defined benefit pension plan maintained by one of its subsidiaries) and
the Conectiv Retirement Plan to create the Pepco Holdings Retirement Plan. (D.I. 1 ¶
29). The formation of the Pepco Holdings Retirement Plan did not alter the manner in
which benefits were expressed for participants in the Conectiv Retirement Plan. (D.I. 1 ¶
29).

three different components: Pay Credits; Transition Credits; and Interest Credits. (D.I. 1 ¶ 24). The Pay Credits and Transition Credits are calculated as a percentage of each participant's compensation for the year. (D.I. 1 ¶¶ 25, 27). The Interest Credits are tied to the thirty-year Treasury rate. (D.I. 1 ¶ 26). From January 1, 1999 to the present, each of the plaintiffs has had their benefits under the Cash-Balance Sub-Plan of the Conectiv Retirement Plan expressed in the form of their account balance. The account balance consists of their opening balance plus the Pay Credits, Interest Credits, and Transition Credits that they earned since January 1, 1999. (D.I. 1 ¶ 38).

Because the Conectiv Cash Balance Sub-Plan is a defined benefit plan, its compliance with ERISA's substantive accrual requirements focuses upon the annuity benefit that would be payable at age 65, not the account balance. (D.I. 1 ¶ 39). When the plaintiffs' account balances are converted to annuity form, it becomes apparent that their accrued benefits fluctuated. For example, "in 1999 and 2000 Plaintiff Charles' accrued benefit increased. Thereafter, it subsequently decreased in three consecutive years: in 2001, his accrued benefit decreased by 4.006%; in 2002, it decreased by 6.932%; and in 2003, it decreased by 2.774%." (D.I. 1 ¶ 41). In 2004, Mr. Charles' accrued benefit increased by 8.43%, but it remains lower than his accrued benefit at the end of 2000. (D.I. 1 ¶ 41). Plaintiffs Ward and Fink had similar experiences. (D.I. 1 ¶ 41).

### ARGUMENT

### DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED.

Defendants have launched a broad-brush attack on the sufficiency of plaintiffs' complaint, asserting that none of the four counts states a claim for relief. The standard governing defendants' motion is demanding; a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) will not be granted unless "it appears beyond doubt that the

6

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

In considering a motion to dismiss for failure to state a claim, the Court must accept all factual allegations in the complaint as true, give the plaintiff the benefit of all reasonable inferences that can be drawn from the allegations, and view them in the light most favorable to the non-moving party. *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 127 (D.N.J. 1999); *see also Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994).[2]  In deciding a motion to dismiss, the Court's function is to test the legal sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case. *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp.2d 42, 53 (D. Del. 2002). The Court should not look to whether plaintiff will "ultimately prevail;" it should only consider whether he will be allowed to offer evidence in support of his claims. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997). As plaintiffs demonstrate below, these well-settled standards indicate that defendants' motion to dismiss should be denied.

A.      *The Conectiv Cash Balance Sub-Plan Violates ERISA's Accrual Requirements.*

While they are designed to mimic a defined contribution plan by providing participants with a benefit that is presented as a lump sum, cash balance plans are defined

---

[2]      Generally, the court is to disregard any material beyond the pleadings. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Without converting the motion to one for summary judgment, a district court may, however, consider documents described or identified in the complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir. 1996); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993); *Pension Benefit Guar. Corp.*, 998 F.2d at 1196-97.

benefit plans, subject to all of the substantive requirements that apply to defined benefit plans. *Esden v. Bank of Boston,* 229 F.3d 154, 158 (2d Cir. 2000). Defendants have acknowledged as much. (*See* D.I. 12 at 2-3)("cash balance plans are defined benefit plans").

A defined benefit plan "must accrue benefits for each active employee at a minimal accrual rate set by statute." *Hoover v. Cumberland, Maryland Area Teamsters Pension Fund,* 756 F.2d at 982 n.10. These minimum accrual requirements, which are set forth in Section 204 (b)(1)(A), (B), (C) of ERISA, 29 U.S.C. § 1054(b)(1)(A), (B), (C), consist of three alternative tests, "each of which specifies how much of the benefit payable at normal retirement age must accrue each year." *Hoover,* 756 F.2d at 982 n.10. The relevant tests are known as the 3 percent method, the 133 1/3 percent method, and the fractional rule. *See generally* Bruce, *Pension Claims, Rights and Obligations,* at 116. In their complaint, the plaintiffs have alleged that the Conectiv Cash Balance Sub-Plan violates these standards. (D.I. 1 ¶¶ 42-45).

Each of the three accrual tests measures the plan's compliance by reference to the participant's "accrued benefit." *See* 29 U.S.C. § 1054(b)(1)(A), (B), (C). ERISA defines the term "accrued benefit" under a defined benefit plan as "the individual's accrued benefit determined under the plan and, except as provided in [29 U.S.C. § 1054(c)(3)], expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). Thus, although a cash balance plan states the amount of a participant's retirement benefits by reference to a hypothetical account balance, that balance must be converted to an annuity to test the plan's compliance with ERISA's accrual standards. *See Esden,* 229 F.3d at 158 n.6 ("However 'hybrid' in design a cash balance plan may be, it remains subject to a regulatory framework that is in many regards rigidly binary.").

8

Under the 3 percent test, a defined benefit plan complies with the minimum accrual standards where the participant's accrued benefit as of any point in time is equal to 3 percent of the normal retirement benefit he would earn under the plan, multiplied by the participant's years of service.[3] Under the 133 1/3 percent test,[4] a defined benefit plan satisfies the minimum accrual standards if the amount of the annual increase in the

---

[3]    Section 204(b)(1)(A) provides as follows:

> A defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which each participant is entitled upon his separation from the service is not less than–
>
> (i) 3 percent of the normal retirement benefit to which he would be entitled at the normal retirement age if he commenced participation at the earliest possible entry age under the plan and served continuously until the earlier of age 65 or the normal retirement age specified under the plan, multiplied by
>
> (ii) the number of years (not in excess of 33 1/3 ) of his participation in the plan.
>
> In the case of a plan providing retirement benefits based on compensation during any period, the normal retirement benefit to which a participant would be entitled shall be determined as if he continued to earn annually the average rate of compensation which he earned during consecutive years of service, not in excess of 10, for which his compensation was the highest. For purposes of this subparagraph, social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after such current year.

29 U.S.C. § 1054(b)(1)(A).
[4]    Section 204(b)(1)(B) provides in relevant part as follows:

> A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

29 U.S.C. § 1054(b)(1)(B).

9

participant's accrued benefit in any particular year cannot be more than "133 1/3 percent of the accrual rate in any earlier year." Bruce, *Pension Claims, Rights and Obligations,* at 119. The final alternative is the fractional method,[5] which "is designed so a participant will accrue the normal retirement benefit ratably over a continuous period of participation from actual entry under the plan to normal retirement age." *Id.* at 121.

In their motion to dismiss, defendants assert that Count I of plaintiffs' complaint should be dismissed because "[i]t is not clear why Plaintiffs believe that the Plan is impermissibly backloaded." (D.I. 12 at 33). This argument misapprehends the requirements of Rule 8(a), which merely call for allegations that will put the defendants on notice of the nature of the claims asserted, not evidentiary detail. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513-14 (2002). Plaintiffs have plainly met this standard, as they have outlined the changes that occurred to their accrued benefits each year under the

---

[5]     Section 204(b)(1)(C) provides as follows:

> A defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which any participant is entitled upon his separation from the service is not less than a fraction of the annual benefit commencing at normal retirement age to which he would be entitled under the plan as in effect on the date of his separation if he continued to earn annually until normal retirement age the same rate of compensation upon which his normal retirement benefit would be computed under the plan, determined as if he had attained normal retirement age on the date any such determination is made (but taking into account no more than the 10 years of service immediately preceding his separation from service). Such fraction shall be a fraction, not exceeding 1, the numerator of which is the total number of his years of participation in the plan (as of the date of his separation from the service) and the denominator of which is the total number of years he would have participated in the plan if he separated from the service at the normal retirement age. For purposes of this subparagraph, social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after such current year.

