# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONNA C. RICHARDS, individually, | : | |
| and on behalf of others similarly | : | |
| situated, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:04-cv-1638 (JCH) |
| FLEETBOSTON FINANCIAL CORP. | : | |
| ET. AL., | : | |
| Defendants. | : | MARCH 31, 2006 |

**RULING ON DEFENDANTS' MOTION TO DISMISS [Doc. No. 30]**

## I.  INTRODUCTION

The lead plaintiff, an employee of the defendant corporation, complains that this

corporation and its pension plan violated her rights under various sections of the

Employee Retirement Income Security Act (ERISA).  The defendants move to dismiss

all six counts of the plaintiff's Complaint as failing to state a claim upon which relief may

be granted.

## II.  FACTS[1]

The lead plaintiff, Donna C. Richards ("Richards"), is an employee of defendant

FleetBoston Financial Corp. ("Fleet Financial") and a participant in the defendant

FleetBoston Pension Plan ("Fleet Amended Plan").  Richards was born on May 15,

1948.

Richards was hired by Hartford National Bank in 1973.  Following a series of

mergers, she became a participant in the Shawmut Retirement Plan.  In 1995, Fleet

---

[1]See Part IV, infra, for a discussion of the pleadings and other documents the court considers and the inferences it draws in ruling on the present motion.

Financial Group acquired Shawmut, and Richards became a Fleet Employee participating in the Fleet Plan. Prior to January 1, 1997, Richards was a participant in a traditional defined benefits pension plan ("Traditional Plan"), under which retiring employees received a percentage of their final average pay for life. Effective January 1, 1997, Fleet amended the Traditional Plan such that it became a "cash balance" benefit.[2] The new plan ("Amended Plan") calculates an employee's retirement benefits as follows. It first adds the employee's age plus years of vesting service to arrive at a number of "points." Pay credits to be added to an employee's hypothetical account each quarter are then calculated by multiplying the employee's compensation for that quarter by certain percentages, as indicated in the following chart, copied from the Amended Plan:

| Points | Pay Credit Rate | |
|---|---|---|
| Number of Points: | Applicable to Compensation Below the Social Security Wage Base | Applicable to Compensation Above the Social Security Wage Base |
| less than 39 | 3% | 6% |
| 40 but less than 50 | 3.5% | 7% |
| 50 but less than 60 | 4.5% | 9% |
| 60 but less than 70 | 5.5% | 11% |
| 70 but less than 80 | 6.5% | 13% |
| 80 or more | 7.5% | 15% |

---

[2]For a general overview of cash balance plans, see Esden v. Bank of Boston, 229 F.3d 154, 158-59 (2d Cir. 2000). See also Eaton v. Onan Corp., 117 F.Supp.2d 812, 816-18 (S.D.Ind. 2000) (discussing history of cash balance plans).

2

Case 3:04-cv-01638-JCH Document 112 Filed 03/31/2006 Page 3 of 52

Defs.' Mem. Supp. Mot. Dismiss, Ex. A [Doc. No. 32]. The employee also receives quarterly interest credits. The interest rate is uniform for all participants and is based on the average annual yield of one-year U.S. Treasury constant maturities for the month preceding the calendar quarter in which the pay period begins. The size of a participant's interest credit in a given quarter depends upon the interest rate, the participant's account balance, and the participant's pay credit for that quarter.

When it adopted the Amended Plan in 1997, Fleet converted the benefits that Richards and other employees in her situation had earned under the Traditional Plan into an opening hypothetical cash balance.[3] It arrived at this opening balance by computing the lump sum, actuarially equivalent value of the benefit payable at age 65 that the employee had accrued under the prior pension plans as of December 31, 1996. Amended Plan Summary Plan Description (SPD), Plf.'s Mem. Ex.1 at 22 [Doc. No. 40]. As the defendants admitted at oral argument on this motion, this opening balance did not include the value of a Traditional Plan participant's right to subsidized early retirement benefits. See Compl. ¶ 31. In calculating the opening balance, the Amended Plan applied a pre-retirement mortality discount, providing for the possibility of death prior to normal retirement, but provided no mechanism for crediting this discount back to participants' accounts as they grow older and the risk of pre-retirement mortality shrinks. Compl. ¶ 35. It employed a 7% interest rate in calculating the value of the frozen benefit derived from the Traditional Plan as an age-65 annuity, for

---

[3]All references to employees' cash balance accounts in this opinion refer to hypothetical accounts that are used to calculate the employees' pension benefits upon termination of employment. Fleet does not actually maintain separate accounts for individual employees, but uses the hypothetical accounts to keep track of the benefits employees have accrued.

purposes of arriving at an opening balance under the Amended Plan, but it provided no
mechanism to adjust this balance when interest rates fall below 7%, as they have over
the last five years. Id.

The Amended Plan provided that, upon termination of employment with Fleet,
an employee who had participated in both the Traditional Plan and the Amended Plan[4]
would receive the greater of her Cash Balance Account, under the Amended Plan, or
her benefit under the Traditional Plan terms, frozen as of January 1, 1997 ("frozen
benefit"). Id. at ¶ 32. This rule, combined with the fact that the Amended Plan
converted less than the full value of the benefits that Richards and other former
Traditional Plan participants had accrued under the Traditional Plan to opening account
balances under the Amended Plan terms, meant that the value of retirement benefits
available to such participants did not increase past the frozen benefit that they had
already accrued as of December 31, 1996, until the amount in the cash balance
account reached and then exceeded that amount. Id. at ¶ 33. This phenomenon,
which Richards refers to as the "wear-away" effect, caused Richards and other
employees to work for many years following 1997 without actually accruing any new
benefits, despite the existence of a hypothetical cash balance account that showed
benefits being added each quarter. Id. at ¶ 34. The use of the pre-retirement mortality
discount and the 7% interest rate exacerbated this wear-away effect. Id. at 35.

---

[4]Employees who had been active participants in the Traditional Plan as of December 31, 1996,
and were not age 50 with at least 15 years of vesting service as of that date, became participants in the
Amended Plan. Amended Plan Summary Plan Description, Plf.'s Mem. Opp. Defs.' Mot. Dismiss, Ex. 1 at
21 [Doc. No.40]. The court's discussion of the wear-away effect refers to the rules governing the benefits
of individuals in this group.

4

Prior to January 1, 1997, Fleet gave no notice to plan participants that they would be experiencing a significant reduction in benefits as a result of the plan amendment. Moreover, the Amended Plan summary plan description ("SPD"), which was distributed to participants, does not mention the wear-away effect, nor state that that participants' benefit accruals under the Amended Plan would be reduced by advancing age.[5] It told participants, "your cash balance benefit builds steadily throughout the time you work at Fleet. Each quarter Fleet makes pay credits and interest credits into an account in your name." Id. at ¶ 40.

Fleet also answered a hypothetical plan participant question, "Can my pension benefit decrease under the new Fleet Pension Plan?," by saying "No." Id. at ¶ 41. It continued, "Whether you participate in the cash balance benefit or the traditional benefit, you will never receive less than the benefit you earned as of December 31, 1996," and did not mention the wear-away effect. Id. Similarly, it did not state that the rate of benefit accruals would decline with age. It stated it was adopting the Amended Plan because it "makes good sense for our employees." Id.

The plaintiff alleges that, in practice, Amended Plan administrators frequently have informed retiring plan participants only of the value of their cash balance accounts, and not of the greater benefits to which they are entitled under the frozen benefit derived from the Traditional Plan terms. Id. at ¶ 36.

---

[5]The plaintiff's theory of age discrimination is based on the argument that employees' cash balance accounts grow at a decreasing rate as participants age, when the value of the participants' accounts is calculated as that of an annual benefit commencing at age 65. This claim is discussed in more detail in Part IV.A, infra.

5

## III.    CAUSES OF ACTION

Richards asserts a number of different claims against the defendants. In Count I, she alleges that the cash balance terms of the Fleet Amended Plan violate ERISA § 204(b)(1)(H), prohibiting an employer from establishing or maintaining plan rules that reduce "the rate of an employee's benefit accrual . . . because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H). In Count II, she alleges that, by conditioning Richards' receipt of cash balance benefits on her foregoing early retirement benefits earned prior to the adoption of the cash balance amendment, the cash balance terms violate ERISA § 203(a), 29 U.S.C. § 1053(a), which requires that benefits are not forfeitable. In Count III, she alleges that, by causing participants who had begun to earn retirement benefits under the Traditional Plan prior to its amendment to experience years in which they accrue zero benefits followed by years in which they accrue actual benefits, the Amended Plan violates the "anti-backloading" rule in ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B). In Count IV, she alleges that the defendants failed to notify her and other participants of a significant reduction in the rate of future benefit accrual 15 days prior to the effective date of the Amended Plan, thereby violating ERISA § 204(h), 29 U.S.C. § 1054(h). In Count V, she alleges that the defendants failed to provide an adequate Summary Plan Description ("SPD"), in violation of ERISA § 102, 29 U.S.C. § 1022. Finally, in Count VI, she alleges that the defendants breached their fiduciary duty by failing to fully inform retiring plan participants of the funds they are owed under the frozen benefit derived from the Fleet Traditional Plan terms. See ERISA § 404, 29 U.S.C. § 1104.

6

For each of these counts, she seeks relief under ERISA § 502(a)(3), which provides that, "A civil action may be brought . . . by a participant . . . (A) to enjoin any act or practice which violates any provision of this subchapter [which includes all of the substantive provisions of ERISA upon which Richards bases her claims] or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan," 29 U.S.C. § 1132(a)(3), and, alternatively or additionally, under ERISA § 502(a)(1)(B), which states that a participant may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B).

The defendants have moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of all counts.

## IV.    STANDARD OF REVIEW

In deciding a rule 12(b)(6) motion to dismiss, the court takes the allegations of the Complaint as true, and construes them in a manner favorable to the pleader. Hoover v. Ronwin, 466 U.S. 558, 587 (1984); see Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overrruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).  In this case, the court also considers the 1997 FleetBoston Plan document, the Summary Plan Description, and the predecessor ("Traditional") Plan document.  It may do so because these documents are integral to the complaint and the plaintiff relies upon them in her complaint. Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); Cortec Indus. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991), cert. denied, 503 U.S. 960 (1992).

7

A Rule 12(b)(6) motion to dismiss tests the adequacy of the complaint. United States v. City of New York, 359 F.3d 83, 87 (2d Cir. 2004). Thus, such a motion can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). A Rule 12(b)(6) motion cannot be granted simply because recovery appears remote or unlikely on the face of a complaint. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Id. (quotation omitted). "[W]hile bald assertions and conclusions of law will not suffice to state a claim, the district court, before granting a motion to dismiss, must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Tarshis v. Riese Org., 211 F.3d 30 (2d Cir. 2000) (internal citations omitted); see Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183 (1984).

