**EXHIBIT "G"**

# Chimicles & Tikellis LLP
### ATTORNEYS AT LAW

One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642.8500
Telecopier: (610) 649.3633
E-mail: Mail@Chimicles.com

Nicholas E. Chimicles
Pamela S. Tikellis *
James R. Malone, Jr.
Michael D. Gottsch
Robert J. Kriner, Jr. *
Steven A. Schwartz
Kimberly M. Donaldson
M. Katherine Meermans
Joseph G. Sauder
Daniel B. Scott
Farema E.F. Burkey
Kimberly Litman Kimmel
Timothy N. Mathews
A. Zachary Naylor *
Timothy P. Briggs
Daniel J. Brown *
Benjamin F. Johns

OF COUNSEL
Morris M. Shuster
Denise Davis Schwartzman
Anthony Allen Geyelin
Candice L.H. Hegedus

*Attorneys admitted to jurisdiction other than PA

October 24, 2006

**VIA EMAIL AND**
**FIRST CLASS MAIL**

Kay Kyungsun Yu, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

Re: <u>Charles v. Pepco Holdings, Inc., No. 05-702 (SLR) (D. Del.)</u>

Dear Kay:

I have had an opportunity to review the defendants' responses to plaintiffs' first set of interrogatories, to review in detail the documents produced to us on September 28, 2006 (PHI00001-3449), and to conduct a preliminary review of the materials produced last evening (PHI003450-3785). Based upon your email to me of yesterday evening, my understanding is that you do not anticipate producing any more responsive documents. Accordingly this letter will serve to outline plaintiffs' views on the status of defendants' discovery responses, and the sufficiency of production to date. I will first address two basic issues relating to the scope of the defendants' responses and the confidentiality of certain materials produced, and then review certain basic broad-ranging issues that cut across the defendants' responses. Finally, I will address some more limited issues or questions that we have concerning the production of documents and interrogatory responses.

First, please advise us whether any information has been withheld from any interrogatory response or any document has been withheld from production based upon a claim of attorney-client privilege, work product protection or similar privilege. To the extent that information or documents have been withheld on the basis of a claim of privilege, please advise when we may expect a log, so that we may test the sufficiency of the claim of privilege in those instances in which we consider it to be warranted.

WILMINGTON OFFICE
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: (302) 656.2500
Telecopier: (302) 656.9053

Kay Kyungsun Yu, Esquire
October 24, 2006
Page 2


Second, we note that certain of the documents produced contain personal financial data, such as Social Security Numbers, earnings and benefit information relating to the named plaintiffs. (*See* PHI003332-3356; 3730-3785). Please be advised that we consider the information that these documents to be properly subject to confidential treatment under the protective order entered in this action. You will note that in producing the plaintiffs' documents pursuant to our disclosures in August, we designated their account statements as confidential.

Turning to issues that appear to cut across a number of different discovery requests, I would first note that plaintiffs have been concerned since receiving defendants' initial disclosures that the identification of persons with knowledge of relevant matter furnished by defendants was inadequate. Review of the materials provided to us to date indicates that there were plainly a variety of other individuals involved. For example, the minutes of the Personnel and Compensation Committee on April 23, 1998 list a series of directors (Gore, McGlynn, Morgan, Emery, Cosgrove), Donald E. Cain, Vice President-Human Resources and Performance Improvement, Benjamin Wilkinson, Manager, Compensation & Benefits Consulting, and Moira K. Donoghue. (*See* PHI001584-87). Similarly, other documents show a variety of personnel were involved in employee communications, including Mr. Wilkinson, Pat Duffy, Harold DeJarnette, Dave Motil (PHI003423-27) and Tricia Gannon (PHI003413-22). No personnel from Watson Wyatt or Towers Perrin have been identified to date. This issue affects the sufficiency of defendants' disclosures, as well as their responses to interrogatories 6 and 10.

As we have discussed in the past, there are two broad areas where plaintiffs believe discovery is appropriate and defendants have indicated that they do not consider the material relevant. The first of these is in the area of design issues. For example, plaintiffs have requested information on the reasons why the cash balance design was selected, and why particular groups were provided with grandfather benefits. For similar reasons, plaintiffs have sought discovery into the reason why separate Sub-Plans for unionized workers were implemented. This issue affects defendants' responses to interrogatories 7, 8, 9, and 11 and document requests 11 through 21.

Plaintiffs believe inquiries into the design issues through the mechanism of these requests are appropriate for two reasons. First, the information is relevant to plaintiffs' claim, in Count IV of the complaints, that Conectiv violated Section 204(h) of ERISA. What triggers the obligation to give notice is the sponsor's expectation that a particular amendment is one that will result in a decrease in the

Kay Kyungsun Yu, Esquire
October 24, 2006
Page 3

rate at which benefits will accrue in the future. *See* 26 C.F.R. § 1.411(d)-6(A-5) (1998) (stating that section 204(h) notice is required in connection with an amendment to a defined benefit plan "if it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age."). In light of this standard, along with the broad standard governing relevance of discovery under Rule 26 of the Federal Rules of Civil Procedure, plaintiffs believe that their inquiries into design matters are reasonably calculated to lead to the discovery of admissible evidence.

