# Exhibit 1

**CONECTIV**

**MINUTES OF THE PERSONNEL AND COMPENSATION COMMITTEE**

Wilmington, Delaware, April 23, 1998

Pursuant to notice, a meeting of the Personnel & Compensation Committee was held beginning at 9:30 a.m. at the principal office of the Company, 800 King Street, Wilmington, Delaware.

| | |
|---|---|
| Present and constituting a quorum: | Directors Gore, McGlynn and Morgan. |
| | Director Emery participated by telephone call. |
| | Director Cosgrove also participated in the meeting. |

Chairman Gore presided.

Donald E. Cain, Vice President - Human Resources and Performance Improvement and Benjamin Wilkinson, Manager, Compensation & Benefits Consulting also participated in the meeting. Moira K. Donoghue acted as Secretary.

The Chairman called the meeting to order, introduced Mr. Cain and Mr. Wilkinson and confirmed that Director Emery could hear the conversation and that the other persons present could hear Director Emery. She then referred to materials that had been previously distributed to the Committee members.

The Chairman then called on Mr. Cain who reviewed the philosophy and approach for employee benefits at Conectiv, with an emphasis on
1. the ability to tailor benefit costs to the needs of individual lines of business
2. the interest in being able to move employees among the lines of business
3. the interest in being competitive both in cost and attractiveness to employees.

Mr. Cain then stated that the proposed benefit program was designed to be at approximately the median of the competitive marketplace, defined as regional employers in general industry. He stated that management proposed to phase in the program, first with management employees and later, following negotiations, with represented employees. He acknowledged that this creates a risk related to the reaction of management employees who will be the first to feel the effect of the changes but stated that this risk could be managed in light of the cost savings to be realized from the new program. Finally, he stated management's commitment to continually review the

PHI001584

appropriateness of the program to the Company's business objectives and to employee interests.

Mr. Wilkinson stated that the long-term goal of management was to have the overall benefit cost at 35 - 36% of pay, which is the general industry standard. He then reviewed the details of the program on a plan by plan basis, specifically:

Management of the Company recommends that the Compensation Committee approve the adoption of a Cash Balance Pension Plan, 401(k) Plan and Welfare Benefit Program for employees and retirees of participating subsidiaries of Conectiv.

First, it is recommended that a cash balance pension plan be adopted to replace the existing traditional defined benefit pension plans of Delmarva Power and Atlantic Energy. The cash balance design is viewed as more appropriate for attracting and retaining employees in a more mobile and independent workforce.

Second, it is recommended that a 401(k) plan be adopted to replace the current 401(k) plans of Delmarva Power and Atlantic Energy. The new plan will be administered by The Vanguard Group, the Trustee, and will offer a broader variety of investment options and a Company matching contribution of 50% on up to the first 6% of an employee's base pay in the form of Conectiv common stock.

Third, Management recommends that a competitive package of welfare plans be offered to all employees including a new flex program that will include multiple options for medical, prescription, dental, vision, life insurance, accidental death and dismemberment coverage and Choice Rewards (e.g., pre-paid legal, cancer insurance, and other non-traditional choices). In addition, employees will be given the option of flexible spending accounts (i.e., both health care and dependent care). Finally, such welfare plans will also include a competitive package of other programs, each with an effective date as indicated in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

Fourth, Management recommends that a post-retirement medical plan and life insurance plan be adopted, effective January 1, 1999. Both plans will have coverage similar to the current plans of Delmarva Power and Atlantic Energy. One additional option will provide opportunity for employees retiring as early as age 50 to receive retiree medical coverage at age 55.

All of the above-mentioned changes will be effective for management employees as indicated in the Attachment and all such changes will be effective for employees represented by IBEW Local Nos. 210, 1238 and 1307 if and when negotiated with each Local, respectively.

Discussion among the Committee members followed the presentation, with a specific focus on ways to control growth in medical plan costs and have employees feel

responsibility to manage those costs and on management's strategy for negotiating these changes with the unions.

Chairman Cosgrove stated that at a future meeting of the Committee management would present for discussion a set of principles to guide future benefit design based on comparative data with other employers in general industry. In addition, members of the Committee requested management to review alternatives in several specific areas of design for future consideration.

Mr. Cain referred specifically to one of the resolutions before the Committee that permits the Vice President - Human Resources and Performance Improvement to make changes in benefit plans and programs from time to time to maintain their competitiveness and respond to business and employee interests, subject to the responsibility of the Committee and the Board of Directors with respect to material amendments to employee benefit plans. The Committee acknowledged the advisability of management having this authority, subject to the understanding that material amendment could occur through a series of smaller, unrelated changes that in themselves are not material.

Following further discussion, on motion duly made, seconded and unanimously adopted it was

RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv Cash Balance Pension Plan with respect to Management employees, effective January 1, 1999, in substantially the same form presented in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv 401(k) Savings Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Welfare Benefits Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Post-Retirement Medical Plan and Retiree Life Insurance Plan for Conectiv, effective January 1, 1999, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Vice President of Human Resources and Performance Improvement be, and hereby is, authorized to negotiate or cause to be negotiated with representatives of IBEW Local Nos. 210, 1238 and 1307 inclusion in any or all of the plans and programs mentioned in the above resolutions and to extend the same or similar terms and conditions of such plans and programs, in whole or in part, to employees represented by such Locals as he deems appropriate.

responsibility to manage those costs and on management's strategy for negotiating these changes with the unions.

Chairman Cosgrove stated that at a future meeting of the Committee management would present for discussion a set of principles to guide future benefit design based on comparative data with other employers in general industry. In addition, members of the Committee requested management to review alternatives in several specific areas of design for future consideration.

Mr. Cain referred specifically to one of the resolutions before the Committee that permits the Vice President - Human Resources and Performance Improvement to make changes in benefit plans and programs from time to time to maintain their competitiveness and respond to business and employee interests, subject to the responsibility of the Committee and the Board of Directors with respect to material amendments to employee benefit plans. The Committee acknowledged the advisability of management having this authority, subject to the understanding that material amendment could occur through a series of smaller, unrelated changes that in themselves are not material.

Following further discussion, on motion duly made, seconded and unanimously adopted it was

RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv Cash Balance Pension Plan with respect to Management employees, effective January 1, 1999, in substantially the same form presented in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv 401(k) Savings Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Welfare Benefits Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Post-Retirement Medical Plan and Retiree Life Insurance Plan for Conectiv, effective January 1, 1999, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Vice President of Human Resources and Performance Improvement be, and hereby is, authorized to negotiate or cause to be negotiated with representatives of IBEW Local Nos. 210, 1238 and 1307 inclusion in any or all of the plans and programs mentioned in the above resolutions and to extend the same or similar terms and conditions of such plans and programs, in whole or in part, to employees represented by such Locals as he deems appropriate.



# C O N E C T I V

# C O M P E N S A T I O N

# A N D

# B E N E F I T S

Ben Wilkinson
April, 1998

PHI001588

# CONECTIV COMPENSATION & BENEFITS

# ROLL-OUT STRATEGY

## CONECTIV Flex

- Effective: 7/1/98
- Health Care, Rx, Dental, Vision
- Life Insurance, AD & D
- Current Benefit Levels & "Buy-ups & downs"
- Business Link
  - Flexible by L.O.B.
  - Framework in place
  - Employee Choice, New Work Force
  - Pre-Tax dollars pay premiums

## Choice Rewards

- Effective: 7/1/98
- Provides additional non-traditional choices (ex: cancer insurance, Pre-Paid Legal)
- No cost to CONECTIV
- Vendor manages deductions, payments to vendors & communications

## Cash Balance Pension Plan

- Effective: 1/1/99
- Basic formula is: End of Year Balance = Beginning of Year Balance + Pay Credits + Interest Credits
- Portable - after 5 year vesting
- Improved employee communications
- Survivor receives the "balance"
- Extensive "Grandfathering"
- Transition Credits
- Business Link
  - Useful in Divestitures
  - Can be differentiated by SBU

PHI001589

## Post-Retirement Medical

- Effective: 1/1/99 (with cash balance plan)
- Provides current benefit levels
- Business Link
  - Provides retirement @ 50, with a benefit available at 55

## 401(k)

- Effective: 7/1/98 - Vanguard will administer
- 3% Company match - Paid in CONECTIV stock
- More fund choices
- Business Link
  - "Competitive" Plan design
  - Employee Stock Ownership

- ## Others
  - Holidays
    - 12 (same as current)
    - move to more "floaters" - keep business open (AE Design)
  - Vacation (1/1/99)
    - Essentially same (2 weeks - 6 weeks)
    - Provide flexibility for experienced hires
  - Employee Variable Compensation Plan (In Place)
    - Profit Sharing - for those not in Management Incentive Plans (3% x pay max)
    - Goals vary by SBU - Provide "Line-of-sight:"
  - Work & Family Programs (As approved)
    - Part-time, "work-from-home", HCRA/DCRA, etc.
  - Performance Mgt. System (2nd Qtr. '98)
    - Based on Competencies
  - Educational Assistance (1/1/99)
    - 80-20% cost split
  - Service Emblems (1/1/99)
    - New design, to fit changing workforce
    - Part of a larger "Recognition Kit": available to SBU's

