IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated | : : : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 05-702 (SLR) |
| | : | |
| PEPCO HOLDINGS, INC.; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | : : | |
| | : | |
| Defendants | : | |
| | : | |

**DEFENDANTS' ANSWERING BRIEF
IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Larry R. Wood, Jr. (Del. Bar No. 3262)
Kay Kyungsun Yu
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000 (telephone)
215.981.4750 (fax)

M. Duncan Grant (Del. Bar No. 2994)
Phillip T. Mellet (Del. Bar No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
302.777.6500

Susan K. Hoffman
James Boudreau
LITTLER MENDELSON PC
Three Parkway
1601 Cherry Street
Philadelphia, PA  19102
267.402.3015 (telephone)
267.430.7275 (fax)

Attorneys for Defendants

Dated: February 16, 2007

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................................1

II.   STATEMENT OF FACTS ................................................................................................2

    A.   The Former ACE and Delmarva Final Average Pay Plans ..................................2

    B.   The Creation of the Cash Balance Plan ................................................................3

    C.   Defendants' Communications Explaining the Cash Balance Plan ........................6

    D.   Allegations of the Complaint................................................................................8

    E.   Plaintiffs' Lack of Due Diligence.........................................................................9

        (1)   Charles ...................................................................................................10
        (2)   Troup .....................................................................................................10
        (3)   Fink .......................................................................................................10
        (4)   Ward ......................................................................................................11

III.  SUMMARY OF ARGUMENT......................................................................................12

IV.   ARGUMENT.................................................................................................................15

    A.   Standard of Review .............................................................................................15

    B.   Plaintiffs Have Not Carried Their Burden Under Rule 23(a)............................16

      1.   The Existence of Intraclass Conflicts Renders Plaintiffs Inadequate
         Representatives ...................................................................................................16

        a.   Not All Class Members Benefit From Undoing the Conversion..............16
        b.   Plaintiffs Cannot Represent Class Members Who Signed Releases .........22

      2.   Plaintiffs' Claims Are Subject to Unique Deficiencies and Defenses And Thus
         Their Claims Are Not Typical ...........................................................................24

        a.   Plaintiffs Lack Standing to Sue Under ERISA § 204(h)...........................25
        b.   Plaintiffs' Individual Claims Are Time Barred .......................................26

    C.   Plaintiffs Have Not Met Their Burden Under Rule 23(b) ..................................27

      1.   This Case Cannot Be Certified Under Rule 23(b)(3) ........................................28

        a.   Plaintiffs' Claims Under ERISA § 204(h) Are Inherently Individualized ...............28
        b.   Plaintiffs' Other Non-Stayed Claims Are Inherently Individualized .......................29

c.  The Application of the Statute of Limitations Raises Highly Individualized Issues ..................................................................30

d.  The Validity of Releases Presents Individualized Issues ...........................32

e.  The Standing of Former Participants under ERISA Presents Individualized Issues ..................................................................33

2.  This Case Cannot Be Certified Under Rule 23(b)(2) ....................................34

3.  This Case Cannot Be Certified Under Rule 23(b)(1) ....................................35

a.  Certification Is Inappropriate Under (b)(1)(A).........................................36

b.  Certification Is Inappropriate Under (b)(1)(B).........................................36

D.  The Class Definition Improperly Include Plan Fiduciaries ...............................37

V.  CONCLUSION ...............................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Access Now, Inc. v. Walt Disney World Co.*, 203 F.R.D. 529 (M.D. Fla. 2001) .......................... 27

*Barnes v. The American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) ........................................... 35

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006) ............................................................. 15, 24

*Carlstrom v. Decision One Corp.*, 217 F.R.D. 514 (D. Mont. 2003) ...................................... 21, 22

*Coburn v. DaimlerChrysler Services North America, LLC*, Civ. A. No. 03-00759, 2005
  WL 736657 (N.D. Ill. Mar. 31, 2005) ..................................................................................... 2

*Cooper v. IBM Person Pension Plan*, Civ. A. No. 99-829-GPM, 2005 WL 1981501 (S.D.
  Ill. Aug. 16, 2005), *rev'd* 457 F.3d 636 (7th Cir. 2006) ......................................................... 8

*Donaldson v. Exelon Corp.*, Civ. A. No. 05-1542, 2006 WL 2668573
  (E.D. Pa. Sept. 14, 2006) .................................................................................................... 27

*Dondore v. NGK Metals Corp.*, Civ. A. No. 00-2441, 2001 WL 516635
  (E.D. Pa. May 16, 2001) ...................................................................................................... 37

*Engers v. AT & T*, 428 F. Supp. 2d 213 (D.N.J. 2006) .......................................................... 25, 26

*Ericson v. Greenberg & Company, P.C.*, 118 Fed. Appx. 608 (3d Cir. 2004) ........................... 33

*Evans v. Akers*, Civ. A. No. 04-11380-WGY, 2006 WL 3518305
  (D. Mass. Dec. 6, 2006) ...................................................................................................... 33

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) ...................................................... 34

*Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996),
  *aff'd* 521 U.S. 591 (1997) ................................................................................................ 17, 21

*Greeley v. KLM Royal Dutch Airlines*, 85 F.R.D. 697 (S.D.N.Y. 1980) ...................................... 23

*Hargrave v. TXU Thrift Plan*, 392 F. Supp. 2d 785 (N.D. Tex. 2005) .......................................... 33

*Huegel v. City of Easton*, Civ. A. No. 00-5077, 2002 WL 32348320
  (E.D. Pa. Oct. 23, 2002) ...................................................................................................... 36

*Johnston v. HBO Film Management, Inc.*, 265 F.3d 178 (3d Cir. 2001) ...................................... 15

#8323439 v1

**Page(s)**

*Langbecker v. Electronic Data System Corp.*, __ F.3d ___, 2007 WL 117465
(5th Cir. Jan. 18, 2007) ................................................................................................ 20, 21, 22

*Leroy v. Paytel III Management Associates, Inc.*, Civ. A. No. 91-1933,
1992 WL 367090 (S.D.N.Y. Nov. 24, 1992) ............................................................. 27

*Leuthner v. Blue Cross and Blue Shield of Northeastern Pennsylvania*,
454 F.3d 120 (3d Cir. 2006) ..................................................................................... 34

*In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir. 2002) ................................................ 31

*Melong v. Micronesian Claims Commission*, 643 F.2d 10 (D.C. Cir. 1980) ......................... 22, 23

*Miller v. Fortis Benefits Insurance Co.*, __ F.3d __, 2007 WL 210370
(3d Cir. Jan. 29, 2007) .............................................................................................. 27

*Newton v. Merrill, Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154
(3d Cir. 2001) ........................................................................................ 15, 28, 29, 30, 34

*Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000) ................................................. 21

*Register v. PNC Financial Services Group, Inc.*, __ F.3d __, 2007 WL 222019 (3d Cir.
2006) ............................................................................................................................ 1, 22

*Richards v. Fleet Boston Financial Corp.*, 235 F.R.D. 165 (D. Conn. 2006) ............................... 22

*Romero v. Allstate Corp.*, 404 F.3d 212 (3d Cir. 2005) ........................................................... 26, 27

*Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90 (W.D. Mo. 1997) ......................... 36

*Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307 (S.D.N.Y. 2003) ...................................... 23, 33

*Stewart v. Avon Products, Inc.*, Civ. A. No. 98-4135, 1999 WL 1038338 (E.D. Pa. Nov.
15, 1999) .................................................................................................................... 23, 24

*Swoope v. BellSouth Telecommunications, Inc.*, Civ. A. No. 97-181, 1998 WL 433952
(N.D. Miss. June 23, 1998) ....................................................................................... 23

*Truckway, Inc. v. General Electric*, Civ. A. No. 91-0122, 1992 WL 70575 (E.D. Pa. Mar.
30, 1992) .................................................................................................................... 36

*In re Unisys Corp. Retiree Medical Benefits Litigation*, 2003 WL 252106 (E.D. Pa. Feb.
4, 2003) ................................................................................................................ 31, 32, 35

*United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274 (7th
Cir. 1985) ................................................................................................................... 21

#8323439 v1

**Page(s)**

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003)..............17, 21

*Walker v. Asea Brown Boveri, Inc. Cash Balance Pension Plan*, 214 F.R.D. 58 (D. Conn. 2003)..........................................................................................................23, 24, 33

**STATUTES**

29 U.S.C. § 1132(a)...........................................................................................................33

ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C)..........................................9

ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G) ......................................................9

ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H) ......................................................9

ERISA § 204(h), 29 U.S.C. § 1054(h)......................................................................9, 25

Fed. R. Civ. P. 23...................................................................................................*passim*

**SECONDARY SOURCES**

C. Wright and A. Miller, 7A *Federal Practice and Procedure* § 1768.........................16

#8323439 v1

## I.    NATURE AND STAGE OF PROCEEDINGS

On September 26, 2005, Plaintiffs J. Michael Charles, Maurice Ward, and Joseph

Fink filed this putative class action, alleging that the Conectiv Cash Balance Sub Plan (the "Cash

Balance Plan") violates the Employee Retirement Income Security Act of 1974 ("ERISA").

