IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated | : <br> : <br> : <br> :     CIVIL ACTION |
| Plaintiffs, | : <br> : |
| v. | :     NO. 05-702 (SLR) <br> : |
| PEPCO HOLDINGS, INC.; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | : <br> : <br> : |
| Defendants | : <br> : |

**APPENDIX TO DEFENDANTS' OPENING BRIEF
IN SUPPORT OF THEIR MOTION FOR LEAVE TO FILE AN EARLY MOTION FOR
SUMMARY JUDGMENT**

Larry R. Wood, Jr. (Del. Bar No. 3262)
Kay Kyungsun Yu
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000 (telephone)
215.981.4750 (fax)

M. Duncan Grant (Del. Bar No. 2994)
Phillip T. Mellet (Del. Bar No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
302.777.6500

Susan K. Hoffman
James Boudreau
LITTLER MENDELSON PC
Three Parkway
1601 Cherry Street
Philadelphia, PA  19102
267.402.3015 (telephone)
267.430.7275 (fax)

Attorneys for Defendants

Dated: February 16, 2007

**TABLE OF CONTENTS**

Transcript of Hearing dated October 26, 2006........................ A-1 to A-25

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

J. MICHAEL CHARLES, MAURICE W.    :    CIVIL ACTION
WARD, JR., and JOSEPH I. FINK,    :
JR., on behalf of themselves and    :
All others similarly situated,    :
                                  :
                    Plaintiffs    :
                                  :
          vs.                     :
                                  :
PEPCO HOLDINGS, INC., CONECTIV    :
and PEPCO HOLDINGS RETIREMENT     :
PLAN,                             :
                    Defendants    :    NO 05-702 (SLR)

- - -

Wilmington, Delaware
Thursday, October 26, 2006
11:30 o'clock, a.m.

- - -

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

- - -

APPEARANCES:

          CHIMICLES & TIKELLIS, LLP
          BY:  A. ZACHARY NAYLOR, ESQ.

                    -and-

          CHIMICLES & TIKELLIS LLP.
          BY:  JAMES R. MALONE, JR., ESQ.
               (Haverford, Pennsylvania)

          Counsel for Plaintiffs


                         Valerie J. Gunning
                         Official Court Reporter


A 1

2

1  APPEARANCES (Continued):

2          PEPPER HAMILTON LLP
           BY:  LARRY R. WOOD, JR., ESQ.

3              -and-

4          PEPPER HAMILTON LLP
5          BY:  SUSAN KATZ HOFFMAN, ESQ.
               (Philadelphia, Pennsylvania)

6

7          Counsel for Defendants

8              -  -  -

9

10            P R O C E E D I N G S

11

12         (Proceedings commenced in the courtroom,
13  beginning at 11:30 a.m.)

14

15         THE COURT:  Good morning, counsel.

16         (Counsel respond, "Good morning, your Honor.")

17         MR. NAYLOR:  Good morning, your Honor.  Zachary
18  Naylor, Chimikles & Tikellis, for plaintiffs.

19         If I may just start by way of introduction, I'm
20  joined by James Malone of our Haverford office, who has been
21  admitted in this case, and with your Honor's permission, will
22  speak on behalf of the plaintiffs today.

23         THE COURT:  All right.  Thank you very much.

24         MR. MALONE:  Thank you for the privilege of
25  appearing, your Honor.

A 2

3

1          THE COURT:  Sure.

2          MR. WOOD:  Good morning, your Honor.  Larry

3    Wood appearing from Pepper Hamilton for the defendants in

4    the matter.  I'm also joined today by my partner, Susan

5    Hoffman, who has also been admitted pro hac vice in this

6    matter and we'll sort of do it together, if that's

7    appropriate.

8          THE COURT:  That's fine.  Thank you very much.

9          MR. WOOD:  Thank you.

10          MS. HOFFMAN:  Good morning.

11          THE COURT:  All right.  Why don't we start with

12   Mr. Malone and plaintiffs' counsel and the areas -- it would

13   appear as though there's a general dispute about the scope of

14   appropriate discovery, but I will let you lead me and we'll

15   see what we can do.

16          MR. MALONE:  I think that's fair.  We had a

17   telephone conference in September, when we first started to

18   discuss the scope of the defendants' objections, and at that

19   time I came away with a clear sense that we were probably

20   going to have a dispute, but it wasn't really ripe yet

21   because we didn't have any documents at the time.  And now we

22   have what we've been told is what they intend to constitute

23   their entire production of documents.

