# EXHIBIT "A"

Westlaw.

2007 WL 222019
--- F.3d ----, 2007 WL 222019 (3rd Cir.(Pa.))
(Cite as: 2007 WL 222019 (3rd Cir.(Pa.)))

Page 1

**H**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Third Circuit.
Sandra REGISTER, Grace B. Merchant, Susan L. Wilson, Kristina Beckman, John J. Daggett and Richard Rhoades, on behalf of themselves and others similarly situated, Appellants
v.
PNC FINANCIAL SERVICES GROUP, INC.; PNC Bank, N.A.; Pension Committee of PNC Financial Services Group, Inc. Pension Plan; PNC Financial Services Group, Inc. Pension Plans.
No. 05-5445.

Argued Dec. 14, 2006.
Filed Jan. 30, 2007.

On Appeal from the United States District Court for the Eastern District of Pennsylvania, (No. 2:04-CV-6097), District Judge: Honorable Legrome D. Davis.

Bryan L. Clobes, Michael S. Tarringer, Miller, Faucher & Cafferty, David H. Weinstein (argued), Andrea L. Wilson, Weinstein, Kitchenoff & Asher, Philadelphia, PA, Attorneys for Appellants.

Alan J. Davis (argued), William A. Slaughter, Arthur Makadon, Barry L. Klein, Allison V. Kinsey, Jamie B. Lehrer, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, Attorneys for Appellees.

Jay E. Sushelsky, AARP Foundation Litigation, Melvin Radowitz, American Association of Retired Persons, Washington, D.C., Attorneys for Amicus Curiae American Association of Retired Persons.

Stephen A. Bokat, Robin S. Conrad, Ellen Dunham Bryant, National Chamber Litigation Center, Inc., Ann Elizabeth Reesman, McGuiness, Norris & Williams, LLP, Washington, D.C., Attorneys for Amicus Curiae Equal Employment Advisory Council and the Chamber of Commerce of the United States of America.

Jeffrey G. Huvelle, David H. Remes, John M. Vine, Covington & Burling, Washington, D.C., Attorneys for Amicus Curiae The ERISA Industry Committee.

Before FISHER, CHAGARES and GREENBERG, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION
*1 This matter comes on before the court on an appeal by Sandra Register, Grace B. Merchant, Susan L. Wilson, Kristina Beckman, John J. Daggett, and Richard Rhoades, ("appellants"), from the district court's order entered on November 21, 2005, granting PNC Financial Services Group, Inc., PNC Bank, NA, Pension Committee of PNC Financial Services Group, Inc. Pension Plan, and PNC Financial Services Group, Inc. Pension Plans' (collectively "PNC") motion to dismiss appellants' amended complaint. *See Register v. PNC Fin. Serv. Group, Inc.*, Civ. No. 04-6097, 2005 WL 3120268 (E.D.Pa. Nov. 21, 2005). The dismissed amended complaint alleged that PNC's conversion of its pension plan from a traditional defined benefit plan to a cash balance plan violated certain provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). The most significant issue on this appeal is whether the district court erred in holding that the PNC cash balance plan does not discriminate against older employees on the basis of their age. For the reasons that follow, we will affirm the district court's November 21, 2005 order in all respects.

II. FACTS AND PROCEDURAL HISTORY
The relevant facts, except in one respect that we discuss later when dealing with the adequacy of a summary plan description that PNC supplied to plan participants, are not in dispute. Before 1999, PNC maintained a traditional defined benefit pension plan for its employees providing that a participant's normal retirement (age 65) benefit was calculated by multiplying a fixed percentage (1.3% for service up to and including 25 years and 1.0% for service in excess of 25 years) with the participant's years of service and final average pay. The plan also provided that if the employee retired after age 50 but before age 65, he could obtain early retirement benefits

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consisting of a portion of his normal retirement benefits.

As of January 1, 1999, PNC switched to a cash balance plan, which is a particular form of defined benefit plan. Under the cash balance plan, PNC established a bookkeeping account known as a cash balance account for every participant. The new plan took the benefits that accrued under the traditional plan and restated them as opening hypothetical cash balance accounts for each participant. The accounts were "hypothetical" because they did not reflect actual contributions to accounts or actual gains and losses allocable to the accounts, but, instead, reflected a value PNC imputed to the hypothetical accounts in the form of annual "credits ."

When PNC converted its traditional plan to a cash balance plan, the early retirement benefits of the old plan were frozen and the participants were given the option of either receiving the accrued (but frozen) early retirement benefits or the benefit they would have accrued under the cash balance plan, whichever was greater. The benefits for those participants that chose to receive the accrued early retirement benefits were frozen from the date of conversion until their account balances under the cash balance plan exceeded the accrued early retirement benefits.

*2 The PNC cash balance plan provides for two types of credits to participants: "earnings or pay credits" and "interest credits." The plan states the earnings credit as a percentage of compensation determined by allocating points for combined age and years of service. The earnings credit ranges from 3% of compensation for participants with less than 40 years of combined age and years of service to 8% of compensation for participants with 70 years or more of combined age and years of service. The second component of the hypothetical account, the interest credit, is determined using an annual interest rate based on the 30-year Treasury rate. The interest credit accrues at the same time that the underlying earnings credit accrues and is projected through age 65 (to offset things such as increased cost of living, inflation, etc.). [FN1] When a participant's employment with PNC ends, the participant may withdraw his hypothetical account balance as a lump sum, convert the account balance into an immediate life annuity, or defer the receipt of a lump sum payment or life annuity until a later date.

> FN1. The plan assumed a benefit commencement date ranging from age 62 to 65.

