110

1    THE WITNESS: I really
2  can't say.
3  BY MR. BASSMAN:
4    Q. Well —
5    A. My, my gut feeling is they
6  would be better under the historic
7  plan.
8    Q. Why?
9    A. And I'm basing that
10  strictly on the information we
11  already spoke about people that are
12  leaving with larger sums of money.
13    Q. Although you do understand
14  that in the case of my hypothetical
15  28 year old leaving, he's going to
16  have to wait at least 25 years to get
17  any money paid to him, right?
18    A. Right.
19    Q. And during that time this
20  hypothetical employee could die,
21  right?
22    A. I would imagine it's within
23  the realm of possibility.
24    Q. Or in the course of 25

111

1  years, something could happen to the
2  plan's finances which could hinder
3  its ability to pay him, right?
4    A. I would imagine so.
5    Q. And so if you don't get
6  your money immediately when you leave
7  the company and it has to sit in a
8  pension plan, there's some risk that
9  either you're not going to be around
10  to get the money or the money's not
11  going to be there to pay you, right?
12    A. Yes.
13    Q. And the portability feature
14  of the cash balance plan eliminates
15  that risk, right?
16    A. It certainly would decrease
17  it. That's for sure.
18    Q. And decreasing that risk is
19  beneficial to, say, my hypothetical
20  28 year old, right?
21    A. I would imagine it would
22  be, yes.
23    Q. So for that person it's
24  certainly possible that even if the

112

1  amount of money he would get under
2  the cash balance plan were lower than
3  under the old Atlantic City plan, it
4  might be in his self interest to be
5  under the cash balance plan because
6  he's guaranteed to get his money the
7  day he walks out the door, right?
8    MR. SAUDER: Objection.
9    THE WITNESS: I don't know
10  if he gets his money the day he walks
11  out the door, but it's liquid in some
12  fashion.
13  BY MR. BASSMAN:
14    Q. And that's an advantage?
15    A. I would believe so.
16    Q. When you spoke to George in
17  1999 about the cash balance plan, did
18  you ask him for any documents?
19    A. I can't say if I did or
20  not. My relationship with him is
21  very casual. I've known him for a
22  long time prior to either one of our
23  employment at ACE, Atlantic City
24  Electric, and as I mentioned before,

113

1  he was a direct report of mine.
2    Q. Did he offer to provide you
3  any documents in 1999?
4    A. No.
5    Q. Did George provide you with
6  the name of anyone else whom you
7  could follow up with with questions
8  about the cash balance plan?
9    A. No.
10    Q. Did you ask him for a
11  follow-up name?
12    A. No. I can't say that I
13  did.
14    Q. Outside of talking to
15  George — by the way, just before I
16  go there, is there anything else that
17  you remember that either you said or
18  George said in that conversation in
19  1999 that you haven't told me
20  already?
21    A. No, I can't say that there
22  is.
23    Q. Outside of talking to
24  George in 1999, did you take any



**James DeCrescenzo Reporting**, LLC

---

**122**

1  because I believe one of these
2  locations that was close to me was
3  closed, and that's maybe why the
4  rescheduling.
5      Q.  So George mentioned to you
6  in 1999 that there will be a series
7  of meetings that will answer your
8  questions about the cash balance
9  plan, right?
10     A.  At some point, yeah. Yes.
11     Q.  But you were never invited
12  to any such meeting?
13     A.  No.
14     Q.  Did you follow up with
15  anyone in HR to ask why you hadn't
16  been invited to a meeting about the
17  cash balance plan after George told
18  you they were going to occur?
19     A.  I can't say that I did.
20     Q.  Do you see any factual
21  statements in Defendant's Exhibit 13
22  based on your view today that you
23  believe are false?
24         MR. SAUDER:  Objection.

---

**123**

1         THE WITNESS:  I can't
2  identify any, no.
3  BY MR. BASSMAN:
4      Q.  And, again, obviously, just
5  the best of your knowledge.
6         You can put this one to the
7  side.
8         Take a look at what's been
9  previously marked, please, as
10  Defendant's Exhibit 14.
11     A.  Okay.
12     Q.  Have you had a chance to
13  look over Defendant's Exhibit 14?
14     A.  Yes.
15     Q.  Ever seen this document
16  before?
17     A.  No.
18     Q.  In your review of this
19  document just now, did you see any
20  factual statements in it that you
21  believe are false?
22         MR. SAUDER:  Objection.
23  BY MR. BASSMAN:
24     Q.  You can answer.

---

**124**

1      A.  I can't say that I do.
2      Q.  You can put this one in the
3  finished pile.
4         If you could take a look at
5  what's previously been marked as
6  Defendant's Exhibit 19.
7         Have you had a chance to
8  look over Defendant's Exhibit 19?
9      A.  Yep.
10     Q.  Ever seen this before? .
11     A.  Nope.
12     Q.  Ever see a document before
13  with the heading Summary Plan
14  Description?
15     A.  No, I have not.
16     Q.  Has any representative of
17  HR at Conectiv ever told you that you
18  could review a copy of a Summary Plan
19  Description?
20     A.  No, they have not.
21     Q.  If you could hand that
22  back.
23     A.  (Witness complies.)
24     Q.  By the way, Mr. Fink, I

---

**125**

1  don't know if you have a preference
2  for when you would like to break for
3  lunch. I notice it's a little after
4  12.
5      A.  No preference whatsoever.
6      Q.  Okay. If at any time you
7  start to feel your stomach rumbling
8  and you'd like to take a break and
9  get some food, just let me know.
10 Otherwise, I'll probably take a lunch
11 stop relatively soon.
12     A.  That's fine.
13     Q.  I'll have you take a look
14 at what's been previously marked
15 Defendant's Exhibit 22.
16        MR. SAUDER:  This document
17 is marked MWW 308 through MWW 311. I
18 think we established yesterday that
19 the last page of the document 311 was
20 inadvertently stapled to this
21 document.
22        MR. BASSMAN:  That's
23 correct, yes.
24 BY MR. BASSMAN:

---

154

1    was electronic e-mail, but there was
2    not a plethora of the systems that we
3    have now. The whole arena has
4    evolved, as you well know, remarkably
5    in the last ten years.
6        Q. You mentioned earlier that
7    you had heard about Local 210
8    repeatedly rejecting the cash balance
9    plan. Did you ever hear about any
10   dispute between Local 210 and
11   Conectiv about the interest rate that
12   should be used to calculate lump sum
13   payments under the old Atlantic City
14   plan?
15       A. I may have, now that you
16   brought that up. There may have been
17   some -- some kind of rhetoric I heard
18   in passing and didn't pay any
19   attention to it because it really
20   didn't affect me at this time. They
21   may have used the wrong rate at one
22   point. I can't really say. It could
23   be just really gossip.
24       Q. And this would, again, be

155

1    gossip from your acquaintances who
2    are officials in the Local?
3        A. Yes.
4        Q. If you win this lawsuit,
5    Mr. Fink, what would you like the
6    court to do?
7        A. What would I like the court
8    to do?
9        Q. Yeah.
10       A. My personal spin on that,
11   I would like to see some change in
12   the -- well, ideally, I'd like for
13   everybody to be made whole. Meaning
14   those of us that were pre-merger
15   hires, not anybody that's
16   subsequently been hired by this
17   newly-formed corporation, go back
18   into the existing Heritage plans,
19   DelMarVa, Atlantic.
20       It's interesting that Pepco
21   elected not to do anything with their
22   Heritage plan on this last merger
23   other than retain it.
24       Q. So what you would ideally

156

1    like, and, again, I'm talking about
2    your ideal form of relief that you
3    would get from the court, is that for
4    everybody who started, you know,
5    before 1999 roughly, to go back, to
6    have their pensions go back under the
7    old Atlantic City plan, right?
8        A. Yes.
9        Q. Anybody who's come to work
10   for Conectiv after the ACE DelMarVa
11   merger, you have no objection to them
12   remaining in the cash balance plan?
13       A. I may have no objection?
14   They may have no objection, but I
15   would not have an objection.
16       Q. Do you feel like the
17   interest of employees who started
18   before the ACE DelMarVa merger and
19   those who started after are the same
20   in regards to the cash balance plan?
21       A. They're similar in nature.
22       Q. Are they different at all?
23       A. Well, there's no
24   grandfathering basically for those

157

1    people, so that is an issue.
2    However, I mean, we all know that
3    there's portability for them. But
4    other than that, there are some
5    subtle differences, but there are
6    other things that are unchanged, caps
7    at 650 percent of a five-year average
8    salary. That would remain unchanged.
9        Q. So you think that for the
10   employees who are hired after the ACE
11   DelMarVa merger, they also have an
12   interest in seeing the cash balance
13   plan declared illegal and the old
14   Atlantic City plan put back in its
15   place?
16       A. If I was in that particular
17   boat, that would be the direction I'd
18   be rowing.
19       Q. How come?
20       A. Just based on what I've
21   said all along, 650 percent cap for
22   starts.
23       Q. Anything else?
24       A. I'm not convinced what

162

1  understanding that to figure out the
2  lump sum payment that you get under
3  the cash balance plan, all you have
4  to do is look at your account
5  balance?
6      A. Would you repeat that
7  again?
8      Q. Sure. If you wanted to
9  figure out what your lump sum payment
10  on retirement would be from the cash
11  balance plan, all you have to do is
12  look at your account balance?
13     A. Basically, that's correct.
14     Q. And we looked earlier at
15  some statements you got from Vanguard
16  that showed your account balance here
17  by year. Do you recall that?
18     A. Yes, I do.
19     Q. I'd like to just pull those
20  out again. It was Defendant's
21  Exhibit 31, which I'm handing over to
22  you right now. If you could just
23  flip through your Vanguard statements
24  year by year, Mr. Fink, and confirm

164

1      A. That's also correct.
2      Q. For the old Atlantic City
3  plan, did you have any understanding
4  that the amount of annuity payment
5  you get each year would be some
6  factor of number times your average
7  pay times your years of service?
8      A. That was part of the high
9  level outline I told you was in the
10  handbook.
11     Q. And so under that formula
12  under the old Atlantic City plan,
13  when you retired, no matter which
14  year you retired, if you have the
15  same salary and years of service, you
16  know, whether you retired in 2001,
17  2002, 2003, your annuity payment will
18  be the same, right?
19         MR. SAUDER: Can you repeat
20  the question?
21  BY MR. BASSMAN:
22     Q. Sure. Let me rephrase
23  that. I think that was a little
24  confusing.

163

1  for me that every year your ending
2  account balance increased.
3      A. That's correct.
4      Q. Do you have any
5  understanding as to how if an annuity
6  would be calculated under the old
7  Atlantic City plan, if you opted to
8  take your retirement benefit as an
9  annuity?
10     A. No. I would have no
11  knowledge whatsoever.
12     Q. Same question under the
13  cash balance plan. Any idea if you
14  opted to take your benefits there as
15  an annuity, how the annuity would be
16  calculated?
17     A. I believe that's part of
18  the Estimator.
19     Q. So you would find out by
20  looking on the Estimator?
21     A. That's correct.
22     Q. But you don't personally
23  know how the Estimator comes up with
24  the number?

165

1         One of the things we talked
2  about earlier is you mentioned under
3  the old Atlantic City plan, because
4  the government multiplier changes
5  from year to year, two employees with
6  the exact same years of service and
7  salary history could get different
8  lump sum payments depending on which
9  calendar year they retired in.
10     A. Yes.
11     Q. My only question was, if
12  you take those same two hypothetical
13  people again, same exact salary
14  history, same exact number of years
15  of service, one retires in 2000, one
16  retires in 2002, they're both under
17  the old Atlantic City plan, they both
18  opt to have their pensions paid as an
19  annuity, isn't it correct that the
20  annuity would be identical for both
21  of them?
22         MR. SAUDER: Objection.
23         THE WITNESS: No.
24  BY MR. BASSMAN:



**James DeCrescenzo Reporting, LLC**

174

1  benefits?
2     A.  Under the old plan?
3     Q.  Under the old plan.
4     A.  There's no surviving
5  benefits, survivor benefits.
6     Q.  And same question, but this
7  time under the cash balance plan.  If
8  you were to die today, what happens
9  to your benefits under the cash
10  balance plan?
11     A.  That lump sum goes to
12  whoever the designated person is.
13     Q.  Like in a 401(k)?
14     A.  That's correct.
15     Q.  Do you view that enhanced
16  survivor benefit as a positive
17  feature of the cash balance plan?
18     A.  One could interpret that as
19  being a positive.
20     Q.  For example, if there were
21  a 30-year-old employee who was
22  diagnosed with a terminal illness,
23  wouldn't that person be better off
24  with a cash balance plan with

175

1  survivor benefits that could help
2  support their family than under the
3  old Atlantic City plan?
4     A.  Possibly.
5     Q.  Do you understand that one
6  of the allegations in your Complaint
7  is that the cash balance plan
8  discriminates on the basis of age?
9     A.  Yes.
10     Q.  How do you understand the
11  cash balance plan discriminates on
12  the basis of age?
13     A.  The same dollar that
14  somebody would put in at 25 years old
15  does not necessarily represent the
16  same thing for somebody at 40 years
17  old when you multiply it all the way
18  out.
19        There's also, in my mind,
20  which might not be necessarily
21  correct, I look at the age
22  discrimination thing goes back to
23  grandfathering for me.
24     Q.  Any other ways that you

