IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

J. MICHAEL CHARLES, MAURICE W. WARD,
JR., and JOSEPH I. FINK, JR., on behalf of
themselves and all others similarly situated,

                                 Plaintiffs,

                       v.

PEPCO HOLDINGS, INC., CONECTIV, and
PEPCO HOLDINGS RETIRMENT PLAN,

                             Defendants.

:     CIVIL ACTION

:     NO. 05-00702 (SLR)

---

## DEFENDANTS' OPENING BRIEF IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

                         M. Duncan Grant (Del Bar No. 2994)
                         Phillip T. Mellet (Del Bar No. 4741)
                         PEPPER HAMILTON LLP
                         Hercules Plaza, Suite 5100
                         1313 N. Market Street
                         P.O. Box 1709
                         Wilmington, DE   19899-1709
                         302.777.6500

Susan Katz Hoffman, Esquire         Larry R. Wood, Jr. (Del Bar No. 3262)
LITTLER MENDELSON, P.C.           Kay Kyungsun Yu
Three Parkway                           Barak A. Bassman
1601 Cherry Street                   PEPPER HAMILTON LLP
Philadelphia, PA  19102             3000 Two Logan Square
267.402-3015 (telephone)           Eighteenth and Arch Streets
267.430.7275 (fax)                   Philadelphia, PA 19103-2799
                         215. 981.4000 (telephone)
                         215.981.4750 (fax)

Dated:  May 1, 2007                Attorneys for Defendants

## TABLE OF CONTENTS

**Page**

I.  NATURE AND STAGE OF PROCEEDINGS ..................................................................1

II. STATEMENT OF FACTS ...........................................................................................2

    A.  The Cash Balance Plan ..........................................................................................2

    B.  The Conversion Process and Notices Provided ....................................................6

    C.  Plaintiffs' Complaint .............................................................................................8

    D.  Plaintiffs' Knowledge of Their Potential Claims .................................................8

        1.  Ward ...............................................................................................................9

        2.  Charles ...........................................................................................................9

        3.  Troup ...........................................................................................................10

        4.  Fink .............................................................................................................10

III. SUMMARY OF ARGUMENT ...................................................................................11

IV. ARGUMENT ..............................................................................................................12

    A.  Standard of Review ..............................................................................................12

    B.  Count I:  Plaintiffs' Claim for Alleged Improper Backloading of Benefits Fails ...........13

    C.  Count II:  Plaintiffs' Claim For Age Discrimination Under ERISA § 204(b)(1)(G) Fails ...........19

    D.  Count IV:  Plaintiffs' Claim For Alleged Improper Notice Under ERISA § 204(h) Fails ...........20

        1.  There Was No Requirement to Provide Notice .............................................21

        2.  Defendants Provided Proper Notice of the Amendment Establishing the Cash Balance Formula ...........22

            a.  Notice Was Sufficiently Detailed ...........................................................23

            b.  Notice Was Timely ..................................................................................24

        3.  Plaintiffs Are Not Entitled to Relief for any Alleged Deficiency in Notice ...........24

E.   Plaintiffs' Claims Are Barred by the Statute of Limitations ..............................26

   1.   Ward ....................................................................................................27

   2.   Charles ................................................................................................27

   3.   Fink .....................................................................................................28

   4.   Troup ...................................................................................................28

V.   CONCLUSION ..............................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Berger v. Xerox Corp.*, 338 F.3d 755 (7th Cir. 2003) ..................................................14

*Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993) ..............13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...........................................................13

*Cooper v. IBM Personal. Pension Plan*, 457 F.3d 636 (7th Cir. 2006),
    *cert. denied*, 2007 WL 91579 (U.S. Jan. 16, 2007)............................................1, 18

*DiCioccio v. Duquesne Light Co.*, 911 F. Supp. 880 (W.D. Pa. 1995).........................................20

*Engers v. AT & T*, 428 F. Supp. 2d 213 (D.N.J. 2006).................................................22

*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000) ................................................14

*Finley v. Dun & Bradstreet Corp.*, __ F. Supp. 2d __, 2007 WL. 196753
    (D.N.J. Jan. 26, 2007)........................................................................25

*Hebert v. AAI UIC Retirement Plan*, Civ. A. No. 05-2283, 2006 WL. 1996855 (D. Md.
    July 13, 2006) ........................................................................27, 28

*Hirt v. The Equitable Retirement Plan for Employees*, 450 F. Supp. 2d 331 (S.D.N.Y.
    2006)................................................................................27, 28

*In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3d Cir. 1993)..............28, 29

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..........................13

*Miller v. Fortis Benefits Insurance Co.*, 475 F.3d 516 (3d Cir. 2007) ....................................27, 28

*Register v. PNC Financial Services Group, Inc.*, 477 F.3d 56
    (3d Cir. 2007) ........................................................1, 2, 4, 12, 13, 14, 22, 23, 24, 25

*Romero v. Allstate Corp.*, 404 F.3d 212 (3d Cir. 2005) .........................................................22, 26

*Wheeler v. Pension Value Plan for Employees of the Boeing Co.*, Civ. A. No. 06-500,
    2007 WL. 781908 (S.D. Ill. Mar. 13, 2007)...............................................16, 17, 18

### STATUTES, REGULATIONS, AND LEGISLATIVE HISTORY

26 C.F.R. § 1.411(b)-1 (b)(2)(ii)(D).........................................................................16, 17

26 U.S.C. § 411(b)(1)(B)(iv) ..........................................................................................17

ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B)................................................16, 17

ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G) ...........................................2,11, 19

ERISA § 204(h), 29 U.S.C. § 1054(h) (1999).......................2, 11, 12, 20, 21, 22, 23, 25

120 Cong. Rec. S15737 (daily ed. August 22, 1974), *reprinted in* 1974 U.S.C.C.A.N.
4639, 5180 .........................................................................................................16

IRS Notice 96-8, 1996-1 C.B. 359 ...............................................................................14

Fed. R.  Civ. P. 56(c) ..............................................................................................12, 13

## I.    NATURE AND STAGE OF PROCEEDINGS

On September 26, 2005, Plaintiffs J. Michael Charles, Maurice Ward, and Joseph Fink filed this putative class action,[1] alleging that the Conectiv Cash Balance Sub Plan (the "Plan" or "Cash Balance Plan") violates the Employee Retirement Income Security Act of 1974 ("ERISA"). (D.I. 1.) Plaintiff Thomas Troup, represented by the same counsel, filed an almost identical Complaint on January 5, 2006, which has been consolidated with the *Charles* action. (D.I. 34.) Plaintiffs brought this action on the heels of the Southern District of Illinois' opinion in *Cooper v. IBM Personal Pension Plan*, 274 F. Supp. 2d 1010, 1021 (S.D. Ill. 2003) that all cash balance plans are *per se* unlawful under ERISA because their benefit accrual formulae supposedly impermissibly discriminate against older workers in violation of ERISA. However, the Seventh Circuit subsequently reversed the *Cooper* decision, *see Cooper v. IBM Personal Pension Plan*, 457 F.3d 636, 637 (7th Cir. 2006), *cert. denied*, 2007 WL 91579 (U.S. Jan. 16, 2007). Earlier this year, the Third Circuit adopted the Seventh Circuit's reasoning in *Register v. PNC Financial Servs. Group, Inc.*, 477 F.3d 56 (3d Cir. 2007), and held that there is nothing age discriminatory about the accrual formulae of cash balance plans. As Plaintiffs have admitted, *Register* forecloses their primary claim that the Cash Balance Plan is *per se* unlawful under ERISA § 204(b)(1)(H). (D.I. 79 and 84.)[2]

Plaintiffs are accordingly left with three claims: (1) Count I, in which they contend that the Cash Balance Plan violates ERISA § 204(b)(1), which prohibits "backloading"

---

[1] The Court has stayed Plaintiffs' Motion for Class Certification pending the outcome of the instant Motion for Summary Judgment. (D.I. 80.)

