IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated | : : : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | NO. 05-00702 (SLR) |
| | : | |
| PEPCO HOLDINGS, INC.; CONECTIV, and PEPCO HOLDINGS RETIRMENT PLAN | : : | |
| Defendants | : : : | |

## APPENDIX TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Larry R. Wood, Jr. (Del Bar No. 3262)
Kay Kyungsun Yu
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215. 981.4000 (telephone)
215.981.4750 (fax)

M. Duncan Grant (Del Bar No. 2994)
Phillip T. Mellet (Del Bar No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
302.777.6500

Susan Katz Hoffman, Esquire
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street
Philadelphia, PA  19102
267.402-3015 (telephone)
267.430.7275 (fax)

Attorneys for Defendants

Dated:  May 1, 2007

## TABLE OF CONTENTS

Part One:  Conectiv Cash Balance Sub-Pan ........................................................ A-1 to A-34

Declaration of James R. Kremmel................................................................... A-35 to A-71

Deposition of James R. Kremmel................................................................... A-72 to A-76

Conectiv:  Minutes of the Personnel and Compensation Committee
     Wilmington, Delaware, April 23, 1998 ................................................ A-77 to A-83

Email sent by Conectiv detailing the Cash Balance Plan
     December 21, 1998............................................................................. A-84 to A-94

Deposition of Thomas S. Troup ..................................................................... A-95 to A-99

Email from William Bates to Maurice Ward
     December 18, 1998........................................................................... A-100 to A-113

Email from Jerome M. Charles to Conectiv's Human Resource Department
     August 20, 2003 ....................................................................................... A-114

Deposition of Joseph I. Fink.......................................................................... A-115 to A-120

Expert Report of Ethan E. Kra....................................................................... A-121 to A-140

PART ONE

CONECTIV CASH BALANCE SUB-PLAN

Effective January 1, 1999

# TABLE OF CONTENTS

Page

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 1 -- DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 2 -- ELIGIBILITY FOR PARTICIPATION . . . . . . . . . . . . . . 14
2.1 Continuing Participants. . . . . . . . . . . . . . . . . . . . . 14
2.2 New Participants . . . . . . . . . . . . . . . . . . . . . . . . 14
2.3 Transferred Employees . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE 3 -- ACCOUNTS AND CREDITS . . . . . . . . . . . . . . . . . . 15
3.1 Establishment of Cash Balance Account. . . . . . . . . . . . . . 15
3.2 Initial Cash Balance. . . . . . . . . . . . . . . . . . . . . . 17
3.3 Pay Credits. . . . . . . . . . . . . . . . . . . . . . . . . . . 17
3.4 Interest Credits . . . . . . . . . . . . . . . . . . . . . . . . 18
3.5 Transition Credits. . . . . . . . . . . . . . . . . . . . . . . 19
3.6 Grandfather Benefit. . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 4 -- ELIGIBILITY FOR RETIREMENT . . . . . . . . . . . . . . . 20
4.1 Dates of Eligibility for Retirement Benefits . . . . . . . . . . 20

ARTICLE 5 -- AMOUNT OF RETIREMENT INCOME . . . . . . . . . . . . . . . 21
5.1 Normal Retirement Benefit . . . . . . . . . . . . . . . . . . . 21
5.2 Terminated Vested Retirement Benefit . . . . . . . . . . . . . . 21
5.3 Deferred Retirement Benefit . . . . . . . . . . . . . . . . . . 21
5.4 Required Distributions . . . . . . . . . . . . . . . . . . . . . 21
5.5 Disability Retirement Benefit . . . . . . . . . . . . . . . . . 22
5.6 Employment After Normal Retirement Age . . . . . . . . . . . . . 22

ARTICLE 6 -- FORMS OF PAYMENT; SURVIVOR BENEFITS . . . . . . . . . . . 24
6.1 Normal Form of Retirement Income . . . . . . . . . . . . . . . . 24
6.2 Pre-Retirement Survivor's Benefits . . . . . . . . . . . . . . . 25
6.3 Grandfather Survivor Benefit. . . . . . . . . . . . . . . . . . 26
6.4 Form of Retirement Income for Former Employees of Conowingo Power Company 26
6.5 Mandatory Lump Sum Distributions. . . . . . . . . . . . . . . . 26
6.6 Optional Forms of Benefit. . . . . . . . . . . . . . . . . . . . 27

## PREAMBLE TO PART ONE

The Conectiv Cash Balance Sub-Plan (the "CB Sub-Plan") is Part One of the Conectiv Retirement Plan (the "Plan"). Provisions generally applicable to this Part One and the other Parts are contained in the Base Plan.

Delmarva Plan Participants or ACE Plan Participants who retired on a Retirement Date or who terminated their employment with the Employer prior to January 1, 1999, must look solely to the Prior Plan provisions in effect on their Retirement Date or termination of employment date for their Retirement Income, if any, except as specifically provided otherwise in the CB Sub-Plan.

## ARTICLE 1
## DEFINITIONS

The following words and phrases as used herein shall have the following meanings, unless a different meaning is plainly required by the context:

1.1 Accrued Benefit means the greater of:

1.1.1. The Participant's Payable Cash Balance, converted to an Actuarially Equivalent single life annuity that is payable as of the determination date; or

1.1.2. The Participant's Minimum Benefit, stated as a life annuity commencing as of the determination date.

1.2 ACE Plan has the meaning ascribed to it in the Base Plan.

1.3 Actuarial Equivalent or Actuarially Equivalent means of equal actuarial value on the basis of the assumptions and factors described in Schedule A.

1.4 Affiliated Company has the meaning ascribed to it in the Base Plan.

1.5 Annuity Starting Date has the meaning ascribed to it in the Base Plan.

1.6 Board of Directors has the meaning ascribed to it in the Base Plan.

1.7 Cash Balance Account means the bookkeeping account maintained with respect to a Participant in accordance with Section 3.1 which is the sum of, as applicable, (a) the Initial Cash Balance, (b) Pay Credits, (c) Interest Credits and (d) Transition Credits.

1.8 CB Sub-Plan has the meaning ascribed to it in the Base Plan.

1.9 Code has the meaning ascribed to it in the Base Plan.

1.10 Committee has the meaning ascribed to it in the Base Plan.

1.11 Company has the meaning ascribed to it in the Base Plan.

1.12 Compensation paid to a Participant by the Employer means[, for the period January 1, 1999 through February 5, 2000,] any amounts paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125, and excluding contributions the Employer makes to this or any other benefit plan, any amounts paid in the form of fringe benefits (including but not limited to reimbursed moving expenses, insurance, and the like; provided, however, that meal allowances shall not be excluded

-3-

A - 4

as fringe benefits) and any dividend rights earned under any executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes. In determining whether a payment is includible under this definition, the rules for the safe harbor definition set forth in Treas. Reg. § 1.415-2(d)(10), as adjusted by Treas. Reg. §§ 1.414(s)-l(c)(3) and (4) shall be applied. Notwithstanding the foregoing, Compensation taken into account for a Participant shall not exceed the annual limitation specified by section 401(a)(17) of the Code and shall be modified to reflect adjustments in the limitation announced by the Secretary of the Treasury at the same time and in the same manner as under section 415(d) of the Code.

[For the period from February 6, 2000 through February 29, 2000, Compensation means:

1.12.1  any amounts paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125 and excluding contributions the Employer make to this or any other benefit plan, any amounts paid in the form of fringe benefits (including, but not limited to reimbursed moving expenses, insurance and the like; provided, however, that meal allowances shall not be excluded as fringe benefits) and any dividend rights earned under any executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes. In determining whether a payment is includible under this definition, the rules for the safe harbor definition set forth in Treas. Reg. §1.415-2(d)(10), as adjusted by Treas. Reg. §§1.414(s)-1(c)(3) and (4) shall be applied.

1.12.2  Notwithstanding Section 1.12.1, for purposes of determining the Grandfather Benefit for under Sections 1.23.2 and 3.6.1, Compensation shall have the same meaning as in the ACE or Delmarva Sub-Plan, as applicable.

1.12.3  Notwithstanding the foregoing, Compensation taken into account for a Participant shall not exceed the annual limitation specified by section 401(a)(17) of the Code and shall be modified to reflect adjustments in the limitation announced by the Secretary of the Treasury at the same time and in the same manner as under section 415(d) of the Code.

Effective March 1, 2000, Compensation means:

1.12.1.  any amounts paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125, and excluding contributions the Employer makes to this or any other benefit plan, any amounts paid in the form of fringe benefits (including but not limited to reimbursed moving expenses, insurance, and the like; provided, however, that meal allowances shall not be excluded as fringe benefits) and any dividend rights earned under any executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes. In determining whether a payment is includible under this definition,

-4-

A - 5

the rules for the safe harbor definition set forth in Treas. Reg. § 1.415-2(d)(10), as adjusted by Treas. Reg. §§ 1.414(s)-l(c)(3) and (4) shall be applied.

1.12.2. Notwithstanding Section 1.12.1, for purposes of determining the Grandfather Benefit for under Sections 1.23.2 and 3.6.1, Compensation shall have the same meaning as in the ACE or Delmarva Sub-Plan, as applicable.

1.12.3. Notwithstanding the foregoing, Compensation taken into account for a Participant shall not exceed the annual limitation specified by section 401(a)(17) of the Code and shall be modified to reflect adjustments in the limitation announced by the Secretary of the Treasury at the same time and in the same manner as under section 415(d) of the Code.

1.12.4. Notwithstanding the foregoing, a Participant who is a highly compensated employee, as defined in Section 414(q) of the Code, may, pursuant to a written agreement with an Employer, elect to exclude all or a portion of his Compensation for purposes of (a) accruing a benefit under the CB Sub-Plan, (b) determining the Participant's Payable Cash Balance, and (c) determining, if applicable, the Participant's Grandfather Benefit.]

1.13  Continuous Service. See "Service."

1.14  Deferred Retirement Date means the first day of the month coincident with or next following the Participant's election to retire from employment with the Employer after attaining Normal Retirement Age. A Participant who elects to commence receipt of retirement benefits while remaining employed on or after attainment of age 70½ shall be deemed to have a Deferred Retirement Date as of the commencement of such in-service benefits.

1.15  Delmarva Plan has the meaning ascribed to it in the Base Plan.

1.16  Disability Retirement Date means the first day of a month coincident with or next following the date a Participant elects to retire from employment as a Non-Bargaining Unit Employee by reason of sickness or injury after (a) completing at least fifteen (15) Years of Service; (b) becoming permanently incapable of performing the duties of any position with the Employer with the degree of efficiency required by the Employer; and (c) providing to the Committee satisfactory medical evidence of disability.

1.17  Effective Date has the meaning ascribed to it in the Base Plan.

1.18  Employee has the meaning ascribed to it in the Base Plan.

1.19  Employer has the meaning ascribed to it in the Base Plan.

-5-

A - 6

1.20 Employment Commencement Date. See "Service."

1.21 Entry Date has the meaning ascribed to it in the Base Plan.

1.22 ERISA has the meaning ascribed to it in the Base Plan.

1.23 Final Average Compensation means:

1.23.1. For purposes of determining the 650% limit on the Payable Cash Balance, the annualized sum of the Participant's highest five (5) consecutive calendar years of Compensation divided by five (5); provided, that if the Participant does not have five (5) consecutive calendar years of Compensation, Final Average Compensation shall be determined using Compensation for all Years of Service with the Employer divided by all Years of Service with the Employer; provided further, that if a Participant has less than 12 months of Service, Final Average Compensation shall equal Compensation paid to the Participant by the Employer.

1.23.2. For purposes of determining the Grandfather Benefit, the sum of Compensation for the periods in the following subsections (i) through (iii) divided by five (5): (i) the last four (4) completed calendar years prior to the determination date; (ii) the completed months in the calendar year in which the determination date occurs; and (iii) that number of months occurring prior to the four (4) calendar years prior to the determination date that is equal to 12 minus the number of months in the preceding subsection (ii); provided, that if the Employee identifies another consecutive sixty (60) month period which produces a larger Final Average Compensation, Compensation from that period shall be used to calculate Final Average Compensation.

[However, effective January 1, 1999, this sub-paragraph 1.23.2 shall be amended to read, For purposes of determining the Grandfather Benefit for Delmarva Plan Grandfathered Participants the sum of Compensation for the periods in the following subsections (i) through (iii) divided by five (5): (i) the last four (4) completed calendar years prior to the determination date; (ii) the completed months in the calendar year in which the determination date occurs; and (iii) that number of months occurring prior to the four (4) calendar years prior to the determination date that is equal to 12 minus the number of months in the preceding subsection (ii); provided, that if the Employee identifies another consecutive sixty (60) month period which produces a larger Final Average Compensation, Compensation from that period shall be used to calculate Final Average Compensation.

1.23.3 Effective January 1, 1999, for purposes of determining the Grandfather Benefit for ACE Plan Grandfathered Participants, Final Average Compensation shall have the same meaning as in the ACE Sub-Plan.]

1.24 Grandfather Benefit means the benefit determined in accordance with Section 3.6.

-6-

A - 7

1.25  Grandfathered Participant means a Prior Plan Participant who is (1) an Employee on the Effective Date and (2) as of the Effective Date (a) is credited with 20 or more Years of Benefit Service or (b) is at least age 50.  A Bargaining Unit Employee who becomes eligible to participate in the CB Sub-Plan pursuant to Section 2.3 shall be a Grandfathered Participant if such Bargaining Unit Employee met the eligibility requirements of the preceding sentence as of the Effective Date.

1.26  Grandfather Period means the period from the Effective Date until the earlier to occur of a Grandfathered Participant's Severance from Employment Date or December 31, 2008.

1.27  Grandfather Survivor Benefit is the benefit determined in accordance with Section 6.3.

1.28  Hour of Service.  See "Service."

1.29  Initial Cash Balance means the amount determined pursuant to Section 3.2.

1.30  Interest Crediting Rate means, for each Plan Year, the 30-year Treasury Bond rate for the October immediately preceding the beginning of the Plan Year.

1.31  Interest Credits means the amount that is credited to a Participant's Cash Balance Account in accordance with Section 3.4.

1.32  Leased Employee has the meaning ascribed to it in the Base Plan.

1.33  Minimum Benefit means the greater of :

1.33.1. The Participant's accrued benefit under the Prior Plan as of December 31, 1998, stated as a life annuity commencing at age 65; provided, that for Prior Plan Participants who transfer to Non-Bargaining Unit Employee status after the Effective Date, the accrued benefit under the Prior Plan shall be determined as of the first anniversary of the date of transfer; provided further, that if the Employee identifies a consecutive 60-month period, other than the 60-month period preceding the Effective Date or, if applicable, the first anniversary of the date of transfer, which produces a larger Minimum Benefit, Compensation from that period shall be used to calculate the Minimum Benefit; or

1.33.2. The Participant's Grandfather Benefit.

1.34  Non-Bargaining Unit Employee has the meaning ascribed to it in the Base Plan.

PHLEGAL: #663223 v8 #7qv08LWPD

A - 8

1.35 <u>Normal Retirement Age</u> means the date upon which a Participant attains age 65.

1.36 <u>Normal Retirement Date</u> means the first day of a month coincident with or next following the date a Participant elects to retire from employment with the Employer upon attaining Normal Retirement Age.

1.37 <u>One Year Break in Service</u>. See "Service."

1.38 <u>Participant</u> has the meaning ascribed to it in the Base Plan.

1.39 <u>Part-Time Employee</u>. See "Service."

1.40 <u>Payable Cash Balance</u> means, as of any determination date, the lesser of (a) the Participant's Cash Balance Account at the determination date or (b) 650% of Final Average Compensation as of such date.

1.41 <u>Pay Crediting Rate</u> means the rate determined in accordance with Section 3.3.2.

1.42 <u>Pay Credits</u> means amounts which are credited to a Participant's Cash Balance Account in accordance with Section 3.3.

1.43 <u>Permanent Break in Service</u>. See "Service."

1.44 <u>Plan Year</u> has the meaning ascribed to it in the Base Plan.

1.45 <u>Post-65 Disability Benefit</u> is the benefit payable upon a Participant's Disability Retirement Date in accordance with Section 5.4.2.

1.46 <u>Pre-Cash Balance Accrued Benefit</u> means accrued benefit under the Prior Plan as of December 31, 1998 assuming that the Compensation used to determine such accrued benefit is the Compensation for the consecutive 60-month period ending on December 31, 1998.

1.47 <u>Pre-65 Disability Benefit</u> is the benefit payable upon a Participant's Disability Retirement Date in accordance with Section 5.4.1.

1.48 <u>Prior Plan</u> has the meaning ascribed to it in the Base Plan.

1.49 <u>Prior Plan Conversion Credit</u> means (a) the actuarial present value of the Pre-Cash Balance Accrued Benefit at earliest retirement age, determined using seven percent (7%) interest and the 1983 GAM unisex mortality table; (b) for Participants who have not reached earliest retirement age as of December 31, 1998, discounted from the earliest retirement

-8-

A - 9

age to the Participant's age at December 31, 1998 at seven percent (7%) interest, but no mortality discount; (c) multiplied by the applicable early retirement reduction factor pursuant to the terms of the Prior Plan; and (d) for a Participant in the Delmarva Plan, increased by thirteen percent (13%) to reflect the adjustment for the subsidized survivor annuity under the Delmarva Plan.

1.50  Reemployment Commencement Date.  See "Service."

1.51  Required Beginning Date has the meaning ascribed to it in the Base Plan.

1.52  Retirement Date means a Participant's Normal Retirement Date, Terminated Vested Retirement Date, Deferred Retirement Date or Disability Retirement Date.

1.53  Retirement Income means the retirement benefits provided to a Participant upon his Retirement Date, or, if applicable the survivor benefits provided to any survivor.

1.54  Service.

1.54.1.  General Rules.  Years of Service shall be credited as provided in this Section.

(a)  Service will be credited for an Employee's entire period of employment as an Employee.

(b)  An Employee shall receive credit for all service credited to an Employee pursuant to the terms of the Prior Plan, provided such Employee is an Employee on the Effective Date.  If an Employee is not an Employee on the Effective Date but has a Reemployment Commencement Date prior to incurring a Permanent Break in Service, then credit for Service prior to the Break shall be restored.  If the Employee has a Reemployment Commencement Date prior to incurring a One-Year Break in Service, such Employee shall be credited with the Service between his Severance from Employment Date and his Reemployment Commencement Date.

(c)  Conectiv Thermal Systems, Inc. and Atlantic Energy Enterprises, Inc. Provisions.

(i)  Solely for purposes of determining eligibility for a Grandfather Benefit, Participants who (A) were formerly employed by Atlantic City Electric Company; (B) immediately thereafter were employed by Conectiv Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc.; and (C) on the Effective Date were employed by Conectiv Thermal Systems, Inc., Atlantic Energy Enterprises, Inc. or Conectiv Resource Partners, shall be credited with their Years of Service for any and all of such companies.  However, their Grandfather Benefit shall be calculated solely on the basis of their prior service with (and

-9-

compensation from) Atlantic City Electric Company plus their Service under this Part on and after the Effective Date (as if such Service were contiguous).

