CONECTIV

## MINUTES OF THE PERSONNEL AND COMPENSATION COMMITTEE

Wilmington, Delaware, April 23, 1998

Pursuant to notice, a meeting of the Personnel & Compensation Committee was held beginning at 9:30 a.m. at the principal office of the Company, 800 King Street, Wilmington, Delaware.

| | |
|---|---|
| Present and constituting a quorum: | Directors Gore, McGlynn and Morgan. |
| | Director Emery participated by telephone call. |
| | Director Cosgrove also participated in the meeting. |

Chairman Gore presided.

Donald E. Cain, Vice President - Human Resources and Performance Improvement and Benjamin Wilkinson, Manager, Compensation & Benefits Consulting also participated in the meeting.  Moira K. Donoghue acted as Secretary.

The Chairman called the meeting to order, introduced Mr. Cain and Mr. Wilkinson and confirmed that Director Emery could hear the conversation and that the other persons present could hear Director Emery.  She then referred to materials that had been previously distributed to the Committee members.

The Chairman then called on Mr. Cain who reviewed the philosophy and approach for employee benefits at Conectiv, with an emphasis on
1. the ability to tailor benefit costs to the needs of individual lines of business
2. the interest in being able to move employees among the lines of business
3. the interest in being competitive both in cost and attractiveness to employees.

Mr. Cain then stated that the proposed benefit program was designed to be at approximately the median of the competitive marketplace, defined as regional employers in general industry.  He stated that management proposed to phase in the program, first with management employees and later, following negotiations, with represented employees.  He acknowledged that this creates a risk related to the reaction of management employees who will be the first to feel the effect of the changes but stated that this risk could be managed in light of the cost savings to be realized from the new program.  Finally, he stated management's commitment to continually review the



appropriateness of the program to the Company's business objectives and to employee interests.

Mr. Wilkinson stated that the long-term goal of management was to have the overall benefit cost at 35 - 36% of pay, which is the general industry standard. He then reviewed the details of the program on a plan by plan basis, specifically:

Management of the Company recommends that the Compensation Committee approve the adoption of a Cash Balance Pension Plan, 401(k) Plan and Welfare Benefit Program for employees and retirees of participating subsidiaries of Conectiv.

First, it is recommended that a cash balance pension plan be adopted to replace the existing traditional defined benefit pension plans of Delmarva Power and Atlantic Energy. The cash balance design is viewed as more appropriate for attracting and retaining employees in a more mobile and independent workforce.

Second, it is recommended that a 401(k) plan be adopted to replace the current 401(k) plans of Delmarva Power and Atlantic Energy. The new plan will be administered by The Vanguard Group, the Trustee, and will offer a broader variety of investment options and a Company matching contribution of 50% on up to the first 6% of an employee's base pay in the form of Conectiv common stock.

Third, Management recommends that a competitive package of welfare plans be offered to all employees including a new flex program that will include multiple options for medical, prescription, dental, vision, life insurance, accidental death and dismemberment coverage and Choice Rewards (e.g., pre-paid legal, cancer insurance, and other non-traditional choices). In addition, employees will be given the option of flexible spending accounts (i.e., both health care and dependent care). Finally, such welfare plans will also include a competitive package of other programs, each with an effective date as indicated in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

Fourth, Management recommends that a post-retirement medical plan and life insurance plan be adopted, effective January 1, 1999. Both plans will have coverage similar to the current plans of Delmarva Power and Atlantic Energy. One additional option will provide opportunity for employees retiring as early as age 50 to receive retiree medical coverage at age 55.

All of the above-mentioned changes will be effective for management employees as indicated in the Attachment and all such changes will be effective for employees represented by IBEW Local Nos. 210, 1238 and 1307 if and when negotiated with each Local, respectively.

Discussion among the Committee members followed the presentation, with a specific focus on ways to control growth in medical plan costs and have employees feel

000008

responsibility to manage those costs and on management's strategy for negotiating these changes with the unions.

Chairman Cosgrove stated that at a future meeting of the Committee management would present for discussion a set of principles to guide future benefit design based on comparative data with other employers in general industry. In addition, members of the Committee requested management to review alternatives in several specific areas of design for future consideration.

Mr. Cain referred specifically to one of the resolutions before the Committee that permits the Vice President - Human Resources and Performance Improvement to make changes in benefit plans and programs from time to time to maintain their competitiveness and respond to business and employee interests, subject to the responsibility of the Committee and the Board of Directors with respect to material amendments to employee benefit plans. The Committee acknowledged the advisability of management having this authority, subject to the understanding that material amendment could occur through a series of smaller, unrelated changes that in themselves are not material.

Following further discussion, on motion duly made, seconded and unanimously adopted it was

RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv Cash Balance Pension Plan with respect to Management employees, effective January 1, 1999, in substantially the same form presented in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv 401(k) Savings Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Welfare Benefits Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Post-Retirement Medical Plan and Retiree Life Insurance Plan for Conectiv, effective January 1, 1999, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Vice President of Human Resources and Performance Improvement be, and hereby is, authorized to negotiate or cause to be negotiated with representatives of IBEW Local Nos. 210, 1238 and 1307 inclusion in any or all of the plans and programs mentioned in the above resolutions and to extend the same or similar terms and conditions of such plans and programs, in whole or in part, to employees represented by such Locals as he deems appropriate.

000009

responsibility to manage those costs and on management's strategy for negotiating these changes with the unions.

Chairman Cosgrove stated that at a future meeting of the Committee management would present for discussion a set of principles to guide future benefit design based on comparative data with other employers in general industry. In addition, members of the Committee requested management to review alternatives in several specific areas of design for future consideration.

Mr. Cain referred specifically to one of the resolutions before the Committee that permits the Vice President - Human Resources and Performance Improvement to make changes in benefit plans and programs from time to time to maintain their competitiveness and respond to business and employee interests, subject to the responsibility of the Committee and the Board of Directors with respect to material amendments to employee benefit plans. The Committee acknowledged the advisability of management having this authority, subject to the understanding that material amendment could occur through a series of smaller, unrelated changes that in themselves are not material.

Following further discussion, on motion duly made, seconded and unanimously adopted it was

RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv Cash Balance Pension Plan with respect to Management employees, effective January 1, 1999, in substantially the same form presented in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv 401(k) Savings Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Welfare Benefits Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Post-Retirement Medical Plan and Retiree Life Insurance Plan for Conectiv, effective January 1, 1999, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Vice President of Human Resources and Performance Improvement be, and hereby is, authorized to negotiate or cause to be negotiated with representatives of IBEW Local Nos. 210, 1238 and 1307 inclusion in any or all of the plans and programs mentioned in the above resolutions and to extend the same or similar terms and conditions of such plans and programs, in whole or in part, to employees represented by such Locals as he deems appropriate.



# C O N E C T I V

# C O M P E N S A T I O N

# A N D

# B E N E F I T S

Ben Wilkinson
April, 1998



PHI001588

A - 81

# CONECTIV COMPENSATION & BENEFITS

## ROLL-OUT STRATEGY

### CONECTIV Flex

- Effective: 7/1/98
- Health Care, Rx, Dental, Vision
- Life Insurance, AD & D
- Current Benefit Levels & "Buy-ups & downs"
- Business Link
  - Flexible by L.O.B.
  - Framework in place
  - Employee Choice, New Work Force
  - Pre-Tax dollars pay premiums

### Choice Rewards

- Effective: 7/1/98
- Provides additional non-traditional choices (ex: cancer insurance, Pre-Paid Legal)
- No cost to CONECTIV
- Vendor manages deductions, payments to vendors & communications

### Cash Balance Pension Plan

- Effective: 1/1/99
- Basic formula is: End of Year Balance = Beginning of Year Balance + Pay Credits + Interest Credits
- Portable - after 5 year vesting
- Improved employee communications
- Survivor receives the "balance"
- Extensive "Grandfathering"
- Transition Credits
- Business Link
  - Useful in Divestitures
  - Can be differentiated by SBU

PHI001589

## Post-Retirement Medical

- Effective: 1/1/99 (with cash balance plan)
- Provides current benefit levels
- Business Link
    - Provides retirement @ 50, with a benefit available at 55

## 401(k)

- Effective: 7/1/98 - Vanguard will administer
- 3% Company match - Paid in CONECTIV stock
- More fund choices
- Business Link
    - "Competitive" Plan design
    - Employee Stock Ownership

- **Others**
    - Holidays
        - 12 (same as current)
        - move to more "floaters" - keep business open (AE Design)
    - Vacation (1/1/99)
        - Essentially same (2 weeks - 6 weeks)
        - Provide flexibility for experienced hires
    - Employee Variable Compensation Plan (In Place)
        - Profit Sharing - for those not in Management Incentive Plans (3% x pay max)
        - Goals vary by SBU - Provide "Line-of-sight:"
    - Work & Family Programs (As approved)
        - Part-time, "work-from-home", HCRA/DCRA, etc.
    - Performance Mgt. System (2nd Qtr. '98)
        - Based on Competencies
    - Educational Assistance (1/1/99)
        - 80-20% cost split
    - Service Emblems (1/1/99)
        - New design, to fit changing workforce
        - Part of a larger "Recognition Kit": available to SBU's

Electronic InSight

To All ADMIN PO Users, All District PO Users, All MAYS LANDING PO Users,
p=CONECTIV;a=CONECTIV;c=US;dda:ZID=Irena.Borro(a)Conectiv.com;

12/22/1998 05:54 PM                                                cc

Subject EXTRA – Benefits policies announced

ELECTRONIC INSIGHT EXTRA
ATTN: CONECTIV MANAGEMENT EMPLOYEES
IMPORTANT BENEFITS INFORMATION

The human resources department released two documents today to help explain
the benefits for management employees for the upcoming year. Both are attached
to this e-mail message.

The first explains the benefits package for Conectiv management employees.
Some of these benefits are new to Conectiv and may be revisited and revised as
we go forward. The second details the cash-balance pension plan. If you have
any questions regarding these documents, please contact the human resources
service center.

If there are Conectiv management employees in your area who do not have
e-mail, please print each a copy of each of these important documents.


Larry Boehm
Conectiv Public Affairs
Phone: 8-220-3024
Fax:  8-220-3141




This Email message and any attachment may contain information that is proprietary, legally privileged, confidential
and/or subject to copyright belonging to Pepco Holdings, Inc. or its affiliates ("PHI"). This Email is intended solely for
the use of the person(s) to which it is addressed. If you are not an intended recipient, or the employee or agent
responsible for delivery of this Email to the intended recipient(s), you are hereby notified that any dissemination,
distribution or copying of this Email is strictly prohibited. If you have received this message in error, please
immediately notify the sender and permanently delete this Email and any copies. PHI policies expressly prohibit
employees from making defamatory or offensive statements and infringing any copyright or any other legal right by
Email communication. PHI will not accept any liability in respect of such communications.

December 18, 1998

TO:     CONECTIV MANAGEMENT EMPLOYEES

FROM:  Human Resources Performance Improvement

### 1999 CONECTIV MANAGEMENT EMPLOYEE POLICIES

Listed below are the 1999 policies for Conectiv Management Employees. These policies are intended for all Conectiv Management employees (defined as those employees who are enrolled in Conectiv Flex Benefits) regardless of whether they were previously with Atlantic Energy or Delmarva. Compensation and Benefits will be reviewing Paid Time Off (PTO) to determine future direction and will communicate the results.

### 1999 Holidays - Effective 1/1/99

Below are the Conectiv 1999 Management Holidays. Management employees can also schedule 4 floating holidays (includes previous Birthday Holiday). Employees will not be paid for any unused floating holidays and are not permitted to carry over these holidays.

| Holiday | Observed On: |
|---|---|
| New Year's Day | Friday, January 1 |
| Memorial Day | Monday, May 31 |
| Independence Day (Sunday 7/4) | Monday, July 5 |
| Labor Day | Monday, September 6 |
| Thanksgiving Day | Thursday, November 25 |
| Friday After Thanksgiving | Friday, November 26 |
| Christmas Eve | Thursday, December 23 |
| Christmas Day | Friday, December 24 |
| | 4 Floating Holidays (to be determined by management discretion) |

### 1999 Vacation Policy - Effective 1/1/99

♦  Employees hired between January 1 and June 30 will receive:
   **One week of vacation after six months of service.**

♦  Employees hired  between July 1 and December 31 will receive:
   **Two weeks of vacation after six months of service**

1

Prior years of service with Delmarva or Atlantic Energy count toward your vacation entitlement. Vacation time may be taken in hourly increments. Currently employees cannot buy or sell vacation time. Employees are eligible to receive vacation as of January 1 of the year in which their service anniversary occurs as follows:

| Yrs. Of Service | Paid Vacation | Yrs. Of Service | Paid Vacation |
|---|---|---|---|
| 1 | 2 weeks | 22 | 4 weeks + 3 days |
| 5 | 2 weeks + 1 day | 23 | 5 weeks |
| 6 | 3 weeks | 27 | 5 weeks + 3 days |
| 14 | 3 weeks + 1 day | 30 or more | 6 weeks |
| 15 | 4 weeks | | |

Banked Vacation (former Delmarva Power management employees): Beginning in 1999, employees will no longer be able to bank vacation weeks for retirement. Any arrangements made before Jan. 1 will be honored. If you have any extra vacation weeks earned in 1998, and you would like to bank them, please contact the Human Resources Service Center by December 31, 1998.

Carryover Vacation (all management employees): If you don't want to use all of your vacation in one year, you may carry over time to the next year. The amount you carry over must be used before regular vacation and cannot exceed your current vacation allotment. Vacation may be carried over after one year of service. Carryover vacation should be scheduled with your manager's approval. You do not have to call Human Resources.

