## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) ) | C. A. NO. 05-702 (SLR) (Lead Case) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) | |
| Defendants. | ) | |

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
302-656-2500 (telephone)
302-656-9053 (fax)
    and
James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

June 19, 2007                    Attorneys for Plaintiffs

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

I.    NATURE AND STAGE OF THE PROCEEDINGS ...................................................1

II.   SUMMARY OF ARGUMENT ....................................................................................1

III.  STATEMENT OF FACTS ...........................................................................................2

IV.   ARGUMENT ...............................................................................................................6

A.    THE PLAN VIOLATES THE MINIMUM ACCRUAL REQUIREMENTS OF ERISA ..............6

B.    THE PLAN VIOLATES SECTION 204(b)(1)(G) OF ERISA .................................12

C.    DEFENDANTS FAILED TO COMPLY WITH SECTION 204(h) .................................14

1.    Defendants Were Required to Provide Notice ...............................................15

2.    Defendants Did Not Issue Notice in a Timely Fashion .................................16

3.    There Is No Evidence That Notice Was Provided Properly ...........................19

a.    Defendants' "EMerging Times" Newsletters Were Insufficient ...................20

b.    Defendants Failed to Properly Disseminate the Undated "Facts" Newsletter .........21

c.    The "May 1998" Notice Was Insufficient ...................................................23

d.    The December 21, 1998 Letter Did Not Satisfy Defendants' Notice Obligation ........................................................................................24

e.    The Amendment Should Be Rescinded .......................................................26

D.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS ............29

1.    Count I and Count II Are Timely ..................................................................29

2.    Count IV Is Timely ......................................................................................30

V.    CONCLUSION ..........................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ackerman v. Warnaco, Inc.,*
  55 F.3d 117 (3d Cir. 1995) ............................................................................................. 27

*Alessi v. Raybestos-Manhattan, Inc.,*
  451 U.S. 504 (1981) ....................................................................................................... 7

*Anderson v. Resolution Trust Corp.,*
  66 F.3d 956 (8th Cir. 1995) ........................................................................................... 14

*Bailey v. Commerce Nat'l Ins. Svcs., Inc.,*
  474 F. Supp. 2d 577 (D. Del. 2007) .............................................................................. 6

*Bellas v. CBS, Inc.,*
  221 F.3d 517 (3d Cir. 2000) .......................................................................................... 6

*Berger v. Xerox Corp. Retirement Income Guarantee Plan,*
  338 F.3d 755 (7th Cir. 2003) ......................................................................................... 9

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,*
  974 F.2d 1358 (3d Cir. 1992) ........................................................................................ 6

*Central Laborers' Pension Fund v. Heinz,*
  541 U.S. 739 (2004) ....................................................................................................... 13

*Charles v. Pepco Holdings, Inc.,*
  437 F. Supp. 2d 248 (D. Del. 2006) .............................................................................. 1, 2

*Charles v. Pepco Holdings, Inc.,*
  2006 U.S. Dist. LEXIS 38941 (D. Del. June 12, 2006) ................................................ 1

*Davidson v. Canteen Corp.,*
  957 F.2d 1404 (7th Cir. 1992) ....................................................................................... 26, 27

*Dayco Corp. v. Goodyear Tire & Rubber Co.,*
  523 F.2d 389 (6th Cir. 1975) ......................................................................................... 37

*DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund,*
  975 F. Supp. 258 (S.D.N.Y. 1997) ................................................................................ 3

*Depenbrock v. Cigna Corp.,*
  389 F.3d 78 (3d Cir. 2004) ............................................................................................ 19

*DiCioccio v. Duquesne Light Co.,*
  911 F. Supp. 880 (W.D. Pa. 1995) ............................................................................... 13

*Esden v. Bank of Boston,*
     229 F.3d at 154 (2D Cir. 2000).................................................................7, 9, 11

*Finley v. Dun & Bradstreet Corp.,*
     417 F. Supp. 2d 485 (D.N.J. 2007)...............................................................27

*Frommert v. Conkright,*
     433 F.3d 254 (2d Cir. 2006)...................................................19, 25, 26, 27

*Gillis v. Hoechst Celanese Corp.,*
     4 F.3d 1137 (3d Cir. 1993).............................................................................15

*Hoover v. Cumberland, Maryland Area Teamsters Pension Fund,*
     756 F.2d 977 (3d Cir. 1985)......................................................................6, 7

*Jordan v. Federal Express Corp.,*
     116 F.3d 1005 (3d Cir. 2005).......................................................................26

*Kurz v. Philadelphia Elec. Co.,*
     96 F.3d 1544 (3d Cir. 1996).........................................................................27

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.,*
     318 F.3d 148 (2d Cir. 2003).........................................................................34

*Lentell v. Merrill Lynch & Co., Inc.,*
     396 F.2d 161 (2d Cir. 2005)....................................................................34-35

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
     998 F.2d 1144 (3d Cir. 1993)..................................................................36, 37

*Mathews v. Kidder Peabody & Co., Inc.,*
     260 F.3d 239 (3d Cir. 2001).........................................................................37

*Miller v. Fortis Benefits Ins. Co.,*
     475 F.3d 516 (3d Cir. 2007)...................................................................29, 31

*Musto v. American Gen. Corp.,*
     861 F.2d 897 (6th Cir. 1998).......................................................................19

*Production & Maint. Employees' Local, Laborers' Int'l Union v. Roadmaster Corp.,*
     954 F.2d 1397 (7th Cir. 1992)............................................................16, 19, 27

*Register v. PNC Fin. Svcs. Group, Inc.,*
     477 F.3d 56 (3d Cir. 2007).....................................................................passim

*Romero v. Allstate Corp.,*
     404 F.3d 212 (3d Cir. 2005).........................................................24, 29, 30, 37

*Scott v. Admin. Comm. of the Allstate Agents Pension Plan,*
    113 F.3d 1193 (11th Cir. 1997) ....................................................................23

*In re Unisys Sav. Plan Litig.,*
    74 F.3d 420 (3d Cir. 1996) ............................................................................6

*Wheeler v. Pension Value Plan for Employees of the Boeing Co.,*
    2007 U.S. Dist. LEXIS 17608 (S.D. Ill. Mar. 13, 2007) ..............................11

*Wood v. Carpenter,*
    101 U.S. 135, 25 L. Ed. 807 (1879) .............................................................37

## RULES, STATUTES AND REGULATIONS

Fed. R. Civ. P. 56 ...................................................................................................6

26 U.S.C. § 401(a)(2) ............................................................................................13

26 U.S.C. § 401(a)(8) ............................................................................................13

26 U.S.C. § 401(a)(15)(A) .....................................................................................13

26 U.S.C. § 411(b)(1)(B) .........................................................................................7

29 U.S.C. § 1002(23) .....................................................................................7, 8, 11

29 U.S.C. § 1024(b)(2) ..........................................................................................19

29 U.S.C. § 1053(a) ...............................................................................................13

29 U.S.C. § 1053(e)(4) ...........................................................................................14

29 U.S.C. § 1054(b)(1)(B) .........................................................................1, 7, 9, 29

29 U.S.C. § 1054(b)(1)(B)(iv) ...............................................................................10

29 U.S.C. § 1054(b)(1)(G) ........................................................................2, 12, 30

29 U.S.C. § 1054(b)(1)(H) .......................................................................................1

29 U.S.C. § 1055(a) ...............................................................................................14

29 U.S.C. § 1055(g) ...............................................................................................15

29 U.S.C. § 1055(h) (1996) ....................................................................................24

29 U.S.C. § 1055(h)(1) (1996) .............................................................2, 14, 16, 26

29 U.S.C. § 1055(h)(2) ..................................................................................................23

29 U.S.C. § 1055(h)(6)(A) ...........................................................................................26

29 U.S.C. § 1056(a) ......................................................................................................14

29 U.S.C. § 1102(a)(1) .................................................................................................16

29 U.S.C. § 1102(b)(1) .................................................................................................17

29 U.S.C. § 1102(b)(2) .................................................................................................17

29 U.S.C. § 1102(b)(4) .................................................................................................17

26 C.F.R. § 1.411(a)-7(a)(1)(ii) ....................................................................................7

26 C.F.R. § 1.411(d)-6 (1999) ................................................................................15, 21

26 C.F.R. § 54.4980F-1 ................................................................................................23

10 Del. C. § 8106 .........................................................................................................29

*Notice of Significant Reduction in the Rate of Benefit Accrual,*
    *60 Fed. Reg. 64,320 (Dec. 15, 1995)* ...............................................................15

*Notice of Significant Reduction in the Rate of Benefit Accrual,*
    *63 Fed. Reg. 68,678 (Dec. 14, 1998)* .........................................................15, 23

## OTHER AUTHORITIES

Notice 2007-6, 2007 I.R.B. 272, 2007 IRB LEXIS 6 (Jan. 16, 2007) ..........................10

H.R. Rep. No. 1280, [1974] U.S. Code Cong. & Admin. News 5077 .....................................19

IRS Notice 96-8, 1996-1 C.B. 359 (Feb. 5, 1996) ....................................................9, 10

## I.     NATURE AND STAGE OF THE PROCEEDINGS.

The first of these consolidated actions challenging the defendants' conversion of traditional defined benefit pension plans to a cash balance plan was filed on September 26, 2005. (D.I. 1).[1] The second action, *Troup v. Pepco Holdings, Inc.,* was filed on January 5, 2006. The complaints raise identical claims against the same defendants arising from the same pension plan.

