## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) | C. A. NO. 05-702 (SLR) WARD, (Lead Case) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) | |
| | ) | |
| Defendants. | ) | |

## APPENDIX TO BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
One Rodney Square
P.O. Box 1035
Wilmington, DE  19899
302-656-2500 (telephone)
302-656-9053 (fax)
and
James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA  19041
610-642-8500 (telephone)
610-649-3633 (fax)

June 19, 2007                    Attorneys for Plaintiffs

Cain Deposition Transcript, dated April 17, 2007 ................................................................ B0001

Charles Deposition Transcript, dated January 9, 2007 ...................................................... B0038

Fink Deposition Transcript, dated January 11, 2007 .......................................................... B0099

Kra Deposition Transcript, dated May 25, 2007 ................................................................ B0150

Conectiv Cash Balance Sub-Plan Spreadsheets,
    Bates Nos. KRA00414-447 [P-34] .............................................................................. B0190

Expert Report of Ethan E. Kra, Ph.D, F.S.A. dated 4/20/07,
    Bates Nos. KRA00019-38 [P-35] ................................................................................ B0224

Maurice W. Ward Cash Balance Account Statement for
    1/1/02-12/31/02, Bates Nos. KRA00168-69 [P-38] .................................................... B0244

5-13-02 Article Titled "Benefits Experts Rebut Report
    Hitting Cash Balance Payouts" [P-39] ........................................................................ B0246

Handwritten Note, Bates No. KRA00001 [P-40] ................................................................ B0248

Kremmel Deposition Transcript, dated March 13, 2007 .................................................... B0249

Troup Deposition Transcript, dated January 12, 2007 ........................................................ B0298

Ward Deposition Transcript, dated January 10, 2007 ........................................................ B0316

Wilkinson Deposition Transcript, dated April 4, 2007 ........................................................ B0364

Charles Declaration .......................................................................................................... B0400

Ward Declaration .............................................................................................................. B0401

Conectiv Cash Balance Plan Slides dated February 20, 1998,
    Bates Nos. JMC00444-458 [D-3] ................................................................................ B0402

April 23, 1998 Minutes of the Personnel and Compensation Committee,
    Bates Nos. PHI001584-91  [P-2] ................................................................................ B0417

Cash Balance Sub-Plan, dated January 1, 1999
    Bates Nos. PHI001538-1583 [P-10] ............................................................................ B0425

Conectiv Retirement Plan, dated January 1, 1999
    Bates Nos. PHI000481-520 ...................................................................... B0471

Mid-Week Extra - Cash Balance Update, dated June 23, 1999
    Bates Nos. JMC00006-7 [D-10] ................................................................ B0511

July 1999, Meeting Powerpoint Presentation on Cash Balance Pension
    Plan, Bates Nos. MWW00301-07  [P-4] ................................................... B0513

2001 Conectiv Retirement Plan Statement of Maurice W. Ward,
    Bates Nos. MWW00004-5 ........................................................................ B0520

Conectiv Total Rewards (Senior Management Powerpoint slides),
    Bates Nos. JMC00197-214 [D-8] .............................................................. B0522

Bates Death Certificate, death January 7, 2002 .............................................. B0540

Excerpt from 2006 Conectiv Form 10-K ......................................................... B0541

Weighted Average Interest Rate Table ........................................................... B0544

Poulin Report .................................................................................................. B0552

# In The Matter Of:

*J. Michael Charles, et al*
*v.*
*Pepco Holdings, Inc., et al*

---

*DONALD E. CAIN*
*April 17, 2007*

---

# REPORTING ASSOCIATES, LLC

*Certified & Registered Professional Reporters*

*Cherry Hill   --   Philadelphia   --   Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

B0001

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2             CIVIL ACTION NO. 05-702(SLR)

 3   -----------------------------------
     J. MICHAEL CHARLES; MAURICE W.
 4   WARD, JR.; and JOSEPH I. FINK, JR.,
     on behalf of themselves and all
 5   others similarly situated,

 6          Plaintiffs,

 7       v.

 8   PEPCO HOLDINGS, INC.; CONECTIV, and
     PEPCO HOLDINGS RETIREMENT PLAN,
 9
            Defendants.
10   -----------------------------------

11

12
            Wilmington, Delaware
13          Tuesday, April 17, 2007

14

15
            TRANSCRIPT of testimony of DONALD E.
16
     CAIN, as taken by and before Sean M. Fallon, a
17
     Registered Professional Reporter and Notary Public,
18
     at the offices of PEPPER HAMILTON LLP, Hercules
19
     Plaza, Suite 5100, 1313 Market Street, commencing
20
     at 10:14 o'clock in the forenoon.
21

22

23

24
```

DONALD E. CAIN

Page 2

```
 1   A P P E A R A N C E S :
 2       CHIMICLES & TIKELLIS LLP
         BY:  JOSEPH G. SAUDER, ESQ.
 3       One Haverford Centre
         361 West Lancaster Avenue
 4       Haverford, PA  19041
         (610) 642-8500
 5       josephsauder@chimicles.com
         Attorneys for Plaintiffs
 6
         PEPPER HAMILTON LLP
 7       BY:  BARAK A. BASSMAN, ESQ.
         3000 Two Logan Square
 8       Eighteenth and Arch Streets
         Philadelphia, PA  19103-2799
 9       (215) 981-4000
         bassmanb@pepperlaw.com
10       Attorneys for Defendants
11       LITTLER MENDELSON
         BY:  SUSAN KATZ HOFFMAN, ESQ.
12       Three Parkway
         1601 Cherry Street, Suite 1400
13       Philadelphia, PA  19102-1321
         (267) 402-3000
14       shoffman@littler.com
         Attorneys for Defendants
15
         BARBARA C. ALEXANDER,
16       ASSISTANT GENERAL COUNSEL
         Pepco Holdings, Inc.
17       P.O. Box 231
         Wilmington, DE  19849-0231
18       (302) 429-3206
         Attorney for Defendants
19
20
21
22
23
24
```

Page 4

```
 1   P-9   Document entitled, "Conectiv Retirement   67
          Plan"
 2
     P-10  Document entitled, "Part One, Conectiv   70
 3        Cash Balance Sub-Plan"
 4
     D-1   Document entitled, "EMerging Times,"   25
 5        Oct. 13, 1997
 6
     D-2   Document entitled, "EMerging Times,"   30
 7        Oct. 20, 1997
 7   D-3   Document entitled, "Conectiv Cash   113
 8        Balance Plan," Feb. 20, 1998
 9
     D-5   Document entitled, "Facts," PHI003365   57
10        thru PHI003372
11   D-6   Document JMC00001 thru JMC00005   53
12   D-7   Document entitled, "Your Conectiv   125
          Total Rewards," JMC00190 thru JMC00196
13
     D-8   Document entitled, "Conectiv Total   117
14        Rewards, The Tangible and Hidden
          Paychecks"
15
     D-9   Document entitled, "InSight,"   73
16        March 1999
16   D-10  Document entitled, "MidWeek Extra,"   80
          June 23, 1999
18
     D-12  Document entitled, "InSight Online,"   93
19        July 9, 1999
20   D-13  Slide Presentation, MWW00219 thru   92
          MWW00225
21
     D-19  Document entitled, "Conectiv   128
22        Retirement Plan, Cash Balance
          Sub-Plan"
23
     D-22  Document entitled, "Introducing the   129
24        New Cash Balance Retirement Plan"
```

Page 3

```
 1           I N D E X
 2   WITNESS                          PAGE
 3   DONALD E. CAIN
 4     By Mr. Sauder            6
 5         E X H I B I T S
 6   NUMBER        DESCRIPTION        PAGE
 7   P-17  Subpoena               24
 8   P-18  E-Mail, PHI003821         55
 9   P-19  E-Mail, PHI003810 and PHI003811   97
10   P-20  E-Mail, PHI003812 thru PHI003814   104
11   P-21  E-Mail, PHI003815 and PHI003816   110
12      EXHIBITS PREVIOUSLY MARKED AND REFERRED TO
13   NUMBER        DESCRIPTION        PAGE
14   P-2   Document entitled, "Conectiv Minutes   32
           of the Personnel and Compensation
15         Committee," 4-23-98
16   P-3   Document entitled, "Facts," MWW00229   64
           thru MWW00232
17
     P-4   Slide Presentation, MWW00301 thru   86
18         MWW00307
19   P-5   Document entitled, "Conectiv   125
           Retirement Plan, Summary Plan
20         Descriptions"
21   P-6   Document entitled, "Pepco Holdings,   130
           Inc., B L England Management
22         Enhanced Severance Plan"
23   P-7   Document entitled, "Pepco Holdings,   131
           Inc., General Release"
24
```

Page 5

```
 1   REQUESTS FOR PRODUCTION:
 2                    PAGE        LINE
 3                    63          15
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 to 5)

B0003

DONALD E. CAIN

1    (It is hereby stipulated and agreed
2  by and among counsel that sealing, certification
3  and filing are waived;
4    It is further stipulated and agreed
5  by and among counsel that all objections, except as
6  to the form of the question, are reserved until the
7  time of trial.)
8    DONALD E. CAIN, after having been
9  first duly sworn, was examined and testified as
10  follows:
11  EXAMINATION
12  BY MR. SAUDER:
13    Q.    Good morning, sir.
14    A.    Hi.
15    Q.    Sir, could you please state your
16  full name and address.
17    A.    Donald E. Cain, 22 Fall Brooke Road,
18  Newark, Delaware, 19711.
19    Q.    And do you have any other addresses?
20    A.    No.
21    Q.    Do you own any other homes?
22    A.    Yes.
23    Q.    Where are the other homes you own?
24    A.    I have a home outside of Fenwick

1  Island.
2    Q.    What's the address?
3    A.    I don't know.
4    Q.    How long have you owned that home?
5    A.    Since 2003.
6    Q.    And you don't have the address?
7    A.    We don't get mail there.
8    Q.    What was your date of birth?
9    A.    8-28-1945.
10    Q.    Are you currently employed?
11    A.    No.
12    Q.    Have you given any prior depositions
13  in any other matters?
14    A.    Yes.
15    Q.    How many times have you been
16  deposed?
17    A.    Best I remember, once.
18    Q.    And how long ago was that?
19    A.    I don't remember.
20    Q.    What did that involve?
21    A.    I don't remember.
22    Q.    Was it work related?
23    A.    Yes.
24    Q.    Was the company being sued for

1  something?
2    A.    I don't remember.
3    Q.    So, let me just give you some
4  background instructions I'm sure you've gone over
5  with your counsel.
6    I just ask that you listen to the
7  question and, if you have any -- if you don't
8  understand the question, that you ask me to repeat
9  the question, because, if you answer, I will assume
10  that you understood the question.
11    A.    Okay.
12    Q.    I also ask that you give all your
13  answers verbally.
14    A.    Okay.
15    Q.    And I'd ask that you let me finish
16  the question before you give an answer, and I will
17  do the same for you, so that the court reporter can
18  take everything down.
19    Do you understand that?
20    A.    Fine.
21    Q.    And if at any point you need a
22  break, just ask us, and we'll accommodate you.  I
23  just ask that, if you need a break, if there is a
24  question pending, that you wait until you give the

1  answer and then we can take a break, okay?
2    A.    Okay.
3    Q.    Sir, are you represented by counsel
4  today?
5    A.    Yes.
6    Q.    And who are you represented by?
7    A.    I think, Susan.
8    Q.    Okay.
9    MR. BASSMAN:  And also --
10    THE WITNESS:  And Pepper.
11    MR. BASSMAN:  -- and Pepper is also
12  representing Mr. Cain.
13  BY MR. SAUDER:
14    Q.    Okay.
15    Sir, prior to today, other than your
16  attorney, did you speak with anyone regarding this
17  lawsuit, which was filed in September, 2005?
18    A.    No.
19    Q.    When did you first learn that there
20  was a lawsuit filed regarding the Cash Balance Plan
21  at Conectiv?
22    A.    When -- after I received a VoiceMail
23  about a deposition from -- was it you?
24    Q.    Yes.

3 (Pages 6 to 9)

B0004

DONALD E. CAIN

Page 10

1    A.    And I talked to counsel at Pepco.
2    Q.    Prior to that, had you known
3  anything about a lawsuit?
4    A.    No.
5    Q.    What, if anything, did you do to
6  prepare for today's deposition?
7    A.    Nothing, other than meet with my
8  counsel.
9    Q.    And, when you say your counsel, is
10 that --
11   A.    Pepper and the other firm.
12   Q.    Okay.
13        And when did you meet with your
14 counsel?
15   A.    In the last couple weeks.  I don't
16 remember the exact day.
17   Q.    How many times did you meet with
18 them?
19   A.    Once.
20   Q.    And for approximately how long?
21   A.    Hour and a half.
22   Q.    Other than that, did you do anything
23 else to prepare for your deposition?
24   A.    No.

Page 11

1    Q.    Have you talked to Ben Wilkinson
2  lately?
3    A.    No.
4    Q.    How about Mr. Kremmel?
5    A.    No.
6    Q.    When was the last time you spoke
7  with Mr. Kremmel?
8    A.    Maybe a year ago.
9    Q.    When was the last time you spoke
10 with Mr. Wilkinson?
11   A.    Probably the last day he was
12 employed.
13   Q.    Do you know when that was?  A year?
14   A.    I don't remember.
15   Q.    Do you know what year it was?
16   A.    No.
17   Q.    Did you review any deposition
18 transcripts in preparation for today's deposition?
19   A.    Deposition -- what do you mean by
20 deposition transcripts?
21   Q.    Did you review the testimony of Mr.
22 Wilkinson?
23   A.    No.
24   Q.    How about Mr. Kremmel?

Page 12

1    A.    No.
2    Q.    Other than your attorney, did you
3  speak with anyone regarding this case?
4    A.    No.
5    Q.    Sir, if you can give me your
6  educational background after high school.
7    A.    I'm a graduate electrical engineer
8  from the University of Delaware.  Graduated in
9  1968.
10   Q.    Any other post-graduate education?
11   A.    No.
12   Q.    Did there come a time when you were
13 employed by Delmarva?
14   A.    Well, the answer is yes.  I'm not
15 sure it was Delmarva at the time.
16   Q.    Who were you hired by?
17   A.    I think Delaware Power & Light
18 probably.  That's another probably answer.  I don't
19 remember really.
20   Q.    What year was that?
21   A.    1968.
22   Q.    At some point in time did that
23 company become Delmarva?
24   A.    Yes.

Page 13

1    Q.    When was that?
2    A.    I don't remember.
3    Q.    And have you worked with -- at what
4  point did you retire from Conectiv?
5    A.    My official retirement was August of
6  2002 from Conectiv.
7    Q.    And, when you were initially hired
8  in 1968, what was your position?
9    A.    I was an engineer in the marketing
10 department.
11   Q.    If you could take me through the
12 different positions you had in the company.
13   A.    Well, I transferred to an engineer
14 in the operations department, became an assistant
15 superintendent in the operations department, became
16 a superintendent.  Was transferred to Salisbury as
17 a manager of operations, came back to Wilmington as
18 vice-president of operations for the Northern
19 Division.  Was promoted to vice-president of
20 administrative services.  Eventually that morphed
21 into vice-president of HR, and that was it.
22   Q.    When you were vice-president of
23 operations, do you know what year that was?
24   A.    Well, I came back from Salisbury in

Reporting Associates, LLC   1-888-795-2323

B0005

DONALD E. CAIN

Page 14

1   1980.
2      Q.    1980, and then how long did you hold
3   that position?
4      A.    I believe it was eight years.
5      Q.    What were your duties and
6   responsibilities in that position?
7      A.    The overall construction and
8   maintenance of the electric and gas facilities in
9   New Castle County.  Customer service.
10     Q.    And you became vice-president of
11  administrative services?
12     A.    Yes.
13     Q.    What did that entail?
14     A.    Well, data processing, fleet
15  services, general services, HR.  There may have
16  been some other general department over there that
17  I'm -- billing services.
18     Q.    And how long did you hold that
19  position?
20     A.    Until the Atlantic merger.
21     Q.    So, 1998, around that year?
22     A.    Whenever that date was.
23     Q.    You said one of your
24  responsibilities in that position dealt with HR?

Page 15

1      A.    Yes.
2      Q.    What exactly did you do with regard
3   to that?
4      A.    Well, provided oversight to the
5   entire HR function.  Oversight and direction.
6      Q.    What does that exactly mean?
7      A.    I don't understand your question.
8      Q.    You were the overall HR --
9      A.    Right.  Responsible for all the HR
10  functions.
11     Q.    And did you report to anyone in that
12  capacity?
13     A.    Yes.
14     Q.    Who did you report to?
15     A.    Initially the CEO, and then the
16  Chief Operating Officer.
17     Q.    Did you make decisions regarding
18  pension plans in that position?
19     A.    I made recommendations.
20     Q.    What type of -- and what was the
21  name of the company at that point, 1988 to 1998?
22     A.    Well, I can't say for certainty.
23  Some point you had Delmarva Power and then you had
24  Conectiv.

Page 16

1      Q.    Do you know at what point it became
2   Delmarva?
3      A.    No.
4      Q.    Were you in a pension plan at that
5   time?
6      A.    Yes.
7      Q.    And what type of pension plan did
8   Delmarva have at that time?  The time you were in
9   the administrative services/HR?
10     A.    The kind of plan where you earn
11  years of credit to a final formula that is applied
12  when you retire.
13     Q.    A defined benefits plan?
14     A.    Yes, I believe that's what it was
15  called.
16     Q.    And is that the plan that you were
17  in?
18     A.    Yes.
19     Q.    After the merger you became
20  vice-president of HR --
21     A.    Yes.
22     Q.    -- for Conectiv?
23     A.    Yes.
24     Q.    Did you play any role in negotiating

Page 17

1   the merger?
2      A.    No.
3      Q.    Who did you report to as
4   vice-president of HR when you were at Conectiv?
5      A.    Well, Howard Cosgrove.
6      Q.    Anyone else?
7      A.    No, not at Conectiv.
8      Q.    At what point in time was the idea
9   discussed that Conectiv would form what's called a
10  Cash Balance Plan?
11     A.    I don't know the exact year, but it
12  would coincide with discussions about getting into
13  new and different types of businesses, specifically
14  things that might have been nonutility businesses.
15     Q.    And when was that in relation to the
16  merger?  At what point in time did you first hear
17  the term "Cash Balance Plan," as it applied to
18  Conectiv?
19     A.    I'm not certain.
20     Q.    Would it have been six months prior
21  to the merger?
22     A.    Yes.
23     Q.    Longer than that?
24     A.    Yes.

5 (Pages 14 to 17)

B0006

DONALD E. CAIN

Page 18

1     Q.     How much longer?
2     A.     I don't know.
3     Q.     More than a year?
4     A.     I don't know.
5     Q.     Who was it that first suggested the
6   Cash Balance Plan?
7     A.     I probably did.
8     Q.     Who did you suggest it to?
9     A.     Probably to the CEO.
10     Q.     And what was your basis for
11   suggesting that?
12     A.     The new business that we were
13   getting into and the need to move people back and
14   forth, plus we had been through some layoffs and
15   had to let people go that were severely
16   disadvantaged under the existing pension plan, and
17   it was very difficult and, so, this seemed like a
18   better solution.
19     Q.     And where did you get that idea?
20     A.     Picked it up from utility industry
21   meetings that I attended.
22     Q.     Had you talked to Watson Wyatt prior
23   to suggesting the idea of a Cash Balance Plan?
24     A.     I don't remember.

Page 19

1     Q.     Had you had a relationship with
2   Watson Wyatt at that time?
3     A.     I don't even remember that.
4     Q.     Did Delmarva have a relationship
5   with Watson Wyatt?
6     A.     I don't remember that.
7     Q.     If they had one, you would have
8   known about it?
9     A.     Yes.  At the time I would have known
10   about it.
11     Q.     Who was the actuary for Delmarva
12   while you were head of HR?
13     A.     Towers Perrin.
14     Q.     Had they suggested a Cash Balance
15   Plan?
16     A.     I don't remember.
17     Q.     Had a Cash Balance Plan ever been
18   suggested prior to the idea that Delmarva would be
19   merging with ACE?
20     A.     Yes.
21     Q.     For Delmarva, itself?
22     A.     For Conectiv.
23     Q.     But, prior to that, had a Cash
24   Balance Plan ever been discussed just for Delmarva,

Page 20

1   prior to the merger even becoming an idea?
2     MR. BASSMAN:  Objection.
3     MR. SAUDER:  You can answer.
4     MR. BASSMAN:  You can answer.
5     THE WITNESS:  The merger was not an
6   idea when we discussed what we were going to do
7   about forming these new businesses.  That was well
8   underway before the merger was discussed.
9   BY MR. SAUDER:
10     Q.     When you were head of HR from 1988
11   to 1998 at the Delmarva entity, had you ever
12   considered a Cash Balance Plan for that entity?
13     A.     First of all, the date is not
14   correct because Conectiv was born -- well, I don't
15   remember when Conectiv was born, but, prior to the
16   merger Delmarva was on its own considering these
17   other businesses and, as part of those discussions,
18   we began reviewing all the benefits, including the
19   pension plan.
20     Q.     So, had a Cash Balance Plan been
21   considered for Delmarva, itself?
22     A.     Yes.
23     Q.     When was that?
24     A.     I don't remember.

Page 21

1     Q.     Shortly before the merger?
2     A.     I don't remember the time frame.
3     Q.     You said you were the one who first
4   suggested it, correct?
5     A.     That was a speculation.  I don't
6   remember a conversation suggesting it, but I would
7   suspect so.
8     Q.     But you are not certain?
9     A.     I'm not certain.
10     Q.     What was the next step after this
11   was first suggested, the Cash Balance Plan?
12     A.     I don't remember.
13     Q.     Do you know who would have been
14   involved in the conversations?
15     A.     No, not at this point.
16     Q.     At some point did you determine that
17   you needed to hire an outside consultant?
18     A.     I don't remember specifically the
19   moment that would have happened.
20     Q.     But at some point?
21     A.     We had outside consultants.  That's
22   a fact.
23     Q.     Well, at some point did Watson Wyatt
24   come in to help out with this?

6 (Pages 18 to 21)

B0007

DONALD E. CAIN

Page 22

1    A.    I don't remember if that's who we
2  had or not.
3    Q.    Did Watson Wyatt implement this
4  plan?
5    A.    I don't remember that.
6    Q.    Did Watson Wyatt ever work for
7  Conectiv?
8    A.    Yes.
9    Q.    Was Watson Wyatt the actuary for
10  Conectiv?
11    A.    I don't believe so.
12    Q.    Who was?
13    A.    Towers Perrin.
14    Q.    Did they help out with the Cash
15  Balance Plan?
16    A.    Yes.
17    Q.    At what point did they get involved
18  with the Cash Balance Plan?
19    A.    I don't remember.
20    Q.    At some point in time you hired Ben
21  Wilkinson?
22    A.    That's correct.
23    Q.    Who was he hired to replace?
24    A.    He was hired to manage --

Page 23

1  temporarily manage the compensation and benefits
2  function while I believe Moira Donohue worked on
3  the merger.
4    Q.    And who interviewed Mr. Wilkinson?
5    A.    I did, for one.  Others may have.
6    Q.    Did you have a prior relationship
7  with Mr. Wilkinson?
8    A.    No.
9    Q.    How did you find Mr. Wilkinson?
10    A.    In discussions with one of our board
11  members from DuPont, who knew that he was, I think,
12  retiring from DuPont or going out on a package or
13  something.
14    Q.    And what role did he play?
15    A.    Well, he managed the compensation
16  and benefits for the Delmarva company while the
17  merger was going on.
18    Q.    Who did he report to?
19    A.    Reported to me.
20    Q.    And what was the Employment
21  Agreement with Mr. Wilkinson when he came on?
22    A.    I don't remember.  It's some type of
23  contract.
24    Q.    He wasn't brought on as a regular

Page 24

1  employee?
2    A.    No.
3         MR. SAUDER:  I'm going to show you
4  what I'll have marked as Plaintiffs' 17.
5         (Exhibit P-17 is marked for
6  identification.)
7  BY MR. SAUDER:
8    Q.    Sir, showing you what's been marked
9  as Plaintiffs' 17.  If you could take a look at
10  that document and let me know if you've seen that
11  document prior to today.
12    A.    It looks like the one that I brought
13  with me.
14    Q.    Sir, this is a subpoena for today's
15  deposition, correct?
16    A.    Yes.
17    Q.    And on the back portion, Exhibit
18  A --
19    A.    Okay.
20    Q.    -- this requests certain documents.
21    A.    Okay.
22    Q.    Do you see that?
23    A.    In the -- on Page 2?
24    Q.    Yes.  On Page 2 and 3.

Page 25

1    A.    Yes.
2    Q.    Do you have any of these documents?
3    A.    No.
4    Q.    Did you look for any of these
5  documents?
6    A.    No.
7    Q.    Are you certain that you have
8  nothing relating to these requests?
9    A.    Absolutely.
10    Q.    Sir, showing you what's been
11  previously marked as Defense Exhibit 1.  Take a
12  look at that document and let me know if you've
13  seen that document prior to today.
14    A.    I have no recollection of this
15  specific document.
16    Q.    You have no recollection whether
17  you've seen this prior to today?
18    A.    No specific recollection.
19    Q.    Do you know who prepared this
20  document?
21    A.    No, I don't.
22    Q.    Do you know if you played any role
23  in preparing this document?
24    A.    I don't know for sure.  It's been a

DONALD E. CAIN

Page 26

1 long time.
2    Q.    Do you know whether this document
3 was disseminated?
4    A.    I can't say that for sure.
5    Q.    Do you see the first column?
6    A.    Okay.
7    Q.    There is question and answer, and
8 then the second -- or the third sentence in on the
9 answer states, "It is designed to be viewed as
10 competitive by employees and flexible to
11 accommodate changing business conditions."
12       Do you see that?
13    A.    Yes.
14    Q.    "Designed to be viewed as
15 competitive by employees," do you have any
16 understanding of what that meant?
17       MR. BASSMAN:  Objection.
18 BY MR. SAUDER:
19    Q.    You can answer, sir.
20    A.    I don't remember exactly.  It would
21 be speculation.
22    Q.    The second column over there is
23 another question down the middle of the page, and
24 down towards the middle of the question it says in

Page 27

1 there, "A new pension plan will replace the old,
2 quote, final pay, end quote, plans with individual,
3 portable accounts."
4    A.    Yes.
5    Q.    Do you see that sentence?
6    A.    Yes.
7    Q.    Do you know if, at that time -- this
8 document is dated October 13, 1997 -- do you know
9 if, at that time, you knew that the plan would be a
10 Cash Balance Plan?
11    A.    I don't know.
12    Q.    This document, the bold portion up
13 in the upper left-hand column states, "Total
14 Rewards Communicate Conectiv."
15       Do you see that?
16    A.    Yes.
17    Q.    "Total Rewards," what does that
18 mean?
19       MR. BASSMAN:  Objection.
20 BY MR. SAUDER:
21    Q.    You can answer, sir.
22    A.    It probably means pay and all
23 benefits.
24    Q.    Are you speculating?

Page 28

1    A.    Yes, because I don't remember
2 exactly.
3    Q.    Okay.
4       Look to the next page.  The question
5 at the top of the page, "When will we know the
6 details of the new total rewards program?"  Then it
7 states, "The Total Rewards transition team is
8 continuing to work out the details of the program
9 throughout the fall, including plans for an
10 extensive communication and educational effort to
11 support employees in making informed decisions
12 about their benefits in a choice" -- and that's in
13 quotes -- environment."
14       "Transition team."  What does that
15 refer to?
16       MR. BASSMAN:  Objection.
17       THE WITNESS:  I don't remember.
18 BY MR. SAUDER:
19    Q.    Do you have any recollection of
20 there being a transition team relating to the
21 benefits package when Conectiv -- when there was a
22 merger?
23    A.    Not specifically.
24    Q.    Did you play any role in any

Page 29

1 transition team with regard to the benefits at that
2 time?
3    A.    I don't remember.
4    Q.    What was Mr. Wilkinson brought on to
5 do?
6    A.    To manage the compensation and
7 benefits function for Delmarva while the merger was
8 going on.
9    Q.    And what does that mean?
10    A.    Means to take care of making sure
11 pay plans and benefit plans are carried out the way
12 they were intended, dealing with issues that arise
13 concerning pay and benefits and those things.
14    Q.    Did he play any role in implementing
15 the Cash Balance Plan?
16    A.    Yes.
17    Q.    Who else played a role in that?
18    A.    I don't remember.
19    Q.    Did you?
20    A.    I provided some oversight at some
21 point.
22    Q.    You were his boss, right?
23    A.    Yes, correct.
24    Q.    Sir, I'm showing you what's

Reporting Associates, LLC   1-888-795-2323

DONALD E. CAIN

Page 30

1 previously been marked Defense Exhibit 2. If you
2 could take a look at this document and let me know
3 if you've seen this prior to today.
4      Q.    No.
5      Q.    Have you had an opportunity to look
6 at the document?
7      A.    No.
8            Do you want me to look at it?
9      Q.    If it will help refresh your
10 recollection, I do.
11           You don't remember seeing this prior
12 to today?
13     A.    I don't remember specifically seeing
14 it.
15     Q.    Are you familiar with the document
16 titled EMerging Times?
17     A.    Only that you put it in front of me
18 now and --
19     Q.    But, prior to this moment, you have
20 no recollection of any documents being entitled
21 "EMerging Times" at Conectiv?
22     A.    Not a specific title, no.
23     Q.    Fair to say you have no recollection
24 of being involved with preparing this document?

Page 31

1      A.    Not specifically this document.
2      Q.    Fair to say you have no idea who
3 prepared this document?
4      A.    I have no idea at this point.
5      Q.    You have no idea how this was
6 communicated or whether this was communicated?
7      A.    No, I would -- it's the document.
8      Q.    Right, okay.
9            You said Watson Wyatt was one of the
10 actuarial firms that worked with Conectiv in
11 implementing the Cash Balance Plan, is that
12 correct?
13           MR. BASSMAN:  Objection.
14 Mischaracterizes his prior testimony.
15 BY MR. SAUDER:
16     Q.    Is that correct?
17     A.    You said actuarial.  Towers Perrin
18 was the actuarial firm, as far as I remember.
19     Q.    What role did Watson Wyatt play in
20 implementing the Cash Balance Plan?
21           MR. BASSMAN:  Objection.
22 BY MR. SAUDER:
23     A.    I don't remember.  I really don't
24 remember.

Page 32

1      Q.    Did you have any role in hiring
2 Watson Wyatt?
3      A.    If they were hired, I may have
4 approved the hiring.
5            I didn't hire them directly.
6      Q.    You have no specific recollection of
7 hiring them?
8      A.    I don't remember.
9      Q.    Do you have any specific
10 recollection of working with Towers with regard to
11 the Cash Balance Plan?
12     A.    Yes, they were the actuary.
13     Q.    And do you know what, if any,
14 experience they had with Cash Balance Plans prior
15 to implementing the Conectiv Cash Balance Plan?
16     A.    I don't remember.
17     Q.    Sir, I'm showing you what has been
18 previously marked as Plaintiffs' Exhibit 2.  If you
19 could take a look at that document and let me know
20 if you've seen that prior to today.
21     A.    Yes.
22     Q.    When did you see that prior to
23 today?
24     A.    I saw it this morning.

Page 33

1      Q.    Prior to this, had you seen it?
2      A.    Not that I remember.
3      Q.    Sir, what is this document?
4      A.    I don't know.
5      Q.    If you could take a look --
6      A.    It says the minutes of the personnel
7 and compensation committee.
8      Q.    Were you present at that meeting?
9      A.    If I'm listed on there, I was.
10     Q.    Are you listed on there?
11     A.    Yes.
12     Q.    So you were there?
13     A.    Yes.
14     Q.    With Mr. Wilkinson?
15     A.    It says he was there, so....
16     Q.    So you assume he was there?
17     A.    I assume he was there.
18     Q.    Do you have any specific
19 recollection of this meeting?
20     A.    No.
21     Q.    Do you know what the purpose of this
22 meeting was?
23     A.    No.
24     Q.    Could you take a look at the

B0010

DONALD E. CAIN

1  document and let me know if that refreshes your
2  recollection as to what the specific purpose of
3  this meeting was?
4      A.    Sounds like -- seems like the
5  purpose was to implement a complete benefits
6  package and compensation package for Conectiv going
7  forward.
8      Q.    Do you know how you prepared for
9  that meeting?
10      A.    I have no idea.
11      Q.    If you look at the first -- the
12  paragraph in the middle of the page that starts
13  out, "The chairman." Do you see that?
14      A.    Yes.
15      Q.    The last sentence of that paragraph
16  states, "She then referred to materials that had
17  been previously distributed to the committee
18  members."
19          Do you see that sentence?
20      A.    Yes.
21      Q.    Now, if you flip to the back portion
22  of this, there is PHI001588, at the bottom
23  right-hand corner, through 91.
24          Do you see that?

1      A.    Yes.
2      Q.    Do you recognize that?
3      A.    No.
4      Q.    Have you seen that attachment prior
5  to today?
6      A.    No.
7      Q.    Do you know if these are the
8  materials that they were referring to in this -- in
9  the minutes?
10      A.    I can't --
11          MR. BASSMAN:  Objection.  You can
12  answer.
13          THE WITNESS:  I don't know.
14          MR. BASSMAN:  Foundation.  He has no
15  foundation to testify as to what the meaning of the
16  terms are in this document.
17  BY MR. SAUDER:
18      Q.    What is your answer, sir?
19      A.    Repeat your question.
20      Q.    Do you know if this is the -- this
21  is the materials that are referred to in the
22  minutes?
23      A.    No, I don't.
24      Q.    You don't know?

1      A.    I don't know.
2      Q.    Do you know if anything was handed
3  out at this meeting?
4      A.    I don't know.
5      Q.    You have no idea?
6      A.    No.
7      Q.    If you look at that attachment, have
8  you seen that attachment prior to today?
9      A.    I don't recollect it.
10      Q.    You don't remember?
11      A.    No.
12      Q.    If you look at the next paragraph,
13  where it starts out, "The chairman then called,"
14  and then there are numbers?
15      A.    Right.
16      Q.    That last numbered sentence, Number
17  3, says, "The interest in being competitive both in
18  cost and attractiveness to employees."
19          Do you see that?
20      A.    Yes.
21      Q.    And that's referring to "The
22  chairman then called on Mr. Cain who reviewed the
23  philosophy and approach for employee benefits at
24  Conectiv, with an emphasis on," and one of the --

1  the emphasis is "The interest in being competitive
2  in both cost and attractiveness to employees."
3          Do you see that?
4      A.    Yes.
5      Q.    What does that mean?  "Competitive
6  in both cost," what does that specific portion
7  mean?
8          MR. BASSMAN:  Objection.  You can
9  answer.
10          THE WITNESS:  The cost -- well, I'm
11  speculating.
12          I don't know the answer to that now.
13  I would just be guessing.
14  BY MR. SAUDER:
15      Q.    Does it mean cost savings to the
16  company?
17          MR. BASSMAN:  Objection.
18          THE WITNESS:  I don't remember.
19  BY MR. SAUDER:
20      Q.    The next paragraph down, do you see
21  the sentence towards the bottom of that, that
22  says -- and this is referring to you -- "He
23  acknowledged that this creates a risk related to
24  the reaction of management employees who will be

10 (Pages 34 to 37)

B0011

DONALD E. CAIN

Page 38

1  the first to feel the effect of the changes but
2  stated that this risk could be managed in light of
3  the cost savings to be realized from the new
4  program."
5        Do you see that?
6     A.  Yes.
7     Q.  What did you mean by, "first to feel
8  the effect of the changes"?
9     A.  The changes -- let's see.  I believe
10 it was that the changes were being made for
11 management employees before bargaining unit
12 employees, which would create some difficulty at
13 the lower -- first level supervisor level.
14    Q.  Why is that?
15    A.  Because the plans would be
16 different.
17    Q.  Why would it create some difficulty?
18 Difficulty for who?
19    A.  For the folks in the management
20 plan.
21    Q.  Why is that?
22    A.  Because the overall benefits package
23 would not be exactly the same as what they were
24 coming out of the union with.

Page 39

1     Q.  They would be worse?
2        MR. BASSMAN:  Objection.
3        THE WITNESS:  I couldn't say today
4  whether it would be worse.  It would be different.
5  BY MR. SAUDER:
6     Q.  Do you remember at the time that you
7  felt it would be worse?
8     A.  I don't remember.
9     Q.  Well, you said "first to feel the
10 effect."  What does that mean?
11       MR. BASSMAN:  Objection.
12       THE WITNESS:  That's who would have
13 the new -- the entire benefits package first.
14 BY MR. SAUDER:
15    Q.  Then you go on to state, "but stated
16 that this risk."
17       What did you mean by that?
18    A.  You know, any time we make a change
19 with employees, you have a risk of them being
20 concerned and, so, just we knew that there would --
21 any time like a major benefit package change you
22 are going to have unrest, and that's a risk and,
23 so, you have to manage it.
24    Q.  And how did you plan on managing it?

Page 40

1     A.  Extensive communications.
2     Q.  To explain that there was nothing to
3  be worried about?
4     A.  To explain the details of it.  We
5  would have been in the posture that employees in
6  the end would have to decide for themselves whether
7  it was good or bad for them, as individuals, but we
8  would communicate all that we could about
9  everything that we knew.
10    Q.  Well, the employees who ended up on
11 a Cash Balance Plan did not have a choice, correct?
12    A.  Well, there were some employees who
13 had the -- who had an option.
14    Q.  Who were they?
15    A.  There were some cut-off set.
16    Q.  Grandfathered employees?
17    A.  Yes.
18    Q.  But, beyond that, the other
19 employees did not have a choice, correct?
20    A.  That's correct.
21    Q.  In managing that risk, was it an
22 effort by the company to communicate to the
23 employees that this was not worse than the plan
24 that they were currently in?

Page 41

1     A.  You know, I don't remember that.
2     Q.  The sentence goes on, "That this
3  risk could be managed in light of the cost savings
4  to be realized from the new program."
5        Do you see that?
6     A.  Yes.
7     Q.  Cost savings to be realized, I
8  assume that's cost savings for the company,
9  correct?
10    A.  From the entire benefit program.
11    Q.  Correct?
12    A.  Yes.
13    Q.  So the company was saving costs,
14 correct?
15    A.  From the entire benefit program.
16    Q.  And the cash balance was a part of
17 that benefit program?
18    A.  But not from that part.
19    Q.  The company wasn't saving money from
20 that?
21    A.  No.
22    Q.  Are you certain of that?
23    A.  Yes.
24    Q.  Why are you so certain of that?

11 (Pages 38 to 41)

B0012

DONALD E. CAIN

Page 42

1    A.    Because the one thing that's very
2 clear to me is that, from the very beginning, our
3 direction was that the implementation of the Cash
4 Balance Plan was to be cost neutral to the company.
5    Q.    And that was, I assume, conveyed to
6 the employees?
7    A.    I assume it was -- you are assuming
8 it was. You can assume that. I don't know that.
9    Q.    Okay.
10    A.    I believe it would have been.
11    Q.    What do you base that belief on?
12    A.    Just because we had a commitment to
13 communicate facts to employees.
14    Q.    Okay.
15        But, overall, the benefits plan was
16 a cost savings to the company, correct?
17    A.    It may have been. It says it was.
18 May have been.
19        I don't remember exactly.
20    Q.    Okay.
21    A.    But I know it wasn't in the Cash
22 Balance Plan.
23    Q.    On next page, if you look at the
24 paragraph that starts, "Mr. Wilkinson," it states

Page 43

1 "Mr. Wilkinson stated that the long-term goal of
2 management was to have the overall benefit cost at
3 35 to 36 percent of pay" --
4    A.    Yes.
5    Q.    -- "which is the general industry
6 standard. He then reviewed the details of the
7 program on a plan-by-plan basis specifically," and
8 then it goes on.
9        Do you see that?
10    A.    Um-hum.
11    Q.    Do you know where that 35 to
12 36 percent number came from?
13    A.    I have no idea.
14    Q.    Do you know if that was an increase
15 or a decrease to the existing structure?
16    A.    I don't know.
17    Q.    Next paragraph states, "Management
18 of the company recommends that the Compensation
19 Committee approve the adoption of a Cash Balance
20 Pension Plan."
21        Do you see that?
22    A.    Yes.
23    Q.    Management of the company, who is
24 that referring to specifically?

Page 44

1        MR. BASSMAN: Objection.
2 BY MR. SAUDER:
3    Q.    You can answer, sir.
4    A.    I don't know that it's anybody
5 specific.
6    Q.    Were you being included in that?
7        MR. BASSMAN: Objection.
8        THE WITNESS: Well, I was part of
9 the management of the company.
10 BY MR. SAUDER:
11    Q.    Would Mr. Wilkinson be included in
12 that?
13        MR. BASSMAN: Objection.
14        THE WITNESS: I think that's a
15 general term.
16 BY MR. SAUDER:
17    Q.    Next paragraph that starts out,
18 "First," last sentence in that paragraph states,
19 "The cash balance design is viewed as more
20 appropriate for attracting and retaining employees
21 in a more mobile and independent workforce."
22        Do you see that?
23    A.    Yes, correct.
24    Q.    Do you know at that time the average

Page 45

1 age of the employees at ACE?
2    A.    No.
3    Q.    How about at Delmarva?
4    A.    No.
5    Q.    Do you know the average length of
6 the employment of the employees at Delmarva at that
7 time?
8    A.    No.
9    Q.    How about at ACE?
10    A.    No.
11    Q.    Go down to the paragraph that starts
12 out, "Third, management recommends that a
13 competitive package of welfare plans," and that
14 sentence goes on.
15    A.    Yes.
16    Q.    It lists a bunch of benefits,
17 including medical, prescription, dental, vision,
18 life insurance, accidental death, dismemberment
19 coverage, and choice rewards, which include prepaid
20 legal, cancer insurance and other nontraditional
21 choices."
22        Do you see that?
23    A.    Right.
24    Q.    Are these all new benefits that were

Reporting Associates, LLC   1-888-795-2323

B0013

DONALD E. CAIN

Page 46

1  taking place at Conectiv at that time?
2      A.    I'd only be presuming.  I don't know
3  that for a fact.
4      Q.    Do you know that the entire benefit
5  package was being overhauled at the time of the
6  merger?
7      A.    I know that.
8      Q.    You mentioned earlier that there
9  were layoffs.  Were there layoffs at the time of
10 the merger?
11     A.    I don't remember.
12           Probably -- I'm going to say
13 probably.
14     Q.    Do you know if there were a lot of
15 layoffs happening at the time of the merger?
16     A.    I don't remember how many.
17     Q.    Do you know if a lot of people were
18 leaving because they were given severance packages?
19     A.    People left for severance packages,
20 yes.
21     Q.    Voluntary and involuntary severance
22 packages?
23     A.    I don't remember exactly.
24     Q.    Well, at the time of the merger

Page 47

1  Delmarva was merging with ACE, correct?
2      A.    Correct.
3      Q.    And ACE is Atlantic City Electric?
4      A.    Yes.
5      Q.    And I assume there was a lot of
6  overlap with the jobs?
7      A.    Yes, there was.
8      Q.    So Conectiv had to lay people off?
9      A.    Yes, but the question you asked me
10 was about voluntary/involuntary.
11     Q.    Right.
12     A.    I can't remember the split of that.
13 There may have been no involuntary.  It may have
14 been all voluntary.
15     Q.    You are just not certain either way?
16     A.    I'm just not certain either way.
17     Q.    If you flip to the next page, that's
18 Bates 1586 --
19     A.    Okay.
20     Q.    -- the second full paragraph down
21 that says, "Mr. Cain referred specifically to one
22 of the resolutions before the committee that
23 permits the vice-president of human resources and
24 performance improvement to make changes in benefit

Page 48

1  plans and programs from time to time to maintain
2  their competitiveness and respond to business and
3  employee interests, subject to the responsibility
4  of the committee and the Board of Directors with
5  respect to material amendments to employee benefit
6  plans."
7      A.    Um-hum.
8      Q.    Was that your title at that time,
9  human resources and performance improvement?
10     A.    It must have been.
11     Q.    And were you able to make minor
12 changes to the plan without approval by the board
13 or the Compensation Committee?
14           MR. BASSMAN:  Objection.  Which
15 plan?
16 BY MR. SAUDER:
17     Q.    The Cash Balance Plan.
18     A.    I don't remember that specifically.
19     Q.    And at this meeting you have no
20 recollection what, if any, materials were presented
21 to the Compensation Committee?
22     A.    No.
23     Q.    You have no specific recollection
24 whether there was a draft of the plan in place at

Page 49

1  that time?
2      A.    No.
3      Q.    No specific recollection?
4      A.    No.
5      Q.    If you flip to the attachment,
6  ending Bates 1589 --
7      A.    Okay.
8      Q.    -- do you see that?  At the bottom
9  of that, in bold, it says "Cash Balance Pension
10 Plan"?
11     A.    Yes.
12     Q.    It says, "Extensive grandfathering."
13           Do you see that?
14     A.    Yes.
15     Q.    When did grandfathering become an
16 issue, that grandfathering would somehow be part of
17 the Cash Balance Plan?
18     A.    I don't know that specifically.
19     Q.    Do you know who that was suggested
20 by?
21     A.    No, I don't.
22     Q.    Did you play a role in making that
23 decision?
24     A.    I probably played a role in

13 (Pages 46 to 49)

B0014

DONALD E. CAIN

Page 50

1  discussing that decision.
2      Q.    Do you know who else would have
3  played a role?
4      A.    No.
5      Q.    And were people grandfathered
6  because you expected some employees to accrue less
7  under the Cash Balance Plan?
8      A.    That wouldn't be my recollection.
9      Q.    What was your recollection of why
10 people were grandfathered?
11     A.    Because everyone starts accruing
12 almost immediately under a Cash Balance Plan, and,
13 therefore, you are increasing the benefit for some
14 folks and you can't have everybody have both, so
15 you had to pick some point where folks wouldn't
16 have access to the old plan.
17     Q.    What do you mean you couldn't have
18 everyone having --
19     A.    Couldn't have both plans.  Wouldn't
20 work and be cost neutral.
21     Q.    But you could have allowed current
22 employees to choose between the plans?
23     A.    I don't -- I don't believe that was
24 an option.

Page 51

1      Q.    But you could have?
2      A.    I don't know that.
3      Q.    What do you mean you don't know
4  that?
5      A.    I don't know that's something we
6  could have done.
7      Q.    Why is that?
8      A.    I just don't remember.
9      Q.    Based on cost?
10     A.    I don't remember that, either.
11         MR. BASSMAN:  Objection.
12         THE WITNESS:  I mean, I remember
13 nothing about that decision, other than I
14 understood we needed some point where folks would
15 be in one plan and some point after which folks
16 would be in either plan.
17 BY MR. SAUDER:
18     Q.    But I'm saying the company, itself,
19 could have, if they wanted to, allowed employees to
20 choose between the Cash Balance Plan or keeping the
21 old defined benefits plan?
22         MR. BASSMAN:  Objection.  Asked and
23 answered several times.
24         MR. SAUDER:  That wasn't asked and

Page 52

1  answered several times.  I didn't get an answer to
2  it.
3         THE WITNESS:  I don't remember any
4  of that discussion.
5  BY MR. SAUDER:
6      Q.    I'm not saying there was a
7  discussion.  I'm saying, it could have happened.
8      A.    I don't know.  I don't know.  I
9  mean, I'm not an expert, and it was ten years ago.
10     Q.    You were grandfathered?
11     A.    Yes.
12     Q.    Did you have a choice between the
13 Cash Balance Plan and the old plan?
14     A.    Yes.
15     Q.    You did?
16     A.    I believe I did.  That's what I
17 think grandfathering did.
18     Q.    So you were grandfathered, and then
19 when you retired did you take your money from the
20 old plan?
21     A.    Yes.
22     Q.    Why is that?
23     A.    Because it was better for me.
24     Q.    Do you know what percentage of

Page 53

1  employees that had the choice between taking money
2  from the old plan and the new plan took money from
3  the old plan?
4      A.    No.
5      Q.    Look at that one bullet there.  It
6  says, "Improved employee communication."
7         Do you see that?
8      A.    Yes.
9      Q.    What's your understanding of what
10 that means?
11         MR. BASSMAN:  Objection.
12         THE WITNESS:  I don't remember.
13 BY MR. SAUDER:
14     Q.    Showing you what has been previously
15 marked as Defense Exhibit 6.  Ask you to take a
16 look at this document and let me know if you've
17 seen this document prior to today.
18     A.    Unless -- if you mean, you know,
19 back in 1998, I may have seen it.  I haven't seen
20 it since then.
21     Q.    But you have no specific
22 recollection of seeing it even back in 1998?
23     A.    No.
24     Q.    No recollection of seeing this

14 (Pages 50 to 53)

B0015

DONALD E. CAIN

Page 54

1 document prior to me putting it in front of you,
2 correct?
3      A.    No.
4      Q.    Fair to say you have no recollection
5 whether you participated in preparing this
6 document?
7      A.    None.
8      Q.    No recollection of whether this was
9 communicated to employees?
10      A.    Not specifically.
11      Q.    Do you know who was in charge of
12 employee communications at that time?
13           MR. BASSMAN:  The time being
14 December 21, 1998?
15           MR. SAUDER:  Yes.
16           THE WITNESS:  I don't specifically
17 remember that.
18 BY MR. SAUDER:
19      Q.    Do you know at that time -- when I
20 say "at that time," I mean December of 1998 --
21 whether you had a desktop computer in your office?
22      A.    I can't -- I don't remember.  I'm
23 going to say probably.
24      Q.    Fair to say you have no idea

Page 55

1 whether -- what portion of the other nonrepresented
2 management employees also would have had a desktop
3 computer?
4      A.    I have no idea.
5      Q.    Do you know whether all of the
6 nonrepresented management employees had E-Mail
7 accounts at that time?
8      A.    I don't know.
9      Q.    Do you know if you did?  Company
10 E-Mail account?
11      A.    '98?
12      Q.    Yes.
13      A.    I would say I did.
14           MR. SAUDER:  Show you what we'll
15 have marked as Plaintiffs' Exhibit 18.
16           (Exhibit P-18 is marked for
17 identification.)
18 BY MR. SAUDER:
19      Q.    Showing you what's been marked as
20 Plaintiffs' Exhibit 18.  If you could take a look
21 at that document and let me know if you've seen it
22 prior to today.
23      A.    No recollection of it.
24      Q.    It says, up in the upper left-hand

Page 56

1 corner, "Electronic InSight."
2      Q.    Do you know what that means?
3      A.    I don't remember.
4      Q.    And then it says, "To all" -- do you
5 see where it says "To" in the upper right-hand
6 corner?
7      A.    Okay.
8      Q.    Do you know who that is referencing
9 in that "To" line?
10      A.    No.
11      Q.    It says, "Conectiv public affairs
12 person, Larry Boehm."
13           Do you know who that person is?
14      A.    I don't remember.
15      Q.    Do you know of a Conectiv public
16 affairs title?
17      A.    It's on the paper.
18      Q.    But you don't specifically have any
19 recollection of what that person did?
20      A.    No.
21      Q.    And you don't know that person?
22      A.    I'm not recollecting anybody.
23      Q.    The last paragraph in that document
24 that starts out, "If there are Conectiv management

Page 57

1 employees in your area who do not have E-Mail,
2 please print each a copy of each of these important
3 documents."
4      Do you see that?
5      A.    Yes.
6      Q.    Does that refresh your recollection
7 that all management employees did not have E-Mail
8 at the time?
9      A.    No.
10      Q.    Fair to say you have no recollection
11 whether all the management employees received a
12 copy of this document?
13      A.    That's correct.
14      Q.    And you have no recollection of
15 receiving a copy of this document?
16      A.    No.
17      Q.    Showing you what has been previously
18 marked as Defense Exhibit 5.
19      Sir, before you look at that
20 document, when you said that you were grandfathered
21 and you took the money under the old plan instead
22 of the Cash Balance Plan --
23      A.    Correct.
24      Q.    -- because it was better for you,

B0016

DONALD E. CAIN

Page 58

1  correct?
2      A.    Yes.
3      Q.    Better for you because you were able
4  to take more money out of the old plan, correct?
5      A.    My benefit was better when I retired
6  under the old plan.
7      Q.    More money, correct?
8      A.    My benefit was better.  Yes, more
9  money.
10     Q.    Sir, if you look at what's
11 previously been marked as Defense Exhibit 5.
12     A.    Okay.
13     Q.    And these pages are out of order --
14     A.    Okay.
15     Q.    -- as it was originally marked.  The
16 second page is 3 and then the next page is 2, but
17 if you'd just take a look at this document and let
18 me know if you've seen this document prior to
19 today.
20     A.    No.
21     Q.    Are you familiar with a document
22 entitled "Facts" while you were at Conectiv?
23     A.    No.
24     Q.    Fair to say you have no idea whether

Page 59

1  you participated in preparing this document?
2      A.    Not at this point.
3      Q.    No idea who prepared this document?
4      A.    No.
5      Q.    No idea whether this document was
6  communicated to employees?
7      A.    No.
8      Q.    Sir, if you look at the bottom of
9  the first page, it states, "New Cash Balance Plan"
10 in bold.
11     A.    Yes.
12     Q.    "New Cash Balance Pension Plan."
13 Second sentence then says, "The Cash Balance
14 Pension Plan is a new concept that has two
15 important advantages.  It's easier to understand
16 than the former plan."
17         Do you see that?
18     A.    Yes.
19     Q.    And was that something that you saw
20 as an advantage?
21     A.    Sure.
22     Q.    Was that something you communicated
23 to employees?
24     A.    It's in this communication.

Page 60

1      Q.    You don't know if that communication
2  went to anybody, correct?
3      A.    I don't know if this specific one
4  went to anyone.
5      Q.    Okay.
6      A.    You keep asking me about this, but I
7  will tell you that I do know that there was many,
8  many communications that were made on an
9  ongoing basis in newsletters, in E-Mails, in hard
10 documents, to communicate all the information that
11 we could give employees to help them understand the
12 changes that were being made.
13         You keep asking me if I remember
14 this document.  I don't remember this specific
15 document.  It's ten years ago.
16     Q.    I'm showing you the document that we
17 received from your counsel.
18     A.    Okay.
19     Q.    That's why I'm asking you.
20     A.    I don't remember.
21     Q.    You just said the ongoing
22 communications you -- as you sit here, you have no
23 specific recollection on how anything was
24 communicated --

Page 61

1      A.    Not of specific vehicles or names or
2  issues, no, I don't.
3      Q.    And you have no idea how any of that
4  was communicated to employees, correct?
5      A.    Any of what?
6      Q.    Any of what you just said?
7      A.    I just said, through a variety of
8  vehicles.  Newsletters, personal mailings,
9  meetings, all kinds of different ways.  There was
10 communications ongoing all the time.
11         You want to know about specific
12 ones.  I can't answer that question.
13     Q.    These are the only ones your counsel
14 gave us, sir.
15     A.    Well --
16         MR. BASSMAN:  Objection.  Arguing
17 with the witness.
18 BY MR. SAUDER:
19     Q.    So, when you say newsletters, how
20 were the newsletters -- were they disseminated in a
21 way that they may be laying around the company for
22 employees to pick up?
23     A.    I don't know if they were handed out
24 or put in places to be picked up.

16 (Pages 58 to 61)

B0017

DONALD E. CAIN

Page 62

1    Q.    And E-Mails, you said that there was
2    communications by E-Mails?
3    A.    To my recollection there were.
4    Q.    But you have no specific
5    recollection?
6    A.    Not a specific recollection of any
7    given specific communication.
8    Q.    How else would things have been
9    communicated to employees?
10   A.    Meetings.
11   Q.    And would you have had employees
12   sign in at meetings?
13   A.    I don't remember.
14   Q.    Would you think not?
15   A.    I wouldn't think -- no, I don't
16   think not; I just don't remember.
17   Q.    How else would communications be --
18   how else would these issues be communicated to
19   employees?
20   A.    Company newsletters.
21   Q.    Right, we talked about that.
22   A.    Yes.  Maybe direct mailings.
23   Q.    But you are not certain?
24   A.    Well, you know, I am certain that I

Page 63

1    got a direct mailing at some time about my cash
2    balance -- you know, about my Cash Balance Plan.
3    Q.    And what did that -- what was that
4    communication?
5    A.    I don't remember, but I remember
6    getting it.
7    Q.    Do you still have it?
8    A.    No.
9    Q.    Did you look for it?
10   A.    No.
11   Q.    You didn't look for it?
12   A.    No.
13   Q.    You may have it?
14   A.    I don't think so.
15   Q.    That was one of the things that we
16   requested that you look for, so I would ask that
17   you -- if you could again look for any
18   communications you may have regarding the requests
19   that we made, okay?
20   A.    Yes.
21   Q.    You say you have no recollection of
22   getting some direct mailing regarding a Cash
23   Balance Plan, correct?
24   A.    Yes.

Page 64

1    Q.    Beyond that, you don't know who else
2    would have received whatever you are talking about,
3    correct?
4    A.    No.
5    Q.    Sir, I'm showing you what has been
6    previously marked as Plaintiffs Exhibit 3.  If you
7    could take a look at that document and let me know
8    if you've seen that prior to today.
9    A.    No.
10   Q.    Haven't seen that?
11   A.    No.
12   Q.    Fair to say you have no recollection
13   of helping prepare this document?
14   A.    Correct.
15   Q.    No idea who prepared this document?
16   A.    Correct.
17   Q.    No idea whether it was disseminated
18   to employees?
19   A.    Correct.
20   Q.    Sir, if you flip to the page that's
21   Bates ends 231.
22   A.    Okay.
23   Q.    See at the bottom there, in bold, it
24   says, "Transition issues"?

Page 65

1    A.    Okay.
2    Q.    And then the last sentence there
3    says, "The transition rules will be designed to be
4    fair to all employees and sensitive to the concerns
5    of various groups affected, from new employees to
6    those who are approaching retirement age."
7    Do you see that, sir?
8    A.    Yes.
9    Q.    Where it says "The transition rules
10   will be designed to be fair to all employees," from
11   your recollection, not just this specific document,
12   was that something that the company was trying to
13   convey to nonrepresented management employees at
14   the time?
15   A.    It's in this document.  I assume it
16   was.
17   Q.    Flip to the next page.  Ends in
18   Bates 232.
19   A.    Okay.
20   Q.    The last sentence of that first
21   paragraph states, "In the meanwhile, please
22   continue to address any questions we may be able to
23   answer to your manager."
24   A.    Yes.

17 (Pages 62 to 65)

B0018

DONALD E. CAIN

Page 66

1    Q.    Do you see that?
2         At that time do you know how
3    "manager" was being defined?
4         MR. BASSMAN:  Objection.
5    BY MR. SAUDER:
6    Q.    You can answer, sir.
7    A.    Well, I can only speculate.  Your
8    immediate supervisor.
9    Q.    And do you know whether the managers
10   that are referenced in this document were -- had
11   any special knowledge regarding the Cash Balance
12   Plan at that time?
13        MR. BASSMAN:  Objection.
14   BY MR. SAUDER:
15   Q.    Whatever time that may have been?
16        MR. BASSMAN:  Objection.
17        THE WITNESS:  I can't say.
18   BY MR. SAUDER:
19   Q.    Prior to the implementation of the
20   Cash Balance Plan, did the managers have any
21   special knowledge or were they given any special
22   knowledge regarding the Cash Balance Plan?
23   A.    I don't know that.
24   Q.    You don't know?

Page 67

1    A.    No.
2    Q.    And, when I say "at the time," this
3    document is not dated, correct?
4    A.    I don't see one.
5         You tell me.
6    Q.    You don't see a date, correct?
7    A.    No, I don't see a date.
8    Q.    All right.
9         Sir, if at any point you need a
10   break, just let me know.
11   A.    I'm good.  Does anyone else need a
12   break?
13   Q.    Sir, again showing you what's been
14   previously marked Plaintiffs' Exhibit 9, if you
15   could take a look at that document and let me know
16   if you've seen that document prior to today.
17   A.    I don't remember.
18        Oh, I -- if you are asking, did I
19   see it back in whatever year this was dated, I
20   can't -- I don't remember.
21        Have I seen it since then?  No.
22   Q.    This was the retirement plan for
23   Conectiv, correct, sir?
24   A.    That's what it says.

Page 68

1    Q.    Take a look through and let me know
2    if you agree this is the retirement plan for
3    Conectiv including the Cash Balance Sub-Plan.
4         MR. BASSMAN:  Clarification.  When
5    you say this is the entire plan including --
6         MR. SAUDER:  I didn't say entire
7    plan.  I said, this is the plan -- Conectiv's
8    retirement plan, including the Cash Balance
9    Sub-Plan.
10        MR. BASSMAN:  Objection.
11        THE WITNESS:  I wouldn't know.  The
12   cover says it is.  That's all I know.
13   BY MR. SAUDER:
14   Q.    If you look at the Bates that ends
15   in 484, do you see that?
16   A.    Okay.
17   Q.    Second paragraph, if you would just
18   read that to yourself and let me know if you agree
19   this includes the Cash Balance Plan.
20        MR. BASSMAN:  Objection.
21        THE WITNESS:  I don't -- I just -- I
22   have no recollection.  I don't even know what all
23   that language means at this point.
24   BY MR. SAUDER:

Page 69

1    Q.    Sir, if you flip to the last page,
2    ends in 520.
3    A.    Yes.
4    Q.    Read that page there and let me know
5    when you've had an opportunity to read that.
6    A.    Yes.
7    Q.    And is that your signature at the
8    bottom of the page?
9    A.    Yes, it is.
10   Q.    This is dated December 10, 1999,
11   correct?
12   A.    Correct.
13   Q.    That's when you signed that page?
14   A.    It's -- yes.
15   Q.    And your signature is, if you look
16   at the top there, certifying that you approve the
17   adoption of the Conectiv retirement plan, correct?
18   A.    Yes.
19   Q.    Do you know if you played a role in
20   preparing this document?
21        MR. BASSMAN:  Objection.  Which
22   document?  This one page?
23        MR. SAUDER:  No.  This entire
24   document, Plaintiffs' Exhibit 9.

18 (Pages 66 to 69)

B0019

DONALD E. CAIN

Page 70

1         THE WITNESS:  Not in preparing it.
2  BY MR. SAUDER:
3         Q.    Sir, I want to show you what's been
4  previously marked as Plaintiffs' Exhibit 10.
5         Have you seen this document prior to
6  today?
7         A.    If you mean 1999, probably.
8         Q.    Okay.
9         A.    If you mean since then, any time in
10  the last five years, no.
11         MR. BASSMAN:  You should probably
12  take a look towards the back of the document.
13  There seems to be something dated after '99.
14         THE WITNESS:  It's -- but I still
15  don't -- I mean, I don't remember.  So, unless I'm
16  going to spend hours going through, which --
17  BY MR. SAUDER:
18         Q.    Sir, the title of this document on
19  the front page, "Part One Conectiv Cash Balance
20  Sub-Plan," do you see that?
21         A.    Yes.
22         Q.    Do you know if you played any role
23  in preparing this document?
24         A.    Probably not.

Page 71

1         Q.    Why do you say that?
2         A.    Because I wouldn't have had the time
3  to prepare this document.
4         Q.    If you flip to Bates PHI15 -- ends
5  1570, toward the back portion of the document.
6         A.    Okay.
7         Q.    That's your signature, correct?
8         A.    Yes.
9         Q.    That's also dated December 10, 1999?
10         A.    Correct.
11         Q.    That's when you would have signed
12  it, correct?
13         A.    Yes.
14         Q.    Your signature is indicating you are
15  adopting the plan, correct?
16         A.    Yes.
17         Q.    If you flip to the next page --
18         A.    Okay.
19         Q.    -- PHI 1571 --
20         A.    Okay.
21         Q.    -- the date on there looks to be
22  January -- I can't make out the number, but
23  January, '01.  Do you see that?
24         A.    Yes.

Page 72

1         Q.    And that's your signature there?
2         A.    Yes.
3         Q.    Do you know what you were doing by
4  signing this particular page?
5         A.    No, I don't.
6         Q.    Are you amending the retirement plan
7  of February of '01, as it says at the top?
8         A.    That's what the page says.
9         Q.    And did you have the authority to
10  amend the plan?
11         A.    I don't remember.
12         Q.    Were you the one who signed off on
13  the amendment?
14         A.    Yes.
15         Q.    And per the previous page, 1570, you
16  were the one who signed off ultimately on the
17  adoption of the plan?
18         A.    Yes, correct.
19         MR. BASSMAN:  Objection.
20         THE WITNESS:  Pursuant to the Comp
21  Committee's approval of the plan.
22  BY MR. SAUDER:
23         Q.    Correct.
24         Same thing on 1573.  Page is titled

Page 73

1  "Clarifying Amendment to Conectiv Retirement Plan,"
2  and then under that it states "Conectiv Cash
3  Balance Sub-Plan, October, 2000."
4         You signed that page?
5         A.    Yes, that's my signature.
6         Q.    You signed on October 1st, 2000,
7  correct?
8         A.    Correct.
9         Q.    And you are -- your signature is
10  indicating there is an amendment to the plan?
11         A.    That's what the page says.
12         Q.    Sir, I'm showing you what's
13  previously been marked as Defense Exhibit 9.  If
14  you could take a look at that document and let me
15  know if you've seen it prior to today.
16         A.    No.
17         Q.    You haven't seen that prior to
18  today?
19         A.    May have seen it in 1999 when it was
20  distributed, but not since then.
21         Q.    Do you have any specific knowledge
22  that it was distributed?
23         A.    No specific knowledge.
24         Q.    Do you have any -- have you ever

19 (Pages 70 to 73)

B0020

DONALD E. CAIN

Page 74

1  seen this document entitled "InSight" while you
2  were at Conectiv?
3      A.    Probably, based on the title of this
4  document.
5      Q.    Do you have any specific
6  recollection of seeing documents entitled
7  "InSight"?
8      A.    No.
9      Q.    Fair to say you have no specific
10  recollection of how these documents would have been
11  distributed?
12      A.    None.
13      Q.    Flip to the second page.  Bates ends
14  3429.  Do you see that?
15      A.    Yes.
16      Q.    At the top it says "Jim Kremmel."
17  Do you know who Jim Kremmel is?
18      A.    Yes.
19      Q.    And what was his role in March of
20  1999?
21      A.    I don't remember.
22      Q.    If you go down where it says,
23  "July/August, Cash Balance Pension Plan Meetings
24  for Employees" in bold.

Page 75

1          Do you see that?
2      A.    Yes.
3      Q.    Do you have any specific
4  recollection of meetings taking place in July or
5  August of 1999 regarding the Cash Balance Pension
6  Plan?
7      A.    I can't remember specifics.
8      Q.    It says, under that subheading, "The
9  human resources team and plan administrator,
10  Vanguard, will hold employee meetings across the
11  company to answer questions about the Cash Balance
12  Pension Plan."
13          Did you have any interaction with
14  Vanguard at or around that time?
15      A.    I can't specifically remember.
16      Q.    Do you remember having any
17  interaction with Vanguard regarding the Cash
18  Balance Plan?
19      A.    I don't remember.
20      Q.    When it says the "Human resources
21  team," do you know who that -- who would have been
22  involved in the human resources team at that time?
23      A.    All 60 or 70 employees that worked
24  in human resources.

Page 76

1      Q.    That would have included you?
2      A.    Yes.
3      Q.    There were 60 or 70 people in human
4  resources at the time?
5      A.    I'm guessing.
6      Q.    Roughly?
7      A.    Roughly.
8      Q.    And that's who you would have
9  included in that sentence?
10      A.    In the way it's offered here, yes.
11      Q.    Did all of the people in the human
12  resources team all, in some way, play a role in the
13  Cash Balance Plan?
14      A.    Not -- other than -- other than
15  interfacing with employees when it was finally
16  implemented, like they would have any other
17  benefit.
18      Q.    So they would have interfaced with
19  other employees?
20      A.    Sure, and maybe not every single
21  employee, but the ones that had face-to-face
22  contact.
23      Q.    What does that mean?
24      A.    Well, not every HR -- some are

Page 77

1  clerks and some are secretaries.  Not all of them
2  would necessarily interface with employees on any
3  benefit.
4      Q.    What portion of the 50 or 60 people
5  that were in HR at the time would have interfaced
6  with employees?
7      A.    I have no idea.
8      Q.    More than half?
9      A.    Maybe.
10      Q.    Next paragraph says, "The Vanguard
11  Group has been selected to be the administrator for
12  all pensions for management employees."
13          Did you play a role in that
14  selection?
15      A.    I don't remember.
16      Q.    Next sentence says, "After August 1,
17  pension questions should be directed to Vanguard.
18  Until then the Conectiv benefits team and the human
19  resource service center will continue to handle
20  pension-related issues."
21          Do you know who the Conectiv
22  benefits team was?
23      A.    It would have been the whole
24  department.

B0021

DONALD E. CAIN

Page 78

1    Q.    The whole HR department?
2    A.    No.  The whole comp and benefits
3  department.
4    Q.    How big was that department at the
5  time?
6    A.    I don't remember.
7    Q.    Larger than 50?
8    A.    No, not that many.
9    Q.    Larger than ten?
10   A.    Probably not.
11   Q.    Less than ten?
12   A.    Probably.
13   Q.    Next it says, "The human resource
14  service center."  What is that?
15   A.    It was a place for employees to call
16  or go to get their questions answered about any of
17  their benefits.
18   Q.    And that would be the human resource
19  department?
20   A.    It would be within the human
21  resource department.
22   Q.    How big was that department within
23  the department?
24   A.    I don't know.  I don't know.

Page 79

1    Q.    More than ten?
2    A.    Probably.
3    Q.    More than the 20?
4    A.    I don't know.
5    Q.    If people called the human resource
6  service center and had a question regarding the
7  Cash Balance Pension Plan would that in any way be
8  noted by the human resource service center?
9    A.    I can only speculate.  I don't know
10  that.
11   Q.    But there was no plan that you know
12  of that was implemented that, if someone called in,
13  that it had to be written down and noted by the
14  human resource center?
15   A.    There was some type of a computer
16  system for them to use to keep track of issues that
17  they dealt with.
18   Q.    But would that deal with just
19  general issues or would that be with every single
20  call that came in they would have to log into a
21  computer somewhere?
22   A.    I don't know.
23   Q.    Do you remember attending any
24  meetings around July, 1999 regarding the Cash

Page 80

1  Balance Pension Plan?
2    A.    No, not specifically.
3    Q.    Sir, showing you what's been marked
4  as Defense Exhibit 10, I want you to have an
5  opportunity to look at that document, I want you to
6  let me know if you've seen it prior to today.
7    A.    I don't have any memory of it.
8    Q.    Look at the second paragraph of the
9  document, second sentence says, as managers, please
10  make sure that everyone who wishes to attend the
11  information sessions is given the opportunity.
12       What do you understand the term, "as
13  managers," to mean?
14       MR. BASSMAN:  Objection.
15  BY MR. SAUDER:
16   Q.    You can answer, sir.
17   A.    Management employees of the company.
18   Q.    So not all nonrepresented management
19  employees?  Are you differentiating that in some
20  way?
21       MR. BASSMAN:  Objection.
22       THE WITNESS:  Explain your
23  differentiation.
24  BY MR. SAUDER:

Page 81

1    Q.    Well, this document, is it fair to
2  say, relates to the Cash Balance Pension Plan?
3    A.    Correct.
4    Q.    Who ultimately went into the Cash
5  Balance Pension Plan?
6    A.    Management employees.
7    Q.    Nonunion?
8    A.    Or nonrepresented employees.
9    Q.    Management employees?
10   A.    Yes.
11   Q.    Differentiate that group from what
12  you just said when I asked you what does as
13  managers -- what does that mean?
14   A.    Yes.
15   Q.    And how?
16   A.    These would be -- generally managers
17  who had some supervisory responsibility, I believe
18  as it's used here.
19   Q.    Fair to say you have no recollection
20  whether you helped prepare this document?
21   A.    No.
22   Q.    No recollection of who prepared this
23  document?
24   A.    No.

21 (Pages 78 to 81)

B0022

DONALD E. CAIN

Page 82

1    Q.    You have no recollection of whether
2  this document was disseminated to employees?
3    A.    No.
4    Q.    Do you have any recollection of
5  informational meetings taking place around July,
6  1999 regarding the Cash Balance Plan?
7    A.    Not specifically.
8    Q.    The next paragraph says, "These
9  meetings will be the best source of information on
10  the plan and employees' opening balances."
11    Do you agree with that statement?
12    A.    I probably agreed with it at the
13  time.
14    Q.    Okay.
15    Next sentence says, "Recent stories
16  in the national media have raised concerns about
17  some Cash Balance Plans that do not offer the same
18  level of financial security or grandfathering
19  provisions as the Conectiv Cash Balance Pension
20  Plan."
21    Do you see that?
22    A.    Yes.
23    Q.    Do you know what that is referring
24  to?

Page 83

1    A.    I believe it's referring to articles
2  that probably have been written in the newspaper
3  about Cash Balance Plans, and the Conectiv plan
4  from the beginning was to be a cost-neutral plan,
5  so it had a lot of good benefits in it and
6  transition things that other plans didn't have.  We
7  wanted to make sure employees knew that.
8    Q.    Knew that the Conectiv plan was
9  different than what was in the national media?
10    A.    Yes, that's correct.
11    Q.    And, in fact, the next sentence
12  states, "One part of the presentation will address
13  these concerns and demonstrate how Conectiv's plan
14  is different."
15    A.    Correct.
16    Q.    And you agree with that statement?
17    A.    Yes -- well, I agree with it -- I'll
18  qualify it.  Because I don't remember exactly what
19  plans were in the national media, so I have to just
20  rely on the fact that this is in here and, so,
21  whatever plans were in there -- in the national
22  media, that's what we were comparing it to.  If you
23  ask me today, I couldn't tell you.
24    Q.    Right.

Page 84

1    It says that Towers was the
2  consulting firm that will act as the actuary.
3    Do you have any recollection who you
4  dealt with at Towers?
5    A.    Dealt with a lot of folks over the
6  years, so --
7    Q.    Do you know who the primary contact
8  would have been regarding the Cash Balance Plan?
9    A.    I couldn't say with certainty,
10  without going back and checking.
11    Q.    The last paragraph on that page
12  states, "If you or your employees have any
13  questions after receiving the opening statements,
14  please hold them until the meetings where experts
15  will be available to respond.
16    Do you see that?
17    A.    Yes.
18    Q.    What is meant by your employees in
19  that sentence?  What is your understanding of what
20  that means?
21    MR. BASSMAN:  Objection.
22    THE WITNESS:  I think we've answered
23  that.
24  BY MR. SAUDER:

Page 85

1    Q.    The same thing, it would be
2  supervisors of the nonrepresented management
3  employees?
4    A.    You asked me the question about
5  managers.
6    Q.    Right.
7    A.    Who this was, seems like, it was
8  addressed to.
9    Q.    Right.
10    A.    So this is just a continuation of
11  that thought.
12    Q.    Okay.
13    Flip to the next page, sir.
14    A.    Okay.
15    Q.    There is a list of what appear to be
16  meetings regarding the Conectiv Cash Balance Plan,
17  and states, "Voluntary informational meeting
18  schedule."
19    A.    Correct.
20    Q.    And then a list of dates and
21  locations.
22    Having looked at that, does that
23  refresh your recollection in any way whether you
24  attended any of those meetings?

22 (Pages 82 to 85)

B0023

DONALD E. CAIN

Page 86

1      A.     No.
2      Q.     Do you have any recollection, based
3  on looking at that, of anything relating to the
4  meetings at that time?
5      A.     No.
6      Q.     So you wouldn't know who would have
7  attended from Conectiv in order to convey the
8  information?
9      A.     No.
10     Q.     And you wouldn't know whether
11  employees signed in?
12     A.     No.
13     Q.     And you wouldn't know what
14  information was conveyed?
15     A.     No.
16     Q.     Sir, showing you what's been
17  previously marked as Plaintiffs' Exhibit 4, if you
18  could take a look at that document and let me know
19  if you've seen that document prior to today.
20     A.     It's the same answer of I've been
21  saying.  If you are asking me, did I see it back in
22  1999, I probably did.
23     Q.     Okay.
24     A.     Have I seen it in preparation for

Page 87

1  today?  No.
2      Q.     And subsequent to 1999 you would
3  have no recollection of seeing it?
4      A.     Nope.
5      Q.     Do you know if you played any role
6  in preparing this document?
7      A.     May have reviewed it.
8      Q.     But no specific recollection?
9      A.     No specific recollection.
10     Q.     You have no specific recollection as
11  to who would have prepared this document?
12     A.     No.
13     Q.     Do you know what the purpose of this
14  document is?
15     A.     No, I don't.  Because, if I look at
16  the first page, it looks like it has something to
17  do with July.
18     Q.     Okay.
19          If you go to the second page, Bates
20  302?
21     A.     Okay.
22     Q.     That top slide up on the left-hand
23  side that says, "Important perspective on
24  Conectiv's new retirement program," do you see

Page 88

1  that?
2      A.     Yes.
3      Q.     I think this is what we were talking
4  about in one of the previous documents, where it
5  says, "Cash Balance Plans are controversial, a
6  series of Wall Street Journal articles,
7  Congressional hearings."
8          Do you see that?
9      A.     Yes.
10     Q.     Is that the same thing that was
11  referenced in D-10, the document we just looked at?
12     A.     It would only be speculation.
13     Q.     But do you assume that's the same
14  thing?
15     A.     I don't have any information to
16  assume that at this point.
17     Q.     Do you have any specific
18  recollection of Wall Street Journal articles that
19  discussed Cash Balance Plans around July of 1999?
20     A.     Not specifically, no.
21     Q.     The next bullet says, "Criticisms
22  leveled at Cash Balance Plans," and one of them
23  says, "Masks cost cutting."
24          Do you see that?

Page 89

1      A.     Yes.
2      Q.     If you go down to the next slide
3  below that, where it says, "Important perspectives
4  on Conectiv's new retirement program," the first
5  slide states, "New program not designed to provide
6  cost savings for Conectiv."
7          Do you see that?
8      A.     That is correct.
9      Q.     So, it's fair to say that the
10  Conectiv Cash Balance Plan was not masking cost
11  cutting, correct?
12     A.     Correct.
13     Q.     I think we talked about this
14  previously.  If you flip back to the top slide
15  again, underneath "Masks cost cutting," it says
16  "Poor handling of communication/transition."
17     A.     Correct.
18     Q.     Fair to say that Conectiv -- that
19  that doesn't apply to the Conectiv Cash Balance
20  Plan?
21     A.     Correct.
22     Q.     And then the next bullet says,
23  "Accruals cease for certain employees."
24          Do you see that?

23 (Pages 86 to 89)

B0024

DONALD E. CAIN

Page 90

1     A.    Yes.
2     Q.    Does that apply to the Conectiv --
3     A.    I don't know what that means at this
4  point.
5     Q.    Do you remember Watson Wyatt ever
6  informing you that this was the richest Cash
7  Balance Plan that they had done up to that point?
8     A.    I don't remember them informing me,
9  but I went through the remainder of my career
10  believing that it was a very good Cash Balance
11  Plan.
12     Q.    Was that something that would have
13  been conveyed to the employees that were ultimately
14  put into the Cash Balance Plan?
15     A.    I can't say.
16     Q.    Well, putting this document aside,
17  do you remember that's something -- that's a
18  message that you, as the head of HR, were looking
19  to convey to the employees, that this was a very
20  good Cash Balance Plan?
21     A.    I can't say for certain.
22     Q.    You have no recollection?
23     A.    No recollection.
24     Q.    If you look up at the top slide on

Page 91

1  the right-hand column --
2     A.    Okay.
3     Q.    -- do you know what that slide is?
4     A.    I can't read it.
5           It says it's a comparison of the two
6  types of plans.
7     Q.    And do you know what data or
8  assumptions went into that chart?
9     A.    No, I don't.
10     Q.    Do you know if you played a role in
11  preparing that chart?
12     A.    Probably not.
13     Q.    Do you know who would have?
14     A.    No.
15     Q.    If you go to Bates 305, Page 5 of
16  this document --
17     A.    Okay.
18     Q.    -- look at the two slides on the
19  right-hand column, the middle and the bottom.  The
20  first one is "Conectiv Cash Balance Plan versus
21  Prior Plan - Delmarva," and the next one with deals
22  with Atlantic.
23           Do you see that?
24     A.    Okay.

Page 92

1     Q.    Do you know who provided the data
2  for these slides?
3     A.    No.
4     Q.    Do you know if you played any role
5  in preparing those slides?
6     A.    No.
7     Q.    And you don't know what the purpose
8  of these slides were, right?
9     A.    Not specifically, no.
10     Q.    Showing you what's been previously
11  marked as Defense Exhibit 13.
12           Sir, Defense Exhibit 13 is a copy of
13  Plaintiffs' Exhibit 4 that we just looked at.  I
14  just have a couple questions.
15           Do you see where it says -- the
16  handwriting on the first page, at the bottom there?
17     A.    Okay.
18     Q.    Is that your handwriting?
19     A.    I don't believe so.
20     Q.    Do you recognize that handwriting?
21     A.    No.
22     Q.    If you go to the page that ends in
23  221, there is handwriting at the bottom of that
24  page.  Do you recognize that handwriting?

Page 93

1     A.    No.
2           (Discussion is held off the record.)
3  BY MR. SAUDER:
4     Q.    Showing you what's been previously
5  marked as Defense Exhibit 12 and ask if you've seen
6  this document prior to today.
7     A.    I'm sure I saw it -- oh, wait a
8  minute, now.  When is this?  July 9, 1999.
9  Probably saw it then.
10     Q.    Other than that, you have no
11  recollection?
12     A.    No.
13     Q.    The title is "InSight Online."
14           Do you know what that is?
15     A.    I don't specifically remember.
16           What's it say at the top?  Doesn't
17  it tell you?
18     Q.    Do you have a specific recollection
19  of documents being issued that said "InSight
20  Online"?
21     A.    No, but it tells you up top what it
22  was.
23     Q.    What was it?
24     A.    It says, "Conectiv's Intranet

24 (Pages 90 to 93)

B0025

DONALD E. CAIN

Page 94

1   resource for corporate news and information."
2        Q.    And when did Conectiv start an
3   Intranet?
4        A.    I don't know.
5        Q.    And you don't know if all the
6   nonrepresented management employees had Internet
7   access or computers on their desks at that time,
8   correct?
9        A.    I don't know for sure.
10       Q.    And you don't know whether they all
11  had E-Mail at the time, correct?
12       A.    I don't know that for sure.
13       Q.    If you go down to where it says
14  "Cash Balance Schedule Revised," do you see that?
15       A.    Yes.
16       Q.    It says, "A revised schedule for
17  Cash Balance Pension Plan meetings is attached."
18            Do you have any recollection of any
19  revisions to any Cash Balance Pension Plan meetings
20  at that time?
21       A.    No.
22       Q.    And there is no schedule attached,
23  correct?
24       A.    I don't see one.

Page 95

1        Q.    And you have no recollection of
2   attending any meetings where you conveyed
3   information regarding the Cash Balance Plan to the
4   nonrepresented management employees?
5        A.    Not specifically.
6        Q.    And no recollection of meetings
7   taking place?
8        A.    Not specifically.
9            MR. SAUDER:  All right, sir, we can
10  break for lunch now.
11           (Recess called at 12:02 p.m.)
12           (Resumed at 12:57 p.m.)
13  BY MR. SAUDER:
14       Q.    Good afternoon, sir.
15           I just want to go back to
16  Plaintiffs' Exhibits 9 and 10.  If you could just
17  take a look.
18           MR. BASSMAN:  Plaintiffs '9 and 10?
19           MR. SAUDER:  Right.
20           THE WITNESS:  Okay.
21  BY MR. SAUDER:
22       Q.    On Plaintiffs'9, the cover says,
23  "Conectiv Retirement Plan," correct?
24       A.    Okay.

Page 96

1        Q.    If you go to 484 on the document --
2   Bates Number 484 --
3        A.    Okay.
4        Q.    -- it says, second paragraph, "This
5   plan is comprised of this document, the base plan,
6   and three parts attached hereto.  Part One consists
7   of the CB" -- which stands for the Cash Balance
8   Sub-Plan -- "and applies solely to certain
9   management employees of the employer."
10            Do you see that?
11       A.    Yes.
12       Q.    So this first document, I think
13  we've established that on the last page that's your
14  signature --
15       A.    Correct.
16       Q.    -- and that's you adopting this
17  portion of the retirement plan, correct?
18       A.    Correct.
19       Q.    And then, on Plaintiffs' 10, which
20  is Part One to that plan --
21       A.    Right.
22       Q.    -- that's the Conectiv Cash Balance
23  Sub-Plan, correct?
24       A.    That's what it says.

Page 97

1        Q.    And then, on Bates 1570 --
2        A.    Yes.
3        Q.    -- that's your signature --
4        A.    Correct.
5        Q.    -- adopting the Part One of that
6   Conectiv Cash Balance Sub-Plan, correct?
7        A.    Yep.
8            MR. SAUDER:  You can put those
9   aside.
10           I'll show you what we'll mark as
11  Plaintiffs' Exhibit 19.
12           (Exhibit P-19 is marked for
13  identification.)
14  BY MR. SAUDER:
15       Q.    I'm showing you an E-Mail document
16  that's marked as Plaintiffs' Exhibit 19, and this
17  is Bates PHI0003810 through 3811.
18       A.    Okay.
19       Q.    Looks like this document was written
20  by Wally Judd.  Do you know who that is?
21       A.    Yes.
22       Q.    Who is that?
23       A.    He worked in -- he was a manager in
24  corporate communications, I believe, at the time.

25 (Pages 94 to 97)

B0026

DONALD E. CAIN

Page 98

1    Q.    And at the time -- this E-Mail is
2  dated April 16, 1998?
3    A.    Yes.
4    Q.    What were his duties and
5  responsibilities at that time?
6    A.    He oversaw communications.
7    Q.    Relating to what?
8    A.    Anything in the corporation, I
9  assume.
10   Q.    And would that be outside
11  communications, also?
12   A.    Probably.
13   Q.    Who did he report to?
14   A.    1998.  I'm not sure.
15   Q.    Did he report to you?
16   A.    No, not in 1998.
17   Q.    At any point?
18   A.    Sometime after the merger, he did,
19  and I don't remember exactly what time that was.
20   Q.    In what capacity?
21   A.    Employee communications manager.
22   Q.    And you don't know how close in time
23  to the actual merger that was?
24   A.    No.

Page 99

1    Q.    And what was his title?
2    A.    When?
3    Q.    After the merger, when he reported
4  to you.
5    A.    I don't remember his exact title,
6  but he was responsible for employee communications.
7    Q.    And what did that mean?
8    A.    Any documents or newsletters or
9  anything that we did with the employees, that was
10  his domain.
11   Q.    Relating to anything?
12   A.    Anything.
13   Q.    Was he still there when you left?
14   A.    Yes.
15   Q.    And what was his title when you
16  left?
17   A.    When I left, I don't know for sure,
18  because he wasn't working for me anymore.
19   Q.    He wasn't working in that same
20  capacity as employee communications?
21   A.    He was doing something with employee
22  communications, but I don't believe it was
23  company-wide anymore.
24        I think it was maybe within one of

Page 100

1  the business units.  I'm vague on that.
2    Q.    But he wasn't reporting to you?
3    A.    Not when I left, no.
4    Q.    Do you know if you would have
5  received this E-Mail?
6    A.    I was part of the group that it was
7  addressed to.
8        I don't remember specifically.
9    Q.    And what group were you part of?
10   A.    Directors, VPs, GMs.
11   Q.    Is that what that stands for,
12  directors, VPs and GMs?
13   A.    Yes.
14   Q.    And then the transition team?
15   A.    I don't know.  It looks like an
16  E-Mail address to me, but I don't --
17   Q.    Okay, but you don't know what "Trans
18  Team" stands for?
19   A.    No.
20   Q.    The body of the E-Mail states, "Here
21  are the responses to questions which have come up
22  in employee meetings about the Conectiv management
23  benefits."
24   A.    Okay.

Page 101

1    Q.    It says, "Here are the responses."
2        Do you know where those responses
3  came from?
4    A.    No, I don't.
5    Q.    And do you know who drafted the
6  responses?
7    A.    No, I don't.
8    Q.    Do you know how the questions were
9  generated?
10   A.    I don't.
11   Q.    And do you know what the purpose of
12  submitting these questions and answers to this
13  group -- what was the purpose of that?
14   A.    I don't know.
15   Q.    Do you know, once these -- what was
16  done after this E-Mail with regard to these
17  questions and answers, do you know?
18   A.    No.
19   Q.    So you don't know the purpose of
20  this exercise?
21   A.    Not at this point.
22   Q.    Do you have any recollection of any
23  employee meetings taking place around this time,
24  April, '98?

26 (Pages 98 to 101)

B0027

DONALD E. CAIN

Page 102

1    A.    No, I have no recollection.
2    Q.    The individuals that were
3  carbon-copied on this E-Mail, do you know any of
4  those individuals?
5        James Weller?
6    A.    Yes.
7    Q.    Who is that?
8    A.    He was involved in power plants at
9  Atlantic before the merger.
10    Q.    And do you know why he would have
11  been on this E-Mail?
12    A.    No.
13    Q.    How about Pat King?
14    A.    Pat King.  I don't see Pat King.
15  Where is it?
16    Q.    The last person on the carbon
17  copies.
18        MR. BASSMAN:  There is a "King comma
19  Pat" over there.
20        THE WITNESS:  Oh.  Well, the King is
21  a location.
22  BY MR. SAUDER:
23    Q.    So you don't know what that Pat --
24    A.    I don't know what the Pat is.

Page 103

1    Q.    How about Harold, last name D-e-J --
2    A.    DeJarnette?
3    Q.    Yes.  Do you know that person?
4    A.    Yes.
5    Q.    Who is that?
6    A.    He was a manager in human resources.
7    Q.    Did he report to you?
8    A.    Yes.
9    Q.    And what was his role?
10    A.    I don't remember a specific role in
11  the merger.
12    Q.    Do you know why he would have been
13  on this E-Mail?
14    A.    No, I don't.
15    Q.    Did you play any role in
16  implementing the Cash Balance Plan?
17    A.    No more so than any other HR
18  employee.
19        He wasn't specifically working on
20  the Cash Balance Plan.
21    Q.    He would have been somebody who,
22  what, answered questions, if employees had them?
23    A.    May have.
24        I don't remember the exact role that

Page 104

1  this was in, but he could of, sure.
2    Q.    Was he still at the company when you
3  left?
4    A.    Yes.
5    Q.    What was his role at that time when
6  you left?
7    A.    Manager -- a human resource manager
8  in one of the nonutility business units.
9        MR. SAUDER:  I'll show you what
10  we'll have marked as Plaintiffs' Exhibit 20.
11        (Exhibit P-20 is marked for
12  identification.)
13  BY MR. SAUDER:
14    Q.    Sir, showing you what's been marked
15  as Plaintiffs' Exhibit 20.  This is Bates PHI003812
16  through 14.
17    A.    Okay.
18    Q.    An E-Mail sent by Wally Judd,
19  May 8th, 1998.
20        Would you have received a copy of
21  this E-Mail?
22    A.    Probably.
23    Q.    And what do you base that on?
24    A.    Just it was sent to leadership

Page 105

1  people, and I don't know -- see, I can't tell
2  you -- it says, "Leadership@Exec."  I don't know
3  exactly what group that's referring to, but I'm
4  just guessing I got a copy of it.
5    Q.    Do you know who would have been in
6  the leadership group, as it's defined here?
7    A.    Not specifically.
8    Q.    But you would -- you assume you
9  would have?
10    A.    Probably.
11    Q.    But you have no specific
12  recollection of receiving this E-Mail?
13    A.    No.
14    Q.    Karen Francks, who is that?
15    A.    She was a human resource manager.
16    Q.    And did she report to you?
17    A.    Yes.
18    Q.    And what was her responsibility?
19    A.    I don't remember at the time.
20    Q.    Was she still there when you left?
21    A.    Yes.
22    Q.    What was her role when you left?
23    A.    When I left, she was manager of
24  leadership -- employee and executive development or

27 (Pages 102 to 105)

B0028

DONALD E. CAIN

Page 106

1  leadership development or something.
2      Q.   Did she report to you when you
3  left -- at the time that you left?
4      A.   Yes.
5      Q.   Did she have any role in employee
6  communication?
7      A.   I don't remember.
8      Q.   The body of the E-Mail, do you see
9  where -- toward the top portion -- first paragraph,
10  I guess the middle of the paragraph, it says, "The
11  thrust of this communications effort has been
12  business leaders telling people working for them
13  about what is going on -- both data and
14  perspective."
15      A.   Um-hum.
16      Q.   Do you know what that means?
17      MR. BASSMAN:  Objection.
18      You can answer.
19      THE WITNESS:  I believe it was part
20  of the communications strategy to try to have as
21  many pieces of information get to employees through
22  the people in their business -- line of business.
23  BY MR. SAUDER:
24      Q.   And how -- so you are saying

Page 107

1  communicating to the business leaders who would
2  then communicate --
3      A.   To employees.
4      Q.   Who are you defining as business
5  leaders?
6      A.   I don't know.  It's a broad term.
7      Q.   You don't know what group that
8  means?
9      A.   I don't think it was a group.  I
10  think it was a general term.
11      Q.   So you have no specific knowledge on
12  how information was communicated from the business
13  leaders, whoever they were, to anybody below them?
14      A.   To any given employee, no.
15      Q.   The bottom of that first paragraph
16  says, "We have responded to about two dozen
17  questions so far and are working on about another
18  dozen."
19      Do you see that?
20      A.   Yes.
21      Q.   And it says, "We have responded."
22      Do you have any idea who that
23  means -- who that relates to?  The "We"?
24      MR. BASSMAN:  Objection.

Page 108

1      THE WITNESS:  No.
2  BY MR. SAUDER:
3      Q.   If you look at the next paragraph,
4  the sentence in the middle that states, "We will be
5  sending out posters to sites reminding people of
6  the sign-up period."
7      Do you know what that means?
8      THE WITNESS:  No.
9      MR. BASSMAN:  Objection.
10  BY MR. SAUDER:
11      Q.   Question Number 5 on the last page
12  of this document, which is 3814 --
13      A.   Okay.
14      Q.   -- the question states, "The Facts
15  newsletters says that, under the new Cash Balance
16  Plan -- new Cash Balance Pension Plan, the entire
17  value of your pension account will be paid to your
18  beneficiary.  Do grandfathered employees have to
19  choose between the plans now for purposes of
20  survivor benefits?"
21      And the answer, "As explained above,
22  you will only need to designate a beneficiary."
23      Do you see that?
24      A.   Yes.

Page 109

1      Q.   You have no idea where that question
2  came from?
3      A.   No.
4      Q.   Do you know what that answer means?
5      MR. BASSMAN:  Objection.
6      THE WITNESS:  It says you only need
7  to designate a beneficiary.
8  BY MR. SAUDER:
9      Q.   If you were grandfathered, was your
10  beneficiary entitled to receive the full amount of
11  your pension, as you understand it?
12      MR. BASSMAN:  Objection.
13      THE WITNESS:  I can't answer that
14  definitively.  I don't remember.
15  BY MR. SAUDER:
16      Q.   Do you remember, under the old plan,
17  whether a beneficiary was entitled to receive the
18  full amount of the pension?  The beneficiary of
19  the --
20      A.   Under what old plan?
21      Q.   Under the defined benefit plan
22  Delmarva and ACE had, prior to the Cash Balance
23  Plan.
24      A.   I can't -- I don't remember ACE,

28 (Pages 106 to 109)

B0029

DONALD E. CAIN

Page 110

1  but, in the Delmarva plan, there was a survivor --
2  well, you took an annuity and the spouse was
3  entitled to 50 percent of the annuity.
4       Q.    And do you know, under the Cash
5  Balance Plan, as this is answered here, whether the
6  individuals that were grandfathered, was the spouse
7  entitled to 100 percent of the annuity if they were
8  grandfathered?
9       A.    No, I don't believe so, but I don't
10 remember.
11      Q.    You are not sure?
12      A.    You are getting into a level of
13 detail that has long escaped me.
14            MR. SAUDER:  Okay.  Show you what
15 will be marked as Plaintiffs' Exhibit 21.
16            (Exhibit P-21 is marked for
17 identification.)
18 BY MR. SAUDER:
19      Q.    Showing you what's been marked as
20 Plaintiffs' Exhibit 21, Bates PHI003815 through 16.
21 It's an E-Mail from Wally Judd, dated 5-14-98.
22            Would you have received a copy of
23 this E-Mail?
24      A.    Probably.

Page 111

1       Q.    Because it says "Leadership"?
2       A.    Probably.
3       Q.    And this is a smaller group than the
4  other E-Mail, correct?
5       A.    It would appear that, from what's on
6  this first page.
7       Q.    And, when I say "the other E-Mail,"
8  I mean Plaintiffs' Exhibit 20.
9             Do you have any specific
10 recollection of receiving this E-Mail?
11      A.    No.
12      Q.    Do you have any recollection of
13 participating in any responses or how responses
14 would be formulated to these questions?
15      A.    Not specifically.
16      Q.    How about generally?
17      A.    Not these particular questions.
18      Q.    And the body of this E-Mail states,
19 "Here is the last set of questions asked by
20 employees at the recent round of management
21 meetings.  Please get the responses out to your
22 people in the best ways you can."
23            Do you know what that means,
24 "Please get the responses out to your people in the

Page 112

1  best ways you can"?  Do you know what that means?
2       A.    Well, it's addressed to the
3  leadership, whoever that is, and it's asking them
4  to make sure this information gets in the hands of
5  everybody and let them determine what's the best
6  way to do it.
7       Q.    Everyone that they are supervising?
8       A.    I would assume that.  I don't know
9  that.
10      Q.    And it's giving the leadership
11 discretion on how to communicate this, correct?
12      A.    Correct.
13      Q.    You have no specific recollection on
14 how this was communicated to anyone beyond --
15      A.    Not any individual.
16      Q.    Would you have had any
17 responsibility to pass this information on to
18 anyone below you?
19      A.    Probably not.
20      Q.    Why do you say that?
21      A.    Because everyone below me probably
22 would have been in that leadership group.
23      Q.    And they would have had
24 responsibility somehow to communicate this to

Page 113

1  someone below them?
2       A.    Well, some of them may have had
3  people that were also in the leadership group but I
4  can't remember exact structure at the time.
5       Q.    But you don't recall implementing
6  some uniform plan on how this information would be
7  communicated to anyone beyond this E-Mail, correct?
8       A.    Not specifically.
9       Q.    Showing you what's been marked as
10 Defense Exhibit 3, have you seen this document
11 prior to today?
12      A.    I probably saw it in 1998 or
13 sometime around then.
14      Q.    Have you had an opportunity to
15 review the document?
16      A.    No.
17      Q.    Do you want to take an opportunity
18 to review it?
19      A.    Sure.
20            Okay.
21      Q.    Does that refresh your recollection
22 as to whether you saw this document prior to today?
23      A.    No.
24      Q.    Do you know what the logo is in the

29 (Pages 110 to 113)

B0030

DONALD E. CAIN

Page 114

1   bottom right-hand corner on the first page?
2       A.   Yes, Watson Wyatt.
3       Q.   And do you know what role they
4   played in the Conectiv Cash Balance Plan in
5   February of '98?
6       A.   I can't say for certain.
7            They were involved somehow because
8   their logo is on the paper.
9       Q.   Is it fair to say that you and Ben
10  Wilkinson were at a meeting where Watson Wyatt
11  presented this slide?
12      A.   How could I say that?
13      Q.   Do you have any recollection of
14  being at a meeting with Ben Wilkinson discussing
15  these issues that are in this document?
16      A.   Not a specific meeting about this
17  document.
18      Q.   Do you remember being in meetings
19  with Ben Wilkinson and Watson Wyatt discussing a
20  Cash Balance Plan?
21      A.   Sometime, sure.
22      Q.   Sometime?  1998?
23      A.   Sometime around implementation.
24      Q.   Who else would have been in those

Page 115

1   meetings on the Conectiv side?
2       A.   I don't have any memory of that.
3       Q.   Who would have been in the meetings
4   from Watson Wyatt?
5       A.   I don't know that, either.
6       Q.   Do you know who the main contact was
7   at Watson Wyatt regarding the Cash Balance Plan?
8       A.   Not today.
9       Q.   Go to page Bates ending 447.
10      A.   Okay.
11      Q.   Do you see that handwriting there?
12      A.   Yes.
13      Q.   Do you recognize that handwriting?
14      A.   No.
15      Q.   Go to Bates 449.
16      A.   Okay.
17      Q.   See that graph there, it's titled,
18  "Pattern of Lump Sum Benefit Growth"?
19      A.   Yes.
20      Q.   Do you know what the purpose was of
21  this data presentation?
22      A.   No.
23      Q.   Do you see at the bottom it says,
24  "Assumes 3 percent annual salary increase"?

Page 116

1       A.   Yes.
2       Q.   Do you know the source of that
3   assumption?
4       A.   No.
5       Q.   Go to Bates 455.
6            Do you see the graph on 455?
7       A.   Yes.
8       Q.   It says at the top, "5 Year
9   Grandfather Provision."
10      A.   Yes.
11      Q.   At some point in time do you recall
12  discussing that the grandfather provision would be
13  five years as opposed to ten years?
14      A.   No.
15      Q.   Would you have participated in any
16  discussions regarding the length of the
17  grandfathering provision?
18      A.   I might have.
19           I don't remember specifically.
20      Q.   But, as the head of HR, do you
21  assume you would have?
22      A.   I think that's a fair assumption,
23  but I don't remember.
24      Q.   Ben Wilkinson would have, also?

Page 117

1       A.   I would assume that, also, but I
2   didn't remember that.
3       Q.   Do you know what the purpose -- what
4   this graph is intended the convey?
5       A.   No.
6       Q.   Do you remember seeing this graph?
7       A.   No.
8       Q.   Fair to say that Watson Wyatt would
9   have also been involved in the grandfathering
10  discussion?
11      A.   That would be a fair assumption.  I
12  don't have any recollection of that specifically.
13      Q.   So you have no recollection of this
14  slide show, correct?
15      A.   No.
16      Q.   Showing you what's been previously
17  marked as Defense Exhibit 8.  If you could take a
18  moment to look at that and let me know if you've
19  seen this document prior to today.
20      A.   Okay.
21      Q.   Have you seen this document prior to
22  today?
23      A.   Not that I remember.
24      Q.   It says on the cover, Conectiv Total

30 (Pages 114 to 117)

B0031

DONALD E. CAIN

1  Rewards, The tangible and hidden paychecks."
2      Do you know what that means, "hidden
3  paychecks"?
4      A.    The benefits, I guess.
5      Q.    Do you know what "hidden" means?
6      MR. BASSMAN:  Objection.
7      THE WITNESS:  No, I don't know
8  specifically what hidden means.
9  BY MR. SAUDER:
10     Q.    In your discussions implementing the
11 Cash Balance Plan, did you ever discuss any, quote,
12 unquote, hidden paychecks?
13     A.    No.
14     Q.    You don't remember that term?
15     A.    No.
16     Q.    Do you recall a presentation where
17 these issues were discussed?  These issues that are
18 in this document?
19     A.    No, I don't.
20     Q.    Go to Bates 199.
21     A.    Okay.
22     Q.    It says "Background" and then it
23 says "Goals."
24     A.    Okay.

1      Q.    And this document has a Conectiv
2  logo on it, correct?
3      A.    Yes, it does.
4      Q.    It says "Goals."  One of the goals
5  is "Costs"?
6      A.    Yes.
7      Q.    Is that referring to cost savings to
8  the company?
9      A.    Yes.
10     MR. BASSMAN:  Objection.
11 BY MR. SAUDER:
12     Q.    You can answer.
13     A.    Probably.
14     Or cost avoidance.  May not be
15 savings.  May have been cost avoidance.
16     Q.    What does that mean?
17     A.    Means to mitigate future increases.
18     Q.    But you are not certain --
19     A.    Not certain.
20     Q.    -- what that means?
21     A.    No.
22     Q.    Go to the Bates that ends 201.  See
23 that chart there that says "Regional Comparisons"?
24     A.    Yes.

1      Q.    Two charts.  One chart on the left
2  says "Retirement," the chart on the right says
3  "Health."
4      A.    Correct.
5      Q.    Do you remember seeing these graphs
6  prior to today?
7      A.    No.
8      Q.    The chart on the left says
9  "Retirement."  It says, "Dollars spent by others
10 for every $100 spent by Conectiv."
11     Do you see that?
12     A.    Okay.
13     Q.    Do you see that?
14     A.    Yes.
15     Q.    And it says -- for Conectiv it has a
16 bar graph with 100 and then -- do you know what
17 that's comparing --
18     A.    No, I don't.
19     Q.    -- that graph?
20     Well, after reviewing that, do you
21 have an understanding of what that graph is
22 supposed to represent?
23     A.    No.
24     Q.    You don't?

1      A.    No.  Not now.
2      Q.    I mean, looking at it now, can you
3  figure out what that graph is supposed to
4  represent?
5      MR. BASSMAN:  Objection.
6      THE WITNESS:  No.  I don't remember
7  specifically enough to explain it to somebody.
8  BY MR. SAUDER:
9      Q.    Do you know if this graph
10 represents, for every $100 Conectiv spent on
11 retirement, Atlantic was spending $122?
12     A.    That's what the chart indicates, but
13 it's not just retirement.  It's pension, 401(k)s
14 and post-retirement medical, according to
15 the footnote.
16     Q.    Right.
17     How about Delmarva?  It says, for
18 every $100 spent, Delmarva was spending $109.
19     A.    That's what the graph says.
20     Q.    Do you have any reason to believe
21 that these numbers aren't accurate?
22     A.    I have no reason to believe they are
23 or aren't.
24     Q.    Do you know where these numbers came

31 (Pages 118 to 121)

B0032

DONALD E. CAIN

Page 122

1  from?
2      A.    I have no idea.
3      Q.    If you look at Bates 203, do you see
4  that graph on the left-hand side of the page?
5      A.    Yes.
6      Q.    Do you know what that graph conveys?
7          MR. BASSMAN:  Objection.
8          THE WITNESS:  Looks like it's a
9  comparison of the current plan with the Cash
10 Balance Plan.
11 BY MR. SAUDER:
12     Q.    Do you know who prepared the graph?
13     A.    No.
14     Q.    Do you know what data or assumptions
15 went into the preparation of this graph?
16     A.    No.
17     Q.    You played no role in preparing the
18 graph?
19     A.    No.
20     Q.    Look to the next page, Bates 204.
21     A.    Okay.
22     Q.    Do you see the handwriting on the
23 right-hand side?
24     A.    Yes.

Page 123

1      Q.    Do you recognize that?
2      A.    No.
3      Q.    How about on the next page, 205?  Do
4  you see that handwriting there?
5      A.    Yes.
6      Q.    You don't recognize it?
7      A.    No.
8      Q.    Flip to 214.
9      A.    Okay.
10     Q.    Do you see that last -- this is a
11 summary, and then the last bullet says, "Expect
12 leaders to support direction and positively engage
13 employees"?
14     A.    Yes.
15     Q.    What do you understand that to mean?
16     A.    What it says.
17     Q.    Who are leaders?
18         MR. BASSMAN:  Objection.
19         THE WITNESS:  Leaders.  People who
20 are natural or designated leaders in the
21 organization.  Managers, supervisors.
22 BY MR. SAUDER:
23     Q.    "Positively engage employees," what
24 does that mean?

Page 124

1          MR. BASSMAN:  Objection.
2          THE WITNESS:  Be willing to discuss
3  things with them.
4  BY MR. SAUDER:
5      Q.    Did you write that sentence?
6      A.    No.
7      Q.    Do you have any specific knowledge
8  of what it was supposed to mean when it was
9  written?
10     A.    No.
11     Q.    Do you know who wrote that then?
12     A.    No.
13     Q.    You are just assuming, based on
14 reading what it says?
15     A.    On what it says.
16     Q.    Right.
17     A.    Yes.
18     Q.    Okay.
19         Is there some understanding within
20 Conectiv that the, quote, unquote, leaders would go
21 out and essentially sell the new plan to the
22 employees?
23         MR. BASSMAN:  Objection.
24         THE WITNESS:  We expected the

Page 125

1  leaders to be supportive of the plan.
2  BY MR. SAUDER:
3      Q.    And to convey that to the employees?
4      A.    Sure.
5      Q.    Sir, showing you what's been marked
6  as Defense Exhibit D-7.
7          Have you seen this document prior to
8  today?
9      A.    I probably saw it in '98 or '99,
10 whenever it was produced.
11     Q.    Would you have played any role in
12 preparing the document?
13     A.    Probably not in preparation.
14     Q.    Do you have any knowledge on how it
15 would have been issued?
16     A.    No.
17     Q.    No knowledge on who it would be
18 issued to?
19     A.    No.
20     Q.    Sir, showing you what's been marked
21 as Plaintiffs' Exhibit 5.
22     A.    Okay.
23     Q.    Have you seen this document prior to
24 today?

32 (Pages 122 to 125)

B0033

DONALD E. CAIN

Page 126

1      A.    When was it produced?
2      Q.    I don't think there is a date on it.
3      A.    I don't see any date on it.
4            I may have seen it. I don't know.
5      Q.    You are not certain?
6      A.    I'm not certain.
7      Q.    Do you know -- at the time that the
8  Cash Balance Plan was implemented, do you know what
9  portion of the employees were union?
10     A.    No.
11     Q.    Do you know what portion were
12  management?
13     A.    No.
14     Q.    Nonunion management?
15     A.    No.
16     Q.    Do you know what portion were
17  grandfathered?
18     A.    No.
19     Q.    So I assume you have -- based on
20  your question to me, that you have no recollection
21  or no specific knowledge on how this or whether
22  this document was disseminated?
23     A.    No.
24     Q.    And no knowledge when it would have

Page 127

1  been?
2      A.    No.
3      Q.    Do you know who this document was
4  prepared by?
5      A.    No.
6      Q.    If you flip to Bates 73 -- ending in
7  73 --
8      A.    Okay.
9      Q.    -- do you see at the very bottom it
10  says, "Employer Identification Number," and that's
11  blank?
12     A.    Yes.
13     Q.    If you go to the next page, 74, it
14  says "Participating Employer," and that's blank?
15     A.    Yes.
16     Q.    And then the "Employer
17  Identification Number" is blank?
18     A.    Yes.
19     Q.    And then, "Trustee," it says, "Name"
20  and "Address," and there is nothing filled in
21  there?
22     A.    Yes.
23     Q.    Do you believe that this may be a
24  draft?

Page 128

1      A.    I have no idea.
2            MR. BASSMAN: Objection.
3            THE WITNESS: I have no idea.
4  BY MR. SAUDER:
5      Q.    Showing you what's been marked as
6  Defendants' 19. Take a look at that document and
7  let me know if you've seen that document prior to
8  today.
9      A.    I don't recollect this specific
10  document.
11     Q.    Do you know what this document is?
12     A.    It says it's the Cash Balance
13  Sub-Plan of the Conectiv Retirement Plan, Summary
14  Plan Description.
15     Q.    And do you know when it would have
16  been issued?
17     A.    No.
18     Q.    Do you know who prepared this
19  document?
20     A.    No.
21     Q.    Do you know if you played any role
22  in preparing this document?
23     A.    I don't remember.
24     Q.    Do you know whether this document

Page 129

1  was disseminated to all employees in the Cash
2  Balance Plan?
3      A.    I really don't know.
4      Q.    If employees requested a copy of the
5  summary plan description, was there anything in
6  place where that would be logged?
7      A.    I don't know that.
8      Q.    You don't know that?
9      A.    No.
10     Q.    There is no date on this document,
11  correct?
12     A.    I don't see one. You looked through
13  it all. I'm sure you know. Is there any date on
14  this document?
15     Q.    I don't see one.
16     A.    Very good. Thank you.
17     Q.    Show us what we've marked as D-22.
18           Sir, the last page of this document,
19  311 -- it's actually not part of the document.
20  That's the way it was initially marked, though. If
21  you'd just look at 308 through 310.
22     A.    Okay.
23     Q.    Have you seen this document prior to
24  today?

33 (Pages 126 to 129)

B0034

DONALD E. CAIN

Page 130

1    A.    I probably saw it when it was
2  issued.
3    Q.    Do you know when that would have
4  been?
5    A.    No idea.
6    Q.    Would you have played any role in
7  preparing this document?
8    A.    Not that I remember.
9    Q.    Fair to say, you have no idea
10  whether or how this was disseminated?
11    A.    No.
12    Q.    Correct?
13    A.    Nope.  No idea.
14    Q.    Showing you what's been marked as
15  Plaintiffs' Exhibit 6.
16    A.    Okay.
17    Q.    Have you seen this document prior to
18  today?
19    A.    No.
20    Q.    Had you seen any employee releases
21  while -- at the time you were at Conectiv?  Had you
22  seen copies of releases?
23    A.    I don't remember.
24    Q.    Did you play any role in

Page 131

1  participating in the drafting of releases?
2    A.    Probably not.
3    Q.    Did you sign a release when you left
4  Conectiv?
5    A.    I don't remember.
6    Q.    Do you know if there were form
7  releases at the time you left Conectiv?
8    A.    I think I answered that one.
9      I don't remember.
10    Q.    You don't remember.
11      Showing you what's been marked as
12  Plaintiffs' Exhibit 7.
13      Have you seen this --
14    A.    No.
15    Q.    -- prior to today?
16    A.    No.
17    Q.    Had the company -- had Pepco come in
18  at the time you left or was it still Conectiv?
19    A.    I retired at the merger, and then I
20  worked for six months as a consultant, but not in
21  the role of human resource VP.
22    Q.    You worked for six months as a
23  consultant for Pepco?
24    A.    Yes.

Page 132

1    Q.    So you had officially retired from
2  Conectiv --
3    A.    Yes.
4    Q.    -- and then came back as a
5  consultant?
6    A.    Correct.
7    Q.    And were you on a contract at that
8  point?
9    A.    Yes.
10    Q.    So you were not --
11    A.    I was not an employee of Pepco; I
12  was a contractor.
13    Q.    What were your responsibilities as a
14  consultant?  What were you consulting regarding?
15    A.    Just helping with all the HR issues
16  of integration and using my experience from the
17  Atlantic merger to help both Pepco and Conectiv
18  people understand some of the issues and how to go
19  about dealing with integration of employees and my
20  knowledge from that.
21    Q.    And were you planning on leaving
22  Conectiv prior to the merger at that time?
23    A.    No.
24    Q.    Did you leave as a result of the

Page 133

1  merger?
2    A.    Correct.
3    Q.    Were you laid off as a result of the
4  merger?
5    A.    Well, I had an agreement and the
6  agreement was violated and I chose to exercise my
7  agreement.
8    Q.    What does that mean, your agreement
9  was violated?
10    A.    Because of the positions and things
11  and the way they worked out post-merger, it didn't
12  satisfy the conditions of the agreement.
13    Q.    Who did you have this agreement
14  with?
15    A.    Conectiv.
16    Q.    What was your understanding of the
17  agreement?
18    A.    Of my Severance Agreement?
19    Q.    What do you say was violated?
20    A.    The position that was being
21  considered, whether I'd be offered it, and who I'd
22  be reporting to, and whether I had to work in
23  Washington, whether all my terms of employment
24  would be the same, and, when it was determined they

34 (Pages 130 to 133)

B0035

DONALD E. CAIN

Page 134

1  wouldn't be, I opted to leave.
2      Q.   What position were they offering you
3  at Pepco that you didn't --
4      A.   They never really offered me a
5  position.
6      Q.   Well, was your understanding that
7  you would not have to move to Washington?
8      A.   No. I was under the belief I might
9  have to move to Washington.
10         You know, obviously, when you have
11  two companies coming together, you have two people
12  doing everything and it was -- it made sense for me
13  to go.
14     Q.   So who did you negotiate the
15  six-month consulting arrangement with?
16     A.   Barbara Graham.
17     Q.   And who was that?
18     A.   She was -- I think she was named
19  the -- either senior VP or executive VP in Pepco
20  post-merger of like all the administrative
21  functions.
22     Q.   So you were hoping to stay on with
23  Pepco in a position that you were satisfied with?
24     A.   Maybe. I can't remember my exact

Page 135

1  emotions at the time.
2      Q.   When did Mr. Wilkinson leave the
3  company?
4      A.   Oh, my. I don't remember.
5      Q.   Do you know who replaced him?
6      A.   I believe it was John Zimmerman, but
7  I don't remember that specifically.
8      Q.   Do you know what John Zimmerman's
9  role was just prior to Mr. Wilkinson's leaving the
10  company?
11     A.   The sequence is kind of fuzzy. At
12  one point he was manager of employee relations,
13  which is primarily union.
14     Q.   When Mr. Wilkinson left, did he
15  essentially just take over that job, also?
16     A.   Yes, I believe so. I believe he had
17  both for a while.
18     Q.   Both positions?
19     A.   For a while.
20         But, you know, I can't remember
21  exact sequence of who left when and how we did
22  things on an interim basis. It's too long ago.
23     Q.   And were you involved in any of the
24  discussions on what would happen -- what, if any,

Page 136

1  changes would take place with regard to any of the
2  benefits just prior to Pepco coming in?
3      A.   During that six months I may have
4  been involved in some discussions around the
5  comparison -- we compared the benefits. I probably
6  was gone before all the final decisions were made.
7      Q.   What does that mean, you compared
8  the benefits?
9      A.   We did some kind of a chart.
10  Even -- as soon as the merger was announced, we
11  began working on that, of putting side by side
12  Pepco benefits and Conectiv benefits and where
13  there were differences and where there were
14  similarities and -- but I don't know what the
15  outcome of all that discussion ended up being.
16     Q.   And was there a comparison with
17  regard to the retirement plan?
18     A.   I'm sure there were.
19     Q.   And did Pepco have a Cash Balance
20  Plan at the time it came into the picture?
21     A.   I don't know. I don't remember.
22     Q.   Was there any discussion at around
23  that time that the Conectiv entity would do away
24  with the Cash Balance Plan post merger?

Page 137

1      A.   I don't believe so.
2      Q.   At any time prior to that -- after
3  the implementation of the Cash Balance Plan and
4  before Pepco came in, was there ever any discussion
5  about doing away with the Cash Balance Plan?
6      A.   I don't believe so.
7      Q.   Do you know if the Cash Balance Plan
8  remained in effect after Pepco came into the
9  picture?
10     A.   I don't know.
11     Q.   Do you know that, as of 2005, new
12  Pepco employees are not put into the Cash Balance
13  Plan?
14         MR. BASSMAN: Objection.
15         THE WITNESS: I didn't know that.
16  BY MR. SAUDER:
17     Q.   Your six-month consulting, were you
18  paid by Pepco?
19     A.   Yes -- well, that's a technical
20  question. I don't know whether one of the
21  entities -- Conectiv Resource Partners might have
22  been the pay vehicle. I don't remember whether the
23  check had Pepco on it or it came from some other
24  place.

35 (Pages 134 to 137)

B0036

DONALD E. CAIN

Page 138

1      Q.    But Pepco was in the picture at the
2  time that you were --
3      A.    Oh, yes.
4      Q.    The merger had taken place?
5      A.    The merger had taken place.
6           MR. SAUDER:  If we could just take
7  five minutes, I just need to look at my notes.
8           MR. BASSMAN:  Okay.
9           (Recess called at 1:51 p.m.)
10          (Resumed at 1:57 p.m.)
11          MR. SAUDER:  Sir, I have no other
12  questions.  I just ask, if you move at any point
13  while this case is still pending, you just notify
14  your counsel so we can keep track.
15          THE WITNESS:  Okay.  I'll be in the
16  same place.
17          MR. SAUDER:  Thank you, sir.
18          MR. BASSMAN:  I have no questions
19  for the witness.  I would just like to note for the
20  record that we will read and sign.
21          (2:01 p.m.)
22
23
24

Page 139

1           C E R T I F I C A T E
2           I, Sean M. Fallon, a Registered
3  Professional Reporter and Notary Public, do hereby
4  certify that, prior to the commencement of the
5  examination, the witness and/or witnesses were
6  sworn by me to testify to the truth and nothing but
7  the truth.
8           I do further certify that the
9  foregoing is a true and accurate computer-aided
10  transcript of the testimony as taken
11  stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13          I do further certify that I am
14  neither of counsel nor attorney for any party in
15  this action and that I am not interested in the
16  event nor outcome of this litigation.
17
18
19
20
21     _____
22          Registered Professional Reporter
            XI00840
            Notary Public
23          My commission expires 12-22-10
24  Dated:  _____

Page 140

1           JURAT
2           I, DONALD E. CAIN, do hereby certify
   that I have read the foregoing transcript of my
3  testimony taken on Tuesday, April 17, 2007, and
   have signed it subject to the following changes:
4
5  PAGE  LINE          CORRECTION
6
7
8
9
10
11
12
13
14
15
16
17
18
19     _____
       DONALD E. CAIN
20
   DATE _____
21
   Sworn and subscribed to before me this
22
   _____ day of _____, 2007.
23     _____
24  NOTARY PUBLIC

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
                     PORTIONS CONFIDENTIAL
 3
 4   J. MICHAEL CHARLES; MAURICE W.
     WARD, JR.; and JOSEPH I. FINK, JR.,
 5   on behalf of themselves and
     all others similarly situated,
 6          Plaintiff
        V                 C.A. No. 05-702(SLR)
 7
     PEPCO HOLDINGS, INC.; CONECTIV, and
 8   PEPCO HOLDINGS RETIREMENT PLAN,
            Defendants
 9                       -   -   -
10   THOMAS S. TROUP, on behalf of himself
     and all others similarly situated,
11          Plaintiff
12      V                 C.A. No. 06-10(SLR)
13   PEPCO HOLDINGS, INC.; CONECTIV, and
     PEPCO HOLDINGS RETIREMENT PLAN,
14          Defendants
15             Oral deposition of JEROME
16   MICHAEL CHARLES, taken at the law
17   offices of Pepper Hamilton LLP, 3000
18   Two Logan Square, Eighteenth and Arch
19   Streets, Philadelphia, Pennsylvania,
20   on Tuesday, January 9, 2007,
21   commencing at 9:39 a.m., before
22   Barbara McKeon Quinn, a Registered
23   Merit Reporter and Notary Public,
24   pursuant to notice.
```

B0038

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 2

```
1    APPEARANCES:
2    JAMES R. MALONE, JR., ESQUIRE
     jamesmalone@chimicles.com
3    JOSEPH G. SAUDER, ESQUIRE
     josephsauder@chimicles.com
4    CHIMICLES & TIKELLIS LLP
     One Haverford Centre
5    361 West Lancaster Avenue
     Haverford, Pennsylvania 19041
6    610-642-8500
     Counsel for Plaintiff
7
     KAY KYUNGSUN YU, ESQUIRE
8    yukay@pepperlaw.com
     SUSAN KATZ HOFFMAN, ESQUIRE
9    PEPPER HAMILTON LLP
     3000 Two Logan Square
10   18th & Arch Streets
     Philadelphia, Pennsylvania 19103
11   215-981-4000
     Counsel for Defendants
12
13          EXHIBIT INDEX
14                      MARKED
15   Defendant's
      1  EMerging Times          75
16       publication dated
         10/13/97
17
      2  EMerging Times          79
18       publication dated
         10/20/97
19
      3  Conectiv Cash Balance   80
20       Plan dated 2/20/98
21    4  facts publication, JMC   85
         215 through 217
22
      5  facts publication, PHI   86
23       3365 through 3372
24
```

Page 4

```
1          EXHIBIT INDEX (CONTINUED)
2                      MARKED
3    Defendant's
     17  Conectiv's Cash Balance    149
4        Pension Plan, JMC 8
         through 19
5
     18  Vanguard Pension           168
6        Estimator, JMC 467
         through 499
7
     19  Conectiv Retirement Plan   175
8        Cash Balance Sub-Plan
         Summary Plan Description
9        JMC 77 through 101
10   20  Complaint                  197
11
12
13
14   INSTRUCTIONS NOT TO ANSWER INDEX
15   BY MR. MALONE                33
16
17
18
19
20
21
22
23
24
```

Page 3

```
1          EXHIBIT INDEX (CONTINUED)
2                      MARKED
3    Defendant's
      6  Letter to Conectiv         93
4        Management Employee dated
         12/21/98, JMC 1 through 5
5
      7  Your Conectiv Total        99
6        Rewards, JMC 190 through
         196
7
      8  Conectiv Total Rewards,    102
8        The tangible and hidden
         paychecks, JMC 197
9        through 214
10    9  InSight publication dated  103
         March 1999
11
     10  MidWeek Extra, Cash        106
12       Balance Update, June 23
         1999, JMC 6 through 7
13
     11  InSight publication dated  110
14       July 1999, PHI 3436
         through 3439
15
     12  InSight Online memo dated  111
16       July 9, 1999, PHI 3440
         through 3442
17
     13  PowerPoint presentation,   112
18       MWW 219 through 225
19   14  Memo, Subject, Cash        117
         Balance Retirement Plan
20       JMC 20
21   15  E-mail string from Paoli   120
         to Charles dated 8/21/03
22       JMC 459
23   16  E-mail string between HR   144
         and Charles, JMC 460
24       through 463
```

Page 5

```
1          JEROME M. CHARLES, having
2    been duly sworn, was examined and
3    testified as follows:
4          THE COURT REPORTER:  Usual
5    stipulations?
6          MR. MALONE:  I want the
7    witness to read and sign.
8                EXAMINATION
9    BY MS. YU:
10      Q.  Could you please state your
11   name for the record.
12      A.  Sure.  Jerome Michael
13   Charles.
14      Q.  Mr. Charles, what's your
15   date of birth?
16      A.  October 18, 1949.
17      Q.  Could you tell me what
18   you've done to prepare for your
19   deposition today.
20      A.  I reviewed the history as
21   far as when I started on this
22   campaign, read through the
23   information that was provided to me
24   by my attorney.
```

B0039

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 6

1    Q.  Have you ever been deposed
2  before, been in a situation like this
3  when someone has taken your
4  deposition?
5    A.  Yes.
6    Q.  Okay.  How many times?
7    A.  Once.
8    Q.  And in what context?
9    A.  There was a litigation
10  against the company that I worked for
11  in reference to an accident that
12  occurred in a municipality, and I was
13  requested to give a deposition on a
14  condition of facilities at that
15  location.
16    Q.  Were you a party in the
17  litigation?
18    A.  No.
19    Q.  Were you a witness?
20    A.  No.
21    Q.  Have you ever been a party
22  to a litigation?
23    A.  No.
24    Q.  Just so that we have some

Page 7

1  ground rules for the deposition
2  today, I'm going to be asking you
3  questions and you're going to be
4  giving me answers.
5      If we could both wait for
6  each other to finish the other
7  starts, it's harder than it sounds,
8  that would help the court reporter
9  out and it will make things go a
10  little bit quicker.
11      If you need to take a
12  break, please just tell me and we can
13  take a break.  All I ask is that if
14  there is a question pending that you
15  answer the question before we take a
16  break.
17    A.  I understand.
18    Q.  If there's anything that
19  you don't understand about my
20  question, please tell me and I will
21  try to make it clearer.  But if you
22  answer we'll all assume that you
23  understood what the question was.
24    A.  Okay.

Page 8

1      MR. MALONE:  You need to
2  keep your voice up a little bit.
3      THE WITNESS:  Oh, okay.
4  It's a little -- the air conditioning
5  makes it a little difficult.
6  BY MS. YU:
7    Q.  Mr. Charles, my name is Kay
8  Yu and I represent the defendants in
9  this litigation to which you are a
10  plaintiff.
11      When did you decide to
12  bring the litigation?
13      MR. MALONE:  Object to the
14  form.  You can answer.
15      THE WITNESS:  Approximately
16  two to three years ago.
17  BY MS. YU:
18    Q.  Why don't we start with
19  some background information about
20  your personal history and your
21  experience.  Can you give me your
22  educational background.
23    A.  Sure.  High school
24  graduation.  Two years of technical

Page 9

1  school.  Part-time county college.
2  Did not finish.
3    Q.  When did you graduate high
4  school?
5    A.  1967, June.
6    Q.  And during what years did
7  you attend school afterwards?
8    A.  Okay.  The technical school
9  was for approximately two years
10  following that.  So that would make
11  it 1969.  Military service, marriage,
12  then 1980, something like that, I
13  attended a county college.
14    Q.  How long were you in the
15  military?
16    A.  Six years.
17    Q.  In what capacity?
18    A.  I was a crypto technician
19  in the Navy.
20    Q.  And where did you serve?
21    A.  Various locations.  The
22  longest was in NeaMakri, Greece.
23    Q.  So starting in
24  approximately 1980, can you give me a

B0040

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 10

1  description of your work history.
2     A.  Sure.  I started working
3  for the company at that time, which
4  was Atlantic City Electric in
5  Atlantic City.  Then moved through
6  various positions, different
7  locations, throughout my career.  I'm
8  not sure if you want every little job
9  and location listed.
10     Q.  Why don't we start with
11  what your position was when you first
12  started working for the company.
13     A.  I was what was called a
14  helper, or it's an entry level
15  position.
16     Q.  And what type of work?
17     A.  I worked in a meter center
18  where we calibrated and tested the
19  electric meters.
20     Q.  Were you a member of a
21  union at that time?
22     A.  Yes.
23     Q.  What union?
24     A.  Local 210.

Page 11

1     Q.  Are you now a member of a
2  union?
3     A.  No, ma'am.
4     Q.  How long were you a member
5  of Local 210?
6     A.  Approximately two to three
7  years.  I'm not sure of the dates.
8  It was quite a while ago.
9     Q.  Have you ever been a member
10  of any other union?
11     A.  No, ma'am.
12     Q.  And that two- to three-year
13  period of time, was that continuous?
14     A.  Yes, ma'am.
15     Q.  How did it come to be that
16  you were no longer a member of the
17  union?
18     A.  There was an opportunity to
19  move out of the union into a
20  non-union position and so I took
21  advantage of that opportunity.
22     Q.  And what was that position?
23     A.  Energy services
24  representative.

Page 12

1     Q.  And what did you do in that
2  position?
3     A.  I was a state certified
4  energy auditor that did energy audits
5  for businesses and homes.
6     Q.  What company were you
7  working for when you started in that
8  position?
9     A.  Atlantic City Electric.
10     Q.  How long did ACE remain
11  your employer?
12     A.  Until the merger.
13        MR. MALONE:  Object to the
14  form.  Can we just stipulate that ACE
15  is Atlantic City Electric?
16        MS. YU:  Sure.
17        THE WITNESS:  Until the
18  merger.  It remained Atlantic City
19  Electric.
20  BY MS. YU:
21     Q.  Do you recall when the
22  merger occurred?
23     A.  1998, I believe.
24     Q.  And what were the companies

Page 13

1  that merged?
2     A.  DelMarVa Power merged,
3  purchased, choose your words,
4  Atlantic City Electric.
5     Q.  And what was the name of
6  the company after the merger?
7     A.  Conectiv.
8     Q.  How long did you remain in
9  the position of energy services
10  representative?
11     A.  I progressed into a
12  different job classification within
13  that department known as a
14  residential representative.
15     Q.  And approximately when did
16  that occur?
17     A.  1982, '83, something like
18  that.
19     Q.  What is your current
20  position?
21     A.  Senior account
22  representative.
23     Q.  And what are your duties in
24  that position?

4 (Pages 10 to 13)

B0041

Page 14

1    A.  I work with large
2 industrial and commercial customers
3 to assist them in their energy needs,
4 calculation of tariffs billing,
5 reliability, the gamut.  Anything
6 that a customer would need.
7        I guess could you look at
8 me as the middleman between the
9 customer and the company.
10    Q.  Without getting into
11 excruciating detail, can you just
12 sort of describe the way that you
13 moved from the residential position
14 that you were describing up to your
15 current position.
16    A.  Sure.  Over a period of
17 years I moved from a residential
18 representative to a commercial
19 representative, moved into
20 engineering, did some engineering
21 design work for approximately six to
22 seven years, moved back into the
23 customer service end as, again, going
24 back as a commercial representative.

Page 15

1        Things changed within the
2 company, the merger, moved up to
3 industrial accounts, and that's sort
4 of where I am right now.
5    Q.  Were all these positions
6 pretty much in the same business area
7 of the company?
8        MR. MALONE:  Object to the
9 form.  You can go ahead and answer.
10        THE WITNESS:  The
11 engineering department was a
12 different branch of the company.
13 Still within the company, but just a
14 different department call center.
15 The customer service end, again, is a
16 different department within the
17 company.
18 BY MS. YU:
19    Q.  When you moved between
20 customer service and engineering and
21 back again, were there any changes to
22 the types of benefits that you
23 received from your employer?
24    A.  No.

Page 16

1        MR. MALONE:  Can I have
2 that question and answer read back?
3        (The reporter read back the
4 following testimony:
5        "Q.  When you moved between
6 customer service and engineering and
7 back again, were there any changes to
8 the types of benefits that you
9 received from your employer?
10        "A.  No.")
11        MR. MALONE:  Is that
12 intended to exclude salary, the
13 question?
14        MS. YU:  Yes.
15        MR. MALONE:  Thank you.
16 BY MS. YU:
17    Q.  I apologize in advance for
18 having to ask this question, but I
19 wanted to ask you if you have had any
20 criminal background history.
21    A.  No, ma'am.  None.
22    Q.  Sorry.  I ask everybody.
23    A.  No offense taken.
24    Q.  Is there anything that

Page 17

1 would preclude you from giving
2 truthful testimony today?
3    A.  No, ma'am.
4    Q.  When did you first learn
5 that your employer was going to adopt
6 a cash balance plan?
7    A.  There was a notification
8 sent out mid-1999 of a pending
9 roll-out of changes into the benefit
10 plans, and there were to be meetings
11 throughout the company to review that
12 plan.  That's basically all there
13 was.
14    Q.  Were there multiple
15 communications regarding the cash
16 balance plan?
17    A.  The exact number I don't
18 remember.  There may have been some,
19 but they were just notices, meeting
20 will be at this location, meeting at
21 that location, particular location
22 within.
23        MS. YU:  Can you excuse me
24 for a minute?

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 18

1    THE WITNESS:  Sure.
2    (Discussion off the
3  record.)
4    MR. MALONE:  Back on the
5  record.
6  BY MS. YU:
7    Q.  Do you recall when the cash
8  balance plan became effective?
9    A.  January 1, 1999.
10    Q.  Did you receive notices
11  regarding the cash balance plan
12  before it was implemented?
13    A.  No.  Other than there's a
14  change coming.
15    Q.  I want to ask you some
16  questions about the way that you keep
17  documents that you get and talk about
18  communications regarding benefits in
19  general from your employer.  I
20  imagine you've received
21  communications over the course of
22  time.
23    MR. MALONE:  Objection to
24  the form of the question.  What do

Page 19

1  you mean by "communications"?
2  Verbal?  Written?  E-mail?  Are you
3  embracing all of that or are you just
4  taking about just physical material?
5    MS. YU:  Well, let's start
6  with written material.
7    MR. MALONE:  Okay.  Thank
8  you.
9  BY MS. YU:
10    Q.  Things that you receive
11  that are written communications
12  either at your work place or at your
13  home.  Do you have a system that you
14  use to manage all that?
15    A.  Yes.
16    MR. MALONE:  Object to the
17  form.
18    THE WITNESS:  Yes.
19  BY MS. YU:
20    Q.  Can you describe what you
21  do with those kinds of
22  communications.
23    A.  I have a desk at my home
24  that is my little space that I keep

Page 20

1  things.  I keep them in binders, in
2  drawers, in files and hang on to
3  them.  I tend to be a pack rat, so to
4  speak.
5    Q.  Do you keep every written
6  communication that you receive
7  regarding your benefits?
8    A.  No.
9    Q.  How do you decide what to
10  keep?
11    A.  If it appears it was an
12  update from something previously
13  supplied, then I'll cast out the old
14  and keep the new.  Anything that
15  appears to be significant information
16  that I should hang on to, then I
17  keep.
18    Q.  Have you received
19  communications from your employer
20  regarding benefits, written
21  communications, at your work place?
22    A.  Typically they send you
23  things to your home, but they do
24  provide occasionally things like

Page 21

1  through a monthly publication or
2  things of that nature at the work
3  place.
4    Q.  Do you have a location
5  where you work where you keep
6  communications like that?
7    A.  Yes.
8    Q.  In addition to the space
9  that you have at home?
10    A.  That is correct.
11    Q.  Have you provided copies of
12  all of that information to your
13  attorney?
14    A.  I'm sorry, I couldn't hear
15  you.
16    Q.  Have you provided copies of
17  all those communications to your
18  attorney?
19    A.  Yes.
20    Q.  Have you ever filed a
21  grievance?
22    A.  No.
23    Q.  Any complaints or charges
24  of any sort against your employer?

B0043

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 22

1          MR. MALONE:  Object as to
2   form.
3          THE WITNESS:  Not when I
4   was in the union.  There was a
5   conversation, e-mail that I had with
6   a prior supervisor of a disagreement.
7   That was a couple years ago.
8   BY MS. YU:
9      Q.   What was the disagreement
10  over?
11     A.   The prior boss that was in
12  his position had indicated there
13  would be opportunities for promotions
14  some time and the opportunity never
15  arose, and a second supervisor moved
16  in, and I had asked him if he had
17  been briefed, and he had indicated
18  that he didn't have any
19  conversations.
20         It was more of a hurtful
21  thing than anything.  They didn't
22  bother to speak to each other before
23  the other one left.  It really wasn't
24  a formal complaint of any sort.

Page 23

1      Q.   Did you pursue that any
2   further?
3      A.   No.
4      Q.   Have you ever researched
5   pension issues?
6          MR. MALONE:  Object to the
7   form of the question.  Could you
8   expand on what you mean by the term
9   "research."
10         MS. YU:  Well, I'd like to
11  ask for an answer first and explore
12  further if there is any confusion.
13         THE WITNESS:  Yes.
14  BY MS. YU:
15     Q.   What kind of research?
16     A.   Internet, monthly
17  publications, all the --
18     Q.   I'm sorry.  What was that?
19     A.   I'm sorry?
20     Q.   You said Internet and
21  then...?
22     A.   Monthly publications.
23         MR. MALONE:  Monthly
24  publications.

Page 24

1   BY MS. YU:
2      Q.   Go ahead.
3      A.   Okay.  And speaking with
4   coworkers.
5      Q.   Can you tell me what you've
6   looked up on the Internet.
7      A.   Sure.
8          MR. MALONE:  With respect
9   to pension issues?
10         MS. YU:  Yes.
11         THE WITNESS:  Information
12  on cash balance plans, how they work,
13  benefits, disadvantages, things of
14  that nature.
15  BY MS. YU:
16     Q.   When was the first time you
17  did such an Internet search?
18     A.   Probably two, three years
19  ago.
20     Q.   Did you do any searches on
21  the Internet when you were informed
22  that your employer was going to adopt
23  a cash balance plan?
24     A.   No.

Page 25

1      Q.   Did you print out any of
2   the information that you found on the
3   Internet?
4      A.   I don't believe so.  I
5   think most -- I may have.  I really
6   don't remember.  But most of it was
7   just reading and absorbing what I
8   found.
9      Q.   If you had printed the
10  information out, would you have kept
11  it?
12     A.   If it was of value, yes.
13     Q.   And where would you have
14  kept it?
15     A.   At my home.
16     Q.   Did you give copies of that
17  research to your attorney?
18     A.   If I had kept it, I would
19  have provided it to him.
20     Q.   You mentioned monthly
21  publications.
22     A.   Yes.
23     Q.   Which monthly publications
24  are you referring to?

7 (Pages 22 to 25)

B0044

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 26

1    A.   I joined AARP and there was
2  a series of articles in that monthly
3  publication around cash balance
4  plans.
5    Q.   When did you join AARP?
6    A.   When I turned 50, 51,
7  something like that.
8    Q.   And have you received those
9  monthly publications since you
10  joined?
11    A.   Yes.
12    Q.   Do you keep copies of the
13  publication?
14    A.   Sometimes.
15    Q.   Did you keep any with
16  respect to cash balance plans?
17    A.   Yes.
18    Q.   Did you provide copies of
19  those documents to your attorney?
20    A.   Yes.
21    Q.   Then you mentioned that you
22  have spoken with coworkers.
23    A.   Yes.
24    Q.   Who have you spoken with?

Page 27

1    A.   List names?
2    Q.   Yes.
3    MR. MALONE:  With respect
4  to cash balance plans?
5    MS. YU:  Yes.
6    THE WITNESS:  Greg
7  Peterson, George Pinto, Karen Ayars,
8  Bill Eppler.  I could list about 100
9  people.  I don't know how far you
10  want me to go.
11    MR. MALONE:  Keep going.
12  You're doing a great job.
13    MS. YU:  Can we make sure
14  that the court reporter gets a chance
15  to take down all the names and if you
16  have any questions about spelling
17  let's take care of them now.
18    MR. MALONE:  Let's go off
19  for a second.
20    (Discussion off the
21  record.)
22    THE WITNESS:  A-Y-A-R-S.
23  E-P-P-L-E-R.  Scott Razzie,
24  R-A-Z-Z-I-E.  Michael Meyer,

Page 28

1  M-E-Y-E-R.  Maury Ward, W-A-R-D.
2  Joseph Fink, F-I-N-K.  Annette
3  Ponzio, P-O-N-Z-I-O.  I'm not sure
4  how that's spelled.
5    Oh, gosh.  There were so
6  many people.  I'm trying to remember
7  all the names here.  Rich Simimoni,
8  S-I-M-I-M-O-N-I.  Joe Limosino,
9  L-I-M-O-S-I-N-O.  Gunther Schmidt,
10  S-C-H-M-I-D-T.
11    MR. MALONE:  You might want
12  to try a hand at the first name on
13  that one.
14    THE WITNESS:  Gunther.
15  G-U -- it looks like Gunther,
16  pronounced Gunther.  G-U-N-T-H-E-R.
17  Something like that.
18    Jules Zuccone,
19  Z-U-C-C-O-N-E.  Oh, gosh.  There's so
20  many people.  It's like trying to
21  remember all my relatives.
22    There's probably plenty
23  more.  I just off the top of my head
24  can't think of them.  At least to say

Page 29

1  there's lots of folks, lots of folks.
2  BY MS. YU:
3    Q.   Let's try to categorize the
4  people that you've spoken with about
5  this.
6    A.   Okay.
7    Q.   Let's start with people
8  outside of the work place.
9    MR. MALONE:  I don't mean
10  to be niggle, but do you mean people
11  that were employed there or employees
12  outside the office?
13    MS. YU:  I was about to
14  start explaining.
15    MR. MALONE:  I'm sorry.
16  BY MS. YU:
17    Q.   So we're talking about --
18  and by the way, who is your current
19  employer?
20    A.   Atlantic City Electric,
21  which is a division of PHI.
22    Q.   How do you want to refer to
23  your employer, PHI or --
24    A.   ACE is fine.

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 30

1    Q.  ACE.  Let's focus on people
2  who are not employed by ACE.
3    A.  Well, there are different
4  divisions within PHI.  So when you
5  say employed by ACE, that means those
6  folks in New Jersey.  There are other
7  folks in DelMarVa.  They're also a
8  division of PHI.  So your question is
9  specifically about ACE employees?
10    Q.  We'll get there.  Why don't
11  we go broader than that.  Why don't
12  we say PHI.
13    A.  Okay.  And what was your
14  question again?
15    Q.  The question is, other than
16  anyone who is employed by PHI, who
17  have you spoken with about cash
18  balance plans?
19    A.  Some of those individuals
20  have since retired, so I would assume
21  you would still refer to them as
22  employees?
23    MR. MALONE:  Well, there's
24  another complication, which is at the

Page 31

1  time of the conversation were they
2  employees or retirees.  This is
3  really more confusing than I thought
4  it would be.
5  BY MS. YU:
6    Q.  Why don't we start with --
7  and what I'm really trying to get at
8  is, have you spoken to your wife,
9  other than your attorney, you know,
10  who outside of the work place?  I
11  mean generally that way.  So that we
12  can then focus in on who you have
13  spoken with through work.
14    A.  Okay.  Outside of the
15  company, Shannon O'Neil, O-N-I-E-L
16  (sic).
17    Q.  And before you go on, can
18  you explain who that person is.
19    A.  Shannon O'Neil is the
20  daughter of a friend who's an
21  attorney.
22    MR. MALONE:  The daughter
23  is the attorney or the friend is the
24  attorney?

Page 32

1    THE WITNESS:  Yes, the
2  daughter.  Shannon is the attorney.
3    Obviously my wife, my
4  father, friends.  You need specific
5  names?
6  BY MS. YU:
7    Q.  Well, let's talk about the
8  conversations that you've had with
9  your friends.  What kind of
10  conversations have you had about cash
11  balance plans?
12    MR. MALONE:  Object as to
13  form.  You can answer.
14    THE WITNESS:  I would ask
15  them if they had any information,
16  knew anything about cash balance
17  plans, if their company did, or have
18  info, things of that nature.
19  BY MS. YU:
20    Q.  And when did you start
21  having these kinds of conversations
22  with your friends?
23    A.  Two to three years ago.
24    Q.  When was the first

Page 33

1  conversation you had with your wife
2  about cash balance plans?
3    A.  Probably around the same
4  time period, two to three years ago.
5    Q.  Did you speak with her
6  about cash balance plans when the
7  plan was adopted effective 1999?
8    A.  Other than that the new
9  company Conectiv had announced they
10  were making changes to the benefits
11  package.
12    Q.  What kind of conversations
13  did you have with Shannon O'Neil
14  about cash balance plans?
15    MR. MALONE:  Can you answer
16  that question -- I'm going to direct
17  him not to answer.  She's an
18  attorney.
19  BY MS. YU:
20    Q.  Did you retain Shannon
21  O'Neil as your attorney?
22    MR. MALONE:  Object to the
23  form of the question.
24    THE WITNESS:  Do I answer

9 (Pages 30 to 33)

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 34

1  that?
2      MR. MALONE:  If you can
3  understand the question of what she
4  means by the term retain, you can
5  answer it.  I think she's getting at
6  whether you consulted with her as an
7  attorney.
8      THE WITNESS:  We had verbal
9  conversations.  I asked her for some
10  assistance.  I did not sign a
11  commitment with her.
12  BY MS. YU:
13      Q.  Were you seeking legal
14  advice in speaking with Shannon
15  O'Neil?
16      A.  Yes.
17      MR. MALONE:  You can answer
18  that.
19      THE WITNESS:  Yes.
20  BY MS. YU:
21      Q.  Have you sought legal
22  advice from any other attorneys?
23      A.  She helped me through the
24  process.  She spoke with other firms.

Page 35

1      MR. MALONE:  As she
2  explores this area, just as a general
3  caution, she's entitled to ask
4  questions about you spoke with this
5  attorney, you spoke with that
6  attorney.
7      She's not entitled, in my
8  view, to probe the substance of
9  discussion that you had with an
10  attorney in the context of seeking
11  legal advice, and try to frame your
12  answers with that in mind.
13      If she asks you a question
14  that I think is inappropriate I will
15  let you know.
16      THE WITNESS:  Fine.
17  BY MS. YU:
18      Q.  What other attorneys, aside
19  from Shannon O'Neil, have you spoken
20  with about cash balance plans?
21      A.  I had done some additional
22  research in looking for an attorney
23  via the Internet and sent an e-mail
24  to a firm that I had found, it's in

Page 36

1  New York City, just inquiring as to
2  their interest in looking at
3  something like this.
4      Q.  What firm was that?
5      A.  I don't know, to tell you
6  the truth.  I don't remember it,
7  because I never got a response back.
8  So I just let it go.
9      Q.  What other attorneys have
10  you spoken with?
11      A.  Other than my current
12  attorneys?
13      Q.  No.  I did not say other
14  than your current attorneys.
15      A.  Only Shannon.
16      Q.  And your current attorneys?
17      A.  Yes.
18      Q.  Who are your current
19  attorneys?
20      A.  Chimicles & Tikellis.
21      Q.  When was the first
22  conversation that you had with
23  Shannon O'Neil?
24      A.  Early 2005.  No.  Probably

Page 37

1  late 2004, something like that.
2  Maybe like 2004.
3      Q.  Did you ever correspond in
4  writing with her?
5      A.  No.  No.  I've known her
6  since she was that big (indicating).
7  So it wasn't necessary.
8      MR. MALONE:  Can I have
9  that read back just as a point of
10  clarification.
11      (The court reporter read
12  back the following:
13      "Q.  Did you ever
14  correspond in writing with her?
15      "A.  No.  No.  I've known
16  her since she was that big
17  (indicating).  So it wasn't
18  necessary.")
19      MR. MALONE:  Writing means
20  e-mail?
21      MS. YU:  Uh-huh.
22      MR. MALONE:  Does that
23  change your answer?
24      THE WITNESS:  I don't think

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 38

1  we ever exchanged e-mails. It was
2  strictly verbal.
3      I'm sorry. Yes, she did
4  send me an e-mail. Yes, she did.
5  BY MS. YU:
6      Q.  Do you still have that
7  e-mail?
8      A.  I may not have it any more.
9  It was very short, a direct reply to
10 a question. I don't believe I kept
11 that. Again, I didn't feel that was
12 necessary, because I know her as well
13 as my own children.
14     Q.  If you kept it, what form
15 would you have kept it in?
16     MR. MALONE:  Object to the
17 form.
18 BY MS. YU:
19     Q.  By that I mean electronic
20 versus a hard copy.
21     A.  Paper. Printed.
22     Q.  If you had a hard copy of
23 that e-mail, would you have provided
24 it to your current attorney?

Page 39

1      A.  Yes.
2      MR. MALONE:  Object as to
3  form.
4  BY MS. YU:
5      Q.  Sir, you said outside of
6  the company you've spoken with your
7  wife --
8      A.  Uh-huh.
9      Q.  -- with Shannon O'Neil,
10 with friends. Is there any other
11 category of people you would describe
12 as having had conversations with?
13     A.  No.
14     Q.  Let's talk about the
15 conversations that you had about cash
16 balance plans with folks within the
17 company.
18     MR. MALONE:  Object to the
19 form of the of the question.
20     MS. YU:  I'm not done with
21 my question.
22     MR. MALONE:  Okay. My
23 problem was with the word company.
24 Just so you know.

Page 40

1  BY MS. YU:
2      Q.  You described different
3  divisions of PHI. What are those
4  divisions?
5      A.  Engineering, district
6  engineering, reliability, system
7  protection, interconnection
8  agreements, purchasing, support
9  people, third-party relationship
10 providers.
11     Q.  Earlier you mentioned that
12 you worked for ACE which was a
13 division of PHI. Are those different
14 divisions than what you're listing
15 here?
16     A.  No. Those are departments,
17 per se.
18     Q.  So what you were just
19 listing are departments?
20     A.  Departments within ACE,
21 DelMarVa Power, and PHI.
22     Q.  Let's talk about it from
23 the level of ACE. What other
24 divisions of PHI are there that are

Page 41

1  similar to the ACE division you
2  referred to?
3      A.  PHI is a holding company.
4  It consists of three power delivery
5  divisions, Atlantic City Electric,
6  DelMarVa Power, Pepco Power.
7      In addition to that,
8  there's also a generation end called
9  Conectiv Energy, another division
10 which is a Conectiv energy supply or
11 something like that, they're a
12 wholesaler. There's approximately I
13 believe five divisions of PHI.
14     Q.  Have you spoken with
15 someone from each of the five
16 divisions that you've just listed
17 about cash balance plans?
18     A.  Definitely two, perhaps
19 three.
20     Q.  Could you tell me which
21 ones.
22     A.  Sure. Obviously ACE,
23 DelMarVa Power, and Pepco Energy
24 Services, which is the wholesale end.

B0048

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 42

1    Q.  Who from Pepco Energy
2  Services have you spoken with about
3  cash balance plans?
4    A.  SueAnn Harrell,
5  H-A-R-R-E-L-L.  Harrell.  Something
6  along those lines.  If I had my phone
7  I could tell you.
8    Q.  Anyone else from Pepco
9  Energy Services?
10    A.  No.  She's the only one.
11    Q.  Who is she?
12    A.  Who is she?  She's a person
13  who works in that division who does
14  sales, wholesale sales of energy.
15    Q.  How do you know her?
16    A.  How do I know her?
17    Q.  Yes.
18    A.  She used to work for
19  Conectiv.  I've met her at meetings
20  and often work-related functions.
21    Q.  Do you work directly with
22  her?
23    A.  Not directly, no.
24    Q.  Have you ever worked

Page 43

1  directly with her?
2    A.  No.
3    Q.  How many people
4  approximately from DelMarVa have you
5  spoken about cash balance plans with?
6    A.  I'd say six to ten.
7    Q.  Who are those individuals?
8    A.  I was afraid you were going
9  to say that.  Mike Meyer, Scott
10  Razzie, Rich Aiello, Tom Cole, Bob
11  Alles.
12    MR. MALONE:  That's a new
13  name.
14    THE WITNESS:  A-L-L-E-S.
15  Cole is C-O-L-E.  That's what I can
16  remember for now.
17  BY MS. YU:
18    Q.  Have you had similar
19  conversations with each of these
20  individuals from DelMarVa about cash
21  balance plans?
22    A.  I'm sorry.  I didn't hear
23  the beginning part of the question.
24    Q.  Have you generally had

Page 44

1  similar conversations with each of
2  these individuals from DelMarVa about
3  cash balance plans?
4    A.  Yes.  Different degrees.
5    Q.  Who have you spoken most
6  with?
7    A.  Mike Meyer.
8    Q.  Anyone else that you've
9  spoken with?
10    A.  Tom Troup.  He's another
11  one I forgot.
12    Q.  Do you know how to spell
13  his name?
14    A.  T-R-O-U-P.
15    Q.  Approximately when was the
16  first time you had a conversation
17  with someone from DelMarVa about cash
18  balance plans?
19    A.  Two years ago, two and a
20  half.
21    Q.  Let's take your
22  conversations with Mike Meyer.
23  What's his position?
24    A.  He handles interconnection

Page 45

1  agreements, contracts.
2    Q.  And how do you know him?
3    A.  Through work.
4    Q.  Have you worked directly
5  with him?
6    A.  Not directly.  Indirectly.
7  He's a resource.
8    Q.  Tell me about the first
9  conversation you had with him about
10  cash balance plans.
11    A.  It was probably at a
12  luncheon after a customer meeting he
13  and I had together, and we just
14  started talking about the pension
15  plans, and how he wasn't
16  grandfathered and I wasn't
17  grandfathered, and sort of along
18  those lines.
19    Q.  When did this conversation
20  occur then?
21    A.  When?
22    Q.  Yes.
23    A.  Again, two, two and a half
24  years ago, something like that.

12 (Pages 42 to 45)

B0049

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 46

1  Q.  Did you raise the issue or
2  did he?
3  A.  I can't say, because when
4  you're having lunch with someone you
5  just have conversations.  I may have
6  said it; he may have said it.  I
7  really don't remember.
8  Q.  What prompted you to start
9  having conversations with people
10  about cash balance plans two or three
11  years ago?
12  A.  When coworkers started to
13  retire, they would make offhand
14  comments to me and other people.
15  Those comments circled around the
16  difference between the -- because
17  those folks who were grandfathered
18  had a choice between two plans, the
19  old retirement plan and the cash
20  balance plan.
21      And they would make offhand
22  comments of the difference monetarily
23  between those two, significant
24  difference, and that's what captured

Page 47

1  my attention.
2  Q.  What were those
3  differences?
4  A.  They were in forms of
5  percentages.  In other words, the ACE
6  plan might be fifty percent more than
7  the cash balance plan for that
8  individual.
9  Q.  Did you ever get any more
10  detailed information from them about
11  the particulars of their benefits?
12  A.  I never wanted to ask
13  anyone how much money they have.
14  That's not appropriate.  What I would
15  ask them is just to supply me with a
16  percentage difference which I felt
17  was reasonable, and they had no
18  objections to it.
19  Q.  How many people did you ask
20  about that?
21  A.  12, 20 people.
22      MR. MALONE:  You know
23  what's coming next.
24      THE WITNESS:  Yes, I do.

Page 48

1      MR. MALONE:  You're going
2  to spell those names.
3      THE WITNESS:  Yes.
4  BY MS. YU:
5  Q.  Who are they?
6  A.  Karen Ayars, George Pinto,
7  Greg Peterson, Annette Ponzio, Rich
8  Simimoni, Scott Razzie.  I don't know
9  if I said Rich Simimoni.  I apologize
10  if I said it before.
11      MR. MALONE:  I think you
12  had.
13      THE WITNESS:  Okay.  There
14  were many more, but right off the top
15  of my head I can't pull every single
16  name.  If I had known ahead of time I
17  would have written them all down.
18  BY MS. YU:
19  Q.  Do you know whether they
20  took lump sum benefits?
21  A.  Do I know why they took the
22  lump sum?
23  Q.  Whether.
24  A.  Oh, whether.  No, I don't

Page 49

1  know that.
2  Q.  Just to clarify, you're not
3  certain what form of retirement
4  benefit they took; is that right?
5  A.  I have to assume the
6  majority of people who do retire take
7  the lump sum, but I can't say that
8  100 percent because that's their
9  business.
10  Q.  So just so I understand,
11  you didn't ask them specifically that
12  question, whether they took a lump
13  sum or some other form?
14  A.  They may have volunteered
15  it, but I didn't ask.
16  Q.  Do you recall whether
17  anybody ever said that they took
18  anything other than a lump sum?
19  A.  There may have been some
20  conversation one person may have
21  decided to take an annuity.
22  Q.  Do you recall who that
23  person was?
24  A.  May have been -- this is a

13 (Pages 46 to 49)

B0050

Page 50

1  new name -- Skip Castaldi,
2  C-A-S-T-A-L-D-I.
3     Q.  Did you also ask him about
4  the difference between the cash
5  balance plan and the grandfathered
6  plan?
7     A.  He was a supervisor of mine
8  at that point.  I think it was
9  inappropriate to ask him.
10       MR. MALONE:  Can I hear the
11  answer?
12       (The reporter read back the
13  following testimony:
14       "A.  He was a supervisor of
15  mine at that point.  I think it was
16  inappropriate to ask him.")
17  BY MS. YU:
18     Q.  So you did not ask him?
19     A.  No.  He just stated that he
20  was deciding that he might take the
21  annuity.
22     Q.  Approximately how many
23  people in the ACE division of PHI
24  have you spoken with about cash

Page 51

1  balance plan?
2     A.  20, 30 people.  I don't
3  know off the top of my head.
4     Q.  Is there anyone in addition
5  to those names that you've listed
6  that you can recall from the ACE
7  division that you've had
8  conversations with?
9     A.  I had some e-mails that I
10  had asked questions concerning of
11  none of those individuals listed.
12     Q.  I'm trying to sort of
13  categorize the kind of conversations
14  that you've had, and so far we've
15  talked about conversations that
16  you've had with coworkers or others
17  regarding their pensions.
18       Other than the folks who
19  retired, what kind of conversations
20  have you had with people who say are
21  still currently employed?
22       MR. MALONE:  Object to the
23  form of the question.
24       THE WITNESS:  When that

Page 52

1  would come up in the conversation, we
2  started discussing the cash balance
3  versus the old plan.  These were a
4  mixture of grandfathered,
5  non-grandfathered employees.
6       Obviously the
7  non-grandfathered employees were not
8  real happy with the predicament that
9  they were in and was hoping that
10  something would happen to allow them
11  to be in a better position to retire.
12       MR. MALONE:  Can I have the
13  question and answer read back?
14       (The reporter read back the
15  following testimony:
16       "Q.  Other than the folks
17  who retired, what kind of
18  conversations have you had with
19  people who say are still currently
20  employed?"
21       "A.  When that would come
22  up in the conversation, we started
23  discussing the cash balance versus
24  the old plan.  These were a mixture

Page 53

1  of grandfathered, non-grandfathered
2  employees.
3       "Obviously the
4  non-grandfathered employees were not
5  real happy with the predicament that
6  they were in and was hoping that
7  something would happen to allow them
8  to be in a better position to
9  retire.")
10       MR. MALONE:  Thank you.
11  I'm just having trouble hearing over
12  the air conditioning sometimes.
13  BY MS. YU:
14     Q.  Did you have any other
15  kinds of conversations about cash
16  balance plans with employees or
17  retirees of ACE?
18       MR. MALONE:  Object to the
19  form of the question.
20       THE WITNESS:  I'm not sure
21  what you mean by different
22  conversations.  I don't quite
23  understand that question.
24  BY MS. YU:

14 (Pages 50 to 53)

B0051

Page 54

1    Q.  I just want to make sure
2  that I understand the kinds of
3  conversations that you had about cash
4  balance plans.  And you said that you
5  had conversations about grandfathered
6  versus non-grandfathered.
7        What other things did you
8  talk about with respect to cash
9  balance plans?
10       MR. MALONE:  Are you
11  talking about the people at ACE now?
12       MS. YU:  Yes.
13       THE WITNESS:  We would talk
14  starting off about the difference.
15  Then it would migrate to different
16  subjects of that, how they were not
17  aware of what had happened.
18       Only through their
19  experience such as mine years later
20  after it was rolled out did they come
21  to the realization that there's a big
22  difference between the two plans, and
23  the reason we all kind of agreed to
24  why we just weren't aware.  Really

Page 55

1  what happened was the manner in which
2  it was rolled out, and during that
3  time it was very trying.
4        Bodies were, not physically
5  but figuratively, being thrown out
6  the building.  So everyone's main
7  concern at that point was just trying
8  to hang on to your job.  That was
9  number one.
10       And it was only later that
11  they, through other conversations, me
12  and other employees, that realized
13  that something just wasn't right.
14       Q.  And what is it that's not
15  right?
16       A.  The feeling was that the
17  class of workers were not treated
18  fairly.
19       Q.  What class of workers?
20       A.  Management not
21  grandfathered, middle management, not
22  supervision, not high supervision,
23  middle folks like me not
24  grandfathered.  And a small select --

Page 56

1  I say select -- small group of union
2  people who had moved from a non-union
3  to a union position or union
4  classification during the time of the
5  merger and they also were not
6  permitted or grandfathered.  Even
7  though the rest of the union folks
8  were, they weren't.  Kind of a real
9  oddball thing that occurred.
10       Q.  What group of employees was
11  that?
12       A.  They're in field engineers,
13  district service engineers, something
14  along those lines.
15       Q.  Did you say that they were
16  non-union and became union?
17       A.  That is correct.
18       Q.  What union did they become
19  part of?
20       A.  210, but I think it's 210 B
21  or something like that.
22       Q.  Have you spoken with
23  anybody who is part of that sort of
24  class that you just described?

Page 57

1        A.  Yes.
2        Q.  Who?
3        A.  Annette Ponzio, one I named
4  before, Gunther Schmidt, Mel Gregory,
5  Joe Limosino, Tim Bateman.
6        MR. MALONE:  I think
7  Bateman may be a new name.
8        THE WITNESS:  Yeah.  That's
9  a new name.  B-A-T-E-M-A-N.
10       Off the top of my head.
11  There's more but I can't think of
12  their names.
13  BY MS. YU:
14       Q.  Now that they are part of
15  the union, do you know whether they
16  participate in the cash balance plan
17  now?
18       A.  They are in the cash
19  balance plan.  They weren't
20  grandfathered.
21       Q.  And these folks are part of
22  the ACE division; is that right?
23       A.  Yes.
24       Q.  You said that the cash

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 58

1  balance plan is unfair to the class
2  of folks that you were describing,
3  which included these folks in the
4  moving from non-union to union.
5        Do you believe that the
6  cash balance plan was unfair -- let
7  me back up.
8        There's a group of folks
9  that you described as middle
10  management not grandfathered.
11     A.  Yes.
12     Q.  And then there are the
13  people who are part of Local 210 B
14  now who are also part of the cash
15  balance plan and not grandfathered.
16  You also said that you felt that the
17  cash balance plan was unfair.
18        I wanted to get a sense
19  from you whether you think it's
20  unfair for the same reasons to both
21  of those classes of individuals.
22     A.  Okay.  So the question I
23  believe you're saying is --
24        MR. MALONE:  I'm going to

Page 59

1  object to the form of the question.
2  BY MS. YU:
3     Q.  Is it unfair in the same
4  way as to both middle management and
5  to the folks in the Local 210 B?
6     A.  Yes.
7     Q.  How is the cash balance
8  plan unfair, in your view?
9     A.  Provides less financial
10  benefit upon retirement than the old
11  plan does.
12     Q.  Is there any other reason
13  that you feel that it's unfair?
14     A.  No.  That's pretty much the
15  foremost reason.  The other reason I
16  use the word unfair is that you have
17  a core of people, workers, that have
18  no choice in what plan they get
19  versus another group who have a
20  choice.
21     Q.  The other group that had a
22  choice, who are you referring to?
23     A.  Anyone who's grandfathered.
24     Q.  Is there any other way that

Page 60

1  the cash balance plan is unfair?
2        MR. MALONE:  Object to the
3  form of the question.
4        THE WITNESS:  I believe
5  there's problems with the funding of
6  it.  I'm not an expert, but I believe
7  there are problems with it.
8  BY MS. YU:
9     Q.  What kind of problems?
10     A.  I believe it's underfunded.
11     Q.  What leads you to believe
12  that the cash balance plan is
13  underfunded?
14     A.  The foremost reason is if
15  this, quote, is an equal or better
16  plan, as it was indicated, why would
17  it be so much less than the prior
18  plan unless it was underfunded, or
19  didn't follow the plan rules as to
20  how it should be funded.
21     MS. YU:  Could you read
22  that back.
23        (The reporter read back the
24  following testimony:

Page 61

1        "A.  The foremost reason is
2  if this, quote, is an equal or better
3  plan, as it was indicated, why would
4  it be so much less than the prior
5  plan unless it was underfunded, or
6  didn't follow the plan rules as to
7  how it should be funded.")
8  BY MS. YU:
9     Q.  Do you have any reason to
10  believe that the plan is not
11  operating under the terms as set
12  forth in the plan document?
13        MR. MALONE:  Objection;
14  form and lack of foundation.
15        THE WITNESS:  I think back
16  when the plan was rolled out and
17  there was handouts given.  It showed
18  a projection of an employee, typical
19  employee, starting at a point and
20  then at requirement ending up at the
21  same location, same place
22  financially.
23        That didn't happen for me
24  and it didn't happen for any of the

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 62

1  folks that I've talked to.
2  BY MS. YU:
3      Q.  How has it not happened for
4  you?
5      A.  Through my investigation
6  internally, talking with other
7  coworkers, specifically coworkers who
8  had my age with just a few months
9  more service, which allowed them to
10  be grandfathered where I was that
11  close and did not, so it was a very
12  close comparison.
13      So I was able to, in
14  talking with them, they would
15  indicate to me percentage difference
16  between those two plans, and I can
17  look at my own plan and know that
18  something's not right, something's
19  not right.
20      Q.  What did you look at under
21  your own plan or your own benefits?
22      A.  The cash balance amounts.
23      Q.  Were you comparing it to
24  something else?

Page 63

1      A.  Comparing it to equal
2  employees, same pay grade, just a
3  little bit more time within the
4  company.  Very similar circumstances.
5      Q.  And was that based on your
6  conversations with them that they
7  said that they had a certain
8  percentage difference between their
9  cash balance and their grandfathered
10  plan?
11      MR. MALONE:  Object to the
12  form of the question.
13  BY MS. YU:
14      Q.  Did you understand the
15  question?
16      A.  I'm sorry?
17      Q.  Did you understand the
18  question?
19      A.  I thought --
20      MR. MALONE:  I just
21  objected to the form.
22      THE WITNESS:  Oh, I'm
23  sorry.
24      MR. MALONE:  I may object

Page 64

1  to the form because there's a pronoun
2  reference in there that doesn't have
3  a antecedent.  It may seem ambiguous
4  to me.
5      If I'm going to instruct
6  you not to answer a question, I will
7  instruct you not to answer.
8      THE WITNESS:  Okay.
9      MR. MALONE:  If you
10  understand her answers you should
11  answer them whether I object or not.
12  If you don't understand her
13  questions, it doesn't matter whether
14  I object.  You have to understand the
15  question she asks when you answer it.
16      THE WITNESS:  Okay.  Could
17  you repeat that question again.
18      MS. YU:  I don't think I
19  can.  Could you read it back, please.
20      (The reporter read back the
21  following testimony:
22      "Q.  And was that based on
23  your conversations with them that
24  they said that they had a certain

Page 65

1  percentage difference between their
2  cash balance and their grandfathered
3  plan?")
4      MR. MALONE:  Same
5  objection.
6      THE WITNESS:  Yes.
7  BY MS. YU:
8      Q.  I just want to make sure
9  that I understand the process that
10  you went through.
11      Did you compare
12  calculations of what your benefit was
13  under the cash balance plan with
14  actual calculations of what you would
15  have been entitled to under the old
16  plan?
17      A.  I tried to do that.  Could
18  not get the information on the old
19  plan.  I was informed that they,
20  Vanguard the holder, could not
21  provide it nor could the HR
22  department for PHI provide it.
23      Q.  So you tried to get that
24  information but could not.  So you

17 (Pages 62 to 65)

B0054

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 66

1  did not make that comparison?
2      A.  I could not make that
3  comparison at the time other than
4  looking and talking with equal folks,
5  my pay grade, time and service, that
6  were grandfathered.
7      Q.  And as you said earlier,
8  you didn't ask them for their pension
9  statements or their calculations, did
10  you?
11      A.  I didn't ask them for any
12  paper copies.  Some were more than
13  willing to verbalize the dollar
14  difference in each one.  People that
15  I know very well were not
16  self-conscious about that, but I
17  never asked people for specific
18  dollar amounts.  It was always
19  volunteered.
20      Q.  I understand that you did
21  not ask for that specific information
22  and I understand why.  Did anybody
23  give you voluntarily their pension
24  calculations?

Page 67

1      A.  Yes.
2          MR. MALONE:  I was going to
3  ask whether you meant in a written
4  form or verbal, but you're probably
5  going there anyway.
6          MS. YU:  Let's go there.
7          MR. MALONE:  Sorry.
8          THE WITNESS:  That's okay.
9  BY MS. YU:
10      Q.  How did they provide you
11  with that information?
12      A.  Verbally.
13      Q.  Did anyone give you their
14  statement or any other written
15  calculations that were provided to
16  them?
17      A.  No.
18      Q.  Who provided you with the
19  verbal information regarding the
20  dollar amounts?
21      A.  Karen Ayars, George Pinto,
22  Greg Peterson.  Many of those other
23  people that I mentioned before
24  that -- I'm having trouble now

Page 68

1  keeping all the names in my head.
2  Mike Meyer, Scott Razzie.
3          MR. MALONE:  This is all
4  dollar amounts?  Because that's what
5  the question was.
6          THE WITNESS:  Oh, I'm
7  sorry.  Yeah, see.  The dollar
8  amounts were limited to about three
9  people, those definitely being Karen
10  Ayars, Greg Peterson, and there was
11  one more.  I can't remember right now
12  who that was.  I'm sorry.
13  BY MS. YU:
14      Q.  So just to clarify the
15  record, the question was relating to
16  who gave you their personal
17  information --
18      A.  Yeah.
19      Q.  -- regarding the actual
20  dollar amounts.  So you listed two
21  and there's probably a third whose
22  name you don't recall right now.
23      A.  Yes.
24          MR. MALONE:  It's very

Page 69

1  important to listen to the question
2  she asks you and answer the question
3  she asks you because otherwise we'll
4  get a muddled record like we started
5  to get there.
6          THE WITNESS:  Okay.
7  BY MS. YU:
8      Q.  Again, they provided this
9  information to you verbally; is that
10  right?
11      A.  Yes.
12      Q.  Did you make a record of
13  what they told you?
14      A.  Mental record.
15      Q.  Did you ever write it down?
16      A.  No.
17      Q.  What were the dollar
18  amounts of what these individuals
19  told you?  What information did they
20  give you?
21          MR. MALONE:  I think we
22  should designate, to the extent that
23  he talks about dollar amounts and
24  ties them to people, we should

18 (Pages 66 to 69)

B0055

Page 70

1  designate that portion of the
2  transcript as confidential.
3       I believe that the
4  stipulated protective order in place
5  permits him to do that.
6       So that you understand,
7  benefits information, Social Security
8  numbers, stuff like that, is not
9  supposed to be splashed all over the
10 public court record.  There's an
11 agreement that we've reached that's
12 been reduced to the form of an Order
13 that allows us to designate a
14 document or a portion of testimony as
15 confidential.
16      That means that if it's
17 filed with the Court it has to be
18 filed under seal.  Any Tom, Dick, and
19 Harry that goes and looks in the
20 court record can't see it.  So with
21 that background.
22      MS. YU:  Yeah.  And I have
23 no problem with treating this
24 information confidentially.

Page 71

1       MR. MALONE:  Thank you.
2  BY MS. YU:
3    Q.  Why don't we start with
4  Karen Ayars.
5    A.  Her cash balance amount,
6  and again, that was a mental
7  remembrance, was somewhere around
8  $180,000, or her lump sum amount for
9  the ACE plan was somewhere around
10 four and a quarter, 400,000.
11      Greg Peterson, his cash
12 balance amount was probably somewhere
13 around, if I remember right,
14 $300,000; his ACE amount was
15 $600,000.
16      Thee was another person I
17 forgot to mention, Rick Williams.
18 His numbers were similar to Greg
19 Peterson's.  I'm not exact on those
20 numbers, but there was a significant
21 difference between them.
22    Q.  Was that the third person
23 that you received numbers from?
24    A.  Yes.

Page 72

1    Q.  Do you know the ages of
2  these three people when they retired?
3    A.  Yes.
4    Q.  What were they?
5    A.  Karen Ayars, little over 55
6  years old; Greg Peterson is currently
7  56 years old; rick Williams is 58
8  years old.
9       MR. MALONE:  Let's have the
10 question and answer read back.  I
11 don't think they mesh.
12      MS. YU:  Well, let's just
13 talk about it.
14      MR. MALONE:  That's fine.
15 BY MS. YU:
16    Q.  You said Greg Peterson is
17 now 56.
18    A.  Yes.
19    Q.  Do you know when he
20 retired?
21    A.  He retired at 54.  He was
22 provided a package incentive,
23 retirement.  In other words, he got
24 his normal retirement at age 55.  So

Page 73

1  they continued to pay him his normal
2  salary while he was off for that one
3  year.
4    Q.  And was that a special
5  retirement package that was offered?
6    A.  There were incentive
7  packages that had been offered since
8  the beginning of the mergers to
9  select groups, individuals.
10   Q.  Do you know whether Karen
11 Ayars was offered that?
12   A.  No.  She was not provided
13 that.
14   Q.  And Karen Ayars was just
15 over 55 when she retired?
16   A.  She retired at 55, yes.  Or
17 just over.
18   Q.  And with respect to Rick
19 Williams, you said he was 58.  Is
20 that now?
21   A.  No.  Now he's 59.
22   Q.  Okay.  So he retired when
23 he was 58?
24   A.  I believe, yes, 58.

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 74

1       MR. MALONE:  Is there a
2   point at which you might be coming up
3   on a good time to break?
4       MS. YU:  This is a good
5   time.
6       RECESS
7       MR. MALONE:  Let's go back
8   on the record.
9   BY MS. YU:
10      Q.  Do you belong to any
11  association that lobbies or is
12  associated in any way with pension
13  reform?
14      A.  No.
15      Q.  Have you given money to any
16  such organizations?
17      A.  No.  Well, if you consider
18  AARP an organization, yes, but that's
19  through the subscription.  It's not a
20  cash donation.  Just keeping my
21  subscription.
22      Q.  So other than AARP, you're
23  not a member of any other
24  association?

Page 75

1       A.  No.
2       (Exhibit D-1 was marked for
3   identification.)
4   BY MS. YU:
5       Q.  Mr. Charles, Exhibit D-1 is
6   a document that says EMerging Times
7   on the top and it's dated October 13,
8   1997.  Do you recall receiving
9   newsletters that are called EMerging
10  Times that look like this?
11      MR. MALONE:  Object to the
12  form of the question.
13      THE WITNESS:  No.  I don't
14  remember this.
15  BY MS. YU:
16      Q.  You just said you don't
17  remember this.  Are you saying you
18  don't remember this particular
19  newsletter or -- I asked a more
20  general question to you.  Do you
21  recall having received anything
22  called EMerging Times?
23      A.  If there were publications
24  like this, they weren't directly sent

Page 76

1   to an employee.  They would be left
2   on a table, a desk, something along
3   those lines, for employees to pick up
4   if they so choose.
5       I don't remember picking up
6   any of these, or perhaps may have and
7   just don't remember.
8       MR. MALONE:  Off the
9   record.
10      (Discussion off the
11  record.)
12  BY MS. YU:
13      Q.  The time frame of this
14  newsletter is October 13, 1997.  Do
15  you recall there being discussions at
16  that time regarding the merger?
17      A.  They would go around the
18  various locations and make progress
19  reports.  I don't remember any
20  discussions around benefits at that
21  point, especially at this time, this
22  is very early.
23      I believe at that time I
24  was even in the engineering

Page 77

1   department, and there was no --
2   nothing earth-shattering that I could
3   remember that was ever shared, other
4   than approval is still pending,
5   things of that nature, you know, the
6   merger itself is still in its
7   process.
8       Q.  If you take a look at the
9   first page in the second column of
10  text.
11      MR. MALONE:  Let the record
12  reflect that the witness is reviewing
13  what's been marked as D-1 for
14  identification purposes.
15  BY MS. YU:
16      Q.  And in the only full
17  paragraph that's in the second column
18  that starts ET, How does the program
19  do that, do you see that there's a
20  reference to a new pension plan sort
21  of halfway down in that paragraph?
22      A.  Just this one page?
23      Q.  Yeah.  Do you see that
24  there's a reference to a new pension

20 (Pages 74 to 77)

B0057

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 78

1  plan?
2      A.   There's some mention here,
3  but it's rather ambiguous.  There's
4  no direct mention of cash balance
5  plan or anything like that.  If I
6  were to read this in 1997, I wouldn't
7  really understand what they were even
8  talking about.
9      Q.   Do you recall being
10  informed in October of '97 that the
11  old pension plan would be replaced?
12     A.   No.
13         MR. MALONE:  Kay, my
14  practice is to have the court
15  reporter take the original exhibits
16  and reproduce them with the
17  transcript with copies as requested
18  by the parties if that's acceptable
19  to you.
20         MS. YU:  That is fine.
21  Except for we may need to be
22  referencing these documents.
23         MR. MALONE:  When the
24  series finish of depositions that

Page 79

1  you're taking.  That's fine.  That's
2  why I asked you the question upfront
3  about whether you were going to
4  sequentially mark them.
5         (Exhibit D-2 was marked for
6  identification.)
7  BY MS. YU:
8      Q.   Mr. Charles, the exhibit
9  that has been marked D-2 is another
10  document with EMerging Times at the
11  top.  This one is dated October 20,
12  1997.
13         Do you recognize this
14  document?
15     A.   No.
16     Q.   Is it possible that you had
17  the document in October of '97 and
18  read it but that you don't recall
19  having read it as you sit here today?
20         MR. MALONE:  Object to the
21  form of the question.
22         THE WITNESS:  In reading
23  through this, I don't ever remember
24  seeing this document.  Ever.

Page 80

1         MR. MALONE:  Let the record
2  reflect that the witness is examining
3  what's been marked D-2 for
4  identification purposes.
5  BY MS. YU:
6      Q.   And there is a reference to
7  a cash balance plan in Exhibit D-2;
8  is that right?
9      A.   I don't know.  Where is it?
10     Q.   Take a look at the second
11  page at the first full paragraph.
12     A.   I'm sorry, I don't ever
13  remember seeing this.
14     Q.   But it does refer to a cash
15  balance plan?
16     A.   They do mention cash
17  balance plan and it being in the
18  design phase.
19         (Exhibit D-3 was marked for
20  identification.)
21  BY MS. YU:
22     Q.   Mr. Charles, Exhibit D-3 is
23  a document on the first page that
24  says Conectiv Cash Balance Plan and

Page 81

1  the date is February 20, 1998.
2         Do you recognize this
3  document?
4      A.   Yes.  I provided this to my
5  attorney.
6      Q.   Did you receive this
7  document in February of '98?
8      A.   No.
9      Q.   How did you obtain this
10  document?
11     A.   Through someone that I know
12  within the company who works
13  previously in the HR department.
14     Q.   Who is that?
15     A.   George Bleazard.
16  B-L-I-Z-Z-A-R-D (sic).
17     Q.   When did you receive this
18  document?
19     A.   Late 2005, early 2006.  I
20  don't remember the exact time.
21     Q.   I'm sorry.  What was the
22  name of the individual who gave it to
23  you again?
24     A.   George Bleazard.

21 (Pages 78 to 81)

B0058

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 82

1    Q.  Tell me about the
2 conversations you had with Mr.
3 Bleazard about cash balance plans.
4    A.  I asked him if he had any
5 information that was provided during
6 any of the roll-outs, anything at all
7 that dealt with the cash balance
8 plan, and he provided this to me.
9    Q.  How many conversations did
10 you have with Mr. Bleazard about cash
11 balance plans?
12    A.  Two, three, four.
13    Q.  Did you talk to him about
14 anything in addition to this document
15 regarding cash balance plans?
16    MR. MALONE:  Object to the
17 form of the question.
18    THE WITNESS:  We may have
19 spoke about other things around the
20 company, people retiring and such,
21 and specifically this document, but
22 that's pretty much it.
23 BY MS. YU:
24    Q.  What was Mr. Bleazard's

Page 83

1 position in HR at the time that he
2 gave this document to you?
3    A.  I'm not sure what his title
4 or his position is.  I just know that
5 this is the department that he used
6 to work in.  There's still a small
7 contingent of those folks.  He's, I
8 suppose, one of the remnants of the
9 original Atlantic City Electric
10 Company HR department.
11    Q.  Did he provide you with any
12 other documents?
13    A.  He may have, but I did not
14 note or document them or label them.
15    Q.  What did he tell you about
16 this document?
17    A.  Other than it was something
18 that he had and was willing to
19 provide it to me.
20    Q.  Did Mr. Bleazard explain to
21 you how he came into possession of
22 Exhibit D-3?
23    A.  I don't remember exactly
24 how he came about it.  I assume it

Page 84

1 was something that was obviously
2 provided to him that he was willing
3 to share with me.
4    Q.  Do you know whether Exhibit
5 D-3 was contained in Mr. Bleazard's
6 own personal files or whether they
7 were from the HR files?
8    A.  Again, I don't know.  I
9 assumed it was his own personal
10 files.
11    Q.  Take a look at the page
12 that's marked JMC 447 of Exhibit D-3.
13    MR. MALONE:  Which would be
14 the fourth physical page.
15 BY MS. YU:
16    Q.  There's some handwritten
17 notes on that page.  Do you know
18 whose handwriting that is?
19    A.  No, I do not.
20    Q.  I take it then it's not
21 your handwriting.
22    A.  No, ma'am.
23    Q.  Did Mr. Bleazard tell you
24 whether or not this information was

Page 85

1 presented in February of 1998?
2    A.  When he supplied this to
3 me, he did not indicate the exact
4 date on which he received it.  Only
5 that this is the date that's on it.
6    Q.  Did he tell you whether he
7 received it at a meeting where this
8 information was presented?
9    A.  No.
10    Q.  When was the first meeting
11 that you attended regarding cash
12 balance plans?
13    MR. MALONE:  I believe
14 that's asked and answered, but go
15 ahead.
16    THE WITNESS:  Okay.  Not
17 exactly sure the exact date, but I do
18 believe it was late 1999, middle,
19 late '99.
20    (Exhibit D-4 was marked for
21 identification.)
22 BY MS. YU:
23    Q.  Exhibit D-4 is a document
24 that says Facts on the top and the

22 (Pages 82 to 85)

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 86

1  pages are numbered JMC 215 through
2  217.  Do you recognize this document?
3      A.  It looks familiar, but I'm
4  not sure if it's something that was
5  provided to me recently.  I believe
6  that's when I saw it.  I'm not sure.
7      (Exhibit D-5 was marked for
8  identification.)
9  BY MS. YU:
10     Q.  Mr. Charles, Exhibit D-5 is
11 another document that starts Facts on
12 the front page.  The document that
13 was D-4 was only three pages and it
14 looked to me that there were some
15 pages missing, so Exhibit D-5, if you
16 can just verify for me that the first
17 page is the same as in D-4.
18     MR. MALONE:  Take your time
19 and look over it carefully.
20     Let the record reflect that
21 the witness is holding D-4 and D-5
22 side by side and comparing the face
23 page of each.
24     THE WITNESS:  They appear

Page 87

1  to be the same.  There may be some
2  difference in the font.  That may be
3  for some reason, I don't know, copy
4  machine may have shrunk down or I
5  don't know.  But they appear to be
6  the same.
7  BY MS. YU:
8      Q.  I'm sorry, in Exhibit D-5
9  the pages are a little out of order,
10 but page two and three of D-5 are
11 backwards.
12     The second page of D-4,
13 could you compare that to the page
14 that has on the bottom PHI 3367.
15     A.  Is this one you're
16 referring to?
17     MR. MALONE:  Go to D-4.
18     MS. YU:  D-4.  Second page
19 of D-4.
20     MR. MALONE:  And then let
21 the record reflect that I'm going to
22 turn to the third physical page of
23 what's been marked Exhibit D-5.
24     MS. YU:  Which is actually

Page 88

1  page PHI 3367.
2      MR. MALONE:  And that the
3  witness is examining them side by
4  side.
5      THE WITNESS:  They seem to
6  be similar.  Again, there appears to
7  be a difference in the font.  There's
8  a number missing on the -- this one
9  on the bottom left, this one has a
10 number two on it and this has no
11 number.
12     MS. YU:  Exhibit D-4?
13     MR. MALONE:  Could you say
14 it again.
15     THE WITNESS:  On Exhibit
16 D-5 on the bottom left-hand corner
17 below the asterisk statement has the
18 number two; this one has no number
19 two.
20 BY MS. YU:
21     Q.  So D-4 does not have the
22 number two.
23     A.  In that same location.
24     Q.  But otherwise they appear

Page 89

1  to be similar?
2      A.  Again, the basic difference
3  being in the font.
4      Q.  But the substance, actual
5  words appear to be the same?
6      A.  Appears to be the same,
7  yes.
8      Q.  And if you could do that
9  again with the last page, the third
10 page of D-4, and if you could compare
11 that to Exhibit D-5, and the PHI
12 number on the bottom right-hand
13 corner is 3368.
14     A.  What is it?
15     Q.  3368.
16     MR. MALONE:  Let the record
17 reflect that the witness has before
18 him Exhibit D-4 page JMC 00217 and
19 Exhibit 5, PHI 003368, and he's
20 examining the two.
21     THE WITNESS:  Again, they
22 appear to be the same except the font
23 is either a bit smaller on D-4 than
24 on D-5.

23 (Pages 86 to 89)

B0060

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 90

1  BY MS. YU:
2      Q.  But the substance of the
3  information appears to be the same?
4      A.  Yes.  They appear to have
5  the same information.
6      Q.  Take a look at the first
7  page of D-5, the last paragraph --
8  last two paragraphs there's a title
9  above it New Cash Balance Pension
10  Plan, and the last sentence says, The
11  new cash balance pension plan will
12  take effect January 1st, 1999.
13          Do you see that?
14      A.  Yes, I do.
15      Q.  Do you recall whether you
16  received this document in the spring
17  of 1998?
18          MR. MALONE:  Objection.
19  Lack of foundation.
20          THE WITNESS:  I don't
21  remember if I received this or when I
22  would receive this.
23  BY MS. YU:
24      Q.  Does that mean that it's

Page 91

1  possible that you received Exhibit
2  D-5 in 1998?
3          MR. MALONE:  Object to the
4  form.
5          THE WITNESS:  Since there's
6  no date on this, I don't know when.
7  I would assume that this was probably
8  put out after January 1 of 1999.  So
9  I don't know when this would have
10  been provided.  Again, we --
11  BY MS. YU:
12      Q.  Why do you assume that it
13  was produced after January 1st, '99?
14      A.  Because it says Effective
15  January 1, 1999.  I would assume they
16  would put that out afterwards.
17      Q.  If you take a look at this
18  sentence it says, The new cash
19  balance plan will take effect January
20  1st of 1999.
21      A.  Yes.
22      Q.  Does that indicate to you
23  that it hasn't yet occurred?
24      A.  No.  It indicates that's

Page 92

1  when it will occur.
2      Q.  Right.  When it will.  If
3  it had already taken effect, and this
4  was in fact published after the cash
5  balance plan became effective,
6  wouldn't they have said it in the
7  past tense rather than the future
8  tense?
9          MR. MALONE:  Objection.
10  Calls for speculation on the witness.
11  May have been written at one time and
12  published at another.
13          THE WITNESS:  I'm not an
14  English major.  So anything is
15  possible in the way this was written.
16  It could have been written up late
17  1999, published after January --
18  written up in 1998 and then published
19  after 1999.  I have no idea.
20  BY MS. YU:
21      Q.  And it also could have been
22  published in 1998 and distributed in
23  1998?
24      A.  That's a possibility.  I

Page 93

1  don't know.
2          (Exhibit D-6 was marked for
3  identification.)
4  BY MS. YU:
5      Q.  Exhibit D-6 is a document
6  that is dated December 21, 1998, and
7  it is number JMC 1 through 5.  Mr.
8  Charles, do you recognize this
9  document?
10      A.  I may have seen it since
11  I've made contact with my attorney.
12  I don't remember if I provided it or
13  someone else may have provided it.  I
14  don't remember in 1998 if I received
15  this or not.
16      Q.  Just to clarify, so it's
17  possible that you received this in
18  December of 1998, but you don't
19  recall one way or the other as you
20  sit here today?
21      A.  It's possible that I
22  received it.  I don't remember
23  receiving it.  Information at this
24  time during this merger was fast and

B0061

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 94

1    furious and the amount of information
2    that was being thrust out.
3         So I can't say absolutely
4    100 percent I never saw it; I just
5    don't remember ever seeing it.
6         Q.   If you take a look at
7    Exhibit D-6 on page JMC 3.
8         MR. MALONE:  Let the record
9    reflect that the witness has turned
10   to the designated page of Exhibit
11   D-6.
12   BY MS. YU:
13        Q.   The very top of the page
14   says Update of Conectiv Facts and in
15   parentheses it says Originally
16   published in the spring of 1998.  Do
17   you see that reference?
18        A.   Yes, I do.
19        Q.   Now, if you can go back to
20   Exhibit D-5.  Could you compare the
21   information that is contained in
22   Exhibit D-6 starting on JMC 3 where
23   it says New Cash Balance Pension
24   Plan.

Page 95

1         Can you compare that to the
2    first page of Exhibit D-5 where it
3    says New Cash Balance Pension Plan
4    and tell me whether it appears to be
5    the same.
6         A.   Are you talking about D-5
7    cover?
8         MR. MALONE:  The witness
9    indicating for the record the cover
10   page to Exhibit D-5, specifically the
11   final section of the three sections
12   of text that appears there.
13   BY MS. YU:
14        Q.   At the bottom of the page
15   it says New Cash Balance Pension
16   Plan.  Compare the paragraph of
17   information there with that in D-6 on
18   JMC 3.
19        A.   Except for a few minor
20   differences in font, I believe
21   there's one word that's italicized in
22   one but not the other, they appear
23   to be the same to me.
24        Q.   Okay.  In Exhibit D-5, if

Page 96

1    you could turn to the page that's on
2    the bottom it says PHI 3367.
3         MR. MALONE:  Let the record
4    reflect that the witness has turned
5    to the indicated page of Exhibit D-5,
6    which is technically the second page
7    of the document but is appearing as
8    the third page of this exhibit.
9    BY MS. YU:
10        Q.   Can you just confirm for me
11   that the titles of the section are
12   the same as appears, starting with
13   the second paragraph, on Exhibit D-6,
14   JMC 3.  So for example, D-5 says
15   Benefit Easier to Understand, and
16   that heading is contained on Exhibit
17   D-6.
18        MR. MALONE:  Let the record
19   reflect that the witness is examining
20   and making a comparison of the
21   referenced portions of D-5 and D-6.
22        THE WITNESS:  Some of it's
23   the same in that paragraph.  Looks
24   like there's a few things that are

Page 97

1    slightly different again with the
2    font.
3    BY MS. YU:
4         Q.   Just to make this a little
5    easier, can we just compare the
6    headings.
7         MR. MALONE:  I'll tell you
8    what I'm going to do.  I haven't
9    flyspecked it, but I'm prepared to
10   stipulate that the first -- I'm going
11   to do it with D-4 because I think it
12   will give you a cleaner record.  If
13   you look at D-4 for a second.
14        THE WITNESS:  I have --
15        MR. MALONE:  You have D-5,
16   but I'm going to offer her a
17   stipulation because otherwise it's
18   going to take all day.  I am prepared
19   to stipulate that, although I have
20   not flyspecked the document, it
21   appears to me that the section of
22   Exhibit 6 commencing on JMC 3
23   through --
24        MS. YU:  We can't do it

25 (Pages 94 to 97)

B0062

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 98

1  with D-4.
2       MR. MALONE:  We can't do it
3  with D-4?
4       MS. YU:  No.  We have to do
5  it with D-5.
6       MR. MALONE:  D-5.  It
7  appears to me that D-5 is
8  substantially similar to the portion
9  of D-6 which commences upon JMC 0003
10  thereafter, and there may be
11  differences in font, there may be
12  incidental differences in emphasis,
13  but in overall substance and thrust
14  of it I believe that they're
15  substantially similar if that's a
16  satisfactory stipulation for your
17  purposes.
18       Do you want that read back,
19  Ms. Yu?
20       MS. YU:  No.  If we
21  included in the stipulation that it
22  was originally published in spring of
23  1998.
24       MR. MALONE:  I can't

Page 99

1  stipulate to that, because your
2  client hasn't dated the D-5 document.
3  He doesn't know when he received it.
4  I'm prepared to say that D-6 suggests
5  perhaps that this was published in
6  the spring of 1998, but I don't know.
7  This could be incorrect, D-6.
8       So the substance of it I
9  agree is substantially identical.  I
10  cannot speak to or stipulate to the
11  date of D-5 based on the record as I
12  know it.
13       MS. YU:  We will accept
14  that stipulation.
15       MR. MALONE:  Thank you.
16       MS. YU:  Thank you.
17       MR. MALONE:  You get extra
18  points for keeping your documents in
19  order.  It makes everybody's life
20  easier.
21       (Exhibit D-7 was marked for
22  identification.)
23  BY MS. YU:
24       Q.  Exhibit D-7 is a document

Page 100

1  which on the first page says, Your
2  Conectiv Total Rewards, and there's
3  1998-99 on the front page.  The
4  document pages are numbered JMC 190
5  through 196.
6       Mr. Charles, do you
7  recognize this document?
8       A.  It looks familiar.  Again,
9  I don't remember whether receiving
10  this directly to me or it was
11  provided to me by someone else within
12  the company.
13       Q.  Again, just to clarify,
14  it's possible that you received this
15  document in '98 or '99 and you don't
16  recall that sitting here today?
17       A.  Again, that's possible, but
18  I cannot tell you for sure.
19       Q.  If you take a look at D-7,
20  on the third page of the exhibit,
21  which is JMC 192, do you see that the
22  numbered page is 24?
23       A.  Yes.
24       MR. MALONE:  The witness

Page 101

1  has turned to the referenced page of
2  Exhibit D-7.
3  BY MS. YU:
4       Q.  Do you know whether you
5  have in your possession a copy of the
6  full document of the pages before
7  page 24?
8       A.  You're asking me if I have
9  copies of this document before this
10  page 24?
11       Q.  Yes.
12       A.  I may have, but, again, I
13  don't -- I can't tell you for sure.
14  If -- and I assume this came from me,
15  I would have supplied everything I
16  had to my attorney.
17       MR. MALONE:  As a general
18  matter, we didn't excerpt a document.
19  If somebody gave us a whole document
20  that might have related to other
21  portions of other benefit packages, I
22  think we gave you the whole thing.
23       It may be that some
24  instance we were provided with

26 (Pages 98 to 101)

B0063

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 102

1  excerpts, but we did not excerpt on
2  our own unless our copy machine did
3  it, which I doubt.
4         (Exhibit D-8 was marked for
5  identification.)
6  BY MS. YU:
7     Q.  Exhibit D-8 appears to be a
8  deck of slides and the first page
9  says Conectiv Total Rewards, The
10 Tangible and Hidden Paychecks.
11        Do you recognize this
12 document?
13    A.  It looks familiar, but,
14 again, I don't remember receiving it
15 directly from the company.  It may
16 have been provided to me by a fellow
17 employee.  It may have been something
18 I pulled out of my personal records.
19 I can't tell you for sure.
20    Q.  If you turn to page JMC 204
21 of Exhibit D-8, there's some
22 handwriting on that page.
23    A.  That's not my handwriting.
24    Q.  That's not your

Page 103

1  handwriting?
2     A.  No.
3     Q.  Take a look at the next
4  page. Is that your handwriting?
5     A.  No.
6         (Exhibit D-9 was marked for
7  identification.)
8  BY MS. YU:
9     Q.  Exhibit D-9 says InSight on
10 top.  It's dated March 1999.  Do you
11 recall receiving communications from
12 Conectiv that look like this and say
13 InSight on the top in this format?
14    A.  Yes.  I remember there were
15 some publications like this.  Again,
16 they were not directly addressed to
17 individuals.  Brought into the work
18 site and put on the table, pick one
19 up, you know.
20    Q.  Do you recall whether you
21 saw this particular newsletter marked
22 as Exhibit D-9 in March of 1999?
23    A.  I don't remember this.  I
24 could have looked at it.  I don't

Page 104

1  remember.  It doesn't bring any
2  memory back to me.
3     Q.  If you look at the second
4  page of Exhibit D-9.
5         MR. MALONE:  Let the record
6  reflect that the witness is turning
7  to the indicated page on Exhibit D-9.
8  BY MS. YU:
9     Q.  Sort of in the middle of
10 the page on the right-hand side it
11 says June/July 1999.
12        MR. MALONE:  Objection to
13 the form of the question.  I believe
14 you mean left-hand side.
15        MS. YU:  I'm sorry.
16        MR. MALONE:  That's okay.
17 BY MS. YU:
18    Q.  Let's do it over.
19        On the second page of
20 Exhibit D-9 on the left-hand side
21 toward the bottom of the page it says
22 June/July 1999, Cash Balance Pension
23 Plan Statements, and it indicates
24 that statements will be provided in

Page 105

1  that time frame.
2         Do you recall whether you
3  received a statement in June or July
4  of 1999?
5     A.  I know in subsequent years
6  we would get one at the end of the
7  year, beginning of the year.  I may
8  have received a notification, a
9  letter, document of some sort
10 indicating my starting balance, but I
11 don't remember.
12    Q.  Below that in Exhibit D-9
13 it says July/August Cash Balance
14 Pension Plan Meetings for Employees.
15 Do you recall attending any meetings
16 in July or August of 1999 regarding
17 cash balance?
18    A.  Yes.
19        MR. MALONE:  This appears,
20 this being Exhibit D-9, appears to be
21 an incomplete document.  I note the
22 second page actually is numbered six,
23 for the record.
24        (Exhibit D-10 was marked

27 (Pages 102 to 105)

Page 106

1  for identification.)
2  BY MS. YU:
3      Q.  Exhibit D-10 says Mid Week
4  Extra on the top and Cash Balance
5  Update. It's dated June 23, 1999.
6  Do you recognize this document, Mr.
7  Charles?
8      A.  No.  I believe that the
9  delivery of this was perhaps via the
10  Internet.  I'm not sure.  Or the
11  intranet that we have.  I may have
12  seen it.  I just -- again, it may
13  have been information that was
14  provided to me that I forwarded to my
15  attorney.
16      Q.  Tell me about the intranet.
17      A.  The company has an internal
18  web system called the intranet in
19  which they can put publications such
20  as this, updates, things like --
21      MR. MALONE:  Indicating for
22  the record Exhibit D-10.  Continue.
23  I'm sorry.
24      THE WITNESS:  That form of

Page 107

1  communication started after the first
2  merger with Conectiv.  Not everybody
3  had access to it so typically what
4  would happen in a building
5  someone who did have the access if
6  they felt it was important would
7  print it, put it on a bulletin board.
8  BY MS. YU:
9      Q.  Did you have access?
10      A.  At this time, 1999?  I
11  can't remember if I did or not.
12  There was a transition there where
13  people were being released, what we
14  call administrative help, that used
15  to type letters and things like that
16  for people like me.
17      It was also during a period
18  of time that I may have been leaving
19  the engineering department, moving in
20  to the -- back into customer service.
21      I believe at that time I
22  may or may not -- I can't remember if
23  I had a PC or not that would have any
24  access to that.

Page 108

1      Q.  So the first paragraph,
2  again, in Exhibit D-10 refers to
3  opening statements.  Can you take a
4  look at that paragraph for me.
5      MR. MALONE:  Let the record
6  reflect that the witness is examining
7  the first page of what's been marked
8  Exhibit D-10.
9      THE WITNESS:  Do you have a
10  question?
11  BY MS. YU:
12      Q.  I will be asking one.  So
13  it refers to opening statements being
14  sent to employees' homes beginning
15  next week, which would be end of
16  June, beginning of July 1999, right?
17      A.  That's what it says.
18      MR. MALONE:  Objection to
19  the form of the question.
20  BY MS. YU:
21      Q.  There's also references to
22  the meetings.  You attended one of
23  those meetings; is that right?
24      MR. MALONE:  Object to the

Page 109

1  form.
2      THE WITNESS:  Yes.
3  BY MS. YU:
4      Q.  If you look at the third
5  paragraph of D-10 it says, These
6  meetings will be the best source of
7  information on the plan and
8  employees' opening balances.  Recent
9  stories in the national media have
10  raised concerns about some cash
11  balance plans that do not offer the
12  same level of financial security or
13  grandfathering provisions as
14  Conectiv's Cash Balance Pension Plan.
15  One part of the presentation will
16  address these concerns and
17  demonstrate how Conectiv's plan is
18  different.
19      Do you recall being
20  provided this information in June of
21  1999?
22      MR. MALONE:  "This
23  information" referencing...?
24      MS. YU:  What I just read

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 110

1  into the record.
2      THE WITNESS: I don't
3  recall it being part of the
4  presentation where I attended.
5      MR. MALONE: Read back the
6  question. Listen to the question. I
7  don't think you're answering her
8  question.
9      (The reporter read back the
10  following testimony:
11      "Q. Do you recall being
12  provided this information in June of
13  1999?")
14      THE WITNESS: No. I don't
15  remember.
16      (Discussion off the
17  record.)
18      MR. MALONE: Let's go back
19  on the record.
20      (Exhibit D-11 was marked
21  for identification.)
22  BY MS. YU:
23      Q. Mr. Charles, Exhibit D-11
24  is another newsletter that says

Page 111

1  InSight on the top. This one is
2  dated July 1999. Do you recall
3  whether you reviewed this newsletter
4  that's Exhibit D-11 in or about July
5  of 1999?
6      A. I don't remember this
7  particular publication being provided
8  to me. I remember that there were
9  publications called InSight, but this
10  particular one, I can't tell you as
11  to whether I ever saw it or not.
12      (Exhibit D-12 was marked
13  for identification.)
14  BY MS. YU:
15      Q. Exhibit D-12 is a document
16  that says InSight Online on the top.
17  Is this information that would appear
18  on the Internet?
19      A. On the intranet, the
20  internal network system. I would
21  assume so since it says so on the
22  document.
23      MS. YU: Why don't we go
24  off the record.

Page 112

1      (Luncheon recess at
2  12:08 p.m.)
3      (Testimony resumed at
4  1:20 p.m.)
5      (Exhibit D-13 was marked
6  for identification.)
7  BY MS. YU:
8      Q. Mr. Charles, Exhibit D-13
9  appears to be a document with some
10  PowerPoint slides and the documents
11  were numbered MWW 219 through 225.
12  Have you seen this document before?
13      A. Yes. I believe that this
14  was something I received from an
15  employee, a coworker.
16      Q. And from whom?
17      A. I honestly don't remember.
18      Q. The date on it is July of
19  1999 and it's entitled Conectiv Cash
20  Balance Pension Plan. Do you recall
21  whether this was part of a
22  presentation at a meeting that you
23  attended in that time frame?
24      A. It may have been, but I

Page 113

1  don't remember this format, this type
2  of format.
3      Q. What do you remember from
4  that meeting?
5      A. The roll-out meeting? Is
6  that the question?
7      Q. The meeting that occurred
8  sometime approximately in July of
9  1999 regarding the cash balance plan.
10      A. The meeting was held in
11  our --
12      MR. MALONE: I'm going to
13  object to the form of the question,
14  the use of the word July. I think he
15  gave you an estimate or range. I
16  don't think he said it was July.
17      Go ahead and answer the
18  question.
19  BY MS. YU:
20      Q. And assuming it's that
21  meeting that took place approximately
22  in that time frame.
23      A. The meeting that I had
24  attended for the roll-out, I remember

B0066

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 114

1 it was in our Carneys Point Building
2 in a multipurpose cafeteria meeting
3 room that was utilized.
4       There was a PowerPoint
5 presentation that was put up onto a
6 screen, and I believe that there was
7 a hand-out given that mirrored the
8 PowerPoint presentation.
9       The presentation was put on
10 by low-level employees, people like
11 myself, that just simply went through
12 the slides and read them off and
13 briefed the people in the meeting
14 that this is the new benefit plan as
15 it's being rolled out.
16       There were different
17 slides, some of them about the
18 medical, dental, vision, and I
19 believe there was something in there
20 that referred to the grandfathering
21 and the cash balance plan, the whole
22 plan.
23       Q.   Do you recall who
24 specifically was doing the

Page 115

1 presentation?
2       A.   No, I don't. I definitely
3 know that it was not a senior member
4 of the organization. I would assume
5 it was a mid-level team member. At
6 that time there were a lot of, quote,
7 teams that were formed to look on
8 different aspects of the business and
9 what directions and research on
10 different subjects.
11       And I assume that one of
12 those groups was part of the benefits
13 package and was one of those
14 individuals or that group that
15 presented the roll-out of that
16 benefits package.
17       Q.   Was there more than one
18 individual giving the presentation?
19       A.   Yes. There were two or
20 three people, and I don't remember
21 the exact number. I know -- I
22 believe it was a mixture of men and
23 women. I don't remember the exact
24 makeup.

Page 116

1       Q.   Do you recall whether Jim
2 Kremmel was one of the individuals
3 giving the presentation?
4       A.   I don't remember particular
5 names or -- or the people themselves,
6 other than I knew they were not
7 senior management. I knew they were
8 company people.
9       Q.   Can you review the slides
10 that are contained in Exhibit D-13
11 and tell me whether that refreshes
12 your recollection as to whether these
13 are the slides that were presented.
14       A.   It looks familiar. I can't
15 say 100 percent that each and every
16 one of these was reviewed. I do
17 remember it was a PowerPoint
18 presentation.
19       Q.   If you look at the second
20 page of D-13.
21       MR. MALONE:  Indicating for
22 the record MWW 00220.
23 BY MS. YU:
24       Q.   And the very first slide on

Page 117

1 the upper left-hand corner says, New
2 plan is a cash balance plan and cash
3 balance plans are controversial.
4 Underneath it says Series of Wall
5 Street Journal articles and then
6 congressional hearings.
7       Do you recall this
8 information being provided to you in
9 the summer of 1999 time frame?
10       A.   No. I don't remember that.
11 I'm pretty sure that slide was not
12 included in the presentation, but I
13 can't be sure.
14       Q.   The third page of D-13
15 which is MWW-221, there's some
16 handwritten notes on the bottom. Is
17 that your handwriting?
18       A.   No.
19       (Exhibit D-14 was marked
20 for identification.)
21 BY MS. YU:
22       Q.   Exhibit D-14 is a
23 single-page document. It says as the
24 subject Cash Balance Retirement Plan

30 (Pages 114 to 117)

B0067

Page 118

1  and says Business Practice effective
2  1/1/99 for Management Employees.
3       Mr. Charles, do you
4  recognize this document?
5       A.  I recognize it in that it
6  was probably something that I either
7  had in my records or was provided to
8  me from someone else, a coworker.
9  But I don't remember when it was
10 handed out and reading it at that
11 particular time.
12      Q.  Do you know where this
13 information came from?
14      MR. MALONE:  I object to
15 the form of the question.  Are you
16 asking where the document came from
17 or where the information conveyed in
18 the document came from?
19      MS. YU:  I don't know yet.
20      MR. MALONE:  Okay.
21      THE WITNESS:  Okay.  Could
22 you ask that question again?  Because
23 I'm not sure what you're asking.
24 BY MS. YU:

Page 119

1       Q.  Well, actually, as I was
2  asking the question, I notice at the
3  bottom it says Back to Top on the
4  bottom of the page.
5       A.  Uh-huh.
6       Q.  Do you know whether this
7  information came off the Internet?
8       A.  I would have to assume it
9  did with that Back to top.  That's
10 the impression you would get.  It may
11 have been on the -- some e-mail or
12 whatever.  I don't know.  I can
13 assume that.
14      Q.  Do you recall looking at
15 any information on the intranet that
16 would include this formatting or this
17 information?
18      MR. MALONE:  Object to the
19 form.  Is that intranet?
20      MS. YU:  Intranet.
21      THE WITNESS:  I don't
22 remember.  I don't remember.  I'm
23 sorry.
24      (Exhibit D-15 was marked

Page 120

1  for identification.)
2  BY MS. YU:
3       Q.  Mr. Charles, Exhibit D-15
4  is an e-mail trail of two messages.
5       A.  Uh-huh.
6       MR. MALONE:  You have to
7  verbalize your responses.  Uh-huh and
8  uh-uh won't come up clearly.
9       THE WITNESS:  Yes.
10      MR. MALONE:  Thank you.
11 BY MS. YU:
12      Q.  The first e-mail that's on
13 the bottom is from you to Conectiv
14 HR; is that right?
15      A.  Yes.
16      Q.  And do you recall sending
17 this message?
18      A.  I'm sorry?
19      Q.  Do you recall sending this
20 message?
21      A.  Yes.
22      Q.  And is the correct time and
23 date on the message, August 20, 2003,
24 at 11:14 a.m.?

Page 121

1       A.  I would have to say yes.
2       Q.  In the first paragraph you
3  state, Are you following the current
4  events of the class action lawsuit by
5  the employees of IBM as it pertains
6  to IBM's decision to convert their
7  employees' retirement plan into the
8  cash balance plan?
9       What prompted you to send
10 this message?
11      A.  The article that I read in
12 AARP magazine.
13      Q.  Do you read the monthly
14 publication from AARP regularly?
15      A.  Yes.
16      Q.  Would you say that you read
17 every monthly publication that you
18 receive from them?
19      MR. MALONE:  Object as to
20 form.
21      THE WITNESS:  For the most
22 part, yes.  I thumb through every
23 page or read everything that's of
24 interest to me.

B0068

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 122

1  BY MS. YU:
2      Q.   Are there any other
3  periodicals that you read regularly
4  that are similar to the AARP
5  publication?
6          MR. MALONE:  Object to the
7  form.
8          THE WITNESS:  No.
9  BY MS. YU:
10     Q.   Are there any other
11 newspapers that you read regularly?
12         MR. MALONE:  Object to the
13 form.
14         THE WITNESS:  Yes.
15 BY MS. YU:
16     Q.   What papers do you read
17 regularly?
18     A.   Local newspapers, area
19 newspapers.
20     Q.   Any national news reports?
21     A.   Occasionally, yes.
22     Q.   Such as...?
23     A.   Philadelphia Inquirer,
24 Atlantic City Press, U.S. News, that

Page 123

1  kind of thing.
2      Q.   Do you read the Wall Street
3  Journal?
4      A.   Rarely.
5      Q.   How about the New York
6  Times?
7      A.   Very rarely.
8      Q.   So of the local newspapers,
9  do you read them on a daily basis or
10 less regularly?
11     A.   Fairly regularly.
12     Q.   And for how long have you
13 been reading the local newspapers?
14     A.   Years.  Decades.
15         MR. MALONE:  I think
16 decades would do the job.
17 BY MS. YU:
18     Q.   What was your concern when
19 you wrote this e-mail?
20     A.   This sort of was leading up
21 to my decision that I needed to do
22 something not only to help me but
23 help other employees, and my attempt
24 was to get some clarification and

Page 124

1  some insight from HR.
2      Q.   What is your understanding
3  of what the IBM litigation was about?
4      A.   From what I read in the
5  articles, that it was a class action
6  spearheaded by a lady, I forget her
7  name, that in reaction or response to
8  what IBM in converting their old
9  retirement plan and new cash balance
10 plan that it affected many of the
11 older employees in the company
12 unfairly.
13         And that's why she took the
14 measures that she did was try to I
15 assume correct something that she
16 felt was wrong.
17     Q.   What is your understanding
18 of the age discrimination claim that
19 was involved in the IBM case?
20         MR. MALONE:  Object to the
21 form of the question.
22         THE WITNESS:  The way that
23 I understood it in the article that
24 when a pension plan is converted for

Page 125

1  older employees, it puts them at a
2  disadvantage in that they won't be
3  able to acquire the same retirement
4  benefits they would have gained from
5  their other plan.
6          So the age portion, the age
7  discrimination portion I believe was
8  because as being an older worker you
9  would not be able to attain the same
10 benefit through a cash balance plan
11 was because you just couldn't work
12 long enough to do that.
13 BY MS. YU:
14     Q.   Do you feel like the claims
15 that were asserted in the IBM case
16 applies with respect to the Conectiv
17 cash balance plan?
18         MR. MALONE:  Object to the
19 form of the question.
20         THE WITNESS:  I see some
21 similarities.  I can't say they're
22 identical, but they're both cash
23 balance plans.  They both affected
24 older workers and that's where I see

B0069

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 126

1  the similarities.
2  BY MS. YU:
3      Q.  Do you believe the Conectiv
4  cash balance plan discriminates
5  against older workers?
6      A.  When you ask that question,
7  you mean did they do that on purpose?
8      Q.  Well, why don't you answer
9  that question.  Do you think that
10  anyone at PHI, its subsidiary
11  companies, its predecessors -- can we
12  define what we're talking about here
13  as the company?
14      MR. MALONE:  I think what
15  you want to talk about because of the
16  timing is you want to talk about
17  Conectiv.  PHI was not in the picture
18  at this time.
19      And if you're going to talk
20  about intent, you're going to hear
21  from me on the difference between
22  general intent and specific intent.
23      So put those on the table
24  for purposes of you starting to frame

Page 127

1  your question and then we'll go from
2  there.
3  BY MS. YU:
4      Q.  Do you believe that anyone
5  at Conectiv acted intentionally to
6  discriminate against older workers?
7      MR. MALONE:  I'll object to
8  the form of the question.  What do
9  you mean by the phrase
10  "intentionally"?
11      MS. YU:  I'm using that
12  phrase because Mr. Charles started
13  with it.
14      MR. MALONE:  I understand
15  that.
16      MS. YU:  So I'm asking him
17  to answer that question.
18      MR. MALONE:  But there's
19  intent in the sense of doing
20  something to accomplish a purpose,
21  and there's intent in the sense of
22  doing something that has a
23  consequence that's foreseeable where
24  you intend to do the act.  Specific

Page 128

1  versus general intent.
2      I think in that context the
3  question is ambiguous, but you can go
4  ahead and answer it.
5      THE WITNESS:  I was not
6  part of the decision-making on
7  converting the conventional
8  retirement plan into a cash balance.
9  I don't know if the company knew 100
10  percent whether it affected employees
11  or not, or did they care, I don't
12  know.
13      So not knowing that, I
14  really have a difficult time in
15  answering your question as to whether
16  they did this as a means of affecting
17  older employees, whether they did
18  that purposely for that, I don't know
19  that.
20  BY MS. YU:
21      Q.  Your employers changed over
22  time, ACE, then Conectiv, and now it
23  seem to be ACE and PHI on some level.
24  Would you answer that question

Page 129

1  differently if it were asked with
2  respect to all of your employers?
3      MR. MALONE:  I'm going to
4  have to object to the form of the
5  question and also for lack of
6  foundation, because this plan was
7  rolled out at one particular time and
8  then imposed upon.
9      THE WITNESS:  Could you
10  restate the question, clarify it?
11  BY MS. YU:
12      Q.  Sure.  What I want to cover
13  is, regardless of the name of your
14  employer for the entire period of
15  time since 1980 or so that you've
16  been working for ACE and its
17  successors, have you ever felt as
18  though there was anyone who was
19  discriminating against you because of
20  your age?
21      MR. MALONE:  In any context
22  at all?
23      MS. YU:  In any context.
24      THE WITNESS:  When it was

33 (Pages 126 to 129)

B0070

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 130

1  rolled out, I was a little confused
2  at the point at which they said
3  you're grandfathered, you're not, and
4  why they picked a particular age.
5         I'm not -- I don't know, I
6  can't say at that point did I feel
7  like I was being discriminated
8  against because of my age.  Strictly
9  I just felt it was rather odd that
10 they point in the sand and said that
11 was it.  I think it was more
12 confusion than it was anything else.
13 BY MS. YU:
14    Q.  Is there any other time or
15 any other instance where you felt you
16 were being discriminated against
17 because of your age?
18    A.  Moving forward in time,
19 after hearing from coworkers the
20 differences between the two pensions,
21 I started to develop the thought
22 that, whether it was done on purpose
23 or accidental, a drawing of a line in
24 the sand saying if you're this age,

Page 131

1  you're okay; if you're not that age,
2  it's not okay, and knowing after
3  doing some research and asking
4  questions about the plan that a man
5  49 years 8 months old missing the
6  cutoff by a few months, that I did
7  feel there was some sort of age
8  discrimination in that.
9         Simply -- not so much that
10 I felt they were targeting a specific
11 age, again going back to the line in
12 the sand wondering, well, why didn't
13 you make it 30 years old, why didn't
14 you make it 25 years old, why didn't
15 you make it Y?  Why 50?  I didn't
16 understand that, or 49, but that was
17 the only feeling that I had at that
18 time that something, you know, it was
19 unfair for older people that were
20 that close to be thrust into a cash
21 balance plan.
22    Q.  Just so I understand your
23 position on what is age
24 discriminatory about the cash balance

Page 132

1  plan --
2         MR. MALONE:  Object to the
3  form.
4         MS. YU:  I'm not even done
5  yet.
6         MR. MALONE:  I'm just
7  putting it on the table.
8         MS. YU:  You succeeded.
9  Now I've lost my train of thought.
10        MR. MALONE:  My concern was
11 that I think you're making a
12 cognitive leap with respect to his
13 testimony that is not supported by
14 the record, and that's why I have the
15 objection to the form of the question
16 that you're going to ask.
17        MS. YU:  Let's start over.
18 BY MS. YU:
19    Q.  Do you feel like the cash
20 balance plan is age discriminatory?
21        MR. MALONE:  Object to the
22 form.  Go ahead and answer if you
23 understand it.
24        THE WITNESS:  Yes.

Page 133

1  BY MS. YU:
2     Q.  How is it age
3  discriminatory?
4     A.  As an older employee, in
5  order for me to gain or acquire the
6  same benefit under that in comparison
7  to the other plan, I would have to
8  work ten, 15 -- I don't know how many
9  more years and may never attain the
10 same amount.
11    Q.  So is it a comparison of
12 the benefit that you get under the
13 cash balance plan with the benefit
14 under the old plan formula that you
15 think is age discriminatory?
16    A.  I believe so, yes.
17    Q.  In what other ways do you
18 feel the cash balance plan is age
19 discriminatory?
20    A.  Only when older employees
21 have no choice and must have that as
22 the retirement plan do I see that as
23 age discriminatory.
24    Q.  So it's the fact that the

34 (Pages 130 to 133)

B0071

Page 134

1  employer adopted the cash balance
2  formulation of the plan and that
3  older workers were required to be in
4  that cash balance formula. Is that
5  what you feel is age discriminatory?
6         MR. MALONE: Object to the
7  form of the question as calling for a
8  legal opinion from a lay witness.
9  You can answer as to your
10 understanding.
11        THE WITNESS: As best I
12 understand the plan, it's my own
13 experience, yes, I believe that the
14 older you are put into the cash
15 balance plan, the more of a
16 disadvantage you're going to be at.
17 BY MS. YU:
18     Q. Who do you think is being
19 harmed by the cash balance plan?
20        MR. MALONE: Object to the
21 form of the question. Go ahead and
22 answer.
23        THE WITNESS: Any
24 non-grandfathered employee from the

Page 135

1  age of 30 up to the cutoff date.
2  BY MS. YU:
3     Q. In that group of people, do
4  you think that some are harmed more
5  than others?
6         MR. MALONE: Object to the
7  form.
8         THE WITNESS: Yes. If
9  you're going strictly by their age, a
10 person can only live so long, and
11 obviously the older you are that
12 you're placed into a cash balance
13 plan the longer you have to stay in
14 that plan to achieve the same
15 retirement benefit as the prior man.
16 BY MS. YU:
17     Q. Are there any other reasons
18 why you think that the cash balance
19 plan is age discriminatory?
20        MR. MALONE: Object insofar
21 as it calls for a legal opinion from
22 a lay witness. Answer as to your
23 understanding.
24        THE WITNESS: The only way

Page 136

1  I can answer that is knowing from my
2  personal experience and other
3  coworkers that the way that it was
4  presented, the way that it's funded,
5  the way that we were put into that
6  plan, that it just didn't provide the
7  same benefits and -- I lost my train
8  of thought.
9  BY MS. YU:
10     Q. I just want to make sure I
11 understand what you've been saying.
12        Is the harm that you feel
13 you've suffered under the cash
14 balance plan because you feel like
15 your benefit under the cash balance
16 plan is not as great as the benefit
17 you would have received under the old
18 plan?
19     A. Yes.
20     Q. Is there any other way that
21 you feel like you've been harmed
22 because of the cash balance plan?
23     A. Harmed in what way?
24 Financially?

Page 137

1     Q. Are there any other ways
2  that you could have been harmed by
3  the cash balance plan?
4         MR. MALONE: Object to the
5  form of the question.
6         THE WITNESS: Perhaps some
7  emotional distress in that now
8  knowing that I may have to work until
9  I'm 70, I don't know.
10 BY MS. YU:
11     Q. Has the adoption of the
12 cash balance plan caused you
13 emotional distress?
14     A. Now knowing or realizing
15 the last couple of years that I can't
16 retire now because there's
17 insufficient funds in it for me to
18 retire. Yes, that is -- it's not
19 making me want to jump out the
20 window, but just makes me know that I
21 can't retire.
22     Q. In terms of the damages
23 that you're seeking to recover
24 through this lawsuit --

35 (Pages 134 to 137)

B0072

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 138

1　　　　MR. MALONE: Objection to
2　the form of the question as calling
3　for a legal conclusion from a lay
4　witness. You can answer as to your
5　understanding.
6　BY MS. YU:
7　　　Q. As to the damages that
8　you're seeking to recover through
9　this litigation, is there anything
10　other than your benefits are less
11　under the cash balance plan formula
12　than you feel they would have been
13　under the old plan, is there anything
14　else that you're seeking to recover
15　in this litigation?
16　　　　MR. MALONE: Same
17　objection.
18　　　　THE WITNESS: The only way
19　I can answer that is if they had
20　never instituted the cash balance
21　plan, if the old plan still exists, I
22　would not be here today. I don't
23　know if that answers your question.
24　BY MS. YU:

Page 139

1　　　Q. What is the recovery that
2　you are seeking from the defendants
3　in this litigation?
4　　　　MR. MALONE: Object to the
5　form of the question. Calling for
6　legal opinion from a lay witness.
7　You can testify as to your
8　understanding.
9　　　　THE WITNESS: Fair. I'm
10　not looking to bankrupt the company,
11　punish anyone, see anyone get fired.
12　I'm just trying to correct a wrong.
13　BY MS. YU:
14　　　Q. How in your view should it
15　be corrected?
16　　　A. Honestly?
17　　　Q. Yes.
18　　　A. Put it back the way it was.
19　　　Q. Is there anything else
20　you're looking for?
21　　　　MR. MALONE: Object to the
22　form of the question.
23　　　　THE WITNESS: In
24　compensation?

Page 140

1　BY MS. YU:
2　　　Q. Yes.
3　　　A. I haven't given thought for
4　that. My primary focus has been
5　strictly on trying to right a wrong,
6　help other employees that are in my
7　situation. I myself aren't looking
8　for any huge personal gain out of
9　this. But for now, all I want to do
10　is just correct this wrongdoing.
11　　　Q. Tell me what you think the
12　wrongdoing is.
13　　　　MR. MALONE: Object to the
14　form of the question. It calls for a
15　legal opinion from a lay witness.
16　You should answer to your
17　understanding.
18　　　　THE WITNESS: If you were
19　to take a poll of the employees of
20　the utility that I work for, The
21　Heritage Company, you would find out
22　that 100 percent of those individuals
23　came to work for that company because
24　they knew it was secure, had a good

Page 141

1　retirement plan, and knew that they
2　could work 25, 30 years, and at that
3　end be able to retire with a nice,
4　full retirement.
5　　　　That's how I would answer
6　that question. I don't know what
7　else you want me to -- you're
8　searching for.
9　BY MS. YU:
10　　　Q. What did the company do
11　that was wrong?
12　　　A. They -- they took something
13　that was -- had been in existence for
14　years, decades, and said, We don't
15　care how long you've been here, we're
16　changing the rules, and we're going
17　to say that this is now the
18　retirement plan, and for those folks
19　not grandfathered, like it or not,
20　this is it.
21　　　　I would assume if they
22　said, Here's a new retirement plan;
23　here's an old retirement plan;
24　everybody, take your pick, I would

36 (Pages 138 to 141)

B0073

Page 142

1  say that would be fair.
2      Q.  Is there anything else that
3  the company did that's part of the
4  wrongdoing that you've been talking
5  about?
6      A.  Not as it pertains to
7  strictly the cash balance plan.
8      Q.  Is there anything else the
9  company has done wrong that does not
10  pertain to the cash balance plan?
11      MR. MALONE:  Object to the
12  form of the question.  The company,
13  who do you mean by the company in
14  this instance?
15      MS. YU:  Well, his
16  employer.
17      MR. MALONE:  Okay.
18      THE WITNESS:  I'm sure
19  there are other injustices that were
20  done to other people that had nothing
21  to do with this plan that I don't
22  know about.
23      I know during the mergers,
24  plural, that numerous people lost

Page 143

1  their jobs for whatever reason.  Was
2  that right or was that wrong?  It's
3  not my company, but certainly for any
4  person to have to deal with that
5  certainly is not a good thing.
6      So if you were to ask that
7  individual, I'm sure they would say
8  they've been wronged.  I've been very
9  fortunate.  I have always had my job,
10  so I can't speak about other things.
11  BY MS. YU:
12      Q.  I'm just thinking about
13  your answer, and I just want to
14  circle back, to bring it back to the
15  cash balance plan.
16      Is there anything other
17  than the adoption of the cash balance
18  plan that there was this change from
19  the old plan to this new cash balance
20  formula, is there anything else that
21  you feel the company did that was
22  part of the wrongdoing with respect
23  to the cash balance plan other than
24  adopting it?

Page 144

1      MR. MALONE:  Object to the
2  form of the question insofar as it
3  calls for a legal opinion from a lay
4  witness.  Also, object to the use of
5  the word "adopting it" which I think
6  is ambiguous given the context of the
7  record.
8  BY MS. YU:
9      Q.  Whatever word you want to
10  use to convey the fact that there was
11  a change from the old plan to
12  implement the new cash balance plan.
13  Whatever terminology you want to use
14  is fine with me.
15      MR. MALONE:  That's fine.
16      THE WITNESS:  No.  The only
17  objection that I have is the placing
18  of those people into the cash balance
19  plan with no other choices.
20      (Exhibit D-16 was marked
21  for identification.)
22  BY MS. YU:
23      Q.  Exhibit D-16.
24      A.  I'm sorry?

Page 145

1      Q.  Exhibit D-16 is an e-mail
2  trail.  Do you recognize these
3  messages?
4      A.  Yes.  If I go back to the
5  beginning, I guess that's --
6      MR. MALONE:  Let the record
7  reflect that the witness has turned
8  to the last page of what is Exhibit
9  D-16 and what would be the
10  penultimate page of D-16.
11  BY MS. YU:
12      Q.  And that is on JMC 462, an
13  e-mail from you that is dated
14  10/24 -- is that 2006?
15      A.  Yes.  '06.  Sure can't be
16  '08.
17      Q.  Not quite yet.
18      Did you send this message
19  to HR?
20      A.  Yes.
21      Q.  What prompted you to send
22  this message?
23      A.  Couple of things.  First, I
24  like having a backup to a backup, and

B0074

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 146

1   no offense to my legal firm, hope
2   this never happens, but a meteor can
3   hit him on the head right in the law
4   firm.
5         So me being the kind of
6   person that likes to have a backup to
7   a backup thought I would look into
8   seeing what opportunities there were
9   should I go back into the union,
10  which I think I stated before I was
11  previously.
12        So I posed this question to
13  HR, if I go back, what happens.
14  That's basically what the question
15  was.
16    Q.   Have you gone back to the
17  union?
18    A.   No.
19    Q.   Did you have a job offer?
20    A.   To go into the union is a
21  bidding process.  It's a posting, you
22  apply for it, if no one else gets it
23  it's yours.
24    Q.   Did you go through a

Page 147

1   bidding process for a job?
2     A.   No.
3         MR. MALONE:  No offense
4   taken, for the record.
5   BY MS. YU:
6     Q.   Are there any union jobs
7   you're interested in right now?
8     A.   No.
9     Q.   So what was the answer that
10  you got?
11    A.   The answer would be -- is
12  that if you go back into the union,
13  you will go back in as a new
14  employee.  So my 27 years of
15  seniority and service went to zero.
16        The cash balance plan would
17  freeze at that point, no other
18  contributions other than whatever
19  interest it gained would be in there,
20  and I would fall as a new employee
21  under the old retirement plan, but
22  starting as day one.  So from zero.
23    Q.   And you would get credit
24  for your 27 years of service under

Page 148

1   the cash balance plan, though?
2     A.   Well, it would freeze.  If
3   I were to go back, whatever was in
4   there would freeze, whatever value it
5   is.
6     Q.   Which accounted for the 27
7   years of service?
8     A.   Not really.
9     Q.   Oh, how not?
10    A.   Because the cash balance
11  plan was instituted in 1999, not
12  1979.
13    Q.   So how do you think it
14  should have worked?
15        MR. MALONE:  Object to the
16  form of the question.
17        THE WITNESS:  I didn't
18  know.  That's why I asked.
19        MR. MALONE:  I think the
20  what needed an antecedent in that
21  question, and I think you've asked
22  one question and you've answered
23  another, but I'm going to shut up and
24  let the lawyer do the job.

Page 149

1   BY MS. YU:
2     Q.   When you asked the
3   question, did you have something in
4   mind in terms of how the crediting of
5   service should work if you went back
6   to the union?
7     A.   No.  Again, that's why I
8   asked the question.
9         (Exhibit D-17 was marked
10  for identification.)
11  BY MS. YU:
12    Q.   Exhibit D-17 is a series of
13  documents that we received from your
14  attorney.  The first page has what's
15  called your opening cash balance on
16  it.  We'll talk about the subsequent
17  pages in a moment.
18        Do you recognize this
19  document, the first page of Exhibit
20  D-17?
21    A.   Not the first page, no.
22    Q.   Did you provide this
23  document to your attorney?
24    A.   I supplied all the

38 (Pages 146 to 149)

B0075

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 150

1  subsequent pages to my attorney. I'm
2  not sure where this first page comes
3  from, but I'm pretty sure I may have
4  seen it prior to today. I just don't
5  remember.
6      Q.  There is a figure under
7  Your Opening Cash Balance.
8          MR. MALONE:  This is a
9  section we're going to want to
10  designate as confidential, but given
11  that you might as well just go ahead
12  and use the number.
13         MS. YU:  We'll go ahead and
14  designate it confidential.
15         MR. MALONE:  That's fine.
16  BY MS. YU:
17     Q.  $138,172.25. Is that your
18  understanding of what your opening
19  cash balance account was on January
20  1st, 1999?
21     A.  I didn't have my first
22  notification what that was. I had
23  all the other ones. I'm not sure --
24  I assume that's correct. I didn't

Page 151

1  have -- like I said, I didn't have
2  all of these.
3      Q.  Do you have any reason to
4  believe it's not correct?
5      A.  I'm sorry?
6      Q.  Do you have any reason to
7  believe that that opening cash
8  balance is not correct?
9      A.  No.
10     Q.  If you look at the
11  information that is on the first page
12  of D-17, it has your Social Security
13  number. Well, actually, could you
14  confirm that that's your Social
15  Security number?
16     A.  Yes, it is.
17     Q.  Is that your correct date
18  of birth?
19     A.  Yes.
20     Q.  And the original hire date,
21  it says September 10, 1979.
22     A.  Yes.
23     Q.  Is that the date that you
24  were hired by ACE?

Page 152

1      A.  Yes.
2      Q.  And the amount of credited
3  service is 19.3095 years. Does that
4  include all the service that you
5  accrued between September 10th, 1979,
6  and December 31st, 1998?
7      A.  Yes.
8      Q.  And according to the
9  information on this statement, it was
10  that number of credited years of
11  service that was used in calculating
12  the opening balance?
13         MR. MALONE:  Object as to
14  form and foundation.
15         THE WITNESS:  I assume so.
16  BY MS. YU:
17     Q.  And assuming that it did,
18  then it took account all of the years
19  of service that you had with your
20  employer to that period of time; is
21  that right?
22     A.  Yes.
23     Q.  If you look at the second
24  two pages -- second and third pages

Page 153

1  of D-17.
2          MR. MALONE:  JMC number 9
3  and number 10.
4          MS. YU:  Yes.
5          MR. MALONE:  Let the record
6  reflect that the witness has turned
7  to the designated pages of D-17.
8  BY MS. YU:
9      Q.  Do you recognize these two
10  pages?
11     A.  Yes.
12     Q.  When did you receive this
13  statement? It looks like a statement
14  that you would receive.
15     A.  Yes. Yes. This went to my
16  home. That would be sometime around
17  the beginning of the year.
18     Q.  And the date on this
19  particular statement is for the
20  calendar year 2002?
21     A.  Yes.
22     Q.  And it indicates what the
23  opening balance was for that year; is
24  that right?

B0076

Page 154

```
1      A.  Yes.
2      Q.  So it gives an opening
3   balance and an ending balance for
4   that calendar year; is that correct?
5      A.  Yes.
6      Q.  The same information is
7   contained in the statements for
8   calendar years 2003 and 2004.  2003
9   is JMC 11 and 12 and then 2004 is JMC
10  13 and 14.  The statement for
11  calendar year 2005 is included in JMC
12  15 and 16.  Is that right?
13     A.  Yes.
14     Q.  If you compare the
15  balances, is there ever a time that
16  the balance declines from year to
17  year?  Did it ever go down?
18     A.  You're referring to the
19  ending balance on each statement?
20     Q.  Look at the ending balance
21  of each statement.
22     A.  No.
23     Q.  So each year the ending
24  balance increased?
```

Page 155

```
1      A.  Some amount, yes.
2      Q.  Take a look at JMC 17
3   through 19.  Do you recognize these
4   pages?
5      A.  Looks like a statement,
6   estimate of retirement benefits for a
7   specific retirement date.
8      Q.  Do you recall receiving
9   this?
10     A.  I may have, yes.
11     Q.  Did you request that these
12  calculations be done?
13     A.  Since this has the Vanguard
14  logo on it, I would assume it was
15  something that I requested perhaps,
16  but they may have sent it to me
17  without my request.  I couldn't
18  remember.
19     Q.  The date on these pages is
20  November 30th, 2004.  Again, it's JMC
21  17 through 19.  There are estimates
22  of benefit amounts on JMC 18 in
23  various forms.
24         Do you have any reason to
```

Page 156

```
1   doubt the accuracy of these
2   calculations?
3      A.  I have no way of proving
4   them to be anything other than
5   accurate.
6      Q.  Do you believe they're
7   accurate?
8      A.  I have to assume so.  I
9   don't have -- I don't do the
10  computations.  I don't keep -- I get
11  a statement and that's what it says
12  it's on there, so I have to assume
13  Vanguard is smart enough not to make
14  a mistake.
15     Q.  Understanding that you have
16  to rely on others to do the actual
17  calculations for you, based on the
18  information that's contained
19  regarding your date of birth and your
20  date of hire, all those things that
21  are contained in these pages from JMC
22  17 to 19, is there anything that
23  leads you to question the accuracy of
24  the information that's provided
```

Page 157

```
1   here?
2      A.  Having no other way or any
3   other thing to compare it to, I have
4   to accept it for the way it is.
5      Q.  Your date of birth and
6   termination date are accurate here;
7   correct?
8         MR. MALONE:  "Here" being
9   on JMC 17?
10        MS. YU:  17.
11        MR. MALONE:  I'm going to
12  object to the form of the question.
13        MS. HOFFMAN:  It's actually
14  a proposed termination date since
15  it's a request.
16        MS. YU:  I said date of
17  birth and date of hire.  That's what
18  I meant to say.
19        MR. MALONE:  Oh, I'm sorry.
20  I thought you said termination date.
21        THE WITNESS:  I think I'm
22  still alive.
23        MR. MALONE:  Well, you're
24  still working, too.
```

B0077

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 158

1    THE WITNESS:  I'm still
2  working, too.
3    RECESS
4  BY MS. YU:
5    Q.  Back on the record.  Mr.
6  Charles, just finally to clarify,
7  take a look at JMC 17, which is part
8  of Exhibit D-17.  Is your date of
9  birth and date of hire accurate on
10  that statement?
11    A.  Yes.
12    Q.  Now, the termination date,
13  you did not terminate your employment
14  on November 30, 2004, did you?
15    A.  No.
16    Q.  Were they taking that as an
17  assumption to calculate and estimate
18  what your retirement benefits were?
19    MR. MALONE:  Objection.
20  Lack of foundation.
21    THE WITNESS:  When you ask
22  for a statement, one of the things
23  they ask you for is when do you think
24  you'll go.  So here's the number,

Page 159

1  here's the date, and that was the
2  date that was presented.
3  BY MS. YU:
4    Q.  And that date is an
5  estimated retirement date?
6    A.  It was just a date that was
7  selected out of the air.  Like I
8  said, if you -- and I assume I did
9  this; I don't really remember.  But
10  in order for them to give you a
11  projection, not only do they need the
12  start date, but you need the stop
13  date, and so you give them the stop
14  date and that was the date I
15  selected.
16    Q.  If we go back to the first
17  page of D-17, it indicates in the
18  middle of the page in the last
19  figure, it says, The monthly accrued
20  benefit as of 12/31/98 payable at
21  normal retirement age.
22    MR. MALONE:  I object to
23  the form, payable at normal
24  retirement.

Page 160

1    MS. YU:  I'm sorry.  Thank
2  you.
3  BY MS. YU:
4    Q.  What do you understand that
5  number to be?
6    A.  I'm assuming they're making
7  a projection at this point that at
8  the normal retirement date, whatever
9  that date is, they're making an
10  estimate as that what you would
11  receive based on what's here now.
12    Q.  Do you know what normal
13  retirement is under the cash balance
14  plan?
15    A.  You can retire early at 55.
16  You have -- you need five years to
17  become vested in the plan first of
18  all.  Okay.  After the five years you
19  can take the plan with you, it's
20  transferable, and all that sort of
21  stuff.  Retirement age I believe is
22  65.  However, you can retire early at
23  55.
24    Q.  So it's your understanding

Page 161

1  of a normal retirement age at 65?
2    A.  As described under both
3  plans, yes.
4    Q.  And at least in the
5  document that shows the opening
6  account balance on January 1st, 1999,
7  again, the first page of D-17, the
8  monthly accrued benefit is $1,438.53.
9    A.  What page are you on?
10    Q.  I'm sorry.  The very first
11  page.
12    MR. MALONE:  Direct your
13  attention to the first page of D-17.
14  There's a figure reflected for
15  monthly accrued benefit as of
16  12/31/1998.  Do you see that?
17    THE WITNESS:  Yes.  The
18  1,438.53, is that number you're
19  referring to?
20  BY MS. YU:
21    Q.  Yes.
22    A.  You want me to compare it
23  to what?
24    Q.  I just wanted to make sure

B0078

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 162

1  that -- is there any reason for you
2  to question that this was accurate at
3  the time that it was calculated as of
4  12/31/98?
5      A.  I have no way of knowing
6  whether it's right or wrong.  All I
7  know is this is what was presented to
8  me.  I don't have any access to the
9  accounting within Vanguard or the
10  Conectiv plan.  So what's provided to
11  me I have to assume is correct.
12     Q.  And do you assume that
13  that's correct?
14     A.  Since it's on the page, I
15  have to, yes.
16     Q.  If we could go back to
17  Exhibit D-16.
18         MR. MALONE:  We can do
19  that.
20         THE WITNESS:  Can you put
21  this up there far out of my spill
22  range.
23  BY MS. YU:
24     Q.  On the first page of

Page 163

1  Exhibit D-16, in the top paragraph
2  there's a formula that they give you.
3  What is your understanding of what
4  this formula is?
5      A.  This is a formula that was
6  utilized under the old plan to
7  determine what your lump sum
8  retirement benefit would be.
9          MR. MALONE:  Can we have
10  the question and the answer read
11  back, because I think the witness may
12  have misspoken.
13         MS. YU:  You know, instead
14  of doing that, why don't we -- I'll
15  do it a different way.
16  BY MS. YU:
17     Q.  The e-mail says, You could
18  multiply 1.6 percent of your average
19  salary, highest five out of last ten
20  years of service, multiply by your
21  years of service under the ACE sub
22  plan.  That would give you your
23  monthly annuity amount.
24         So referring to that

Page 164

1  formula, is it your understanding
2  that that would give you at least an
3  estimate of what your benefit would
4  have been under the old plan, the
5  annuity benefit would be?
6      A.  An estimate?
7      Q.  Yes.
8      A.  I would assume it would
9  give some sort of an idea.
10     Q.  What is your current
11  salary?
12         MR. MALONE:  Subject to the
13  confidential designation?
14         MS. YU:  Yes.
15         THE WITNESS:  At the end of
16  '06 I think my last statement was and
17  don't -- I think it was $86,000.
18         Can I add to that?
19  BY MS. YU:
20     Q.  Certainly.
21     A.  That is not my base salary.
22  That's with bonus and selling back a
23  couple weeks of vacation.
24     Q.  Is it your understanding

Page 165

1  that the entire amount of your
2  salary, the approximately $86,000,
3  would be taken into account in
4  calculating your retirement under the
5  old plan?
6      A.  Under the old plan.
7      Q.  Under the old plan.
8      A.  Yes.
9      Q.  That is your understanding?
10     A.  Yes.
11     Q.  In the e-mail it says
12  highest five out of the last ten
13  years of service.  Would 86,000 be at
14  the higher end of your compensation
15  over the last ten years?
16     A.  There might have been one
17  prior year it was higher than that.
18  I'm not sure what year that would
19  have been.  Two years ago, three
20  years ago when the company did very
21  well and the bonus that was provided
22  was substantially higher.
23     Q.  Would 86,000 be a pretty
24  good estimate of the average?

42 (Pages 162 to 165)

B0079

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 166

1    MR. MALONE:  Object to the
2  form.  Average over what time?
3    MS. YU:  Average for the
4  highest five out of the last ten
5  years.
6    THE WITNESS:  That would be
7  a guess on my part.  I don't
8  really -- I don't remember each
9  year's salary.  I only remember last
10  year because I just saw the last
11  paycheck, and I do remember that
12  there was one year that I did well
13  compensation-wise because the company
14  did well that year.
15    It was -- is 86,000 an
16  average?  I don't -- I can't say yes
17  or no.  I don't know.
18  BY MS. YU:
19    Q.  But with this formula, you
20  could calculate what your monthly
21  annuity would have been under the old
22  plan; correct?
23    MR. MALONE:  Objection to
24  the form of the question.

Page 167

1    THE WITNESS:  I could use
2  it to get a rough estimate, I
3  suppose.
4  BY MS. YU:
5    Q.  Did you do that after you
6  received this e-mail?
7    A.  I didn't think it was
8  necessary at that point.  That wasn't
9  really what I was -- the primary
10  question that I was asking.  I don't
11  think that was...
12    Q.  What was your primary
13  question?
14    A.  My primary question was
15  what would -- and that was what I
16  directed to the HR department, if I
17  go back as a union representative,
18  what would I see?
19    I think she's trying to ask
20  me if you go back into the union,
21  this is how you would calculate that,
22  going back into the union.  I don't
23  think she's stating in here -- she
24  stated in here this is how you

Page 168

1  calculate currently what you would be
2  getting in your present position.
3    I think she's referring to
4  if I go back in the union and if I
5  want to know what it would be, that's
6  what I would use.
7    (Exhibit D-18 was marked
8  for identification.)
9  BY MS. YU:
10    Q.  Mr. Charles, do you
11  recognize the documents that have
12  been marked as Exhibit D-18?
13    A.  Yes.
14    Q.  Could you explain to me
15  what Exhibit D-18 is.
16    A.  Sure.  The first page lists
17  all the estimates that was done to
18  forecast what I would receive as a
19  pension annuity lump sum with a
20  specific retirement date that I would
21  request.
22    They're numbered -- I guess
23  they're in order?  Yes.  The first --
24  and there was a period of time when

Page 169

1  the only way you could get an
2  estimate like this would be to call
3  Vanguard directly and request it.
4    Then they updated their
5  website, made some improvements where
6  you could go in and do it yourself,
7  and some of these other ones were
8  done by phone.  You can see from the
9  way --
10    MR. MALONE:  Let the record
11  reflect the witness is indicating the
12  first page of what's been marked as
13  Exhibit D-18.
14  BY MS. YU:
15    Q.  Which is JMC 467.
16    So on each of the dates
17  that are listed on the first page of
18  D-18, are those dates upon which you
19  requested an estimate?
20    A.  Yes.  Either I did it or it
21  was done over the phone.
22    Q.  Are those estimates
23  attached to the first page?
24    A.  I have not looked at every

43 (Pages 166 to 169)

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 170

1  one, but I assume that's what they
2  are.
3        MR. MALONE:  There were six
4  estimates as to which we claim the
5  work product protection for which you
6  have the list and which you don't
7  have the estimate.
8        They are between May 20 and
9  July 18 when he was asked to prepare
10  estimates at my direction.  Other
11  than that, I believe the package of
12  estimates is complete.
13        MS. HOFFMAN:  Our silence
14  doesn't mean our consent.
15        MR. MALONE:  I'm not
16  interpreting that in any way, shape,
17  or form.
18  BY MS. YU:
19    Q.  Mr. Charles, if you could
20  look at the pages JMC 472 and 473 of
21  D-18.
22        Actually, I'm sorry,
23  they're not the pages I wanted you to
24  look at.  They are JMC 478 and 479.

Page 171

1        Can you tell on what date
2  you requested this pension estimate?
3        MR. MALONE:  From examining
4  these two pages or from examining the
5  document as a whole?
6        MS. YU:  From examining the
7  document as a whole.
8        THE WITNESS:  Yes.  There's
9  an ID number at the top,
10  corresponding title page, and the
11  date it was created.
12        MR. MALONE:  Referencing
13  the columns on the first page.
14        THE WITNESS:  Thank you.
15  BY MS. YU:
16    Q.  So am I correct that the
17  estimate on JMC 478 that starts on
18  that page, the number is 17054889,
19  and then if we look for that ID on
20  the first page of D-18 it corresponds
21  with estimate number 17?
22    A.  Yes.
23    Q.  Which looks like was
24  requested on April 26 of 2006?

Page 172

1    A.  That's the date I created
2  it.
3    Q.  That it was created?
4    A.  It was created.
5    Q.  The pension start date I
6  believe is on page JMC 469 listed as
7  11/1/2014; is that right?
8    A.  Start date?
9    Q.  The pension payment start
10  date.
11    A.  Well, yeah.  That would be
12  the date that I said that's when I
13  want to start taking my pension
14  payments, yes.
15    Q.  What age would you be on
16  November 1st, 2014?
17    A.  Hopefully I'm still alive.
18  I would assume I would be 64.  No.
19  65.  65.
20    Q.  And age 65 is the normal
21  retirement age under the cash balance
22  plan; is that right?
23    A.  I believe so, yes.
24    Q.  So these annuity amounts

Page 173

1  show what your monthly benefit in the
2  form of an annuity would be at normal
3  retirement age?
4        MR. MALONE:  As reflected
5  on JMC 00478?
6        MS. YU:  Yes.
7        THE WITNESS:  From this
8  projection, yes.
9  BY MS. YU:
10    Q.  Do you recall when the
11  first time was that you asked for a
12  pension estimate?
13    A.  I believe it would be 2004.
14  Spring.
15    Q.  So the list of estimates
16  that appears on the first page of
17  D-18 is not a complete list of all
18  the requests that you've made?
19        MR. MALONE:  Object to the
20  form of the question, use of the word
21  complete.
22        THE WITNESS:  There may
23  have been other ones.  I don't know
24  if there are.  I know that in 2004 is

44 (Pages 170 to 173)

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 174

1    when I started looking to see and
2    gathering more information on pension
3    payout with the cash balance plan.
4        I would assume that from
5    these dates these were all that
6    either I requested by phone or via
7    the web and there are no other ones.
8    I'm not sure when I said spring of
9    '04 whether that was correct or not.
10   BY MS. YU:
11       Q.   So there may have been
12   other estimates that you requested or
13   submitted for, but you're not certain
14   whether they're all reflected on this
15   list or not?
16       A.   I have to assume that
17   everything I asked for is reflected
18   here.  But, again, when they
19   instituted the web access, I don't
20   know if prior to that there were
21   other estimates provided that would
22   not show up on here.  So everything
23   that I have I presented to my
24   attorney.

Page 175

1        Q.   Okay.
2        (Exhibit D-19 was marked
3    for identification.)
4    BY MS. YU:
5        Q.   Mr. Charles, do you
6    recognize the document that's been
7    marked as D-19?
8        A.   Yes.  I believe this is the
9    description of a cash balance sub
10   plan in connection with the
11   retirement plan.
12       Q.   How did you obtain this
13   document?
14       A.   It can be acquired through
15   the intranet, the company's internal
16   website.
17       Q.   Is that in fact how you
18   obtained this copy?
19       A.   I believe that's how I got
20   it, yes.
21       Q.   There's a reference on the
22   second page of Exhibit 19 on JMC 78
23   that refers to transition credits.
24   Do you know whether you received any

Page 176

1    transition credits?
2        MR. MALONE:  Object to the
3    form of the question.
4        THE WITNESS:  I believe I
5    was provided some amount of
6    transition credits when I moved from
7    the old retirement plan to this plan.
8    BY MS. YU:
9        Q.   Do you have an
10   understanding of why you received
11   those transition credits?
12       A.   I'm sorry.  I could not
13   hear you.
14       Q.   Do you have an
15   understanding of why you received
16   those transition credits?
17       A.   I know there was a formula
18   that was developed to produce a
19   starting point forecast balance.  I
20   don't know how the formula was
21   created or who created it or how it
22   got put together.  That's basically
23   all I know about that.
24       Q.   What's your understanding

Page 177

1    of pay credits under the cash balance
2    plan?
3        A.   Pay credits would be each
4    year in addition to the interest that
5    a cash balance requires there's some
6    pay credits that are put into that
7    based on salary.
8        Q.   Do you know whether the pay
9    credits, the percentage of pay
10   credits, is determined by age?
11       A.   As far as I know it's based
12   on your salary.
13       Q.   Take a look at the second
14   page of D-19, and there's a part
15   that's really the bottom half of the
16   page and it says Participant's Age
17   and Pay Credit Rate.
18       A.   Uh-huh.
19       Q.   It says Under 30 it's five
20   percent; 30 to 34, six percent; 35 to
21   39, seven percent; 40 to 44 is eight
22   percent; 45 to 49 is nine percent,
23   and it says 50 and over is ten
24   percent.

45 (Pages 174 to 177)

B0082

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 178

1      Is it your understanding
2   that what percentage pay credit that
3   you get is dependent on what your age
4   is and where you fall in this
5   bracket?
6      A.  Yes.
7      Q.  So what is the percentage
8   of pay credit that you're receiving
9   now?
10      A.  I would be ten percent.
11      Q.  And then ten percent of
12   your salary; is that correct?
13      A.  That's the way it's
14   outlined, yes.
15      Q.  And is it your
16   understanding that you've received
17   pay credits in accordance with this
18   table of percentages since the
19   inception of the cash balance plan?
20      A.  From the information that
21   I've received, going back to the
22   other documents, it does indicate
23   there was a payment for that.  I
24   assume that that's correct.

Page 180

1      THE WITNESS:  From whom?
2   BY MS. YU:
3      Q.  From anybody regarding the
4   cash balance plan.
5      A.  I've asked other employees
6   if they had any handouts, brochures,
7   information as it pertained to the
8   cash balance conversion, yes.
9      Q.  Have you ever made a
10   request to the plan administrator for
11   a plan document pertaining to the
12   cash balance plan?
13      MR. MALONE:  Object to the
14   form of the question.
15      THE WITNESS:  Since I was
16   able to acquire this through the
17   intranet, I had no need to make a
18   formal request to HR, whomever there.
19   BY MS. YU:
20      Q.  From whom have you received
21   plan documents?
22      A.  When you're referring to
23   the plan documents, are you referring
24   to this document and the other --

Page 179

1      Q.  Have you read the Summary
2   Plan Description?
3      A.  I'm sorry.  What is it?
4      Q.  Have you read this Summary
5   Plan Description?
6      A.  I've read through it.  I'm
7   not completely versed on it, but I
8   have read through it.
9      Q.  Do you have any reason to
10   believe that it does not accurately
11   reflect the terms of the cash balance
12   plan?
13      MR. MALONE:  Objection.
14   Lack of foundation.
15      THE WITNESS:  Not being
16   versed in documents like this, I
17   assume that it is written
18   appropriately for a cash balance
19   plan, but I am not an expert.
20   BY MS. YU:
21      Q.  Have you ever requested
22   copies of plan documents?
23      MR. MALONE:  Object to the
24   form.

Page 181

1      MR. MALONE:  Indicating for
2   the record Exhibit D-19.
3   BY MS. YU:
4      Q.  This is a Summary Plan
5   Description, which is considered a
6   plan document.  There are other types
7   of plan documents, and I'm asking you
8   that question really in reaction to
9   your answer where you said that you
10   had asked for plan documents from
11   other employees.
12      A.  The question I asked other
13   employees was not specifically do you
14   have plan documents.  The question I
15   asked coworkers is do you have any
16   information on the cash balance plan.
17   Never specifically did I ask for a
18   plan document.
19      Q.  Did you receive any plan
20   documents from your coworkers or
21   whoever you asked that question of?
22      A.  I may have, but, again, all
23   the documentation I received from
24   coworkers I did not identify, tag,

46 (Pages 178 to 181)

B0083

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 182

1   label in any way.  So their
2   information just got mixed in with
3   what I had, what I acquired off the
4   Internet, or what I got from AARP all
5   lumped together.
6        Q.  I don't think we ever
7   finished the conversation about the
8   categories of people that you talked
9   to about the cash balance plan.
10       You described conversations
11  that you had with coworkers, and then
12  we also talked about conversations
13  you had with family and friends.
14       I want to make sure I cover
15  the conversations that you had with
16  people in HR or any questions that
17  you had about the cash balance plan
18  that you directed, really, toward
19  your employer.
20       In that category of types
21  of conversations, we looked at a
22  couple e-mails that you sent.  Are
23  there other communications, whether
24  by e-mail or verbally, that you had,

Page 183

1   or in writing, with other people at
2   HR or who were administering the
3   plan?
4        MR. MALONE:  Object to the
5   form of the question.  Go ahead and
6   answer.
7        THE WITNESS:  I may have
8   had some verbal conversations with
9   people at HR prior to these e-mails.
10       MR. MALONE:  Verbal meaning
11  oral?
12       THE WITNESS:  Telephone
13  call.  Not face to face.  I don't
14  even remember whom I may have spoke
15  to around the cash balance and around
16  the old sub plan.
17  BY MS. YU:
18       Q.  Would those telephone
19  conversations have been any different
20  from the kinds of questions that you
21  were asking in your e-mails?
22       MR. MALONE:  Object to the
23  form of the question.  Lack of
24  foundation.  You haven't actually

Page 184

1   established that he had a telephone
2   conversation.
3        THE WITNESS:  I would have
4   to assume that all my inquiries that
5   I had made verbally, over the phone,
6   to people in HR, had something to do
7   with either the old sub plan or the
8   cash balance plan.  I don't know any
9   other reason why I would be asking
10  questions.
11  BY MS. YU:
12       Q.  Other than the
13  conversations that we've talked about
14  already, are there any other
15  categories of people that you've had
16  conversations with about the cash
17  balance plan?
18       MR. MALONE:  I'm going to
19  object to the form.  Basically my
20  concern is we covered this in the
21  morning, and now it's several hours
22  later and I'm not sure that any of us
23  remember what he's covered.  That's
24  my concern.  But you can answer the

Page 185

1   question to the best of your ability.
2        THE WITNESS:  I'm sure that
3   there are many people that I've
4   spoken to at different levels about
5   the cash balance plan.  Do I remember
6   every single conversation?  No.  Are
7   there any that stick out in my mind?
8   Not particularly.  Just many
9   conversations.  I can't answer you
10  any other way.
11  BY MS. YU:
12       Q.  Is there anything about a
13  cash balance plan in and of itself
14  that you think is age discriminatory?
15       MR. MALONE:  Object to the
16  form of the question insofar as it
17  calls for a legal opinion from a lay
18  witness.  You can answer to the best
19  of your ability and understanding.
20       THE WITNESS:  My limited
21  knowledge, not being an expert, what
22  I am able to understand from written
23  documentation on the Internet and
24  publications is that the cash balance

B0084

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 186

1  plan when provided to older employees
2  puts them at a disadvantage.
3       If I was 22 years old or 23
4  years old starting in a new company
5  in a cash balance plan, I probably
6  would have had no objections to it.
7  BY MS. YU:
8       Q.  So if that younger worker
9  in their twenties stays working for
10  the same company in a cash balance
11  plan until their fifties, would the
12  cash balance plan be age
13  discriminatory by the time that they
14  reached their fifties?
15       MR. MALONE:  I have the
16  same objection insofar as it calls
17  for a legal conclusion.
18       THE WITNESS:  Not knowing
19  that and only going by the material
20  that was presented at various times
21  from the company, that that's what
22  the message was that they presented,
23  that if a young person moves in the
24  cash balance plan at a young age

Page 187

1  they'll be fine.
2       MS. YU:  Could you read
3  back that answer, please.
4       MR. MALONE:  You can read
5  the question, too.
6       (The reporter read back the
7  following testimony:
8       "Q.  So if that younger
9  worker in their twenties stays
10  working for the same company in a
11  cash balance plan until their
12  fifties, would the cash balance plan
13  be age discriminatory by the time
14  that they reached their fifties?
15       "A.  Not knowing that and
16  only going by the material that was
17  presented at various times from the
18  company, that that's what the message
19  was that they presented, that if a
20  young person moves in the cash
21  balance plan at a young age they'll
22  be fine.")
23  BY MS. YU:
24       Q.  What materials are you

Page 188

1  referring to?
2       A.  What I've read in AARP,
3  that kind of thing.
4       Q.  Okay.  So not necessarily
5  materials from the company?
6       A.  No.  No.
7       Q.  Is there any material that
8  you've received from the company that
9  you feel supports your age
10  discrimination claim?
11       MR. MALONE:  Object to the
12  form of the question as far as it
13  calls for a legal conclusion from a
14  lay witness.
15       THE WITNESS:  The
16  information itself?  The printed
17  information that was supplied,
18  whether -- I'm not sure.  I know as
19  it affects me personally -- could you
20  repeat that question, because I'm
21  getting -- we've been going over this
22  all day long; I'm starting to get
23  fuzzy.
24  BY MS. YU:

Page 189

1       Q.  I'm just asking whether
2  there is any material that you
3  received from your employer that you
4  think supports your claim of age
5  discrimination with respect to the
6  cash balance plan.
7       MR. MALONE:  I have the
8  same objection, that it calls for a
9  legal conclusion.
10       THE WITNESS:  The piece
11  that I would assume would give that
12  impression would be the age at which
13  you would be placed into the cash
14  balance plan.  For me that would be
15  49 years and whatever months.
16  BY MS. YU:
17       Q.  I just want to make sure
18  that I understand.  Are you referring
19  to the grandfathering clause?
20       A.  Yes.
21       Q.  Are there any other
22  materials that you feel supports your
23  claim of age discrimination from the
24  company?

48 (Pages 186 to 189)

B0085

Page 190

1    A.  Other than material stating
2 that 50 years old was the cutoff.
3    Q.  Aside from the
4 grandfathering provision, do you
5 think the conversion itself to the
6 cash balance plan was age
7 discriminatory?
8       MR. MALONE:  Object to the
9 form of the question.
10      THE WITNESS:  That's an
11 open-ended question.  I can't answer
12 that question.  I mean, are you
13 asking for somebody who's 49?  47?
14 48?  30 years old?  I don't -- I
15 can't answer that question.
16      I just know that people who
17 are older, not quite 50, but older
18 people just as far as population
19 goes, by not being grandfathered
20 would not acquire the same retirement
21 benefit.
22 BY MS. YU:
23    Q.  So you're saying it depends
24 on what the age of the individual was

Page 191

1 at the time of the conversion?
2       MR. MALONE:  Object again
3 as to calls for a legal conclusion.
4       THE WITNESS:  I would
5 assume that.
6 BY MS. YU:
7    Q.  So if the cash balance plan
8 had been in place from the time you
9 started working at the company, would
10 that cash balance plan have been age
11 discriminatory?
12      MR. MALONE:  Objection.
13 Lack of foundation.  Calls for
14 speculation.
15      THE WITNESS:  I have no
16 idea.  I don't know.  You're asking
17 me to go back in time 27 years and
18 project forward.  I can't do that.  I
19 don't know.
20 BY MS. YU:
21    Q.  The reason I stated the
22 question in that way was to clarify
23 my understanding of what you're
24 claiming is wrongful about the cash

Page 192

1 balance plan.  Let me try it a
2 different way.
3       From what I gather, the
4 fact that the grandfathering clause
5 applied only to certain individuals
6 with a certain age and level of
7 service, that is one way that you
8 feel the cash balance plan is age
9 discriminatory; is that right?
10    A.  Yes.
11    Q.  And I just want to make
12 sure that I have a complete
13 understanding of all the ways that
14 you feel that the cash balance plan
15 is age discriminatory.
16      MR. MALONE:  Subject to the
17 objection that you're asking for
18 legal conclusions from a non-lawyer.
19      MS. YU:  I'm not asking him
20 to make legal conclusions, but I
21 understand your objection, so we'll
22 leave it there.
23 BY MS. YU:
24    Q.  I just want to make sure

Page 193

1 that I understand all the ways that
2 you think the cash balance plan harms
3 you -- harms participants because of
4 age.
5       MR. MALONE:  Same
6 objection.
7 BY MS. YU:
8    Q.  I'm just trying to state
9 the question to ask, is there
10 anything about the cash balance
11 formula itself?
12      And the reason I took it
13 back to day one is that that takes
14 the grandfathering clause out of it.
15 There would be no reason to
16 grandfather anybody because everybody
17 had that plan.
18      So if everybody had that
19 plan, do you think there's anything
20 age discriminatory about a cash
21 balance plan in and of itself?
22      MR. MALONE:  Objection.
23 Calls for speculation.
24      THE WITNESS:  It's

49 (Pages 190 to 193)

B0086

Page 194

1 conjecture. I can't answer that
2 question. You're asking me to answer
3 something that I have no knowledge of
4 or no experience in. I don't know.
5      I can't -- I can't honestly
6 tell you yes, it is, or no, it isn't
7 age discriminatory based on starting
8 at 29, 28, 25, or 39. I can only
9 tell you from my experience and in
10 that age that certainly appears to be
11 that way.
12 BY MS. YU:
13     Q. Is it your understanding
14 that you receive interest credits as
15 well under the cash balance plan?
16     A. Yes.
17     Q. And do those interest rates
18 fluctuate?
19        MR. MALONE: Object to the
20 form of the question.
21        THE WITNESS: Yes. I
22 believe they're based on a 30-year
23 treasury note, something along those
24 lines.

Page 195

1 BY MS. YU:
2     Q. Do you feel that you've
3 been harmed as a result of
4 fluctuations in the interest rate
5 that has been applied under the cash
6 balance plan?
7     A. The only way I can answer
8 that is knowing all those aspects is
9 that --
10        MR. MALONE: Can you answer
11 that question without getting into
12 discussions that we've had in the
13 context of an attorney-client
14 relationship?
15        THE WITNESS: Difficult.
16        MR. MALONE: Answer it as
17 best you can without revealing the
18 substance of our communications. If
19 you can't, you can't.
20        But if you can fairly meet
21 the substance of her question without
22 revealing things that we exchanged as
23 part of our attorney-client
24 relationship, then you should.

Page 196

1        THE WITNESS: It would be
2 difficult for me to try to answer
3 that question without violating the
4 client-attorney relationship.
5 BY MS. YU:
6     Q. Can you try?
7     A. Rephrase it. Restate it,
8 the question.
9     Q. I'm asking whether you feel
10 that any fluctuations in the interest
11 rate as applied as part of the
12 interest credit under the cash
13 balance plan has resulted in harm to
14 you.
15        MR. MALONE: Can you answer
16 that question without revealing the
17 substance of our communications on
18 that subject matter?
19        THE WITNESS: The interest
20 credits that I received, I do not
21 know whether they're right or they're
22 wrong, if they're harmful, if they're
23 good. I don't know.
24        (Exhibit D-20 was marked

Page 197

1 for identification.)
2 BY MS. YU:
3     Q. Mr. Charles, do you
4 recognize the exhibit that's been
5 marked as D-20?
6     A. Yes.
7     Q. Did you draft any part of
8 this document?
9     A. You say draft. Did I write
10 any of it?
11     Q. Yes.
12     A. I supplied some information
13 I'm sure that was utilized in this,
14 but I did not draft it, no.
15     Q. What information did you
16 provide that was used in preparing
17 the Complaint that's been marked as
18 D-20?
19        MR. MALONE: Hold on a
20 second. Can you read that back? I
21 need to think about this one a little
22 bit.
23        (The reporter read back the
24 following testimony:

B0087

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 198

1      "Q.  What information did
2  you provide that was used in
3  preparing the Complaint that's been
4  marked as D-20?")
5          MR. MALONE:  Here's my
6  concern.  When you ask an open-ended
7  question like that, there's stuff
8  that he's given me that was given me
9  clearly for the purpose of winding up
10  in the Complaint.
11          Then there's other
12  information we've exchanged which may
13  or may not be reflected in the
14  document.  So it would be more
15  comfortable for me and less likely to
16  generate an instruction not to answer
17  if you would point him at a
18  particular segment of the Complaint.
19          It's your deposition;
20  you'll do it whatever way you want,
21  but just from my perspective I think
22  that might actually might work
23  better.
24          MS. YU:  I understand your

Page 199

1  concern.  As soon as I asked the
2  question I -- not that I'm soliciting
3  any attorney-client privileged
4  information here.
5          MR. MALONE:  I didn't think
6  you were.  I don't know what he's
7  going to say.
8          MS. YU:  Understood.
9  BY MS. YU:
10      Q.  Mr. Charles, if you take a
11  look at page 13 of Exhibit D-20 and
12  specifically paragraph 41.
13          MR. MALONE:  You should
14  read the paragraph carefully yourself
15  and let her then ask some questions
16  about it rather than try to do both
17  at once.
18  BY MS. YU:
19      Q.  Have you had a chance to
20  review the paragraph?
21      A.  That one paragraph, yes.
22  Paragraph 41?
23      Q.  Yes.  Paragraph 41
24  describes the conversion of account

Page 200

1  balance to an annuity commencing at
2  age 65.  Is that your understanding?
3      A.  Yes.
4      Q.  Then there are allegations
5  with respect to the annuity amount
6  fluctuating from year to year.  It
7  says specifically that your annuity
8  decreased in 2001, 2002, and 2003.
9          Is that the basis for your
10  feeling that the cash balance plan is
11  age discriminatory?
12      A.  There are several bases to
13  that, this being one of them.
14      Q.  When you say there are
15  several bases for that, you mean
16  there are several bases for your
17  feeling that the cash balance plan is
18  age discriminatory?
19      A.  You're saying feeling.
20  Feelings mean something different
21  than actual numbers.  So if you're
22  asking me how I feel, that's totally
23  different than what numbers may
24  reflect.

Page 201

1          So to answer your question,
2  do I feel that the cash balance plan
3  is age discriminatory based on this
4  and solely on this or other things?
5  You're saying other things.
6      Q.  You said this was one of
7  several things.
8      A.  Right.  The other thing
9  is --
10      Q.  Let's focus on the thing
11  first, though.
12      A.  Okay.
13      Q.  And my use of the word feel
14  like it's age discriminatory is
15  probably not a good word.  I'm trying
16  to avoid your objection.
17          So I am not asking you to
18  suddenly become an attorney to be
19  able to make a legal conclusion, but
20  from what I understand the reason
21  that you brought this lawsuit is
22  because you feel that, or you think,
23  or it is, and that remains to be
24  determined, I guess we haven't gone

51 (Pages 198 to 201)

B0088

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 202

1  through the answer part of what your
2  claims are, but I assume that one of
3  the claims that you are asserting is
4  that the cash balance plan is age
5  discriminatory.
6      A.  Yes.
7      Q.  And I assume that because
8  you were bringing the age
9  discrimination claim that it's your
10  position that there is support for
11  that.
12     A.  It's one of the reasons.
13     Q.  So let me clarify that the
14  decrease in your annuity that's
15  described in paragraph 41, is that
16  one of the reasons that you think
17  supports your claim of age
18  discrimination?
19     A.  Yes.
20     Q.  How so?
21     A.  Reduced benefits.
22     Q.  Do you know why your
23  annuity decreased from year to year?
24         MR. MALONE:  Can you answer

Page 203

1  that without getting into substance
2  of our communications?
3         THE WITNESS:  No.
4  BY MS. YU:
5      Q.  Paragraph 41 also states
6  that in 2004 your annuity increased
7  by 8.43 percent.  Is that a fact that
8  supports your claim of age
9  discrimination?
10         MR. MALONE:  Object to the
11  form of the question.  You're not
12  fairly construing the allegation as a
13  whole; you've quoted one part of the
14  sentence.
15         THE WITNESS:  41 in itself
16  is one aspect of my Complaint.  I
17  can't narrow in on one number, one
18  line, and one sentence.  I can't say
19  that because one year it decreased,
20  that's the reason why.  It's in its
21  entirety.
22  BY MS. YU:
23     Q.  Okay.  Explain to me how
24  paragraph 41 in its entirety supports

Page 204

1  your claim that the cash balance plan
2  was age discriminatory.
3         MR. MALONE:  Object insofar
4  as it calls for a legal conclusion.
5  Testify to the best of your knowledge
6  and understanding without revealing
7  the substance of our communications.
8         THE WITNESS:  As it's
9  formulated in 41, in my eyes it
10  indicates that there is some form of
11  discrimination.  I'm having
12  difficulty answering your questions
13  because you seem to keep going back
14  and back on the same question.
15  BY MS. YU:
16     Q.  I need to have a clear
17  understanding of what the basis for
18  your age discrimination claim is, and
19  I would like to know how paragraph 41
20  fits in to your age discrimination
21  claim.
22         MR. MALONE:  Same objection
23  to the extent it calls for a legal
24  conclusion.  And, again, caution the

Page 205

1  witness not to reveal the substance
2  of communications with counsel.
3         THE WITNESS:  Think of it
4  as one item, one proof, one aspect of
5  the whole picture, the way it's laid
6  out is presenting a conclusion
7  that -- based on these numbers.
8         I don't know how else I can
9  answer that question that you would
10  like me to answer without getting
11  into client-attorney information.
12  BY MS. YU:
13     Q.  How are the fluctuations
14  described in paragraph 41, how were
15  they caused on account of age?
16         MR. MALONE:  Objection to
17  the form of the question.  Also be
18  careful when you frame your response
19  that you do not reveal the substance
20  of our communications.
21         THE WITNESS:  Since this is
22  part of our brief -- Complaint, I
23  can't really answer it any more than
24  the way I have without getting into

B0089

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 206

1  client-attorney privileges.  I cannot
2  answer you any other way.
3  BY MS. YU:
4     Q.  Do you know, do you
5  yourself have an understanding of
6  what caused these fluctuations in
7  your annuity?
8        MR. MALONE:  That question
9  calls for a yes-or-no answer.
10       THE WITNESS:  Yes.
11  BY MS. YU:
12     Q.  What is your personal
13  knowledge?
14       MR. MALONE:  Can you answer
15  that question without revealing the
16  substance of our communications?
17       MS. YU:  It's about his
18  knowledge, not about your
19  communications.
20       MR. MALONE:  But if his
21  knowledge is derived from our
22  communications and our work product,
23  it's privileged.
24       MS. YU:  How does it become

Page 207

1  his knowledge if it's just
2  communication that you made to him?
3        MR. MALONE:  Client comes
4  to a lawyer with a problem; client
5  gives lawyer background facts about
6  client's situation.  Lawyer conducts
7  an investigation designed to
8  determine client's rights based upon
9  the facts provided the client.
10       The lawyer conducts sources
11  and develops data and information.
12  Lawyer conveys that data and
13  information to client in conjunction
14  and in the course of rendering legal
15  advice and in anticipation of
16  prospective litigation.
17       I think that you're going
18  to find that any knowledge that he
19  has on the subject of these
20  fluctuations came from me.  In fact,
21  you haven't established yet that he
22  knew about these fluctuations before
23  he contacted a lawyer.
24       MS. YU:  I'm just talking

Page 208

1  about the factual allegations that
2  appear in --
3        MR. MALONE:  I will tell
4  you that the factual allegations
5  about how his accrued benefit
6  decreased in particular years and
7  increased in particular years
8  represents attorney-work product.
9        MS. YU:  Okay.
10  BY MS. YU:
11     Q.  Mr. Charles, do you have
12  information regarding your annuity at
13  normal retirement age for the years
14  from 1999 through 2004?
15       MR. MALONE:  That's a yes
16  or no.
17       THE WITNESS:  Yes.
18  BY MS. YU:
19     Q.  How did you obtain that
20  information?
21     A.  Through the Vanguard
22  estimates.
23     Q.  When did you obtain those
24  estimates?

Page 209

1     A.  In a prior documentation.
2  The dates are there.
3        MR. MALONE:  Can you read
4  back the last two questions and
5  responses?
6        (The court reporter read
7  back the following:
8        "Q.  Mr. Charles, do you
9  have information regarding your
10  annuity at normal retirement age for
11  the years from 1999 through 2004?
12       "A.  Yes.
13       "Q.  How did you obtain
14  that information?
15       "A.  Through the Vanguard
16  estimates.")
17  BY MS. YU:
18     Q.  So if we look at Exhibit
19  D-18 --
20     A.  Is that 18?
21       MR. MALONE:  Yes.  That's
22  this one.
23  BY MS. YU:
24     Q.  Which of the estimates

B0090

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 210

1  contain that information?
2     A.  I'm sorry?
3     Q.  Which of the estimates that
4  appear on the first page of Exhibit
5  D-18 contain that information?
6     A.  Every single one.  Each
7  estimate provides a lump sum and
8  annuity amount.
9     Q.  At normal retirement age?
10    A.  At the projected retirement
11 age that I requested.  There is one
12 in there for the age 65.  We're
13 looking for age 65.  It's here.
14    Q.  Did you create any of these
15 pension estimates at the request of
16 your attorney?
17    A.  Yes.
18       MR. MALONE:  Those are the
19 ones that you don't have.  They did
20 not form the basis of that allegation
21 in paragraph 41.
22       MS. HOFFMAN:  When you say
23 "they," which do you mean?
24       MR. MALONE:  None of the

Page 211

1  estimates form the basis for that.
2  That's why I said the paragraph is
3  work product.
4        MS. HOFFMAN:  These
5  estimates or the estimates you
6  withheld?
7        MR. MALONE:  None of the
8  estimates generated from the Vanguard
9  site whether those produced in D-18
10 nor the six that we've indicated that
11 we have withheld on the basis of work
12 product formed the predicate for the
13 allegations related to his accrued
14 benefit as stated in paragraph 41 of
15 his Complaint.
16       Instead, as I indicated to
17 you earlier, that information is
18 attorney work product derived from
19 data.
20       MS. YU:  It was provided by
21 Mr. Charles?
22       MR. MALONE:  Can we go off
23 the record and maybe I can clarify
24 this and then we can go back on?

Page 212

1        (Discussion off the
2  record.)
3        MR. MALONE:  While we were
4  off the record we had a colloquy to
5  try and explain for the benefit of
6  the defendant the source data
7  underlying the allegations of
8  paragraph 41, and in words or in
9  substance what I tried to convey to
10 them and hopefully explained was
11 this:
12       Mr. Charles cannot look at
13 his annual account statements under
14 the cash balance plan and tell what
15 his accrued benefit defined as a
16 single life annuity commencing at age
17 65 is.
18       Mr. Charles provided me
19 with a variety of data.  I had, as
20 you can see from account statements,
21 his date of birth, his hire date, his
22 years of service.  I had his account
23 balances at various points in time.
24       Taking that information we

Page 213

1  were then able to generate an annual
2  accrued benefit expressed as an age
3  65 annuity for each year, and it is
4  that work product of ours that
5  underlies the allegations in
6  paragraph 41 in the Complaint.
7        The work product is derived
8  from the basic raw data that we've
9  been talking about.  One, when did
10 you start, what -- you know, all
11 that.  But he didn't come to me and
12 say, My annuity went down by 8.43
13 percent.
14       Okay.  That in substance is
15 what we discussed, and that's the
16 representation that I'll make with
17 respect to paragraph 41.
18       MS. YU:  Very good.
19 BY MS. YU:
20    Q.  Taking a look at Exhibit
21 D-20 again, can you turn to page 14.
22    A.  14.
23    Q.  Under Count I there is an
24 allegation with respect to minimum

B0091

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 214

1  accrual requirements.  What's your
2  understanding of the claim that you
3  are asserting in Count I?
4        MR. MALONE:  Give her your
5  best layman's understanding.  Don't
6  tell her the substance of things that
7  I told you.
8        THE WITNESS:  It's going to
9  be difficult to separate those
10  conversations.  I'll try to answer
11  this way.  That I know under ERISA
12  there are certain regulations for
13  funding that must be met.
14        And I believe that the cash
15  balance plan under the work that
16  was -- we have done prove that it's
17  not meeting them.
18  BY MS. YU:
19     Q.  Count II is brought under
20  Section 204 (b)(1)(G) of ERISA.  Can
21  you tell me what your understanding
22  is of the claims that you are
23  asserting in Count II.
24        MR. MALONE:  Take your time

Page 215

1  to read that section of the Complaint
2  which appears on page 14 and 15 of
3  Exhibit D-20, and under the same
4  instructions, give her your best
5  layman's understanding; don't give
6  her the substance of things that I've
7  told you as your lawyer.
8        THE WITNESS:  Could you
9  repeat your question?
10  BY MS. YU:
11     Q.  What is your understanding
12  of the claims that you are asserting
13  in Count II of your Complaint?
14     A.  Again, as I interpret what
15  ERISA states that in subsequent years
16  under the cash balance plan I don't
17  receive the full benefit that I
18  should be getting.  That's as far as
19  I can go without revealing other
20  sources.
21     Q.  Do you know what an accrued
22  benefit is as that term is defined
23  under ERISA?
24        MR. MALONE:  Object to the

Page 216

1  form of question.  That calls for a
2  legal conclusion.  You can testify to
3  your understanding, but you can't
4  testify to what I told you.
5        THE WITNESS:  Accrued
6  benefit is a benefit that develops
7  over a period of years.
8  BY MS. YU:
9     Q.  Is it your understanding
10  that an accrued benefit is expressed
11  in the form of an annuity at the age
12  of 65 of normal retirement age?
13     A.  As it pertains to the cash
14  balance plan?
15     Q.  Yes.
16     A.  Yes.
17     Q.  That is your understanding?
18     A.  (Witness nods.)
19        MR. MALONE:  You've got to
20  verbalize.
21        THE WITNESS:  Yes.
22  BY MS. YU:
23     Q.  Count III is a claim under
24  Section 204 (b)(1)(H) --

Page 217

1        MR. MALONE:  Count III is
2  stayed so we shouldn't be taking any
3  discovery as to it.
4        MS. YU:  I'm sorry.  You're
5  absolutely right.
6        MR. MALONE:  You fought
7  valiantly.
8        MS. YU:  Thank you for the
9  reminder.
10  BY MS. YU:
11     Q.  Moving on to Count IV, it's
12  a claim brought under section 204(h)
13  of ERISA.  What is your understanding
14  of the claims you are asserting in
15  Count IV?
16        MR. MALONE:  Reread Count
17  IV as set forth on D-20, testify to
18  your layman's understanding without
19  revealing the substance of our
20  communications.
21        THE WITNESS:  Could you ask
22  your question again, please.
23  BY MS. YU:
24     Q.  What is your understanding

55 (Pages 214 to 217)

B0092

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 218

1  of the claims that you are asserting
2  in Count IV of your Complaint?
3       A.   Again, without trying to
4  break our bond, what I believe is
5  that the current plan as it exists
6  does not provide the same benefit,
7  employees were not notified that the
8  new plan would provide less benefit,
9  and that this reduction, because it
10  was not explained to us, fails this
11  article.
12      Q.   Can we take a look at
13  Exhibits D-5 and D-6.
14          MR. MALONE:  Sure.  It will
15  just take me a minute to go find them
16  in the pile.
17          THE WITNESS:  We're not
18  supposed to be going backwards.
19          MR. MALONE:  D-5 and D-6?
20          MS. YU:  Yes.
21          MR. MALONE:  I grabbed D-5
22  and D-4.  I'm sorry.  Let me get my
23  act together here.
24  BY MS. YU:

Page 219

1       Q.   Mr. Charles, we talked
2  about Exhibit D-5 and Exhibit D-6
3  earlier, and you testified that you
4  did not have a recollection one way
5  or the other as to whether you
6  received these documents in 1998.
7       A.   Yes.
8       Q.   Do you have any reason to
9  believe that these documents were not
10  mailed to you by your employer?
11  Let's take one exhibit at a time.
12          MR. MALONE:  Thank you.
13          THE WITNESS:  Okay.
14  BY MS. YU:
15      Q.   Let's take D-6.  D-6 is
16  dated December 21, 1998.  Do you have
17  any reason to believe that your
18  employer did not send this document
19  to you on or around December 21st,
20  1998?
21      A.   Since it's not addressed to
22  me, I can assume that it came from
23  some source.  I don't know where.  I
24  cannot say that I did not see it on

Page 220

1  or around December 21st, '98 or
2  January of 2000.  I don't even
3  remember where I may have acquired
4  this document.
5       Q.   I understand that.
6       A.   Right.
7       Q.   My question has to do with
8  whether you have any personal
9  knowledge regarding whether or not
10  your employer sent this document to
11  you.
12      A.   Again, they -- I can't say
13  yes or no.  I don't know.  There's no
14  address.  It may have been.
15          MR. MALONE:  She's asking
16  in substance, do you have any facts
17  in your knowledge that you could rely
18  upon to say I didn't get this?
19          MS. YU:  Or they didn't
20  send it.
21          MR. MALONE:  I think that's
22  what she's trying to get at.
23          THE WITNESS:  No.  I don't
24  have any facts to prove it one way or

Page 221

1  the other.
2  BY MS. YU:
3       Q.   I'm going to do the same
4  thing with D-5.  Do you have any
5  personal knowledge, or are there
6  other facts that you can point to
7  that establish that your employer did
8  not send this document that's in D-5
9  to you in 1998?
10          MR. MALONE:  I'm going to
11  object to the form of that just
12  because, as we've discussed before,
13  the documents are undated and we have
14  no way of knowing the date.  If you
15  could break it down, I would be
16  happier.
17          In other words, ask him if
18  he knows and then tie it to the date.
19  You would have a cleaner record that
20  way.
21          MS. YU:  Okay.
22  BY MS. YU:
23      Q.   Regardless of the time
24  frame -- I'll just take it from

B0093

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 222

1  there -- do you have any personal
2  knowledge, are there any facts that
3  you can point to that show that this
4  document that's in D-5 was not sent
5  to you?
6      A.  I don't have any facts to
7  prove it one way or the other.  I
8  know that these types of information
9  were just on a desk, in a holder, on
10  a bulletin board.
11         You're walking by, oh,
12  what's that.  That kind of thing.
13  They were not directly mailed to
14  individuals.
15      Q.  Do you know for a fact that
16  this particular document that's been
17  marked as Exhibit D-5 was one of
18  those documents that you were
19  describing, the materials that were
20  left to pick up?  Do you know with
21  certainty that this was one of those
22  documents?
23      A.  I don't know for certainty
24  whether it was left, whether it was

Page 223

1  printed.  I have no recollection.  I
2  can't answer that.
3      Q.  So, again, you don't have
4  any personal knowledge with respect
5  to whether or not your employer in
6  fact sent Exhibit D-5 to you?
7      A.  No.
8      Q.  On top of that, you don't
9  have any information that this
10  document that's in Exhibit D-5 was
11  not sent to you sometime in 1998?
12      A.  The only way I can answer
13  that is that this type of device,
14  communication was not, to my
15  knowledge, mailed, presented,
16  hand-delivered to anyone.
17         So I can't say for sure
18  that I did or didn't walk by, pick
19  one up, oh, what is that, or didn't.
20  I don't know.
21      Q.  That wasn't my question.
22         MR. MALONE:  She's trying
23  to focus you on a temporal scope.
24  It's important to her when this was

Page 224

1  disseminated.  If you know when it
2  was disseminated --
3         MS. YU:  That's one thing.
4  I'm also asking sort of a negative of
5  that.
6         MR. MALONE:  I understand.
7  BY MS. YU:
8      Q.  Do you know that it wasn't
9  in 1998?  Now, I understand your
10  testimony that there was some
11  information that was left for
12  employees to pick up and all that.
13         But my question is specific
14  to this particular exhibit and the
15  time frame that we're talking about
16  now that we've added to this
17  question.
18         And the question is, do you
19  have any personal knowledge to show
20  that this exhibit, D-5, was not sent
21  to you by your employer in 1998?
22      A.  The difficulty with that
23  question, you keep saying to me, was
24  it sent to me.

Page 225

1      Q.  I'm not saying was it sent
2  to you.  I'm not asking you that.
3         MR. MALONE:  Why don't you
4  rephrase the question, made available
5  to you, which I think would embrace
6  his concept of it being left on
7  desktops or kiosks or on bulletin
8  boards, and then focus the question
9  on temporal scope.
10         Is that what you're
11  trying --
12         MS. HOFFMAN:  How about the
13  document was or wasn't issued.
14         MR. MALONE:  Issued is
15  fine.  Issue works.  You say sent; he
16  thinks through the mail.
17         THE WITNESS:  Or handed to
18  me.
19         MS. YU:  I can do it both
20  ways.
21         MR. MALONE:  That's fine.
22         MS. YU:  I can do it both
23  ways.
24         MR. MALONE:  That's cool.

B0094

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 226

1    Nice clean record.
2    BY MS. YU:
3        Q.  I want my question answered
4    as well.  So we'll do it your way
5    first.  The question is, Exhibit
6    D-5 --
7        A.  Yes.
8        Q.  -- do you have any personal
9    knowledge that this exhibit was not
10   issued to you at some point during
11   the year 1998?
12       A.  No.
13       Q.  Do you have any personal
14   knowledge that Exhibit D-5 was not
15   sent to you by your employer at some
16   point during 1998?
17       A.  I'm confident that it was
18   not sent to me via mail because of
19   the way this is distributed.  It's
20   not mailed.  It is a hand-out at a
21   kiosk or a table top.
22       Q.  Do you have specific
23   knowledge with respect to this
24   particular exhibit that that was the

Page 227

1    way this particular exhibit in D-5
2    was issued?
3        A.  Could you repeat that one
4    more time?
5        Q.  You've talked about how
6    certain information was left for
7    employees to pick up from time to
8    time by your employer; is that right?
9        A.  Yes.
10       Q.  Do you know with certainty
11   that the Exhibit D-5, the information
12   that's presented in the facts
13   newsletter was presented in that way,
14   that it was left for individuals to
15   pick up?  Do you have a specific
16   recollection of this particular
17   exhibit?
18       MR. MALONE:  As contrasted
19   with something that might be laid out
20   the same way, similar font, similar
21   typeface?
22       MS. YU:  Correct.
23       THE WITNESS:  I have no
24   knowledge as to whether it was

Page 228

1    provided or it wasn't provided.  I
2    don't remember the document.  I don't
3    remember picking it up.  I don't
4    remember reading it.
5        I can't answer that any
6    other way, other than I know I'm
7    repeating myself, it was not mailed
8    to me.
9    BY MS. YU:
10       Q.  How do you know it was not
11   mailed to you?
12       A.  Because this type of
13   information was not sent through the
14   mail.
15       Q.  So you know with certainty
16   that this type of information was
17   never sent to you in the mail?
18       A.  As far as I know, I've
19   never received it in the mail.
20       Q.  But you don't have any
21   recollection with respect to this
22   particular document --
23       A.  No.
24       Q.  -- that's Exhibit D-5?

Page 229

1        A.  No.
2        MS. YU:  Can we take a
3    quick break?
4        MR. MALONE:  That would be
5    wonderful.
6        RECESS
7    BY MS. YU:
8        Q.  Let's do some calculations.
9        A.  Let's do some calculations.
10       Q.  Yes.  We're going to
11   calculate what your accrued benefit
12   under the old plan would be based on
13   the e-mail that was sent to you; it's
14   D-16.
15       MR. MALONE:  I remember
16   that.  I don't know if we're going to
17   be able to do a calculation but we'll
18   see.
19       MS. YU:  We should have
20   brought a calculator.
21       THE WITNESS:  Sorry.  I
22   don't have one.
23       MR. MALONE:  Well, we can
24   certainly button down what the inputs

B0095

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 230

1    would be.  Whether we'll be able to
2    generate calculations, we'll see.
3         MS. YU:  Fortunately Susan
4    did them on Excel for us, so we can
5    at least agree on --
6         MR. MALONE:  I don't know
7    if she's going to pass Dalbert
8    especially with that hand.
9    BY MS. YU:
10        Q.  It says multiply 1.6
11   percent by your average salary.  And
12   why don't we just assume the 86,000.
13        MR. MALONE:  Okay.  As his
14   average over five?
15        MS. YU:  As his average.
16   Let's just assume that that's it.
17   And if we need to revise that based
18   on actual salary information we can,
19   but this will give us at least an
20   estimate of what his pension would
21   have been under the old plan.
22        So it's 86,000, we'll
23   multiply it by 1.6 percent, we get
24   1,376.

Page 231

1         MR. MALONE:  1,376, is 1.6
2    percent of 86,000.
3         MS. YU:  86,000.
4         MR. MALONE:  I probably
5    have a calculator on here.
6         MS. HOFFMAN:  I can give it
7    to you on touch screen.
8         MR. MALONE:  This is fine.
9    I've never used this before.
10        Bingo.  I agree.  1.6
11   percent of 86,000 equals $1,376.
12        MS. YU:  Then you multiply
13   it by your years of service, and
14   we'll just assume all of your years
15   of service, which was the 27 years
16   that you calculated.
17        THE WITNESS:  Calculated
18   for today, okay.
19        MS. YU:  And we get 37,152.
20        MR. MALONE:  I come up with
21   35,152.
22        MS. YU:  35,152?
23        MS. HOFFMAN:  No.
24        MS. YU:  37,152.

Page 232

1         MR. MALONE:  Okay.  I'm
2    going to assume for the purposes of
3    this record, because this is pretty
4    hypothetical, that that's an accurate
5    calculation.
6         MS. HOFFMAN:  Since ours is
7    higher than yours.
8         MR. MALONE:  It falls under
9    the old zealous advocate thing.
10        MS. YU:  Divided by 12, and
11   we get 3,096.
12        MR. MALONE:  $3,096.
13        MS. YU:  Which would be a
14   rough estimate of what his monthly
15   annuity would be at normal retirement
16   age under the old plan.
17        MR. MALONE:  And any age
18   after age 55 under the old plan.
19        MS. HOFFMAN:  True but
20   irrelevant.
21        MR. MALONE:  Depends upon
22   your perspective.
23        MS. YU:  In other words,
24   the accrued benefit under the old

Page 233

1    plan --
2         MR. MALONE:  This --
3         MS. YU:  -- would be an
4    estimate of that.
5         MR. MALONE:  -- would be an
6    estimate assuming that the salary
7    information is accurate and assuming
8    that your calculations are accurate,
9    would be an estimate.
10        MS. YU:  Then if we look at
11   D-18 again.
12        Look at JMC 478, which is
13   the calculation which estimates Mr.
14   Charles' accrued benefit as that term
15   is defined by ERISA with respect to
16   the cash balance plan.
17        MR. MALONE:  It's an
18   estimate generated by Vanguard.
19        MS. YU:  Yes.
20        MR. MALONE:  Okay.
21        MS. YU:  With retirement
22   date of November 1st, 2014, which is
23   age 65 for Mr. Charles.
24        MR. MALONE:  Uh-huh.

B0096

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 234

1    MS. YU:  So if we compare
2  the numbers of the annuity amounts,
3  the annuity that is estimated with
4  respect to the cash balance plan at
5  normal retirement age for Mr. Charles
6  is $3,306.64.
7    MR. MALONE:  That's what's
8  reflected on JMC 478 as an estimate.
9    MS. YU:  Yes.
10 BY MS. YU:
11   Q.  So even comparing what your
12 pension at normal retirement age is
13 estimated to be under the cash
14 balance plan, in comparing that with
15 what your accrued benefit would have
16 been under the old plan, the estimate
17 for your pension under the cash
18 balance plan is higher.
19   MR. MALONE:  Object to the
20 form of the question.  Because we
21 don't know all the assumptions that
22 go into the estimate.  For example,
23 does this reflect working through
24 normal retirement age in which case

Page 235

1  he would have different years of
2  credited service.
3  BY MS. YU:
4    Q.  If your benefit at normal
5  retirement age in the form of annuity
6  under the cash balance plan were
7  higher than your crude benefit under
8  the old plan, would you be harmed by
9  the cash balance plan?
10   MR. MALONE:  I'll object to
11 the form of the question as calling
12 for a legal conclusion by a lay
13 witness.
14   THE WITNESS:  Since I don't
15 have numbers provided to me that are
16 exact from Vanguard, I can't really
17 say yes or no that is true.  I
18 don't know.
19 BY MS. YU:
20   Q.  I understand the objection
21 that Mr. Malone is making, which is
22 why I stated my question in a
23 hypothetical.
24   So putting aside the

Page 236

1  numbers and the calculations, let's
2  assume that the benefit under the
3  cash balance formula in the form of
4  an annuity at age 65 is higher than
5  your accrued benefit under the old
6  plan, which would be a normal
7  retirement age annuity, if that were
8  the case, do you feel you would have
9  been harmed?
10   MR. MALONE:  I'm going to
11 object to the question for the same
12 basis, again, and I also think it's
13 misleading given the structure of the
14 old plan with the retirement rights
15 in the ad to focus solely upon his
16 age 65 under that plan.
17   THE WITNESS:  I think the
18 way you calculated that annuity is
19 not exactly right.  You're stating my
20 age currently, my years current, and
21 this is for age 65.  This is eight
22 years down the road.  That's not
23 today.
24   So that's why I can't say I

Page 237

1  would -- one would be better than the
2  other.
3  BY MS. YU:
4    Q.  I understand your
5  testimony, but my question is
6  slightly different from that, and
7  because I understand those issues,
8  let's put aside the calculations we
9  did and the numbers and just assume
10 that the annuity at normal retirement
11 age under the cash balance plan is
12 higher than the annuity at normal
13 retirement age under the old plan
14 under the same assumptions.
15   MR. MALONE:  And under the
16 same objection.
17 BY MS. YU:
18   Q.  We're doing apples to
19 apples now.  But if looking at apples
20 to apples your benefit calculated as
21 an annuity at age 65 under the cash
22 balance plan, assuming that that's
23 greater than what you had under the
24 old plan, do you still feel like you

B0097

ORAL DEPOSITION OF JEROME MICHAEL CHARLES, 1/9/07

Page 238

1  have been harmed by the cash balance
2  plan?
3       MR. MALONE:  Same
4  objection.
5       THE WITNESS:  With your
6  assumptions that you're stating, how
7  can I not agree to that question?
8  Your assumptions state that the cash
9  balance plan at age 65 would have a
10  greater annuity value than the old
11  retirement plan.
12       So under that assumption, I
13  have to agree.  But to say I myself
14  personally agree that I will have
15  greater benefit, I don't know that.
16  I can't say that.  I can only go by
17  your assumptions and agree with your
18  assumption.
19       MS. YU:  I don't have any
20  further questions.
21       MR. MALONE:  I have no
22  questions for you today.  Thank you.
23       (Testimony concluded at
24  4:30 p.m.)

Page 239

1       WITNESS CERTIFICATION
2
3       I hereby certify that I
4  have read the foregoing transcript of
5  my deposition testimony, and that my
6  answers to the questions propounded,
7  with the attached corrections or
8  changes, if any, are true and
9  correct.
10
11
12  _____
    DATE      JEROME MICHAEL CHARLES
13
14
15
16
17
18  _____
    PRINTED NAME
19
20
21
22
23
24

61 (Pages 238 to 239)

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
                   PORTIONS CONFIDENTIAL
 3
 4    J. MICHAEL CHARLES; MAURICE W.
      WARD, JR.; and JOSEPH I. FINK, JR.,
 5    on behalf of themselves and
      all others similarly situated,
 6          Plaintiff
        V                C.A. No. 05-702(SLR)
 7
      PEPCO HOLDINGS, INC.; CONECTIV, and
 8    PEPCO HOLDINGS RETIREMENT PLAN,
            Defendants
 9                       -  -  -
10    THOMAS S. TROUP, on behalf of himself
      and all others similarly situated,
11          Plaintiff
12       V                C.A. No. 06-10(SLR)
13    PEPCO HOLDINGS, INC.; CONECTIV, and
      PEPCO HOLDINGS RETIREMENT PLAN,
14          Defendants
15              Oral deposition of JOSEPH
16    I. FINK, taken at the law offices of
17    Pepper Hamilton LLP, 3000 Two Logan
18    Square, Eighteenth and Arch Streets,
19    Philadelphia, Pennsylvania, on
20    Thursday, January 11, 2007,
21    commencing at 9:34 a.m., before
22    Barbara McKeon Quinn, a Registered
23    Merit Reporter and Notary Public,
24    pursuant to notice.
```

B0099

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 2

1  APPEARANCES:
2  JOSEPH G. SAUDER, ESQUIRE
   josephsauder@chimicles.com
3  CHIMICLES & TIKELLIS LLP
   One Haverford Centre
4  361 West Lancaster Avenue
   Haverford, Pennsylvania 19041
5  610-642-8500
   Counsel for Plaintiff
6
   BARAK A. BASSMAN, ESQUIRE
7  bassmanb@pepperlaw.com
   PEPPER HAMILTON LLP
8  3000 Two Logan Square
   18th & Arch Streets
9  Philadelphia, Pennsylvania 19103
   215-981-4000
10 Counsel for Defendants
11
12     EXAMINATION INDEX
13 JOSEPH I. FINK
      BY MR. BASSMAN          3
14
15
16     EXHIBIT INDEX
17              MARKED
18 Defendant's
   31 Conectiv's Cash Balance      49
19    Pension Plan statement
      for Joseph Fink as of
20    1/1/99, JIF 1 through 14
21 32 Vanguard Pension           49
      Estimator, JIF 18 through
22    39
23
24

Page 3

1        THE COURT REPORTER:  Usual
2  stipulations?
3        MR. SAUDER:  Read and sign.
4        EXAMINATION
5  BY MR. BASSMAN:
6     Q.  Good morning, Mr. Fink.
7     A.  Good morning.
8     Q.  My name is Barak Bassman.
9  I'm an attorney for the defendants in
10 this case.  We met just a moment ago.
11 Before we begin, I want to just go
12 over a few quick ground rules that
13 will make today go more quickly and
14 more smoothly.
15       First, as you can see, the
16 court reporter is writing down
17 everything that we say.  A written
18 record is being made of today's
19 proceedings.
20       In order for all your
21 answers to be recorded properly,
22 you're going to have to answer my
23 questions verbally.  I know sometimes
24 when we talk in conversation, you

Page 4

1  know, you shrug your shoulders, you
2  nod your head.  Unfortunately today
3  you can't do that.  All your
4  responses have to be verbal.
5        Is that okay?
6     A.  That's fine.
7     Q.  Also, to help the court
8  reporter out, we should both try not
9  to talk over each other.  It becomes
10 very difficult for her to sort out
11 who's talking if, you know, I start
12 talking, you interrupt me or I
13 interrupt you.
14       So I'm going to make an
15 effort not to talk while you're
16 talking.  I'd ask that you do the
17 same for me.
18    A.  Understood.
19    Q.  If at any time I ask you a
20 question that you don't understand,
21 please let me know and I'll rephrase.
22 If you do answer my question, I'm
23 going to assume that you understand
24 it.

Page 5

1        Is that okay?
2     A.  That's fine.
3     Q.  If at any time you need a
4  break, you need to use the rest room,
5  you need to stretch your legs, please
6  just let me know.  This is not an
7  interrogation; you're not a prisoner.
8        Just let me know and I'll
9  try to wrap up my line of questioning
10 as soon as possible so we can take a
11 break.
12    A.  That's fine.
13    Q.  We're only here to find out
14 what you know.  Obviously you don't
15 know everything under the sun,
16 neither do I, neither does anyone.
17 If you don't know the answer to
18 something I'm asking you, it's okay
19 to say I don't know.  I'm sure both I
20 and your lawyer agree on the point
21 that we don't want you guessing or
22 speculating.
23       Is that okay?
24    A.  Understood.

B0100

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 6

1    Q.   There are a large number of
2  different entities in this case.
3  There are several defendants, some of
4  who are formed by the mergers of
5  other companies.  For the sake of
6  clarity, I want to let you know that
7  when I use the term Conectiv, I'm
8  going to be referring to every
9  defendant in this case and all their
10  predecessors including Atlantic City
11  and DelMarVa.
12       So if I use the term
13  Conectiv I mean everybody.  If I want
14  to ask you a question about a
15  specific entity just alone by itself,
16  I'll let you know.
17    A.   Very good.
18    Q.   Is there any reason, as you
19  sit here today, you can't testify
20  fully and truthfully?
21    A.   None.
22    Q.   Are you under any physical
23  impairment, taking any medication
24  today that could affect your memory

Page 7

1  or your ability to recall events?
2    A.   None.
3    Q.   What did you do to prepare
4  for today's deposition?
5    A.   Very little.
6    Q.   Did you review any
7  documents?
8    A.   I reviewed documents with
9  my attorney last week.
10    Q.   Okay.  And you met with
11  your attorney once?
12    A.   Physically, yes, face to
13  face once last week.
14    Q.   Have you discussed today's
15  deposition with anyone other than
16  your attorney?
17    A.   No.
18    Q.   And you said one meeting
19  face to face.  Did you have any phone
20  conversations with your attorney to
21  get ready for today's deposition?
22    A.   No.
23    Q.   And how long did the
24  meeting last week last?

Page 8

1    A.   Approximately two hours.
2    Q.   Do you recall what
3  documents you reviewed at that
4  meeting?
5    A.   There was a host of
6  documents there were reviewed.
7    Q.   Do you remember what any of
8  them were?
9    A.   Some.
10    Q.   What were they?
11    A.   Specifically I remember a
12  PowerPoint slide production.
13    Q.   Anything else come to mind?
14    A.   I saw what I believe were
15  old company information sheets.
16    Q.   Anything else?
17    A.   I can't recall.
18    Q.   Okay.  Do you know Mr.
19  Charles?
20    A.   Yes, I do.
21    Q.   Did you speak with Mr.
22  Charles about today's deposition?
23    A.   No, I did not.
24    Q.   Do you know Mr. Ward?

Page 9

1    A.   Yes, I do.
2    Q.   Did you speak with him
3  about today's deposition?
4    A.   No, I did not.
5    Q.   Do you know Mr. Troup?
6    A.   No, I do not.
7    Q.   When did you graduate from
8  high school?
9    A.   1973. '2. 1972.
10    Q.   You look like a 1973 grad.
11       What high school did you
12  graduate from?
13    A.   Holy Spirit.
14    Q.   And where is that?
15    A.   Absecon, New Jersey.
16    Q.   Could you briefly describe
17  your education after high school.
18    A.   I have some courses at
19  Atlantic Community College.
20    Q.   Did you receive a degree?
21    A.   No.  I do not have an
22  associate's degree.
23    Q.   Do you remember what the
24  courses were in at community college?

3 (Pages 6 to 9)

B0101

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 10

1     A.   Just liberal arts.
2  Communications, algebra, introduction
3  to computers.
4     Q.   General academic subjects?
5     A.   That's correct.
6     Q.   And when did you take those
7  courses?
8     A.   1991.
9     Q.   Could you tell me what the
10 first job you've had after high
11 school was.
12    A.   I'm not positive, but it
13 may have been at Lenox China.
14    Q.   How long were you there?
15    A.   Maybe a year.
16    Q.   What were your
17 responsibilities at Lenox China?
18    A.   Just laborers.
19    Q.   And where do you go after
20 Lenox China?
21    A.   The Navy.
22    Q.   How long were you in the
23 Navy?
24    A.   Two years.

Page 11

1     Q.   Were you drafted into the
2  Navy or did you volunteer?
3     A.   No.  No.  I was a
4  volunteer.
5     Q.   And what did you do in the
6  Navy?
7     A.   I was an aviation
8  electrician.
9     Q.   When you left the Navy
10 where did you go?
11    A.   I went to Modern Gas
12 Company.
13    Q.   How long were you at Modern
14 Gas?
15    A.   Until I was employed by
16 Atlantic City Electric.
17 Approximately ten years.
18    Q.   Until about 1987?
19    A.   That's correct.
20    Q.   And what did you do at
21 Modern Gas?
22    A.   Ultimately I was a district
23 manager.
24    Q.   What did you start doing at

Page 12

1  Modern Gas?
2     A.   I was a field helper.
3     Q.   And then you were promoted
4  to district manager?
5     A.   Throughout that time, yeah.
6  I had several different positions
7  throughout that time.
8     Q.   Do you remember what they
9  were?
10    A.   Went from being a field
11 helper to being a repair technician,
12 and I was supervising those
13 technicians and then I ultimately
14 became a district manager.
15    Q.   What was the business of
16 Modern Gas?
17    A.   It was a propane gas
18 company.
19    Q.   During your time at Modern
20 Gas, were you a member of any union?
21    A.   No, I was not.
22    Q.   And you left Modern Gas and
23 went to Atlantic City Electric in
24 1987?

Page 13

1     A.   That's correct.
2     Q.   I assume you've been at
3  Atlantic City Electric or its
4  successors ever since 1987.
5     A.   Almost 20 years.
6     Q.   Could you describe for me
7  what positions you've held at
8  Atlantic City and its successors?
9     A.   Started off as a meter
10 reader.  I transferred to be an
11 overhead line laborer.  From there I
12 became a single-phase meter
13 technician.  From there I was a
14 poly-phase meter technician.
15 Ultimately a meter repair specialist.
16 I was the test facility supervisor.
17 And ultimately I was a zone
18 supervisor, which is what I am
19 currently.
20    Q.   And what do you do as a
21 zone supervisor?
22    A.   I'm responsible for the
23 maintenance and upkeep of all the
24 billing meters in the system,

4 (Pages 10 to 13)

Page 14

1  installation, removal.
2      Q.   For a particular zone?
3      A.   Well, there are zones --
4  that's terminology that's pretty
5  broad based.  It really encompasses
6  several districts which would be West
7  Creek, Atlantic City, Pleasantville,
8  Cape May, and a piece of Hammonton.
9          Approximately two years ago
10  I took a two-week acting assignment
11  to fill in for an opening in the test
12  facility in Mays Landing as the
13  supervisor along with my normal
14  position.
15      Q.   During your time at
16  Atlantic City or its successors, were
17  you ever a union member?
18      A.   Yes, I was.
19      Q.   When were you a union
20  member?
21      A.   Until I became the shop
22  supervisor in '92.
23      Q.   And the union you were a
24  member of was Local 210 of the IBEW?

Page 15

1      A.   That's correct.
2      Q.   And IBEW is the
3  International Brotherhood of
4  Electrical Workers?
5      A.   Yes, it is.
6      Q.   Did you ever hold any
7  positions in the local?
8      A.   All of the positions I held
9  prior to '92 were.
10      Q.   Actually, my question was a
11  little different.  Were you ever an
12  officer of the union?
13      A.   I was an acting shop
14  steward.
15      Q.   When were you an acting
16  shop steward?
17      A.   For approximately a year
18  and -- I want to say in approximately
19  1990.
20      Q.   What did you do as an
21  acting shop steward for the union?
22      A.   I was a union
23  representative to all the personnel
24  that were in the meter test facility.

Page 16

1      Q.   Were you involved in member
2  grievances when you were an acting
3  shop steward?
4      A.   Yes, I was.
5      Q.   How were you involved?
6      A.   A shop steward is the first
7  line of representation for the local
8  members.
9      Q.   Were any of the grievances
10  that you were involved in concerning
11  pension benefits?
12      A.   No.  None.
13      Q.   How many grievances were
14  you involved in when you were the
15  acting shop steward?
16      A.   Maybe a dozen.
17      Q.   Do you remember just
18  generally what they were about?
19      A.   Contractual violations for
20  various things.  Like what types of
21  work were being done across
22  department lines and things of that
23  nature.
24      Q.   Have you ever been a

Page 17

1  plaintiff in a lawsuit before?
2      A.   No.
3      Q.   Ever been a defendant in a
4  lawsuit before?
5      A.   No.
6      Q.   Did you yourself ever file
7  a union grievance?
8      A.   Yes.
9      Q.   When was that?
10      A.   1989.
11      Q.   And just to be clear, when
12  you were a union member you filed one
13  grievance only, right?
14      A.   No.  I filed a number of
15  grievances.
16      Q.   Filed a number, okay.
17  That's what I was wondering about.
18          How many grievances did you
19  file?
20      A.   I can't recall.  A
21  reasonable amount.  More -- more than
22  half a dozen.
23      Q.   More than ten?
24      A.   Possibly.

B0103

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 18

1    Q.   And do you remember when
2  the first grievance was filed?
3     A.   Somewhere during the course
4  of 1989.  I can't recall the month.
5  Possibly in around the May, June area
6  possibly.
7     Q.   And did any of the
8  grievances that you filed relate to
9  pension benefits?
10    A.   No, they did not.
11    Q.   If you could just sort of
12  describe for me generally the subject
13  matter of the grievances that you
14  filed.
15    A.   They tended to be around
16  what I considered wrongful hiring,
17  were being passed over for being
18  hired in a specific position.
19    Q.   So these would be
20  grievances over...?
21    A.   Hiring practice.
22    Q.   Okay.  Were you complaining
23  that the company didn't hire you for
24  positions that you had applied for?

Page 19

1     A.   That is correct.
2     Q.   Did you prevail in all of
3  these grievances?
4     A.   Ultimately there was an
5  arbitration that I won.
6     Q.   And you were promoted after
7  the arbitration?
8     A.   It was offered to me.
9     Q.   Did you take it?
10    A.   No, I did not.
11    Q.   In the arbitration were you
12  represented by an attorney?
13    A.   No.
14    Q.   Do you remember testifying
15  in the arbitration?
16    A.   No.  It was a union
17  management arbitration and it's very
18  rare that -- the individuals that are
19  the grievants are probably rarely
20  involved.
21    Q.   Did others provide
22  testimony in the arbitration?
23    A.   Not to my knowledge.
24    Q.   Do you remember who the

Page 20

1  arbitrator was?
2     A.   No, I couldn't begin to
3  recall.
4     Q.   Do you remember when the
5  arbitration was conducted?
6     A.   It was approximately a year
7  later before it came to fruition.
8     Q.   So around 1990, 1991?
9     A.   That's correct.
10    Q.   Now, you mentioned one
11  arbitration that you won but you
12  filed at least half a dozen
13  grievances.  Was this one arbitration
14  to resolve all of your grievances or
15  were there separate arbitrations for
16  each grievance?
17    A.   It was to resolve a number
18  of those grievances.
19    Q.   Have you ever filed an
20  administrative complaint with the
21  pension plan?
22    A.   No.
23    Q.   Have you ever been
24  convicted of a crime?

Page 21

1     A.   No.
2     Q.   You testified earlier that
3  you know Mr. Charles, right?
4     A.   Yes.
5     Q.   When did you meet him?
6     A.   I've known Mike Charles
7  casually for maybe ten years.
8     Q.   How did you two meet?
9     A.   Just in the course of
10  business, in the corporation.
11    Q.   Would you consider him a
12  friend?
13    A.   I would consider him a
14  coworker.
15    Q.   Ever seen him socially?
16    A.   Never.
17    Q.   And you also said that you
18  knew Mr. Ward, right?
19    A.   That's correct.
20    Q.   How long have you known Mr.
21  Ward?
22    A.   Since 1989.
23    Q.   And how did you two meet?
24    A.   He was in the meter

6 (Pages 18 to 21)

B0104

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 22

1 department when I came to the meter
2 department.
3    Q.  Would you consider him a
4 friend?
5    A.  He's a casual acquaintance.
6    Q.  Ever socialize with him?
7    A.  No, not outside company
8 functions after hours.
9    Q.  So something like a happy
10 hour for employees one afternoon, you
11 guys might see each other?
12    A.  I don't drink.
13    Q.  Okay.  Company picnic.
14    A.  That's a company function
15 in my mind.
16    Q.  But it's not as if you and
17 Mr. Ward ever did anything like go to
18 a ball game together on a weekend.
19    A.  No.  That's correct.  We
20 have not.
21    Q.  Do you read any newspapers
22 regularly?
23    A.  Yes, I do.
24    Q.  What do you read?

Page 23

1    A.  Philadelphia Daily News and
2 the Atlantic City Press.
3    Q.  Are you a subscriber to
4 either newspaper?
5    A.  The Atlantic City Press.
6    Q.  Do you read it every day?
7    A.  I try.
8    Q.  And how long have you been
9 a daily reader of the Atlantic City
10 Press?
11    A.  30 years.
12    Q.  Do you subscribe to any
13 magazines?
14    A.  No, I do not.
15    Q.  Do you belong to any
16 organizations?
17    A.  No, I don't.
18    Q.  Have you ever belonged to
19 any organizations, leaving aside the
20 union?
21    A.  No.  I haven't.
22    Q.  Have you ever donated any
23 money to any organizations?
24    A.  Only to the United Way.

Page 24

1    Q.  Do you have Internet access
2 in your home?
3    A.  Yes, I do.
4    Q.  When did you get Internet
5 access at home?
6    A.  1997.
7    Q.  Do you research news items
8 on the Internet?
9    A.  Outside of sporting events,
10 probably very rarely.
11    Q.  Ever research pension
12 issues on the web?
13    A.  No.
14    Q.  Do you have a home e-mail
15 account?
16    A.  Yes.
17    Q.  What is your current home
18 e-mail account?
19    A.  Jifink@comcast.net.
20    Q.  And how long --
21    MR. SAUDER:  I'm sorry.
22 Just if we could mark that portion
23 confidential of the transcript and
24 also same goes with regard to

Page 25

1 yesterday.
2    MR. BASSMAN:  Sure.
3    MR. SAUDER:  Okay.
4 BY MR. BASSMAN:
5    Q.  How long have you had the
6 personal e-mail account at
7 Jifink@comcast.net?
8    A.  Several years.  I can't --
9 whenever I went to cable access.
10    Q.  So at least two years?
11    A.  Two or three.
12    Q.  Did you have a home e-mail
13 address before that?
14    A.  No.
15    Q.  Have you ever sent or
16 received e-mails in your home e-mail
17 address about this lawsuit?
18    A.  The only e-mails I've ever
19 received about this lawsuit are from
20 my attorney.
21    Q.  Have you ever sent or
22 received any e-mails on your home
23 e-mail account about any of
24 Conectiv's pension plans?

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 26

1   A.  Never.
2   Q.  Have you ever communicated
3  through your home e-mail, either
4  sending or receiving, with either Mr.
5  Charles or Mr. Ward?
6   A.  No.
7   Q.  When you started at
8  Atlantic City in 1987, what was your
9  understanding as to your pension
10  plan?
11   A.  With respect to what aspect
12  of it?
13   Q.  Well, you understood that
14  you had a pension plan when you
15  started.
16   A.  That's correct.
17   Q.  What was your understanding
18  as to how your pension would be
19  computed when you started in 1987?
20   A.  I had none.
21   Q.  Did you receive any
22  documents about it?
23   A.  No.
24   Q.  Did you ask about it?

Page 27

1   A.  No.
2   Q.  So when you started at
3  Atlantic City in 1987, you knew there
4  was a pension plan, but you really
5  didn't know anything about it?
6   A.  They give you a handbook,
7  an employee handbook, that gave a
8  very high level -- I gave it like the
9  once-over I would say.  It was very
10  high level explaining that you --
11  that there was a company retirement
12  plan, and it was always very
13  difficult it seemed to me to find out
14  any information in depth.
15   Q.  What efforts did you take
16  to try to find out any information in
17  depth?
18   A.  When?
19   Q.  Let's start in 1987.
20   A.  In 1987, none.
21   Q.  When did you first
22  undertake any efforts to find out
23  about the pension plan?
24   MR. SAUDER:  With regard to

Page 28

1  the ACE plan?
2   MR. BASSMAN:  The ACE plan
3  that was in effect before January 1,
4  1999.
5   MR. SAUDER:  Okay.
6   THE WITNESS:  Probably
7  somewhere in the early '90s I was
8  curious about it.
9  BY MR. BASSMAN:
10   Q.  And what did you do in the
11  early '90s to find out more?
12   A.  I asked questions of the HR
13  representative.
14   Q.  You said early '90s.  I
15  just want to be clear.  Do you recall
16  if when you started asking the HR
17  department about the pension plan,
18  was that before or after you stopped
19  being a union member?
20   A.  It was after.
21   Q.  So you were in management
22  at this point?
23   A.  Yes.
24   Q.  Was the fact that you

Page 29

1  transitioned to management one of the
2  reasons you became more interested in
3  your pension plan?
4   A.  Yes.
5   Q.  Do you remember who you
6  spoke to in HR?
7   A.  No, I don't.
8   Q.  And do you remember what
9  questions you asked back in this
10  early '90s period?
11   A.  I'm just speculating, but I
12  believe it was about what age could
13  you retire.
14   Q.  And were your questions
15  answered?
16   A.  To the best of my knowledge
17  at that time.  Best I can recall.
18   Q.  Were you asking about early
19  retirement benefits then?
20   A.  I was asking what was the
21  earliest we could retire, I believe.
22   Q.  And what do you remember
23  the answer being in the early '90s?
24   A.  If I'm not mistaken, it was

8 (Pages 26 to 29)

B0106

Page 30

1   55 years of age.
2       Q.   When you spoke to the HR
3   rep in the early '90s at Atlantic
4   City, did you ask for copies of any
5   documents relating to the pension
6   plan?
7       A.   No, I did not.
8       Q.   Did the HR rep offer to
9   provide you any documents about the
10  pension plan?
11      A.   No, he did not.
12      Q.   Aside from the employee
13  handbook that you described earlier,
14  did you ever receive any documents
15  about the Atlantic City plan before
16  January 1999?
17      A.   No.
18      Q.   You testified that HR told
19  you that you could retire at age 55.
20  In the early '90s they told you that.
21  Did you have any understanding at
22  that time as to how the amount of
23  pension that you would be paid would
24  be calculated?

Page 31

1       A.   There was a high level
2   explanation in that handbook that
3   surrounded your average salary over
4   the course of your career.  Dollars
5   averaged out with a multiplier for
6   the length of service.  Other than
7   those, I can't remember any other
8   more specifics.
9       Q.   But your understanding was
10  in the early '90s that the amount of
11  pension that you could collect would
12  be based in some way on a salary you
13  had earned as an employee at Atlantic
14  City and the length of service,
15  right?
16      A.   Yes.
17      Q.   And that the higher your
18  salary was and the longer your
19  service, the higher your benefit
20  would be?
21      A.   At that time, yes.
22      Q.   Again, talking about just
23  what you understood in the early
24  '90s.

Page 32

1       A.   Yes.
2       Q.   Before January 1, 1999, did
3   you ever complain to anyone about the
4   Atlantic City pension plan?
5       A.   No.
6       Q.   Were you happy with the
7   plan from before January 1, 1999?
8           MR. SAUDER:  Objection to
9   the form.  Answer if you understand
10  the question.
11          THE WITNESS:  What do you
12  mean was I happy with it?
13  BY MR. BASSMAN:
14      Q.   I'll rephrase.  Before
15  January 1, 1999, so before the cash
16  balance conversion that we'll talk
17  about in a bit, at any time did you
18  personally wish that Atlantic City or
19  its successors changed the terms of
20  your pension plan?
21      A.   No.
22      Q.   Now, in January 1, 1999,
23  the Conectiv pension plan converted
24  to a cash balance plan, right?

Page 33

1       A.   Correct.
2       Q.   When did you first become
3   suspicious that your rights were
4   being violated by the cash balance
5   plan?
6           MR. SAUDER:  Objection to
7   the form.  You can answer.
8           THE WITNESS:  I became
9   suspicious of how the plan would
10  ultimately suit me around 2004 maybe.
11  BY MR. BASSMAN:
12      Q.   What happened in 2004 that
13  aroused your suspicion?
14      A.   I guess it was the number
15  of employees that were grandfathered
16  under the old plan had pretty much
17  started to leave and then there was a
18  group of individuals that were
19  leaving under the new plan.
20          And there seemed to be a
21  disparity in the dollar values that
22  were ultimately coming out of that.
23      Q.   And I assume the disparity
24  that you saw was that employees

B0107

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 34

1  retiring under the new cash balance
2  plan were receiving lower payments
3  when they left than employees who
4  were grandfathered?
5      A.  That is correct.
6      Q.  How did you find out the
7  amount of money that these retiring
8  employees were receiving?
9      A.  There was some complaining
10 more or less from some of the people
11 that were separating under cash
12 balance.
13     Q.  Do you remember who was
14 complaining?
15     A.  Not off the top of my head.
16     Q.  Were any of these people
17 complaining directly to you
18 personally?
19     A.  Some were -- some
20 statements were made in passing as
21 you would see people in the hallways
22 and have brief conversations saying,
23 you know, wishing them well in their
24 new endeavors and certain topics

Page 35

1  would come up.
2      Sometimes it would be I
3  wish I was leaving, you know, or I
4  was grandfathered or, you know,
5  things of that nature.  They felt
6  they would have made out better.
7      Q.  Did any of these departing
8  employees in 2004 provide you with
9  dollar figures of the amount of their
10 benefits?
11     A.  I'm sure there was one or
12 two, but I couldn't begin to tell you
13 what those dollar figures were.  At
14 that time it didn't -- didn't feel it
15 was any of my personal business what,
16 you know, their dollar value was.  I
17 just had questions about my own at
18 that particular point.
19     Q.  But you just had the
20 general sense from conversations
21 around the office that benefits were
22 higher for employees who were
23 grandfathered than employees who were
24 not.

Page 36

1      A.  Correct.
2      Q.  And by grandfathered, just
3  to clear up the terms, I assume
4  you're meaning employees who had the
5  option to take benefits under the old
6  Atlantic City plan and not the cash
7  balance plan if they chose?
8      A.  Yes.
9      Q.  And you were not
10 grandfathered, right?
11     A.  No, I was not.
12     Q.  How old are you, Mr. Fink?
13     A.  Currently?
14     Q.  Yes.  Today.
15     A.  I'm currently 52.
16     Q.  After you became suspicious
17 that your rights maybe were violated
18 by the cash balance plan, what
19 actions did you take?
20     A.  I think that's when I
21 possibly started looking at the
22 Vanguard site a little closer.
23     Q.  What in particular were you
24 looking at on the Vanguard site?

Page 37

1      A.  The portion that contains
2  the retirement dollars.
3      Q.  Is that the Pension
4  Estimator?
5      A.  Yes, it is.
6      Q.  Had you used the Pension
7  Estimator before 2004?
8      A.  No.  I'm not sure it
9  existed before 2004.  I don't really
10 know if it did or not, but, no, I did
11 not.
12     Q.  Had you looked at the
13 Vanguard website before 2004?
14     A.  Yes, because it's also tied
15 to my 401(k).
16     Q.  Had you ever researched
17 your cash balance benefits under the
18 Vanguard website before 2004?
19     A.  I attempted to, but early
20 in that process information was not
21 available on the website, had not
22 been put up on the website.
23     Q.  And do you remember when
24 the early unsuccessful attempts were?

10 (Pages 34 to 37)

B0108

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 38

1    A.   In the area that we're
2  talking about.
3    Q.   '98, '99, around that time
4  frame?
5    A.   No.  No.  I'm talking about
6  in '04.
7    Q.   Oh, in '04.  So the first
8  time you tried to research your cash
9  balance benefits on the Vanguard
10  website was in 2004?
11    A.   I believe that's correct,
12  yes.
13    Q.   And what was the problem
14  that you encountered when you first
15  tried to look up your benefits on the
16  website?
17    A.   It gave me my lump sum but
18  I wanted information about how
19  things -- how the plan operated which
20  was not available.
21    Q.   What steps did you take to
22  find out how the plan operated?
23    A.   I believe when I spoke to
24  Vanguard about various things, about

Page 39

1  matching 401(k) moneys and pension,
2  it was a dial-in type of phone call,
3  and that's where I got the
4  information that it was not available
5  on the website at that time.
6    Q.   Do you remember who you
7  spoke to at Vanguard?
8    A.   No.
9    Q.   This is just like a 1-800
10  number you called?
11    A.   Yes.
12    Q.   This was a customer service
13  rep who answered?
14    A.   No.
15    Q.   After you spoke to the
16  customer service rep at Vanguard, did
17  you make any other efforts to find
18  out how the cash balance plan works?
19    A.   I believe I may have
20  possibly asked HR.
21    Q.   When you say "asked HR,"
22  would you have sent them an e-mail or
23  called them on the phone?
24    A.   I believe I more than

Page 40

1  likely spoke face to face with the
2  representative.
3    Q.   There's an HR rep in your
4  facility where you work?
5    A.   In that region, yes.  I
6  come in and out of that facility,
7  yes, on a daily basis.
8    Q.   Do you remember at all what
9  you said to the HR representative?
10    A.   I imagine it was very high
11  level.  Like is there any
12  documentation, you know, type of
13  thing.
14    Q.   Do you remember any
15  response?
16    A.   There is somewhere, but
17  it's not, you know, I don't have it,
18  you know, right in my fingertips type
19  of thing.  I'll see if I can, you
20  know, conjure up something for you.
21    Q.   Was anything ever conjured
22  up for you?
23    A.   No.
24    Q.   Besides the meeting with

Page 41

1  the Conectiv HR rep and the phone
2  call with the representative from
3  Vanguard, did you take any other
4  actions to investigate how the cash
5  balance plan works?
6    A.   Nothing outside of
7  occasionally looking at that Pension
8  Estimator.  I believe I may have
9  possibly, to the best of my
10  recollection, asked another, you
11  know, 1-800 phone call about a 401(k)
12  issue and tacked that on and said,
13  hey, is that up and functioning type
14  of thing at some point later.
15    Q.   Does Conectiv have an
16  intranet that you can access as an
17  employee?
18    A.   Yes.
19    Q.   Did you ever attempt to
20  research issues about the cash
21  balance plan on the Conectiv
22  intranet?
23    A.   That's where I made all my
24  contacts.

11 (Pages 38 to 41)

B0109

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 42

1    Q.  Okay.
2    A.  There's a link from our
3  intranet.
4    Q.  To the Vanguard site?
5    A.  Yes.
6    Q.  Okay.  Have you ever heard
7  of something called the Summary Plan
8  Description?
9    A.  I can't recall, that
10  terminology anyway.
11    Q.  After you became suspicious
12  that the cash balance plan may be
13  violating your rights --
14      MR. SAUDER:  Objection to
15  that.
16  BY MR. BASSMAN:
17    Q.  -- did you speak with any
18  coworkers at Conectiv about the plan?
19      MR. SAUDER:  Objection.  I
20  think it mischaracterizes his
21  testimony.
22      MR. BASSMAN:  You can
23  answer.
24      MR. SAUDER:  You can answer

Page 43

1  if you understand the question or if
2  you agree with the characterization.
3      THE WITNESS:  Repeat the
4  question.
5  BY MR. BASSMAN:
6    Q.  Sure.  After you became
7  suspicious that your rights may be
8  violated by the cash balance plan in
9  2004, did you share your concerns
10  with any coworkers at Conectiv?
11      MR. SAUDER:  Same
12  objection.
13      THE WITNESS:  There were a
14  number of us sharing those concerns
15  back and forth.
16  BY MR. BASSMAN:
17    Q.  Do you remember who those
18  employees were?
19    A.  There was several employees
20  that were management employees.
21    Q.  What were their names?
22    A.  One would be Mr. Ward.
23    Q.  Who else?
24    A.  I can think of a host of

Page 44

1  people who have separated, but I
2  can't swear to the fact that we had a
3  direct conversation about -- about
4  the numbers of their separation or
5  their potential separations.
6    Q.  Just, actually, to go back
7  a second, you testified earlier that
8  you spoke to departing employees when
9  they retired about their pension
10  benefits?
11    A.  Uh-huh.
12    Q.  Is that a yes?
13    A.  Yes.
14    Q.  Just remember you have to
15  answer verbally.
16    A.  Yes.
17    Q.  Were any of those retiring
18  employees 65 years old or older?
19    A.  I don't believe so.  I
20  believe they were all in their
21  mid-fifties.
22    Q.  So they were all, at least
23  among the grandfathered employees,
24  they were taking advantage of the

Page 45

1  option under the old Atlantic City
2  plan to retire early at age 55?
3    A.  Or thereabouts.  55, 56,
4  57.  I believe there was a ten-year
5  window from merger that they could
6  exercise that option.
7    Q.  Besides Mr. Ward, can you
8  remember the name of any other
9  individual with whom you shared your
10  concerns about the cash balance plan?
11    A.  That I shared my concerns?
12    Q.  Yes.
13    A.  In any depth no one other
14  than Mr. Ward.
15    Q.  Did anybody share their
16  concerns about the cash balance plan
17  with you?
18    A.  There was a lot of talk
19  amongst management employees that the
20  cash balance plan was not as
21  lucrative as the Heritage plan.
22    Q.  And by Heritage plan you
23  mean the previous Atlantic City plan?
24    A.  That is correct.  It was

12 (Pages 42 to 45)

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 46

1   casual dialogue in an office.
2       Q.   Do you believe personally
3   today that the cash balance plan is
4   not as lucrative as the original ACE
5   plan?
6       A.   Yes.
7       Q.   Why?
8       A.   Just by looking at that
9   Pension Estimator, knowing my current
10  age, my current length of service,
11  and seeing what people are leaving
12  now as that window for grandfathering
13  is closing, looking at their numbers.
14      Q.   So some departing employees
15  have shared their numbers with you?
16      A.   That's correct.
17      Q.   Do you remember who they
18  are?
19      A.   Yes.
20      Q.   Who?
21      A.   Scott Baker, for one.
22      Q.   Who else?
23      A.   Charles Weeks.
24      Q.   How do you spell Weeks?

Page 47

1       A.   W-E-E-K-S.
2       Q.   Okay.  Like multiple weeks?
3       A.   Yes.
4       Q.   Anybody else?
5       A.   Just them specifically
6   because of their -- they are my
7   contemporaries in the same building
8   performing the same function and are
9   capable in age.  Slightly older.
10      Q.   Do you know how old Mr.
11  Baker was when he retired?
12      A.   These gentlemen have not
13  retired.  They are -- they are
14  currently positioning to retire.
15      Q.   What do you mean by
16  "positioning to retire"?
17      A.   They have I presume called
18  an actuary to get those figures.
19      Q.   And how old is Mr. Baker
20  today, if you know?
21      A.   I want to say 54.
22      Q.   And Mr. Weeks?
23      A.   54.
24      Q.   And both Mr. Baker and Mr.

Page 48

1   Weeks are grandfathered?
2       A.   Yes, they are.
3       Q.   Now, when you say -- you
4   used the term numbers, that you
5   looked at their numbers.  I assume
6   that's the lump sum payment they'd be
7   entitled to upon retirement?
8       A.   That's correct.
9       Q.   Would it be your intention
10  when you retire to take your
11  retirement benefits in a lump sum
12  payment?
13      A.   More than likely.
14      Q.   Do you know any Conectiv
15  employee who was offered the option
16  of an immediate lump sum payment when
17  they retired who declined it?
18      A.   I can't say.
19      Q.   Can you think of any?
20      A.   No.
21      Q.   So to the best of your
22  knowledge, everyone that you know
23  who's retired has taken the option to
24  receive their benefits in a lump sum?

Page 49

1       A.   To the best of my
2   knowledge.
3       Q.   Let's take a look at
4   Pension Estimator.
5           MR. BASSMAN:  I think we're
6   up to 31.
7           (Exhibit D-31 was marked
8   for identification.)
9   BY MR. BASSMAN:
10      Q.   Mr. Fink, you've been
11  handed a document that's been marked
12  Defendant's Exhibit 31.  If you could
13  just take a moment to look it over.
14          Looks like I gave you the
15  wrong one.  This wasn't the one I
16  meant to give you.  Pass that back to
17  me.  We'll keep this and use it in a
18  little bit.
19          (Exhibit D-32 was marked
20  for identification.)
21  BY MR. BASSMAN:
22      Q.   Mr. Fink, you've been now
23  presented with a document that was
24  marked Defendant's Exhibit 32.  If

13 (Pages 46 to 49)

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 50

1   you could take a moment to look it
2   over, please.
3           MR. SAUDER:  I'll ask, as
4   we discussed yesterday, that this
5   portion of the transcript be marked
6   confidential.
7           MR. BASSMAN:  Okay.
8   BY MR. BASSMAN:
9       Q.   Have you had an opportunity
10  to review Defendant's 32?
11      A.   Yes.
12      Q.   And is Defendant's 32 a
13  copy of the Pension Estimator
14  calculations that you ran on the
15  Vanguard site?
16      A.   Yes.
17      Q.   Are there any Pension
18  Estimator calculations that you made
19  on the Vanguard site that are missing
20  from Defendant's Exhibit 32?
21      A.   No.
22      Q.   So this appears complete to
23  you?
24      A.   Yes.

Page 51

1       Q.   Looking at the first page
2   of Defendant's 32, on the bottom it
3   says the first estimate they created
4   was June 15, 2004.
5       A.   Yes.
6           MR. SAUDER:  For the
7   record, this is JIF 18.
8   BY MR. BASSMAN:
9       Q.   Does seeing that date
10  created 6/15/2004 entry refresh your
11  recollection as to when you started
12  having conversations with departing
13  employees about the amount of the
14  cash balance benefits versus benefits
15  under the old plan?
16      A.   More or less.
17      Q.   Were those conversations
18  around June of 2004?
19      A.   To the best of my
20  recollection.
21      Q.   Do you remember there being
22  much lag time between having those
23  conversations and you starting to run
24  numbers on the Pension Estimator?

Page 52

1       A.   I don't recall with
2   absolute certainty, but I don't think
3   there was very much.
4       Q.   And moving up on the first
5   page of Defendant's 32 you ran two
6   calculations on April 1, 2005.
7       A.   Yes.
8       Q.   Do you recall why you were
9   running calculations on that date?
10      A.   More than likely it
11  surrounded other individuals
12  separating and casual conversation
13  about dollar values of lump sums.
14      Q.   And those conversations
15  would have prompted your curiosity to
16  go back on to the Vanguard site and
17  run some numbers?
18      A.   Yes.
19      Q.   Moving ahead, you also made
20  some calculations June 27 of 2005.
21  Do you see that?
22      A.   Yes.
23      Q.   Do you recall why you were
24  making Pension Estimator calculations

Page 53

1   on that date?
2       A.   More than likely for the
3   same reason.
4       Q.   And moving up, October 31,
5   2006, do you recall why you were
6   making calculations that day?
7       A.   Probably verifying what the
8   dollar values looked like.
9       Q.   And why would you be
10  verifying what the dollar values
11  looked like on October 31 of 2006?
12      A.   For the same purpose, to
13  see if the -- with individuals over
14  the last ten years have separated not
15  in any -- there was no mass exodus
16  after the initial merger.  They
17  trickled out over that course of
18  time, and it very well could have
19  been I was just curious as to what
20  the dollar value looked like at that
21  time.
22      Q.   Same question for January
23  8th, 2007.
24      A.   That was just curiosity.

B0112

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 54

1    Q.   When you calculate
2   potential benefits under the Pension
3   Estimator, could you tell me what
4   information you enter into the
5   system.
6    A.   It asks you things like
7   spousal information, projected
8   retirement dates, things of that
9   nature.
10   Q.   Does it ask you to put in a
11  date when you'll stop working at
12  Conectiv?
13   A.   Yes, it does.
14   Q.   And Vanguard also asks you
15  to put in a date when you'll start
16  getting your pension payments, right?
17   A.   Both.
18   Q.   And they don't have to be
19  the same date?
20   A.   I believe that's correct,
21  yes.
22   Q.   Does the Pension Estimator
23  allow you to enter information about
24  what you think your salary increases

Page 55

1   might be in the future?
2    A.   I believe I saw that on
3   1/8/07 that it does.
4    Q.   And when you ran any of
5   these calculations, did you put in
6   any projected salary increases?
7    A.   If I did, it was more than
8   likely whatever the contractual
9   arrangement with the local union is,
10  because our salary structure is based
11  on a certain gap between that.
12   Q.   And if you look at, on the
13  first page of Defendant's 32, on the
14  far right-hand column you see Status.
15   A.   Uh-huh.
16   Q.   Is that a yes?
17   A.   Yes.
18   Q.   Just remember --
19   A.   Yes.
20   Q.   -- to keep answering
21  verbally.
22       Do you recall ever seeing
23  anything written in the Status
24  column?

Page 56

1    A.   No.
2    Q.   Any idea what the Status
3   column refers to?
4    A.   No.
5    Q.   You can put that document
6   aside.
7        When was the first time
8   that you spoke to a lawyer about your
9   concerns about the cash balance plan?
10  I just want to caution you, I only
11  want a date or approximate date in
12  response to my question.
13   A.   First conversation I ever
14  had with a lawyer would be with Mr.
15  Malone.
16   Q.   When was that?
17   A.   I want to say sometime
18  maybe in the third or fourth quarter
19  of '05.
20   Q.   And did you call Mr. Malone
21  or did he call you?
22   A.   No.  I called him.
23   Q.   What prompted you to call
24  Mr. Malone?

Page 57

1    A.   A conversation with a
2   coworker.
3    Q.   Which coworker?
4    A.   Mr. Ward.
5    Q.   Do you remember when that
6   conversation was?
7    A.   It would be in close
8   proximity to that time frame.
9    Q.   So just before you called
10  Mr. Malone, you had had a
11  conversation with Mr. Ward?
12   A.   Yes.
13   Q.   And what do you recall Mr.
14  Ward saying to you in this
15  conversation?
16   A.   I can't remember the -- the
17  exact dialogue, but the conversation
18  surrounded the cash balance plan.
19   Q.   Was this conversation in
20  person or over the phone?
21   A.   In person.
22   Q.   And who initiated it?
23   A.   I'm not sure.  We work in
24  the exact same area.

15 (Pages 54 to 57)

B0113

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 58

1    Q.  Do you remember the general
2  substance of what Mr. Ward said to
3  you?
4    A.  It was about the cash
5  balance plan.
6    Q.  Do you remember what he
7  said about the cash balance plan?
8    A.  We were just questioning
9  the validity of it versus the
10  heritage plan.
11    Q.  Why were you questioning
12  the validity of the cash balance
13  plan?
14    A.  About dollar amounts.
15    Q.  So when you say validity,
16  you were questioning which one was
17  higher or lower, the cash balance
18  plan or the old ACE plan?
19    A.  Yes.
20    Q.  Were either you or Mr. Ward
21  in this conversation questioning the
22  legal validity of the cash balance
23  plan?
24    A.  No.

Page 59

1    Q.  Did Mr. Malone's name come
2  up in this conversation?
3    A.  Yes.
4    Q.  And who brought it up?
5    A.  Mr. Ward.
6    Q.  And what did Mr. Ward say
7  to you about Mr. Malone?
8    A.  I actually asked Mr. Ward
9  about Mr. Malone, about attorneys.
10    Q.  Okay.  So you asked Mr.
11  Ward if there was an attorney that
12  you could call to discuss your
13  concerns about the cash balance plan?
14    A.  That's correct.
15    Q.  And he gave you Mr.
16  Malone's name?
17    A.  That's correct.
18    Q.  Did he tell you if he had
19  already spoken to Mr. Malone?
20    A.  I don't recall if he said
21  he had spoken to him or he would
22  speak to him at that time.
23    Q.  In this conversation, did
24  Mr. Ward discuss with you the

Page 60

1  possibility of a class action
2  lawsuit?
3    A.  No.
4    Q.  Did Mr. Ward tell you where
5  he got Mr. Malone's name from?
6    A.  I don't recall.
7    Q.  Did you ask?
8    A.  No.
9    Q.  Before calling Mr. Malone,
10  did you do any research about Mr.
11  Malone or his law firm?
12    A.  No.
13    Q.  Have you discussed this
14  lawsuit with anyone other than your
15  attorneys?
16    A.  No.  Not really, no.
17    Q.  Is it no or is it not
18  really?
19    A.  No.
20    Q.  When I say discussions with
21  attorneys, just to be clear, if you
22  and Mr. Ward and Mr. Charles all
23  together were meeting with your
24  attorneys, I'm considering that a

Page 61

1  discussion with your attorneys.
2    A.  Yes.
3    Q.  Is that what you
4  understood?
5    A.  Yes.
6    Q.  Okay.  We've been going
7  just a little over an hour.  So I
8  just wanted to see if you needed a
9  break or if you wanted to keep
10  rolling.
11    A.  No.
12    Q.  Okay.  Again, if you feel
13  you need a break at any point, you
14  know, just pipe up.
15        Let me take a step back.
16  What is your understanding as to how
17  benefits are calculated under the
18  cash balance plan?
19    A.  I don't have a good
20  understanding.
21    Q.  Tell me what your
22  understanding is, you know, today.
23  Knowing that you're not an expert in
24  this.

Page 62

1      MR. SAUDER:  And, again, I
2   would just caution the witness to not
3   discuss anything that you discussed
4   with counsel with regard to what your
5   understanding is.
6        If you have any
7   understanding independent of any
8   conversations that you've had with
9   your attorneys, that's what you can
10  answer.
11      THE WITNESS:  I just don't
12  have a good understanding of it to be
13  very candid.
14  BY MR. BASSMAN:
15     Q.  Is it your testimony that
16  you have no understanding as to how
17  benefits are calculated under the
18  cash balance plan outside of
19  discussions with your attorneys?
20     A.  Yes.
21     Q.  Have you ever heard the
22  term, again, outside of discussions
23  with your attorneys, have you ever
24  heard the term pay credit rate?

Page 63

1      A.  No.
2      Q.  Ever heard the term
3   interest credit?
4      A.  I may have heard that term.
5      Q.  Do you remember what
6   context you may have heard the term?
7      A.  Maybe in a document or on
8   an annual statement possibly.
9      Q.  Ever heard the term
10  transition credit?  Again, outside of
11  discussions with your lawyers.
12     A.  I've heard the term, but
13  I'm not necessarily absolutely
14  familiar as to what it means.
15     Q.  Let's take a look at
16  Defendant's Exhibit 31.  Have you had
17  an opportunity to look over
18  Defendant's Exhibit 31?
19     A.  Yes.
20     Q.  And is Defendant's Exhibit
21  31 a series of statements about the
22  value of your cash balance account
23  that you received from Conectiv and
24  Vanguard?

Page 64

1      A.  Yes.
2      Q.  I'd like to start with the
3   first page titled Conectiv's Cash
4   Balance Plan.  Do you see that?
5      A.  Yes.
6      Q.  And it says, the second
7   sentence, it says, This statement
8   shows the opening cash balance
9   account on January 1, 1999 for Joseph
10  Fink.
11      Did you receive the first
12  page of Defendant's Exhibit 31 in
13  1999?
14     A.  Yes.
15     Q.  Do you recall approximately
16  when in 1999 you received it?
17     A.  Not really.
18     Q.  Do you see there's a
19  reference to your opening cash
20  balance 66,851.03?
21     A.  Yes.
22     Q.  Do you have any
23  understanding as to what that dollar
24  figure represents?

Page 65

1      A.  Outside of my opening cash
2   balance?
3      Q.  Yeah.  How that dollar
4   figure was computed.
5      A.  No.
6      Q.  If you look just to the
7   right of the dollar figure you see a
8   little text.
9      A.  Yes.
10     Q.  And you see one of the
11  sentences there is, Your account
12  balance was determined to be the
13  present value of your accrued benefit
14  as of December 31, 1999 determined
15  using actuarial tables to reflect
16  life expectancy and the time value of
17  money.
18      Do you see that language?
19     A.  Yes.
20     Q.  Based on that sentence, do
21  you have any understanding as to how
22  this opening cash balance dollar
23  figure was computed?
24     A.  Vaguely.

B0115

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 66

1    Q.  What's your vague
2  understanding?
3    A.  I don't know where the --
4  the numbers themselves actually came
5  from.  Where is the -- I mean what's
6  the actuarial tables?  I don't know
7  what the actuarial -- what tables
8  they're referring to.  I've never
9  seen these tables.
10    Q.  But is it your
11  understanding that the actuarial
12  tables refer to your accrued benefit
13  under the old Atlantic City plan?
14    A.  I would believe so.
15    Q.  So that this opening cash
16  balance of 66,851.03 relates in some
17  way to the benefit that you accrued
18  under the old Atlantic City plan?
19    A.  Yes.
20    Q.  Is it your understanding
21  that this is an attempt to give a
22  lump sum value as of January 1999,
23  January 1, 1999, as the benefits you
24  had accrued under the old Atlantic

Page 67

1  City plan?
2    A.  Yes.
3    Q.  By the way, in any of the
4  documents in Defendant's Exhibit 31,
5  are you aware of any factual
6  misstatements or misrepresentations?
7    A.  No.
8    Q.  If you go to the second
9  page of D-31.  The document Bates
10  number -- and Bates numbers are those
11  little numbers on the right-hand
12  corner of the page that lawyers stick
13  on.  You'll see that's there's a JIF
14  002.
15    A.  Yes.
16    Q.  Are the documents that are
17  Bates numbered JIF 002 and 003 your
18  Vanguard statement of your cash
19  balance benefits that were earned in
20  1999?
21    A.  Yes.
22    Q.  I'd like to take a look
23  through the statement with you.  You
24  see under the heading Your Cash

Page 68

1  Balance Account?
2    A.  Yes.
3    Q.  And there's Opening
4  Balance?
5    A.  Yes.
6    Q.  And opening balance is that
7  same $66,851.03 number?
8    A.  Yes, it is.
9    Q.  And underneath opening
10  balance there's Employer Contribution
11  Credit.  Do you see that?
12    A.  Yes, I do.
13    Q.  Do you have any
14  understanding as to what employer
15  contribution credit means?
16    A.  I speculate that it would
17  be what the employer has paid into
18  this fund.
19    Q.  If you look down -- see,
20  there's some text under Your Cash
21  Balance Account further down on the
22  page?
23        If you look at the second
24  paragraph you see it says, The

Page 69

1  employer contribution credit shown
2  above is based on your age as of
3  12/31/99, and then there's a
4  parenthesis that says i.e., you know,
5  five percent pay credit for under age
6  50 and so on?
7    A.  Yes.
8    Q.  And does that paragraph
9  help you to understand what the term
10  employer contribution credit means?
11    A.  Yes.
12    Q.  What do you think it means?
13    A.  It's in effect what I
14  previously stated, that it's the
15  employer's contribution based on
16  apparently age and salary structure.
17    Q.  Right.  So that each year
18  Conectiv takes a certain percentage
19  of your salary and puts that in as
20  the employer contribution credit into
21  your cash balance account, right?
22    A.  Yes.
23    Q.  And if you look at the
24  employer contribution credit

B0116

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 70

1  paragraph that we were just focusing
2  on, is it correct that the pay credit
3  rate increases as you age?
4      A.  Yes, it does.
5      Q.  So Conectiv is putting a
6  higher percentage of salary for older
7  workers than younger workers into
8  cash balance accounts, right?
9      A.  I would imagine it would
10  also be tied to salary structure.
11     Q.  Right.
12     A.  Yes.
13     Q.  But the percentage of the
14  salary that's being taken?
15     A.  On age, yes.  Percentage
16  does elevate with age.
17     Q.  Let's go back up to the box
18  with the numbers.  And underneath
19  Employer Contribution Credit you see
20  an entry that says Interest Credit.
21     A.  Yes.
22     Q.  What is your understanding
23  of what interest credit refers to?
24     A.  I'm reading that off of

Page 71

1  this statement.  I understand what
2  that statement says.
3      Q.  Are you looking at the
4  paragraph that begins The interest
5  credit is based on...?
6      A.  Yes.
7      Q.  Okay.  And reading that
8  paragraph, what do you understand?
9      A.  It's based on the treasury
10  bond.
11     Q.  Okay.  So Conectiv based on
12  the treasury bond rate will credit
13  your account with a certain amount of
14  money in that year, right?
15     A.  Yes.
16     Q.  And that's what happened
17  here.  Your account was credited with
18  $3,349.24.
19     A.  Yes.
20     Q.  As best you understand, do
21  all employees regardless of age
22  receive the same interest credit?
23     A.  Yes.
24     Q.  And if we go back up to the

Page 72

1  little box with the numbers again,
2  you see there's transition credit.
3      A.  Yes.
4      Q.  Okay.  What is your
5  understanding of transition credit?
6  And, again, feel free to look at the
7  paragraph down here that discusses
8  transition credits.
9      A.  It's based on service time,
10  service longevity.
11     Q.  So that, for instance, for
12  employees with 20 to 35 years of
13  service, you know, would receive an
14  additional four percent of their pay
15  credited into their cash balance
16  account, right?
17     A.  That's what it states.
18     Q.  Any reason to believe it's
19  wrong?
20     A.  No.
21     Q.  And the transition credit
22  rate increases when you work more
23  years, right?
24     A.  Yes, it does.

Page 73

1      Q.  Then if you go back and
2  Look at top, let's go back to the
3  first page of this 1999 statement,
4  you see an ending balance?
5      A.  Yes, I do.
6      Q.  And would you agree that if
7  you took the opening balance and
8  added the employer contribution
9  credit, interest credit, and
10  transition credit you get an ending
11  balance?
12     A.  Yes.
13     Q.  And is it your
14  understanding that the ending balance
15  represents the lump sum value of your
16  cash balance benefits, you know, as
17  of the date of statement?
18     A.  Yes.
19     Q.  Now, you received this
20  statement in 2000; is that correct?
21     A.  Yes.
22     Q.  And this statement as we
23  just walked through provides
24  information about how your cash

B0117

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 74

1  balance benefits are computed, right?
2      A.   Yes, it does.
3      Q.   And you testified earlier
4  that you hadn't seen any documents
5  that explained how your cash balance
6  benefits are computed, right?
7          MR. SAUDER:  Objection.  I
8  think that mischaracterizes the
9  testimony.
10 BY MR. BASSMAN:
11     Q.   Okay.  I'll rephrase.
12         Have you ever seen any
13 documents that explain how your cash
14 balance benefits are computed?
15     A.   Outside of this document,
16 no.
17     Q.   I assume when you say "this
18 document," you mean outside of this
19 Vanguard statement and other Vanguard
20 statements.
21     A.   Yes.
22     Q.   So the Vanguard statements
23 contain some explanation as to how
24 your cash balance benefits are

Page 75

1  calculated, but no other documents
2  that you've seen do?
3      A.   That's correct.
4      Q.   When you received your
5  Vanguard statements, did they come in
6  the mail?
7      A.   Yes.
8      Q.   And when you received one,
9  did you read it?
10     A.   Yes.
11     Q.   Did you read all of the
12 text that we just went through?
13     A.   Not necessarily.
14     Q.   Did you just look at the
15 numbers and the balances?
16     A.   More often than not.
17     Q.   And clearly you didn't
18 throw out the statements that you
19 received, right?
20     A.   That's correct.
21     Q.   Did you put them in a file
22 somewhere?
23     A.   Yes, I did.
24     Q.   Is there a file in your

Page 76

1  house where you keep pension-related
2  documents?
3      A.   There's a file in my house
4  that has whatever they send in the
5  mail to me with respect to these
6  statements.
7      Q.   And do you also keep 401(k)
8  plan statements in that file?
9      A.   In a different file.
10     Q.   Okay.  So you have a file
11 just for the cash balance plan.
12     A.   (Witness nods.)
13     Q.   Is that yes?
14     A.   Yes.
15     Q.   Sorry, I didn't hear you.
16         Have you provided your
17 lawyers with all the documents that
18 are in that file?
19     A.   Yes, I have.
20     Q.   You can put this to the
21 side.
22         When did you first learn
23 that Conectiv was switching to a cash
24 balance plan?

Page 77

1      A.   Somewhere in the first
2  quarter of 1999.
3      Q.   And how did you learn?
4      A.   Probably off of a bulletin
5  board.
6      Q.   When you say off of a
7  bulletin board, is there a physical
8  bulletin board in your office?
9      A.   Yes.
10     Q.   And it has company
11 announcements on it?
12     A.   Yes.
13     Q.   Are these announcements
14 that are tacked on to the board?
15     A.   Yes.
16     Q.   Did you attend any meetings
17 in 1998 or 1999 about the cash
18 balance plan conversion?
19     A.   No.
20     Q.   Were you invited to any?
21     A.   Not that I recall.
22     Q.   What do you remember seeing
23 on the bulletin board that told you
24 about the cash balance plan

B0118

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 78

1  conversion?
2      A.  I don't recall what the
3  document itself looked like.
4      Q.  Was it anything more
5  detailed than there will be a
6  conversion to something called the
7  cash balance plan?
8      A.  I don't even know if it
9  was -- it was very broad based.
10  Something maybe along the lines of
11  cash balance is coming or, you know.
12      Q.  No details, though?
13      A.  No.  No details, no.
14      Q.  Do you recall receiving any
15  documents from Conectiv?  When I say
16  receiving, I mean receive in any way.
17  E-mail to you, sent to your mailbox,
18  physical mailbox, either at home or
19  work, handed out to you.
20          Do you remember receiving
21  any documents from Conectiv
22  discussing the cash balance plan
23  conversion?
24      A.  No.

Page 79

1      Q.  A question I meant to ask
2  you earlier, I assume the only lawyer
3  you've spoken to you about your
4  concerns of the cash balance plan is
5  Mr. Malone and other people in his
6  firm.
7      A.  That is correct.
8      Q.  Let's take a look at what
9  was previously marked Defendant's
10  Exhibit 1, and if you could take a
11  look over that.
12      A.  Okay.
13      Q.  Have you had a chance to
14  look over Defendant's Exhibit 1?
15      A.  Yes.
16      Q.  Ever seen this document
17  before?
18      A.  Never.
19      Q.  Ever seen any document
20  before titled EMerging Times?
21      A.  I don't recall.
22      Q.  Does Conectiv from time to
23  time provide newsletters to its
24  employees?

Page 80

1      A.  PHI has a monthly
2  newsletter.
3      Q.  As I said earlier, when I
4  say Conectiv I mean everybody.
5      A.  Currently, yes.
6      Q.  Do you know how long those
7  newsletters have been coming?
8      A.  Since the second merger.
9  Approximately six, seven months after
10  the second merger.
11      Q.  Which would be
12  approximately when?
13      A.  Within the last 18 months.
14      Q.  Before the second merger,
15  did you receive newsletters from
16  management?
17          MR. SAUDER:  Can we just
18  clarify what you mean by the second
19  merger.
20          THE WITNESS:  The merger of
21  Conectiv with Pepco.
22  BY MR. BASSMAN:
23      Q.  Okay.  And before that
24  second merger, did you receive

Page 81

1  employee newsletters?
2      A.  Rarely.
3      Q.  When you've received
4  employee newsletters at any time, has
5  it been your practice to read them?
6      A.  Yes.
7      Q.  And when you read them, do
8  you read them cover to cover, every
9  word, or do you read them
10  selectively?
11      A.  I skim them, because
12  they're generally about other
13  employees, retirements, hirings,
14  night away campaigns, things of that
15  nature.
16      Q.  Ever recall seeing any
17  reference in any of the newsletters
18  you've ever seen from management
19  about pension plan issues?
20      A.  No.
21      Q.  If you look in Defendant's
22  Exhibit 1, on the first page you'll
23  see there's a column on the
24  right-hand side.

B0119

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 82

1    A.  Yes.
2    Q.  And if you look on the
3  bottom right you see there's a Q and
4  A between ET and BW.  Do you see
5  that?
6    A.  Uh-huh.
7    Q.  Yes?
8    A.  Yes.
9    Q.  Okay.  Again, just try to
10  remember to answer verbally.
11    A.  Yes.
12    Q.  If you go in BW's comments
13  to around the middle of that
14  paragraph, do you see a sentence that
15  begins A new pension plan?
16    A.  Yes.
17    Q.  Do you see the sentence, A
18  new pension plan will replace the old
19  final pay plans with individual
20  portable accounts?
21    A.  Yes, I see that.
22    Q.  Do you remember any
23  discussion in the fall of 1997 around
24  your office about a new pension plan

Page 83

1  coming in to place that will replace
2  the old one?
3    A.  None.
4    Q.  You can put that aside.
5      Take a look at what's been
6  previously marked Defendant's Exhibit
7  2.
8    A.  Okay.
9    Q.  Have you had an opportunity
10  to look over Defendant's 2?
11    A.  Yes.
12    Q.  Ever seen this before?
13    A.  No.
14    Q.  If you could turn to the
15  second page of Defendant's Exhibit 2,
16  and just read over to yourself on the
17  left-hand column the Q and A that
18  begins ET, Can you tell us more about
19  the new pension arrangement, and just
20  read that question and BW's response
21  to it to yourself.
22      MR. SAUDER:  This is PHI
23  3362.
24      THE WITNESS:  Okay.

Page 84

1  BY MR. BASSMAN:
2    Q.  Have you had a chance to
3  review the Q and A that I just
4  directed you to?
5    A.  Yes.
6    Q.  In just that Q and A that I
7  directed you to, on page PHI 3362,
8  did you see any misstatements of
9  fact?
10      MR. SAUDER:  Objection.
11  You can answer it if you understand
12  the question.
13      THE WITNESS:  With respect
14  to what parts of it?
15  BY MR. BASSMAN:
16    Q.  Is anything in the BW
17  paragraph factually inaccurate as far
18  as you know?
19    A.  Not to my knowledge.
20    Q.  Okay.  Put that one aside.
21      Moving along, let's take a
22  look at what's been previously marked
23  Defendant's Exhibit 3.
24    A.  Okay.

Page 85

1    Q.  Have you had a chance to
2  look over Defendant's Exhibit 3?
3    A.  Yes.
4    Q.  Ever seen this before?
5    A.  No.
6    Q.  If you could turn to the
7  fourth page of Defendant's 3, which
8  has the Bates stamp JMC 447.
9    A.  Okay.
10    Q.  Do you see some handwriting
11  on that page?
12    A.  Yes, I do.
13    Q.  Do you recognize the
14  handwriting?
15    A.  No, I don't.  It's not
16  mine.
17    Q.  You can put that aside.
18      Let's take a look at what's
19  been previously marked Defendant's
20  Exhibit 4.
21      MR. SAUDER:  Just for the
22  record, this is JMC 215 through 217.
23      THE WITNESS:  Okay.
24  BY MR. BASSMAN:

22 (Pages 82 to 85)

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 86

1    Q.  Have you had an opportunity
2  to review Defendant's Exhibit 4?
3    A.  Yes, I have.
4    Q.  Ever seen this document
5  before?
6    A.  No, I have not.
7    Q.  Have you ever received
8  documents from Conectiv that are
9  titled facts, f-a-c-t-s?
10   A.  Very rarely.
11   Q.  When do you recall seeing
12  documents with the header "facts?"
13   A.  Mostly secondhand.  I mean,
14  during that time, this time
15  specifically, there was a large
16  amount of physical transition
17  movement from one place to another as
18  a result of downsizing buildings, and
19  for the longest time mail stops were
20  absolute chaos.
21      MR. SAUDER:  I just ask you
22  to define what you mean by "this
23  time."  What time frame are you
24  talking about?

Page 87

1      THE WITNESS:  "This time"
2  we're talking about in the first half
3  of 1999 going up through '98 to the
4  merger.
5  BY MR. BASSMAN:
6    Q.  So when you say the merger,
7  the merger between Atlantic City and
8  DelMarVa?
9    A.  That's correct.
10   Q.  But you have seen documents
11  with the heading "facts" before?
12   A.  Yes.
13   Q.  When you say secondhand, do
14  you mean that other employees would
15  give them to you?
16   A.  Lying about.
17   Q.  Okay.  So they would be
18  lying about the office and you would
19  pick one up?
20   A.  Well, I don't mean lying in
21  any great numbers.  I mean, if I went
22  to another facility and saw something
23  laying there I may have went, picked
24  it up and glanced at it casually.

Page 88

1    Q.  But you don't remember
2  receiving documents with the title
3  "facts" in your mailbox either at
4  work or at home?
5    A.  That's correct.
6    Q.  In your review of
7  Defendant's Exhibit 4, did you see,
8  and again, just to the best of your
9  knowledge, any representations that
10  were made that are factually
11  inaccurate?
12   A.  No.
13   Q.  And would you agree that
14  Defendant's Exhibit 4 contains an
15  explanation as to how benefits are
16  calculated under the cash balance
17  plan?  Again, to the best of your
18  knowledge.
19   A.  Yes.
20   Q.  You can put this one aside.
21      Move on to Defendant's
22  Exhibit Number 6.  If you could take
23  a minute to look over that.
24   A.  Okay.

Page 89

1    Q.  Have you had an opportunity
2  to review Defendant's Exhibit 6?
3    A.  Yes.
4    Q.  Ever seen this before?
5    A.  No.
6    Q.  On December 21, 1998, were
7  you a Conectiv management employee?
8    A.  Yes, I was.
9    Q.  And it's your testimony
10  that even though you were a Conectiv
11  management employee, you never
12  received this notice?
13   A.  Yes, that is correct.
14   Q.  Did anyone else with whom
15  you worked in late 1998, early 1999
16  tell you that they had received a
17  notice like this?
18   A.  No.
19      MR. SAUDER:  Objection to
20  the term "notice."
21  BY MR. BASSMAN:
22   Q.  In your review of
23  Defendant's Exhibit 6, and, again, to
24  the best of your knowledge, did you

B0121

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 90

1  see any statements that you believe
2  are factually inaccurate?
3      A.  No.
4      Q.  Would you agree that
5  Defendant's Exhibit 6 explains how
6  benefits are calculated under the
7  cash balance plan?
8      A.  Yes.
9      Q.  Okay.  You can put this one
10  aside.
11      Probably what you guessed
12  is the next one we're going to do is
13  Defendant's Exhibit Number 7.  Take a
14  moment to look that over.
15      MR. SAUDER:  For the
16  record, this is JMC 190 through 196.
17      THE WITNESS:  Okay.
18  BY MR. BASSMAN:
19      Q.  Have you had a chance to
20  look over Defendant's Exhibit 7?
21      A.  Yes, I have.
22      Q.  Ever seen this before?
23      A.  No, I have not.
24      Q.  Have you ever seen any

Page 91

1  documents before titled Your Conectiv
2  Total Rewards?
3      A.  No.
4      Q.  Anybody else with whom you
5  work ever tell you that they received
6  a document titled Your Conectiv Total
7  Rewards?
8      A.  No.
9      Q.  Ever see a document in a
10  Conectiv facility titled Your
11  Conectiv Total Rewards?
12      A.  No.
13      Q.  In your review of
14  Defendant's Exhibit 7, did you see,
15  and, again, just to the best of your
16  knowledge, any factual inaccuracies?
17      A.  No.
18      MR. SAUDER:  Objection.
19  You can answer.
20  BY MR. BASSMAN:
21      Q.  And would you agree that
22  Defendant's Exhibit 7 contains an
23  explanation as to how benefits are
24  calculated under the cash balance

Page 92

1  plan?
2      A.  Yes.
3      Q.  Put that one to the side.
4      Let's take a look at what's
5  been previously marked Defendant's
6  Exhibit 8.  If you could take a look
7  over that.
8      Have you had a chance to
9  review Defendant's Exhibit 8?
10      A.  Yes, I have.
11      Q.  And have you ever seen this
12  before?
13      A.  No, I have not.
14      Q.  In your review of
15  Defendant's Exhibit 8, did you see
16  any representations that you think
17  were false?
18      MR. SAUDER:  Objection.
19      THE WITNESS:  I just
20  haven't seen this document.
21  BY MR. BASSMAN:
22      Q.  Okay.  And my question is,
23  just when you looked it over now for
24  the first time, did you say anything

Page 93

1  in the document that you thought was
2  untrue?
3      A.  No.
4      MR. SAUDER:  Objection.
5  Same objection.
6  BY MR. BASSMAN:
7      Q.  Do you agree that
8  Defendant's Exhibit 8 also contains
9  an explanation as to how benefits are
10  calculated under the cash balance
11  plan?
12      A.  Yes.
13      Q.  Mr. Fink, do you have any
14  understanding as to why Conectiv
15  converted to a cash balance plan?
16      A.  Do I have any
17  understanding?
18      Q.  Yes.
19      MR. SAUDER:  Independent of
20  any conversations you had with your
21  attorney.
22      THE WITNESS:  No.
23  BY MR. BASSMAN:
24      Q.  And, again, independent of

B0122

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 94

1    any conversations with your
2    attorneys, do you have an opinion as
3    to why Conectiv converted to a cash
4    balance plan?
5        A.   Yes.
6        Q.   What is it?
7        A.   Cost savings.
8        Q.   Just a way to save money?
9        A.   Yes.
10       Q.   And why do you think that
11   it's cheaper for Conectiv to provide
12   the cash balance plan than the
13   previous Atlantic City plan?
14       A.   In one of those documents I
15   saw something I had never seen in
16   writing before about a 650 percent
17   cap on that money.
18       Q.   When you say one of those
19   documents, you mean one of the
20   documents that you've looked at this
21   morning?
22       A.   Yes.  That is correct.
23       Q.   Besides the document that
24   you looked at this morning with the

Page 95

1    reference to the 650 percent cap, any
2    other reason why you think the cash
3    balance plan is cheaper for Conectiv
4    than the old Atlantic City plan?
5        A.   No.
6        Q.   So did you just form that
7    opinion this morning?
8        A.   No.  I said that was the
9    first time I saw that in writing.
10       Q.   Okay.  Had you heard
11   verbally that the cash balance plan
12   is cheaper than the old Atlantic City
13   plan?
14       A.   Yes.
15       Q.   From whom?  And, again,
16   excluding your lawyers.
17       A.   My contemporaries.
18       Q.   Who?
19       A.   Well, it's -- it's widely
20   spoken amongst management people that
21   are subject to this retirement.
22   There is frequently reference to that
23   650 percent cap that I've never seen
24   in writing.

Page 96

1        Q.   But you had heard about it
2    before?
3        A.   Yes.
4        Q.   Let's take a look at what's
5    been previously marked Defendant's
6    Exhibit 9.
7            MR. SAUDER:  This is PHI
8    3428 through 3431.
9            THE WITNESS:  Okay.
10   BY MR. BASSMAN:
11       Q.   Have you had a chance to
12   look over Defendant's Exhibit 9?
13       A.   Yes, I have.
14       Q.   Ever seen it before?
15       A.   No, I have not.
16       Q.   Ever seen an employee
17   newsletter from Conectiv titled
18   InSight before?
19       A.   On occasion.
20       Q.   Did you receive a copy of a
21   newsletter titled InSight in your
22   home or employee mailboxes?
23       A.   No.
24       Q.   In what context did you see

Page 97

1    InSight?
2        A.   Casual contact in, you
3    know, company facility.
4        Q.   But a copy has never been
5    sent to you as far as you remember?
6        A.   No.
7        Q.   When you are seeing copies
8    of InSight, the newsletter InSight in
9    facilities, is it your practice to
10   read it?
11       A.   Not necessarily.  I have on
12   occasion picked them up and scanned
13   them, as I said previously.
14       Q.   Why don't you read them all
15   as a matter of practice?
16       A.   It's -- if I'm not getting
17   it, I'm not really -- at the time --
18   at the time of merger there was also
19   some malfunction with home addresses,
20   and for the longest time all of my
21   company materials were going to my
22   ex-wife's house, including sometimes
23   statements and things of that nature.
24       Q.   Do you recall when that

B0123

Page 98

1  problem was corrected?
2      A.  It was corrected, it
3  happened again, and then it was
4  re-corrected.  I can't tell you
5  specifically what those dates were.
6      Q.  Has the company
7  inadvertently sent mail to your
8  ex-wife's address in the last five
9  years?
10     A.  Yes.
11     Q.  Last two years?
12     A.  Yes.
13     Q.  Last year?
14     A.  Yes.
15     Q.  Okay.  We're only in '07.
16     A.  Not this year.  It
17 surrounded existing stock
18 information.
19     Q.  If you could turn to the
20 second page of Defendant's Exhibit 9,
21 and if you could look on -- you see
22 there's a left-hand column titled
23 Cash Balance Communications Coming.
24     A.  Yes.

Page 99

1      Q.  If you look at the bottom
2  of that column, do you see a heading
3  July, August Cash Balance Pension
4  Plan Meetings for Employees?
5      A.  I do.
6      Q.  Does that heading refresh
7  your recollection as to whether you
8  attended any meetings about the cash
9  balance plan?
10     A.  I did not attend any such
11 meeting or did I have knowledge of
12 any such meetings.
13     Q.  Never heard at all from
14 anyone you worked with in 1999 that
15 there were meetings being conducted
16 about the cash balance plan?
17     A.  There was always some
18 rhetoric about the meetings being
19 held, but there was never any held in
20 the facility I worked at nor was
21 there any information relating to
22 attendance locally to one.
23     Q.  And what facility were you
24 located in in 1999?

Page 100

1      A.  In 1999 I was relocated to
2  the Pleasantville district from the
3  Cologne complex in Cologne, New
4  Jersey.
5      Q.  And you weren't invited to
6  attend any meetings in a different
7  facility in 1999?
8      A.  No.  No.  Somewhere in the
9  beginning of -- excuse me --
10 somewhere in the mid-portion of '98
11 we transitioned from one building to
12 another.  Bear in mind that I am the
13 only management employee in my area.
14 I supervised at that time 30 union
15 people that were unaffected by this.
16     Q.  When you say in your area,
17 is that in the Pleasantville
18 facility?
19     A.  Yes.
20     MR. BASSMAN:  Okay.  Let's
21 take a five-minute break.
22     RECESS
23     MR. BASSMAN:  Back on the
24 record.

Page 101

1  BY MR. BASSMAN:
2      Q.  Mr. Fink, could you please
3  take a look over a document
4  previously marked Defendant's Exhibit
5  10.
6      Have you had an opportunity
7  to look over Defendant's Exhibit 10?
8      A.  Yes, I have.
9      Q.  Ever seen this before?
10     A.  No, I have not.
11     Q.  If I could direct your
12 attention on Defendant's Exhibit 10
13 to the third paragraph and the second
14 sentence.
15     Do you see the sentence,
16 quote, Recent stories in the national
17 media have raised concerns about some
18 cash balance plans?
19     A.  I see that.
20     Q.  Do you remember in 1999
21 seeing any stories in the media about
22 cash balance plans?
23     A.  I don't recall.
24     Q.  Do you remember any

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 102

1  discussion with coworkers in 1999
2  about media stories about cash
3  balance plans?
4      A.  One liners.  No real
5  discussion.
6      Q.  What sort of one liners do
7  you remember?
8      A.  People's comments of, you
9  know, they're really getting us or
10  this is, you know, a real bargain
11  kind of thing.
12     Q.  A real bargain for the
13  employer?
14     A.  Yes.  It was derisive type
15  of things.
16         MR. SAUDER:  And just to
17  clarify, just to read the full
18  sentence it says, Recent stories in
19  the national media have raised
20  concerns about some cash balance
21  plans that do not offer the same
22  level of financial security or
23  grandfathering provisions as
24  Conectiv's cash balance pension plan,

Page 103

1  period.
2          Next sentence, One part of
3  the presentation will address these
4  concerns and demonstrate how
5  Conectiv's plan is different.
6  BY MR. BASSMAN:
7      Q.  Who do you remember in 1999
8  making these derisive comments?
9      A.  I can't -- I couldn't give
10  you a name.  It was just the
11  common -- it was common bantering of
12  anybody that was affected by this.
13     Q.  Did you take part in that
14  bantering in 1999?
15     A.  I can't say that I did, no.
16     Q.  Can you say that you
17  didn't?
18     A.  I couldn't say either way.
19     Q.  It's possible?
20     A.  It's possible.
21     Q.  In 1999 were you unhappy
22  with the switch to a cash balance
23  plan?
24         MR. SAUDER:  Objection to

Page 104

1  the term "unhappy."
2  BY MR. BASSMAN:
3      Q.  Well, do you want me to
4  rephrase the question?
5      A.  Please.
6      Q.  In 1999, did you believe
7  that you would be adversely affected
8  financially by the switch to a cash
9  balance plan?
10     A.  I was unsure but highly
11  suspicious.
12     Q.  And why were you suspicious
13  in 1999?
14     A.  Because of things like we
15  just touched on.  Bantering of
16  coworkers as you pass by and
17  one-line, you know, statements about
18  total payoffs and what they could
19  possibly be and the loss of funds.
20     Q.  When other employees made
21  statements to you in 1999, these
22  derisive comments that you've
23  described, did you ask them any
24  follow-up questions?

Page 105

1      A.  No.
2      Q.  After you heard these
3  derisive comments in 1999, did you
4  yourself take any steps to research
5  cash balance plans?
6      A.  I can't say that I did at
7  this point in 1999.  I can't say
8  that.  I don't think I had a good
9  enough understanding.  I don't think
10  there was enough information
11  presented to me, or at least that I
12  had access to, based on the things
13  that I have explained to you about
14  the closing of facilities, the
15  movement of people, and so on.
16     Q.  Understanding that you
17  didn't feel you had much information
18  in 1999, did you take any steps in
19  1999 to find out more about
20  Conectiv's cash balance plan?
21     A.  Outside of my contact to
22  the HR representative to say, you
23  know, is there any information about
24  this in maybe '04, I had a similar

27 (Pages 102 to 105)

B0125

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 106

1   kind of contact casually with that
2   person because I've known the HR
3   representative; actually used to work
4   for me.
5       Q.   So in 1999 you went and
6   spoke with the HR representative?
7       A.   I can't say that I sought
8   him out.  It was a casual contact
9   somewhere.  You know, it was like,
10  hey, George, you know, what's up with
11  that kind of thing.
12      Q.   What's George's last name?
13      A.   Bleazard.
14      Q.   Can you spell that.
15      A.   B-L-E-A-Z-A-R-D.
16      Q.   And what did George say to
17  you?
18      A.   He said he thought it was
19  better because it was portable and so
20  on and the company was very adamant
21  about that it was better, from what
22  little information I could ever get,
23  because it was portable, and I see
24  that in these documents frequently.

Page 107

1       Q.   What is your understanding
2   of the term portable?
3       A.   There was some dialogue at
4   some point, and I can't tell you
5   where or when, about the American
6   work force and how people that are 21
7   won't have jobs that will last 20, 25
8   years, 30 years for large
9   corporations or utilities and retire
10  from them.
11          People would have
12  futuristically three, four short-term
13  stints of employment, five years,
14  blah, blah, blah, ten years, 15
15  years.
16          Portable meaning that you
17  spend five years at AE and you take
18  your pension, it's not frozen into
19  your pension plan, you take that lump
20  sum and you can move it to where you
21  would want to move it to.
22      Q.   And is it your
23  understanding that under the old
24  Atlantic City plan, if, say, an

Page 108

1   employee left the company at age 30
2   they couldn't take an immediate lump
3   sum on their pension; they had to
4   wait until age 55 or 65?
5       A.   That is correct.  That was
6   my understanding.
7       Q.   Do you agree with George
8   today that the portability in the
9   cash balance plan is a benefit that
10  wasn't contained in the old Atlantic
11  City plan?
12      A.   It may be the only benefit.
13      Q.   But it is a benefit?
14      A.   I would think it would be
15  beneficial for anybody that was a
16  short-term person of five, six,
17  seven, eight years to be able to --
18  and young, to be able to move their
19  money where it could do them more
20  justice where they could get a bigger
21  sum of money that they could accrue
22  interest rates on.
23      Q.   Do you think for short-term
24  employees the cash balance plan is

Page 109

1   financially better than the old
2   Atlantic City plan?
3          MR. SAUDER:  Objection.
4          THE WITNESS:  I can't say.
5   BY MR. BASSMAN:
6       Q.   No opinion about that one
7   way or the other?
8       A.   I wouldn't -- I wouldn't --
9   I don't have enough information
10  really complete.  You know, there's
11  too many things to speculate there
12  for that, for somebody who's just
13  short-term, salary -- there's a whole
14  host of things.
15      Q.   Let me give you a
16  hypothetical then.  If an employee
17  were to start at Conectiv at age 18,
18  work for ten years and leave at age
19  28, do you think that person, that
20  particular person, would be better
21  off financially under the cash
22  balance plan or under the old
23  Atlantic City plan?
24          MR. SAUDER:  Objection.

B0126

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 110

```
 1        THE WITNESS: I really
 2   can't say.
 3   BY MR. BASSMAN:
 4        Q.  Well --
 5        A.  My, my gut feeling is they
 6   would be better under the historic
 7   plan.
 8        Q.  Why?
 9        A.  And I'm basing that
10   strictly on the information we
11   already spoke about people that are
12   leaving with larger sums of money.
13        Q.  Although you do understand
14   that in the case of my hypothetical
15   28 year old leaving, he's going to
16   have to wait at least 25 years to get
17   any money paid to him, right?
18        A.  Right.
19        Q.  And during that time this
20   hypothetical employee could die,
21   right?
22        A.  I would imagine it's within
23   the realm of possibility.
24        Q.  Or in the course of 25
```

Page 111

```
 1   years, something could happen to the
 2   plan's finances which could hinder
 3   its ability to pay him, right?
 4        A.  I would imagine so.
 5        Q.  And so if you don't get
 6   your money immediately when you leave
 7   the company and it has to sit in a
 8   pension plan, there's some risk that
 9   either you're not going to be around
10   to get the money or the money's not
11   going to be there to pay you, right?
12        A.  Yes.
13        Q.  And the portability feature
14   of the cash balance plan eliminates
15   that risk, right?
16        A.  It certainly would decrease
17   it.  That's for sure.
18        Q.  And decreasing that risk is
19   beneficial to, say, my hypothetical
20   28 year old, right?
21        A.  I would imagine it would
22   be, yes.
23        Q.  So for that person it's
24   certainly possible that even if the
```

Page 112

```
 1   amount of money he would get under
 2   the cash balance plan were lower than
 3   under the old Atlantic City plan, it
 4   might be in his self interest to be
 5   under the cash balance plan because
 6   he's guaranteed to get his money the
 7   day he walks out the door, right?
 8        MR. SAUDER: Objection.
 9        THE WITNESS: I don't know
10   if he gets his money the day he walks
11   out the door, but it's liquid in some
12   fashion.
13   BY MR. BASSMAN:
14        Q.  And that's an advantage?
15        A.  I would believe so.
16        Q.  When you spoke to George in
17   1999 about the cash balance plan, did
18   you ask him for any documents?
19        A.  I can't say if I did or
20   not.  My relationship with him is
21   very casual.  I've known him for a
22   long time prior to either one of our
23   employment at ACE, Atlantic City
24   Electric, and as I mentioned before,
```

Page 113

```
 1   he was a direct report of mine.
 2        Q.  Did he offer to provide you
 3   any documents in 1999?
 4        A.  No.
 5        Q.  Did George provide you with
 6   the name of anyone else whom you
 7   could follow up with with questions
 8   about the cash balance plan?
 9        A.  No.
10        Q.  Did you ask him for a
11   follow-up name?
12        A.  No.  I can't say that I
13   did.
14        Q.  Outside of talking to
15   George -- by the way, just before I
16   go there, is there anything else that
17   you remember that either you said or
18   George said in that conversation in
19   1999 that you haven't told me
20   already?
21        A.  No, I can't say that there
22   is.
23        Q.  Outside of talking to
24   George in 1999, did you take any
```

B0127

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 114

1  steps to investigate Conectiv's cash
2  balance plan?
3      A.  No.  I knew George, like I
4  said, for a considerable length of
5  time.  He was purveying that it was
6  in everyone's best interest, but I'm
7  still very suspect of whether or not
8  it was in everyone's best interest.
9      Q.  So you didn't believe him
10  in 1999?
11     A.  I can't say that I didn't
12  believe him.  I just was -- it was
13  unclear to me.  I know George, I have
14  a reasonable amount of faith in his
15  judgment, but that doesn't mean that
16  I would believe him -- he doesn't
17  have carte blanche with me.
18     Q.  Okay.  So after talking to
19  George in 1999, you weren't fully
20  convinced that the cash balance plan
21  was going to be in your best
22  interest?
23     A.  It's hard for me to say,
24  because there was so, so many people

Page 115

1  that were saying that it was not in
2  their best interest, but the little
3  dribs and drabs that I would get --
4  and from people, like I just said,
5  that I would have a reasonable amount
6  of trust in that represented the
7  corporation said that it would be in
8  everybody's best interest.
9          But portability to me
10  doesn't necessarily encapsulate
11  everything that's in my best
12  interest.  It is a benefit, but it
13  would not necessarily be something
14  that I would sell my soul for.
15     Q.  Is it your intent to remain
16  an employee of Conectiv until you
17  retire?
18     A.  Yes.
19     Q.  So given that intent,
20  portability is not much of a benefit
21  to you personally?
22     A.  That's correct.
23     Q.  You can put this document
24  aside.

Page 116

1          Let's take a look at
2  Defendant's Exhibit 11.
3      A.  Okay.
4      Q.  Have you had a chance to
5  look over Defendant's Exhibit 11?
6      A.  Yes, I have.
7      Q.  Ever seen this before?
8      A.  No, I've not.
9      Q.  Okay.  Put that one just
10  back in the middle of the table.
11         Take a look over
12  Defendant's Exhibit 12.
13     A.  Okay.
14     Q.  Have you had a chance to
15  look over Defendant's 12?
16     A.  Yes, I have.
17     Q.  Ever seen this before?
18     A.  No, I haven't.
19     Q.  Have you ever seen an
20  online publication on the Conectiv
21  intranet called InSight?
22     A.  I don't recall ever seeing
23  this document online.
24     Q.  Do you remember ever seeing

Page 117

1  anything titled InSight on the
2  Conectiv intranet page?
3      A.  Not that I can recall.
4      Q.  You can put that one over
5  there.
6          Take a look at what's been
7  marked Defendant's Exhibit 13.
8      A.  Okay.
9      Q.  Have you had a chance to
10  look over Defendant's Exhibit 13?
11     A.  Yes, I have.
12     Q.  Ever seen this before?
13     A.  No, I have not.
14     Q.  If you look on the first
15  page, do you see some handwriting?
16     A.  Yes, I do.
17     Q.  Do you recognize that
18  handwriting?
19     A.  No, it's not mine.
20     Q.  Okay.  Do you recognize it
21  as anybody else's?
22     A.  No.
23     Q.  Can you turn to the second
24  page of Exhibit 13.  I want to direct

30 (Pages 114 to 117)

Page 118

1  your attention to the box in the top
2  left-hand corner with the heading
3  Important Perspectives on Conectiv's
4  New Retirement Program.
5      A.  Okay.
6      Q.  Do you see that?
7      A.  Yes, I do.
8      Q.  I want you to look at the
9  second bullet point that says, Cash
10  balance plans are controversial.  Do
11  you see that?
12      A.  Yes, I do.
13      Q.  Do you remember, outside of
14  what you've already testified to, any
15  discussions in 1999 about cash
16  balance plans being controversial?
17      A.  No.  This is the first time
18  I've seen it in writing in a
19  company document.
20      Q.  And underneath cash balance
21  plans are controversial you see the
22  sub bullet Series of Wall Street
23  Journal articles.
24      A.  Yes.

Page 119

1      Q.  Have you ever heard of any
2  Wall Street Journal articles about
3  cash balance plans?
4      A.  No, I've not.
5      Q.  Never mentioned to you by
6  any coworkers?
7      A.  No.
8      Q.  And you've never read any?
9      A.  No.
10      Q.  If you had seen this slide
11  in a presentation, would you have
12  researched those articles and read
13  them?
14      A.  I would be probably
15  inclined to at least investigate
16  something about them.
17      Q.  And underneath the sub
18  bullet Series of Wall Street
19  articles, do you see another sub
20  bullet that says Congressional
21  hearings?
22      A.  Yes.
23      Q.  Did you ever hear any
24  discussion at any time about

Page 120

1  congressional hearings regarding cash
2  balance plans?
3      A.  No.
4      Q.  Do you ever read about
5  congressional hearings about cash
6  balance plans?
7      A.  No.
8      Q.  The next full bullet
9  says -- you see Criticisms leveled at
10  cash balance plans?
11      A.  Yes, I do.
12      Q.  And the first one, the
13  first sub bullet under that you see
14  is Masks cost cutting.
15      A.  Yes.
16      Q.  And that's the criticism of
17  the Conectiv cash balance plan, one
18  of them, that you heard in 1999?
19      A.  In a different mannerism.
20      Q.  But the same basic
21  criticism?
22      A.  Same principal, yeah.
23      Q.  And the next sub bullet is
24  Poor handling of communication

Page 121

1  transition.  Do you see that?
2      A.  Yes, I do.
3      Q.  In 1999, do you recall any
4  discussions among Conectiv employees
5  about a poor handling of
6  communication/transition?
7      A.  Other than my own
8  occasional rumblings?
9      Q.  Yes.
10      A.  No.
11      Q.  What were your occasional
12  rumblings?
13      A.  I believe during one of
14  those casual conversations with
15  George Bleazard it was that I was not
16  comfortable with what was going on
17  because I didn't have enough
18  information.
19      Q.  Did he offer to provide you
20  more information?
21      A.  Well, I believe he said
22  there will be a series of meetings
23  like I'm seeing throughout these
24  documents.  I thought it was comical

31 (Pages 118 to 121)

Page 122

1  because I believe one of these
2  locations that was close to me was
3  closed, and that's maybe why the
4  rescheduling.
5      Q.   So George mentioned to you
6  in 1999 that there will be a series
7  of meetings that will answer your
8  questions about the cash balance
9  plan, right?
10     A.   At some point, yeah.  Yes.
11     Q.   But you were never invited
12  to any such meeting?
13     A.   No.
14     Q.   Did you follow up with
15  anyone in HR to ask why you hadn't
16  been invited to a meeting about the
17  cash balance plan after George told
18  you they were going to occur?
19     A.   I can't say that I did.
20     Q.   Do you see any factual
21  statements in Defendant's Exhibit 13
22  based on your view today that you
23  believe are false?
24        MR. SAUDER:  Objection.

Page 123

1        THE WITNESS:  I can't
2  identify any, no.
3  BY MR. BASSMAN:
4      Q.   And, again, obviously, just
5  the best of your knowledge.
6        You can put this one to the
7  side.
8        Take a look at what's been
9  previously marked, please, as
10  Defendant's Exhibit 14.
11     A.   Okay.
12     Q.   Have you had a chance to
13  look over Defendant's Exhibit 14?
14     A.   Yes.
15     Q.   Ever seen this document
16  before?
17     A.   No.
18     Q.   In your review of this
19  document just now, did you see any
20  factual statements in it that you
21  believe are false?
22        MR. SAUDER:  Objection.
23  BY MR. BASSMAN:
24     Q.   You can answer.

Page 124

1      A.   I can't say that I do.
2      Q.   You can put this one in the
3  finished pile.
4        If you could take a look at
5  what's previously been marked as
6  Defendant's Exhibit 19.
7        Have you had a chance to
8  look over Defendant's Exhibit 19?
9      A.   Yep.
10     Q.   Ever seen this before?
11     A.   Nope.
12     Q.   Ever see a document before
13  with the heading Summary Plan
14  Description?
15     A.   No, I have not.
16     Q.   Has any representative of
17  HR at Conectiv ever told you that you
18  could review a copy of a Summary Plan
19  Description?
20     A.   No, they have not.
21     Q.   If you could hand that
22  back.
23     A.   (Witness complies.)
24     Q.   By the way, Mr. Fink, I

Page 125

1  don't know if you have a preference
2  for when you would like to break for
3  lunch.  I notice it's a little after
4  12.
5      A.   No preference whatsoever.
6      Q.   Okay.  If at any time you
7  start to feel your stomach rumbling
8  and you'd like to take a break and
9  get some food, just let me know.
10  Otherwise, I'll probably take a lunch
11  stop relatively soon.
12     A.   That's fine.
13     Q.   I'll have you take a look
14  at what's been previously marked
15  Defendant's Exhibit 22.
16        MR. SAUDER:  This document
17  is marked MWW 308 through MWW 311.  I
18  think we established yesterday that
19  the last page of the document 311 was
20  inadvertently stapled to this
21  document.
22        MR. BASSMAN:  That's
23  correct, yes.
24  BY MR. BASSMAN:

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 126

1    Q.  Have you had a chance to
2  review Defendant's Exhibit 22?
3    A.  Yes.
4    Q.  Just focusing on the first
5  three pages of the exhibit, which I
6  think really, as your counsel just
7  explained, forms the document
8  entitled Introducing the New Cash
9  Balance Plan Retirement Plan.
10       Have you seen those first
11  three pages before?
12    A.  Just looks like many of the
13  other documents today.
14    Q.  So you've never seen it
15  before?
16    A.  No.
17    Q.  Again, directing your
18  attention to the first three pages of
19  Exhibit 22, to the best of your
20  knowledge, are any of the factual
21  statements set forth inaccurate?
22       MR. SAUDER:  Objection.
23       THE WITNESS:  No.
24  BY MR. BASSMAN:

Page 127

1    Q.  You can put that aside.
2       Let's take a look at what's
3  been previously marked Defendant's
4  Exhibit 23.  Defendant's Exhibit 23
5  is a letter that Mr. Ward testified
6  he received from Conectiv's HR
7  department in September 2002.
8       Have you had a chance to
9  look over Defendant's Exhibit 23?
10    A.  Yes.
11    Q.  Have you ever seen this
12  document before?
13    A.  No.
14    Q.  Have you ever received a
15  letter from Conectiv's HR department
16  enclosing information about any
17  Conectiv pension benefits?
18    A.  I don't recall ever seeing
19  this or getting anything.  I don't
20  recognize this manager's name.
21    Q.  When you say you don't
22  remember receiving anything, I assume
23  you don't recall ever receiving a
24  letter in this format from an HR

Page 128

1  representative of Conectiv?
2    A.  That's correct.
3    Q.  Do you recall any of your
4  coworkers discussing receiving a
5  Summary Plan Description in the mail?
6    A.  No.
7    Q.  Mr. Ward never told you he
8  received one in the mail?
9    A.  No.
10    Q.  In 2004 when you became
11  suspicious of the cash balance plan,
12  did you ask any of your coworkers if
13  they had received any documents about
14  it?
15    A.  No.  I can't say that I
16  did.  I -- I believe that's when I
17  started directing my activity
18  directly to the site.
19    Q.  If you could put this one
20  to the side.
21       I'd like to move back in
22  numerical order a little bit and show
23  you what's been previously marked as
24  Defendant's Exhibit 15.  If you could

Page 129

1  take a look over that.
2    A.  Okay.
3    Q.  Have you had a chance to
4  look over Defendant's 15?
5    A.  Yes.
6    Q.  Have you ever seen this
7  document before?
8    A.  No.
9    Q.  If I could direct your
10  attention to Mr. Charles' e-mail on
11  the bottom?
12    A.  Yes.
13    Q.  You see in the first
14  sentence under Dear HR, you see that
15  Mr. Charles makes a reference to a
16  class action lawsuit by the employees
17  of IBM as it pertains to IBM's
18  decision to convert their employees
19  retirement plan into the cash balance
20  plan?
21    A.  Yes.
22    Q.  Before today have you ever
23  heard of a class action lawsuit
24  against IBM about IBM's cash balance

33 (Pages 126 to 129)

B0131

Page 130

1  plan?
2    A.  Yes.
3    Q.  When did you first hear
4  about the IBM lawsuit?
5    A.  I heard it on the news
6  possibly, like the 6 o'clock news on
7  the television.
8    Q.  Do you remember what
9  station?
10    A.  No.
11    Q.  Is there any particular
12  news station that you typically watch
13  in the evening?
14    A.  3, 6, or 10, one of the
15  Philadelphia stations.
16    Q.  After you heard about the
17  IBM lawsuit on the news, did you
18  discuss it with anyone?
19    A.  No.
20    Q.  Did you take any steps to
21  research what was going on in that
22  lawsuit?
23    A.  At that time, no.
24    Q.  At any later time did you?

Page 131

1    A.  I subsequently found the
2  website that has some information
3  about the lawsuit on it.
4    Q.  Do you recall when you
5  found that website?
6    A.  It was relatively current.
7    Q.  Within the last six months?
8    A.  Six to 12 possibly.  It was
9  not a very professional site.  It was
10  more someone had a page posted on the
11  Internet or a site on the Internet.
12    Q.  And how did you find this
13  website?
14    A.  I was looking for
15  something -- I don't remember what
16  prompted me to do it, but I did find
17  it.  Inadvertently, almost.
18    Q.  So you didn't run a search
19  through a search engine trying to
20  find websites that addressed the IBM
21  lawsuit?
22    A.  No.  I just kind of like
23  stumbled on it, and tied it back to
24  what I had heard previously on the

Page 132

1  news and then stopped and looked at
2  it.
3    Q.  Ever discuss the IBM
4  lawsuit with Mr. Charles?
5    A.  Nope.
6    Q.  When you went on the
7  website, did the website link you to
8  any documents about the lawsuit?
9    A.  No.  It wasn't very
10  professional.
11    Q.  Do you remember what the
12  URL was?
13    A.  No.
14    Q.  Did you print any pages
15  from it?
16    A.  No.
17    Q.  Looking further at Mr.
18  Charles' e-mail -- actually, I take
19  that back.
20      One other follow-up
21  question.  Do you remember when you
22  saw this TV news story?
23    A.  I can't really quantify as
24  to when.  I can't really say when.

Page 133

1    Q.  Before 2005?
2    A.  I'm going to say around
3  that time.  I can't be absolutely
4  certain.
5    Q.  Okay.  Looking, again, at
6  Mr. Charles' e-mail, I want to direct
7  you to the second paragraph, and in
8  particular the second to the last
9  sentence in it, where Mr. Charles
10  wrote, I've always felt from the
11  inception of the cash balance plan
12  that it was unfair.
13    A.  Yes.
14    Q.  Do you see that?
15    A.  Yes, I do.
16    Q.  Has Mr. Charles expressed
17  that sentiment to you?
18    A.  Not necessarily in -- in
19  that language.
20    Q.  In what language did he?
21    A.  It was just very vague
22  about how it was calculated.  What --
23  you know, more so about I guess how
24  things were enacted.

34 (Pages 130 to 133)

B0132

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 134

1    Q.  In what way?
2    A.  Meaning, you know, the
3  grandfathering and things of that
4  nature more than the calculation.
5    Q.  Okay.  So what Mr. Charles
6  complained to you about is that he
7  wasn't among the people given
8  grandfather benefits and he wasn't --
9  right?
10    A.  He was not grandfathered?
11    Q.  Right.  That was his
12  complaint to you.
13    A.  If you can call it a real
14  complaint.  He's not really a
15  complaining type of individual, but
16  there was some very brief
17  conversation with -- with Mike that
18  that was one of his sticking points.
19    Q.  What were his other
20  sticking points?
21    A.  I can't really say that --
22  other than that, that's all I really
23  took away from it.  Didn't
24  necessarily -- I don't have a daily

Page 135

1  working relationship with Mr.
2  Charles.
3      He's in another part of the
4  service territory.  It's very rare
5  that I would have a conversation with
6  him.
7      I would bump into him maybe
8  if I had to do something in an
9  adjacent work region, or maybe
10  because of the nature of his position
11  earlier on, before probably even --
12  or right around the merger time, I
13  might have to have some service
14  provided through a metering
15  department for something that he
16  needed done.
17    Q.  Did Mr. Ward ever express
18  to you any sticking points about the
19  cash balance plan?
20    A.  Other than the total
21  dollars, no.
22    Q.  And sitting here today, do
23  you have any sticking points about
24  the cash balance plan?

Page 136

1    A.  Grandfathering and total --
2  total lump sum.
3    Q.  Anything else?
4    A.  No.
5    Q.  When you say "total lump
6  sum," you're referring to the total
7  lump sum you believe that you would
8  get in a cash balance plan as
9  compared to the total lump sum that
10  you believe you would have gotten if
11  the old Atlantic City plan had
12  continued?
13    A.  That's correct.
14    Q.  If it were to turn out that
15  your lump sum would be higher upon
16  retirement in the cash balance plan
17  than in the -- than if the old
18  Atlantic City plan had continued, do
19  you believe that you would have
20  benefited from the conversion to the
21  cash balance plan?
22    A.  Retirement age changed.
23    Q.  Assuming you're retiring at
24  age 65 for purposes of my question.

Page 137

1    A.  I would think that would be
2  a detriment to me as opposed to being
3  able to retire at 55.
4    Q.  When you say able to retire
5  at 55, you mean able to retire with
6  full pension benefits at age 55,
7  right?
8    A.  Right.
9      MR. BASSMAN:  This is
10  actually a good stopping point for
11  where I am, so why don't we take a
12  lunch break now.
13      MR. SAUDER:  Okay.
14      (Luncheon recess at
15  12:23 p.m.)
16      (Testimony resumed at
17  1:24 p.m.)
18      MR. BASSMAN:  Back on the
19  record.
20  BY MR. BASSMAN:
21    Q.  Good afternoon, Mr. Fink.
22    A.  Good afternoon.
23    Q.  I wanted to start this
24  afternoon by following up on a couple

35 (Pages 134 to 137)

B0133

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 138

1  of small items to just to make sure I
2  have the facts straight here.
3         You testified earlier
4  today, Mr. Fink, that you read the
5  Philadelphia Daily News; is that
6  right?
7      A.  Yes.
8      Q.  Do you read that newspaper
9  every day?
10     A.  Frequently.  I won't say
11 every day but several times a week.
12     Q.  At least three times a week
13 usually?
14     A.  Probably.
15     Q.  And for how long has it
16 been your practice to read the
17 Philadelphia Daily News at least
18 three times a week?
19     A.  For some time, very long
20 time.
21     Q.  More than ten years?
22     A.  Yes.
23     Q.  You are aware that Mr.
24 Charles and Mr. Ward were both

Page 139

1  deposed in this case earlier this
2  week?
3      A.  Yes, that's my
4  understanding.
5      Q.  Have you spoken to Mr.
6  Charles about his deposition?
7      A.  No.
8      Q.  Have you spoken to Mr. Ward
9  about his deposition?
10     A.  No, I have not.
11     Q.  Have you spoken to Mr.
12 Troup about his deposition tomorrow?
13     A.  No.  I've never spoken with
14 Mr. Troup.  Wouldn't know him if he
15 walked in here.
16     Q.  You described this morning
17 calling Mr. Malone after you met with
18 Mr. Ward.  Before you met with Mr.
19 Malone, you had given any thought to
20 suing Conectiv about the cash balance
21 plan?
22     A.  I thought about at least
23 seeking legal advice.  I don't know
24 if I would say suing them, but I

Page 140

1  would say at least having it looked
2  at in some fashion.
3      Q.  Why did you want to have it
4  looked at?
5      A.  I just -- well, it was
6  something that I always felt that was
7  beyond my span of control.  It was
8  not -- it was hearsay and I always --
9  and use those type of terms because I
10 was not really party to any
11 organized, structured, you know,
12 dissemination of any information
13 about this.  Was really -- I'm just
14 trying to find the right words.
15        Well, ask me the question
16 again.
17     Q.  Sure.  You testified that
18 before you went to see Mr. Malone you
19 were thinking about contacting a
20 lawyer to have issues regarding the
21 cash balance plan looked at.
22     A.  Uh-huh.
23     Q.  And the question was, why
24 did you want a lawyer to look at

Page 141

1  those issues?
2      A.  I always felt, I guess,
3  ultimately, that it was something I
4  was never sure if it was in my best
5  interest.  It was something more or
6  less, mostly more, imposed upon the
7  management employees, and the
8  speculation was that it was going to
9  be something that was going to be
10 unilateral across all the working
11 levels, which never happened.  They
12 immediately balked and didn't want to
13 have anything to do with it.
14     Q.  When you say they balked,
15 do you mean the unions?
16     A.  Yes.
17     Q.  And so the union members
18 have never been converted to a cash
19 balance plan?
20     A.  No.  And I believe they
21 attempted to do that this last
22 contractual negotiation yet again and
23 it was not successful.
24     Q.  And that would be the

B0134

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 142

1 contractual negotiation between
2 Conectiv and Local 210?
3    A.  Yes.
4    Q.  And what do you know about
5 those negotiations?
6    A.  Little.  Less than I
7 normally do.  As I get more seniority
8 or longevity in the management side
9 of the corporation, I know less about
10 the local.
11       I do know some local
12 officials from my time there and in
13 passing, you know, comments were
14 made, you know, back and forth or
15 just very brief, you know, one
16 liners.
17    Q.  Do you remember what the
18 substance of those comments were?
19    A.  Along the lines of we're
20 not taking that pension plan; you
21 guys can keep that thing.
22    Q.  Did they tell you why they
23 didn't want to take it?
24    A.  I didn't really -- it's one

Page 143

1 of those, you know, in the hallway,
2 you know, in a tunnel type of thing,
3 you know, in passing it was, yeah,
4 well, it is what it is for us; it's
5 different, you know.
6    Q.  So the union officials
7 didn't offer a reason and you didn't
8 ask them?
9    A.  No.  And it's been their
10 position, or the position that
11 they're actually in, I should say, is
12 that it's negotiable for them;
13 there's no negotiating for us.  It's
14 beyond my span of control.  It's
15 something that I had to accept
16 whether I liked it or not.
17    Q.  When did you find out that
18 Local 210 had rejected the cash
19 balance plan?
20    A.  That was some time ago.
21 There had been talks back and forth
22 from what I understood of previous
23 negotiations about attempting to get
24 them to roll it into the cash balance

Page 144

1 and they were subsequently -- this
2 past negotiation was the first time
3 in 20 years I saw picketers on our
4 property.
5    Q.  And were there signs that
6 the picketers held up?
7    A.  Well, yes.  It was not
8 specific to this pension.  It was --
9 it was an open situation for wages
10 and benefits.
11    Q.  So none of the signs
12 referred to the cash balance plan?
13    A.  No.  No.
14    Q.  Were the picketers handing
15 out leaflets or any kind of
16 information?
17    A.  Not related to specifically
18 naming the cash balance as any
19 problem.
20    Q.  So you had testified
21 earlier that you always felt that the
22 cash balance plan might not be in
23 your best interest, right?
24    A.  Unless I was 20 years old

Page 145

1 and wanted to work five years and use
2 that portability.
3    Q.  And for a person like that
4 it could be in their best interest?
5    A.  I would surmise, yes,
6 that's correct.
7    Q.  But you are not in that
8 position at all?
9    A.  I wish I was in that
10 position.  I'd be 25 years younger.
11    Q.  You testified earlier I
12 believe that you contacted Mr. Malone
13 in 2005 for the first time.
14    A.  I believe that's correct.
15 Towards the second half.
16    Q.  Is there any reason you
17 didn't contact an attorney earlier?
18    A.  There had been some
19 speculation that individuals were
20 making those attempts, and I don't
21 know who they were or what level of
22 activity they were pursuing, but they
23 were encountering some difficulty
24 finding someone who didn't have a

B0135

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 146

1  conflict of interest.
2      Q.   And do you remember how you
3  heard about these attempts to find a
4  lawyer by other employees?
5      A.   No.  I can't honestly say
6  that I do.
7      Q.   Do you remember
8  approximately what year you heard
9  about those attempts?
10     A.   It may have been just in
11 the early portion or the first half
12 of 2005.  It wasn't like it was
13 ancient history.
14     Q.   Since this lawsuit has been
15 filed, have any Conectiv employees
16 approached you to talk about it?
17     A.   Not with respect to detail.
18     Q.   Well, how about at all?
19 Anybody ask you at all about the
20 lawsuit?
21     A.   They may say things like
22 I'm glad someone's doing something,
23 things of that nature, but most of
24 them have the sensibility, I'm sure,

Page 147

1  that you're not supposed to discuss
2  anything.
3          I've actually had people
4  say that to me, but I'm glad
5  somebody's at least looking at this.
6      Q.   Did you ask any of your
7  fellow employees if they would be
8  willing to join the lawsuit as a
9  plaintiff?
10     A.   No.
11     Q.   You testified this morning
12 that there had been some problems
13 with Conectiv sending you mail
14 because Conectiv mailings had been
15 sent to your ex-wife's address.  Do
16 you recall that testimony?
17     A.   Yes, I do.
18     Q.   Just want to see if I have
19 the facts straight here.  First, and
20 obviously I don't want to delve into
21 the details of any of this, but just
22 for purposes of a time line, when did
23 you and your former wife cease to
24 live together?

Page 148

1      A.   1997.
2      Q.   And how did you discover
3  that Conectiv was sending mailings to
4  her address instead of yours?
5      A.   Well, sometimes she would
6  say that I had mail there.  And there
7  would certainly be gaps of time when
8  she would say nothing and I'm sure it
9  just went (indicating).
10     Q.   Do you remember the first
11 time your ex-wife told you that she
12 had some of your mail from Conectiv?
13     A.   I believe I left that
14 premise in October of '97 to where
15 I'm currently residing.  Somewhere in
16 that time frame, you know, subsequent
17 to that, maybe November, December.
18     Q.   Towards the end of 1997?
19     A.   '97 into '98, that's
20 correct.
21     Q.   Okay.  What steps did you
22 take to remedy the problem?
23     A.   Well, I changed my address,
24 at least I thought I did, and I'm not

Page 149

1  sure what happened.  On more than one
2  occasion old addresses have come --
3  two weeks ago everybody's paycheck
4  came back with -- all my direct
5  reports -- in places they lived 20
6  years ago on the envelopes.  No rhyme
7  or reason.
8          I mean, that was long
9  before either merger, so I don't know
10 what goes on in IT or IS, or whatever
11 they call themselves nowadays,
12 information systems, information
13 technologies.
14     Q.   Now, when you say you
15 changed your address, did you inform
16 someone at Conectiv that you had a
17 new address?
18     A.   Yes.
19     Q.   Who?
20     A.   I don't recall who.
21 There's -- there's profiles that they
22 would -- you know, I might have even
23 just told a clerk that was in my
24 office at that time.  I had a

B0136

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 150

1  clerical staff that reported to me in
2  my office.
3      Q.  And I think you mentioned
4  that as recently as this past year in
5  2006 a Conectiv mailing had gone to
6  your ex-wife?
7      A.  Yes.  About stock dividends
8  from an old stock program.
9      Q.  How did you find out about
10  that mailing going to your ex-wife?
11     A.  My daughter.
12     Q.  Does your daughter live
13  with your ex-wife?
14     A.  She was briefly.
15     Q.  So your daughter called you
16  up and told you?
17     A.  She just brought it to my
18  house.
19     Q.  And what did you do after
20  you found out that that mailing went
21  to your ex-wife's address?
22     A.  I looked at it and realized
23  it was relatively of no consequence
24  or minimal consequence to me.  It

Page 151

1  didn't revolve around any giant
2  moneys or anything, and it appeared
3  to be done by a contractor that
4  they've hired to administer that
5  program.
6      Q.  Did you call anyone at
7  Conectiv after your daughter brought
8  you that piece of mail?
9      A.  No.  There is no Conectiv
10  to call, per se.  I would have to
11  call someone in Atlantic City, and it
12  would go back to that contractor who
13  is maybe in Washington.
14     Q.  I assume between the first
15  time that your ex-wife told you she
16  got some of your mail in late '97,
17  early '98, and this most recent
18  incident where your daughter brought
19  the mailing to you last year, in
20  between those two times, to the best
21  of your knowledge, have other pieces
22  of Conectiv mail been sent to your
23  ex-wife's address?
24     A.  Yes.

Page 152

1      Q.  And --
2      A.  Well, excuse me.  Meaning
3  credit union statements that are not
4  really that type of information that
5  you're referring to.  Other personal
6  information that would come from the
7  corporation.
8      Q.  And did you have a standard
9  practice as to what steps you would
10  take to correct the mislabeling of
11  your address after you found out each
12  time that a piece of mail had gone to
13  your ex-wife's address?
14     A.  Well, for when you're
15  talking about mail that's coming from
16  the corporation, it's -- it's
17  generally speaking as this whole
18  thing has unfolded from the first
19  merger, was one thing when I would
20  contact HR or a clerical support
21  person in HR for Atlantic City, but
22  then when we became Conectiv, more
23  and more of these functions got split
24  up and pushed out into contract

Page 153

1  areas.
2      So I can't say that I had
3  any routine for taking care of it,
4  no.  It's just you had to call and
5  give it your best shot with whoever
6  it is you thought you had to call.
7      Q.  And each time you found out
8  that mail had been improperly sent to
9  your ex-wife's address instead of
10  your own address by Conectiv, you
11  placed a phone call to try to remedy
12  the situation?
13     A.  Yes.  As long as I knew
14  that there was something of grave
15  importance.  I'm not talking about
16  statements from a dental plan.  I'm
17  talking about things that would be
18  related to my employment.
19     Q.  And you would place a phone
20  call, I just want to be clear, not
21  send an e-mail or write a letter or
22  something like that?
23     A.  No.  The reality, back in
24  '97 and '98, there was not -- there

B0137

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 154

1  was electronic e-mail, but there was
2  not a plethora of the systems that we
3  have now.  The whole arena has
4  evolved, as you well know, remarkably
5  in the last ten years.
6      Q.  You mentioned earlier that
7  you had heard about Local 210
8  repeatedly rejecting the cash balance
9  plan.  Did you ever hear about any
10  dispute between Local 210 and
11  Conectiv about the interest rate that
12  should be used to calculate lump sum
13  payments under the old Atlantic City
14  plan?
15      A.  I may have, now that you
16  brought that up.  There may have been
17  some -- some kind of rhetoric I heard
18  in passing and didn't pay any
19  attention to it because it really
20  didn't affect me at this time.  They
21  may have used the wrong rate at one
22  point.  I can't really say.  It could
23  be just really gossip.
24      Q.  And this would, again, be

Page 155

1  gossip from your acquaintances who
2  are officials in the Local?
3      A.  Yes.
4      Q.  If you win this lawsuit,
5  Mr. Fink, what would you like the
6  court to do?
7      A.  What would I like the court
8  to do?
9      Q.  Yeah.
10      A.  My personal spin on that,
11  I would like to see some change in
12  the -- well, ideally, I'd like for
13  everybody to be made whole.  Meaning
14  those of us that were pre-merger
15  hires, not anybody that's
16  subsequently been hired by this
17  newly-formed corporation, go back
18  into the existing Heritage plans,
19  DelMarVa, Atlantic.
20          It's interesting that Pepco
21  elected not to do anything with their
22  Heritage plan on this last merger
23  other than retain it.
24      Q.  So what you would ideally

Page 156

1  like, and, again, I'm talking about
2  your ideal form of relief that you
3  would get from the court, is that for
4  everybody who started, you know,
5  before 1999 roughly, to go back, to
6  have their pensions go back under the
7  old Atlantic City plan, right?
8      A.  Yes.
9      Q.  Anybody who's come to work
10  for Conectiv after the ACE DelMarVa
11  merger, you have no objection to them
12  remaining in the cash balance plan?
13      A.  I may have no objection?
14  They may have no objection, but I
15  would not have an objection.
16      Q.  Do you feel like the
17  interest of employees who started
18  before the ACE DelMarVa merger and
19  those who started after are the same
20  in regards to the cash balance plan?
21      A.  They're similar in nature.
22      Q.  Are they different at all?
23      A.  Well, there's no
24  grandfathering basically for those

Page 157

1  people, so that is an issue.
2  However, I mean, we all know that
3  there's portability for them.  But
4  other than that, there are some
5  subtle differences, but there are
6  other things that are unchanged, caps
7  at 650 percent of a five-year average
8  salary.  That would remain unchanged.
9      Q.  So you think that for the
10  employees who are hired after the ACE
11  DelMarVa merger, they also have an
12  interest in seeing the cash balance
13  plan declared illegal and the old
14  Atlantic City plan put back in its
15  place?
16      A.  If I was in that particular
17  boat, that would be the direction I'd
18  be rowing.
19      Q.  How come?
20      A.  Just based on what I've
21  said all along, 650 percent cap for
22  starts.
23      Q.  Anything else?
24      A.  I'm not convinced what

40 (Pages 154 to 157)

B0138

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 158

1  happens to the total lumps and, you
2  know, how they mature, how it's
3  accrued.  There just seems to be too
4  big a difference when I hear people
5  that have 600,000 in their, you know,
6  that are grandfathered at this
7  moment, and guys that aren't
8  grandfathered they're not really -- I
9  mean, they're so close in years of
10 service and not -- you know, they're
11 very close in age that didn't make
12 the cutoff and the discrepancy is too
13 large.  You're talking well over,
14 well over $100,000 in some cases.
15 That's a lot of money when you're
16 going to retire.
17     Q.   Under the old Atlantic City
18 plan, do you have any understanding
19 as to how under that plan lump sum
20 payments were calculated?
21     A.   Very, very vague.
22     Q.   What is your --
23     A.   There was a -- there was a
24 multiplier that was a variable from

Page 159

1  the government set that was your
2  multiplier for your years of service.
3  There was an averaging of your
4  salary.  So, I mean, there's an
5  overall understanding.  I can't tell
6  you it's, you know, an absolute
7  understanding.
8      Q.   Ever heard the phrase PBGC
9  rate?
10     A.   No.
11     Q.   Doesn't ring a bell?
12     A.   No.  Not -- that acronym
13 does not ring a bell, no.
14     Q.   Did you ever hear anything
15 about under the old Atlantic City
16 plan the use of interest rates to
17 calculate lump sum payments?
18     A.   Well, that would be the --
19 would that not be the multiplier that
20 the government supplied?
21     Q.   Okay.  When you meant the
22 government multiplier you were
23 referring to the interest rate
24 calculations?

Page 160

1      A.   Yes.
2      Q.   Do you know if that
3  government multiplier was the same
4  every year?
5      A.   It's my understanding it
6  was variable slightly.
7      Q.   So if -- hypothetically,
8  let's say you have two employees,
9  call them A and B.  Both have the
10 same number years of service, same
11 salary history, they're identical in
12 every way, they're both under the old
13 Atlantic City plan, one retires in
14 2000, one retires in 2002.  Following
15 me so far?
16     A.   Uh-huh.  Yes.
17     Q.   It's possible that even
18 though their years of service and
19 salary histories are identical, their
20 lump sum payments on the old Atlantic
21 City plan could be different because
22 the government multipliers could have
23 been different in those different
24 years, right?

Page 161

1      A.   It's my understanding that
2  that is possible in a very minimal
3  sense.
4      Q.   But it is possible?
5      A.   Yes.
6      Q.   And, of course, you're not
7  an actuary?
8      A.   No, I'm not.
9      Q.   And, I mean, obviously you
10 understand that these calculations
11 are very difficult.
12     A.   Yes, they are, I'm sure.
13     Q.   So when you say minimal,
14 are you really just guessing as to
15 whether they're minimal or do you
16 have some basis?
17     A.   I'm just basing this on the
18 numbers that I've heard peoples
19 espouse over the years that have
20 separated under the Heritage plan.
21     Q.   Okay.
22     A.   Based on what I know about
23 them for age and service length.
24     Q.   And is it your

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 162

1  understanding that to figure out the
2  lump sum payment that you get under
3  the cash balance plan, all you have
4  to do is look at your account
5  balance?
6      A.  Would you repeat that
7  again?
8      Q.  Sure.  If you wanted to
9  figure out what your lump sum payment
10  on retirement would be from the cash
11  balance plan, all you have to do is
12  look at your account balance?
13     A.  Basically, that's correct.
14     Q.  And we looked earlier at
15  some statements you got from Vanguard
16  that showed your account balance here
17  by year.  Do you recall that?
18     A.  Yes, I do.
19     Q.  I'd like to just pull those
20  out again.  It was Defendant's
21  Exhibit 31, which I'm handing over to
22  you right now.  If you could just
23  flip through your Vanguard statements
24  year by year, Mr. Fink, and confirm

Page 163

1  for me that every year your ending
2  account balance increased.
3      A.  That's correct.
4      Q.  Do you have any
5  understanding as to how if an annuity
6  would be calculated under the old
7  Atlantic City plan, if you opted to
8  take your retirement benefit as an
9  annuity?
10     A.  No.  I would have no
11  knowledge whatsoever.
12     Q.  Same question under the
13  cash balance plan.  Any idea if you
14  opted to take your benefits there as
15  an annuity, how the annuity would be
16  calculated?
17     A.  I believe that's part of
18  the Estimator.
19     Q.  So you would find out by
20  looking on the Estimator?
21     A.  That's correct.
22     Q.  But you don't personally
23  know how the Estimator comes up with
24  the number?

Page 164

1      A.  That's also correct.
2      Q.  For the old Atlantic City
3  plan, did you have any understanding
4  that the amount of annuity payment
5  you get each year would be some
6  factor of number times your average
7  pay times your years of service?
8      A.  That was part of the high
9  level outline I told you was in the
10  handbook.
11     Q.  And so under that formula
12  under the old Atlantic City plan,
13  when you retired, no matter which
14  year you retired, if you have the
15  same salary and years of service, you
16  know, whether you retired in 2001,
17  2002, 2003, your annuity payment will
18  be the same, right?
19         MR. SAUDER:  Can you repeat
20  the question?
21  BY MR. BASSMAN:
22     Q.  Sure.  Let me rephrase
23  that.  I think that was a little
24  confusing.

Page 165

1         One of the things we talked
2  about earlier is you mentioned under
3  the old Atlantic City plan, because
4  the government multiplier changes
5  from year to year, two employees with
6  the exact same years of service and
7  salary history could get different
8  lump sum payments depending on which
9  calendar year they retired in.
10     A.  Yes.
11     Q.  My only question was, if
12  you take those same two hypothetical
13  people again, same exact salary
14  history, same exact number of years
15  of service, one retires in 2000, one
16  retires in 2002, they're both under
17  the old Atlantic City plan, they both
18  opt to have their pensions paid as an
19  annuity, isn't it correct that the
20  annuity would be identical for both
21  of them?
22         MR. SAUDER:  Objection.
23         THE WITNESS:  No.
24  BY MR. BASSMAN:

42 (Pages 162 to 165)

B0140

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 166

1    Q.  Why not?
2    A.   Length of service is part
3  of the multiplier.
4    Q.  Oh, no.  I'm assuming that
5  they have the same length of service.
6    A.  Okay.  I'm sorry.  You did
7  say that.  You said they would be
8  equal.  And your -- and your synopsis
9  of that was again...?
10    Q.  Is it correct that they'd
11  be equal?
12    A.  Not necessarily.
13    Q.  Why not?
14    A.  Could very well be a minor
15  percentage because of the interest.
16    Q.  Okay.  One of the things we
17  went over this morning if you recall
18  was the fact that there's an interest
19  credit that's added to your account
20  balance in the cash balance plan each
21  year.
22       Do you remember that
23  discussion?
24    A.  Yes.

Page 167

1    Q.  And that that interest
2  credit is pegged to the treasury
3  rate?
4    A.  Yes.
5    Q.  And is it your
6  understanding that the treasury rate
7  changes each year, right?
8    A.  Yes.
9    Q.  So that the percentage
10  interest credit will shift year to
11  year; correct?
12    A.  Correct.
13    Q.  Do you believe that the
14  fact that -- and I ask this question
15  leaving aside any discussions you may
16  have with your lawyers, you know,
17  outside of discussions with
18  counsel -- do you believe that the
19  use of a varying interest rate each
20  year harms you?
21    A.  It certainly could.
22    Q.  Because the interest rate
23  could go down one year, right?
24    A.  Or it could go down

Page 168

1  consecutively.
2    Q.  And it would benefit you if
3  it went up, right?
4    A.  Yes.
5    Q.  And you wouldn't be able to
6  figure out whether the interest rate
7  fluctuations in the end benefit you
8  or harm you until you retire, right?
9       MR. SAUDER:  Objection.  If
10  you understand the question and
11  figure out a calculation, you can
12  answer it.
13       THE WITNESS:  I can't do
14  that.
15  BY MR. BASSMAN:
16    Q.  Sure.  Let me break it down
17  for you a little.  As you testified,
18  sometimes interest rates can go down,
19  right?
20    A.  Yes, I did.
21    Q.  And when the interest rates
22  go down, the percentage interest
23  credit that gets added to your cash
24  balance plan is going to be lower.

Page 169

1    A.  That's correct.
2    Q.  And the reverse is also
3  true.  If interest rates go up, that
4  percentage interest credit goes up,
5  right?
6    A.  I would believe so.
7    Q.  Which means your money will
8  be credited to your cash balance
9  account at a higher rate than in the
10  year before if the interest rate goes
11  up?
12    A.  I would believe that to be
13  correct also.
14    Q.  So my question for you is,
15  over the course of time, as interest
16  rates are going up or down, you won't
17  be able to know whether at the end of
18  the day when you take your money out
19  of the plan in a lump sum payment the
20  interest rates going up and down hurt
21  you or benefit you, you know, until
22  it's all over?
23       MR. SAUDER:  Objection.
24       THE WITNESS:  I'm not --

43 (Pages 166 to 169)

B0141

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 170

1  I'm not following you with that whole
2  line of questioning.  I mean, I
3  think -- I think I know where you're
4  going, but I'm not positive.
5  BY MR. BASSMAN:
6      Q.  Tell me where you think I'm
7  going.
8          MR. SAUDER:  Objection.  I
9  object to that.
10 BY MR. BASSMAN:
11     Q.  Please go ahead.
12     A.  I don't -- let me give you
13 what I believe is -- would be my
14 answer.  Let me give you my answer.
15         MR. SAUDER:  Okay.  I'm
16 going to object.  I just ask you to
17 rephrase the question so that he's
18 not giving me -- answering to something
19 that he thinks he's answering to a
20 question he doesn't quite understand.
21         MR. BASSMAN:  My
22 understanding right now is that Mr.
23 Fink's explaining to me what he does
24 not understand in my question so I

Page 171

1  can rephrase it.
2          MR. SAUDER:  Is that what
3  you're doing?
4          THE WITNESS:  Yes.
5          What you're basically
6  asking me is I won't be able to tell
7  until the day I retire if I've been
8  harmed by a fluctuation in interest
9  rates in the cash balance plan?
10 BY MR. BASSMAN:
11     Q.  That's exactly what I'm
12 asking.
13     A.  No.  I'll know before that,
14 because I'll be able to look at an
15 annual statement.
16     Q.  So let's take an example
17 and make this a little more concrete.
18         Assume next year that
19 interest rates fall in half.  In that
20 case the fluctuating interest rates
21 will hurt you, right?
22     A.  Yes.
23     Q.  Let's say, then, the year
24 after the economy goes haywire,

Page 172

1  interest rates, you know, go up 15
2  times.  That, of course, would result
3  in a higher interest crediting rate
4  that year; correct?
5      A.  Yes.
6      Q.  Over the course of those
7  two years you may wind up with more
8  money than if the interest rates
9  hadn't been allowed to fluctuate at
10 all, right?
11     A.  In theory, yes.
12     Q.  So my point would be, and
13 this is all I was trying to drive at,
14 that you can't really tell how the
15 ups and downs of interest rates will
16 affect your final payment as compared
17 to just the static interest rate
18 until you take your money out of the
19 plan and you see how everything
20 performed over time.
21         Would you agree with that
22 conclusion?
23     A.  No.  I still go back and
24 say I could see it on an annual

Page 173

1  basis.  The only thing that I would
2  not be able to see is the final year.
3      Q.  Okay.  But --
4      A.  Because I'm taking my money
5  when -- I'm taking my money in that
6  final year and when my statement
7  comes at the end of that year then I
8  would know, but I'm retiring so the
9  curtain has been closed.
10         On an annual -- with an
11 annual statement I can tell what --
12 what is happening over and over
13 again, year in, year out.
14     Q.  Under the old Atlantic City
15 plan, do you have an understanding
16 that -- you're today you said 52
17 years old?
18     A.  Yes.
19     Q.  Okay.  And I apologize this
20 question is a little morbid.  But if
21 you were covered by the old Atlantic
22 City plan and you were to die today,
23 what is your understanding as to what
24 would happen to your pension

44 (Pages 170 to 173)

B0142

Page 174

1   benefits?
2       A.   Under the old plan?
3       Q.   Under the old plan.
4       A.   There's no surviving
5   benefits, survivor benefits.
6       Q.   And same question, but this
7   time under the cash balance plan.  If
8   you were to die today, what happens
9   to your benefits under the cash
10  balance plan?
11      A.   That lump sum goes to
12  whoever the designated person is.
13      Q.   Like in a 401(k)?
14      A.   That's correct.
15      Q.   Do you view that enhanced
16  survivor benefit as a positive
17  feature of the cash balance plan?
18      A.   One could interpret that as
19  being a positive.
20      Q.   For example, if there were
21  a 30-year-old employee who was
22  diagnosed with a terminal illness,
23  wouldn't that person be better off
24  with a cash balance plan with

Page 175

1   survivor benefits that could help
2   support their family than under the
3   old Atlantic City plan?
4       A.   Possibly.
5       Q.   Do you understand that one
6   of the allegations in your Complaint
7   is that the cash balance plan
8   discriminates on the basis of age?
9       A.   Yes.
10      Q.   How do you understand the
11  cash balance plan discriminates on
12  the basis of age?
13      A.   The same dollar that
14  somebody would put in at 25 years old
15  does not necessarily represent the
16  same thing for somebody at 40 years
17  old when you multiply it all the way
18  out.
19          There's also, in my mind,
20  which might not be necessarily
21  correct, I look at the age
22  discrimination thing goes back to
23  grandfathering for me.
24      Q.   Any other ways that you

Page 176

1   view the plan as discriminating on
2   the basis of age?
3       A.   No.
4       Q.   Let's take each one of
5   those starting with the
6   grandfathering.  Who are the victims
7   of age discrimination when it comes
8   to grandfathering?
9       A.   All those people that were
10  long-term employees that were not 50
11  years old at the particular time the
12  cash balance was instituted.
13      Q.   So younger long-term
14  employees were the victims?
15      A.   The middle ground people.
16  Not the real young ones that would
17  probably benefit from cash balance.
18  The ones that are in between, the
19  Mike Charles type of guys that were
20  very close and didn't -- had fell
21  slightly short for years of service
22  or months short in age that are
23  stranded.
24      Q.   Now, you said the real

Page 177

1   young people benefit from the cash
2   balance plan?
3       A.   I don't know if I said the
4   real young people benefit, but what
5   we have said earlier in this
6   conversation is that there's
7   circumstances that would possibly be
8   more beneficial to them, portability,
9   those type of things.
10      Q.   So for some real young
11  people, some of them may be better
12  off in the cash balance plan than the
13  old Atlantic City plan?
14      A.   In my mind if we're talking
15  about mobility, portability, or if
16  we're talking about dollars.
17      Q.   If you wanted to figure out
18  if the cash balance plan or the old
19  Atlantic City plan was better for a
20  young person -- by young I mean, say,
21  someone under 30 -- do you believe
22  that you would have to sit down and
23  talk with that person and find out
24  what their particular goals and plans

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 178

1  are?
2      A.  I would imagine it would be
3  beneficial.  I mean, you're making a
4  decision for somebody that you have
5  no knowledge of what their
6  aspirations are.  Maybe they have a
7  desire to work for five years.
8          Maybe -- maybe they're of
9  the mindset that they'd like to have
10  a long-term career in that
11  particular, you know, position that
12  they're in, or in that particular
13  company that they're in.
14      Q.   So if you really wanted to
15  figure out what's in the interest of
16  any 26-year-old employee of Conectiv
17  today, the best way to find out would
18  be to sit down and talk to that
19  person and find out what their goals
20  and aspirations are, right?
21      MR. SAUDER:  Objection.
22      THE WITNESS:  I would
23  imagine you would have to solicit
24  some sort of response from them,

Page 179

1  verbal, written, or otherwise.
2  BY MR. BASSMAN:
3      Q.   Now, going back to
4  grandfathering, you mentioned that
5  the middle guys, I assume like you
6  and Mr. Charles, are the worst off,
7  right?
8      A.   Him more so than me.
9      Q.   Why him more so than you?
10      A.   He was -- he has longer
11  service than I.  He's older than I
12  am.  He was just very close to
13  grandfathering and just missed it.
14      Q.   Do you consider yourself
15  one of these middle guys?
16      A.   Basically, yes.
17      Q.   And the beneficiaries, the
18  people being discriminated in favor
19  of, are the older, the oldest
20  employees, right?
21      A.   Can you say that again?
22      Q.   Sure.  Well, let me ask you
23  this way.  What is your understanding
24  of the criteria for qualifying for

Page 180

1  the grandfather benefits?
2      A.  50 years old or 20 years of
3  service.
4      Q.  At what time?  50 years as
5  of what date?
6      A.  The first of '99.
7      Q.  Okay.  So for the oldest or
8  longest serving employees of Conectiv
9  as of 1999 were the recipients of the
10  grandfather benefits, right?
11      A.  Well, they either had the
12  age or the years of service.  One or
13  the other.
14      Q.  And it's the recipients of
15  the grandfather benefits who are the
16  people being discriminated in -- whom
17  Conectiv was discriminating in favor
18  of?
19      A.  In theory, someone could
20  work for five years for the
21  corporation, be 50 years old and be
22  grandfathered, and I could be 47
23  years old and have 20 years in and
24  not be grandfathered.  I don't think

Page 181

1  that that's appropriate.
2      Q.  And, in fact, in that case,
3  the company is, in the hypothetical
4  you gave, the company is
5  discriminating against you because
6  you're younger, right?
7      A.  In my mind.
8      Q.  Now, you also mentioned as
9  another reason why you think the cash
10  balance plan is age discriminatory
11  that the same dollar someone earns at
12  20 is not going to be the same as a
13  dollar earned by someone at age 45.
14  I was wondering if you could just
15  explain that.
16      MR. SAUDER:  Outside any
17  communications you had with counsel.
18      THE WITNESS:  I can't.
19  BY MR. BASSMAN:
20      Q.  Okay.  So --
21      A.  Based on that statement.
22      Q.  Okay.  So just to be clear,
23  for that particular theory of age
24  discrimination, your knowledge only

46 (Pages 178 to 181)

B0144

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 182

1    comes from privileged attorney-client
2    communications?
3        A.  Yes.
4        Q.  Okay.  And that did not
5    occur to you as a basis for thinking
6    the plan was age discriminatory
7    before you spoke to Mr. Malone?
8        A.  I can't say that there was
9    not some -- some very brief espousing
10   by someone.  That someone could very
11   well have been Michael.  I can't
12   recall.  But it was not something
13   that was necessarily -- that I was
14   grasping at the time.
15       Q.  Okay.  Earlier this
16   morning, as I'm sure you recall, we
17   took a long time going through a
18   large number of documents about the
19   cash balance plan.
20           Do you remember that?
21       A.  Yes, I do.
22       Q.  Based on your review of
23   those documents this morning, did it
24   strike you that the documents omitted

Page 183

1    any information that you felt should
2    have been included in a notice to
3    Conectiv employees that would explain
4    how the cash balance plan works?
5        MR. SAUDER:  Objection to
6    the form.  We looked at 30-some
7    documents.  I don't know what
8    documents you're referencing.
9        MR. BASSMAN:  All of them.
10   Anything he thought that he didn't
11   see in any one of them, you know,
12   that should have been in there.
13       MR. SAUDER:  Objection to
14   form and objection to the fact that
15   it may call for a legal opinion by a
16   lay witness.  But to that extent you
17   can answer the question.
18       THE WITNESS:  I saw things
19   that I didn't think were in my best
20   interest in those documents, but I
21   don't know that there's anything
22   illegal.
23   BY MR. BASSMAN:
24       Q.  And if it were up to you,

Page 184

1    do you believe that those documents
2    should have explained that certain
3    aspects of the cash balance plan
4    weren't in your best interest?
5        A.  I think that there should
6    have been some better documentation.
7    There's things in those documents
8    that I had never seen until today.
9    The cap, for instance, which is
10   something that I surmise is very
11   detrimental to me in my particular
12   case.
13       And I would -- if -- if
14   these documents had some -- or if the
15   corporation had some mechanism for
16   signing for these documents, or some
17   way of -- some accountability for
18   these sessions that they say existed,
19   and then I see in some cases where
20   they were rescheduled and I see
21   locations there that I'm not sure
22   even were active, which may have
23   caused the rescheduling.
24       You have to understand this

Page 185

1    is merger related, the closing of
2    these facilities and the movement of
3    these people.  If there had been
4    better accountability from whatever
5    group of individuals in the
6    corporation, whether it was the
7    senior leadership team or whoever was
8    functioning on their behalf, or
9    whatever HR team was doing this, with
10   respect to how this information was
11   disseminated to you, to me, to
12   whomever.
13       In other words, did you get
14   a document back from Joseph Fink
15   saying he signed and accepted
16   delivery of these or if he elected to
17   throw them out, or if they went to
18   his ex-wife's home, or wherever they
19   may have gone, then you would know
20   that that person had no knowledge of
21   this -- these activities, but it's a
22   little more than just me having a
23   wrong address listed with a
24   corporation briefly more than once.

47 (Pages 182 to 185)

B0145

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 186

1    There's too many people
2  that seem to not have been able to
3  find any of these meetings or be able
4  to attend these meetings.
5    Q.  I want to go back to a
6  couple things you just said.  You
7  mentioned that the 650 percent cap
8  was very detrimental to you.
9    A.  Yes.
10    Q.  I'm just wondering why you
11  think the 650 percent cap is
12  detrimental to you.
13    A.  Well, it stops the maturity
14  of that lump sum.  It has a cap on
15  it.
16    Q.  Is it your understanding
17  the cap applies to the lump sum or
18  that it applies to an annuity
19  payment?
20    A.  Well, to the lump sum.
21    Q.  Okay.
22    A.  And it very well could be
23  to the annuity also.  I don't have
24  the expertise to know that.

Page 187

1    Q.  Okay.  And you mentioned
2  that before today you had heard about
3  the 650 percent cap, right?
4    A.  Yes.
5    Q.  Did you ever ask anyone in
6  HR Conectiv why that cap was in
7  place?
8    A.  No.  I don't believe I
9  recognized that cap was there until
10  right around the time I was using
11  this pension calculator when I
12  couldn't make it go beyond a certain
13  point.
14    That's when I was like
15  there's something wrong.  I believed
16  honestly there was something wrong
17  with the website software, and then I
18  realized the -- I believe it may have
19  been Mr. Ward who told me no, that
20  there was a cap and that's when I
21  started to...
22    Q.  You also mentioned that too
23  many people were not able to find out
24  about the meetings about the cash

Page 188

1  balance plans in 1999 that you saw
2  referenced in the documents we looked
3  at this morning.
4    Besides yourself, are you
5  aware of anyone else who you know of
6  was not even invited to a meeting in
7  1999 about the cash balance plan?
8    A.  I don't know that anybody
9  was ever invited in the mannerism
10  which I think you're suggesting.
11  There was not a written invitation to
12  me, or there was not a directive
13  written to me personally, or to any
14  one individual to say there's a
15  meeting here that you need to come to
16  to have all your questions answered
17  about cash balance.
18    Or there's a mandatory
19  meeting for us to forward information
20  to you so that we can with a clear
21  conscious say that we have provided
22  you all the information that we have.
23  It was more like -- like it was
24  imposed.  Well, not like.  It was

Page 189

1  imposed.
2    Q.  Let me change my question
3  slightly.  Are you aware of -- and,
4  obviously, again, this is all just to
5  the best of your knowledge.
6    Are you aware of anyone
7  besides yourself who was an employee
8  of Conectiv in 1999 who did not
9  attend a meeting that year about the
10  new cash balance plans?
11    A.  Is there anyone else
12  besides me?
13    Q.  Yeah.  That you know of.
14    A.  I can't -- I can't say
15  whether or not they attended a
16  meeting.  No, I can't say that.
17    Q.  Okay.
18    A.  I can say there's a number
19  of people that professed that they
20  don't know anything about it and it
21  was they weren't sure that there were
22  meetings and they didn't know if they
23  missed something, things of nature.
24  There's more than one person that

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 190

1    should be able to tell you that.
2        Q.   Do you remember who told
3    you things of that nature?
4        A.   It could possibly be one of
5    the clerks that work for me that has
6    separated.
7        Q.   Do you remember the clerk's
8    name?
9        A.   Janet Brent.  I can't -- I
10   can't swear to that, though.  I don't
11   remember.  There's -- there's been a
12   cast of non-union clerical supporting
13   people, but I just can't -- could
14   have been -- could have been her.
15   May not have been her.  I've had
16   various clerks over the years.
17       And, remember, there's only
18   a very small percentage of people in
19   my operation that this really
20   affects.  The rest are all in the
21   Heritage members.
22       Q.   Because they're all union
23   members?
24       A.   Absolutely.  There's 32

Page 191

1    people working out of that particular
2    office.  There may have been two to
3    four of us that were non-union.
4        Q.   Have you considered
5    applying for a position that would be
6    a bargaining unit position again so
7    that you could be under the old
8    Atlantic City plan?
9        A.   Yes.
10       Q.   When did you consider that?
11       A.   Off and on.  As a matter of
12   fact, I contacted George Bleazard and
13   asked him what would happen to my
14   pension, and he told me it would be
15   frozen and I would start a new one.
16       Q.   So your current benefits
17   would be frozen in the cash balance
18   plan and you would start from square
19   one in the union plan?
20       A.   That's what he told me,
21   yes.  I asked him would my moneys be
22   rolled backwards.  He told me no,
23   that would not be the case.
24       Q.   I just want to make sure I

Page 192

1    understand this.  So what he told you
2    was that if you switched to a
3    bargaining unit position, you
4    wouldn't get credit in the union's
5    plan for your years of service as a
6    management employee?
7        A.   And I would lose my
8    previous years that had been already
9    converted.
10       Q.   Okay.
11       A.   In other words, at some
12   point when the numbers were closer, I
13   had given consideration to that, and
14   as the years -- it's not feasible for
15   me at this time.  Would not be in my
16   best interest.
17       Q.   And if you could just
18   explain why it would not be in your
19   best interest.
20       A.   Well, I would have -- I'd
21   be starting another pension from
22   zero.
23       Q.   So you feel that if you
24   switched --

Page 193

1        A.   Growth would not be the
2    same.
3        Q.   Okay.  So you feel if you
4    switch today to a bargaining unit
5    position, by the time you retire
6    you'll have less money in pension
7    benefits than if you just continued
8    on in the cash balance plan in your
9    current position?
10       A.   It's likely just because of
11   the pools of money, size of the
12   funds.
13       Q.   When you were considering
14   whether to go to a bargaining unit
15   position, did you make any attempts
16   to figure out what the value of your
17   pension benefits would be under the
18   old Atlantic City pension if you
19   started in a bargaining unit
20   position, say, tomorrow and retired
21   at 55 or 65?
22       A.   No.
23       Q.   Do you understand that one
24   of the claims in your Complaint is

49 (Pages 190 to 193)

B0147

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 194

1  that the cash balance plan is
2  illegally backloaded?
3      A.   Illegally backloaded
4  meaning...?
5      Q.   Have you ever heard the
6  term backloading in connection with a
7  pension plan?
8      A.   No.  I can't say that I'm
9  familiar with that term.
10     Q.   Is it your understanding
11 that one of the claims in your
12 Complaint is that under the cash
13 balance plan a disproportionately
14 large amount of your pension benefits
15 accrue towards the end of your time
16 as an employee as compared to
17 beginning?
18     A.   Yes.
19     Q.   And outside of discussions
20 with counsel, you know, and obviously
21 I don't want you to go into that,
22 outside of what you've discussed with
23 your attorneys, what is your basis
24 for believing that that is the case?

Page 195

1      A.   The basis for believing
2  that is we go into those Estimators
3  and how it -- first off, the cap
4  comes into play.  And this -- at some
5  point when Mr. Ward discussed with me
6  that cap that I alluded to just
7  earlier in this conversation, some
8  talk between us about a crossover
9  point.
10         But it appears that most
11 cases there is no crossover point
12 because of that cap.  In other words,
13 the crossover point meaning that
14 there was a possibility that the cash
15 balance could exceed your Heritage
16 plan, but based on that cap it
17 doesn't appear that that's really
18 ever going to occur.
19     Q.   Any other basis?
20     A.   No.  None that I can bring
21 to mind right now.
22     Q.   And, again, obviously
23 leaving aside any discussions with
24 your attorneys.

Page 196

1      Do you understand that in
2  your Complaint in this case you are
3  asking the court to appoint you as a
4  representative of a class of other
5  people?
6      A.   Yes.
7      Q.   What do you understand your
8  duties to be as a class
9  representative?
10     A.   To do what would ultimately
11 would be fair and equitable for the
12 group.  Not necessarily what would be
13 in my own personal best interest.
14     Q.   Do you feel that you could
15 represent the class if your personal
16 best interest diverged from what was
17 best for the group?
18     A.   Yes.
19         MR. BASSMAN:  At this point
20 I actually think I'm relatively close
21 to being done.  So why don't we take
22 a ten-minute break and let me go
23 through my notes and see if we can
24 wrap up shortly.

Page 197

1      MR. SAUDER:  Okay.
2      RECESS
3      MR. BASSMAN:  Back on the
4  record.
5  BY MR. BASSMAN:
6      Q.   Mr. Fink, I just have a
7  couple last questions for you.
8      You testified earlier that
9  Local 210 rejected Conectiv's
10 attempts to impose a cash balance
11 plan.  Do you recall that testimony?
12     A.   Yes, I do.
13     Q.   Do you know when you first
14 learned that Local 210 had rejected
15 Conectiv's attempts to impose a cash
16 balance plan?
17     A.   It was back in the early
18 part of the year 2000, 2001, whenever
19 the contractual agreement with 210
20 had expired and they started having
21 talks about -- I think they were just
22 open-ended discussions with them and
23 they were, from what I understood,
24 adamant that they would not accept

B0148

ORAL DEPOSITION OF JOSEPH I. FINK, 1/11/07

Page 198

1  that.
2      Q.  And these would be the
3  first collective bargaining agreement
4  discussions after the ACE DelMarVa
5  merger?
6      A.  I would think so.  Those
7  agreements have been contractually
8  extended on one-year increments.
9      Q.  And you testified that you
10  found out about Local 210's position
11  on the cash balance plan from talking
12  to union officials whom you're
13  acquainted with, right?
14      A.  Yes, I did.
15      Q.  Did any of those officials
16  ever mention whether the union
17  consulted any attorneys about the
18  cash balance plan proposal from
19  Conectiv?
20      A.  I do believe they had an
21  attorney look at it.  I don't know
22  his name.  I'm not sure it wasn't
23  some attorney that was from the
24  International or retained by the

Page 200

1          MR. SAUDER:  Yes.
2          MR. BASSMAN:  We're done.
3          (Testimony concluded at
4  2:28 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 199

1  International.
2      Q.  Did you ever ask your
3  acquaintances in the union if you
4  could speak with their lawyer --
5      A.  No.
6      Q.  -- about your concerns with
7  the cash balance plan?
8      A.  No.
9      Q.  Why not?
10      A.  I just don't think that's
11  appropriate.
12      Q.  Did you ever ask any union
13  officials if they could refer you to
14  a lawyer to talk to you about the
15  cash balance plan?
16      A.  No.
17          MR. BASSMAN:  Well, at this
18  point, I'm done.
19          Joe, do you have any
20  questions?
21          MR. SAUDER:  I have no
22  questions.
23          MR. BASSMAN:  You guys are
24  reading and signing?

Page 201

1          WITNESS CERTIFICATION
2
3          I hereby certify that I
4  have read the foregoing transcript of
5  my deposition testimony, and that my
6  answers to the questions propounded,
7  with the attached corrections or
8  changes, if any, are true and
9  correct.
10
11
12  _____  _____
    DATE          JOSEPH I. FINK
13
14
15
16
17
18          _____
            PRINTED NAME
19
20
21
22
23
24

B0149

# In The Matter Of:

*J. Michael Charles, et al*
*v.*
*Pepco Holdings, Inc., et al*

---

*ETHAN E. KRA*
*May 25, 2007*
*Volume 1*

---

## *REPORTING ASSOCIATES, LLC*

*Certified & Registered Professional Reporters*

*Cherry Hill   --   Philadelphia   --   Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

B0150

ETHAN E. KRA

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2            CIVIL ACTION NO. C.A. NO. 05-702(SLR)

3    -----------------------------------
     J. MICHAEL CHARLES; MAURICE W.
4    WARD, JR.; and JOSEPH I. FINK, JR.,
     on behalf of themselves and all
5    others similarly situated,

6            Plaintiffs,

7        v.

8    PEPCO HOLDINGS, INC.; CONECTIV, and
     PEPCO HOLDINGS RETIREMENT PLAN,
9
             Defendants.
10   -----------------------------------

11

12

             New York, New York
13           Friday, May 25, 2007

14

15

             TRANSCRIPT of testimony of ETHAN E. KRA,
16
     as taken by and before Sean M. Fallon, a Registered
17
     Professional Reporter and Notary Public of the
18
     Commonwealth of Pennsylvania, at the offices of
19
     LITTLER MENDELSON, 885 Third Avenue, 16th Floor,
20
     commencing at 9:09 o'clock in the forenoon.
21

22

23

24
```

B0151

ETHAN E. KRA

Page 2

1  A P P E A R A N C E S :
2     CHIMICLES & TIKELLIS LLP
       BY:  JAMES R. MALONE, JR., ESQ.
3         JOSEPH G. SAUDER, ESQ.
       One Haverford Centre
4      361 West Lancaster Avenue
       Haverford, PA  19041
5      (610) 642-8500
       jamesmalone@chimicles.com
6      josephsauder@chimicles.com
       Attorneys for Plaintiffs
7
       PEPPER HAMILTON LLP
8      BY:  BARAK A. BASSMAN, ESQ.
       3000 Two Logan Square
9      Eighteenth and Arch Streets
       Philadelphia, PA  19103-2799
10     (215) 981-4000
       bassmanb@pepperlaw.com
11     Attorneys for Defendants
12     LITTLER MENDELSON
       BY:  SUSAN KATZ HOFFMAN, ESQ.
13     Three Parkway
       1601 Cherry Street, Suite 1400
14     Philadelphia, PA  19102-1321
       (267) 402-3000
15     shoffman@littler.com
       Attorneys for Defendants
16
       BARBARA C. ALEXANDER,
17     ASSISTANT GENERAL COUNSEL
       Pepco Holdings, Inc.
18     P.O. Box 231
       Wilmington, DE  19849-0231
19     (302) 429-3206
       Attorney for Defendants
20
21
22
23
24

Page 4

1         (It is hereby stipulated and agreed
2  by and among counsel that sealing, certification
3  and filing are waived;
4         It is further stipulated and agreed
5  by and among counsel that all objections, except as
6  to the form of the question, are reserved until the
7  time of trial.)
8         ETHAN E. KRA, after having taken an
9  affirmation to testify truthfully, was examined and
10 testified as follows:
11 EXAMINATION
12 BY MR. MALONE:
13     Q.    Good morning, Mr. Kra.  My name is
14 Jim Malone.  I represent the Plaintiffs in a
15 lawsuit against Pepco Holdings and Conectiv that
16 relates to their pension plan.
17         I'm going to be asking you some
18 questions today about that lawsuit.  Mr. Fallon is
19 going to try to take down my questions and your
20 answers.  His fingers are very quick, but they are
21 not quick enough to catch us both talking at the
22 same time, so it's important that you let me finish
23 my questions and I will try and restrain myself and
24 not ask you another question until you finish the

Page 3

1              I N D E X
2  WITNESS                        PAGE
3  ETHAN E. KRA
4     By Mr. Malone            4, 147
5     By Mr. Bassman             144
6
7         E X H I B I T S
8
   NUMBER      DESCRIPTION       PAGE
8
   P-30  List of Expert Witness Cases      28
9
   P-31  Plaintiffs' Answering Brief In     59
10     Opposition to Defendants' Motion
       to Dismiss
11
   P-32  E-Mail, Mar. 14, 2007, Hoffman to Kra,   61
12     with Attachment
13 P-33  Conectiv Cash Balance Pension Plan   68
       Statement
14
   P-34  Documents KRA 00414-447         69
15
   P-35  Expert Report               70
16
   P-36  E-Mail, Bonin to Kra, Apr. 16, 2007   73
17
   P-37  Part One, Conectiv Cash Balance    89
18     Sub-Plan
19 P-38  Pepco Holdings, Inc. Cash Balance   92
       Account Statement
20
   P-39  Reprint of an Article from Business   112
21     Insurance, May 13, 2002
22 P-40  Handwritten Notes, KRA 00001        114
23 P-41  Letter, Yu to Kra, April 17, 2007    125
24 P-42  E-Mail String, KRA 00391 and 392    132

Page 5

1  answer that you give.  I'm usually the one that
2  breaks that rule.
3         If you need to take a break for any
4  reason, let me know.  The only thing I would ask is
5  that you answer a pending question before we take a
6  break.
7         If you don't hear a question, don't
8  understand a question, he'll be happy to read it
9  back for you.  If you don't understand it, let me
10 know, maybe I can give you a better question; maybe
11 not.  We'll see.
12         Are you employed, sir?
13     A.    Yes.
14     Q.    Where are you employed?
15     A.    Mercer Human Resource Consulting,
16 Inc.
17     Q.    And you are based here in New York?
18     A.    Yes, when I'm not on an airplane.
19     Q.    I know the feeling very well.
20         Now, Mercer is affiliated with Marsh
21 & McLennan, is that correct?
22     A.    We are a wholly-owned subsidiary,
23 through -- I don't remember what legal chains -- of
24 MMC.

Reporting Associates, LLC   1-888-795-2323

B0152

ETHAN E. KRA

Page 6

1    Q.    And then MMC is the ultimate parent
2    of --
3    A.    Yes.
4    Q.    -- Marsh & McClennan?
5    A.    Marsh, Inc. -- it's -- MMC is the
6    parent, Marsh, Inc., we're selling Putnam,
7    Mercer --
8    Q.    You did a great diagram with your
9    hands.  Now let me see if I can break it down in
10   words so we can get it on the record.
11        MMC is the ultimate parent --
12   A.    Yes.
13   Q.    -- and then it has a series of
14   subsidiaries, which include your employer, Oliver
15   Wyman and Marsh & McLennan?
16   A.    Marsh, Inc.
17   Q.    Marsh, Inc.  I'm sorry.
18   A.    And it currently owns Putnam, but
19   that is pending sale.
20   Q.    Okay.
21   A.    It may have other subsidiaries of
22   minor nature, and Kroll -- I don't know all the
23   legal entities owned by my parent company.
24   Q.    Your work, do you only work within

Page 7

1    the Mercer Human Resource Consulting, or do you
2    work for some of the other subsidiaries on
3    occasion?
4    A.    I am employed by Mercer Human
5    Resource Consulting.
6         I will, on occasion, collaborate
7    with colleagues in our MMC companies on a
8    particular client issue, if the issue transcends
9    just human resources.
10   Q.    Have you collaborated with anyone
11   outside of Mercer Human Resources in connection
12   with your work on this case?
13   A.    The only individual outside of
14   Mercer Human Resource Consulting is, MMC has
15   attorneys that must approve all engagement letters,
16   so the engagement letter on this assignment had to
17   be approved by MMC counsel.
18   Q.    To your knowledge, do any of the
19   affiliated MMC companies have an ongoing business
20   relationship with Pepco Holdings?
21   A.    I do not know.
22   Q.    Is that something that you made
23   inquiry about as part of your considering whether
24   to take this engagement?

Page 8

1    A.    No.
2    Q.    Does your firm have any policy with
3    respect to that, to your knowledge?
4    A.    It would be handled by the -- there
5    is a policy, and that is the responsibility of the
6    client manager -- client relationship manager.
7    Q.    And who is the client relationship
8    manager on this matter?
9    A.    My understanding is it's Mr. Welch,
10   in our Washington office.
11   Q.    And what is Mr. Welch's title?
12   A.    He is a worldwide partner.
13   Q.    And what is your title?
14   A.    Worldwide partner, chief actuary,
15   U.S. Retirement.
16   Q.    You've been employed at Mercer Human
17   Resource since 1977, is that correct?
18   A.    Correct.
19   Q.    And you are an actuary?
20   A.    Yes.
21   Q.    And you are also an enrolled
22   actuary?
23   A.    Yes.
24   Q.    And could you explain to a layman

Page 9

1    what the significance is of your status as an
2    enrolled actuary?
3    A.    Enrolled actuaries are individuals
4    who have passed examinations pertinent to pension
5    work under ERISA, examinations that are
6    administered either directly or under the aegis of
7    or in conjunction with the Joint Board of the
8    Enrollment of Actuaries, which is a group of five
9    individuals who are federal employees who set the
10   standards for actuaries who are -- if I could use
11   the word license -- I don't want to use -- it's not
12   a legal license, but -- licensed to prepare filings
13   on pension matters, certain particular filings that
14   are filed with the Internal Revenue Service and the
15   Pension Benefit Guaranty Corporation.
16   Q.    That would include the Schedule B
17   that would appear on a 5500 filing?
18   A.    Correct.
19   Q.    And how long have you been an
20   enrolled actuary?
21   A.    I became an enrolled actuary, I
22   believe it was, in 1979.
23   Q.    And you kept current with your
24   registration?

3 (Pages 6 to 9)

B0153

ETHAN E. KRA

Page 10

1    A.    Yes, I have.
2    Q.    Do you regularly prepare 5500
3  filings in your current position?
4    A.    I do not prepare the filings,
5  themselves.  I do review and sign Schedule Bs.
6    Q.    Tell me about how you got involved
7  in this case.
8    A.    I received an E-Mail from one of my
9  colleagues saying that they were in need of an
10  expert witness on a particular client and asked if
11  I'd be available.
12    Q.    Who E-Mailed you, do you recall?
13    A.    I believe it was Gary Jerome.
14    Q.    What is Mr. Jerome's position?
15    A.    Gary Jerome is a worldwide partner,
16  Mercer Human Resource Consulting.
17    Q.    And is he an actuary, as well?
18    A.    No.
19    Q.    What does he do, functionally?
20    A.    He is in the management of the
21  retirement business.  I believe he is more
22  currently involved in defined contribution plans
23  and defined benefit plans.
24    Q.    And how about yourself?  Do you have

Page 11

1  a greater involvement with defined benefit as
2  contrasted with defined contribution?
3    A.    More defined benefit than defined
4  contribution.
5    Q.    And when, approximately, were you
6  contacted by Mr. Jerome?
7    A.    Sometime earlier this year.
8    Q.    Does your firm now, Mercer Human
9  Resource, have an ongoing relationship with Pepco
10  Holdings?
11    A.    I -- there is a client manager.  I
12  am not aware of the extent of any business
13  relationship.
14    Q.    Have you previously done work for
15  Pepco Holdings?
16    A.    I believe that I was involved with
17  one of its predecessor companies at a previous job.
18        In 1975, when I was an employee at
19  the Prudential Insurance Company of America, I was
20  given the task of analyzing the sources of
21  actuarial gains and losses on the Atlantic City
22  Electric pension planning.
23    Q.    You've got a very good memory.
24    A.    It was a major assignment for a new

Page 12

1  actuarial trainee.
2    Q.    Still, 1975 is going back a ways.
3        Other than that assignment for ACE,
4  you've never done -- personally done any work for
5  Pepco Holdings?
6    A.    I do not recall any other work on
7  this company.
8    Q.    Did you have assistants for your
9  work in this case?
10    A.    Yes.
11    Q.    How many people would you say were
12  directly involved in your work?
13    A.    Three.
14    Q.    And who were they?
15    A.    Bruce Cadenhead.
16    Q.    Can you spell that?
17    A.    C-a-d-e-n-h-e-a-d.
18    Q.    And -- well, let's get the three
19  down first and then we can --
20    A.    Michele Miller and Stephane --
21    Q.    S-t-e-p-h-a-n?
22    A.    I don't know.
23    Q.    Okay.
24    A.    And I believe the last name, and I

Page 13

1  may be butchering it, is Bohne, B-o-h-n-e, but I
2  could not be sure of the spelling or the
3  pronunciation because he reported to Bruce on the
4  assignment.
5    Q.    Okay.
6        Now, let's go back to Bruce
7  Cadenhead.  What's his position with -- can I call
8  it MRC?
9    A.    Just call it Mercer.
10    Q.    Mercer?  Okay.
11        What's his position with Mercer?
12    A.    He is a principal.
13    Q.    Now, is that different from a
14  worldwide partner?
15    A.    One notch below.
16    Q.    Is he an actuary?
17    A.    Yes.
18    Q.    Is he an enrolled actuary?
19    A.    Yes.
20    Q.    He's subordinate to you in the chain
21  of command?
22    A.    He is marginally less --
23  subordinate, yes.
24    Q.    And what -- how would you describe

4 (Pages 10 to 13)

B0154

ETHAN E. KRA

Page 14

1 Bruce's role in this engagement to someone who was
2 completely unfamiliar with the work that your firm
3 did?
4        A.    I got the materials, I went through
5 them.  I met with Bruce, gave him a copy of the
6 materials, outlined what I would like programmed in
7 broad terms, and he, working with Stephane, had
8 Stephane program it, and he checked it and then
9 presented it to me.  I went over it, I went through
10 all the methods and assumptions.  Said, "Nope,
11 that's not what I wanted.  This is what I wanted."
12        So, I would not go through and check
13 the detailed numbers, until I knew all the methods
14 and assumptions were as I wanted them to be.
15        Q.    Did that take a couple times?
16        A.    Once or twice, back and forth,
17 and --
18        Q.    Okay.
19        A.    And then checked it over, and then
20 Michele -- Michele Miller is my administrative
21 assistant, she takes care of things like typing,
22 filing, E-Mailing, copying, and Stephane is a
23 junior analyst.
24        Q.    Now, is Stephane an actuary?

Page 15

1        A.    I do not believe so.  I believe he
2 may be taking some exams, but I do not believe that
3 he has credentials yet.
4        Q.    How long has Stephane been working
5 with your firm?
6        A.    I'm not sure.  He's in a pool of
7 junior analysts that -- I'm a parasite -- I just
8 draw upon as I need.  Bruce selected him to work on
9 it with him, based on knowledge level,
10 availability.  He's been with us somewhere between
11 zero and probably three years.
12        Q.    How about Bruce?  How long has Bruce
13 been with Mercer?
14        A.    Bruce joined Mercer mid to late
15 '80s.
16        Q.    Did you feel like you had adequate
17 resources to get the job done?
18        A.    Most certainly.
19        Q.    How about data?  Were you happy with
20 the data?
21        A.    The data we got was enough to do the
22 work.
23        Q.    What data did you get, just in broad
24 brush strokes?

Page 16

1        A.    Well, we gave it in our -- attached
2 to our report, the data that we used.  It would
3 include -- we would normally ask either for date of
4 birth or attained age.
5        Q.    Right.
6        A.    Generally we prefer, for our
7 programming, date of birth, but we'll take age, and
8 we don't view that as a deficiency because, if you
9 have age in years and months, you can back into
10 date of birth within about 15 days, and that's
11 close enough for the rounding in actuarial
12 formulas.
13        Q.    Okay.
14        A.    Same thing with date of employment
15 or years of service.  We might prefer one, but
16 we'll take either one, because we can convert from
17 one to the other.
18        Q.    Right.
19        A.    We ask for pay, as defined in the
20 plan document under the old formula.
21        Q.    Okay.  Which was different for some
22 of them, than it is under the new formula, right?
23        A.    Correct.
24        So, we asked for pay under the old

Page 17

1 formula for specific years, we asked for pay under
2 the new formula for the period when the new formula
3 was in effect.
4        We asked for statements from the
5 recordkeeper on the cash balance plan so that we
6 could look at how they calculated the benefits.  It
7 provides number of -- I won't call them audit
8 checks, but reasonability checks, in that we can
9 then verify that, A, we understand the plan and how
10 it works because we can match what the vendor did;
11 B, we can confirm that the data is consistent with
12 what the vendor got.
13        We are not auditors, we are not
14 going to go in and check the W-2s and payroll in
15 the bowels of the company's basement to see that
16 they were correctly transmitted to us.
17        Q.    But you'd like the numbers to foot?
18        A.    But we would like the numbers to --
19 exactly.  We would like numbers to cross-foot
20 between what we get from the vendor, who does the
21 recordkeeping, and the raw data that we got from
22 the company, and we compare that to a plan document
23 to make sure that we understand how the plan works
24 in operation, and that we believe that the plan

5 (Pages 14 to 17)

B0155

ETHAN E. KRA

Page 18

1  document we have is the plan document that is being
2  administered.
3      Q.    Did you find any variation between
4  how the plan is operating and the plan document, as
5  part of your work?
6      A.    Yes.
7      Q.    What did you find?
8      A.    We found that one of the
9  participants is being given too large a cash
10 balance benefit on transition credits.  That one of
11 the participants, under the plan document, should
12 be getting smaller transition credits than the
13 vendor is currently crediting on all the
14 statements.
15     Q.    I'm probably going to regret asking
16 that question, but the question is that I probably
17 should know which one it is.
18     A.    I'd have to look at the file.
19     Q.    Is it an ACE guy or a Delmarva guy?
20     A.    I don't remember.  I just remember
21 that one of them was getting transition credits as
22 if he had been there a year longer than he really
23 had.
24     Q.    Anything else?

Page 19

1      A.    That's the only inconsistency we
2  found.
3      Q.    You've been working as an actuary
4  for about 30 years now?
5      A.    Thirty years at Mercer.
6      Q.    Mercer.
7      A.    And, prior to that, just under four
8  years at Prudential.
9      Q.    Now, Prudential, did you do pension
10 or did you do life?
11     A.    I did a mixture.
12     Q.    At Mercer, what do you do?  Do you
13 do just pension or do you do other things?
14     A.    I do pension, retiree medical, as
15 far as accounting and financing, but not design.  I
16 don't get into designing the details of the
17 program.  I was more the financial --
18     Q.    So you would be, on the retiree
19 medical front, involved with part of the process
20 where financial statements would reflect an
21 accumulated value for that potential liability?
22     A.    I work on that, as well as issues
23 relating to pre-funding retiree medical.  I work on
24 the financial aspects of executive benefit

Page 20

1  programs.
2      Q.    Would that be like Top Hat plans,
3  things like that?
4      A.    Top Hat plans, Rabbi trusts, secular
5  trusts and various other programs.
6      Q.    We covered pension, retiree medical
7  financial side, and executive compensation.
8            Anything else that you do?
9      A.    COLI and BOLI.
10     Q.    I'm going to learn something new.
11 What are COLI and BOLI?
12     A.    COLI is Corporate Owned Life
13 Insurance; BOLI, Bank Owned Life Insurance.
14           These are financial investments of
15 companies that are very often used to shadow-fund
16 employee benefit obligations, but, technically,
17 could be used to finance other business operational
18 issues.
19     Q.    So, we've done pension, we've done
20 retiree medical, we've done executive compensation,
21 we've done COLI and BOLI.
22           Anything else?
23     A.    I would be involved in non-
24 discrimination testing on defined contribution

Page 21

1  plans, as well.
2      Q.    How about on the defined benefit
3  side?  Do you do discrimination work on that?
4      A.    I would be involved in non-
5  discrimination testing there.  Various types of
6  analyses for government filings.  Involved with the
7  legislative and regulatory process in Washington.
8      Q.    Anything else?
9      A.    I'm an officer in some of the
10 actuarial organizations.
11     Q.    Which ones?
12     A.    I currently serve as vice-president
13 in the Society of Actuaries.
14     Q.    Okay.
15     A.    And I am vice-chair of the Pension
16 Section Council of the American Academy of
17 Actuaries, plus a list of committees that you can
18 see from my CV.
19     Q.    In those roles, do you have -- is
20 part of your work commenting on or propounding on
21 drafting statements of actuarial standards?
22     A.    We will comment on actuarial
23 standards -- proposed actuarial standards of
24 practice.  We will develop practice notes for

B0156

ETHAN E. KRA

Page 22

1  practitioners on actuarial standards of practice.
2      Q.     In laymen's terms, what are
3  actuarial standards of practice?
4      A.     There is an Actuarial Standards
5  Board, which represents major actuarial
6  organizations in the United States, and it has a
7  number of actuarial standards of practice, which
8  are guidelines of appropriate actuarial practice
9  for actuaries practicing in different areas.
10            Example would be data.  What is
11 expected of an actuary to review data.  An actuary
12 is not expected to audit the data, but is expected
13 to look at the data for internal consistency.
14     Q.     Making sure the numbers foot?
15     A.     Right.
16     Q.     Because, if the numbers don't foot,
17 then maybe the data is not reliable and maybe you
18 should ask more questions?
19     A.     If the numbers don't foot, then to
20 what extent don't they foot?  Usually a large
21 company, large amount of data, there will be a
22 number of discrepancies.  Is it material or is it
23 not?
24            So, for example, if I get 10,000

Page 23

1  data records, and I find that three people's date
2  of birth changed in the day of the month, I'm not
3  even going to bother to follow up on it because
4  it's irrelevant to the process.
5      Q.     Right.
6      A.     On the other hand, if I have 10,000
7  records, a thousand of them have changes in year of
8  birth or sex --
9      Q.     That's a problem.
10     A.     -- I'm going to have to ask some
11 questions.
12     Q.     And year of birth and sex are
13 important, because that would affect the life
14 expectancy that would drive a lot of your work, is
15 that correct?
16     A.     Life expectancy, among other
17 factors.
18     Q.     Now, are there statements of
19 actuarial standards of practice that govern your
20 work when you testify as an expert?
21     A.     Yes.
22     Q.     Is that 17?
23     A.     I'd have to look up the number.
24     Q.     Can you summarize what your

Page 24

1  understanding is of those standards that govern
2  work for an actuary while he appears as an expert
3  witness?
4      A.     It's an extensive standard, but
5  among them is:  To only testify on issues that one
6  is qualified to testify on.  It's been a while
7  since I actually read it, so I'm not going to be
8  able to tell you the details of what's in it, but
9  it's just almost become part of the psyche of the
10 actuary that a good actuary internalizes those
11 standards and, in fact, at Mercer we even have
12 higher standards, in some respects, so that we
13 would only testify on those items that we feel
14 qualified to testify.
15     Q.     Okay.
16     A.     Only testify on items that we
17 believe to be true.
18     Q.     That's a good one.
19     A.     Yes.
20            Know that we are not for sale.  We
21 just -- we look at it -- my position is, we look at
22 an issue, we figure out what we believe the answer
23 to be, we say it.  If somebody doesn't like it,
24 they don't have to take us.

Page 25

1      Q.     Fair enough.
2             Do you know whether the governing
3  actuarial standards for expert testimony
4  specifically provide that you are supposed to
5  review them in connection with each engagement?
6      A.     I do not recall that.
7      Q.     Now, how about the people that work
8  with the testifying actuary?  Are they bound by the
9  same standards of conduct in connection with the
10 engagement?
11     A.     Well, take Stephane Bonin.  He's not
12 even an actuary.
13     Q.     Okay.
14     A.     The actuarial standards of practice
15 can't bind him.
16     Q.     Right.
17     A.     Bruce Cadenhead is an actuary.
18     Q.     They bind Bruce.
19     A.     They bind Bruce.
20     Q.     And they require Bruce to supervise
21 Stephane in connection with his work?
22     A.     They require Bruce to do
23 professional work in all respects.  We don't wait
24 for the standard to say, Thou shalt do the right

7 (Pages 22 to 25)

B0157

ETHAN E. KRA

Page 26

1  thing.  We, as a firm, say, Thou shalt do the right
2  thing, and just make sure that the standard isn't
3  raising the bar higher than we would have.
4         But, as a firm, we have very high
5  standards.  So what we do is, when new standards
6  come out, we compare the standards to our own
7  internal corporate policies --
8      Q.    To see if you need to make changes?
9      A.    Make changes.
10        And, if we are ready at a higher
11  level, we say, that's very nice.  Now everybody
12  else will be coming closer to us.
13      Q.    Do you have a review system for work
14  in the office?  Let me give you a context for this,
15  because I have a lot more experience dealing with
16  CPAs at public companies than I have dealing with
17  actuaries.
18        For example, for SEC filings, it is
19  common that most major CPA firms, before the
20  opinion goes out the door, a partner that has not
21  been directly involved in the engagement reviews
22  the work, reviews the audit plan, and then signs
23  off on it.  The function is called a review partner
24  and whatever.

Page 27

1         The long-winded question is, do you
2  have somebody that performs that function
3  generally?
4      A.    At Mercer, any piece of work must
5  be -- is done by one person and reviewed by
6  another.  In this case, it would be viewed that
7  Bruce did the work and I reviewed it --
8      Q.    Okay.
9      A.    -- even though -- it's the type of
10  situation where you can have the signing person be
11  the reviewer, if the other person who is competent
12  to do the job --
13      Q.    Could have signed it on his own?
14      A.    Could have signed it on his own.
15        Since Bruce was clearly competent to
16  sign on his own, as an experienced, very senior
17  actuary, well-recognized in the profession, we met
18  the standards, within Mercer, to have it peer
19  reviewed.
20      Q.    Have you testified before?
21      A.    Yes.
22        MR. MALONE:  I think we have a list.
23        Let's go off the record.
24        (Discussion is held off the record.)

Page 28

1         (Exhibit P-30 is marked for
2  identification.)
3  BY MR. MALONE:
4      Q.    The court reporter has handed you a
5  document that we've marked P-30 for identification
6  purposes.
7         Can you tell me what this is?
8      A.    This is a list of cases in which I
9  have been involved as an expert witness.
10     Q.    And did you prepare this?
11     A.    Yes.
12     Q.    What records did you rely upon to
13  prepare Plaintiffs' 30?
14     A.    I keep a running list.  Just took
15  the last one from the last time I had it prepared,
16  check if there are any new cases, add them, if need
17  be, and send it on to the next attorney.
18     Q.    Let's start with Alexander versus
19  Primerica Holdings.  Now, that was a welfare case,
20  is that correct?
21     A.    That was a case involving retiree
22  medical benefits and retiree life benefits.
23     Q.    And on whose behalf did you testify
24  in that case, do you recall?

Page 29

1      A.    Primerica.
2      Q.    And what was the broad subject
3  matter of your opinions in that case?
4      A.    The issue was whether or not a
5  benefit change to the retiree medical -- to the
6  retiree medical program circa 1984 was a benefit
7  improvement or a benefit reduction.
8      Q.    And that was relevant to the vesting
9  arguments in the case?
10     A.    That was relevant to the issue of
11  whether or not the retired executives, when they,
12  in fact, were the executives -- when they made a
13  change, whether they cut benefits or improved
14  benefits.  Their claim was that they never intended
15  the reservation of rights to allow them to cut
16  benefits.
17     Q.    And Frank versus Landry -- Frank
18  Landry versus the Airline Pilots Association, what
19  can you tell me about that case?
20     A.    That was a case involving the
21  pension plan of Taca Airlines, a foreign flag
22  carrier that left the United States, abandoned a
23  pension plan, that had possibly not had all the
24  paperwork done correctly, and now the issue was how

8 (Pages 26 to 29)

B0158

ETHAN E. KRA

Page 30

1   to distribute the monies in the trust among the
2   various pilots.
3       Q.     And who did you appear before on
4   that matter?
5       A.     A.L.P.A. retained me -- the Airline
6   Pilots Association -- to prepare a reasonable and
7   justifiable and defensible method of allocating the
8   assets among the pilots, present it to the court,
9   so that the monies could be distributed in a
10  reasonable fashion.
11      Q.     The Fresca case?
12      A.     That was an age discrimination case,
13  representing FDIC, and I'll be honest with you, I
14  don't remember all the details on that.  That was
15  13 years ago.
16      Q.     Yes, that was a long time ago.  What
17  I saw of it was it involved medical and life
18  insurance benefits --
19      A.     Yes.
20      Q.     -- that had been rejected by the
21  FDIC as part of a -- I forget the technical word.
22  It's when banks go bankrupt.
23      A.     Yes.
24      Q.     Banks technically can't go bankrupt.

Page 31

1   Neither can life insurance companies.  They have
2   their own insolvency proceedings.
3       A.     Right.
4       Q.     How about the Compagnie Nationale
5   Air France cases?
6       A.     Those were two cases that were
7   combined in the Southern District of Florida.
8   Since Air France is an entity of the French
9   government, the trial cannot be by jury; it must be
10  a bench trial.  It was an age discrimination case
11  that looked at all of the benefits, compensation
12  they would have gotten, they could have gotten,
13  they actually got, to determine whether or not they
14  had suffered any damages.
15      Q.     Who did you appear on behalf of?
16      A.     Air France.
17      Q.     And Tepperman versus MacAndrews &
18  Forbes Group?
19      A.     I prepared an expert report.  There
20  were no depositions.  I never got to trial.
21      Q.     What kind of case was that?
22      A.     That was a -- Mr. Tepperman was, I
23  believe, suing for wrongful discharge, and it was
24  looking at the pension benefits, and there were

Page 32

1   issues as to various pension plan amendments?
2       Q.     And you were working with MacAndrews
3   & Forbes on that?
4       A.     Yes.
5       Q.     And in the City of Philadelphia case
6   you worked for the city, is that right?
7       A.     I represented the city, I prepared
8   an expert report.  I believe that reference to the
9   expert report was in the public record.  I do not
10  know whether the expert report, itself, got into
11  the public record.
12      Q.     Depends on how you define "public
13  record," too.  It may not be easy to retrieve.
14      A.     I don't know, yes, but the reason I
15  know that reference to it was -- it was in the
16  public record, subsequently I was called by a
17  reporter.
18      Q.     There you go.
19             How about Vornado versus Trustees?
20      A.     I represented the trustees of a
21  multi-employer pension plan.  Litigation was a
22  pension issue.
23      Q.     This was withdrawal liability?
24      A.     This was actually relating to

Page 33

1   whether or not the withdrawing employer could
2   demand a split -- a bifurcation of the pension
3   plan, and the issues relating to rules, and then
4   ultimately went on to withdrawal liability.
5       Q.     How about the Garelick versus Rodier
6   Corporation?
7       A.     Worked with Rodier, do not recall
8   the details, other than -- I just don't recall.
9       Q.     That's fine.
10             The CIGNA case, what did that
11  involve, do you remember?
12      A.     That was non-qualified benefits
13  funded with COLI --
14      Q.     Okay.
15      A.     -- I believe, and I think that was
16  the CIGNA case.
17      Q.     And how about the Leonard F. versus
18  Israel Discount?
19      A.     That was a disability litigation on
20  long-term disability.  ADA.
21      Q.     Yes, ADA.  What was your roll in
22  that case, do you recall?
23      A.     Representing Israel Discount Bank on
24  long-term disability policy issues and pricing.

9 (Pages 30 to 33)

B0159

ETHAN E. KRA

Page 34

1    Q.    I take it from this that the last
2  time that you testified in a case was 1998.  Is
3  that correct?
4    A.    Let's see, I've been --
5    Q.    No, I might have been wrong.
6        MR. BASSMAN:  And, when you say
7  "testified," do you mean at deposition or at trial?
8        MR. MALONE:  Either or.  I'm
9  looking -- it's probably '99.
10        THE WITNESS:  I was in Miami in '99.
11    Yes.
12  BY MR. MALONE:
13    Q.    Any particular reason why you
14  haven't had a testifying engagement --
15    A.    Generally, our firm does not look --
16  seek out expert witness work.  Try to -- as I've
17  moved up the line, we find it better to work on
18  other things.
19    Q.    That's okay.  You don't have to like
20  lawyers.  We won't be offended.  We are used to it.
21  Actuaries have a much better public image than
22  lawyers do.
23        So, you've been an actuary involved
24  with pension issues under ERISA at least since 1979

Page 35

1  when you became enrolled, is that correct?
2    A.    Yes.
3    Q.    Have you come to form an
4  understanding of what the term "accrued benefit"
5  means, under ERISA?
6    A.    Yes.
7    Q.    And what's your understanding?
8    A.    It's a benefit based on salary and
9  service, compensation, all factors, through the
10  current date, but anticipating the possibility of
11  additional service that would vest that already
12  accrued benefit, if I can be circular in my
13  definition, for various entitlements.
14    Q.    Let's talk about vesting, so we get
15  that on the table and get that out of the way,
16  because that does kind of confuse things.
17        ERISA sets vesting standards for
18  pension plans?
19    A.    Yes.
20    Q.    And, for an employee, for example,
21  that starts today, he or she may earn an accrued
22  benefit under an ERISA-regulated qualified pension
23  plan, but, if they leave before they satisfy the
24  vesting schedule, they don't get that, is that

Page 36

1  correct?
2    A.    If an employee leaves before
3  satisfying the vesting requirements under the plan,
4  and does not get re-employed, then they would
5  forfeit the benefit.
6    Q.    And the re-employment might also
7  turn on when they got re-employed, because -- if
8  the break in service was too long?
9    A.    Correct.
10    Q.    Now, ERISA defines -- or divides
11  pension plans into two broad categories, is that
12  correct?
13    A.    First of all, you have profit
14  sharing plans and pension plans.
15    Q.    Right.
16    A.    Within pension plans, you have
17  defined contribution pension plans and defined
18  benefit pension plans.
19    Q.    In defined contribution pension
20  plans, can you give me an example that a layman
21  would understand as a typical or stereotypical
22  defined contribution plan?
23    A.    There are relative -- in the
24  universe of pension plans, defined contribution

Page 37

1  pension plans are less common.  They would be plans
2  where the company promises to deposit a formulaic
3  amount of money into an account on behalf of an
4  individual based on service, compensation, other
5  factors, and is committed to, independent of the
6  profitability of the company, with no board
7  discretion, and would require a plan amendment to
8  change that.
9        So, in a defined contribution
10  pension plan, the participant can look to the four
11  corners of the plan document and know how much the
12  employer must deposit on his or her behalf.
13        The actual value that that will then
14  accumulate to will depend on the investment return
15  in whichever account it's deposited.  The plan may
16  offer the employee choice or it may have no choice.
17  There may be one pool of money, there may be
18  multiple pools of money, and that's all a part of
19  the plan design.
20        MR. MALONE:  Can you read back his
21  answer, which was very thorough, but very long, and
22  I want to make sure I understand it before I try to
23  break it down.
24        (Pertinent portion of the record is

B0160

ETHAN E. KRA

Page 38

1  read.)
2  BY MR. MALONE:
3      Q.    Because defined contributions are
4  pension plans regulated under the Internal Revenue
5  Code, the employer can't have discretion because
6  the IRS requires that there be some definitely
7  determinable benefit, is that correct?
8      A.    A pension plan must have a
9  definitely determinable benefit formula.  In a
10  defined contribution plan, that is determined by
11  how much money is deposited.
12      Q.    And in a defined benefit plan?
13      A.    Defined benefit plan defines, by
14  formula, what the participant will receive.
15      Q.    In a defined contribution plan,
16  what's your understanding of what constitutes the
17  accrued benefit of a participant?
18      A.    In a defined contribution plan, the
19  accrued benefit would equal the account balance.
20      Q.    And that's defined by statute, as
21  you understand it?
22      A.    I'd have to check whether it's
23  statute or regulation.
24      Q.    One or the other?

Page 39

1      A.    I believe so.
2      Q.    An example of a defined contribution
3  pension plan that might be common might be a 401(k)
4  plan with an employer match?
5      A.    No.
6      Q.    No?
7      A.    A 401(k) plan is a profit sharing
8  plan.
9      Q.    Interesting.
10      A.    A 401 feature may not be legally
11  added to a defined contribution pension plan.
12      Q.    Interesting.
13          Savings plan with an employer match?
14      A.    Savings plan is a colloquial term of
15  art, not in the Internal Revenue Code.
16      Q.    Oh, I know that.
17      A.    A savings plan would imply employee
18  discretionary contributions, which could be either
19  pretax or after tax.  If they were pretax, that
20  would constitute a 401(k) feature and could only be
21  part of a profit sharing plan.
22      Q.    Okay.
23      A.    If they were after tax, they would
24  be voluntary contributions, they could be put into

Page 40

1  a profit sharing plan.  I believe, but I'm not
2  sure, that they could also be put into a defined
3  contribution pension plan, although that -- I don't
4  know if I've ever seen one, so I never researched
5  whether it would be permitted.
6      Q.    Now, in a defined benefit plan, what
7  determines the employees' accrued benefit?
8      A.    In a defined benefit plan, you look
9  to the four corners of the plan document, and that
10  would determine, based on all of the relevant
11  factors, which could include the employee's date of
12  birth, date of hire, compensation, job category,
13  all of the factors relating to the individual, and
14  perhaps exterior factors, such as Treasury interest
15  rates, or other factors as defined in the document,
16  which would then develop a benefit amount, which
17  could be expressed either as an annuity or
18  expressed as a lump sum.
19      Q.    Historically, did ERISA require that
20  it be expressed as an annuity?
21      A.    I'm not going to comment on ERISA.
22  I believe the IRS has historically required that
23  the plan document at least describe how -- if it's
24  not expressed as an annuity, how to convert it to

Page 41

1  an annuity.
2      Q.    And the IRS requires the plan
3  document to spell out the actuarial assumptions
4  that would be used to perform that calculation?
5      A.    The plan document must specify the
6  assumptions that would be used to convert the lump
7  sum amount into an annuity --
8      Q.    And --
9      A.    -- but many plan documents do not
10  define the benefit in terms of annuities, but
11  define them in terms of lump sums.  However, they
12  do provide conversion factors.
13      Q.    And the reason the IRS requires the
14  plan to spell out the conversion factors is so that
15  benefits would continue to be definitely
16  determinable and the employer would not have
17  discretion with respect to the amount of the
18  benefit?
19          MR. BASSMAN:  Objection.  You can
20  answer.
21          THE WITNESS:  I would say the reason
22  the IRS requires that they be provided is because
23  ERISA requires that, absent spousal consent, a
24  pension plan, whether defined contribution or

11 (Pages 38 to 41)

B0161

ETHAN E. KRA

Page 42

1  defined benefit, must pay the benefit for a married
2  participant in the form of a qualified joint and
3  survivor annuity and, therefore, the defined
4  benefit plan must contain factors to convert all
5  forms of benefit into annuities to comply with the
6  requirement that, absent spousal consent, a married
7  participant receive the benefit as a qualified
8  joint and survivor annuity and, absent the
9  individual's consent, for a non-married individual,
10  the benefit be payable as a life annuity.
11        Q.    Single-life annuity commencing at
12  age 65?
13        A.    A single-life annuity that would be
14  payable at the normal retirement age, as defined in
15  the plan document, which might be other than 65.
16        Q.    Did you finish your answer?
17        A.    Yes.
18        Q.    We talked about some defined benefit
19  plans that expressed the accrued benefit in the
20  form of a lump sum.
21              Is there a name you would normally
22  use for that?
23        A.    There are a number of types of plan
24  that would -- in the defined benefit realm that

Page 43

1  express the accrued benefit in terms of a lump sum.
2  Pension equity plan, cash balance plan, would
3  represent two varieties or two flavors.
4        Q.    How would you contrast, in general
5  terms, a pension equity plan, on the one hand, from
6  a cash balance plan, on the other?
7        A.    The typical pension equity plan
8  bases the benefit on usually something approaching
9  final pay or final average pay, could be one year
10  or five years or something in between, and then
11  bases it on other factors, such as age and service
12  and points that are accumulated; whereas, a cash
13  balance plan typically will base the benefit on pay
14  credits that are accumulated each year, and then
15  interest credits that are credited on those pay
16  credits each year, and both of them would then
17  define a benefit payable on a particular date, in
18  terms of a lump sum amount.
19              In a pension equity plan there may
20  also be interest factors.
21        Q.    Typically, a cash balance plan is a
22  career average pay plan, as contrasted with a final
23  average pay plan?
24        A.    A cash balance plan will typically

Page 44

1  involve pay over the individual's career.  For a
2  plan that was cash balance for the entirety of the
3  individual's participation, it would generally be
4  pay over the years in which the individual
5  participated.
6              For a plan that became cash balance
7  part way through the individual's career, there are
8  a number of different ways in which a company could
9  convert from a traditional plan to a cash balance
10  plan.
11              Typically, they would look at pay
12  throughout the career after the date of conversion.
13  How they set up the benefit at the initial date
14  could vary, depending on plan design.
15        Q.    Which is why I asked a bad question,
16  because, if a plan didn't start out as a cash
17  balance plan from Day 1, it wouldn't be a career
18  average pay plan because you would have to take
19  account of the prior benefit structure, correct?
20        A.    Some plans that convert to cash
21  balance do go back and pick up pay history from
22  date of employment.  Others will convert the
23  benefit formula at date of conversion using other
24  methodologies.  And the number of methodologies is

Page 45

1  probably as many as there are plans out there,
2  although some may have used identical methodologies
3  because they had the same person drafting them,
4  designing them or copying them, but there are quite
5  large number of different designs.
6        Q.    Now, as you understand it, when we
7  are dealing with defined benefit plans, are there
8  requirements under ERISA that regulate the rate at
9  which the participants' accrued benefit grows?
10        A.    ERISA and the Internal Revenue Code
11  have rules on -- rules preventing a plan from doing
12  what's called back-loading.  Namely, you cannot do
13  an end-run around the vesting rules by delaying the
14  accrual of benefits to late in the career.
15              There are rules at which -- a plan
16  must satisfy one of three sets of rules, so as to
17  accrue benefits at a reasonable rate early enough
18  in a person's career.
19        Q.    And those three tests are 3 percent
20  interest?
21        A.    There is a 3 percent test, there is
22  a four-thirds test or the 133 and a third test, and
23  then there is the service proration test.
24        Q.    Also known as the fractional test?

12 (Pages 42 to 45)

B0162

ETHAN E. KRA

Page 46

1    A.    It's also known as the fractional
2 rule.
3    Q.    How does the 3 percent test work?
4    A.    You would take the person today, you
5 would project the person's benefit to normal
6 retirement date, assuming no future pay increases,
7 no changes in the cost of living, no changes in the
8 Social Security tax wage base.  In fact, everything
9 would remain constant, except the person's service
10 and age.
11        You would then multiple it by 3
12 percent, times the number of years of service the
13 person has had to date, and, if the accrued benefit
14 is greater than that, you pass.  If it's not, you
15 don't pass that test.  But the requirements are
16 not -- you do not have to pass all three tests.
17    Q.    Any one?
18    A.    Correct.  You only have to pass any
19 one of the tests and you are home free.
20    Q.    Now, you kept compensation static
21 under 3 percent.
22    A.    Um-hum.
23    Q.    And you kept the Social Security
24 wage base --

Page 47

1    A.    Kept every -- wage base static, CPI
2 static.  The cost of living doesn't change.
3    Q.    CPI, you meant Consumer Price Index?
4    A.    Consumer Price Index, or any other
5 similar factor -- you keep interest rates constant.
6        It's as if the world remains in a
7 constant state, except for the fact that this
8 person is getting older and earning more service.
9    Q.    Does the statute or the regulation
10 specifically mention interest rates in the context
11 of fractional?
12    A.    I would have to look at that.
13    Q.    I was curious, if you kept the age
14 and the service static, could you ever have a plan
15 that passed --
16    A.    I didn't say you keep age and
17 service static.
18    Q.    No.  I said, if you -- if you kept
19 age and service static, the plan couldn't pass,
20 could it?
21    A.    No.  If you kept age and service
22 static, then you'd have a hundred percent of the
23 benefit accrued, so you'd always pass, so it would
24 be a vacuous test.

Page 48

1    Q.    It would be pointless?
2    A.    Right.
3    Q.    Before we leave 3 percent, can a
4 plan that looks at career pay pass 3 percent, as
5 you understand it?
6    A.    My understanding is that the IRS, in
7 reviewing plans that are based on career pay, looks
8 to the four-thirds test.
9    Q.    That, at least as far as the IRS is
10 concerned, that's the only one that's going to
11 work?
12    A.    That's my --
13        MR. BASSMAN:  Objection.  You can
14 answer.
15 BY MR. MALONE:
16    Q.    Let me withdraw the question and
17 rephrase it.
18        Your understanding of the IRS's
19 position is that the only one that a career-based
20 pension plan -- defined benefit pension plan can
21 pass is the 133 and a third?
22    A.    My understanding is that, in testing
23 a career average defined benefit pension plan, the
24 IRS looks to the four-thirds test as the

Page 49

1 appropriate methodology for testing.
2        I have not seen situations where
3 demonstrations have been attempted using other
4 methodologies and if anyone has tried to discuss
5 that with the Service.  So, I'm not saying it's the
6 exclusive, but it's the one that we've seen.
7    Q.    Let's go to the 133 and a third
8 test, or the four-thirds test.  You can use either
9 one, whichever is more comfortable for you.
10    A.    Um-hum.
11    Q.    How does that work?
12    A.    You look at the benefit being
13 accrued in a given year.  Benefit accrued in a
14 given year is benefit end of the year minus benefit
15 beginning of the year.  The difference represents
16 how much you earned during the year.
17        You then assume that all factors
18 remain constant into the future, such as pay -- the
19 regulations say all factors remaining constant,
20 except, of course, the person has to age and get
21 more service.
22    Q.    Do the regs say that?
23    A.    I would have to look at them.
24    Q.    Okay.

13 (Pages 46 to 49)

B0163

Page 50

1    A.    But that's the common application of
2 them by all actuaries.
3    Q.    Because, once again, it wouldn't
4 make any sense -- if you kept the age and the
5 service static, the test wouldn't accomplish
6 anything?
7    A.    Correct.
8        You then look at each year into the
9 future, what is projected to be accrued in each
10 ensuing year, and, under the four-thirds test, the
11 test is passed if no year in the future you accrue
12 a benefit that's more than four-thirds of the
13 benefit you are accruing this year.
14        In doing the test -- it's a
15 prospective test only, it is not a retrospective
16 test, so you don't have to look at what happened in
17 the past.  So, for example, if a person got a big
18 pay increase, and now is earning a higher benefit,
19 that doesn't ruin the test because -- let's say
20 someone's salary doubles, and our benefit is just a
21 career average 1 percent of pay.  The person goes
22 from $10,000 a year of pay to $20,000 a year of
23 pay, that year's accrual is $100 in the year he
24 earns 10,000, 200 in the year he earns 20,000.

Page 51

1        Two hundred is more than four-thirds
2 of 100.
3    Q.    Even a lawyer can figure that out.
4    A.    That does not fail the four-thirds
5 test.
6    Q.    Because you keep the pay static?
7    A.    Because the pay went up.  And, even
8 if the pay historically has gone up -- that's why
9 we don't look backwards -- because we are only
10 looking prospectively.
11    Q.    How about the fractional test, which
12 you had another name for, but I can't remember the
13 name you applied?
14    A.    The fractional test, or the service
15 proration test.
16        You project the benefit to normal
17 retirement date.  Again, assuming constant factors
18 of compensation, Social Security, et cetera, but
19 projecting continued service, and aging to normal
20 retirement date.  You then multiply that benefit by
21 a fraction.  The numerator is past credited
22 service, the denominator is total credited service.
23        You then get a -- multiply that
24 times the benefit at normal retirement date.  If

Page 52

1 the benefit earned to date is greater, you pass --
2 greater than or equal to.  If it's less, you fail.
3 So that would be an example.
4        Let's assume you gave a benefit that
5 was 2 percent a year for the first ten years,
6 nothing thereafter.
7    Q.    That would flunk.
8    A.    That would pass.
9    Q.    Oh, would it?  Okay.
10    A.    Because -- let's assume the person
11 were going to have 20 years of service.  At
12 retirement they would have a 20 percent benefit.
13 As long as they earned 1 percent every year, they
14 pass.  So that benefit is front-loaded.
15    Q.    Okay.
16    A.    It does not violate back-loading.
17    Q.    If it was the other way around, it
18 would?
19    A.    If you gave nothing for the first
20 ten years and 2 percent for the last ten years,
21 that would be a classic back-loaded formula, which
22 Congress intended to prohibit in a qualified plan.
23    Q.    We've used that technical term,
24 "qualified plan," and we probably ought to put some

Page 53

1 parameters on it.  What do you understand by the
2 term "qualified plan," when you use it?
3    A.    A plan which is -- a pension or
4 profit sharing plan subject to Title 1 of ERISA and
5 subject to the qualification rules of the Internal
6 Revenue Code.  It's a legal term that I would
7 really have to defer to counsel to put a better
8 definition around.
9    Q.    But it's a term you work with on a
10 day-to-day basis?
11    A.    A term I work with on a day-to-day
12 basis.  I know one when I see one, but I'd have to
13 ask a lawyer to define it.
14    Q.    Now, in a cash balance plan what
15 constitutes the participants' accrued benefit?
16    A.    Depends on how it's defined in the
17 plan document.  Some plan documents will define it
18 equal to the account balance, and then the optional
19 forms will include the annuity, which is defined
20 because it's required.  Other plans will define it
21 in terms of the annuity.
22        You have to look at a plan document.
23    Q.    Now, let's take that thought and
24 meld that with our tests that we've been talking

14 (Pages 50 to 53)

B0164

ETHAN E. KRA

1  about.
2        If an actuary is reviewing a cash
3  balance plan to determine whether it comports with
4  the back-loading standards and the plan defines the
5  accrued benefit as the account balance, how would
6  you apply the tests?  To the account balance?
7        A.    In a defined benefit cash balance
8  plan -- qualified defined benefit plan, I would do
9  the testing on the normal retirement benefit,
10  payable as an annuity.
11        Q.    Even if the plan specified a lump
12  sum as the accrued benefit?
13        A.    I would still base it on the annuity
14  form.
15        Q.    And you would do the same thing if
16  the plan, although it was a cash balance plan,
17  specified the accrued benefit as the -- as the
18  single life --
19        A.    My understanding is that the
20  requirements are that all defined benefit plans
21  have back-loading tested on the normal retirement
22  annuity.  The IRS typically is -- in every test
23  that I've seen them require, that's the only thing
24  they are willing to look at.

1        So, I'm not going to give a legal
2  discourse as to whether that's the right answer or
3  the wrong answer, but my understanding is that
4  that's the only thing the IRS will look at.
5        Q.    And, on a practical level, if they
6  wouldn't look at it, you can't advise a client to
7  the contrary?
8        A.    There are certain things I know I
9  can change and certain things I know I can't and,
10  if the IRS tells me these are the rules --
11        Q.    That's what you have to work with?
12        A.    That's what I have to work with.
13        Q.    Now, do you have any familiarity
14  with the idea of calculating a rate of benefit
15  accrual under a defined benefit pension plan?
16        MR. BASSMAN:  Objection.  You can
17  answer.
18        THE WITNESS:  That is a term that I
19  believe has been subject to significant litigation
20  in quite a few cases, and different judges have
21  given differing opinions.
22        Some will -- have said that you will
23  look at the account balance and look at how that
24  changes, or the amount credited to it on account of

1  the service.  So, in other words, you would look at
2  the -- not the account balance, but the amount
3  added to the account balance on account of the
4  service rendered during the year.
5        An account balance grows due to two
6  factors:  An amount attributable to service
7  rendered during the year, and an amount
8  attributable to an interest or investment credit on
9  previous account balances.
10        My understanding is, if you are
11  looking at the account balance type approach, you
12  would look at the amount credited on account of the
13  service rendered during the year, otherwise
14  colloquially known as the pay credit.
15  BY MR. MALONE:
16        Q.    You would carve out the interest
17  credit?
18        A.    Yes.
19        Q.    And that's because that's deemed
20  accrued in the past, correct?
21        A.    Correct.
22        If you were looking at it on an
23  annuity basis, you would look at the change in the
24  annuity attributable to service during the year,

1  again carving out all interest factors, which would
2  include any interest credited on the account
3  balance or any change in the interest rate due to
4  external forces not under the control of the plan
5  sponsor.
6        So, for example, if I'm CitiGroup,
7  and I have a cash balance pension plan, if I tie
8  the interest crediting rate to the CitiGroup prime
9  interest rate, that's under my control; whereas, if
10  I tie it to J.P. Morgan's, Chase's prime rate,
11  that's not under my control.  Or, if I tie it to
12  Treasury's, that's not under my control.
13        So, as long as it's something not
14  under my control, as a plan sponsor, and it's
15  attributable to prior accruals, that's not a part
16  of this year's accrual.  So, anything affected by
17  interest on prior accruals is part of the past, the
18  old accrued benefit; anything attributable to
19  amounts being credited on account of service
20  rendered or paid during the current year is part of
21  this year's accrual.
22        Q.    Does that complete your answer?
23        A.    I think so.
24        Q.    Okay.

Reporting Associates, LLC   1-888-795-2323

B0165

ETHAN E. KRA

Page 58

1    A.    Sorry if I'm too complete.
2    Q.    No, you are not too complete, but,
3  when somebody gives a long answer and they pause,
4  I'm never quite sure whether they are catching
5  their breath or they need some more water and they
6  have more to say, or whether they are done, so,
7  every once in a while, I will ask you if you've
8  completed your answer. It doesn't mean I have a
9  problem with your answer, I'm not being critical.
10  I'm just trying to make sure that I have your
11  answer out on the table before I try and grapple
12  with it, okay?
13    A.    Certainly.
14    Q.    Approximately how many hours did
15  your team at Mercer work on this case, do you know?
16    A.    Don't have the time records.
17  Haven't checked.
18    Q.    Can you give me a reasonable
19  estimate?
20    A.    Somewhere between 20 and 40. Don't
21  know.
22         I need to restate that. Maybe 25 to
23  50.
24    Q.    That includes the entire team?

Page 59

1    A.    Yes. That's just an estimate.
2    Q.    I understand.
3    A.    I mean, if it was 55, I'm not guilty
4  of perjury.
5    Q.    I understand. You've labeled this
6  an estimate, I asked you for a reasonable estimate
7  because you didn't know the right answer, so I'm
8  stuck with the fact that it's an estimate, and
9  that's fine.
10         (Exhibit P-31 is marked for
11  identification.)
12  BY MR. MALONE:
13    Q.    The court reporter has handed you a
14  document that's been marked Plaintiffs' Exhibit 31
15  for identification purposes.
16         Do you see at the bottom it's got
17  KRA 00338?
18    A.    Yes.
19    Q.    This came from your files?
20    A.    Yes.
21    Q.    You understood that you were
22  supposed to produce all of your records with
23  respect to this engagement?
24    A.    Yes.

Page 60

1    Q.    And you made a diligent search of
2  your files?
3    A.    What I did is I took my file, or my
4  secretary brought me my file, I looked at it and
5  said, "Make me a copy and send it to Barak." I did
6  not go through and check every page to make sure
7  she Xeroxed diligently, but my presumption is that
8  she did that task and sent it off.
9    Q.    Did you review Plaintiffs' 31 as
10  part of your work?
11    A.    I read through it before we started
12  the work.
13    Q.    Let me direct your attention --
14  there is just a few pages I have a couple questions
15  on. If you would go to Page 5 of Plaintiffs' 31,
16  which would be KRA 00343.
17    A.    Yes.
18    Q.    There is handwriting there?
19    A.    Yes.
20    Q.    Is that your handwriting?
21    A.    No.
22    Q.    Do you know whose it is?
23    A.    I believe it was there when I
24  received the document.

Page 61

1    Q.    So, it's not somebody at Mercer?
2    A.    Not to my knowledge.
3    Q.    How about Page 6?
4    A.    I believe that was there when I
5  received it.
6    Q.    How about Page 10?
7    A.    I believe that was there when I
8  received it.
9    Q.    And Page 11?
10    A.    I can't tell whether that is my
11  writing or somebody else's when I got it. I don't
12  know.
13    Q.    Do you remember specifically reading
14  31?
15    A.    I remember looking through a whole
16  pile of documents at the beginning, and I don't
17  recall which one was which, but I would -- I make
18  it a policy, when I get all the documents --
19    Q.    You want to look at everything at
20  least once?
21    A.    I want to look at everything once,
22  get a flavor of what's going on.
23         (Exhibit P-32 is marked for
24  identification.)

ETHAN E. KRA

Page 62

1    BY MR. MALONE:
2        Q.     The court reporter has handed you
3    what we've marked Plaintiffs' 32.  This, again,
4    came from your files.  It appears to be an E-Mail
5    printed off from your desktop and it has an
6    attachment to it of what appears to me to be an
7    Excel spreadsheet.
8            Can you take a look at this and see
9    if you've seen this before?
10       A.     Yes.
11       Q.     First of all, do the E-Mail and the
12   spreadsheet belong together?
13       A.     I believe so.
14       Q.     What does Plaintiffs' 32 comprise?
15       A.     It's a cover E-Mail from Susan
16   Hoffman, counsel --
17       Q.     Distinguished counsel, please.
18       A.     Distinguished counsel.
19           -- to me, with an attached Excel
20   workbook that has data in it.
21       Q.     And is this data, which begins at
22   KRA 00124 -- is this information that you relied
23   upon in your work in this case?
24       A.     This was part of the data that we

Page 63

1    used in preparing our report.
2        Q.     Now, on 124 we've got Mr. Charles?
3        A.     Yes.
4        Q.     And at the -- well, turning the page
5    landscape-wise, as you and I both have so we can
6    actually read the numbers, in the left-hand column
7    there are a series of phrases there.
8        A.     Yes.
9        Q.     Determination date, what do you
10   understand that to mean?
11       A.     Data as of a given date.  This page,
12   my understanding is, represents a report of data as
13   of nine different dates, each represented by a
14   column of numbers.
15       Q.     And each headed by a year?
16       A.     Each headed by a year, and
17   determination dates represents the date within that
18   year as of which the information was determined.
19       Q.     And the next one down is age of
20   determination date.  That's pretty straightforward.
21       A.     That we used to determine an
22   estimate of the date of birth, and used that as a
23   proxy for age.  It looked as if most of these were
24   rounded to the nearest month, and we did not feel

Page 64

1    that that was material for our analysis.
2        Q.     Normal retirement date.
3        A.     That would be the first of the
4    month, coinciding with the next following -- the
5    attainment of age 65.
6        Q.     So, for Mr. Charles here, it would
7    appear that his birthday was in October, because
8    his normal retirement date falls in November, is
9    that correct?
10       A.     Either it was October or, if the
11   rounding was such that he was born November 5th,
12   they are off by a month.
13       Q.     And age 65, as you understand it, is
14   the normal retirement date under the cash balance
15   sub-plan?
16       A.     My understanding is that that is the
17   normal retirement date as defined in the current
18   plan document.
19       Q.     Do you know whether it was the same
20   in the predecessor plan document?
21       A.     I would have to go back and look at
22   it again.  I would prefer to review the document
23   before shooting from the hip.
24       Q.     And then there is an early

Page 65

1    retirement date.
2        A.     Yes.
3        Q.     And what's your understanding of
4    that date?
5        A.     Until he's attained his earliest
6    possible retirement date, it shows the date -- the
7    earliest date at which he could retire.
8            Once the determination date is after
9    that date -- he can't retire retrospectively -- so
10   it shows the current date.
11       Q.     And age as of ERD is pretty much
12   self-explanatory.
13       A.     Yes.
14       Q.     Credited service, what do you
15   understand that number to reflect?
16       A.     It says, "Credited service for the
17   prior plan."
18       Q.     Okay.
19       A.     So, this plan is the successor to
20   another plan, and that other plan document had,
21   within the four corners of the document, a
22   definition of credited service.  This, to my
23   understanding, is the service that would be
24   determined as credited service under the

17 (Pages 62 to 65)

B0167

ETHAN E. KRA

Page 66

1  definitions of that plan document, as of the
2  determination date.
3      Q.    Now, I was looking at Mr. Charles'
4  numbers here under credited service and, in the
5  first left-hand column of numbers, for 1999, we go
6  19.312 in credited service.
7          Do you see that, sir?
8      A.    Yes.
9      Q.    In 2000 the same entry is 20.3083,
10  and then the following year is 21.3087.  Is there
11  any particular reason for that variance?
12      A.    -- I would not know and, since the
13  difference was such a minuscule amount, it was
14  just --
15      Q.    Not material?
16      A.    -- not material to any analysis that
17  I was doing, and, so, I gave it no concern.
18      Q.    Okay.
19      A.    The difference, for example, between
20  19.312, if I were to add one to it, would get
21  20.312.  The difference between that and 20.3083 is
22  less than .004 of a year, which is about two days.
23  Not significant in crediting service.
24      Q.    Okay.

Page 67

1          Now, going back to the words and
2  away from the numbers, final average pay for the
3  prior plan, what do you understand the significance
4  of that to be.
5      A.    That would be the -- using the
6  definition of compensation under the pre-cash
7  balance plan, what would that individual's final
8  average pay have been, had that plan been continued
9  unchanged.
10      Q.    And the predecessor plan was the
11  final average pay plan?
12      A.    I believe so.
13      Q.    And then, below that, there is no
14  actual label, but, if you look in each column,
15  there is a series of numbers, starting with
16  54,204.90 in the 1999 column, and going down.
17          What did you understand those to
18  reflect?
19      A.    My understanding of those numbers
20  were that they represented the prior five years
21  compensation as defined in the prior plan document,
22  so that 55,873.85 represented the average of the
23  five numbers that appear below it, and that was
24  consistent with the fact that, as we move to the

Page 68

1  right, each number appears in the next column one
2  row lower.
3      Q.    I had the same reaction when I
4  looked at it.
5          Obviously, you looked at the numbers
6  to see if they foot.  Did you do any other tests on
7  this data to see whether it was accurate?
8      A.    Checked that the ages moved up and
9  that they were all consistent, but, other than
10  that, we had no data source to check this against.
11          (Exhibit P-33 is marked for
12  identification.)
13  BY MR. MALONE:
14      Q.    The court reporter has handed you
15  Plaintiff's 33, which is a single-page document,
16  bearing JMC 00008.  Why don't you take a moment to
17  look at that.
18          You've had a minute to review
19  Plaintiffs' 33?
20      A.    Yes.
21      Q.    The first thing you did was to get
22  your pencil out and made sure the numbers matched
23  back to Plaintiffs' 32?
24      A.    I looked at that.

Page 69

1      Q.    There is a variance there, for
2  credited service, between 32 and 33.  Do you see
3  that?
4      A.    Yes.
5      Q.    Is that material to you?
6      A.    No.  The difference is .0025 years,
7  which is approximately one day.
8      Q.    In fact, it might just be the
9  difference between December 31st of 1998 and
10  January 1 of 1999.
11      A.    Very well could be.
12      Q.    Okay.
13      A.    I don't know.
14      Q.    Did you receive Plaintiff's 33?
15      A.    I do not believe I've ever seen this
16  document before today.
17          MR. MALONE:  That's all I have for
18  you on 33.
19          Plaintiffs' 34.
20          (Exhibit P-34 is marked for
21  identification.)
22          (Recess called at 10:29 a.m.)
23          (Resumed at 10:38 a.m.)
24          MR. MALONE:  Let's go back on the

18 (Pages 66 to 69)

B0168

ETHAN E. KRA

Page 70

1  record.
2  BY MR. MALONE:
3      Q.    Mr. Kra, the court reporter has
4  handed you what we've marked Plaintiffs' 34 for
5  identification purposes.
6            Can you tell me what this is?
7      A.    This is a set of computer printouts
8  that we sent to counsel as part of discovery.
9      Q.    What role did Plaintiffs' 34 have in
10  your work in this case?
11      A.    Before I can answer that, I would
12  need to have a copy of my expert report in front of
13  me.
14      Q.    That's fair.  We can do that for
15  you.  I was going to get around to marking that one
16  of these days.
17      A.    Sorry.  I need that.
18      Q.    I'd rather have you answer it
19  accurately now, than get your deposition transcript
20  back with a lot of scribbling over it and then have
21  to worry about whether we have to come back and
22  have another session.
23            (Exhibit P-35 is marked for
24  identification.)

Page 71

1  BY MR. MALONE:
2      Q.    Let the record reflect that the
3  witness is examining the first page of Plaintiffs'
4  33 and comparing it --
5      A.    34.
6      Q.    34, thank you, and comparing it to
7  the tables that appear in the body of Plaintiffs'
8  35.
9            You had an opportunity to look at 34
10  and look at 35.
11      A.    Yes.
12      Q.    Can you tell me what role 34 played
13  in your work?
14      A.    There are numbers that appear on
15  this page --
16      Q.    This page being the first page of --
17      A.    The first page of P-34, which appear
18  in my expert report.
19      Q.    Okay.
20      A.    And, so this page was used in the
21  development of opinions in the expert report.
22      Q.    Can we call this a workpaper?
23      A.    This is an Excel spreadsheet.
24      Q.    Who was responsible for preparing

Page 72

1  P-34?
2      A.    This was prepared, under my
3  direction, by Bruce Cadenhead, and, under his
4  direction, by Stephane Bonin.
5      Q.    And what do you understand the
6  purpose of Plaintiffs' 34 to be?
7      A.    What this did was, I had calculated
8  the accrued benefit at January 1, 1999, based on
9  the old plan document, pre-cash balance, and on
10  January 1, 1999, based on immediately the new plan
11  document, which reflected the conversion from a
12  final pay formula to a cash balance formula, and
13  also determined the projected benefit at normal
14  retirement date, as of that date, assuming pay
15  could remain constant.
16      Q.    I'm just looking for something.  I'm
17  not ignoring you.  There was something in here
18  that --
19      A.    In determining the projected cash
20  balance benefit, we used the actual compensation
21  received during 1999, because that was under a
22  different definition than the old plan document,
23  and I did not have 1998 pay using the cash balance
24  definition of compensation.

Page 73

1      Q.    Actually, this is Mr. Troup.  You
2  may want to check your expert report.  I think what
3  you are going to find is that, for Mr. Troup, the
4  definition of compensation is the same --
5      A.    Okay.
6      Q.    -- but you are the expert on --
7      A.    I would have to go back and
8  double-check that.
9      Q.    Yes, but I think that where the
10  definitional difference appears is between the ACE
11  plan and the cash balance sub-plan.
12      A.    Okay.  Then I may -- but, I believe
13  we used the same methodology for all of the -- we
14  used 1999 pay, because that was what was actually
15  used in the cash balance calculations.
16      Q.    I'm going to mark another document,
17  but we are not going to leave this one, so hang on
18  to 34 and you may want to have 35 handy....
19            (Exhibit P-36 is marked for
20  identification.)
21  BY MR. MALONE:
22      Q.    Now, the court reporter has handed
23  you what we've marked as Plaintiffs' 36.  A single
24  piece of paper, appears to be an E-Mail, it was

19 (Pages 70 to 73)

B0169

ETHAN E. KRA

Page 74

1  produced from your files, KRA 00043.
2      A.    And --
3      Q.    We can do a couple things with this.
4  It's from Stephane?
5      A.    Yes.
6      Q.    There is a link in the E-Mail.  Do
7  you see that?
8      A.    Yes.
9      Q.    Do you know, as you sit here today,
10  whether the link that's in Stephane's E-Mail, which
11  is Plaintiffs' 36, is the spreadsheet which is
12  Plaintiffs' 34?
13      A.    What we -- I do not know which --
14  whether it's -- I believe 4 is the final one, but
15  I'd have to go back to the files and check whether
16  it was -- whether we had 3 and 4 or 4 and 5.
17      I don't recall.
18      Q.    There were a series of spreadsheets
19  created in Excel as part of your team's work on
20  this case?
21      A.    Yes.
22      Q.    Were they revisions of -- did they
23  reflect an evolving document or do they reflect
24  different series of documents?

Page 75

1      A.    They reflected my correcting their
2  earlier work.  In other words, Stephane did it,
3  Bruce reviewed it, he found a mistake, then he went
4  to Version 2.  Then it got to me, I said, "No,
5  that's not what I meant.  This is what it is," then
6  began the next version, until, finally, I said,
7  "That's what I meant."
8      Q.    Okay.
9          Now, with that out of the way, I
10  think we can dispose of 36 for a while.  I don't
11  think we need that anymore.
12          Can you tell me whether 34 is the
13  final version of the Excel spreadsheet that was
14  generated by your team in the course of this
15  engagement?
16      A.    I believe that it was.  It has the
17  numbers that I used.
18      Q.    In other words, previously, when you
19  were looking at your report, what you were doing
20  was trying to verify whether some of the numbers on
21  34 made their way into the report?
22      A.    Yes.
23      Q.    And, based on that, at least you can
24  infer that this is the final version?

Page 76

1      A.    Yes.
2      Q.    Let's go back to 34 now, and let's
3  see if we can spend some time with this, just to
4  make sure I understand what this document reflects.
5      A.    Um-hum.
6      Q.    Holding the page landscape-wise, so
7  we can all read the numbers and columns, the
8  extreme left-hand column names the rows that appear
9  across, and the first thing it says is "Record."
10  What does that mean?
11      A.    Probably -- I'm only speculating --
12  that we input the data into our system, four people
13  four records.  This is the first page.  Check the
14  others, see if the --
15      Q.    If you go to 417, you'll see that's
16  2, and, if you go to 420 -- it's really hard to
17  read, but I think it might be 3.
18      A.    I'm just speculating that the four
19  individuals are numbered 1 through 4.  It's easier
20  to program numbers than names.
21      Q.    Than names, sure.
22          Then there is a year?
23      A.    Yes.
24      Q.    Is that 1998?

Page 77

1      A.    I think it's 1999, but I can't read
2  it.
3      Q.    Then it says, "Use year-end
4  factors," and it says, "False."
5          Do you know what that means?
6      A.    I am not sure which the name is, but
7  one issue that came up in doing this analysis,
8  which led to my correcting what they had previously
9  done, is, in doing the analysis for a given year,
10  originally Bruce thought, Well, when I come to the
11  end of the year, I already know next year's Social
12  Security wage base, I should already program that
13  in, and I said, "No."
14          So, it's true and false, whether you
15  recognize what's known at the end of the year for
16  the ensuing year, the factors that change, or do
17  you base it on the current year factors.
18      Q.    Okay.
19      A.    So, I believe what that was is he
20  programmed it so he could use the same spreadsheet
21  and calculate it both ways, but I said that my
22  analysis is based on the current year, I don't have
23  a crystal ball where I look into future years, I
24  don't recognize future years until they actually

20 (Pages 74 to 77)

B0170

ETHAN E. KRA

Page 78

1  come to transpire.
2      Q.     Then we have the name, estimated
3  date of birth, which is self-explanatory.
4          What is the projected cash balance
5  benefit?
6      A.    That would represent what we are
7  projecting this individual to have as the cash
8  balance benefit, payable as an annuity on his
9  normal retirement date, assuming all of the factors
10  remain constant.
11     Q.     So that would be the annual amount
12  of a single-life annuity?
13     A.     Single-life, or whatever form is
14  payable under the plan. I'd have to check whether
15  the plan offers a free five-year certain, or
16  whatever type of optional form, but, whatever the
17  form is under the plan document, that would be the
18  life annuity, under the plan formula, using the
19  conversion factors in the plan document, so that I
20  can make an apples-to-apples comparison of either
21  annuity to annuity or lump sum to lump sum. I
22  can't compare a lump sum to annuity. Those are
23  non-comparable benefits.
24     Q.     And that's an annual figure there,

Page 79

1  the 38,278.10, is that correct?
2      A.    That's correct. I have not worried
3  about whether it's exactly divisible by 12 and
4  there is a fraction of a bene.
5      Q.     And beneath that is a projected
6  final pay benefit of, in this instance, 28,982.51,
7  if I'm reading it correctly.
8      A.    Yes, 28,982.51.
9      Q.     What does that represent?
10     A.     That represents, had the old plan
11  continued under the same conditions that I just
12  described, what the annual benefit payable at
13  normal retirement date would have been, as an
14  annual benefit, and divide by 12 to get the monthly
15  check.
16     Q.     And this would have been the
17  standard normal retirement benefit under the terms
18  of the old plan?
19     A.     Correct.
20     Q.     In other words, this is not
21  reflective of the value of the joint and survivor?
22     A.     This is whatever the formula under
23  the plan would give, before adjustment for any
24  optional form of benefit.

Page 80

1      Q.     And, when you use the phrase,
2  "optional form of benefit," that includes a joint
3  and survivor, even though technically that may be
4  required, depending on the particular circumstances
5  of the individual?
6      A.    Correct.
7      Q.     Okay.
8          As part of your work, did you come
9  to form an understanding of how opening balances
10  were calculated for participants that were -- let
11  me back up and lay some groundwork and some
12  foundation. Otherwise, it's not going to be a very
13  good question.
14          You understood that this case
15  involved the Conectiv retirement plan, is that
16  correct?
17     A.    Yes.
18     Q.     And you understood that the Conectiv
19  retirement plan had various sub-plans, is that
20  correct?
21     A.    Yes.
22     Q.     And you understood that the one
23  sub-plan of particular interest to us here is the
24  cash balance sub-plan, is that correct?

Page 81

1      A.    Correct.
2      Q.     And you understood that the Conectiv
3  retirement plan was formed by reason of the merger
4  of two predecessor plans, is that correct?
5      A.    Correct.
6      Q.     And one of those was sponsored by
7  Atlantic City Electric, is that correct?
8      A.    Correct.
9      Q.     Is that the plan you worked on way
10  back when?
11     A.     1975.
12     Q.     And the other one was sponsored by
13  Delmarva, is that correct?
14     A.     Correct.
15     Q.     And the two predecessor -- or can we
16  call them heritage plans? Is that a comfortable --
17     A.     That's fine.
18     Q.     Okay.
19          The two heritage plans were both
20  final average pay plans?
21     A.     I believe so.
22     Q.     Okay.
23          Did they have --
24     A.     With respect to the employees that

Reporting Associates, LLC   1-888-795-2323

B0171

ETHAN E. KRA

Page 82

1  went into the cash balance plan.
2      Q.    Right.  Thank you for that
3  qualification.
4          Now, some defined benefit pension
5  plans, in addition to offering an annuity
6  commencing at age 65, also offer an early
7  retirement benefit, is that correct?
8      A.    Correct.
9      Q.    And sometimes they are subsidized,
10  is that correct?
11      A.    Correct.
12      Q.    And an example of a subsidized early
13  retirement benefit might be a plan that says, "Here
14  is my accrued benefit.  It's a thousand dollars
15  this year, as a single-life annuity at age 65.  If
16  I have sufficient years of service, and I've
17  reached age 65, I can receive that same amount
18  commencing at age 55 without actuarial reduction."
19          Is that a subsidy, as you
20  understood --
21      A.    You said, if I reach age 65.
22      Q.    Oh, I worked so hard on that
23  question.  Let me try it again.  Thank you for
24  making me be precise.

Page 83

1          An example of a subsidized early
2  retirement benefit might be a plan which permits a
3  participant to leave at age 55, receiving monthly
4  pension payments that are equal to the value of his
5  dollar amount of age 65 annuity without any
6  actuarial reduction?
7      A.    That would represent a significant
8  subsidy in a benefit formula.
9      Q.    Is there a rule of thumb that
10  actuaries have that -- for example, if a
11  participant came and the plan didn't have a
12  subsidy, and they wanted advice, I'd like to leave
13  at 55, and my age 65 accrued benefit is a thousand
14  dollars, is there some rule of thumb that would let
15  you tell them how much they would actually get if
16  they left early?
17      A.    It depends on the interest rate and
18  the mortality table.  The factors could be anywhere
19  from -- the age 55 actuarial equivalent to an age
20  65 benefit might be a factor of somewhere around
21  40 percent.
22      Q.    So that, in my example, if the
23  participant came, and his benefit was -- at age 65
24  was a thousand, would he get 400, under the

Page 84

1  40 percent, or 600?
2      A.    400.
3      Q.    So the value of the subsidy, then,
4  would be the 60 percent?
5      A.    In that particular fact pattern.
6      Q.    Now, did these two heritage plans
7  have subsidized early retirement benefits?
8      A.    I believe so.
9      Q.    Do you recall, in general terms --
10      A.    I do not recall the detail.  I'd
11  have to look at the plan document.
12      Q.    Do you know what happened to the
13  subsidized early retirement benefits, as part of
14  the conversion?
15          MR. BASSMAN:  Objection.  You can
16  answer.
17          THE WITNESS:  I would have to look
18  at the conversion factors.  I believe that the
19  opening balance reflected some or all -- I would
20  not -- I'd have to look at the factors -- reflected
21  some early retirement subsidy.
22  BY MR. MALONE:
23      Q.    Do you know whether one of the plans
24  had a subsidized joint and survivor annuity?

Page 85

1      A.    I'd have to look at the document
2  to --
3      Q.    Now, let's go back to the first page
4  of Plaintiffs 34 and make sure that I understand
5  how this document works and what it reflects.
6          As we move down the left-hand
7  column, we've got a boldface section that says,
8  "Conectiv Cash Balance Sub-Plan."  Do you see that,
9  sir?
10      A.    Yes.
11      Q.    And then further down we have,
12  "Prior Plan," also in bold.  Do you see that, sir?
13      A.    Yes.
14      Q.    Am I correct, then, that the segment
15  that comes under the first bold heading, "Conectiv
16  Cash Balance Sub-Plan," reflects your analysis of
17  the relevant factors that tell you what Mr.
18  Troup's accrued benefit, under the terms of the
19  Conectiv cash balance sub-plan, were as of any
20  particular determination date?
21      A.    What this says is, under the
22  Conectiv -- given the compensation that we have
23  here, remaining constant, we are calculating out
24  the cash balance, and, assuming interest rates

ETHAN E. KRA

Page 86

1  remain constant, we are calculating out the cash
2  balance account and projecting it out.
3      Q.    Okay.
4          And then, when we come down to prior
5  plan, you've got Arabic 2, in bold "Prior Plan,"
6  and in this instance it's Delmarva, this reflects
7  your calculation, as of particular determination
8  dates, of what the accrued benefit for Mr. Troup
9  would have been, if he had stayed in the old plan,
10  is that correct?
11      A.    This is the benefit under the old
12  plan, representing his service to that date.  So,
13  we have his pay, final average pay, credited
14  service, the average Social Security wages which
15  were used in the calculation under the plan
16  document, wages subject to Social Security, and
17  then we have --
18      Q.    Was there a differential multiplier
19  under Delmarva for that?
20      A.    I believe that there was some
21  differential.  I'd have to look back at the plan
22  document.
23      Q.    Okay.
24      A.    But, what we did is, we took the

Page 87

1  plan document, applied the relevant factors -- in
2  our internal computer systems we have historical
3  Social Security wage bases, so there are certain
4  factors that our software calls up from the general
5  Mercer -- I want to call it bank of software that's
6  in our network, which would include historical
7  Social Security wage bases, give it a mortality
8  table and an interest rate conversion factor to
9  convert between lump sums and annuities.
10          So that we don't have to reprogram
11  that every time we do an assignment, we have a -- I
12  don't know what to call it -- add-ins or bank of
13  software that --
14      Q.    It's like a template.
15      A.    Well, Excel actually goes out
16  into --
17      Q.    It's cross-linked to a database and
18  then it updates itself, correct?
19      A.    It cross-links to a database and
20  calculation -- not just the database, but
21  calculation formulas that can then be brought in
22  that are part of our standard actuarial repertoire
23  that don't vary from plan to plan.  We would put an
24  interest rate or a name of a mortality table, and

Page 88

1  then it will do all of the things that we need it
2  to do.
3      Q.    And you found that system
4  historically to be reliable?
5      A.    It's very reliable, because it's
6  used uniformly across the entire United States.
7  That means every Mercer actuary and analyst is
8  using it.  If there were a mistake -- it's
9  maintained from one central place.  If there is a
10  mistake, when that gets found, it goes straight
11  back to the central place, fix it or else, and get
12  it out -- fixed immediately.
13          So, when you have a few thousand
14  people using the same tools, they are all checking
15  it, they are all making sure it's right.
16      Q.    Now, looking under the Conectiv cash
17  balance sub-plan section of the first page of P-34,
18  you have an interest crediting rate, is that
19  correct?
20      A.    Yes.
21      Q.    What did you understand to be the
22  interest crediting rate under the cash balance
23  sub-plan?
24      A.    My understanding is that there is an

Page 89

1  interest crediting rate under the plan document,
2  but, instead of having to calculate that, we
3  actually got statements showing what the interest
4  credits were.
5          We checked that against our
6  historical interest files, and found them -- I
7  mean, we didn't worry about -- I didn't check to
8  make sure it was down to the last decimal point,
9  but they were reasonably close to what our
10  databanks showed as interest rates for that era,
11  and 5.01, which was on the sheet that we got
12  from -- I believe it's Vanguard that does the
13  recordkeeping, matched it up, plugged it in our
14  spreadsheet.
15      Q.    Do you know what the source --
16  underlying source of that 5.01 percent is?  Do you
17  remember?
18      A.    I would have to check the plan
19  document, but I believe it's tied to some
20  government interest rate.
21          (Exhibit P-37 is marked for
22  identification.)
23  BY MR. MALONE:
24      Q.    The court reporter has handed you a

23 (Pages 86 to 89)

B0173

ETHAN E. KRA

Page 90

1  document that we've marked as Plaintiffs'
2  Exhibit 37 for identification.
3      Let me direct your attention, if I
4  might, just to save some time, to Page KRA 00187,
5  and specifically to Paragraph 1.30.
6      Do you see that, sir?
7      A.  Yes.
8      Q.  And this indicates that the interest
9  crediting rate under the cash balance sub-plan
10  constitutes the 30-year Treasury bond rate for the
11  October immediately preceding the beginning of the
12  Plan Year.
13      Do you see that?
14      A.  Yes.
15      Q.  Does that refresh your recollection
16  as to what the 5.01 percent appearing in the
17  interest credit was?
18      A.  Yes.  That would then represent the
19  30-year Treasury bond rate for October of 1998.
20      Q.  And you applied that on a static
21  basis to each subsequent year, is that correct?
22      A.  Yes.  Because, if we were doing this
23  in 1999, we would have no idea which way interest
24  rates would be going for future years.

Page 91

1      MR. MALONE:  Move to strike the
2  balance of the response after "Yes."
3  BY MR. MALONE:
4      Q.  Let me direct your attention, then,
5  to the years of service.  That changes each year,
6  as he works another year, is that correct?
7      A.  Correct.
8      Q.  And his age increases?
9      A.  Yes.
10      Q.  Now, did you get statements from the
11  various participants for multiple years?
12      A.  We got statements from the cash
13  balance recordkeeper for a number of different
14  years.
15      Q.  Okay.
16      Under this model, would you expect
17  the cash balance figure that is -- let's do this.
18  Let's take Mr. Ward, who you'll find on 417, and
19  let's look at 2002 for a second.
20      Let the record reflect that the
21  witness is comparing Plaintiffs' 34 back against
22  his report, which I believe is Plaintiffs' 35.
23      A.  35, yes.
24      Q.  I have a relatively simple question

Page 92

1  for you, which is, is the number calculated, under
2  your model for Mr. Ward, as a balance for --
3  opening balance for 1-1-2003 -- is that number
4  consistent with what would be on his year-end
5  statement for 2002?
6      A.  Start again.  The -- please repeat
7  the question.
8      Q.  Let me break it down to you, because
9  I have to lay some foundation.  That's part of why
10  it wasn't a good question.
11      Under this plan, participants got
12  statements that reflected the balance of their
13  account at the end of a particular plan year,
14  correct?
15      A.  They got statements annually.  I
16  believe it was as of year-end.
17      MR. MALONE:  Let's mark one.  Let's
18  try and do in a nice, neat, tidy way, and see if we
19  can't generate a halfway decent record.
20      (Exhibit P-38 is marked for
21  identification.)
22  BY MR. MALONE:
23      Q.  The court reporter has handed you a
24  document we've marked Plaintiffs' Exhibit 38.  That

Page 93

1  came out of your file, because it has a Bates
2  number with your name on it.
3      A.  Yes.
4      Q.  This is a statement for Mr. Ward for
5  year-end 2002.
6      A.  Correct.
7      Q.  And it tells him what his ending
8  balance in his account was on 2002, correct?
9      A.  Um-hum, correct.
10      Q.  Now, your spreadsheet generally
11  speaks as of the beginning of the year, but the
12  number is going to be the same.  In other words,
13  the value of his account at the end of a particular
14  plan year should be exactly the same as the value
15  of his account at the beginning of the next plan
16  year, is that correct?
17      A.  My spreadsheet actually provides
18  account balances beginning and end of year.
19      Q.  Okay.
20      Look at 2002, if you would, for Mr.
21  Ward on KRA 417 of Plaintiffs' 34.  The number that
22  you have for an account balance at the end of 2002
23  is 149,939.40, is that correct?
24      A.  Yes.

24 (Pages 90 to 93)

ETHAN E. KRA

Page 94

1    Q.    And the number for his year-end
2  ending balance in 2002, as reflected on Exhibit 38,
3  is higher, is that correct?
4    A.    Correct.
5    Q.    And it's higher because you
6  maintained the static interest rate assumption of
7  5.01 percent, is that correct?
8    A.    It's two factors.
9    Q.    Okay.
10    A.    One is, I assumed constant pay.
11    Q.    Okay.
12    A.    This spreadsheet does not reflect
13  any pay increases after 1999.
14    Q.    And that's reflected in the total
15  compensation line, which is the fourth row down
16  from the subheading "Conectiv Cash Balance
17  Sub-Plan," and it says $70,385.51 for each year, is
18  that correct?
19    A.    Correct. That's one factor.
20        The other factor is holding the
21  interest rate constant at 5.01 percent.
22    Q.    Okay.
23    A.    In fact, if I'm looking at this
24  statement -- yes, okay.

Page 95

1    Q.    In fact, if we turn to the second
2  page of Plaintiffs' 38, we'll see that, in
3  actuality, his compensation for 2002 was higher
4  than the number that you are using in your model,
5  since you kept his compensation static. He
6  actually earned $80,000 that year.
7    A.    Correct.
8    Q.    And that would be true across the
9  board. In other words, if we went through this
10  exercise on each one of these Plaintiffs, we would
11  see variations, once we got past 1999, between the
12  amount of the ending balance on their statement and
13  the amount of the ending balance on Plaintiffs' 34,
14  because of the two factors you identified:
15  Maintaining the pay static, and maintaining the
16  interest credit rate static?
17    A.    Correct.
18    Q.    Now, this plan had provisions in it
19  for transition credits. Do you remember that?
20    A.    Yes.
21    Q.    And do you remember how the
22  transition credits worked? Do you want to look at
23  the plan?
24    A.    If I could look at the plan

Page 96

1  document.
2    Q.    That's fine. Let me see if I can
3  get a good page reference for that, or at least a
4  section number.
5        I would take a look, Mr. Kra, at
6  Section 3.53, and I think that would give you --
7    A.    Based on the participants' years of
8  service, as of the effective date, there were
9  transition crediting rates, representing different
10  percentages. In this case, Mr. Ward, who had 17
11  and a fraction years of service as of the effective
12  date of the cash balance plan, fell into the
13  category of 16 to 19 years.
14    Q.    Okay.
15    A.    According to Page 19 of the plan
16  document, an individual with 16 to 19 years gets a
17  transition crediting rate of 3 percent, which would
18  mean that each year he would get 3 percent of that
19  year's recognized compensation as an additional pay
20  credit in the cash balance account.
21    Q.    And, under your analysis, did you
22  assume that that transition credit stayed static?
23    A.    Yes.
24    Q.    So that, for example, when Mr. Ward

Page 97

1  got out to the 20-year point, he did not get the
2  benefit of the increase in the transition credit
3  for purposes of your analysis?
4    A.    He did not, because the plan
5  document does not call for it. The plan document
6  determines transition credits as of the given --
7    Q.    The effective date.
8    A.    The effective date, not based on the
9  current date.
10    Q.    Okay.
11    A.    So, an individual's transition
12  crediting rate is fixed immutably on the date of --
13  the effective date of the conversion of the plan.
14    Q.    But their pay credit rate, which is
15  what I wanted to ask you about, is the one that
16  shifts, is that correct?
17    A.    The pay crediting rate, as defined
18  in Section 3.3.2, is a function of the individual's
19  attained age.
20        That increases each year, as the
21  person gets older.
22    Q.    And you reflected that in your
23  analysis under employer contribution credit, is
24  that correct?

25 (Pages 94 to 97)

B0175

ETHAN E. KRA

Page 98

1    A.    Yes.  That can be seen on my
2  spreadsheet in the row titled, "Employer
3  Contribution Credit."  In the case of Mr. Ward, in
4  1999, that was 8 percent, in 2000 through 2004 it
5  was 9 percent, in 2005 and subsequent years it was
6  10 percent.  That just recognizes that he was
7  getting older as time marches on.
8    Q.    As are we all.
9    A.    Beats the alternative.
10    Q.    That's what President Clinton said
11  when they asked him about his 50th birthday.
12            Now, going back to Mr. Ward on Page
13  417, we've got a row that's still under the heading
14  of "Conectiv Cash Balance Sub-Plan," that says,
15  "Accrued Benefit (BOY)."
16            Do you see that?
17    A.    Yes.
18    Q.    First of all, can you tell me what
19  "BOY" means?
20    A.    Beginning of year.
21    Q.    Thought so.
22            And you've got a figure there of
23  $23,014.11, is that correct?
24    A.    Yes.

Page 99

1    Q.    Now, this 23,000 and change figure
2  represents what?
3    A.    That represents the cash balance
4  account, as of January 1, 1999, converted to an
5  annuity payable at age 65, determined under the
6  factors in the plan document.
7    Q.    And then, further down in the same
8  row, for 1999, for Mr. Ward, on 417 of Plaintiffs'
9  34, you've got an annual benefit payable at age 65
10  of -- I'm going to say it's 17,433.84, but I could
11  be reading it wrong.
12    A.    That's right.
13    Q.    And how was that calculated?
14    A.    That's the prior plan benefit.
15    Q.    Okay.
16    A.    Had the plan not been amended to
17  cash balance, and had Mr. Ward continued under the
18  old plan, his accrued benefit, payable at age 65,
19  under the old plan, using his final average pay as
20  of that date, and the formulas in the old plan
21  would have generated a life annuity of $17,433.80.
22    Q.    So, why is it higher under the new
23  plan, as of January 1, 1999, than under the old
24  plan?

Page 100

1    A.    The calculation of the opening
2  account balance provided an amount greater than the
3  mere conversion of the accrued benefit payable at
4  age 65 into a lump sum.
5    Q.    And that was because of subsidized
6  benefits under the prior plan?
7    A.    That was because of how they decided
8  to determine opening account balances.  That is a
9  design issue that the company, based on whoever
10  they had advising them at the time, decided was
11  what they wanted to provide as the benefit level.
12    Q.    Now, if we turn to 418 and 419 of
13  Plaintiffs' 34, we've got a different looking kind
14  of spreadsheet for Mr. Ward.  It's headed at the
15  top, "Name, Maurice Ward, Beginning of Year
16  Factors," and them it sets valuation dates.
17    A.    Um-hum.
18    Q.    Why don't you walk me through this
19  and explain to me, as best you can, what this --
20  what 418 and 419 of Plaintiffs' 34 represent.
21    A.    This is for Mr. Ward.  The numbers
22  going down in the left-most column represent
23  assuming benefit -- based on benefits accrued
24  through a given date.  Valuation year is, if we

Page 101

1  look at the plan in 1999, old plan, if he only
2  worked through January 1, 1999, his benefit would
3  have been 17,433.84.
4    Q.    And the benefit figure that's there
5  for the 17,433.84 is the normal retirement benefit
6  that he had earned as of that date under the terms
7  of the old plan?
8    A.    Correct.
9    Q.    Okay.
10            Next column over would be --
11    A.    Well, do you want me to just run
12  down the columns.
13    Q.    Okay, sure.
14    A.    1-1-2000, the number below that
15  represents the same item, assuming he worked one
16  more year, but based on all the factors from 1999.
17    Q.    Okay.
18    A.    Holding them constant.
19            The next number, assuming he worked
20  until 1-1-2001 --
21    Q.    And so forth --
22    A.    -- again, holding -- so forth and so
23  on.
24            The new plan represents the cash

26 (Pages 98 to 101)

ETHAN E. KRA

Page 102

1  balance plan. If we -- as of January 1, 1999, if
2  we took the opening account balance, convert it to
3  an annuity payable at age 65, it's $23,014.11.
4       Q.    And then it just --
5       A.    The next one is, if he works one
6  more year, gets one more year's worth of pay
7  credits, what would that annuity payable at age 65
8  be, based on the fact that he has an additional
9  year's worth of pay credits.
10           The interest credits on the
11  23,014.11, or the amount that went into developing
12  the 23,014.11, are already embedded there, because
13  interest credits on prior account balances are
14  attributable to the past service. You don't have
15  to work another year to get your interest credits.
16  They just are there because your money is there --
17  or, not your money, but your account balance is
18  sitting there.
19       Q.    Technically, there is not a physical
20  account in this plan design?
21       A.    Right, correct. There is a notional
22  account, and that notional account growth is
23  credited with interest, and that interest credit on
24  the notional account is on account of having worked

Page 103

1  in prior years. That interest is not predicated on
2  your working during the current year.
3       Q.    And, in fact, if it was, the IRS --
4  do they take a position on what would happen?
5       A.    If the interest were conditioned on
6  working during that year, then that interest would
7  be deemed part of that year's accrual, and it would
8  make it very difficult for the plan to pass some of
9  the IRS qualification tests.
10           As a result -- I won't say as a
11  result, but virtually every plan that I've ever
12  seen will provide the interest credit on the
13  account balance, independent of whether the
14  individual is working or not.
15       Q.    Okay.
16       A.    I'm not saying there aren't plans
17  that don't do that, but I'm not dealing with them.
18       Q.    They are somebody else's headache.
19       A.    Yes.
20       Q.    Now, let's move over to valuation
21  year 2000.
22       A.    Valuation year 2000 represents doing
23  the same exercise, but starting at January 1, 2000,
24  with all the facts known at January 1, 2000.

Page 104

1       So, I look at the interest rates in
2  2000, I look at the pay levels in 2000, so now I
3  have more information on salary, I have more
4  information on interest rates.
5       Q.    Let's stop and break that down right
6  there. If we compare, for Mr. Ward, on KRA 418,
7  his 1-1-2000 accrued benefit, under the terms of
8  the old plan, they are identical in both the
9  valuation year 1999 and 2000, but then, when you go
10  to 2001, they change.
11           Is that change in 2001 reflective of
12  the fact that you have different salary data?
13       A.    I have some additional salary
14  information for 2000. New salary information.
15       Q.    Let me direct your attention to
16  valuation year 1999. The accrued benefit, under
17  the term of the new plan, of 2000 -- for -- as of
18  1-1-2000, is less than the same amount for
19  valuation year 2000.
20           Do you see that?
21       A.    Yes.
22       Q.    And that is reflective of changes in
23  the interest rates?
24       A.    That would reflect -- that probably

Page 105

1  is very significantly affected by interest rate
2  changes. There would also be some new salary
3  information, but the bulk of that would be change
4  in interest rates.
5       Q.    And then the tables just continue in
6  that same pattern for subsequent valuation years,
7  is that correct?
8       A.    Correct.
9       Q.    So that, when I go out to valuation
10  year 2002 -- obviously, we start with 1-1-2002,
11  because he can't retire in the past --
12       A.    Um-hum.
13       Q.    -- and you are simply calculating
14  his benefits based on updated information and doing
15  a side-by-side comparison, is that correct?
16       A.    Um-hum.
17       Q.    When I get over on 419, under old
18  plan, in or about 2011 you've got a shaded box in
19  valuation year 2006.
20       A.    Um-hum.
21       Q.    What does that represent?
22       A.    Represents years in which old plan
23  is greater than new plan.
24       Q.    Comparing accrued benefit at age 65

27 (Pages 102 to 105)

B0177

ETHAN E. KRA

Page 106

1    to accrued benefit at age 65, is that correct?
2        A.    Correct.
3        Q.    Now, we could go through the same
4    exercise with the other three Plaintiffs.  The
5    explanation would be the same?
6        A.    Same story.
7            The difference is, there were some
8    differences in the prior plan between the different
9    Plaintiffs, and we reflected the differences in the
10   prior plans in determining the old plan.
11       Q.    So that, if one had a different
12   definition of compensation than the other, you used
13   the one that was in the heritage plan for the
14   particular plan?
15       A.    For that particular Plaintiff.  And,
16   if there was a difference in the formula, we would
17   reflect the difference in the formula.
18       Q.    We had touched a little bit on the
19   idea of what would happen if you conditioned the
20   future interest credits under a cash balance plan
21   on future service, and I think you had indicated --
22   I don't want to put words in your mouth.  I'm just
23   trying to supply some context for the question --
24   that the IRS has taken a position that would make

Page 107

1    it difficult for the plan to -- a plan configured
2    in that fashion to pass some of the required tests.
3            Is there a particular IRS
4    pronouncement that that --
5        A.    I believe there was an IRS
6    pronouncement -- I can't site which one -- which
7    addressed the issue of whether the interest credits
8    were predicated on continued employment versus part
9    of the entitlement on account of past employment.
10           I do not recall which IRS
11   pronouncement it was and the exact wording
12   contained therein.
13       Q.    Does the phrase "Notice 96-8" ring a
14   bell with you?
15       A.    Yes.
16       Q.    And do you have a recollection of
17   Notice 96-8?
18       A.    96-8, if I recall correctly, dealt
19   with interest crediting rates that the IRS would
20   view as -- I don't know what the right term is --
21   reasonable, acceptable, or somehow blessed, if they
22   were in a cash balance plan.  That, if the interest
23   crediting rate followed one of those regimes or
24   produced -- or was a lower interest crediting rate,

Page 108

1    and was part of the accrued benefit as opposed to
2    part of -- condition -- as opposed to being
3    conditioned -- I don't want to use the exact term
4    "accrued benefit," but, if the interest crediting
5    was not conditioned on continued employment, then,
6    as far as certain issues of whip-saw, which was a
7    term used in the literature, the plan would not be
8    in violation, and I think that related to Internal
9    Revenue Code Section 417E.
10       Q.    417E sets what's known as the
11   applicable interest rate?
12       A.    Yes.
13       Q.    And the applicable interest rate in
14   the current regime is the 30-year Treasury, is that
15   correct?
16       A.    Not -- 30-year -- just a second.
17   Through the end of 2007, it's the 30-year
18   Treasury.  After 2007, it will be based on
19   corporate yield curve and there will be a
20   transition period where the interest rate changes
21   from one to the other over a period of years.
22       Q.    You used the phrase "whip-saw," and
23   we probably ought to talk, at least very briefly,
24   about what happens with whip-saw.

Page 109

1        A.    Under 417E, there is a minimum
2    amount that must be paid as a lump sum, if a plan
3    is to be qualified, if the plan offers a lump sum.
4    There is no requirement that a plan offer a lump
5    sum, but, if you do pay a lump sum out of a
6    qualified pension plan, there is a minimum amount,
7    which is based on the present value of the normal
8    retirement benefit payable at the normal retirement
9    age, determined using the applicable interest rate
10   and the applicable mortality table.
11           The IRS notice that you referred to
12   said that, if the interest crediting rate on a cash
13   balance plan does not exceed one of the safe
14   harbors contained in that notice, then the plan
15   would be deemed to satisfy that requirement.
16           I don't have the exact wording of
17   exactly what --
18       Q.    I'm not trying to -- I'm dealing
19   with a very broad brush here.
20       A.    I'm not going to say exactly what it
21   gave -- which comfort zone it gave, but that was
22   the general gist.
23       Q.    Let me see if I can put some
24   parameters on what constitutes whip-saw, and then

28 (Pages 106 to 109)

B0178

ETHAN E. KRA

Page 110

1   you'll correct me, if -- or probably more likely
2   when -- I get it wrong.
3          Were there situations that existed
4   where cash balance plans had an interest crediting
5   rate that was not tied to one of the relevant rates
6   that the IRS permitted you to discount an annuity
7   to present value for purposes of a lump sum
8   calculation?
9      A.   Yes.
10     Q.   And, in those circumstances, was it
11  conceivable that the present value of the accrued
12  benefit expressed as an annuity under such a cash
13  balance plan would be different than the notional
14  account?
15     A.   Yes.
16     Q.   And that's what whip-saw is?
17     A.   Whip-saw would be if the present
18  value of the annuity payable at the normal
19  retirement date exceeded the notional -- the dollar
20  amount of the notional account.
21          Example.  If a cash balance plan
22  guaranteed an 8 percent interest crediting rate,
23  and 30-year Treasuries were at 6 percent, then you
24  would project the notional account at 8 percent to

Page 111

1   normal retirement date, again for -- to an annuity,
2   and discount at 6 percent.  If you project at 8 and
3   discount at 6, you usually end up with a larger
4   number.
5      Q.   A happy participant, but an unhappy
6   employer.
7          Have you ever expressed an opinion
8   on whether Notice 96-8 is sound?
9      A.   I don't recall.
10     Q.   Are you familiar with a publication
11  known as "Business Insurance"?
12     A.   Yes.
13     Q.   Have you ever spoken to
14  representatives at Business Insurance --
15     A.   Yes.
16     Q.   -- on matters relating to pensions?
17     A.   Yes.
18     Q.   Do you recall speaking to someone at
19  Business Insurance in or about May of 2002?
20     A.   I've spoken to more reporters over
21  the years than I care to remember.
22          I don't recall dates for specific
23  conversations.
24     Q.   I don't blame you.

Page 112

1          Do you recall there coming a time
2   when the General Accounting Office came out with a
3   report that suggested that a lot of participants
4   were getting shortchanged in their lump sum
5   calculations for cash balance accounts?
6      A.   I remember there was a GAO report.
7   I don't recall the details right now.  That was
8   about -- as you indicated, about five years ago.
9          I've read quite a few GAO reports in
10  the past five years.
11          (Exhibit P-39 is marked for
12  identification.)
13  BY MR. MALONE:
14     Q.   The court reporter has handed you
15  what we've marked as Plaintiffs' Exhibit 39 for
16  identification purposes.  It's a reprint of an
17  article from Business Insurance, May 13, 2002.
18          Why don't you take a moment or two
19  to review it, and then I'll ask you a question or
20  two about it.
21     A.   Um-hum.
22     Q.   Does this refresh your recollection
23  as to the GAO report on whip-saw?
24     A.   Somewhat.  I think I really would

Page 113

1   like to look at the GAO report before I express
2   another opinion on it.
3      Q.   On Page 2 it attributes to you a
4   comment that the GAO report was not a product of an
5   unbiased evaluator.
6          Do you see that?
7      A.   Yes.
8      Q.   Did you actually say that, do you
9   know?
10     A.   I believe I did, but I don't
11  remember.
12     Q.   Any reason to doubt that it's an
13  accurate quote of you?
14     A.   No.
15     Q.   Do you remember anything that led
16  you to conclude that the GAO report was something
17  other than work done by an unbiased evaluator?
18     A.   I'd have to look at the report again
19  to refresh my memory.
20     Q.   Okay.
21          Further on it attributes the comment
22  that the Inspector General is relying on something
23  that hasn't even gotten to the level of proposed
24  regulation.

29 (Pages 110 to 113)

B0179

Page 114

1        Do you see that?
2    A.    Yes.
3    Q.    And they are citing it as the
4  gospel, close quote.
5    A.    Um-hum.
6    Q.    Is that something you said?
7    A.    I don't recall.
8        I may have.
9    Q.    Is that a reference to Notice 96-8?
10   A.    I believe so.
11       MR. MALONE:  That's all I have for
12  you on Exhibit 39.
13       (Exhibit P-40 is marked for
14  identification.)
15  BY MR. MALONE:
16   Q.    Mr. Kra, the court reporter has
17  handed you a document we've marked Plaintiffs'
18  Exhibit 40 for identification purposes.  It's a
19  single sheet of paper that was produced from your
20  file.  It looks like one of those little pads you
21  pick up at your hotels, in this instance the
22  Marriott Wardman Park Hotel.
23   A.    Yes.
24   Q.    Is this your handwriting?

Page 115

1    A.    Yes.
2    Q.    Just could you satisfy my curiosity
3  as to where the Marriott Wardman Park Hotel is?
4    A.    Washington, D.C.
5    Q.    What do these notes reflect?
6    A.    These were chicken scratch notes I
7  took and analyses I did as I read through the plan
8  document the first time.
9    Q.    Were you sitting in the hotel in
10  Washington?
11   A.    Yes.
12   Q.    I ask because I abscond with these
13  pads all the time and people get notes from me in
14  the office on all these different ones.
15   A.    I was giving a speech there.
16   Q.    Walk me through them, if you can.
17       I mean, "Pepco" is obvious, in the
18  upper right-hand corner.  That's your client -- or,
19  in this instance, it's the defendant in the case in
20  which you are being asked to consider rendering
21  opinions.
22   A.    Yes.
23       MR. BASSMAN:  Objection.  You can
24  answer.

Page 116

1        THE WITNESS:  I'm just saying Pepco,
2  I think, was -- that looks like my secretary's
3  writing on Pepco.
4    Q.    Oh, okay.  That's your secretary?
5    A.    I think so.  I'm not sure.
6    Q.    So she knew what file to stick it
7  in?
8    A.    Yes.
9    Q.    "Accrual" you've got?
10   A.    Yes.
11   Q.    And then you've got an equal sign?
12   A.    Yes.
13   Q.    And then you've got what you called
14  chicken scratch.  I wouldn't have called it that,
15  but since -- can you interpret what the -- there is
16  like a formula there.
17   A.    Accrued benefit, accrued EOY, end of
18  year, minus accrued EOY, end of year, without,
19  this -- TY, this year's, service and pay.
20   Q.    Okay.
21   A.    So I defined the accrual for a given
22  year as the increase in the accrued benefit at the
23  end of the year solely attributable to this year's
24  service and pay.

Page 117

1    Q.    Now, the next line down, "What about
2  PS/TS?"
3    A.    I was considering whether or not --
4  if I had to do any analysis on the fractional rule.
5    Q.    And PS and TS -- PS is?
6    A.    Past service.
7    Q.    And TS is total service?
8    A.    Total service.
9    Q.    This is probably a good time -- we
10  talked about numerators and denominators before,
11  but lawyers aren't real good on that.  The
12  numerator is the top of the fraction?
13   A.    Yes.
14   Q.    And the denominator is the bottom?
15   A.    Yes.
16   Q.    The next down?
17   A.    "Old revenue ruling on Delta
18  factors."  I don't recall what that was about.
19   Q.    Delta is a --
20   A.    Change.
21   Q.    Okay.  Thank you.
22       And then you got 5 percent, 6
23  percent, 7 percent, 8 percent, and a line.
24   A.    Right.  That was the -- Page 17 of

30 (Pages 114 to 117)

B0180

ETHAN E. KRA

Page 118

1  the plan document has the pay crediting rates, and
2  I copied that information from the plan document on
3  to this note pad.
4      Q.    Okay.
5      A.    That's where you have less than 30,
6  30 to 34, 35 to 39, 40 to 44, 45 to 49, 50 plus,
7  where the plan document says 50 and over.
8      Q.    Well, you did it in two places,
9  though.  You have it in a line going across and
10  then you did it in columns.
11     A.    Right.
12     Q.    Is there any significance to that?
13     A.    Yes.  Because what I'm doing is, I
14  was looking at the four-thirds rule.
15     Q.    Okay.
16     A.    What I was looking at is -- down the
17  column I put the pay crediting rates, and I put the
18  same pay crediting rates across the top, and then I
19  looked at the relationships of those pay crediting
20  rates.
21         If the pay crediting rate in a
22  future year is no more than four-thirds of an
23  earlier year, there is nothing to analyze.  If the
24  pay crediting rate is more than four-thirds of an

Page 119

1  earlier year, then the question is, how can the
2  plan pass the four-thirds rule?  The way the plan
3  passes the four-thirds rule is by having interest
4  credits from the earlier year to the later year.
5         So, if I give a 5 percent pay
6  credit, and then if I give 4 percent interest
7  credits for ten years, ignoring compound interest,
8  I've given 40 percent, so 40 percent on 5 percent
9  gives you 7 percent.  So then I would compare that
10  7 percent times four-thirds with the interest --
11  with the pay crediting rate in the subsequent year.
12     Q.    Okay.
13     A.    So, what I was determining here was
14  what is the minimum interest crediting rate
15  necessary so that the plan would pass back-loading
16  under the 133 and a third percent rule.  So, what I
17  determined was, as long as the plan's interest
18  crediting rate for a given year is always at least
19  1.95 percent, the plan will, by definition, by
20  form, pass the four-thirds rule.
21     Q.    And that's applying the same types
22  of parameters you applied -- as are set forth in
23  Plaintiffs' 34, where you are keeping pay static
24  and you are keeping --

Page 120

1      A.    This is applying the IRS methodology
2  of how the analysis is done, which is based on
3  static pay and assuming interest rates remain
4  constant.
5      Q.    Is that IRS methodology reflected in
6  any particular document?
7      A.    I would have to look at the
8  regulations under Code Section 411 to determine
9  exactly what words they used about holding factors
10  constant.  There is terminology there.  I'd have to
11  look for the exact words.
12     Q.    Now, further on you've got -- below
13  that table --
14     A.    Um-hum.
15     Q.    Let me go back to the -- at the 35
16  to 39 line you've got 7 percent, and then you've
17  got 0.981, is that?
18     A.    0.98 percent.
19     Q.    Okay.
20         And what does that 0.98 percent
21  reflect?
22     A.    If I take four-thirds of five, that
23  would give me 20 thirds, which is six and
24  two-thirds percent.

Page 121

1      Q.    Right.
2      A.    7 percent --
3      Q.    Is more.
4      A.    -- is more than six and two-thirds
5  percent.
6      Q.    So that --
7      A.    Therefore, if I had no interest
8  credit, I would fail the four-thirds rule.
9         I determined that, as long as the
10  plan credited at least 0.98 percent interest each
11  year, that the year -- the last year I can get a 5
12  percent credit is age 29.
13     Q.    Right.
14     A.    The first year I can get a 7 percent
15  credit is age 35.  That's six years later.
16         So, if I get 0.98 percent for six
17  years on the 5 percent credit, and then multiple it
18  by four-thirds, I'm bigger than 7.  Therefore, I
19  would pass.
20     Q.    As I go down to 40 to 44, I guess it
21  is, the 1.671 just reflects the same calculation
22  for the 8 percent rate?
23     A.    It's -- 1.167 percent --
24     Q.    Okay.

31 (Pages 118 to 121)

B0181

ETHAN E. KRA

Page 122

1    A.    -- is the minimum interest crediting
2  rate that I would need, so that a 5 percent credit
3  at age 29 would pass the four-thirds test, against
4  an 8 percent credit at age 40.  Among those two
5  interest rates, those are the worst possible
6  combination of years.
7         What I'm doing is a worst case
8  scenario analysis.
9    Q.    Right.  And the same thing just
10 continues down in the same line?
11   A.    Yes.
12   Q.    Now, breaking away from that box in
13 the middle, we've got 3.4.2 interest credit until
14 NRD.
15   A.    That's a reference to the plan
16 document, and what I was doing is confirming that
17 the interest credits under the plan continue to a
18 participant who leaves employment, but does not
19 take a lump sum until normal retirement date.
20        So, if an individual has a cash
21 balance in the notional account and leaves
22 employment at, let's say, for argument's sake, age
23 42, and does not take a lump sum immediately, but
24 leaves the balance in the plan, that individual

Page 123

1  will get whatever interest credits the plan credits
2  each year thereafter through age 65, even though
3  that individual is not working.
4         I wanted to make sure that the plan
5  had that language in it.
6    Q.    Otherwise, it would change the
7  analysis you had done above, correct?
8    A.    Correct.
9         So my concern is, does the plan do
10 what most plans that I look at do?  I don't make
11 the assumption that it does it, until I find the
12 section in the plan document that so provides.
13   Q.    Now, underneath the line "3.4.2
14 interest credits under NRD," you've got what?
15   A.    "For VTs."  For vested terms.
16   Q.    That would refer to a participant
17 who has met the vesting schedule on the plan and
18 then leaves?
19   A.    Correct.
20   Q.    Next line, "5.2 comma."
21   A.    "5.2 comma CF," confrere or cite,
22 "1.56."  So, what I did was I looked at 3.4.2,
23 5.2 --
24   Q.    Is that a reference to the plan?

Page 124

1    A.    Plan document.  And I looked at
2  1.565.  Those are three different pieces of the
3  plan document, and I looked at the three of them in
4  conjunction with each other in drawing my
5  conclusion, and then I wrote the word -- letters
6  "OK," meaning I don't have a problem.
7    Q.    Okay.
8         And then you have the distinguished
9  gentleman sitting next to you -- his phone number
10 there?
11   A.    Correct.
12   Q.    Did you and he chat while you were
13 doing this?
14   A.    No.
15   Q.    Is his phone number there for any
16 particular reason?
17   A.    I had a phone call after I did this.
18   Q.    And the pad was handy.
19   A.    The same pad, and it was probably
20 the first time I had spoken with him, so I needed
21 his phone number.
22   Q.    Fair enough.
23   A.    Or, if it wasn't the first time, it
24 was, I needed the phone number to call him.  I

Page 125

1  don't remember.
2         (Recess called at 11:47 a.m.)
3         (Exhibit P-41 is marked for
4  identification.)
5  BY MR. MALONE:
6    Q.    The court reporter has handed you a
7  document we've marked Plaintiffs' 41 for
8  identification purposes.
9    A.    Um-hum.
10   Q.    Why don't you take a moment to
11 review that, and I'll ask you one or two questions
12 on it, and then we'll break so you can eat your
13 lunch.  I wouldn't want to say I withheld food from
14 a witness to get a better answer.
15   A.    Okay.
16   Q.    Can you tell me what 41 is?
17   A.    I believe this is the engagement
18 letter with respect to the services we are
19 providing in this matter.
20   Q.    And you signed on behalf of Mercer?
21   A.    Yes.
22   Q.    And do you recall approximately how
23 long after you were first contacted about this case
24 that you signed the retainer letter?

32 (Pages 122 to 125)

B0182

ETHAN E. KRA

Page 126

1    A.    Couple months.
2    Q.    Is that common?
3    A.    It was a matter of having the
4  lawyers between Mercer and the law firms
5  representing the defendant work out the exact
6  language in the engagement letter.
7         I generally don't get involved in a
8  lot of the -- that material.  That's not my
9  expertise.
10        MR. MALONE:  Okay.  Why don't we
11  break now, since your lunch is here.
12        (Recess called at 12:04 p.m.)
13        (Resumed at 12:52 p.m.)
14  BY MR. MALONE:
15   Q.    Can you fish 35 out of the pile for
16  me?  That would be your report.
17        Can you tell who drafted 35?
18   A.    I did.
19   Q.    You did?
20   A.    Yes.
21   Q.    And did you have assistance from
22  anyone?
23   A.    The numbers came off the
24  spreadsheet.

Page 127

1    Q.    So that entails the --
2    A.    The work of Bruce Cadenhead and the
3  people that assisted him.
4         My administrative assistant may have
5  pulled an old expert report to format it, and she
6  helped me in that respect.
7         She used to be a legal secretary
8  before I hired her.
9    Q.    Smart woman.
10   A.    Thank you.
11   Q.    She got out of the --
12   A.    She got out just before her boss was
13  disbarred.
14   Q.    Excellent.
15   A.    And I had assistance, again, from
16  Bruce in getting the thing together -- and Michele,
17  in putting together the list of documents.
18   Q.    Okay.
19   A.    The data summary would have been put
20  together by Bruce and Stephane, which I would have
21  then reviewed against the original material.
22   Q.    Okay.
23   A.    And Bruce would have reviewed what I
24  wrote, to make sure that it matched what he did.

Page 128

1    Q.    What he understood?
2    A.    What he understood and did.  To make
3  sure that what I wrote and what he understood the
4  program did --
5    Q.    Correlated?
6    A.    -- correlated, and he would have
7  been the peer review of the document.
8    Q.    Just as you were the peer review of
9  the underlying work product?
10   A.    Right.
11   Q.    Is that common in the firm, for two
12  actuaries to work together and sort of cross-peer
13  review each other on the same assignment?
14   A.    It depends on the magnitude of the
15  assignment, but there are -- I wanted a very high
16  quality actuary working with me on this, and Bruce
17  is one of the top guys I've got in the firm.
18   Q.    Okay.
19   A.    He is exceedingly well respected in
20  the industry, and I don't tolerate anything other
21  than the best working for me.
22   Q.    Let me take you to KRA 23 of
23  Plaintiffs' 35.
24   A.    Um-hum.  Okay.

Page 129

1    Q.    This is your CV?
2    A.    Yes.
3    Q.    And you reviewed it and it's
4  reasonably accurate?
5    A.    I have one tiny correction.
6    Q.    Okay.
7    A.    KRA 00024, under "ERISA Industry
8  Committee," the Pension Funding Task Force, 2004 to
9  2006.  It disbanded after the enactment of the
10  Pension Protection Act.
11   Q.    What was your roll in connection
12  with the Pension Protection Act and ERISA Industry
13  Committee?
14   A.    Well, independent of the ERISA
15  Industry Committee, our firm put together a
16  proposal for pension funding reform that we floated
17  in Washington before the administration came out
18  with their proposal.
19        We met with various plan sponsors,
20  the ERISA Industry Committee, the American Benefits
21  Council, and we went to the Pension Benefit
22  Guaranty Corporation.  We met with staffers on the
23  Hill, the Department of Labor, Department of
24  Treasury, Joint Tax, and I probably had over 30

33 (Pages 126 to 129)

B0183

ETHAN E. KRA

Page 130

1  meetings in Washington, as well as going around the
2  country meeting with plan sponsors trying to get
3  support.
4          Many aspects of that proposal were,
5  in fact, incorporated in one of the Bills.  The
6  Senate Finance Committee Bill was very
7  substantially drawn from the Mercer proposal that I
8  helped pull together.  Conference committee, some
9  of it -- it changed, but there are certain areas of
10 that Bill where I see my footprints very strongly.
11      Q.    For the uninitiated, what is the
12 ERISA Industry Committee?
13      A.    The ERISA Industry Committee is a
14 trade association representing plan sponsors and
15 consulting firms.  I'm not sure who else may be
16 paying dues.  They are a lobbying group, and they
17 deal with benefits issues in the Washington sea.
18      Q.    They are advocates for sponsors?
19      A.    They represent plan sponsors.
20      Q.    In litigation as well as NAQ?
21      A.    I believe they filed amicus briefs
22 in some situations where they felt it was a very
23 significant issue for the benefits community.
24      Q.    I think we've covered a lot of

Page 131

1  what's covered in your report already as part of
2  your testimony, but, let me ask you this.  Were you
3  ever asked to calculate the rate of future benefit
4  accrual under the heritage plans and to contrast
5  that with the cash balance sub-plan, as part of
6  your work?
7       A.    I'm not sure I understand the
8  question.
9       Q.    Are you familiar with a provision of
10 ERISA, which, in statutory terms, is 204H, that
11 imposes a notice requirement for plan sponsors?
12      A.    Yes.
13      Q.    And what's your understanding of
14 what 204H required, bearing in mind that this
15 conversion occurred effective as of 1-1-99?
16      A.    If there would be a -- I'm not sure
17 if the word is significant or substantial, or if
18 there was a non-immaterial -- and I'm not sure of
19 the exact demarcation.  I'd have to look at the
20 exact wording in the statute -- reduction in
21 benefits at normal retirement, that a notice would
22 have to be given to participants.
23      Q.    Is that something that you examined
24 as part of your work here?

Page 132

1       A.    What I looked at was, as of
2  conversion date, did the projected benefit at
3  normal retirement date go up or down as a result of
4  the conversion.
5       Q.    Now, none of the plaintiffs were at
6  age 65 as of that date, were they?
7       A.    No.
8       Q.    And, once you concluded that it went
9  up by reason of conversion, that stopped your
10 analysis?
11      A.    I concluded that went up, I reported
12 that.
13          (Exhibit P-42 is marked for
14 identification.)
15 BY MR. MALONE:
16      Q.    The court reporter has handed you a
17 document marked Plaintiffs' 42 for purposes of
18 identification.  Appears to be an E-Mail printed
19 out from your system --
20      A.    Um-hum.
21      Q.    -- and commences on KRA 391.
22          Would you take a moment or two to
23 review it and then I'll ask you a few questions
24 about it.

Page 133

1       A.    Um-hum.
2       Q.    Can you tell me what this is, first
3  of all?
4       A.    This represents an E-Mail -- well,
5  it's two E-Mails.  One from Gary Jerome to Susan
6  Hoffman, asking who the client is for --
7       Q.    Purposes of the retention letter?
8       A.    -- who the client is and who to send
9  bills to.  The second is an E-Mail from me to Susan
10 Hoffman, copying Gary Jerome and John Welch,
11 summarizing a telephone call with Susan, when she
12 contacted me about potentially being the expert
13 witness, in which I summarized the conversation and
14 outlined what I understood the issues to be and
15 then identified that I would be comfortable with
16 the approaches, subject to making sure that the
17 facts matched the assertions made, because I have
18 to make sure that the facts are correct before I
19 can draw my conclusions.
20      Q.    Let's start with -- we had spoken
21 earlier about approximately when you first got
22 involved with this engagement --
23      A.    Yes.
24      Q.    -- and you weren't quite sure.

34 (Pages 130 to 133)

B0184

ETHAN E. KRA

Page 134

1       Does the date of the E-Mail from Mr.
2   Jerome refresh your recollection at all?
3       A.    Yes.  It appears that my E-Mail was
4   sent to Susan Hoffman on Monday, March 5th,
5   referring to a telephone call the prior Friday,
6   which would have been March 2nd, so my presumption
7   is that that may have been the first call --
8       Q.    At least that you participated in?
9       A.    -- that I participated in or the
10  first substantive call.
11      Q.    So that, perhaps sometime in late
12  February, your firm was contacted, but this is
13  reasonably proximal with the commencement of
14  substantive work?
15      A.    Correct.
16      Q.    What I would like you to tell me is,
17  when you say you are comfortable with the
18  approaches that we discussed for the three claims,
19  what you can recall discussing.
20      A.    Well, the issue of whether changes
21  in external interest rates from one year to the
22  next, as it affects the benefits -- whether that is
23  factored into the back-loading determination or is
24  it excluded, and my understanding is, in the

Page 135

1   analysis of back-loading, you hold factors constant
2   and use a prospective and not a retrospective
3   analysis and, therefore, the change in interest
4   rates would not affect back-loading.
5       This was before I did the analysis
6   that was on that handwritten Marriott notepad, so
7   that I could not confirm that there was no
8   back-loading based on that phone conversation, but
9   that this issue of change in interest rates would
10  not create, in and of itself, a back-loading issue.
11      Q.    In your view?
12      A.    In my understanding of the way
13  back-loading is calculated and determined.
14      Q.    Okay.
15      A.    It would also go to the issue of
16  reduction of benefit on account of increasing age.
17  That changes in interest rates external, out of the
18  control of the plan sponsor, to the effect that --
19  to the extent that they affect the benefit, that
20  would not constitute a prohibited reduction of
21  benefit on account of increasing age.  That is
22  not on account of increasing age; that is on
23  account of a change in interest rates.
24      So, where ERISA prohibits reducing

Page 136

1   benefits on account of increasing age, the change
2   in interest rates, as they worked through the
3   plan -- as described to me, would not be a
4   violation of that ERISA requirement.
5       Q.    As you understand it?
6       A.    As I understand it.
7       Q.    How about 204H?
8       A.    204H, the issue is whether the
9   notice was properly provided and whether or not the
10  notice was required, and --
11      Q.    Let's break that down.  Did any of
12  your work speak to whether the notice was properly
13  provided?
14      A.    I did not analyze the legal
15  requirements and the actual sequence of events with
16  respect to notices.
17      Q.    So you focused solely on whether it
18  was required?
19      A.    Yes.
20      Q.    Okay.
21      A.    And my analysis was not as to the
22  legal issue of whether or not it was required; but
23  my analysis was solely on the issue of, were
24  benefits increased or decreased?  I leave to the

Page 137

1   lawyers to argue whether a notice is required in
2   that situation.
3       Q.    And your analysis of whether the
4   benefits were increased or decreased was focused
5   solely upon the benefits as of 1-1-99, is that
6   correct?
7       A.    Yes.
8       Q.    What you've been referring, and I've
9   been treating as, an E-Mail from you to Ms. Hoffman
10  technically comes from Ms. Miller.
11      Did you dictate this to her?
12      A.    She's my assistant.  I dictate, she
13  prints, I review, she hits the send button.
14      Q.    Fair enough.  I just wanted to
15  button that down on the record.
16      A.    Yes.  No.  This is my work product
17  sent from her computer.
18      Q.    That's what I had suspected, but I
19  just wanted to know that.
20      A.    Okay.
21      Q.    Now, we've been talking some today
22  about some of the assumptions that went into your
23  work and the idea of keeping interest rates static
24  for purposes of the back-loading concept and the

35 (Pages 134 to 137)

B0185

ETHAN E. KRA

Page 138

1  idea of keeping compensation static.
2          Are you familiar with the process
3  that is used to reflect pension liabilities on a
4  sponsor's financial statements?
5      A.    Yes.
6      Q.    That's something that you work with
7  from time to time, is it not?
8      A.    Yes.
9      Q.    When I look at a plan sponsor's
10  balance sheet, and I see an entry in there that's
11  reflective of pension liabilities as a liability on
12  the balance sheet, what is the actuarial work
13  that's behind that?
14      A.    I have to ask you to refine your
15  question.
16      Q.    Okay.
17      A.    Do you mean, using accounting
18  standards in 1998, '99 or using accounting
19  standards of 2007?
20      Q.    Let's start with 1998 and '99.
21      A.    Okay.
22          In 1998, '99 there were two concepts
23  used in determining financial statements:  One was
24  the accumulated benefit obligation, and one was the

Page 139

1  projected benefit obligation.  The accumulated
2  benefit obligation only reflected salaries earned
3  to date.  Did not reflect any projection of future
4  pay increases.  It was based on service to date and
5  pay to date.
6          The projected benefit obligation
7  would reflect service to date, but future salary
8  increases.
9          The minimum liability on a balance
10  sheet, the one which was compared to the assets for
11  a minimum liability on balance sheets, was based on
12  the accumulated benefit obligation, which did not
13  reflect salary increases.
14          The profit and loss statement, which
15  would affect the balance sheet, the earnings, the
16  charge to earnings, was based on the projected
17  benefit obligation.
18          So, both concepts were used in
19  determining corporate financials.
20      Q.    Now, before we leave '98 and '99, we
21  talked about accumulated benefit obligation.  To
22  the extent that interest rates were relevant in
23  that time period to determining an accumulated
24  benefit obligation for financial reporting

Page 140

1  purposes, were they maintained as static or was
2  there some other assumption that was used?
3      A.    The interest rate that would be used
4  for determining the liabilities would be based on a
5  snapshot picture of high quality corporate bonds as
6  of the date of determination, reflective of the
7  duration of the liability, the time period over
8  which benefits were to be paid.  Reflective of high
9  quality corporate bonds, which the SEC, I believe,
10  has stated, at least in speeches, to be AA, AAA
11  bonds.
12          It is not based on any projection of
13  future changes in those interest rates.  In fact,
14  it would be, I believe, malpractice for an actuary
15  to determine financial statement entries based on
16  anything other than the spot rate, and the actuary
17  is required to ignore any presumption about changes
18  in that going forward.
19      Q.    Does that change when you deal with
20  projected benefit obligation or is that interest
21  rate --
22      A.    Projected benefit obligation would
23  be determined the same way.
24          The only thing that would change is

Page 141

1  the duration of the liability, so you might be
2  looking at different bonds on the same date,
3  because the projected benefit obligation would
4  generally show more of the benefits being paid at a
5  later date, so, therefore, you would have longer
6  term bonds, but they would be bonds available in
7  the marketplace at the market price of the
8  determination date, which is technically called the
9  measurement date.
10      Q.    Right.
11          Let's go to 2007.  What's changed?
12      A.    In 2007, under FAS 158, the primary
13  driver is the projected benefit obligation.
14      Q.    And that takes into account future
15  salary increases?
16      A.    That's current accounting.
17      Q.    Now, projected benefit obligation,
18  as of '98 and '99, what standards were used to
19  determine the rate of future salary growth?
20      A.    The standards were that one would
21  look at -- first of all, they would have to be
22  consistent with the discount rate.  All the
23  economic assumptions would have to be internally
24  consistent and reasonably related.  You couldn't --

36 (Pages 138 to 141)

ETHAN E. KRA

Page 142

1  you would be improper to assume interest rate of 6
2  percent and salary increases of 12 percent.
3      Q.    Right.
4      A.    That would be an unstable situation,
5  unless you happen to have some group for which that
6  was appropriate.  But, long-term that's not --
7  that's not viable for 40 years.
8            You would look at the pay structure
9  of the company, you would look at the underlying
10 interest rate presumed in the other economic
11 assumptions, you would allow something for
12 productivity, which is the difference between the
13 taxable wage base and the Consumer Price Index, and
14 then you would put something on for seniority and
15 merit, which generally would be a positive entry
16 through about somewhere in the late 40s to early
17 50s, and then possibly a negative entry thereafter,
18 as -- depending on the pay structure of the plan
19 sponsor.  You'd have to look at data.
20     Q.    Have those standards changed with
21 the change within the accounting?
22     A.    No.
23     Q.    So you are still applying the same
24 actuarial standards.  The main difference between

Page 143

1  now and '98 and '99 is that, across the board, the
2  focus is on projected benefit obligation?
3      A.    On corporate financials, the focus
4  now has been primarily on the projected benefit
5  obligation.  In 1998 and '99, the focus was on both
6  numbers.  They were both very important in the
7  determination of corporate balance sheets.
8      Q.    Now, when an enrolled actuary
9  prepares the Schedule B for a pension plan, he's
10 required to calculate liabilities under a number of
11 different tests, I think.  Is there -- are there
12 different liability standards for purposes of
13 Schedule B?
14     A.    There are a number of different
15 liabilities shown on a Schedule B.  Some of them
16 use mandated assumptions, some of them use the
17 actuary's best estimate assumptions.
18     Q.    Okay.
19     A.    That's statutory and regulatory.
20     Q.    Right.
21           Which ones use the actuary's best
22 estimate?
23     A.    The primary entries in the funding
24 standard account for amortization schedules, normal

Page 144

1  cost, as well as the accrued liability shown on one
2  of the lines on the Schedule B or the unfunded
3  liability on a different line, depending on the
4  funding method chosen.
5            MR. MALONE:  Why don't we take five
6  minutes and I'll see if I have anything else to go
7  over with you.
8            THE WITNESS:  Okay.
9            (Recess called at 1:17 p.m.)
10           (Resumed at 1:22 p.m.)
11           MR. MALONE:  I don't have anything
12 more for you today.  Thank you for your time.
13 You've been very patient.
14 EXAMINATION
15 BY MR. BASSMAN:
16     Q.    Mr. Kra, I have just one or two
17 quick questions for you.  If you can turn back to
18 what was marked as Plaintiffs' 34, the set of
19 spreadsheets, and if you could turn to the second
20 page, and I believe you testified a little earlier
21 about a similar set of tables dealing with Mr.
22 Ward.
23     A.    Yes.
24     Q.    I just want to make sure I

Page 145

1  understand, and the record is clear, on exactly
2  what you were doing on these spreadsheets, so,
3  looking at the second page of P-34, which is Bates
4  numbered KRA 00415, on the far left you have two
5  columns headed valuation year 1999.
6            Do you see that?
7      A.    Yes.
8      Q.    And, in each of these columns, you
9  are computing an accrued benefit under the heritage
10 versus the cash balance plan for certain years,
11 right?
12     A.    Correct.
13     Q.    Now, for valuation year 1999, what
14 assumptions are you holding constant for each one
15 of these calculations, old plan versus new plan?
16     A.    I hold constant the pay, and I hold
17 constant the interest rate used in -- crediting in
18 the cash balance account, and I hold constant the
19 interest rate used for converting a lump sum into
20 an annuity.
21     Q.    And, when you say you hold the pay
22 constant, that's the pay as of January 1, 1999?
23     A.    For the old plan, it would be the
24 pay as of January 1, 1999.  For the new plan, I'm

37 (Pages 142 to 145)

B0187

ETHAN E. KRA

Page 146

1  holding constant the pay during '99, because that
2  was the first year there was a cash balance plan.
3  So I used pay for the year.
4          Given the difference in magnitude of
5  the numbers using spot pay versus full year's pay
6  might change the numbers slightly, but would not
7  change the direction of the numbers, the -- the
8  relative positioning of the numbers.
9      Q.    And you used the same methodology
10 for each valuation year for Mr. Troup here?
11     A.    When I got to the next valuation
12 year, I looked at the interest rates and the pay in
13 that year, and then I held them constant for all
14 future years.  So, in any given column, interest
15 rates and pay are being held constant, but they
16 will vary as you go from one set of columns to the
17 next set of columns.
18         MR. MALONE:  Sean, could you read
19 back his answer, because I think he misspoke.
20         (Pertinent portion of the record is
21 read.)
22 BY MR. BASSMAN:
23     Q.    And you followed that same
24 methodology for each one of the spreadsheets in

Page 147

1  P-34 that discussions valuation years --
2          MR. MALONE:  Object to the form.
3  BY MR. BASSMAN:
4      Q.    -- in a format similar to KRA 415?
5          MR. MALONE:  You can answer.  I just
6  objected to the form of his question.  He's leading
7  you.  He's not supposed to do that.
8          THE WITNESS:  Okay.
9          Yes.
10         MR. BASSMAN:  I have nothing
11 further.
12 FURTHER EXAMINATION
13 BY MR. MALONE:
14     Q.    That stimulated a question on my
15 part.  Can you drag it back for me.
16         Let's go back to KRA 416 in
17 Plaintiffs' 34 for a second, which is Mr. Troup,
18 and this is what we were just looking at?
19     A.    Um-hum.
20     Q.    Now, I understand 1999.
21         Now we are looking at, say, 2003.
22 The valuation year 2003, the left-hand column,
23 which is the heritage pay, what is going be to kept
24 constant here is the average pay formula under the

Page 148

1  old plan, is that correct?
2          MR. BASSMAN:  Objection.  You can
3  answer.
4          THE WITNESS:  What's held constant
5  under the old plan is -- and we can -- my belief is
6  that we recognized pay through that year and then
7  we hold that constant, so average pay will actually
8  increment very slightly as you go through the next
9  few years because -- or will change slightly,
10 because you have a different final average pay as
11 you are recognizing more of the most recent year.
12     Q.    And, in fact, that's illustrated --
13 if we go to the first page of P-34, you've got a
14 series of rows there that are marked Pay N-1, Pay
15 N-2?
16     A.    Yes.
17     Q.    And if I go out, eventually the
18 numbers are all the same?
19     A.    Yes.
20     Q.    Now, let's go back to 416 for a
21 minute.  When we switch over to the new plan,
22 what's being kept constant?  I understand rate.
23 That's easy.
24     A.    What's being held constant in new

Page 149

1  plan, on Page 415, in a given column, is the pay,
2  because -- since it's not a final average pay plan,
3  but each year's pay is used directly in that year's
4  benefit, so the -- in the 1999 column we have 1999
5  pay --
6      Q.    1999 termination -- or transition
7  credits, to the extent that they qualify?
8      A.    Yes, transition credits, but the key
9  is that the pay for '99 is assumed to be the same
10 pay in 2000, in 2001, in 2002, in 2003.  So, there
11 is no phase-in to getting to the same number,
12 whereas, in final average pay, five -- it takes
13 five years until you get the same number.
14     Q.    And then the same thing happens in
15 each subsequent year?
16     A.    Yes, and, in addition, the interest
17 crediting rate --
18     Q.    Will change?
19     A.    -- is -- well, for a given column is
20 the same.
21     Q.    Right.
22     A.    Within a given column the interest
23 crediting rate is identical and the interest
24 conversion rate is identical.

38 (Pages 146 to 149)

B0188

ETHAN E. KRA

Page 150

1    When you go from one column to the
2 next, those two interest rates will change, because
3 now we are using the interest rate from one year
4 later, and you will have a new pay level.
5    Q.    Now, interest crediting rate and
6 interest conversion rate, under the cash balance
7 sub-plan, were the same, were they not?
8    A.    I believe they are.
9    Q.    You know what, why don't we just
10 button that down.
11    If you go to the plan document and
12 go to -- I believe you'll find Attachment A in
13 there somewhere.
14    A.    Schedule A?
15    Q.    Schedule A.
16    A.    Actuarial equivalence -- A.1.1,
17 Unless otherwise specified, actuarial equivalence
18 shall be determined by using the Applicable
19 Interest Rate, and it goes on to describe the
20 30-year Treasury for the October preceding and
21 cites exactly where you get it from, from the
22 Internal Revenue Bulletin, and then it goes on and
23 describes some other aspects.
24    There are some different situations

Page 151

1 for disability benefits in A.1.2.
2    Q.    But we don't have that in this case?
3    A.    We don't have that issue.
4    Q.    So, the answer is that the crediting
5 rate and the conversion rate are the same, is that
6 correct?
7    A.    Yes.
8    MR. MALONE:  Thank you very much.
9    MR. BASSMAN:  I have no further
10 questions.  We will read and sign.
11    MR. MALONE:  That's fine.
12    MR. BASSMAN:  Thank you again for
13 your time.
14    (1:29 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 152

1    C E R T I F I C A T E
2    I, Sean M. Fallon, a Registered
3 Professional Reporter and Notary Public, do hereby
4 certify that, prior to the commencement of the
5 examination, the witness and/or witnesses were
6 sworn by me to testify to the truth and nothing but
7 the truth.
8    I do further certify that the
9 foregoing is a true and accurate computer-aided
10 transcript of the testimony as taken
11 stenographically by and before me at the time,
12 place and on the date hereinbefore set forth.
13    I do further certify that I am
14 neither of counsel nor attorney for any party in
15 this action and that I am not interested in the
16 event nor outcome of this litigation.
17
18
19
20
21    _____
    Registered Professional Reporter
22    XI00840
    Notary Public
23    My commission expires 12-22-10
24 Dated: _____

Page 153

1    JURAT
2    I, ETHAN E. KRA, do hereby certify
    that I have read the foregoing transcript of my
3 testimony taken on Friday, May 25, 2007, and have
    signed it subject to the following changes:
4
    PAGE  LINE        CORRECTION
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19    _____
    ETHAN E. KRA
20
    DATE _____
21
    Sworn and subscribed to before me this
22
    _____ day of _____, 2007.
23    _____
24    NOTARY PUBLIC

39 (Pages 150 to 153)

B0189


EXHIBIT
[illegible]
6/25/07
LEGALINC 800-631-6989

| Record | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | | | | | | | | | | | | | | | | | |
| Use Year-end Factors | | | | | | | | | | | | | | | | | |
| Name | Thomas E Troop | | | | | | | | | | | | | | | | |
| Estimated Date of Birth | 10/15/1979 | | | | | | | | | | | | | | | | |
| Proj Cash Balance Benefit | $ 38,275.10 | | | | | | | | | | | | | | | | |
| Proj Final Pay Benefit | $ 28,582.51 | | | | | | | | | | | | | | | | |

**1) Cerestly Cash Balance Sub-Plan**

| | 1/1/1998 | 1/1/1999 | 1/1/2000 | 1/1/2001 | 1/1/2002 | 1/1/2003 | 1/1/2004 | 1/1/2005 | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | | | | | | | | | | | | | | | | |
| Age at val date | 49.92 | | 50.92 | 51.92 | 52.92 | 53.92 | 54.92 | 55.92 | 56.92 | 57.92 | 58.92 | 59.92 | 60.92 | 61.92 | 82.9187 | 83.92 |
| Hire date | 10/15/1979 | | | | | | | | | | | | | | | |
| Total compensation | 63,522.62 | | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 |
| | | | | | | | | | | | | | | | | |
| Interest credit | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 6.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% |
| Employer contribution credit | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| | | | | | | | | | | | | | | | | |
| Effective Date | | | | | | | | | | | | | | | | |
| Years of service as of val date | 19.23 | 19.23 | 20.23 | 21.23 | 22.23 | 23.23 | 24.23 | 25.23 | 26.23 | 27.23 | 28.23 | 29.23 | 30.23 | 31.23 | 32.23 | 33.23 |
| Years of service as of 1/1/1999 | | 19.23 | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Transition credit | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| | | | | | | | | | | | | | | | | |
| Opening balance | 129,777.43 | | 144,537.22 | 160,036.48 | 176,312.24 | 193,403.43 | 211,350.88 | 230,197.50 | 249,088.33 | 270,770.68 | 292,694.24 | 315,511.15 | 339,576.20 | 364,846.61 | 391,383.68 | 419,240.95 |
| Interest credit | 8,501.85 | | 7,241.31 | 8,017.83 | 8,833.24 | 9,689.51 | 10,588.88 | 11,532.89 | 12,524.42 | 13,565.61 | 14,658.97 | 15,807.11 | 17,012.77 | 18,276.63 | 19,601.83 | 21,004.42 |
| Employer contribution credit EOY 06 | 6,352.26 | | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 | 6,352.26 |
| Transition credit EOY 06 | 1,905.68 | | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 | 1,905.68 |
| Ending balance | 144,537.22 | | 160,036.48 | 176,312.24 | 193,403.43 | 211,350.88 | 230,197.50 | 249,988.33 | 270,770.68 | 292,694.24 | 315,511.15 | 339,576.20 | 364,846.61 | 391,383.68 | 419,240.95 | 448,513.31 |
| Beginning balance projected to 65 | 271,266.55 | | 297,725.38 | 303,370.87 | 316,287.51 | 332,483.91 | 345,903.00 | 358,677.10 | 371,136.98 | 382,811.95 | 393,932.90 | 404,517.42 | 414,598.82 | 424,201.16 | 433,344.47 | 442,051.53 |
| Annuity factor at 65 | 11.78 | | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 |
| Accrued Benefit (boy) | 23,031.41 | | 24,414.48 | 25,744.44 | 27,093.81 | 28,114.42 | 29,341.48 | 30,444.34 | 31,464.78 | 33,446.44 | 33,418.83 | 34,427.38 | 35,182.39 | 36,497.74 | 34,773.44 | 37,413.44 |

**2) Prior Plan   Delmarva**

| | 1/1/1998 | 1/1/1999 | 1/1/2000 | 1/1/2001 | 1/1/2002 | 1/1/2003 | 1/1/2004 | 1/1/2005 | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAY H-1 | 65,531.14 | | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 |
| PAY H-2 | 63,439.78 | | 65,531.14 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 |
| PAY H-3 | 61,973.14 | | 63,439.78 | 65,531.14 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 |
| PAY H-4 | 61,074.37 | | 61,973.14 | 63,439.78 | 65,531.14 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 |
| PAY H-5 | 59,267.75 | | 61,074.37 | 61,973.14 | 65,531.14 | 65,531.14 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 | 63,522.62 |
| | | | | | | | | | | | | | | | | |
| FAE (boy) for the Prior Plan | 62,257.24 | | 63,108.21 | 63,507.86 | 63,907.76 | 63,924.32 | 63,924.32 | 63,924.32 | 63,924.32 | 63,924.32 | 63,924.32 | 63,924.32 | 63,924.32 | 63,924.32 | 63,924.32 | 63,924.32 |
| | | 1/1/1999 | 1/1/2000 | 1/1/2001 | 1/1/2002 | 1/1/2003 | 1/1/2004 | 1/1/2005 | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 |
| Credited service for the Prior Plan | | 19.23 | 20.23 | 21.23 | 22.23 | 23.23 | 24.23 | 25.23 | 26.23 | 27.23 | 28.23 | 29.23 | 30.23 | 31.23 | 32.23 | 33.23 |
| Average SS Wages (tax prior to val date) | 31,129 | | 33,066 | 35,000 | 36,889 | 38,774 | 40,636 | 42,477 | 44,320 | 46,160 | 47,997 | 49,763 | 51,460 | 53,131 | 54,769 | 56,371 |
| | | | | | | | | | | | | | | | | |
| Annual benefit payable at 65 (normal retirement date) | 17,347.04 | | 18,417.16 | 19,371.13 | 20,285.16 | 21,044.77 | 21,826.47 | 22,467.46 | 22,237.14 | 24,074.71 | 24,806.29 | 24,630.64 | 26,248.85 | 26,351.44 | 27,466.10 | 28,346.21 |

Name    Thomas S Troup

Beginning of Year Factors

| | Valuation Year 1999 | | Valuation Year 2000 | | Valuation Year 2001 | | Valuation Year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | 17,357.06 | 23,021.41 | | | | | | |
| 1/1/2000 | 18,417.65 | 24,416.40 | 18,417.65 | 31,930.13 | | | | |
| 1/1/2001 | 19,371.13 | 25,744.85 | 19,489.02 | 33,696.46 | 19,489.02 | 30,696.07 | | |
| 1/1/2002 | 20,268.15 | 27,009.91 | 20,515.05 | 35,358.73 | 20,603.63 | 32,248.51 | 20,603.63 | 29,350.74 |
| 1/1/2003 | 21,054.77 | 28,214.62 | 21,441.78 | 36,923.07 | 21,626.90 | 33,715.84 | 22,009.65 | 30,798.29 |
| 1/1/2004 | 21,826.67 | 29,361.85 | 22,222.87 | 38,395.25 | 22,498.82 | 35,102.73 | 23,297.28 | 32,172.72 |
| 1/1/2005 | 22,587.46 | 30,454.35 | 23,125.88 | 39,780.71 | 23,528.00 | 36,413.60 | 24,775.12 | 33,477.72 |
| 1/1/2006 | 23,337.14 | 31,494.72 | 23,888.81 | 41,084.54 | 24,411.38 | 37,652.60 | 26,140.13 | 34,716.80 |
| 1/1/2007 | 24,075.72 | 32,485.46 | 24,640.02 | 42,311.55 | 25,172.71 | 38,823.88 | 27,416.05 | 35,893.30 |
| 1/1/2008 | 24,806.09 | 33,428.93 | 25,382.41 | 43,466.30 | 25,924.50 | 39,930.56 | 28,239.34 | 37,010.36 |
| 1/1/2009 | 25,530.06 | 34,327.39 | 26,117.78 | 44,553.01 | 26,668.56 | 40,976.76 | 29,054.13 | 38,071.00 |
| 1/1/2010 | 26,249.66 | 35,182.99 | 26,848.16 | 45,575.69 | 27,406.91 | 41,965.60 | 29,862.44 | 39,078.07 |
| 1/1/2011 | 26,961.49 | 35,997.76 | 27,570.16 | 46,538.13 | 28,136.14 | 42,900.24 | 30,660.86 | 40,034.26 |
| 1/1/2012 | 27,666.60 | 36,773.66 | 28,284.82 | 47,443.87 | 28,857.32 | 43,783.84 | 31,450.46 | 40,942.16 |
| 1/1/2013 | 28,365.31 | 37,512.54 | 28,992.45 | 48,296.25 | 29,570.76 | 44,618.61 | 32,231.55 | 41,804.19 |
| 1/1/2014 | 29,057.92 | 38,216.17 | 29,693.38 | 49,098.42 | 30,276.77 | 45,407.81 | 33,004.43 | 42,622.68 |
| 2/1/2014 | 28,982.51 | 38,278.10 | 29,608.92 | 49,171.96 | 30,181.38 | 45,478.87 | 32,902.45 | 42,695.03 |

Name  Thomas S Troup

| Date | Valuation Year 2003 | | Valuation Year 2004 | | Valuation Year 2005 | | Valuation Year 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | | | | | | | | |
| 1/1/2000 | | | | | | | | |
| 1/1/2001 | | | | | | | | |
| 1/1/2002 | | | | | | | | |
| 1/1/2003 | 22,009.65 | 28,606.42 | | | | | | |
| 1/1/2004 | 23,293.53 | 29,887.92 | 23,293.53 | 31,153.28 | | | | |
| 1/1/2005 | 24,767.31 | 31,109.21 | 24,747.73 | 32,419.64 | 24,747.73 | 30,798.59 | | |
| 1/1/2006 | 26,127.95 | 32,273.12 | 26,087.24 | 33,623.86 | 26,431.54 | 32,012.34 | 26,431.54 | 31,087.15 |
| 1/1/2007 | 27,399.18 | 33,382.34 | 27,335.79 | 34,768.99 | 28,050.64 | 33,169.84 | 28,490.57 | 32,289.68 |
| 1/1/2008 | 28,217.49 | 34,439.45 | 28,148.88 | 35,857.93 | 29,241.52 | 34,273.69 | 30,153.69 | 33,438.44 |
| 1/1/2009 | 29,026.25 | 35,446.89 | 28,952.95 | 36,893.43 | 30,447.55 | 35,326.38 | 31,864.28 | 34,535.84 |
| 1/1/2010 | 29,828.16 | 36,407.00 | 29,750.02 | 37,878.13 | 31,692.57 | 36,330.29 | 33,646.17 | 35,584.18 |
| 1/1/2011 | 30,619.83 | 37,322.00 | 30,536.70 | 38,814.51 | 32,537.89 | 37,287.66 | 35,060.68 | 36,585.65 |
| 1/1/2012 | 31,402.31 | 38,194.00 | 31,314.03 | 39,704.95 | 33,373.51 | 38,200.66 | 35,985.49 | 37,542.35 |
| 1/1/2013 | 32,175.93 | 39,025.04 | 32,082.35 | 40,551.69 | 34,199.75 | 39,071.35 | 36,860.19 | 38,456.27 |
| 1/1/2014 | 32,940.97 | 39,817.03 | 32,841.94 | 41,356.88 | 35,016.90 | 39,901.68 | 37,745.09 | 39,329.34 |
| 2/1/2014 | 32,832.66 | 39,886.34 | 32,730.74 | 41,427.76 | 34,904.83 | 39,974.08 | 37,527.30 | 39,405.00 |

KRA00416

B0192

**Record**  
**Year**  
**Use Year-end Factors** 85.1%  
**Estimated Date of Birth** 6/15/1955  
**Name** Mounkes Wood  
**Proj Cash Balance Benefit** $ 50,419.28  
**Proj Final Pay Benefit** $ 42,833.15

**1) Condirectly Cash Balance Sub-Plan**

| | 1/1/1999 | 1/1/2000 | 1/1/2001 | 1/1/2002 | 1/1/2003 | 1/1/2004 | 1/1/2005 | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 1/1/1999 | 1/1/2000 | 1/1/2001 | 1/1/2002 | 1/1/2003 | 1/1/2004 | 1/1/2005 | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 |
| Age at val date | 43.33 | 44.33 | 45.33 | 46.33 | 47.33 | 48.33 | 49.33 | 50.33 | 51.33 | 52.33 | 53.33 | 54.33 | 55.33 | 56.3333 | 57.33 |
| Hire date | 11/6/1991 | | | | | | | | | | | | | | |
| Total compensation | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 | 70,385.51 |
| Interest credit | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% | 5.01% |
| Employer contribution credit | 8.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Effective Date | | | | | | | | | | | | | | | |
| Years of service as of val date | 17.15 | | | | | | | | | | | | | | |
| Years of service as of 1/1/1998 | 17.15 | | | | | | | | | | | | | | |
| Transition credit | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| Opening balance | 84,035.74 | 106,489.34 | 120,270.71 | 134,742.54 | 146,939.40 | 165,807.63 | 182,655.38 | 200,956.51 | 220,174.54 | 240,355.41 | 261,547.23 | 283,800.95 | 307,169.51 | 331,708.82 | 357,477.55 |
| Interest Credit | 4,711.19 | 5,335.12 | 6,023.55 | 6,750.00 | 7,511.96 | 8,311.47 | 9,151.03 | 10,067.92 | 11,050.74 | 12,041.81 | 13,103.52 | 14,216.43 | 15,380.19 | 16,518.61 | 17,908.63 |
| Employer contribution credit EOY 05 | 5,633.84 | 6,334.70 | 6,334.70 | 6,334.70 | 6,334.70 | 6,334.70 | 7,038.55 | 7,038.55 | 7,038.55 | 7,038.55 | 7,038.55 | 7,038.55 | 7,038.55 | 7,038.55 | 7,038.55 |
| Translation credit EOY 05 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 | 2,111.57 |
| Ending balance | 106,489.34 | 120,270.71 | 134,742.54 | 148,939.40 | 165,807.63 | 182,655.38 | 200,956.51 | 220,174.54 | 240,355.41 | 261,547.23 | 283,800.96 | 307,169.51 | 331,708.82 | 357,477.55 | 384,537.29 |
| Beginning balance projected to 55 | 271,250.54 | 292,464.44 | 314,554.88 | 335,581.03 | 356,823.73 | 374,700.58 | 392,887.46 | 411,659.19 | 429,456.78 | 448,452.82 | 468,955.09 | 470,550.99 | 452,728.64 | 506,706.01 | 520,046.53 |
| Annuity factor at 65 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 | 11.78 |
| Accrued Benefit (boy) | 23,014.41 | 24,811.64 | 26,493.16 | 28,478.38 | 30,176.27 | 31,797.14 | 33,338.78 | 34,979.20 | 36,443.76 | 37,888.63 | 39,288.41 | 40,867.46 | 41,813.01 | 42,899.13 | 44,138.84 |

**2) Prior Plan**

ACE

| | 1/1/1999 | 1/1/2000 | 1/1/2001 | 1/1/2002 | 1/1/2003 | 1/1/2004 | 1/1/2005 | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAYH-1 | 65,120.34 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 |
| PAYH-2 | 69,531.73 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 |
| PAYH-3 | 61,050.93 | 69,133.73 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 |
| PAYH-4 | 60,727.64 | 60,929.73 | 69,031.73 | 65,132.34 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 |
| PAYH-5 | 58,972.04 | 59,737.64 | 59,031.73 | 65,031.73 | 65,120.34 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 |
| FAE (boy) for the Prior Plan | 63,542.54 | 65,594.53 | 67,473.40 | 69,008.62 | 69,808.62 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 | 69,132.01 |
| Credited service for the Prior Plan | 1/1/1999 17.15 | 1/1/2000 18.15 | 1/1/2001 19.15 | 1/1/2002 20.15 | 1/1/2003 21.15 | 1/1/2004 22.15 | 1/1/2005 23.15 | 1/1/2006 24.15 | 1/1/2007 25.15 | 1/1/2008 28.15 | 1/1/2009 27.15 | 1/1/2010 28.15 | 1/1/2011 28.15 | 1/1/2012 30.15 | 1/1/2013 31.15 |
| Average SS Wage (day prior to val date) | 31,129 | 33,066 | 35,003 | 36,869 | 38,774 | 40,626 | 42,477 | 44,329 | 46,180 | 47,997 | 49,783 | 51,460 | 53,131 | 54,769 | 56,371 |
| Annual benefit payable at 65 (normal retirement date) | 17,433.34 | 19,046.24 | 20,671.44 | 22,272.56 | 23,277.40 | 24,497.84 | 25,684.64 | 26,710.14 | 27,814.38 | 28,932.40 | 30,035.61 | 31,154.42 | 32,340.74 | 33,246.84 | 34,463.34 |

KRA00417

B0193

Name: Maurice Ward

Beginning of Year Factors

| Date | Valuation Year 1999 | | Valuation Year 2000 | | Valuation Year 2001 | | Valuation Year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | 17,433.84 | 23,014.11 | | | | | | |
| 1/1/2000 | 19,046.34 | 24,818.55 | 19,046.34 | 35,085.55 | | | | |
| 1/1/2001 | 20,671.48 | 26,693.15 | 20,710.32 | 37,855.38 | 20,710.32 | 33,513.68 | | |
| 1/1/2002 | 22,272.06 | 28,478.29 | 22,353.82 | 40,462.02 | 22,700.01 | 35,868.36 | 22,700.01 | 31,682.55 |
| 1/1/2003 | 23,377.50 | 30,178.27 | 23,463.31 | 42,915.10 | 24,178.84 | 38,093.96 | 24,383.14 | 33,784.76 |
| 1/1/2004 | 24,497.95 | 31,797.14 | 24,677.69 | 45,223.67 | 25,819.36 | 40,197.55 | 26,247.28 | 35,780.77 |
| 1/1/2005 | 25,604.06 | 33,338.78 | 25,838.89 | 47,396.23 | 27,429.84 | 42,185.82 | 28,100.69 | 37,675.97 |
| 1/1/2006 | 26,710.18 | 34,929.20 | 26,955.14 | 49,611.19 | 29,029.75 | 44,221.70 | 29,962.86 | 39,625.39 |
| 1/1/2007 | 27,816.29 | 36,443.75 | 28,071.40 | 51,695.65 | 30,231.92 | 46,145.97 | 31,446.61 | 41,476.33 |
| 1/1/2008 | 28,922.40 | 37,886.03 | 29,187.66 | 53,657.32 | 31,434.09 | 47,964.76 | 32,697.08 | 43,233.78 |
| 1/1/2009 | 30,028.51 | 39,259.51 | 30,303.91 | 55,503.42 | 32,636.26 | 49,683.83 | 33,947.56 | 44,902.46 |
| 1/1/2010 | 31,134.62 | 40,567.46 | 31,420.17 | 57,240.76 | 33,838.43 | 51,308.67 | 35,198.03 | 46,486.85 |
| 1/1/2011 | 32,240.74 | 41,813.01 | 32,536.43 | 58,875.75 | 35,040.60 | 52,844.43 | 36,448.50 | 47,991.20 |
| 1/1/2012 | 33,346.85 | 42,999.13 | 33,652.68 | 60,414.42 | 36,242.77 | 54,296.00 | 37,698.97 | 49,419.57 |
| 1/1/2013 | 34,452.96 | 44,128.66 | 34,768.94 | 61,862.44 | 37,444.94 | 55,667.99 | 38,949.44 | 50,775.79 |
| 1/1/2014 | 35,559.07 | 45,204.30 | 35,885.20 | 63,225.16 | 38,647.11 | 56,964.77 | 40,199.91 | 52,063.50 |
| 1/1/2015 | 36,665.18 | 46,228.63 | 37,001.45 | 64,507.60 | 39,849.28 | 58,190.46 | 41,450.39 | 53,286.16 |
| 1/1/2016 | 37,771.30 | 47,204.08 | 38,117.71 | 65,714.49 | 41,051.45 | 59,348.96 | 42,700.86 | 54,447.07 |
| 1/1/2017 | 38,877.41 | 48,101.31 | 39,233.97 | 66,811.53 | 42,253.62 | 60,406.60 | 43,951.33 | 55,511.73 |
| 1/1/2018 | 39,983.52 | 48,781.77 | 40,350.22 | 67,633.75 | 43,455.79 | 61,202.72 | 45,201.80 | 56,316.80 |
| 1/1/2019 | 41,089.63 | 49,429.76 | 41,466.48 | 68,407.52 | 44,657.96 | 61,955.20 | 46,452.27 | 57,081.20 |
| 1/1/2020 | 42,195.75 | 50,046.84 | 42,582.74 | 69,135.71 | 45,860.13 | 62,666.43 | 47,702.74 | 57,806.99 |
| 9/1/2020 | 42,933.15 | 50,458.26 | 43,326.91 | 69,630.04 | 46,661.57 | 63,145.09 | 48,536.39 | 58,291.57 |

B0194

Name          Maurice Ward

| | Valuation Year 2003 | | Valuation Year 2004 | | Valuation Year 2005 | | Valuation Year 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | | | | | | | | |
| 1/1/2000 | | | | | | | | |
| 1/1/2001 | | | | | | | | |
| 1/1/2002 | | | | | | | | |
| 1/1/2003 | 24,383.14 | 30,623.22 | | | | | | |
| 1/1/2004 | 26,345.34 | 32,465.64 | 26,345.34 | 34,331.45 | | | | |
| 1/1/2005 | 28,305.68 | 34,221.49 | 28,488.70 | 36,200.13 | 28,488.70 | 33,749.29 | | |
| 1/1/2006 | 30,283.63 | 36,034.29 | 30,665.47 | 38,125.19 | 30,784.04 | 35,624.05 | 30,784.04 | 34,205.40 |
| 1/1/2007 | 31,892.01 | 37,761.92 | 32,488.50 | 39,955.80 | 32,735.45 | 37,411.92 | 33,409.65 | 36,091.73 |
| 1/1/2008 | 33,275.97 | 39,408.38 | 34,102.92 | 41,696.58 | 34,488.07 | 39,116.92 | 35,890.09 | 37,893.73 |
| 1/1/2009 | 34,548.58 | 40,977.48 | 35,621.80 | 43,351.94 | 36,154.98 | 40,742.90 | 38,338.43 | 39,615.16 |
| 1/1/2010 | 35,821.19 | 42,472.86 | 36,933.94 | 44,926.08 | 37,624.97 | 42,293.53 | 40,643.47 | 41,259.64 |
| 1/1/2011 | 37,093.80 | 43,897.98 | 38,246.08 | 46,422.98 | 38,961.66 | 43,772.28 | ▓▓▓▓▓▓ | 42,830.59 |
| 1/1/2012 | 38,366.41 | 45,256.15 | 39,558.23 | 47,846.43 | 40,298.36 | 45,182.50 | ▓▓▓▓▓▓ | 44,331.31 |
| 1/1/2013 | 39,639.02 | 46,550.50 | 40,870.37 | 49,200.03 | 41,635.05 | 46,527.35 | ▓▓▓▓▓▓ | 45,764.93 |
| 1/1/2014 | 40,911.63 | 47,784.04 | 42,182.51 | 50,487.22 | 42,971.74 | 47,809.88 | ▓▓▓▓▓▓ | 47,134.46 |
| 1/1/2015 | 42,184.24 | 48,959.62 | 43,494.66 | 51,711.24 | 44,308.44 | 49,032.97 | ▓▓▓▓▓▓ | 48,442.76 |
| 1/1/2016 | 43,456.85 | 50,079.97 | 44,806.80 | 52,875.21 | 45,645.13 | 50,199.36 | ▓▓▓▓▓▓ | 49,692.57 |
| 1/1/2017 | 44,729.46 | 51,111.27 | 46,118.94 | 53,944.31 | 46,981.82 | 51,273.76 | ▓▓▓▓▓▓ | 50,845.79 |
| 1/1/2018 | 46,002.07 | 51,883.99 | 47,431.08 | 54,753.95 | 48,318.52 | 52,089.75 | ▓▓▓▓▓▓ | 51,723.14 |
| 1/1/2019 | 47,274.68 | 52,639.95 | 48,743.23 | 55,523.87 | 49,655.21 | 52,867.92 | ▓▓▓▓▓▓ | 52,561.26 |
| 1/1/2020 | 48,547.29 | 53,350.85 | 50,055.37 | 56,256.01 | 50,991.90 | 53,610.02 | ▓▓▓▓▓▓ | 53,361.92 |
| 9/1/2020 | 49,395.70 | 53,823.48 | 50,930.13 | 56,743.74 | 51,883.03 | 54,102.69 | ▓▓▓▓▓▓ | 53,892.00 |

KRA00420

B0196

Name    Jerome Charles

Beginning of Year Factors

| | Valuation Year 1999 | | Valuation Year 2000 | | Valuation Year 2001 | | Valuation Year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | 17,264.57 | 25,425.91 | | | | | | |
| 1/1/2000 | 18,196.68 | 26,819.99 | 18,196.68 | 35,386.04 | | | | |
| 1/1/2001 | 19,092.54 | 28,147.56 | 19,302.88 | 37,296.34 | 19,302.88 | 33,865.04 | | |
| 1/1/2002 | 20,163.90 | 29,411.79 | 20,727.48 | 39,094.10 | 21,561.88 | 35,856.08 | 21,561.88 | 32,523.04 |
| 1/1/2003 | 21,057.62 | 30,615.70 | 21,882.89 | 40,785.95 | 23,626.49 | 37,737.97 | 23,781.06 | 34,261.00 |
| 1/1/2004 | 22,104.23 | 31,762.18 | 23,332.43 | 42,378.13 | 26,060.02 | 39,516.70 | 26,382.43 | 35,911.17 |
| 1/1/2005 | 23,013.42 | 32,853.96 | 24,611.82 | 43,876.51 | 28,398.19 | 41,197.92 | 28,901.70 | 37,477.99 |
| 1/1/2006 | 23,922.61 | 33,893.65 | 25,584.16 | 45,286.62 | 30,504.10 | 42,786.97 | 31,201.97 | 38,965.66 |
| 1/1/2007 | 24,831.80 | 34,883.73 | 26,556.50 | 46,613.65 | 31,663.43 | 44,288.90 | 32,568.92 | 40,378.19 |
| 1/1/2008 | 25,740.99 | 35,826.58 | 27,528.84 | 47,862.51 | 32,822.75 | 45,708.50 | 33,761.39 | 41,719.36 |
| 1/1/2009 | 26,650.17 | 36,724.45 | 28,501.17 | 49,037.80 | 33,982.07 | 47,050.28 | 34,953.87 | 42,992.79 |
| 1/1/2010 | 27,559.36 | 37,579.48 | 29,473.51 | 50,143.84 | 35,141.40 | 48,318.50 | 36,146.35 | 44,201.90 |
| 1/1/2011 | 28,468.55 | 38,393.72 | 30,445.85 | 51,184.73 | 36,300.72 | 49,517.20 | 37,338.82 | 45,349.93 |
| 1/1/2012 | 29,377.74 | 39,169.11 | 31,418.19 | 52,164.29 | 37,460.04 | 50,650.18 | 38,531.30 | 46,439.97 |
| 1/1/2013 | 30,286.93 | 39,907.50 | 32,380.53 | 53,086.15 | 38,619.35 | 51,721.06 | 39,723.78 | 47,474.94 |
| 1/1/2014 | 31,196.12 | 40,610.67 | 33,362.86 | 53,953.70 | 39,778.69 | 52,733.22 | 40,916.25 | 48,457.64 |
| 11/1/2014 | 31,953.78 | 41,151.88 | 34,173.15 | 54,620.37 | 40,744.79 | 53,509.38 | 41,909.98 | 49,211.80 |

KRA00421

Name   Jerome Charles

| | Valuation Year 2003 | | Valuation Year 2004 | | Valuation Year 2005 | | Valuation Year 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | | | | | | | | |
| 1/1/2000 | | | | | | | | |
| 1/1/2001 | | | | | | | | |
| 1/1/2002 | | | | | | | | |
| 1/1/2003 | 23,781.06 | 31,734.28 | | | | | | |
| 1/1/2004 | 26,639.88 | 33,357.04 | 26,639.88 | 34,826.41 | | | | |
| 1/1/2005 | 29,437.77 | 34,903.55 | 29,328.54 | 36,414.44 | 29,328.54 | 34,519.60 | | |
| 1/1/2006 | 32,037.85 | 36,377.40 | 31,810.76 | 37,924.54 | 32,101.12 | 36,060.31 | 32,101.12 | 34,973.03 |
| 1/1/2007 | 33,725.78 | 37,782.01 | 33,372.19 | 39,360.54 | 33,974.99 | 37,529.61 | 34,301.39 | 36,402.51 |
| 1/1/2008 | 35,260.41 | 39,120.62 | 34,771.71 | 40,726.09 | 35,709.00 | 38,930.81 | 36,385.71 | 37,768.07 |
| 1/1/2009 | 36,505.84 | 40,396.34 | 35,999.87 | 42,024.63 | 37,167.25 | 40,267.07 | 38,218.16 | 39,072.58 |
| 1/1/2010 | 37,751.26 | 41,612.12 | 37,228.03 | 43,259.45 | 38,769.74 | 41,541.40 | 40,218.76 | 40,318.77 |
| 1/1/2011 | 38,996.68 | 42,770.78 | 38,456.20 | 44,433.68 | 40,048.76 | 42,756.66 | | 41,509.25 |
| 1/1/2012 | 40,242.10 | 43,875.00 | 39,684.36 | 45,550.29 | 41,327.78 | 43,915.61 | | 42,646.50 |
| 1/1/2013 | 41,487.53 | 44,927.34 | 40,912.52 | 46,612.11 | 42,606.80 | 45,020.83 | | 43,732.91 |
| 1/1/2014 | 42,732.95 | 45,930.23 | 42,140.68 | 47,621.84 | 43,885.83 | 46,074.84 | | 44,770.75 |
| 11/1/2014 | 43,770.80 | 46,700.43 | 43,164.15 | 48,396.79 | 44,951.68 | 46,884.18 | | 45,558.23 |

KRA00422

B0198



KRA00423

Name    Joseph Fink

Beginning of Year Factors

| | Valuation Year 1999 | | Valuation Year 2000 | | Valuation Year 2001 | | Valuation Year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | 11,141.94 | 15,142.38 | | | | | | |
| 1/1/2000 | 12,624.46 | 16,887.21 | 12,624.46 | 23,430.02 | | | | |
| 1/1/2001 | 14,020.51 | 18,548.80 | 14,139.56 | 25,845.81 | 14,139.56 | 23,039.23 | | |
| 1/1/2002 | 15,364.27 | 20,131.11 | 15,619.89 | 28,119.28 | 15,907.84 | 25,177.14 | 15,907.84 | 22,399.67 |
| 1/1/2003 | 16,416.98 | 21,637.93 | 16,801.17 | 30,258.82 | 17,416.55 | 27,197.84 | 17,430.32 | 24,155.82 |
| 1/1/2004 | 17,533.37 | 23,072.86 | 18,114.64 | 32,272.31 | 19,096.90 | 29,107.78 | 19,126.21 | 25,823.27 |
| 1/1/2005 | 18,589.91 | 24,563.55 | 19,360.29 | 34,339.44 | 20,748.88 | 31,077.12 | 20,795.49 | 27,550.41 |
| 1/1/2006 | 19,646.45 | 25,983.13 | 20,460.61 | 36,284.80 | 22,295.00 | 32,938.50 | 22,360.69 | 29,190.32 |
| 1/1/2007 | 20,702.99 | 27,334.98 | 21,560.93 | 38,115.54 | 23,493.97 | 34,697.83 | 23,580.50 | 30,747.38 |
| 1/1/2008 | 21,759.52 | 28,622.33 | 22,661.25 | 39,838.44 | 24,692.94 | 36,360.73 | 24,783.88 | 32,225.80 |
| 1/1/2009 | 22,816.06 | 29,848.27 | 23,761.58 | 41,459.84 | 25,891.91 | 37,932.46 | 25,987.27 | 33,629.54 |
| 1/1/2010 | 23,872.60 | 31,015.71 | 24,861.90 | 42,985.71 | 27,090.88 | 39,418.02 | 27,190.66 | 34,962.37 |
| 1/1/2011 | 24,929.14 | 32,127.45 | 25,962.22 | 44,421.70 | 28,289.85 | 40,822.15 | 28,394.05 | 36,227.87 |
| 1/1/2012 | 25,985.68 | 33,186.16 | 27,062.54 | 45,773.08 | 29,488.82 | 42,149.30 | 29,597.43 | 37,429.45 |
| 1/1/2013 | 27,042.22 | 34,194.35 | 28,162.87 | 47,044.86 | 30,687.80 | 43,403.70 | 30,800.82 | 38,570.34 |
| 1/1/2014 | 28,098.76 | 35,154.44 | 29,263.19 | 48,241.71 | 31,886.77 | 44,589.33 | 32,004.21 | 39,653.60 |
| 1/1/2015 | 29,155.30 | 36,068.73 | 30,363.51 | 49,368.05 | 33,085.74 | 45,709.97 | 33,207.59 | 40,682.13 |
| 1/1/2016 | 30,211.83 | 36,939.40 | 31,463.83 | 50,428.04 | 34,284.71 | 46,769.17 | 34,410.98 | 41,658.72 |
| 1/1/2017 | 31,268.37 | 37,768.52 | 32,564.16 | 51,425.58 | 35,483.68 | 47,770.31 | 35,614.37 | 42,585.97 |
| 1/1/2018 | 32,324.91 | 38,558.09 | 33,664.48 | 52,364.35 | 36,682.65 | 48,716.56 | 36,817.76 | 43,466.39 |
| 1/1/2019 | 33,381.45 | 39,309.99 | 34,764.80 | 53,247.82 | 37,881.63 | 49,610.94 | 38,021.14 | 44,302.33 |
| 2/1/2019 | 33,469.50 | 39,376.03 | 34,856.49 | 53,328.70 | 37,981.54 | 49,691.24 | 38,121.43 | 44,376.31 |

KRA00424

B0200

Name    Joseph Fink

| | Valuation Year 2003 | | Valuation Year 2004 | | Valuation Year 2005 | | Valuation Year 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | | | | | | | | |
| 1/1/2000 | | | | | | | | |
| 1/1/2001 | | | | | | | | |
| 1/1/2002 | | | | | | | | |
| 1/1/2003 | 17,430.32 | 22,024.34 | | | | | | |
| 1/1/2004 | 19,194.07 | 23,537.03 | 19,194.07 | 24,803.58 | | | | |
| 1/1/2005 | 20,939.40 | 25,109.70 | 21,039.66 | 26,449.92 | 21,039.66 | 24,770.99 | | |
| 1/1/2006 | 22,588.81 | 26,608.48 | 22,800.73 | 28,015.48 | 22,954.66 | 26,263.57 | 22,954.66 | 25,305.63 |
| 1/1/2007 | 23,901.02 | 28,036.85 | 24,236.00 | 29,504.21 | 24,560.41 | 27,726.05 | 25,112.06 | 26,868.94 |
| 1/1/2008 | 25,204.99 | 29,398.10 | 25,674.41 | 30,919.90 | 26,185.87 | 29,101.68 | 27,345.46 | 28,362.36 |
| 1/1/2009 | 26,428.82 | 30,695.40 | 27,044.10 | 32,266.13 | 27,759.15 | 30,413.55 | 29,583.00 | 29,789.01 |
| 1/1/2010 | 27,652.66 | 31,931.74 | 28,296.42 | 33,546.30 | 29,231.63 | 31,664.61 | 31,776.50 | 31,151.88 |
| 1/1/2011 | 28,876.49 | 33,110.00 | 29,548.75 | 34,763.65 | 30,525.35 | 32,857.69 | 33,886.66 | 32,463.82 |
| 1/1/2012 | 30,100.33 | 34,232.90 | 30,801.07 | 35,921.27 | 31,819.06 | 33,995.48 | 35,921.00 | 33,697.55 |
| 1/1/2013 | 31,324.16 | 35,303.04 | 32,053.40 | 37,022.08 | 33,112.78 | 35,080.53 | 37,867.55 | 34,885.68 |
| 1/1/2014 | 32,547.99 | 36,322.90 | 33,305.72 | 38,068.89 | 34,406.49 | 36,115.29 | 39,150.00 | 36,020.69 |
| 1/1/2015 | 33,771.83 | 37,294.84 | 34,558.05 | 39,064.32 | 35,700.21 | 37,102.10 | 39,584.51 | 37,104.95 |
| 1/1/2016 | 34,995.66 | 38,221.12 | 35,810.38 | 40,010.92 | 36,993.92 | 38,043.17 | 40,018.99 | 38,140.74 |
| 1/1/2017 | 36,219.50 | 39,103.88 | 37,062.70 | 40,911.06 | 38,287.64 | 38,940.62 | 42,453.47 | 39,130.23 |
| 1/1/2018 | 37,443.33 | 39,945.16 | 38,315.03 | 41,767.04 | 39,581.36 | 39,796.48 | 43,887.94 | 40,075.47 |
| 1/1/2019 | 38,667.17 | 40,746.92 | 39,567.35 | 42,581.01 | 40,875.07 | 40,612.67 | 45,220.47 | 40,978.46 |
| 2/1/2019 | 38,769.15 | 40,817.12 | 39,671.71 | 42,652.74 | 40,982.88 | 40,683.95 | 45,441.98 | 41,056.74 |

KRA00425

B0201



KRA00426

Name: Thomas S Troup

## Beginning of Year Factors

| | Valuation Year 1999 | | Valuation Year 2000 | | Valuation Year 2001 | | Valuation Year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | 15,914.04 | 23,021.41 | | | | | | |
| 1/1/2000 | 16,900.19 | 24,416.40 | 16,918.28 | 31,930.13 | | | | |
| 1/1/2001 | 17,840.95 | 25,744.85 | 17,984.39 | 33,696.46 | 17,961.99 | 30,696.07 | | |
| 1/1/2002 | 18,687.32 | 27,009.91 | 18,967.82 | 35,358.73 | 19,040.95 | 32,248.51 | 19,295.77 | 29,350.74 |
| 1/1/2003 | 19,378.77 | 28,214.62 | 19,808.06 | 36,923.07 | 19,985.40 | 33,715.84 | 20,643.39 | 30,798.29 |
| 1/1/2004 | 20,213.08 | 29,361.85 | 20,802.89 | 38,395.25 | 21,093.13 | 35,102.73 | 22,188.02 | 32,172.72 |
| 1/1/2005 | 21,047.39 | 30,464.35 | 21,661.54 | 39,780.71 | 22,073.37 | 36,413.60 | 23,638.90 | 33,477.72 |
| 1/1/2006 | 21,881.70 | 31,494.72 | 22,520.20 | 41,084.54 | 22,948.35 | 37,652.60 | 25,018.24 | 34,716.80 |
| 1/1/2007 | 22,716.01 | 32,485.46 | 23,378.85 | 42,311.55 | 23,823.33 | 38,823.68 | 25,972.14 | 35,893.30 |
| 1/1/2008 | 23,550.32 | 33,428.93 | 24,237.51 | 43,466.30 | 24,698.31 | 39,930.55 | 26,926.04 | 37,010.36 |
| 1/1/2009 | 24,384.63 | 34,327.39 | 25,096.16 | 44,553.01 | 25,573.29 | 40,976.76 | 27,879.94 | 38,071.00 |
| 1/1/2010 | 25,218.94 | 35,182.99 | 25,954.82 | 45,575.69 | 26,448.27 | 41,965.60 | 28,833.85 | 39,078.07 |
| 1/1/2011 | 26,053.25 | 35,997.76 | 26,813.47 | 46,538.13 | 27,323.25 | 42,900.24 | 29,787.75 | 40,034.26 |
| 1/1/2012 | 26,887.56 | 36,773.66 | 27,672.13 | 47,443.87 | 28,198.23 | 43,783.64 | 30,741.65 | 40,942.16 |
| 1/1/2013 | 27,721.87 | 37,512.54 | 28,530.78 | 48,286.25 | 29,073.21 | 44,618.61 | 31,695.55 | 41,804.19 |
| 1/1/2014 | 28,556.18 | 38,216.17 | 29,389.44 | 49,098.42 | 29,948.19 | 45,407.81 | 32,649.45 | 42,622.68 |
| 2/1/2014 | 28,625.70 | 38,278.10 | 29,460.99 | 49,171.96 | 30,021.10 | 45,478.87 | 32,728.94 | 42,695.03 |

KRA00427

B0203

Name    Thomas S Troup

| | Valuation Year 2003 | | Valuation Year 2004 | | Valuation Year 2005 | | Valuation Year 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | | | | | | | | |
| 1/1/2000 | | | | | | | | |
| 1/1/2001 | | | | | | | | |
| 1/1/2002 | | | | | | | | |
| 1/1/2003 | 20,589.63 | 28,606.42 | | | | | | |
| 1/1/2004 | 22,132.55 | 29,887.92 | 22,093.81 | 31,153.28 | | | | |
| 1/1/2005 | 23,581.78 | 31,109.21 | 23,523.80 | 32,419.64 | 23,809.57 | 30,798.59 | | |
| 1/1/2006 | 24,959.51 | 32,273.12 | 24,880.91 | 33,623.86 | 25,527.02 | 32,012.34 | 25,865.81 | 31,087.15 |
| 1/1/2007 | 25,911.86 | 33,382.34 | 25,811.23 | 34,768.99 | 26,844.30 | 33,169.84 | 27,645.74 | 32,289.68 |
| 1/1/2008 | 26,863.55 | 34,439.45 | 26,739.49 | 35,857.93 | 28,186.14 | 34,273.69 | 29,483.26 | 33,438.44 |
| 1/1/2009 | 27,815.23 | 35,446.89 | 27,686.78 | 36,893.43 | 29,573.63 | 35,326.38 | 31,399.46 | 34,535.84 |
| 1/1/2010 | 28,766.92 | 36,407.00 | 28,634.07 | 37,878.13 | 30,585.48 | 36,330.29 | 32,973.07 | 35,584.18 |
| 1/1/2011 | 29,718.61 | 37,322.00 | 29,581.37 | 38,814.51 | 31,597.33 | 37,287.66 | 34,063.90 | 36,585.65 |
| 1/1/2012 | 30,670.29 | 38,194.00 | 30,528.66 | 39,704.95 | 32,609.18 | 38,200.66 | 35,154.74 | 37,542.35 |
| 1/1/2013 | 31,621.98 | 39,025.04 | 31,475.95 | 40,551.69 | 33,621.02 | 39,071.35 | 36,245.58 | 38,456.27 |
| 1/1/2014 | 32,573.67 | 39,817.03 | 32,423.24 | 41,356.88 | 34,632.87 | 39,901.68 | 37,336.41 | 39,329.34 |
| 2/1/2014 | 32,652.97 | 39,886.34 | 32,502.18 | 41,427.76 | 34,717.20 | 39,974.08 | 37,427.32 | 39,405.00 |

KRA00428

B0204



KRA00429

Name     Maurice Ward

Beginning of Year Factors

| | Valuation Year 1999 | | Valuation Year 2000 | | Valuation Year 2001 | | Valuation Year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | 17,996.83 | 23,014.11 | | | | | | |
| 1/1/2000 | 19,591.90 | 24,818.56 | 19,628.72 | 35,085.56 | | | | |
| 1/1/2001 | 21,166.63 | 26,693.15 | 21,244.33 | 37,855.38 | 21,573.33 | 33,513.68 | | |
| 1/1/2002 | 22,220.50 | 28,478.29 | 22,343.13 | 40,462.02 | 23,035.52 | 35,868.36 | 23,230.15 | 31,682.55 |
| 1/1/2003 | 23,391.84 | 30,178.27 | 23,563.47 | 42,915.10 | 24,653.59 | 38,093.96 | 25,062.18 | 33,784.76 |
| 1/1/2004 | 24,497.95 | 31,797.14 | 24,722.63 | 45,223.67 | 26,244.86 | 40,197.55 | 26,886.73 | 35,780.77 |
| 1/1/2005 | 25,604.06 | 33,338.78 | 25,838.89 | 47,396.23 | 27,827.58 | 42,185.82 | 28,722.05 | 37,675.97 |
| 1/1/2006 | 26,710.18 | 34,929.20 | 26,955.14 | 49,611.19 | 29,029.75 | 44,221.70 | 30,195.14 | 39,625.39 |
| 1/1/2007 | 27,816.29 | 36,443.75 | 28,071.40 | 51,695.65 | 30,231.92 | 46,145.97 | 31,446.61 | 41,476.33 |
| 1/1/2008 | 28,922.40 | 37,886.03 | 29,187.66 | 53,657.32 | 31,434.09 | 47,964.76 | 32,697.08 | 43,233.78 |
| 1/1/2009 | 30,028.51 | 39,259.51 | 30,303.91 | 55,503.42 | 32,636.26 | 49,683.83 | 33,947.56 | 44,902.46 |
| 1/1/2010 | 31,134.62 | 40,557.46 | 31,420.17 | 57,240.76 | 33,838.43 | 51,308.67 | 35,198.03 | 46,486.85 |
| 1/1/2011 | 32,240.74 | 41,813.01 | 32,536.43 | 58,875.75 | 35,040.60 | 52,844.43 | 36,448.50 | 47,991.20 |
| 1/1/2012 | 33,346.85 | 42,999.13 | 33,652.68 | 60,414.42 | 36,242.77 | 54,296.00 | 37,698.97 | 49,419.57 |
| 1/1/2013 | 34,452.96 | 44,128.66 | 34,768.94 | 61,862.44 | 37,444.94 | 55,667.99 | 38,949.44 | 50,775.79 |
| 1/1/2014 | 35,559.07 | 45,204.30 | 35,885.20 | 63,225.16 | 38,647.11 | 56,984.77 | 40,199.91 | 52,063.50 |
| 1/1/2015 | 36,665.18 | 46,228.63 | 37,001.45 | 64,507.60 | 39,849.28 | 58,190.46 | 41,450.39 | 53,286.16 |
| 1/1/2016 | 37,771.30 | 47,204.08 | 38,117.71 | 65,714.49 | 41,051.45 | 59,348.96 | 42,700.86 | 54,447.07 |
| 1/1/2017 | 38,877.41 | 48,101.31 | 39,233.97 | 66,811.53 | 42,253.62 | 60,406.60 | 43,951.33 | 55,511.73 |
| 1/1/2018 | 39,983.52 | 48,781.77 | 40,350.22 | 67,633.75 | 43,455.79 | 61,202.72 | 45,201.80 | 56,316.80 |
| 1/1/2019 | 41,089.63 | 49,429.76 | 41,466.48 | 68,407.52 | 44,657.96 | 61,955.20 | 46,452.27 | 57,081.20 |
| 1/1/2020 | 42,195.75 | 50,046.84 | 42,582.74 | 69,135.71 | 45,860.13 | 62,666.43 | 47,702.74 | 57,806.99 |
| 9/1/2020 | 42,933.15 | 50,458.26 | 43,326.91 | 69,630.04 | 46,661.57 | 63,145.09 | 48,536.39 | 58,291.57 |

KRA00430

B0206

Name: Maurice Ward

| Date | Valuation Year 2003 | | Valuation Year 2004 | | Valuation Year 2005 | | Valuation Year 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | | | | | | | | |
| 1/1/2000 | | | | | | | | |
| 1/1/2001 | | | | | | | | |
| 1/1/2002 | | | | | | | | |
| 1/1/2003 | 25,155.82 | 30,623.22 | | | | | | |
| 1/1/2004 | 27,082.86 | 32,465.64 | 27,257.97 | 34,331.45 | | | | |
| 1/1/2005 | 29,029.53 | 34,221.49 | 29,395.57 | 36,200.13 | 29,509.22 | 33,749.29 | | |
| 1/1/2006 | 30,623.82 | 36,034.29 | 31,196.60 | 38,125.19 | 31,433.73 | 35,624.05 | 32,081.12 | 34,205.40 |
| 1/1/2007 | 32,003.36 | 37,761.92 | 32,798.68 | 39,955.80 | 33,169.11 | 37,411.92 | 34,517.50 | 36,091.73 |
| 1/1/2008 | 33,275.97 | 39,408.38 | 34,309.55 | 41,696.58 | 34,823.20 | 39,116.92 | 36,926.22 | 37,893.73 |
| 1/1/2009 | 34,548.58 | 40,977.48 | 35,621.80 | 43,351.94 | 36,288.28 | 40,742.90 | 39,199.54 | 39,615.16 |
| 1/1/2010 | 35,821.19 | 42,472.86 | 36,933.94 | 44,926.08 | 37,624.97 | 42,293.53 | 41,398.10 | 41,259.64 |
| 1/1/2011 | 37,093.80 | 43,897.98 | 38,246.08 | 46,422.98 | 38,961.66 | 43,772.28 | 42,668.84 | 42,830.59 |
| 1/1/2012 | 38,366.41 | 45,256.15 | 39,558.23 | 47,846.43 | 40,298.36 | 45,182.50 | 44,339.58 | 44,331.31 |
| 1/1/2013 | 39,639.02 | 46,550.50 | 40,870.37 | 49,200.03 | 41,635.05 | 46,527.35 | 45,810.32 | 45,764.93 |
| 1/1/2014 | 40,911.63 | 47,784.04 | 42,182.51 | 50,487.22 | 42,971.74 | 47,809.88 | 47,281.06 | 47,134.46 |
| 1/1/2015 | 42,184.24 | 48,959.62 | 43,494.66 | 51,711.24 | 44,308.44 | 49,032.97 | 48,751.80 | 48,442.76 |
| 1/1/2016 | 43,456.85 | 50,079.97 | 44,806.80 | 52,875.21 | 45,645.13 | 50,199.36 | 50,222.54 | 49,692.57 |
| 1/1/2017 | 44,729.46 | 51,111.27 | 46,118.94 | 53,944.31 | 46,981.82 | 51,273.76 | 51,693.28 | 50,845.79 |
| 1/1/2018 | 46,002.07 | 51,893.99 | 47,431.08 | 54,753.95 | 48,318.52 | 52,089.75 | 53,164.02 | 51,723.14 |
| 1/1/2019 | 47,274.68 | 52,639.95 | 48,743.23 | 55,523.87 | 49,655.21 | 52,867.92 | 54,634.76 | 52,561.26 |
| 1/1/2020 | 48,547.29 | 53,350.85 | 50,055.37 | 56,256.01 | 50,991.90 | 53,610.02 | 56,105.50 | 53,361.92 |
| 9/1/2020 | 49,385.70 | 53,823.48 | 50,930.13 | 56,743.74 | 51,883.03 | 54,102.69 | 57,065.99 | 53,892.00 |

KRA00431



KRA00432

Name: Jerome Charles

**Beginning of Year Factors**

| | Valuation Year 1999 | | Valuation Year 2000 | | Valuation Year 2001 | | Valuation Year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | 17,300.82 | 25,425.91 | | | | | | |
| 1/1/2000 | 18,140.62 | 26,819.99 | 18,397.15 | 35,386.04 | | | | |
| 1/1/2001 | 19,260.17 | 28,147.56 | 19,798.50 | 37,296.34 | 20,595.50 | 33,865.04 | | |
| 1/1/2002 | 20,098.82 | 29,411.79 | 20,944.20 | 39,094.10 | 22,613.00 | 35,856.08 | 22,760.94 | 32,523.04 |
| 1/1/2003 | 21,195.04 | 30,615.70 | 22,372.72 | 40,785.95 | 24,988.12 | 37,737.97 | 25,297.27 | 34,261.00 |
| 1/1/2004 | 22,104.23 | 31,762.18 | 23,639.48 | 42,378.13 | 27,276.26 | 39,516.70 | 27,759.88 | 35,911.17 |
| 1/1/2005 | 23,013.42 | 32,853.96 | 24,611.82 | 43,876.51 | 29,344.78 | 41,197.92 | 30,016.13 | 37,477.99 |
| 1/1/2006 | 23,922.61 | 33,893.65 | 25,584.16 | 45,286.62 | 30,504.10 | 42,786.97 | 31,376.44 | 38,965.66 |
| 1/1/2007 | 24,831.80 | 34,883.73 | 26,556.50 | 46,613.65 | 31,663.43 | 44,288.90 | 32,568.92 | 40,378.19 |
| 1/1/2008 | 25,740.99 | 35,826.58 | 27,528.84 | 47,862.51 | 32,822.75 | 45,708.50 | 33,761.39 | 41,719.35 |
| 1/1/2009 | 26,650.17 | 36,724.45 | 28,501.17 | 49,037.80 | 33,982.07 | 47,050.28 | 34,953.87 | 42,992.79 |
| 1/1/2010 | 27,559.36 | 37,579.48 | 29,473.51 | 50,143.84 | 35,141.40 | 48,318.50 | 36,146.35 | 44,201.90 |
| 1/1/2011 | 28,468.55 | 38,393.72 | 30,445.85 | 51,184.73 | 36,300.72 | 49,517.20 | 37,338.82 | 45,349.93 |
| 1/1/2012 | 29,377.74 | 39,169.11 | 31,418.19 | 52,164.29 | 37,460.04 | 50,650.18 | 38,531.30 | 46,439.97 |
| 1/1/2013 | 30,286.93 | 39,907.50 | 32,390.53 | 53,086.15 | 38,619.36 | 51,721.06 | 39,723.78 | 47,474.94 |
| 1/1/2014 | 31,196.12 | 40,610.67 | 33,362.86 | 53,953.70 | 39,778.69 | 52,733.22 | 40,916.25 | 48,457.64 |
| 11/1/2014 | 31,953.78 | 41,151.88 | 34,173.15 | 54,620.37 | 40,744.79 | 53,509.38 | 41,909.98 | 49,211.80 |

KRA00433

Name    Jerome Charles

| Date | Valuation Year 2003 | | Valuation Year 2004 | | Valuation Year 2005 | | Valuation Year 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | | | | | | | | |
| 1/1/2000 | | | | | | | | |
| 1/1/2001 | | | | | | | | |
| 1/1/2002 | | | | | | | | |
| 1/1/2003 | 25,544.13 | 31,734.28 | | | | | | |
| 1/1/2004 | 28,274.77 | 33,357.04 | 28,169.86 | 34,826.41 | | | | |
| 1/1/2005 | 30,820.24 | 34,903.55 | 30,601.78 | 36,414.44 | 30,881.10 | 34,519.60 | | |
| 1/1/2006 | 32,490.94 | 36,377.40 | 32,150.31 | 37,924.54 | 32,731.03 | 36,060.31 | 33,045.48 | 34,973.03 |
| 1/1/2007 | 34,014.99 | 37,782.01 | 33,543.55 | 39,360.54 | 34,447.74 | 37,529.61 | 35,100.54 | 36,402.51 |
| 1/1/2008 | 35,260.41 | 39,120.62 | 34,649.53 | 40,726.09 | 35,899.26 | 38,930.81 | 36,914.32 | 37,768.07 |
| 1/1/2009 | 36,505.84 | 40,396.34 | 35,873.38 | 42,024.63 | 37,490.71 | 40,267.07 | 38,891.93 | 39,072.58 |
| 1/1/2010 | 37,751.26 | 41,612.12 | 37,097.23 | 43,259.45 | 38,769.74 | 41,541.40 | [illegible] | 40,318.77 |
| 1/1/2011 | 38,996.68 | 42,770.78 | 38,321.07 | 44,433.68 | 40,048.76 | 42,756.66 | [illegible] | 41,509.25 |
| 1/1/2012 | 40,242.10 | 43,875.00 | 39,544.92 | 45,550.29 | 41,327.78 | 43,915.61 | [illegible] | 42,646.50 |
| 1/1/2013 | 41,487.53 | 44,927.34 | 40,768.77 | 46,612.11 | 42,606.80 | 45,020.83 | [illegible] | 43,732.91 |
| 1/1/2014 | 42,732.95 | 45,930.23 | 41,992.61 | 47,621.84 | 43,885.83 | 46,074.84 | [illegible] | 44,770.75 |
| 11/1/2014 | 43,770.80 | 46,700.43 | 43,012.48 | 48,396.79 | 44,951.68 | 46,884.18 | [illegible] | 45,558.23 |

KRA00434



KRA00435

Name        Joseph Fink

Beginning of Year Factors

| | Valuation Year 1999 | | Valuation Year 2000 | | Valuation Year 2001 | | Valuation Year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | 11,622.13 | 15,142.38 | | | | | | |
| 1/1/2000 | 12,989.22 | 16,887.21 | 13,099.51 | 23,430.02 | | | | |
| 1/1/2001 | 14,311.57 | 18,548.80 | 14,549.67 | 25,845.81 | 14,817.90 | 23,039.23 | | |
| 1/1/2002 | 15,340.42 | 20,131.11 | 15,723.84 | 28,119.28 | 16,299.75 | 25,177.14 | 16,312.64 | 22,399.67 |
| 1/1/2003 | 16,476.83 | 21,637.93 | 17,023.08 | 30,258.62 | 17,946.14 | 27,197.84 | 17,973.69 | 24,155.82 |
| 1/1/2004 | 17,533.37 | 23,072.86 | 18,259.96 | 32,272.31 | 19,569.63 | 29,107.78 | 19,613.60 | 25,823.27 |
| 1/1/2005 | 18,589.91 | 24,563.56 | 19,360.29 | 34,339.44 | 21,096.02 | 31,077.12 | 21,158.18 | 27,550.41 |
| 1/1/2006 | 19,646.45 | 25,983.13 | 20,460.61 | 36,284.80 | 22,295.00 | 32,938.50 | 22,377.11 | 29,190.32 |
| 1/1/2007 | 20,702.99 | 27,334.98 | 21,560.93 | 38,115.54 | 23,493.97 | 34,697.83 | 23,580.50 | 30,747.38 |
| 1/1/2008 | 21,759.52 | 28,622.33 | 22,661.25 | 39,838.44 | 24,692.94 | 36,360.73 | 24,783.88 | 32,225.80 |
| 1/1/2009 | 22,816.06 | 29,848.27 | 23,761.58 | 41,459.84 | 25,891.91 | 37,932.46 | 25,987.27 | 33,629.54 |
| 1/1/2010 | 23,872.60 | 31,015.71 | 24,861.90 | 42,985.71 | 27,090.88 | 39,418.02 | 27,190.66 | 34,962.37 |
| 1/1/2011 | 24,929.14 | 32,127.45 | 25,962.22 | 44,421.70 | 28,289.85 | 40,822.15 | 28,394.05 | 36,227.87 |
| 1/1/2012 | 25,985.68 | 33,186.16 | 27,062.54 | 45,773.08 | 29,488.82 | 42,149.30 | 29,597.43 | 37,429.45 |
| 1/1/2013 | 27,042.22 | 34,194.35 | 28,162.87 | 47,044.86 | 30,687.80 | 43,403.70 | 30,800.82 | 38,570.34 |
| 1/1/2014 | 28,098.76 | 35,154.44 | 29,263.19 | 48,241.71 | 31,886.77 | 44,589.33 | 32,004.21 | 39,653.60 |
| 1/1/2015 | 29,155.30 | 36,068.73 | 30,353.51 | 49,368.05 | 33,085.74 | 45,709.97 | 33,207.59 | 40,682.13 |
| 1/1/2016 | 30,211.83 | 36,939.40 | 31,463.83 | 50,428.04 | 34,284.71 | 46,769.17 | 34,410.98 | 41,658.72 |
| 1/1/2017 | 31,268.37 | 37,768.52 | 32,564.16 | 51,425.58 | 35,483.68 | 47,770.31 | 35,614.37 | 42,585.97 |
| 1/1/2018 | 32,324.91 | 38,558.09 | 33,664.48 | 52,364.35 | 36,682.65 | 48,716.55 | 36,817.76 | 43,466.39 |
| 1/1/2019 | 33,381.45 | 39,309.99 | 34,764.80 | 53,247.82 | 37,881.63 | 49,610.94 | 38,021.14 | 44,302.33 |
| 2/1/2019 | 33,469.50 | 39,376.03 | 34,856.49 | 53,328.70 | 37,981.54 | 49,691.24 | 38,121.43 | 44,376.31 |

KRA00436

B0212

Name    Joseph Fink

| | Valuation Year 2003 | | Valuation Year 2004 | | Valuation Year 2005 | | Valuation Year 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan | Old Plan | New Plan |
| 1/1/1999 | | | | | | | | |
| 1/1/2000 | | | | | | | | |
| 1/1/2001 | | | | | | | | |
| 1/1/2002 | | | | | | | | |
| 1/1/2003 | 18,037.46 | 22,024.34 | | | | | | |
| 1/1/2004 | 19,749.33 | 23,537.03 | 19,843.89 | 24,803.58 | | | | |
| 1/1/2005 | 21,374.04 | 25,109.70 | 21,574.56 | 26,449.92 | 21,720.22 | 24,770.99 | | |
| 1/1/2006 | 22,681.28 | 26,608.48 | 22,999.16 | 28,015.46 | 23,307.02 | 26,283.57 | 23,830.51 | 25,305.63 |
| 1/1/2007 | 23,981.15 | 28,036.85 | 24,427.79 | 29,504.21 | 24,914.41 | 27,726.05 | 26,017.70 | 26,868.94 |
| 1/1/2008 | 25,204.99 | 29,398.10 | 25,791.77 | 30,919.90 | 26,473.71 | 29,101.68 | 28,213.10 | 28,362.36 |
| 1/1/2009 | 26,428.82 | 30,695.40 | 27,044.10 | 32,266.13 | 27,937.92 | 30,413.55 | 30,369.71 | 29,789.01 |
| 1/1/2010 | 27,652.66 | 31,931.74 | 28,296.42 | 33,546.30 | 29,231.63 | 31,664.61 | 32,402.02 | 31,151.88 |
| 1/1/2011 | 28,876.49 | 33,110.00 | 29,548.75 | 34,763.65 | 30,525.35 | 32,857.69 | 33,846.01 | 32,453.82 |
| 1/1/2012 | 30,100.33 | 34,232.90 | 30,801.07 | 35,921.27 | 31,819.06 | 33,995.48 | 35,281.01 | 33,697.55 |
| 1/1/2013 | 31,324.16 | 35,303.04 | 32,053.40 | 37,022.08 | 33,112.78 | 35,080.53 | 36,715.56 | 34,885.68 |
| 1/1/2014 | 32,547.99 | 36,322.90 | 33,305.72 | 38,068.89 | 34,406.49 | 36,115.29 | 38,150.04 | 36,020.69 |
| 1/1/2015 | 33,771.83 | 37,294.84 | 34,558.05 | 39,064.32 | 35,700.21 | 37,102.10 | 39,584.51 | 37,104.95 |
| 1/1/2016 | 34,995.66 | 38,221.12 | 35,810.38 | 40,010.92 | 36,993.92 | 38,043.17 | 41,010.99 | 38,140.74 |
| 1/1/2017 | 36,219.50 | 39,103.88 | 37,062.70 | 40,911.06 | 38,287.64 | 38,940.62 | 42,453.47 | 39,130.23 |
| 1/1/2018 | 37,443.33 | 39,945.16 | 38,315.03 | 41,767.04 | 39,581.36 | 39,796.48 | 43,887.94 | 40,075.47 |
| 1/1/2019 | 38,667.17 | 40,746.92 | 39,567.35 | 42,581.01 | 40,875.07 | 40,612.67 | 45,322.42 | 40,978.46 |
| 2/1/2019 | 38,769.15 | 40,817.12 | 39,671.71 | 42,652.74 | 40,992.88 | 40,683.95 | 45,441.95 | 41,056.74 |

KRA00438



B0215



B0216



KRA00441

**Record**
**Year**
Name: Thomas S Troup
Date of Birth: 1/15/1949
Proj Cash Balance Benefit: $ 40,400.96
Proj Final Pay Benefit: $ 37,339.62

## 1) Consctiv Cash Balance Sub-Plan

| | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 |
| Age at val date | 56.92 | 57.92 | 58.92 | 59.92 | 60.92 | 61.92 | 62.92 | 63.92 | 64.92 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.0000 | 65.00 |
| Hire date | | | | | | | | | | | | | | | | |
| Total compensation | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 6,757.69 | | | | | | | |
| Interest credit | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% |
| Employer contribution credit | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Effective Date | | | | | | | | | | | | | | | | |
| Years of service as of val date | 26.23 | 27.23 | 28.23 | 29.23 | 30.23 | 31.23 | 32.23 | 33.23 | 34.23 | 34.31 | 34.31 | 34.31 | 34.31 | 34.31 | 34.31 | 34.31 |
| Years of service as of 1/1/1999 | 19.23 | | | | | | | | | | | | | | | |
| Transition credit | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2016 | 2016 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Opening balance | 260,343.80 | 283,059.89 | 307,340.79 | 332,788.82 | 359,471.08 | 387,447.43 | 416,780.63 | 447,536.49 | 479,764.02 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 |
| Interest credit | 12,154.09 | 13,728.89 | 14,906.03 | 16,140.26 | 17,434.35 | 18,791.20 | 20,213.86 | 21,705.52 | 1,930.13 | | | | | | | |
| Employer contribution credit EOY 05 | 8,109.23 | 8,109.23 | 8,109.23 | 8,109.23 | 8,109.23 | 8,109.23 | 8,109.23 | 8,109.23 | 675.77 | | | | | | | |
| Transition credit EOY 05 | 2,432.77 | 2,432.77 | 2,432.77 | 2,432.77 | 2,432.77 | 2,432.77 | 2,432.77 | 2,432.77 | 202.73 | | | | | | | |
| Ending balance | 283,059.89 | 307,340.79 | 332,788.82 | 359,471.08 | 387,447.43 | 416,780.63 | 447,536.49 | 479,764.02 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 |
| Beginning balance projected to 65 | 378,801.19 | 385,901.15 | 408,983.17 | 423,274.73 | 436,185.82 | 448,365.43 | 460,060.64 | 471,037.64 | 481,681.33 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 | 482,601.64 |
| Annuity factor at 65 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 |
| Accrued Benefit (bcv) | 31,543.83 | 33,142.84 | 34,230.04 | 35,442.79 | 36,513.60 | 37,534.88 | 38,508.92 | 39,437.91 | 40,223.32 | 40,400.96 | 40,400.96 | 40,400.96 | 40,400.96 | 40,400.96 | 40,400.96 | 40,400.96 |

## 2) Prior Plan

DelMarVa

| | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 | 2/1/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAY N | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 |
| PAY N-1 | 75,930.59 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 |
| PAY N-2 | 71,771.99 | 75,930.59 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 |
| PAY N-3 | 71,880.42 | 71,771.99 | 75,930.59 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 |
| PAY N-4 | 71,992.55 | 71,900.42 | 71,771.99 | 75,930.59 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 |
| Final average pay for the Prior Plan | 74,553.58 | 76,375.53 | 78,195.81 | 80,059.98 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 | 81,092.33 |
| Credited service for the Prior Plan | 26.23 | 27.23 | 28.23 | 29.23 | 30.23 | 31.23 | 32.23 | 33.23 | 34.23 | 34.31 | 34.31 | 34.31 | 34.31 | 34.31 | 34.31 | 34.31 |
| Future increase of wage base Covered Comp (eoy) | 0.00% 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 |
| Accrual benefit at 65 (normal retirement date) | 25,788.78 | 27,676.16 | 29,411.11 | 31,124.76 | 32,696.60 | 33,884.09 | 35,072.37 | 36,160.85 | 37,248.93 | 37,339.62 | 37,339.62 | 37,339.62 | 37,339.62 | 37,339.62 | 37,339.62 | 37,339.62 |

Record
Year
Name: Maurita Ward
Date of Birth: 8/15/1955
Proj Cash Balance Benefit: $ 55,722.97
Proj Final Pay Benefit: $ 57,085.59

## 1) Core/div Cash Balance Sub-Plan

| | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 | 1/1/2017 | 1/1/2018 | 1/1/2019 | 1/1/2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 | 1/1/2017 | 1/1/2018 | 1/1/2019 | 1/1/2020 |
| Age at val date | 50.33 | 51.33 | 52.33 | 53.33 | 54.33 | 55.33 | 56.33 | 57.33 | 58.33 | 59.33 | 60.33 | 61.33 | 62.33 | 63.3333 | 64.33 |
| Hire date | 11/9/1981 | | | | | | | | | | | | | | |
| Total compensation | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 | 94,131.49 |
| Interest credit | 4.68% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% |
| Employer contribution credit | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Effective Date | 1/1/1999 | | | | | | | | | | | | | | |
| Years of service as of val date | 24.15 | 25.15 | 26.15 | 27.15 | 28.15 | 29.15 | 30.15 | 31.15 | 32.15 | 33.15 | 34.15 | 35.15 | 36.15 | 37.16 | 38.15 |
| Years of service as of 1/1/1999 | 17.15 | | | | | | | | | | | | | | |
| Transition credit | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Opening balance | 211,976.33 | 234,106.03 | 257,728.72 | 282,465.66 | 308,402.34 | 335,596.94 | 364,110.49 | 394,006.94 | 425,353.37 | 458,220.10 | 492,680.87 | 528,395.61 | 563,435.95 | 600,175.74 | 638,697.41 |
| Interest Credit | 9,920.59 | 11,355.80 | 12,499.84 | 13,699.58 | 14,957.51 | 16,276.45 | 17,659.36 | 19,109.34 | 20,629.64 | 22,223.68 | 23,895.02 | 25,627.19 | 27,326.84 | 29,108.52 | 30,651.22 |
| Employer contribution credit EOY 06 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 9,413.15 | 8,275.43 |
| Transition credit EOY 06 | 2,823.94 | 2,823.94 | 2,823.94 | 2,823.94 | 2,823.94 | 2,823.94 | 2,823.94 | 2,823.94 | 2,823.94 | 2,823.94 | 2,406.57 | | | | |
| Ending balance | 234,106.03 | 257,728.72 | 282,465.66 | 308,402.34 | 335,596.94 | 364,110.49 | 394,006.94 | 425,353.37 | 458,220.10 | 492,680.87 | 528,395.61 | 563,435.95 | 600,175.74 | 638,697.41 | 665,924.06 |
| Beginning balance projected to 65 | 414,986.83 | 447,270.44 | 490,829.58 | 490,829.58 | 511,109.91 | 530,452.13 | 548,895.86 | 566,493.86 | 583,274.22 | 599,270.37 | 614,542.23 | 628,603.50 | 639,200.02 | 648,470.10 | 659,165.20 |
| Annuity factor at 65 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 |
| Accrued Benefit (boy) | 34,707.96 | 37,443.22 | 39,309.66 | 41,089.77 | 42,787.63 | 44,406.77 | 45,951.10 | 47,424.00 | 48,828.76 | 50,168.65 | 51,446.36 | 52,625.50 | 53,517.60 | 54,370.15 | 55,183.66 |

### ACE

### 1) Prior Plan

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAY N | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 |
| PAY N-1 | 83,543.32 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 |
| PAY N-2 | 82,008.84 | 83,543.32 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 |
| PAY N-3 | 79,538.16 | 82,008.84 | 83,543.32 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 |
| PAY N-4 | 78,154.48 | 79,538.16 | 82,008.84 | 83,543.32 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Final average pay for the Prior Plan | 83,033.23 | 85,788.55 | 88,263.20 | 90,246.66 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 | 91,921.25 |
| Credited service for the Prior Plan | 1/1/2006 24.15 | 1/1/2007 25.15 | 1/1/2008 26.15 | 1/1/2009 27.15 | 1/1/2010 28.15 | 1/1/2011 29.15 | 1/1/2012 30.15 | 1/1/2013 31.15 | 1/1/2014 32.15 | 1/1/2015 33.15 | 1/1/2016 34.15 | 1/1/2017 35.15 | 1/1/2018 36.15 | 1/1/2019 37.15 | 1/1/2020 38.15 |
| Future increase of wage base | 0.00% | | | | | | | | | | | | | | |
| Covered Comp (eoy) | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 | 81,780 |
| Annual benefit at 65 (normal retirement date) | 32,081.12 | 34,517.60 | 36,338.23 | 39,199.64 | 41,336.10 | 42,668.84 | 44,339.58 | 45,810.33 | 47,281.06 | 48,751.80 | 50,222.54 | 51,693.28 | 53,164.02 | 54,634.76 | 56,105.50 |

| Record | | |
|---|---|---|
| Year | | |
| Name | Jerome Charles | |
| Date of Birth | 10/15/1949 | |
| Proj Cash Balance Benefit | $ 46,766.33 | |
| Proj Final Pay Benefit | $ 47,051.77 | |

## 1) Cash Balance Sub-Plan

| Date | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 1/1/2014 | 1/1/2014 | 1/1/2014 | 1/1/2014 | 1/1/2014 | 1/1/2014 | 11/1/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age at val date | 56.17 | 57.17 | 58.17 | 59.17 | 60.17 | 61.17 | 62.17 | 63.17 | 64.17 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.0000 | 65.00 |
| Hire date | 9/10/1979 | | | | | | | | | | | | | | | |
| Total compensation | 86,492.78 | 86,492.78 | 86,492.78 | 86,492.78 | 86,492.78 | 86,492.78 | 86,492.78 | 86,492.78 | 72,077.32 | | | | | | | |
| Interest credit | 4.65% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% |
| Employer contribution credit | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Effective Date | 1/1/1999 | | | | | | | | | | | | | | | |
| Years of service as of val date | 26.31 | 27.31 | 28.31 | 29.31 | 30.31 | 31.31 | 32.31 | 33.31 | 34.31 | 35.15 | 35.15 | 35.15 | 35.15 | 35.15 | 35.15 | 35.15 |
| Years of service as of 1/1/1989 | 19.31 | | | | | | | | | | | | | | | |
| Transition credit | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

| | 2006 | 2007 | 2008 | 2008 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening balance | 283,010.00 | 308,353.86 | 335,428.49 | 363,605.76 | 393,559.13 | 424,755.95 | 457,465.60 | 491,761.67 | 527,721.10 | 558,637.85 | 558,637.85 | 558,637.85 | 558,637.85 | 558,637.85 | 558,637.85 | |
| Interest Credit | 13,264.87 | 14,955.65 | 16,268.28 | 17,644.58 | 19,087.63 | 20,600.66 | 22,187.08 | 23,850.44 | 21,326.73 | | | | | | | |
| Employer contribution credit EOY 06 | 8,649.28 | 8,649.28 | 8,649.28 | 8,649.28 | 8,649.28 | 8,649.28 | 8,649.28 | 8,649.28 | 7,207.73 | | | | | | | |
| Transition credit EOY 06 | 3,459.71 | 3,459.71 | 3,459.71 | 3,459.71 | 3,459.71 | 3,459.71 | 3,459.71 | 3,459.71 | 2,369.28 | | | | | | | |
| Ending balance | 308,363.86 | 335,428.49 | 363,605.76 | 393,559.13 | 424,755.95 | 457,465.60 | 491,761.67 | 527,721.10 | 558,637.85 | 558,637.85 | 558,637.85 | 558,637.85 | 558,637.85 | 558,637.85 | 558,637.85 | |
| Beginning balance projected to 65 | 423,001.14 | 446,871.72 | 465,608.00 | 479,570.12 | 494,793.68 | 509,313.44 | 523,161.18 | 536,368.76 | 548,965.21 | | | | | | | |
| Annuity factor at 65 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | |
| Accrued Benefit (boy) | 35,486.86 | 37,408.84 | 38,810.81 | 40,147.18 | 41,421.64 | 42,637.14 | 43,796.42 | 44,902.08 | 45,956.89 | 46,766.33 | 46,766.33 | 46,766.33 | 46,766.33 | 46,766.33 | 46,766.33 | |

## ACE

## 2) Prior Plan

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAY N | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | |
| PAY N-1 | 79,938.92 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | |
| PAY N-2 | 76,490.39 | 79,938.92 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | |
| PAY N-3 | 77,038.93 | 76,490.39 | 79,938.92 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | |
| PAY N-4 | 74,529.78 | 77,838.93 | 76,490.39 | 79,938.92 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | |
| Final average pay for the Prior Plan | 78,494.32 | 80,323.08 | 61,490.01 | 82,826.65 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | 83,673.58 | |

| | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 11/1/2014 | 11/1/2014 | 11/1/2014 | 11/1/2014 | 11/1/2014 | 11/1/2014 | 11/1/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credited service for the Prior Plan | 26.31 | 27.31 | 28.31 | 29.31 | 30.31 | 31.31 | 32.31 | 33.31 | 34.31 | 35.15 | 35.15 | 35.15 | 35.15 | 35.15 | 35.15 | 35.15 |
| Future Increase of weage base | 0.00% | | | | | | | | | | | | | | | |
| Covered Comp (eoy) | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 | 69,732 |
| Annual benefit at 65 (normal retirement date) | 33,046.44 | 35,100.54 | 36,514.22 | 36,891.93 | 40,581.02 | 41,919.79 | 43,258.57 | 44,597.35 | 45,936.13 | 47,051.77 | 47,051.77 | 47,051.77 | 47,051.77 | 47,051.77 | 47,051.77 | 47,051.77 |

B0220

Record
Year
Name: Joseph Fink
Date of Birth: 1/15/1954
Proj Cash Balance Benefit: $ 42,343.33
Proj Final Pay Benefit: $ 45,441.96

## 1) Conectiv Cash Balance Sub-Plan

| | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 | 1/1/2017 | 1/1/2018 | 1/1/2019 | 2/1/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 | 1/1/2017 | 1/1/2018 | 1/1/2019 | 2/1/2019 |
| Age at val date | 51.92 | 52.92 | 53.92 | 54.92 | 55.92 | 56.92 | 57.92 | 58.92 | 58.92 | 60.92 | 61.92 | 62.92 | 63.92 | 64.9107 | 65.00 |
| Hire date | 5/26/1987 | | | | | | | | | | | | | | |
| Total compensation | 90,860.56 | 107.3% | 90,860.56 | 90,860.56 | 90,860.56 | 90,860.56 | 90,860.56 | 90,860.56 | 90,860.56 | 90,860.56 | 90,860.56 | 90,860.56 | 90,860.56 | | |
| Interest credit | 4.83% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% | 4.85% |
| Employer contribution credit | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Effective Date | 1/1/1999 | | | | | | | | | | | | | | |
| Years of service as of val date | 18.60 | 19.60 | 20.60 | 21.60 | 22.60 | 23.60 | 24.60 | 25.60 | 26.60 | 27.60 | 28.60 | 29.60 | 30.60 | 31.60 | 31.68 |
| Years of service as of 1/1/1999 | 11.60 | | | | | | | | | | | | | | |
| Transition credit | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening balance | 188,802.84 | 197,308.73 | 207,308.73 | 228,350.15 | 250,328.61 | 273,372.82 | 297,534.67 | 322,868.37 | 349,430.75 | 377,281.41 | 406,482.82 | 437,100.51 | 469,203.15 | 502,862.77 | 505,803.78 |
| Interest Credit | 7,850.61 | 8,088.74 | 10,058.35 | 11,074.99 | 12,140.34 | 13,258.58 | 14,430.43 | 15,659.12 | 16,947.39 | 18,297.44 | 19,714.42 | 21,919.37 | 22,758.35 | 2,032.40 | 757.17 |
| Employer contribution credit EOY 06 | 9,086.06 | 9,086.06 | 9,086.06 | 9,086.06 | 9,086.06 | 9,086.06 | 9,086.06 | 9,086.06 | 9,086.06 | 9,086.06 | 9,086.06 | 0,086.06 | 9,086.08 | 9,086.08 | 161.43 |
| Transition credit EOY 06 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | 1,817.21 | - |
| Ending balance | 187,308.73 | 207,308.61 | 228,350.55 | 250,328.61 | 273,372.82 | 297,534.67 | 322,868.37 | 349,430.75 | 377,281.41 | 406,482.82 | 437,100.51 | 469,203.15 | 502,862.77 | 505,803.78 | 505,803.78 |
| Beginning balance projected to 65 | 306,724.52 | 332,121.70 | 350,551.62 | 361,123.04 | 384,893.38 | 400,882.27 | 415,131.56 | 430,675.47 | 444,546.64 | 457,770.17 | 470,303.75 | 462,427.66 | 493,804.86 | 504,851.35 | 505,803.78 |
| Annuity factor at 65 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 | 11.95 |
| Accrued Benefit (boy) | 25,677.42 | 27,803.86 | 29,346.41 | 30,817.90 | 32,221.12 | 33,559.83 | 34,835.43 | 36,053.97 | 37,215.19 | 38,332.70 | 39,378.88 | 40,366.40 | 41,347.22 | 42,253.60 | 42,343.33 |

## 2) Prior Plan

ACE

| | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 | 1/1/2017 | 1/1/2018 | 1/1/2019 | 2/1/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAY N | 80,857.22 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 |
| PAY N-1 | 78,270.35 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 |
| PAY N-2 | 78,057.22 | 89,057.22 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 |
| PAY N-3 | 78,489.64 | 78,270.35 | 89,057.22 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 |
| PAY N-4 | 75,211.71 | 76,489.64 | 78,270.35 | 89,057.22 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 |

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Final average pay for the Prior Plan | 80,096.74 | 82,985.35 | 85,618.37 | 87,895.25 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 | 89,654.76 |

| | 1/1/2006 | 1/1/2007 | 1/1/2008 | 1/1/2009 | 1/1/2010 | 1/1/2011 | 1/1/2012 | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 | 1/1/2017 | 1/1/2018 | 1/1/2019 | 2/1/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credited service for the Prior Plan | 18.60 | 19.60 | 20.60 | 21.60 | 22.60 | 23.60 | 24.60 | 25.60 | 26.60 | 27.60 | 28.60 | 29.60 | 30.60 | 31.60 | 31.68 |
| Future increase of wage base | 0.00% | | | | | | | | | | | | | | |
| Covered Comp (eoy) | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 | 78,660 |

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual benefit at 65 (normal retirement date) | 23,830.51 | 26,617.70 | 28,213.10 | 30,368.71 | 32,412.13 | 33,846.61 | 35,281.08 | 36,715.66 | 38,160.04 | 39,584.51 | 41,018.99 | 42,453.47 | 43,887.94 | 45,322.42 | 45,441.96 |

KRA00445

**Miller, Michelle**

From:           Cadenhead, Bruce
Sent:           Monday, May 14, 2007 1:17 PM
To:             Miller, Michelle ; Kra, Ethan
Subject:        Expert witness

Version 3 is in the same directory as version 4. Version 3 uses year-end interest rates (as of the particular valuation date) to project and convert the cash balance. In versions 4 and 5 we use the beginning of year interest rate. Version 3 (2) is an earlier version of 3 that had an error in the Delmarva formula (for Troup) where the pay in excess of the breakpoint was being given both the base and the excess accrual rate instead of just the excess accrual rate.

Bruce Cadenhead, FSA, EA
Principal
Mercer Human Resource Consulting
1166 Avenue of the Americas
New York, NY 10036
USA

phone: +1 212 345 7257
mobile : +1 917 626 0689
fax: +1 212 345 7414
assistant: Irene Geczi
assistant phone: +1 212 345 7149

mailto:bruce.cadenhead@mercer.com
www.mercerHR.com

Circular 230 disclaimer: The information contained in this document (including any attachments) is not intended by Mercer to be used, and it cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code that may be imposed on the taxpayer.

1

B0222

**Miller, Michelle**

| | |
|---|---|
| From: | Cadenhead, Bruce |
| Sent: | Monday, May 14, 2007 12:57 PM |
| To: | Miller, Michelle ; Kra, Ethan |
| Subject: | Corrected spreadsheet |

There were two differences between version 4 and version 5
- for Troup only, the offset was incorrect. Version 4 was using covered comp where the plan actually specifies a different averaging of the SS wage base. The correct averaging is used in version 5
- for all participants, final average earnings under the old plan was being calculated using year-end final average earnings instead of beginning of year final average earnings

Bruce Cadenhead, FSA, EA
Principal
Mercer Human Resource Consulting
1166 Avenue of the Americas
New York, NY 10036
USA

phone: +1 212 345 7257
mobile : +1 917 626 0689
fax: +1 212 345 7414
assistant: Irene Geczi
assistant phone: +1 212 345 7149

mailto:bruce.cadenhead@mercer.com
www.mercerHR.com

Circular 230 disclaimer:  The information contained in this document (including any attachments) is not intended by Mercer to be used, and it cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code that may be imposed on the taxpayer.

1

B0223

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all similarly situated | ) ) ) ) ) |
| Plaintiffs, | ) ) Case No.: 05-702 (SLR) |
| v. | ) ) |
| PEPCO HOLDINGS, INC., CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) ) |
| Defendants | ) ) ) |

## EXPERT REPORT OF ETHAN E. KRA, PH.D, F.S.A.

### BACKGROUND

1.      I am the Chief Actuary-Retirement of Mercer Human Resource Consulting. I am

also a Fellow of the Society of Actuaries, a Fellow of the Conference of Consulting Actuaries, a

member of the American Academy of Actuaries and an Enrolled Actuary under ERISA. I have

given over 130 speeches on employee benefits issues over the past 30 years at various professional

meetings and seminars and have authored or co-authored numerous articles on employee benefit

issues. I am often quoted in such publications as The New York Times, The Wall Street Journal,

Time, Newsweek and other financial publications. My curriculum vitae is appended to this report

as Attachment 1.

2.      My responsibilities at Mercer Human Resource Consulting include advising clients

on the design, funding and expense allocation of employee and executive benefits, including

retirement, death, disability and health benefits.

EXHIBIT

P-35

5/25/07

KRA00019

B0224

3.    This Report has been prepared for counsel for PepCo Holdings. Inc.

4.    My time on this project is being billed at $625 per hour, plus expenses. Others working on this project are being billed at our standard hourly billing rates.

FINDINGS

5.    In each year that I reviewed (1999 through 2007), the plan passes the 133 1/3% rule under IRC §411(b)(1)(B).

6.    The pleadings note that Plaintiffs' benefits decreased in certain years. These negative adjustments to the annuity payable at normal retirement date were solely on account of interest rate changes. In each of those years, they experienced a positive benefit accrual on account of increased age, service and compensation received during the year.

7.    As of the effective date of the plan amendment (January 1, 1999), the accrued benefit (payable at normal retirement date) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan. This determination was based on service and plan factors (including interest rates used for crediting to the cash balance accounts and for converting cash balance accounts to annuities) as of January 1, 1999 remaining constant through normal retirement date. Following is a table summarizing these results:

| Name | Accrued Benefit at 1/1/99, payable at Normal Retirement Date under Pre-Amended Plan | Accrued Benefit at 1/1/99, payable at Normal Retirement Date under Amended Plan |
|---|---|---|
| Thomas S Troup | 17,357.06 | 23,021.41 |
| Maurice Ward | 17,433.84 | 23,014.11 |
| Jerome Charles | 17,264.57 | 25,425.91 |
| Joseph Fink | 11,141.94 | 15,142.38 |

B0225

8.    As of the effective date of the plan amendment (January 1, 1999), the projected benefit (payable at normal retirement date) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan. This determination was based on compensation and plan factors (including interest rates used for crediting to the cash balance accounts and for converting cash balance accounts to annuities) during 1999 remaining constant through the normal retirement date. This analysis reflects actual compensation received during 1999 and is not based solely on compensation as of January 1, 1999. However, for purposes of this determination, each Plaintiff was assumed to continue to earn service through his normal retirement date. Following is a table summarizing these results:

| Name | Projected Benefit at 1/1/99, payable at Normal Retirement Date under Pre-Amended Plan | Projected Benefit at 1/1/99, payable at Normal Retirement Date under Amended Plan |
|---|---|---|
| Thomas S Troup | 28,982.51 | 38,278.10 |
| Maurice Ward | 42,933.15 | 50,458.26 |
| Jerome Charles | 31,953.78 | 41,151.88 |
| Joseph Fink | 33,469.50 | 39,376.03 |

### METHODS, ASSUMPTIONS AND DATA

9.    In preparing this report, I have reviewed the following documents:

• Part One CONECTIV CASH BALANCE SUB-PLAN Effective as at January 1, 1999.

• ATLANTIC CITY ELECTRIC COMPANY RETIREMENT PLAN As Amended and Restated Effective January 1, 1994

• DELMARVA POWER & LIGHT COMPANY RETIREMENT PLAN as amended or restated through January 1, 1995

B0226

10.    In preparing this report, I have utilized the data that were supplied to me and which are summarized on Attachment 2.

11.    All projections of benefits from any given date are based on the interest rates, salaries, Social Security law (including Taxable Wage Base) in effect as of the relevant date.

_Ethn E Kra_

_____
Ethan E. Kra

State of New York          )
                           ) ss.
County of New York         )

Affirmed to before me this 20th day of April, 2007, by Ethan E. Kra.

*LaDrena D. Andrews*
*Notary Public, State of New York*
*No. 01AN5058283*
*Qualified In Queens County*
*Cert. Filed In New York County*
*Cert. Filed In Kings County*
*Commission Expires*

_____
Notary Public

My commission expires: _____

B0227

ATTACHMENT 1

# Ethan E. Kra

Mercer Human Resource Consulting
1166 Avenue of the Americas
New York, NY 10036
Phone: 212-345-7125

## Education:

B.A., Yale University, summa cum laude, honors with exceptional distinction in mathematics, 1969.

M.A., Yale University, mathematics, 1969.

M.Phil., Yale University, mathematics, 1973.

Ph.D., Yale University, mathematics, 1974.

Thesis: Infinitary Forcing for Languages with the Q-Quantifier: Fefferman Vaught Theorems for Infinitary Forcing.

Academic Honors:    Woodrow Wilson Fellow

National Science Foundation Fellow

Prize Teaching Fellowship (Yale University)

Phi Beta Kappa

## Professional Organization and Credentials:

Fellow, Society of Actuaries (1976)

Vice President (2006– )

Board of Governors (1997–2000); Operations Committee (1997–2000)

Pension Section Council (1991-94), Vice-Chair (1992-93), Chair (1993–94)

FAS 106 Task Force (1993-99), Co-chair (1993–99)

Financial Economics and the Actuarial Model Task Force (jointly held with American Academy of Actuaries (2002– ), Chair (2002–2004)

Discipline Committee (2000–05)

Retirement Practice Advancement Committee (1992–2004), Chair (1997–2000)

Non-Mortality Decrement Task Force (2000–04)

Jointly Administered Examinations for Enrollment of Actuaries Committee (1978–79)

Part 4 Examination Committee (1979–80)

B0228

**ATTACHMENT 1**

    Fellow, Conference of Consulting Actuaries (1985)

        Intersector Committee (1992–94)

    Member, American Academy of Actuaries (1979)

        Board of Directors (2003–2006)

        Pension Practice Council (1993–94, 1997– ), Vice Chair (2000–03, 2005– )

        Pension Committee (1994– )

        Defined Benefit Revitalization Task Force (2003–04)

        Washington Forum Planning Committee (2002)

        Strategic Planning Task Force (1997–98)

    Member, American Society of Pension Actuaries (1996)

    American Benefits Council (formerly known as Association of Private Pension and Welfare Plans)

        Retirement Savings Committee (1991-1997)

        Retirement and Investment Policy Committee (1999– )

        Retirement Income Task Force (1997– )

    ERISA Industry Committee

        Pension Funding Task Force (2004– )

        Retirement Security Committee (2003– )

    Enrolled Actuary (1979)

    Chartered Life Underwriter (1977)

    Insurance Licenses in New York and New Jersey

    Actuarial Standards Board General Committee (2002–2004)

*Employment:*

    Mercer Human Resource Consulting, 1977 to present.

        Currently Chief Actuary-Retirement, with responsibilities in the areas of design and funding of pension and group insurance benefits, structuring and funding of non-qualified pension benefits years and the proper accounting for expense of employee benefits.

        Internal positions include:

            ▪ Chair, Actuarial Resource Network

            ▪ Former Chair, New York Region Professional Standards Committee

B0229

ATTACHMENT 1

    Principal (1984-1989); Managing Director (1989 to present); designation subsequently changed from Managing Director to Worldwide Partner.

Prudential Insurance Company of America, 1973-77.

    Actuarial program, including assignments in long and short term disability insurance (3/76–4/77); group pensions (8/74–2/76); group insurance systems and aviation reinsurance.

Yale University, 1971-73.

    Prize Teaching Fellow, 1972-73

    Teaching Fellow, 1971-72

## *Speeches and Lectures:*

"Pension Reform: What You Need to Know and What You Need to Do", panelist on Corporate Treasurers Council webcast.

"Late Breaking Developments", panelist at the 2006 Conference of Consulting Actuaries Annual Meeting.

"Pension Funds in Crisis – Next Generation Plan Design: What Will It Look Like for Generation X and Y?", panelist at Strategic Research Institute Conference.

"Pension Reform: What You Need to Know and What You Need to Do", panelist at the Association of Financial Professionals Annual Conference.

"Are Defined Benefit Plans an Endangered Species?, panelist at OPERS 5th Annual Investment Forum.

"Pension Accounting Reform & the Future of Defined Benefit Plans – Did the Markets, the Accounting or the Funding Rules Cause the Pension Crisis?" , panelist at Strategic Research Institute Conference.

"General Session 1 – Pension Funding Reform", panelist at the 2006 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2005 Conference of Consulting Actuaries Annual Meeting.

"Addressing the Financial Risks from Retirement Systems Seminar: Changing Our Focus: Consulting About Risk", panelist at the 2005 Society of Actuaries Spring Meeting.

"2005 Pension Symposium – Pension Funding Reform", speaker at the symposium co-sponsored by the American Academy of Actuaries, the American Society of Pension Professionals & Actuaries and the Society of Actuaries.

"Practicing Professionalism", panelist at the 2005 Enrolled Actuaries Meeting.

"Education 2005: Update from the Pension Perspective", panelist at the 2004 Society of Actuaries Annual Meeting.

KRA00025

B0230

**ATTACHMENT 1**

"Pension Funding Proposals", panelist at the 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2004 Society of Actuaries Annual Spring Meeting.

"The Great Unknown: Q & N/A's", panelist at the 2004 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2003 Conference of Consulting Actuaries Annual Meeting.

"The Great Controversy Symposium: Employer Perspective (Part 1)", moderator and panelist at the SOA Symposium, "The Great Controversy: Current Pension Actuarial Practice in Light of Financial Economics".

"Late Breaking Developments", panelist at the 2003 Society of Actuaries Annual Spring Meeting.

"Rulings and Regulations Update", panelist at the 2003 Enrolled Actuaries Meeting.

"Q and N/A", panelist at the 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2002 Society of Actuaries Annual Meeting.

"Does the Syllabus Prepare Us for the Jobs of the Future?", panelist at the 2002 Society of Actuaries Annual Meeting.

"Rulings and Regulations Update", panelist at the 2002 Society of Actuaries Annual Spring Meeting.

"New Mortality Tables on Pension Plans", panelist at the 2002 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at the 2002 Enrolled Actuaries Meeting.

"Is That Your Final Answer?", panelist at the 2001 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments – Wass Up!", panelist at the 2001 Conference of Consulting Actuaries Annual Meeting.

"Does ERISA Bias Lead to Equity Investment?", panelist at the Society of Actuaries 2001 Annual Spring Meeting.

"Late Breaking Developments Part 2: Court Cases", moderator at the Society of Actuaries 2001 Annual Spring Meeting

"Effective Use of Pension Surplus", panelist at the 2001 Enrolled Actuaries Meeting.

"Funding Retiree Welfare Benefits", panelist at the 2001 Enrolled Actuaries Meeting.

- 4 -

B0231

ATTACHMENT 1

"Rulings and Regulation Update", panelist at the 2001 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the Conference of Consulting Actuaries 2000 Annual Meeting.

"Déjà vu All Over Again – Q&N/A's", panelist at the Conference of Consulting Actuaries 2000 Annual Meeting.

"Financing Voluntary Nonqualified Deferred Compensation Plans", presenter at Financial Executives Institute National teleconference.

"Late Breaking Developments and Rulings", panelist at the Society of Actuaries 2000 Annual Spring Meeting.

"Discussion of IRS Gray Book and PBGC Blue Book", panelist at 2000 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at 2000 Enrolled Actuaries Meeting.

"Q&NA's – Gray Areas", panelist at 2000 Enrolled Actuaries Meeting.

"Reopening the Great Debate: ERISA Funding", panelist at the Society of Actuaries 1999 Annual Meeting.

"Dial 10-10-GATT for Pension Plan Mortality", panelist at the Society of Actuaries 1999 Annual Meeting.

"Q&NA's", panelist at the Conference of Consulting Actuaries 1999 Annual Meeting.

"Late Breaking Developments", panelist at the Conference of Consulting Actuaries 1999 Annual Meeting.

"Overview of Deferred Compensation Plans", panelist at 1999 Non-Qualified Executive Retirement Programs Conference sponsored by International Business Communications.

"Pension Rulings and Regulations Update", panelist at the Society of Actuaries 1999 Annual Spring Meeting.

"Discussion of Gray Book Questions and Answers", panelist at 1999 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at 1999 Enrolled Actuaries Meeting.

"Tales of Terror – Ethics, Actuaries, the ABCD and the Law", speaker at the Conference of Consulting Actuaries 1998 Annual Meeting.

"Pension Rulings and Regulations Update", panelist at the Society of Actuaries 1998 Annual Meeting.

"Technical Concerns: Late-Breaking Pension Developments", panelist at the Society of Actuaries 1998 Annual Spring Meeting.

"Discussion of Gray Book Questions and Answers", panelist at 1998 Enrolled Actuaries Meeting.

- 5 -

KRA00027

B0232

ATTACHMENT 1

"Postretirement Welfare Benefits", panelist at 1998 Enrolled Actuaries Meeting.

"Exercising Professional Judgement – An Exercise in Futility", panelist of General Session #1 of the 1998 Enrolled Actuaries Meeting.

"Questions and Answers with the Experts", panelist at Conference of Consulting Actuaries 1997 Annual Meeting.

"So What's New?—Late Breaking Developments", panelist at Conference of Consulting Actuaries 1997 Annual Meeting.

"Financing Executive Deferred Compensation with Life Insurance—Does It Make Economic Sense When the Insurance Company Doesn't Run the Numbers?", panelist at the American Bar Association's 1997 Annual Meeting.

"Split Dollar Life Insurance – The True Economics (Pre TAM/PLR)", panelist at the American Bar Association's 1997 Annual Meeting.

"Trends & Issues in Non-Qualified Pension Plans", speaker at the Financial Executives Institute sponsored by the Committee on Investment of Employee Benefit Assets.

"Pension Simplification – Defined Benefit Issues", panelist at the Society of Actuaries 1997 Annual Spring Meeting.

"Approaching the Decision Making Process:  How to Compare the Alternatives", panelist at 1997 Non-Qualified Executive Retirement Programs Conference sponsored by International Business Communications.

"Employee Benefits in Captives", panelist at 1997 Captives Insurance Operations Conference.

"Post-Retirement Welfare Benefits", panelist at 1997 Enrolled Actuaries Meeting.

"Exercising Professional Judgment – An Exercise in Futility?", panelist at 1997 Enrolled Actuaries Meeting.

"Gray Book Questions and Answers", speaker at 1997 Enrolled Actuaries Meeting.

"Small Business Job Protection Act of 1996 (Pension Simplification???)", panelist of General Session #1 at 1997 Enrolled Actuaries Meeting.

"Basics of Funding Retiree Medical", panelist at Conference of Consulting Actuaries 1996 Annual Meeting.

"Plan Qualification/Registration Issues for Multinational Sponsors", moderator and panelist at the Society of Actuaries 1996 Spring Meeting.

"SFAS 106/112 For the 'Know it All'", co-chair and speaker at Society of Actuaries May 1996 seminar.

"Employee Benefit in Captives" speaker at 1996 Captive Insurance Operations Conference sponsored by the Hartford Institute on Insurance Taxation.

B0233

## ATTACHMENT 1

"Non-Qualified Executive Compensation" chair and moderator for Center for Business Intelligence seminar; spoke on "Integrating Non-qualified Plan Objectives to Attract & Retain Key Employees" and "Funding and Securing Non-Qualified Supplemental Executive Benefit Programs".

"Gray Book Questions and Answers", speaker at 1996 Enrolled Actuaries Meeting.

"Pick your iq", speaker at 1996 Enrolled Actuaries Meeting.

"415 Limitations After GATT - Revenue Ruling 95-29" speaker at 1996 Enrolled Actuaries Meeting.

"How to Calculate Federal Insurance Contributions Act Tax on Supplemental Executive Retirement Plans", moderator and speaker at the Society of Actuaries 1995 Spring Meeting.

"Employee Benefits and U.S. Captives", speaker at the 33rd RIMS Annual Conference.

"Employee Benefits in Captives" speaker at Tenth Anniversary Captive Insurance Operations Conference.

"Pick Your i", speaker at 1995 Enrolled Actuaries Meeting.

"Pension Aspects of GATT", speaker at the Employee Benefits Group Inc.

"Financing Corporate Liabilities", speaker at Benefit and Financial Strategies after OBRA, seminars sponsored by CIGNA.

"Why Aren't More Captives Writing Employee Benefit Coverage?", speaker at 21st Annual Captive Insurance Companies Association, Inc. Conference.

"Post-Retirement Welfare Benefits", speaker at 1994 Enrolled Actuaries meeting.

"Employee Benefits", speaker at 1994 Conference on Offshore Captive Insurance Operations sponsored by the Center for Tax Education and Research.

"Employee Benefits in a Captive Insurance Company?", speaker at joint Mercer/Marsh & McLennan client seminars.

"Retirement Programs for Law Firm Partners", speaker, Symposium on Employee Benefits.

"FAS 106 Technical Issues", speaker and co-chair at Society of Actuaries Seminar.

"FAS 106 Consulting Issues", speaker and co-chair at Society of Actuaries Seminar.

"Post Retirement Welfare Benefits - Funding", panelist at 1993 Enrolled Actuaries Meeting.

"Cash Balance Plans" moderator at Society of Actuaries Seminars.

"FAS 106 Strategies and the Impact on Executive Compensation", speech at Healthcare Issues Confronting Corporate America, Client Forum sponsored by Chase Manhattan Bank.

"Funding and Financing Retiree Health: Who Should Pay and How?", speech at Post-Retirement Health Care Benefits sponsored by Institute for International Research.

KRA00029

B0234

ATTACHMENT 1

"Post Retirement Health Benefit Funding", moderator and speaker at the Society of Actuaries 1992 Spring Meeting.

"Post-Employment Welfare Benefits - Funding", moderator and speaker at 1992 Enrolled Actuaries Meeting.

"Permitted Disparity", presentation to Practising Law Institute.

"Funding & Insured Funding Vehicles for Retiree Health", speech at The First Annual Pension and Employee Benefits Conference sponsored by Pensions and Investments.

"Funding and Financing Retiree Medical Benefits: Cost Effective Strategies", speech at Post-Retirement Health Care Benefits seminar sponsored by Institute for International Research.

"Audience Dialogue with the IRS", moderator at the Society of Actuaries 1991 Spring Meeting.

"Message from the IRS", moderator at the Society of Actuaries 1997 Spring Meeting.

"Funding Alternatives for Post-Employment Welfare Benefits", speeches at Post Retirement Health Care seminars sponsored by Fidelity Investments Institutional Services.

"Funding Alternatives for Post Employment Benefits", speaker and moderator at 1991 Enrolled Actuaries Meeting.

"Integrating Retirement Plans into Estate Planning", speech to Tax & Estate Planning Council of Nassau County.

"Post-Retirement Medical Benefits: A Look at FASB Requirements and New Strategies for Controlling Costs", speaker at Mercer seminars.

"Post-Retirement Medical Benefits vs. Pension Benefits: Contrast in Asset/Liability Issues", speech at Asset Liability Management for Pension Funds sponsored by the Institute for International Research.

"What's New in Retiree Medical Funding Vehicles", speech at Post Retirement Medical seminar sponsored by Institute for International Research.

"Mergers and Acquisitions", speech to the New York County Lawyers Association.

"Mergers and Acquisitions, Employee Benefit Issues", speech to New York Metro Area Chapter - ISCEBS.

"The Funding and Financing of Retiree Medical Benefits", speech at Benefits News Analysis seminar on Managing Post-Retirement Medical Benefits.

"Applications for Post Retirement Medical Obligations", speech at Morgan Stanley seminar on ESOP Strategies and Implementation Issues.

"Pre-funding vs. Pay-as-you-go: Viable & Innovative Financing Options", speech at Institute for International Research seminar on Designing & Funding Cost-effective Employee Benefit Plans.

KRA00030

B0235

**ATTACHMENT 1**

"Changing Perspectives Which Motivate Asset - Liability Management:  What Are the True Liabilities and How Do They Affect Matching?", speech at the second Annual Meeting on Asset/ Liability Management for Pension Funds sponsored by the Institute for International Research.

"Funding Executive Benefits", discussion leader for the Financial Executives Institute Financial Policy Peer Group Series.

"Highly Compensated Employees... Controlled Groups... Lines of Business...Aggregation Techniques", workshop speaker at Section 89 seminar sponsored by William M. Mercer, Inc.

"Omnibus Reconciliation Act of 1987 - Effects on Employee Benefit Plans", speech at William M. Mercer, Inc. seminar.

"Managing Future Liabilities – Investment Strategies for Funding Retiree Health Care Benefits", speech at first Annual Symposium on Funding Post-employment Health Care Benefits sponsored by the Institute for International Research.

"Actuarial Considerations for Self-funded Benefit Plans", panel seminar speaker at New York State Public Sector Coalition on Health Benefits Annual Conference.

"The Actuary and Post-retirement Welfare Benefits", speech to Actuaries Club of New York.

"The Effects of Tax Reform on Welfare Plans", lecture at 1987 Accounting Conference sponsored by the Foundation for Accounting.

"Coping with COBRA", speech to the Cultural Institutions Personnel Group.

"Defined Contribution Plans - Impact of 1986 Tax Reform Act", panel speaker at Mercer-Meidinger seminar.

"Tax Reform Legislation - Whither Goest Thou?", panel speaker at annual meeting of Conference of Actuaries in Public Practice.

"An Advanced Course in Employee Benefits", course leader/teacher for American Management Association.

"Select and Ultimate Financial Assumptions in Pension Plan Valuations", workshop chairperson at the Society of Actuaries 1985 Annual meeting.

"Coping with REACT Regulations", workshop panelist for the American Pension Conference.

"The Effect of the Treasury Tax Reform Proposals on Educational Institutions", speech to the Eastern Association of College and University Officers.

"Post Retirement Medical and Death Benefits", speech to American Management Association Annual Compensation/Employee Benefits Briefing.

"Using Insurance as a Capital Accumulation Device", course teacher for Practising Law Institute.

B0236

ATTACHMENT 1

"Fundamentals of Employee Benefits", course leader/teacher for American Management Association.

"Retirement Equity Act", speech to New York Personnel Management Association.

"Post-retirement Medical and Death Benefits: The Unrecognized Liability", speaker at Mercer-Meidinger seminar.

"Funding Vehicles for Pension Plans", workshop chairperson at the Society of Actuaries 1983 Spring Meeting.

"Hidden Pension Liabilities in an Acquisition", speaker at Mercer-Meidinger seminar.

"New Challenges and Opportunities for Welfare Plans", panelist at Mercer workshop.

"Opting Out of Social Security", speaker at Mercer sponsored seminar for hospital personnel executives.

"Executive Benefits Funded Through Life Insurance", speech at Mercer sponsored seminar for hospital personnel executives.

"Response to the Multiemployer Pension Plan Amendments Act of 1980", workshop chairperson at the Society of Actuaries 1981 Spring Meeting.

"Considerations in Selection of Actuarial Assumptions/Methods for Larger Plans", teacher at Enrolled Actuaries' Annual Meeting.

"Plan Sponsor Responses To The "Age Discrimination in Employment Act" (ADEA) – Employee Benefits", workshop chairperson at the Society of Actuaries 1980 Spring Meeting.

"Coordination of Social Security with...", workshop co-chairperson at Society of Actuaries 1979 Annual Meeting.

*Publications:*

"A Proposal for Pension Funding Reform", The Future of Pension Plan Funding and Disclosure Monograph, July 2005, the Society of Actuaries, co-authored with Donald E. Fuerst.

"Durational (Select and Ultimate) Discount Rates for FAS 87 and 106 Valuations", The Pension Forum, December 2004, the Society of Actuaries, co-authored with Ron Iverson, Heidi Rackley and Steve Alpert.

"Late Breaking Developments", transcript, 2003 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"Q & N/A", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

- 10 -

KRA00032

B0237

ATTACHMENT 1

"New Mortality Tables for Pension Plans", transcript, 2002 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", transcript, 2002 Enrolled Actuaries Meeting.

"Is That Your Final Answer?", transcript, 2001 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments - Wass Up!", transcript, 2001 Conference of Consulting Actuaries Annual Meeting.

"Déjà vu All Over Again – Q & N/A!", transcript, 2000 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2000 Conference of Consulting Actuaries Annual Meeting.

"Q&N/A", transcript, 1999 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 1999 Conference of Consulting Actuaries Annual Meeting.

"So What's New? Late Breaking Developments", transcript, 1997 Conference of Consulting Actuaries Annual Meeting.

"Post-Retirement Welfare Benefits", transcript, 1997 Enrolled Actuaries Meeting.

"Exercising Professional Judgment—An Exercise in Futility?", transcript, 1997 Enrolled Actuaries Meeting.

"Small Business Job Protection Act of 1996 (Pension Simplification???)", transcript, 1997 Enrolled Actuaries Meeting.

"Basics of Funding Retiree Medical Funding", transcript, 1996 Conference of Consulting Actuaries Meeting.

"Pick your iq", transcript, 1996 Enrolled Actuaries Meeting.

"415 Limitations After GATT—Revenue Ruling 95-29" transcript, 1996 Enrolled Actuaries Meeting.

"Pick Your i", transcript, 1995 Enrolled Actuaries Meeting.

"New Rules for Underfunded Pension Plans, The Retirement Protection Act of 1994", a William M. Mercer, Inc. commentary, co-author.

"Post-Retirement Welfare Benefits", Transcript, 1994 Enrolled Actuaries Meeting.

"Post-Retirement Welfare Benefits - Funding", Transcript, 1993 Enrolled Actuaries Meeting.

"Employee Benefits in a Captive Insurance Company?", Mercer Bulletin, July, 1993.

"Decisions - FAS 106", Mercer Bulletin, September 1992.

"Postretirement Health Benefits Funding", Record of the Society of Actuaries 1992, Vol. 18. No. 1A.

"Post-Retirement Health Benefit Funding", Transcript, 1992 Enrolled Actuaries Meeting.

- 11 -

B0238

ATTACHMENT 1

"Retiree Medical Benefits: Making the Fund or Finance Decision", co-author with William A. Bader, The Journal of Corporate Accounting and Finance, Spring 1992.

"Audience Dialogue with the IRS", Record of the Society of Actuaries 1991, Vol. 17, No. 3.

"Message from the IRS", Record of the Society of Actuaries 1991, Vol. 17, No. 3.

"Funding Alternatives for Post Employment Benefits", Transcript, 1991 Enrolled Actuaries Meeting.

"New Directions in Retirement Planning," a William M. Mercer, Inc. series of commentaries, co-author.

"Miscellaneous 401(a)(4) and Related Issues; a Discussion of Various Issues", in Complying With the New Nondiscrimination and Minimum Coverage Regulations, Practising Law Institute, 1991.

"Funding and Financing Retiree Medical Benefits", Mercer Bulletin, September 1991.

"Retiree Health Benefits in the 1990's", a William M. Mercer, Inc. commentary, co-author.

"Permitted Disparity" in Complying With the New Nondiscrimination and Minimum Coverage Regulations, Practising Law Institute, 1991.

"Secular Trusts and Annuities - Securing Executive Benefits After Tax Reform", a William M. Mercer, Inc. commentary, co-author.

"Omnibus Budget Reconciliation Act of 1987: What it Means to Pensions and Employee Benefits", a William M. Mercer, Inc. commentary, co-author.

"Tax Reform: What It Will Mean to Benefits and Compensation - A Mercer-Meidinger Commentary", co-author.

"Using Insurance as a Capital Accumulation Device", in Executive Compensation, Practising Law Institute.

"How to Protect Yourself Against Medical Insurance Gaps", Bottom Line Personnel.

"How to Identify Gaps In Life and Disability Insurance", Bottom Line Personnel.

### *Internal Mercer Communiqués - author/co-author of the following:*

"FAS 158 and Multiemployer Plans", co-authored with James Dexter.

"Computation of Actuarial Value of Assets: Corridor Limit Application", co-authored with Carol Gramer.

"Selecting Cross-Border Accounting Assumptions", co-authored with Bruce Cadenhead, Wendy McFee and Phil Turner.

"Retiree medical Pre-funding in 401(h) accounts and VEBAs", co-authored with Heidi Rackley, Judy Bauserman, Barbara McGeoch, Scott Tucker and Derek Guyton.

"International Accounting Changes Target Multiemployer Plans", co-authored with James Dexter.

- 12 -

B0239

## ATTACHMENT 1

"Tax Effects of the New Medicare Prescription Drug Subsidy", co-authored with Fran Bruno and Mark Hamelburg.

"Employee Benefits in a Captive Insurance Company", co authored with Rich Fuerstenberg, Mark Hamelburg and Henry Saveth.

"DOL Benefits-in-a-Captive Ruling Imminent" co-authored with Henry Saveth, and Mark Hamelburg.

"Peer Review of Cross-Border Actuarial Work", co-authored with Bruce Cadenhead.

"Professional Standard – Signing and Peer Reviewing Actuarial Reports", co-authored with Derek Guyton.

"Guidelines for Selecting Certain Assumptions", co-authored with Paul Zeisler and Bruce Cadenhead.

"Spin-off Assumptions", co-authored with Bruce Cadenhead.

"Pension Valuation Checklist for Multiemployer Plans: Updated to Reflect Changes Included in the Economic Growth and Tax Relief Reconciliation Act of 2001", co-authored with Carol Gramer.

"Reorganization Status for Multiemployer Plans", co-authored with Carol Gramer.

"Aggregate Entry Age Normal Funding Method Violates IRS Reasonable Funding Regulations".

"Section 414(k) Plans – Actuarial Issues", co-authored with Ron Iverson.

"Captive Insurance Companies and Employee Benefits", co-authored with Henry Saveth.

"Select and Ultimate Discount Rates for FAS 87 & 106 Valuations", co-authored with Ron Iverson and Heidi Dexter.

"Tax Gross Up Calculations for Executive Benefits", co-authored with Frank Burianek, Gary Thomas.

"Professional Standard – Signing/Peer Reviewing Actuarial Reports".

"Mergers and Acquisitions", co-authored with Bert Bernier, Edgar Friedman, Kevin Minor and Scott Tucker.

"Automatic approval for change in funding method for plans with negative unfunded liability".

"E-54—International Accounting Standards", co-authored with Ron Iverson, Wendy McFee, Larry Bader and Frank Todisco.

"Pension Valuation Checklist for Multiemployer Plans", co-authored with Carol Gramer.

"Change in SFAS 87/106 Measurement Date", co-authored with Kevin Minor and Bob Behar.

"1996 Schedule B", co-authored with Bruce Cadenhead and Ed Greene.

B0240

**ATTACHMENT 1**

"Consulting Issues Relating to Repeal of IRC Section 415(e)", co-authored with Carol Gramer.

"PBGC Variable Premium Calculations", co-authored with Bob Behar and Steven Gagel.

"Document Retention".

"Plan Spinoffs".

"FAS 87 & 106 Discount Rates".

"Multiple Employer Plans:  Do I have one and what do I do now?", co-authored with Joy Theobald.

"Technical Actuarial Questions on Bulletin Board".

"Peer Review for Actuarial Reports".

"Continuing Education for Actuaries".

"Negative Unfunded Accrued Liabilities", co-authored with David Jarrett.

"Separate Line of Business".

"Testimony on 401(a)(4) Regulation Package".

"Schedule B - Deficit Reduction Contribution".

"Required Distributions Under Section 401(a)(9) - Qualified Plans".

"Business Combination Accounting".

"Retroactively Changing the Amortization Period for Gains and Losses Recognized as of 1/1/88".

"Meeting With IRS".

"Meeting With IRS".

"U.S. Controlled Group Benefit Issue for Foreign Parent Companies".

"Meeting With IRS".

"Revenue Notice 89-70 Warning on Early Retirement Using 1/15, 1/30".

"Calculating Benefits for Employees Who Attain age 70½".

"Taxation of Long Term Care Insurance".

"Bank Ownership of Individual Policies".

"Proposed Section 89 and 125 Regulations".

"Required Distributions From Qualified Plans: One Year Deferral of Effective Date".

"Determination of FAS 87 Pension Expense for Secular Trusts".

"Analysis of Social Security Integration Requirements".

"Integration Under Tax Reform '86 - A White Paper".

- 14 -

B0241

**ATTACHMENT 1**

"Market Crash of October 19, 1987".

"DOL Guidelines for Benefit Plans under ADEA", co-authored with Solomon Weinberger.

*Quoted frequently by New York Times, Wall Street Journal, Business Week, Newsweek, Time, Fortune, etc.*

B0242

Attachment 2

## Individual Data

| Name | | Thomas S Troup | Maurice Ward | Jerome Charles | Joseph Fink |
|---|---|---|---|---|---|
| Age as of 1/1/1999 | | 49.92 | 43.33 | 49.17 | 44.92 |
| Hire Date | | 10/15/1979 | 11/9/1981 | 9/10/1979 | 5/26/1987 |
| Credited Service for the prior plan as of 1/1/1999 | | 19.227 | 17.148 | 19.312 | 11.595 |
| Transition Credit Rate | | 3% | 3% | 4% | 2% |
| Cash Balance (opening balance) | 1999 | $  129,777.43 | $  94,035.74 | $  138,172.25 | $  66,851.03 |
| Compensation used for the Cash Balance Plan | 1999 | $  63,522.62 | $  70,385.51 | $  56,824.37 | $  73,536.98 |
| Compensation used for the Pre-Amended Plan | 1999 | $  63,522.62 | $  69,132.01 | $  56,824.37 | $  66,033.68 |
| | 1998 | $  65,531.14 | $  68,120.34 | $  54,204.90 | $  64,323.53 |
| | 1997 | $  63,439.78 | $  69,931.73 | $  57,735.84 | $  66,544.46 |
| | 1996 | $  61,973.14 | $  61,050.93 | $  53,503.84 | $  59,343.20 |
| | 1995 | $  61,074.37 | $  59,737.64 | $  57,686.84 | $  56,983.59 |
| | 1994 | $  59,267.75 | $  58,872.04 | $  56,237.84 | $  53,092.05 |
| Pre-Amended Plan | | Delmarva | ACE | ACE | ACE |

Cash Balance Plan Interest Crediting Rate for 1999: 5.01%, compounded annually

B0243

January 01, 2002 – December 31, 2002

For information contact:
**Vanguard Participant Services**
In the USA (800) 523-1188
Or via the internet at: *www.vanguard.com*

 Pepco Holdings, Inc

HAURICE W WARD
421 W HERSCHEL ST
EGG HARBOR NJ 08215-3512

PEPCO HOLDINGS INC.
CONECTIV RETIREMENT PLAN
PLAN No. :    020108

Confirmation Number : 17576414

THIS IS A REVISED STATEMENT

YOUR CASH BALANCE ACCOUNT

|  | Year-to-date |
|---|---|
| Opening Balance | $ 138,245.26 |
| Employer Contribution Credit | 7,245.65 |
| Interest Credit | 7,354.65 |
| Transition Credit | 2,415.22 |
| Ending Balance | $ 155,260.78 |

Your transition credit percentage for the year was 3.00% .

Hire Date: November 09, 1981
Employment Status: EMPLOYED

### YOUR CASH BALANCE ACCOUNT

Vanguard is pleased to provide you with this Cash Balance statement. The information presented in this statement is based on the available data on file. For those employees who are "grandfathered" (i.e., employees who, as of 12/31/1998 have either (a) completed 20 years of service or (b) attained age 50 or older) your grandfathered benefit may be greater. If you have questions regarding this statement, your balances, or if you notice any discrepancies, please contact Vanguard directly at 1(800)523-1188.

The "Employer Contribution Credit" shown above is based on your age as of December 31, 2002 (i.e., 5% pay credit for under age 30; 6% for age 30 to 34; 7% for 35 to 39; 8% for 40 to 44; 9% for 45 to 49; 10% for age 50 and over). Recognized pay includes base salary, bonus, overtime, awards, etc.

The "Interest Credit" is based on the 30 year U.S. Treasury Securities rate and changes each year. During 2002, your account grew by 5.32% as shown above. For 2003, the rate will decrease to 4.93%. This new rate will be reflected on next year's statement.

Page 1 of 2                              3                                      1 - 2

x

EXHIBIT
P-38
5/25/07

PHI003772

KRA00168

B0244



## YOUR CASH BALANCE ACCOUNT                                        (continued)

The "Transition Credit" shown above (if any) is based on your total service as of 1/1/1999 (i.e. those with 10 to 11 years of service at 1/1/1999 receive a 1% additional pay credit; 12-15 years receive a 2% credit; 16-19 years receive a 3% credit and 20-35 years receive an additional 4% credit). Transition credits continue until your years of service exceed 35, at which point they cease.

The "Ending Balance" (i.e., the value of your accounts as of 1/1/2003) is the sum of your Opening Balance plus your 2002 Employer Contribution Credit, Interest Credit, and Transition Credit.

The compensation you earned during the year was $80,507.26.

### TRANSACTION DETAIL MODULE

| Date | Description | Rate | Transaction Amount | Balance |
|------|-------------|------|--------------------|---------|
| | Opening Balance | | | $138,245.26 |
| 12/31/2002 | Interest Credit | 5.320000000 | 7,354.65 | 145,599.91 |
| 12/31/2002 | Employer Contribution Credit | 9.000000000 | 7,245.65 | 152,845.56 |
| 12/31/2002 | Transition Credit | 3.000000000 | 2,415.22 | 155,260.78 |
| | Ending Balance | | 17,015.52 | $155,260.78 |

PH1003773

B0245

96 of 157 DOCUMENTS

Copyright 2002 Crain Communications Inc.
Business Insurance

May 13, 2002, Monday

**SECTION:** Pg. 3

**LENGTH:** 1007 words

**HEADLINE:** Benefits experts rebut report hitting cash balance payouts; Official contends that plans short-change participants

**BYLINE:** JERRY GEISEL

**BODY:**

WASHINGTON-Benefits consultants are attacking as biased and misleading a report by the Labor Department Office of the Inspector General that employers are shortchanging employees in cash balance pension plans by giving them less than what the workers are legally entitled to when they leave.

The inspector general's report examined 60 cash balance plans with more than 209,000 participants and found that, in 13 of those plans, employees who left employment before normal retirement age did not receive the pension benefits to which they were legally entitled. The inspector general's report estimates that, for the plans it reviewed, plan participants may be underpaid $17 million a year.

Extrapolating those results to all cash balance plans-the inspector general cited industry estimates of a total of 300 to 700 such plans-plan participants leaving before retirement may be underpaid by between $85 million and $199 million annually, the report says. Employers sponsoring the plans were not identified.

The report, says Rep. Bernard Sanders, I-Vt., one of Congress' most vocal critics of cash balance plans, "proves that a number of companies are illegally slashing the pension benefits of their employees by hundreds of millions of dollars every single year by shifting to cash balance plans."

But Ann Combs, the Labor Department's assistant secretary for pension and welfare benefits, wrote the inspector general, questioning whether the study proves there is a need for greater federal scrutiny of cash balance plans.

"A number of questions came to mind as to whether the sampling methodology employed by the audit team was appropriate for reaching such a broad conclusion and whether the assumptions used to extrapolate the error from the sample to the overall population were correct," she wrote.

In the absence of the inspector general providing the Labor Department with more detailed information, "we cannot commit to redirecting our enforcement resources to cash balance plan benefit calculations at this time," Ms. Combs wrote.

Benefit consultants, who have examined the report in detail, said in most cases, employees in the plans the inspector general examined received the balances to which the plans said they were entitled.

"There is no evidence presented that the participants didn't receive what was promised to them by the plans," said Larry Sher, a principal and director of research at Buck Consultants Inc. in New York.

Consultants say the report based its findings on a method of calculating benefits that has never been required by the Internal Revenue Service.

Others say the report is so biased as not to be creditable.



EXHIBIT

p - 39

5/25/02

Benefits experts rebut report hitting cash balance payouts; Official contends that plans short-change participants
Business Insurance May 13, 2002, Monday

"I cannot accept that this was done by an unbiased evaluator," said Ethan Kra, chief actuary at William M. Mercer Inc. in New York.

A cash balance plan combines elements of defined benefit and defined contribution plans, though legally cash balance plans are defined benefit plans. Like defined benefit plans, employees in cash balance plans are protected from investment risk. The employer agrees to provide a certain benefit, based on a percentage of pay. In addition, the employer credits the benefit with interest, such as the prevailing rate on 30-year Treasury bonds.

Like defined contribution plans, benefits are expressed as an account balance or lump sum, which employees can take when they leave or retire. Employees also can take the amount as a monthly annuity, though few do so.

Benefit consultants' chief gripe with the report is that nearly all the shortfalls cited by the inspector general are not the result of employer mistakes. Rather, consultants say the shortfalls the report identified are due to the inspector general's reliance on a methodology outlined in an IRS notice-but which was never formally proposed as a regulation and has been rejected by at least one federal court.

"The inspector general is relying on something that hasn't even gotten to the level of a proposed regulation, and they are citing it as the gospel," Mr. Kra said.

"This is clearly an unsettled area of the law," said Alan Glickstein, a consultant in the Wellesley Hills, Mass., office of Watson Wyatt Worldwide.

At issue is whether there can be situations where cash balance plan participants are entitled to more than their account balances when they leave. In the 1996 notice, the IRS said the account balance must be projected to normal retirement age using the interest rate specified in the plan.

In an example provided by the IRS notice, an employee terminates employment at age 45 with an account balance of $45,000. The plan provides interest credits of 8% a year. Using the 8% interest rate, the $45,000 account balance projected to normal retirement age would be $209,743.

Under the IRS methodology, the $209,743 would be discounted using the 30-year Treasury bond rate-an index set under a 1994 federal law. The example assumes a 30-year T-bond rate of 6.5%. If $209,743 is discounted to age 45 at 6.5%, the present value of the employee's account balance would be $59,524.

As a result, the IRS said in its notice, if the cash balance plan paid the account balance of $45,000 instead of $59,524, the employee would receive $14,524 less than the amount to which the employee is entitled.

The result, known as "whip-saw," can be avoided, under the IRS notice, if an employer uses the 30-year T-bond rate as an annual interest credit or one of several other interest rates, such as the one-year Treasury bill rate, plus one percentage point.

In March, a federal court, in a case involving Georgia-Pacific Corp.'s cash balance plan, rejected this methodology.

Contrary to what the inspector general is suggesting, "this is a methodology that never has been finalized and has been rejected by at least one court," Mr. Kra said.

Copies of the report, "PWBA Needs to Improve Oversight of Cash Balance Plan Lump Sum Distributions," is available at the Office of Inspector General's Web site, www.oig.dol.gov.

**LOAD-DATE:** May 17, 2002

B0247

PepCo

Accrual
= AccDec4 - AccD ~~EC4 w/o PY service~~
                            & Py

What about PS/PS

Old Pos ~~Rul~~ on Δ factors

|       |     | 5% | 6% | 7% | 8% |
|-------|-----|----|----|----|----|
| < 30  | 5%  |    |    |    |    |
| 30-34 | 6%  |    |    |    |    |
| 35-39 | 7%  | 0.98% |  |  |  |
| 40-44 | 8%  | 1.16% |  |  |  |
| 45-49 | 9%  | 1.89% |  |  |  |
| 50+   | 10% | 1.95% |  |  |  |

3.4.2  Interest credits until NRD
            for   VT's
5.2 , cf. 1.5b        ok

Barak Bussman
     215-981-4771



**Marriott**
WARDMAN PARK HOTEL

EXHIBIT
P-40
5/25-07

KRA00001
KRA00001

B0248

# In The Matter Of:

*J. Michael Charles, et al*
*v.*
*Pepco Holdings, Inc., et al*

---

*JAMES B. KREMMEL*
*March 13, 2007*

---

## REPORTING ASSOCIATES, LLC

*Certified & Registered Professional Reporters*

*Cherry Hill   --   Philadelphia   --   Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

B0249

Page 1

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2           CIVIL ACTION NO. C.A. NO. 05-702(SLR)

3    -----------------------------------
     J. MICHAEL CHARLES; MAURICE W.
4    WARD, JR.; and JOSEPH I. FINK, JR.,
     on behalf of themselves and all
5    others similarly situated,

6            Plaintiffs,

7        v.

8    PEPCO HOLDINGS, INC.; CONECTIV, and
     PEPCO HOLDINGS RETIREMENT PLAN,
9
             Defendants.
10   -----------------------------------

11

12

             Philadelphia, Pennsylvania
13           Tuesday, March 13, 2007

14

15

             TRANSCRIPT of testimony of JAMES R.
16
     KREMMEL, as taken by and before Sean M. Fallon, a
17
     Registered Professional Reporter and Notary Public
18
     of the Commonwealth of Pennsylvania, at the offices
19
     of PEPPER HAMILTON LLP, 3000 Two Logan Square,
20
     Eighteenth and Arch Streets, commencing at 10:12
21
     o'clock in the forenoon.
22

23

24

B0250

Page 2

```
1   A P P E A R A N C E S:
2       CHIMICLES & TIKELLIS LLP
3       BY:  JAMES R. MALONE, JR., ESQ.
            JOSEPH G. SAUDER, ESQ.
4       One Haverford Centre
        361 West Lancaster Avenue
        Haverford, PA  19041
5       (610) 642-8500
        jamesmalone@chimicles.com
6       josephsauder@chimicles.com
        Attorneys for Plaintiffs
7
        PEPPER HAMILTON LLP
8       BY:  KAY KYUNGSUN YU, ESQ.
        3000 Two Logan Square
9       Eighteenth and Arch Streets
        Philadelphia, PA  19103-2799
10      (215) 981-4000
        yukay@pepperlaw.com
11      Attorneys for Defendants
12      LITTLER MENDELSON
        BY:  SUSAN KATZ HOFFMAN, ESQ.
13      Three Parkway
        1601 Cherry Street, Suite 1400
14      Philadelphia, PA  19102-1321
        (267) 402-3000
15      shoffman@littler.com
        Attorneys for Defendants
16
        BARBARA ALEXANDER, ASSISTANT GENERAL COUNSEL
17      Pepco Holdings, Inc.
        P.O. Box 231
18      Wilmington, DE  19899-0231
        (302) 429-3206
19      Attorney for Defendants
20
21
22
23
24
```

Page 4

```
1   P-14  Certificate of Authorized Signers,   172
          Corporate
2
    P-15  Printout of webpage, ZeroDegrees     181
3
4
5
6        EXHIBITS PREVIOUSLY MARKED AND REFERRED TO
7   NUMBER        DESCRIPTION              PAGE
8   D-1   EMerging Times, Oct. 13, 1997     15
9   D-2   EMerging Times, Oct. 20, 1997     18
10  D-3   Conectiv Cash Balance Plan,       20
          Feb. 20, 1998
11  D-5   Facts Newsletter                  39
12  D-6   Document entitled, Dear Conectiv  45
          Management Employee, Dec. 21, 1998
13
    D-7   Your Conectiv Total Rewards       61
14
15  D-8   Conectiv Total Rewards, The Tangible  70
          and Hidden Paychecks
16  D-9   InSight Newsletter, March 1999    79
17  D-10  MidWeek Extra, June 23, 1999      84
18  D-12  InSight Online, July 9, 1999      102
19  D-13  PowerPoint Slides, July 1999      125
20  D-19  Conectiv Retirement Plan, Cash Balance  126
          Sub-Plan, Summary Plan Description
21
    D-22  Introducing the New Cash Balance  109
22        Retirement Plan, Conectiv
23
24
```

Page 3

```
1           I N D E X
2   WITNESS                     PAGE
3   JAMES R. KREMMEL
4       By Mr. Malone          5,179
5       By Ms. Yu             176
6
7          E X H I B I T S
8   NUMBER      DESCRIPTION          PAGE
9   P-1   Notice of Deposition        13
10  P-2   Minutes of the Personnel and  30
          Compensation Committee, April 23, 1998
11
    P-3   Facts Newsletter, MWW00229-00232   35
12
    P-4   PowerPoint Slides, MWW00301-00307  112
13
    P-5   Conectiv Retirement Plan    129
14
    P-6   B L England Management Enhanced  133
15        Severance Plan
16  P-7   Pepco Holdings, Inc. General Release,  137
          Gene T. Carey
17
    P-8   Cash Balance Account Statement, Jerome  139
18        M. Charles, Jan. 1, 2000-Dec. 31, 2000
19  P-9   Conectiv Retirement Plan    145
20  P-10  Part One, Conectiv Cash Balance  146
          Sub-Plan, Effective Jan. 1, 1999
21
    P-11  Form 10-Q, Sept. 30, 2006   148
22
    P-12  Declaration of James R. Kremmel  153
23
    P-13  Atlantic Electric Employee Retirement  172
24        Plan
```

Page 5

```
1           (It is hereby stipulated and agreed
2   by and among counsel that sealing, certification
3   and filing are waived;
4           It is further stipulated and agreed
5   by and among counsel that all objections, except as
6   to the form of the question, are reserved until the
7   time of trial.)
8           JAMES R. KREMMEL, after having been
9   first duly sworn, was examined and testified as
10  follows:
11  EXAMINATION
12  BY MR. MALONE:
13      Q.   Good morning, Mr. Kremmel.  My name
14  is Jim Malone, and I represent the Plaintiffs in a
15  case against Pepco Holdings, Inc. and Conectiv, and
16  I'm going to be asking you a few questions today as
17  part of that litigation.
18           Mr. Fallon is going to take down my
19  questions, your responses.  We can't talk at the
20  same time.  He's very quick with his fingers, he's
21  very agile, but he can't deal with that, so you
22  have to try and let me finish my question, even if
23  you think you know where I'm going, and I have to
24  try and let you finish your response, even though I
```

2 (Pages 2 to 5)

B0251

JAMES R. KREMMEL

Page 6

1  think I know what you are going to say.
2        It's important that you understand
3  my question.  If you don't understand my question
4  because I'm inarticulate, tell me, and I'll try and
5  give you a better question.  If you don't hear the
6  question, I can repeat it or Sean can read it back
7  for you, but, at the end of the day your testimony
8  will be transcribed and, if you answer a question,
9  everyone is going to look at that and assume that
10  you heard it, understood it, and are answering to
11  the best of your knowledge.
12        The other thing you can't do is what
13  you are doing right now.  Nodding your head,
14  shaking your head, um-hum, uh-huh.  You have to
15  verbalize a response, yes, no, maybe, whatever
16  explanation you need to give.
17        Have you been deposed before?
18     A.    Yes, I have.
19     Q.    How many times?
20     A.    That I -- twice, that I can recall.
21     Q.    What kind of matters did they
22  involve?
23     A.    Matters involving claims, from a
24  benefits administration standpoint, in previous

Page 7

1  roles.
2     Q.    Now, you graduated from Juniata
3  College in 1982, is that correct?
4     A.    That's correct.
5     Q.    And you had a B.S. in biology?
6     A.    That's correct.
7     Q.    You have an M.B.A. from Capital
8  University, is that correct?
9     A.    That's correct.
10     Q.    1989?
11     A.    Or thereabouts, yes.
12     Q.    Did you go while you were working or
13  did you -- were you full time?
14     A.    It was an evening program.  I was
15  working full time.
16     Q.    Starting in 1983 you worked as an
17  industrial hygienist for the State of Ohio, is that
18  correct?
19     A.    Yes.
20     Q.    And you stayed in that position
21  until 1986?
22     A.    Yes.
23     Q.    And in 1986 you took a position as
24  an industrial hygienist at American Electric Power,

Page 8

1  is that correct?
2     A.    That's correct.
3     Q.    And they are in Columbus?
4     A.    Columbus, Ohio, yes.
5     Q.    And you left that position in 1988
6  to go the Raytheon?
7     A.    Yes.
8     Q.    Also as an industrial hygienist?
9     A.    Yes.
10     Q.    This is probably a good point to ask
11  you what an industrial hygienist does.
12     A.    Industrial hygiene is a science
13  associated with health and safety in the workplace.
14  It's mainly -- focuses on air quality, noise and
15  other environmental factors in the workplace.
16     Q.    OSHA compliance?
17     A.    Yes.
18     Q.    You left Raytheon in 1990 to go to
19  Delmarva Power?
20     A.    That's correct.
21     Q.    And that was your first position at
22  that company?
23     A.    Yes, it was.
24     Q.    And that was as an industrial

Page 9

1  hygienist?
2     A.    Yes.
3     Q.    And then in 1994 you became an
4  employee relations specialist, is that correct?
5     A.    That's correct.
6     Q.    And you held that position until
7  1998?
8     A.    Correct.
9     Q.    How did your role change when you
10  shifted from being an industrial hygienist to being
11  an employee relations specialist?
12     A.    An employee relations specialist for
13  Delmarva was responsible for working around
14  employee matters and union issues around the
15  Collective Bargaining Agreements that were in place
16  between Delmarva and the different unions that
17  represented the unionized workforce.
18     Q.    Was it a promotion?
19     A.    It was a promotion, yes.
20     Q.    Did you have people working that you
21  supervised?
22     A.    Not initially, no.
23     Q.    Then in 1998 you became an employee
24  relations specialist at Conectiv, is that correct?

3 (Pages 6 to 9)

B0252

JAMES R. KREMMEL

Page 10

1    A.    I believe that's correct, yes.
2    Q.    Did you receive any kind of training
3  as you moved from the industrial hygiene to
4  employee relations specialty?
5    A.    Yes.
6    Q.    Could you summarize it briefly for
7  me?
8    A.    Combination of on-the-job training
9  and technical training.  Conferences, seminars.
10    Q.    Do you -- did you finish your
11  response?
12    A.    Yes, I did.
13    Q.    Do you belong to any professional
14  societies?
15    A.    Presently?
16    Q.    Yes.
17    A.    Yes.  World At Work.
18    Q.    Any others?
19    A.    Not to my recollection.  I believe
20  that's the only one right now.
21    Q.    Fair enough.
22        What was your next position after
23  you were an employee relations specialist at
24  Conectiv?

Page 11

1    A.    To my recollection, I was benefits
2  manager for Conectiv.
3    Q.    And that was from 1999 to 2001?
4    A.    I believe that's correct, yes.
5    Q.    And then you became compensation
6  manager?
7    A.    Yes.  That would have been my next
8  role.
9    Q.    And how long did you hold that
10  position?
11    A.    I was compensation manager for
12  Conectiv from 2001 through the merger with Pepco in
13  August of 2002.
14    Q.    And, after August, 2002, what
15  position did you assume?
16    A.    I was manager of compensation for
17  Pepco Holdings.
18    Q.    And is that your current position?
19    A.    No.
20    Q.    What's your current position?
21    A.    My current position is principal
22  consultant for Pepco Holdings.
23    Q.    Is that a full-time salaried
24  position?

Page 12

1    A.    It is a full-time salaried position.
2    Q.    How would you describe your job to
3  someone who was unfamiliar with it?
4    A.    My present job?
5    Q.    Um-hum, your present job.
6    A.    I manage executive compensation
7  programs for PHI and also special projects for PHI,
8  for the vice-president of people, strategy and
9  human resources.
10    Q.    I'd like to focus your attention on
11  the period 1998 and 1999 and your role at what was
12  then Conectiv.
13        Did you have employees working for
14  you and reporting to you at that time?
15    A.    For part of that period, yes.
16    Q.    Who were they?
17    A.    Initially, as benefits manager --
18  this would have been after I was promoted to
19  benefits manager for Conectiv -- I had one
20  individual that I recall reporting to me.  His name
21  was Alan Beattie.
22    Q.    And to whom did you report in the
23  period, say, between '97 and '99?
24    A.    I reported to John Zimmerman.

Page 13

1    Q.    And what was Mr. Zimmerman's
2  position?
3    A.    Mr. -- it -- Mr. Zimmerman's
4  position changed during that period.
5    Q.    What was his first position during
6  that time period?
7    A.    Mr. Zimmerman was manager of
8  employee relations for Delmarva Power, then
9  Conectiv, and then it changed to manager of
10  compensation and benefits for Conectiv.
11    Q.    And, during the time frame 1997 to
12  1999, to whom did Mr. Zimmerman report?
13    A.    Mr. Zimmerman reported to Don Cain,
14  who was the vice-president of human resources.
15    Q.    C-a-i-n?
16    A.    C-a-i-n.
17    Q.    Now, is Mr. Zimmerman still with the
18  company?
19    A.    He is not.
20    Q.    And Mr. Cain has left, as well?
21    A.    That's correct.
22        MR. MALONE:  Plaintiffs-1, please.
23        (Exhibit P-1 is marked for
24  identification.)

4 (Pages 10 to 13)

B0253

JAMES R. KREMMEL

Page 14

1  BY MR. MALONE:
2      Q.    Mr. Kremmel, the court reporter has
3  handed you a document which we've marked
4  Plaintiffs-1 for identification purposes today.
5          Have you seen this before?
6      A.    Yes, I have.
7      Q.    Do you understand that you are
8  appearing today as a designee on behalf of your
9  employer to answer questions on certain subject
10 matters?
11     A.    Yes, I do.
12     Q.    And are you prepared to do so today?
13     A.    I'm prepared to do so, to the best
14 of my ability.
15     Q.    That's all we can ask of you, sir.
16 Thank you.
17         MS. YU:  Jim, I have a question for
18 you.
19         MR. MALONE:  Sure.
20         MS. YU:  It says, "Plaintiffs'
21 Amended Notice."
22         MR. MALONE:  That's correct.
23         MS. YU:  Is this the one that we
24 received?  I don't recall receiving this.

Page 15

1          MR. MALONE:  Off the record for a
2  second.
3          (Discussion is held off the record.)
4          MR. MALONE:  To the extent I can,
5  I'm going to try to reuse things that you've
6  already marked and, so, I will occasionally be
7  giving him D-1, D-7, and so forth.
8  BY MR. MALONE:
9      Q.    Let's start with D-1.  Mr. Kremmel,
10 I've handed you what we've previously marked as
11 Defendants-1 for identification.  It's a document
12 headed "EMerging Times."  Bears a date of
13 October 13, 1997.
14         Why don't you take a moment to
15 review it and see if it's familiar to you.
16     A.    It is familiar to me, yes.
17     Q.    Now, in October of 1997, had the
18 merger that formed Conectiv been finalized?
19     A.    No, I do not believe it was.  No.
20     Q.    And, hence, in the upper left-hand
21 corner we see, "We are becoming Conectiv," is that
22 correct?
23     A.    That's correct, yes.
24     Q.    Did you receive a copy of this in

Page 16

1  October of 1997?
2      A.    I don't recall whether I did or
3  didn't.
4      Q.    Do you know who prepared
5  Defendants-1?
6      A.    Who, individually?
7      Q.    Yes.
8      A.    No.
9      Q.    Do you know who approved it and
10 authorized that it be disseminated in some fashion?
11     A.    No, I don't know who directly
12 approved it.
13     Q.    On the first page, in the left-hand
14 column, the name Ben Wilkinson appears.
15         Do you see that, sir?
16     A.    Yes.
17     Q.    Do you know Mr. Wilkinson?
18     A.    I know who Ben Wilkinson was, yes.
19     Q.    What was his position in or about
20 October, 1997, as you understood it?
21     A.    I believe Ben's position was manager
22 of compensation and benefits.
23     Q.    And, in that capacity, did you work
24 with him at all?

Page 17

1      A.    Yes, I did.
2      Q.    How did you interact with Mr.
3  Wilkinson in this rough time period of October of
4  1997?
5      A.    I was a member of the overall
6  project team that was responsible for implementing
7  the new -- company's new Total Rewards program.
8      Q.    What did the Total Rewards program
9  involve?
10     A.    The -- it was an overall redesign of
11 the compensation and benefits programs for what
12 would be the new company, Conectiv.
13     Q.    So, that embraced health plans,
14 pension plans, holidays, vacation schedules, pay
15 structures?
16     A.    Essentially, yes.
17     Q.    Anything else that I've left out?
18     A.    I think you've got the majority of
19 it.
20     Q.    And did you have any particular
21 role, what your duties were, as part of the Total
22 Rewards team?
23     A.    As a team member, as part of the
24 project team.  No special responsibilities, other

5 (Pages 14 to 17)

B0254

JAMES R. KREMMEL

Page 18

1 than as part of the team helping to facilitate the
2 initiative.
3       Q.     Focusing on Exhibit D-1 for a
4 moment, do you know how that was issued to the
5 workforce?
6       A.     This individual communication, I
7 believe, was distributed in a hard copy, printed
8 internally by the company's general printing group,
9 and then distributed to employees.
10      Q.     Was it aimed at any particular
11 category of employees or was it everyone that was
12 drawing a paycheck?
13      A.     This communication, I believe, was
14 targeted to all employees in the company, sir.
15      Q.     Thank you, sir. Let's go to
16 Defendants-2.
17             Mr. Kremmel, I've handed you a
18 document which was previously marked as
19 Defendants-2. It's a similar newsletter. This one
20 bearing the date, October 20th, 1997.
21             I'd ask you to take a moment to
22 review it and see if it is familiar to you.
23      A.     It is similar, yes, sir.
24      Q.     Do you know who was responsible for

Page 19

1 authoring this?
2       A.     Who, directly?
3             No, I do not.
4       Q.     Was there anyone who was on the
5 Total Rewards team that was particularly tasked
6 with handling employee communications?
7       A.     Not individually, to the best of my
8 recollection.
9       Q.     Did you receive a copy of
10 Defendants-2 in or about October of 1997?
11      A.     I do not recall personally.
12      Q.     As part of your work on the Total
13 Rewards team, did you come to form an understanding
14 that one element of the potential changes would be
15 a cash balance pension plan?
16      A.     Could you repeat the question,
17 please?
18             MR. MALONE: Can you read that back.
19 I think I botched it.
20             (Pertinent portion of the record is
21 read.)
22             THE WITNESS: Yes, I did.
23 BY MR. MALONE:
24      Q.     When did it come to your attention

Page 20

1 that a cash balance pension plan was under
2 consideration?
3       A.     Are you looking for a date, sir?
4       Q.     You can give me your best estimate.
5 I don't want you to guess or speculate, but, if you
6 have a rough sense --
7       A.     I do not recall the first time that
8 I had knowledge that we were considering a cash
9 balance plan.
10      Q.     Do you know when the decision was
11 finalized that a cash balance plan would be
12 adopted?
13      A.     Yes, I do.
14      Q.     And, to the best of your
15 recollection, when was that?
16      A.     To the best of my recollection, it
17 would have been at a meeting of the Board of
18 Directors of Conectiv in -- I don't recall the
19 month -- March or April of 2000 -- or, excuse me,
20 1998.
21      Q.     Mr. Kremmel, I've handed you a
22 document which has been marked previously as
23 Defendants-3. It appears to me to be presentation
24 materials. On the first page it says, "Conectiv

Page 21

1 Cash Balance Plan, February 20, 1998."
2             Why don't you take a moment to
3 review it and then I'll ask you a few questions
4 about it.
5       A.     Okay.
6       Q.     Have you seen Defendants-3
7 previously?
8       A.     Yes, I have.
9       Q.     To the best of your recollection,
10 when was the first time that you saw Defendants-3?
11      A.     To the best of my recollection, it
12 would have been earlier this year, sir, sometime
13 after the first of this year.
14      Q.     Let me direct your attention to the
15 lower right-hand corner above the exhibit marking.
16      A.     Okay.
17      Q.     There is a logo there.
18      A.     Yes.
19      Q.     Do you recognize the logo?
20      A.     I believe that's the logo of the
21 firm of Watson Wyatt.
22      Q.     And Watson Wyatt is an actuarial
23 consulting firm, is that correct?
24      A.     I believe that's correct.

6 (Pages 18 to 21)

B0255

JAMES R. KREMMEL

Page 22

1    Q.    Are they currently the plan's
2  actuaries?
3    A.    They are currently the plan's
4  actuaries.
5    Q.    In or about 1998, who were the
6  actuaries for Delmarva and Atlantic City Electric?
7    A.    I can speak to the actuary for
8  Delmarva Power --
9    Q.    Okay.
10    A.    -- which was the firm of Towers
11  Perrin.
12    Q.    Okay.
13    A.    I'm not sure that I know who the
14  actuary, at the time, for Atlantic Electric was,
15  sir.
16    Q.    After the Atlantic City Electric
17  plan and the Delmarva plans were merged, Towers
18  Perrin served as the actuary for a number of years,
19  is that correct?
20    A.    After the closing of the merger
21  with -- between Atlantic and Delmarva, Towers
22  Perrin was the actuary for Conectiv.
23    Q.    In or about 1998, do you know what
24  services, if any, Watson Wyatt was providing to

Page 23

1  Delmarva or Atlantic City Electric?
2    A.    I do.
3    Q.    And what were they?
4    A.    They were supporting Conectiv, or
5  what would be Conectiv, in the design of components
6  of the Total Rewards program.
7    Q.    Which particular components?
8    A.    One of which I know was a redesign
9  of the company's retirement plans.
10    Q.    Did you have any direct interaction
11  with representatives of Watson Wyatt in or about
12  1998?
13    A.    Yes.
14    Q.    Who did you deal with from Watson
15  Wyatt?
16    A.    I recall one individual that I had
17  worked with.  His name was -- or is David Speier.
18    Q.    Can you spell the last name, please.
19    A.    To the best of my recollection, it
20  is S-p-i-e -- or e-i-e-r.  S-p-e-i-e-r.
21    Q.    Thank you.
22    And what did you understand Mr.
23  Speier's function to be?
24    A.    David was providing consultative

Page 24

1  services in the design of the retirement plans.
2    Q.    Were you working with him on the
3  design of the new retirement plan?
4    A.    No.
5    Q.    Did you have any direct working
6  relationship, in or around 1998, with
7  representatives of Watson Wyatt?
8    A.    Yes.
9    Q.    How would you describe your role?
10    A.    I was part of -- I previously
11  mentioned I was part of the Total Rewards project
12  team.  Watson Wyatt would attend those meetings and
13  I -- we would have had -- I know I would have had
14  conversations with them as part of that -- as part
15  of the project team.
16    Q.    Do you know who prepared Defendants
17  Exhibit 3?
18    A.    Other than it's work product of
19  Watson Wyatt, I do not know who individually
20  prepared it, no.
21    Q.    Do you have an understanding as to
22  who, at Delmarva, Atlantic City Electric, or
23  Conectiv, was the intended recipient of
24  Defendants-3?

Page 25

1    A.    I do not know who, specifically,
2  this was prepared for, no.
3    Q.    Is this something that was provided
4  to the employees as a group?
5    A.    Not to the best of my recollection,
6  sir.
7    Q.    Let me direct your attention, if I
8  might, to the fourth physical page of Defendants-3.
9    MS. HOFFMAN:  Is that the one
10  labeled JMC 00447?
11    MR. MALONE:  Yes, it is.
12  BY MR. MALONE:
13    Q.    Should have a heading, "Cash Balance
14  Plan Example," and then, "Pay credits, 8 percent."
15    Do you have that, sir?
16    A.    I'm with you, yes.
17    Q.    Do you see the handwriting on the
18  page?
19    A.    I do.
20    Q.    Do you recognize the handwriting?
21    A.    I do not.
22    Q.    Let me have you turn two pages in to
23  JMC 00449.  Still in Defendants-3.  There is a
24  graph there.

7 (Pages 22 to 25)

B0256

JAMES R. KREMMEL

Page 26

1    Do you see that, sir?
2    A.    I do see the graph, yes.
3    Q.    Do you have some understanding of
4  what the purpose of this data presentation was?
5    A.    I have a general understanding.
6    Q.    What's your understanding?
7    A.    I think what the graph is attempting
8  to show is the growth in the value of a pension
9  benefit over time using certain assumptions.
10    Q.    And there is a footnote on the graph
11  that identifies a salary increase assumption, is
12  that correct?
13    A.    Yes.
14    Q.    Do you know what the source of that
15  assumption was?
16    A.    I do not.
17    Q.    Let me turn, in Defendants-3, to JMC
18  00455.
19    A.    455?
20    Q.    Yes.  You'll have a page headed, "5
21  Year Grandfather Provision."
22        Do you have that before you?
23    A.    I do.
24    Q.    Do you have an understanding of what

Page 27

1  the graph here is intended to convey?
2    A.    I believe it's similarly showing
3  accumulation of pension benefits over time, based
4  on certain assumptions.
5    Q.    And this compares different benefit
6  designs, is that correct?
7    A.    I'm not sure how -- I'm not sure I
8  understand your question.
9    Q.    Let's do it this way.  Prior to the
10  time that the merger that created Conectiv closed,
11  Atlantic City Electric had it own defined benefit
12  plan, is that correct?
13    A.    That is correct.
14    Q.    And Delmarva had its own defined
15  benefit plan, is that correct?
16    A.    That is correct.
17    Q.    And those two were subsequently
18  merged to create the Conectiv retirement plan, is
19  that correct?
20    A.    No, I'm not sure that is correct,
21  sir.
22    Q.    As of January 1, 1999, did Conectiv
23  have a defined benefit retirement plan for its
24  management employees, i.e., nonunionized?

Page 28

1    A.    Did Conectiv?
2    Q.    Have a defined benefit pension plan
3  that was in effect as of January 1, 1999?
4    A.    I don't believe it did, no.
5    Q.    Did it subsequently come to have a
6  defined benefit pension plan?
7    A.    Did Conectiv have a defined benefit
8  pension plan?
9    Q.    Yes.
10    A.    As of 1-1-99, Conectiv had a cash
11  balance plan.
12    Q.    So you would distinguish a cash
13  balance plan from a defined benefit plan?
14    A.    I'm not sure that I'm technically
15  qualified to know necessarily what the definition
16  of a defined plan is and whether the cash balance
17  fits that definition.
18    Q.    That's fine.
19        Let me go back and unpack that and
20  see if I can clean this mess up I made by using
21  technical jargon.
22    A.    Okay.
23    Q.    Atlantic City Electric had a pension
24  plan and Delmarva had a pension plan prior to the

Page 29

1  merger, is that correct?
2    A.    That is correct.
3    Q.    And, after the merger that created
4  Conectiv went into effect, those two pension plans
5  were merged to create a new pension plan, is that
6  correct?
7    A.    I don't believe that's correct, no.
8    Q.    Effective January 1, 1999, Conectiv
9  had a cash balance plan covering certain of its
10  employees?
11    A.    Is that a question?
12    Q.    Yes.
13    A.    What's the question?
14    Q.    Is it correct that, as of January 1,
15  1999, Conectiv had a cash balance plan covering
16  certain of its employees?
17    A.    That's correct.
18    Q.    Did it provide for grandfathering of
19  certain employees?
20    A.    It did.
21    Q.    Was it a five-year grandfather
22  provision?
23    A.    No, I do not believe it was.
24    Q.    Okay.

8 (Pages 26 to 29)

B0257

JAMES R. KREMMEL

Page 30

1    Were you privy to any of the
2 discussions over whether it should be five-year
3 grandfathering or ten-year grandfathering or some
4 other basis?
5    A.    Not that I recall, sir.
6    MR. MALONE:  Could you mark that as
7 Plaintiffs-2.
8    (Exhibit P-2 is marked for
9 identification.)
10 BY MR. MALONE:
11    Q.    The court reporter has handed you a
12 document which we've marked Plaintiffs-2 for
13 identification purposes.  The first page is headed
14 "Conectiv Minutes of the Personnel and Compensation
15 Committee," and bears the date of April 23, 1998.
16    Why don't you take a moment to
17 review Plaintiffs-2 and then I'll ask you a few
18 questions about it.
19    A.    Okay, I'm ready, sir.
20    Q.    Have you seen Plaintiffs-2 before?
21    A.    Yes, I have.
22    Q.    When do you first recall seeing
23 Plaintiffs-2?
24    A.    I recall first seeing it -- would

Page 31

1 have been probably late April, 1998, is when I
2 would have first seen this document.
3    Q.    And we had discussed earlier the
4 timing when the decision to go forward with the
5 cash balance plan was made, and I think, to
6 summarize your testimony -- not put words in your
7 mouth -- you had suggested that March or April was
8 the relevant time frame when the final decision to
9 adopt the cash balance plan was made.
10    Does this refresh your recollection
11 as to the timing of that decision?
12    A.    Yes, it does.
13    Q.    To your understanding, is
14 Plaintiffs-2 minutes summarizing the meeting at
15 which the decision to adopt the cash balance design
16 was made?
17    A.    That's my understanding, yes.
18    Q.    Let me direct your attention to --
19 Mr. Cain and Mr. Wilkinson are listed in the
20 minutes.
21    Do you see that?
22    A.    Yes, I do.
23    Q.    Did you discuss the meeting that is
24 summarized in Plaintiffs-2 with Mr. Cain?

Page 32

1    A.    I don't recall discussing the
2 meeting.
3    Q.    How about Mr. Wilkinson?
4    A.    Nor do I recall.
5    Q.    Did you offer any assistance to them
6 in preparing for a meeting with a committee of the
7 board to discuss the cash balance plan?
8    A.    Not to my recollection.
9    Q.    You were working as part of the
10 Total Rewards team in April, 1998, is that correct?
11    A.    Yes, I was.
12    Q.    Did you help either Mr. Cain or Mr.
13 Wilkinson prepare for any meeting with a committee
14 of the board as part of that work?
15    A.    I do not recall directly assisting
16 in that -- them in that, no.  No, I do not.
17    Q.    Did you discuss with Mr. Wilkinson
18 or Mr. Cain their preparation for such a meeting?
19    A.    I do not recall any such
20 conversations.
21    Q.    Let me direct your attention to the
22 second page of Plaintiffs-2, which bears the
23 designation PHI 1585.  I'd like to focus your
24 attention on the first full paragraph, which starts

Page 33

1 "Mr. Wilkinson stated that the long-term goal of
2 management."
3    Do you see that, sir?
4    A.    Yes, I do.
5    Q.    Were you familiar with what the
6 overall goals management had for benefit costs were
7 in or about April of 1998?
8    A.    I recall these numbers.
9    Q.    They seem accurate to you?
10    A.    Yes, they do.
11    Q.    Would those numbers represent an
12 increase or decrease from the existing cost
13 structure?
14    A.    To the best of my recollection, it
15 was -- it was approximately equal to the existing
16 cost structure.  To the best of my recollection.
17    Q.    Let me direct your attention to what
18 appears to be an attachment to the minutes which
19 are P-2.  It starts at 1588.  The document entitled
20 "Conectiv Compensation and Benefits."
21    Do you know who authored this?
22    A.    Ben Wilkinson's name is on the
23 document, so I would presume it was prepared by Mr.
24 Wilkinson.

9 (Pages 30 to 33)

B0258

JAMES R. KREMMEL

Page 34

1    Q.    Did you assist Mr. Wilkinson in any
2  way in preparing this attachment to P-2?
3    A.    Not that I recall, sir.
4    Q.    Okay.
5         Let me direct your attention to Page
6  PHI 1589.  At the bottom third of the page there is
7  a header for a Cash Balance Plan and then a series
8  of bullet points.
9         Do you see that, sir?
10   A.    Yes, I do.
11   Q.    The last bullet point has two
12  indented bullet points on it, at the bottom of the
13  page.  "Business Link, Useful in Divestitures, Can
14  be Differentiated by SBU."
15        Do you see that, sir?
16   A.    Yes, I do.
17   Q.    Do you have any understanding of
18  what aspect of the cash balance plan might have
19  made it useful in divestitures?
20   A.    I don't know what was intended by
21  this.  I could hypothesize, but I don't know what
22  specifically --
23   Q.    I'm asking you specifically if you
24  know.

Page 35

1    A.    Well, the concept of the cash
2  balance benefit is the ability to provide a benefit
3  that is -- that accrues over the life of the
4  benefit and is portable for the individual
5  participant.  And from -- in that context, from a
6  divestiture standpoint, it would provide a benefit
7  that provided value to an individual in the event
8  that a business unit was sold.
9    Q.    And then the next reference is --
10  there is a phrase, "Can be differentiated by SBU."
11        Do you know what that means?
12   A.    Again, while I'm not sure that I
13  understand the original context, you know,
14  hypothetically, the intention -- again, one of the
15  values of the plan was that we could utilize it
16  in -- in different units and -- you know, and have
17  the ability to have the benefit -- tailor the
18  benefit to the individual company to, again,
19  provide us the ability to attract and retain the
20  best talent within those businesses that the
21  company might acquire.
22        MR. MALONE:  That's all I have for
23  you on Plaintiffs-2.
24        (Exhibit P-3 is marked for

Page 36

1  identification.)
2  BY MR. MALONE:
3    Q.    Mr. Kremmel, the court reporter has
4  handed you a document we marked Plaintiffs Exhibit
5  3 for identification purposes.  It's headed,
6  "Facts, We are Becoming Conectiv."
7         Ask you to take a moment to review
8  it and then I'll ask you a few questions about it.
9    A.    Okay, I'm ready.
10   Q.    Have you seen this before?
11   A.    Yes, I have.
12   Q.    When, approximately, do you first
13  recall seeing it?
14   A.    I don't recall when I first recalled
15  seeing it.  Most recently I saw it sometime after
16  the first of the year 2007.
17   Q.    Can you tell me who was responsible
18  for creating Plaintiffs-3?
19   A.    Who specifically was responsible?
20        I don't know, sir.
21   Q.    Did you have any role in creating
22  Plaintiffs Exhibit 3 as part of your work on the
23  Total Rewards team?
24   A.    I may have, yes.

Page 37

1    Q.    But you can't recall?
2    A.    I don't recall specifically what
3  that was.
4    Q.    Can you tell me approximately when
5  this document was created?
6    A.    Sir, you asked when -- approximately
7  when it was created.  I would approximately guess
8  that it was sometime in early 1998.
9    Q.    You used a word there I don't like.
10  "Guess."
11   A.    Ask your question again.
12   Q.    To the best of your ability today,
13  would you estimate that this was created in or
14  about early 1998?
15   A.    To the best of my recollection, yes.
16   Q.    And on what do you base that
17  recollection or inference?
18   A.    The context of the document.
19   Q.    Specifically, the first sentence?
20   A.    The overall context of the document.
21   Q.    Do you know whether this was
22  something that was disseminated broadly to
23  employees or was tailored to a particular audience?
24   A.    I believe this document was -- the

10 (Pages 34 to 37)

B0259

JAMES R. KREMMEL

Page 38

1  audience for this document was the nonrepresented
2  employees in Atlantic and Delmarva at the time.
3      Q.    And, by "nonrepresented," you mean
4  those that are not unionized?
5      A.    Not represented by a Collective
6  Bargaining Agreement, yes.
7      Q.    Do you know how it was disseminated?
8      A.    From it's appearance, sir, this
9  appears to, again, have been -- would have been
10  printed by the company and distributed hard copy.
11  That's my -- that's how I believe it was
12  distributed.
13      Q.    Do you recall if you got a copy of
14  this in or about early 1998?
15      A.    I don't specifically recall, no.
16      Q.    Do you have an understanding what
17  the purpose of disseminating Plaintiffs-3 was?
18      A.    Yes.
19      Q.    What was the purpose, to your
20  understanding?
21      A.    As part of the ongoing broad
22  communications to the employees of the company
23  about the roll-out of the new Total Rewards
24  program.  This was just one of the many components

Page 39

1  that were rolled out as part of those
2  communications.
3      Q.    I'm handing you, sir, what we
4  previously marked as Defendants Exhibit 5 for
5  identification purposes.  This is another document
6  known as Facts, F-a-c-t-s.
7      A.    Okay, I'm prepared.
8      Q.    Have you seen it before?
9      A.    Yes, I have.
10      Q.    To the best of your recollection,
11  what's the first time that you saw Defendants-5?
12      A.    It would have been in April of 1998.
13      Q.    And do you know when this document
14  was issued?
15          This document being D-5.
16      A.    The specific date?  I do not.
17      Q.    Are you able to give me some
18  reasonable estimate, based on your knowledge, of
19  when it was issued?
20      A.    Yes, I am.
21      Q.    Could you do so, please.
22      A.    It would have been sometime in April
23  or May of 1998.
24      Q.    And what leads you to draw that

Page 40

1  conclusion?
2      A.    Because, on the last page, which is
3  PHI 0033, at least on my copy -- there may be a
4  last digit that's missing --
5      Q.    It's cut off there.
6      A.    In any case, the top of the page
7  reads "Total Rewards Communication Plan."  This is
8  just a partial extract of the overall
9  communications plan for the Total Rewards program
10  and identifies this as the third Facts Newsletter
11  and that it would be distributed in April or May of
12  1998.
13      Q.    And if I could send you back to
14  Plaintiffs-3 for a minute, which was the last
15  document we were looking at, Plaintiffs-3 was
16  issued prior to Defendants-5, is that correct?
17      A.    That would be -- to the best of my
18  knowledge, I believe that's correct, yes.
19      Q.    Let's go back to Defendants-5.
20  That's the only question I have for you on
21  Plaintiffs-3.
22          We were looking at a timeline on the
23  last physical page of Defendants-5.  And this
24  timeline -- first, to your knowledge, does it

Page 41

1  appear reasonably accurate?
2      A.    Yes, it does.
3      Q.    It indicates that Defendants-5 is
4  the third Facts Newsletter, is that correct?
5      A.    Yes.
6      Q.    Okay.
7          Do you know when the first Facts
8  Newsletter was issued?
9      A.    Can I look back in the pile?
10      Q.    Sure.  Absolutely.
11          Let the record reflect that the
12  witness is reviewing some of the documents
13  previously marked either at this deposition or
14  during the deposition of plaintiff.
15      A.    Could you repeat your question?
16          MR. MALONE:  Can you read it back,
17  Sean.
18          (Pertinent portion of the record is
19  read.)
20          THE WITNESS:  I do not know
21  specifically when the first Facts Newsletter was
22  issued, no.
23  BY MR. MALONE:
24      Q.    Can you give me a reasonable

11 (Pages 38 to 41)

B0260

JAMES R. KREMMEL

Page 42

1    estimate, to the best of your present recollection?
2        A.    To the best of my recollection, it
3    would have been sometime between -- sometime
4    between the fall of 1997 and the spring of 1998.
5        Q.    Focusing in on Defendants Exhibit 5,
6    did you have a role in preparing Defendants-5?
7        A.    To the best of my recollection, I
8    did have a role in preparing this document.
9        Q.    And what was your role?
10       A.    As part of the reviewing the content
11   of the information as part of the Total Rewards
12   team, and preparing it for printing and
13   distribution.
14       Q.    Who was responsible for the overall
15   content?
16       A.    Who ultimately was responsible for
17   the overall content?
18       Q.    Let me withdraw that and try to --
19   who wrote it?
20       A.    I don't recall specifically who
21   wrote it.
22       Q.    Do you remember who you conveyed
23   information to for the purposes of preparation of
24   D-5?

Page 43

1        A.    I believe -- I guess that's not the
2    right way to answer it.
3            To the best of my recollection, it
4    was individuals with the company's corporate
5    communications team that would have supported the
6    Total Rewards project team.
7        Q.    So these were not HR people?
8        A.    That actually did the writing?
9            No.  They would have been
10   professional communicators.
11       Q.    This was reviewed and approved by
12   the HR department before it was issued?
13       A.    That is correct.
14       Q.    Who was responsible at that time for
15   reviewing employee communications with respect to
16   the Total Rewards program?
17       A.    At that time, sir, there would have
18   been multiple individuals who would have reviewed
19   it.  I don't recall exactly when I became manager
20   of benefits specifically, but I would have reviewed
21   it, the manager of compensation and benefits would
22   have reviewed it, and the vice-president of human
23   resources for the company would have reviewed it at
24   this point.

Page 44

1        Q.    As of April of 1998, who was the
2    manager of compensation and benefits?
3        A.    I believe at that point it was still
4    Ben Wilkinson.
5        Q.    And who was the vice-president of
6    human resources?  Mr. Cain?
7        A.    At that point it was Don Cain, yes.
8        Q.    Anyone else in the chain of command
9    that would have been responsible for reviewing and
10   approving D-5?
11       A.    Other than, as I previously
12   mentioned, probably at this point most of the
13   project team would have seen it -- at least seen
14   the draft and had had an opportunity to comment.
15           Your question was chain of command.
16   There would have been no one else in the chain of
17   command that I recall.
18       Q.    Thank you, sir.
19           Do you know how this was
20   disseminated?
21       A.    This would have been, again, printed
22   internally by the company and delivered -- this
23   individual document was delivered to individuals'
24   homes -- it was mailed to their homes.

Page 45

1        Q.    How do you know that?
2        A.    On, again, the last page of the
3    document, PH -- the document -- it reads to me, PHI
4    0033, it's franked with -- for U.S. postage and has
5    an address on it.
6        Q.    In or about April of 1998, did the
7    company keep records when it made mailings of
8    benefits information to employees?
9        A.    The company kept a copy of what was
10   mailed.
11       Q.    Did it keep a log that would tell
12   you the date that it was mailed?
13       A.    Not to the best of my recollection,
14   no.
15       Q.    Okay.
16           Mr. Kremmel, I've handed you what's
17   previously been marked as D-6 for identification
18   purposes.  It's a multipage document that bears the
19   date of December 21, 1998, and is headed, "Dear
20   Conectiv Management Employee."
21           Why don't you take a moment to
22   review it and then I'll ask you a few questions
23   about it.
24       A.    Okay.

12 (Pages 42 to 45)

B0261

JAMES R. KREMMEL

Page 46

1        Okay, sir.
2    Q.    Have you seen this before?
3    A.    Yes, I have.
4    Q.    When did you first see it?
5    A.    To the best of my recollection, I
6 saw it in the fall of 1998.
7    Q.    And what was the context in which
8 you first saw it in the fall of 1998?
9    A.    I would have had part of -- I would
10 have had input into the preparation of the document
11 at that time, sir.
12    Q.    Do you know who was the principal
13 author of Defendants-6?
14    A.    I do not know specifically who the
15 author was, no.
16    Q.    Are you able to identify some or all
17 of the people who, in the fall of 1998, were
18 working to create the document which became
19 Defendants-6?
20    A.    Other than myself, no, not at this
21 point. I don't recall.
22    Q.    Who was the manager of compensation
23 and benefits as of December, 1998?
24    A.    December of '98. To the best of my

Page 47

1 recollection -- I'll restate it. I don't know -- I
2 do not know specifically at this point who was
3 manager of compensation and benefits in the fall of
4 1998, sir.
5    Q.    Who was the vice-president human
6 resources in or about the fall of 1998?
7    A.    Don Cain.
8    Q.    When did Mr. Cain leave the company?
9    A.    To the best of my recollection, Mr.
10 Cain left the company in 2002.
11    Q.    How about Mr. Wilkinson?
12    A.    I do not recall when Mr. Wilkinson
13 left the company, sir.
14    Q.    Could you describe for me what input
15 you had into the creation of Defendants-6.
16    A.    I don't recall exactly what specific
17 input I had. I do recall the document and -- at
18 the time, but I don't recall specifically which of
19 these I might have written or what I -- input I
20 had.
21    Q.    Did you come to have some
22 understanding as to why Defendants-6 was being
23 issued?
24    A.    To the best of my recollection,

Page 48

1 this -- Number 1, I don't believe this is a full
2 document, sir.
3    Q.    Okay.
4    A.    I believe this was part of -- part
5 of the company's ongoing communications of the
6 Total Rewards program, and as -- as part of which
7 the company put together a series of questions and
8 answers to help employees understand different
9 concepts, and this was, I believe, a part of those
10 questions and answers that were part of the overall
11 communications effort of the Total Rewards program.
12    Q.    When you say that D-6 is not a
13 complete document, do you mean that there are
14 attachments that should be included with D-6?
15    A.    No. I -- no, I don't know whether
16 or not there was additional document -- or
17 attachments or not. It just -- it seems unusual to
18 me that there is no -- at least on the first page
19 there is no --
20    Q.    Logo?
21    A.    -- logo on it, which leads me to
22 believe that this might have been a component of an
23 E-Mail communication or another -- part of another
24 communications package that we would have put

Page 49

1 together at the time.
2    Q.    Do you know how Defendants-6 was
3 issued?
4    A.    Specifically how it was distributed?
5      No, I do not.
6    Q.    Do you recall receiving a copy of
7 Defendants-6?
8    A.    Specifically, I don't recall, no.
9    Q.    As of December, 1998, did the
10 company keep records of the communications that it
11 disseminated to employees with respect to its
12 benefit plans?
13    A.    The company kept copies of the
14 materials, to the best of my recollection, but not
15 a listing of who was or wasn't distributed any of
16 the communications, sir.
17    Q.    Do you know whether those records
18 still exist with respect to Defendants-6?
19    A.    We are looking at a copy of it.
20    Q.    I understand. This was produced by
21 the Plaintiffs.
22    A.    Okay.
23    Q.    Do you know whether the company has
24 its records of communications it had with its

13 (Pages 46 to 49)

B0262

JAMES R. KREMMEL

Page 50

1  employees on the subject of benefits in the period
2  of late 1998 and early 1999?
3       A.   I don't know for a fact, sir, no.
4       Q.   If you wanted to find that out, who
5  would you ask?
6       A.   I would probably -- I would go to
7  the current manager of compensation and benefits
8  for the company.
9       Q.   And who is that?
10      A.   Mike -- Michael Sullivan.
11      Q.   And where does he work?
12      A.   Mr. Sullivan works in Washington,
13  D.C.
14      Q.   Let me direct your attention to the
15  third paragraph appearing on the first page of D-6
16  for the moment.
17      A.   Okay.
18      Q.   There are some names listed there
19  and there is a phrase that's used.  Do you see the
20  phrase, "Human resources strategic business
21  partner"?
22      A.   Yes.
23      Q.   Do you know what that means?
24      A.   Yes.

Page 51

1       Q.   Can you explain your understanding
2  of the term.
3       A.   Human -- at the time, the human
4  resources strategic business partners were human
5  resource professionals that were in the area -- in
6  the different areas of the business and had
7  responsibility and accountability for day-to-day HR
8  matters within the different individual lines of
9  business.
10      Q.   Was this by location or by business
11  function?
12      A.   Primarily by business function, sir.
13      Q.   Who is Pat Duffy?
14      A.   Pat Duffy was a human resources
15  professional for the company.
16      Q.   Where was she based in or about
17  December of 1998?
18      A.   He was based in Wilmington,
19  Delaware.
20      Q.   Sorry.  That's one of those
21  ambiguous names.
22           Is Mr. Duffy still with the company?
23      A.   He is.
24      Q.   What's his position now?

Page 52

1       A.   I do not know his specific title,
2  sir.
3       Q.   Is he still in human resources?
4       A.   No, he's not, to the best of my
5  knowledge.  To my knowledge, he's not.
6       Q.   How about Harold DeJarnette?  What
7  were his duties in or about December of 1998?
8       A.   Again, human resources strategic
9  business partner for the company.
10      Q.   And he's referenced in the context
11  of supply.  What does that mean?
12      A.   Would have been energy -- energy
13  supply.
14      Q.   Power generation?
15      A.   Our energy business, the power
16  generation business, yes, sir.
17      Q.   And Mr. Duffy was listed under
18  energy delivery and services.  What areas of the
19  company did that embrace?
20      A.   The regulated utility business.
21      Q.   Then we come to Mr. Wilkinson.  Had
22  his duties changed in any way by December, 1998,
23  from what we previously discussed?
24      A.   Apparently.

Page 53

1       Q.   Okay.
2       A.   Yes.
3       Q.   Is his shift to become a human
4  resources strategic business partner, is that a
5  promotion or is that a lateral move?
6       A.   At the time, to the best of my
7  recollection, that's a lateral move, sir.
8       Q.   And he's listed in the shared
9  services context.  Do you understand what that
10  means?
11      A.   Yes, I do.
12      Q.   And what's your understanding of
13  shared services?
14      A.   Shared services were strategic type
15  services that supported the overall business
16  enterprise:  Human resources, accounting, finance,
17  information technology.  Those and others.  Those
18  types of services.
19      Q.   I may have skipped something with
20  Mr. DeJarnette.  Is he still with the company?
21      A.   Mr. DeJarnette is still with the
22  company, yes, sir.
23      Q.   And what does he do?
24      A.   Mr. DeJarnette is vice-president of

14 (Pages 50 to 53)

B0263

JAMES R. KREMMEL

Page 54

1    human resources for Conectiv Energy Services.
2        Q.    And what is the relationship of
3    Conectiv Energy Services to Pepco Holdings, as you
4    understand it?
5        A.    To the best of my understanding,
6    Conectiv Energy Services is a wholly-owned
7    subsidiary of Pepco Holdings.
8        Q.    Does it have a particular business
9    function?
10       A.    Yes, it does.
11       Q.    And what's your understanding of its
12   business function?
13       A.    Primarily associated in the energy
14   supply business and nonregulated trading
15   businesses -- energy trading businesses.
16       Q.    Energy supply would embrace power
17   generation?
18       A.    Or procurement, yes, sir.
19       Q.    Then we have Dave Motil?  I may be
20   butchering his name.  M-o-t-i-l.
21       A.    Yes, sir.
22       Q.    What was Mr. Motil's job function in
23   or about December, 1998?
24       A.    I believe Mr. Motil was also an HR

Page 55

1    strategic business partner at the time.
2        Q.    Is that a full-time job?
3        A.    Yes, it is.
4        Q.    And for what line of business of the
5    company was he responsible?
6        A.    To the best of my recollection, Mr.
7    Motil was a strategic partner for the company's
8    nonregulated businesses, to the best of my
9    recollection.
10       Q.    Can you give me a little thumbnail
11   sketch of what falls under the nonregulated
12   businesses heading?
13       A.    Companies that we're not required --
14   or that we do not derive rates that are approved
15   through the Public Service Commission in any of the
16   states that we operate.
17       Q.    Can you give me an example?  Even a
18   hypothetical is --
19       A.    At the time -- at the time an
20   example might have been some HVAC businesses --
21   business lines that the company had acquired.  And
22   that's contemporary to 1998.
23       Q.    Now, D-6 moves on with a series of
24   questions and answers.

Page 56

1        Q.    Do you see that, sir?
2        A.    Yes, I do.
3        Q.    The first question is, "What is a
4    cash balance plan?"  Do you see that?
5        "Cash balance pension plan," excuse
6    me.
7        A.    I do.
8        Q.    Let me direct your attention to the
9    first sentence of the answer.  It says, "Each year
10   the company credits your individual pension account
11   with a cash contribution equal to a percentage of
12   your total pay, including overtime and bonus."
13       Do you see that, sir?
14       A.    Yes, I do.
15       Q.    As you understand the cash balance
16   plan that was implemented at Conectiv, effective as
17   of January 1, 1999, does each employee have a
18   hypothetical account?
19       A.    I believe they do, yes.
20       Q.    And that account receives credits
21   annually, is that correct?
22       A.    That's correct.
23       Q.    And the credits come in three
24   different forms, correct?

Page 57

1        Rather than testing your memory, one
2    of the forms of credit that is applied to the
3    employees' account is a PET credit, is that
4    correct?
5        A.    That's correct.
6        Q.    And that's calculated as a
7    percentage of their annual compensation, is that
8    correct?
9        A.    It's calculated as a percentage of
10   their pensionable -- what's considered pensionable
11   earnings, yes.
12       Q.    Another category of credit that is
13   applied to the account is reflective of interest,
14   is that correct?
15       A.    That's correct.
16       Q.    And that's calculated on the basis
17   of the 30-year Treasury for October of the prior
18   year, is that correct?
19       A.    To the best of my recollection,
20   that's correct, yes, sir.
21       Q.    And then there are also provisions
22   for what are called transition credits, is that
23   correct?
24       A.    That is correct, yes, sir.

15 (Pages 54 to 57)

B0264

JAMES R. KREMMEL

Page 58

1    Q.    And transition credits are also
2  applied to pensionable compensation, is that
3  correct?
4    A.    That's correct.
5    Q.    Going back, then, to what I was
6  focused on in D-6, which is the first sentence of
7  the first answer to the first question, the phrase
8  "Cash contribution" is used.
9        Is it your understanding that these
10  credits that are made to the employee's account on
11  an annual basis are cash?
12    A.    Yes.
13    Q.    Let me direct your attention to the
14  second page of D-6, JMC 00002. The upper half of
15  the page will give you two tables and then there is
16  a series of questions and answers below that.
17        If I could focus your attention on
18  the second of the three questions and answers,
19  which is headed, "In general, what are the
20  differences in the two plans."
21    A.    Okay.
22    Q.    What I'd like you to do is just
23  review the answer to that question and then tell me
24  whether, to the best of your knowledge, that's a

Page 59

1  reasonably accurate summary of the differences
2  between the two plans?
3    A.    Okay, sir.
4    Q.    To the best of your knowledge, is
5  the description of the differences between the
6  Atlantic Energy plan and the Delmarva plan
7  accurate, as it appears in the second question and
8  answer on the second page of D-6?
9    A.    To the best of my knowledge, it is
10  correct, yes.
11    Q.    Did you come to form an
12  understanding that the company had a legal
13  obligation to provide some notification to its
14  employees about its adoption of the cash balance
15  plan?
16    A.    Yes.
17    Q.    And what did you understand the
18  nature of that obligation to be?
19    A.    To the best of my recollection,
20  prior to the implementation of a new plan, there
21  was a requirement to disclose the terms and
22  conditions of the plan.
23    Q.    And was D-6 intended to fulfill that
24  function?

Page 60

1        MS. YU:  Objection to the form.
2        THE WITNESS:  I'm sorry?
3  BY MR. MALONE:
4    Q.    She objected to the form of my
5  question. She didn't like my question. She wants
6  me to give you a better one.
7        To the best of your knowledge, sir,
8  was D-6 intended to fulfill the company's
9  obligation to notify employees of the terms and
10  conditions of the new plan?
11        MS. YU:  Objection.
12  BY MR. MALONE:
13    Q.    You can answer. She's making her
14  record.
15    A.    No, not to the best of my
16  recollection.
17        MR. MALONE:  Now might be a good
18  time for a break. Is that okay?
19        MS. YU:  Um-hum.
20        (Discussion is held off the record.)
21        (Recess called at 11:35 a.m.)
22        (Resumed at 11:53 a.m.)
23  BY MR. MALONE:
24    Q.    We had a break in the proceedings.

Page 61

1  Is there anything that you need to correct in your
2  prior testimony?
3    A.    I don't believe so, no.
4    Q.    Okay.
5        I'm handing you what we have
6  previously marked as Defendants-7 for
7  identification purposes. It's a multi-page
8  document that has, on the first page, "Your
9  Conectiv Total Rewards" and the Conectiv logo.
10        Why don't you take a moment to look
11  at that and then I'll ask you a few questions about
12  it.
13    A.    I'm ready.
14    Q.    Have you seen it before?
15    A.    Yes, I have.
16    Q.    Do you know approximately when you
17  first saw it?
18    A.    It would have been in May or June of
19  1998.
20    Q.    The document, itself, is undated,
21  correct?
22    A.    That's not correct.
23    Q.    Is there a date located on it?
24    A.    On the cover of it it identifies it

16 (Pages 58 to 61)

B0265

JAMES R. KREMMEL

Page 62

1   as the Conectiv 1998-'99.
2       Q.    But it doesn't tell you a specific
3   date when it was issued, does it?
4       A.    I do not see it.
5           MS. YU:  Can we clarify on the
6   record, also, that D-7, after the first page and on
7   the contents, is really Pages 24 through 28 of a
8   document?  It looks like it's an excerpt.
9           MR. MALONE:  I can tell you that
10  this is how we produced it to you, which is how we
11  had it, and this is what was marked at, I think,
12  Mr. Charles' deposition.
13          MS. YU:  But it --
14          MR. MALONE:  Whether it's part of a
15  bigger document, I don't know.  I can look at the
16  table of contents, and that certainly seems like a
17  rational inference to draw.
18          I'm sure Mr. Kremmel could probably
19  enlighten us about that, if --
20          MS. YU:  I just wanted to clarify
21  that as you are asking the questions.
22          MR. MALONE:  Sure.
23  BY MR. MALONE:
24      Q.    At least the part of the document

Page 63

1   that you have as D-7 does not appear to have a
2   specific date on it that would tell us when it was
3   issued.
4       A.    That's how it appears to me, yes.
5       Q.    You were able to place this as being
6   something that was issued in or about May or June
7   of 1998.
8           How did you do that?
9       A.    I recall that this document was part
10  of an open enrollment kit that the company utilized
11  during that time period for employees to enroll in
12  flex benefits.
13      Q.    Let's unpack that a little bit.
14          Open enrollment kit, did that relate
15  to health benefits?
16      A.    Health benefits was a component of
17  it, yes, sir.
18      Q.    What other elements were involved?
19      A.    Well, I'm referring -- I refer to
20  JMC 00191, which was the table of contents for this
21  document.
22      Q.    Right.
23      A.    Covered medical options that were
24  available, prescription benefits, dental options

Page 64

1   that are available, vision care options that are
2   available, life insurance options that are
3   available, health care and dependent care
4   reimbursement accounts.
5           Those were the components that were
6   involved, to the best of my recollection.
7       Q.    Taking a look at D-7, particularly
8   at the third physical page, which is headed "New
9   Cash Balance Plan," that has a Number 24 in the
10  lower left-hand corner.
11      A.    I see that, yes.
12      Q.    To your knowledge, is D-7 an excerpt
13  from or appear to be an excerpt from a larger
14  document?
15      A.    It appears to be, yes, sir.
16      Q.    Did you have a role in preparing the
17  larger document of which D-7 forms a part?
18      A.    To the best of my recollection, yes,
19  I did.
20      Q.    And would you describe your role, to
21  the best of your recollection, please.
22      A.    As part of the review of the
23  materials that were included in the document and
24  prior to its distribution.

Page 65

1       Q.    Who else was responsible for
2   preparation of the larger document of which D-7
3   forms a part?
4       A.    I don't recall specifically who
5   might have been part of that preparation, other
6   than myself.
7       Q.    What was your position at the
8   company in or about May or June of 1998?  Still
9   senior benefits consultant?
10      A.    I believe at the time I was, sir,
11  yes.
12      Q.    Was Mr. Wilkinson still the manager
13  of compensation and benefits?
14      A.    To the best of my recollection, yes,
15  sir.
16      Q.    Do you know when he left the
17  company?
18      A.    I do not know when Mr. Wilkinson
19  left the company, sir.
20      Q.    Mr. Cain was still vice-president of
21  human resources at this time?
22      A.    He was.
23      Q.    Do you know how this document was
24  issued?

17 (Pages 62 to 65)

B0266

JAMES R. KREMMEL

Page 66

1    A.    To the best of my recollection, this
2  document was mailed to the homes of each of the
3  individuals that it was targeted to.
4    Q.    And did you receive one?
5    A.    I would have at the time, yes, sir.
6    Q.    Do you have a recollection that you
7  did?
8    A.    Yes, sir, I do.
9    Q.    Now, we had talked a little earlier
10  in your testimony about the company's obligation to
11  notify employees of the terms and conditions of the
12  new cash balance plan.
13        Did the document of which D-7 forms
14  a part serve to fulfill that function?
15        MS. YU:  Objection.
16        THE WITNESS:  To the best of my
17  recollection, it did, yes, sir.
18  BY MR. MALONE:
19    Q.    Do you have an understanding that
20  employees have the right to request access to the
21  plan documents that an employer maintains for their
22  welfare and pension benefit plan?
23        MS. YU:  I'm sorry.  Could you read
24  that back?

Page 67

1        (Pertinent portion of the record is
2  read.)
3        THE WITNESS:  Yes, that is my
4  understanding.
5  BY MR. MALONE:
6    Q.    In the period from 1998 -- late 1998
7  to the end of 1999, was there a particular person
8  at Conectiv that was responsible for receiving and
9  handling requests for plan documents?
10    A.    To the best of my recollection, I
11  don't recall that there is -- was one specific
12  person, no, sir.
13    Q.    Were there any particular people who
14  were responsible for that function?
15    A.    Again, not particular people that
16  I'm aware of, individuals that I'm aware of.
17    Q.    Are there individuals that you know
18  of that were responsible, in the period of late
19  1998 through the close of 1999, for responding to
20  inquiries from participants seeking access to plan
21  documents?
22        MS. YU:  Objection as the form.
23  BY MR. MALONE:
24    Q.    If you understand the question, you

Page 68

1  can go ahead and answer it.
2    A.    I really don't.  Could you please
3  rephrase?
4    Q.    Sure.
5        If a participant wrote in and said,
6  "Dear Conectiv, I'd like to see the plan document
7  for the 401(k) plan," were there people that were
8  responsible for addressing that in the period late
9  1998 through the close of 1999?
10    A.    There is a department that was
11  responsible for that.
12    Q.    Who was the head of that department
13  in that time frame?
14    A.    The head of the department would
15  have been the manager of compensation and benefits.
16  I don't recall who was the manager of compensation
17  and benefits in late 1999.
18    Q.    And were there other people in that
19  department working with him on dealing with
20  requests for plan documents?
21    A.    There would have been, yes, sir.
22    Q.    How many people staffed the
23  department, to the best of your recollection?
24    A.    I don't recall the exact number,

Page 69

1  sir.
2    Q.    Okay.
3        Did the department have a name?
4    A.    Yes.
5    Q.    What was the name?
6    A.    Compensation and benefits.
7    Q.    Was there a log maintained when
8  participants wrote to request documents, to your
9  knowledge?
10    A.    Not to my knowledge, sir, no.
11    Q.    Does the company maintain records of
12  those requests?
13    A.    Could you repeat the question for
14  me, please?
15        (Pertinent portion of the record is
16  read.)
17        THE WITNESS:  On a case-by-case
18  basis, they may, but I don't -- again, to repeat my
19  question -- answer to the previous question, I
20  don't believe that there was a log or anything
21  kept, sir.
22  BY MR. MALONE:
23    Q.    But they keep a file copy?
24    A.    I'm not -- I don't know whether or

18 (Pages 66 to 69)

B0267

JAMES R. KREMMEL

Page 70

1  not there is a copy kept in each circumstance, sir.
2  No, I don't -- I don't know that answer.
3      Q.    Okay.  That's all I have for you on
4  D-7.
5          Mr. Kremmel, I've handed you what
6  was previously marked as D-8, a multiple-page
7  document that's headed, "Conectiv Total Rewards,
8  The Tangible and Hidden Paychecks."
9          Why don't you take a moment to
10  review it and then I'll ask you a few questions
11  about it.
12      A.    Okay, sir.
13      Q.    Have you seen D-8 before?
14      A.    I have seen it before.
15      Q.    When was the first time you saw D-8?
16      A.    To best of my recollection, it was
17  sometime after the first of the year 2007.  This
18  year.
19      Q.    Can you tell me what D-8 is?
20      A.    To the best of my knowledge, D-8 is
21  a presentation of the Total Rewards design that was
22  prepared for the Conectiv leadership team to
23  communicate to the managers and leaders throughout
24  the company of the designs that were going to be

Page 71

1  implemented for the new company.
2      Q.    I think you used the phrase -- not
3  trying to put words in your mouth; just trying to
4  put it in context -- "Conectiv management team or
5  leadership team."
6          Could you define that in some way,
7  so that I might be able to identify the type or
8  level of employee?
9      A.    Sure.
10          Again, to the best of my
11  recollection, it would be for department managers,
12  general managers, senior leaders and executives in
13  the company.
14      Q.    So D-8 was not something that was
15  designed as a mass communication for all employees?
16      A.    No.
17          This was, again, part of our -- the
18  overall communication strategy.  This was a
19  document that, to the best of my knowledge, was
20  prepared to communicate to the leadership team so
21  that they'd be best positioned to answer, you know,
22  questions and understand the business context of
23  the changes.
24      Q.    What's your knowledge based on?

Page 72

1      A.    Based on the flow, the content, and,
2  most importantly, information on the last page, JMC
3  00214.
4      Q.    What is it about the last page
5  that's distinctive to you?
6      A.    The very last statement on the page.
7      Q.    "Expect leaders" --
8      A.    The third bullet that says, "Expect
9  leaders to support direction and positively engage
10  employees."
11      Q.    Do you know who prepared D-8?
12      A.    I do not know specifically who
13  prepared it, no, I do not.
14      Q.    Were there any people on the
15  Conectiv Total Rewards team that were primarily
16  focused on the communication strategy to more
17  senior level employees?
18      A.    Not to my recollection, no, sir.
19      Q.    Have you discussed D-8 with anyone?
20      A.    Yes.
21      Q.    Who?  With whom?
22      A.    My attorney.
23      Q.    Anyone else?
24      A.    Not to my knowledge.

Page 73

1      Q.    Let me direct your attention, if I
2  might, to Page 201.  That is JMC 00201.  You should
3  have a graph there -- a bar graph of regional
4  comparisons.
5          Do you see that, sir?
6      A.    I do see it.
7      Q.    What do you understand the graph on
8  page JMC 00201 of D-8 to convey?
9          MS. YU:  Are you asking about a
10  specific graph or both?
11          MR. MALONE:  Both of them.
12          THE WITNESS:  Let me respond with
13  half the graph first and respond to the graph
14  that's titled "Retirement."
15  BY MR. MALONE:
16      Q.    Let the record reflect that the
17  witness has placed his hands on either side of the
18  bar graph that's the left-hand side of the
19  indicated page in the record.
20      A.    To the best of my knowledge, what
21  this graph is intended to show is a relative
22  comparison of -- of expenditures by the company
23  relative to other regional companies.
24      Q.    The first bar on the left-hand side

19 (Pages 70 to 73)

B0268

JAMES R. KREMMEL

Page 74

1  of the left-hand graph has a figure there for
2  Atlantic.
3        Do you see that, sir?
4        A.    I do.
5        Q.    And, to your knowledge, is that
6  figure that's reflected in that bar graph accurate?
7        A.    I don't have any direct knowledge of
8  whether it is or not accurate.
9        Q.    Do you have any reason, as you sit
10 here today, sir, to believe that any of the figures
11 appearing in the left-hand bar graph are
12 inaccurate?
13       A.    No.  No, I don't.
14       Q.    Let me take you over to the
15 right-hand bar graph for a second.
16       What do you understand this to
17 convey?
18       A.    That would be the bar graph on the
19 right side of the page --
20       Q.    Right side of the page.
21       A.    -- with the title of "Health" --
22       Q.    That's correct.
23       A.    -- and a "2" on it?
24       Again, it is the relative comparison

Page 75

1  of dollars spent of Conectiv versus other -- other
2  companies in the region.
3        Q.    Now, these bars have two shadings to
4  them, don't they?
5        A.    They appear to, yes.
6        Q.    Do you understand what the different
7  shadings mean, in context?
8        A.    I do.
9        Q.    Could you explain it?
10       A.    To my -- the best of my knowledge,
11 it is showing not only the overall comparison of --
12 of -- of expenditures by Conectiv versus the
13 regional companies, but also the proportion of
14 that -- those expenditures that are incurred by the
15 employer and also the employee.
16       Q.    Okay.
17       As you look at the right-hand bar
18 graph of Page JMC 00201 of Defendants-8, do you see
19 any figures there that appear to be incorrect to
20 you?
21       A.    Again, I don't have any direct
22 knowledge of whether they are or are not correct,
23 sir.
24       Q.    So you have no reason to believe

Page 76

1  that they are inaccurate?
2        A.    I believe -- no reason to believe
3  they are not accurate, yes.
4        Q.    Let me take you, if I might, to JMC
5  00203 of Defendants-8.  You should be at a page
6  headed "Overview:  Cash Balance Pensions."
7        Do you have that, sir?
8        A.    Yes, I do.
9        Q.    And, in the right-hand segment of
10 the page there is a graph there.
11       Do you see that?
12       A.    Not on the right-hand side.
13       Q.    Strike that.
14       The left-hand side of the page there
15 is a line graph, is that correct?
16       A.    There is a graph, yes.
17       Q.    What do you understand this graph to
18 convey?
19       A.    My understanding -- or, when I look
20 at this graph, it appears to be a conceptual
21 drawing of a comparison between a cash balance
22 plan -- or it says "New cash balance" plan and
23 current plan.
24       Q.    Do you know who prepared that graph?

Page 77

1        A.    No, I don't know individual -- or
2  specifically who prepared it.
3        Q.    Do you know any of the data or
4  assumptions that went into that graph?
5        A.    No, I do not.  Again, it appears to
6  me to be a conceptual drawing.
7        Q.    Let me take to you the next page, if
8  I might, which is JMC 00204 of D-8.
9        A.    Okay.
10       Q.    Directing your attention to the
11 right half of the page -- and I mean the right half
12 this time -- do you see some handwritten notes at
13 the bottom?
14       A.    I do, yes.
15       Q.    Do you recognize the handwriting?
16       A.    I do not, no.
17       Q.    It's not yours?
18       A.    No, not to the best of my
19 recollection.
20       Q.    How about the next page, which would
21 be JMC 00205?  Do you see, in handwriting, "Salary
22 day before you retire"?
23       A.    I do see that.
24       Q.    Do you recognize that?

20 (Pages 74 to 77)

B0269

JAMES R. KREMMEL

Page 78

1    A.    I do not recognize it.
2    Q.    Can you tell me, from the context of
3  D-8, approximately when it may have been issued?
4    A.    Can I review the document?  Just
5  take a peak for a minute?
6    Q.    Sure, absolutely.
7    A.    Sir, I believe the timing of the
8  document was April/May of 1998.
9    Q.    And you base that on?  Any
10  particular aspects of the document that suggest
11  that to you?
12    A.    A couple things, sir.  One, on JMC
13  00207, the title of the page is "Overview:
14  Conectiv Flex."  This was the enrollment -- first
15  enrollment period in the new post-merger health and
16  welfare benefits in the -- you know, it talks about
17  the enrollment period being from May through June
18  of 1998.
19    Q.    And, based on that, you can infer
20  that this was issued sometime prior to May 18th, is
21  that correct?
22    A.    That and, based on my -- there is
23  also -- well, that's the most direct reference.
24  Also, just at the time that timing would fit with

Page 79

1  the strategy of how we would -- how we would roll
2  out new plans in the company and communicate new
3  plans in the company to the leadership team.
4    Q.    Were there meetings scheduled, to
5  your recollection, in the April/May time frame for
6  the leadership team to help them understand what
7  the strategy was on rolling out the new plan?
8    A.    Was the question the date, sir?
9    MR. MALONE:  Sean, could you read it
10  back?
11    (Pertinent portion of the record is
12  read.)
13    THE WITNESS:  I don't -- not to my
14  recollection.
15  BY MR. MALONE:
16    Q.    You did not attend any such
17  meetings?
18    A.    Not to my recollection.
19    Q.    Mr. Kremmel, I've handed you a
20  document that was previously marked D-9 for
21  identification purposes.  It's headed, InSight, I-n
22  capital S-i-g-h-t, and appears to bear a date of
23  March of 1999.  You can take a moment to review it
24  and then I'll ask you a few questions about it.

Page 80

1    A.    Okay.
2    Q.    You've seen this before?
3    A.    I have.
4    Q.    What is D-9?
5    A.    What is D-9?
6    Q.    Yes.
7    A.    D-9 was a communication of Conectiv
8  to employees.
9    Q.    Do you know how D-9 was disseminated
10  to employees?
11    A.    To the best of my recollection, D-9
12  would have been distributed in a hard copy to
13  employees.
14    Q.    Internally?
15    A.    I believe this document was
16  distributed internally, yes.
17    Q.    Let me direct your attention to the
18  second page of D-9, and the left-hand column.
19    Do you see your name?
20    A.    Yes.
21    Q.    Did you author what is set forth in
22  the left-hand column?
23    A.    I believe at the time I worked with
24  an individual in our corporate communications

Page 81

1  group, but the contact would have been mine, yes.
2    Q.    Do you recall who it was you worked
3  with?
4    A.    Not specifically, no, I do not.
5    Q.    What was your position in or about
6  March of 1999?
7    A.    I believe at this point I was
8  manager of benefits for Conectiv.
9    Q.    So you had replaced Mr. Wilkinson?
10    A.    No, sir.
11    Q.    Was Mr. Wilkinson still at the
12  company in March of 1999?
13    A.    I don't know, sir.
14    Q.    Okay.
15    A.    I don't recall.
16    Q.    As of March of 1999, who did you
17  report to?
18    A.    To the best of my recollection, I
19  reported to John Zimmerman.
20    Q.    And Mr. Zimmerman, in turn, reported
21  to Don Cain?
22    A.    Don Cain, yes, sir.
23    Q.    Let me focus you on the boldface
24  type in the left-hand column on the second page of

21 (Pages 78 to 81)

B0270

JAMES R. KREMMEL

Page 82

1   D-9. I'm going to call that a timeline.
2          Do you think that's a fair
3   characterization?
4       A.   Yes.
5       Q.   As you sit here today, does the
6   timeline indicated in boldface type in the left
7   column on the second page of D-9 appear reasonably
8   accurate to you?
9       A.   I don't have any reason not to
10  believe it's accurate.
11      Q.   Okay.
12      A.   That I believe, no.
13      Q.   Let me direct your attention, if I
14  might, to the paragraph following the third set of
15  boldface type. You'll see there -- boldface says
16  "July/August, Cash Balance Pension Plan Meeting for
17  Employees," and then it references the human
18  resources team.
19          Do you see that, sir?
20      A.   Yes, I do.
21      Q.   Can you tell me who comprised the
22  human resource team? Who did you mean to embrace
23  when you used that phrase?
24      A.   I think, contemporary to this, it

Page 83

1   would have been the individuals in the compensation
2   and benefits group of the company.
3       Q.   Would that include the, I think we
4   called it, the human resources strategic business
5   partners?
6       A.   No.
7       Q.   Were there, in fact, a series of
8   meetings held in or about July or August of 1999
9   to -- for employees to attend to learn about the
10  cash balance plan?
11      A.   Yes, there were.
12      Q.   And did you participate in those
13  meetings?
14      A.   I participated in some of those
15  meetings, yes, sir.
16      Q.   Do you recall approximately how
17  many?
18      A.   I do not recall, no, sir.
19      Q.   Were the meetings recorded in some
20  form?
21      A.   The meetings were not videotaped or
22  not audio recorded, no.
23      Q.   Were there minutes maintained?
24      A.   No, not to my recollection.

Page 84

1       Q.   I've handed you a document that's
2   been marked D-10 previously. It's two pages long
3   and headed "MidWeek Extra," and bears the date of
4   June 23, 1999.
5          Why don't you take a moment to
6   review it and then I'll ask you a few questions
7   about it.
8          Let's go off the record while he
9   does that.
10          (Discussion is held off the record.)
11          Have you had an opportunity to
12  review D-10?
13      A.   Yes, I have, sir.
14      Q.   Have you seen it before?
15      A.   Yes, I have, sir.
16      Q.   When did you first see it?
17      A.   Sir, I would have first seen it in
18  June of 1999.
19      Q.   Did you write it?
20      A.   I do not recall writing the
21  document, no.
22      Q.   Do you know who authored it?
23      A.   I do not know who the author of it
24  was, no.

Page 85

1       Q.   Who was it sent to? "It" being
2   D-10.
3       A.   I don't -- I don't know who,
4   specifically, it was sent to.
5       Q.   Can you break it down by role at the
6   company?
7       A.   To the best of my recollection, this
8   was sent to all nonrepresented employees in the
9   company. To the best of my recollection.
10      Q.   Let me direct your attention to the
11  second paragraph on the first page of D-10 and
12  specifically the second sentence.
13      A.   Yes.
14      Q.   It says, "As managers, please make
15  sure that everyone who wishes to attend the
16  information session is given the opportunity."
17          Do you see that?
18      A.   Um-hum. Yes, sir, I do.
19      Q.   The next page has a schedule of
20  meetings. Correct?
21      A.   The second page does have a listing
22  of meetings, yes, sir.
23      Q.   Now, what employees were offered the
24  opportunity to attend the meetings on the cash

22 (Pages 82 to 85)

B0271

Page 86

1 balance plan?  Nonrepresented, represented, or
2 both?
3        A.    To the best of my recollection,
4 all -- all nonrepresented employees were invited.
5 Again, to the best of my recollection, I don't
6 recall that any represented employees who wished to
7 attend and were not on shift, if they wanted to
8 attend, that they could not attend, but the target
9 of the meetings was for the nonrepresented
10 employees.
11       Q.    Because they were the ones who would
12 be affected by the changes?
13       A.    That's correct.
14       Q.    Now, the last paragraph on the first
15 page says -- starts, "If you or your employees have
16 questions after receiving the opening statements,
17 please hold them until the meetings."
18       Do you see that, sir?
19       A.    I do see that.
20       Q.    I look at that and I look at the
21 statement earlier, "as managers," and it struck me
22 that this document didn't appear to be intended for
23 all nonrepresented employees.
24       Do you agree or disagree with that?

Page 87

1        A.    Sir, it's my recollection that this
2 communication went to all nonrepresented employees.
3        Q.    That's fine.
4        A.    I don't recall that it was limited
5 just to managers or supervisors.
6        Q.    In the third paragraph appearing on
7 the first page of D-10 there is a statement there
8 that the meetings that are being discussed in D-10
9 will be the best source of information on the plan
10 and employees' opening balances.
11       Do you see that, sir?
12       A.    Which paragraph?
13       Q.    Third paragraph.
14       A.    Okay.  Let me read it.
15       Q.    First page, first sentence.
16       A.    I see it.
17       Q.    Do you agree or disagree with that
18 statement?
19       A.    Contemporary to the time -- I agree
20 that, yes, the intention of these meetings was to
21 present the plan and answer any and all questions
22 that any participant in the meeting would bring up,
23 to the best of our ability.
24       Q.    That paragraph continues by

Page 88

1 discussing stories in the national media raising
2 concerns about some cash balance plans that, quote,
3 do not offer the same level of financial security
4 or grandfathering provisions as Conectiv's cash
5 balance plan.
6        Do you see that, sir?
7        A.    I do see that statement, yes.
8        Q.    Was part of the purpose of the
9 meetings that were scheduled for employees to
10 explain to them how Conectiv's cash balance plan
11 was a better plan than some of the others?
12       MS. YU:  Objection to form.
13       THE WITNESS:  I -- could you repeat
14 the question?  I want to make sure I answer it
15 correctly.  Or could you please read the question
16 back?
17       (Pertinent portion of the record is
18 read.)
19       THE WITNESS:  No.  I don't believe
20 the objective of the meeting was to explain to the
21 employees that the Conectiv plan was a better plan
22 than the others.
23 BY MR. MALONE:
24       Q.    What was the purpose of the

Page 89

1 meeting -- meetings?  Excuse me.
2        A.    The purpose of the meeting was to
3 present information on the plans and answer
4 employees' questions -- any employees' -- questions
5 that they might have about their opening cash
6 balance statement or any other questions that they
7 might have about the implementation of the new
8 plan.
9        Q.    Let me direct your attention to the
10 second sentence appearing on the third paragraph of
11 the first page of D-10.  It reads, "Recent stories
12 in the national media have raised concerns about
13 some cash balance plans that do not offer the same
14 level of financial security or grandfathering
15 provisions as Conectiv's cash balance plan."
16       Is that an accurate statement?
17       A.    I have no reason to believe it's not
18 accurate.
19       Q.    You attended some of the employee
20 meetings that were held in or about July of 1999 to
21 explain the plan, did you not?
22       A.    Yes, I did.
23       Q.    In words or in substance, were
24 employees told that, while there were recent

23 (Pages 86 to 89)

B0272

JAMES R. KREMMEL

Page 90

1  stories in the national media that raised concerns
2  about some cash balance plans, the Conectiv plan
3  offered a greater level of financial security or
4  grandfathering?
5          MS. YU:  Object to the form.
6          THE WITNESS:  I don't recall exactly
7  what the context was that we presented to
8  employees, although I do recall that there was
9  discussion of the issue as part of the
10  presentation.  I don't recall the specific
11  statements that were made or -- or what the
12  presentation was, sir.
13  BY MR. MALONE:
14      Q.    Let me take you to the next
15  paragraph.  The second sentence indicates that
16  "Vanguard will act as the plan administrator and
17  the Towers Perrin consulting firm will act as the
18  actuary."
19          Do you see that, sir?
20      A.    Second sentence in the fourth
21  paragraph -- yes.
22      Q.    That's correct.
23          As you recall the employee meetings
24  that you attended in or about July of 1999, were

Page 91

1  there representatives of Vanguard in attendance at
2  those meetings?
3      A.    There were.
4      Q.    Do you recall particular individuals
5  from Vanguard who appeared?
6      A.    I do not recall the names of the
7  individuals.
8      Q.    By title?
9      A.    No, I don't.
10      Q.    Do you know whether the same person
11  from Vanguard attended all the meetings?
12      A.    I don't recall, no, whether or not
13  the -- whether or not the same individual came to
14  each meeting.
15          As I recall, just to further -- I
16  mean, I believe there was a team from Vanguard that
17  attended, and I don't recall whether the same --
18  all or the same individuals attended each of the
19  meetings.
20      Q.    When you say there was a team, does
21  that mean that at a particular meeting there might
22  be more than one representative of Vanguard, or
23  does that mean that there might be more than one
24  representative of Vanguard who were staffing

Page 92

1  particular meetings?
2      A.    There would -- I believe that there
3  was more than one representative of Vanguard at
4  each of the meetings.  If that helps.
5      Q.    That's much more precise than what I
6  asked you.  Thank you.
7          How about Towers Perrin?  Was
8  someone from Towers Perrin at every one of these
9  meetings for employees?
10      A.    Yes, there was.
11      Q.    Was it the same person?
12      A.    Again, I don't recall whether or not
13  the same person attended each meeting or not, sir.
14      Q.    Do you remember the names of any of
15  the people from Towers Perrin?
16      A.    I do not.
17      Q.    Do you remember, by title or
18  function, who -- you know, some descriptive feature
19  of the Towers Perrin personnel?
20      A.    I don't recall the titles of any of
21  the individuals who attended the meetings.
22      Q.    How many meetings did you attend?
23      A.    I don't recall the number of
24  meetings that I attended.

Page 93

1      Q.    Did you keep notes?
2      A.    Not to my recollection, no.
3      Q.    Let me ask you to turn to the second
4  page of D-10.  The table suggests that a number of
5  meetings were scheduled at a number of locations
6  between July 12th and July 29th.
7          Do you see that?
8      A.    Yes, I do.
9      Q.    That time frame, is that consistent
10  with your recollection of when the meetings took
11  place?
12      A.    Yes, sir, it is.
13      Q.    And how would you describe the
14  format of the meeting to someone that had not
15  attended?
16      A.    The format of the meeting?
17      Q.    Yes.
18      A.    It was a -- to my recollection, it
19  was a presentation and question and answer period
20  at each of the presentations, sir.
21      Q.    And at each presentation was there
22  someone from human resources to give a
23  presentation?
24      A.    There would have been, yes.

24 (Pages 90 to 93)

B0273

JAMES R. KREMMEL

Page 94

1    Q.    And was there someone from Vanguard
2  at each?
3    A.    To the best of my recollection, yes,
4  there was.
5    Q.    And was there someone from Towers
6  Perrin?
7    A.    Again, to the best of my
8  recollection, there was.
9    Q.    Were there any other team members
10 who were part of the presentation team at these
11 employee meetings, other than HR, Vanguard, Towers
12 Perrin?
13    A.    Team members?  I'm not sure what you
14 mean by "team member."
15    Q.    Let me do it in a little colloquial
16 fashion.  The employees walked into a room; there
17 were a bunch of people up on the dais giving a
18 presentation.  Somebody from HR, somebody from
19 Vanguard, somebody from Towers Perrin.
20        Anybody else?
21    A.    I don't recall any other specific
22 company representatives that were there, sir.
23    Q.    Any outside representatives?
24    A.    I don't specifically recall any

Page 95

1  outside representatives being at any of the
2  meetings.
3    Q.    Okay.
4        Now, from the chart, it appears that
5  you were having multiple meetings on multiple days
6  at multiple locations to roll out the cash balance
7  plan.
8        Is that correct?
9    A.    That's correct, yes, sir.
10    Q.    What measures were taken to make
11 sure that the presentation was reasonably
12 consistent from location to location and from time
13 to time?
14    A.    Again, to the best of my
15 recollection, the same presentation was utilized at
16 each location.
17    Q.    In what form was that presentation?
18    A.    It was an overhead PowerPoint
19 presentation that was followed at each of the
20 presentations.
21    Q.    And were notes provided to the
22 speakers to assist them with the PowerPoint
23 presentation?
24    A.    Not to my recollection sir, no.

Page 96

1    Q.    Do you know who prepared the
2  PowerPoint presentation?
3    A.    I do not.
4    Q.    Did you assist in preparing it?
5    A.    I recall assisting in it, yes.  I
6  don't recall who actually prepared it.
7    Q.    At any of the meetings that you
8  attended, were you one of the people providing the
9  presentation?
10    A.    I believe I was, yes.
11    Q.    Did that happen on more than one
12 occasion?
13    A.    To the best of my recollection, it
14 did, yes.
15    Q.    Can you tell me something about
16 locations at which you may have appeared to give a
17 presentation?
18    A.    I believe the first meeting that's
19 listed on July 12th, I attended that meeting, and I
20 believe -- to the best of my recollection, I also
21 attended the meetings at NDGO and at King Street on
22 July 13th and July 14th.
23    Q.    Okay.
24    A.    Those are ones that I -- I

Page 97

1  believe -- I believe -- my recollection is I
2  attended all three of those.
3        I don't recall which of the others
4  that I attended.  Although there were others, I
5  just don't recall which ones I would have attended,
6  sir.
7    Q.    What does NDGO mean?
8    A.    That's an acronym for Northern
9  Division, General Offices.  It's in Newark,
10 Delaware.
11    Q.    Is that where you are now?
12    A.    That's where my office is, yes.
13    Q.    Did they take attendance at the
14 meetings?
15    A.    Not to my recollection.
16    Q.    Were the meetings mandatory?
17    A.    No.  The employees -- it was not a
18 mandatory condition of employment that they attend.
19    Q.    Do you have any ability to estimate
20 what percentage of employees attended?
21    A.    Only my gut recollection at the
22 time.  It's my -- it would be subjective, not
23 objective.
24    Q.    I'll take subjective.

25 (Pages 94 to 97)

B0274

JAMES R. KREMMEL

Page 98

1    A.    If they were available, they were
2   there, and we made it very -- we tried very hard at
3   the time, as we did, typically, in the company with
4   any types of new programs, to do multiple times,
5   multiple shifts, because some of the engineers and
6   supervisors at the power plants would have been on
7   shift.
8           We tried to make sure that -- with
9   this type of a roll-out, we tried to make sure that
10  you had the ability for employees to be available
11  for one or more of the meetings.  And they weren't
12  precluded from coming -- only going to one, if they
13  had other questions.
14   Q.    How were the questions handled?
15   A.    Right at the end of the presentation
16  there was a question and answer period.
17   Q.    Were suggested answers to
18  anticipated questions prepared in advance of the
19  meetings?
20   A.    Not to my recollection, no, sir.
21   Q.    So that, depending upon the
22  particular meeting that an employee attended, the
23  same question might be answered slightly
24  differently, from one meeting to the next?

Page 99

1    A.    Slightly differently?
2           Possibly.
3    Q.    Who was responsible for answering
4   the questions?  Was it a human resources person or
5   was it allocated among human resources, Vanguard
6   and Towers Perrin?
7    A.    My recollection of the time is that
8   it was a team question and answers, and, by "team,"
9   I mean it would have been the -- a combination of
10  all of the above, the company representatives,
11  Vanguard and Towers Perrin, depending on the
12  question and the context of the question.
13          If it had something to do with what
14  number would I call if I have a question for
15  Vanguard, the Vanguard representative would
16  respond.  If it was a technical question around how
17  my starting cash balance was estimated, it might
18  have been Towers who would respond.  If it was a
19  general question of, you know, business or
20  whatever, the company representative might respond.
21          It would really depend on what the
22  question was, but that's my recollection of how the
23  questions were answered.  We would look to the
24  individual on the team who was in the position to

Page 100

1   give the best and most concise answer to the
2   question.
3    Q.    Now, in the actual presentation
4   part, did Vanguard representatives speak?
5    A.    To the best of my recollection, they
6   did, yes.
7    Q.    And what topics did they generally
8   cover?
9    A.    Again, to the best of my
10  recollection, it was their role as recordkeeper and
11  administrator of the plan, and that was a new role
12  for them.  It was one of the first opportunities to
13  have them in front of the employees.
14   Q.    Did representatives of Towers Perrin
15  speak as part of the presentation at these
16  meetings?
17   A.    They did, to the best of my
18  recollection.
19   Q.    To the best of your recollection,
20  what topics did they cover?
21   A.    Topics concerning the calculation
22  of -- the calculation of the initial cash balances,
23  and also the plan design type questions.
24   Q.    And what topics did the human

Page 101

1   resources people generally cover?
2    A.    Overview questions -- well, act as
3   the facilitator of the meeting, do introductions,
4   and then more of some kind of -- more background
5   information on the plan.
6    Q.    If I can focus you back on the
7   second page of D-10 for a second.  The table has,
8   in the far right-hand column, a series of on-site
9   contacts.
10          Do you see that?
11   A.    I do.
12   Q.    The first one is Marie Falkowski.
13          Do you know what her position was in
14  or about July of 1999?
15   A.    To the best of my recollection, she
16  was the building attendant at the conference
17  center -- the Conectiv conference center.
18   Q.    So, if I look at this table -- or
19  this column, these are not people that are in the
20  human resources department, are they?
21   A.    No, sir.
22   Q.    Is there something you need to
23  correct?
24   A.    I believe one of the individuals

26 (Pages 98 to 101)

B0275

JAMES R. KREMMEL

Page 102

1  might have been in the human resources department
2  at the time.
3       Q.    Who would that be?
4       A.    I believe Kelley McMillan might --
5  might have been in human resources at the time,
6  sir.
7       Q.    And she's listed for the July 14th
8  King Street meeting?
9       A.    July 14th, yes, and that -- and,
10  again, the rest of these individuals were
11  secretaries or building attendants at these
12  locations.  But I believe Kelley McMillan might
13  have been in human resources as an administrative
14  assistant.
15       Q.    Was the King Street facility the
16  principal executive offices at that time?
17       A.    At that time, yes, sir, it was.
18       Q.    Thank you for that clarification.
19            Moving on to D-12.  I've handed you
20  a document we've previously marked as D-12 for
21  identification purposes.  It's headed "InSight
22  Online."  Bears the date, July 9, 1999 in the upper
23  quarter of the first page, but also bears a date of
24  8/9/2006 at the bottom of the page, next to the

Page 103

1  URL.
2       A.    Okay.
3       Q.    Have you seen this before?
4       A.    I have.
5       Q.    Can you tell me what this is?
6       A.    This was a communication -- employee
7  communication developed by Conectiv.
8       Q.    How was this disseminated?
9       A.    To the best of my recollection, this
10  was disseminated by E-Mail or on the company
11  Intranet.
12       Q.    Do you recall when the company
13  established the Intranet?
14       A.    I do not, no.
15       Q.    The second to last paragraph on the
16  first page of D-12 indicates that the schedule for
17  the meetings was revised.
18            Do you see that?
19       A.    I do.
20       Q.    Can you summarize for me in any way
21  what the changes were to the schedule that we
22  previously saw?
23       A.    I don't recall, sir.
24       Q.    Were more meetings scheduled?

Page 104

1       A.    I don't recall, sir.
2       Q.    Did the meetings extend into August?
3       A.    I don't recall, sir.
4       Q.    Do you know who prepared D-12?
5       A.    I do not know the specific
6  individual that prepared it, no, I do not.
7       Q.    Was there someone at the company, in
8  or about July of 1999, who was responsible for
9  preparing the InSight Online document?
10       A.    There was a department who was
11  responsible for it.  I don't believe there is -- I
12  don't know if there is any one individual that was
13  responsible for it.
14       Q.    And what department was that?
15       A.    It would have been the company's
16  communications or corporate communications
17  department.
18       Q.    Who was the head of that department
19  in or about July, 1999?
20       A.    I do not recall.
21       Q.    Do you remember anyone who was the
22  head of that department in the period between, say,
23  1997 and the close of 1999?
24       A.    The head of the department?

Page 105

1            I do not recall any heads of the
2  department.  Sorry.
3       Q.    Can you identify anyone that worked
4  in that department in the period from late 1997
5  through the close of 1999?
6       A.    I remember there was a gentleman by
7  the name of Larry Boehm, B-o-e-h-m, who was in the
8  department at the time.  I do not believe he was
9  the manager of the department, though, sir.
10       Q.    Did you interact with Mr. Boehm in
11  connection with employee communications with
12  respect to the adoption of the cash balance plan?
13       A.    I recall working with Larry on
14  different communications.  I don't recall if any of
15  them had specifically to do with the adoption of
16  the cash balance plan.
17       Q.    Let me rephrase the question and not
18  make it so narrow.
19            We've reviewed this morning, and a
20  little bit this afternoon, various communications
21  that were provided to employees about changes in
22  the overall benefit plans, and we've gone from
23  exhibit to exhibit to exhibit.
24            Did you work with Mr. Boehm on any

27 (Pages 102 to 105)

B0276

JAMES R. KREMMEL

Page 106

1  of those, to your recollection?
2      A.    I believe Mr. Boehm is listed as the
3  editor on one of those communications that we've
4  reviewed today, yes, sir.
5      Q.    Anyone else you can recall working
6  with in the corporate communications department in
7  the period from late 1997 through the close of
8  1999?
9      A.    I don't recall anyone else
10 specifically, no.  He's the only one.
11     MR. MALONE:  Why don't we break now.
12     (Recess called at 12:56 p.m.)
13     (Resumed at 1:59 p.m.)
14 BY MR. MALONE:
15     Q.    We had a break for lunch.
16     Anything that you need to correct in
17 your prior testimony?
18     A.    Not at this time.
19     Q.    We were looking at D-12 before
20 lunch.  Can you just grab that real quickly.
21     A.    Got it.
22     Q.    Okay.
23     Do you know, as of 1998 and 1999,
24 whether all employees had access to computers at

Page 107

1  their workplace?  Carving out the represented
2  employees.
3      A.    I don't recall whether every
4  employee had a computer on their desk.  No, I don't
5  recall at that point.  That's 1998, '99.  I can't
6  recall.
7      Q.    How about E-Mail?  Let me re-do
8  that.
9      How about official company E-Mail?
10     A.    I don't recall whether every
11 employee had an account.  If they had a
12 workstation, my -- to the best of my knowledge,
13 they would have had an E-Mail.
14     I don't -- can you ask the question
15 again?  Did you say, just the nonunion employees?
16     Q.    Yes.
17     Could you please read the question
18 back?
19     MR. MALONE:  Let's read him back the
20 last couple questions and see where we are, and
21 give him his answers, too.
22     (Pertinent portion of the record is
23 read.)
24 BY MR. MALONE:

Page 108

1      Q.    Are you satisfied with your
2  response?
3      A.    No.
4      Q.    Do you want to try another answer?
5      A.    I believe all of the nonrepresented
6  employees would have had an E-Mail account and
7  access to E-Mail.
8      I don't believe -- I'm not sure that
9  all of them actually had a PC on their desk.
10     Q.    Thank you for the clarification.
11     A.    It was the union employees that -- I
12 believe we had some kiosks set up for the non --
13 the nonmanagement employees to be able to access,
14 but I'm not sure exactly how some of the non --
15 nonrepresented management employees, whether
16 everyone had a PC --
17     Q.    Okay.
18     A.    -- but I believe they all had an
19 E-Mail account.
20     Q.    Do you know approximately when the
21 E-Mail system reached that point that, basically,
22 all nonmanagement employees had an account?
23     A.    I do not remember, no.
24     Q.    Do you remember when you first got

Page 109

1  an E-Mail account?  Official company E-Mail
2  account?
3      A.    No, I don't, sir.
4      Q.    That's fine.  Thanks.
5      I'm going to hand you a document
6  which we previously marked as D-22 for
7  identification purposes.  It's a multi-page
8  document.  The first page is headed, "Introducing
9  The New Cash Balance Retirement Plan," and bears
10 the logo of Conectiv.
11     Why don't you take a moment to
12 review D-22 and I'll ask you a few questions about
13 it.
14     A.    Okay, sir.
15     Q.    Have you seen D-22 before?
16     A.    I have.
17     Q.    Can you recall, to the best of your
18 ability, when it was you first saw D-22?
19     A.    Most recently, I had seen it after
20 the first of this year.  I don't recall when, prior
21 to this year, I saw it.  I do recall seeing it, but
22 I can't put a time frame to it.
23     Q.    That's fine.
24     Did you have a role in the

28 (Pages 106 to 109)

B0277

JAMES R. KREMMEL

Page 110

1  preparation of D-22.
2      A.    I don't recall that I did.
3      Q.    Do you know who was responsible for
4  preparing D-22?
5      A.    I believe -- let me just read one
6  more thing.
7          First off, I believe this is not one
8  document, sir; I believe this is two documents.
9      Q.    Okay.
10     A.    I believe pages MWW 00308, MWW
11  00309, MWW 00310 are one document --
12     Q.    You know what?  I agree with you.
13     A.    -- and I --
14     Q.    311 is a separate document.  I'm not
15  quite sure how we got to that point, but let's
16  focus on everything except for 311.
17     A.    Okay.
18          I believe this document was prepared
19  by the Vanguard Group.
20     Q.    And do you know approximately when
21  it was disseminated?
22     A.    I do not.
23     Q.    Do you know how it was disseminated?
24     A.    Best of my recollection, this would

Page 111

1  have been mailed to participants, sir.
2      Q.    By Vanguard?
3      A.    By Vanguard, yes.
4      Q.    To your recollection, did you
5  receive one at home?
6      A.    I don't recall individually
7  receiving one -- this one at home.
8      Q.    Can you tell me approximately when
9  Vanguard issued this document?
10     A.    From the context of the document, it
11  appears that it would have come out in the middle
12  of the year 1999, and I get that from the last
13  italicized sentence on Page MWW 0308, in the top
14  part of the page, where it says, "The cash balance
15  plan officially took effect January 1, 1999.  You
16  recently received a statement showing your opening
17  balance in the new plan."
18     Q.    The statements were mailed
19  approximately when?
20     A.    Approximately, I believe, June of
21  '99 -- May/June, '99, to the best of my
22  recollection.
23     Q.    Who was responsible for mailing the
24  initial cash balance account statements?

Page 112

1      A.    I don't recall who was responsible
2  for mailing them initially from participants.  I --
3  I don't recall exactly who mailed them.
4      Q.    Do you know who prepared them?  Was
5  it Vanguard or the company or was a third-party
6  involved?
7      A.    I believe Vanguard prepared the
8  statements, sir.
9          MR. MALONE:  That's all I have for
10  you on D-22.
11          P-4.
12          (Exhibit P-4 is marked for
13  identification.)
14  BY MR. MALONE:
15     Q.    The court reporter has handed you a
16  document which we marked as P-4 for identification
17  purposes.  It's perhaps six or seven pages long and
18  appears to be a series of PowerPoint slides.
19          Why don't you take a moment to
20  review the document and I'll ask you some
21  questions.  For the record, P-4 begins on MWW
22  00301.
23     A.    Okay, I'm ready.
24     Q.    Tell me what P-4 is.

Page 113

1      A.    To the best of my recollection, P-4
2  is another presentation that was given at employee
3  meetings conducted to communicate the new cash
4  balance plan to employees in the summer of 1999.
5      Q.    So this is the presentation we were
6  talking about earlier when I was asking about the
7  meetings?
8      A.    To the best of my recollection, this
9  is the presentation, yes.
10     Q.    Was it handed out to employees?
11     A.    To the best of my recollection,
12  these were the PowerPoint slides that were
13  presented and that we also distributed a copy of
14  the PowerPoint slides to employees at some point
15  during the meeting.
16     Q.    Was it distributed in this format,
17  where you have six slides on a page?
18     A.    Yes, sir, to the best of my
19  recollection.
20     Q.    Do you recall who prepared the
21  PowerPoint presentation?
22     A.    I do not recall specifically who
23  prepared it, no.
24     Q.    Did you have a role in the

29 (Pages 110 to 113)

B0278

JAMES R. KREMMEL

Page 114

1   preparation of it?
2       A.    I believe I had -- I had part of the
3   review of the presentation, yes.
4       Q.    Do you recall discussing the
5   PowerPoint presentation with representatives of
6   Vanguard?
7       A.    I don't personally recall discussing
8   it with Vanguard. I would infer that, as they were
9   a presenter in here, that we would have reviewed
10  their slides with them, or they would have given us
11  their slides of information to present as part of
12  this, but I don't recall personally talking with
13  Vanguard.
14      Q.    How about Towers Perrin? Do you
15  recall any personal discussion between you and
16  representatives of Towers Perrin in the context of
17  discussing these slides?
18      A.    I don't recall personally
19  discussing -- preparing the slides with -- with
20  Towers Perrin, no.
21      Q.    Now, you had attended some of the
22  employee meetings in or about July of '99 that were
23  focused on the roll-out of the new plan, but not
24  all of them, is that right?

Page 115

1       A.    That's correct.
2       Q.    At the meetings that you attended,
3   were the same slides used?
4       A.    To the best of my recollection, yes,
5   this was the presentation.
6       Q.    Approximately how long was the
7   presentation, in terms of duration?
8       A.    Best of my recollection, it was less
9   than an hour for the formal presentation part, sir.
10      Q.    And then you had a period after that
11  part for questions?
12      A.    Yes, we did.
13      Q.    Let me direct you to the second page
14  of P-4. If you look at the lowest left-hand slide,
15  there is a graph there.
16           Do you know what that is?
17      A.    It is difficult to read --
18      Q.    I agree with that.
19      A.    -- but, to the best that I can read
20  it, I believe it is yields on 30-year U.S. Treasury
21  bonds as of certain particular dates in time.
22      Q.    And 30-year U.S. Treasury bonds were
23  relevant for purposes of the class -- or the cash
24  balance plan because that was the index that was

Page 116

1   used to set the interest credits, is that correct?
2       A.    Yes.
3       Q.    Let me withdraw that and fix that,
4   because I didn't quite get that right.
5           The rate for 30-year U.S. Treasury
6   bonds is relevant to an understanding of the cash
7   balance plan because that is the rate used in any
8   particular plan year to calculate an employee's
9   interest credits in his or her hypothetical
10  account, is that correct?
11      A.    That's one reason why it might be
12  relevant, yes.
13      Q.    Are there others?
14      A.    I'm not sure that there are, but I
15  think that's one of them, as it relates to this
16  plan.
17      Q.    Now, if we look at the slide at the
18  top of the left-hand column on the second page of
19  P-4, there are bullet points indicating that cash
20  balance plans are controversial and have been the
21  subject of certain criticisms.
22           Do you see that, sir?
23      A.    On page --
24      Q.    Page 2, left column, top slide.

Page 117

1       A.    Oh, okay.
2           Yes, I do see that.
3       Q.    But the next slide subsequent to
4   that comments on certain facts that are intended to
5   rebut the criticisms, does it not?
6           MS. YU: Objection to form.
7           THE WITNESS: Could you read that
8   back for me, please?
9           (Pertinent portion of the record is
10  read.)
11  BY MR. MALONE:
12      Q.    Let me fix it. I gave you an
13  ambiguous question, depending on which way you move
14  around the page.
15           I had focused you first on the slide
16  in the upper left-hand corner of Page 2 of P-4,
17  which recounted certain controversial aspects of
18  the cash balance plan and criticisms of it. The
19  slide that comes directly beneath that outlines
20  facts that are intended to rebut those criticisms,
21  does it not?
22           MS. YU: Objection to form.
23           THE WITNESS: I don't think -- no.
24  No, I don't think so.

30 (Pages 114 to 117)

B0279

JAMES R. KREMMEL

Page 118

BY MR. MALONE:
1
2    Q.    So, for example, the statement that
3    "The new program is not designed to provide cost
4    savings for Conectiv" is not intended to address
5    the criticism that cash balance plans mask cost
6    cutting?
7         MS. YU:  Objection to form.
8         THE WITNESS:  No, I don't believe
9    that's what it was intended to do directly, no.
10   BY MR. MALONE:
11        Q.    Well, what was it intended to do, in
12   your view?
13        A.    I think this -- in my -- best of my
14   recollection, this information was put together to
15   distinguish and -- and frame the retirement
16   plans -- the new retirement plans that the company
17   was putting in place as the plans for the company.
18        MR. MALONE:  Can I hear the answer
19   read back?
20        (Pertinent portion of the record is
21   read.)
22   BY MR. MALONE:
23        Q.    Distinguish from what?
24        A.    The previous retirement plans that

Page 119

1    the company had had in place.
2         Q.    Those are the heritage plans at
3    Atlantic City Electric and Delmarva?
4         A.    In part, yes.
5         Q.    Let me move you to the next slide
6    immediately to the right, so that we are in the
7    middle of the right-hand column of Page 2 of P-4.
8         A.    I'm with you.
9         Q.    The first bullet point indicates
10   that the "New cash balance plan provides higher
11   than average annual contribution credit."
12        Was that intended to rebut some of
13   the criticisms of cash balance plans alluded to in
14   one of the earlier slides?
15        MS. YU:  Objection to the form.
16        THE WITNESS:  I don't believe -- I
17   don't believe so, no, sir.  Not to the best of my
18   recollection.
19   BY MR. MALONE:
20        Q.    In the upper right-hand corner of
21   Page 2 of P-4 there is a line graph there.
22        Do you see that, sir?
23        A.    Barely.  Yes.
24        Q.    Do you know what that is?

Page 120

1         A.    I believe I do, yes.
2         Q.    What is your understanding of that
3    graph on Page 2 of P-4 in the upper right-hand
4    corner?
5         A.    I believe it is trying to show
6    accrual patterns of benefits between two different
7    plans.
8         Q.    Do you know any of the data or
9    assumptions that went into this graph?  This graph
10   being the one in the upper right-hand corner of
11   Page 2 of P-4.
12        A.    No, I do not.
13        Q.    Do you know who prepared the graph?
14        A.    No, I do not.
15        Q.    Do you know whether it was prepared
16   internally or by Towers Perrin?
17        A.    I do not.
18        Q.    Are you familiar with the measures
19   that have been undertaken by Conectiv or Pepco
20   Holdings to gather documents that might be relevant
21   to this litigation?
22        A.    I can -- I'm aware of what my
23   efforts were, related to that, sir.
24        Q.    Could you describe what your efforts

Page 121

1    were.
2         A.    To review and look through archived
3    historical documents and information and collect
4    such information.
5         Q.    Did you locate a copy of these
6    PowerPoint slides as part of that process?
7         A.    I don't recall whether or not I
8    found that -- this particular slide as part of
9    that, sir.
10        Q.    If you wanted to find the original
11   PowerPoint slides so that they could be big enough
12   that we all could read them, is there a particular
13   person we'd go to at the company?
14        A.    I would have to fall back to the
15   manager of compensation and benefits for the
16   company, sir.
17        Q.    And who is that presently?
18        A.    His name is Mike Sullivan.
19        Q.    Thank you.  You had answered that
20   for me earlier.
21        Do you know whether Mr. Sullivan was
22   contacted as part of the defendants' efforts to
23   collect documents relevant to this litigation?
24        A.    I don't -- other than the

31 (Pages 118 to 121)

B0280

JAMES R. KREMMEL

Page 122

1  discussions that I had with him as part of
2  reviewing documents, I don't know what other
3  contact might have been had, sir.
4       Q.    Could you summarize what discussions
5  you had with Mr. Sullivan on the effort to locate
6  documents relevant to this litigation?
7       A.    Other than letting him know that, as
8  part of my job assignments or part my work
9  assignments, that I was working assisting counsel,
10  in terms of locating information, and that, you
11  know, if I needed any assistance from any of his
12  team members, just so that he would know what was
13  going on in advance, from a courtesy standpoint.
14       Q.    Did he furnish you with any
15  documents?
16       A.    Not to my knowledge.  I don't recall
17  that he provided me anything, no.
18       Q.    Did you convey all the documents
19  that were located to counsel or did you convey some
20  and others convey others?
21       A.    I conveyed everything that I
22  identified to counsel.
23            I can't speak to others.
24       Q.    Let me take you to MWW 00305 on P-4.

Page 123

1            MS. HOFFMAN:  Four or 5?
2            MR. MALONE:  Five.
3  BY MR. MALONE:
4       Q.    The middle and lower slides in the
5  right-hand column have some tables.  One is headed,
6  "Conectiv Cash Balance Account vs. Prior Plan-
7  Delmarva," and the other is "Conectiv Cash Balance
8  Account vs. Prior Plan-Atlantic."
9            Do you see those?
10       A.    I believe so, yes, sir.
11       Q.    Do you know what the data sources
12  underlying these tables were?
13       A.    The specific data sources for these?
14            I don't know specifically, no.
15       Q.    Do you have any knowledge at all as
16  to what the source data there is?  Where it comes
17  from?
18       A.    I could -- I could hypothesize.  I
19  do not know specifically who prepared the tables.
20       Q.    If you were going to prepare tables
21  like this, where would you go to get the data?
22       A.    This information that we are looking
23  at here, I would -- I would expect that this was
24  provided by the company's actuary.

Page 124

1       Q.    Which, at the time, was Towers
2  Perrin?
3       A.    That's correct.
4       Q.    And currently is Watson Wyatt?
5       A.    That's correct.
6       Q.    Now, you used these slides
7  personally at certain meetings, is that correct?
8       A.    I was in attendance at certain
9  meetings where these slides were used, yes.
10       Q.    Were you a presenter at certain
11  meetings?
12       A.    Yes.
13       Q.    And, when you did the presentation,
14  did you use these slides?
15       A.    Yes.
16       Q.    Okay.
17            What I'd like you to do, if you
18  could, is page through and tell me if you can
19  identify particular slides that you personally did
20  not handle because you asked Towers Perrin to
21  handle, because you asked Vanguard to handle.
22            Anything on Page 1?
23       A.    Make sure I understand your
24  question.  You are asking me -- I'll restate it to

Page 125

1  you.  You are asking me to state which of these I
2  personally would have presented and which of these
3  would have been presented by another party --
4       Q.    Bingo.
5       A.    -- is that correct?
6       Q.    That's correct.
7       A.    At this point I don't recall which
8  ones I would have done.  Again, I could
9  hypothesize, based on some of the topics.
10            For example, the ones that are
11  titled "The Vanguard," I would hypothesize that
12  Vanguard was a presenter, but, other than that, I
13  don't recall who presented what this many years
14  ago.
15       Q.    Okay.  That's all I'm going to have
16  for you on that one.
17            I've handed you D-13, which appears
18  to be another set of P-4.
19            Would you agree with that?
20       A.    It appears to be, yes, sir.
21       Q.    Your name is misspelled, I see, on
22  the first page there.
23            Do you see that?
24       A.    I see a reference to a Jim Krimble,

32 (Pages 122 to 125)

B0281

Page 126

1  yes.
2      Q.    That's not your name.
3            Do you recognize that handwriting?
4      A.    I do not, no, sir.
5      Q.    And, if you go to MWW 00221, do you
6  see handwriting at the bottom?
7      A.    I do, yes.
8      Q.    Do you recognize that?
9      A.    I do not recognize it, no.
10     Q.    That's all I have for you on D-13.
11  Thank you.
12            I've handed you what's been marked
13  D-19 for identification purposes.  Why don't you
14  take a moment to look at it.  It's actually kind of
15  long, so I'm not going to tell you to read the
16  whole thing, but you can look at any part of it you
17  want.
18     A.    Okay.
19     Q.    Have you seen this before?
20     A.    Yes, I have.
21     Q.    And what is D-19?
22     A.    D-19 was the company -- or
23  Conectiv's summary plan description for the cash
24  balance sub-plan of the Conectiv retirement plan.

Page 127

1      Q.    Can you tell me approximately when
2  D-19 was issued?
3      A.    I do not recall.
4      Q.    Were you involved in the preparation
5  of D-19?
6      A.    I don't recall that I was involved.
7      Q.    Historically, in the period of 1997
8  to the present, do you periodically work on summary
9  plan descriptions?
10     A.    I have, yes.
11     Q.    Do you recall working on summary
12  plan descriptions with respect to the pension plan?
13     A.    I recall reviewing some of the
14  documents, some of the information in summary plan
15  descriptions.  I just don't recall the time frame,
16  when, sir, or whether I did on this document.
17     Q.    In the period from late 1997 through
18  the end of calendar year 1999, were there people at
19  Conectiv that were normally responsible for the
20  preparation of summary plan descriptions?
21     A.    Responsible in -- from the
22  standpoint that they were accountable to do it.  I
23  believe that we used -- utilized legal counsel to
24  actually draft this document, sir --

Page 128

1      Q.    In-house or --
2      A.    -- but the compensation benefits
3  department overall, and human resources, would have
4  been accountable to get it done, but I believe we
5  utilized legal counsel to draft this document.
6      Q.    Was that someone in-house or an
7  outside firm?
8      A.    I believe it was -- it was an
9  outside firm.
10     Q.    How was the summary plan description
11  disseminated to employees in connection with the
12  cash balance sub-plan?
13     A.    To the best of my recollection, the
14  summary plan descriptions were prepared and printed
15  and distributed to employees.  I do not recall
16  whether they were mailed or whether they were made
17  available or available upon request, but I know
18  that they were printed and -- I just don't recall
19  the exact method of distribution.
20     Q.    Are there records kept that you
21  could look at that would tell you how particular
22  summary plan descriptions were disseminated to the
23  employees?
24     A.    I don't believe so -- that there

Page 129

1  are, no, sir.
2            (Exhibit P-5 is marked for
3  identification.)
4  BY MR. MALONE:
5      Q.    The court reporter has handed you a
6  document marked P-5 for identification purposes.
7            Can you tell me what it is?
8      A.    A document prepared by Conectiv,
9  summary plan descriptions for the -- for three
10  different retirement sub-plans.
11     Q.    Let's just very quickly touch on
12  the -- we spent a fair amount of time on the cash
13  balance summary.  Let's quickly touch on the
14  Delmarva and ACE sub-plans.
15            Who was covered by those?
16     A.    You need to give me a time period so
17  that I could answer that, sir.
18     Q.    Let's focus on the effective date
19  when the cash balance sub-plan went into place,
20  which is January 1, 1999.
21            At that time were there also two
22  other sub-plans?
23     A.    Yes, there were.
24     Q.    One was Delmarva and one was ACE?

33 (Pages 126 to 129)

B0282

JAMES R. KREMMEL

Page 130

1   A.   Yes, they were.
2   Q.   Which employees were covered by the
3  Delmarva sub-plan as of January 1, 1999?
4   A.   Represented employees in the company
5  with Local 1238 and 1307.
6   Q.   Has that changed between 1999 and
7  the present?  Let me unpack that and do this a
8  different way.
9       Is there still a Delmarva sub-plan?
10  A.   There is.
11  Q.   Has the scope of that plan, in terms
12 of the categories of employees covered by it,
13 changed since 1999?
14  A.   In terms of the categories that are
15 covered, to the best of my knowledge, it has not.
16  Q.   Okay.
17  A.   To the employees that are covered.
18  Q.   Let's shift to the ACE sub-plan.  As
19 of January 1, 1999, what employees would be covered
20 by the ACE sub-plan?
21  A.   Represented employees with IBEW
22 Local 210.
23  Q.   Has that changed since January 1,
24 1999?

Page 131

1   A.   In terms of who's covered, no.
2   Q.   Can you tell me approximately when
3  Plaintiffs-5 was issued?
4   A.   Sir, I don't -- other than going
5  through the whole document, I don't see -- it's not
6  obvious to me there is a date of issuance on this.
7  I could surmise, but I don't --
8   Q.   Let me send you to MWW 00056, which
9  would be the second physical page of the document.
10  A.   Okay.
11  Q.   In the lower right-hand corner there
12 is "PHLEGAL," followed by numbers and some other
13 file identification.
14  A.   I see that, yes.
15  Q.   Do you know what that file
16 identification means?
17  A.   To the best of my knowledge, it
18 identifies a legal document -- a Pepper Hamilton
19 legal document.
20  Q.   Do you know where the electronic
21 version of this document would be lodged?
22  A.   I have no idea.
23  Q.   Can you tell, from looking at
24 this -- at P-5, whether it was formally issued to

Page 132

1  employees or not?
2   A.   I have no reason to think that it
3  was not issued to employees.  There is -- I see no
4  markings of "Draft" or "Confidential Copy" or
5  anything on this that would lead me to believe that
6  it was not issued to them, no.
7   Q.   Let me send you to MWW 00073 and 74
8  for a second.  At the bottom, last line on the
9  page, it says, "Employer identification number,"
10 then it's blank.
11  A.   Yes.
12  Q.   And then on the subsequent page, the
13 participating employer, the employer identification
14 number, and the name and address of the trustee are
15 also absent, is that correct?
16  A.   Appears to be, yes.
17  Q.   Would it be reasonable to infer that
18 this was not formally issued, based on those
19 omissions?
20  A.   No, I wouldn't make that assumption.
21      (The following portion of this
22 transcript has been designated confidential.)
23
24

Page 133

1      (Exhibit P-6 is marked for
2  identification.)
3      MR. MALONE:  The court reporter has
4  handed you, Mr. Kremmel, a document we marked
5  Plaintiffs-6 for identification purposes.  It's
6  headed, "Copy, Pepco Holdings, Inc., B L England
7  Management Enhanced Severance Plan."  Why don't you
8  take a look at it and I will ask you some questions
9  about it.
10      I should note, for the record, that
11 the document has been designated as confidential
12 under the Protective Order, and we'll need to
13 designate the discussion of it in the transcript as
14 confidential, as well.
15      (Discussion is held off the record.)
16      THE WITNESS:  Okay, sir, I'm ready.
17 BY MR. MALONE:
18  Q.   Have you seen Plaintiffs-6 before?
19  A.   I have not.
20  Q.   Do you know what the B L England is
21 a reference to?
22  A.   Best of my knowledge, it's referring
23 to the B L England generating station located in
24 southern New Jersey.

34 (Pages 130 to 133)

B0283

CONFIDENTIAL

Page 134

1      Q.     Are you familiar with a B L England
2  Management Enhanced Severance Plan?
3      A.     Not specifically, until I've seen
4  this document.
5      Q.     Were you aware that there was a
6  reduction in force going on at B L England?
7      A.     I was, yes.
8      Q.     Did you understand that, as part of
9  the reduction in force, some employees would be
10  offered a severance program?
11      A.     I was.
12      Q.     Did you understand that the
13  severance program would be conditioned upon their
14  granting a release?
15      A.     That is the standard practice of the
16  company, yes, sir.
17      Q.     Do you know who prepared PL-6?
18      A.     Who individually prepared it?
19          I do not, sir.
20      Q.     Over the course of your employment
21  at Conectiv, and now Pepco Holdings, you've had
22  various benefits responsibilities.  In that
23  context, have you become familiar with the
24  company's general practice in handling severance

Page 135

1  packages?
2      A.     I have, yes.
3      Q.     And is it generally customary that
4  the company has a release when it offers a
5  severance package?
6      A.     It is.
7      Q.     Is there a particular pattern of who
8  prepares the release?  Whether it's an internal
9  company lawyer or outside counsel?
10      A.     In my experience, it is usually
11  internal counsel for the company.
12      Q.     Are there particular internal
13  lawyers that have that as their personal
14  responsibility?
15      A.     Not that I'm aware of, that there is
16  one attorney that specifically does releases, no.
17  Not to my knowledge.
18      Q.     Have you worked with a particular
19  in-house counsel on releases in the past?
20      A.     Yes, I have.
21      Q.     In the context of severance
22  programs?
23      A.     Yes, I have.
24      Q.     Can you tell me who you've worked

Page 136

1  with in the past in that context?
2      A.     The attorney that I've worked with's
3  name is Susan Power.
4      Q.     Is she still there?
5      A.     Yes, she is.
6      Q.     Let me direct your attention to the
7  second page of P-6 for a second.  In Paragraph 3,
8  part of the release covers matters arising under
9  the Employee Retirement Income Security Act of
10  1974.
11          Do you know whether employees who
12  were tendered a release, in the form of
13  Plaintiffs-6, were advised that there was pending
14  litigation arising under that statute?
15      MS. YU:  Could you read that back?
16      MR. MALONE:  Sure.
17          (Pertinent portion of the record is
18  read.)
19      MS. YU:  Just this particular one?
20      MR. MALONE:  Just this particular --
21  a release in the form of PL-6.
22      MS. YU:  Any release in the form of
23  PL-6?
24      MR. MALONE:  Yes.

Page 137

1      MS. YU:  Objection as to form.
2      THE WITNESS:  I did not handle these
3  releases, so I don't have any knowledge of what
4  they were and weren't advised, sir.
5  BY MR. MALONE:
6      Q.     If you wanted to find out who was
7  responsible for dealing with the employees who
8  received a release in connection with the B L
9  England Management Enhanced Severance Plan, who
10  would you contact at the company?
11      A.     At this point I would probably ask
12  our legal -- the company's legal department.
13      Q.     Would you contact Ms. Power?
14      A.     I would contact Ms. Power.
15      Q.     Do you know approximately how many
16  employees have received a proposed release as part
17  of the B L England Management Enhanced Severance
18  Plan?
19      A.     I do not have personal knowledge of
20  that, no.
21          (Exhibit P-7 is marked for
22  identification.)
23  BY MR. MALONE:
24      Q.     The court reporter has handed you a

35 (Pages 134 to 137)

B0284

CONFIDENTIAL

Page 138

1  document that we've marked Plaintiffs-7 for
2  identification.  It has the logo, Pepco Holdings,
3  Inc. on the top and says, "General Release."
4          Have you seen Plaintiffs-7 before?
5      A.   I don't recall seeing this, no, sir.
6      Q.   This particular release, which is
7  P-7, has been signed and dated by a particular
8  employee, apparently a Mr. Gene Carey.
9          Do you see that?
10     A.   I do see that, yes.
11     Q.   Have you seen a document similar in
12 form to P-7 that has not been signed and dated by
13 an individual employee?
14     A.   Not that I recall.
15     Q.   Do you know who Mr. Carey is?
16     A.   I do not.
17     Q.   Does the company have standard forms
18 for releases that it uses in connection with
19 severance programs?
20     A.   I believe that it does, yes.
21     Q.   Is this document, being P-7, similar
22 to the standard forms that you are familiar with?
23     A.   I have no reason to think -- to
24 think that it's not.

Page 139

1      Q.   Do you know how many employees have
2  signed a release in the form of Plaintiffs-7 since
3  September of 2005?
4      A.   I do not.
5      Q.   Let me direct your attention to Page
6  2 of Plaintiffs-7, and specifically Subparagraph B,
7  which provides, as part of the release, that there
8  is a release of matters under the Employee
9  Retirement Income Security Act of 1974.
10         And my question, sir, is simply, do
11 you know whether Mr. Gene Carey was advised that
12 this litigation was pending prior to the time that
13 he executed his release?
14     A.   I had no knowledge of Mr. Carey's
15 severance, so I can't speak to that.
16         MR. MALONE:  For the record, P-7 was
17 also designated as confidential, so that the
18 portion of the transcript covering my discussion of
19 P-7 with the witness should likewise be designated
20 as confidential.
21         (Recess called at 2:53 p.m.)
22         (Resumed at 3:04 p.m.)
23         (Exhibit P-8 is marked for
24 identification.)

Page 140

1  BY MR. MALONE:
2      Q.   We had a break.  Is there anything
3  that you need to correct in your prior testimony?
4      A.   Not at this time.
5      Q.   Let me direct your attention to what
6  we've marked as Plaintiffs Exhibit 8, which is a
7  series of account statements that, although they
8  are not marked as confidential, we previously
9  agreed should be treated as such.
10         Let me direct your attention to the
11 first one -- first page of Plaintiffs Exhibit 8.
12 Have you seen this before?
13     A.   I believe I have, yes.
14     Q.   Were you asked to gather account
15 statements for the named Plaintiffs in these cases
16 on behalf of counsel?
17     A.   I was not.
18     Q.   Do you know who was?
19     A.   No, I don't.
20     Q.   I note on the first page it
21 indicates that this is a revised statement.
22         Do you see that?  It would be
23 underneath the confirmation number on the first
24 page and above your cash balance account.

Page 141

1      A.   I do see that, yes.
2      Q.   Do you know as of when it would have
3  been revised?
4      A.   I do not, no.
5      Q.   The first page of Plaintiffs-8
6  appears to be the account statement reflecting the
7  credits that were applied to Mr. Charles' account
8  following the conclusion of 2000.
9          Is that correct?
10     A.   Following the conclusion of the
11 year -- from January 1st, 2000 through December 31,
12 2000, yes.
13     Q.   And those account statements are
14 generally issued in the subsequent year, correct?
15     A.   That's correct, yes.
16     Q.   Page 1 of Plaintiffs-8 has the logo
17 of Pepco Holdings on it, does it not?
18     A.   It does, yes.
19     Q.   As of January of 2001, was Pepco
20 Holdings formally affiliated with Conectiv?
21     A.   No, it was not.
22     Q.   When did Pepco Holdings acquire
23 Conectiv?
24     A.   I believe it was August of 2002,

36 (Pages 138 to 141)

B0285

CONFIDENTIAL

Page 142

1  sir.  Best of my knowledge.
2      Q.   Do you know how the account
3  statements which comprise Plaintiffs-8 were
4  generated?
5      A.   Based on the appearance of the
6  document, they appear to have been prepared by
7  Vanguard, who is the administrator of the cash
8  balance plan.
9      Q.   Let me just focus on the first two
10 pages of Plaintiffs-8, which is a statement issued
11 to Mr. Charles reflecting the changes to his
12 account following the conclusion of 2000.
13         Does that appear to be a Xerox copy
14 of what he would have received in early 2001?
15     A.   No, not to me.  No.
16     Q.   In light of the Pepco Holdings logo?
17     A.   Yes.
18     Q.   Do you know whether Vanguard keeps
19 hard copies of all of the account statements for
20 participants?
21     A.   I do not believe that they do.  To
22 the best of my recollection.
23     Q.   Do you know whether Vanguard
24 maintained the opening account statements for all

Page 143

1  participants?
2      A.   I don't believe that they did, sir.
3  I don't believe that they retained copies of the
4  statement, itself, no.
5      Q.   To your knowledge, does Vanguard
6  still retain, in electronic form, copies of the
7  original opening statements of the plan
8  participants?
9      A.   It's my understanding that they do
10 not.
11     Q.   And on what is that understanding
12 based?
13     A.   Just my understanding of their
14 records.  They keep an electronic -- the
15 quantifiable documentation and the personal
16 information, but they don't have an archive that
17 has copies of the statements in them.
18         That was my understanding when I was
19 benefits manager.  What's happened since then -- it
20 may have changed, but that was my understanding
21 when I was benefits manager.
22     Q.   If I wanted to go to Vanguard and
23 ask them to give me the data that appeared on one
24 of my client's opening statements, to your

Page 144

1  understanding, would they be able to furnish me
2  with that?
3      A.   I believe so, yes.
4      Q.   Did Conectiv retain hard copies of
5  any employee statements?
6      A.   Not of the employee statements, no,
7  sir, not to the best of my recollection.
8          (End of confidential portion of
9  transcript.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 145

1          (Exhibit P-9 is marked for
2  identification.)
3  BY MR. MALONE:
4      Q.   The court reporter has handed you a
5  document we marked Plaintiffs-9 for identification
6  purposes.  Could you take a moment to review it and
7  tell me if you know what it is.
8      A.   It appears to be the plan document
9  for the Conectiv retirement plan.
10     Q.   Directing your attention to the last
11 page of the exhibit, there is a signature there.
12     A.   Yes.
13     Q.   That's Mr. Cain's signature?
14     A.   To the best of my knowledge, yes.
15     Q.   Are you familiar with his signature?
16     A.   That's what I recall it being, to
17 the best of my knowledge, yes.
18     Q.   To your knowledge, when was the plan
19 document for the Conectiv retirement plan put in
20 its final form?
21         MS. YU:  Objection to the form.
22         THE WITNESS:  I don't recall the
23 exact date, sir.  This document is dated
24 December 10th, but I'm not sure that this was that

37 (Pages 142 to 145)

B0286

JAMES R. KREMMEL

Page 146

1  document that you are referring to.
2  BY MR. MALONE:
3      Q.    Did you have a role in preparing the
4  plan document?
5      A.    Only -- only as part of -- from a
6  review standpoint, sir.  I did not draft it.
7      Q.    I understand.
8          Who else do you know that was
9  responsible for reviewing the form of the document
10 internally at Conectiv?
11     A.    Personally, I do not recall who all
12 reviewed it at the time.
13     Q.    Do you remember anyone else who
14 reviewed it beside yourself?
15     A.    Not -- not to the best of my
16 knowledge, no.
17         (Exhibit P-10 is marked for
18 identification.)
19 BY MR. MALONE:
20     Q.    The court reporter has handed you
21 what we've marked Plaintiffs-10 for identification
22 purposes.
23         Could you take a moment to review
24 Plaintiffs-10 and then I'll ask you a few questions

Page 147

1  about it.
2      A.    Okay, I think I'm ready, sir.
3      Q.    Have you seen Plaintiffs-10 before?
4      A.    I believe I have, yes.
5      Q.    What is it?
6      A.    It's the Cash Balance -- Conectiv
7  Cash Balance Sub-Plan of the Conectiv Retirement
8  Plan.
9      Q.    This is the official plan document
10 for the cash balance sub-plan, as you understand
11 it?
12     A.    I believe it is so -- it is, yes,
13 sir.
14     Q.    Let me direct your attention, if I
15 might, to Page PHI 1570.
16     A.    Okay.
17     Q.    Is that Mr. Cain's signature there?
18     A.    To the best of my recollection, yes.
19     Q.    And on the subsequent page, 1571?
20     A.    To the best of my recollection, yes.
21     Q.    And on the following page, 1572?
22     A.    To the best of my recollection, yes.
23     Q.    Did you have a role in the
24 preparation of Plaintiffs-10?

Page 148

1      A.    I believe I had a role in reviewing
2  the plan, yes, sir.
3      Q.    Do you recall anyone else internally
4  at Conectiv who was responsible for reviewing
5  Plaintiffs-10?
6      A.    I do not, no.
7      Q.    Do you recall discussing
8  Plaintiffs-10 with Mr. Cain?
9      A.    I do not recall any conversations
10 discussing that with Mr. Cain, no, at this time.
11         (Exhibit P-11 is marked for
12 identification.)
13 BY MR. MALONE:
14     Q.    Here is what we are going to do.  If
15 you look at this document, you are going to see at
16 the bottom a little SEC signature.
17         Do you see that?
18     A.    Yes, I do.
19     Q.    And if you look in the parentheses
20 right before the date, there will be page numbers
21 there.
22     A.    Yes.
23     Q.    So, the first page, you got 1 of
24 236.

Page 149

1      A.    That's what I see.
2      Q.    Let's go to 49 of 236 and 50 of 236.
3      A.    I'm on Page 49, I think.
4      Q.    You have to use these numbers.  The
5  SEC --
6      A.    Oh, I'm sorry.
7      Q.    The documents don't paginate
8  correctly when you download them from their
9  website.
10     A.    What pages, again, sir?
11     Q.    49 of 236, using the little
12 parenthetical on the bottom of the page.
13     A.    I believe I have it.
14     Q.    If you have the right page in front
15 of you, there should be, in the middle of it,
16 roughly, italicized, the phrase, "Cash balance plan
17 litigation."
18     A.    I see it.
19     Q.    What I want you to do is I want you
20 to read that section, continuing over onto the
21 subsequent page, which would be number 50 of 236,
22 and I'm going to ask you some questions about it.
23         Now, by directing your attention to
24 that piece of this document, that's not intended to

38 (Pages 146 to 149)

B0287

JAMES R. KREMMEL

Page 150

1  say you can't look at something else, if you need
2  it to understand a question, understand the
3  context, or anything else.  It's simply intended to
4  focus you on one place, so that I'm not having you
5  read a 236-page document.
6      A.    I appreciate that.
7      Q.    Okay.
8      A.    Okay, I've reviewed it.
9      Q.    This section of the 10-K discusses
10  cash balance plan litigation, does it not?
11      MS. YU:  10-Q.
12      THE WITNESS:  This is a 10-Q.
13  BY MR. MALONE:
14      Q.    I'm sorry.
15      But the passage I directed your
16  attention to discusses cash balance plan
17  litigation?
18      A.    I believe that, to my reading of it,
19  yes, sir.
20      Q.    Do you understand that to relate to
21  this case?
22      A.    I do, yes.
23      Q.    Did you have a role in preparing
24  this section of the SEC filing?

Page 151

1      A.    I did not.
2      Q.    Let me focus you in, if I could, on
3  Page 50 of 236, using the SEC's URL at the bottom
4  of the page.
5      A.    I'm with you.
6      Q.    Okay.
7      After discussing the company's view
8  of it's legal position, it goes on to estimate
9  something called ABO and projected benefit
10  obligation.
11      Do you see that?
12      A.    I do.
13      Q.    What's ABO?  Do you know what that
14  means?
15      A.    To the best of my knowledge, ABO is
16  accumulated benefit obligation.
17      Q.    And then the estimate that they
18  provide for ABO and PBO is $12 million.
19      Do you see that?
20      A.    I do see that, yes.
21      Q.    Do you know who calculated that
22  number?
23      A.    I do not know directly who
24  calculated that number, no.

Page 152

1      Q.    Do you know what data they used to
2  calculate that number?
3      A.    I don't know directly what data they
4  used, no.
5      Q.    Do you know any formula or
6  assumptions that went into the calculation of the
7  $12 million estimate?
8      A.    I'm not sure that I do, no.
9      Q.    If you wanted to find out how that
10  number was generated, the $12 million estimate for
11  PBO and ABO, where would you go?
12      A.    I would go to the company's actuary,
13  Watson Wyatt.
14      Q.    Any particular person at Watson
15  Wyatt you would contact?
16      A.    Not necessarily, no.
17      Q.    Is there someone that you routinely
18  communicate with at Watson Wyatt when you have
19  questions about pension matters?
20      A.    There are several individuals that I
21  would communicate with.
22      Q.    Who are?
23      A.    I believe the company's -- the
24  principal that is responsible for Conectiv

Page 153

1  business -- or, excuse me, PHI business overall.
2  His name is Ray Shaak.  Ray, last name is
3  S-h-a-a-k.
4      Q.    And where is he based?  In Virginia?
5      A.    Alexandria, I believe.
6      Q.    Anyone else at Watson Wyatt?
7      A.    That's who I would go to, but I do
8  not know who prepared these numbers.
9      Q.    When did you first learn that these
10  numbers were prepared?
11      A.    When I read the 10-Q, in the fall.
12      Q.    Did anyone contact your department,
13  to your knowledge, for information to prepare those
14  numbers?
15      A.    No.
16      MR. MALONE:  You are free to put the
17  10-Q away.
18      (Exhibit P-12 is marked for
19  identification.)
20  BY MR. MALONE:
21      Q.    The court reporter has handed you a
22  document marked Plaintiffs-12.
23      Have you seen it before?
24      A.    Yes, I have.

39 (Pages 150 to 153)

B0288

JAMES R. KREMMEL

Page 154

1    Q.    Is this a declaration that you
2  submitted in connection with this case?
3    A.    Yes, it is.
4    Q.    And directing your attention to Page
5  7, is that your signature, sir?
6    A.    Yes, it is.
7    Q.    Okay.
8        Let me direct your attention to Page
9  2 of your declaration, and Paragraph 3.  Paragraph
10 3 describes certain features of the ACE plan.
11       Do you see that, sir?
12   A.    I see Paragraph 3, yes.
13   Q.    There is a reference in Paragraph 3
14 to the ACE plan?
15   A.    Yes.
16   Q.    What does that ACE plan stand for?
17   A.    I believe the reference is to the
18 ACE retirement plan.
19   Q.    ACE is an acronym for Atlantic City
20 Electric.
21   A.    Oh, excuse me.  Atlantic City
22 Electric Company.
23   Q.    And, when you use the phrase "ACE
24 plan" here, you are referring to the heritage plan

Page 155

1  that was in place at Atlantic City Electric prior
2  to the adoption of the cash balance sub-plan?
3    A.    In part, yes.
4    Q.    And any -- what else are you
5  referring to by the phrase "ACE plan"?
6    A.    Well, there is an ACE sub-plan that
7  is part of the PHI retirement plan currently.
8    Q.    Okay.
9    A.    But I believe the reference here is
10 to the Atlantic City Electric Company retirement
11 plan that was the predecessor.
12   Q.    Okay.
13       And in Paragraph 3 you highlight
14 certain aspects of that predecessor plan, is that
15 correct?
16   A.    Yes, it is.
17   Q.    Did that plan have a lump sum
18 distribution option?
19   A.    It did have a lump sum distribution
20 option, yes, as part of it.
21   Q.    Was lump sum distribution available
22 only to those whose total distributive amount would
23 be under $5000?
24   A.    No.

Page 156

1    Q.    Was there any limit on the amount of
2  lump sum distribution?
3    A.    Only as to the terms -- I don't
4  recall whether or not the plan provided a maximum
5  benefit or not, but the terms were -- it was
6  specifically that you had to be over age 55 to
7  receive a lump sum benefit.
8        I don't recall if there was a
9  maximum specified.
10   Q.    Let me direct your attention to
11 Paragraph 6 for a second.
12       Do you see that?
13   A.    I do.
14   Q.    You indicate here that, on April the
15 23rd of 1998, Conectiv's Board of Directors amended
16 the ACE and Delmarva final average pay plans?
17   A.    I see that, yes.
18   Q.    Could you grab P-2 out of the stack
19 for me -- Plaintiffs-2, which was the minutes we
20 were talking about earlier this morning.  If they
21 are in order, it's going to be well down towards
22 the bottom.
23   A.    P-2.
24   Q.    Okay.

Page 157

1        Simple question.  Let's see if I can
2  make it work.  In your declaration, which is P-12,
3  in Paragraph 6 you reference a meeting of
4  Conectiv's Board of Directors on April the 23rd of
5  1998.
6        Were you referring to the meeting
7  that is summarized in Plaintiffs-2?
8    A.    Yes.
9    Q.    Let me take you, then, to --
10   A.    We are done with P-2?
11   Q.    Yes, I think so.
12       Let me take you to Page 3, Paragraph
13 10 of your declaration.  I'd like to focus you on
14 the first sentence, which says, "Conectiv
15 structured the cash balance plan so that, in most
16 cases, the account balance would be identical to
17 the immediate lump sum payment value of the
18 participant's benefits."
19       Do you see that, sir?
20   A.    I do.
21   Q.    Are there circumstances in which the
22 account balance would not be identical to the
23 immediate lump sum payment value of the
24 participant's benefits?

40 (Pages 154 to 157)

B0289

JAMES R. KREMMEL

Page 158

1          MS. YU:  Objection to the form.
2          THE WITNESS:  I can't think of any.
3  I don't believe so.
4  BY MR. MALONE:
5      Q.     Let me focus you, then, on Paragraph
6  11.  Paragraph 11 states, "Based upon my knowledge,
7  belief, and information provided to me, of the 520
8  participants who have elected a form of benefit
9  under the cash balance plan, 500 -- that is,
10  approximately 96 percent -- have requested to
11  receive a lump sum."
12          First, is that an accurate
13  statement, as you understand it?
14      A.     Based on my knowledge, belief and
15  information provided to me, yes.
16      Q.     Let's unpack those three things.
17  What's the source your knowledge as
18  referenced in Paragraph 11?
19      A.     My legal counsel.
20      Q.     What's the source of your belief?
21      A.     I have no reason to -- not to
22  believe assertations (sic) of my legal counsel that
23  were provided to me.
24      Q.     And what's the source of the

Page 159

1  information?
2      A.     I don't know what the source of the
3  information was directly.
4      Q.     So, the sole basis for the statement
5  in Paragraph 11 is information conveyed to you by
6  counsel, is that correct?
7          MS. YU:  Objection to form.
8          THE WITNESS:  Correct.
9  BY MR. MALONE:
10      Q.     And you did not do anything to
11  independently verify that information?
12      A.     I did not.
13      Q.     Okay.
14      A.     I had no reason to disbelieve it.
15      Q.     Of the 520 -- first of all, do you
16  know that there were 520 participants that have
17  elected a form of benefit under the cash balance
18  plan?
19      A.     To the extent of information that
20  was provided to me.
21      Q.     Before you had whatever
22  conversations you had with counsel as part of
23  preparing this declaration, if I could have taken
24  your deposition that day, would you have been able

Page 160

1  to tell me that 520 people had elected a benefit?
2      A.     No.
3      Q.     Do you know how many of those were
4  65 or older?
5      A.     I do not know the demographics of
6  that number, sir.
7      Q.     When a participant elects a benefit
8  as part of their departure, are there forms they
9  have to fill out?
10      A.     Yes, there are.
11      Q.     And those are kept and logged in the
12  human resources department someplace?
13      A.     No, they are not.
14      Q.     Where are they kept?
15      A.     By the Vanguard Group.
16      Q.     So that Vanguard would have data and
17  statistics that would verify the accuracy of the
18  information that you've set forth here?
19      A.     I would think so, yes, sir.
20      Q.     And would Vanguard have the ability
21  to tell me what percentage of them were 65 or older
22  and what percentage of them were not?
23      A.     I believe they have that data, yes.
24      Q.     Do the forms require the

Page 161

1  participants to submit their date of birth with
2  their election forms?
3      A.     To the best of my knowledge, the
4  date of birth of the individual is already on the
5  election form.  That's information that Vanguard
6  has as part of their management of the plan.
7      Q.     Let me ask you to turn to Paragraph
8  14.  In the second sentence you indicate that
9  "Conectiv increased the employer matching
10  contributions in its 401(k) plan."
11          Do you see that, sir?
12      A.     Yes, I do.
13      Q.     Can you describe how the new
14  Conectiv 401(k) plan match structure differed from
15  its predecessor plans?
16      A.     Not off of the top of my head, no.
17  I would have to refer to either information you've
18  provided or other historical information.
19      Q.     Were you a participant in the
20  Delmarva 401(k) plan?
21      A.     Yes, sir.
22      Q.     Did you have a match?
23      A.     Yes, sir.
24      Q.     Was the match in cash or in stock?

41 (Pages 158 to 161)

B0290

JAMES R. KREMMEL

Page 162

1    A.    In stock.
2    Q.    Do you remember anything about the
3  match formula?
4    A.    In what time period, sir?
5    Q.    Right before Conectiv was formed.
6  Say, in or about 1998, do you remember what the
7  match structure was under the Delmarva 401(k) plan?
8    A.    I remember there was a match. I do
9  not recall the specific number of the match prior
10  to. I know that it was higher after -- after the
11  implementation of the change.
12    Q.    Now let me take you to Paragraph 15.
13  In the first sentence you indicate that "Conectiv
14  also took steps to protect the expectations of
15  long-term employees close to retirement."
16        Do you see that, sir?
17    A.    Yes, I do.
18    Q.    Why did they do that?
19    A.    I think it was part of the strategy
20  to take into consideration and -- long service of
21  employees and those who might be close to
22  retirement when we would make a change. That there
23  was, you know, some consideration of that time
24  period and some expectations that they might have

Page 163

1  created -- or might have been created by the
2  company prior to that.
3    Q.    Did you perceive the possibility to
4  exist that some employees could be worse off under
5  the new plan formula than under the old?
6        MS. YU: Objection to the form.
7        THE WITNESS: Did I, personally?
8  BY MR. MALONE:
9    Q.    Yes.
10    A.    Could you restate the question?
11    Q.    Sure.
12        Let me try to go at it this way. To
13  your understanding, was one of the reasons
14  grandfathering was put in place for certain
15  categories of employees a concern that the benefits
16  they might earn under the new cash balance formula
17  would not be as great as what they would have
18  earned under their heritage plans?
19        MS. YU: Objection to the form.
20        THE WITNESS: I don't know how to
21  answer. I don't believe that was the prime
22  consideration, no.
23  BY MR. MALONE:
24    Q.    Was it a consideration?

Page 164

1        MS. YU: Objection to form.
2        THE WITNESS: I don't believe so,
3  no.
4  BY MR. MALONE:
5    Q.    What role did you have in
6  determining the structure of grandfather benefits
7  under the cash balance sub-plan?
8    A.    I had input as part of the project
9  team.
10    Q.    Who had the most input?
11    A.    To my recollection, it was Don Cain,
12  who was vice-president of human resources at the
13  time.
14    Q.    Could you turn to Page 6 of your
15  declaration, which is Plaintiffs-12. Let me direct
16  your attention to Paragraph 18.
17    A.    Okay.
18    Q.    The first sentence indicates, "There
19  are at least 90 members of the putative class who
20  have executed releases with defendants for any
21  ERISA claim (except for claims for accrued and
22  vested benefits as set forth in the plan documents)
23  in exchange for severance payments."
24        Do you see that, sir?

Page 165

1    A.    I do see that.
2    Q.    What was the basis on which you made
3  that statement?
4    A.    Information provided to me by
5  counsel.
6    Q.    So, you didn't review the releases
7  personally?
8    A.    I did not.
9    Q.    You would not be able to identify
10  the 90 employees involved?
11    A.    I would not, personally, no.
12    Q.    Do you know over what period of time
13  those releases were executed?
14    A.    I do not.
15    Q.    Would you be able to tell me, of the
16  90, how many were executed after the litigation was
17  filed and how many were executed before?
18    A.    I could not, no.
19    Q.    Where would you go for that
20  information?
21    A.    To my legal counsel.
22    Q.    Anyplace internally?
23    A.    My internal legal counsel.
24        (The following portion of this

42 (Pages 162 to 165)

B0291

Page 166

1   transcript has been designated confidential.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 167

1       Q.     Let's turn to Page 7 of your
2   declaration, and Page 7 contains some personal
3   financial data, so we will be treating this
4   discussion as confidential under the Protective
5   Order.
6           Do you see a table there?
7   A.     Yes, I do.
8   Q.     Did you prepare the table?
9   A.     I did not.
10  Q.     Now, the table has columns in it
11  which reflect accrued benefits.
12          Do you see that?
13  A.     I do see that.
14  Q.     And there is a number for each
15  plaintiff, correct?
16  A.     I do see that, yes.
17  Q.     Did you calculate the numbers?
18  A.     I did not.
19  Q.     Do you know who calculated the
20  numbers?
21  A.     I don't know specifically who
22  calculated them, no.  I don't know the individual.
23  Q.     Did you do anything to independently
24  verify the accuracy of the numbers that are set

Page 168

1   forth in the table?
2   A.     I did not.
3   Q.     When were you first contacted and
4   requested to provide a declaration in connection
5   with this case?
6   A.     I don't recall the exact date, sir.
7   Q.     Was it this year or last year?
8   A.     I believe it was since the beginning
9   of the year, sir, 2007.
10  Q.     To the best of your recollection,
11  approximately how long before the time you signed
12  the declaration were you contacted requesting you
13  to provide a declaration?
14  A.     I don't recall the exact time frame.
15  Q.     Was it a week, a month, a day?
16  A.     I don't recall the exact time frame.
17  Q.     Did you receive a draft in advance?
18  A.     I did receive a draft.
19  Q.     And did you make any comments or
20  corrections on the draft, without revealing what
21  the substance of them may be?
22  A.     I don't recall making any changes,
23  no.
24          MR. MALONE:  Let's take a break.

Page 169

1           (End of confidential portion of
2   transcript.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

43 (Pages 166 to 169)

B0292

JAMES R. KREMMEL

Page 170

1          (Recess called at 3:45 p.m.)
2          (Resumed at 3:57 p.m.)
3    BY MR. MALONE:
4        Q.    Anything you need to correct in your
5    testimony?
6        A.    Yes.
7        Q.    What's that?
8        A.    In my role as corporate designee,
9    I'd like to clarify a couple points, if I could.
10            Referring back to P-11 --
11       Q.    The 10-Q?
12       A.    -- the 10-Q -- help me find the page
13   again.
14       Q.    Would be 49 and 50 of 236, using the
15   little parentheticals.
16       A.    Okay.
17            On Page 50 of 236, I'd like to
18   address the information regarding the ABO and PBO
19   obligation that is presented in the 10-Q.
20       Q.    Sure.
21       A.    It is my information, relayed to me
22   by counsel, that the $12 million number was a
23   number provided by Watson Wyatt, the company's
24   plan's actuary, was related to me by legal counsel.

Page 171

1        Q.    Anything else on that subject?
2        A.    I don't believe so, no.
3        Q.    Anything else you need to correct or
4    amplify?
5        A.    One other point.  As part of P-12,
6    on Page 7, the table at the top of Page 7 --
7        Q.    Yes.
8        A.    -- that we discussed relating to
9    accrued benefits, under the previous Atlantic City
10   Electric and Delmarva plans versus accrued benefits
11   under the cash balance plan --
12       Q.    Yes.
13       A.    -- that the basis for this
14   information was data provided by The Vanguard Group
15   to my legal counsel.
16       Q.    Is it your understanding that
17   Vanguard calculated the accrued benefits figure for
18   the cash balance plan?
19       A.    That's my understanding, yes, sir.
20       Q.    And is it your understanding that
21   Vanguard calculated the applicable ACE or Delmarva
22   plan accrued benefits?
23       A.    That's my understanding, yes, sir.
24       Q.    Do you have any independent basis

Page 172

1    for that, other than what you were told by your
2    counsel?
3        A.    Other than what I was relayed by my
4    legal counsel, no, sir.
5        Q.    Anything else that you need to
6    correct or amplify?
7        A.    That's all I have, thank you.
8        MR. MALONE:  Let's mark 13.
9            (Exhibits P-13 and P-14 are marked
10   for identification.)
11   BY MR. MALONE:
12       Q.    Take a look at Plaintiffs-13 first.
13       A.    Okay.
14       Q.    Can you tell me what it is?
15       A.    It appears to me to be the Atlantic
16   City Electric Company Retirement Plan plan
17   document.
18       Q.    To your knowledge, is this the plan
19   document that was in place immediately preceding
20   the time when the Conectiv cash balance sub-plan
21   was adopted?
22       A.    I believe it is, yes, sir.
23       Q.    Let me take you to Plaintiffs-14.
24       A.    Okay.

Page 173

1        Q.    First, we've got a bunch of
2    signatures on the front -- face page of
3    Plaintiffs-14.
4        A.    Okay.
5        Q.    Is that Mr. Cain's signature?
6        A.    To the best of my recollection, yes.
7        Q.    And beneath that Moira K. Donoghue
8    is listed.  Are you familiar with her signature?
9        A.    I am, yes.
10       Q.    Is that her signature appearing
11   beneath Mr. Cain's?
12       A.    I believe, to the best of my
13   knowledge, it is, yes.
14       Q.    And Alan Beattie is listed below Ms.
15   Donoghue, is that correct?
16       A.    Yes, he is.
17       Q.    And are you familiar with his
18   signature?
19       A.    Yes, I am.
20       Q.    And is that his signature that
21   appears below Ms. Donoghue's?
22       A.    To the best of my knowledge, yes.
23       Q.    The last person listed in the middle
24   of the page is Donald P. Connelly.  Do you see

44 (Pages 170 to 173)

B0293

JAMES R. KREMMEL

Page 174

1   that, sir?
2       A.    I do.
3       Q.    Do you know Mr. Connelly?
4       A.    I did know him, yes.
5       Q.    Are you familiar with his signature?
6       A.    Yes, I am.
7       Q.    And is that his signature that
8   appears there?
9       A.    To the best of my recollection, yes.
10      Q.    And it also appears a second time as
11  secretary?
12      A.    Yes.
13      Q.    Can you tell me what P-14 is?
14      A.    To the best of my knowledge, it is
15  the Delmarva Power & Light Company Retirement
16  Plan plan document.
17      Q.    To the best of your knowledge, is
18  this the plan document that was controlling
19  immediately preceding the time when the Conectiv
20  cash balance sub-plan became effective?
21      A.    Yes.
22      Q.    I think you had said Mr. Cain left
23  the company in 2002?
24      A.    To the best of my recollection, yes.

Page 175

1       Q.    Did he retire?
2       A.    He did.
3       Q.    Had he reached normal retirement
4   age?
5       A.    Not to my recollection.
6       Q.    Did he take another position after
7   he left, to your knowledge?
8       A.    With Pepco Holdings?
9       Q.    With any other company.
10      A.    I'd have no idea what Don has done.
11      Q.    Have you spoken with him since he
12  left?
13      A.    I have.
14      Q.    When was the last time you chatted
15  with him?
16      A.    I would guess about -- that phrase,
17  I'm sorry. Approximately nine months ago.
18      Q.    What was the context?
19      A.    We had breakfast.
20      Q.    Did you discuss the litigation in
21  any way?
22      A.    Did not.
23      Q.    Ben Wilkinson, do you know when he
24  left the company?

Page 176

1       A.    I do not.
2       Q.    Do you know anything about the
3   circumstances that led him to leave?
4       A.    I do not.
5       Q.    Do you know whether he was fired?
6       A.    I do not.
7       Q.    When was the last time you spoke
8   with Mr. Wilkinson?
9       A.    I don't recall the last time I spoke
10  to Mr. Wilkinson.
11      Q.    Have you spoke to him since he left
12  the company?
13      A.    I have not.
14          MR. MALONE: That's all I have for
15  you right now, subject to whatever examination your
16  counsel may have.
17          MS. YU: I just have a couple of
18  questions.
19          MR. MALONE: Sure.
20  EXAMINATION
21  BY MS. YU:
22      Q.    If you could take a look at Exhibit
23  D-5.
24      A.    Okay.

Page 177

1       Q.    And, while we are looking for
2   exhibits, and P-2.
3       A.    Okay.
4       Q.    Mr. Kremmel, you had indicated in
5   your earlier testimony that you understood that the
6   timing of the distribution of D-5, which was the
7   third Facts Newsletter, was in April or May of
8   1998.
9       A.    That's correct.
10      Q.    So -- and then we also have P-2,
11  which are the minutes of the Personnel and
12  Compensation Committee, dated April 23, 1998.
13          Did the third Facts Newsletter go
14  out before or after the meeting on April 23, 1998?
15      A.    To the best of my recollection, the
16  third Facts Newsletter would have gone out after
17  the meeting on April 23rd of '98 of the Board of
18  Directors.
19      Q.    Would you take a look back at the
20  10-Q.
21      A.    Okay.
22      Q.    Now, I understand that you were not
23  personally involved in drafting the description of
24  the cash balance plan litigation that's contained

45 (Pages 174 to 177)

B0294

JAMES R. KREMMEL

Page 178

1 in the 10-Q, correct?
2       A.    That's correct.
3       Q.    In your designation as the
4 representative for the company in this deposition,
5 do you have a general understanding of what the
6 approximation of $12 million that's referred to in
7 the description is?
8       A.    To my understanding, that number was
9 provided by the company's actuaries and it
10 represents a liability number associated with
11 re-establishing retroactively benefits under the
12 Delmarva Power retirement -- the previous Delmarva
13 Power retirement plan and the Atlantic City
14 Electric retirement plan and freezing the benefits
15 under the cash balance plan.
16       Q.    Mr. Kremmel, are you a participant
17 in the cash balance plan?
18       A.    I am, yes.
19       Q.    How long have you been a
20 participant?
21       A.    Since January 1st, 1999.
22       Q.    Have you been participating
23 continuously in the cash balance plan since then?
24       A.    No.

Page 179

1       Q.    And have you ever taken a
2 distribution from the cash balance plan?
3       A.    I have, yes.
4       Q.    Can you describe the circumstances
5 under which you took a distribution?
6       A.    I left Pepco Holdings from -- for
7 one year, in late 2004, early 2005, to accept a
8 position as manager of compensation and benefits
9 with American Water for that short period of time.
10       Q.    From your own personal perspective,
11 again, not as the corporate designee, but from your
12 own perspective as a participant in the cash
13 balance plan, do you have a sense of whether you
14 were harmed or benefited by the adoption of the
15 cash balance plan as opposed to the prior plan that
16 was in place?
17       MR. MALONE:  Object as to form.
18       THE WITNESS:  My -- my personal
19 opinion is that myself and my family have been
20 benefited by the -- by the cash balance plan.
21       MS. YU:  That's all I have.
22 FURTHER EXAMINATION
23 BY MR. MALONE:
24       Q.    How much of your time was spent on

Page 180

1 matters relating to the cash balance plan in the
2 period late 1998 and 1999?  Can you give me some
3 sense of an estimate?
4       A.    I do not recall at this point how
5 many hours I might have spent specifically on the
6 cash balance plan.
7       Q.    Was it a significant undertaking
8 that took a lot of your attention?
9       A.    It was one of several undertakings
10 that took my attention during that period of time.
11       Q.    And you worked intensively on it?
12       A.    On?  On the cash balance plan?
13       Q.    Cash balance plan, yes.
14       A.    To the extent that I was on the
15 Total Rewards project team, yes.
16       Q.    And did you consider your service on
17 the Total Rewards project team to be a significant
18 achievement?
19       A.    I think I contributed adequately, as
20 any of the other team members did.
21       Q.    Was it significant to you that there
22 were no initial lawsuits surrounding the roll-out
23 of the cash balance plan?
24       A.    No, sir.

Page 181

1       Q.    No?
2             Have you ever indicated to someone
3 that one of your professional qualifications was
4 that you assisted in this transition and there were
5 no lawsuits?
6       A.    I don't recall ever making that
7 assertation, no.
8       Q.    What's Zerodegrees?
9       A.    Zerodegrees in what context, sir?
10       Q.    Zerodegrees.com.
11       A.    I have no idea.
12       Q.    Did you ever post your resume on the
13 Internet?
14       A.    I have, yes.
15       MR. MALONE:  Let's mark that as
16 Plaintiffs-15.
17       (Exhibit P-15 is marked for
18 identification.)
19 BY MR. MALONE:
20       Q.    Take a look at the first paragraph
21 at the bottom of the page on Plaintiffs-15.  It
22 says, "Objective:  A management position in
23 compensation, executive compensation, benefits,
24 compensation and benefits or human resources."

46 (Pages 178 to 181)

B0295

JAMES R. KREMMEL

Page 182

1      Did you ever post your resume on the
2  Internet that said that was your objective?
3      A.   I have no reason not to think that I
4  did.
5      Q.   And, if you'll turn the page, under
6  the heading of "Experience," the first listing
7  says, "Manager compensation and executive
8  compensation, August, 2002 to present, Pepco
9  Holdings, Inc., Wilmington, Delaware.
10     Do you see that, sir?
11     A.   At the top of the page?
12     Q.   Yes.  Top of Page 2, right after the
13  all caps "Experience."
14     A.   Got it.
15     Q.   Was that accurate as of 2005?
16     A.   To the best of my recollection, yes.
17     Q.   And further down it indicates that,
18  from 2001 to 2002, you served as compensation
19  manager at Conectiv.  Is that correct?
20     A.   Yes.
21     Q.   And further down it indicates that,
22  from 1999 to 2001, you served as benefits manager
23  at Conectiv, is that correct?
24     A.   To the best of my recollection, yes.

Page 183

1      Q.   Is this something that you
2  personally posted on the Internet, Plaintiffs-15?
3      A.   I have no reason to believe I
4  didn't.
5      Q.   Let me direct your attention to the
6  third page.  Roughly a third of the way down the
7  page it indicates that you were a senior employee
8  relations consultant from 1998 to 1999 at Conectiv.
9      Do you see that, sir?
10     A.   I do.
11     Q.   Is that a true statement?
12     A.   To the best of my recollection, yes.
13     Q.   And then it says, "Assumed
14  supervision of the Conectiv benefits team in 1999.
15  Implemented a flexible benefits program, new 401(k)
16  programs and administrators, and the transition
17  from a traditional defined benefits pension plan to
18  a cash balance pension plan.  Managed the
19  outsourcing of pension administration.  Transitions
20  were made without any individual or class action
21  lawsuits."
22     Did you write that?
23     A.   I have no reason to think that I
24  didn't.

Page 184

1      Q.   Then it continues and says,
2  "Restaffed benefits team due to poor performance."
3      Did you write that?
4      A.   I have no reason to believe that I
5  didn't.
6      Q.   What did you mean when you said
7  "Restaffed benefits team due to poor performance"?
8      A.   That we retained new individuals in
9  the company.
10     Q.   And were certain individuals let go?
11     A.   Certain individuals left the
12  company.
13     Q.   Who left?
14     A.   Alan Beattie.
15     Q.   Anyone else?
16     A.   Not to my knowledge.
17     Q.   Was Mr. Beattie's departure due to
18  dissatisfaction with his performance?
19     A.   No.
20     Q.   Who was added to the benefits team?
21     A.   As I recall, the individual that we
22  hired was Kathy Snyder.
23     Q.   And what position did she assume?
24     A.   A benefits analyst position.

Page 185

1      Q.   What were the duties of benefits
2  analyst?
3      A.   Administration of the company's
4  benefits plans.
5      Q.   When were you rehired by Pepco
6  Holdings?
7      A.   In June of 2005.
8      Q.   And in what context?
9      A.   I'm not sure I understand your
10  question.
11     Q.   What led you to come back?
12     A.   I was asked to come back.
13     Q.   And why were you asked to come back?
14     A.   To be able to provide services --
15  professional services to the company.
16     Q.   Were you dissatisfied with your
17  existing position at that time?
18     A.   My existing position at American
19  Water?
20     Q.   Yes.
21     A.   Not necessarily, no.
22     Q.   Why did you leave Conectiv
23  initially?
24     A.   To accept a promotion with American

47 (Pages 182 to 185)

B0296

JAMES R. KREMMEL

Page 186

```
1   Water.
2            MR. MALONE:  I'm done.
3            THE WITNESS:  Okay.
4            MS. YU:  I have nothing.
5            (4:18 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 188

```
1              JURAT
2         I, JAMES R. KREMMEL, do hereby
    certify that I have read the foregoing transcript
3   of my testimony taken on Tuesday, March 13, 2007,
    and have signed it subject to the following
4   changes:
5   PAGE LINE        CORRECTION
6
7
8
9
10
11
12
13
14
15
16
17
18
19    _____
      JAMES R. KREMMEL
20
    DATE _____
21
    Sworn and subscribed to before me this
22
    _____ day of _____, 2007.
23
    _____
24  NOTARY PUBLIC
```

Page 187

```
1            C E R T I F I C A T E
2         I, Sean M. Fallon, a Registered
3   Professional Reporter and Notary Public of the
4   Commonwealth of Pennsylvania, do hereby certify
5   that, prior to the commencement of the examination,
6   the witness and/or witnesses were sworn by me to
7   testify to the truth and nothing but the truth.
8         I do further certify that the
9   foregoing is a true and accurate computer-aided
10  transcript of the testimony as taken
11  stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13        I do further certify that I am
14  neither of counsel nor attorney for any party in
15  this action and that I am not interested in the
16  event nor outcome of this litigation.
17
18
19
20
      _____
21    Registered Professional Reporter
      XI00840
22    Notary Public of the Commonwealth
      of Pennsylvania
23    My commission expires 12-22-10
24  Dated: _____
```

Reporting Associates, LLC856-795-2323

B0297



**WILCOX & FETZER LTD.**

# CONFIDENTIAL

In the Matter Of:

## Charles, et al.

### v.

## Pepco Holdings, Inc., et al.

C.A. # 05-702

Transcript of:
# Thomas S. Troup

January 12, 2007

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B0298

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J. MICHAEL CHARLES; MAURICE W. WARD,     )
JR.; and JOSEPH I. FINK, JR., on          )
behalf of themselves and all others       )
similarly situated,                       )
                                          )
                        Plaintiffs,       )
                                          )  Civil Action
            v.                            )  No. 05-702
                                          )
PEPCO HOLDINGS, INC., CONECTIV, and       )
PEPCO HOLDINGS RETIREMENT PLAN,           )  PAGE 43 IS
                                          )  CONFIDENTIAL
                        Defendants.       )

            Deposition of THOMAS S. TROUP taken
pursuant to notice at the law offices of Pepper
Hamilton LLP, 1313 Market Street, Hercules Plaza,
Fifth Floor, Wilmington, Delaware, beginning at
9:35 a.m. on Friday, January 12, 2007, before Kathleen
White Palmer, Registered Merit Reporter and Notary
Public.
APPEARANCES:
            JOSEPH G. SAUDER, ESQUIRE
            CHIMICLES & TIKELLIS LLP
              One Haverford Centre
              Haverford, Pennsylvania 19041
              for the Plaintiffs
            KAY KYUNGSUN YU, ESQUIRE
            PEPPER HAMILTON LLP
              3000 Two Logan Square
              Philadelphia, Pennsylvania 19103-2799
              for the Defendants
------------------------------------------------------------
            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

B0299

CONFIDENTIAL
Thomas S. Troup

Charles, et al.
v.
C.A. # 05-702

Pepco Holdings, Inc., et al.
January 12, 2007

Page 2

1        THOMAS S. TROUP,
2   the witness herein, having first been
3   duly sworn on oath, was examined and
4   testified as follows:
5   BY MS. YU:
6   Q.   Good morning, Mr. Troup.
7   **A.   Good morning.**
8       MR. SAUDER:  Just before we get started, we
9   are going to read and sign.
10  BY MS. YU:
11  Q.   Could you please state your name for the
12  record?
13  **A.   Thomas S. Troup.**
14  Q.   Thank you, Mr. Troup.
15     My name is Kay Yu and I represent the
16  defendants in the litigation that you have brought
17  against Pepco Holdings, Conectiv, and the Pepco
18  Retirement Plan.  Mr. Troup, I just wanted to get some
19  preliminary matters out of the way.
20     Have you ever been deposed before?
21  **A.   Yes.**
22  Q.   In what context?
23  **A.   As -- there was a bodily injury lawsuit against**
24  **Pepco -- let me back up.**

Page 3

1     **It was a subrogation claim, and in my**
2  **position as the insurance manager for Conectiv at the**
3  **time, there was some questions with respect to the**
4  **workmen's compensation benefits and general liability**
5  **and insurance benefits associated with the bodily**
6  **injury claim.**
7  Q.   Who brought that claim?
8  **A.   A construction worker at our Indian River power**
9  **plant.**
10  Q.   Do you recall the name of the worker?
11  **A.   No, I don't.  I'll probably think of it, but I**
12  **can't think of it at the moment.**
13  Q.   Have you been deposed more than once?
14  **A.   No.  That's all.**
15  Q.   Have you ever been a party to a litigation
16  other than this one?
17  **A.   No.**
18  Q.   During the course of the question and answers
19  today, I just want to make sure we give each other a
20  chance to finish both the answer and the question
21  before we start up.  The court reporter needs to take
22  down everything that everybody says, and it makes it a
23  lot easier for everyone if we can try to do that.
24  **A.   Fine.**

Page 4

1  Q.   Also, as you just did, you need to verbalize
2  all of your answers.
3  **A.   I'll try to remember that.  I'm good at**
4  **nodding.**
5  Q.   So am I.
6     Mr. Troup, is there any reason that you
7  cannot provide truthful testimony today?
8  **A.   No.**
9  Q.   Are you on any medication?
10  **A.   I have -- take Crestor for cholesterol**
11  **medicine, but that's all.**
12  Q.   Do you have any criminal convictions or
13  arrests?
14  **A.   No.**
15  Q.   Could you tell me a little bit about your
16  educational background?
17  **A.   I have a college degree from Bloomsburg**
18  **University in business.  That's my, you know,**
19  **educational background.**
20  Q.   What year did you graduate?
21  **A.   1970 I graduated.**
22  Q.   What year did you graduate high school?
23  **A.   1966.**
24  Q.   Which high school did you attend?

Page 5

1  **A.   Shikellamy High School, S-h-i-k-e-l-l-a-m-y.**
2  Q.   Did you graduate college with a degree?
3  **A.   Yes.**
4  Q.   What was that degree?
5  **A.   Business.**
6  Q.   Do you have any other degrees?
7  **A.   I have a CPCU, chartered property and casualty**
8  **underwriter, an insurance designation.**
9  Q.   When did you obtain that designation?
10  **A.   I think it was 1994.**
11  Q.   Who is your current employer?
12  **A.   Pepco Holdings, Inc.**
13  Q.   Can we refer to Pepco Holdings, Inc., as PHI?
14  **A.   That's fine.**
15  Q.   How long have you been working for PHI?
16  **A.   Twenty-seven years.**
17     MR. SAUDER:  Just to clarify, are we
18  referring to PHI as just PHI, just Pepco or Delmarva?
19  If we can just clarify that.
20     THE WITNESS:  PHI and all predecessor
21  companies.
22     MR. SAUDER:  Okay.
23  BY MS. YU:
24  Q.   Thank you.

2 (Pages 2 to 5)

CONFIDENTIAL          Charles, et al.          v.          Pepco Holdings, Inc., et al.
Thomas S. Troup                        C.A. # 05-702                January 12, 2007

Page 6

1    To the best of your knowledge, can you give
2 me a history of the predecessor companies?
3    A.  It started out as Delmarva Power.  In the late
4 '90s we merged with Atlantic City, became Conectiv.
5 Conectiv was then purchased by Pepco in 2002 to form
6 Pepco Holdings.
7    Q.  Do you recall what year you started working for
8 Delmarva Power?
9    A.  1979, October the 15th.
10    Q.  What was your job at that time?
11    A.  Insurance analyst.
12    Q.  Briefly, what did you do between 1970 and 1979
13 in terms of your job?
14    A.  I worked for several other companies, either in
15 accounting or insurance.
16    Q.  Have your job duties changed?
17    A.  Yes.
18         MR. SAUDER:  Objection.  Just with regard
19 to -- can you just clarify that?
20         MS. YU:  Sure.
21 BY MS. YU:
22    Q.  Have your job duties changed since you started
23 working for Delmarva in 1979?
24    A.  Yes.

Page 7

1    Q.  Can you give me a general history of the
2 varying positions and when there were major changes in
3 your job duties?
4    A.  From 1979 until 2006 I was in the insurance
5 department, essentially the same job duties and
6 responsibilities.  2006 I'm now in the claims
7 department.
8    Q.  What are your current duties?
9    A.  I deal with liability claims against the
10 company brought by customers.
11    Q.  Can you give me an example of the type of
12 claim?
13    A.  We seal someone's electric and air.  The food
14 is damaged in the refrigerator.  It's my job to
15 negotiate a settlement with them.  The majority of it
16 is property damage.
17    Q.  Are you currently the member of a union?
18    A.  No.
19    Q.  Have you ever been a member of a union?
20    A.  No.
21    Q.  Prior than this lawsuit, have you ever filed
22 any complaints or charges against your employer?
23    A.  No.
24    Q.  Prior to January 1st of 1999, what's your

Page 8

1 understanding of how your pension benefits worked?
2    A.  Prior to January 1st, 1999, I would have a
3 defined benefit plan, pension plan.
4    Q.  Do you have an understanding of how your
5 benefits would have been calculated under that defined
6 benefit plan?
7    A.  Yes.
8    Q.  Could you tell me what your understanding is?
9    A.  Have to do with the -- I believe it's the last
10 five years of my salary, and then there were certain
11 factors applied to that along with my years of service
12 to determine an amount.
13    Q.  Did that benefit or the pension plan change at
14 some point?
15    A.  For me?
16    Q.  Yes.
17    A.  January 1st, 1999, it changed.
18    Q.  What's your understanding of how it changed at
19 that time?
20    A.  It became a cash balance pension plan.
21    Q.  What is your understanding of how a cash
22 balance plan works?
23    A.  The cash balance pension plan was that the
24 company gave us a -- determined a starting balance for

Page 9

1 each of the employees, and then going forward there
2 would be monies put into the plan for each employee.
3 You know, some percentage of their -- of salary.  And
4 for me, because I was -- I would also have been, you
5 know, able to get certain transition credits applied
6 to that.
7    Q.  What's your understanding of how you became
8 eligible to receive transition credits?
9    A.  It was based upon my age, the number of years
10 of service I had with the company.
11    Q.  Is it fair to say that the transition credits
12 were larger for people who had more service and who
13 were older?
14    A.  Yes.  They were graduated up based on age and
15 years of service.
16    Q.  With respect to the pay credits, what's your
17 understanding of what percentage an individual
18 participant gets in terms of pay credits?
19    A.  I guess I don't understand what you mean by
20 "pay credits."
21    Q.  Is it your understanding that pay credits are
22 provided under the cash balance plan?
23    A.  There's a percentage applied against my salary
24 to increase the, you know -- that would come out to

3 (Pages 6 to 9)

B0301

CONFIDENTIAL
Thomas S. Troup

Charles, et al.
v.
C.A. # 05-702

Pepco Holdings, Inc., et al.
January 12, 2007

Page 10

1   be, you know, added to my, you know, previous balance,
2   yes. Is that what you mean by "pay credits"?
3   Q. Yes.
4   A. Okay. There's pay credits and then transition
5   credits.
6   Q. Are there also interest credits?
7   A. Well, I take the interest credits. I'm
8   thinking they're part of the -- part of the transition
9   credits.
10   Q. When did you first learn that the pension plan
11   was going to be changed to a cash balance formula?
12   A. I believe it was sometime in the early part of
13   1998, you know, the company was coming out with
14   literature introducing, you know, the new pension
15   plan, the cash balance plan.
16   Q. What is your current job title?
17   A. Senior claims representative.
18   Q. From 1979 to 2006, did you have different job
19   titles?
20   A. Yeah, yeah. But they were all within, you
21   know, the realm of doing insurance.
22   Q. What was your last job title in the insurance
23   department?
24   A. Insurance coordinator.

Page 11

1   Q. Do you know what your job title was in 1999?
2   A. I think I was called -- no, I don't
3   specifically remember what it was. It had something
4   to do with insurance.
5   Q. Mr. Troup, I am handing you what has been
6   marked as Exhibit D-1. Do you recognize this
7   document?
8   A. (The witness reviews the document.) I can't
9   say that I, you know, remember receiving this. I may
10   have.
11   Q. I'm also going to hand you Exhibit D-2. Both
12   Exhibit D-1 and Exhibit D-2 say "Emerging Times" on
13   the top. Do you recall receiving this type of
14   communication?
15   A. Yeah. I remember receiving this type of
16   communication. The title "Emerging Times" is kind
17   of -- I don't remember that, but that's not to say
18   that it wasn't issued. It looks like it's an official
19   company document that would have been handed to
20   employees.
21   Q. If you take a look at the second page of
22   Exhibit D-2, in the first full paragraph, the question
23   says: "Can you tell us more about the new pension
24   arrangement?"

Page 12

1   A. Okay.
2   Q. And then the answer says: "The design of the
3   plan is not yet finalized, but we know it will be
4   what's called a cash balance plan."
5       Exhibit D-2 is dated October 20th, 1997.
6   Is this information consistent with what you recall
7   you were provided by your employer regarding the new
8   pension plan?
9       MR. SAUDER: Objection to form.
10       You can answer if you understand the
11   question.
12   A. Would you repeat it, please?
13   Q. Sure.
14       You indicated previously that sometime in
15   1998 the company had announced that there was going to
16   be a change in the pension plan. Exhibit D-2 is dated
17   October 20th, 1997, and includes information regarding
18   what's called a cash balance plan. Is this the kind
19   of information that you recall receiving?
20   A. Yeah. You know, I used the date 1999 because,
21   you know, that's around the time -- you know, I was
22   not pinpointing a specific date. It could have been
23   slightly earlier than that.
24   Q. Mr. Troup, Exhibit D-3 is a document that says

Page 13

1   "Conectiv Cash Balance Plan" on the front and it's
2   dated February 20th, 1998.
3   A. Yes.
4   Q. Have you ever seen this document before?
5   A. Yeah. This looks like a document that would
6   have been presented to the employees to outline the,
7   you know, cash balance pension plan.
8   Q. Do you recall whether you received this
9   information in or around February 1998?
10       MR. SAUDER: Objection. It assumes facts
11   not in evidence.
12       THE WITNESS: So --
13       MR. SAUDER: You can answer to the extent:
14   Do you know that you have seen this document before?
15   BY MS. YU:
16   Q. My question was whether you recalled having
17   received this in or around February of 1998.
18   A. Yes. I mean, the first page of the document or
19   page number 2 where they talk about, you know, the
20   combination of your pension and your 401(k), you know,
21   that looks like something that I did see at that
22   particular time.
23       MR. SAUDER: I just indicate for the record
24   that's Bates JMC445.

4 (Pages 10 to 13)

B0302

Page 14

1   Q.  Mr. Troup, you were reviewing various pages in
2   Exhibit D-3.  Is this the type of information, the
3   information that's contained in D-3, that you received
4   in 1998?
5       MR. SAUDER:  Objection with regard to "type
6   of information."
7   A.  Yes.  I mean, they talk, you know, in page
8   number 3, obviously beginning-of-the-year balance, pay
9   credits, interest credits, end-of-the-year balance.
10      MR. SAUDER:  That's JMC446.
11  Q.  As you look through the document, is there
12  anything that you feel that was not explained to you
13  in the 1998 time frame?
14      MR. SAUDER:  Objection.  Can you clarify
15  the question?
16  Q.  Mr. Troup, do you understand the question?
17  A.  Would you repeat it, please?
18  Q.  Sure.
19      If you could take a look at the information
20  that's contained in Exhibit D-3 and tell me if you
21  feel like there's any information in the exhibit that
22  was not explained to you in the 1998 time frame.
23  A.  (The witness reviews the document.)  I don't
24  remember on page 450 anything about statutory rules

Page 15

1   that will not allow the company to use rates greater
2   than the 30-year treasury rate.
3       Page 453, I don't remember receiving any
4   instructions or explanation with respects to how they
5   went from the $200,000 annuity to a value of $16,949.
6       And I never heard anything mentioned about
7   the -- this is page 454 -- the old plan may be frozen
8   five to ten years into the future.  I never remember
9   hearing anything about a five-year freeze.
10  Q.  Do you recall hearing about a ten-year freeze?
11  A.  Yes.
12      And I don't remember, page 458, anything
13  about that at all where there is comparisons of
14  Delmarva and Atlantic.
15      And I don't remember seeing anything that
16  would have had that "W" on the bottom right-hand page.
17  Q.  Anything else in that document?
18  A.  That's all.
19  Q.  Thank you, Mr. Troup.
20      Mr. Troup, this is Exhibit D-5, which is a
21  document that says "facts" on the top.
22      Do you recall receiving documents that
23  generally look like this?
24  A.  Yes.

Page 16

1   Q.  Do you recall receiving this particular
2   document in Exhibit D-5?
3   A.  It looks like a document that would have been
4   handed out by the company to the employees.  I don't
5   specifically remember this one, but, you know, I --
6   the title "facts," the Conectiv logo next to it, you
7   know, it's their style.  I believe I would have
8   received something like that, yes.
9   Q.  Mr. Troup, if you turn to the third page of
10  Exhibit D-5, which is numbered PHI3367, which is
11  actually page 2 of the exhibit, it's numbered page 2,
12  there is a list of the pension credits, it says
13  "percentage of pay" in a chart toward the bottom of
14  the page.
15      Does this accurately reflect what your
16  understanding is of the percentage of pay that
17  participants receive based on their age?
18  A.  Yes.
19  Q.  And those percentages increase as a participant
20  gets older?
21  A.  Yes.
22  Q.  Then the last paragraph on PHI3367 says:  "The
23  company also credits your account with interest each
24  year based on the current 30-year U.S. Treasury bond."

Page 17

1       Is that consistent with your understanding
2   of how the cash balance works?
3   A.  Yes.
4   Q.  If you turn to the page previous to that, which
5   is PHI3366, which is actually the third page, page 3
6   of this exhibit, I apologize, it's a little out of
7   order, there's a description of what the transition
8   credits will be.
9       Is this consistent with what your
10  understanding of what the transition credits were?
11  A.  Yes.
12  Q.  Do you recall which percentage of transition
13  credits you received?
14  A.  When?
15  Q.  Upon conversion to the cash balance.
16  A.  I would have had 3 percent.
17  Q.  Do you recall receiving this type of
18  information that we just reviewed that was contained
19  in Exhibit D-5 prior to January 1st, 1999?
20  A.  I can't recall that I received anything prior
21  to then.  You know, this looks like a document that
22  outlines the cash balance plan in its more formalized
23  form.  I believe that happened in the, you know, the
24  early part of '99.

5 (Pages 14 to 17)

B0303

CONFIDENTIAL                Charles, et al.        v.          Pepco Holdings, Inc., et al.
Thomas S. Troup                          C.A. # 05-702                January 12, 2007

Page 18

1    Q.   Just to clarify, at the latest it was provided
2    to you in the early part of 1999.  Is it possible it
3    could have been provided to you in 1998?
4         MR. SAUDER:  Objection.  Calls for
5    speculation.
6    A.   Possibly.
7    Q.   Mr. Troup, what is your date of birth?
8    A.   1/26/49.
9    Q.   Are you a member of AARP?
10   A.   No, no, haven't done that yet.  They've
11   solicited me.
12   Q.   Mr. Troup, why did you bring a lawsuit against
13   the defendants in this case?
14   A.   I felt that I was, you know, being wronged by
15   the company with respect to, you know, the pension
16   plan that I'm, you know, being under the cash balance
17   pension plan.  That it would be -- you know, I would
18   be receiving reduced benefits.
19   Q.   Reduced benefits compared to what?
20   A.   Compared to the previous plan that was in
21   place.
22   Q.   How is the cash balance plan unfair to you?
23   A.   How is the cash balance plan unfair to me?
24   That if I were to be -- still been under the defined

Page 19

1    benefit plan upon the time of my retirement, my
2    benefits would be greater than under the cash balance
3    plan.
4    Q.   Do you believe that the cash balance plan
5    discriminates you on the basis of age?
6    A.   Yes, I do.
7    Q.   Do you believe the cash balance plan
8    discriminates against everyone on the basis of age?
9    A.   I don't know the answer to that.
10   Q.   Do you think there are any participants who are
11   better off under the cash balance plan as compared to
12   the old plan?
13   A.   Again, I don't know the answer to that.
14   Q.   How does the cash balance plan discriminate
15   against you on the basis of age?
16   A.   By the formula that's being used, it would
17   reduce the amount of my accrued pension benefits that
18   would be in my plan in my account from -- from start
19   until the date I retire.  You know, under the defined
20   benefit plan, I would be afforded higher benefits,
21   higher pension benefits.
22   Q.   Just to clarify, when you referred to the
23   "defined benefit plan," you are referring to the plan
24   that was in effect prior to January 1st of 1999?

Page 20

1    A.   Yes, that's correct.
2    Q.   Can we refer to that either as the defined
3    benefit plan or the old plan?
4    A.   Yes.
5    Q.   How long have you felt that the cash balance
6    plan has been unfair to you?
7    A.   Probably over the last several years, when I
8    started to seriously think about retiring.
9    Q.   Mr. Troup, that is Exhibit D-6, which is a
10   letter dated December 21st, 1998.  Do you recognize
11   this document?
12   A.   Yes, it looks familiar.
13   Q.   Do you recall whether you received Exhibit D-6
14   in or around December 21st, 1998?
15   A.   It would probably be around that time, yes.
16   Q.   How did you receive the document, a copy of
17   which is Exhibit D-6?
18   A.   I don't remember that.
19   Q.   Exhibit D-6 is describing the cash balance
20   pension plan that was announced earlier in 1998; is
21   that right?
22   A.   Yes.
23   Q.   Could you take a few minutes to review the
24   information in this exhibit and tell me if there is

Page 21

1    anything, to the best of your knowledge, that's not
2    accurately described with respect to the cash balance
3    plan?
4         MR. SAUDER:  Objection to the extent that
5    it calls for a legal opinion by a lay witness.
6    A.   So I can answer or not answer?
7    Q.   You can answer.
8    A.   Would you repeat the question?
9    Q.   Sure.
10        Could you review Exhibit D-6 and tell me,
11   to the best of your knowledge, whether you think that
12   there's anything inaccurate in this document?
13        MR. SAUDER:  Same objection.
14        You can answer to the extent you
15   understand.
16   A.   I don't know that I would know what was
17   inaccurate.  It looks like it's, you know, questions
18   about the cash balance plan and answers.  I believe
19   the questions that are answered appear to be answered
20   accurately, correctly.  Is there anything of doubt?  I
21   don't know.
22   Q.   The third, fourth, and fifth pages of
23   Exhibit D-6 --
24        MR. SAUDER:  JMC3, 4, and 5.

6 (Pages 18 to 21)

Page 22

1    Q.  -- If you take a look at JMC3, at the top of
2    the page it says:  "Update of Conectiv facts" and it
3    says it was originally published in the spring of
4    1998.
5           If you could take a look at the information
6    in Exhibit D-5, starting with the first page, which
7    begins "New cash balance pension plan," and just so
8    you know, we already have a stipulation on the record
9    that this substantially the same information contained
10   in it.  I just wanted to get confirmation from you
11   that this information that was in the December 21st,
12   1998, letter is substantially similar to the
13   information contained in Exhibit D-5.
14   A.  Yes.
15   Q.  What was your reaction to being informed of the
16   change in the cash balance plan that was going to be
17   effective in 1999?
18   A.  I knew it was a change, a change in, you know,
19   but that I'd still have a pension and that this was a
20   plan that the company was coming out with to provide
21   pension benefits to, you know, at the time, you know,
22   the management employees and eventually, you know, all
23   employees.
24   Q.  Is there any information that you wished you

Page 23

1    had gotten in December 1998 about the implementation
2    of the cash balance plan?
3    A.  You mean at that time?
4    Q.  At that time.
5    A.  No.  The company seemed to be answering all
6    the -- you know, any question that I had.  You know,
7    pension was a benefit, but it wasn't something that
8    was foremost on my mind at the time.  You know, I read
9    the information.  I think I understood what they were
10   talking about.
11   Q.  Mr. Troup, Exhibit D-7 is a document that says
12   "Your Conectiv Total Rewards" and it has "1998-99" on
13   the front cover.  Do you recognize this cover page?
14   A.  Yeah.  It looks like a cover page of a document
15   I, you know, I probably received.
16   Q.  Do you know whether you still have a copy of
17   this document in your possession?
18   A.  I might, but I'm not positive.
19   Q.  Do you have a system in place for information
20   that you receive from your employer regarding your
21   pension benefits?
22   A.  I -- you know, I -- you know, I keep some.  I
23   don't keep others.  I keep what I think is relevant.
24   Q.  Is there --

Page 24

1    A.  Over time, I mean, the company provides you
2    with, you know, volumes and volumes of paper.  You
3    can't keep it all.  I don't -- you know, I don't try
4    to keep it all.
5    Q.  Is there one central location where you try to
6    keep it?
7    A.  Yeah, yeah, I have a file drawer that, you
8    know, talks about benefits, pension, health plan, life
9    plan, yeah.
10   Q.  Where is that central file?
11   A.  At work.
12   Q.  Did you provide a copy of that file to your
13   attorney?
14   A.  Yes, that pertained to pension.
15   Q.  So do you think that you have provided
16   everything in your possession that relates to pension
17   benefits to your attorneys?
18   A.  All those that I could find, yes.
19   Q.  Mr. Troup, Exhibit D-8 is a document that says
20   on the front "Conectiv Total Rewards, The tangible and
21   hidden paychecks."  Do you recall ever seeing this
22   document?
23   A.  (The witness reviews the document.)  Based on
24   the cover page, it's something that I may have

Page 25

1    received.  But, you know, when I go through the, you
2    know, contents inside, there's information here that
3    doesn't look like I would have received this, this
4    type of information, some of it from the company.
5           So, you know, I think my answer to that
6    would probably be probably not, not something I would
7    have received if this is the, you know, complete
8    document that would have been, you know -- you're
9    asking me, you know, did the company provide that to
10   me and I don't think so.
11   Q.  That's based on your recollection of what's
12   contained in the document?
13   A.  Yes.
14   Q.  Exhibit D-9 is a copy of a document that says
15   "InSight" on the top and it's dated March 1999.  Is
16   this a kind of document you recall having received?
17           MR. SAUDER:  Objection to the form.  You
18   mean documents entitled "InSight"?
19           MS. YU:  Yes.
20           MR. SAUDER:  Okay.
21   A.  Yes, I remember receiving documents entitled
22   "InSight."
23   BY MS. YU:
24   Q.  If you look at the second page of Exhibit D-9,

7 (Pages 22 to 25)

B0305

Page 26

1 which is PHI3429, there is a section on the left-hand
2 side about the cash balance plan. There is a
3 reference to cash balance pension plan statements,
4 that they anticipate going out in June or July of
5 1999.
6         Did you receive that, an opening statement
7 in that time frame?
8     A.  I received an opening statement, yes. If
9 that's the -- you know, I'm not -- I don't recollect
10 the specific time frame that I received it, what date,
11 but, you know, I would have to think it would probably
12 be around that time frame possibly.
13     Q.  There's also a reference to cash balance
14 pension plan meetings for employees. Do you recall
15 attending a meeting like that?
16     A.  Yeah, I would have gone to a meeting.
17     Q.  Mr. Troup, Exhibit D-10 is a document that says
18 "Midweek Extra" on the top and it says "Cash balance
19 update, June 23, 1999." Do you recognize this
20 document?
21     A.  It looks like a document I would receive from
22 the company.
23     Q.  In the third paragraph of Exhibit D-10 starting
24 at the second sentence, it says: "Recent stories in

Page 27

1 the national media have raised concerns about some
2 cash balance plans that do not offer the same level of
3 financial security or grandfathering provisions as
4 Conectiv's cash balance pension plan. One part of the
5 presentation will address these concerns and
6 demonstrate how Conectiv's plan is different."
7         Do you recall any of the stories that they
8 are referring to in the national media?
9     A.  I think they mentioned, you know, that there
10 have been other cash balance plans, you know, that
11 other companies had had and that, you know, their
12 employees had, you know, concerns with respects to. I
13 don't remember specifics or names of the companies or
14 anything that I can recollect.
15     Q.  Mr. Troup, Exhibit D-11 is another document
16 that's entitled "InSight." This one is dated July
17 1999. Do you recall whether you received this
18 document?
19     A.  Again, it looks like a document I would have
20 received, yes.
21         MR. SAUDER: Mr. Troup, I would just
22 caution you to listen to the question with regard to
23 this document. I think the question was: Did you
24 receive this document?

Page 28

1     A.  (The witness reviews the document.) Yeah.
2 Again, it becomes very difficult to answer,
3 specifically. The company provides you with all kinds
4 of communication documents in different formats. For
5 me to sit here and specifically say that, yes, I
6 received this document, I don't know if that would be
7 a truthful answer, you know. But can I say I -- you
8 know, it looks like something I may have received, but
9 I don't know.
10     Q.  These are the types of documents you recall
11 having received; correct?
12     A.  Yeah, this type.
13     Q.  But you don't have a specific recollection as
14 to this particular document?
15     A.  I could have been on vacation when this came
16 out. I may not have gotten it as an example of, you
17 know, why I may not have gotten it. You know, it's
18 not something I would have kept, to the best of my
19 knowledge.
20     Q.  Exhibit D-12 is a document that's says "InSight
21 online" on the top of it. Do you know what that is in
22 reference to?
23     A.  Well, it mentions here, it says it's Conectiv's
24 intranet resource for corporate news and information.

Page 29

1     Q.  Did you have access to Conectiv's intranet?
2     A.  Yes.
3     Q.  When did this intranet access become available?
4     A.  I think whenever we got a computer. I believe
5 that when we received computers, that to the -- and
6 the intranet was there, you know, we had access to it.
7 Depending upon what your job was, it was something
8 that you needed to do your job, I believe they
9 provided that access to people who had computers.
10     Q.  Did you receive a computer when they first
11 started rolling out computers?
12     A.  You know, one, I don't remember when that was.
13 I -- you know, I did have a computer. When did I
14 first receive a computer? I don't remember.
15     Q.  Do you remember in what decade?
16     A.  You know, I'm thinking it was in -- you know,
17 it was definitely -- you know, I definitely had a
18 computer in the 1990s. Is that good enough?
19     Q.  To the best of your recollection.
20     A.  Yeah. I can remember, you know, years and
21 years and years ago and I didn't have computer. But,
22 you know, when did I get a computer? I don't
23 remember.
24     Q.  Did you have access to a computer in 1999?

8 (Pages 26 to 29)

B0306

Page 30

1  A.  Yes.
2  Q.  Did you access the online information on the
3  intranet from time to time?
4  A.  You mean this type of information?
5  Q.  Any type of information.
6  A.  Company information?
7  Q.  Yes.
8  A.  Some.  You know, yeah.
9  Q.  Did you use it to access information on the
10  cash balance plan?
11  A.  No, not that I remember.
12  Q.  Exhibit D-13 is a compilation of slides.  The
13  first one says "Conectiv Cash Balance Pension Plan"
14  and it's dated July 1999.
15      Do you recall whether these slides were
16  part of the presentation made regarding the cash
17  balance plan in that time frame?
18  A.  It looks like, you know, the type of handout
19  that would have been provided at a, you know, a
20  meeting to go over the cash balance pension plan.
21  Q.  Do you recall attending a meeting on the cash
22  balance plan?
23  A.  Yeah, I attended a meeting, yes.
24  Q.  Was it, to your recollection, the July 1999

Page 31

1  time frame?
2  A.  I thought it would have been sooner than that.
3  If the plan would have been started in 1/1/99, that
4  they would have had meetings prior to its, you know,
5  starting.  But, you know, I did attend -- when they
6  had meetings regarding, you know, benefits or
7  whatever, you know, I attended those meetings, yes.
8  Q.  Will you look at MWW-220, which is the second
9  page of Exhibit D-13?  The first slide on the upper
10  left-hand corner refers to The Wall Street Journal and
11  congressional hearings.  Do you recall that part of
12  the discussion?
13  MR. SAUDER:  I just object to the form,
14  assuming there was a discussion.
15      But you can answer.
16  A.  I don't remember congressional hearings.  I
17  remember the mention of Wall Street Journal articles,
18  and that's -- you know, I don't remember the rest of
19  it.  You know, it's not something that stuck with me
20  from a meeting.
21  Q.  What's your recollection of the discussion
22  about Wall Street Journal articles?
23  A.  That there were companies that, you know,
24  moved to cash balance pension plans and that, you

Page 32

1  know, the employees had concerns.
2  Q.  Did you do anything to follow up on The Wall
3  Street Journal articles?  Did you look them up on the
4  Internet?
5  A.  No, I didn't do that.
6  Q.  Are there periodicals or newspapers that you
7  read on a regular basis?
8  A.  Typically the local paper.
9  Q.  Which one is that?
10  A.  It would be The News Journal.
11  Q.  Are there any other magazines or periodicals
12  that you read on a regular basis?
13  A.  No, not really.  I watch TV.
14  Q.  Do you watch the news on TV?
15  A.  Excuse me?
16  Q.  Do you watch the news on TV?
17  A.  Occasionally.
18  Q.  Do you read the paper every day or less than
19  every day?
20  A.  Probably several times a week.
21  Q.  How long have you been reading your local paper
22  on a regular basis?
23  A.  You know, ever since we moved to Delaware,
24  probably.

Page 33

1  Q.  When was that?
2  A.  1979.
3  Q.  When was the first time you consulted with an
4  attorney regarding your cash balance plan?
5  A.  I would have made a phone call to Mr. Sauder's
6  firm probably -- I guess it was probably about a year
7  ago.
8  Q.  Have you spoken with any other attorneys about
9  the cash balance plan?
10  A.  Yeah.  I had contacted several other attorneys
11  prior to that about, you know, initiating this type of
12  a suit, but, you know, they weren't interested in
13  doing it.  And that would have been about, you know,
14  six months to a year prior to that.
15  Q.  How many attorneys did you consult?
16  A.  There was one in Wilmington and one in
17  Philadelphia.  I don't remember the names, though.
18  I'm sorry.
19  Q.  How did you first learn about the lawsuit
20  brought by Mr. Charles, Mr. Ward, and Mr. Fink?
21  A.  I heard it through the grapevine at work and,
22  you know, since I had been looking to pursue, you
23  know, a suit myself and been unsuccessful, you know,
24  when I heard this, you know, it piqued my interest.

9 (Pages 30 to 33)

B0307

CONFIDENTIAL
Thomas S. Troup

Charles, et al.
v.
C.A. # 05-702

Pepco Holdings, Inc., et al.
January 12, 2007

---

Page 34

1　Q.　How long have you known Mr. Charles?

2　A.　I don't. He's a -- you know, he's an employee.

3　I never met him.

4　Q.　Have you had any conversations with him at all?

5　A.　Yes. I called him when I heard about the suit

6　and, you know, asked him questions about it.

7　Q.　Is that the first time you had spoken with him?

8　A.　To the best of my knowledge, yes.

9　Q.　And you called him, he didn't call you?

10　A.　Correct.

11　Q.　Is he the first person that you called about

12　the lawsuit?

13　　　　MR. SAUDER: Objection to the form.

14　A.　About this lawsuit?

15　Q.　The lawsuit that was filed by Mr. Charles,

16　Mr. Ward, and Mr. Fink.

17　A.　Yes, he was the first one that I called because

18　I knew he -- you know, there was, you know, one in the

19　works and I called -- you know, I called him.

20　Q.　Do you recall who told you about the lawsuit

21　initially?

22　A.　No. You know, it was water cooler talk and

23　they said the names of the people in Atlantic that

24　were bringing it, and so I made a call.

---

Page 35

1　Q.　Approximately when did that discussion occur

2　around the water cooler?

3　A.　Approximately it would have been, you know,

4　probably the day before I spoke to, you know, Jim

5　Malone.

6　Q.　How many conversations have you had with

7　Mr. Charles?

8　A.　Of --

9　　　　MR. SAUDER: Objection. You mean prior

10　to --

11　　　　MS. YU: Ever.

12　　　　MR. SAUDER: Okay.

13　A.　I think I've spoken to him twice.

14　BY MS. YU:

15　Q.　In the first conversation you had with him when

16　you called him, what was the substance of your

17　discussion?

18　A.　You know, what law firm was he using, how do I

19　get in touch with him.

20　Q.　Did you talk about the claims asserted in the

21　complaint?

22　A.　No, no. I think just, you know, that, you

23　know, they were bringing a lawsuit against the company

24　for the, you know, cash balance pension plan and I

---

Page 36

1　said I've been looking to do the same thing. How do I

2　get in touch with the attorney that you're using? And

3　he gave me the, you know, name and number.

4　Q.　How long did that conversation last?

5　A.　A couple minutes at most.

6　Q.　When was the next conversation that you had

7　with Mr. Charles?

8　A.　Sometime after I had contact -- sometime in the

9　early part of 2006. I just called him to say, you

10　know: Have you heard anything from Jim Malone? How

11　are things going? And we just kind of chitchatted

12　about -- he told me, you know, what he knew as to what

13　was going on with the lawsuit.

14　Q.　Do you recall specifically what he told you?

15　A.　No, not specifically. I was okay with the

16　information that he told me and, you know -- but

17　specifically, you know, no, I don't. Specifically, I

18　don't remember what, you know, he told me.

19　Q.　How long did that conversation last?

20　A.　A minute or two.

21　Q.　Have you had any other conversations with

22　Mr. Charles?

23　A.　Not that I recall, no.

24　Q.　Have you ever spoken with Mr. Ward, with

---

Page 37

1　Maurice Ward?

2　A.　No, I don't believe so.

3　Q.　Have you had any conversations with Joseph

4　Fink?

5　A.　No.

6　Q.　Have you had any conversations with anyone

7　regarding their deposition testimony?

8　A.　Just with my attorney about my being deposed.

9　　　　MR. SAUDER: Okay.

10　Q.　What have you done in preparation for your

11　deposition today?

12　A.　Spoke with my attorney.

13　Q.　Is there anything else you've done?

14　A.　No.

15　Q.　Did you review any documents on your own?

16　A.　Yeah. I looked at the, you know, the

17　information that was provided to me by my attorney.

18　Q.　Did you review any other documents?

19　A.　No.

20　Q.　Did you review documents with your attorneys?

21　A.　Yes.

22　Q.　Have you had any conversations with your

23　coworkers about the cash balance plan?

24　A.　Yes.

---

10 (Pages 34 to 37)

CONFIDENTIAL          Charles, et al.                    v.              Pepco Holdings, Inc., et al.
Thomas S. Troup                        C.A. # 05-702                     January 12, 2007

Page 38

1    Q.   What kind of conversations have you had?
2    A.   You know, that it was -- that this is the
3    new -- the pension plan of the company. You know,
4    what -- how it compares against the defined benefit
5    plan, those types of conversations.
6    Q.   Approximately how many coworkers have you had
7    those discussions with?
8    A.   You know, probably less than ten.
9    Q.   What division of PHI do you work for?
10   A.   Right now?
11   Q.   Yes.
12   A.   I'm in the legal department.
13   Q.   Were there people in the legal department that
14   you had discussions with with respect to the cash
15   balance plan?
16   A.   I've spoken to my, you know, my manager about
17   it. That's all. You know, the manager of claims.
18   Q.   Who is the manager of claims?
19   A.   Howard Yourinson.
20   Q.   What discussion did you have with him about the
21   cash balance plan?
22   A.   You know, comparing it against the defined
23   benefit plan.
24   Q.   What did he tell you in the context of those

Page 39

1    conversations?
2    A.   He told me that he was grandfathered; I was
3    not. And then we spoke in -- you know, about -- you
4    know, based upon your age, you know, where are you
5    going to come out when it's time for you to retire,
6    and what would be the -- what would be your benefit
7    under the defined benefit plan versus the cash balance
8    plan.
9    Q.   In the context of your conversations with your
10   manager, were you asking whether he could pursue a
11   complaint?
12   A.   Whether he could --
13   Q.   Were you talking to him in the context of your
14   relationship as manager/employee, or was it more of a
15   discussion that you had with other workers about the
16   cash balance plan?
17   A.   It would have been sort of a, you know, peer
18   level discussion, not as a, you know, employee/manager
19   relationship.
20   Q.   So was there any formal complaint that you were
21   trying to lodge with him as your manager?
22   A.   No.
23   Q.   Do you think that there's anything about the
24   cash balance plan that's illegal?

Page 40

1         MR. SAUDER: I just object and caution you
2    not to answer if it involved anything that you learned
3    through communications with your attorney. Beyond any
4    communications with your attorney, if you feel that
5    you can answer the question, you can go ahead and
6    answer.
7    A.   I didn't think it was illegal, no. I mean, I
8    had known that other companies had cash balance plans,
9    so, you know, based upon that, you know, I didn't
10   think that the company would present us something that
11   was illegal.
12   Q.   We talked a little bit about how you thought
13   the cash balance plan was unfair.
14   A.   Yes.
15   Q.   And you referred to a comparison of the
16   benefits under the cash balance formula as compared to
17   the old plan.
18        Am I right in understanding that that's one
19   way that you think that the cash balance plan is
20   unfair?
21   A.   Yes.
22   Q.   Is it unfair in any ways other than as compared
23   to the old plan?
24   A.   Other than affording, you know, lower -- fewer

Page 41

1    benefits at time of retirement for me?
2    Q.   Yes.
3    A.   I didn't -- no, I didn't think it was unfair,
4    you know, for any other reason, no.
5    Q.   Have you done any calculations of what your
6    benefit would have been under the old plan?
7    A.   I've made, you know, some, you know, some
8    estimates. You know, you know what your salary is.
9    You know what the factors that are associated with,
10   you know, the defined benefit plan, so you can, you
11   know, estimate what your expected value in the pension
12   plan would be, yes.
13   Q.   Did you come to any conclusions after having
14   done those estimates?
15   A.   Yes.
16   Q.   What were those conclusions?
17   A.   That the benefit under the defined benefit plan
18   would be greater than the cash balance plan.
19   Q.   Did you keep those calculations that you did?
20   A.   No, because it was something I could replicate
21   at any given time. It was, you know, a thing of, you
22   know, at the moment. So it's not something that I
23   could say that I've -- that I could go to a file and
24   hand it to you right now, no.

B0309

CONFIDENTIAL
Thomas S. Troup

Charles, et al.

v.
C.A. # 05-702

Pepco Holdings, Inc., et al.
January 12, 2007

Page 42

1
2
3
4
5
6
7
8   PAGE 43 OF THIS TRANSCRIPT
9
10  HAS BEEN DEEMED TO BE CONFIDENTIAL
11
12  BY THE PARTIES AND CAN BE FOUND IN A
13
14  SEALED ENVELOPE AT END OF THIS
15
16  TRANSCRIPT.
17
18
19
20
21
22
23
24

Page 44

1   BY MS. YU:
2      Q.  Mr. Troup, Exhibit D-15 is a copy of an e-mail
3   trail between Mike Charles and Francis Paoli. Have
4   you ever seen this document before?
5      A.  (The witness reviews the document.)  No.
6      Q.  Did your first conversation with Mr. Charles
7   occur after August of 2003?
8      A.  Yes.
9      Q.  Mr. Troup, you indicated there were
10  approximately ten coworkers that you had had
11  conversations with about the cash balance plan?
12     A.  Yeah.
13     Q.  Could you tell me the names of those
14  individuals?  And if you could spell their names if
15  they're difficult to spell.
16     A.  Well, one was, you know, Howard Yourinson,
17  Y-o-u-r-i-n-s-o-n.  I'm trying to think of who they
18  might be.
19         MR. SAUDER:  I just ask you not to
20  speculate.  If you know the names of the people, then
21  you can name them and not people who you may have --
22     A.  Other than Howard, I don't remember -- you
23  know, I guess I would be speculating in some respects.
24  I may or may not have had that conversation with

Page 43

1      Q.  What is your current salary?
2      A.  I believe it's around 75,000 a year.
3         MR. SAUDER:  I just ask that any
4   salary-related information be marked as
5   "Confidential."
6         MS. YU:  Certainly.
7   BY MS. YU:
8      Q.  Was that approximately what your salary was for
9   2006?
10     A.  I think my salary for 2006 was probably a
11  little higher because we -- in 2006 we had a -- I'm
12  trying to think what you would call it because we had
13  not getting it in 2007.  A bonus.  So that would have
14  inflated the 2006 salary over my base salary, and base
15  salary being the 75,000.
16     Q.  What was the bonus amount?
17     A.  I think it moved it up to about 81,000.
18         MS. YU:  Can we go off the record?
19         (Discussion off the record.)
20         (A recess was taken at this time.)
21
22
23
24

Page 45

1   people.  But to -- I don't know that I can name them,
2   specifically.  But I can say that I did have
3   conversations with other people.
4      Q.  Where do you work currently?
5      A.  I work in Salisbury, Maryland.
6      Q.  How long have you been at that location?
7      A.  Six months.
8      Q.  How many employees are working at that
9   location?
10     A.  Probably one-200, 100 to 200 people.
11     Q.  Where were you working prior to this location?
12     A.  800 King Street, Wilmington.
13     Q.  How many employees were at that location?
14     A.  It varied.  You mean at what particular time?
15  You know --
16     Q.  Right before the move.
17     A.  Right before I moved to Salisbury?
18     Q.  Yes.
19     A.  Thirty or 40.
20     Q.  Have you had conversations with coworkers about
21  the cash balance plan in the last six months?
22     A.  Yes.
23     Q.  Were these conversations with people who were
24  working at the same location you were?

12 (Pages 42 to 45)

Page 46

1    A. Yes.
2    Q. Have you ever had any conversations with
3    coworkers about the cash balance plan other than the
4    other named defendants in this litigation that were
5    not working in the same location as you were?
6    A. Possibly. You know, I may have had a phone
7    conversation with people, you know, as you're talking
8    business and it rolls into other subjects. You know,
9    the cash balance may have been one of those subjects,
10   yes.
11   Q. Do you recall who outside of your workplace
12   they might have been?
13   A. Outside of the workplace?
14   Q. Outside of your physical work location.
15   A. You know, the only one that I specifically
16   remember, I was riding in a car with a construction
17   supervisor in the, you know, rural parts of the
18   eastern shore of Maryland. He was retiring soon or he
19   talked about retiring soon and I told him I was under
20   the cash balance pension plan.
21        That's, you know, the only one specifically
22   outside of my work location that I can remember, you
23   know.
24   Q. What was the name of that individual?

Page 47

1    A. Ronny Newcomb. You know, and it was just two
2    guys chatting in a car riding down the road.
3    Q. Other than mentioning that you were in the cash
4    balance plan, was there anything else that you
5    discussed with him?
6    A. Just that I was -- you know, wasn't
7    grandfathered. That was about it.
8    Q. Approximately when did this conversation occur?
9    A. It would have been about -- probably about a
10   month -- would have been in, I think, December of '06,
11   about a month ago.
12   Q. Do you recall approximately when the first
13   conversation you had with a coworker about cash
14   balance plan would have been?
15   A. Well, I mean, we certainly -- you know, I
16   talked to people, you know, when it first came out and
17   we had meetings. You know, you talk about it. You
18   know, you tell people that, you know, you weren't
19   grandfathered. You know, but, you know, specifically
20   who they were, I don't remember.
21        Other than that, I don't -- you know, it
22   comes up in conversation, you talk about it.
23   MS. YU: I think this should be D-33.
24   (Defendant's Exhibit 33 was marked for

Page 48

1    identification.)
2    BY MS. YU:
3    Q. We've just marked as Exhibit D-33 a document
4    that says: "This statement shows the opening Cash
5    Balance Account on January 1, 1999, for Thomas S.
6    Troup."
7        Do you recognize this document?
8    A. Yes.
9    Q. Do you recall approximately when you received
10   this document?
11   A. Sometime in 1999.
12   Q. There's some handwritten notations and other
13   markings. Is that your handwriting?
14   A. Yes, it is.
15   Q. Did you make those notations shortly after you
16   received this document?
17   A. That I don't remember. You know, it -- with it
18   showing 1999 and 2000 as the headings under the
19   columns there and then just arrows going out, that
20   would lead me to believe that, you know, I would have
21   done it sometime shortly after receiving it.
22   Q. Is that your Social Security number that
23   appears?
24   A. Yes, it is.

Page 49

1    Q. Is the date of birth and the date of hire
2    correct?
3    A. Yes.
4    Q. Is amount of service credited correct?
5    A. Yes.
6    Q. Is there any information that appears in
7    Exhibit D-33 that is inaccurate to your knowledge?
8    A. No.
9        (Defendant's Exhibit 34 was marked for
10   identification.)
11   BY MS. YU:
12   Q. Exhibit D-34 that we just marked is a
13   collection of statement information. Do you recognize
14   these documents?
15   A. Yes.
16   Q. Do you recall how you received these
17   statements?
18   A. I think they mail them to your home.
19   Q. Can you confirm for me that there is
20   information regarding the opening balance and ending
21   balance? I'll just go through the years. It's 2000,
22   2001, 2002, 2003, and then 2005?
23   A. Is 2004 there, also?
24   Q. I'm sorry. Did I miss one? Yes.

13 (Pages 46 to 49)

Page 50

1    So it contains information for each year
2   from 2000 through 2005?
3    A.  Yes.
4        MR. SAUDER:  Just for the record, this is
5   marked TST2 through TST8.
6    Q.  Is there any information that's contained in
7   Exhibit D-34 that is inaccurate to your knowledge?
8    A.  No.
9    Q.  Does your ending balance increase every year?
10   A.  Yes.
11       (Defendant's Exhibit 35 was marked for
12   identification.)
13  BY MS. YU:
14   Q.  Mr. Troup, Exhibit D-35 says "InSight online"
15  on the top of it and it's dated April 7th, 2000.  Do
16  you recognize this document?
17   A.  Yes.
18   Q.  How did you obtain this document?
19   A.  I think the company provided it to us or I -- I
20  don't specifically remember how I got it, but, you
21  know, it would have been issued by the company, I
22  believe.  At the time, Conectiv.
23   Q.  To your knowledge, did you obtain this document
24  sometime in April 2000?

Page 52

1   1997?
2    A.  It shows what my accrued invested retirement
3   benefit would have been as of January 1st, 1997.  And
4   then there's also a chart there that, you know,
5   projects them forward.
6    Q.  This is personalized information for you?
7    A.  Yes, correct.
8    Q.  Have you written any e-mails about the cash
9   balance plan?
10   A.  Not that I remember, no.
11   Q.  Have you gotten any e-mails about the cash
12  balance plan other than employer communications?
13   A.  No, not that I'm aware of.
14   Q.  And I said e-mail generally.  Do you have a
15  home e-mail address?
16   A.  No.  No, I do not.
17   Q.  You have an e-mail address for work?
18   A.  Yes.
19   Q.  Is that the only e-mail account that you use?
20   A.  Yes.  You know, there might be something, you
21  know, sent to my wife, but -- you know, her e-mail
22  address at home, but very little is used there.
23   Q.  Would there be anything about cash balance
24  plans on your home e-mail?

Page 51

1    A.  Yes, I think so.
2    Q.  Is this part of the information that was
3   available online on the intranet?
4    A.  It appears to be, yes.  You know, when the
5   company provides you with communications, you know,
6   they also provide you with a link that you can just
7   kind of click on it and it zips you to it.  That's
8   probably how I would have accessed this as opposed to
9   specifically searching for it, you know, on the
10  intranet.
11       (Defendant's Exhibit 36 was marked for
12  identification.)
13  BY MS. YU:
14   Q.  Exhibit D-36 is a document that says "Your
15  Total Compensation Statement, 1997," and it has
16  "Delmarva Power" on it.  Do you recognize this
17  document?
18   A.  Yes.
19   Q.  This document is numbered TST10 through 22.
20       What's described in this document?
21   A.  The total compensation provided me, you know,
22  by Delmarva Power in the year 1997.
23   Q.  If you turn to page TST20, are these
24  calculations showing what your benefits were as of

Page 53

1    A.  No.
2    Q.  Mr. Troup, what is your understanding of the
3   claims that you have brought in your lawsuit?
4    A.  The accounts, as I understand them, that have
5   been brought is that the company, one, didn't
6   adequately tell us about the fact that the annuity
7   value of the pension plan could go down and that, you
8   know, the annuity value of the plan has gone down and
9   that it's not supposed to go down.
10   Q.  And when you say it's not supposed to go down,
11  it's not supposed to go down for any reason?
12       MR. SAUDER:  I just object and just caution
13  the witness with regard to any attorney/client
14  communications, if you can answer that question
15  outside of any attorney/client communications, then
16  you are free to answer the question.
17   A.  I don't know how to do that.
18   Q.  What other claims are you asserting in your
19  lawsuit?
20   A.  Those are the ones that I remember.  I know
21  there's four counts.  I don't specifically remember
22  what the other two are.
23   Q.  Is part of your claim that you did not get
24  timely notice?

14 (Pages 50 to 53)

Page 54

1    A.  Timely notice of what?
2    Q.  Let's go back to the first item that you listed
3  with respect to your lawsuit.  You said that there was
4  not disclosure of the fact that the annuity could go
5  down.
6    A.  Yes.
7    Q.  Are you claiming that that disclosure was not
8  made in a timely way?
9    A.  I don't remember it being disclosed at all,
10  ever.
11    Q.  If you could refer back to Exhibit D-6, this
12  letter is dated December 21, 1998.  If you had
13  received this notice three days earlier, is there
14  anything that you would have done differently with
15  respect to the cash balance plan?
16    A.  Three days earlier than December 21st, 1998?
17    Q.  Yes.
18    A.  No.  I don't know that three days would make a
19  difference.
20    Q.  Have you ever requested any pension estimates
21  from Vanguard?
22    A.  No.
23    Q.  Have you been online on their site at all?
24    A.  Yes.

Page 55

1    Q.  What have you looked for when you were on the
2  site?
3    A.  My 401(k) pension.  My 401 plan -- 401(k) plan,
4  monies.
5    Q.  Have you looked up information on your cash
6  balance plan on the Vanguard site?
7    A.  I know it's there.  It shows -- it shows the
8  balance, the current balance at the end of a year so
9  that --
10    Q.  But you've never asked for estimates to be done
11  on the website?
12    A.  No.
13    Q.  Is it your understanding that one of the claims
14  asserted in your complaint is a claim that the cash
15  balance plan is backloaded?
16    A.  I don't know what you mean by "backloaded."
17    Q.  Backloading meaning that significantly more
18  benefits accrue at the end of your service with the
19  company as opposed to toward the beginning of your
20  service with the company.
21    A.  Say that again, please.
22    Q.  That backloading means that significantly more
23  of your benefits accrue at the end of your service
24  rather than at the beginning of your service.

Page 56

1    A.  Under the cash balance plan?
2    Q.  Yes.
3    A.  No, I'm not aware -- I'm not aware that that is
4  the case, and I'm not aware that, you know, that is
5  one of the, you know, points in the lawsuit.
6    Q.  Do you feel like you've been harmed by the
7  change to the cash balance formula?
8    A.  Yes.
9    Q.  Can you tell me how you've been harmed by it?
10    A.  Well, that when I do retire, I'll have less
11  money available to me for retirement.
12    Q.  Is there any other way that you've been harmed?
13    A.  No.  I think that's pretty much it.  It comes
14  down to money.
15    Q.  Money, again, compared to the cash balance plan
16  as opposed to the benefits under the old plan?
17    A.  Yes.
18    Q.  Is it your understanding that the complaint
19  contains allegations that the cash balance plan is age
20  discriminatory?
21    A.  Describe to me "age discriminatory."
22    Q.  That the cash balance plan hurts older workers
23  as opposed to younger workers.
24    A.  Yes.

Page 57

1    Q.  What group of older workers do you think are
2  worse off under the cash balance plan?
3        MR. SAUDER:  Objection to the extent you're
4  comfortable answering that without violating any
5  attorney/client communication.
6    A.  I don't know how to answer.
7    Q.  Do you think that there's anybody, any plan
8  participant who benefits, who is better off because of
9  the cash balance plan as opposed to the old pension
10  plan?
11    A.  I don't know the answer to that.
12    Q.  How does the plan, the cash balance plan
13  discriminate against older workers?
14        MR. SAUDER:  Same objection.
15    A.  It just provides them with lesser monies at
16  retirement.
17    Q.  Are there certain features of the cash balance
18  plan that might be more beneficial to an individual
19  based on their circumstances?
20        MR. SAUDER:  Objection to form.
21    A.  You know, I don't know how to answer that.
22    Q.  Do you understand the question?
23    A.  No.
24    Q.  Do you understand the cash balance plan to have

15 (Pages 54 to 57)

B0313

CONFIDENTIAL
Thomas S. Troup

Charles, et al.
v.
C.A. # 05-702

Pepco Holdings, Inc., et al.
January 12, 2007

Page 58

1 portable benefits?
2   A.  Yes.
3   Q.  What does that mean?
4   A.  You leave the company, you can take it with
5 you.
6   Q.  Is it your understanding that the cash balance
7 plan is more portable than the benefits under the old
8 plan?
9   A.  I believe, yes, that's, you know, that's true.
10   Q.  So if an employee is looking for portable
11 benefits, are they better off under the cash balance
12 plan than under the old plan?
13        MR. SAUDER:  Objection.
14   A.  You know, I -- I think that depends upon the
15 individual circumstances.
16   Q.  What remedy are you looking for from the Court
17 in this lawsuit?
18   A.  Reinstatement into the defined benefit plan.
19   Q.  Is there anything else you are looking for?
20   A.  No.
21   Q.  Do you understand that this lawsuit has been
22 brought as a class action?
23   A.  Yes.
24   Q.  Are you seeking to be a class representative?

Page 59

1   A.  Yes.
2   Q.  What's your understanding of your duties as a
3 class representative?
4   A.  It would be my duties to represent the
5 interests of the members of the class.
6   Q.  What is your understanding of how that class is
7 defined?
8   A.  It would include those people who are in the
9 cash balance plan and any people who would have been
10 grandfathered after the grandfathering period ends.
11   Q.  Does that class include everyone regardless of
12 their age?
13   A.  I believe so, yes.
14   Q.  Do you believe that everybody in the class has
15 the same interests?
16   A.  Not necessarily, no, not exactly the same
17 interests.  I think there is commonality, but, you
18 know, there could be some differences, also.
19   Q.  Do you think everybody who is part of the class
20 that you were describing is worse off under the cash
21 balance plan?
22   A.  I don't know the answer to that.
23        (Defendant's Exhibit 37 was marked for
24 identification.)

Page 60

1 BY MS. YU:
2   Q.  We have just marked as Exhibit D-37 a copy of
3 the class action complaint that is captioned Thomas S.
4 Troup vs. Pepco Holdings, Inc., et al.
5        Do you recognize this document?
6   A.  Yes.
7   Q.  Did you participate in the preparation of this
8 document, the drafting of this document at all?
9   A.  No.  I mean, you know, my attorneys would have
10 provided me a copy of it, you know, is this
11 information accurate.  You know, if that's what you
12 mean by "drafting," the answer would be yes.  If, you
13 know -- but putting the form together and, you know,
14 laying it out in this particular order, you know, no.
15   Q.  If you would take a look at paragraph 39, which
16 starts on page 13 and continues on to page 14, could
17 you just review that paragraph for a minute?
18   A.  (The witness reviews the document.)
19   Q.  What is your understanding of what an accrued
20 benefit is?
21   A.  What is due me at some later date.
22   Q.  Is it your understanding that under the cash
23 balance plan your accrued benefit is the amount of
24 your annuity at age 65?

Page 61

1   A.  Say that again, please.
2   Q.  Is it your understanding that under the cash
3 balance plan your accrued benefit is the annuity
4 amount that you would receive at age 65?
5   A.  Until I spoke with my attorney, I wasn't aware
6 that age 65 was a significant date or period of time
7 that applied to, you know, the cash balance plan.
8   Q.  On page 14 in paragraph 39, the factual
9 allegations include percentages in various years where
10 your accrued benefit has decreased and then increased.
11 Do you know how these percentages were calculated?
12        MR. SAUDER:  Objection to the extent you
13 can answer that question without violating any
14 attorney/client communication.
15        MS. YU:  My particular question was does he
16 know, and it's a yes-or-no answer.
17 BY MS. YU:
18   Q.  I don't think that you have to rely on your
19 advice of counsel to answer yes or no whether you know
20 or not how these were calculated.
21   A.  No.
22   Q.  Do you have an understanding of what caused the
23 increases and decreases?
24        MR. SAUDER:  Same objection.

16 (Pages 58 to 61)

302-655-0477

B0314



Page 62

1   A.  Do I understand it?  No.
2   Q.  Is it your claim that these fluctuations were
3   on account of age?
4        MR. SAUDER:  Same objection.
5   A.  I don't know.
6        MS. YU:  Can we go off the record?
7        (Discussion off the record.)
8        MS. YU:  Mr. Troup, I am concluded with my
9   questioning.
10       MR. SAUDER:  I have no questions.
11       THE WITNESS:  Thank you.
12       MS. YU:  Thank you.
13       (The deposition was then concluded at
14  12:05 p.m.)
15            - - - - -
16
17       INDEX TO TESTIMONY
18
19  THOMAS S. TROUP                    PAGE
20
    Examination by Ms. Yu              2
21
22            - - - - -
23
24

Page 64

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 63

1        INDEX TO EXHIBITS
2
    DEFENDANT'S EXHIBIT NO.:          PAGE
3
4   33  A one-page copy of a document entitled
        "Conectiv's Cash Valance Pension Plan"   47
5
6   34  A seven-page copy of a document entitled
        "Your Cash Balance Account" dated
        January 1, 2000 - December 31, 2000     49
7
8   35  A one-page copy of a document entitled
        "InSight online" dated April 7, 2000    50
9   36  A multipage copy of a document entitled
        "Your Total Compensation Statement, 1997" 51
10
11  37  A multipage copy of a Complaint        59
12
            - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

Page 65

1   State of Delaware )
2                    )
3   New Castle County )
4
5
6        CERTIFICATE OF REPORTER
7
8        I, Kathleen White Palmer, Registered
    Professional Reporter and Notary Public, do hereby
9   certify that there came before me on the 12th day of
    January, 2007, the deponent herein, THOMAS S. TROUP,
10  who was duly sworn by me and thereafter examined by
    counsel for the respective parties; that the questions
11  asked of said deponent and the answers given were
    taken down by me in Stenotype notes and thereafter
12  transcribed into typewriting under my direction.
13       I further certify that the foregoing is
    a true and correct transcript of the testimony given
14  at said examination of said witness.
15       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
16  interested in the event of this suit.
17
18
19
20
21       Kathleen White Palmer, RPR, RMR, CLR
         Certification No. 149-RPR
22       (Expires January 31, 2008)
23
    DATED:  January 15, 2007
24

17 (Pages 62 to 65)

B0315

```
 1               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
                  PORTIONS CONFIDENTIAL
 3
 4    J. MICHAEL CHARLES; MAURICE W.
      WARD, JR.; and JOSEPH I. FINK, JR.,
 5    on behalf of themselves and
      all others similarly situated,
 6         Plaintiff
         V                 C.A. No. 05-702(SLR)
 7
      PEPCO HOLDINGS, INC.; CONECTIV, and
 8    PEPCO HOLDINGS RETIREMENT PLAN,
           Defendants
 9                    -  -  -
10    THOMAS S. TROUP, on behalf of himself
      and all others similarly situated,
11         Plaintiff
12       V                 C.A. No. 06-10(SLR)
13    PEPCO HOLDINGS, INC.; CONECTIV, and
      PEPCO HOLDINGS RETIREMENT PLAN,
14         Defendants
15           Oral deposition of MAURICE
16    W. WARD, JR., taken at the law
17    offices of Pepper Hamilton LLP, 3000
18    Two Logan Square, Eighteenth and Arch
19    Streets, Philadelphia, Pennsylvania,
20    on Wednesday, January 10, 2007,
21    commencing at 9:40 a.m., before
22    Barbara McKeon Quinn, a Registered
23    Merit Reporter and Notary Public,
24    pursuant to notice.
```

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 2

1  APPEARANCES:
2    JOSEPH G. SAUDER, ESQUIRE
     josephsauder@chimicles.com
3    CHIMICLES & TIKELLIS LLP
     One Haverford Centre
4    361 West Lancaster Avenue
     Haverford, Pennsylvania 19041
5    610-642-8500
     Counsel for Plaintiff
6
     BARAK A. BASSMAN, ESQUIRE
7    bassmanb@pepperlaw.com
     SUSAN KATZ HOFFMAN, ESQUIRE
8    PEPPER HAMILTON LLP
     3000 Two Logan Square
9    18th & Arch Streets
     Philadelphia, Pennsylvania 19103
10   215-981-4000
     Counsel for Defendants
11
12
13    EXAMINATION INDEX
14  MAURICE W. WARD, JR.
     BY MR. BASSMAN        4
15
16    EXHIBIT INDEX
17              MARKED
18  Defendant's
     21  Vanguard Pension        49
19     Estimator document, MWW
       334 through 393
20
     22  Introducing the New Cash    110
21     Balance Retirement Plan
       MWW 308 through 311
22
     23  Letter to Plan          112
23     Participant from Curriden
       dated September 2002, MWW
24     127

Page 3

1    EXHIBIT INDEX (CONTINUED)
2              MARKED
3  Defendant's
     24  Retirement Plan, Cash    114
4     Balance Sub-Plan
       Delmarva Sub-Plan, ACE
5     Sub-Plan, Summary Plan
       Description dated
6     September 2002
7    25  Plaintiffs' Consolidated    126
       Initial Disclosures
8
     26  Statement to Ward from    150
9     Vanguard for 1/1/01
       through 1/31/01, MWW 4
10    and 5
11   27  Statement to Ward from    150
       Vanguard for 1/1/02
12     through 1/31/02, MWW 6
       and 7
13
     28  Statement to Ward from    150
14     Vanguard for 1/1/03
       through 1/31/03, MWW 8
15    and 9
16   29  Statement to Ward from    150
       Vanguard for 1/1/04
17     through 1/31/04, MWW 10
       and 11
18
     30  Statement to Ward from    150
19     Pepco Holdings for 1/1/05
       through 1/31/05, MWW 12
20    and 13
21
22
23
24

Page 4

1        MAURICE W. WARD, JR.,
2   having been duly sworn, was examined
3   and testified as follows:
4        MR. SAUDER:  I'd like the
5   witness to read and sign.
6          EXAMINATION
7   BY MR. BASSMAN:
8    Q.   Good morning, Mr. Ward.  We
9   met just a moment ago.  My name is
10  Barak Bassman.  I'm an attorney for
11  the defendants in this case.
12        I know there are a lot of
13  different defendants and parties in
14  this case, some of whom were formed
15  by other parties and other companies.
16        So to keep everything
17  simple as we go along today, I'm
18  going to refer to all the defendants
19  and all their predecessors
20  collectively as Conectiv.  Is that
21  okay?
22    A.   Sure.
23    Q.   If I'm referring to any
24  specific particular entity, other

Page 5

1   than all of them, I'll let you know.
2   But if I use the word Conectiv in a
3   question, feel free to assume that's
4   every one of the defendants, ACE,
5   DelMarVa and so on.
6    A.   Okay.
7    Q.   As you can see, the court
8   reporter is writing down everything
9   that we're saying today.  Because of
10  that, it's very important that you
11  answer all my questions verbally.
12        She can't write down a
13  shrug or a nod or a shake of the head
14  or anything like that.  So I'd ask
15  that you please answer everything
16  verbally.
17    A.   Okay.
18    Q.   Also, again, I'll try not
19  to talk over you and I ask that you
20  try not to talk over me, just because
21  that will make things easier for the
22  court reporter as she's writing
23  everything down and it creates a
24  smoother record.

2 (Pages 2 to 5)

B0317

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 6

1     A.  Okay.
2     Q.  If I ask you a question and
3  you don't understand what I'm saying,
4  please let me know.  I'm not here to
5  trick you or fool you.
6  Misunderstandings happen.
7        So if there's anything that
8  I ask you and you don't understand,
9  please just let me know and I'll
10  rephrase.  If you do answer my
11  question, I'm going to assume you
12  understand it.
13     A.  Okay.  That's clear.
14     Q.  If at any time you need a
15  break, need to use the rest room,
16  stretch your legs, whatever, just let
17  me know.  This isn't, you know, an
18  interrogation in a secret detention
19  facility.
20        Let me know and I'll try to
21  wrap up my line of questioning as
22  soon as possible.
23     A.  Okay.  Thanks.
24     Q.  I just want to ask, is

Page 7

1  there any reason today that you can't
2  testify fully and truthfully?
3     A.  No.
4     Q.  Anything medical, physical
5  today impairing your memory in any
6  way?
7     A.  No.
8     Q.  What did you do to prepare
9  for today's deposition?
10     A.  As far as?
11     Q.  Did you meet with anyone?
12     A.  We, we met.
13     Q.  Besides your lawyer, did
14  you meet with anybody else?
15     A.  No.
16     Q.  Did you talk about today's
17  deposition with anyone other than
18  your lawyer?
19     A.  No.
20     Q.  Did you review any
21  documents to get ready for today's
22  deposition?
23     A.  Not any time real soon.  I
24  mean, over the last week or so.

Page 8

1     Q.  And what documents did you
2  look at?
3     A.  The Complaint.  That was
4  basically it.
5     Q.  Okay.  I'd like to just
6  start by going through a bit of your
7  background.  What year did you
8  graduate from high school?
9     A.  1973.
10     Q.  And where did you graduate
11  from?
12     A.  Absegamie High School.
13     Q.  Where is that?
14     A.  In Mays Landing, New
15  Jersey.
16     Q.  Do you have any education
17  after high school?
18     A.  Yes.  I have two years of
19  college.
20     Q.  Where were they?
21     A.  Atlantic Community College.
22     Q.  Did you get an Associate's
23  degree?
24     A.  Yes, I did.

Page 9

1     Q.  Do you have a major field?
2     A.  Electronics.
3     Q.  After you got your
4  Associate's, any more education?
5     A.  A few college classes.
6     Q.  Do you remember what they
7  were in?
8     A.  Statistics.
9     Q.  And where did you take
10  those?
11     A.  Stockton.
12     Q.  That's in Trenton?
13     A.  No.  It's in Pomona or
14  Galloway Township.  I think that's
15  it, yeah.
16     Q.  And when did you get your
17  Associate's degree?
18     A.  1975.
19     Q.  And when did you take the
20  classes at Stockton?
21     A.  Just over the next few
22  years.  I took like one or two
23  classes.
24     Q.  So sort of over the course

3 (Pages 6 to 9)

B0318

Page 10

1  of the late '70s?
2      A.  That's correct.
3      Q.  What was the first job you
4  had after graduating community
5  college?
6      A.  I worked as an electronics
7  technician for Rainbow Electronics.
8      Q.  How long were you there?
9      A.  For about a year.
10     Q.  Where did you go from
11 there?
12     A.  New Jersey State Police.
13     Q.  And how long were you a
14 policeman?
15     A.  No.  I was a civilian.  I
16 was a radio technician.
17     Q.  How long were you a radio
18 tech at the police?
19     A.  Approximately about a year.
20     Q.  Then where did you go?
21     A.  The FAA, Federal Aviation
22 Administration.
23     Q.  What did you do for the
24 FAA?

Page 11

1      A.  I was a computer tech.
2      Q.  For how long?
3      A.  Four or five years.
4      Q.  Was that in New Jersey or
5  in D.C.?
6      A.  It was actually in New
7  York.
8      Q.  Okay.  Where did you go
9  when you left the FAA?
10     A.  Actually I worked in New
11 York for a couple years and then back
12 in New Jersey for a few years.  So I
13 left there to go with the Atlantic
14 City Electric or Atlantic Electric at
15 the time.
16     Q.  Have you been at Atlantic
17 City Electric or its successors ever
18 since?
19     A.  Yes.
20     Q.  When was your start date at
21 Atlantic City?
22     A.  October of '81.
23     Q.  Before we get into your
24 time at Atlantic City, I just want to

Page 12

1  go over a couple things about your
2  other jobs.  When you worked for
3  Rainbow Electronics, were you a
4  member of a union?
5      A.  No.
6      Q.  And where was that company
7  located?
8      A.  In Northfield, New Jersey.
9  Northfield, New Jersey.
10     Q.  When you were in the state
11 police as a radio tech, were you a
12 union member?
13     A.  No.  Oh, boy.  No, I don't
14 think so.
15     Q.  Okay.  Same question for
16 the FAA.
17     A.  I was part of -- we were
18 part of a union, yes, subsidiary of
19 air traffic control unit.
20     Q.  When you were a union
21 member at the FAA, did you hold any
22 positions in that union?
23     A.  No.
24     Q.  So you joined Atlantic City

Page 13

1  in October of 1981.  Could you walk
2  through for me the different
3  positions that you've held at
4  Atlantic City?
5      A.  I was an engineering
6  assistant in the meter department.
7      Q.  When were you the
8  engineering assistant?
9      A.  For the first maybe six or
10 seven years of my career.  I can't
11 remember exact dates.
12     Q.  That's okay.  Again, as we
13 go throughout this, I mean I might be
14 trying to jog your memory about
15 things in years past, which is a bad
16 habit that all lawyers have.
17        The best that you can
18 remember.  I mean, neither I nor your
19 counsel want you to guess or
20 speculate.
21     A.  Okay.  The job title
22 changed a number of times, so -- but
23 it was basically the same job in
24 engineering.

4 (Pages 10 to 13)

B0319

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 14

1    Q.   And what did you do in that
2  job?
3    A.   I was in the meter
4  department as an engineering person
5  to do -- purchase material and design
6  metering installations and support
7  the department.
8    Q.   When you were in that
9  position, were you a member of a
10  union?
11    A.   No.
12    Q.   What was your next job at
13  Atlantic City?
14    A.   Supervisor, meter
15  supervisor.
16    Q.   How long were you a meter
17  supervisor?
18    A.   Until approximately three
19  years ago.
20    Q.   Okay.  So around '87, '88
21  until '03, '04?
22    A.   Yes.  That's correct.
23    Q.   I assume as a supervisor
24  you weren't in a union.

Page 15

1    A.   No.  That's correct.
2    Q.   And what did you do as a
3  meter supervisor?
4    A.   Supervise all the field
5  meter people that worked out of the
6  Cologne meter office and the shop
7  operations in Cologne.
8    Q.   When you say shop
9  operations --
10    A.   We had a meter test
11  facility there.
12    Q.   Okay.  After you were a
13  meter supervisor, what has your
14  position been?
15    A.   Since that time I'm the
16  communications supervisor for
17  Atlantic City Electric obviously.
18    Q.   What do you do as
19  communications supervisor?
20    A.   Supervise the seven
21  communications technicians.
22    Q.   I assume as a supervisor
23  you're not in the union.
24    A.   That's correct.

Page 16

1    Q.   And that's the job you hold
2  today?
3    A.   That's correct.
4    Q.   Before this case, were you
5  ever involved as a plaintiff in any
6  lawsuits?
7    A.   No.
8    Q.   Ever involved as a
9  defendant?
10    A.   No.
11    Q.   Ever testify in any
12  lawsuits?
13    A.   I -- not in any lawsuits,
14  no.
15    Q.   Did you testify in some
16  other proceeding?
17    A.   Just as a -- I think I did
18  a deposition once as a -- in the
19  meter department as a, I guess an
20  expert witness or something for the
21  BPU hearing I think it was or
22  something.
23    Q.   That's a state
24  administrative?

Page 17

1    A.   That's correct.
2    Q.   Do you remember when that
3  was?
4    A.   No, I don't.
5    Q.   Would you say it's more
6  than five years ago?
7    A.   Yes, it was.
8    Q.   More than ten years ago?
9    A.   Boy, I don't know.  I
10  couldn't put a date on it.
11    Q.   Okay.  Ever been convicted
12  of a crime?
13    A.   No.
14    Q.   You mentioned you were a
15  union member at the FAA; correct?
16    A.   Yes.
17    Q.   Did you ever file a
18  grievance with the union when you
19  were there?
20    A.   No.
21    Q.   Have you ever filed an
22  administrative action with a pension
23  plan?
24    A.   No.

5 (Pages 14 to 17)

B0320

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 18

1    Q.  From the time you started
2  at Atlantic City until January 1,
3  1999, looking at that time period,
4  what is your understanding as to how
5  your pension benefits were
6  calculated?
7    A.  I'm not sure I understand
8  the question.
9    Q.  Let me break that down a
10  little.
11    A.  Okay.
12    Q.  When you started at
13  Atlantic City, did you have an
14  understanding as to whether there was
15  a pension plan in place?
16    A.  Yes.  Yes, I did.
17    Q.  Did you review any
18  documents at that time about what the
19  pension plan was, how it worked?
20    A.  I knew it was a retirement
21  plan that I could retire at age 55.
22    Q.  So you knew it had an early
23  retirement option.
24    A.  That's correct.  With no

Page 19

1  penalties at that time.
2    Q.  Did you have any
3  understanding as to how the amount of
4  your pension was going to be
5  computed?
6    A.  Vaguely.  Not, not in any
7  detail.
8    Q.  What was your vague
9  understanding?
10    A.  That -- no.  I just really
11  had a basic understanding of the
12  plan.  Just that it was -- it was --
13  I could take it in a lump sum or I
14  could get a monthly annuity.
15    Q.  Did you have any
16  understanding, and again, this is
17  back when you started in '81, as to
18  how the annuity was calculated?
19    A.  Not the specifics of it,
20  no.
21    Q.  Have you ever heard the
22  term final average pay plan?
23    A.  No.
24    Q.  Between the time you were

Page 20

1  hired in '81 and January 1, 1999, did
2  your understanding as to how your
3  pension benefits were calculated or
4  what pension benefits were available
5  to change in any way?
6    A.  Could you get more specific
7  about that?
8    Q.  Sure.  You mentioned in
9  1981 that you had a vague
10  understanding when you started
11  Atlantic City there was a pension
12  plan in place, it had an early
13  retirement benefit, you could take it
14  as annuity or a lump sum, right?
15    A.  That's correct.
16    Q.  Between the time you
17  started and you had that
18  understanding and January 1 of 1999,
19  did your understanding as to what
20  rights you had under the pension plan
21  change in any way?
22    A.  In I guess it was towards
23  the end of 1998 there were some
24  preliminary meetings on the cash

Page 21

1  balance plan that was going to be
2  implemented.
3    Q.  Okay.  Leaving aside the
4  cash balance plan, we'll get to it in
5  a little bit.
6    A.  Okay.  Okay.
7    Q.  Did your understanding ever
8  change as to how the pre cash balance
9  plan worked?
10    A.  No.
11    Q.  Do you subscribe to any
12  newspapers?
13    A.  No.
14    Q.  Do you read any newspapers
15  regularly?
16    A.  Not regularly, no.
17    Q.  Anything you read just
18  occasionally?
19    A.  The AARP newspaper.  No.
20  Just the Atlantic City Press I do
21  look at occasionally.
22    Q.  And when you say
23  "occasionally," is this maybe once or
24  twice a week?

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 22

1     A.   Maybe once a week.
2     Q.   Usually at least once a
3  month?
4     A.   Yes, I would say.
5     Q.   And how long have you been
6  looking at the Atlantic City Press
7  around once a month at least?
8     A.   Probably most of my life.
9     Q.   Certainly since the time
10  you've been working for Atlantic City
11  Electric; is that right?
12     A.   Yes, that's correct.
13     Q.   Again, as I said earlier,
14  you know, it's normal in conversation
15  to just nod.
16     A.   Yeah.  Okay.
17     Q.   The court reporter is
18  taking a record, so we've got to make
19  sure that everything's verbalized.
20     A.   Okay.
21     Q.   Ever read any other
22  newspapers?
23     A.   Not on a regular basis, no.
24     Q.   Read anything else

Page 23

1  irregularly?
2     A.   As far as newspapers are
3  concerned?
4     Q.   Yeah.
5     A.   No, not really.  I mean
6  maybe an occasional, you know, the
7  U.S. News Today, or whatever that is.
8     Q.   Oh, U.S.A. Today?
9     A.   U.S.A. Today, yeah.
10  Occasionally.
11     Q.   And do you read any
12  magazines regularly?
13     A.   Not regularly, no.
14     Q.   Any ones you read
15  occasionally?
16     A.   Occasionally Golf magazine,
17  auto, you know, magazines.
18     Q.   Anything else you can think
19  of?
20     A.   No.  Not really.  Like I
21  say, I get an AARP newspaper once a
22  month.  I look at that.
23     Q.   Are you an AARP member?
24     A.   Yes, I am.

Page 24

1     Q.   When did you join the AARP?
2     A.   When I turned 50, so it was
3  a year and a half ago.
4     Q.   And you mentioned they have
5  a newspaper.  Do they send you
6  publications in the mail?
7     A.   Yes.  I think it's once a
8  month we get a newspaper, like a
9  paper.
10     Q.   Do you read the
11  publications they send you?
12     A.   Glance through it
13  occasionally.
14     Q.   Have you ever attended any
15  meetings conducted by the AARP?
16     A.   No, I haven't.
17     Q.   Have you ever belonged to
18  any other organizations besides the
19  AARP?
20     A.   United States Golf
21  Association, but other than that, no.
22     Q.   That one sounds like a lot
23  more fun than the AARP.
24     A.   Yeah.  Yeah.  You're right.

Page 25

1     Q.   Do you have an Internet
2  connection in your home?
3     A.   Yes, I do.
4     Q.   Is it a dial-up or high
5  speed?
6     A.   Now it's high speed.
7     Q.   When did you get an
8  Internet hookup?
9     A.   Couldn't give you an exact
10  date, but I've had it, I've had
11  dial-up for a number of years and I
12  recently converted to high speed
13  Internet.
14     Q.   Would you say you've had
15  dial-up at least five years?
16     A.   Yes.
17     Q.   Do you have a home e-mail
18  address?
19     A.   Yes, I do.
20     Q.   What is it?
21     A.   Mcwardjr@comcast.net.
22     Q.   How long have you had that
23  e-mail address?
24     A.   About maybe three months,

7 (Pages 22 to 25)

B0322

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 26

1  something like that.
2      Q.   Did you have a personal
3  e-mail address before that one?
4      A.   Yes.
5      Q.   What was it?
6      A.   Mcward@att.net, and I still
7  have that e-mail address also.
8      Q.   How long did you have the
9  att.net e-mail?
10     A.   Couldn't give you an exact
11 date, but I -- more than three years.
12     Q.   Do you use your home e-mail
13 account frequently?
14     A.   Yes.
15     Q.   Check it every day?
16     A.   Pretty much.
17     Q.   Send messages mostly every
18 day?
19     A.   Maybe not every day, but
20 yeah.
21     Q.   Regularly?
22     A.   Regularly, yeah.
23     Q.   Do you have Internet access
24 at work?

Page 27

1      A.   Yes.
2      Q.   How long have you had
3  Internet access on the job?
4      A.   Couldn't give you an exact
5  date on that.  It was part of a
6  package I guess for a while.
7      Q.   You have a work e-mail
8  address, right?
9      A.   That's correct.  I think we
10 have two basically.
11     Q.   Did you ever research
12 pension related issues on the
13 Internet?
14     A.   Occasionally, yes.
15     Q.   When you research pension
16 related issues on the Internet, do
17 you print out the pages that you're
18 reading or not?
19     A.   I may have occasionally.  I
20 normally don't.  I don't think.  No.
21 No, not normally.
22     Q.   But you have in the past
23 printed some pages?
24     A.   Yes, I have.

Page 28

1      Q.   What do you do with those
2  pages after you print them?
3      A.   I toss them normally.  Just
4  it's easier to read than using the
5  screen.
6      Q.   Have you tossed any since
7  this lawsuit was filed?
8      A.   I don't think I have any,
9  so yes, I assume I have.
10     Q.   Are there any websites in
11 particular you look at for pension
12 issues?
13     A.   None in particular come to
14 mind.  Just a Google search.
15     Q.   For example, can you give
16 me some examples of Google searches
17 you've run?
18     A.   I ran a search when I heard
19 about the IBM cash balance suit and
20 just did a Google search on it and
21 read a little bit about it.
22     Q.   When did you hear about
23 that lawsuit?
24     A.   Boy, I don't -- I would say

Page 29

1  it had to be probably sometime maybe
2  mid, late 2004 maybe.  It had to be a
3  couple of years.
4      Q.   Do you remember how you
5  heard about it?
6      A.   Just through work, people
7  talking.
8      Q.   Do you remember from whom
9  in particular?
10     A.   No, I don't.
11     Q.   Did you talk to Mr. Charles
12 about the IBM lawsuit?
13     A.   I don't remember.  I assume
14 we had the discussion about it, but I
15 don't remember exactly when and if we
16 talked about that specifically.
17     Q.   Okay.  Actually I should
18 back up for a second.  Do you know
19 Mr. Charles?
20     A.   Yes, I do.
21     Q.   How long have you known
22 him?
23     A.   Probably over 20 years.
24     Q.   Did you two meet shortly

8 (Pages 26 to 29)

B0323

Page 30

1  after you went to work for Atlantic
2  City?
3      A.  He worked in the same
4  department I worked in.
5      Q.  Would you consider him a
6  friend?
7      A.  Yes.
8      Q.  Do you see him socially?
9      A.  Not normally, no.
10     Q.  Do you two still work in
11  the same facility, physical facility?
12     A.  No, we don't.
13     Q.  Do you know Mr. Fink?
14     A.  Yes, I do.
15     Q.  How long have you known
16  him?
17     A.  More than -- probably more
18  than 15 years.
19     Q.  Did you meet him on the job
20  as well?
21     A.  Yes, that's correct.
22     Q.  Would you call him a
23  friend?
24     A.  Yes.

Page 31

1      Q.  Do you see him socially at
2  all?
3      A.  I have.
4      Q.  And Mr. Troup.  Do you know
5  him?
6      A.  No, I don't.
7      Q.  Have you heard of him?
8      A.  Yes, I have.
9      Q.  Because of this lawsuit or
10  in another context?
11     A.  That's correct.
12     Q.  Because of this lawsuit?
13     A.  Yes, that's correct.
14     Q.  Now, you mentioned earlier
15  meetings in 1998 about the cash
16  balance plan.  And I think just for
17  making this a clear record, I think
18  the cash balance plan is technically
19  referred to as the cash balance sub
20  plan of a larger plan.
21      Just as we go forward
22  today, I will just use the term cash
23  balance plan to refer to the cash
24  balance sub plan that you participate

Page 32

1  in.
2      A.  Okay.
3      Q.  Just to make things
4  simpler.  You mentioned that in 1998
5  there were meetings about the cash
6  balance plan.
7      A.  That's correct.
8      Q.  Were those meetings you
9  attended?
10     A.  I attended one or two
11  initial meetings.
12     Q.  And those were initial
13  meetings in 1998?
14     A.  Yes.  I think they were at
15  the end of '98.
16     Q.  Who do you remember
17  attended those meetings?
18     A.  I don't remember.
19     Q.  Were these one on one
20  meetings or was this a group meeting?
21     A.  Group meeting.
22     Q.  Was there someone from
23  Conectiv HR department who conducted
24  the meeting?

Page 33

1      A.  I don't remember.
2      Q.  But there was a presenter
3  at the meeting?
4      A.  That's correct.
5      Q.  And you were in the
6  audience at the meeting?
7      A.  That's correct.
8      Q.  What do you remember the
9  presenter telling you from these
10  initial meetings in 1998 about the
11  cash balance plan?
12     A.  I don't remember a lot
13  about the presentations except the
14  one thing that stuck in my mind was
15  that it was, the new plan was going
16  to be a portable plan, and that would
17  be -- and that there wasn't a lot of
18  specifics about the plan at that
19  time.  More data was to follow.
20     Q.  With the advantage of
21  hindsight, do you believe that the
22  presenters in those meetings at the
23  end of 1998, or presenter, made any
24  misrepresentations?

B0324

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 34

1    A.  I don't really remember
2  enough about the presentation to
3  really answer that correctly.
4    Q.  From what you recall,
5  though, you don't remember them
6  saying anything that you later found
7  out was untrue; is that right?
8    A.  Can't put my finger on
9  anything, no, because they were
10  pretty generic.
11    Q.  Very broad, very general
12  type of presentation?
13    A.  That's correct.  Yes.
14    Q.  Again, we need to be a
15  little careful about talking over
16  each other.
17    A.  Sorry.
18    Q.  So again, just wait until I
19  finish and then you'll go.  It will
20  just make things easier for the court
21  reporter.
22    A.  Okay.
23    Q.  What is your understanding,
24  sitting here today, as to how pension

Page 35

1  benefits are calculated under the
2  cash balance plan?
3    A.  That my -- an opening
4  balance was created and that some
5  number is put into my account based
6  on my age, years of service, and some
7  interest number.
8    Q.  You mentioned that the
9  amount of money put into your account
10  can vary based on your age and years
11  of service, right?
12    A.  I think, yes.
13    Q.  And is that because the
14  older you are, the more years of
15  service there are, the more money
16  goes into your account?
17    A.  That's my understanding.
18    Q.  You mentioned an interest
19  rate.  That's an amount of interest
20  that's added to your account each
21  year.  Is that your understanding?
22    A.  That's how much -- the
23  account grows by some interest rate.
24    Q.  Is it your understanding

Page 36

1  that interest rate is the same for
2  everybody in the cash balance plan?
3    A.  I think that the rate it
4  grows by some interest rate I think
5  is the same, yes.
6    Q.  Do you have any
7  understanding where that interest
8  rate comes from?
9    A.  It has to do with the
10  treasury note I think or the treasury
11  bond, but I'm not sure.
12    Q.  And it can vary from year
13  to year?
14    A.  That's correct.
15    Q.  But within each year
16  everybody in the plan gets the same
17  interest rate?
18    A.  As far as I know, yes.
19    Q.  Okay.  And again, I'm just
20  talking about your understanding.
21    A.  Yes.  There's a document
22  around here that explains it all, but
23  yeah.
24    Q.  Now, you mentioned there

Page 37

1  were these meetings in 1998.  Before
2  the meetings had you heard anything
3  about a cash balance plan coming?
4    A.  No.
5    Q.  How did you find out about
6  the meetings?
7    A.  Can't remember if it was a
8  memo that was sent out.  I was
9  notified some kind of way through
10  work.
11    Q.  Through what I call
12  generically official management
13  channels?
14    A.  That's correct.  As part of
15  the merger package basically, yeah.
16  Information.
17    Q.  When you say merger, I
18  assume you're referring to the merger
19  between Atlantic City and DelMarVa?
20    A.  That's correct.
21    Q.  Again, slow down a little.
22    A.  Sorry.
23    Q.  That's okay.  At a certain
24  point in time, did you become

10 (Pages 34 to 37)

B0325

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 38

1   suspicious that the cash balance plan
2   violated your rights?
3       A.   At the time of the merger
4   or the time of the conversion or?
5       Q.   Any time.
6       A.   Wasn't until basically the
7   last few years that I had enough
8   information to really know that it
9   appeared to be a big difference
10  between the two plans.
11      Q.   Now, when you say between
12  the two plans I assume you mean
13  between the cash balance plan and the
14  previous plan.
15      A.   That's correct.
16      Q.   What information did you
17  get that led you to believe there was
18  a big difference between the two?
19      A.   Comments from colleagues
20  and employees that were retiring that
21  got both numbers.
22      Q.   Were those people that were
23  grandfathered with the old plan?
24      A.   They were, yes.

Page 39

1       Q.   Do you remember any
2   particular names of who you spoke to?
3       A.   Tom Rehr, Joe Baldwin.
4   There was a number of employees.
5   There are two names that come to
6   mind.
7       Q.   Okay.  If you think of any
8   as we go on today, feel free to just
9   let me know.
10      A.   Okay.
11      Q.   And again, by the way, if
12  any of these questions we ask -- and
13  sometimes it happens I ask you a
14  question and then, you know, two
15  hours later a light bulb goes off and
16  you realize there's something else
17  you want to say.
18          At any time today if you
19  like, you can add to, amend, change
20  your answer to any question.  I mean
21  this isn't a game of gotcha.  We're
22  just here to find out what you know.
23      A.   Okay.
24          (Ms. Hoffman entered the

Page 40

1   room.)
2   BY MR. BASSMAN:
3       Q.   You mentioned Mr. Rehr and
4   Mr. Baldwin.  Do you remember when
5   you spoke to Mr. Rehr?
6       A.   Two or three years ago.
7       Q.   And when he was retiring,
8   was he 65 years old or younger?
9       A.   55.  Or thereabouts.  I
10  don't know exactly.
11      Q.   I think you mentioned
12  earlier that the old Atlantic City
13  plan had an early retirement option
14  when you're 55; is that right?
15      A.   That's correct.
16      Q.   So Mr. Rehr was retiring
17  under that option?
18      A.   That's correct.
19      Q.   And Mr. Baldwin, when do
20  you remember speaking to him?
21      A.   Approximately a year ago,
22  little more.
23      Q.   And when he was retiring,
24  how old was he?

Page 41

1       A.   Upper 50s.  I don't know
2   exactly.
3       Q.   Under 65?
4       A.   That's correct.
5       Q.   So was he also taking
6   advantage of the early retirement
7   benefit under the old plan?
8       A.   Yes.
9       Q.   And when you talked to Mr.
10  Rehr and Mr. Baldwin about the
11  differences between the two plans,
12  what information specifically did
13  they give you?
14      A.   I didn't get their exact
15  numbers.  Just the comments that
16  there was a huge difference between
17  the cash balance and the ACE plan.
18      Q.   I assume when you say huge
19  difference, the old plan was better
20  than the cash balance plan for them?
21      A.   Yes.
22      Q.   And by better I mean it
23  gave them a higher payment?
24      A.   Yes.

B0326

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 42

1    Q.   And did you ask them for
2  any details about this difference?
3    A.   I didn't get specifics, no
4  exact numbers or anything.
5    Q.   And they did not show you
6  any documents or anything like that?
7    A.   No.
8    Q.   And as far as you know,
9  those two benefit calculations were
10 computed for them to retire at age 55
11 or in their late 50s, right?
12   A.   Yes.
13   Q.   Those weren't numbers as if
14 they were retiring at age 65?
15   A.   No, not to my knowledge.
16   Q.   As far as you know?
17   A.   As far as I know.
18   Q.   As far as you know, they
19 were not age 65 numbers?
20   A.   That's correct.
21   Q.   Before you spoke to Mr.
22 Rehr, did you have any suspicions
23 that your rights were being violated
24 by the cash balance plan?

Page 43

1    A.   I didn't really have enough
2  information to know or -- because I
3  didn't really know what my numbers
4  were going to be.
5    Q.   When Conectiv converted to
6  a cash balance plan were you worried?
7    A.   When Conectiv converted to
8  the cash balance plan, there was so
9  much turmoil going on in the company
10 that the retirement plan wasn't on
11 the top of my -- we had to rebid our
12 jobs, we shut down departments, I
13 moved the operations to Delaware,
14 moved buildings.  So no, it wasn't,
15 you know...
16   Q.   Now, you mentioned you
17 heard about the IBM cash balance suit
18 in mid, late 2004.  Was that before
19 or after you spoke to Mr. Rehr as
20 best you can recall?
21   A.   It was all at about the
22 same time frame.  So I don't know if
23 it was before or after.
24   Q.   When was the first time you

Page 44

1  consulted a lawyer about the cash
2  balance plan?  Again, all I want from
3  this is a date.
4        I want to just let you
5  know, and I'm sure your counsel will
6  agree, neither of us want you talking
7  about the substance of anything you
8  said to a lawyer.
9        But just when was the first
10 time you went to a lawyer about the
11 cash balance plan?
12   A.   It was the summer of 2005.
13   Q.   And again, for this
14 question I just want a name.  Who did
15 you go to see?
16   A.   I didn't go to -- Mike
17 Charles asked me if I would be
18 involved and contact our law firm.
19   Q.   The Chimicles law firm?
20   A.   That's correct.
21   Q.   Before you contacted the
22 Chimicles firm, had Mr. Charles told
23 you anything about his discussions
24 with them?

Page 45

1    A.   Yes.  Some discussions.
2    Q.   And just for the
3  discussions before you got in touch
4  with Chimicles, what did Mr. Charles
5  tell you?
6    A.   Basically that he spoke
7  with this law firm and asked if I
8  would like to get involved and asked
9  me to contact Mr. Malone for more
10 information.
11   Q.   And when you say get
12 involved, did he explain get involved
13 with what?
14   A.   Just stated that they would
15 like to have more than one person as
16 part of the Complaint.
17   Q.   Did you ask why they wanted
18 more than one person?
19   A.   I think he explained.  In
20 case he got hit by a bus, but...
21   Q.   And when did you have this
22 conversation with Mr. Charles?
23   A.   Summer of 2005.
24   Q.   So shortly after that

B0327

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 46

1    conversation you called up Chimicles
2    and made an appointment?
3       A.  I basically just spoke with
4    them on the phone.
5       Q.  And before that
6    conversation, had Mr. Charles
7    indicated to you in any way that he
8    felt his rights were being violated
9    under the cash balance plan?
10      A.  Yes.  He expressed -- at
11   that time he expressed that.  Yes.
12      Q.  Do you remember the first
13   time he told you that?
14      A.  No, I don't.
15      Q.  Would it have been at least
16   five years ago?
17      A.  No.
18      Q.  Within the last three years
19   or so?
20      A.  Within the last three years
21   I would say.
22      Q.  And prior to speaking to
23   Mr. Charles, did you have any
24   intention yourself to find a lawyer?

Page 47

1       A.  I didn't actively pursue
2    anything.  I didn't really think out
3    that far.
4       Q.  Did you speak to Mr. Fink
5    at all about seeing a lawyer?
6       A.  Yes.
7       Q.  When?
8       A.  Right after I talked to Mr.
9    Malone.
10      Q.  Okay.  So you contacted Mr.
11   Fink and referred Mr. Malone to him?
12      A.  Yes, that's correct.
13      Q.  Okay.  Before you referred
14   Mr. Malone to Mr. Fink, had Mr. Fink
15   expressed any dissatisfaction to you
16   about the cash balance plan?
17      A.  We had discussions about
18   it, yes.
19      Q.  All right.  Could you
20   describe sort of generally the
21   substance of those discussions?
22      A.  Just around our, the
23   Vanguard Estimator, Pension
24   Estimator.

Page 48

1       Q.  In your own words, what is
2    the Vanguard Estimator?
3       A.  It's a tool on the Vanguard
4    website which enables us to calculate
5    out our retirement benefit.
6       Q.  And if you could just give
7    me a little bit more detail.  How do
8    you use that tool?  Walk me through
9    it step by step.
10      A.  It's an online screen that
11   you can put in when you would like to
12   retire and it calculates what your
13   benefit would be.
14      Q.  Okay.  And you're allowed
15   to put in whatever retirement date
16   you want this to assume, right?
17      A.  That's correct.
18      Q.  And when you say it gives
19   you your benefit, does it give you a
20   lump sum, an annuity, both, as best
21   you remember?
22      A.  Both.
23      Q.  I assume both you and Mr.
24   Fink, by the way, were running

Page 49

1    numbers on the Vanguard Estimator?
2       A.  I know I did and I know
3    Joe -- he mentioned that he ran some,
4    so I assume he did.
5       Q.  Why were you running
6    numbers on the Vanguard Estimator?
7       A.  I wanted to see what my
8    cash balance numbers would be based
9    on the discussions I had with Mr.
10   Rehr.
11      Q.  Okay.  So you spoke to Mr.
12   Rehr, got a little suspicious, and
13   decided to run some numbers?
14      A.  That's correct.
15         (Exhibit D-21 was marked
16   for identification.)
17   BY MR. BASSMAN:
18      Q.  Mr. Ward, I'm giving you a
19   document we just marked Defendant's
20   Exhibit 21.
21         We got this document from
22   your counsel, and as I understand the
23   page numbering conventions your
24   counsel uses, if you look at the

13 (Pages 46 to 49)

B0328

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 50

1  bottom right-hand corner it says MWW,
2  and it's our understanding these are
3  documents that you gave your lawyer?
4      A.  Yes.
5      Q.  Take a moment just to look
6  over Defendant's 21.
7          Have you had an opportunity
8  to take a look at Defendant's 21?
9      A.  Yes.
10     Q.  And is this a printout of
11 the Pension Estimator calculations
12 you were just describing?
13     A.  Yes.
14     Q.  And I notice these go back
15 to September 1, 2004 if you look on
16 the second page; is that right?
17     A.  Yes.
18     Q.  Did you do any Pension
19 Estimator calculations before then?
20     A.  No.
21     Q.  Had you heard of the
22 Pension Estimator before that?
23         Let me rephrase.  Did you
24 know if this tool existed before

Page 51

1  September 1, 2004?
2      A.  Sometime probably in the
3  August time frame, I'm not -- it took
4  me time to get a user ID and all to
5  be able to do it.  So I would say
6  about that time is when I found out.
7      Q.  So did you need to request
8  a specific user ID to use the Pension
9  Estimator?
10     A.  Had to go on and register
11 with Vanguard online.
12     Q.  And how long did that
13 process take to get a user ID?
14     A.  I don't recall, but I think
15 it's just days.  So...
16     Q.  Less than a month?
17     A.  Yes.  Yes.
18     Q.  Less than a week?
19     A.  Probably, yes.
20     Q.  Before you got your user
21 name, were you aware that the Pension
22 Estimator existed, that this was
23 something you could access?
24     A.  I would say yes, but not --

Page 52

1  as soon as I found out about it I
2  registered.  So there might have been
3  a week or two or month or whatever it
4  is, but...
5      Q.  How did you find out about
6  it?
7      A.  Through somebody at work,
8  and I don't recall who it was.
9      Q.  Was it someone at HR?
10     A.  No.  It was one of my
11 fellow employees, but I don't
12 remember who it was.
13     Q.  And do you remember how the
14 Pension Estimator came up in
15 conversation?
16     A.  During the discussions with
17 the other employees about the
18 numbers, the retirees, recent
19 retirees were getting and, you know,
20 just asking how did you find out what
21 your numbers are going to be.
22         Oh, there's a Pension
23 Estimator out on the Vanguard
24 website.

Page 53

1      Q.  Do you remember who told
2  you that?
3      A.  No, I don't.
4      Q.  Do you remember sort of
5  generally who was part of these
6  conversations?
7      A.  General office discussion.
8  So it's probably somebody in my
9  department, but I don't recall who.
10     Q.  How many people are in your
11 department?
12     A.  In electric maintenance
13 there's 60 or 70 people maybe.
14     Q.  Okay.  First estimate you
15 did was September 1, 2004.
16     A.  Yes.
17     Q.  And you testified earlier
18 that you started running calculations
19 in the Pension Estimator after you
20 spoke to Mr. Rehr; is that right?
21     A.  Yes, I think he was the
22 one.
23     Q.  Looking at page two of this
24 exhibit, the 9/1/2004, does that

14 (Pages 50 to 53)

B0329

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 54

1  refresh your recollection in any way
2  as to the precise date that you spoke
3  to Mr. Rehr?
4      A.  No, it doesn't.
5      Q.  Does it help you
6  approximate the date you spoke to
7  him?
8      A.  Probably within a month of
9  that time frame give or take.  I
10  don't -- I can't come up with an
11  exact date for you.
12      Q.  Okay.  That's fine.  I
13  notice looking at this that the days
14  that you seem to have run
15  calculations go in clusters.
16      For instance, if you take a
17  look on page two, you ran two on
18  September 1, 2004; then you ran
19  several on November 5th, 2004, and
20  then several on November 18th.  Do
21  you see that?
22      A.  Yes.
23      Q.  Is there any particular
24  reason that you were running Pension

Page 55

1  Estimator calculations on the dates
2  indicated on these first two pages?
3      A.  Just to get values for
4  different retirement dates, 55, 57,
5  58, 60, you know.
6      Q.  My question is actually a
7  little different.  For instance, was
8  there any reason why on November 5th,
9  2004 you were running these
10  calculations as opposed to doing it
11  two weeks later or earlier?
12      A.  No.  No particular reason.
13      Q.  If you look, just take a
14  look through these dates starting
15  from the top at 12/22/06 and going
16  down to 9/1/04, do you remember, you
17  know, any discussions around the
18  times that you made these
19  calculations about the cash balance
20  plan?
21      A.  Not particularly, no.
22      Q.  By the way, is Defendant's
23  Exhibit 21 a complete set of all the
24  Pension Estimator calculations you

Page 56

1  ever ran?
2      A.  To the best of my
3  knowledge, yes.  I don't know how to
4  delete them, so...
5      Q.  Did you ever try to delete
6  them?
7      A.  No.
8      Q.  When you say you don't know
9  how to delete them, are these stored
10  electronically in your account on
11  Vanguard?
12      A.  That's correct.
13      Q.  So you could generate these
14  just by going on your account and
15  printing them all off?
16      A.  That's how I got these.
17      Q.  Okay.  I believe the status
18  field looks like it's redacted, and I
19  don't want you to tell me what was in
20  it right now specifically, but what's
21  the subject matter of what goes in
22  the status field?
23      A.  I don't know.  I don't
24  remember.

Page 57

1      Q.  Is it something that you
2  would write?
3      A.  I don't think so.  I don't,
4  I don't know.  I've never entered
5  anything in there, so...
6      Q.  I guess my next question
7  for you is, what was in the status
8  field that's been redacted?
9      MR. SAUDER:  Just for the
10  record, I don't know that anything
11  was redacted from this document.
12      MR. BASSMAN:  Oh, okay.  I
13  just noticed it was blank, and I
14  remember seeing a set of e-mail
15  traffic that there had been
16  redactions on this document.
17      MR. SAUDER:  There were
18  redactions with regard to Mike
19  Charles but there were calculations
20  that he ran based on our request, and
21  that was what was redacted.
22      I don't know that anything
23  was redacted from the status field of
24  these documents.

B0330

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 58

BY MR. BASSMAN:
1  BY MR. BASSMAN:
2    Q.  Okay.  With that
3  correction, do you remember if
4  anything was in the status fields?
5    A.  No, I don't.
6    Q.  Okay.  I see you ran two
7  estimates on December 22nd, 2006.  Do
8  you see that?
9    A.  Yes.
10    Q.  Why were you running
11  estimates on December 22nd?
12    A.  I don't remember.  I just
13  wanted to get updated numbers.  If
14  you look through -- maybe to explain
15  it.
16        Each of the documents
17  it's -- it doesn't give you a lot of
18  information on what I requested at
19  that time.  So the estimated years of
20  service come out zero and zero.
21    Q.  Uh-huh.
22    A.  So a lot of the old
23  documents I don't remember.
24        At the time I would have,

Page 59

1  because I hit the buttons, because
2  you put the year you want to collect
3  your money and the year you want to
4  retire and they can be different and
5  it would give you a different number.
6        So I was just checking the
7  Pension Estimator at that time.
8    Q.  You can put this aside.
9  Put it sort of in the middle of the
10  table would be good.
11        You mentioned that in '98
12  there were a couple of initial
13  meetings about the cash balance plan.
14    A.  That's correct.
15    Q.  Did you attend any meetings
16  in 1999 about the cash balance plan?
17    A.  I don't remember.  I know I
18  attended one or two meetings.  I know
19  the first one I think was at the end
20  of '98; the second one could have
21  been in early '99, but...
22    Q.  Okay.  You specifically
23  remember there were two meetings.
24    A.  I think I attended two

Page 60

1  meetings.
2    Q.  Okay.  Do you remember
3  receiving any documents about the
4  cash balance plan conversion?
5    A.  I do remember receiving
6  some generic documents.
7    Q.  Did you read them?
8    A.  Yes.
9    Q.  When Conectiv makes -- I
10  assume from time to time Conectiv
11  makes documents available to
12  employees about the pension plan.
13    A.  That's correct.
14    Q.  And it also sends you
15  documents on the plan as well, right?
16    A.  Periodically, yes.
17    Q.  And do you read those
18  documents?
19    A.  I don't, I don't read them
20  all in full.
21    Q.  Do you believe that your
22  pension rights are important?
23    A.  Yes.
24    Q.  And that the amount of your

Page 61

1  pension is important for your
2  personal financial planning, right?
3    A.  Yes.
4    Q.  Given the importance of the
5  pension for your personal financial
6  planning, do you try to pay
7  particular attention to
8  communications about your rights
9  under your pension plan?
10    A.  I do now.
11    Q.  When did you start?
12    A.  Around 2004.
13    Q.  And before then?
14    A.  Not really, no.
15    Q.  We've been going by the way
16  for about an hour.  So I just wanted
17  to see, I'm about to segue into going
18  through a number of documents.  So I
19  just wanted to see how you're doing,
20  if you need a break, or you want to
21  keep going.
22        MR. SAUDER:  You want to
23  take a break?  It's up to you.
24        THE WITNESS:  I'm fine.

16 (Pages 58 to 61)

B0331

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 62

1        MR. BASSMAN:  Let's keep
2   going.
3        THE WITNESS:  You okay?
4   BY MR. BASSMAN:
5        Q.  The more we go, the sooner
6   you're out of here.
7        A.  Okay.  That's fine.
8        Q.  I want you to take a look
9   at a document that was marked
10  yesterday as Defendant's Exhibit 1.
11       Have you had an opportunity
12  to look over Defendant's 1?
13       A.  Yes.
14       Q.  Ever seen this document
15  before?
16       A.  Don't remember seeing it,
17  no.
18       Q.  Have you ever seen any
19  other documents titled Conectiv
20  EMerging Times?
21       A.  I don't recall it.
22       Q.  If I could direct your
23  attention to, on the first page in
24  the far right you see that there's a

Page 63

1   little Q and A on the bottom that
2   begins ET, How does the program do
3   that.  Do you see that?
4        A.  Yes, I do.
5        Q.  If you could just read to
6   yourself the BW response to the end
7   of the page.  Just that paragraph.
8        Have you had a chance to
9   read that paragraph?
10       A.  Yes, I have.
11       Q.  In the paragraph that you
12  just read sitting here today, do you
13  believe that any of the statements in
14  it were inaccurate?  And again, just
15  as far as you know.
16       A.  As -- yeah.  I don't know
17  if we -- if Conectiv enacted all
18  these things that they spoke about.
19  No, I don't know of anything that's
20  really inaccurate with this.
21       Q.  Okay.  You can put that
22  back in the big pile.
23       Let's take a look at what
24  was previously marked as Defendant's

Page 64

1   Exhibit 2, which is another issue of
2   EMerging Times.  Take a look over
3   that.
4        A.  Okay.
5        Q.  Have you had a chance to
6   look over Defendant's 2?
7        A.  Yes.
8        Q.  Before we go there, have
9   you ever seen this document before?
10       A.  I don't remember seeing it.
11       Q.  And again, you don't
12  remember ever seeing any documents in
13  the format of EMerging Times or a
14  publication like that?
15       A.  I may have.  I don't
16  remember, though, specifically.
17       Q.  Turn to the second page.
18  And if you see, there's another one
19  of these back and forths and look on
20  the left-hand column.  You see ET
21  starts saying, Can you tell us more
22  about the pension arrangement.  Do
23  you see that?
24       A.  Yes.

Page 65

1        MR. SAUDER:  Just
2   indicating for the record it's PHI
3   3362.
4   BY MR. BASSMAN:
5        Q.  Could you just read to
6   yourself the Q and A starting with
7   that question to the end of BW's
8   answer?
9        A.  Okay.
10       Q.  Have you had a chance to
11  review that Q and A?
12       A.  Yes.
13       Q.  And again, just to the best
14  of your knowledge and understanding,
15  is there anything in the Q and A that
16  is inaccurate?
17       A.  No, I don't think so.
18       Q.  Okay.
19       MR. SAUDER:  Again, we're
20  only talking about the one paragraph
21  which starts the question, Can you
22  tell us more about the new pension
23  arrangement?
24       MR. BASSMAN:  Yes.  Just

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 66

1 the paragraph that comes right after
2 that.
3 BY MR. BASSMAN:
4    Q.  The next one is Defendant's
5 Exhibit, what's marked as Defendant's
6 Exhibit 3.  If you could take a look
7 over Defendant's 3.
8         Have you had an opportunity
9 to look over Exhibit 3?
10    A.  Yes.
11    Q.  Have you ever seen this
12 document before?
13    A.  I think I have, yes.
14    Q.  When did you see it?
15    A.  I don't remember.  I don't
16 know if it's -- if I saw it when it
17 came out or if I saw it a year and a
18 half ago when I compiled documents.
19 I'm not really sure.
20    Q.  You say a year and a half
21 when you compiled documents.  Why
22 were you compiling documents a year
23 and a half ago?
24    A.  When we spoke to Mr. Malone

Page 67

1 he asked what do we have in reference
2 to the cash balance plan and to send
3 him everything he had, and if we knew
4 anybody else that might have any
5 documentation, too.
6         So you know, once, once
7 the -- we filed the Complaint, a lot
8 of employees gave us a lot of
9 information.  So I may have saw it
10 then.  I don't remember.
11    Q.  When you say employees were
12 giving you information, was that in
13 response to you asking them for
14 information or did they voluntarily
15 give it to you?
16    A.  Some, both.
17    Q.  Have you talked about this
18 lawsuit with other employees at
19 Conectiv?
20    A.  To some extent.
21    Q.  Who have you spoken to?
22 And again, just when I ask you this
23 question I just want to be clear, I'm
24 not asking about any, you know,

Page 68

1 meetings that may have occurred with
2 you and Mr. Charles and Mr. Fink and
3 your counsel.
4    A.  Uh-huh.
5    Q.  I mean discussions outside
6 the presence of your lawyer.
7    A.  I mean a number of
8 employees.  Give some names.  I mean,
9 I don't remember everybody.
10    Q.  Give me who you got.
11    A.  Okay.  I got information
12 from Fred Rose, Elsie McHenry.
13    Q.  How do you spell that?
14    A.  M-C-H-E-N-R-Y I think it
15 is.
16    Q.  And the first name was?
17    A.  Elsie, E-L-S-I-E.  There
18 were a number of other employees, and
19 I don't remember their names.
20    Q.  Again, as I said earlier,
21 if anybody else's name pops into your
22 head later on just let me know.
23    A.  Okay.
24    Q.  What does Mr. Rose do at

Page 69

1 Conectiv?
2    A.  He's an engineer in
3 electric maintenance.
4    Q.  Does he work in the same
5 department as you?
6    A.  Same, same section, yes.
7    Q.  And what does Ms. McHenry
8 do?
9    A.  She works in New Castle as
10 an analyst.
11    Q.  What does she analyze?
12    A.  I don't know what she
13 really does right now.  But I used to
14 work with her for years in the meter
15 department.  That's how I know her.
16    Q.  New Castle, is that
17 headquarters?
18    A.  One of our headquarters.
19 That's our New Castle regional
20 office.
21    Q.  And do you remember what
22 kind of information Mr. Rose gave
23 you?
24    A.  No, I don't.  I just know

18 (Pages 66 to 69)

B0333

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 70

1  it was a lot of documents.
2      Q.   And do you remember what
3  information Ms. McHenry gave you?
4      A.   Same thing.  I don't have
5  any specifics.  I didn't keep a log
6  of who gave me what, so I don't
7  really know.
8      Q.   You do remember that both
9  of them gave you documents, though.
10     A.   Yes, I do.
11     Q.   And did they give you hard
12 copy documents or did they forward
13 things by e-mail?
14     A.   Hard copy documents.
15     Q.   Did they give you any
16 information on top of what was in the
17 documents?
18     A.   No.
19     Q.   And did you call both Mr.
20 Rose and Ms. McHenry to ask them if
21 they had any documents?
22     A.   I don't recall how I got
23 the information from them, if I asked
24 them or if they just asked me if I

Page 71

1  needed anything.
2      Q.   Has anyone, any other
3  employee at Conectiv, asked you about
4  the status of this lawsuit?
5      A.   Probably the majority of
6  the people in the Atlantic region.
7  Yes, a large number of people.
8      Q.   And what have you told
9  them?
10     A.   To check the website.
11     Q.   Check the Chimicles firm's
12 website?
13     A.   That's correct.
14     Q.   Have you ever provided any
15 more detail than that?
16     A.   I don't remember specifics.
17 Maybe comments, that it's going okay
18 or just generic information.
19     Q.   Anybody ever ask you
20 whether you thought you had a strong
21 or a weak case?
22     A.   They have, and I couldn't
23 give them a response, so...
24     Q.   If you could turn to the

Page 72

1  fourth page of this exhibit, which
2  has the Bates number -- and those are
3  the little numbers in the corner that
4  lawyers put on them.  JMC 447.
5      A.   Yes.
6      Q.   Do you see there's some
7  handwriting on this page?
8      A.   Yes.
9      Q.   Do you recognize the
10 handwriting?
11     A.   No, I don't.
12     Q.   You can put this one to the
13 side.
14     A.   (Witness complies.)
15     Q.   Okay.  Number 4 now.  I ask
16 you to take a look at what's
17 previously been marked Defendant's
18 Exhibit 4.  If you could just take a
19 look over that.
20     A.   Okay.
21     Q.   Have you had a chance to
22 look over Defendant's 4?
23     A.   Yes.
24     Q.   Have you ever -- well,

Page 73

1  first let me ask you, have you seen
2  this document before?
3      A.   I don't remember seeing it,
4  no.
5      Q.   Have you seen documents in
6  this format with the fax heading on
7  it?
8      A.   Yes, I have.
9      Q.   And in what context have
10 you seen them?
11     A.   Around the office
12 they're -- and I can't remember how
13 often we got them.  They might have
14 been weekly at the time or monthly or
15 some, some periodic cycle we would
16 get information.
17     Q.   And so on some periodic
18 basis management at Conectiv would
19 send to your internal mailbox a
20 document like this titled facts,
21 F-A-C-T-S?
22     A.   I'm not sure how we got
23 them.  Whether it went to a mailbox
24 or just somebody handed them out or

B0334

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 74

1 they sat on a table somewhere, but
2 they were around the office.
3    Q.  And they were available?
4    A.  Yes.
5    Q.  Do you remember always
6 reading each issue of facts?
7    A.  No.
8    Q.  Why didn't you read them
9 all?
10    A.  Can't answer that.
11    Q.  In hindsight do you think
12 you should have?
13    A.  There was a lot of stuff
14 going on then, and like I said
15 before, we were bidding our jobs, we
16 were closing departments.
17       You know, there was a lot
18 of stuff that was being finalized,
19 but the compensation package and
20 benefit package that just wasn't as
21 important -- maybe it should have
22 been, but...
23    Q.  Well, with full 20/20
24 hindsight, do you wish that you had

Page 75

1 paid more attention to communications
2 about compensation and benefit issues
3 back in 1998 and 1999?
4    A.  Yes.
5    Q.  Do you feel that there was
6 information out there that you could
7 have accessed at the time that you
8 didn't?
9    A.  There could have been more
10 information than I did look for, yes.
11 I'm sure there was.
12    Q.  And I assume in 1998 and
13 1999 you weren't trying to uncover
14 information about the compensation
15 and benefit package, right?
16    A.  That's correct.
17    Q.  You never, as far as you
18 can recall, you never called anyone
19 at HR and asked any questions about
20 it?
21    A.  No.  Not that I recall, no.
22    Q.  When you attended these two
23 meetings, did you ask any questions
24 of the presenter?

Page 76

1    A.  I don't recall, no.
2    Q.  Did you take any notes?
3    A.  I don't remember taking
4 any, no.  It was just general
5 information.
6    Q.  Were there any documents
7 passed out at those meetings?
8    A.  I don't remember.
9    Q.  Looking at Defendant's
10 Exhibit 4, there's a heading that
11 begins -- you see New Cash Balance
12 Plan towards the bottom of the first
13 page?
14    A.  Yes.
15    Q.  From the text that begins
16 under that heading Until Now, do you
17 see that?
18    A.  Yes.
19    Q.  From Until Now to the end
20 of this document, do you see any
21 representations that you believe are
22 inaccurate?
23    A.  No.  I don't see anything
24 inaccurate.

Page 77

1    Q.  I just noticed you were
2 glancing at the first page.  If you
3 could also take a look at the back
4 two pages.  Just make sure that you
5 don't see anything inaccurate in them
6 either.
7    A.  I don't see anything
8 inaccurate that I can see.
9    Q.  Okay, thanks.  You can put
10 that one to the side in the done
11 pile.
12       Let's skip ahead to
13 Defendant's Exhibit 6.  If you could
14 take a look over that.
15    A.  Okay.
16    Q.  Have you had an opportunity
17 to review Exhibit 6?
18    A.  Yes.
19    Q.  Have you ever seen this
20 document before?
21    A.  Yes.
22    Q.  And did you receive a copy
23 on or about December 21, 1998?
24    A.  I don't remember.  Again, I

B0335

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 78

1  don't remember when I saw it.  It
2  could have been a year and a half ago
3  or could have been in 1998.  I don't
4  remember.
5      Q.  Do you have any reason to
6  believe you didn't receive a copy of
7  what's been marked as Defendant's 6
8  in December of '98?
9      A.  No.
10     Q.  In December of '98, do you
11 believe you would have been a
12 Conectiv management employee?
13     A.  Yes.
14     Q.  When you looked over this
15 document just now, Defendant's
16 Exhibit 6, did you see any
17 representations that you believe are
18 inaccurate?
19         MR. SAUDER:  Objection to
20 form.  You can answer.
21         THE WITNESS:  Huh?
22         MR. SAUDER:  You can
23 answer.
24         THE WITNESS:  Oh.  No.

Page 79

1  BY MR. BASSMAN:
2      Q.  Put this one to the side.
3          Let's take a look at
4  Defendant's Exhibit 7.  If you could
5  take a look over that one.
6      A.  Okay.
7      Q.  Have you had a chance to
8  look over Defendant's 7?
9      A.  Yes.
10     Q.  Have you ever seen this
11 document before?
12     A.  Again, yes, I have, but I
13 don't know when.
14     Q.  Have you ever seen
15 documents before with the title Your
16 Conectiv Total Rewards?
17     A.  Yes.
18     Q.  In what context?
19     A.  I might be confusing
20 that -- I think it's the Conectiv
21 Totals Rewards we get -- I think in
22 Atlantic City Electric also Total
23 Rewards as a publication handed out
24 or given.

Page 80

1      Q.  You mentioned that there
2  are Your Conectiv Total Rewards
3  publications that are handed out or
4  given.  Do you read each one that's
5  handed out or given?
6      A.  No.  I don't know if I've
7  read them all.
8      Q.  Do you make an effort to
9  read them all?
10     A.  I would glance over them.
11 Not word for word probably.
12     Q.  Why don't you read them all
13 word for word?
14     A.  Don't know.  Can't answer
15 that.
16     Q.  Sitting here with perfect
17 hindsight today, January 2007, do you
18 wish that you had read them all word
19 for word?
20     A.  Yes.
21     Q.  Would you have acted
22 differently if you read them all word
23 for word in 1998 and 1999?
24         MR. SAUDER:  Objection to

Page 81

1  form.
2  BY MR. BASSMAN:
3      Q.  You can answer.
4      A.  I don't think so.
5      Q.  In your review of
6  Defendant's 7, did you see any
7  representations that you believe are
8  inaccurate?
9          MR. SAUDER:  Objection to
10 form.
11         THE WITNESS:  The --
12 BY MR. BASSMAN:
13     Q.  Feel free to take another
14 look if you want to.
15     A.  Okay.  The, the charts and
16 the graphs and the what if and the
17 person making this amount of money
18 over this many years, I don't know
19 how accurate that is I mean, but as
20 far as -- and that goes with all the
21 other documents and saying I could
22 correct something.
23         I can't -- I have no way to
24 validate that these charts and graphs

21 (Pages 78 to 81)

B0336

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 82

1  are correct or that the, you know,
2  the examples that they've used are
3  correct, but the concept of what's
4  being said I don't see anything as
5  being inaccurate.
6      Q.  Okay.
7          MR. SAUDER:  Before we go
8  on, I just note that this seems to be
9  a partial document, that the first
10 numbered page which is Bates JMC 192
11 starts on page 24.
12         MR. BASSMAN:  Okay.
13 BY MR. BASSMAN:
14     Q.  And again, just so we're
15 clear, when I'm referring to if
16 there's anything in the document,
17 just so the record is clear, I just
18 mean the exhibit, what was just shown
19 to you, just those pages, that
20 physical set.
21     A.  Okay.
22     Q.  You mentioned earlier that
23 you had been friends with Mr. Charles
24 for over 20 years; is that right?

Page 83

1      A.  Yes.
2      Q.  Do you speak with Mr.
3  Charles regularly?
4      A.  Not on a regular basis, no.
5      Q.  How often do you speak with
6  him?
7      A.  I'd say periodically
8  because we, we work together still on
9  projects.
10     Q.  How often do you think you
11 spoke with him around 1998 and 1999?
12     A.  I can't, can't recall.  Not
13 very often.
14     Q.  Do you speak with him more
15 often now than you did in 1998 and
16 1999?
17     A.  Yes.
18     Q.  How come?
19     A.  We work together a lot
20 closer on projects now.
21     Q.  Let me actually broaden the
22 question a little.  How often did you
23 communicate, by that I mean not just
24 speak but, you know, e-mail, write if

Page 84

1  you wrote letters, but communicate
2  with Mr. Charles back in 1998 and
3  1999?
4      A.  Not very often.
5      Q.  More than once a year?
6      A.  It could have been, but I
7  don't recall.  It wasn't on a regular
8  basis.
9      Q.  Did you communicate with
10 him at all in '98 and '99?
11     A.  I can't say I did.  I don't
12 remember.
13     Q.  When Mr. Charles first
14 spoke to you about contacting the
15 Chimicles firm, did he mention to you
16 whether he had spoken to other
17 employees about contacting the
18 Chimicles firm?
19     A.  I don't recall.  He may
20 have, but I don't recall.
21     Q.  Did you speak to any
22 employees other than Mr. Fink about
23 contacting the Chimicles firm?
24     A.  I spoke with Mr. Rose, Fred

Page 85

1  Rose.
2      Q.  And when did you speak to
3  him?
4      A.  In the August, September
5  time frame.  Summer of 2005.
6      Q.  When you say you spoke with
7  him, was this an in-person
8  conversation?
9      A.  That's correct.
10     Q.  And who initiated the
11 conversation?
12     A.  I did.
13     Q.  Why did you initiate this
14 conversation?
15     A.  To see if he would like to
16 be involved, if he would like to
17 contact Mr. Malone to be involved in
18 the Complaint.
19     Q.  And why did you approach
20 Mr. Rose in particular to talk about
21 this Complaint?
22     A.  Because he was also a non
23 grandfathered employee like myself
24 with a similar situation.

B0337

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 86

1    Q.  Had Mr. Rose complained to
2  you at all about the cash balance
3  plan?
4    A.  About that time, yes.
5    Q.  And before this
6  conversation about going to the
7  Chimicles firm?
8    A.  Shortly before that, yes.
9    Q.  Do you remember what the
10 substance of his complaint about the
11 cash balance plan was?
12   A.  No, I don't.
13   Q.  In this conversation about
14 when you asked Mr. Rose if he would
15 be interested in signing on as a
16 plaintiff in this lawsuit, what do
17 you remember saying to him?
18   A.  Basically just asked him if
19 he would like to get involved in, in
20 this action.
21   Q.  Did you tell him anything
22 about the case?
23   A.  Just a little bit of
24 information that I had.

Page 87

1    Q.  Do you remember what that
2  information was?
3    A.  Just generic information
4  about the suit.
5    Q.  Did he ask you any
6  questions about the lawsuit?
7    A.  I don't recall.  I just
8  know -- I asked him if he was
9  interested and if he was to contact
10 Mr. Malone.
11   Q.  What did Mr. Rose say to
12 you during this conversation?
13   A.  That he didn't feel
14 comfortable in doing that.
15   Q.  Did you ask him why?
16   A.  He didn't -- he just said
17 he wasn't comfortable.
18   Q.  I understand.  Did you ask
19 him why he felt he wasn't
20 comfortable?
21   A.  He was concerned about
22 losing his employment.
23   Q.  Did he give you any reason
24 why he was concerned?

Page 88

1    A.  Not particularly.
2    Q.  Were you concerned?
3    A.  Absolutely.
4    Q.  And why is that?
5    A.  I'm filing a suit against
6  my employer.  It just makes me
7  uncomfortable.
8    Q.  But your employer to date
9  hasn't done anything in retaliation
10 for this lawsuit, right?
11   A.  No.  That's correct.
12   Q.  Let's take a look at Number
13 8.  If you could take a look over
14 what's been marked as Defendant's 8.
15   A.  Okay.
16   Q.  Have you had a chance to
17 look over Defendant's 8?
18   A.  Yes, I have.
19   Q.  Ever seen this before?
20   A.  Yes, I have, but I don't
21 know when.
22   Q.  So you're not sure if you
23 saw the document at the time it was
24 generated or as part of your search

Page 89

1  about 18 months ago for documents on
2  the cash balance plan?
3    MR. SAUDER:  Objection with
4  regard to the time it was generated.
5  I don't believe this document is
6  dated.
7    MR. BASSMAN:  Okay.  I'll
8  withdraw that.  I'll rephrase.
9  BY MR. BASSMAN:
10   Q.  I assume when you say
11 you're unsure when you saw it, you're
12 not sure if you saw this in
13 connection with collecting documents
14 about 18 months ago for the lawsuit
15 or if you saw it some other time?
16   A.  That's correct.
17   Q.  In your review of this
18 document, did you see any
19 representations that you believe are
20 inaccurate?
21   MR. SAUDER:  Objection.
22 BY MR. BASSMAN:
23   Q.  You can answer.
24   A.  Again, with the other

23 (Pages 86 to 89)

B0338

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 90

1  documents, the graphs of the new cash
2  balance versus our current plan and
3  where they interact and where they --
4  I have no way to valid that, that
5  doesn't look correct, but I --
6  there's no numbers to go with it to
7  know, so...
8      Q.  When you say something
9  doesn't look correct, can you show me
10  which graph you're thinking doesn't
11  look correct?
12      A.  Page seven, Overview of
13  Cash Balance Pensions.
14      Q.  And are you looking at the
15  graph that has Concept on top and
16  Dollars on the side?
17      A.  That's correct.
18      Q.  What looks inaccurate to
19  you on this graph?
20          MR. SAUDER:  Just for the
21  record, this is Bates 203 on the
22  document.
23          THE WITNESS:  Yes, okay.  I
24  don't know if that's the annuity, if

Page 91

1  it's the lump sum.  Is that our
2  current AE plan?  The DelMarVa plan?
3  And what's the retirement age date?
4  I mean --
5  BY MR. BASSMAN:
6      Q.  Okay.  So it's not that
7  something strikes you as
8  affirmatively false in this graph;
9  it's just that you don't have enough
10  information to know what's being
11  represented.
12      A.  And this shows the plans
13  being equal at a retirement date.
14      Q.  And you think that's false?
15      A.  Yes, I do.
16      Q.  And you think that's false
17  based on your discussions with Mr.
18  Rehr and Mr. Baldwin?
19      A.  That's correct.
20      Q.  Besides your discussions
21  with Mr. Rehr and Mr. Baldwin, any
22  other basis for thinking that it
23  would be a false statement to say
24  that the cash balance plan and the

Page 92

1  old plan could result in the same
2  benefit at retirement?
3          MR. SAUDER:  I would just
4  caution the witness to the extent
5  that it involves any attorney-client
6  communications that he obviously do
7  not answer any questions with regard
8  to attorney-client communications,
9  but if you can answer the question
10  aside from anything you've learned
11  from your attorney, go ahead and
12  answer.
13          THE WITNESS:  Just based on
14  the -- just based on the calculations
15  I've made on the Pension Estimator.
16  BY MR. BASSMAN:
17      Q.  And Mr. Rehr and Mr.
18  Baldwin both retired before age 65,
19  right?
20      A.  That's correct.
21      Q.  Leaving aside this graph,
22  is there anything else in Defendant's
23  8, any other representation that you
24  believe is inaccurate?

Page 93

1          MR. SAUDER:  Again, I would
2  object.
3          THE WITNESS:  I don't see
4  anything, no.
5          MR. BASSMAN:  Okay.  At
6  this point, I think you may be a bit
7  more of a trooper than I am.  I want
8  to take five to stretch my legs, so
9  let's take a five-minute break.
10          THE WITNESS:  Sure.
11          RECESS
12          MR. BASSMAN:  Back on the
13  record.
14          MR. SAUDER:  There's an
15  agreement that Mr. Ward's Vanguard
16  estimates, which have been marked as
17  D-21, will be marked as confidential,
18  and there's also an agreement with
19  regard to Mr. Fink's Vanguard
20  estimates that they will also be
21  marked as confidential.
22  BY MR. BASSMAN:
23      Q.  Mr. Ward, before we broke,
24  you mentioned that you ran a number

24 (Pages 90 to 93)

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 94

1  of calculations on the Pension
2  Estimator and that you did this after
3  speaking with Mr. Rehr.  Do you
4  recall that testimony?
5      A.  Yes.
6      Q.  And the reason that you
7  wanted to run calculations on the
8  Pension Estimator was to compare how
9  your benefits under the cash balance
10  plan compared to the old plan; is
11  that right?
12     A.  That's correct.
13     Q.  How did you figure out what
14  your benefits were under the old
15  plan?
16     A.  I basically couldn't for
17  the lump sum.  Had to approximate
18  them based on Mr. Rehr's approximate
19  numbers he gave me.
20     Q.  So you just used Mr. Rehr's
21  numbers as a proxy for your own?
22     A.  That's correct.  Because we
23  make roughly the same amount of money
24  with -- would have approximately the

Page 95

1  same years of service.
2      Q.  Did Mr. Rehr give you the
3  amount -- first off, let me back up
4  for a second.  Did Mr. Rehr take a
5  lump sum or an annuity when he
6  retired?
7      A.  Lump sum.
8      Q.  And did he tell you the
9  amount of the lump sum?
10     A.  Not the exact amount.
11     Q.  Did he give you a ballpark
12  figure?
13     A.  He did, yes.
14     Q.  What was it?
15     A.  It was in -- I don't recall
16  the exact number but it was over
17  600,000.
18     Q.  You mentioned earlier that
19  you spoke to several individuals who
20  were retiring.
21     A.  Yes, that's correct.
22     Q.  Did any of those
23  individuals opt for an annuity
24  instead of a lump sum?

Page 96

1      A.  No, not that I'm aware of.
2      Q.  Do you know of any other
3  Conectiv employee who when they
4  retired opted for an annuity instead
5  of a lump sum?
6      A.  No.
7      Q.  Let's take a look at
8  Defendant's Exhibit 9.
9      A.  Okay.
10     Q.  Have you ever seen this
11  document before?
12     A.  I don't recall seeing it,
13  no.
14     Q.  Have you ever seen other
15  documents titled InSight, a Conectiv
16  employee newsletter?
17     A.  Yes, I have.
18     Q.  In what context?
19     A.  I have just seen the
20  InSight name.  I do remember seeing
21  issues.  I don't recall what issues,
22  but I have seen them.
23     Q.  Have you ever seen the
24  InSight letter delivered to your

Page 97

1  internal mailbox at the company?
2      A.  I don't recall.
3      Q.  Have you ever received a
4  copy of an InSight newsletter?
5      A.  An InSight, yes, I have,
6  but I don't know how I received it.
7      Q.  Anything secret about
8  what's in an InSight newsletter as
9  far as you know?
10     MR. SAUDER:  Objection.
11  BY MR. BASSMAN:
12     Q.  You can answer.
13     A.  Anything --
14     Q.  Secret.
15     A.  -- secret?  Not that I'm
16  aware of, no.
17     Q.  You can put this to the
18  side.
19     MR. SAUDER:  Just noting
20  for the record that document starts
21  on PHI 3428, the next page is 3426,
22  and that's page number 6, so this
23  appears to be an incomplete document.
24  BY MR. BASSMAN:

25 (Pages 94 to 97)

B0340

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 98

1    Q.  Have you ever read any
2  InSight newsletters?
3    A.  I can't recall what copies
4  I would have read, but I think I
5  have, yes.
6    Q.  Do you try to read every
7  InSight newsletter that you receive?
8    A.  No.
9    Q.  Why not?
10    A.  Just never took the time to
11  read them.
12    Q.  Let's take a look at
13  Defendant's 10.  Can you take a look
14  over Defendant's 10?
15    A.  Okay.
16    Q.  Have you had a chance to
17  look over Defendant's Exhibit 10?
18    A.  Yes.
19    Q.  Ever seen this before?
20    A.  I don't recall seeing it.
21    Q.  If you look at the third
22  paragraph, I refer your attention
23  there.
24    A.  Yes.

Page 99

1    Q.  You see the second sentence
2  begins, Recent stories?  Could you
3  just read that sentence aloud that
4  begins Recent stories.
5    A.  Okay.  Recent -- do you
6  want me to read it aloud?
7    Q.  Yes.
8    A.  "Recent stories in the
9  national media have raised concerns
10  about some cash balance plans that do
11  not offer the same level of financial
12  security or grandfathering provisions
13  as cash -- Conectiv's cash balance
14  pension plan."
15    Q.  Thanks.  Do you remember
16  hearing any discussion in or around
17  June 23rd, 1999 of stories in the
18  national media raising concerns about
19  cash balance plans?
20    A.  No, I don't.
21    Q.  Did you ever in 1999 try to
22  research any media stories about cash
23  balance plans?
24    A.  I don't recall doing so,

Page 100

1  no.
2    Q.  In your review of
3  Defendant's Exhibit 10, did you see
4  any representations that you think
5  are inaccurate?
6    MR. SAUDER:  Objection.
7  Objection to the form.
8    Objection to the fact that
9  it calls for an opinion, and
10  objection to the fact that if there's
11  anything in here with regard to
12  whether it calls for a legal opinion
13  by a lay witness, and I would make
14  that same objection with regard to
15  every other time that question was
16  asked.
17  BY MR. BASSMAN:
18    Q.  You can answer.
19    A.  I don't -- I don't see
20  anything that's inaccurate.
21    Q.  Let's put this one aside.
22    Moving right along.  Let's
23  take a look at Number 11.  Have you
24  had an opportunity to review

Page 101

1  Defendant's 11?
2    A.  Yes.
3    Q.  Have you ever seen this
4  document before?
5    A.  I don't remember seeing it,
6  no.
7    Q.  Okay.  You can put that one
8  aside.  You can put that one in the
9  finished pile.
10    Take a look at Defendant's
11  Exhibit 12.  Have you had an
12  opportunity to look over Defendant's
13  Exhibit 12?
14    A.  Yes.
15    Q.  Have you ever seen this
16  before?
17    A.  I don't remember seeing it.
18    Q.  Have you ever seen any
19  documents titled InSight Online?
20    A.  No, I don't.  That probably
21  wouldn't have been a document if it
22  was online too, so...
23    Q.  Okay.  Is there an intranet
24  at Conectiv?

26 (Pages 98 to 101)

B0341

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 102

1    A.  Yes, there is.
2    Q.  And do you access the
3  intranet regularly?
4    A.  Yes, I do.
5    Q.  Have you ever seen an
6  InSight page on the Conectiv
7  intranet?
8    A.  I don't recall.  It's
9  Atlantic City Electric now, so it's a
10  different intranet site, so I don't
11  recall it.
12    Q.  What types of material
13  generally right now are posted on the
14  Conectiv intranet?
15    A.  On the Atlantic or on PHI?
16    Q.  Or the Atlantic City, PHI
17  intranet.
18    A.  Corporate directories,
19  news, employees information,
20  department information, phone
21  numbers.
22    Q.  Are there any employee
23  newsletters or bulletins that are
24  posted on the intranet?

Page 103

1    A.  Yes, I think there is.
2    Q.  Do you read them regularly?
3    A.  Not regularly, no.
4    Q.  Have you ever read them
5  regularly?
6    A.  I don't recall, no.  Not on
7  a regular basis.
8    Q.  Any particular reason why
9  you read some intranet bulletins but
10  not others?
11    A.  Something that catches my
12  eye if I happen to be on the site
13  from the heading.
14    Q.  Do you remember anything
15  catching your eye about pension plan?
16    A.  No, I don't.
17    Q.  Put that one to the side.
18    Let's take a look at
19  Defendant's Exhibit 13.
20    A.  Okay.
21    Q.  Have you had a chance to
22  look over Defendant's 13?
23    A.  Yes, I have.
24    Q.  Have you ever seen this

Page 104

1  document before?
2    A.  Yes, I have.
3    Q.  When?
4    A.  I can't recall.
5    Q.  I believe you testified
6  earlier that you attended two
7  meetings of the cash balance plan in
8  '98 and '99?
9    A.  That's correct.
10    Q.  And you said the first
11  meeting at the end of '98 was very
12  general, right?
13    A.  If I recall they were both
14  very general.
15    Q.  Okay.  Looking at the first
16  page of D-13, in the top left-hand
17  corner you see the date July 1999?
18    MR. SAUDER:  Just for the
19  record, we're on MWW 219.
20  BY MR. BASSMAN:
21    Q.  Right over there.
22    A.  Oh, yes.  Okay.  Yes.
23    Q.  Does looking at that date
24  refresh your recollection as to when

Page 105

1  you attended a meeting about the cash
2  balance plan?
3    A.  No, it doesn't.
4    Q.  And I assume when -- let's
5  take a step back.
6    When you testified that
7  you're not sure when you saw the
8  document that's been marked
9  Defendant's 13, is that because
10  you're not sure if you saw it as part
11  of your document collection effort
12  about 18 months ago or in some other
13  context?
14    A.  That's correct.
15    Q.  If you could turn to the
16  second page of this exhibit, which
17  has Bates number MWW 220, and I'd
18  like to direct your attention to the
19  upper left.  Do you see a box that
20  says Important Perspectives on
21  Conectiv's New Retirement Program?
22    A.  Yes.
23    Q.  And you see the second
24  bullet says, cash balance plans are

B0342

Page 106

1  controversial.
2      A.   Yes.
3      Q.   Do you remember any
4  discussions in 1999 with anyone at
5  Conectiv about cash balance plans
6  being controversial?
7      A.   No.
8      Q.   And I take it then you
9  don't remember either presenter at
10  the meetings you attended --
11      A.   No, I don't.
12      Q.   Hold on.  Just wait for me
13  to finish.
14      A.   I'm sorry.
15      Q.   -- telling you that cash
16  balance plans are controversial?
17      A.   No, I don't.
18      Q.   See under the second
19  bullet, cash balance plans are
20  controversial, there's a little
21  subheading, Series of Wall Street
22  Journal articles.  Do you see that?
23      A.   Yes, I do.
24      Q.   Do you remember hearing any

Page 107

1  discussion in 1999 within Conectiv
2  about Wall Street Journal articles
3  addressing the cash balance plans?
4      A.   No, I don't.  And I don't
5  read the Wall Street Journal.
6      Q.   Did any other employee whom
7  you spoke to make any reference to
8  Wall Street Journal articles about
9  cash balance plans?
10      A.   Not that I recall.
11      Q.   Under Wall Street Journal
12  articles there's another heading that
13  says Congressional Hearings.  Do you
14  remember any discussion about
15  congressional hearings addressing
16  cash balance plans among Conectiv
17  employees in 1999?
18      A.   No, I don't recall.
19      Q.   If at one of your meetings
20  in '98 or 99 this slide was presented
21  which says Important Perspectives on
22  Conectiv's New Retirement Program
23  with these points, would you have
24  taken any action to research these

Page 108

1  Wall Street Journal articles or
2  congressional hearings?
3      A.   I can't really answer that.
4  Like I said, in prior, in 1998 and
5  1999 that time frame of the Conectiv
6  merger, I was more worried about
7  keeping my job than my retirement
8  plan, because we all had to bid our
9  jobs.
10      So I don't know if I can
11  answer that question correctly.  I
12  don't know.
13      Q.   Just if you could answer it
14  to the best of your ability.
15      A.   I may have done maybe some
16  research, but I don't know.
17      Q.   In looking over your
18  Defendant's Exhibit 13, did you see
19  any representations that you believe
20  are inaccurate?
21      MR. SAUDER:  Objection to
22  form.  Objection to the fact that it
23  calls for possibly a legal opinion by
24  a lay witness.

Page 109

1      MR. BASSMAN:  You can
2  answer.
3      THE WITNESS:  As with all
4  the other documents of graphs and
5  charts and all that stuff, the
6  accuracy of the data I can't, can't
7  say it's accurate.  I mean, I don't
8  see anything in writing that appears
9  to be inaccurate.
10      MR. BASSMAN:  Okay.  Put
11  that one to the side.
12  BY MR. BASSMAN:
13      Q.   Take a look at Defendant's
14  Exhibit 14.
15      A.   Okay.
16      Q.   Have you had a chance to
17  look over Defendant's Exhibit 14?
18      A.   Yes, I have.
19      Q.   Ever seen this document
20  before?
21      A.   I don't recall it, no.
22      Q.   Ever see any document in
23  this format before with a Subject and
24  a Business Practice heading?

B0343

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 110

1      A.  I mean I would get memos
2   all the time with, you know, similar
3   form letters, but...
4      Q.  And does this appear to you
5   to be a standard memo format for
6   Conectiv?
7      A.  It appears to be a business
8   letter.  There's no heading or
9   anything on it that would normally be
10  there, I mean, but it could be.
11     Q.  In your review of
12  Defendant's 14, do you see any
13  representations that you believe are
14  inaccurate?
15     A.  No, I don't.
16        MR. SAUDER:  Objection.
17  Again, the fact that it may call for
18  a legal opinion by a lay witness.
19        MR. BASSMAN:  Put that one
20  to the side.
21        Could we mark this.
22        (Exhibit D-22 was marked
23  for identification.)
24  BY MR. BASSMAN:

Page 111

1      Q.  You've just been handed a
2   document that's been marked D-22.  If
3   you could take a moment to look it
4   over.
5        Just so the record is
6   clear, I think by accident the
7   document that was the last exhibit we
8   looked at, Number 14, was
9   accidentally stapled to the back of
10  this.
11        So just in case you start
12  wondering why that's there.  I think
13  that was an accident.
14     A.  Okay.
15     Q.  Have you had an opportunity
16  to take a look over D-22?
17     A.  Yes.
18     Q.  Ever seen this document
19  before?
20     A.  Yes, I have.
21     Q.  Do you recall when?
22     A.  No, I don't.
23     Q.  Same difficulty as with the
24  other documents?

Page 112

1      A.  That's correct.
2      Q.  Okay.  In your review of
3   D-22, and just the first three pages
4   of D-22, the ones that are Bates
5   numbered MWW 308, 309 and 310, do you
6   see any representations that you
7   believe are inaccurate?
8         MR. SAUDER:  Again,
9   objection to the form, and objection
10  to the fact that it calls for a legal
11  opinion by a lay witness.  Take your
12  time and review the document.
13        THE WITNESS:  No.  I don't
14  really see anything inaccurate.
15        MR. BASSMAN:  Okay.  You
16  can put that to the side.
17        (Exhibit D-23 was marked
18  for identification.)
19  BY MR. BASSMAN:
20     Q.  You've been handed a
21  document marked D-23.  If you could
22  please take a look over this.
23     A.  Okay.
24     Q.  Have you had a chance to

Page 113

1   look over D-23?
2      A.  Yes, I have.
3      Q.  Have you seen this before?
4      A.  Yes, I have.
5      Q.  Is D-23 a copy of a letter
6   that you received from Lynn Curriden
7   in September of 2002?
8      A.  I think it is, yes.
9      Q.  And accompanying this
10  letter did you receive the
11  attachments that are referred to?
12     A.  Yes, I think I did, yes.
13     Q.  Before receiving this
14  letter in September of 2002, had you
15  ever received a copy of a document
16  called the Summary Plan Description?
17     A.  I don't recall that.
18     Q.  Have you ever heard of a
19  Summary Plan Description?
20     A.  I don't recall it, no.
21     Q.  Doesn't ring a bell?
22     A.  No, it doesn't.
23     Q.  Do you ever remember
24  reading a document titled Summary

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 114

1  Plan Description?
2      A.  I just don't recall it.  I
3  may have.
4      Q.  Here, let me show you one
5  that might help you.
6      A.  Okay.
7      Q.  You can put that to the
8  side.
9      A.  (Witness complies.)
10        MR. BASSMAN:  If you could
11  mark this D-24.
12        (Exhibit D-24 was marked
13  for identification.)
14  BY MR. BASSMAN:
15      Q.  I've given you a document
16  that's been marked D-24.  If you
17  could take a moment just to quickly
18  skim through it.  It's very long, so
19  I wouldn't ask you to sit and read
20  that through right now.
21      A.  Okay.
22      Q.  Have you had a chance to
23  just give a quick skim to D-24?
24      A.  Yes, I have.

Page 115

1      Q.  Do you recognize D-24 as
2  the Summary Plan Description that was
3  enclosed in the September 2002
4  letter?
5      A.  Yes, I do.
6      Q.  Did you read the Summary
7  Plan Description?
8      A.  I don't recall.  I'm
9  sure -- I don't recall doing that.
10      Q.  Do you have any reason to
11  believe that you did read it?
12      A.  Could you repeat the
13  question, please.
14      Q.  Sure.  Actually let me ask
15  you a different question.  Do you
16  have any recollection of reading this
17  document marked D-24 either in whole
18  or in part at any time?
19      A.  The last time I remember
20  reading the document was 18 months
21  ago when I compiled the documents.
22      Q.  Do you have any
23  recollection of reading the document
24  that's been marked D-24 either in

Page 116

1  whole or in part?
2      A.  Possibly in part.  Not in
3  whole.  I remember scanning the
4  document but not --
5      Q.  But not?
6      A.  And I can't say when it
7  was.  Whether it was 2002 when it was
8  presented or a couple years later or
9  what.
10      Q.  You're confident, though,
11  that you've never read the document
12  that's been marked D-24 cover to
13  cover, word for word?
14      A.  Relatively confident, yes.
15      Q.  Do you remember which parts
16  of the document marked D-24 you read
17  in the past?
18      A.  I would have read the cash
19  balance and the ACE sub plan, not the
20  DelMarVa sub plan.
21      Q.  But you do recall reading
22  the entire discussion on the cash
23  balance sub plan at some point?
24      A.  At some point, yes.

Page 117

1      Q.  You don't recall whether
2  you read it in September 2002 when
3  you got the document.
4      A.  That's correct.
5      Q.  Had you ever received a
6  copy of Summary Plan Description for
7  the cash balance sub plan before
8  September 2002?
9      A.  I don't recall.
10      Q.  Did you ever ask for one
11  before September 2002?
12      A.  I don't recall asking for
13  one, no.
14      Q.  Do you have any reason to
15  believe that before September 2002 if
16  you had asked the HR department at
17  Conectiv for a copy of the Summary
18  Plan Description for the cash balance
19  sub plan that they would have
20  withheld the document from you?
21      A.  I have no reason to believe
22  that.
23      Q.  Do you think anyone from
24  the Conectiv HR department has ever

B0345

Page 118

1  lied to you?
2       MR. SAUDER:  Objection.
3  Can you clarify the question?  Ever
4  on any subject?
5       MR. BASSMAN:  Yes.
6       MR. SAUDER:  If you
7  understand the question you can
8  answer.
9       THE WITNESS:  I've never
10  caught them in a lie.  Have they ever
11  lied to me?  I don't know.
12  BY MR. BASSMAN:
13      Q.  Again, to the best of your
14  knowledge.
15      A.  To the best of my
16  knowledge, I'm not aware of any lies
17  that they've told me in the past.
18      Q.  Okay.  Let's take a look at
19  what's been marked previously as
20  Defendant's 15.  Take a look over
21  this document.
22      A.  Okay.
23      Q.  Have you had a chance to
24  look over Defendant's 15?

Page 119

1       A.  Yes, I have.
2       Q.  Ever seen this document
3  before today?
4       A.  In part at our -- a week
5  ago.
6       Q.  Okay.  Are you unsure if --
7  just answer this yes or no.  Are you
8  unsure if to answer my question you
9  would have to disclose a conversation
10  with your attorney?
11      A.  That's correct.
12      MR. BASSMAN:  Why don't we
13  take a five-minute break.  You guys
14  can just talk it over, and I just
15  want to make sure you have a chance
16  to convey your concerns to your
17  counsel.
18      THE WITNESS:  Okay.
19      RECESS
20  BY MR. BASSMAN:
21      Q.  Back on the record.  The
22  question pending was have you seen
23  Defendant's Exhibit 15 before?
24      A.  Yes, I have.

Page 120

1       Q.  Okay.  Have you seen it
2  outside of discussions with your
3  counsel?
4       A.  No.
5       Q.  All right.  If you could
6  take a look at the bottom half of
7  Defendant's 15, which is Mr. Charles'
8  e-mail to the HR department.  If I
9  could direct your attention to the
10  second paragraph, last sentence.
11      Do you see the sentence
12  that Mr. Charles wrote, I always felt
13  from the inception of the cash
14  balance plan that it was unfair?
15      A.  Yes.
16      Q.  Has Mr. Charles expressed a
17  view to you that he's felt from the
18  inception of the cash balance plan
19  that it was unfair?
20      MR. SAUDER:  And again, I
21  would just caution you to not convey
22  any communications that you had with
23  counsel in the presence of Mr.
24  Charles.

Page 121

1       Anything you've had outside
2  of counsel's presence that was not
3  related to any legal advice, if you
4  can answer that question, go ahead
5  and answer it.
6       THE WITNESS:  I don't
7  recall a comment from Mr. Charles
8  like that outside of counsel.
9  BY MR. BASSMAN:
10      Q.  Okay.  And again, leaving
11  aside any discussions with your
12  counsel, or any meetings where you
13  were present with your counsel, do
14  you remember anyone, any employee at
15  Conectiv, expressing to you that they
16  felt that from the inception of the
17  cash balance plan it was unfair?
18      A.  No.
19      Q.  Do you have any
20  recollection in 1998 or 1999 of any
21  Conectiv employees expressing the
22  opinion that the cash balance plan
23  was unfair?
24      A.  A lot of the discussions

B0346

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 122

1  around the grandfathering and the age
2  cutoff, but as far as the plan being
3  unfair and for what particular
4  reason, I don't recall anything.
5      Q.  You can put that aside.
6      Do you personally sitting
7  here today believe the cash balance
8  plan is unfair?
9      A.  Now?
10     Q.  Yes.
11     A.  Yes, I do.
12     Q.  Why?
13         MR. SAUDER:  Again, I'll
14  just caution you to not reveal any
15  communications you've had with your
16  attorneys or anything you've learned
17  based on discussions with your
18  attorneys.
19         To the extent you can
20  answer that question without
21  breaching any attorney-client
22  communications, then you can answer
23  the question.
24         THE WITNESS:  If we've

Page 123

1  discussed this in the past I mean --
2         MR. SAUDER:  Can we just go
3  off the record for a second.
4         MR. BASSMAN:  Sure.  Off
5  the record.
6         (Discussion off the
7  record.)
8  BY MR. BASSMAN:
9      Q.  Back on the record.
10     A.  Yes.  I mean, my feeling is
11  that, you know, I was converted from
12  a traditional plan that I was in to a
13  new cash balance plan in my early,
14  mid-40s with almost 20 years of
15  experience -- 20 years in the company
16  and basically, you know, what I
17  thought I was going to have at 55 now
18  I'm not even going to have at 65.
19         So in that case, yes, I
20  feel it's unfair.
21     Q.  And when you say not going
22  to have, I assume you mean that you
23  believe that when you retire, whether
24  at age 55 or age 65, your benefit

Page 124

1  will be lower under the cash balance
2  plan than it would have been if the
3  old plan had continued?
4      A.  That's correct.
5      Q.  And you reached that
6  conclusion running the calculations
7  on the Pension Estimator and
8  comparing those to Mr. Rehr's lump
9  sum?
10     A.  That's correct.
11     Q.  And just so I'm clear,
12  because I remember we had some
13  discussion before about the age of
14  departing employees as they retire.
15         You believe the plan's
16  unfair because under the cash balance
17  plan your benefit would be lower than
18  it would have been under the old plan
19  based on retirement dates of both age
20  55 and age 65?
21     A.  Can you rephrase the
22  question.
23     Q.  Sure.  Let me break it into
24  two questions.

Page 125

1      A.  Okay.
2      Q.  That was a little compound.
3  Do you believe sitting here today
4  that your retirement benefit, if you
5  retire at age 55, will be lower under
6  the cash balance plan than it would
7  have been if the old plan had
8  continued?
9      A.  That's correct.
10     Q.  Same question, but this
11  time your retirement age is 65.
12     A.  Yes, I do, but I don't know
13  to what extent.
14     Q.  So the calculations that
15  you ran were assuming retirement at
16  age 55?
17     A.  At age, at age 55 I had the
18  lump sum numbers, the approximate
19  numbers from my fellow employees, and
20  I didn't have any age 65 numbers from
21  them, so...
22     Q.  So you don't have a good
23  comparison?
24     A.  That's correct.

B0347

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 126

1    Q.  Do you have any
2    understanding if you decided to
3    retire this afternoon how your
4    benefits would compare under the cash
5    balance plan versus the old plan?
6        A.  I've never run those
7    numbers.  Never thought about it.
8        Q.  Don't know?
9        A.  No, I don't.
10       Q.  Okay.  Let's go ahead and
11   mark this.
12           (Exhibit D-25 was marked
13   for identification.)
14   BY MR. BASSMAN:
15       Q.  I've given you a document
16   that's been marked D-25.  This is a
17   copy of Plaintiffs' Consolidated
18   Initial Disclosures in this case.  If
19   you could take a look over D-25.
20       A.  Okay.
21       Q.  Have you had a chance to
22   look over D-25?
23       A.  Yes, I have.
24       Q.  Ever seen this document

Page 127

1    before?
2        A.  Yes, I think I have.
3        Q.  If you could turn to page
4    seven.  Do you see there's a heading
5    Maurice W. Ward, Jr., on the top of
6    the page?
7        A.  Yes, I do.
8        Q.  Could you look over the
9    list of documents that begins under
10   your name and continues to the top of
11   page eight if you see?
12       A.  Yes.
13       Q.  And just confirm for me
14   that these are documents that you
15   provided to your counsel.
16       A.  I mean, I don't know if
17   this is all of them or if it's a full
18   list or what.  I don't have it in my
19   memory everything I've given them,
20   but I assume it's correct.
21       Q.  Do any documents appear to
22   be missing to you?
23       A.  Just those statements that
24   I know aren't listed.

Page 128

1        Q.  Just the Pension Estimator
2    statements.
3        A.  Yes.
4            MR. SAUDER:  Indicating for
5    the record D-21.
6            THE WITNESS:  I'm not aware
7    of anything else that's missing.
8    BY MR. BASSMAN:
9        Q.  Okay.  Do you have any
10   documents in your possession today
11   that relate to the cash balance plan
12   that you have not provided to your
13   attorneys?
14       A.  No, I don't.
15       Q.  Leaving aside hard copy
16   documents, you mentioned earlier you
17   had a personal home e-mail account;
18   is that right?
19       A.  Yes, I do.
20       Q.  Have you ever sent or
21   received e-mails relating to the
22   Conectiv cash balance plan in your
23   home e-mail account?
24       A.  I don't recall doing that,

Page 129

1    no.
2        Q.  Do you exchange e-mails on
3    your home e-mail account with Mr.
4    Charles?
5        A.  No, I don't.  Oh, not
6    documents.
7        Q.  Have you ever sent or
8    received an e-mail from Mr. Charles
9    off your home e-mail account?
10       A.  Yes, I have.
11       Q.  More than once?
12       A.  Maybe.  Probably one or two
13   times.  Three times maybe.  Small
14   number.
15       Q.  Did you search those
16   e-mails in connection with this
17   litigation to see if any of them
18   address the cash balance plan?
19       A.  No, I didn't.  They were
20   just recent e-mails, so...
21       Q.  Did any of these recent
22   e-mails address the cash balance
23   plan?
24       A.  They were just dates of

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 130

1  meetings and stuff.
2      Q.  About this lawsuit?
3      A.  Yeah.  Yes.
4          MR. BASSMAN:  Have these
5  been withheld as privileged?
6          MR. SAUDER:  Dates of
7  meetings with regard to e-mails?
8          MR. BASSMAN:  Whatever
9  these e-mails that have been
10  exchanged between Mr. Ward and Mr.
11  Charles.
12         MR. SAUDER:  We may not
13  have a copy of the e-mails that were
14  exchanged with regard to the dates to
15  depositions and dates to anything
16  else relevant to this litigation.
17         So if you want to request a
18  copy, you know, we can certainly see
19  if we can get copies of them and take
20  a look at them and see if there's any
21  privilege or any work product.
22         MR. BASSMAN:  I would ask
23  if you could go and search Mr. Ward's
24  e-mail account from his home e-mail

Page 131

1  to see if he has any responsive
2  documents, because we think those
3  would be encompassed in our document
4  requests.
5          MR. SAUDER:  Okay.
6          MR. BASSMAN:  Thanks.
7  BY MR. BASSMAN:
8      Q.  The same document,
9  Defendant's 25.  If you could turn to
10  page eight.  You see the heading that
11  says Rule 26 (a)(1)(C) Disclosure
12  Damage Computation?
13     A.  Yes.
14     Q.  If you could turn to the
15  next page.  Under that heading
16  there's a bullet -- I want you to
17  look at the second and third bullets.
18         If you could read over them
19  and confirm for me that this is the
20  relief that you personally would like
21  from the court if you won this
22  lawsuit.
23         MR. SAUDER:  Are you on
24  page nine?

Page 132

1          MR. BASSMAN:  Page nine,
2  yes.
3          THE WITNESS:  Starting out
4  Reformation of the?
5  BY MR. BASSMAN:
6      Q.  Yes.
7      A.  Okay.
8      Q.  Do those two bullets I just
9  directed you to accurately reflect
10  what you would like the court to do
11  in this case?
12     A.  Yes.
13     Q.  And that would be to
14  eliminate the cash balance plan and
15  reinstate the old plan, right?
16     A.  That's correct.
17     Q.  And do you think that you
18  will be better off financially if the
19  court were to do that?
20     A.  Yes.
21     Q.  If it were to turn out that
22  your retirement benefits were higher
23  under the cash balance plan than they
24  would have been under the old plan,

Page 133

1  would you change your mind?
2          MR. SAUDER:  Objection to
3  the form.
4  BY MR. BASSMAN:
5      Q.  You can answer.
6      A.  No.  Because of the age,
7  because of the age also.  The age 65
8  versus age 55 retirement date.
9      Q.  I'm not sure I follow.  Can
10  you explain what you mean?
11     A.  In the ACE plan, in the
12  traditional Atlantic plan that we
13  have now I could retire at 55 with no
14  reduction in benefit.  At age -- I'd
15  have to work until I'm 65 under the
16  Conectiv cash balance plan.
17         So I would have to work ten
18  more years basically to get a similar
19  benefit.
20     Q.  Besides losing the early
21  retirement option that was in the old
22  ACE plan, has the cash balance plan
23  conversion harmed you in any way?
24         MR. SAUDER:  Objection.

34 (Pages 130 to 133)

B0349

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 134

1        THE WITNESS:  Could you
2  clarify that a little bit?
3  BY MR. BASSMAN:
4        Q.  Sure.  Leaving aside the
5  loss of the age 55 early retirement
6  option, putting that to the side, do
7  you believe that Conectiv switching
8  from the old ACE plan to the cash
9  balance plan made you worse off in
10  any way?
11        MR. SAUDER:  Objection.
12  Ambiguous.
13        THE WITNESS:  Financially I
14  feel it has.
15  BY MR. BASSMAN:
16        Q.  In what way?
17        A.  I feel the benefit is less.
18  Based on my calculations, the
19  benefit's less.
20        Q.  Anything else?
21        A.  The cash balance plan
22  itself or the lawsuit I mean?
23        Q.  No.  Just the cash balance.
24        A.  No, I'm not aware of any.

Page 135

1        Q.  Okay.  By the way, you can
2  put Defendant's 25 to the side in the
3  increasingly large done pile.
4        One of the things that you
5  testified about earlier is that it's
6  your understanding that the interest
7  rate that the cash balance plan
8  applies to your account each year
9  changes year to year, right?
10        MR. SAUDER:  I would just
11  caution the witness with regard to
12  the fact that anything you learned in
13  attorney-client communications, to
14  not convey.
15        If there's something you
16  learned prior to retaining an
17  attorney or outside of the
18  attorney-client communication you can
19  answer.
20        THE WITNESS:  I kind of
21  like to hold off on that, because I'm
22  not sure when I heard it or how I
23  heard it.
24  BY MR. BASSMAN:

Page 136

1        Q.  You can't say, just so I'm
2  clear, leaving aside any discussions
3  you might have with your attorney,
4  you cannot say that you have an
5  understanding as to how the interest
6  credit mechanism works in the cash
7  balance plan?
8        A.  Just by the documents that
9  have been provided, they showed that
10  it varies.  It averages eight percent
11  based on the U.S. Treasury, you know.
12        Q.  So leaving aside your
13  discussions with attorneys, you did
14  understand that the interest credit
15  rate does change year to year?
16        A.  That's what the documents
17  say.
18        Q.  Do you have any reason to
19  believe the documents are false in
20  any way in that regard?
21        A.  No.
22        Q.  Do you believe they're
23  true?
24        A.  Yes.  I guess, yeah.

Page 137

1        Q.  And you also testified
2  earlier that it's your understanding
3  that the interest credit rate is
4  pegged to the treasury rate in some
5  way.
6        A.  In some way.
7        Q.  Do you believe that the
8  fact that the interest credit rate
9  changes year to year is unfair to
10  you?
11        MR. SAUDER:  Objection.
12  Again, I would just caution you not
13  to answer if it's going to breach any
14  attorney-client communications.
15        If you can answer that
16  question outside the scope of any
17  communications you had with counsel,
18  you can answer.
19        THE WITNESS:  I can't at
20  that point then.
21  BY MR. BASSMAN:
22        Q.  Okay.  Any knowledge you
23  have would come from your
24  attorney-client communications?

35 (Pages 134 to 137)

B0350

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 138

1    A.  That's correct.
2    Q.  Okay.  I assume you would
3  give me the same answer if I changed
4  the word unfair to harm or injury in
5  the question?
6    A.  Yes.
7    Q.  I've kind of reached a
8  logical stopping point and if it's
9  okay with everyone, let's take a
10  break for lunch.
11    A.  Sure.
12    MR. BASSMAN:  We'll
13  reconvene at 1:15.
14    (Luncheon recess at
15  12:17 p.m.)
16    (Testimony resumed at
17  1:34 p.m.)
18  BY MR. BASSMAN:
19    Q.  On the record.  Good
20  afternoon, Mr. Fink.  I wanted to
21  switch gears with you.
22    A.  Mr. Ward.
23    Q.  Mr. Ward.  Excuse me.  I'm
24  sorry.

Page 139

1    A.  I've been called a lot of
2  things.
3    Q.  I'm thinking of tomorrow.
4    A.  Never Fink.
5    Q.  Did you ever hear of a
6  dispute dealing with pension plan
7  computations between Local 210 and
8  Conectiv?
9    MR. SAUDER:  Objection.
10    THE WITNESS:  Could you
11  rephrase the question, please?
12  BY MR. BASSMAN:
13    Q.  Sure.  There was a union
14  that represented certain employees of
15  Atlantic City; is that right?
16    A.  Yes.
17    Q.  Is that Local 210?
18    A.  Yes, it is.
19    Q.  And what's the parent
20  union?  Local 210 of?
21    A.  IBEW.
22    Q.  International Brotherhood
23  of Electrical Workers?
24    A.  Yes.

Page 140

1    Q.  And the union has a
2  separate plan than the cash balance
3  plan?
4    A.  Yes.
5    Q.  For the union's members I
6  mean.
7    A.  Yes.
8    Q.  They're covered in a
9  different plan.
10    A.  Yes, they are.
11    Q.  And that plan that they're
12  covered on is the old ACE plan that
13  you used to be covered under, right?
14    A.  Yes, it is.
15    Q.  Their plan never converted
16  over to the cash balance plan.
17    A.  That's correct.
18    Q.  Are you aware of any
19  disputes between Local 210 and
20  Conectiv's management about how to
21  calculate pension payments under
22  their plan?
23    A.  No, I'm not.
24    Q.  Were the lump sums

Page 141

1  available under the old ACE plan?
2    A.  To who?
3    Q.  To a retiring employee.
4  Could you take your benefit as a lump
5  sum?
6    A.  Yes.
7    Q.  Like Mr. Rehr did.
8    A.  That's correct.
9    Q.  And do you have any
10  understanding as to how those lump
11  sums were computed under the old ACE
12  plan?
13    A.  No, I don't.  Not the
14  specifics.
15    Q.  Do you have any general
16  understanding as to how they were
17  computed?
18    A.  Very general knowledge
19  using some formula -- let me back up
20  and say if no, I really don't have
21  any detail on that.
22    Q.  Tell me what you got.
23    A.  Okay.  It's a, it's a
24  calculated number based on some

36 (Pages 138 to 141)

B0351

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 142

1  federal, federal guidelines. There's
2  like a -- I can't even explain it. I
3  don't really have any specifics.
4      Q.  When you say federal
5  guidelines, those federal guidelines
6  that deal in some way or another with
7  interest rates?
8      A.  It's like a --
9      MR. SAUDER:  Again, I would
10 just object to the extent if it
11 involves any attorney-client
12 communication.
13     Other than that, if you can
14 answer the question without
15 discussing anything that was
16 discussed with your counsel, go ahead
17 and answer the question.
18     THE WITNESS:  The old plan
19 was calculated I think using -- I
20 can't remember the name of the, the
21 P --
22 BY MR. BASSMAN:
23     Q.  PBGC?
24     A.  Yes. That number was

Page 143

1  involved along with some other number
2  and it looked at the -- it looked at
3  also an interest rate, but I don't
4  know what it was based on. Probably
5  some kind of a bond rate or something
6  was involved, I think.
7      Q.  Do you remember any
8  disagreement between Local 210 of the
9  IBEW and Conectiv's management about
10 what interest rate should be used in
11 the lump sum calculation for the
12 union members?
13     A.  No specifics on it, no, I
14 don't.
15     Q.  Anything more general that
16 you heard about that?
17     A.  No, I don't.
18     Q.  You testified earlier, Mr.
19 Ward, that your understanding of the
20 cash balance plan is that you get an
21 account, a hypothetical account, that
22 is added to each year, right?
23     A.  Yes.
24     Q.  And you get a statement

Page 144

1  every year from Vanguard that gives
2  you your account balance, right?
3      A.  Yes.
4      Q.  And is it your
5  understanding that when you retire,
6  if you take a lump sum payment, it
7  will be the amount that's listed in
8  your account balance?
9      A.  Yes.
10     Q.  Do you understand that you
11 also have the option under the cash
12 balance plan to take an annuity
13 instead of a lump sum?
14     A.  Yes.
15     Q.  Do you have any
16 understanding as to how the annuity
17 would be computed under the cash
18 balance plan?
19     A.  No, not the details of it.
20 Just that the Vanguard calculator
21 shows what it would be.
22     Q.  When you looked at the
23 Vanguard calculator to see what it
24 would be, did you notice that the

Page 145

1  numbers tended to move around up and
2  down on the annuity?
3      A.  Yes, I did, but I couldn't
4  relate it to the way I ran the
5  Estimator, because I ran so many
6  versions of it, or whether it had to
7  do with some kind of a monthly or
8  yearly. So yes, I did see it change,
9  but I didn't know why.
10     Q.  So from what you saw, as
11 you understood it, for whatever
12 reasons, and I'm not asking you to be
13 an expert actuary certainly or know
14 how this stuff is computed -- I know
15 I probably couldn't give you details
16 how it's computed either, but for
17 whatever reason if you took your
18 payment as an annuity from what you
19 saw under the cash balance plan, the
20 amount of the annuity as a monthly
21 payment seems to go up and down when
22 you ran different tests on the
23 Pension Estimator, right?
24     MR. SAUDER:  Objection with

37 (Pages 142 to 145)

B0352

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 146

1  regard to ambiguity of the question.
2  BY MR. BASSMAN:
3      Q.  You can answer.
4      A.  Yes, I did.
5      Q.  Let's talk for a second
6  about the old plan, the ACE plan.
7  Do you have an understanding as to
8  how -- let me take a step back.  Can
9  we talk about lump sum for a second.
10        You understand that under
11  the old ACE plan before the cash
12  balance plan you could take your
13  benefit in the form of an annuity,
14  right?
15      A.  Yes.
16      Q.  And that would be a certain
17  payment per month for the rest of
18  your life.
19      A.  Yes.
20      Q.  And do you have any
21  understanding as to how the annuity
22  was calculated?
23      A.  Yes.
24      Q.  What's your understanding?

Page 147

1      A.  That it's the average of my
2  highest five of the last ten years
3  and it's 1.6 percent times my number
4  of years service times my highest
5  average peak salary -- the highest
6  average salary for five of the last
7  ten.
8      Q.  Okay.  So in the old plan
9  then, the ACE plan, in terms of your
10  annuity, as long as you're retiring
11  with the same salary history and the
12  same years of service, you know,
13  whether that point hits in 2004,
14  2005, 2006, you should get the same
15  annuity, right?
16      A.  No.  Because my years of
17  service make the multiplier go up.
18      Q.  Assuming that your years of
19  service are the same, the fact that
20  you hit the years of service in '04
21  as opposed to '05 shouldn't affect
22  your annuity.
23      A.  But in '05 I'll have more
24  years than I do in '04.

Page 148

1      Q.  Let me give you a
2  hypothetical.  It will clear this up.
3        If you assume that same,
4  you know, salary history, you retire
5  in 2004 with 30 years, somebody else
6  retires in 2006 with 30 years, under
7  the old ACE plan, the two of you
8  should get the same annuity.
9      MR. SAUDER:  Objection.
10      THE WITNESS:  Yes.
11  BY MR. BASSMAN:
12      Q.  Okay.  Do you have any
13  understanding if the same two
14  hypothetical, you and Mr.
15  hypothetical here, both retiring
16  after 30 years, one of you in '04,
17  one of you in '06, same salary
18  history, do you have any
19  understanding that the two of you
20  would get the same lump sum
21  necessarily under the old plan?
22      A.  Could you repeat the
23  question.  I'm sorry.
24      Q.  Sure.  Going back to this

Page 149

1  hypothetical, two employees under the
2  old ACE plan, both retiring with the
3  exact same salary history, both have
4  30 years of service.  One retires in
5  2004, one retires in 2006.
6        If they both opt for a lump
7  sum payment at retirement, is it your
8  understanding that their lump sum
9  payments will necessarily be the same
10  or could they differ?
11      A.  They could differ.
12      Q.  Why do you think that is?
13      A.  Because of the items I
14  couldn't describe earlier that were
15  variables based on bond rate or
16  whatever you use to calculate that
17  number.
18      Q.  But something varies when
19  you calculate it, the lump sums,
20  under the old plan.  You don't know
21  exactly what, but there's something
22  variable.
23      A.  That's correct.  Could
24  vary, yes.

38 (Pages 146 to 149)

B0353

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 150

1       MR. BASSMAN:  Okay.  I want
2   to go ahead and I'm going to mark a
3   few.
4       (Exhibits D-26 through D-30
5   were marked for identification.)
6   BY MR. BASSMAN:
7       Q.  Mr. Ward, I've just handed
8   you a series of documents marked
9   Defendant's 26, 27, 28 and 29 and 30.
10  If you could take a moment to look
11  them over.
12      A.  Okay.
13      Q.  Have you had a chance to
14  look over Defendant's Exhibit 26, 27,
15  28, 29 and 30?
16      A.  Yes.
17      Q.  Are these documents all
18  copies of statements that you
19  received from Vanguard for your cash
20  balance account?
21      A.  Yes.
22      MR. SAUDER:  I would just
23  ask that these documents also be
24  marked confidential.

Page 151

1       MR. BASSMAN:  Sure.
2       MR. SAUDER:  And this part
3   of the transcript be marked
4   confidential.
5       MR. BASSMAN:  No objection.
6   BY MR. BASSMAN:
7       Q.  And one of the things I
8   noticed, these are in chronological
9   order, Mr. Ward.  The earliest we
10  have is one that goes January 1 of
11  2001 to December 31, 2001.  That's
12  Defendant's 26.
13      A.  Yes.
14      Q.  Did you receive statements
15  in 1999 and in 2000 from Vanguard for
16  the cash balance plan?
17      A.  I assume I did.  I don't
18  know.
19      Q.  Any reason to think you
20  didn't?
21      A.  No.
22      Q.  Did you retain any
23  statements from 1999 or 2000?
24      A.  I sent -- I don't know

Page 152

1   which ones I sent.  I sent all I had
2   to my attorneys.
3       Q.  So whatever you had you
4   sent to --
5       A.  That's correct.
6       Q.  -- your counsel?
7       A.  That's correct.
8       Q.  Do you remember throwing
9   out any statements from Vanguard at
10  any point?
11      A.  I don't remember throwing
12  any out, no.
13      Q.  And do you recall
14  approximately when you sent your
15  statements over to your counsel?
16      A.  It would have been last
17  fall.  2005, fall of 2005.
18      Q.  Is there a file that you
19  have in your home where you keep all
20  these statements?
21      A.  There is now.
22      Q.  Was there in 1999?
23      A.  No.  Not particularly, no.
24      Q.  Back in 1999, was there any

Page 153

1   sort of file or area in your home at
2   all where you kept pension related
3   materials?
4       A.  No.
5       Q.  Was this anywhere in your
6   office where you kept documents or
7   materials that related to your
8   pension plan back in '99?
9       A.  No.  My office moved three
10  or four times.  No.
11      Q.  Looking at Defendant's 26,
12  27, 28, 29 and 30, do you have any
13  reason to believe that any of the
14  information on these Vanguard
15  statements is inaccurate in any way?
16      MR. SAUDER:  Objection.
17  Object just to the extent that it
18  calls for any legal conclusion by a
19  lay witness.  You can answer.
20      THE WITNESS:  I can't
21  validate the numbers, but I assume
22  they're correct.
23  BY MR. BASSMAN:
24      Q.  You have no reason to

39 (Pages 150 to 153)

B0354

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 154

1  believe they're incorrect or not?
2      A.  No.  That's correct.
3      Q.  I want you to look over
4  these statements Defendant's Exhibit
5  26 through 30.  Can you confirm for
6  me that each year your ending account
7  balance is higher than it was for the
8  previous year?
9      A.  Yes.
10     Q.  And in fact, since the cash
11 balance plan has been in effect, has
12 your account balance ever decreased?
13     A.  You mean the ending
14 balance?
15     Q.  Yeah.
16     A.  No.
17     Q.  It always goes higher each
18 time you get a statement?
19     A.  By some number, yes.
20     Q.  Have you ever called
21 Vanguard to discuss anything that
22 appeared on your cash balance plan
23 statement?
24     A.  No.

Page 155

1      Q.  Ever communicated with
2  Vanguard in any way about your cash
3  balance plan account?
4      A.  No.
5          MR. SAUDER:  Just to
6  clarify, with the exception of --
7          MR. BASSMAN:  With the
8  exception of Pension Estimator.
9          THE WITNESS:  Yes.
10         MR. BASSMAN:  I was leaving
11 that to the side.  That's a good
12 clarification.
13 BY MR. BASSMAN:
14     Q.  Okay.  You can put those
15 aside.
16         I want to talk to you a
17 little bit about your claims you've
18 asserted in your Complaint.  Do you
19 understand that one of the claims
20 that you have asserted against
21 Conectiv is that the cash balance
22 plan is age discriminatory?
23     A.  Yes.
24     Q.  What is your understanding

Page 156

1  as to why the cash balance plan is
2  age discriminatory?
3          MR. SAUDER:  You can answer
4  to the extent you don't violate any
5  attorney-client communications.
6          THE WITNESS:  Are you
7  talking about in our Complaint?
8  BY MR. BASSMAN:
9      Q.  I'm just talking in
10 general.  Let me back up for a
11 second.
12         Is it your personal belief,
13 just yes or no sitting here today,
14 that the Conectiv cash balance plan
15 is age discriminatory?
16     A.  Yes.
17     Q.  When did you form that
18 belief?
19     A.  Around 2004.
20     Q.  During your discussions
21 with Mr. Rehr?
22     A.  Yes.
23     Q.  And in 2004, what was the
24 basis of your belief that the cash

Page 157

1  balance plan is age discriminatory?
2      A.  Because I was converted to
3  a plan in my early forties that gave
4  me a reduced benefit that I couldn't
5  make up in the remaining years I have
6  before I reach retirement age.
7      Q.  Okay.  So just so I'm a
8  little clear on what the issue is
9  here, if the cash balance plan had
10 existed from your first day at
11 Atlantic City, you wouldn't have
12 considered it age discriminatory?
13     A.  Not based on the
14 information I have, no.
15     Q.  Interest credits are given
16 to everyone the same amount
17 regardless of age -- same rate,
18 excuse me, regardless of age each
19 year?
20         MR. SAUDER:  Objection.
21 Can you rephrase the question?
22         MR. BASSMAN:  Sure.
23 BY MR. BASSMAN:
24     Q.  I'll make it a little

40 (Pages 154 to 157)

B0355

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 158

1  clearer.  The cash balance plan
2  provides the same interest credit
3  rate for each employee each year
4  regardless of age, right?
5       MR. SAUDER:  I would again
6  object.  I would just object to the
7  extent it violates any
8  attorney-client communication.  If
9  you can answer beyond that.
10       THE WITNESS:  Yeah, I'd
11  rather not answer that.
12  BY MR. BASSMAN:
13     Q.  So independent of
14  discussions with your counsel, I just
15  want to be clear, you have no
16  understanding as to whether a
17  participant in the Conectiv cash
18  balance plan's interest credit rate
19  for a particular year is different
20  based on age?
21     A.  Based on the documentation
22  from the cash balance plan it says
23  that the interest rates are the same
24  for everybody regardless of age.

Page 159

1     Q.  And do you have any reason
2  to believe those documents are false?
3     A.  That's where I have to rely
4  on...
5     Q.  Okay.  Outside of
6  discussions with counsel, do you have
7  any reason to believe those documents
8  are false?
9     A.  No.
10     Q.  Then in addition there's a
11  what's called a pay credit under the
12  cash balance plan, right, that's
13  added to your account balance each
14  year?
15     A.  Uh-huh.
16     Q.  Is that yes?
17     A.  Yes.  I'm sorry.  Yes.
18     Q.  And the pay credit is a
19  certain percentage of your salary
20  gets credited into the account,
21  right?
22     A.  Yes.
23     Q.  And that pay credit rate
24  does vary with age, right?

Page 160

1     A.  Yes.
2     Q.  And older employees get a
3  higher pay credit rate than younger
4  employees, right?
5     A.  Yes.
6     Q.  So in terms of the pay
7  credit rate, the plan is tilted in
8  favor of older employees, right?
9       MR. SAUDER:  Objection.
10       THE WITNESS:  I agree they
11  get a higher percent.  Is it -- I
12  don't know where the curve takes it,
13  but they do get a higher percent.  So
14  there is some advantage for the older
15  employees.
16  BY MR. BASSMAN:
17     Q.  There's also something
18  called the transition credit, right?
19     A.  Yes.
20     Q.  What is your understanding
21  of what a transition credit is?
22     A.  Boy, I don't remember
23  exactly.
24     Q.  Do you recall a transition

Page 161

1  credit rate -- let me see if I can
2  jog your memory a little -- being a
3  credit that certain long-term
4  employees got of Conectiv at the time
5  of the conversion?
6       MR. SAUDER:  Objection to
7  the term long-term employee.
8       MR. BASSMAN:  I'll
9  rephrase.
10  BY MR. BASSMAN:
11     Q.  Take a look at Defendant's
12  20.  Defendant's Exhibit 20 is a copy
13  of the Complaint that your counsel
14  filed on your behalf in this case.
15       If you could turn to page
16  ten of the Complaint.  You'll see
17  there's a chart on the top of the
18  page that your counsel prepared.
19     A.  Yes.
20     Q.  Do you see that?
21     A.  Yes, I do.
22     Q.  And then on one side of the
23  chart is years of service and on the
24  other is transition crediting rate?

41 (Pages 158 to 161)

B0356

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 162

1    A.  Yes.
2    Q.  Does this chart refresh
3  your recollection that for employees
4  of a certain tenure in the cash
5  balance plan there's an additional
6  transition crediting rate that's
7  added to your account balance?
8    A.  Yes.
9    Q.  And that's a feature that
10  will favor longer term employees,
11  right?
12    A.  Yes.
13    Q.  How long have you been with
14  the company, sir?
15    A.  25 years.
16    Q.  So you are eligible for the
17  maximum transition crediting rate;
18  correct?
19    A.  Yes.
20    Q.  So as compared to say an 18
21  year old who would be hired tomorrow
22  by Conectiv, you will have a higher
23  pay credit rate and a higher
24  transitioning crediting rate for your

Page 163

1  account, right?
2    A.  Yes.
3    Q.  And the same interest
4  credit rate?
5    A.  Yes.
6    Q.  So purely based on the fact
7  that you would be older than the 18
8  year old new hire and that you have
9  worked longer, you'll be getting
10  money added to your account at a
11  faster rate; correct?
12    A.  Yes.
13        MR. SAUDER:  Objection.
14  BY MR. BASSMAN:
15    Q.  Now, to go back to when we
16  started talking a little bit earlier
17  about your belief about age
18  discrimination in 2004, who did you
19  believe were the victims of
20  discrimination then?
21    A.  My belief was really
22  anybody over the age of about 40 that
23  you wouldn't really have enough years
24  to even change employers to make up

Page 164

1  the difference in the retirement
2  fund.
3    Q.  So it would be those
4  employees who are over 40 but too
5  young to get the grandfather benefit?
6    A.  That's correct.
7    Q.  In your opinion, again,
8  just your personal opinion, do you
9  believe that any employees of
10  Conectiv benefited from the
11  conversion to a cash balance plan?
12    A.  I'm personally not aware of
13  any.
14    Q.  Do you think it's possible
15  that anyone could benefit from the
16  conversion to the cash balance plan?
17        MR. SAUDER:  Objection.
18        THE WITNESS:  I'm not an
19  actuary to run the numbers.  I
20  haven't seen it, but I can't answer
21  that.
22  BY MR. BASSMAN:
23    Q.  You don't know one way or
24  the other?

Page 165

1    A.  Yeah.  I don't know one way
2  or the other, that's correct.
3    Q.  Now, you've described for
4  us a couple points why you think that
5  it would be in your personal interest
6  to have the court declare the cash
7  balance plan illegal and reinstate
8  the old ACE plan.  Do you recall that
9  testimony?
10    A.  Yes.
11    Q.  If someone were to benefit
12  financially from the plan conversion,
13  do you believe that they would have
14  different interest than yours?
15    A.  Could you --
16    Q.  Sure.  You believe that
17  it's in your personal financial self
18  interest to have the cash balance
19  plan eliminated and the old ACE plan
20  reinstated, right?
21    A.  Yes.
22    Q.  If the old plan were
23  reinstated, your retirement benefits
24  will be higher, right?

42 (Pages 162 to 165)

B0357

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 166

1    A.   Yes.
2    Q.   And in order to achieve
3  that result, you filed this lawsuit,
4  right?
5    A.   Yes.
6    Q.   If somebody's benefits
7  would be higher under the cash
8  balance plan than the ACE plan, do
9  you believe it would be in their self
10 interest for this lawsuit to win?
11      MR. SAUDER:  Objection.
12      THE WITNESS:  I mean, if it
13 would financially hurt them to go
14 back to the --
15 BY MR. BASSMAN:
16   Q.   Yes.
17   A.   I can't see how it could be
18 in their best interest unless there's
19 years of retirement involved.
20 Because if they could retire five
21 years sooner, what's that worth.  I
22 don't know.  I can't put a number on
23 that.
24      So to answer that question,

Page 167

1  I would have to try to put myself in
2  somebody else's shoes which is hard
3  to do.
4    Q.   Okay.
5    A.   Because the financial piece
6  isn't the only piece.
7    Q.   What would the other piece
8  be?
9    A.   Five years not working.
10   Q.   So just the ability to
11 leave early?
12   A.   Yes.
13   Q.   And when you say the
14 ability to leave early, I assume you
15 mean the ability to retire early with
16 full retirement benefits, right?
17   A.   That's correct.
18   Q.   There's nothing that would
19 stop you tomorrow from retiring,
20 right?
21      MR. SAUDER:  Objection.
22 BY MR. BASSMAN:
23   Q.   If you wanted to.
24   A.   If I had the age, you know.

Page 168

1    Q.   You could choose to retire
2  today; you would just have lower
3  benefits --
4    A.   Yes.
5    Q.   -- than if you continued to
6  work longer, right?
7    A.   Yes.  But under the ACE
8  plan I couldn't retire today.  You
9  would have to be 55.
10   Q.   To retire with full
11 benefits?
12   A.   Even, even under the old
13 plan you have to be 55 years of age
14 to go under ACE.
15   Q.   Okay.  If you retire today,
16 do you have any understanding as to
17 whether you would be paid any
18 benefits?
19   A.   Define benefits.
20   Q.   Could you get your account
21 balance paid to you in a lump sum if
22 you retired today?
23   A.   Yes.
24   Q.   Was that the case under the

Page 169

1  old plan?
2    A.   No.
3    Q.   Is that an advantage of the
4  cash balance plan?
5    A.   To someone that was
6  planning on leaving, yes.  And that
7  was a portable plan, and that is one
8  advantage.
9    Q.   So for somebody who's a
10 shorter term employee, the cash
11 balance plan may be better than the
12 old ACE plan?
13   A.   It's possible, yes.
14   Q.   If you decided to change
15 jobs tomorrow since -- I assume
16 you're under age 55 right now?
17   A.   Yes, I am.
18   Q.   If you decided to change
19 jobs tomorrow, you will have
20 benefited from the conversion, won't
21 you?
22      MR. SAUDER:  Objection.
23      THE WITNESS:  Not
24 necessarily.

43 (Pages 166 to 169)

B0358

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 170

1  BY MR. BASSMAN:
2     Q.   Well, how old are you, sir?
3     A.   51 and a half.  Almost 52.
4     Q.   Okay.  So if you decided to
5  take a job with a new employer today,
6  under the cash balance plan you could
7  receive your current account balance
8  as a lump sum, right?
9     A.   That's correct.
10    Q.   If the old ACE plan were in
11 place, if you switched to another job
12 today, could you receive your
13 benefits today in a lump sum payment?
14    A.   No.  I'm not aware, no.
15    Q.   As far as you know.
16    A.   As far as I know I
17 couldn't, no.
18    Q.   Do you consider that to be
19 an advantage, the ability to know
20 that you can switch jobs and get an
21 immediate pension payment?
22    A.   Not when the number would
23 be that much smaller.  I would just
24 wait until I'm 55 and get my ACE

Page 171

1  plan.
2     Q.   What about for an employee
3  who is just -- again, you know, to
4  the best of your understanding, an
5  employee who's 30 years old who's
6  thinking about switching jobs after
7  working at Conectiv for ten years.
8        Do you believe they would
9  be in a better position under the
10 cash balance plan than the old ACE
11 plan?
12       MR. SAUDER:  Objection
13       THE WITNESS:  I can't
14 answer that question for somebody
15 else.  I don't know.  There might
16 still be.  I don't know their
17 numbers.
18       There could be a dramatic
19 difference between their cash balance
20 and they're vested at ACE plan, if
21 they're under the ACE plan.
22       So they might want to leave
23 that in the ACE plan, too, until
24 they're 55 and then draw it.  You

Page 172

1  know, I don't have those numbers.
2  BY MR. BASSMAN:
3     Q.   In your experience at
4  Conectiv, do you know anyone when
5  they retired or left the company who
6  turned down an option to take an
7  immediate lump sum payment?
8     A.   As in?  Could you, could
9  you rephrase?
10    Q.   Sure.  One of the things
11 you mentioned in response to my
12 hypothetical about a 30 year old
13 employee who might want to change
14 jobs is they might have thought that
15 they'd be better off letting their
16 money sit in the ACE plan and taking
17 it at age 55 rather than taking a
18 lump sum right now in the cash
19 balance plan, right?
20    A.   Possibly.
21    Q.   I was just wondering if in
22 your experience at Conectiv if you
23 know anyone who when they had the
24 chance to take an immediate lump sum

Page 173

1  on leaving the company turned it
2  down.
3     A.   I don't know of anybody.
4     Q.   One of the things that you
5  mentioned is a 30 year old could
6  leave the money to sit for 25 years,
7  right, and take their pension at 55?
8     A.   If they were vested I think
9  they can.  To my knowledge.
10    Q.   Assuming they're vested.
11    A.   Okay.
12    Q.   There is a risk, isn't
13 there, that the 30 year old could
14 die?  We're talking under the old ACE
15 plan.
16    A.   Uh-huh.
17    Q.   There's a risk, isn't
18 there, that the 30 year old could die
19 in the intervening years, right?
20    A.   Oh, yeah.
21    Q.   A risk that the plan could
22 become insolvent?
23    A.   Yes.
24    Q.   A risk that the money

44 (Pages 170 to 173)

B0359

Page 174

1  either Mr. 30 year old won't be here
2  to get the money or the money won't
3  be there for him in 25 years, right?
4      A.  Yes.
5      Q.  And you eliminate that risk
6  when you can get an immediate lump
7  sum payment under the cash balance
8  plan, right?
9      A.  Yes.
10     Q.  And there's real value to
11 eliminating that risk, isn't there?
12     MR. SAUDER:  Objection.
13     THE WITNESS:  I'm sure
14 there is, yes.
15 BY MR. BASSMAN:
16     Q.  I mean it's a benefit of
17 the cash balance plan.
18     A.  Sure.
19     Q.  It's a positive thing.
20     A.  Yes.
21     Q.  Now, switching gears for a
22 minute.  We spent a lot of time this
23 morning going over many documents
24 from '97, '98 and '99 about the cash

Page 175

1  balance conversion.  I assume you
2  recall having looked through all
3  those this morning.
4      A.  Yes.
5      Q.  Do you believe that any of
6  those documents omitted information
7  that should have been included in the
8  notice to you?
9      MR. SAUDER:  Again, I would
10 just object to the extent that it
11 involves any attorney-client
12 communication.
13     THE WITNESS:  With the
14 exception of information we've
15 discussed, I'm not aware of any.
16 BY MR. BASSMAN:
17     Q.  And again, leaving aside
18 anything that may have been discussed
19 between you and your attorney,
20 looking back, is there any
21 information that you wished had been
22 orally presented to you at the two
23 meetings you attended about the cash
24 balance conversion?

Page 176

1      MR. SAUDER:  I'm sorry.
2  Can you just repeat that question.
3      (The reporter read back the
4  following testimony:
5      "Q.  And again, leaving
6  aside anything that may have been
7  discussed between you and your
8  attorney, looking back, is there any
9  information that you wished had been
10 orally presented to you at the two
11 meetings you attended about the cash
12 balance conversion?")
13     MR. SAUDER:  I would just
14 object to the form, but if you
15 understand the question you can
16 answer.
17     THE WITNESS:  The two
18 meetings I attended were very
19 general.  So I mean, I mean the plan
20 wasn't even -- I don't even think the
21 plan was actually formalized by that
22 point in time.  So I mean --
23 BY MR. BASSMAN:
24     Q.  I'll ask it even more

Page 177

1  broadly then.
2      Other than what you may
3  have discussed with your attorneys,
4  is there anything at all that you
5  wish in hindsight Conectiv had
6  communicated to you in 1998 and 1999
7  about the cash balance plan
8  conversion?
9      A.  Not the conversion as much
10 as the plan itself, because it was
11 presented to me, the things I
12 remember about the cash balance plan
13 presentations were the rah, rah
14 how good it would be for us, and not
15 how there was such a dramatic
16 difference at, at age 55 or 65 at the
17 time of retirement.
18     So I had no, no
19 understanding it was that dramatic of
20 a difference until just a few years
21 ago.
22     Q.  So in retrospect, you
23 wished that in 1998 and 1999 Conectiv
24 had given you more detail comparing

45 (Pages 174 to 177)

B0360

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 178

1  how much your benefits would be under
2  the cash balance plan versus the old
3  ACE plan?
4      A.  That's correct.
5      Q.  Anything else you wish they
6  told you back -- anything else you
7  wish that Conectiv had communicated
8  to you back in 1998 and 1999?
9          MR. SAUDER:  With regard to
10  that cash balance plan?
11  BY MR. BASSMAN:
12      Q.  Yes.
13      A.  I'm not aware of any.
14      Q.  One of the notices that we
15  looked at earlier was dated December
16  21, 1998.  Do you recall seeing that?
17      A.  Yes.  The one in December,
18  yes.
19      Q.  If you had received that on
20  December 21st, 1998, I know you can't
21  remember whether you did or didn't,
22  just assume that for the sake of this
23  question, would you have acted any --
24  let me strike that.  Let me rephrase.

Page 179

1          Would it have made any
2  difference to your actions if you
3  received that exact notice on
4  December 18th, 1998, as opposed to
5  December 21st, 1998?
6          MR. SAUDER:  I would just
7  object and ask that he be shown the
8  document.
9          THE WITNESS:  Yeah.  Can I
10  see the document?  I'm sorry.
11  BY MR. BASSMAN:
12      Q.  Sure.  The document, again,
13  if you could just read off the
14  Exhibit Number on the bottom, Mr.
15  Ward.
16      A.  D-6.
17      Q.  6.
18      A.  I'm sorry.  Can you repeat
19  the question, please.
20      Q.  Sure.  For the notice
21  that's dated December 21, 1998 that
22  was marked as Defendant's Exhibit 6,
23  would you have acted any differently
24  in your life if you received that

Page 180

1  notice on December 18th as opposed to
2  December 21st of 1998?
3      A.  Probably not.
4      Q.  Thanks.  That's all.
5          Do you understand that one
6  of the claims that your attorneys
7  have asserted in their Complaint in
8  this case is that the cash balance
9  plan is impermissibly backloaded?
10      A.  Yes.
11      Q.  And what is your
12  understanding of backloading?
13          MR. SAUDER:  Again, just
14  object just to the extent it involves
15  any attorney-client communications.
16  If you can answer it outside any
17  attorney-client communications, go
18  ahead and answer it.
19          THE WITNESS:  That's how I
20  had it explained so.
21  BY MR. BASSMAN:
22      Q.  Did you before you met with
23  attorneys at the Chimicles firm, did
24  you have any belief one way or the

Page 181

1  other as to whether the cash balance
2  plan was impermissibly backloaded?
3      A.  No.
4      Q.  In your Complaint you
5  understand that you are asking the
6  court to appoint you as a
7  representative of a class of other
8  persons; correct?
9      A.  Yes.
10      Q.  And those other persons
11  would be everybody else, almost
12  everybody else that participates in
13  the cash balance plan, right?
14      A.  Yes.
15      Q.  If the court were to
16  appoint you as a class
17  representative, what is your
18  understanding as to your obligations
19  to the other members of the class?
20      A.  To ensure that the class is
21  represented, the entire class.
22      Q.  And when you say to ensure
23  the entire class is represented, what
24  does that mean to you?

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 182

1    A.  Everybody that's in the
2  same non grandfathered situation that
3  I am would be covered.
4    Q.  And what do you understand
5  you're supposed to do as a class
6  representative for them?
7    A.  Provide testimony, provide
8  documentation.
9    Q.  Do you believe that you
10  could represent a member of a class
11  whose financial interests were
12  different from yours as regards the
13  cash balance plan?
14      MR. SAUDER:  I'm sorry.
15  Can you read back the question.
16      (The court reporter read
17  back the following:
18      "Q.  Do you believe that
19  you could represent a member of a
20  class whose financial interests were
21  different from yours as regards the
22  cash balance plan?")
23      MR. SAUDER:  I'll object to
24  the extent that the question is

Page 183

1  ambiguous.  If you understand what
2  he's asking, you can answer the
3  question.
4      THE WITNESS:  Could you
5  explain it a little more?
6  BY MR. BASSMAN:
7    Q.  Sure.
8    A.  I think I know what you
9  mean but I want to --
10    Q.  Okay.  You understand that
11  as a class representative, if you're
12  appointed, you will be prosecuting
13  this lawsuit on behalf of thousands
14  of other people, right?
15    A.  Yes.
16    Q.  And that you will have an
17  obligation to look after their
18  interests; correct?
19    A.  Yes.
20    Q.  Would you be able to
21  advance the interests of somebody
22  whose own financial interest
23  conflicted with yours?
24      MR. SAUDER:  I would object

Page 184

1  to the term conflicted.
2      THE WITNESS:  One person
3  that would have a different interest
4  than the other 19,999?
5  BY MR. BASSMAN:
6    Q.  Sure.  Just say one for
7  example.  Could you represent that
8  one person?
9    A.  My interest is for the
10  class.  If it's going to hurt the
11  other 1,999, I don't know how to
12  answer that.
13      MR. BASSMAN:  I think I'm
14  actually pretty close to wrapping up.
15  Let's take ten minutes and I want to
16  go over my notes.
17      RECESS
18  BY MR. BASSMAN:
19    Q.  Back on the record.  Just a
20  few more questions, Mr. Fink, a
21  couple things I just wanted to nail
22  down.
23    A.  Mr. Ward.
24    Q.  Mr. Ward.  I keep wanting

Page 185

1  to jump ahead to tomorrow.  Do you
2  guys look alike at all by the way?
3    A.  No.  No.  He'll probably
4  take offense to that.
5    Q.  One of the things we talked
6  about earlier with the Pension
7  Estimators, the calculations that you
8  ran which are here as Exhibit 21.
9    A.  Yes.
10    Q.  When you put in a request
11  for a Pension Estimator calculation,
12  do you recall if you put in a
13  termination date?
14    A.  Yes.  And that's part of
15  why there were so many of them run.
16  There's like a -- I can't remember
17  the terminology, if it's a
18  termination date or last day worked,
19  and then the other one is the day you
20  draw your pension I think is the
21  other.
22    Q.  Okay.  So you put in both
23  day you want to start on your pension
24  and the last day you worked?

47 (Pages 182 to 185)

B0362

ORAL DEPOSITION OF MAURICE W. WARD, JR., 1/10/07

Page 186

1    A.  Yes.  And if you put down a
2  different dates, the number changes.
3    Q.  When you say if you put
4  down different dates, different dates
5  for either one?
6    A.  Yes.  Yes.  So if I put
7  last day worked today, but I don't
8  draw my pension until 2020, it
9  changes the Pension Estimator, which
10  I don't know if it's valid even, but
11  it allows you to do it.
12    Q.  Okay.
13    A.  But that's why there's a
14  lot of numbers there.
15    Q.  Another question, and this
16  is even of the old ACE plan, and I
17  apologize if this question is about
18  to become a little morbid, but if
19  there were never a cash balance plan
20  and you were still under the old ACE
21  plan and you were to die today, what
22  is your understanding as to what
23  happens to your pension benefit?
24    A.  It's my understanding --

Page 188

1    MR. SAUDER:  Objection.
2    THE WITNESS:  More
3  generous.
4    MR. BASSMAN:  Okay.  That's
5  all I've got.  I don't know if you
6  have any questions.
7    MR. SAUDER:  I have no
8  questions.
9    MR. BASSMAN:  You guys are
10  reading and signing?
11    MR. SAUDER:  Yes.
12    MR. BASSMAN:  You are a
13  free man.
14    (Testimony concluded at
15  2:30 p.m.)
16
17
18
19
20
21
22
23
24

Page 187

1  it's my understanding that under the
2  cash balance plan I think my, whoever
3  the survivor is, would get some
4  portion or some of it.
5    Q.  Leaving aside the cash
6  balance plan.  Under the old plan.
7    A.  Under the ACE plan?  I'm
8  not sure.
9    Q.  Did you ever read or hear
10  anything about how under the ACE plan
11  if you were to die before you began
12  drawing your pension, that your
13  surviving spouse would only get half
14  of your pension, not the full
15  pension?
16    A.  I don't remember reading
17  that, but I assume there is a
18  difference because of the way the
19  wording in the cash balance plan is,
20  so...
21    Q.  And in this respect, in
22  terms of surviving benefits on death,
23  is the cash balance plan more or less
24  generous than the old ACE plan?

Page 189

1    WITNESS CERTIFICATION
2
3    I hereby certify that I
4  have read the foregoing transcript of
5  my deposition testimony, and that my
6  answers to the questions propounded,
7  with the attached corrections or
8  changes, if any, are true and
9  correct.
10
11
12  _____  _____
   DATE       MAURICE W. WARD, JR.
13
14
15
16
17
18
19  _____
   PRINTED NAME
20
21
22
23
24

48 (Pages 186 to 189)

B0363

# In The Matter Of:

*J. Michael Charles, et al*
*v.*
*Pepco Holdings, Inc., et al*

---

*BENJAMIN D. WILKINSON*
*April 4, 2007*

---

## *REPORTING ASSOCIATES, LLC*

*Certified & Registered Professional Reporters*

*Cherry Hill   --   Philadelphia   --   Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

B0364

BENJAMIN D. WILKINSON

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
      ---------------------------
 3  J. MICHAEL CHARLES; MAURICE      CIVIL ACTION
    W. WARD, JR.; and JOSEPH I.
 4  FINK, JR.; on behalf of
    themselves and all others
 5  similarly situated,

 6            Plaintiffs,

 7        v.

 8  PEPCO HOLDINGS, INC.;
    CONECTIV, and PEPCO HOLDINGS
 9  RETIREMENT PLAN,

10            Defendants.        NO. 05-702(SLR)
      ---------------------------
11
              Philadelphia, Pennsylvania
12            Wednesday, April 4, 2007

13            Transcript of testimony of BENJAMIN D.

14  WILKINSON, as taken by and before DENISE M.

15  PITCHFORD, Registered Professional Reporter and

16  Notary Public, at the offices of PEPPER HAMILTON,

17  LLP, 3000 Two Logan Square, 18th & Arch Streets,

18  commencing at 10:11 o'clock in the forenoon.

19

20

21

22

23

24
```

B0365

BENJAMIN D. WILKINSON

Page 2

1  A P P E A R A N C E S :
2    CHIMICLES & TIKELLIS, LLP
      BY:  JOSEPH G. SAUDER, ESQ.
3    One Haverford Centre
      361 West Lancaster Avenue
4    Haverford, PA 19041
      (610) 642-8500
5    JosephSauder@Chimicles.com
      Attorneys for Plaintiffs
6
      PEPPER HAMILTON, LLP
7    BY:  KAY KYUNGSUN YU, ESQ.
      3000 Two Logan Square
8    18th & Arch Streets
      Philadelphia, PA 19103-2799
9    (215) 981-4188
      yukay@pepperlaw.com
10   Attorneys for Defendants
11
12   A L S O  P R E S E N T :
13     BARBARA C. ALEXANDER
14
15
16
17
18
19
20
21
22
23
24

Page 3

1                 I N D E X
2  WITNESS                          PAGE
3  BENJAMIN D. WILKINSON
4    By Mr. Sauder            4,129
5    By Ms. Yu                  123
6
7              E X H I B I T S
8  NUMBER        DESCRIPTION        PAGE
9  P-16          Notice of Deposition    14
10
11
12  REQUEST FOR PRODUCTION:
13            PAGE          LINE
14            123            9
15
16  DIRECTIONS NOT TO ANSWER:
17            PAGE          LINE
18            13            10
19
20
21
22
23
24

Page 4

1            (It is hereby stipulated and
2  agreed by and between counsel that sealing,
3  certification and filing are waived;
4            It is further stipulated and agreed
5  by and between counsel, that all objections, except
6  as to the form of the question, are reserved until
7  the time of trial.)
8            BENJAMIN D. WILKINSON, after having
9  been first duly sworn, was examined and testified
10  as follows:
11  EXAMINATION
12  BY MR. SAUDER:
13     Q.     Good morning, sir.
14     A.     Good morning.
15     Q.     Sir, can you state your name and
16  address?
17     A.     Benjamin D. Wilkinson, 131 Montchan
18  Drive, Greenville, Delaware.
19     Q.     Do you have any other addresses?
20     A.     No.
21     Q.     Are you currently employed?
22     A.     No.
23     Q.     Have you given a deposition before?
24     A.     No.

Page 5

1     Q.     Okay.  Let me just go through some
2  brief background.  I'm sure you've already
3  discussed this with your attorney, but if at any
4  point you don't understand a question that I ask, I
5  ask that you ask me to rephrase the question.
6  Otherwise, if you answer the question, I will
7  assume that you understood the question.
8     A.     Got you.
9     Q.     Also, I ask that you give all of
10  your answers verbally, so that the court reporter
11  can take down your answers.  And try and refrain
12  from nodding your head yes or no.  If you just give
13  verbal answers.
14     A.     Okay.
15     Q.     And I just ask that you let me
16  finish my question before you answer the question,
17  and I will do the same for you, so that the court
18  reporter can take everything down, okay?
19            If at any point in this deposition
20  you need a break, just let us know and we will
21  accommodate you.  I just ask that if there's a
22  question pending, that you answer the question
23  before we take a break.
24            Can you tell me what your

2 (Pages 2 to 5)

B0366

BENJAMIN D. WILKINSON

Page 6

1  educational history is after high school?
2      A.    I went to Hobart College, and then I
3  got an MBA from the University of Buffalo.
4      Q.    And did there come a time when you
5  were employed by Conectiv?
6      A.    Yes.
7      Q.    And when was that?
8      A.    The late '90s.
9      Q.    When exactly?
10     A.    I think it was '96 through '99.
11     Q.    When was your final day at Conectiv?
12     A.    It was in the fall of '99, I think.
13     Q.    Going backwards from 1996, where did
14  you work prior to Conectiv?
15     A.    DuPont.
16     Q.    And when were you at DuPont?
17     A.    When?
18     Q.    Yeah, what time frame.
19     A.    31 years.
20     Q.    And what did you do at DuPont?
21     A.    Human resource work, compensation of
22  benefits.
23     Q.    Is that what you did the entire time
24  you were at DuPont?

Page 7

1      A.    No.  I had a stint in the
2  International Department and a stint in Labor
3  Relations, and we were in three different plant
4  sites.
5      Q.    And during the time that you were in
6  compensation and benefits, how long a time period
7  were you in that department?
8      A.    On and off, probably about 10 years.
9      Q.    And when you left DuPont, is that
10  the department you left from?
11     A.    I left from Human Resources, yes.
12     Q.    What was your official title when
13  you left?
14     A.    Personnel manager.
15     Q.    And in the capacity in Human
16  Resources, what duties and responsibilities did you
17  have at DuPont?
18     A.    As a personnel manager, we handled
19  the personnel issues that went with the staff
20  departments, pay raises, bonus administration,
21  discipline, advice on benefits, counsel to the
22  management.
23     Q.    Did you make decisions regarding the
24  pension plan at DuPont?

Page 8

1      A.    No.
2      Q.    At any point during the time that
3  you were at DuPont, did you have decision-making
4  over the pension plan at DuPont?
5      A.    No.
6      Q.    Did they have a cash balance plan at
7  DuPont?
8      A.    No.
9      Q.    When you -- did you leave DuPont to
10  go to Conectiv?
11     A.    I retired from DuPont.
12     Q.    And were you retired for some period
13  of time before you were hired at Conectiv?
14     A.    One week.
15     Q.    And how is it that you were hired at
16  Conectiv?
17     A.    Conectiv was going, or actually
18  Delmarva was in the process of purchasing Atlantic
19  City Electric, and the manager of compensation and
20  benefits was assigned to the transition team for
21  the merger, so they had an opening and they came to
22  DuPont looking for someone that was recently
23  retired that might take the job as a contractor.
24     Q.    And who did you meet with or

Page 9

1  interview with at that time with Conectiv?
2      A.    Don Cain.
3      Q.    Anyone else?
4      A.    I think I met with the then manager,
5  Moira Donohue, but it was mostly with Don Cain.
6      Q.    Did you know Don Cain prior to
7  interviewing?
8      A.    No.
9      Q.    And what was the arrangement that
10  day?  You said, you came on as a contract employee?
11     A.    Yes.
12     Q.    And what was the arrangement that
13  they set up for you to come on Conectiv as a
14  contract employee?
15     A.    I signed up for a year.
16     Q.    And then what happened at the end of
17  that year?
18     A.    It got extended to another year and
19  then a third year.
20     Q.    Each time it got extended for a full
21  year?
22     A.    As I recall.
23     Q.    And who did you negotiate with at
24  the end of the year?

3 (Pages 6 to 9)

B0367

BENJAMIN D. WILKINSON

Page 10

1    A.    Don Cain.
2    Q.    What was his position at the time?
3    A.    Vice President of Human Resources.
4    Q.    You left in the fall of 1999, is
5  that correct?
6    A.    I think so, yeah.
7    Q.    Did they try and keep you on for
8  another year?
9    A.    No, that was the end.
10    Q.    The end of what?
11    A.    The end of the contract agreements.
12    Q.    Was there a reason that you left at
13  that time?
14    A.    Yeah.  They were down-sizing the
15  human resource function and it didn't seem right to
16  downsize permanent employees when you had
17  contractors on the role.
18    Q.    Did you come there for a specific
19  reason, to accomplish a specific goal?
20    A.    They were going through the
21  acquisition of Atlantic City Electric.  That was
22  the reason they needed somebody.
23    Q.    And what was your understanding of
24  what you would be responsible for when you first

Page 11

1  signed up for the initial first year?
2    A.    Compensation and benefits.
3    Q.    Did you understand that you would be
4  responsible for overseeing any change in the
5  pension plan?
6    A.    Yes.
7    Q.    And overall, any changes that would
8  happen with regard to medical coverage, health
9  insurance?
10    A.    Yes.
11    Q.    Had the merger taken place at the
12  time you first arrived?
13    A.    No.
14    Q.    So, you were initially hired by
15  Delmarva?
16    A.    Yes.
17    Q.    Conectiv was not an entity at that
18  time?
19    A.    Not even named.
20    Q.    Did you play any role in the
21  negotiation of the merger?
22    A.    No.
23    Q.    Do you remember when the merger took
24  place?

Page 12

1    A.    Late '90s is the best I can...
2    Q.    What, if anything, did you do to
3  prepare for the deposition today?
4    A.    I met with the lawyers here for a
5  couple of hours last week.
6    Q.    Okay.  And who did you meet with,
7  without telling me what you discussed, but who did
8  you meet with?
9    A.    Barak.
10        MS. YU:  Barak Bassman.
11        THE WITNESS:  Barak Bassman.
12  BY MR. SAUDER:
13    Q.    Anyone else?
14    A.    Barbara.
15    Q.    Okay.  And did you review any
16  documents?
17    A.    Yes.
18    Q.    And do you remember what documents
19  you reviewed?
20        MS. YU:  I'm going to object to that
21  question.
22  BY MR. SAUDER:
23    Q.    Do you remember how many documents
24  you reviewed?

Page 13

1    A.    Here?
2    Q.    At any time in preparation for this
3  deposition.
4        MS. YU:  I'm going to object to him
5  answering the volume of documents that he reviewed.
6  That's work product.
7  BY MR. SAUDER:
8    Q.    Do you remember what types of
9  documents you reviewed?
10        MS. YU:  I'm going to instruct the
11  witness not to answer that question.
12  BY MR. SAUDER:
13    Q.    Approximately how long did you meet
14  with the attorneys here?
15    A.    Two to three hours.
16    Q.    Did you meet with anyone else?
17    A.    No.
18    Q.    Are you represented by counsel
19  today?
20    A.    Yes.
21    Q.    Indicating for the record, Kay Yu.
22  Prior to meeting with counsel last week, had you
23  ever talked to counsel regarding this case?
24    A.    No.

4 (Pages 10 to 13)

B0368

BENJAMIN D. WILKINSON

Page 14

1    Q.    I will show you what we've marked as
2    Plaintiffs Exhibit 16.
3        (Exhibit P-16 marked for
4    identification.)
5    BY MR. SAUDER:
6    Q.    I'm showing you what has been marked
7    as Plaintiff's 16.  If you could take a look at
8    that document and tell me if you've seen that
9    before today's deposition.  Have you seen this
10   document prior to today's deposition?
11   A.    Not the top two pages.
12       MR. SAUDER:  And just indicating for
13   the record, Plaintiff's Exhibit 16 is the Notice of
14   Deposition that's painted for today's deposition
15   with an attached exhibit requesting certain
16   documents.
17   BY MR. SAUDER:
18   Q.    Other than the top two pages, did
19   you see the other pages?
20   A.    Yes.
21   Q.    Pages 3 through 7?
22   A.    Actually, they look a little
23   different.
24   Q.    Were you served with a subpoena at

Page 15

1    your home?
2    A.    My wife was.
3    Q.    Okay.  And prior to being served
4    with the subpoena, did you know anything about a
5    litigation involving the cash balance plan at
6    Conectiv?
7    A.    No.
8    Q.    When you received this subpoena, did
9    you talk to anybody about the case other than your
10   attorneys?
11   A.    My wife.
12   Q.    Okay.  Anyone else?
13   A.    No.
14   Q.    Did you talk to Don Cain?
15   A.    No.
16   Q.    Have you talked to him since you
17   left the company?
18   A.    No.
19   Q.    Did you talk to anyone at Pepco?
20   A.    Barbara.
21   Q.    Okay.  On Page 6 and 7, this
22   subpoena requests certain documents?
23   A.    Yes.
24   Q.    Did you make an effort to locate any

Page 16

1    documents that were requested in this subpoena?
2    A.    I had absolutely no documents.
3    Q.    Okay.  At the time you were hired by
4    Conectiv and interviewed with Don Cain, you said
5    Conectiv itself hadn't even been in existence,
6    correct?
7    A.    Correct.
8    Q.    And the name itself hadn't been in
9    existence, correct?
10   A.    Correct.
11   Q.    When Don Cain interviewed you, did
12   he -- did you have an understanding that a cash
13   balance plan would be -- a cash balance plan would
14   be implemented at Conectiv?
15   A.    No.
16   Q.    Did you understand there would be
17   changes in the pension plan?
18   A.    Yes.
19   Q.    And what was your conversation
20   regarding the changes that would happen with regard
21   to a pension plan?
22   A.    We were going to hire outside comp
23   and benefits consultants to help us decide what to
24   put in place.

Page 17

1    Q.    And who told you that?
2    A.    I believe Don Cain did.
3    Q.    And did you know who you were going
4    to hire?
5    A.    I don't think so at that point.
6    Q.    Did you have input on who would be
7    hired?
8    A.    Yes.
9    Q.    And who did you ultimately hire?
10   A.    Watson Wyatt.
11   Q.    And was that your choice?
12   A.    Not my decision.
13   Q.    But did you suggest Watson Wyatt?
14   A.    Yes.
15   Q.    Why was that?
16   A.    They appeared to be very capable.
17   Q.    Had you worked with them at DuPont?
18   A.    No.
19   Q.    Did you meet with or interview other
20   actuarial firms?
21   A.    Yes.
22   Q.    Who did you meet with?
23   A.    The one I remember was Fred Cook.
24   Q.    What was your understanding from Don

5 (Pages 14 to 17)

B0369

BENJAMIN D. WILKINSON

Page 18

1  Cain or anyone at Conectiv -- and when I say
2  Conectiv, I also mean Delmarva who you were
3  ultimately hired by -- of why they were looking to
4  change the pension plan at that time?
5      A.    It was going to be a new company and
6  it was going to be, not only a regulated industry,
7  but non-regulated businesses. And I knew they were
8  going to have to move people back and forth between
9  regulated and non-regulated, and that the company
10 would be entirely different. It wouldn't be just a
11 utility anymore. So, they wanted to design a
12 benefit plan that would fit general industry, not
13 utility.
14     Q.    When you say "benefit plan," how do
15 you define benefit plans?
16     A.    The benefit plans, vacation,
17 holidays, health, pension, savings plan, 401(k).
18     Q.    Was there anything specifically
19 discussed about the pension plan?
20     A.    At the beginning?
21     Q.    Yes.
22     A.    No.
23     Q.    Did you meet with Watson Wyatt prior
24 to hiring them?

Page 19

1      A.    We interviewed them.
2      Q.    How many times did you meet with
3  them?
4      A.    I don't recall.
5      Q.    Did you personally meet with them?
6      A.    Yes.
7      Q.    Do you know who you met with?
8      A.    I remember two. John Candelaro, I
9  think it was.
10     Q.    Do you know how to spell that?
11     A.    No. And David Speir. John was the
12 lead. And there was a third person that
13 specialized in health care, and I don't recall her
14 name.
15     Q.    Who would have been at those
16 meetings from Conectiv?
17     A.    At what point?
18     Q.    Initially.
19     A.    Probably my counterpart from
20 Atlantic and maybe Don Cain. Certainly, Don Cain.
21     Q.    Who was your counterpart from
22 Atlantic?
23     A.    Her first name was Maryann, and I
24 can't remember her last name. She was the

Page 20

1  compensation person, and I don't remember the
2  benefits person.
3      Q.    Did John Candelaro and David
4  Speir -- ultimately, were they the two that were
5  the main contact at Watson Wyatt --
6      A.    Yes.
7      Q.    -- through this change?
8      A.    Yes.
9      Q.    Do you remember how many meetings
10 there would have been between Conectiv and Watson
11 Wyatt before they were ultimately hired?
12     A.    I don't recall.
13     Q.    Do you know if the compensation plan
14 was specifically discussed at any of these meetings
15 before Watson Wyatt was hired?
16     A.    Probably.
17     Q.    And do you know what was discussed?
18     A.    We had to give them an understanding
19 of what each company had so they had some
20 grounding.
21     Q.    And did you tell them what you were
22 looking to accomplish by changing the pension plan?
23     A.    Just the competitive general
24 industry pension plan.

Page 21

1      Q.    And what does that mean to you?
2      A.    It means it would be competitive
3  versus general industry versus just utility.
4      Q.    And when you say "competitive," how
5  do you define that?
6      A.    It would provide a benefit that was
7  competitive.
8      Q.    Can you define that?
9      A.    Not at the top, not at the bottom,
10 somewhere in the upper quartile maybe.
11     Q.    At any point during those meetings
12 prior to actually hiring Watson Wyatt, was the cash
13 balance discussed, that a cash balance plan would
14 be implemented?
15     A.    I don't think so.
16     Q.    Do you know how long a process went
17 on from the initial interview with Watson Wyatt
18 until they were ultimately brought on?
19     A.    I don't remember.
20     Q.    Would it have been less than six
21 months?
22     A.    That's likely.
23     Q.    Less than three months?
24     A.    From their first discussions with

6 (Pages 18 to 21)

B0370

BENJAMIN D. WILKINSON

Page 22

1  us --
2      Q.    Right.
3      A.    -- until they were hired?
4      Q.    Yes.
5      A.    Probably less than three.
6      Q.    And were you involved with the
7  initial discussions or had Conectiv already been
8  having discussions with actuarial firms prior to
9  you being hired?
10     A.    I don't know what they had done
11  before I got there.
12     Q.    Was there any indication, to you,
13  when it was decided that Watson Wyatt would be one
14  of the firms that would be interviewed, that they
15  had already talked to them?
16     A.    I don't think so.
17     Q.    Okay.  Do you know if Don Cain had
18  any prior relationships with Watson Wyatt?
19     A.    I don't know.
20     Q.    Do you know if Conectiv or Delmarva
21  had any prior relationship with Watson Wyatt?
22     A.    I don't know.
23     Q.    Who had the ultimate authority to
24  make the decision to hire Watson Wyatt?

Page 23

1      A.    I recall it's probably Don Cain and
2  I -- it was probably Don Cain.
3      Q.    Do you know what time frame they
4  would have been hired?
5      A.    I don't understand.
6      Q.    You were brought on in 1996?
7      A.    I think, yeah.
8      Q.    Do you know in what time frame,
9  relative to that, that they ultimately would have
10  been hired and brought on to implement these
11  changes?
12     A.    I don't recall.
13     Q.    Did you hire any other consultants
14  with regard to changing the benefits plan at
15  Conectiv?
16     A.    No.
17     Q.    Did your counterpart from ACE have
18  input into who was ultimately hired as a
19  consultant?
20     A.    I believe they had input, but not
21  the final say.
22     Q.    It would have been the Delmarva's
23  side that had the final say?
24     A.    Yes.

Page 24

1      Q.    I'm showing you what has been
2  previously marked as Defense Exhibit 1.  I'm
3  showing you what has been previously marked as
4  Defense Exhibit 1.  Do you recognize this document?
5      A.    Yes.
6      Q.    What is this document?
7      A.    It's a communication document to
8  employees about upcoming benefits, I believe.
9      Q.    And in the upper --
10     A.    And pay.
11     Q.    Excuse me?
12     A.    And compensation.
13     Q.    In the upper right-hand corner of
14  the document, it's dated October 13th, 1997?
15     A.    Correct.
16     Q.    That was prior to the merger,
17  correct?
18     A.    I believe so.
19     Q.    The merger took place sometime March
20  of 1998, is that your recollection?
21     A.    I just don't remember the exact
22  date.
23     Q.    Okay.  Sometime early 1998?
24     A.    That sounds about right.  I just

Page 25

1  can't remember the date.
2      Q.    Okay.  Do you know who prepared this
3  document?
4      A.    I believe it was the public
5  relations people in Delmarva.
6      Q.    Did you play any role in preparing
7  this document?
8      A.    Probably proofread, but not
9  preparing.
10     Q.    So, this is something that the
11  Public Relations Department and Delmarva would have
12  typed up and you would have looked at and
13  proofread?
14     A.    Yes.
15     Q.    And do you remember if you made any
16  corrections to what they prepared?
17     A.    I don't remember.
18     Q.    Do you know if anybody else would
19  have had any input in the document?
20     A.    It's possible that Don Cain may have
21  reviewed this.  I just don't remember.
22     Q.    What was your title at the time?
23     A.    Manager of Compensation and
24  Benefits.

7 (Pages 22 to 25)

B0371

BENJAMIN D. WILKINSON

Page 26

1    Q.    Were you in any way involved in --
2    personally, did you have any pension plan at
3    Conectiv when you were hired?
4        A.    Was I in a pension plan?
5        Q.    At Conectiv.
6        A.    No.
7        Q.    You were in a pension plan from
8    DuPont?
9        A.    DuPont.
10       Q.    So, that wasn't part of your deal,
11   that you would be involved in any type of pension
12   plan?
13       A.    No.
14       Q.    So, prior to you proofreading this,
15   you would not have been involved in any of the
16   substance that went into this, that would have been
17   done by the public relations people at Delmarva?
18       A.    Yes.
19       Q.    Did you know how big that department
20   was?
21       A.    Not big, but maybe five or six
22   people.
23       Q.    Do you know who the head was of that
24   department?

Page 27

1        A.    Mike something or other.  I can't
2    remember his last name.
3        Q.    It says "Total Rewards Communicate
4    Conectiv."  What does "Total Rewards," what does
5    that mean to you?
6        A.    That was a phrase used to describe
7    the entire package of compensation and benefits.
8    And total rewards was something that the management
9    picked.
10       Q.    When you say "entire package," what
11   would be included in that entire package?
12       A.    All of the pay scales, all of the
13   incentive plans, all of the benefits, the flexible
14   benefits.
15       Q.    The health benefits?
16       A.    Yes.
17       Q.    Holidays?
18       A.    Yes.
19       Q.    Vacation?
20       A.    Yep.
21       Q.    And these were all new -- these were
22   all changes that were going to take place for
23   employees at both Delmarva and ACE, correct?
24       A.    For the non-represented people.

Page 28

1        Q.    Right.  They would all be -- all of
2    these changes would affect them, correct?
3        A.    Yes.
4        Q.    Do you know whether this was --
5    strike that.
6            Do you know how this was
7    disseminated?
8        A.    This?
9        Q.    Yes.
10       A.    I think they were just produced in
11   bulk and then distributed to the business units,
12   who got them to the management, who gave them the
13   employees.
14       Q.    Is it possible they would have just
15   been laying around for people to pick up?
16       A.    Yes.
17       Q.    Do you know whether that would have
18   taken place at just Delmarva?
19       A.    I assumed it took place in the
20   non-represented population in ACE too, but I wasn't
21   there to see it.
22       Q.    You have no personal knowledge of
23   that, correct?
24       A.    No.

Page 29

1        Q.    On the second column on the first
2    page towards the bottom, the middle of that
3    paragraph, it says, there's a reference, "A new
4    pension plan will replace the old, quote, final
5    pay, end quote, plans with individual portable
6    accounts."
7            Do you see that reference?
8        A.    Uh-huh.  Yes.
9        Q.    At that time, did you know that it
10   would be a cash balance plan?
11       A.    I believe we did, because we kind of
12   described the basic structure of a cash balance
13   plan in this paragraph.
14       Q.    Do you remember when you were first
15   aware that it would be a cash balance plan?
16       A.    No.
17       Q.    Do you remember who suggested that
18   initially?
19       A.    I believe it was Watson Wyatt.
20       Q.    And you would have been involved in
21   those meetings?
22       A.    Yes.
23       Q.    On the next page, at the top, first
24   paragraph, it says, "When we will know the details

8 (Pages 26 to 29)

B0372

BENJAMIN D. WILKINSON

Page 30

1  of the new total rewards program?" And then it
2  states, "The total rewards transition team is
3  continuing to work out the details." And then the
4  sentence goes on. "The transition team," what was
5  the transition team?
6        A.    That was a team that had both
7  Delmarva and ACE employees on it that was given the
8  responsibility of managing the transition between
9  two separate companies into one Conectiv.
10       Q.    And were you part of that team?
11       A.    On and off.
12       Q.    And what was your role with regard
13 to that team?
14       A.    Basically, it was to do the
15 compensation and benefits work. Not to worry about
16 the structure of the merger.
17       Q.    Do you know how big that transition
18 team was?
19       A.    Oh. I think, depending on the topic
20 of the meeting, the composition would float. From
21 an employer relations standpoint, that was the only
22 piece we were worried about. We weren't worried
23 about buildings and structure and location.
24       Q.    Was it more than 50 people?

Page 31

1        A.    Oh, never that big.
2        Q.    Less than 25 people?
3        A.    Probably.
4        Q.    Was there someone that was the head
5  of the entire transition team?
6        A.    Well, I guess ultimately the
7  Chairman of the Board was in charge of it, but from
8  an employee relations standpoint, Don Cain was
9  possibly the hit man.
10       Q.    I'm done with that document. I'll
11 show you what's been previously marked as Defense
12 Exhibit 2. I'm showing you what's been marked D-2.
13 It's also titled EMerging Times. It's dated
14 October 20, 1997. Do you recognize this document?
15       A.    I recognize the structure of it.
16 EMerging Times was kind of the banner under which
17 all of these communications were done. The
18 particular words in here don't ring any bells.
19       Q.    Do not ring any bells?
20       A.    If I took time to read the whole
21 thing, I probably would. But just on the face of
22 it, it doesn't look that familiar.
23       Q.    Okay. And EMerging Times, this is
24 similar to the document we just looked at, D-1,

Page 32

1  correct?
2        A.    Yes.
3        Q.    And the same thing with regard to
4  how this would have been disseminated, it's
5  possible this would have been laying around for
6  employees to pick up a copy?
7        A.    Probably, yes.
8        Q.    Was there anyone that was on the
9  total rewards team that was specifically tasked
10 with communications to employees?
11       A.    Yes.
12       Q.    And do you know who that was?
13       A.    Wally Judd.
14       Q.    J-u-d-d?
15       A.    Yes.
16       Q.    And do you know what his title was?
17       A.    I don't remember.
18       Q.    Was he a Delmarva employee?
19       A.    Yes.
20       Q.    And was he still there when you
21 left?
22       A.    Yes.
23       Q.    In the same capacity?
24       A.    Yes.

Page 33

1        Q.    Did you have much interaction with
2  him?
3        A.    Yes.
4        Q.    Is this document, a document that
5  you, same thing, that it would have been prepared
6  by someone in public relations and you would have
7  proofread, or is this a document you may not have
8  even proofread?
9        A.    Oh, I would have proofread this one.
10 It's got my name in it.
11       Q.    Other than that, would it have been
12 the same as D-1, public relations would have
13 prepared the document for you to proofread?
14       A.    Yes.
15       Q.    If you turn to the second page of
16 this document, first full paragraph. It states,
17 "Can you tell us more about the new pension
18 arrangement?" The next sentence is, "The design of
19 the plan is not yet finalized, but we know it will
20 be what's called a 'cash balance' plan."
21            At that time, October 20th, 1997,
22 had the decision been made that it would be a cash
23 balance plan?
24       A.    I believe so. But the particular

9 (Pages 30 to 33)

B0373

BENJAMIN D. WILKINSON

Page 34

1  design elements were not final.
2      Q.    Okay.  Other than Watson Wyatt --
3  I'm talking about outside consultants other than
4  Watson Wyatt.  Did anyone else play a role in
5  making a decision at that time that Conectiv would
6  be implementing what would be called a cash balance
7  plan?
8          MS. YU:  Objection as to form.
9          MR. SAUDER:  You can answer.
10         MS. YU:  You can answer.
11         THE WITNESS:  Please repeat.
12  BY MR. SAUDER:
13     Q.    Okay.  With regard to outside
14  consultants, anyone other than Watson Wyatt that
15  would have played a role in deciding that Conectiv
16  would be implementing a cash balance plan at that
17  time?
18         MS. YU:  Objection.  Objection as to
19  form.
20         THE WITNESS:  Not that I recall.
21  BY MR. SAUDER:
22     Q.    Who was specifically tasked with
23  working on the cash balance plan from Conectiv?
24     A.    There was a benefits consultant

Page 35

1  named Alan Beattie, who was the corporate pension
2  person.
3      Q.    Was he a Delmarva employee at the
4  time you were hired?
5      A.    Yes.
6      Q.    And do you know how long he had been
7  with the company?
8      A.    No.
9      Q.    Do you know if he was a contract
10  employee or was he --
11     A.    No, he was a regular employee.
12     Q.    And was he still there when you
13  left?
14     A.    No.
15     Q.    Do you know when he left the
16  company?
17     A.    About a year before I did, I think.
18  Maybe six months.
19     Q.    Would he have left prior to January
20  1999?
21     A.    I don't remember.
22     Q.    Do you know why he left the company?
23     A.    They were down-sizing the human
24  resources function.

Page 36

1      Q.    Do you know if he was given a
2  severance package?
3      A.    Probably was.
4      Q.    Do you know if it was voluntary or
5  involuntary?
6      A.    Don't remember.
7      Q.    Is there a significant amount of
8  down-sizing going on at this time?
9      A.    No.
10     Q.    No, I'm sorry.  At the time around
11  the merger?
12     A.    Yes.
13     Q.    In both ACE and Delmarva?
14     A.    Yes.
15     Q.    And I used the term "significant."
16  How would you define "significant amount of
17  down-sizing"?
18     A.    Well, it was significant in that
19  there were a lot of duplicate functions, so you had
20  to eliminate a lot of that interface.  And these
21  aren't big groups of people.  There might have
22  been, I don't know, 50 or 60 total in the function
23  across both companies, but I don't remember
24  specific numbers on how many left.

Page 37

1      Q.    But there was significant
2  down-sizing in all different departments in
3  Delmarva and ACE around that time, correct?
4      A.    Yes.
5      Q.    Do you know percentage-wise what
6  percentage of Delmarva employees would have been
7  downsized around that time?
8      A.    No.
9      Q.    How about ACE, same question?
10     A.    No.
11     Q.    Do you know if more people were
12  downsized at ACE proportionately as opposed to
13  Delmarva?
14     A.    I don't know that.
15     Q.    Did you play any role in that?
16     A.    No.
17     Q.    And when did that begin, that
18  process of down-sizing in relation to when you were
19  hired?
20     A.    Probably nearer the end of my three
21  years there.  The first year, year and a half was
22  pretty busy with just doing the merger.
23     Q.    Is it fair to say that it would have
24  taken place sometime in, at least mid to late 1998?

B0374

BENJAMIN D. WILKINSON

Page 38

```
 1      A.   I can't be sure.
 2      Q.   Well, you left in the fall of 1999,
 3  correct?
 4      A.   Correct.
 5      Q.   I will show you what's been
 6  previously marked as Plaintiff's Exhibit 2.  Take a
 7  look at Plaintiff's Exhibit 2.  Tell me if you
 8  recognize that document after you've had an
 9  opportunity to review it.
10      A.   I recognize it, yes.
11      Q.   And what is this document?
12      A.   It's the Minutes of the Personnel
13  and Compensation Committee Meeting on April 23rd,
14  1998.
15      Q.   Have you seen this document prior to
16  today?
17      A.   Yes.
18      Q.   And when did you see it?
19      A.   The last time I saw it, it was
20  earlier.  The last time I was in here.
21      Q.   Prior to that, did you see it?
22      A.   Probably on April 23rd, 1998.
23      Q.   That was the date of the meeting,
24  correct?
```

Page 39

```
 1      A.   Yes.
 2      Q.   And these are the minutes from the
 3  meeting?
 4      A.   Yes.
 5      Q.   And you would have seen it on the
 6  same day?
 7      A.   No.  Probably a day or two after.  I
 8  imagine it was written after the meeting.
 9      Q.   And what would be the purpose of you
10  seeing a copy of the minutes of the meeting shortly
11  thereafter the meeting?
12      A.   I guess just to get a copy.
13      Q.   Okay.  Not to make corrections or
14  anything like that?
15      A.   No, no.
16      Q.   And you -- were you present at this
17  meeting?
18      A.   Yes.
19      Q.   And what was the purpose that you
20  were present at this meeting?
21      A.   Because I was involved in the design
22  of compensation and benefits.
23      Q.   Prior to this April 23rd, 1998
24  meeting, had you been to other board meetings?
```

Page 40

```
 1      A.   This was not a board meeting.
 2      Q.   I mean, had you been to other
 3  compensation committee meetings?
 4      A.   I don't remember.
 5      Q.   Don Cain was also present?
 6      A.   Yes.
 7      Q.   And what was the purpose of this
 8  specific meeting?
 9      A.   I guess it was just to brief them on
10  what all the thinking was on the compensation and
11  benefits plans and to get their approval or their
12  blessing before it went to the full board.  I can't
13  remember if it went to the full board.  Maybe the
14  comp committee just did it.
15      Q.   And who made the presentation at
16  this meeting?
17      A.   I think it was both Don Cain and
18  myself.
19      Q.   Prior to the meeting, did anyone
20  help you and Don Cain prepare for the meeting?
21      A.   I don't think so.
22      Q.   The first full paragraph, last
23  sentence states, "She then referred to materials
24  that had been previously distributed to the
```

Page 41

```
 1  committee members."
 2           Do you see that sentence?
 3      A.   Yes.
 4      Q.   And then if you flip to the back
 5  portion of this, the Bates stamp, which is the
 6  number that's in the bottom right-hand corner is
 7  1 -- the last four numbers are 1588.  Do you see
 8  that?
 9      A.   This one?
10      Q.   Correct.
11      A.   Yes.
12      Q.   Is that the material that's
13  referenced in that sentence?
14      A.   I believe so.
15      Q.   That was the material that was
16  handed out to the compensation committee?
17      A.   Yes.
18      Q.   The next paragraph, there's a Number
19  3.  Let me read the first sentence.  It says, "The
20  Chairman then called on Mr. Cain who reviewed the
21  philosophy and approach for employee benefits at
22  Conectiv, with an emphasis on," and Number 3,
23  states, "The interest in being competitive both in
24  cost and attractiveness to employees."
```

11 (Pages 38 to 41)

B0375

BENJAMIN D. WILKINSON

1    Do you see that?
2    A.    Yes.
3    Q.    "Competitive in both costs," what
4 does that mean to you?
5    A.    Well, it means that it's not the
6 most -- it's not the richest and it's not the
7 poorest. It's competitive with whatever companies
8 you're comparing yourself to. And cost effective
9 means that it's cost effective.
10    Q.    Cost effective to the company?
11    A.    Yes.
12    Q.    And the next paragraph, the sentence
13 that starts -- and this is referencing Mr. Cain --
14 "He acknowledged that this creates a risk related
15 to the reaction of management employees who will be
16 the first to feel the effect of the changes, but
17 stated that this risk could be managed in light of
18 the cost savings to be realized from the new
19 program."
20    Do you see that sentence?
21    A.    Uh-huh.
22    Q.    Okay. And the "cost savings to be
23 realized" is the cost savings to the company,
24 correct?

1    A.    Yes.
2    Q.    You see the next page, first full
3 paragraph, it says, "Mr. Wilkinson stated that the
4 long-term goal of management was to have the
5 overall benefit cost at 35 to 36 percent of pay,
6 which is the general industry standard. He then
7 reviewed the details of the program on a plan by
8 plan basis, specifically."
9    Do you see this?
10    A.    Yes.
11    Q.    Who came up with the figure of 30
12 (sic) to 36 percent of pay?
13    MS. YU: Objection as to form. 35
14 to 36.
15 BY MR. SAUDER:
16    Q.    I'm sorry, 35 to 36.
17    A.    I believe it was Watson Wyatt.
18    Q.    Where it says that you stated that
19 the long-term goal of management, is the "long-term
20 goal," was that a decrease of the existing
21 structure that you know?
22    A.    Where are you reading from?
23    Q.    From that same sentence. The first
24 sentence, "Mr. Wilkinson stated that the long-term

1 goal of management was to have the overall benefit
2 cost at 35 to 36 percent of pay."
3    35 to 36 percent of pay, was that a
4 decrease of the existing structure?
5    MS. YU: For both Delmarva and ACE?
6    MR. SAUDER: Well, for Delmarva.
7    THE WITNESS: Can you say the
8 question again?
9 BY MR. SAUDER:
10    Q.    Yeah. The number that you said you
11 believe Watson Wyatt came up with, the 35 to 36
12 percent of pay --
13    A.    Uh-huh.
14    Q.    -- do you know if that was a
15 decrease, the percentage-wise to the existing
16 structure that was in Delmarva at the time?
17    A.    I don't remember.
18    Q.    How about ACE, the same question?
19    A.    I don't know specifically about ACE.
20    Q.    Okay. And what was the
21 recommendation by you and Mr. Cain at this meeting?
22    A.    I guess it was to get the
23 compensation committee's approval that the
24 attachment was something they could approve.

1    Q.    Okay. And that's what they would
2 have had a copy of, is this attachment, which is
3 Bates PHI0015883 through 1591, correct?
4    A.    Yes.
5    Q.    Okay. And you were seeking their
6 approval on that, those page numbers?
7    A.    That's my memory.
8    Q.    Okay. Were any outside consultants
9 present at this meeting?
10    A.    I don't recall.
11    Q.    Do you know if this is something
12 they would have attended?
13    MS. YU: Objection as to form.
14    THE WITNESS: I don't recall the
15 consultants meeting with the board or the
16 subcommittees of the board.
17 BY MR. SAUDER:
18    Q.    If you look on the page that ends in
19 Bates 1586.
20    A.    Uh-huh.
21    Q.    Second full paragraph, it starts
22 out, "Mr. Cain referred specifically to one of the
23 resolutions before the Committee that permits the
24 Vice President - Human Resources and Performance

B0376

BENJAMIN D. WILKINSON

Page 46

1   Improvement to make changes in benefit plans and
2   programs from time to time to maintain their
3   competitiveness and response to business and
4   employee interests, subject to the responsibility
5   of the Committee and the Board of Directors with
6   respect to material amendments to employee benefit
7   plans."
8          Do you see that sentence?
9      A.   Uh-huh.
10     Q.    And that was Mr. Cain at the time,
11  he was the Vice President of Human Resources?
12     A.   Yes.
13     Q.    And this was, he was reminding the
14  board or the committee that he had the authority to
15  make amendments to the plan, is that your
16  understanding?
17     A.   Minor.  Yes, minor amendments.
18     Q.    And he would sign off on those minor
19  amendments?
20     A.   Yes.
21     Q.    And then go down to the next
22  paragraph, which is the sentence stating,
23  "Following further discussion, on motion duly made,
24  seconded and unanimously adopted it was resolved,

Page 47

1   that the Personnel & Compensation Committee hereby
2   approves the Conectiv Cash Balance Pension Plan
3   with respect to management employees, effective
4   January 1, 1999, in substantially the same form
5   presented in the attachment entitled, 'Conectiv
6   Compensation and Benefits.'"  And then in parens it
7   says "the Attachment."
8          Do you see that?
9      A.   Yes.
10     Q.    And that, again, this attachment
11  that we're referencing, it starts on 1588 and goes
12  through 1591?
13     A.   Yes, correct.
14     Q.    Is it fair to say at that time, you
15  didn't have a plan -- you didn't have an actual
16  plan in place, correct?
17         MS. YU:  Objection as to form.
18         THE WITNESS:  We didn't --
19  BY MR. SAUDER:
20     Q.    I mean, you didn't have a full
21  document that an employee could see what the plan
22  was at that time, correct?
23         MS. YU:  Objection as to form.
24         THE WITNESS:  I don't remember.  I

Page 48

1   doubt we had it firmly resolved, because we
2   wouldn't have done that until we had the
3   committee's approval, but I'm sure there were
4   drafts.
5   BY MR. SAUDER:
6      Q.    Okay.  But what the committee was
7   looking at was the attachment, correct?
8      A.   Correct.
9      Q.    Okay.  And your name is on that
10  attachment dated April 19, 1998, is that correct?
11     A.   Yes.
12     Q.    Did you draft that attachment?
13     A.   Yes.
14     Q.    Did anyone else participate in
15  drafting that attachment?
16     A.   Probably not.
17     Q.    Okay.  And if you flip to the Bates
18  Page 1589.  Do you see that page?
19     A.   Yes.
20     Q.    Okay.  It says "Cash Balance Pension
21  Plan" at the bottom?
22     A.   Yes.
23     Q.    And then there are a couple of
24  bullet points that go to the bottom of the page.

Page 49

1      A.   Uh-huh.
2      Q.    That's the specific reference to the
3   cash balance plan in this document, correct?
4      A.   Yes.
5      Q.    Okay.  And there's no other
6   reference to the cash balance plan in the remainder
7   part of the attachment?
8      A.   I don't believe so.
9          THE WITNESS:  Can I take five
10  minutes?
11         MR. SAUDER:  Oh, sure.
12         (Recess at 11:06 a.m.)
13         (Resumed at 11:14 a.m.)
14  BY MR. SAUDER:
15     Q.    We are still looking at the
16  Plaintiff's Exhibit 2, on the same page we were
17  looking at before the break, which is Bates ending
18  1589.  Under the Cash Balance Pension Plan, under
19  those bullet points there, is it fair to say there
20  was no procedure, looking only at these bullet
21  points, for establishing and carrying out funding
22  of the plan?
23     A.   Say it again.
24         MS. YU:  Objection as to form.

Reporting Associates, LLC  1-888-795-2323

B0377

BENJAMIN D. WILKINSON

1  BY MR. SAUDER:
2     Q.   If you focus on these bullet points,
3  which is the area of this attachment that focuses
4  on the cash balance pension plan --
5     A.   Yes.
6     Q.   -- within those bullet points, it's
7  fair to say that there's no procedure for
8  establishing and carrying out the funding of the
9  plan and how that's done?
10     MS. YU:  Objection.
11  BY MR. SAUDER:
12     Q.   That's not in these bullet points,
13  correct?
14     A.   No.
15     MS. YU:  Objection as to form.
16  BY MR. SAUDER:
17     Q.   Your answer is no, correct?
18     A.   Correct.
19     MS. YU:  There was an objection
20  stated too.
21     MR. SAUDER:  Okay.
22  BY MR. SAUDER:
23     Q.   And also with regard to these bullet
24  points on the cash balance plan, there's no

1  description on how to allocate the responsibilities
2  for the operation and administration of the plan,
3  correct?
4     A.   Correct.
5     MS. YU:  Objection as to form.
6  BY MR. SAUDER:
7     Q.   And there's also no indication on
8  the basis on which the payments are made to and
9  from the plan, correct --
10     MS. YU:  Objection --
11  BY MR. SAUDER:
12     Q.   -- under these bullet points?
13     MS. YU:  Objection as to form.
14     THE WITNESS:  Correct.
15  BY MR. SAUDER:
16     Q.   Okay.  Sir, there's also a bullet
17  point which says, "Extensive, 'Grandfathering'."
18     Do you see that?
19     A.   Yes.
20     Q.   Do you know who was grandfathered
21  under this plan?
22     A.   I don't recall the details.
23     Q.   Was Don Cain an employee who would
24  have been -- he was a regular employee, right --

1     A.   Yes.
2     Q.   -- he wasn't a contract employee?
3  So, he was involved in the Delmarva pension plan,
4  correct?
5     A.   Yes.
6     Q.   And do you know if he was someone
7  who was grandfathered?
8     A.   I don't recall.
9     Q.   It's your understanding that the
10  individuals who would have been grandfathered were
11  employees that were age 50 or older or with 20
12  years of service as of December 31st, 1998.  Is
13  that your understanding?
14     A.   That sounds correct.
15     Q.   And was the reason for
16  grandfathering those individuals, that you expected
17  some of the employees to accrue less in the new
18  plan?
19     MS. YU:  Objection as to form.
20     THE WITNESS:  Say it another way.
21  BY MR. SAUDER:
22     Q.   One of the reasons that you -- that
23  the determination was made to grandfather this
24  category of employees was that there was an

1  expectation that they would accrue less under the
2  new cash balance plan as opposed to the original
3  plan that they were in?
4     MS. YU:  Objection as to form.
5     THE WITNESS:  No.  I believe the
6  reason for the grandfathering was there was a very
7  strong attachment by the employees of both Delmarva
8  and ACE to their existing plans.  And in order to
9  make this palpable for the management employees,
10  the grandfathering took place.  They wanted the
11  reception to be good for the whole package.
12  BY MR. SAUDER:
13     Q.   What do you mean "very strong
14  attachment," how do you describe that?
15     A.   Just a mentality among the
16  non-represented employees that they had a very good
17  benefit plan, and they understood it.  And this
18  cash balance plan was something new, which they
19  didn't understand.  I think that was the rationale.
20     Q.   And how did you gather that
21  intelligence?
22     MS. YU:  Objection as to form.
23     THE WITNESS:  Just from interfacing
24  with other employees and being told that.

14 (Pages 50 to 53)

B0378

Page 54

BY MR. SAUDER:
2    Q.    The individuals that were
3  grandfathered were grandfathered for 10 years after
4  the January 1st, 1999, is that your understanding?
5  There was a 10-year grandfathering?
6    A.    I don't recall.
7    Q.    That's not on this document,
8  correct?
9    A.    No.
10    Q.    And is your understanding that the
11  individuals that were grandfathered, their pension
12  was computed under both the old formula and the new
13  one, and they had an opportunity to take the
14  greater amount?
15    A.    Correct.
16    Q.    Is it fair to say, for a period of
17  time, the greater amount would have been the old
18  plan?
19        MS. YU:  Objection as to form.
20        THE WITNESS:  I don't recall.
21  BY MR. SAUDER:
22    Q.    Do you know what portion of
23  individuals who were grandfathered ultimately took
24  the money under the old plan when they retired?

Page 55

1        MS. YU:  Objection as to form.
2        THE WITNESS:  No.
3  BY MR. SAUDER:
4    Q.    Under the last bullet point, which
5  states, "Business Link," there's a sub-bullet point
6  which says, "Useful in the Divestitures."
7        Do you see that?
8    A.    Yes.
9    Q.    What does that mean?
10    A.    I believe that means if you're going
11  to divest a business unit, you can carve out what
12  pension has been accrued by those people that have
13  been divested.
14    Q.    And that was one of the useful
15  things with regard to this plan?
16    A.    That was the link to the business.
17    Q.    Okay.  I will show you what's been
18  previously marked as Defense Exhibit 6.  After
19  you've had an opportunity to review this document,
20  I'm going to ask if you've seen this document prior
21  to today?
22    A.    Yes.
23    Q.    And when did you see this document
24  prior to today?

Page 56

1    A.    I think the last time I saw this
2  document was in 1998.
3    Q.    And why would you have seen it in
4  1998?
5    A.    As a recipient at that point.
6    Q.    And why would you have received a
7  copy of this?
8    A.    Because I was the personnel manager
9  for what they called Shared Services.
10    Q.    And what was Shared Services?
11    A.    Staff functions.
12    Q.    And what does that mean?
13    A.    Accounting, Human Resources, Public
14  Affairs.
15    Q.    Was that a change in position
16  from --
17    A.    Yes.
18    Q.    And why was it a change?
19    A.    For about the last year, I did this
20  as opposed to the compensation and benefits job.
21  After the merger was over and the benefits were in
22  place, I became a personnel manager.
23    Q.    With regard to -- you had received
24  this.  How would you have received this; would they

Page 57

1  have handed you a copy of this, because you were on
2  the --
3    A.    I'm referred to in the document as
4  the contract for Shared Services.
5    Q.    How would you have actually received
6  a copy of it?
7    A.    In the company mail, I guess.
8    Q.    What's that, you have like an in-box
9  or something?
10    A.    Yes.
11    Q.    Did you play any role in drafting
12  this document?
13    A.    Not that I recall.
14    Q.    Was this something that you would
15  have seen before it went out, had an opportunity to
16  proofread?
17    A.    Probably not.
18    Q.    Why do you say that?
19    A.    Because I was in a different job.
20    Q.    Do you have any personal knowledge
21  on how this was disseminated?
22    A.    Probably just through the normal
23  company mail.
24    Q.    But you have no personal knowledge

15 (Pages 54 to 57)

B0379

BENJAMIN D. WILKINSON

Page 58

1  how it was disseminated?
2      A.    No.
3      Q.    When you say "the normal company
4  mail," what does that mean?
5      A.    I guess the administrative assistant
6  of the person who wrote this would probably get the
7  copies made and then distribute them through the
8  buildings.
9      Q.    And then once they were distributed
10  from the buildings, then what would happen?
11     A.    I guess the administrative
12  assistants would take them and put them in
13  everybody's mailbox.
14     Q.    When you say everybody's mailbox,
15  what do you mean?
16     A.    All the management employees.
17     Q.    Did all the management employees
18  have mailboxes?
19     A.    I don't recall.
20     Q.    Okay. I'm showing you what has been
21  previously marked as Defense Exhibit 5. The way
22  this was originally marked, the second page is Page
23  Number 3, and then the third page is Page Number 2,
24  so these pages are out of order. But after you

Page 59

1  take a look at this document, and tell me if you
2  recognize this document or if you've seen it
3  before?
4      A.    Yes, I've seen it.
5      Q.    When did you see this document
6  before today?
7      A.    Last week here.
8      Q.    Prior to that, did you see the
9  document?
10     A.    Probably when it was written.
11     Q.    And --
12     A.    There's no date on it, so I can't
13  give you --
14     Q.    Why would you have seen it when it
15  was written?
16     A.    Because I was a personnel manager,
17  and it was dealing with personnel issues.
18     Q.    And is this something that you would
19  have had a hand in drafting?
20     A.    Probably not. This was after the
21  merger was effected.
22     Q.    Who would have drafted this at that
23  time?
24     A.    Probably Wally Judd, the

Page 60

1  communications guy.
2      Q.    And who would have reviewed it?
3      A.    Probably the then person in charge
4  of benefits and compensation.
5      Q.    Who was that?
6      A.    I don't remember who took it.
7      Q.    Is that somebody that replaced you
8  in that position?
9      A.    Yeah.
10     Q.    Do you know where that person came
11  from?
12     A.    It got jumbled up because originally
13  they were going to take the secretary of Atlantic,
14  the corporate secretary, and put her in the job.
15  And she decided after a week, she didn't want to do
16  it, and she left. And then it was decided that the
17  compensation and benefits work would be combined
18  with labor relations under a fellow named John
19  Zimmerman. And that's when I stepped out.
20     Q.    Of that position?
21     A.    Uh-huh, yes.
22     Q.    Is John Zimmerman still there when
23  you left?
24     A.    Yes.

Page 61

1      Q.    And do you know what his title was?
2      A.    Manager/Labor Relations.
3      Q.    When you stepped out of that
4  position into the Shared Services position, who did
5  you report to?
6      A.    Don Cain.
7      Q.    Under the first -- under the
8  paragraph, which is entitled New Cash Balance
9  Pension Plan, at the bottom of that page --
10     A.    Yes.
11     Q.    -- do you see that?
12     A.    Yes.
13     Q.    The second sentence states, "The
14  'cash balance' pension plan has a new concept that
15  has two important advantages; it's easier to
16  understand than the former plan."
17          Do you see that?
18     A.    Yes.
19     Q.    And that was one of the perceived
20  advantages, from Conectiv's standpoint?
21     A.    Yes.
22     Q.    Under the page, that's Page Number 4
23  on the actual document, under "'Grandfather'
24  Protection for Older and Long Service Employees,"

16 (Pages 58 to 61)

B0380

BENJAMIN D. WILKINSON

Page 62

1  do you see that?
2      A.    Yes.
3      Q.    Who was involved in the
4  decision-making process with regard to who would be
5  grandfathered?
6      A.    The final decision was probably made
7  by the Chairman.
8      Q.    And how was that presented?
9      A.    Most likely in a presentation by the
10  Watson Wyatt consultants and the Human Resources
11  people in Conectiv.
12      Q.    When you say the Human Resources
13  people in Conectiv, who would they have been that
14  would have been involved in the decision-making
15  process?
16      A.    The compensation and benefits
17  people.
18      Q.    Who was that?
19      A.    At that point it was probably John
20  Zimmerman and a guy named Jim Kremmel.
21      Q.    Would Don Cain have been involved in
22  those discussions?
23      A.    Probably, yes.
24      Q.    Were you involved in those

Page 63

1  discussions?
2      A.    It's hard to tell, because there's
3  no date on this.  I can't remember when this came
4  out.
5      Q.    So, you can't recall?
6      A.    Un-unh.
7      Q.    At any point, do you remember being
8  involved in discussions with regard to what group
9  of people would be grandfathered?
10      A.    Yes, during all of the original plan
11  design meetings.
12      Q.    And who was involved during the
13  point in time when you were involved with those
14  discussions?
15      A.    Watson Wyatt.
16      Q.    Anyone else?
17      A.    Probably Don Cain.
18      Q.    And what were the decisions that
19  were made while you were involved with the
20  discussions?
21      A.    About what?
22      Q.    About who would be grandfathered.
23      A.    Oh, probably a recommendation from
24  Watson Wyatt.

Page 64

1      Q.    Watson Wyatt would have come up with
2  the parameters?
3      A.    The scenarios.  And then they would
4  play the scenarios out for the management team, and
5  we would make a decision on what we wanted to take
6  up.
7      Q.    When you say "the scenarios," would
8  that include essentially crunching numbers and
9  showing you what the numbers are?
10      A.    Yes.
11      Q.    Do you remember if at any point in
12  time a shorter grandfather period was discussed?
13  We stated earlier that there was a 10-year
14  grandfather.  Do you know if at any point in time a
15  shorter grandfathering period was discussed?
16      A.    I don't recall.
17      Q.    Based on what was ultimately
18  implemented, the parameters that were ultimately
19  decided on, is it your understanding that Don Cain
20  would have been grandfathered?
21      MS. YU:  Objection as to form.
22      THE WITNESS:  I believe so, because
23  he had a lot of service.
24  BY MR. SAUDER:

Page 65

1      Q.    Okay.  How about John Zimmerman?
2      A.    I don't know.
3      Q.    Is this a document that you, this
4  D-5, is this a document that you would have
5  received?
6      A.    Yes.
7      Q.    And why would you have received a
8  copy of it?
9      A.    Because it deals with human
10  resources and personnel and compensation and
11  benefits, and that's the business I was in.
12      Q.    Okay.  But nothing in this document
13  would have directly affected your compensation, is
14  that fair?
15      A.    It would have impacted me because I
16  was in the 401(k) savings plan.
17      Q.    Okay.  Do you have a specific
18  recollection of receiving this document, and if so,
19  how you received this document?
20      A.    No.
21      Q.    No to --
22      A.    Oh, wait a minute.  It was mailed to
23  the homes.
24      Q.    What do you base that on?

17 (Pages 62 to 65)

B0381

BENJAMIN D. WILKINSON

Page 66

1    A.    The back page.
2    Q.    Okay.  And do you know if -- do you
3  have a specific recollection of whether this was
4  mailed to your home?
5    A.    No.
6    Q.    And do you have any specific
7  knowledge of who other than -- well, do you have
8  any specific knowledge that it was, in fact, mailed
9  to all of the employees' homes?
10    A.    I'm assuming it was because of the
11  back page.
12    Q.    Okay, but you have no specific
13  knowledge of that?
14    A.    No.
15    Q.    That's a no?
16    A.    That's a no.
17    Q.    I'll show you what has been marked
18  previously as Plaintiff's Exhibit three.  This is
19  also a document with the heading "facts," a similar
20  heading to the document we just looked at, D-5.
21  Once you've had an opportunity to review this
22  document, if you could just let me know if you've
23  seen this document prior to today?
24    A.    Yes.

Page 67

1    Q.    When did you see this?
2    A.    I can't recall if the last time I
3  saw it was nine years ago or when we were in here
4  last week.  We went through a lot of documents.
5    Q.    And do you have a -- prior to last
6  week, do you have a specific recollection of seeing
7  this document?
8    A.    No.
9    Q.    Well, this document, is it fair to
10  say that this document is the same heading as the
11  document we looked at, at D-5?
12    A.    Yes.
13    Q.    And do you see any notation on here
14  that this document was -- this specific document
15  was mailed to anyone?
16    A.    No.
17    Q.    Is there any date on this document?
18    A.    No.
19    Q.    Do you have any specific knowledge
20  of how this document was disseminated?
21    A.    No.
22    Q.    Do you have any general knowledge on
23  how this document would have been disseminated?
24    A.    Probably through the company mail.

Page 68

1    Q.    Is this also a document, like the
2  documents we discussed earlier, that may have been
3  laying around for employees to pick up?
4    MS. YU:  Objection as to form.
5    THE WITNESS:  Sure.
6  BY MR. SAUDER:
7    Q.    Do you know who prepared this
8  document?
9    A.    I don't recall.
10    Q.    Do you know if you played any role
11  in preparing this document?
12    A.    Without a date, it's very hard to
13  tell.  There were lots of these documents prepared
14  under the heading, "facts."
15    Q.    And when you say a lot of documents
16  prepared under the heading, "facts," is that, there
17  would have been prepared under the heading, "facts"
18  that would have had nothing to do with the cash
19  balance plan?
20    A.    Probably there were different
21  "facts" sheets for the 401(k) and the health care
22  plans, and all under the same theme about the facts
23  about the benefits.
24    Q.    For all of the changes that were

Page 69

1  taking place at the time?
2    A.    Yes.
3    Q.    If you look at the Bates that ends
4  in 231, "Transition Issues."  Do you see that?
5    A.    Uh-huh.
6    Q.    At the last sentence of that
7  paragraph states, "The transition rules will be
8  designed to be fair to all employees and sensitive
9  to the concerns of various groups affected, from
10  new employees to those who are approaching
11  retirement age."
12    Who was the targeted audience for
13  this communication?
14    MS. YU:  Objection.
15  BY MR. SAUDER:
16    Q.    Who do you think the targeted
17  audience would have been for this communication?
18    MS. YU:  Objection as to form.
19  BY MR. SAUDER:
20    Q.    You can answer.
21    A.    Who was the target audience?
22    Q.    Well, let me rephrase that.  Is it
23  fair to say that the targeted audience for this
24  communication would have been individuals who

18 (Pages 66 to 69)

B0382

BENJAMIN D. WILKINSON

Page 70

1   ultimately ended up in the cash balance plan?
2        MS. YU:  Objection as to form.
3   BY MR. SAUDER:
4        Q.   At least that subset?
5        MS. YU:  Objection.
6        THE WITNESS:  I think that's fair.
7   BY MR. SAUDER:
8        Q.   If you flip to the last page where
9   it says, "Additional Information to Come."
10       A.   Uh-huh.
11       Q.   The last sentence in the first
12  paragraph states, "In the meanwhile, please
13  continue to address any questions we may be able to
14  answer to your manager."
15            What does that mean, "to your
16  manager," who are they referring to?
17       A.   Well, the audience for this were the
18  non-represented employees, all of whom have a
19  management structure that they're in.  And I guess
20  this is an attempt to say, "If you've got
21  questions, go to your manager, don't go to human
22  resources."
23       Q.   And were the managers -- did the
24  managers have any special knowledge with regard to

Page 71

1   this plan?
2        A.   The managers over a period of time
3   attended several orientation meetings so that they
4   understood how these things worked better than the
5   average employee did.
6        Q.   Okay.  Managers from both ACE and
7   Delmarva?
8        A.   Yes.
9        Q.   And who would have been leading
10  or -- who would have been instructing in those
11  sessions?  In other words, who would have been
12  imparting the knowledge onto these managers in
13  those sessions?
14       A.   It could have been compensation and
15  benefits people.  It might have been Watson Wyatt
16  early on.  It might have been one of the three
17  Human Resources managers who had gotten specific
18  training.
19       Q.   Would you have been involved in any
20  of those meetings?
21       A.   Probably.
22       Q.   And do you know when those meetings
23  took place?
24       A.   No, I don't recall.

Page 72

1        Q.   Do you have any specific
2   recollection of actually being involved in those
3   meetings?
4        A.   I remember sitting through several
5   of them.
6        Q.   And how was this -- how did this
7   presentation happen?  Was it individuals from Human
8   Resources and Watson Wyatt would stand up and
9   explain the plan?
10       A.   Yes, and then take questions and
11  maybe have handouts at the meeting, and just like a
12  typical informational session.
13       Q.   And do you have any specific
14  recollection of handouts actually being handed out
15  at these meetings?
16       A.   No specific recollection, but I'm
17  sure there were things handed out.  That's just the
18  way we operated.
19       Q.   Would you have prepared the
20  handouts?
21       A.   Myself?
22       Q.   Yes.
23       A.   No.
24       Q.   Would you have played any role in

Page 73

1   preparing the substance of the handouts?
2        A.   If there were questions, someone
3   might come to me and ask something, but...
4        Q.   And there would have been multiple
5   meetings?
6        A.   Yes.
7        Q.   Yes?
8        A.   Yes.
9        Q.   And there would have been different
10  people from Human Resources essentially imparting
11  the information at these different meetings?
12       MS. YU:  Objection as to form.
13       THE WITNESS:  That's quite possible
14  because there was a lot going on besides new
15  compensation and benefits.  The recruiting process
16  was changing, the structure of the function was
17  changing.  So, there was lots of different reasons
18  to get the line managers together and talk to them.
19  And there was a certain amount of uncertainty among
20  most management employees.  It's a, "Are we going
21  to be the next ones that get bought?"  Lots of
22  questions like that.
23  BY MR. SAUDER:
24       Q.   So, is it fair to say that

Reporting Associates, LLC   1-888-795-2323

B0383

BENJAMIN D. WILKINSON

Page 74

1  management employees were concerned about losing
2  their job at the time?
3      A.    Sure.
4      Q.    At these meetings where the managers
5  were given specific information about the changes
6  that were happening within the company, were you
7  one of the individuals -- for the meetings that you
8  believe you may have been present at, were you one
9  of the individuals that would have made a
10  presentation?
11     A.    Conceivably, but I don't remember
12  any specific presentations.
13     Q.    Okay.  I will show you what's
14  previously been marked as Plaintiff's Exhibit 9.
15  Have you had an opportunity to look at Plaintiff's
16  Exhibit 9?
17     A.    Yes.
18     Q.    Have you seen this document before
19  today?
20     A.    Yes.
21     Q.    When did you see it?
22     A.    Probably back in the late '90s.
23     Q.    If you flip to the last page, dated
24  December 10th, 1999, does that refresh your

Page 75

1  recollection on the time frame you would have seen
2  this document for the first time?
3      A.    I probably would have seen this
4  before it was actually submitted to the board.
5      Q.    You say late '90s.  Sometime -- you
6  would have seen it first perhaps sometime after
7  June of 1999, is that fair?
8           MS. YU:  Objection as to form.
9  BY MR. SAUDER:
10     Q.    You can answer.
11     A.    Probably.
12     Q.    Okay.  What is this document?
13     A.    This is the official plan language
14  for the pension plan.
15     Q.    And on that last page, Don Cain, it
16  says, "Don Cain, Vice President of Human Resources
17  and Productivity Improvement."  Is that Don Cain's
18  signature on that page?
19     A.    Yes.
20     Q.    And you know what Don Cain's
21  signature looks like?
22     A.    Yes.
23     Q.    And is Don Cain's signature on this
24  page an indication that he is formally adopting the

Page 76

1  plan?
2           MS. YU:  Objection as to form.
3           THE WITNESS:  I forgot the question
4  now.
5  BY MR. SAUDER:
6      Q.    Is this -- we've established that
7  this is Don Cain's signature on the bottom of this
8  last page, which is Bates PHI000520?
9      A.    That's correct.
10     Q.    Is Don Cain's signature on this page
11  an indication that this is Don Cain formally
12  adopting the plan?
13          MS. YU:  Objection as to form.
14          THE WITNESS:  I guess so.  This is
15  actually a board document, I believe.  I don't
16  quite know how to answer your question.  He just
17  signed it because it was submitted under his name.
18  BY MR. SAUDER:
19     Q.    But in the first sentence it says,
20  "I, Donald Cain, Vice President of Human Resources
21  and Productivity Improvement of Conectiv (the
22  'Company'), a Delaware corporation, hereby certify
23  that I approve the adoption of the Conectiv (the
24  'Plan') document in the form attached hereto,

Page 77

1  effective January 1st, 1999," correct?
2      A.    That's what it says.
3      Q.    Okay.  And he goes on to state that
4  he is given that authority by the compensation
5  committee meeting of April 23rd, 1999, correct?
6      A.    Yes.
7      Q.    Or 1998, I'm sorry.  Correct?
8      A.    Yes.
9      Q.    And this is the actual plan?
10          MS. YU:  Objection.
11  BY MR. SAUDER:
12     Q.    This is the Conectiv cash balance
13  plan, correct?
14          MS. YU:  Objection as to form.
15          THE WITNESS:  Yes, as written by
16  Pepper Hamilton.
17  BY MR. SAUDER:
18     Q.    Did you play any role in preparing
19  this document?
20     A.    No.
21     Q.    Do you know if Don Cain played any
22  role in preparing this document?
23     A.    I don't know.
24     Q.    Do you know at what point this

20 (Pages 74 to 77)

B0384

BENJAMIN D. WILKINSON

Page 78

1  document reached its final form?
2         MS. YU:  Objection as to form.
3         THE WITNESS:  I assume it was
4  sometime in early December 1999.
5  BY MR. SAUDER:
6      Q.    Okay.  That's all of the questions I
7  have for that document, sir.  I'll show you what's
8  been previously marked as Plaintiff's Exhibit 10.
9  I'm going to ask you to flip to the back portion of
10  this document, which is the Bates PHI001571.  Are
11  you on that page, sir?
12     A.    001571?
13     Q.    Right.
14     A.    Yes.
15     Q.    And the header on that is "February
16  2001 Amendment To Retirement Plan"?
17     A.    Yes.
18     Q.    And this is, again, this is the
19  "Conectiv Cash Balance Sub-Plan," correct, the
20  front of this?
21     A.    Yes.
22     Q.    And is that Don Cain's signature on
23  1571?
24     A.    Yes.

Page 79

1      Q.    And the date on that is January
2  2000 -- yeah, January.  It looks like January 2001,
3  at least, correct, that time frame?
4      A.    Yes.
5      Q.    I can't see what the other actual
6  specific date is.  And is this your understanding
7  that this is Don Cain amending some portion of the
8  plan?
9      A.    I've never seen this document
10  before.
11     Q.    Okay.  If you review what's taking
12  place on that page, is it your understanding that
13  that's what's happening, that Don Cain is amending
14  some portion of the plan?
15         MS. YU:  Objection as to form.  The
16  document speaks for itself.
17  BY MR. SAUDER:
18     Q.    You can answer, sir.
19     A.    I forget the question again.
20     Q.    I'm sorry.  Is it your understanding
21  that Don Cain's signature indicates that there's
22  some type of an amendment to the plan?
23         MS. YU:  Objection as to form.
24  BY MR. SAUDER:

Page 80

1      Q.    You can answer.
2      A.    That's what it looks like.
3      Q.    And he was given that authority, or
4  at least that was discussed at that April 1998
5  meeting that you attended, correct?
6      A.    I believe so.
7      Q.    Sir, I'm going to show you what's
8  previously been marked as Defense Exhibit 9.  Do
9  you recognize Defense Exhibit 9, sir?
10     A.    I don't remember this one.
11     Q.    Do you recognize the title of this
12  type of document which says "InSight"?
13     A.    I recognize the title, yes.
14     Q.    And what is your understanding of
15  how these InSight type of documents, which states
16  underneath, "InSight, The Conectiv Employee
17  Newsletter."  What's your understanding of how they
18  were or whether they were disseminated within the
19  company?
20     A.    It doesn't really appear that this
21  one was mailed, but it's hard to tell.  It was
22  either mailed to the homes or it was just
23  distributed widely through the different management
24  ranks.

Page 81

1      Q.    Would that be similar to distributed
2  widely, would that be something that may be laying
3  around the company?
4         MS. YU:  Objection as to form.
5         THE WITNESS:  Sure.
6  BY MR. SAUDER:
7      Q.    If you flip to the second page of
8  this document, which ends in Bates PHI003429.  Do
9  you see that?
10     A.    Yes.
11     Q.    There is a reference on the first
12  column, bottom subheading, which says,
13  "July/August - Cash Balance Pension Plan Meeting
14  For Employees."  Do you see that?
15     A.    No.  Where are you?
16     Q.    Right here.  Right at this
17  subheading that says "July/August - Cash Balance
18  Pension Plan Meetings For Employees," bold.
19     A.    Got you.
20     Q.    Okay.  Are you aware of any meetings
21  that took place around July or August of 1999
22  regarding the cash balance pension plan, specific
23  meetings with employees?
24     A.    I don't recall any.

21 (Pages 78 to 81)

B0385

BENJAMIN D. WILKINSON

Page 82

1    Q.    Do you know if you participated in
2  any of them?
3    A.    Probably not, because I wasn't in
4  the plan.  I didn't have any interest in how it
5  worked.
6    Q.    Would you have participated as
7  someone who would make a presentation at these
8  types of meetings?
9    A.    I think by this point in time, the
10  benefit responsibility had switched to John and Jim
11  Kremmel.
12    Q.    John Zimmerman and Jim Kremmel?
13    A.    Yes.
14    Q.    I'm showing you what has been
15  previously marked as Defense Exhibit 10.  I'm
16  showing you what has been marked as Defense Exhibit
17  10.  Do you recognize this document?
18    A.    No, I don't remember this.  There's
19  no dates again.  Oh, yeah, there's June 1999.
20    Q.    Go to the second paragraph, second
21  sentence.  It starts, "As managers, please make
22  sure that everyone who wishes to attend the
23  information session is given the opportunity."
24          Do you have an understanding of how

Page 83

1  this communication would have been disseminated
2  within the company?
3    A.    Probably just through the normal
4  document distribution system, which would have
5  involved the administrative assistants, the
6  mailroom.
7    Q.    Do you know if the target audience
8  of this communication would have been the managers?
9          MS. YU:  Objection as to form.
10          THE WITNESS:  I think it would have
11  been anybody who was in the cash balance plan.
12  BY MR. SAUDER:
13    Q.    So, what does that mean to you where
14  it says, "As managers, please make sure that
15  everyone who wishes to attend the information
16  session is given the opportunity."
17    A.    I would guess that means be
18  flexible, and that this is very important, we want
19  you to encourage all of your people to come.
20    Q.    And then the bottom, last paragraph,
21  first sentence states, "If you or your employees
22  have any questions after receiving the opening
23  statements, please hold them until the meetings
24  where experts will be available to respond."

Page 84

1          Is that sentence in conjunction with
2  the sentence that states, "As managers" in any way
3  lead you to believe that this communication was
4  specifically designed for managers?
5          MS. YU:  Objection as to form.
6          THE WITNESS:  I'm not sure I
7  understand what you mean.
8  BY MR. SAUDER:
9    Q.    Well, we went through the sentence
10  that states, "As managers."  And then the next
11  sentence we went through was, "If you or your
12  employees have any questions."  What does that
13  mean, "if you or your employees"?
14          MS. YU:  Objection as to form.
15          THE WITNESS:  If you or -- I guess
16  it's, "If you, Mr. Manager and the employees that
17  work for you."
18  BY MR. SAUDER:
19    Q.    Okay.  The third paragraph, where it
20  starts out, "These meetings will be the best source
21  of information on the plan and employees' opening
22  balances.  Recent stories in the national media
23  have raised concerns about some cash-balance plans
24  that do not offer the same level of financial

Page 85

1  security or grandfathering provisions as Conectiv's
2  Cash Balance Pension Plan.  One part of the
3  presentation will address these concerns and
4  demonstrate how Conectiv's plan is different."
5          Do you see that?
6    A.    Yes.
7    Q.    What's your understanding of that
8  last portion, where it says, "and demonstrate how
9  Conectiv's plan is different"?
10          MS. YU:  Objection as to form.
11          THE WITNESS:  Well, I think it means
12  that Conectiv's plan design was different than the
13  plan design that was discussed in the national
14  media.
15  BY MR. SAUDER:
16    Q.    Okay.  The next paragraph down
17  states, second sentence in, where it says that,
18  "The Vanguard Group will act as the plan
19  administrator, and the Towers Perrin consulting
20  firm will act as the actuary."
21    A.    Which paragraph you got?
22    Q.    It's the fourth paragraph, second
23  sentence.
24    A.    Okay.

22 (Pages 82 to 85)

B0386

BENJAMIN D. WILKINSON

Page 86

1    Q.    At what point were they, was Towers
2  brought in as an actuary, do you recall?
3    A.    No, I don't recall.
4    Q.    Did you have any interaction with
5  them?
6    A.    Very little.
7    Q.    And in what capacity would you have
8  interacted with them?
9    A.    Maybe to ask some questions, but
10  actuarial work was not my strong suit.
11    Q.    Who would have been the main contact
12  at Conectiv with Towers?
13    A.    Probably someone in the finance
14  field.  Somebody who worked for the CFO.  Maybe the
15  treasurer or the --
16    Q.    And who was the treasurer at the
17  time?
18    A.    Oh, I don't remember.
19    Q.    Going back to that sentence where it
20  says, "demonstrate how the Conectiv's plan is
21  different," and you stated "different than the
22  plans that were in the national media."  Is it your
23  understanding that these meetings, one of the
24  purposes of these meetings was to explain to the

Page 87

1  employees that the Conectiv plan was, in fact,
2  different than the plans that were in the national
3  media?
4    A.    That's --
5    MS. YU:  Objection.
6  BY MR. SAUDER:
7    Q.    Go ahead.
8    A.    That's what I'm guessing.
9    Q.    That's what you're assuming?
10    A.    That's what I'm assuming.
11    Q.    If you flip to the second page of
12  that document, it has a list of meetings.
13    A.    Yes.
14    Q.    Based on my review of this list,
15  does this in any way refresh your recollection as
16  to whether you attended any of those meetings?
17    A.    I probably did.  I just don't
18  remember this specific meeting, but this is a
19  common format for sending out notices of big
20  meetings where they want everybody to attend.
21    Q.    And do you have an understanding of
22  the format of these meetings?
23    A.    Probably presentations by someone to
24  large assembled groups.

Page 88

1    Q.    But you don't know who that someone
2  would have been?
3    A.    I don't recall, no.
4    Q.    Would you have presented anything at
5  any of these meetings?
6    A.    Probably not.
7    Q.    So, is it fair to say that you have
8  no specific recollection of being at any of these
9  meetings?
10    A.    The format of these documents is
11  very familiar, but I don't remember a specific --
12  we went to a lot of meetings.  Actually, it looks
13  like the Vanguard Group did this one.
14    Q.    And you're stating that because it
15  says "Vanguard Group" on the top of that second
16  page?
17    A.    That's correct.
18    Q.    I'm showing you what has been
19  previously marked as Plaintiff's Exhibit 4.  Sir,
20  after you've had an opportunity to review
21  Plaintiff's Exhibit 4, if you would just let me
22  know if you've seen that document prior to today.
23    A.    It looks like a copy of
24  transparencies or slides used in an informational

Page 89

1  meeting.
2    Q.    Prior to today, have you seen this?
3    A.    Probably back in 1999.
4    Q.    And why would you have seen it then?
5    A.    Probably went to a meeting and got a
6  copy.
7    Q.    Okay.  But you have no specific
8  recollection?
9    A.    (Witness indicating.)
10    Q.    Do you know if you played any role
11  in preparing any of these slides?
12    A.    Doubtful.
13    Q.    Because of the timing, is that why
14  you answered that way, because of the timing?
15    A.    Yes.
16    Q.    Do you know how this was presented?
17    MS. YU:  Objection as to form.
18    THE WITNESS:  It appears to be a
19  presentation made by Vanguard.
20  BY MR. SAUDER:
21    Q.    If you turn to the second page of
22  this document, Bates ending 302.
23    A.    Uh-huh.
24    Q.    First slide up in the upper

23 (Pages 86 to 89)

B0387

BENJAMIN D. WILKINSON

Page 90

1    left-hand corner states "Important Perspectives on
2    Conectiv's New Retirement Program."
3            Do you see that?
4        A.    Yes.
5        Q.    And then in the second bullet it
6    says, "Cash balance plans are controversial."  And
7    there's two subheadings, which says "Series of Wall
8    Street Journal articles" and the second heading
9    "Congressional hearings."
10           Do you see that?
11       A.    Yes.
12       Q.    Do you have any specific
13   recollection what, if anything, was discussed
14   regarding that at these meetings?
15       A.    There was a series of Wall Street
16   Journal articles that came out, I think, concerning
17   IBM and their cash balance plan that a lot of our
18   employees saw in the paper, and I guess it raised
19   concerns in their mind, since they now have a cash
20   balance plan, that there was something wrong.
21       Q.    And the next bullet says "Criticisms
22   leveled at cash balance plans," and then it has
23   three subparts.
24       A.    Uh-huh.

Page 91

1        Q.    And the first one is "Masks cost
2    cutting."  Do you see that?
3        A.    Yes.
4        Q.    Okay.  And if you go down to the
5    next slide right below that, on the left-hand side,
6    which is titled, "Important Perspectives on
7    Conectiv's New Retirement Program."
8        A.    Yes.
9        Q.    Okay.  And the first bullet on that
10   is, "New program not designed to provide cost
11   savings for Conectiv."  Do you see that?
12       A.    Yes.
13       Q.    Is that bullet meant to address the
14   concern of masks cost cutting?
15           MS. YU:  Objection as to form.
16           THE WITNESS:  I think that bullet
17   probably refers to the fact that Conectiv cash
18   balance plan, in the words of Watson Wyatt, was the
19   richest cash balance plan their firm had ever put
20   in place.  It was not designed to mask any cost
21   cutting.  It was very rich, very generous.
22   BY MR. SAUDER:
23       Q.    And that's one of the points that
24   that bullet is addressing, correct, the bullet that

Page 92

1    says, "New program not designed to provide cost
2    savings for Conectiv," correct?
3            MS. YU:  Objection as to form.
4            THE WITNESS:  I'm sorry.  You're
5    talking to me?
6    BY MR. SAUDER:
7        Q.    Yes.  That's what that -- one of the
8    points that bullet was designed to address was, as
9    we discussed, the mask cost cutting, the bullet
10   that says, "New program not designed to provide
11   cost savings for Conectiv," correct?
12           MS. YU:  Objection.
13           THE WITNESS:  Correct.
14   BY MR. SAUDER:
15       Q.    And then we go to that top side in
16   the upper left-hand corner again, the second bullet
17   says, "Poor handling of the
18   communication/transition."
19           Do you see that?
20       A.    Where are you, the top left?
21       A.    Yeah, top left, right under, still
22   under the "Criticisms leveled at cash balance
23   plan."
24       A.    Yes.

Page 93

1        Q.    It says, "Poor handling of
2    communication/transition."
3        A.    Right.
4        Q.    Okay.
5        A.    I don't think that refers to the
6    Conectiv plan, though.  I think that refers to the
7    general public stuff that would be written about in
8    the Wall Street Journal.
9        Q.    Because there were prior documents
10   that we looked at that specifically said
11   communication was one of the benefits of this new
12   plan, correct?
13           MS. YU:  Objection.
14           THE WITNESS:  It was a very high
15   priority.
16   BY MR. SAUDER:
17       Q.    Okay.  And what about the last
18   bullet where it says, "Accruals cease for certain
19   employees" under one of the "Criticisms leveled at
20   cash balance plans."
21           That was not referring to the
22   Conectiv plan, correct?
23           MS. YU:  Objection.
24           THE WITNESS:  I don't believe so.  I

24 (Pages 90 to 93)

B0388

Page 94

1  think this is just talking about the general
2  publicity that the Wall Street Journal was giving
3  these plans.
4  BY MR. SAUDER:
5      Q.    If you look at the upper top slide
6  on the right-hand side there.
7      A.    Yes.
8      Q.    There's a graph.  This is still on
9  Page 302.  Do you know what data or assumptions or
10  where the data came from to put this graph
11  together?
12          MS. YU:  Objection.
13          THE WITNESS:  I assume it came from
14  either the actuaries or from Watson Wyatt or maybe
15  Vanguard.
16  BY MR. SAUDER:
17      Q.    Okay.  If you go to 305, Bates 305.
18  Two charts on the right-hand side, bottom?
19      A.    Uh-huh.
20      Q.    "Conectiv Cash Balance Account
21  Versus Prior Plan - Delmarva," and then there's a
22  similar slide for Atlantic.  Is the same answer
23  with regard to where you believe the data sources
24  came from for these charts?

Page 95

1          MS. YU:  Objection.
2          THE WITNESS:  I'm not sure I can
3  answer that.  I would guess the data came from an
4  outside consultant of some sort.
5  BY MR. SAUDER:
6      Q.    Now, do you know if Don Cain would
7  have been an individual who would have made a
8  presentation at any of these types of meetings?
9      A.    It's likely at the beginning when
10  they were just rolling things out to the senior
11  management team, that he would have made either
12  introductions or part of the presentation.
13      Q.    But not --
14      A.    Not down in the weed.
15      Q.    But not to the non-senior
16  management?
17      A.    No.
18      Q.    Let me show you what has been marked
19  as Defense Exhibit 13.  I'm just going to show you
20  the first page there where it says -- there's
21  handwriting on the left-hand side.
22      A.    Yes.
23      Q.    You recognize that handwriting?
24      A.    Not really.  I recognize the name.

Page 96

1      Q.    Okay.  If you go to the page Bates
2  ending 221, the handwriting at the bottom there, it
3  says, "Date 12/98."
4          Do you recognize that handwriting?
5      A.    No.
6      Q.    That's all I have for that.  I will
7  show you what has been previously marked as Defense
8  Exhibit 12.  I'm showing you what has been marked
9  as Defense Exhibit 12.  Have you seen this document
10  prior to today?
11      A.    I don't recognize this document.
12      Q.    If you go to the bottom portion of
13  the first page where it says in bold "Cash Balance
14  Schedule Revised."
15          Do you see that?
16      A.    Yes.
17      Q.    And the first sentence says, "A
18  revised schedule for Cash Balance Pension Plan
19  meetings is attached."
20          Do you have any recollection that
21  there was a revision to those July 1999 meetings?
22          MS. YU:  Objection.
23          THE WITNESS:  No.
24  BY MR. SAUDER:

Page 97

1      Q.    The header of this document is
2  "InSight online."  And underneath it says,
3  "Conectiv's Intranet resource for corporate news
4  and information."
5          Do you see that?
6      A.    Yes.
7      Q.    What is your understanding of how
8  this type of document or how this specific document
9  was disseminated?
10          MS. YU:  Objection.
11          THE WITNESS:  It appears that it was
12  disseminated on the Internet, not in hard copy.
13  BY MR. SAUDER:
14      Q.    On the Intranet, the Conectiv
15  Intranet?
16      A.    Yes.
17      Q.    And do you know at the time in July
18  of 1999, if all management, non-represented
19  management employees who would have been put in the
20  cash balance plan, do you know if all of those
21  individuals had a work computer?
22          MS. YU:  Objection.
23          THE WITNESS:  I don't know.
24  BY MR. SAUDER:

25 (Pages 94 to 97)

B0389

BENJAMIN D. WILKINSON

Page 98

1  Q.   Do you know if they all had an
2  e-mail account, company e-mail account?
3  A.   It's highly likely everyone did, but
4  I just don't know that for a fact.
5  Q.   Okay.  Is it fair to say that you
6  have no recollection of in any way preparing this
7  document?
8  A.   No.
9  THE WITNESS:  Can I get another five
10 minutes?
11 MR. SAUDER:  Yes.
12 (Recess at 12:26 p.m.)
13 (Resumed at 12:36 p.m.)
14 BY MR. SAUDER:
15 Q.   I'll show you what's been previously
16 marked as Defendant's Exhibit 3.  Sir, I'm showing
17 you what has been marked as Defendant's Exhibit 3.
18 It's entitled "Conectiv Cash Balance Plan."  It's
19 dated February 20, 1998.  If you can take a look at
20 that, and let me know if you've seen this document
21 before today.
22 A.   Yes, I've seen this.
23 Q.   When did you see this document prior
24 to today?

Page 99

1  A.   February 20th, 1998.
2  Q.   And in what context did you see this
3  document on that date?
4  A.   This is a Watson Wyatt presentation.
5  Q.   And you were present at the
6  presentation?
7  A.   Yes.
8  Q.   Who was present at the presentation?
9  A.   Don Cain, myself and probably three
10 Watson Wyatt consultants.
11 Q.   Anyone else from Conectiv?
12 A.   I don't remember.
13 Q.   And when I say "Conectiv," I mean
14 anyone else from, also include in that Delmarva or
15 Atlantic City Electric.
16 A.   I just don't remember.
17 Q.   And you say three Watson Wyatt
18 consultants?
19 A.   Yes, the three that I mentioned
20 earlier.
21 Q.   Okay.  And what was the purpose of
22 this presentation?
23 A.   The purpose was to bring senior
24 management, Don Cain, up to speed on the current

Page 100

1  thinking around how we could design a cash balance
2  plan.
3  Q.   And was this a presentation where
4  Watson Wyatt was essentially making presentation to
5  you, Don Cain, and anyone else from Conectiv who
6  may have been present?
7  A.   Yes.
8  Q.   So, you played no role in preparing
9  these slides?
10 A.   No.
11 Q.   If you flip to the Bates page that
12 ends 447.  It's entitled "Cash Balance Plan
13 Example."
14 A.   Okay.
15 Q.   Do you recognize the handwriting on
16 that document, on that page?
17 A.   No.
18 Q.   If you go to the Bates Page 449,
19 "Pattern of Lump Sum Benefit Growth."  Do you see
20 that graph there?
21 A.   Yes.
22 Q.   Do you know the purpose of this data
23 presentation in that graph?
24 MS. YU:  Objection.

Page 101

1  THE WITNESS:  Do I know the purpose?
2  BY MR. SAUDER:
3  Q.   Yeah.  Do you know what this was --
4  what were they conveying to you here?
5  MS. YU:  Objection.
6  BY MR. SAUDER:
7  Q.   And when I say that, I mean Watson
8  Wyatt.
9  MS. YU:  Objection.
10 THE WITNESS:  What they were
11 portraying, how your benefit would increase over a
12 career based on a three percent annual salary
13 increase.
14 BY MR. SAUDER:
15 Q.   And where it says "Assumes three
16 percent annual salary increase," do you know the
17 source of that assumption?
18 MS. YU:  Objection.
19 THE WITNESS:  It's Watson Wyatt's
20 actuaries, I guess.
21 BY MR. SAUDER:
22 Q.   You didn't have any input in coming
23 up with that three percent number?
24 A.   No.

26 (Pages 98 to 101)

B0390

BENJAMIN D. WILKINSON

Page 102

1    Q.    Did you know if Don Cain did?
2    A.    I doubt it.
3    Q.    Why do you say that?
4    A.    Because it's a Watson Wyatt
5 presentation.
6    Q.    Flip to the page ending Bates 455.
7 It's entitled "5 Year Grandfather Provision."
8    A.    Okay.
9    Q.    It says -- strike that.
10        What is this graph here designed to
11 convey?
12        MS. YU:  Objection.
13 BY MR. SAUDER:
14    Q.    Or what was Watson Wyatt conveying
15 to you in this graph?
16        MS. YU:  Objection.
17        THE WITNESS:  I guess it's designed
18 to show how, over again, over a period of time how
19 the current Atlantic pension benefit grows and how
20 the grandfathered cash balance plan would grow.
21 BY MR. SAUDER:
22    Q.    And what is that -- what is that
23 indicating to you?
24    A.    It's indicating to me that the

Page 103

1 grandfathered cash balance plan is better than the
2 current plan.
3    Q.    How about at age 59?
4    A.    It appears that they're about the
5 same at age 59.  And at age 61, the grandfather
6 cash balance becomes better.
7    Q.    How about at age 58?
8    A.    At age 58, it would appear that the
9 current -- no.  It's kind of hard to tell.  It's
10 not really clear here.
11    Q.    Well, there's a grid on the
12 right-hand side of the graph, correct?
13    A.    Yeah, I see it.
14    Q.    Okay.  Does this solid line, to you,
15 indicate the cash balance plan?
16    A.    It does to me, yeah.
17    Q.    And the dotted line indicates the
18 current plan, which would have been the plan in
19 effect prior to the cash balance plan being
20 implemented?
21    A.    That's correct, I think.
22    Q.    So, then at age 58, it would
23 indicate that the current plan was better than the
24 cash balance plan, correct?

Page 104

1    A.    That's the way it looks.
2        MS. YU:  Objection.  Joe, are you
3 asking him about his interpretation of this graph?
4        MR. SAUDER:  That's what I'm asking.
5 BY MR. SAUDER:
6    Q.    Is that the way it looks, sir?
7    A.    That's the way it looks to me.
8    Q.    The same thing with regard to age
9 59, it looks like the current plan was better than
10 the cash balance plan, correct?
11        MS. YU:  Objection.
12        THE WITNESS:  That's the way it
13 looks.
14 BY MR. SAUDER:
15    Q.    Okay.  And again, it assumes three
16 percent salary increase on the bottom of that
17 graph.  Is the source of that assumption Watson
18 Wyatt?
19    A.    Yes.
20    Q.    And this is entitled "5 Year
21 Grandfather provision," correct, up at the top of
22 this?
23    A.    Yes.
24    Q.    And ultimately, Conectiv implemented

Page 105

1 a 10 year grandfather provision, correct?
2    A.    Yes.
3    Q.    And do you know when this slide was
4 presented, whether that was discussed, whether it
5 would be a five-year or 10-year or some other
6 number?
7    A.    Say again.
8    Q.    When this slide was presented by
9 Watson Wyatt to you and Don Cain at this February,
10 1998 presentation, do you know if it was discussed
11 at that time whether there would be a five year
12 grandfather provision or a 10 year grandfather
13 provision?
14    A.    I don't recall.
15    Q.    Okay.  Is that something that you
16 and Don Cain would have had input in conjunction
17 with Watson Wyatt before it was finalized?
18    A.    Yes.
19    Q.    Subsequent to this meeting, do you
20 have any recollection of having a meeting with
21 Watson Wyatt where you and Don Cain were present,
22 and Watson Wyatt was, again, making some type of
23 presentation regarding the cash balance plan?
24    A.    I'm not sure I understood you.

27 (Pages 102 to 105)

B0391

BENJAMIN D. WILKINSON

Page 106

1    Q.    You stated that you and Don Cain
2    were at the February 28th, 1998 presentation by
3    Watson Wyatt.  Subsequent to that time, do you
4    remember having another similar meeting with Watson
5    Wyatt?
6    A.    Oh, yes.
7    Q.    Okay.  Regarding the cash balance
8    plans?
9    A.    (Witness nods.)
10    Q.    Yes?
11    A.    Lots.
12    Q.    And it would have been just you and
13    Don Cain from Conectiv, primarily?
14    A.    Well, there probably would have been
15    somebody there from Atlantic Electric also, and
16    there probably would have been someone from
17    Delmarva's finance group, but I don't recall all of
18    the faces.
19    Q.    Would any other consultants have
20    been present, outside consultants?
21    A.    Probably not.
22    Q.    And the purpose of those meetings
23    would be what?
24    A.    Keep tweaking the plan design until

Page 107

1    it was something that everybody was comfortable
2    with.
3    Q.    The cash balance plan?
4    A.    Yep.
5    Q.    Did Watson Wyatt work on anything
6    other than the cash balance plan?
7    A.    Yes, they worked on health care.  I
8    think that's all.  The cash balance plan and health
9    care.
10    Q.    And would you have been present at
11    the health care meetings?
12    A.    Yes.
13    Q.    Would Don Cain have been present?
14    A.    Only at the point where it was
15    necessary to get senior management approval to keep
16    pushing ahead.
17    Q.    You said there would have been lots
18    of other meetings with Watson Wyatt and you and Don
19    Cain regarding the cash balance plan and tweaking
20    the cash balance plan.  Do you know, in relation to
21    February '98, how far beyond that you would have
22    still been meeting with Watson Wyatt tweaking the
23    plan?
24    A.    This presentation was likely made

Page 108

1    fairly well along, because it's very detailed with
2    regard to examples and numbers.
3    Q.    So, there would have been meetings
4    prior to this?
5    A.    Yes.
6    Q.    And meetings subsequent to this?
7    A.    Probably.
8    Q.    You're just not sure how far in time
9    subsequent to this the meetings would have taken
10    place?
11    A.    No.
12    Q.    I'm showing you what's previously
13    marked as Defense Exhibit 8.  After you've had an
14    opportunity to review this document, if you would
15    let me know that you've seen this prior to today.
16    A.    Okay.  I forget the question again.
17    Q.    Do you know if -- have you seen this
18    document prior to today?
19    A.    I think so, yes.
20    Q.    When would you have seen this
21    document?
22    A.    Somewhere or sometime during the
23    design of the entire benefit package, not just the
24    cash balance, but the whole thing.

Page 109

1    Q.    But prior to it actually being
2    finalized?
3    A.    Yes.
4    Q.    And in what context would you have
5    seen this document?
6    A.    It was a -- in all likelihood, a
7    presentation to some group.
8    Q.    Would it have been senior
9    management?
10    A.    Probably.
11    Q.    And do you know who would have made
12    the presentation?
13    A.    I don't recall.
14    Q.    When you say "probably senior
15    management," what leads you to believe that it
16    would have been probably senior management?
17    A.    It's the kind -- it's -- the design
18    of the document is such that you would find it in
19    those kinds of meetings.  It's an overview to get
20    there.
21    Q.    How would you define "senior
22    management" in this context?
23    A.    That could probably go to include
24    the CEO, maybe the top 10 or 12 guys or gals.

28 (Pages 106 to 109)

B0392

BENJAMIN D. WILKINSON

Page 110

1    Q.    Don Cain?
2    A.    Yeah, Cain would definitely have
3  been in there.
4    Q.    But you're not including in that the
5  non-represented management employees who ended up
6  in the cash balance plan?
7    A.    Non-represented management.
8    Q.    I mean --
9    A.    We didn't seek approval from the
10  line managers on any of this. We took it to them
11  as a done deal.
12    Q.    And that's what this document is, in
13  your mind, that's what this document is doing, is
14  essentially working through the kinks in the plan?
15    MS. YU: Objection.
16    THE WITNESS: Yep.
17  BY MR. SAUDER:
18    Q.    Did you play any role in preparing
19  this document?
20    A.    I don't think so.
21    Q.    Do you know when this presentation
22  took place?
23    A.    No.
24    Q.    This document is not dated, correct?

Page 111

1    A.    No.
2    MR. SAUDER: Do you want to take a
3  break? You have your call, right?
4    MS. YU: Yeah, that would be great.
5    (Recess at 12:55 p.m.)
6    (Resumed at 1:20 p.m.)
7  BY MR. SAUDER:
8    Q.    So, we're still looking at what's
9  been marked as Defense Exhibit 8?
10    A.    Right.
11    Q.    On the first page of that under
12  "Conectiv Total Awards," it says, "The tangible and
13  hidden paychecks." What's your understanding of
14  what "hidden paychecks," what does that mean in
15  this context?
16    A.    What page are you on?
17    Q.    The first page, the cover page, or
18  the very first cover page.
19    A.    I think that referred to the fact
20  that the total rewards concept was that all of the
21  benefits put together are very competitive. Some
22  are tangible, you can see them and touch them and
23  understand them. And others are kind of hidden,
24  like the subsidiaries and the health care and

Page 112

1  things like that.
2    Q.    What other things were hidden?
3    A.    Let's see. I'm trying to remember
4  if they had -- I think they had a survivor benefit
5  too that you don't really think about while you're
6  alive. Those are the two that come to mind.
7    Q.    If you flip to the Bates page ending
8  199.
9    A.    Right.
10    Q.    It's entitled "Background" at the
11  top. And then it says "Goals" in the middle of
12  that page.
13    A.    Uh-huh.
14    Q.    And one of the goals, it says,
15  "Costs." Is that referencing a cost savings to the
16  company?
17    MS. YU: Objection.
18    THE WITNESS: I'm drawing a blank as
19  to why that's in there. I can speak to the other
20  three, but --
21  BY MR. SAUDER:
22    Q.    Well, is it fair to say that
23  wouldn't have been a goal of the company to have
24  increased cost?

Page 113

1    MS. YU: Objection.
2    THE WITNESS: Correct. It probably
3  had reference to the ability to control costs, that
4  they just won't go berserk.
5  BY MR. SAUDER:
6    Q.    Okay. If you flip to the page
7  ending 201.
8    A.    Yep.
9    Q.    You see those two graphs on that
10  page?
11    A.    Yes.
12    Q.    The graph on the left-hand side says
13  "Retirement."
14    A.    Uh-huh.
15    Q.    And the right-hand side is the
16  "Health" graph?
17    A.    Yes.
18    Q.    If you look at the graph
19  "Retirement." Does that graph indicate to you that
20  for every $100 spent by Conectiv for the retirement
21  benefits, it was comparing every $100 that Conectiv
22  spent to other companies?
23    MS. YU: Objection.
24    THE WITNESS: Other local companies.

29 (Pages 110 to 113)

B0393

BENJAMIN D. WILKINSON

Page 114

BY MR. SAUDER:
2    Q.    Okay.  Atlantic -- for every $100
3  Conectiv was spending, Atlantic was spending $122
4  on retirement, is that correct?
5    A.    Yes.
6    Q.    And Delmarva was spending $109 on
7  the retirement, correct?
8    A.    Yes.
9    Q.    If you flip to the page ending 203.
10    A.    Okay.
11    Q.    The graph on the left-hand side?
12    A.    Yes.
13    Q.    Do you know who that was prepared
14  by?
15    A.    I'm guessing -- I just don't know.
16    Q.    Do you know what the graph is meant
17  to convey?
18        MS. YU:  Objection.
19        THE WITNESS:  Yes.  It's meant to
20  convey that this kind of a plan design is better
21  suited to what the company, at that point, thought
22  was going to be the new workforce.  People leaving
23  at earlier ages, not people staying until they've
24  got 40 years service.

Page 115

BY MR. SAUDER:
2    Q.    And do you know what data or
3  assumptions went into the graph?
4    A.    No.
5    Q.    Under age and dollars, there's no
6  number there, correct?
7    A.    Not on this copy.
8    Q.    If you flip to the next page, Bates
9  204.  Do you see that handwriting there in the
10  bottom right-hand corner that says, "15 pre tax,
11  five percent after."
12    A.    Yes.
13    Q.    Do you know whose handwriting that
14  is?
15    A.    No.
16    Q.    How about the next page, it's Bates
17  205.
18    A.    Yep.
19    Q.    There's handwriting there.  Do you
20  recognize that?
21    A.    No.
22    Q.    If you flip to the last page, Bates
23  ending 214.
24    A.    Okay.

Page 116

1    Q.    It says "Summary" is the topic and
2  then the last bullet says "Expect leaders to
3  support direction and positively engage employees."
4        Do you know who that's referring to,
5  "leaders"?
6    A.    That would refer to the line
7  management.  We expect the line management people
8  to get on this bandwagon and go out and tell
9  everybody how good this package is.
10    Q.    Okay.  I'm showing you what's
11  previously been marked as Defense Exhibit 7.  I ask
12  you, sir, to take a look at that document and let
13  me know if you've seen that prior to today?
14    A.    I'm sorry, what was the question
15  again?
16    Q.    Have you seen this document prior to
17  today?
18    A.    Yes.
19    Q.    And when would you have seen it?
20    A.    Probably when it was put together.
21  But there are no dates.  And it's not the entire
22  document.
23    Q.    Okay.  On the portion of the
24  document that's been marked as, again, as Defense

Page 117

1  Exhibit 7, you don't see a date on there, correct?
2    A.    No.
3    Q.    Did you play any role in preparing
4  this document?
5    A.    I don't remember this one.
6    Q.    Do you know who it would have been
7  issued to?
8    A.    This probably went to all employees,
9  given the way it's written, "Your Total Conectiv
10  Rewards."
11    Q.    And do you know how it would have
12  been sent?
13    A.    Through the normal internal
14  communications channels.
15    Q.    And if you turn to Bates ending 191.
16  It's a Table of Contents.
17    A.    Yes.
18    Q.    This is a portion of all of the
19  changes that were involved in the total rewards
20  package?
21        MS. YU:  I'm sorry.  Can you repeat
22  that?
23  BY MR. SAUDER:
24    Q.    Is this Table of Contents, a portion

30 (Pages 114 to 117)

B0394

BENJAMIN D. WILKINSON

Page 118

1  of all of the changes that were involved in the
2  total rewards package?
3      A.    Yes.
4      Q.    I'll show you what's been marked as
5  Plaintiff's Exhibit 5. Sir, I'm showing you what's
6  been marked as Plaintiff's Exhibit 5. After you've
7  had an opportunity to review that document, can you
8  tell me, have you seen that document prior to
9  today?
10     A.    I don't recall.
11     Q.    What is this document, sir?
12     A.    It's a summary plan description.
13     Q.    Do you see a date on this document?
14     A.    No.
15     Q.    If you flip to the Bates ending 73.
16     A.    73?
17     Q.    Yeah, it ends in 73.
18     A.    Oh, oh. I'm looking at the --
19     Q.    Sorry.
20     A.    Okay.
21     Q.    You see where it says, at the very
22  bottom of the page, "Employer Identification
23  Number"?
24     A.    Yes.

Page 119

1      Q.    Do you see that's blank?
2      A.    Yes.
3      Q.    Okay. If you flip over to the next
4  page, where it says "Participating Employer" and
5  then "Employer Education Number" and they're both
6  blank?
7      A.    Yes.
8      Q.    And then Number 8 says "Trustee" and
9  that says "Name and Address," and there's nothing
10  filled in there?
11     A.    Yes.
12     Q.    Is this an indication to you that
13  this is a draft?
14         MS. YU: Objection.
15         THE WITNESS: I don't know.
16  BY MR. SAUDER:
17     Q.    Okay. I will show you what's
18  previously been marked as Defendant's 19. Sir, I'm
19  showing you what's been marked as D-19. After
20  you've had an opportunity to review this, have you
21  seen this document prior to today?
22     A.    I don't remember this.
23     Q.    You don't remember seeing this?
24     A.    No.

Page 120

1      Q.    And you don't see the date on this
2  either, correct?
3      A.    No.
4      Q.    I will show you what's been
5  previously marked as Defense Exhibit 22. And the
6  last page on this document is actually not part of
7  this document. It was stapled in and added in part
8  of the exhibits, so that's not part of the
9  document. I just ask you to review Bates ending
10  308 through 310. I would ask you if you've seen
11  this document prior to today?
12     A.    On Page 310?
13     Q.    I'm sorry. 308 through 310 is the
14  actual document, that portion of the document, have
15  you seen that prior to today?
16     A.    I do not remember this one.
17     Q.    I'll show you what's been previously
18  marked as Plaintiff's Exhibit 6. I'm showing you
19  what's been marked as Plaintiff's Exhibit 6. After
20  you've had an opportunity to look at this, I will
21  ask if you've seen this document prior to today?
22     A.    No, I've never seen this.
23     Q.    Do you know what this document is?
24     A.    It looks like a severance agreement

Page 121

1  or something.
2      Q.    Did you, during the time that you
3  were at Conectiv, did you play any role in drafting
4  severance agreements or releases?
5      A.    No.
6      Q.    Did you see any releases that
7  employees signed when they left the company?
8      A.    I think so. I just don't recall any
9  specific one.
10     Q.    And were there form releases --
11     A.    Yes.
12     Q.    -- that Conectiv used?
13     A.    Yes.
14     Q.    Did you sign a release when you left
15  the company?
16     A.    No.
17     Q.    I'll show you what's been marked as
18  Plaintiff's Exhibit 7. Sir, I'm showing you what
19  has previously been marked as Plaintiff's Exhibit
20  7. Have you seen this document prior to today?
21     A.    No.
22     Q.    This was also marked "General
23  Release" with the title "Pepco Holdings." Have you
24  ever seen a form similar to this release?

31 (Pages 118 to 121)

B0395

BENJAMIN D. WILKINSON

Page 122

1   A.   No.
2   Q.   You were gone from the company by
3  the time Pepco came in, correct?
4   A.   Oh, yes.
5   Q.   Sir, of the -- when the cash balance
6  plan became effective, do you know, in percentages
7  or proportionate, what percentage of employees at
8  Conectiv, which would have been Delmarva and ACE,
9  what percentage were grandfathered?
10       MS. YU:  Objection.
11       THE WITNESS:  I wouldn't have the
12  faintest idea.
13  BY MR. SAUDER:
14   Q.   Do you know what percentage were
15  union?
16       MS. YU:  Objection.
17       THE WITNESS:  No.
18  BY MR. SAUDER:
19   Q.   And do you know what percentage were
20  management that were not represented, in other
21  words, a percentage that ended up in the cash
22  balance plan?
23       MS. YU:  Objection.
24       THE WITNESS:  You mean the

Page 123

1  percentage of the total workforce?
2  BY MR. SAUDER:
3   Q.   Right.
4   A.   No.
5       MR. SAUDER:  I think I'm done.  Can
6  we just take five minutes?
7       MS. YU:  Sure, sure.
8       (Discussion is held off the record.)
9       MR. SAUDER:  Sir, I don't have any
10  other questions, but I would just ask, if you plan
11  on moving and end up moving any time in the near
12  future before this case is resolved, if you can
13  contact your counsel from Pepper Hamilton and just
14  let them know of any change of address.
15       THE WITNESS:  Sure.
16       MR. SAUDER:  I have no other
17  questions at this time.
18       MS. YU:  I just have a few questions
19  EXAMINATION
20  BY MS. YU:
21   Q.   Mr. Wilkinson, we have reviewed a
22  few documents, a number of which are communications
23  that relate to the implementation of the cash
24  balance plan.  And I would like to review with you

Page 124

1  which ones of these communications were prepared
2  during the time that you were in the position with
3  HR and compensation and benefits and which were
4  not, when you moved on to the next position with
5  Conectiv.  So, I thought we could just go through
6  and if you could indicate which ones --
7   A.   Okay.
8   Q.   -- are in those general categories,
9  that would be great.  The first one we didn't have
10  marked, but I think it was Defense Exhibit 1.
11       MR. SAUDER:  October 13, 1997.
12  BY MS. YU:
13   Q.   October 13, 1997.  Mr. Wilkinson,
14  what was your position during that time frame?
15   A.   I was the manager of compensation
16  and benefits.
17   Q.   Do you have any specific knowledge
18  right now as to how that communication was, in
19  fact, distributed to employees?
20   A.   This was probably distributed
21  through the normal communication channels that the
22  two companies set up when they merged.
23   Q.   And I understand that you testified
24  that there were general ways in which

Page 125

1  communications were distributed and, for example, I
2  understand that you said they could be sent by mail
3  to a person's home?
4   A.   Uh-huh.
5   Q.   That they may be distributed
6  internally through the company, that there may be
7  electronic means as well, so there's a variety of
8  processes through which communications were
9  distributed.  Do you have any personal knowledge
10  right now as you're sitting here today as to which
11  method was used specifically for that
12  communication?
13   A.   I would have to guess.
14   Q.   So, you don't have any -- I want you
15  only to explain what you, in fact, remember.  And
16  if you would have to guess -- I understand that
17  there are things that you could probably look at as
18  to the document that might give you some indication
19  as a likely or a probable method -- but
20  specifically as to, in fact, this was distributed,
21  do you have any personal knowledge or recollection
22  as you sit here today?
23   A.   This is one of many under the
24  EMerging Times banner.

32 (Pages 122 to 125)

B0396

BENJAMIN D. WILKINSON

Page 126

1      Q.      Yes.
2      A.      Which was a theme developed by the
3   communications people early on.  So every time
4   somebody says, "Hey, there's a new EMerging Times
5   coming out, go get a copy," you knew it had to do
6   with the merger itself.
7      Q.      But this specific one that is dated
8   October 13th, 1997, do you know how it was
9   distributed?
10     A.      I can't say for certain.
11     Q.      What's been marked as Defendant's
12  Exhibit 2 is the EMerging Times dated October 20th,
13  1997?
14     A.      Correct.
15     Q.      Were you the manager of compensation
16  and benefits at that time?
17     A.      Yes.
18     Q.      Do you know specifically how this
19  particular communication, which is dated October
20  20th, 1997 was distributed?
21     A.      I can't say exactly.
22     Q.      Now, I'm handing you what's been
23  marked as D-6, which is a communication dated
24  December 21st, 1998.

Page 127

1      A.      Yes.
2      Q.      What was your position at that time?
3      A.      I was a Human Resources personnel
4   manager.
5      Q.      Okay.  Did you have any
6   responsibility for the distribution of that
7   communication?
8      A.      In the role as the Human Resources
9   personnel manager, yes, it was my responsibility to
10  make sure this communication got to or was
11  available to everybody that was in the Shared
12  Services group.
13     Q.      Did you have any such
14  responsibilities for any employees outside of the
15  Shared Services group?
16     A.      No.
17     Q.      Do you know specifically how that
18  particular communication in D-6 was actually
19  distributed?
20     A.      No.
21     Q.      I am going to hand you D-5, which is
22  one of the "facts" communications.
23     A.      Okay.
24     Q.      Do you know how that particular

Page 128

1   communication was distributed to employees?
2      A.      This one was mailed to the
3   employee's homes.
4      Q.      I'm handing you P-3.
5      A.      Okay.
6      Q.      Do you have any specific knowledge
7   as to how that particular communication was
8   distributed to employees?
9      A.      No.
10     Q.      I'm handing you D-9, which is an
11  InSite communication that is dated March 1999.  Do
12  you have any specific knowledge as to how that
13  particular communication was distributed?
14     A.      No.
15     Q.      This is D-10.  It's the Mid Week
16  Extra communication dated June 23rd, 1999.
17     A.      Yes.
18     Q.      Do you have any specific knowledge
19  as to how that communication was distributed to
20  employees?
21     A.      No.
22     Q.      This is Exhibit D-12.  It says
23  "InSight online."  Do you have any specific
24  knowledge as to how that communication was

Page 129

1   distributed to employees?
2      A.      Electronically.
3      Q.      This is D-7, a portion of "Your
4   Conectiv Total Rewards."  And on the front page it
5   says "Conectiv 1998 to '99."
6              Do you have any specific knowledge
7   as to how that communication was distributed to
8   employees?
9      A.      No.
10     Q.      Finally, this is D-22.  And that
11  communication says "Introducing the New Cash
12  Balance Plan Retirement Plan" at the top.  Do you
13  have any specific knowledge how that communication
14  was distributed to employees?
15     A.      No.
16     Q.      Okay.
17         MR. SAUDER:  That was D-22?
18         MS. YU:  D-22, yes.  Those are all
19  of the questions I have.
20         MR. SAUDER:  I just have a couple
21  based on that.
22  FURTHER EXAMINATION
23  BY MR. SAUDER:
24     Q.      Looking back at D-6.

33 (Pages 126 to 129)

B0397