BENJAMIN D. WILKINSON

Page 130

1    A.    Got it.
2    Q.    You said, based on your role at that
3  time, it was your responsibility to make sure that
4  the employees in Shared Services either got it or
5  it was available to them?
6    A.    Yes.
7    Q.    And when you say "were made
8  available to them," what do you mean by that?
9    A.    Stacks of these left in the office
10  areas.
11    Q.    Okay.  D-5.  If you could take a
12  look at D-5 and P-3.  D-5, you said, was mailed?
13    A.    It appears though it was, because
14  the last page is a mailing address of an employee
15  named Karen Franks.
16    Q.    Right.  But beyond that mailing
17  address on this specific document, you have no
18  knowledge of whether this was mailed to anyone
19  other than her?
20    A.    I guess not.
21    Q.    And you have no specific knowledge
22  whether this was actually even mailed to Karen,
23  correct?
24    A.    I don't know that.

Page 131

1    Q.    Okay.  And finally, if you look at
2  D-12.  You said that D-12 was e-mailed, correct, or
3  electronically delivered to employees?
4    A.    Yes.
5    Q.    And you're basing that on what?
6    A.    On the electronic InSight based on
7  the front page.
8    Q.    On the word "InSight" up top, the
9  heading?
10    A.    Yes.
11    MS. YU:  Well, he said electronic
12  InSight at the very top of the page.
13  BY MR. SAUDER:
14    Q.    What are we looking at?
15    MS. YU:  I think maybe your copy is
16  not as clear.
17    MR. SAUDER:  Can I see it?  Okay.
18  BY MR. SAUDER:
19    Q.    But again, you have no specific
20  recollection on which employees had their own
21  computers at Conectiv at that time, correct?
22    A.    Say that one again.
23    Q.    You had no recollection at this
24  time, July 9th, 1999, what employees had their own

Page 132

1  computer terminals at Conectiv?
2    A.    Nope.
3    Q.    And you had no knowledge of whether
4  all of the employees had their own e-mail account
5  at that time, correct?
6    A.    I don't know.
7    MR. SAUDER:  Okay.  That's all I
8  have.
9    MS. YU:  I have no questions.
10    (1:53 p.m.)

Page 133

1    C E R T I F I C A T E
2    I, Denise M. Pitchford, a Certified
3  Shorthand Reporter and Notary Public, do hereby
4  certify that prior to the commencement of the
5  examination, the witness and/or witnesses were
6  sworn by me to testify to the truth and nothing but
7  the truth.
8    I do further certify that the foregoing
9  is a true and accurate computer-aided transcript of
10  the testimony as taken stenographically by and
11  before me at the time, place and on the date
12  hereinbefore set forth.
13    I do further certify that I am neither of
14  counsel nor attorney for any party in this action,
15  that I am not interested in the event nor outcome
16  of this litigation.
17
18
19
20
21    _____
      Certified Shorthand Reporter
22    XI01866
      Notary Public
23    My Commission Expires June 30, 2008
24    Dated:  _____

34 (Pages 130 to 133)

B0398

BENJAMIN D. WILKINSON

Page 134

```
 1              JURAT
 2         I, BENJAMIN D. WILKINSON, do hereby
    certify that I have read the foregoing transcript
 3  of my testimony taken on Wednesday, April 4, 2007
    and have signed it subject to the following
 4  changes:
 5  PAGE  LINE          CORRECTION
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19  _____
        BENJAMIN D. WILKINSON
20
    DATE _____
21
    Sworn and subscribed to me before this
22
    _____ day of _____, 2007
23
    _____
24  NOTARY PUBLIC
```

35 (Page 134)

B0399

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) ) | C. A. NO. 05-702 (SLR) (Lead Case) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) | |
| Defendants. | ) | |

### DECLARATION OF J. MICHAEL CHARLES

J. Michael Charles declares under penalty of perjury as follows:

1. On August 20, 2003 I emailed Human Resources about the pension plan.

2. In that email I stated: "I've always felt from the inception of the cash balance plan that it was unfair."

3. I was not asked to explain this statement at my deposition.

4. At the time I wrote the email, I meant the plan was unfair at its inception because I could not choose my pension plan. I was forced, as many other employees were, into the cash balance plan because I just missed the cut off for grandfathering by both age and service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___5 7h___ day of June, 2007 at Bridgeton, New Jersey.

_____
J. Michael Charles

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) ) | C. A. NO. 05-702 (SLR) (Lead Case) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) | |
| Defendants. | ) | |

DECLARATION OF MAURICE W. WARD

Maurice W. Ward declares under penalty of perjury as follows:

1. I thoroughly searched my archived emails and do not have a copy of the December 18, 1998 William Bates's email.

2. I have no recollection of ever seeing the three *Wall Street Journal* articles titled:

    a. 'Cash Balance' Saves Millions Hides Pitfalls From Workers

    b. Longtime Employees Face A Pension-Benefit 'Plateau'

    c. Employees Will Need to Know Traits of 'Cash-Balance' Plan

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ 6 _____ day of June, 2007 at Egg Harbor, New Jersey.

_____
Maurice W. Ward

B0401



# Conectiv
# Cash Balance Plan

## February 20, 1998

JMC00444

B0402

# Types of Plans

## Defined Contribution

- 401(k)
- Profit Sharing
- ESOP

## Hybrid

## Defined Benefit

JMC00445

B0403

# Cash Balance Plan

Provides for a Lump Sum that Accumulates Like a 401(k) Plan. When Employee Terminates, Balance is Portable

$$\text{Beginning of Year Balance} + \text{Pay Credits} + \text{Interest Credits} = \text{End of Year Balance}$$

JMC00446

B0404

# Cash Balance Plan Example

- Pay Credits:

  8% of Total Pay - Base, Bonus and Overtime

- Interest Credits:

  30 Year Treasury Rate - Use 6%

- Balance Payable as a Lump Sum

  – Upon Termination

  – Upon Death

JMC00447

B0405

# Cash Balance Plan Example
## Account Growth

### Stockman, New Hire Age 25 with $35,000 Annual Salary

| | Year 1 Pay $35,000 | Year 2 Pay $36,000 | Year 3 Pay $37,000 |
|---|---|---|---|
| Beginning Balance | $0 | $2,800 | $5,848 |
| Interest Credits | $0 | $168 | $351 |
| Pay Credits | $35,000 x .08<br>$2,800 | $36,000 x .08<br>$2,880 | $37,000 x .08<br>$2,960 |
| Ending Balance | $2,800 | $5,848 | $9,159 |

JMC00448

B0406



# Pattern of Lump Sum Benefit Growth



New Hire Age 25 with $35,000 Annual Salary

* Assumes 3% annual salary increase

JMC00449

B0407



# Interest Credits to Account

- Interest credits established at the beginning of each year
  - Interest equals the 30 year Treasury rate at the time
  - If the rate was set today, it would be 6.00%

- Statutory rules will not allow the Company to use a rate greater than the 30 year Treasury rate

JMC00450



# Cash Balance Plan Example
## Convert Existing Benefit to Cash Balance

### Age 40 with 15 Years of Service and $45,000 Final Average Pay

Benefit at Atlantic

$.016 \times \$45,000 \times 15 = \$10,800$

Value at Age 55:
Annuity payable for life

$12.4 \times \$10,800 = \$133,920$

Value at Age 40
If employee expected to earn
6% until age 55

$\$133,920$ Discounted
15 Years at 6% = $55,880$

JMC00451

B0409

# Pattern of Lump Sum Benefit Growth

## Employee Age 40 with 15 Years of Service and $50,000 Annual Salary



| | 40 | 45 | 50 | 55 | 60 | 65 |
|---|---|---|---|---|---|---|
| $800,000 | | | | | | |
| $700,000 | | | | | | |
| $600,000 | | | | | | |
| $500,000 | | | | | | |
| $400,000 | | | | | | |
| $300,000 | | | | | | |
| $200,000 | | | | | | |
| $100,000 | | | | | | |
| $0 | | | | | | |

* Assumes 3% annual salary increase

JMC00452

B0410



# Cash Balance Plan Example
## Arriving at an Annuity

Employee Age 55 with $200,000 Balance

- Upon retirement, employee makes an election to receive balance as an annuity or lump sum

  – Single Life annuity derived by converting balance to annuity at 30 year Treasury rate for the year

  $200,000/11.8 = $16,949

  – 50% Joint & Survivor annuity also available

  $200,000/12.5 = $16,000

JMC00453



# Grandfathering Concept

- Certain Employees close to retirement may be allowed to continue in the old plans for a limited period of time

  – Employee gets the greater of the value of old plan and new plan

  – Old plan may be frozen five to ten years into the future

JMC00454

B0412

# 5 Year Grandfather Provision

## Atlantic Employee Age 52 with 27 Years of Service and $75,000 Annual Salary



**Annuity**

Legend:
- ■ Current Pl
- ● 8% CB Pl
- ✕ Grandfather

* Assumes 3% annual salary increase.

JMC00455



# Comparison to Current Plans

## Cash Balance Plan

Benefit always available as lump sum

Entire account balance payable upon death of employee

Benefit earned evenly over entire career

Lump sum is defined, and annuity varies with market rates

## Current Plans

Benefit available as lump sum in some circumstances

50% of accrued benefit payable upon death of employee

Most of benefit earned when employee becomes retirement eligible

Annuity is defined, and if lump sum available, lump sum moves with market rates

JMC00456



# How Benefits are Allocated



**Current Plan**

- Pre-Retirement Departures
- Retirements

**Cash Balance**

- Pre-Retirement Departures
- Retirements

JMC00457

B0415



# Pension Benefits Provided as % of Pay

New Hire Age 25 with $35,000 Annual Salary

Legend:
- Atlantic
- Delmarva
- 8% CB Pl

Replacement Ratio: 80%, 70%, 60%, 50%, 40%, 30%, 20%, 10%, 0%

Age axis: 25, 30, 35, 40, 45, 50, 55, 60, 65

* Assumes 3% annual salary increase

JMC00458

B0416

# CONECTIV

## MINUTES OF THE PERSONNEL AND COMPENSATION COMMITTEE

Wilmington, Delaware, April 23, 1998

Pursuant to notice, a meeting of the Personnel & Compensation Committee was held beginning at 9:30 a.m. at the principal office of the Company, 800 King Street, Wilmington, Delaware.

|  |  |
|---|---|
| Present and constituting a quorum: | Directors Gore, McGlynn and Morgan. |
|  | Director Emery participated by telephone call. |
|  | Director Cosgrove also participated in the meeting. |

Chairman Gore presided.

Donald E. Cain, Vice President - Human Resources and Performance Improvement and Benjamin Wilkinson, Manager, Compensation & Benefits Consulting also participated in the meeting. Moira K. Donoghue acted as Secretary.

The Chairman called the meeting to order, introduced Mr. Cain and Mr. Wilkinson and confirmed that Director Emery could hear the conversation and that the other persons present could hear Director Emery. She then referred to materials that had been previously distributed to the Committee members.

The Chairman then called on Mr. Cain who reviewed the philosophy and approach for employee benefits at Conectiv, with an emphasis on
1. the ability to tailor benefit costs to the needs of individual lines of business
2. the interest in being able to move employees among the lines of business
3. the interest in being competitive both in cost and attractiveness to employees.

Mr. Cain then stated that the proposed benefit program was designed to be at approximately the median of the competitive marketplace, defined as regional employers in general industry. He stated that management proposed to phase in the program, first with management employees and later, following negotiations, with represented employees. He acknowledged that this creates a risk related to the reaction of management employees who will be the first to feel the effect of the changes but stated that this risk could be managed in light of the cost savings to be realized from the new program. Finally, he stated management's commitment to continually review the

000007

appropriateness of the program to the Company's business objectives and to employee interests.

Mr. Wilkinson stated that the long-term goal of management was to have the overall benefit cost at 35 - 36% of pay, which is the general industry standard. He then reviewed the details of the program on a plan by plan basis, specifically:

Management of the Company recommends that the Compensation Committee approve the adoption of a Cash Balance Pension Plan, 401(k) Plan and Welfare Benefit Program for employees and retirees of participating subsidiaries of Conectiv.

First, it is recommended that a cash balance pension plan be adopted to replace the existing traditional defined benefit pension plans of Delmarva Power and Atlantic Energy. The cash balance design is viewed as more appropriate for attracting and retaining employees in a more mobile and independent workforce.

Second, it is recommended that a 401(k) plan be adopted to replace the current 401(k) plans of Delmarva Power and Atlantic Energy. The new plan will be administered by The Vanguard Group, the Trustee, and will offer a broader variety of investment options and a Company matching contribution of 50% on up to the first 6% of an employee's base pay in the form of Conectiv common stock.

Third, Management recommends that a competitive package of welfare plans be offered to all employees including a new flex program that will include multiple options for medical, prescription, dental, vision, life insurance, accidental death and dismemberment coverage and Choice Rewards (e.g., pre-paid legal, cancer insurance, and other non-traditional choices). In addition, employees will be given the option of flexible spending accounts (i.e., both health care and dependent care). Finally, such welfare plans will also include a competitive package of other programs, each with an effective date as indicated in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

Fourth, Management recommends that a post-retirement medical plan and life insurance plan be adopted, effective January 1, 1999. Both plans will have coverage similar to the current plans of Delmarva Power and Atlantic Energy. One additional option will provide opportunity for employees retiring as early as age 50 to receive retiree medical coverage at age 55.

All of the above-mentioned changes will be effective for management employees as indicated in the Attachment and all such changes will be effective for employees represented by IBEW Local Nos. 210, 1238 and 1307 if and when negotiated with each Local, respectively.

Discussion among the Committee members followed the presentation, with a specific focus on ways to control growth in medical plan costs and have employees feel

PHI001585

B0418

responsibility to manage those costs and on management's strategy for negotiating these changes with the unions.

Chairman Cosgrove stated that at a future meeting of the Committee management would present for discussion a set of principles to guide future benefit design based on comparative data with other employers in general industry. In addition, members of the Committee requested management to review alternatives in several specific areas of design for future consideration.

Mr. Cain referred specifically to one of the resolutions before the Committee that permits the Vice President - Human Resources and Performance Improvement to make changes in benefit plans and programs from time to time to maintain their competitiveness and respond to business and employee interests, subject to the responsibility of the Committee and the Board of Directors with respect to material amendments to employee benefit plans. The Committee acknowledged the advisability of management having this authority, subject to the understanding that material amendment could occur through a series of smaller, unrelated changes that in themselves are not material.

Following further discussion, on motion duly made, seconded and unanimously adopted it was

RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv Cash Balance Pension Plan with respect to Management employees, effective January 1, 1999, in substantially the same form presented in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv 401(k) Savings Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Welfare Benefits Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Post-Retirement Medical Plan and Retiree Life Insurance Plan for Conectiv, effective January 1, 1999, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Vice President of Human Resources and Performance Improvement be, and hereby is, authorized to negotiate or cause to be negotiated with representatives of IBEW Local Nos. 210, 1238 and 1307 inclusion in any or all of the plans and programs mentioned in the above resolutions and to extend the same or similar terms and conditions of such plans and programs, in whole or in part, to employees represented by such Locals as he deems appropriate.

000009

PHI001586

B0419

responsibility to manage those costs and on management's strategy for negotiating these changes with the unions.

Chairman Cosgrove stated that at a future meeting of the Committee management would present for discussion a set of principles to guide future benefit design based on comparative data with other employers in general industry. In addition, members of the Committee requested management to review alternatives in several specific areas of design for future consideration.

Mr. Cain referred specifically to one of the resolutions before the Committee that permits the Vice President - Human Resources and Performance Improvement to make changes in benefit plans and programs from time to time to maintain their competitiveness and respond to business and employee interests, subject to the responsibility of the Committee and the Board of Directors with respect to material amendments to employee benefit plans. The Committee acknowledged the advisability of management having this authority, subject to the understanding that material amendment could occur through a series of smaller, unrelated changes that in themselves are not material.

Following further discussion, on motion duly made, seconded and unanimously adopted it was

RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv Cash Balance Pension Plan with respect to Management employees, effective January 1, 1999, in substantially the same form presented in the attachment entitled "Conectiv Compensation and Benefits" (the "Attachment").

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Conectiv 401(k) Savings Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Welfare Benefits Plan with respect to Management employees, effective July 1, 1998, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Personnel & Compensation Committee hereby approves the Post-Retirement Medical Plan and Retiree Life Insurance Plan for Conectiv, effective January 1, 1999, in substantially the same form presented in the Attachment.

FURTHER RESOLVED, That the Vice President of Human Resources and Performance Improvement be, and hereby is, authorized to negotiate or cause to be negotiated with representatives of IBEW Local Nos. 210, 1238 and 1307 inclusion in any or all of the plans and programs mentioned in the above resolutions and to extend the same or similar terms and conditions of such plans and programs, in whole or in part, to employees represented by such Locals as he deems appropriate.

000009

PHI001587

B0420



# C O N E C T I V

# C O M P E N S A T I O N

# A N D

# B E N E F I T S

Ben Wilkinson
April, 1998



PHI001588

B0421

## CONECTIV COMPENSATION & BENEFITS

## ROLL-OUT STRATEGY

### CONECTIV Flex

- Effective: 7/1/98
- Health Care, Rx, Dental, Vision
- Life Insurance, AD & D
- Current Benefit Levels & "Buy-ups & downs"
- Business Link
  - Flexible by L.O.B.
  - Framework in place
  - Employee Choice, New Work Force
  - Pre-Tax dollars pay premiums

### Choice Rewards

- Effective: 7/1/98
- Provides additional non-traditional choices (ex: cancer insurance, Pre-Paid Legal)
- No cost to CONECTIV
- Vendor manages deductions, payments to vendors & communications

### Cash Balance Pension Plan

- Effective: 1/1/99
- Basic formula is: End of Year Balance = Beginning of Year Balance + Pay Credits + Interest Credits
- Portable - after 5 year vesting
- Improved employee communications
- Survivor receives the "balance"
- Extensive "Grandfathering"
- Transition Credits
- Business Link
  - Useful in Divestitures
  - Can be differentiated by SBU

PHI001589

B0422

## Post-Retirement Medical

- Effective: 1/1/99 (with cash balance plan)
- Provides current benefit levels
- Business Link
  - Provides retirement @ 50, with a benefit available at 55

## 401(k)

- Effective: 7/1/98 - Vanguard will administer
- 3% Company match - Paid in CONECTIV stock
- More fund choices
- Business Link
  - "Competitive" Plan design
  - Employee Stock Ownership

- Others
  - Holidays
    - 12 (same as current)
    - move to more "floaters" - keep business open (AE Design)
  - Vacation (1/1/99)
    - Essentially same (2 weeks - 6 weeks)
    - Provide flexibility for experienced hires
  - Employee Variable Compensation Plan (In Place)
    - Profit Sharing - for those not in Management Incentive Plans (3% x pay max)
    - Goals vary by SBU - Provide "Line-of-sight:"
  - Work & Family Programs (As approved)
    - Part-time, "work-from-home", HCRA/DCRA, etc.
  - Performance Mgt. System (2nd Qtr. '98)
    - Based on Competencies
  - Educational Assistance (1/1/99)
    - 80-20% cost split
  - Service Emblems (1/1/99)
    - New design, to fit changing workforce
    - Part of a larger "Recognition Kit": available to SBU's

2     PHI001590

B0423

- <u>Management Overtime Policy</u> (7/1/98)
  - Announced 1st qtr, '98
  - Objective is to become competitive
  - Managing reaction
- <u>Management Shift Differential</u>  (7/1/98)
  - Announced with job offers
  - Increase to competitive levels
- <u>Severance Program</u> (1/1/99)
  - 2 wks/yr of service is basic design
  - General Industry competitive
- <u>Retiree Life Insurance</u>  (1/1/99)
  - Effective with c/b pension plan
  - Coverage similar to current plans
- <u>Pensioner Health Care Premiums</u> (1/1/99)
  - Objective is to establish premiums at a level found in general industry

PART ONE

CONECTIV CASH BALANCE SUB-PLAN

Effective January 1, 1999

PHLEGAL: #663223 v5 (#7qv05!.WPD)

## TABLE OF CONTENTS

Page

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 1 -- DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 2 -- ELIGIBILITY FOR PARTICIPATION . . . . . . . . . . . . . . . . . . . . . . . . 14
    2.1 Continuing Participants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    2.2 New Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    2.3 Transferred Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE 3 -- ACCOUNTS AND CREDITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    3.1 Establishment of Cash Balance Account. . . . . . . . . . . . . . . . . . . . . . . . . 15
    3.2 Initial Cash Balance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    3.3 Pay Credits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    3.4 Interest Credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    3.5 Transition Credits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    3.6 Grandfather Benefit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 4 -- ELIGIBILITY FOR RETIREMENT . . . . . . . . . . . . . . . . . . . . . . . . . 20
    4.1 Dates of Eligibility for Retirement Benefits . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE 5 -- AMOUNT OF RETIREMENT INCOME . . . . . . . . . . . . . . . . . . . . . 21
    5.1 Normal Retirement Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    5.2 Terminated Vested Retirement Benefit . . . . . . . . . . . . . . . . . . . . . . . . . 21
    5.3 Deferred Retirement Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    5.4 Required Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    5.5 Disability Retirement Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    5.6 Employment After Normal Retirement Age . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE 6 -- FORMS OF PAYMENT; SURVIVOR BENEFITS . . . . . . . . . . . . . . . 24
    6.1 Normal Form of Retirement Income . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    6.2 Pre-Retirement Survivor's Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    6.3 Grandfather Survivor Benefit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    6.4 Form of Retirement Income for Former Employees of Conowingo Power Company 26
    6.5 Mandatory Lump Sum Distributions. . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    6.6 Optional Forms of Benefit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

PHI001539

B0426

## PREAMBLE TO PART ONE

The Conectiv Cash Balance Sub-Plan (the "CB Sub-Plan") is Part One of the Conectiv Retirement Plan (the "Plan"). Provisions generally applicable to this Part One and the other Parts are contained in the Base Plan.

Delmarva Plan Participants or ACE Plan Participants who retired on a Retirement Date or who terminated their employment with the Employer prior to January 1, 1999, must look solely to the Prior Plan provisions in effect on their Retirement Date or termination of employment date for their Retirement Income, if any, except as specifically provided otherwise in the CB Sub-Plan.

PHI001540

B0427

# ARTICLE 1
## DEFINITIONS

The following words and phrases as used herein shall have the following meanings, unless a different meaning is plainly required by the context:

    1.1 <u>Accrued Benefit</u> means the greater of:

        1.1.1.  The Participant's Payable Cash Balance, converted to an Actuarially Equivalent single life annuity that is payable as of the determination date; or

        1.1.2.  The Participant's Minimum Benefit, stated as a life annuity commencing as of the determination date.

    1.2 <u>ACE Plan</u> has the meaning ascribed to it in the Base Plan.

    1.3 <u>Actuarial Equivalent or Actuarially Equivalent</u> means of equal actuarial value on the basis of the assumptions and factors described in Schedule A.

    1.4 <u>Affiliated Company</u> has the meaning ascribed to it in the Base Plan.

    1.5 <u>Annuity Starting Date</u> has the meaning ascribed to it in the Base Plan.

    1.6 <u>Board of Directors</u> has the meaning ascribed to it in the Base Plan.

    1.7 <u>Cash Balance Account</u> means the bookkeeping account maintained with respect to a Participant in accordance with Section 3.1 which is the sum of, as applicable, (a) the Initial Cash Balance, (b) Pay Credits, (c) Interest Credits and (d) Transition Credits.

    1.8 <u>CB Sub-Plan</u> has the meaning ascribed to it in the Base Plan.

    1.9 <u>Code</u> has the meaning ascribed to it in the Base Plan.

    1.10 <u>Committee</u> has the meaning ascribed to it in the Base Plan.

    1.11 <u>Company</u> has the meaning ascribed to it in the Base Plan.

    1.12 <u>Compensation</u> paid to a Participant by the Employer means any amounts paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125, and excluding contributions the Employer makes to this or any other benefit plan, any amounts paid in the form of fringe benefits (including but not limited to reimbursed moving expenses, insurance, and the like; provided, however, that meal allowances shall not be excluded as fringe benefits) and any dividend rights earned under any

-3-

PHLEGAL: #663223 v5 (#7qv051.WPD)

PHI001541

B0428

executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes. In determining whether a payment is includible under this definition, the rules for the safe harbor definition set forth in Treas. Reg. § 1.415-2(d)(10), as adjusted by Treas. Reg. §§ 1.414(s)-l(c)(3) and (4) shall be applied. Notwithstanding the foregoing, Compensation taken into account for a Participant shall not exceed the annual limitation specified by section 401(a)(17) of the Code and shall be modified to reflect adjustments in the limitation announced by the Secretary of the Treasury at the same time and in the same manner as under section 415(d) of the Code.

1.13    Continuous Service. See "Service."

1.14    Deferred Retirement Date means the first day of the month coincident with or next following the Participant's election to retire from employment with the Employer after attaining Normal Retirement Age. A Participant who elects to commence receipt of retirement benefits while remaining employed on or after attainment of age 70½ shall be deemed to have a Deferred Retirement Date as of the commencement of such in-service benefits.

1.15    Delmarva Plan has the meaning ascribed to it in the Base Plan.

1.16    Disability Retirement Date means the first day of a month coincident with or next following the date a Participant elects to retire from employment as a Non-Bargaining Unit Employee by reason of sickness or injury after (a) completing at least fifteen (15) Years of Service; (b) becoming permanently incapable of performing the duties of any position with the Employer with the degree of efficiency required by the Employer; and (c) providing to the Committee satisfactory medical evidence of disability.

1.17    Effective Date has the meaning ascribed to it in the Base Plan.

1.18    Employee has the meaning ascribed to it in the Base Plan.

1.19    Employer has the meaning ascribed to it in the Base Plan.

1.20    Employment Commencement Date. See "Service."

1.21    Entry Date has the meaning ascribed to it in the Base Plan.

1.22    ERISA has the meaning ascribed to it in the Base Plan.

1.23    Final Average Compensation means:

1.23.1. For purposes of determining the 650% limit on the Payable Cash Balance, the annualized sum of the Participant's highest five (5) consecutive calendar years of Compensation divided by five (5); provided, that if the Participant does not have five (5)

-4-

PHI001542

B0429

consecutive calendar years of Compensation, Final Average Compensation shall be determined using Compensation for all Years of Service with the Employer divided by all Years of Service with the Employer; provided further, that if a Participant has less than 12 months of Service, Final Average Compensation shall equal Compensation paid to the Participant by the Employer.

1.23.2. For purposes of determining the Grandfather Benefit, the sum of Compensation for the periods in the following subsections (i) through (iii) divided by five (5): (i) the last four (4) completed calendar years prior to the determination date; (ii) the completed months in the calendar year in which the determination date occurs; and (iii) that number of months occurring prior to the four (4) calendar years prior to the determination date that is equal to 12 minus the number of months in the preceding subsection (ii); provided, that if the Employee identifies another consecutive sixty (60) month period which produces a larger Final Average Compensation, Compensation from that period shall be used to calculate Final Average Compensation.

1.24  Grandfather Benefit means the benefit determined in accordance with Section 3.6.

1.25  Grandfathered Participant means a Prior Plan Participant who is (1) an Employee on the Effective Date and (2) as of the Effective Date (a) is credited with 20 or more Years of Benefit Service or (b) is at least age 50. A Bargaining Unit Employee who becomes eligible to participate in the CB Sub-Plan pursuant to Section 2.3 shall be a Grandfathered Participant if such Bargaining Unit Employee met the eligibility requirements of the preceding sentence as of the Effective Date.

1.26  Grandfather Period means the period from the Effective Date until the earlier to occur of a Grandfathered Participant's Severance from Employment Date or December 31, 2008.

1.27  Grandfather Survivor Benefit is the benefit determined in accordance with Section 6.3.

1.28  Hour of Service.  See "Service."

1.29  Initial Cash Balance means the amount determined pursuant to Section 3.2.

1.30  Interest Crediting Rate means, for each Plan Year, the 30-year Treasury Bond rate for the October immediately preceding the beginning of the Plan Year.

1.31  Interest Credits means the amount that is credited to a Participant's Cash Balance Account in accordance with Section 3.4.

1.32  Leased Employee has the meaning ascribed to it in the Base Plan.

-5-

PHLEGAL: #663223 v5 (#7qv05LWPD)

PHI001543

B0430

1.33  Minimum Benefit means the greater of :

1.33.1. The Participant's accrued benefit under the Prior Plan as of December 31, 1998, stated as a life annuity commencing at age 65; provided, that for Prior Plan Participants who transfer to Non-Bargaining Unit Employee status after the Effective Date, the accrued benefit under the Prior Plan shall be determined as of the first anniversary of the date of transfer; provided further, that if the Employee identifies a consecutive 60-month period, other than the 60-month period preceding the Effective Date or, if applicable, the first anniversary of the date of transfer, which produces a larger Minimum Benefit, Compensation from that period shall be used to calculate the Minimum Benefit; or

1.33.2. The Participant's Grandfather Benefit.

1.34  Non-Bargaining Unit Employee has the meaning ascribed to it in the Base Plan.

1.35  Normal Retirement Age means the date upon which a Participant attains age 65.

1.36  Normal Retirement Date means the first day of a month coincident with or next following the date a Participant elects to retire from employment with the Employer upon attaining Normal Retirement Age.

1.37  One Year Break in Service.  See "Service."

1.38  Participant has the meaning ascribed to it in the Base Plan.

1.39  Part-Time Employee.  See "Service."

1.40  Payable Cash Balance means, as of any determination date, the lesser of (a) the Participant's Cash Balance Account at the determination date or (b) 650% of Final Average Compensation as of such date.

1.41  Pay Crediting Rate means the rate determined in accordance with Section 3.3.2.

1.42  Pay Credits means amounts which are credited to a Participant's Cash Balance Account in accordance with Section 3.3.

1.43  Permanent Break in Service.  See "Service."

1.44  Plan Year has the meaning ascribed to it in the Base Plan.

-6-

PHI001544

B0431

1.45  Post-65 Disability Benefit is the benefit payable upon a Participant's Disability Retirement Date in accordance with Section 5.4.2.

1.46  Pre-Cash Balance Accrued Benefit means accrued benefit under the Prior Plan as of December 31, 1998 assuming that the Compensation used to determine such accrued benefit is the Compensation for the consecutive 60-month period ending on December 31, 1998.

1.47  Pre-65 Disability Benefit is the benefit payable upon a Participant's Disability Retirement Date in accordance with Section 5.4.1.

1.48  Prior Plan has the meaning ascribed to it in the Base Plan.

1.49  Prior Plan Conversion Credit means (a) the actuarial present value of the Pre-Cash Balance Accrued Benefit at earliest retirement age, determined using seven percent (7%) interest and the 1983 GAM unisex mortality table; (b) for Participants who have not reached earliest retirement age as of December 31, 1998, discounted from the earliest retirement age to the Participant's age at December 31, 1998 at seven percent (7%) interest, but no mortality discount; (c) multiplied by the applicable early retirement reduction factor pursuant to the terms of the Prior Plan; and (d) for a Participant in the Delmarva Plan, increased by thirteen percent (13%) to reflect the adjustment for the subsidized survivor annuity under the Delmarva Plan.

1.50  Reemployment Commencement Date.  See "Service."

1.51  Required Beginning Date has the meaning ascribed to it in the Base Plan.

1.52  Retirement Date means a Participant's Normal Retirement Date, Terminated Vested Retirement Date, Deferred Retirement Date or Disability Retirement Date.

1.53  Retirement Income means the retirement benefits provided to a Participant upon his Retirement Date, or, if applicable the survivor benefits provided to any survivor.

