# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) | C. A. NO. 05-702 (SLR) (Lead Case) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) | |
| | ) | |
| Defendants. | ) | |

## BREIF IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
302-656-2500 (telephone)
302-656-9053 (fax)

and

James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

June 19, 2007                    Attorneys for Plaintiffs

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

I.    NATURE AND STAGE OF THE PROCEEDINGS .................................................1

II.   SUMMARY OF ARGUMENT ..............................................................................2

III.  STATEMENT OF FACTS .....................................................................................3

IV.   ARGUMENT .........................................................................................................4

A.    PARAGRAPHS 11, 17 AND 18 OF THE KREMMEL DECLARATION SHOULD BE
      STRICKEN, AS KREMMEL LACKS PERSONAL KNOWLEDGE ...............................4

B.    THE PURPORTED EMAIL AND ARTICLES SHOULD BE STRICKEN....................9

C.    THE EXPERT REPORT OF ETHAN KRA SHOULD BE STRICKEN.....................12

1.    Kra's Opinion on Backloading Should Be Stricken ..........................................12

2     Kra's Opinion that the Plaintiffs' Cash Balance Account Grew Should Be Stricken .........17

3.    Kra's Opinion that the Value of the January 1, 1999 Annuity Benefit Increased
      Should Be Stricken ..........................................................................................18

4.    Kra's Opinion on the Projected Value of Plaintiffs' Accrued Benefits at Normal
      Retirement Age Should Be Stricken ................................................................20

V.    CONCLUSION......................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Charles v. Pepco Holdings, Inc.*,
   437 F. Supp. 2d 248 (D. Del. 2006)..........................................................................1

*Charles v. Pepco Holdings, Inc.*,
   2006 U.S. Dist. LEXIS 38941 (D. Del. June 12, 2006)..........................................1

*Cifarelli v. Village of Babylon*,
   93 F.3d 47 (2d Cir. 1996).........................................................................................5

*Esden v. Bank of Boston*,
   229 F.3d 154 (2d Cir. 2000)....................................................................................16

*Evans v. Techs. Apps. & Servs. Co.*,
   80 F.3d 954 (4th Cir. 1996) .....................................................................................5

*Gillis v. Hoechst Celanese Corp.*,
   4 F.3d 1137 (3d Cir. 1993)......................................................................................18

*Hirt v. The Equitable Retirement Plan*,
   441 F. Supp. 2d 516 (S.D.N.Y. 2006).....................................................................19

*Humane Soc. of the United States v. Babbitt*,
   46 F.3d 93 (D.C. Cir. 1995).......................................................................................4

*In re Japanese Elec. Prods. Antitrust Litig.*,
   723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds sub nom.*,
   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).............10

*Londrigan v. FBI*,
   670 F.2d 1164 (D.C. Cir. 1981) ................................................................................5

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
   998 F.2d 1224 (3d Cir. 1993)..................................................................................11

*Rambus, Inc. v. Infineon Techs. AG*,
   348 F. Supp. 2d 698 (E.D. Va. 2005) ......................................................................11

*Register v. PNC  Financial Services Group, Inc.*,
   477 F.3d 56 (3d Cir. 2007)..................................................................................18, 19

*Schneider v. Fried*,
   320 F.3d 396 (3d Cir. 2003)........................................................................12, 17, 18

*Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*,
    63 F.3d 1267 (3d Cir. 1995)...........................................................11

*United States v. Consol. Rail Corp.*,
    729 F. Supp. 1461 (D. Del. 1990).......................................... 4-5

*United States v. Ferber*,
    966 F. Supp. 90 (D. Mass. 1997) .....................................................11

*Williams v. Borough of West Chester*,
    891 F.2d 458 (3d Cir. 1989)...........................................................11

## RULES, STATUTES AND REGULATIONS

29 U.S.C. § 1002(23) ...............................................................16, 17

29 U.S.C. § 1054(b)(1)(B) .............................................................3, 12

29 U.S.C. § 1054(b)(1)(B)(i) ...............................................................18

29 U.S.C. § 1054(b)(1)(B)(iv) ..............................................................16

29 U.S.C. § 1054(b)(1)(G) ...............................................................3, 17

29 U.S.C. § 1054(b)(1)(H)...................................................................1

29 U.S.C. § 1054(g)(1) ....................................................................19

29 U.S.C. § 1054(h) .........................................................................3

Fed. R. Civ. P. 56(e) ....................................................................2, 4

Fed. R. Evid. 803(6) ......................................................................11

Fed. R. Evid. 901(b)(4) ...................................................................11

Fed. R. Evid. 902 .........................................................................11

26 C.F.R. § 1.411(b)-1(b)(2)(ii)(D) ......................................................16

26 C.F.R. § 1.411(d)-6 (1999) ................................................ 18, 19, 20-21

## I.    NATURE AND STAGE OF THE PROCEEDINGS.

The first of these actions challenging the defendants' conversion of traditional defined benefit pension plans to a cash balance plan was filed on September 26, 2005. (D.I. 1.).[1] The second action, *Troup v. Pepco Holdings, Inc.,* was filed on January 5, 2006. The complaints raise identical claims against the same defendants arising from the same pension plan.

