IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J. MICHAEL CHARLES, MAURICE W. WARD,　　　:
JR., and JOSEPH I. FINK, JR., on behalf of　　　　:
themselves and all others similarly situated,　　　　:
　　　　　　　　　　　　　　　　　　　　　　:　　CIVIL ACTION
　　　　　　　　　　　　　Plaintiffs,　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　　　　　　　:　　NO. 05-00702 (SLR)
　　　　　　　　　　　　　　　　　　　　　　:
PEPCO HOLDINGS, INC., CONECTIV, and　　　　:
PEPCO HOLDINGS RETIREMENT PLAN,　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　Defendants.　　　　:

**APPENDIX TO
DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION TO STRIKE**

M. Duncan Grant (Del Bar No. 2994)
Phillip T. Mellet (Del Bar No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
302.777.6500

Susan Katz Hoffman, Esquire　　　　　　Larry R. Wood, Jr. (Del Bar No. 3262)
LITTLER MENDELSON, P.C.　　　　　　Kay Kyungsun Yu
Three Parkway　　　　　　　　　　　　Barak A. Bassman
1601 Cherry Street　　　　　　　　　　PEPPER HAMILTON LLP
Philadelphia, PA  19102　　　　　　　　3000 Two Logan Square
267.402-3015 (telephone)　　　　　　　Eighteenth and Arch Streets
267.430.7275 (fax)　　　　　　　　　　Philadelphia, PA 19103-2799
　　　　　　　　　　　　　　　　　　215. 981.4000 (telephone)
　　　　　　　　　　　　　　　　　　215.981.4750 (fax)

Dated:  July 3, 2007　　　　　　　　　Attorneys for Defendants

## TABLE OF CONTENTS

Declaration of Jaime Moore ........................................................................... B-1 to B-3

Email from William O. Bates to Maurice W. Ward
December 18, 1998 ..................................................................................... B-4 to B-17

Email in Maurice Ward's archive dated December 22, 1998
Subject line "EXTRA- Benefits policies announced." ........................................ B-18 to B-30

Screen Snapshot of Maurice Ward's Email Archive ........................................... B-31

Declaration of James R. Kremmel ..................................................................... B-32 to B-68

Excerpts from Deposition of James R. Kremmel ................................................ B-69 to B-90

Expert Report of Ethan E. Kra ......................................................................... B-91 to B-110

Supplemental Expert Report of Ethan E. Kra ................................................... B-111 to B-118

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | CIV. A. NO. 05-702 (SLR) (Lead Case) |
| Plaintiffs, | ) |
| v. | ) |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) |
| Defendants. | |

### DECLARATION OF JAMIE MOORE

I, Jamie Moore, being over 18 years of age, being of sound mind and capable of making this affidavit, and being personally acquainted with the facts described herein, which are true and correct to the best of my knowledge and belief, state the following:

1    I am the Supervisor of Messaging and Core Applications in the IT Department of Defendant Pepco Holdings, Inc. ("Pepco"). My responsibilities include maintenance of all email servers for Pepco and administration of Pepco's email system. I have worked for Pepco, either as an employee or a contractor, for the past twelve years.

2.    At the request of counsel, I searched the email inbox and personal email archive of Pepco employee Maurice W. Ward for any email messages containing the term "cash balance.

3.    The personal email archive contains any emails that Mr. Ward copied and placed there either at the time that Pepco changed email systems from Microsoft Exchange to Lotus Notes in 2004 or later.

4.   Among the emails that I found in Mr. Ward's personal archive was an email dated December 18, 1998 from William O. Bates to Mr. Ward with the subject line "Cash Balance Pension Info." Attached to this email are three files, which appear to be articles from *The Wall Street Journal*. According to the information within Pepco's email servers, Mr. Ward placed this email into his archive on December 9, 2004. A true and correct copy of this December 1998 email from Mr. Bates is attached as Exhibit A.

5.   Another email that I found in Mr. Ward's archive is an email dated December 22, 1998 with the subject line "EXTRA – Benefits policies announced." A true and correct copy of this email, with all attachments, is attached as Exhibit B.

6.   I forwarded both emails to Barbara Alexander, Esq., an attorney for Pepco.

7.   On June 26, 2007, I again opened Mr. Ward's personal archive to confirm that it contained Mr. Bates' email. Once more, I found Mr. Bates' email, with all three attachments, within Mr. Ward's archive. Attached as Exhibit C is a screen snapshot of the contents of Mr. Ward's archive, which clearly shows Mr. Bates' email.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Date    6-29-2007

By: _____
Jamie Moore
Pepco Holdings, Inc.
701 Ninth Street, N.W.

-2-

Washington, DC

Dated:

-3-

# Redacted

William O. Bates

12/18/1998 10:04 AM

To Maurice W. Ward

cc

Subject Cash Balance Pension Info

Maury here is the Info I have on Cash Balance Pensions FYI

This Email message and any attachment may contain information that is proprietary, legally privileged, confidential and/or subject to copyright belonging to Pepco Holdings, Inc. or its affiliates ("PHI"). This Email is intended solely for the use of the person(s) to which it is addressed. If you are not an intended recipient, or the employee or agent responsible for delivery of this Email to the intended recipient(s), you are hereby notified that any dissemination,

4/10/2007

B - 4

distribution or copying of this Email is strictly prohibited. If you have received this message in error, please immediately notify the sender and permanently delete this Email and any copies. PHI policies expressly prohibit employees from making defamatory or offensive statements and infringing any copyright or any other legal right by Email communication. PHI will not accept any liability in respect of such communications.

4/10/2007



The Wall Street Journal Interactive Edition

December 4, 1998

Leader

# 'Cash Balance' Saves Millions, Hides Pitfalls From Workers

By Ellen E. Schultz and Elizabeth MacDonald
Staff Reporters of The Wall Street Journal

Largely out of sight, an ingenious change in the way big companies structure their pension plans is saving them millions of dollars, with barely a peep of resistance. Unless they happen to have a Jim Bruggeman on their staff.

Sifting through his bills and junk mail one day last year, Mr. Bruggeman found the sort of notice most people look at but don't spend a lot of time on: His company was making some pension-plan changes.



[1] The Ins and Outs of Cash-Balance Plans

The company, **Central & South West** Corp., was replacing its traditional plan with a new variety it said was easier to understand and better for today's more-mobile work force. A brochure sent to workers stressed that "the changes being made are good for both you and the company."

Alone among Central & South West's 7,000 employees, Mr. Bruggeman, a 49-year-old engineer in the Dallas utility's Tulsa, Okla., office, set out to discover exactly how the new system, known as a cash-balance plan, worked. During a year-long quest to master the assumptions, formulas and calculations behind it, Mr. Bruggeman found himself at odds with his superiors, and labeled a troublemaker. In the end, though, he figured out something about the new pension system that few other employees have noticed: For many of them, it is far from a good deal.

But it clearly was, as the brochure noted, good for the company. A peek at a CSW regulatory filing in March 1998, after the new plan took effect, shows that the company saved $20 million in pension costs last year alone. Other government filings revealed that whereas the year before, CSW had set aside $30 million to fund its pension obligations, after it made the mid-1997 switch it didn't have to pay a dime to fund the pension plan.

## Pension Light

The switch to cash-balance pension plans -- details later -- is the biggest development in the pension world in years, so big that some consultants call it revolutionary. Certainly, many call it lucrative; one says such a pension plan ought to be thought of as a profit center. Not since companies dipped into pension funds in the 1980s to finance leveraged buyouts have corporate treasurers been so abuzz over a pension technique.



Media

But its little-noticed dark side -- one that many companies don't make very clear to employees, to say the least -- is that a lot of older workers will find their pensions cut, in some cases deeply.

So far, only the most financially sophisticated employees have figured this out, because the formulas are so complex. Even the Labor Department and the Internal Revenue Service have trouble with them. So thousands of employees, while acutely aware of how the stock market affects their retirement nest eggs, are oblivious to the effect of this change.

One might get the impression, from the rise of 401(k) retirement plans funded jointly by employer and employee, that pensions are a dead species. In fact, nearly all large employers still have pension plans, because pulling the plug would be too costly; the company would have to pay out

all accrued benefits at once. Meanwhile, companies face growing obligations as the millions of baby boomers move into their peak pension-earning years.

Now, however, employers have discovered a substitute for terminating the pension plan: a restructuring that often makes it unnecessary ever to feed the plan again.

## Pitfalls for Employers

But this financially appealing move has its risks. The IRS has never given its blessing to some of the maneuvers involved. If employers don't win a lobbying battle currently being waged for exemptions from certain pension rules, some of these plans could be in for a costly fix.

In addition, the way employers are handling the transition could result in employee-relations backlashes as more and more older workers eventually figure out they are paying the price for the transformation of traditional pension plans.

In those traditional plans, most of the benefits build up in an employee's later years. Typical formulas multiply years of service by the average salary in the final years, when pay usually is highest. As a result, as much as half of a person's pension is earned in the last five years on the job.

With the new plans, everyone gets the same steady annual credit toward an eventual pension, adding to his or her pension-account "cash balance." Employers contribute a percentage of an employee's pay, typically 4%. The balance earns an interest credit, usually around 5%. And it is portable when the employee leaves.

