# KREMMEL EXHIBIT B



We are becoming

# EMerging Times

conectiv    your connection to the latest employee news ♦ Oct. 30, 1997

## Sharpening The Focus: Total Rewards

*Editor's Note: In the last issue, EMerging Times talked to Ben Wilkinson, chair of the total rewards transition team, about the philosophy underlying the new Conectiv compensation and benefits arrangements. In this issue, we've focused on some currently available details about the program.*

*ET: You said that "flexible benefits" give employees the opportunity to tailor their needs as well as their family's. What benefits will be offered under the flexible benefits portion of the total rewards program?*
BW: There will be medical—including prescription and vision; dental; disability; and life insurance options—including dependent life coverages; health care and dependent care reimbursement accounts; and time off—including vacation, holidays, and sick leave. Plus, we're looking into offering a number of other

options that will give employees even more choice and flexibility. And, of course, there are benefits outside the flexible benefits program–pension and 401(k), for instance.

*ET: How will the flexible benefits program work?*
BW: Basically, it works like this: Conectiv will give you an amount of benefit credits–like benefit dollars–to allocate among your benefit choices. You will use your credits to purchase the types and levels of benefits that you decide fit your needs. You may be able to waive coverage under certain plans, which would free a number of credits that you could use to buy other benefits you need. If you have credits remaining after designing your benefits package, you will receive the balance in cash as taxable income added to your pay. If, on the other hand, your benefit choices cost more than your

*Continued on page 2*

## "Comparable" Job Defined

The issue of what is a "comparable" job is of significance to employees as they consider job offers with Conectiv. That is because, if an employee turns down a comparable job, he or she would not be eligible for any involuntary separation benefit. However, if an employee turns down a job that is not comparable, he or she would be eligible for 50 percent of the involuntary separation benefit.

A job will be considered "comparable" if the new pay target for the job is 85 percent or greater than what the employee's present job is currently paid. A job is "less than comparable" if the pay target is less than 85 percent of what the employee's present job is currently paid. Pay target is defined as the competitive rate for the job as set by line management.

What the employee's present job is currently paid will be determined as follows:

Employees in non-union jobs–top of core band (AE) or the midpoint (DPL) for the job when the offer is made.
Employees in union jobs–current final pay rate (AE and DPL) when the offer is made.

It's important to note that the determination is based on what the job is paid, not what the employee in the job is paid.

If you have questions about how your job is currently paid please talk to your supervisor.

# Total Rewards

*Continued from page 1*

benefit credits, you pay the difference through payroll deductions. In most cases, your contributions are deducted from your pay on a before-tax basis. Being able to use before-tax dollars to buy benefits is a benefit in itself, since it helps you get more for your money.

*ET: Can you tell us more about the new pension arrangements?*
BW: The design of the plan is not yet finalized, but we know it will be what's called a "cash balance" plan. Unlike the companies' current final pay plans that pay a benefit based on a formula applied at the end of your career, the cash balance plan provides each employee with a record keeping account into which the company credits a percentage of pay each year. The account balance will grow based on a set interest rate. At least annually, employees will receive a statement telling them their account balance. The account balance is portable, which means it can be rolled into another employer's plan or an IRA if you leave Conectiv.

*ET: What happens to the benefit an employee has already earned under a current AE or DPL pension plan?*
BW: Employees have a nonforfeitable right to–that is , they can't lose–the value of the benefits they have accrued in their current pension plans.

*ET: If the merger closes January 1, 1998, and the new benefits program isn't effective until mid 1998, what benefits will employees have during that time?*
BW: Employees will remain covered

under their current benefit plans between the merger closing date and mid 1998.

*ET: When will any changes in how employees are paid begin to affect individual employees?*
BW: Changes in the direct pay aspects of the total rewards program will begin to affect individual employees at the time each employee actually begins his or her "new" job with Conectiv–that is, following the selection process that will take place after the merger closing date. In other words, the "effective date" for changes in direct pay will vary based on the situation of the individual employee.

*ET: How will employees find out more about the Conectiv total rewards program?*
BW: The plan is to issue a series of newsletters over the next seven months leading up to benefits enrollment in May. Each newsletter will deal with some aspect of the total rewards program. Then, in the spring, each employee will receive a "decision kit" that provides the detailed information needed to make choices under the flexible benefits program. We will hold meetings for employees so they can hear about the program and get answers to any questions they may have. Our goal is to provide the resources employees need to make well-informed decisions about their benefits.

*Note: For employees working under labor agreements, all pay and benefits must be negotiated.*

**Conectiv Human Resources Implementation Team now located at Deepwater, N.J. 8th Floor**

FAX (609)299-7492

| | |
|---|---|
| Debby Turner-Fox | (609)299-8003 |
| Sue Waddington | (609)299-8005 |
| Arden Jones | (609)299-8004 |
| Darren Dorrell | (609)299-7491 |

## Selection Process Continues

For employees who have self nominated for a position in the current Conectiv selection process ...
The hiring manager will call during the next two weeks to let you know if you will have an interview and, if so, to make interview arrangements.

Should you not hear from the hiring manager in that time period, contact Bob Pavlovski, AE human resources, (609) 645-4708 or Peg Symes, DPL human resources, (302) 429-3426.

## Time Is Running Out On ERO Windows

The election windows for the Enhanced Retirement Offer (ERO) will soon close for all eligible Atlantic Energy and Delmarva Power employees. Eligible for the ERO are:

At Atlantic Energy
* non-union and union employees who, by December 31, 1998, will be age 55 or older, and have at least five years of continuous service

At Delmarva Power
* non-union and union employees who, by December 31, 1998, will be age 55 or older, and who have at least 12 years of continuous service

Closing dates for eligible employees vary. If you are eligible for this option, please make sure you make your decision and return your election forms to your supervisor by the date listed below.

Non-Union Atlantic Energy & Delmarva Power Employees
October 31, 1997

Atlantic Energy Local 210 Members
November 30, 1997

Delmarva Power Local 1238 and Local 1307 Members
December 18, 1997

The ERO is the first of the voluntary staff reduction offerings in connection with the merger. The intent is to rely as much as possible on voluntary approaches, which the senior leadership team believes to be the more compassionate way to meet the unavoidable business need to reduce the number of employees in the merged company.

If you have questions about the ERO option, please contact the ERO hotline 1-888-376-8997, at Delmarva Power, or 1-800-608-0098, at Atlantic Energy.

## Important Numbers To Remember

The Employee Merger Hotline—Record your question, we'll get back to you within two business days: 1-800-201-4718.

The Employee Assistance Program (EAP)—Available 24 hours/7 days per week for you and your family members:

AE–1-800-608-0098
DPL–1-800-843-9775

If you have questions pertaining specifically to the ERO, call the ERO Hotline:

AE–1-800-608-0098
DPL–1-888-376-8997

# KREMMEL EXHIBIT C



# *facts* conectiv



*Over the next few weeks, you'll learn details of the Total Rewards Program*

## CONECTIV TOTAL REWARDS PROGRAM FINALIZED

During the last several weeks, details of Conectiv's Total Rewards Program for management have been finalized. The new program will cover all Conectiv management employees. Coverage for union employees is subject to collective bargaining.

Over the next few weeks, you'll learn the details of the program and the benefit options available to you. You've already received two newsletters giving some background information about the new pension and flexible benefits plans. With this issue of *facts* and the next one, we'll explain more about the program and the decisions you'll be making soon.

In May, you will each receive a personalized "decision kit" that will help you make your flexible benefit elections. We'll also hold group meetings and provide a hotline to answer your questions. (For more on the communications schedule, see the back cover.) Your *Conectiv Flex* benefits will start July 1.

## YOUR PAY

Pay is, of course, an important element in the Total Rewards Program. Conectiv has made sure that our *base pay levels are competitive* with what is being paid for similar jobs in general industry in the areas in which we operate. Each employee will be informed about his or her "competitive base opportunity"—that is, the potential base salary for the job over time, given sustained solid individual performance.

In addition, all employees not participating in management or business unit variable pay plans will participate in Conectiv's *Variable Pay Opportunity*—our new plan that replaces the former DPL (CPIP) and AE (Corporate Bonus) profit sharing plans. Annual payouts will be based on how well Conectiv as a whole and individual business units achieve pre-established financial goals.

## NEW CASH BALANCE PENSION PLAN

Until now, employees of both DPL and AE have been covered by what are known as "final pay" pension plans. The "cash balance" pension plan is a new concept that has two important advantages: it's *easier to understand* than the former plans, and it's totally *"portable."* Both these features support our goal of designing a benefits package that meets the needs of today's more independent, more mobile workforce.

The new cash balance pension plan will take effect January 1, 1999.

B - 47



*The new cash balance pension plan is easier to understand, and goes with you if you leave Conectiv after you're vested.*

## Benefit Easier to Understand

The way the new pension plan works is simple. Each year the company makes a cash contribution equal to a percentage of your total pay, including overtime and bonus, to your individual pension account. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the current cash value of your account is yours.

Over the years, as you watch your pension account grow, you'll have a clearer idea of your own financial position. And you'll be better able to plan for your future.

## Portability a Plus

Today, people who work for a single company throughout their careers are in the minority. So being able to transfer accumulated pension credit from one employer to the next is an important plus.

With the new cash balance plan, if you leave Conectiv after you have completed five years of service and are vested, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years.

## Company Contributions and Interest

Conectiv makes all the contributions to your cash balance pension account. These contributions are based on a percentage of your *total* pay, *including* overtime and bonuses. Contributions increase with age, as shown below. You are not required to contribute to the pension plan.

| Age* | Pension Credit (% of Pay) | Age* | Pension Credit (% of Pay) |
|---|---|---|---|
| Under 30 | 5% | 40 to 44 | 8% |
| 30 to 34 | 6% | 45 to 49 | 9% |
| 35 to 39 | 7% | 50 and over | 10% |

The company also credits your account with *interest* each year based on the current 30-year U.S. Treasury bond rate. This rate changes based on economic conditions. Currently, it is 6%. Historically, it has averaged about 8%.

---

* Based on your age as of January 1st; contributions are prorated if you move to a higher age bracket in mid-year.

2

## Conversion to the New Pension Plan

The new cash balance pension plan will cover all Conectiv employees* as of January 1, 1999. Benefits already earned under the former DPL and AE pension plans are *fully protected*, and will be converted to an equivalent cash amount. This will form your "starting balance" under the new plan.

Your starting balance will, in essence, provide you with the lump sum amount you would need today to purchase a lifetime annuity equal to the benefit you've earned to date under your DPL or AE pension plan. The conversion formula will take into account any early retirement and survivor benefits which are part of the current plans.

Later this year, you'll receive a personalized pension statement showing your lump sum "starting balance" under the new plan.

## Transition Credits with Ten or More Years' Service

If you have completed between ten and 35 years of service with DPL or AE as of January 1, 1999, you will also be eligible for annual *transition credits*. This means the company will contribute an *additional* amount to your pension account *each year*. Your transition credit percentage depends on your completed service as of January 1, 1999, and remains constant until you have completed 35 years of service. At that point, transition credits stop.

| Service as of 1/1/99 | Transition Credit (% of Pay) | Service as of 1/1/99 | Transition Credit (% of Pay) |
|---|---|---|---|
| 10 to 11 years | 1% | 16 to 19 | 3% |
| 12 to 15 years | 2% | 20 years or more | 4% |

For example, if you have completed 13 years of service as of January 1, 1999, the company will make an additional contribution of 2% of your total pay to your account every year until you complete 35 years of service.

## Annual Statements

Each year, you'll receive a personal statement of your pension account which will show the company's contributions (basic amount plus any transition credits), interest credit and total balance, so you'll be able to watch the progress of your account over the years.

*Benefits already earned under DPL and AE plans are fully protected.*

---

* Subject to collective bargaining agreement.

3

| A Quick Look at the New "Cash Balance" Pension Plan | |
|---|---|
| Company Contributions | • Made annually to your account based on a percentage of pay<br>• Age-related percentage ranges from 5% to 10% |
| Interest | Credited each year based on the 30-year U.S. Treasury bond rate at the time |
| Conversion to New Plan | • Benefits accrued under DPL and AE pension plans to be converted to a cash equivalent starting balance under new plan<br>• Starting balance also credited with interest annually (see above) |
| Transition Credits | With 10 years of service as of 1/1/99, you receive an additional annual company contribution of 1% to 4% of pay |
| Vesting | Upon completion of five years of service (including service with DPL and AE) |
| Portability | Totally portable; current value of your account is yours if you leave Conectiv after you are vested |
| Survivor's Benefit | Full current value of your account is paid to your spouse or beneficiary if you die while actively employed |
| Payment options at retirement | Lump sum cash option or several lifetime monthly payment options (annuities); cash option can be rolled over to an IRA to continue tax deferral |

## "Grandfather" Protection for Older and Long Service Employees

Of course, many employees have already worked for most of their careers under the former "final pay" pension plans. For this reason, two groups of people will also continue to be covered by their former plans for the next ten years. They are employees who, as of January 1, 1999:

• have completed 20 years of service, or
• are age 50 or older

These "grandfathered" employees will have their pensions calculated under both the former and new plans, and will receive whichever value is greater.

