## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) ) | C. A. NO. 05-702 (SLR) (Lead Case) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) | |
| Defendants. | ) | |

### REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
302-656-2500 (telephone)
302-656-9053 (fax)

and

James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

July 16, 2007                    Attorneys for Plaintiffs

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

I.   INTRODUCTION ................................................................. 1

II.  ARGUMENT ..................................................................... 2

A.   PARAGRAPHS 11, 17 AND 18 OF THE KREMMEL DECLARATION SHOULD BE
     STRICKEN, AS KREMMEL LACKS PERSONAL KNOWLEDGE ................... 2

B.   THE PURPORTED EMAIL SHOULD BE STRICKEN ........................... 8

C.   THE EXPERT REPORT OF ETHAN KRA SHOULD BE STRICKEN ............. 11

1.   Kra's Opinion on Backloading Should Be Stricken ..................... 11

2    Kra's Opinion that the Plaintiffs' Cash Balance
     Account Grew Should Be Stricken .................................... 13

3.   Kra's Opinion that the Value of the January 1, 1999
     Annuity Benefit Increased Should Be Stricken ........................ 14

4.   Kra's Opinion on the Projected Value of Plaintiffs'
     Accrued Benefits at Normal Retirement Age Should Be Stricken ....... 15

III. CONCLUSION ................................................................ 17

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Blackburn v. United Parcel Serv.,*
    179 F.3d 81 (3d Cir. 1999) ...............................................................................8

*Bouriez v. Carnegie Mellon University,*
    No. 02-2104, 2005 U.S. Dist. LEXIS 25771 (W.D. Pa. Oct. 28, 2005)...........................9

*Bushman v. Halm,*
    798 F.2d 651 (3d Cir. 1986) ...............................................................................6

*J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,*
    909 F.2d 1524 (3d Cir. 1990) .............................................................................9

*Lebanon Farm Disposals, Inc. v. County of Lebanon,*
    No. 03-0682, 2006 U.S. Dist. LEXIS 45329 (M.D. Pa. July 5, 2006) ...........................6

*Maldonado v. Ramirez,*
    757 F.2d 48 (3d Cir. 1985) .................................................................................7

*NLRB v. FES,*
    301 F.3d 83 (3d Cir. 2002) .................................................................................6

*Petruzzi's IGA Supermarkets, Inc., v. Darling-Delaware Co.,*
    998 F.2d 1224 (3d Cir. 1993) .............................................................................8

*Philbin v. Trans Union Corp.,*
    101 F.3d 957 (3d Cir. 1996) ...............................................................................8

*Proctor v. Armds, Inc.,*
    No. 04-cv-899 (PGS), 2006 U.S. Dist. LEXIS 85333 (D.N.J. Nov. 20, 2006) ...............9

*Schneider v. Fried,*
    320 F.3d 396 (3d Cir. 2003) ..............................................................................14

*Williams v. West Chester,*
    891 F.2d 458 (3d Cir. 1989) ............................................................................8, 9

## **Statutes and Rules**

29 U.S.C. § 1002(23) ............................................................................................................13, 14

29 U.S.C. § 1054(b)(1)(B) ........................................................................................................11

29 U.S.C. § 1054(b)(1)(G) ........................................................................................................14

26 C.F.R. § 1.411(d)-6 (Q&A 5, 7) (1999) ..............................................................................15

FED. R. CIV. P. 56(e) ..................................................................................................................1

FED. R. EVID. 602 ................................................................................................................1, 7, 8

# I.     INTRODUCTION

At the outset, plaintiffs would like to address a misconception: defendants label plaintiffs' claim under Section 204(b)(1)(H) as plaintiffs' "lead claim." Actually, it was the third count of a four count complaint that sought the same relief for each of the alleged violations of ERISA. It was not the lead claim in the sense that it was given the most prominent place in the complaint, nor was it ever labeled by plaintiffs as their "lead claim." Thus, the fact that Count III is no longer viable due to an intervening change in the law has little bearing at this point. Three alternative claims remain, each of which is independently viable, as plaintiffs demonstrated in their response to defendants' motion for summary judgment.

