IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

J. MICHAEL CHARLES, MAURICE W. WARD,      :
JR., and JOSEPH I. FINK, JR., on behalf of    :
themselves and all others similarly situated,   :
                                             :    CIVIL ACTION
                              Plaintiffs,    :
                                             :
                  v.                         :    NO. 05-00702 (SLR)
                                             :
PEPCO HOLDINGS, INC., CONECTIV, and          :
PEPCO HOLDINGS RETIRMENT PLAN,               :
                                             :
                            Defendants.      :

**DEFENDANTS' JOINT REPLY BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT
AND ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS'
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

M. Duncan Grant (Del Bar No. 2994)
Phillip T. Mellet (Del Bar No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
302.777.6500

Susan Katz Hoffman, Esquire
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street
Philadelphia, PA  19102
267.402-3015 (telephone)
267.430.7275 (fax)

Larry R. Wood, Jr. (Del Bar No. 3262)
Kay Kyungsun Yu
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215. 981.4000 (telephone)
215.981.4750 (fax)

Dated:  August 3, 2007

Attorneys for Defendants

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................1

II.   ARGUMENT.........................................................................................................2

   A.   Defendants Are Entitled to Summary Judgment on Count I ................................2

   B.   Defendants Are Entitled to Summary Judgment on Count II...............................4

   C.   Defendants Are Entitled to Summary Judgment on Count IV ..............................6

     1.   No Plaintiff Was Entitled to Notice................................................................6

     2.   Defendants Provided Sufficient Notice ...........................................................9

     3.   Plaintiffs Are Not Entitled to Relief..............................................................15

   D.   Plaintiffs' Claims Are Time Barred.......................................................................16

     1.   Plaintiff Ward ................................................................................................16

     2.   Plaintiff Troup ...............................................................................................18

     3.   Plaintiff Fink ..................................................................................................19

     4.   Plaintiff Charles.............................................................................................19

III.  CONCLUSION ....................................................................................................20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aiello v. Midwest Operating Eng'rs Health & Welfare Fund*, No. 91-7998, 1993 WL. 81437 (N.D. Ill. Mar. 19, 1993) .............................................................................. 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 14

*Bausch v. Philatelic Leasing, Ltd.*, 728 F. Supp. 1201 (D. Md. 1990), *aff'd* 34 F.3d 1066 (4th Cir. 1994) ................................................................................................ 18

*Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993) ............ 7, 8

*Campbell v. Emery Air Freight Corp.*, No. 93-6568, 1995 WL. 286722 (E.D. Pa. May 9, 1995) ................................................................................................................... 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................... 7, 8

*Charles v. Pepco Holdings, Inc.*, 437 F. Supp. 2d 248 (D. Del. 2006) ......................... 4, 5, 11

*Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995) ...................................... 10

*DeBenedictis* v. Merrill Lynch & Co., Inc., __ F.3d __, 2007 WL 1732254 (3d Cir. June 18, 2007) ................................................................................................................ 18

*DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085 (E.D. Cal. 2005) ....................................................................................................................... 18

*Depenbrock v. CIGNA Corp.*, 389 F.3d 78 (3d Cir. 2004) ............................................ 10

*DiCioccio v. Duquesne Light Co.*, 911 F. Supp. 880 (W.D. Pa. 1995) ............................. 5

*Engers v. AT & T*, 428 F. Supp. 2d 213 (D.N.J. 2006) ................................................. 6, 8

*Farrell v. AstraZeneca Pharm. LP*, No. 04-285, 2005 WL. 2122678 (D. Del. Sept. 2, 2005) .................................................................................................................... 11, 14

*Finley v. Dun & Bradstreet Corp.*, __ F. Supp. 2d __, 2007 WL. 196753 (D.N.J. Jan. 26, 2007) ...................................................................................................................... 15

*Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000) ...................................................... 17

*GO Computers, Inc. v. Microsoft Corp.*, 437 F. Supp. 2d 497 (D. Md. 2006) ................. 17

Page

*Haigler v. CIGNA Corp.*, Civ. A. No. 04-851, 2006 WL. 196936 (M.D. Fla. Jan. 24, 2006)...........................................................................................................................10

*Halliburton Co. Benefits Committee v. Graves*, 463 F.3d 360 (5th Cir. 2006)............................10

*Heil v. Midwest Operating Eng'rs Health & Welfare Fund*, No. 92-4337, 1993 WL. 226303 (N.D. Ill. June 24, 1993)...............................................................................................14

*LC Capital Partners LP v. Frontier Insurance Group, Inc.*, 318 F.3d 148 (2d Cir. 2003)...........18

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005)................................................18

*In re Milk Products Antitrust Litigation*, 84 F. Supp. 2d 1016 (D. Minn. 1997), *aff'd* 195 F.3d 430 (8th Cir. 1999)...........................................................................................................18

*Pocahantas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir. 1987)............17

*Register v. PNC Financial Services Group, Inc.*, 477 F.3d 56 (3d Cir. 2007)...................1, 3, 11, 12, 15

*Romero v. Allstate Corp.*, 404 F.3d 212 (3d Cir. 2005)........................................................11, 16

*Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120 (3d Cir. 1998)........................................14

*United States v. Cooper*, 396 F.3d 308 (3d Cir. 2005)...................................................................3

*Volk v. D.A. Davidson & Co.*, 816 F.2d 1406 (9th Cir. 1987)......................................................17

*Wheeler v. Pension Value Plan for Employees of the Boeing Co.*, Civ. A. No. 06-500, 2007 WL. 781908 (S.D. Ill. Mar. 13, 2007)...............................................................................3

*William v. Borough of West Chester*, 891 F.2d 458 (3d Cir. 1989)..............................................14

