## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) | C. A. NO. 05-702 (SLR) (Lead Case) |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) | |
| Defendants. | ) ) | |

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
## FOR SUMMARY JUDGMENT

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
Scott M. Tucker (#4925)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
302-656-2500 (telephone)
302-656-9053 (fax)
        and
James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

September 4, 2007                    Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

I. ARGUMENT ...................................................................................................1

A. THE CASH BALANCE SUB-PLAN HAS VIOLATED SECTION 204(b)(1)(B) OF
ERISA SINCE THE CONVERSION ..............................................................................1

B. PLAINTIFFS HAVE SUFFERED A DECREASE IN ACCRUED BENEFITS AS A
RESULT OF THE STRUCTURE OF THE CASH BALANCE SUB-PLAN ......................................3

C. DEFENDANTS FAILED TO COMPLY WITH SECTION 204(h) ................................3

1. Defendants Were Required to Provide Notice ....................................................3

2. Defendants Did Not Issue Notice in a Timely Fashion ........................................8

3. There Is No Evidence that Notice Was Provided Properly....................................10

4. The Amendment Should Be Rescinded .............................................................12

D. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS ................15

1. Plaintiff Charles Has a Timely Claim................................................................16

2. Plaintiff Ward and Plaintiff Troup Have Timely Claims......................................17

3. Plaintiff Fink Has a Timely Claim....................................................................20

II. CONCLUSION ................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bausch v. Philatelic Leasing, Ltd.,*
728 F. Supp. 1201 (D. Md. 1990) ...................................................................19

*Curtiss-Wright Corp. v. Schoonejongen,*
514 U.S. 73 (1995).........................................................................................9

*DeFazio v. Hollister Employee Share Ownership Trust,*
406 F. Supp. 2d 1085 (E.D. Cal. 2005) ........................................................19

*Depenbrock v. Cigna Corp.,*
389 F.3d 78 (3d Cir. 2004) ....................................................................... 8-9, 10

*DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund,*
975 F. Supp. 258 (S.D.N.Y. 1997) ................................................................16

*Esden v. Bank of Boston,*
229 F.3d 154 (2d Cir. 2000) ..................................................................... 1-2

*Forbes v. Eagleson,*
228 F.3d 471 (3d Cir. 2000) ..........................................................................18

*Frommert v. Conkright,*
433 F.3d 254 (2d Cir. 2006) ..........................................................................13

*GO Computers, Inc. v. Microsoft Corp.,*
437 F. Supp. 2d 497 (D. Md. 2006).............................................................19

*Hirt v. The Equitable Retirement Plan,*
441 F. Supp. 2d 516 (S.D.N.Y. 2006).............................................................3

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.,*
318 F.3d 148 (2d Cir. 2003) .....................................................................18, 19

*In re Milk Prods. Antitrust Litig.,*
84 F. Supp. 2d 1016 (D. Minn. 1997) ...........................................................19

*Miller v. Fortis Benefits Ins. Co.,*
475 F.3d 516 (3d Cir. 2007) ..........................................................................16

*Pocahantas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987) ...................................................................19

*Production & Maint. Employees' Local, Laborers' Int'l Union v. Roadmaster Corp.*,
    954 F.2d 1397 (7th Cir. 1992) ....................................................... 10, 12-13

*Register v. PNC Fin. Svcs. Group, Inc.*,
    477 F.3d 56 (3d Cir. 2007) .........................................................................1

*Romero v. Allstate Corp.*,
    404 F.3d 212 (3d Cir. 2005) ...............................................................16, 19

*Volk v. D.A. Davidson & Co.*,
    816 F.2d 1406 (9th Cir. 1987) ..................................................................18

## STATUTES AND RULES

26 U.S.C. § 411(c)(2)(B) ....................................................................................2

26 U.S.C. § 411(c)(3) .........................................................................................2

26 U.S.C. § 417(e)(3)(A)(i) .................................................................................2

26 U.S.C. § 417(e)(3)(A)(ii)(II) ..........................................................................2

29 U.S.C. § 1002(23) ..........................................................................................1

29 U.S.C. § 1054(h)(1) .....................................................................................3, 8

29 U.S.C. § 1054(h)(6)(A) ................................................................................12

29 U.S.C. § 1102(b)(1) ......................................................................................10

29 U.S.C. § 1102(b)(2) ......................................................................................10

29 U.S.C. § 1102(b)(4) ...................................................................................9, 10

26 C.F.R. § 1.401-1(b)(1)(i) ................................................................................9

26 C.F.R. § 1.401(a)(4)-8(c)(3)(vi)(A) ...............................................................2

26 C.F.R. § 1.411(a)-7(a)(1)(ii) ..........................................................................2

26 C.F.R. § 1.411(d)-6 ......................................................................................4, 7, 11

26 C.F.R. § 54.4980F-1 ...........................................................................................13

## OTHER AUTHORITIES

Rev. Rul. 74-385, 1974-2 C.B. 130 ...........................................................................9

