# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) | C. A. NO. 05-702 (SLR) (Lead Case) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF JAMES R. MALONE, JR. PURSUANT TO FED. R. CIV. P. 56(f).**

James R. Malone, Jr. declares under penalty of perjury as follows:

1.      I am an attorney-at-law admitted to practice in the Commonwealth of Pennsylvania and before the Supreme Court of the United States, the United States Courts of Appeals for the First, Third, Fifth, Sixth, Seventh, Ninth and D.C. Circuits and before the United States District Courts for the Eastern District of Pennsylvania, the Northern District of California, and the Eastern District of Michigan. I am a member of the firm of Chimicles & Tikellis LLP; I have been admitted *pro hac vice*, and I appear in this matter as counsel for the plaintiffs. I submit this declaration, upon personal knowledge, in support of Plaintiffs' Motion for Continuance Pursuant to FED. R. CIV. P. 56(f) or for a Preclusion Order.

2.      Plaintiffs seek a continuance pursuant to Rule 56(f) of the Federal Rules of Civil Procedure because they conducted discovery in this action that was limited in scope by the Court's Order of November 14, 2006 (D.I. 62), which precluded them from

conducting discovery designed to explore defendants' state of mind and expectations in adopting the relevant plan amendment. Having complied with the Court's Order, plaintiffs are now faulted by defendants for failure to produce the very evidence that plaintiffs had sought to develop with the discovery they were barred from conducting, as defendants assert that judgment should be entered in their favor due to the absence of proof in these areas. (D.I. 102 at 8).

3.      After this Court denied defendants' motion to dismiss, the parties conducted an initial meeting, as required under Rule 26(f), on July 10, 2006. Following the meeting, plaintiffs prepared and filed a report on the planning meeting, which included an outline on what discovery they thought was relevant. (D.I. 36). Among the topics listed were discovery into the reasons why the Cash Balance Sub-Plan was adopted and "the extent to which defendants expected the Cash Balance Sub-Plan to result in lower benefit accruals." (D.I. 36 at 3). Plaintiffs also indicated in their report that they would seek discovery relevant to remedies. (*Id.* at 4).

4.      After the scheduling conference, the parties prepared and submitted a Joint Scheduling Order, which included the various topics on which the parties believed that discovery would be necessary. (D.I. 40, ¶ 2(a), (b)). Paragraph 2(a) of the proposed order reflected plaintiffs' views of what discovery they needed, and it included the reasons the defendants adopted the Cash Balance Plan, "the extent to which defendants expected the Cash Balance Sub-Plan to result in lower benefit accruals" and the question of "the appropriate remedies for defendants' alleged violations of ERISA." (D.I. 40, ¶ 2(a)). Paragraph 2(b) reflected defendants' views, and they indicated that

discovery on "the extent to which defendants and/or plaintiffs expected the Cash Balance Sub-Plan to result in lower or higher benefit accruals," as well as "the appropriate remedies." (*Id.*, ¶ 2(b)). I prepared the draft of the Joint Scheduling Order, and I can attest to the fact that this language was lifted from Defendants' Report of Parties' Planning Meeting. (*See* D.I. 37, ¶ 3(a)(ii)).

5. On August 18, 2006, plaintiffs served their First Set of Interrogatories and Requests for Production of Documents, a true and correct copy of which is attached hereto as Exhibit 1. Defendants served extensive objections to these discovery requests on September 20, 2006.

6. At the initial planning meeting, we were advised that the defendants were having great difficulty locating relevant documents. In light of this complication, plaintiffs prepared subpoenas to the defendants' actuarial consulting firms, Towers, Perrin, Forster, & Crosby, Inc. ("Towers Perrin"), and Watson Wyatt & Co. ("Watson Wyatt") to assure that plaintiffs had full documentary discovery.

7. On September 15, 2006, I issued a subpoena to Towers Perrin from the United States District Court for the Eastern District of Pennsylvania, which was returnable on October 4, 2006. A true and correct copy of this subpoena is attached as Exhibit 2. Counsel for Towers Perrin requested an extension of the return date, which I granted.

8. In addition, I retained associate counsel in Washington D.C., who issued a subpoena from the United States District Court for the District of the District of Columbia upon Watson Wyatt that was returnable October 5, 2006. A true and correct

copy of this subpoena is attached hereto as Exhibit 3. On October 2, 2006, counsel for Watson Wyatt issued formal written objections to the scope of the subpoena.

9.      After receiving defendants' objections to our discovery requests, their responses, and reviewing the entirety of their document production, which was represented to be complete, I sent a letter to defendants' counsel outlining plaintiffs' position on where their responses were deficient on October 24, 2006. A true and correct copy of this letter is attached hereto as Exhibit 4.

10.      At the end of the very next day, the defendants filed a Motion for a Protective Order. No consultation with me or with any other attorney in my firm preceded this filing.

11.      On October 26, 2006, this Court held a discovery conference at 11:30 a.m. At the conference, the Court heard from plaintiffs and defendants on the appropriate scope of discovery. A copy of the transcript of the proceeding is attached hereto as Exhibit 5.

12.      Pending a decision by the Court, plaintiffs extended the deadlines for Towers Perrin and Watson Wyatt to comply with their subpoenas to permit the Court to rule on the appropriate scope of discovery.

13.      On November 14, 2006, the Court entered an Order that limited defendants' written discovery obligations to providing copies of the Cash Balance Sub-Plan, summary plan descriptions, annual reports on Form 5500 for the Cash Balance Sub-Plan, participant statements, and employee communications relating to the

amendment creating the Cash Balance Sub-Plan. Plaintiffs' subpoenas to Towers Perrin and Watson Wyatt were also quashed. (D.I. 62.)

14.    Plaintiffs thereafter conducted all of their discovery under the limitations imposed by the relevance determination that the Court had made in its November 14, 2006 Order. This has had several consequences, which I outline below.

15.    First, documentary evidence has been restricted solely to defendants. No documents have been obtained from the actuarial consultants who advised the defendants in adopting the plan amendment, as our subpoenas to them were quashed. Defendants, of course, remained free to confer with these consultants over the course of the litigation.

16.    Second, the scope of the material that plaintiffs have obtained from the defendants has been limited due to the Court's November 14th Order. There is very little evidence on what the defendants' expectations were concerning this plan when it was adopted. The defendants only produced one document that speaks to the issue, the minutes of an April 1998 board committee meeting at which the cash balance design was endorsed. (*See* D.I. 94 at B0417-424). The two other documents that touch upon the issue of defendants' expectations were sets of PowerPoint slides used in management presentations; these documents were uncovered by plaintiffs as part of their investigation and were not produced by defendants. (D.I. 94 at B0402-416, B0522-539).

17.    Third, there are witnesses whom we did not depose because the reason to depose them was to explore areas that the Court had determined were irrelevant. For example, four directors were listed in the minutes of the meeting on April 23, 1988 at

which a committee of the board endorsed the cash balance design. (D.I. 94 at B0417).

Before the October 26th conference, I had expected to seek deposition testimony from

one or more of these individuals to determine what Conectiv expected to happen as a

result of the plan, including the extent of the cost savings that were expected. The

Court's November 14th Order made those depositions pointless, as we would not have

the documents needed to extract any meaningful testimony from witnesses identified

with an adverse party, and the results of any testimony would be irrelevant. Similarly,

in their disclosures, plaintiffs had identified representatives of Towers Perrin and

Watson Wyatt, and I had planned to conduct depositions of them to establish what they

told Conectiv were the likely consequences of the cash balance design, among other

things. Once the Court endorsed the defendants' position that this information was not

relevant, there was no purpose to be achieved from pursuing those depositions.

18.     Fourth, even for those witnesses whom we did depose, the November

14th Order altered the way in which we conducted their examination. If the Court had

adopted our position that the defendants' state of mind and expectations were relevant,

we would have devoted substantial time to exploring those issues and presumably

would have done so armed with relevant documents.

19.     Fifth, in February 2007, we negotiated with the defendants an agreement

to proceed with an early summary judgment motion, in lieu of concluding all discovery

by July 25, 2007 as contemplated by the parties' Joint Scheduling Order. The Court's

November 14th Order also influenced those discussions. Defendants were initially

reluctant to permit any deposition discovery other than James Kremmel. Plaintiffs

wanted to depose two other former human resources executives, Benjamin Wilkinson and Donald Cain. Frankly, if we had known that defendants would ultimately argue that plaintiffs had to establish "that, *at the time of the amendment,* Defendants should reasonably have anticipated that [plaintiffs'] rate of future benefit accrual would decline," (D.I. 102 at 8) (emphasis in original), we never would have agreed to the arrangement and would, instead, have sought further discovery.

20.     In light of the foregoing, I submit that plaintiffs timely sought discovery on "the extent to which defendants expected the Cash Balance Sub-Plan to result in lower benefit accruals" and only ceased to pursue that discovery when directed to do so by the Court. Accordingly, plaintiffs have been prejudiced by defendants' recent shift in position, which calls for them to prove facts that they were precluded from exploring in discovery where the facts and evidence are within defendants' possession or subject to their control. Defendants succeeded in narrowing discovery by asserting that the only question under Section 204(h) of ERISA was whether the plan amendment had the effect of significantly reducing future benefits. (D.I. 71 at 10; Ex. 5 at 10). Now defendants' fault plaintiffs for failing to show that they subjectively expected the amendment to have this effect.

21.     There appear to be two alternative remedies available to address the present situation: either defendants should be barred from changing their position on what the plaintiffs are required to prove, or plaintiffs should be permitted to conduct the discovery that they initially designed to address the very arguments that they defendants are now making. This would include full compliance by defendants with

plaintiffs' document requests, and enforcement of plaintiffs' subpoenas issued to Towers Perrin and Watson Wyatt. Following the completion of the additional documentary discovery, there would plainly be the need for additional deposition discovery, which would include testimony from representatives of Towers Perrin and Watson Wyatt, as well as additional testimony from other individuals identified in the additional documents produced. At a minimum, four additional depositions would likely be needed, including representatives of Towers Perrin and Watson Wyatt, as well as former directors, officers and employees of Conectiv. Depending upon what the documents show, it is conceivable that more than four depositions would need to be conducted, or that persons previously deposed in these actions would need to be re-deposed.