29 U.S.C. § 1054(b)(1)(C).

10

Conectiv Cash Balance Sub-plan (D.I. 1 ¶ 41), and have identified the statutory provisions that have been violated. (D.I. 1 ¶¶ 43-45). Since the complaint satisfies Rule 8(a) of the Federal Rules of Civil Procedure, defendants' attack on Count I can only be sustained if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. at 45-46.

Turning to the merits, the plaintiffs allege that when their cash balance account values are converted to a single life annuity commencing at age 65 to test the plan's compliance with these standards, it is apparent that they each suffered negative accruals. (D.I. 1 ¶ 41). The decreases in the plaintiffs' accrued benefits simply cannot be squared with either the 3 percent test (which calls for the benefit to *increase* by 3 percent per year) or the fractional test (which requires that benefits accrue ratably over the employee's period of service). And defendants do not argue that the plan satisfies either of these standards.[6]

Thus, to satisfy the minimum accrual standards, the plan must meet the 133 1/3 percent test; based upon the allegations of the complaint, however, the plan fails this test because the amount by which plaintiff Charles' accrued benefit increased in 2004 exceeded 133 1/3% of the percentage change in a prior year.

To illustrate the application of the 133 1/3 percent test, consider the situation of a participant who had, as of the end of 2000, earned a monthly pension benefit of $1,000 and whose accrued benefit had the same percentage changes that plaintiff Charles

---

[6]    In *Eaton v. Onan Corp.*, 117 F. Supp. 2d 812, 843 (S.D. Ind. 2000), the court commented that a cash balance plan that took all of an employees' compensation into account could not satisfy the 3 percent rule or the fractional method, as they pertain to plans that only take account of compensation over a ten-year period in calculating benefits. Thus, even if the Conectiv plan had not permitted negative accruals, it is doubtful that it could satisfy either test, because the plan does not limit the compensation considered to a ten-year period.

experienced in subsequent years.[7] In 2001, the monthly accrued benefit would drop from $1,000 at the beginning of the year to $959.94 at the end of the year; in 2002, the accrued benefit would drop to $893.40; and in 2003, the accrued benefit would drop to $868.61. In 2004, the participant's monthly annuity benefit would increase to $941.84. This hypothetical, derived from plaintiff Charles' actual experience, demonstrates that the plan does not satisfy this test because the rate at which the participant earned benefits in 2004 was more than 133 1/3 percent of the rate that applied in a prior year, as illustrated below:

| Year | Monthly Annuity | Percentage change | 133.33% of accrual rate |
|------|-----------------|-------------------|-------------------------|
| 2000 | $    1,000.00 |            |            |
| 2001 | $      959.94 | -4.00600% | -5.34% |
| 2002 | $      893.40 | -6.93200% | -9.24% |
| 2003 | $      868.61 | -2.77400% | -3.70% |
| 2004 | $      941.84 | 8.43000% | - |

Defendants nonetheless argue that an interpretive notice issued by the IRS conclusively determined that the type of cash balance plan that Conectiv adopted satisfies the 133 1/3 percent rule. This contention should not detain the Court for long.

In 1996, the I.R.S. issued the notice that defendants cite, I.R.S. Notice 96-8, 1996-1 C.B. 359, 1996 WL 17901 (Feb. 5, 1996) (attached at Tab 1). The notice indicated that it was outlining and requesting comments on proposed guidance on a particular issue, the

---

[7]    Specifically, the plaintiffs have alleged that plaintiff Charles' accrued benefit fluctuated as follows:

> in 1999 and 2000 Plaintiff Charles' accrued benefit increased. Thereafter, it subsequently decreased in three consecutive years: in 2001, his accrued benefit decreased by 4.006%; in 2002, it decreased by 6.932%; and in 2003, it decreased by 2.774%. This represented a total decrease in his annual annuity benefit of over $4,000 between the close of 2000 and the close of 2003. In 2004, Plaintiff Charles' accrued benefit increased by 8.43%, but was still significantly lower than the amount of his accrued benefit as of the end of calendar year 2000.

(D.I. 1 ¶ 41).

calculation of lump sum distributions under cash balance plans. *See* I.R.S. Notice 96-8,

1996-1 C.B. 359, Westlaw print at 1. The courts that have treated Notice 96-8 as

authoritative have relied upon it in addressing its intended subject matter: the calculation of

lump sum distributions from cash balance plans.[8] *See Esden,* 229 F.3d at 168-69; *see also*

*Berger v. Xerox Corp. Retirement Income Guarantee Plan,* 338 F.3d 755, 762 (7th Cir.

2003).

In Notice 96-8, the IRS distinguished between two types of cash balance plans,

frontloaded plans and backloaded plans:

> Cash balance plans can be categorized based on when the benefits
> attributable to interest credits accrue. Under one type of cash balance plan
> (referred to in this notice as a frontloaded interest credit plan), future
> interest credits to an employee's hypothetical account balance are not
> conditioned upon future service. . . . Thus, in the case of a frontloaded
> interest credit plan, the benefits attributable to future interest credits with
> respect to a hypothetical allocation accrue at the same time that the benefits
> attributable to the hypothetical allocation accrue. As a result, if an employee
> terminates employment and defers distribution to a later date, interest
> credits will continue to be credited to that employee's hypothetical account.

> A second type of cash balance plan (referred to in this notice as a
> backloaded interest credit plan) conditions future interest credits upon
> further service. In the case of a backloaded interest credit plan, benefits
> attributable to interest credits do not accrue until the interest credits are
> credited to the employee's account. Because backloaded interest credit
> plans typically will not satisfy any of the accrual rules in section
> 411(b)(1)(A), (B) or (C), it is anticipated that the proposed guidance will
> address only frontloaded interest credit plans.

Notice 96-8, Westlaw print at 3. While defendants assert that the I.R.S. opined that

frontloaded cash balance plans will normally satisfy the 133 1/3 percent rule (D.I. 12 at 33),

Notice 96-8 merely states that backloaded plans normally will not satisfy the accrual rules,

---

[8]     There can be a difference between the discounted present value of an employee's
annuity benefit under a cash balance plan and the value of the hypothetical account,
depending upon the rate that the plan uses to calculate interest credits. *See Esden,* 229
F.3d at 165.

not that all frontloaded plans do.  Nor would the I.R.S. likely issue such a broad

endorsement without utilizing the formal notice and comment procedure prescribed by the

Administrative Procedure Act.  Indeed, the I.R.S. has delayed the issuance of

determination letters in connection with conversions from traditional defined benefit plans

to cash balance plans due to uncertainty about their legality.  *See* I.R.S. Announcement

2003-1, 2003-1 C.B. 281, 2002 WL 31747446 (January 13, 2003)(stating that technical

advice on cash balance conversions needed to process determination letter requests would

be deferred pending final issuance of regulations)(attached as Tab 2).[9]

Moreover, even if Notice 96-8 had expressed an opinion that a front-loaded cash

balance plan would comply with the 133 1/3 percent test, it would not be entitled to

deference here, where the allegations of the complaint support an inference that the

Conectiv plan violates the plain language of the 133 1/3 percent rule.  *See, e.g., Tax*

*Analysts v. I.R.S.,* 350 F.3d 100, 102-03 (D.C. Cir. 2003)(plain meaning of statute controls

over agency interpretation).