Although the defendants state that their motion to dismiss the plaintiff's complaint is brought pursuant to Rule 12(b)(6), Defs.' Mot. Dismiss [Doc. No. 30], they argue in part that Richards lacks constitutional standing to bring the claim in Count VI. "[A] district court must generally resolve material factual disputes and establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits." Alliance for Envtl. Renewal v. Pyramid Crossgates Co., 436 F.3d 82 (citing Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101 (1998)). Therefore, the court will treat the defendants'

8

motion to dismiss Count VI as a Rule 12(b)(1) motion to dismiss for lack of subject

matter jurisdiction.  See, e.g., Franchi v. Manbeck, Civ. No. 90cv517 (PCD), 1991 WL

137276, at *3 n.2 (D.Conn. 1991) ("Inasmuch as this court could not consider the

sufficiency of the complaint under Rule 12(b)(6), unless jurisdiction is established under

Rule 12(b)(1), the motion will be treated first as one for dismissal for lack of subject

matter jurisdiction.").

> A case is properly dismissed for lack of subject matter jurisdiction under
> Rule 12(b)(1) when the district court lacks the statutory or constitutional
> power to adjudicate it.  In resolving a motion to dismiss for lack of subject
> matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to
> evidence outside the pleadings.  A plaintiff asserting subject matter
> jurisdiction has the burden of proving by a preponderance of the evidence
> that it exists.

Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (internal citations omitted).

## V.    DISCUSSION

### A.    Age Discrimination Claim (Count I)

#### 1.    Statutory Standing to Bring Claim Under ERISA §204(b)(1)(H)

The defendants argue that Richards may not bring her Count One claim under

ERISA §204(b)(1)(H) because this subsection protects only plan participants who are

age 65 or above, and Richards has not yet reached this age.[6]  In order to address this

argument, the court must construe that Section.

As the Supreme Court has instructed, "[t]he preeminent canon of statutory

interpretation requires us to "presume that [the] legislature says in a statute what it

means and means in a statute what it says there." BedRoc Ltd., LLC v. United States,

---

[6] Richards is currently age 58.  See Part I, supra.

9

541 U.S. 176, 183 (2004) (internal citation omitted); see Nicolaou v. Horizon Media,

Inc., 402 F.3d 325, 329 (2d Cir. 2005) (citing BedRoc). "Thus, our inquiry begins with

the statutory text, and ends there as well if the text is unambiguous." Bedroc, 541 U.S.

at 183 (internal citations omitted).

The plain language of section 204(b)(1)(H)(i) prohibits reductions in the rate of

benefit accrual "because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H)(i).[7]

---

[7]This subsection states in full:

(i)Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated
as not satisfying the requirements of this paragraph [discussing benefit accrual
requirements for pension plans] if, under the plan, an employee's benefit accrual is
ceased, or the rate of an employee's benefit accrual is reduced, because of the
attainment of any age.

(ii) A plan shall not be treated as failing to meet the requirements of this subparagraph
solely because the plan imposes (without regard to age) a limitation on the amount of
benefits that the plan provides or a limitation on the number of years of service or years of
participation which are taken into account for purposes of determining benefit accrual
under the plan.

(iii) In the case of any employee who, as of the end of any plan year under a defined
benefit plan, has attained normal retirement age under such plan—

(I) if distribution of benefits under such plan with respect to such employee has
commenced as of the end of such plan year, then any requirement of this subparagraph
for continued accrual of benefits under such plan with respect to such employee during
such plan year shall be treated as satisfied to the extent of the actuarial equivalent of
in-service distribution of benefits, and

(II) if distribution of benefits under such plan with respect to such employee has not
commenced as of the end of such year in accordance with section 1056 (a)(3) of this title,
and the payment of benefits under such plan with respect to such employee is not
suspended during such plan year pursuant to section 1053 (a)(3)(B) of this title, then any
requirement of this subparagraph for continued accrual of benefits under such plan with
respect to such employee during such plan year shall be treated as satisfied to the extent
of any adjustment in the benefit payable under the plan during such plan year attributable
to the delay in the distribution of benefits after the attainment of normal retirement age.
The preceding provisions of this clause shall apply in accordance with regulations of the
Secretary of the Treasury. Such regulations may provide for the application of the
preceding provisions of this clause, in the case of any such employee, with respect to any
period of time within a plan year.

(iv) Clause (i) shall not apply with respect to any employee who is a highly compensated
employee (within the meaning of section 414 (q) of title 26) to the extent provided in
regulations prescribed by the Secretary of the Treasury for purposes of precluding

10

The inclusion of the word "any," when given "its ordinary, common meaning," In re Caldor Corp., 303 F.3d 161, 168 (2d Cir. 2002) (internal citation omitted), renders this language unambiguous with respect to the question of whether it protects only employees who have reached age 65. By its own terms, this subsection applies to employees of any age. See Wells v. Gannett Retirement Plan, 385 F.Supp.2d 1101, 1102 (D.Co. 2005) ("The term is unambiguous, and there is no need to resort to legislative history or other sources for its interpretation. This provision applies to the attainment of 'any age' and not just to the attainment of normal retirement age").

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). The court has reviewed the other provisions of ERISA cited by the defendants, and none create ambiguity as to whether "attainment of any age," ERISA § 204(b)(1)(H)(i), means what it says, or whether it means, as defendants suggest, "attainment of any age over 65." The court has considered all of the defendants' arguments and is not persuaded to read the statute other than as its plain meaning suggests.

---

discrimination in favor of highly compensated employees within the meaning of subchapter D of chapter 1 of title 26.

(v) A plan shall not be treated as failing to meet the requirements of clause (i) solely because the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals.

(vi) Any regulations prescribed by the Secretary of the Treasury pursuant to clause (v) of section 411 (b)(1)(H) of title 26 shall apply with respect to the requirements of this subparagraph in the same manner and to the same extent as such regulations apply with respect to the requirements of such section 411 (b)(1)(H).

29 U.S.C. § 1054(b)(1)(H).

11

Because the text of the statute is not ambiguous, the court need not look beyond

it. See BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) ("The preeminent

canon of statutory interpretation requires us to "presume that [the] legislature says in a

statute what it means and means in a statute what it says there. Thus, our inquiry

begins with the statutory text, and ends there as well if the text is unambiguous.")

(considering the statutory text but declining to consider legislative history) (internal

citations omitted). The defendants argue that "courts regularly look to legislative history

to interpret statutory language that might appear unambiguous on its face," Defs.' Reply

Br. Supp. Mot. Dismiss at 7 [Doc. No. 45-1], but the only precedential opinion they cite

for this proposition actually held that the court did not have to consider administrative

rules and advisory committee notes because Congress's intent was clear from the face

of the statute in question. See In re Caldor Corp., 303 F.3d 161, 171 (2d Cir. 2002).

Only in dicta did the Court of Appeals "add that we find no tension between our reading

of § 1109(b) and the rules and notes relied on by the Joint Liquidators." See id.

Moreover, even if the court did take into account the legislative history and the

statutory heading, it does not find that any of the defendants' arguments in those

regards present "rare and exceptional circumstances" that would require the court to

disregard the plain language of the statute. See Rubin v. United States, 449 U.S. 424,

430 (1981). Although the current language of section 204(b)(1)(H)(i) derives from a

section of the Omnibus Budget Reconciliation Act of 1986 ("OBRA 1986") whose

statutory heading reads, "Benefit Accrual Beyond Normal Retirement Age," the statutory

heading alone (which is not in the codified statutory provision) is not sufficient to compel

a reading of the statute not indicated by its unambiguous text. See Pennsylvania Dep't

12

of Corrections v. Yeskey, 524 U.S. 206, 212 (1998) ("[T]he title of a statute . . . cannot

limit the plain meaning of the text.  For interpretive purposes, [it is] of use only when [it]

shed[s] light on some ambiguous word or phrase.") (internal citation omitted) (ellipses

and brackets in Yeskey); Cheung v. United States, 213 F.3d 82, 90 (2d Cir. 2000)

("Although mindful of the limited role of statutory headings in textual interpretation, this

Court has recognized that statutory headings may be used to resolve ambiguities in the

text.") (internal citation and quotation marks omitted).

Similarly, the legislative history is not as clear as the defendants would make it

out to be, and could lend some support to both sides.  The defendants focus primarily

on the statement in the OBRA 1986 Conference Report that:

> Under the conference agreement, the rules preventing the reduction or
> cessation of benefit accruals on account of attainment of any age are not
> intended to apply in cases in which a plan satisfies the normal benefit
> accrual requirements for employees who have not attained normal
> retirement age.

H.R. Conf. Rep. No. 99-1012, at 379 (1986), reprinted in 1986 U.S.C.C.A.N. 3868,

4024.  However, the Report immediately continues by explaining, beginning in the same

paragraph:

> Under the benefit accrual rules, the rate of benefit accrual for an
> employee may vary depending on the number of years of service an
> employee may complete between date of hire and the attainment of
> normal retirement age.
>
> For example, under the fractional benefit accrual rule, an employee may
> accrue a benefit ratably for each year of service between the employee's
> date of hire and the employee's attainment of normal retirement age.  If a
> plan has a normal retirement age of 65, under this fractional rule, an
> employee who is hired at age 45 would accrue the normal retirement
> benefit between age 45 and age 65 (normal retirement age).  Thus, the
> employee would accrue the benefit over 20 years. On the other hand, an
> employee with the same salary hired at age 55 would accrue the same

13

> normal retirement benefit over 10 years (the number of years between
> date of hire and normal retirement age). In this example, when both
> employees have completed five years of service, they will have different
> accrued benefits because of the different rate of benefit accrual for each
> year of service. The conferees do not intend that the plan is to be treated
> as violating the general rule that benefit accruals cannot be reduced or
> ceased on account of the attainment of age merely because a younger
> employee has a lower accrued benefit than an older employee with the
> same number of years of service.

Id. In light of this explanation and example, the sentence the defendants have quoted

may at least arguably be stating a much different proposition than that urged by them.

It is quite possible that the report used the phrase "for employees who have not

attained normal retirement age" merely to modify the phrase "normal benefit accrual

requirements," and not to limit the application of the new age discrimination provisions.