For example, discussions between Conectiv's management and its outside consultants concerning the cash balance design presumably touched on the likely future cost of benefits under a cash balance design as contrasted with final average pay plans such as those already in place. Indeed the minutes cited above specifically indicate that the cash balance plan was being adopted as part of an overall package of benefits that was intended to place Conectiv's benefits costs at the median of the competitive market. (PHI001584). Similarly, the very fact that grandfather benefits were offered to some workers suggests that management recognized that adoption of a cash balance design would result in lower benefit accruals for some classes of workers. Discovery into the discussions held on who would qualify for grandfather benefits is thus reasonably calculated to lead to discoverable evidence on the question whether Conectiv expected the adoption of the Cash Balance Sub-Plan to lead to a reduction in future age 65 retirement benefits, which would trigger its obligation to give notice. Similarly, the minutes cited above note that the same benefits changes to be imposed on management would also be the subject of future negotiations with the various IBEW locals. As a matter of historical fact, we know that did not occur, since the ACE Sub-Plan and Delmarva Sub-Plan retain the traditional final average pay design. Discovery into the reasons why these structures were retained for represented workers also is thus reasonably calculated to lead to discoverable evidence on the question whether adoption of the Cash Balance Sub-Plan was expected to result in lower benefit accruals.

Second, we believe the same discovery is relevant to the issue of remedies. If plaintiffs prevail on any of their claims, we expect defendants will oppose any retroactive relief, arguing that they acted in good faith and had no reason to believe that there was anything wrong with the cash balance design they adopted. Information about the discussions of the design in advance will be relevant to rebut that type of contention.

The other major area where plaintiffs and defendants have differing views of relevance is on the subject of drafts. This issue affects defendants' responses to

Kay Kyungsun Yu, Esquire
October 24, 2006
Page 4

document requests 22 through 24. At present, we have documentation of the terms of the plan at two points in time. As of April 1998, when the cash balance design was endorsed by the Personnel and Compensation Committee, the terms of the plan consisted of ten bullet points and were less than half of a page. Grandfathering was treated with the phrase "Extensive 'Grandfathering.'" (PHI001589). The ultimate plan as implemented was considerably longer. We believe that some exploration of the process of how the plan evolved from ten bullet points into the final version is appropriate for the same reasons outlined above in connection with the design issues. First, tracing the evolution of the plan will likely shed light on the extent to which it was expected to result in lower age 65 retirement benefits for certain classes of workers. Second, the information will likely shed light on the issue of the sponsor's good faith belief in the legitimacy of the design it adopted. Drafts of the employee communications are similarly relevant in our view. In that connection we note that at least some of the communications in connection with the conversion noted that "Cash balance plans are controversial" while endeavoring to assure the employees who had been converted that this one was different. (*See* MWW 00219-225).

In addition to these broad areas of dispute, there are areas in which defendants' document production appears to be incomplete. Four areas, in particular, stand out.

First, we have been given a redacted spreadsheet with data for various employees that drove the opening balance calculation. (PHI003332-56). The only data appearing is for plaintiffs Charles, Fink and Ward. No data is furnished for plaintiff Troup, and all of the other data for all other employees is eliminated. In this area, we believe we should be furnished with the relevant data for plaintiff Troup (which, as noted above, should be designated as confidential). We should also discuss some way in which the same data for non-party participants can be furnished without complete personal identification information as it may be relevant for class issues.

Second, although we have been furnished with various account statements for the named plaintiffs (PHI003730-85), we have not been furnished with their opening statements. As you know from our disclosures, some, but not all of the named plaintiffs retained their opening statements. We would prefer to work with copies produced by defendants to avoid issues about authenticity.

Kay Kyungsun Yu, Esquire
October 24, 2006
Page 5

   Third, we are missing the 1997 5500 for the Delmarva predecessor plan, and the 2001 5500 furnished was a facsimile version downloaded from freeerisa.com.

   Fourth, we note the April 28, 1998 minutes of the Personnel and Compensation Committee, and the attachment thereto, and wish to inquire whether there are any prior or subsequent board or committee minutes or resolutions in which the Conversion or the Cash Balance Sub-Plan were discussed, approved or ratified.

   Finally, based upon a comparison of what our clients produced and what defendants have produced, we are concerned that the production of employee communications is incomplete. For example, Plaintiff Ward produced a PowerPoint presentation that defendants have not produced. Similarly, one newsletter produced (PHI003436-39) refers to a schedule for employee meetings in a June 24, 1999 newsletter, but the newsletter has not been produced.

   Once you have had an opportunity to review this letter, I suggest we schedule a time to discuss the issues outlined above to see whether we can reach some compromise. We can also discuss at that time the status of your efforts to identify any relevant electronic data.

              Sincerely,

              James R. Malone, Jr.

JRM/lbc

cc: Joseph G. Sauder, Esquire
   A. Zachary Naylor, Esquire