PHI001590

- <u>Management Overtime Policy</u> (7/1/98)
  - Announced 1st qtr, '98
  - Objective is to become competitive
  - Managing reaction
- <u>Management Shift Differential</u>  (7/1/98)
  - Announced with job offers
  - Increase to competitive levels
- <u>Severance Program</u> (1/1/99)
  - 2 wks/yr of service is basic design
  - General Industry competitive
- <u>Retiree Life Insurance</u>  (1/1/99)
  - Effective with c/b pension plan
  - Coverage similar to current plans
- <u>Pensioner Health Care Premiums</u> (1/1/99)
  - Objective is to establish premiums at a level found in general industry

PHI001591

# Exhibit 2

CONECTIV

RETIREMENT PLAN

As Amended and Restated

Effective January 1, 1999

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000481

## TABLE OF CONTENTS

Page

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 1    ADOPTION OF PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 2    CONSTITUENT PARTS; COMMON PROVISIONS . . . . . . . . . . . . . . . . . 3
  2.1.    Constituent Parts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  2.2.    Accrued Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  2.3.    Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  2.4.    Common Provisions and Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE 3    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 4    ADMINISTRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  4.1.    Plan Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  4.2.    Delegation of Powers and Responsibilities . . . . . . . . . . . . . . . . . . . . . . 12
  4.3.    Employment of Consultants and Counsel . . . . . . . . . . . . . . . . . . . . . . . 13
  4.4.    Responsibilities Several and Not Joint . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  4.5.    Retirement Plan Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  4.6.    Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  4.7.    Plan Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  4.8.    Agents For Receipt of Legal Process . . . . . . . . . . . . . . . . . . . . . . . . . 13
  4.9.    Procedure for Filing A Claim for Benefits . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE 5    CODE SECTION 415 LIMIT ON BENEFITS . . . . . . . . . . . . . . . . . . . . 16
  5.1.    General Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  5.2.    Incorporation of Code Section 415 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  5.3.    Limitation in Case of Defined Benefit Plan and Defined Contribution Plan for
          Same Employee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE 6    DISTRIBUTION RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  6.1.    Required Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  6.2.    Direct Rollovers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  6.3.    Rules for Election of Optional Form of Benefit . . . . . . . . . . . . . . . . . . . 18
  6.4.    Mandatory Retirement for Certain Executives. . . . . . . . . . . . . . . . . . . . 21

ARTICLE 7    TOP-HEAVY PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000482

Page

7.1.    Purpose ................................................ 22
7.2.    Definitions ............................................ 22
7.3.    Determination of Whether Plan is Top-Heavy ................. 23
7.4.    Aggregation Group of Employer Plans ...................... 24
7.5.    Special Minimum Benefit Requirement in Event Plan Becomes Top-Heavy. . . 24
7.6.    Minimum Vesting. ...................................... 24
7.7.    Terminated Participants ................................. 25
7.8.    Termination of Top-Heavy Status. ......................... 25
7.9.    Multiple Top-Heavy Plans ............................... 25

ARTICLE 8    AMENDMENT AND TERMINATION ...................... 26
8.1.    Company's Right to Amend the Plan ....................... 26
8.2.    Participant's Rights Not to Be Affected By Merger. .......... 26
8.3.    Distribution or Allocation of Assets Upon Complete or Partial Termination of
        Plan. ................................................. 26
8.4.    Provision to Prevent Discrimination ...................... 28
8.5.    Definitions ............................................ 29

ARTICLE 9    GENERAL PROVISIONS .............................. 31
9.1.    Incapacity ............................................ 31
9.2.    Merger ............................................... 31
9.3.    No Specific Rights ..................................... 31
9.4.    Employment Rights .................................... 31
9.5.    Plan Benefits Nonassignable ............................ 31
9.6.    Alienation ............................................ 32
9.7.    Employer's Liability Limited to Assets in the Plan ........... 32
9.8.    Applicable Law ....................................... 32
9.9.    Severability of Provisions .............................. 32
9.10.   Missing Participant .................................... 33
9.11.   Gender, Tense and Headings ............................ 33
9.12.   Protected Benefits ..................................... 33

ARTICLE 10   FINANCING THE PLAN .............................. 34
10.1.   No Participant Contributions ........................... 34
10.2.   Employer Contributions ................................ 34
10.3.   Plan Funds to be Held in Trust .......................... 34
10.4.   Trust for the Exclusive Benefit of Plan Participants ......... 34

SCHEDULE A .................................................. 35
SCHEDULE B .................................................. 36
SCHEDULE C

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000483

CONECTIV
RETIREMENT PLAN

PREAMBLE

The Conectiv Retirement Plan (the "Plan") is the result of the merger and consolidation of the Delmarva Power and Light Company Retirement Plan (the "Delmarva Plan") and the Atlantic City Electric Company Retirement Plan (the "ACE Plan"). The Delmarva Plan was merged with and into the ACE Plan and renamed the Conectiv Retirement Plan (the "Plan"), effective December 30, 1998. On January 1, 1999 (the "Effective Date"), a cash balance component for certain management employees of the Employer was incorporated into the Plan (hereinafter the "CB Sub-Plan").

The Plan is comprised of this document (the "Base Plan") and three Parts attached hereto. Part One consists of the CB Sub-Plan and applies solely to certain management employees of the Employer. Part Two consists of the Delmarva Sub-Plan and applies solely to union-represented employees of the Employer who are eligible to participate in Part Two in accordance with its terms and conditions. Part Three consists of the ACE Sub-Plan and applies solely to union-represented employees of the Employer who are eligible to participate in Part Three in accordance with its terms and conditions.

The Base Plan makes provisions for matters which apply generally to all Parts and the employees, retirees and beneficiaries under the respective Parts. In this regard, the Plan contemplates that each Part: (i) will have a distinct benefit structure applicable only to certain, identifiable participants, (ii) will be evidenced by a distinguishable document (which are listed in Article 2 and made a part hereof), and (iii) may have separate accounts for cost allocation purposes.

Following the merger of the Delmarva Plan into the ACE Plan and the amendment and restatement of the Plan to include the CB Sub-Plan, all the assets held in the Trust are available to pay the benefits of any Plan Participant eligible for benefits under any one or more of the Parts of the Plan described in Article 2.

The Plan is effective, generally, January 1, 1999, except that the provisions specified in Schedule B have earlier effective dates to comply with the requirements of applicable law. To the extent necessary, the Prior Plans are deemed amended by these provisions.

# ARTICLE 1
## ADOPTION OF PLAN

1.1.    The Plan as herein amended and restated, has been adopted by the Company for the exclusive benefit of its employees who are or become eligible to participate under the terms and conditions of Parts One, Two or Three of the Plan.

1.2.    The Plan shall consist of this Base Plan and Parts One, Two and Three which are attached hereto and made a part hereof.  A Participant shall be eligible to participate in Part One and/or Part Two and/or Three, to the extent that Part One and/or Part Two and/or Part Three applies to such Participant, and he or she shall receive the benefits defined in such Part(s) under the terms and conditions of such Part(s) (except to the extent such terms and conditions are superseded or supplemented by the Base Plan).  The terms of the Base Plan shall apply to all Participants.  In the event of a conflict between any term of the Base Plan and one or more of the constituent Parts, the terms of the Base Plan shall control.

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000485

ARTICLE 2
CONSTITUENT PARTS; COMMON PROVISIONS ·

    2.1.    Constituent Parts. Part One was created when the Plan was amended and restated on the Effective Date. Parts Two and Three each comprised a separate plan immediately prior to their merger into this Plan. One or more of the Parts of the Plan may be amended by the Company in accordance with the Base Plan without affecting any other Part of the Plan.

    2.1.1. Part One. Part One shall consist of the CB Sub-Plan.

    2.1.2. Part Two. Part Two shall consist of the Delmarva Sub-Plan.

    2.1.3. Part Three. Part Three shall consist of the ACE Sub-Plan.

    2.2.    Accrued Benefits. Each Participant's accrued benefits and other rights, benefits and/or features applicable thereto shall be governed by the applicable Part(s), as amended from time to time.

    2.2.1. Service Credited Under More Than One Part. A Participant shall accrue benefits for a particular period of Service under only one Part. Under certain circumstances, a Participant may be entitled to a benefit under one Part for a particular period of Service which is defined in such Part as the higher of the benefit accrued under two Parts. Nevertheless, the Participant's benefit for such period of Service shall be as defined in the Part which makes reference to the higher benefit for such Service.