(D.I. 1.)  Plaintiff Thomas Troup, represented by the same counsel, filed an almost identical

Complaint on January 5, 2006, which has been consolidated with the *Charles* action.  (D.I. 34.)

As Plaintiffs explained in their Complaint, they

> bring this action seeking appropriate declaratory, injunctive or
> other relief, including a declaration that the Cash Balance Sub
> Plan, which went into place through amendment of defined benefit
> plans maintained by the Atlantic City Electric Company and the
> Delmarva Power and Light Company, is invalid and that the
> accrued benefits of plaintiffs and each member of the class should
> therefore be calculated under and pursuant to the terms of the
> predecessor plans sponsored by the Atlantic City Electric
> Company and the Delmarva Power and Light Company.

(D.I. 1, ¶ 1.)  In other words, the purpose of this action is to undo the conversion to the Cash

Balance Plan and to reinstate *in toto* the immediate predecessor plans.

This Court had earlier denied Defendants' Motion to Dismiss three counts of the

Complaint, but stayed Defendants' Motion as to Plaintiffs' principal claim, that the Cash Balance

Plan allegedly violates ERISA § 204(b)(1)(H), pending the Third Circuit's ruling in *Register v.*

*PNC Financial Servs. Group, Inc.*  (D.I. 30 and 31.)  On January 30, 2007, the Third Circuit held

that the Complaint in *Register*, which asserted almost identical allegations under not only

204(b)(1)(H) but also ERISA § 204(h)'s notice provision and ERISA's "backloading"

requirements, failed to state a claim for relief.  *See Register v. PNC Financial Servs. Group, Inc.*,

__ F.3d __, 2007 WL 222019 (3d Cir. 2006).  Defendants are accordingly concurrently filing

both a Notice of Supplemental Authority in support of their Motion to Dismiss and a Motion

seeking leave to file an early Motion for Summary Judgment on Plaintiffs' individual claims, as

permitted by Federal Rule 23. *See generally Coburn v. DaimlerChrysler Services North America, LLC*, Civ. A. No. 03-00759, 2005 WL 736657 at *7-8 (N.D. Ill. Mar. 31, 2005) (holding that it was appropriate to address merits of putative class representatives' individual claims on summary judgment before ruling on class certification).

After the Court's Motion to Dismiss ruling, the parties engaged in fact discovery, which is now virtually complete. Plaintiffs have produced the relevant documents within their possession and have been deposed. Defendants responded to Plaintiffs' Interrogatories and produced documents required by this Court's Order of November 14, 2006, which defined the appropriate scope of document discovery. (D.I. 62.)

Plaintiffs now move for class certification. Regardless of the merits (or lack thereof) of this case, this is not an appropriate case for class treatment. Although Plaintiffs purport to represent nearly all participants in the Cash Balance Plan, many of those participants do not share their interest in undoing the Cash Balance Plan because they benefited from the plan conversion. As it is black letter law that Plaintiffs cannot represent absent class members with conflicting interests, their Motion should be denied.

Moreover, as explained below, Plaintiffs' claims are beset by unique defenses, rendering them atypical. Finally, all of their claims, plus the affirmative defenses of the statute of limitations and of release, require highly individualized inquiries rendering certification improper under any of the three subsections of Rule 23(b).

## II.    STATEMENT OF FACTS

### A.    The Former ACE and Delmarva Final Average Pay Plans

On March 1, 1998, the Atlantic City Electric Company ("ACE") and Delmarva Power and Light Company ("Delmarva") became wholly-owned subsidiaries of Conectiv. (D.I. 1, ¶ 17.) At that time, ACE and Delmarva both sponsored "final average" pension pay plans,

under which a participant's benefit, measured as an annuity, was the product of average salary, years of service, and a multiplication factor (the "ACE Final Average Pay Plan" and the "Delmarva Final Average Pay Plan"). (App. at B1, ¶ 2.) The ACE Plan prohibited participants from withdrawing benefits, either as a lump sum payment or an annuity, until at least age 55.[1] (App. at B2, ¶ 3.) Similarly, the Delmarva Plan only permitted participants to withdraw benefits before retirement under limited circumstances. (App. at B2, ¶ 4.) Thus, if an employee chose to leave ACE at age 35 after 10 years' service, benefits could not be accessed for at least twenty years. (App. at B2, ¶ 5.)

**B.    The Creation of the Cash Balance Plan**

On April 23, 1998, Conectiv's Board of Directors amended the ACE and Delmarva Final Average Pay Plans to establish the Cash Balance Plan effective January 1, 1999. (App. at B2, ¶ 6.) The Cash Balance Plan covered all employees not represented by a union. (*Id.*) The Cash Balance Plan calculates benefits through the use of a hypothetical "account." (App. at B2, ¶ 7.) Each year, Conectiv credits a certain percentage of each employee's pay to this account, with the percentages increasing with age. (*Id.*) The Cash Balance Plan also provides an "interest credit," whereby it increases the amount of each account by an interest percentage based on long-term Treasury bond rates. (App. at B2, ¶ 8.)

For example, if a participant is 40 years old, earns $50,000 per year, had an opening account for the year of $100,000, and the interest credit rate is 5%, then Conectiv will credit each employee's account with $4,000 in pay credits (the applicable 8% pay credit rate times $50,000) plus $5,200 in interest credits (5% interest rate times ($100,000 plus $4,000).

---

[1] The ACE Final Average Pay Plan did, though, provide that participants who terminated employment before accruing benefits with a present value of more than $5,000 could be subject to automatic cash out. (App. at B2, ¶ 3.)

(App. at B3, ¶ 9.)  This employee's account balance would accordingly increase from $100,000 to $109,200.  (*Id.*)

Conectiv structured the Cash Balance Plan so that in most cases the account balance would be identical to the immediate lump sum payment value of the participant's benefits.  (App. at B3, ¶ 10.)  The Cash Balance Plan provides an immediate lump sum payment option when an employee leaves the company, as opposed to being forced to wait until retirement to collect any benefits, as under the former ACE and Delmarva Final Average Pay Plans, *i.e.*, the Cash Balance Plan provides enhanced portability.  (*Id.*)  This benefit has been of real value: of the 520 participants who have elected a form of benefit under the Cash Balance Plan, 500 – that is, approximately *96%* – have requested to receive a lump sum.  (App. at B3, ¶ 11.)

Conectiv also increased survivor benefits under the Cash Balance Plan.  (App. at B3, ¶ 12.)  Under the former ACE and Delmarva Final Average Pay Plans, a surviving spouse could only receive half of the value of a deceased participant's accrued benefit.  (*Id.*)  The Cash Balance Plan provides that surviving spouses receive the full amount of the participant's accrued benefit – an important benefit for an employee with a serious health condition who is concerned about providing for his or her family in the wake of premature death.  (*Id.*)

Furthermore, the Cash Balance Plan, unlike its predecessors, permits participants to provide survivor benefits to individuals other than a spouse, such as a child or a domestic partner.  (App. at B4, ¶ 13.)  This change was an important benefit enhancement for unmarried employees.  (*Id.*)

The Cash Balance Plan amendment also coincided with two other enhancements to the Conectiv benefits package.  First, Conectiv increased the employer matching contributions

in its 401(k) plan, which covered the same employees. (App. at B4, ¶ 14.) Second, Conectiv expanded access to retiree medical coverage. (*Id.*)

Conectiv also took steps to protect the expectations of long-term employees close to retirement. Thus, employees who either attained the age of 50 or completed more than twenty years of service on or before December 31, 1998, the effective date of the Plan conversion, were "grandfathered," *i.e.*, so long as they retired within the next ten years, these long term employees received the larger of the benefits accrued under either the formula contained in their former Final Average Pay Plans or their new Cash Balance Plan formula. (App. at B4, ¶ 15.) Moreover, even if they should retire after January 1, 2009, grandfathered employees will still be entitled to receive the greater of their benefits under the previous plan formula as of December 31, 2008 or the Cash Balance Plan formula as of the date of retirement. (*Id.*)

Conectiv took additional steps to protect other long term employees who were not as close to retirement age. The Cash Balance Plan provides for "transition credits," which are enhanced levels of pay credits for employees who have devoted many years of service to the company. (App. at B4, ¶ 16.) Specifically, the Cash Balance Plans adds an additional 1% pay credit for employees with 10 to 11 years of service; 2% for employees with 12-15 years of service; 3% for employees with 16-19 years of service; and 4% for employees with 20 or more years of service. (*Id.*)

In fact, contrary to Plaintiffs' insinuations, some long-term employees have profited quite handsomely from the conversion to the Cash Balance Plan – ***including the Plaintiffs themselves.*** Below is a table comparing each Plaintiff's accrued benefit, measured as an annuity commencing at age 65 – the standard by which Plaintiffs assert accrued benefits must be measured (D.I. 1, ¶ 40) – under both the Cash Balance Plan presently and what they would

-5-

have been under the previous ACE and Delmarva Final Average Pay Plans had there been no

conversion.  As is evident, each Plaintiff has accrued a higher annuity under the Cash Balance

Plan:

| Plaintiff | Accrued Benefit Measured As An Age 65 Annuity, as of 1/1/2007, Previous ACE/Delmarva Plan | Accrued Benefit Measured As An Age 65 Annuity, as of 1/1/2007, Cash Balance Plan |
|---|---|---|
| J. Michael Charles | $2,858.07/month | $3,117.92/month |
| Maurice Ward | $2,784.19/month | $3,121.09/month |
| Joseph Fink | $2,092.67/month | $2,317.13/month |
| Thomas Troup | $2,706.52/month | $2,762.10/month |

(App. at B6-7, ¶ 19.)