24          And I think the areas that are in dispute, if I

25   would summarize, one big picture area is the area of

A 3

4

1    discovery into the background of decision-making on the plan

2    design.

3           The defendants, as I understand it, take the

4    position that, look, you've got the final version of the

5    plan, that's what controls your clients' rights.  You are

6    not -- it's not relevant what led us to make the decisions

7    about that because those are sponsor decisions.  You can't

8    attack them as fiduciary breaches.

9           Our view of it is somewhat different.  We view

10   the design issues as relevant in two different contexts.  On

11   a broad basis, we view it relevant to the issue of remedies.

12   And the issue of remedies is probably best crystallized by

13   the 1978 Supreme Court case, City of Los Angeles versus

14   Manhart, which is 535 U.S. 702.

15          What happened in Manhart was this:  There was a

16   pension plan which called for contributions from the

17   employees that was sponsored by the City of Los Angeles.

18   Women were charged more than men on the theory that,

19   statistically, they were more likely to live longer lives.

20   The women did not like this.  They filed a suit under

21   Title 7.

22          The District Court ruled that this was a

23   violation of Title 7, charging the women more to participate

24   in a pension plan than the men, and it ordered that all those

25   payments be disgorged.

A 4

1       What happened, however, it worked its way up to

2  the Supreme Court and the Supreme Court said, yes, you're

3  right.  It is discrimination, but the ruling is new, it's

4  novel, it's unanticipated.  So we don't think it would be

5  fair and appropriate, in structured and equitable relief to

6  impose on the plan and its responsible source the obligation

7  to go back and undo that, that we will make the relief

8  prospective only.

9       And that theme, then, came up in the IBM case,

10  where the defendant argued the same thing.  They were not

11  successful then, but at the end of the day they won in the

12  Seventh Circuit on the merits, so we don't know what the

13  Seventh Circuit would have done on this issue.

14       So, to us, on the issue of remedies, good faith,

15  what your expectations are, some discovery into why was

16  this design adopted?  Why is it that the management

17  workers have the cash balance design, but the unionized

18  workers don't?

19       It seems relevant to what the employer's

20  state of mind was in adopting the plan and could serve to

21  rebut a contention that we acted completely in good faith,

22  we're shocked and astonished that our plan violates the

23  law.

24       The second area where we see this to be relevant

25  is narrower.  It has to do with the claim under 204(h).  And

6

1   under 204(h), that's the notice requirement.  And basically,

2   we've looked at the Treasury regs that were in place at the

3   time that this conversion took place, and under those

4   regulations, what they indicate is that notice is a

5   requirement for an amendment to a defined benefit plan only

6   if it is reasonably expected to change the amount of future

7   and/or benefit accruals.

8          So, again, in that context, we see some relevance

9   to what was the sponsor told by its consultants, for example,

10  about what the impact of this benefit change would be.  What

11  were their expectations in terms of cost savings, because

12  that's, under the Treasury rules, appears to be what triggers

13  their notice obligation.

14         The other big picture area where we have a

15  dispute I think is the extent to which we as plaintiffs

16  should have access to drafts, and we've basically asked for

17  access to drafts in two areas that we think are important:

18  One is the drafts of the cash balance plan itself.  We think

19  learning and understanding to some degree, detail, how that

20  evolved is relevant for the same reasons that we think that

21  the discussions of design are.  That basically they're going

22  to tell us something about state of mind, structure,

23  expectations.

24         The other area where we've asked for the drafts

25  is in connection with the employee communications because

1  we'd like to understand how these revolve.

2          Now, what we have on the plan side is we have

3  minutes of a committee meeting of the board of Conectiv,

4  where they discuss a number of different structural benefit

5  changes and they receive an outline of proposed terms of the

6  plan, very brief, ten lines, and they approve that, and then

7  we have the final plan document itself.  We think it's

8  appropriate to test through discovery how we got from that

9  narrow document to the 30, 40 page document that actually

10  governs.

11          The other area where we'd like to explore drafts

12  in some degree, detail, is the communications that went out

13  to the employees, what they were told, how that process

14  evolved, what decisions were made and what the employees

15  should or should not be told.  Those are the big picture

16  areas.