In 2004, a group of plan participants who were current and former PNC employees and pension plan beneficiaries brought suit against PNC claiming that the PNC cash balance plan violated various ERISA provisions. First, they alleged that the plan violated the ERISA anti-backloading provision, 29 U.S.C. § 1054(b)(1)(B), because the participants that chose to retain the accrued (but frozen) early retirement benefits did not receive additional benefit accruals until the cash balance plan benefit caught up to their frozen prior plan benefit (Count I). Second, they contended that an employee's benefit accrual decreases because of age in violation of the ERISA's defined benefit plan anti-discrimination provision, id. at § 1054(b)(1)(H)(i) (Count II). Third, they alleged that PNC violated ERISA's notice, id. at § § 1054(h), 1022, and fiduciary duty requirements, id. at § 1104 (Counts III-V). [FN2]

> FN2. Appellants sought to bring the action on behalf of a class and subclass of current and former employees but in view of the court's disposition of the case the court never considered whether to certify the classes.

On May 23, 2005, PNC filed a motion to dismiss the amended complaint. The district court granted PNC's motion to dismiss all counts for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Appellants have appealed from that order to this court.

III. JURISDICTION AND STANDARD OF REVIEW

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). We have jurisdiction pursuant to 28 U.S.C. § § 1291 and 1294(1). "In reviewing a district court's dismissal of a complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted, our review is plenary and we apply the same test as the district court." Maio v. Aetna, Inc., 221 F.3d 472, 481 (3d Cir.2000). "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." Id. at 481-82 (quoting In re Burlington Coat Factory § . Litig., 114 F.3d 1410, 1420 (3d Cir.1997)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Id. at 482 (quoting Burlington Coat Factory, 114 F.3d at 1420) (internal quotations omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IV. DISCUSSION
*A. The PNC Cash Balance Plan Does Not Violate ERISA's Anti-Discrimination Provision.*

1. What is a cash-balance plan?

*3 There are two general types of pension plans: defined contribution plans and defined benefit plans. A defined contribution plan is a pension plan in which an individual account is established for an employee to which his employer (and sometimes the employee too) contributes a specific amount. *See* 29 U.S.C. § 1002(34); *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 439, 119 S.Ct. 755, 761 (1999). The employee is entitled "to whatever assets are dedicated to his individual account." *Id.* at 439, 119 S.Ct. at 761. The employee bears the investment risks and the employer does not guarantee a retirement benefit to the employee. *See id.,* 119 S.Ct. at 761. [FN3]

> FN3. Of course, in some cases the loss may be shifted to another party. *See* 29 U.S.C. § 1132(a).

A defined benefit plan, on the other hand, is any plan that is not a defined contribution plan. 29 U.S.C. § 1002(35). It is generally a pension plan where the employee is promised a retirement benefit based on a formula the plan sets forth. The plan consists of a "general pool of assets rather than individual dedicated accounts." *Hughes Aircraft,* 525 U.S. at 439, 119 S.Ct. at 761. Participants in a defined benefit plan have no claim to any particular asset that composes a part of the plan's general asset pool, but, instead, receive "an annuity based on the retiree's earnings history, usually the most recent or highest paid years, and the number of completed years of service to the company." *Depenbrock v. Cigna Corp.,* 389 F.3d 78, 79 n. 1 (3d Cir.2004) (quoting *Campbell v. BankBoston, N.A.,* 327 F.3d 1, 4 (1st Cir.2003)). Under a defined benefit plan the entity funding the plan, *i.e.,* the employer, bears the investment risks.

The pension plan at issue in this case is a cash balance plan. A cash balance plan, by law, is a form of defined benefit plan and must comply with the statutory regulations applicable to defined benefit plans. *See, e.g., Esden v. Bank of Boston,* 229 F.3d 154, 158 (2d Cir.2000). However, in actuality, a cash balance plan is a hybrid between a defined contribution plan and a defined benefit plan as it contains attributes of both. *See, e.g., id.* at 158-59.

A cash balance plan is classified as a defined benefit plan because cash balance plans, like traditional defined benefit plans such as the plan PNC maintained before January 1, 1999, "are required to offer payment of an employee's benefit in the form of a series of payments for life...." *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.,* 334 F.3d 365, 370 n. 6 (3d Cir.2003) (quoting U.S. Dep't of Labor, Employee Benefits Sec. Admin., "Frequently Asked Questions about Cash Balance Pension Plans," at 2, *available at* http://www.dol.gov/ebsa/faqs/faq--consumer--cashbalanceplans.html). Nevertheless, a cash balance plan differs from a traditional defined benefit plan in that "traditional defined benefit plans define an employee's benefit as a series of monthly payments for life to begin at retirement, but cash balance plans define the benefit in terms of a stated account balance," albeit a "hypothetical" account. *Id* . Thus, cash balance plans are like defined contribution plans in that both define the employee's benefit in terms of a stated balance.

*4 Cash balance plan accounts "are often referred to as hypothetical accounts because they do not reflect actual contributions to an account or actual gains and losses allocable to the account." *Id.* Instead, the employer imputes value to the hypothetical account in the form of annual "credits." *Cooper v. IBM Pers. Pension Plan,* 457 F.3d 636, 637 (7th Cir.2006), *cert. denied,* --- U.S. ----, --- S.Ct. ----, 2007 WL 91579 (U.S. Jan. 16, 2007). As is the case here, there are typically two types of credits: (1) "pay credits" or "earnings credits," which are hypothetical contributions an employer makes usually expressed as a percentage of wages or salary and may vary with employee tenure, and (2) "interest credits," which are hypothetical earnings (either a fixed or variable rate linked to an index such as the 1-year Treasury bill rate) on the account balance. *See Berger v. Xerox Corp. Ret. Income Guarantee Plan,* 338 F.3d 755, 758 (7th Cir.2003); *Esden,* 229 F.3d at 158.