176

1  view the plan as discriminating on
2  the basis of age?
3     A.  No.
4     Q.  Let's take each one of
5  those starting with the
6  grandfathering.  Who are the victims
7  of age discrimination when it comes
8  to grandfathering?
9     A.  All those people that were
10  long-term employees that were not 50
11  years old at the particular time the
12  cash balance was instituted.
13     Q.  So younger long-term
14  employees were the victims?
15     A.  The middle ground people.
16  Not the real young ones that would
17  probably benefit from cash balance.
18  The ones that are in between, the
19  Mike Charles type of guys that were
20  very close and didn't -- had fell
21  slightly short for years of service
22  or months short in age that are
23  stranded.
24     Q.  Now, you said the real

177

1  young people benefit from the cash
2  balance plan?
3     A.  I don't know if I said the
4  real young people benefit, but what
5  we have said earlier in this
6  conversation is that there's
7  circumstances that would possibly be
8  more beneficial to them, portability,
9  those type of things.
10     Q.  So for some real young
11  people, some of them may be better
12  off in the cash balance plan than the
13  old Atlantic City plan?
14     A.  In my mind if we're talking
15  about mobility, portability, or if
16  we're talking about dollars.
17     Q.  If you wanted to figure out
18  if the cash balance plan or the old
19  Atlantic City plan was better for a
20  young person -- by young I mean, say,
21  someone under 30 -- do you believe
22  that you would have to sit down and
23  talk with that person and find out
24  what their particular goals and plans

James DeCrescenzo Reporting, LLC
InnovatingLitigation
1880 JFK Blvd., 9th Floor, Philadelphia, PA 19103
215.564.3905                                              FAX  215.751.0581

B 46

178

1  are?
2  A.  I would imagine it would be
3  beneficial.  I mean, you're making a
4  decision for somebody that you have
5  no knowledge of what their
6  aspirations are.  Maybe they have a
7  desire to work for five years.
8  Maybe -- maybe they're of
9  the mindset that they'd like to have
10  a long-term career in that
11  particular, you know, position that
12  they're in, or in that particular
13  company that they're in.
14  Q.  So if you really wanted to
15  figure out what's in the interest of
16  any 26-year-old employee of Conectiv
17  today, the best way to find out would
18  be to sit down and talk to that
19  person and find out what their goals
20  and aspirations are, right?
21  MR. SAUDER:  Objection.
22  THE WITNESS:  I would
23  imagine you would have to solicit
24  some sort of response from them,

179

1  verbal, written, or otherwise.
2  BY MR. BASSMAN:
3  Q.  Now, going back to
4  grandfathering, you mentioned that
5  the middle guys, I assume like you
6  and Mr. Charles, are the worst off,
7  right?
8  A.  Him more so than me.
9  Q.  Why him more so than you?
10  A.  He was -- he has longer
11  service than I.  He's older than I
12  am.  He was just very close to
13  grandfathering and just missed it.
14  Q.  Do you consider yourself
15  one of these middle guys?
16  A.  Basically, yes.
17  Q.  And the beneficiaries, the
18  people being discriminated in favor
19  of, are the older, the oldest
20  employees, right?
21  A.  Can you say that again?
22  Q.  Sure.  Well, let me ask you
23  this way.  What is your understanding
24  of the criteria for qualifying for

180

1  the grandfather benefits?
2  A.  50 years old or 20 years of
3  service.
4  Q.  At what time?  50 years as
5  of what date?
6  A.  The first of '99.
7  Q.  Okay.  So for the oldest or
8  longest serving employees of Conectiv
9  as of 1999 were the recipients of the
10  grandfather benefits, right?
11  A.  Well, they either had the
12  age or the years of service.  One or
13  the other.
14  Q.  And it's the recipients of
15  the grandfather benefits who are the
16  people being discriminated in -- whom
17  Conectiv was discriminating in favor
18  of?
19  A.  In theory, someone could
20  work for five years for the
21  corporation, be 50 years old and be
22  grandfathered, and I could be 47
23  years old and have 20 years in and
24  not be grandfathered.  I don't think

181

1  that that's appropriate.
2  Q.  And, in fact, in that case,
3  the company is, in the hypothetical
4  you gave, the company is
5  discriminating against you because
6  you're younger, right?
7  A.  In my mind.
8  Q.  Now, you also mentioned as
9  another reason why you think the cash
10  balance plan is age discriminatory
11  that the same dollar someone earns at
12  20 is not going to be the same as a
13  dollar earned by someone at age 45.
14  I was wondering if you could just
15  explain that.
16  MR. SAUDER:  Outside any
17  communications you had with counsel.
18  THE WITNESS:  I can't.
19  BY MR. BASSMAN:
20  Q.  Okay.  So --
21  A.  Based on that statement.
22  Q.  Okay.  So just to be clear,
23  for that particular theory of age
24  discrimination, your knowledge only

**JAR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd.. 6th Floor. Philadelphia. PA 19103

215.564.3905                    FAX  215.751.0581

# EXHIBIT 3

# CONDENSED TRANSCRIPT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### PORTIONS CONFIDENTIAL

J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated,
     Plaintiff

V          C.A. No. 05-702(SLR)

PEPCO HOLDINGS, INC.; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN,
     Defendants

THOMAS S. TROUP, on behalf of himself and all others similarly situated,
     Plaintiff

V          C.A. No. 06-10(SLR)

PEPCO HOLDINGS, INC.; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN,
     Defendants

       Oral deposition of MAURICE W. WARD, JR., taken at the law offices of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, on Wednesday, January 10, 2007, commencing at 9:40 a.m., before Barbara McKeon Quinn, a Registered Merit Reporter and Notary Public, pursuant to notice.

## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103

215.564.3905
PHONE

215.7

58

BY MR. BASSMAN:
1
2    Q.   Okay.  With that
3  correction, do you remember if
4  anything was in the status fields?
5    A.   No, I don't.
6    Q.   Okay.  I see you ran two
7  estimates on December 22nd, 2006.  Do
8  you see that?
9    A.   Yes.
10   Q.   Why were you running
11 estimates on December 22nd?
12   A.   I don't remember.  I just
13 wanted to get updated numbers.  If
14 you look through -- maybe to explain
15 it.
16      Each of the documents
17 it's -- it doesn't give you a lot of
18 information on what I requested at
19 that time.  So the estimated years of
20 service come out zero and zero.
21   Q.   Uh-huh.
22   A.   So a lot of the old
23 documents I don't remember.
24      At the time I would have,

59

1  because I hit the buttons, because
2  you put the year you want to collect
3  your money and the year you want to
4  retire and they can be different and
5  it would give you a different number.
6      So I was just checking the
7  Pension Estimator at that time.
8    Q.   You can put this aside.
9  Put it sort of in the middle of the
10 table would be good.
11      You mentioned that in '98
12 there were a couple of initial
13 meetings about the cash balance plan.
14   A.   That's correct.
15   Q.   Did you attend any meetings
16 in 1999 about the cash balance plan?
17   A.   I don't remember.  I know I
18 attended one or two meetings.  I know
19 the first one I think was at the end
20 of '98; the second one could have
21 been in early '99, but...
22   Q.   Okay.  You specifically
23 remember there were two meetings.
24   A.   I think I attended two

60

1  meetings.
2    Q.   Okay.  Do you remember
3  receiving any documents about the
4  cash balance plan conversion?
5    A.   I do remember receiving
6  some generic documents.
7    Q.   Did you read them?
8    A.   Yes.
9    Q.   When Conectiv makes -- I
10 assume from time to time Conectiv
11 makes documents available to
12 employees about the pension plan.
13   A.   That's correct.
14   Q.   And it also sends you
15 documents on the plan as well, right?
16   A.   Periodically, yes.
17   Q.   And do you read those
18 documents?
19   A.   I don't, I don't read them
20 all in full.
21   Q.   Do you believe that your
22 pension rights are important?
23   A.   Yes.
24   Q.   And that the amount of your

61

1  pension is important for your
2  personal financial planning, right?
3    A.   Yes.
4    Q.   Given the importance of the
5  pension for your personal financial
6  planning, do you try to pay
7  particular attention to
8  communications about your rights
9  under your pension plan?
10   A.   I do now.
11   Q.   When did you start?
12   A.   Around 2004.
13   Q.   And before then?
14   A.   Not really, no.
15   Q.   We've been going by the way
16 for about an hour.  So I just wanted
17 to see, I'm about to segue into going
18 through a number of documents.  So I
19 just wanted to see how you're doing,
20 if you need a break, or you want to
21 keep going.
22      MR. SAUDER:  You want to
23 take a break?  It's up to you.
24      THE WITNESS:  I'm fine.



**James DeCrescenzo Reporting**, LLC

## 70

1 it was a lot of documents.
2   Q. And do you remember what
3 information Ms. McHenry gave you?
4   A. Same thing. I don't have
5 any specifics. I didn't keep a log
6 of who gave me what, so I don't
7 really know.
8   Q. You do remember that both
9 of them gave you documents, though.
10   A. Yes, I do.
11   Q. And did they give you hard
12 copy documents or did they forward
13 things by e-mail?
14   A. Hard copy documents.
15   Q. Did they give you any
16 information on top of what was in the
17 documents?
18   A. No.
19   Q. And did you call both Mr.
20 Rose and Ms. McHenry to ask them if
21 they had any documents?
22   A. I don't recall how I got
23 the information from them, if I asked
24 them or if they just asked me if I

## 71

1 needed anything.
2   Q. Has anyone, any other
3 employee at Conectiv, asked you about
4 the status of this lawsuit?
5   A. Probably the majority of
6 the people in the Atlantic region.
7 Yes, a large number of people.
8   Q. And what have you told
9 them?
10   A. To check the website.
11   Q. Check the Chimicles firm's
12 website?
13   A. That's correct.
14   Q. Have you ever provided any
15 more detail than that?
16   A. I don't remember specifics.
17 Maybe comments, that it's going okay
18 or just generic information.
19   Q. Anybody ever ask you
20 whether you thought you had a strong
21 or a weak case?
22   A. They have, and I couldn't
23 give them a response, so...
24   Q. If you could turn to the

## 72

1 fourth page of this exhibit, which
2 has the Bates number — and those are
3 the little numbers in the corner that
4 lawyers put on them. JMC 447.
5   A. Yes.
6   Q. Do you see there's some
7 handwriting on this page?
8   A. Yes.
9   Q. Do you recognize the
10 handwriting?
11   A. No, I don't.
12   Q. You can put this one to the
13 side.
14   A. (Witness complies.)
15   Q. Okay. Number 4 now. I ask
16 you to take a look at what's
17 previously been marked Defendant's
18 Exhibit 4. If you could just take a
19 look over that.
20   A. Okay.
21   Q. Have you had a chance to
22 look over Defendant's 4?
23   A. Yes.
24   Q. Have you ever -- well,

## 73

1 first let me ask you, have you seen
2 this document before?
3   A. I don't remember seeing it,
4 no.
5   Q. Have you seen documents in
6 this format with the fax heading on
7 it?
8   A. Yes, I have.
9   Q. And in what context have
10 you seen them?
11   A. Around the office
12 they're -- and I can't remember how
13 often we got them. They might have
14 been weekly at the time or monthly or
15 some, some periodic cycle we would
16 get information.
17   Q. And so on some periodic
18 basis management at Conectiv would
19 send to your internal mailbox a
20 document like this titled facts,
21 F-A-C-T-S?
22   A. I'm not sure how we got
23 them. Whether it went to a mailbox
24 or just somebody handed them out or

**74**

1 they sat on a table somewhere, but
2 they were around the office.
3    Q.  And they were available?
4    A.  Yes.
5    Q.  Do you remember always
6 reading each issue of facts?
7    A.  No.
8    Q.  Why didn't you read them
9 all?
10   A.  Can't answer that.
11   Q.  In hindsight do you think
12 you should have?
13   A.  There was a lot of stuff
14 going on then, and like I said
15 before, we were bidding our jobs, we
16 were closing departments.
17      You know, there was a lot
18 of stuff that was being finalized,
19 but the compensation package and
20 benefit package that just wasn't as
21 important -- maybe it should have
22 been, but...
23   Q.  Well, with full 20/20
24 hindsight, do you wish that you had

**75**

1 paid more attention to communications
2 about compensation and benefit issues
3 back in 1998 and 1999?
4    A.  Yes.
5    Q.  Do you feel that there was
6 information out there that you could
7 have accessed at the time that you
8 didn't?
9    A.  There could have been more
10 information than I did look for, yes.
11 I'm sure there was.
12   Q.  And I assume in 1998 and
13 1999 you weren't trying to uncover
14 information about the compensation
15 and benefit package, right?
16   A.  That's correct.
17   Q.  You never, as far as you
18 can recall, you never called anyone
19 at HR and asked any questions about
20 it?
21   A.  No.  Not that I recall, no.
22   Q.  When you attended these two
23 meetings, did you ask any questions
24 of the presenter?

**76**

1    A.  I don't recall, no.
2    Q.  Did you take any notes?
3    A.  I don't remember taking
4 any, no.  It was just general
5 information.
6    Q.  Were there any documents
7 passed out at those meetings?
8    A.  I don't remember.
9    Q.  Looking at Defendant's
10 Exhibit 4, there's a heading that
11 begins -- you see New Cash Balance
12 Plan towards the bottom of the first
13 page?
14   A.  Yes.
15   Q.  From the text that begins
16 under that heading Until Now, do you
17 see that?
18   A.  Yes.
19   Q.  From Until Now to the end
20 of this document, do you see any
21 representations that you believe are
22 inaccurate?
23   A.  No.  I don't see anything
24 inaccurate.