[2] This Court stayed Defendants' Motion to Dismiss Plaintiffs' claim under Section 204(b)(1)(H) pending the Third Circuit's decision in *Register*. (D.I. 30 and 31.) While the Court has yet to lift the stay and rule on Defendants' Motion, in light of Plaintiffs' admission, Defendants understand that this issue is resolved by the *Register* opinion and will not address this claim in the instant Motion for Summary Judgment.

of benefits, *i.e.*, requiring a disproportionately larger share of retirement benefits to accrue in later years as opposed to earlier years (D.I. 1, ¶¶ 42-45); (2) Count II, in which Plaintiffs allege that the Cash Balance Plan violates ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), which provides that the Cash Balance Plan is not lawful "if the participant's accrued benefit is reduced on account of any increase in his age or service" (D.I. 1, ¶ 47); and (3) Count IV, in which Plaintiffs allege that, pursuant to ERISA § 204(h), they did not receive proper notice of the amendment establishing the cash balance formula.  (D.I. 1, ¶¶ 51-53.)

The Court denied Defendants' Motion to Dismiss these three claims in orders dated June 12, 2006 and July 11, 2006 (D.I. 24, 25, 30, and 31.)  The parties have completed fact discovery, and Defendants now bring the instant Motion for Summary Judgment on Plaintiffs' three remaining claims.  As detailed below, each claim fails as a matter of law based on the undisputed evidence in the record.  Moreover, even if there were any merit to any of Plaintiffs' claims (and there is not), the claims of each Plaintiff are barred by the applicable three-year statute of limitations.

## II.    STATEMENT OF FACTS

### A.    The Cash Balance Plan

This case addresses the lawfulness of Defendants' Cash Balance Plan.  The Third Circuit in *Register* explained in detail the nature of a cash balance pension plan:

> There are two general types of pension plans:  defined contribution plans and defined benefit plans.  A defined contribution plan is a pension plan in which an individual account is established for an employee to which his employer (and sometimes the employee too) contributes a specific amount.  The employee is entitled "to whatever assets are dedicated to his individual account."  The employee bears the investment risks and the employer does not guarantee a retirement benefit to the employee.
>
> A defined benefit plan, on the other hand, is any plan that is not a defined contribution plan.  It is generally a pension plan where the

employee is promised a retirement benefit based on a formula the plan sets forth. The plan consists of a "general pool of assets rather than individual dedicated accounts." Participants in a defined benefit plan have no claim to any particular asset that composes a part of the plan's general asset pool, but, instead, receive "an annuity based on the retiree's earnings history, usually the most recent or highest paid years, and the number of completed years of service to the company." Under a defined benefit plan the entity funding the plan, *i.e.,* the employer, bears the investment risks.

The pension plan at issue in this case is a cash balance plan. A cash balance plan, by law, is a form of defined benefit plan and must comply with the statutory regulations applicable to defined benefit plans. However, in actuality, a cash balance plan is a hybrid between a defined contribution plan and a defined benefit plan as it contains attributes of both.

A cash balance plan is classified as a defined benefit plan because cash balance plans, like traditional defined benefit plans such as the plan PNC maintained before January 1, 1999, "are required to offer payment of an employee's benefit in the form of a series of payments for life...." Nevertheless, a cash balance plan differs from a traditional defined benefit plan in that "traditional defined benefit plans define an employee's benefit as a series of monthly payments for life to begin at retirement, but cash balance plans define the benefit in terms of a stated account balance," albeit a "hypothetical" account. Thus, cash balance plans are like defined contribution plans in that both define the employee's benefit in terms of a stated balance.

Cash balance plan accounts "are often referred to as hypothetical accounts because they do not reflect actual contributions to an account or actual gains and losses allocable to the account." Instead, the employer imputes value to the hypothetical account in the form of annual "credits." As is the case here, there are typically two types of credits: (1) "pay credits" or "earnings credits," which are hypothetical contributions an employer makes usually expressed as a percentage of wages or salary and may vary with employee tenure, and (2) "interest credits," which are hypothetical earnings (either a fixed or variable rate linked to an index such as the 1-year Treasury bill rate) on the account balance. . . .

When a participant becomes entitled to receive benefits under a cash balance plan, his benefits are defined in terms of an account balance, which then may be converted actuarially into an annuity

> at the option of the participant. As is true in the case of traditional
> defined benefit plans, the employer funding the plan bears the
> investment risks associated with the plan. This risk could be
> considerable because, unlike in the case of defined contribution
> plans, cash balance plans accounts grow on the basis of a
> predetermined formula rather than on the basis of actual earnings.

*Register*, 477 F.3d at 61-63 (citations and footnotes omitted).

Defendants' Plan became effective in its current form as a cash balance plan on

January 1, 1999. (D.I. 1, ¶ 21.) Under the Cash Balance Plan, each participant accrues benefits

each year in the form of pay credits and interest credits added to his or her hypothetical account

balance. *See generally* Plan §§ 3.3 and 3.4 (App. at A-21 to A-23.) The pay credits are

determined as follows:

| Participant's Age In Year Credit Is Added To Account | Pay Credit Rate |
|---|---|
| Under 30 | 5% |
| 30-34 | 6% |
| 35-39 | 7% |
| 40-44 | 8% |
| 45-49 | 9% |
| 50 and over | 10% |

*Id.* § 3.3.2 (App. at A-21.) For example, "[u]nder this formula, an employee who reached age

forty in 1999 with an annual salary of $55,000 would receive a Pay Credit of $4,400 [for that

year], which equals her salary of $55,000 multiplied by the 8% rate applicable for participants

age forty to forty-four." (D.I. 1, ¶ 25.) Each year new Pay Credits are added to each

participant's hypothetical cash balance account, so that the account's value increases every year

of employment. *See* Plan § 3.3.1 (App. at A-21.) For example, if the employee in the

hypothetical above worked another year at the exact same salary, her hypothetical account

balance would rise an additional $4,400, not counting Interest Credits. Of course, the older the

employee becomes, the more Pay Credits are credited to her account, as the Pay Credit rate

increases with age.

To avoid the erosion of the value of the hypothetical account balances by

inflation, the Cash Balance Plan provides Interest Credits that are applied to the hypothetical

account balances each year.  As Plaintiffs explain in their Complaint:

> Interest Credits under the [Plan] are calculated based upon the
> thirty year Treasury Bond rate as of October 31 of the prior year.
> At the end of each calendar year, an Interest Credit is made to the
> [employee's hypothetical] account by multiplying the opening
> account balance as of the beginning of the year by the applicable
> thirty year treasury rate.  Under this formula, an employee who had
> a plan account balance of $5,000 as of January 1, 2000 would
> receive an interest credit to [his] account as of December 31, 2000
> in the amount of $300, which represents the $5,000 account
> balance as of the commencement of the year multiplied by the
> thirty year treasury rate as of October 31, 1999, which was 6%.

(D.I. 1, ¶ 26).

Finally, there is an additional benefit for Cash Balance Plan participants, like each

Plaintiff in this case, who had substantial prior service in Defendants' pre-1999, non-cash

balance versions of the Plan.  These participants receive special, additional Transition Credits to

those employees' accounts based on the following formula:

| Participant's Years of Service as of Effective Date (January 1, 1999) | Transition Crediting Rate |
| --- | --- |
| Less than 10 years | 0% |
| 10-11 years | 1% |
| 12-15 years | 2% |
| 16-19 years | 3% |
| 20 or more years | 4% |

*See* Plan § 3.5.3 (App. at A-23.)  "Under this formula, an employee with twelve years of service

under a predecessor plan [formula] who earned $55,000 during 1999 would receive a Transition

Credit of $1,100, determined by multiplying [his] salary of $55,000 by the 2% Transition Credit

rate applicable to employees who had twelve to fifteen years of service as of January 1, 1999."