(ii)    Participants who (A) transferred from Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc. to Delmarva Power and Light Company, Atlantic City Electric Company or Conectiv Resource Partners before January 1, 1998, (B) continued to perform services for Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc., and (C) were employed by Delmarva Power and Light Company, Atlantic City Electric Company or Conectiv Resource Partners on the Effective Date, shall become Participants in this Part on the same basis as all other Prior Plan Participants as of the Effective Date, based on their accrued benefits and service credits as calculated under the Prior Plan in which they were participating immediately prior to the Effective Date.

(iii)    All other Participants who are employed by Conectiv Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc. on or after the Effective Date or who transferred from Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc. to Delmarva Power and Light Company, Atlantic City Electric Company or Conectiv Resource Partners on or after January 1, 1998, shall receive credit for their Years of Service for all such companies for purposes of calculating vesting service and for eligibility for Transition Credits. Any such Participants who were participating in a Prior Plan immediately prior to the Effective Date shall have a Minimum Benefit as defined in Section 1.33.1, but shall have an Initial Cash Balance equal to zero, subject to the provisions of Section 3.2.3.

(d)    Service will be credited for periods while on authorized leave of absence with full salary (provided the Employee returns to the Employer's employ at the expiration of the authorized leave). Service will not be credited for periods of authorized leave of absence without pay, but such an authorized leave of absence without pay shall not constitute a break in Service provided the Employee returns to the Employer's employ at the expiration of the authorized leave. A layoff period of less than one (1) year will be considered such a leave of absence without pay.

(e)    Service will also be credited for employment with any employer acquired by the Company on such terms as may be approved by the Board of Directors.

(f)    Notwithstanding any provision of the Plan to the contrary, contributions, benefits and service credits with respect to qualified military service will be provided in accordance with Code section 414(u) in accordance with the Uniformed Services Employment and Reemployment Rights Act of 1994.

(g)    If a Leased Employee becomes an Employee, service will be credited for purposes of eligibility and vesting for periods after December 31, 1988 that the Employee was a Leased Employee.

-10-

(h)    Service shall not include Years of Service with respect to which an employee received a mandatory lump sum distribution (excluding a "deemed cash out"), as described in Section 6.5. Further, Service shall be disregarded once a Participant commences receipt of Retirement Income; provided, however, that if a Participant is reemployed, Service shall be considered for purposes of eligibility for Transition Credits.

1.54.2. Elapsed Time Rule; Determination of Years of Service. An Employee will be credited with whole and partial Years of Service on the basis of the elapsed time rule as described in this Section 1.54.2.

(a)    Basic Elapsed Time Rule. Years of Service under the elapsed time rule are based on the passage of time during which the employment relationship exists. One (1) Year of Service is credited for each 365 days of employment (366 days for a period that includes February 29). A day of employment is credited for each day of the period beginning on an Employee's Employment Commencement Date (or Reemployment Commencement Date, if applicable) and ending with his Severance from Employment Date.

(b)    Employment Commencement Date means the first date on which an Employee is credited with Service for the Employer; provided that if an Employee's first day of Service is the first business day of any calendar year, such Employee will be deemed to have been hired on December 31 of the prior year.

(c)    Reemployment Commencement Date means the first date on which an Employee is credited with Service for the Employer following a break in credited Service.

(d)    Severance from Employment Date means the earlier of (i) the date an Employee quits, is discharged, retires or dies, or (ii) the date 365 days after the date he is first absent from employment for any reason (including e.g., lay off, disability, leave of absence, vacation) provided he is continuously absent from employment for such 365-day period.

(e)    One-Year Break in Service. An Employee will incur a One-Year Break in Service if he is continuously absent from employment for 365 or more days following a Severance from Employment Date.

(f)    Permanent Break in Service means five (5) consecutive One Year Breaks in Service; provided, however, that an Employee who has been credited with five (5) Years of Service shall not thereafter incur a Permanent Break in Service.

1.54.3. Rules For Vesting Purposes Only. The following rules apply for the purposes of vesting:

-11-

(a) <u>Service Spanning Rules</u>. If an Employee's employment is terminated by reason of a quit, discharge, or retirement and the Employee then returns to employment within 365 days of his Severance from Employment Date, he shall be credited with Service during that period of severance. If an Employee severs from Service by reason of a quit, discharge or retirement during an absence from Service of 365 days or less for any reason other than a quit, discharge or retirement and the Employee then returns to employment within 365 days of the date on which he was first absent from Service, he shall be credited with Service during that period of severance.

(b) <u>Special Rule for Former ACE Plan Participants</u>. If a Non-Bargaining Unit Employee was a Participant in the ACE Plan on December 29, 1998 and is a Non-Bargaining Unit Employee on the Effective Date, such Participant shall, for vesting purposes only, be deemed to have been hired on the January 1 of the Plan Year in which such Participant's Employment Commencement Date or Reemployment Commencement Date occurred.

(c) <u>Limited Break in Service</u>. An Employee will incur a break in Service if he is continuously absent from employment for 365 or more days following a Severance from Employment Date, unless the Employee establishes that the absence is for maternity or paternity reasons. In such a case, the Employee will not incur a break in Service until he is continuously absent from employment for two consecutive 365-day periods following a Severance from Employment Date. For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence on account of (1) the pregnancy of the Employee; (2) the birth of the child of the Employee; (3) the adoption of a child by the Employee; or (4) the immediate post-natal or post-adoption care of a child of the Employee.

(d) <u>Forfeiting Years of Service for Vesting Purposes</u>. If an Employee incurs a break in Service at a time when he is not credited with at least five (5) Years of Service for vesting purposes, and if such period of break in Service equals or exceeds five (5) years, then his prior period of Service will be forfeited. If an Employee incurs a break in Service at a time when he is credited with at least five (5) Years of Service for vesting purposes, such Employee will not forfeit any Service because of the break in Service.

1.54.4. <u>Exception to Break in Service Rules</u>. Notwithstanding the foregoing, if an Employee has at least ten (10) Years of Continuous Service when he retires, and if such Employee forfeited other Years of Service on account of a break in Service, he shall nevertheless be credited with the otherwise forfeited Years of Service just prior to his most recent break in Service which caused the forfeiture.

1.54.5. <u>No Amendment to Reduce Credited Service</u>. No amendment to this CB Sub-Plan or the Base Plan shall cause any Employee to be credited with less Service with respect to employment prior to the amendment than would have been credited under the terms of the CB Sub-Plan or the Base Plan in effect prior to the amendment.

-12-

1.54.6. Rules of Construction. The foregoing rules for crediting Service shall be interpreted and applied in accordance with the rules prescribed in Department of Labor Regulation 29 CFR § 2530.200.

1.54.7. Continuous Service means continuous full-time or part-time employment.

1.54.8. Years of Benefit Service. For a Participant who is not a Part-Time Employee, Years of Benefit Service shall equal Years of Service. For a Participant who is a Part-Time Employee, Years of Benefit Service will be credited for periods of part-time employment, and solely for purposes of calculating a Grandfather Benefit under Section 3.6 or Section 6.3, as follows:

| Hours of Service Completed in Accrual Computation Period | Percentage of Full Year of Benefit Service Credited |
| --- | --- |
| Less than 1,000 | 0% |
| 1,000-1,200 | 60% |
| 1,201-1,400 | 70% |
| 1,401-1,600 | 80% |
| 1,601-1,800 | 90% |
| 1,801 or more | 100% |

The accrual computation period begins on the employment commencement date as a Part-Time Employee (or re-employment commencement date as a Part-Time Employee, if applicable) and each anniversary date thereafter.

(a)     Part-Time Employee means any Employee whose regularly-scheduled work schedule is for less than 40 hours per week on average.

(b)     Hour of Service means each hour for which an Employee is:

(i)     Directly or indirectly paid or entitled to payment by the Employer for the performance of duties;

(ii)     Directly or indirectly paid or entitled to payment by the Employer on account of a period of time during which no duties were performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, or an authorized leave of absence. However, no more than 501 Hours of Service shall be credited under this subparagraph (ii) on account of any single continuous period during which the Employee performs no duties

-13-

(whether or not such period occurs in a single computation period). Payments made or due under a plan maintained by the Employer solely to comply with applicable worker's compensation, unemployment compensation, or disability insurance law, or to reimburse an Employee for medical or medically-related expenses shall not be considered as payments by the Employer for purposes of this subparagraph; or

    (iii)    Either awarded back pay or for which the Employer agrees to pay such back pay, irrespective of mitigation of damages. An Hour of Service received under this subparagraph (iii) shall be credited to that computation period for which the award was granted. The same Hours of Service shall not be credited both under subparagraph (i) or (ii), as the case may be, and under this subparagraph (iii). Hours of Service for which back pay is awarded or agreed to with respect to periods described in subparagraph (ii) shall be subject to the limitations set forth in that subparagraph.

    For purposes of subparagraphs (ii) and (iii), and for purposes of subparagraphs (i) in the case of an Employee for whom records of hours worked are not required by applicable law to be kept, an Employee shall be credited with 10 Hours of Service for each day for which he would have been required to be credited with an Hour of Service. Hours of Service shall be credited to the applicable computation period in accordance with Department of Labor Regulation Section 2530.200b-2(b) and (c).

    1.54.9. Family and Medical Leave Act. Solely for purposes of calculating an Employee's Service for vesting purposes, Service shall also be credited to the extent required under the Family and Medical Leave Act to avoid a break in Service during any period that an Employee is on an approved leave of absence, provided the Employee returns to work for the Employer at the end of such leave of absence.

    1.55 Severance from Employment Date. See "Service."

    1.56 Terminated Vested Retirement Date means the first day of the month coincident with or next following a Participant's Severance from Employment Date after completing five (5) Years of Service; provided, that a Participant may elect to defer the Terminated Vested Retirement Date to the first day of any month after the attainment of age fifty-five (55) or current age if older, but not beyond the Participant's Normal Retirement Age.

    1.57 Transition Credits means amounts that are credited to a Participant's Cash Balance Account in accordance with Section 3.5.

    1.58 Year of Benefit Service. See "Service."

    1.59 Year of Service. See "Service."

-14-

1.60 Special Retirement Date Definition for Certain Participants.  In the case of a Participant with a Minimum Benefit or Grandfather Benefit calculated under the ACE Sub-Plan, who elects to retire on a Retirement Date on or before January 1, 2000 or who is eligible for a Terminated Vested Benefit and who last earned an Hour of Service before January 1, 2000, such Participant may elect to have his Minimum Benefit or Grandfather Benefit calculated as if his Retirement Date were the first of the month in which his election to retire was submitted, but only if his election to retire is submitted on or before the 15th day of such month; otherwise, his Minimum Benefit or Grandfather Benefit shall be calculated as if his Retirement Date were the date otherwise specified in this Plan.

PHLEGAL: #663223 v8 #7qv08LWPD

A - 16

{\*\*}

## ARTICLE 2
## ELIGIBILITY FOR PARTICIPATION

2.1 _Continuing Participants_. Each Non-Bargaining Unit Employee who was a Participant in one of the Prior Plans on December 31, 1998 and is a Non-Bargaining Unit Employee on the Effective Date shall be a Participant in the CB Sub-Plan as of the Effective Date.

2.2 _New Participants_.

2.2.1. _General_.

(a)    Each other Non-Bargaining Unit Employee shall become a Participant as of the Entry Date coincident with or next following the date on which he completes a Year of Service, provided that he is a Non-Bargaining Unit Employee on such Entry Date.

(b)    An Employee who completes the eligibility requirements of Section 2.2.1(a) but who is not a Non-Bargaining Unit Employee on the Entry Date, shall be eligible to participate on the first date thereafter on which he completes an Hour of Service as a Non-Bargaining Unit Employee.

2.2.2. _Termination of Employment Prior to Entry Date_.

(a)    An Employee who has a Severance from Employment Date prior to completing the eligibility requirements of Section 2.2.1 and who has a Reemployment Commencement Date prior to incurring a One-Year Break in Service, shall be eligible to participate as of the next Entry Date coincident with or next following the date on which he completes a Year of Service, provided he is a Non-Bargaining Unit Employee on such date.

(b)    An Employee who has a Severance From Employment Date prior to completing the eligibility requirements of Section 2.2.1 and who does not thereafter have a Reemployment Commencement Date prior to incurring a One-Year Break in Service, shall not receive credit for his prior service for purposes of eligibility and shall be required to complete the requirements of Section 2.2.1.

2.3 _Transferred Employees_. A Local 1238 Employee, Local 1307 Employee, or Local 210 Employee who becomes a Non-Bargaining Unit Employee shall remain a participant in the ACE Sub-Plan or Delmarva Sub-Plan in which he was previously a participant for one year following the date of transfer. If such Employee remains as a Non-Bargaining Unit Employee one year from the date of transfer, he shall become a Participant in the CB Sub-Plan as of the January 1 that occurs within the twelve-month period following the date of transfer.

-16-

A - 17

-17-

# ARTICLE 3

## ACCOUNTS AND CREDITS

3.1 <u>Establishment of Cash Balance Account</u>. A Cash Balance Account shall be established and maintained for each Participant and credits shall be made to such Cash Balance Account in accordance with the provisions of this Article 3. The Cash Balance Accounts established and maintained hereunder are for bookkeeping purposes only and shall not be construed as creating for any Participant a right to specific assets of the Plan.

3.2 <u>Initial Cash Balance</u>. Each Participant shall have an Initial Cash Balance, determined as follows.

3.2.1. <u>New Participants</u>. Employees who first become Participants on or after the Effective Date shall have an Initial Cash Balance of zero.

3.2.2. <u>Prior Plan Participants as of December 31, 1998</u>. For Employees who, as of December 31, 1998, were Participants in one of the Prior Plans and are Non-Bargaining Unit Employees on the Effective Date, the Initial Cash Balance as of the Effective Date is the Prior Plan Conversion Credit.

3.2.3. <u>Thermal Systems, Inc. and Atlantic Energy Enterprises, Inc. Transfers</u>. Participants described in Section 1.54.1(c)(i) or (iii) will have an Initial Cash Balance of zero unless they have a frozen benefit under the ACE Plan accrued prior to their employment by Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc., in which event, their Initial Cash Balance shall be determined in accordance with Section 3.2.2.

3.2.4. <u>Prior Plan Participants Who are Rehired</u>.

(a)    If a Non-Bargaining Unit Employee (i) was a participant in one of the Prior Plans, (ii) terminated employment as a Non-Bargaining Unit Employee prior to the Effective Date, (iii) has not begun to receive benefits under such Prior Plan, and (iv) is rehired as a Non-Bargaining Unit Employee on or after the Effective Date and prior to incurring a Five-Year Break in Service, the Initial Cash Balance shall be the Prior Plan Conversion Credit, credited with Interest Credits at the Interest Crediting Rate from the Effective Date to the Reemployment Commencement Date.

(b)    If a Non-Bargaining Unit Employee (i) was a participant in one of the Prior Plans, (ii) terminated employment as a Non-Bargaining Unit Employee prior to the Effective Date, (iii) has not begun to receive benefits under such Prior Plan, and (iv) is rehired as a Non-Bargaining Unit Employee on or after the Effective Date and after incurring a Five-Year Break in Service, the Initial Cash Balance shall be zero.

-18-

(c)    If a Non-Bargaining Unit Employee (i) was a participant in one of the Prior Plans, (ii) terminated employment as a Non-Bargaining Unit Employee prior to the Effective Date, (iii) commenced receipt of benefits pursuant to the terms of the Prior Plan, either in annuity or lump sum form, and (iv) is rehired as a Non-Bargaining Unit Employee on or after the Effective Date, the Initial Cash Balance shall be zero.

3.2.5.  CB Sub-Plan Participants Who Terminate After Effective Date and are Rehired.

(a)    If a Participant in the CB Sub-Plan with a vested benefit (i) terminates employment after the Effective Date, (ii) has not commenced receipt of Retirement Income, and (iii) is later rehired as a Non-Bargaining Unit Employee prior to incurring a Permanent Break in Service, the Cash Balance Account shall be credited with Interest Credits at the Interest Crediting Rate from the date of termination as a Non-Bargaining Unit Employee to the reemployment date, but no new Initial Cash Balance shall be created.

(b)    If a Participant in the CB Sub-Plan with a vested benefit (i) terminates employment after the Effective Date with a vested benefit, (ii) commences receipt of Retirement Income, and (iii) is rehired as a Non-Bargaining Unit Employee at a later date, the Initial Cash Balance shall be zero. Notwithstanding the foregoing, if a Participant in the CB Sub-Plan with an entitlement to a Minimum Benefit received his Retirement Income in the form of a single-sum distribution prior to the Participant's attainment of age 55 and is rehired, within five years after the date of such distribution, into any position covered by any Sub-Plan within the Plan, such Participant shall be entitled to a restoration of his Accrued Benefit attributable to such distribution if the Participant repays such distribution, with interest calculated at the Interest Crediting Rate in effect as of such repayment date (compounded annually), within five years after the first date of such reemployment.

(c)    If a Participant (i) terminates employment after the Effective Date, (ii) was deemed to have received a single-sum payment of zero, and (iii) is rehired as a Non-Bargaining Unit Employee at a time when the consecutive One-Year Breaks in Service is less than the greater of (x) the number of full Years of Service for vesting purposes the Employee had accrued before his Severance from Employment Date or (y) five, the Initial Cash Balance shall be the Cash Balance Account as determined at the time of such Participant's Severance from Employment Date, with Interest Credits from the Severance from Employment Date to the Reemployment Commencement Date. Otherwise, the Initial Cash Balance shall be zero.

3.2.6.  Transfers From Union to Management. {A} [Effective January 1, 1999 through December 31, 1999, a] Local 1238 Employee, Local 1307 Employee, or Local 210 Employee who becomes a Non-Bargaining Unit Employee after the Effective Date shall have an Initial Cash Balance, provided such Employee remains a Non-Bargaining Unit Employee one year from the date of transfer. If the transferred Employee remains a Non-Bargaining Unit

-19-

Employee one year from the date of transfer, the Initial Cash Balance for such Employee shall be the Prior Plan Conversion Credit as of the January 1 that occurs in the year of transfer; provided that the Prior Plan Conversion Credit shall be determined as of the January 1 contained in the year of transfer rather than December 31, 1998; and further provided that an interest rate that is 2% above the applicable interest rate as of such January 1 (as defined in Schedule A) shall be substituted for 7% in the calculation of such Prior Plan Conversion Credit.

[Effective January 1, 2000, a Local 1238 Employee, Local 1307 Employee, or Local 210 Employee who becomes a Non-Bargaining Unit Employee after the Effective Date shall have an Initial Cash Balance, provided such Employee remains a Non-Bargaining Unit Employee one year from the date of transfer. If the transferred Employee remains a Non-Bargaining Unit Employee one year from the date of transfer, the Initial Cash Balance for such Employee shall be the Prior Plan Conversion Credit as of the January 1 that occurs in the year of transfer; provided that the Prior Plan Conversion Credit shall be determined as of the January 1 contained in the year of transfer rather than December 31, 1998; and further provided only with respect to transfers which occurred prior to January 1, 2000, that an interest rate that is 2% above the applicable interest rate as of such January 1 (as defined in Schedule A) shall be substituted for 7% in the calculation of such prior Plan Conversion Credit.]