Vacation Eligibility for Part-Time Employees

Employees working part-time (less than 40 hours in a work week) are eligible for one week's vacation (40 hours) after working six months.

Holidays For Part-Time Employees

Part-time employees will be paid only if the Holiday is part of their normally scheduled work week. They are also eligible to receive 16 hours as their Floating Holiday entitlement.

**Long Term Disability (LTD)**

LTD income is provided to employees in the event they are totally disabled by injury or sickness on or off the job. If eligible, employees are automatically covered on the first day of work. Conectiv currently pays the entire cost of benefits. LTD is a termination benefit. Eligibility is determined if an employee has been "totally disabled" for the latter of three consecutive months or the exhaustion of sick leave.

PHI003823

A - 86

Amount of Benefits

LTD benefits pay 66-2/3% of the employee's base monthly salary that was paid at the time the disability occurred. This payment includes disability and retirement payments the employee and family receive from Social Security, Workers' Compensation, retirement plan benefits, earnings continuation from any other employer, group insurance benefits, and other similar benefits. Regardless of other income, the minimum benefit is $50. LTD payments are not adjusted for cost of living increases.

Applying for Benefits

Should disability occur, a claim must be filed within 90 days after total disability begins. Proof of disability must be filed within 90 days after the claim forms are sent. Employees may be required from time to time to continue to submit proof while receiving benefits. To apply or for plan details, call Disability Management at 1-800-204-6141.

**Family Medical Leave Act**

The Family Medical leave Act provides unpaid leave for personal serious medical conditions, caring for family members with serious medical conditions, or for the birth or adoption of a child. The Act provides for 12 weeks in a rolling 12-month period. This allotment can be taken in hours, days, weeks, or in total.

Effective 1/1/99 Conectiv's Family Medical Leave policy will run concurrent with sick leave (for personal illness qualified events). A publication is being developed with additional information on the Act, how to track time, time coding, and administration. In the meantime if you need specific, immediate guidance, please call Disability Management at 1-800-204-6141 or your HR Business Partner.

**Sick Leave**

Employees are eligible for sick leave coverage as soon as employment begins. In the event an employee is temporarily disabled, except for an illness or accident covered by Workers' Compensation, he/she will receive full pay according to the following schedule:

| Years of Service | Days of Sick Leave Per Calendar Year |
|---|---|
| Less than 5 | 50 days |
| 5 but less than 10 | 100 days |
| 10 but less than 20 | 110 days |
| 20 but less than 30 | 120 days |
| 30 or more | 130 days |

PHI003824

A - 87

The amount of sick leave may be extended upon recommendation of line management and approval by Compensation and Benefits. Employees will be required to provide physician notes for extended absences.

### Jury Duty

In 1999, if an employee is called to jury duty or subpoenaed as a witness, employees are eligible to keep the payment they receive while serving on jury duty in addition to their regular pay.

### Perfect Attendance Award

Employees are eligible to receive a Perfect Attendance Award either in the form of cash or one day off with pay. Two levels of awards are granted, depending on the amount of perfect attendance. For one year of perfect attendance, the award is either 1 personal day off with pay or $150 in cash (less taxes). For multiple years, the award is either 1 personal day off with pay plus $100 (less taxes) or $250 (less taxes). If employees choose a cash award, the amount will be included in their regular paycheck. Awards are processed by the Human Resources Service Center.

Perfect Attendance means no full days off for illness, occupational injury, or full days off without pay. This revised program (outlined above) begins in 1999. Any perfect attendance awards earned in 1998 from previous company plans (AE or DP), will be honored in 1999. Employees with multiple years under the old programs will be grandfathered into the new program.

### Funeral Leave

If there is a death in the immediate family, employees are eligible to receive up to four days of paid leave. Depending on circumstances, leave may be extended, with line management's approval.

### Leave of Absence

With line management's approval, employees may be granted a leave of absence, without pay, of one week for each full year of service.

Medical, Dental, Vision, and Life Insurance coverage is continued during a leave of absence, provided payments for these benefits are made by the employee. For more details, contact the Human Resources Service Center at 1-800-201-4718.

PHI003825

A - 88

**Military Duty**

Employees are eligible to receive military leave each calendar year for the purpose of attending training sessions of the National Guard or Reserves. Employees will receive the difference between base pay and military pay for up to two weeks each year.

**1999 Conectiv Severance Plan**

Eligibility

♦ Conectiv employees whose employment is severed as a result of elimination of his/her position or consolidation of his/her position with another position which results in a layoff are eligible benefits under the Severance Plan. Eligibility includes Management employees working as regular full-time employees, excluding part-time or temporary employees, contract employees employed for a specific term or limited contract, or students hired in conjunction with a work-study program.

Plan Provisions:

♦ 2 weeks of pay for each full year of continuous service, with a minimum of 4 weeks pay.

♦ 2 months of Company-paid COBRA benefits if less than 5 full years of continuous service, 6 months after 5 years of service.

♦ 2 months of Company-sponsored career counseling if less than 5 full years of continuous service, 6 months after 5 years of service.

♦ Years of service will be determined using the same approach that is used for pension purposes under the Conectiv Cash Balance Plan.

♦ The amount of severance payment will be based upon the employee's base salary. Forms of variable pay (incentives, spot awards, or other non-base amounts) are excluded.

Questions on any of the above policies should be directed to your respective HR Business Partner or the Human Resources Service Center at 1-800-201-4718.

Kld:1999pol.doc-12/21/98

5

PHI003826

A - 89

December 21, 1998

Dear Conectiv Management Employee,

Beginning January 1, Conectiv will switch to a "cash balance" pension plan as announced earlier this year. In order to provide you with your opening balance, the Company will use your 1998 earnings, which will not be finalized until late January, 1999. At the same time as we are moving to the cash balance pension plan, the Company is outsourcing pension administration to the Vanguard Group, which is also the administrator of Conectiv's 401K plans and PAYSOP plans. Vanguard will verify the conversion calculations, and will then distribute your individual account balances by the end of the second quarter of 1999.

Until individual statements can be prepared, we have created two tables of example calculations so employees can estimate their opening balances. Remember that these tables are examples only, and that your actual cash balances will reflect your particular circumstances. There will be more detailed communications in the Spring. If you have general questions, please hold them until these communications are available. We have included in this letter answers to some general questions about the new program.

If you are at retirement age and are planning to retire in the first quarter of 1999, please call the Human Resources Strategic Business Partner for your area: Pat Duffy, Energy Delivery & Services, at 220-3155; Harold DeJarnette, Supply, at 220-3252; Ben Wilkinson, Shared Services, at 220-3047; and Dave Motil at 250-6020.

We hope this preliminary information is helpful to you.

**Q. What is a "cash balance" pension plan?**
A. Each year the company credits your individual pension account with a cash contribution equal to a percentage of your total pay, including overtime and bonus. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the current cash value of your account is yours. If you leave Conectiv after you have completed five years of service and are vested, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years. At retirement, you can take the money in a lump sum and roll it over, tax deferred, into the investment vehicle you select. Or you can elect to receive lifetime monthly payments, either for yourself, or for you and your spouse. Each year, you'll receive a statement of your pension account showing all transactions and its total balance.

**Q. What are the key components of Conectiv's new cash balance pension plan?**
A. Please see the accompanying "Update of Conectiv Facts," below.

**Q. What are the advantages of cash balance?**
A. Your cash balance pension account is completely portable. In addition, the plan contains increased "beneficiary" benefits: the full value of the account transfers to your spouse, family, or estate in the event of your death. Employees will receive annual statements showing the actual current value of their pension account. These features mean that the cash balance pension plan helps to meet more diverse needs of today's and tomorrow's employees.

**Q. Are there some grandfathering provisions and other transition rules?**
A. You may recall that, as part of the approach taken by management to provide minimal impact on the existing workforce, extensive protections were woven into the new plan for employees approaching the retirement age. Any employee aged 50 or with 20 years of service as of December 31, 1998 is "grandfathered" for ten years after January 1, 1999. This means that when a grandfathered participant retires, the pension is computed both under the old formula and the new one, and the participant receives the greater amount. In addition, retirees choosing the old formula will be able to take a lump-sum distribution of their pension during the 10 year period. These provisions are for the next ten years when the benefits under the old plan are calculated, frozen, and compared at retirement to the cash balance amounts to determine the best benefit for the employee. In addition to the grandfather provision, favorable transition rules apply for longer service employees. This means those employees will get extra annual credits to their accounts during the ten year period.

PHI003827

A - 90

**Conectiv Cash Balance Retirement Plan**
**January 1, 1999 Account Balance Estimate**
**(For employees formerly covered by the ACE Plan)**

| Average Five Year Earnings | Age/Service | | | | | | |
|---|---|---|---|---|---|---|---|
| | 35/10 | 40/15 | 40/20 | 45/20 | 50/20 | 50/25 | 55/25 |
| $30,000 | 14,600 | 30,800 | 41,100 | 57,600 | 80,800 | 101,000 | 141,700 |
| $40,000 | 19,500 | 41,100 | 54,800 | 76,800 | 107,700 | 134,700 | 188,900 |
| $50,000 | 24,400 | 51,300 | 68,500 | 96,000 | 134,700 | 168,300 | 236,100 |
| $75,000 | 36,600 | 77,000 | 102,700 | 144,000 | 202,000 | 252,500 | 354,200 |

**Conectiv Cash Balance Retirement Plan**
**January 1, 1999 Account Balance Estimate**
**(For employees formerly covered by the DP & L Plan)**

| Average Five Year Earnings | Age/Service | | | | | | |
|---|---|---|---|---|---|---|---|
| | 35/10 | 40/15 | 40/20 | 45/20 | 50/20 | 50/25 | 55/25 |
| $30,000 | 11,800 | 24,800 | 33,100 | 46,400 | 65,100 | 81,300 | 114,100 |
| $40,000 | 15,700 | 33,100 | 44,100 | 61,800 | 86,700 | 108,400 | 152,100 |
| $50,000 | 19,700 | 41,300 | 55,100 | 77,300 | 108,400 | 135,500 | 190,100 |
| $75,000 | 29,500 | 62,000 | 82,700 | 116,000 | 162,600 | 203,300 | 285,200 |

**Q. Why are there two charts?**
A. Pension benefits differed between the two merger partners, Atlantic Energy and Delmarva Power, and employees are entitled to the benefits already earned. Opening balances will be different for two hypothetical employees having the same age and length of service, but coming from different companies. But, going forward, future credits to the accounts will be computed in exactly the same manner.

**Q. In general, what are the differences in the two plans?**
A. The main difference is that Atlantic Energy employees could retire at 55 with no reduction in benefit, while Delmarva Power employees could retire at 60 with no reduction in benefit, or at 55 with a 24% reduction in benefit. The Atlantic Energy percentage multiplier is 1.6%, compared to the Delmarva Power 1.5% On the other hand, Delmarva Power employees have an enhanced survivor benefit that Atlantic Energy employees do not have. These differences have been quantified and were used in calculating these tables.

**Q. Are there additional key variables other than earnings, age, and service time to consider when reviewing these charts?**
A. The tables reflect the present value of money. Another factor that may not be as obvious, but that is significant in the opening balance calculation, is your distance from retirement age. So while additional service is important and is reflected as you move from left to right in the chart, it is also significant that you are also moving closer to age 55. The closer you are to age 55 the less the benefit earned to date that must be discounted to compute the opening balance. Or conversely, the younger you are, the more of the benefit must be discounted to compute the opening balance. This is why the initial balances for younger people appear smaller.

Note: This information is intended to be used as a guideline only for eligible employees. The employees eligible for the cash balance pension plan are management employees currently enrolled in Conectiv Flex benefits.

**Update of Conectiv Facts (Originally Published in the Spring of 1998)**

**New Cash Balance Pension Plan**

Until now, employees of both DPL and AE have been covered by what are known as "final pay" pension plans. The "cash balance" pension plan is a new concept that has two important advantages: It's easier to *understand* than the former plans, and it's totally *"portable."* Both these features support our goal of designing a benefits package that meets the needs of today's more independent, more mobile workforce. The new cash balance pension plan will take effect January 1, 1999.

**Benefit Easier to Understand**

The way the new pension works is simple. Each year the company makes a cash contribution equal to a percentage of your total pay, including overtime and bonus, to your individual pension account. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the cash value of your account is yours.

Over the years, as you watch your pension account grow, you'll have a clearer idea of your own financial position. And you'll be able to plan for your future.

**Portability a Plus**

With the new cash balance plan, if you leave Conectiv after you are vested and have completed five years of service, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years.

**Company Contributions and Interest**

Conectiv makes all the contributions to your cash balance pension account. These contributions are based as a percentage of your *total* pay, *including* overtime and bonuses. Contributions increase with age, as shown below. You are not required to contribute to the pension plan.

| Annual Company Pension Contributions | | | |
|---|---|---|---|
| Age[1] | Pension Credit (% of Pay) | Age | Pension Credit (% of Pay) |
| Under 30 | 5% | 40-44 | 8% |
| 30 to 34 | 6% | 45-49 | 9% |
| 35-39 | 7% | 50 and over | 10% |

---

[1] Based on your age as of January 1st; contributions are prorated if you move to a higher age bracket in mid-year.

PHI003829

The company also credits your account with *interest* each year based on the current 30-yr. U.S. Treasury bond rate. This rate changes based on economic conditions. Currently it is 5%. Historically, it has averaged about 8%.