In the *Charles* action, the Court denied the defendants' motion to dismiss on June 12, 2006, *Charles v. Pepco Holdings, Inc.,* 2006 U.S. Dist. LEXIS 38941 (D. Del. June 12, 2006) (D.I. 24, 25). Defendants moved for re-argument, and the Court denied that motion on July 11, 2006, while staying Count III.[2] *Charles v. Pepco Holdings, Inc.,* 437 F. Supp. 2d 248, 252 (D. Del. 2006). (D.I. 30, 31). Defendants filed answers to the complaints on August 1, 2006 (D.I. 38, 39), and discovery has been proceeding. The parties entered into a stipulation permitting defendants to file an early summary judgment motion on May 1, 2007, which the Court has approved. (D.I. 80, 91). Plaintiffs submit this brief in opposition to defendants' summary judgment motion and in support of their cross-motion for summary judgment.

## II.     SUMMARY OF ARGUMENT.

**A.**     While ERISA offers three alternative accrual standards for defined benefit plans, a cash balance plan is only capable of satisfying the 133 1/3 percent test of Section 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B). *See Register v. PNC Fin. Svcs. Group, Inc.,* 477 F.3d 56, 70 (3d Cir. 2007). The plan here violated this provision because the value of plaintiffs'

---

[1]     All references are to the docket in the main action.

[2]     Count III alleged a claim under Section 204(b)(1)(H) of ERISA, 29 U.S.C. § 1054(b)(1)(H), and was stayed pending disposition of an appeal pending in a similar case, *Register v. PNC Fin. Svcs. Group, Inc.,* No. 05-5445 (3d Cir.). The Court of Appeals ultimately issued an opinion which is fatal to Count III, and it rejected a petition for rehearing. (D.I. 79, 84).

accrued benefits under the relevant plan for one year exceeded "the value of a benefit accrued in any particular year by more than 33%." *Id.* (citations omitted).

      **B.**    A plan violates Section 204(b)(1)(G) of ERISA if a participant's "accrued benefit is reduced on account of any increase in his age or service." 29 U.S.C. § 1054(b)(1)(G). The plan violated this provision because the plaintiffs' accrued benefits decreased following additional years of service and increases in their age.

      **C.**    The validity of an amendment to a pension plan that results in "a significant reduction in the rate of future benefit accrual" is conditioned upon adequate notice, which must come after the adoption of the amendment and fifteen days before its effective date. 29 U.S.C. § 1054(h)(1) (1996). The adoption of the cash balance plan triggered this requirement, but defendants failed to provide timely notice, which rendered the amendment ineffective. Defendants also failed to disseminate notice properly and failed to provide sufficient information.

      **D.**    Plaintiffs' claims were timely filed under the relevant three-year limitations period. This Court previously rejected defendants' contentions to the contrary, and the additional facts developed in discovery do not provide a sufficient basis to show that, as a matter of law, plaintiffs' claims are untimely.

### III.    STATEMENT OF FACTS.

      These consolidated actions involve defendants' conversion of two traditional defined benefit pension plans to a single cash balance plan. This conversion became effective January 1, 1999, when the plaintiffs were placed into Conectiv's Cash Balance Sub-Plan. (D.I. 1 ¶ 24 & D.I. 38 ¶ 24).

      Prior to 1998, Atlantic City Electric Company ("Atlantic City Electric") and Delmarva Power & Light Company ("Delmarva") were independent companies, each of which maintained its own defined benefit pension plan. (D.I. 1 ¶ 17; D.I. 38 ¶ 17).

Following the merger of the two companies to form Conectiv, on April 23, 1998, the

Personnel and Compensation Committee of Conectiv met and approved a proposal to

adopt a cash balance pension plan. At that time, however, few of the details had been

worked out; instead, the committee was presented with very skeletal terms, such as

"Basic Formula is End of Year Balance + Beginning of Year Balance + Pay Credits +

Interest Credits."(App. at B0417-422). No specifics on how these credits would be

calculated were offered.

On December 30, 1998, Delmarva's pension plan merged into the plan

maintained by Atlantic City Electric, and the survivor was renamed the Conectiv

Retirement Plan. (D.I. 1 ¶ 18; D.I. 38 ¶ 18). Plan documents for the Conectiv Retirement

Plan and the Cash Balance Sub-Plan were formally adopted almost one year later, on

December 10, 1999. (App. at B0457, 510).

Prior to the effective date of the Conectiv Cash Balance Sub-Plan, in the Spring

and in December of 1998, Conectiv prepared documents or materials concerning the

pension plan conversion. (D.I. 1 ¶¶ 30, 34; D.I. 38 ¶¶ 30, 34). There are questions,

however, over whether these materials were used, how they were sent and to whom

they were issued. Significantly, defendants' disclosures did not inform the participants

that they might suffer adverse effects due to the change. Instead, the materials

emphasized the benefits of the new arrangement and indicated that the plan was

designed to protect the interests of older workers through grandfathering. (D.I. 89 at

A50-57, A90-94).

Defendants scheduled meetings that were held in approximately July, 1999, after

the effective date of the new plan. Standardized presentation materials were apparently

used at the meetings, emphasizing the benefits of the new arrangement. These materials

sought to contrast the new Conectiv cash balance plan with other companies' plans that

3

had received negative media attention. (D.I. 89 at A65-71). The materials specifically

indicated that the new plan was "not designed to provide cost savings for Conectiv."

(D.I. 89 at A66).

From January 1, 1999 through the present, each of the plaintiffs has been a

participant in the Cash Balance Sub-Plan of the Conectiv Retirement Plan, currently the

Pepco Holdings Retirement Plan,[3] and each has had his benefits under the Cash-Balance

Sub-Plan expressed in the form of an account balance. The account balance consists of

each plaintiff's opening balance plus the Pay Credits, Interest Credits, and Transition

Credits that they have earned since January 1, 1999. (D.I. 1 ¶ 38; D.I. 38 ¶ 38). The

plaintiffs have received annual statements that reflect the changes to their account

balance. (App. at B0244, 520).

Although the plaintiffs all receive statements relating to the amount of their

account balance, the Cash Balance Sub-Plan defines a participant's "Accrued Benefit" as

the greater of: "[t]he Participant's Payable Cash Balance, converted to an Actuarial

Equivalent single life annuity . . . ." or "[t]he Participant's Minimum Benefit, stated as a

life annuity commencing as of the determination date."[4] (App. at B0428). "Payable Cash

Balance," in turn, "means, as of any determination date, the lesser of (a) the Participant's

Cash Balance Account at the determination date or (b) 650% of Final Average

Compensation as of such date." (App. at B0431).

---

[3]    On August 1, 2002, Conectiv became a wholly-owned subsidiary of Pepco
Holdings. (D.I. 1 ¶ 29; D.I. 38 ¶ 29). Thereafter, Pepco Holdings merged the Pepco
General Retirement Plan (a defined benefit pension plan maintained by one of its
subsidiaries) and the Conectiv Retirement Plan to create the Pepco Holdings Retirement
Plan. (D.I. 1 ¶ 29; D.I. 38 ¶ 29). The formation of the Pepco Holdings Retirement Plan
did not alter the manner in which benefits were expressed for participants in the
Conectiv Retirement Plan. (D.I. 1 ¶ 29; D.I. 38 ¶ 29).
[4]    The "Minimum Benefit" refers to the greater of the benefit that had been accrued
under the old plan or the grandfathered benefit under the new plan. (*See* App. at B0431).

The "Cash Balance Account" consists of the opening balance[5], plus the Pay Credits, Interest Credits and Transition Credits that have been applied since the effective date of the conversion. (App. at B0428). Pay Credits are to be credited to the Cash Balance Account as of the end of each plan year, in accordance with a prescribed schedule under Section 3.3 of the plan, ranging from a low of five percent of compensation for those under thirty to a high of ten percent for those fifty or older. (App. at B0442).

Interest Credits are to be credited to each participant's account as of the end of each Plan Year, and, under Section 3.4.1, they are to be calculated by multiplying "the Interest Crediting Rate for such Plan Year" by the amount of the account as of January 1 of the applicable year. (App. at B0443). The "Interest Crediting Rate" is "for each Plan Year, the 30-year Treasury Bond rate for the October immediately preceding the beginning of the Plan Year." (App. at B0430). Generally, under Section 3.4.2 of the Cash Balance Sub-Plan, Interest Credits will continue to be applied to a participant's account until he retires or for those who leave before reaching normal retirement age, the date when they reach normal retirement age. (App. at B0443). Transition Credits are calculated by applying a multiplier to a participant's compensation for the year; the multiplier ranges from zero, for those with less than ten years of service at January 1, 1999, to four percent for those who had twenty or more years of service as of that date. (App. at B0444).

---

[5]    The opening balance is the "Initial Cash Balance," which is defined as "the amount determined pursuant to Section 3.2." (App. at B0430). Because the plaintiffs were participants in a predecessor plan as of December 31, 1998, Section 3.2.2 dictates that their Initial Cash Balance equal the "Prior Plan Conversion Credit." (App. at B0440). This term is defined as the actuarial equivalent of the accrued benefit earned under the old plan at the earliest retirement age, subject to certain adjustments. (App. at B0432).

When plaintiffs' accrued benefits are calculated under the terms of the Cash Balance Sub-Plan, they show decreases in several years, commencing in 2001, and increases in 2004 and 2006, by amounts that exceed the level permitted under the 133 $^{1/3}$ percent test for minimum accruals. (Poulin Decl. ¶¶ 14-19 & Ex. D; App. at B0555-557, 568).

## IV.    ARGUMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is only appropriate where the record demonstrates that there are no issues of material fact and that a party is entitled to judgment as a matter of law. *Bellas v. CBS, Inc.*, 221 F.3d 517, 522 (3d Cir. 2000) (citations omitted); *see also Bailey v. Commerce Nat'l Ins. Svcs., Inc.*, 474 F. Supp. 2d 577, 582 (D. Del. 2007). The party who is opposing a motion for summary judgment "is entitled to receive the benefit of the doubt when his assertions conflict with those of the movant and to have inferences from the underlying facts drawn in his favor." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 433 n.10 (3d Cir. 1996) (*citing Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992)).