1.54  Service.

1.54.1. General Rules.  Years of Service shall be credited as provided in this Section.

(a)  Service will be credited for an Employee's entire period of employment as an Employee.

(b)  An Employee shall receive credit for all service credited to an Employee pursuant to the terms of the Prior Plan, provided such Employee is an Employee on the Effective Date.  If an Employee is not an Employee on the Effective Date but has a

-7-

PHLEGAL: #663223 v5 (#7qv05LWPD)

PHI001545

B0432

Reemployment Commencement Date prior to incurring a Permanent Break in Service, then credit for Service prior to the Break shall be restored. If the Employee has a Reemployment Commencement Date prior to incurring a One-Year Break in Service, such Employee shall be credited with the Service between his Severance from Employment Date and his Reemployment Commencement Date.

(c)    Conectiv Thermal Systems, Inc. and Atlantic Energy Enterprises, Inc. Provisions.

(i)    Solely for purposes of determining eligibility for a Grandfather Benefit, Participants who (A) were formerly employed by Atlantic City Electric Company; (B) immediately thereafter were employed by Conectiv Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc.; and (C) on the Effective Date were employed by Conectiv Thermal Systems, Inc., Atlantic Energy Enterprises, Inc. or Conectiv Resource Partners, shall be credited with their Years of Service for any and all of such companies. However, their Grandfather Benefit shall be calculated solely on the basis of their prior service with (and compensation from) Atlantic City Electric Company plus their Service under this Part on and after the Effective Date (as if such Service were contiguous).

(ii)    Participants who (A) transferred from Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc. to Delmarva Power and Light Company, Atlantic City Electric Company or Conectiv Resource Partners before January 1, 1998, (B) continued to perform services for Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc., and (C) were employed by Delmarva Power and Light Company, Atlantic City Electric Company or Conectiv Resource Partners on the Effective Date, shall become Participants in this Part on the same basis as all other Prior Plan Participants as of the Effective Date, based on their accrued benefits and service credits as calculated under the Prior Plan in which they were participating immediately prior to the Effective Date.

(iii)    All other Participants who are employed by Conectiv Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc. on or after the Effective Date or who transferred from Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc. to Delmarva Power and Light Company, Atlantic City Electric Company or Conectiv Resource Partners on or after January 1, 1998, shall receive credit for their Years of Service for all such companies for purposes of calculating vesting service and for eligibility for Transition Credits. Any such Participants who were participating in a Prior Plan immediately prior to the Effective Date shall have a Minimum Benefit as defined in Section 1.33.1, but shall have an Initial Cash Balance equal to zero, subject to the provisions of Section 3.2.3.

(d)    Service will be credited for periods while on authorized leave of absence with full salary (provided the Employee returns to the Employer's employ at the expiration of the authorized leave). Service will not be credited for periods of authorized leave of absence without pay, but such an authorized leave of absence without pay shall not constitute

-8-

PHI001546

B0433

a break in Service provided the Employee returns to the Employer's employ at the expiration of the authorized leave. A layoff period of less than one (1) year will be considered such a leave of absence without pay.

(e)     Service will also be credited for employment with any employer acquired by the Company on such terms as may be approved by the Board of Directors.

(f)     Notwithstanding any provision of the Plan to the contrary, contributions, benefits and service credits with respect to qualified military service will be provided in accordance with Code section 414(u) in accordance with the Uniformed Services Employment and Reemployment Rights Act of 1994.

(g)     If a Leased Employee becomes an Employee, service will be credited for purposes of eligibility and vesting for periods after December 31, 1988 that the Employee was a Leased Employee.

(h)     Service shall not include Years of Service with respect to which an employee received a mandatory lump sum distribution (excluding a "deemed cash out"), as described in Section 6.5. Further, Service shall be disregarded once a Participant commences receipt of Retirement Income; provided, however, that if a Participant is reemployed, Service shall be considered for purposes of eligibility for Transition Credits.

1.54.2. Elapsed Time Rule; Determination of Years of Service. An Employee will be credited with whole and partial Years of Service on the basis of the elapsed time rule as described in this Section 1.54.2.

(a)     Basic Elapsed Time Rule. Years of Service under the elapsed time rule are based on the passage of time during which the employment relationship exists. One (1) Year of Service is credited for each 365 days of employment (366 days for a period that includes February 29). A day of employment is credited for each day of the period beginning on an Employee's Employment Commencement Date (or Reemployment Commencement Date, if applicable) and ending with his Severance from Employment Date.

(b)     Employment Commencement Date means the first date on which an Employee is credited with Service for the Employer; provided that if an Employee's first day of Service is the first business day of any calendar year, such Employee will be deemed to have been hired on December 31 of the prior year.

(c)     Reemployment Commencement Date means the first date on which an Employee is credited with Service for the Employer following a break in credited Service.

-9-

PHLEGAL: #663223 v5 (#7qv05LWPD)

PHI001547

B0434

(d)     <u>Severance from Employment Date</u> means the earlier of (i) the date an Employee quits, is discharged, retires or dies, or (ii) the date 365 days after the date he is first absent from employment for any reason (including e.g., lay off, disability, leave of absence, vacation) provided he is continuously absent from employment for such 365-day period.

(e)     <u>One-Year Break in Service</u>.  An Employee will incur a One-Year Break in Service if he is continuously absent from employment for 365 or more days following a Severance from Employment Date.

(f)     <u>Permanent Break in Service</u> means five (5) consecutive One Year Breaks in Service; provided, however, that an Employee who has been credited with five (5) Years of Service shall not thereafter incur a Permanent Break in Service.

1.54.3.  <u>Rules For Vesting Purposes Only</u>.  The following rules apply for the purposes of vesting:

(a)     <u>Service Spanning Rules</u>.  If an Employee's employment is terminated by reason of a quit, discharge, or retirement and the Employee then returns to employment within 365 days of his Severance from Employment Date, he shall be credited with Service during that period of severance.  If an Employee severs from Service by reason of a quit, discharge or retirement during an absence from Service of 365 days or less for any reason other than a quit, discharge or retirement and the Employee then returns to employment within 365 days of the date on which he was first absent from Service, he shall be credited with Service during that period of severance.

(b)     <u>Special Rule for Former ACE Plan Participants</u>.  If a Non-Bargaining Unit Employee was a Participant in the ACE Plan on December 29, 1998 and is a Non-Bargaining Unit Employee on the Effective Date, such Participant shall, for vesting purposes only, be deemed to have been hired on the January 1 of the Plan Year in which such Participant's Employment Commencement Date or Reemployment Commencement Date occurred.

(c)     <u>Limited Break in Service</u>.  An Employee will incur a break in Service if he is continuously absent from employment for 365 or more days following a Severance from Employment Date, unless the Employee establishes that the absence is for maternity or paternity reasons.  In such a case, the Employee will not incur a break in Service until he is continuously absent from employment for two consecutive 365-day periods following a Severance from Employment Date.  For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence on account of (1) the pregnancy of the Employee; (2) the birth of the child of the Employee; (3) the adoption of a child by the Employee; or (4) the immediate post-natal or post-adoption care of a child of the Employee.

-10-

PHI001548

B0435

(d)     Forfeiting Years of Service for Vesting Purposes.  If an Employee incurs a break in Service at a time when he is not credited with at least five (5) Years of Service for vesting purposes, and if such period of break in Service equals or exceeds five (5) years, then his prior period of Service will be forfeited.  If an Employee incurs a break in Service at a time when he is credited with at least five (5) Years of Service for vesting purposes, such Employee will not forfeit any Service because of the break in Service.

1.54.4. Exception to Break in Service Rules.  Notwithstanding the foregoing, if an Employee has at least ten (10) Years of Continuous Service when he retires, and if such Employee forfeited other Years of Service on account of a break in Service, he shall nevertheless be credited with the otherwise forfeited Years of Service just prior to his most recent break in Service which caused the forfeiture.

1.54.5. No Amendment to Reduce Credited Service.  No amendment to this CB Sub-Plan or the Base Plan shall cause any Employee to be credited with less Service with respect to employment prior to the amendment than would have been credited under the terms of the CB Sub-Plan or the Base Plan in effect prior to the amendment.

1.54.6. Rules of Construction.  The foregoing rules for crediting Service shall be interpreted and applied in accordance with the rules prescribed in Department of Labor Regulation 29 CFR § 2530.200.

1.54.7. Continuous Service means continuous full-time or part-time employment.

1.54.8. Years of Benefit Service.  For a Participant who is not a Part-Time Employee, Years of Benefit Service shall equal Years of Service.  For a Participant who is a Part-Time Employee, Years of Benefit Service will be credited for periods of part-time employment, and solely for purposes of calculating a Grandfather Benefit under Section 3.6 or Section 6.3, as follows:

| Hours of Service Completed in Accrual Computation Period | Percentage of Full Year of Benefit Service Credited |
|---|---|
| Less than 1,000 | 0% |
| 1,000-1,200 | 60% |
| 1,201-1,400 | 70% |
| 1,401-1,600 | 80% |
| 1,601-1,800 | 90% |
| 1,801 or more | 100% |

-11-

PHI001549

B0436

The accrual computation period begins on the employment commencement date as a Part-Time Employee (or re-employment commencement date as a Part-Time Employee, if applicable) and each anniversary date thereafter.

        (a)    Part-Time Employee means any Employee whose regularly-scheduled work schedule is for less than 40 hours per week on average.

        (b)    Hour of Service means each hour for which an Employee is:

        (i)    Directly or indirectly paid or entitled to payment by the Employer for the performance of duties;

        (ii)    Directly or indirectly paid or entitled to payment by the Employer on account of a period of time during which no duties were performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, or an authorized leave of absence. However, no more than 501 Hours of Service shall be credited under this subparagraph (ii) on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period). Payments made or due under a plan maintained by the Employer solely to comply with applicable worker's compensation, unemployment compensation, or disability insurance law, or to reimburse an Employee for medical or medically-related expenses shall not be considered as payments by the Employer for purposes of this subparagraph; or

        (iii)    Either awarded back pay or for which the Employer agrees to pay such back pay, irrespective of mitigation of damages. An Hour of Service received under this subparagraph (iii) shall be credited to that computation period for which the award was granted. The same Hours of Service shall not be credited both under subparagraph (i) or (ii), as the case may be, and under this subparagraph (iii). Hours of Service for which back pay is awarded or agreed to with respect to periods described in subparagraph (ii) shall be subject to the limitations set forth in that subparagraph.

        For purposes of subparagraphs (ii) and (iii), and for purposes of subparagraphs (i) in the case of an Employee for whom records of hours worked are not required by applicable law to be kept, an Employee shall be credited with 10 Hours of Service for each day for which he would have been required to be credited with an Hour of Service. Hours of Service shall be credited to the applicable computation period in accordance with Department of Labor Regulation Section 2530.200b-2(b) and (c).

        1.54.9. Family and Medical Leave Act. Solely for purposes of calculating an Employee's Service for vesting purposes, Service shall also be credited to the extent required under the Family and Medical Leave Act to avoid a break in Service during any period that an

PHLEGAL: #663223 v5 (#7qv05LWPD)

PHI001550

B0437

Employee is on an approved leave of absence, provided the Employee returns to work for the Employer at the end of such leave of absence.

 1.55 <u>Severance from Employment Date</u>. See "Service."

 1.56 <u>Terminated Vested Retirement Date</u> means the first day of the month coincident with or next following a Participant's Severance from Employment Date after completing five (5) Years of Service; provided, that a Participant may elect to defer the Terminated Vested Retirement Date to the first day of any month after the attainment of age fifty-five (55) or current age if older, but not beyond the Participant's Normal Retirement Age.

 1.57 <u>Transition Credits</u> means amounts that are credited to a Participant's Cash Balance Account in accordance with Section 3.5.

 1.58 <u>Year of Benefit Service</u>. See "Service."

 1.59 <u>Year of Service</u>. See "Service."

PHLEGAL: #663223 v5 (#7qv0$LWPD)

PHI001551

B0438

ARTICLE 2
ELIGIBILITY FOR PARTICIPATION

2.1 <u>Continuing Participants</u>. Each Non-Bargaining Unit Employee who was a Participant in one of the Prior Plans on December 31, 1998 and is a Non-Bargaining Unit Employee on the Effective Date shall be a Participant in the CB Sub-Plan as of the Effective Date.

2.2 <u>New Participants</u>.

2.2.1. <u>General</u>.

(a)    Each other Non-Bargaining Unit Employee shall become a Participant as of the Entry Date coincident with or next following the date on which he completes a Year of Service, provided that he is a Non-Bargaining Unit Employee on such Entry Date.

(b)    An Employee who completes the eligibility requirements of Section 2.2.1(a) but who is not a Non-Bargaining Unit Employee on the Entry Date, shall be eligible to participate on the first date thereafter on which he completes an Hour of Service as a Non-Bargaining Unit Employee.

2.2.2. <u>Termination of Employment Prior to Entry Date</u>.

(a)    An Employee who has a Severance from Employment Date prior to completing the eligibility requirements of Section 2.2.1 and who has a Reemployment Commencement Date prior to incurring a One-Year Break in Service, shall be eligible to participate as of the next Entry Date coincident with or next following the date on which he completes a Year of Service, provided he is a Non-Bargaining Unit Employee on such date.

(b)    An Employee who has a Severance From Employment Date prior to completing the eligibility requirements of Section 2.2.1 and who does not thereafter have a Reemployment Commencement Date prior to incurring a One-Year Break in Service, shall not receive credit for his prior service for purposes of eligibility and shall be required to complete the requirements of Section 2.2.1.

2.3 <u>Transferred Employees</u>. A Local 1238 Employee, Local 1307 Employee, or Local 210 Employee who becomes a Non-Bargaining Unit Employee shall remain a participant in the ACE Sub-Plan or Delmarva Sub-Plan in which he was previously a participant for one year following the date of transfer. If such Employee remains as a Non-Bargaining Unit Employee one year from the date of transfer, he shall become a Participant in the CB Sub-Plan as of the January 1 that occurs within the twelve-month period following the date of transfer.

-14-

PHLEGAL: #663223 v5 (#7qv05LWPD)

PHI001552

B0439

ARTICLE 3

ACCOUNTS AND CREDITS

3.1 <u>Establishment of Cash Balance Account</u>. A Cash Balance Account shall be established and maintained for each Participant and credits shall be made to such Cash Balance Account in accordance with the provisions of this Article 3. The Cash Balance Accounts established and maintained hereunder are for bookkeeping purposes only and shall not be construed as creating for any Participant a right to specific assets of the Plan.

3.2 <u>Initial Cash Balance</u>. Each Participant shall have an Initial Cash Balance, determined as follows.

3.2.1. <u>New Participants</u>. Employees who first become Participants on or after the Effective Date shall have an Initial Cash Balance of zero.

3.2.2. <u>Prior Plan Participants as of December 31, 1998</u>. For Employees who, as of December 31, 1998, were Participants in one of the Prior Plans and are Non-Bargaining Unit Employees on the Effective Date, the Initial Cash Balance as of the Effective Date is the Prior Plan Conversion Credit.

3.2.3. <u>Thermal Systems, Inc. and Atlantic Energy Enterprises, Inc.</u> <u>Transfers</u>. Participants described in Section 1.54.1(c)(i) or (iii) will have an Initial Cash Balance of zero unless they have a frozen benefit under the ACE Plan accrued prior to their employment by Thermal Systems, Inc. or Atlantic Energy Enterprises, Inc., in which event, their Initial Cash Balance shall be determined in accordance with Section 3.2.2.

3.2.4. <u>Prior Plan Participants Who are Rehired</u>.

(a) If a Non-Bargaining Unit Employee (i) was a participant in one of the Prior Plans, (ii) terminated employment as a Non-Bargaining Unit Employee prior to the Effective Date, (iii) has not begun to receive benefits under such Prior Plan, and (iv) is rehired as a Non-Bargaining Unit Employee on or after the Effective Date and prior to incurring a Five-Year Break in Service, the Initial Cash Balance shall be the Prior Plan Conversion Credit, credited with Interest Credits at the Interest Crediting Rate from the Effective Date to the Reemployment Commencement Date.

(b) If a Non-Bargaining Unit Employee (i) was a participant in one of the Prior Plans, (ii) terminated employment as a Non-Bargaining Unit Employee prior to the Effective Date, (iii) has not begun to receive benefits under such Prior Plan, and (iv) is rehired as a Non-Bargaining Unit Employee on or after the Effective Date and after incurring a Five-Year Break in Service, the Initial Cash Balance shall be zero.

-15-

PHI001553

B0440

(c)    If a Non-Bargaining Unit Employee (i) was a participant in one of the Prior Plans, (ii) terminated employment as a Non-Bargaining Unit Employee prior to the Effective Date, (iii) commenced receipt of benefits pursuant to the terms of the Prior Plan, either in annuity or lump sum form, and (iv) is rehired as a Non-Bargaining Unit Employee on or after the Effective Date, the Initial Cash Balance shall be zero.

3.2.5.    CB Sub-Plan Participants Who Terminate After Effective Date and are Rehired.

(a)    If a Participant in the CB Sub-Plan with a vested benefit (i) terminates employment after the Effective Date, (ii) has not commenced receipt of Retirement Income, and (iii) is later rehired as a Non-Bargaining Unit Employee prior to incurring a Permanent Break in Service, the Cash Balance Account shall be credited with Interest Credits at the Interest Crediting Rate from the date of termination as a Non-Bargaining Unit Employee to the reemployment date, but no new Initial Cash Balance shall be created.

(b)    If a Participant in the CB Sub-Plan with a vested benefit (i) terminates employment after the Effective Date with a vested benefit, (ii) commences receipt of Retirement Income, and (iii) is rehired as a Non-Bargaining Unit Employee at a later date, the Initial Cash Balance shall be zero. Notwithstanding the foregoing, if a Participant in the CB Sub-Plan with an entitlement to a Minimum Benefit received his Retirement Income in the form of a single-sum distribution prior to the Participant's attainment of age 55 and is rehired, within five years after the date of such distribution, into any position covered by any Sub-Plan within the Plan, such Participant shall be entitled to a restoration of his Accrued Benefit attributable to such distribution if the Participant repays such distribution, with interest calculated at the Interest Crediting Rate in effect as of such repayment date (compounded annually), within five years after the first date of such reemployment.

(c)    If a Participant (i) terminates employment after the Effective Date, (ii) was deemed to have received a single-sum payment of zero, and (iii) is rehired as a Non-Bargaining Unit Employee at a time when the consecutive One-Year Breaks in Service is less than the greater of (x) the number of full Years of Service for vesting purposes the Employee had accrued before his Severance from Employment Date or (y) five, the Initial Cash Balance shall be the Cash Balance Account as determined at the time of such Participant's Severance from Employment Date, with Interest Credits from the Severance from Employment Date to the Reemployment Commencement Date. Otherwise, the Initial Cash Balance shall be zero.

3.2.6.    Transfers From Union to Management.    A Local 1238 Employee, Local 1307 Employee, or Local 210 Employee who becomes a Non-Bargaining Unit Employee after the Effective Date shall have an Initial Cash Balance, provided such Employee remains a Non-Bargaining Unit Employee one year from the date of transfer. If the transferred Employee

-16-

PHI001554

B0441

remains a Non-Bargaining Unit Employee one year from the date of transfer, the Initial Cash Balance for such Employee shall be the Prior Plan Conversion Credit as of the January 1 that occurs in the year of transfer; provided that the Prior Plan Conversion Credit shall be determined as of the January 1 contained in the year of transfer rather than December 31, 1998; and further provided that an interest rate that is 2% above the applicable interest rate as of such January 1 (as defined in Schedule A) shall be substituted for 7% in the calculation of such Prior Plan Conversion Credit.

3.2.7.   Transfers From Management to Union.  A Participant who becomes a Local 1238 Employee, Local 1307 Employee, or Local 210 Employee shall, as of the date of transfer, no longer be eligible to participate in the CB Sub-Plan, but the Cash Balance Account shall be credited with Interest Credits as provided in Section 3.4 until distributed.

3.3  Pay Credits.

3.3.1.   In General.  Pay Credits shall be credited to the Cash Balance Account of each Participant as of the last day of each Plan Year in an amount equal to the product of (x) the pay crediting rate, as determined below, and (y) the Participant's Compensation as a Non-Bargaining Unit Employee for the Plan Year.

3.3.2.   Pay Crediting Rate.  The Pay Crediting Rate for a Plan Year shall be a percentage determined on the basis of the age that the Participant attains in that Plan Year, as follows:

| Participant's Age | Pay Crediting Rate |
| --- | --- |
| Under 30 | 5.0% |
| 30-34 | 6.0% |
| 35-39 | 7.0% |
| 40-44 | 8.0% |
| 45-49 | 9.0% |
| 50 and over | 10.0% |

3.3.3.   Pay Crediting in Year of Termination.  In the Plan Year in which a Participant terminates employment as a Non-Bargaining Unit Employee the Participant shall receive a Pay Credit for such Plan Year equal to the applicable Pay Crediting Rate for such Plan Year multiplied by the Participant's Compensation as a Non-Bargaining Unit Employee for such Plan Year.  The Pay Credit shall be credited to the Participant's Cash Balance Account as of the earlier of the last day of the month preceding the Annuity Starting Date or the last day of the Plan Year in which the termination occurs.

3.3.4.   Pay Crediting in First Year of Participation.  In the Plan Year in which a Participant first becomes a Participant, the Participant shall receive an additional Pay Credit equal to (a) the amount that would have been credited to such Participant's Cash Balance

-17-

PHI001555

B0442

Account as of December 31 of the prior Plan Year had the Participant been a Participant as of the later of (i) the day the Participant became a Non-Bargaining Unit Employee or (ii) the January 1 immediately following the Participant's transfer into a Non-Bargaining Unit Employee position as described in Section 2.3; plus (b) an amount equal to the Interest Credits that would have been credited on the amount specified in (a) from the date such amount would have been credited to the Cash Balance Account (if the Participant had then been a Participant) up to the date such additional Pay Credit is actually credited to the Cash Balance Account.

3.4  <u>Interest Credits</u>.

3.4.1.  <u>In General</u>.  As of the end of each Plan Year, Interest Credits will be credited to the Cash Balance Account of each Participant. Interest Credits shall be equal to the Interest Crediting Rate for such Plan Year multiplied by the amount credited to such Account as of January 1 of such Plan Year.

3.4.2.  <u>Duration of Interest Credits</u>.  Interest Credits shall continue to be credited to the Cash Balance Account of a Participant until the earlier to occur of the Participant's Retirement Date or, if applicable, the Annuity Starting Date for survivor benefits; provided, however, that (a) Interest Credits shall cease, in the case of a Participant who has a Severance from Employment Date prior to reaching Normal Retirement Age, on such Participant's attainment of Normal Retirement Age and (b) Interest Credits shall continue to be credited to the Cash Balance Account of a Participant who is receiving Pre-65 Disability Benefits until such Participant's attainment of Normal Retirement Age.

3.4.3.  <u>Interest Credits In Final Year of Participation</u>.

(a)  <u>General</u>.  The Interest Crediting Rate in the Plan Year in which the Annuity Starting Date occurs shall be multiplied by a fraction, the numerator of which is the number of months in the Plan Year prior to the Annuity Starting Date and the denominator of which is twelve (12).

(b)  <u>Lump Sums</u>.  In the Plan Year in which the Annuity Starting Date occurs, the Interest Credit with respect to lump sum distributions shall be credited as of the Annuity Starting Date, and, if payment is delayed beyond the Annuity Starting Date, Interest Credits shall be credited to the date of distribution.

(c)  <u>Annuity Payments</u>.  In the Plan Year in which the Annuity Starting Date occurs, the Interest Credit with respect to annuity payments shall be credited as of the Annuity Starting Date. No Interest Credits shall be credited for a period of two (2) months after the Annuity Starting Date in the event payment is delayed due to administrative processing time. If annuity payments are delayed more than two months after the Annuity Starting Date, no interest shall be paid if the delay in payment is due to the Participant's or beneficiary's delay in

-18-

PHI001556

B0443

submitting paperwork or due to other factors beyond the control of the Plan Administrator. If interest is paid on delayed annuity payments pursuant to this paragraph, the interest shall be paid at the Interest Crediting Rate in effect as of the Annuity Starting Date.

### 3.5 Transition Credits.

3.5.1. <u>Eligibility for Transition Credits</u>. Participants who (a) were Non-Bargaining Unit Employees on December 31, 1998; (b) remain Non-Bargaining Unit Employees on the Effective Date; and (c) were credited with at least ten (10) Years of Service as of January 2, 1999 are eligible for Transition Credits.

3.5.2. <u>Duration of Transition Credits</u>. Transition Credits will be credited to Participants who meet the eligibility criteria of Section 3.5.1, as of the end of each Plan Year, beginning as of the Effective Date. Transition Credits will continue to be credited until the Plan Year in which the Participant is credited with more than 35 Years of Service.

3.5.3. <u>Amount of Transition Credit</u>. Transition Credits shall be credited to the Cash Balance Account of each eligible Participant in an amount equal to (x) the product of the transition crediting rate, as determined below, and (y) the Participant's Compensation as a Non-Bargaining Unit Employee for the Plan Year.

| Participant's Years of Service As of Effective Date | Transition Crediting Rate |
|---|---|
| less than 10 years | 0.0% |
| 10-11 years | 1.0% |
| 12-15 years | 2.0% |
| 16-19 years | 3.0% |
| 20 or more years | 4.0% |

### 3.6 Grandfather Benefit.

3.6.1. <u>Retirement-Eligible Grandfathered Participants</u>. The Grandfather Benefit of Grandfathered Participants who, as of their Retirement Date, are eligible for early or normal retirement pursuant to the terms of Parts One, Two or Three, as applicable, shall be determined as the accrued benefit of such Grandfathered Participant as of such Participant's Retirement Date, determined pursuant to the terms of the applicable Part as if the Participant had continued to participate in the applicable Part from the Effective Date through the Grandfather Period, including any applicable reduction for early commencement; or, if applicable, the Actuarial Equivalent lump sum present value of such accrued benefit, determined in accordance with the factors set forth in Schedule A.

3.6.2. <u>Non-Retirement-Eligible Grandfathered Participants</u>. The Grandfather Benefit of Grandfathered Participants who, as of their Retirement Date, are not

-19-

PHLEGAL: #663223 v5 (#7qv05LWPD)

PHI001557

B0444

eligible for early or normal retirement pursuant to the terms of Parts One, Two or Three, as applicable, shall be determined as the accrued benefit determined pursuant to the terms of the applicable Part as of such Participant's Retirement Date as if the Participant had continued to participate in the applicable Part from the Effective Date through the Grandfather Period, payable at age 65 for Delmarva Plan Grandfathered Participants and at age 55 for ACE Plan Grandfathered Participant, and then reduced for early commencement; or, if applicable, the Actuarial Equivalent lump sum present value of such accrued benefit, determined in accordance with the factors set forth in Schedule A.

-20-

PHI001558

B0445

ARTICLE 4
ELIGIBILITY FOR RETIREMENT

    4.1  <u>Dates of Eligibility for Retirement Benefits</u>.  A Participant shall be entitled to retire and receive Retirement Income under the CB Sub-Plan on the Participant's Normal Retirement Date, Terminated Vested Retirement Date, Deferred Retirement Date, or Disability Retirement Date.  Notwithstanding the preceding sentence, a Participant who has had a Severance from Employment Date shall be required to commence receipt of benefits under the CB Sub-Plan upon attainment of his Normal Retirement Age.

-21-

PHI001559

B0446

# ARTICLE 5
## AMOUNT OF RETIREMENT INCOME

5.1 <u>Normal Retirement Benefit</u>. Upon attaining one's Normal Retirement Date, a Participant shall be entitled to Retirement Income equal to his Accrued Benefit, determined as of his Normal Retirement Date.

5.2 <u>Terminated Vested Retirement Benefit</u>.

5.2.1. <u>Termination Prior to Completion of Five (5) Years of Service or Attainment of Normal Retirement Age</u>. If a Participant has a Severance from Employment Date prior to the Participant's completion of five (5) Years of Service for vesting purposes, and he has not attained Normal Retirement Age, he shall not be entitled to any benefits under the Plan.

5.2.2. <u>Termination After Completion of Five (5) Years of Service</u>. If a Participant has a Severance from Employment Date after completion of five (5) Years of Service for vesting purposes, but prior to his Normal Retirement Date, Disability Retirement Date, or Deferred Retirement Date, the Participant shall be eligible to receive Retirement Income equal to his Accrued Benefit, determined as of his Terminated Vested Retirement Date.

5.3 <u>Deferred Retirement Benefit</u>. A Participant who retires after attainment of Normal Retirement Age shall be entitled, on his Deferred Retirement Date, to receive Retirement Income equal to his Accrued Benefit as of such Deferred Retirement Date.

5.4 <u>Required Distributions</u>. For years commencing after December 31, 1999, in the event the Participant continues in the employ of the Employer after he has attained the age of 70½, payments will commence as set forth in Section 6.1 of the Base Plan.

5.5 <u>Disability Retirement Benefit</u>. A Participant who has a Disability Retirement Date shall be entitled to disability benefits as follows.

5.5.1. <u>Pre-65 Disability Benefit</u>.

(a) <u>Amount and Form</u>. The Pre-65 Disability Benefit shall equal the lesser of (1) the Cash Balance Account as of the Disability Retirement Date projected to Normal Retirement Age and credited with interest at the rate of four percent (4%) each Plan Year or (2) 650% of such Participant's Final Average Compensation as of the Disability Retirement Date, converted into an Actuarially Equivalent single life annuity.

(b) <u>Timing</u>. The Pre-65 Disability Benefit shall commence on the Participant's Disability Retirement Date, and will terminate on the earliest to occur of (i) the

-22-

PHI001560

B0447

Participant's attainment of Normal Retirement Age (at which time the Participant shall be entitled to a Post-65 Disability Retirement Benefit), (ii) death of the Participant, or (iii) the first day of the month following recovery from disability.

5.5.2. Post-65 Disability Benefit.

(a)    Amount and Form.  The Post-65 Disability Benefit shall equal the Accrued Benefit at such Participant's Normal Retirement Date, subject to the Participant's election to have such benefit paid in any one of the optional forms specified in Section 6.6 in accordance with the procedures specified in Section 6.3 of the Base Plan.

(b)    Timing.  The Post-65 Disability Benefit shall be payable on the first day of the month coinciding with or next following attainment of Normal Retirement Age, to a Participant who has had a Disability Retirement Date prior to Normal Retirement Age and whose disability continues to such Participant's attainment of Normal Retirement Age.

5.5.3.  One-Time Disability Benefit Election.  In lieu of the Pre-65 Disability Benefit and the Post-65 Disability Benefit, a Participant may elect, upon his Disability Retirement Date, to be treated as a terminated vested Participant who is eligible for a Terminated Vested Retirement Date.  If the Participant makes such an election, any payments to the Participant shall be made in accordance with Section 5.2.

5.5.4.  Grandfather Disability Benefit.  In lieu of the benefits provided by Sections 5.5.1, 5.5.2, and 5.5.3, Grandfathered Participant who has a Disability Retirement Date on or before the expiration of the Grandfather Period may elect to receive the Grandfather Benefit, determined in accordance with Section 3.6 payable in the form of an Actuarially Equivalent single life annuity until the earlier to occur of (i) the Participant's attainment of Normal Retirement Age, (ii) death of the Participant, or (iii) the first day of the month following recovery from disability, at which time the Participant shall be entitled to a Post-65 Disability Retirement Benefit, or, in the event of the Participant's death, the payment of a pre-retirement survivor benefit in accordance with Section 6.2.