In the *Charles* action, the Court denied the defendants' motion to dismiss on June 12, 2006. *Charles v. Pepco Holdings, Inc.,* 2006 U.S. Dist. LEXIS 38941 (D. Del. June 12, 2006).  Defendants moved for re-argument, and the Court denied that motion on July 11, 2006, while staying Count III.[2] *Charles v. Pepco Holdings, Inc.,* 437 F. Supp.2d 248, 252 (D. Del. 2006). Defendants filed answers to the complaints on August 1, 2006 (D.I. 38, 39), and discovery has been proceeding.

In February 2007, the parties entered into a stipulation permitting defendants to file an early summary judgment motion on May 1, 2007, which the Court has approved. (D.I. 80, 91). On May 1, 2007, defendants submitted a variety of materials in support of their motion for summary judgment. (D.I. 89). Plaintiffs submit this brief in support of their motion to strike certain of the evidentiary materials that defendants have submitted.

---

[1]        All references are to the docket in the main action.

[2]        Count III alleged a claim under Section 204(b)(1)(H) of ERISA, 29 U.S.C. § 1054(b)(1)(H), and was stayed pending disposition of an appeal  in a similar case, *Register v. PNC Fin. Servs. Group, Inc.,* No. 05-5445 (3d Cir.). The Court of Appeals ultimately issued an opinion which is fatal to Count III, and it rejected a petition for rehearing. (D.I. 79, 84).

## II.    SUMMARY OF ARGUMENT.

James R. Kremmel is an employee of defendant Pepco Holdings, Inc. ("Pepco Holdings"). On February 16, 2007 he submitted a seven page declaration in conjunction with the defendants' opposition to plaintiffs' motion for class certification. (*See* D.I. 73). This same declaration was resubmitted on May 1, 2007 in support of defendants' motion for summary judgment. (*See* D.I. 89 at A35-41.)

Federal Rule of Civil Procedure 56(e) requires that "affidavits shall be made on personal knowledge" setting forth admissible facts, and demonstrate that the "affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Kremmel admitted at his deposition that he lacked personal knowledge to support the statements in paragraphs 11 and 18 of his declaration. Kremmel's testimony further demonstrates that he lacked personal knowledge regarding paragraph 17, which is the paragraph primarily relied upon by defendants in their motion for summary judgment. As such, paragraphs 11, 17, and 18 of Kremmel's declaration run afoul of Federal Rule of Civil Procedure 56(e) and therefore should be stricken.

In order to establish that plaintiff Ward's claims are time barred, defendants rely on a single email allegedly sent to Ward on December 18, 1998. (D.I. 89 at A100-113). The defendants suggest that three *Wall Street Journal* articles were attached to the email. (*Id.*). This email should be stricken because it has not been authenticated and is inadmissible hearsay.

In an effort to counter plaintiffs' contentions that the Cash Balance Sub-Plan violates ERISA's minimum accrual standards, and that notice was required under Section 204(h) of ERISA, defendants have submitted the expert report of Ethan Kra, an

actuary. (D.I. 89 at A121-140). While Kra is qualified, Kra's report should be stricken because it does not meet all of the requirements of Federal Rule of Evidence 702.

### III.     STATEMENT OF FACTS.

These consolidated actions involve defendants' conversion of two traditional defined benefit pension plans to a single cash balance plan. This conversion became effective January 1, 1999 when the plaintiffs were placed into Conectiv's Cash Balance Sub-Plan. The plaintiffs allege that the provisions of the Cash Balance Sub-Plan violate Sections 204(b)(1)(B) and 204(b)(1)(G) of ERISA, 29 U.S.C. § 1054(b)(1)(B), (G), and that adequate notice of the adoption of the Cash Balance Sub-Plan was not provided, as required by Section 204(h) of ERISA, 29 U.S.C. § 1054(h). Defendants have moved for summary judgment, and plaintiffs question the admissibility of three evidentiary submissions.

Prior to the effective date of the Conectiv Cash Balance Sub-Plan, defendants contend that they issued a series of documents concerning the conversion. (D.I. 88 at 6). There are questions, however, over whether, when , how and to whom these materials were disseminated. In their summary judgment motion, defendants contend that the notices they provided were both timely and sufficient. To support this argument, defendants rely upon Kremmel's declaration to address when and how the materials were distributed, which is relevant to plaintiffs' notice claim and to defendants' limitations defense. (D.I. 89 at A35-71).

In connection with their limitations defense, defendants submitted a December 18, 1998 email purportedly sent to plaintiff Ward, along with a series of news stories they suggest were attached to it. (D.I. 89 at A100-113). Finally, defendants rely upon the Report of Ethan Kra to establish that the Cash Balance Sub-Plan satisfies ERISA's

minimum accrual standards and that no notice was required under Section 204(h) of ERISA.  Plaintiffs seek to strike these materials for the reasons set forth below.

## IV. ARGUMENT.

Under Rule 56, where a party believes that affidavits or other evidence submitted in support of a motion for summary judgment is not appropriate for consideration, the appropriate remedy is to file a motion to strike. *See Humane Soc. of the United States v. Babbitt,* 46 F.3d 93, 96 n.5 (D.C. Cir. 1995). Accordingly, plaintiffs have moved to strike portions of Kremmel's declaration, the email and its purported attachments, and Kra's report.