For the young, 4% of pay each year is more than what they were accruing under the old plan. But for those nearing retirement, the amount is far less. So an older employee who is switched into a cash-balance system can find his or her eventual pension reduced by 20% to 50% or, in rare cases, even more.

This is one way companies save money with the switch. The other is a bit more complicated. Companies can also benefit from the way they invest the assets in the cash-balance accounts.

If the employer promised to credit 5% interest to employees' account balances, it can keep whatever it earns above that amount. The company can use these earnings to finance other benefits, to pay for a work-force reduction, or -- crucially -- to cover future years' contributions. This is why the switch makes pension plans self-funding for many companies.

Although employers can do this with regular pensions, the savings are greater and easier to measure in cash-balance plans. The savings often transform an underfunded pension plan into one that is fully funded. "Cash-balance plans have a positive effect on a company's profitability," says Joseph Davi, a benefits consultant at Towers Perrin in Stamford, Conn. They "could be considered a profit center."

## Motive for the Move

Employers, however, are almost universally reticent about how they benefit. "Cost savings were not the reason the company switched to a cash-balance plan," says Paul Douty, the compensation director at Mr. Bruggeman's employer, CSW. Sure, the move resulted in substantial cost savings, he says, but the company's goal was to become more competitive and adapt to changing times. Besides, he notes, the $20 million in pension-plan savings last year were partly offset by a $3 million rise in costs in the 401(k); the company let employees contribute more and increased its matching contributions.

There is another reason some employers like cash-balance plans: By redistributing pension assets from older to younger workers, they turn pension rights -- which many young employees ignore, since their pension is so far in the future -- into appealing benefits today. At the same time, older workers lose a financial incentive to stay on the job, since their later years no longer can balloon the pension.

Some pension professionals think companies should be more candid. "If what you want to do is get rid of older workers, don't mask it as an improvement to the pension plan," says Michael Pikelny, an employee-benefits specialist at Hartmarx Corp., an apparel maker in Chicago that decided not to install a cash-balance plan.

B - 7

Under a Microscope

Most employees aren't equipped to question what employers tell them. But Mr. Bruggeman was. He had a background in finance, his hobby was actuarial science, he had taken graduate-level courses in statistics and probability, and he knew CSW's old pension plan inside and out. So when the company announced it was converting to a cash-balance plan last year, he began asking it for the documents and assumptions he needed to compare the old pension to the new one.

With each new bit of data, he gained another insight. First, he figured out that future pension accruals had been reduced by at least 30% for most employees. CSW got rid of early-retirement and other subsidies and reduced the rates at which employees would accrue pensions in the future.

Employees wouldn't necessarily conclude this from the brochures the human-resources department handed out. Like most employers that switch to cash-balance plans, CSW assured employees that the overall level of retirement benefits would remain unchanged. But a close reading of the brochure revealed that this result depended on employees' putting more into their 401(k) plans, gradually making up for the reduction in pensions.

At a question-and-answer session on the new plan before it was adopted, Mr. Bruggeman spoke up and told co-workers how their pensions were being reduced. The next day, he says, his supervisor in Tulsa came to his office and told him that CSW management in Dallas was concerned that his remarks would "cause a class-action suit" or "uprising," and said he shouldn't talk to any other employees. He says the supervisor, Peter Kissman, informed him that if he continued to challenge the new pension plan, CSW officials would think he wasn't a team player, and his job could be in jeopardy.

Asked about this, Mr. Kissman says: "In my department I would not tolerate employee harassment. I believe the company feels the same way. Past that, I really can't speak to this issue. It's being investigated by the company."

A Few Sweeteners

Employers, aware that switching to cash-balance plans can slam older workers, often offer features to soften the blow. They may agree to contribute somewhat more than the standard 4% of pay for older employees, or they may provide a "grandfather clause." CSW offered both options, saying employees 50 or older with 10 years of service could stay in the old plan if they wished. Mr. Bruggeman, a 25-year veteran, was just shy of 49. He calculated that people in his situation would see their pensions fall 50% under the new plan, depending on when they retired.

Mr. Bruggeman told company officials that the plan wasn't fair to some long-term employees. Subsequently, he says, in his November 1997 performance evaluation, his supervisor's only criticism was that he "spends too much time thinking about the pension plan." A CSW official says the company can't discuss personnel matters.

What bothered Mr. Bruggeman even more was his discovery of one of the least-known features of cash-balance plans: Once enrolled in them, some employees don't earn any more toward their pension for several years.

The reasons are convoluted, but in a nutshell: Most employees believe the opening balance in their new pension account equals the credits they've earned so far under the old plan. But in fact, the balance often is lower.

When employers convert to a cash-balance plan, they calculate a present-day, lump-sum value for the benefit each employee has already earned. In Mr. Bruggeman's case, this was $352,000 -- something he discovered only after obtaining information from the company and making the calculations himself. Yet Mr. Bruggeman's opening account in the cash-balance plan was just $296,000, because the company figured it using different actuarial and other assumptions.

This is generally legal, despite a federal law that bars companies from cutting already-earned pensions. If Mr. Bruggeman quit, he would get the full $352,000, so the law isn't violated. But if he stays, it will take several years of pay credits and interest before his balance gets back up to $352,000.

'Wearaway'

Mr. Douty says this happened to fewer than 2% of workers at CSW. But at some companies that switch to cash-balance

plans, far more are affected. At AT&T Corp., which adopted a cash-balance plan this year, many older workers will have to work three to eight years before their balance catches up and they start building up their pension pot again. "Wearaway," this is called. Only if an employee knows what figures to ask for can he or she make a precise comparison of old and new benefits.

Indeed, the difficulty of making comparisons has sometimes been portrayed as an advantage of switching to cash-balance plans. A partner at the consulting firm that invented the plans in the 1980s told a client in a 1989 letter: "One feature which might come in handy is that it is difficult for employees to compare prior pension benefit formulas to the account balance approach."

Asked to comment, the author of that line, Robert S. Byrne of Kwasha Lipton (now a unit of PricewaterhouseCoopers), says, "Dwelling on old vs. new benefits is probably not something that's a good way to go forward."

At one company, employees did know how to make comparisons. When Deloitte & Touche started putting a cash-balance plan in place last year, some older actuaries rebelled. The firm eventually allowed all who had already been on the staff when the cash-balance plan was adopted to stick with the old benefit if they wished.

## Struggle at Chase

At **Chase Manhattan** Corp., two executives in the private-banking division hired an actuary and calculated that their future pensions had fallen 45% as a result of a conversion to a cash-balance plan by Chase predecessor Chemical Bank. "I would have had to work about 10 more years before I broke even and got a payout equal to my old pension," says one of the executives, John Healy, now 61.

He and colleague Nathan Davi say that after seven years of their complaints, Chase agreed to give each a pension lump sum of about $487,000, which was roughly $72,000 more than what they would have received under the new cash-balance plan. Although a Chase official initially said the bank had "never given any settlement to any employee over the bank's pension plans," when told about correspondence about the Healy-Davi case, Chase said that a review had determined that about 1,000 employees could be eligible for additional benefits. "We amended the plan so that it would cover all similarly situated employees," a spokesman said.

How many quiet arrangements have been reached is unknown. But employees are currently pressing class-action suits against **Georgia-Pacific** Corp. and **Cummins Engine** Co.'s Onan Corp. subsidiary, alleging that cash-balance plans illegally reduce pensions. (Both defendants are fighting the suits.) Judges have recently dismissed similar suits against **Bell Atlantic** Corp. and **BankBoston** N.A.

## Concern at the IRS

Not aware of any of this ferment, Mr. Bruggeman in August 1998 filed his multiple-spreadsheet analysis of the CSW cash-balance plan with the IRS and the Labor Department, asking them for a review. Soon after, he says, a manager in CSW's benefits department called him in and "wanted to know what it would take for me to drop all this." The answer wasn't to be "grandfathered" and exempted from the new plan. "I told him all I want is for the company to ... be fair to employees," he says. "It's the principle of the thing."

The manager couldn't be reached for comment, but a CSW official says the company takes complaints "very seriously and they're thoroughly investigated. In every part of this type of investigation an employee is interviewed by a company representative, and in every initial interview the employee is asked for suggestions on what might be a preferred solution."

Even without Mr. Bruggeman's input, the IRS has a lot of cash-balance data on its plate. The agency is swamped with paperwork from hundreds of new plans seeking its approval, and applications are piling up. The delay is due in part to concern at the IRS that such plans may violate various pension laws, according to a person familiar with the situation. Meanwhile, the consulting firms that create the plans for companies are lobbying for exemptions from certain pension rules.

They say they aren't worried. That's because "companies who now have these plans are sufficiently powerful,

B - 9

sufficiently big and have enough clout that they could get Congress to bend the law ... to protect their plans," says Judith Mazo, a Washington-based senior vice president for consulting firm Segal Co. Regulators, meanwhile, are playing catch-up. Bottom line, Ms. Mazo says: "The plans are too big to fail."

**URL for this Article:**
http://interactive.wsj.com/archive/retrieve.cgi?id=SB912665592910209500.djm

**Hyperlinks in this Article:**
(1) http://interactive.wsj.com/archive/retrieve.cgi?id=SB912729707109952500.djm

Copyright © 1998 Dow Jones & Company, Inc. All Rights Reserved.

Printing, distribution, and use of this material is governed by your Subscription Agreement and copyright laws.