## Payment Options at Retirement

The new pension plan also gives you a great deal of flexibility when you retire. You may take the full value of your pension in a single lump sum, which you may then roll over, tax deferred, into the investment vehicle you select. Or you may elect guaranteed lifetime monthly payments for yourself or you and your spouse (an "annuity").

## Survivor Benefits

The new pension plan provides another advantage in case of your death after you are vested but before retirement. Under the former plans, survivor benefits were payable only to a spouse, and then in an amount equal to about *half* of your accrued benefit. With the new plan, the *entire cash value* of your pension account would be paid to your beneficiary who, with your spouse's consent, can be anyone you name.

4

B - 50

# 401(K) SAVINGS PLAN

The 401(k) plan, with its automatic, tax-deferred saving feature, company match and investment options, has become an important part of the retirement benefits package at both DPL and AE. Today, many employees are building a strong financial future for themselves by participating actively in these plans.

Conectiv will also sponsor a 401(k) plan that blends features from both prior plans.

## Company Match and Savings Options

Beginning July 1, the Company will match 50% of the first 6% of pay that you save, in the form of Conectiv stock. Making the match in stock helps reinforce one of Conectiv's key goals for our Total Rewards Program—linking employees' interests with the Company's business success. In other words, the better we do financially, as reflected in Conectiv's stock price, the better you will do, too.

You may contribute a total of up to 20% of pay to the plan—up to 15% on a before-tax basis and up to 5% on an after-tax basis.

## New Investment Choices

The new 401(k) plan will offer a broader range of investment choices than either the DPL or AE plans. The Vanguard Group, one of the country's largest and most respected mutual fund companies, will be responsible for maintaining account records as well as managing most of the investment funds.

Investment options will include both fixed income and diversified stock funds. In addition, you will have the choice of investing your account in one of two "LifeStrategy" funds that automatically apportion your account among several different funds according to your investment goals.



Under the new 401k plan, Conectiv will match 50% of the first 6% of pay you save.

### New 401(k) Investment Options

**Stock Funds**
- Vanguard Index Trust -- 500 Portfolio*
- T. Rowe Price International Stock
- Baron Asset Fund
- Vanguard/PRIMECAP
- Vanguard/Windsor II
- Vanguard Growth & Income Portfolio

**LifeStrategy Funds**
- Vanguard LifeStrategy Portfolio – Growth Portfolio
- Vanguard LifeStrategy Portfolios – Moderate Growth Portfolio

**Fixed Income Funds**
- Vanguard Bond Index Fund – Total Bond Market Portfolio
- Vanguard Retirement Savings Trust

Later this spring you'll have the opportunity to learn more about the new investment funds. In August, Vanguard will automatically transfer your investment in current plan funds to comparable new funds, with no tax liability at transfer. You will then be free to make any investment changes you want.

*"Standard & Poor's 500," "S&P 500®," "Standard & Poor's®," "S&P®," and "500" are trademarks of the McGraw-Hill Companies, Inc.

5



*Conectiv Flex lets YOU choose the benefits that are right for you . . .*

## CONECTIV FLEX

Conectiv Flex, our new flexible benefits program, goes into effect July 1, 1998. Conectiv Flex lets you choose the benefits that are right for you from among a broad variety of options. Highlights of your Conectiv Flex program follow. You'll receive more details about the program in the next few weeks.

## Conectiv Flex Means Advantages for You

With Conectiv Flex, you choose the benefits you want each year, and you can change your benefits annually, as your needs change. In this way, Conectiv can be sure it is making the wisest use of the dollars it sets aside each year to pay for benefits. Conectiv Flex offers:

- *A range of benefits* from which to choose (see Highlights..., right)

- *Cash back*—Conectiv pays the major portion of the cost of coverage under Conectiv Flex. Each benefit option has a price tag, depending on the type and level of benefit you choose. If the benefits you choose cost *more* than the amount Conectiv pays, you pay the difference through payroll deduction—usually on a *before-tax* basis. If the benefits you choose cost *less* than the amount Conectiv pays, you will receive extra dollars in your paycheck as taxable cash.

- *Tax advantages*—With Conectiv Flex, you get the advantage of tax breaks permitted by law. For example, amounts you pay toward health care coverage are deducted from your pay on a *before-tax* basis. And, when you participate in a Health Care or a Dependent Care Reimbursement Account, you pay no federal or Social Security taxes on the dollars that go into your account(s) or on the dollars that are reimbursed to you.

## FlexPhone Telephone Enrollment

In May, you'll be able to enroll for your Conectiv Flex benefits for July 1998-July 1999 using any touch tone phone and the personalized enrollment fact sheet that you will receive.

The FlexPhone system is quick and easy. It ensures privacy and confidentiality using your own Personal Identification Number (PIN). Complete instructions for enrolling by phone will be included with the Conectiv Flex decision kit that you'll receive in May.

---

**Watch for the next issue of *facts* to learn more about your *Conectiv Flex* benefit options.**

---

6

C



*You'll be able to enroll for Flex using the FlexPhone system.*

This newsletter covers only the highlights of your Conectiv Total Rewards Program. Details of the plans are contained in the official plan documents. In the case of questions, the documents always govern.

7



*FlexPhone . . . a quick and easy way to enroll.*

## TOTAL REWARDS COMMUNICATION PLAN

This schedule will give you an idea of what you can expect to hear about the new Total Rewards Program between now and the July 1 effective date.

- 3rd *facts* newsletter (this one) ..................................................... April-May
- 4th *facts* newsletter (more details on flexible benefits—medical, dental, life insurance and reimbursement accounts) ....................................................... April-May
- 5th *facts* newsletter (more information on the new 401(k) plan) ....................................................... May-June
- "Decision Kits" mailed to you ....................................................... Mid-May
- Employee meetings and benefits hotline ....................................................... April-May
- Enrollment period for flexible benefits ....................................................... Mid-May to June 1
- Flex benefits effective date ....................................................... July 1

First Class
U.S. Postage
P A I D
Wilmington, DE
Permit #61

KAREN E FRANCKS
300 ROBERT DR
FORREST BROOK GLEN
WILMINGTON DE 19804-2316

 **conectiv**

800 King Street
P.O. Box 231
Wilmington, DE 19899

# KREMMEL EXHIBIT D

December 21, 1998

Dear Conectiv Management Employee,

Beginning January 1, Conectiv will switch to a "cash balance" pension plan as announced earlier this year. In order to provide you with your opening balance, the Company will use your 1998 earnings, which will not be finalized until late January, 1999. At the same time as we are moving to the cash balance pension plan, the Company is outsourcing pension administration to the Vanguard Group, which is also the administrator of Conectiv's 401K plans and PAYSOP plans. Vanguard will verify the conversion calculations, and will then distribute your individual account balances by the end of the second quarter of 1999.

Until individual statements can be prepared, we have created two tables of example calculations so employees can estimate their opening balances. Remember that these tables are examples only, and that your actual cash balances will reflect your particular circumstances. There will be more detailed communications in the Spring. If you have general questions, please hold them until these communications are available. We have included in this letter answers to some general questions about the new program.

If you are at retirement age and are planning to retire in the first quarter of 1999, please call the Human Resources Strategic Business Partner for your area: Pat Duffy, Energy Delivery & Services, at 220-3155; Harold DeJarnette, Supply, at 220-3252; Ben Wilkinson, Shared Services, at 220-3047; and Dave Moől at 250-6020.

We hope this preliminary information is helpful to you.

Q. What is a "cash balance" pension plan?
A. Each year the company credits your individual pension account with a cash contribution equal to a percentage of your total pay, including overtime and bonus. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the current cash value of your account is yours. If you leave Conectiv after you have completed five years of service and are vested, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years. At retirement, you can take the money in a lump sum and roll it over, tax deferred, into the investment vehicle you select. Or you can elect to receive lifetime monthly payments, either for yourself, or for you and your spouse. Each year, you'll receive a statement of your pension account showing all transactions and its total balance.

Q. What are the key components of Conectiv's new cash balance pension plan?
A. Please see the accompanying "Update of Conectiv Facts," below.

Q. What are the advantages of cash balance?
A. Your cash balance pension account is completely portable. In addition, the plan contains increased "beneficiary" benefits: the full value of the account transfers to your spouse, family, or estate in the event of your death. Employees will receive annual statements showing the actual current value of their pension account. These features mean that the cash balance pension plan helps to meet more diverse needs of today's and tomorrow's employees.

Q. Are there some grandfathering provisions and other transition rules?
A. You may recall that, as part of the approach taken by management to provide minimal impact on the existing workforce, extensive protections were woven into the new plan for employees approaching the retirement age. Any employee aged 50 or with 20 years of service as of December 31, 1998 is "grandfathered" for ten years after January 1, 1999. This means that when a grandfathered participant retires, the pension is computed both under the old formula and the new one, and the participant receives the greater amount. In addition, retirees choosing the old formula will be able to take a lump-sum distribution of their pension during the 10 year period. These provisions are for the next ten years when the benefits under the old plan are calculated, frozen, and compared at retirement to the cash balance amounts to determine the best benefit for the employee. In addition to the grandfather provision, favorable transition rules apply for longer service employees. This means those employees will get extra annual credits to their accounts during the ten year period.

Conectiv Cash Balance Retirement Plan
January 1, 1999 Account Balance Estimate
(For employees formerly covered by the ACE Plan)

| Average Five Year Earnings | Age/Service | | | | | | |
|---|---|---|---|---|---|---|---|
| | 35/10 | 40/15 | 40/20 | 45/20 | 50/20 | 50/25 | 55/25 |
| $30,000 | 14,600 | 30,800 | 41,100 | 57,600 | 80,800 | 101,000 | 141,700 |
| $40,000 | 19,300 | 41,100 | 54,800 | 76,800 | 107,700 | 134,700 | 188,900 |
| $50,000 | 24,400 | 51,300 | 68,500 | 96,000 | 134,700 | 168,300 | 236,100 |
| $75,000 | 36,600 | 77,000 | 102,700 | 144,000 | 202,000 | 252,500 | 354,200 |

Conectiv Cash Balance Retirement Plan
January 1, 1999 Account Balance Estimate
(For employees formerly covered by the DP & L Plan)

| Average Five Year Earnings | Age/Service | | | | | | |
|---|---|---|---|---|---|---|---|
| | 35/10 | 40/15 | 40/20 | 45/20 | 50/20 | 50/25 | 55/25 |
| $30,000 | 11,800 | 24,800 | 33,100 | 46,400 | 65,100 | 81,300 | 114,100 |
| $40,000 | 15,700 | 33,100 | 44,100 | 61,800 | 86,700 | 108,400 | 152,100 |
| $50,000 | 19,700 | 41,300 | 55,100 | 77,300 | 108,400 | 135,500 | 190,100 |
| $75,000 | 29,500 | 62,000 | 82,700 | 116,800 | 162,600 | 203,300 | 285,200 |

Q. Why are there two charts?
A. Pension benefits differed between the two merger partners, Atlantic Energy and Delmarva Power, and employees are entitled to the benefits already earned. Opening balances will be different for two hypothetical employees having the same age and length of service, but coming from different companies. But, going forward, future credits to the accounts will be computed in exactly the same manner.

Q. In general, what are the differences in the two plans?
A. The main difference is that Atlantic Energy employees could retire at 55 with no reduction in benefit, while Delmarva Power employees could retire at 60 with no reduction in benefit, or at 55 with a 24% reduction in benefit. The Atlantic Energy percentage multiplier is 1.6%, compared to the Delmarva Power 1.5%. On the other hand, Delmarva Power employees have an enhanced survivor benefit that Atlantic Energy employees do not have. These differences have been quantified and were used in calculating these tables.

Q. Are there additional key variables other than earnings, age, and service that to consider when reviewing these charts?
A. The tables reflect the present value of money. Another factor that may not be as obvious, but that is significant in the opening balance calculation, is your distance from retirement age. So while additional service is important and is reflected as you move from left to right in the chart, it is also significant that you are also moving closer to age 55. The closer you are to age 55 the less the benefit earned to date that must be discounted to compute the opening balance. Or conversely, the younger you are, the more of the benefit must be discounted to compute the opening balance. This is why the initial balances for younger people appear smaller.

Note: This information is intended to be used as a guideline only for eligible employees. The employees eligible for the cash balance pension plan are management employees currently enrolled in Conectiv Flex benefits.

B - 56

Update of Conectiv Facts (Originally Published in the Spring of 1998)

## New Cash Balance Pension Plan

Until now, employees of both DPL and AE have been covered by what are known as "final pay" pension plans. The "cash balance" pension plan is a new concept that has two important advantages: It's easier to *understand* than the former plans, and it's totally *"portable."* Both these features support our goal of designing a benefits package that meets the needs of today's more independent, more mobile workforce. The new cash balance pension plan will take effect January 1, 1999.

## Benefit Easier to Understand

The way the new pension works is simple. Each year the company makes a cash contribution equal to a percentage of your total pay, including overtime and bonus, to your individual pension account. Throughout your Conectiv career, your account grows through additional yearly company contributions, plus interest. When you retire, the cash value of your account is yours.

Over the years, as you watch your pension account grow, you'll have a clearer idea of your own financial position. And you'll be able to plan for your future.

## Portability a Plus

With the new cash balance plan, if you leave Conectiv after you are vested and have completed five years of service, you can transfer your pension account either to your new employer's plan or to your own IRA. Taxes are deferred on the transfer, so your full account can continue growing for the rest of your working years.