The defendants' response to plaintiffs' motion to strike similarly distorts the record. James Kremmel's sworn testimony contradicts portions of his declaration, but the defendants continue to insist that Kremmel had *personal knowledge* relating to the dissemination of notice required by Section 204(h) of ERISA. To that end, defendants have submitted Kremmel's declaration for a third time.  Repetition of testimony, however, is no substitute for competence to testify. Both Rule 56(e) of the Federal Rules of Civil Procedure and Rule 602 of the Federal Rules of Evidence require that any evidence from a fact witness be based upon personal knowledge.  FED. R. CIV. P. 56(e) ("affidavits shall be on personal knowledge . . . and shall affirmatively show the affiant is competent to testify to the matters stated therein"); FED. R. EVID. 602 (witness may not testify

absent submission of evidence "sufficient to support a finding that the witness

has personal knowledge of the matter").

Similarly, in their effort to rely upon a 1998 email, which defendants

provided months after Ward's deposition, defendants wholly ignore the hearsay

statement contained in the text of the email. Controlling precedent, however,

does not allow a court to consider a hearsay statement on a motion for summary

judgment where the statement would be inadmissible at trial.

Finally, defendants' arguments and Kra's supplemental report do nothing

to cure the failure of Kra's opinions to meet the reliability and fit requirements.

Plaintiffs moved to strike paragraphs 5, 6, 7 and 8 of Kra's initial report but

defendants' answering brief only substantively addresses paragraph 6 and a

portion of paragraph 5.

## II.    ARGUMENT

### A.    PARAGRAPHS 11, 17 AND 18 OF THE KREMMEL DECLARATION SHOULD BE STRICKEN, AS KREMMEL LACKS PERSONAL KNOWLEDGE.

In their answering brief, the defendants again ignore Kremmel's sworn

testimony. Kremmel's deposition testimony shows that his declaration was

based on hopeful assumptions, not personal knowledge.

There is no evidence to support paragraphs 17(a) and 17(b) of Kremmel's

Declaration. Defendants argue "Kremmel obviously 'believed' that the

newsletters were distributed because he knows that happened based on his

personal knowledge." (D.I. 97 at 9). But there is simply no evidence to support

the contention that Kremmel has personal knowledge that the October 13

"EMerging Times" newsletter was "distributed . . . to all employees" and the

October 20 version was "distributed." In fact, Kremmel has no recollection

whether he received copies of either document. (Kremmel Dep. 15:24-16:3; 19:9-

11; D.I. 94 at B0254, 255).

In paragraph 17(c), Kremmel declares that sometime in May 1998,

"Conectiv distributed to all employees a 'Facts' newsletter." Defendants argue

that Kremmel testified based on his personal knowledge that the newsletter was

mailed to employees' homes and no corroborating evidence is required under

Rule 56(e). (D.I. 97 at 9-10). The relevant testimony, however, demonstrates that

Kremmel is simply <u>assuming</u> this newsletter was mailed to employees' homes

based on the fact that one particular exhibit contained the mailing address of

Human Resources Manager Karen Francks.[1] There is no evidence that Kremmel

---

[1]    Wilkinson initially made a similar assumption but later clarified his
answer:

> Q.    Okay.  D-5.  If you could take a look at D-5 and P-3.  D-5, you
> said, was mailed?
> A.    It appears though it was, because  the last page is a mailing
> address of an employee named Karen Franks (sic).
> Q.    Right.  But beyond that mailing  address on this specific
> document, you have no knowledge of whether this was mailed to
> anyone other than her?
> A.    I guess not.
> Q.    And you have no specific knowledge whether this was
> actually even mailed to Karen, correct?
> A.    I don't know that.

(Wilkinson Dep. 130:11-24; D.I. 94 at B0398)

attempted to determine whether Conectiv actually distributed this newsletter to

all employees. That is because no such evidence exists. Kremmel testified:

> Q. Do you know how this was disseminated?
> A.   This would have been, again, printed internally by the
> company and delivered -- this individual document was delivered
> to individuals' homes -- it was mailed to their homes.
> Q.   How do you know that?
> A.   On, again, the last page of the document, PH -- the document -
> - it reads to me, PHI 0033, it's franked (sic) with -- for U.S. postage
> and has an address on it.
> Q.   In or about April of 1998, did the company keep records when
> it made mailings of benefits information to employees?
> A.   The company kept a copy of what was mailed.
> Q.   Did it keep a log that would tell you the date that it was
> mailed?
> A.   Not to the best of my recollection, no.