## STATUTES, REGULATIONS, AND LEGISLATIVE HISTORY

ERISA § 204, 29 U.S.C. § 1054.............................................................................................*passim*

26 U.S.C. § 411(b)(1)(B)(iv)..........................................................................................................2

26 C.F.R. § 1.411(b)-1(b)(2)(ii)(D).........................................................................................2, 6, 14

IRS Notice 96-8...............................................................................................................................3

Rev. Rul. 79-90, 1979-1 C.B. 155..................................................................................................3

Rev. Rul. 81-12, 1981-1 C.B. 228...............................................................................................3, 5

**Page**

120 Cong. Rec. S15737 (daily ed. August 22, 1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 5180 ................................................................................................................2

I.    **INTRODUCTION**

In their Opening Brief, Defendants demonstrated that the three remaining claims in this case fail on the undisputed facts. In response, Plaintiffs have not asserted that there are any disputed issues of fact that require a trial. Rather, recognizing that the facts are undisputed, Plaintiffs have opposed Defendants' Motion for Summary Judgment with a Cross Motion of their own. The parties are agreed that this case is ripe for disposition.

It is clear that the disposition should be in Defendants' favor. As Defendants have shown, the plain language of the relevant statutes and regulations, the case law, and this Court's two prior rulings on the Motion to Dismiss all compel the dismissal of Plaintiffs' action. By contrast, Plaintiffs fail to muster virtually any legal authority, preferring instead to resort to rhetoric to make their case. Most strikingly, Plaintiffs refuse to grapple with the Third Circuit's opinion in *Register v. PNC Financial Servs. Group, Inc.*, 477 F.3d 56, 70-72 (3d Cir. 2007), which decisively rejected a similar putative class action challenge to a cash balance pension plan; indeed, two of Plaintiffs' three remaining claims – alleged illegal backloading and failure to provide proper notice of conversion to a cash balance formula – were expressly raised by the Plaintiffs in *Register*, and soundly defeated.[1]

As detailed below, the application of the actual controlling legal authorities to the admittedly undisputed factual record defeats Plaintiffs' claims. This Reply will not repeat the arguments raised in Defendants' Opening Brief, but will only address each of Plaintiffs' various arguments *seriatim*.

---

[1] Plaintiffs were already forced to concede that *Register* foreclosed their primary claim in this case, that cash balance plans are *per se* unlawful under the age discrimination provision of ERISA § 204(b)(1)(H). (D.I. 79 and 84.)

## II.    ARGUMENT

### A.    Defendants Are Entitled to Summary Judgment on Count I

Plaintiffs' claim under Count I – that the Plan is impermissibly "backloaded" – fails as a matter of law.  As Defendants predicted in their Opening Brief, Plaintiffs' only so-called "evidence" to resist summary judgment on this claim is to proffer calculations based on fluctuating interest rates, or put differently, to fail to hold the interest crediting rate constant as required by law when running the technical actuarial tests for backloading.  (D.I. 93 at 10-11.)  Notably, Plaintiffs nowhere dispute the conclusion of Defendants' expert, Ethan Kra, that, holding the interest crediting rate constant, the Plan passes ERISA's backloading test.  The Court is therefore faced with a simple question of law:  does ERISA require the interest crediting rate to be held constant when testing for compliance with the anti-backloading rules?

The answer is "yes:"

- The statute expressly provides that "social security benefits ***and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year***" when testing for backloading.  29 U.S.C. § 1054(b)(1)(B)(iv) (emphasis added).  *See also* 120 Cong. Rec. S15737 (daily ed. August 22, 1974) (statement of Sen. Williams), *reprinted in* 1974 U.S.C.C.A.N. 4639, 5180 ("In applying the 133 1/3% test, social security benefit levels for future years and other factors relevant in computing benefits, including salary differentials are to be held constant").

- The parallel provision of the Internal Revenue Code likewise provides that "social security benefits ***and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year***" when testing for backloading.  26 U.S.C. § 411(b)(1)(B)(iv).

- Treasury Department regulations likewise provide that "for any plan year, social security benefits ***and all relevant factors used to compute benefits, e.g., consumer price index, are treated as remaining constant as of the beginning of the current plan year for all subsequent plan years***" when testing for backloading.  26 C.F.R. § 1.411(b)-1(b)(2)(ii)(D) (emphasis added).  At his deposition, Plaintiffs' expert Claude Poulin admitted that the Treasury Department treats the interest crediting rate as a "relevant

factor" in computing benefits. *See* Poulin Dep., at 172:19-172:24 (App. at C-3).[2]

- In IRS Notice 96-8, the Treasury Department expressly endorsed the use of variable interest crediting rates in cash balance plans – a position that would be nonsensical if the use of such interest crediting rates would render these plans in violation of the backloading rules. *See generally* 1996-1 C.B. 359.[3]

- To the extent there was any doubt as to the matter, in *Wheeler v. Pension Value Plan for Employees of the Boeing Co.*, Civ. A. No. 06-500, 2007 WL 781908 (S.D. Ill. Mar. 13, 2007), the court held that, in testing a cash balance plan for backloading, the interest crediting rate must be held constant. *See also Register v. PNC Financial Servs. Group, Inc.*, 477 F.3d 56, 70-72 (3d Cir. 2007) (rejecting similar claim for backloading violation against a cash balance plan).

Plaintiffs do not cite a single legal authority to the contrary. Instead, they try, without success, to argue that the authorities cited by Defendants somehow do not mean what they say. Admitting that the clear language of the ERISA statute and the Treasury Department regulations require the interest rate to be held constant, Plaintiffs make the absurd argument that the statute and implementing regulations "cannot be taken literally." (D.I. 93 at 10.) This Court, however, has a duty to apply the plain language of the statute, not some alternate, "figurative" meaning. *See United States v. Cooper*, 396 F.3d 308, 310 (3d Cir. 2005) ("where the statute is clear . . . the text of the statute is the end of the matter").