## I.    ARGUMENT

### A.    THE CASH BALANCE SUB-PLAN HAS VIOLATED SECTION 204(b)(1)(B) OF ERISA SINCE THE CONVERSION.

Plaintiffs have demonstrated that the plan violates ERISA's minimum accrual requirements. While the statute offers three alternatives, the 133 $^{1/3}$ percent rule of Section 204(b)(1)(B) of ERISA is the only accrual standard available to a cash balance plan. *See Register v. PNC Fin. Svcs. Group, Inc.,* 477 F.3d 56, 70 (3d Cir. 2007). Under this test, "the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any previous year by more than 33%." *Id.* (*quoting Esden v. Bank of Boston,* 229 F.3d 154, 167 n.18 (2d Cir. 2000)). Plaintiffs' expert, Claude Poulin, developed a year-by-year comparison of accrued benefits under the plan, calculated as an actuarially equivalent annuity of the account balance for each plan year, and his analysis demonstrates that in 2004, following several years in which the annuity value decreased, it increased by an amount in excess of 133 $^{1/3}$ percent. (Poulin Decl. ¶ 19 & Ex. D; D.I. 94 at B0557, B0568; Poulin Supp. Decl. ¶ 7 & Ex. D; App. at D0432, D0434-436). The same thing happened again in 2006. (*Id.*). Defendants consider Poulin's analysis to be faulty, and they assert that Poulin should have used the rate in effect for the first plan year.

The problem with defendants' approach is that Section 204(b)(1)(B) dictates that the test apply to the "accrued  benefit," which must be "determined under the plan." 29 U.S.C. § 1002(23). This plan prescribed the interest crediting rate to be used in each plan year as the 30-year Treasury rate for October of the prior year. (D.I. 94 at B0430). The interest credits form part of each participant's accrued benefit. *See Esden,*

229 F.3d at 159 (calculation of value of participant's accrued benefit requires projection of cash balance to retirement age). The IRS has explicitly recognized this, defining a participant's accrued benefit under a cash balance plan to include "the automatic adjustments for interest through normal retirement age required under paragraph (c)(3)(iv) of this section." 26 C.F.R. § 1.401(a)(4)-8(c)(3)(vi)(A). Thus, in calculating the value of a participant's accrued benefit as of 2002, the projected future interest credits must be included, and, under the plan, they must based upon the 30-year Treasury rate for October 2001, not some other rate.

Moreover, to calculate a participant's accrued benefit for any particular year, the projected lump sum value at retirement age has to be converted to an actuarially equivalent annuity. 26 C.F.R. § 1.411(a)-7(a)(1)(ii). Under the plain language of this plan, "Actuarial Equivalence" must be determined on the basis of the 30-year Treasury rate in effect for October of the prior year. (Cash Balance Sub-Plan, Schedule A; D.I. 94 at B0454). These provisions leave no room to apply the 1998 Treasury rate to calculate what a participant's accrued benefit was as of 2004.[1]

---

[1]    The plan document includes these provisions because it is required to do so. The Treasury Regulations dictate that actuarial equivalence be determined under Section 411(c)(3) of the Code. *See* 26 C.F.R. § 1.411(a)-7(a)(1)(ii). That provision of the Code mandates that actuarial equivalence be determined under Code Sections 411(c)(1), (2). *See* 26 U.S.C. § 411(c)(3). Code Section 411(c)(2)(B), in turn, directs that actuarial equivalence for accrued benefits under a defined benefit plan be calculated "using an interest rate which would be used under the plan under section 417(e)(3)." 26 U.S.C. § 411(c)(2)(B). Section 417(e)(3), in turn, directs that "present value" be determined using the "applicable interest rate." 26 U.S.C. § 417(e)(3)(A)(i). That rate is defined as the current 30-year Treasury rate. *See* 26 U.S.C. § 417(e)(3)(A)(ii)(II).

### B. PLAINTIFFS HAVE SUFFERED A DECREASE IN ACCRUED BENEFITS AS A RESULT OF THE STRUCTURE OF THE CASH BALANCE SUB-PLAN.

Plaintiffs have also demonstrated that the plan's operation has resulted in the reduction of accrued benefits from one year to the next on several occasions. (Poulin Decl. ¶ 22 & Ex. E; D.I. 94 at B0558-559, 569; Poulin Supp. Decl. ¶ 8 & Ex. E; App. at D0432, D0437-439). Plaintiffs believe that they have sufficiently established that this pattern of decreases by reason of the plan's operation violates Section 204(b)(1)(G) of ERISA. (*See* D.I. 93 at 12-14).