22.     Based upon the materials that have been uncovered in discovery, I believe that further discovery, as outlined above, will permit plaintiffs to demonstrate that defendants are chargeable with knowledge that the Cash Balance Sub-Plan would result in lower benefits for participants.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 4/th day of September, 2007 at Haverford, Pennsylvania.


James R. Malone, Jr.
(appearing *pro hac vice*)


8

# Exhibit 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

J. MICHAEL CHARLES; MAURICE W. )  C. A. NO. 05-702 (SLR)
WARD, JR.; and JOSEPH I. FINK, JR., on behalf )  (Lead Case)
of themselves and all others similarly situated, )
     )
     Plaintiffs,  )
     )
    v.   )
     )
PEPCO HOLDINGS, INC; CONECTIV, and )
PEPCO HOLDINGS RETIREMENT PLAN, )
     )
     Defendants.  )

## PLAINTIFFS' FIRST SET OF INTERROGATORIES
## AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, plaintiffs, J.

Michael Charles, Maurice W. Ward, Jr., Joseph I. Fink, Jr. and Thomas S. Troup, hereby

request that defendants i) furnish separate answers, under oath, to the interrogatories

contained herein within 30 days of service; and ii) produce for inspection and copying the

documents described in the requests for production contained herein at the offices of

Chimicles & Tikellis LLP, One Rodney Square, Wilmington DE 19899 within 30 days of

service, or at such other time and location as the parties may agree.

### DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions shall apply to this First Set of

Interrogatories and Requests for Production of Documents:

1.  "Conectiv" shall mean Conectiv, its predecessors and successors and all of

their officers, directors, employees, and agents.

2.  "Pepco" shall mean Pepco Holdings, Inc., its predecessors and successors,

and all of their officers, directors, employees, and agents.

1

3.    "ACE" shall mean Atlantic City Electric Company, its predecessors and successors, and all of their officers, directors, employees, and agents.

4.    "Delmarva" shall mean Delmarva Power & Light Company, its predecessors and successors, and all of their officers, directors, employees, and agents.

5.    "Towers Perrin" shall mean Towers Perrin, its predecessors and successors, and all of their officers, directors, employees, and agents.

6.    "Watson Wyatt" shall mean Watson Wyatt & Co., its predecessors and successors, and all of their officers, directors, employees, and agents.

7.    "ACE Plan" shall mean the Atlantic City Electric Company Retirement Plan.

8.    "Delmarva Plan" shall mean the Delmarva Power & Light Company Retirement Plan.

9.    "Conectiv Plan" shall mean the Conectiv Retirement Plan, which was the successor by merger to the ACE Plan and the Delmarva Plan.

10.    "Pepco Holdings Plan" shall mean the Pepco Holdings Retirement Plan.

11.    "ACE Sub-Plan" shall mean the sub-plan of the Conectiv Plan that covers employees represented by IBEW Local 210 or Local 210A.

12.    "Delmarva Sub-Plan" shall mean the sub-plan of the Conectiv Plan that covers employees represented by IBEW Local 1238, Local 1238A, Local 1307, or Local 1307A.

13.    "Cash Balance Sub-Plan" shall mean the Conectiv Cash Balance Sub-Plan which became effective as of January 1, 1999.

14.    "Conversion" shall refer to the transaction or transactions in which the ACE Plan and the Delmarva Plan were merged to form the Conectiv Plan and the Cash Balance Sub-Plan became effective.

2

15.    "Grandfather Benefits" shall refer to the benefits provided to certain participants in the Conectiv Plan and the Pepco Holdings Plan pursuant to section 3.6 of the Cash Balance Sub-Plan.

16.    The term "Document" shall mean any tangible thing within the scope of Rule 34 of the Federal Rules of Civil Procedure, and includes data stored electronically (including but not limited to electronic mail) or in any other format from which any information can be derived or retrieved. The term "document" also all attachments, enclosures or documents affixed or referred to in any documents identified in response to any of the following document requests. Any copy or draft of a document containing any information in addition to or in any way different from that contained in or on the original shall be deemed a separate document for purposes of these requests.

17.    "Person" shall mean any individual, partnership, firm, association, organization or other entity.

18.    "Communicate" or "communication" means the transmission of data, information or ideas, whether orally, in writing, or via electronic media.

19.    "Identify" generally means to specify, list, enumerate, catalog, classify, mark or name.

20.    When identification of a Document is requested, state the type of Document (e.g., letter, memorandum, email, *etc.*), date, author, addressee(s), name and address of custodian, location, number of pages and description of general subject matter. If any such Document was but is no longer in your possession or subject to your control, identify it as set forth herein and state what disposition was made of it and the date of such disposition.

21.    When identification of a Person is requested herein, state the name, present or last known address, present occupation and place of employment, and the dates and nature, if any, of such Person's affiliation or relationship at any time with the defendant(s).

22.    "Relates" or "relating to" or "referring to," means in any way concerning, constituting, analyzing, discussing, describing, considering, modifying, amending, confirming, endorsing, evidencing, representing, supporting, modifying, terminating, revoking, canceling, indicating or listing, unless qualified by a work of limitation.

23.    If you claim any form of privilege or confidentiality, whether based on statute or otherwise, as a ground for not answering an interrogatory or any part thereof, or for not producing a document or any part thereof, set forth in complete detail each and every fact upon which the privilege or confidentiality is based on, if referring to a document, include a complete description of the document, including sufficient facts for the Court to make a full determination of whether the claim is valid. If you maintain that a matter is attorney-client privileged notwithstanding the fiduciary exception to the privilege, state with specificity all reasons why you contend that the fiduciary exception is not applicable.

## INTERROGATORIES

1.    Identify each Person who has provided information to assist in answering any of these interrogatories.

2.    Describe Conectiv's retention policies for all Documents relating to the ACE Plan, the Delmarva Plan, the Conectiv Plan, the Conversion and the Cash Balance Sub-Plan.

3.    Identify all Persons with knowledge of your retention policies for all Documents relating to the ACE Plan, the Delmarva Plan, the Conectiv Plan, the Conversion and the Cash Balance Sub-Plan.

4

4.    If any Document relating to the ACE Plan, the Delmarva Plan, the Conectiv Plan, the Conversion and the Cash Balance Sub-Plan has been destroyed, please provide the following information: a) identify the Document; b) state the date it was destroyed; c) state why the Document was destroyed; and d) identify the Person who authorized its destruction.

5.    Identify all Persons with knowledge of the existence and location of any data stored in electronic form that refers or relates to the Conversion or the Cash Balance Sub-Plan.

6.    Identify all Persons with knowledge of the Conversion.

7.    Identify all Persons with knowledge of the reasons why Conectiv elected to adopt the Cash Balance Sub-Plan.

8.    Identify all Persons with knowledge of the reasons why Conectiv elected to adopt the ACE Sub-Plan.

9.    Identify all Persons with knowledge of the reasons why Conectiv elected to adopt the Delmarva Sub-Plan.

10.    Identify all Persons with knowledge of the Communications that Conectiv issued to participants in the ACE Plan, the Delmarva Plan and the Conectiv Plan advising them of the Conversion or their rights under the Cash Balance Sub-Plan.

11.    Identify all Persons with knowledge of the manner in which the terms for Grandfather Benefits were selected.

12.    Identify all Persons who were compensated for services rendered in connection with the Conversion from the assets of the ACE Plan, the Delmarva Plan, or the Conectiv Plan.

13.    Does any defendant intend to rely upon the advice of counsel as a defense to any claim in this action?

5

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.     All plan documents for the ACE Plan, the Delmarva Plan, the Conectiv Plan, the Pepco Holdings Plan, the ACE Sub-Plan and the Delmarva Sub-Plan and all amendments to them.

2.     All plan documents for the Cash Balance Sub-Plan, all drafts of them and all amendments to them.

3.     All Documents and Communications relating to the approval of amendments to the ACE Plan, the Delmarva Plan or both in connection with the Conversion.

4.     All minutes and other records of the Board of Directors or any committee thereof of ACE, Delmarva or Conectiv that refer to the Conversion or the adoption of the Cash Balance Sub-Plan.

5.     All Summary Plan Descriptions for the ACE Plan, the Delmarva Plan, the Conectiv Plan, and the Pepco Holdings Plan.

6.     All Summary Annual Reports for the ACE Plan, the Delmarva Plan, the Conectiv Plan, and the Pepco Holdings Plan.

7.     All Summaries of Material Modifications for the ACE Plan, the Delmarva Plan, the Conectiv Plan, and the Pepco Holdings Plan for each year such documents have been prepared.

8.     All Form 5500 Annual Reports, including all schedules and attachments thereto, for the ACE Plan and the Delmarva Plan for 1997 and 1998.

9.     All Form 5500 Annual Reports, including all schedules and attachments thereto, for the Conectiv Retirement Plan from 1999 to the present.

10.    All Documents referring or relating to the Conversion.

6

11.    All Documents that refer or relate to the reasons for adopting the Cash Balance Sub-Plan.

12.    All Documents that refer or relate to the terms on which Grandfather Benefits would be offered.

13.    All Documents that refer or relate to the reasons why the ACE Sub-Plan was adopted.

14.    All Documents that refer or relate to the reasons why the Delmarva Sub-Plan was adopted.

15.    All Communications referring or relating to the extent to which adoption of the Cash Balance Sub-Plan would result in a significant reduction in the rate of future benefits accrual for participants in the ACE Plan.

16.    All Communications referring or relating to the extent to which adoption of the Cash Balance Sub-Plan would result in a significant reduction in the rate of future benefits accrual for participants in the Delmarva Plan.

17.    All Communications referring or relating to any curtailment of Conectiv's pension obligations under generally accepted accounting principles that would result from the Conversion.