Defendants also invoke a Treasury Regulation, issued under Section 411(b)(1)(B)

of the Internal Revenue Code, the parallel tax provision to Section 204(B)(1)(B) of ERISA;

the relevant regulation provides that "the 133 1/3 percent rule does not restrict subsequent

accrual rate decreases."  26 C.F.R. § 1.411(b)-1(b)(1)(iii), Example 1.  Here, plaintiffs have

---

[9]     Notice 96-8 itself indicates that it anticipated issuance of regulations addressing cash
balance plans.  On October 20, 1999, the Department of the Treasury and the Internal
Revenue Service issued a notice soliciting comments "regarding potential issues arising
under their jurisdiction with respect to . . . cash balance plans."  *Solicitation for Comments,*
64 Fed. Reg. 56,578 (Oct. 20, 1999).  In 2002, proposed regulations were formally issued.
*Reductions of Accruals and Allocations Because of the Attainment of Any Age;*
*Application of Nondiscrimination Cross-Testing Rules to Cash Balance Plans,* 67 Fed. Reg.
76,123 (Dec. 11, 2002).  Recently the proposed regulations were withdrawn, pending
legislative action.  Announcement 2004-57, 2004 WL 1330416 (July 6, 2004) (attached at
Tab 3).

14

not just experienced a decrease in the rate at which they earned accrued benefits under the plan, they have experienced an actual reduction in the amount of their accrued benefits.

At best, Example 1 suggests that the plan may not have violated the 133 1/3 percent test due to the negative accruals suffered in 2001 through 2003. The plan nonetheless violates the 133 1/3 percent test because the 8.43% increase which plaintiff Charles experienced in 2004 exceeds 133 1/3 percent of the rate of accrual in a prior year. The regulations provide a related example:

> Example (3). On January 1, 1980, the C Corporation's defined benefit plan provides for an annual benefit (commencing at age 65) of a percentage of a participant's average compensation for the period of 3 consecutive years of participation for which his compensation is the highest. The percentage is 2 percent for each of the first 5 years of participation; 1 percent for each of the next 5 years of participation; and 1 1/2 percent for each year thereafter. The appropriate computation period is the calendar year. Even though the average rate of accrual under the C Corporation's plan is not less rapidly than ratably, the C Corporation's plan does not satisfy the requirements of this subparagraph because the rate of accrual for all years of participation in excess of 10 (1 1/2 percent) for any employee who is actually accruing benefits or who could accrue benefits exceeds 133 1/3 percent of the rate of accrual for the sixth through tenth years of participation, respectively (1 percent).

26 C.F.R. § 1.411(b)-1(b)(1)(iii), Example 3.

Plaintiff Charles had an 8.43% increase in his accrued benefit in 2004, and that increase was more than 133 1/3 percent of the rate at which he earned accrued benefits in the prior year. As a consequence, the allegations of the complaint support the conclusion that the plan violates Section 204(b)(1)(B) of ERISA, 29 U.S.C. § 1054(b)(1)(B), and Count I of the complaint therefore states a claim for relief.

B.      *The Conectiv Cash Balance Sub-Plan Violates Section 204(b)(1)(G) of ERISA.*

In addition to regulating the rate at which a participant earns benefits under a defined benefit plan, Section 204 provides other protections for workers. Section

204(b)(1)(G) provides that a defined benefit plan "shall be treated as not satisfying the requirements of this paragraph if the participant's accrued benefit is reduced on account of any increase in his age or service." 29 U.S.C. § 1054(b)(1)(G).

As the Conectiv plan is a defined benefit plan, "accrued benefit" is defined as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). Plaintiffs have alleged that when their account balances are converted to an age sixty-five annuity, it becomes apparent that their accrued benefit decreased after they rendered additional years of service. This happened to plaintiff Charles in 2001, 2002 and 2003, and plaintiffs Ward and Fink similarly have alleged that they suffered negative accruals. (D.I. 1 ¶ 41). In construing the parallel provision of the Internal Revenue Code, Section 411(b)(1)(G), the Treasury Department has taken the position that a decrease in the participant's accrued benefit will violate Section 411(b)(1)(G) of the Internal Revenue Code. *See* 26 C.F.R. § 1.401(*l*)-1(b) ("a plan may not adjust benefits in *any* manner that results in a decrease in any employee's accrued benefit in violation of Section 411(d)(6) and Section 411(b)(1)(G)") (emphasis supplied).

Defendants first assert that Count II should be dismissed because the decrease in plaintiffs' accrued benefits resulted from changes in the thirty-year Treasury rate, not from an increase in their age and service. Defendants are essentially urging the Court to ignore the fact that the plaintiffs' accrued benefits decreased and focus upon the increase in the hypothetical account balance. (D.I. 12 at 13 & n.4). This simply represents an effort to argue that the plaintiffs' accrued benefit is actually their hypothetical account balance, and not an annuity "commencing at normal retirement age." The Court should reject defendants' argument because the plain language of ERISA expressly requires that the

accrued benefit be determined as an annuity commencing at normal retirement age. *See* 29 U.S.C. § 1002(23).

Indeed, in Notice 96-8, the I.R.S. explicitly stated that "[t]he requirements referred to in this notice apply even in the case of a cash balance plan that defines an employee's accrued benefit as an amount equal to the employee's hypothetical account balance." I.R.S. Notice 96-8, 1996-1 C. B. 359, Westlaw print at 5. Although arising in a different context, this reflects a determination by the I.R.S. that the relevant provisions of the Internal Revenue Code do not permit a cash balance plan to define an employee's accrued benefit as her cash balance account value. Defendants apparently recognize that the cash balance account cannot be treated as an employee's accrued benefit, since the Conectiv Cash Balance Sub-Plan defines accrued benefit as follows:

    1.1  Accrued Benefit means the greater of:

    1.1.1    The Participant's Payable Cash Balance, converted to an Actuarial Equivalent single life annuity that is payable as of the determination date; or

    1.1.2    The Participant's Minimum Benefit, stated as a life annuity commencing as of the determination date.

(D.I. 13 at A-4). The term "Payable Cash Balance" is, in turn, defined as "the lesser of (a) the Participant's Cash Balance Account at the determination date or (b) 650% of Final Average Compensation as of such date." (D.I. 13 at A-9).

Thus, the governing statute, applicable regulations, and the language of the plan itself all prohibit equating the hypothetical value of the plaintiffs' cash balance accounts with their accrued benefits. Accordingly, defendants' argument that the decreases in plaintiffs' accrued benefits are not actionable should be rejected. Ultimately, defendants' argument that the decrease in the plaintiffs' accrued benefit resulted from changes in the applicable

interest rate ignores the basic thrust of plaintiffs' complaint, which is that the Conectiv Cash Balance Sub-Plan has a design flaw: because benefits are based upon a growth of a hypothetical account, when the account is converted to an annuity a participant's accrued benefit *can decrease* despite additional service. Defendants have offered nothing from the legislative history of ERISA generally or Section 204(b)(1)(G) in particular that would suggest that the Court is free to ignore a decrease in a participant's accrued benefit following an additional year of service.

The only case which defendants rely upon to support their challenge to Count II of the complaint is distinguishable. In *DiCioccio v. Duquesne Light Co.*, 911 F. Supp. 880 (W.D. Pa. 1995), the Court was not dealing with a cash balance plan. Instead, it was dealing with a plan that had an offset for Social Security benefits. 911 F. Supp. at 903-04. The Court held that the plaintiffs' claim failed because an offset based on Social Security benefits was appropriate under ERISA. *Id.* at 905 (*citing Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504 (1981); 26 C.F.R. § 1.411(a)–4(a)). The *DiCioccio* court also explicitly noted that Congress had endorsed changes to payments from benefit plans based upon changes in Social Security benefits so long as they occurred prior to either the date when a participant receives his first benefit payment or terminates his employment, whichever is earlier. *Id.* at 905-06 (*citing* 26 U.S.C. § 401(a)(15)(A)).