This is consistent with the fact that the particular example of a "normal benefit accrual

requirement" used in the second paragraph above, "the fractional benefit accrual rule,"

is a rule used to determine the required rate of benefit accrual for the years prior to

normal retirement age. See id.; ERISA § 204(b)(1)(c)), 29 U.S.C. § 1054(b)(1)(c)).[8]

---

[8]A defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which
any participant is entitled upon his separation from the service is not less than a fraction of the
annual benefit commencing at normal retirement age to which he would be entitled under the plan
as in effect on the date of his separation if he continued to earn annually until normal retirement
age the same rate of compensation upon which his normal retirement benefit would be computed
under the plan, determined as if he had attained normal retirement age on the date any such
determination is made (but taking into account no more than the 10 years of service immediately
preceding his separation from service). Such fraction shall be a fraction, not exceeding 1, the
numerator of which is the total number of his years of participation in the plan (as of the date of
his separation from the service) and the denominator of which is the total number of years he
would have participated in the plan if he separated from the service at the normal retirement age.
For purposes of this subparagraph, social security benefits and all other relevant factors used to
compute benefits shall be treated as remaining constant as of the current year for all years after
such current year.

29 U.S.C. § 1054(b)(1)(C).

14

Additionally, the court finds that the floor statements the defendants have cited,

by of individual legislators who sponsored the bill, do not override the meaning arising

from the clear statutory text.[9]

Finally, the IRS's recent interpretation of section 411(b)(1)(H) of Title 26 of the

United States Code, which was passed into law at the same time as ERISA §

204(b)(1)(H) and uses exactly the same language, supports the court's reading of the

latter statutory section. In an explanatory section in a 2002 notice of proposed

rulemaking under section 411(b)(1)(H), the IRS stated,

> Section[] 411(b)(1)(H) . . . prohibit[s] cessation of accruals or allocations,
> and reduction in the rate of benefit accrual or allocation, because of the
> attainment of any age. Under th[is] section[], attainment of any age means
> a participant's growing older. Accordingly, these regulations, like the 1988
> proposed regulations, would apply regardless of whether the participant is
> older than, younger than, or at normal retirement age.

> Some commentators have suggested that only cessations or reductions
> after attainment of normal retirement age are prohibited by these sections.
> This interpretation is not consistent with the language of the statute, which
> does not specify any minimum age at which the rule applies, and is not
> adopted under these proposed regulations.

67 Fed. Reg. 76,123-01, 76,124 (Dec. 11, 2002). While proposed regulations

themselves "are not authoritative until finalized," Greenhalgh v. Putnam Sav. Bank, 140

F.3d 427, 430 n.4 (2d Cir. 1998), an interpretation of a statute by the agency charged

with its administration, when not promulgated as a regulation, is nevertheless "entitled

to respect" to the extent it has the "power to persuade." See Christensen v. Harris

County, 529 U.S. 576, 587 (2000) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140

---

[9]It bears noting that, merely because the Conference Report or a member of Congress noted a
purpose for the legislation, it does not mean that was the only purpose.

15

(1944)); Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273
F.3d 481 (2d Cir. 2001) (quoting Christensen). The court finds this interpretation to be
persuasive, although the court's holding would be the same even in the absence of this
notice of proposed rulemaking.

Therefore, while recognizing that its decision on this issue is contrary to that of
several other courts, see Tootle v. ARINC, Inc., 222 F.R.D. 88 (D.Md. 2004); Engers v.
AT&T Corp., No. 98-3660 (NHP), 2001 U.S. Dist. LEXIS 25889, at *8-*13 (D.N.J. June
6, 2001); Eaton v. Onan Corp., 117 F.Supp.2d 812, 825-29 (S.D.Ind. 2000); see also
Campbell v. BankBoston, N.A., 327 F.3d 1, 10 (1st Cir. 2003) (noting in dicta that "the
ERISA age discrimination provision may not even apply to workers younger than the
age of normal retirement"),[10] the court concludes that Richards' age does not bar her
from asserting a claim for age discrimination pursuant to ERISA § 204(b)(1)(H).

## 2. Age Discrimination Theory

The court now turns to the question of whether Richards has stated a claim upon
which relief may be granted in Count I of her complaint. She alleges in this count that,
"the cash balance terms of the Fleet Plan" violate the age discrimination provision of

---

[10]In both Eaton and Engers, the courts reasoned that the language reading, "rate of an
employee's benefit accrual," was ambiguous, but that issue is separate from the issue of age. Neither of
these courts, nor the court in Tootle, offered any specific reason for treating the language pertaining to
age as ambiguous. Eaton stated only that, "although the statutory language does not expressly limit the
prohibitions to benefit accruals occurring after an employee reaches normal retirement age, there are
unusually strong indications in the legislative history that Congress intended they be so limited." 117
F.Supp.2d at 825. Tootle did not address at all the question of whether the statute was ambiguous as to
the age of protected employees. The court respectfully disagrees with the Tootle court's decision to
inquire into the legislative history without first fully addressing the question of whether the plain language
of the statute was unambiguous as to the specific issue of the age of employees protected by the statute.

The court also notes that it does not consider an additional case cited by the defendants, Hurlic v.
S. California Gas Co., No.CV05-5027 (C.D.Cal. Oct. 18, 2005), to be persuasive, because that case was
dismissed without opinion. The defendants have not provided this court with any record of the court's
reasoning in Hurlic.

16

ERISA § 204(b)(1)(H), as quoted above. The defendants argue that this claim should be dismissed, even if the court reaches its merits, because the Amended Plan does not discriminate on the basis of age.

Cash balance plans are a form of pension that have become increasingly prevalent in recent years. See Eaton, 117 F.Supp.2d at 816-18 (defining and discussing the history of cash balance plans). Thus, the issue of whether cash balance plans violate ERISA's age discrimination provision is one that courts have only recently begun to address.

_____a.____Meaning of "Rate of Benefit Accrual." The parties' main dispute, like that of other parties to have litigated this issue, centers on the meaning of the phrase "the rate of an employee's benefit accrual," as it is used in ERISA Section 204(b)(1)(H)(i).[11] If section 204(b)(1)(H) permits a participant's rate of benefit accrual to be "measured in terms of the change in the balance of each participant's hypothetical account," Eaton, 117 F.Supp.2d at 824, then the Amended Plan does not discriminate on the basis of age. In a particular quarter, given two employees who are identically situated except for their ages, the Amended Plan never allocates a smaller cash value to the older employee's hypothetical account than that allocated to the younger employee's hypothetical account. On the other hand, as the defendants conceded at oral argument, if section 204(b)(1)(H) requires "a participant's rate of benefit accrual to be measured solely in terms of an annuity payable at normal retirement age," Eaton, 117

---

[11]Although Richards also asserts other claims more specific to the Amended Plan, particularly with regard to the manner in which the Amended Plan affects those employees who had accrued benefits under the Traditional Plan, but who were not permitted to continue to accrue new benefits under the Traditional Plan after its amendment, she does not press these claims as the basis for Count I.

Case 3:04-cv-01698-JCH    Document 112    Filed 03/31/2006    Page 18 of 52

F.Supp.2d at 823, then the Amended Plan does add a greater value to the younger employee's hypothetical account than to the older employee's account. See id.; Cooper, 274 F.Supp.2d at 1016. Under the Amended Plan's cash balance terms, an older employee receiving the same dollar amount of contribution to her cash balance account in a given quarter as that received by a younger employee buys a smaller age-65 pension annuity with that money. This phenomenon occurs because the older worker is closer to retirement, so the money contributed to her hypothetical account has less time to earn annual interest credits under the plan than does the money contributed to the younger worker's account. The Amended Plan's method of including age and years of service in the determination of quarterly pay credits, such that older employees tend to receive increasingly higher additions of cash value to their hypothetical accounts, mitigates this disparity in age-65 annuity value. See Compl. ¶ 25, 29. However, the pay credits do not increase quickly enough to eliminate the disparity, so employees experience an increasingly lower rate of benefit accrual as they age, if that rate is defined as the change in the value of their accrued benefit measured as an annual benefit commencing at normal retirement age. See id. at ¶ 29.

The Second Circuit has not yet ruled on the manner in which ERISA requires courts to calculate the rate of benefit accrual, and district courts who have addressed it are divided. Compare Register v. PNC Financial Svcs. Group, No. 04-CV-6097, 2005 WL 3120268, at *4-*8 (E.D.Pa. Nov. 21, 2005); Tootle v. ARINC, Inc., 222 F.R.D. 88 (D.Md. 2004); Eaton v. Onan Corp., 117 F.Supp.2d 812 (S.D.Ind. 2000); with Cooper v. IBM Personal Pension Plan, 274 F.Supp.2d 1010 (S.D.Ill. 2003); see also Campbell v. BankBoston, N.A., 327 F.3d 1, 10 (1st Cir. 2003) (noting in dicta that "it is by no means

18

clear that the annuity method is the only permitted method in this context"). The former group of district court opinions are not consistent with the Second Circuit's opinion in Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000), which provides an important guide to the court in determining the meaning of the terms Congress used in ERISA § 204(b)(1)(H)(i).

The Esden court held that, even though cash balance plans "are designed to imitate some features of defined contribution plans, they are nonetheless defined benefit plans under ERISA." 229 F.3d at 158. "However 'hybrid' in design a cash balance plan may be, it remains subject to a regulatory framework that is in many respects rigidly binary." Id. at 159 n.6. Indeed, the defendants concede that the Amended Plan, as a cash balance plan, must comply with ERISA provisions applicable to defined benefit plans. Defs.' Reply Br. Supp. Mot. Dismiss at 10 [Doc. No 45].

In Esden, the Second Circuit held that the classification of cash balance plans as defined benefit plans has "wide-reaching" "regulatory consequences." It specifically recognized that the appropriate definition of "accrued benefit" to use in regard to cash balance plans is that for defined benefit plans: "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A). "Only for a defined contribution plan is 'accrued benefit' defined as simply 'the balance of an individual's account.'" Esden, 229 F.3d at 158 (citing ERISA § 3(23), 29 U.S.C. § 1002(23)(B)). It also held that cash balance plans, as defined benefit plans," "are subject to a series of parallel statutory constraints–under ERISA and I.R.C. [Internal Revenue Code]–from which defined contribution plans are exempted." Esden, 229

19

F.3d at 158; see id. at 159 (citing several examples).

The Esden court recognized that "the governing statutes [including ERISA] and regulations were developed with traditional final-pay defined benefit plans in mind; they do not always fit in a clear fashion with cash balance plans and they sometimes require outcomes that are in tension with the objectives of those plans." Id. at 159. Nevertheless, it enforces the regulatory consequences that arise from the classification of cash balance plans as defined benefit plans. See id. at 158-59.

The Eastern District of Pennsylvania, in a holding that conflicts with that of several other courts to have addressed this issue, held that "rate of benefit accrual" is the grammatically correct way of saying "the rate of accrued benefit," the phrase that is defined in ERISA § 3(23), and that the term "rate of benefit accrual" is therefore unambiguous. Cooper, 274 F.Supp.2d at 1016. This court concurs with the Cooper court's ultimate reading of the phrase "rate of benefit accrual," although the grammatical relationship between the terms "rate of benefit accrual" and "accrued benefit" is not the only reason for its holding.