    2.2.2. Selection of Distribution Options for Participants with Service Credited Under More than One Part. A Participant generally shall receive his accrued benefit at retirement or other termination of employment pursuant to the terms of the Part described in Section 2.2.1. If a Participant has accrued benefits under two different Parts for two periods of Service, and if neither Part has provided credit to the Participant for service under the other Part, the Participant shall be entitled to elect separate distribution options for the benefit accrued under each Part, subject to the terms of each Part (provided, however, that in determining whether a benefit may be distributed without the Participant's consent prior to retirement, in lump sum form, the lump sum values of the Participant's benefits under each such Part shall be combined to determine if the lump sum value is $5,000 or less). If, however, the Part in which the Participant most recently accrued benefits has provided credit to the Participant for the Service accrued under the other Part (or has provided a minimum benefit equal to the benefit accrued under the other Part), the Participant's options regarding distribution will be as set forth in the Part in which the Participant most recently accrued benefits.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000486

2.3.    <u>Participants</u>.  Participation in the Plan shall be governed by the eligibility provisions of the applicable Part(s).

2.4.    <u>Common Provisions and Definitions</u>.  Articles 2 through 10 are intended to set forth a uniform system of administration for the Plan and for compliance with the requirements of ERISA and the Code, as well as certain other matters common to the Parts of the Plan.  The provisions set forth in these Articles will govern the operations of all Parts of the Plan to the extent hereof.  Any portion of Part One, Part Two or Part Three that is inconsistent or in conflict with the Base Plan shall be deemed deleted and superseded and shall have no further legal effect.

-4-

PHI000487

# ARTICLE 3
## DEFINITIONS

Initially capitalized terms used in the Plan shall have the meanings as defined in the respective Parts as applied to that Part; provided, however, the following definitions as used in the Base Plan shall have the meanings indicated below for both the Base Plan and the Parts and shall supersede the same definitions in any of the Parts to the extent inconsistent therewith:

      3.1.    Accrued Benefit has the meaning ascribed to it in the respective Parts.

      3.2.    ACE Plan means the Atlantic City Electric Company Retirement Plan as in effect prior to the Effective Date.

      3.3.    ACE Sub-Plan means the ACE Plan as amended on and after the Effective Date and which is contained in Part Three hereof.

      3.4.    Actuarial Equivalent has the meaning ascribed to in the respective Parts.

      3.5.    Affiliated Company means:

      3.5.1.  any company which is included within a controlled group of corporations with the Company as determined under Code section 414(b);

      3.5.2.  any trades or businesses (whether or not incorporated) which are under common control with the Company as described in Code section 414(c); and

      3.5.3.  any company which is included in an affiliated service group within the meaning of Code section 414(m) or included pursuant to regulations issued under Code section 414(o).

      3.6.    Annuity Starting Date means the first day of the month coincident with or next following the Participant's Retirement Date.

      3.7.    Base Plan means that part of the Plan which contains provisions generally applicable to Parts One, Two and Three.

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000488

3.8.    <u>Board of Directors</u> means the Board of Directors of the Company.

3.9.    <u>Break in Service</u> means a "Break in Service" as defined in the respective Parts.

3.10.    <u>CB Sub-Plan</u> means the cash balance component of the Plan which was effective on the Effective Date and is contained in Part One hereof.

3.11.    <u>Code</u> means the Internal Revenue Code of 1986, as amended.

3.12.    <u>Committee</u> means the Retirement Plan Committee as described in Section 4.5.

3.13.    <u>Company</u> means Conectiv and any successor thereto.

3.14.    <u>Compensation</u> has the meaning ascribed to it in the Parts.

3.15.    <u>Deferred Retirement Date</u> has the meaning ascribed to in the Parts.

3.16.    <u>Delmarva Plan</u> means the Delmarva Power and Light Company Retirement Plan as in effect prior to the Effective Date.

3.17.    <u>Delmarva Sub-Plan</u> means the Delmarva Plan as amended on and after the Effective Date and which is contained in Part Two hereof.

3.18.    <u>Effective Date</u> means January 1, 1999.

3.19.    <u>Employee</u> means any person who is employed by the Employer in a category listed on Schedule C; provided, however, that an individual shall not be eligible to become a Participant or to remain an active Participant if (a) he is not on an employee payroll of an Employer; (b) he has entered into a written agreement with an Employer which provides that he shall not participate in the Plan; or (c) he is in a group of employees that is excluded from the Plan pursuant to his Employer's declaration of joinder in the Plan or as otherwise specified in Schedule C.

3.19.1.    <u>Bargaining Unit Employee</u> means a Local 1238 Employee, Local 1307 Employee, or a Local 210 Employee.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000489

3.19.2.  Local 1238 Employee means an Employee whose employment is covered by a collective bargaining agreement with Local 1238, IBEW, AFL-CIO.

3.19.3.  Local 1307 Employee means an Employee whose employment is covered by a collective bargaining agreement with Local 1307, IBEW, AFL-CIO.

3.19.4.  Local 210 Employee means an Employee whose employment is covered by a collective bargaining agreement with Local 210, IBEW, AFL-CIO.

3.19.5.  Non-Bargaining Unit Employee means an Employee whose employment is not subject to a collective bargaining agreement, or an Employee subject to a collective bargaining agreement that is first effective on or after January 1, 1999 and that provides for continued participation in the CB Sub-Plan.

3.19.6.  Leased Employee means a leased employee within the meaning of section 414(n) of the Code.

3.20.  Employer means the Company and all Affiliated Companies that, with the approval of the Company, have joined the Plan by vote of the Affiliated Company's Board.

3.21.  Enrolled Actuary means an individual who has been approved by the Joint Board For The Enrollment of Actuaries to perform actuarial services required under ERISA.

3.22.  Entry Date means each January 1 and July 1.

3.23.  ERISA means the Employee Retirement Income Security Act of 1974, as amended.

3.24.  Limitation Year means the Plan Year or such other twelve-consecutive month period as may be designated by the Company.

3.25.  Normal Retirement Age means "Normal Retirement Age" as defined in the respective Parts.

3.26.  Part means the applicable sub-plan as follows:

3.26.1.  Part One means that part of the Plan which contains the CB Sub-Plan.

PHLEGAL: #650902 v7 (dy8m071.WPD)

PHI000490

3.26.2.  Part Two means that part of the Plan which contains the Delmarva Sub-Plan, as amended on and after the Effective Date.

3.26.3.  Part Three means that part of the Plan which contains the ACE Sub-Plan, as amended on and after the Effective Date.

3.27.  Participant means an Employee who becomes a participant pursuant to the eligibility provisions of the applicable Part and who continues to be entitled to any benefits under the Plan.

3.28.  Plan means the Conectiv Retirement Plan, as herein amended and restated, and any amendments thereto.  The Plan consists of the Base Plan and Parts One, Two and Three.

3.29.  Plan Administrator means the Committee.

3.30.  Plan Year means a calendar year.

3.31.  Prior Plan means, as applicable, the ACE Plan or the Delmarva Plan.

3.32.  Retirement Income has the meaning ascribed to it in the Parts.

3.33.  Required Beginning Date means April 1 of the calendar year following the later of (i) the calendar year in which the Participant retires or (ii) the calendar year in which the Participant attains age 70½, provided, however that:

3.33.1.  If a Participant in Part One who is not a 5% owner of the Employer affirmatively elects, such Participant's Required Beginning Date may be April 1 of the calendar year following the calendar year in which the Participant attains age 70½, notwithstanding the fact that the Participant has not yet retired;

3.33.2.  If a Participant is a 5% owner of an Employer, the Required Beginning Date shall be April 1 of the calendar year following the calendar year in which the Participant attains age 70½.

3.34.  Trust means any trust under which the assets or any portion of the assets of this Plan are held.

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000491

3.35. <u>Trust Agreement</u> means the trust agreement(s) between the Company and the Trustees or any successor agreement(s).

3.36. <u>Trustees</u> means the individual(s) or institution(s) named in the Trust Agreement(s) as trustees of the assets of this Plan, or any successor trustees.

3.37. <u>Year of Service</u> means "Year of Service" as defined in the respective Parts.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000492

ARTICLE 4
ADMINISTRATION

4.1.    <u>Plan Administration</u>.

    · 4.1.1.  <u>Named Fiduciary</u>.  The "Named Fiduciary" of the Plan as described in Section 402 of ERISA shall be the Company.

    4.1.2.  <u>Allocation of Powers and Responsibilities</u>.  The powers and responsibilities of the Named Fiduciary with respect to the Plan are allocated to its Board of Directors, its Personnel and Compensation Committee, and officers and employees, who shall exercise such authority on behalf of the Company, as follows:

    (a)    To the Board of Directors or the Personnel and Compensation Committee of the Board of Directors of the Company, subject to Section 8.1, to · establish, continue, amend, modify or terminate the Plan; provided, however, that the Retirement Plan Committee shall have the power and authority to amend the Plan as provided in Section 4.1.2(f)(x) below.

    (b)    To the Chairman of the Board of Directors of the Company, to appoint the members of a Retirement Plan Investment Committee (the "Investment Committee"); provided, however, that the Chairman shall advise the Board of Directors of such appointments.