**C.    Defendants' Communications Explaining the Cash Balance Plan**

Realizing that the conversion to the Cash Balance Plan represented a change in

benefits philosophy, Conectiv provided a series of notices to its employees before the January 1,

1999 effective date, including:

- In October 13, 1997, Conectiv distributed a newsletter to all employees titled "EMerging Times" that noted that "A new pension plan will replace the old 'final pay' plans with individual, portable accounts."  (App. at B8-11.)

- One week later, on October 20, 1997, the next issue of "EMerging Times" provided even more detail:  "The design of the plan is not yet finalized, but we know it will be what's called a 'cash balance' plan.  Unlike the companies' current final pay plans that pay a benefit based on a formula applied at the end of your career, the cash balance plan provides each employee with a record keeping account into which the company credits a percentage of pay each year.  The account balance will grow based on a set interest rate."  (App. at B12-15.)

- In May 1998, after the Board adopted the amendment, Conectiv distributed to all employees a "Facts" newsletter.  (App. at B16-23.) Under the heading "New Cash Balance Pension Plan," this newsletter

contains just over three single spaced pages explaining in detail how the Cash Balance Plan operates. *Id.* The newsletter further informed employees that the Cash Balance Plan would be effective January 1, 1999. (*Id.*)

- On December 21, 1998, Conectiv sent to all employees who would be enrolled in the Cash Balance Plan a five page, single-spaced letter outlining in detail how the Cash Balance Plan computes benefits. (App. at B24-28.)

After the Cash Balance Plan went into effect, Conectiv conducted a series of meetings with employees in July 1999 regarding the new pension benefit structure. (App. at B6, ¶ 17(e).) In advance of these meetings, Conectiv distributed a newsletter titled "Mid Week Extra: Cash balance update June 23, 1999" to Cash Balance Plan participants. (*Id.*) This newsletter expressly stated the company's intention to discuss criticism that had been leveled against cash balance pension plans, noting that "recent stories in the national media have raised concerns about some cash balance plans. . . ." (App. at B29-30.)

Conectiv used a standardized Power Point slide presentation in these meetings. (App. at B6, ¶ 17(e).) One of these slides addressed directly the criticisms that were being directed at cash balance plans. That slide read as follows:

Important Perspectives on Conectiv's New Retirement Program

- New plan is a cash balance plan
- Cash balance plans are controversial
  - -- Series of Wall Street Journal articles
  - -- Congressional Hearings
- Criticisms leveled at cash balance plans
  - -- Masks cost cutting
  - -- Poor handling of communication/transition
  - -- Accruals cease for certain employees

-7-

(App. at B32.)  In particular, at each meeting, Conectiv discussed the then-brewing controversy

over IBM's decision to convert to a cash balance plan.  (App. at B6, ¶ 17(e).)  That controversy

resulted in the well-publicized filing of a class action lawsuit against IBM on November 1, 1999

that alleged IBM's cash balance formula violated ERISA.  *See Cooper v. IBM Person Pension*

*Plan*, Civ. A. No. 99-829-GPM, 2005 WL 1981501 at *1 (S.D. Ill. Aug. 16, 2005), *rev'd* 457

F.3d 636 (7th Cir. 2006).

### D.    Allegations of the Complaint

Plaintiffs are each long-term employees of Defendant Conectiv or its

predecessors, having continuously worked for Conectiv or its predecessors since at least 1987.

(D.I. 1, ¶¶ 4-6; D.I. 69, at Ex. 4 ¶ 4.)  Plaintiffs were employees as of the January 1, 1999

conversion to the Cash Balance Plan, and thus benefit from Transition Credits.  *Id.*  Furthermore,

as each Plaintiff is now over fifty years old, Plaintiffs enjoy the maximum Pay Credit rate.  *Id.*

Plaintiffs devote only one paragraph of their Complaint to explaining how they

have allegedly been harmed by the conversion to the Cash Balance Plan.  That paragraph

provides, in full:

> Because the conversion of the account balance to an annuity
> commencing at age sixty-five is sensitive to fluctuations in the
> thirty year treasury rate, participants can actually suffer reductions
> in their accrued benefits under the [Cash Balance Plan].  For
> example, in 1999 and 2000 Plaintiff Charles' accrued benefit
> increased.  Thereafter, it subsequently decreased in three
> consecutive years:  in 2001, his accrued benefit decreased by
> 4.006%; in 2002, it decreased by 6.932%; in 2003, it decreased by
> 2.774%.  This represented a total decrease in his annual annuity
> benefit of over $4,000 between the close of 2000 and the close of
> 2003.  In 2004, Plaintiff Charles' accrued benefit increased by
> 8.43%, but was still significantly lower than the amount of his
> accrued benefit as of the end of calendar year 2000.  In terms of
> the annual amount of annuity benefit, Plaintiff Charles' accrued
> benefit as of December 31, 2004 was over $1,500 less than it had
> been at the end of 2000.  Plaintiffs Ward and Fink similarly
> suffered negative accruals.

-8-

(D.I. 1, ¶ 41.)  Notably, though, each Plaintiff conceded that, measured as a lump sum, their accrued benefits have never declined.  (App. at B45, B56, B64, B69.)

Plaintiffs allege four causes of action based on their supposed injury from changing interest rates.  The Court has stayed Count III, which alleged violations of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and thus that count is not subject to the instant Motion.  The non-stayed counts are as follows.  In Count I, Plaintiffs contend that the Cash Balance Plan violates ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), which prohibits "backloading" of benefits, *i.e.*, requiring a disproportionately large share of retirement benefits to accrue in later years as opposed to earlier years.  *Id.* ¶¶ 42-45.  In Count II of their Complaint, Plaintiffs allege that the Cash Balance Plan violates ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), which provides that the Cash Balance Plan is not lawful "if the participant's accrued benefit is reduced on account of any increase in his age or service."  Finally, in Count IV, Plaintiffs allege that Defendants did not properly amend the previous Plans effective January 1, 1999 to calculate benefits under the cash balance formula because Plaintiffs purportedly did not receive the notice of amendment required by ERISA § 204(h), 29 U.S.C. § 1054(h).  (D.I. 1, ¶ 53.)

### E.    Plaintiffs' Lack of Due Diligence

Even though all four Plaintiffs were employees of Conectiv when the conversion to the Cash Balance Plan occurred on January 1, 1999, they waited until September 2005 – over *six years* later – to file this action.  This lag was not because of a sudden revelation of new information in 2005 (which is not even alleged), but rather because each Plaintiff sat on his rights.  Below is a brief summary of the facts in the record as to each Plaintiff's failure to pursue his alleged rights.

#8323439 v1

### (1)    Charles

On August 20, 2003, Mr. Charles wrote the following in an email to Conectiv's

Human Resources Department:

> Are you following the events of the current class action lawsuit by
> the employees of IBM as it pertains to IBM's decision to convert
> their employees' retirement plan into the Cash Balance Plan?
>
> As one of the A. E. employees that missed the cut off date [for
> grandfathering] of 1/1/99 by both age and time with the Company
> by only a few months (start date 9/10/79 birthday 10/18/49) this
> event has caught my attention. ***I've always felt from the inception
> of the cash balance plan that it was unfair.***

(App. at B72.) (emphasis added). Thus, Mr. Charles has admitted that he believed that his rights

were violated from the "inception" of the Cash Balance Plan in January 1999.

### (2)    Troup

Mr. Troup testified that he attended one of Conectiv's employee meetings in the

summer of 1999 to discuss the new Cash Balance Plan.  (App. at B68.)  Mr. Troup recalled that

there was discussion at that meeting regarding articles that the *Wall Street Journal* had recently

published about employee concerns that their rights were violated by conversions to cash balance

plans.  (*Id.*)  Mr. Troup, however, did nothing after the meeting to follow up on this discussion.

(*Id.*)  Had he exercised the minimal diligence to read the referenced *Wall Street Journal* articles,

Mr. Troup would have learned immediately of the controversies surrounding the legality of cash

balance plans.  *See* App. at B73-82.