17          There are some minor areas where we think there

18  are gaps in production that I don't think we need to bother

19  you with today because I think we should just talk those over

20  and it may be they simply don't have a document that I think

21  they should have.  But that's how I would frame the big

22  picture issues that I think we are disputing.

23          THE COURT:  All right.  Thank you very much.

24          Let's hear from defendants' counsel with respect

25  to the two major issues, and then if the defendant has any

8

1    concerns of their own, then I would like to hear those as

2    well.

3                MR. WOOD:  May I stay here, your Honor, or do you

4    think I won't be picked up on the tape?

5                THE COURT:  We don't have tape.  We have a real

6    person, and as long as Valerie can hear you, then I don't

7    mind if you stay there for discovery.

8                MR. WOOD:  Thank you.

9                THE COURT:  I will limit it to that.

10               MR. WOOD:  Okay.  Fair enough.

11               I guess I'd just like to start with one thing

12   that Mr. Malone said that I think really hits the nub of what

13   the real dispute is here, and the discovery dispute is just a

14   necessary corollary of the dispute.  He said that they would

15   like to get this information because they think it relates to

16   plan design.  That was also in the plaintiffs', the

17   supplemental discovery statement.

18               The plan design issue is really the one that

19   was at the fore in the Cooper case, is:  Is a cash balance

20   plan design inherently age discriminatory?  Cooper rejected

21   that.  The Seventh Circuit said there was nothing, there's

22   no age discrimination component to that plan design.  And

23   then Congress, under the President, adopted the Pension

24   Protection Act, which says that as of August 18th of '06,

25   it is for sure there's no discrimination on a going forward

A 8

1   basis.

2           So that is the count in the complaint, Count 3,

3   that your Honor has stayed, pending the decision in

4   Register.  Register was a decision of the Eastern District of

5   Pennsylvania, where Judge Davis found that there was no claim

6   under 204(b)(1)(H), the age discrimination claim, the plan

7   design claim.

8           So what we're left with are three nonstate

9   claims.  One is a back-loading claim that is a simple

10  formulaic test based on the plan language.  No discovery is

11  even needed for that.  We've cited a couple of cases in our

12  supplemental statement where Courts have, in fact, made that

13  decision on the basis of the plan itself.

14          Then the second claim they have is the

15  claim under 204(b)(1)(G), and, again, that's a plan-related

16  claim.  What is the language of the plan say and does it

17  violate ERISA?

18          And then their last claim is the 204(b)(1)(H)

19  claim -- 204(h) claim.  I'm sorry.  It has two essential

20  components.  One is a notice component and the other

21  component is notice isn't even necessary unless at the time

22  the plan was adopted, there was, in fact, a significant

23  reduction in the rate of future benefit accrual.

24          And we did also cite to your Honor a case, Konig

25  versus Intercontinental, 880 F. Supp. 372, Eastern District

1    of Pennsylvania, 1995.  And in that case, the Court stated on

2    the 204(h) claim, quote, "ERISA does not ask why this

3    amendment was made, it asks only was there an amendment and

4    did it result in a significant reduction in the rate of

5    future benefit accrual."

6            Defendants have produced a substantial number

7    of documents that relate to all of the plan documents, the

8    summary plan description documents, the annual report form

9    550's, employee communications, as well as the individual

10   participant account statements.

11           So discovery has been provided that enables

12   the decision to be made today.  I understand it's not

13   briefed --

14           THE COURT:  Thank you.

15           MR. WOOD:  -- on all of the nonstayed claims.

16           And I guess where the real dispute is, when we

17   were on our conference call in the original scheduling order,

18   we were talking about do we divide class certification

19   discovery from merits discovery, and the idea was, let's try

20   to not bicker about what discovery fits into which bucket.

21   And now we're at the point where we're bickering about what

22   discovery fits into the nonstayed claims versus the stayed

23   claim, which is the Cooper claim.

24           And I think the thing that we would like to

25   suggest as an efficient and cost-effective way to deal

11

1   with this is, if we assume that, make it in two assumptions.

2   If you assume that the Third Circuit looks at Register and

3   affirms, and so there is, in this circuit, there is no age

4   discrimination claim under 204(b)(1)(H), the stayed claim,

5   than we're exactly where we are today.

6          If the Third Circuit were to reverse the Register

7   decision, all of the discovery that Mr. Malone seeks or

8   probably a goodly portion of the background-type information

9   he describes would be relevant to that claim.