Employers design cash balance plans so that when a participant receives a pay or earnings credit for a year of service, he also receives the right to future interest credits projected out until normal retirement age. When a participant becomes entitled to receive benefits under a cash balance plan, his benefits are defined in terms of an account balance, which then may be converted actuarially into an annuity at the option of the participant. As is true in the case of traditional defined benefit plans, the employer funding the plan bears the investment risks associated with the plan. This risk could be considerable because, unlike in the case of defined contribution

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plans, cash balance plans accounts grow on the basis of a predetermined formula rather than on the basis of actual earnings.

2. The competing positions.

In order to understand this case it is essential to recognize that, as we already have indicated, cash balance plans are a type of defined benefit plan. This point is crucial because the classification of cash balance plans as defined benefit plans triggers a host of regulatory provisions applicable to defined benefit plans but not to defined contribution plans. Application of the provisions, however, may be difficult because Congress enacted ERISA and the administrative agencies adopted the defined benefit plan regulations before the creation of cash balance plans and thus before employers such as PNC began converting their extant plans to cash balance plans. Thus, the original rules for defined benefit plans simply did not address the unique features and hybrid nature of cash balance plans. This circumstance has required courts, and no doubt persons designing and administering cash balance plans, to face the unenviable task of trying to fit cash balance plans, pension plans with fundamental differences from traditional defined benefit plans and with many attributes of defined contribution plans, within the defined benefit plan framework, a process somewhat similar to placing a round peg into a square hole. As might be expected this task has proven not to be easy, and, as will be seen below, has led courts throughout the country to reach diametrically opposed conclusions with respect to applying ERISA provisions to cash balance plans. [FN4]

> FN4. Of course, as will become apparent, our opinion in this case applies settled principles of law and, once we blow away the smoke, is not particularly complex. Nevertheless we point to Internal Revenue Service Notice 2007-06, posted at http://www.irs.gov/ pub/irs--drop/n-07-06.pdf dealing with the adoption of the Pension Protection Act of 2006 ("PPA'06") to demonstrate how complex questions with respect to cash balance plans can be. We discuss PPA'06 below. *See infra* n. 8.

*5 One such troublesome provision is ERISA's defined benefit plan age anti-discrimination provision which states:
  [A] defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's *benefit accrual* is reduced, because of the attainment of any age.
  29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added).

This provision is the partial source of the disagreements in this case and, indeed, the outcome of this appeal largely is dependent on the meaning of "benefit accrual" within section 1054(b)(1)(H)(i). Appellants argue that the term "benefit accrual" refers to the employee's retirement benefit (the age-65 annuity), *i.e.,* the output from the plan. Appellants contend that the PNC plan is discriminatory because interest credits used to determine the annuity are based on future interest credits projected through the participant's normal retirement date. As such, they allege in their amended complaint that the interest credits decrease in value as participants move closer to the normal retirement date. Appellants argue that this consequence results in the reduction in the annuity based solely on age in violation of section 1054(b)(1)(H)(i).

A reader of this opinion might wonder how interest credits could be said to decrease in value with the passage of time as everybody knows that the longer a sum of money draws interest the greater the accumulated interest will be. Accordingly, we will explain appellants' position by way of example. It really is quite simple. Someone who leaves PNC at age 50 after 20 years of service will have a larger annual benefit at age 65 than someone whose 20 years of service conclude with retirement at age 65 because the former receives 15 years more interest than the latter. *See Cooper,* 457 F.3d at 638.

For support of their definition of "benefit accrual," appellants point to 29 U.S.C. § 1002(23)(A), which defines "accrued benefit" as "an annual benefit commencing at normal retirement age ." Appellants ask us to equate the terms "benefit accrual" and "accrued benefit." Thus, the argument goes, when the definition of "accrued benefit" is inserted into section 1054(b)(1)(H)(i), the anti-discrimination provision invalidates cash balance plans (the PNC plan as well as any other conceivable cash balance plan) because interest credits, which are projected to age 65, will have reduced value in terms of the age-65 annuity for older employees because they have less time to accrue interest. It should be obvious that the potential impact of this appeal therefore is enormous with respect to cash balance plans. [FN5] Indeed, the district court stated its view, with which we agree, that appellants' argument, if accepted, would mean "that all cash balance plans violate the ERISA age discrimination provision by virtue of their design."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Register,* 2005 WL 3120268, at *6. [FN6]

> FN5. Appellees cite materials in their brief suggesting that almost one half of the assets in defined benefit pension plans are in cash balance plans. Appellees contend that the impact of our opinion in this case if the court adopts appellants' arguments "would have wide ranging ramifications, sweeping away twenty years of guidance, practice and thought, and invalidating hundreds of pension plans affecting millions of employees and billions" of dollars of benefits." Appellees' br. at 7. Even though we have learned from many years of judicial and legal experience in both the public and private sectors to be skeptical when a litigant suggests the "horribles" that can follow from the result of a case, still it is obvious that much is at stake here.

> FN6. Actually the district court here was making reference to an observation in *Tootle v. ARINC, Inc.,* 222 F.R.D. 88, 93 (D.Md.2004). The *Tootle* court in turn was referring to the effect of the district court's opinion in *Cooper v. IBM Pers. Pension Plan,* 274 F.Supp.2d 1010 (S.D.Ill.2003), that the Court of Appeals for the Seventh Circuit reversed in *Cooper,* 457 F.3d 636, a case that we discuss below at length.