**77**

1    Q.  I just noticed you were
2 glancing at the first page.  If you
3 could also take a look at the back
4 two pages.  Just make sure that you
5 don't see anything inaccurate in them
6 either.
7    A.  I don't see anything
8 inaccurate that I can see.
9    Q.  Okay, thanks.  You can put
10 that one to the side in the done
11 pile.
12      Let's skip ahead to
13 Defendant's Exhibit 6.  If you could
14 take a look over that.
15   A.  Okay.
16   Q.  Have you had an opportunity
17 to review Exhibit 6?
18   A.  Yes.
19   Q.  Have you ever seen this
20 document before?
21   A.  Yes.
22   Q.  And did you receive a copy
23 on or about December 21, 1998?
24   A.  I don't remember.  Again, I

78

1 don't remember when I saw it. It
2 could have been a year and a half ago
3 or could have been in 1998. I don't
4 remember.
5     Q.  Do you have any reason to
6 believe you didn't receive a copy of
7 what's been marked as Defendant's 6
8 in December of '98?
9     A.  No.
10     Q.  In December of '98, do you
11 believe you would have been a
12 Conectiv management employee?
13     A.  Yes.
14     Q.  When you looked over this
15 document just now, Defendant's
16 Exhibit 6, did you see any
17 representations that you believe are
18 inaccurate?
19     MR. SAUDER: Objection to
20 form.  You can answer.
21     THE WITNESS: Huh?
22     MR. SAUDER: You can
23 answer.
24     THE WITNESS: Oh.  No.

80

1     Q.  You mentioned that there
2 are Your Conectiv Total Rewards
3 publications that are handed out or
4 given.  Do you read each one that's
5 handed out or given?
6     A.  No.  I don't know if I've
7 read them all.
8     Q.  Do you make an effort to
9 read them all?
10     A.  I would glance over them.
11 Not word for word probably.
12     Q.  Why don't you read them all
13 word for word?
14     A.  Don't know.  Can't answer
15 that.
16     Q.  Sitting here with perfect
17 hindsight today, January 2007, do you
18 wish that you had read them all word
19 for word?
20     A.  Yes.
21     Q.  Would you have acted
22 differently if you read them all word
23 for word in 1998 and 1999?
24     MR. SAUDER: Objection to

79

1 BY MR. BASSMAN:
2     Q.  Put this one to the side.
3     Let's take a look at
4 Defendant's Exhibit 7.  If you could
5 take a look over that one.
6     A.  Okay.
7     Q.  Have you had a chance to
8 look over Defendant's 7?
9     A.  Yes.
10     Q.  Have you ever seen this
11 document before?
12     A.  Again, yes, I have, but I
13 don't know when.
14     Q.  Have you ever seen
15 documents before with the title Your
16 Conectiv Total Rewards?
17     A.  Yes.
18     Q.  In what context?
19     A.  I might be confusing
20 that -- I think it's the Conectiv
21 Totals Rewards we get -- I think in
22 Atlantic City Electric also Total
23 Rewards as a publication handed out
24 or given.

81

1 form.
2 BY MR. BASSMAN:
3     Q.  You can answer.
4     A.  I don't think so.
5     Q.  In your review of
6 Defendant's 7, did you see any
7 representations that you believe are
8 inaccurate?
9     MR. SAUDER: Objection to
10 form.
11     THE WITNESS: The --
12 BY MR. BASSMAN:
13     Q.  Feel free to take another
14 look if you want to.
15     A.  Okay.  The, the charts and
16 the graphs and the what if and the
17 person making this amount of money
18 over this many years, I don't know
19 how accurate that is I mean, but as
20 far as -- and that goes with all the
21 other documents and saying I could
22 correct something.
23     I can't -- I have no way to
24 validate that these charts and graphs

**James DeCrescenzo Reporting**, LLC

---

94

1  of calculations on the Pension
2  Estimator and that you did this after
3  speaking with Mr. Rehr. Do you
4  recall that testimony?
5    A. Yes.
6    Q. And the reason that you
7  wanted to run calculations on the
8  Pension Estimator was to compare how
9  your benefits under the cash balance
10 plan compared to the old plan; is
11 that right?
12   A. That's correct.
13   Q. How did you figure out what
14 your benefits were under the old
15 plan?
16   A. I basically couldn't for
17 the lump sum. Had to approximate
18 them based on Mr. Rehr's approximate
19 numbers he gave me.
20   Q. So you just used Mr. Rehr's
21 numbers as a proxy for your own?
22   A. That's correct. Because we
23 make roughly the same amount of money
24 with -- would have approximately the

---

95

1  same years of service.
2    Q. Did Mr. Rehr give you the
3  amount -- first off, let me back up
4  for a second. Did Mr. Rehr take a
5  lump sum or an annuity when he
6  retired?
7    A. Lump sum.
8    Q. And did he tell you the
9  amount of the lump sum?
10   A. Not the exact amount.
11   Q. Did he give you a ballpark
12 figure?
13   A. He did, yes.
14   Q. What was it?
15   A. It was in -- I don't recall
16 the exact number but it was over
17 600,000.
18   Q. You mentioned earlier that
19 you spoke to several individuals who
20 were retiring.
21   A. Yes, that's correct.
22   Q. Did any of those
23 individuals opt for an annuity
24 instead of a lump sum?

---

96

1    A. No, not that I'm aware of.
2    Q. Do you know of any other
3  Conectiv employee who when they
4  retired opted for an annuity instead
5  of a lump sum?
6    A. No.
7    Q. Let's take a look at
8  Defendant's Exhibit 9.
9    A. Okay.
10   Q. Have you ever seen this
11 document before?
12   A. I don't recall seeing it,
13 no.
14   Q. Have you ever seen other
15 documents titled InSight, a Conectiv
16 employee newsletter?
17   A. Yes, I have.
18   Q. In what context?
19   A. I have just seen the
20 InSight name. I do remember seeing
21 issues. I don't recall what issues,
22 but I have seen them.
23   Q. Have you ever seen the
24 InSight letter delivered to your

---

97

1  internal mailbox at the company?
2    A. I don't recall.
3    Q. Have you ever received a
4  copy of an InSight newsletter?
5    A. An InSight, yes, I have,
6  but I don't know how I received it.
7    Q. Anything secret about
8  what's in an InSight newsletter as
9  far as you know?
10       MR. SAUDER: Objection.
11 BY MR. BASSMAN:
12   Q. You can answer.
13   A. Anything --
14   Q. Secret.
15   A. -- secret? Not that I'm
16 aware of, no.
17   Q. You can put this to the
18 side.
19       MR. SAUDER: Just noting
20 for the record that document starts
21 on PHI 3428, the next page is 3426,
22 and that's page number 6, so this
23 appears to be an incomplete document.
24 BY MR. BASSMAN:

---



**James DeCrescenzo Reporting, LLC**

98

1    Q. Have you ever read any
2  InSight newsletters?
3    A. I can't recall what copies
4  I would have read, but I think I
5  have, yes.
6    Q. Do you try to read every
7  InSight newsletter that you receive?
8    A. No.
9    Q. Why not?
10   A. Just never took the time to
11 read them.
12   Q. Let's take a look at
13 Defendant's 10. Can you take a look
14 over Defendant's 10?
15   A. Okay.
16   Q. Have you had a chance to
17 look over Defendant's Exhibit 10?
18   A. Yes.
19   Q. Ever seen this before?
20   A. I don't recall seeing it.
21   Q. If you look at the third
22 paragraph, I refer your attention
23 there.
24   A. Yes.

100

1  no.
2    Q. In your review of
3  Defendant's Exhibit 10, did you see
4  any representations that you think
5  are inaccurate?
6      MR. SAUDER: Objection.
7  Objection to the form.
8        Objection to the fact that
9  it calls for an opinion, and
10 objection to the fact that if there's
11 anything in here with regard to
12 whether it calls for a legal opinion
13 by a lay witness, and I would make
14 that same objection with regard to
15 every other time that question was
16 asked.
17 BY MR. BASSMAN:
18   Q. You can answer.
19   A. I don't -- I don't see
20 anything that's inaccurate.
21   Q. Let's put this one aside.
22     Moving right along. Let's
23 take a look at Number 11. Have you
24 had an opportunity to review

99

1    Q. You see the second sentence
2  begins, Recent stories? Could you
3  just read that sentence aloud that
4  begins Recent stories.
5    A. Okay. Recent -- do you
6  want me to read it aloud?
7    Q. Yes.
8    A. "Recent stories in the
9  national media have raised concerns
10 about some cash balance plans that do
11 not offer the same level of financial
12 security or grandfathering provisions
13 as cash -- Conectiv's cash balance
14 pension plan."
15   Q. Thanks. Do you remember
16 hearing any discussion in or around
17 June 23rd, 1999 of stories in the
18 national media raising concerns about
19 cash balance plans?
20   A. No, I don't.
21   Q. Did you ever in 1999 try to
22 research any media stories about cash
23 balance plans?
24   A. I don't recall doing so,

101

1  Defendant's 11?
2    A. Yes.
3    Q. Have you ever seen this
4  document before?
5    A. I don't remember seeing it,
6  no.
7    Q. Okay. You can put that one
8  aside. You can put that one in the
9  finished pile.
10     Take a look at Defendant's
11 Exhibit 12. Have you had an
12 opportunity to look over Defendant's
13 Exhibit 12?
14   A. Yes.
15   Q. Have you ever seen this
16 before?
17   A. I don't remember seeing it.
18   Q. Have you ever seen any
19 documents titled InSight Online?
20   A. No, I don't. That probably
21 wouldn't have been a document if it
22 was online too, so...
23   Q. Okay. Is there an intranet
24 at Conectiv?



**James DeCrescenzo Reporting, LLC**
InnovatingLitigation
1880 JFK Blvd, 6th Floor, Philadelphia, PA 19103

---

130

1  meetings and stuff.
2  Q. About this lawsuit?
3  A. Yeah. Yes.
4     MR. BASSMAN: Have these
5  been withheld as privileged?
6     MR. SAUDER: Dates of
7  meetings with regard to e-mails?
8     MR. BASSMAN: Whatever
9  these e-mails that have been
10 exchanged between Mr. Ward and Mr.
11 Charles.
12    MR. SAUDER: We may not
13 have a copy of the e-mails that were
14 exchanged with regard to the dates to
15 depositions and dates to anything
16 else relevant to this litigation.
17    So if you want to request a
18 copy, you know, we can certainly see
19 if we can get copies of them and take
20 a look at them and see if there's any
21 privilege or any work product.
22    MR. BASSMAN: I would ask
23 if you could go and search Mr. Ward's
24 e-mail account from his home e-mail

---

131

1  to see if he has any responsive
2  documents, because we think those
3  would be encompassed in our document
4  requests.
5     MR. SAUDER: Okay.
6     MR. BASSMAN: Thanks.
7  BY MR. BASSMAN:
8     Q. The same document,
9  Defendant's 25. If you could turn to
10 page eight. You see the heading that
11 says Rule 26 (a)(1)(C) Disclosure
12 Damage Computation?
13    A. Yes.
14    Q. If you could turn to the
15 next page. Under that heading
16 there's a bullet -- I want you to
17 look at the second and third bullets.
18    If you could read over them
19 and confirm for me that this is the
20 relief that you personally would like
21 from the court if you won this
22 lawsuit.
23    MR. SAUDER: Are you on
24 page nine?

---

132

1     MR. BASSMAN: Page nine,
2  yes.
3     THE WITNESS: Starting out
4  Reformation of the?
5  BY MR. BASSMAN:
6     Q. Yes.
7     A. Okay.
8     Q. Do those two bullets I just
9  directed you to accurately reflect
10 what you would like the court to do
11 in this case?
12    A. Yes.
13    Q. And that would be to
14 eliminate the cash balance plan and
15 reinstate the old plan, right?
16    A. That's correct.
17    Q. And do you think that you
18 will be better off financially if the
19 court were to do that?
20    A. Yes.
21    Q. If it were to turn out that
22 your retirement benefits were higher
23 under the cash balance plan than they
24 would have been under the old plan,

---

133

1  would you change your mind?
2     MR. SAUDER: Objection to
3  the form.
4  BY MR. BASSMAN:
5     Q. You can answer.
6     A. No. Because of the age,
7  because of the age also. The age 65
8  versus age 55 retirement date.
9     Q. I'm not sure I follow. Can
10 you explain what you mean?
11    A. In the ACE plan, in the
12 traditional Atlantic plan that we
13 have now I could retire at 55 with no
14 reduction in benefit. At age -- I'd
15 have to work until I'm 65 under the
16 Conectiv cash balance plan.
17    So I would have to work ten
18 more years basically to get a similar
19 benefit.
20    Q. Besides losing the early
21 retirement option that was in the old
22 ACE plan, has the cash balance plan
23 conversion harmed you in any way?
24    MR. SAUDER: Objection.