(D.I. 1, ¶ 28.)  This hypothetical employee will continue to receive the 2% per year Transition

Credit until he surpasses thirty-five total years of service.  *See* Plan § 3.5.2 (App. at A-23.)

**B.      The Conversion Process and Notices Provided**

Leading up to the January 1, 1999 effective date of the Cash Balance Plan

amendment, Defendants provided a series of notices to its employees, including:

- In October 13, 1997, Conectiv distributed a newsletter to all employees titled "EMerging Times" that noted that "A new pension plan will replace the old 'final pay' plans with individual, portable accounts."  (App. at A-42 to A-45.)

- One week later, on October 20, 1997, the next issue of "EMerging Times" provided even more detail:  "The design of the plan is not yet finalized, but we know it will be what's called a 'cash balance' plan.  Unlike the companies' current final pay plans that pay a benefit based on a formula applied at the end of your career, the cash balance plan provides each employee with a record keeping account into which the company credits a percentage of pay each year.  The account balance will grow based on a set interest rate." (App. at A-46 to A-49.)

- On April 23, 1998, the Compensation Committee of the Board of Directors of Conectiv adopted the cash balance formula amendment.  *See* Kremmel Deposition at 30:11-31:17 (App. at A-73); Kremmel Declaration, ¶ 6 (App. at A-36); *see also* App. at A-77 to A-83.  Shortly thereafter, in May 1998, Conectiv mailed to all employees' homes a "Facts" newsletter.  Kremmel Deposition at 44:19-45:5, 177:4-177:18 (App. at A-75 to A-76); Kremmel Declaration, ¶ 17(c) (App. at A-39.)  Under the heading "New Cash Balance Pension Plan," this newsletter contains just over three single spaced pages explaining in detail how the Cash Balance Plan operates.  (App. at A-50 to A-57.)  The newsletter further informed employees that the Cash Balance Plan would be effective January 1, 1999.  (*Id.*)

- On December 21, 1998, Conectiv sent, by email, to all employees who would be enrolled in the Cash Balance Plan a five page, single-spaced letter outlining in detail how the Cash Balance Plan computes benefits.  (App. at A-84 to A-94.)

After the Cash Balance Plan went into effect, Conectiv conducted a series of

meetings with employees in July 1999 regarding the new pension benefit structure.  *See*

-6-

Kremmel Declaration, ¶ 17(e) (App. at A-40.)  In advance of these meetings, Conectiv

distributed a newsletter titled "Mid Week Extra: Cash balance update June 23, 1999" to Cash

Balance Plan participants.  (*Id.*)  This newsletter expressly stated the company's intention to

discuss criticism that had been leveled against cash balance pension plans, noting that "recent

stories in the national media have raised concerns about some cash balance plans. . . ."  (App. at

A-63 to A-64.)

      Conectiv used a standardized Power Point slide presentation in these meetings.

*See* Kremmel Declaration, ¶ 17(e) (App. at A-40.)  One of these slides addressed directly the

criticisms that were being directed at cash balance plans.  That slide read as follows:

> Important Perspectives on Conectiv's New Retirement Program
>
> - New plan is a cash balance plan
> - Cash balance plans are controversial
>     - -- Series of Wall Street Journal articles
>     - -- Congressional Hearings
> - Criticisms leveled at cash balance plans
>     - -- Masks cost cutting
>     - -- Poor handling of communication/transition
>     - -- Accruals cease for certain employees

(App. at A-66).  In particular, at each meeting, Defendants discussed the then-brewing

controversy over IBM's decision to convert to a cash balance plan.  *See* Kremmel Declaration, ¶

17(e) (App. at A-40.)  That controversy resulted in the well-publicized filing of a class action

lawsuit against IBM on November 1, 1999 that alleged IBM's cash balance formula violated

ERISA.  *See Cooper v. IBM Personal Pension Plan*, Civ. A. No. 99-829-GPM, 2005 WL

1981501 at *1 (S.D. Ill. Aug. 16, 2005), *rev'd* 457 F.3d 636 (7th Cir. 2006).

### C.    Plaintiffs' Complaint

Plaintiffs are each long-term employees of Defendant Conectiv or its predecessors, having continuously worked for Conectiv or its predecessors since at least 1987. (D.I. 1, ¶¶ 4-6); *see also* Troup Deposition at 5:11-5:21 (App. at A-96.)  Plaintiffs were employees as of the January 1, 1999 conversion to the Plan's cash balance formula, and thus benefit from Transition Credits. *Id.*  Furthermore, as each Plaintiff is now over fifty years old, Plaintiffs enjoy the maximum Pay Credit rate. *Id.*

Plaintiffs devote one paragraph of their Complaint to explaining how they have allegedly been harmed.  That paragraph provides, in full:

> Because the conversion of the account balance to an annuity commencing at age sixty-five is sensitive to fluctuations in the thirty year treasury rate, participants can actually suffer reductions in their accrued benefits under the [Plan].  For example, in 1999 and 2000 Plaintiff Charles' accrued benefit increased.  Thereafter, it subsequently decreased in three consecutive years:  in 2001, his accrued benefit decreased by 4.006%; in 2002, it decreased by 6.932%; in 2003, it decreased by 2.774%.  This represented a total decrease in his annual annuity benefit of over $4,000 between the close of 2000 and the close of 2003.  In 2004, Plaintiff Charles' accrued benefit increased by 8.43%, but was still significantly lower than the amount of his accrued benefit as of the end of calendar year 2000.  In terms of the annual amount of annuity benefit, Plaintiff Charles' accrued benefit as of December 31, 2004 was over $1,500 less than it had been at the end of 2000.  Plaintiffs Ward and Fink similarly suffered negative accruals.

(D.I. 1, ¶ 41.)

### D.    Plaintiffs' Knowledge of Their Potential Claims

Defendants have asserted in this case that each Plaintiff's claim is barred by the applicable statute of limitations.  (D.I. 38, at Third Defense.)  Below is a summary of the undisputed evidence in the record as to when each Plaintiff learned, or should have learned, of the alleged claims in this case.

### 1.     Ward

On December 18, 1998 – approximately two weeks before the cash balance amendment was effective – Plaintiff Maurice Ward received an email from a William Bates, with the subject line "Cash Balance Pension Info." (App. at A-100 to A-113.) In the email, Mr. Bates wrote "Maury here is the info I have on Cash Balance Pensions FYI" and attached three articles from *The Wall Street Journal*. (App. at A-100.) The first article, titled "'Cash Balance' Saves Millions, Hides Pitfalls From Workers," included the following information:

- "But employees are currently pressing class-action suits against Georgia-Pacific Corp. and Cummins Engine Co.'s Onan Corp. subsidiary, alleging that cash balance plans illegally reduce pensions." (App. at A-105.)

- The article stated that there was "concern at the IRS that such plans may violate various pension laws . . ." (*Id.*)

- "The IRS has never given its blessing to some of the maneuvers involved. If employers don't win a lobbying battle currently being waged for exemptions from certain pension rules, some of these plans could be in for a costly fix." (App. at A-103.)

- The article stated the "little noticed dark side" of cash balance plans is that "a lot of older workers will find their pensions cut, in come cases deeply." (App. at A-102.)