3.2.7. <u>Transfers From Management to Union</u>. A Participant who becomes a Local 1238 Employee, Local 1307 Employee, or Local 210 Employee shall, as of the date of transfer, no longer be eligible to participate in the CB Sub-Plan, but the Cash Balance Account shall be credited with Interest Credits as provided in Section 3.4 until distributed.

3.3 <u>Pay Credits</u>.

3.3.1. <u>In General</u>. Pay Credits shall be credited to the Cash Balance Account of each Participant as of the last day of each Plan Year in an amount equal to the product of (x) the pay crediting rate, as determined below, and (y) the Participant's Compensation as a Non-Bargaining Unit Employee for the Plan Year.

3.3.2. <u>Pay Crediting Rate</u>. The Pay Crediting Rate for a Plan Year shall be a percentage determined on the basis of the age that the Participant attains in that Plan Year, as follows:

| Participant's Age | Pay Crediting Rate |
| --- | --- |
| Under 30 | 5.0% |
| 30-34 | 6.0% |
| 35-39 | 7.0% |
| 40-44 | 8.0% |
| 45-49 | 9.0% |
| 50 and over | 10.0% |

-20-

3.3.3.  Pay Crediting in Year of Termination. In the Plan Year in which a Participant terminates employment as a Non-Bargaining Unit Employee the Participant shall receive a Pay Credit for such Plan Year equal to the applicable Pay Crediting Rate for such Plan Year multiplied by the Participant's Compensation as a Non-Bargaining Unit Employee for such Plan Year. The Pay Credit shall be credited to the Participant's Cash Balance Account as of the earlier of the last day of the month preceding the Annuity Starting Date or the last day of the Plan Year in which the termination occurs.

3.3.4.  Pay Crediting in First Year of Participation. In the Plan Year in which a Participant first becomes a Participant, the Participant shall receive an additional Pay Credit equal to (a) the amount that would have been credited to such Participant's Cash Balance Account as of December 31 of the prior Plan Year had the Participant been a Participant as of the later of (i) the day the Participant became a Non-Bargaining Unit Employee or (ii) the January 1 immediately following the Participant's transfer into a Non-Bargaining Unit Employee position as described in Section 2.3; plus (b) an amount equal to the Interest Credits that would have been credited on the amount specified in (a) from the date such amount would have been credited to the Cash Balance Account (if the Participant had then been a Participant) up to the date such additional Pay Credit is actually credited to the Cash Balance Account.

3.4  Interest Credits.

3.4.1.  In General. As of the end of each Plan Year, Interest Credits will be credited to the Cash Balance Account of each Participant. Interest Credits shall be equal to the Interest Crediting Rate for such Plan Year multiplied by the amount credited to such Account as of January 1 of such Plan Year.

3.4.2.  Duration of Interest Credits. Interest Credits shall continue to be credited to the Cash Balance Account of a Participant until the earlier to occur of the Participant's Retirement Date or, if applicable, the Annuity Starting Date for survivor benefits; provided, however, that (a) Interest Credits shall cease, in the case of a Participant who has a Severance from Employment Date prior to reaching Normal Retirement Age, on such Participant's attainment of Normal Retirement Age and (b) Interest Credits shall continue to be credited to the Cash Balance Account of a Participant who is receiving Pre-65 Disability Benefits until such Participant's attainment of Normal Retirement Age.

3.4.3.  Interest Credits In Final Year of Participation.

(a)  General. The Interest Crediting Rate in the Plan Year in which the Annuity Starting Date occurs shall be multiplied by a fraction, the numerator of which is the number of months in the Plan Year prior to the Annuity Starting Date and the denominator of which is twelve (12).

-21-

A - 22

(b)    Lump Sums. In the Plan Year in which the Annuity Starting Date occurs, the Interest Credit with respect to lump sum distributions shall be credited as of the Annuity Starting Date, and, if payment is delayed beyond the Annuity Starting Date, Interest Credits shall be credited to the date of distribution

(c)    Annuity Payments. In the Plan Year in which the Annuity Starting Date occurs, the Interest Credit with respect to annuity payments shall be credited as of the Annuity Starting Date. No Interest Credits shall be credited for a period of two (2) months after the Annuity Starting Date in the event payment is delayed due to administrative processing time. If annuity payments are delayed more than two months after the Annuity Starting Date, no interest shall be paid if the delay in payment is due to the Participant's or beneficiary's delay in submitting paperwork or due to other factors beyond the control of the Plan Administrator. If interest is paid on delayed annuity payments pursuant to this paragraph, the interest shall be paid at the Interest Crediting Rate in effect as of the Annuity Starting Date.

### 3.5  Transition Credits.

3.5.1.  Eligibility for Transition Credits. Participants who (a) were Non-Bargaining Unit Employees on December 31, 1998; (b) remain Non-Bargaining Unit Employees on the Effective Date; and (c) were credited with at least ten (10) Years of Service as of January 2, 1999 are eligible for Transition Credits.

3.5.2.  Duration of Transition Credits. Transition Credits will be credited to Participants who meet the eligibility criteria of Section 3.5.1, as of the end of each Plan Year, beginning as of the Effective Date. Transition Credits will continue to be credited until the Plan Year in which the Participant is credited with more than 35 Years of Service.

3.5.3.  Amount of Transition Credit. Transition Credits shall be credited to the Cash Balance Account of each eligible Participant in an amount equal to (x) the product of the transition crediting rate, as determined below, and (y) the Participant's Compensation as a Non-Bargaining Unit Employee for the Plan Year.

| Participant's Years of Service As of Effective Date | Transition Crediting Rate |
|---|---|
| less than 10 years | 0.0% |
| 10-11 years | 1.0% |
| 12-15 years | 2.0% |
| 16-19 years | 3.0% |
| 20 or more years | 4.0% |

3.6 <u>Grandfather Benefit</u>. **[Effective on and after February 6, 2000, wherever the term "Parts One, Two or Three, as applicable" appears in this Section 3.6, it shall be replaced with the term "ACE Sub-Plan, the Cash Balance Sub Plan or the Delmarva Sub Plan, as applicable."]**

3.6.1. <u>Retirement-Eligible Grandfathered Participants</u>. The Grandfather Benefit of Grandfathered Participants who, as of their Retirement Date, are eligible for early or normal retirement pursuant to the terms of Parts One, Two or Three, as applicable, shall be determined as the accrued benefit of such Grandfathered Participant as of such Participant's Retirement Date, determined pursuant to the terms of the applicable Part as if the Participant had continued to participate in the applicable Part from the Effective Date through the Grandfather Period, including any applicable reduction for early commencement; or, if applicable, the Actuarial Equivalent lump sum present value of such accrued benefit, determined in accordance with the factors set forth in Schedule A. **[Effective on and after February 6, 2000, the term "Parts One, Two or Three, as applicable" shall be replaced with the term "ACE Sub-Plan, the Cash Balance Sub Plan or the Delmarva Sub Plan, as applicable," wherever such term appears.]**

3.6.2. <u>Non-Retirement-Eligible Grandfathered Participants</u>. The Grandfather Benefit of Grandfathered Participants who, as of their Retirement Date, are not eligible for early or normal retirement pursuant to the terms of Parts One, Two or Three, as applicable, shall be determined as the accrued benefit determined pursuant to the terms of the applicable Part as of such Participant's Retirement Date as if the Participant had continued to participate in the applicable Part from the Effective Date through the Grandfather Period, payable at age 65 for Delmarva Plan Grandfathered Participants and at age 55 for ACE Plan Grandfathered Participant, and then reduced for early commencement; or, if applicable, the Actuarial Equivalent lump sum present value of such accrued benefit, determined in accordance with the factors set forth in Schedule A.

PHLEGAL: #663223 v8 #7qv08LWPD

A - 24

# ARTICLE 4
## ELIGIBILITY FOR RETIREMENT

4.1 <u>Dates of Eligibility for Retirement Benefits</u>. A Participant shall be entitled to retire and receive Retirement Income under the CB Sub-Plan on the Participant's Normal Retirement Date, Terminated Vested Retirement Date, Deferred Retirement Date, or Disability Retirement Date. Notwithstanding the preceding sentence, a Participant who has had a Severance from Employment Date shall be required to commence receipt of benefits under the CB Sub-Plan upon attainment of his Normal Retirement Age.

PHLEGAL: #663223 v8 #7qv08!.WPD

A - 25

## ARTICLE 5
## AMOUNT OF RETIREMENT INCOME

5.1 <u>Normal Retirement Benefit</u>. Upon attaining one's Normal Retirement Date, a Participant shall be entitled to Retirement Income equal to his Accrued Benefit, determined as of his Normal Retirement Date.

5.2 <u>Terminated Vested Retirement Benefit</u>.

5.2.1. <u>Termination Prior to Completion of Five (5) Years of Service or Attainment of Normal Retirement Age</u>. If a Participant has a Severance from Employment Date prior to the Participant's completion of five (5) Years of Service for vesting purposes, and he has not attained Normal Retirement Age, he shall not be entitled to any benefits under the Plan.

5.2.2. <u>Termination After Completion of Five (5) Years of Service</u>. If a Participant has a Severance from Employment Date after completion of five (5) Years of Service for vesting purposes, but prior to his Normal Retirement Date, Disability Retirement Date, or Deferred Retirement Date, the Participant shall be eligible to receive Retirement Income equal to his Accrued Benefit, determined as of his Terminated Vested Retirement Date.

5.3 <u>Deferred Retirement Benefit</u>. A Participant who retires after attainment of Normal Retirement Age shall be entitled, on his Deferred Retirement Date, to receive Retirement Income equal to his Accrued Benefit as of such Deferred Retirement Date.

5.4 <u>Required Distributions</u>. For years commencing after December 31, 1999, in the event the Participant continues in the employ of the Employer after he has attained the age of 70½, payments will commence as set forth in Section 6.1 of the Base Plan.

5.5 <u>Disability Retirement Benefit</u>. A Participant who has a Disability Retirement Date shall be entitled to disability benefits as follows.

5.5.1. <u>Pre-65 Disability Benefit</u>.

(a)    <u>Amount and Form</u>. The Pre-65 Disability Benefit shall equal the lesser of (1) the Cash Balance Account as of the Disability Retirement Date projected to Normal Retirement Age and credited with interest at the rate of four percent (4%) each Plan Year or (2) 650% of such Participant's Final Average Compensation as of the Disability Retirement Date, converted into an Actuarially Equivalent single life annuity.

(b)    <u>Timing</u>. The Pre-65 Disability Benefit shall commence on the Participant's Disability Retirement Date, and will terminate on the earliest to occur of (i) the

-25-

Participant's attainment of Normal Retirement Age (at which time the Participant shall be entitled to a Post-65 Disability Retirement Benefit), (ii) death of the Participant, or (iii) the first day of the month following recovery from disability.

### 5.5.2. Post-65 Disability Benefit.

(a)    Amount and Form. The Post-65 Disability Benefit shall equal the Accrued Benefit at such Participant's Normal Retirement Date, subject to the Participant's election to have such benefit paid in any one of the optional forms specified in Section 6.6 in accordance with the procedures specified in Section 6.3 of the Base Plan.

(b)    Timing. The Post-65 Disability Benefit shall be payable on the first day of the month coinciding with or next following attainment of Normal Retirement Age, to a Participant who has had a Disability Retirement Date prior to Normal Retirement Age and whose disability continues to such Participant's attainment of Normal Retirement Age.

### 5.5.3. One-Time Disability Benefit Election. In lieu of the Pre-65 Disability Benefit and the Post-65 Disability Benefit, a Participant may elect, upon his Disability Retirement Date, to be treated as a terminated vested Participant who is eligible for a Terminated Vested Retirement Date. If the Participant makes such an election, any payments to the Participant shall be made in accordance with Section 5.2.

### 5.5.4. Grandfather Disability Benefit. In lieu of the benefits provided by Sections 5.5.1, 5.5.2, and 5.5.3, Grandfathered Participant who has a Disability Retirement Date on or before the expiration of the Grandfather Period may elect to receive the Grandfather Benefit, determined in accordance with Section 3.6 payable in the form of an Actuarially Equivalent single life annuity until the earlier to occur of (i) the Participant's attainment of Normal Retirement Age, (ii) death of the Participant, or (iii) the first day of the month following recovery from disability, at which time the Participant shall be entitled to a Post-65 Disability Retirement Benefit, or, in the event of the Participant's death, the payment of a pre-retirement survivor benefit in accordance with Section 6.2.

### 5.6 Employment After Normal Retirement Age.

### 5.6.1. Reemployment after Receipt of Retirement Income. If a Participant is reemployed after commencement of receipt of Retirement Income, his Retirement Income payments, if applicable, shall not be suspended and any benefits accruing as a result of his reemployment will be determined in accordance with Section 5.6.6.

### 5.6.2. Continued Employment After Normal Retirement Age. No Retirement Income shall be paid before a Participant's Required Beginning Date if such Participant remains an Employee after attaining his Normal Retirement Age, subject to the Participant's right to elect to commence receipt of Retirement Income in accordance with Section

-26-

6.1 of the Base Plan.

      5.6.3.  <u>Notification and Appeal of Suspension</u>.  The Committee shall notify the Participant by personal delivery or first class mail of the suspension of benefits during the first month in which such suspension of benefits occurs.  A Participant may ask the Committee in writing to make a determination as to whether specific contemplated continued employment will result in suspension of his benefits.  The Committee shall respond to such a request in writing within 60 days of its receipt of the request.

      5.6.4.  <u>Commencement of Retirement Income</u>.  Retirement Income suspended under this Section 5.6 shall commence no later than the earlier of (A) the first day of the third calendar month following the month in which the Participant has a Severance from Employment Date or, if later, the first day of the calendar month following receipt by the Committee of the Participant's notice that he has incurred a Severance from Employment Date or (B) the Participant's Required Beginning Date.  The initial payment shall include payment for the current month and for any previous calendar months since the Participant's Severance from Employment Date.

      5.6.5.  <u>Amount of Retirement Income</u>.  Retirement Income shall be calculated on the basis of the Accrued Benefit earned through the period of continued employment and the provisions of the Plan as then in effect.  The Retirement Income shall be paid in the form determined pursuant to Article 6.

      5.6.6.  <u>Calculation of Retirement Income In Event of Reemployment</u>.  In the case of a Participant whose Retirement Income commenced to be paid, upon his subsequent Severance from Employment Date, the Retirement Income shall be computed, based on Retirement Income accrued during the period beginning on his Reemployment Commencement Date and ending on his Severance from Employment Date.

-27-

A - 28

# ARTICLE 6

# FORMS OF PAYMENT;
# SURVIVOR BENEFITS

## 6.1  Normal Form of Retirement Income.

**6.1.1.  Single Participants.** Retirement Income payments to a Participant who retires under Article 4 shall be paid monthly commencing on the first day of the month coincident with or immediately following the Participant's Retirement Date and terminating with the last monthly payment due prior to his death. In the event the Participant retires on a Deferred Retirement Date, the benefit shall not be less than the amount payable on the Normal Retirement Date.

**6.1.2.  Married Participants.**

    (a)  **In General.** If a Participant has completed at least five (5) Years of Service or has attained Normal Retirement Age and is a married Participant on his Retirement Date, the normal form of Retirement Income shall be a joint and 50% survivor annuity which is the Actuarial Equivalent of a single life annuity, consisting of a reduced annuity paid for the life of the Participant and, upon his death, one-half of such reduced annuity paid to the surviving spouse for life, such survivor's benefits to be paid in equal monthly installments commencing on the first day of the month immediately following the Participant's death. Such survivor annuity shall be paid only to a spouse who was married to the Participant on the Retirement Date.

    (b)  **Special Provision for Delmarva Plan Participants.** Notwithstanding the preceding subsection (a), a Participant with a Minimum Benefit under the Delmarva Plan who (i) in the case of a Participant with a Normal Retirement Date, Disability Retirement Date or Deferred Retirement Date, is married on such Retirement Date, or (ii) in the case of a Participant with a Terminated Vested Retirement Date, is married on the Retirement Date to the same spouse that such Participant was married to on the date of such Participant's termination shall be entitled to the greater of (A) an unreduced joint and 50% survivor annuity with respect to the Minimum Benefit or (B) a reduced joint and 50% survivor annuity with respect to his Payable Cash Balance as described in Section 6.1.2(a).

    (c)  **Special Provision for ACE Plan Participants.** Notwithstanding the preceding subsection (a), if a married Participant has a Minimum Benefit under the ACE Plan and that Minimum Benefit (payable in the Normal Form for a married Participant under the ACE Sub-Plan) is greater than the normal form of benefit described in Section 6.1.2(a), the normal form for such Participant shall be the Minimum Benefit payable in

-28-

the Normal Form for a married Participant under the ACE Sub-Plan. If a married Participant has a Minimum Benefit under the ACE Plan and the normal form of benefit described in Section 6.1.2(a) is greater than the Minimum Benefit payable in the Normal Form for a married Participant under the ACE Sub-Plan but less than the Minimum Benefit payable as a single life annuity, the Participant shall be entitled to elect (subject to spousal consent as described in Section 6.3.4 of the Base Plan) between the Minimum Benefit payable in the Normal Form for a married Participant under the ACE Sub-Plan or the Payable Cash Balance payable in the normal form specified in Section 6.1.2(a).

6.2 Pre-Retirement Survivor's Benefits. The beneficiaries of Participants who die after the completion of at least five (5) Years of Service or attainment of Normal Retirement Age, but prior to their Terminated Vested Retirement Date, Normal Retirement Date or Deferred Retirement Date shall be entitled to a survivor benefit determined in accordance with this Section 6.2.

6.2.1.  Amount of Benefit. The survivor benefit shall be (a) the Participant's Payable Cash Balance, payable in an immediate lump sum or (b) for a beneficiary who is the surviving spouse of a Participant, the Participant's Payable Cash Balance, converted to an Actuarially Equivalent single life annuity payable immediately.

6.2.2.  Form of Benefit. The automatic form of benefit for beneficiaries who are not the surviving spouse of the Participant is a lump sum. The automatic form of benefit for a beneficiary who is a surviving spouse of the Participant is a single life annuity; provided that a beneficiary may elect payment in the form of a lump sum.

6.2.3.  Time of Distribution. A survivor benefit which is to be paid in the form of a single sum shall be paid as soon as practicable after the death of the Participant, but in no event later than the calendar year containing the fifth anniversary of the date of the Participant's death. Payment in the form of a single life annuity will be made as soon as practicable following the Participant's death, unless, in the case of a beneficiary who is a surviving spouse, such beneficiary elects to defer payment, but, in any event, payment may not be deferred later than the earlier to occur of the Participant's Normal Retirement Age or Required Beginning Date.