## Conversion to the New Pension Plan

The new cash balance pension plan will cover all Conectiv management employees as of January 1, 1999. Benefits already earned under the former DPL and AE pension plans are *fully protected* and will be converted to an equivalent cash amount. This will form your "starting balance" under the new plan.

Your stating balance will, in essence, provide you with the lump-sum amount you would need today to purchase a lifetime annuity equal to the benefit you've earned to date under your DPL or AE pension plan. The conversion formula will take in account any early retirement and survivor benefits which are part of the current plans.

## Transition Credits with Ten or More Years' Service

If you have completed between ten and 35 years of service with DPL or AE as of January 1, 1999, you will also be eligible for annual *transition credits*. This means the company will contribute an *additional* amount to your pension account *each year*. Your transition credit percentage depends on your completed service as of January 1, 1999, and remains constant until you have completed 35 years of service. At that point, transition credits stop.

| Annual Transition Credits | | | |
|---|---|---|---|
| Service as of 1/1/99 | Transition Credit (% of Pay) | Service as of 1/1/99 | Transition Credit (% of Pay) |
| 10 to 11 years | 1% | 16 to 19 | 3% |
| 12 to 15 years | 2% | 20 years or more | 4% |

For example, if you have completed 13 years of service as of January 1, 1999, the company will make an additional contribution of 2% of your total pay to your account every year until you complete 35 years of service.

## Annual Statements

Each year, you'll receive a personal statement of your pension account which will show the company's contributions (basic amount plus any transition credits), interest credit and total balance, so you'll be able to watch the progress of your account over the years.

## "Grandfather" Protection for Older and Long Service Employees

Of course, many employees have already worked for most of their careers under the former "final pay" pension plans. For this reason, two groups of people will continue to be covered by their former plans for the next ten years. They are employees who, as of January 1, 1999:

- have completed 20 years of service, or
- are age 50 or older.

These "grandfathered" employees will have their pensions calculated under both the former and new plans, and will receive whichever value is greater. As an additional benefit, grandfathered employees have the option to elect a lump sum distribution under the former plan.

## Payment Options at Retirement

The new pension plan also gives you a great deal of flexibility when you retire. You may take the full value of your pension in a single lump sum, which you may then roll over, tax deferred, into the investment vehicle you select. Or you may elect guaranteed lifetime monthly payments for yourself, or for you and your spouse (an "annuity").

## Survivor Benefits

If you die after you are vested but before retirement, the new pension plan provides another advantage to your survivor. Under the former plans, survivor benefits were payable only to the spouse, and then at an amount equal to about *half* of your accrued benefit. With the new plan, the *entire cash value* of your pension account would be paid to your beneficiary who, with your spouse's consent, can be anyone you name.

| A Quick Look at the New "Cash Balance" Pension Plan | |
| --- | --- |
| Company Contributions | Made annually to your account based on a percentage of pay. Age-related percentages range from 5% to 10%. |
| Interest | Credited each year, based on the 30-year U.S. treasury bond rate at the time. |
| Conversion to New Plan | Benefits accrued under DPL and AE pension plans to be converted to a cash equivalent starting balance under new plan. Starting balance also credited with interest annually. |
| Transition Credits | With 10 years of service as of 1/1/99, you receive an additional annual company contribution of 1% to 4% of pay. |
| Vesting | Upon completion of five years of service (including service with DPL and AE). |
| Portability | Totally portable: current value of your account is yours if you leave Conectiv after you are vested. |
| Survivor's Benefit | Full current value of your account is paid to your spouse or beneficiary if you die while actively employed. |
| Payment options at retirement | Lump-sum cash option, or several lifetime monthly payment options (annuities): cash option can be rolled over to an IRA to continue tax deferral. |

Updated 12/21/98

PHI003831

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J. MICHAEL CHARLES; MAURICE W. WARD,   )
JR.; and JOSEPH I. FINK, JR., on        )
behalf of themselves and all others     )
similarly situated,                      )
                                          )
                         Plaintiffs,     )
                                          )   Civil Action
          v.                              )   No. 05-702
                                          )
PEPCO HOLDINGS, INC., CONECTIV, and     )
PEPCO HOLDINGS RETIREMENT PLAN,          )   PAGE 43 IS
                                          )   CONFIDENTIAL
                         Defendants.     )

          Deposition of THOMAS S. TROUP taken
pursuant to notice at the law offices of Pepper
Hamilton LLP, 1313 Market Street, Hercules Plaza,
Fifth Floor, Wilmington, Delaware, beginning at
9:35 a.m. on Friday, January 12, 2007, before Kathleen
White Palmer, Registered Merit Reporter and Notary
Public.

APPEARANCES:
          JOSEPH G. SAUDER, ESQUIRE
          CHIMICLES & TIKELLIS LLP
            One Haverford Centre
            Haverford, Pennsylvania 19041
            for the Plaintiffs
          KAY KYUNGSUN YU, ESQUIRE
          PEPPER HAMILTON LLP
            3000 Two Logan Square
            Philadelphia, Pennsylvania 19103-2799
            for the Defendants
------------------------------------------------------
          WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Thomas S. Troup

5

1    A.    Shikellamy High School, S-h-i-k-e-l-l-a-m-y.

2    Q.    Did you graduate college with a degree?

3    A.    Yes.

4    Q.    What was that degree?

5    A.    Business.

6    Q.    Do you have any other degrees?

7    A.    I have a CPCU, chartered property and casualty

8  underwriter, an insurance designation.

9    Q.    When did you obtain that designation?

10    A.    I think it was 1994.

11    Q.    Who is your current employer?

12    A.    Pepco Holdings, Inc.

13    Q.    Can we refer to Pepco Holdings, Inc., as PHI?

14    A.    That's fine.

15    Q.    How long have you been working for PHI?

16    A.    Twenty-seven years.

17          MR. SAUDER:  Just to clarify, are we

18  referring to PHI as just PHI, just Pepco or Delmarva?

19  If we can just clarify that.

20          THE WITNESS:  PHI and all predecessor

21  companies.

22          MR. SAUDER:  Okay.

23  BY MS. YU:

24    Q.    Thank you.

Thomas S. Troup

30

1    A.    Yes.

2    Q.    Did you access the online information on the

3    intranet from time to time?

4    A.    You mean this type of information?

5    Q.    Any type of information.

6    A.    Company information?

7    Q.    Yes.

8    A.    Some.  You know, yeah.

9    Q.    Did you use it to access information on the

10   cash balance plan?

11   A.    No, not that I remember.

12   Q.    Exhibit D-13 is a compilation of slides.  The

13   first one says "Conectiv Cash Balance Pension Plan"

14   and it's dated July 1999.

15          Do you recall whether these slides were

16   part of the presentation made regarding the cash

17   balance plan in that time frame?

18   A.    It looks like, you know, the type of handout

19   that would have been provided at a, you know, a

20   meeting to go over the cash balance pension plan.

21   Q.    Do you recall attending a meeting on the cash

22   balance plan?

23   A.    Yeah, I attended a meeting, yes.

24   Q.    Was it, to your recollection, the July 1999

Thomas S. Troup

31

```
 1   time frame?

 2      A.   I thought it would have been sooner than that.

 3   If the plan would have been started in 1/1/99, that

 4   they would have had meetings prior to its, you know,

 5   starting.  But, you know, I did attend -- when they

 6   had meetings regarding, you know, benefits or

 7   whatever, you know, I attended those meetings, yes.

 8      Q.   Will you look at MWW-220, which is the second

 9   page of Exhibit D-13?  The first slide on the upper

10   left-hand corner refers to The Wall Street Journal and

11   congressional hearings.  Do you recall that part of

12   the discussion?

13           MR. SAUDER:  I just object to the form,

14   assuming there was a discussion.

15           But you can answer.

16      A.   I don't remember congressional hearings.  I

17   remember the mention of Wall Street Journal articles,

18   and that's -- you know, I don't remember the rest of

19   it.  You know, it's not something that stuck with me

20   from a meeting.

21      Q.   What's your recollection of the discussion

22   about Wall Street Journal articles?

23      A.   That there were companies that, you know, had

24   moved to cash balance pension plans and that, you
```

Thomas S. Troup

32

1    know, the employees had concerns.

2      Q.    Did you do anything to follow up on The Wall

3    Street Journal articles?  Did you look them up on the

4    Internet?

5      A.    No, I didn't do that.

6      Q.    Are there periodicals or newspapers that you

7    read on a regular basis?

8      A.    Typically the local paper.

9      Q.    Which one is that?

10     A.    It would be The News Journal.

11     Q.    Are there any other magazines or periodicals

12   that you read on a regular basis?

13     A.    No, not really.  I watch TV.

14     Q.    Do you watch the news on TV?

15     A.    Excuse m?

16     Q.    Do you watch the news on TV?

17     A.    Occasionally.

18     Q.    Do you read the paper every day or less than

19   every day?

20     A.    Probably several times a week.

21     Q.    How long have you been reading your local paper

22   on a regular basis?

23     A.    You know, ever since we moved to Delaware,

24   probably.

# Redacted

William O. Bates

12/18/1998 10:04 AM

To Maurice W. Ward

cc

Subject Cash Balance Pension Info

Maury here is the Info I have on Cash Balance Pensions FYI

This Email message and any attachment may contain information that is proprietary, legally privileged, confidential and/or subject to copyright belonging to Pepco Holdings, Inc. or its affiliates ("PHI"). This Email is intended solely for the use of the person(s) to which it is addressed. If you are not an intended recipient, or the employee or agent responsible for delivery of this Email to the intended recipient(s), you are hereby notified that any dissemination,

4/10/2007

PHI003832

distribution or copying of this Email is strictly prohibited. If you have received this message in error, please immediately notify the sender and permanently delete this Email and any copies. PHI policies expressly prohibit employees from making defamatory or offensive statements and infringing any copyright or any other legal right by Email communication. PHI will not accept any liability in respect of such communications.

4/10/2007

The Wall Street Journal Interactive Edition

December 4, 1998

## Leader

# 'Cash Balance' Saves Millions, Hides Pitfalls From Workers

**By Ellen E. Schultz and Elizabeth MacDonald**
Staff Reporters of The Wall Street Journal

Largely out of sight, an ingenious change in the way big companies structure their pension plans is saving them millions of dollars, with barely a peep of resistance. Unless they happen to have a Jim Bruggeman on their staff.

Sifting through his bills and junk mail one day last year, Mr. Bruggeman found the sort of notice most people look at but don't spend a lot of time on: His company was making some pension-plan changes.



The company, **Central & South West Corp.**, was replacing its traditional plan with a new variety it said was easier to understand and better for today's more-mobile work force. A brochure sent to workers stressed that "the changes being made are good for both you and the company."

Alone among Central & South West's 7,000 employees, Mr. Bruggeman, a 49-year-old engineer in the Dallas utility's Tulsa, Okla., office, set out to discover exactly how the new system, known as a cash-balance plan, worked. During a year-long quest to master the assumptions, formulas and calculations behind it, Mr. Bruggeman found himself at odds with his superiors, and labeled a troublemaker. In the end, though, he figured out something about the new pension system that few other employees have noticed: For many of them, it is far from a good deal.

But it clearly was, as the brochure noted, good for the company. A peek at a CSW regulatory filing in March 1998, after the new plan took effect, shows that the company saved $20 million in pension costs last year alone. Other government filings revealed that whereas the year before, CSW had to set aside $30 million to fund its pension obligations, after it made the mid-1997 switch it didn't have to pay a dime to fund the pension plan.

### Pension Light

The switch to cash-balance pension plans -- details later -- is the biggest development in the pension world in years, so big that some consultants call it revolutionary. Certainly, many call it lucrative; one says such a pension plan ought to be thought of as a profit center. Not since companies dipped into pension funds in the 1980s to finance leveraged buyouts have corporate treasurers been so abuzz over a pension technique.

Media

But its little-noticed dark side -- one that many companies don't make very clear to employees, to say the least -- is that a lot of older workers will find their pensions cut, in some cases deeply.

So far, only the most financially sophisticated employees have figured this out, because the formulas are so complex. Even the Labor Department and the Internal Revenue Service have trouble with them. So thousands of employees, while acutely aware of how the stock market affects their retirement nest eggs, are oblivious to the effect of this change.

One might get the impression, from the rise of 401(k) retirement plans funded jointly by employer and employee, that pensions are a dead species. In fact, nearly all large employers still have pension plans, because pulling the plug would be too costly; the company would have to pay out

PHI003834

all accrued benefits at once. Meanwhile, companies face growing obligations as the millions of baby boomers move into their peak pension-earning years.

Now, however, employers have discovered a substitute for terminating the pension plan: a restructuring that often makes it unnecessary ever to feed the plan again.

## Pitfalls for Employers

But this financially appealing move has its risks. The IRS has never given its blessing to some of the maneuvers involved. If employers don't win a lobbying battle currently being waged for exemptions from certain pension rules, some of these plans could be in for a costly fix.

In addition, the way employers are handling the transition could result in employee-relations backlashes as more and more older workers eventually figure out they are paying the price for the transformation of traditional pension plans.

In those traditional plans, most of the benefits build up in an employee's later years. Typical formulas multiply years of service by the average salary in the final years, when pay usually is highest. As a result, as much as half of a person's pension is earned in the last five years on the job.

With the new plans, everyone gets the same steady annual credit toward an eventual pension, adding to his or her pension-account "cash balance." Employers contribute a percentage of an employee's pay, typically 4%. The balance earns an interest credit, usually around 5%. And it is portable when the employee leaves.