Against this background, we turn to consideration of defendants' contentions. As will be seen, the record does not support the entry of judgment in defendants' favor. Instead, it supports a judgment for plaintiffs.

## A.    THE PLAN VIOLATES THE MINIMUM ACCRUAL REQUIREMENTS OF ERISA.

The Cash Balance Sub-Plan is a form of defined benefit plan which must comply with all of the relevant statutory requirements. *Register,* 477 F.3d at 62. Under ERISA's minimum accrual standards, a defined benefit plan "must accrue benefits for each active employee at a minimal accrual rate set by statute." *Hoover v. Cumberland, Maryland Area Teamsters Pension Fund,* 756 F.2d 977, 982 n.10 (3d Cir. 1985). These minimum accrual requirements consist of three alternative tests, "each of which specifies how much of the

benefit payable at normal retirement age must accrue **each year**." *Hoover,* 756 F.2d at 982 n.10 (emphasis supplied). Only one of the statutory tests, the 133 $^{1/3}$ percent rule, applies to cash balance plans. *Register,* 477 F.3d at 70.

Plaintiffs claim that the Cash Balance Sub-Plan violated the 133 $^{1/3}$ percent rule of Section 204 (b)(1)(B) of ERISA, 29 U.S.C. § 1054(b)(1)(B).[6] This test "requires that the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any particular year by more than 33%." *Register,* 477 F.3d at 70 (*quoting Esden v. Bank of Boston,* 229 F.3d 154, 167 n.18 (2d Cir. 2000)); *see also Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 514 n.9 (1981) (Section 204(b)(1)(B) "permits the use of any accrual formula as the long as the accrual rate for a given year of service does not vary beyond a specified percentage from the accrual rate of any other year under the plan.").

Compliance with ERISA's minimum accrual standards is measured by reference to the participants' "accrued benefit," which the statute requires to be "expressed in the form of an annual benefit commencing at normal retirement age . . . ." 29 U.S.C. § 1002(23). If a defined benefit plan does not express the benefit in this form, it must convert the benefit formula to an actuarially equivalent annuity. *See* 26 C.F.R. § 1.411(a)-7(a)(1)(ii).

In order to test compliance of the plan with the requirements of Section 204(b)(1)(B), it is therefore necessary to calculate the plaintiffs' "accrued benefits" for each plan year. This is accomplished by taking their account balance and projecting the interest credits forward to normal retirement age, using the "Interest Crediting Rate" for that plan year to calculate the amount of the interest credits that would be earned in each future year up to the time the plaintiff reaches normal retirement age, and then

---

[6]     *See also* 26 U.S.C. § 411(b)(1)(B) (parallel provision of the Code governing tax qualification).

converting the projected lump sum value at normal retirement age to a single life annuity.[7] (Poulin Decl. ¶ 14; App. at B0555-556).

Thus, for plan year 1999, the calculation of each plaintiff's accrued benefit would be accomplished by taking the account balance and projecting the future interest credits using the 30-year Treasury rate for October 1998. (*See* App. at B0430 (defining "Interest Crediting Rate" as "for each Plan Year, the 30-year Treasury Bond rate for the October immediately preceding the beginning of the plan year")). The projected account balance would then be converted to a single life annuity, which is the form in which ERISA and the plan provide that the "accrued benefit" be expressed. 29 U.S.C. § 1002(23). (*See* App. at B0428 (defining "Accrued Benefit" as "the Participant's Payable Cash Balance, converted to an Actuarial Equivalent single life annuity that is payable as of the determination date")). The same exercise is then repeated for each subsequent plan year, using the 30-year Treasury rate for the prior October to project out the interest credits and then converting the projected account value into a single life annuity. Compliance with Section 204(b)(1)(B) is then measured by examining the pattern of growth in the accrued benefit. The plan will pass the anti-backloading test so long as the value of the benefit accrued in any year does not "exceed the value of a benefit accrued in any particular year by more than 33%." *Register,* 477 F.3d at 70 (*quoting Esden v. Bank of Boston,* 229 F.3d 154, 167 n.18 (2d Cir. 2000)).

Plaintiffs have furnished this calculation as performed by an enrolled actuary. Claude Poulin calculated the accrued benefit for each plan year by projecting the future interest credits to age sixty-five, using the required 30-year Treasury rate for that year and then converting the projected balance to a single life annuity. (Poulin Decl. ¶¶ 14-19

---

[7]      As noted, the plan specifies the use of the thirty-year Treasury rate for the October preceding the plan year as the interest crediting rate. A table of these rates, as published by the IRS, is included in the appendix. (App. at B0544-551).

& Ex. D; App. at B0555-557, 568). The accrued benefits increased in some plan years but decreased in others. In plan year 2004, the accrued benefit grew by a substantial amount, after a series of plan years in which it decreased. By comparing the accrued benefit as of one plan year to the accrued benefit as of another year, Poulin was able to the determine the "annual rate at which any individual who is . . . participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year." 29 U.S.C. § 1054(b)(1)(B).

Defendants assert that the IRS, in Notice 96-8, conclusively ruled that all cash balance plans that do not condition future interest credits on continued service pass the 133 $1/3$ percent test.[8] Defendants previously raised this contention in their unsuccessful motion to dismiss, where it was rejected. (D.I. 12 at 33-34). Turning to the substance of the argument, in 1996, the IRS issued the notice that defendants cite, IRS Notice 96-8, 1996-1 C.B. 359 (Feb. 5, 1996). The notice indicated that it was requesting comments on proposed guidance on a particular issue, the calculation of lump sum distributions under cash balance plans. *See* IRS Notice 96-8, 1996-1 C.B. 359. The courts that have treated Notice 96-8 as authoritative have relied upon it in addressing its intended subject matter: the calculation of lump sum distributions from cash balance plans.[9] *See Esden v. Bank of Boston,* 229 F.3d at 168-69; *see also Berger v. Xerox Corp. Retirement Income Guarantee Plan,* 338 F.3d 755, 762 (7th Cir. 2003). Indeed, the IRS has indicated that Notice 96-8 "proposed a safe harbor" for plans offering frontloaded interest credits in which no violation of Section 411(a) (regulating vesting standards and barring

---

[8]    Ironically, defendants' expert takes a skeptical view of Notice 96-8, as he previously criticized a Labor Department report for treating it like "gospel." (Pl. Ex. 39; App. at B0246-247; Kra dep. at 111:7-114:12; App. at B0179-180).

[9]    There can be a difference between the discounted present value of an employee's annuity benefit under a cash balance plan and the value of the hypothetical account, depending upon the rate that the plan uses to calculate interest credits. *See Esden,* 229 F.3d at 165.

forfeitures) or Section 417(e) (regulating rates used to value benefits) would result if the plan distributed a lump sum distribution "equal to the employee's hypothetical account balance." Notice 2007-6, 2007 I.R.B. 272, 2007 IRB LEXIS 6 at * 8 (Jan. 16, 2007).

In Notice 96-8, the IRS distinguished backloaded cash balance plans, which only provide interest credits to those who continue to work, from plans that did not condition interest credits on additional service, which it characterized as frontloaded plans. Against that background, Notice 96-8 merely stated that backloaded plans normally will not satisfy the accrual rules, not that all frontloaded plans do. *See* Notice 96-8, 1996-1 C.B. 359, 1996 IRB LEXIS 51 at *8-*9 ("Because back-loaded interest credit plans typically will not satisfy any of the accrual rules in section 411(b)(1)(A),(B), or (C), it is anticipated that proposed guidance will address only frontloaded interest credit plans.").

In addition, defendants assert that the governing provision of ERISA and related Treasury regulations mandate that the interest rate be kept static to test compliance, and they have offered an expert's testimony that the plan does not violate the 133 $^{1/3}$ percent rule based upon that assumption. There are several problems with this assertion.

First, neither the relevant statute nor the regulation specifically say that interest rates should be kept static. The statute contains a provision, which is echoed in the regulation, stating that "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year." 29 U.S.C. § 1054(b)(1)(B)(iv); *see also* 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(D). While the language of these provisions is broad, they cannot be taken literally. Mr. Kra, defendants' own expert, acknowledged that age and service (two critical factors used to calculate benefits under a pension plan) could not be kept

constant or the accrual standards would be rendered meaningless.[10] (Kra Dep. at 45:6-50:7, App. at B0162-164).

Second, Kra's assumption that employees' accrued benefits should be calculated on the basis of a hypothetical static rate cannot be squared with the plain language of this plan or ERISA's definition of "accrued benefit." ERISA expressly provides that a participant's accrued benefit is "the individual's accrued benefit determined under the plan . . . ." 29 U.S.C. § 1002(23). This plan specifies a particular interest rate to be used to calculate interest credits under the plan, which is the thirty-year Treasury rate for October of the prior plan year. (App. at B0430). Kra's method is inconsistent with the requirements of the plan, as he is calculating accrued benefits for plan year 2000 based upon the October 1998 rate of 5.01%, rather than the rate specified in the plan, the October 1999 rate, which was 6.26%.[11] (App. at B0547).

Defendants also rely upon *Wheeler v. Pension Value Plan for Employees of the Boeing Co.,* 2007 U.S. Dist. LEXIS 17608 (S.D. Ill. Mar. 13, 2007), as further support. *Wheeler,* however, rests primarily on the same misreading of Notice 96-8 that defendants proffer here. *See Wheeler,* 2007 U.S. Dist. LEXIS 17608 at *11-*12 (construing Notice 96-8 to validate all cash balance plans so long as interest credits are not conditioned upon future service). Moreover, the plan at issue in *Wheeler* (unlike the plan here) had a lower limit on the interest crediting rate of 5.25%, giving an assumption of a static interest rate some plausible basis. *Id.* at *10.