5.6  Employment After Normal Retirement Age.

5.6.1.  Reemployment after Receipt of Retirement Income.  If a Participant is reemployed after commencement of receipt of Retirement Income, his Retirement Income payments, if applicable, shall not be suspended and any benefits accruing as a result of his reemployment will be determined in accordance with Section 5.6.6.

5.6.2.  Continued Employment After Normal Retirement Age.  No Retirement Income shall be paid before a Participant's Required Beginning Date if such Participant remains an Employee after attaining his Normal Retirement Age, subject to the

-23-

PHI001561

B0448

Participant's right to elect to commence receipt of Retirement Income in accordance with Section 6.1 of the Base Plan.

      5.6.3.  <u>Notification and Appeal of Suspension</u>.  The Committee shall notify the Participant by personal delivery or first class mail of the suspension of benefits during the first month in which such suspension of benefits occurs.  A Participant may ask the Committee in writing to make a determination as to whether specific contemplated continued employment will result in suspension of his benefits.  The Committee shall respond to such a request in writing within 60 days of its receipt of the request.

      5.6.4.  <u>Commencement of Retirement Income</u>.  Retirement Income suspended under this Section 5.6 shall commence no later than the earlier of (A) the first day of the third calendar month following the month in which the Participant has a Severance from Employment Date or, if later, the first day of the calendar month following receipt by the Committee of the Participant's notice that he has incurred a Severance from Employment Date or (B) the Participant's Required Beginning Date.  The initial payment shall include payment for the current month and for any previous calendar months since the Participant's Severance from Employment Date.

      5.6.5.  <u>Amount of Retirement Income</u>.  Retirement Income shall be calculated on the basis of the Accrued Benefit earned through the period of continued employment and the provisions of the Plan as then in effect.  The Retirement Income shall be paid in the form determined pursuant to Article 6.

      5.6.6.  <u>Calculation of Retirement Income In Event of Reemployment</u>.  In the case of a Participant whose Retirement Income commenced to be paid, upon his subsequent Severance from Employment Date, the Retirement Income shall be computed, based on Retirement Income accrued during the period beginning on his Reemployment Commencement Date and ending on his Severance from Employment Date.

PHLEGAL: #663223 v5 (#7qv05LWPD)

PHI001562

B0449

# ARTICLE 6

## FORMS OF PAYMENT;
## SURVIVOR BENEFITS

### 6.1 Normal Form of Retirement Income.

6.1.1. **Single Participants.** Retirement Income payments to a Participant who retires under Article 4 shall be paid monthly commencing on the first day of the month coincident with or immediately following the Participant's Retirement Date and terminating with the last monthly payment due prior to his death. In the event the Participant retires on a Deferred Retirement Date, the benefit shall not be less than the amount payable on the Normal Retirement Date.

6.1.2. **Married Participants.**

(a) **In General.** If a Participant has completed at least five (5) Years of Service or has attained Normal Retirement Age and is a married Participant on his Retirement Date, the normal form of Retirement Income shall be a joint and 50% survivor annuity which is the Actuarial Equivalent of a single life annuity, consisting of a reduced annuity paid for the life of the Participant and, upon his death, one-half of such reduced annuity paid to the surviving spouse for life, such survivor's benefits to be paid in equal monthly installments commencing on the first day of the month immediately following the Participant's death. Such survivor annuity shall be paid only to a spouse who was married to the Participant on the Retirement Date.

(b) **Special Provision for Delmarva Plan Participants.** Notwithstanding the preceding subsection (a), a Participant with a Minimum Benefit under the Delmarva Plan who (i) in the case of a Participant with a Normal Retirement Date, Disability Retirement Date or Deferred Retirement Date, is married on such Retirement Date, or (ii) in the case of a Participant with a Terminated Vested Retirement Date, is married on the Retirement Date to the same spouse that such Participant was married to on the date of such Participant's termination shall be entitled to the greater of (A) an unreduced joint and 50% survivor annuity with respect to the Minimum Benefit or (B) a reduced joint and 50% survivor annuity with respect to his Payable Cash Balance as described in Section 6.1.2(a).

(c) **Special Provision for ACE Plan Participants.** Notwithstanding the preceding subsection (a), if a married Participant has a Minimum Benefit under the ACE Plan and that Minimum Benefit (payable in the Normal Form for a married Participant under the ACE Sub-Plan) is greater than the normal form of benefit described in Section 6.1.2(a), the normal form for such Participant shall be the Minimum Benefit payable in

-25-

PHI001563

B0450

the Normal Form for a married Participant under the ACE Sub-Plan. If a married Participant has a Minimum Benefit under the ACE Plan and the normal form of benefit described in Section 6.1.2(a) is greater than the Minimum Benefit payable in the Normal Form for a married Participant under the ACE Sub-Plan but less than the Minimum Benefit payable as a single life annuity, the Participant shall be entitled to elect (subject to spousal consent as described in Section 6.3.4 of the Base Plan) between the Minimum Benefit payable in the Normal Form for a married Participant under the ACE Sub-Plan or the Payable Cash Balance payable in the normal form specified in Section 6.1.2(a).

6.2  Pre-Retirement Survivor's Benefits. The beneficiaries of Participants who die after the completion of at least five (5) Years of Service or attainment of Normal Retirement Age, but prior to their Terminated Vested Retirement Date, Normal Retirement Date or Deferred Retirement Date shall be entitled to a survivor benefit determined in accordance with this Section 6.2.

6.2.1.  Amount of Benefit. The survivor benefit shall be (a) the Participant's Payable Cash Balance, payable in an immediate lump sum or (b) for a beneficiary who is the surviving spouse of a Participant, the Participant's Payable Cash Balance, converted to an Actuarially Equivalent single life annuity payable immediately.

6.2.2.  Form of Benefit. The automatic form of benefit for beneficiaries who are not the surviving spouse of the Participant is a lump sum. The automatic form of benefit for a beneficiary who is a surviving spouse of the Participant is a single life annuity; provided that a beneficiary may elect payment in the form of a lump sum.

6.2.3.  Time of Distribution. A survivor benefit which is to be paid in the form of a single sum shall be paid as soon as practicable after the death of the Participant, but in no event later than the calendar year containing the fifth anniversary of the date of the Participant's death. Payment in the form of a single life annuity will be made as soon as practicable following the Participant's death, unless, in the case of a beneficiary who is a surviving spouse, such beneficiary elects to defer payment, but, in any event, payment may not be deferred later than the earlier to occur of the Participant's Normal Retirement Age or Required Beginning Date.

6.2.4.  Beneficiary Designations. In the event there is not a valid beneficiary designation form on file for a Participant, the survivor benefit shall be paid, in the case of a Participant who is a married Participant on the date of his death, as an immediate single life annuity to such Participant's surviving spouse. In the case of a Participant who is not a married Participant on the date of his death, the survivor benefit shall be paid as an immediate lump sum to the beneficiary designated under the Conectiv Savings and Investment Plan. In the event such Participant does not have a beneficiary designated under the Conectiv Savings and Investment Plan, the benefit shall be paid in equal shares to such Participant's surviving children,

-26-

PHI001564

B0451

or if there are none, in equal shares to such Participant's surviving parents, or if none, then to such Participant's estate.

### 6.3  Grandfather Survivor Benefit.

6.3.1.  Entitlement to Grandfather Survivor Benefit. Notwithstanding the provisions of Section 6.2, the surviving spouse of a Participant who dies after the completion of at least five (5) Years of Service or attainment of Normal Retirement Age, but prior to the Participant's Retirement Date, shall be entitled to a survivor benefit pursuant to this Section 6.3, and not Section 6.2, if the Grandfather Survivor Benefit, determined below, is greater than the survivor benefit determined pursuant to Section 6.2.

6.3.2.  Amount and Form of Grandfather Survivor Benefit. The Grandfather Survivor Benefit is a spousal survivor annuity equal to 50% of the Participant's Grandfather Benefit, determined as of the date of his death, such payments to be made in equal monthly installments to commence on the first day of the month coincident with or immediately following the Participant's death and to cease with the last monthly payment due prior to the spouse's death; provided that a beneficiary may elect payment in the form of a lump sum that is the Actuarial Equivalent of the Grandfather Survivor Benefit.

6.3.3.  Beneficiary Designation. If a Participant eligible for a Grandfather Survivor Benefit has designated a non-spousal beneficiary pursuant to Section 6.2.4, such designation may specify that the designation is to be revoked or inapplicable in the event the Grandfather Survivor Benefit is greater than the survivor benefit determined pursuant to Section 6.2.

### 6.4  Form of Retirement Income for Former Employees of Conowingo Power Company. A Participant who is a former employee of Conowingo Power Company ("COPCO") and who became an Employee in connection with the acquisition of COPCO by the Company, shall be entitled to elect the contingent annuity option set forth in Section 5.3 of the Service Annuity Plan of PECO Energy Company (the "PECO Plan"), attached hereto as Schedule B, with respect to his accrued benefit as of June 15, 1995. Such contingent annuity option shall be subject to the same restrictions that would have been in effect under the PECO Plan at the time of the acquisition.

### 6.5  Mandatory Lump Sum Distributions. In the case of a Participant whose vested Accrued Benefit under the Plan has an Actuarially Equivalent present value of Five Thousand Dollars ($5,000) or less, the full amount of such benefit shall be payable in a lump sum as soon as administratively feasible after such Participant's Severance from Employment Date. In the event the vested Accrued Benefit is zero, the Participant will be deemed to have received a distribution of his Accrued Benefit.

-27-

PHI001565

B0452

6.6  Optional Forms of Benefit.

6.6.1.  Participant's Right to Elect.  In lieu of the normal form of Retirement Income provided in Section 6.1, a Participant may elect among the following optional forms of benefit, provided that a married Participant must satisfy the conditions set forth in Section 6.3 of the Base Plan in order to elect an optional form of benefit.  Each optional form of benefit shall be the Actuarial Equivalent of the normal form of Retirement Income.

6.6.2.  Single Life Annuity Option.  In lieu of the normal form, a Participant may elect a single life annuity, with monthly payments commencing on the first day of the month coincident with or immediately following the Participant's Retirement Date and terminating with the last monthly payment due prior to his death.

6.6.3.  Contingent Annuitant Option.  In lieu of the normal form, a Participant may elect a reduced monthly benefit commencing on the Participant's Retirement Date and payable for his lifetime with a monthly benefit payable to his surviving contingent annuitant after the Participant's death, commencing as of the first day of the month following his death and payable for the contingent annuitant's lifetime; the amount of monthly benefit payable to the contingent annuitant shall be equal to 50% or 100% of the monthly benefit amount payable to the Participant, as specified by the Participant in his election of this option.

6.6.4.  Single-Sum Distribution Option.  In lieu of the normal form of benefit, a Participant may elect a single-sum distribution, payable as soon as practicable following the Participant's Retirement Date.

6.6.5.  Level Income Option.  In lieu of the normal form of benefit, a Participant who was a participant in the ACE Plan prior to the Effective Date may elect a monthly benefit in the form of a single life annuity, commencing on his Retirement Date, adjusted so that the Participant's total income, including both the adjusted monthly benefit and the unreduced Primary Insurance Benefits payable to him under Title II of the Federal Social Security Act, are as nearly uniform as possible both before and after such date; the amount of monthly benefit payable under the CB Sub-Plan will be in a greater amount before the unreduced Primary Insurance Benefits begin and in a reduced amount after that date.

6.6.6.  Twenty-Five Percent Survivor Annuity.  In lieu of the normal form, a Participant who was a participant in the ACE Plan prior to the Effective Date may elect a reduced monthly benefit commencing on the Participant's Retirement Date and payable for his lifetime with a monthly benefit payable to his surviving contingent annuitant after the Participant's death, commencing as of the first day of the month following his death and payable for the contingent annuitant's lifetime; the amount of monthly benefit payable to the contingent annuitant shall be equal to 25% of the monthly benefit amount payable to the Participant.

-28-

PHI001566

B0453

CONECTIV RETIREMENT PLAN
CB SUB-PLAN
<u>SCHEDULE A</u>

A.1    Actuarial Equivalence for any benefit option converted from the Payable Cash Balance
shall be determined as follows:

A.1.1  Unless otherwise specified below, Actuarial Equivalence shall be determined by
using the Applicable Interest Rate, which is the annual interest rate on 30-year Treasury
securities as specified by the Commissioner of Internal Revenue for the October preceding the
calendar year containing the annuity starting date, as published in the Internal Revenue Bulletin
or any successor publication thereto, and the Applicable Mortality Table, which is the mortality
table based on the prevailing commissioners' standard table as prescribed by the Commissioner
pursuant to Code §417(e) (currently 1983 GAM).

A.1.2  In the case of a Disability Benefit payable before age 65, the annuity benefit that is
the Actuarial Equivalent of the Payable Cash Balance shall be determined by projecting the
Payable Cash Balance to age 65, using a four percent (4%) annual interest rate, and then
converting to an annuity form by using the rates specified in Section A.1.1.

A.1.3  In the case of any benefit option that is available only to former participants in a
Prior Plan but that is based on the Payable Cash Balance, Actuarial Equivalence shall be
determined by using the applicable table or rates as set forth in the applicable Sub-Plan.  Where
the applicable Sub-Plan uses a table for such Actuarial Equivalence that does not cover the age of
the Participant, the rates set forth in Section A.1.1 shall be used to determine such Actuarial
Equivalence.

A.2    Actuarial Equivalence for Minimum Benefit or Grandfather Benefit

A.2.1  Unless otherwise specified below, Actuarial Equivalence for a Minimum Benefit
or Grandfather Benefit shall be determined on the basis set forth in Schedule A (as of the date of
such determination) of the ACE Sub-Plan or Delmarva Sub-Plan under which the Participant was
covered on the day before his or her entry into this CB Sub-Plan, as such Sub-Plan may have
been amended prior to the date of such determination.

A.2.2  Where the applicable Sub-Plan uses a table for such Actuarial Equivalence that
does not cover the age of the Participant, the rates set forth in Section A.1.1 shall be used to
determine such Actuarial Equivalence; provided that

(a)    annuity benefits for a Minimum Benefit or Grandfather Benefit
commencing before age 55 determined under the ACE Sub-Plan shall be determined by using the
factors applicable to a deferred vested benefit as set forth in the Delmarva Sub-Plan, and lump
sum equivalencies for such Minimum Benefit or Grandfather Benefit shall be determined by
using the actuarial factors set forth in the Ace Sub-Plan, but in either case such equivalencies
shall be determined by valuing the benefit commencing at age 65 rather than age 55; and

PHI001567

B0454

A 2.3

(b)    joint and survivor optional forms for a Minimum Benefit, Grandfather Benefit, or Grandfather Survivor Benefit determined under the Delmarva Sub-Plan (where the spouse or surviving spouse is the joint annuitant) shall be converted from the 50% joint and survivor form to the desired optional form (other than a single life annuity) by taking into account the fact that the normal form of benefit is a fully-subsidized 50% joint and survivor annuity (where the Participant is married as of the annuity starting date or date of death and entitled to such unreduced 50% joint and survivor annuity), but any other optional annuity form shall be the actuarial equivalent of the single life annuity (not reflecting the value of the fully-subsidized 50% joint and survivor annuity); and

A 2.4

(c)    the lump sum equivalency of a Minimum Benefit, Grandfather Benefit, or Grandfather Survivor Benefit determined under the Delmarva Sub-Plan (where the Participant is married as of the annuity starting date or date of death and entitled to an unreduced 50% joint and survivor annuity) shall reflect the value of such unreduced annuity.

PHLEGAL: #729433 v4 FM%6104L.WPD

PHI001568

B0455

# SCHEDULE B

## Service Annuity Plan of PECO Energy Company

PHLEGAL: #663223 v5 (#7qv0S!.WPD)

PHI001569

B0456

**CONECTIV**

**CERTIFICATION OF VICE PRESIDENT
FOR HUMAN RESOURCES AND PRODUCTIVITY IMPROVEMENT**

I, Donald E. Cain, Vice President for Human Resources and Productivity Improvement of Conectiv (the "Company"), a Delaware corporation, hereby certify that I approve the adoption of the Conectiv Retirement Plan (the "Plan") document in the form attached hereto, effective January 1, 1999. My approval is given pursuant to the adoption of the Plan by the Personnel & Compensation Committee of the Board of Directors (the "Committee") of the Company on April 23, 1998 and the authorization of the Committee granted to me at a meeting of the Committee held on April 23, 1998.

Date:  December 10, 1999

_Donald E. Cain_

Donald E. Cain
Vice President for Human Resources and
Productivity Improvement

PHI001570

B0457

## FEBRUARY 2001 AMENDMENT TO RETIREMENT PLAN

The Vice President of HR and Performance Improvement, being empowered by Vote of the Personnel and Compensation Committee of the Board of Directors of Conectiv, hereby amends the Conectiv Retirement Plan to incorporate certain benefits awarded to salaried employees pursuant to various severance plans and change in control agreements.

RESOLVED, That the Conectiv Retirement Plan (the "Retirement Plan") be, and it hereby is, amended effective January 1, 2001, as follows:

1.      Section A.2.3 of Schedule A of the Cash Balance Sub-Plan is amended to read as follows:

A.2.3.  In the event a Participant terminates employment at or after attaining age 52 and is eligible to receive severance benefits pursuant to a severance plan adopted by the Employer or a change-in-control agreement between the Employer and the Participant, which plan or agreement calls for the Participant to be treated as if he or she terminated employment at or after age 55 for purposes of early retirement at such age, such Participant's Grandfather Benefit or Minimum Benefit calculated pursuant to the Delmarva Sub-Plan shall be paid at or after his attainment of age 55, by using the early retirement factors contained in Table C of the Delmarva Sub-Plan, rather than the early retirement factors contained in Table B of the Delmarva Sub-Plan.

_1/30/01_
Date

_Donald E Cain_
Donald Cain
Vice President of HR and Performance Improvement

PHI001571

B0458

AMENDMENT TO
CONECTIV RETIREMENT PLAN

CONECTIV CASH BALANCE SUB-PLAN
DECEMBER 2000

The Vice President for Human Resources and Performance Improvement, being empowered by Vote of the Personnel and Compensation Committee of the Board of Directors of Conectiv, hereby amends the Conectiv Retirement Plan (Conectiv Cash Balance Sub-Plan), effective January 1, 2000.

Section 3.2.6 is amended to read as follows:

3.2.6    Transfers From Union to Management.  A Local 1238 Employee, Local 1307 Employee, or Local 210 Employee who becomes a Non-Bargaining Unit Employee after the Effective Date shall have an Initial Cash Balance, provided such Employee remains a Non-Bargaining Unit Employee one year from the date of transfer.  If the transferred Employee remains a Non-Bargaining Unit Employee one year from the date of transfer, the Initial Cash Balance for such Employee shall be the Prior Plan Conversion Credit as of the January 1 that occurs in the year of transfer; provided that the Prior Plan Conversion Credit shall be determined as of the January 1 contained in the year of transfer rather than December 31, 1998; and further provided only with respect to transfers which occurred prior to January 1, 2000, that an interest rate that is 2% above the applicable interest rate as of such January 1 (as defined in Schedule A) shall be substituted for 7% in the calculation of such prior Plan Conversion Credit.

Executed this _1st_ day of _December_, 200_0_.

_Donald E Cain_

Donald Cain
Vice President for Human Resources and
Performance Improvement

PHLEGAL: #1002790 v1 (LHR@01I.DOC)

PHI001572

B0459

CLARIFYING AMENDMENT TO
CONECTIV RETIREMENT PLAN

CONECTIV CASH BALANCE SUB-PLAN
OCTOBER 2000

The Vice President for Compensation and Benefits, being empowered by Vote of the Personnel and Compensation Committee of the Board of Directors of Conectiv, hereby amends the Conectiv Retirement Plan (Conectiv Cash Balance Sub-Plan) to clarify an ambiguity in the Plan regarding the calculation of lump sum benefits for retirement-eligible Participants with a Minimum Benefit, Grandfather Benefit, or Grandfather Survivor Benefit determined under the Delmarva Sub-Plan.

Schedule A, paragraph A.2 of the Cash Balance Sub-Plan is amended by renumbering sub-paragraphs A.2.2(b) and (c) as paragraphs A.2.3 and A.2.4, respectively, and as so renumbered, sub-paragraph A.2.4 is amended to read as follows:

A.2.4  The lump sum equivalency of a Minimum Benefit, Grandfather Benefit, or Grandfather Survivor Benefit determined under the Delmarva Sub-Plan shall be the actuarial equivalent of the single life annuity commencing on the Annuity Starting Date (including the value of the early retirement subsidy), and, where the Participant is married as of the Annuity Starting Date or date of death and entitled to an unreduced 50% joint and survivor annuity, shall reflect the value of such unreduced annuity.

The foregoing amendment is effective January 1, 1999.

Executed this \sr day of October, 2000.

Donald Cain
Vice President for Compensation and Benefits

AMENDMENT
TO CONECTIV RETIREMENT PLAN

CONECTIV CASH BALANCE SUB-PLAN
MARCH 2000

The Vice President for Compensation and Benefits, being empowered by Vote of the Personnel and Compensation Committee of the Board of Directors of Conectiv, hereby amends the Conectiv Retirement Plan (Conectiv Cash Balance Sub-Plan), effective March 1, 2000, as follows.

1.      Whereas Section 1.12 provides the definition of Compensation intended to be used for all purposes under the Plan, and whereas Conectiv desires to permit participants who are highly compensated to elect, pursuant to agreements entered into with Conectiv or another company that participates in the Plan, to exclude all or a portion of their compensation for purposes of accruing a benefit under the Conectiv Cash Balance Sub-Plan, the definition of Compensation is hereby amended as of the date of execution below by amending Section 1.12 of the Conectiv Cash Balance Sub-Plan in its entirety to read as follows:

> 1.12  Compensation paid to a Participant by the Employer means

> > 1.12.1.  any amounts paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125, and excluding contributions the Employer makes to this or any other benefit plan, any amounts paid in the form of fringe benefits (including but not limited to reimbursed moving expenses, insurance, and the like; provided, however, that meal allowances shall not be excluded as fringe benefits) and any dividend rights earned under any executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes.  In determining whether a payment is includible under this definition, the rules for the safe harbor definition set forth in Treas. Reg. § 1.415-2(d)(10), as adjusted by Treas. Reg. §§ 1.414(s)-1(c)(3) and (4) shall be applied.

> > 1.12.2.  Notwithstanding Section 1.12.1, for purposes of determining the Grandfather Benefit for under Sections 1.23.2 and 3.6.1, Compensation shall have the same meaning as in the ACE or Delmarva Sub-Plan, as applicable.

> > 1.12.3.  Notwithstanding the foregoing, Compensation taken into account for a Participant shall not exceed the annual limitation specified by section 401(a)(17) of the Code and shall be modified to reflect adjustments in the limitation announced by the Secretary of the Treasury at the same time and in the same manner as under section 415(d) of the Code.

1.12.4.  Notwithstanding the foregoing, a Participant who is a highly compensated employee, as defined in Section 414(q) of the Code, may, pursuant to a written agreement with an Employer, elect to exclude all or a portion of his Compensation for purposes of (a) accruing a benefit under the CB Sub-Plan, (b) determining the Participant's Payable Cash Balance, and (c) determining, if applicable, the Participant's Grandfather Benefit.

Executed this 1st day of March, 2000.

Donald Cain
Vice President for Compensation and Benefits

PHLEGAL: #859093 v1 ($#VP01LWPD)

PHI001575

B0462

CLARIFYING AND CORRECTIVE AMENDMENT
TO CONECTIV RETIREMENT PLAN

CONECTIV CASH BALANCE SUB-PLAN
FEBRUARY 2000

The Vice President for Compensation and Benefits, being empowered by Vote of the Personnel and Compensation Committee of the Board of Directors of Conectiv, hereby amends the Conectiv Retirement Plan (Conectiv Cash Balance Sub-Plan) to correct certain clerical errors and ambiguity in the Plan.

1.      Whereas Section 1.12 provides the definition of Compensation intended to be used for all purposes under the Plan, except the calculation of the Grandfather Benefit, and the definition of compensation used to calculate the Grandfather Benefit is to be taken from the applicable Prior Plan's Sub-Plan, except for the calculation of final average compensation (as described in Paragraph 2 of this Amendment), so as to avoid any ambiguity in the calculation of the Grandfather Benefit, the definition of Compensation is hereby amended as of the Effective Date by amending Section 1.12 of the Plan in its entirety to read as follows:

1.12  Compensation paid to a Participant by the Employer means

1.12.1.  any amounts paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125, and excluding contributions the Employer makes to this or any other benefit plan, any amounts paid in the form of fringe benefits (including but not limited to reimbursed moving expenses, insurance, and the like; provided, however, that meal allowances shall not be excluded as fringe benefits) and any dividend rights earned under any executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes.  In determining whether a payment is includible under this definition, the rules for the safe harbor definition set forth in Treas. Reg. § 1.415-2(d)(10), as adjusted by Treas. Reg. §§ 1.414(s)-l(c)(3) and (4) shall be applied.

1.12.2.  Notwithstanding Section 1.12.1, for purposes of determining the Grandfather Benefit for under Sections 1.23.2 and 3.6.1, Compensation shall have the same meaning as in the ACE or Delmarva Sub-Plan, as applicable.

1.12.3.  Notwithstanding the foregoing, Compensation taken into account for a Participant shall not exceed the annual limitation specified by section 401(a)(17) of the Code and shall be modified to reflect adjustments in the limitation announced by the Secretary of the Treasury at the same time and in the same manner as under section 415(d) of the Code.

2.      Whereas Section 3.6 provides that the Grandfather Benefit shall be determined as if the Participant had participated in the applicable Sub-Plan, but Section 1.23.2 provides for a special definition of Final Average Compensation designed to apply to Delmarva Plan Grandfathered

PHI001576

B0463

Participants, thereby creating uncertainty as to the definition of Final Average Compensation to be applied to ACE Plan Grandfathered Participants, Section 1.23 of the Plan is hereby amended as of the Effective Date:

(a) by changing the introductory sentence of sub-section 1.23.2 to read, "For purposes of determining the Grandfather Benefit for Delmarva Plan Grandfathered Participants, . . ."

(b) by adding thereto a new sub-section 1.23.3 to read,

1.23.3.  For purposes of determining the Grandfather Benefit for ACE Plan Grandfathered Participants, Final Average Compensation shall have the same meaning as in the ACE Sub-Plan.

3.      Section 3.6 is amended by replacing the term "Parts One, Two, or Three, as applicable" with the term "the ACE Sub-Plan, the Cash Balance Sub-Plan, or the Delmarva Sub-Plan, as applicable" wherever such term appears.

Executed this **6** day of February, 2000.

*Donald E Cain*

Donald Cain
Vice President for Compensation and Benefits

AMENDMENT TO RETIREMENT PLAN
1999-2000 SEVERANCE PROGRAM BENEFIT

The Vice President for Compensation and Benefits, being empowered by Vote of the Personnel and Compensation Committee of the Board of Directors of Conectiv, hereby amends the Conectiv Retirement Plan to incorporate certain benefits awarded to salaried employees pursuant to the 1999-2000 Special Severance Plan.

RESOLVED, That the Conectiv Retirement Plan (the "Retirement Plan") be, and it hereby is, amended effective January 1, 1999, as follows:

1.    Schedule A of the Cash Balance Sub-Plan is amended to add a new Section A.2.3, to read as follows:

A.2.3.  In the event a Participant terminates employment at or after attaining age 52 and is eligible to receive severance benefits pursuant to a Severance Plan adopted by the Employer that is effective during 1998, 1999, or 2000, such Participant's Grandfather Benefit or Minimum Benefit calculated pursuant to the Delmarva Sub-Plan shall be paid at or after his attainment of age 55, by using the early retirement factors contained in Table C of the Delmarva Sub-Plan, rather than the early retirement factors contained in Table B of the Delmarva Sub-Plan.

2.    Table C of the Delmarva Sub-Plan shall be amended by adding the following paragraph at the bottom of such Table:

The factors set forth in this Table C shall be used to calculate the Early Retirement benefit payable to a Participant who terminated employment pursuant to the requirements set forth in Section 4.12(A) of the Delmarva Plan as in effect prior to the Effective Date of this Plan, or as subsequently amended, or pursuant to the Company's 1999 Targeted Voluntary Retirement Program.

3.    The ACE Sub-Plan is amended by adding the following Section 1.51 to Article I:

1.51    Special Retirement Date Definition for Certain Participants.  In the case of a Participant who elects to retire on a Retirement Date on or before January 1, 2000, or a Participant who is eligible for a Terminated Vested Benefit and who last earned an Hour of Service before January 1, 2000, such Participant may elect to have his Retirement Date be the first of the month in which his election to retire was submitted, but only if his election to retire is submitted on or before the 15th day of such month; otherwise his Retirement Date shall be the date otherwise specified in this Plan.

4.    The Cash Balance Sub-Plan is amended by adding the following Section 1.60 to Article I:

PHI001578

B0465

1.60    Special Retirement Date Definition for Certain Participants.  In the case of a Participant with a Minimum Benefit or Grandfather Benefit calculated under the ACE Sub-Plan, who elects to retire on a Retirement Date on or before January 1, 2000 or who is eligible for a Terminated Vested Benefit and who last earned an Hour of Service before January 1, 2000, such Participant may elect to have his Minimum Benefit or Grandfather Benefit calculated as if his Retirement Date were the first of the month in which his election to retire was submitted, but only if his election to retire is submitted on or before the 15th day of such month; otherwise his Minimum Benefit or Grandfather Benefit shall be calculated as if his Retirement Date were the date otherwise specified in this Plan.

_Donald E. Cain_
Donald E. Cain

Dated:  _12/10/99_

PHLEGAL: #450571 v1 (9NNV01!.WPD)

PHI001579

B0466

## CLARIFYING AND CORRECTIVE AMENDMENT
## TO CONECTIV RETIREMENT PLAN

## CONECTIV CASH BALANCE SUB-PLAN
## FEBRUARY 2000

The Vice President for Compensation and Benefits, being empowered by Vote of the Personnel and Compensation Committee of the Board of Directors of Conectiv, hereby amends the Conectiv Retirement Plan (Conectiv Cash Balance Sub-Plan) to correct certain clerical errors and ambiguity in the Plan.

1.    Whereas Section 1.12 provides the definition of Compensation intended to be used for all purposes under the Plan, except the calculation of the Grandfather Benefit, and the definition of compensation used to calculate the Grandfather Benefit is to be taken from the applicable Prior Plan's Sub-Plan, except for the calculation of final average compensation (as described in Paragraph 2 of this Amendment), so as to avoid any ambiguity in the calculation of the Grandfather Benefit, the definition of Compensation is hereby amended as of the Effective Date by amending Section 1.12 of the Plan in its entirety to read as follows:

    1.12  Compensation paid to a Participant by the Employer means

        1.12.1.  any amounts paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125, and excluding contributions the Employer makes to this or any other benefit plan, any amounts paid in the form of fringe benefits (including but not limited to reimbursed moving expenses, insurance, and the like; provided, however, that meal allowances shall not be excluded as fringe benefits) and any dividend rights earned under any executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes.  In determining whether a payment is includible under this definition, the rules for the safe harbor definition set forth in Treas. Reg. § 1.415-2(d)(10), as adjusted by Treas. Reg. §§ 1.414(s)-l(c)(3) and (4) shall be applied.

        1.12.2.  Notwithstanding Section 1.12.1, for purposes of determining the Grandfather Benefit for under Sections 1.23.2 and 3.6.1, Compensation shall have the same meaning as in the ACE or Delmarva Sub-Plan, as applicable.