### A.    PARAGRAPHS 11, 17 AND 18 OF THE KREMMEL DECLARATION SHOULD BE STRICKEN, AS KREMMEL LACKS PERSONAL KNOWLEDGE.

On March 13, 2007, Kremmel was deposed in his individual capacity and as the defendants' designee on the issues addressed in his declaration. Based on Kremmel's deposition testimony, paragraphs 11, 17, and 18 of his declaration should be stricken,  as Kremmel lacks the requisite personal knowledge to support his statements in these paragraphs.[3]

Federal Rule of Civil Procedure 56(e) requires that "[s]upporting and opposing affidavits shall be made on **personal knowledge**, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e) (emphasis added). An affidavit made on information and belief is insufficient to rebut a properly offered motion for summary judgment. *United States v. Consol. Rail Corp.,* 729 F. Supp. 1461, 1466 (D. Del.

---

[3]    While plaintiffs object to the referenced paragraphs of Kremmel's declaration, they do not object to the Court's consideration of the documents submitted as exhibits to his declaration.

1990). Thus, a court may strike statements in an affidavit (1) for which the affiant lacks

personal knowledge; (2) that set forth facts inadmissible at trial; or (3) to which the

affiant is not competent to testify. The "requirement of personal knowledge by the

affiant is unequivocal, and cannot be circumvented," and "[a]n affidavit based merely

on information and belief is unacceptable." *See Londrigan v. FBI*, 670 F.2d 1164, 1174 n.52,

53 (D.C. Cir. 1981) (citations omitted). Thus, statements that are impermissible hearsay,

conclusory, or self-serving are generally precluded. *See Cifarelli v. Village of Babylon*, 93

F.3d 47, 51 (2d Cir. 1996); *Evans v. Techs. Apps. & Servs. Co.*, 80 F.3d 954, 962 (4th Cir.

1996).

Kremmel testified at his deposition that he received a draft of the declaration

sometime in 2007. (Kremmel Dep. 168:3-23; D.I. 94 at B0292). He made no changes to the

draft before signing. (*Id.*). Kremmel admitted at his deposition that he lacked personal

knowledge to support the statements in paragraphs 11 and 18 of his declaration:

> Q.     So, the sole basis for the statement in Paragraph 11 is information
>        conveyed to you by counsel, is that correct?
> MS. YU:  Objection to form.
> THE WITNESS:  Correct.
> Q.     And you did not do anything to independently verify that
>        information?
> A.     I did not.
>        . . .
> Q.     Could you turn to Page 6 of your declaration, which is Plaintiffs-
>        12. Let me direct your attention to Paragraph 18.
> A.     Okay.
> Q.     The first sentence indicates, "There are at least 90 members of the
>        putative class who have executed releases with defendants for any
>        ERISA claim (except for claims for accrued and vested benefits as
>        set forth in the plan documents) in exchange for severance
>        payments."
>        Do you see that, sir?
> A.     I do see that.
> Q.     What was the basis on which you made that statement?
> A.     Information provided to me by counsel.
> Q.     So, you didn't review the releases personally?

A.    I did not.

(Kremmel Dep. at 159:4-12, 164:14-165:8; D.I. 94 at B0290-291).

Kremmel's testimony regarding paragraphs 11 and 18 establishes that he lacked the requisite personal knowledge required under Federal Rule of Civil Procedure 56(e). Therefore, paragraphs 11 and 18 should be stricken from his declaration.

Kremmel's testimony further demonstrates that he lacked personal knowledge to support paragraph 17, the paragraph primarily relied upon by defendants in their motion for summary judgment. Putting aside the fact that paragraph 17 of Kremmel's declaration is inconsistent with the testimony of human resources executives Cain and Wilkinson, as well as the testimony of the plaintiffs, it is also inconsistent with Kremmel's own testimony and thus should be stricken.

While Kremmel states in paragraphs 17(a) and 17(b) of his declaration that the October 13 "EMerging Times" newsletter was "distributed . . . to all employees" and the October 20 version was "distributed," he has no recollection whether he received copies of either document. (Kremmel Dep. 15:24-16:3; 19:9-11; D.I. 94 at B0254, 255). Significantly, he conceded at his deposition that he only has a **belief** that the October 13 newsletter was distributed to all employees:

> Q.    Focusing on Exhibit D-1 for a moment, do you know how that was issued to the workforce?
> A.    This individual communication, **I believe**, was distributed in a hard copy, printed internally by the company's general printing group, and then distributed to employees.
> Q.    Was it aimed at any particular category of employees or was it everyone that was drawing a paycheck?
> A.    This communication, **I believe**, was targeted to all employees in the company, sir.

(Kremmel Dep. 18:3-14; D.I. 94 at B0255) (emphasis added).

In paragraph 17(c), Kremmel declares that sometime in May 1998, "Conectiv distributed to all employees a 'Facts' newsletter." Kremmel's testimony below, however, acknowledges that the company had no records to indicate that this document was actually mailed to all employees:

> Q.    In or about April of 1998, did the company keep records when it made mailings of benefits information to employees?
> A.    The company kept a copy of what was mailed.
> Q.    Did it keep a log that would tell you the date that it was mailed?
> A.    Not to the best of my recollection, no.

(Kremmel Dep. 45:6-14; D.I. 94 at B0261). His failure to review any records indicating that this undated "Facts" newsletter was in fact "distributed to all employees" in May 1998 demonstrates that Kremmel lacks the requisite basis to state that the document was in fact distributed and when that happened.