For information about subscribing, go to http://wsj.com

Close Window



☒ The Wall Street Journal Interactive Edition

December 18, 1998

## Mutual Funds

# Longtime Employees Face
# A Pension-Benefit 'Plateau'

By ELLEN E. SCHULTZ
Staff Reporter of THE WALL STREET JOURNAL

On Jan. 1, longtime employees at a number of large companies will temporarily cease to earn new pension benefits. For the lucky, this no-benefits period will last as little as one year. For others, it could be a decade or more.

These employees work for employers converting traditional pension plans to new "cash balance" retirement plans, under which an employer creates hypothetical employee accounts to which the employer contributes a percentage of the employee's pay each year, as well as interest.

But the pain of conversion to these little-understood hybrid plans won't be shared across the board: Younger employees and recently hired workers will earn pension benefits right away.

All this will come as a surprise to many people, even at the hundreds of companies that already have made this pension shift. Cash-balance plans are growing popular with employers who see drawbacks to traditional pension plans, which pay retiring employees designated monthly amounts. Upon eliminating a so-called defined-benefit plan and adopting a cash-balance one, an employer determines the value of benefits built up by his employees under the traditional plan, and places some, or all, of that value into individual employee accounts. Those individual accounts then grow, courtesy of pay and interest credits made by the employer, over the years.

Readers with comments or questions about cash-balance pension plans can write to Ellen Schultz at editors@interactive.wsj.com[1]

While these individual accounts can be taken with an employee when changing jobs, what is riling some who've looked closely at this newfangled plan is that employers have a lot of leeway in how they credit workers for the value of their built-up pension benefits. Older workers, in particular, often aren't credited for the full value of what they've already earned, and the result is that they can work years before earning pension benefits above and beyond what they had under the traditional plan.

☒ Pension 'Plateau'

"It would be nice if they told people they will work a number of years" without benefit of improving their pension standing, says an employee at Empire Blue Cross Blue Shield, in Albany, N.Y., which adopts a cash-balance plan in January. The 25-year Empire veteran, who doesn't wish to be identified, calculated she must work seven years before earning new pension benefits. An Empire spokeswoman says employees will receive detailed information soon about their status.

Employers aren't eager to tell employees that their pension accrual might cease for a while, because they figure workers will get pretty mad if they find out. Which is true.

When Ispat Inland Inc., a steel company in East Chicago, Ind., announced last month it would shift to a cash-balance plan Jan. 1, Paul Schroeder, a 44-year-old engineer with 19 years at the company, calculated it would take nine to 13 years before he acquired additional pension benefits. After some Ispat employees confronted management last week, employees received a communication from the human-resources department confirming "the vast majority would experience a plateau in the growth of their pension benefit."

What's the size of this plateau? Five to 13 years for some, according to an Ispat spokesman. Facing a 13-year plateau, for example, would be a 40-year-old with 22 years of service, earning $45,000.

Here are answers to commonly asked questions about opening-account balances:

### What happens when an employer converts to a cash-balance plan?

Employers generally determine a value of each employee's existing pension and put this into an individual "account." Then, each year, the employer credits the account with a percentage of pay (often 4%) and interest, often 5%.

### Is the starting account balance the equivalent of the old pension benefit?

In many cases, no. The actual value of your old pension benefit might be $50,000, but your opening balance might be, say, $35,000. As a result, you wouldn't actually earn a new pension benefit until the pay and interest credits bring the account to $50,000. (The ranges vary.)

Some employers call this a "plateauing" of your pension; actuaries call it "wear away," because you wear away the old benefit before earning a fresh one.

### Is this legal?

By law, an earned pension can't be taken away or reduced. But a low opening balance doesn't violate this law, because, if you quit your job before your pension benefit started growing again, you would receive the full $50,000 in the above example.

It is legal for employers to establish opening balances using whatever criteria they deem appropriate. In a session in March held by the Conference of Consulting Actuaries in Washington, a panel of pension experts joked that the starting balance could be based on shoe size or license-plate numbers.

Of course, employers use more rational factors when calculating opening balances. One with a big punch: excluding the value of early-retirement subsidies. "It effectively means [affected employees] aren't getting an accrual, and they're angry, legitimately angry," says William Sohn, a cash-balance expert with Buck Consultants in New York. But, from an employer's perspective, such subsidies aid only early retirees, so removing them seems fair, he adds.

### Don't employers have to tell you that your opening balance is lower?

Good question. Most employers aren't very clear. The information given by Empire Blue Cross Blue Shield to employees says: "Your starting account balance represents the current value of the benefit you have earned as of Dec. 31, 1998." In fact, balances will be lower for employees like the one quoted above.

The Empire employee complains she and a colleague haven't been able to obtain the information needed to calculate

exactly how long their wear-away period is. Among other things, they'd like to figure out if it makes sense to look for jobs elsewhere with better benefits.

An Empire spokeswoman says the company will tell employees in March what old benefits are worth and what opening balances will be. She points out that the company has increased its matching contribution to the 401(k) plan to help employees save more.

### How can I find out if I'm affected?

Federal law entitles you to request a statement of your "vested accrued benefit," expressed as a single-life age 65 annuity, as well as in optional forms such as lump sum. You may do this once every 12 months, in writing, and employers have 30 days to respond. Compare this with your account balance to see where you stand.

\* \* \*

### Money-Fund Assets Declined In the Latest Week

Money-market mutual-fund assets fell $7.59 billion to $1.393 trillion in the week ended Wednesday from a revised $1.401 trillion, the Investment Company Institute said.

The trade group recently changed the way it reports fund assets. The group previously tracked assets by retail and institutional funds. However, because institutions often invest in retail funds and individuals often invest in institutional funds, the group now tracks money-market fund assets by share classes. Retail-class shares often have lower minimum-investment requirements and higher annual expenses than institutional-class funds.

Assets of the 921 retail-class shares increased $1.8 billion to $825.49 billion, the trade group said. Among retail-class shares, assets of the 570 taxable shares rose $1.68 billion to $678.9 billion, while assets of the 351 tax-exempt shares increased $118.3 million to $146.59 billion.

Assets of the 750 institutional-class shares decreased $9.39 billion to $567.76 billion. Among institutional-class shares, assets of the 587 taxable shares fell $9.24 billion to $519.14 billion, while assets of the 163 tax-exempt shares fell $153.9 million to $48.61 billion.

**URL for this Article:**
http://interactive.wsj.com/archive/retrieve.cgi?id=SB913943019539981000.djm

**Hyperlinks in this Article:**
(1) mailto:editors@interactive.wsj.com

Copyright © 1998 Dow Jones & Company, Inc. All Rights Reserved.

Printing, distribution, and use of this material is governed by your Subscription Agreement and copyright laws.

For information about subscribing, go to http://wsj.com

Close Window



The Wall Street Journal Interactive Edition

December 4, 1998

**Mutual Funds**

# Employees Will Need to Know Traits of 'Cash-Balance' Plan

By ELLEN E. SCHULTZ
Staff Reporter of THE WALL STREET JOURNAL

It's the biggest thing to happen to your retirement savings since the rise of the 401(k) plan: a hybrid pension, the most common of which is called a "cash-balance plan." And even if you never gave your pension much thought before, you might want to now.

If you're in your 20s or 30s, a cash-balance account can enable you to start building up thousands of dollars of retirement money that you can take with you when you change jobs.

But if you're in your 40s, 50s or 60s, the switch to a cash-balance plan probably leaves you worse off: Your pensions have been reduced, sometimes substantially. Also you may not be earning a pension in the initial years after the cash-balance plan is adopted -- and you won't even know it.

[1]Readers with questions or comments about cash balance and other hybrid pension plans can write to Ellen Schultz at editors@interactive.wsj.com[2].

You may already have a hybrid pension plan if you work at **MCI WorldCom**, **American Express** Co., or one of the more than 300 large employers that have switched from traditional pensions. Within a decade, pension experts believe, most large companies will probably have converted their traditional pension plans to cash-balance type plans. Pension plans run by unions and government also are thinking of making the switch. And even the giant 401(k) administrators, including Fidelity Investments and Vanguard Group, are getting into the action, handling the record-keeping for a growing number of companies with cash-balance plans.

[3]'Cash Balance' Saves Millions, Hides Pitfalls From Workers

[4]Money-Fund Assets Climbed $12.68 Billion in Latest Week

However, employers are adopting these complex hybrid pension plans so quickly that regulators haven't kept up. And employees have nowhere to turn for unbiased information. The Labor Department, consumer groups, and even the American Association of Retired Persons are only just beginning the task of trying to figure out how these plans work, and how they affect employees.

Short of hiring an actuary, you probably can't figure out whether you're better or worse off if you're a veteran at your company. Still, with the information below, you'll be able to ask your employer better questions about how your benefits are being determined.

**How does a cash-balance plan work?**

Employers make a hypothetical contribution based on a percentage of your pay, typically 4%, to a hypothetical account each year. Your account "earns" a hypothetical annual interest credit, often tied to the 30-year Treasury rate. For example, if your salary is $40,000 a year, your "account" will receive a contribution of $1,600. After a year, your account balance will be given an interest credit, of typically 5%.