## Company Contributions and Interest

Conectiv makes all the contributions to your cash balance pension account. These contributions are based as a percentage of your *total* pay, *including* overtime and bonuses. Contributions increase with age, as shown below. You are not required to contribute to the pension plan.

| Annual Company Pension Contributions | | | |
|---|---|---|---|
| Age[1] | Pension Credit (% of Pay) | Age | Pension Credit (% of Pay) |
| Under 30 | 5% | 40-44 | 8% |
| 30 to 34 | 6% | 45-49 | 9% |
| 35-39 | 7% | 50 and over | 10% |

[1] Based on your age as of January 1st; contributions are prorated if you move to a higher age bracket in mid-year.

The company also credits your account with *interest* each year based on the current 30-yr. U.S. Treasury bond rate. This rate changes based on economic conditions. Currently it is 5%. Historically, it has averaged about 8%.

## Conversion to the New Pension Plan

The new cash balance pension plan will cover all Conectiv management employees as of January 1, 1999. Benefits already earned under the former DPL and AE pension plans are *fully protected* and will be converted to an equivalent cash amount. This will form your "starting balance" under the new plan.

Your starting balance will, in essence, provide you with the lump-sum amount you would need today to purchase a lifetime annuity equal to the benefit you've earned to date under your DPL or AE pension plan. The conversion formula will take in account any early retirement and survivor benefits which are part of the current plans.

## Transition Credits with Ten or More Years' Service

If you have completed between ten and 35 years of service with DPL or AE as of January 1, 1999, you will also be eligible for annual *transition credits*. This means the company will contribute an *additional* amount to your pension account each year. Your transition credit percentage depends on your completed service as of January 1, 1999, and remains constant until you have completed 35 years of service. At that point, transition credits stop.

| Annual Transition Credits | | | |
|---|---|---|---|
| Service as of 1/1/99 | Transition Credit (% of Pay) | Service as of 1/1/99 | Transition Credit (% of Pay) |
| 10 to 11 years | 1% | 16 to 19 | 3% |
| 12 to 16 years | 2% | 20 years or more | 4% |

For example, if you have completed 13 years of service as of January 1, 1999, the company will make an additional contribution of 2% of your total pay to your account every year until you complete 35 years of service.

## Annual Statements

Each year, you'll receive a personal statement of your pension account which will show the company's contributions (basic amount plus any transition credits), interest credit and total balance, so you'll be able to watch the progress of your account over the years.

## "Grandfather" Protection for Older and Long Service Employees

Of course, many employees have already worked for most of their careers under the former "final pay" pension plans. For this reason, two groups of people will continue to be covered by their former plans for the next ten years. They are employees who, as of January 1, 1999:

- have completed 20 years of service, or
- are age 50 or older.

These "grandfathered" employees will have their pensions calculated under both the former and new plans, and will receive whichever value is greater. As an additional benefit, grandfathered employees have the option to elect a lump sum distribution under the former plan.

Payment Options at Retirement

The new pension plan also gives you a great deal of flexibility when you retire. You may take the full value of your pension in a single lump sum, which you may then roll over, tax deferred, into the investment vehicle you select. Or you may elect guaranteed lifetime monthly payments for yourself, or for you and your spouse (an "annuity").

Survivor Benefits

If you die after you are vested but before retirement, the new pension plan provides another advantage to your survivor. Under the former plans, survivor benefits were payable only to the spouse, and then at an amount equal to about *half* of your accrued benefit. With the new plan, the *entire cash value* of your pension account would be paid to your beneficiary who, with your spouse's consent, can be anyone you name.

| A Quick Look at the New "Cash Balance" Pension Plan | |
|---|---|
| Company Contributions | Made annually to your account based on a percentage of pay. Age-related percentages range from 5% to 10%. |
| Interest | Credited each year, based on the 30-year U.S. treasury bond rate at the time. |
| Conversion to New Plan | Benefits accrued under DPL and AE pension plans to be converted to a cash equivalent starting balance under new plan. Starting balance also credited with interest annually. |
| Transition Credits | With 10 years of service as of 1/1/99, you receive an additional annual company contribution of 1% to 4% of pay. |
| Vesting | Upon completion of five years of service (including service with DPL and AE). |
| Portability | Totally portable: current value of your account is yours if you leave Conectiv after you are vested. |
| Survivor's Benefit | Full current value of your account is paid to your spouse or beneficiary if you die while actively employed. |
| Payment options at retirement | Lump-sum cash option, or several lifetime monthly payment options (annuities); cash option can be rolled over to an IRA to continue tax deferral. |

Updated 12/21/98

# KREMMEL

# EXHIBIT E

# **Mid**Week **Extra**

### *Cash balance update*
#### June 23, 1999

Opening statements for the Cash Balance Pension Plan will be mailed to employees' homes beginning next week. Thirty informational meetings are scheduled throughout the company from July 12 to July 29 to familiarize employees with the plan and to answer questions. A draft schedule is below. This schedule is firm, but could be amended if there are major conflicts in your area.

Because this issue is very important to employees, the meetings are being scheduled during working hours. As managers, please make sure that everyone who wishes to attend the information sessions is given the opportunity. If employees are unable to attend meetings at their work sites, they may attend sessions elsewhere.

These meetings will be the best source of information on the plan and employees' opening balances. Recent stories in the national media have raised concerns about some cash-balance plans that do not offer the same level of financial security or grandfathering provisions as Conectiv's Cash Balance Pension Plan. One part of the presentation will address these concerns and demonstrate how Conectiv's plan is different. Members of the leadership group of managers and above are invited to the first meeting, July 12 at the Conference Center. This meeting will give you perspective you can use to help yourself and your employees.

The Cash Balance Pension Plan is a portable pension that you may take with you if you leave the company at any time after a five-year vesting period. The Vanguard Group will act as the plan administrator, and the Towers Perrin consulting firm will act as the actuary. The plan is easy to understand. Each year, the company makes a cash contribution to your account equal to a percentage of your total pay, including overtime and variable pay. Through your career, the account grows with additional contributions and accrued interest. When you leave or retire, the value of the account is yours, provided you are vested.

It's important to note that opening balances reflect the current value of your benefit under the Delmarva and Atlantic plans. Keep in mind that the balances reflect the present-day value of money. This balance will continue to grow through annual contributions, interest, and depending on your age and service, transition credits. The calculations will be discussed at the meetings.

Upon receipt of the statements, employees should check the information. If you believe any of the info in your statement is incorrect, follow the instructions on the opening-balance statement. Please do not call the Human Resources Service Center or the plan administrator.

If you or your employees have any questions after receiving the opening statements, please hold them until the meetings, where experts will be available to respond. The meetings were scheduled after the mailings to enable employees to prepare questions. They will be the best source of information on the plan at this time. After the meetings, the Human Resource Service Center and Vanguard will be prepared to answer any questions you may have going forward.

(see schedule, next page)

## VANGUARD GROUP
## CONECTIV CASH BALANCE PLAN
## VOLUNTARY INFORMATIONAL MEETING SCHEDULES

| Date | Location | Time | On-Site Contact |
|------|----------|------|-----------------|
| Mon., 7/12 | Top 209 Mtg – Conf Center, Room C<br>UoP – Conf Center, Room C | 8a-9:30a<br>10a-11:30a<br>1:00p-2p<br>2:30p-4p | Marie Falkowski, 8-235-5 |
| Tues., 7/13 | NDGO – Operations Conf Rooms A, B, C | 11p-12:30p<br>1:30p-3p<br>3:30p-5p | Janet Rudinoff, 8-225-448 |
| Wed., 7/14 | King Street – Multi-Purpose Room | 10:30a-12p<br>1:30p-3p<br>3:30p-5p | Kelley McMillan, 8-220-3 |
| Thurs., 7/15 | Pencader – Pencader Room | 9a-10:30a | Caren Samluk, 8-225-577! |
| Thurs., 7/15 | MLK – Multi-Purpose Conf Room | 1:30p-3p | TBA |
| Fri., 7/16 | Data Center – Rooms 2 A&B | 9a-10:30a<br>1:30p-3p | Carol Peterson, 8-235-514 |
| Mon., 7/19 | Centreville – General Meeting Room | 9a-10:30a | Terri Layton, 8-425-4125 |
| Mon., 7/19 | SDGO – Room 1, 1st Floor | 1:30p-3p<br>3:30p-5p | Lora Brittingham, 8-230-6 |
| Tues., 7/20 | Millsboro – Main Conf Room | 9a-10:30a | Nancy Gosnell, 8-440-335 |
| Tues., 7/20 | Indian River Power Plant – 1st Fl Conf Room | 1:30p-3p | Melinda Taylor, 8-330-35 |
| Wed., 7/21 | Indian River Power Plant – 1st Fl Conf Room | 8:30a-10a | Melinda Taylor, 8-330-35 |
| Wed., 7/21 | Carney's Point (TENTATIVE) | 3:30p-5p | TBA |
| Thurs., 7/22 | Delaware City Power Plant – General Mtg Rm | 9a-10:30a | Debbi Murray, 8-320-671: |
| Thurs., 7/22 | EdgeMoor Power Plant/Hay Rd – 1st Fl Assembly Room | 1:30p-3p | Arta Trabant, 8-325-7047 |
| Mon., 7/26 | Deepwater Station, NJ – 4th Fl Conf Room | 9a-10:30a | Donna Harris, 8-500-1726 |
| Mon., 7/26 | B L England, NJ – General Conf Room | 1:30-3p | Mary Ann Jarman, 8-500- |
| Tues., 7/27 | Glassboro/Winslow – Main Conf Room | 9a-10:30a | Brenda Okamoto, 8-500-7 |
| Tues., 7/27 | Cape May, NJ – Main Conf Room | 2:30p-4p | Louise McNew, 8-500-38( |
| Weds., 7/28 | Admin Complex/Pleasantville, NJ – Cafeteria | 9a-10:30a | Cheryl, 8-500-4317 |
| Weds., 7/28 | Mays Landing, NJ – Conf Room G | 1:30p-3p | Trish Smith, 8-500-6475 |
| Thurs., 7/29 | B L England, NJ – General Conf Room | 9a-10:30a | Mary Ann Jarman, 8-500-. |

Note: Where a morning meeting is planned, the room has been reserved for all morning. Conversely, where an afternoon meeting is planned, the room has been reserved for all afternoon. Also, an overhead projector has been reserved for each meeting site.

B - 61

# KREMMEL
# EXHIBIT F

**Conectiv:**
**Cash Balance Pension Plan**

A New and Valuable Plan for Today's Employees

July 1998


conectiv

---

**Today's Agenda**

- Introduction and Overview — Conectiv
- What is Cash Balance? — Conectiv
- Differences of Old vs. New Plan — Towers Perrin
- Vanguard's Role — Vanguard
- Answering Your Questions — All

---

**Why are We Here?**

- Overview for the change to a new plan
- Highlight advantages of the new plan
- Explain how the cash balance plan works
- Help you understand the value of your pension
- Make sure you understand Vanguard's role with regard to your pension and 401(k) plans
- Answer your questions

---

**Why Change to a New Plan?**

The Workplace Has Evolved Since Pension Plans were First Introduced

- Our business is changing and to succeed, we must attract and retain a more independent, more mobile workforce. Today's employees desire pension portability.
- Our benefits programs need to reflect the evolving trends of our employees.

---

**Why Cash Balance Benefits Today's Employees**

- Easier access
  - Your account is portable—you can take it with you after you're vested
- Higher confidence
  - The new plan is easier to understand—company makes an annual contribution to your account
- More convenience
  - You'll have a great deal of flexibility in choosing payment options when you retire

---

**Why Cash Balance Benefits Today's Employees**

- Greater comfort
  - You'll receive an annual statement so you'll know the value of your account each year
- Better value
  - New plan captures the best of final pay and cash balance retirement plans
  - Annual interest credit rate higher than current
  - "Grandfather" protection for pre-retirement and long service employees

Conectiv
July 1998
Page 5


John Kimble in HR.