 (Kremmel Dep. 44:19-24; 45:1-14; D.I. 94 at B0261). Thus, Kremmel did not

possess the requisite knowledge to state that the document was in fact

distributed and when that happened. This is further corroborated by the

testimony that Kremmel has no recollection of when the first "Facts" newsletter

was issued. (Kremmel Dep. 41:3-22; D.I. 94 at B0260).

Turning to paragraph 17(d), Kremmel testified (as a corporate designee)

that the December 21, 1998 letter was **not** intended to fulfill the defendants' legal

obligation to notify employees of an amendment to the plan. (Kremmel Dep.

60:7-16; D.I. 94 at B0265). Based on Kremmel's deposition testimony, paragraph

17(d) of his Declaration, in which he declares that "on December 21, 1998,

Conectiv sent to all employees who would be enrolled in the Cash Balance Plan"

a letter outlining how the plan would compute benefits, is irrelevant for the purpose of plaintiffs' claim that defendants violated Section 204(h) of ERISA.

Plaintiffs' counsel, in preparing the complaint and opposing the motion to dismiss, had assumed that it was the December 1998 letter that was intended to fulfill that function. However, the evidence has now shown that assumption to be mistaken. Moreover, even if the December 1998 document had been intended to serve as notice, Kremmel does not know how this document was distributed, he does not remember receiving a copy, and the defendants have no records of who received a copy of this document.[2] (Kremmel Dep. 49:2-50:3; D.I. 94 at B0262-263). In fact, at his deposition Kremmel questioned the completeness and authenticity of the document. (Kremmel Dep. 47:21-49:1; D.I. 94 at B0262).

In paragraph 17(e), Kremmel declares that "Conectiv distributed a newsletter titled 'Mid Week Extra: Cash balance update June 23, 1999'" to participants. Kremmel admitted, however, at his deposition that he in fact does not know who was sent this document. (Kremmel Dep. 84:1-85:4; D.I. 94 at B0271). Defendants argue that Kremmel's best guess is good enough because he had supervisory responsibilities for the dissemination of these documents. (D.I. 97 at 8-11). That, however, is contradicted by Kremmel's own testimony. Kremmel testified:

---

[2]    Former human resources executives Wilkinson and Cain could not explain the dissemination of the December 21, 1998 letter. Wilkinson lacked any personal knowledge of how the document was disseminated. (Wilkinson Dep. at 57:20-58:2; D.I. at B0379-380). Similarly, Cain had no recollection of ever seeing this document. (Cain Dep. at 53:14-55:13; D.I. 94. at B0015-16).

> Q.    And did you have any particular role, what your duties were,
> as part of the Total Rewards team?
> A.    As a team member, as part of the project team.  No special
> responsibilities, other than as part of the team helping to facilitate
> the initiative.

(Kremmel Dep. 17:23-18:2; D.I. 94 at B0254).

> Q.    Was there anyone who was on the Total Rewards team that
> was particularly tasked with handling employee communications?
> A.    Not individually, to the best of my recollection.

(Kremmel Dep. 19:4-8; D.I. 94 at B0255).