---

[2] This is not the only statutory and regulatory language that Poulin failed to apply. In Paragraph 17 of his Report, Mr. Poulin writes that, to pass the backloading tests, "the rate of benefit accrual in any given year may not exceed the rate in any *previous* year by more than 33 1/3%." (D.I. 94 at B-556) (Report of Claude Poulin, ¶ 17) (emphasis added). ERISA, however, provides that a "plan satisfies the requirements of this paragraph of a particular plan year if under the plan . . . the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan *for any later plan year* is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year." 29 U.S.C. § 1054(b)(1)(B) (emphasis added).

[3] *See also* Rev. Rul. 79-90, 1979-1 C.B. 155 (recognizing the validity of using variable standards, *i.e.*, variable interest rates that are tied to an index and, therefore, precludes employer discretion); Rev. Rul. 81-12, 1981-1 C.B. 228 (noting that any variations that result from the fluctuations of a variable interest rate does not constitute a change in participants' accrued benefits).

-3-

Plaintiffs also remarkably contend that this Court rejected Defendants' arguments in its Motion to Dismiss ruling. (D.I. 93 at 9.) The Court held no such thing. Rather, the Court denied Defendants' Motion because "[f]rom the record, it is unclear exactly what calculation defendants are proposing as the proper method to test whether a cash balance plan meets ERISA's minimum accrual requirements and whether the Sub-Plan would then pass these requirements." *Charles v. Pepco Holdings, Inc.*, 437 F.Supp.2d 248, 251 (D. Del. 2006). Plaintiffs' mischaracterization of this Court's statement illustrates that they have no support for their position and are overreaching.

In sum, the disposition of Count I is straightforward. Plaintiffs can only show a backloading violation by ignoring the statutory mandate to hold the interest rate constant. ERISA, however, mandates that "***all*** other relevant factors used to compute benefits shall be treated as remaining constant" when testing for backloading. Plaintiffs' claim therefore fails under the plain language of the statute.

### B.    Defendants Are Entitled to Summary Judgment on Count II

Count II of the Complaint alleges that the Cash Balance Plan violates ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), which provides that a plan is not lawful "if the participant's accrued benefit is reduced on account of any increase in his age or service." In its opinion denying Defendants' Motion to Dismiss, the Court expressly recognized that Plaintiffs' claim could not proceed unless Plaintiffs proffered certain evidence:

> Defendants correctly point out that § 204(b)(1)(G) does not prohibit any decrease in the value of the accrued benefit, so plaintiffs' claim that the "accrued benefit can decrease despite additional service" is insufficient to show a violation of § 204(b)(1)(G). (D.I. 16 at 18.) However, whether the use of a variable interest rate actually caused plaintiffs' accrued benefits to decrease "on account of additional service" is an allegation that plaintiffs must be given an opportunity to demonstrate.

-4-

*Charles*, 437 F. Supp. 2d at 251.  Put differently, as the plain language of the statute makes clear, Plaintiffs must show that any reduction in accrued benefits was ***caused*** by an increase in age or years of service.  *See also DiCioccio v. Duquesne Light Co.*, 911 F. Supp. 880, 904 (W.D. Pa. 1995) (rejecting 204(b)(1)(G) claim because "the participants' benefit calculations with regard to years of service are uniform and the Supplemental Plan does not require separate calculations once a participant has worked for a specific number of years or has reached a specific age").

Plaintiffs concede that they have no evidence that their accrued benefits were reduced because of any factor other than fluctuating interest rates.  (D.I. 93 at 12) (conceding that "the change in interest rates explains the reason why the plaintiffs' accrued benefits decreased from one year to the next").[4]  *See also* Rev. Rul. 81-12, 1981-1 C.B. 228 (variations resulting from the fluctuations of a variable interest rate does not constitute a change in participants' accrued benefits).  In other words, all Plan participants – regardless of age – would have been impacted by the same change in interest rates.

Nevertheless, ignoring the Court's earlier opinion and citing no case law or regulation in support, Plaintiffs once again self-servingly proclaim that the Plan somehow violates Section 204(b)(1)(G) because "a participant's accrued benefit **can decrease** despite additional service."  (D.I. 93 at 13) (emphasis in original).  This, however, is the very theory that the Court has already held is legally invalid.  *See Charles*, 437 F. Supp. 2d at 251 ("Defendants correctly point out that § 204(b)(1)(G) does not prohibit any decrease in the value of the accrued benefit, ***so plaintiffs' claim that the 'accrued benefit can decrease despite additional service' is insufficient to show a violation of § 204(b)(1)(G)***" (emphasis added)).  Plaintiffs' inability to present any evidence to support their theory and their recognition that fluctuating interest rates

_____

[4] *Cf. also* D.I. 94 at B-559 (Expert Report of Claude Poulin, ¶ 24) ("changes in interest rates . . . may explain the reductions in accrued benefits").

caused any alleged reductions in accrued benefits are admissions that Defendants are entitled to judgment as a matter of law.

### C.    Defendants Are Entitled to Summary Judgment on Count IV

Finally, Defendants are entitled to summary judgment as to Count IV of Plaintiffs' Complaint, which alleges that Defendants violated ERISA § 204(h) by failing to provide adequate notice of the amendment establishing the cash balance formula.  Defendants demonstrated in their Opening Brief that this claim fails on three distinct grounds: (1) no Plaintiff was entitled to notice; (2) Defendants provided sufficient and timely notice; and (3) Plaintiffs have not made the showing of extraordinary circumstances required to assert a notice or reporting violation under ERISA.  (D.I. 88 at 20-26.)  Any one of these points, by itself, defeats Count IV.