### C. DEFENDANTS FAILED TO COMPLY WITH SECTION 204(h).

Plaintiffs have amply demonstrated that the Cash Balance Sub-Plan provides lower benefits, and that defendants were consequently obligated to provide notice under Section 204(h) of ERISA "after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment." 29 U.S.C. § 1054(h)(1) (1996). Plaintiffs have also demonstrated that defendants failed to provide timely notice. Defendants now make a series of baseless arguments and provide an eleventh hour affidavit from a previously unnamed witness in an effort to paper over the deficiencies in their records.

### 1. *Defendants Were Required to Provide Notice.*

In a cash balance plan, participants earn pension benefits evenly over the course of their careers, while traditional defined benefit plans are final average pay plans, which provide the greatest level of accruals at the end of the career. *See Hirt v. The Equitable Retirement Plan,* 441 F. Supp. 2d 516, 536 (S.D.N.Y. 2006). As a consequence, "[t]he result of a shift from a traditional defined benefit plan to a cash balance plan,

without the protection of grandfathering provision, is generally a significant reduction in the rate of future benefit accruals." *Id.* As a recent GAO study commented, "[o]ur comparison of a typical FAP plan that is converted to a typical CB plan finds that, regardless of a worker's age, more workers would have received greater benefits under the FAP plan that under the typical CB plan." (App. at D0359).

Under Section 204(h), a notice is required if a plan amendment "is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." 26 C.F.R. § 1.411(d)-6 (Q&A 5) (1999). Plaintiffs' actuarial expert, Claude Poulin, has demonstrated that the Cash Balance Sub-Plan results in lower benefits.[2] Poulin's analysis is supported by the record.

First, Donald Cain, the former head of human resources, and the individual who formally adopted the Cash Balance Sub-Plan, testified that he got a better benefit under the heritage plan when he retired:

> Q. Did you have a choice between the Cash Balance Plan and the old plan?
> A. Yes.
> Q. You did?
> A. I believe I did. That's what I think grandfathering did.
> Q. So you were grandfathered, and then when you retired did you take your money from the old plan?
> A. Yes.
> Q. Why is that?
> A. Because it was better for me.

---

[2]    (Poulin Decl. ¶¶ 25-28 & Exs. F-1, F-2; App. at B0560-562, B0570, B0571; Poulin Supp. Decl. ¶¶ 9, 10, Exs. F-1, F-2; App. at D0432-433, D0440-445). In his original declaration, Poulin indicated that he prepared illustrations based upon plaintiff Charles as he expected the patterns shown by him to be mirrored by the other plaintiffs. (Poulin Decl. ¶ 19; D.I. 94 at B0557). As defendants appear to contest this, in his supplemental declaration Poulin provides calculations for each plaintiff. (Poulin Supp. Decl. ¶¶ 9, 10, Exs. F-1, F-2; App. at D0432-433, D0440-445).

(Cain Dep. 52:12-23; D.I. 94 at B0015). Cain acknowledged that the benefit was better under the old plan because it provided more money. (Cain Dep. 57:19-58:9; D.I. 94 at B0016-17). Similarly, the most recent proxy statement issued by Pepco Holdings, Inc. indicates that two of its directors, who are participants in the Cash Balance Sub-Plan, have higher benefits under the grandfathered formula than under the cash balance design; one accrued a higher benefit under the Atlantic City Electric formula, and the other did so under the Delmarva formula. (Excerpt from Proxy Statement, App. at D0006-07).

Second, the defendants' March 1, 2007 10-K also demonstrates that the heritage plans provide better benefits. In it, defendants discuss this pending litigation and state "if the plaintiffs were to prevail, the ABO and projected benefit obligation (PBO), calculated in accordance with SFAS No. 87, each would increase by approximately $12 million." (D.I. 94 at B0543). The $12 million[3] reflects money taken directly from the plaintiffs' and proposed class members' pockets as a result of the conversion to the cash balance plan.

This should come as no surprise to the defendants. After all, if the defendants had expected the Cash Balance Sub-Plan to generate retirement benefits equal to or greater than the predecessor plans, there would have been no need to grandfather anyone. Defendants recently acknowledged this:

> the Cash Balance Sub-Plan may not be as lucrative as the predecessor traditional defined benefit plans for employees who were older or closer to retirement when the change was made.

---

[3]    Plaintiffs have not received discovery to independently determine the accuracy of this figure.

> That is why Conectiv created the 10-year grandfathering period to
> provide additional protection for those employees who were close
> to retirement or had more than 20 years of service.

(App. at D0347). Indeed, the minutes of a board committee meeting at which the cash

balance plan was discussed indicate that Conectiv expected "cost savings to be

recognized from the new program." (D.I. 94 at B0417).