18.    All Communications between Conectiv and Towers Perrin referring or relating to the Conversion or the Cash Balance Sub-Plan.

19.    All Communications between Conectiv and Towers Perrin referring or relating to Grandfather Benefits.

20.    All Communications between Conectiv and Watson Wyatt referring or relating to the Conversion or the Cash Balance Sub-Plan.

21.    All Communications between Conectiv and Watson Wyatt referring or relating to Grandfather Benefits.

22.    All Communications issued to participants in the ACE Plan advising them of the Conversion or of their rights under the Cash Balance Sub-Plan, and all drafts of each such Communication.

23.    All Communications issued to participants in the Delmarva Plan advising them of the Conversion or of their rights under the Cash Balance Sub-Plan, and all drafts of each such Communication.

24.    All Communications directed to the named plaintiffs advising them of the Conversion or of their rights under the Cash Balance Sub-Plan, and all drafts of each such Communication.

25.    All statements issued to the named plaintiffs reflecting the amount of their account under the Cash Balance Sub-Plan.

26.    All Documents identified in Defendants' Rule 26(a)(1)(B) Disclosures.

27.    All Documents that refer or relate to your retention policies for all Documents relating to the ACE Plan, the Delmarva Plan, the Conectiv Plan, the Conversion and the Cash Balance Sub-Plan.

Dated: August 18, 2006

**CHIMICLES & TIKELLIS LLP**

By: _A. Zachary Naylor/Kew_
Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
302-656-2500 (telephone)
302-656-9053 (fax)

**CHIMICLES & TIKELLIS LLP**
James R. Malone, Jr.
*(pro hac vice)*
Joseph G. Sauder
*(pro hac vice)*
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610-642-8500 (telephone)
610-649-3633 (fax)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Joseph G. Sauder, hereby certify that I have on this dated caused Plaintiff's First

Set of Interrogatories and Document Requests to be served via first class United States mail

on the following:

M. Duncan Grant, Esquire
Pepper Hamilton LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709

Susan Katz Hoffman, Esquire
Larry R. Wood, Jr., Esquire
Kay Kyungsun Yu, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103-2799

Dated:  August 18, 2006

_____
Joseph G. Sauder

# Exhibit 2

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

_____EASTERN_____    DISTRICT OF    _____PENNSYLVANIA_____

CHARLES

V.

PEPCO HOLDINGS, INC.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  05-702 (SLR) (D. Del.)

TO:  TOWERS, PERRIN, FORSTER & CROSBY, INC.,
     d/b/a TOWERS PERRIN
     Centre Square East, 1500 Market Street
     Philadelphia, PA  19102

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

DOCUMENTS DESCRIBED IN ATTACHMENT A

| PLACE   CHIMICLES & TIKELLIS LLP<br>361 West Lancaster Avenue, Haverford, PA  19041 | DATE AND TIME<br>10/4/2006 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)    Attorney for Plaintiffs | DATE   9/15/06 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

James R. Malone, Jr.    CHIMICLES & TIKELLIS LLP, 361 W. Lancaster Avenue, Haverford, PA 19041, 610-642-8500

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

SERVED ON (PRINT NAME)  Linda Nelson

MANNER OF SERVICE  Legal Assnt.

SERVED BY (PRINT NAME)  Alford Terry

TITLE  Messenger

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on  9-18-06
DATE

SIGNATURE OF SERVER  *Alford Terry*

ADDRESS OF SERVER  3221 N. Marston St Philadelphia, PA. 19129

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

## ATTACHMENT A

## DEFINITIONS AND INSTRUCTIONS

1.      "Conectiv" shall mean Conectiv, a Delaware corporation, its predecessors and successors and all of their officers, directors, employees, and agents.

2.      "Pepco" shall mean Pepco Holdings, Inc., a Delaware corporation, its predecessors and successors, and all of their officers, directors, employees, and agents.

3.      "ACE" shall mean Atlantic City Electric Company, a New Jersey corporation, its predecessors and successors, and all of their officers, directors, employees, and agents.

4.      "Delmarva" shall mean Delmarva Power & Light Company, a Delaware and Virginia corporation, its predecessors and successors, and all of their officers, directors, employees, and agents.

5.      "You" or "Towers Perrin" shall mean Towers, Perrin, Forster & Crosby, Inc., a Pennsylvania corporation doing business under the fictitious name Towers Perrin, its predecessors and successors, and all of their officers, directors, employees, and agents.

6.      "Watson Wyatt" shall mean Watson Wyatt & Co., a Delaware corporation, its predecessors and successors, and all of their officers, directors, employees, and agents.

7.    "ACE Plan" shall mean the Atlantic City Electric Company Retirement Plan.

8.    "Delmarva Plan" shall mean the Delmarva Power & Light Company Retirement Plan.

9.    "Conectiv Plan" shall mean the Conectiv Retirement Plan, which was the successor by merger to the ACE Plan and the Delmarva Plan.

10.    "Pepco Holdings Plan" shall mean the Pepco Holdings Retirement Plan.

11.    "ACE Sub-Plan" shall mean the sub-plan of the Conectiv Plan that covers employees represented by IBEW Local 210 or Local 210A.

12.    "Delmarva Sub-Plan" shall mean the sub-plan of the Conectiv Plan that covers employees represented by IBEW Local 1238, Local 1238A, Local 1307, or Local 1307A.

13.    "Cash Balance Sub-Plan" shall mean the Conectiv Cash Balance Sub-Plan which became effective as of January 1, 1999.

14.    "Conversion" shall refer to the transaction or transactions in which the ACE Plan and the Delmarva Plan were merged to form the Conectiv Plan and the Cash Balance Sub-Plan became effective.

15.    "Grandfather Benefits" shall refer to the benefits provided to certain participants in the Conectiv Plan and the Pepco Holdings Plan pursuant to section 3.6 of the Cash Balance Sub-Plan.

16.    The term "Document" shall mean any tangible thing within the scope of Rule 34 of the Federal Rules of Civil Procedure, and includes data stored electronically (including but not limited to electronic mail) or in any other format from which any information can be derived or retrieved. The term "document" also all attachments, enclosures or documents affixed or referred to in any documents identified in response to any of the following document requests. Any copy or draft of a document containing any information in addition to or in any way different from that contained in or on the original shall be deemed a separate document for purposes of these requests.

17.    "Person" shall mean any individual, partnership, firm, association, organization or other entity.

18.    "Communicate" or "Communication" means the transmission of data, information or ideas, whether orally, in writing, or via electronic media.

19.    The "Actions" shall refer to *Charles v. Pepco Holdings, Inc.*, No. 05-702 (SLR)(D. Del.), *Troup v. Pepco Holdings, Inc*, No. 06-0010(SLR)(D. Del.), or either of them.

20.    If you claim any form of privilege, whether based on statute or otherwise, as a ground for not producing a document or any part thereof, set forth in complete detail each and every fact upon which the privilege or confidentiality is based on, if referring to a document, include a complete description of the document, including sufficient facts for the Court to make a full determination of whether the claim is valid.

21.    To the extent that you believe that documents responsive to this subpoena are entitled to confidential treatment under Rule 26(c) of the Federal Rules of Civil Procedure, you may be entitled to designate them as confidential under a protective order entered by the Court in this action, a copy of which can be obtained from the attorney who issued this subpoena.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Conectiv that refer or relate to the Conversion.

2.    All correspondence, e-mails or other Documents that reflect or record Communications between You and ACE that refer or relate to the Conversion.

3.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Delmarva that refer or relate to the Conversion.

4.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Watson Wyatt that refer or relate to the Conversion.

5.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Pepco that refer or relate to the Actions.

6.      All correspondence, e-mails or other Documents that reflect or record Communications between You and Conectiv that refer or relate to the Actions.

7.      All correspondence, e-mails or other Documents that reflect or record Communications between You and Watson Wyatt that refer or relate to the Actions.

8.      All Documents and Communications relating to the approval of amendments to the ACE Plan, the Delmarva Plan or both in connection with the Conversion.

9.      All Documents that refer or relate to the merger of the ACE Plan and the Delmarva Plan.

10.     All Form 5500 Annual Reports, including all schedules and attachments thereto, for the ACE Plan and the Delmarva Plan for plan years 1997 and 1998.

11.     All Documents generated in the course of preparing the Form 5500 Annual Reports and the schedules and attachments thereto for the ACE Plan and the Delmarva Plan for plan years 1997 and 1998.

12.     All actuarial reports for the ACE Plan and the Delmarva Plan for 1997 and 1998.

13.     All Documents generated in the course of preparing the actuarial reports for the ACE Plan and the Delmarva Plan for plan years 1997 and 1998.

14. All actuarial reports or opinion letters issued in connection with the Conversion.

15. All Documents generated in the course of preparing any actuarial report or opinion letter issued in connection with the Conversion.

16. All Form 5500 Annual Reports, including all schedules and attachments thereto, for the Conectiv Plan for plan years 1999 to 2002.

17. All Documents generated in the course of preparing the Form 5500 Annual Reports and the schedules and attachments thereto for the Conectiv Plan for plan years 1999 to 2002.

18. All actuarial reports for the Conectiv Plan for plan years 1999 to 2002.

19. All Documents generated in the course of preparing the actuarial reports for the Conectiv Plan for plan years 1999 to 2002.

20. All Documents referring or relating to the Conversion.

21. All Documents that refer or relate to the reasons why the Cash Balance Sub-Plan was adopted.

22. All Documents that refer or relate to the terms on which Grandfather Benefits would be offered.

23. All Documents that refer or relate to the reasons why the ACE Sub-Plan was adopted.

24. All Documents that refer or relate to the reasons why the Delmarva Sub-Plan was adopted.

25.    All Documents that refer or relate to the extent to which the Cash Balance Sub-Plan would comply with Section 204(b)(1)(A), (B), (C) of ERISA, 29 U.S.C. § 1054(b)(1)(A), (B), (C), and Section 411(b)(1)(A), (B), (C) of the Internal Revenue Code, 26 U.S.C. § 411(b)(1)(A), (B), (C).