Defendants myopically focus upon language from *DiCioccio* noting that the benefit calculations for years of service were uniform and there was no change in the manner in which calculations were performed when a participant had worked a certain number of years or reached a specific age. *See DiCioccio,* 911 F. Supp. at 204. At best this is dicta, in view of the basis on which the *DiCioccio* court disposed of the Section 204(b)(1)(G) claim. To the extent that this can be read as a square holding that Section 204(b)(1)(G) will only

18

be violated if an express provision of a plan calls for the reduction of a participant's accrued benefit following additional service or age, *DiCioccio* is inconsistent with Section 1.401(*l*)-1(b) of the Treasury Regulations, cited above.

If Congress intended to limit the scope of Section 204(b)(1)(G) of ERISA only to plans that, by their terms, explicitly provided for a decrease in accrued benefits based upon an increase in age or service, it would have said so. ERISA repeatedly demonstrates that when Congress sought to regulate the written terms of a plan, rather than the manner in which it operated, it knew how to do so. *See* 29 U.S.C. § 1053(a) ("Each pension plan *shall provide* that an employee's right to his normal retirement benefit is nonforfeitable . . . .") (emphasis supplied); 29 U.S.C. § 1053(c)(4) ("A plan shall not fail to meet the requirements of this subsection if, *under the terms of the plan,* the present value of the nonforfeitable accrued benefit is determined . . . .") (emphasis supplied); 29 U.S.C. § 1055(a) ("Each pension plan to which this section applies *shall provide* . . . .") (emphasis supplied); 29 U.S.C. § 1056(a) ("Each pension plan *shall provide* . . . . ") (emphasis supplied).

The relevant provisions of the Internal Revenue Code governing tax treatment of employee benefit plans display the same pattern. *See* 26 U.S.C. § 401(a)(2) (imposing requirement for qualification of a trust forming a part of any pension plan that "*under the trust instrument* it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be . . . used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries . . . .")(emphasis supplied); 26 U.S.C. § 401(a)(8) ("A trust forming a part of a defined benefit plan shall not constitute a qualified trust under this

section *unless the plan provides* that forfeitures must not be applied to increase the benefits any employee would otherwise receive under the plan.")(emphasis supplied).[10]

As the allegations of the complaint support the conclusion that the plaintiffs suffered a decrease in their accrued benefits after the conclusion of additional years of service, defendants' motion to dismiss Count II should be denied.

C.     *The Conectiv Cash Balance Sub-Plan Violates Section 204(b)(1)(H) of ERISA.*

In Count III of their complaint, the plaintiffs allege that the Conectiv plan violates Section 204(b)(1)(H) of ERISA, which provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age."  29 U.S.C. § 1054(b)(1)(H)(i).

In their motion to dismiss, the defendants raise two specific challenges to plaintiffs' claim under this provision.  First, they assert that "attainment of any age" actually means "attainment of normal retirement age."  Second, they assert that the terms "benefit accrual" and "rate of . . . benefit accrual" should not be determined by reference to the changes in an employee's accrued benefit from one year to the next.  Defendants also assert that the reductions in the rate of benefit accrual under the plan suffered by plaintiffs do not result from "attainment of any age."  Plaintiffs address these contentions below.

### 1.     "Any Age" Means Any Age.

Section 204(b)(1)(H) of ERISA was enacted as part of the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874 (1986)("OBRA").[11]

---

[10]     *See also* 26 U.S.C. § 401(a)(13)(A); 26 U.S.C. § 401(a)(14); 26 U.S.C. § 411(a); 26 U.S.C. § 411(a)(11)(A); 26 U.S.C. § 411(a)(11)(D).

[11]     The relevant amendments to ADEA, ERISA and the Internal Revenue Code appear in the Statutes at Large at 100 Stat. 1973-1978.

Defendants contend that Section 204(b)(1)(H) of ERISA does not provide any protections for workers who have not reached normal retirement age. (D.I. 12 at 14). The Third Circuit has not yet addressed this issue, which has divided the lower courts. Two district courts have previously rejected the defendants' contention that Section 204(b)(1)(H) only protects those who have reached normal retirement age. *See Cooper v. The IBM Personal Pension Plan*, 274 F. Supp. 2d 1010, 1013-14 (S.D. Ill. 2003); see *also Wells v. Gannett Retirement Plan*, 385 F. Supp. 2d 1101, 1102 (D. Colo. 2005). In *Wells*, the court concluded that "any age" was unambiguous and that any resort to legislative history or other sources for interpretation was inappropriate. *Id.*

In 2002, the Treasury Department issued proposed regulations that also rejected the defendants' argument. *See Reductions of Accruals and Allocations Because of the Attainment of Any Age; Application of Nondiscrimination Cross-Testing Rules to Cash Balance Plans*, 67 Fed. Reg. 76,123, 76,124 (Dec. 11, 2002). The notice of proposed rulemaking stated in relevant part a follows:

> Applicability Prior to Normal Retirement Age
>
> Sections 411(b)(1)(H) and 411(b)(2) prohibit cessation of accruals or allocations, and reduction in the rate of benefit accrual or allocation, because of the attainment of any age. Under these sections, attainment of any age means a participant's growing older. Accordingly, these regulations, like the 1988 proposed regulations,[12] would apply regardless of whether the participant is older than, younger than, or at normal retirement age.
>
> Some commentators have suggested that only cessations or reductions after attainment of normal retirement age are prohibited by these sections. This interpretation is not consistent with the language of the

---

[12]     *Income Taxes; Continued Accruals Beyond Normal Retirement Age*, 53 Fed. Reg. 11,876 (Apr. 11, 1988). The 1988 notice of proposed rulemaking included a proposed Treasury regulation which interpreted Section 411(b)(1)(H), based upon its plain language, as prescribing the discontinuation of accrual of benefits or a reduction in the rate of accrual of benefits based upon the attainment of any age, not normal retirement age. *See* 53 Fed. Reg. at 11,879-80.

statute, which does not specify any minimum age at which the rule applies,
and is not adopted under these proposed regulations.

*Id.* [13]  Moreover, Congress used the precise term "normal retirement age" in another

portion of the same statute. *See* 29 U.S.C. § 1054(b)(1)(H)(iii) ("in the case of an

employee who . . . *has attained normal retirement age*")(emphasis supplied).  Plainly, when

Congress wrote Section 204(b)(1)(H), it knew how to use the term "normal retirement

age."

In contrast, other district courts have reached the opposite conclusion, holding that

while Section 204(b)(1)(H)(i) uses the term "any age," Congress only intended to offer

protection for employees who continued to work after they reach normal retirement age,

which is defendants' position here. *See Eaton v. Onan Corp.,* 117 F. Supp. 2d 812, 826-

829 (S.D. Ind. 2000); *see also Tootle v. ARINC, Inc.,* 222 F.R.D. 88, 92-93 (D. Md.

2004); *Engers v. AT&T Corp.,* 2001 U.S. Dist. Lexis 25889 (D.N.J. June 6,

2001)(appended to defendants' opening brief).

These courts focus upon a statutory heading contained in OBRA and a heading in

the Internal Revenue Code to support the conclusion that Section 204(b)(1)(H) only

applies to workers who have reached normal retirement age.  For example, in *Eaton,* the

Court acknowledged that "[p]laintiffs point out correctly that the statutory language of the

OBRA 1986 pension age discrimination provisions does not specifically limit those

requirements to employees who are past normal retirement age." 117 F. Supp. 2d at 826.

Nonetheless, based primarily on the headings, along with surrounding legislative history,

the Court concluded that Section 204(b)(1)(H) was only intended to apply once an

_____

[13]      Subsequently, the 2002 proposed regulations were withdrawn pending legislative
action.  *See* I.R.S. Announcement 2004-57, 2004 WL 1330416 (July 6, 2004).

22

employee reached "normal retirement age." *Id.* at 826-29.  *See also Tootle*, 222 F.R.D. at 93.

This analysis is flawed because it places undue reliance upon the headings of statutes, instead of focusing upon their text:

> The title of a statute and the heading of a section cannot limit the plain meaning of the text.  For interpretative purposes they are of use only when they shed light on some ambiguous word or phrase.  They are but tools available for the resolution of a doubt.  But they cannot undo or limit that which the text makes plain.