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). As the Second Circuit emphasized in Esden, ERISA has a binary structure, under which defined benefit plans face significantly different requirements from those applicable to defined contribution plans. 229 F.3d at 158 & n.6, 159. The structure of section 204(b) itself is binary. Whereas section 204(b)(1) states requirements for defined benefit plans, section 204(b)(2) states parallel requirements for defined

20

contribution plans. Section 204(b)(2)(A) contains an age discrimination provision parallel to that of section 204(b)(1)(H). Whereas the latter prohibits a reduction in "the rate of an employee's benefit accrual," the former prohibits a reduction in "the rate at which amounts are allocated to the employee's account." "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." Sosa v. Alvarez-Machain, 542 U.S. 692, 712 n.9 (2004) (citing 2A N. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th ed.2000)). The court finds that Congress did not intend that "the rate of an employee's benefit accrual," as used in section 204(b)(1)(H)(i), to be measured as "the rate at which amounts are allocated to the employee's account." Congress' use of the latter phrase, which explicitly requires measurements involving an increase in account balances, in ERISA § 204(b)(2) demonstrates that Congress could have used the same phrase in the age discrimination provision governing defined benefit plans had it intended to apply the same measurement rule to defined benefit plans. Instead, it used a completely different phrase, "rate of benefit accrual." ERISA § 204(b)(1)(H)(i).

In light of the great similarity that this phrase bears to the statutorily defined term "accrued benefit," and the fact that ERISA requires accrued benefit to be measured as an annual benefit commencing at normal retirement age for defined benefit plans, but requires accrued benefit to be measured as the balance of an individual's account for defined contribution plans, the term "rate of benefit accrual," as used in section 204(b)(1)(H)(i), refers to rate measured as a change in the annual benefit commencing

21

at normal retirement age.[12]  The statute is unambiguous in this respect, and the court

need not inquire further into its meaning.

Defendants' primary arguments in support of measuring the "rate of benefit

accrual" as the rate of change in hypothetical account balances, adopted from the

reasoning in Eaton, focus on the practical consequences of the contrary interpretation

or on the legislative history.  In light of this court's holding that the meaning of this

---

[12]Although not necessary to this holding, the following observations lend further support to the plaintiff's interpretation of Section 204(b)(1)(H)(i).  First, in its commentary accompanying final regulations issued in 2003, the IRS has interpreted the phrase "rate of future benefit accrual," as used in the notice provision of section 204(h), as follows:  "an amendment to a defined benefit plan reduces the rate of future benefit accrual only if it is reasonably expected that the amendment will reduce the amount of the future annual benefit commencing at normal retirement age (or at actual retirement age, if later) for benefits accruing for a year."  68 F.R. 17277, 17282 (2003) (emphasis added).  Although the IRS has not issued final regulations on ERISA § 204(b)(1)(H)(i), its interpretation of the phrase "rate of future benefit accrual" suggests that it would similarly interpret the phrase "rate of benefit accrual" as requiring measurement using "the amount of the future annual benefit commencing at normal retirement age (or at actual retirement age, if later)."  Id.  The IRS has jurisdiction over the interpretation of ERISA § 204, Greenlaugh v. Putnam Sav. Bank, 140 F.3d 428, 428 n.1 (2d Cir. 1998), and its interpretations are entitled to deference, Esden, 229 F.3d at 169.

Second, section 204(b)(1)(G) states that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if the participant's accrued benefit is reduced on account of any increase in his age or service."  By using the statutorily defined term "accrued benefit" here, Congress clearly indicated that the question of whether an employee's pension benefits were reduced is to be answered with reference to an annual benefit commencing at normal retirement age.  The fact that section 204(b)(1)(G) requires the overall value of the accrued benefit to be measured as an annual benefit commencing at normal retirement age, in the context of determining whether age discrimination is occurring, lends further support to the court's reading of "rate of benefit accrual" in the age discrimination provision of section 204(b)(1)(H)(i) to mean the rate of increase in this annual benefit commencing at normal retirement age.

The defendants argue that measuring the rate of benefit accrual as the rate of change in the annual benefit a participant would receive commencing at age 65 is incorrect because it would invalidate section 204(c)(2)(B).  Section 204(c)(2)(B) reads:

In the case of a defined benefit plan, the accrued benefit derived from contributions made by an employee as of any applicable date is the amount equal to the employee's accumulated contributions expressed as an annual benefit commencing at normal retirement age, using an interest rate which would be used under the plan under section 1055(gg)(3) of this title (as of the determination date).

29 U.S.C. § 1054(c)(2)(B).  The defendants argue that this rule permits a plan to give equal cash amounts of interest to two participants of different ages who made equal contributions to their accounts, and that the plaintiff's reading of section 204(b)(1)(H) would invalidate this treatment.  However, section 204(c)(2)(B) appears to address only that part of accrued benefit that is derived from employee contribution, and does not impose any requirement as to the total rate of benefit accrual.

phrase is clear from ERISA itself, and the fact that Esden requires this court to apply
ERISA's defined benefit plan rules to cash balance plans even if they result in
apparently unintended consequences, the court finds that inquiring any further into the
practical consequences of the application of the section 3(23) "accrued benefit"
definition would be inappropriate. See Esden, 229 F.3d at 159.

None of the arguments advanced by the defendants or the cases they have cited
would suggest "rare and exceptional circumstances," Rubin, 449 U.S. at 430, as to
overcome the presumption that Congress "says in a statute what it means and means
in a statute what it says there," BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183
(2004) (internal citation omitted); see Nicolaou v. Horizon Media, Inc., 402 F.3d 325,
329 (2d Cir. 2005) (citing BedRoc), and permit the court to disregard the plain meaning
of the statutory text. For example, the defendants argue that requiring the rate of
benefit accrual to be measured as a rate of increase in an annual benefit commencing
at age 65 would not make sense if applied to employees over 65. However, the
plaintiff's interpretation of "rate of benefit accrual," applied to employees older than 65,
does not necessarily lead to results that would contradict the Congressional intent
expressed in the statutory text. Because the definition of "accrued benefit" for defined
benefit plans is not explicitly limited to employees under 65, see ERISA § 3(23), it is
reasonable to assume that Congress intended that "accrued benefits" be "expressed in
the form of an annual benefit commencing at normal retirement age," even for
employees older than 65. In applying this rule to the calculation of the "rate of benefit
accrual" for an employee older than 65, one possibility would be that which the
defendants suggest – to refer to an annuity projected backwards in time to age 65.

23

This result would not necessarily be absurd. Congress' intent was to assure a benefit measured as of normal retirement age. The value of that benefit does not change, regardless of whether the employee is younger or older than normal retirement age. What it costs to provide the benefit may change depending on an employee's age. However, that was not Congress' concern when it prohibited the dimunition of the rate of accrual of the benefit expressed as an annual benefit commencing at normal retirement age.

The court will not delve into the legislative history to seek a meaning for language that is unambiguous. It does note that it disagrees with the Eastern District of Pennsylvania's holding with respect to the OBRA 1986 Conference Report language. See Register v. PNC Financial Svcs. Group, No. 04-CV-6097, 2005 WL 3120268, at *7 (E.D.Pa. Nov. 21, 2005) (quoting general statement in OBRA 1986 Conference Report statement that "[p]resent law specifies certain requirements with respect to the rate at which benefits are accrued (i.e., earned) under a pension plan") (quoting H.R. Conf. Rep. No. 99-1012, at 375 (1986)). The conference report does not clearly address the issue of how the "rate of benefit accrual" should be measured, and certainly does not create "rare and exceptional circumstances" to ignore the plain language of the statute by reading in words that are not there.

The defendants' additional argument that a court may not find age discrimination in the fundamental effects of the time value of money and that this effect is inherent in all cash balance plans is simply a restatement of the dispute between the parties. The defendants cite only two authorities for this argument, Eaton and Lunn v.Montgomery Ward & Co., 166 F.3d 880, 883 (7th Cir. 1999). The court has already discussed the

24

reasons for its disagreement with Eaton. The Lunn court did observe that, "no one

supposes . . . that defined benefit plans violate ERISA, or any other statute, merely

because, depending on the age of the employee and his choice of whether to retire, the

actuarial value of his retirement benefits may be less than if he had retired at the

normal retirement age" and that it is "unlikely that ERISA would require a subsidy for

older workers." 166 F.3d at 883. However, Lunn did not specifically consider the

meaning of the phrase "rate of benefit accrual." In light of the Second Circuit's

reasoning in Esden and the language and structure of ERISA itself, the court adheres

to its conclusion regarding the reading of section 204(b)(1)(H).

The court respectfully disagrees with the reasoning of the Eastern District of

Pennsylvania in Register v. PNC Financial Svcs. Group, No. 04-CV-6097, 2005 WL

3120268 (E.D.Pa. Nov. 21, 2005), with respect to the manner in which cash balance

plans are treated under ERISA:

> Cash balance plans accrue benefits differently than traditional defined
> benefit plans. Under a traditional defined benefit plan, the benefits are
> defined in terms of the age 65 annuity. Therefore, it follows logically that
> the rate of benefit accrual is the change in the accrued benefit. Cash
> balance plans are not defined in terms of an age 65 annuity, rather they
> are defined in terms of an account balance that grows with pay credits
> and interest. Therefore, it follows logically that the rate of benefit accrual
> is determined by the change in account balance.

2005 WL 3120268, at *7. This reasoning conflicts with Esden because it effectively

treats cash balance plans as if they are defined contribution plans, when they ought to

be treated as defined benefit plans. See Esden, 229 F.3d at 158-59.

In sum, the court has considered all of the defendants' arguments, but finds

them unpersuasive. ERISA itself requires the court to compare annual benefits

25

commencing at normal retirement age when considering age discrimination in a cash balance plan under section 204(b)(1)(H). The court may not pick a different outcome, even one that may appear more sensible to some, when Congress has not chosen that course.

     b.    Hazen Argument.   The defendants argue further that Richards has failed to state a claim even if section 204(b)(1)(H) does require that the "rate of benefit accrual" be measured in terms of an annual benefit commencing at age 65. They argue that changes in the value of benefits that correlate with age, but are not caused by age, cannot constitute unlawful age discrimination. Their argument in this respect relies on the Supreme Court's decision in Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993), which held that a disparate treatment claim under the related Age Discrimination in Employment Act (ADEA) must fail if the employer's adverse employment action was solely motivated by factors other than age, even if these factors were correlated with age. Id. at 611. However, Hazen Paper left open the question of whether the ADEA permitted suits on a theory of disparate impact. Id. at 610. The recent decision in Smith v. City of Jackson, 544 U.S. 228 (2005), held that section 4(a)(2) of the Age Discrimination in Employment Act does permit disparate impact claims, albeit in more narrow circumstances than Title VII. In light of City of Jackson, Hazen does not support the defendants' position, and they cite no authority to suggest that a claim under ERISA § 204(b)(1)(H) in particular would require a showing of improper motivation.