    (c)    To the Investment Committee:

    (i)    To manage and control the Plan assets, including the power to select an investment manager or managers to manage and control (including the power to acquire and dispose of) any Plan assets; provided, however, that the investment manager or managers must be approved by the Board of Directors or the Personnel and Compensation Committee of the Board of Directors, and must:

    (A)   ·be (1) registered as an investment advisor under the Investment Advisors Act of 1940, (2) a bank, as defined in that Act, or (3) an insurance company qualified to manage, acquire or dispose of any plan asset under the laws of more than one state; and

    (B)    acknowledge in writing that it is a fiduciary with respect to the Plan.

-10-

PHI000493

(ii)    To (A) select an actuary for the Plan (as necessary); (B) periodically obtain, review and approve the actuary's determination of the contributions required to fund the costs of such Plans; and (C) authorize the required contributions.

(iii)    To establish the funding policy of the Plan, based on the objectives and financial needs of the Plan and coordinate the investment policies of the Plan with the funding policy.

(iv)    To authorize the Treasurer of the Company or an Employer to remit contributions to the Plan's trusts.

(v)    To select a Trustee of the Plan assets; provided, however, that the Investment Committee shall advise the Board of Directors of such selection.

(d)    To the President of the Company, to select the members of the Retirement Plan Committee.

(e)    To the Chief Financial Officer or Treasurer of the Company, to maintain a funding policy consistent with the business requirements of the Company and the requirements of law.

(f)    To the Retirement Plan Committee (as created and defined in Section 4.5 below):

(i)    To recommend to the Board of Directors or the Personnel and Compensation Committee of the Board of Directors a plan whose provisions are most compatible with the Company's desire to provide retirement and other benefits for its Employees and its financial ability to provide such benefits;

(ii)    To determine eligibility of Employees for benefits under the Plan;

(iii)    To require any person to furnish such information as may be required for the proper administration of the Plan as a condition to receiving any benefits under the Plan;

(iv)    To instruct the Trustee as to disbursement of Plan funds to pay benefits in accordance with the terms of the Plan;

(v)    To administer the claims procedure (as established in Section 4.9) in accordance with the terms of the Plan and in a manner which treats all claimants fairly and equitably;

-11-

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000494

(vi)    To maintain all Plan records required by law;

(vii)    To ensure that all reports and disclosure statements are filed as required by law;

(viii)    To comply with all requirements of ERISA and the Code and to take whatever action is necessary to maintain the Plan as a qualified plan under Section 401(a) of the Code or of any succeeding corresponding provision of the federal Internal Revenue laws;

(ix)    To make rules and regulations for the administration of the Plan not inconsistent with the terms of the Plan; and

(x)    With the advice of counsel and subject to Section 8.1:

(A)    to make such amendments or modifications to the Plan as may be (1) required by law, including ERISA or the Code, (2) necessary to maintain the tax-qualified status of the Plan, or (3) necessary to comply with collective bargaining agreements; or

(B)    to make such administrative, technical or clarifying amendments as may be necessary, advisable or desirable (1) to improve administration of the Plan, (2) to carry out the intent of amendments to the Plan approved by the Board of Directors or any Committee of the Board of Directors, or (3) to carry out the intent of resolutions of the Board of Directors or any Committee of the Board of Directors pertaining to or affecting the Plan;

Provided, however, that the Retirement Plan Committee shall advise the Board of Directors of any such amendments or modifications.

4.2.    Delegation of Powers and Responsibilities.  Any powers and responsibilities of the Named Fiduciary (other than any powers and duties related to the management and control of Plan assets) allocated under Section 4.1.2 may be further delegated in writing by the Board of Directors or the Personnel and Compensation Committee of the Board of Directors, the Chairman of the Board of Directors, the Investment Committee, the President, the Chief Financial Officer or Treasurer, or the Retirement Plan Committee, as the case may be.  Any person or legal entity may serve in more than one fiduciary capacity with respect to the Plan and Trust.

-12-

PHLEGAL: #650502 v7 (dy8m071.WPD)

PHI000495

4.3.    Employment of Consultants and Counsel. The Board of Directors or the Personnel and Compensation Committee of the Board of Directors, the Chairman of the Board of Directors, the Investment Committee, the President, the Chief Financial Officer or Treasurer, or the Retirement Plan Committee, or any person delegated the powers and responsibilities of any of them pursuant to Section 4.2 may employ one or more persons to render advice with regard to powers and responsibilities allocated under Section 4.1.2.

4.4.    Responsibilities Several and Not Joint. The powers and responsibilities allocated to the Board of Directors or the Personnel and Compensation Committee of the Board of Directors, the Chairman of the Board of Directors, the Investment Committee, the President, the Chief Financial Officer or Treasurer, or the Retirement Plan Committee, as the case may be, or those powers and responsibilities delegated to any other person pursuant to Section 4.2 shall be several and not joint.

4.5.    Retirement Plan Committee. There is hereby created a Retirement Plan Committee (the "Committee") to be composed of at least three members. The members shall be appointed by the President of the Company and shall serve without compensation at the pleasure of the President. The Committee shall have the duties and responsibilities with respect to the administration of the Plan more particularly set out above in Section 4.1.2(f). The Committee may act at meetings at which a majority of its members shall be present. The action of a majority of the Committee present shall constitute the action of the Committee. The Committee may also act by written resolution without the holding of a meeting. Any resolution concurred in by a majority of its members shall be the action of the Committee. The Committee shall have full discretion to determine any questions of fact, interpretation, definition, or administration under the Plan and such determinations shall be conclusive and binding on all persons to the fullest extent permitted by law. Written minutes shall be kept of the Committee's meetings and actions. No member of the Committee who is a Participant shall vote on any matter affecting his individual account. The expenses of the Committee shall be paid by the Company.

4.6.    Administrator. The Administrator shall be the person so designated in writing by the Retirement Plan Committee.

4.7.    Plan Administrator. The "Plan Administrator" for the purposes of ERISA shall be the Company.

4.8.    Agents For Receipt of Legal Process. The Company and the Trustee are designated as the agents for the receipt of service of process.

-13-

PHI000496

4.9.    Procedure for Filing A Claim for Benefits.

4.9.1.    Claim Forms.  The Committee shall provide on request forms on which any person may file a claim for benefits under the Plan.  A claim shall be filed with the Administrator.

4.9.2.    Notice of Denial of Claim.  If a claim is wholly or partially denied, written notice of the decision shall be given to the claimant within a reasonable time after the filing of the claim.  Such notice shall be written in a manner calculated to be understood by the claimant and shall contain the following:

(a)    The specific reason or reasons for denial;

(b)    Reference to specific Plan provisions on which the denial is based;

(c)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(d)    An explanation of the Plan's claim review procedure.

4.9.3.    Review of Claim Denial.  A claimant whose claim for benefits has been denied in whole or in part in accordance with Section 4.9.2 may obtain a review of such denial by making a written request to the Committee within sixty (60) days of notice of any such denial.  The time for requesting such a review may be extended by the Committee under circumstances where the claimant's failure to request a review within the sixty (60) day limit is excusable.  For the purposes of this right to request a review of a claim denial, a claimant shall be deemed to have received notice of denial of a claim if the claimant receives no notice of the granting or denial of a claim within sixty (60) days of making such claim.  A claimant shall be entitled to review all Plan documents pertaining to his claim.  A claimant shall be entitled to submit written arguments in support of his claim.

4.9.4.    Notice of Denial of Claim After Review.  If a claim is wholly or partially denied upon a review in accordance with Section 4.9.3, written notice of such decision shall be given to the claimant within sixty (60) days of the filing of the request for review, unless special circumstances require an extension of time for processing, in which case a decision shall be rendered as soon as possible but not later than one hundred twenty (120) days after, receipt of a request for review.  If such an extension of time for review is required because of special circumstances, written notice of the extension shall be furnished to the claimant prior to the commencement of the extension.  The decision on review shall be in writing and shall include specific reasons for the decision, written in a manner calculated to be understood by, the

PHLEGAL: #650902.v7 (dy8ml07!.WPD)

PHI000497

claimant, and shall include specific references to the pertinent plan provisions on which the decision is based.

-15-

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000498

## ARTICLE 5
## CODE SECTION 415 LIMIT ON BENEFITS

5.1.    General Rule.  Notwithstanding any provisions of the Plan to the contrary, in no event shall the projected annual benefit payable to the Participant in the form of a straight life annuity or a qualified joint and survivor annuity (with no ancillary benefits) exceed the lesser of:

5.1.1.  $90,000 (or such higher amount as may be allowed pursuant to Code Section 415(d)), or

5.1.2.  100% of the Participant's average compensation for his high three years.

5.2.    Incorporation of Code Section 415.  In determining whether the annual benefit exceeds the limitation set forth under the general rule, the provisions of Code Section 415 and the regulations issued thereunder are herein incorporated by reference.