### (3)    Fink

Mr. Fink showed a similar dearth of due diligence.  He testified that in 1999 he

heard discussions among his colleagues that there may be problems with the new Cash Balance

Plan.  (App. at B40.)  Mr. Fink admitted that in 1999 he was "***highly suspicious***" that the Cash

Balance Plan would adversely impact his personal finances.  (*Id.*) (emphasis added).  Mr. Fink

-10-

raised his concerns with an acquaintance in the Conectiv Human Resources Department, George

Bleazard.  (App. at B41.)  Mr. Fink testified that Mr. Bleazard informed Mr. Fink that there

would be upcoming meetings at which the new plan would be discussed, but that he (Fink) never

bothered to follow up:

> Q. So George mentioned to you in 1999 that there will be a series
> of meetings that will answer your questions about the cash balance
> plan, right?
>
> A. At some point, yeah.  Yes.
>
> Q. But you were never invited to any such meeting?
>
> A. No.
>
> Q. Did you follow up with anyone in HR to ask why you hadn't
> been invited to a meeting about the cash balance plan after George
> told you they were going to occur?
>
> A. I can't say that I did.

(App. at B43.)  Of course, it was at these meetings that Conectiv voluntarily disclosed the then-

brewing controversies over the legality of cash balance plans.  (App. at B6, ¶ 17(e).)

### (4)    Ward

Finally, Mr. Ward testified that he simply ignored Conectiv's numerous notices

outlining the new Cash Balance Plan's terms in 1998 and 1999:

> Q. When Conectiv makes – I assume from time to time Conectiv
> makes documents available to employees about the pension plan.
>
> A. That's correct.
>
> Q. And it also sends you documents on the plan as well, right?
>
> A. Periodically, yes.
>
> Q. And do you read those documents?
>
> A. I don't, I don't read them all in full.
>
> Q. Do you believe that your pension rights are important?

#8323439 v1

A. Yes.

Q. And that the amount of your pension is important for your personal financial planning, right?

A. Yes.

Q. Given the importance of the pension for your personal financial planning, do you try to pay particular attention to communications about your rights under your pension plan?

A. I do now.

Q. When did you start?

A. Around 2004.

Q. And before then?

A. Not really, no.

(App. at B49.).  Mr. Ward further testified that, in hindsight, he probably should have read more:

Q. Well, with full 20/20 hindsight, do you wish that you had paid more attention to communications about compensation and benefit issues back in 1998 and 1999?

A. Yes.

Q. Do you feel that there was information out there that you could have accessed at the time that you didn't?

A. There could have been more information than I did look for, yes.  I'm sure there was.

(App. at B51.) *See also* App. at B52 and B54.

## III.    SUMMARY OF ARGUMENT

1.    Plaintiffs have failed to meet their burden of showing that class certification is appropriate in this case.  First, they are inadequate representatives.

a.    Plaintiffs cannot satisfy the adequacy of representation requirement of Rule 23(a)(4) because there is a fundamental conflict of interest between the putative class representatives and other participants in the Cash Balance Plan.  While the putative

-12-

class representatives have stated in sworn deposition testimony that the purpose of this lawsuit is to undo the conversion to the Cash Balance Plan and to reinstate the prior ACE and Delmarva Final Average Pay Plans *in toto*, those same putative representatives admitted that this result will actually harm certain absent class members who benefit from the enhanced portability and survivor benefits in the Cash Balance Plan.

        b.     Moreover, Plaintiffs' interests conflict with those of absent class members who have signed releases of ERISA claims in exchange for severance payments.

        2.     Second, Plaintiffs also cannot satisfy the typicality requirements of Rules 23(a)(4) because their individual claims are subject to the following unique deficiencies and defenses:

        a.     None of the named Plaintiffs has standing to sue for alleged invalid notice under ERISA § 204(h) of the amendment establishing the Cash Balance Plan, and thus cannot make out a *prima facie* case of liability. That section only requires that Defendants provide notice to plan participants who will suffer a significant reduction in the rate of future benefit accrual because of the relevant amendment. Here, though, Plaintiffs' accrued benefits **increased** because of the amendment establishing the Cash Balance Plan, *i.e.*, these four individual Plaintiffs have accrued higher normal retirement benefits under the Cash Balance Plan than they would have under the predecessor plans. They were accordingly not entitled to any notice of amendment under ERISA § 204(h).

        b.     Each Plaintiff's individual claim is barred by the statute of limitations.

        3.     Third, class certification is inappropriate under each subsection of Rule 23(b)(3) because individual issues predominate:

a.     As noted above, each class member will only have a claim under ERISA § 204(h) if his or her benefits are lower under the Cash Balance Plan than they would have been under the previous ACE and Delmarva Final Average Pay Plans.  This requires an analysis of each individual plan participant's circumstances.

b.     Plaintiffs' theory of injury is that, ***measured as an annuity***, their accrued benefits may decline under the Cash Balance Plan.  However, ***measured as a lump sum payment***, no participant's accrued benefits can ever decline.  Thus, the only way to determine whether any purported class member has a claim is to ask if he or she intends to receive benefits as a lump sum or an annuity – a wholly individualized exercise.

c.     Determining whether, and to what extent, the statute of limitations may bar each individual class members' claims will require an individualized assessment of each person's claim, especially how and when each individual allegedly learned of the supposed "repudiation" of his or her rights under ERISA.

d.     Determining the validity of any releases executed by individual class members.

e.     Determining whether former plan participants have standing to sue.

4.     Fourth, it is inappropriate to certify this action under Rule 23(b)(2) because the multiplicity of individualized issues shows that the alleged class is not sufficiently cohesive.

5.     Fifth, it is inappropriate to certify this action under Rule 23(b)(1).

#8323439 v1

       a.     Certification is inappropriate under (b)(1)(A) because Plaintiffs have failed to show that Defendants are potentially subject to conflicting orders from different tribunals.

       b.     Certification is inappropriate under (b)(1)(B) because the disposition of Plaintiffs' individual claims will not preclude other class members' potential claims.

      6.     Finally, even if this case could be certified (which it cannot), the class improperly includes the current and former fiduciaries of the Cash Balance Plan.

## IV.    ARGUMENT

### A.    Standard of Review

Plaintiffs have moved for certification of a class consisting of all participants in the Cash Balance Plan, except grandfathered employees who will reach age 65 by the end of 2008. (D.I. 68, at 9.) The Third Circuit has held that:

> A class may be certified only if the court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. In addition, parties seeking certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). Depending on the circumstances, class certification questions are sometimes enmeshed in the factual and legal issues comprising the plaintiff's cause of action, and courts may delve beyond the pleadings to determine whether the requirements for class certification are satisfied.

*Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006) (quotations and citations omitted); *see also Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 189 (3d Cir. 2001) ("it is apparent that not only was it appropriate, but also necessary, for the district court to examine the factual record underlying plaintiffs' allegations in making its certification decision"); *Newton v. Merrill, Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154, 168-169 (3d Cir. 2001) ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to

#8323439 v1

determine whether the alleged claims can be properly resolved as a class action . . . . We must probe beyond the surface of plaintiffs' allegations . . .").

> The four requirements of 23(a) that Plaintiffs must establish are that:
>
> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

While Defendants do not contest the numerosity requirement of (a)(1) or the commonality requirement of (a)(2), a rigorous analysis of the record shows that class certification is inappropriate because Plaintiffs cannot meet either the adequacy requirement of Rule 23(a)(4) or the typicality requirement of Rule 23(a)(3). Moreover, Plaintiffs cannot satisfy the requirements of any subsection of Rule 23(b).

**B.    Plaintiffs Have Not Carried Their Burden Under Rule 23(a)**

**1.    The Existence of Intraclass Conflicts Renders Plaintiffs Inadequate Representatives**

**a.    Not All Class Members Benefit From Undoing the Conversion**

Plaintiffs cannot satisfy their burden to show that they are adequate class representatives pursuant to Rule 23(a)(4) because their interests and goals directly conflict with many members of the putative class. "It is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objects of those being represented." C. Wright and A. Miller, 7A *Federal Practice and Procedure* § 1768. Thus, class certification must be denied where there is a fundamental conflict of interest:

> Significantly, the existence of minor conflicts alone will not defeat
> a party's claim to class certification: the conflict must be a
> "fundamental" one going to the specific issues in controversy. A
> fundamental conflict exists where some party members claim to
> have been harmed by the same conduct that benefited other
> members of the class. In such a situation, the named
> representatives cannot "vigorously prosecute the interests of the
> class through qualified counsel" because their interests are actually
> or potentially antagonistic to, or in conflict with, the interests and
> objectives of other class members.

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)

(citations omitted); *see also Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 630-632 (3d Cir.

1996) (Becker, J.) (district court abused its discretion in certifying class where representatives'

claims for relief conflicted with those of some absent class members), *aff'd* 521 U.S. 591 (1997).

This case presents a classic instance of a fundamental collision of interests: the

putative class representatives have brought the instant action for the express purpose of undoing

the conversion to the Cash Balance Plan and reinstating the former ACE and Delmarva Final

Average Pay Plans – a result that will actually harm a large number of absent class members.

This creates an intractable and irreconcilable intraclass conflict.

Plaintiffs have not hesitated to state the purpose of this action. In Paragraph 1 of

their Complaint, they baldly represent that they

> bring this action seeking appropriate declaratory, injunctive or
> other relief, including a declaration that the Cash Balance Sub
> Plan, which went into place through amendment of defined benefit
> plans maintained by the Atlantic City Electric Company and the
> Delmarva Power and Light Company, is invalid and that the
> accrued benefits of plaintiffs and each member of the class should
> therefore be calculated under and pursuant to the terms of the
> predecessor plans sponsored by the Atlantic City Electric
> Company and the Delmarva Power and Light Company.