10         So we're sort of at a position where it seems to

11  make sense that we either stay the entirety of the case

12  pending the Register decision because that will allow either

13  discovery to proceed or not, or if we could file early

14  summary judgment motions on the three nonstayed claims, and

15  to the extent that the plaintiff thinks that any additional

16  discovery is necessary, Rule 56(f) provides that mechanism

17  and they can supply an affidavit, et cetera, in terms of what

18  other discovery they need on the nonstayed claims to defeat

19  the summary judgment.

20         THE COURT:  All right.  Well, I do not --

21         MR. MALONE:  May I respond?

22         THE COURT:  Let me ask questions.

23         MR. MALONE:  I'm sorry.

24         THE COURT:  I don't do early summary judgment,

25  for a couple of reasons.  Number one, I've got such an

A 11

12

1   incredibly large motion practice, particularly when they
2   are patent litigation, that the last thing I want is to
3   go through a motion practice in a case only to have the
4   nonmoving party say, oh, but the record isn't complete and
5   I'm confident there's discovery out there.  That is a
6   monumental waste of my time and of your client's money.
7           So I don't generally do that unless there are
8   stipulated facts and it's really an issue of law and I'm
9   happy to do it then.
10          how long has the Third Circuit had this case?  I
11  mean, are we expecting a decision momentarily?
12          MR. MALONE:  I have not checked recently, but I
13  know it has been fully briefed for several months.  I don't
14  believe it has been listed for argument, your Honor, but I
15  will have to confess, it has probably been a couple weeks
16  since I checked the docket.
17          MR. WOOD:  That's to the best of my recollection
18  as well.
19          THE COURT:  And fact discovery is a long ways
20  off?
21          MR. MALONE:  July I believe is the cutoff.
22          MR. WOOD:  Right.  In this case.
23          THE COURT:  Because what I was anticipating you
24  were going to say is that we should give this discovery
25  dispute a few more months because if the Third Circuit

13

1   reverses and even the defendants believe this discovery would

2   be relevant under those circumstances, that the discovery

3   dispute would go away because this discovery would be made

4   available without further discussion.

5           Now, I am not sure how that affects the discovery

6   schedule here, but that was what had crossed my mind in terms

7   of what you might say.

8           Let's set that aside for a moment.

9           With respect to -- I think you certainly

10  addressed your position with respect to the notice

11  requirements of 204(h).  You didn't necessarily, at least I

12  didn't understand you to specifically address the whole

13  remedies argument that was made.  That seems to me there is a

14  distinction between the two arguments.

15          MR. WOOD:  Again, the remedies argument is one

16  that the plaintiffs even recognize was at the forefront of

17  the Cooper case and Mr. Malone described it fairly eloquently

18  when he said the issue is all of a sudden, there's liability

19  created when nobody ever thought it could have existed, and

20  that was exactly the Cooper decision.

21          And since that case was reversed and there

22  was no age discrimination and that's the one Register has,

23  we actually agree.  I mean, I agree completely with your

24  Honor, that would be the most appropriate and most cost

25  efficient and effective way to deal with this, would be to

1    just put this off until the Third Circuit rules.

2              THE COURT:  Or for some period of time until it

3    becomes unreasonable in light of the schedule to wait for the

4    Third Circuit to rule.

5              MR. WOOD:  Right.  If I may interrupt you for one

6    second?

7              THE COURT:  Yes.

8              MR. WOOD:  I'm sorry.  I have terrible allergies

9    today.

10              THE COURT:  Well, this building is not a healthy

11    building, so it's not surprising.

12              MR. WOOD:  For instance, the first count, the

13    back-loading count, the plaintiff even recognizes in

14    the complaint at Paragraph 45 that it's the -- and, again,

15    Mr. Malone, I will sort of jump topics for a second, he

16    referenced union plans.  The only plan that's at issue in

17    this case is the cash balance subplan.  And even in their

18    complaint on Page 1, the plaintiffs state that, as plaintiffs

19    demonstrate below the Conectiv cash balance subplan violates

20    ERISA.  That's what is at issue, not union plans, not any

21    other type of plans.

22              In Count 1, they say that the cash balance

23    subplan does not satisfy the tests, and that goes back

24    to the formulaic approach.  It's the plan language.  You

25    have the tests provided for in the regs.  You run the math

15.

1   and you determine whether there was a back-loaded violation.