*6 Appellants also point to the parallel anti-discrimination provision applicable to defined contribution plans, 29 U.S.C. § 1054(b)(2)(A), which prohibits reductions based on "amounts ... allocated to the employee's account." [FN7] Appellants argue that "allocat[ions]" as used in the defined contribution plan provision refers to contributions or inputs and Congress used a different phrase ("benefit accrual") in the defined benefit plan provision to refer to something else, *i.e.,* the age-65 annuity or outputs. In addition, appellants emphasized at oral argument that defining "benefit accrual" in terms of the age-65 annuity is consistent with "employee expectations."

> FN7. Section 1054(b)(2)(A) provides:
> A defined contribution plan satisfies the requirements of this paragraph if, under the plan, allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age.

PNC, on the other hand, argues that "benefit accrual" refers to the employer's contributions in the form of credits to the hypothetical accounts, *i.e.,* the inputs to the plan. Thus, according to PNC, because all participants receive the same interest credit, there is no discrimination against older participants and any increase in the value of the annuity results from the time value of money, not discrimination, and thus is entirely appropriate.

For support, PNC relies on the fact that a cash balance plan, while classified as a defined benefit plan, differs from a traditional defined benefit plan in that an employee's benefit in a cash balance plan is set forth in terms of a stated account balance while a traditional defined benefit plan is defined in terms of an age-65 annuity. See *Burstein,* 334 F.3d at 370 n. 6. Thus, they urge us to look at the inputs into the account, not the outputs represented by the payment of the annuity. Additionally, PNC points to the parallel anti-discrimination provision applicable to defined contribution plans, section 1054(b)(2)(A), which legitimizes equal contributions made to defined contribution plans that grow to greater amounts for younger workers because of the time value of money. It argues that Congress could not have intended to make the same economic consequence legal for one type of pension plan but illegal for the other. [FN8]

> FN8. We recognize that section 701(a)(1) of the Pension Protection Act of 2006, H.R. 4, 109th Cong. § 701 (2006), ("PPA'06") provides that the accrued benefit for the purposes of cash balance plans may be expressed as the balance of a hypothetical account and significantly modified the application of the ERISA anti-discrimination provisions to cash balance plans, thus apparently settling the age discrimination dispute at issue here prospectively from June 29, 2005. However, PPA'06 specifically indicates that nothing in the amendments "shall be construed to create an inference" with respect to the ERISA's defined benefit plan anti-discrimination provision, section 1054(b)(1)(H), "as in effect before such amendments." Section 701(d). Thus, we cannot draw any inference from Congress's decision to recognize the legality of cash balance plans with respect to certain ERISA anti-discrimination provisions prospectively and seemingly insulate such plans from the anti-discrimination provision at issue in this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case.

3. Caselaw

Last year the Court of Appeals for the Seventh Circuit became the first court of appeals to confront squarely the discrimination issue raised on this appeal. *See Cooper,* 457 F.3d 636. Making an argument similar to that that the appellants advance here, the plaintiffs in *Cooper* argued that the IBM cash balance plan at issue in *Cooper* was discriminatory because, regardless of equal employer credits put into the account, "benefit accrual" refers to what the employee takes out upon retirement, and thus, younger employees receive interest credits for more years. *Id.* at 638. The court rejected this argument because it concluded that the phrase "benefit accrual" as used in the defined benefit plan provision "reads most naturally as a reference to what the employer puts in" the account, not what an employee takes out upon retirement. *Id.* at 639.

*7 The court of appeals compared the parallel anti-discrimination provisions applicable to defined contribution plans and defined benefit plans, and concluded that they proscribe the same conduct even though the rule for defined benefit plans indicates what is prohibited and the rule for defined contribution plans indicates what is permitted, *i.e.,* "the employer can't stop making allocations (or accruals) to the plan or change their rate on account of age." *Id.* at 638. The court reasoned that given the similarity of the subsections in both function and expression, it would be incongruous to say that the differences in the accumulation of interest on equal employer cash contributions made to defined contributions plans are not discriminatory while the differences in interest that accumulates on equal credits made to hypothetical cash balance accounts are discriminatory. *Id.* at 638-39. Rather, the court concluded that the computation of interest in both situations is not indicative of age discrimination as nothing "suggests that Congress set out to legislate against the fact that younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings. Treating the time value of money as a form of discrimination is not sensible." *Id.* at 639 (citing *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611, 113 S.Ct. 1701, 1706-07 (1993)). [FN9]

> FN9. Unfortunately for appellants, their brief on this appeal relied in part on the district court opinion in *Cooper,* 274 F.Supp.2d 1010 (S.D.Ill.2003), which the court of appeals reversed. Of course, inasmuch as appellants in their brief in this court noted that *Cooper* was on appeal to the Court of Appeals for the Seventh Circuit they assumed the risk that the court of appeals would reverse the district court in that case. The district court in *Cooper* believed that "benefit accrual" means the same thing as "accrued benefit," but that Congress used different language in order to be "grammatically correct." *Cooper,* 274 F.Supp.2d at 1016. The district court in our case decided the case between the time of the district court's opinion in *Cooper* and the court of appeals' opinion reversing the district court, but, with considerable prescience, declined to follow the district court's opinion in *Cooper* and, instead, reached a diametrically opposite result supported by other precedent.