154

1  believe they're incorrect or not?
2  A. No. That's correct.
3  Q. I want you to look over
4  these statements Defendant's Exhibit
5  26 through 30. Can you confirm for
6  me that each year your ending account
7  balance is higher than it was for the
8  previous year?
9  A. Yes.
10  Q. And in fact, since the cash
11  balance plan has been in effect, has
12  your account balance ever decreased?
13  A. You mean the ending
14  balance?
15  Q. Yeah.
16  A. No.
17  Q. It always goes higher each
18  time you get a statement?
19  A. By some number, yes.
20  Q. Have you ever called
21  Vanguard to discuss anything that
22  appeared on your cash balance plan
23  statement?
24  A. No.

155

1  Q. Ever communicated with
2  Vanguard in any way about your cash
3  balance plan account?
4  A. No.
5  MR. SAUDER: Just to
6  clarify, with the exception of --
7  MR. BASSMAN: With the
8  exception of Pension Estimator.
9  THE WITNESS: Yes.
10  MR. BASSMAN: I was leaving
11  that to the side. That's a good
12  clarification.
13  BY MR. BASSMAN:
14  Q. Okay. You can put those
15  aside.
16  I want to talk to you a
17  little bit about your claims you've
18  asserted in your Complaint. Do you
19  understand that one of the claims
20  that you have asserted against
21  Conectiv is that the cash balance
22  plan is age discriminatory?
23  A. Yes.
24  Q. What is your understanding

156

1  as to why the cash balance plan is
2  age discriminatory?
3  MR. SAUDER: You can answer
4  to the extent you don't violate any
5  attorney-client communications.
6  THE WITNESS: Are you
7  talking about in our Complaint?
8  BY MR. BASSMAN:
9  Q. I'm just talking in
10  general. Let me back up for a
11  second.
12  Is it your personal belief,
13  just yes or no sitting here today,
14  that the Conectiv cash balance plan
15  is age discriminatory?
16  A. Yes.
17  Q. When did you form that
18  belief?
19  A. Around 2004.
20  Q. During your discussions
21  with Mr. Rehr?
22  A. Yes.
23  Q. And in 2004, what was the
24  basis of your belief that the cash

157

1  balance plan is age discriminatory?
2  A. Because I was converted to
3  a plan in my early forties that gave
4  me a reduced benefit that I couldn't
5  make up in the remaining years I have
6  before I reach retirement age.
7  Q. Okay. So just so I'm a
8  little clear on what the issue is
9  here, if the cash balance plan had
10  existed from your first day at
11  Atlantic City, you wouldn't have
12  considered it age discriminatory?
13  A. Not based on the
14  information I have, no.
15  Q. Interest credits are given
16  to everyone the same amount
17  regardless of age -- same rate,
18  excuse me, regardless of age each
19  year?
20  MR. SAUDER: Objection.
21  Can you rephrase the question?
22  MR. BASSMAN: Sure.
23  BY MR. BASSMAN:
24  Q. I'll make it a little



**JDR**

**James DeCrescenzo Reporting,** LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

45 (Pages 174 to 177)

---

**174**

1  either Mr. 30 year old won't be here
2  to get the money or the money won't
3  be there for him in 25 years, right?
4      A.  Yes.
5      Q.  And you eliminate that risk
6  when you can get an immediate lump
7  sum payment under the cash balance
8  plan, right?
9      A.  Yes.
10      Q.  And there's real value to
11  eliminating that risk, isn't there?
12          MR. SAUDER:  Objection.
13          THE WITNESS:  I'm sure
14  there is, yes.
15  BY MR. BASSMAN:
16      Q.  I mean it's a benefit of
17  the cash balance plan.
18      A.  Sure.
19      Q.  It's a positive thing.
20      A.  Yes.
21      Q.  Now, switching gears for a
22  minute.  We spent a lot of time this
23  morning going over many documents
24  from '97, '98 and '99 about the cash

---

**175**

1  balance conversion.  I assume you
2  recall having looked through all
3  those this morning.
4      A.  Yes.
5      Q.  Do you believe that any of
6  those documents omitted information
7  that should have been included in the
8  notice to you?
9          MR. SAUDER:  Again, I would
10  just object to the extent that it
11  involves any attorney-client
12  communication.
13          THE WITNESS:  With the
14  exception of information we've
15  discussed, I'm not aware of any.
16  BY MR. BASSMAN:
17      Q.  And again, leaving aside
18  anything that may have been discussed
19  between you and your attorney,
20  looking back, is there any
21  information that you wished had been
22  orally presented to you at the two
23  meetings you attended about the cash
24  balance conversion?

---

**176**

1          MR. SAUDER:  I'm sorry.
2  Can you just repeat that question.
3          (The reporter read back the
4  following testimony:
5          "Q.  And again, leaving
6  aside anything that may have been
7  discussed between you and your
8  attorney, looking back, is there any
9  information that you wished had been
10  orally presented to you at the two
11  meetings you attended about the cash
12  balance conversion?")
13          MR. SAUDER:  I would just
14  object to the form, but if you
15  understand the question you can
16  answer.
17          THE WITNESS:  The two
18  meetings I attended were very
19  general.  So I mean, I mean the plan
20  wasn't even -- I don't even think the
21  plan was actually formalized by that
22  point in time.  So I mean --
23  BY MR. BASSMAN:
24      Q.  I'll ask it even more

---

**177**

1  broadly then.
2          Other than what you may
3  have discussed with your attorneys,
4  is there anything at all that you
5  wish in hindsight Conectiv had
6  communicated to you in 1998 and 1999
7  about the cash balance plan
8  conversion?
9      A.  Not the conversion as much
10  as the plan itself, because it was
11  presented to me, the things I
12  remember about the cash balance plan
13  presentations were the rah, rah about
14  how good it would be for us, and not
15  how there was such a dramatic
16  difference at, at age 55 or 65 at the
17  time of retirement.
18          So I had no, no
19  understanding it was that dramatic of
20  a difference until just a few years
21  ago.
22      Q.  So in retrospect, you
23  wished that in 1998 and 1999 Conectiv
24  had given you more detail comparing

---

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

44 (Pages 170 to 173)

170

1   BY MR. BASSMAN:
2       Q.   Well, how old are you, sir?
3       A.   51 and a half. Almost 52.
4       Q.   Okay. So if you decided to
5   take a job with a new employer today,
6   under the cash balance plan you could
7   receive your current account balance
8   as a lump sum, right?
9       A.   That's correct.
10      Q.   If the old ACE plan were in
11  place, if you switched to another job
12  today, could you receive your
13  benefits today in a lump sum payment?
14      A.   No. I'm not aware, no.
15      Q.   As far as you know.
16      A.   As far as I know I
17  couldn't, no.
18      Q.   Do you consider that to be
19  an advantage, the ability to know
20  that you can switch jobs and get an
21  immediate pension payment?
22      A.   Not when the number would
23  be that much smaller. I would just
24  wait until I'm 55 and get my ACE

171

1   plan.
2       Q.   What about for an employee
3   who is just — again, you know, to
4   the best of your understanding, an
5   employee who's 30 years old who's
6   thinking about switching jobs after
7   working at Conectiv for ten years.
8       Do you believe they would
9   be in a better position under the
10  cash balance plan than the old ACE
11  plan?
12      MR. SAUDER: Objection
13      THE WITNESS: I can't
14  answer that question for somebody
15  else. I don't know. There might
16  still be. I don't know their
17  numbers.
18      There could be a dramatic
19  difference between their cash balance
20  and they're vested at ACE plan, if
21  they're under the ACE plan.
22      So they might want to leave
23  that in the ACE plan, too, until
24  they're 55 and then draw it. You

172

1   know, I don't have those numbers.
2   BY MR. BASSMAN:
3       Q.   In your experience at
4   Conectiv, do you know anyone when
5   they retired or left the company who
6   turned down an option to take an
7   immediate lump sum payment?
8       A.   As in? Could you, could
9   you rephrase?
10      Q.   Sure. One of the things
11  you mentioned in response to my
12  hypothetical about a 30 year old
13  employee who might want to change
14  jobs is they might have thought that
15  they'd be better off letting their
16  money sit in the ACE plan and taking
17  it at age 55 rather than taking a
18  lump sum right now in the cash
19  balance plan, right?
20      A.   Possibly.
21      Q.   I was just wondering if in
22  your experience at Conectiv if you
23  know anyone who when they had the
24  chance to take an immediate lump sum

173

1   on leaving the company turned it
2   down.
3       A.   I don't know of anybody.
4       Q.   One of the things that you
5   mentioned is a 30 year old could
6   leave the money to sit for 25 years,
7   right, and take their pension at 55?
8       A.   If they were vested I think
9   they can. To my knowledge.
10      Q.   Assuming they're vested.
11      A.   Okay.
12      Q.   There is a risk, isn't
13  there, that the 30 year old could
14  die? We're talking under the old ACE
15  plan.
16      A.   Uh-huh.
17      Q.   There's a risk, isn't
18  there, that the 30 year old could die
19  in the intervening years, right?
20      A.   Oh, yeah.
21      Q.   A risk that the plan could
22  become insolvent?
23      A.   Yes.
24      Q.   A risk that the money



**James DeCrescenzo Reporting**, LLC

*Innovating Litigation*



**186**

1    A.  Yes.  And if you put down a
2 different dates, the number changes.
3    Q.  When you say if you put
4 down different dates, different dates
5 for either one?
6    A.  Yes.  Yes.  So if I put
7 last day worked today, but I don't
8 draw my pension until 2020, it
9 changes the Pension Estimator, which
10 I don't know if it's valid even, but
11 it allows you to do it.
12    Q.  Okay.
13    A.  But that's why there's a
14 lot of numbers there.
15    Q.  Another question, and this
16 is even of the old ACE plan, and I
17 apologize if this question is about
18 to become a little morbid, but if
19 there were never a cash balance plan
20 and you were still under the old ACE
21 plan and you were to die today, what
22 is your understanding as to what
23 happens to your pension benefit?
24    A.  It's my understanding --

**188**

1    MR. SAUDER:  Objection.
2    THE WITNESS:  More
3 generous.
4    MR. BASSMAN:  Okay.  That's
5 all I've got.  I don't know if you
6 have any questions.
7    MR. SAUDER:  I have no
8 questions.
9    MR. BASSMAN:  You guys are
10 reading and signing?
11    MR. SAUDER:  Yes.
12    MR. BASSMAN:  You are a
13 free man.
14    (Testimony concluded at
15 2:30 p.m.)
16
17
18
19
20
21
22
23
24

**187**

1 it's my understanding that under the
2 cash balance plan I think my, whoever
3 the survivor is, would get some
4 portion or some of it.
5    Q.  Leaving aside the cash
6 balance plan.  Under the old plan.
7    A.  Under the ACE plan?  I'm
8 not sure.
9    Q.  Did you ever read or hear
10 anything about how under the ACE plan
11 if you were to die before you began
12 drawing your pension, that your
13 surviving spouse would only get half
14 of your pension, not the full
15 pension?
16    A.  I don't remember reading
17 that, but I assume there is a
18 difference because of the way the
19 wording in the cash balance plan is,
20 so...
21    Q.  And in this respect, in
22 terms of surviving benefits on death,
23 is the cash balance plan more or less
24 generous than the old ACE plan?

**189**

1    WITNESS CERTIFICATION
2
3    I hereby certify that I
4 have read the foregoing transcript of
5 my deposition testimony, and that my
6 answers to the questions propounded,
7 with the attached corrections or
8 changes, if any, are true and
9 correct.
10
11
12 _____    _____
   DATE        MAURICE W. WARD, JR.
13
14
15
16
17
18
19    _____
   PRINTED NAME
20
21
22
23
24



# EXHIBIT 4

# CONDENSED TRANSCRIPT

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

### PORTIONS CONFIDENTIAL

J. MICHAEL CHARLES; MAURICE W.
WARD, JR.; and JOSEPH I. FINK, JR.,
on behalf of themselves and
all others similarly situated,
     Plaintiff

    V               C.A. No. 05-702(SLR)

PEPCO HOLDINGS, INC.; CONECTIV, and
PEPCO HOLDINGS RETIREMENT PLAN,
     Defendants

         -  -  -

THOMAS S. TROUP, on behalf of himself
and all others similarly situated,
     Plaintiff

    V              C.A. No. 06-10(SLR)

PEPCO HOLDINGS, INC.; CONECTIV, and
PEPCO HOLDINGS RETIREMENT PLAN,
     Defendants

        Oral deposition of JEROME MICHAEL CHARLES, taken at the law offices of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, on Tuesday, January 9, 2007, commencing at 9:39 a.m., before Barbara McKeon Quinn, a Registered Merit Reporter and Notary Public, pursuant to notice.



**James DeCrescenzo Reporting, LLC**

INNOVATING LITIGATION
215.564.3905    1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103    215.751.0581
PHONE             www.jdreporting.com                   FAX

46

1     Q. Did you raise the issue or
2 did he?
3     A. I can't say, because when
4 you're having lunch with someone you
5 just have conversations. I may have
6 said it; he may have said it. I
7 really don't remember.
8     Q. What prompted you to start
9 having conversations with people
10 about cash balance plans two or three
11 years ago?
12     A. When coworkers started to
13 retire, they would make offhand
14 comments to me and other people.
15 Those comments circled around the
16 difference between the -- because
17 those folks who were grandfathered
18 had a choice between two plans, the
19 old retirement plan and the cash
20 balance plan.
21     And they would make offhand
22 comments of the difference monetarily
23 between those two, significant
24 difference, and that's what captured

47

1 my attention.
2     Q. What were those
3 differences?
4     A. They were in forms of
5 percentages. In other words, the ACE
6 plan might be fifty percent more than
7 the cash balance plan for that
8 individual.
9     Q. Did you ever get any more
10 detailed information from them about
11 the particulars of their benefits?
12     A. I never wanted to ask
13 anyone how much money they have.
14 That's not appropriate. What I would
15 ask them is just to supply me with a
16 percentage difference which I felt
17 was reasonable, and they had no
18 objections to it.
19     Q. How many people did you ask
20 about that?
21     A. 12, 20 people.
22     MR. MALONE: You know
23 what's coming next.
24     THE WITNESS: Yes, I do.