The other two articles – titled "Long Time Employees Face A Pension-Benefit 'Plateau'" and "Employees Will Need To Know Traits Of 'Cash Balance' Plan" – contained similar detail on the operation and criticisms of cash balance plans. (App. at A-107 to A-113.)

### 2.     Charles

On August 20, 2003, Mr. Charles wrote the following in an email to Conectiv's Human Resources Department:

> Are you following the events of the current class action lawsuit by the employees of IBM as it pertains to IBM's decision to convert their employees' retirement plan into the Cash Balance Plan?

> As one of the A. E. employees that missed the cut off date [for
> grandfathering] of 1/1/99 by both age and time with the Company
> by only a few months (start date 9/10/79 birthday 10/18/49) this
> event has caught my attention. ***I've always felt from the inception***
> ***of the cash balance plan that it was unfair.***

(App. at A-114.) (emphasis added).

### 3.    Troup

Mr. Troup testified that he attended one of Conectiv's employee meetings in the

summer of 1999 to discuss the new Cash Balance Plan. *See* Troup Deposition at 30:12-31:7

(App. at A-97 to A-98.) Mr. Troup recalled that there was discussion at that meeting regarding

articles that the *Wall Street Journal* had recently published about employee concerns that their

rights were violated by conversions to cash balance plans. *See* Troup Deposition at 31:8-31:20

(App. at A-98.) Mr. Troup, however, did not follow up and read any of the referenced articles.

*See* Troup Dep. at 32:2-32:5 (App. at A-99.)

### 4.    Fink

Mr. Fink testified that in 1999 he heard discussions among his colleagues that

there may be problems with the new Cash Balance Plan. *See* Fink Deposition at 102:6-104:19

(App. at A-116 to A-118.) Mr. Fink admitted that in 1999 he was "***highly suspicious***" that the

Cash Balance Plan would adversely impact his personal finances. (*Id.*) (emphasis added). Mr.

Fink raised his concerns with an acquaintance in the Conectiv Human Resources Department,

George Bleazard. *See* Fink Deposition at 106:5-106:15 (App. at A-119.) Mr. Fink testified that

Mr. Bleazard informed Mr. Fink that there would be upcoming meetings at which the new plan

would be discussed, but that he (Fink) never bothered to follow up:

> Q. So George mentioned to you in 1999 that there will be a series
> of meetings that will answer your questions about the cash balance
> plan, right?
>
> A. At some point, yeah. Yes.

Q. But you were never invited to any such meeting?

A. No.

Q. Did you follow up with anyone in HR to ask why you hadn't
been invited to a meeting about the cash balance plan after George
told you they were going to occur?

A. I can't say that I did.

*See* Fink Deposition at 122:5-122:19 (App. at A-120.)

## III.    SUMMARY OF ARGUMENT

1.    Plaintiffs' claim that the Cash Balance Plan is illegally "backloaded" fails
as a matter of law, and also because the undisputed evidence shows that the Cash Balance Plan
satisfies ERISA's tests for backloading.

2.    Plaintiffs' claim that the Cash Balance Plan violates ERISA
§ 204(b)(1)(G), which prohibits reductions in accrued benefits because of age or additional
service, also fails.  Here, there is no evidence that any reduction in Plaintiffs' accrued benefits
was caused by any factor other than fluctuating interest rates, which apply to all participants
uniformly and without regard to age or length of service.

3.    There is no evidence in the record to support Plaintiffs' claim that
Defendants failed to provide any notice of the January 1, 1999 amendment that ERISA § 204(h)
purportedly requires.

a.    As a threshold matter, Plaintiffs were not entitled to any notice of
the January 1, 1999 amendment.  ERISA § 204(h) only requires that Defendants provide advance
notice of amendments that "provide for a significant reduction in the rate of future benefit
accrual."  Here, the undisputed evidence shows that, at the time of the amendment, Plaintiffs'
accrued benefits were higher under the Cash Balance Plan formula than they would have been

absent the amendment.  Thus, the amendment *increased* their benefits and there was therefore no requirement to provide any notice.

           b.      Furthermore, Defendants did provide adequate notice.  The Third Circuit held in *Register* that the version of Section 204(h) in effect in 1998 and 1999 merely required that, after the adoption of the relevant amendment but more than 15 days before its effective date, Defendants provide a summary of the amendment's terms.  Here, shortly after the Compensation Committee of the Board of Directors adopted the relevant amendment on April 23, 1998 and well before the January 1, 1999 effective date, Defendants distributed a newsletter outlining the operation of the new Cash Balance Plan formula.

           c.      Finally, even if Plaintiffs could point to a technical violation of ERISA § 204(h), their claim still fails as a matter of law because there is no evidence that Defendants engaged in fraud or acted in bad faith.  The Third Circuit has repeatedly held that there is no cause of action for violations of ERISA's reporting and disclosure provisions absent "extraordinary circumstances" such as fraud and bad faith.  Here, Defendants repeatedly and accurately explained the terms of the amendment establishing the cash balance formula to plan participants and there is no evidence of fraud.

           4.      Each Plaintiff's claim is barred by the applicable three year statute of limitations as the record is undisputed that each Plaintiff knew or should have known of his alleged claims six years before the filing of this Complaint.

## IV.    ARGUMENT

### A.    Standard of Review

           Rule 56 of the Federal Rules of Civil Procedure provides that a moving party is entitled to summary judgment when the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the non-movant fails to produce evidence of an essential element for which it has the burden of proof, the movant is entitled to summary judgment as a matter of law. *Celotex*, 477 U.S. at 323; *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302 (3d Cir. 1993). Similarly, if the movant does not shoulder the burden of proof, its burden is "discharged by showing -- that is, pointing out to the district court -- that there is an absence of evidence to support the [Plaintiff's] case." *Celotex*, 477 U.S. at 325. When responding to such a motion for summary judgment, the non-moving party must demonstrate that there are "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).

Here, Plaintiffs bear the burden of proof on each element of each one of their claims. Accordingly, to defeat this Motion, it is Plaintiffs' burden to produce admissible evidence that a reasonable fact finder could find in their favor as to each element of each claim.

**B.    Count I:  Plaintiffs' Claim for Alleged Improper Backloading of Benefits Fails**

Plaintiffs' claim that the Cash Balance Plan is improperly "backloaded" fails. The Third Circuit in *Register* recently explained that:

> The purpose of the anti-backloading provision is to "prevent an employer from avoiding the vesting requirements [of ERISA] through minimal accrual of benefits in early years of employment, followed by larger benefit accruals as an employee nears retirement." Congress intended by the anti-backloading provision to prohibit an employer from "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and ... concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement."

*Register*, 477 F.3d at 71 (citations omitted). ERISA contains three alternative, technical actuarial tests for complying with the anti-backloading requirement, only one of which, the 133 1/3% rule,

applies to cash balance plans. *Id.* at 70.  Plaintiffs admit that their backloading claim turns upon

this test.  (D.I. 16, at 11) ("to satisfy the minimum accrual standards, the plan must meet the 133

1/3 percent test").  Under that test, "ERISA 'requires that the value of the benefit accrued in any

year may not exceed the value of a benefit accrued in the previous year by more than 33%.'"

*Register*, 477 F.3d at 71 (citation omitted).