6.2.4.  Beneficiary Designations. In the event there is not a valid beneficiary designation form on file for a Participant, the survivor benefit shall be paid, in the case of a Participant who is a married Participant on the date of his death, as an immediate single life annuity to such Participant's surviving spouse. In the case of a Participant who is not a married Participant on the date of his death, the survivor benefit shall be paid as an immediate lump sum to the beneficiary designated under the Conectiv Savings and Investment Plan. In the event such Participant does not have a beneficiary designated under the Conectiv Savings and Investment Plan, the benefit shall be paid in equal shares to such Participant's surviving children, or if there are none, in equal shares to such Participant's surviving parents, or if none, then to

-29-

such Participant's estate.

### 6.3 Grandfather Survivor Benefit.

6.3.1. <u>Entitlement to Grandfather Survivor Benefit</u>. Notwithstanding the provisions of Section 6.2, the surviving spouse of a Participant who dies after the completion of at least five (5) Years of Service or attainment of Normal Retirement Age, but prior to the Participant's Retirement Date, shall be entitled to a survivor benefit pursuant to this Section 6.3, and not Section 6.2, if the Grandfather Survivor Benefit, determined below, is greater than the survivor benefit determined pursuant to Section 6.2.

6.3.2. <u>Amount and Form of Grandfather Survivor Benefit</u>. The Grandfather Survivor Benefit is a spousal survivor annuity equal to 50% of the Participant's Grandfather Benefit, determined as of the date of his death, such payments to be made in equal monthly installments to commence on the first day of the month coincident with or immediately following the Participant's death and to cease with the last monthly payment due prior to the spouse's death; provided that a beneficiary may elect payment in the form of a lump sum that is the Actuarial Equivalent of the Grandfather Survivor Benefit.

6.3.3. <u>Beneficiary Designation</u>. If a Participant eligible for a Grandfather Survivor Benefit has designated a non-spousal beneficiary pursuant to Section 6.2.4, such designation may specify that the designation is to be revoked or inapplicable in the event the Grandfather Survivor Benefit is greater than the survivor benefit determined pursuant to Section 6.2.

### 6.4 Form of Retirement Income for Former Employees of Conowingo Power Company.

A Participant who is a former employee of Conowingo Power Company ("COPCO") and who became an Employee in connection with the acquisition of COPCO by the Company, shall be entitled to elect the contingent annuity option set forth in Section 5.3 of the Service Annuity Plan of PECO Energy Company (the "PECO Plan"), attached hereto as Schedule B, with respect to his accrued benefit as of June 15, 1995. Such contingent annuity option shall be subject to the same restrictions that would have been in effect under the PECO Plan at the time of the acquisition.

### 6.5 Mandatory Lump Sum Distributions.

In the case of a Participant whose vested Accrued Benefit under the Plan has an Actuarially Equivalent present value of Five Thousand Dollars ($5,000) or less, the full amount of such benefit shall be payable in a lump sum as soon as administratively feasible after such Participant's Severance from Employment Date. In the event the vested Accrued Benefit is zero, the Participant will be deemed to have received a distribution of his Accrued Benefit.

-30-

6.6 Optional Forms of Benefit.

      6.6.1. Participant's Right to Elect. In lieu of the normal form of Retirement Income provided in Section 6.1, a Participant may elect among the following optional forms of benefit, provided that a married Participant must satisfy the conditions set forth in Section 6.3 of the Base Plan in order to elect an optional form of benefit. Each optional form of benefit shall be the Actuarial Equivalent of the normal form of Retirement Income.

      6.6.2. Single Life Annuity Option. In lieu of the normal form, a Participant may elect a single life annuity, with monthly payments commencing on the first day of the month coincident with or immediately following the Participant's Retirement Date and terminating with the last monthly payment due prior to his death.

      6.6.3. Contingent Annuitant Option. In lieu of the normal form, a Participant may elect a reduced monthly benefit commencing on the Participant's Retirement Date and payable for his lifetime with a monthly benefit payable to his surviving contingent annuitant after the Participant's death, commencing as of the first day of the month following his death and payable for the contingent annuitant's lifetime; the amount of monthly benefit payable to the contingent annuitant shall be equal to 50% or 100% of the monthly benefit amount payable to the Participant, as specified by the Participant in his election of this option.

      6.6.4. Single-Sum Distribution Option. In lieu of the normal form of benefit, a Participant may elect a single-sum distribution, payable as soon as practicable following the Participant's Retirement Date.

      6.6.5. Level Income Option. In lieu of the normal form of benefit, a Participant who was a participant in the ACE Plan prior to the Effective Date may elect a monthly benefit in the form of a single life annuity, commencing on his Retirement Date, adjusted so that the Participant's total income, including both the adjusted monthly benefit and the unreduced Primary Insurance Benefits payable to him under Title II of the Federal Social Security Act, are as nearly uniform as possible both before and after such date; the amount of monthly benefit payable under the CB Sub-Plan will be in a greater amount before the unreduced Primary Insurance Benefits begin and in a reduced amount after that date.

      6.6.6. Twenty-Five Percent Survivor Annuity. In lieu of the normal form, a Participant who was a participant in the ACE Plan prior to the Effective Date may elect a reduced monthly benefit commencing on the Participant's Retirement Date and payable for his lifetime with a monthly benefit payable to his surviving contingent annuitant after the Participant's death, commencing as of the first day of the month following his death and payable for the contingent annuitant's lifetime; the amount of monthly benefit payable to the contingent annuitant shall be equal to 25% of the monthly benefit amount payable to the Participant.

PHLEGAL: #663223 v8 #7qvO81.WPD

A - 32

CONECTIV RETIREMENT PLAN
CB SUB-PLAN
SCHEDULE A

A.1    Actuarial Equivalence for any benefit option converted from the Payable Cash Balance shall be determined as follows:

A.1.1  Unless otherwise specified below, Actuarial Equivalence shall be determined by using the Applicable Interest Rate, which is the annual interest rate on 30-year Treasury securities as specified by the Commissioner of Internal Revenue for the October preceding the calendar year containing the annuity starting date, as published in the Internal Revenue Bulletin or any successor publication thereto, and the Applicable Mortality Table, which is the mortality table based on the prevailing commissioners' standard table as prescribed by the Commissioner pursuant to Code §417(e) (currently 1983 GAM).

A.1.2  In the case of a Disability Benefit payable before age 65, the annuity benefit that is the Actuarial Equivalent of the Payable Cash Balance shall be determined by projecting the Payable Cash Balance to age 65, using a four percent (4%) annual interest rate, and then converting to an annuity form by using the rates specified in Section A.1.1.

A.1.3  In the case of any benefit option that is available only to former participants in a Prior Plan but that is based on the Payable Cash Balance, Actuarial Equivalence shall be determined by using the applicable table or rates as set forth in the applicable Sub-Plan. Where the applicable Sub-Plan uses a table for such Actuarial Equivalence that does not cover the age of the Participant, the rates set forth in Section A.1.1 shall be used to determine such Actuarial Equivalence.

A.2    Actuarial Equivalence for Minimum Benefit or Grandfather Benefit

A.2.1  Unless otherwise specified below, Actuarial Equivalence for a Minimum Benefit or Grandfather Benefit shall be determined on the basis set forth in Schedule A (as of the date of such determination) of the ACE Sub-Plan or Delmarva Sub-Plan under which the Participant was covered on the day before his or her entry into this CB Sub-Plan, as such Sub-Plan may have been amended prior to the date of such determination.

A.2.2  Where the applicable Sub-Plan uses a table for such Actuarial Equivalence that does not cover the age of the Participant, the rates set forth in Section A.1.1 shall be used to determine such Actuarial Equivalence; provided that †

(a)† annuity benefits for a Minimum Benefit or Grandfather Benefit commencing before age 55 determined under the ACE Sub-Plan shall be determined by using the factors applicable to a deferred vested benefit as set forth in the Delmarva Sub-Plan, and lump sum equivalencies for such Minimum Benefit or Grandfather Benefit shall be determined by using the actuarial factors set forth in the Ace Sub-Plan, but in either case such equivalencies shall be determined by valuing the benefit commencing at age 65 rather than age 55†, and †[. ]

[(b)] [A.2.3  Effective January 1, 1999, in the event a Participant terminates employment at or after attaining age 52 and is eligible to receive severance benefits pursuant to a Severance Plan adopted by the Employer that is effective during 1998, 1999 or 2000, such Participant's Grandfather Benefit or Minimum Benefit calculated pursuant to the Delmarva Sub-Plan paid at or after his attainment of age 55, by using the early retirement factors contained in Table C of the Delmarva Sub-Plan, rather than the early retirement factors contained in Table B of the Delmarva Sub-Plan.

Effective January 1, 1999 through December 31, 2000,] joint and survivor optional forms for a Minimum Benefit, Grandfather Benefit, or Grandfather Survivor Benefit determined under the Delmarva Sub-Plan (where the spouse or surviving spouse is the joint annuitant) shall be converted from the 50% joint and survivor form to the desired optional form (other than a single life annuity) by taking into account the fact that the normal form of benefit is a fully-subsidized 50% joint and survivor annuity (where the Participant is married as of the annuity starting date or date of death and entitled to such unreduced 50% joint and survivor annuity), but any other optional annuity form shall be the actuarial equivalent of the single life annuity (not reflecting the value of the fully-subsidized 50% joint and survivor annuity)[, and][.]

[(c)] [Effective January 1, 2001, in the event a Participant terminates employment at or after attaining age 52 and is eligible to receive severance benefits pursuant to a severance plan adopted by the Employer or a change-in-control agreement between the Employer and the Participant, which plan or agreement calls for the Participant to be treated as if he or she terminated employment at or after age 55 for purposes of early retirement at such age, such Participant's Grandfather Benefit or Minimum Benefit calculated pursuant to the Delmarva Sub-Plan shall be paid at or after his attainment of age 55, by using the early retirement factors contained in Table C of the Delmarva Sub-Plan, rather than the early retirement factors contained in Table B of the Delmarva Sub-Plan.

A.2.4  Effective January 1, 1999,] the lump sum equivalency of a Minimum Benefit, Grandfather Benefit, or Grandfather Survivor Benefit determined under the Delmarva Sub-Plan [(][shall be the actuarial equivalent of the single life annuity commencing on the Annuity Starting Date (including the value of the early retirement subsidy), and,] where the Participant is married as of the [annuity starting date] [Annuity Starting Date] or date of death and entitled to an unreduced 50% joint and survivor annuity[)][,] shall reflect the value of such unreduced annuity.

-3-

A - 34

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J. MICHAEL CHARLES; MAURICE W. WARD,        )     CIV. A. NO. 05-702 (SLR)
JR.; and JOSEPH I. FINK, JR., on behalf of        )     (Lead Case)
themselves and all others similarly situated,     )
                                                  )
                        Plaintiffs,               )
                                                  )
            v.                                    )
                                                  )
PEPCO HOLDINGS, INC; CONECTIV, and                )
PEPCO HOLDINGS RETIREMENT PLAN,                   )
                                                  )
                        Defendants.               )

DECLARATION OF JAMES R. KREMMEL

STATE OF DELAWARE            :
                                          ss.
COUNTY OF NEW CASTLE         :

        I, James R. Kremmel, being over 18 years of age, being of sound mind and

capable of making this affidavit, and being personally acquainted with the facts described herein,

which are true and correct to the best of my knowledge and belief, state the following:

        1.  I am a Principal Consultant in the Department of Human Resources at Pepco

Holdings, Inc.  From January 1, 1999 until August 24, 2001, I was Manager of Benefits for

Conectiv.  Previously, I held a comparable position in the Human Resources Department of the

Delmarva Power and Light Company.

**The ACE and Delmarva Final Average Pay Plans**

        2.  Before their merger to form Conectiv on March 1, 1998, the Atlantic City

Electric Company ("ACE") and the Delmarva Power and Light Company ("Delmarva") both

sponsored "final average" pension pay plans, under which a participant's benefit, measured as an

annuity, was the product of average salary, years of service, and a multiplication factor (the "ACE Final Average Pay Plan" and the "Delmarva Final Average Pay Plan").

3.   The ACE Plan did not allow participants to withdraw benefits, either as a lump sum payment or an annuity, until at least age 55. The ACE Final Average Pay Plan did, though, provide that participants who terminated employment before accruing benefits with a present value of more than $5,000 could be subject to automatic cash out.

4.   Similarly, the Delmarva Plan only permitted participants to withdraw benefits before retirement under limited circumstances.

5.   Thus, if an employee chose to leave ACE at age 35 after 10 years' service, he or she could not access their benefits for at least twenty years.

### The Cash Balance Plan

6.   On April 23, 1998, Conectiv's Board of Directors amended the ACE and Delmarva Final Average Pay Plans to establish the Conectiv Cash Balance Sub Plan (the "Cash Balance Plan") effective January 1, 1999. The Cash Balance Plan covered all employees not represented by a union.

7.   The Cash Balance Plan calculates benefits through the use of a hypothetical "account." Each year, Conectiv credits a certain percentage of each employee's pay to this account, with the percentages increasing with age.

8.   The Cash Balance Plan also provides an "interest credit," whereby it increases the amount of each account by an interest percentage based on long-term Treasury bond rates.

A - 36

9.   For example, if a participant were 40 years old, earned $50,000 per year, had an opening account for the year of $100,000, and the interest credit rate were 5%, then Conectiv would credit each employee's account with $4,000 in pay credits (the applicable 8% pay credit rate times $50,000) plus $5,200 in interest credits (5% interest rate times ($100,000 plus $4,000). This employee's account balance would accordingly increase from $100,000 to $109,200.

10.   Conectiv structured the Cash Balance Plan so that in most cases the account balance would be identical to the immediate lump sum payment value of the participant's benefits.  The Cash Balance Plan provides an immediate lump sum payment option when an employee leaves the company, as opposed to being forced to wait until retirement to collect any benefits, as under the former ACE and Delmarva Final Average Pay Plans, i.e., the Cash Balance Plan provides enhanced portability.

11.   Based upon my knowledge, belief, and information provided to me, of the 520 participants who have elected a form of benefit under the Cash Balance Plan, 500 -- that is, approximately 96% -- have requested to receive a lump sum.

12.   Conectiv also increased survivor benefits under the Cash Balance Plan.  Under the former ACE and Delmarva Final Average Pay Plans, a surviving spouse could only receive half of the value of a deceased participant's accrued benefit.  The Cash Balance Plan provides that surviving spouses receive the full amount of the participant's accrued benefit -- an important benefit for an employee with a serious health condition who is concerned about providing for his or her family in the wake of premature death.

13. Furthermore, the Cash Balance Plan, unlike its predecessors, permits participants to provide survivor benefits to individuals other than a spouse, such as a child or a domestic partner. This change was an important benefit enhancement for unmarried employees.

14. The Cash Balance Plan amendment also coincided with two other enhancements to the Conectiv benefits package. First, Conectiv increased the employer matching contributions in its 401(k) plan, which covered the same employees. Second, Conectiv expanded access to retiree medical coverage.

15. Conectiv also took steps to protect the expectations of long-term employees close to retirement. Thus, employees who either attained the age of 50 or completed more than twenty years of service on or before December 31, 1998, the effective date of the Plan conversion, were "grandfathered," i.e., so long as they retired within the next ten years, these long term employees received the larger of the benefits accrued under either the formula contained in their former Final Average Pay Plans or their new Cash Balance Plan formula. Moreover, even if they should retire after January 1, 2009, grandfathered employees will still be entitled to receive the greater of their benefits under the previous plan formula as of December 31, 2008 or the Cash Balance Plan formula as of the date of retirement.

16. Conectiv took additional steps to protect other long-term employees who were not as close to retirement age. The Cash Balance Plan provides for "transition credits," which are enhanced levels of pay credits for employees who had devoted many years of service to the company. Specifically, the Cash Balance Plans adds an additional 1% pay credit for employees with 10 to 11 years of service; 2% for employees with 12-15 years of service; 3% for employees with 16-19 years of service; and 4% for employees with 20 or more years of service.

-4-

A - 38

**Notice Provided to Employees of the Cash Balance Conversion**

17. Realizing that the conversion to the Cash Balance Plan represented a change in benefits philosophy, Conectiv provided a series of notices to its employees before the January 1, 1999 effective date, including:

  a. In October 13, 1997, Conectiv distributed a newsletter to all employees titled "EMerging Times" that noted that "A new pension plan will replace the old 'final pay' plans with individual, portable accounts." A copy of this newsletter is attached as Exhibit A.

  b. One week later, on October 30, 1997, Conectiv distributed the next issue of "EMerging Times," which provided even more detail. A copy of this newsletter is attached as Exhibit B.

  c. In May 1998, after the Board adopted the Cash Balance Plan amendment, Conectiv distributed to all employees a "Facts" newsletter. Under the heading "New Cash Balance Pension Plan," this newsletter contains just over three single spaced pages explaining in detail how the Cash Balance Plan operates. The newsletter further informed employees that the Cash Balance Plan would be effective January 1, 1999. A copy of this newsletter is attached as Exhibit C.

  d. On December 21, 1998, Conectiv sent to all employees who would be enrolled in the Cash Balance Plan a five page, single-spaced letter outlining in detail how the Cash Balance Plan computes benefits. A copy of this letter is attached as Exhibit D.

e.      After the Cash Balance Plan went into effect, Conectiv conducted a series of meetings with employees in July 1999 regarding the new pension benefit structure. In advance of these meetings, Conectiv distributed a newsletter titled "Mid Week Extra: Cash balance update June 23, 1999" to Cash Balance Plan participants. This newsletter expressly stated the company's intention to discuss criticism that had been leveled against cash balance pension plans, noting that "recent stories in the national media have raised concerns about some cash balance plans . . ." A copy of this newsletter is attached as Exhibit E. Conectiv used a standardized Power Point slide presentation in these meetings. A copy of that slide presentation is attached as Exhibit F. At each meeting, Conectiv discussed the then-brewing controversy over IBM's decision to convert to a cash balance plan.

### Execution of Releases

18. There are at least 90 members of the putative class who have executed releases with Defendants of any ERISA claims (except for claims for accrued and vested benefits as set forth in the plan documents) in exchange for severance payments. Plaintiffs, however, have signed no such releases.

### Effect of the Cash Balance Conversion Upon the Plaintiffs

19. Based upon my knowledge, belief , and information provided to me, below is a table comparing each Plaintiff's accrued benefit, measured as an annuity commencing at age 65, under both the Cash Balance Plan presently and what they would have been under the previous ACE and Delmarva Final Average Pay Plans had there been no conversion:

-6-

| Plaintiff | Accrued Benefit Measured As An Age 65 Annuity, as of 1/1/2007, Previous ACE/Delmarva Plan | Accrued Benefit as of 1/1/2007 Measured As An Age 65 Annuity, Cash Balance Plan |
| --- | --- | --- |
| J. Michael Charles | $2,858.07/month | $3,117.92/month |
| Maurice Ward | $2,784.19/month | $3,121.09/month |
| Joseph Fink | $2,092.67/month | $2,317.13/month |
| Thomas Troup | $2,706.52/month | $2,762.10 |

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

By: _____

James R. Kremmel
Pepco Holdings, Inc.
Human Resources
401 Eagle Run Road
Newark, DE 19702

Dated: 2-16-2007

-7-

A - 41

# KREMMEL EXHIBIT A

We are becoming

conectiv

# EMerging Times

your connection to the latest merger news • Oct. 15, 1997

# Total Rewards Communicate Conectiv

*EMerging Times* talked to Ben Wilkinson, chair of the total rewards transition team, about compensation and benefit programs as we will know them in Conectiv.