For the young, 4% of pay each year is more than what they were accruing under the old plan. But for those nearing retirement, the amount is far less. So an older employee who is switched into a cash-balance system can find his or her eventual pension reduced by 20% to 50% or, in rare cases, even more.

This is one way companies save money with the switch. The other is a bit more complicated. Companies can also benefit from the way they invest the assets in the cash-balance accounts.

If the employer promised to credit 5% interest to employees' account balances, it can keep whatever it earns above that amount. The company can use these earnings to finance other benefits, to pay for a work-force reduction, or -- crucially -- to cover future years' contributions. This is why the switch makes pension plans self-funding for many companies.

Although employers can do this with regular pensions, the savings are greater and easier to measure in cash-balance plans. The savings often transform an underfunded pension plan into one that is fully funded. "Cash-balance plans have a positive effect on a company's profitability," says Joseph Davi, a benefits consultant at Towers Perrin in Stamford, Conn. They "could be considered a profit center."

## Motive for the Move

Employers, however, are almost universally reticent about how they benefit. "Cost savings were not the reason the company switched to a cash-balance plan," says Paul Douty, the compensation director at Mr. Bruggeman's employer, CSW. Sure, the move resulted in substantial cost savings, he says, but the company's goal was to become more competitive and adapt to changing times. Besides, he notes, the $20 million in pension-plan savings last year were partly offset by a $3 million rise in costs in the 401(k); the company let employees contribute more and increased its matching contributions.

There is another reason some employers like cash-balance plans: By redistributing pension assets from older to younger workers, they turn pension rights -- which many young employees ignore, since their pension is so far in the future -- into appealing benefits today. At the same time, older workers lose a financial incentive to stay on the job, since their later years no longer can balloon the pension.

Some pension professionals think companies should be more candid. "If what you want to do is get rid of older workers, don't mask it as an improvement to the pension plan," says Michael Pikelny, an employee-benefits specialist at Hartmarx Corp., an apparel maker in Chicago that decided not to install a cash-balance plan.

PHI003835

**Under a Microscope**

Most employees aren't equipped to question what employers tell them. But Mr. Bruggeman was. He had a background in finance, his hobby was actuarial science, he had taken graduate-level courses in statistics and probability, and he knew CSW's old pension plan inside and out. So when the company announced it was converting to a cash-balance plan last year, he began asking it for the documents and assumptions he needed to compare the old pension to the new one.

With each new bit of data, he gained another insight. First, he figured out that future pension accruals had been reduced by at least 30% for most employees. CSW got rid of early-retirement and other subsidies and reduced the rates at which employees would accrue pensions in the future.

Employees wouldn't necessarily conclude this from the brochures the human-resources department handed out. Like most employers that switch to cash-balance plans, CSW assured employees that the overall level of retirement benefits would remain unchanged. But a close reading of the brochure revealed that this result depended on employees' putting more into their 401(k) plans, gradually making up for the reduction in pensions.

At a question-and-answer session on the new plan before it was adopted, Mr. Bruggeman spoke up and told co-workers how their pensions were being reduced. The next day, he says, his supervisor in Tulsa came to his office and told him that CSW management in Dallas was concerned that his remarks would "cause a class-action suit" or "uprising," and said he shouldn't talk to any other employees. He says the supervisor, Peter Kissman, informed him that if he continued to challenge the new pension plan, CSW officials would think he wasn't a team player, and his job could be in jeopardy.

Asked about this, Mr. Kissman says: "In my department I would not tolerate employee harassment. I believe the company feels the same way. Past that, I really can't speak to this issue. It's being investigated by the company."

**A Few Sweeteners**

Employers, aware that switching to cash-balance plans can slam older workers, often offer features to soften the blow. They may agree to contribute somewhat more than the standard 4% of pay for older employees, or they may provide a "grandfather clause." CSW offered both options, saying employees 50 or older with 10 years of service could stay in the old plan if they wished. Mr. Bruggeman, a 25-year veteran, was just shy of 49. He calculated that people in his situation would see their pensions fall 50% under the new plan, depending on when they retired.

Mr. Bruggeman told company officials that the plan wasn't fair to some long-term employees. Subsequently, he says, in his November 1997 performance evaluation, his supervisor's only criticism was that he "spends too much time thinking about the pension plan." A CSW official says the company can't discuss personnel matters.

What bothered Mr. Bruggeman even more was his discovery of one of the least-known features of cash-balance plans: Once enrolled in them, some employees don't earn any more toward their pension for several years.

The reasons are convoluted, but in a nutshell: Most employees believe the opening balance in their new pension account equals the credits they've earned so far under the old plan. But in fact, the balance often is lower.

When employers convert to a cash-balance plan, they calculate a present-day, lump-sum value for the benefit each employee has already earned. In Mr. Bruggeman's case, this was $352,000 -- something he discovered only after obtaining information from the company and making the calculations himself. Yet Mr. Bruggeman's opening account in the cash-balance plan was just $296,000, because the company figured it using different actuarial and other assumptions.

This is generally legal, despite a federal law that bars companies from cutting already-earned pensions. If Mr. Bruggeman quit, he would get the full $352,000, so the law isn't violated. But if he stays, it will take several years of pay credits and interest before his balance gets back up to $352,000.

**'Wearaway'**

Mr. Douty says this happened to fewer than 2% of workers at CSW. But at some companies that switch to cash-balance

plans, far more are affected. At AT&T Corp., which adopted a cash-balance plan this year, many older workers will have to work three to eight years before their balance catches up and they start building up their pension pot again. "Wearaway," this is called. Only if an employee knows what figures to ask for can he or she make a precise comparison of old and new benefits.

Indeed, the difficulty of making comparisons has sometimes been portrayed as an advantage of switching to cash-balance plans. A partner at the consulting firm that invented the plans in the 1980s told a client in a 1989 letter: "One feature which might come in handy is that it is difficult for employees to compare prior pension benefit formulas to the account balance approach."

Asked to comment, the author of that line, Robert S. Byrne of Kwasha Lipton (now a unit of PricewaterhouseCoopers), says, "Dwelling on old vs. new benefits is probably not something that's a good way to go forward."

At one company, employees did know how to make comparisons. When Deloitte & Touche started putting a cash-balance plan in place last year, some older actuaries rebelled. The firm eventually allowed all who had already been on the staff when the cash-balance plan was adopted to stick with the old benefit if they wished.

## Struggle at Chase

At **Chase Manhattan** Corp., two executives in the private-banking division hired an actuary and calculated that their future pensions had fallen 45% as a result of a conversion to a cash-balance plan by Chase predecessor Chemical Bank. "I would have had to work about 10 more years before I broke even and got a payout equal to my old pension," says one of the executives, John Healy, now 61.

He and colleague Nathan Davi say that after seven years of their complaints, Chase agreed to give each a pension lump sum of about $487,000, which was roughly $72,000 more than what they would have received under the new cash-balance plan. Although a Chase official initially said the bank had "never given any settlement to any employee over the bank's pension plans," when told about correspondence about the Healy-Davi case, Chase said that a review had determined that about 1,000 employees could be eligible for additional benefits. "We amended the plan so that it would cover all similarly situated employees," a spokesman said.

How many quiet arrangements have been reached is unknown. But employees are currently pressing class-action suits against **Georgia-Pacific** Corp. and **Cummins Engine** Co.'s Onan Corp. subsidiary, alleging that cash-balance plans illegally reduce pensions. (Both defendants are fighting the suits.) Judges have recently dismissed similar suits against **Bell Atlantic** Corp. and **BankBoston** N.A.

## Concern at the IRS

Not aware of any of this ferment, Mr. Bruggeman in August 1998 filed his multiple-spreadsheet analysis of the CSW cash-balance plan with the IRS and the Labor Department, asking them for a review. Soon after, he says, a manager in CSW's benefits department called him in and "wanted to know what it would take for me to drop all this." The answer wasn't to be "grandfathered" and exempted from the new plan. "I told him all I want is for the company to ... be fair to employees," he says. "It's the principle of the thing."

The manager couldn't be reached for comment, but a CSW official says the company takes complaints "very seriously and they're thoroughly investigated. In every part of this type of investigation an employee is interviewed by a company representative, and in every initial interview the employee is asked for suggestions on what might be a preferred solution."

Even without Mr. Bruggeman's input, the IRS has a lot of cash-balance data on its plate. The agency is swamped with paperwork from hundreds of new plans seeking its approval, and applications are piling up. The delay is due in part to concern at the IRS that such plans may violate various pension laws, according to a person familiar with the situation. Meanwhile, the consulting firms that create the plans for companies are lobbying for exemptions from certain pension rules.

They say they aren't worried. That's because "companies who now have these plans are sufficiently powerful,

sufficiently big and have enough clout that they could get Congress to bend the law ... to protect their plans," says Judith Mazo, a Washington-based senior vice president for consulting firm Segal Co. Regulators, meanwhile, are playing catch-up. Bottom line, Ms. Mazo says: "The plans are too big to fail."

**URL for this Article:**
http://interactive.wsj.com/archive/retrieve.cgi?id=SB912665592910209500.djm

**Hyperlinks in this Article:**
(1) http://interactive.wsj.com/archive/retrieve.cgi?id=SB912729707109952500.djm

Copyright © 1998 Dow Jones & Company, Inc. All Rights Reserved.

Printing, distribution, and use of this material is governed by your Subscription Agreement and copyright laws.

For information about subscribing, go to http://wsj.com

Close Window

=

PHI003838



☒ The Wall Street Journal Interactive Edition

December 18, 1998

## Mutual Funds

# Longtime Employees Face A Pension-Benefit 'Plateau'

**By ELLEN E. SCHULTZ**
Staff Reporter of THE WALL STREET JOURNAL

On Jan. 1, longtime employees at a number of large companies will temporarily cease to earn new pension benefits. For the lucky, this no-benefits period will last as little as one year. For others, it could be a decade or more.

These employees work for employers converting traditional pension plans to new "cash balance" retirement plans, under which an employer creates hypothetical employee accounts to which the employer contributes a percentage of the employee's pay each year, as well as interest.

But the pain of conversion to these little-understood hybrid plans won't be shared across the board: Younger employees and recently hired workers will earn pension benefits right away.

All this will come as a surprise to many people, even at the hundreds of companies that already have made this pension shift. Cash-balance plans are growing popular with employers who see drawbacks to traditional pension plans, which pay retiring employees designated monthly amounts. Upon eliminating a so-called defined-benefit plan and adopting a cash-balance one, an employer determines the value of benefits built up by his employees under the traditional plan, and places some, or all, of that value into individual employee accounts. Those individual accounts then grow, courtesy of pay and interest credits made by the employer, over the years.

> Readers with comments or questions about cash-balance pension plans can write to Ellen Schultz at editors@interactive.wsj.com[1]

While these individual accounts can be taken with an employee when changing jobs, what is riling some who've looked closely at this newfangled plan is that employers have a lot of leeway in how they credit workers for the value of their built-up pension benefits. Older workers, in particular, often aren't credited for the full value of what they've already earned, and the result is that they can work years before earning pension benefits above and beyond what they had under the traditional plan.

☒ Pension 'Plateau'

PHI003839

"It would be nice if they told people they will work a number of years" without benefit of improving their pension standing, says an employee at Empire Blue Cross Blue Shield, in Albany, N.Y., which adopts a cash-balance plan in January. The 25-year Empire veteran, who doesn't wish to be identified, calculated she must work seven years before earning new pension benefits. An Empire spokeswoman says employees will receive detailed information soon about their status.

Employers aren't eager to tell employees that their pension accrual might cease for a while, because they figure workers will get pretty mad if they find out. Which is true.

When Ispat Inland Inc., a steel company in East Chicago, Ind., announced last month it would shift to a cash-balance plan Jan. 1, Paul Schroeder, a 44-year-old engineer with 19 years at the company, calculated it would take nine to 13 years before he acquired additional pension benefits. After some Ispat employees confronted management last week, employees received a communication from the human-resources department confirming "the vast majority would experience a plateau in the growth of their pension benefit."

What's the size of this plateau? Five to 13 years for some, according to an Ispat spokesman. Facing a 13-year plateau, for example, would be a 40-year-old with 22 years of service, earning $45,000.

Here are answers to commonly asked questions about opening-account balances:

**What happens when an employer converts to a cash-balance plan?**

Employers generally determine a value of each employee's existing pension and put this into an individual "account." Then, each year, the employer credits the account with a percentage of pay (often 4%) and interest, often 5%.

**Is the starting account balance the equivalent of the old pension benefit?**

In many cases, no. The actual value of your old pension benefit might be $50,000, but your opening balance might be, say, $35,000. As a result, you wouldn't actually earn a new pension benefit until the pay and interest credits bring the account to $50,000. (The ranges vary.)

Some employers call this a "plateauing" of your pension; actuaries call it "wear away," because you wear away the old benefit before earning a fresh one.

**Is this legal?**

By law, an earned pension can't be taken away or reduced. But a low opening balance doesn't violate this law, because, if you quit your job before your pension benefit started growing again, you would receive the full $50,000 in the above example.

It is legal for employers to establish opening balances using whatever criteria they deem appropriate. In a session in March held by the Conference of Consulting Actuaries in Washington, a panel of pension experts joked that the starting balance could be based on shoe size or license-plate numbers.

Of course, employers use more rational factors when calculating opening balances. One with a big punch: excluding the value of early-retirement subsidies. "It effectively means [affected employees] aren't getting an accrual, and they're angry, legitimately angry," says William Sohn, a cash-balance expert with Buck Consultants in New York. But, from an employer's perspective, such subsidies aid only early retirees, so removing them seems fair, he adds.