---

[10]     The fact that neither ERISA nor the relevant Treasury regulations specifically address how to treat fluctuating interest rates in calculating accrued benefits under a cash balance plan is not surprising: "the governing statues and regulations were developed with traditional final-pay defined benefit plans in mind . . . ." *Esden,* 229 F.3d at 159. The first cash balance plan was created in 1985, while the relevant regulations were promulgated in 1977.

[11]     For this and other reasons, plaintiffs are filing a motion to strike Mr. Kra's declaration, as well as certain other materials lodged by defendants in the record.

**B.     THE PLAN VIOLATES SECTION 204(b)(1)(G) of ERISA.**

*Register* held that a cash balance plan did not violate Section 204(b)(1)(H) of

ERISA because the term "rate of benefit accrual" was properly measured by credits

applied to a participant's notional account, rather than changes in the accrued benefit, as

defined under ERISA. 477 F.3d at 68. While *Register* is dispositive of Count III, it has no

impact on Count II because Section 204(b)(1)(G) explicitly speaks to the participant's

accrued benefit; a defined benefit plan violates this provision "if the participant's

**accrued benefit** is reduced on account of any increase in his age or service." 29 U.S.C. §

1054(b)(1)(G) (emphasis supplied).

Here, the record demonstrates that the plaintiffs' accrued benefits decreased

several years in a row, as they rendered additional years of service. (Poulin Decl. ¶¶ 14-

19, 22 & Ex. E; App. at B0555-557, 558-559, 569). Under the plain language of Section

204(b)(1)(G), plaintiffs have suffered  a reduction in their accrued benefit "on account of"

an increase in age or service.

Defendants counter that the decrease in accrued benefit was the result of the

change in interest rates from one year to the next, not the fact that plaintiffs worked an

additional year. This essentially asks the Court to assess the plan's compliance with

Section 204(b)(1)(G) based upon the value of the cash balance, rather than the actuarially

equivalent annuity. The plain language of the statute, however, focuses upon the

accrued benefit.

While the change in interest rates explains the reason why the plaintiffs' accrued

benefits decreased from one year to the next despite additional service, that does not

excuse it. Ultimately, defendants' argument that the decrease in the plaintiffs' accrued

benefit resulted from changes in the applicable interest rate ignores the basic thrust of

plaintiffs' complaint, which is that the plan has a design flaw:  because benefits are

based upon growth of a hypothetical account, when the account is converted to an annuity a participant's accrued benefit **can decrease** despite additional service. Defendants' suggestion that the Court ignore the decreases in plaintiffs' accrued benefits that have occurred is inconsistent with "ERISA's objective of protecting employees' justified expectation of receiving the benefits their employers promise them." *Central Laborers' Pension Fund v. Heinz,* 541 U.S. 739, 743 (2004).

The only authority that defendants offer does not involve a cash balance plan or the calculation of annuities under one. *See DiCioccio v. Duquesne Light Co.*, 911 F. Supp. 880 (W.D. Pa. 1995). Instead, the court was dealing with a plan that had an offset for Social Security benefits. 911 F. Supp. at 903-04. The *DiCioccio* Court held that the plaintiffs' claim failed because an offset based on Social Security benefits was appropriate under ERISA, as Congress had explicitly authorized the particular benefit cut. *Id.* at 905-06 (*citing* 26 U.S.C. § 401(a)(15)(A)).

While there is dicta in *DiCioccio* suggesting that Section 204(b)(1)(G) would only be violated if a plan contained an express term that called for a reduction of accrued benefits based on additional service, that is not dispositive. First, the use of a fluctuating interest crediting rate is itself an express term of this plan. Second, if Congress wanted to limit the application of Section 204(b)(1)(G) to plans that explicitly provided for such a reduction, it would have said so. ERISA repeatedly demonstrates that when Congress sought to regulate the written terms of a plan, rather than the manner in which it operated, it knew how to do so.[12] *See* 29 U.S.C. § 1053(a) ("Each pension plan **shall**

---

[12]     The relevant provisions of the Internal Revenue Code governing tax treatment of employee benefit plans display the same pattern. *See* 26 U.S.C. § 401(a)(2) (imposing requirement for qualification of a trust forming a part of any pension plan that "**under the trust instrument** it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be . . . used for, or diverted to, purposes other than for the exclusive

13

**provide** that an employee's right to his normal retirement benefit is nonforfeitable . . . .")
(emphasis supplied); 29 U.S.C. § 1053(e)(4) ("A plan shall not fail to meet the
requirements of this subsection if, **under the terms of the plan**, the present value of the
nonforfeitable accrued benefit is determined . . . .") (emphasis supplied); 29 U.S.C. §
1055(a) ("Each pension plan to which this section applies **shall provide** . . . .") (emphasis
supplied); 29 U.S.C. § 1056(a) ("Each pension plan **shall provide** . . . .") (emphasis
supplied).

C.     DEFENDANTS FAILED TO COMPLY WITH SECTION 204(h).

The Conectiv Retirement Plan and its predecessor are all defined benefit pension
plans subject to Section 204(h) of ERISA, 29 U.S.C. § 1054(h) (1996).[13] Section 204(h)
imposes a notice requirement that applies to amendments which "provide for a
significant reduction in the rate of future benefit accrual." 29 U.S.C. § 1054(h)(1) (1996);
*cf. Anderson v. Resolution Trust Corp.*, 66 F.3d 956, 959 (8th Cir. 1995) ("The 1991
amendment to Midwest Savings's pension plan does not even fall within the scope of
section 204(h), because the 1991 amendment did not affect 'the rate of future benefit

---

benefit of his employees or their beneficiaries . . . .") (emphasis supplied); 26 U.S.C. §
401(a)(8) ("A trust forming a part of a defined benefit plan shall not constitute a
qualified trust under this section **unless the plan provides** that forfeitures must not be
applied to increase the benefits any employee would otherwise receive under the plan.")
(emphasis supplied).

[13]     Section 204(h), at the time of the amendment, provided in relevant part as
follows:

> **(h) Notice of significant reduction in benefit accruals**
> **(1)** A plan described in paragraph (2) may not be amended so as to
> provide for a significant reduction in the rate of future benefit accrual,
> unless, after adoption of the plan amendment and not less than 15 days
> before the effective date of the plan amendment, the plan administrator
> provides a written notice, setting forth the plan amendment and its
> effective date, to--
> **(A)** each participant in the plan . . . .

29 U.S.C. § 1054(h)(1) (1996).

accrual.'"). Here the record demonstrates that defendants were required to provide notice, but they did not comply with the statutory requirements.

      1.      *Defendants Were Required to Provide Notice.*

Under Section 204(h), participants must be notified of "an amendment [that] affects the rate of future benefit accrual only if it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." 26 C.F.R. § 1.411(d)-6 (Q&A 5) (1999).[14] The regulations explicitly provide that this is determined "based on reasonable expectations taking into account the relevant facts and circumstances at the time the amendment is adopted . . . ." 26 C.F.R. § 1.411(d)-6 (Q&A 7) (1999).

Plaintiffs have retained an enrolled actuary to determine whether the amendment establishing the Cash Balance Sub-Plan will change the rate of future benefit accrual under the plan. Under Poulin's analysis, the level of the plaintiffs' accrued benefit under the terms of the Cash Balance Sub-Plan at the time they reach normal retirement age is lower than it would have been under the predecessor plan. (Poulin Decl. ¶¶ 25-28 & Exs. F-1, F-2; App. at B0560-562, 570, 571). Defendants' expert offers a competing analysis, but it is premised upon the unrealistic assumption that the plaintiffs would receive no increase in pay for the rest of their working lives.[15] (D.I. 89 at 123).

---

[14]     Temporary regulations were issued in 1995. *See Notice of Significant Reduction in the Rate of Benefit Accrual*, 60 Fed. Reg. 64,320 (Dec. 15, 1995). Final regulations were issued December 14, 1998, and applied to plan amendments adopted on or after December 12, 1998. *See Notice of Significant Reduction in the Rate of Benefit Accrual*, 63 Fed. Reg. 68,678 (Dec. 14, 1998). These were published in the Code of Federal Regulations at 26 C.F.R. § 1.411(d)-6 (1999).

[15]     Defendants make much of the fact that immediately following the amendment, the value of accrued benefits for the plaintiffs increased. This is a red herring. In calculating opening balances, the value of early retirement benefits and subsidized survivors' benefits under the heritage plans was included. (*See* D.I. 89 at A52 ("The conversion formula will take account of any early retirement benefits and survivor benefits which are part of the current plan."); *see also* D.I. 89 at A68-69). These types of

2.    *Defendants Did Not Issue Notice in a Timely Fashion.*

At the outset, defendants have a fundamental problem: none of the documents that they contend served to satisfy the notice requirement would have been timely. The statute required that notice be provided "after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment." 29 U.S.C. § 1054(h)(1) (1996). Defendants failed to satisfy this requirement, as the plan became effective as of January 1, 1999, but it was not formally adopted until December 10, 1999.

While the Cash Balance Sub-Plan went into effect on January 1, 1999, the Cash Balance Sub-Plan document explicitly indicates that it was adopted on December 10, 1999. (App. at B0457). Donald Cain, the official who formally adopted the plan as the authorized representative of Conectiv, acknowledged this in his deposition. (*See* Cain Dep. at 69:7-18; 96:19-97:7; App. at B0019, 26). Benjamin Wilkinson, who worked on the conversion and attended the relevant meeting, corroborated this point:

> Q.    Do you know at what point this document reached its final form?
> MS. YU:  Objection as to form.
> THE WITNESS:  I assume it was sometime in early December 1999.