        1.12.3.  Notwithstanding the foregoing, Compensation taken into account for a Participant shall not exceed the annual limitation specified by section 401(a)(17) of the Code and shall be modified to reflect adjustments in the limitation announced by the Secretary of the Treasury at the same time and in the same manner as under section 415(d) of the Code.

2.    Whereas Section 3.6 provides that the Grandfather Benefit shall be determined as if the Participant had participated in the applicable Sub-Plan, but Section 1.23.2 provides for a special definition of Final Average Compensation designed to apply to Delmarva Plan Grandfathered

PHI001580

B0467

Participants, thereby creating uncertainty as to the definition of Final Average Compensation to be applied to ACE Plan Grandfathered Participants, Section 1.23 of the Plan is hereby amended as of the Effective Date:

(a) by changing the introductory sentence of sub-section 1.23.2 to read, "For purposes of determining the Grandfather Benefit for Delmarva Plan Grandfathered Participants, . . ."

(b) by adding thereto a new sub-section 1.23.3 to read,

1.23.3.  For purposes of determining the Grandfather Benefit for ACE Plan Grandfathered Participants, Final Average Compensation shall have the same meaning as in the ACE Sub-Plan.

3.    Section 3.6 is amended by replacing the term "Parts One, Two, or Three, as applicable" with the term "the ACE Sub-Plan, the Cash Balance Sub-Plan, or the Delmarva Sub-Plan, as applicable" wherever such term appears.

Executed this **6** day of February, 2000.

*Donald E Cain*

Donald Cain
Vice President for Compensation and Benefits

AMENDMENT TO RETIREMENT PLAN
1999-2000 SEVERANCE PROGRAM BENEFIT

The Vice President for Compensation and Benefits, being empowered by Vote of the Personnel and Compensation Committee of the Board of Directors of Conectiv, hereby amends the Conectiv Retirement Plan to incorporate certain benefits awarded to salaried employees pursuant to the 1999-2000 Special Severance Plan.

RESOLVED, That the Conectiv Retirement Plan (the "Retirement Plan") be, and it hereby is, amended effective January 1, 1999, as follows:

1.    Schedule A of the Cash Balance Sub-Plan is amended to add a new Section A.2.3, to read as follows:

A.2.3.  In the event a Participant terminates employment at or after attaining age 52 and is eligible to receive severance benefits pursuant to a Severance Plan adopted by the Employer that is effective during 1998, 1999, or 2000, such Participant's Grandfather Benefit or Minimum Benefit calculated pursuant to the Delmarva Sub-Plan shall be paid at or after his attainment of age 55, by using the early retirement factors contained in Table C of the Delmarva Sub-Plan, rather than the early retirement factors contained in Table B of the Delmarva Sub-Plan.

2.    Table C of the Delmarva Sub-Plan shall be amended by adding the following paragraph at the bottom of such Table:

The factors set forth in this Table C shall be used to calculate the Early Retirement benefit payable to a Participant who terminated employment pursuant to the requirements set forth in Section 4.12(A) of the Delmarva Plan as in effect prior to the Effective Date of this Plan, or as subsequently amended, or pursuant to the Company's 1999 Targeted Voluntary Retirement Program.

3.    The ACE Sub-Plan is amended by adding the following Section 1.51 to Article I:

1.51    Special Retirement Date Definition for Certain Participants.  In the case of a Participant who elects to retire on a Retirement Date on or before January 1, 2000, or a Participant who is eligible for a Terminated Vested Benefit and who last earned an Hour of Service before January 1, 2000, such Participant may elect to have his Retirement Date be the first of the month in which his election to retire was submitted, but only if his election to retire is submitted on or before the 15th day of such month; otherwise his Retirement Date shall be the date otherwise specified in this Plan.

4.    The Cash Balance Sub-Plan is amended by adding the following Section 1.60 to Article I:

PHI001582

B0469

1.60    <u>Special Retirement Date Definition for Certain Participants</u>.  In the case of a Participant with a Minimum Benefit or Grandfather Benefit calculated under the ACE Sub-Plan, who elects to retire on a Retirement Date on or before January 1, 2000 or who is eligible for a Terminated Vested Benefit and who last earned an Hour of Service before January 1, 2000, such Participant may elect to have his Minimum Benefit or Grandfather Benefit calculated as if his Retirement Date were the first of the month in which his election to retire was submitted, but only if his election to retire is submitted on or before the 15th day of such month; otherwise his Minimum Benefit or Grandfather Benefit shall be calculated as if his Retirement Date were the date otherwise specified in this Plan.

_____
Donald E. Cain

Dated: _12/10/99_____

PHLEGAL: #450571 v1 (9NNV01!.WPD)

PHI001583

B0470

CONECTIV

RETIREMENT PLAN

As Amended and Restated

Effective January 1, 1999

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000481

B0471

# TABLE OF CONTENTS

Page

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 1    ADOPTION OF PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 2    CONSTITUENT PARTS; COMMON PROVISIONS . . . . . . . . . . . . . . . . . . . 3
    2.1.    Constituent Parts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.2.    Accrued Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.3.    Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.4.    Common Provisions and Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE 3    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 4    ADMINISTRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.1.    Plan Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.2.    Delegation of Powers and Responsibilities . . . . . . . . . . . . . . . . . . . . . 12
    4.3.    Employment of Consultants and Counsel . . . . . . . . . . . . . . . . . . . . . . 13
    4.4.    Responsibilities Several and Not Joint . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.5.    Retirement Plan Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.6.    Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.7.    Plan Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.8.    Agents For Receipt of Legal Process . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.9.    Procedure for Filing A Claim for Benefits . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE 5    CODE SECTION 415 LIMIT ON BENEFITS . . . . . . . . . . . . . . . . . . . . 16
    5.1.    General Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    5.2.    Incorporation of Code Section 415 . . . . . . . . . . . . . . . . . . . . . . . . . 16
    5.3.    Limitation in Case of Defined Benefit Plan and Defined Contribution Plan for
        Same Employee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE 6    DISTRIBUTION RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    6.1.    Required Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    6.2.    Direct Rollovers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    6.3.    Rules for Election of Optional Form of Benefit . . . . . . . . . . . . . . . . . . 18
    6.4.    Mandatory Retirement for Certain Executives. . . . . . . . . . . . . . . . . . . 21

ARTICLE 7    TOP-HEAVY PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000482

B0472

Page

7.1.   Purpose ................................................... 22
7.2.   Definitions ............................................... 22
7.3.   Determination of Whether Plan is Top-Heavy .................... 23
7.4.   Aggregation Group of Employer Plans ......................... 24
7.5.   Special Minimum Benefit Requirement in Event Plan Becomes Top-Heavy. . 24
7.6.   Minimum Vesting. ......................................... 24
7.7.   Terminated Participants .................................... 25
7.8.   Termination of Top-Heavy Status. ............................ 25
7.9.   Multiple Top-Heavy Plans .................................. 25

ARTICLE 8   AMENDMENT AND TERMINATION .......................... 26
8.1.   Company's Right to Amend the Plan .......................... 26
8.2.   Participant's Rights Not to Be Affected By Merger. ............... 26
8.3.   Distribution or Allocation of Assets Upon Complete or Partial Termination of
       Plan. ................................................... 26
8.4.   Provision to Prevent Discrimination .......................... 28
8.5.   Definitions ............................................... 29

ARTICLE 9   GENERAL PROVISIONS ................................. 31
9.1.   Incapacity ............................................... 31
9.2.   Merger .................................................. 31
9.3.   No Specific Rights ........................................ 31
9.4.   Employment Rights ....................................... 31
9.5.   Plan Benefits Nonassignable ................................ 31
9.6.   Alienation ............................................... 32
9.7.   Employer's Liability Limited to Assets in the Plan ............... 32
9.8.   Applicable Law ........................................... 32
9.9.   Severability of Provisions .................................. 32
9.10.  Missing Participant ....................................... 33
9.11.  Gender, Tense and Headings ................................ 33
9.12.  Protected Benefits ........................................ 33

ARTICLE 10  FINANCING THE PLAN ................................. 34
10.1.  No Participant Contributions ................................ 34
10.2.  Employer Contributions .................................... 34
10.3.  Plan Funds to be Held in Trust .............................. 34
10.4.  Trust for the Exclusive Benefit of Plan Participants .............. 34

SCHEDULE A ................................................... 35
SCHEDULE B ................................................... 36
SCHEDULE C

PHLEGAL: #650902 v7 (dy8m07!.WPD)

-ii-

PHI000483

B0473

CONECTIV
RETIREMENT PLAN

PREAMBLE

The Conectiv Retirement Plan (the "Plan") is the result of the merger and consolidation of the Delmarva Power and Light Company Retirement Plan (the "Delmarva Plan") and the Atlantic City Electric Company Retirement Plan (the "ACE Plan"). The Delmarva Plan was merged with and into the ACE Plan and renamed the Conectiv Retirement Plan (the "Plan"), effective December 30, 1998. On January 1, 1999 (the "Effective Date"), a cash balance component for certain management employees of the Employer was incorporated into the Plan (hereinafter the "CB Sub-Plan").

The Plan is comprised of this document (the "Base Plan") and three Parts attached hereto. Part One consists of the CB Sub-Plan and applies solely to certain management employees of the Employer. Part Two consists of the Delmarva Sub-Plan and applies solely to union-represented employees of the Employer who are eligible to participate in Part Two in accordance with its terms and conditions. Part Three consists of the ACE Sub-Plan and applies solely to union-represented employees of the Employer who are eligible to participate in Part Three in accordance with its terms and conditions.

The Base Plan makes provisions for matters which apply generally to all Parts and the employees, retirees and beneficiaries under the respective Parts. In this regard, the Plan contemplates that each Part: (i) will have a distinct benefit structure applicable only to certain, identifiable participants, (ii) will be evidenced by a distinguishable document (which are listed in Article 2 and made a part hereof), and (iii) may have separate accounts for cost allocation purposes.

Following the merger of the Delmarva Plan into the ACE Plan and the amendment and restatement of the Plan to include the CB Sub-Plan, all the assets held in the Trust are available to pay the benefits of any Plan Participant eligible for benefits under any one or more of the Parts of the Plan described in Article 2.

The Plan is effective, generally, January 1, 1999, except that the provisions specified in Schedule B have earlier effective dates to comply with the requirements of applicable law. To the extent necessary, the Prior Plans are deemed amended by these provisions.

# ARTICLE 1
## ADOPTION OF PLAN

      1.1.    The Plan as herein amended and restated, has been adopted by the Company for the exclusive benefit of its employees who are or become eligible to participate under the terms and conditions of Parts One, Two or Three of the Plan.

      1.2.    The Plan shall consist of this Base Plan and Parts One, Two and Three which are attached hereto and made a part hereof.  A Participant shall be eligible to participate in Part One and/or Part Two and/or Three, to the extent that Part One and/or Part Two and/or Part Three applies to such Participant, and he or she shall receive the benefits defined in such Part(s) under the terms and conditions of such Part(s) (except to the extent such terms and conditions are superseded or supplemented by the Base Plan).  The terms of the Base Plan shall apply to all Participants.  In the event of a conflict between any term of the Base Plan and one or more of the constituent Parts, the terms of the Base Plan shall control.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000485

B0475

## ARTICLE 2
## CONSTITUENT PARTS; COMMON PROVISIONS

2.1.    <u>Constituent Parts</u>. Part One was created when the Plan was amended and restated on the Effective Date. Parts Two and Three each comprised a separate plan immediately prior to their merger into this Plan. One or more of the Parts of the Plan may be amended by the Company in accordance with the Base Plan without affecting any other Part of the Plan.

2.1.1.    <u>Part One</u>. Part One shall consist of the CB Sub-Plan.

2.1.2.    <u>Part Two</u>. Part Two shall consist of the Delmarva Sub-Plan.

2.1.3.    <u>Part Three</u>. Part Three shall consist of the ACE Sub-Plan.

2.2.    <u>Accrued Benefits</u>. Each Participant's accrued benefits and other rights, benefits and/or features applicable thereto shall be governed by the applicable Part(s), as amended from time to time.

2.2.1.    <u>Service Credited Under More Than One Part</u>. A Participant shall accrue benefits for a particular period of Service under only one Part. Under certain circumstances, a Participant may be entitled to a benefit under one Part for a particular period of Service which is defined in such Part as the higher of the benefit accrued under two Parts. Nevertheless, the Participant's benefit for such period of Service shall be as defined in the Part which makes reference to the higher benefit for such Service.

2.2.2.    <u>Selection of Distribution Options for Participants with Service Credited Under More than One Part</u>. A Participant generally shall receive his accrued benefit at retirement or other termination of employment pursuant to the terms of the Part described in Section 2.2.1. If a Participant has accrued benefits under two different Parts for two periods of Service, and if neither Part has provided credit to the Participant for service under the other Part, the Participant shall be entitled to elect separate distribution options for the benefit accrued under each Part, subject to the terms of each Part (provided, however, that in determining whether a benefit may be distributed without the Participant's consent prior to retirement, in lump sum form, the lump sum values of the Participant's benefits under each such Part shall be combined to determine if the lump sum value is $5,000 or less). If, however, the Part in which the Participant most recently accrued benefits has provided credit to the Participant for the Service accrued under the other Part (or has provided a minimum benefit equal to the benefit accrued under the other Part), the Participant's options regarding distribution will be as set forth in the Part in which the Participant most recently accrued benefits.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000486

B0476

2.3.     <u>Participants</u>.  Participation in the Plan shall be governed by the eligibility provisions of the applicable Part(s).

2.4.     <u>Common Provisions and Definitions</u>.  Articles 2 through 10 are intended to set forth a uniform system of administration for the Plan and for compliance with the requirements of ERISA and the Code, as well as certain other matters common to the Parts of the Plan.  The provisions set forth in these Articles will govern the operations of all Parts of the Plan to the extent hereof.  Any portion of Part One, Part Two or Part Three that is inconsistent or in conflict with the Base Plan shall be deemed deleted and superseded and shall have no further legal effect.

PHLEGAL: #650902.v7 (dy8m07l.WPD)

PHI000487

B0477

ARTICLE 3
DEFINITIONS

Initially capitalized terms used in the Plan shall have the meanings as defined in the respective Parts as applied to that Part; provided, however, the following definitions as used in the Base Plan shall have the meanings indicated below for both the Base Plan and the Parts and shall supersede the same definitions in any of the Parts to the extent inconsistent therewith:

      3.1.   Accrued Benefit has the meaning ascribed to it in the respective Parts.

      3.2.   ACE Plan means the Atlantic City Electric Company Retirement Plan as in effect prior to the Effective Date.

      3.3.   ACE Sub-Plan means the ACE Plan as amended on and after the Effective Date and which is contained in Part Three hereof.

      3.4.   Actuarial Equivalent has the meaning ascribed to in the respective Parts.

      3.5.   Affiliated Company means:

      3.5.1.  any company which is included within a controlled group of corporations with the Company as determined under Code section 414(b);

      3.5.2.  any trades or businesses (whether or not incorporated) which are under common control with the Company as described in Code section 414(c); and

      3.5.3.  any company which is included in an affiliated service group within the meaning of Code section 414(m) or included pursuant to regulations issued under Code section 414(o).

      3.6.   Annuity Starting Date means the first day of the month coincident with or next following the Participant's Retirement Date.

      3.7.   Base Plan means that part of the Plan which contains provisions generally applicable to Parts One, Two and Three.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000488

B0478

3.8.     Board of Directors means the Board of Directors of the Company.

3.9.     Break in Service means a "Break in Service" as defined in the respective Parts.

3.10.   CB Sub-Plan means the cash balance component of the Plan which was effective on the Effective Date and is contained in Part One hereof.

3.11.   Code means the Internal Revenue Code of 1986, as amended.

3.12.   Committee means the Retirement Plan Committee as described in Section 4.5.

3.13.   Company means Conectiv and any successor thereto.

3.14.   Compensation has the meaning ascribed to it in the Parts.

3.15.   Deferred Retirement Date has the meaning ascribed to in the Parts.

3.16.   Delmarva Plan means the Delmarva Power and Light Company Retirement Plan as in effect prior to the Effective Date.

3.17.   Delmarva Sub-Plan means the Delmarva Plan as amended on and after the Effective Date and which is contained in Part Two hereof.

3.18.   Effective Date means January 1, 1999.

3.19.   Employee means any person who is employed by the Employer in a category listed on Schedule C; provided, however, that an individual shall not be eligible to become a Participant or to remain an active Participant if (a) he is not on an employee payroll of an Employer; (b) he has entered into a written agreement with an Employer which provides that he shall not participate in the Plan; or (c) he is in a group of employees that is excluded from the Plan pursuant to his Employer's declaration of joinder in the Plan or as otherwise specified in Schedule C.

3.19.1.   Bargaining Unit Employee means a Local 1238 Employee, Local 1307 Employee, or a Local 210 Employee.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

-6-

PHI000489

B0479

3.19.2.  <u>Local 1238 Employee</u> means an Employee whose employment is covered by a collective bargaining agreement with Local 1238, IBEW, AFL-CIO.

3.19.3.  <u>Local 1307 Employee</u> means an Employee whose employment is covered by a collective bargaining agreement with Local 1307, IBEW, AFL-CIO.

3.19.4.  <u>Local 210 Employee</u> means an Employee whose employment is covered by a collective bargaining agreement with Local 210, IBEW, AFL-CIO.

3.19.5.  <u>Non-Bargaining Unit Employee</u> means an Employee whose employment is not subject to a collective bargaining agreement, or an Employee subject to a collective bargaining agreement that is first effective on or after January 1, 1999 and that provides for continued participation in the CB Sub-Plan.

3.19.6.  <u>Leased Employee</u> means a leased employee within the meaning of section 414(n) of the Code.

3.20.    <u>Employer</u> means the Company and all Affiliated Companies that, with the approval of the Company, have joined the Plan by vote of the Affiliated Company's Board.

3.21.    <u>Enrolled Actuary</u> means an individual who has been approved by the Joint Board For The Enrollment of Actuaries to perform actuarial services required under ERISA.

3.22.    <u>Entry Date</u> means each January 1 and July 1.

3.23.    <u>ERISA</u> means the Employee Retirement Income Security Act of 1974, as amended.

3.24.    <u>Limitation Year</u> means the Plan Year or such other twelve-consecutive month period as may be designated by the Company.

3.25.    <u>Normal Retirement Age</u> means "Normal Retirement Age" as defined in the respective Parts.

3.26.    <u>Part</u> means the applicable sub-plan as follows:

3.26.1.  <u>Part One</u> means that part of the Plan which contains the CB Sub-Plan.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000490

B0480

3.26.2. <u>Part Two</u> means that part of the Plan which contains the Delmarva Sub-Plan, as amended on and after the Effective Date.

3.26.3. <u>Part Three</u> means that part of the Plan which contains the ACE Sub-Plan, as amended on and after the Effective Date.

3.27. <u>Participant</u> means an Employee who becomes a participant pursuant to the eligibility provisions of the applicable Part and who continues to be entitled to any benefits under the Plan.

3.28. <u>Plan</u> means the Conectiv Retirement Plan, as herein amended and restated, and any amendments thereto. The Plan consists of the Base Plan and Parts One, Two and Three.

3.29. <u>Plan Administrator</u> means the Committee.

3.30. <u>Plan Year</u> means a calendar year.

3.31. <u>Prior Plan</u> means, as applicable, the ACE Plan or the Delmarva Plan.

3.32. <u>Retirement Income</u> has the meaning ascribed to it in the Parts.

3.33. <u>Required Beginning Date</u> means April 1 of the calendar year following the later of (i) the calendar year in which the Participant retires or (ii) the calendar year in which the Participant attains age 70½, provided, however that:

3.33.1. If a Participant in Part One who is not a 5% owner of the Employer affirmatively elects, such Participant's Required Beginning Date may be April 1 of the calendar year following the calendar year in which the Participant attains age 70½, notwithstanding the fact that the Participant has not yet retired;

3.33.2. If a Participant is a 5% owner of an Employer, the Required Beginning Date shall be April 1 of the calendar year following the calendar year in which the Participant attains age 70½.

3.34. <u>Trust</u> means any trust under which the assets or any portion of the assets of this Plan are held.

PHLEGAL: #650902 v7 (dy8m07l.WPD)

PHI000491

B0481

3.35.   Trust Agreement means the trust agreement(s) between the Company and the Trustees or any successor agreement(s).

3.36.   Trustees means the individual(s) or institution(s) named in the Trust Agreement(s) as trustees of the assets of this Plan, or any successor trustees.

3.37.   Year of Service means "Year of Service" as defined in the respective Parts.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000492

B0482

ARTICLE 4
ADMINISTRATION

4.1.    Plan Administration.

    4.1.1.  Named Fiduciary.  The "Named Fiduciary" of the Plan as described in Section 402 of ERISA shall be the Company.

    4.1.2.  Allocation of Powers and Responsibilities.  The powers and responsibilities of the Named Fiduciary with respect to the Plan are allocated to its Board of Directors, its Personnel and Compensation Committee, and officers and employees, who shall exercise such authority on behalf of the Company, as follows:

    (a)    To the Board of Directors or the Personnel and Compensation Committee of the Board of Directors of the Company, subject to Section 8.1, to establish, continue, amend, modify or terminate the Plan; provided, however, that the Retirement Plan Committee shall have the power and authority to amend the Plan as provided in Section 4.1.2(f)(x) below.

    (b)    To the Chairman of the Board of Directors of the Company, to appoint the members of a Retirement Plan Investment Committee (the "Investment Committee"); provided, however, that the Chairman shall advise the Board of Directors of such appointments.

    (c)    To the Investment Committee:

    (i)    To manage and control the Plan assets, including the power to select an investment manager or managers to manage and control (including the power to acquire and dispose of) any Plan assets; provided, however, that the investment manager or managers must be approved by the Board of Directors or the Personnel and Compensation Committee of the Board of Directors, and must:

    (A)    be (1) registered as an investment advisor under the Investment Advisors Act of 1940, (2) a bank, as defined in that Act, or (3) an insurance company qualified to manage, acquire or dispose of any plan asset under the laws of more than one state; and

    (B)    acknowledge in writing that it is a fiduciary with respect to the Plan.

PHLEGAL: #650902.v7 (dy8m07!.WPD)

PHI000493

B0483

(ii)    To (A) select an actuary for the Plan (as necessary); (B) periodically obtain, review and approve the actuary's determination of the contributions required to fund the costs of such Plans; and (C) authorize the required contributions.

(iii)    To establish the funding policy of the Plan, based on the objectives and financial needs of the Plan and coordinate the investment policies of the Plan with the funding policy.

(iv)    To authorize the Treasurer of the Company or an Employer to remit contributions to the Plan's trusts.

(v)    To select a Trustee of the Plan assets; provided, however, that the Investment Committee shall advise the Board of Directors of such selection.

(d)    To the President of the Company, to select the members of the Retirement Plan Committee.

(e)    To the Chief Financial Officer or Treasurer of the Company, to maintain a funding policy consistent with the business requirements of the Company and the requirements of law.

(f)    To the Retirement Plan Committee (as created and defined in Section 4.5 below):

(i)    To recommend to the Board of Directors or the Personnel and Compensation Committee of the Board of Directors a plan whose provisions are most compatible with the Company's desire to provide retirement and other benefits for its Employees and its financial ability to provide such benefits;

(ii)    To determine eligibility of Employees for benefits under the Plan;

(iii)    To require any person to furnish such information as may be required for the proper administration of the Plan as a condition to receiving any benefits under the Plan;

(iv)    To instruct the Trustee as to disbursement of Plan funds to pay benefits in accordance with the terms of the Plan;

(v)    To administer the claims procedure (as established in Section 4.9) in accordance with the terms of the Plan and in a manner which treats all claimants fairly and equitably;

-11-

PHI000494

B0484

(vi)    To maintain all Plan records required by law;

(vii)    To ensure that all reports and disclosure statements are filed as required by law;

(viii)    To comply with all requirements of ERISA and the Code and to take whatever action is necessary to maintain the Plan as a qualified plan under Section 401(a) of the Code or of any succeeding corresponding provision of the federal Internal Revenue laws;

(ix)    To make rules and regulations for the administration of the Plan not inconsistent with the terms of the Plan; and

(x)    With the advice of counsel and subject to Section 8.1:

(A)    to make such amendments or modifications to the Plan as may be (1) required by law, including ERISA or the Code, (2) necessary to maintain the tax-qualified status of the Plan, or (3) necessary to comply with collective bargaining agreements; or

(B)    to make such administrative, technical or clarifying amendments as may be necessary, advisable or desirable (1) to improve administration of the Plan, (2) to carry out the intent of amendments to the Plan approved by the Board of Directors or any Committee of the Board of Directors, or (3) to carry out the intent of resolutions of the Board of Directors or any Committee of the Board of Directors pertaining to or affecting the Plan;

Provided, however, that the Retirement Plan Committee shall advise the Board of Directors of any such amendments or modifications.

4.2.    <u>Delegation of Powers and Responsibilities</u>.  Any powers and responsibilities of the Named Fiduciary (other than any powers and duties related to the management and control of Plan assets) allocated under Section 4.1.2 may be further delegated in writing by the Board of Directors or the Personnel and Compensation Committee of the Board of Directors, the Chairman of the Board of Directors, the Investment Committee, the President, the Chief Financial Officer or Treasurer, or the Retirement Plan Committee, as the case may be.  Any person or legal entity may serve in more than one fiduciary capacity with respect to the Plan and Trust.

-12-

PHI000495

B0485

4.3.  Employment of Consultants and Counsel.  The Board of Directors or the Personnel and Compensation Committee of the Board of Directors, the Chairman of the Board of Directors, the Investment Committee, the President, the Chief Financial Officer or Treasurer, or the Retirement Plan Committee, or any person delegated the powers and responsibilities of any of them pursuant to Section 4.2 may employ one or more persons to render advice with regard to powers and responsibilities allocated under Section 4.1.2.

4.4.  Responsibilities Several and Not Joint.  The powers and responsibilities allocated to the Board of Directors or the Personnel and Compensation Committee of the Board of Directors, the Chairman of the Board of Directors, the Investment Committee, the President, the Chief Financial Officer or Treasurer, or the Retirement Plan Committee, as the case may be, or those powers and responsibilities delegated to any other person pursuant to Section 4.2 shall be several and not joint.

4.5.  Retirement Plan Committee.  There is hereby created a Retirement Plan Committee (the "Committee") to be composed of at least three members.  The members shall be appointed by the President of the Company and shall serve without compensation at the pleasure of the President. ·The Committee shall have the duties and responsibilities with respect to the administration of the Plan more particularly set out above in Section 4.1.2(f). The Committee may act at meetings at which a majority of its members shall be present.  The action of a majority of the Committee present shall constitute the action of the Committee.  The Committee may also act by written resolution without the holding of a meeting.  Any resolution concurred in by a majority of its members shall be the action of the Committee.  The  Committee shall have full discretion to determine any questions of fact, interpretation, definition, or administration under the Plan and such determinations shall be conclusive and binding on all persons to the fullest extent permitted by law.  Written minutes shall be kept of the Committee's meetings and actions. No member of the Committee who is a Participant shall vote on any matter affecting his individual account.  The expenses of the Committee shall be paid by the Company.

4.6.  Administrator.  The Administrator shall be the person so designated in writing by the Retirement Plan Committee.

4.7.  Plan Administrator.  The "Plan Administrator" for the purposes of ERISA shall be the Company.

4.8.  Agents For Receipt of Legal Process.  The Company and the Trustee are designated as the agents for the receipt of service of process.

-13-

PHI000496

B0486

4.9.    Procedure for Filing A Claim for Benefits.

4.9.1.    Claim Forms.  The Committee shall provide on request forms on which any person may file a claim for benefits under the Plan.  A claim shall be filed with the Administrator.

4.9.2.    Notice of Denial of Claim.  If a claim is wholly or partially denied, written notice of the decision shall be given to the claimant within a reasonable time after the filing of the claim.  Such notice shall be written in a manner calculated to be understood by the claimant and shall contain the following:

(a)    The specific reason or reasons for denial;

(b)    Reference to specific Plan provisions on which the denial is based;

(c)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(d)    An explanation of the Plan's claim review procedure.

4.9.3.    Review of Claim Denial.  A claimant whose claim for benefits has been denied in whole or in part in accordance with Section 4.9.2 may obtain a review of such denial by making a written request to the Committee within sixty (60) days of notice of any such denial.  The time for requesting such a review may be extended by the Committee under circumstances where the claimant's failure to request a review within the sixty (60) day limit is excusable.  For the purposes of this right to request a review of a claim denial, a claimant shall be deemed to have received notice of denial of a claim if the claimant receives no notice of the granting or denial of a claim within sixty (60) days of making such claim.  A claimant shall be entitled to review all Plan documents pertaining to his claim.  A claimant shall be entitled to submit written arguments in support of his claim.

4.9.4.    Notice of Denial of Claim After Review.  If a claim is wholly or partially denied upon a review in accordance with Section 4.9.3, written notice of such decision shall be given to the claimant within sixty (60) days of the filing of the request for review, unless special circumstances require an extension of time for processing, in which case a decision shall be rendered as soon as possible but not later than one hundred twenty (120) days after, receipt of a request for review.  If such an extension of time for review is required because of special circumstances, written notice of the extension shall be furnished to the claimant prior to the commencement of the extension.  The decision on review shall be in writing and shall include specific reasons for the decision, written in a manner calculated to be understood by, the

-14-

PHI000497

B0487

claimant, and shall include specific references to the pertinent plan provisions on which the decision is based.

-15-

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000498

B0488

## ARTICLE 5
## CODE SECTION 415 LIMIT ON BENEFITS

5.1.    General Rule.  Notwithstanding any provisions of the Plan to the contrary, in no event shall the projected annual benefit payable to the Participant in the form of a straight life annuity or a qualified joint and survivor annuity (with no ancillary benefits) exceed the lesser of:

5.1.1.  $90,000 (or such higher amount as may be allowed pursuant to Code Section 415(d)), or

5.1.2.  100% of the Participant's average compensation for his high three years.

5.2.    Incorporation of Code Section 415.  In determining whether the annual benefit exceeds the limitation set forth under the general rule, the provisions of Code Section 415 and the regulations issued thereunder are herein incorporated by reference.

5.3.    Limitation in Case of Defined Benefit Plan and Defined Contribution Plan for Same Employee.  If, in any Limitation Year beginning before January 1, 2000, a Participant is a participant in one or more defined contribution plans sponsored by an Employer, the annual benefit of the Participant under the Plan shall be reduced to the extent necessary to meet the combined plan limits of section 415(e) of the Code.

-16-

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000499

B0489

ARTICLE 6
DISTRIBUTION RULES

6.1.    Required Distributions

6.1.1.  The requirements of this Section shall apply to any distribution of a Participant's benefits and will take precedence over any inconsistent provisions of the Plan.  All distributions required under this Section shall be determined and made in accordance with Code Section 401(a)(9) and the regulations promulgated thereunder.

6.1.2.  Distribution of a Participant's benefits shall commence no later than the Participant's Required Beginning Date.

6.2.    Direct Rollovers

6.2.1.  Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Section, a Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

6.2.2.  The following definitions shall apply solely for the purposes of this Section:

(a)    Direct Rollover means a payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

(b)    Distributee  means an Employee or former Employee.  In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

(c)    Eligible Retirement Plan means an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code that accepts the Distributee's Eligible Rollover Distribution.  However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement plan or individual retirement annuity.