In paragraph 17(d), Kremmel declares that "on December 21, 1998, Conectiv sent to all employees who would be enrolled in the Cash Balance Plan" a letter outlining how the plan would compute benefits. In reality, however, Kremmel does not know how this document was distributed, he does not remember receiving a copy, and the defendants have no records of who received a copy of this document. (Kremmel Dep. 49:2-50:3; D.I. 94 at B0262-263). Refuting his own statement in the introduction of paragraph 17, Kremmel testified that the December 21, 1998 letter was **not** intended to fulfill the defendants' legal obligation to notify employees of an amendment to the plan. (Kremmel Dep. 60:7-16; D.I. 94 at B0265).

In paragraph 17(e), Kremmel declares that "Conectiv distributed a newsletter titled 'Mid Week Extra: Cash balance update June 23, 1999'" to participants. Kremmel admitted, however, at his deposition that he in fact does not know who this document was sent to. (Kremmel Dep. 84:1-85:4; D.I. 94 at B0271).

Kremmel also states that Conectiv used a standardized PowerPoint slide presentation in these meetings and further declares that at each meeting, Conectiv discussed the then-brewing controversy over IBM's decision to convert to a cash balance plan. Kremmel, however, did not personally attend every employee meeting and conceded that these meetings were not recorded by video or audio and no minutes were taken:

> Q.    Were there, in fact, a series of meetings held in or about July or August of 1999 to -- for employees to attend to learn about the cash balance plan?
> A.    Yes, there were.
> Q.    And did you participate in those meetings?
> A.    I participated in some of those meetings, yes, sir.
> Q.    Do you recall approximately how many?
> A.    I do not recall, no, sir.
> Q.    Were the meetings recorded in some form?
> A.    The meetings were not videotaped or not audio recorded, no.
> Q.    Were there minutes maintained?
> A.    No, not to my recollection.
>          . . .
> Q.    How many meetings did you attend?
> A.    I don't recall the number of meetings that I attended.
> Q.    Did you keep notes?
> A.    Not to my recollection, no.

(Kremmel Dep. 83:7-24; 92:22-93:-2; D.I. 94 at B0271, 273).

In his testimony, Kremmel acknowledged the fact that the presentation at particular meetings might have varied:

> Q.    And how would you describe the format of the meeting to someone that had not attended?
> A.    The format of the meeting?
> Q.    Yes.
> A.    It was a -- to my recollection, it was a presentation and question and answer period at each of the presentations, sir.
>          . . .
>          Now, from the chart, it appears that you were having multiple meetings on multiple days at multiple locations to roll out the cash balance plan. Is that correct?
> A.    That's correct, yes, sir.

> Q. What measures were taken to make sure that the presentation was reasonably consistent from location to location and from time to time?
>
> A. Again, to the best of my recollection, the same presentation was utilized at each location.
>
> Q. In what form was that presentation?
>
> A. It was an overhead PowerPoint presentation that was followed at each of the presentations.
>
> Q. And were notes provided to the speakers to assist them with the PowerPoint presentation?
>
> A. Not to my recollection sir, no.
>
> . . .
>
> Q. How were the questions handled?
>
> A. Right at the end of the presentation there was a question and answer period.
>
> Q. Were suggested answers to anticipated questions prepared in advance of the meetings?
>
> A. Not to my recollection, no, sir.
>
> Q. So that, depending upon the particular meeting that an employee attended, the same question might be answered slightly differently, from one meeting to the next?
>
> A. Slightly differently?  Possibly.

(Kremmel Dep. 93:13-20; 95:4-24; 98:14-99:2; D.I. 94 at B0273-275).

Kremmel's testimony demonstrates that he lacks the requisite personal knowledge to declare that "[a]t each meeting, Conectiv discussed the then-brewing controversy over IBM's decision to convert to a cash balance plan." Thus, paragraph 17(e) of his declaration should also be stricken.

**B.    THE PURPORTED EMAIL AND ARTICLES SHOULD BE STRICKEN.**

Defendants rely on a purported email allegedly sent to plaintiff Ward on December 18, 1998 to argue that his claims are time barred. (D.I. 88 at 27). The defendants suggest that three *Wall Street Journal* articles were attached to the email. (*Id.*). This email should be stricken because it has not been authenticated and because it is inadmissible hearsay.

There are several problems with the authenticity of the email and its purported attachments. First, there is no indication from the face of the email itself that there was any attachment. Second, the bottom of the email has inaccurate company information: "[t]his Email message and any attachment may contain information that is proprietary, legally privileged, confidential and/or subject to copyright belonging to Pepco Holdings, Inc. or its affiliates ('PHI')." (D.I. 89 at A100). In 1998, when the email was purportedly sent, Ward was employed by Conectiv, not Pepco Holdings. Pepco purchased Conectiv in August 1, 2002, over three years after the date of this purported email. (D.I. 1 ¶ 29; D.I. 38 ¶ 29; Kremmel Dep. 11:5-13; D.I. 94 at B0253). Thus, the document on its face raises serious issues concerning its authenticity. *Cf. In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 293 (3d Cir. 1983) (noting firm logo helps establish authenticity of memoranda) *rev'd on other grounds sub nom., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Here, unlike *Japanese Electronic Products,* the corporate identification raises questions about the authenticity of the document instead of supporting it.

While plaintiff Ward was deposed for almost five hours on January 10, 2007, defendants never asked about this document, which they did not produce until April 10, 2007. This email is not attached to an affidavit, nor is it otherwise authenticated by an individual with personal knowledge of its contents.