**Can I take the money with me?**

At most companies, you can roll the balance into an IRA when you change jobs. Some employers have restrictions. At

AT&T, departing workers can take, in a lump sum, an amount no greater than the equivalent of one year's salary. So, if someone makes $70,000 and his account balance is $150,000, he will have to leave $80,000 in the plan, and will ultimately receive it as a monthly payment at age 65 when he retires. At Boeing, workers who leave must wait until they are age 65 -- and then must receive an annuity.

**I'm in my 30s. Is this a good deal for me?**

For most younger employees, cash-balance plans are great. Dan Stier, a 30-year-old product manager at AG Communication Systems in Phoenix, figures he will have more than $30,000 in the cash-balance account after five years, when he expects he'll probably change jobs. "I never figured I'd be on the job long enough to take advantage of a pension," he says.

Still, younger workers need to realize that cash-balance plans are no panacea for job-hopping: Most have five-year vesting, so if you leave before then, you don't get a dime. What's more, the widely touted "portability" isn't really a new advantage: Most employers with traditional pension plans automatically cash out departing employees with less than $5,000 in accrued pension benefits, a group that typically includes younger and lower-paid workers.

**What about people in their 40s, 50s and 60s?**

Switching out of a traditional pension into a cash-balance plan after years on the job can reduce your pension from 20% to 50% or even more.

Here's why: With a traditional pension, your benefit rises sharply during your later years with a company. The formulas generally multiply your years of service by your highest final average pay. As a result, you might be earning half your pension in your last five to 10 years on the job.

When you switch to a cash-balance plan, you lose those later years of big accruals. An oversimplified way of looking at it: For someone in his 60s, it's as if instead of getting the equivalent of 50% of pay each year credited to his pension, he will get 4%.

**What about transitional benefits for older workers?**

To soften the blow to older workers who are switched out of traditional pensions in the later years, some employers increase the annual pay credit for older employees. Someone in his 20s might get 2% of pay credited to his cash-balance account, while a person in his 60s will receive 8%. That's done because a 25-year-old has decades in which to earn a compounded return on his money, so a dollar is worth more to him than to someone older. But higher pay credits don't come close to replacing the value of the old pension for older employees.

Some employers allow certain older workers to remain in the old pension until they retire, or at least for several years. But if you just miss the cutoff, you're out of luck. Other companies give certain older workers a boost in their opening account balances.

**How is my opening account balance determined?**

With a cash-balance plan, you get an account statement that shows what your hypothetical balance is. At Boeing, which is adopting a cash-balance plan for salaried workers in January, workers will start with an opening account balance of zero. Each year, the pay and interest credits will build up. (Meanwhile, the old pension amounts people earned before the conversion will be kept in a different account, which earns interest.) This is the most straightforward way to establish an opening account balance.

Other companies do it differently. They figure out the value of the pension you've already earned in the old plan. They then calculate what this would be worth if it were turned into a lump sum. This amount then becomes your opening account balance.

Most employees think their opening account balances are the equivalent of their old pension benefit. But many employers give you a lower opening account balance. If your old pension lump sum is worth $50,000, your opening

balance might be only $37,000.

**Do I suffer financially if my opening account balance is smaller?**

If you were to leave your job soon after your company converts to a cash-balance plan, you would be entitled by law to receive the larger amount. (A pension you have already earned can't be taken away). So, even if your opening account balance is $37,000, if your old pension benefit is worth $50,000, you will have a lump sum of $50,000 when you leave.

However, if you don't leave, you won't be earning a new pension benefit until your cash-balance account increases to the level of your old benefit. This is impossible to see. Your account statement will show a steady increase, but since you don't know that your old benefit might have been worth more, you aren't aware that you're still just catching up to the benefit you have already earned. This is called "wear away," because you are wearing away your old benefit before you begin to earn a new benefit.

## Questions You Need to Ask

Four things to find out about your cash balance plan:

- **Has your future pension accrual been reduced?**
  If it has been, you will have received a "204(h) notice," which employers are required by law to give you.

- **Do you qualify for "transitional benefits" for older workers?**
  Ask for examples of how people with various ages and years of service will be affected.

- **Is your opening account balance lower than what your old pension benefit is worth?**
  Ask what your lump sum would be if you left your job. If it's higher than your cash balance, you're not earning a benefit yet.

- **Has your 401(k) improved?**
  Employers often increase the matching contributions when adopting cash-balance plans. You will need to contribute more to make up for the reduction in your pension.

At some companies, this "wear-away period" is only a year or so. But at AT&T, which converted to a cash-balance plan last January, it can take years before older workers earn new benefits. This is partly why more than 15,000 managers accepted an early-retirement offer made soon after the conversion to a cash-balance plan. AT&T communicated this clearly to its employees, but most companies don't.

If your account balance is lower than your old legally protected benefit, then you might be pleased to discover that if you were to leave your job soon after the conversion, you would receive a larger amount than what your cash-balance account statement shows.

On the other hand, if you stay on the job, you won't be earning a benefit for a while, so you need to boost your savings to make up for it.

To find out what your old benefit was worth, ask your employer what the benefit would have been if you left your job the day after the pension converted to a cash-balance plan. (Or, in other words, ask what your "actuarial equivalent of the frozen accrued benefit" would be, using all the subsidies and assumptions in the old plan, as the law requires).

\* \* \*

**NO GAIN, NO PAIN:** While mutual funds that charge a performance fee aren't unusual, the Royce Funds in New York has just introduced a product that will only charge a performance fee if it makes a profit. The Royce Select Fund, which

will invest in small and micro-capitalization companies, says it will waive its performance fee if it produces a loss. As additional incentive to start, Charles Royce, the fund's manager, says he will invest $1 million in the new fund and will waive the performance fee until the vehicle achieves a 15% total return.

The fund isn't open to riff-raff, however. Only wealthy individuals with a net worth of $1.5 million or more will be permitted to invest in Royce Select Fund. A minimum investment of $50,000 is required. The fund intends to close once it reaches $150 million in assets.

Ronald Roge, an investment adviser in Bohemia, N.Y., says the product is attractive because it "gives the fund manager the same incentive to want to see the fund achieve as its clients."

*-- Pui-Wing Tam*

**PUBLIC UPGRADE:** Fidelity Investments wants its lower-profile, public-sector clients to get online, too.

The giant mutual-fund and brokerage company, which is making greater use of the Internet in its core businesses, said Thursday it has launched a new Web site called SLAMNet for clients in its State and Local Asset Management program. The site allows treasurers and investment managers of public bodies -- ranging from states to local school districts -- to buy and redeem Fidelity money-market funds for their accounts online.

Previously, managers could move funds electronically through a special software package, says Thomas L. Hughes Jr., a Fidelity senior vice president. But the new site also integrates market news, data and information about Fidelity funds and fund managers, cutting down on the amount of time public officials spend researching their investments.

*-- Rebecca Buckman*

**URL for this Article:**
http://interactive.wsj.com/archive/retrieve.cgi?id=SB912729707109952500.djm

**Hyperlinks in this Article:**
(1) mailto:editors@interactive.wsj.com
(2) mailto:editors@interactive.wsj.com
(3) http://interactive.wsj.com/archive/retrieve.cgi?id=SB912665592910209500.djm
(4) http://interactive.wsj.com/archive/retrieve.cgi?id=SB912731089759834500.djm

Copyright © 1998 Dow Jones & Company, Inc. All Rights Reserved.

Printing, distribution, and use of this material is governed by your Subscription Agreement and copyright laws.

For information about subscribing, go to http://wsj.com

Close Window

=

# Redacted

Redacted

Redacted

Electronic InSight                To All ADMIN PO Users, All District PO Users, All MAYS LANDING PO Users,
                                  p=CONECTIV;a=CONECTIV;c=US;dda:ZID=Irena.Borre(s)Conectiv.com;
12/22/1998 05:54 PM               cc
                                  Subject EXTRA – Benefits policies announced

ELECTRONIC INSIGHT EXTRA
ATTN: CONECTIV MANAGEMENT EMPLOYEES
IMPORTANT BENEFITS INFORMATION

The human resources department released two documents today to help explain
the benefits for management employees for the upcoming year. Both are attached
to this e-mail message.

The first explains the benefits package for Conectiv management employees.
Some of these benefits are new to Conectiv and may be revisited and revised as
we go forward. The second details the cash-balance pension plan. If you have
any questions regarding these documents, please contact the human resources
service center.

If there are Conectiv management employees in your area who do not have
e-mail, please print each a copy of each of these important documents.


Larry Boehm
Conectiv Public Affairs
Phone: 8-220-3024
Fax:  8-220-3141

This Email message and any attachment may contain information that is proprietary, legally privileged, confidential
and/or subject to copyright belonging to Pepco Holdings, Inc. or its affiliates ("PHI"). This Email is intended solely for
the use of the person(s) to which it is addressed. If you are not an intended recipient, or the employee or agent
responsible for delivery of this Email to the intended recipient(s), you are hereby notified that any dissemination,
distribution or copying of this Email is strictly prohibited. If you have received this message in error, please
immediately notify the sender and permanently delete this Email and any copies. PHI policies expressly prohibit
employees from making defamatory or offensive statements and infringing any copyright or any other legal right by
Email communication. PHI will not accept any liability in respect of such communications.