## Important Perspectives on Conectiv's New Retirement Program

- New plan is a cash balance plan
- Cash balance plans are controversial
  - Series of Wall Street Journal articles
  - Congressional hearings
- Criticisms leveled at cash balance plans
  - Benefit 'and cutting'
  - Poor handling of communication/transition
  - Accrued rates for certain employees



## Important Perspectives on Conectiv's New Retirement Program

- New program not designed to provide cost savings for Conectiv
- New cash balance plan captures best of both types of retirement plans
  - Guaranteed benefit feature of plan retirement plan
  - Portability and precise account balance feature of an individual account plan like the former 401(k) plan
- Conectiv matching contribution increased under 401(k) plan for former Delmarva people

## Important Perspectives on Conectiv's New Retirement Program

- New cash balance plan provides higher than average annual contribution credit
- Additional contribution credits made each year for all employees with at least 10 years of service by the end of 1998
  - Continued until you have 30 years of service
- Annual interest credit rate on account balance higher than average
  - Majority of plans have index based on 30 years or shorter term
- Value of prior plan, including early retirement values and transfer benefit, preserved at time of conversion in increased balance
  - All employees immediately start earning additional benefit amounts



## Important Perspectives on Conectiv's New Retirement Program

- Prior retirement plan formula continued for 10 years for broader group of employees than most employers cover
  - Age 35 to 39 years of service
  - Best better of prior plan or new formula
- Conversion of old prior plan formula to expiring accrued included generous features
  - Early retirement subsidy included
  - Service benefit value included, even for single employees

Conectiv
July 1998
Page 2

### Calculation of Conectiv Opening Cash Balance

Opening Balance—Atlantic

- 60-month average of earnings from 1994 through 1998
- Credited years and months of benefit service from date of hire up to December 31, 1998
- Atlantic accrued benefit is:
  - [1.2% of 60-month average earnings] x [credited years and months of benefit service]
  - Service capped at 30 years if hired after January 1, 1998

### Calculation of Conectiv Opening Cash Balance

Early Retirement Subsidy—Delmarva

- Benefit is payable without reduction at Normal Retirement Age = 65
- Eligible for early payment of benefit as early as age 55 with 15 years of service
- Benefit is reduced for payment earlier than 65 as follows:
  - 3% reduction per year at age 64
  - 10% reduction per year at age 63
  - 5% reduction per year at age 57
  - 3% reduction per year at age 56
  - 5% reduction per year at age 55
- No subsidy at age 55 and above if accrued service is 30 years or more

### Calculation of Conectiv Opening Cash Balance

Early Retirement Subsidy—Atlantic

- Benefit is payable without reduction at Normal Retirement Age = 65
- Eligible for early payment of benefit as early as age 55 with 15 years of service
- Benefit is not reduced for payment earlier than 65



### Calculation of Conectiv Opening Cash Balance

Spouse Death Benefit—Delmarva

- Delmarva pays spouse death benefit at no charge to employee
- Generally, a spouse death benefit is worth 40% to 50% in married employees
- For opening account balances, Conectiv has provided a 45% death benefit for all employees, regardless of whether or not they were married on December 31, 1998

### Calculation of Conectiv Opening Cash Balance

Present Value

- Interest rate used to determine present value is 7%
- Value of benefit is determined at earliest retirement age (or current age if later)
- Value of benefit is discounted back to current age, if applicable

Conectiv
July 1999
Page 4

**Retirement Plan Services
Through Vanguard**

- Request cash balance estimates at retirement and future projections
- Request a benefit estimate
  - Initially 10 to 15 days for written estimate
  - In early 2000, estimates online and by end of 2 days

**Retirement Plan Services
Through Vanguard**

- Notices sent for vested, accrued benefits and cash balance upon termination
- Payout options and paperwork
  - Lump sum
  - Roll over to an IRA
  - Special tax treatment
- Notification at age 65 with payout information and paperwork
  - Note: Keep address current with Conectiv Pension Resource Service Contact

**Retirement Plan Services
Through Vanguard**

- Plan information
  - Plan provisions
  - Payout options
  - Eligibility
  - Vesting


Conectiv
July 1999
Page 7

B - 68

```
00001
 1         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2      CIVIL ACTION NO. C.A. NO. 05-702(SLR)

 3   --------------------------------
      J. MICHAEL CHARLES; MAURICE W.
 4   WARD, JR.; and JOSEPH I. FINK, JR.,
      on behalf of themselves and all
 5   others similarly situated,

 6        Plaintiffs,

 7      v.

 8   PEPCO HOLDINGS, INC.; CONECTIV, and
     PEPCO HOLDINGS RETIREMENT PLAN,
 9
          Defendants.
10   --------------------------------

11

12
          Philadelphia, Pennsylvania
13        Tuesday, March 13, 2007

14

15
          TRANSCRIPT of testimony of JAMES R.
16
     KREMMEL, as taken by and before Sean M. Fallon, a
17
     Registered Professional Reporter and Notary Public
18
     of the Commonwealth of Pennsylvania, at the offices
19
     of PEPPER HAMILTON LLP, 3000 Two Logan Square,
20
     Eighteenth and Arch Streets, commencing at
21
     o'clock in the forenoon.
22

23

24
```

00009
1 hygienist?

2   A.   Yes.

3   Q.   And then in 1994 you became an

4 employee relations specialist, is that correct?

5   A.   That's correct.

6   Q.   And you held that position until

7 1998?

8   A.   Correct.

9   Q.   How did your role change when you

10 shifted from being an industrial hygienist to being

11 an employee relations specialist?

12   A.   An employee relations specialist for

13 Delmarva was responsible for working around

14 employee matters and union issues around the

15 Collective Bargaining Agreements that were in place

16 between Delmarva and the different unions that

17 represented the unionized workforce.

18   Q.   Was it a promotion?

19   A.   It was a promotion, yes.

20   Q.   Did you have people working that you

21 supervised?

22   A.   Not initially, no.

23   Q.   Then in 1998 you became an employee

24 relations specialist at Conectiv, is that correct?

B - 70

00010

1    A.    I believe that's correct, yes.

2    Q.    Did you receive any kind of training

3 as you moved from the industrial hygiene to

4 employee relations specialty?

5    A.    Yes.

6    Q.    Could you summarize it briefly for

7 me?

8    A.    Combination of on-the-job training

9 and technical training.  Conferences, seminars.

10    Q.    Do you -- did you finish your

11 response?

12    A.    Yes, I did.

13    Q.    Do you belong to any professional

14 societies?

15    A.    Presently?

16    Q.    Yes.

17    A.    Yes.  World At Work.

18    Q.    Any others?

19    A.    Not to my recollection.  I believe

20 that's the only one right now.

21    Q.    Fair enough.

22        What was your next position after

23 you were an employee relations specialist at

24 Conectiv?

00011

1     A.     To my recollection, I was benefits

2 manager for Conectiv.

3     Q.     And that was from 1999 to 2001?

4     A.     I believe that's correct, yes.

5     Q.     And then you became compensation

6 manager?

7     A.     Yes.  That would have been my next

8 role.

9     Q.     And how long did you hold that

10 position?

11     A.     I was compensation manager for

12 Conectiv from 2001 through the merger with Pepco in

13 August of 2002.

14     Q.     And, after August, 2002, what

15 position did you assume?

16     A.     I was manager of compensation for

17 Pepco Holdings.

18     Q.     And is that your current position?

19     A.     No.

20     Q.     What's your current position?

21     A.     My current position is principal

22 consultant for Pepco Holdings.

23     Q.     Is that a full-time salaried

24 position?

B - 72

00017

1    A.    Yes, I did.

2    Q.    How did you interact with Mr.

3 Wilkinson in this rough time period of October of

4 1997?

5    A.    I was a member of the overall

6 project team that was responsible for implementing

7 the new -- company's new Total Rewards program.

8    Q.    What did the Total Rewards program

9 involve?

10    A.    The -- it was an overall redesign of

11 the compensation and benefits programs for what

12 would be the new company, Conectiv.

13    Q.    So, that embraced health plans,

14 pension plans, holidays, vacation schedules, pay

15 structures?

16    A.    Essentially, yes.

17    Q.    Anything else that I've left out?

18    A.    I think you've got the majority of

19 it.

20    Q.    And did you have any particular

21 role, what your duties were, as part of the Total

22 Rewards team?

23    A.    As a team member, as part of the

24 project team.  No special responsibilities, other

B - 73

00018

1  than as part of the team helping to facilitate the

2  initiative.

3      Q.    Focusing on Exhibit D-1 for a

4  moment, do you know how that was issued to the

5  workforce?

6      A.    This individual communication, I

7  believe, was distributed in a hard copy, printed

8  internally by the company's general printing group,

9  and then distributed to employees.

10     Q.    Was it aimed at any particular

11 category of employees or was it everyone that was

12 drawing a paycheck?

13     A.    This communication, I believe, was

14 targeted to all employees in the company, sir.

15     Q.    Thank you, sir.  Let's go to

16 Defendants-2.

17         Mr. Kremmel, I've handed you a

18 document which was previously marked as

19 Defendants-2.  It's a similar newsletter.  This one

20 bearing the date, October 20th, 1997.

21         I'd ask you to take a moment to

22 review it and see if it is familiar to you.

23     A.    It is similar, yes, sir.

24     Q.    Do you know who was responsible for

00019

1  authoring this?

2      A.    Who, directly?

3          No, I do not.

4      Q.    Was there anyone who was on the

5  Total Rewards team that was particularly tasked

6  with handling employee communications?

7      A.    Not individually, to the best of my

8  recollection.

9      Q.    Did you receive a copy of

10  Defendants-2 in or about October of 1997?

11      A.    I do not recall personally.

12      Q.    As part of your work on the Total

13  Rewards team, did you come to form an understanding

14  that one element of the potential changes would be

15  a cash balance pension plan?

16      A.    Could you repeat the question,

17  please?

18          MR. MALONE:  Can you read that back.

19  I think I botched it.

20          (Pertinent portion of the record is

21  read.)

22          THE WITNESS:  Yes, I did.

23  BY MR. MALONE:

24      Q.    When did it come to your attention

00042

1  estimate, to the best of your present recollection?

2      A.    To the best of my recollection, it

3  would have been sometime between -- sometime

4  between the fall of 1997 and the spring of 1998.

5      Q.    Focusing in on Defendants Exhibit 5,

6  did you have a role in preparing Defendants-5?

7      A.    To the best of my recollection, I

8  did have a role in preparing this document.

9      Q.    And what was your role?

10     A.    As part of the reviewing the content

11  of the information as part of the Total Rewards

12  team, and preparing it for printing and

13  distribution.

14     Q.    Who was responsible for the overall

15  content?

16     A.    Who ultimately was responsible for

17  the overall content?

18     Q.    Let me withdraw that and try to --

19  who wrote it?

20     A.    I don't recall specifically who

21  wrote it.

22     Q.    Do you remember who you conveyed

23  information to for the purposes of preparation of

24  D-5?

00043

1    A.    I believe -- I guess that's not the

2  right way to answer it.

3        To the best of my recollection, it

4  was individuals with the company's corporate

5  communications team that would have supported the

6  Total Rewards project team.

7    Q.    So these were not HR people?

8    A.    That actually did the writing?

9        No.  They would have been

10  professional communicators.

11    Q.    This was reviewed and approved by

12  the HR department before it was issued?

13    A.    That is correct.

14    Q.    Who was responsible at that time for

15  reviewing employee communications with respect to

16  the Total Rewards program?

17    A.    At that time, sir, there would have

18  been multiple individuals who would have reviewed

19  it.  I don't recall exactly when I became manager

20  of benefits specifically, but I would have reviewed

21  it, the manager of compensation and benefits would

22  have reviewed it, and the vice-president of human

23  resources for the company would have reviewed it at

24  this point.

00044

1    Q.    As of April of 1998, who was the

2 manager of compensation and benefits?

3    A.    I believe at that point it was still

4 Ben Wilkinson.

5    Q.    And who was the vice-president of

6 human resources? Mr. Cain?

7    A.    At that point it was Don Cain, yes.

8    Q.    Anyone else in the chain of command

9 that would have been responsible for reviewing and

10 approving D-5?

11    A.    Other than, as I previously

12 mentioned, probably at this point most of the

13 project team would have seen it -- at least seen

14 the draft and had had an opportunity to comment.

15         Your question was chain of command.

16 There would have been no one else in the chain of

17 command that I recall.

18    Q.    Thank you, sir.

19         Do you know how this was

20 disseminated?

21    A.    This would have been, again, printed

22 internally by the company and delivered -- this

23 individual document was delivered to individuals'

24 homes -- it was mailed to their homes.

00045

1    Q.    How do you know that?

2    A.    On, again, the last page of the

3  document, PH -- the document -- it reads to me, PHI

4  0033, it's franked with -- for U.S. postage and has

5  an address on it.

6    Q.    In or about April of 1998, did the

7  company keep records when it made mailings of

8  benefits information to employees?

9    A.    The company kept a copy of what was

10  mailed.

11    Q.    Did it keep a log that would tell

12  you the date that it was mailed?

13    A.    Not to the best of my recollection,

14  no.

15    Q.    Okay.

16        Mr. Kremmel, I've handed you what's

17  previously been marked as D-6 for identification

18  purposes. It's a multipage document that bears the

19  date of December 21, 1998, and is headed, "Dear

20  Conectiv Management Employee."

21        Why don't you take a moment to

22  review it and then I'll ask you a few questions

23  about it.

24    A.    Okay.

00046
1        Okay, sir.

2    Q.    Have you seen this before?

3    A.    Yes, I have.

4    Q.    When did you first see it?

5    A.    To the best of my recollection, I

6  saw it in the fall of 1998.

7    Q.    And what was the context in which

8  you first saw it in the fall of 1998?

9    A.    I would have had part of -- I would

10  have had input into the preparation of the document

11  at that time, sir.

12    Q.    Do you know who was the principal

13  author of Defendants-6?

14    A.    I do not know specifically who the

15  author was, no.

16    Q.    Are you able to identify some or all

17  of the people who, in the fall of 1998, were

18  working to create the document which became

19  Defendants-6?

20    A.    Other than myself, no, not at this

21  point. I don't recall.

22    Q.    Who was the manager of compensation

23  and benefits as of December, 1998?

24    A.    December of '98. To the best of my

00064

1  that are available, vision care options that are

2  available, life insurance options that are

3  available, health care and dependent care

4  reimbursement accounts.

5         Those were the components that were

6  involved, to the best of my recollection.

7     Q.    Taking a look at D-7, particularly

8  at the third physical page, which is headed "New

9  Cash Balance Plan," that has a Number 24 in the

10  lower left-hand corner.