Defendants' argument that Kremmel "clearly" has personal knowledge because of supervisory responsibilities is without merit. (D.I. 97 at 9.). Affiants' statements require personal knowledge based on specific facts, not upon information and belief.  Defendants are attempting to stretch the bounds of Kremmel's specific personal knowledge. In *Lebanon Farm Disposals, Inc. v. County of Lebanon,* No. 03-0682, 2006 U.S. Dist. LEXIS 45329 (M.D. Pa. July 5, 2006), the court permitted testimony of an affiant based on his general knowledge of a local industry, but found that he had overstepped his personal knowledge when testifying to specific facts based upon deposition testimony of another witness. *Id.* at *6-*7. Here, like the affiant in *Lebanon Farm Disposals, Inc.,* Kremmel attested in his declaration specifically to facts that at best were only his assumptions. This type of guesswork does not suffice. *See NLRB v. FES,* 301 F.3d 83, 95 (3d Cir. 2002) (conclusory assertions inadequate on summary judgment); *Bushman v. Halm,* 798 F.2d 651, 660 (3d Cir. 1986) (Rule 56(e) requires specific facts rather

than conclusions); *Maldonado v. Ramirez,* 757 F.2d 48, 50-51 (3d Cir. 1985) (affiant must set forth facts rather than opinions or conclusions).

In paragraph 17(e) Kremmel further declares that at each meeting held in July 1999, Conectiv discussed the then-brewing controversy over IBM's decision to convert to a cash balance plan. Kremmel admits he did not personally attend every employee meeting and conceded that these meetings were not recorded by video or audio and no minutes were taken (Kremmel Dep. 83:7-24; 92:22-93:-2; D.I. 94 at B0271, 273). Kremmel acknowledged, as he must, that the presentation at particular meetings might have varied. (Kremmel Dep. 93:13-20; 95:4-24; 98:14-99:2; D.I. 94 at B0273-275). Kremmel's testimony demonstrates that he lacks the requisite personal knowledge to declare that "[a]t each meeting, Conectiv discussed the then-brewing controversy over IBM's decision to convert to a cash balance plan." Thus, paragraph 17(e) of his declaration should also be stricken.

Finally, Kremmel acknowledged that he lacked personal knowledge to support the statements in paragraphs 11 and 18 of his declaration. (Kremmel Dep. at 159:4-12, 164:14-165:8; D.I. 94 at B0290-291). Defendants have now submitted Kremmel's Declaration on three separate occasions. (D.I. 73 at B1-7, 89 at A35-41, 98 at B32-38). Defendants acknowledge that these paragraphs are not relevant to their summary judgment, and there is no question that they do not contain competent testimony as required by FED. R. EVID. 602. Thus, paragraphs 11 and 18 should be stricken.

7

**B.     THE PURPORTED EMAIL SHOULD BE STRICKEN.**

Defendants rely on a purported email allegedly sent to plaintiff Ward on December 18, 1998, to argue that his claims are time barred. (D.I. 88 at 27.) The defendants suggest that three *Wall Street Journal* articles were attached to the email. (*Id.*) While defendants have belatedly offered evidence to meet their burden to show that this email may be what it purports to be, the email should still be stricken because it is inadmissible hearsay.

The defendants offer the email to show that the statement, "Maury here is the Info I have on Cash Balance Pensions FYI," was true, as they seek to prove that Ward received this email, from William O. Bates on December 18, 1998 with the purported attachments. This statement, however, is rank hearsay and cannot be considered on a motion for summary judgment.

On a motion for summary judgment, a court may not consider a hearsay statement that would be inadmissible at trial. *Blackburn v. United Parcel Serv.*, 179 F.3d 81, 95 (3d Cir. 1999) (citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n.1 (3d Cir. 1996)). Accordingly, "hearsay evidence produced in sworn testimony may be considered only if the out-of-court declarant could later present that evidence through direct testimony, i.e. 'in a form that would be admissible at trial.'" *Williams v. West Chester,* 891 F.2d 458, 466 n.12 (3d Cir. 1989);  *see also*, *Petruzzi's IGA Supermarkets, Inc., v. Darling-Delaware Co.,* 998 F.2d 1224, 1234 n.9 (3d Cir. 1993) (observing that evidence introduced at summary judgment stage must be "capable of being admissible at trial"). Hearsay declarations in affidavits

may be considered in summary judgment only where the declarant would be available for trial and the declaration as set forth in the affidavit would be admissible if it were made by the declarant in court. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990). The mere possibility that a hearsay statement will be admissible at trial does not permit its consideration at the summary judgment stage. *Proctor v. Armds, Inc.*, No. 04-cv-899 (PGS), 2006 U.S. Dist. LEXIS 85333, at *13 (D.N.J. Nov. 20, 2006); *Bouriez v. Carnegie Mellon Univ.*, No. 02-2104, 2005 U.S. Dist. LEXIS 25771, *24 (W.D. Pa. Oct. 28, 2005) (citations omitted); *see also Williams v. Borough of West Chester*, 891 F.2d 458, 466 (3d Cir. 1989).