### 1.    No Plaintiff Was Entitled to Notice

As Plaintiffs do not dispute, they are only entitled to notice under Section 204(h) if the amendment in question provides for a significant reduction in their rate of future benefit accrual.  *See generally Engers v. AT & T*, 428 F. Supp. 2d 213, 218-223 (D.N.J. 2006).  Plaintiffs concede that "this is determined 'based on reasonable expectations taking into account the relevant facts and circumstances at the time the amendment is adopted . . .'" D.I. 93 at 15, *quoting* 26 C.F.R. § 1.411(d)-6 (Q & A 7) (1999).  The undisputed facts show that, based on information known as of the amendment's January 1, 1999 effective date, there was no reasonable basis to expect the cash balance conversion to reduce any Plaintiff's rate of future benefit accrual.

As Defendants' expert, Ethan Kra, showed, Plaintiffs' accrued benefits increased markedly on the effective date of the cash balance amendment.  (D.I. 89 at A-122) (Report of Ethan Kra, ¶ 7).  Plaintiffs concede that this calculation is correct.  (D.I. 93 at 15 n. 15.)  Thus,

the question of Plaintiffs' entitlement to notice narrows to whether Defendants, as of the time of the amendment, could reasonably expect that this gap favoring the cash balance formula would be eliminated and somehow reversed based upon future events.

Again, the undisputed evidence defeats Plaintiffs' claim. Using the their compensation as of 1999 (which is the information that Defendants would have known as of the amendment's effective date), and projecting that earnings level forward to normal retirement age, Mr. Kra showed that each Plaintiff would still have higher benefits under the cash balance formula. (D.I. 89 at A-123) (Report of Ethan Kra, ¶ 8). Plaintiffs have not contested these calculations.

In response, Plaintiffs point to the Expert Report of Claude Poulin. (D.I. 93 at 15.) As a threshold matter, Mr. Poulin only offers calculations for Plaintiff Charles. (D.I. 94 at B-570 to B-571) (Report of Claude Poulin at Exhs. F-1 and F-2.) Plaintiffs have accordingly failed to come forward with any alleged evidence that Plaintiffs Ward, Fink, and Troup were entitled to notice, thereby entitling Defendants to summary judgment as to those three Plaintiffs. *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1302 (3d Cir. 1993).

Nor has Mr. Poulin shown that Plaintiff Charles was entitled to notice. First, Mr. Poulin argues that, because Conectiv in 1999 assumed a 4.5% per year aggregate increase in future salaries across the entire workforce when preparing its financial statements, Defendants should have assumed that Mr. Charles would see his salary increase at this rate indefinitely. (D.I. 94 at B-560 to B-561) (Report of Claude Poulin, ¶28.) Mr. Poulin offers no reason why Mr. Charles' personal salary should be assumed to mimic exactly the aggregate labor costs of the whole company, which includes thousands of employees (most of whose compensation was set by Collective Bargaining Agreements with local affiliates of the International Brotherhood of

Electrical Workers).  Indeed, based on the data in the Exhibits to the Poulin Report, Mr. Charles'

pay actually *decreased* from 2003 to 2004.  Similarly, using Mr. Poulin's data, Mr. Charles' pay

increased by less than 2% from 2001 to 2002.  There is therefore no reason to believe that Mr.

Charles' salary should reasonably have been expected to increase by as lockstep 4.5% per year.

In the alternative, Mr. Poulin claims that Conectiv should reasonably have

anticipated in 1999 that Mr. Charles would be harmed by the amendment because, based on his

average actual salary growth over the next seven years (1999 to 2006), Mr. Charles could turn

out to be worse off under the cash balance formula.  (D.I. 94 at B-560) (Report of Claude Poulin,

¶ 27.)  Plaintiffs nowhere explain, though, how in *1999* Conectiv was supposed to be able to

predict Mr. Charles' next seven years of salary with pinpoint accuracy.

Mr. Poulin admitted, in fact, at his deposition that he did not base either

projection upon his own independent, professional judgment as an actuary.  Rather, Plaintiffs'

counsel instructed him to use these two methods for projecting future benefits.  *See* Poulin Dep.

at 215:23-216:15 (App. at C – 4-5).  By contrast, in a different case challenging AT & T's

conversion to a cash balance formula under ERISA § 204(h), Mr. Poulin – just like Mr. Kra here

– held salary at the time of the amendment constant for projecting future benefits.  *See* Poulin

Dep. at 239:1-239:11 (App. at C - 6); Exhibit C-1 to Poulin Report in *Engers v. AT & T* (App. at

C - 18).

In conclusion, Plaintiffs have not shown that, *at the time of the amendment*,

Defendants should reasonably have anticipated that Mr. Charles' rate of future benefit accrual

would decline.  This failure of proof entitles Defendants to summary judgment.  *See generally*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Bixler v. Central Pa. Teamsters Health &*

*Welfare Fund,* 12 F.3d 1292, 1302 (3d Cir. 1993).

### 2.    Defendants Provided Sufficient Notice

Moreover, even if Plaintiffs were entitled to notice, Defendants have shown that their May 1998 "Facts" newsletter easily discharged any notice requirement. (D.I. 88 at 22-24.) In response, Plaintiffs offer several arguments trying to show that there was something improper about this notice. These attempts are unavailing.

### a.    Notice Was Timely

Plaintiffs first argument is that the May 1998 notice was untimely. Both parties agree that ERISA § 204(h) requires that any notice be issued after the amendment is adopted but at least fifteen days before its effective date. (D.I. 93 at 16.) The May 1998 notice was timely because it was issued after the April 23, 1998 adoption of the amendment but well before the January 1, 1999 effective date. (D.I. 88 at 6, 24.) According to Plaintiffs, however, the cash balance amendment was not adopted until December 1999, rendering the May 1998 notice premature. (D.I. 93 at 19.) There is no evidence to support this contention.