In an effort to counter this evidence, defendants offer Ethan Kra's calculations,

which are premised upon the unrealistic assumption that the plaintiffs would receive

no increase in pay for the rest of their working lives.[4] (D.I. 89 at 123; Kra Dep. at 72:5-

73:15; D.I. 94 at B0169) (stating that 1999 compensation was used). Kra, however,

acknowledged at his deposition that actuaries routinely consider future salary increases

---

[4]    Defendants, again ignoring the evidence, argue that Poulin held salaries static in
*Engers v. AT&T.* In fact, as Poulin explained at his deposition, his declaration was a
rebuttal to another expert who fixed the benefit payable under the prior plan. Poulin
explained:

> A: . . . my Declaration, which incidentally was a rebuttal Declaration to a
> Declaration or an affidavit that had been prepared by the defendant's
> actuary which fixed the benefit payable under the prior plan to what it
> was on the date of conversion and comparing it to an increasing benefit
> under the cash balance plan.
>      And I thought I had said in my calculation that you present things
> this way, not assuming that the prior plan's benefit formula would
> continue, but freezing the benefit, in other words, freezing the protective
> benefit to where it was and comparing this to a benefit that is increasing is
> not the way to do it.
>      This is what I said in my Declaration, but it was not understood.
> Because in fact, my, my Declaration also said that the benefit that would
> eventually be paid at normal retirement age would be greater than the
> benefit under the prior version of the plan than under the cash balance
> plan.

(Poulin Dep. 226:3-227:8; App. at D0146).

when calculating projected pension liabilities for purposes of financial reporting. (Kra Dep. 138:2-139:19; D.I. 94 at B0186). Conectiv followed this convention, assuming a rate of salary growth of 4.5% in preparing its financial statements for 1998 and 1999. (Excerpt from 10-K; App. at D0427). Indeed, Watson Wyatt's presentation to management on the possibility of adopting a cash balance design also assumed salary growth. (D.I. 94 at B0407, B0410, B0413) (graphs presenting patterns in benefit changes based on 3% salary growth).

The relevant regulatory standard for Section 204(h) notice directs that the determination of whether a plan amendment results in a reduction in the rate of future benefit accrual should be based upon "reasonable expectations" that consider "relevant facts and circumstances." 26 C.F.R. § 1.411(d)-6 (Q&A 5, 7) (1999). The assumption that none of the plan participants would ever get another raise would have been difficult to justify in 1998, since defendants were assuming there would be salary growth in considering the adoption of the plan and in reporting on their pension liabilities. It is even harder to justify Kra's assumption now, when the plaintiffs' compensation records demonstrate that they did have salary increases. Kra's flawed analysis is directly contradicted by the actual evidence. Cain's testimony, the defendants' 10-K and their recent acknowledgement to grandfathered employees all demonstrate that this was a cost savings plan for the defendants.

Certain aspects of defendants' reply brief suggest that plaintiffs need to show more than the simple fact that there have been lower accruals to prevail: "the question of Plaintiffs' entitlement to notice narrow to whether Defendants, as of the time of the

amendment, could reasonably expect this gap favoring the cash balance formula would be eliminated and reversed based upon future events." (D.I. 102 at 7). Actually, plaintiffs sought discovery to prove precisely this, but defendants filed a successful motion for a protective order, precluding the discovery because their expectations and state of mind were irrelevant. (D.I. 60-62). Defendants now contend that judgment should be entered in their favor because plaintiffs have not marshaled evidence showing that defendants expected the Cash Balance Sub-Plan to result in lower benefits. (D.I. 102 at 8). In light of this shift in defendants' position, plaintiffs are filing a motion seeking relief under Rule 56(f) of the Federal Rules of Civil Procedure to permit the discovery that the defendants now indicate is necessary. In the alternative, plaintiffs seek a preclusion order.

2.      *Defendants Did Not Issue Notice in a Timely Fashion.*

Defendants' argument that the May 1998 notice was timely is directly contradicted by the evidence. The statute required that notice be provided "after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment." 29 U.S.C. § 1054(h)(1) (1996). As plaintiffs demonstrated in their prior brief, defendants failed to satisfy this requirement, as the plan became effective as of January 1, 1999, but it was not formally adopted until December 10, 1999.

In response, defendants conflate the legal requirements for an amendment procedure with the legal requirements of an amended plan document. While the amendment procedure can be informal, the result has to be a document that meets ERISA's statutory requirements. *Depenbrock v. Cigna Corp.*, 389 F.3d 78, 83 (3d Cir. 2004)

("Regardless of the method specified for amendment, however, an indispensable requirement under ERISA for effective amendment is that the plan amendment be in writing). Defendants cite cases for the proposition that the amendment **procedure**, need not be detailed: "[w]hatever level of specificity a company ultimately chooses, in an amendment procedure . . . , it is bound to that level." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 85 (1995). These cases are irrelevant to the issue, as they address who has authority to amend a plan, not what form an amendment must take.