26.    All Documents that refer or relate to the extent to which the Cash Balance Sub-Plan would comply with Section 204(b)(1)(G) of ERISA, 29 U.S.C. § 1054(b)(1)(G), and Section 411(b)(1)(G) of the Internal Revenue Code.

27.    All Documents that refer or relate to the extent to which adoption of the Cash Balance Sub-Plan would result in a significant reduction in the rate of future benefits accrual for participants in the ACE Plan.

28.    All Documents that refer or relate to the extent to which adoption of the Cash Balance Sub-Plan would result in a significant reduction in the rate of future benefits accrual for participants in the Delmarva Plan.

29.    All Documents that refer or relate to any curtailment of Conectiv's pension obligations under generally accepted accounting principles that would result from the Conversion.

30.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Conectiv that refer or relate to Grandfather Benefits.

31.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Watson Wyatt that refer or relate to Grandfather Benefits.

32.    All Communications issued to participants in the ACE Plan advising them of the Conversion or of their rights under the Cash Balance Sub-Plan, and all drafts of each such Communication.

33.    All Communications issued to participants in the Delmarva Plan advising them of the Conversion or of their rights under the Cash Balance Sub-Plan, and all drafts of each such Communication.

34.    Documents sufficient to identify all present and former Towers Perrin personnel who worked on the Conversion.

35.    All Documents that refer or relate to your retention policies for all Documents relating to the ACE Plan, the Delmarva Plan, the Conectiv Plan, the Conversion and the Cash Balance Sub-Plan.

# Exhibit 3

AO88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF _____ THE DISTRICT OF COLUMBIA

CHARLES

**V.**

**SUBPOENA IN A CIVIL CASE**

PEPCO HOLDINGS, INC.

Case Number:[1]  05-702 (SLR) (D. Del.)

TO:  WATSON WYATT & CO.
     901 North Glebe Road
     Arlington, VA  22203

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

DOCUMENTS DESCRIBED IN ATTACHMENT A

| PLACE   FINKELSTEIN THOMPSON & LOUGHRAN   1050 30th Street, NW, Washington, DC  20007 | DATE AND TIME   10/5/2006 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Benjamin J. Weir* | 9/18/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

   Benjamin J. Weir, FINKELSTEIN THOMPSON & LOUGHRAN
   1050 30th Street, NW, Washington, DC  20007, 202-337-8000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Charles

vs.

Pepco Holdings, Inc.

## No. 05-702 SLR

### AFFIDAVIT OF SERVICE

to wit: Washington, DC

I, ROBERT PROFFITT, having been duly authorized to make service of the Subpoena Duces Tecum and Attachment A in the above entitled case, hereby depose and say:

That my date of birth / age is 11-26-1955.

That my place of business is 1827 18th Street, N.W., Washington, D.C. 20009 (202) 667-0050.

That service was made by a private process server.

That I am not a party to or otherwise interested in this suit.

That at 1:40 pm on September 19, 2006, I served Watson Wyatt & Co. at 901 North Glebe Road, Arlington, Virginia 22203 by serving Paul Meyer, General Counsel, authorized to accept.  Described herein:

```
   SEX-   MALE
   AGE-   53
HEIGHT-   5'10"
  HAIR-   BROWN
WEIGHT-   220
  RACE-   WHITE
```

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the RETURN of SERVICE and STATEMENT OF SERVICE FEES is true and correct.

Executed on ___9-20-06___
            Date

ROBERT PROFFITT
1827 18th Street, N.W.,
Washington, D.C. 20009
Our File#- 176838

RECEIVED

SEP 3 1 2006

NANCY MAYER WHITTINGTON
U.S. DISTRICT

## ATTACHMENT A

## DEFINITIONS AND INSTRUCTIONS

1.    "Conectiv" shall mean Conectiv, a Delaware corporation, its predecessors and successors and all of their officers, directors, employees, and agents.

2.    "Pepco" shall mean Pepco Holdings, Inc., a Delaware corporation, its predecessors and successors, and all of their officers, directors, employees, and agents.

3.    "ACE" shall mean Atlantic City Electric Company, a New Jersey corporation, its predecessors and successors, and all of their officers, directors, employees, and agents.

4.    "Delmarva" shall mean Delmarva Power & Light Company, a Delaware and Virginia corporation, its predecessors and successors, and all of their officers, directors, employees, and agents.

5.    "Towers Perrin" shall mean Towers, Perrin, Forster & Crosby, Inc., a Pennsylvania corporation doing business under the fictitious name Towers Perrin, its predecessors and successors, and all of their officers, directors, employees, and agents.

6.    "You" or "Watson Wyatt" shall mean Watson Wyatt & Co., a Delaware corporation, its predecessors and successors, and all of their officers, directors, employees, and agents.

7.     "ACE Plan" shall mean the Atlantic City Electric Company Retirement Plan.

8.     "Delmarva Plan" shall mean the Delmarva Power & Light Company Retirement Plan.

9.     "Conectiv Plan" shall mean the Conectiv Retirement Plan, which was the successor by merger to the ACE Plan and the Delmarva Plan.

10.     "Pepco Holdings Plan" shall mean the Pepco Holdings Retirement Plan.

11.     "ACE Sub-Plan" shall mean the sub-plan of the Conectiv Plan that covers employees represented by IBEW Local 210 or Local 210A.

12.     "Delmarva Sub-Plan" shall mean the sub-plan of the Conectiv Plan that covers employees represented by IBEW Local 1238, Local 1238A, Local 1307, or Local 1307A.

13.     "Cash Balance Sub-Plan" shall mean the Conectiv Cash Balance Sub-Plan which became effective as of January 1, 1999.

14.     "Conversion" shall refer to the transaction or transactions in which the ACE Plan and the Delmarva Plan were merged to form the Conectiv Plan and the Cash Balance Sub-Plan became effective.

15.     "Grandfather Benefits" shall refer to the benefits provided to certain participants in the Conectiv Plan and the Pepco Holdings Plan pursuant to section 3.6 of the Cash Balance Sub-Plan.

16.    The term "Document" shall mean any tangible thing within the scope of Rule 34 of the Federal Rules of Civil Procedure, and includes data stored electronically (including but not limited to electronic mail) or in any other format from which any information can be derived or retrieved. The term "document" also all attachments, enclosures or documents affixed or referred to in any documents identified in response to any of the following document requests. Any copy or draft of a document containing any information in addition to or in any way different from that contained in or on the original shall be deemed a separate document for purposes of these requests.

17.    "Person" shall mean any individual, partnership, firm, association, organization or other entity.

18.    "Communicate" or "Communication" means the transmission of data, information or ideas, whether orally, in writing, or via electronic media.

19.    The "Actions" shall refer to *Charles v. Pepco Holdings, Inc.*, No. 05-702 (SLR)(D. Del.), *Troup v. Pepco Holdings, Inc,* No. 06-0010(SLR)(D. Del.), or either of them.

20.    If you claim any form of privilege, whether based on statute or otherwise, as a ground for not producing a document or any part thereof, set forth in complete detail each and every fact upon which the privilege or confidentiality is based on, if referring to a document, include a complete description of the document, including sufficient facts for the Court to make a full determination of whether the claim is valid.

4

21.    To the extent that you believe that documents responsive to this subpoena are entitled to confidential treatment under Rule 26(c) of the Federal Rules of Civil Procedure, you may be entitled to designate them as confidential under a protective order entered by the Court in this action, a copy of which can be obtained from the attorney who issued this subpoena.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Conectiv that refer or relate to the Conversion.

2.    All correspondence, e-mails or other Documents that reflect or record Communications between You and ACE that refer or relate to the Conversion.

3.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Delmarva that refer or relate to the Conversion.

4.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Towers Perrin that refer or relate to the Conversion.

5.    All correspondence, e-mails or other Documents that reflect or record Communications between You and Pepco that refer or relate to the Actions.

6. All correspondence, e-mails or other Documents that reflect or record Communications between You and Conectiv that refer or relate to the Actions.

7. All correspondence, e-mails or other Documents that reflect or record Communications between You and Towers Perrin that refer or relate to the Actions.

8. All Documents and Communications relating to the approval of amendments to the ACE Plan, the Delmarva Plan or both in connection with the Conversion.

9. All Documents that refer or relate to the merger of the ACE Plan and the Delmarva Plan.

10. All actuarial reports or opinion letters issued in connection with the Conversion.

11. All Documents generated in the course of preparing any actuarial report or opinion letter issued in connection with the Conversion.

12. All Form 5500 Annual Reports, including all schedules and attachments thereto, for the Pepco Holdings Plan for plan years 2003 to present.

13. All Documents generated in the course of preparing the Form 5500 Annual Reports and the schedules and attachments thereto for the Pepco Holdings Plan for plan years 2003 to present.

14. All actuarial reports for the Pepco Holdings Plan for plan years 2003 to present.

6

15.    All Documents generated in the course of preparing the actuarial reports for the Pepco Holdings Plan for plan years 2003 to present.

16.    All Documents referring or relating to the Conversion.

17.    All Documents that refer or relate to the reasons why the Cash Balance Sub-Plan was adopted.

18.    All Documents that refer or relate to the terms on which Grandfather Benefits would be offered.

19.    All Documents that refer or relate to the reasons why the ACE Sub-Plan was adopted.

20.    All Documents that refer or relate to the reasons why the Delmarva Sub-Plan was adopted.

21.    All Documents that refer or relate to the extent to which the Cash Balance Sub-Plan would comply with Section 204(b)(1)(A), (B), (C) of ERISA, 29 U.S.C. § 1054(b)(1)(A), (B), (C), and Section 411(b)(1)(A), (B), (C) of the Internal Revenue Code, 26 U.S.C. § 411(b)(1)(A), (B), (C).

22.    All Documents that refer or relate to the extent to which the Cash Balance Sub-Plan would comply with Section 204(b)(1)(G) of ERISA, 29 U.S.C. § 1054(b)(1)(G), and Section 411(b)(1)(G) of the Internal Revenue Code.