*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (citations omitted); *see also Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (same); *A. W. v. Jersey City Pub. Sch.*, 341 F.3d 234, 249 (3d Cir. 2003) ("Section headings neither take the place of nor limit the plain meaning of the statute's text.") (citations omitted); *Sandoval v. Reno*, 166 F.3d 225, 235 (3d Cir. 1999)("a title alone is not controlling")(citations omitted).  Thus, headings can only be considered where the text of the statute itself is ambiguous.  *See Brotherhood of R.R. Trainmen*, 331 U.S. at 529 ("for interpretative purposes, [headings] are of use only when they shed light on some ambiguous word or phrase"); *see also Bamba v. Riley*, 366 F.3d 195, 202 n.10 (3d Cir. 2004)(same)).

These principles significantly undercut the validity of the cases on which defendants rely.  Indeed, the *Eaton* court itself explicitly noted that the statute it was construing "does not specifically limit [its] requirements to employees who are past normal retirement age." 117 F. Supp. 2d at 826.  Despite the plain language of the statute, the *Eaton* court engaged in a free-wheeling review of the legislative history to sustain a different result.[14]  Absent any

---

[14]      In considering the reliability of the legislative history, it is worth noting that the relevant amendments to ADEA, ERISA and the Internal Revenue Code contained in

23

ambiguity in the text of the statute consideration of the heading or related legislative history is inappropriate. *See Ross v. Hotel Employees and Restaurant Employees Int'l Union,* 266 F.3d 236, 245 (3d Cir. 2001) ("we begin by looking at the statute's language. If the language is plain, we need look no further."); *See also Ratzlaf v. United States,* 510 U.S. 135, 147-48 (1994)("we do not resort to legislative history to cloud a statutory text that is clear"). As a consequence, *Eaton* and its progeny should not be followed.

Moreover, applying the plain language of the statute would not frustrate any significant Congressional policy. Even assuming that the primary purpose behind Section 204(b)(1)(H) was to offer protection for workers who continued their employment beyond normal retirement age, it would not be irrational for Congress to draft a broader remedial statute protecting workers of "any age."

### 2.      The Rate of Benefit Accrual Should be Measured by Accrued Benefits.

Defendants also posit that the statutory terms "benefit accrual" and "rate of . . . benefit accrual" should not be treated as referencing the statutory term "accrued benefit." (D.I. 12 at 20-21). The term "rate of benefit accrual" also appears in Section 204(h) of ERISA, 29 U.S.C. § 1054(h). In that context, the Treasury Department historically treated the statutory language "rate of future benefit accrual" as a reference to the rate of changes in a participant's accrued benefit. For example, in 1995, the Treasury Department issued temporary regulations under Section 204(h) of ERISA; the preamble to the regulations stated in relevant part as follows:

> Section 204(h) of ERISA does not apply to an amendment that does not affect the rate of future benefit accrual. These regulations clarify that an amendment to a defined benefit plan that does not affect the annual benefit

---

OBRA were minute elements of a sprawling piece of legislation. The Conference Report on OBRA is over two hundred pages long. H.R. Conf. Rep. No. 1012, 99th Cong., 2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 3868-4072.

> commencing at normal retirement age does not affect the rate of future
> benefit accrual for purposes of Section 204(h). Accordingly, the regulations
> provide that the plan administrator of a defined benefit plan is not required
> to provide Section 204(h) notice with respect to an amendment that does
> not affect the future annual benefit payable at normal retirement age, even if
> the amendment affects other forms of payment (such as a single sum
> distribution) or benefits commencing at a date other than normal retirement
> age (such as an early retirement benefit).

*Notice of Significant Reduction in the Rate of Future Benefit Accrual*, 60 Fed. Reg. 64,320,

64,321 (Dec. 15, 1995).

Shortly before the effective date of the Conectiv Cash Balance Sub-plan, the

Treasury Department issued final regulations under Section 204(h) of ERISA, and the

preamble to the final regulations reiterated this position:

> The final regulations, like the proposed and temporary regulations,
> interpret Section 204(h) as applying with respect to changes that affect the
> annual benefit commencing at normal retirement age. The statutory phrase
> "rate of future benefit accrual" implies, on its face, that Section 204(h) is
> limited to changes in the accrued benefit.

*Notice of Significant Reduction in the Rate of Future Benefit Accrual*, 63 Fed. Reg. 68,678,

68,680 (Dec. 14, 1998). While these regulations were issued in a different context, there

is nothing in the text of the statute as it was in effect suggesting that the term "rate of future

benefit accrual" would mean something different in two parts of the same statute.

In *Cooper v. The IBM Personal Pension Plan*, the court expressly rejected

defendants' assertion that the statutory term "rate of future benefit accrual" in Section

204(b)(1)(H) should be construed as referring to something other than changes in the

statutorily defined accrued benefit. As the *Cooper* court explained, Congress used a

different term than "accrued benefit" in Section 204(b)(1)(H), because it was grammatically

correct to do so. 274 F. Supp. 2d at 1016-17.

25

In contrast, cases that support defendants' interpretation cast about outside of Section 204 of ERISA to find an alternative definition of the term rate of future benefit accrual. For example, *Eaton v. Onan Corp.* notes regulations issued under Section 411(a)(4) of the Internal Revenue Code (a provision which prohibits a plan from discriminating in favor of highly compensated employees) as a potential source for the meaning of the term "rate of future benefit accrual." 117 F. Supp. 2d at 830, n.8.[15]  The Treasury regulations promulgated under Section 401(a)(4) of the Internal Revenue Code include a provision that authorizes the application of an immediate annuity test for those employees who have passed normal retirement age to analyze whether a plan discriminates in favor of highly compensated employees. *See* 26 C.F.R. § 1.401(a)(4)-3(l)(3).

There are several problems with this approach. First, the relevant statutory provision of the Internal Revenue Code, Section 401(a)(4), has no counterpart in ERISA. Moreover, the Internal Revenue Code counterpart to Section 204(b)(1)(H) of ERISA is contained in Section 411 of the Internal Revenue Code. *See* 26 U.S.C. § 411(b)(1)(H). Section 411 of the Internal Revenue Code explicitly directs that a participant's accrued benefit under a defined benefit plan be expressed as an annuity:

> *For purposes of this section*, the term "accrued benefit" means –

---

[15]     As defendants note, in 2001, Congress revamped Section 204(h) of ERISA. In doing so, Congress provided that a plan amendment eliminating or reducing either early retirement benefits or a retirement-type subsidy would be treated as reducing the rate of future benefit accrual for purposes of 204(h) of ERISA. *See* 29 U.S.C. § 1054(h)(9). In effect, Congress made a policy decision that these types of benefits should be treated as if they were part of the employee's "accrued benefit" for purposes of Section 204(h). In contrast, in Section 204(b)(1)(h), Congress explicitly carved these types of benefits out of the definition of the term "rate of future benefit accruals." *See* 29 U.S.C. § 1054(b)(1)(H)(v) ("A plan shall not be treated as failing to meet the requirements of clause (i) solely because the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals.").

> (i) in the case of a defined benefit plan, the employee's accrued benefit determined under the plan and, except as provided in subsection (c)(3), expressed in the form of an annual benefit commencing at normal retirement age . . . .

26 U.S.C. § 411(a)(7)(A)(emphasis supplied). This of course is precisely the same

definition of "accrued benefit" that ERISA uses and that defendants ask this Court to

ignore. *See* 29 U.S.C. § 1002(23)(A).