     The defendants cite as support for their argument the Eaton court's observation that,

> in OBRA 1986, Congress expressly permitted the rate of benefit accrual
> (however it is measured) to decline over time as long as the decline is tied
> to the participant's years of service rather than the participant's age (and
> despite the one-to-one correlation of age and years of service). Those
> pension age discrimination provisions all make clear that a defined benefit
> plan can even completely stop benefits from accruing to an employee if
> the plan has a dollar or percentage cap on benefits, or if the plan limits the
> number of years of service that will be counted in calculating benefits.

117 F.Supp.2d at 831-32 (citing 29 U.S.C. §§ 623(l)(2), 1054(b)(1)(H)(ii); 26 U.S.C. §

411(b)(1)(H)(ii)).  The cited ERISA provision, section 1054(b)(1)(H)(ii) of Title 29 of the

United States Code, reads:

> A plan shall not be treated as failing to meet the requirements of this
> subparagraph solely because the plan imposes (without regard to age) a
> limitation on the amount of benefits that the plan provides or a limitation
> on the number of years of service or years of participation which are taken
> into account for purposes of determining benefit accrual under the plan.

Section 411(b)(1)(H)(ii) of Title 26 is the parallel provision from the Internal Revenue

Code, identical to that of ERISA.  This provision does permit a pension plan to take into

account years of service or participation in determining benefits, and perhaps to place

an absolute ceiling on the total benefits available under a plan.  Richards, however,

does not allege that the Amended Plan violates section 204(b)(1)(H) for these reasons.

She alleges that "an older worker with the same rate of pay and years of service as a

younger worker, receiving the same dollar amount of contribution to her cash balance

account, buys an increasingly smaller age-65 pension annuity with that money because

the closer the older worker gets to retirement age the less time the money contributed

has to earn annual interest credits under the plan." Compl. ¶ 29.  Years of service or

participation and the value of previously accrued benefits may tend to correlate with

age, but they are not perfectly correlated therewith.  An older employee may have fewer

27

years of service and participation than a younger employee and may have accrued

fewer benefits than a younger employee with more years of service. In contrast, the

number of years between an individual's age and age 65 is always perfectly correlated

with age.

The defendant presents no authority that persuades the court that Richards has

failed to make out a claim in Count I.[13]  The court finds that Count I states a claim upon

which relief may be granted. It denies the defendants' motion to dismiss insofar as it is

premised on the substantive claim in Count I.

## B.   Violation of ERISA § 203(a) Non-Forfeitability Provision (Count II): Wear-Away

In Count II, Richards asserts a claim under ERISA § 203(a), which requires

that "[e]ach pension plan shall provide that an employee's right to his normal retirement

benefit is nonforfeitable upon the attainment of normal retirement age" and sets forth

specific requirements for determining whether a benefit satisfies the requirements of

this paragraph. 29 U.S.C. § 1053(a). ERISA § 3(19) states in relevant part,

> The term "nonforfeitable" when used with respect to a pension benefit or
> right means a claim obtained by a participant or his beneficiary to that part
> of an immediate or deferred benefit under a pension plan which arises
> from the participant's service, which is unconditional, and which is legally
> enforceable against the plan.

29 U.S.C. § 1002(19).

---

[13]The court notes that the other authority that the defendants cite for their Hazen argument,
Campbell v. BankBoston, N.A., 206 F.Supp.2d 70, 78 (D.Mass. 2002), did not address any claim under
ERISA. On appeal, the First Circuit Court of Appeals did express some doubt on the theory of liability that
Richards advances here, but it refused to decide the issue because it had not been presented to the lower
court. Campbell v. BankBoston, N.A., 327 F.3d 1, 9-10 (1st Cir. 2003).

Richards claims that the Amended Plan's cash balance terms violate section

203(a) because they "condition Richards' receipt of cash balance benefits on her

foregoing the early retirement benefits she earned prior to the adoption of the cash

balance amendment." Compl. ¶ 44. Although the defendants did not raise a

substantive challenge to this Count in their initial memorandum, they do raise a

substantive challenge in responding to arguments in the plaintiff's opposition brief. The

defendants argue that the plaintiff has failed to allege facts that would state that the

Amended Plan requires a forfeiture. They argue that the Amended Plan does not

require a choice between alternative benefits, because "participants who accrued a

benefit prior to the conversion to a cash balance formula receive one benefit which is

always the greater of (1) their cash balance account benefit and (2) their benefit

accrued under the Traditional Plan as of December 31, 1996." Defs.' Reply Br. at 14

[Doc. No. 45-1]. They further argue that, "because the only benefit that participants are

entitled to under the cash balance formula is the greater of their benefit under the old

plan or under the cash balance formula, there is never a 'forfeiture of any accrued

benefit." Id. at 14-15.

The Supreme Court has held that defining the "content of the benefit that, once

vested, cannot be forfeited" is a "threshold issue" that must be resolved in order to

determine if a plan violates section 203(a). Alessi v. Raybestos-Manhattan, Inc., 451

U.S. 504, 511 (1981):

> [W]hat defines the content of the benefit that, once vested, cannot be
> forfeited? ERISA leaves this question largely to the private parties
> creating the plan. That the private parties, not the Government, control
> the level of benefits is clear from the statutory language defining
> nonforfeitable rights as well as from other portions of ERISA. ERISA

29

defines a "nonforfeitable" pension benefit or right as "a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." 29 U.S.C. § 1002(19). In construing this definition last Term, we observed: "[T]he term 'forfeiture' normally connotes a total loss in consequence of some event rather than a limit on the value of a person's rights. Each of the examples of a plan provision that is expressly described as not causing a forfeiture listed in [§ 1053(a)(3)] describes an event–such as death or temporary re-employment–that might otherwise be construed as causing a forfeiture of the entire benefit. It is therefore surely consistent with the statutory definition of "nonforfeitable" to view it as describing the quality of the participant's right to a pension rather than a limit on the amount he may collect." Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. [359,] 372-373 . . . . Similarly, the statutory definition of "nonforfeitable" assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit. As we explained last Term, "it is the claim to the benefit, rather than the benefit itself, that must be 'unconditional' and 'legally enforceable against the plan.' " Id., at 371 . . . .

Id. at 511-12; see Williams v. Caterpillar, Inc., 944 F.2d 658, 664 (9th Cir. 1991)

("[C]ourts have uniformly relied on Alessi to uphold the formulas by which employers

compute the amount of their employees' benefits, so long as the pension plans in

question satisfy ERISA's guidelines"). The terms[14] of the Amended Plan itself state that

an employee in Richards' position, upon termination of employment, will receive the

greater of the balance in her hypothetical cash balance account and the frozen benefit

derived from the Traditional Plan. Thus, the Amended Plan terms give Richards no

claim to benefit accrual during the years in which her hypothetical account balance is

---

[14]The plaintiff does allege that the plan administrators frequently fail to follow the plan terms, which specify that a retiring employee receives the greater of the frozen Traditional Plan benefit and the amount in the hypothetical cash balance account. She alleges that "many plan administrators frequently inform retiring plan participants only of the value of their cash balance accounts and fail to inform them of the greater benefits they are owed under the frozen benefit derived from the Traditional Plan Terms." Compl. ¶ 36. However, Richards' non-forfeiture claim in Count II is premised solely on the plan terms themselves. Compl. ¶ 44-45.

below the value of her frozen Traditional Plan benefit. Section 203(a) gives Richards a non-forfeitable claim to her accrued benefit, but the balance of the hypothetical cash account does not become part of her accrued benefit until it surpasses the value of the frozen Traditional Plan benefit. Thus, the plan does not require a forfeiture of an accrued benefit, nor is the receipt of accrued benefits conditional.

Therefore, the court grants the motion to dismiss with respect to Count II. Particularly because the court's decision rests on an argument raised after plaintiff opposed the motion to dismiss, the court will reconsider this ruling if the plaintiff moves within two weeks. The plaintiff is also granted leave to replead if the court has misconstrued the terms of the Amended Plan and she can accurately allege that the Amended Plan requires forfeiture of accrued benefits.

## C.    Violation of ERISA § 204(b)(1)(B)'s Anti-Backloading Provision (Count III): Substantive Argument

In Count III, Richards alleges that the wear-away effect violates ERISA § 204(b)(1)(B) because it causes Richards and other participants "to face years where they accrue zero benefits followed by years where they accrue actual benefits." Compl. ¶ 46. Section 204(b)(1)(B), which applies to the Amended Plan, prohibits defined benefit plans from backloading benefits such that they increase by more than 33 1/3% from one year to another.

The defendants did not make any substantive arguments with respect to Count III in their memorandum in support of the motion to dismiss. In their reply to the plaintiff's opposition to the motion to dismiss, the defendants for the first time argued that plans involving a wear-away effect do not violate ERISA. However, they cited no

31

authority that has addressed the question of whether the wear-away effect violates section 204(b)(1)(B) in particular, nor did they present any substantive argument on section 204(b)(1)(B).

In November 2005, two days after the Eastern District of Pennsylvania dismissed a claim that a wear-away provision similar to that in the Amended Plan violated the anti-backloading rule, the defendants submitted a supplemental memorandum alerting the court to that decision.  See Register v. PNC Financial Svcs. Group, Inc., No. 04-CV-6097, 2005 WL 3120268 (Nov. 21, 2005).  The Register court cited ERISA § 204(B)(1)(B)(i), which states that, for the purposes of the anti-backloading provision, "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years."  Relying on this provision, it reasoned that the plaintiff had not stated a claim because the rate at which benefits accrued in the hypothetical cash balance accounts, viewed in isolation, did not violate the anti-backloading rule.

The Second Circuit has held that the section 204(b)(1)(B) "test applies to how a given plan operates at a given time and prevents it from being unfairly weighted against shorter-term employees; but it is irrelevant to across-the-board increases in benefit rates made at some future time on behalf of all current employees regardless of period of service."  Langman v. Laub, 328 F.3d 68, 71 (2d Cir. 2003); see Allen v. Honeywell Retirement Earnings Plan, 382 FSupp.2d 1139, 1160 (D.Ariz. 2005) ("[I]n determining whether a new benefit formula violates the 133 1/3 rule, one does not compare the new formula with the old formula; rather, the backloading question must be answered by considering the new formula on a stand-alone basis.").