5.3.    Limitation in Case of Defined Benefit Plan and Defined Contribution Plan for Same Employee.  If, in any Limitation Year beginning before January 1, 2000, a Participant is a participant in one or more defined contribution plans sponsored by an Employer, the annual benefit of the Participant under the Plan shall be reduced to the extent necessary to meet the combined plan limits of section 415(e) of the Code.

-16-

PHI000499

# ARTICLE 6
## DISTRIBUTION RULES

6.1.   <u>Required Distributions</u>

      6.1.1.  The requirements of this Section shall apply to any distribution of a Participant's benefits and will take precedence over any inconsistent provisions of the Plan. All distributions required under this Section shall be determined and made in accordance with Code Section 401(a)(9) and the regulations promulgated thereunder.

      6.1.2.  Distribution of a Participant's benefits shall commence no later than the Participant's Required Beginning Date.

6.2.   <u>Direct Rollovers</u>

      6.2.1.  Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Section, a Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

      6.2.2.  The following definitions shall apply solely for the purposes of this Section:

      (a)   <u>Direct Rollover</u> means a payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

      (b)   <u>Distributee</u> means an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

      (c)   <u>Eligible Retirement Plan</u> means an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code that accepts the Distributee's Eligible Rollover Distribution. However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement plan or individual retirement annuity.

-17-

PHI000500

(d)    Eligible Rollover Distribution means any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: (1) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated beneficiary, or for a specified period of ten years or more; (2) any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; and (3) the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

6.3.    Rules for Election of Optional Form of Benefit.

6.3.1. Committee to Inform Participant of Option. A Participant may elect an optional form of benefit under the applicable Part by filing a written notice with the Committee in the form and manner prescribed by the Committee. The following rules shall be applied in a uniform and nondiscriminatory manner with respect to the election of optional forms of benefit, as provided under the applicable Part(s).

6.3.2. Except as provided in Section 6.3.4, a Participant may elect an optional form of benefit at any time during the period that begins 90 days before the first day of the calendar month in which his Annuity Starting Date falls and ends on the Annuity Starting Date. Any election of any optional form of benefit shall remain revocable until the later of:

(a)    the seventh day after the date on which the explanation described in Section 6.3.7 is provided, or

(b)    that Participant's Annuity Starting Date.

6.3.3. Each Participant whose benefits have been suspended during a period of reemployment, may make the election described in Section 6.3.2 upon the resumption of benefit payments, with respect to his entire Accrued Benefit. For purposes of applying Section 6.3.2 to the preceding sentence, the Participant's Annuity Starting Date shall be the date on which suspended benefits resume.

6.3.4. Spousal Consent. A Participant who does not establish to the satisfaction of the Committee that he has no spouse on his Annuity Starting Date may elect to receive an optional form of benefit under Section 6.3.2 only if:

(a)    The benefit is a joint and survivor annuity with the Participant's spouse that provides for periodic payments after the Participant's death each of which is fifty percent (50%) or one hundred percent (100%) of the periodic payment to the Participant; or

-18-

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000501

(b)    Participant's spouse (or the spouse's legal guardian if the spouse is legally incompetent) executes a written instrument whereby such spouse:

(i)    consents not to receive the normal form of benefit; and

(ii)    consents to the specific optional form elected by the Participant, or (provided such instrument acknowledges the spouse's right to limit consent to a specific optional form) to the Participant's right to choose any optional form without any further consent by the spouse; and

(iii)    if applicable, consents in writing to either the specific beneficiary or beneficiaries named by the Participant pursuant to his election, or (provided such instrument acknowledges the spouse's right to limit consent to a specific beneficiary) to the Participant's right to name any beneficiary or beneficiaries without any further consent by the spouse; and

(iv)    such instrument acknowledges the effect of the election to which the spouse's consent is being given and is witnessed by a Plan representative or a notary public; or

(c)    the Participant (A) establishes to the satisfaction of the Committee that his spouse cannot be located or (B) furnishes a court order to the Committee establishing that the Participant is legally separated or has been abandoned (within the meaning of local law), unless a qualified domestic relations order pertaining to such Participant provides that the spouse's consent must be obtained.

The consent of a spouse in accordance with this Section 6.3.4 shall not be effective with respect to other spouses of the Participant, and an election to which Section 6.3.4(c) applies shall become void if the circumstances obviating such requirement of consent of the spouse cease to exist before the Participant's Annuity Starting Date.

6.3.5.  Revocation of Election.  A Participant may revoke an election under Section 6.3.4.  Such revocation may be made at any time during the election period described in Section 6.3.2.  Such revocation shall not void any prospectively effective consent given by the Participant's spouse in connection with the revoked election.

-19-

PHI000502

6.3.6. <u>Death of Spouse or Beneficiary Before Annuity Starting Date</u>. If a Participant's spouse or other beneficiary dies before the Participant's Annuity Starting Date, but after an election of a joint and survivor annuity has been made hereunder, the election shall be automatically revoked.

6.3.7. <u>Explanation to Participants</u>. The Committee shall provide to each Participant (whose vested Accrued Benefit has an Actuarial Equivalent single-sum value in excess of $5,000) no more than 90 days before his Annuity Starting Date a written explanation of:

(a)     the terms and conditions of the normal form of benefit and each optional form of benefit, including information explaining the relative values of each form of benefit;

(b)     the Participant's right to waive the normal form of benefit and the effect of such waiver;

(c)     the rights of the Participant's spouse with respect to such waiver;

(d)     the right to revoke an election to receive an optional form of benefit and the effect of such revocation;

(e)     if the Participant has not reached age 65, the Participant's right to defer commencement of his benefit until his Required Beginning Date;

(f)     the right to at least 30 days to consider whether to waive the normal form of benefit and consent to a form of distribution other than the normal form of benefit. The 30-day consideration period shall be measured from the date on which the written explanation described in this Section 6.3.7 is provided.

Notwithstanding any other Plan provision, if a Participant so elects, the date on which that Participant's first benefit payment is actually made may be less than 30 days (but in no event less than seven days) after the date on which the notice described in Section 6.3.7 is provided.

-20-

PHI000503

6.4.    Mandatory Retirement for Certain Executives.

6.4.1.  Certain Executives.  An Employee, who for the two years prior to his sixty-fifth (65th) birthday has been employed in a bona fide executive or a high policy-making position, must retire on or before the first day of the month coincident with or next following his sixty-fifth (65th) birthday provided that the Employee is then entitled to an immediate non-forfeitable annual retirement benefit from the Employer of at least $44,000.

6.4.2.  Exception to Mandatory Retirement for Certain Executives.  The Employer, at the specific request of its Board of Directors and in its absolute discretion, may defer the mandatory retirement of certain executives for a period of not more than one year, subject to further deferments for periods of not more than one year, by action taken in each case not more than sixty (60) days prior to the termination of any such extended period.

-21-

PHLEGAL: #650902.v7 (dy8m07LWPD)

## ARTICLE 7
### TOP-HEAVY PROVISIONS

7.1.    Purpose. The purpose of this Article is to comply with the rules applicable to Top-Heavy plans contained in Section 416 of the Code and the appropriate regulations of the Internal Revenue Service thereunder. The rules set forth in this Article shall be operative if the Plan is, or becomes, Top-Heavy within the meaning of Section 416 of the Code and the regulations thereunder.

7.2.    Definitions. For purposes of this Article only, the following terms shall have the meanings set forth below:

7.2.1.    Determination Date means, as to any Plan Year, the last day of any preceding Plan Year or, in the case of the first Plan Year, the last day of such Plan Year.

7.2.2.    Key Employee means any Employee, or former Employee, or beneficiary of either, who at any time during the Plan Year or the four preceding Plan Years is:

(a)    an officer of the Employer having an annual Section 415 Compensation greater than the amount determined by multiplying fifty percent (50%) of the dollar limitation under Section 415(b)(1)(A) of the Code;

(b)    one of the 10 Employees owning the largest interests in the Employer and having an annual Section 415 Compensation at least equal to the dollar limitation under Section 415(c)(1)(A) of the Code;

(c)    a 5% owner of the Employer; or

(d)    a 1% owner of the Employer having aggregate annual Section 415 Compensation of at least $150,000 from the Employer and any Affiliated Employer.

For purposes of subparagraphs (b), (c) and (d), owners of the Employer shall include those considered as owners within the meaning of Section 318 of the Code. In identifying the top 10 Employee owners under Section 7.2.2(b), only owners of greater than a one-half percent (½%) interest in the Employer will be considered, and if several Employees have equal ownership interests, those Employees with higher Section 415 Compensation shall be treated as having a greater ownership interest. The determination of who is a Key Employee shall be made in accordance with Section 416(i) of the Code and the regulations thereunder, the provisions of which are incorporated herein by reference.

-22-

PHI000505

7.2.3.  Non-Key Employee means any Employee other than a Key Employee, and shall include any former Key Employees.

7.2.4.  Present Value means the present value of a Participant's accrued benefit as of his Normal Retirement Date (or attained age, if later) determined under the rules prescribed by Section 416 of the Code and the regulations issued thereunder.  The Present Value shall be calculated as of the latest valuation date used for computing Plan costs for minimum funding purposes using the interest, pre-retirement and post-retirement mortality assumptions set forth in Schedule A of the Delmarva Sub-Plan.  In computing Present Value, future withdrawal or salary increase assumptions shall not be taken into account.