(D.I. 1, ¶ 1.); *see also id.*, at Prayer for Relief ¶¶ F and G.

-17-

Plaintiffs were even more explicit about their aims at their depositions. Each putative class representative testified that it is his personal goal to have the Court declare the Cash Balance Plan illegal and to reinstate the former ACE and Delmarva Plans. (App. at B44, B55, B63, B71.)

Nevertheless, the record, including the deposition testimony of the Plaintiffs themselves, is clear that other putative class members benefit from the Cash Balance Plan. As Plaintiffs readily conceded at their depositions, the Cash Balance Plan provides greater portability of benefits than the former ACE and Delmarva Plans, *i.e.*, a departing employee under the Cash Balance Plan can receive an immediate lump sum payment of benefits where that same employee under the previous plans would be forced to wait until retirement age to collect any benefits. (App. at B41, B58, B70-71.) Plaintiff Ward testified to the advantages of portability:

> Q. One of the things that you mentioned is a 30 year old could leave the money to sit [in the former ACE Plan] for 25 years, right, and take their pension at 55?
>
> A. If they were vested I think they can. To my knowledge.
>
> Q. Assuming they're vested.
>
> A. Okay.
>
> Q. There is a risk, isn't there, that the 30 year old could die? We're talking under the old ACE plan.
>
> A. Uh-huh.
>
> Q. There's a risk, isn't there, that the 30 year old could die in the intervening years, right?
>
> A. Oh, yeah.
>
> Q. A risk that the plan could become insolvent?
>
> A. Yes.

Q. A risk that the money, either Mr. 30 year old won't be here to get the money or the money won't be there for him in 25 years, right?

A. Yes.

Q. And you eliminate that risk when you can get an immediate lump sum payment under the cash balance plan, right?

A. Yes.

Q. And there's real value to eliminating that risk, isn't there?

MR. SAUDER: Objection.

THE WITNESS: I'm sure there is, yes.

(App. at B57-58.)

Plaintiff Fink unsurprisingly testified that the portability of benefits could render the Cash Balance Plan more attractive to younger and shorter-term employees than the previous ACE and Delmarva Plans, depending upon each individual's subjective goals:

Q. Now, you said the real young people benefit from the cash balance plan?

A. I don't know if I said the real young people benefit, but what we have said earlier in this conversation is that there's circumstances that would possibly be more beneficial to them, portability, those type of things.

Q. So for some real young people, some of them may be better off in the cash balance plan than the old Atlantic City plan?

A. In my mind if we're talking about mobility, portability, or if we're talking about dollars.

Q. If you wanted to figure out if the cash balance plan or the old Atlantic City plan was better for a young person -- by young I mean, say, someone under 30 -- do you believe that you would have to sit down and talk with that person and find out what their particular goals and plans are?

A. I would imagine it would be beneficial.  I mean, you're making a decision for somebody that you have no knowledge of what their aspirations are.  Maybe they have a desire to work for five years.

-19-

Maybe -- maybe they're of the mindset that they'd like to have a long-term career in that particular, you know, position that they're in, or in that particular company that they're in.

Q. So if you really wanted to figure out what's in the interest of any 26-year-old employee of Conectiv today, the best way to find out would be to sit down and talk to that person and find out what their goals and aspirations are, right?

MR. SAUDER: Objection.

THE WITNESS: I would imagine you would have to solicit some sort of response from them, verbal, written, or otherwise.

(App. at B46-47.)  Similarly, Plaintiff Troup testified that it could be in the interest of some plan participants to retain the Cash Balance Plan, depending upon "individual circumstances." (App. at B71.)  Moreover, Plaintiff Charles testified that "[i]f I was 22 years old or 23 years old starting in a new company in a cash balance plan, I probably would have had no objections to it." (App. at B65.)

In addition to greater portability, the Cash Balance Plan also provides greater survivor benefits.  Mr. Fink admitted that the enhanced survivor benefits under the Cash Balance Plan could be beneficial to a very ill employee concerned about dying prematurely.  (App. at B46.); *see also* App. at B59 (Mr. Ward testifying that the Cash Balance Plan offers enhanced survivor benefits).

In sum, contrary to the conclusory assertions of Plaintiffs' Brief, not every member of the class stands to gain by having this Court reinstate the previous ACE and Delmarva Final Average Pay Plans.  The relief that Plaintiffs seek – undoing the conversion – will actually leave many members of the class in a worse position.  Plaintiffs cannot adequately represent these individuals' interests (and, indeed, have disavowed any such interests), and, thus, the instant Motion should be denied. *See Langbecker v. Electronic Data Sys. Corp.*, __ F.3d ___, 2007 WL 117465 at *11-12 (5th Cir. Jan. 18, 2007) (abuse of discretion for district court to

certify class action in ERISA case because of, *inter alia*, intraclass conflicts); *Valley Drug Co. v.*

*Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189-1192 (11th Cir. 2003) (abuse of discretion

for district court to certify class action because of intraclass conflicts); *Pickett v. Iowa Beef*

*Processors*, 209 F.3d 1276, 1280-1281 (11th Cir. 2000) (same); *Georgine v. Amchem Products,*

*Inc.*, 83 F.3d 610, 630-632 (3d Cir. 1996) (Becker, J.) (district court abused its discretion in

certifying class where representatives' claims for relief conflicted with those of some absent

class members), *aff'd* 521 U.S. 591 (1997); *United Independent Flight Officers, Inc. v. United*

*Air Lines, Inc.*, 756 F.2d 1274, 1284 (7th Cir. 1985) (class certification properly denied in ERISA

action where there were intraclass conflicts); *Carlstrom v. Decision One Corp.*, 217 F.R.D. 514,

517 (D. Mont. 2003) (intraclass conflicts rendered certification inappropriate in ERISA action).

The Fifth Circuit's opinion last month in *Langbecker* is on point and provides a

good illustration of why Plaintiffs' Motion for Class Certification must be denied.  There, a

putative class alleged that Defendant's offering of its own stock as an investment option in

Defendant's 401(k) plan was a breach of fiduciary duty under ERISA.  *Langbecker*, 2007 WL

117465 at *1-2.  Plaintiffs sought, *inter alia*, an injunction eliminating the company's stock as an

investment option.  *Id.* at *2.  The District Court certified a class of all plan participants.  *Id.*

The Fifth Circuit reversed.  Notably, the Court held that certification was

improper because of intraclass conflicts regarding the relief sought:

> Substantial conflicts exist among the class members, raising
> questions about the adequacy of the lead Plaintiffs' ability to
> represent the class.  Even after the EDS earnings warning and the
> drop in its stock price, thousands of Plan Participants (would-be
> class members) . . . continued to direct money *into* the EDS Stock
> Fund.  Over forty-four thousand Participants maintained
> investments in EDS stock as of February, 2004. . . . The intraclass
> conflict is exacerbated because [Plaintiffs] seek injunctive relief
> that would dissolve the EDS Stock Fund; the Fund cannot be

-21-

> partially shut down for the litigating Plaintiffs and remain open for
> absent class members who desire this investment option.

*Id.* at *11 (emphasis in original).

This case presents the identical situation: the class representatives seek to eliminate pension benefits that other absent class members will want. There is therefore an intractable and irreconcilable conflict between the named Plaintiffs and the absent class members, rendering Plaintiffs' representation inadequate and certification improper.[2]

### b.    Plaintiffs Cannot Represent Class Members Who Signed Releases

There is also another potential conflict of interest between Plaintiffs and certain members of the class who have released any claims under ERISA beyond claims for accrued and vested benefits as set forth in the plan documents. There are at least 90 members of the putative class who have executed such releases with Defendants of any ERISA claims in exchange for severance payments. (App. at B6, ¶ 18.) Plaintiffs, however, have signed no such releases. (*Id.*) This presents an inherent conflict: Plaintiffs may lack sufficient incentive to litigate the validity of the absent class members' releases, as Plaintiffs lack any personal stake in the question.

Numerous courts have held that a putative class representative who has not executed a release cannot adequately represent class members who have. *See Melong v. Micronesian Claims Comm'n*, 643 F.2d 10, 13-16 (D.C. Cir. 1980) (class certification denied because plaintiffs cannot represent absent class members who signed releases); *Carlstrom v.*

---

[2] Plaintiffs cite one opinion to the contrary in their briefs, *Richards v. Fleet Boston Financial Corp.*, 235 F.R.D. 165 (D. Conn. 2006), where the court certified an ERISA class action in spite of alleged intraclass conflicts. It is difficult to discern what persuasive value this opinion may have, as the Third Circuit expressly rejected the underlying liability opinion in *Richards* in the recent *Register* decision. *See Register*, 2007 WL 222019 at *7 (listing the *Richards* court as one of several district courts whose holdings were rejected). Moreover, the *Richards* court declined to look beyond the pleadings in assessing a Motion for Class Certification. *See Richards*, 235 F.R.D. at 168. This procedure is at odds with the Third Circuit's clear instruction to conduct a rigorous evidentiary analysis to determine whether Plaintiffs have discharged their burden under Rule 23.