2   No amount of discovery changes that and that's what the case

3   say when they decide it on the basis of the face of the

4   plan.

5           So that's why we were sort of betwixt and

6   between.  No additional discovery is needed on the three

7   nonstated claims, but discovery would still be needed on the

8   stayed claim if that ever came back to life.

9           THE COURT:  All right.  Thank you.

10          Let's go back to Mr. Malone.

11          MR. MALONE:  I will be brief, your Honor.

12          I think on the point of remedies, my colleagues

13  are correct, that the in the Cooper case, the blindside issue

14  of liability was briefed on the issue of remedy, but my point

15  is this:  I don't think that's simply an age discrimination

16  issue.

17          When the Supreme Court dealt with it in Manhart,

18  they talked about it in terms of what is the scope of

19  appropriate equitable relief.  That really shouldn't be a

20  surprise to us given traditional equitable principles or a

21  chance to look at the totality of circumstances and try and

22  come up with a fair decree.

23          My expectation would be that the same issue of

24  expectations, what were you told by your consultants about

25  this plan design, would be equally relevant if, for example,

1    we prove that it violates the anti-back loading rules.  Did

2    they know that that was an issue?  We've seen some indication

3    in documents that the defendants acknowledged that this form

4    of design was controversial.

5              So I think the remedy issue isn't simply

6    204(b)(1)(H), and I think if, for example, the Third Circuit

7    decides that Judge Easterbrook was right in the Cooper case,

8    we are still going to be talking about whether or not the

9    defendant got blindsided here.  And so I think that this

10    issue remains relevant in the case.

11              Turning to the 204(h) notice issue for a second,

12    your Honor can read the case when you get a chance, but

13    what you need to understand about the Konig case was the

14    issue of good faith and expectations was a little different

15    than what we're talking about when we quote the Treasury

16    regulation.

17              What happened in Konig was the defendant was

18    arguing that the Court should disregard one of a series of

19    amendments in assessing whether it violated 204(h).  They had

20    an amendment in 19 -- plan in 1988.  It was amended in 1989

21    and subsequently.  And they said, well, the intervening

22    amendment, that was only intended to deal with some tax law

23    issues that we expected to occur and they never occurred, so

24    you shouldn't pay any attention to that.

25              And it's in that context that, you know, as the

17

1    Court describes in footnote 4, defendants argue that the IIP

2    1989 plan was in effect for only one year because the

3    anticipated impact of the tax law changes was incorrect.

4    They complained the more accurate comparison was between the

5    IIP 1988 plan and the ILC 1989 plan, and it's in that context

6    that the Court goes on to say that defendants' argument

7    assumes something about 1054(H) that's not in the statute.

8    Namely, that a good-faith amendment or an amendment based on

9    faulty assumptions or incorrect interpretations is exempt

10   from the notice requirement.

11          What we're saying is that based on the Treasury

12   regulation, Treasury Department being the agency responsible

13   for construing this part of the statute, that the plain

14   language of the regulation says there has to be an

15   expectation that the amendment will result in lower benefit

16   accruals to trigger the notice requirement.  So I look at

17   that and I say I'm the plaintiff, I think I have the burden

18   of proof on that issue, and that is how I would respond to

19   those two issues.

20          THE COURT:  All right.  Thank you.

21          MR. WOOD:  Your Honor, may I have a small

22   rebuttal?

23          THE COURT:  Yes.

24          MR. WOOD:  I will address a few points.  The

25   Konig case was actually litigated by Ms. Hoffman.

A 17

18

1        Getting to the point of remedy, Rule 26 defines

2    what's relevant in terms of discovery, discovery that's

3    relevant to a claim or defendants.

4        What Mr. Malone is raising is something that

5    happens after the case is over, when you say, oh, my gosh,

6    look what happened, there's a new rule of law and it's

7    not fair.  Again, that was Cooper.  It's not any of these

8    other claims.  If there's a back-loading violation, there's

9    a back-loading violation, and the plan has to be changed.

10   Those are strict ERISA requirements.

11       THE COURT:  All right.  Well, I guess I'm not

12   quite sure I understand what you are saying.  Generally,

13   damages, I mean, damages, unless you bifurcate damages, that

14   evidence is generally --

15       MR. WOOD:  I'm sorry, your Honor.  It's not a

16   question of damages.  It's a question of an escape hatch from

17   damages, and that's not what is at issue here.  It hasn't

18   even been raised.  It couldn't possibly be raised because the

19   case hasn't been litigated.  But, again, that's what was at

20   issue in Cooper and that's where it would be an issue if that

21   claim were still in existence in this case.