The majority of district courts that have confronted this issue, including the district court in this case, have reached the same result that the court of appeals reached in *Cooper. See Drutis v. Quebecor World (USA), Inc.,* 459 F.Supp.2d 580 (E.D.Ky.2006); *Laurent v. PriceWaterhouseCoopers LLP,* 448 F.Supp.2d 537 (S.D.N.Y.2006); *Hirt v. Equitable Ret. Plan for Employees, Managers & Agents,* 441 F.Supp.2d 516 (S.D.N.Y.2006); *Register v. PNC Fin. Serv. Group, Inc.,* 2005 WL 3120268; *Tootle v. ARINC, Inc.,* 222 F.R.D. 88 (D.Md.2004); *Eaton v. Onan Corp.,* 117 F.Supp.2d 812 (S.D.Ind.2000).

Yet the court of appeals' view in *Cooper* is not unanimous as certain district courts within the Second Circuit disagree with the result that the court of appeals reached in *Cooper,* and these courts have held that cash balance plans are discriminatory. *See Parsons v. AT & T Pension Benefit Plan,* 2006 WL 3826694 (D.Conn. Dec. 26, 2006) (slip op.); *In re Citigroup Pension Plan ERISA Litig.,* --- F.Supp.2d -- --, 2006 WL 3613691 (S.D.N.Y. Dec. 12, 2006); *In re J.P. Morgan Chase Cash Balance Litig.,* 460 F.Supp.2d 479 (S.D.2006); *Richards v. FleetBoston Fin. Corp.,* 427 F.Supp.2d 150 (D.Conn.2006). [FN10]

> FN10. It seems to us to be inevitable that the Court of Appeals for the Second Circuit ultimately will decide the discrimination issue for that circuit. But pending that day we think that we should consider the conflicting views of the district courts within

that circuit and have done so.

The Second Circuit district courts that found discrimination in the circumstances that we face relied on three basic rationales in reaching their conclusion. First, they relied on either the statutorily defined term of "accrued benefit" or the dictionary definition of "benefit accrual" in concluding that "benefit accrual" refers to the outputs of the cash balance plan, *i.e.*, the age-65 annuity. Second, they found it significant that as a form of defined benefit plan, participants in a cash balance plan are promised a benefit upon retirement, not contributions in an account, and thus, the court in considering the discrimination issue should focus on the plan's outputs. Lastly, they believed that Congress, in choosing to prohibit discriminatory "allocat[ions]" in the defined contribution plan provision but discriminatory "benefit accrual[s]" in the defined benefit plan provision, must have intended to proscribe different conduct. Appellants' arguments here echo these considerations.

4. Analysis.

*8 It is well-settled that "[t]he role of the courts in interpreting a statute is to give effect to Congress's intent." Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir.2001). "When interpreting statutes or regulations, the first step is to determine whether the language at issue has a plain and unambiguous meaning." Dobrek v. Phelan, 419 F.3d 259, 263 (3d Cir.2005). "Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute." Rosenberg, 274 F.3d at 141. "[T]he plain meaning of statutory language is often illuminated by considering not only the particular statutory language at issue, but also the structure of the section in which the key language is found, the design of the statute as a whole and its object...." Alaka v. Attorney General, 456 F.3d 88, 104 (3d Cir.2006) (internal quotation marks omitted); see also King v. St. Vincent's Hosp., 502 U.S. 215, 221, 112 S.Ct. 570, 574 (1991) ("a statute is to be read as a whole ... since the meaning of statutory language, plain or not, depends on context"); M.A. ex rel. E.S. v. State-Operated Sch. Dist. of Newark, 344 F.3d 335, 348 (3d Cir.2003) (holding that it would be a mistake to "squint[ ] myopically" at the phrase in question and interpret it in isolation rather than in the context of the "text and structure" of the statute as a whole). Where the statutory language, on examination of "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" is plain and unambiguous, further inquiry is not required. Rosenberg, 274 F.3d at 141.

The requirement that "[s]tatutes must be interpreted to receive a sensible construction, limiting application so as not to lead to injustice and oppression ..." also guides us. Evcco Leasing Corp. v. Ace Trucking Co., 828 F.2d 188, 195 (3d Cir.1987). In this light, "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." American Tobacco Co. v. Patterson, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538 (1982).

With these principles in mind, we again set forth the defined benefit plan anti-discrimination provision at issue:
> [A] defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's *benefit accrual* is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added). As we discussed at length above, the age discrimination component of this case comes down to the meaning of "benefit accrual" as applied to cash balance plans. ERISA does not define the phrase, and its plain meaning is not evident from the particular language at issue. However, while the meaning of that phrase may not be evident from a reading of the words "benefit accrual" in isolation, a consideration of the context in which Congress used the words and the object of the ERISA anti-discrimination provisions makes its meaning clear.

*9 By engaging in this exercise in considering context, we reach the same conclusion as that of the court of appeals in *Cooper* for the reasons that follow. First, as we have explained, "cash balance plans define the benefit in terms of a stated account balance," not "as a series of monthly payments for life to begin at retirement" like a traditional defined benefit plan. Burstein, 334 F.3d at 370 n. 6. Thus, the "benefit" as used in the phrase "benefit accrual" refers to the stated account balance as that is how the benefit is defined by cash balance plans. Once this proposition is grasped, it becomes clear that the "accrual" of "benefit" in section 1054(b)(1)(H)(i) refers to the credits deposited into the participant's cash balance accounts, *i.e.*, the inputs. If we concluded otherwise we simply would ignore the characteristic of a cash balance plan distinguishing it from a traditional defined benefits plan, *i.e.*, that a cash balance plan account is defined in terms of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stated account balance. Contrary to appellants' assertions, we do not believe that a cash balance plan's technical classification as a defined benefit plan compels us to disregard this critical distinction and thereby unreasonably interfere with employers in the crafting of pension plans. [FN11]

> FN11. The district court in this case pointed out the advantages to both employees and employers of cash balance plans as compared to traditional defined benefit plans. Register, 2005 WL 3120268, at *1. Courts should not rush in to preclude persons interested in plans, whether employees or employers, from securing these benefits.