48

1     MR. MALONE: You're going
2 to spell those names.
3     THE WITNESS: Yes.
4 BY MS. YU:
5     Q. Who are they?
6     A. Karen Ayars, George Pinto,
7 Greg Peterson, Annette Ponzio, Rich
8 Simimoni, Scott Razzie. I don't know
9 if I said Rich Simimoni. I apologize
10 if I said it before.
11     MR. MALONE: I think you
12 had.
13     THE WITNESS: Okay. There
14 were many more, but right off the top
15 of my head I can't pull every single
16 name. If I had known ahead of time I
17 would have written them all down.
18 BY MS. YU:
19     Q. Do you know whether they
20 took lump sum benefits?
21     A. Do I know why they took the
22 lump sum?
23     Q. Whether.
24     A. Oh, whether. No, I don't

49

1 know that.
2     Q. Just to clarify, you're not
3 certain what form of retirement
4 benefit they took; is that right?
5     A. I have to assume the
6 majority of people who do retire take
7 the lump sum, but I can't say that
8 100 percent because that's their
9 business.
10     Q. So just so I understand,
11 you didn't ask them specifically that
12 question, whether they took a lump
13 sum or some other form?
14     A. They may have volunteered
15 it, but I didn't ask.
16     Q. Do you recall whether
17 anybody ever said that they took
18 anything other than a lump sum?
19     A. There may have been some
20 conversation one person may have
21 decided to take an annuity.
22     Q. Do you recall who that
23 person was?
24     A. May have been -- this is a



---

**50**

1  new name — Skip Castaldi,
2  C-A-S-T-A-L-D-I.
3      Q.  Did you also ask him about
4  the difference between the cash
5  balance plan and the grandfathered
6  plan?
7      A.  He was a supervisor of mine
8  at that point. I think it was
9  inappropriate to ask him.
10      MR. MALONE:  Can I hear the
11  answer?
12      (The reporter read back the
13  following testimony:
14      "A.  He was a supervisor of
15  mine at that point. I think it was
16  inappropriate to ask him.")
17  BY MS. YU:
18      Q.  So you did not ask him?
19      A.  No. He just stated that he
20  was deciding that he might take the
21  annuity.
22      Q.  Approximately how many
23  people in the ACE division of PHI
24  have you spoken with about cash

---

**51**

1  balance plan?
2      A.  20, 30 people. I don't
3  know off the top of my head.
4      Q.  Is there anyone in addition
5  to those names that you've listed
6  that you can recall from the ACE
7  division that you've had
8  conversations with?
9      A.  I had some e-mails that I
10  had asked questions concerning of
11  none of those individuals listed.
12      Q.  I'm trying to sort of
13  categorize the kind of conversations
14  that you've had, and so far we've
15  talked about conversations that
16  you've had with coworkers or others
17  regarding their pensions.
18      Other than the folks who
19  retired, what kind of conversations
20  have you had with people who say are
21  still currently employed?
22      MR. MALONE:  Object to the
23  form of the question.
24      THE WITNESS:  When that

---

**52**

1  would come up in the conversation, we
2  started discussing the cash balance
3  versus the old plan. These were a
4  mixture of grandfathered,
5  non-grandfathered employees.
6      Obviously the
7  non-grandfathered employees were not
8  real happy with the predicament that
9  they were in and was hoping that
10  something would happen to allow them
11  to be in a better position to retire.
12      MR. MALONE:  Can I have the
13  question and answer read back?
14      (The reporter read back the
15  following testimony:
16      "Q.  Other than the folks
17  who retired, what kind of
18  conversations have you had with
19  people who say are still currently
20  employed?"
21      "A.  When that would come
22  up in the conversation, we started
23  discussing the cash balance versus
24  the old plan. These were a mixture

---

**53**

1  of grandfathered, non-grandfathered
2  employees.
3      "Obviously the
4  non-grandfathered employees were not
5  real happy with the predicament that
6  they were in and was hoping that
7  something would happen to allow them
8  to be in a better position to
9  retire.")
10      MR. MALONE:  Thank you.
11  I'm just having trouble hearing over
12  the air conditioning sometimes.
13  BY MS. YU:
14      Q.  Did you have any other
15  kinds of conversations about cash
16  balance plans with employees or
17  retirees of ACE?
18      MR. MALONE:  Object to the
19  form of the question.
20      THE WITNESS:  I'm not sure
21  what you mean by different
22  conversations. I don't quite
23  understand that question.
24  BY MS. YU:

---

---

**138**

1 MR. MALONE: Objection to
2 the form of the question as calling
3 for a legal conclusion from a lay
4 witness. You can answer as to your
5 understanding.
6 BY MS. YU:
7 Q. As to the damages that
8 you're seeking to recover through
9 this litigation, is there anything
10 other than your benefits are less
11 under the cash balance plan formula
12 than you feel they would have been
13 under the old plan, is there anything
14 else that you're seeking to recover
15 in this litigation?
16 MR. MALONE: Same
17 objection.
18 THE WITNESS: The only way
19 I can answer that is if they had
20 never instituted the cash balance
21 plan, if the old plan still exists, I
22 would not be here today. I don't
23 know if that answers your question.
24 BY MS. YU:

---

**139**

1 Q. What is the recovery that
2 you are seeking from the defendants
3 in this litigation?
4 MR. MALONE: Object to the
5 form of the question. Calling for
6 legal opinion from a lay witness.
7 You can testify as to your
8 understanding.
9 THE WITNESS: Fair. I'm
10 not looking to bankrupt the company,
11 punish anyone, see anyone get fired.
12 I'm just trying to correct a wrong.
13 BY MS. YU:
14 Q. How in your view should it
15 be corrected?
16 A. Honestly?
17 Q. Yes.
18 A. Put it back the way it was.
19 Q. Is there anything else
20 you're looking for?
21 MR. MALONE: Object to the
22 form of the question.
23 THE WITNESS: In
24 compensation?

---

**140**

1 BY MS. YU:
2 Q. Yes.
3 A. I haven't given thought for
4 that. My primary focus has been
5 strictly on trying to right a wrong,
6 help other employees that are in my
7 situation. I myself aren't looking
8 for any huge personal gain out of
9 this. But for now, all I want to do
10 is just correct this wrongdoing.
11 Q. Tell me what you think the
12 wrongdoing is.
13 MR. MALONE: Object to the
14 form of the question. It calls for a
15 legal opinion from a lay witness.
16 You should answer to your
17 understanding.
18 THE WITNESS: If you were
19 to take a poll of the employees of
20 the utility that I work for, The
21 Heritage Company, you would find out
22 that 100 percent of those individuals
23 came to work for that company because
24 they knew it was secure, had a good

---

**141**

1 retirement plan, and knew that they
2 could work 25, 30 years, and at that
3 end be able to retire with a nice,
4 full retirement.
5 That's how I would answer
6 that question. I don't know what
7 else you want me to -- you're
8 searching for.
9 BY MS. YU:
10 Q. What did the company do
11 that was wrong?
12 A. They -- they took something
13 that was -- had been in existence for
14 years, decades, and said, We don't
15 care how long you've been here, we're
16 changing the rules, and we're going
17 to say that this is now the
18 retirement plan, and for those folks
19 not grandfathered, like it or not,
20 this is it.
21 I would assume if they
22 said, Here's a new retirement plan;
23 here's an old retirement plan;
24 everybody, take your pick, I would

---

**James DeCrescenzo Reporting**, LLC

215.564.3905                FAX 215.751.0581

1880 JFI          B 63          3103

154

1    A. Yes.
2    Q. So it gives an opening
3  balance and an ending balance for
4  that calendar year; is that correct?
5    A. Yes.
6    Q. The same information is
7  contained in the statements for
8  calendar years 2003 and 2004. 2003
9  is JMC 11 and 12 and then 2004 is JMC
10  13 and 14. The statement for
11  calendar year 2005 is included in JMC
12  15 and 16. Is that right?
13    A. Yes.
14    Q. If you compare the
15  balances, is there ever a time that
16  the balance declines from year to
17  year? Did it ever go down?
18    A. You're referring to the
19  ending balance on each statement?
20    Q. Look at the ending balance
21  of each statement.
22    A. No.
23    Q. So each year the ending
24  balance increased?

155

1    A. Some amount, yes.
2    Q. Take a look at JMC 17
3  through 19. Do you recognize these
4  pages?
5    A. Looks like a statement,
6  estimate of retirement benefits for a
7  specific retirement date.
8    Q. Do you recall receiving
9  this?
10    A. I may have, yes.
11    Q. Did you request that these
12  calculations be done?
13    A. Since this has the Vanguard
14  logo on it, I would assume it was
15  something that I requested perhaps,
16  but they may have sent it to me
17  without my request. I couldn't
18  remember.
19    Q. The date on these pages is
20  November 30th, 2004. Again, it's JMC
21  17 through 19. There are estimates
22  of benefit amounts on JMC 18 in
23  various forms.
24    Do you have any reason to

156

1  doubt the accuracy of these
2  calculations?
3    A. I have no way of proving
4  them to be anything other than
5  accurate.
6    Q. Do you believe they're
7  accurate?
8    A. I have to assume so. I
9  don't have – I don't do the
10  computations. I don't keep – I get
11  a statement and that's what it says
12  it's on there, so I have to assume
13  Vanguard is smart enough not to make
14  a mistake.
15    Q. Understanding that you have
16  to rely on others to do the actual
17  calculations for you, based on the
18  information that's contained
19  regarding your date of birth and your
20  date of hire, all those things that
21  are contained in these pages from JMC
22  17 to 19, is there anything that
23  leads you to question the accuracy of
24  the information that's provided

157

1  here?
2    A. Having no other way or any
3  other thing to compare it to, I have
4  to accept it for the way it is.
5    Q. Your date of birth and
6  termination date are accurate here;
7  correct?
8    MR. MALONE: "Here" being
9  on JMC 17?
10    MS. YU: 17.
11    MR. MALONE: I'm going to
12  object to the form of the question.
13    MS. HOFFMAN: It's actually
14  a proposed termination date since
15  it's a request.
16    MS. YU: I said date of
17  birth and date of hire. That's what
18  I meant to say.
19    MR. MALONE: Oh, I'm sorry.
20  I thought you said termination date.
21    THE WITNESS: I think I'm
22  still alive.
23    MR. MALONE: Well, you're
24  still working, too.



186

1 plan when provided to older employees
2 puts them at a disadvantage.
3 If I was 22 years old or 23
4 years old starting in a new company
5 in a cash balance plan, I probably
6 would have had no objections to it.
7 BY MS. YU:
8 Q. So if that younger worker
9 in their twenties stays working for
10 the same company in a cash balance
11 plan until their fifties, would the
12 cash balance plan be age
13 discriminatory by the time that they
14 reached their fifties?
15 MR. MALONE: I have the
16 same objection insofar as it calls
17 for a legal conclusion.
18 THE WITNESS: Not knowing
19 that and only going by the material
20 that was presented at various times
21 from the company, that that's what
22 the message was that they presented,
23 that if a young person moves in the
24 cash balance plan at a young age

187

1 they'll be fine.
2 MS. YU: Could you read
3 back that answer, please.
4 MR. MALONE: You can read
5 the question, too.
6 (The reporter read back the
7 following testimony:
8 "Q. So if that younger
9 worker in their twenties stays
10 working for the same company in a
11 cash balance plan until their
12 fifties, would the cash balance plan
13 be age discriminatory by the time
14 that they reached their fifties?
15 "A. Not knowing that and
16 only going by the material that was
17 presented at various times from the
18 company, that that's what the message
19 was that they presented, that if a
20 young person moves in the cash
21 balance plan at a young age they'll
22 be fine.")
23 BY MS. YU:
24 Q. What materials are you

188

1 referring to?
2 A. What I've read in AARP,
3 that kind of thing.
4 Q. Okay. So not necessarily
5 materials from the company?
6 A. No. No.
7 Q. Is there any material that
8 you've received from the company that
9 you feel supports your age
10 discrimination claim?
11 MR. MALONE: Object to the
12 form of the question as far as it
13 calls for a legal conclusion from a
14 lay witness.
15 THE WITNESS: The
16 information itself? The printed
17 information that was supplied,
18 whether -- I'm not sure. I know as
19 it affects me personally -- could you
20 repeat that question, because I'm
21 getting -- we've been going over this
22 all day long; I'm starting to get
23 fuzzy.
24 BY MS. YU:

189

1 Q. I'm just asking whether
2 there is any material that you
3 received from your employer that you
4 think supports your claim of age
5 discrimination with respect to the
6 cash balance plan.
7 MR. MALONE: I have the
8 same objection, that it calls for a
9 legal conclusion.
10 THE WITNESS: The piece
11 that I would assume would give that
12 impression would be the age at which
13 you would be placed into the cash
14 balance plan. For me that would be
15 49 years and whatever months.
16 BY MS. YU:
17 Q. I just want to make sure
18 that I understand. Are you referring
19 to the grandfathering clause?
20 A. Yes.
21 Q. Are there any other
22 materials that you feel supports your
23 claim of age discrimination from the
24 company?