   The IRS, in Notice 96-8, has opined that cash balance plan formulas, like the one

at issue in this case, will satisfy the 133 1/3 percent rule so long as "future interest credits to an

employee's hypothetical account balance are not conditioned upon future service." *See* 1996-1

C.B. 359.  The IRS referred to such compliant plans as "frontloaded interest credit plans." *Id.*

Here, the Plan does not condition the receipt of future interest credits upon future service.  The

Plan provides that "Interest Credits shall continue to be credited to the Cash Balance Account of

a Participant until the earlier to occur of the Participant's Retirement Date, or, if applicable the

Annuity Starting Date for survivor benefits" – with no requirement of future service.  *See* Plan

§ 3.4.2 (App. at A-22.)  Thus, the Plan satisfies the accrual requirements set forth in Notice 96-8

and complies with ERISA's backloading requirements.  *See Berger v. Xerox Corp.*, 338 F.3d

755, 762 (7th Cir. 2003) ("The Internal Revenue Service's Notice 96-8 . . . is an authoritative

interpretation of the applicable statutes and regulations"); *Esden v. Bank of Boston*, 229 F.3d

154, 169 (2d Cir. 2000) (Notice 96-8 "represents the agency's 'fair and considered judgment on

the matter' and is therefore entitled to deference").  Defendants' expert, Mr. Kra, confirmed that

the Cash Balance Plan has always complied with the 133 1/3 percent rule.  *See* Kra Report ¶ 5

(App. at A-122.)

   It is not entirely clear why Plaintiffs believe that the Cash Balance Plan is

improperly backloaded.  In their Complaint, Plaintiffs merely asserted, without any explanation,

that the Cash Balance Plan "does not satisfy" the anti-backloading rules.  (D.I. 1, ¶ 45.)  When

Defendants challenged Plaintiffs' backloading claim in a Motion to Dismiss, Plaintiffs offered

the following theory as to how the Cash Balance Plan fails to satisfy the 133 1/3 percent test:

> Thus, to satisfy the minimum accrual standards, the plan must meet
> the 133 1/3 percent test; based upon the allegations of the
> Complaint, however, the plan fails to meet this test because the
> amount by which plaintiff Charles' accrued benefit increased in
> 2004 exceeded 133 1/3 percent of the percentage change in a prior
> year.

(D.I. 16, 11.)  Plaintiffs further argued that "Plaintiff Charles had an 8.43% increase in his

accrued benefit in 2004, and that increase was more than 133 1/3 percent of the rate at which he

earned accrued benefits in the prior year." *Id.* at 15.

      In their Brief, Plaintiffs sidestepped any discussion of *why* they alleged that Mr.

Charles' accrued benefit increased in 2004.  However, in the Complaint, Plaintiffs explained that

it was because of shifting interest rates:

> ***Because the conversion of the account balance to an annuity***
> ***commencing at age sixty-five is sensitive to fluctuations in the***
> ***thirty year treasury rate***, participants can actually suffer reductions
> in their accrued benefits under the [Plan].  For example, in 1999
> and 2000 Plaintiff Charles' accrued benefit increased.  Thereafter,
> it subsequently decreased in three consecutive years:  in 2001, his
> accrued benefit decreased by 4.006%; in 2002, it decreased by
> 6.932%; in 2003, it decreased by 2.774%.  This represented a total
> decrease in his annual annuity benefit of over $4,000 between the
> close of 2000 and the close of 2003.  ***In 2004, Plaintiff Charles'***
> ***accrued benefit increased by 8.43%***, but was still significantly
> lower than the amount of his accrued benefit as of the end of
> calendar year 2000.  In terms of the annual amount of annuity
> benefit, Plaintiff Charles' accrued benefit as of December 31, 2004
> was over $1,500 less than it had been at the end of 2000.  Plaintiffs
> Ward and Fink similarly suffered negative accruals.

(D.I. 1, ¶ 41. (emphasis added))  Plaintiffs' reasoning thus appears to proceed as follows:  (1) the

Cash Balance Plan's formula for converting the cash balance account balance into an annuity

depends upon each year's Applicable Interest Rate, which varies with changing Treasury bond

yields, *see* Plan at Schedule A, § A.1.1 (App. at A-33); (2) as a result of changing interest rates, the amount of the benefit measured as an annuity can fluctuate significantly from year to year, depending on shifting interest rates; (3) in 2004, because of a change in the applicable interest rates from previous years, Mr. Charles' benefits grew at a rate that violated 133 1/3 percent rule.

Significantly, Plaintiffs' theory is premised on an incorrect application of law. Plaintiffs' theory assumes that, under the 133 1/3 percent rule, the interest rate need not be held constant. Using that assumption (changing interest rates) is how Plaintiffs allege that annuity values can allegedly change so dramatically, thereby creating the alleged shifts in the rate of benefit growth.[3]

Plaintiffs' assumption is wrong. Under the law, in analyzing whether a Plan is impermissibly backloaded, all relevant factors, such as salary, used to determine a participant's accrual under the Plan remain constant. *See generally* 29 U.S.C. § 1054(b)(1)(B)(iv) and 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(D).[4] Indeed, the recent decision in *Wheeler v. Pension Value Plan for Employees of the Boeing Co.*, Civ. A. No. 06-500, 2007 WL 781908 (S.D. Ill. Mar. 13, 2007), is directly on point. There, the court rejected an identical backloading challenge to the Boeing Company's cash balance plan, which similarly used a varying interest rate for annuity conversions. In *Wheeler*, just as in this case, "Plaintiffs do not dispute that, assuming a constant rate of interest, the Plan is not backloaded, but argue that the 'real-world' effect of the Plan's use

_____

[3] Ironically, Plaintiffs also premise their argument that the Plan impermissibly **reduced** their accrued benefit on account of age or additional service in violation of ERISA § 204(b)(1)(G) upon the effect that changing interest rates have upon the conversion of their account balances to age-65 annuities. (D.I. 1, ¶ 41.) Plaintiffs appear to proceed on a theory of "heads I win, tails you lose:" changing interest rates either increase the value of their accrued benefits measured as an age-65 annuity, in which case Plaintiffs decry alleged backloading, or reduce them, in which case Plaintiffs allege age discrimination. The law rejects Plaintiffs' approach.

[4] *See also* 120 Cong. Rec. S15737 (daily ed. August 22, 1974) (statement of Sen. Williams), *reprinted in* 1974 U.S.C.C.A.N. 4639, 5180 ("In applying the 133 1/3% test, social security benefit levels for future years and other factors relevant in computing benefits, including salary differentials are to be held constant").

of a variable interest rate (the annual rate on 30-year Treasury securities) to compute 'Interest

Credits' creates a situation in which variations in the 30-year Treasury rate are likely to cause

backloading." *Id.* at *3.  The *Wheeler* court concluded that this argument is "simply wrong."  *Id.*

   The court explained that the law is clear that, in testing for backloading, the

applicable interest rate must be held constant:

> As Boeing points out, in testing the Plan for backloading Boeing is
> entitled to assume a constant rate of interest with respect to the
> accrual of "Interest Credits" in a Plan participant's CBA.  For
> purposes of the 133-1/3% rule, ERISA §  204(b)(1)(B), 29 U.S.C.
> § 1054(b)(1)(B), provides that "all ... relevant factors used to
> compute benefits shall be treated as remaining constant as of the
> current year for all years after the current year." 29 U.S.C. §
> 1054(b)(1)(B)(iv).  The parallel provision of the Internal Revenue
> Code ("IRC") concerning backloading likewise states that under
> the 133-1/3% rule "all ... factors used to compute benefits shall be
> treated as remaining constant[.]" 26 U.S.C. § 411(b)(1)(B)(iv).
> Finally, regulations promulgated by the Treasury Department
> regarding section 411 of the IRC, which are owed, of course, the
> highest degree of deference by the Court, *see Bankers Life & Cas.
> Co. v. United States*, 142 F.3d 973, 983 (7th Cir.1998) (citing
> *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467
> U.S. 837, 842-43 (1984)); *University of Chicago Hosps. v. United
> States*, No. 05 C 5120, 2006 WL 2631974, at *2 (N.D.Ill. Sept. 8,
> 2006), state that, for purposes of the 133-1/3% rule,
>
> "for any plan year, social security benefits and all relevant factors
> used to compute benefits, *e.g.*, consumer price index, are treated as
> remaining constant as of the beginning of the current plan year for
> all subsequent plan years."
>
> 26 C.F.R. § 1.411(b)-1 (b)(2)(ii)(D).