ET: It would be an understatement to say employees are curious about the pay and benefits programs being developed for Conectiv. Since we can't wave a magic wand and instantly know it all, let's start with the name. Why "total rewards" instead of the standard "compensation and benefits" or the more '90s "total compensation?"

BW: For one thing, we want to make a clear distinction between Conectiv and the past. This is a new program for a new company in a changing business environment. It is designed to be viewed as competitive by employees and flexible to accommodate changing business conditions. We want to emphasize the notion of rewards–payment in return for effort and results–as opposed to traditional entitlement programs with their guarantees and their payouts not generally linked to individual or corporate performance. "Rewards" refer to all the elements of remuneration–direct pay and all benefit plans–that are available to employees.

ET: What are the major changes that signal the need for this new "total rewards" approach?

BW: There are the changes in our industry–deregulation with resulting greater competition and movement into non-regulated businesses. And, there are societal changes as well–the demand for benefits flexible enough to meet the work and family needs of a diverse workforce and for more "portable" benefits that reflect the fact that fewer people are staying in one place for their entire careers. And there's the immediate need to support our rapid transition to Conectiv.

ET: What is the connection between how Conectiv employees are "rewarded" and this changing environment?

BW: Companies reward systems aren't an accident. They're a way of communicating and supporting the organization's values and strategies. They help to attract, retain and motivate employees with the behaviors and competencies necessary for the company to succeed. In the new, highly competitive environment in which Conectiv will be operating, we need a new employee mindset–one that embraces risk-taking and decision-making, that aligns employees' interests closely with those of the company, and that "vests" the employee in the performance of the company. Our program has to be designed to link corporate and individual performance to a much greater extent than in the past.

ET: How does the program do that?

BW: In a number of ways. On the direct pay side, we will place a greater emphasis on variable pay–that is, incentive arrangements that link employees' pay more directly to individual and business performance. We will find new, innovative ways to introduce company stock as a vehicle for performance rewards and for focusing people on what is happening in the business. We will reward not only individual effort, but collective contributions to the company's success through a new profit-sharing plan. A new pension plan will replace the old "final pay" plans with individual, portable accounts. And, there will be an opportunity for employees to tailor their benefits–like medical, dental, life, disability, etc.–to their own and their families' needs through the new flexible benefits program. Not a totally new concept to AE employees, "flex" moves us away from the "one-size-fits-all" benefits offerings of the past. It provides each employee with credits, which can be used to purchase levels of benefits appropriate to his or her needs or which can be taken as additional cash compensation.

Continued on page 2

D - 1

EXHIBIT NO.____

PHI003

A - 42

# Total Rewards

ET: When will be know the details of the new total rewards program?
BW: The total rewards transition team is continuing to work out the details of the program throughout the fall-including plans for an extensive communication and educational effort to support employees in making informed decisions about their benefits in a "choice" environment.

ET: When is the new total rewards pro - gram scheduled to become effective?
BW: Direct pay aspects of the program will become effective as soon as possible following the merger closing date. The benefits portion of the program is intended to become effective July 1, 1998, in order to allow time to complete selection for Conectiv and for effectively communicating the new benefits program and enrollment process. Employees will make their flexible benefit choices in late spring. Of course, for employees working under labor agreements, all pay and benefits must be negotiated.
*See the next issue of EMerging Times for more information about Conectiv total rewards.*

# Preparing for the Interview

As employees and hiring teams prepare for Conectiv's next round of job selection, they will notice something new in the position selection process: the use of "competencies" and the use of behavioral interviewing. The following information on these parts of the interview should prove helpful.

Competencies are defined as knowledge, skills and behaviors. "Job Competency Models" are lists of critical knowledge, skills and behaviors for success in a particular job. By mid-October, hiring managers will complete job competency models for positions in this round of selection.

To create the Job Competency Models, hiring managers are reviewing strategies, business goals and job expectations. They are then considering what it will take to meet those expectations. This information is compared with one of three "working competency models" that have been created to cover the positions generically (and which will be distributed on October 15 by the electronic means used to distribute the position summaries). After finalizing the list to the 12-15 most important criteria, they are prioritizing the critical few to use in interviewing. The hiring manager should then share the competency model for the specific job or pool of jobs with the candidates for that job.

When selecting people for positions, it is important to know what competencies are crucial to the success of the business group and the employee in a specific job, and to hire according to those competencies. Behavioral Interviewing is founded on the premise that past performance is the best indicator of future performance.

As an interviewee, you are likely to notice some key differences:
- You will be asked to share past experiences in detail
- You will be asked to speak in terms of "I" and not "we"
- You may not be asked more traditional questions (e.g., "What are your greatest strengths?")
- You will be asked to describe what your actually did or thought or felt in a real situation rather than what you might do in a hypothetical situation.

For example the interviewer may ask something like (if "problem-solving" were a key competency), "Tell me about a time when you had a customer request that you could not satisfy?" You would answer the question, and the interviewer would likely respond by digging deeper into the story that you tell.

To prepare, a candidate should anticipate some of the key competencies for the job and think through a couple of performance-based anecdotes or stories which demonstrate performance of the competency.

Your answers will improve the hiring team's assessment your skills. Employees who have been interviewed in this way say that they felt the interviewer had a much better sense of their capabilities than most interviewers had in the past, which made the experience feel fairer. More and more companies have adopted this approach to interviewing. Interviewers report higher confidence in their selections and greater success for the employee selected.

PHI003

A - 43

# More Information About Relocation Benefits

Merger-related relocation benefits are available to Atlantic Energy non-union and Delmarva Power management employees:

- for whom relocation is a condition of their accepting a Conectiv job;
- whose commute increases by at least 70 miles round trip; or,
- whose new commute is 100 miles or more round trip.

The merger-related relocation benefits (see chart below) provide allowances to eligible homeowners for moving expenses, transfer taxes, points on a new mortgage, temporary living expenses, realtor sales commissions, settlement costs, and miscellaneous expenses. A homeowner is someone who owns his/her primary residence.

There are also allowances, shown below, for eligible renters for moving expenses, lease buyout, temporary living expenses, and miscellaneous expenses.

**Conectiv Transition Employee Relocation Assistance Policy
Summary of Plan Design**

*Allowance for a management/non-union employee who currently owns their primary residence*

| Feature | Typical Coverage |
| --- | --- |
| Movement of household goods | Paid through an approved mover $3,000 for self move |
| Property transfer tax | Paid |
| Points on new mortgage | Lesser of 3 pts. or $6,000 |
| Temporary living | 60 days at a maximum of $3,800 |
| Realtor sales commission at prevailing rates | Maximum of $10,500 |
| Miscellaneous expense | 1 month salary |
| Settlement cost | Actual expense up to $2,000 |
| Home purchase option | Equity advance with agreement of sale |
| Tax gross up | Yes - for some cost |

*Allowance for a management/non-union employee who currently rents*

| Feature | Coverage |
| --- | --- |
| Movement of household goods | Paid through an approved mover $3000 for self move |
| Lease Buyout | 2 months |
| Temporary living | 60 days to a maximum of $3,000 |
| Miscellaneous Expense | 1 months salary |

If you have any questions on relocation benefits, call the Employee Merger Hotline at 1-800-201-4718.

PH1003

A - 44

# Additional Support Offerings Scheduled To Meet Huge Demand

The response to the initial offering of Employee Support workshops has been gratifying—in fact, it's been overwhelming. As a result, the Employee Support Transition Team is making every effort to schedule additional workshops as quickly as possible.

To meet an immediate need for additional support for those who are candidates in the current round of selection for Conectiv (see the October 8 *EMerging Times*), the Employee Support Transition Team arranged for internal consulting sources and scheduled additional workshops that began Saturday, October 11, and held open houses October 13 and 15. The open houses are an innovative approach to giving employees immediate access to a variety of employee support offerings, which are focused and condensed into short periods of time to accommodate busy schedules.

To get the message out as quickly as possible to those needing to prepare themselves for the current round of selection, an e-mail and FLASH bulletin describing the additional offerings went out to all employees last Thursday. Additional workshops are currently being scheduled for employees who will be participating in selection at a later time. Information about those workshops will be communicated in the very near future.

For more information about future workshops continue to check your e-mail, bulletin boards, and *Emerging Times*.

# Important Numbers To Remember

The Employee Merger Hotline — Record your question; we'll get back to you within two business days: 1-800-201-4718.

The Employee Assistance Program (EAP) – Available 24 hours/7 days per week for you and your family members:
AE – 1-800-608-0098
DPL – 1-800-843-9775

If you have questions pertaining specifically to the ERO, call the ERO Hotline:
AE – 1-800-608-0098
DPL – 1-888-376-8997

B 11

PHI00.

A - 45

# KREMMEL EXHIBIT B



We are becoming

# EMerging Times

conectiv   your connection to the latest merger news • Oct. 20, 1997

## Sharpening The Focus: Total Rewards

*Editor's Note: In the last issue, EMerging Times talked to Ben Wilkinson, chair of the total rewards transition team, about the philosophy underlying the new Conectiv compensation and benefits arrangements. In this issue, we've focused on some currently avail-able details about the program.*

*ET: You said that "flexible benefits" give employees the opportunity to tailor their needs as well as their family's. What benefits will be offered under the flexible benefits portion of the total rewards program?*
BW: There will be medical–including prescription and vision; dental; disability; and life insurance options–including dependent life coverages; health care and dependent care reimbursement accounts; and time off–including vacation, holidays, and sick leave. Plus, we're looking into offering a number of other

options that will give employees even more choice and flexibility. And, of course, there are benefits outside the flexible benefits program–pension and 401(k), for instance.

*ET: How will the flexible benefits program work?*
BW: Basically, it works like this: Conectiv will give you an amount of benefit credits–like benefit dollars–to allocate among your benefit choices. You will use your credits to purchase the types and levels of benefits that you decide fit your needs. You may be able to waive coverage under certain plans, which would free a number of credits that you could use to buy other benefits you need. If you have credits remaining after designing your benefits package, you will receive the balance in cash as taxable income added to your pay. If, on the other hand, your benefit choices cost more than your

Continued on page 2

## "Comparable" Job Defined

The issue of what is a "comparable" job is of significance to employees as they consider job offers with Conectiv. That is because, if an employee turns down a comparable job, he or she would not be eligible for any involuntary separation benefit. However, if an employee turns down a job that is not comparable, he or she would be eligible for 50 percent of the involuntary separation benefit.

A job will be considered "comparable" if the new pay target for the job is 85 percent or greater than what the employee's present job is currently paid. A job is "less than comparable" if the pay target is less than 85 precent of what the employee's present job is currently paid. Pay target is defined as the competitive rate for the job as set by line management.

What the employee's present job is currently paid will be determined as follows:

Employees in non-union jobs–top of core band (AE) or the midpoint (DPL) for the job when the offer is made.
Employees in union jobs–current final pay rate (AE and DPL) when the offer is made.

It's important to note that the determination is based on what the job is paid, not what the employee in the job is paid.

If you have questions about how your job is currently paid please talk to your supervisor.

B 12



EXHIBIT NO.____

PHI00;

A - 46

# Total Rewards

*Continued from page 1*

benefit credits, you pay the difference through payroll deductions. In most cases, your contributions are deducted from your pay on a before-tax basis. Being able to use before-tax dollars to buy benefits is a benefit in itself, since it helps you get more for your money.

*ET: Can you tell us more about the new pension arrangement?*
BW: The design of the plan is not yet finalized, but we know it will be what's called a "cash balance" plan. Unlike the companies' current final pay plans that pay a benefit based on a formula applied at the end of your career, the cash balance plan provides each employee with a record keeping account into which the company credits a percentage of pay each year. The account balance will grow based on a set interest rate. At least annually, employees will receive a statement telling them their account balance. The account balance is portable, which means it can be rolled into another employer's plan or an IRA if you leave Conectiv.

*ET: What happens to the benefit an employee has already earned under a current AE or DPL pension plan?*
BW: Employees have a nonforfeitable right to—that is , they can't lose—the value of the benefits they have accrued in their current pension plans.

*ET: If the merger closes January 1, 1998, and the new benefits program isn't effective until mid 1998, what benefits will employees have during that time?*
BW: Employees will remain covered

under their current benefit plans between the merger closing date and mid 1998.

*ET: When will any changes in how employees are paid begin to affect individual employees?*
BW: Changes in the direct pay aspects of the total rewards program will begin to affect individual employees at the time each employee actually begins his or her "new" job with Conectiv—that is, following the selection process that will take place after the merger closing date. In other words, the "effective date" for changes in direct pay will vary based on the situation of the individual employee.

*ET: How will employees find out more about the Conectiv total rewards program?*
BW: The plan is to issue a series of newsletters over the next seven months leading up to benefits enrollment in May. Each newsletter will deal with some aspect of the total rewards program. Then, in the spring, each employee will receive a "decision kit" that provides the detailed information needed to make choices under the flexible benefits program. We will hold meetings for employees so they can hear about the program and get answers to any questions they may have. Our goal is to provide the resources employees need to make well-informed decisions about their benefits.

*Note: For employees working under labor agreements, all pay and benefits must be negotiated.*

---

## Conectiv
## Human Resources
## Implementation
## Team now located
## at Deepwater, N.J.
## 8th Floor

FAX (609)299-7492

| Debby Turner-Fox | (609)299-8003 |
| Sue Waddington | (609)299-8005 |
| Arden Jones | (609)299-8004 |
| Darren Dorrell | (609)299-7491 |

---

PHI00?

A - 47

## Selection Process Continues

*For employees who have self nominated for a position in the current Conectiv selection process ....*
The hiring manager will call during the next two weeks to let you know if you will have an interview and, if so, to make interview arrangements.

Should you not hear from the hiring manager in that time period, contact Bob Pavlovski, AE human resources, (609) 645-4708 or Peg Symes, DPL human resources, (302) 429-3426.

## Time Is Running Out On ERO Windows

The election windows for the Enhanced Retirement Offer (ERO) will soon close for all eligible Atlantic Energy and Delmarva Power employees. Eligible for the ERO are:

At Atlantic Energy
* non-union and union employees who, by December 31, 1998, will be age 55 or older, and have at least five years of continuous service

At Delmarva Power
* non-union and union employees who, by December 31, 1998, will be age 55 or older, and who have at least 12 years of continuous service

Closing dates for eligible employees vary. If you are eligible for this option, please make sure you make your decision and return your election forms to your supervisor by the date listed below.

Non-Union Atlantic Energy & Delmarva Power Employees
October 31, 1997

Atlantic Energy Local 210 Members
November 30, 1997

Delmarva Power Local 1238 and Local 1307 Members
December 18, 1997

The ERO is the first of the voluntary staff reduction offerings in connection with the merger. The intent is to rely as much as possible on voluntary approaches, which the senior leadership team believes to be the more compassionate way to meet the unavoidable business need to reduce the number of employees in the merged company.

If you have questions about the ERO option, please contact the ERO hotline 1-888-376-8997, at Delmarva Power, or 1-800-608-0098, at Atlantic Energy.

PH100

## Important Numbers To Remember

The Employee Merger Hotline—Record your question, we'll get back to you within two business days: 1-800-201-4718.

The Employee Assistance Program (EAP)–Available 24 hours/7 days per week for you and your family members:

AE–1-800-608-0098
DPL–1-800-843-9775

If you have questions pertaining specifically to the ERO, call the ERO Hotline:

AE–1-800-608-0098
DPL–1-888-376-8997

B 15

PHI00:

A - 49

# KREMMEL EXHIBIT C

# facts

## conectiv



*Over the next few weeks, you'll learn details of the Total Rewards Program*

## CONECTIV TOTAL REWARDS PROGRAM FINALIZED

During the last several weeks, details of Conectiv's Total Rewards Program for management have been finalized. The new program will cover all Conectiv management employees. Coverage for union employees is subject to collective bargaining.

Over the next few weeks, you'll learn the details of the program and the benefit options available to you. You've already received two newsletters giving some background information about the new pension and flexible benefits plans. With this issue of *facts* and the next one, we'll explain more about the program and the decisions you'll be making soon.

In May, you will each receive a personalized "decision kit" that will help you make your flexible benefit elections. We'll also hold group meetings and provide a hotline to answer your questions. (For more on the communications schedule, see the back cover.) Your *Conectiv Flex* benefits will start July 1.

## YOUR PAY

Pay is, of course, an important element in the Total Rewards Program. Conectiv has made sure that our *base pay levels are competitive* with what is being paid for similar jobs in general industry in the areas in which we operate. Each employee will be informed about his or her "competitive base opportunity"—that is, the potential base salary for the job over time, given sustained solid individual performance.

In addition, all employees not participating in management or business unit variable pay plans will participate in Conectiv's *Variable Pay Opportunity*—our new plan that replaces the former DPL (CPIP) and AE (Corporate Bonus) profit sharing plans. Annual payouts will be based on how well Conectiv as a whole and individual business units achieve pre-established financial goals.

## NEW CASH BALANCE PENSION PLAN

Until now, employees of both DPL and AE have been covered by what are known as "final pay" pension plans. The "cash balance" pension plan is a new concept that has two important advantages: it's *easier to understand* than the former plans, and it's totally *"portable."* Both these features support our goal of designing a benefits package that meets the needs of today's more independent, more mobile workforce.

The new cash balance pension plan will take effect January 1, 1999.



D-5

EXHIBIT NO._____
____PHIC



*The new cash balance pension plan is easier to understand, and goes with you if you leave Conectiv after you're vested.*

## Benefit Easier to Understand

The way the new pension plan works is simple. Each year the company makes a cash contribution equal to a percentage of your total pay, including overtime and bonus, to your individual pension account. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the current cash value of your account is yours.

Over the years, as you watch your pension account grow, you'll have a clearer idea of your own financial position. And you'll be better able to plan for your future.

## Portability a Plus

Today, people who work for a single company throughout their careers are in the minority. So being able to transfer accumulated pension credit from one employer to the next is an important plus.

With the new cash balance plan, if you leave Conectiv after you have completed five years of service and are vested, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years.

## Company Contributions and Interest

Conectiv makes all the contributions to your cash balance pension account. These contributions are based on a percentage of your *total* pay, *including* overtime and bonuses. Contributions increase with age, as shown below. You are not required to contribute to the pension plan.

| Age* | Pension Credit (% of Pay) | Age* | Pension Credit (% of Pay) |
|---|---|---|---|
| Under 30 | 5% | 40 to 44 | 8% |
| 30 to 34 | 6% | 45 to 49 | 9% |
| 35 to 39 | 7% | 50 and over | 10% |

The company also credits your account with *interest* each year based on the current 30-year U.S. Treasury bond rate. This rate changes based on economic conditions. Currently, it is 6%. Historically, it has averaged about 8%.

---

* Based on your age as of January 1st; contributions are prorated if you move to a higher age bracket in mid-year.