**Don't employers have to tell you that your opening balance is lower?**

Good question. Most employers aren't very clear. The information given by Empire Blue Cross Blue Shield to employees says: "Your starting account balance represents the current value of the benefit you have earned as of Dec. 31, 1998." In fact, balances will be lower for employees like the one quoted above.

The Empire employee complains she and a colleague haven't been able to obtain the information needed to calculate

exactly how long their wear-away period is. Among other things, they'd like to figure out if it makes sense to look for jobs elsewhere with better benefits.

An Empire spokeswoman says the company will tell employees in March what old benefits are worth and what opening balances will be. She points out that the company has increased its matching contribution to the 401(k) plan to help employees save more.

### How can I find out if I'm affected?

Federal law entitles you to request a statement of your "vested accrued benefit," expressed as a single-life age 65 annuity, as well as in optional forms such as lump sum. You may do this once every 12 months, in writing, and employers have 30 days to respond. Compare this with your account balance to see where you stand.

* * *

### Money-Fund Assets Declined In the Latest Week

Money-market mutual-fund assets fell $7.59 billion to $1.393 trillion in the week ended Wednesday from a revised $1.401 trillion, the Investment Company Institute said.

The trade group recently changed the way it reports fund assets. The group previously tracked assets by retail and institutional funds. However, because institutions often invest in retail funds and individuals often invest in institutional funds, the group now tracks money-market fund assets by share classes. Retail-class shares often have lower minimum-investment requirements and higher annual expenses than institutional-class funds.

Assets of the 921 retail-class shares increased $1.8 billion to $825.49 billion, the trade group said. Among retail-class shares, assets of the 570 taxable shares rose $1.68 billion to $678.9 billion, while assets of the 351 tax-exempt shares increased $118.3 million to $146.59 billion.

Assets of the 750 institutional-class shares decreased $9.39 billion to $567.76 billion. Among institutional-class shares, assets of the 587 taxable shares fell $9.24 billion to $519.14 billion, while assets of the 163 tax-exempt shares fell $153.9 million to $48.61 billion.

**URL for this Article:**
http://interactive.wsj.com/archive/retrieve.cgi?id=SB913943019539981000.djm

**Hyperlinks in this Article:**
(1) mailto:editors@interactive.wsj.com

Copyright © 1998 Dow Jones & Company, Inc. All Rights Reserved.

Printing, distribution, and use of this material is governed by your Subscription Agreement and copyright laws.

For information about subscribing, go to http://wsj.com

Close Window

=

☒ The Wall Street Journal Interactive Edition

December 4, 1998

## Mutual Funds

# Employees Will Need to Know Traits of 'Cash-Balance' Plan

**By ELLEN E. SCHULTZ**
Staff Reporter of THE WALL STREET JOURNAL

It's the biggest thing to happen to your retirement savings since the rise of the 401(k) plan: a hybrid pension, the most common of which is called a "cash-balance plan." And even if you never gave your pension much thought before, you might want to now.

If you're in your 20s or 30s, a cash-balance account can enable you to start building up thousands of dollars of retirement money that you can take with you when you change jobs.

But if you're in your 40s, 50s or 60s, the switch to a cash-balance plan probably leaves you worse off: Your pensions have been reduced, sometimes substantially. Also you may not be earning a pension in the initial years after the cash-balance plan is adopted -- and you won't even know it.

> ☒ [1]Readers with questions or comments about cash balance and other hybrid pension plans can write to Ellen Schultz at editors@interactive.wsj.com[2].

You may already have a hybrid pension plan if you work at **MCI WorldCom**, **American Express** Co., or one of the more than 300 large employers that have switched from traditional pensions. Within a decade, pension experts believe, most large companies will probably have converted their traditional pension plans to cash-balance type plans. Pension plans run by unions and government also are thinking of making the switch. And even the giant 401(k) administrators, including Fidelity Investments and Vanguard Group, are getting into the action, handling the record-keeping for a growing number of companies with cash-balance plans.

> ☒ [3]'Cash Balance' Saves Millions, Hides Pitfalls From Workers
>
> ☒ [4]Money-Fund Assets Climbed $12.68 Billion in Latest Week

However, employers are adopting these complex hybrid pension plans so quickly that regulators haven't kept up. And employees have nowhere to turn for unbiased information. The Labor Department, consumer groups, and even the American Association of Retired Persons are only just beginning the task of trying to figure out how these plans work, and how they affect employees.

Short of hiring an actuary, you probably can't figure out whether you're better or worse off if you're a veteran at your company. Still, with the information below, you'll be able to ask your employer better questions about how your benefits are being determined.

### How does a cash-balance plan work?

Employers make a hypothetical contribution based on a percentage of your pay, typically 4%, to a hypothetical account each year. Your account "earns" a hypothetical annual interest credit, often tied to the 30-year Treasury rate. For example, if your salary is $40,000 a year, your "account" will receive a contribution of $1,600. After a year, your account balance will be given an interest credit, of typically 5%.

### Can I take the money with me?

At most companies, you can roll the balance into an IRA when you change jobs. Some employers have restrictions. At

PHI003842

AT&T, departing workers can take, in a lump sum, an amount no greater than the equivalent of one year's salary. So, if someone makes $70,000 and his account balance is $150,000, he will have to leave $80,000 in the plan, and will ultimately receive it as a monthly payment at age 65 when he retires. At Boeing, workers who leave must wait until they are age 65 -- and then must receive an annuity.

### I'm in my 30s. Is this a good deal for me?

For most younger employees, cash-balance plans are great. Dan Stier, a 30-year-old product manager at AG Communication Systems in Phoenix, figures he will have more than $30,000 in the cash-balance account after five years, when he expects he'll probably change jobs. "I never figured I'd be on the job long enough to take advantage of a pension," he says.

Still, younger workers need to realize that cash-balance plans are no panacea for job-hopping: Most have five-year vesting, so if you leave before then, you don't get a dime. What's more, the widely touted "portability" isn't really a new advantage: Most employers with traditional pension plans automatically cash out departing employees with less than $5,000 in accrued pension benefits, a group that typically includes younger and lower-paid workers.

### What about people in their 40s, 50s and 60s?

Switching out of a traditional pension into a cash-balance plan after years on the job can reduce your pension from 20% to 50% or even more.

Here's why: With a traditional pension, your benefit rises sharply during your later years with a company. The formulas generally multiply your years of service by your highest final average pay. As a result, you might be earning half your pension in your last five to 10 years on the job.

When you switch to a cash-balance plan, you lose those later years of big accruals. An oversimplified way of looking at it: For someone in his 60s, it's as if instead of getting the equivalent of 50% of pay each year credited to his pension, he will get 4%.

### What about transitional benefits for older workers?

To soften the blow to older workers who are switched out of traditional pensions in the later years, some employers increase the annual pay credit for older employees. Someone in his 20s might get 2% of pay credited to his cash-balance account, while a person in his 60s will receive 8%. That's done because a 25-year-old has decades in which to earn a compounded return on his money, so a dollar is worth more to him than to someone older. But higher pay credits don't come close to replacing the value of the old pension for older employees.

Some employers allow certain older workers to remain in the old pension until they retire, or at least for several years. But if you just miss the cutoff, you're out of luck. Other companies give certain older workers a boost in their opening account balances.

### How is my opening account balance determined?

With a cash-balance plan, you get an account statement that shows what your hypothetical balance is. At Boeing, which is adopting a cash-balance plan for salaried workers in January, workers will start with an opening account balance of zero. Each year, the pay and interest credits will build up. (Meanwhile, the old pension amounts people earned before the conversion will be kept in a different account, which earns interest.) This is the most straightforward way to establish an opening account balance.

Other companies do it differently. They figure out the value of the pension you've already earned in the old plan. They then calculate what this would be worth if it were turned into a lump sum. This amount then becomes your opening account balance.

Most employees think their opening account balances are the equivalent of their old pension benefit. But many employers give you a lower opening account balance. If your old pension lump sum is worth $50,000, your opening

balance might be only $37,000.

**Do I suffer financially if my opening account balance is smaller?**

If you were to leave your job soon after your company converts to a cash-balance plan, you would be entitled by law to receive the larger amount. (A pension you have already earned can't be taken away). So, even if your opening account balance is $37,000, if your old pension benefit is worth $50,000, you will have a lump sum of $50,000 when you leave.

However, if you don't leave, you won't be earning a new pension benefit until your cash-balance account increases to the level of your old benefit. This is impossible to see. Your account statement will show a steady increase, but since you don't know that your old benefit might have been worth more, you aren't aware that you're still just catching up to the benefit you have already earned. This is called "wear away," because you are wearing away your old benefit before you begin to earn a new benefit.

## Questions You Need to Ask

Four things to find out about your cash balance plan:

- **Has your future pension accrual been reduced?**
  If it has been, you will have received a "204(h) notice," which employers are required by law to give you.

- **Do you qualify for "transitional benefits" for older workers?**
  Ask for examples of how people with various ages and years of service will be affected.

- **Is your opening account balance lower than what your old pension benefit is worth?**
  Ask what your lump sum would be if you left your job. If it's higher than your cash balance, you're not earning a benefit yet.

- **Has your 401(k) improved?**
  Employers often increase the matching contributions when adopting cash-balance plans. You will need to contribute more to make up for the reduction in your pension.

At some companies, this "wear-away period" is only a year or so. But at AT&T, which converted to a cash-balance plan last January, it can take years before older workers earn new benefits. This is partly why more than 15,000 managers accepted an early-retirement offer made soon after the conversion to a cash-balance plan. AT&T communicated this clearly to its employees, but most companies don't.

If your account balance is lower than your old legally protected benefit, then you might be pleased to discover that if you were to leave your job soon after the conversion, you would receive a larger amount than what your cash-balance account statement shows.

On the other hand, if you stay on the job, you won't be earning a benefit for a while, so you need to boost your savings to make up for it.

To find out what your old benefit was worth, ask your employer what the benefit would have been if you left your job the day after the pension converted to a cash-balance plan. (Or, in other words, ask what your "actuarial equivalent of the frozen accrued benefit" would be, using all the subsidies and assumptions in the old plan, as the law requires).

\* \* \*

**NO GAIN, NO PAIN:** While mutual funds that charge a performance fee aren't unusual, the Royce Funds in New York has just introduced a product that will only charge a performance fee if it makes a profit. The Royce Select Fund, which

PHI003844

will invest in small and micro-capitalization companies, says it will waive its performance fee if it produces a loss. As additional incentive to start, Charles Royce, the fund's manager, says he will invest $1 million in the new fund and will waive the performance fee until the vehicle achieves a 15% total return.

The fund isn't open to riff-raff, however. Only wealthy individuals with a net worth of $1.5 million or more will be permitted to invest in Royce Select Fund. A minimum investment of $50,000 is required. The fund intends to close once it reaches $150 million in assets.

Ronald Roge, an investment adviser in Bohemia, N.Y., says the product is attractive because it "gives the fund manager the same incentive to want to see the fund achieve as its clients."

*-- Pui-Wing Tam*

**PUBLIC UPGRADE:** Fidelity Investments wants its lower-profile, public-sector clients to get online, too.

The giant mutual-fund and brokerage company, which is making greater use of the Internet in its core businesses, said Thursday it has launched a new Web site called SLAMNet for clients in its State and Local Asset Management program. The site allows treasurers and investment managers of public bodies -- ranging from states to local school districts -- to buy and redeem Fidelity money-market funds for their accounts online.

Previously, managers could move funds electronically through a special software package, says Thomas L. Hughes Jr., a Fidelity senior vice president. But the new site also integrates market news, data and information about Fidelity funds and fund managers, cutting down on the amount of time public officials spend researching their investments.

*-- Rebecca Buckman*

**URL for this Article:**
http://interactive.wsj.com/archive/retrieve.cgi?id=SB912729707109952500.djm

**Hyperlinks in this Article:**
(1) mailto:editors@interactive.wsj.com
(2) mailto:editors@interactive.wsj.com
(3) http://interactive.wsj.com/archive/retrieve.cgi?id=SB912665592910209500.djm
(4) http://interactive.wsj.com/archive/retrieve.cgi?id=SB912731089759834500.djm

Copyright © 1998 Dow Jones & Company, Inc. All Rights Reserved.

Printing, distribution, and use of this material is governed by your Subscription Agreement and copyright laws.

For information about subscribing, go to http://wsj.com

Close Window

=

**Charles, Mike**

| | |
|---|---|
| From: | Paoli, Frances |
| Sent: | Thursday, August 21, 2003 9:02 AM |
| To: | Charles, Mike |
| Subject: | RE: Cash Balance plan |

Good Morning Mike,

Yes, our benefits design group is aware of the IBM case and are following this issue and all of the activity surrounding cash balance plans. We expect the ultimate impact of this case will not be known for some time and we will continue to follow all of the activity and make decisions at the company level at the appropriate time.

I hope this information is helpful. If you have any additional questions, please contact the HR Service Center at 800-201-4718.

Frances Anne Paoli
Conectiv HR Service Center

———Original Message———
| | |
|---|---|
| From: | Charles, Mike |
| Sent: | Wednesday, August 20, 2003 11:14 AM |
| To: | Conectiv HR |
| Subject: | Cash Balance plan |

Dear HR,

Are you following the current events of the class action lawsuit by the employees of IBM as it pertains to IBM's decision to convert their employees retirement plan into the Cash Balance Plan?