(Wilkinson Dep. at 77:24-78:4; App. at B0384-385). Thus, defendants made it impossible for themselves to comply with the statutory requirements.  *See Production & Maint. Employees' Local, Laborers' Int'l Union v. Roadmaster Corp.,* 954 F.2d 1397, 1403 (7th Cir. 1992) (stating that provision of notice prior to adoption of plan violated Section 204(h)).

Despite the facts, defendants assert that the plan was "adopted" on April 23, 1998 by the Compensation Committee of the Board of Directors of Conectiv. (D.I. 88 at

---

benefits are protected from elimination under Section 204(g) of ERISA, 29 U.S.C. § 1054(g), even though they do not fit the formal statutory definition of "accrued benefits." *See Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1143-44 (3d Cir. 1993). As defendants' expert acknowledged, early retirement benefits have substantial value over and above the value of the age sixty-five annuity provided under a plan. (Kra Dep. at 82:4-84:21, App. at B0172).

24). Section 402 of ERISA, however, establishes specific requirements for a plan. First, a plan must be in writing. 29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument."). Section 402(b) of ERISA further directs that any plan document contain certain required features, which include "a procedure for establishing and carrying out a funding policy," a description of any procedure "for the allocation of responsibilities for the operation and administration of the plan," and a statement of "the basis on which payments are made to and from the plan." 29 U.S.C. § 1102(b)(1), (2), (4).

The result of the April 23, 1998 committee meeting was the adoption of a resolution approving a cash balance design as attached to the committee minutes, and authorizing Donald E. Cain to adopt a formal plan document. (App. at B0417-422). The attachment to the minutes, which is what defendants contend constituted the plan as adopted, provided only a bare outline of the relevant terms:

- Effective: 1/1/99
- Basic formula is: End of Year Balance = Beginning of Year Balance + Pay Credits + Interest Credits
- Portable – after 5 year vesting
- Improved employee communications
- Survivor receives the "balance"
- Extensive "Grandfathering"
- Transition Credits
- Business Link
  - Useful in Divestitures
  - Can be differentiated by SBU

(App. at B0422).

This falls far short of complying with Section 402(b) of ERISA, since the bullet points did not "provide a procedure for establishing and carrying out a funding policy," did not "describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan," and did not "specify the basis on which

17

payments are made to and from the plan." *Cf.* 29 U.S.C. § 1102(b)(1), (2), (4) (imposing these requirements on every written employee benefit plan).

In fact, Wilkinson, who had also attended the meeting and prepared the attachment, conceded that the attachment "adopted" by the Committee had no procedure for establishing and carrying out funding of the plan, no description on how to allocate the responsibilities for the operation and administration of the plan and there was no indication for the basis on which the payments are made to and from the plan:

> Q.     Okay. But what the committee was looking at was the attachment, correct?
> A.     Correct.
> . . .
> BY MR. SAUDER:
> Q.     If you focus on these bullet points, which is the area of this attachment that focuses on the cash balance pension plan --
> A.     Yes.
> Q.     -- within those bullet points, it's fair to say that there's no procedure for establishing and carrying out the funding of the plan and how that's done?
> MS. YU:  Objection.
> BY MR. SAUDER:
> Q.     That's not in these bullet points, correct?
> A.     No.
> MS. YU:  Objection as to form.
> BY MR. SAUDER:
> Q.     Your answer is no, correct?
> A.     Correct.
> MS. YU:  There was an objection stated too.
> MR. SAUDER:  Okay.
> BY MR. SAUDER:
> Q.     And also with regard to these bullet points on the cash balance plan, there's no description on how to allocate the responsibilities for the operation and administration of the plan, correct?
> A.     Correct.
> MS. YU:  Objection as to form.
> BY MR. SAUDER:
> Q.     And there's also no indication on the basis on which the payments are made to and from the plan, correct --
> MS. YU:  Objection --
> BY MR. SAUDER:
> Q.     -- under these bullet points?
> MS. YU:  Objection as to form.
> THE WITNESS:  Correct.

18

*(See* Wilkinson Dep. at 48:6-8; 50:2-51:14; App. at B0377-378).

Plainly, the Cash Balance Sub-Plan was not adopted until December 10, 1999, when Mr. Cain formally adopted the plan document. *See Depenbrock v. Cigna Corp.,* 389 F.3d 78, 83 (3d Cir. 2004) (modification of pension plan was not adopted until document was executed by authorized officer). As a consequence of their delay in adopting the plan, defendants were simply unable to comply with their statutory notice obligation: while the relevant statute directed that notice be provided **after adoption** and before the effective date, whatever notice defendants provided (a point on which the record is far from clear), was issued before the effective date **and before the plan was adopted** in a written form. This did not comply with Section 204(h). *See Roadmaster,* 954 F.2d at 1403.

Nor should this be treated as some trivial violation: "[a] written plan is to be required in order that every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Musto v. American Gen. Corp.,* 861 F.2d 897, 910 (6th Cir. 1998) (*quoting* H.R. Rep. No. 1280, [1974] U.S. Code Cong. & Admin. News 5077).[16] Since defendants did not send timely notice, the plan amendment was ineffective. *Frommert v. Conkright,* 433 F.3d 254, 263, 268 (2d Cir. 2006).

3.      *There Is No Evidence That Notice Was Provided Properly.*

Ignoring the fact that no notice they issued could have been timely, defendants argue that "the evidence is undisputed that [Conectiv] discharged any obligation to provide notice under ERISA § 204(h)." (D.I. 88 at 22). They highlight four documents, alleging these documents were disseminated to plan participants for the purpose of

---

[16]      Once an employer adopts a formal plan document or amendment, the participants are entitled to examine it, so that they may ascertain what their rights are. 29 U.S.C. § 1024(b)(2) (directing that plan administrator make copies of "the bargaining agreement, trust agreement, contract or other instruments under which the plan was established or operated available for examination by any plan participant or beneficiary").

fulfilling the Section 204(h) notice requirement: an October 13, 1997 "EMerging Times" newsletter; an October 20, 1997 "EMerging Times" newsletter; an undated "Facts" newsletter (which they claim was issued in May 1998); and a December 21, 1998 letter. (D.I. 88 at 6).

In addition to the fact that the defendants could not comply with Section 204(h) because they did not formally adopt the Cash Balance Plan until after it went into effect, each of these documents has obvious deficiencies that preclude the defendants from establishing that they satisfied their notice obligations.

a.    Defendants' "EMerging Times" Newsletters Were Insufficient.

The first two documents defendants claim provided notice are EMerging Times newsletters from October 1997, before the merger became effective. The first, an October 13, 1997 EMerging Times newsletter, has a single reference to a change in the pension plan: "A new pension plan will replace the old 'final pay' plans with individual, portable accounts." (D.I. 89 at A42). This single sentence falls woefully short of providing adequate notice. The second, an October 20, 1997 EMerging Times newsletter, acknowledges that "[t]he design of the plan is not yet finalized, but we know it will be what's called a 'cash balance' plan." (D.I. 89 at A47). Defendants do not suggest how a plan can be summarized in any meaningful way, when its terms have not been finalized.

Even if these newsletters had been properly disseminated[17] they would have only alerted employees that a new pension plan was in development. In fact, the

_____

[17]    When asked about one of the EMerging Times newsletters, Benjamin Wilkinson testified as follows:
    Q.    Do you know how this was disseminated?
    A.    This?
    Q.    Yes.
    A.    I think they were just produced in bulk and then distributed to the business units, who got them to the management, who gave them the employees.

defendants' concede that in October 1997 the plan was still a work in progress. Neither

of these documents properly summarizes the plan "in a manner calculated to be

understood by the average plan participant." 26 C.F.R. §1.411(d)-6 (Q&A 10) (1999).

Totally missing are the details about the structure of Pay Credits, Interest Credits,

Transition Credits, and the like.

      b.  <u>Defendants Failed to Properly Disseminate the Undated "Facts"</u>
          <u>Newsletter</u>.

Defendants now argue that the undated "Facts" newsletter was the primary

source of notice to plan participants.[18] (D.I. 88 at 23-24). There is, however, no competent

evidence to support defendants' contention that they "mailed the 'Facts' newsletter to

each participant's home." At the relevant time, the applicable regulations provide that a

plan administrator "may use any method reasonably calculated to **ensure actual receipt**

of the section 204(h) notice. First class mail to the last known address of the party is an

acceptable delivery method. Likewise, hand delivery is acceptable." 26 C.F.R. §1.411(d)-6

(Q&A 11) (1999) (emphasis added).

---

      Q.     Is it possible they would have just been laying around for people
to pick up?
      A.     Yes.

(Wilkinson Dep. at 28:6-16; App. at B0372). His testimony was consistent with that of
plaintiff Charles. (Charles Dep. at 75:5-76:7; App. at B0057). Defendant's own designee
testified that he did not receive some of these newsletters. (Kremmel Dep. at 15:9-16:3;
App. at B0254). Kremmel nevertheless signed a declaration indicating that these
documents were distributed to all employees. (D.I. 89 at A39). Plaintiffs are filing a
motion to strike portions of that declaration. At best documents like these **may** have
been left laying around some facilities for employees to pick up. This method is not
reasonably calculated to ensure actual receipt by the plan participants. 26 C.F.R.
§1.411(d)-6 (Q&A 11) (1999).

[18]     Defendants in their motion to dismiss argued the primary sources for notice
were the "Spring 1998" disclosure and the "December 1998" letter discussed above. (D.I.
12 at 5-6). Plaintiffs' counsel, in preparing the complaint and opposing the motion to
dismiss, had assumed that it was the December 1998 letter that was intended to fulfill
that function.