-17-

PHI000500

B0490

(d)    Eligible Rollover Distribution means any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: (1) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated beneficiary, or for a specified period of ten years or more; (2) any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; and (3) the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

6.3.    Rules for Election of Optional Form of Benefit.

6.3.1.    Committee to Inform Participant of Option.  A Participant may elect an optional form of benefit under the applicable Part by filing a written notice with the Committee in the form and manner prescribed by the Committee.  The following rules shall be applied in a uniform and nondiscriminatory manner with respect to the election of optional forms of benefit, as provided under the applicable Part(s).

6.3.2.    Except as provided in Section 6.3.4, a Participant may elect an optional form of benefit at any time during the period that begins 90 days before the first day of the calendar month in which his Annuity Starting Date falls and ends on the Annuity Starting Date.  Any election of any optional form of benefit shall remain revocable until the later of:

(a)    the seventh day after the date on which the explanation described in Section 6.3.7 is provided, or

(b)    that Participant's Annuity Starting Date.

6.3.3.    Each Participant whose benefits have been suspended during a period of reemployment, may make the election described in Section 6.3.2 upon the resumption of benefit payments, with respect to his entire Accrued Benefit.  For purposes of applying Section 6.3.2 to the preceding sentence, the Participant's Annuity Starting Date shall be the date on which suspended benefits resume.

6.3.4.    Spousal Consent.  A Participant who does not establish to the satisfaction of the Committee that he has no spouse on his Annuity Starting Date may elect to receive an optional form of benefit under Section 6.3.2 only if:

(a)    The benefit is a joint and survivor annuity with the Participant's spouse that provides for periodic payments after the Participant's death each of which is fifty percent (50%) or one hundred percent (100%) of the periodic payment to the Participant; or

-18-

PHI000501

B0491

(b)    Participant's spouse (or the spouse's legal guardian if the spouse is legally incompetent) executes a written instrument whereby such spouse:

(i)    consents not to receive the normal form of benefit; and

(ii)    consents to the specific optional form elected by the Participant, or (provided such instrument acknowledges the spouse's right to limit consent to a specific optional form) to the Participant's right to choose any optional form without any further consent by the spouse; and

(iii)    if applicable, consents in writing to either the specific beneficiary or beneficiaries named by the Participant pursuant to his election, or (provided such instrument acknowledges the spouse's right to limit consent to a specific beneficiary) to the Participant's right to name any beneficiary or beneficiaries without any further consent by the spouse; and

(iv)    such instrument acknowledges the effect of the election to which the spouse's consent is being given and is witnessed by a Plan representative or a notary public; or

(c)    the Participant (A) establishes to the satisfaction of the Committee that his spouse cannot be located or (B) furnishes a court order to the Committee establishing that the Participant is legally separated or has been abandoned (within the meaning of local law), unless a qualified domestic relations order pertaining to such Participant provides that the spouse's consent must be obtained.

The consent of a spouse in accordance with this Section 6.3.4 shall not be effective with respect to other spouses of the Participant, and an election to which Section 6.3.4(c) applies shall become void if the circumstances obviating such requirement of consent of the spouse cease to exist before the Participant's Annuity Starting Date.

6.3.5.    Revocation of Election.  A Participant may revoke an election under Section 6.3.4.  Such revocation may be made at any time during the election period described in Section 6.3.2.  Such revocation shall not void any prospectively effective consent given by the Participant's spouse in connection with the revoked election.

-19-

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000502

B0492

6.3.6.  <u>Death of Spouse or Beneficiary Before Annuity Starting Date</u>.  If a Participant's spouse or other beneficiary dies before the Participant's Annuity Starting Date, but after an election of a joint and survivor annuity has been made hereunder, the election shall be automatically revoked.

6.3.7.  <u>Explanation to Participants</u>.  The Committee shall provide to each Participant (whose vested Accrued Benefit has an Actuarial Equivalent single-sum value in excess of $5,000) no more than 90 days before his Annuity Starting Date a written explanation of:

(a)     the terms and conditions of the normal form of benefit and each optional form of benefit, including information explaining the relative values of each form of benefit;

(b)     the Participant's right to waive the normal form of benefit and the effect of such waiver;

(c)     the rights of the Participant's spouse with respect to such waiver;

(d)     the right to revoke an election to receive an optional form of benefit and the effect of such revocation;

(e)     if the Participant has not reached age 65, the Participant's right to defer commencement of his benefit until his Required Beginning Date;

(f)     the right to at least 30 days to consider whether to waive the normal form of benefit and consent to a form of distribution other than the normal form of benefit.  The 30-day consideration period shall be measured from the date on which the written explanation described in this Section 6.3.7 is provided.

Notwithstanding any other Plan provision, if a Participant so elects, the date on which that Participant's first benefit payment is actually made may be less than 30 days (but in no event less than seven days) after the date on which the notice described in Section 6.3.7 is provided.

-20-

PHI000503

B0493

6.4.    Mandatory Retirement for Certain Executives.

6.4.1.  Certain Executives.  An Employee, who for the two years prior to his sixty-fifth (65th) birthday has been employed in a bona fide executive or a high policy-making position, must retire on or before the first day of the month coincident with or next following his sixty-fifth (65th) birthday provided that the Employee is then entitled to an immediate non-forfeitable annual retirement benefit from the Employer of at least $44,000.

6.4.2.  Exception to Mandatory Retirement for Certain Executives.  The Employer, at the specific request of its Board of Directors and in its absolute discretion, may defer the mandatory retirement of certain executives for a period of not more than one year, subject to further deferments for periods of not more than one year, by action taken in each case not more than sixty (60) days prior to the termination of any such extended period.

-21-

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000504

B0494

## ARTICLE 7
## TOP-HEAVY PROVISIONS

7.1.    <u>Purpose</u>.  The purpose of this Article is to comply with the rules applicable to Top-Heavy plans contained in Section 416 of the Code and the appropriate regulations of the Internal Revenue Service thereunder.  The rules set forth in this Article shall be operative if the Plan is, or becomes, Top-Heavy within the meaning of Section 416 of the Code and the regulations thereunder.

7.2.    <u>Definitions</u>.  For purposes of this Article only, the following terms shall have the meanings set forth below:

7.2.1.  <u>Determination Date</u> means, as to any Plan Year, the last day of any preceding Plan Year or, in the case of the first Plan Year, the last day of such Plan Year.

7.2.2.  <u>Key Employee</u> means any Employee, or former Employee, or beneficiary of either, who at any time during the Plan Year or the four preceding Plan Years is:

(a)    an officer of the Employer having an annual Section 415 Compensation greater than the amount determined by multiplying fifty percent (50%) of the dollar limitation under Section 415(b)(1)(A) of the Code;

(b)    one of the 10 Employees owning the largest interests in the Employer and having an annual Section 415 Compensation at least equal to the dollar limitation under Section 415(c)(1)(A) of the Code;

(c)    a 5% owner of the Employer; or

(d)    a 1% owner of the Employer having aggregate annual Section 415 Compensation of at least $150,000 from the Employer and any Affiliated Employer.

For purposes of subparagraphs (b), (c) and (d), owners of the Employer shall include those considered as owners within the meaning of Section 318 of the Code.  In identifying the top 10 Employee owners under Section 7.2.2(b), only owners of greater than a one-half percent (½%) interest in the Employer will be considered, and if several Employees have equal ownership interests, those Employees with higher Section 415 Compensation shall be treated as having a greater ownership interest.  The determination of who is a Key Employee shall be made in accordance with Section 416(i) of the Code and the regulations thereunder, the provisions of which are incorporated herein by reference.

-22-

PHI000505

B0495

7.2.3.  Non-Key Employee means any Employee other than a Key Employee, and shall include any former Key Employees.

7.2.4.  Present Value means the present value of a Participant's accrued benefit as of his Normal Retirement Date (or attained age, if later) determined under the rules prescribed by Section 416 of the Code and the regulations issued thereunder. The Present Value shall be calculated as of the latest valuation date used for computing Plan costs for minimum funding purposes using the interest, pre-retirement and post-retirement mortality assumptions set forth in Schedule A of the Delmarva Sub-Plan. In computing Present Value, future withdrawal or salary increase assumptions shall not be taken into account.

7.2.5.  Valuation Date means the most recent valuation date occurring within the 12-month period ending on the Determination Date.

7.3.  Determination of Whether Plan is Top-Heavy. This Plan will be deemed to be Top-Heavy for any Plan Year if, as of the Determination Date for the preceding Plan Year,

(a)  the Present Value of the cumulative accrued benefits under the Plan for Key Employees exceeds sixty percent (60%) of the Present Value of the cumulative accrued benefits under the Plan for all Employees, or

(b)  the Plan is included in a Required Aggregation Group and the sum of the present value of the cumulative accrued benefits for Key Employees under all defined benefit plans included in such group and the aggregate of the accounts of Key Employees under all defined contribution plans included in such group exceeds sixty percent (60%) of a similar sum determined for all Employees, or

(c)  the Plan is part of a Required Aggregation Group and part of a Permissive Aggregation Group and the present value of the cumulative accrued benefits for Key Employees under all defined benefit plans included in the Permissive Group and the aggregate of accounts of Key Employees under all defined contributions plans in the Permissive Group exceeds sixty percent (60%) of a similar sum determined for all Employees.

A former Participant's Accrued Benefit is to be disregarded in determining whether the Plan is Top-Heavy, unless the Participant performed any services for the Employer within the 5- year period ending on the Determination Date.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000506

B0496

7.4.   <u>Aggregation Group of Employer Plans</u>.  All corporations and businesses that are aggregated under Sections 414(b), (c) and (m) of the Code with the Employer must be considered with the Employer for the purposes of determining whether the Plan is Top-Heavy. All plans of the Employer in which a Key Employee participates, and each other stock bonus, pension or profit sharing plan, if any, of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Section 401(a)(4) or Section 410 of the Code, will be aggregated as a Required Aggregation Group within the meaning of Section 416(g) of the Code. Each plan in the Required Aggregation Group will be Top-Heavy if the group is Top-Heavy, and no plan in the group will be Top-Heavy if the group is not Top-Heavy.

In addition, the Employer may elect to include as part of the Permissive Aggregation Group under Section 416(g) of the Code any plans that are not part of a Required Aggregation Group but that satisfy the requirements of Sections 401(a)(4) and 410 of the Code when considered together with the plans constituting the Required Aggregation Group. If the Permissive Aggregation Group is Top-Heavy, only those plans which are part of the Required Aggregation Group will be subject to the additional requirements applicable to Top-Heavy plans as herein provided.

7.5.   <u>Special Minimum Benefit Requirement in Event Plan Becomes Top-Heavy</u>.  In the event that the Plan shall be determined to be Top-Heavy as to any Plan Year, the following special minimum benefit requirement shall become operative for such Plan Year: If a Participant's employment is terminated during a Top-Heavy Plan Year, his annual Retirement Income expressed as a single life annuity at Normal Retirement Age (as defined in the respective Parts) shall be the greater of : (1) the amount of the Normal Retirement Income determined under the respective Parts; or (2) his "average annual compensation" times the lesser of (i) 2% times his Years of Service, or (ii) 20%, offset by the Employer's contributions to his account in any defined contribution plan maintained by the Employer during any Top-Heavy Plan Year. For such purposes, "average annual compensation" shall mean a Participant's average annual compensation for the period of consecutive years (not exceeding five) when the Participant had the highest aggregate compensation from the Employer. "Years of Service" shall only include a Year of Service if a Top-Heavy Plan Year ended during such year.

7.6.   <u>Minimum Vesting</u>.  If a Participant's employment is terminated prior to his being eligible for a retirement benefit and prior to his being credited with at least five (5) Years of Service but after being credited with at least three (3) Years of Service, he shall be entitled to Retirement Income if his termination of employment occurs during a Top-Heavy Plan Year. A Participant entitled to benefits under this paragraph shall be eligible to receive his Retirement Income in the manner provided in the respective Parts.

-24-

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000507

B0497

7.7.    <u>Terminated Participants</u>.  This Article 7 shall not apply to any Participant who does not complete an Hour of Service after the Plan becomes Top-Heavy.

7.8.    <u>Termination of Top-Heavy Status</u>.  In the event that the Plan is Top-Heavy within the meaning of Section 416 of the Code for any Plan Year, and in a subsequent Plan Year the Plan ceases to be Top-Heavy, a Participant so credited with at least five (5) Years of Service as of his last day of the Top-Heavy Year may elect, on termination of employment, to receive Retirement Income as if such termination had occurred during a Top-Heavy Plan Year.

7.9.    <u>Multiple Top-Heavy Plans</u>.  In the event that a Participant in the Plan is also participating in another qualified retirement plan maintained by the Company or an Affiliated Company during a Plan Year in which both the Plan and such other plan are Top-Heavy, the Participant shall receive the minimum contribution or benefit under the other plan in lieu of the minimum benefit provided for in Section 7.5 of this Plan.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000508

B0498

## ARTICLE 8
## AMENDMENT AND TERMINATION

8.1.    <u>Company's Right to Amend the Plan</u>.  The Company reserves the right at any time and from time to time, and retroactively if deemed necessary or appropriate to meet the requirements of Code Section 401(a), ERISA or any other law affecting the Plan, to amend any provision of the Plan; provided, however, that no such amendment shall make it possible for any part of the corpus or income of the Trust Fund to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and their joint annuitants and beneficiaries under the Plan prior to the satisfaction of all Plan liabilities, nor shall any amendment make it possible to deprive any Participant of a previously accrued benefit, or eliminate or reduce an early retirement benefit or a retirement-type subsidy (as defined in the applicable regulations) or eliminate an optional form of benefit, except to the extent permitted by Code Section 412(c)(8).  Amendments to the Plan may be adopted by action of the Board of Directors or the Personnel and Compensation Committee of the Board of Directors, or such other person to who such authority has been delegated as set forth in Article 4.

8.2.    <u>Participant's Rights Not to Be Affected By Merger</u>.  In the event of any merger or consolidation with, or transfer of assets or liabilities to, any other plan, each Participant (if the Plan were to terminate immediately after the merger, consolidation, or transfer) shall be entitled to receive a benefit which is not less than the benefit he would have been entitled to receive if the Plan had terminated immediately before the merger, consolidation, or transfer. In the case of a merger with or transfer of assets and liabilities from a defined benefit plan whose liabilities are less than three percent (3%) of the assets of the Plan, a special schedule of benefits (consisting of all benefits that would be provided by the transferor plan on a termination basis just prior to the merger or transfer) shall be prepared and, in the event of a termination of this Plan within five (5) years of the date of the merger or transfer, such benefits shall be payable in a priority category higher than the highest priority category of ERISA Section 4044 as those categories are set forth in Section 8.3.

8.3.    <u>Distribution or Allocation of Assets Upon Complete or Partial Termination of Plan</u>.  While the Company intends to continue the Plan indefinitely, nevertheless it assumes no contractual obligation as to its continuance and the Board of Directors or the Personnel and Compensation Committee of the Board of Directors may terminate the Plan at any time.  In the event there is a termination or partial termination of the Plan, all Participants' interests in the Plan shall be nonforfeitable to the extent of the sufficiency of the Plan assets and such assets shall be allocated in accordance with ERISA Section 4044 for the purposes of providing Retirement Income and survivor's benefits accrued under the Plan to the date of the termination of the Plan as follows:

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000509

B0499

8.3.1. <u>Benefits in Pay Status 3 Years Prior to Plan Termination</u>. First, an amount equal to the value of the Retirement Income (excluding any increases in such Retirement Income resulting from Plan amendments during the preceding five (5) years), accrued to all Participants, their joint annuitants and beneficiaries:

(a)    To whom Retirement Income benefits have been in pay status for at least three (3) years prior to the date of Plan termination (taking the lowest benefit in pay status during the last three (3) years preceding the date of Plan termination); and

(b)    To whom Retirement Income benefits (other than those described in the foregoing subparagraph) would have been in pay status had an eligible Participant actually retired on a Retirement Date at least three (3) years prior to the date of Plan termination, as if such Retirement Income benefits had commenced under the normal form of benefit payment under the Plan as of the beginning of such period.

8.3.2. <u>Other Benefits Guaranteed by the PBGC</u>. Second, an amount equal to the value of all other nonforfeitable Benefits under the Plan (other than those Benefits which become non-forfeitable solely because of the termination of the Plan) to the extent such Benefits are guaranteed by the Pension Benefit Guaranty Corporation.

8.3.3. <u>All Other Nonforfeitable Benefits</u>. Third, an amount equal to the value of all other nonforfeitable Benefits under the Plan.

8.3.4. <u>All Other Benefits</u>. Fourth, an amount equal to the value of all other Benefits under the Plan.

8.3.5. <u>Excess To Be Refunded To Employer</u>. Fifth, if any amounts remain after complete allocation for the purposes of Sections 8.3.1 through 8.3.4 above, such amounts shall be paid to the Employer upon the complete termination of the Plan.

Such allocation for Participants and beneficiaries in each of the above priority groups will be on the basis of the lump sum equivalent value of the retirement Benefit of each determined as of the date the Plan was terminated or partially terminated on the basis of annuity rates currently available from a leading insurance company designated by the Committee for this purpose, with no commitment to actually purchase annuities from such insurance company. The market values available for each priority group will be allocated to Participants and beneficiaries in that group up to but not exceeding lump sum equivalent value. In priority group First, the allocation will be pro-rata. Except as otherwise required by ERISA Section 4044(b), in priority group Second, Third and Fourth, it will be in order of age, oldest first. Any market value remaining after full allocation to all Participants and beneficiaries will be allocated to the Employer.

-27-

PHI000510

B0500

Any fluctuation in market value, up or down, prior to the date of actual application or distribution will be shared pro-rata by the persons, including the Employer, to whom such market value was allocated pursuant to the preceding paragraph. Eventual distribution to Participants, beneficiaries, and the Employer will be on the basis of market values at the time of such distribution.

8.3.6. <u>Allocations Within Priority Groups</u>. In the event assets shall be insufficient to provide in full the interests described in the priority groups identified in Sections 8.3.1, 8.3.3, 8.3.4, the available assets for such groups shall be allocated among the individuals, interests described in such groups, pro-rata among such individuals, interests on the basis of the present value (as of the Plan termination date) of their respective interests as described in such paragraph, and not previously provided for under the Trust Agreement. In the event that the assets available for allocation under Section 8.3.2 are insufficient to satisfy in full the Benefits of Participants described within that Section, the available assets for such class shall be allocated on the basis of the Benefits of Participants of that class and their joint annuitants and beneficiaries, not previously provided for under the Trust Agreement, based upon the Plan as in effect at the beginning of the five (5) year period ending on the date of Plan termination; or, if additional assets remain available for allocation under Section 8.3.2, the available assets shall be allocated on the basis of the Plan as amended by the most recent Plan amendment effective during such five (5) year period, under which the assets available for allocation are sufficient to satisfy in full the Benefits of the class of individuals described in Section 8.3.2; and any assets thereafter remaining to be allocated under Section 8.3.2 shall be allocated on the basis of the Plan as amended by the next succeeding Plan amendment effective during such five (5) year period.

8.3.7. <u>Partial Termination</u>. Notwithstanding any provision in the Plan to the contrary, in the event of a partial termination, the allocation prescribed in this Section 8.3 shall be performed for the sole purpose of determining the extent to which unvested Participants' Benefits affected by the partial termination shall be vested, to the extent funds are allocated to such Benefits as of the date of partial termination. Any Participants who are not affected by the partial termination shall not become vested on account of such partial termination. After such determination, the allocation of assets as of such partial termination shall become inapplicable with respect to any future termination or partial termination.

8.4. <u>Provision to Prevent Discrimination</u>. In the event of termination of the plan, the Benefit payable to any Highly Compensated Employee (and any former Highly, Compensated Employee) will be limited to a Benefit that is nondiscriminatory under Section 401(a)(4) of the Code.

PHLEGAL: #650902.v7 (dy8m07LWPD)

PHI000511

B0501

8.4.1. The annual payments under the Plan to or on behalf of any employee described in Section 8.4.3 shall be restricted to an amount in each taxable year of the Employee equal to the payments that would be made to or on behalf of the Employee under:

     (a)    A straight life annuity that is the Actuarial Equivalent of the Accrued Benefit and other Benefits to which the Employee is entitled under the Plan (other than a Social Security Supplement), and

     (b)    The amount of the payments that the Employee is entitled to receive under a Social Security Supplement.

8.4.2. The restrictions in Section 8.4.1 above shall not apply, if any of the following requirements are satisfied:

     (a)    After payment to or on behalf of an Employee described in Section 8.4.3 of all Benefits payable to or on behalf of the Employee, the value of Plan assets equals or exceeds 110% of the value of Current Liabilities;

     (b)    The value of Benefits payable to or on behalf of an Employee described in Section 8.4.3 is less than 1% of the value of the Current Liabilities before distribution; or

     (c)    The value of the Benefits payable to or on behalf of an Employee described in Section 8.4.3 does not exceed the amount described in Section 411(a)(11)(A) of the Code.

8.4.3. The Employees whose Benefits are restricted on distribution include all Participants and former Participants who are Highly Compensated Employees. A Participant or former Participant who is a Highly Compensated Employee is not subject to restriction under this Section if he is not one of the 25 Employees and former Employees of the employer with the largest amount of Compensation in the current or in any prior Plan Year.

8.4.4. Valuation. Any reasonable and consistent method selected by the Committee may be used to determine the value of Current Liabilities and Plan Assets.

8.5.    Definitions. For purposes of Sections 8.3 and 8.4 the following definitions shall apply:

     (a)    Accrued Benefit means the Normal Benefit payable at Normal Retirement Date determined pursuant to the Plan. In the event a Participant terminates employment prior to his Normal Retirement Date, the Accrued Benefit shall be equal to the Normal Retirement Benefit computed as of the date of termination of employment.

-29-

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000512

B0502

(b)    <u>Actuarial Equivalent</u> means the equivalent of the benefit otherwise payable to a Participant or a survivor, whichever is applicable using the factors set forth in Schedule A of the Delmarva Sub-Plan.

(c)    <u>Benefit</u> means, among other benefits under the Plan, loans in excess of the amounts set forth in Section 72(p)(2)(A) of the Code, any periodic income, any withdrawal values payable to a living or former Employee, and any death benefits under the Plan not provided for by Insurance on the Employee's or Former Employee's life.

(d)    <u>Current Liabilities</u> shall have the meaning set forth in Section 412(l)(7) of the Code.

(e)    <u>Compensation</u> means any amount paid to the Participant by the Employer paid as salary, overtime, shift differential or bonus, including elective deferrals to plans described under Code Sections 401(k) and 125, and excluding, contributions the Employer makes to this or any other benefit plan, any amounts paid in the form of fringe benefits (including, but not limited to reimbursed moving expenses, insurance, and the like; provided, however, that effective January 1, 1996, meal allowances shall not be excluded as fringe benefits) and any dividend rights earned under any executive compensation plan of the Company even though such amounts may be taxable for federal income tax purposes.  In determining whether a payment is includible under this definition, the rules for the safe harbor definition set forth in Treas. Reg Section 1.415-2(d)(10), as adjusted by Treas. Reg. Section 1.414(s)-1(c)(3) and (4) shall be applied.  Notwithstanding the foregoing, annual Compensation taken into account for a Participant shall not exceed $160,000 or such higher amount as permitted under Section 401(a)(17).

(f)    <u>Highly Compensated Employee</u> shall have the meaning set forth in Section 414(q) of the Code.

(g)    <u>Social Security Supplement</u> shall have the meaning set forth in Treas. Reg. § 1.411(a)-7(c)(4)(ii).

-30-

PHI000513

B0503

ARTICLE 9
GENERAL PROVISIONS

9.1.    Incapacity.  If any person shall be physically or mentally incapable of receiving or acknowledging receipt of any payment of pension benefits hereunder, the Plan Administrator or Trustee, upon the receipt of satisfactory evidence that such person is so incapacitated and that another person or institution is maintaining him or her and that no guardian or committee has been appointed for him or her, may provide for such payment of pension benefits hereunder to such person or institution so maintaining him or her and any such payments so made shall be deemed for every purpose to have been made to such person.

9.2.    Merger.  In the case of any merger or consolidation of the Plan, with, or transfer of assets or liabilities respecting the Plan to, any other Plan, each Participant or Beneficiary in the Plan would (if the Plan had then terminated) receive a benefit hereunder immediately after such merger, consolidation or transfer which is no less than the benefit he or she would have been entitled to receive immediately before such merger, consolidation or transfer (if the Plan had then terminated).

9.3.    No Specific Rights.  Nothing contained herein shall be deemed to give any Participant any interest in any specific property of the Trust or any right except to receive a pension or other benefit as expressly provided for in the Plan.

9.4.    Employment Rights.  Participation in the Plan shall not give any right to any Employee to be retained in the employ of the Employer nor shall it interfere with the right of the Employer to discharge any Employee and to deal with him or her without regard to the existence of the Plan and without regard to the effect that such treatment might have upon him or her as a Participant in the Plan.

9.5.    Plan Benefits Nonassignable.  Except as required under a qualified domestic relations order, as defined in Code Section 414(p), or as may otherwise be provided by law, no distribution or payment under the Plan to any Participant, beneficiary, or joint annuitant shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, whether voluntary or involuntary, and any attempt to so anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void; nor shall any such distribution or payment be in any way liable for or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to such distribution or payment.  If any Participant, beneficiary, or joint annuitant is adjudicated bankrupt or purports to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge any such distribution or payment, voluntarily or involuntarily, the Administrator, in his discretion, may hold or cause to be held or applied such distribution or payment or any part thereof to or for the benefit of such Participant, beneficiary, or joint annuitant in such manner as the Administrator shall direct.

-31-

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000514

B0504

9.6.    Alienation.

9.6.1.  The income and principal of the Trust Fund are for the sole use and benefit of the Participants and beneficiaries of the Plan, and, to the extent permitted by law, shall be free, clear, and discharged of and from, and are not to be in any way liable for, debts, contracts or agreements, now contracted or which may hereafter be contracted, and from all claims and liabilities now or hereafter incurred by any Participant or beneficiary. It is intended by the Company that the Trust Fund shall constitute a spendthrift trust under the laws of the state in which the Participant is domiciled. No Participant shall have the right to commute, withdraw, surrender, encumber, alienate or assign any of the income or principal of the Trust Fund or any of the benefits to become due unto any person or persons under the Trust Agreement or the Plan except as specifically provided by the terms thereof.

9.6.2.  The provisions of Section 9.6.1 shall not apply to a "qualified domestic relations order" as defined in Code Section 414(p). The Plan Administrator shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Further, to the extent provided under a qualified domestic relations order, a former spouse of a Participant shall be treated as the spouse or surviving spouse of the Participant for all purposes under the Plan.

9.7.    Employer's Liability Limited to Assets in the Plan. The Trust Fund shall be the sole source of benefits under this Plan, and each Employee, Participant, joint annuitant, beneficiary, or any other person who shall claim the right to any payment or benefit under this Plan shall be entitled to look only to the Trust Fund for payment of benefits. Except as may be otherwise provided by ERISA or other applicable law, the Employer shall have no liability to make or continue from its own funds the payment of any benefit under the Plan.

9.8.    Applicable Law. The Plan shall be governed by, and construed in accordance with, the laws of the State of Delaware except to the extent that such laws have been specifically preempted by ERISA or other Federal legislation.

9.9.    Severability of Provisions. If any provision or portion of a provision of the Plan is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the balance of the Plan. The Plan shall be construed and enforced as if such provision had not been included, provided, however, the Plan shall be reformed only to the extent necessary to comply with applicable laws.

-32-

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000515

B0505

9.10.   <u>Missing Participant</u>.  In the event that all or any portion of a pension or other distribution payable to a Participant remains unpaid solely by reason of the inability of the Plan Administrator, after a good faith effort, to ascertain the address of such Participant, the amount so distributable shall be forfeited.  In the event a Participant is located subsequent to the forfeiture, such benefit shall be restored.

9.11.   <u>Gender, Tense and Headings</u>.  Whenever any words are used herein in the masculine or feminine gender, they shall be construed as though they were also used in the opposite gender in all cases where they would so apply.  Whenever any words used herein are in the singular form, they shall be construed as though they were also used in the plural form in all cases where they would so apply.  Headings of Articles and Sections as used herein are inserted solely for convenience and reference and constitute no part of the Plan.

9.12.   <u>Protected Benefits</u>.  The Plan shall preserve any protected benefits as defined in Code Section 411(d) of the Code or the regulations promulgated thereunder in any of the prior plans for the benefit of the Participants who were covered by such prior plan.

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000516

B0506

ARTICLE 10
FINANCING THE PLAN

10.1.    No Participant Contributions.  Participants shall make no contributions under the Plan.

10.2.    Employer Contributions.  The Employer shall make such contributions from time to time which it shall deem necessary to provide the benefits of this Plan.  The minimum amount of such contributions shall be that amount which is required to meet the minimum funding standard of ERISA (unless waived pursuant to the Code) or otherwise to maintain the Plan's qualification under Code Section 401(a).  However, the Employer is under no obligation to make any contributions under the Plan after the Plan is terminated, whether or not benefits accrued or vested prior to such date of termination have been fully funded.  Any forfeitures under the Plan shall be applied to reduce the Employer's periodic contributions and shall not increase the benefit otherwise payable to any Participant.

10.3.    Plan Funds to be Held in Trust.  All Employer contributions in connection with the Plan shall be paid to a Trustee under a Trust Agreement established in connection with the Plan.  All such contributions and the earnings thereon shall be held and disbursed in accordance with the provisions of the Plan and the Trust Agreement.  No person shall have any interest in, or right to, any part of the funds held in the Trust, except as expressly provided in the Plan and the Trust Agreement.

10.4.    Trust for the Exclusive Benefit of Plan Participants.  The Plan assets held in trust shall not inure to the benefit of the Employer prior to the satisfaction of all liabilities of the Plan and shall be held for the exclusive purposes of providing benefits to Participants and/or their joint annuitants and beneficiaries, and for defraying the reasonable expenses of administering the Plan.  However, if an Employer contribution is conditioned upon deductibility of the contribution under the Code Section 404, then, to the extent the deduction is disallowed, the contribution (to the extent disallowed) shall be returned to the Employer within one (1) year after the date the deduction is disallowed.  In addition, if a contribution or any portion thereof is made by the Employer by a mistake of fact, the contribution or such portion shall be returned to the Employer within one (1) year after the date of payment.

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000517

B0507

CONECTIV RETIREMENT PLAN

<u>SCHEDULE B</u>

The following retroactive effective dates indicate changes to Prior Plan provisions as required by changes in laws and regulations pursuant to Rev. Proc. 97-41. Where indicated, the provisions as set forth in the Plan and its Sub-Plans are effective on the indicated retroactive dates as if they were set forth in the respective Prior Plans as of such dates.

| Effective Date | Provision | Delmarva Retirement Plan | Atlantic City Electric Plan |
|---|---|---|---|
| December 12, 1994 | "USERRA" compliance (Code section 414(u)) | Delmarva Sub-Plan §1.28.1(e) | Ace Sub-Plan §3.8 |
| January 1, 1997 | Family aggregation rules eliminated (Code section 401(a)(17)) | Delmarva Sub-Plan §1.9 | Ace Sub-Plan §1.16 |
| January 1, 1997 | "Highly Compensated Employee" definition revised (Code section 414(q)(1)) | Base Plan §8.4 and §8.5(f) | Base Plan §8.4 and §8.5(f) |
| January 1, 1997 | "Leased Employee" definition revised (Code section 414(n)(2)) | Base Plan §3.19.6 | Base Plan §3.19.6 |

For purposes of the Plan, the following provisions are effective on or after the Effective Date and, thus, do not require retroactive effective dates:

(i)      Required Beginning Date, Code section 401(a)(9) (Base Plan §3.33);

(ii)     $5,000 involuntary cash-out threshold, Code section 411(a)(11) (Base Plan §2.2.2 and §6.3.7; Delmarva Sub-Plan §5.4.1(b) and §6.3.2(a), (b); Ace Sub-Plan §4.6);

(iii)    GATT actuarial equivalent, Code section 417(e)(3)(A) (Delmarva Sub-Plan Schedule A; ACE Sub-Plan Schedule A); and

(iv)    Repeal of combined plan limits, Code section 415(e) (Base Plan §5.3).