Ward has thoroughly searched his archived emails and does not have a copy of this particular email. (*See* Ward Dec. ¶1; D.I. 94 at B0401). Furthermore, he has no recollection of ever seeing the three *Wall Street Journal* articles which defendants now claim were attached to the email. (*See* Ward Dec. ¶ 2; D.I. 94 at B0401). The email is not among the categories of self-authenticating documents enumerated in Federal Rule of

13

Evidence 902. *See* Fed. R. Evid. 902; *see also* Fed. R. Evid. 901(b)(4) (characteristics and contents of document, taken in conjunction with circumstances, will authenticate it).

The email is also inadmissible hearsay; it is not a business record under Rule 803(6). *See United States v. Ferber*, 966 F. Supp. 90, 98-99 (D. Mass. 1997) (In denying admittance of an e-mail disseminated in the course of business, the court focused on Rule 803(6)'s requirements that it must be the routine business practice of the individual to make the record and that the individual has a duty to make and maintain the record); *accord Rambus, Inc. v. Infineon Techs. AG*, 348 F. Supp.2d 698, 705 (E.D. Va. 2005). *See also* Fed. R. Evid. 803(6) advisory committee's note ("Absence of routineness raises lack of motivation to be accurate.").

There is a more fundamental problem: the alleged sender of this email, William O. Bates died on January 7, 2002. (*See* D.I. 94 at B0540). While a party may utilize hearsay to some extent in connection with a motion for summary judgment, the hearsay must ultimately be "reduc[ible] to admissible evidence." *Williams v. Borough of West Chester*, 891 F.2d 458, 466 n.12 (3d Cir. 1989) (citations omitted); *id.* at 473 (Stapleton, J. concurring and dissenting). Consequently, the rule in this circuit is that hearsay statements can be considered on a motion for summary judgment only if they are capable of being admissible at trial. *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (*citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)). Defendants cannot produce Bates at trial, and his email statement is therefore inadmissible at this stage. Thus, the email and it purported attachments should be stricken.

C.    THE EXPERT REPORT OF ETHAN KRA SHOULD BE STRICKEN.

Defendants have submitted the report of Ethan Kra, an actuary, to support their

contention that the Conectiv Cash Balance Sub-Plan complies with the minimum accrual

standards of ERISA, and that no notice was required under Section 204(h) of ERISA. The

admissibility of expert testimony under Federal Rule of Evidence 702 rests on three

factors. First, the witness must be qualified as an expert, meaning that "the witness

possess specialized expertise." *Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003). Second,

the testimony of the witness must be reliable: "it must be based upon the 'methods and

procedures of science" rather than on 'subjective belief or unsupported speculation'; the

expert must have 'good grounds' for his or her belief." *In re Paoli Railroad Yard PCB*

*Litig.,* 35 F.3d 717, 742 (3d Cir. 1994) (*quoting Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S.

579, 590 (1993)). Third, the expert's testimony must meet the "fit" requirement, which

requires that the testimony "be relevant for the purposes of the case and must assist the

trier of fact." *Schneider,* 320 F.3d at 404. While Kra, as an enrolled actuary, plainly meets

the qualification requirements, there are serious questions whether his opinions meet the

reliability and fit requirements.

1.    *Kra's Opinion on Backloading Should be Stricken.*

In paragraph 5 of his report, Kra opines that the plan passed the 133 $^{1/3}$ rule of

Section 204(b)(1)(B) of ERISA, 29 U.S.C. § 1054(b)(1)(B). (D.I. 89 at A122). Kra's

deposition testimony demonstrates that this opinion is unreliable. According to Mr. Kra,

the backloading test must be conducted on the basis of the annuity value:

> Q.    Now, in a cash balance plan what constitutes the participants'
> accrued benefit?
> A.    Depends on how it's defined in the plan document. Some plan
> documents will define it equal to the account balance, and then
> the optional forms will include the annuity, which is defined

<table>
<tr><td></td><td>because it's required. Other plans will define it in terms of the annuity.<br>You have to look at a plan document.</td></tr>
<tr><td>Q.</td><td>Now, let's take that thought and meld that with our tests that we've been talking about.<br>If an actuary is reviewing a cash balance plan to determine whether it comports with the back-loading standards and the plan defines the accrued benefit as the account balance, how would you apply the tests? To the account balance?</td></tr>
<tr><td>A.</td><td>In a defined benefit cash balance plan -- qualified defined benefit plan, I would do the testing on the normal retirement benefit, payable as an annuity.</td></tr>
<tr><td>Q.</td><td>Even if the plan specified a lump sum as the accrued benefit?</td></tr>
<tr><td>A.</td><td>I would still base it on the annuity form.</td></tr>
<tr><td>Q.</td><td>And you would do the same thing if the plan, although it was a cash balance plan, specified the accrued benefit as the -- as the single life –</td></tr>
<tr><td>A.</td><td>My understanding is that the requirements are that all defined benefit plans have back-loading tested on the normal retirement annuity. The IRS typically is -- in every test that I've seen them require, that's the only thing they are willing to look at.</td></tr>
</table>

(Kra Dep. 53:14-54:24; D.I. 94 at B0164-165).