December 18, 1998

TO:     CONECTIV MANAGEMENT EMPLOYEES

FROM:  Human Resources Performance Improvement

### 1999 CONECTIV MANAGEMENT EMPLOYEE POLICIES

Listed below are the 1999 policies for Conectiv Management Employees. These policies are intended for all Conectiv Management employees (defined as those employees who are enrolled in Conectiv Flex Benefits) regardless of whether they were previously with Atlantic Energy or Delmarva. Compensation and Benefits will be reviewing Paid Time Off (PTO) to determine future direction and will communicate the results.

### 1999 Holidays - Effective 1/1/99

Below are the Conectiv 1999 Management Holidays. Management employees can also schedule 4 floating holidays (includes previous Birthday Holiday). Employees will not be paid for any unused floating holidays and are not permitted to carry over these holidays.

| Holiday | Observed On: |
|---|---|
| New Year's Day | Friday, January 1 |
| Memorial Day | Monday, May 31 |
| Independence Day (Sunday 7/4) | Monday, July 5 |
| Labor Day | Monday, September 6 |
| Thanksgiving Day | Thursday, November 25 |
| Friday After Thanksgiving | Friday, November 26 |
| Christmas Eve | Thursday, December 23 |
| Christmas Day | Friday, December 24 |
| | 4 Floating Holidays (to be determined by management discretion) |

### 1999 Vacation Policy - Effective 1/1/99

♦ Employees hired between January 1 and June 30 will receive:
  **One week of vacation after six months of service.**

♦ Employees hired between July 1 and December 31 will receive:
  **Two weeks of vacation after six months of service**

1

Prior years of service with Delmarva or Atlantic Energy count toward your vacation entitlement. Vacation time may be taken in hourly increments. Currently employees cannot buy or sell vacation time. Employees are eligible to receive vacation as of January 1 of the year in which their service anniversary occurs as follows:

| Yrs. Of Service | Paid Vacation | Yrs. Of Service | Paid Vacation |
|---|---|---|---|
| 1 | 2 weeks | 22 | 4 weeks + 3 days |
| 5 | 2 weeks + 1 day | 23 | 5 weeks |
| 6 | 3 weeks | 27 | 5 weeks + 3 days |
| 14 | 3 weeks + 1 day | 30 or more | 6 weeks |
| 15 | 4 weeks | | |

Banked Vacation (former Delmarva Power management employees): Beginning in 1999, employees will no longer be able to bank vacation weeks for retirement. Any arrangements made before Jan. 1 will be honored. If you have any extra vacation weeks earned in 1998, and you would like to bank them, please contact the Human Resources Service Center by December 31, 1998.

Carryover Vacation (all management employees): If you don't want to use all of your vacation in one year, you may carry over time to the next year. The amount you carry over must be used before regular vacation and cannot exceed your current vacation allotment. Vacation may be carried over after one year of service. Carryover vacation should be scheduled with your manager's approval. You do not have to call Human Resources.

Vacation Eligibility for Part-Time Employees

·    Employees working part-time (less than 40 hours in a work week) are eligible for one week's vacation (40 hours) after working six months.

Holidays For Part-Time Employees

Part-time employees will be paid only if the Holiday is part of their normally scheduled work week. They are also eligible to receive 16 hours as their Floating Holiday entitlement.

**Long Term Disability (LTD)**

LTD income is provided to employees in the event they are totally disabled by injury or sickness on or off the job. If eligible, employees are automatically covered on the first day of work. Conectiv currently pays the entire cost of benefits. LTD is a termination benefit. Eligibility is determined if an employee has been "totally disabled" for the latter of three consecutive months or the exhaustion of sick leave.

Amount of Benefits

LTD benefits pay 66-2/3% of the employee's base monthly salary that was paid at the time the disability occurred. This payment includes disability and retirement payments the employee and family receive from Social Security, Workers' Compensation, retirement plan benefits, earnings continuation from any other employer, group insurance benefits, and other similar benefits. Regardless of other income, the minimum benefit is $50. LTD payments are not adjusted for cost of living increases.

Applying for Benefits

Should disability occur, a claim must be filed within 90 days after total disability begins. Proof of disability must be filed within 90 days after the claim forms are sent. Employees may be required from time to time to continue to submit proof while receiving benefits. To apply or for plan details, call Disability Management at 1-800-204-6141.

**Family Medical Leave Act**

The Family Medical leave Act provides unpaid leave for personal serious medical conditions, caring for family members with serious medical conditions, or for the birth or adoption of a child. The Act provides for 12 weeks in a rolling 12-month period. This allotment can be taken in hours, days, weeks, or in total.

Effective 1/1/99 Conectiv's Family Medical Leave policy will run concurrent with sick leave (for personal illness qualified events). A publication is being developed with additional information on the Act, how to track time, time coding, and administration. In the meantime if you need specific, immediate guidance, please call Disability Management at 1-800-204-6141 or your HR Business Partner.

**Sick Leave**

Employees are eligible for sick leave coverage as soon as employment begins. In the event an employee is temporarily disabled, except for an illness or accident covered by Workers' Compensation, he/she will receive full pay according to the following schedule:

| Years of Service | Days of Sick Leave Per Calendar Year |
|---|---|
| Less than 5 | 50 days |
| 5 but less than 10 | 100 days |
| 10 but less than 20 | 110 days |
| 20 but less than 30 | 120 days |
| 30 or more | 130 days |

3

The amount of sick leave may be extended upon recommendation of line management and approval by Compensation and Benefits. Employees will be required to provide physician notes for extended absences.

### Jury Duty

In 1999, if an employee is called to jury duty or subpoenaed as a witness, employees are eligible to keep the payment they receive while serving on jury duty in addition to their regular pay.

### Perfect Attendance Award

Employees are eligible to receive a Perfect Attendance Award either in the form of cash or one day off with pay. Two levels of awards are granted, depending on the amount of perfect attendance. For one year of perfect attendance, the award is either 1 personal day off with pay or $150 in cash (less taxes). For multiple years, the award is either 1 personal day off with pay plus $100 (less taxes) or $250 (less taxes). If employees choose a cash award, the amount will be included in their regular paycheck. Awards are processed by the Human Resources Service Center.

Perfect Attendance means no full days off for illness, occupational injury, or full days off without pay. This revised program (outlined above) begins in 1999. Any perfect attendance awards earned in 1998 from previous company plans (AE or DP), will be honored in 1999. Employees with multiple years under the old programs will be grandfathered into the new program.

### Funeral Leave

If there is a death in the immediate family, employees are eligible to receive up to four days of paid leave. Depending on circumstances, leave may be extended, with line management's approval.

### Leave of Absence

With line management's approval, employees may be granted a leave of absence, without pay, of one week for each full year of service.

Medical, Dental, Vision, and Life Insurance coverage is continued during a leave of absence, provided payments for these benefits are made by the employee. For more details, contact the Human Resources Service Center at 1-800-201-4718.

B - 24

## Military Duty

Employees are eligible to receive military leave each calendar year for the purpose of attending training sessions of the National Guard or Reserves. Employees will receive the difference between base pay and military pay for up to two weeks each year.

## 1999 Conectiv Severance Plan

### Eligibility

- Conectiv employees whose employment is severed as a result of elimination of his/her position or consolidation of his/her position with another position which results in a layoff are eligible benefits under the Severance Plan. Eligibility includes Management employees working as regular full-time employees, excluding part-time or temporary employees, contract employees employed for a specific term or limited contract, or students hired in conjunction with a work-study program.

### Plan Provisions:

- 2 weeks of pay for each full year of continuous service, with a minimum of 4 weeks pay.

- 2 months of Company-paid COBRA benefits if less than 5 full years of continuous service, 6 months after 5 years of service.

- 2 months of Company-sponsored career counseling if less than 5 full years of continuous service, 6 months after 5 years of service.

- Years of service will be determined using the same approach that is used for pension purposes under the Conectiv Cash Balance Plan.

- The amount of severance payment will be based upon the employee's base salary. Forms of variable pay (incentives, spot awards, or other non-base amounts) are excluded.

Questions on any of the above policies should be directed to your respective HR Business Partner or the Human Resources Service Center at 1-800-201-4718.

Kld:1999pol.doc-12/21/98

5

December 21, 1998

Dear Conectiv Management Employee,

Beginning January 1, Conectiv will switch to a "cash balance" pension plan as announced earlier this year. In order to provide you with your opening balance, the Company will use your 1998 earnings, which will not be finalized until late January, 1999. At the same time as we are moving to the cash balance pension plan, the Company is outsourcing pension administration to the Vanguard Group, which is also the administrator of Conectiv's 401K plans and PAYSOP plans. Vanguard will verify the conversion calculations, and will then distribute your individual account balances by the end of the second quarter of 1999.

Until individual statements can be prepared, we have created two tables of example calculations so employees can estimate their opening balances. Remember that these tables are examples only, and that your actual cash balances will reflect your particular circumstances. There will be more detailed communications in the Spring. If you have general questions, please hold them until these communications are available. We have included in this letter answers to some general questions about the new program.

If you are at retirement age and are planning to retire in the first quarter of 1999, please call the Human Resources Strategic Business Partner for your area: Pat Duffy, Energy Delivery & Services, at 220-3155; Harold DeJarnette, Supply, at 220-3252; Ben Wilkinson, Shared Services, at 220-3047; and Dave Motil at 250-6020.

We hope this preliminary information is helpful to you.