11    A.    I see that, yes.

12    Q.    To your knowledge, is D-7 an excerpt

13  from or appear to be an excerpt from a larger

14  document?

15    A.    It appears to be, yes, sir.

16    Q.    Did you have a role in preparing the

17  larger document of which D-7 forms a part?

18    A.    To the best of my recollection, yes,

19  I did.

20    Q.    And would you describe your role, to

21  the best of your recollection, please.

22    A.    As part of the review of the

23  materials that were included in the document and

24  prior to its distribution.

00083

1 would have been the individuals in the compensation

2 and benefits group of the company.

3    Q.    Would that include the, I think we

4 called it, the human resources strategic business

5 partners?

6    A.    No.

7    Q.    Were there, in fact, a series of

8 meetings held in or about July or August of 1999

9 to -- for employees to attend to learn about the

10 cash balance plan?

11    A.    Yes, there were.

12    Q.    And did you participate in those

13 meetings?

14    A.    I participated in some of those

15 meetings, yes, sir.

16    Q.    Do you recall approximately how

17 many?

18    A.    I do not recall, no, sir.

19    Q.    Were the meetings recorded in some

20 form?

21    A.    The meetings were not videotaped or

22 not audio recorded, no.

23    Q.    Were there minutes maintained?

24    A.    No, not to my recollection.

00085

1    Q.    Who was it sent to?  "It" being

2  D-10.

3    A.    I don't -- I don't know who,

4  specifically, it was sent to.

5    Q.    Can you break it down by role at the

6  company?

7    A.    To the best of my recollection, this

8  was sent to all nonrepresented employees in the

9  company.  To the best of my recollection.

10    Q.    Let me direct your attention to the

11  second paragraph on the first page of D-10 and

12  specifically the second sentence.

13    A.    Yes.

14    Q.    It says, "As managers, please make

15  sure that everyone who wishes to attend the

16  information session is given the opportunity."

17        Do you see that?

18    A.    Um-hum.  Yes, sir, I do.

19    Q.    The next page has a schedule of

20  meetings.  Correct?

21    A.    The second page does have a listing

22  of meetings, yes, sir.

23    Q.    Now, what employees were offered the

24  opportunity to attend the meetings on the cash

00093

1    Q.   Did you keep notes?

2    A.   Not to my recollection, no.

3    Q.   Let me ask you to turn to the second

4  page of D-10.  The table suggests that a number of

5  meetings were scheduled at a number of locations

6  between July 12th and July 29th.

7       Do you see that?

8    A.   Yes, I do.

9    Q.   That time frame, is that consistent

10  with your recollection of when the meetings took

11  place?

12    A.   Yes, sir, it is.

13    Q.   And how would you describe the

14  format of the meeting to someone that had not

15  attended?

16    A.   The format of the meeting?

17    Q.   Yes.

18    A.   It was a -- to my recollection, it

19  was a presentation and question and answer period

20  at each of the presentations, sir.

21    Q.   And at each presentation was there

22  someone from human resources to give a

23  presentation?

24    A.   There would have been, yes.

00094

1    Q.    And was there someone from Vanguard

2    at each?

3    A.    To the best of my recollection, yes,

4    there was.

5    Q.    And was there someone from Towers

6    Perrin?

7    A.    Again, to the best of my

8    recollection, there was.

9    Q.    Were there any other team members

10    who were part of the presentation team at these

11    employee meetings, other than HR, Vanguard, Towers

12    Perrin?

13    A.    Team members?  I'm not sure what you

14    mean by "team member."

15    Q.    Let me do it in a little colloquial

16    fashion.  The employees walked into a room; there

17    were a bunch of people up on the dais giving a

18    presentation.  Somebody from HR, somebody from

19    Vanguard, somebody from Towers Perrin.

20        Anybody else?

21    A.    I don't recall any other specific

22    company representatives that were there, sir.

23    Q.    Any outside representatives?

24    A.    I don't specifically recall any

B - 85

00095

1  outside representatives being at any of the

2  meetings.

3      Q.    Okay.

4            Now, from the chart, it appears that

5  you were having multiple meetings on multiple days

6  at multiple locations to roll out the cash balance

7  plan.

8            Is that correct?

9      A.    That's correct, yes, sir.

10     Q.    What measures were taken to make

11  sure that the presentation was reasonably

12  consistent from location to location and from time

13  to time?

14     A.    Again, to the best of my

15  recollection, the same presentation was utilized at

16  each location.

17     Q.    In what form was that presentation?

18     A.    It was an overhead PowerPoint

19  presentation that was followed at each of the

20  presentations.

21     Q.    And were notes provided to the

22  speakers to assist them with the PowerPoint

23  presentation?

24     A.    Not to my recollection sir, no.

00096

1    Q.    Do you know who prepared the

2  PowerPoint presentation?

3    A.    I do not.

4    Q.    Did you assist in preparing it?

5    A.    I recall assisting in it, yes. I

6  don't recall who actually prepared it.

7    Q.    At any of the meetings that you

8  attended, were you one of the people providing the

9  presentation?

10    A.    I believe I was, yes.

11    Q.    Did that happen on more than one

12  occasion?

13    A.    To the best of my recollection, it

14  did, yes.

15    Q.    Can you tell me something about

16  locations at which you may have appeared to give a

17  presentation?

18    A.    I believe the first meeting that's

19  listed on July 12th, I attended that meeting, and I

20  believe -- to the best of my recollection, I also

21  attended the meetings at NDGO and at King Street on

22  July 13th and July 14th.

23    Q.    Okay.

24    A.    Those are ones that I -- I

00097

1  believe -- I believe -- my recollection is I

2  attended all three of those.

3        I don't recall which of the others

4  that I attended.  Although there were others, I

5  just don't recall which ones I would have attended,

6  sir.

7    Q.    What does NDGO mean?

8    A.    That's an acronym for Northern

9  Division, General Offices.  It's in Newark,

10  Delaware.

11   Q.    Is that where you are now?

12   A.    That's where my office is, yes.

13   Q.    Did they take attendance at the

14  meetings?

15   A.    Not to my recollection.

16   Q.    Were the meetings mandatory?

17   A.    No.  The employees -- it was not a

18  mandatory condition of employment that they attend.

19   Q.    Do you have any ability to estimate

20  what percentage of employees attended?

21   A.    Only my gut recollection at the

22  time.  It's my -- it would be subjective, not

23  objective.

24   Q.    I'll take subjective.

00179

1    Q.    And have you ever taken a

2    distribution from the cash balance plan?

3    A.    I have, yes.

4    Q.    Can you describe the circumstances

5    under which you took a distribution?

6    A.    I left Pepco Holdings from -- for

7    one year, in late 2004, early 2005, to accept a

8    position as manager of compensation and benefits

9    with American Water for that short period of time.

10    Q.    From your own personal perspective,

11    again, not as the corporate designee, but from your

12    own perspective as a participant in the cash

13    balance plan, do you have a sense of whether you

14    were harmed or benefited by the adoption of the

15    cash balance plan as opposed to the prior plan that

16    was in place?

17        MR. MALONE:  Object as to form.

18        THE WITNESS:  My -- my personal

19    opinion is that myself and my family have been

20    benefited by the -- by the cash balance plan.

21        MS. YU:  That's all I have.

22    FURTHER EXAMINATION

23    BY MR. MALONE:

24    Q.    How much of your time was spent on

00180

1 matters relating to the cash balance plan in the

2 period late 1998 and 1999? Can you give me some

3 sense of an estimate?

4    A.    I do not recall at this point how

5 many hours I might have spent specifically on the

6 cash balance plan.

7    Q.    Was it a significant undertaking

8 that took a lot of your attention?

9    A.    It was one of several undertakings

10 that took my attention during that period of time.

11    Q.    And you worked intensively on it?

12    A.    On? On the cash balance plan?

13    Q.    Cash balance plan, yes.

14    A.    To the extent that I was on the

15 Total Rewards project team, yes.

16    Q.    And did you consider your service on

17 the Total Rewards project team to be a significant

18 achievement?

19    A.    I think I contributed adequately, as

20 any of the other team members did.

21    Q.    Was it significant to you that there

22 were no initial lawsuits surrounding the roll-out

23 of the cash balance plan?

24    A.    No, sir.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all similarly situated | ) ) ) ) ) |
| Plaintiffs, | ) ) Case No.: 05-702 (SLR) ) |
| v. | ) ) |
| PEPCO HOLDINGS, INC., CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) ) |
| Defendants | ) ) ) |

### EXPERT REPORT OF ETHAN E. KRA, PH.D, F.S.A.

#### BACKGROUND

1.     I am the Chief Actuary-Retirement of Mercer Human Resource Consulting. I am also a Fellow of the Society of Actuaries, a Fellow of the Conference of Consulting Actuaries, a member of the American Academy of Actuaries and an Enrolled Actuary under ERISA. I have given over 130 speeches on employee benefits issues over the past 30 years at various professional meetings and seminars and have authored or co-authored numerous articles on employee benefit issues. I am often quoted in such publications as The New York Times, The Wall Street Journal, Time, Newsweek and other financial publications. My curriculum vitae is appended to this report as Attachment 1.

2.     My responsibilities at Mercer Human Resource Consulting include advising clients on the design, funding and expense allocation of employee and executive benefits, including retirement, death, disability and health benefits.

B - 91

3.    This Report has been prepared for counsel for PepCo Holdings, Inc.

4.    My time on this project is being billed at $625 per hour, plus expenses. Others working on this project are being billed at our standard hourly billing rates.

### FINDINGS

5.    In each year that I reviewed (1999 through 2007), the plan passes the 133 1/3% rule under IRC §411)(b)(1)(B).

6.    The pleadings note that Plaintiffs' benefits decreased in certain years. These negative adjustments to the annuity payable at normal retirement date were solely on account of interest rate changes. In each of those years, they experienced a positive benefit accrual on account of increased age, service and compensation received during the year.

7.    As of the effective date of the plan amendment (January 1, 1999), the accrued benefit (payable at normal retirement date) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan. This determination was based on service and plan factors (including interest rates used for crediting to the cash balance accounts and for converting cash balance accounts to annuities) as of January 1, 1999 remaining constant through normal retirement date. Following is a table summarizing these results:

| Name | Accrued Benefit at 1/1/99, payable at Normal Retirement Date under Pre-Amended Plan | Accrued Benefit at 1/1/99, payable at Normal Retirement Date under Amended Plan |
|---|---|---|
| Thomas S Troop | 17,357.06 | 23,021.41 |
| Maurice Ward | 17,433.84 | 23,014.11 |
| Jerome Charles | 17,264.57 | 25,425.91 |
| Joseph Fink | 11,141.94 | 15,142.38 |

8.    As of the effective date of the plan amendment (January 1, 1999), the projected benefit (payable at normal retirement date) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan. This determination was based on compensation and plan factors (including interest rates used for crediting to the cash balance accounts and for converting cash balance accounts to annuities) during 1999 remaining constant through the normal retirement date. This analysis reflects actual compensation received during 1999 and is not based solely on compensation as of January 1, 1999. However, for purposes of this determination, each Plaintiff was assumed to continue to earn service through his normal retirement date. Following is a table summarizing these results:

| Name | Projected Benefit at 1/1/99, payable at Normal Retirement Date under Pre-Amended Plan | Projected Benefit at 1/1/99, payable at Normal Retirement Date under Amended Plan |
|---|---|---|
| Thomas S Troup | 28,982.51 | 38,278.10 |
| Maurice Ward | 42,933.15 | 50,458.26 |
| Jerome Charles | 31,953.78 | 41,151.88 |
| Joseph Fink | 33,469.50 | 39,376.03 |

### METHODS, ASSUMPTIONS AND DATA

9.    In preparing this report, I have reviewed the following documents:

• Part One CONECTIV CASH BALANCE SUB-PLAN Effective as at January 1, 1999.

• ATLANTIC CITY ELECTRIC COMPANY RETIREMENT PLAN As Amended and Restated Effective January 1, 1994

• DELMARVA POWER & LIGHT COMPANY RETIREMENT PLAN as amended or restated through January 1, 1995

10.    In preparing this report, I have utilized the data that were supplied to me and which are summarized on Attachment 2.

11.    All projections of benefits from any given date are based on the interest rates, salaries, Social Security law (including Taxable Wage Base) in effect as of the relevant date.

_____
Ethan E. Kra

State of New York      )
                       ) ss.
County of New York     )

Affirmed to before me this 20th day of April, 2007, by Ethan E. Kra.

LaDrena D. Andrews
Notary Public, State of New York
No. 01AN5088283
Qualified In Queens County
Cert. Filed In New York County
Cert. Filed In Kings County
Commission Expires _____

_____
Notary Public

My commission expires: _____

ATTACHMENT 1

# Ethan E. Kra

Mercer Human Resource Consulting
1166 Avenue of the Americas
New York, NY 10036
Phone: 212-345-7125

*Education:*

B.A., Yale University, summa cum laude, honors with exceptional distinction in mathematics, 1969.

M.A., Yale University, mathematics, 1969.

M.Phil., Yale University, mathematics, 1973.

Ph.D., Yale University, mathematics, 1974.

Thesis: Infinitary Forcing for Languages with the Q-Quantifier: Fefferman Vaught Theorems for Infinitary Forcing.