With this backdrop, defendants have attempted to mischaracterize the hearsay statement. Initially, defendants acknowledge that the hearsay statement is the email text and not the alleged attachments. (D.I. 97 at 6). Later, defendants reference the text of the email in an attempt to prove that Ward received the purported attachments on the specific date (D.I. 97 at 6), while arguing that the attached *Wall Street Journal* articles are admissible hearsay statements because they are not offered for the truth of the matter asserted. (*Id.* at 7.) Defendants make no argument about the actual hearsay statement contained in the text of the email and cite no hearsay exceptions to support the admissibility of the email text.

Significantly, defendants cannot verify the hearsay statement through direct testimony at trial because William O. Bates died on January 7, 2002. (*See*

D.I. 94 at B0540.). Defendants cannot produce Bates at trial, and his email statement is therefore inadmissible at this stage. Thus, the email should be stricken.

As for the articles, defendants' argument that Ward was on inquiry notice in 1999 as a result of *Wall Street Journal* articles,[3] is directly contradicted by defendants' prior statements that these articles were irrelevant to their plan. These *Wall Street Journal* articles were discussed and dismissed as irrelevant in the presentation materials used at the July 1999 meetings, which defendants described as being the "best source of information" regarding the cash balance plan. (D.I. 89 at A63). In light of the defendants' representations to the participants that these articles were irrelevant to the Conectiv plan, plaintiffs are puzzled how the articles can provide inquiry notice, particularly as Ward has no recollection of them.

---

[3]     Ward stated in his original declaration that following a thorough search of his archived emails, he could not locate a copy of the December 18, 1998 Bates's email. (Ward Decl.; App. at B0401). The defendants' email system has changed since 1998 and Ward was unsure how to access emails from the prior email systems. (Ward Supp. Decl.; App. at C0001). However, he has now located a copy of the December 18, 1998 Bates's email in the email archives. (Ward Supp. Decl.; App. at C0001). Ward still has no recollection of ever seeing the three *Wall Street Journal* articles titled:

> a. 'Cash Balance' Saves Millions Hides Pitfalls From Workers
> b. Longtime Employees Face A Pension-Benefit 'Plateau'
> c. Employees Will Need to Know Traits of 'Cash-Balance' Plan

(Ward Supp. Decl.; App. at C0001).

**C.     THE EXPERT REPORT OF ETHAN KRA SHOULD BE STRICKEN.**

Plaintiffs moved to strike paragraphs 5, 6, 7 and 8 of the April 20, 2007

report submitted by defendants' expert, Ethan Kra.  Defendants, in their

answering brief, chose to substantively address only paragraph 6 and a portion

of paragraph 5.  Defendants' arguments and Kra's supplemental report do

nothing to cure the failure of Kra's opinions to meet the reliability and fit

requirements.

*1.     Kra's Opinion on Backloading Should be Stricken.*

In paragraph 5 of his report, Kra opines that the plan passed the 133 $^{1/3}$

percent rule of Section 204(b)(1)(B) of ERISA, 29 U.S.C. § 1054(b)(1)(B). (D.I. 89 at

A122).  Kra testified at his deposition that the backloading test must be

conducted on the basis of the annuity value.  Kra testified:

> Q.     Now, in a cash balance plan what constitutes the participants'
> accrued benefit?
> A.     Depends on how it's defined in the plan document.  Some
> plan documents will define it equal to the account balance, and
> then the optional forms will include the annuity, which is defined
> because it's required.  Other plans will define it in terms of the
> annuity.
> You have to look at a plan document.
> Q.     Now, let's take that thought and meld that with our tests that
> we've been talking about.  If an actuary is reviewing a cash balance
> plan to determine whether it comports with the back-loading
> standards and the plan defines the accrued benefit as the account
> balance, how would you apply the tests?  To the account balance?
> A.     In a defined benefit cash balance plan -- qualified defined
> benefit plan, I would do the testing on the normal retirement
> benefit, payable as an annuity.
> Q.     Even if the plan specified a lump sum as the accrued benefit?
> A.     I would still base it on the annuity form.