As Defendants explained in their Opening Brief, the Compensation Committee of the Board of Directors of Conectiv adopted the cash balance formula amendment on April 23, 1998. (D.I. 88 at 6, 24.) Plaintiffs do not dispute that the Compensation Committee of the Board adopted "a resolution approving a cash balance design" on this date. (D.I. 93 at 17.) Plaintiffs, however, contend that the "resolution" did not contain sufficient detail to be a proper "amendment," and that the document with sufficient detail to be an amendment was not executed until December 1999. (D.I. 93 at 17-19.)

Plaintiffs' argument misconstrues the nature of ERISA's requirements for Plan amendments. While ERISA requires that the Plan have an amendment procedure, there is no requirement that amendments contain any particular degree of specificity. As the Supreme Court has explained: "ERISA . . . follows standard trust law principles in dictating only that whatever

level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 85 (1995). Indeed, in *Curtiss-Wright*, the Supreme Court expressly rejected the argument that a Plan's amendment procedure must require enough detail "to enable beneficiaries to learn their rights and obligations under the plan at any time." *Id.* at 83. The Third Circuit has aptly characterized the requirements for amending a plan as "*de minimis.*" *See Depenbrock v. CIGNA Corp.*, 389 F.3d 78, 81 (3d Cir. 2004). Plaintiffs' only argument to the contrary is to cite the statutory requirements for the specificity of the Plan document itself. (D.I. 93 at 17.) The Supreme Court in *Curtiss-Wright* made clear, however, that those requirements do not apply to amendments. *See Curtiss-Wright*, 514 U.S. at 83 (distinguishing detailed requirements of Plan document from amendment procedure); *see also Halliburton Co. Benefits Committee v. Graves*, 463 F.3d 360, 372 (5th Cir. 2006) (clause in merger agreement approved by Board of Directors constituted valid plan amendment); *Haigler v. CIGNA Corp.*, Civ. A. No. 04-851, 2006 WL 196936 at *3-4 (M.D. Fla. Jan. 24, 2006) (Board resolution constituted valid plan amendment even in the "absence of a formal plan document").

There is no doubt that the Compensation Committee's action was a proper amendment under plan procedure (a point that Plaintiffs nowhere contest). At the relevant time, the cash balance amendment was an amendment to the Delmarva Power and Light Company Retirement Plan (the "Delmarva Plan") and the Atlantic City Electric Company Retirement Plan (the "ACE Plan"). Both Plans expressly permitted amendment by action of the Board of Directors. *See* Delmarva Plan § 9.01 (App. at C - 68); ACE Plan § 11.01 (App. at C – 128-29). On March 1, 1998, the Conectiv Board of Directors[5] delegated to the Compensation Committee

_____

[5] Although ACE and Delmarva had merged to form Conectiv, they did not merge their retirement plans until December 1998.

-10-

the authority to execute pension plan amendments that did not materially increase the company's

pension costs. (App. at C - 145).

Accordingly, the Compensation Committee had authority to amend the ACE and

Delmarva Plans to adopt the cash balance formula on April 23, 1998 so long as that amendment

did not materially increase Conectiv's pension funding costs. As Conectiv's then-Vice President

for Human Resources, Donald Cain, has testified that this amendment was designed to be cost-

neutral, it was clearly within the Committee's authority to adopt. *See* Cain Dep. at 41:24-42:4

(App. at C – 183-84). As the May 1998 Facts newsletter was disseminated after the

Compensation Committee's action, it was timely under ERISA § 204(h).

### b.    Notice Was Sufficiently Detailed

Plaintiffs next attack the May 1998 Facts newsletter by claiming that it was

allegedly insufficiently detailed because it did not inform Plan participants that "they may suffer

adverse effects." (D.I. 93 at 24.) This Court already rejected this argument in its Motion to

Dismiss opinion:

> In count IV, plaintiffs allege that the notice provided was
> insufficient under ERISA § 204(h), which requires written notice
> of the plan amendment "not less than 15 days before the effective
> date of the plan amendment" when the plan amendment results in a
> "significant reduction in the rate of future benefit accrual." (D.I. 1
> at ¶ 53) Plaintiffs argue that any notice provided by defendants was
> insufficient because it failed to warn participants that they may
> suffer adverse effects from the plan amendment. (D.I. 16 at 30)
> Defendants correctly point out that the law only requires the notice
> to include an understandable summary of the amendment and not a
> description of its potentially adverse effects. *See Register*, at 2005
> WL 3120268 *8.

*Charles v. Pepco Holdings, Inc.*, 437 F.Supp.2d 248, 252 (D. Del. 2006). After the Court issued

this opinion, the Third Circuit in *Register* confirmed that, for plan amendments before 2001,[6]

---

[6] Congress amended ERISA § 204(h) in 2001. *See* Historical and Statutory Notes to 29 U.S.C. § 1054.
The 2001 amendments to ERISA § 204(h) only apply to plan amendments effective after June 7, 2001, *i.e.*, two and
(continued...)

ERISA § 204(h) did not require any disclosure of potential adverse effects. *See Register*, 477

F.3d at 72 (affirming grant of motion to dismiss claim under ERISA § 204(h)).