Assuming the Compensation Committee had the legal authority to amend the plan, the bullet points that the Committee "authorized" at the April 23, 1998 meeting were statutorily deficient, as plaintiffs noted in their prior brief. Section 402(b)(4) of ERISA provides that: "Every employee benefit plan shall -- (4) specify the basis on which payments are made to and from the plan." 29 U.S.C. § 1102(b)(4). Similarly, the Treasury Regulations require that a pension plan provide for "definitely determinable benefits." 26 C.F.R. § 1.401-1(b)(1)(i). This latter requirement is met when the level of employee benefits is computed via a fixed formula and "*is not within the discretion of the employer.*" *See* Rev. Rul. 74-385, 1974-2 C.B. 130. The bullet points presented to the compensation committee did not meet this standard because it is impossible to tell how participants would earn benefits, as the formulae for pay credits and for interest credits were not set forth. (D.I. 94 at B0422).

Wilkinson, who drafted the bullet points, conceded that the attachment presented to the Committee had no procedure for establishing and carrying out funding of the plan, no description on how to allocate the responsibilities for the operation and

9

administration of the plan and no indication of the basis on which the payments are made to and from the plan. (*See* Wilkinson Dep. at 48:6-8; 50:2-51:14; D.I. 94 at B0377-378). These are mandatory requirements of "[e]very employee benefit plan" under ERISA. 29 U.S.C. § 1102(b)(1), (2), (4).

The result of the April 23, 1998 committee meeting was the adoption of a resolution approving a cash balance design as attached to the committee minutes, and authorizing Cain to adopt a formal plan document, which Cain admits he did on December 10, 1999. (Cain Dep. at 95:1-97:7; D.I. 94 at B0026). S*ee Depenbrock v. Cigna Corp.*, 389 F.3d at 83 (modification of pension plan was not adopted until document was executed by authorized officer). Thus, even if defendant's undated "Facts" newsletter was properly disseminated in May 1998, that was before the effective date **and before the plan was adopted** in a written form. This did not comply with Section 204(h). *See Production & Maint. Employees' Local, Laborers' Int'l Union v. Roadmaster Corp.*, 954 F.2d 1397, 1403 (7th Cir. 1992) (stating that provision of notice prior to adoption of plan violated Section 204(h)). Because defendants failed to provide timely notice under Section 204(h), plaintiffs' motion for summary judgment on Count IV must be granted.

3.     *There Is No Evidence That Notice Was Provided Properly.*

Defendants have another problem: they now rest their contention that notice was provided on an undated document, and they have no records to show when or how it was disseminated or to whom.[5] At the relevant time, the applicable regulations provided that a plan administrator "may use any method reasonably calculated to

---

[5]     Initially, defendants cited four different documents as candidates for Section 204(h) notice.

**ensure actual receipt** of the section 204(h) notice. First class mail to the last known address of the party is an acceptable delivery method. Likewise, hand delivery is acceptable." 26 C.F.R. §1.411(d)-6 (Q&A 11) (1999) (emphasis added). The record provides no evidence to show effective dissemination of the relevant document. (Charles Dep. at 90:6-22; D.I. 94 at B0061; *see* Fink Dep. at 86:7-20; D.I. 94 at B0121; *see also* Fink Dep. at 87:13-88:5; D.I. 94 at B0121). No records have been produced by defendants to explain the dissemination of the May 1998 document. (Kremmel Dep. at 45:6-14; D.I. 94 at B0261; Cain Dep. at 58:21-23; 60:1-4; D.I. 94 at B0017).

The defendants dug a hole for themselves by filing a summary judgment motion without adequate evidentiary support: they sought to establish that they had mailed notice of the cash balance plan amendment with the declaration of James Kremmel. (D.I. 89 at A35-41). While Kremmel's declaration purported to show that various materials were distributed to employees, his deposition testimony demonstrated that he lacked personal knowledge of the statements he made on the subject of notice. (Kremmel Dep. 18:3-14, 45:6-14, 49:2-50:3, 84:1-85:4 ; D.I. 94 at B0255, B0261, B0262-263, B0271).

Apparently recognizing they had a problem, defendants kept digging. With their reply brief in support of their summary judgment motion, defendants submitted a declaration from Karen E. Francks, who purports to attest that various materials were duly mailed to participants. (D.I. 103 at C185-186). Ms. Francks (whom defendants never identified as a potential witness), acknowledged at her deposition that she lacked personal knowledge that the materials were mailed. (Francks Dep. at 55:4-56:21; 58:18-59:6; 59:18-60:1; 61:7-17; 65:11-67:20; 69:12-70:20; 72:1-21; 74:20-77:13; App. at D0251-253;

D0256; D0257-258; D0259-260; D0265-268; D-270-272; D0273-274; D0277-281). Since Ms. Francks has acknowledged that she lacked personal knowledge to support the statements made in her affidavit, it must be stricken for failure to comply with Rule 56(e) of the Federal Rules of Civil Procedure. (*See* D.I. 96 at 7-8).