23.    All Documents that refer or relate to the extent to which adoption of the Cash Balance Sub-Plan would result in a significant reduction in the rate of future benefits accrual for participants in the ACE Plan.

24. All Documents that refer or relate to the extent to which adoption of the Cash Balance Sub-Plan would result in a significant reduction in the rate of future benefits accrual for participants in the Delmarva Plan.

25. All Documents that refer or relate to any curtailment of Conectiv's pension obligations under generally accepted accounting principles that would result from the Conversion.

26. All correspondence, e-mails or other Documents that reflect or record Communications between You and Conectiv that refer or relate to Grandfather Benefits.

27. All correspondence, e-mails or other Documents that reflect or record Communications between You and Towers Perrin that refer or relate to Grandfather Benefits.

28. All Communications issued to participants in the ACE Plan advising them of the Conversion or of their rights under the Cash Balance Sub-Plan, and all drafts of each such Communication.

29. All Communications issued to participants in the Delmarva Plan advising them of the Conversion or of their rights under the Cash Balance Sub-Plan, and all drafts of each such Communication.

30. Documents sufficient to identify all present and former Watson Wyatt personnel who worked on the Conversion.

31.     All Documents that refer or relate to your retention policies for all

Documents relating to the ACE Plan, the Delmarva Plan, the Conectiv Plan, the

Pepco Holdings Plan, the Conversion and the Cash Balance Sub-Plan.

# Exhibit 4

# Chimicles & Tikellis LLP

ATTORNEYS AT LAW

One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642.8500
Telecopier: (610) 649.3633
E-mail: Mail@Chimicles.com

Nicholas E. Chimicles
Pamela S. Tikellis *
James R. Malone, Jr.
Michael D. Gottsch
Robert J. Kriner, Jr. *
Steven A. Schwartz
Kimberly M. Donaldson
M. Katherine Meermans
Joseph G. Sauder
Daniel B. Scott
Fatema E.F. Burkey
Kimberly Litman Kimmel
Timothy N. Mathews
A. Zachary Naylor *
Timothy P. Briggs
Daniel J. Brown *
Benjamin F. Johns

OF COUNSEL
Morris M. Shuster
Denise Davis Schwartzman
Anthony Allen Geyelin
Candice L.H. Hegedus

*Attorneys admitted to
Jurisdiction other than PA

October 24, 2006

**VIA EMAIL AND
FIRST CLASS MAIL**

Kay Kyungsun Yu, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

Re: <u>Charles v. Pepco Holdings, Inc., No. 05-702 (SLR) (D. Del.)</u>

Dear Kay:

I have had an opportunity to review the defendants' responses to plaintiffs' first set of interrogatories, to review in detail the documents produced to us on September 28, 2006 (PHI00001-3449), and to conduct a preliminary review of the materials produced last evening (PHI003450-3785). Based upon your email to me of yesterday evening, my understanding is that you do not anticipate producing any more responsive documents. Accordingly this letter will serve to outline plaintiffs' views on the status of defendants' discovery responses, and the sufficiency of production to date. I will first address two basic issues relating to the scope of the defendants' responses and the confidentiality of certain materials produced, and then review certain basic broad-ranging issues that cut across the defendants' responses. Finally, I will address some more limited issues or questions that we have concerning the production of documents and interrogatory responses.

First, please advise us whether any information has been withheld from any interrogatory response or any document has been withheld from production based upon a claim of attorney-client privilege, work product protection or similar privilege. To the extent that information or documents have been withheld on the basis of a claim of privilege, please advise when we may expect a log, so that we may test the sufficiency of the claim of privilege in those instances in which we consider it to be warranted.

WILMINGTON OFFICE
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: (302) 656.2500
Telecopier: (302) 656.9053



Kay Kyungsun Yu, Esquire
October 24, 2006
Page 2

Second, we note that certain of the documents produced contain personal financial data, such as Social Security Numbers, earnings and benefit information relating to the named plaintiffs. (*See* PHI003332-3356; 3730-3785). Please be advised that we consider the information that these documents to be properly subject to confidential treatment under the protective order entered in this action. You will note that in producing the plaintiffs' documents pursuant to our disclosures in August, we designated their account statements as confidential.

Turning to issues that appear to cut across a number of different discovery requests, I would first note that plaintiffs have been concerned since receiving defendants' initial disclosures that the identification of persons with knowledge of relevant matter furnished by defendants was inadequate. Review of the materials provided to us to date indicates that there were plainly a variety of other individuals involved. For example, the minutes of the Personnel and Compensation Committee on April 23, 1998 list a series of directors (Gore, McGlynn, Morgan, Emery, Cosgrove), Donald E. Cain, Vice President-Human Resources and Performance Improvement, Benjamin Wilkinson, Manager, Compensation & Benefits Consulting, and Moira K. Donoghue. (*See* PHI001584-87). Similarly, other documents show a variety of personnel were involved in employee communications, including Mr. Wilkinson, Pat Duffy, Harold DeJarnette, Dave Motil (PHI003423-27) and Tricia Gannon (PHI003413-22). No personnel from Watson Wyatt or Towers Perrin have been identified to date. This issue affects the sufficiency of defendants' disclosures, as well as their responses to interrogatories 6 and 10.

As we have discussed in the past, there are two broad areas where plaintiffs believe discovery is appropriate and defendants have indicated that they do not consider the material relevant. The first of these is in the area of design issues. For example, plaintiffs have requested information on the reasons why the cash balance design was selected, and why particular groups were provided with grandfather benefits. For similar reasons, plaintiffs have sought discovery into the reason why separate Sub-Plans for unionized workers were implemented. This issue affects defendants' responses to interrogatories 7, 8, 9, and 11 and document requests 11 through 21.

Plaintiffs believe inquiries into the design issues through the mechanism of these requests are appropriate for two reasons. First, the information is relevant to plaintiffs' claim, in Count IV of the complaints, that Conectiv violated Section 204(h) of ERISA. What triggers the obligation to give notice is the sponsor's expectation that a particular amendment is one that will result in a decrease in the

Kay Kyungsun Yu, Esquire
October 24, 2006
Page 3

rate at which benefits will accrue in the future. *See* 26 C.F.R. § 1.411(d)-6(A-5)
(1998) (stating that section 204(h) notice is required in connection with an
amendment to a defined benefit plan "if it is reasonably expected to change the
amount of the future annual benefit commencing at normal retirement age."). In
light of this standard, along with the broad standard governing relevance of
discovery under Rule 26 of the Federal Rules of Civil Procedure, plaintiffs believe
that their inquiries into design matters are reasonably calculated to lead to the
discovery of admissible evidence.

        For example, discussions between Conectiv's management and its outside
consultants concerning the cash balance design presumably touched on the likely
future cost of benefits under a cash balance design as contrasted with final average
pay plans such as those already in place. Indeed the minutes cited above specifically
indicate that the cash balance plan was being adopted as part of an overall package
of benefits that was intended to place Conectiv's benefits costs at the median of the
competitive market. (PHI001584). Similarly, the very fact that grandfather benefits
were offered to some workers suggests that management recognized that adoption
of a cash balance design would result in lower benefit accruals for some classes of
workers. Discovery into the discussions held on who would qualify for grandfather
benefits is thus reasonably calculated to lead to discoverable evidence on the
question whether Conectiv expected the adoption of the Cash Balance Sub-Plan to
lead to a reduction in future age 65 retirement benefits, which would trigger its
obligation to give notice. Similarly, the minutes cited above note that the same
benefits changes to be imposed on management would also be the subject of future
negotiations with the various IBEW locals. As a matter of historical fact, we know
that did not occur, since the ACE Sub-Plan and Delmarva Sub-Plan retain the
traditional final average pay design. Discovery into the reasons why these structures
were retained for represented workers also is thus reasonably calculated to lead to
discoverable evidence on the question whether adoption of the Cash Balance Sub-
Plan was expected to result in lower benefit accruals.

        Second, we believe the same discovery is relevant to the issue of remedies.
If plaintiffs prevail on any of their claims, we expect defendants will oppose any
retroactive relief, arguing that they acted in good faith and had no reason to believe
that there was anything wrong with the cash balance design they adopted.
Information about the discussions of the design in advance will be relevant to rebut
that type of contention.

        The other major area where plaintiffs and defendants have differing views
of relevance is on the subject of drafts. This issue affects defendants' responses to

Kay Kyungsun Yu, Esquire
October 24, 2006
Page 4

document requests 22 through 24. At present, we have documentation of the terms of the plan at two points in time. As of April 1998, when the cash balance design was endorsed by the Personnel and Compensation Committee, the terms of the plan consisted of ten bullet points and were less than half of a page. Grandfathering was treated with the phrase "Extensive 'Grandfathering.'" (PHI001589). The ultimate plan as implemented was considerably longer. We believe that some exploration of the process of how the plan evolved from ten bullet points into the final version is appropriate for the same reasons outlined above in connection with the design issues. First, tracing the evolution of the plan will likely shed light on the extent to which it was expected to result in lower age 65 retirement benefits for certain classes of workers. Second, the information will likely shed light on the issue of the sponsor's good faith belief in the legitimacy of the design it adopted. Drafts of the employee communications are similarly relevant in our view. In that connection we note that at least some of the communications in connection with the conversion noted that "Cash balance plans are controversial" while endeavoring to assure the employees who had been converted that this one was different. (*See* MWW 00219-225).

In addition to these broad areas of dispute, there are areas in which defendants' document production appears to be incomplete. Four areas, in particular, stand out.

First, we have been given a redacted spreadsheet with data for various employees that drove the opening balance calculation. (PHI003332-56). The only data appearing is for plaintiffs Charles, Fink and Ward. No data is furnished for plaintiff Troup, and all of the other data for all other employees is eliminated. In this area, we believe we should be furnished with the relevant data for plaintiff Troup (which, as noted above, should be designated as confidential). We should also discuss some way in which the same data for non-party participants can be furnished without complete personal identification information as it may be relevant for class issues.