In *Tootle v. ARINC, Inc.*, the Court adopted a more aggressive approach, choosing

simply to ignore the fact that a cash balance plan is a defined benefit plan, and instead

using the standards for a defined contribution plan:

> Calculating accrued benefits in terms of an age-65 annuity is not the only option available under ERISA. For plans which involve individual accounts, such as traditional defined contribution plans, accrued benefits are calculated as "the balance of the individual's account." 29 U.S.C. § 1002(23)(B). ERISA's prohibition on age discrimination for defined contribution plans also differs slightly, stating that a plan satisfies the requirement as long as "allocations to the employee's account are not ceased and the rate at which amounts are allocated into the employee's account is not reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(2)(A). These ERISA provisions provide a better measure for examining possible age discrimination in cash balance plans.

222 F.R.D. at 93-94. Rewriting statutes is a task for Congress, not the courts. *See Esden,*

229 F.3d at 158 n.6 ("However 'hybrid' in design a cash balance plan may be, it remains

subject to a regulatory framework that is in many regards rigidly binary."). The Court

should reject defendants' invitation to legislate.

Defendants also assert that *In re Gulf Pension Litig.*, 764 F. Supp. 1149 (S.D. Tex.

1991), *aff'd*, 36 F.3d 1308 (5th Cir. 1994) supports their contention that the "date of future

benefit accrual" under Section 204(b)(1)(H) of ERISA should not be measured by

plaintiffs' accrued benefits. (D.I. 12 at 20-21). *Gulf Pension* involved a claim that a

pension plan had partially terminated under Section 411(d)(3) of the Internal Revenue

Code due to benefit decreases. The district court held that accrued benefits and ancillary benefits (such as disability pensions) should be considered in assessing whether a termination occurred. *Id.* at 1176-77. In contrast, section 204(b)(1)(H) expressly carves out ancillary benefits, such as early retirement benefits. 29 U.S.C. § 1054(b)(1)(H)(v). While *Gulf* suggests that the rate of benefit accrual for purposes of a partial termination may embrace more than accrued benefits, it offers no support for defendants' argument that accrued benefits are irrelevant under Section 204(b)(1)(H).

### 3.   The Rate of Benefit Accrual Under the Plan Decreases With Age.

When the rate of benefit accrual is measured by looking at an employee's accrued benefit, it is apparent that the Conectiv Cash Balance Sub-Plan violates Section 204(b)(1)(H). Because of the interest credits, a dollar credited to the account of a younger worker will be worth more than a dollar credited to the account of an older worker, when the accounts are converted to an age 65 annuity. *See Cooper,* 274 F. Supp. 2d at 1021; *see generally* Edward Zelinsky, *The Cash Balance Controversy,* 19 VA. TAX. REV. 683, 733 (2000)("There is no dispute about the underlying arithmetic of cash balance plan arrangements: each year as a cash balance plan participant ages, the same contribution made for her in a previous year declines in value in annuity terms."). Professor Zelinsky offers a simple solution: if the cash balance formula provides for a modest increase in the contribution for each additional year of age in an amount sufficient to offset the differential in the annuity amount, the plan will comply. *Id.* at 734-35. The Conectiv plan does not do this; instead it changes the pay credit amount for every five years of additional age. (*See* D.I. 1 ¶ 25). As a result, the annuity value for a 41 year old is greater than what a 44 year old would receive based upon the same compensation, which violates Section 204(b)(1)(H).

D.   *Conectiv Violated Section 204(h) of ERISA.*

The Conectiv Retirement Plan, its predecessor and successors are all defined

benefit pension plans subject to Section 204(h) of ERISA, 29 U.S.C. § 1054(h).   Section

204(h) imposes a notice requirement that only applies to amendments which "provide for a

significant reduction in the rate of future benefit accrual." 29 U.S.C. § 1054(h)(1); *cf.*

*Anderson v. Resolution Trust Corp.,* 66 F.3d 956, 959 (8th Cir. 1995)("The 1991

amendment to Midwest Savings's pension plan does not even fall within the scope of

section 204(h), because the 1991 amendment did not affect 'the rate of future benefit

accrual.'").   Conectiv was required to notify each participant of the proposed amendment,

advising them of the possible adverse effects of the plan amendment.   29 U.S.C. § 1054(h).

Section 204(h) forbids "secret" amendments through which an employee could

have the value of his or her benefits reduced by a prospective amendment to the accrual

provisions of a pension plan.   Thus, participants must be notified of "an amendment [that]

affects the rate of future benefit accrual only if it is reasonably expected to change the

amount of the future annual benefit commencing at normal retirement age." *See* 26 C.F.R.

§ 1.411(d)-6 (A-5)(1999).   Plaintiffs have alleged that the Conectiv Cash Balance Sub-Plan

was an amendment that provided for a significant reduction in the rate of future benefit

accrual.   (D.I. 1 ¶ 52).   Contrary to defendants' argument that the provisions of Section

204(h) were met because Plaintiffs "concede throughout their complaint that they received

. . . written notices,"[16] neither the Spring nor December 1998 brochures satisfied the

requirements of providing notice under Section 204(h) for two reasons.   Both documents

failed to notify plan participants that they might suffer adverse effects from the plan

amendment, and both were untimely as a matter of law.

---

[16] (D.I. 12 at 35).

### 1.    Conectiv Did Not Provide Sufficient Information.

Assuming the notices had been timely issued, they nevertheless must be written in a way that can be understood by the "average plan participant" in order to comply with ERISA Section 204(h). *See Scott v. Admin. Comm. of the Allstate Agents Pension Plan*, 113 F.3d 1193, 1200 (11ᵗʰ Cir. 1997) (noting "Treasury Regulation § 1.411(d)- 6T illustrates that, in inquiring into whether a notice satisfies ERISA § 204(h), the focus should be on whether 'the average plan participant' is able to understand the information which the plan sponsor is required to communicate.").[17]  Since the Section 204(h) notice requirement is only triggered where an amendment "provide[s] for a significant reduction in the rate of future benefit accrual," for the notice to both serve its purpose and be legally valid it must inform plan participants in understandable language that they may suffer adverse effects of the plan amendment.  At the time that Conectiv issued its disclosures to participants concerning the new cash balance plan, it presumably knew that the design of the plan would result in a significant reduction in future benefit accruals.  Nonetheless, it failed to give the requisite notice required by Section 204(h) of ERISA, 29 U.S.C. § 1054(h).

Both the Spring and December 1998 publications substantively fail to adhere to Section 204(h)'s requirement for a number of reasons.  Most significantly, defendants used these materials as a marketing tool to tout the "advantages" of the cash balance plan while failing to inform the average participant that they may suffer adverse effects of the plan amendment.  (*See* Appendix at B-1–B-5).  In addition, the publications discuss "'Grandfather' Protection for Older and Long Service Employees" and how these

---

[17]    Additionally, the IRS regulations currently in effect state "[t]he information in a section 204(h) notice must be written in a manner calculated to be understood by the average plan participant and to apprise the applicable individual of the significance of the notice."  26 C.F.R. § 54.4980F-1, Q &A 11(a)(2).

employees would "have their pensions calculated under both the former and new plans, and will receive whichever value is greater." Since no such protection was offered for the remaining plan participants and they were never informed that they may suffer adverse effects of the plan amendment, they had no reason to believe they were adversely affected by the plan amendment.

### 2.    Conectiv Did Not Provide Timely Notice.

Conectiv's notice was also untimely under Section 204(h). Defendants concede that Section 204(h) in effect at the time the plan was converted required that "after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice" that the plan intends to adopt amendments that reduce future accruals.[18] (D.I. 12 at 35 n.13).

---

[18] Section 204(h) version in effect at the time of the amendment provided:

(h) Notice of significant reduction in benefit accruals
(1) A plan described in paragraph (2) may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to—
(A) each participant in the plan,
(B) each beneficiary who is an alternate payee (within the meaning of section 1056(d)(3)(K) of this title) under an applicable qualified domestic relations order (within the meaning of section 1056(d)(3)(B)(i) of this title), and
(C) each employee organization representing participants in the plan, except that such notice shall instead be provided to a person designated, in writing, to receive such notice on behalf of any person referred to in subparagraph (A), (B), or (C).
(2) A plan is described in this paragraph if such plan is—
(A) a defined benefit plan, or
(B) an individual account plan which is subject to the funding standards of section 1082 of this title."