32

In light of the text of section 204(b)(1)(B)(i) and Langman, the court holds that
the plaintiff has failed to state a claim under section 204(b)(1)(B). If the Amended Plan
is treated as having been in effect for all plan years, employees such as Richards would
never have accrued a benefit under the Traditional Plan, and would have started
accruing benefits under the cash balance formula from the start of their employment.
Assuming such a scenario, such employees would suffer no backloading of benefits.
The court grants the defendants' motion to dismiss on Count III. However, because the
plaintiff has not had an opportunity in writing to address the bases for the court's
decision in this regard, the court will reconsider this part of its decision if the plaintiff so
requests within two weeks of this ruling.

## D.    Violation of ERISA § 204(h) (Count IV): Failure to Supply Advance Notice of a Significant Benefit Decrease: Defendants' argument that they provided sufficient notice

In Count IV, Richards claims that the defendants' failure to notify her and other
plan participants of the significant reduction in the rate of future benefit accrual that the
Amended Plan would cause for them violated ERISA § 204(h). At the time of the 1997
plan amendment, this section provided,

> A single-employer plan may not be amended so as to provide for a
> significant reduction in the rate of future benefit accrual, unless, after
> adoption of the plan amendment and not less than 15 days before the
> effective date of the plan amendment, the plan administrator provides a
> written notice, setting forth the plan amendment and its effective date, to--
> (1) each participant in the plan . . . .

Consolidated Omnibus Budget Reconciliation Act of 1985, Title XI, § 11006, 100 Stat.

82 (1986) (current version at 29 U.S.C. § 1054(h)). The alleged reduction in the rate of

future benefit accrual, as asserted in this claim, results not only from the use of a cash

33

balance plan, but also the "wear-away" effect, the pre-retirement mortality discount, and the use of the 7% interest rate.

The defendants argue, for the first time in their Reply Brief in Support of Summary Judgment, that they provided notice that satisfied the version of section 204(h) in effect in 1997, as interpreted by the regulations in effect at that time. Specifically, they argue that an Employee Reference Guide, a copy of which they attach to their Reply Brief, provided the required notice. However, the plaintiff has not alleged that this Guide was provided to employees at least 15 days before the effective date of the plan amendment, and the court cannot assume that was so provided. It therefore may not consider the Guide for purposes of Count IV. The defendants point to no other communication in which they provided the required advance notice to plan participants. Therefore, the court finds no basis for the defendants' argument that it provided notice that would comply with section 204(h). It denies the defendants' motion to dismiss Count IV on this ground.

## E. Prejudice (Counts IV and V)[15]

The defendants argue that Counts IV and V fail to state a claim because Richards did not allege prejudice. The court has already summarized the claim asserted in Count IV, see Part IV.D., supra. Count V claims that the defendants violated ERISA § 102, 29 U.S.C. § 1022, and its implementing regulations, 29 C.F.R. § 2520.102, by failing to explain terms such as the wear-away effect and the manner in

---

[15]Aside from their prejudice argument, the defendants do not argue that Count V fails to state a claim for any substantive reason (i.e., any reason aside from failure to exhaust, requesting the wrong remedy, and improperly naming the corporate employer as a defendant). Although the Eastern District of Pennsylvania dismissed a section 102 claim in Register, the defendants do not make any specific argument that the Fleet Amended Plan SPD gave adequate notice.

34

which the cash balance plan reduces the rate of benefit accrual as participants age.

In Burke v. Kodak Retirement Income Plan, 336 F.3d 103 (2d Cir. 2003), the Court of Appeals adopted the "likely prejudice" standard for claims alleging that SPDs do not meet the requirements of ERISA. To show "likely prejudice," a plaintiff must show that she was "'likely to have been harmed' by the faulty SPD. Frommert v. Conkright, 433 F.3d 254, 267 (2d Cir. 2006) (quoting Burke, 336 F.3d at 112).

In light of Frommert, which addressed a section 204(h) claim, the defendants concede that Richards' ERISA § 204(h) claim "cannot be dismissed for her failure to allege *actual* prejudice." Defs.' Mem. Re: 3rd Supplemental Authority in Support of Dismissal at 2 [Doc. No. 92-1]. They argue that this claim should fail because she has not pled "likely prejudice." Id. The parties agree that a claim under section 102 is subject to the "likely prejudice" standard. See Defs.' Mem. Supp. Mot. Dismiss at 32 [Doc. No. 31]; Plf.'s Mem. Opp. Mot. Dismiss at 32 [Doc. No. 40].[16]

The Burke court, which reviewed a summary judgment ruling, held that a plaintiff had made an initial showing that he was likely to have been harmed because the "conspicuous absence of the domestic partnership affidavit requirement in [a self-contained section of the SPD] likely led the Burkes to believe that an affidavit was unnecessary" for certain benefits, for which the plan actually required an affidavit. 336 F.3d at 114. It held that this showing gave rise to a presumption of prejudice, and that the defendants had not presented sufficient rebuttal evidence to show that the plaintiffs were actually aware of the requirement that had been omitted from the SPD. Frommert

---

[16]Richards argues that the Second Circuit does not require her to plead "likely prejudice," but only to prove it at subsequent stages in the litigation. The court need not address this argument in light of its Ruling.

held that a defendant's failure to notify participants of a significant reduction in the rate
of future benefit accrual for up to five years after the reduction began was sufficient to
establish likely prejudice because it "likely, and quite reasonably, led plan participants to
believe it was not a component of the Plan."  433 F.3d at 267.

    As relevant to Count IV, Richards has pled that, "Fleet did not explain the full
import of the cash balance terms in a summary plan description distributed to plan
participants, including but not limited to an explanation of the wear-away effect and a
disclosure that benefit accruals under the plan are reduced by advancing age."  Compl.
¶ 39.  She has pled that it failed to notify her and other plan participants "of a significant
reduction in the rate of future benefit accrual 15 days prior to the January 1, 1997
effective date" of the Amended Plan, in violation of section 204(h).  Id. at ¶ 48.
Although the Complaint does not specify when Richards actually learned of the manner
in which the Amended Plan would significantly reduce the rate of her future benefit
accrual, the Complaint, read in light of the SDP at issue, could support a finding that the
defects in notice "likely, and quite reasonably, led plan participants to believe" that the
wear-away effect and decreasing rate of benefit accrual were not components of the
plan.  Frommert, 433 F.3d at 267.  Neither the complaint nor the plan documents
present any basis for the court to infer that Richards was aware that the Amended Plan
would significantly reduce the rate of her future benefit accrual despite the defendants'
failure to disclose this information.  Therefore, the court denies the defendants' motion
to dismiss Count IV for a failure to plead likely prejudice.

    In Count V, Richards alleges that Fleet failed to "explain the full import of the
cash balance plan terms in a summary plan description distributed to plan participants,

36

including but not limited to a complete explanation of the wear-away effect and an explicit explanation of how benefit accruals under the plan are reduced by advancing age." Compl. ¶ 50. For the same reasons stated in the preceding paragraph, the court finds that she has sufficiently alleged "likely prejudice" for purposes of this motion. It denies the motion to dismiss Count V insofar as it is premised on a failure to allege likely prejudice.

## F.   Constitutional Standing to Bring Claim for Violation of ERISA § 404: Breach of Fiduciary Duty (Count VI)

In Count VI, Richards alleges that the defendants breached their fiduciary duty to plan participants because, "Plan administrators frequently inform retiring plan participants only of the value of their cash benefit accounts and fail to inform them of the greater benefits they are owed under the frozen benefit derived from the Traditional Plan Terms." Compl. ¶ 52. Defendants concede that Richards is a plan "participant." However, they argue that she has failed to satisfy Article III's standing requirements as to this claim because she has not alleged any injury-in-fact. Richards admits that she has not yet suffered any harm as a result of the alleged breach of fiduciary duty. In her responses to the motion to dismiss, she does not discuss the legal standard for constitutional standing or its application to her claim. Rather, she argues that she has statutory standing, an issue the defendants have not contested.

The Second Circuit has made clear that "statutory standing under ERISA . . . will not suffice to substitute for Article III standing." Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 443 F.3d 181, 201 (2d Cir. 2005). Constitutional standing is a jurisdictional prerequisite to the court's

37

consideration of her claim. See Alliance for Envtl. Renewal v. Pyramid Crossgates Co.,

436 F.3d 82, 85 (2d Cir. 2006) ("An important component of the Article III jurisdictional

limit of federal courts to deciding 'cases' or 'controversies'"); Wright, Miller & Cooper,

Federal Practice and Procedure: Jurisdiction 2d § 3531 at 345.

"Standing . . . like other jurisdictional inquiries, cannot be inferred

argumentatively from averments in the pleadings, but rather must affirmatively appear

in the record. To that end, it is the burden of the party who seeks the exercise of

jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to

invoke judicial resolution of the dispute." Thompson v. County of Franklin, 15 F.3d 245,

249 (2d Cir. 1994) (internal citation and quotation marks omitted). However, "[a]lthough

standing is a fundamental jurisdictional requirement, it is still subject to the same

degree of proof that governs other contested factual issues. Thus, at the pleading

stage, standing allegations need not be crafted with precise detail, nor must the plaintiff

prove his allegations of injury." Baur v. Veneman, 352 F.3d 625, 631 (2d Cir. 2003)

(internal citations omitted).

The Second Circuit has described the application of the standing requirement in

a class action as follows:

> The Supreme Court has held that if none of the named plaintiffs
> purporting to represent a class establishes the requisite of a case or
> controversy with the defendant[ ], none may seek relief on behalf of
> himself or any other member of the class. Moreover, the named class
> plaintiffs must allege and show that they personally have been injured, not
> that injury has been suffered by other, unidentified members of the class
> to which they belong and which they purport to represent.

38

Central States, 443 F.3d at 199 (internal citations and quotation marks omitted). A class representative must have standing at the time of class certification.[17]

To satisfy Article III's standing requirement, a plaintiff generally "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Alliance for Envtl. Renewal v. Pyramid Crossgates Co., 436 F.3d 82, 85 (2d Cir. 2005). One of the most important constitutional standing requirements is "injury-in-fact." "To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be concrete and particularized as well as actual or imminent, not conjectural or hypothetical." Baur, 437 F.3d at 633 (internal citations and quotation marks omitted). "[T]o support standing, the plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." Id. (internal citation omitted).

Therefore, the court must determine whether the plaintiff has alleged an imminent injury. "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is certainly impending." Lujan v. Defenders of Wildlife, 504 U.S. 555, 563 n.2 (1992); see McConnell v. Federal Election Com'n, 540 U.S. 93, 226 (2003) (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)) ("A threatened injury must be certainly impending to constitute injury in fact");

---

[17] However, he or she may subsequently continue to represent the class even if his or her individual claim becomes moot. Id.