7.2.5.  Valuation Date means the most recent valuation date occurring within the 12-month period ending on the Determination Date.

7.3.    Determination of Whether Plan is Top-Heavy.  This Plan will be deemed to be Top-Heavy for any Plan Year if, as of the Determination Date for the preceding Plan Year,

(a)    the Present Value of the cumulative accrued benefits under the Plan for Key Employees exceeds sixty percent (60%) of the Present Value of the cumulative accrued benefits under the Plan for all Employees, or

(b)    the Plan is included in a Required Aggregation Group and the sum of the present value of the cumulative accrued benefits for Key Employees under all defined benefit plans included in such group and the aggregate of the accounts of Key Employees under all defined contribution plans included in such group exceeds sixty percent (60%) of a similar sum determined for all Employees, or

(c)    the Plan is part of a Required Aggregation Group and part of a Permissive Aggregation Group and the present value of the cumulative accrued benefits for Key Employees under all defined benefit plans included in the Permissive Group and the aggregate of accounts of Key Employees under all defined contributions plans in the Permissive Group exceeds sixty percent (60%) of a similar sum determined for all Employees.

A former Participant's Accrued Benefit is to be disregarded in determining whether the Plan is Top-Heavy, unless the Participant performed any services for the Employer within the 5- year period ending on the Determination Date.

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000506

7.4.    Aggregation Group of Employer Plans.  All corporations and businesses that are aggregated under Sections 414(b), (c) and (m) of the Code with the Employer must be considered with the Employer for the purposes of determining whether the Plan is Top-Heavy. All plans of the Employer in which a Key Employee participates, and each other stock bonus, pension or profit sharing plan, if any, of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Section 401(a)(4) or Section 410 of the Code, will be aggregated as a Required Aggregation Group within the meaning of Section 416(g) of the Code.  Each plan in the Required Aggregation Group will be Top-Heavy if the group is Top-Heavy, and no plan in the group will be Top-Heavy if the group is not Top-Heavy.

In addition, the Employer may elect to include as part of the Permissive Aggregation Group under Section 416(g) of the Code any plans that are not part of a Required Aggregation Group but that satisfy the requirements of Sections 401(a)(4) and 410 of the Code when considered together with the plans constituting the Required Aggregation Group.  If the Permissive Aggregation Group is Top-Heavy, only those plans which are part of the Required Aggregation Group will be subject to the additional requirements applicable to Top-Heavy plans as herein provided.

7.5.    Special Minimum Benefit Requirement in Event Plan Becomes Top-Heavy.  In the event that the Plan shall be determined to be Top-Heavy as to any Plan Year, the following special minimum benefit requirement shall become operative for such Plan Year: If a Participant's employment is terminated during a Top-Heavy Plan Year, his annual Retirement Income expressed as a single life annuity at Normal Retirement Age (as defined in the respective Parts) shall be the greater of : (1) the amount of the Normal Retirement Income determined under the respective Parts; or (2) his "average annual compensation" times the lesser of (i) 2% times his Years of Service, or (ii) 20%, offset by the Employer's contributions to his account in any defined contribution plan maintained by the Employer during any Top-Heavy Plan Year.  For such purposes, "average annual compensation" shall mean a Participant's average annual compensation for the period of consecutive years (not exceeding five) when the Participant had the highest aggregate compensation from the Employer.  "Years of Service" shall only include a Year of Service if a Top-Heavy Plan Year ended during such year.

7.6.    Minimum Vesting.  If a Participant's employment is terminated prior to his being eligible for a retirement benefit and prior to his being credited with at least five (5) Years of Service but after being credited with at least three (3) Years of Service, he shall be entitled to Retirement Income if his termination of employment occurs during a Top-Heavy Plan Year.  A Participant entitled to benefits under this paragraph shall be eligible to receive his Retirement Income in the manner provided in the respective Parts.

-24-

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000507

7.7.    <u>Terminated Participants</u>.  This Article 7 shall not apply to any Participant who does not complete an Hour of Service after the Plan becomes Top-Heavy.

7.8.    <u>Termination of Top-Heavy Status</u>.  In the event that the Plan is Top-Heavy within the meaning of Section 416 of the Code for any Plan Year, and in a subsequent Plan Year the Plan ceases to be Top-Heavy, a Participant so credited with at least five (5) Years of Service as of his last day of the Top-Heavy Year may elect, on termination of employment, to receive Retirement Income as if such termination had occurred during a Top-Heavy Plan Year.

7.9.    <u>Multiple Top-Heavy Plans</u>.  In the event that a Participant in the Plan is also participating in another qualified retirement plan maintained by the Company or an Affiliated Company during a Plan Year in which both the Plan and such other plan are Top-Heavy, the Participant shall receive the minimum contribution or benefit under the other plan in lieu of the minimum benefit provided for in Section 7.5 of this Plan.

PHLEGAL: #650902.v7 (dy8md71.WPD)

PHI000508

## ARTICLE 8
## AMENDMENT AND TERMINATION

8.1. <u>Company's Right to Amend the Plan</u>. The Company reserves the right at any time and from time to time, and retroactively if deemed necessary or appropriate to meet the requirements of Code Section 401(a), ERISA or any other law affecting the Plan, to amend any provision of the Plan; provided, however, that no such amendment shall make it possible for any part of the corpus or income of the Trust Fund to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and their joint annuitants and beneficiaries under the Plan prior to the satisfaction of all Plan liabilities, nor shall any amendment make it possible to deprive any Participant of a previously accrued benefit, or eliminate or reduce an early retirement benefit or a retirement-type subsidy (as defined in the applicable regulations) or eliminate an optional form of benefit, except to the extent permitted by Code Section 412(c)(8). Amendments to the Plan may be adopted by action of the Board of Directors or the Personnel and Compensation Committee of the Board of Directors, or such other person to who such authority has been delegated as set forth in Article 4.

8.2. <u>Participant's Rights Not to Be Affected By Merger</u>. In the event of any merger or consolidation with, or transfer of assets or liabilities to, any other plan, each Participant (if the Plan were to terminate immediately after the merger, consolidation, or transfer) shall be entitled to receive a benefit which is not less than the benefit he would have been entitled to receive if the Plan had terminated immediately before the merger, consolidation, or transfer. In the case of a merger with or transfer of assets and liabilities from a defined benefit plan whose liabilities are less than three percent (3%) of the assets of the Plan, a special schedule of benefits (consisting of all benefits that would be provided by the transferor plan on a termination basis just prior to the merger or transfer) shall be prepared and, in the event of a termination of this Plan within five (5) years of the date of the merger or transfer, such benefits shall be payable in a priority category higher than the highest priority category of ERISA Section 4044 as those categories are set forth in Section 8.3.

8.3. <u>Distribution or Allocation of Assets Upon Complete or Partial Termination of Plan</u>. While the Company intends to continue the Plan indefinitely, nevertheless it assumes no contractual obligation as to its continuance and the Board of Directors or the Personnel and Compensation Committee of the Board of Directors may terminate the Plan at any time. In the event there is a termination or partial termination of the Plan, all Participants' interests in the Plan shall be nonforfeitable to the extent of the sufficiency of the Plan assets and such assets shall be allocated in accordance with ERISA Section 4044 for the purposes of providing Retirement Income and survivor's benefits accrued under the Plan to the date of the termination of the Plan as follows:

-26-

PHI000509

8.3.1.  <u>Benefits in Pay Status 3 Years Prior to Plan Termination</u>.  First, an amount equal to the value of the Retirement Income (excluding any increases in such Retirement Income resulting from Plan amendments during the preceding five (5) years), accrued to all Participants, their joint annuitants and beneficiaries:

(a)    To whom Retirement Income benefits have been in pay status for at least three (3) years prior to the date of Plan termination (taking the lowest benefit in pay status during the last three (3) years preceding the date of Plan termination); and

(b)    To whom Retirement Income benefits (other than those described in the foregoing subparagraph) would have been in pay status had an eligible Participant actually retired on a Retirement Date at least three (3) years prior to the date of Plan termination, as if such Retirement Income benefits had commenced under the normal form of benefit payment under the Plan as of the beginning of such period.

8.3.2.  <u>Other Benefits Guaranteed by the PBGC</u>.  Second, an amount equal to the value of all other nonforfeitable Benefits under the Plan (other than those Benefits which become non-forfeitable solely because of the termination of the Plan) to the extent such Benefits are guaranteed by the Pension Benefit Guaranty Corporation.

8.3.3.  <u>All Other Nonforfeitable Benefits</u>.  Third, an amount equal to the value of all other nonforfeitable Benefits under the Plan.

8.3.4.  <u>All Other Benefits</u>.  Fourth, an amount equal to the value of all other Benefits under the Plan.