*Decision One Corp.*, 217 F.R.D. 514, 517 (D. Mont. 2003) (same); *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 317-321 (S.D.N.Y. 2003) (same); *Stewart v. Avon Prods., Inc.*, Civ. A. No. 98-4135, 1999 WL 1038338 at *4-5 (E.D. Pa. Nov. 15, 1999) (same); *Swoope v. BellSouth Telecommunications, Inc.*, Civ. A. No. 97-181, 1998 WL 433952 at *2-4 (N.D. Miss. June 23, 1998) (same); *Greeley v. KLM Royal Dutch Airlines*, 85 F.R.D. 697, 700-701 (S.D.N.Y. 1980); *cf. Walker v. Asea Brown Boveri, Inc. Cash Balance Pension Plan*, 214 F.R.D. 58, 64-66 (D. Conn. 2003) (plaintiffs in putative ERISA class action challenging cash balance plan who had signed releases could not represent absent class members who had not signed releases).

The principal difficulty is that absent class members who signed releases must prove that the releases are invalid to recover, but the named Plaintiffs have no incentive to advance this argument:

> Plaintiffs whose claims are not subject to defenses based on their execution of General and Lump Sum Releases are not adequate representatives of individuals for whom the validity of these Releases may be a major focus of litigation. Although Plaintiffs' claims may not be antagonistic to those of class members who have signed General and Lump Sum Releases, Plaintiffs do not share the same legal challenges and are not required to litigate the same issues as members of the Class who may have released their claims to additional benefits.

*Spann*, 219 F.R.D. at 320. As a consequence, "there is no assurance that [the named Plaintiff] will vigorously litigate" the enforceability of the absent class members' releases and "absent such assurance plaintiff cannot be considered an adequate class representative under Rule 23(a)(4)." *Greeley*, 85 F.R.D. at 700; *see also Melong*, 643 F.2d at 15 ("When a purported class representative has not executed a release and need not establish that the release is defective in his individual case, serious questions are raised concerning the typicality of the class representative's claims and the adequacy of his representation of other class members").

Conversely, it may not be in every absent class members' interest to invalidate the

releases.  As the Eastern District of Pennsylvania explained:

> The signing Class members received a lump sum payment in
> exchange for their release.  If joined in Plaintiff's proposed Class,
> they may be forced to return the payment and be subject to
> counterclaim by [Defendant] for breach of the release agreement.
> Second, the releasee Class members may end up with less money if
> the release is voided and the Class loses.  Third, even if the Class
> wins, they may still receive less in damages than they did from the
> lump sum payment.  All of these potential conflicts of interest
> could lead to a schism between Plaintiff and the various putative
> Class members regarding the appropriate strategy and remedy to
> pursue.

*Stewart*, 1999 WL 1038338 at *5 (citation omitted).

### 2.    Plaintiffs' Claims Are Subject to Unique Deficiencies and Defenses And Thus Their Claims Are Not Typical

Plaintiffs likewise cannot show that they meet Rule 23(a)'s typicality requirement

because their individual claims are subject to unique deficiencies and defenses.  *See, e.g.*, *Walker*

*v. Asea Brown Boveri, Inc. Cash Balance Pension Plan*, 214 F.R.D. 58, 63-66 (D. Conn. 2003)

(denying certification of class challenging cash balance plan's compliance with ERISA because

named representatives subject to unique defenses).  The Third Circuit has explained that a

"proposed class representative is neither typical nor adequate if the representative is subject to a

unique defense that is likely to become a major focus of the litigation."  *Beck v. Maximus, Inc.*,

457 F.3d 291, 300 (3d Cir. 2006).  Thus,

> To defeat class certification, a defendant must show some degree
> of likelihood a unique defense will play a significant role at trial.
> If a court determines an asserted unique defense has no merit, the
> defense will not preclude class certification.

*Id.*  As detailed below, Defendants have several meritorious defenses unique to the named

Plaintiffs.

#8323439 v1

a.    **Plaintiffs Lack Standing to Sue Under ERISA § 204(h)**

Count IV of the Complaint alleges that Defendants violated ERISA § 204(h), which imposes certain notice requirements for pension plan amendments that will result in a "significant reduction in the rate of future benefit accrual," by not providing proper and timely notice of the amendment establishing the Cash Balance Plan.  (D.I. 1, ¶¶ 51-53.)  None of the named Plaintiffs, however, have had their rate of benefit accrual reduced because of this amendment; to the contrary, their accrued benefits are *higher* now than they would have been under the previous ACE and Delmarva Final Average Pay Plans.

As noted above, each Plaintiff has accrued a higher benefit measured as an annuity under the Cash Balance Plan than he would have earned under the predecessor plans:

| Plaintiff | Accrued Benefit Measured As An Age 65 Annuity, as of 1/1/2007, Previous ACE/Delmarva Plan | Accrued Benefit Measured As An Age 65 Annuity, as of 1/1/2007, Cash Balance Plan |
|---|---|---|
| J. Michael Charles | $2,858.07/month | $3,117.92/month |
| Maurice Ward | $2,784.19/month | $3,121.09/month |
| Joseph Fink | $2,092.67/month | $2,317.13/month |
| Thomas Troup | $2,706.52/month | $2,762.10/month |

(App. at B6-7, ¶ 19.)

Accordingly, these four Plaintiffs were not entitled to notice pursuant to ERISA § 204(h), because they experienced no "significant reduction in the rate of future benefit accrual."  The recent opinion in *Engers v. AT & T*, 428 F.Supp.2d 213 (D.N.J. 2006), is directly on point.  There, as here, Plaintiffs alleged that Defendant violated ERISA § 204(h) by providing insufficient notice of a conversion to a cash balance plan.  *Id.* at 218-220.  The Court granted

-25-

summary judgment to the Defendant, because each Plaintiff's accrued benefits were higher under

the new plan than the previous one. *Id.* at 220-223. As the *Engers* Court noted:

> . . . a plaintiff must first establish that the amendment in question
> provided for a significant reduction in the rate of benefit accrual.
> If a plaintiff is unable to prove that the amendment in question
> would provide for such a reduction, § 204(h) would not require the
> provision of any notice. A court would then have no need to reach
> any allegation that notice was untimely or otherwise deficient. In
> short, there could be no claim.

*Id.* at 220.

### b.    Plaintiffs' Individual Claims Are Time Barred

Furthermore, each named Plaintiff is subject to a unique, and highly meritorious,

defense based on the statute of limitations. In claims for ERISA violations, other than for breach

of fiduciary duty (where ERISA provides a statute of limitations), the Third Circuit has held

"that the 'limitations period applicable to the forum state claim most analogous to the ERISA

claim at hand' is to be borrowed and applied." *Romero v. Allstate Corp.*, 404 F.3d 212, 220 (3d

Cir. 2005). Here, the Court has ruled that the most analogous Delaware statute of limitations is

the three-year period in 10 Del. C. § 8106 for an "action based on a statute." (D.I. 24, at 4.)

The Third Circuit has held that, based on general federal common law, an ERISA

claim accrues for purposes of the statute of limitations "when the plaintiff discovers, or with due

diligence should have discovered, the injury that forms the basis for the claim." *Romero*, 404

F.3d at 222. When the claims allege that a feature of the plan at issue is illegal under ERISA, the

statute of limitations begins to run once there has been a "clear repudiation" of the alleged rights

in question. *Id.* at 223-224. Thus, "when an ERISA plan is amended but the fact that the

amendment actually affects a particular employee or group of employees cannot be known until

some later event, the cause of action of the employee will not accrue until such time as the

-26-

employee knew or should have known that the amendment has brought about a clear repudiation of certain rights that the employee believed he or she had under the plan." *Id.* at 223.

In sum, in this case, Plaintiffs' individual claims are subject to a meritorious statute of limitations defense if the evidence shows that they knew or should have known by the exercise of due diligence that their rights were "repudiated" by the January 1, 1999 amendment more than three years before the Complaint was filed, *i.e.*, by September 26, 2002.

As discussed above, there is compelling evidence that each Plaintiff could have learned of his alleged claim through the exercise of due diligence before September 2002. *Supra* at 9-12; *see generally Miller v. Fortis Benefits Ins. Co.*, __ F.3d __, 2007 WL 210370 at *3-6 (3d Cir. Jan. 29, 2007) (motion to dismiss ERISA case properly granted based on running of the statute of limitations because Plaintiff failed to exercise due diligence). Thus, each Plaintiff here is subject to a meritorious statute of limitations defense, thereby defeating typicality. *See Donaldson v. Exelon Corp.*, Civ. A. No. 05-1542, 2006 WL 2668573 at *4 (E.D. Pa. Sept. 14, 2006) (named plaintiff not typical because plaintiff was subject to defense of failure to file timely charge with EEOC); *Leroy v. Paytel III Management Assocs., Inc.*, Civ. A. No. 91-1933, 1992 WL 367090 at *2-3 (S.D.N.Y. Nov. 24, 1992) (denying class certification based on unique statute of limitations defense against named plaintiff); *cf. Access Now, Inc. v. Walt Disney World Co.*, 203 F.R.D. 529, 531 n. 3 (M.D. Fla. 2001) ("typicality of claims between the named plaintiff and the proposed class may not be present if a named Plaintiff is subject to a unique defense, such as the statute of limitations").