22       In any other normal case, if there were a single

23   back-loading claim filed, you'd never see anybody trotting to

24   court saying, well, there's a remedy, and so for an

25   injunction case, because a remedy -- because remedies could

A 18

1   be a way to avoid an injunction or damages, therefore, I get

2   broader discovery than is permissible by the rules and that

3   is not the way the law is.

4          THE COURT:  You're saying it might be relevant,

5   but it is not relevant now?

6          MR. WOOD:  It's not relevant to the three

7   nonstayed claims, correct.

8          THE COURT:  Until they're resolved?

9          I guess what I'm trying to figure out is what

10  you're saying is this discovery with respect to at least the

11  back-loading claim is premature?

12         MR. WOOD:  That's correct.  And then Susan

13  Hoffman would like to just talk quickly about the Konig

14  case.

15         THE COURT:  All right.

16         MR. WOOD:  Thank you.

17         THE COURT:  No need to talk quickly.

18         MS. HOFFMAN:  With your permission, your Honor,

19  I'm sort of the substantive technical person here.

20         I represented the defendant in the Konig case and

21  the issue there was that there was, if you might want to call

22  it, a secret plan amendment.  There was a -- there was a plan

23  amendment that was adopted by the buyer of a business because

24  the seller told them that would be the formula that would be

25  in effect for this group in the seller's plan ones the new

20

1   tax laws took effect.

2           So that's the formula the buyer adopted, but they

3   never told any of the employees about it because they never

4   got around to sending any notices.

5           Then, the seller, it turned out, didn't adopt

6   that formula.  They adopted a different formula.  The buyer's

7   plan was changed to reflect that formula and that's the one

8   the participants found out about.

9           There was a reduction from the interim formula to

10  the final formula but no reduction from the old formula to

11  the final formula.  So our defense was you have to look at

12  employee expectations.  They never knew about this interim

13  formula, so how can you -- 204(h) is designed to deal with

14  employee expectations,.  They're disappointed.  We lost.  And

15  we lost because the judge said it does not matter whether

16  anyone knew about it or not.  It does not matter whether

17  anyone thought there was a reduction or not.  You look at the

18  formula before, the formula after, and that's how you tell if

19  there's a significant reduction.

20          That was the Konig case.

21          Mr. Malone cites a regulation that says you

22  need to give a notice if it's reasonably expected.

23  Reasonably means a reasonable person looking at the

24  formula.  If I'm badly advised and I adopt a formula that

25  cuts benefit accruals by half, but I don't expect that,

A 20

1   it's not a reasonable expectation not to expect that and

2   a notice would be required whether I thought it was going

3   to happen or not.

4           On the other hand, if I am badly advised and

5   I think there's going to be a reduction by half but it

6   turns out there is an increase and I don't give a notice,

7   there's no violation just because I thought there would be a

8   reduction.  You need to have a significant reduction in the

9   rate of future benefit accrual, and that's formula to

10  formula.  Expectations have nothing to do with it.

11          On the back-loading issue, a plan has to satisfy

12  one of the rules.  In a back-loading case, the remedy is to

13  restructure the plan to satisfy one of the back-loading

14  rules, and it may be, if they were to succeed in showing that

15  this plan violated a back-loading rule, that the parties

16  would then present options for the Court to restructure the

17  plan to comply with ERISA, and then the plaintiffs would have

18  a claim under the restructured benefit plan.

19          You don't ordinarily get damages in an ERISA case

20  because it's equitable relief.  You get, in this type of

21  case, a restructuring of the plan to satisfy the rules.  And

22  the issue in Cooper was, is the restructuring of the plan to

23  give everybody the most valuable accrual rate that the

24  youngest person got?  That would have been the enormous

25  amounts of damages that everyone was bandying about.  But,

22

1  again, that only applies on those age discrimination counts.

2  The three nonstayed counts here, back-loading and this

3  reduction in benefit caused by the change in interest rates,

4  those are nowhere near the scope of the types of remedies at

5  issue with the age discrimination count.

6          One final mention.  We do have third-party

7  subpoenas here, which are as broad as the dispute between

8  the parties, and I don't want the Court to overlook the fact

9  that one of our goals is to try to prevent sort of a fishing

10  expedition on the part of, you know, of the third parties,

11  which were the various actuarial advisors the employer had.