Second, a comparison of the parallel defined benefit plan and defined contribution plan anti-discrimination provisions reinforces our interpretation. This comparison is particularly relevant in that both cash balance plans and defined contribution plans are defined in terms of their stated account balances, albeit one is hypothetical and the other is cash. In comparing the two anti-discrimination provisions, we agree with the analysis and conclusion reached by the court of appeals in *Cooper*. The provisions are nearly identical and prohibit the same behavior, *i.e.*, "the employer can't stop making allocations (or accruals) to the plan or change their rate on account of age." Cooper, 457 F.3d at 638. In this regard we point out that under ERISA section 204(b)(2)(A) a defined contribution plan is not age discriminatory if "the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(2)(A). The PNC plan does not make such a reduction. Rather, the PNC plan calculates earnings credits based on points allocated for combined age and years of service [FN12] and interest credits with identical rates credited into the participants' accounts regardless of their age.

> FN12. The PNC plan is different from some plans in that earnings credits take into account both age and years of service, and thus older employees actually are rewarded because of their age in this respect.

Contrary to appellants' assertions, there is simply no evidence that, by prohibiting discriminatory "allocat[ions]" in one provision and "accrual[s]" in the other, Congress intended to provide different metrics for detecting discrimination. Such a construction would lead to a result that is not sensible. The effect of the cash balance design that appellants challenge (the accumulation of interest) is identical to the accumulation of interest on employer contributions under defined contribution plans. Accordingly, employer contributions in both instances ultimately are more valuable when those contributions are made to younger employees as the contributions have a longer time to grow. That unremarkable consequence of a contribution growing in value because of earnings on it is no different than that when a bank deposit is drawing interest. The longer the deposit remains in the bank in an interest bearing account, the more it is worth. We do not find any support for appellants' argument that Congress wanted to prohibit such a consequence with respect to cash balance plans, but legitimize it for defined contribution plans. Rather, the similarities of the anti-discrimination provisions governing defined benefit and defined contribution plans suggest that Congress was not seeking to prohibit the consequences of the time value of money in either circumstance, and appellants have not offered a reasonable explanation of why Congress would have wanted to do so.

*10 While we agree with appellants that we are not permitted to rewrite a statute and we must adhere to the statutory text applicable to defined benefit plans, we have not rewritten anything here. The fact is that even though a cash balance plan's classification as a defined benefit plan is important, it is also important that it be understood that cash balance plans include attributes of both defined benefit and defined contribution plans. It seems to us that when dealing with a hybrid plan subject to defined benefit plan rules, a court should look to the parallel defined contribution plan anti-discrimination provision to clarify the meaning of "benefit accrual" within the cash balance plan context. Contrary to appellants' assertions, in doing so, we are not reclassifying cash balance plans as defined contribution plans nor are we ignoring the language of the statute, but, instead, we are looking to the parallel anti-discrimination provisions because "the plain meaning of statutory language is often illuminated by considering not only the particular statutory language at issue, but also the structure of the section in which the language is found, the design of the statute as a whole and its object...." Alaka, 456 F.3d at 104 (internal quotation marks omitted). This is a fundament of statutory interpretation.

Finally, in our analysis of the discrimination issue we address appellants' remaining arguments (and those accepted by the minority courts). First, contrary to appellants' contention, "accrued benefit," which

section 1002(23)(A), defines as "an annual benefit commencing at normal retirement age," is simply not the same thing as "benefit accrual." We find no indication that Congress intended that courts and administrators use these phrases interchangeably. Additionally, we agree with the court of appeals in *Cooper* that "[t]he phrase 'benefit accrual' reads most naturally as a reference to what the employer puts in ..., while the defined phrase 'accrued benefit' refers to outputs after compounding." *Cooper, 457 F.3d at 639.*

Moreover, we are not persuaded by the appellants' position that the result we reach runs contrary to "employee expectations," which, according to appellants, focuses on their retirement annuity and not their account balance. We have examined the summary plan description PNC distributed relating to the cash balance plan as this document provides the best insight into what the employees should "expect" from the plan. The plan description reveals the following. "Each quarter, [the employees will] receive a statement showing the value of [their] account[s], including Earnings Credits and Interest Credits," app. at 224, "which allows [the employees] to watch [their] retirement benefits grow from year to year, just as [they] do with [their] [Incentive Savings Plan] account," *id.* at 221. At the time an employee leaves PNC, so long as he is vested he has immediate access to his account balance and may take the cash balance account value either in the form of a lump sum payment (subject to income taxes and possibly penalties) or, at his election receive monthly annuity payments. *Id.* at 222, 229. It is clear from the summary plan description that the credit accruals in the cash balance account provided to each employee on a quarterly basis, and not the prospective (and optional) conversion to an age-65 annuity, best defines what the employees should "expect" from the PNC plan. In sum, we find that PNC's cash balance plan does not discriminate against participants because of age in violation of section 1054(b)(1)(H)(i). As the district court put it in *Eaton*, "[t]he concept of the 'benefit of accrual rate' does not have a single, self-evident meaning, especially in the complex world of pension plan regulation." *Eaton, 117 F.Supp.2d at 830.*

*11 In applying the anti-discrimination provision in the context of cash balance plans, which defines the benefit in terms of the cash balance account, we are concerned with what PNC puts into an employee's account, not what the employee eventually may obtain from the plan on retirement. In evaluating the plan's inputs, PNC does not reduce contributions (in the form of either earnings or interest credits) to older employees. The circumstance that the same contribution in the form of interest credits may result in a more valuable annuity for a younger employee is not discrimination in whole or in part based on age; rather it is the completely appropriate consequence of the application of an age-neutral principle to an accumulating account of the time value of money. The fact is that rather than we rewriting the statute, it is the appellants that are doing so in order to accommodate their position. As is our obligation we are honoring the intent of Congress in reaching our result.