**James DeCrescenzo Reporting, LLC**
InnovatingLitigation

215.564.3905                    1880 JFK Blvd, 6th Floor Philadelphia PA 19103          FAX 215.751.0581

# EXHIBIT 5



**WILCOX & FETZER LTD.**

# CONFIDENTIAL

### In the Matter Of:

## Charles, et al.
## v.
## Pepco Holdings, Inc., et al.

### C.A. # 05-702

---

### Transcript of:
# Thomas S. Troup

### January 12, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B 66

CONFIDENTIAL        Charles, et al.            v.                      Pepco Holdings, Inc., et al.
Thomas S. Troup                          C.A. # 05-702                          January 12, 2007

                                                                              Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J. MICHAEL CHARLES; MAURICE W. WARD, )
JR.; and JOSEPH I. FINK, JR., on     )
behalf of themselves and all others  )
similarly situated,                  )
                                     )
                        Plaintiffs,  )
                                     )    Civil Action
            v.                       )    No. 05-702
                                     )
PEPCO HOLDINGS, INC., CONECTIV, and  )
PEPCO HOLDINGS RETIREMENT PLAN,      )    PAGE 43 IS
                                     )    CONFIDENTIAL
                        Defendants.  )


            Deposition of THOMAS S. TROUP taken
pursuant to notice at the law offices of Pepper
Hamilton LLP, 1313 Market Street, Hercules Plaza,
Fifth Floor, Wilmington, Delaware, beginning at
9:35 a.m. on Friday, January 12, 2007, before Kathleen
White Palmer, Registered Merit Reporter and Notary
Public.
APPEARANCES:
            JOSEPH G. SAUDER, ESQUIRE
            CHIMICLES & TIKELLIS LLP
              One Haverford Centre
              Haverford, Pennsylvania 19041
              for the Plaintiffs
            KAY KYUNGSUN YU, ESQUIRE
            PEPPER HAMILTON LLP
             3000 Two Logan Square
             Philadelphia, Pennsylvania 19103-2799
             for the Defendants
--------------------------------------------------------
                    WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Page 30

1  A. Yes.
2  Q. Did you access the online information on the
3  intranet from time to time?
4  A. You mean this type of information?
5  Q. Any type of information.
6  A. Company information?
7  Q. Yes.
8  A. Some. You know, yeah.
9  Q. Did you use it to access information on the
10  cash balance plan?
11  A. No, not that I remember.
12  Q. Exhibit D-13 is a compilation of slides. The
13  first one says "Conectiv Cash Balance Pension Plan"
14  and it's dated July 1999.
15      Do you recall whether these slides were
16  part of the presentation made regarding the cash
17  balance plan in that time frame?
18  A. It looks like, you know, the type of handout
19  that would have been provided at a, you know, a
20  meeting to go over the cash balance pension plan.
21  Q. Do you recall attending a meeting on the cash
22  balance plan?
23  A. Yeah, I attended a meeting, yes.
24  Q. Was it, to your recollection, the July 1999

Page 31

1  time frame?
2  A. I thought it would have been sooner than that.
3  If the plan would have been started in 1/1/99, that
4  they would have had meetings prior to its, you know,
5  starting. But, you know, I did attend -- when they
6  had meetings regarding, you know, benefits or
7  whatever, you know, I attended those meetings, yes.
8  Q. Will you look at MWW-220, which is the second
9  page of Exhibit D-13? The first slide on the upper
10  left-hand corner refers to The Wall Street Journal and
11  congressional hearings. Do you recall that part of
12  the discussion?
13      MR. SAUDER: I just object to the form,
14  assuming there was a discussion.
15      But you can answer.
16  A. I don't remember congressional hearings. I
17  remember the mention of Wall Street Journal articles,
18  and that's -- you know, I don't remember the rest of
19  it. You know, it's not something that stuck with me
20  from a meeting.
21  Q. What's your recollection of the discussion
22  about Wall Street Journal articles?
23  A. That there were companies that, you know, had
24  moved to cash balance pension plans and that, you

Page 32

1  know, the employees had concerns.
2  Q. Did you do anything to follow up on The Wall
3  Street Journal articles? Did you look them up on the
4  Internet?
5  A. No, I didn't do that.
6  Q. Are there periodicals or newspapers that you
7  read on a regular basis?
8  A. Typically the local paper.
9  Q. Which one is that?
10  A. It would be The News Journal.
11  Q. Are there any other magazines or periodicals
12  that you read on a regular basis?
13  A. No, not really. I watch TV.
14  Q. Do you watch the news on TV?
15  A. Excuse m?
16  Q. Do you watch the news on TV?
17  A. Occasionally.
18  Q. Do you read the paper every day or less than
19  every day?
20  A. Probably several times a week.
21  Q. How long have you been reading your local paper
22  on a regular basis?
23  A. You know, ever since we moved to Delaware,
24  probably.

Page 33

1  Q. When was that?
2  A. 1979.
3  Q. When was the first time you consulted with an
4  attorney regarding your cash balance plan?
5  A. I would have made a phone call to Mr. Sauder's
6  firm probably -- I guess it was probably about a year
7  ago.
8  Q. Have you spoken with any other attorneys about
9  the cash balance plan?
10  A. Yeah. I had contacted several other attorneys
11  prior to that about, you know, initiating this type of
12  a suit, but, you know, they weren't interested in
13  doing it. And that would have been about, you know,
14  six months to a year prior to that.
15  Q. How many attorneys did you consult?
16  A. There was one in Wilmington and one in
17  Philadelphia. I don't remember the names, though.
18  I'm sorry.
19  Q. How did you first learn about the lawsuit
20  brought by Mr. Charles, Mr. Ward, and Mr. Fink?
21  A. I heard it through the grapevine at work and,
22  you know, since I had been looking to pursue, you
23  know, a suit myself and been unsuccessful, you know,
24  when I heard this, you know, it piqued my interest.

9 (Pages 30 to 33)

Page 50

1        So it contains information for each year
2    from 2000 through 2005?
3    A.  Yes.
4        MR. SAUDER:  Just for the record, this is
5    marked TST2 through TST8.
6    Q.  Is there any information that's contained in
7    Exhibit D-34 that is inaccurate to your knowledge?
8    A.  No.
9    Q.  Does your ending balance increase every year?
10   A.  Yes.
11       (Defendant's Exhibit 35 was marked for
12   identification.)
13   BY MS. YU:
14   Q.  Mr. Troup, Exhibit D-35 says "InSight online"
15   on the top of it and it's dated April 7th, 2000.  Do
16   you recognize this document?
17   A.  Yes.
18   Q.  How did you obtain this document?
19   A.  I think the company provided it to us or I -- I
20   don't specifically remember how I got it, but, you
21   know, it would have been issued by the company, I
22   believe.  At the time, Conectiv.
23   Q.  To your knowledge, did you obtain this document
24   sometime in April 2000?

Page 51

1    A.  Yes, I think so.
2    Q.  Is this part of the information that was
3    available online on the intranet?
4    A.  It appears to be, yes.  You know, when the
5    company provides you with communications, you know,
6    they also provide you with a link that you can just
7    kind of click on it and it zips you to it.  That's
8    probably how I would have accessed this as opposed to
9    specifically searching for it, you know, on the
10   intranet.
11       (Defendant's Exhibit 36 was marked for
12   identification.)
13   BY MS. YU:
14   Q.  Exhibit D-36 is a document that says "Your
15   Total Compensation Statement, 1997," and it has
16   "Delmarva Power" on it.  Do you recognize this
17   document?
18   A.  Yes.
19   Q.  This document is numbered TST10 through 22.
20       What's described in this document?
21   A.  The total compensation provided me, you know,
22   by Delmarva Power in the year 1997.
23   Q.  If you turn to page TST20, are these
24   calculations showing what your benefits were as of

Page 52

1    1997?
2    A.  It shows what my accrued invested retirement
3    benefit would have been as of January 1st, 1997.  And
4    then there's also a chart there that, you know,
5    projects them forward.
6    Q.  This is personalized information for you?
7    A.  Yes, correct.
8    Q.  Have you written any e-mails about the cash
9    balance plan?
10   A.  Not that I remember, no.
11   Q.  Have you gotten any e-mails about the cash
12   balance plan other than employer communications?
13   A.  No, not that I'm aware of.
14   Q.  And I said e-mail generally.  Do you have a
15   home e-mail address?
16   A.  No.  No, I do not.
17   Q.  You have an e-mail address for work?
18   A.  Yes.
19   Q.  Is that the only e-mail account that you use?
20   A.  Yes.  You know, there might be something, you
21   know, sent to my wife, but -- you know, her e-mail
22   address at home, but very little is used there.
23   Q.  Would there be anything about cash balance
24   plans on your home e-mail?

Page 53

1    A.  No.
2    Q.  Mr. Troup, what is your understanding of the
3    claims that you have brought in your lawsuit?
4    A.  The accounts, as I understand them, that have
5    been brought is that the company, one, didn't
6    adequately tell us about the fact that the annuity
7    value of the pension plan could go down and that, you
8    know, the annuity value of the plan has gone down and
9    that it's not supposed to go down.
10   Q.  And when you say it's not supposed to go down,
11   it's not supposed to go down for any reason?
12       MR. SAUDER:  I just object and just caution
13   the witness with regard to any attorney/client
14   communications, if you can answer that question
15   outside of any attorney/client communications, then
16   you are free to answer the question.
17   A.  I don't know how to do that.
18   Q.  What other claims are you asserting in your
19   lawsuit?
20   A.  Those are the ones that I remember.  I know
21   there's four counts.  I don't specifically remember
22   what the other two are.
23   Q.  Is part of your claim that you did not get
24   timely notice?

14 (Pages 50 to 53)

Page 54

1  A. Timely notice of what?
2  Q. Let's go back to the first item that you listed
3  with respect to your lawsuit. You said that there was
4  not disclosure of the fact that the annuity could go
5  down.
6  A. Yes.
7  Q. Are you claiming that that disclosure was not
8  made in a timely way?
9  A. I don't remember it being disclosed at all,
10 ever.
11 Q. If you could refer back to Exhibit D-6, this
12 letter is dated December 21, 1998. If you had
13 received this notice three days earlier, is there
14 anything that you would have done differently with
15 respect to the cash balance plan?
16 A. Three days earlier than December 21st, 1998?
17 Q. Yes.
18 A. No. I don't know that three days would make a
19 difference.
20 Q. Have you ever requested any pension estimates
21 from Vanguard?
22 A. No.
23 Q. Have you been online on their site at all?
24 A. Yes.

Page 55

1  Q. What have you looked for when you were on the
2  site?
3  A. My 401(k) pension. My 401 plan -- 401(k) plan,
4  monies.
5  Q. Have you looked up information on your cash
6  balance plan on the Vanguard site?
7  A. I know it's there. It shows -- it shows the
8  balance, the current balance at the end of a year so
9  that --
10 Q. But you've never asked for estimates to be done
11 on the website?
12 A. No.
13 Q. Is it your understanding that one of the claims
14 asserted in your complaint is a claim that the cash
15 balance plan is backloaded?
16 A. I don't know what you mean by "backloaded."
17 Q. Backloading meaning that significantly more
18 benefits accrue at the end of your service with the
19 company as opposed to toward the beginning of your
20 service with the company.
21 A. Say that again, please.
22 Q. That backloading means that significantly more
23 of your benefits accrue at the end of your service
24 rather than at the beginning of your service.

Page 56

1  A. Under the cash balance plan?
2  Q. Yes.
3  A. No, I'm not aware -- I'm not aware that that is
4  the case, and I'm not aware that, you know, that is
5  one of the, you know, points in the lawsuit.
6  Q. Do you feel like you've been harmed by the
7  change to the cash balance formula?
8  A. Yes.
9  Q. Can you tell me how you've been harmed by it?
10 A. Well, that when I do retire, I'll have less
11 money available to me for retirement.
12 Q. Is there any other way that you've been harmed?
13 A. No. I think that's pretty much it. It comes
14 down to money.
15 Q. Money, again, compared to the cash balance plan
16 as opposed to the benefits under the old plan?
17 A. Yes.
18 Q. Is it your understanding that the complaint
19 contains allegations that the cash balance plan is age
20 discriminatory?
21 A. Describe to me "age discriminatory."
22 Q. That the cash balance plan hurts older workers
23 as opposed to younger workers.
24 A. Yes.