*Id.* (footnote omitted).  The court further pointed out that in Notice 96-8, the IRS expressly stated

that "frontloaded" cash balance plans ***using variable Treasury bond rates***, like Boeing's and the

Cash Balance Plan in this case, are entirely permissible and satisfy ERISA's backloading

requirements.  *Id.* at *4.  The court further observed that not only was Plaintiffs' theory legally

meritless, but that it also contravened the policy goals underlying ERISA:

Finally, the Court notes the "gotcha!" quality of Plaintiffs' theory, which seeks to trip up the Plan on the basis of swings in the 30-year Treasury rate. The Court sees no compelling interest in playing such games, or in forcing Boeing to alter Plan provisions that obviously are intended to benefit Plan participants. As discussed, the Plan provides a minimum 5.25% floor for computing "Interest Credits," but the variable rate enables participants to do better than 5.25% in Plan years when the applicable 30-year Treasury rate exceeds the 5.25% floor. It would be easy for the Plan to adopt a fixed rate for computing "Interest Credits," but this would not necessarily be in the interest of Plan participants. It is apparent that any variations in the interest-crediting rate under the Plan are unrelated to distinctions of age and years of service intended to favor older employees and to coerce employees to remain in service until retirement age. *See Richards v. FleetBoston Fin. Corp.*, 427 F.Supp.2d 150, 171 (D.Conn.2006) (quoting *Langman v. Laub*, 328 F.3d 68, 71 (2d Cir.2003)) (stating that "the [ERISA §] 204(b)(1)(B) 'test [of backloading] applies to how a given plan operates at a given time and prevents it from being unfairly weighted against shorter-term employees; but it is irrelevant to across-the-board increases in benefit rates made at some future time on behalf of all current employees regardless of period of service."); *Campanella v. Mason Tenders' Dist. Council Pension Plan*, 299 F.Supp.2d 274, 284 (S.D.N.Y.2004) (an "across-the-board prospective increase in benefit rates for all employees" regardless of age and years of service does not constitute unlawful backloading under ERISA). *See also Cooper*, 457 F.3d at 642 (noting that "[l]itigation cannot compel an employer to make plans more attractive," but that "[i]t is possible ... for litigation about pension plans to make everyone [including participants] worse off.").

*Id.* at *5.

Accordingly, in determining whether Defendants' Cash Balance Plan complies with the applicable 133 1/3 percent test for backloading, the relevant interest rate must be held constant. For example, if a hypothetical year's interest crediting rate was 10% and the employee's pay was $50,000 per year, then the proper test for backloading is whether in any year from then until the employee reaches age 65, that employee would accrue benefits at ***that*** particular year's interest crediting rate that are more than 33% of a previous year's benefits based on applicable Pay and Transition Credits from $50,000 per year in income. Defendants' expert,

Mr. Kra, performed this calculation for each Plan year's interest crediting rate and found that the 133 1/3 percent test was satisfied each time.  *See* Kra Report ¶ 5 (App. at A-122.)

       In sum, Plaintiffs' claim for alleged illegal backloading is without merit, and Defendants are entitled to summary judgment.

**C.    Count II:  Plaintiffs' Claim For Age Discrimination Under ERISA § 204(b)(1)(G) Fails**

       Plaintiffs' second claim is that the Cash Balance Plan allegedly violates ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), which provides that the Cash Balance Plan is not lawful "if the participant's accrued benefit is reduced on account of any increase in his age or service."  According to Plaintiffs' Complaint, the Plan violates this statutory section because it "permits the accrued benefit of a participant to be reduced in subsequent years."  (D.I. 1, ¶ 47.) Plaintiffs allege that their accrued benefits were reduced "because the conversion to an annuity commencing at age sixty-five is *sensitive to fluctuations in the thirty year treasury rate*." (*Id.*, ¶ 41 (emphasis added)).  Plaintiffs' theory appears to be that their alleged reduction in accrued benefit "in subsequent years" caused by changing interests is actionable under ERISA § 204(b)(1)(G).

       In its opinion denying Defendants' Motion to Dismiss, the Court expressly rejected Plaintiffs' theory that the Cash Balance Plan is illegal simply because Plaintiffs' accrued benefits can decrease based on reasons other than an increase in age or years of service, such as changing interest rates:

> Defendants correctly point out that § 204(b)(1)(G) does not prohibit any decrease in the value of the accrued benefit, so plaintiffs' claim that the "accrued benefit can decrease despite additional service" is insufficient to show a violation of § 204(b)(1)(G). (D.I. 16 at 18.)  However, whether the use of a variable interest rate actually caused plaintiffs' accrued benefits to decrease "on account of additional service" is an allegation that plaintiffs must be given an opportunity to demonstrate.

(D.I. 30, at 5.)

Discovery has now concluded and Plaintiffs have had their opportunity. The Cash Balance Plan contains no provision which reduces benefits because of age or years of service. Plaintiffs have uncovered no evidence showing the Cash Balance Plan reduces a participant's accrued benefit on account of an increase in age or years of service. It is undisputed that the Plan provides one, uniform interest crediting rate for all participants, regardless of age or years of service. *See* Plan § 3.4 (App. at A-22 to A-23.) The only age-related change in the benefit accrual formula is that the rate of Pay Credits and Transition Credits ***increases*** based on additional age and service – a fact Plaintiffs readily admit in their Complaint. (D.I. 1, ¶¶ 25, 28.)

As the Cash Balance Plan does not reduce a participant's accrued benefit based on any increase in age or service, Plaintiffs' claim fails and Defendants are entitled to summary judgment. *See DiCioccio v. Duquesne Light Co.*, 911 F. Supp. 880, 904 (W.D. Pa. 1995) (rejecting 204(b)(1)(G) claim because "the participants' benefit calculations with regard to years of service are uniform and the Supplemental Plan does not require separate calculations once a participant has worked for a specific number of years or has reached a specific age").

### D.     Count IV: Plaintiffs' Claim For Alleged Improper Notice Under ERISA § 204(h) Fails

In Count IV of their Complaint, Plaintiffs allege that they purportedly did not receive the notice of the amendment establishing the cash balance formula required by ERISA § 204(h), 29 U.S.C. § 1054(h). (D.I. 1, ¶ 53.) As explained below, this claim fails for three reasons. First, there was no requirement to provide any notice to Plaintiffs. Second, the notices provided discharged any obligation that Defendants had under Section 204(h). Third, there is no evidence of the type of egregious, bad faith conduct required by the Third Circuit for an action challenging alleged noncompliance with ERISA's notice provisions.

### 1.    There Was No Requirement to Provide Notice

ERISA § 204(h) as then written provided that a "plan . . . may not be amended *so as to provide for a significant reduction in the rate of future benefit accrual*, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date . . ."  ERISA § 204(h), 29 U.S.C. § 1054(h) (1999) (emphasis added).  The statute thus, on its face, only applies to amendments that reduce future benefit accruals and imposes no notice requirements for any other amendments.