2

PHI0

## Conversion to the New Pension Plan

The new cash balance pension plan will cover all Conectiv employees* as of January 1, 1999. Benefits already earned under the former DPL and AE pension plans are *fully protected*, and will be converted to an equivalent cash amount. This will form your "starting balance" under the new plan.

Your starting balance will, in essence, provide you with the lump sum amount you would need today to purchase a lifetime annuity equal to the benefit you've earned to date under your DPL or AE pension plan. The conversion formula will take into account any early retirement and survivor benefits which are part of the current plans.

Later this year, you'll receive a personalized pension statement showing your lump sum "starting balance" under the new plan.

## Transition Credits with Ten or More Years' Service

If you have completed between ten and 35 years of service with DPL or AE as of January 1, 1999, you will also be eligible for annual *transition credits*. This means the company will contribute an *additional* amount to your pension account *each year*. Your transition credit percentage depends on your completed service as of January 1, 1999, and remains constant until you have completed 35 years of service. At that point, transition credits stop.

| Annual Transition Credits | | | |
|---|---|---|---|
| Service as of 1/1/99 | Transition Credit (% of Pay) | Service as of 1/1/99 | Transition Credit (% of Pay) |
| 10 to 11 years | 1% | 16 to 19 | 3% |
| 12 to 15 years | 2% | 20 years or more | 4% |

For example, if you have completed 13 years of service as of January 1, 1999, the company will make an additional contribution of 2% of your total pay to your account every year until you complete 35 years of service.

## Annual Statements

Each year, you'll receive a personal statement of your pension account which will show the company's contributions (basic amount plus any transition credits), interest credit and total balance, so you'll be able to watch the progress of your account over the years.

---

* Subject to collective bargaining agreements.

3

> Benefits already earned under DPL and AE plans are fully protected.

PHI00

A - 52

## A Quick Look at the New "Cash Balance" Pension Plan

| | |
|---|---|
| **Company Contributions** | • Made annually to your account based on a percentage of pay<br>• Age-related percentage ranges from 5% to 10% |
| **Interest** | Credited each year based on the 30-year U.S. Treasury bond rate at the time |
| **Conversion to New Plan** | • Benefits accrued under DPL and AE pension plans to be converted to a cash equivalent starting balance under new plan<br>• Starting balance also credited with interest annually (see above) |
| **Transition Credits** | With 10 years of service as of 1/1/99, you receive an additional annual company contribution of 1% to 4% of pay |
| **Vesting** | Upon completion of five years of service (including service with DPL and AE) |
| **Portability** | Totally portable; current value of your account is yours if you leave Conectiv after you are vested |
| **Survivor's Benefit** | Full current value of your account is paid to your spouse or beneficiary if you die while actively employed |
| **Payment options at retirement** | Lump sum cash option or several lifetime monthly payment options (annuities); cash option can be rolled over to an IRA to continue tax deferral |

## "Grandfather" Protection for Older and Long Service Employees

Of course, many employees have already worked for most of their careers under the former "final pay" pension plans. For this reason, two groups of people will also continue to be covered by their former plans for the next ten years. They are employees who, as of January 1, 1999:

• have completed 20 years of service, or
• are age 50 or older

These "grandfathered" employees will have their pensions calculated under both the former and new plans, and will receive whichever value is greater.

## Payment Options at Retirement

The new pension plan also gives you a great deal of flexibility when you retire. You may take the full value of your pension in a single lump sum, which you may then roll over, tax deferred, into the investment vehicle you select. Or you may elect guaranteed lifetime monthly payments for yourself or you and your spouse (an "annuity").

## Survivor Benefits

The new pension plan provides another advantage in case of your death after you are vested but before retirement. Under the former plans, survivor benefits were payable only to a spouse, and then in an amount equal to about *half* of your accrued benefit. With the new plan, the *entire cash value* of your pension account would be paid to your beneficiary who, with your spouse's consent, can be anyone you name.

4

PHI003

A - 53

# 401(K) SAVINGS PLAN

The 401(k) plan, with its automatic, tax-deferred saving feature, company match and investment options, has become an important part of the retirement benefits package at both DPL and AE. Today, many employees are building a strong financial future for themselves by participating actively in these plans.

Conectiv will also sponsor a 401(k) plan that blends features from both prior plans.

## Company Match and Savings Options

Beginning July 1, the Company will match 50% of the first 6% of pay that you save, in the form of Conectiv stock. Making the match in stock helps reinforce one of Conectiv's key goals for our Total Rewards Program—linking employees' interests with the Company's business success. In other words, the better we do financially, as reflected in Conectiv's stock price, the better you will do, too.

You may contribute a total of up to 20% of pay to the plan—up to 15% on a before-tax basis and up to 5% on an after-tax basis.

## New Investment Choices

The new 401(k) plan will offer a broader range of investment choices than either the DPL or AE plans. The Vanguard Group, one of the country's largest and most respected mutual fund companies, will be responsible for maintaining account records as well as managing most of the investment funds.

Investment options will include both fixed income and diversified stock funds. In addition, you will have the choice of investing your account in one of two "LifeStrategy" funds that automatically apportion your account among several different funds according to your investment goals.

### New 401(k) Investment Options

**Stock Funds**
- Vanguard Index Trust – 500 Portfolio*
- T. Rowe Price International Stock
- Baron Asset Fund
- Vanguard/PRIMECAP
- Vanguard/Windsor II
- Vanguard Growth & Income Portfolio

**LifeStrategy Funds**
- Vanguard LifeStrategy Portfolio – Growth Portfolio
- Vanguard LifeStrategy Portfolios – Moderate Growth Portfolio

**Fixed Income Funds**
- Vanguard Bond Index Fund – Total Bond Market Portfolio
- Vanguard Retirement Savings Trust

Later this spring you'll have the opportunity to learn more about the new investment funds. In August, Vanguard will automatically transfer your investment in current plan funds to comparable new funds, with no tax liability at transfer. You will then be free to make any investment changes you want.

*"Standard & Poor's 500," "S&P 500®," "Standard & Poor's®," "S&P®," and "500" are trademarks of the McGraw-Hill Companies, Inc.

*Under the new 401k plan, Conectiv will match 50% of the first 6% of pay you save.*

5

PHI003

A - 54



*Conectiv Flex lets YOU choose the benefits that are right for you . . .*

## CONECTIV FLEX

*Conectiv Flex*, our new flexible benefits program, goes into effect July 1, 1998. *Conectiv Flex* lets you choose the benefits that are right for you from among a broad variety of options. Highlights of your *Conectiv Flex* program follow. You'll receive more details about the program in the next few weeks.

## Conectiv Flex Means Advantages for You

With *Conectiv Flex*, you choose the benefits you want each year, and you can change your benefits annually, as your needs change. In this way, Conectiv can be sure it is making the wisest use of the dollars it sets aside each year to pay for benefits. *Conectiv Flex* offers:

- *A range of benefits* from which to choose (see *Highlights...*, right)

- *Cash back*—Conectiv pays the major portion of the cost of coverage under *Conectiv Flex*. Each benefit option has a price tag, depending on the type and level of benefit you choose. If the benefits you choose cost *more* than the amount Conectiv pays, you pay the difference through payroll deduction— usually on a *before-tax* basis. If the benefits you choose cost *less* than the amount Conectiv pays, you will receive extra dollars in your paycheck as taxable cash.

- *Tax advantages*—With *Conectiv Flex*, you get the advantage of tax breaks permitted by law. For example, amounts you pay toward health care coverage are deducted from your pay on a *before-tax* basis. And, when you participate in a Health Care or a Dependent Care Reimbursement Account, you pay no federal or Social Security taxes on the dollars that go into your account(s) or on the dollars that are reimbursed to you.

## FlexPhone Telephone Enrollment

In May, you'll be able to enroll for your *Conectiv Flex* benefits for July 1998- July 1999 using any touch tone phone and the personalized enrollment fact sheet that you will receive.

The FlexPhone system is quick and easy. It ensures privacy and confidentiality using your own Personal Identification Number (PIN). Complete instructions for enrolling by phone will be included with the *Conectiv Flex* decision kit that you'll receive in May.

> Watch for the next issue of
> *facts* to learn more
> about your *Conectiv Flex*
> benefit options.

6

PHI002

A - 55



*You'll be able to enroll for Flex using the FlexPhone system.*

This newsletter covers only the highlights of your Conectiv Total Rewards Program. Details of the plans are contained in the official plan documents. In the case of questions, the documents always govern.

7

PHI003

A - 56



*FlexPhone . . .
a quick and
easy way to
enroll.*

## TOTAL REWARDS COMMUNICATION PLAN

This schedule will give you an idea of what you can expect to hear about the new Total Rewards Program between now and the July 1 effective date.

- 3rd *facts* newsletter (this one) ................................................April-May
- 4th *facts* newsletter (more details on flexible benefits—medical, dental, life insurance and reimbursement accounts) ................................................April-May
- 5th *facts* newsletter (more information on the new 401(k) plan) ................................................May-June
- "Decision Kits" mailed to you ................................................Mid-May
- Employee meetings and benefits hotline ................................................April-May
- Enrollment period for flexible benefits ................................................Mid-May to June 1
- Flex benefits effective date ................................................July 1

ɹɹ|ɹ|ɹɹ||ɹɹ||ɹɹ|ɹɹ|||ɹ||ɹ|ɹɹ||ɹ|ɹɹ||ɹ|ɹ|ɹɹ|ɹ|ɹɹ||ɹ||ɹ|ɹ|ɹɹ||ɹɹɹ|ɹ|ɹ||

D
KAREN E FRANCKS
FOREST BROOK GLEN
200 FOREST DR
WILMINGTON DE 19804-2316

**conectiv**
800 King Street
P.O. Box 231
Wilmington, DE 19899

First Class
U.S. Postage
P A I D
Wilmington, DE
Permit #68

PH100

A - 57

# KREMMEL EXHIBIT D

December 21, 1998

Dear Conectiv Management Employee,

Beginning January 1, Conectiv will switch to a "cash balance" pension plan as announced earlier this year. In order to provide you with your opening balance, the Company will use your 1998 earnings, which will not be finalized until late January, 1999. At the same time as we are moving to the cash balance pension plan, the Company is outsourcing pension administration to the Vanguard Group, which is also the administrator of Conectiv's 401K plans and PAYSOP plans. Vanguard will verify the conversion calculations, and will then distribute your individual account balances by the end of the second quarter of 1999.

Until individual statements can be prepared, we have created two tables of example calculations so employees can estimate their opening balances. Remember that these tables are examples only, and that your actual cash balances will reflect your particular circumstances. There will be more detailed communications in the Spring. If you have general questions, please hold them until these communications are available. We have included in this letter answers to some general questions about the new program.

If you are at retirement age and are planning to retire in the first quarter of 1999, please call the Human Resources Strategic Business Partner for your area: Pat Duffy, Energy Delivery & Services, at 220-3155; Harold DeJarnette, Supply, at 220-3252; Ben Wilkinson, Shared Services, at 220-3047; and Dave Motil at 250-6020.

We hope this preliminary information is helpful to you.

Q. What is a "cash balance" pension plan?
A. Each year the company credits your individual pension account with a cash contribution equal to a percentage of your total pay, including overtime and bonus. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the current cash value of your account is yours. If you leave Conectiv after you have completed five years of service and are vested, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years. At retirement, you can take the money in a lump sum and roll it over, tax deferred, into the investment vehicle you select. Or you can elect to receive lifetime monthly payments, either for yourself, or for you and your spouse. Each year, you'll receive a statement of your pension account showing all transactions and its total balance.

Q. What are the key components of Conectiv's new cash balance pension plan?
A. Please see the accompanying "Update of Conectiv Facts," below.

Q. What are the advantages of cash balance?
A. Your cash balance pension account is completely portable. In addition, the plan contains increased "beneficiary" benefits: the full value of the account transfers to your spouse, family, or estate in the event of your death. Employees will receive annual statements showing the actual current value of their pension account. These features mean that the cash balance pension plan helps to meet more diverse needs of today's and tomorrow's employees.

Q. Are there some grandfathering provisions and other transition rules?
A. You may recall that, as part of the approach taken by management to provide minimal impact on the existing workforce, extensive protections were woven into the new plan for employees approaching the retirement age. Any employee aged 50 or with 20 years of service as of December 31, 1998 is "grandfathered" for ten years after January 1, 1999. This means that when a grandfathered participant retires, the pension is computed both under the old formula and the new one, and the participant receives the greater amount. In addition, retirees choosing the old formula will be able to take a lump-sum distribution of their pension during the 10 year period. These provisions are for the next ten years when the benefits under the old plan are calculated, frozen, and compared at retirement to the cash balance amounts to determine the best benefit for the employee. In addition to the grandfather provision, favorable transition rules apply for longer service employees. This means those employees will get extra annual credits to their accounts during the ten year period.

JMC00001

D-6

EXHIBIT NO._____

BMW/19/07

Conectiv Cash Balance Retirement Plan
January 1, 1999 Account Balance Estimate
(For employees formerly covered by the ACE Plan)

| | Age/Service | | | | | | |
|---|---|---|---|---|---|---|---|
| Average Five Year Earnings | 35/10 | 40/15 | 40/20 | 45/20 | 50/20 | 50/25 | 55/25 |
| $30,000 | 14,600 | 30,800 | 41,100 | 57,600 | 80,800 | 101,000 | 141,700 |
| $40,000 | 19,500 | 41,100 | 54,800 | 76,800 | 107,700 | 134,700 | 188,900 |
| $50,000 | 24,400 | 51,300 | 68,500 | 96,000 | 134,700 | 168,300 | 236,100 |
| $75,000 | 36,600 | 77,000 | 102,700 | 144,000 | 202,000 | 252,500 | 354,200 |

Conectiv Cash Balance Retirement Plan
January 1, 1999 Account Balance Estimate
(For employees formerly covered by the DP & L Plan)

| | Age/Service | | | | | | |
|---|---|---|---|---|---|---|---|
| Average Five Year Earnings | 35/10 | 40/15 | 40/20 | 45/20 | 50/20 | 50/25 | 55/25 |
| $30,000 | 11,800 | 24,800 | 33,100 | 46,400 | 65,100 | 81,300 | 114,100 |
| $40,000 | 15,700 | 33,100 | 44,100 | 61,800 | 86,700 | 108,400 | 152,100 |
| $50,000 | 19,700 | 41,300 | 55,100 | 77,300 | 108,400 | 135,500 | 190,100 |
| $75,000 | 29,500 | 62,000 | 82,700 | 116,000 | 162,600 | 203,300 | 285,200 |

Q. Why are there two charts?
A. Pension benefits differed between the two merger partners, Atlantic Energy and Delmarva Power, and employees are entitled to the benefits already earned. Opening balances will be different for two hypothetical employees having the same age and length of service, but coming from different companies. But, going forward, future credits to the accounts will be computed in exactly the same manner.

Q. In general, what are the differences in the two plans?
A. The main difference is that Atlantic Energy employees could retire at 55 with no reduction in benefit, while Delmarva Power employees could retire at 60 with no reduction in benefit, or at 55 with a 24% reduction in benefit. The Atlantic Energy percentage multiplier is 1.6%, compared to the Delmarva Power 1.5% On the other hand, Delmarva Power employees have an enhanced survivor benefit that Atlantic Energy employees do not have. These differences have been quantified and were used in calculating these tables.

Q. Are there additional key variables other than earnings, age, and service time to consider when reviewing these charts?
A. The tables reflect the present value of money. Another factor that may not be as obvious, but that is significant in the opening balance calculation, is your distance from retirement age. So while additional service is important and is reflected as you move from left to right in the chart, it is also significant that you are also moving closer to age 55. The closer you are to age 55 the less the benefit earned to date that must be discounted to compute the opening balance. Or conversely, the younger you are, the more of the benefit must be discounted to compute the opening balance. This is why the initial balances for younger people appear smaller.

Note: This information is intended to be used as a guideline only for eligible employees. The employees eligible for the cash balance pension plan are management employees currently enrolled in Conectiv Flex benefits.

JMC00002

B 25

A - 59

Update of Conectiv Facts (Originally Published in the Spring of 1998)

### New Cash Balance Pension Plan

Until now, employees of both DPL and AE have been covered by what are known as "final pay" pension plans. The "cash balance" pension plan is a new concept that has two important advantages: It's easier to *understand* than the former plans, and it's totally *"portable."* Both these features support our goal of designing a benefits package that meets the needs of today's more independent, more mobile workforce. The new cash balance pension plan will take effect January 1, 1999.

### Benefit Easier to Understand

The way the new pension works is simple. Each year the company makes a cash contribution equal to a percentage of your total pay, including overtime and bonus, to your individual pension account. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the cash value of your account is yours.

Over the years, as you watch your pension account grow, you'll have a clearer idea of your own financial position. And you'll be able to plan for your future.

### Portability a Plus

With the new cash balance plan, if you leave Conectiv after you are vested and have completed five years of service, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years.

### Company Contributions and Interest

Conectiv makes all the contributions to your cash balance pension account. These contributions are based as a percentage of your *total* pay, *including* overtime and bonuses. Contributions increase with age, as shown below. You are not required to contribute to the pension plan.

**Annual Company Pension Contributions**

| Age[1] | Pension Credit (% of Pay) | Age | Pension Credit (% of Pay) |
|---|---|---|---|
| Under 30 | 5% | 40-44 | 8% |
| 30 to 34 | 6% | 45-49 | 9% |
| 35-39 | 7% | 50 and over | 10% |

[1] Based on your age as of January 1st; contributions are prorated if you move to a higher age bracket in mid-year.

JMC00003

A - 60

The company also credits your account with *interest* each year based on the current 30-yr. U.S. Treasury bond rate. This rate changes based on economic conditions. Currently it is 5%. Historically, it has averaged about 8%.

## Conversion to the New Pension Plan

The new cash balance pension plan will cover all Conectiv management employees as of January 1, 1999. Benefits already earned under the former DPL and AE pension plans are *fully protected* and will be converted to an equivalent cash amount. This will form your "starting balance" under the new plan.

Your stating balance will, in essence, provide you with the lump-sum amount you would need today to purchase a lifetime annuity equal to the benefit you've earned to date under your DPL or AE pension plan. The conversion formula will take in account any early retirement and survivor benefits which are part of the current plans.

## Transition Credits with Ten or More Years' Service

If you have completed between ten and 35 years of service with DPL or AE as of January 1, 1999, you will also be eligible for annual *transition credits*. This means the company will contribute an *additional* amount to your pension account *each year*. Your transition credit percentage depends on your completed service as of January 1, 1999, and remains constant until you have completed 35 years of service. At that point, transition credits stop.

| Annual Transition Credits | | | |
|---|---|---|---|
| Service as of 1/1/99 | Transition Credit (% of Pay) | Service as of 1/1/99 | Transition Credit (% of Pay) |
| 10 to 11 years | 1% | 16 to 19 | 3% |
| 12 to 15 years | 2% | 20 years or more | 4% |

For example, if you have completed 13 years of service as of January 1, 1999, the company will make an additional contribution of 2% of your total pay to your account every year until you complete 35 years of service.