As one of the A. E. employees that missed the cut off date of 1/1/99 by both age and time with the Company by only a few months (start date 9/10/79 birthday 10/18/49) this event has caught my attention. I've always felt from the inception of the cash balance plan that it was unfair. However, as a employee I knew there was little I could do.

What would be the impact to Conectiv employees like me if the suit against IBM is ultimately ruled in favor of the employees? Would the employees that did not make the cut off of have to sue Conectiv to get the same option as those that did make the cut off? Or would Conectiv automatically provide the employees that did not make the cut off date the same option (A.E. Plan or Cash Balance Plan) as those that did make the cut off?

Thank you for your time
*J. Michael Charles*
*Senior Account Manager*
Conectiv
856 453 5012 NJ
8 500 5012 Internal
856 305 0032 cell
856 435 5040 NJ Fax
mike.charles@conectiv.com

1

JMC00459

A - 114

# ORIGINAL TRANSCRIPT

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

#### PORTIONS CONFIDENTIAL

J. MICHAEL CHARLES; MAURICE W.
WARD, JR.; and JOSEPH I. FINK, JR.,
on behalf of themselves and
all others similarly situated,
      Plaintiff
    v           C.A. No. 05-702(SLR)

PEPCO HOLDINGS, INC.; CONECTIV, and
PEPCO HOLDINGS RETIREMENT PLAN,
    Defendants
            -  -  -

THOMAS S. TROUP, on behalf of himself
and all others similarly situated,
      Plaintiff

    v           C.A. No. 06-10(SLR)

PEPCO HOLDINGS, INC.; CONECTIV, and
PEPCO HOLDINGS RETIREMENT PLAN,
    Defendants

Oral deposition of JOSEPH I. FINK, taken at the law offices of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, on Thursday, January 11, 2007, commencing at 9:34 a.m., before Barbara McKeon Quinn, a Registered Merit Reporter and Notary Public, pursuant to notice.



## James DeCrescenzo Reporting, LLC
### INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

A - 115

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

1   discussion with coworkers in 1999

2   about media stories about cash

3   balance plans?

4          A.     One liners.   No real

5   discussion.

6          Q.     What sort of one liners do

7   you remember?

8          A.     People's comments of, you

9   know, they're really getting us or

10  this is, you know, a real bargain

11  kind of thing.

12         Q.     A real bargain for the

13  employer?

14         A.     Yes.   It was derisive type

15  of things.

16         MR. SAUDER:   And just to

17  clarify, just to read the full

18  sentence it says, Recent stories in

19  the national media have raised

20  concerns about some cash balance

21  plans that do not offer the same

22  level of financial security or

23  grandfathering provisions as

24  Conectiv's cash balance pension plan,

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                         FAX  215.751.0581

A - 116

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

1    period.

2         Next sentence, One part of

3    the presentation will address these

4    concerns and demonstrate how

5    Conectiv's plan is different.

6    BY MR. BASSMAN:

7         Q.    Who do you remember in 1999

8    making these derisive comments?

9         A.    I can't -- I couldn't give

10   you a name.  It was just the

11   common -- it was common bantering of

12   anybody that was affected by this.

13        Q.    Did you take part in that

14   bantering in 1999?

15        A.    I can't say that I did, no.

16        Q.    Can you say that you

17   didn't?

18        A.    I couldn't say either way.

19        Q.    It's possible?

20        A.    It's possible.

21        Q.    In 1999 were you unhappy

22   with the switch to a cash balance

23   plan?

24             MR. SAUDER:   Objection to

**JDR**                                          A-117

**James DeCrescenzo Reporting**, LLC
215.564.3905            InnovatingLitigation            FAX 215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

1    the term "unhappy."

2    BY MR. BASSMAN:

3        Q.    Well, do you want me to

4    rephrase the question?

5        A.    Please.

6        Q.    In 1999, did you believe

7    that you would be adversely affected

8    financially by the switch to a cash

9    balance plan?

10       A.    I was unsure but highly

11   suspicious.

12       Q.    And why were you suspicious

13   in 1999?

14       A.    Because of things like we

15   just touched on.   Bantering of

16   coworkers as you pass by and

17   one-line, you know, statements about

18   total payoffs and what they could

19   possibly be and the loss of funds.

20       Q.    When other employees made

21   statements to you in 1999, these

22   derisive comments that you've

23   described, did you ask them any

24   follow-up questions?



**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                              FAX  215.751.0581



1  kind of contact casually with that

2  person because I've known the HR

3  representative; actually used to work

4  for me.

5      Q.  So in 1999 you went and

6  spoke with the HR representative?

7      A.  I can't say that I sought

8  him out.  It was a casual contact

9  somewhere.  You know, it was like,

10 hey, George, you know, what's up with

11 that kind of thing.

12     Q.  What's George's last name?

13     A.  Bleazard.

14     Q.  Can you spell that.

15     A.  B-L-E-A-Z-A-R-D.

16     Q.  And what did George say to

17 you?

18     A.  He said he thought it was

19 better because it was portable and so

20 on and the company was very adamant

21 about that it was better, from what

22 little information I could ever get,

23 because it was portable, and I see

24 that in these documents frequently.

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
215.564.3905    FAX 215.751.0581

A-119

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

1    because I believe one of these

2    locations that was close to me was

3    closed, and that's maybe why the

4    rescheduling.

5         Q.    So George mentioned to you

6    in 1999 that there will be a series

7    of meetings that will answer your

8    questions about the cash balance

9    plan, right?

10        A.    At some point, yeah.  Yes.

11        Q.    But you were never invited

12   to any such meeting?

13        A.    No.

14        Q.    Did you follow up with

15   anyone in HR to ask why you hadn't

16   been invited to a meeting about the

17   cash balance plan after George told

18   you they were going to occur?

19        A.    I can't say that I did.

20        Q.    Do you see any factual

21   statements in Defendant's Exhibit 13

22   based on your view today that you

23   believe are false?

24             MR. SAUDER:   Objection.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

A-120

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all similarly situated | ) ) ) ) ) |
|  | ) Case No.: 05-702 (SLR) |
| Plaintiffs, | ) |
| v. | ) ) |
| PEPCO HOLDINGS, INC., CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) |
|  | ) |
| Defendants | ) ) |

## EXPERT REPORT OF ETHAN E. KRA, PH.D, F.S.A.

### BACKGROUND

1.      I am the Chief Actuary-Retirement of Mercer Human Resource Consulting. I am
also a Fellow of the Society of Actuaries, a Fellow of the Conference of Consulting Actuaries, a
member of the American Academy of Actuaries and an Enrolled Actuary under ERISA. I have
given over 130 speeches on employee benefits issues over the past 30 years at various professional
meetings and seminars and have authored or co-authored numerous articles on employee benefit
issues. I am often quoted in such publications as The New York Times, The Wall Street Journal,
Time, Newsweek and other financial publications. My curriculum vitae is appended to this report
as Attachment 1.

2.      My responsibilities at Mercer Human Resource Consulting include advising clients
on the design, funding and expense allocation of employee and executive benefits, including
retirement, death, disability and health benefits.

A-121

3.     This Report has been prepared for counsel for PepCo Holdings. Inc.

4.     My time on this project is being billed at $625 per hour, plus expenses. Others working on this project are being billed at our standard hourly billing rates.

### FINDINGS

5.     In each year that I reviewed (1999 through 2007), the plan passes the 133 1/3% rule under IRC §411(b)(1)(B).

6.     The pleadings note that Plaintiffs' benefits decreased in certain years. These negative adjustments to the annuity payable at normal retirement date were solely on account of interest rate changes. In each of those years, they experienced a positive benefit accrual on account of increased age, service and compensation received during the year.

7.     As of the effective date of the plan amendment (January 1, 1999), the accrued benefit (payable at normal retirement date) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan. This determination was based on service and plan factors (including interest rates used for crediting to the cash balance accounts and for converting cash balance accounts to annuities) as of January 1, 1999 remaining constant through normal retirement date. Following is a table summarizing these results:

| Name | Accrued Benefit at 1/1/99, payable at Normal Retirement Date under Pre-Amended Plan | Accrued Benefit at 1/1/99, payable at Normal Retirement Date under Amended Plan |
|---|---|---|
| Thomas S Troup | 17,357.06 | 23,021.41 |
| Maurice Ward | 17,433.84 | 23,014.11 |
| Jerome Charles | 17,264.57 | 25,425.91 |
| Joseph Fink | 11,141.94 | 15,142.38 |

8.    As of the effective date of the plan amendment (January 1, 1999), the projected benefit (payable at normal retirement date) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan. This determination was based on compensation and plan factors (including interest rates used for crediting to the cash balance accounts and for converting cash balance accounts to annuities) during 1999 remaining constant through the normal retirement date. This analysis reflects actual compensation received during 1999 and is not based solely on compensation as of January 1, 1999. However, for purposes of this determination, each Plaintiff was assumed to continue to earn service through his normal retirement date. Following is a table summarizing these results:

| Name | Projected Benefit at 1/1/99, payable at Normal Retirement Date under Pre-Amended Plan | Projected Benefit at 1/1/99, payable at Normal Retirement Date under Amended Plan |
|---|---|---|
| Thomas S Troup | 28,982.51 | 38,278.10 |
| Maurice Ward | 42,933.15 | 50,458.26 |
| Jerome Charles | 31,953.78 | 41,151.88 |
| Joseph Fink | 33,469.50 | 39,376.03 |

## METHODS, ASSUMPTIONS AND DATA

9.    In preparing this report, I have reviewed the following documents:

- Part One CONECTIV CASH BALANCE SUB-PLAN Effective as at January 1, 1999.

- ATLANTIC CITY ELECTRIC COMPANY RETIREMENT PLAN As Amended and Restated Effective January 1, 1994

- DELMARVA POWER & LIGHT COMPANY RETIREMENT PLAN as amended or restated through January 1, 1995

A-123

10.    In preparing this report, I have utilized the data that were supplied to me and which are summarized on Attachment 2.

11.    All projections of benefits from any given date are based on the interest rates, salaries, Social Security law (including Taxable Wage Base) in effect as of the relevant date.

_____

Ethan E. Kra

State of New York        )
                         ) ss.
County of New York       )

Affirmed to before me this 20th day of April, 2007, by Ethan E. Kra.

LaDrena D. Andrew
Notary Public, State of New York
No. 01RN5088283
Qualified In Queens County
Cert. Filed In New York County
Cert. Filed In Kings County
Commission Expires _____

_____
Notary Public

My commission expires: _____

A-124

ATTACHMENT 1

# Ethan E. Kra

Mercer Human Resource Consulting
1166 Avenue of the Americas
New York, NY 10036
Phone: 212-345-7125

## Education:

B.A., Yale University, summa cum laude, honors with exceptional distinction in mathematics, 1969.

M.A., Yale University, mathematics, 1969.

M.Phil., Yale University, mathematics, 1973.

Ph.D., Yale University, mathematics, 1974.

> Thesis: Infinitary Forcing for Languages with the Q-Quantifier: Fefferman Vaught Theorems for Infinitary Forcing.

Academic Honors:    Woodrow Wilson Fellow

National Science Foundation Fellow

Prize Teaching Fellowship (Yale University)

Phi Beta Kappa

## Professional Organization and Credentials:

Fellow, Society of Actuaries (1976)

Vice President (2006– )

Board of Governors (1997–2000); Operations Committee (1997–2000)

Pension Section Council (1991-94), Vice-Chair (1992-93), Chair (1993–94)

FAS 106 Task Force (1993-99), Co-chair (1993–99)

Financial Economics and the Actuarial Model Task Force (jointly held with American Academy of Actuaries (2002– ), Chair (2002–2004)

Discipline Committee (2000–05)

Retirement Practice Advancement Committee (1992–2004), Chair (1997–2000)

Non-Mortality Decrement Task Force (2000–04)

Jointly Administered Examinations for Enrollment of Actuaries Committee (1978–79)

Part 4 Examination Committee (1979–80)

A-125

**ATTACHMENT 1**

Fellow, Conference of Consulting Actuaries (1985)

Intersector Committee (1992–94)

Member, American Academy of Actuaries (1979)

Board of Directors (2003–2006)

Pension Practice Council (1993–94, 1997– ), Vice Chair (2000–03, 2005– )

Pension Committee (1994– )

Defined Benefit Revitalization Task Force (2003–04)

Washington Forum Planning Committee (2002)

Strategic Planning Task Force (1997–98)

Member, American Society of Pension Actuaries (1996)

American Benefits Council (formerly known as Association of Private Pension and Welfare Plans)

Retirement Savings Committee (1991-1997)

Retirement and Investment Policy Committee (1999– )

Retirement Income Task Force (1997– )

ERISA Industry Committee

Pension Funding Task Force (2004– )

Retirement Security Committee (2003– )

Enrolled Actuary (1979)

Chartered Life Underwriter (1977)

Insurance Licenses in New York and New Jersey

Actuarial Standards Board General Committee (2002–2004)

## *Employment:*

Mercer Human Resource Consulting, 1977 to present.

Currently Chief Actuary-Retirement, with responsibilities in the areas of design and funding of pension and group insurance benefits, structuring and funding of non-qualified pension benefits years and the proper accounting for expense of employee benefits.

Internal positions include:

- Chair, Actuarial Resource Network
- Former Chair, New York Region Professional Standards Committee

A-126

ATTACHMENT 1

      Principal (1984-1989); Managing Director (1989 to present); designation subsequently changed from Managing Director to Worldwide Partner.

Prudential Insurance Company of America, 1973-77.

      Actuarial program, including assignments in long and short term disability insurance (3/76–4/77); group pensions (8/74–2/76); group insurance systems and aviation reinsurance.