The record provides no evidence to show effective dissemination of the relevant

documents. Plaintiff Charles testified:

> Q.    Take a look at the first page of D-5, the last paragraph -- last two
> paragraphs there's a title above it New Cash Balance Pension Plan, and
> the last sentence says, The new cash balance pension plan will take effect
> January 1st, 1999. Do you see that?
> A.    Yes, I do.
> Q.    Do you recall whether you received this document in the spring of
> 1998?
> MR. MALONE:  Objection. Lack of foundation.
> THE WITNESS:  I don't remember if I received this or when I would
> receive this.

(Charles Dep. at 90:6-22; App. at B0061).

Plaintiff Fink testified that he only viewed these types of documents if they were

"lying about" the facility. (*See* Fink Dep. at 86:7-20; App. at B0121; *see also* Fink Dep. at

87:13-88:5; App. at B0121). No records have been produced by defendants to explain the

dissemination of the May 1998 document. In fact, James Kremmel, defendants' designee,

testified:

> Q.    In or about April of 1998, did the company keep records when it
> made mailings of benefits information to employees?
> A.    The company kept a copy of what was mailed.
> Q.    Did it keep a log that would tell you the date that it was mailed?
> A.    Not to the best of my recollection, no

(Kremmel Dep. at 45:6-14; App. at B0261). Cain, who was the head of human resources,

also offered testimony that fails to support defendants' position:

> Q.    Are you familiar with a document entitled "Facts" while you were
> at Conectiv?
> A.    No.
> . . .
> Q.    You don't know if that communication went to anybody, correct?
> A.    I don't know if this specific one went to anyone.

(Cain Dep. at 58:21-23; 60:1-4; App. at B0017). Thus, the record does not support

defendants' contention that the undated "Facts" brochure was mailed to every

participant's home, and instead shows that defendants failed to properly disseminate D-5, the undated "May 1998" newsletter.

        c.     <u>The "May 1998" Notice Was Insufficient</u>.

Even if the "May 1998" document was disseminated in a timely and appropriate manner, it was insufficient to provide proper notice. Guidelines promulgated by the IRS clarify that Section 204(h) notice is required where an amendment is "reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." *Notice of Significant Reduction in the Rate of Benefit Accrual,*, 63 Fed. Reg. 68,678, 68,680 (Dec. 14, 1998). The 2001 statutory amendment made explicit that which was implicit in the requirement of a notice. The Section 204(h) notice requirement, as amended in 2001, requires a notice "written in a manner calculated to be understood by the average plan participant," and "provid[ing] sufficient information . . . to allow applicable individuals to understand the effect of the plan amendment." 29 U.S.C. § 1054(h)(2). Thus, even if defendants' "notice" had been timely issued, it nevertheless must be written in a way that can be understood by the "average plan participant" in order to comply with Section 204(h). *See Scott v. Admin. Comm. of the Allstate Agents Pension Plan*, 113 F.3d 1193, 1200 (11th Cir. 1997) (noting "Treasury Regulation § 1.411(d)-6T illustrates that, in inquiring into whether a notice satisfies ERISA § 204(h), the focus should be on whether 'the average plan participant' is able to understand the information which the plan sponsor is required to communicate.").[19]

While *Register* notes that "[t]he summary need not explain how the individual benefit of each participant or alternate payee will be affected by the amendment,"477

---

[19]    Additionally, the IRS regulations currently in effect state "[t]he information in a section 204(h) notice must be written in a manner calculated to be understood by the average plan participant and to apprise the applicable individual of the significance of the notice." 26 C.F.R. § 54.4980F-1 (Q&A 11(a)(2)).

F.3d at 73, the Section 204(h) notice requirement is only triggered where an amendment "provide[s] for a significant reduction in the rate of future benefit accrual."[20] Thus, for the notice to serve its purpose, it must inform plan participants in understandable language that they may suffer adverse effects of the plan amendment because ERISA does not require "plan participants and beneficiaries likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA, to become watchdogs over potential plan errors and abuses." *Romero v. Allstate Corp.*, 404 F.3d 212, 224 (3d Cir. 2005) (citations omitted).

Defendants rely on *Register* to argue there "was no requirement to disclose potential adverse effects under ERISA § 204(h) as it existed in 1998 and 1999." (D.I. 88 at 25). In *Register*, however, the defendants did notify the plan participants of the amendment's potential adverse effects. The last page of the 20-page brochure said that the "amendments to the Pension Plan effective January 1, 1999 described in this brochure **may affect the future rate of benefit accruals under the Pension Plan and in some instances may reduce the rate of future Pension Plan benefit accruals**." *Register* at 72-73 (emphasis added).

In stark contrast to *Register,* the May 1998 newsletter failed to adhere to Section 204(h)'s requirement for a number of reasons. Most significantly, defendants used these materials as a marketing tool to tout the "advantages" of the cash balance plan while failing to inform the average participant that they may suffer adverse effects of the plan amendment. (*See* D.I. 89 at A50-57).

      d.    <u>The December 21, 1998 Letter Did Not Satisfy Defendants' Notice Obligation</u>.

---

[20]    29 U.S.C. § 1054(h) (1996).

Finally, defendants point to a December 21, 1998 letter as satisfying Section 204(h). First, this letter cannot satisfy defendants' obligation because it was issued less than fifteen days prior to the effective date of the plan amendment. *See Frommert v. Conkright,* 433 F.3d at 268 (amendment invalid where "it was not preceded by fifteen days notice to Plan participants"). Second, defendants' designee admitted that the December 21, 1998 letter, marked at D-6, was not intended to fulfill the defendants' notice obligation:

> Q.    Did you come to form an understanding that the company had a legal obligation to provide some notification to its employees about its adoption of the cash balance plan?
> A.    Yes.
> Q.    And what did you understand the nature of that obligation to be?
> A.    To the best of my recollection, prior to the implementation of a new plan, there was a requirement to disclose the terms and conditions of the plan.
> . . .
> BY MR. MALONE:
> Q.    . . .To the best of your knowledge, sir, was D-6 intended to fulfill the company's obligation to notify employees of the terms and conditions of the new plan?
> MS. YU:  Objection.
> BY MR. MALONE:
> Q.    You can answer. She's making her record.
> A.    No, not to the best of my recollection.

(Kremmel Dep. at 59:11-22; 60:7-16; App. at B0265).

There is no evidence that the plaintiffs Charles, Fink and Ward received a copy of D-6 on or about December 21, 1998. Plaintiff Charles testified that he did not recall it. (Charles Dep. at 93:5-15; App. at B0061). Fink testified that he had never seen it. (*See* Fink Dep. at 88:21-89:5; App. at B0121). Finally, Ward testified that he could not recall whether he saw it in 1998 or in connection with this litigation. (Ward Dep. at 77:12-78:4; App. at B0335-336).

Former human resources executives Wilkinson and Cain could not explain the dissemination of D-6. Wilkinson lacked any personal knowledge of how the document

25

was disseminated. (Wilkinson Dep. at 57:20-58:2; App. at B0379-380). Similarly, Cain had no recollection of ever seeing this document. (Cain Dep. at 53:14-55:13; App. at B0015-16). Thus, the evidence does not show that plaintiffs received a copy of the December 21, 1998 letter by email or any other means.

        e.     <u>The Amendment Should Be Rescinded.</u>

Defendants' argument that a showing of "extraordinary circumstances" is required under Section 204(h) is at odds with the statute in place at the time of the amendment. That requirement was imposed for the first time under the amendments enacted in 2001. 29 U.S.C. § 1054(h)(6)(A).

The defendants' reliance on *Register* and *Jordan v. Federal Express Corp.*, 116 F.3d 1005 (3d Cir. 2005) for the proposition that "extraordinary circumstances" are required to gain relief under Section 204(h) is equally misplaced. The statute expressly conditions the validity of an amendment on the provision of notice: "[a] plan . . . **may not be amended** so as to provide for a significant reduction in the rate of future benefit accrual, **unless** . . . the plan administrator provides a written notice." 29 U.S.C. § 1054(h)(1) (1996) (emphasis added). Under Section 204(h), "plan sponsors are prohibited from amending a plan in a way that reduces future benefit accrual without notice to plan participants." *Frommert v. Conkright*, 433 F.3d at 263; *see also Davidson v. Canteen Corp.*, 957 F.2d 1404, 1409 (7th Cir. 1992) ("The amendment of a retirement plan to deprive some of the plan's participants of a benefit they were promised, when advance notice of that amendment would have allowed them to prevent injury from the amendment, is exactly what § 204(h) clearly outlaws.").

Neither *Register* nor *Jordan* required a showing of "extraordinary circumstances" under Section 204(h). *Register* discussed the "extraordinary circumstances" requirement in the context of the summary plan description, 477 F.3d at 74, and in *Jordan* it was

addressed where the plan administrator allegedly failed "to disclose material features of his retirement benefit election and joint annuitant designation." 116 F.3d at 1010.

In *Frommert*, the Second Circuit held that a plan amendment adopted without proper notice was "ineffective." 433 F.3d at 263. Noting the "obvious common sense behind [section] 204(h)," *Davidson v. Canteen Corp.*, 957 F.2d at 1408, the Seventh Circuit concluded that Congress had plainly assessed "[t]he burden such a notice requirement places on a plan sponsor," and deemed an amendment ineffective due to failure to timely and adequately notify participant. *Id.* at 1409; *see also Roadmaster*, 954 F.2d at 1406-08 (rescinding amendments deemed ineffective for untimely and inadequate notice).