-35-

PHLEGAL: #650902 v7 (dy8m07!.WPD)

PHI000518

B0508

CONECTIV RETIREMENT PLAN

SCHEDULE C
(EFFECTIVE JANUARY 1, 1999)

The following table indicates Employers that have become participating employers in the Plan and, where indicated, those Employees who are eligible for participation in the Plan.

| Corporation | Effective Date/Prior Service | Comments |
|---|---|---|
| Conectiv Resource Partners | | |
| Atlantic City Electric | | FET employees represented by Local 210 are in cash balance sub-plan unless agreement specifies otherwise |
| Delmarva Power & Light | | |
| Conectiv Services, Inc. | | Only employees who had been Participants in the Plan or a Prior Plan immediately prior to transfer to CSI |
| Conectiv Communications | | |
| Conectiv Thermal | See CB Sub-Plan §1.54.1(c) | |
| Atlantic Energy Enterprises | See CB Sub-Plan §1.54.1(c) | |
| Conectiv Solutions LLC | Prior service with Power Consulting Group | Power Consulting Group employees only |

-36-

PHLEGAL: #650902 v7 (dy8m07LWPD)

PHI000519

B0509

**CONECTIV**

**CERTIFICATION OF VICE PRESIDENT
FOR HUMAN RESOURCES AND PRODUCTIVITY IMPROVEMENT**

I, Donald E. Cain, Vice President for Human Resources and Productivity Improvement of Conectiv (the "Company"), a Delaware corporation, hereby certify that I approve the adoption of the Conectiv Retirement Plan (the "Plan") document in the form attached hereto, effective January 1, 1999. My approval is given pursuant to the adoption of the Plan by the Personnel & Compensation Committee of the Board of Directors (the "Committee") of the Company on April 23, 1998 and the authorization of the Committee granted to me at a meeting of the Committee held on April 23, 1998.

Date:  December 10, 1999

_Donald E Cain_

Donald E. Cain
Vice President for Human Resources and
Productivity Improvement

PHI000520

B0510

# **Mid**Week **Extra**

## *Cash balance update*
### June 23, 1999

Opening statements for the Cash Balance Pension Plan will be mailed to employees' homes beginning next week. Thirty informational meetings are scheduled throughout the company from July 12 to July 29 to familiarize employees with the plan and to answer questions. A draft schedule is below. This schedule is firm, but could be amended if there are major conflicts in your area.

Because this issue is very important to employees, the meetings are being scheduled during working hours. As managers, please make sure that everyone who wishes to attend the information sessions is given the opportunity. If employees are unable to attend meetings at their work sites, they may attend sessions elsewhere.

These meetings will be the best source of information on the plan and employees' opening balances. Recent stories in the national media have raised concerns about some cash-balance plans that do not offer the same level of financial security or grandfathering provisions as Conectiv's Cash Balance Pension Plan. One part of the presentation will address these concerns and demonstrate how Conectiv's plan is different. Members of the leadership group of managers and above are invited to the first meeting, July 12 at the Conference Center. This meeting will give you perspective you can use to help yourself and your employees.

The Cash Balance Pension Plan is a portable pension that you may take with you if you leave the company at any time after a five-year vesting period. The Vanguard Group will act as the plan administrator, and the Towers Perrin consulting firm will act as the actuary. The plan is easy to understand. Each year, the company makes a cash contribution to your account equal to a percentage of your total pay, including overtime and variable pay. Through your career, the account grows with additional contributions and accrued interest. When you leave or retire, the value of the account is yours, provided you are vested.

It's important to note that opening balances reflect the current value of your benefit under the Delmarva and Atlantic plans. Keep in mind that the balances reflect the present-day value of money. This balance will continue to grow through annual contributions, interest, and depending on your age and service, transition credits. The calculations will be discussed at the meetings.

Upon receipt of the statements, employees should check the information. If you believe any of the info in your statement is incorrect, follow the instructions on the opening-balance statement. Please do not call the Human Resources Service Center or the plan administrator.

If you or your employees have any questions after receiving the opening statements, please hold them until the meetings, where experts will be available to respond. The meetings were scheduled after the mailings to enable employees to prepare questions. They will be the best source of information on the plan at this time. After the meetings, the Human Resource Service Center and Vanguard will be prepared to answer any questions you may have going forward.

*(see schedule, next page)*

JMC00006

04/25/2001    09:31    CONECTIV → 816096255274    NO.306    0003

## VANGUARD GROUP
## CONECTIV CASH BALANCE PLAN
## VOLUNTARY INFORMATIONAL MEETING SCHEDULES

| Date | Location | Time | On-Site Contact |
|---|---|---|---|
| Mon., 7/12 | Top 209 Mtg – Conf Center, Room C | 8a-9:30a | Marie Falkowski, 8-235-5 |
| | UoP – Conf Center, Room C | 10a-11:30a | |
| | | 1:00p-2p | |
| | | 2:30p-4p | |
| Tues., 7/13 | NDGO – Operations Conf Rooms A, B, C | 11p-12:30p | Janet Rudinoff, 8-225-448 |
| | | 1:30p-3p | |
| | | 3:30p-5p | |
| Wed, 7/14 | King Street – Multi-Purpose Room | 10:30a-12p | Kelley McMillan, 8-220-3 |
| | | 1:30p-3p | |
| | | 3:30p-5p | |
| Thurs., 7/15 | Pencader – Pencader Room | 9a-10:30a | Caren Samluk, 8-225-5779 |
| Thurs., 7/15 | MLK – Multi-Purpose Conf Room | 1:30p-3p | TBA |
| Fri., 7/16 | Data Center – Rooms 2 A&B | 9a-10:30a | Carol Peterson, 8-235-514 |
| | | 1:30p-3p | |
| Mon., 7/19 | Centreville – General Meeting Room | 9a-10:30a | Terri Layton, 8-425-4125 |
| Mon., 7/19 | SDGO – Room 1, 1st Floor | 1:30p-3p | Lora Brittingham, 8-230-6 |
| | | 3:30p-5p | |
| Tues., 7/20 | Millsboro – Main Conf Room | 9a-10:30a | Nancy Gosnell, 8-440-335 |
| Tues., 7/20 | Indian River Power Plant – 1st Fl Conf Room | 1:30p-3p | Melinda Taylor, 8-330-35 |
| Wed., 7/21 | Indian River Power Plant – 1st Fl Conf Room | 8:30a-10a | Melinda Taylor, 8-330-35 |
| Wed., 7/21 | Carney's Point (TENTATIVE) | 3:30p-5p | TBA |
| Thurs., 7/22 | Delaware City Power Plant – General Mtg Rm | 9a-10:30a | Debbi Murray, 8-320-671: |
| Thurs., 7/22 | EdgeMoor Power Plant/Hay Rd – 1st Fl Assembly Room | 1:30p-3p | Arta Trabant, 8-325-7047 |
| Mon., 7/26 | Deepwater Station, NJ – 4th Fl Conf Room | 9a-10:30a | Donna Harris, 8-500-1726 |
| Mon., 7/26 | B L England, NJ – General Conf Room | 1:30-3p | Mary Ann Jarman, 8-500-. |
| Tues., 7/27 | Glassboro/Winslow – Main Conf Room | 9a-10:30a | Brenda Okamoto, 8-500-7 |
| Tues., 7/27 | Cape May, NJ – Main Conf Room | 2:30p-4p | Louise McNew, 8-500-38( |
| Weds., 7/28 | Admin Complex/Pleasantville, NJ – Cafeteria | 9a-10:30a | Cheryl, 8-500-4317 |
| Weds., 7/28 | Mays Landing, NJ – Conf Room G | 1:30p-3p | Trish Smith, 8-500-6475 |
| Thurs., 7/29 | B L England, NJ – General Conf Room | 9a-10:30a | Mary Ann Jarman, 8-500-. |

Note: Where a morning meeting is planned, the room has been reserved for all morning. Conversely, where an afternoon meeting is planned, the room has been reserved for all afternoon. Also, an overhead projector has been reserved for each meeting site.

JMC00007

B0512

**Conectiv:**
## Cash Balance Pension Plan

A New and Valuable Plan for Today's Employees

July 1999



---

### Today's Agenda

- Introduction and Overview — Conectiv
- What is Cash Balance? — Conectiv
- Differences of Old vs. New Plan — Towers Perrin
- Vanguard's Role — Vanguard
- Answering Your Questions — All

---

### Why are We Here?

- Overview for the change to a new plan
- Highlight advantages of the new plan
- Explain how the cash balance plan works
- Help you understand the value of your pension
- Make sure you understand Vanguard's role with regard to your pension and 401(k) plans
- Answer your questions

---

### Why Change to a New Plan?

**The Workplace Has Evolved Since Pension Plans were First Introduced**

- Our business is changing and to succeed, we must attract and retain a more independent, more mobile workforce. Today's employees desire pension portability.
- Our benefits programs need to reflect the evolving needs of our employees.

---

### Why Cash Balance Benefits Today's Employees

- Easier access
  - Your account is portable—you can take it with you after you're vested
- Higher confidence
  - The new plan is easier to understand—company makes an annual contribution to your account
- More convenience
  - You'll have a great deal of flexibility in choosing payment options when you retire

---

### Why Cash Balance Benefits Today's Employees

- Greater comfort
  - You'll receive an annual statement so you'll know the value of your account each year
- Better value
  - New plan captures the best of final pay and cash balance retirement plans
  - Annual interest credit rate higher than normal
  - "Grandfather" protection for pre-retirement and long service employees

MWW00301

B0513

## Important Perspectives on Conectiv's New Retirement Program

- New plan is a cash balance plan
- Cash balance plans are controversial
  - Series of Wall Street Journal articles
  - Congressional hearings
- Criticisms leveled at cash balance plans
  - Masks cost cutting
  - Poor handling of communication/transition
  - Accruals cease for certain employees



## Important Perspectives on Conectiv's New Retirement Program

- New program not designed to provide cost savings for Conectiv
- New cash balance plan captures best of both types of retirement plans
  - Guaranteed benefit feature of prior retirement plan
  - Portability and precise account balance feature of an individual account plan like the current 401(k) plan
- Conectiv matching contribution increased under 401(k) plan for former Delmarva people

## Important Perspectives on Conectiv's New Retirement Program

- New cash balance plan provides higher than average annual contribution credit
- Additional contribution credits made each year for all employees with at least 10 years of service by the end of 1998
  - Continued until you have 35 years of service
- Annual interest credit rate on account balances higher than average
  - Majority of plans have a rate based on 10 years or shorter term
- Value of prior plan, including early retirement values and survivor benefit, preserved at time of conversion to account balance
  - All employees immediately start earning additional benefit amounts



## Important Perspectives on Conectiv's New Retirement Program

- Prior retirement plan formula continues for 10 years for broader group of employees than most employers cover
  - Age 50 or 20 years of service
  - Get better of prior plan or new formula
- Conversion of old prior plan formula to opening account included generous features
  - Early retirement subsidy included
  - Survivor benefit value included, even for single employees

Conectiv
July 1999
Page 2

MWW00302

B0514

## Basics of New Conectiv Cash Balance Plan

**Opening Balance**

- Fair value of prior plan benefit earned through 1998
- Determined using 7% long-term rate for conversion and includes value of early retirement benefit and spouse death benefit
- You immediately begin to earn additional retirement benefits

**Employee Contributions**

- You are neither required nor permitted to contribute your own money to the plan
- You can contribute more money to your 401(k) plan

---

## Basics of New Conectiv Cash Balance Plan

**Conectiv Contributions**

- Conectiv will credit your account at the end of each year with a promised percentage of your total pay
- Contribution amount will be at least 5% of your total pay and increases up to 10% on your age
  - Continues as long as you remain employed
- Total pay includes your base pay or salary, overtime, shift differential and bonus
- Additional annual contributions will be credited to your account if you had at least 10 years of service by the end of 1998
  - Continues until you have 35 years of service

---

## Basics of New Conectiv Cash Balance Plan

**Account Earnings**

- Your account will be credited with interest at the end of each year based on the rate for the 30-year U.S. Treasury bond

**Account Balance Protection**

- The value of your account balance is guaranteed by Conectiv and the Pension Benefit Guaranty Corporation

**Grandfather Protection**

- If you were either age 50 or had 20 years of service by January 1, 1999, you continue to earn pension benefits under your prior retirement formula for next 10 years of continued service

---

## Basics of New Conectiv Cash Balance Plan

**Entitlement To Your Account**

- You are fully vested in your account balance and all future Conectiv contributions and earnings credited to your account once you have completed five years of service
- You may withdraw the full value of your account when you leave Conectiv for any reason if you are vested in your account
  - No waiting until early retirement age to receive account
  - Value is capped at 650% of final average pay
  - Can not roll over to IRA

---

## Basics of New Conectiv Cash Balance Plan

**Right To A Monthly Pension**

- If you don't want to withdraw your account in a lump sum, you may elect to receive a monthly pension as you could under the prior plan
  - Monthly pension will be better of monthly pension you are entitled to under prior plan (including grandfather protection if applicable) or provided as a lifetime benefit by your cash balance plan account

**Death Benefit**

- If you are vested and die, your entire account balance will be paid to your spouse or other designated beneficiary

---

## Calculation of Conectiv Opening Cash Balance

**Opening Balance—Delmarva**

- 60-month average of earnings from 1994 through 1998
- Credited years and months of benefit service from date of hire to December 31, 1998
- Delmarva accrued benefit is greater of:
  - (1.5% of 60-month average earnings) x (credited benefit service)
  - (1.3% of 60-month average earnings up to the monthly average of the Social Security Wage Base over the last 35 years) x (credited service) + (1.8 of 60-month average earnings over the average Social Security Wage Base) x (credited service)

MWW00303

B0515

## Calculation of Conectiv Opening Cash Balance

**Opening Balance—Atlantic**

- 60-month average of earnings from 1994 through 1998
- Credited years and months of benefit service from date of hire up to December 31, 1998
- Atlantic accrued benefit is:
  - (1.6% of 60-month average earnings) x (credited years and months of benefit service)
  - Service capped at 30 years if hired after January 1, 1989

## Calculation of Conectiv Opening Cash Balance

**Early Retirement Subsidy—Delmarva**

- Benefit is payable without reduction at Normal Retirement Age = 65
- Eligible for early payment of benefit as early as age 55 with 15 years of service
- Benefit is reduced for early payment earlier than 65 as follows:
  - 5% reduction (95%) at ages 59-64
  - 10% reduction (90%) at age 58
  - 15% reduction (85%) at age 57
  - 20% reduction (80%) at age 56
  - 24% reduction (76%) at age 55
- No reduction at age 60 and above if credited service is 20 years or more

## Calculation of Conectiv Opening Cash Balance

**Early Retirement Subsidy—Atlantic**

- Benefit is payable without reduction at Normal Retirement Age = 65
- Eligible for early payment of benefit as early as age 55 with 5 years of service
- Benefit is not reduced for payment earlier than 65



## Calculation of Conectiv Opening Cash Balance

**Spouse Death Benefit—Delmarva**

- Delmarva pays spouse death benefits at no charge to employee
- Generally, a spouse death benefit is worth 6% to 10% to married employees
- For opening account balances, Conectiv has provided a 13% death benefit for all employees, regardless of whether or not they were married on December 31, 1998

## Calculation of Conectiv Opening Cash Balance

**Present Value**

- Interest rate used to determine present value is 7%
- Value of benefit is determined at earliest retirement age (or current age if later)
- Value of benefit is discounted back to current age, if applicable

MWW00304

B0516

## Calculation of Conectiv Opening Cash Balance

Example

* Current age = 40; Credited benefit service = 10 years

  1998 pay = $38,000

  1997 pay = $37,000

  1996 pay = $35,000

  1995 pay = $33,000

  1994 pay = $31,000

  Average pension earnings = $34,600

  60-month average earnings = $2,900

## Calculation of Conectiv Opening Cash Balance

Example

* Delmarva monthly accrued benefit is greater of:
  - (1.5% of $2,900) x (10 years) = $435
  - (1.3% of $2,594 (monthly average of SSWB)) x (10 years) +
    (1.6% of $306 (excess of $2,900 over $2,594)) x 10 years = $366
* Atlantic monthly accrued benefit is greater of:
  - (1.6% of $2,900) x (10 years) = $464

## Calculation of Conectiv Opening Cash Balance—Delmarva

* Value of accrued benefit at age 55 (age eligible for early retirement)
  - Monthly accrued benefit = $435
  - Times life annuity factor = 141.8672
    (Value of benefit at age 55, assuming benefit is paid monthly from age 55 until
    death; using current mortality assumptions and 7% interest)
  - Times early retirement factor = 0.75
    (Reduction applied at earliest retirement age, 55, assuming continued service)
  - Times spouse death benefit factor = 1.13
  - Equals $52,924
* Discount age 55 value back to current age
  - 15 years discount from earliest retirement age (55) to current age (40)
  - $52,924 ÷ 2.759032 = $19,182

## Conectiv Cash Balance Account vs. Prior Plan—Delmarva

| Current Age | Current Service | Current Pay | Value of Benefits (in $ Thousands) | |
|---|---|---|---|---|
| | | | Cash Balance Plan | Prior Delmarva Plan |
| 25 | 0 | 40 | 0 | 0 |
| 33 | 10 | 40 | 13 | 2 |
| 45 | 17 | 50 | 78 | 29 |
| 50 | 19 | 50 | 105 | 53 |
| 55 | 25 | 50 | 195 | 162 |
| 60 | 35 | 50 | 278 | 287 |

## Calculation of Conectiv Opening Cash Balance—Atlantic

* Value of accrued benefit at age 55 (age eligible for early retirement)
  - Monthly accrued benefit = $464
  - Times life annuity factor = 141.8672
    (Value of benefit at age 55, assuming benefit is paid monthly from age 55 until
    death; using current mortality assumptions and 7% interest)
  - Times early retirement factor = 1.0
    (Reduction applied at earliest retirement age, 55, assuming continued service)
  - Equals $65,734
* Discount age 55 value back to current age
  - 15 years discount from earliest retirement age (55) to current age (40)
  - $65,734 ÷ 2.759032 = $23,825

## Conectiv Cash Balance Account vs. Prior Plan—Atlantic

| Current Age | Current Service | Current Pay | Value of Benefits (in $ Thousands) | |
|---|---|---|---|---|
| | | | Cash Balance Plan | Prior Atlantic Plan |
| 25 | 0 | 40 | 0 | 0 |
| 33 | 10 | 40 | 16 | 16* |
| 45 | 17 | 40 | 98 | 98* |
| 50 | 25 | 50 | 172 | 172** |
| 55 | 25 | 50 | 258 | 256 |
| 60 | 35 | 50 | 252 | 252 |

*Theoretical value only; lump-sum amount is not actually available until age 55.

MWW00305

B0517

## Conectiv Cash Balance Going Forward

*Accrual of Account Balance*

- Conectiv contributes 5% to 10% of pay into your account at the end of each year
- Contribution amount dependent on age each year
  - Up to age 29      5%
  - Age 30-34         6%
  - Age 35-39         7%
  - Age 40-44         8%
  - Age 45-49         9%
  - Age 50 and over   10%

## Conectiv Cash Balance Going Forward

*Accrual of Account Balance*

- Additional transition contributions made at the end of the year if you had 10 years of service on December 31, 1998
- Transition contribution amount dependent on service on December 31, 1998
  - Service less than 10 years   0%
  - Service of 10-11 years       1%
  - Service of 12-15 years       2%
  - Service of 16-19 years       3%
  - Service of 20 years or more  4%
- Account balance is credited with interest at the end of each year
  - Interest based on the rate for 30-year Treasury bonds—6.01% in 1999

## Conectiv Cash Balance Going Forward

*Example*

- Current age = 40; 1999 pay = $40,000
- EOY account balance = $20,000; credited service on 12/31/1998 = 10 years
- EOY account balance is the sum of:
  - Conectiv annual contribution = $3,200 (8% of $40,000)
  - Transition contribution = $400 (1% of $40,000)
  - Interest credit for one year = $1,002 ($20,000 times 5.01%)
  - Equals $24,602

## The Vanguard Group—Your Retirement Plan Administrator

- Who we are
  - You know us—We're recordkeepers and investor for Conectiv Savings and Investment 401(k) Plan
    - As of July we're now recordkeeper for Cash Balance Plan

## Vanguard Advantages

- "One-stop resource" for 401(k) and Cash Balance questions
- Participant Services can help with both plans at 1-800-523-1188
- Recordkeeper for PAYSOP/ESOP Plan

## 401(k)/Cash Balance Difference

- Important note: with Cash Balance, you cannot
  - Direct Investments
  - Take loans
  - Contribute
  - Annual statement vs. quarterly with 401(k) (cash balance statement only changes annually)
  - Next annual Cash Balance statement comes from Vanguard—next April

Conectiv
July 1999
Page 6

MWW00306

B0518

**Retirement Plan Services Through Vanguard**

- Request cash balance estimates at retirement and future projections
- Request a benefit estimate
  - Initially this takes 10-15 days for written estimate
  - In early 2000, estimates online and by mail in 2 days

**Retirement Plan Services Through Vanguard**

- Notices sent for vested, accrued benefits and cash balance upon termination
- Payout options and paperwork
  - Lump sum
  - Roll over to an IRA
  - Spousal consent forms
- Notification at age 65 with payout information and paperwork
  - *Note: Keep address current with Conectiv Human Resource Service Center*

**Retirement Plan Services Through Vanguard**

- Plan Information:
  - Plan provisions
  - Payout options
  - Eligibility
  - Vesting

MWW00307

B0519



CONECTIV

January 01, 2001 – December 31, 2001                    Page 1 of 2

For information call:
Vanguard Participant Services
1(800) 523-1188



MAURICE W WARD
421 W HERSCHEL ST
EGG HARBOR NJ 08215-3512

CONECTIV RETIREMENT PLAN
Plan No:        020108

Soc Sec No:     ████████████
Hire Date:      11/09/1981

Employment Status:   Active

## YOUR CASH BALANCE ACCOUNT

|                                | This Year     |
|--------------------------------|---------------|
| **Opening Balance**            | **$122,088.51** |
| Employer Contribution Credit   | 6,806.53      |
| Interest Credit                | 7,091.14      |
| Transition Credit              | 2,258.88      |
| **Ending Balance**             | **$138,245.26** |

Your transition credit percentage for the Year was 3.0000%.

## YOUR CASH BALANCE ACCOUNT

Vanguard is pleased to provide you with this Cash Balance statement. The information presented in this statement is based on the available data on file. For those employees who are "grandfathered" (i.e., employees who, as of 1/1/99 have either (a) completed 20 years of service or (b) attained age 50 or older) your grandfathered benefit may be greater. If you have questions regarding this statement, your balances, or if you notice any discrepancies, please contact Vanguard directly at 1(800)523-1188.

The "Employer Contribution Credit" shown above is based on your age as of 12/31/01 (i.e., 5% pay credit for under age 30; 6% for age 30 to 34; 7% for 35 to 39; 8% for 40 to 44; 9% for 45 to 49; 10% for age 50 and over). Recognized pay includes base salary, bonus, overtime, awards, etc.

The "Interest Credit" is based on the 30 year U.S. Treasury Bond rate and changes each year. During 2001, your account grew by 5.80% as shown above. For 2002, the rate will decrease to 5.32%. This new rate will be reflected on next year's statement.

The "Transition Credit" shown above (if any) is based on your total service as of 1/1/99

0195                                                    02200                    X

THE**Vanguard**GROUP.          0000989          

MWW00004
CONFIDENTIAL

B0520



CONECTIV

January 01, 2001 – December 31, 2001          Page 2 of 2

For information call:
Vanguard Participant Services
1(800) 523-1188

MAURICE W WARD

## YOUR CASH BALANCE ACCOUNT (CONT'D.)

(i.e. those with 10 to 11 years of service at 1/1/99 receive a 1% additional pay credit; 12-15 years receive a 2% credit; 16-19 years receive a 3% credit and 20-35 years receive an additional 4% credit) Transition credits continue until your years of service exceed 35, at which point they cease.

The "Ending Balance" (i.e., the value of your accounts as of 1/1/2002) is the sum of your Opening Balance plus your 2001 Employer Contribution Credit, Interest Credit, and Transition Credit.

## TRANSACTION DETAIL MODULE

| Date | Description | Compensation During Year | Rate | Transaction Amount | Balance |
|------|-------------|--------------------------|------|--------------------|---------|
| | Opening Balance | | | | $122,088.61 |
| 12/31/2001 | Employer Contribution Credit | 75,629.27 | 9.000000000% | 6,806.63 | 128,895.24 |
| 12/31/2001 | Interest Credit | | 5.800000000 | 7,081.14 | 135,976.38 |
| 12/31/2001 | Transition Credit | | 9.000000000 | 2,268.88 | 138,245.26 |
| | Ending Balance | $75,629.27 | | $16,156.63 | $138,245.26 |

THE **Vanguard** GROUP.

0000390

0195          02200          K

MWW00005
CONFIDENTIAL

B0521

conectiv

# Conectiv Total Rewards

*The tangible and hidden paychecks*

JMC00197

conectiv

# Main Points

## 1. Very Competitive in the Region

- Moves in the direction of making us more compatible
- Still provides high level of care
- Offers more choices

## 2. Responsive to Needs of Business

## 3. Will affect people differently—and that's okay

- By Business Group
- Atlantic, Delmarva, Unions, Unregulated Conectiv

## 4. People will need to make choices in mid May

## 5. Implementation in phases

JMC00198

B0523


conectiv

# Background

**Why?**

Position for Competition

Serve the Business Group Strategies

Enhance Performance of Workforce

**Goals:**

Costs

Flexibility

More Choices

Changing Needs of Workforce

JMC00199

B0524

**conectiv**

# How did we do?

## Flexibility, Choices, Contemporary Workforce

- Good

## Cost

- Build framework, but not dramatic savings
  - Move toward principle of "results based" vs. entitlement
  - Begin to emphasize variable pay
  - Begin to drive to 80/20 cost share

- Positions us to be more market-based (yet consistent with "soft landing")

JMC00200

B0525

*conectiv*

# Regional Comparisons

## Retirement(1)

Dollars spent by others for every
$100 spent by Conectiv



## Health(2)

Dollars spent by others for every
$100 spent by Conectiv



1 Pension, 401K, Post-Retirement Medical
2 Medical + Dental

JMC00201

B0526


*conectiv*

# Pay

- **Base**
  - Market priced
- **Annual Variable**
  - Ability to earn substantially beyond market
- **Long-term**
  - Primarily tied to corporate performance
- **Spot**
  - Cash anytime

JMC00202

# Overview: Cash Balance Pensions


conectiv

**When:** 1/1/99

**Advantages:** Portability
Better Survivors Benefits

**Grandfathering:** Yes. Choice for 10 years
for those 50 and older, or
have more than 20 years
with company.

**Vesting:** 5 years

**Business Rationale:** Employees more mobile

**Communications:** Special home newsletter
Personal calculations
in Fall

**Retiree Health Care:** Special plan affecting
persons 50 years and older
having 15 years with
company. Can rejoin at 55
with proof of insurability.

**Concept**

Dollars

New Cash Balance

Current

Age

R
(Retirement
Date)

JMC00203

B0528

conectiv

# Overview: 401K

Increase Match to

# 3%

Vanguard: 11 fund choices

**When:** 7/1/98

**Advantages:** More Company contribution to encourage employee savings

**Business Rationale:** Encourage Portable Retirement Savings & Employee Ownership

**Training:** By Vanguard in May/June

15% pre tax
5% after

JMC00204

B0529


*conectiv*

# Overview: Total Pension Package

## Designed to provide:

- 90% of Pre-retirement Income     *Salary day before you retire*

- 100+% of Pre-retirement Income with Social Security

JMC00205

B0530


conectiv

# Transition

## Summary: Pension

- More modern

- Package provides comparable value

- More need for individuals to manage

## Why Flex?

- More & broader choices for dollars available

- Better cost control for company

- "One size fits all" no longer appropriate

JMC00206

*conectiv*

# Overview: Conectiv Flex

**When:** 7/1/98

**Enrollment Period:** May 18 – June 1

**How:** By touchtone phone

**Business Rationale:** Provide more options for available $

**Communications:** Home newsletter
Q&A Hotline meetings
Customized enrollment kit

## Option Areas:

- Medical (up to 4)
- Dental (up to 3)
- Vision (up to 3)
- Life Insurance (up to 9)
  - Employee
  - Spouse
  - Children
- AD&D (up to 7)
  - Employee
  - Spouse
  - Children

JMC00207

B0532



**conectiv**

# Overview: Conectiv Flex Medical

## Goal: Everybody at 80/20 over time

- Today Delmarva    93/7
- AE        80/20

## Affects people differently—it's okay

- 8 starting points
  - (AE, DPL, Conectiv management; 210, 1238, 1307; AE, DPL pensioners)
- Examples
  - AE management & unions—about the same
  - DPL unions—negotiated increases, Fall of '97
  - DPL management
    - increases in two phases—7/98 & 7/99
    - pre tax mitigates by about 1/3

# And, in late 1990's, costs of programs are closer

JMC00208

**conectiv**

# The Benefits of Pretax Medical Payments

**Example:** $40/mo. increase in medical payments

40% tax rate combined state & federal

**After Tax**
Out-of-Pocket

# $40

**Pre Tax**
Out-of-Pocket

# $24

($16 that would have gone to pay taxes can now go to pay medical.)

JMC00209

B0534



**conectiv**

# Overview: Conectiv Choice

## Employees can buy:

- Cancer insurance
- Prepaid legal services

**When:** 7/1/98

**Enrollment Period:** To be determined

**Business Rationale:** Provide more options

**Communications:** Separate from vendor

JMC00210

**conectiv**

# Overview: Holidays (Draft)

**When:** 1/1/99

**Business Rationale:** More responsive to customers

**Communications:** Home newsletter

**Set:**
- New Year's Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving
- Day after Thanksgiving
- Christmas Eve Day
- Christmas Day

**8** Set

**+4** Floating

**12** Total

JMC00211

B0536

**conectiv**

# Overview: Vacation Draft

**When:** 1/1/99

**Business Rationale:** Flexibility for experienced hires

**Communications:** Home Newsletter

| Years | Weeks |
|-------|-------|
| 1     | 2     |
| 6     | 3     |
| 15    | 4     |
| 23    | 5     |
| 30    | 6     |

JMC00212

B0537



*conectiv*

# Other

## Disability
- Design in Fall
- Current policies apply

## Post Retirement Medical
- About same except for special "50" provision

## Retiree Life Insurance
- About the same

## Conectiv Severance
- Design in Fall

## Service Emblems
- Design in progress

## Work & Family
- Design in progress

JMC00213



# Summary

- **Hidden Paycheck**
  - About 35% to 40% of base pay

- **Good Balance**
  - Positions us toward competitive markets
  - Provides high level of care for employees

- **Expect leaders to support direction and positively engage employees**

JMC00214

This is to certify that this is a true copy of the record which is on file in the Pennsylvania Division of Vital Records in accordance with Act 66, P.L. 304, approved by the General Assembly, June 29, 1953.