Yet in conducting his test of the plan he did something different. Kra developed

a hand-written matrix on a sheet of scratch paper that examined the pay crediting rate

applied to a participant's account under the Conectiv Cash Balance Plan, not the annuity

amount:

(*See* Pl. Ex. 40; D.I. 94 at B0248). He explained the document at his deposition:

> Q.  Mr. Kra, the court reporter has handed you a document we've marked Plaintiffs' Exhibit 40 for identification purposes. It's a single sheet of paper that was produced from your file. It looks like one of those little pads you pick up at your hotels, in this instance the Marriott Wardman Park Hotel.
> A.  Yes.
> Q.  Is this your handwriting?
> A.  Yes.
>      . . .
> Q.  What do these notes reflect?
> A.  These were chicken scratch notes I took and analyses I did as I read through the plan document the first time.
> Q.  Were you sitting in the hotel in Washington?
> A.  Yes.
>      . . .
> Q.  . . . And then you got 5 percent, 6 percent, 7 percent, 8 percent, and a line.
> A.  Right.  That was the -- Page 17 of the plan document has the pay crediting rates, and I copied that information from the plan document on to this note pad.
> Q.  Okay.
> A.  That's where you have less than 30, 30 to 34, 35 to 39, 40 to 44, 45 to 49, 50 plus, where the plan document says 50 and over.
> Q.  Well, you did it in two places, though. You have it in a line going across and then you did it in columns.
> A.  Right.

Q.     Is there any significance to that?

A.     Yes.  Because what I'm doing is, I was looking at the four-thirds rule.

Q.     Okay.

A.     What I was looking at is -- down the column I put the pay crediting rates, and I put the same pay crediting rates across the top, and then I looked at the relationships of those pay crediting rates.

If the pay crediting rate in a future year is no more than four-thirds of an earlier year, there is nothing to analyze.  If the pay crediting rate is more than four-thirds of an earlier year, then the question is, how can the plan pass the four-thirds rule?  The way the plan passes the four-thirds rule is by having interest credits from the earlier year to the later year.

So, if I give a 5 percent pay credit, and then if I give 4 percent interest credits for ten years, ignoring compound interest, I've given 40 percent, so 40 percent on 5 percent gives you 7 percent.  So then I would compare that 7 percent times four-thirds with the interest -- with the pay crediting rate in the subsequent year.

Q.     Okay.

A.     So, what I was determining here was what is the minimum interest crediting rate necessary so that the plan would pass back-loading under the 133 and a third percent rule. So, what I determined was, as long as the plan's interest crediting rate for a given year is always at least 1.95 percent, the plan will, by definition, by form, pass the four-thirds rule.

(Kra Dep. at 114:16-115:1; 115:5-115:11; 117:21-119:20; D.I. 94 at B0180-181). Since Kra's method of testing backloading did not conform to what he said was the applicable standard, it is plainly unreliable, and also fails the fit requirement as it does not address a fact in issue and therefore will not assist the trier of fact.

Defendants' brief in support of their summary judgment motion hints at another problem; defendants assert that in applying the backloading test, interest rates must be kept static. (D.I. 88 at 16). Frankly, it does not appear that Kra applied this approach in testing backloading, but to the extent he did it is problematic. Defendants' contention rests upon a provision of Section 204(b)(1)(B) which states "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant

as of the current year for all years after the current year." 29 U.S.C. § 1054(b)(1)(B)(iv); *see also* 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(D). While the language of these provisions is broad, they cannot be taken literally. Mr. Kra acknowledged that age and service (two critical factors used to calculate benefits under a pension plan) could not be kept constant or the accrual standards would be rendered meaningless. (Kra Dep. at 45:6-50:7, D.I. 94 at B0162-164). The fact that neither ERISA nor the relevant Treasury regulations specifically address how to treat fluctuating interest rates in calculating accrued benefits under a cash balance plan is not surprising: "the governing statues and regulations were developed with traditional final-pay defined benefit plans in mind . . . ." *Esden v. Bank of Boston,* 229 F.3d 154, 159 (2d Cir. 2000). The first cash balance plan was created in 1985, while the relevant regulations were promulgated in 1977.

There is another problem: an assumption that employees' accrued benefits should be calculated on the basis of a hypothetical static rate cannot be squared with the plain language of this plan or ERISA's definition of "accrued benefit." ERISA expressly provides that a participant's accrued benefit is "the individual's accrued benefit determined under the plan . . . ." 29 U.S.C. § 1002(23). This plan specifies a particular interest rate to be used to calculate interest credits under the plan, which is the thirty-year Treasury rate for October of the prior plan year. (D.I. 94 at B0430). Assuming a static rate is inconsistent with the requirements of the plan, as the result is that accrued benefits for plan year 2000 would be calculated based upon the October 1998 rate of 5.01%, rather than the rate specified in the plan, the October 1999 rate, which was 6.26%. (D.I. 94 at B0547)

2.     *Kra's Opinion that the Plaintiffs' Cash Balance Account Grew*
       *Should Be Stricken.*

In paragraph 6 of his report, Kra states that each year, plaintiffs "experienced a positive benefit accrual on account of increased age, service and compensation received during the year." (D.I. 89 at A122). This statement should be stricken, as it does not meet the fit requirement: it is not "relevant for the purposes of the case." *Schneider,* 320 F.3d at 404.

First, paragraph 6 is not relevant to plaintiffs' backloading claim. As Kra acknowledged at his deposition, the backloading test has to be applied to the annuity value, not the account balance. (Kra Dep. 53:14-54:24; D.I. 94 at B0164-165). Therefore, the fact that the plaintiffs' account balance may have increased is not relevant to their claim that the plan violated the backloading standard of ERISA Section 204(b)(1)(B).