**Q. What is a "cash balance" pension plan?**
A. Each year the company credits your individual pension account with a cash contribution equal to a percentage of your total pay, including overtime and bonus. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the current cash value of your account is yours. If you leave Conectiv after you have completed five years of service and are vested, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years. At retirement, you can take the money in a lump sum and roll it over, tax deferred, into the investment vehicle you select. Or you can elect to receive lifetime monthly payments, either for yourself, or for you and your spouse. Each year, you'll receive a statement of your pension account showing all transactions and its total balance.

**Q. What are the key components of Conectiv's new cash balance pension plan?**
A. Please see the accompanying "Update of Conectiv Facts," below.

**Q. What are the advantages of cash balance?**
A. Your cash balance pension account is completely portable. In addition, the plan contains increased "beneficiary" benefits: the full value of the account transfers to your spouse, family, or estate in the event of your death. Employees will receive annual statements showing the actual current value of their pension account. These features mean that the cash balance pension plan helps to meet more diverse needs of today's and tomorrow's employees.

**Q. Are there some grandfathering provisions and other transition rules?**
A. You may recall that, as part of the approach taken by management to provide minimal impact on the existing workforce, extensive protections were woven into the new plan for employees approaching the retirement age. Any employee aged 50 or with 20 years of service as of December 31, 1998 is "grandfathered" for ten years after January 1, 1999. This means that when a grandfathered participant retires, the pension is computed both under the old formula and the new one, and the participant receives the greater amount. In addition, retirees choosing the old formula will be able to take a lump-sum distribution of their pension during the 10 year period. These provisions are for the next ten years when the benefits under the old plan are calculated, frozen, and compared at retirement to the cash balance amounts to determine the best benefit for the employee. In addition to the grandfather provision, favorable transition rules apply for longer service employees. This means those employees will get extra annual credits to their accounts during the ten year period.

**Conectiv Cash Balance Retirement Plan**
**January 1, 1999 Account Balance Estimate**
**(For employees formerly covered by the ACE Plan)**

| Average Five Year Earnings | Age/Service | | | | | | |
|---|---|---|---|---|---|---|---|
| | 35/10 | 40/15 | 40/20 | 45/20 | 50/20 | 50/25 | 55/25 |
| $30,000 | 14,600 | 30,800 | 41,100 | 57,600 | 80,800 | 101,000 | 141,700 |
| $40,000 | 19,500 | 41,100 | 54,800 | 76,800 | 107,700 | 134,700 | 188,900 |
| $50,000 | 24,400 | 51,300 | 68,500 | 96,000 | 134,700 | 168,300 | 236,100 |
| $75,000 | 36,600 | 77,000 | 102,700 | 144,000 | 202,000 | 252,500 | 354,200 |

**Conectiv Cash Balance Retirement Plan**
**January 1, 1999 Account Balance Estimate**
**(For employees formerly covered by the DP & L Plan)**

| Average Five Year Earnings | Age/Service | | | | | | |
|---|---|---|---|---|---|---|---|
| | 35/10 | 40/15 | 40/20 | 45/20 | 50/20 | 50/25 | 55/25 |
| $30,000 | 11,800 | 24,800 | 33,100 | 46,400 | 65,100 | 81,300 | 114,100 |
| $40,000 | 15,700 | 33,100 | 44,100 | 61,800 | 86,700 | 108,400 | 152,100 |
| $50,000 | 19,700 | 41,300 | 55,100 | 77,300 | 108,400 | 135,500 | 190,100 |
| $75,000 | 29,500 | 62,000 | 82,700 | 116,000 | 162,600 | 203,300 | 285,200 |

Q. **Why are there two charts?**
A. Pension benefits differed between the two merger partners, Atlantic Energy and Delmarva Power, and employees are entitled to the benefits already earned. Opening balances will be different for two hypothetical employees having the same age and length of service, but coming from different companies. But, going forward, future credits to the accounts will be computed in exactly the same manner.

Q. **In general, what are the differences in the two plans?**
A. The main difference is that Atlantic Energy employees could retire at 55 with no reduction in benefit, while Delmarva Power employees could retire at 60 with no reduction in benefit, or at 55 with a 24% reduction in benefit. The Atlantic Energy percentage multiplier is 1.6%, compared to the Delmarva Power 1.5% On the other hand, Delmarva Power employees have an enhanced survivor benefit that Atlantic Energy employees do not have. These differences have been quantified and were used in calculating these tables.

Q. **Are there additional key variables other than earnings, age, and service time to consider when reviewing these charts?**
A. The tables reflect the present value of money. Another factor that may not be as obvious, but that is significant in the opening balance calculation, is your distance from retirement age. So while additional service is important and is reflected as you move from left to right in the chart, it is also significant that you are also moving closer to age 55. The closer you are to age 55 the less the benefit earned to date that must be discounted to compute the opening balance. Or conversely, the younger you are, the more of the benefit must be discounted to compute the opening balance. This is why the initial balances for younger people appear smaller.

Note: This information is intended to be used as a guideline only for eligible employees. The employees eligible for the cash balance pension plan are management employees currently enrolled in Conectiv Flex benefits.

B - 27

**Update of Conectiv Facts (Originally Published in the Spring of 1998)**

### New Cash Balance Pension Plan

Until now, employees of both DPL and AE have been covered by what are known as "final pay" pension plans. The "cash balance" pension plan is a new concept that has two important advantages: It's easier to *understand* than the former plans, and it's totally *"portable."* Both these features support our goal of designing a benefits package that meets the needs of today's more independent, more mobile workforce. The new cash balance pension plan will take effect January 1, 1999.

### Benefit Easier to Understand

The way the new pension works is simple. Each year the company makes a cash contribution equal to a percentage of your total pay, including overtime and bonus, to your individual pension account. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the cash value of your account is yours.

Over the years, as you watch your pension account grow, you'll have a clearer idea of your own financial position. And you'll be able to plan for your future.

### Portability a Plus

With the new cash balance plan, if you leave Conectiv after you are vested and have completed five years of service, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years.

### Company Contributions and Interest

Conectiv makes all the contributions to your cash balance pension account. These contributions are based as a percentage of your *total* pay, *including* overtime and bonuses. Contributions increase with age, as shown below. You are not required to contribute to the pension plan.

| Annual Company Pension Contributions | | | |
|---|---|---|---|
| Age[1] | Pension Credit (% of Pay) | Age | Pension Credit (% of Pay) |
| Under 30 | 5% | 40-44 | 8% |
| 30 to 34 | 6% | 45-49 | 9% |
| 35-39 | 7% | 50 and over | 10% |

---

[1] Based on your age as of January 1st; contributions are prorated if you move to a higher age bracket in mid-year.

The company also credits your account with *interest* each year based on the current 30-yr. U.S. Treasury bond rate. This rate changes based on economic conditions. Currently it is 5%. Historically, it has averaged about 8%.

## Conversion to the New Pension Plan

The new cash balance pension plan will cover all Conectiv management employees as of January 1, 1999. Benefits already earned under the former DPL and AE pension plans are *fully protected* and will be converted to an equivalent cash amount. This will form your "starting balance" under the new plan.

Your stating balance will, in essence, provide you with the lump-sum amount you would need today to purchase a lifetime annuity equal to the benefit you've earned to date under your DPL or AE pension plan. The conversion formula will take in account any early retirement and survivor benefits which are part of the current plans.

## Transition Credits with Ten or More Years' Service

If you have completed between ten and 35 years of service with DPL or AE as of January 1, 1999, you will also be eligible for annual *transition credits*. This means the company will contribute an *additional* amount to your pension account *each year*. Your transition credit percentage depends on your completed service as of January 1, 1999, and remains constant until you have completed 35 years of service. At that point, transition credits stop.

| Annual Transition Credits | | | |
|---|---|---|---|
| Service as of 1/1/99 | Transition Credit (% of Pay) | Service as of 1/1/99 | Transition Credit (% of Pay) |
| 10 to 11 years | 1% | 16 to 19 | 3% |
| 12 to 15 years | 2% | 20 years or more | 4% |

For example, if you have completed 13 years of service as of January 1, 1999, the company will make an additional contribution of 2% of your total pay to your account every year until you complete 35 years of service.

## Annual Statements

Each year, you'll receive a personal statement of your pension account which will show the company's contributions (basic amount plus any transition credits), interest credit and total balance, so you'll be able to watch the progress of your account over the years.

## "Grandfather" Protection for Older and Long Service Employees

Of course, many employees have already worked for most of their careers under the former "final pay" pension plans. For this reason, two groups of people will continue to be covered by their former plans for the next ten years. They are employees who, as of January 1, 1999:

- have completed 20 years of service, or
- are age 50 or older.

These "grandfathered" employees will have their pensions calculated under both the former and new plans, and will receive whichever value is greater. As an additional benefit, grandfathered employees have the option to elect a lump sum distribution under the former plan.

## Payment Options at Retirement

The new pension plan also gives you a great deal of flexibility when you retire. You may take the full value of your pension in a single lump sum, which you may then roll over, tax deferred, into the investment vehicle you select. Or you may elect guaranteed lifetime monthly payments for yourself, or for you and your spouse (an "annuity").