Academic Honors:    Woodrow Wilson Fellow

National Science Foundation Fellow

Prize Teaching Fellowship (Yale University)

Phi Beta Kappa

*Professional Organization and Credentials:*

Fellow, Society of Actuaries (1976)

Vice President (2006– )

Board of Governors (1997–2000); Operations Committee (1997–2000)

Pension Section Council (1991-94), Vice-Chair (1992-93), Chair (1993–94)

FAS 106 Task Force (1993-99), Co-chair (1993–99)

Financial Economics and the Actuarial Model Task Force (jointly held with American Academy of Actuaries (2002– ), Chair (2002–2004)

Discipline Committee (2000–05)

Retirement Practice Advancement Committee (1992–2004), Chair (1997–2000)

Non-Mortality Decrement Task Force (2000–04)

Jointly Administered Examinations for Enrollment of Actuaries Committee (1978–79)

Part 4 Examination Committee (1979–80)

- 1 -

ATTACHMENT 1

Fellow, Conference of Consulting Actuaries (1985)

Intersector Committee (1992–94)

Member, American Academy of Actuaries (1979)

Board of Directors (2003–2006)

Pension Practice Council (1993–94, 1997– ), Vice Chair (2000–03, 2005– )

Pension Committee (1994– )

Defined Benefit Revitalization Task Force (2003–04)

Washington Forum Planning Committee (2002)

Strategic Planning Task Force (1997–98)

Member, American Society of Pension Actuaries (1996)

American Benefits Council (formerly known as Association of Private Pension and Welfare Plans)

Retirement Savings Committee (1991-1997)

Retirement and Investment Policy Committee (1999– )

Retirement Income Task Force (1997– )

ERISA Industry Committee

Pension Funding Task Force (2004– )

Retirement Security Committee (2005– )

Enrolled Actuary (1979)

Chartered Life Underwriter (1977)

Insurance Licenses in New York and New Jersey

Actuarial Standards Board General Committee (2002–2004)

*Employment:*

Mercer Human Resource Consulting, 1977 to present.

Currently Chief Actuary-Retirement, with responsibilities in the areas of design and funding of pension and group insurance benefits, structuring and funding of non-qualified pension benefits years and the proper accounting for expense of employee benefits.

Internal positions include:

- Chair, Actuarial Resource Network
- Former Chair, New York Region Professional Standards Committee

- 2 -

ATTACHMENT 1

Principal (1984-1989); Managing Director (1989 to present); designation subsequently changed from Managing Director to Worldwide Partner.

Prudential Insurance Company of America, 1973-77.

Actuarial program, including assignments in long and short term disability insurance (3/76–4/77); group pensions (8/74–2/76); group insurance systems and aviation reinsurance.

Yale University, 1971-73.

Prize Teaching Fellow, 1972-73

Teaching Fellow, 1971-72

*Speeches and Lectures:*

"Pension Reform: What You Need to Know and What You Need to Do", panelist on Corporate Treasurers Council webcast.

"Late Breaking Developments", panelist at the 2006 Conference of Consulting Actuaries Annual Meeting.

"Pension Funds in Crisis – Next Generation Plan Design: What Will It Look Like for Generation X and Y?", panelist at Strategic Research Institute Conference.

"Pension Reform: What You Need to Know and What You Need to Do", panelist at the Association of Financial Professionals Annual Conference.

"Are Defined Benefit Plans an Endangered Species?, panelist at OPERS 5th Annual Investment Forum.

"Pension Accounting Reform & the Future of Defined Benefit Plans – Did the Markets, the Accounting or the Funding Rules Cause the Pension Crisis?" , panelist at Strategic Research Institute Conference.

"General Session I – Pension Funding Reform", panelist at the 2006 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2005 Conference of Consulting Actuaries Annual Meeting.

"Addressing the Financial Risks from Retirement Systems Seminar: Changing Our Focus: Consulting About Risk", panelist at the 2005 Society of Actuaries Spring Meeting.

"2005 Pension Symposium – Pension Funding Reform", speaker at the symposium co-sponsored by the American Academy of Actuaries, the American Society of Pension Professionals & Actuaries and the Society of Actuaries.

"Practicing Professionalism", panelist at the 2005 Enrolled Actuaries Meeting.

"Education 2005: Update from the Pension Perspective", panelist at the 2004 Society of Actuaries Annual Meeting.

- 3 -

ATTACHMENT 1

"Pension Funding Proposals", panelist at the 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2004 Society of Actuaries Annual Spring Meeting.

"The Great Unknown: Q & N/A's", panelist at the 2004 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2003 Conference of Consulting Actuaries Annual Meeting.

"The Great Controversy Symposium: Employer Perspective (Part 1)", moderator and panelist at the SOA Symposium, "The Great Controversy: Current Pension Actuarial Practice in Light of Financial Economics".

"Late Breaking Developments", panelist at the 2003 Society of Actuaries Annual Spring Meeting.

"Rulings and Regulations Update", panelist at the 2003 Enrolled Actuaries Meeting.

"Q and N/A", panelist at the 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2002 Society of Actuaries Annual Meeting.

"Does the Syllabus Prepare Us for the Jobs of the Future?", panelist at the 2002 Society of Actuaries Annual Meeting.

"Rulings and Regulations Update", panelist at the 2002 Society of Actuaries Annual Spring Meeting.

"New Mortality Tables on Pension Plans", panelist at the 2002 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at the 2002 Enrolled Actuaries Meeting.

"Is That Your Final Answer?", panelist at the 2001 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments – Wass Up!", panelist at the 2001 Conference of Consulting Actuaries Annual Meeting.

"Does ERISA Bias Lead to Equity Investment?", panelist at the Society of Actuaries 2001 Annual Spring Meeting.

"Late Breaking Developments Part 2: Court Cases", moderator at the Society of Actuaries 2001 Annual Spring Meeting

"Effective Use of Pension Surplus", panelist at the 2001 Enrolled Actuaries Meeting.

"Funding Retiree Welfare Benefits", panelist at the 2001 Enrolled Actuaries Meeting.

- 4 -

ATTACHMENT 1

"Rulings and Regulation Update", panelist at the 2001 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the Conference of Consulting Actuaries 2000 Annual Meeting.

"Déjà vu All Over Again – Q&N/A's", panelist at the Conference of Consulting Actuaries 2000 Annual Meeting.

"Financing Voluntary Nonqualified Deferred Compensation Plans", presenter at Financial Executives Institute National teleconference.

"Late Breaking Developments and Rulings", panelist at the Society of Actuaries 2000 Annual Spring Meeting.

"Discussion of IRS Gray Book and PBGC Blue Book", panelist at 2000 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at 2000 Enrolled Actuaries Meeting.

"Q&NA's – Gray Areas", panelist at 2000 Enrolled Actuaries Meeting.

"Reopening the Great Debate: ERISA Funding", panelist at the Society of Actuaries 1999 Annual Meeting.

"Dial 10-10-GATT for Pension Plan Mortality", panelist at the Society of Actuaries 1999 Annual Meeting.

"Q&NA's", panelist at the Conference of Consulting Actuaries 1999 Annual Meeting.

"Late Breaking Developments", panelist at the Conference of Consulting Actuaries 1999 Annual Meeting.

"Overview of Deferred Compensation Plans", panelist at 1999 Non-Qualified Executive Retirement Programs Conference sponsored by International Business Communications.

"Pension Rulings and Regulations Update", panelist at the Society of Actuaries 1999 Annual Spring Meeting.

"Discussion of Gray Book Questions and Answers", panelist at 1999 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at 1999 Enrolled Actuaries Meeting.

"Tales of Terror – Ethics, Actuaries, the ABCD and the Law", speaker at the Conference of Consulting Actuaries 1998 Annual Meeting.

"Pension Rulings and Regulations Update", panelist at the Society of Actuaries 1998 Annual Meeting.

"Technical Concerns: Late-Breaking Pension Developments", panelist at the Society of Actuaries 1998 Annual Spring Meeting.

"Discussion of Gray Book Questions and Answers", panelist at 1998 Enrolled Actuaries Meeting.

- 5 -

B - 99

ATTACHMENT 1

"Postretirement Welfare Benefits", panelist at 1998 Enrolled Actuaries Meeting.

"Exercising Professional Judgement – An Exercise in Futility", panelist of General Session #3 of the 1998 Enrolled Actuaries Meeting.

"Questions and Answers with the 'Experts", panelist at Conference of Consulting Actuaries 1997 Annual Meeting.

"So What's New?—Late Breaking Developments", panelist at Conference of Consulting Actuaries 1997 Annual Meeting.

"Financing Executive Deferred Compensation with Life Insurance—Does It Make Economic Sense When the Insurance Company Doesn't Run the Numbers?", panelist at the American Bar Association's 1997 Annual Meeting.

"Split Dollar Life Insurance – The True Economics (Pre TAM/PLR)", panelist at the American Bar Association's 1997 Annual Meeting.

"Trends & Issues in Non-Qualified Pension Plans", speaker at the Financial Executives Institute sponsored by the Committee on Investment of Employee Benefit Assets.

"Pension Simplification – Defined Benefit Issues", panelist at the Society of Actuaries 1997 Annual Spring Meeting.

"Approaching the Decision Making Process:  How to Compare the Alternatives", panelist at 1997 Non-Qualified Executive Retirement Programs Conference sponsored by International Business Communications.

"Employee Benefits in Captives", panelist at 1997 Captives Insurance Operations Conference.

"Post-Retirement Welfare Benefits", panelist at 1997 Enrolled Actuaries Meeting.

"Exercising Professional Judgment – An Exercise in Futility?", panelist at 1997 Enrolled Actuaries Meeting.

"Gray Book Questions and Answers", speaker at 1997 Enrolled Actuaries Meeting.

"Small Business Job Protection Act of 1996 (Pension Simplification???)", panelist of General Session #1 at 1997 Enrolled Actuaries Meeting.

"Basics of Funding Retiree Medical", panelist at Conference of Consulting Actuaries 1996 Annual Meeting.

"Plan Qualification/Registration Issues for Multinational Sponsors", moderator and panelist at the Society of Actuaries 1996 Spring Meeting.

"SFAS 106/112 For the 'Know it All'", co-chair and speaker at Society of Actuaries May 1996 seminar.

"Employee Benefit In Captives" speaker at 1996 Captive Insurance Operations Conference sponsored by the Hartford Institute on Insurance Taxation.

- 6 -

B - 100

ATTACHMENT 1

"Non-Qualified Executive Compensation" chair and moderator for Center for Business Intelligence seminar; spoke on "Integrating Non-qualified Plan Objectives to Attract & Retain Key Employees" and "Funding and Securing Non-Qualified Supplemental Executive Benefit Programs".

"Gray Book Questions and Answers", speaker at 1996 Enrolled Actuaries Meeting.

"Pick your iq", speaker at 1996 Enrolled Actuaries Meeting.

"415 Limitations After GATT - Revenue Ruling 95-29" speaker at 1996 Enrolled Actuaries Meeting.

"How to Calculate Federal Insurance Contributions Act Tax on Supplemental Executive Retirement Plans", moderator and speaker at the Society of Actuaries 1995 Spring Meeting.

"Employer Benefits and U.S. Captives", speaker at the 33rd RIMS Annual Conference.

"Employee Benefits in Captives" speaker at Tenth Anniversary Captive Insurance Operations Conference.

"Pick Your i", speaker at 1995 Enrolled Actuaries Meeting.

"Pension Aspects of GATT", speaker at the Employee Benefits Group Inc.

"Financing Corporate Liabilities", speaker at Benefit and Financial Strategies after OBRA, seminars sponsored by CIGNA.

"Why Aren't More Captives Writing Employee Benefit Coverage?", speaker at 21st Annual Captive Insurance Companies Association, Inc. Conference.

"Post-Retirement Welfare Benefits", speaker at 1994 Enrolled Actuaries meeting.

"Employee Benefits", speaker at 1994 Conference on Offshore Captive Insurance Operations sponsored by the Center for Tax Education and Research.

"Employee Benefits in a Captive Insurance Company?", speaker at joint Mercer/Marsh & McLennan client seminars.

"Retirement Programs for Law Firm Partners", speaker, Symposium on Employee Benefits.

"FAS 106 Technical Issues", speaker and co-chair at Society of Actuaries Seminar.

"FAS 106 Consulting Issues", speaker and co-chair at Society of Actuaries Seminar.

"Post Retirement Welfare Benefits - Funding", panelist at 1993 Enrolled Actuaries Meeting.

"Cash Balance Plans" moderator at Society of Actuaries Seminars.

"FAS 106 Strategies and the Impact on Executive Compensation", speech at Healthcare Issues Confronting Corporate America, Client Forum sponsored by Chase Manhattan Bank.

"Funding and Financing Retiree Health: Who Should Pay and How?", speech at Post-Retirement Health Care Benefits sponsored by Institute for International Research.

- 7 -

B - 101

ATTACHMENT 1

"Post Retirement Health Benefit Funding", moderator and speaker at the Society of Actuaries 1992 Spring Meeting.

"Post-Employment Welfare Benefits - Funding", moderator and speaker at 1992 Enrolled Actuaries Meeting.

"Permitted Disparity", presentation to Practising Law Institute.

"Funding & Insured Funding Vehicles for Retiree Health", speech at The First Annual Pension and Employee Benefits Conference sponsored by Pensions and Investments.