> Q.    And you would do the same thing if the plan, although it was a cash balance plan, specified the accrued benefit as the -- as the single life --
>
> A.    My understanding is that the requirements are that all defined benefit plans have back-loading tested on the normal retirement annuity.  The IRS typically is -- in every test that I've seen them require, that's the only thing they are willing to look at.
>
> So, I'm not going to give a legal discourse as to whether that's the right answer or the wrong answer, but my understanding is that that's the only thing the IRS will look at.

(Kra Dep. 53:14-55:4; D.I. 94 at B0164-165).  Kra, however, developed a hand-written matrix on a sheet of scratch paper that examined the pay crediting rate applied to a participant's account under the Conectiv Cash Balance Plan, not the annuity amount. (*See* Pl. Ex. 40; D.I. 94 at B0248).  Kra's supplemental report fails to remedy this clear inconsistency.

Kra's  method of testing backloading did not conform to what he testified was the applicable standard, it is plainly unreliable, and also fails the fit requirement as it does not address a fact in issue and therefore will not assist the trier of fact.

Defendants assert in their brief in support of their summary judgment motion that interest rates must be kept static when applying the backloading test, (D.I. 88 at 16). While a broadly worded provision of Section 204(b)(1)(B) states "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year," Kra acknowledged that this provision cannot  be taken literally. Kra stated at his deposition that age and service could not be kept constant or the

accrual standards would be rendered meaningless. (Kra Dep. at 45:6-50:7, D.I. 94 at B0162-164). Defendants dismiss this issue in a footnote stating only that "[t]his is a point of legal contention, not expert methodology. . . . " (D.I.97 at 12 n. 3).

Significantly, however, Kra's assumption that employees' accrued benefits should be calculated on the basis of a hypothetical static rate cannot be squared with the plain language of this plan or ERISA's definition of "accrued benefit." ERISA expressly provides that a participant's accrued benefit is "the individual's accrued benefit determined under the plan . . . ." 29 U.S.C. § 1002(23). This plan specifies that the thirty-year Treasury rate for October of the prior plan year is to be used to calculate interest credits under the plan. (D.I. 94 at B0430). Kra calculated accrued benefits for plan year 2000 based upon the October 1998 rate of 5.01%, rather than the rate specified in the plan, the October 1999 rate, which was 6.26%. (D.I. 94 at B0547). Thus, Kra's static rate assumption is inconsistent with the requirements of the plan and ERISA.

2.    *Kra's Opinion that the Plaintiffs' Cash Balance Account Grew Should Be Stricken.*

Defendants argue that paragraph 6 of Kra's report, in which he states that each year, plaintiffs "experienced a positive benefit accrual on account of increased age, service and compensation received during the year" is relevant only to Count II. (D.I.97 at 13).

The growth in the account value, however, is not relevant to the plaintiffs' claim under Section 204(b)(1)(G). That section provides that a defined benefit

plan "shall be treated as not satisfying the requirements of this paragraph if the participant's **accrued benefit** is reduced on account of any increase in his age or service." 29 U.S.C. § 1054(b)(1)(G) (emphasis supplied). The term "accrued benefit" is defined as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). Here, the relevant plan document specifically provides that the plaintiffs' accrued benefit is the annuity. (D.I. 94 at B0428). Thus, paragraph 6 should be stricken, as it does not meet the fit requirement because it is not "relevant for the purposes of the case." *Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003).

>     3.    *Kra's Opinion that the Value of the January 1, 1999*
>           *Annuity Benefit Increased Should Be Stricken.*

Defendants make no argument in response to Plaintiffs' assertion that paragraph 7 of Kra's report fails to meet the fit requirement. In paragraph 7, Kra states that "[a]s of the effective date of the plan amendment (January 1, 1999), the accrued benefit (payable at normal retirement age) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan." (D.I. 89 at A122). For the reasons stated in plaintiffs' brief in support of their motion to strike, this paragraph is irrelevant to the three remaining claims and should be stricken.