Plaintiffs simply ignore this Court's prior opinion, even though it is now the law

of the case. They attempt to distinguish *Register* on the ground that the notice in that case

contained a boilerplate provision that in "some instances" the cash balance amendment could

reduce future accruals, while the Facts newsletter lacked similar verbiage. (D.I. 93 at 24.) The

Third Circuit in *Register* did not hold, however, that the notice in question provided sufficient

warnings of adverse consequences; on the contrary, the Third Circuit held that no such warning

was necessary at all:

> The district court concluded that PNC satisfied the section 1054(h)
> notice requirements applicable at the time of the conversion and
> we agree. The brochure set forth the plan amendment and the
> effective date. That explanation was all that was required.
> ***Contrary to appellants' argument, the Treasury Regulations at
> the time of the amendment were clear that PNC was not required
> to discuss "how the individual benefit of each participant or
> alternate payee will be affected by the amendment."***

*Register*, 477 F.3d at 73 (emphasis added).

### c.    Notice Was Properly Disseminated

Finally, Plaintiffs attempt to "create" a challenge as to whether the notice was

disseminated. This contention is likewise belied by the undisputed facts. James Kremmel, a

human resources executive directly involved in the conversion process in 1998 and 1999,

testified that the May 1998 Facts newsletter was distributed by mail:

Q. Do you know how this was disseminated?

---

(continued...)

a half years after the amendment at issue here. *See Romero v. Allstate Corp.*, 404 F.3d 212, 218 n. 4 (3d Cir. 2005)
(discussing effective date of 2001 amendment); *accord Register*, 477 F.3d at 72.

> A. This would have been, again, printed internally by the company
> and delivered – this individual document was delivered to
> individuals' homes -- it was mailed to their homes.

(D.I. 89 at A-75) (Kremmel Dep. at 44:19-44:24).  Defendants also submit the Declaration of

Karen Francks, the Conectiv Human Resources employee in charge of employee mailings in

1998, who likewise testifies that the Facts newsletter was mailed to employees' homes.  (App. at

C – 186; C – 187-95).[7]

      If this testimony were not clear enough, Defendants produced a copy of the Facts

newsletter with a postage frank and address as follows:



(D.I. 89 at A-57.)

      Plaintiffs concede that "first class mail to the last known address of the party is an

acceptable delivery method."  (D.I. 93 at 21.)  Thus, the undisputed testimony establishes proper

dissemination of the May 1998 notice.

      Undaunted, Plaintiffs claim that they can show a violation of ERISA because

Defendants did not also present additional records of mailing as well as Mr. Kremmel's

---

[7] Ms. Francks also testifies that another document, an employee benefits "Decision Kit," containing significant detail about the then-forthcoming cash balance conversion, was mailed to employees' homes after the Board of Directors adopted the cash balance amendment on April 23, 1998 but before May 18, 1998.  (App. at C – 186; C – 196-236).

testimony.  (D.I. 93 at 22.)  Plaintiffs cite no legal authority for their bizarre argument that the

testimony of a witness with personal knowledge, like Mr. Kremmel, is somehow invalid without

additional corroboration.[8]  *See Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d

Cir. 1998) ("It is by now axiomatic that 'a nonmoving party . . . cannot defeat summary

judgment simply by asserting that a jury might disbelieve an opponent's'" evidence); *William v.

Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (arguments attacking the credibility

of witnesses "cannot defeat summary judgment.  Instead, the nonmoving party must 'present

affirmative evidence in order to defeat a properly supported motion for summary judgment'"

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)).

　　　　Next Plaintiffs note that neither Plaintiff Charles nor Plaintiff Fink recalls

receiving the newsletter in the mail.  (D.I. 93 at 22.)  At best, this is a denial of receipt, which is

irrelevant.  Under the regulations in effect at the time Defendants did not need to guarantee

receipt but rather "use any method ***reasonably calculated*** to ensure actual receipt of the section

204(h) notice."  26 C.F.R. § 1.411(d)-6 (Q & A 11) (1999).  Mailing the notice was just such a

method.  *Id.; see also, Farrell v. AstraZeneca Pharm. LP,* No. 04-285, 2005 WL 2122678, at *5

(D. Del. Sept. 2, 2005) (mailing an ERISA notice to an employee's last known address

constitutes a good faith effort at notification; no requirement has been imposed on the employer

to ensure that the notice was received); *accord Campbell v. Emery Air Freight Corp.*, No. 93-

6568, 1995 WL 286722, at *1 (E.D. Pa. May 9, 1995) (ERISA regulations have been interpreted

not to require employee benefit plans prove that participants received notices); *Heil v. Midwest

Operating Eng'rs Health & Welfare Fund*, No. 92-4337, 1993 WL 226303 at *5 (N.D. Ill. June

24, 1993) (noting that "plaintiff has not identified any ERISA provision that requires ERISA

---

[8] Plaintiffs note that a former employee of Conectiv, Donald Cain, could not recall, one way or the other, if the May 1998 notice was disseminated.  (D.I. 93 at 22.)  As this testimony in no way varies Mr. Kremmel's account, it provides no support to Plaintiffs.

plans to verify their members' receipt of notifications"); *Aiello v. Midwest Operating Eng'rs Health & Welfare Fund*, No. 91-7998, 1993 WL 81437, at *3 (N.D. Ill. Mar. 19, 1993) ("ERISA does not require the Fund to verify that the participant actually received the documents. They may be sent by first-, second-, or even third-class-mail").

### 3. Plaintiffs Are Not Entitled to Relief

Finally, even if Plaintiffs could show a violation ERISA § 204(h), they are not entitled to any relief. This is because the Third Circuit has made clear that "'substantive remedies are generally not available for violations of ERISA's reporting and disclosure requirements' except 'where the plaintiff can demonstrate the presence of extraordinary circumstances.'" *Register*, 477 F.3d at 74, *quoting Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1011 (3d Cir. 1997), which are not present here.[9]

Plaintiffs contend in their Answering Brief that extraordinary circumstances exist because Conectiv allegedly lied to its employees when it represented in 1998 and 1999 that the cash balance conversion was not a cost savings measure. (D.I. 93 at 28.) Plaintiffs are wrong. Conectiv's then-Vice President of Human Resources Donald Cain testified that the conversion was designed to be cost neutral. Cain Dep. at 41:2-42:22 (App. at C - 183-84). Former Conectiv Benefits Manager Ben Wilkinson testified similarly:

> Q. Okay. And the first bullet on that is, "New program not designed to provide cost savings for Conectiv." Do you see that?
>
> A. Yes.
>
> Q. Is that bullet meant to address the concern of masks cost cutting?