But that does not end the story: during her deposition, Ms. Francks commented that she wished she "had a choice" and was unhappy that she was not grandfathered, as she understood her old plan benefit was better. (Francks Dep. at 93:7-24; App. at D0303-304). Thus, Ms. Francks offers defendants no proof that notice was provided, but bolsters plaintiffs' position that it was required.

    4.    *The Amendment Should Be Rescinded.*

Defendants have adopted a position that "extraordinary circumstances" are required for plaintiffs to obtain relief under Section 204(h). They advised plaintiffs, by letter dated August 31, 2007, however, that they were withdrawing any contention that plaintiffs must establish bad faith to prevail.

The idea that "extraordinary circumstances" are required to obtain relief is at odds with the statute in place at the time of the amendment. When the statute was amended in 2001, a provision was added for relief that involved an "egregious failure" to provide notice. 29 U.S.C. § 1054(h)(6)(A). It is thus inapplicable to this case as the conversion took place in 1999. None of the prior appellate decisions addressing Section 204(h) speak of imposing an additional requirement that there must be extraordinary circumstances to justify relief. *See Roadmaster,* 954 F.2d at 1404 ("Section 204(h)'s language is also clear and imperative: a plan 'may not be amended' absent proper

notice."); *see also Frommert v. Conkright,* 433 F.3d 254, 266 (2d Cir. 2006). Moreover, the Treasury Regulations promulgated under the 2001 amendment to Section 204(h) define an egregious failure to include problems with notice that are not intentional, which suggests an "egregious failure" under the amended statute need not involve intentional acts. 26 C.F.R. § 54.4980F-1 (Q&A 14). Defendants' argument that plaintiffs must show "extraordinary circumstances" rests upon a misreading of relevant authority. (*See* D.I. 93 at 26-27).

As part of their argument that there are no "extraordinary circumstances," defendants argue that they did not expect the plan to result in lower accruals. For example, defendants invoke Cain's testimony that "the conversion was designed to be cost neutral" to the company. (D.I. 102 at 15). This testimony is unavailing in light of the overwhelming contradictory evidence. First, the cash balance plan was not cost-neutral for Cain, as he chose to retire under the old Delmarva plan, which provided him a greater financial benefit than the cash balance plan. Second, if the cash balance formula was not going to result in lower accruals there would be no reason to grandfather anyone. Third, the defendants acknowledge in their 10-K that converting to the cash balance plan saved them $12 million. Finally, defendants recently informed grandfathered employees that the cash balance plan is "not as lucrative" as the predecessor ACE and Delmarva final average pay plans. Thus, simply because Cain said the plan was designed to be "cost neutral" does not make it so. In fact, the actual evidence proves otherwise. Indeed, Ms. Francks, the newly-discovered witness who supplied an affidavit in an effort to show that notice was mailed testified at her

deposition that she understood her benefits would be twenty-five percent higher under the old plan. (Francks Dep. at 93:7-24; App. at D0303-304).

In 2006, the defendants successfully precluded plaintiffs from obtaining discovery from Watson Wyatt and Towers, Perrin, Forster, & Crosby, Inc., the actuaries who worked on various stages of the Plan. (D.I. 60-62). Defendants now disingenuously argue notice was not required because the cash balance plan was "cost-neutral" and "based on the information known as of the amendment's January 1, 1999 effective date, there was no reasonable basis to expect the cash balance conversion to reduce any plaintiff's rate of future benefit accrual." (D.I. 102 at 6). They also invoke hearsay, describing what Watson Wyatt representatives said about the plan.

Although defendants succeeded in barring plaintiffs from conducting discovery on the issue, there is still evidence that cost savings were expected. The plaintiffs uncovered a February 20, 1998 slide presentation prepared by Watson Wyatt which indicates that grandfather benefits were expected to be greater than cash balance benefits, an indication that the predecessor plans provided greater benefits. (D.I. 94 at B0413). As one of defendants' human resources executives explained, this presentation was provided to senior management, not participants such as the plaintiffs. (Wilkinson Dep. at 98:15-99:12; D.I. 94 at B390)

Moreover, the minutes of the board committee meeting at which the cash balance design was endorsed indicated that it was being adopted as part of a package of benefit changes designed "to be at approximately the median of the competitive market place . . . ." (D.I. 94 at B0417). The minutes also indicated that the company expected

"cost savings to be realized from the new program." (*Id.*). PowerPoint slides used to brief senior managers on the Company's new benefits package indicated that Conectiv would be spending $100 dollars on post-retirement benefits for every $122 previously spent by Atlantic City Electric and every $109 previously spent by Delmarva. (D.I. 94 at B0526). Defendants argue the chart compared "retirement costs," but the 10-K, which indicates it would cost defendants $12 million in additional pension benefits if plaintiffs prevail, corroborates plaintiffs' argument. Taken together, these materials indicate that defendants expected to save money through the new design; since the savings would come from the participants' pockets, these materials suggest that defendants were aware that the Cash Balance Sub-Plan would result in lower benefits at age 65. Meanwhile, defendants assured participants that cost savings were not involved. (D.I. 94 at B0514) ("New program not designed to provide cost savings for Conectiv.").