Second, although we have been furnished with various account statements for the named plaintiffs (PHI003730-85), we have not been furnished with their opening statements. As you know from our disclosures, some, but not all of the named plaintiffs retained their opening statements. We would prefer to work with copies produced by defendants to avoid issues about authenticity.

Kay Kyungsun Yu, Esquire
October 24, 2006
Page 5


Third, we are missing the 1997 5500 for the Delmarva predecessor plan, and the 2001 5500 furnished was a facsimile version downloaded from freeerisa.com.

Fourth, we note the April 28, 1998 minutes of the Personnel and Compensation Committee, and the attachment thereto, and wish to inquire whether there are any prior or subsequent board or committee minutes or resolutions in which the Conversion or the Cash Balance Sub-Plan were discussed, approved or ratified.

Finally, based upon a comparison of what our clients produced and what defendants have produced, we are concerned that the production of employee communications is incomplete. For example, Plaintiff Ward produced a PowerPoint presentation that defendants have not produced. Similarly, one newsletter produced (PHI003436-39) refers to a schedule for employee meetings in a June 24, 1999 newsletter, but the newsletter has not been produced.

Once you have had an opportunity to review this letter, I suggest we schedule a time to discuss the issues outlined above to see whether we can reach some compromise.  We can also discuss at that time the status of your efforts to identify any relevant electronic data.

Sincerely,

James R. Malone, Jr.

JRM/lbc

cc:  Joseph G. Sauder, Esquire
     A. Zachary Naylor, Esquire

# Exhibit 5

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

– – –

| | | |
|---|---|---|
| J. MICHAEL CHARLES, MARUICE W. WARD, JR., ANDJOSEPH I. FINK, JR., on behalf of themselves and All others similarly situated, | : : : : | CIVIL ACTION |
| Plaintiffs | : : | |
| vs. | : : : | |
| PEPCO HOLDINGS, INC., CONECTIV and PEPCO HOLDINGS RETIREMENT PLAN, | : : : | |
| Defendants | : | NO 05-702 (SLR) |

– – –

Wilmington, Delaware
Thursday, October 26, 2006
11:30 o'clock, a.m.

– – –

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

– – –

APPEARANCES:

      CHIMICLES & TIKELLIS, LLP
      BY:  A. ZACHARY NAYLOR, ESQ.

              -and-

      CHIMICLES & TIKELLIS LLP.
      BY:  JAMES R. MALONE, JR., ESQ.
         (Haverford, Pennsylvania)

        Counsel for Plaintiffs

                    Valerie J. Gunning
                    Official Court Reporter



ORIGINAL

1    APPEARANCES (Continued):

2            PEPPER HAMILTON LLP
             BY:  LARRY R. WOOD, JR., ESQ.

3                   -and-

4

5            PEPPER HAMILTON LLP
             BY:  SUSAN KATZ HOFFMAN, ESQ.
             (Philadelphia, Pennsylvania)

6

7                Counsel for Defendants

8                     -  -  -

9

10               P R O C E E D I N G S

11

12           (Proceedings commenced in the courtroom,

13   beginning at 11:30 a.m.)

14

15           THE COURT:  Good morning, counsel.

16           (Counsel respond, "Good morning, your Honor.")

17           MR. NAYLOR:  Good morning, your Honor.  Zachary

18   Naylor, Chimicles & Tikellis, for plaintiffs.

19           If I may just start by way of introduction, I'm

20   joined by James Malone of our Haverford office, who has been

21   admitted in this case, and with your Honor's permission, will

22   speak on behalf of the plaintiffs today.

23           THE COURT:  All right.  Thank you very much.

24           MR. MALONE:  Thank you for the privilege of

25   appearing, your Honor.

1           THE COURT:  Sure.

2           MR. WOOD:  Good morning, your Honor.  Larry

3  Wood appearing from Pepper Hamilton for the defendants in

4  the matter.  I'm also joined today by my partner, Susan

5  Hoffman, who has also been admitted pro hac vice in this

6  matter and we'll sort of do it together, if that's

7  appropriate.

8           THE COURT:  That's fine.  Thank you very much.

9           MR. WOOD:  Thank you.

10          MS. HOFFMAN:  Good morning.

11          THE COURT:  All right.  Why don't we start with

12  Mr. Malone and plaintiffs' counsel and the areas -- it would

13  appear as though there's a general dispute about the scope of

14  appropriate discovery, but I will let you lead me and we'll

15  see what we can do.

16          MR. MALONE:  I think that's fair.  We had a

17  telephone conference in September, when we first started to

18  discuss the scope of the defendants' objections, and at that

19  time I came away with a clear sense that we were probably

20  going to have a dispute, but it wasn't really ripe yet

21  because we didn't have any documents at the time.  And now we

22  have what we've been told is what they intend to constitute

23  their entire production of documents.

24          And I think the areas that are in dispute, if I

25  would summarize, one big picture area is the area of

4

1    discovery into the background of decision-making on the plan

2    design.

3              The defendants, as I understand it, take the

4    position that, look, you've got the final version of the

5    plan, that's what controls your clients' rights.  You are

6    not -- it's not relevant what led us to make the decisions

7    about that because those are sponsor decisions.  You can't

8    attack them as fiduciary breaches.

9              Our view of it is somewhat different.  We view

10    the design issues as relevant in two different contexts.  On

11    a broad basis, we view it relevant to the issue of remedies.

12    And the issue of remedies is probably best crystallized by

13    the 1978 Supreme Court case, City of Los Angeles versus

14    Manhart, which is 535 U.S. 702.

15              What happened in Manhart was this:  There was a

16    pension plan which called for contributions from the

17    employees that was sponsored by the City of Los Angeles.

18    Women were charged more than men on the theory that,

19    statistically, they were more likely to live longer lives.

20    The women did not like this.  They filed a suit under

21    Title 7.

22              The District Court ruled that this was a

23    violation of Title 7, charging the women more to participate

24    in a pension plan than the men, and it ordered that all those

25    payments be disgorged.

1           What happened, however, it worked its way up to
2   the Supreme Court and the Supreme Court said, yes, you're
3   right.  It is discrimination, but the ruling is new, it's
4   novel, it's unanticipated.  So we don't think it would be
5   fair and appropriate, in structured and equitable relief to
6   impose on the plan and its responsible source the obligation
7   to go back and undo that, that we will make the relief
8   prospective only.
9           And that theme, then, came up in the IBM case,
10  where the defendant argued the same thing.  They were not
11  successful then, but at the end of the day they won in the
12  Seventh Circuit on the merits, so we don't know what the
13  Seventh Circuit would have done on this issue.
14          So, to us, on the issue of remedies, good faith,
15  what your expectations are, some discovery into why was
16  this design adopted?  Why is it that the management
17  workers have the cash balance design, but the unionized
18  workers don't?
19          It seems relevant to what the employer's
20  state of mind was in adopting the plan and could serve to
21  rebut a contention that we acted completely in good faith,
22  we're shocked and astonished that our plan violates the
23  law.
24          The second area where we see this to be relevant
25  is narrower:  It has to do with the claim under 204(h).  And

6

1    under 204(h), that's the notice requirement.  And basically,

2    we've looked at the Treasury regs that were in place at the

3    time that this conversion took place, and under those

4    regulations, what they indicate is that notice is a

5    requirement for an amendment to a defined benefit plan only

6    if it is reasonably expected to change the amount of future

7    and/or benefit accruals.

8            So, again, in that context, we see some relevance

9    to what was the sponsor told by its consultants, for example,

10   about what the impact of this benefit change would be.  What

11   were their expectations in terms of cost savings, because

12   that's, under the Treasury rules, appears to be what triggers

13   their notice obligation.

14           The other big picture area where we have a

15   dispute I think is the extent to which we as plaintiffs

16   should have access to drafts, and we've basically asked for

17   access to drafts in two areas that we think are important:

18   One is the drafts of the cash balance plan itself.  We think

19   learning and understanding to some degree, detail, how that

20   evolved is relevant for the same reasons that we think that

21   the discussions of design are.  That basically they're going

22   to tell us something about state of mind, structure,

23   expectations.

24           The other area where we've asked for the drafts

25   is in connection with the employee communications because

1    we'd like to understand how these revolve.

2         Now, what we have on the plan side is we have

3    minutes of a committee meeting of the board of Conectiv,

4    where they discuss a number of different structural benefit

5    changes and they receive an outline of proposed terms of the

6    plan, very brief, ten lines, and they approve that, and then

7    we have the final plan document itself.  We think it's

8    appropriate to test through discovery how we got from that

9    narrow document to the 30, 40 page document that actually

10   governs.

11        The other area where we'd like to explore drafts

12   in some degree, detail, is the communications that went out

13   to the employees, what they were told, how that process

14   evolved, what decisions were made and what the employees

15   should or should not be told.  Those are the big picture

16   areas.

17        There are some minor areas where we think there

18   are gaps in production that I don't think we need to bother

19   you with today because I think we should just talk those over

20   and it may be they simply don't have a document that I think

21   they should have.  But that's how I would frame the big

22   picture issues that I think we are disputing.

23             THE COURT:  All right.  Thank you very much.

24             Let's hear from defendants' counsel with respect

25   to the two major issues, and then if the defendant has any

1    concerns of their own, then I would like to hear those as

2    well.

3              MR. WOOD:  May I stay here, your Honor, or do you

4    think I won't be picked up on the tape?

5              THE COURT:  We don't have tape.  We have a real

6    person, and as long as Valerie can hear you, then I don't

7    mind if you stay there for discovery.

8              MR. WOOD:  Thank you.

9              THE COURT:  I will limit it to that.

10             MR. WOOD:  Okay.  Fair enough.

11             I guess I'd just like to start with one thing

12   that Mr. Malone said that I think really hits the nub of what

13   the real dispute is here, and the discovery dispute is just a

14   necessary corollary of the dispute.  He said that they would

15   like to get this information because they think it relates to

16   plan design.  That was also in the plaintiffs', the

17   supplemental discovery statement.