29 U.S.C. § 1054.

Defendants' December 21, 1998 publication explaining the plan in a question and answer format was issued in conjunction with an "Update of Conectiv Facts (Originally Published in the Spring of 1998)." (Appendix, B-1-B-5) The "Update" was also dated December 21, 1998. (Appendix, B-3-B5). At the time this material was issued it violated Section 204(h)(1)'s 15 day requirement. At the earliest, it was sent only 11 days before the amendment's effective date of January 1, 1999.

There is no indication that the original Spring of 1998 publication was issued "after adoption of the plan amendment" as required by Section 204(h)(1).[19] *See Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (noting the court is "required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."). At a minimum, a factual issue remains as to whether defendants met the timing requirements of Section 204(h).

E.    *Plaintiffs' Claims are Not Barred By the Statute of Limitations.*

Defendants' position that all of plaintiffs' claims should be dismissed as untimely is unpersuasive boilerplate. As an initial matter, affirmative defenses are rarely appropriate grounds for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Moreover, to argue that these claims were not timely filed, Defendants apply a standard that has been rejected by the

---

[19]    While under the current version of Section 204(h), notice issued prior to an adoption of the plan amendment may satisfy the Section 204(h)(1) requirement, defendants concede that no such exception was in effect at the time of the plan conversion. (D.I 12 at 35 n.13) Nevertheless, if the pre-amendment exception was effective at the time of the plan conversion, there would still remain genuine issues of material fact as to the date when the plan amendment was adopted, the date of the Spring 1998 issuance, and whether the final terms of the amendment were consistent with the original Spring 1998 issuance. Presumably some changes occurred, necessitating defendants' untimely issuance of the December 21, 1998 publication and "Update of Conectiv Facts (Originally Published in the Spring of 1998)."

Third Circuit, and, in doing so, ignore accepted standards which demonstrate that Plaintiffs' claims are timely.

As an affirmative defense, *see* Fed. R. Civ. P. 8(c), the statute of limitations is rarely appropriate as a basis for disposition on a motion to dismiss. Only if "the complaint shows affirmatively that the claim is barred" may affirmative defenses be asserted in a motion to dismiss under Rule 12(b)(6). *DeWitt v. Penn-Del Directory Corp.* 872 F. Supp. 126, 133 (D. Del. 1994) (*quoting Herron v. Herron,* 255 F.2d 589, 593 (5th Cir. 1958)); *see also Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir. 2002)(noting limitations defenses may properly be raised on a motion under Rule 12(b)(6) "only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.")(citations omitted). Here, the complaint does not affirmatively show that the claims asserted are barred.

While ERISA does not expressly limit the time for filing non-fiduciary duty claims, such as those asserted here, in *Gluck v. Unisys Corp.,* 960 F.2d 1168 (3d Cir. 1992), the Third Circuit instructed that ERISA litigants are to look to the "limitations period applicable to the forum state claim most analogous to the ERISA claim at hand" for ERISA non-fiduciary duty claims. *Id.* at 1180; *see also Connors v. Consolidation Coal Co.,* 866 F.2d 599, 603 (3d Cir. 1989) (*citing DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 158-60 (1983)). Defendants concede that the analogous limitations period is the three-year limitations period provided by 10 Del. C. § 8106. (D.I. 12 at 10). However, the parties disagree as to when plaintiffs' claims accrue. This disagreement is pivotal.

Defendants argue that all of plaintiffs' claims accrued on January 1, 1999, the effective date of the plan amendment. (D.I. 12 at 11). Defendants' position has been flatly rejected by the Third Circuit, which has joined a number of other courts rejecting a rule

which ties the date of accrual to the date of amendment, in the context of certain ERISA non-fiduciary duty claims. *Romero v. Allstate Corp.,* 404 F.3d 212, 224 (3d Cir. 2005); *see also Meagher v. Int'l Assoc. of Machinists and Aerospace Workers Pension Plan,* 856 F.2d 1418, 1423 (9th Cir. 1988) (reversing dismissal of ERISA section 204(g) claim as time-barred from the date of amendment and reasoning that plaintiffs were harmed by the wrongful application of the challenged amendment, not by its enactment); *Laurenzano v. Blue Cross and Blue Shield of Mass., Inc. Retirement Income Trust,* 134 F. Supp.2d 189, 209-210 (D. Mass. 2001) (refusing to find ERISA challenge to lump sum distribution paid in lieu of an annuity that did not include a cost of living adjustment component commenced in 1999 time-barred even though the lump sum option had been in place since 1976).

In rejecting such a rule, the court in *Romero* noted that "[a] rule that unwaveringly ties the date of accrual to the date of amendment would have the undesirable effect of requiring plan participants and beneficiaries 'likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA, to become watchdogs over potential [p]lan errors and abuses.'" *Romero,* 404 F.3d at 224 (*quoting DeVito,* 975 F. Supp. at 265). *Romero* further states that such a rule "would impose an unfair duty of clairvoyance on employees . . . who allege that an amendment's detrimental effect on them was triggered not at the time of its adoption, but rather at some later time by a subsequent event." *Id.*

While the applicable statute of limitations may be borrowed from state law, federal law determines the date on which a statute of limitation begins to run. *See Holmberg v.*

*Armbrecht,* 327 U.S. 392, 397 (1946).[20]  In the absence of any contrary directive from

Congress, courts generally employ the federal "discovery rule" in a federal question case to

determine when the federal claim accrues for limitations purposes. *See Keystone Ins. Co.*

*v. Houghton,* 863 F.2d 1125, 1127-28 (3d Cir.1988), *abrogated on other grounds by Klehr*

*v. A.O. Smith Corp.,* 521 U.S. 179 (1997).[21]

     A claim will generally accrue when plaintiffs discover, or with due diligence should

have discovered, the injury that forms the basis for the claim. *See, e.g., Union Pacific R.R.*

*Co. v. Beckham,* 138 F.3d 325, 330 (11th Cir. 1998).  More specifically, in the ERISA

context, many courts have held that an ERISA non-fiduciary duty claim accrues after a

claim for benefits due under an ERISA plan has been made and formally denied. *See id.*

at 330 (citing *Cotter v. Eastern Conf. of Teamsters Retirement Plan,* 898 F.2d 424 (4th Cir.

1990)); *see also Daill v. Sheet Metal Workers' Local 73 Pension Fund,* 100 F.3d 62, 65 (7th

---

[20]    *See also PaineWebber Inc. v. Faragalli,* 61F.3d 1063, 1066-67 (3d Cir. 1995)
(stating, in context of a claim to compel arbitration under the Federal Arbitration Act,
"[w]hile a state statute of limitations may be 'borrowed' for a federal claim, federal, not
state, law governs as to when the cause of action accrues"); *see also Admin. Comm. of the*
*Wal-Mart Stores, Inc. Health and Welfare Plan v. Soles,* 336 F.3d 780, 785 (8th Cir. 2003)
(stating in ERISA action, "[f]ederal law also determines when the cause of action accrues");
*Union Pacific R.R. Co. v. Beckham,* 138 F.3d 325, 330 (11th Cir. 1998) (stating in ERISA
action, "despite determining the limitations period by analyzing state law, this Court looks
to federal common law to determine the time at which a plaintiff's federal claim accrues");
*Connors v. Hallmark & Son Coal Co.,* 935 F.2d 336, 341 (D.D.C. 1991); *Dixon v.*
*Anderson,* 928 F.2d 212, 215 (6th Cir. 1991); *Northern California Retail Clerks Unions and*
*Food Employees Joint Pension Trust Fund v. Jumbo Markets, Inc.,* 906 F.2d 1371, 1372
(9th Cir. 1990); *Herm v. Stafford,* 663 F.2d 669, 682 (6th Cir. 1981).