39

see also id. (quoting Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) ("A plaintiff seeking injunctive relief must show he is 'immediately in danger of sustaining some direct injury as [a] result' of the challenged conduct). Temporal remoteness of an injury can prevent it from meeting the imminence standard. See McConnell, 495 U.S. at 157-58 (holding that an injury that could not occur earlier than 2008 was "too remote temporally" to give a plaintiff standing to sue in 2003).

In the particular case of ERISA fiduciary duty claims, the Second Circuit recently cited with approval a Third Circuit holding that "a plan participant may have Article III standing to obtain injunctive relief related to ERISA's disclosure and fiduciary duty requirements without a showing of individual harm to the participant." Central States, 433 F.3d at 199 (citing Horvath v. Keystone Health Plan East, Inc., 333 F.3d 450 (3d Cir. 2003) and Gillis v. Hoechst Celanese Corp., 4 F.3d 1137 (3d Cir. 1993)). On the other hand, a showing of "individual loss" by the plaintiff is required for claims seeking restitution or disgorgement, even when the plaintiff premises such claims on violations of section 404. Id. at 200 (quoting Horvath v. Keystone Health Plan East, Inc., 333 F.3d 450 (3d Cir. 2003) and citing Bollig v. Christian Comm. Homes and Servs., 2003 WL 23200362, at *2 (W.D.Wis. July 10, 2003)).

"[W]ith regard to injunctive relief, it is well-established that [t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." Horvath, 333 F.3d at 456 (internal citations omitted). Horvath had brought a claim under ERISA § 404 alleging that the defendant company breached its fiduciary duty to plan participants by failing to inform them of certain cost-saving incentives that were offered to physicians providing care

40

under the HMO used by employees. The Third Circuit held, in language subsequently

quoted in Central States, that

> Here, the disclosure requirements and fiduciary duties contained in ERISA
> create in Horvath certain rights, including the rights to receive particular
> information and to have Keystone act in a fiduciary capacity. Thus,
> Horvath need not demonstrate actual harm in order to have standing to
> seek injunctive relief requiring that Keystone satisfy its statutorily-created
> disclosure or fiduciary responsibilities.

Central States, 433 F.3d at 199 (quoting Horvath, 333 F.3d).

In Count VI, Richards seeks relief under the same section of ERISA as Horvath.

However, she fails to allege that the Plan administrators have committed, or imminently

are going to commit, a breach of their statutory fiduciary obligations as to her. She

alleges only that the plan administrators "frequently inform retiring plan participants only

of the value of their cash benefit accounts and fail to inform them of the greater benefits

they are owed under the frozen benefit derived from the Traditional Plan Terms."

These facts might demonstrate a breach of that fiduciary duty that the administrators

owed to the retiring plan participants, but they do not support a conclusion that the

administrators breached their fiduciary duty to Richards. She makes no averment as to

the age at which she plans to retire, or whether her own frozen benefit derived from the

Traditional Plan will exceed the value of her hypothetical cash balance account as of

the date on which she intends to require. Moreover, she does not allege that the Fleet

plan administrators invariably, or even usually, misinform retiring participants, but rather

that they do so "frequently." The Complaint therefore does not allege an imminent

breach of the defendants' fiduciary duty as to Richards.

In contrast, Horvath had alleged that the plan administrators breached their fiduciary duty to plan participants generally, because they failed to disclose information about the only health plan available to the participants, including Horvath. Similarly, Central States involved a pharmaceutical benefits manager's breaches of fiduciary duty as to an entire pension plan. See 433 F.3d at 187-88 (describing claims that included misleading statements about the defendant's ability to control costs, self-dealing in management of pension plan pharmacy benefit, and failures to disclose management practices or their costs to the pension plan); see also Financial Insts. Retirement Fund v. Office of Thrift Supervision, 964 F.2d 142 (2d Cir. 1992) (holding in dicta that participants who had been transferred from a multi-employer pension fund to the Office of Thrift Supervision had Article III standing where they had alleged that fund directors breached their fiduciary duties in allocating a portion of the fund's surplus to the banks that had previously employed the participants, rather than the Office of Thrift Supervision).

Richards cites Mullins v. Pfizer, 23 F.3d 663 (2d Cir. 1994) in support of her argument that she has standing. In that case, however, only the issue of statutory standing appears to have been at issue. Mullins alleged that Pfizer, his former employer, had deliberately misled him as to its decision to offer its employees a new voluntary severance agreement that would provide additional benefits above normal early retirement benefits to employees who volunteered to retire early. Mullins retired shortly before Pfizer announced that it would be offering this severance agreement. He alleged that he suffered great financial loss as a result of Pfizer's fraudulent misrepresentation. Thus, he clearly alleged injury; the only question was whether he

42

was a "participant" for purposes of statutory standing.

Because Richards has not alleged any injury-in-fact, even considering the generous manner in which this Article III requirement has been applied to ERISA fiduciary duty claims, she lacks constitutional standing to pursue the claims in Count VI of the Complaint. The court grants the motion to dismiss Count VI.

At oral argument, Richards' counsel admitted that Richards had not alleged that she ever asked about her own benefits, nor that she planned to retire at any particular time. However, he represented that Richards did ask the Plan administrators what her benefits were, and they told her only the value of her frozen benefit derived from the Traditional Plan. Richards is granted leave to replead, within two weeks of this Ruling, should she be able to allege additional facts that would establish that she has constitutional standing. However, the court notes that the facts that her counsel represented at oral argument would not establish that she has standing for the claim alleging that the Plan administrators gave misinformation and diminished benefits to retiring class members.

## G.    Exhaustion (Counts IV & V)

The defendants further contend that the surviving claims of the Complaint fail to state a claim upon which relief may be granted because Richards has failed to plead that she exhausted administrative remedies by pressing her claims with plan administrators before filing the present suit.[18] Richards' principal response to this argument is that the court should not require exhaustion of her claims because they

---

[18]The defendants argued that Richards did not exhaust Counts II-VI but concede Richards did, in fact, exhaust the claim in Count I of the Complaint.

43

allege that the terms of the Amended Plan violate ERISA, rather than that the
administrators have incorrectly denied her benefits owed under the terms of the
Amended Plan.

The Third, Fourth, Fifth, Sixth, Ninth, and Tenth Circuits have all held that
exhaustion is not a prerequisite to suits alleging statutory ERISA violations. See Smith
v. Sydnor, 184 F.3d 356, 362 (4th Cir. 1999) (holding that claim for breach of fiduciary
duty in violation of ERISA § 404 does not have an exhaustion requirement unless "the
resolution of the claim rests upon an interpretation and application of an ERISA-
regulated plan rather than upon an interpretation and application of ERISA.") (emphasis
in original); id. at 364 (reasoning that, while ERISA mandates administrative review
procedures for denial of benefits under a plan, it mandates no administrative review
procedures for claims that the plan terms violate ERISA, and that interpretation of the
statute, unlike that of the plan terms, is within the special expertise of the courts);
Chailland v. Brown & Root, Inc., 45 F.3d 947 (5th Cir. 1995) (reasoning that complaint
involved termination by employer, rather than the plan administrator, and therefore, did
not involve an ERISA-covered plan, and that presenting claim to administrator would be
futile); Richards v. General Motors Corp., 991 F.2d 1227 (6th Cir. 1993) (holding that
retaliatory discharge claim need not be exhausted because it was not a claim covered
by plan review provisions but asserted other rights under ERISA; Held v. Mfrs. Hanover
Leasing Corp., 912 F.2d 1197, 1204-05 (10th Cir. 1990) (relying upon Ninth and Third
Circuit cases cited below to conclude that exhaustion of claim alleging termination in
violation of ERISA § 510 was unnecessary and holding that "[r]equiring appellant to
press this claim with [the employer] would serve little purpose."); Zipf v. Am. Telephone

44

& Telegraph Co., 799 F.2d 889, 891-92 (3d Cir. 1986) (reviewing legislative history and limited administrative review procedure required by ERISA and concluding that Congress did not intend to require administrative exhaustion for claims of discrimination in violation of ERISA § 510); Amaro v. Continental Can Co., 724 F.2d 747 (9th Cir. 1984) (holding that exhaustion of arbitration procedure was not required for ERISA § 510 discrimination claim, based upon the fact that ERISA neither mandates nor recommends any internal appeal procedure for such claims, that statutory interpretation "is a task for the judiciary," and a review of Supreme Court cases on arbitrability of rights provided by other statutes).

In contrast, the Eleventh Circuit requires exhaustion of statutory ERISA claims, although it recognizes that courts have discretion to waive this requirement if exhaustion would be futile or the remedy inadequate, see Mason v. Continental Group, Inc., 763 F.2d 1219, 1224-27 (11th Cir. 1984), and the Seventh Circuit holds that the decision of whether to require exhaustion falls within the district court's discretion, see Lindemann v. Mobil Oil Corp., 79 F.3d 647, 650 (7th Cir. 1996); Kross v. Western Elec. Co., Inc., 701 F.2d 1238, 1243-45 (7th Cir. 1985);

Although the Second Circuit Court of Appeals has not addressed the question of whether plaintiffs asserting statutory claims must exhaust administrative remedies before bringing suit in federal court, it has noted that, "[d]istrict courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation." Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 102 (2d Cir. 2005) (quoting DePace v. Matsushita Elec. Corp. of Am., 257 F.Supp.2d 543, 557-58 (E.D.N.Y. 2003) (collecting cases); see, e.g., Campanella v. Mason Tenders' District

45

Council Pension Plan, 299 F.Supp.2d 274, 281 (2005); Blessing v. J.P. Morgan Chase & Co., No. 02 Civ. 3874 (LMM), 2003 U.S. Dist. LEXIS 2604 (S.D.N.Y. 2003) (citing Hoodack v. IBM, 202 F.Supp.2d 109, 113-15 (S.D.N.Y. 2002), Gray v. Briggs, No. 97 CIV. 6252 (DLC), 1998 U.S. Dist. LEXIS 10057 (S.D.N.Y. 1998) (agreeing with Lawford, although lack of exhaustion requirement not in dispute), Molina v. Mallah Org., Inc., 804 F. Supp. 504, 511-12 (S.D.N.Y. 1992); Lawford)); Novak v. TRW, Inc., 822 F.Supp. 963, 969 (E.D.N.Y. 1993) (relying on Lawfordv. New York Life Ins. Co., 739 F.Supp. 906 (S.D.N.Y. 1990) and Zipf); Lawford (relying on Zipf and Bird v. Shearson Lehman/Am. Express, Inc., 871 F.2d 292 (2d Cir. 1989)).