8.3.5.  <u>Excess To Be Refunded To Employer</u>.  Fifth, if any amounts remain after complete allocation for the purposes of Sections 8.3.1 through 8.3.4 above, such amounts shall be paid to the Employer upon the complete termination of the Plan.

Such allocation for Participants and beneficiaries in each of the above priority groups will be on the basis of the lump sum equivalent value of the retirement Benefit of each determined as of the date the Plan was terminated or partially terminated on the basis of annuity rates currently available from a leading insurance company designated by the Committee for this purpose, with no commitment to actually purchase annuities from such insurance company.  The market values available for each priority group will be allocated to Participants and beneficiaries in that group up to but not exceeding lump sum equivalent value.  In priority group First, the allocation will be pro-rata.  Except as otherwise required by ERISA Section 4044(b), in priority group Second, Third and Fourth, it will be in order of age, oldest first.  Any market value remaining after full allocation to all Participants and beneficiaries will be allocated to the Employer.

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000510

Any fluctuation in market value, up or down, prior to the date of actual application or distribution will be shared pro-rata by the persons, including the Employer, to whom such market value was allocated pursuant to the preceding paragraph. Eventual distribution to Participants, beneficiaries, and the Employer will be on the basis of market values at the time of such distribution.

8.3.6.  <u>Allocations Within Priority Groups</u>.  In the event assets shall be insufficient to provide in full the interests described in the priority groups identified in Sections 8.3.1, 8.3.3, 8.3.4, the available assets for such groups shall be allocated among the individuals, interests described in such groups, pro-rata among such individuals, interests on the basis of the present value (as of the Plan termination date) of their respective interests as described in such paragraph, and not previously provided for under the Trust Agreement. In the event that the assets available for allocation under Section 8.3.2 are insufficient to satisfy in full the Benefits of Participants described within that Section, the available assets for such class shall be allocated on the basis of the Benefits of Participants of that class and their joint annuitants and beneficiaries, not previously provided for under the Trust Agreement, based upon the Plan as in effect at the beginning of the five (5) year period ending on the date of Plan termination; or, if additional assets remain available for allocation under Section 8.3.2, the available assets shall be allocated on the basis of the Plan as amended by the most recent Plan amendment effective during such five (5) year period, under which the assets available for allocation are sufficient to satisfy in full the Benefits of the class of individuals described in Section 8.3.2; and any assets thereafter remaining to be allocated under Section 8.3.2 shall be allocated on the basis of the Plan as amended by the next succeeding Plan amendment effective during such five (5) year period.

8.3.7.  <u>Partial Termination</u>.  Notwithstanding any provision in the Plan to the contrary, in the event of a partial termination, the allocation prescribed in this Section 8.3 shall be performed for the sole purpose of determining the extent to which unvested Participants' Benefits affected by the partial termination shall be vested, to the extent funds are allocated to such Benefits as of the date of partial termination. Any Participants who are not affected by the partial termination shall not become vested on account of such partial termination. After such determination, the allocation of assets as of such partial termination shall become inapplicable with respect to any future termination or partial termination.

8.4.  <u>Provision to Prevent Discrimination</u>.  In the event of termination of the plan, the Benefit payable to any Highly Compensated Employee (and any former Highly, Compensated Employee) will be limited to a Benefit that is nondiscriminatory under Section 401(a)(4) of the Code.

PHLEGAL: #650902.v7 (dy8m07LWPD)

PHI000511

8.4.1.  The annual payments under the Plan to or on behalf of any employee described in Section 8.4.3 shall be restricted to an amount in each taxable year of the Employee equal to the payments that would be made to or on behalf of the Employee under:

(a)    A straight life annuity that is the Actuarial Equivalent of the Accrued Benefit and other Benefits to which the Employee is entitled under the Plan (other than a Social Security Supplement), and

(b)    The amount of the payments that the Employee is entitled to receive under a Social Security Supplement.

8.4.2.  The restrictions in Section 8.4.1 above shall not apply, if any of the following requirements are satisfied:

(a)    After payment to or on behalf of an Employee described in Section 8.4.3 of all Benefits payable to or on behalf of the Employee, the value of Plan assets equals or exceeds 110% of the value of Current Liabilities;

(b)    The value of Benefits payable to or on behalf of an Employee described in Section 8.4.3 is less than 1% of the value of the Current Liabilities before distribution; or

(c)    The value of the Benefits payable to or on behalf of an Employee described in Section 8.4.3 does not exceed the amount described in Section 411(a)(11)(A) of the Code.

8.4.3.  The Employees whose Benefits are restricted on distribution include all Participants and former Participants who are Highly Compensated Employees. A Participant or former Participant who is a Highly Compensated Employee is not subject to restriction under this Section if he is not one of the 25 Employees and former Employees of the employer with the largest amount of Compensation in the current or in any prior Plan Year.

8.4.4.  Valuation.  Any reasonable and consistent method selected by the Committee may be used to determine the value of Current Liabilities and Plan Assets.

8.5.    Definitions.  For purposes of Sections 8.3 and 8.4 the following definitions shall apply:

(a)    Accrued Benefit means the Normal Benefit payable at Normal Retirement Date determined pursuant to the Plan.  In the event a Participant terminates employment prior to his Normal Retirement Date, the Accrued Benefit shall be equal to the Normal Retirement Benefit computed as of the date of termination of employment.

-29-

PHI000512

(b)     <u>Actuarial Equivalent</u> means the equivalent of the benefit otherwise payable to a Participant or a survivor, whichever is applicable using the factors set forth in Schedule A of the Delmarva Sub-Plan.

(c)     <u>Benefit</u> means, among other benefits under the Plan, loans in excess of the amounts set forth in Section 72(p)(2)(A) of the Code, any periodic income, any withdrawal values payable to a living or former Employee, and any death benefits under the Plan not provided for by Insurance on the Employee's or Former Employee's life.

(d)     <u>Current Liabilities</u> shall have the meaning set forth in Section 412(l)(7) of the Code.

(e)     <u>Compensation</u> means any amount paid to the Participant by the Employer paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125, and excluding, contributions the Employer makes to this or any other benefit plan, any amounts paid in the form of fringe benefits (including, but not limited to reimbursed moving expenses, insurance, and the like; provided, however, that effective January 1, 1996, meal allowances shall not be excluded as fringe benefits) and any dividend rights earned under any executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes.  In determining whether a payment is includible under this definition, the rules for the safe harbor definition set forth in Treas. Reg. Section 1.415-2(d)(10), as adjusted by Treas. Reg. Section 1.414(s)-1(c)(3) and (4) shall be applied.  Notwithstanding the foregoing, annual Compensation taken into account for a Participant shall not exceed $160,000 or such higher amount as permitted under Section 401(a)(17).

(f)     <u>Highly Compensated Employee</u> shall have the meaning set forth in Section 414(q) of the Code.

(g)     <u>Social Security Supplement</u> shall have the meaning set forth in Treas.  Reg. § 1.411(a)-7(c)(4)(ii).

-30-

PHI000513

## ARTICLE 9
## GENERAL PROVISIONS

9.1.    Incapacity.  If any person shall be physically or mentally incapable of receiving or acknowledging receipt of any payment of pension benefits hereunder, the Plan Administrator or Trustee, upon the receipt of satisfactory evidence that such person is so incapacitated and that another person or institution is maintaining him or her and that no guardian or committee has been appointed for him or her, may provide for such payment of pension benefits hereunder to such person or institution so maintaining him or her and any such payments so made shall be deemed for every purpose to have been made to such person.

9.2.    Merger.  In the case of any merger or consolidation of the Plan, with, or transfer of assets or liabilities respecting the Plan to, any other Plan, each Participant or Beneficiary in the Plan would (if the Plan had then terminated) receive a benefit hereunder immediately after such merger, consolidation or transfer which is no less than the benefit he or she would have been entitled to receive immediately before such merger, consolidation or transfer (if the Plan had then terminated).

9.3.    No Specific Rights.  Nothing contained herein shall be deemed to give any Participant any interest in any specific property of the Trust or any right except to receive a pension or other benefit as expressly provided for in the Plan.

9.4.    Employment Rights.  Participation in the Plan shall not give any right to any Employee to be retained in the employ of the Employer nor shall it interfere with the right of the Employer to discharge any Employee and to deal with him or her without regard to the existence of the Plan and without regard to the effect that such treatment might have upon him or her as a Participant in the Plan.

9.5.    Plan Benefits Nonassignable.  Except as required under a qualified domestic relations order, as defined in Code Section 414(p), or as may otherwise be provided by law, no distribution or payment under the Plan to any Participant, beneficiary, or joint annuitant shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, whether voluntary or involuntary, and any attempt to so anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void; nor shall any such distribution or payment be in any way liable for or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to such distribution or payment.  If any Participant, beneficiary, or joint annuitant is adjudicated bankrupt or purports to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge any such distribution or payment, voluntarily or involuntarily, the Administrator, in his discretion, may hold or cause to be held or applied such distribution or payment or any part thereof to or for the benefit of such Participant, beneficiary, or joint annuitant in such manner as the Administrator shall direct.