## C.    Plaintiffs Have Not Met Their Burden Under Rule 23(b)

Plaintiffs have similarly failed to show that class certification is appropriate under any of the subsections of Rule 23(b). Perhaps realizing that their Motion is flawed, Plaintiffs adopt a "belt and suspenders" approach of seeking certification under all three subsections. (D.I.

-27-

68 at 15-22.) Nevertheless, they fail to establish the propriety of certification under any of the three prongs because of the predominance of individualized issues.

### 1. This Case Cannot Be Certified Under Rule 23(b)(3)

Rule 23(b)(3) provides that an action may be certified if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The Third Circuit has explained that "predominance measures whether the class is sufficiently cohesive to warrant certification" and that "predominance is significantly more demanding" than the commonality requirement of Rule 23(a)(2). *Newton v. Merrill, Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001). Here, individual questions predominate, rendering certification under Rule 23(b)(3) improper.

### a. Plaintiffs' Claims Under ERISA § 204(h) Are Inherently Individualized

Individual issues clearly predominate in Plaintiffs' claim under ERISA § 204(h). As noted above, a class member is only entitled to notice, and thus has a claim, under Section 204(h), if the amendment establishing the Cash Balance Plan resulted in their accrued benefits being lower as compared to what they would have been under the pre-amendment plan (if, indeed, any of them did). *Supra* at 25-26. The problem here is that, as the circumstances of the named Plaintiffs demonstrate, not every participant in the Cash Balance Plan experienced a significant reduction in the rate of future benefit accrual. *Supra* at 25-26. As a result, this Court would have to make a participant-by-participant determination to see who was entitled to notice and thus has a claim – a wholly individualized "prove in" procedure. This, of course, defeats the efficiency of class treatment.

-28-

The Third Circuit's opinion in *Newton v. Merrill, Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001), is directly on point. There, Plaintiffs alleged that Defendant violated federal securities law by only quoting securities prices pursuant to the National Best Bid and Offer system, as opposed to exploring all possible quotation sources. *Id.* at 162. The lower court had denied Plaintiffs' Motion for Class Certification. *Id.* The Third Circuit affirmed.

The Third Circuit noted that "to show economic loss, plaintiffs must establish that a 'better' price was available for each executed trade. If a 'better' price was unavailable for a particular trade, then a class member could not have suffered injury and cannot maintain a Rule 10b-5 claim." *Id.* at 178. As in this case, the "issue is not the calculation of damages but whether or not class members have any claims at all." *Id.* at 189. The Third Circuit held that the need for a trade by trade analysis to assess the existence of a claim rendered the claim improper for certification under Rule 23(b), because of the predominance of individual issues. *Id.* at 187-188.

*Newton* controls this case. Here, each individual class member must prove a significant reduction in benefits ***before*** he or she is entitled to notice and can bring a claim. As in *Newton*, this individualized inquiry will overwhelm any common issues. The Third Circuit put the matter succinctly when it observed that "if proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Id.* at 172. This is precisely such a case, and Plaintiffs' claims under ERISA § 204(h) should accordingly not be certified.

### b.    Plaintiffs' Other Non-Stayed Claims Are Inherently Individualized

Plaintiffs' other non-stayed claims likewise suffer from an overabundance of individualized proof. Plaintiffs' alleged harm for these claims is that, ***measured as an annuity***,

-29-

their accrued benefits under the Cash Balance Plan are subject to reduction in some years. (D.I. 1, ¶ 41.) Even assuming that this allegation is true, however, it cannot be disputed that, ***measured as a lump sum payment***, *i.e.*, the amount of the hypothetical account balance, their benefits have never declined. Each Plaintiff so admitted at his deposition. (App. at B45, B56, B64, B69.)

Thus, in order to be injured by an alleged decrease in benefits, each member of the class must wish to elect to take their benefit as an annuity, not as a lump sum. However, of the 520 participants who have elected a form of benefit under the Cash Balance Plan, 500 – that is, approximately *96%* – have requested to receive a lump sum. (App. at B3, ¶ 11.) Plaintiffs likewise concurred at their depositions there was almost no one who had declined the opportunity to receive a lump sum payment in lieu of an annuity. (App. at B39, B53, B58, B61-62.) Plaintiff Fink intends to elect to take a lump sum payment. (App. at B39.)

At a minimum, Plaintiffs would have to survey each class member of the class to see if any of them actually intend to elect to receive benefits as an annuity – a completely individualized analysis (and one subject to the shifting whims of the various individuals). Thus, as in *Newton*, *supra*, there is no class-wide basis to assess the fact of injury. These claims likewise cannot be certified.

### c.    The Application of the Statute of Limitations Raises Highly Individualized Issues

Moreover, the application of the statute of limitations to each putative class member's claim involves a highly individualized inquiry that renders class treatment inappropriate. As noted above, there is evidence that at least the named Plaintiffs' claims are time barred. *Supra* at 9-12, 26-27. Significantly, each Plaintiff is subject to a slightly different argument regarding the timeliness of his claims; there is no way that the statute of limitations

-30-

defenses as to Messrs. Charles, Troup, Ward, and Fink can be adjudicated on common proof. *Supra* at 9-12. If there is no common proof for only *four* class members, there can logically be none for what Plaintiffs assert will be a class in the thousands.

The Third Circuit has explained that, in assessing whether a statute of limitations defense defeats class certification under Rule 23(b), district courts are to balance the common issue of Defendants' alleged concealment against the individualized issues of discovery and due diligence:

> It generally has been recognized that the question of concealment by [an] antitrust defendant is a common question, subject to being uniformly resolved on behalf of all members of the class. However the question of discovery of the cause of action by a plaintiff presents an individual question. Similarly, the issue of due diligence seemingly raises an individual question. Thus, the broad issue of fraudulent concealment presents both common and individual issues; therefore, the determination whether an antitrust action involving fraudulent concealment may proceed as a class action turns upon which aspect of the issue may be considered to predominate.

*In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160-161 (3d Cir. 2002) (quotations and citations omitted).

Here, the individual issues of due diligence predominate. There was no concealment of any material fact by Defendants. As detailed above, Defendants provided numerous, detailed notices explaining the workings of the Cash Balance Plan. (App. at B5-6, ¶ 17.) Defendants, in July 1999, affirmatively told their employees that cash balance plan conversions were the subject of intense media and legislative scrutiny. (*Id.*) Put simply, the issue of concealment is irrelevant because nothing was concealed. Thus, the only question for application of the statute of limitations is the individualized one of due diligence.

*In re Unisys Corp. Retiree Medical Benefits Litig.*, 2003 WL 252106 (E.D. Pa. Feb. 4, 2003), is instructive. There, the Court decertified a class in an ERISA action based on,

among other factors, the individualized inquiries required to assess the running of the statute of limitations. *Id.* at *6. The Plaintiffs in *Unisys* alleged that Defendants breached their fiduciary duties under ERISA by misrepresenting the availability of certain benefits, and a class was previously certified under Rule 23(b)(2). *Id.* at *1-4. The Court noted that the individualized questions presented by the statute of limitations weighed in favor of decertification:

> In deciding whether a retiree's claim is barred by the statute of limitations, the Court will be faced with a myriad of individual determinations. For example, in each case the evidence may vary as to when a Unisys representative last told the employee falsely that his or her retirement health benefit was secure and when and how he or she ultimately learned that retiree medical benefits were no longer free. Indeed, there may be cases in which the employee learned the truth only when the bill came in the mail. Each of these individualized determinations could affect when the statute of limitations began to run for a given class member. Unisys's statute of limitations defense thus presents several issues which must be addressed individually by the Court.

*Id.* at *6.

### d.    The Validity of Releases Presents Individualized Issues

In addition, determining the validity of any releases raises highly individualized issues. As noted above, at least 90 members of the alleged class have signed releases. (App. at B6, ¶ 18.) Whether these class members have claims requires a highly individualized analysis of the validity of each release:

> The court is required to closely inspect the totality of the circumstances surrounding a waiver of ERISA benefits. This analysis requires an examination of the following factors:
>
> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of the plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney [as well as whether an employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so], and (6) whether the consideration given in

-32-

> exchange for the waiver exceeds employee benefits to which the
> employee was already entitled by contract or law.

*Walker v. Asea Brown Boveri, Inc. Cash Balance Pension Plan*, 214 F.R.D. 58, 65-66 (D. Conn.

2003) (citations omitted; brackets in original).  The Court will clearly need to conducts numerous

of mini-trials to determine whether each class member who signed a release has a valid claim.

Class certification is therefore inappropriate.  *See Spann v. AOL Time Warner, Inc.*, 219 F.R.D.