12          THE COURT:  All right.  Thank you very much.

13          MS. HOFFMAN:  Thank you.

14          THE COURT:  Mr. Malone?

15          MR. MALONE:  Yes, your Honor.  The only comment I

16  have is that I should alert the Court that while there are

17  third-party subpoenas, they are not issued from this

18  district.  One was issued from the Eastern District of

19  Pennsylvania, the other from the district of the District of

20  Columbia.  So I'm not sure that, even if we get to the point

21  of briefing motions in this case on this discovery dispute,

22  I'm not sure this was the right court to do that because Rule

23  45 explicitly says that that is the dispute that has taken

24  the Court that issues the subpoenas -- subpoena.

25          THE COURT:  Surely, but one also likes to think

1   that if a judge in the court in which the case is being

2   litigated opines about the appropriate scope of discovery,

3   that parties will listen regardless of where the subpoenas

4   are sought.

5          It seems to me, quite frankly, Mr. Malone, that

6   it is not at all clear that your request for this broad scope

7   of discovery is relevant at this stage and I am inclined to

8   hold off on this until the Third Circuit speaks, although I

9   am not going to give the Third Circuit until the end of

10  discovery, but I would like to give them a little more time

11  because I don't believe in making decisions unless I have

12  to.

13         I think the defendants have indicated that they

14  don't contest the fact that it would be relevant if the Third

15  Circuit ruled one way.  I guess we're back where we are if

16  the Third Circuit doesn't rule that way.  So I don't know

17  whether putting anything off makes any sense.

18         I don't think I need briefing.  You've both given

19  me positions in your discovery papers.  I might think about

20  it a little bit longer and issue a short decision.

21         MR. MALONE:  Thank you very much for your time.

22         MR. WOOD:  Could I just add one point?

23         THE COURT:  Yes.

24         MR. WOOD:  I do recognize that the Court doesn't

25  like the early summary judgment motions and, in fact, most

24

1   courts don't, but if we get to that point where the Third

2   Circuit affirms Register and we're back here in a couple

3   months, it was just a suggestion that we've utilized

4   effectively with some other courts before to control

5   discovery that is marginal at best and then you get a real

6   edition quickly on the scope and just move forward.

7          If summary judgment is available at that point,

8   then that's even better for the Court, for the parties.   It

9   cuts the cost and expense.

10          THE COURT:  My only hesitation with that when the

11  parties don't agree to facts is that, quite frankly, again,

12  with the motion practice I have, I jump into a case once and

13  I just can't promise that I will get to your motions any

14  sooner than if you waited until the end of discovery, and

15  that's my hesitation, is that you tell me these things, you

16  file your motions, and then I've got trials coming up that I

17  have a deadline to issue the summary judgment decisions and I

18  don't do you any favors.

19          But certainly we can talk about it again.  I will

20  try to get a decision out within the next week based on your

21  argument.  And I think you are all very articulate and it's a

22  pleasure to hear you.  And if other discovery disputes arise

23  in the meantime, again, I don't like a motion practice.  I

24  would rather you e-mail my chambers and particularly if you

25  agree that there's a dispute, then I'm happy to meet with you

A 24

25

1   again.  All right?

2         MR. WOOD:  We apologize for filing a motion for

3   protective order.  It was sort of protective from the

4   third-party discovery.

5         THE COURT:  And I have to say I need to change my

6   language to make it clear.  I say no motions to compel.

7   Obviously, a motion for protective order is just the reverse

8   side of it.  It is a discovery-related paper.  I would rather

9   talk to people than look at more paper.

10         All right.  Thank you very much.

11         (Counsel responds, "Thank you, your Honor.")

12         (Hearing concluded.)

13         - - -

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I, Phillip T. Mellet, hereby certify that on February 16, 2007 a true and correct copy of the foregoing Motion for Leave to File an Early Motion for Summary Judgment, Opening Brief, proposed Order, and appendix were served via ECF on the following:

Pamela S. Tikellis
Robert J. Kriner, Jr.
A. Zachary Naylor
Robert R. Davis
CHIMICLES & TIKELLIS LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899

James R. Malone, Jr.
Joseph G. Sauder
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Attorneys for Plaintiffs

/s/ Phillip T. Mellet
Phillip T. Mellet (Del. Bar No. 4741)