B. *The PNC Cash-Balance Plan Does Not Violate ERISA's Anti-Backloading Rules.*

ERISA contains three alternative anti-backloading tests, each of which specifies how much of the pension benefit must accrue each year: the 3% rule, the 133 1/3% rule, and the fractional accrual rule. 29 U.S.C. § 1054(b)(1)(A). In this case, it is undisputed that the only test that applies is the 133 1/3% rule because the PNC cash balance plan is calculated using a career pay history. [FN13] The applicable provision states:

> FN13. In their brief appellants state that the "District Court correctly held that the PNC Plan must comply with the 133 1/3 % rule of § 204(b)(1)(B)." Appellants' br. at 36.

A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year. For purposes of this subparagraph--
(i) any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years....
29 U.S.C. § 1054(b)(1)(B). It is clear from this section that ERISA "requires that the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any previous year by more than 33%." *Esden, 229 F.3d at 167 n. 18.*

The purpose of the anti-backloading provision is to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"prevent an employer from avoiding the vesting requirements through minimal accrual of benefits in early years of employment, followed by larger benefit accruals as an employee nears retirement." *Hoover v. Cumberland, Md. Area Teamsters Pension Fund,* 756 F.2d 977, 982 n. 10 (3d Cir.1985). Congress intended by the anti-backloading provision to prohibit an employer from "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and ... concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement." *Langman v. Laub,* 328 F.3d 68, 71 (2d Cir.2003) (quoting H.R. REP. NO. 93-807, at 4688 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4688).

*12 Appellants argue that the PNC cash balance plan violates section 1054(b)(1)(B) for the following reasons. Under the prior defined benefit plan, participants age 50 and older were entitled to an early retirement benefit which included an early retirement subsidy. When PNC converted its prior plan to a cash balance plan, the participants were given the option of either receiving the accrued early retirement benefits or the benefit they would have accrued under the cash balance plan, whichever benefit is greater. For those participants that chose to receive the accrued early retirement benefits, their hypothetical benefits were frozen from the date of conversion until their hypothetical account balances exceeded that amount. Then, once the cash balance exceeded the accrued early retirement benefit under the prior plan, the credits into the cash balance account would commence.

Appellants contend that the period in which the early retirement benefits remains level (often called the "wear-away") followed by a resumption of accruals once the cash balance exceeds the frozen amount violates section 1054(b)(1)(B) "[s]ince the previous growth rate of benefits had been zero [and] this new increase will automatically be at a rate greater than 133 1/3% of the previous growth rate." Appellants' br. at 43. Appellants reach this conclusion because they believe that the court should use two separate formulas to make a determination under section 1054 for those participants that chose to retain their early retirement benefits: the prior plan formula to determine their previous accrued benefits including the early-retirement subsidy and the cash balance formula once the account exceeds the benefits under the prior plan.

Appellants cite to Treasury Regulation § 1.411(b)-1(a) for support. That regulation states:
> A defined benefit plan may provide that accrued benefits for participants are determined under more than one plan formula. In such a case, the accrued benefits under all such formulas must be aggregated in order to determine whether or not the accrued benefits under the plan for participants satisfy one of the alternative methods.
> 26 C.F.R. § 1.411(b)-1(a).

Appellants' argument fails, however, because it cannot surmount the barrier that the regulation they cite does not apply in cases of plan amendments. Rather, it applies in cases where there are two co-existing formulas under a single plan. The governing provision is section 1.411(b)-1(b)(2)(ii)(A), 26 C.F.R. 1.411(b)-1(b)(2)(ii)(A), 29 U.S.C. § 1054(b)(1)(B)(i), the plan amendment provision under the 133 1/3% rule, which states, "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." Thus, once there is an amendment to the prior plan, only the new plan formula is relevant when ascertaining if the plan satisfies the 133 1/3% test. A participant's election to retain his early retirement benefits from the old plan is not relevant to this calculation. If we treat the amended plan as in effect for all other plan years, as Congress directs us to do, appellants never would have accrued a benefit under the old plan and would have started to accrue benefits under the cash balance formula from the beginning of their employment. Accordingly, there is no violation of the anti-backloading provisions under appellants' aggregate-formula theory. Moreover, the objective of the anti-backloading provisions, to prevent a plan "from being unfairly weighted against shorter-term employees," *Langman,* 328 F.3d at 71, simply is not implicated by the PNC conversion.

**C. *PNC Did Not Violate ERISA's Notice Requirements.***

*13 At the time of the PNC amendment, 29 U.S.C. § 1054(h)(1)(A) provided that a plan,
> may not be amended so as to provide for a significant reduction in the rate of the future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to ... each participant in the plan.... [FN14]

> FN14. Congress amended ERISA in 2002 to provide that an amendment must "be written

in a manner calculated to be understood by the average plan participant and shall provide sufficient information ... to allow applicable individuals to understand the effect of the plan amendment." 29 U.S.C. § 1054(h)(2).

The Treasury Regulations that existed at the time of the amendment indicated that the notice need not contain an exact quotation of the text of the amendment, but may contain "a summary of the amendment ... if the summary is written in a manner calculated to be understood by the average plan participant and contains the effective date. The summary need not explain how the individual benefit of each participant ... will be affected by the amendment." *Scott v. Admin. Comm. of the Allstate Agents Pension Plan,* 113 F.3d 1193, 1200 (11th Cir.1997) (quoting 26 C.F.R. § 1411(d)-6T (1996)).