Page 57

1  Q. What group of older workers do you think are
2  worse off under the cash balance plan?
3      MR. SAUDER: Objection to the extent you're
4  comfortable answering that without violating any
5  attorney/client communication.
6  A. I don't know how to answer.
7  Q. Do you think that there's anybody, any plan
8  participant who benefits, who is better off because of
9  the cash balance plan as opposed to the old pension
10 plan?
11 A. I don't know the answer to that.
12 Q. How does the plan, the cash balance plan
13 discriminate against older workers?
14      MR. SAUDER: Same objection.
15 A. It just provides them with lesser monies at
16 retirement.
17 Q. Are there certain features of the cash balance
18 plan that might be more beneficial to an individual
19 based on their circumstances?
20      MR. SAUDER: Objection to form.
21 A. You know, I don't know how to answer that.
22 Q. Do you understand the question?
23 A. No.
24 Q. Do you understand the cash balance plan to have

15 (Pages 54 to 57)

CONFIDENTIAL          Charles, et al.                    Pepco Holdings, Inc., et al.
Thomas S. Troup                        v.                January 12, 2007
                                 C.A. # 05-702

Page 58

1  portable benefits?
2  **A. Yes.**
3  Q. What does that mean?
4  **A. You leave the company, you can take it with**
5  **you.**
6  Q. Is it your understanding that the cash balance
7  plan is more portable than the benefits under the old
8  plan?
9  **A. I believe, yes, that's, you know, that's true.**
10 Q. So if an employee is looking for portable
11 benefits, are they better off under the cash balance
12 plan than under the old plan?
13          MR. SAUDER: Objection.
14 **A. You know, I -- I think that depends upon the**
15 **individual circumstances.**
16 Q. What remedy are you looking for from the Court
17 in this lawsuit?
18 **A. Reinstatement into the defined benefit plan.**
19 Q. Is there anything else you are looking for?
20 **A. No.**
21 Q. Do you understand that this lawsuit has been
22 brought as a class action?
23 **A. Yes.**
24 Q. Are you seeking to be a class representative?

Page 59

1  **A. Yes.**
2  Q. What's your understanding of your duties as a
3  class representative?
4  **A. It would be my duties to represent the**
5  **interests of the members of the class.**
6  Q. What is your understanding of how that class is
7  defined?
8  **A. It would include those people who are in the**
9  **cash balance plan and any people who would have been**
10 **grandfathered after the grandfathering period ends.**
11 Q. Does that class include everyone regardless of
12 their age?
13 **A. I believe so, yes.**
14 Q. Do you believe that everybody in the class has
15 the same interests?
16 **A. Not necessarily, no, not exactly the same**
17 **interests. I think there is commonality, but, you**
18 **know, there could be some differences, also.**
19 Q. Do you think everybody who is part of the class
20 that you were describing is worse off under the cash
21 balance plan?
22 **A. I don't know the answer to that.**
23          **(Defendant's Exhibit 37 was marked for**
24 **identification.)**

Page 60

1  **BY MS. YU:**
2  Q. We have just marked as Exhibit D-37 a copy of
3  the class action complaint that is captioned Thomas S.
4  Troup vs. Pepco Holdings, Inc., et al.
5          Do you recognize this document?
6  **A. Yes.**
7  Q. Did you participate in the preparation of this
8  document, the drafting of this document at all?
9  **A. No. I mean, you know, my attorneys would have**
10 **provided me a copy of it, you know, is this**
11 **information accurate. You know, if that's what you**
12 **mean by "drafting," the answer would be yes. If you**
13 **know -- but putting the form together and, you know,**
14 **laying it out in this particular order, you know, no.**
15 Q. If you would take a look at paragraph 39, which
16 starts on page 13 and continues on to page 14, could
17 you just review that paragraph for a minute?
18 **A. (The witness reviews the document.)**
19 Q. What is your understanding of what an accrued
20 benefit is?
21 **A. What is due me at some later date.**
22 Q. Is it your understanding that under the cash
23 balance plan your accrued benefit is the amount of
24 your annuity at age 65?

Page 61

1  **A. Say that again, please.**
2  Q. Is it your understanding that under the cash
3  balance plan your accrued benefit is the annuity
4  amount that you would receive at age 65?
5  **A. Until I spoke with my attorney, I wasn't aware**
6  **that age 65 was a significant date or period of time**
7  **that applied to, you know, the cash balance plan.**
8  Q. On page 14 in paragraph 39, the factual
9  allegations include percentages in various years where
10 your accrued benefit has decreased and then increased.
11 Do you know how these percentages were calculated?
12          MR. SAUDER: Objection to the extent you
13 can answer that question without violating any
14 attorney/client communication.
15          MS. YU: My particular question was does he
16 know, and it's a yes-or-no answer.
17 BY MS. YU:
18 Q. I don't think that you have to rely on your
19 advice of counsel to answer yes or no whether you know
20 or not how these were calculated.
21 **A. No.**
22 Q. Do you have an understanding of what caused the
23 increases and decreases?
24          MR. SAUDER: Same objection.

16 (Pages 58 to 61)

302-655-0477

# EXHIBIT 6

**Charles, Mike**

From:        Paoli, Frances
Sent:        Thursday, August 21, 2003 9:02 AM
To:          Charles, Mike
Subject:     RE: Cash Balance plan

Good Morning Mike,

Yes, our benefits design group is aware of the IBM case and are following this issue and all of the activity surrounding cash balance plans. We expect the ultimate impact of this case will not be known for some time and we will continue to follow all of the activity and make decisions at the company level at the appropriate time.

I hope this information is helpful. If you have any additional questions, please contact the HR Service Center at 800-201-4718.

Frances Anne Paoli
Conectiv HR Service Center

-----Original Message-----
From:        Charles, Mike
Sent:        Wednesday, August 20, 2003 11:14 AM
To:          Conectiv HR
Subject:     Cash Balance plan

Dear HR,

Are you following the current events of the class action lawsuit by the employees of IBM as it pertains to IBM's decision to convert their employees retirement plan into the Cash Balance Plan?

As one of the A. E. employees that missed the cut off date of 1/1/99 by both age and time with the Company by only a few months (start date 9/10/79 birthday 10/18/49) this event has caught my attention. I've always felt from the inception of the cash balance plan that it was unfair. However, as a employee I knew there was little I could do.

What would be the impact to Conectiv employees like me if the suit against IBM is ultimately ruled in favor of the employees? Would the employees that did not make the cut off of have to sue Conectiv to get the same option as those that did make the cut off? Or would Conectiv automatically provide the employees that did not make the cut off date the same option (A.E. Plan or Cash Balance Plan) as those that did make the cut off?

Thank you for your time

*J. Michael Charles*
*Senior Account Manager*
Conectiv
856 453 5012 NJ
8 500 5012 Internal
856 305 0032 cell
856 435 5040 NJ Fax
mike.charles@conectiv.com

1

JMC00459

D-15

EXHIBIT NO.
PJ114  11 1107

# EXHIBIT 7

1 of 1 DOCUMENT

Copyright 1999 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



(Copyright (c) 1999, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL

The Wall Street Journal

June 14, 1999 Monday

**SECTION:** Pg. C1

**LENGTH:** 948 words

**HEADLINE: IBM Pension-Plan Changes Spark Ire-Filled Web Site**

**BYLINE:** By Ellen E. Schultz and Jon G. Auerbach, Staff Reporters of The Wall Street Journal

**BODY:**

Hunkered down in front of computer screens with their office doors closed, employees of International Business Machines Corp. are logging onto a spicy new Web site: The IBM Pension Club on Yahoo.

Created less than three weeks ago by an IBM employee, the site is getting 15,000 hits a day, and hundreds of messages from mostly infuriated employees, who are exchanging calculations, complaints and condolences involving changes coming to their pension plan on July 1. At that time, IBM is converting its pension plan to a "cash balance" plan, an increasingly common variety of pension that usually reduces benefits for longer-service workers.

"People are in total shock" about the conversion, says William L. Edge, an 18-year IBM veteran in Atlanta who works for IBM's year-2000 sales and marketing team. After finding out about the site, he spent an entire evening scouring messages on the site. Mr. Edge, 46 years old, estimates that the value of his pension will fall to $350,000 from $600,000 under the new plan. "I'm going to have to stay at IBM an additional five years" to make up the difference, he complains.

An IBM spokesman said the company decided to make the shift because the new plan awards "performance and not strictly tenure." He said the new plan is allowing the company to increase other types of compensation, such as stock options.

IBM, based in Armonk, N.Y., is one of more than 300 employers to so far make this money-saving pension switch, and while plenty of workers elsewhere are pretty steamed, this is the first Web uprising. In the past, a complex pension change usually sailed over the heads of employees; in the Internet era, this isn't so, especially when a company has thousands of computer uber-dorks on staff.

Indeed, many of IBM's 260,000 employees around the world are using the devices they make -- computers -- to

protest the pension change. "I'd like to think this group is too intelligent and motivated to let a bunch of corporate actuaries sell us down the river and think we're too stupid to figure out their half-truths," notes NiceGuys-Win-in-the-End.

Kevin Chapman, an IBM engineer in Rochester, Minn., says a friend told him about the Yahoo! Inc. site last Wednesday and he's since spent hours reading the postings. Mr. Chapman, 41, estimates that the value of his pension will be set back 30% to 50% under the new plan. While he's worked for IBM 11 years, he is too young to qualify for special benefits that people closer to retirement can get to help them retain benefits they would have received under the old plan.

The Yahoo site is also a place where people are simply blowing off steam, including opining on such matters as the salary of IBM Chief Executive Louis V. Gerstner Jr. One posting suggests that workers hire an airplane to drag a banner between IBM's San Jose, Calif., Cottle Road/Santa Teresa lab and Almaden Research facility for 90 minutes, during lunch time. "It would cost about $480 to fly a banner," writes davejay2. "I think that would be money well spent, and I might just spring for it myself. You get 40 characters including spaces. I'm taking suggestions for the message."

His suggestion: "Hey Lou, `thou shalt not Steal.'"

After the pension change was announced in May, employees began comparing their old and new benefits, using information provided by the company as well as numbers they crunched using an "Estimator" pension calculator on the company's own Web site. But IBM took the estimator off-line for several weeks starting in May, and, when reactivated, it no longer allowed employees to calculate benefits under the existing plan, Mr. Edge says. He and some others believe the company eliminated the feature so employees couldn't calculate their benefit reductions.

An IBM spokesman said the company took the old tool off-line because "it really does not seem appropriate to be modeling a plan that no longer exists."

Whatever the motivation, the action only stirred IBMers into a further Webfrenzy. They began picking apart virtually every actuarial assumption related to IBM's calculation of benefits.

"The mathematically disadvantaged half-wits in HR can't hold up a conversation on the topic of calculating anything," notes "IBM-Ghost." "They are more like used-car salesmen trying to sell a car with a sawdust filled transmission (my apologies to any used-car salesmen as you probably have more integrity than HR)," wrote "idontknowaboutyou."

To be fair, other postings mention human-resource staff and managers who have tried to help them figure out where they stand.

The creator of the site, Sang J. Moon, a 31-year-old information-technology specialist with IBM Global Services in Bethesda, Md., says he didn't intend to create an Internet flamethrower. He intended the site, he says, as a place where employees -- both for and against the change -- could share information and ideas.

Mr. Moon, who has been with IBM for about five years, says he initially didn't understand why people were upset with the impending change. But after weeks of monitoring the site, he now has "respect" for people who believe they'll lose major benefits. (That monitoring doesn't take place at the office; Mr. Moon says his supervisor warned him not to watch the site while at work, and not to use his company computer.)

The Yahoo IBM Pension Club site isn't the only one with posts about IBM's pension plan. Just 10 days ago, an IBM employee in Austin, Texas, set up www.cashpensions.com, packed with information for employees of any company to use to calculate their pensions and contact their politicians. Meanwhile, Yahoo also features a site encouraging IBM employees to channel their frustration into a unionization drive.

IBM Pension-Plan Changes Spark Ire-Filled Web Site The Wall Street Journ

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

# EXHIBIT 8

2 of 2 DOCUMENTS

Copyright 1999 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



**factiva.**

(Copyright (c) 1999, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL

The Wall Street Journal

May 5, 1999 Wednesday

**SECTION:** Pg. C1

**LENGTH:** 1120 words

**HEADLINE: Actuaries Become Red-Faced Over Recorded Pension Talk**

**BYLINE:** By Ellen E. Schultz, Staff Reporter of The Wall Street Journal

**BODY:**

Tape recordings of indiscreet gabbing. Congressional sessions at which they are played. And subsequent red faces.

No, this isn't an issue of national security. We are talking actuaries.

The tapes in question weren't recorded surreptitiously, but with the knowledge of the folks now embarrassed by them. And they are at the center of a controversy.

How so? On the tapes -- often in abstruse jargon but occasionally in comprehensible English, immortalized by firms that routinely tape conference sessions-actuaries and lawyers candidly discuss things that perhaps they would rather the whole world not know. Matters such as how they help employers cut pension benefits and change retirement plans to reshape their work forces -- contradicting, at times, what they have been saying publicly about the reasons for the changes.

And the chatter has relevance to millions of workers because companies nationwide are converting pension plans to the style often touted on these tapes, so-called cash-balance plans. These new plans provide hypothetical employee "accounts" into which employers make annual contributions, and the accounts earn "interest."

Conversion of an old-fashioned pension plan into the new style also often means that accrual of pension benefits can halt, for years, for older, longtime employees, and these workers' retirement benefits often are significantly smaller than they would be under a traditional pension. Employers often play down these effects when announcing their conversions. But critics of the new plans say it is precisely these cost-saving features that make them attractive to employers.

That is where the tapes come in, because they shed light on the thinking of those who are behind the pension

shuffle.