Defendants' counsel has retained the services of Ethan Kra, one of the country's leading actuaries in the pension field, to analyze the effect of the cash balance formula amendment upon Plaintiffs as of the amendment's effective date, January 1, 1999.  Mr. Kra determined, based upon 1999 salary and the interest rate in effect for 1999 that Plaintiffs would accrue a greater benefit under the Cash Balance Plan than the predecessor plans in the future:

| Name | Projected Benefit at 1/1/99, payable at Normal Retirement Date under Pre-Amended Plan | Projected Benefit at 1/1/99, payable at Normal Retirement Date under Amended [Cash Balance] Plan |
| --- | --- | --- |
| Thomas S. Troup | 28,982.51 | 38,278.10 |
| Maurice Ward | 42,933.15 | 50,458.26 |
| Jerome Charles | 31,953.78 | 41,151.88 |
| Joseph Fink | 33,469.50 | 39,376.03 |

Kra Report, ¶ 8 (App. at A-123.)

Accordingly, Plaintiffs were not entitled to any notice under Section 204(h) regarding the Cash Balance Plan amendment, as that amendment would not result in any reduction (much less a significant reduction) in their rate of future benefit accrual. The recent opinion in *Engers v. AT & T*, 428 F. Supp. 2d 213 (D.N.J. 2006), is instructive. There, as here, Plaintiffs alleged that Defendant violated ERISA § 204(h) by providing insufficient notice of a conversion to a cash balance plan. *Id.* at 218-220. The Court granted summary judgment to the Defendant, because each Plaintiff's accrued benefits were projected to be higher at age 65 under the new plan than the previous one. *Id.* at 220-223. As the *Engers* Court noted:

> . . . a plaintiff must first establish that the amendment in question provided for a significant reduction in the rate of benefit accrual. If a plaintiff is unable to prove that the amendment in question would provide for such a reduction, § 204(h) would not require the provision of any notice. A court would then have no need to reach any allegation that notice was untimely or otherwise deficient. In short, there could be no claim.

*Id.* at 220.

### 2. Defendants Provided Proper Notice of the Amendment Establishing the Cash Balance Formula

Even assuming, *arguendo*, that Defendants were required to provide notice to Plaintiffs (which they were not), the evidence is undisputed that they discharged any obligation to provide notice under ERISA § 204(h). The statute in effect at the time of the cash balance conversion[5] contained two requirements for proper notice: (1) that the notice accurately summarize the terms and effective date of the amendment and (2) that notice be provided "not

---

[5] Congress amended ERISA § 204(h) in 2001. *See* Historical and Statutory Notes to 29 U.S.C. § 1054. The 2001 amendments to ERISA § 204(h) only apply to plan amendments effective after June 7, 2001, *i.e.*, two and a half years after the amendment at issue here. *See Romero v. Allstate Corp.*, 404 F.3d 212, 218 n. 4 (3d Cir. 2005) (discussing effective date of 2001 amendment); *accord Register*, 477 F.3d at 72.

less than 15 days before the effective date of the plan amendment." *See Register*, 477 F.3d at 72-73; ERISA § 204(h), 29 U.S.C. § 1054(h) (1999).  Both requirements are met in this case.

**a.      Notice Was Sufficiently Detailed**

The Third Circuit in *Register* explained the substantive standard for notice under the statute as it existed in 1998 and 1999:

> The Treasury Regulations that existed at the time of the amendment indicated that the notice need not contain an exact quotation of the text of the amendment, but may contain "a summary of the amendment ... if the summary is written in a manner calculated to be understood by the average plan participant and contains the effective date.  The summary need not explain how the individual benefit of each participant ... will be affected by the amendment."

*Register*, 477 F.3d at 72 (citation omitted) (affirming grant of motion to dismiss claim under ERISA § 204(h)).  Indeed, this Court had presciently held in its Motion to Dismiss opinion that "the law only requires the notice to include an understandable summary of the amendment and not a description of its potentially adverse effects."  (D.I. 30, at 7.)

Defendants clearly complied with this requirement.  In May 1998, shortly after adoption of the Cash Balance Plan amendment, Defendants issued a "Facts" newsletter that set forth in detail the terms of the cash balance amendment and the amendment's effective date.  *See* Kremmel Declaration, ¶ 17(c) (App. at A-39) and App. at A-50 to A-57.  Defendants mailed the "Facts" newsletter to each participant's home.  *See* Kremmel Deposition at 39:3-39:23, 44:19-44:24 (App. at A-74 to A-75.)  The "Facts" newsletter provided the following information:

- The January 1, 1999 effective date of the amendment (App. at A-50 to A-57);

- A description of the rights to elect lump sum payments or annuities under the amendment (*Id.*);

- A description of how pay credits, interest credits, and transition credits would be calculated under the cash balance formula (*Id.*);

-23-

- How opening cash balance account balances would be computed (*Id.*); and

- The amount of survivor benefits (*Id.*).

The "Facts" newsletter thus easily satisfied the then-existing notice standard.

### b.    Notice Was Timely

This notice was also timely, as Defendants mailed the "Facts" newsletter well

more than 15 days before the January 1, 1999 effective date of the amendment. The "Facts"

newsletter was mailed in May 1998, shortly after the amendment was adopted on April 23, 1998.

*See* Kremmel Declaration, ¶ 17(c) (App. at A-39.) As this notice was provided over ***seven***

***months*** before the amendment's effective January 1, 1999 effective date, it was timely.

### 3.    Plaintiffs Are Not Entitled to Relief for any Alleged Deficiency in Notice

Finally, even if Plaintiffs had any evidence that they were entitled to notice and

that there was a technical failure in the notice provided (which they do not), their claim under

ERISA § 204(h) still fails. This is because the Third Circuit has made clear that "'substantive

remedies are generally not available for violations of ERISA's reporting and disclosure

requirements' except 'where the plaintiff can demonstrate the presence of extraordinary

circumstances.'" *Register*, 477 F.3d at 74, *quoting Jordan v. Fed. Express Corp.*, 116 F.3d 1005,

1011 (3d Cir. 1997). While there is no "rigid definition" of "extraordinary circumstances," they

"'generally involve acts of bad faith on the part of the employer, attempts to actively conceal a

significant change in the plan, or commission of fraud.'" *Id.*, *quoting Jordan*, *supra*.

Here, there is no such evidence. Far from concealing the cash balance

amendment, Defendants provided multiple written notices and held informational meetings at

which they informed employees of national media stories criticizing cash balance plans. *See*

*generally* Kremmel Declaration, ¶ 17 (App. at A-39 to A-40.) There was no attempt whatsoever

to conceal the existence of the amendment; to the contrary, Defendants took aggressive steps to ensure that all participants knew about it.

The *only* alleged misrepresentation that Plaintiffs have identified is that Defendants purportedly "fail[ed] to inform the average participant that they may suffer adverse effects" because of the conversion to the cash balance formula.  (D.I. 16, at 30.)  Even assuming that there was an "adverse effect" (which there was not), both this Court and the Third Circuit in *Register*, though, have held that there was no requirement to disclose potential adverse effects under ERISA § 204(h) as it existed in 1998 and 1999.  *See Register*, 477 F.3d at 73 ("Contrary to appellants' argument, the Treasury Regulations at the time of the amendment were clear that PNC was not required to discuss 'how the individual benefit of each participant or alternate payee will be affected by the amendment'"); D.I 30, at 7 ("the law only requires the notice to include an understandable summary of the amendment and not a description of its potentially adverse effects").

As there is no evidence of bad faith or fraud, Plaintiffs' claim under ERISA § 204(h) therefore fails and Defendants are entitled to summary judgment.  *See Finley v. Dun & Bradstreet Corp.*, __ F. Supp. 2d __, 2007 WL 196753 at *8-9 (D.N.J. Jan. 26, 2007) (granting motion to dismiss claim under ERISA § 204(h) for failure to allege extraordinary circumstances); *cf. Register*, 477 F.3d at 74 (affirming order dismissing claim for insufficient disclosures in cash balance plan's Summary Plan Description for failure to allege extraordinary circumstances); *Jordan*, 116 F.3d at 1011-1012 (affirming summary judgment for defendant as to alleged violations of ERISA reporting and disclosure requirements because of lack of evidence of extraordinary circumstances).