## Annual Statements

Each year, you'll receive a personal statement of your pension account which will show the company's contributions (basic amount plus any transition credits), interest credit and total balance, so you'll be able to watch the progress of your account over the years.

## "Grandfather" Protection for Older and Long Service Employees

JMC00004

B 27

A - 61

Of course, many employees have already worked for most of their careers under the former "final pay" pension plans. For this reason, two groups of people will continue to be covered by their former plans for the next ten years. They are employees who, as of January 1, 1999:

- have completed 20 years of service, or
- are age 50 or older.

These "grandfathered" employees will have their pensions calculated under both the former and new plans, and will receive whichever value is greater. As an additional benefit, grandfathered employees have the option to elect a lump sum distribution under the former plan.

### Payment Options at Retirement

The new pension plan also gives you a great deal of flexibility when you retire. You may take the full value of your pension in a single lump sum, which you may then roll over, tax deferred, into the investment vehicle you select. Or you may elect guaranteed lifetime monthly payments for yourself, or for you and your spouse (an "annuity").

### Survivor Benefits

If you die after you are vested but before retirement, the new pension plan provides another advantage to your survivor. Under the former plans, survivor benefits were payable only to the spouse, and then at an amount equal to about *half* of your accrued benefit. With the new plan, the *entire cash value* of your pension account would be paid to your beneficiary who, with your spouse's consent, can be anyone you name.

| A Quick Look at the New "Cash Balance" Pension Plan | |
|---|---|
| Company Contributions | Made annually to your account based on a percentage of pay. Age-related percentages range from 5% to 10%. |
| Interest | Credited each year, based on the 30-year U.S. treasury bond rate at the time. |
| Conversion to New Plan | Benefits accrued under DPL and AE pension plans to be converted to a cash equivalent starting balance under new plan. Starting balance also credited with interest annually. |
| Transition Credits | With 10 years of service as of 1/1/99, you receive an additional annual company contribution of 1% to 4% of pay. |
| Vesting | Upon completion of five years of service (including service with DPL and AE). |
| Portability | Totally portable: current value of your account is yours if you leave Conectiv after you are vested. |
| Survivor's Benefit | Full current value of your account is paid to your spouse or beneficiary if you die while actively employed. |
| Payment options at retirement | Lump-sum cash option, or several lifetime monthly payment options (annuities); cash option can be rolled over to an IRA to continue tax deferral. |

Updated 12/21/98

JMC00005

B 28

A - 62

# KREMMEL EXHIBIT E

06/25/2001    09:31    CONECTIV ÷ 8166962552742                    NO.306    D002

# **Mid**Week **Extra**

### *Cash balance update*
June 23, 1999

Opening statements for the Cash Balance Pension Plan will be mailed to employees' homes beginning next week. Thirty informational meetings are scheduled throughout the company from July 12 to July 29 to familiarize employees with the plan and to answer questions. A draft schedule is below. This schedule is firm, but could be amended if there are major conflicts in your area.

Because this issue is very important to employees, the meetings are being scheduled during working hours. As managers, please make sure that everyone who wishes to attend the information sessions is given the opportunity. If employees are unable to attend meetings at their work sites, they may attend sessions elsewhere.

These meetings will be the best source of information on the plan and employees' opening balances. Recent stories in the national media have raised concerns about some cash-balance plans that do not offer the same level of financial security or grandfathering provisions as Conectiv's Cash Balance Pension Plan. One part of the presentation will address these concerns and demonstrate how Conectiv's plan is different. Members of the leadership group of managers and above are invited to the first meeting, July 12 at the Conference Center. This meeting will give you perspective you can use to help yourself and your employees.

The Cash Balance Pension Plan is a portable pension that you may take with you if you leave the company at any time after a five-year vesting period. The Vanguard Group will act as the plan administrator, and the Towers Perrin consulting firm will act as the actuary. The plan is easy to understand. Each year, the company makes a cash contribution to your account equal to a percentage of your total pay, including overtime and variable pay. Through your career, the account grows with additional contributions and accrued interest. When you leave or retire, the value of the account is yours, provided you are vested.

It's important to note that opening balances reflect the current value of your benefit under the Delmarva and Atlantic plans. Keep in mind that the balances reflect the present-day value of money. This balance will continue to grow through annual contributions, interest, and depending on your age and service, transition credits. The calculations will be discussed at the meetings.

Upon receipt of the statements, employees should check the information. If you believe any of the info in your statement is incorrect, follow the instructions on the opening-balance statement. Please do not call the Human Resources Service Center or the plan administrator.

If you or your employees have any questions after receiving the opening statements, please hold them until the meetings, where experts will be available to respond. The meetings were scheduled after the mailings to enable employees to prepare questions. They will be the best source of information on the plan at this time. After the meetings, the Human Resource Service Center and Vanguard will be prepared to answer any questions you may have going forward.

*(see schedule, next page)*

JMC00006



D-10
EXHIBIT NO._____
PMQ11/9/07

A - 63

| | VANGUARD GROUP | | |
|---|---|---|---|
| | CONECTIV CASH BALANCE PLAN | | |
| | VOLUNTARY INFORMATIONAL MEETING SCHEDULES | | |
| Date | Location | Time | On-Site Contact |
| Mon., 7/12 | Top 209 Mtg – Conf Center, Room C<br>UoP – Conf Center, Room C | 8a-9:30a<br>10a-11:30a<br>1:00p-2p<br>2:30p-4p | Marie Falkowski, 8-235-5 |
| Tues., 7/13 | NDGO – Operations Conf Rooms A, B, C | 11p-12:30p<br>1:30p-3p<br>3:30p-5p | Janet Rudinoff, 8-225-448 |
| Wed., 7/14 | King Street – Multi-Purpose Room | 10:30a-12p<br>1:30p-3p<br>3:30p-5p | Kelley McMillan, 8-220-3 |
| Thurs., 7/15 | Pencader – Pencader Room | 9a-10:30a | Caren Samluk, 8-225-577! |
| Thurs., 7/15 | MLK – Multi-Purpose Conf Room | 1:30p-3p | TBA |
| Fri., 7/16 | Data Center – Rooms 2 A&B | 9a-10:30a<br>1:30p-3p | Carol Peterson, 8-235-514 |
| Mon., 7/19 | Centreville – General Meeting Room | 9a-10:30a | Terri Layton, 8-425-4125 |
| Mon., 7/19 | SDGO – Room 1, 1st Floor | 1:30p-3p<br>3:30p-5p | Lora Brittingham, 8-230-6 |
| Tues., 7/20 | Millsboro – Main Conf Room | 9a-10:30a | Nancy Gosnell, 8-440-335 |
| Tues., 7/20 | Indian River Power Plant – 1st Fl Conf Room | 1:30p-3p | Melinda Taylor, 8-330-35 |
| Wed., 7/21 | Indian River Power Plant – 1st Fl Conf Room | 8:30a-10a | Melinda Taylor, 8-330-35 |
| Wed., 7/21 | Carney's Point (TENTATIVE) | 3:30p-5p | TBA |
| Thurs., 7/22 | Delaware City Power Plant – General Mtg Rm | 9a-10:30a | Debbi Murray, 8-320-671: |
| Thurs., 7/22 | EdgeMoor Power Plant/Hay Rd – 1st Fl<br>Assembly Room | 1:30p-3p | Arta Trabant, 8-325-7047 |
| Mon., 7/26 | Deepwater Station, NJ – 4th Fl Conf Room | 9a-10:30a | Donna Harris, 8-500-1726 |
| Mon., 7/26 | B L England, NJ – General Conf Room | 1:30-3p | Mary Ann Jarman, 8-500- |
| Tues., 7/27 | Glassboro/Winslow – Main Conf Room | 9a-10:30a | Brenda Okamoto, 8-500-7 |
| Tues., 7/27 | Cape May, NJ – Main Conf Room | 2:30p-4p | Louise McNew, 8-500-38( |
| Weds., 7/28 | Admin Complex/Pleasantville, NJ – Cafeteria | 9a-10:30a | Cheryl, 8-500-4317 |
| Weds., 7/28 | Mays Landing, NJ – Conf Room G | 1:30p-3p | Trish Smith, 8-500-6475 |
| Thurs., 7/29 | B L England, NJ – General Conf Room | 9a-10:30a | Mary Ann Jarman, 8-500- |

Note: Where a morning meeting is planned, the room has been reserved for all morning.
Conversely, where an afternoon meeting is planned, the room has been reserved for all
afternoon. Also, an overhead projector has been reserved for each meeting site.

JMC00007

B 30

A - 64

# KREMMEL
# EXHIBIT F

**Conectiv:**
## Cash Balance Pension Plan

A New and Valuable Plan for Today's Employees

July 1999

conectiv

---

**Today's Agenda**

- Introduction and Overview — Conectiv
- What is Cash Balance? — Conectiv
- Differences of Old vs. New Plan — Towers Perrin
- Vanguard's Role — Vanguard
- Answering Your Questions — All

---

**Why are We Here?**

- Overview for the change to a new plan
- Highlight advantages of the new plan
- Explain how the cash balance plan works
- Help you understand the value of your pension
- Make sure you understand Vanguard's role with regard to your pension and 401(k) plans
- Answer your questions

---

**Why Change to a New Plan?**

The Workplace Has Evolved Since Pension Plans were First Introduced

- Our business is changing and to succeed, we must attract and retain a more independent, more mobile workforce. Today's employees desire pension portability.
- Our benefits programs need to reflect the evolving needs of our employees.

---

**Why Cash Balance Benefits Today's Employees**

- Easier access
  - Your account is portable—you can take it with you after you're vested
- Higher confidence
  - The new plan is easier to understand—company makes an annual contribution to your account
- More convenience
  - You'll have a great deal of flexibility in choosing payment options when you retire

---

**Why Cash Balance Benefits Today's Employees**

- Greater comfort
  - You'll receive an annual statement so you'll know the value of your account each year
- Better value
  - New plan captures the best of final pay and cash balance retirement plans
  - Annual interest credit rate higher than normal
  - "Grandfather" protection for pre-retirement and long service employees

Conectiv
July 1999
Page 1

---

MWW00219

B 31

D-13
EXHIBIT NO._____

A - 65

### Important Perspectives on Conectiv's New Retirement Program

- New plan is a cash balance plan
- Cash balance plans are controversial
  - Series of Wall Street Journal articles
  - Congressional hearings
- Criticisms leveled at cash balance plans
  - Attempts cost cutting
  - Poor handling of communication/transition
  - Accruals cease for certain employees



### Important Perspectives on Conectiv's New Retirement Program

- New program not designed to provide cost savings for Conectiv
- New cash balance plan captures best of both types of retirement plans
  - Guaranteed benefit feature of prior retirement plan
  - Portability and precise account balance feature of an individual account plan like the current 401(k) plan
- Conectiv matching contribution increased under 401(k) plan for former Delmarva people

### Important Perspectives on Conectiv's New Retirement Program

- New cash balance plan provides higher than average annual contribution credit
- Additional contribution credits made each year for all employees with at least 10 years of service by the end of 1998
  - Continued until you have 35 years of service
- Annual interest credit rate on account balance higher than average
  - Majority of plans have a rate based on 10 years or shorter term
- Value of prior plan, including early retirement values and survivor benefit, preserved at time of conversion in account balance
  - All employees immediately start earning additional benefit accruals

### Important Perspectives on Conectiv's New Retirement Program

- Prior retirement plan formula continues for 10 years for broader group of employees than most employers cover
  - Age 35 or 35 years of service
  - Get better of prior plan or new formula
- Conversion of old prior plan formula to opening account included generous features
  - Early retirement subsidy included
  - Survivor benefit value included, even in single employees

Conectiv
July 1999
Page 2

MWW00220

B 32

A - 66

## Basics of New Conectiv Cash Balance Plan

**Opening Balance**

- Fair value of prior plan benefit earned through 1998
- Determined using 7% long-term rate for conversion and includes value of early retirement benefit and spouse death benefit
- You immediately begin to earn additional retirement benefits

**Employee Contributions**

- You are neither required nor permitted to contribute your own money to the plan
- You can contribute more money in your 401(k) plan

## Basics of New Conectiv Cash Balance Plan

**Conectiv Contributions**

- Conectiv credits your account at the end of each year with a promised percentage of your total pay
- Contribution amount will be at least 5% of your total pay and increases up to 10% as your age
  - Continues as long as you remain employed
- Total pay includes your base pay or salary, overtime, shift differential and bonus
- Additional annual contributions will be credited to your account if you had at least 10 years of service by the end of 1998
  - Continues until you have 30 years of service

## Basics of New Conectiv Cash Balance Plan

**Account Earnings**

- Your account will be credited with interest at the end of each year based on the rate for the 30-year U.S. Treasury bond

**Account Balance Protection**

- The value of your account balance is guaranteed by Conectiv and the Pension Benefit Guaranty Corporation

**Contribution Protection**

- If you were either age 50 or had 20 years of service by January 1, 1999, you continue to earn pension benefits under your prior retirement formula for next 10 years of continued service

## Basics of New Conectiv Cash Balance Plan

**Entitlement To Your Account**

- You are fully vested in your account balance and all future Conectiv contributions and earnings credited to your account once you have completed five years of service
- You may withdraw the full value of your account when you leave Conectiv for any reason if you are vested in your account
  - No waiting until early retirement age to receive account
  - Value is capped at 100% of final average pay
  - Can roll over to IRA

## Basics of New Conectiv Cash Balance Plan

**Right To A Monthly Pension**

- If you don't want to withdraw your account in a lump sum, you may elect to receive a monthly pension as you could under the prior plan
  - Monthly pension will be better of monthly pension you are entitled to under prior plan (including grandfather protection if applicable) or provided as a lifetime benefit by your cash balance plan account

**Death Benefit**

- If you are vested and die, your entire account balance will be paid to your spouse or other designated beneficiary

## Calculation of Conectiv Opening Cash Balance

**Opening Balance—Delmarva**

- 60-month average of earnings from 1994 through 1998
- Credited years and months of benefit service from date of hire to December 31, 1998
- Delmarva accrued benefit is greater of:
  - (1.3% of 60-month average earnings) x (credited benefit service)
  - (1.3% of 60-month average earnings up to the monthly average of the Social Security Wage Base over the last 35 years) x (credited service) + (1.8 of 60-month average earnings over the average Social Security Wage Base) x (credited service)

Conectiv
- July 1999
Page 3

*Date 12/48 age 49  average pay*

MWW00221

B 33

**Calculation of Conectiv Opening Cash Balance**

Opening Balance—Atlantic

- 60-month average of earnings from 1994 through 1998
- Credited years and months of benefit service from date of hire up to December 31, 1998
- Atlantic accrued benefit is:
  - [1.6% of 60-month average earnings] x (credited years and months of benefit service)
  - Service capped at 30 years if hired after January 1, 1988

---

**Calculation of Conectiv Opening Cash Balance**

Early Retirement Subsidy—Delmarva

- Benefit is payable without reduction at Normal Retirement Age = 65
- Eligible for early payment of benefit as early as age 55 with 15 years of service
- Benefit is reduced for payment earlier than 65 as follows:
  - 6% reduction (6%) at ages 59-64
  - 18% reduction (18%) at age 58
  - 13% reduction (13%) at age 57
  - 33% reduction (33%) at age 56
  - 34% reduction (34%) at age 55
- No reduction at age 60 and above if credited service is 30 years or more

---

**Calculation of Conectiv Opening Cash Balance**

Early Retirement Subsidy—Atlantic

- Benefit is payable without reduction at Normal Retirement Age = 65
- Eligible for early payment of benefit as early as age 55 with 5 years of service
- Benefit is not reduced for payment earlier than 65

---



---

**Calculation of Conectiv Opening Cash Balance**

Spouse Death Benefit—Delmarva

- Delmarva pays spouse death benefit at no charge to employee
- Generally, a spouse death benefit is worth 8% to 10% in married employees
- For opening account balances, Conectiv has provided a 13% death benefit for all employees, regardless of whether or not they were married on December 31, 1998

---

**Calculation of Conectiv Opening Cash Balance**

Present Value

- Interest rate used to determine present value is 7%
- Value of benefit is determined at earliest retirement age (or current age if later)
- Value of benefit is discounted back to current age, if applicable

Conectiv
July 1999
Page 4

MWW00222

B 34

A - 68

**Calculation of Conectiv Opening Cash Balance**

Example

- Current age = 40; Credited benefit service = 10 years

  1998 pay = $39,000

  1997 pay = $37,000

  1996 pay = $35,000

  1995 pay = $33,000

  1994 pay = $31,000

  Average pension earnings = $34,800

  60-month average earnings = $2,900

---

**Calculation of Conectiv Opening Cash Balance**

Example

- Delmarva monthly accrued benefit is greater of:
  - (1.3% of $2,900) x (10 years) = $435
  - (1.3% of $2,304 [monthly average of $2,468]) x (10 years) +
    (1.6% of $596 [excess of $2,900 over $2,304]) x 10 years = $396
- Atlantic monthly accrued benefit is greater of:
  - (1.3% of $2,900) x (10 years) = $464

---

**Calculation of Conectiv Opening Cash Balance—Delmarva**

- Value of accrued benefit at age 55 (age eligible for early retirement)
  - Monthly accrued benefit = $435
  - Times the annuity factor = 141.8572
    (Value of benefit at age 55, assuming benefit is paid monthly from age 55 until death using current annuity assumptions and 7% interest)
  - Times early retirement factor = $.50
    (Reduction applies at earliest retirement age, 55, assuming continued service)
  - Times spouse death benefit factor = 1.13
  - Equals $63,284
- Discount age 55 value back to current age
  - 15 years discount from earliest retirement age (55) to current age (40)
  - $63,284 ÷ 2.759032 = $46,100

---

**Conectiv Cash Balance Account vs. Prior Plan—Delmarva**

| Current Age | Credited Service | Current Pay | Value of Benefits (in $ Thousands) | |
|---|---|---|---|---|
| | | | Cash Balance Plan | Prior Balance Plan |
| | | | 6 | 6 |
| 30 | 5 | 40 | 9 | 8 |
| 40 | 10 | 45 | 46 | 30 |
| 50 | 20 | 50 | 145 | 100 |
| 55 | 25 | 55 | 200 | 200 |
| 60 | 30 | 60 | 445 | 500 |

---

**Calculation of Conectiv Opening Cash Balance—Atlantic**

- Value of accrued benefit at age 55 (age eligible for early retirement)
  - Monthly accrued benefit = $464
  - Times the annuity factor = 141.8572
    (Value of benefit at age 55, assuming benefit is paid monthly from age 55 until death using current annuity assumptions and 7% interest)
  - Times early retirement factor = 1.0
    (Reduction applies at earliest retirement age, 55, assuming continued service)
  - Equals $65,784
- Discount age 55 value back to current age
  - 15 years discount from earliest retirement age (55) to current age (40)
  - $65,784 ÷ 2.759032 = $23,845