Yale University, 1971-73.

      Prize Teaching Fellow, 1972-73

      Teaching Fellow, 1971-72

## *Speeches and Lectures:*

"Pension Reform: What You Need to Know and What You Need to Do", panelist on Corporate Treasurers Council webcast.

"Late Breaking Developments", panelist at the 2006 Conference of Consulting Actuaries Annual Meeting.

"Pension Funds in Crisis – Next Generation Plan Design: What Will It Look Like for Generation X and Y?", panelist at Strategic Research Institute Conference.

"Pension Reform: What You Need to Know and What You Need to Do", panelist at the Association of Financial Professionals Annual Conference.

"Are Defined Benefit Plans an Endangered Species?, panelist at OPERS 5th Annual Investment Forum.

"Pension Accounting Reform & the Future of Defined Benefit Plans – Did the Markets, the Accounting or the Funding Rules Cause the Pension Crisis?" , panelist at Strategic Research Institute Conference.

"General Session 1 – Pension Funding Reform", panelist at the 2006 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2005 Conference of Consulting Actuaries Annual Meeting.

"Addressing the Financial Risks from Retirement Systems Seminar: Changing Our Focus: Consulting About Risk", panelist at the 2005 Society of Actuaries Spring Meeting.

"2005 Pension Symposium – Pension Funding Reform", speaker at the symposium co-sponsored by the American Academy of Actuaries, the American Society of Pension Professionals & Actuaries and the Society of Actuaries.

"Practicing Professionalism", panelist at the 2005 Enrolled Actuaries Meeting.

"Education 2005: Update from the Pension Perspective", panelist at the 2004 Society of Actuaries Annual Meeting.

A-127

## ATTACHMENT 1

"Pension Funding Proposals", panelist at the 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2004 Society of Actuaries Annual Spring Meeting.

"The Great Unknown: Q & N/A's", panelist at the 2004 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2003 Conference of Consulting Actuaries Annual Meeting.

"The Great Controversy Symposium: Employer Perspective (Part 1)", moderator and panelist at the SOA Symposium, "The Great Controversy: Current Pension Actuarial Practice in Light of Financial Economics".

"Late Breaking Developments", panelist at the 2003 Society of Actuaries Annual Spring Meeting.

"Rulings and Regulations Update", panelist at the 2003 Enrolled Actuaries Meeting.

"Q and N/A", panelist at the 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2002 Society of Actuaries Annual Meeting.

"Does the Syllabus Prepare Us for the Jobs of the Future?", panelist at the 2002 Society of Actuaries Annual Meeting.

"Rulings and Regulations Update", panelist at the 2002 Society of Actuaries Annual Spring Meeting.

"New Mortality Tables on Pension Plans", panelist at the 2002 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at the 2002 Enrolled Actuaries Meeting.

"Is That Your Final Answer?", panelist at the 2001 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments – Wass Up!", panelist at the 2001 Conference of Consulting Actuaries Annual Meeting.

"Does ERISA Bias Lead to Equity Investment?", panelist at the Society of Actuaries 2001 Annual Spring Meeting.

"Late Breaking Developments Part 2: Court Cases", moderator at the Society of Actuaries 2001 Annual Spring Meeting

"Effective Use of Pension Surplus", panelist at the 2001 Enrolled Actuaries Meeting.

"Funding Retiree Welfare Benefits", panelist at the 2001 Enrolled Actuaries Meeting.

A-128

**ATTACHMENT 1**

"Rulings and Regulation Update", panelist at the 2001 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the Conference of Consulting Actuaries 2000 Annual Meeting.

"Déjà vu All Over Again – Q&N/A's", panelist at the Conference of Consulting Actuaries 2000 Annual Meeting.

"Financing Voluntary Nonqualified Deferred Compensation Plans", presenter at Financial Executives Institute National teleconference.

"Late Breaking Developments and Rulings", panelist at the Society of Actuaries 2000 Annual Spring Meeting.

"Discussion of IRS Gray Book and PBGC Blue Book", panelist at 2000 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at 2000 Enrolled Actuaries Meeting.

"Q&NA's – Gray Areas", panelist at 2000 Enrolled Actuaries Meeting.

"Reopening the Great Debate: ERISA Funding", panelist at the Society of Actuaries 1999 Annual Meeting.

"Dial 10-10-GATT for Pension Plan Mortality", panelist at the Society of Actuaries 1999 Annual Meeting.

"Q&NA's", panelist at the Conference of Consulting Actuaries 1999 Annual Meeting.

"Late Breaking Developments", panelist at the Conference of Consulting Actuaries 1999 Annual Meeting.

"Overview of Deferred Compensation Plans", panelist at 1999 Non-Qualified Executive Retirement Programs Conference sponsored by International Business Communications.

"Pension Rulings and Regulations Update", panelist at the Society of Actuaries 1999 Annual Spring Meeting.

"Discussion of Gray Book Questions and Answers", panelist at 1999 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at 1999 Enrolled Actuaries Meeting.

"Tales of Terror – Ethics, Actuaries, the ABCD and the Law", speaker at the Conference of Consulting Actuaries 1998 Annual Meeting.

"Pension Rulings and Regulations Update", panelist at the Society of Actuaries 1998 Annual Meeting.

"Technical Concerns: Late-Breaking Pension Developments", panelist at the Society of Actuaries 1998 Annual Spring Meeting.

"Discussion of Gray Book Questions and Answers", panelist at 1998 Enrolled Actuaries Meeting.

A-129

ATTACHMENT 1

"Postretirement Welfare Benefits", panelist at 1998 Enrolled Actuaries Meeting.

"Exercising Professional Judgement – An Exercise in Futility", panelist of General Session #1 of the 1998 Enrolled Actuaries Meeting.

"Questions and Answers with the Experts", panelist at Conference of Consulting Actuaries 1997 Annual Meeting.

"So What's New?—Late Breaking Developments", panelist at Conference of Consulting Actuaries 1997 Annual Meeting.

"Financing Executive Deferred Compensation with Life Insurance—Does It Make Economic Sense When the Insurance Company Doesn't Run the Numbers?", panelist at the American Bar Association's 1997 Annual Meeting.

"Split Dollar Life Insurance – The True Economics (Pre TAM/PLR)", panelist at the American Bar Association's 1997 Annual Meeting.

"Trends & Issues in Non-Qualified Pension Plans", speaker at the Financial Executives Institute sponsored by the Committee on Investment of Employee Benefit Assets.

"Pension Simplification – Defined Benefit Issues", panelist at the Society of Actuaries 1997 Annual Spring Meeting.

"Approaching the Decision Making Process: How to Compare the Alternatives", panelist at 1997 Non-Qualified Executive Retirement Programs Conference sponsored by International Business Communications.

"Employee Benefits in Captives", panelist at 1997 Captives Insurance Operations Conference.

"Post-Retirement Welfare Benefits", panelist at 1997 Enrolled Actuaries Meeting.

"Exercising Professional Judgment – An Exercise in Futility?", panelist at 1997 Enrolled Actuaries Meeting.

"Gray Book Questions and Answers", speaker at 1997 Enrolled Actuaries Meeting.

"Small Business Job Protection Act of 1996 (Pension Simplification???)", panelist of General Session #1 at 1997 Enrolled Actuaries Meeting.

"Basics of Funding Retiree Medical", panelist at Conference of Consulting Actuaries 1996 Annual Meeting.

"Plan Qualification/Registration Issues for Multinational Sponsors", moderator and panelist at the Society of Actuaries 1996 Spring Meeting.

"SFAS 106/112 For the 'Know it All'", co-chair and speaker at Society of Actuaries May 1996 seminar.

"Employee Benefit in Captives" speaker at 1996 Captive Insurance Operations Conference sponsored by the Hartford Institute on Insurance Taxation.

A-130

ATTACHMENT 1

"Non-Qualified Executive Compensation" chair and moderator for Center for Business Intelligence seminar; spoke on "Integrating Non-qualified Plan Objectives to Attract & Retain Key Employees" and "Funding and Securing Non-Qualified Supplemental Executive Benefit Programs".

"Gray Book Questions and Answers", speaker at 1996 Enrolled Actuaries Meeting.

"Pick your iq", speaker at 1996 Enrolled Actuaries Meeting.

"415 Limitations After GATT - Revenue Ruling 95-29" speaker at 1996 Enrolled Actuaries Meeting.

"How to Calculate Federal Insurance Contributions Act Tax on Supplemental Executive Retirement Plans", moderator and speaker at the Society of Actuaries 1995 Spring Meeting.

"Employee Benefits and U.S. Captives", speaker at the 33rd RIMS Annual Conference.

"Employee Benefits in Captives" speaker at Tenth Anniversary Captive Insurance Operations Conference.

"Pick Your i", speaker at 1995 Enrolled Actuaries Meeting.

"Pension Aspects of GATT", speaker at the Employee Benefits Group Inc.

"Financing Corporate Liabilities", speaker at Benefit and Financial Strategies after OBRA, seminars sponsored by CIGNA.

"Why Aren't More Captives Writing Employee Benefit Coverage?", speaker at 21st Annual Captive Insurance Companies Association, Inc. Conference.

"Post-Retirement Welfare Benefits", speaker at 1994 Enrolled Actuaries meeting.

"Employee Benefits", speaker at 1994 Conference on Offshore Captive Insurance Operations sponsored by the Center for Tax Education and Research.

"Employee Benefits in a Captive Insurance Company?", speaker at joint Mercer/Marsh & McLennan client seminars.

"Retirement Programs for Law Firm Partners", speaker, Symposium on Employee Benefits.

"FAS 106 Technical Issues", speaker and co-chair at Society of Actuaries Seminar.

"FAS 106 Consulting Issues", speaker and co-chair at Society of Actuaries Seminar.

"Post Retirement Welfare Benefits - Funding", panelist at 1993 Enrolled Actuaries Meeting.

"Cash Balance Plans" moderator at Society of Actuaries Seminars.

"FAS 106 Strategies and the Impact on Executive Compensation", speech at Healthcare Issues Confronting Corporate America, Client Forum sponsored by Chase Manhattan Bank.

"Funding and Financing Retiree Health: Who Should Pay and How?", speech at Post-Retirement Health Care Benefits sponsored by Institute for International Research.

A-131

**ATTACHMENT 1**

"Post Retirement Health Benefit Funding", moderator and speaker at the Society of Actuaries 1992 Spring Meeting.

"Post-Employment Welfare Benefits - Funding", moderator and speaker at 1992 Enrolled Actuaries Meeting.

"Permitted Disparity", presentation to Practising Law Institute.

"Funding & Insured Funding Vehicles for Retiree Health", speech at The First Annual Pension and Employee Benefits Conference sponsored by Pensions and Investments.

"Funding and Financing Retiree Medical Benefits: Cost Effective Strategies", speech at Post-Retirement Health Care Benefits seminar sponsored by Institute for International Research.

"Audience Dialogue with the IRS", moderator at the Society of Actuaries 1991 Spring Meeting.

"Message from the IRS", moderator at the Society of Actuaries 1997 Spring Meeting.

"Funding Alternatives for Post-Employment Welfare Benefits", speeches at Post Retirement Health Care seminars sponsored by Fidelity Investments Institutional Services.

"Funding Alternatives for Post Employment Benefits", speaker and moderator at 1991 Enrolled Actuaries Meeting.

"Integrating Retirement Plans into Estate Planning", speech to Tax & Estate Planning Council of Nassau County.

"Post-Retirement Medical Benefits: A Look at FASB Requirements and New Strategies for Controlling Costs", speaker at Mercer seminars.

"Post-Retirement Medical Benefits vs. Pension Benefits: Contrast in Asset/Liability Issues", speech at Asset Liability Management for Pension Funds sponsored by the Institute for International Research.

"What's New in Retiree Medical Funding Vehicles", speech at Post Retirement Medical seminar sponsored by Institute for International Research.

"Mergers and Acquisitions", speech to the New York County Lawyers Association.

"Mergers and Acquisitions, Employee Benefit Issues", speech to New York Metro Area Chapter - ISCEBS.

"The Funding and Financing of Retiree Medical Benefits", speech at Benefits News Analysis seminar on Managing Post-Retirement Medical Benefits.

"Applications for Post Retirement Medical Obligations", speech at Morgan Stanley seminar on ESOP Strategies and Implementation Issues.

"Pre-funding vs. Pay-as-you-go: Viable & Innovative Financing Options", speech at Institute for International Research seminar on Designing & Funding Cost-effective Employee Benefit Plans.

A-132

ATTACHMENT 1

"Changing Perspectives Which Motivate Asset - Liability Management: What Are the True Liabilities and How Do They Affect Matching?", speech at the second Annual Meeting on Asset/ Liability Management for Pension Funds sponsored by the Institute for International Research.

"Funding Executive Benefits", discussion leader for the Financial Executives Institute Financial Policy Peer Group Series.

"Highly Compensated Employees... Controlled Groups... Lines of Business...Aggregation Techniques", workshop speaker at Section 89 seminar sponsored by William M. Mercer, Inc.

"Omnibus Reconciliation Act of 1987 - Effects on Employee Benefit Plans", speech at William M. Mercer, Inc. seminar.

"Managing Future Liabilities – Investment Strategies for Funding Retiree Health Care Benefits", speech at first Annual Symposium on Funding Post-employment Health Care Benefits sponsored by the Institute for International Research.

"Actuarial Considerations for Self-funded Benefit Plans", panel seminar speaker at New York State Public Sector Coalition on Health Benefits Annual Conference.