In *Finley v. Dun & Bradstreet Corp.*, 417 F. Supp.2d 485 (D.N.J. 2007), the District of New Jersey dismissed a Section 204(h) claim for failure to allege extraordinary circumstances. 417 F. Supp.2d 485, 465. In *Finley*, however, the district court relied primarily on *Ackerman v. Warnaco, Inc.* 55 F.3d 117 (3d Cir. 1995), a case where the plaintiffs alleged they did not receive adequate notice of the elimination of a termination allowance policy, which is a welfare plan, not a defined benefit pension plan. *Id.* at 120-21. Thus, *Ackerman* did not address whether "extraordinary circumstances" were required under Section 204(h), and the *Finley* Court's conclusion to the contrary rests upon a misreading of *Ackerman*.

While plaintiffs need not show "extraordinary circumstances," the record has evidence of the type of bad faith that has previously supported a finding of "extraordinary circumstances." The Third Circuit has not provided a rigid definition, but "extraordinary circumstances" generally involve acts of bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud. *See Ackerman v. Warnaco, Inc.*, 55 F.3d at 125; *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996) ("To support [the extraordinary circumstances] element, we

27

have previously required a showing of affirmative acts of fraud or similarly inequitable conduct by an employer.").

In addressing participants such as the plaintiffs, defendants publicly stated that the cash balance plan was "not designed to provide cost savings for Conectiv." (App. at B0514). Behind closed doors, however, the defendants' senior management team was well aware that the cash balance plan was implemented as a significant costs savings measure for Conectiv. During the design of the new benefits package, Wilkinson and Cain, along with senior management, attended a meeting to discuss the cash balance plan. (Wilkinson Dep. at 108:8-110:16; App. at B0392-393). At the meeting Cain and Wilkinson were shown slides, one of which indicated that the cash balance plan provides costs savings when compared to the traditional ACE and Delmarva defined benefit plans. (App. at B0526). Wilkinson discussed this material:

> Q.  If you look at the graph "Retirement." Does that graph indicate to you that for every $100 spent by Conectiv for the retirement benefits, it was comparing every $100 that Conectiv spent to other companies?
> MS. YU:  Objection.
> THE WITNESS:  Other local companies.
> BY MR. SAUDER:
> Q.  Okay. Atlantic -- for every $100 Conectiv was spending, Atlantic was spending $122 on retirement, is that correct?
> A.  Yes.
> Q.  And Delmarva was spending $109 on the retirement, correct?
> A.  Yes.

(Wilkinson Dep. at 113:18-114:8; App. at B0393-394).

In fact, the defendants' March 1, 2007 10-K corroborates this point. In it, defendants discuss this pending litigation and state in relevant part:

> PHI estimates that, if the plaintiffs were to prevail, the ABO and projected benefit obligation (PBO), calculated in accordance with SFAS No. 87, each would increase by approximately $12 million, assuming no change in benefits for persons who have already retired or whose employment has been terminated and using actuarial valuation data as of the time the suit was filed. The ABO represents the present value that participants have earned as of the date of calculation. This means that only service already

28

> worked and compensation already earned and paid is considered. The
> PBO is similar to the ABO, except that the PBO includes recognition of the
> effect that estimated future pay increases would have on the pension plan
> obligation.

(App. at B0543).

Defendants deceived the plan participants, telling them that the cash balance

plan was not a cost savings measure. At the same time, senior management was

discussing how the cash balance plan would decease Conectiv's costs.

### D.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.

Recognizing that the relevant limitations period is the three-year limitations

period provided by 10 Del. C. § 8106, defendants argue that all of plaintiffs' claims

accrued by September 26, 2002, three years prior to the filing of the *Charles* complaint.

(D.I. 12 at 27). The evidence is to the contrary.

In denying defendants' motion to dismiss, this Court adopted the "clear

repudiation" standard established in *Romero v. Allstate Corp.* (D.I. 24 at 6). In *Romero*, the

Third Circuit held that:

> when an ERISA plan is amended but the fact that the amendment
> actually affects a particular employee or group of employees cannot be
> known until some later event, the cause of action of the employee will not
> accrue until such time as the employee knew or should have known that
> the amendment has brought about a clear repudiation of certain rights
> that the employee believed he or she had under the plan.

404 F.3d at 223; *see also Miller v. Fortis Benefits Ins. Co.,* 475 F.3d 516 (3d Cir. 2007).

Applying the "clear repudiation" standard, all of plaintiffs' claims were timely filed.

*1.    Count I and Count II Are Timely.*

Count I alleges a violation of the 133 $^{1/3}$ percent test of Section 204(b)(1)((B) of

ERISA, 29 U.S.C. § 1054(b)(1)(B). Claude Poulin demonstrates from the plaintiffs' actual

experiences that the plan fails the 133 $^{1/3}$ percent method for the first time in 2004. Even

assuming that plaintiffs were sufficiently knowledgeable to calculate their accrued

benefit at that time, which is unlikely, the three year limitations period would have expired in 2007. Therefore, Count I was timely filed.

Section 204(b)(1)(G) of ERISA precludes a reduction in a worker's accrued benefit on account of any increase in age or service. 29 U.S.C. § 1054(b)(1)(G). The plan defines participants' accrued benefits in terms of their annuity. Claude Poulin demonstrates that when plaintiffs' cash balance account values are converted to a single life annuity commencing at age 65 the plaintiffs each suffered negative accruals. This first occurred in 2001.

Importantly, the annual statements issued by defendants never provided the plan participants with a calculation of the converted single life annuity; instead benefits were described by reference to the account balance. (*See, e.g.,* Ward 2001 Statement; App. at B0520). Therefore, a plan participant could not determine on the face of their annual cash balance account statements that their accrued benefit decreased. Further, the plan participant has no duty to retain an actuary to convert the cash balance to a single life annuity commencing at age 65 in order to test the plan's compliance with "the intricacies of pension plan formulas and the technical requirements of ERISA." *Romero,* 404 F.3d at 224 (*quoting DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund,* 975 F. Supp. 258, 265 (S.D.N.Y. 1997). The limitations period begins to run only when there has been a clear repudiation of the benefits that is made known to the plan participants. *Id.* at 223. Consequently, Count II was timely filed.

>    2.    *Count IV Is Timely.*

The federal discovery rule applies to determine the date of accrual of the Section 204(h) claim. *Romero,* 404 F.3d at 225. In applying this rule, the Third Circuit reasoned that "[i]t would make no sense, and indeed do a remarkable disservice to the underlying purposes of ERISA and its disclosure requirements, to deem a notice claim to have

accrued before a plaintiff knows or should know that an amendment has the effect

which triggers the notice requirement." *Id.; see also Miller v. Fortis Benefits Ins. Co.*, 475

F.3d. at 522-23.

　　　　Here, there is no evidence to demonstrate, as a matter of law, that plaintiffs were

on notice that the amendment to the plan reduced the rate at which they accrued

benefits more than three years before the complaint was filed. In fact, the plaintiffs'

testimony demonstrates that their notice claims did not accrue until 2004. As the

plaintiffs explained, their realization that they would be worse off under the new plan

than the old was triggered at that time by conversations with individuals who were

retiring and were grandfathered under the ACE and Delmarva Sub-Plans.  In January

2007, plaintiff Charles testified:

> Q.　　Well, let's talk about the conversations that you've had with your
> friends. What kind of conversations have you had about cash balance
> plans?
> MR. MALONE:  Object as to form. You can answer.
> THE WITNESS:  I would ask them if they had any information, knew
> anything about cash balance plans, if their company did, or have info,
> things of that nature.
> BY MS. YU:
> Q.　　And when did you start having these kinds of conversations with
> your friends?
> A.　　Two to three years ago.

(Charles Dep. at 32:7–32:23; App at B0046). (*See also* Fink Dep. at 33:2-34:5; App. at

B0107-108 (became suspicious in 2004); Ward Dep. at 37:23-38:24; App. at B0325-326

(discussions with departing grandfathered employees in "the last few years" made him

suspicious)).

　　　　Similarly, plaintiff Troup testified that the first time he contacted an attorney

regarding the cash balance plan was approximately eighteen to twenty-four months

prior to his deposition. (Troup Dep. at 33:3-33:14; App. at B0307). Ignoring the record,

defendants argue that plaintiffs were on inquiry notice of their claims by 1999. There is

simply nothing in the record to support this argument. In fact, defendants repeatedly

informed plan participants that the cash balance plan was different and better than other

cash balance plans in the news.

<u>Plaintiff Charles.</u>

Defendants allege that plaintiff Charles was on inquiry notice in January 1999

because of an August 20, 2003 email he sent to human resources, which stated in

relevant part:

> As one of the A.E. employees that missed the cut off date if 1/1/99 by
> both age and time with the Company by only a few months (start date
> 9/10/79 birthday 10/18/49) this event has caught my attention. I've
> always felt from the inception of the cash balance plan that it was unfair.
> However, as a [sic] employee I knew there was little I could do.

(D.I. 89 at A114).[21]

Defendants now argue that Charles's claims are time barred based solely on this

email. During his seven-hour deposition, defense counsel never bothered to directly ask

Charles about his statement: "I've always felt from the inception of the cash balance plan

that it was unfair." Charles nonetheless explained at his deposition that he felt the plan

was unfair because he had no choice as to which form of benefit he received: "I would

assume if they said, Here's a new retirement plan; here's an old retirement plan;

everybody, take your pick, I would say that would be fair." (*See* Charles Dep. at 141:10-

142:1; App. at B0073-74). He has submitted a declaration to expand upon this point,

since he was not asked about it. (Charles Decl.; App. at B0400).