**WARNING: It is illegal to duplicate this copy by photostat or photograph.**

Calvin B. Johnson, M.D., M.P.H.
Secretary of Health



Frank Yeropoli
State Registrar

4116759

No.

JUN 15 2007

Date

H105.143 Rev. 2/87

COMMONWEALTH OF PENNSYLVANIA • DEPARTMENT OF HEALTH • VITAL RECORDS
**CERTIFICATE OF DEATH**

| | | STATE FILE NUMBER | | |
|---|---|---|---|---|
| 1. NAME OF DECEDENT (First, Middle, Last) William O. Bates | SEX Male | SOCIAL SECURITY NUMBER 144 — 36 — 7388 | DATE OF DEATH (Month, Day, Year) January 7, 2002 | |

| AGE (Last Birthday) 55 Yrs. | UNDER 1 YEAR Months Days | UNDER 1 DAY Hours Minutes | DATE OF BIRTH (Month, Day, Year) 2/28/1946 | BIRTHPLACE (City and State or Foreign Country) Absecon, NJ | PLACE OF DEATH (Check only one – see instructions on other side) HOSPITAL: Inpatient ☐ ER/Outpatient ☐ DOA ☐  OTHER: Nursing Home ☐ Residence ☐ Other (Specify) ☐ |
|---|---|---|---|---|---|

| COUNTY OF DEATH Philadelphia | CITY, BORO, TWP. OF DEATH Philadelphia | FACILITY NAME (If not institution, give street and number) Thomas Jefferson Hospital | WAS DECEDENT OF HISPANIC ORIGIN? No ☐ Yes ☐ If yes, specify Cuban, Mexican, Puerto Rican, etc. | RACE – American Indian, Black, White, etc. (Specify) White |
|---|---|---|---|---|

| DECEDENT'S USUAL OCCUPATION (Give kind of work done during most of working life, do not use retired) Major Accounts Exec | KIND OF BUSINESS/INDUSTRY Utility | WAS DECEDENT EVER IN U.S. ARMED FORCES? Yes ☐ No ☐ | DECEDENT'S EDUCATION (Specify only highest grade completed) Elementary/Secondary (0-12)  College (1-4 or 5+) | MARITAL STATUS – Married Never Married, Widowed, Divorced (Specify) Never married | SURVIVING SPOUSE (If wife, give maiden name) None |
|---|---|---|---|---|---|

| DECEDENT'S MAILING ADDRESS (Street, City/Town, State, Zip Code) 512 Clarks Landing Road Galloway, NJ 08215 | DECEDENT'S ACTUAL RESIDENCE (See instructions on other side) | 17a. State New Jersey | 17b. County Atlantic | 17c. City or Town Galloway | If decedent was of Hispanic origin in a township? Yes ☐ No, decedent lived in township? ☐ No, decedent lived outside township or city limits of ___ | Citby/boro. |
|---|---|---|---|---|---|---|

| FATHER'S NAME (First, Middle, Last) Walter O. Bates | MOTHER'S NAME (First, Middle, Maiden Surname) Emma M. Sullivan |
|---|---|

| INFORMANT'S NAME (Type/Print) Donald Bates | INFORMANT'S MAILING ADDRESS (Street, City/Town, State, Zip Code) 516 W. Clarks Landing Road Egg Harbor, NJ 08215 |
|---|---|

| METHOD OF DISPOSITION Burial ☐ Cremation ☐ Removal from State ☐ Donation ☐ Other (Specify) | DATE OF DISPOSITION (Month, Day, Year) 1/11/2002 | PLACE OF DISPOSITION (Name of Cemetery or Other Place) Germania Cemetery | LOCATION - City/Town, State, Zip Code Galloway Township New Jersey 08215 |
|---|---|---|---|

| SIGNATURE OF FUNERAL SERVICE LICENSEE OR PERSON ACTING AS SUCH Susan L. Paloga | LICENSE NUMBER FD-013599-L | NAME AND ADDRESS OF FACILITY Atwood-Peterson-O'Brien F.H. Bophair, NJ 08215 1114 White Horse Pike |
|---|---|---|

| 33a. Complete items 23a-c only when certifying physician is not available at time of death to certify cause of death. | 33b. To the best of my knowledge, death occurred at the time, date and place stated. (Signature and Title) | LICENSE NUMBER | DATE SIGNED (Month, Day, Year) |
|---|---|---|---|

| 35a. | 35b. TIME OF DEATH 1:30 A.M. | DATE PRONOUNCED DEAD (Month, Day, Year) January 7, 2002 | WAS CASE REFERRED TO MEDICAL EXAMINER/CORONER? Yes ☐ No ☐ |
|---|---|---|---|

37. PART I.  Enter the diseases, injuries or complications which caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock or heart failure. List only one cause on each line.

| IMMEDIATE CAUSE (Final disease or condition resulting in death) → | Hypokalemia | | Approximate interval between onset and death | PART II. Other significant conditions contributing to death, but not resulting in the underlying cause given in PART I. |
|---|---|---|---|---|
| | DUE TO (OR AS A CONSEQUENCE OF): | | | |
| Sequentially list conditions if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury resulting in death) LAST | CRA, DM, Renal Failure | | | |
| | DUE TO (OR AS A CONSEQUENCE OF): | | | |

| WAS AN AUTOPSY PERFORMED? Yes ☐ No ☐ | WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? Yes ☐ No ☐ | MANNER OF DEATH Natural ☐ Homicide ☐ Accident ☐ Pending Investigation ☐ Suicide ☐ Could not be determined ☐ | DATE OF INJURY (Month, Day, Year) | TIME OF INJURY | INJURY AT WORK? Yes ☐ No ☐ | DESCRIBE HOW INJURY OCCURRED |
|---|---|---|---|---|---|---|
| | | | PLACE OF INJURY - At home, farm, street, factory, office building, etc. (Specify) | | LOCATION (Street, City/Town, State) | |

| CERTIFIER (Check only one) *CERTIFYING PHYSICIAN (Physician certifying cause of death when another physician has pronounced death and completed item 23) ☐ To the best of my knowledge, death occurred due to the cause(s) and manner as stated. *PRONOUNCING AND CERTIFYING PHYSICIAN (Physician both pronouncing death and certifying to cause of death) ☐ To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner as stated. *MEDICAL EXAMINER/CORONER ☐ On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner as stated. | SIGNATURE AND TITLE OF CERTIFIER ___ MD (Intern) | | LICENSE NUMBER MT0803-46T | DATE SIGNED (Month, Day, Year) 1-7-02 |
|---|---|---|---|---|
| | NAME AND ADDRESS OF PERSON WHO COMPLETED CAUSE OF DEATH (Item 27) Type or Print BIPIN RAVINDRAN T.J.U.H. Phila. Pa 19107 | | | |

| REGISTRAR'S SIGNATURE AND NUMBER Frances A. Dellollio | [35327] | DATE FILED (Month, Day, Year) JAN 14 2002 |
|---|---|---|

B0540

10-K 1 phi10k2006.htm ANNUAL REPORT ON FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended <u>December 31, 2006</u>

| Commission<br>File Number | Name of Registrant, State of<br>Incorporation,<br>Address of Principal Executive Offices,<br><u>and Telephone Number</u> | I.R.S. Employer<br>Identification Number |
|---|---|---|
| 001-31403 | **PEPCO HOLDINGS, INC.**<br>(Pepco Holdings or PHI), a<br> Delaware corporation<br>701 Ninth Street, N.W.<br>Washington, D.C. 20068<br>Telephone: (202)872-2000 | 52-2297449 |
| 001-01072 | **POTOMAC ELECTRIC POWER COMPANY**<br>(Pepco), a District of<br> Columbia and Virginia<br> corporation<br>701 Ninth Street, N.W.<br>Washington, D.C. 20068<br>Telephone: (202)872-2000 | 53-0127880 |
| 001-01405 | **DELMARVA POWER & LIGHT COMPANY**<br>(DPL), a Delaware and<br> Virginia corporation<br>800 King Street, P.O. Box 231<br>Wilmington, Delaware 19899<br>Telephone: (202)872-2000 | 51-0084283 |
| 001-03559 | **ATLANTIC CITY ELECTRIC COMPANY**<br>(ACE), a New Jersey<br> corporation<br>800 King Street, P.O. Box 231<br>Wilmington, Delaware 19899<br>Telephone: (202)872-2000 | 21-0398280 |

Continued

## GENERAL LITIGATION

During 1993, Pepco was served with Amended Complaints filed in the state Circuit Courts of Prince George's County, Baltimore City and Baltimore County, Maryland in separate ongoing, consolidated proceedings known as "In re: Personal Injury Asbestos Case." Pepco and other corporate entities were brought into these cases on a theory of premises liability. Under this theory, the plaintiffs argued that Pepco was negligent in not providing a safe work environment for employees or its contractors, who allegedly were exposed to asbestos while working on Pepco's property. Initially, a total of approximately 448 individual plaintiffs added Pepco to their complaints. While the pleadings are not entirely clear, it appears that each plaintiff sought $2 million in compensatory damages and $4 million in punitive damages from each defendant.

Since the initial filings in 1993, additional individual suits have been filed against Pepco, and significant numbers of cases have been dismissed. As a result of two motions to dismiss, numerous hearings and meetings and one motion for summary judgment, Pepco has had approximately 400 of these cases successfully dismissed with prejudice, either voluntarily by the plaintiff or by the court. As of January 31, 2007, there are approximately 180 cases still pending against Pepco in the State Courts of Maryland; of which approximately 85 cases were filed after December 19, 2000, and have been tendered to Mirant for defense and indemnification pursuant to the terms of the Asset Purchase and Sale Agreement between Pepco and Mirant relating to the sale of Pepco's generation assets. Under the terms of the Settlement Agreement, Mirant has agreed to assume this contractual obligation. For a description of the Settlement Agreement, see the discussion of the relationship with Mirant in Note (12), "Commitments and Contingencies," to the Financial Statements of PHI included in Item 8 "Financial Statements and Supplementary Data" herein and to the section headed "Regulatory and Other Matters -- Relationship with Mirant Corporation" included in Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" herein.

While the aggregate amount of monetary damages sought in the remaining suits (excluding those tendered to Mirant) exceeds $360 million, PHI and Pepco believe the amounts claimed by current plaintiffs are greatly exaggerated. The amount of total liability, if any, and any related insurance recovery cannot be determined at this time; however, based on information and relevant circumstances known at this time, neither PHI nor Pepco believes these suits will have a material adverse effect on its financial position, results of operations or cash flows. However, if an

---

unfavorable decision were rendered against Pepco, it could have a material adverse effect on Pepco's and PHI's financial position, results of operations or cash flows.

## CASH BALANCE PLAN LITIGATION

In 1999, Conectiv established a cash balance retirement plan to replace defined benefit retirement plans then maintained by ACE and DPL. Following the acquisition by Pepco of Conectiv, this plan became the Conectiv Cash Balance Sub-Plan within the PHI Retirement Plan. On September 26, 2005, three management employees of PHI Service Company filed suit in the United States District Court for the District of Delaware (the Delaware District Court) against the PHI Retirement Plan, PHI and Conectiv (the PHI Parties), alleging violations of ERISA, on behalf of a class of management employees who did not have enough age and service when the Cash Balance Sub-Plan was

B0542

implemented in 1999 to assure that their accrued benefits would be calculated pursuant to the terms of the predecessor plans sponsored by ACE and DPL. A fourth plaintiff was added to the case to represent DPL-heritage "grandfathered" employees who will not be eligible for early retirement at the end of the grandfathered period.

The plaintiffs have challenged the design of the Cash Balance Sub-Plan and are seeking a declaratory judgment that the Cash Balance Sub-Plan is invalid and that the accrued benefits of each member of the class should be calculated pursuant to the terms of the predecessor plans. Specifically, the complaint alleges that the use of a variable rate to compute the plaintiffs' accrued benefit under the Cash Balance Sub-Plan results in reductions in the accrued benefits that violate ERISA. The complaint also alleges that the benefit accrual rates and the minimal accrual requirements of the Cash Balance Sub-Plan violate ERISA as did the notice that was given to plan participants upon implementation of the Cash Balance Sub-Plan.

The PHI Parties filed a motion to dismiss the suit, which was denied by the court on July 11, 2006. The Delaware District Court stayed one count of the complaint regarding alleged age discrimination pending a decision in another case before the United States Court of Appeals for the Third Circuit (the Third Circuit). On January 30, 2007, the Third Circuit issued a ruling in the other case that PHI's counsel believes should result in the favorable disposition of all of the claims (other than the claim of inadequate notice) against the PHI Parties in the Delaware District Court. The PHI Parties filed pleadings apprising the Delaware District Court of the Third Circuit's decision on February 16, 2007, at the same time they filed their opposition to plaintiffs' motion.

While PHI believes it has an increasingly strong legal position in the case and that it is therefore unlikely that the plaintiffs will prevail, PHI estimates that, if the plaintiffs were to prevail, the ABO and projected benefit obligation (PBO), calculated in accordance with SFAS No. 87, each would increase by approximately $12 million, assuming no change in benefits for persons who have already retired or whose employment has been terminated and using actuarial valuation data as of the time the suit was filed. The ABO represents the present value that participants have earned as of the date of calculation. This means that only service already worked and compensation already earned and paid is considered. The PBO is similar to the ABO, except that the PBO includes recognition of the effect that estimated future pay increases would have on the pension plan obligation.

33

## ENVIRONMENTAL LITIGATION

PHI, through its subsidiaries, is subject to regulation by various federal, regional, state, and local authorities with respect to the environmental effects of its operations, including air and water quality control, solid and hazardous waste disposal, and limitations on land use. In addition, federal and state statutes authorize governmental agencies to compel responsible parties to clean up certain abandoned or unremediated hazardous waste sites. PHI's subsidiaries may incur costs to clean up currently or formerly owned facilities or sites found to be contaminated, as well as other facilities or sites that may have been contaminated due to past disposal practices. Although penalties assessed for violations of environmental laws and regulations are not recoverable from customers of the operating utilities, environmental clean-up costs incurred by Pepco, DPL and ACE would be included by each company in its respective cost of service for ratemaking purposes.



**Weighted Average Interest Rate Table**

---

**Legend:**

- Weighted Average Interest Rate = Wtd Avg
- Permissible Range = xx to xxx%
- 30 Year Treasury Securities Rate = 30-yr TSR
- 30 Year Constant Maturity Rate = 30-yr TCM

**Note:** The 120% weighted average figures from 2001 may be used for IRC section 412(m) purposes for the 2002 plan year.

---

| Month/Year | Wtd Avg | 90 to 105% | 90 to 110% | 30-yr TSR |
|---|---|---|---|---|
| May-07 | - | - | - | 4.90 |
| Apr-07 | - | - | - | 4.87 |
| Mar-07 | - | - | - | 4.72 |
| Feb-07 | - | - | - | 4.82 |
| Jan-07 | - | - | - | 4.85 |
| **Month/Year** | **Wtd Avg** | **90 to 105%** | **90 to 110%** | **30-yr TSR** |
| Dec-06 | - | - | - | 4.68 |
| Nov-06 | - | - | - | 4.69 |
| Oct-06 | - | - | - | 4.85 |
| Sep-06 | - | - | - | 4.85 |
| Aug-06 | 4.84 | 4.35 to 5.08 | 4.35 to 5.32 | 5.00 |
| Jul-06 | 4.83 | 4.35 to 5.07 | 4.35 to 5.31 | 5.13 |
| Jun-06 | 4.82 | 4.34 to 5.06 | 4.34 to 5.31 | 5.16 |
| May-06 | 4.82 | 4.34 to 5.06 | 4.34 to 5.30 | 5.20 |
| Apr-06 | 4.82 | 4.34 to 5.06 | 4.34 to 5.30 | 5.06 |
| Mar-06 | 4.83 | 4.34 to 5.07 | 4.34 to 5.31 | 4.73 |
| Feb-06 | 4.84 | 4.35 to 5.08 | 4.35 to 5.32 | 4.58 |
| Jan-06 | 4.85 | 4.37 to 5.10 | 4.37 to 5.34 | 4.59 |
| **Month/Year** | **Wtd Avg** | **90 to 105%** | **90 to 110%** | **30-yr TSR** |
| Dec-05 | 4.87 | 4.38 to 5.11 | 4.38 to 5.35 | 4.65 |
| Nov-05 | 4.88 | 4.39 to 5.12 | 4.39 to 5.37 | 4.73 |
| Oct-05 | 4.89 | 4.40 to 5.13 | 4.40 to 5.38 | 4.68 |

| Sep-05 | 4.91 | 4.42 to 5.16 | 4.42 to 5.40 | 4.47 |
| Aug-05 | 4.94 | 4.44 to 5.18 | 4.44 to 5.43 | 4.46 |
| Jul-05 | 4.97 | 4.47 to 5.21 | 4.47 to 5.46 | 4.41 |
| Jun-05 | 5.00 | 4.50 to 5.25 | 4.50 to 5.50 | 4.29 |
| May-05 | 5.03 | 4.52 to 5.28 | 4.52 to 5.53 | 4.49 |
| Apr-05 | 5.05 | 4.54 to 5.30 | 4.54 to 5.55 | 4.65 |
| Mar-05 | 5.06 | 4.55 to 5.31 | 4.55 to 5.57 | 4.78 |
| Feb-05 (* Corrected Numbers) | 5.08* | 4.57 to 5.33* | 4.57 to 5.59* | 4.55 |
| Jan-05 | 5.10 | 4.59 to 5.35 | 4.59 to 5.61 | 4.73* (* Corrected Number) |
| **Month/Year** | **Wtd Avg** | **90 to 105%** | **90 to 110%** | **30-yr TSR** |
| Dec-04 | 5.11 | 4.60 to 5.37 | 4.60 to 5.62 | 4.86 |
| Nov-04 | 5.12 | 4.61 to 5.38 | 4.61 to 5.63 | 4.89 |
| Oct-04 | 5.14 | 4.62 to 5.39 | 4.62 to 5.65 | 4.86 |
| Sep-04 | 5.15 | 4.64 to 5.41 | 4.64 to 5.67 | 4.90 |
| Aug-04 | 5.16 | 4.65 to 5.42 | 4.65 to 5.68 | 5.06 |
| Jul-04 | 5.17 | 4.65 to 5.43 | 4.65 to 5.69 | 5.22 |
| Jun-04 | 5.17 | 4.65 to 5.43 | 4.65 to 5.68 | 5.41 |
| May-04 | 5.17 | 4.65 to 5.43 | 4.65 to 5.69 | 5.42 |
| Apr-04 | 5.18 | 4.67 to 5.44 | 4.67 to 5.70 | 5.14 |
| Mar-04 | 5.21 | 4.69 to 5.47 | 4.69 to 5.73 | 4.74 |
| Feb-04 | 5.23 | 4.70 to 5.49 | 4.70 to 5.75 | 4.93 |
| Jan-04 | 5.25 | 4.72 to 5.51 | 4.72 to 5.77 | 4.98 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 120%** | **30-yr TSR** |
| Dec-03 | 5.26 | 4.74 to 5.79 | 4.74 to 6.32 | 5.07 |
| Nov-03 | 5.28 | 4.75 to 5.81 | 4.75 to 6.33 | 5.12 |
| Oct-03 | 5.29 | 4.76 to 5.82 | 4.76 to 6.35 | 5.16 |
| Sep-03 | 5.30 | 4.77 to 5.84 | 4.77 to 6.37 | 5.14 |
| Aug-03 | 5.31 | 4.78 to 5.85 | 4.78 to 6.38 | 5.31 |
| Jul-03 | 5.34 | 4.81 to 5.87 | 4.81 to 6.41 | 4.93 |
| Jun-03 | 5.39 | 4.85 to 5.93 | 4.85 to 6.46 | 4.37 |
| May-03 | 5.43 | 4.89 to 5.97 | 4.89 to 6.52 | 4.53 |
| Apr-03 | 5.46 | 4.91 to 6.00 | 4.91 to 6.55 | 4.90 |
| Mar-03 | 5.49 | 4.94 to 6.03 | 4.94 to 6.58 | 4.80 |

| Feb-03 | 5.51 | 4.96 to 6.06 | 4.96 to 6.62 | 4.81 |
| Jan-03 | 5.54 | 4.98 to 6.09 | 4.98 to 6.65 | 4.94 |
| Dec-02 | 5.56 | 5.00 to 6.12 | 5.00 to 6.67 | 4.92 |
| Nov-02 | 5.58 | 5.02 to 6.14 | 5.02 to 6.70 | 4.96 |
| Oct-02 | 5.60 | 5.04 to 6.16 | 5.04 to 6.72 | 4.93 |
| Sep-02 | 5.63 | 5.07 to 6.20 | 5.07 to 6.76 | 4.76 |
| Aug-02 | 5.65 | 5.09 to 6.22 | 5.09 to 6.78 | 5.08 |
| Jul-02 | 5.67 | 5.10 to 6.23 | 5.10 to 6.80 | 5.39 |
| Jun-02 | 5.68 | 5.11 to 6.24 | 5.11 to 6.81 | 5.52 |
| May-02 | 5.69 | 5.12 to 6.25 | 5.12 to 6.82 | 5.65 |
| Apr-02 | 5.69 | 5.12 to 6.26 | 5.12 to 6.83 | 5.68 |
| Mar-02 | 5.69 | 5.12 to 6.26 | 5.12 to 6.83 | 5.71 |
| Feb-02 | 5.70 | 5.13 to 6.27 | 5.13 to 6.84 | 5.40 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 120%** | **30-yr TCM** |
| Jan-02 | 5.71 | 5.14 to 6.28 | 5.14 to 6.85 | 5.45 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 105%** | **30-yr TCM** |
| Dec-01 | 5.72 | 5.15 to 6.29 | 5.15 to 6.01 | 5.48 |
| Nov-01 | 5.74 | 5.17 to 6.32 | 5.17 to 6.03 | 5.12 |
| Oct-01 | 5.76 | 5.18 to 6.34 | 5.18 to 6.05 | 5.32 |
| Sep-01 | 5.77 | 5.20 to 6.35 | 5.20 to 6.06 | 5.48 |
| Aug-01 | 5.79 | 5.21 to 6.37 | 5.21 to 6.08 | 5.48 |
| Jul-01 | 5.80 | 5.22 to 6.38 | 5.22 to 6.09 | 5.61 |
| Jun-01 | 5.82 | 5.24 to 6.40 | 5.24 to 6.11 | 5.67 |
| May-01 | 5.83 | 5.25 to 6.42 | 5.25 to 6.12 | 5.78 |
| Apr-01 | 5.85 | 5.26 to 6.43 | 5.26 to 6.14 | 5.65 |
| Mar-01 | 5.87 | 5.29 to 6.46 | 5.29 to 6.17 | 5.34 |
| Feb-01 | 5.89 | 5.30 to 6.48 | 5.30 to 6.19 | 5.45 |
| Jan-01 | 5.91 | 5.32 to 6.50 | 5.32 to 6.21 | 5.54 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 105%** | **30-yr TCM** |
| Dec-00 | 5.93 | 5.34 to 6.52 | 5.34 to 6.23 | 5.49 |
| Nov-00 | 5.94 | 5.34 to 6.53 | 5.34 to 6.23 | 5.78 |
| Oct-00 | 5.95 | 5.35 to 6.54 | 5.35 to 6.24 | 5.80 |
| Sep-00 | 5.96 | 5.36 to 6.56 | 5.36 to 6.26 | 5.83 |
| Aug-00 | 5.98 | 5.38 to 6.57 | 5.38 to 6.28 | 5.72 |

| Month/Year | Wtd Avg | 90 to 110% | 90 to 105% | 30-yr TCM |
|---|---|---|---|---|
| Jul-00 | 5.99 | 5.39 to 6.59 | 5.39 to 6.29 | 5.85 |
| Jun-00 | 6.01 | 5.41 to 6.61 | 5.41 to 6.31 | 5.93 |
| May-00 | 6.02 | 5.41 to 6.62 | 5.41 to 6.32 | 6.15 |
| Apr-00 | 6.03 | 5.43 to 6.64 | 5.43 to 6.33 | 5.85 |
| Mar-00 | 6.04 | 5.44 to 6.64 | 5.44 to 6.34 | 6.05 |
| Feb-00 | 6.03 | 5.43 to 6.64 | 5.43 to 6.34 | 6.23 |
| Jan-00 | 6.01 | 5.41 to 6.61 | 5.41 to 6.31 | 6.63 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 105%** | **30-yr TCM** |
| Dec-99 | 6.00 | 5.40 to 6.60 | 5.40 to 6.30 | 6.35 |
| Nov-99 | 5.99 | 5.39 to 6.59 | 5.39 to 6.29 | 6.15 |
| Oct-99 | 5.99 | 5.39 to 6.59 | 5.39 to 6.29 | 6.26 |
| Sep-99 | 6.00 | 5.40 to 6.60 | 5.40 to 6.30 | 6.07 |
| Aug-99 | 6.01 | 5.41 to 6.61 | 5.41 to 6.31 | 6.07 |
| Jul-99 | 6.03 | 5.42 to 6.63 | 5.42 to 6.33 | 5.98 |
| Jun-99 | 6.04 | 5.44 to 6.65 | 5.44 to 6.34 | 6.04 |
| May-99 | 6.07 | 5.46 to 6.68 | 5.46 to 6.38 | 5.81 |
| Apr-99 | 6.11 | 5.50 to 6.72 | 5.50 to 6.42 | 5.55 |
| Mar-99 | 6.15 | 5.54 to 6.77 | 5.54 to 6.46 | 5.58 |
| Feb-99 | 6.19 | 5.57 to 6.81 | 5.57 to 6.50 | 5.37 |
| Jan-99 | 6.24 | 5.62 to 6.87 | 5.62 to 6.55 | 5.16 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 106%** | **30-yr TCM** |
| Dec-98 | 6.29 | 5.66 to 6.92 | 5.66 to 6.67 | 5.06 |
| Nov-98 | 6.34 | 5.71 to 6.98 | 5.71 to 6.72 | 5.25 |
| Oct-98 | 6.40 | 5.76 to 7.05 | 5.76 to 6.79 | 5.01 |
| Sep-98 | 6.46 | 5.82 to 7.11 | 5.82 to 6.85 | 5.20 |
| Aug-98 | 6.51 | 5.86 to 7.16 | 5.86 to 6.90 | 5.54 |
| Jul-98 | 6.55 | 5.90 to 7.21 | 5.90 to 6.95 | 5.68 |
| Jun-98 | 6.59 | 5.93 to 7.25 | 5.93 to 6.99 | 5.70 |
| May-98 | 6.63 | 5.97 to 7.29 | 5.97 to 7.03 | 5.93 |
| Apr-98 | 6.67 | 6.00 to 7.34 | 6.00 to 7.07 | 5.92 |
| Mar-98 | 6.71 | 6.04 to 7.38 | 6.04 to 7.11 | 5.95 |
| Feb-98 | 6.73 | 6.06 to 7.41 | 6.06 to 7.14 | 5.89 |
| Jan-98 | 6.77 | 6.09 to 7.44 | 6.09 to 7.17 | 5.81 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 107%** | **30-yr TCM** |

| Month/Year | Wtd Avg | 90 to 110% | 90 to 108% | 30-yr TCM |
|---|---|---|---|---|
| Dec-97 | 6.79 | 6.11 to 7.47 | 6.11 to 7.26 | 5.99 |
| Nov-97 | 6.81 | 6.13 to 7.49 | 6.13 to 7.29 | 6.11 |
| Oct-97 | 6.83 | 6.14 to 7.51 | 6.14 to 7.30 | 6.33 |
| Sep-97 | 6.84 | 6.15 to 7.52 | 6.15 to 7.31 | 6.50 |
| Aug-97 | 6.85 | 6.16 to 7.53 | 6.16 to 7.33 | 6.58 |
| Jul-97 | 6.86 | 6.18 to 7.55 | 6.18 to 7.34 | 6.51 |
| Jun-97 | 6.87 | 6.18 to 7.56 | 6.18 to 7.35 | 6.77 |
| May-97 | 6.87 | 6.19 to 7.56 | 6.19 to 7.35 | 6.94 |
| Apr-97 | 6.87 | 6.18 to 7.56 | 6.18 to 7.35 | 7.09 |
| Mar-97 | 6.87 | 6.18 to 7.56 | 6.18 to 7.35 | 6.93 |
| Feb-97 | 6.88 | 6.19 to 7.57 | 6.19 to 7.36 | 6.69 |
| Jan-97 | 6.88 | 6.19 to 7.57 | 6.19 to 7.36 | 6.83 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 108%** | **30-yr TCM** |
| Dec-96 | 6.89 | 6.20 to 7.58 | 6.20 to 7.44 | 6.55 |
| Nov-96 | 6.91 | 6.22 to 7.60 | 6.22 to 7.46 | 6.48 |
| Oct-96 | 6.91 | 6.22 to 7.61 | 6.22 to 7.47 | 6.81 |
| Sep-96 | 6.91 | 6.22 to 7.60 | 6.22 to 7.46 | 7.03 |
| Aug-96 | 6.92 | 6.22 to 7.61 | 6.22 to 7.47 | 6.84 |
| Jul-96 | 6.92 | 6.23 to 7.61 | 6.23 to 7.47 | 7.03 |
| Jun-96 | 6.92 | 6.23 to 7.61 | 6.23 to 7.48 | 7.06 |
| May-96 | 6.93 | 6.24 to 7.63 | 6.24 to 7.49 | 6.93 |
| Apr-96 | 6.95 | 6.26 to 7.65 | 6.26 to 7.51 | 6.79 |
| Mar-96 | 6.98 | 6.28 to 7.67 | 6.28 to 7.53 | 6.60 |
| Feb-96 | 7.01 | 6.31 to 7.71 | 6.31 to 7.57 | 6.24 |
| Jan-96 | 7.05 | 6.35 to 7.76 | 6.35 to 7.62 | 6.05 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **90 to 109%** | **30-yr TCM** |
| Dec-95 | 7.09 | 6.38 to 7.80 | 6.38 to 7.73 | 6.06 |
| Nov-95 | 7.13 | 6.42 to 7.85 | 6.42 to 7.77 | 6.26 |
| Oct-95 | 7.16 | 6.45 to 7.88 | 6.45 to 7.81 | 6.37 |
| Sep-95 | 7.19 | 6.47 to 7.91 | 6.47 to 7.84 | 6.55 |
| Aug-95 | 7.20 | 6.48 to 7.92 | 6.48 to 7.85 | 6.86 |
| Jul-95 | 7.23 | 6.51 to 7.96 | 6.51 to 7.88 | 6.72 |
| Jun-95 | 7.27 | 6.54 to 7.99 | 6.54 to 7.92 | 6.57 |
| May-95 | 7.29 | 6.56 to 8.02 | 6.56 to 7.95 | 6.95 |