Nor is growth in the account value relevant to the plaintiffs' claim under Section 204(b)(1)(G), as that section provides that a defined benefit plan "shall be treated as not satisfying the requirements of this paragraph if the participant's **accrued benefit** is reduced on account of any increase in his age or service." 29 U.S.C. § 1054(b)(1)(G) (emphasis supplied). Since we are dealing with a defined benefit plan, "accrued benefit" is defined as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). The relevant plan document also specifically provides that the plaintiffs' accrued benefit is the annuity. (D.I. 94 at B0428).

Finally, growth in the account value is irrelevant to plaintiffs' notice claim. The relevant Treasury Regulations instruct that the notice requirement under Section 204(h) is triggered by an amendment that reduces the annuity value that they can earn

following the amendment: "an amendment affects the rate of future benefit accrual only if it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." *See* 26 C.F.R. § 1.411(d)-6 (Q&A 5) (1999).

As Kra's opinion in paragraph 6 is not relevant, it would not assist a trier of fact and consequently does not satisfy the fit requirement. *Schneider,* 320 F.3d at 404. Consequently, paragraph 6 of his report should be stricken.

>   3.    *Kra's Opinion that the Value of the January 1, 1999 Annuity*
>         *Benefit Increased Should Be Stricken.*

In paragraph 7 of his report, Kra states that "[a]s of the effective date of the plan amendment (January 1, 1999), the accrued benefit (payable at normal retirement age) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan." (D.I. 89 at A122). This paragraph should be stricken as it does not meet the fit requirement.[4]

First, the comparison of the accrued benefit under the old plans and the new plan as of January 1, 1999 is not relevant to plaintiffs' backloading claim, because Section 204(b)(1)(B) explicitly requires that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." 29 U.S.C. § 1054(b)(1)(B)(i). This is why the plaintiffs' backloading claim failed in *Register v. PNC*

_____

[4]    The reason for the increase is simple: in calculating opening balances, the value of early retirement benefits and subsidized survivors' benefits under the heritage plans was included. (*See* D.I. 89 at A52 ("The conversion formula will take account of any early retirement benefits and survivor benefits which are part of the current plan."); *see also* D.I. 89 at A68-69). These types of benefits are protected from elimination under Section 204(g) of ERISA, 29 U.S.C. § 1054(g), even though they do not fit the formal statutory definition of "accrued benefits." *See Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1143-44 (3d Cir. 1993). Kra acknowledged the fact that early retirement benefits have substantial value over and above the value of the age sixty-five annuity provided under a plan. (Kra Dep. at 82:4-84:21, D.I. 94 at B0172).

*Financial Services Group, Inc.*, 477 F.3d 56 (3d Cir. 2007); the *Register* plaintiffs sought to compare the value of the benefits they had earned under the pre-amendment plan with their benefit under the amended plan to demonstrate backloading. The Third Circuit held that this was an improper application of the backloading test. 477 F.3d at 71-72.

Second, the comparison of the accrued benefit under the old plans and the new plan as of January 1, 1999 is not relevant to plaintiffs' claim under Section 204(b)(1)(G), because they are complaining about the fact that they suffered decreases in their accrued benefits in subsequent years. (*See* D.I. 1 ¶ 41).

Third, the comparison of the accrued benefit under the old plans and the new plan as of January 1, 1999 is not relevant to plaintiffs' notice claim. That comparison would be relevant for purposes of Section 204(g) of ERISA, which generally bars an amendment to a plan that results in a decrease in accrued benefits. 29 U.S.C. § 1054(g)(1) ("The accrued benefit of a participant under a plan may not be decreased by an amendment to a plan [subject to limited exceptions]").

Section 204(h) notice, however, turns upon the rate of future benefit accrual, not a snapshot of the effect of the amendment: "an amendment affects the rate of future benefit accrual only if it is reasonably expected to change the amount of the **future** annual benefit commencing at normal retirement age." 26 C.F.R. § 1.411(d)-6 (Q&A 5) (1999) (emphasis supplied). The determination is to be made upon the basis of "reasonable expectations taking into account the relevant facts and circumstances at the time the amendment is adopted . . . ." 26 C.F.R. § 1.411(d)-6 (Q&A 7) (1999); *see also Hirt v. The Equitable Retirement Plan,* 441 F. Supp.2d 516, 533 (S.D.N.Y. 2006). The named plaintiffs were not at retirement age as of January 1, 1999, or they would have been grandfathered. Thus, an assumption that they would retire as of that date would not be

a reasonable one. Consequently, a comparison of the benefits provided as of January 1,

1999 under the old plans and the new plans is not relevant to determine a fact in issue,

and paragraph 7 of Kra's report does not meet the fit requirement.

4.      *Kra's Opinion on the Projected Value of Plaintiffs' Accrued*
        *Benefits at Normal Retirement Age Should Be Stricken.*

In paragraph 8 of his report, Kra offers the opinion that "[a]s of the effective date

of the plan amendment (January 1, 1999), the projected benefit (payable at normal

retirement date) for each of the Plaintiffs was larger under the amended plan than under

the pre-amended plan." (D.I. 89 at A123). While this portion of Kra's report asks a

relevant question (what benefits the plaintiffs will have when they retire), it should be

stricken because it rests upon an unrealistic assumption: Kra assumed the plaintiffs

would never get another raise for the rest of their lives. (Kra Dep. at 72:5-73:15; D.I. 94 at

B0169) (stating that 1999 compensation was used).