## Survivor Benefits

If you die after you are vested but before retirement, the new pension plan provides another advantage to your survivor. Under the former plans, survivor benefits were payable only to the spouse, and then at an amount equal to about *half* of your accrued benefit. With the new plan, the *entire cash value* of your pension account would be paid to your beneficiary who, with your spouse's consent, can be anyone you name.

| A Quick Look at the New "Cash Balance" Pension Plan | |
|---|---|
| Company Contributions | Made annually to your account based on a percentage of pay. Age-related percentages range from 5% to 10%. |
| Interest | Credited each year, based on the 30-year U.S. treasury bond rate at the time. |
| Conversion to New Plan | Benefits accrued under DPL and AE pension plans to be converted to a cash equivalent starting balance under new plan. Starting balance also credited with interest annually. |
| Transition Credits | With 10 years of service as of 1/1/99, you receive an additional annual company contribution of 1% to 4% of pay. |
| Vesting | Upon completion of five years of service (including service with DPL and AE). |
| Portability | Totally portable: current value of your account is yours if you leave Conectiv after you are vested. |
| Survivor's Benefit | Full current value of your account is paid to your spouse or beneficiary if you die while actively employed. |
| Payment options at retirement | Lump-sum cash option, or several lifetime monthly payment options (annuities): cash option can be rolled over to an IRA to continue tax deferral. |

Updated 12/21/98

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR.; on behalf of themselves and all others similarly situated, | ) ) ) ) | CIV. A. NO. 05-702 (SLR) (Lead Case) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF JAMES R. KREMMEL

STATE OF DELAWARE                              :
                                               :  ss.
COUNTY OF NEW CASTLE                           :

I, James R. Kremmel, being over 18 years of age, being of sound mind and capable of making this affidavit, and being personally acquainted with the facts described herein, which are true and correct to the best of my knowledge and belief, state the following:

1. I am a Principal Consultant in the Department of Human Resources at Pepco Holdings, Inc. From January 1, 1999 until August 24, 2001, I was Manager of Benefits for Conectiv. Previously, I held a comparable position in the Human Resources Department of the Delmarva Power and Light Company.

### The ACE and Delmarva's Final Average Pay Plans

2. Before their merger to form Conectiv on March 1, 1998, the Atlantic City Electric Company ("ACE") and the Delmarva Power and Light Company ("Delmarva") both sponsored "final average" pension pay plans, under which a participant's benefit, measured as an

annuity, was the product of average salary, years of service, and a multiplication factor (the "ACE Final Average Pay Plan" and the "Delmarva Final Average Pay Plan").

3.  The ACE Plan did not allow participants to withdraw benefits, either as a lump sum payment or an annuity, until at least age 55. The ACE Final Average Pay Plan did, though, provide that participants who terminated employment before accruing benefits with a present value of more than $5,000 could be subject to automatic cash out.

4.  Similarly, the Delmarva Plan only permitted participants to withdraw benefits before retirement under limited circumstances.

5.  Thus, if an employee chose to leave ACE at age 35 after 10 years' service, he or she could not access their benefits for at least twenty years.

### The Cash Balance Plan

6.  On April 23, 1998, Conectiv's Board of Directors amended the ACE and Delmarva Final Average Pay Plans to establish the Conectiv Cash Balance Sub Plan (the "Cash Balance Plan") effective January 1, 1999. The Cash Balance Plan covered all employees not represented by a union.

7.  The Cash Balance Plan calculates benefits through the use of a hypothetical "account." Each year, Conectiv credits a certain percentage of each employee's pay to this account, with the percentages increasing with age.

8.  The Cash Balance Plan also provides an "interest credit," whereby it increases the amount of each account by an interest percentage based on long-term Treasury bond rates.

-2-

9.  For example, if a participant were 40 years old, earned $50,000 per year, had an opening account for the year of $100,000, and the interest credit rate were 5%, then Conectiv would credit each employee's account with $4,000 in pay credits (the applicable 8% pay credit rate times $50,000) plus $5,200 in interest credits (5% interest rate times ($100,000 plus $4,000). This employee's account balance would accordingly increase from $100,000 to $109,200.

10.  Conectiv structured the Cash Balance Plan so that in most cases the account balance would be identical to the immediate lump sum payment value of the participant's benefits. The Cash Balance Plan provides an immediate lump sum payment option when an employee leaves the company, as opposed to being forced to wait until retirement to collect any benefits, as under the former ACE and Delmarva Final Average Pay Plans, i.e., the Cash Balance Plan provides enhanced portability.

11.  Based upon my knowledge, belief, and information provided to me, of the 520 participants who have elected a form of benefit under the Cash Balance Plan, 500 – that is, approximately 96% – have requested to receive a lump sum.

12.  Conectiv also increased survivor benefits under the Cash Balance Plan. Under the former ACE and Delmarva Final Average Pay Plans, a surviving spouse could only receive half of the value of a deceased participant's accrued benefit. The Cash Balance Plan provides that surviving spouses receive the full amount of the participant's accrued benefit – an important benefit for an employee with a serious health condition who is concerned about providing for his or her family in the wake of premature death.

-3-

13. Furthermore, the Cash Balance Plan, unlike its predecessors, permits participants to provide survivor benefits to individuals other than a spouse, such as a child or a domestic partner. This change was an important benefit enhancement for unmarried employees.

14. The Cash Balance Plan amendment also coincided with two other enhancements to the Conectiv benefits package. First, Conectiv increased the employer matching contributions in its 401(k) plan, which covered the same employees. Second, Conectiv expanded access to retiree medical coverage.

15. Conectiv also took steps to protect the expectations of long-term employees close to retirement. Thus, employees who either attained the age of 50 or completed more than twenty years of service on or before December 31, 1998, the effective date of the Plan conversion, were "grandfathered," i.e., so long as they retired within the next ten years, these long term employees received the larger of the benefits accrued under either the formula contained in their former Final Average Pay Plans or their new Cash Balance Plan formula. Moreover, even if they should retire after January 1, 2009, grandfathered employees will still be entitled to receive the greater of their benefits under the previous plan formula as of December 31, 2008 or the Cash Balance Plan formula as of the date of retirement.

16. Conectiv took additional steps to protect other long-term employees who were not as close to retirement age. The Cash Balance Plan provides for "transition credits," which are enhanced levels of pay credits for employees who had devoted many years of service to the company. Specifically, the Cash Balance Plans adds an additional 1% pay credit for employees with 10 to 11 years of service; 2% for employees with 12-15 years of service; 3% for employees with 16-19 years of service; and 4% for employees with 20 or more years of service.

-4-

Notice Provided to Employees of the Cash Balance Conversion

17. Realizing that the conversion to the Cash Balance Plan represented a change in benefits philosophy, Conectiv provided a series of notices to its employees before the January 1, 1999 effective date, including:

a. In October 13, 1997, Conectiv distributed a newsletter to all employees titled "EMerging Times" that noted that "A new pension plan will replace the old 'final pay' plans with individual, portable accounts." A copy of this newsletter is attached as Exhibit A.

b. One week later, on October 20, 1997, Conectiv distributed the next issue of "EMerging Times," which provided even more detail. A copy of this newsletter is attached as Exhibit B.

c. In May 1998, after the Board adopted the Cash Balance Plan amendment, Conectiv distributed to all employees a "Facts" newsletter. Under the heading "New Cash Balance Pension Plan," this newsletter contains just over three single spaced pages explaining in detail how the Cash Balance Plan operates. The newsletter further informed employees that the Cash Balance Plan would be effective January 1, 1999. A copy of this newsletter is attached as Exhibit C.

d. On December 21, 1998, Conectiv sent to all employees who would be enrolled in the Cash Balance Plan a five page, single-spaced letter outlining in detail how the Cash Balance Plan computes benefits. A copy of this letter is attached as Exhibit D.

-5-

B - 36

e.     After the Cash Balance Plan went into effect, Conectiv conducted a series of meetings with employees in July 1999 regarding the new pension benefit structure. In advance of these meetings, Conectiv distributed a newsletter titled "Mid Week Extra: Cash balance update June 23, 1999" to Cash Balance Plan participants. This newsletter expressly stated the company's intention to discuss criticism that had been leveled against cash balance pension plans, noting that "recent stories in the national media have raised concerns about some cash balance plans . . ." A copy of this newsletter is attached as Exhibit E. Conectiv used a standardized Power Point slide presentation in these meetings. A copy of that slide presentation is attached as Exhibit F. At each meeting, Conectiv discussed the then-brewing controversy over IBM's decision to convert to a cash balance plan.

### Execution of Releases

18.     There are at least 90 members of the putative class who have executed releases with Defendants of any ERISA claims (except for claims for accrued and vested benefits as set forth in the plan documents) in exchange for severance payments. Plaintiffs, however, have signed no such releases.

### Effect of the Cash Balance Conversion Upon the Plaintiffs

19.     Based upon my knowledge, belief , and information provided to me, below is a table comparing each Plaintiff's accrued benefit, measured as an annuity commencing at age 65, under both the Cash Balance Plan presently and what they would have been under the previous ACE and Delmarva Final Average Pay Plans had there been no conversion:

-6-

| Plaintiff | Accrued Benefit Measured As An Age 65 Annuity, as of 1/1/2007, Previous ACE/Delmarva Plan | Accrued Benefit as of 1/1/2007 Measured As An Age 65 Annuity, Cash Balance Plan |
|---|---|---|
| J. Michael Charles | $2,858.07/month | $3,117.92/month |
| Maurice Ward | $2,784.19/month | $3,121.09/month |
| Joseph Fink | $2,092.67/month | $2,317.13/month |
| Thomas Troup | $2,706.52/month | $2,762.10 |

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

By: _James R. Kreinmel_

James R. Kreinmel
Pepco Holdings, Inc.
Human Resources
401 Eagle Run Road
Newark, DE 19702

Dated: 2-16-2007

-7-

B - 38

# KREMMEL
# EXHIBIT A

## We are becoming

# EMerging Times

## conectiv

... connection to the latest merger news • Oct. No. 1997

## Total Rewards Communicate Conectiv

*EMerging Times* talked to Ben Wilkinson, chair of the total rewards transition team, about compensation and benefit programs as we will know them in Conectiv.