"Funding and Financing Retiree Medical Benefits: Cost Effective Strategies", speech at Post-Retirement Health Care Benefits seminar sponsored by Institute for International Research.

"Audience Dialogue with the IRS", moderator at the Society of Actuaries 1991 Spring Meeting.

"Message from the IRS", moderator at the Society of Actuaries 1997 Spring Meeting.

"Funding Alternatives for Post-Employment Welfare Benefits", speeches at Post Retirement Health Care seminars sponsored by Fidelity Investments Institutional Services.

"Funding Alternatives for Post Employment Benefits", speaker and moderator at 1991 Enrolled Actuaries Meeting.

"Integrating Retirement Plans into Estate Planning", speech to Tax & Estate Planning Council of Nassau County.

"Post-Retirement Medical Benefits: A Look at FASB Requirements and New Strategies for Controlling Costs", speaker at Mercer seminars.

"Post-Retirement Medical Benefits vs. Pension Benefits: Contrast in Asset/Liability Issues", speech at Asset Liability Management for Pension Funds sponsored by the Institute for International Research.

"What's New in Retiree Medical Funding Vehicles", speech at Post Retirement Medical seminar sponsored by Institute for International Research.

"Mergers and Acquisitions", speech to the New York County Lawyers Association.

"Mergers and Acquisitions, Employee Benefit Issues", speech to New York Metro Area Chapter - ISCEBS.

"The Funding and Financing of Retiree Medical Benefits", speech at Benefits News Analysis seminar on Managing Post-Retirement Medical Benefits.

"Applications for Post Retirement Medical Obligations", speech at Morgan Stanley seminar on ESOP Strategies and Implementation Issues.

"Pre-funding vs. Pay-as-you-go: Viable & Innovative Financing Options", speech at Institute for International Research seminar on Designing & Funding Cost-effective Employee Benefit Plans.

- 8 -

ATTACHMENT 1

"Changing Perspectives Which Motivate Asset - Liability Management: What Are the True Liabilities and How Do They Affect Matching?", speech at the second Annual Meeting on Asset/ Liability Management for Pension Funds sponsored by the Institute for International Research.

"Funding Executive Benefits", discussion leader for the Financial Executives Institute Financial Policy Peer Group Series.

"Highly Compensated Employees... Controlled Groups... Lines of Business...Aggregation Techniques", workshop speaker at Section 89 seminar sponsored by William M. Mercer, Inc.

"Omnibus Reconciliation Act of 1987 - Effects on Employee Benefit Plans", speech at William M. Mercer, Inc. seminar.

"Managing Future Liabilities – Investment Strategies for Funding Retiree Health Care Benefits", speech at first Annual Symposium on Funding Post-employment Health Care Benefits sponsored by the Institute for International Research.

"Actuarial Considerations for Self-funded Benefit Plans", panel seminar speaker at New York State Public Sector Coalition on Health Benefits Annual Conference.

"The Actuary and Post-retirement Welfare Benefits", speech to Actuaries Club of New York.

"The Effects of Tax Reform on Welfare Plans", lecture at 1987 Accounting Conference sponsored by the Foundation for Accounting.

"Coping with COBRA", speech to the Cultural Institutions Personnel Group.

"Defined Contribution Plans - Impact of 1986 Tax Reform Act", panel speaker at Mercer-Meidinger seminar.

"Tax Reform Legislation - Whither Goest Thou?", panel speaker at annual meeting of Conference of Actuaries in Public Practice.

"An Advanced Course in Employee Benefits", course leader/teacher for American Management Association.

"Select and Ultimate Financial Assumptions in Pension Plan Valuations", workshop chairperson at the Society of Actuaries 1985 Annual meeting.

"Coping with REACT Regulations", workshop panelist for the American Pension Conference.

"The Effect of the Treasury Tax Reform Proposals on Educational Institutions", speech to the Eastern Association of College and University Officers.

"Post Retirement Medical and Death Benefits", speech to American Management Association Annual Compensation/Employee Benefits Briefing.

"Using Insurance as a Capital Accumulation Device", course teacher for Practising Law Institute.

- 9 -

B - 103

ATTACHMENT J

"Fundamentals of Employee Benefits", course leader/teacher for American Management Association.

"Retirement Equity Act", speech to New York Personnel Management Association.

"Post-retirement Medical and Death Benefits: The Unrecognized Liability", speaker at Mercer-Meidinger seminar.

"Funding Vehicles for Pension Plans", workshop chairperson at the Society of Actuaries 1983 Spring Meeting.

"Hidden Pension Liabilities in an Acquisition", speaker at Mercer-Meidinger seminar.

"New Challenges and Opportunities for Welfare Plans", panelist at Mercer workshop.

"Opting Out of Social Security", speaker at Mercer sponsored seminar for hospital personnel executives.

"Executive Benefits Funded Through Life Insurance", speech at Mercer sponsored seminar for hospital personnel executives.

"Response to the Multiemployer Pension Plan Amendments Act of 1980", workshop chairperson at the Society of Actuaries 1981 Spring Meeting.

"Considerations in Selection of Actuarial Assumptions/Methods for Larger Plans", teacher at Enrolled Actuaries' Annual Meeting.

"Plan Sponsor Responses To The "Age Discrimination in Employment Act" (ADEA) – Employee Benefits", workshop chairperson at the Society of Actuaries 1980 Spring Meeting.

"Coordination of Social Security with...", workshop co-chairperson at Society of Actuaries 1979 Annual Meeting.

*Publications:*

"A Proposal for Pension Funding Reform", The Future of Pension Plan Funding and Disclosure Monograph, July 2005, the Society of Actuaries, co-authored with Donald E. Fuerst.

"Durational (Select and Ultimate) Discount Rates for FAS 87 and 106 Valuations", The Pension Forum, December 2004, the Society of Actuaries, co-authored with Ron Iverson, Heidi Rackley and Steve Alpert.

"Late Breaking Developments", transcript, 2003 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"Q & N/A", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

- 10 -

ATTACHMENT 1

"New Mortality Tables for Pension Plans", transcript, 2002 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", transcript, 2002 Enrolled Actuaries Meeting.

"Is That Your Final Answer?", transcript, 2001 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments - Wass Up!", transcript, 2001 Conference of Consulting Actuaries Annual Meeting.

"Déjà vu All Over Again – Q & N/A!", transcript, 2000 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2000 Conference of Consulting Actuaries Annual Meeting.

"Q&N/A", transcript, 1999 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 1999 Conference of Consulting Actuaries Annual Meeting.

"So What's New? Late Breaking Developments", transcript, 1997 Conference of Consulting Actuaries Annual Meeting.

"Post-Retirement Welfare Benefits", transcript, 1997 Enrolled Actuaries Meeting.

"Exercising Professional Judgment—An Exercise in Futility?", transcript, 1997 Enrolled Actuaries Meeting.

"Small Business Job Protection Act of 1996 (Pension Simplification???)", transcript, 1997 Enrolled Actuaries Meeting.

"Basics of Funding Retiree Medical Funding", transcript, 1996 Conference of Consulting Actuaries Meeting.

"Pick your iq", transcript, 1996 Enrolled Actuaries Meeting.

"415 Limitations After GATT—Revenue Ruling 95-29" transcript, 1996 Enrolled Actuaries Meeting.

"Pick Your i", transcript, 1995 Enrolled Actuaries Meeting.

"New Rules for Underfunded Pension Plans, The Retirement Protection Act of 1994", a William M. Mercer, Inc. commentary, co-author.

"Post-Retirement Welfare Benefits", Transcript, 1994 Enrolled Actuaries Meeting.

"Post-Retirement Welfare Benefits - Funding", Transcript, 1993 Enrolled Actuaries Meeting.

"Employee Benefits in a Captive Insurance Company?", Mercer Bulletin, July, 1993.

"Decisions - FAS 106", Mercer Bulletin, September 1992.

"Postretirement Health Benefits Funding", Record of the Society of Actuaries 1992, Vol. 18, No. 1A.

"Post-Retirement Health Benefit Funding", Transcript, 1992 Enrolled Actuaries Meeting.

- 11 -

ATTACHMENT 1

"Retiree Medical Benefits: Making the Fund or Finance Decision", co-author with William A. Bader, The Journal of Corporate Accounting and Finance, Spring 1992.

"Audience Dialogue with the IRS", Record of the Society of Actuaries 1991, Vol. 17, No. 3.

"Message from the IRS", Record of the Society of Actuaries 1991, Vol. 17, No. 3.

"Funding Alternatives for Post Employment Benefits", Transcript, 1991 Enrolled Actuaries Meeting.

"New Directions in Retirement Planning," a William M. Mercer, Inc. series of commentaries, co-author.

"Miscellaneous 401(a)(4) and Related Issues; a Discussion of Various Issues", in Complying With the New Nondiscrimination and Minimum Coverage Regulations, Practising Law Institute, 1991.

"Funding and Financing Retiree Medical Benefits", Mercer Bulletin, September 1991.

"Retiree Health Benefits in the 1990's", a William M. Mercer, Inc. commentary, co-author.

"Permitted Disparity" in Complying With the New Nondiscrimination and Minimum Coverage Regulations, Practising Law Institute, 1991.

"Secular Trusts and Annuities - Securing Executive Benefits After Tax Reform", a William M. Mercer, Inc. commentary, co-author.

"Omnibus Budget Reconciliation Act of 1987: What it Means to Pensions and Employee Benefits", a William M. Mercer, Inc. commentary, co-author.

"Tax Reform: What It Will Mean to Benefits and Compensation - A Mercer-Meidinger Commentary", co-author.

"Using Insurance as a Capital Accumulation Device", in Executive Compensation, Practising Law Institute.

"How to Protect Yourself Against Medical Insurance Gaps", Bottom Line Personnel.

"How to Identify Gaps In Life and Disability Insurance", Bottom Line Personnel.

### Internal Mercer Communiqués - author/co-author of the following:

"FAS 158 and Multiemployer Plans", co-authored with James Dexter.

"Computation of Actuarial Value of Assets: Corridor Limit Application", co-authored with Carol Gramer.

"Selecting Cross-Border Accounting Assumptions", co-authored with Bruce Cadenhead, Wendy McFee and Phil Turner.

"Retiree medical Pre-funding in 401(h) accounts and VEBAs", co-authored with Heidi Rackley, Judy Bauserman, Barbara McGeoch, Scott Tucker and Derek Guyton.

"International Accounting Changes Target Multiemployer Plans", co-authored with James Dexter.

- 12 -

B - 106

ATTACHMENT I

"Tax Effects of the New Medicare Prescription Drug Subsidy", co-authored with Fran Bruno and Mark Hamelburg.

"Employee Benefits in a Captive Insurance Company", co-authored with Rich Fuerstenberg, Mark Hamelburg and Henry Saveth.

"DOL Benefits-in-a-Captive Ruling Imminent" co-authored with Henry Saveth, and Mark Hamelburg.

"Peer Review of Cross-Border Actuarial Work", co-authored with Bruce Cadenhead.

"Professional Standard – Signing and Peer Reviewing Actuarial Reports", co-authored with Derek Guyton.

"Guidelines for Selecting Certain Assumptions", co-authored with Paul Zeisler and Bruce Cadenhead.

"Spin-off Assumptions", co-authored with Bruce Cadenhead.

"Pension Valuation Checklist for Multiemployer Plans: Updated to Reflect Changes Included in the Economic Growth and Tax Relief Reconciliation Act of 2001", co-authored with Carol Gramer.

"Reorganization Status for Multiemployer Plans", co-authored with Carol Gramer.

"Aggregate Entry Age Normal Funding Method Violates IRS Reasonable Funding Regulations".

"Section 414(k) Plans – Actuarial Issues", co-authored with Ron Iverson.

"Captive Insurance Companies and Employee Benefits", co-authored with Henry Saveth.

"Select and Ultimate Discount Rates for FAS 87 & 106 Valuations", co-authored with Ron Iverson and Heidi Dexter.

"Tax Gross Up Calculations for Executive Benefits", co-authored with Frank Burianek, Gary Thomas.

"Professional Standard – Signing/Peer Reviewing Actuarial Reports".

"Mergers and Acquisitions", co-authored with Bert Bernier, Edgar Friedman, Kevin Minor and Scott Tucker.

"Automatic approval for change in funding method for plans with negative unfunded liability".

"E-54—International Accounting Standards", co-authored with Ron Iverson, Wendy McFee, Larry Bader and Frank Todisco.

"Pension Valuation Checklist for Multiemployer Plans", co-authored with Carol Gramer.

"Change in SFAS 87/106 Measurement Date", co-authored with Kevin Minor and Bob Behar.

"1996 Schedule B", co-authored with Bruce Cadenhead and Ed Greene.

- 13 -

ATTACHMENT 1

"Consulting Issues Relating to Repeal of IRC Section 415(e)", co-authored with Carol Gramer.

"PBGC Variable Premium Calculations", co-authored with Bob Behar and Steven Gagel.

"Document Retention".

"Plan Spinoffs".

"FAS 87 & 106 Discount Rates".

"Multiple Employer Plans: Do I have one and what do I do now?", co-authored with Joy Theobald.

"Technical Actuarial Questions on Bulletin Board".

"Peer Review for Actuarial Reports".

"Continuing Education for Actuaries".