> **4.** *Kra's Opinion on the Projected Value of Plaintiffs'*
> *Accrued Benefits at Normal Retirement Age Should Be*
> *Stricken.*

Defendants chose not to substantively respond to Plaintiffs' assertion that paragraph 8 of Kra's report should be stricken.  Instead, defendants argue in a footnote that the issue "turns upon a legal question of what assumptions must be used to measure anticipated future benefit accruals."  (D.I.97 at 12 n. 3).

In paragraph 8, Kra offers the opinion that "[a]s of the effective date of the plan amendment (January 1, 1999), the projected benefit (payable at normal retirement date) for each of the Plaintiffs was larger under the amended plan than under the pre-amended plan." (D.I. 89 at A123). This statement rests upon the unrealistic assumption that the plaintiffs would never again get another raise. (Kra Dep. at 72:5-73:15; D.I. 94 at B0169) (stating that 1999 compensation was used).  Kra, however, acknowledged at his deposition that actuaries routinely consider future salary increases when calculating projected pension liabilities for purposes of financial reporting, (Kra Dep.138:2-139:19; D.I. 94 at B0186).

In fact, the relevant regulatory standard for Section 204(h) notice requires that the determination of whether a plan amendment results in a reduction in the rate of future benefit accrual should be based upon "reasonable expectations" that consider "relevant facts and circumstances."[4] Thus, there has to be some

---

[4]    The relevant regulation provided in relevant part as follows:

Q-5: What is an amendment that affects the rate of future benefit accrual for purposes of section 204(h)?

rationale for the assumptions used to estimate the value of the benefits the plaintiffs would have at normal retirement age. Kra's assumption that there would be no change in the plaintiffs' compensation ever again is patently unreasonable and does not meet this standard.

---

A-5: (a) In general--(1) Defined benefit plans. For purposes of section 204(h), an amendment to a defined benefit plan affects the rate of future benefit accrual only if it is **reasonably expected** to change the amount of the future annual benefit commencing at normal retirement age. For this purpose, the annual benefit commencing at normal retirement age is the benefit payable in the form in which the terms of the plan express the accrued benefit (or, in the case of a plan in which the accrued benefit is not expressed in the form of an annual benefit commencing at normal retirement age, the benefit payable in the form of a single life annuity commencing at normal retirement age that is the actuarial equivalent of the accrued benefit expressed under the terms of the plan, as determined in accordance with the principles of section 411(c)(3) of the Code).

. . .

Q-7: What is the basic principle used in determining whether an amendment provides for a significant reduction in the rate of future benefit accrual for purposes of section 204(h)?
A-7: **Whether an amendment provides for a significant reduction in the rate of future benefit accrual for purposes of section 204(h) is determined based on reasonable expectations taking into account the relevant facts and circumstances at the time the amendment is adopted.** For a defined benefit plan this is done by comparing the amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan as amended, with the amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan prior to amendment.

26 C.F.R. § 1.411(d)-6 (Q&A 5, 7) (1999) (emphasis supplied).

Kra's assumption that plaintiffs would never receive any increase in compensation for the balance of their working lives is impossible to reconcile with the regulatory requirement that the effect of a plan amendment on future benefits be weighed on the basis of reasonable expectations. Accordingly, paragraph 8 of Kra's report should be stricken.

### III. CONCLUSION.

Based upon the arguments and authorities set forth above, plaintiffs respectfully request that their motion to strike be granted.

Respectfully submitted,

Dated: July 16, 2007                    **CHIMICLES & TIKELLIS LLP**

By: _/s/ A. Zachary Naylor_
    Pamela S. Tikellis (#2172)
    Robert J. Kriner (#2546)
    A. Zachary Naylor (#4439)
    One Rodney Square
    P.O. Box 1035
    Wilmington, DE 19899
    302-656-2500 (telephone)
    302-656-9053 (fax)

and

James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

Attorneys for Plaintiffs