---

[9] Plaintiffs claim that the Third Circuit's precedent regarding ERISA reporting and disclosure requirements does not apply to the disclosure requirements of Section 204(h). (D.I. 93 at 26-27.) Plaintiffs cite not a single case from this circuit in support of this argument and simply dismiss as wrong the District of New Jersey's on point opinion in *Finley v. Dun & Bradstreet Corp.*, __ F. Supp. 2d __, 2007 WL 196753 at *8-9 (D.N.J. Jan. 26, 2007) applying the extraordinary circumstances standard to a claim under ERISA § 204(h).

MS. YU: Objection as to form.

THE WITNESS: I think that bullet probably refers to the fact that
Conectiv cash balance plan, in the words of [actuarial consultant]
Watson Wyatt, was the richest cash balance plan their firm had
ever put in place. It was not designed to mask any cost cutting. It
was very rich, very generous.

Wilkinson Dep. at 91:9-91:21 (App. at C – 239).

Plaintiffs' only evidence to the contrary is an out of context quote from Mr.

Wilkinson's deposition where he was reading from a document that he did not author and for

whose accuracy he could not couch. *See* Wilkinson Dep. at 114:13-114:24 (App. at C – 240).

Moreover, that document did not compare pension plan costs from different plan formulae.

Instead, it compared pre- and post-amendment "retirement" costs, which included retiree medical

coverage expenses. *See* JMC00201 (App. at C – 245).[10]

### D.    Plaintiffs' Claims Are Time Barred

Finally, even if there were any merit to any of Plaintiffs' claims (which there is

not), the undisputed evidence shows that each Plaintiff's claims are barred by the applicable

three-year statute of limitations. This is because, as Defendants have shown in detail, each

Plaintiff was on inquiry notice of his claims as far back as 1999 – six years before this case was

filed. *See generally Romero v. Allstate Corp.*, 404 F.3d 212, 222 (3d Cir. 2005) (adopting

general federal discovery rule for ERISA actions). In response, Plaintiffs have failed to show

that their claims were timely filed. Defendants are accordingly entitled to summary judgment.

### 1.    Plaintiff Ward

As Defendants have pointed out, Mr. Ward was clearly on notice of his claim in

December 1998, because he received copies via email that month of three *Wall Street Journal*

---

[10] Plaintiffs also make the strange argument that Conectiv in *1998 and 1999* engaged in fraud based on
information in its *2007* Form 10-K. (D.I. 93 at 28-29.) Plaintiffs nowhere explain the supposed connection between
the two.

articles detailing the legal criticisms of cash balance plans. (D.I. 88 at 27.)  Undoubtedly

recognizing that this evidence dooms his claims, Plaintiffs' first contention is that the email is

supposedly inauthentic and fabricated. (D.I. 93 at 34.)  Defendants have already rebutted this

point in their Answering Brief to Plaintiffs' Motion to Strike (D.I. 97), presenting the sworn

Declaration of their email administrator that he produced this email to counsel from Mr. Ward's

personal email archive, where the message still resides.  In fact, in their Reply Brief in Support

of their Motion to Strike, Plaintiffs concede that the email is authentic.  (D.I. 100 at 10, n. 3.)

Plaintiffs next argue that, even though Mr. Ward was on notice in 1998 (almost

seven years before suing) that cash balance plans were being challenged as unlawful, he can still

toll the limitations period because Defendants denied that their Cash Balance Plan was in any

way illegal, thereby allegedly lulling Mr. Ward into a false comfort.  (D.I. 93 at 34.)  This

argument has no merit.  Federal courts, including the Third Circuit, have repeatedly rejected the

argument that a defendant's denial of wrongdoing either constitutes fraudulent concealment or

serves as an estoppel to toll the statute of limitations.  *See Forbes v. Eagleson*, 228 F.3d 471, 487

(3d Cir. 2000) ("Although it is true that Eagleson denied wrongdoing, nonetheless, his denials do

not allow plaintiffs, who were aware of their potential claim, to allege ignorance"); *Volk v. D.A.*

*Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) ("Once appellants had clear knowledge of

their claims, it was not reasonable for them to rely on reassuring comments" denying

wrongdoing); *Pocahantas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-219

(4th Cir. 1987) (argument that denial of wrongdoing tolls statute "borders on sophistry and fails

of its own weight.  To permit a claim of fraudulent concealment to rest on no more than an

alleged failure to own up to illegal conduct . . . would effectively nullify the statute of limitations

. . ."); *GO Computers, Inc. v. Microsoft Corp.*, 437 F. Supp. 2d 497, 501 (D. Md. 2006) (denials

of wrongdoing "do not themselves provide a valid basis for failing to conduct a reasonable

-17-

inquiry"); *DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085, 1094 (E.D. Cal. 2005) (denial of wrongdoing did not toll statute in ERISA action); *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1023 (D. Minn. 1997) ("Simply denying the existence of an antitrust violation does not constitute fraudulent concealment"), *aff'd* 195 F.3d 430 (8th Cir. 1999); *Bausch v. Philatelic Leasing, Ltd.*, 728 F.Supp. 1201, 1207 (D. Md. 1990) (denial of wrongdoing does not toll statute), *aff'd* 34 F.3d 1066 (4th Cir. 1994). The cases cited by Plaintiffs are in accord. *See LC Capital Partners LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155-156 (2d Cir. 2003) (affirming the dismissal of plaintiffs' claims as time barred and holding that plaintiffs could not reasonably rely on defendant's assurances that its finances were sound).[11]

### 2.    Plaintiff Troup

As Defendants have noted, Mr. Troup admitted at his deposition that he attended a meeting in Summer 1999 when Defendants informed him that *The Wall Street Journal* had run a series of articles criticizing cash balance plans, but Mr. Troup – in a complete failure of his duty to investigate potential claims – never followed up and read them. (D.I. 88 at 28.) Plaintiffs' only response is to argue again that Mr. Troup was supposedly lulled by Defendants' allegedly false assurances that the Plan was legal. (D.I. 93 at 34-36.) As explained above, this argument has no merit. *See supra* at 17-18.