### D.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.

Applying the "clear repudiation" standard established in *Romero v. Allstate Corp.*, 404 F.3d 212 (3d Cir. 2005), which this Court adopted in denying defendants' motion to dismiss, all of plaintiffs' claims were timely filed. As plaintiffs discussed in their prior brief, their claim under Section 204(b)(1)(B) of ERISA could not have accrued prior to 2004, as that was the first time that the plan violated the 133 $^{1/3}$ percent rule. (D.I. 93 at 29-30). As for Count II of the complaints, the plaintiffs suffered negative accruals in 2001, but they were not provided with information on their accrued benefits that would have shown this; instead defendants elected to furnish only the account balance. The plaintiffs were not obligated to retain an actuary to evaluate this information, as

15

participants are not expected to understand "the intricacies of pension plan formulas and the technical requirements of ERISA." *Romero,* 404 F.3d at 224 (*quoting DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund,* 975 F. Supp. 258, 265 (S.D.N.Y. 1997)). Although they do not distinguish between the various claims in plaintiffs' complaints, defendants appear to focus primarily upon the notice claim set forth in Count IV.

The federal discovery rule applies to determine the date of accrual of the Section 204(h) claim. *Romero,* 404 F.3d at 225. In applying this rule, the Third Circuit reasoned that "[i]t would make no sense, and indeed do a remarkable disservice to the underlying purposes of ERISA and its disclosure requirements, to deem a notice claim to have accrued before a plaintiff knows or should know that an amendment has the effect which triggers the notice requirement." *Id.; see also Miller v. Fortis Benefits Ins. Co.,* 475 F.3d. 516, 522-23 (3d Cir. 2007).

Plaintiffs' testimony demonstrates that their notice claims did not accrue until 2004. (Charles Dep. at 32:7–32:23; D.I. 94 at B0046; *see also* Fink Dep. at 33:2-34:5; D.I. 94 at B0107-108 (became suspicious in 2004); Ward Dep. at 37:23-38:24; D.I. 94 at B0325-326 (discussions with departing grandfathered employees in "the last few years" made him suspicious); Troup Dep. at 33:3-33:14; D.I. 94 at B0307). Ignoring the record, defendants argue that plaintiffs were on inquiry notice of their claims by 1999.

1.     *Plaintiff Charles Has a Timely Claim.*

Defendants distort Charles's testimony to argue his claims are time barred. (D.I. 102 at 19). The evidence demonstrates that when Charles testified that the cash balance plan "provides less financial benefit upon retirement than the old one does" and is

16

therefore unfair, Charles was referring to his belief *now*, after the facts have actually come to light. (Charles Dep. at 55:10-55:18; D.I. 94 at B0052; Charles Dep. at 57:24-58:11; 59:3-59:20; D.I. 94 at B0052-53). His belief that the plan was unfair *at its inception* was based on the fact that he had no choice of which form of benefit he received, while other employees did. (*See* Charles Dep. at 141:10-142:1; D.I. 94 at B0073-74). Charles submitted a declaration to expand upon this point, since he was not asked about it during his seven hour deposition. (Charles Decl.; D.I. 94 at B0400).

Defendants' argument that Charles never had a "choice" to pick his pension plan at Conectiv or ACE is irrelevant. Mr. Cain, defendants' former human resources chief never had a "choice" to pick his pension plan in the past, but he was given a choice when he was grandfathered. Charles was not given a choice because of a cut-off he perceived to be arbitrary. Apparently, he was not alone in that view: Ms. Francks, who is in the human resources department, indicated at her deposition that she wished she had been given a choice. (Francks Dep. at 93:7-24; App. at D0303-304). After working for defendants for over 19 years and 3 months, Charles missed the grandfathering cut off by a matter of months. Significantly, defendants no longer place their new employees into the cash balance plan at issue in this case. Since 2005, defendants' new employees have been placed in a defined benefits plan more akin to the predecessor plans. (Summary Plan Description; App. at D0312, D0318).