18             The plan design issue is really the one that

19   was at the fore in the Cooper case, is:  Is a cash balance

20   plan design inherently age discriminatory?  Cooper rejected

21   that.  The Seventh Circuit said there was nothing, there's

22   no age discrimination component to that plan design.  And

23   then Congress, under the President, adopted the Pension

24   Protection Act, which says that as of August 18th of '06,

25   it is for sure there's no discrimination on a going forward

1   basis.

2            So that is the count in the complaint, Count 3,

3   that your Honor has stayed, pending the decision in

4   Register.  Register was a decision of the Eastern District of

5   Pennsylvania, where Judge Davis found that there was no claim

6   under 204(b)(1)(H), the age discrimination claim, the plan

7   design claim.

8            So what we're left with are three nonstate

9   claims.  One is a back-loading claim that is a simple

10  formulaic test based on the plan language.  No discovery is

11  even needed for that.  We've cited a couple of cases in our

12  supplemental statement where Courts have, in fact, made that

13  decision on the basis of the plan itself.

14            Then the second claim they have is the

15  claim under 204(b)(1)(G), and, again, that's a plan-related

16  claim.  What is the language of the plan say and does it

17  violate ERISA?

18            And then their last claim is the 204(b)(1)(H)

19  claim -- 204(h) claim.  I'm sorry.  It has two essential

20  components.  One is a notice component and the other

21  component is notice isn't even necessary unless at the time

22  the plan was adopted, there was, in fact, a significant

23  reduction in the rate of future benefit accrual.

24            And we did also cite to your Honor a case, Konig

25  versus Intercontinental, 880 F. Supp. 372, Eastern District

1   of Pennsylvania, 1995.  And in that case, the Court stated on

2   the 204(h) claim, quote, "ERISA does not ask why this

3   amendment was made, it asks only was there an amendment and

4   did it result in a significant reduction in the rate of

5   future benefit accrual."

6            Defendants have produced a substantial number

7   of documents that relate to all of the plan documents, the

8   summary plan description documents, the annual report form

9   550's, employee communications, as well as the individual

10  participant account statements.

11           So discovery has been provided that enables

12  the decision to be made today.  I understand it's not

13  briefed --

14           THE COURT:  Thank you.

15           MR. WOOD:  -- on all of the nonstayed claims.

16           And I guess where the real dispute is, when we

17  were on our conference call in the original scheduling order,

18  we were talking about do we divide class certification

19  discovery from merits discovery, and the idea was, let's try

20  to not bicker about what discovery fits into which bucket.

21  And now we're at the point where we're bickering about what

22  discovery fits into the nonstayed claims versus the stayed

23  claim, which is the Cooper claim.

24           And I think the thing that we would like to

25  suggest as an efficient and cost-effective way to deal

1    with this is, if we assume that, make it in two assumptions.

2    If you assume that the Third Circuit looks at Register and

3    affirms, and so there is, in this circuit, there is no age

4    discrimination claim under 204(b)(1)(H), the stayed claim,

5    than we're exactly where we are today.

6           If the Third Circuit were to reverse the Register

7    decision, all of the discovery that Mr. Malone seeks or

8    probably a goodly portion of the background-type information

9    he describes would be relevant to that claim.

10           So we're sort of at a position where it seems to

11    make sense that we either stay the entirety of the case

12    pending the Register decision because that will allow either

13    discovery to proceed or not, or if we could file early

14    summary judgment motions on the three nonstayed claims, and

15    to the extent that the plaintiff thinks that any additional

16    discovery is necessary, Rule 56(f) provides that mechanism

17    and they can supply an affidavit, et cetera, in terms of what

18    other discovery they need on the nonstayed claims to defeat

19    the summary judgment.

20           THE COURT:  All right.  Well, I do not --

21           MR. MALONE:  May I respond?

22           THE COURT:  Let me ask questions.

23           MR. MALONE:  I'm sorry.

24           THE COURT:  I don't do early summary judgment,

25    for a couple of reasons.  Number one, I've got such an

1   incredibly large motion practice, particularly when they
2   are patent litigation, that the last thing I want is to
3   go through a motion practice in a case only to have the
4   nonmoving party say, oh, but the record isn't complete and
5   I'm confident there's discovery out there.  That is a
6   monumental waste of my time and of your client's money.
7           So I don't generally do that unless there are
8   stipulated facts and it's really an issue of law and I'm
9   happy to do it then.
10          how long has the Third Circuit had this case?  I
11  mean, are we expecting a decision momentarily?
12          MR. MALONE:  I have not checked recently, but I
13  know it has been fully briefed for several months.  I don't
14  believe it has been listed for argument, your Honor, but I
15  will have to confess, it has probably been a couple weeks
16  since I checked the docket.
17          MR. WOOD:  That's to the best of my recollection
18  as well.
19          THE COURT:  And fact discovery is a long ways
20  off?
21          MR. MALONE:  July I believe is the cutoff.
22          MR. WOOD:  Right.  In this case.
23          THE COURT:  Because what I was anticipating you
24  were going to say is that we should give this discovery
25  dispute a few more months because if the Third Circuit

1    reverses and even the defendants believe this discovery would

2    be relevant under those circumstances, that the discovery

3    dispute would go away because this discovery would be made

4    available without further discussion.

5         Now, I am not sure how that affects the discovery

6    schedule here, but that was what had crossed my mind in terms

7    of what you might say.

8         Let's set that aside for a moment.

9         With respect to -- I think you certainly

10   addressed your position with respect to the notice

11   requirements of 204(h).  You didn't necessarily, at least I

12   didn't understand you to specifically address the whole

13   remedies argument that was made.  That seems to me there is a

14   distinction between the two arguments.

15        MR. WOOD:  Again, the remedies argument is one

16   that the plaintiffs even recognize was at the forefront of

17   the Cooper case and Mr. Malone described it fairly eloquently

18   when he said the issue is all of a sudden, there's liability

19   created when nobody ever thought it could have existed, and

20   that was exactly the Cooper decision.

21        And since that case was reversed and there

22   was no age discrimination and that's the one Register has,

23   we actually agree.  I mean, I agree completely with your

24   Honor, that would be the most appropriate and most cost

25   efficient and effective way to deal with this, would be to

1    just put this off until the Third Circuit rules.

2                THE COURT:  Or for some period of time until it

3    becomes unreasonable in light of the schedule to wait for the

4    Third Circuit to rule.

5                MR. WOOD:  Right.  If I may interrupt you for one

6    second?

7                THE COURT:  Yes.

8                MR. WOOD:  I'm sorry.  I have terrible allergies

9    today.

10                THE COURT:  Well, this building is not a healthy

11    building, so it's not surprising.

12                MR. WOOD:  For instance, the first count, the

13    back-loading count, the plaintiff even recognizes in

14    the complaint at Paragraph 45 that it's the -- and, again,

15    Mr. Malone, I will sort of jump topics for a second, he

16    referenced union plans.  The only plan that's at issue in

17    this case is the cash balance subplan.  And even in their

18    complaint on Page 1, the plaintiffs state that, as plaintiffs

19    demonstrate below the Conectiv cash balance subplan violates

20    ERISA.  That's what is at issue, not union plans, not any

21    other type of plans.

22                In Count 1, they say that the cash balance

23    subplan does not satisfy the tests, and that goes back

24    to the formulaic approach.  It's the plan language.  You

25    have the tests provided for in the regs.  You run the math

 1    and you determine whether there was a back-loaded violation.

 2    No amount of discovery changes that and that's what the case

 3    say when they decide it on the basis of the face of the

 4    plan.

 5              So that's why we were sort of betwixt and

 6    between.  No additional discovery is needed on the three

 7    nonstated claims, but discovery would still be needed on the

 8    stayed claim if that ever came back to life.

 9              THE COURT:  All right.  Thank you.

10              Let's go back to Mr. Malone.

11              MR. MALONE:  I will be brief, your Honor.

12              I think on the point of remedies, my colleagues

13    are correct, that the in the Cooper case, the blindside issue

14    of liability was briefed on the issue of remedy, but my point

15    is this:  I don't think that's simply an age discrimination

16    issue.

17              When the Supreme Court dealt with it in Manhart,

18    they talked about it in terms of what is the scope of

19    appropriate equitable relief.  That really shouldn't be a

20    surprise to us given traditional equitable principles or a

21    chance to look at the totality of circumstances and try and

22    come up with a fair decree.

23              My expectation would be that the same issue of

24    expectations, what were you told by your consultants about

25    this plan design, would be equally relevant if, for example,

1    we prove that it violates the anti-back loading rules.  Did

2    they know that that was an issue?  We've seen some indication

3    in documents that the defendants acknowledged that this form

4    of design was controversial.

5             So I think the remedy issue isn't simply

6    204(b)(1)(H), and I think if, for example, the Third Circuit

7    decides that Judge Easterbrook was right in the Cooper case,

8    we are still going to be talking about whether or not the

9    defendant got blindsided here.  And so I think that this

10   issue remains relevant in the case.

11            Turning to the 204(h) notice issue for a second,

12   your Honor can read the case when you get a chance, but

13   what you need to understand about the Konig case was the

14   issue of good faith and expectations was a little different

15   than what we're talking about when we quote the Treasury

16   regulation.

17            What happened in Konig was the defendant was

18   arguing that the Court should disregard one of a series of

19   amendments in assessing whether it violated 204(h).  They had

20   an amendment in 19 -- plan in 1988.  It was amended in 1989

21   and subsequently.  And they said, well, the intervening

22   amendment, that was only intended to deal with some tax law

23   issues that we expected to occur and they never occurred, so

24   you shouldn't pay any attention to that.

25            And it's in that context that, you know, as the

1    Court describes in footnote 4, defendants argue that the IIP

2    1989 plan was in effect for only one year because the

3    anticipated impact of the tax law changes was incorrect.

4    They complained the more accurate comparison was between the

5    IIP 1988 plan and the ILC 1989 plan, and it's in that context

6    that the Court goes on to say that defendants' argument

7    assumes something about 1054(H) that's not in the statute.