[21]    *See also Union Pacific R.R. Co. v. Beckham,* 138 F.3d 325, 330-31 (11th Cir. 1998)
(*citing, inter alia, Connors v. Hallmark & Son Coal Co.,* 935 F.2d 336, 342 (D.C.Cir. 1991)
(listing cases (including *Houghton* ) in which eight federal courts of appeals had held that
"the discovery rule is the general accrual rule in federal courts ... [and] is to be applied in
all federal question cases") and *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th
Cir. 1990) (holding that the discovery rule is "read into statutes of limitations in federal-
question cases (even when those statutes of limitations are borrowed from state law")");
*Admin. Comm. of the Wal-Mart Stores Health and Welfare Plan v. Soles,* 336 F.3d 780,
786 (8th Cir. 2003) (citing *Union Pacific* and applying the discovery rule).

Cir. 1996); *Tanzillo v. Local Union 617, Int'l Bhd. of Teamsters,* 769 F.2d 140, 143-44 (3d

Cir. 1985). Under this formulation, the accrual date for Counts I, II and III of the

Complaint begins when the Plaintiffs retire and their requests for pension payments are

denied. Applying this formulation here, where the Plaintiffs have not yet retired and thus,

have not yet made a request for pension payments, the September 26, 2005 complaint was

timely filed within the three year limitations period of 10 Del. C. § 8106.

Under limited circumstances, courts have held that an ERISA non-fiduciary claim

may accrue before a formal application is made or before benefits are formally denied, if

"there has been a repudiation [of the benefits] by the fiduciary" and only if such

repudiation "is *clear* and made known to the beneficiar[y]." *Miles v. New York State*

*Teamsters Conf. Pension and Retirement Fund Employee Pension Benefit Plan,* 698 F.2d

593, 598 (2d Cir. 1983)(internal citations omitted, emphasis in the original); *see also Daill,*

100 F.3d at 65-67 ("a cause of action accrues upon a clear and unequivocal repudiation of

rights under the pension plan which has been made known to the beneficiary"); *Union*

*Pacific,* 138 F.3d at 330-31 (citing *Miles*); *Carey v. Int'l Bhd. of Elec. Workers Local 363*

*Pension Plan,* 201 F.3d 44, 47-48 (2d Cir. 1999) (listing cases using the clear repudiation

standard in the absence of a formal application for benefits).

The Third Circuit has applied this "clear repudiation" standard in a number of

ERISA cases. *See, e.g., Henglein v. Colt Indus. Operating Corp.,* 260 F.3d 201, 214 (3d

Cir. 2001) ("In the circumstances here, where there was an outright repudiation at the time

the employees' services were terminated, it is reasonable to expect that the statute of

limitations [on plaintiffs' claim that they were entitled to shut-down benefits under an

ERISA-governed plan] began to run at that point.")

The Third Circuit most recently held in *Romero* that "when an ERISA plan is amended but the fact that the amendment actually affects a particular employee or group of employees cannot be known until some later event, the cause of action of the employee will not accrue until such time as the employee knew or should have known that the amendment has brought about a clear repudiation of certain rights that the employee believed he or she had under the plan." *Romero,* 404 F.3d at 223. Applying the "clear repudiation" standard, all of plaintiffs' claims were timely filed.

### 1.    Count I is Timely.

The relevant tests set forth in Section 204 (b)(1)(A), (B), (C) of ERISA, 29 U.S.C. § 1054(b)(1)(A),(B),(C), are known as the 3 percent method, the 133 1/3 percent method, and the fractional rule. Each of these three accrual tests measures the Plan's compliance by reference to the participant's "accrued benefit." Defendants do not argue that the Plan satisfies either the 3 percent method or the fractional rule. The hypothetical in Section A, derived from plaintiff Charles' actual experience, demonstrates that the plan fails the 133 1/3 percent method for the first time in 2004. Even assuming that plaintiff Charles was sufficiently knowledgeable to calculate his accrued benefit at that time, which is unlikely, the three year limitations period would expire in 2007. Therefore, Count I was timely filed.

### 2.    Counts II and III are Timely.

Section 204(b)(1)(G) of ERISA precludes a reduction in a worker's accrued benefit on account of any increase in age or service, while section 204(b)(1)(H) bars a reduction in the rate of benefit accrual due to "attainment of any age." 29 U.S.C. § 1054(b)(1)(G), (H). The Conectiv plan is a defined benefit plan, and "accrued benefit" is consequently defined as "the individual's accrued benefit determined under the plan and . . . expressed in the

37

form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). While a cash balance plan states the amount of a participant's retirement benefits by reference to a hypothetical account balance, that balance *must be converted* to an annuity to test the plan's compliance with ERISA's accrual standards. In their complaint, the plaintiffs allege that when their cash balance account values are converted to a single life annuity commencing at age 65 to test the plan's compliance with these standards, it is apparent that they each suffered negative accruals. This first occurred in 2001.

Importantly, the defendants never provided the plan participants with a calculation of the converted single life annuity; instead benefits were described by reference to the account balance. Therefore, a plan participant could not determine on the face of their annual cash balance account statements that their accrued benefit decreased. Further, the plan participant has no duty to retain an actuary to convert the cash balance to a single life annuity commencing at age 65 in order to test the plan's compliance with "the intricacies of pension plan formulas and the technical requirements of ERISA." *Romero,* 404 F.3d at 224 (*quoting DeVito,* 975 F. Supp. at 265). The accrual date begins to run only when there has been a clear repudiation of the benefits that is made known to the plan participants. *Id.* at 223; *see also Miles,* 698 F.2d at 598. Neither on the face of this complaint nor on any documents proffered by defendants can the court determine when such a clear repudiation occurred. This is a factual issue which precludes dismissal of Counts II and III for failure to comply with the limitations period.

### 3.  Count IV is Timely.

As discussed in section D, defendants' Spring and Winter 1998 publications fail to satisfy the notice requirements of Section 204(h). ERISA Section 204(h) notice

requirement is triggered where an amendment "provide[s] for a significant reduction in the rate of future benefit accrual."

The court must use the federal discovery rule to discern the date of accrual of the Section 204(h) claim. *Romero,* 404 F.3d at 225. In applying this rule, the Third Circuit in *Romero* reasoned that "[i]t would make no sense, and indeed do a remarkable disservice to the underlying purposes of ERISA and its disclosure requirements, to deem a notice claim to have accrued before a plaintiff knows or should know that an amendment has the effect which triggers the notice requirement." *Id.*

There is simply nothing in the complaint that would support the conclusion that, as a matter of law, the plaintiffs were on notice that the amendment to the plan reduced the rate at which they accrued benefits more than three years before the complaint was filed. *See Epright v. Envtl. Resources Management, Inc. Health and Welfare Plan,* 81 F.3d 335 (3d Cir. 1996) ("When a letter terminating or denying Plan benefits does not explain the proper steps for pursuing review of the termination or denial, the Plan's time bar for such a review is not triggered."); *White v. Jacobs Eng'g Group Long Term Disability Benefit Plan,* 896 F.2d 344, 350 (9ᵗʰ Cir. 1989) (when a benefits termination notice fails to explain the proper steps for appeal, the plan's time bar is not triggered); *Kodes v. Warren Corp.,* 24 F. Supp.2d 93, 102-03 (D. Mass. 1998) (limitation period on wrongful denial of benefits claim did not begin to run because plaintiff did not receive adequate written notice of the denial of benefits). Consequently, dismissal of Count IV for violation of the statute of limitations is inappropriate.

## CONCLUSION

Based upon the arguments and authorities set forth above, plaintiffs respectfully

request that defendants' motion to dismiss be denied.

Dated: December 16, 2005

**CHIMICLES & TIKELLIS LLP**

Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
Robert R. Davis (#4536)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
302-656-2500 (telephone)
302-656-9053 (fax)

and

James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

Attorneys for Plaintiffs