The Second Circuit has also held, in the context of discussing a plan governed by the Federal Employee Health Benefits Act, that "[t]he exhaustion requirement may arise from explicit statutory language or from an administrative scheme providing for agency relief." Kennedy, 989 F.2d at 593. ERISA contains neither an explicit exhaustion requirement nor any suggestion that plan administrators provide a review procedure for claims other than those contesting denial of benefits under the plan. See id. at 594 ("ERISA does not provide for OPM review, but instead requires that all benefit plans provide for carrier review."). Moreover, the legislative history analyzed in Zipf persuades the court that Congress did not intend to impose an exhaustion requirement on employees' claims that pension plan terms violated the substantive guarantees of ERISA, in contrast to an employee's claim that she had a right to benefits under the terms of a particular plan. See Zipf, 799 F.2d at 891-92; see also Lawford, 739 F.Supp. at 912 (citing Zipf with approval).

As the Third Circuit explained further:

46

> When a plan participant claims that he or she has unjustly been denied benefits,
> it is appropriate to require participants first to address their complaints to the
> fiduciaries to whom Congress, in Section 503, assigned the primary responsibility
> for evaluating claims for benefits. [See 29 U.S.C. § 1133.] This ensures that the
> appeals procedures mandated by Congress will be employed, permits officials of
> benefit plans to meet the responsibilities properly entrusted to them, encourages
> the consistent treatment of claims for benefits, minimizes the costs and delays of
> claim settlement in a nonadversarial setting, and creates a record of the plan's
> rationales for denial of the claim.  See Wolf v. National Shopmen Pension Fund,
> 728 F.2d 182, 185 (3d Cir.1984); Grossmuller v. International Union, 715 F.2d
> 853, 856-57 (3d Cir.1983); Amato v. Bernard, 618 F.2d 559, 567 (9th Cir.1980);
> see also Barrowclough[ v. Kidder, Peabody & Co., Inc.], 752 F.2d [923,] 939.
>
> However, when the claimant's position is that his or her federal rights guaranteed
> by ERISA have been violated, these considerations are simply inapposite.
> Unlike a claim for benefits brought pursuant to a benefits plan, a Section 510
> claim asserts a statutory right which plan fiduciaries have no expertise in
> interpreting.  Accordingly, one of the primary justifications for an exhaustion
> requirement in other contexts, deference to administrative expertise, is simply
> absent.  Indeed, there is a strong interest in judicial resolution of these claims,
> for the purpose of providing a consistent source of law to help plan fiduciaries
> and participants predict the legality of proposed actions.  Moreover, statutory
> interpretation is not only the obligation of the courts, it is a matter within their
> peculiar expertise.  Alexander v. Gardner-Denver Co., 415 U.S. 36, 57, 94 S.Ct.
> 1011, 1024, 39 L.Ed.2d 147 (1974).

Zipf, 799 F.2d at 891-92.

The Seventh and Eleventh Circuit decisions that have permitted district courts to

impose an exhaustion requirement in cases not involving benefits allegedly required by

a plan reason that an exhaustion requirement for statutory claims serves several useful

purposes.  These include compilation of a factual record and a reasoned decision

before the case reaches the courts, minimizing frivolous lawsuits, promoting non-

adversarial dispute resolution, decreasing the cost and time of settling claims, and

avoiding premature judicial intervention that could prevent plan trustees from effectively

and efficiently carrying out their duties.  Lindemann v. Mobil Oil Corp., 79 F.3d 647, 650

(7th Cir. 1996); Mason v. Continental Group, Inc., 763 F.2d 1219, 1227 (11th Cir.

1985).  The Second Circuit has recognized that similar purposes lie behind the well-settled exhaustion requirement for traditional denials of benefits claims.[19]

However, the court finds that not all of these purposes apply in the present situation.  In particular, it agrees with the Third Circuit's reasons as to why courts should not accord deference to private plan administrators in the area of statutory interpretation.  Similarly, it finds that judicial intervention in the present case is not premature and would not interfere with plan administrators' abilities to perform their duties because the present case does not involve claims for which ERISA requires administrators to operate a routine review procedure.  Moreover, neither the Seventh nor the Eleventh Circuit opinions persuade the court that the Zipf court's view of the legislative history and congressional intent is incorrect.

Because all of Richards' surviving claims will require review of whether the Amended Plan conforms with the substantive guarantees of ERISA, rather than review of the denial of benefits under the terms of the plan, the court finds that the plaintiff need not have exhausted her claim in order to bring the present suit.

---

[19]The Second Circuit has held, in the context of considering whether it would be futile for a plaintiff to administratively exhaust a claim for benefits owed under a particular pension plan, that:

> [t]he primary purposes of the exhaustion requirement are to: (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not de novo.

Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 133 (2d Cir. 2001) (quoting Kennedy v. Empire Blue Cross and Blue Shield, 989 F.2d 588, 594 (2d Cir. 1993)).  The Second Circuit has also stated, in a similar context, that the exhaustion requirement is intended to "help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." Kennedy, 989 F.2d at 595 (quoting Denton v. First Nat'l Bank of Waco, Texas, 765 F.2d 1295 (5th Cir.), reh'g denied, 772 F.2d 904 (5th Cir. 1985) (quoting Amato v. Bernard, 618 F.2d 559, 567 (9th Cir. 1980))); Barnett v. IBM, 885 F.Supp. 581, 587 (S.D.N.Y. 1995) (quoting language from Kennedy).

48

The defendants' argument to the contrary assumes that the category into which
a claim falls for purposes of exhaustion – that is, whether they have alleged a "plan-
based" claim, such that the Second Circuit requires exhaustion, or a "statutory
violation," such that the Second Circuit has not addressed the issue of whether
exhaustion is required, see Nechis v. Oxford Health Plans, Inc., 421 F.3d 96,102 (2d
Cir. 2005) – depends upon under which section of ERISA the plaintiffs seek relief.
They argue that all claims seeking relief under ERISA § 502(a)(1)(B), which permits
suits by a participant "to recover benefits due to him under the terms of his plan, to
enforce his rights under the terms of the plan, or to clarify his rights to future benefits
under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B), require exhaustion under
settled Second Circuit law.[20]  Although most claims appropriately seeking relief under
this subsection are likely to be "plan-based," the case law suggests that the court
should look at the substance of the claims, rather than the remedy sought, in order to
categorize them. See Nechis, 421 F.3d at 102-03 (discussing possibility that claims at
issue might not have an exhaustion requirement while also observing with respect to
one of the same claims that the plaintiff "could have pursued an alternative and
effective remedy under § 502(a)(1)(B) of ERISA to recover the value of benefits wrongly
denied"). Here, the plaintiff's surviving claims all seek relief for statutory violations,
rather than violations of the terms of the Amended Plan. Therefore, the court denies
the motion to dismiss insofar as it is premised on a failure to exhaust administrative
remedies.

---

[20]Richards seeks relief on each count under ERISA § 502(a)(1)(B) "and/or" § 502(a)(3).

49

## H.     § 502(a)(3) Claims for Equitable Relief (Counts IV and V)[21]

Richards seeks relief on each count under ERISA § 502(a)(1)(B) "and/or"

§ 502(a)(3).  Section 502(a)(1)(B) provides that "a civil action may be brought . . . by a

participant . . . to recover benefits due to him under the terms of the plan, or to clarify

his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

Section 502(a)(3) provides that a participant may bring suit "to enjoin any act or practice

which violates any provision of this subchapter or the terms of the plan."  Id. at

§ 1132(a)(3).  The Supreme Court has held that "§ 502's structure suggests that

Congress intended the general 'catchall' provisions of subsections (3) and (5) to act as

a safety net, offering appropriate equitable relief for injuries caused by violations that

§ 502 does not elsewhere adequately remedy."  Varity Corp. v. Howe, 516 U.S. 489,

512 (1996).  The defendants argue that the section 502(a)(3) claims for equitable relief

in Counts IV and V should be dismissed because Richards seeks benefits under

section 502(a)(1)(B) in the same counts, and she cannot ultimately prevail on claims for

relief under both sections 502(a)(3) and 502(a)(1)(B).

However, at oral argument, the defendants acknowledged that the rule that

Richards can only obtain a remedy under one of the two subsections applies only at the

end of the case.  The court finds that determining which remedy is more appropriate

would be premature at the motion to dismiss stage.  It therefore denies the motion to

dismiss Richards' claims for equitable relief pursuant to ERISA § 502(a)(3) in Counts IV

---

[21]The defendants raised the same argument with respect to Counts II and III.  However, the court
will not address Counts II and III here because they have already been dismissed.  See Parts IV.B & IV.C,
supra.

50

and V.

## I.    Claims Against the Corporate Employer

The defendants also argue that Fleet Financial Corporation ("Fleet Financial," or "corporate employer") is not a proper defendant in this action, and that only the Fleet Amended Plan itself can be a proper defendant. It is undisputed that Fleet Financial is not itself named as a plan administrator on the Amended Plan, whereas its co-defendant, Fleet Amended Plan, is so named.

The court agrees with the defendants that Richards cannot maintain any of her actions pursuant to section 502(a)(1)(B) against the corporate employer. See Crocco v. Xerox Corp., 137 F.3d 105, 107 (2d Cir. 1998) (holding that an employer not named as a plan administrator may not be liable "as a de facto co-administrator [] in a suit brought under § 502(a)(1)(B), where the employer has designated a plan administrator in accordance with 29 U.S.C. § 1002(16)(A)"[22]).

However, Crocco left open the possibilities that a plan participant might sue a corporate employer who was not a named plan administrator as a fiduciary, where the participant is bringing a breach of fiduciary duty claim, and that a participant might be able to sue the corporate employer for equitable relief under section 502(a)(3). 137

---

[22]The term "administrator" means--

(i) the person specifically so designated by the terms of the instrument under which the plan is operated;

(ii) if an administrator is not so designated, the plan sponsor; or

(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).

51

F.3d at 107 n.2. The defendants do not advance any arguments as to why Richards' claims pursuant to section 502(a)(3) may not be brought against the corporate employer.

The court therefore grants the Motion to Dismiss all claims pursuant to section 502(a)(1)(B) against Fleet Financial Corporation only, and denies the Motion to Dismiss claims pursuant to section 502(a)(3) in Counts I, IV, and V against Fleet Financial Corporation.

## VI.    CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part the defendants' Motion to Dismiss the plaintiff's Complaint [**Doc. No. 30**]. The court grants the Motion to Dismiss Counts II, III, and VI in their entirety, with the right to replead, including on the ground discussed herein. It further grants the Motion to Dismiss as to all claims pursuant to ERISA § 503(a)(1)(B) against Fleet Financial Corporation. The court denies the Motion to Dismiss as to the remaining claims in Counts I, IV, and V.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 31st day of March, 2006.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

52