-31-

PHI000514

9.6.    Alienation.

9.6.1.  The income and principal of the Trust Fund are for the sole use and benefit of the Participants and beneficiaries of the Plan, and, to the extent permitted by law, shall be free, clear, and discharged of and from, and are not to be in any way liable for, debts, contracts or agreements, now contracted or which may hereafter be contracted, and from all claims and liabilities now or hereafter incurred by any Participant or beneficiary.  It is intended by the Company that the Trust Fund shall constitute a spendthrift trust under the laws of the state in which the Participant is domiciled.  No Participant shall have the right to commute, withdraw, surrender, encumber, alienate or assign any of the income or principal of the Trust Fund or any of the benefits to become due unto any person or persons under the Trust Agreement or the Plan except as specifically provided by the terms thereof.

9.6.2.  The provisions of Section 9.6.1 shall not apply to a "qualified domestic relations order" as defined in Code Section 414(p).  The Plan Administrator shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders.  Further, to the extent provided under a qualified domestic relations order, a former spouse of a Participant shall be treated as the spouse or surviving spouse of the Participant for all purposes under the Plan.

9.7.    Employer's Liability Limited to Assets in the Plan.  The Trust Fund shall be the sole source of benefits under this Plan, and each Employee, Participant, joint annuitant, beneficiary, or any other person who shall claim the right to any payment or benefit under this Plan shall be entitled to look only to the Trust Fund for payment of benefits.  Except as may be otherwise provided by ERISA or other applicable law, the Employer shall have no liability to make or continue from its own funds the payment of any benefit under the Plan.

9.8.    Applicable Law.  The Plan shall be governed by, and construed in accordance with, the laws of the State of Delaware except to the extent that such laws have been specifically preempted by ERISA or other Federal legislation.

9.9.    Severability of Provisions.  If any provision or portion of a provision of the Plan is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the balance of the Plan.  The Plan shall be construed and enforced as if such provision had not been included, provided, however, the Plan shall be reformed only to the extent necessary to comply with applicable laws.

PHLEGAL: #650902 v7 (dy8m07l.WPD)

PHI000515

9.10.  <u>Missing Participant</u>.  In the event that all or any portion of a pension or other distribution payable to a Participant remains unpaid solely by reason of the inability of the Plan Administrator, after a good faith effort, to ascertain the address of such Participant, the amount so distributable shall be forfeited.  In the event a Participant is located subsequent to the forfeiture, such benefit shall be restored.

9.11.  <u>Gender, Tense and Headings</u>.  Whenever any words are used herein in the masculine or feminine gender, they shall be construed as though they were also used in the opposite gender in all cases where they would so apply.  Whenever any words used herein are in the singular form, they shall be construed as though they were also used in the plural form in all cases where they would so apply.  Headings of Articles and Sections as used herein are inserted solely for convenience and reference and constitute no part of the Plan.

9.12.  <u>Protected Benefits</u>.  The Plan shall preserve any protected benefits as defined in Code Section 411(d) of the Code or the regulations promulgated thereunder in any of the prior plans for the benefit of the Participants who were covered by such prior plan.

-33-

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000516

ARTICLE 10
FINANCING THE PLAN

10.1.    No Participant Contributions.  Participants shall make no contributions under the Plan.

10.2.    Employer Contributions.  The Employer shall make such contributions from time to time which it shall deem necessary to provide the benefits of this Plan.  The minimum amount of such contributions shall be that amount which is required to meet the minimum funding standard of ERISA  (unless waived pursuant to the Code) or otherwise to maintain the Plan's qualification under Code Section 401(a).  However, the Employer is under no obligation to make any contributions under the Plan after the Plan is terminated, whether or not benefits accrued or vested prior to such date of termination have been fully funded.  Any forfeitures under the Plan shall be applied to reduce the Employer's periodic contributions and shall not increase the benefit otherwise payable to any Participant.

10.3.    Plan Funds to be Held in Trust.  All Employer contributions in connection with the Plan shall be paid to a Trustee under a Trust Agreement established in connection with the Plan.  All such contributions and the earnings thereon shall be held and disbursed in accordance with the provisions of the Plan and the Trust Agreement.  No person shall have any interest in, or right to, any part of the funds held in the Trust, except as expressly provided in the Plan and the Trust Agreement.

10.4.    Trust for the Exclusive Benefit of Plan Participants.  The Plan assets held in trust shall not inure to the benefit of the Employer prior to the satisfaction of all liabilities of the Plan and shall be held for the exclusive purposes of providing benefits to Participants and/or their joint annuitants and beneficiaries, and for defraying the reasonable expenses of administering the Plan.  However, if an Employer contribution is conditioned upon deductibility of the contribution under the Code Section 404, then, to the extent the deduction is disallowed, the contribution (to the extent disallowed) shall be returned to the Employer within one (1) year after the date the deduction is disallowed.  In addition, if a contribution or any portion thereof is made by the Employer by a mistake of fact, the contribution or such portion shall be returned to the Employer within one (1) year after the date of payment.

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000517

CONECTIV RETIREMENT PLAN

<u>SCHEDULE B</u>

The following retroactive effective dates indicate changes to Prior Plan provisions as required by changes in laws and regulations pursuant to Rev. Proc. 97-41. Where indicated, the provisions as set forth in the Plan and its Sub-Plans are effective on the indicated retroactive dates as if they were set forth in the respective Prior Plans as of such dates.

| <u>Effective Date</u> | <u>Provision</u> | <u>Delmarva Retirement Plan</u> | <u>Atlantic City Electric Plan</u> |
|---|---|---|---|
| December 12, 1994 | "USERRA" compliance (Code section 414(u)) | Delmarva Sub-Plan §1.28.1(e) | Ace Sub-Plan §3.8 |
| January 1, 1997 | Family aggregation rules eliminated (Code section 401(a)(17)) | Delmarva Sub-Plan §1.9 | Ace Sub-Plan §1.16 |
| January 1, 1997 | "Highly Compensated Employee" definition revised (Code section 414(q)(1)) | Base Plan §8.4 and §8.5(f) | Base Plan §8.4 and §8.5(f) |
| January 1, 1997 | "Leased Employee" definition revised (Code section 414(n)(2)) | Base Plan §3.19.6 | Base Plan §3.19.6 |

For purposes of the Plan, the following provisions are effective on or after the Effective Date and, thus, do not require retroactive effective dates:

(i)    Required Beginning Date, Code section 401(a)(9) (Base Plan §3.33);

(ii)    $5,000 involuntary cash-out threshold, Code section 411(a)(11) (Base Plan §2.2.2 and §6.3.7; Delmarva Sub-Plan §5.4.1(b) and §6.3.2(a), (b); Ace Sub-Plan §4.6);

(iii)    GATT actuarial equivalent, Code section 417(e)(3)(A) (Delmarva Sub-Plan Schedule A; ACE Sub-Plan Schedule A); and

(iv)    Repeal of combined plan limits, Code section 415(e) (Base Plan §5.3).

-35-

PHI000518

## CONECTIV RETIREMENT PLAN

### SCHEDULE C
### (EFFECTIVE JANUARY 1, 1999)

The following table indicates Employers that have become participating employers in the Plan and, where indicated, those Employees who are eligible for participation in the Plan.

| Corporation | Effective Date/Prior Service | Comments |
|---|---|---|
| Conectiv Resource Partners | | |
| Atlantic City Electric | | FET employees represented by Local 210 are in cash balance sub-plan unless agreement specifies otherwise |
| Delmarva Power & Light | | |
| Conectiv Services, Inc. | | Only employees who had been Participants in the Plan or a Prior Plan immediately prior to transfer to CSI |
| Conectiv Communications | | |
| Conectiv Thermal | See CB Sub-Plan §1.54.1(c) | |
| Atlantic Energy Enterprises | See CB Sub-Plan §1.54.1(c) | |
| Conectiv Solutions LLC | Prior service with Power Consulting Group | Power Consulting Group employees only |

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000519

**CONECTIV**

**CERTIFICATION OF VICE PRESIDENT
FOR HUMAN RESOURCES AND PRODUCTIVITY IMPROVEMENT**

I, Donald E. Cain, Vice President for Human Resources and Productivity Improvement of Conectiv (the "Company"), a Delaware corporation, hereby certify that I approve the adoption of the Conectiv Retirement Plan (the "Plan") document in the form attached hereto, effective January 1, 1999.  My approval is given pursuant to the adoption of the Plan by the Personnel & Compensation Committee of the Board of Directors (the "Committee") of the Company on April 23, 1998 and the authorization of the Committee granted to me at a meeting of the Committee held on April 23, 1998.

Date:  December 10, 1999

_Donald E Cain_
_____

Donald E. Cain
Vice President for Human Resources and
Productivity Improvement

PHI000520