307, 323 (S.D.N.Y. 2003) (individualized questions regarding enforceability of releases rendered

certification improper under Rule 23(b)); *cf. Walker*, 214 F.R.D. at 65-66 (denying motion to

certify class action challenging cash balance plan because "the court finds that a fact-specific

inquiry will be necessary to determine whether either of the named plaintiffs knowingly and

voluntarily waived their rights to Pension benefits under the Plan").

> ### e.     The Standing of Former Participants under ERISA Presents
> ### Individualized Issues

Finally, determining whether former participants who have received all benefits in

a lump sum payment have standing to sue under ERISA presents a wholly individualized

inquiry.  The proposed class includes "***all*** persons who have had their accrued benefit

determined" by the Cash Balance Plan, and thus includes former plan participants who have

received all of their benefits in the form of a lump sum.  (D.I. 68, at 9.)  ERISA, however,

generally limits standing to "participants" and "beneficiaries."  *See* 29 U.S.C. § 1132(a).  Thus,

former participants who have received all benefits in a lump sum payout generally lack standing

and have no claim.  *See Ericson v. Greenberg & Company, P.C.*, 118 Fed. Appx. 608, 610-611

(3d Cir. 2004) (former participant lacked standing); *Evans v. Akers*, Civ. A. No. 04-11380-WGY,

2006 WL 3518305 at *3-4 (D. Mass. Dec. 6, 2006) (same); *Hargrave v. TXU Thrift Plan*, 392 F.

Supp. 2d 785, 788-790 (N.D. Tex. 2005) (same).

There are only three narrow exceptions to the general rule: (1) that the former participant has a colorable claim for benefits; (2) that "but for" the alleged ERISA violation, that particular former participant would have remained a plan participant; or (3) that former participant has a reasonable expectation of returning to work for Defendants. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117-118 (1989); *Leuthner v. Blue Cross and Blue Shield of Northeastern Pennsylvania*, 454 F.3d 120, 124-129 (3d Cir. 2006). To determine whether any absent class member qualifies under one of these three prongs would entail a highly individualized, person by person inquiry that renders certification inappropriate. *See Newton, supra.* For example, to determine whether an alleged violation of ERISA caused a former participant to leave the plan would require a mini-trial addressing the circumstances of that individual's departure from the company.

### 2.    This Case Cannot Be Certified Under Rule 23(b)(2)

Plaintiffs likewise cannot show that certification is appropriate under Rule 23(b)(2). Rule 23(b)(2) provides that a class may be certified where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The requirements of Rule 23(b)(2) is even more exacting than under (b)(3):

> [T]he cohesiveness requirement enunciated by both this Court and the Supreme Court extends beyond Rule 23(b)(3) class actions. Indeed, a (b)(2) class may require more cohesiveness than a (b)(3) class. This is so because in a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out.
>
> While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive. . . . "Thus, the court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representative's claims present different individual issues than the claims of the absent class members present."

-34-

> Second, "the suit could become unmanageable and little value
> would be gained in proceeding as a class action . . . if significant
> individual issues were to arise consistently."

*Barnes v. The American Tobacco Co.*, 161 F.3d 127, 142-143 (3d Cir. 1998) (citations omitted).

Thus, in *Barnes* the Third Circuit held that a (b)(2) class was properly decertified because of

there were "too many individual issues to permit certification." *Id.* at 143.  Similarly, in *In re*

*Unisys Corp. Retiree Medical Benefits Litig.*, 2003 WL 252106 (E.D. Pa. Feb. 4, 2003), the

Court decertified an ERISA class under (b)(2) because of the predominance of individualized

issues. *Id.* at *3-6.

As already noted above, Plaintiffs cannot meet the more lenient requirements of

(b)(3) because of the multiplicity of individualized issues.  Therefore, *a fortiori*, they cannot

meet the more stringent requirements of Rule 23(b)(2).

### 3.    This Case Cannot Be Certified Under Rule 23(b)(1)

Finally, certification is inappropriate under Rule 23(b)(1).  That Rule provides

that provides that the Court may certify a class action if:

> (1) the prosecution of separate by or against individual members of
> the class would create a risk of
>
> (A) inconsistent or varying adjudications with respect to individual
> members of the class which would establish incompatible
> standards of conduct for the party opposing the class, or
>
> (B) adjudications with respect to individual members of the class
> which would as a practical matter be dispositive of the interests of
> other class members not parties to the adjudications or
> substantially impair or impede their ability to protect their interests
> . . . ,

Plaintiffs purport to invoke both (b)(1)(A) and (b)(1)(B).  (D.I. 68, at 16-18.)  However,

certification is appropriate under neither prong in this case.

### a.    Certification Is Inappropriate Under (b)(1)(A)

Plaintiffs have failed to meet their burden under Rule 23(b)(1)(A), because there is not a shred of evidence that Defendants are faced with the risk of inconsistent results in separate lawsuits. The Cash Balance Plan conversion occurred on January 1, 1999 – over eight years ago. In that time, this is the only lawsuit challenging either the Cash Balance Plan's accrual formula or the conversion process. Indeed, any new lawsuit would likely be barred by the applicable three-year statute of limitations. There is therefore no realistic danger that dueling courts will order inconsistent relief, and certification is therefore inappropriate under (b)(1)(A). *See Huegel v. City of Easton*, Civ. A. No. 00-5077, 2002 WL 32348320 at *4 (E.D. Pa. Oct. 23, 2002) (denying certification under (b)(1)(A) because "there is no evidence that another cause of action may be brought" against Defendant).

### b.    Certification Is Inappropriate Under (b)(1)(B)

Nor is certification appropriate under Rule 23(b)(1)(B). Individual adjudications here would not, as a practical matter, be dispositive of the claims of all class members because of the myriad highly individualized issues discussed above. For example, if the Court should find that these four named Plaintiffs failed to exercise due diligence so that their claims are barred by the statute of limitations, that holding would have no impact on any other individual's claim. Conversely, a finding that some class members' claims would be barred under the defense of release would have no bearing on the named Plaintiffs' claims, as they have not executed releases. Thus, certification under (b)(1)(B) is inappropriate. *See Huegel v. City of Easton*, Civ. A. No. 00-5077, 2002 WL 32348320 at *5 (E.D. Pa. Oct. 23, 2002) (certification denied under (b)(1)(B) because of the prevalence of individualized issues); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 99 (W.D. Mo. 1997) (same); *Truckway, Inc. v. General Electric*, Civ. A. No. 91-0122, 1992 WL 70575 at *6 (E.D. Pa. Mar. 30, 1992) (same).

-36-

### D.    The Class Definition Improperly Include Plan Fiduciaries

Even if, *arguendo*, a class could be certified, the class definition improperly includes the current and former fiduciaries who have managed and guided the Cash Balance Plan, some of whom are also participants in it.  These fiduciaries are not proper class members.  This lawsuit is challenging the legality of these fiduciaries' individual actions and decisions, which puts the interests of the named representatives squarely at odds with those of the fiduciaries.  As discussed above, it is black letter law that the class representatives cannot represent absent class members with diametrically opposed interests.  *See supra* at 16.

Furthermore, including the fiduciaries is not only improper, but will unnecessarily prejudice Defendants' ability to defend this case.  Should a class be certified, Defendants' ability to communicate with class members, who will be represented by class counsel appointed per Rule 23(g), may well be severely curtailed.  *See, e.g., Dondore v. NGK Metals Corp.*, Civ. A. No. 00-2441, 2001 WL 516635 at *2 (E.D. Pa. May 16, 2001) (discussing restrictions on communications between Defendants and absent class members).  The Cash Balance Plan fiduciaries, though, are Defendants' key witnesses, with whom Defendants will need to consult to mount a defense.  Thus, if any class is certified (which Defendants believe would be inconsistent with Rule 23), the class definition should be revised to exclude current and former fiduciaries.

#8323439 v1

## V.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court

deny Plaintiffs' Motion for Class Certification.

Respectfully submitted,

/s/ Phillip T. Mellet
M. Duncan Grant (Del. Bar No. 2994)
Phillip T. Mellet (Del. Bar No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
302.777.6500

Susan K. Hoffman
James Boudreau
LITTLER MENDELSON PC
Three Parkway
1601 Cherry Street
Philadelphia, PA  19102
267.402.3015 (telephone)
267.430.7275 (fax)

Larry R. Wood, Jr. (Del. Bar No. 3262)
Kay Kyungsun Yu
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000 (telephone)
215.981.4750 (fax)

Attorneys for Defendants

Dated:  February 16, 2007

#8323439 v1

## CERTIFICATE OF SERVICE

I, Phillip T. Mellet, hereby certify that on February 16, 2007 a true and correct copy of the Defendants' Answering Brief in Opposition to Plaintiffs' Motion for Class Certification and appendix were served via ECF on the following:

Pamela S. Tikellis
Robert J. Kriner, Jr.
A. Zachary Naylor
Robert R. Davis
CHIMICLES & TIKELLIS LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899

James R. Malone, Jr.
Joseph G. Sauder
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Attorneys for Plaintiffs

/s/ Phillip T. Mellet
Phillip T. Mellet (Del. Bar No. 4741)