In this case, PNC issued a 20-page brochure which summarized the changes to the plan, described the cash balance pension plan design, offered additional resources for more information, defined important words and terms, and instructed participants on how to read their personalized statements. The last page of the plan stated:
> This brochure represents notification as required under section 204(h) of [ERISA, 29 U.S.C. § 1054(h) ] with respect to the amendments to the Pension Plan. The amendments to the Pension Plan effective January 1, 1999 described in this brochure may affect the future rate of benefit accruals under the Pension Plan and in some instances may reduce the rate of future Pension Plan benefit accruals.

App. at 237.

Appellants challenge one aspect of the notice. They believe that the notice was flawed because it failed to explain to the participants that the conversion would "significantly reduce[ ] the rate of future pension plan benefit accruals for each plan participant." Appellants' br. at 49. Appellants believe that PNC should have done more than tell the participants that the new plan "may affect the future rate of benefit accruals" and "in some instances may reduce the rate of future Pension Plan benefit accruals."

The district court concluded that PNC satisfied the section 1054(h) notice requirements applicable at the time of the conversion and we agree. The brochure set forth the plan amendment and the effective date. That explanation was all that was required. Contrary to appellants' argument, the Treasury Regulations at the time of the amendment were clear that PNC was not required to discuss "how the individual benefit of each participant or alternate payee will be affected by the amendment." [FN15]

> FN15. We express no opinion on whether the notice would satisfy current law.

D. *Appellants Fail to State a Claim With Respect to the Insufficiency of the Summary Plan Description.*

Appellants allege in Count IV of their amended complaint that the summary plan description is insufficient under 29 U.S.C. § 1022(a), because it fails to disclose (1) that the cash balance plan reduces accrual rates based on a participant's age, and (2) that the cash balance plan does not retain the early retirement subsidy available under the old plan. 29 U.S.C. § 1022(a) provides,
> *14 [t]he summary plan description ... shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title. [FN16]

> FN16. Subsection (b) requires that the summary plan description contain certain categories of information, all of which the PNC summary plan description included. 29 U.S.C. § 1022(b).

With respect to appellants' first contention set forth above, PNC's allocations to participants under the cash balance plan are not reduced on account of age, and thus it hardly would have been appropriate to say that they were. The district court dismissed appellant's second contention as it concluded that the average plan participant would recognize that the early retirement subsidy, by its omission from the summary plan description, was being terminated. This conclusion gives rise to the single factual matter in dispute in this litigation to which we made reference at the outset of this opinion. But even assuming that appellants are correct that this conclusion required factual findings the making of which was inappropriate at the motion to dismiss stage of the litigation, appellants nevertheless fail to

state a claim upon which relief may be granted with respect to nondisclosure of the termination of the early retirement subsidy because there would not be a remedy available under ERISA to them even if the district court's conclusion with respect to the plan participants' perception was incorrect. Indeed, at oral argument before us appellants could not identify with specificity the appropriate relief for this violation if there was one.

In the "Prayer for Relief" section of their amended complaint, appellants seek relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3). However, section 1132(a)(2) is not applicable to the summary plan description allegations in Count IV because (a)(2) applies only to liability for breach of fiduciary duty, a matter not at issue on this appeal. [FN17] Under section (a)(3), participants may seek "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations, or (ii) to enforce any provisions of this subchapter or the terms of the plan." While (A) does not apply as there is no act or practice to enjoin with respect to the allegedly misleading summary plan description, appellants arguably can ask for "appropriate equitable relief ... to redress [the disclosure] violations," under section 1132(a)(3)(B)(i). However, we have indicated that "substantive remedies are generally not available for violations of ERISA's reporting and disclosure requirements" except "where the plaintiff can demonstrate the presence of extraordinary circumstances." Jordan v. Fed. Express Corp., 116 F.3d 1005, 1011 (3d Cir.1997) (quoting Ackerman v. Warnaco, Inc., 55 F.3d 117, 124 (3d Cir.1995)). While we "have not provided a rigid definition of 'extraordinary circumstances,' " such circumstances "generally involve acts of bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud." Id.

> FN17. The district court dismissed appellants' breach of fiduciary duty claims and they have not raised the dismissal of the claims as an issue on this appeal.

*15 In this case, viewing the allegations in the light most favorable to appellants, Count IV of the amended complaint is devoid of any allegation that even approaches "extraordinary circumstances" as we defined it in Jordan. Rather, paragraph 67 of the amended complaint states, "On information and belief, Defendants distributed to participants a Summary Plan Description ("SPD") of the Plan, as amended by the new Cash Balance Formula. The SPD, however, fails to disclose the Cash Balance Formula's failure to include the protected early retirement subsidy...." The allegation does not assert that PNC acted in bad faith, nor does it allege that PNC attempted to "actively conceal" the termination of the early retirement subsidy or that PNC committed fraud. Instead, according to the amended complaint, PNC merely "fail[ed] to disclose" the termination of the subsidy and the alleged reduction of future benefit accruals. Thus, appellants have not set forth an "extraordinary circumstance" that triggers equitable remedies under section 1132(a)(3)(B)(i). Accordingly, we will affirm the order dismissing Count IV.

### V. CONCLUSION

For the foregoing reasons, we will affirm the order of November 21, 2005 granting PNC's motion to dismiss appellants' amended complaint.

--- F.3d ----, 2007 WL 222019 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

• 05-5445 (Docket) (Dec. 20, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.