The tapes came to light when Denver attorney William Carr, who was doing research on cash-balance plans, reviewed more than 40 hours of coma-inducing cassettes from conferences with titles such as "Cash Balance Plans: Current Issues" and "Nontraditional Plans After General Agreement on Tariffs and Trade." He recently played the tapes at a briefing for congressional staffers on disclosure issues in pensions.

A sample of the taped comments shows why they are finding their way into the Sony Walkmans of other attorneys, congressional staff, the Internal Revenue Service, the U.S. Treasury and the American Association of Retired Persons, sparking a stir in the seemingly low-profile actuarial world.

Particularly embarrassing are the comments directly contradicting recent public utterances of cash-balance-plan promoters. For instance, at the Senate committee briefing on pension-disclosure issues, staffers passed around an information release that PricewaterhouseCoopers, a leading pension consultant to employers, sent to lawmakers and the news media. It noted that recent newspaper articles "leave readers with the unsubstantiated conclusion that corporate America uses cash-balance plans to mask significant reductions in pension benefits and costs."

It also noted: "It is unfair to imply that employers chose to switch to cash-balance plans in order to mask benefit reductions."

Now listen to the tapes: ". . . Converting to a cash-balance plan does have an advantage as it masks a lot of the changes. . . . There is very little comparison that can be done between the two plans," said William Torrie, an actuary at PricewaterhouseCoopers, at a Society of Actuaries meeting in New York in October 1998.

"If you decide your plan's too rich, and you want to cut back, and you only want to do it for new hires, changing to a totally different type of plan will let you do that without being obvious about it," said Norman Clausen, a principal at consulting firm Kwasha Lipton, now a unit of PricewaterhouseCoopers, at a Society of Actuaries meeting in Colorado Springs, Colo., in June 1996.

A spokesman for PricewaterhouseCoopers responds: "The quotes being circulated by lawyers and others are taken out of context and are relatively small elements of a much-larger presentation on the issues of cash-balance plans."

Elsewhere in the tapes, addressing the question of whether cash-balance plans reduce benefits, Amy Viener, an actuary at William M. Mercer Inc., noted at the October actuary society's meeting: "You switch to a cash-balance plan where the people are probably getting smaller benefits, at least the older-longer-service people; but they are really happy, and they think you are great for doing it."

An actuary with Watson Wyatt Worldwide who spoke on a panel called "Introduction to Cash Balance/Pension Equity Plans" alongside Ms. Viener, is heard saying on a tape: "It is not until they are ready to retire that they understand how little they are actually getting." "Right, but they're happy while they're employed," responded Ms. Viener of Mercer during the panel discussion.

In a written statement yesterday, Ms. Viener emphasizes that there are many benefits to cash-balance plans, including a "more-equitable approach" to different age groups, and that "most employees seem to prefer them." Among the pluses: Employees who change jobs "will fare much better under a cash-balance plan."

Other tapes capture actuaries wondering about their responsibility under current disclosure laws, which require employers to notify employees of significant cuts in retirement benefits. The law "doesn't require you to say, 'We're significantly lowering your benefit.' All it says is, 'Describe the amendment.' So you describe the amendment," noted Paul Strella, a lawyer with Mercer, at the same New York meetings.

A Mercer spokeswoman says Mr. Strella was traveling on client business and was unavailable for comment.

Actuaries Become Red-Faced Over Recorded Pension Talk The Wall Street Jo

Kyle Brown, an actuary at Watson Wyatt, also noted on one of the tapes: "Since the [required notice] doesn't have to include the words that 'your rate of future-benefit accrual is being reduced,' you don't have to say those magic words. You just have to describe what is happening under the plan. . . . I wouldn't put in those magic words."

A spokesman for Watson Wyatt says, "The term 'magic words' was a lawyer's reference to the triggering words in the [disclosure] statute." He adds that Mr. Brown was advocating clear communication to plan participants.

Donald Grubbs, a consulting actuary for 40 years and former director of the actuarial division at the Internal Revenue Service in Washington, says actuaries are like anyone else: "There are those that are very conscientious and those that are maybe less so." Still, he adds, cash-balance plans have a tendency to reduce benefits for older people, and "I'd think anyone making that change should make that clear to employees."

(See related letter: "Letters to the Editor: Truth Be Told. . ." -- WSJ May 12, 1999)

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

# EXHIBIT 9

1 of 1 DOCUMENT

Copyright 1999 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



factiva.

(Copyright (c) 1999, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

February 11, 1999 Thursday

**SECTION:** Fund Track; Pg. C1

**LENGTH:** 1470 words

**HEADLINE: Older Workers Fight `Cash Balance' Plans**

**BYLINE:** By Ellen E. Schultz, Staff Reporter of The Wall Street Journal

**BODY:**

When is equal treatment of workers really unequal when it comes to pensions?

That question is at the crux of a lawsuit brought by older workers at Onan Corp., a Cummins Engine Co. unit, challenging a new type of pension plan that is saving corporations millions of dollars but reducing the pension benefits of older workers.

The issue is whether the new pension programs, called "cash balance" or "pension equity" plans, discriminate against older workers, even though they appear to pay older workers the same benefit -- and, in some cases, a bigger benefit -- than younger workers receive.

In Onan's case, the cash-balance plan adopted in 1989 provides all workers with annual credits of about 3.5% of their pay, an amount that is placed, like other such plans, into hypothetical individual "accounts" that then earn interest. But a class-action lawsuit filed in May 1997 in U.S. District Court in Indianapolis on behalf of workers argues that this treatment is in fact unequal. The reason is basically twofold: Older workers have less time to use the power of compounded interest to build up benefits, and the benefits they receive under the new plan in most cases fall short of what they would have received had the company's old-fashioned pension plan remained in place. Because younger workers are better off on both fronts, the lawsuit contends that the new pension plan is discriminatory. The suit is scheduled for trial in December.

"People who are younger will be OK, but the old-timers got hurt," says 59-year-old Jan Alden, who worked at Onan for 25 years until she was laid off two years ago. She will soon begin collecting a $200-amonth retirement check from the company. "This is simple, blatant age discrimination," maintains Stephen Langlie, an engineer who logged 37 years at Onan, based in Fridley, Minn., and is the force behind much of the legal activism there.

For the company's part, a spokeswoman concedes that "some employees might find this [change] beneficial, others less beneficial." While various revisions by Onan to its pension program over the past two decades make comparisons difficult, Onan doesn't dispute that many older workers will receive lower benefits than they would have. But the spokeswoman adds, "Onan doesn't believe there can be age discrimination when anyone, regardless of age, gets the same contribution each year." Onan plans to fight the suit.

From the workers' perspective, the issue with those equal contributions is that a 25-year-old has 40 years to earn a compounded rate of return before retirement at age 65, while a 60-year old only has five years. This means that the rate of accrual of pension benefits is actually declining as a person ages.

What's more, Onan workers contend in their suit that they were harmed by being pulled from a pension plan under which a lot of their retirement pay would have been built up at the end of their careers. Under conventional pensions, as much as half of a worker's retirement benefit is earned in the last five or so years on the job.

The workers also say it is unfair that Onan, like many other employers, established opening balances for the workers' hypothetical "accounts" that were lower than the present value of their already earned pension benefits. This means that some older workers have spent years simply earning back their old benefits, not adding new ones. Younger workers, meanwhile, added new benefits right away.

There is little question these conversions can save companies millions of dollars and that older workers are the primary source of the savings. Actuaries estimate that cash-balance plans pay some older workers 50% less than what they would have received in traditional plans.

As employers by the hundreds switch to cash-balance-type pensions, older workers are in uncharted legal waters. The practice "might be legal under the Tax Code, though illegal under the Age Discrimination in Employment Act," says Deene Goodlaw, professor of law at Boalt Hall School of Law at the University of California at Berkeley. But this novel collision of age-discrimination and pension law has never been tested in the courts, and that is one reason pension experts are watching the Onan case closely. If courts were to rule in the workers' favor, cash-balance-type plans "will all crash and burn," says Thomas Lowman, an actuary at Bolton Offutt Donovan Inc., a Baltimore consulting firm. But he thinks it unlikely the plans will meet such a fate.

In defending the plans, employers don't dispute that the rate of accrual of pension benefits in a cash-balance plan goes down as workers age. Nor do they dispute that the federal Employee Retirement Income Security Act, the nation's pension law, prohibits pension plans from reducing the rate of accrual as workers age. Instead, these employers maintain that the law doesn't apply to them.

Employers generally interpret the law as applying only to conventional pensions, not to the new ones. They say cash-balance plans ought to be treated like 401(k)s, which, by law, are savings plans, not pensions. This distinction is important because federal law doesn't burden savings plans with the accrual rules.

However, critics counter that workers who participate in 401(k)s are entitled to keep all investment gains, while employers keep some investment gains under cash-balance plans.

In defending the plans, employers also note that the Internal Revenue Service, which enforces federal pension law, hasn't told anyone to stop what they are doing. "The IRS has looked the other way for more than a decade, so employers feel the IRS has acquiesced in their view of the law-that there is no age discrimination," says Lee Sheppard, a lawyer who recently wrote about the legal issues in Tax Notes, a tax journal in Arlington, Va.

The IRS declined to comment.

THE GABELLI IPO: The first publicly traded shares of Gabelli Asset Management Inc., the mutual-fund company run by noted stock picker Mario Gabelli, were priced last night at $17.50 each and the IPO is to begin trading today on

Older Workers Fight `Cash Balance' Plans The Wall Street Journal Fe

the New York Stock Exchange under the symbol GBL.

At the IPO price, Gabelli has a stockmarket value of $525 million. The company raised $105 million through the sale of six million shares, representing 20% of the company's equity; Mr. Gabelli will retain about 98% of its voting power.

In an amendment to its registration statement filed yesterday, the company said Mr. Gabelli received more than $43 million in compensation in 1998. As part of the stock sale, he accepted a reduction of his share of the company's annual pretax profit to 10% from 20%. In exchange, Mr. Gabelli is due to receive a $50 million lump-sum payment, plus 6% annual interest, in 2002. The firm expects to take a charge of $1.10 a share in the current quarter to cover the deferred payment.

-- Patrick McGeehan

BOGLE JUNIOR: John Bogle Jr., a partner at Numeric Investors LP in Boston, is leaving the firm, according to an announcement from Langdon Wheeler, Numeric's president. Mr. Wheeler said that Mr. Bogle Jr., son of Vanguard Group founder John Bogle, is leaving "to pursue other opportunities." Mr. Wheeler noted that Mr. Bogle Jr. has been with Numeric almost since the firm's inception in 1989, and "has made many important contributions." Numeric uses quantitative analysis to picks stocks for its mutual funds.

The younger Mr. Bogle couldn't be reached for comment. He is known for a consumer-friendly business philosophy that matches his father's. In July 1996, for instance, he canceled an advisory contract to run a quantitative small-capitalization stock fund for Quantitative Group of Funds in a dispute over high fund expenses.

```
-- Pui-Wing Tam
   ---
              FUND PERFORMANCE DERBY
    How the Biggest Funds in the Category Performed
  Total      Y-to-D     1 Year    3 Year    5 Years
  Assets     12/31/98   2/09/98   2/09/96   2/09/94
 (Billions)  2/09/99    2/09/99   2/09/99   2/05/99
MSDW US Govt;B
$ 4.98       + 0.07%    + 6.18%  + 19.64%  + 35.06%
Vankamp Govt Secs;A
  1.88       - 0.20     + 6.92   + 19.68   + 34.13
Lord Abbett Inv:Govt;A
  1.69       + 0.33     + 7.46   + 20.07   + 32.44
Fidelity Govt Income
  1.58       - 0.49     + 6.97   + 19.81   + 34.20
Putnam American Govt;A
  1.46       - 0.40     + 7.09   + 20.53   + 38.63
Amer Fds Inc:US Govt
  1.36       - 0.42     + 6.55   + 19.13   + 31.63
Strong Government
  1.33       - 0.10     + 6.99   + 20.53   + 39.52
Federated Gv Inc Sec;F
```

B 81

Older Workers Fight `Cash Balance' Plans The Wall Street Journal Fe

```
      1.26          - 0.08      + 6.62    + 21.47    + 37.18
One Group:Govt Bond;Fid
      1.01          - 0.26      + 6.93    + 20.83    + 38.32
Prudential Govt Inc;A
     0.84           - 0.75      + 7.29    + 19.33    + 37.16
Lipper Gen'l U.S. Govt. Fd Indx
                    - 0.42      + 6.49    + 19.23    + 32.97
     --
S&P 500 (divs. reinvested)
                    - 0.94     +22.11    + 95.57    +186.39
     --
Source: Lipper
```

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

## CERTIFICATE OF SERVICE

I, Phillip T. Mellet, hereby certify that on February 16, 2007 a true and correct copy of the Defendants' Answering Brief in Opposition to Plaintiffs' Motion for Class Certification and appendix were served via ECF on the following:

> Pamela S. Tikellis
> Robert J. Kriner, Jr.
> A. Zachary Naylor
> Robert R. Davis
> CHIMICLES & TIKELLIS LLP
> One Rodney Square
> P.O. Box 1035
> Wilmington, DE 19899
>
> James R. Malone, Jr.
> Joseph G. Sauder
> CHIMICLES & TIKELLIS LLP
> One Haverford Centre
> 361 West Lancaster Avenue
> Haverford, PA 19041
> Attorneys for Plaintiffs

/s/ Phillip T. Mellet
Phillip T. Mellet (Del. Bar No. 4741)