**E.    Plaintiffs' Claims Are Barred by the Statute of Limitations**

Finally, even if there were any merit to any of Plaintiffs' three remaining claims (which there is not), their action is barred by the statute of limitations.  In claims for ERISA violations, other than for breach of fiduciary duty (where ERISA provides a statute of limitations), the Third Circuit has held "that the 'limitations period applicable to the forum state claim most analogous to the ERISA claim at hand' is to be borrowed and applied."  *Romero v. Allstate Corp.*, 404 F.3d 212, 220 (3d Cir. 2005).  Here, the Court has ruled that the most analogous Delaware statute of limitations is the three-year period in 10 Del. C. § 8106 for an "action based on a statute."  (D.I. 24, at 4.)

The Third Circuit has held that, based on general federal common law, an ERISA claim accrues for purposes of the statute of limitations "when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim."  *Romero*, 404 F.3d at 222.  When the claims allege that a feature of the plan at issue is illegal under ERISA, the statute of limitations begins to run once there has been a "clear repudiation" of the alleged rights in question.  *Id.* at 223-224.  Under this standard, the cause of action of the employee accrues when the "employee knew or should have known that the amendment has brought about a clear repudiation of certain rights that the employee believed he or she had under the plan."  *Id.* at 223.

The Third Circuit has further explained that the "clear repudiation" rule does not require that Plaintiffs must formally apply for benefits from the plan and be denied, but rather must simply be on inquiry notice that their rights may be violated:

> Notably, a ***formal*** denial is not required if there has already been a repudiation of the benefits by the fiduciary which was ***clear*** and made known to the beneficiary.  In other words, some "event other than a denial of a claim" may trigger the statute of limitations by clearly alerting the plaintiff that his entitlement to benefits has been repudiated.

*Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520-521 (3d Cir. 2007) (emphasis in original; citations omitted). Thus, in this case, Plaintiffs' individual claims are time barred if they knew, or should have known by the exercise of due diligence, that their rights were "repudiated" when the Cash Balance Plan amendment became effective on January 1, 1999 more than three years before the Complaint was filed, *i.e.*, by September 26, 2002. The undisputed evidence is that they did.

### 1.    Ward

In December 1998, Plaintiff Ward received three *Wall Street Journal* articles via email that detailed critiques of the legal validity of cash balance plans, including noting that employees at various companies had commenced class action lawsuits challenging the legality of cash balance plans. (App. at A-100 to A-113.) Thus, over ***six years*** before he sued, Mr. Ward was on notice that cash balance plans allegedly could violate ERISA. His claim is clearly time barred. *See Hebert v. AAI UIC Retirement Plan*, Civ. A. No. 05-2283, 2006 WL 1996855 at *3 (D. Md. July 13, 2006) (claims barred by statute of limitations because "it appears that Hebert was aware, in 1994, of the specific calculation formula and the then recent changes to the compensation caps that were affecting AAI's calculations"); *Hirt v. The Equitable Retirement Plan for Employees*, 450 F. Supp. 2d 331, 333-334 (S.D.N.Y. 2006) (claims challenging notice of cash balance conversion under ERISA § 204(h) time barred because claims accrued on effective date of plan amendment as Plaintiffs received some prior notice of relevant plan amendment); *cf. Miller*, 475 F.3d at 521-522 (claim for improper calculation of benefits accrued in 1987 when Plaintiff first received check for improper amount).

### 2.    Charles

Similarly, Plaintiff Charles has admitted that he has believed "from the inception of the cash balance plan that it was unfair." (App. at A-114.) As the "inception" was in January

1999, Mr. Charles concededly was on notice of his claim for over *six years* before he sued. His claim is likewise time barred. *See Hebert*, 2006 WL 1996855 at *3 (claims barred by statute of limitations because "it appears that Hebert was aware, in 1994, of the specific calculation formula and the then recent changes to the compensation caps that were affecting AAI's calculations"); *Hirt*, 450 F. Supp. 2d at 333-334 (claims challenging notice of cash balance conversion under ERISA § 204(h) time barred because claims accrued on effective date of plan amendment as Plaintiffs received some prior notice of relevant plan amendment); *cf. Miller*, 475 F.3d at 521-522 (claim for improper calculation of benefits accrued in 1987 when Plaintiff first received check for improper amount).

### 3.    Fink

Plaintiff Fink admitted at his deposition that he was "*highly suspicious*" in *1999* – that is, *six years* before he sued – that the Cash Balance Plan would adversely affect him. *See* Fink Deposition at 104:6-104:11 (App. at A-118.) This suspicion was sufficient, by itself, to put Mr. Fink on inquiry notice of his claim. In the context of the federal discovery rule, the Third Circuit has held that "'any fact that should excite [the plaintiff's] *suspicion* is the same as actual knowledge of the entire claim.'" *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1179 (3d Cir. 1993) (emphasis added; citation omitted). Mr. Fink's claim is therefore time barred.

### 4.    Troup

Finally, Plaintiff Troup admitted at his deposition that in July 1999 (*i.e.*, over *six years* before filing this action), he attended meetings regarding the Cash Balance Plan where Defendants informed him and the other attendees that *The Wall Street Journal* had published a series of articles attacking the validity of cash balance plans. *See* Troup Deposition at 30:12-31:20 (App. at A-97 to A-98.) Mr. Troup, however, never even bothered to read these articles,

which detailed the legal criticisms of cash balance plans. *See* Troup Deposition at 32:2-32:5

(App. at A-99); App. at A-102 to A-113.  Mr. Troup's failure to read these materials is

attributable to nothing but his lack of due diligence, and his claim is accordingly time barred.

*See generally In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d at 1178-1179 (under

federal discovery rule, plaintiff must "exercise[] due diligence in investigating his cause of

action").

## V.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request that their Motion

for Summary Judgment be granted and that this action be dismissed with prejudice.

Respectfully submitted,

/s/ Phillip T. Mellet
M. Duncan Grant (Del. Bar No. 2994)
Phillip T. Mellet (Del. Bar No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
302.777.6500

Susan K. Hoffman                     Larry R. Wood, Jr. (Del. Bar No. 3262)
LITTLER MENDELSON PC                  Kay Kyungsun Yu
Three Parkway                        Barak A. Bassman
1601 Cherry Street                   PEPPER HAMILTON LLP
Philadelphia, PA  19102              3000 Two Logan Square
267.402.3015 (telephone)             Eighteenth and Arch Streets
267.430.7275 (fax)                   Philadelphia, PA 19103-2799
                                     215.981.4000 (telephone)
                                     215.981.4750 (fax)

Dated:  May 1, 2007                  Attorneys for Defendants

## CERTIFICATE OF SERVICE

I, Phillip T. Mellet, hereby certify that on May 1, 2007 a true and correct copy of

Defendants' Motion for Summary Judgment, Defendants' Opening Brief in Support of Their

Motion for Summary Judgment, and proposed Order was served upon the following via

CM/ECF:

> Pamela S. Tikellis, Esq.
> Robert J. Kriner, Jr., Esq.
> A. Zachary Naylor, Esq.
> Robert R. Davis, Esq.
> CHIMICLES & TIKELLIS LLP
> One Rodney Square
> P.O. Box 1035
> Wilmington, DE 19899
>
> Attorneys for Plaintiffs

/s/ Phillip T. Mellet
Phillip T. Mellet (Del. Bar No. 4741)