---

**Conectiv Cash Balance Account vs. Prior Plan—Atlantic**

| Current Age | Current Service | Current Pay | Value of Benefits (in $ Thousands) | |
|---|---|---|---|---|
| | | | Cash Balance Plan | Prior Atlantic Plan |
| | | | 6 | 6 |
| 30 | 5 | 40 | 9 | 10* |
| 40 | 10 | 45 | 10 | 10** |
| 50 | 20 | 50 | 145 | 100** |
| 55 | 25 | 55 | 200 | 200 |
| 60 | 30 | 60 | 200 | 200 |

Conectiv
July 1999
Page 5

---

B 35

MWW00223

A - 69

**Conectiv Cash Balance Going Forward**

Accrual of Account Balance
- Conectiv contributes 3% to 10% of pay less your account at the end of each year
- Contribution amount dependent on age each year
  - Up to age 29 — 3%
  - Age 30-34 — 5%
  - Age 35-39 — 7%
  - Age 40-44 — 8%
  - Age 45-49 — 9%
  - Age 50 and over — 10%

**Conectiv Cash Balance Going Forward**

Accrual of Account Balance
- Additional transition contributions made at the end of the year if you had 10 years of service on December 31, 1998
- Transition contribution accrual dependent on service on December 31, 1998
  - Service less than 10 years — 0%
  - Service of 10-11 years — 1%
  - Service of 12-16 years — 2%
  - Service of 16-19 years — 3%
  - Service of 20 years or more — 4%
- Account balance is credited with interest at the end of each year
  - Interest based on the rate for 30-year Treasury bonds—5.07% in 1999

**Conectiv Cash Balance Going Forward**

Example
- Current age = 40; 1999 pay = $40,000
- BOY account balance = $20,000; credited service on 12/31/1998 = 10 years
- EOY account balance is the sum of:
  - Conectiv annual contribution = $3,200 (8% of $40,000)
  - Transition contribution = $400 (1% of $40,000)
  - Interest credit for one year = $1,002 ($20,000 times 5.01%)
- Equals $24,602

**The Vanguard Group—Your Retirement Plan Administrator**

- Who we are
  - You know us—We're recordkeeper and investor for Conectiv Savings and Investment 401(k) Plan
    - As of July we're also recordkeeper for Cash Balance Plan

**Vanguard Advantages**

- "One-stop resource" for 401(k) and Cash Balance questions
- Participant Services can help with both plans at 1-800-523-1188
- Recordkeeper for PAYSOP/ESOP Plan

**401(k)/Cash Balance Difference**

- Important note: with Cash Balance, you cannot
  - Direct investments
  - Take loans
  - Contribute
  - Annual statement vs. quarterly with 401(k) (cash balance statement only changes annually)
  - Next annual Cash Balance statement comes from Vanguard—sent April

Conectiv
July 1999
Page 6

MWW00224

B 36

**Retirement Plan Services Through Vanguard**

- Request cash balance estimates at retirement and future projections
- Request a benefit estimate
  - Initially 24t takes 10-15 days for written estimate
  - In early 2000, estimates online and by mail in 2 days

**Retirement Plan Services Through Vanguard**

- Notices sent for vested, accrued benefits and cash balance upon termination
- Payout options and paperwork
  - Lump sum
  - Roll over to an IRA
  - Spousal consent forms
- Notification at age 65 with payout information and paperwork
  - Note: Keep address current with Conectiv Human Resource Service Center

**Retirement Plan Services Through Vanguard**

- Plan Information:
  - Plan provisions
  - Payout options
  - Eligibility
  - Vesting

Conectiv
July 1999
Page 7

MWW00225

B 37

A - 71

```
00001
  1            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
  2          CIVIL ACTION NO. C.A. NO. 05-702(SLR)
  3     ----------------------------------
        J. MICHAEL CHARLES; MAURICE W.
  4     WARD, JR.; and JOSEPH I. FINK, JR.,
        on behalf of themselves and all
  5     others similarly situated,
  6              Plaintiffs,
  7          v.
  8     PEPCO HOLDINGS, INC.; CONECTIV, and
        PEPCO HOLDINGS RETIREMENT PLAN,
  9
                 Defendants.
 10     ----------------------------------
 11
 12
                 Philadelphia, Pennsylvania
 13              Tuesday, March 13, 2007
 14
 15
                 TRANSCRIPT of testimony of JAMES R.
 16
        KREMMEL, as taken by and before Sean M. Fallon, a
 17
        Registered Professional Reporter and Notary Public
 18
        of the Commonwealth of Pennsylvania, at the offices
 19
        of PEPPER HAMILTON LLP, 3000 Two Logan Square,
 20
        Eighteenth and Arch Streets, commencing at
 21
        o'clock in the forenoon.
 22
 23
 24
```

SHEET 9   PAGE 30

00030

```
 1              Were you privy to any of the
 2  discussions over whether it should be five-year
 3  grandfathering or ten-year grandfathering or some
 4  other basis?
 5       A.     Not that I recall, sir.
 6       MR. MALONE:  Could you mark that as
 7  Plaintiffs-2.
 8              (Exhibit P-2 is marked for
 9  identification.)
10  BY MR. MALONE:
11       Q.     The court reporter has handed you a
12  document which we've marked Plaintiffs-2 for
13  identification purposes.  The first page is headed
14  "Conectiv Minutes of the Personnel and Compensation
15  Committee," and bears the date of April 23, 1998.
16              Why don't you take a moment to
17  review Plaintiffs-2 and then I'll ask you a few
18  questions about it.
19       A.     Okay, I'm ready, sir.
20       Q.     Have you seen Plaintiffs-2 before?
21       A.     Yes, I have.
22       Q.     When do you first recall seeing
23  Plaintiffs-2?
24       A.     I recall first seeing it -- would
```

PAGE 31

00031

```
 1  have been probably late April, 1998, is when I
 2  would have first seen this document.
 3       Q.     And we had discussed earlier the
 4  timing when the decision to go forward with the
 5  cash balance plan was made, and I think, to
 6  summarize your testimony -- not put words in your
 7  mouth -- you had suggested that March or April was
 8  the relevant time frame when the final decision to
 9  adopt the cash balance plan was made.
10              Does this refresh your recollection
11  as to the timing of that decision?
12       A.     Yes, it does.
13       Q.     To your understanding, is
14  Plaintiffs-2 minutes summarizing the meeting at
15  which the decision to adopt the cash balance design
16  was made?
17       A.     That's my understanding, yes.
18       Q.     Let me direct your attention to --
19  Mr. Cain and Mr. Wilkinson are listed in the
20  minutes.
21              Do you see that?
22       A.     Yes, I do.
23       Q.     Did you discuss the meeting that is
24  summarized in Plaintiffs-2 with Mr. Cain?
```

PAGE 32

00032

```
 1       A.     I don't recall discussing the
 2  meeting.
 3       Q.     How about Mr. Wilkinson?
 4       A.     Nor do I recall.
 5       Q.     Did you offer any assistance to them
 6  in preparing for a meeting with a committee of the
 7  board to discuss the cash balance plan?
 8       A.     Not to my recollection.
 9       Q.     You were working as part of the
10  Total Rewards team in April, 1998, is that correct?
11       A.     Yes, I was.
12       Q.     Did you help either Mr. Cain or Mr.
13  Wilkinson prepare for any meeting with a committee
14  of the board as part of that work?
15       A.     I do not recall directly assisting
16  in that -- them in that, no.  No, I do not.
17       Q.     Did you discuss with Mr. Wilkinson
18  or Mr. Cain their preparation for such a meeting?
19       A.     I do not recall any such
20  conversations.
21       Q.     Let me direct your attention to the
22  second page of Plaintiffs-2, which bears the
23  designation PHI 1585.  I'd like to focus your
24  attention on the first full paragraph, which starts
```

PAGE 33

00033

```
 1  "Mr. Wilkinson stated that the long-term goal of
 2  management."
 3              Do you see that, sir?
 4       A.     Yes, I do.
 5       Q.     Were you familiar with what the
 6  overall goals management had for benefit costs were
 7  in or about April of 1998?
 8       A.     I recall these numbers.
 9       Q.     They seem accurate to you?
10       A.     Yes, they do.
11       Q.     Would those numbers represent an
12  increase or decrease from the existing cost
13  structure?
14       A.     To the best of my recollection, it
15  was -- it was approximately equal to the existing
16  cost structure.  To the best of my recollection.
17       Q.     Let me direct your attention to what
18  appears to be an attachment to the minutes which
19  are P-2.  It starts at 1588.  The document entitled
20  "Conectiv Compensation and Benefits."
21              Do you know who authored this?
22       A.     Ben Wilkinson's name is on the
23  document, so I would presume it was prepared by Mr
24  Wilkinson.
```

A - 73

SHEET 11  PAGE 38

00038

1   audience for this document was the nonrepresented
2   employees in Atlantic and Delmarva at the time.
3       Q.    And, by "nonrepresented," you mean
4   those that are not unionized?
5       A.    Not represented by a Collective
6   Bargaining Agreement, yes.
7       Q.    Do you know how it was disseminated?
8       A.    From it's appearance, sir, this
9   appears to, again, have been -- would have been
10  printed by the company and distributed hard copy.
11  That's my -- that's how I believe it was
12  distributed.
13      Q.    Do you recall if you got a copy of
14  this in or about early 1998?
15      A.    I don't specifically recall, no.
16      Q.    Do you have an understanding what
17  the purpose of disseminating Plaintiffs-3 was?
18      A.    Yes.
19      Q.    What was the purpose, to your
20  understanding?
21      A.    As part of the ongoing broad
22  communications to the employees of the company
23  about the roll-out of the new Total Rewards
24  program.  This was just one of the many components

PAGE 40

00040

1   conclusion?
2       A.    Because, on the last page, which is
3   PHI 0033, at least on my copy -- there may be a
4   last digit that's missing --
5       Q.    It's cut off there.
6       A.    In any case, the top of the page
7   reads "Total Rewards Communication Plan."  This is
8   just a partial extract of the overall
9   communications plan for the Total Rewards program
10  and identifies this as the third Facts Newsletter
11  and that it would be distributed in April or May of
12  1998.
13      Q.    And if I could send you back to
14  Plaintiffs-3 for a minute, which was the last
15  document we were looking at, Plaintiffs-3 was
16  issued prior to Defendants-5, is that correct?
17      A.    That would be -- to the best of my
18  knowledge, I believe that's correct, yes.
19      Q.    Let's go back to Defendants-5.
20  That's the only question I have for you on
21  Plaintiffs-3.
22           We were looking at a timeline on the
23  last physical page of Defendants-5.  And this
24  timeline -- first, to your knowledge, does it

PAGE 39

00039

1   that were rolled out as part of those
2   communications.
3       Q.    I'm handing you, sir, what we
4   previously marked as Defendants Exhibit 5 for
5   identification purposes.  This is another document
6   known as Facts, F-a-c-t-s.
7       A.    Okay, I'm prepared.
8       Q.    Have you seen it before?
9       A.    Yes, I have.
10      Q.    To the best of your recollection,
11  what's the first time that you saw Defendants-5?
12      A.    It would have been in April of 1998.
13      Q.    And do you know when this document
14  was issued?
15           This document being D-5.
16      A.    The specific date?  I do not.
17      Q.    Are you able to give me some
18  reasonable estimate, based on your knowledge, of
19  when it was issued?
20      A.    Yes, I am.
21      Q.    Could you do so, please.
22      A.    It would have been sometime in April
23  or May of 1998.
24      Q.    And what leads you to draw that

PAGE 41

00041

1   appear reasonably accurate?
2       A.    Yes, it does.
3       Q.    It indicates that Defendants-5 is
4   the third Facts Newsletter, is that correct?
5       A.    Yes.
6       Q.    Okay.
7       Q.    Do you know when the first Facts
8   Newsletter was issued?
9       A.    Can I look back in the pile?
10      Q.    Sure.  Absolutely.
11           Let the record reflect that the
12  witness is reviewing some of the documents
13  previously marked either at this deposition or
14  during the deposition of plaintiff.
15      A.    Could you repeat your question?
16           MR. MALONE:  Can you read it back,
17  Sean.
18           (Pertinent portion of the record is
19  read.)
20           THE WITNESS:  I do not know
21  specifically when the first Facts Newsletter was
22  issued, no.
23  BY MR. MALONE:
24      Q.    Can you give me a reasonable

SHEET 12    PAGE 42

00042

1 estimate, to the best of your present recollection?
2        A.    To the best of my recollection, it
3 would have been sometime between -- sometime
4 between the fall of 1997 and the spring of 1998.
5        Q.    Focusing in on Defendants Exhibit 5,
6 did you have a role in preparing Defendants-5?
7        A.    To the best of my recollection, I
8 did have a role in preparing this document.
9        Q.    And what was your role?
10       A.    As part of the reviewing the content
11 of the information as part of the Total Rewards
12 team, and preparing it for printing and
13 distribution.
14       Q.    Who was responsible for the overall
15 content?
16       Q.    Who ultimately was responsible for
17 the overall content?
18       Q.    Let me withdraw that and try to --
19 who wrote it?
20       A.    I don't recall specifically who
21 wrote it.
22       Q.    Do you remember who you conveyed
23 information to for the purposes of preparation of
24 D-5?

PAGE 43

00043

1        A.    I believe -- I guess that's not the
2 right way to answer it.
3        To the best of my recollection, it
4 was individuals with the company's corporate
5 communications team that would have supported the
6 Total Rewards project team.
7        Q.    So these were not HR people?
8        A.    That actually did the writing?
9        No.    They would have been
10 professional communicators.
11       Q.    This was reviewed and approved by
12 the HR department before it was issued?
13       A.    That is correct.
14       Q.    Who was responsible at that time for
15 reviewing employee communications with respect to
16 the Total Rewards program?
17       A.    At that time, sir, there would have
18 been multiple individuals who would have reviewed
19 it. I don't recall exactly when I became manager
20 of benefits specifically, but I would have reviewed
21 it, the manager of compensation and benefits would
22 have reviewed it, and the vice-president of human
23 resources for the company would have reviewed it at
24 this point.

PAGE 44

00044

1        Q.    As of April of 1998, who was the
2 manager of compensation and benefits?
3        A.    I believe at that point it was still
4 Ben Wilkinson.
5        Q.    And who was the vice-president of
6 human resources?  Mr. Cain?
7        A.    At that point it was Don Cain, yes.
8        Q.    Anyone else in the chain of command
9 that would have been responsible for reviewing and
10 approving D-5?
11       A.    Other than, as I previously
12 mentioned, probably at this point most of the
13 project team would have seen it -- at least seen
14 the draft and had had an opportunity to comment.
15       Your question was chain of command.
16 There would have been no one else in the chain of
17 command that I recall.
18       Q.    Thank you, sir.
19       Q.    Do you know how this was
20 disseminated?
21       A.    This would have been, again, printed
22 internally by the company and delivered -- this
23 individual document was delivered to individuals'
24 homes -- it was mailed to their homes.

PAGE 45

00045

1        Q.    How do you know that?
2        A.    On, again, the last page of the
3 document, PH -- the document -- it reads to me, PH
4 0033, it's franked with -- for U.S. postage and has
5 an address on it.
6        Q.    In or about April of 1998, did the
7 company keep records when it made mailings of
8 benefits information to employees?
9        A.    The company kept a copy of what was
10 mailed.
11       Q.    Did it keep a log that would tell
12 you the date that it was mailed?
13       A.    Not to the best of my recollection,
14 no.
15       Q.    Okay.
16       Mr. Kremmel, I've handed you what's
17 previously been marked as D-6 for identification
18 purposes.  It's a multipage document that bears the
19 date of December 21, 1998, and is headed, "Dear
20 Conectiv Management Employee."
21       Why don't you take a moment to
22 review it and then I'll ask you a few questions
23 about it.
24       A.    Okay.

A - 75

SHEET 45  PAGE 174

```
00174
 1  that, sir?
 2       A.    I do.
 3       Q.    Do you know Mr. Connelly?
 4       A.    I did know him, yes.
 5       Q.    Are you familiar with his signature?
 6       A.    Yes, I am.
 7       Q.    And is that his signature that
 8  appears there?
 9       A.    To the best of my recollection, yes.
10       Q.    And it also appears a second time as
11  secretary?
12       A.    Yes.
13       Q.    Can you tell me what P-14 is?
14       A.    To the best of my knowledge, it is
15  the Delmarva Power & Light Company Retirement
16  Plan plan document.
17       Q.    To the best of your knowledge, is
18  this the plan document that was controlling
19  immediately preceding the time when the Conectiv
20  cash balance sub-plan became effective?
21       A.    Yes.
22       Q.    I think you had said Mr. Cain left
23  the company in 2002?
24       A.    To the best of my recollection, yes.
```

PAGE 175

```
00175
 1       Q.    Did he retire?
 2       A.    He did.
 3       Q.    Had he reached normal retirement
 4  age?
 5       A.    Not to my recollection.
 6       Q.    Did he take another position after
 7  he left, to your knowledge?
 8       A.    With Pepco Holdings?
 9       Q.    With any other company.
10       A.    I'd have no idea what Don has done.
11       Q.    Have you spoken with him since he
12  left?
13       A.    I have.
14       Q.    When was the last time you chatted
15  with him?
16       A.    I would guess about -- that phrase,
17  I'm sorry.  Approximately nine months ago.
18       Q.    What was the context?
19       A.    We had breakfast.
20       Q.    Did you discuss the litigation in
21  any way?
22       A.    Did not.
23       Q.    Ben Wilkinson, do you know when he
24  left the company?
```

PAGE 176

```
00176
 1       A.    I do not.
 2       Q.    Do you know anything about the
 3  circumstances that led him to leave?
 4       A.    I do not.
 5       Q.    Do you know whether he was fired?
 6       A.    I do not.
 7       Q.    When was the last time you spoke
 8  with Mr. Wilkinson?
 9       A.    I don't recall the last time I spoke
10  to Mr. Wilkinson.
11       Q.    Have you spoke to him since he left
12  the company?
13       A.    To the best of my recollection, the
14            MR. MALONE:  That's all I have for
15  you right now, subject to whatever examination your
16  counsel may have.
17            MS. YU:  I just have a couple of
18  questions.
19            MR. MALONE:  Sure.
20  EXAMINATION
21  BY MS. YU:
22       Q.    If you could take a look at Exhibit
23  D-5.
24       A.    Okay.
```

PAGE 177

```
00177
 1       Q.    And, while we are looking for
 2  exhibits, and P-2.
 3       A.    Okay.
 4       Q.    Mr. Kremmel, you had indicated in
 5  your earlier testimony that you understood that the
 6  timing of the distribution of D-5, which was the
 7  third Facts Newsletter, was in April or May of
 8  1998.
 9       A.    That's correct.
10       Q.    So -- and then we also have P-2,
11  which are the minutes of the Personnel and
12  Compensation Committee, dated April 23, 1998.
13            Did the third Facts Newsletter go
14  out before or after the meeting on April 23, 1998?
15       A.    To the best of my recollection, the
16  third Facts Newsletter would have gone out after
17  the meeting on April 23rd of '98 of the Board of
18  Directors.
19       Q.    Would you take a look back at the
20  10-Q.
21       A.    Okay.
22       Q.    Now, I understand that you were not
23  personally involved in drafting the description of
24  the cash balance plan litigation that's contained
```

A - 76