"The Actuary and Post-retirement Welfare Benefits", speech to Actuaries Club of New York.

"The Effects of Tax Reform on Welfare Plans", lecture at 1987 Accounting Conference sponsored by the Foundation for Accounting.

"Coping with COBRA", speech to the Cultural Institutions Personnel Group.

"Defined Contribution Plans - Impact of 1986 Tax Reform Act", panel speaker at Mercer-Meidinger seminar.

"Tax Reform Legislation - Whither Goest Thou?", panel speaker at annual meeting of Conference of Actuaries in Public Practice.

"An Advanced Course in Employee Benefits", course leader/teacher for American Management Association.

"Select and Ultimate Financial Assumptions in Pension Plan Valuations", workshop chairperson at the Society of Actuaries 1985 Annual meeting.

"Coping with REACT Regulations", workshop panelist for the American Pension Conference.

"The Effect of the Treasury Tax Reform Proposals on Educational Institutions", speech to the Eastern Association of College and University Officers.

"Post Retirement Medical and Death Benefits", speech to American Management Association Annual Compensation/Employee Benefits Briefing.

"Using Insurance as a Capital Accumulation Device", course teacher for Practising Law Institute.

A-133

ATTACHMENT 1

"Fundamentals of Employee Benefits", course leader/teacher for American Management Association.

"Retirement Equity Act", speech to New York Personnel Management Association.

"Post-retirement Medical and Death Benefits: The Unrecognized Liability", speaker at Mercer-Meidinger seminar.

"Funding Vehicles for Pension Plans", workshop chairperson at the Society of Actuaries 1983 Spring Meeting.

"Hidden Pension Liabilities in an Acquisition", speaker at Mercer-Meidinger seminar.

"New Challenges and Opportunities for Welfare Plans", panelist at Mercer workshop.

"Opting Out of Social Security", speaker at Mercer sponsored seminar for hospital personnel executives.

"Executive Benefits Funded Through Life Insurance", speech at Mercer sponsored seminar for hospital personnel executives.

"Response to the Multiemployer Pension Plan Amendments Act of 1980", workshop chairperson at the Society of Actuaries 1981 Spring Meeting.

"Considerations in Selection of Actuarial Assumptions/Methods for Larger Plans", teacher at Enrolled Actuaries' Annual Meeting.

"Plan Sponsor Responses To The "Age Discrimination in Employment Act" (ADEA) – Employee Benefits", workshop chairperson at the Society of Actuaries 1980 Spring Meeting.

"Coordination of Social Security with...", workshop co-chairperson at Society of Actuaries 1979 Annual Meeting.

## Publications:

"A Proposal for Pension Funding Reform", The Future of Pension Plan Funding and Disclosure Monograph, July 2005, the Society of Actuaries, co-authored with Donald E. Fuerst.

"Durational (Select and Ultimate) Discount Rates for FAS 87 and 106 Valuations", The Pension Forum, December 2004, the Society of Actuaries, co-authored with Ron Iverson, Heidi Rackley and Steve Alpert.

"Late Breaking Developments", transcript, 2003 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"Q & N/A", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

A-134

ATTACHMENT 1

"New Mortality Tables for Pension Plans", transcript, 2002 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", transcript, 2002 Enrolled Actuaries Meeting.

"Is That Your Final Answer?", transcript, 2001 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments - Wass Up!", transcript, 2001 Conference of Consulting Actuaries Annual Meeting.

"Déjà vu All Over Again – Q & N/A!", transcript, 2000 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2000 Conference of Consulting Actuaries Annual Meeting.

"Q&N/A", transcript, 1999 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 1999 Conference of Consulting Actuaries Annual Meeting.

"So What's New? Late Breaking Developments", transcript, 1997 Conference of Consulting Actuaries Annual Meeting.

"Post-Retirement Welfare Benefits", transcript, 1997 Enrolled Actuaries Meeting.

"Exercising Professional Judgment—An Exercise in Futility?", transcript, 1997 Enrolled Actuaries Meeting.

"Small Business Job Protection Act of 1996 (Pension Simplification???)", transcript, 1997 Enrolled Actuaries Meeting.

"Basics of Funding Retiree Medical Funding", transcript, 1996 Conference of Consulting Actuaries Meeting.

"Pick your iq", transcript, 1996 Enrolled Actuaries Meeting.

"415 Limitations After GATT—Revenue Ruling 95-29" transcript, 1996 Enrolled Actuaries Meeting.

"Pick Your i", transcript, 1995 Enrolled Actuaries Meeting.

"New Rules for Underfunded Pension Plans, The Retirement Protection Act of 1994", a William M. Mercer, Inc. commentary, co-author.

"Post-Retirement Welfare Benefits", Transcript, 1994 Enrolled Actuaries Meeting.

"Post-Retirement Welfare Benefits - Funding", Transcript, 1993 Enrolled Actuaries Meeting.

"Employee Benefits in a Captive Insurance Company?", Mercer Bulletin, July, 1993.

"Decisions - FAS 106", Mercer Bulletin, September 1992.

"Postretirement Health Benefits Funding", Record of the Society of Actuaries 1992, Vol. 18, No. 1A.

"Post-Retirement Health Benefit Funding", Transcript, 1992 Enrolled Actuaries Meeting.

A-135

ATTACHMENT 1

"Retiree Medical Benefits: Making the Fund or Finance Decision", co-author with William A. Bader, The Journal of Corporate Accounting and Finance, Spring 1992.

"Audience Dialogue with the IRS", Record of the Society of Actuaries 1991, Vol. 17, No. 3.

"Message from the IRS", Record of the Society of Actuaries 1991, Vol. 17, No. 3.

"Funding Alternatives for Post Employment Benefits", Transcript, 1991 Enrolled Actuaries Meeting.

"New Directions in Retirement Planning," a William M. Mercer, Inc. series of commentaries, co-author.

"Miscellaneous 401(a)(4) and Related Issues; a Discussion of Various Issues", in Complying With the New Nondiscrimination and Minimum Coverage Regulations, Practising Law Institute, 1991.

"Funding and Financing Retiree Medical Benefits", Mercer Bulletin, September 1991.

"Retiree Health Benefits in the 1990's", a William M. Mercer, Inc. commentary, co-author.

"Permitted Disparity" in Complying With the New Nondiscrimination and Minimum Coverage Regulations, Practising Law Institute, 1991.

"Secular Trusts and Annuities - Securing Executive Benefits After Tax Reform", a William M. Mercer, Inc. commentary, co-author.

"Omnibus Budget Reconciliation Act of 1987: What it Means to Pensions and Employee Benefits", a William M. Mercer, Inc. commentary, co-author.

"Tax Reform: What It Will Mean to Benefits and Compensation - A Mercer-Meidinger Commentary", co-author.

"Using Insurance as a Capital Accumulation Device", in Executive Compensation, Practising Law Institute.

"How to Protect Yourself Against Medical Insurance Gaps", Bottom Line Personnel.

"How to Identify Gaps In Life and Disability Insurance", Bottom Line Personnel.

## Internal Mercer Communiqués - author/co-author of the following:

"FAS 158 and Multiemployer Plans", co-authored with James Dexter.

"Computation of Actuarial Value of Assets: Corridor Limit Application", co-authored with Carol Gramer.

"Selecting Cross-Border Accounting Assumptions", co-authored with Bruce Cadenhead, Wendy McFee and Phil Turner.

"Retiree medical Pre-funding in 401(h) accounts and VEBAs", co-authored with Heidi Rackley, Judy Bauserman, Barbara McGeoch, Scott Tucker and Derek Guyton.

"International Accounting Changes Target Multiemployer Plans", co-authored with James Dexter.

A-136

ATTACHMENT 1

"Tax Effects of the New Medicare Prescription Drug Subsidy", co-authored with Fran Bruno and Mark Hamelburg.

"Employee Benefits in a Captive Insurance Company", co authored with Rich Fuerstenberg, Mark Hamelburg and Henry Saveth.

"DOL Benefits-in-a-Captive Ruling Imminent" co-authored with Henry Saveth, and Mark Hamelburg.

"Peer Review of Cross-Border Actuarial Work", co-authored with Bruce Cadenhead.

"Professional Standard – Signing and Peer Reviewing Actuarial Reports", co-authored with Derek Guyton.

"Guidelines for Selecting Certain Assumptions", co-authored with Paul Zeisler and Bruce Cadenhead.

"Spin-off Assumptions", co-authored with Bruce Cadenhead.

"Pension Valuation Checklist for Multiemployer Plans: Updated to Reflect Changes Included in the Economic Growth and Tax Relief Reconciliation Act of 2001", co-authored with Carol Gramer.

"Reorganization Status for Multiemployer Plans", co-authored with Carol Gramer.

"Aggregate Entry Age Normal Funding Method Violates IRS Reasonable Funding Regulations".

"Section 414(k) Plans – Actuarial Issues", co-authored with Ron Iverson.

"Captive Insurance Companies and Employee Benefits", co-authored with Henry Saveth.

"Select and Ultimate Discount Rates for FAS 87 & 106 Valuations", co-authored with Ron Iverson and Heidi Dexter.

"Tax Gross Up Calculations for Executive Benefits", co-authored with Frank Burianek, Gary Thomas.

"Professional Standard – Signing/Peer Reviewing Actuarial Reports".

"Mergers and Acquisitions", co-authored with Bert Bernier, Edgar Friedman, Kevin Minor and Scott Tucker.

"Automatic approval for change in funding method for plans with negative unfunded liability".

"E-54—International Accounting Standards", co-authored with Ron Iverson, Wendy McFee, Larry Bader and Frank Todisco.

"Pension Valuation Checklist for Multiemployer Plans", co-authored with Carol Gramer.

"Change in SFAS 87/106 Measurement Date", co-authored with Kevin Minor and Bob Behar.

"1996 Schedule B", co-authored with Bruce Cadenhead and Ed Greene.

A-137

ATTACHMENT 1

"Consulting Issues Relating to Repeal of IRC Section 415(e)", co-authored with Carol Gramer.

"PBGC Variable Premium Calculations", co-authored with Bob Behar and Steven Gagel.

"Document Retention".

"Plan Spinoffs".

"FAS 87 & 106 Discount Rates".

"Multiple Employer Plans: Do I have one and what do I do now?", co-authored with Joy Theobald.

"Technical Actuarial Questions on Bulletin Board".

"Peer Review for Actuarial Reports".

"Continuing Education for Actuaries".

"Negative Unfunded Accrued Liabilities", co-authored with David Jarrett.

"Separate Line of Business".

"Testimony on 401(a)(4) Regulation Package".

"Schedule B - Deficit Reduction Contribution".

"Required Distributions Under Section 401(a)(9) - Qualified Plans".

"Business Combination Accounting".

"Retroactively Changing the Amortization Period for Gains and Losses Recognized as of 1/1/88".

"Meeting With IRS".

"Meeting With IRS".

"U.S. Controlled Group Benefit Issue for Foreign Parent Companies".

"Meeting With IRS".

"Revenue Notice 89-70 Warning on Early Retirement Using 1/15, 1/30".

"Calculating Benefits for Employees Who Attain age 70½".

"Taxation of Long Term Care Insurance".

"Bank Ownership of Individual Policies".

"Proposed Section 89 and 125 Regulations".

"Required Distributions From Qualified Plans: One Year Deferral of Effective Date".

"Determination of FAS 87 Pension Expense for Secular Trusts".

"Analysis of Social Security Integration Requirements".

"Integration Under Tax Reform '86 - A White Paper".

A-138

ATTACHMENT 1

"Market Crash of October 19, 1987".

"DOL Guidelines for Benefit Plans under ADEA", co-authored with Solomon Weinberger.

*Quoted frequently by New York Times, Wall Street Journal, Business Week, Newsweek, Time, Fortune, etc.*

A-139

**Attachment 2**

## Individual Data

| Name | | Thomas S Troup | Maurice Ward | Jerome Charles | Joseph Fink |
|---|---|---|---|---|---|
| Age as of 1/1/1999 | | 49.92 | 43.33 | 49.17 | 44.92 |
| Hire Date | | 10/15/1979 | 11/9/1981 | 9/10/1979 | 5/26/1987 |
| Credited Service for the prior plan as of 1/1/1999 | | 19.227 | 17.148 | 19.312 | 11.595 |
| Transition Credit Rate | | 3% | 3% | 4% | 2% |
| Cash Balance (opening balance) | 1999 | $ 129,777.43 | $ 94,035.74 | $ 138,172.25 | $ 66,851.03 |
| Compensation used for the Cash Balance Plan | 1999 | $ 63,522.62 | $ 70,385.51 | $ 56,824.37 | $ 73,536.98 |
| Compensation used for the Pre-Amended Plan | 1999 | $ 63,522.62 | $ 69,132.01 | $ 56,824.37 | $ 66,033.68 |
| | 1998 | $ 65,531.14 | $ 68,120.34 | $ 54,204.90 | $ 64,323.53 |
| | 1997 | $ 63,439.78 | $ 69,931.73 | $ 57,735.84 | $ 66,544.46 |
| | 1996 | $ 61,973.14 | $ 61,050.93 | $ 53,503.84 | $ 59,343.20 |
| | 1995 | $ 61,074.37 | $ 59,737.64 | $ 57,686.84 | $ 56,983.59 |
| | 1994 | $ 59,267.75 | $ 58,872.04 | $ 56,237.84 | $ 53,092.05 |
| Pre-Amended Plan | | Delmarva | ACE | ACE | ACE |

Cash Balance Plan Interest Crediting Rate for 1999: 5.01%, compounded annually