---

[21]    Significantly, the defendants' human resources representative replied as follows:
[O]ur benefits design group is aware of the IBM case and are following
this issue and all of the activity surrounding cash balance plans. We
expect the ultimate impact of this case will not be known for some time
and we will continue to follow all of the activity and make decisions at
the company level at the appropriate time.
(D.I. 89 at A114). The defendants were assuring Charles in August 2003 that the IBM
case should not alarm him and there were no reasons to be concerned about the Cash
Balance Sub-Plan.

Charles further first testified about his conversations with co-workers in 2004:

> A:    And it was only later that they, through other conversations, me and other employees, that realized that something just wasn't right.
> Q.    And what is it that's not right?
> A.    The feeling was that the class of workers were not treated fairly.

(Charles Dep. at 55:10-55:18; App at B0052). Charles later explained:

> Q.    You said that the cash balance plan is unfair to the class of folks that you were describing, which included these folks in the moving from non-union to union. Do you believe that the cash balance plan was unfair -- let me back up. There's a group of folks that you described as middle management not grandfathered.
> A.    Yes.
> . . .
> Q.    Is it unfair in the same way as to both middle management and to the folks in the Local 210 B?
> A.    Yes.
> Q.    How is the cash balance plan unfair, in your view?
> A.    Provides less financial benefit upon retirement than the old plan does.
> Q.    Is there any other reason that you feel that it's unfair?
> A.    No. That's pretty much the foremost reason. **The other reason I use the word unfair is that you have a core of people, workers, that have no choice in what plan they get versus another group who have a choice**.

(Charles Dep. at 57:24-58:11; 59:3-59:20; App. at B0052-53) (emphasis added).

Against this background, defendants' argument that plaintiff Charles was on inquiry notice since 1999 fails for two reasons. First, the reason Mr. Charles thought it was unfair from the inception have nothing to do with the economic effect of the plan; instead he resented the fact that others were given a choice of plans and he was not. Second, unfair does not equate with illegal; the fact that Mr. Charles felt he should have gotten a choice does not demonstrate, as a matter of law, that he knew he would be worse of under the new plan.

<u>Plaintiff Ward and Plaintiff Troup.</u>

Defendants argue plaintiffs Troup and Ward were on inquiry notice as the result of certain *Wall Street Journal* articles.[22] Plaintiff Ward is claimed to have had the articles while plaintiff Troup is faulted for failing to find them. There is no competent evidence to show that plaintiff Ward ever received these articles. While defendants proffer an email to show that, Ward has no recollection of receiving it,[23] and the email does not appear to have any attachments to it, although defendants have submitted it with articles that Ward also has no recollection of seeing. (Ward Decl.; App. at B0401). Accordingly, plaintiffs are filing a motion to strike the email that defendants rely upon.

In any event, these *Wall Street Journal* articles were discussed and dismissed as irrelevant at the July 1999 meetings, which defendants described as being the "best source of information" regarding the cash balance plan. (D.I. 89 at A63). These reliable words of comfort by management were designed to refute any and all suspicions of the plan participants. *Cf. LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) ("There are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management."). Thus, defendants' argument that Troup and Ward were on inquiry notice in 1999 as a result of *Wall Street Journal* articles, is directly contradicted by defendants' prior statements that these articles were irrelevant to their plan. *Cf. Lentell v.*

---

[22]    Defendants criticize plaintiff Fink for not attending the July 1999 informational meetings, however, had he been properly notified and attended he would have been told to disregard the *Wall Street Journal* articles and any other bad news he may have heard about cash balance plans because the Conectiv Cash Balance plan was "different" and better.

[23]    The email is frankly fishy looking. (D.I. 89 at A100-113). There are a variety of problems with this document, and plaintiffs are moving to strike it. The employee who purportedly sent it died several years ago. (App. at B0540).

*Merrill Lynch & Co., Inc.*, 396 F.2d 161, 171 (2d Cir. 2005) (generic articles discussing

conflicts of interest of investment analysts insufficient to trigger inquiry notice).

Cain and Wilkinson both testified that plan participants were informed that the

Conectiv plan differed from the "controversial plans" discussed in the news. Wilkinson

testified:

> Q.    Okay. The third paragraph, where it starts out, "These meetings
> will be the best source of information on the plan and employees'
> opening balances. Recent stories in the national media have raised
> concerns about some cash-balance plans that do not offer the same level
> of financial security or grandfathering provisions as Conectiv's Cash
> Balance Pension Plan. One part of the presentation will address these
> concerns and demonstrate how Conectiv's plan is different."
> Do you see that?
> A.    Yes.
>  Q.    What's your understanding of that last portion, where it says,
> "and demonstrate how Conectiv's plan is different"?
> MS. YU:  Objection as to form.
> THE WITNESS:  Well, I think it means that Conectiv's plan design was
> different than the plan design that was discussed in the national media.

(Wilkinson Dep. at 84:19-85:14; App. at B0386). Cain reiterated these points in his

testimony:

> Q:    Okay.
> Next sentence says, "Recent stories in the national media have raised
> concerns about some Cash Balance Plans that do not offer the same level
> of financial security or grandfathering provisions as the Conectiv Cash
> Balance Pension Plan."
> Do you see that?
> A.    Yes.
> Q.    Do you know what that is referring to?
> A.    I believe it's referring to articles that probably have been written
> in the newspaper about Cash Balance Plans, and the Conectiv plan from
> the beginning was to be a cost-neutral plan, so it had a lot of good
> benefits in it and transition things that other plans didn't have. We
> wanted to make sure employees knew that.
> Q.    Knew that the Conectiv plan was different than what was in the
> national media?
> A.    Yes, that's correct.
> Q.    And, in fact, the next sentence states, "One part of the
> presentation will address these concerns and demonstrate how Conectiv's
> plan is different."
> A.    Correct.

35

(Cain Dep. at 82:14-83:15; App. at B0023).

Cain also addressed the slide presentation shown to employees:

Q.    The next bullet says, "Criticisms leveled at Cash Balance Plans," and one of them says, "Masks cost cutting."
Do you see that?
A.    Yes.
Q.    If you go down to the next slide below that, where it says, "Important perspectives on Conectiv's new retirement program," the first slide states, "New program not designed to provide cost savings for Conectiv."
Do you see that?
A.    That is correct.
Q.    So, it's fair to say that the Conectiv Cash Balance Plan was not masking cost cutting, correct?
A.    Correct.

(Cain Dep. at 88:21-89:12; App. at B0024).

Defendants informed the plan participants that the *Wall Street Journal* articles and any other "bad news" relating to cash balance plans were irrelevant to the Conectiv cash balance plan. Thus, despite defendants' arguments, there was no reason for plaintiffs Ward and Troup to locate and read these articles. The defendants themselves have made it clear that they had nothing to do with the Conectiv Cash Balance Plan.

Plaintiff Fink.

Defendants argue plaintiff Fink was on inquiry notice in 1999 because he testified he was "highly suspicious." (D.I. 88 at 28) (*citing In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1179 (3d Cir. 1993)). Defendants cite *Lower Lake Erie* to argue that Fink's suspicions placed him on inquiry notice. *Id.* Contrary to defendants' assertion, the Third Circuit in *Lower Lake Erie* did not hold "any fact that should excite [the plaintiff's] suspicion is the same as actual knowledge of the entire claim." *Id.* What the defendants' state as the Court's holding was actually language from a Sixth Circuit case addressing the pleading standards relating to tolling of antitrust claims due to fraudulent

36

concealment, not the application of the discovery rule under ERISA. The Sixth Circuit case paraphrased a century old Supreme Court case.[24] The defendants now mistakenly claim that language is the holding of *Lower Lake Erie*.

Nevertheless, Fink's suspicion did not equate with knowledge of the economic impact of the plan. The Third Circuit has previously cautioned against adopting too broad an interpretation of inquiry notice. *See Mathews v. Kidder Peabody & Co., Inc.,* 260 F.3d 239, 253 (3d Cir. 2001); *see also Romero,* 404 F.3d at 225. Moreover, the defendants ignore testimony that goes to the heart of the matter. When asked when he **first** suspected that his rights were violated by the new plan, Fink testified that "I became suspicious of how the plan would ultimately suit me around 2004 maybe."(Fink Dep. at 33:2-33:10; App at B0107).

Significantly, Fink testified that he discussed the plan with the defendants' human resources representative in 1999 and was informed that the cash balance plan was "better" than the ACE plan. Fink testified that he spoke with George Bleazard from human resources:

> Q.    And what did George say to you?
> A.    He said he thought it was better because it was portable and so on and the company was very adamant about that it was better, from what little information I could ever get, because it was portable, and I see that in these documents frequently.

(*See* Fink Dep. at 105:16-106:24; App. at B0125-126).

---

[24]    *See In re Lower Lake Erie,* 996 F.2d at 1179 (discussing *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389 (6th Cir. 1975), and *Wood v. Carpenter,* 101 U.S. 135, 25 L.Ed. 807 (1879)).

37

## V.  CONCLUSION

Based upon the arguments and authorities set forth above, plaintiffs respectfully request that defendants' motion for summary judgment be denied and that judgment be entered in their favor on Counts I, II and IV.

Respectfully submitted,

Dated:   June 19, 2007                    **CHIMICLES & TIKELLIS LLP**

By:   _/s/ A. Zachary Naylor_
        Pamela S. Tikellis (#2172)
        Robert J. Kriner (#2546)
        A. Zachary Naylor (#4439)
        One Rodney Square
        P.O. Box 1035
        Wilmington, DE 19899
        302-656-2500 (telephone)
        302-656-9053 (fax)

        and

        James R. Malone, Jr.
        (*pro hac vice*)
        Joseph G. Sauder
        (*pro hac vice*)
        One Haverford Centre
        361 West Lancaster Avenue
        Haverford, PA 19041
        610-642-8500 (telephone)
        610-649-3633 (fax)

Attorneys for Plaintiffs