| Month/Year | Wtd Avg | 90 to 110% | - | 30-yr TCM |
|---|---|---|---|---|
| Apr-95 | 7.30 | 6.57 to 8.03 | 6.57 to 7.95 | 7.36 |
| Mar-95 | 7.30 | 6.57 to 8.03 | 6.57 to 7.96 | 7.45 |
| Feb-95 | 7.29 | 6.56 to 8.02 | 6.56 to 7.95 | 7.61 |
| Jan-95 | 7.27 | 6.55 to 8.00 | 6.55 to 7.93 | 7.85 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **-** | **30-yr TCM** |
| Dec-94 | 7.26 | 6.53 to 7.98 | - | 7.87 |
| Nov-94 | 7.24 | 6.52 to 7.97 | - | 8.08 |
| Oct-94 | 7.23 | 6.51 to 7.95 | - | 7.94 |
| Sep-94 | 7.23 | 6.50 to 7.95 | - | 7.71 |
| Aug-94 | 7.23 | 6.51 to 7.95 | - | 7.49 |
| Jul-94 | 7.24 | 6.51 to 7.96 | - | 7.58 |
| Jun-94 | 7.26 | 6.53 to 7.98 | - | 7.40 |
| May-94 | 7.27 | 6.55 to 8.00 | - | 7.41 |
| Apr-94 | 7.30 | 6.57 to 8.03 | - | 7.27 |
| Mar-94 | 7.33 | 6.60 to 8.06 | - | 6.91 |
| Feb-94 | 7.37 | 6.64 to 8.11 | - | 6.49 |
| Jan-94 | 7.43 | 6.68 to 8.17 | - | 6.29 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **-** | **30-yr TCM** |
| Dec-93 | 7.48 | 6.73 to 8.23 | - | 6.25 |
| Nov-93 | 7.54 | 6.79 to 8.29 | - | 6.21 |
| Oct-93 | 7.61 | 6.85 to 8.37 | - | 5.94 |
| Sep-93 | 7.68 | 6.91 to 8.45 | - | 6.00 |
| Aug-93 | 7.74 | 6.97 to 8.52 | - | 6.32 |
| Jul-93 | 7.79 | 7.01 to 8.57 | - | 6.63 |
| Jun-93 | 7.84 | 7.06 to 8.62 | - | 6.81 |
| May-93 | 7.89 | 7.10 to 8.68 | - | 6.92 |
| Apr-93 | 7.95 | 7.15 to 8.74 | - | 6.85 |
| Mar-93 | 8.00 | 7.20 to 8.80 | - | 6.82 |
| Feb-93 | 8.04 | 7.24 to 8.85 | - | 7.09 |
| Jan-93 | 8.07 | 7.27 to 8.88 | - | 7.34 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **-** | **30-yr TCM** |
| Dec-92 | 8.10 | 7.29 to 8.91 | - | 7.44 |
| Nov-92 | 8.12 | 7.31 to 8.94 | - | 7.61 |
| Oct-92 | 8.15 | 7.34 to 8.97 | - | 7.53 |

| Month/Year | Wtd Avg | 90 to 110% | - | 30-yr TCM |
|---|---|---|---|---|
| Sep-92 | 8.19 | 7.37 to 9.01 | - | 7.34 |
| Aug-92 | 8.23 | 7.41 to 9.06 | - | 7.39 |
| Jul-92 | 8.27 | 7.44 to 9.09 | - | 7.60 |
| Jun-92 | 8.29 | 7.46 to 9.12 | - | 7.84 |
| May-92 | 8.32 | 7.49 to 9.15 | - | 7.89 |
| Apr-92 | 8.35 | 7.51 to 9.18 | - | 7.96 |
| Mar-92 | 8.37 | 7.53 to 9.20 | - | 7.97 |
| Feb-92 | 8.39 | 7.55 to 9.23 | - | 7.85 |
| Jan-92 | 8.42 | 7.58 to 9.26 | - | 7.58 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **-** | **30-yr TCM** |
| Dec-91 | 8.45 | 7.61 to 9.30 | - | 7.70 |
| Nov-91 | 8.47 | 7.63 to 9.32 | - | 7.92 |
| Oct-91 | 8.50 | 7.65 to 9.36 | - | 7.93 |
| Sep-91 | 8.54 | 7.68 to 9.39 | - | 7.95 |
| Aug-91 | 8.56 | 7.70 to 9.42 | - | 8.14 |
| Jul-91 | 8.57 | 7.71 to 9.42 | - | 8.45 |
| Jun-91 | 8.57 | 7.71 to 9.43 | - | 8.47 |
| May-91 | 8.59 | 7.73 to 9.45 | - | 8.27 |
| Apr-91 | 8.61 | 7.75 to 9.47 | - | 8.21 |
| Mar-91 | 8.61 | 7.75 to 9.48 | - | 8.29 |
| Feb-91 | 8.63 | 7.76 to 9.49 | - | 8.03 |
| Jan-91 | 8.63 | 7.77 to 9.49 | - | 8.27 |
| **Month/Year** | **Wtd Avg** | **90 to 110%** | **-** | **30-yr TCM** |
| Dec-90 | 8.63 | 7.77 to 9.49 | - | 8.24 |
| Nov-90 | 8.63 | 7.76 to 9.49 | - | 8.54 |
| Oct-90 | 8.61 | 7.75 to 9.48 | - | 8.86 |
| Sep-90 | 8.60 | 7.74 to 9.46 | - | 9.03 |
| Aug-90 | 8.59 | 7.73 to 9.45 | - | 8.86 |
| Jul-90 | 8.58 | 7.72 to 9.44 | - | 8.50 |
| Jun-90 | 8.58 | 7.72 to 9.43 | - | 8.46 |
| May-90 | 8.57 | 7.71 to 9.43 | - | 8.73 |
| Apr-90 | 8.56 | 7.70 to 9.42 | - | 8.76 |
| Mar-90 | 8.55 | 7.70 to 9.41 | - | 8.56 |
| Feb-90 | 8.55 | 7.70 to 9.41 | - | 8.50 |

| Jan-90 | 8.56 | 7.71 to 9.42 | - | 8.26 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR. on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-702 (SLR) |
| PEPCO HOLDINGS, INC., CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF CLAUDE POULIN, F.S.A., M.A.A.A., E.A.

I, Claude Poulin, am over 21 years of age and based on personal knowledge, state as follows:

1.  I am an Enrolled Actuary under ERISA, a Fellow in the Society of Actuaries, and a member of the American Academy of Actuaries. I have over 30 years of experience in designing, administering, and reviewing defined benefit pension plans, including providing advice to employers, unions, governments, employees and their representatives. My Curriculum Vitae is attached as Exhibit A.

2.  I have been an actuarial consultant to the AARP, the EEOC, the Internal Revenue Service as well as the CWA, the IBEW and the UAW. For the last twenty-five years, I have also served as the Actuarial Trustee of the Connecticut State Employees Retirement Commission.

3.  At the time the Employee Retirement Income Security Act (ERISA) was enacted in 1974, I was the Senior Actuary for the United Automobile Workers ("UAW").

1

In that capacity I was responsible for the review and compliance under ERISA of approximately 3,000 pension plans the UAW had negotiated. I testified several times before Congressional Committees of both the U.S. House and Senate on matters related to ERISA.

4.  I have attached as Exhibit B a list of the cases in which I have testified as an expert at trial or at deposition within the last four years.

5.  I have been retained in this matter to determine whether (1) the rate of future benefit accrual under the Conectiv cash balance plan violated the 133 1/3% accrual rule (2) participants' accrued benefits were reduced on account of increasing age or service in violation of Section 204(b)(1)(G) of ERISA and (3) the levels of benefit accrual rates under the Conectiv cash balance pension plan effective January 1, 1999, were significantly lower than the benefit accrual rates in effect under the prior versions of the plan, in which case notice of the reductions should have been given to the affected participants;  I am compensated at the rate of $425 per hour.

6.  In order to perform these analyses, I have reviewed copies of the documents listed on Exhibit C.

7.  The Atlantic City Electric Company Retirement Plan and the Delmarva Power & Light Company Retirement Plan were merged in the Conectiv Sub-Plan on December 31, 1998, which was converted to the Conectiv Cash Balance Sub-Plan on January 1, 1999.

8.  The Atlantic City Electric Company Retirement Plan and the Delmarva Power &

2

Light Company Retirement Plan were traditional defined benefit pension plans providing retirement benefits equal to participants' final average compensation multiplied by their number of years of credited service times a benefit accrual percentage.

9.  The Cash Balance Plan amendment created cash balance accounts (hypothetical account balances) for active participants as of January 1, 1999 and provided future benefit accruals in the form of pay credits, transition credits and interest credits. As explained in greater detail in paragraph 15, in order to determine the rate of future benefit accrual under a cash balance plan, the pay and transition credits must be projected to the participant's normal retirement age (age 65) using the interest credits specified under the terms of the plan. The annual increase in accrued benefit at age 65 is then converted into a benefit accrual rate.

10. Even though a cash balance plan resembles a defined contribution plan in some respects because of the existence of pay credits and account balances, it is a defined benefit plan under ERISA and the Internal Revenue Code because individual accounts do not actually exist. The pay credits and account balances under a cash balance plan are entirely notional constructs. Under a defined benefit plan covered by ERISA, the "accrued benefit" is "expressed in the form of an annual benefit commencing at normal retirement age."  Only under a defined contribution plan is the accrued benefit defined as the balance in the individual's account.

11. The following table shows the pay crediting rates, based on the employee's age,

3

B0554

which multiplied by the employee's compensation for the year provide the pay credits.

| Age Bands | Pay Credit |
|---|---|
| Below 30 | 5.00% |
| 30-34 | 6.00% |
| 35-39 | 7.00% |
| 40-44 | 8.00% |
| 45-49 | 9.00% |
| 50 and Above | 10.00% |

12. The following table shows the transition crediting rates, based on the employee's years of service on January 1, 1999, which multiplied by the employee's compensation for the year provide the transition credits.

| Service | Transition Credit |
|---|---|
| Under 10 years | 0.00% |
| 10-11 years | 1.00% |
| 12-15 years | 2.00% |
| 16-19 years | 3.00% |
| 20 or more years | 4.00% |

13. For each plan year, the interest crediting rate is equal to the 30-year treasury rate for the month of October immediately preceding the beginning of the plan year.

14. In order to determine the employee's accrued benefit payable at normal retirement age under the Conectiv Cash Balance Pension Plan, it is necessary to take the following steps as of any date of determination (DOD).

Step 1:  determine the amount of the employee's hypothetical account balance at the DOD;

Step 2:  determine the interest credit rate to be used between the DOD and the employee's normal retirement age of 65;

Step 3:  determine the employee's attained age at the DOD;

Step 4: calculate the number of years from the DOD until the employee will attain the normal retirement age of 65;

4

Step 5: increase the account balance at the DOD with interest at the interest crediting rate (determined in Step 2) for the number of years until the employee will attain age 65;

Step 6: divide the account balance as "projected to age 65" by the age 65 annuity factor specified in the Plan to determine the annuity payable commencing at age 65. This annuity is the accrued benefit under the plan.

15. Each year's benefit accrual can be obtained by substituting for the account balance in Step 1 above the annual pay and transition credits payable under the Conectiv Cash Balance Pension Plan. The rate of benefit accrual is then determined by dividing the thus-obtained benefit accrual by the employee's compensation for the year.

16. ERISA provides three alternate methods to determine whether a defined benefit plan meets the benefit accrual requirements: the 3% rule, the 133 1/3% rule and the fractional rule. The 3% and the fractional rules may not be used by career-average plans where pension benefits are based on employees' compensation earned over a period exceeding ten years. Therefore, the only rule available to the Conectiv cash balance pension plan – a career-average plan – is the 133 1/3% rule.

17. Under the 133 1/3% rule, the rate of benefit accrual in any given year may not exceed the rate of benefit accrual of any previous year by more than 33 1/3%. This rule refers to a rate of benefit accrual, not a dollar amount. Therefore, the accrued benefit of a participant could increase by more than 33 1/3% as a result of a substantial salary increase and the plan would still meet the rule. If in a given year, however, the increase in the age 65 normal retirement benefit of a participant

5

expressed as a percentage of compensation – the rate of benefit accrual for that year – exceeds 33 1/3% of the rate of any previous year, the rule will not be met.

18. Attached Exhibit D illustrates the application of the 133 1/3% rule in the case of plaintiff Jerome Charles. Column 3 shows his actual pay each year from 1999 to 2006 and Column 4 shows the amount in his cash balance account at the beginning of each one of these years. Column 5 shows the accrued benefit, i.e., the pension benefit payable at normal retirement age computed using the methodology I described in paragraph 15 above. The accrued benefit each year is the result of projecting the account balance at the beginning of each year to normal retirement age using the interest crediting rate in effect for the year and then dividing the result by the annuity conversion factor based on the actuarial assumptions specified in the plan. The increase or reduction in the accrued benefit presented in Column 6 is then divided by the employee's compensation, which yields the rate of benefit accrual shown in Column 7.

19. Column 7 of Exhibit D shows that in 2004 and 2006, the rates of benefit accrual exceeded 133 1/3% of the benefit accrual rates of several previous years since any positive quantity divided by zero (or a negative amount) is obviously greater than 133 1/3% of that amount. Similar calculations performed  in the case of the other three plaintiffs would show similar overall results while the actual numbers vary.

20. In the first full paragraph on page 14 of the Defendants' Opening Brief in Support of their Motion for Summary Judgment, Defendants assert that the "IRS, in Notice 96-8, has opined that cash balance plan formulas, like the one at issue in this case, will satisfy the 133 1/3% rule so long as "future interest credits to an employee's

6

hypothetical account balance are not conditioned upon future service." This statement is inaccurate. Notice 96-8 does not say that. It does not even mention the 133 1/3% rule. The full sentence dealing with that issue in notice 96-8 reads as follows:

> "Cash balance plans can be categorized based on when the benefits attributable to interest credits accrue. Under one type of cash balance plan (referred to in this notice as a frontloaded interest credit plan), future interest credits to an employee's hypothetical account balance are not conditioned upon future service"

21. The IRS did say that backloaded interest credit plans are unlikely to meet the backloading requirements of Section 411(b) of the Internal Revenue Code , but it does not follow that frontloaded interest credit plans meet the 133 1/3% rule ipso facto. Frontloading interest credits is a necessary, but not sufficient, attribute to meet the requirement. A cash balance pension plan that would not condition future interest credits upon future service, i.e., that would qualify as a "frontloaded interest credit plan", but that would provide pay credits equal to 1% of pay for the first 10 years of service and 10% of pay for years of service in excess of 10, would obviously not meet the 133 1/3% rule, nor any other benefit accrual requirement.

22. Attached Exhibit E is a variation of Exhibit D with the emphasis on the fact that the negative rates of benefit accrual in certain years result in reductions in accrued benefits payable at normal retirement age, from one plan year to the next.  Section 204(b)(1)(G) of ERISA makes clear that a defined benefit plan will not meet the benefit accrual requirements of ERISA if a participant's accrued benefit is reduced

B0558

on account of any increase in age or service.

23. In paragraph 6 of his Report, Mr. Kra writes: "The pleadings note that Plaintiffs' benefits decreased in certain years. These negative adjustments to the annuity payable at normal retirement date were solely on account of interest rate changes. In each of those years, they experienced a positive benefit accrual on account of increased age, service and compensation received during the year." It is surprising that Mr. Kra would characterize reductions in accrued benefits at normal retirement age as "positive benefit accruals", since he admitted during his deposition that, in the case of a defined benefit plan, the rate of benefit accrual is measured by the rate of increase in the accrued benefit payable as an annuity at normal retirement age and not by the increase in the participant's account balance, as implied in his report..

24. Mr. Kra suggests that reductions in accrued benefits attributable to changes in interest rates are acceptable. They are not. They may explain the reductions in accrued benefits, but they do not justify them. Changes in interest rates also explain the "whipsaw" phenomenon, whereby an interest crediting rate greater the Internal Revenue Code Section 417(e)(3) rate – currently the 30-year Treasury rate – results in the lump sum value of the accrued benefit payable at normal retirement age being greater than the account balance. Mr. Kra apparently believes that employers should equally not worry about "whipsaw". Criticizing a 2002 Report by the Labor Department Office of the Inspector General that employers are shortchanging employees in cash balance plans by ignoring "whipsaw" and therefore not complying with the IRS directive in its Notice 96-8 – the same

8

Notice Defendants invoke to erroneously conclude the Conectiv cash balance plan meets the 133 1/3% rule – , Mr. Kra stated "The inspector general is relying on something that hasn't even gotten to the level of a proposed regulation, and they are citing it as the gospel". He also said that the methodology prescribed by Notice 96-8 "has never been finalized and has been rejected by at least one court"  In this instance again, the statute is clear: there is perhaps no need for regulation when Section 417(e)(3) says that the present value, or lump sum value, of a qualified joint and survivor annuity – the normal form of the accrued benefit under a defined benefit plan – must be calculated using the applicable mortality table and "the applicable interest rate". This interest rate is defined as the 30-year Treasury rate. If fluctuating interest rates result in the interest crediting rate in a future plan year being greater than the 30-year Treasury rate, the plan must still pay participants electing a lump sum in that year the present value of the accrued benefit payable at normal retirement age, an amount that in that year will exceed the account balance. My understanding is that this practice is well known among pension practitioners.

25. Section 204(h) of ERISA states that if an amendment to a pension plan provides for a significant reduction in the rate of future benefit accrual, a notice with information sufficient to understand the effect of the plan amendment must be given to the affected plan participants.

26. In paragraph 8 of his report, Mr. Kra states the projected benefit payable at normal retirement age will be greater under the cash balance version of the Conectiv pension plan than under its previous final average plan versions. In reaching this conclusion, not only does Mr. Kra ignore salary increases after 1999 - an important

9

consideration when comparing benefits payable under a career-average plan to those payable under a final average pay plan, where salary increases play an important role and may not be ignored – he also surprisingly assumes <u>lower compensation</u> for computing benefits under the pre-conversion plans than under the cash balance plan. (Emphasis added). See Attachment 2 to Mr. Kra's report.

27. The attached Exhibit F-1 shows that when normal salary increases – actual salary increases from 1999 through 2006, and the same average annual increases from 2007 through attainment of age 65 in 2014 – are assumed to take place, the retirement benefit of $5,858 payable at age 65 is 48% greater under the previous final average pay version of the plan than the accrued benefit of $3,952 derived from the account balance at age 65. The retirement benefit of $5,858 is the result of the final average compensation of $124,429 times 1.6% times the number of years of service at age 65, 35.3.

28. In its 1999 Form 10-K, Conectiv disclosed it assumed that future salary increases would average 4.5% in the calculation of its pension liabilities. Exhibit F-2 shows that assuming future salary increases of 4.5%, the projected accrued benefit of

10

$4,749 payable at normal retirement age under the prior plan would still be 29 % larger than the accrued benefit of $3,689 derived from the account balance at that age. The cash balance amendment therefore resulted in a significant reduction in the rate of future benefit accrual under the Conectiv pension plan

29. The Temporary Regulations promulgated by the Secretary of the Treasury, 26 CFR 1.411(d)(6) which were in effect at the time of the plan amendments- and have since become Final - specified in Q&A-4 that Section 204(h) notice is required for an amendment to a defined benefit plan that provides for a significant reduction in the rate of future benefit accrual, and in Q&A-5 that "an amendment to a defined benefit plan affects the rate of future benefit accrual only if it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age."

I declare under penalty of perjury that the foregoing is true to the best of my knowledge.

Signed: _____
Claude Poulin

Date: June 18, 2007

B0562

**Exhibit A**

# CURRICULUM VITAE
# OF CLAUDE POULIN

| | |
|---|---|
| EDUCATION: | Fellow of the Society of Actuaries, Chicago, 1972 |
| | Laval University, School of Business Administration Quebec City, 1966, Degree in Actuarial Science |
| | University of Montreal, 1963, B.A., Mathematics |
| EMPLOYMENT: Since 1980 | POULIN ASSOCIATES, INC. 117 E. Hunter Street Madison, N.C.  27025 (336) 445-9917 |
| | Founder and president of Poulin Associates, Inc., an independent actuarial and employee benefit consulting firm with offices in Washington, D.C., North Carolina, Virginia and Montreal, Canada; special expertise as a consultant and actuarial expert witness in ERISA cases (pension and welfare benefits). |
| 1969 to 1980 | UNITED AUTOMOBILE WORKERS (UAW), Detroit, Michigan |
| | Senior Actuarial Consultant and Assistant Director of the UAW Social Security Department; responsible for monitoring over 3,000 pension and welfare plans for the Union |
| 1966 to 1969 | SUN LIFE ASSURANCE COMPANY, Montreal, Canada |
| | Actuarial Assistant, pensions and group insurance operations |
| PROFESSIONAL CREDENTIALS: | Member of the American Academy of Actuaries |
| | Enrolled Actuary under ERISA |
| | Fellow of the Canadian Institute of Actuaries |
| | Member of the International Actuarial Association |
| | Appointed by the Governor of the State of Connecticut as Actuarial Trustee of the Connecticut State Employees' Retirement Commission |

B0563

| | |
|---|---|
| PROFESSIONAL CREDENTIALS (continued) | Member of the 1979 Panel of Actuaries and Economists to the Social Security Advisory Council, members of which were appointed by President Carter. |

Member of the Pension Benefit Guaranty Corporation (PBGC) 1977 Panel on Contingent Employer Liability Insurance.

Member of the 1977 Task Force of the Financial Accounting Standards Board (FASB) on Accounting and Reporting for Employee Benefit Plans.

Member of the Bureau of National Affairs (BNA) Pension Reporter Advisory Board  (1981-1987).

Testified before Committees of the United States House and Senate on ERISA and related matters.

Testified before several Canadian Commissions on pension reform.

Frequent radio and television commentator on economic and social affairs.

B0564

# **Prior Expert Testimony**

<u>Cooper v. IBM Personal Pension Plan</u>, Civil Action No. 99-829-GPM, filed in the United States District Court for the Southern District of Illinois.

<u>Jamal Kifafi, et al.  v.  Hilton Hotels Retirement Plan</u>, Civil Action No. 98-1517, filed in the United States District Court for the District of Columbia.

<u>Janice C. Amara, et al. v. CIGNA Corp. and CIGNA Pension Plan</u>, Civil Action No. 3:01-CV-2361(DJS) in the United States District Court for the District of Connecticut.

<u>Engers, et al. v. AT&T and AT&T Management Pension Plan</u>, Civil Action No. 98-CV-3660 (NHP) in the United States District Court for the District of New Jersey (Newark)

<u>McCarthey, et al. v. Dun & Bradstreet, et al.</u>, Civil Action No. 03:CV 431(SRU) filed in the United States District Court for the District of Connecticut

<u>Shaver, et al. v. Siemens Westinghouse Retirement Plan, et al.</u> Civil Action No. 02-1424 in the United States District Court for the Western District of Pennsylvania

<u>Loewy, et al. v. Motorola Inc. Pension Plan, et al.</u>, Case No. CV 03-2284 PHX FJM filed in the United States District Court for the District of Arizona

<u>Richards, et al. v. Fleet Boston Financial Pension Plan</u>, Civil Action No. 3:04CV1638(JCH) filed in the United States District Court for the District of Connecticut.

<u>Drutis, et al., v. Rand McNally & Company and Quebecor World, Inc.</u>, Civil Action No. 5:04-CV-00269-KSF in the United States District Court for the Eastern District of Kentucky

<u>George Tedeshi, et al. v. Mercer Human Resource Consulting, et al.</u>, Civil Action No. 04ca003566 in the Superior Court of the District of Columbia, Civil Division

Exhibit C

# Documents Reviewed

- The Class Action Complaint (Charles, Ward and Fink) dated September 26, 2005 and the Class Action Complaint (Troup) dated January 5, 2006

- The relevant sections of the Atlantic City Electric Company Retirement Plan as Amended and Restated Effective January 1, 1994

- The relevant sections of the Delmarva Power & Light Company Retirement Plan (as amended and restated through January 1, 1995)

- The relevant sections of the  Conectiv Cash Balance Sub-Plan (Part One) Effective 1, 1999

- Conectiv Retirement Plan, ACE Sub-Plan Summary Plan Description

- Conectiv 1998-99 "Your Conectiv Total Rewards"

- Cash balance account statements from 1999 to 2006 for four named plaintiffs

- Defendants Answering Brief in Opposition to Plaintiffs' Motion for Class Action Certification

- Court Order of July 11, 2006

- Appendix to Defendants' Opening Brief in Support of their Motion for Summary Judgment

- Plaintiff' Answering Brief in Opposition to Defendants' Motion to Dismiss

- Transcripts of Depositions of Messrs Donald Cain, and James Kremmel

- Expert Report of Ethan Kra

- Unedited Transcript of Mr. Kra's Deposition of May 25, 2007

- Attachments to Mr. Kra's Report and documents produced during Mr. Kra's Deposition, including email exchanges between Mr. Kra, members of his firm and Defendants' Counsel

- IRS Notice 96-8

- Relevant sections of ERISA and the Internal Revenue Code, and Regulations thereunder

**Exhibit D**

## Conectiv Cash Balance Sub-Plan
### Testing for 133 1/3% Rule
*Jerome M. Charles*

| Year | Age | Pay | Cash Balance Account BOY | Accrued Benefit at Age 65 | Increase or Reduction in Accrued Benefit During Year | Rate of Benefit Accrual |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1999 | 50 | $56,824 | $138,172 | $2,080 | N/A | |
| 2000 | 51 | 62,711 | 153,050 | 2,860 | $780 | 16.47% |
| 2001 | 52 | 76,159 | 171,410 | 2,749 | -111 | -2.12% |
| 2002 | 53 | 77,191 | 192,014 | 2,653 | -96 | -1.52% |
| 2003 | 54 | 81,649 | 213,036 | 2,598 | -54 | -0.84% |
| 2004 | 55 | 80,479 | 234,970 | 2,845 | 247 | **3.63%** |
| 2005 | 56 | 86,370 | 258,361 | 2,828 | -17 | -0.25% |
| 2006 | 57 | 86,493 | 283,010 | 2,871 | 42 | **0.59%** |

**Exhibit E**

## Conectiv
Progression of Accrued Benefits Over Time
*Jerome M. Charles*

| Year | Age | Pay | Cash Balance Account BOY | Accrued Benefit at Age 65 | Percentage Increase / Reduction in Accrued Benefit |
|------|-----|-----|--------------------------|---------------------------|---------------------------------------------------|
| (1) | (2) | (3) | (4) | (5) | (6) |
| 1999 | 50 | $56,824 | $138,172 | $2,080 | |
| 2000 | 51 | 62,711 | 153,050 | 2,860 | 37.48% |
| 2001 | 52 | 76,159 | 171,410 | 2,749 | -3.87% |
| 2002 | 53 | 77,191 | 192,014 | 2,653 | -3.51% |
| 2003 | 54 | 81,649 | 213,036 | 2,598 | -2.05% |
| 2004 | 55 | 80,479 | 234,970 | 2,845 | 9.49% |
| 2005 | 56 | 86,370 | 258,361 | 2,828 | -0.59% |
| 2006 | 57 | 86,493 | 283,010 | 2,871 | 1.50% |

B0569

**Conectiv**
Comparison of Accrued Benefits at Normal Retirement Age
*Jerome M. Charles*

| Year | Age | Pay | Cash Balance Account BOY | Contribution Credits | Transition Credits | Interest Credits | Balance EOY | Cash Balance Accrued Benefit at Age 65 |
|------|-----|-----|--------------------------|---------------------|--------------------|------------------|-------------|----------------------------------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| 1999 | 50.0 | 56,824 | $138,172 | $5,682 | $2,273 | $6,922 | $153,050 | $2,080 |
| 2000 | 51.0 | 62,711 | 153,050 | 6,271 | 2,508 | 9,581 | 171,410 | 2,860 |
| 2001 | 52.0 | 76,159 | 171,410 | 7,616 | 3,046 | 9,942 | 192,014 | 2,749 |
| 2002 | 53.0 | 77,191 | 192,014 | 7,719 | 3,088 | 10,215 | 213,036 | 2,653 |
| 2003 | 54.0 | 81,649 | 213,036 | 8,165 | 3,266 | 10,503 | 234,970 | 2,598 |
| 2004 | 55.0 | 80,479 | 234,970 | 8,048 | 3,219 | 12,124 | 258,361 | 2,845 |
| 2005 | 56.0 | 86,370 | 258,361 | 8,637 | 3,455 | 12,556 | 283,010 | 2,828 |
| 2006 | 57.0 | 86,493 | 283,010 | 8,649 | 3,460 | 13,245 | 308,363 | 2,871 |
| 2007 | 58.0 | 91,843 | 308,363 | 9,184 | 3,674 | 14,956 | 336,177 | 3,065 |
| 2008 | 59.0 | 97,523 | 336,177 | 9,752 | 3,901 | 16,305 | 366,135 | 3,187 |
| 2009 | 60.0 | 103,555 | 366,135 | 10,355 | 4,142 | 17,758 | 398,390 | 3,311 |
| 2010 | 61.0 | 109,960 | 398,390 | 10,996 | 4,398 | 19,322 | 433,106 | 3,436 |
| 2011 | 62.0 | 116,761 | 433,106 | 11,676 | 4,670 | 21,006 | 470,459 | 3,562 |
| 2012 | 63.0 | 123,982 | 470,459 | 12,398 | 4,959 | 22,817 | 510,633 | 3,691 |
| 2013 | 64.0 | 131,651 | 510,633 | 13,165 | 5,266 | 24,766 | 553,830 | 3,820 |
| 2014 | 65.0 | 139,793 | 553,830 | 13,979 | 5,592 | 26,861 | 600,262 | $3,952 |

FAC     $124,429          Projected accrued benefit under prior plan     **$5,858**

**Conectiv**

Comparison of Accrued Benefits at Normal Retirement Age

*Jerome M. Charles*

| Year | Age | Pay (4.5% increase after 1999) | Cash Balance Account BOY | Contribution Credits | Transition Credits | Interest Credits | Balance EOY | Cash Balance Accrued Benefit at Age 65 |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | | (4) | (5) | (6) | (7) | (8) | (9) |
| 1999 | 50.0 | 56,824 | $138,172 | $5,682 | $2,273 | $6,922 | $153,050 | $2,080 |
| 2000 | 51.0 | 59,381 | 153,050 | 5,938 | 2,375 | 9,581 | 170,944 | 2,860 |
| 2001 | 52.0 | 62,054 | 170,944 | 6,205 | 2,482 | 9,915 | 189,546 | 2,742 |
| 2002 | 53.0 | 64,846 | 189,546 | 6,485 | 2,594 | 10,084 | 208,709 | 2,618 |
| 2003 | 54.0 | 67,764 | 208,709 | 6,776 | 2,711 | 10,289 | 228,485 | 2,545 |
| 2004 | 55.0 | 70,814 | 228,485 | 7,081 | 2,833 | 11,790 | 250,189 | 2,766 |
| 2005 | 56.0 | 74,000 | 250,189 | 7,400 | 2,960 | 12,159 | 272,708 | 2,739 |
| 2006 | 57.0 | 77,330 | 272,708 | 7,733 | 3,093 | 12,763 | 296,297 | 2,766 |
| 2007 | 58.0 | 80,810 | 296,297 | 8,081 | 3,232 | 14,370 | 321,981 | 2,945 |
| 2008 | 59.0 | 84,446 | 321,981 | 8,445 | 3,378 | 15,616 | 349,419 | 3,053 |
| 2009 | 60.0 | 88,247 | 349,419 | 8,825 | 3,530 | 16,947 | 378,721 | 3,160 |
| 2010 | 61.0 | 92,218 | 378,721 | 9,222 | 3,689 | 18,368 | 409,999 | 3,266 |
| 2011 | 62.0 | 96,367 | 409,999 | 9,637 | 3,855 | 19,885 | 443,375 | 3,372 |
| 2012 | 63.0 | 100,704 | 443,375 | 10,070 | 4,028 | 21,504 | 478,978 | 3,478 |
| 2013 | 64.0 | 105,236 | 478,978 | 10,524 | 4,209 | 23,230 | 516,941 | 3,584 |
| 2014 | 65.0 | 109,971 | 516,941 | 10,997 | 4,399 | 25,072 | 557,409 | **$3,689** |

| | FAC | $100,899 | | Projected accrued benefit under prior plan | | | | **$4,749** |

B0571