In a vacuum, this assumption is patently unreasonable. It is even harder to

defend when the relevant regulatory standard for Section 204(h) notice is considered:

> Q-5: What is an amendment that affects the rate of future benefit accrual
> for purposes of section 204(h)?
> A-5: (a) In general--(1) Defined benefit plans. For purposes of section
> 204(h), an amendment to a defined benefit plan affects the rate of future
> benefit accrual only if it is **reasonably expected** to change the amount of
> the future annual benefit commencing at normal retirement age. For this
> purpose, the annual benefit commencing at normal retirement age is the
> benefit payable in the form in which the terms of the plan express the
> accrued benefit (or, in the case of a plan in which the accrued benefit is
> not expressed in the form of an annual benefit commencing at normal
> retirement age, the benefit payable in the form of a single life annuity
> commencing at normal retirement age that is the actuarial equivalent of
> the accrued benefit expressed under the terms of the plan, as determined
> in accordance with the principles of section
> 411(c)(3) of the Code).
>
> . . .

> Q-7: What is the basic principle used in determining whether an amendment provides for a significant reduction in the rate of future benefit accrual for purposes of section 204(h)?
>
> A-7: **Whether an amendment provides for a significant reduction in the rate of future benefit accrual for purposes of section 204(h) is determined based on reasonable expectations taking into account the relevant facts and circumstances at the time the amendment is adopted.** For a defined benefit plan this is done by comparing the amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan as amended, with the amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan prior to amendment.

26 C.F.R. § 1.411(d)-6 (Q&A 5, 7)(1999) (emphasis supplied). Since there is a specific regulatory requirement that the determination whether a plan amendment results in a reduction in the rate of future benefit accrual be based upon "reasonable expectations" that consider "relevant facts and circumstances," there has to be some rationale for the assumptions used to estimate the value of the benefits the plaintiffs would have at normal retirement age. An assumption that there would be no change in the plaintiffs' compensation ever again does not meet this standard.

Indeed, Kra acknowledged that in calculating projected pension liabilities for purposes of financial reporting, actuaries routinely consider future salary increases:

> . . . Are you familiar with the process that is used to reflect pension liabilities on a sponsor's financial statements?
>
> A.   Yes.
>
> Q.   That's something that you work with from time to time, is it not?
>
> A.   Yes.
>
> Q.   When I look at a plan sponsor's balance sheet, and I see an entry in there that's reflective of pension liabilities as a liability on the balance sheet, what is the actuarial work that's behind that?
>
> A.   I have to ask you to refine your question.
>
> Q.   Okay.
>
> A.   Do you mean, using accounting standards in 1998 '99 or using accounting standards of 2007?
>
> Q.   Let's start with 1998 and '99.
>
> A.   Okay.

> In 1998, '99 there were two concepts used in determining financial statements:  One was the accumulated benefit obligation, and one was the projected benefit obligation. The accumulated benefit obligation only reflected salaries earned to date. Did not reflect any projection of future pay increases. It was based on service to date and pay to date.
>
> The projected benefit obligation would reflect service to date, but future salary increases.
>
> The minimum liability on a balance sheet, the one which was compared to the assets for a minimum liability on balance sheets, was based on the accumulated benefit obligation, which did not reflect salary increases.
>
> The profit and loss statement, which would affect the balance sheet, the earnings, the charge to earnings, was based on the projected benefit obligation.
>
> So, both concepts were used in determining corporate financials.

(Kra Dep.138:2-139:19; D.I. 94 at B0186).

The underlying analytical work done by Kra's colleagues demonstrates that his opinion that the projected future benefit at retirement age under the new plan is higher than under the old plan is highly sensitive to the operative assumption that pay was static. When projections were calculated using subsequent years compensation levels (*See* Kra Dep. 100:12-106:6; D.I. 94 at B0176-178), the results changed. For plaintiffs Ward and Charles, use of 2006 valuation figures resulted in a higher level of benefits under the old plan. (Pl. Ex. 34 at KRA00419, 422; D.I. 94 at B0195, 198). For plaintiff Fink, this occurred if either 2005 or 2006 compensation was used. (Pl. Ex. 34 at KRA00425; D.I. 94 at B0201).

The assumption that the plaintiffs would receive no increases in compensation after 1999 was patently unreasonable, particularly in view of their actual experience. Moreover, such an assumption is impossible to reconcile with the regulatory requirement that the effect of a plan amendment on future benefits be weighed on the

basis of reasonable expectations. Accordingly, paragraph 8 of Kra's report should be stricken.

## V.    CONCLUSION.

Based upon the arguments and authorities set forth above, plaintiffs respectfully request that their motion to strike be granted.

Dated:  June 19, 2007                    Respectfully submitted,

                                         **CHIMICLES & TIKELLIS LLP**


By:    */s/ A. Zachary Naylor*
       Pamela S. Tikellis (#2172)
       Robert J. Kriner (#2546)
       A. Zachary Naylor (#4439)
       One Rodney Square
       P.O. Box 1035
       Wilmington, DE 19899
       302-656-2500 (telephone)
       302-656-9053 (fax)

                and

       James R. Malone, Jr.
       (*pro hac vice*)
       Joseph G. Sauder
       (*pro hac vice*)
       One Haverford Centre
       361 West Lancaster Avenue
       Haverford, PA 19041
       610-642-8500 (telephone)
       610-649-3633 (fax)

       Attorneys for Plaintiffs