**ET:** It would be an understatement to say employees are curious about the pay and benefits programs being developed for Conectiv. Since we can't weave a magic wand and instantly know it all, let's start with the name. Why "total rewards" instead of the standard "compensation and benefits" or the more '90s "total compensation?"

**BW:** For one thing, we want to make a clear distinction between Conectiv and the past. This is a new program for a new company in a changing business environment. It is designed to be viewed as competitive by employees and flexible to accommodate changing business conditions. We want to emphasize the notion of rewards—payment in return for effort and results—as opposed to traditional entitlement programs with their guarantees and their payouts not generally linked to individual or corporate performance. "Rewards" refer to all the elements of remuneration—direct pay and all benefit plans—that are available to employees.

**ET:** What are the major changes that signal the need for this new "total rewards" approach?

**BW:** There are the changes in our industry—deregulation with resulting greater competition and movement into non-regulated businesses. And, these are societal changes as well—the demand for benefits flexible enough to meet the work and family needs of a diverse workforce and for more "portable" benefits that reflect the fact that fewer people are staying in one place for their entire careers. And, there's the immediate need to support our rapid transition to Conectiv.

**ET:** What is the connection between how Conectiv employees are "rewarded" and this changing environment?

**BW:** Companies' reward systems aren't an accident. They're a way of communicating and supporting the organization's values and strategies. They help to attract, retain and motivate employees with the behaviors and competencies necessary for the company to succeed. In the new, highly competitive environment in which Conectiv will be operating, we need a new employee mindset—one that embraces risk-taking and decision-making, that aligns employees' interests closely with those of the company, and that "owns" the employee in the performance of the company. Our program has to be designed to link corporate and individual performance to a much greater extent than in the past.

**ET:** How does the program do that?

**BW:** In a number of ways. On the direct pay side, we will place a greater emphasis on variable pay—that is, incentive arrangements that link employees' pay more directly to individual and business performance. We will find new, innovative ways to introduce company stock as a vehicle for performance rewards and for focusing people on what is happening in the business. We will reward not only individual effort, but collective contributions to the company's success through a new profit-sharing plan. A new pension plan will replace the old "final pay" plans with individual, portable accounts. And, there will be an opportunity for employees to tailor their benefits—like medical, dental, life, disability, etc.—to their own and their families' needs through the new flexible benefits program. Not a totally new concept to AE employees, "flex" moves us away from the "one-size-fits-all" benefits offerings of the past. It provides each employee with credits, which can be used to purchase levels of benefits appropriate to his or her needs or which can be taken as additional cash compensation.

*Continued on page 2*

## Total Rewards

*ET: When will we know the details of the new total rewards program?*
BW: The total rewards transition team is continuing to work out the details of the program throughout the fall—including plans for an extensive communications and educational effort to support employees in making informed decisions about their benefits in a "choice" environment.

*ET: When is the new total rewards program scheduled to become effective?*
BW: Direct pay aspects of the program will become effective as soon as possible

following the merger closing date. The benefits portion of the program is intended to become effective July 1, 1998, in order to allow time to complete selection for Conectiv and for effectively communicating the new benefits program and enrollment process. Employees will make their flexible benefit choices in late spring. Of course, for employees working under labor agreements, all pay and benefits must be negotiated.
*See the next issue of EMerging Times for more information about Conectiv total rewards.*

## Preparing for the Interview

As employees and hiring teams prepare for Conectiv's next round of job selection, they will notice something new in the position selection process: the use of "competencies" and the use of behavioral interviewing. The following information on these parts of the interview should prove helpful.

Competencies are defined as knowledge, skills and behaviors. "Job Competency Models" are lists of critical knowledge, skills and behaviors for success in a particular job. By mid-October, hiring managers will complete job competency models for positions in this round of selection.

To create the Job Competency Models, hiring managers are reviewing strategies, business goals and job expectations. They are then considering what it will take to meet those expectations. This information is compared with one of three "working competency models" that have been created to cover the positions generically (and which will be distributed on October 15 by the electronic means used to distribute the position summaries). After finalizing the list to the 12-15 most important criteria, they are prioritizing the critical few to use in interviewing. The hiring manager should then share the competency model for the specific job or pool of jobs with the candidates for that job.

When selecting people for positions, it is important to know what competencies are crucial to the success of the business group and the employee in a specific job, and to hire according to those competencies. Behavioral interviewing is founded on the premise that past performance is the best indicator of future performance.

As an interviewee, you are likely to notice some key differences:

*   You will be asked to share past experiences in detail
*   You will be asked to speak in terms of "I" and not "we"
*   You may not be asked more traditional questions (e.g., "What are your greatest strengths?")
*   You will be asked to describe what your actually did or thought or felt in a real situation rather than what you might do in a hypothetical situation.

For example the interviewer may ask something like (if "problem-solving" were a key competency), "Tell me about a time when you had a customer request that you could not satisfy?" You would answer the question, and the interviewer would likely respond by digging deeper into the story that you tell.

To prepare, a candidate should anticipate some of the key competencies for the job and think through a couple of performance-based anecdotes or stories which demonstrate performance of the competency.

Your answers will improve the hiring team's assessment your skills. Employees who have been interviewed in this way say that they felt the interviewer had a much better sense of their capabilities than most interviewers had in the past, which made the experience feel fairer. More and more companies have adopted this approach to interviewing. Interviewers report higher confidence in their selections and greater success for the employee selected.

B - 40

# More Information About Relocation Benefits

Merger-related relocation benefits are available to Atlantic Energy non-union and Delmarva Power management employees:

- for whom relocation is a condition of their accepting a Conectiv job;
- whose commute increases by at least 70 miles round trip; or,
- whose new commute is 100 miles or more round trip.

The merger-related relocation benefits (see chart below) provide allowances to eligible homeowners for moving expenses, transfer taxes, points on a new mortgage, temporary living expenses, realtor sales commissions, settlement costs, and miscellaneous expenses. A homeowner is someone who owns his/her primary residence.

There are also allowances, shown below, for eligible renters for moving expenses, lease buyout, temporary living expenses, and miscellaneous expenses.

**Conectiv Transition Employee Relocation Assistance Policy**
**Summary of Plan Design**

**Allowance for a management/non-union employee who currently owns their primary residence**

| Feature | Typical Coverage |
|---|---|
| Movement of household goods | Paid through an approved mover $3,000 for self-move |
| Property transfer tax | Paid |
| Points on new mortgage | Lesser of 3 pts, or $6,000 |
| Temporary living | 60 days at a maximum of $3,800 |
| Realtor sales commission at prevailing rates | Maximum of $10,500 |
| Miscellaneous expense | 1 month salary |
| Settlement cost | Actual expense up to $2,000 |
| Home purchase option | Equity advance with agreement of sale |
| Tax gross up | Yes - for some cost |

**Allowance for a management/non-union employee who currently rents**

| Feature | Coverage |
|---|---|
| Movement of household goods | Paid through an approved mover $3000 for self move |
| Lease Buyout | 2 months |
| Temporary living | 60 days to a maximum of $3,000 |
| Miscellaneous Expense | 1 months salary |

If you have any questions on relocation benefits, call the Employee Merger Hotline at 1-800-201-4718.

B - 41

## Additional Support Offerings Scheduled To Meet Huge Demand

The response to the initial offering of Employee Support workshops has been gratifying-in fact, it's been overwhelming...As a result, the Employee Support Transition Team is making every effort to schedule additional workshops as quickly as possible.

To meet an immediate need for additional support for those who are candidates in the current round of selection for Conectiv (see the October 8 Emerging Times), the Employee Support Transition Team arranged for internal consulting sources and scheduled additional workshops that began Saturday, October 11, and held open houses October 13 and 15. The open houses are an innovative approach to giving employees immediate access to a variety of employee support offerings, which are focused and condensed into short periods of time to accommodate busy schedules.

To get the message out as quickly as possible to those needing to prepare themselves for the current round of selection, an e-mail and FLASH bulletin describing the additional offerings went out to all employees last Thursday. Additional workshops are currently being scheduled for employees who will be participating in selection at a later time. Information about those workshops will be communicated in the very near future.

For more information about future workshops continue to check your e-mail, bulletin boards, and Emerging Times.

---

## Important Numbers To Remember

The Employee Merger Hotline — Record your question; we'll get back to you within two business days: 1-800-201-6718.

The Employee Assistance Program (EAP) – Available 24 hours/7 days per week for you and your family members:

AE – 1-800-608-0098
DPL – 1-800-843-9775

If you have questions pertaining specifically to the ERO, call the ERO Hotline:

AE – 1-800-608-0098
DPL – 1-888-376-8397