"Negative Unfunded Accrued Liabilities", co-authored with David Jarrett.

"Separate Line of Business".

"Testimony on 401(a)(4) Regulation Package".

"Schedule B - Deficit Reduction Contribution".

"Required Distributions Under Section 401(a)(9) - Qualified Plans".

"Business Combination Accounting".

"Retroactively Changing the Amortization Period for Gains and Losses Recognized as of 1/1/88".

"Meeting With IRS".

"Meeting With IRS".

"U.S. Controlled Group Benefit Issue for Foreign Parent Companies".

"Meeting With IRS".

"Revenue Notice 89-70 Warning on Early Retirement Using 1/15, 1/30".

"Calculating Benefits for Employees Who Attain age 70½".

"Taxation of Long Term Care Insurance".

"Bank Ownership of Individual Policies".

"Proposed Section 89 and 125 Regulations".

"Required Distributions From Qualified Plans: One Year Deferral of Effective Date".

"Determination of FAS 87 Pension Expense for Secular Trusts".

"Analysis of Social Security Integration Requirements".

"Integration Under Tax Reform '86 - A White Paper".

- 14 -

B - 108

ATTACHMENT 1

"Market Crash of October 19, 1987".

"DOL Guidelines for Benefit Plans under ADEA", co-authored with Solomon Weinberger.

*Quoted frequently by New York Times, Wall Street Journal, Business Week, Newsweek, Time, Fortune, etc.*

- 11 -

Attachment 2

## Individual Data

| | Name | Thomas S Troup | Maurice Ward | Jerome Charles | Joseph Fink |
|---|---|---|---|---|---|
| | Age as of 1/1/1999 | 49.92 | 43.33 | 49.17 | 44.92 |
| | Hire Date | 10/15/1979 | 11/9/1981 | 9/10/1979 | 5/26/1987 |
| | Credited Service for the prior plan as of 1/1/1999 | 19.277 | 17.148 | 19.312 | 11.595 |
| | Transition Credit Rate | 3% | 3% | 4% | 2% |
| Cash Balance (opening balance) | 1999 | $ 129,777.43 | $ 94,035.74 | $ 138,172.25 | $ 66,851.05 |
| Compensation used for the Cash Balance Plan | 1999 | $ 53,522.62 | $ 70,385.51 | $ 56,824.37 | $ 73,536.98 |
| Compensation used for the Pre-Amended Plan | 1999 | $ 53,522.62 | $ 66,132.01 | $ 56,824.37 | $ 66,033.68 |
| | 1998 | $ 55,531.14 | $ 68,120.34 | $ 54,204.90 | $ 64,323.53 |
| | 1997 | $ 53,439.78 | $ 59,931.73 | $ 57,735.84 | $ 66,544.46 |
| | 1996 | $ 51,972.14 | $ 61,050.93 | $ 53,503.84 | $ 59,343.20 |
| | 1995 | $ 61,074.37 | $ 59,737.64 | $ 57,666.84 | $ 56,983.59 |
| | 1994 | $ 56,267.75 | $ 56,872.04 | $ 56,237.84 | $ 53,052.06 |
| | Pre-Amended Plan | Delmarva | ACE | ACE | ACE |

Cash Balance Plan Interest Crediting Rate for 1998: 5.01%, compounded annually

B - 110

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>PEPCO HOLDINGS, INC., CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)  Case No.: 05-702 (SLR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### SUPPLEMENTAL EXPERT REPORT OF ETHAN E. KRA, PH.D, F.S.A.

#### Backloading

1.     On pages 15 through 18 of the Brief in support of Plaintiffs' Motion to Strike, counsel asks that my opinion on backloading be stricken. That motion is based on the allegation that my conclusions were developed on the basis of the pay crediting rate applied to a participant's account and not the annuity amount. Plaintiffs' Motion shows a total lack of understanding of my analysis and the underlying methodology.

2.     In testing backloading, I compared the amount of accrual of annuity payable at normal retirement age based on pay credits at one age with the amount of accrual of annuity payable at normal retirement age based on pay credits at another age. I then compared each possible age at which the benefit could be accrued with each subsequent age at which a benefit could be accrued, up through normal retirement age. I then demonstrated that for no combination of ages the amount of accrual of annuity payable at normal retirement age times 4/3 is less than

B - 111

the amount of accrual of annuity payable at normal retirement age earned at the subsequent age. Thus, my analysis of backloading was to test the age combinations that could produce the "worst case" results – i.e. where the ratio of accrual rates is highest. With respect to the design of the Conectiv Cash Balance Sub-Plan, that worst case analysis was a comparison of the age 29 accrual (payable as an annuity at age 65), with the age 50 accrual (payable as an annuity at age 65). The objective of the analysis was to determine the minimum interest crediting rate necessary to avoid backloading.

3.    Plaintiffs' motion alleges that my methodology is invalid solely because it uses the pay crediting rate in place of the amount of annuity accrual in the analysis. However, basic algebraic principles can be used to demonstrate that these two approaches are mathematically equivalent. As an expert and experienced mathematician, I am quite familiar with the rules of algebra. Algebra allows for the cancellation of like amounts that appear in both the numerator and the denominator of a fraction. In addition, it allows for multiplication and division in both parts of an inequality without changing the relationship of the inequality, provided the constant multiplicand or divisor is a positive number. Similarly, I also appropriately utilized logarithms and the exponential function. Utilization of algebra is standard practice for actuaries.

4.    The following formula represents the conversion of a 5% pay credit earned at age 29 into a life annuity payable at age 65.

$$5\% \times \text{pay} \times (1 + i)^{(65-29)} \text{ divided (annuity factor @ 65)}$$

where "$i$" represents the assumed constant interest rate from age 29 to age 65.

5.    The following formula represents the conversion of a 10% pay credit earned at age 50 into a life annuity payable at age 65.

$$10\% \times \text{pay} \times (1 + i)^{(65-50)} \text{ divided (annuity factor @ 65)}$$

B - 112

6.    In order to pass the 133 1/3% test (i.e., the 4/3rds test), one must demonstrate that the annuity payable at age 65 that is earned at any age is at least 3/4ths of the annuity payable at age 65 earned at any future age. Thus, the analysis of backloading required the determination of the lowest single interest rate such that the plan design would not be backloaded no matter which combination of ages were compared. The next step was to determine the "worst case" combination. The worst case combination was the comparison of the age 29 accrual to the age 50 accrual.

7.    This required determining the minimum interest crediting rate "$i$" such that:

$$[5\% \times pay \times (1 + i)^{(65 - 29)} \text{ divided (annuity factor @ 65)}] \times 4/3$$

$$\geq$$

$$[10\% \times pay \times (1 + i)^{(65 - 50)} \text{ divided (annuity factor @ 65)}]$$

8.    Pursuant to the rules of Algebra, one may cancel out the term "annuity factor @ age 65" without changing the inequality, provided the "annuity factor @ age 65" is a positive number. Needless to say, the cost of annuity at any age within the normal life span of an individual is greater than zero. Thus, the inequality simplified to:

$$[5\% \times pay \times (1 + i)^{(65 - 29)}] \times 4/3$$

$$\geq$$

$$[10\% \times pay \times (1 + i)^{(65 - 50)}]$$

B - 113

9.    Similarly, assuming pay to be greater than zero, the above inequality simplified to:

$$[5\% \times (1 + i)^{(65-29)}] \times 4/3$$

$$\geq$$

$$[10\% \times (1 + i)^{(65-50)}]$$

10.    Again, 10% is a positive number. Thus, dividing both parts of the inequality by 10% further simplified the inequality as follows:

$$[0.5 \times (1 + i)^{(65-29)}] \times 4/3$$

$$\geq$$

$$[(1 + i)^{(65-50)}]$$

11.    Further simplifying the algebra, I got:

$$[2/3 \times (1 + i)^{(65-29)}]$$

$$\geq$$

$$[(1 + i)^{(65-50)}]$$

12.    Dividing both parts of the inequality by $(1 + i)(65 - 50)$, I got:

$$[2/3 \times (1 + i)^{(50-29)}] \geq 1.0$$

13.    Multiplying both parts of the inequality by 3/2, yielded:

$$(1 + i)^{(50-29)} \geq 1.5$$

14.    Taking the natural log of both sides of the inequality yields:

$$\ln ((1 + i)^{(50-29)}) \geq \ln (1.5)$$

B - 114

15.    This is equivalent to:

$$(50 - 29) \times \ln (1 + i) \geq \ln (1.5)$$

or

$$21 \times \ln (1 + i) \geq 0.405465108\ldots$$

or

$$\ln (1 + i) \geq 0.019307862\ldots$$

or

$$e^{(\ln (1 + i))} \geq e^{0.019307862}$$

or

$$(1 + i) \geq 1.019495465\ldots$$

or

$$i \geq 0.019495465\ldots$$

or

$$i \geq 1.9495465\ldots\%$$

16.    My notes simplified this to $i \geq 1.95\%$

17.    The same methodology similarly was used in comparing the various other combinations of ages. Each analysis utilized the same basic inequality of:

$$[y\% \times \text{pay} \times (1 + i)^{(65 - t)} \text{ divided (annuity factor @ 65)}] \times 4/3$$

$$\geq$$

$$[z\% \times \text{pay} \times (1 + i)^{(65 - w)} \text{ divided (annuity factor @ 65)}],$$

where $y\%$ is the pay credit associated with age $t$ and $z\%$ is the pay credit associated with age $w$ and $w$ is greater than $t$. In theory, each possible combination of ages would need to be analyzed where $w$ and $t$ were both equal to or greater than the minimum age required for participation in

B - 115

the plan, $w$ and $t$ are less than or equal to the normal retirement age and $w$ is greater than $t$.

However, since the annuity factor at age 65 is independent of the variables $y, z, t$ & $w$ and we

have demonstrated that the annuity factor (as well as pay) essentially disappear from the

algebraic relationship, the extract of my handwritten notes shown in the Plaintiffs' Motion, in

fact, represented a comparison of the accrual of an annuity payable at age 65 earned at one age

with the accrual of an annuity payable at age 65 earned at another age. Based on my extensive

experience in doing this type of analysis, I did not need to calculate each and every age. Rather,

based on the design, I was able to determine those few age combinations that would produce the

greatest strain on the test and only look at those particular ages. In fact, the combination of ages

which produced the greatest minimum interest crediting rate $i$ was age 29 compared with age 50.

This resulted in a requirement of a minimum interest crediting rate of 1.95%. Any other

combination of ages would meet the 133 1/3% backloading test even with a somewhat lower

interest crediting rate. Based on the information previously provided to me for us in preparation

of my original report, the actual interest crediting rate for the Conectiv Cash Balance Sub-Plan

has always exceeded 2% per annum.

18.     The above methodology is the standard approach utilized by actuaries in testing

step-rated cash balance plans for backloading.

### Assumption of A Static Future Interest Rate

19.     On page 19 of Plaintiffs' Motion to Strike, Plaintiffs' counsel states:

> There is another problem: an assumption that employees' accrued benefits should
> be calculated on the basis of a hypothetical static rate cannot be squared with the
> plain language of this plan or ERISA's definition of "accrued benefit."

20.     I find it most interesting that Plaintiffs' counsel objects to this methodology when

Plaintiffs' own expert witness utilizes the identical methodology in his report.

B - 116

21.    In Exhibits D, E, F-1 and F-2 of the Expert Report of Claude Poulin, Mr. Poulin calculates an accrued benefit at age 65 based on a cash balance account as of a given date. It is mathematically impossible to calculate that benefit at age 65 without making an assumption about interest crediting between the date of the calculation and age 65. In fact, on each line of each of these exhibits, Mr. Poulin appears to assume a fixed interest crediting rate from the year represented in that line through age 65.

22.    The standard approach used by actuaries is to assume a static interest rate for future years. In fact, that is the methodology utilized by the Internal Revenue Service in all forms of nondiscrimination testing. Indeed, in all of my years of experience, this is the only method that I've seen any actuary use in testing for backloading.

23.    There are some factors that will differ in future years (e.g., CPI, Taxable Wage Base, interest crediting rate), where by December of the given calendar year it is already known that the factor for the next year will differ from the current year.

24.    IRS Regulation §1.411(b)-1(b)(2)(ii)(D) addresses this issue. It states:

> For purposes of this paragraph, for any plan year, social security benefit and all relevant factors used to compute benefits, e.g., consumer price index, are treated as remaining constant as of the beginning of the current plan year for all subsequent plan years.

25.    It must be noted that the IRS mandates that, in computing benefits, the analysis utilizes relevant factors that are determined "as of the beginning of the current plan year for all subsequent years." Plantiffs' motion objects to my analysis in that it does not reflect factors that changed after the beginning of the year. My analysis, however, is based on rules mandated by the IRS, as well as my extensive experience and understanding of the standard practices for such testing.

B - 117

26.     In the 20+ years that I have been involved in backloading analysis, this is the only
approach that I have seen used and is the standard approach used by actuaries.


_____
Ethan E. Kra

State of New York          )
                           ) ss.
County of New York         )

Affirmed to before me this 29ᵗʰ day of ___June___, 2007, by Ethan E. Kra.


_____
Notary Public

My commission expires: 3/12/2011

**Michelle Miller**
NOTARY PUBLIC, State of New York
No: 01MI6162376
Qualified in Queens County
Commission expires 3/12/20 11