---

[11] The other case cited by Plaintiffs is off point. In *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005), the court found that articles in the financial press about certain conflicts of interest did not put plaintiffs on inquiry notice of related, but distinct, allegations of fraud. Here, by contrast the *Wall Street Journal* articles discussed the very heart of Plaintiffs' claims: that cash balance plan formulae, by their design, are inherently unlawful under ERISA and discriminate against older workers. (D.I. 89 at A-100 to A-113.) *See also DeBenedictis v. Merrill Lynch & Co., Inc.*, __ F.3d __, 2007 WL 1732254 at *8-9 (3d Cir. June 18, 2007) (rejecting argument by same Plaintiffs' attorneys that newspaper articles failed to put Plaintiffs on inquiry notice of potential claims).

### 3.     Plaintiff Fink

Mr. Fink's claims are also time barred, because he admitted at his deposition that he was suspicious in 1999 that the new cash balance formula could violate his rights, yet inexplicably took no action.  (D.I. 88 at 28.)  Plaintiffs offer two contentions to salvage Mr. Fink's claims.  First, they argue that Mr. Fink did not really suspect that his rights were violated until 2004.  (D.I. 93 at 37.)  This argument ignores Mr. Fink's deposition testimony that he was "*highly suspicious*" in 1999 that the cash balance conversion would injure him.  (D.I. 88 at 28.)  Plaintiffs' second argument is that, as with Messrs. Ward and Troup, Mr. Fink was supposedly misled by Defendants' denial of wrongdoing.  (D.I. 93 at 37.)  As explained above, this argument has no merit.  *See supra* at 17-18.

### 4.     Plaintiff Charles

Finally, Mr. Charles' claims are time barred because he admitted in an email in 2003 that he has "always felt from the inception of the cash balance plan that it was unfair." (D.I. at 88 at 27-28.)  In response, Plaintiffs make the absurd suggestion that Mr. Charles' belief, from the "inception," that the Cash Balance Plan is unfair did not relate to the economic impact of the cash balance conversion upon him, but rather to his inability to pick a different pension plan option.  (D.I. 93 at 32-33.)  This contention is without merit.  In testimony quoted on page 33 of Plaintiffs' Brief, Mr. Charles conceded that he believes that the Cash Balance Plan is "unfair" because it "provides less financial benefit upon retirement than the old plan does."  (D.I. 93 at 33.)  Indeed, it would make no sense to argue that Mr. Charles would be treated "unfairly" if he were "forced" into a more lucrative pension plan.  Furthermore, there is no evidence that Mr. Charles had *ever* "chosen" his pension plan at either Conectiv or Atlantic City Electric; rather, he was always "forced" into the plan that his employer chose to sponsor for him.

As a fallback, Plaintiff contend yet again that Mr. Charles was misled by Defendants' denials of wrongdoing. (D.I. 93 at 32 n. 21.) As explained above, this argument has no merit. *See supra* at 17-18.[12]

## III.    CONCLUSION

For the reasons set forth herein and in Defendants' Opening Brief, the Court should grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Cross Motion.

Respectfully submitted,

/s/ Phillip T. Mellet
M. Duncan Grant (Del. Bar No. 2994)
Phillip T. Mellet (Del. Bar No. 4741)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
302.777.6500

Susan K. Hoffman                    Larry R. Wood, Jr. (Del. Bar No. 3262)
LITTLER MENDELSON PC                Kay Kyungsun Yu
Three Parkway                       Barak A. Bassman
1601 Cherry Street                  PEPPER HAMILTON LLP
Philadelphia, PA 19102              3000 Two Logan Square
267.402.3015 (telephone)           Eighteenth and Arch Streets
267.430.7275 (fax)                  Philadelphia, PA  19103-2799
                                    215.981.4000 (telephone)
                                    215.981.4750 (fax)

Dated:  August 3, 2007             Attorneys for Defendants

---

[12] In an attempt to distract the Court from the damning evidence of their lack of due diligence, Plaintiffs also try to argue that their claims are timely because they allegedly did not accrue until after September 2002. (D.I. 93 at 29-32.) These arguments are without merit. First, Plaintiffs concede that the supposed violation of ERISA § 204(b)(1)(G) "first occurred in 2001" – which is outside of the limitations period. (D.I. 93 at 30.) Second, Plaintiffs assert that their claim under ERISA § 204(h) for inadequate notice is timely, because they allegedly had no ability to know that the cash balance conversion would injure them before 2004. (D.I. 93 at 30-31.) As shown above, however, each Plaintiff knew or had reason to know of the purported injury by 1999. *See supra* at 16-20; D.I. 88 at 27-29. Finally, Plaintiffs allege that they were first injured by supposed Plan backloading in 2004. (D.I. 93 at 29-30.) But, by Plaintiffs' own admission, their benefits ***increased*** in 2004. (D.I. 1, ¶ 41.) Plaintiffs offer no explanation how an increase in benefits can constitute an injury from which their claim can accrue.