> 2. *Plaintiff Ward and Plaintiff Troup Have Timely Claims.*

Defendants argue plaintiffs Troup and Ward were on inquiry notice as the result of certain *Wall Street Journal* articles. Yet defendants told participants that the Conectiv

cash balance plan was "different" and better than the plans discussed in the 1998 *Wall Street Journal* articles. The defendants specifically addressed the *Wall Street Journal* articles at the July 1999 meetings, which defendants described as being the "best source of information" regarding *this* cash balance plan. (D.I. 89 at A63). Cain and Wilkinson both testified that plan participants were informed that the Conectiv plan differed from the "controversial plans" discussed in the news. (Wilkinson Dep. at 84:19-85:14; D.I. 94 at B0386; Cain Dep. at 82:14-83:15; D.I. 94 at B0023; Cain Dep. at 88:21-89:12; D.I. 94 at B0024). *Cf. LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) ("There are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management.").

Defendants' reliance on a series of cases for the irrelevant proposition that a defendant's denial of wrongdoing does not toll the statute of limitations is misplaced. (D.I. 102 at 17). Defendants' argument does not address whether the articles were sufficient to place Ward on inquiry notice. Instead defendants rely on cases where the defendants were the subject of an investigation,[6] where plaintiffs had received specific

---

[6]     *Forbes v. Eagleson*, 228 F.3d 471, 487 (3d Cir. 2000) (plaintiffs' claims time-barred due to publishing of three articles regarding an investigation of defendant and filing of one complaint, all more than four years before the filing in this case); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) (plaintiff's claims time-barred due to annual report acknowledging ongoing IRS investigation, more than four years before the filing in this case).

and actual notice,[7] where the facts were there to be discovered and plaintiff delayed in bringing suit,[8] and where plaintiffs relied on defendant's bald assertions of innocence.[9]

Here, the statute of limitations does not begin to run "until such time as the employee knew or should have known that the amendment has brought about a clear repudiation of certain rights that the employee believed he or she had under the plan." *Romero*, 404 F.3d at 223. Defendants ignore the fact that the *Wall Street Journal* articles were about *different* plans and that they repeatedly told plan participants that the articles were irrelevant to their cash balance plan. Thus, the articles could not have placed Ward or Troup on inquiry notice.

---

[7]     *GO Computers, Inc. v. Microsoft Corp.*, 437 F. Supp. 2d 497, 501 (D. Md. 2006) (claims time-barred because plaintiff was aware of defendant's activities but made a business decision not to pursue a lawsuit for more than four years prior to filing suit); *DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085, 1094 (E.D. Cal. 2005) (plaintiff's claims barred where plaintiff had personally acknowledged defendant's illegal activities more then four years prior to bringing suit).

[8]     *Pocahantas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-219 (4th Cir. 1987) (claim barred where "simple inquiry and consultation of public records" would have revealed defendant's wrongdoing).

[9]     *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1023 (D. Minn. 1997) (plaintiff's claims were time-barred because the defendants' statements denying the existence of an antitrust violation were insufficient to show fraudulent concealment); *Bausch v. Philatelic Leasing, Ltd.*, 728 F. Supp. 1201, 1207 (D. Md. 1990) (plaintiffs' claims barred because defendant's continuance reassurance that an ongoing lawsuit was of no consequence could not toll statute of limitations); *LC Capital Partners LP v. Frontier Ins. Group, Inc.*, 318 F.3d at 155-156 ("Here, all three factors point against the reasonableness of reliance on Frontier's reassurances. Under-reserving is obviously a serious problem for an insurance company. The prospect that the problem would recur was heightened when three substantial reserve charges were taken within four years, indicating the likelihood of either a fundamental defect in the company's reserve methodology or the company's refusal to face reality. The 'reassuring' statements by management were mere expressions of hope, devoid of any specific steps taken to avoid under-reserving in the future. In these circumstances, the claimed reassurances are unavailing.").

3.    *Plaintiff Fink Has A Timely Claim.*

Dissatisfied with their own leading question, defendants misstate Fink's

testimony in order to argue he was on inquiry notice in 1999. (D.I. 102 at 19). Fink said

he became suspicious that his rights were being violated in 2004. Fink testified:

> Q.  When did you first become suspicious *that your rights were being*
> *violated* by the cash balance plan?
> MR. SAUDER:  Objection to the form.  You can answer.
> THE WITNESS:  I became suspicious of how the plan would ultimately
> suit me around 2004 maybe.

(Fink Dep. at 33:2-33:10; D.I. 94 at B0107) (emphasis supplied). Thus, Fink's claims were

timely filed.

## II.  CONCLUSION

Based upon the arguments and authorities set forth above, plaintiffs respectfully

request that judgment be entered in their favor on Counts I, II and IV.

Respectfully submitted,

Dated:  September 4, 2007          **CHIMICLES & TIKELLIS LLP**

By:  /s/Scott M. Tucker
         Pamela S. Tikellis (#2172)
         Robert J. Kriner (#2546)
         A. Zachary Naylor (#4439)
         Scott M. Tucker (#4925)
         One Rodney Square
         P.O. Box 1035
         Wilmington, DE 19899
         302-656-2500 (telephone)
         302-656-9053 (fax)

and

James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

Attorneys for Plaintiffs