8    Namely, that a good-faith amendment or an amendment based on

9    faulty assumptions or incorrect interpretations is exempt

10   from the notice requirement.

11            What we're saying is that based on the Treasury

12   regulation, Treasury Department being the agency responsible

13   for construing this part of the statute, that the plain

14   language of the regulation says there has to be an

15   expectation that the amendment will result in lower benefit

16   accruals to trigger the notice requirement. So I look at

17   that and I say I'm the plaintiff, I think I have the burden

18   of proof on that issue, and that is how I would respond to

19   those two issues.

20            THE COURT:  All right.  Thank you.

21            MR. WOOD:  Your Honor, may I have a small

22   rebuttal?

23            THE COURT:  Yes.

24            MR. WOOD:  I will address a few points.  The

25   Konig case was actually litigated by Ms. Hoffman.

1          Getting to the point of remedy, Rule 26 defines
2    what's relevant in terms of discovery, discovery that's
3    relevant to a claim or defendants.
4          What Mr. Malone is raising is something that
5    happens after the case is over, when you say, oh, my gosh,
6    look what happened, there's a new rule of law and it's
7    not fair.  Again, that was Cooper.  It's not any of these
8    other claims.  If there's a back-loading violation, there's
9    a back-loading violation, and the plan has to be changed.
10   Those are strict ERISA requirements.
11         THE COURT:  All right.  Well, I guess I'm not
12   quite sure I understand what you are saying.  Generally,
13   damages, I mean, damages, unless you bifurcate damages, that
14   evidence is generally --
15         MR. WOOD:  I'm sorry, your Honor.  It's not a
16   question of damages.  It's a question of an escape hatch from
17   damages, and that's not what is at issue here.  It hasn't
18   even been raised.  It couldn't possibly be raised because the
19   case hasn't been litigated.  But, again, that's what was at
20   issue in Cooper and that's where it would be an issue if that
21   claim were still in existence in this case.
22         In any other normal case, if there were a single
23   back-loading claim filed, you'd never see anybody trotting to
24   court saying, well, there's a remedy, and so for an
25   injunction case, because a remedy -- because remedies could

19

1    be a way to avoid an injunction or damages, therefore, I get

2    broader discovery than is permissible by the rules and that

3    is not the way the law is.

4         THE COURT:  You're saying it might be relevant,

5    but it is not relevant now?

6         MR. WOOD:  It's not relevant to the three

7    nonstayed claims, correct.

8         THE COURT:  Until they're resolved?

9         I guess what I'm trying to figure out is what

10   you're saying is this discovery with respect to at least the

11   back-loading claim is premature?

12        MR. WOOD:  That's correct.  And then Susan

13   Hoffman would like to just talk quickly about the Konig

14   case.

15        THE COURT:  All right.

16        MR. WOOD:  Thank you.

17        THE COURT:  No need to talk quickly.

18        MS. HOFFMAN:  With your permission, your Honor,

19   I'm sort of the substantive technical person here.

20        I represented the defendant in the Konig case and

21   the issue there was that there was, if you might want to call

22   it, a secret plan amendment.  There was a -- there was a plan

23   amendment that was adopted by the buyer of a business because

24   the seller told them that would be the formula that would be

25   in effect for this group in the seller's plan ones the new

1    tax laws took effect.

2         So that's the formula the buyer adopted, but they

3    never told any of the employees about it because they never

4    got around to sending any notices.

5         Then, the seller, it turned out, didn't adopt

6    that formula.  They adopted a different formula.  The buyer's

7    plan was changed to reflect that formula and that's the one

8    the participants found out about.

9         There was a reduction from the interim formula to

10   the final formula but no reduction from the old formula to

11   the final formula.  So our defense was you have to look at

12   employee expectations.  They never knew about this interim

13   formula, so how can you -- 204(h) is designed to deal with

14   employee expectations.  They're disappointed.  We lost.  And

15   we lost because the judge said it does not matter whether

16   anyone knew about it or not.  It does not matter whether

17   anyone thought there was a reduction or not.  You look at the

18   formula before, the formula after, and that's how you tell if

19   there's a significant reduction.

20        That was the Konig case.

21        Mr. Malone cites a regulation that says you

22   need to give a notice if it's reasonably expected.

23   Reasonably means a reasonable person looking at the

24   formula.  If I'm badly advised and I adopt a formula that

25   cuts benefit accruals by half, but I don't expect that,

1   it's not a reasonable expectation not to expect that and

2   a notice would be required whether I thought it was going

3   to happen or not.

4           On the other hand, if I am badly advised and

5   I think there's going to be a reduction by half but it

6   turns out there is an increase and I don't give a notice,

7   there's no violation just because I thought there would be a

8   reduction.  You need to have a significant reduction in the

9   rate of future benefit accrual, and that's formula to

10  formula.  Expectations have nothing to do with it.

11          On the back-loading issue, a plan has to satisfy

12  one of the rules.  In a back-loading case, the remedy is to

13  restructure the plan to satisfy one of the back-loading

14  rules, and it may be, if they were to succeed in showing that

15  this plan violated a back-loading rule, that the parties

16  would then present options for the Court to restructure the

17  plan to comply with ERISA, and then the plaintiffs would have

18  a claim under the restructured benefit plan.

19          You don't ordinarily get damages in an ERISA case

20  because it's equitable relief.  You get, in this type of

21  case, a restructuring of the plan to satisfy the rules.  And

22  the issue in Cooper was, is the restructuring of the plan to

23  give everybody the most valuable accrual rate that the

24  youngest person got?  That would have been the enormous

25  amounts of damages that everyone was bandying about.  But,

22

1    again, that only applies on those age discrimination counts.

2    The three nonstayed counts here, back-loading and this

3    reduction in benefit caused by the change in interest rates,

4    those are nowhere near the scope of the types of remedies at

5    issue with the age discrimination count.

6                One final mention. We do have third-party

7    subpoenas here, which are as broad as the dispute between

8    the parties, and I don't want the Court to overlook the fact

9    that one of our goals is to try to prevent sort of a fishing

10   expedition on the part of, you know, of the third parties,

11   which were the various actuarial advisors the employer had.

12               THE COURT:  All right.  Thank you very much.

13               MS. HOFFMAN:  Thank you.

14               THE COURT:  Mr. Malone?

15               MR. MALONE:  Yes, your Honor.  The only comment I

16   have is that I should alert the Court that while there are

17   third-party subpoenas, they are not issued from this

18   district.  One was issued from the Eastern District of

19   Pennsylvania, the other from the district of the District of

20   Columbia.  So I'm not sure that, even if we get to the point

21   of briefing motions in this case on this discovery dispute,

22   I'm not sure this was the right court to do that because Rule

23   45 explicitly says that that is the dispute that has taken

24   the Court that issues the subpoenas -- subpoena.

25               THE COURT:  Surely, but one also likes to think

1   that if a judge in the court in which the case is being

2   litigated opines about the appropriate scope of discovery,

3   that parties will listen regardless of where the subpoenas

4   are sought.

5            It seems to me, quite frankly, Mr. Malone, that

6   it is not at all clear that your request for this broad scope

7   of discovery is relevant at this stage and I am inclined to

8   hold off on this until the Third Circuit speaks, although I

9   am not going to give the Third Circuit until the end of

10  discovery, but I would like to give them a little more time

11  because I don't believe in making decisions unless I have

12  to.

13           I think the defendants have indicated that they

14  don't contest the fact that it would be relevant if the Third

15  Circuit ruled one way.  I guess we're back where we are if

16  the Third Circuit doesn't rule that way.  So I don't know

17  whether putting anything off makes any sense.

18           I don't think I need briefing.  You've both given

19  me positions in your discovery papers.  I might think about

20  it a little bit longer and issue a short decision.

21           MR. MALONE:  Thank you very much for your time.

22           MR. WOOD:  Could I just add one point?

23           THE COURT:  Yes.

24           MR. WOOD:  I do recognize that the Court doesn't

25  like the early summary judgment motions and, in fact, most

24

1    courts don't, but if we get to that point where the Third

2    Circuit affirms Register and we're back here in a couple

3    months, it was just a suggestion that we've utilized

4    effectively with some other courts before to control

5    discovery that is marginal at best and then you get a real

6    edition quickly on the scope and just move forward.

7            If summary judgment is available at that point,

8    then that's even better for the Court, for the parties.  It

9    cuts the cost and expense.

10           THE COURT:  My only hesitation with that when the

11   parties don't agree to facts is that, quite frankly, again,

12   with the motion practice I have, I jump into a case once and

13   I just can't promise that I will get to your motions any

14   sooner than if you waited until the end of discovery, and

15   that's my hesitation, is that you tell me these things, you

16   file your motions, and then I've got trials coming up that I

17   have a deadline to issue the summary judgment decisions and I

18   don't do you any favors.

19           But certainly we can talk about it again.  I will

20   try to get a decision out within the next week based on your

21   argument.  And I think you are all very articulate and it's a

22   pleasure to hear you.  And if other discovery disputes arise

23   in the meantime, again, I don't like a motion practice.  I

24   would rather you e-mail my chambers and particularly if you

25   agree that there's a dispute, then I'm happy to meet with you

1    again.  All right?

2                MR. WOOD:  We apologize for filing a motion for

3    protective order.  It was sort of protective from the

4    third-party discovery.

5                THE COURT:  And I have to say I need to change my

6    language to make it clear.  I say no motions to compel.

7    Obviously, a motion for protective order is just the reverse

8    side of it.  It is a discovery-related paper.  I would rather

9    talk to people than look at more paper.

10               All right.  Thank you very much.

11               (Counsel responds, "Thank you, your Honor.")

12               (Hearing concluded.)

13                        - - -

14

15

16

17

18

19

20           I hereby certify that the foregoing is a true
             and accurate transcript from my stenographic
21           notes in the proceeding.

22           _____
             Official Court Reporter
23           U. S. District Court

24

25