**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| J. MICHAEL CHARLES; MAURICE W. WARD, JR.; and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | ) ) ) ) ) | C. A. NO. 05-702 (SLR) (Lead Case) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PEPCO HOLDINGS, INC; CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) | |
| Defendants. | ) ) | |

**APPENDIX TO REPLY BRIEF IN SUPPORT OF**
**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**
**(VOLUME I OF II)**

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
One Rodney Square
P.O. Box 1035
Wilmington, DE  19899
302-656-2500 (telephone)
302-656-9053 (fax)
    and
James R. Malone, Jr.
(*pro hac vice*)
Joseph G. Sauder
(*pro hac vice*)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA  19041
610-642-8500 (telephone)
610-649-3633 (fax)

September 4, 2007                    Attorneys for Plaintiffs

## <u>TABLE OF CONTENTS - VOLUME I</u>

Pepco Holdings Proxy Statement ..................................................................................... D0001

Deposition Transcript of Claude Poulin,
    dated July 27, 2007 ................................................................................... D0009

Deposition Transcript of Karen E. Francks,
    dated August 27, 2007 .............................................................................. D0181

Pepco Holdings Summary Plan Description ................................................................. D0309

**Table of Contents**

**SCHEDULE 14A**
**(RULE 14a-101)**
**INFORMATION REQUIRED IN PROXY STATEMENT**

**SCHEDULE 14A INFORMATION**
**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**
**(Amendment No.      )**

Filed by the Registrant    ✖

Filed by a Party other than the Registrant    ˙˙

Check the appropriate box:

˙˙    Preliminary Proxy Statement                       ˙˙    Confidential, For Use of the Commission Only
                                                                              (as permitted by Rule 14a-6(e)(2))

✖    Definitive Proxy Statement
˙˙    Definitive Additional Materials
˙˙    Soliciting Material Under Rule 14a-12

**PEPCO HOLDINGS, INC.**

**(Name of Registrant as Specified in Its Charter)**

(Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

Payment of Filing Fee (Check the appropriate box):

✖    No fee required.

˙˙    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    1.    Title of each class of securities to which transaction applies:

    2.    Aggregate number of securities to which transaction applies:

    3.    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    4.    Proposed maximum aggregate value of transaction:

    5.    Total fee paid:

˙˙    Fee paid previously with preliminary materials:

˙˙    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

    1.    Amount previously paid:

2.   Form, Schedule or Registration Statement No.:

3.   Filing Party:

4.   Date Filed:

**Table of Contents**



### Proxy Statement and
### 2006 Annual Report to Shareholders

Dear Fellow Shareholders,

I am pleased to report that in 2006 Pepco Holdings, Inc. (PHI) applied its extensive experience and leadership abilities to meet significant challenges successfully, while enhancing our focus on growth and the creation of shareholder value.

Despite higher energy costs, ever-increasing consumer expectations, unprecedented political involvement in utility affairs and adverse weather, our stock held its value and we finished the year stronger than we started it.

As examples of our progress in 2006 we
- implemented balanced rate mitigation plans that helped transition customers to higher Standard Offer Service supply rates without unduly affecting shareholders,
- filed four distribution rate cases to cover the increased costs of providing service and decouple earnings from kilowatt-hour usage,
- proposed a major transmission line to boost reliability throughout our service area,
- agreed to sell the last of our regulated generation assets,
- negotiated a favorable settlement in the Mirant bankruptcy case,
- achieved strong gross margins in our wholesale energy business despite mild weather, and
- posted another record year in our retail energy company.

This progress was reflected in our financial performance, which included
- a 4 percent annual increase in the dividend in January 2006,
- a 52.6 percent total return to shareholders, measured over the past three years, and
- paying down over $1 billion of debt since 2003.

**Results of Operations**

The achievements outlined above are especially noteworthy given the challenging environment in which they were accomplished. Especially mild weather throughout the year, combined with increased energy costs, resulted in reduced electricity sales per customer for the first time since the 1970s, even though we reached all-time summer peak demand in all jurisdictions in 2006.

PHI's consolidated earnings in 2006 were $248.3 million, or $1.30 per share, compared to $371.2 million, or $1.96 per share, in 2005. Excluding special items (which are items not indicative of ongoing performance), earnings for the full year 2006 would have been $254.1 million, or $1.33 per share, compared to $287.8 million, or $1.52 per share, in 2005. Milder weather resulted in a $.17 per share reduction in 2006 compared to 2005.

Despite lower earnings, shareholder value continued to grow as indicated by our growth in total return and stock performance. I believe this reflects

Letter to Shareholders                                                                                    Cover Page
Notice of 2007 Annual Meeting and Proxy Statement                                                                  1

Policy on the Approval of Services Provided by the Independent Auditor    A-1

2006 Annual Report to Shareholders    B-1

• Business of the Company    B-8

• Management's Discussion and Analysis    B-19

• Quantitative and Qualitative Disclosures about Market Risk    B-78

• Consolidated Financial Statements    B-84

Board of Directors and Officers    B-158

Investor Information    B-159

Table of Contents

Mr. Shaw — 34,355 shares; Mr. Sim — 16,853 shares; and Dr. Mayberry — 15,732 shares), as further described below, and (ii) shares earned under the Merger Integration Success Program under the LTIP based on performance criteria for a performance period ended December 31, 2003, which together with reinvested dividends vested in 2006 (Mr. Wrasse — 9,421 shares; Mr. Rigby — 3,444 shares; Mr. Torgerson — 6,468 shares; Mr. Shaw — 7,867 shares; Mr. Sim — 3,650 shares; and Dr. Mayberry — 2,243 shares). Also includes (i) for Mr. Wraase 14,822 shares of restricted stock granted as a retention award in 2003 that vested in 2006 and (ii) for Mr. Shaw 44,871 shares of restricted stock that vested in 2006, which originated as a restricted stock award under the Conectiv Long-Term Incentive Plan and converted into shares of restricted PHI common stock in connection with the merger of Pepco and Conectiv in 2002.

(25) Represents the aggregate market value of the vested shares calculated by multiplying the number of shares that vested on a given date by the closing market price of the Company common stock on that date,

For the three-year performance cycle ending December 31, 2006, under the LTIP, participating executives, including each of the executive officers listed in the Summary Compensation Table, were entitled to earn shares of common stock based on the Company's total shareholder return (consisting of stock price appreciation and dividends) compared to that of other companies in a peer group comprised of 21 gas and electric distribution companies (including the Company) over the three-year period. During the three-year period, the Company had a total shareholder return of 52.64%, exceeding the medium total shareholder return among the peer group companies of 50.38% and ranking the Company tenth within the group of 21. This result entitled each of the participating executives to receive an award of shares equal to 140% of the target number of shares.

### PENSION BENEFITS
### AT DECEMBER 31, 2006

| Name | Plan Name | Number of Years of Credited Service (26) | Present Value of Accumulated Benefits (27) | Payments During Last Fiscal Year |
|---|---|---|---|---|
| Dennis R. Wraase | Pepco General Retirement Subplan | 32 yrs. 11 mos. | $ 1,226,434 | $ 0 |
| | Executive Retirement Plan | 37 yrs. 9 mos. | 9,477,726 | 0 |
| Joseph M. Rigby | Conectiv Cash Balance Subplan | 27 yrs. 11 mos. | 616,948 | 0 |
| | Conectiv SERP | 27 yrs. 11 mos. | 402,250 | 0 |
| William T. Torgerson | Pepco General Retirement Subplan | 24 yrs. 2 mos. | 740,515 | 0 |
| | Executive Retirement Plan | 37 yrs. 7 mos. | 3,742,755 | 0 |
| Thomas S. Shaw | Conectiv Cash Balance Subplan | 35 yrs. 5 mos. | 1,525,831 | 0 |
| | Conectiv SERP | 38 yrs. 5 mos. | 5,859,255 | 0 |
| William J. Sim | Pepco General Retirement Subplan | 29 yrs. 9 mos. | 881,306 | 0 |
| | Executive Retirement Plan | 37 yrs. 0 mos. | 1,357,629 | 0 |
| Ed R. Mayberry (28) | Pepco General Retirement Subplan | 25 yrs. 7 mos. | 864,282 | 55,041 |
| | Executive Retirement Plan | 27 yrs. 7 mos. | 273,524 | 17,419 |

(26) Number of years of service credited at December 31, 2006.

(27) Represents the actuarial present value, in the case of Messrs. Wraase, Rigby, Torgerson and Shaw, of the executive's accumulated pension benefit calculated as of December 31, 2006, assuming the executive retires

Table of Contents

at the earliest time he may retire under the applicable plan without any benefit reduction due to age and, in the case of Mr. Sim and Dr. Mayberry, of the executive's actual retirement benefit. The valuation method and all material assumptions applied in calculating the actuarial present value are set forth in Note 6 to the Company's consolidated financial statements which are included in the Company's Annual Report to Shareholders attached as Annex B to this Proxy Statement.

(28)  In April 2006, Dr. Mayberry received lump sum payments of $802,673 under the Supplemental Executive Retirement Benefit Structure and $840,526 under the Executive Performance Supplemental Retirement Benefit Structure of the Executive Retirement Plan, representing payments to which he was entitled by reason of his retirement. See "Termination of Employment and Change in Control Benefits — Mayberry Retirement Arrangements."

## Retirement Plans

The Company's retirement plans consist of a tax-qualified defined benefit pension plan and two supplemental executive retirement plans.

### The Pepco Holdings Retirement Plan

The Pepco Holdings Retirement Plan consists of several subplans. Each of the executives listed in the Summary Compensation Table participates in either the Pepco General Retirement Subplan or the Conectiv Cash Balance Subplan.

*Pepco General Retirement Subplan.*    All employees who were employed by Pepco on August 1, 2002, the date of the merger of Pepco and Conectiv, are eligible to participate in the Pepco General Retirement Subplan. The plan provides participating employees who have at least five years of service with retirement benefits based on the participant's average salary for the final three years of employment and the number of years of credited service under the plan at the time of retirement. Normal retirement age under the Pepco General Retirement Subplan is 65. Participants who have reached age 55 and have at least 30 years of credited service are eligible for early retirement without any reduction in benefits. Participants who have reached age 55 and who have 10 years of credited service are eligible for retirement benefits prior to normal retirement age, at a benefit level that is reduced from the benefit level at normal retirement age by 2% for each year that the early retirement date precedes the normal retirement date. Plan benefits are partially offset by the Social Security benefits received by the participant. Benefits under the plan are paid in the form of a monthly annuity selected by the participant from among several available annuity options. Mr. Wraase and Mr. Torgerson are participants in the Pepco General Retirement Subplan. Mr. Wraase is eligible for retirement under the plan without any reduction in benefits and Mr. Torgerson is eligible for early retirement with reduced benefits. If Mr. Torgerson had retired on December 31, 2006, the actuarial present value of his retirement benefit under the Pepco General Retirement Subplan as of that date would have been $747,102; however, the additional supplemental retirement benefit he would be entitled to receive under the Supplemental Executive Retirement Benefit Structure of the Executive Retirement Plan, as described below, would offset the reduction in benefits that he would have incurred under the Pepco General Retirement Subplan by reason of his early retirement. Mr. Sim and Dr. Mayberry each retired before becoming eligible for early retirement without any reduction in benefits. In each case, however, the supplemental retirement benefits he has received or is entitled to receive under the Supplemental Executive Retirement Benefit Structure of the Executive Retirement Plan, as described below, offset the reduction in benefits that he incurred under the Pepco General Retirement Subplan by reason of his early retirement. See "Termination of Employment and Change in Control Benefits — Sim Retirement Arrangements" and "Termination of Employment and Change in Control Benefits — Mayberry Retirement Arrangements."

*Conectiv Cash Balance Subplan.*    Most non-unionized employees who were employed by Conectiv on August 1, 2002, are eligible to participate in the Conectiv Cash Balance Subplan, including Messrs. Rigby and Shaw. The Conectiv Cash Balance Subplan is a cash balance pension plan. Under the plan, a record-keeping

D0006

**Table of Contents**

account in a participant's name is credited with an amount equal to a percentage, which varies depending on the participant's age at the end of the plan year, of the participant's total pay, consisting of base pay, overtime and bonuses. Also, participants in the Atlantic City Electric Retirement Plan, in which Mr. Rigby participated, and the Delmarva Retirement Plan, in which Mr. Shaw participated, who had at least ten years of credited service as of December 31, 1998, the inception date of the Conectiv Cash Balance Subplan, are eligible to receive additional transition credits until the participant's combined years of service under the prior plan and the Conectiv Cash Balance subplan total 35.

Participants employed on the inception date of the Conectiv Cash Balance Subplan were credited with an initial cash balance equal to the present value of their annuity benefits as of that date earned under the Atlantic City Electric Retirement Plan or the Delmarva Retirement Plan. Each participant's account balance is supplemented annually with interest credits equal to the prevailing 30-year U.S. Treasury bond rate. Benefits become vested after five years of service. When a participant terminates employment (regardless of age), the amount credited to his or her account, at the election of the participant, is converted into one of several actuarially equivalent annuities selected by the participant or is paid to the participant in a lump sum (which cannot exceed 6.5 times the participant's final average compensation). For 2006, Mr. Rigby had a Company credit percentage of 9%, and until December 31, 2013, receives an annual transition credit of 4%, of total pay. For 2006, Mr. Shaw had a Company credit percentage of 10%, and until July 26, 2006, received an annual transition credit of 4%, of total pay.

The Conectiv Cash Balance Subplan also provides for certain "grandfathered" rights that existed under the Delmarva Retirement Plan and under the Atlantic City Electric Retirement Plan, which apply to employees who had either 20 years of credited service or had attained age 50 on or before January 1, 1999. Under these grandfathering provisions, employees who participated in the Delmarva Retirement Plan or the Atlantic City Electric Retirement Plan are assured a minimum retirement benefit calculated for all years of service up to the earlier of December 31, 2008, or retirement, according to their original benefit formula under the applicable plan. There is no Social Security offset under either the Delmarva Retirement Plan or the Atlantic City Electric Retirement Plan. Normal retirement age under both the Delmarva Retirement Plan and the Atlantic City Electric Retirement Plan is 65. Under the Delmarva Retirement Plan, participants who have reached age 55 and have at least 15 years of continuous service are eligible for retirement benefits prior to normal retirement age, at a reduced level of benefit that is a function of retirement age and years of service. Under the Atlantic City Electric Retirement Plan, participants who have reached age 55 and have at least 5 years of credited service are eligible for retirement without any reduction in the benefits they would be entitled to receive at normal retirement age. Benefits under the Atlantic City Electric Retirement Plan are paid either in the form of a monthly annuity selected by the participant from among several available annuity options or in a lump sum of an actuarial equivalent amount. Benefits under the Delmarva Retirement Plan are payable only in the form of a monthly annuity selected by the participant from several actuarially equivalent annuity options. At the time of an employee's retirement, the benefit under the Delmarva Retirement Plan or the Atlantic City Electric Retirement Plan is compared to the employee's cash balance account under the Conectiv Cash Balance Subplan and the employee will receive whichever is greater. On December 31, 2008, the participant's grandfathered benefit under the Delmarva Retirement Plan or Atlantic City Electric Retirement Plan will be frozen, and all future benefit accruals will be under the cash balance formula of the Conectiv Cash Balance Subplan.

Mr. Rigby continues to accrue benefits under the Atlantic City Electric Retirement Plan formula and Mr. Shaw continues to accrue benefits under the Delmarva Retirement Plan formula. In the case of Mr. Rigby, the present value of accumulated benefits under the Conectiv Cash Balance Subplan, as shown in the Pension Benefits at December 31, 2006 table above, reflects the value of his grandfathered benefits under the Atlantic City Electric Retirement Plan, which exceeds the value of his accumulated benefits as otherwise calculated under the Conectiv Cash Balance Subplan. In the case of Mr. Shaw, the present value of accumulated benefits under the Conectiv Cash Balance Subplan, as shown in the Pension Benefits at December 31, 2006 table above, reflects the value of his grandfathered benefits under the Delmarva Retirement Plan, which exceeds the value of his accumulated benefits as otherwise calculated under the Conectiv Cash Balance Subplan.

http://www.sec.gov/Archives/edgar/data/1135971/000119312507068574/ddef14a.htm (71 of 353)8/30/2007 6:09:05 AM

D0007

Table of Contents

Mr. Shaw is eligible for early retirement under the terms of the Delmarva Retirement Plan at a reduced benefit level from that to which he would be entitled at normal retirement age. If Mr. Shaw had retired on December 31, 2006, the net present value of his retirement benefits as of that date, calculated using the Delmarva Retirement Plan formula, which would exceed his cash balance under the Conectiv Cash Balance Subplan, would have been $667,019; however, the additional supplemental retirement benefit he would be entitled to receive under the Conectiv SERP, as described below, would offset the reduction in benefits that he would have incurred by reason of his early retirement. Mr. Rigby is not eligible for early retirement under the Atlantic City Electric Retirement Plan formula of the Conectiv Cash Balance Subplan. At December 31, 2006, the amount credited to his account under the Conectiv Cash Balance Subplan was $709,528. Had Mr. Rigby retired on that date, that balance, at his election, would have been converted into one of several actuarially equivalent annuities or would have been paid to him in a lump sum.

### Executive Retirement Plan

The Executive Retirement Plan is a non-tax-qualified supplemental retirement plan. Eligibility to participate in the Executive Retirement Plan is determined by the Company's Chief Executive Officer (and, in the case of the Chief Executive Officer, by the Board of Directors). Each of Messrs. Wraase and Torgerson is, and each of Mr. Sim and Dr. Mayberry was at the time of his retirement, designated as a participant in each of the benefit structures under the Executive Retirement Plan described below. The following benefit structures make up the Executive Retirement Plan:

*Supplemental Benefit Structure.*   Under provisions of the Internal Revenue Code, the level of a participant's pension benefit under a tax-qualified pension plan and the amount of compensation that may be taken into account in calculating that benefit are limited (the "Qualified Plan Limitations"). In addition, under the terms of the Pepco Holdings Retirement Plan salary deferrals elected by the participant under the Company's deferred compensation plans (other than the participant's pre-tax contributions made under the PHI Retirement Savings Plan) are not taken into account as compensation for purposes of calculating a participant's retirement benefit. If applicable, these provisions have the effect of reducing the participant's retirement benefit relative to what the participant otherwise would be entitled to receive under the plan's benefit formula. If a participant's retirement benefits under the Pepco Holdings Retirement Plan are reduced by either or both of these limitations, the Company, under the Supplemental Benefit Structure, will pay a supplemental retirement benefit to a participant equal to the difference between (i) the participant's actual benefit under the Pepco Holdings Retirement Plan and (ii) what the participant would have received under the Pepco Holdings Retirement Plan (A) were the Qualified Plan Limitations not applicable and (B) had the deferred compensation earned by the executive that was excluded from the executive's compensation base used in determining retirement benefits under the Pepco Holdings Retirement Plan been included in such compensation base. The benefit under the Supplemental Benefit Structure vests under the same terms and conditions as the participant's retirement benefits under the Pepco Holdings Retirement Plan. Messrs. Wraase, Torgerson and Sim and Dr. Mayberry are participants in the Supplemental Benefit Structure. The purpose of the Supplemental Benefit Structure is to enable participants to receive the full retirement benefits they are entitled to receive under the Pepco Holdings Retirement Plan without reduction due the Internal Revenue Code limits and compensation deferral elections made by the participant.

*Supplemental Executive Retirement Benefit Structure.*   Under the Supplemental Executive Retirement Benefit Structure, a participating executive whose employment by the Company terminates on or after age 59 for any reason other than death (or prior to age 59, if such termination follows a change in control of the Company) is entitled to a supplemental retirement benefit equal to the difference between (i) the executive's actual benefit under the Pepco Holdings Retirement Plan and his supplemental benefits under the Supplemental Benefit Structure and the Executive Performance Supplemental Retirement Benefit Structure (as described below) and (ii) what the executive would have received had the executive been credited with the additional years of service provided for under the Supplemental Executive Retirement Benefit Structure. As of December 31, 2006, the additional years of service credited under the Supplemental Executive Retirement Benefit Structure to the NEOs

40

D0008

00001

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE

2

3  J. MICHAEL CHARLES; MAURICE W.
   WARD, JR.; and JOSEPH I. FINK, JR.,

4  on behalf of themselves and
   all others similarly situated,

5       Plaintiff
      V          C.A. No. 05-702(SLR)

6

   PEPCO HOLDINGS, INC.; CONECTIV, and

7  PEPCO HOLDINGS RETIREMENT PLAN,
        Defendants

8              - - -

9  THOMAS S. TROUP, on behalf of himself
   and all others similarly situated,

10       Plaintiff

11    V          C.A. No. 06-10(SLR)

12  PEPCO HOLDINGS, INC.; CONECTIV, and
    PEPCO HOLDINGS RETIREMENT PLAN,

13       Defendants

14

15       Oral deposition of CLAUDE

16  POULIN, taken at the law offices of

17  Pepper Hamilton LLP, 3000 Two Logan

18  Square, Eighteenth and Arch Streets,

19  Philadelphia, Pennsylvania, on

20  Friday, July 27, 2007, commencing at

21  approximately 9:09 a.m., before

22  Barbara McKeon Quinn, a Registered

23  Merit Reporter and Notary Public,

24  pursuant to notice.


00002

1  APPEARANCES:

2  JAMES R. MALONE, ESQUIRE
   jamesmalone@chimicles.com

3  JOSEPH G. SAUDER, ESQUIRE
   josephsauder@chimicles.com

4     CHIMICLES & TIKELLIS LLP
      One Haverford Centre

D0009

5   361 West Lancaster Avenue
    Haverford, Pennsylvania 19041
6   610-642-8500
    Counsel for Plaintiff
7
    KAY KYUNGSUN YU, ESQUIRE
8   yukay@pepperlaw.com
    PEPPER HAMILTON LLP
9   3000 Two Logan Square
    18th & Arch Streets
10   Philadelphia, Pennsylvania 19103
    215-981-4000
11        and
    SUSAN KATZ HOFFMAN, ESQUIRE
12   shoffman@littler.com
    LITTLER MENDELSON
13   Three Parkway
    1601 Cherry Street
14   Suite 1400
    Philadelphia, Pennsylvania 19102
15   Counsel for Defendant
16  ALSO PRESENT:
17   Barbara C. Alexander, Esquire
    Ethan E. Kra, Ph.D., FSA
18
19
20        EXAMINATION INDEX
21  CLAUDE POULIN
    BY MS. YU              5
22   BY MR. MALONE         263
23
24


00003
1        EXHIBIT INDEX
2                 MARKED
3  Poulin
    1   Notice 96-8          71
4
    2   Part One, Conectiv Cash   83
5        Balance Sub Plan
        Effective January 1, 1999
6

3   Exhibit F-1, Conectiv        90
7       Comparison of Accrued
        Benefits at Normal
8       Retirement Age
        spreadsheet
9
    4   Revenue Ruling 185,       105
10       1953-2 CB 202
11   5    Revenue Ruling 81-12,   118
        1981-1 CB 228, IRC
12       Sec(s).411
13   6    Declaration of Claude    128
        Poulin, B0552 through 571
14
    7   Code Section 411(b),      161
15       pages 1079 and 1080
16   8    Code & Regulations, pages  167
        1102 through 1106
17
    9   Court Decision for Larry    174
18       Wheeler, et al. v.
        Pension Value Plan for
19       Employees of the Boeing
        Company, et al.
20
    10   Atlantic City Electric    206
21       Company Retirement Plan
        As Amended and Restated
22       Effective January 1
        1994, PHI000611 and
23       PHI000617
24

00004

1       EXHIBIT INDEX (CONTINUED)
2                   MARKED
3   Poulin
    11   Part Three ACE Sub Plan,    208
4       PHI000576 through
        PHI000607
5
    12   Atlantic City Electric    217
6       Company Retirement Plan

D0011

       As Amended and Restated
7       Effective January 1, 1994
8   13   Philip C. Engers, Warren       227
        J. McFall, Donald G.
9       Noerr & Gerald Smith v
        AT&T Court Decision
10
    14   Affidavit of Claude      228
11       Poulin in Engers v. AT&T

12
13
14
15
16
17
18
19
20
21
22
23
24


00005
1        CLAUDE POULIN, having been
2   duly sworn, was examined and
3   testified as follows:
4        THE COURT REPORTER:  Usual
5   stipulations?
6        MR. MALONE:  I'd like the
7   witness to read and sign.
8              EXAMINATION
9   BY MS. YU:
10    Q.  Good morning, Mr. Poulin.
11    A.  Good morning.
12    Q.  My name is Kay Yu and I
13   represent the defendants in an action
14   brought by plaintiffs, Michael
15   Charles, Maurice Ward, Joseph Fink,
16   and a Mr. Troup against Pepco
17   Holdings, Conectiv, and Pepco
18   Holdings Retirement Plan.
19        Are you aware of this

D0012

20  litigation?
21     A.  Yes, I am.
22     Q.  Could you please state your
23  full name for the record.
24     A.  My name is Claude,

00006
 1  C-L-A-U-D-E, Poulin, P-O-U-L-I-N.
 2     Q.  And Mr. Poulin, are you
 3  currently employed?
 4     A.  Yes, I am.
 5     Q.  And by whom are you
 6  employed?
 7     A.  By Poulin Associates, Inc.
 8     Q.  And where is that located?
 9     A.  This is located -- there
10  are two locations.  One is in North
11  Carolina at 117 East Hunter Street in
12  Madison, North Carolina, and the
13  second location is in northern
14  Virginia.
15         Now, Poulin Associates also
16  has a subsidiary in Canada, Poulin
17  Actuarial Services, that I started in
18  1982.
19         At the present time Poulin
20  Associates is fifty percent owner of
21  Poulin Actuarial Services in
22  Montreal, Canada.
23     Q.  Did you say fifty percent
24  owner?

00007
 1     A.  Yes.
 2     Q.  Who are the other owners?
 3     A.  The president of Poulin
 4  Actuarial Services in Montreal.  His
 5  name is Martin Faucher,
 6  F-A-U-C-H-E-R.
 7     Q.  What is your position with
 8  Poulin Associates?
 9     A.  I am the president of
10  Poulin Associates.

D0013

11      Q.   Are there other employees
12  of Poulin Associates?
13      A.   Yes.
14      Q.   How many?
15      A.   Well, two in the United --
16  three in the United States.
17      Q.   And who are they?
18      A.   Darla Rivi, R-I-V-I.  Shay
19  McNeal, M-c-N-E-A-L.  And Gilda
20  Hunter, H-U-N-T-E-R.
21      Q.   Do you consider yourself an
22  employee of Poulin Associates?
23      A.   Yes.
24      Q.   Mr. Poulin, could you

00008
 1  describe for me your professional
 2  credentials.
 3      A.   I received a BA from
 4  University of Montreal in 1963.  Then
 5  I received a degree in actuarial
 6  science at Lavalle University, which
 7  was in the faculty of business
 8  administration in 1966.
 9          I became an associate of
10  the Society of Actuaries in 1966 and
11  a fellow of the Society of Actuaries
12  in 1972.
13          ERISA was passed in 1974
14  and it created the title of enrolled
15  actuary.  I became an enrolled
16  actuary in 1976, and I also am a
17  member of the American Academy of
18  Actuaries.
19      Q.   Are you a member of any
20  other organizations?
21          MR. MALONE:  Object to the
22  form.  I assume you mean professional
23  organizations.
24          MS. YU:  Professional

00009
 1  organizations.

D0014

2        THE WITNESS:  I'm also a
3    fellow of the Canadian Institute of
4    Actuaries.
5    BY MS. YU:
6        Q.    What does it take to become
7    a fellow of that organization?
8        A.    Of the Institute of --
9    Canadian Institute of Actuaries?
10        Q.    Yes.
11        A.    This -- well, at that
12    time -- I became a fellow a long time
13    ago -- the fellowship into the
14    Society of Actuaries was the
15    condition -- of course, residency and
16    to work on Canadian clients, which I
17    did in the '70s and '80s.
18            But the fellowship in the
19    Society of -- my fellowship in the
20    Society of Actuaries was the
21    criterion to establish eligibility
22    for fellowship in the Canadian
23    Institute of Actuaries.
24        Q.    Where do you currently

00010
1    reside?
2        A.    In Madison, North Carolina.
3        Q.    And how long have you
4    resided there?
5        A.    Since the end of 2005.
6        Q.    Currently do you work
7    primarily in the United States?
8        A.    I believe I work
9    exclusively in the United States.
10        Q.    And how long have you
11    worked exclusively in the United
12    States?
13        A.    Probably since the end of
14    the 1980s.  There may have been a
15    couple of cases in the early '90s,
16    but essentially the last 15 years
17    have been -- my work was in the
18    United States.

D0015

19    Q.  Mr. Poulin, I understand
20  that you served as an actuarial
21  consultant to the AARP; is that
22  correct?
23    A.  Yes.
24    Q.  During what time frame did

00011
1  you act in that capacity?
2    A.  I believe it was around
3  1999, 2000.
4    Q.  Have you served as a
5  consultant to the AARP since then?
6    A.  I don't think so.
7    Q.  And when did you serve as
8  an actuarial consultant to the EEOC?
9    A.  It was around the same
10  time.  I would say 1998, '99, 2000.
11  1999 and 2000.
12    Q.  And what were the topics or
13  issues that you were consulting on?
14    A.  For whom?
15    Q.  For the EEOC.
16    A.  It was the cash balance
17  plan.
18    Q.  What was the nature of the
19  work that you did for the EEOC?
20      MR. MALONE:  To the extent
21  that you are under some
22  confidentiality restriction that
23  precludes you from discussing
24  particular details, please bear that

00012
1  in mind, but give her as full a
2  response as you can without violating
3  any confidentiality restriction
4  you're subject to.
5      THE WITNESS:  Yes.
6  BY MS. YU:
7    Q.  If there is such a
8  confidentiality restriction, you can
9  let us know.

10      MR. MALONE:  Yes.  Put that
11  on the table so we know whether it's
12  there or not.
13      THE WITNESS:  The EEOC at
14  that time had two cases that were
15  conversions from traditional defined
16  benefit plans to cash balance plans.
17      And I believe that this was
18  around the time that there had been a
19  flurry of articles in the media about
20  the -- about cash balance plans in
21  general, and age discrimination in
22  particular in cash balance plans.
23      And I was asked by the EEOC
24  to review the provisions of these

00013
1  plans and to determine whether there
2  had been -- there was age
3  discrimination.  This was essentially
4  the issue.
5      There may have been other
6  issues, because there were a number
7  of meetings, but this is the one that
8  I recall.
9  BY MS. YU:
10    Q.  What was your conclusion
11  with respect to whether cash balance
12  plans were age discriminatory?
13    A.  Well, my conclusion was
14  that these two plans, these two plans
15  of -- that the provisions of the cash
16  balance plan resulted in age
17  discrimination in the sense that the
18  rates of benefit accrual were
19  decreasing on account of age.
20    Q.  And is that pursuant to a
21  particular statute that you made that
22  conclusion?
23    A.  This was based on ERISA and
24  the Internal Revenue Code, the

00014

D0017

1  relevant provisions of the Internal
2  Revenue Code.
3      Q.  Could you tell us, if you
4  can, which two cash balance plans you
5  reviewed.
6      A.  I do remember, but I'm not
7  sure that I'm at liability to divulge
8  this information.  I do not recall
9  the nature of the confidentiality
10  agreement that I signed back in 1999.
11         And I don't know where I
12  would find this confidentiality
13  agreement so that -- these are two
14  large corporations, one in the
15  Northeast and the other one in the
16  South.
17      Q.  Let me ask you this.  Did
18  you submit any written reports with
19  respect to your conclusions to the
20  EEOC?
21      A.  Yes, I did.
22      Q.  Do you know whether they
23  were published in any form?
24      A.  Published?  I don't think

00015
1  so.  Certainly not the -- in the
2  large distribution.  I don't think
3  that there was a large distribution
4  of this report.
5      Q.  What were the nature of the
6  issues that you consulted with the
7  AARP on?
8      A.  It was similar.  It dealt
9  with cash balance plans and
10  specifically the issue of age
11  discrimination, and it was around the
12  same time for the same reasons.
13      Q.  Were there any other issues
14  other than age discrimination that
15  you were analyzing?
16         MR. MALONE:  For the AARP?
17         MS. YU:  For either.  We'll

18  do one or the other.  We'll start
19  with AARP.
20      MR. MALONE:  Thank you.
21      THE WITNESS:  For AARP, I
22  don't think so.  For EEOC, I don't
23  recall if there were other issues
24  such as reduction in the rate of

00016
1  future benefit accrual as a result of
2  a conversion.  It may have, but I
3  don't recall that specifically.
4  BY MS. YU:
5      Q.  Did you provide a report to
6  the AARP?
7      A.  Yes.
8      Q.  Since the 1999, 2000 time
9  frame, have you consulted with the
10  EEOC since then?
11      A.  No.
12      Q.  Have you ever served as a
13  consultant to the Internal Revenue
14  Service?
15      A.  Yes, I did.
16      Q.  And when was that?
17      A.  This was around 1990, '91,
18  '92.
19      Q.  And what were the issues
20  involved?
21      A.  At that time it was the IRS
22  had started litigation, if you will,
23  against small -- against law firms,
24  and the issue was the actuarial

00017
1  assumptions or the reasonableness of
2  actuarial assumptions for small
3  plans.
4      Q.  What were the conclusions
5  that you came to with respect to the
6  work you did for the IRS?
7      A.  Well, specifically the IRS
8  at that time was concentrating on two

D0019

9    discrete issues, which was the
10   retirement age and the retirement age
11   assumption in a plan and also the
12   interest rate assumption.
13        And the plans in question
14   assumed that -- these were
15   attorneys -- that the attorneys would
16   retire at age 55, all of them, and
17   that the interest rate assumption was
18   five percent.
19        There were other issues
20   that were not really addressed, too,
21   but there were assumptions with
22   that -- and my conclusion was at that
23   time that these assumptions were not
24   reasonable.

00018
1     Q.   Were you ever retained as
2    an expert witness by the IRS?
3     A.   I was retained as -- as an
4    expert.  I do not recall -- it was in
5    tax court.  I do not recall
6    testifying in court.  If witness --
7    if this is what you mean by witness
8    as opposed to preparing a report or a
9    declaration.
10    Q.   Do you recall whether
11   anyone took your deposition in the
12   context of those matters with the
13   IRS?
14    A.   I do not recall.
15    Q.   Did your consultation with
16   the EEOC involve any litigation?
17    A.   No.
18    Q.   Did your consultation with
19   the AARP involve any litigation?
20    A.   No.
21    Q.   Did you also serve as an
22   actuarial consultant to CWA?
23    A.   Yes.
24    Q.   At what period of time did

00019
1    you serve in that capacity?
2        A.   I believe that I've been
3    providing that consultation,
4    actuarial services to CWA, for the
5    last 25 years since I started my firm
6    in 1980.
7        Q.   Can you describe what you
8    do for the CWA.
9        A.   There have been a number
10   of -- a number of issues.  The main
11   one that comes to mind is the
12   reviewing, the actuarial reports of
13   the New Jersey Public Employee
14   Retirement System over the years and
15   determine the funding status of the
16   plan, I specifically recall from 1992
17   onward.
18           In 1997 New Jersey decided
19   to bond the unfunded liability of the
20   New Jersey systems and I provided
21   consulting services at that time
22   based on that, what it meant, and
23   what would be the -- the impact of
24   bonding the unfunded liabilities,

00020
1    unfunded pension liabilities.
2            And also CWA has been
3    negotiating pension benefit
4    improvements over the years and I was
5    asked to prepare cost estimates for
6    certain pension benefit improvements
7    that would then be discussed by the
8    actuary of the employer.
9        Q.   Now, the services you
10   provided to the CWA, was that with
11   respect to a particular plan or
12   multiple plans?
13       A.   It's been a number of plans
14   over the last 25 years.
15       Q.   Which plans?
16       A.   Well, especially the -- the

D0021

17  AT&T plan originally, and then the,
18  what was then called the Baby Bell
19  plans, which were the companies after
20  the divestiture of 1984.
21        And the -- there have been
22  various names for all of these
23  various entities, and I did
24  provide -- I reviewed the pension

00021
1  benefit improvements of Bell
2  Atlantic, Nynex, Ameritech, over the
3  years.
4     Q.   Now, your review of these
5  reports, were the reports prepared by
6  another actuary and you would review
7  them?
8     A.   Yes.
9     Q.   What was the last service
10  that you provided to the CWA?
11     A.   The last service was
12  related to the unfunded liability of
13  the New Jersey PERS, I believe this
14  was last year, and there had been a
15  flurry of articles in New Jersey and
16  elsewhere about the magnitude of the
17  unfunded liabilities.
18        And Governor Corzine had
19  said -- I believe it might be a year
20  ago now -- that his administration
21  intended to fund these plans to a
22  greater extent than it had been
23  previously.
24     Q.   Have you ever addressed any

00022
1  cash balance plan issues for the CWA?
2     A.   Yes, I did.
3     Q.   And when was that?
4     A.   The exact time might be
5  1991, 1992.  At that time the --
6  AT&T.  AT&T wanted to convert its
7  pension plan for covering members of

D0022

8    CWA as opposed to the management plan
9    from a defined benefit, traditional
10   defined benefit plan to a cash
11   balance plan.  It may have been in
12   1990.
13          And at that time I was not
14   very familiar with the cash balance
15   plan.  So that's when I -- I looked
16   at the -- I reviewed the plan and I
17   met with representatives of CWA to
18   discuss the impact on the -- on their
19   members of converting to a cash
20   balance plan.
21    Q.   What resulted from those
22   discussions?
23          MR. MALONE:  Object to the
24   form.  You can answer the question if

00023
1    you understand it.
2          THE WITNESS:  I recall that
3    in 1991 AT&T decided not to convert
4    its pension plan covering members,
5    CWA members, to a cash balance plan,
6    and continued the current version of
7    the plan at that time.
8    BY MS. YU:
9     Q.   Did there ever come a time
10   subsequent to then that AT&T
11   converted to a cash balance plan?
12    A.   Yes, it did.
13    Q.   Do you know when that
14   occurred?
15          MR. MALONE:  I'm a little
16   late with the objection, but can we
17   clarify whether we're talking about
18   management plan or CWA plan?  I
19   apologize.
20          MS. YU:  No problem.  That
21   would be a good clarification to
22   make.
23          THE WITNESS:  They were
24   both -- they were both converted to

00024
1  cash balance plans, the management
2  plan and the non management plan, and
3  I believe this took place in 1997,
4  1998.
5  BY MS. YU:
6      Q.   And do you know whether
7  that conversion took place at the
8  same time for both management and
9  union employees?
10     A.   I do not recall.
11     Q.   Were there any other cash
12  balance issues that you consulted
13  with the CWA on?
14     A.   I believe that I had a
15  similar involvement with respect to
16  Bell Atlantic, but I don't recall the
17  particulars.  I believe it also came
18  to the same conclusion, but this
19  would have been in the early '90s
20  when I was asked to review a similar
21  proposal by the employer.
22     Q.   So both the consultation on
23  the AT&T plan and the Bell Atlantic
24  plans occurred in the '90 to '92 time

00025
1  frame?
2      A.   I believe so.
3      Q.   Since then you have not
4  consulted with the CWA on cash
5  balance plan issues?
6      A.   I may have at the time of
7  conversion of their collectively
8  bargained plan, and I recall that the
9  issue at that time was to convert the
10  already existing benefits under the
11  old plan, taking into account the
12  early retirement subsidies provided
13  by the old plan -- by the prior
14  version of the plan.
15         And this may have been

16  after 1992.  I think it may have
17  taken place around the time of the
18  conversion of the CWA -- of the CWA
19  plan, AT&T/CWA plan.
20      Q.  As you were providing these
21  consultation services, did you ever
22  attend bargaining sessions?
23      A.  Nope.
24      Q.  Did you provide written

00026
 1  reports during the course of your
 2  consultation with CWA?
 3      A.  I may have.  I don't
 4  recall.
 5      Q.  Have you been an actuarial
 6  consultant to the IBEW?
 7      A.  Yes.
 8      Q.  And during what period of
 9  time have you provided consultation
10  to the IBEW?
11      A.  This would have been in the
12  early 2000, 2002, '3.  Around that
13  time.  Six or seven years ago.
14      Q.  And what was the topic on
15  which you were consulted?
16      A.  This was not in the context
17  of litigation.  It was IBEW -- well,
18  a certain local in New York State
19  had -- there had been a change in
20  membership -- a change in leadership
21  of the Local.
22          And there was an already
23  existing cash balance plan that had
24  been recently converted, and I

00027
 1  explained the various features of the
 2  cash balance plan to groups of
 3  employees and retirees or future
 4  retirees.
 5      Q.  Approximately how many
 6  members did you meet with or present

7   to?
8       A.   Is your question how many
9   members were covered by the plan or
10  how many members did I talk to?
11      Q.   How many members did you
12  talk to?
13      A.   Maybe 200.
14      Q.   Did you meet with groups of
15  members at the time?
16      A.   Yes.
17      Q.   And what was the format of
18  your presentation?
19      A.   It was explaining the
20  features of the cash balance plan and
21  there was -- there were a number of
22  issues, is that the -- that cash
23  balance plan in particular, the --
24  the interest crediting rate was -- I

00028
1   believe was based on October of the
2   previous year, like the Conectiv
3   plan.
4           And this was made known to
5   participates around November 20th,
6   the previous months, and this had an
7   impact on the lump sum that they were
8   receiving under the plan.
9           And the question was for
10  many people, Should I retire on
11  December 1st or January 1st?  Because
12  in many cases it represented a
13  difference of several -- tens of
14  thousands of dollars, and I believe I
15  met with them, I believe November
16  25th for instance.
17          So that they had a week to
18  make that decision, so I was
19  explaining the -- because if they did
20  not retire by the end of November,
21  then it was too late to avail
22  themselves of the benefit of the
23  higher lump sum that would have been

D0026

24  available on December 1st as opposed

00029
1  to January 1st.  So this was the
2  issue.
3        And another issue was that
4  the -- there had been some
5  grandfathering features in the plans
6  which were more generous to
7  management employees than to -- than
8  under the features of the provisions
9  of the collectively bargained plan,
10  and they wanted to obtain the same
11  grandfathering, which I believe
12  was -- would have meant a reduction
13  from age 45 to age 40.
14    Q.  What plan was involved?
15    A.  Niagara Mohawk.
16    Q.  And how many members were
17  there in the plan?
18    A.  I do not recall.
19    Q.  Did you ever meet
20  individually with members?
21      MR. MALONE:  In the context
22  of this particular litigation?
23      MS. YU:  Yes.
24      THE WITNESS:  Yes, I did.

00030
1  BY MS. YU:
2    Q.  Now, at the time that you
3  were providing these services for
4  IBEW, had the conversion to the cash
5  balance formula just taken place?
6    A.  It had already taken place,
7  yes.
8      MR. MALONE:  I think what
9  she's asking you, though, is relative
10  proximity between the conversion date
11  and the time you're rendering the
12  services, not whether it occurred.
13      THE WITNESS:  It may have
14  been in the previous two years,

15  previous three-year period.  It was
16  new.
17  BY MS. YU:
18      Q.  New, but it was not -- you
19  were not giving presentations
20  explaining the cash balance formula
21  that was just about to be adopted; it
22  had already been adopted; correct?
23      A.  That's correct.
24      Q.  Do you know whether you

00031
 1  were making your presentations to the
 2  members during the first year that
 3  the plan had been implemented?
 4      A.  No.
 5          MR. MALONE:  No, you don't
 6  know?
 7          THE WITNESS:  No, I don't
 8  know.
 9          MR. MALONE:  Thank you.
10  BY MS. YU:
11      Q.  You had indicated that
12  having known what the interest rate
13  would be, the October interest rate
14  that would be used for the plan here,
15  would that apply to the cash balance
16  formula or to the prior plan?
17      A.  Probably apply to the prior
18  plan.  I don't recall the
19  particulars, but I do recall that the
20  lump sum resulting from the change in
21  interest rate was -- would have been
22  dramatically reduced in this
23  particular year.  I don't recall the
24  year.

00032
 1      Q.  Did you provide this
 2  service to the IBEW for more than one
 3  plan year?
 4      A.  This particular service was
 5  for one plan year.

6      MR. MALONE:  I think she
7  asked about plans and not plan years.
8  I could be wrong.
9        MS. YU:  No.  Plan year.
10       MR. MALONE:  Oh, I'm sorry.
11  My apology.
12        THE WITNESS:  Could you
13  repeat the question, please?
14  BY MS. YU:
15    Q.  Sure.  I hope I can.
16        You just indicated that the
17  services that you provided was for a
18  particular plan year.
19    A.  Yes.
20    Q.  Did you provide similar
21  services for any other plan years?
22        MR. MALONE:  To the IBEW?
23        MS. YU:  To the IBEW.
24        THE WITNESS:  Yes.

00033
1  BY MS. YU:
2    Q.  So you provided these
3  services over multiple years?
4    A.  Two or three years.  Even
5  though the nature may have changed
6  somewhat, but I particularly remember
7  this meeting that took place just
8  prior to this critical date.
9    Q.  Was that the case for the
10  other presentations that you were
11  making, or really was that unique to
12  that one year?
13    A.  It may have been unique for
14  that plan year.
15    Q.  And it was known at the
16  time for that particular plan year
17  that the change in the interest rate
18  would result in a lower lump sum
19  value in the next plan year?
20    A.  It had just become known,
21  yes.
22    Q.  It had just become known.

23  Is it possible that the change in the
24  lump sum would not necessarily be a


00034
1  reduction but could also be an
2  increase?
3      A.  Yes.
4      Q.  And what is that dependent
5  on?
6      A.  It does depend on the
7  interest rate that was used to
8  calculate the value of the benefit at
9  age 65.
10      Q.  And how is it determined
11  what interest rate would be applied?
12      A.  I'm sorry?
13      Q.  How is it determined what
14  interest rate would be applied?
15          MR. MALONE:  In the context
16  of this IBEW plan?
17          MS. YU:  Yes.
18          THE WITNESS:  There was a
19  provision of the plan that specified
20  the interest rate that would be
21  applied.
22  BY MS. YU:
23      Q.  We're just now talking
24  about how a lump sum may change


00035
1  depending on the interest rate
2  applied.
3      A.  I'm sorry.  Is that a
4  question?
5      Q.  Well, let me put it this
6  way.  Is that what we're talking
7  about right now?
8      A.  Could you --
9      Q.  You described a situation
10  where a participant would make a
11  decision with respect to when to
12  retire specifically because of a
13  change in interest rates affecting

D0030

14    the dollar amount of the lump sum
15    benefit.
16        A.  Yes.
17        Q.  And in this particular year
18    there was going to be a decrease in
19    the lump sum value; correct?
20        A.  Yes.  And my understanding
21    that this was for the -- the
22    actuarial present value of what is
23    called sometimes a protected benefit
24    or the minimum benefit or the benefit

00036
1    that existed on the conversion of the
2    plan.
3          So that this benefit, even
4    though the accrued benefit per se was
5    the same from year X to X plus one to
6    X plus two, its value expressed as a
7    lump sum changed.
8        Q.  And in that year it
9    decreased?
10        A.  The accrued benefit did not
11    decrease, but the lump sum value of
12    that benefit did.
13        Q.  Okay.  Would you
14    characterize the decrease in that
15    lump sum amount as a negative benefit
16    accrual?
17        A.  No.  It has nothing to do
18    with benefit accruals.
19        Q.  Did you provide any other
20    types of consulting services for the
21    IBEW other than what we've just been
22    talking about in terms of the
23    presentations to members?
24        A.  I have a vague recollection

00037
1    at one point they may have wanted to
2    increase their pay credit schedule
3    from X to Y, and I may have provided
4    services along those lines, but

5    it's -- it's vague.
6      Q.  Do you have a sense of a
7    time frame in which you did that?
8      A.  It was -- may have been
9    later than this meeting I alluded to.
10   Probably the subsequent year.
11     Q.  So approximately when was
12   the last time you provided services
13   to IBEW?
14     A.  Could have been 2002 for
15   instance.
16     Q.  And since then you have not
17   provided them any additional
18   services?
19     A.  No.
20     Q.  Were you a consultant to
21   the UAW?
22        MR. MALONE:  Object to the
23   form of the question.  You can
24   answer.  I'm just --

00038
1         THE WITNESS:  Yes.
2    BY MS. YU:
3      Q.  Can you describe the nature
4    of the services you provided to the
5    UAW.
6      A.  This was I believe at the
7    end of the 1980s, and I used to be on
8    the staff of UAW, and I believe that
9    the issue was one particular -- was
10   the president of a local, and there
11   was an issue with the pension plan
12   which was -- which had been
13   negotiated by UAW.
14        And I did provide services
15   to UAW to their legal department at
16   that time, but I don't recall the
17   particulars or the names of the
18   people except the attorney I worked
19   with.
20     Q.  Do you recall what issues
21   were involved?

22    A.  I believe that the issue
23   was that the president of that local
24   expected a larger retirement benefit

00039
1   than he was receiving, and I was
2   involved in calculating and reviewing
3   calculations that had been done by
4   the -- by the staff.
5    Q.  And you mentioned you had
6   been on the staff of the UAW.
7    A.  By the staff I mean by
8   the -- administrative staff that did
9   the calculation for this particular
10  person; it was not the same staff
11  that I worked with when I was there.
12     MR. MALONE:  It was the
13  employers?
14     THE WITNESS:  It was -- it
15  had been done by the employer, and I
16  was representing at that time the --
17  I was not representing.  I was
18  working with the UAW attorneys who
19  were defendants in that case.
20  BY MS. YU:
21    Q.  Oh, was that a litigation?
22    A.  Yes.
23    Q.  Were you retained as an
24  expert witness?

00040
1    A.  I do not recall exactly
2   whether it was litigation per se or
3   an arbitration hearing.  It may have
4   been an arbitration hearing, but it's
5   been a very long time ago.
6    Q.  Do you recall whether you
7   gave any testimony?
8    A.  I don't think I did.
9    Q.  Am I correct in that you
10  stated that you were on the staff of
11  the UAW?
12     A.  Yes, I was.

13    Q.  What was your role there?
14    A.  Well, I started in 1969 as
15  an actuarial consultant, and I became
16  the senior actuarial consultant in
17  1972 and the -- in the Social
18  Security department, which is really
19  an employee benefits department, and
20  I became the assistant director in
21  1976 until 1980.
22    Q.  Have you done any other
23  consulting for the UAW?
24    A.  Yes, I did.  In the '80s.

00041
1    Q.  On what topics?
2    A.  It was related to a piece
3  of legislation.  I do not recall
4  whether it was TEFRA or TRA 86, but
5  it was around that time in the mid
6  '80s.
7        And I was asked to review
8  their pension plans in conjunction
9  with their legal department for
10  meeting the new requirements.  It may
11  have been TRA 86, but I don't recall
12  exactly.
13    Q.  Have you ever consulted
14  with the UAW on any cash balance plan
15  issues?
16    A.  No.
17    Q.  When was the last time you
18  testified before any congressional
19  committee?
20    A.  May have been in 1979.
21    Q.  What was the topic on which
22  you testified in 1979?
23    A.  I testified on various
24  issues.  I do not recall.

00042
1    Q.  Am I correct that in 1979
2  you were not testifying as to any
3  issues regarding cash balance plans?

D0034

4     A.   You are correct.
5     Q.   As an actuary, are you well
6  versed and familiar with the Internal
7  Revenue Code?
8         MR. MALONE:  Object to the
9  form of the question.  Go ahead.  You
10  can answer to the best of your
11  ability.
12        THE WITNESS:  As an
13  enrolled actuary I am, yes.
14  BY MS. YU:
15     Q.   Are all actuaries enrolled
16  actuaries?
17     A.   No.
18     Q.   Are actuaries who are not
19  enrolled actuaries required to be
20  familiar with the Internal Revenue
21  Code?
22        MR. MALONE:  Object to the
23  form of the question.
24        THE WITNESS:  It entirely

00043
1  depends on their area of expertise.
2  There are casualty actuaries.  There
3  are life insurance actuaries.  There
4  are pension actuaries.  There are
5  maritime law actuaries.
6         So that they may have to be
7  involved with a certain provisions of
8  the Internal Revenue Code, but I
9  don't know for sure.
10  BY MS. YU:
11     Q.   Do you consider yourself a
12  pension actuary?
13     A.   Yes.
14     Q.   Are there any other areas
15  that you feel you are an expert
16  actuary in in addition to the pension
17  area?
18     A.   Certainly not to the same
19  extent as pension.  There are certain
20  issues that -- recent issues, for

D0035

21  instance, retiree health benefits
22  that certain -- I have to backtrack a
23  little bit.
24      Over the years there have

00044
1   been additional accounting
2   requirements for pension plans that
3   did not exist when I became an
4   actuary, and there are also some
5   calculations that I'm now required by
6   employers that were not required 20
7   years ago, 25 years ago.  This
8   applies to both the private sector
9   and the public sector.
10      And recently retiree health
11  benefit liabilities have to be
12  computed by employers first in the
13  private sector, then in the public
14  sector.
15      In my role as actuarial
16  trustee of the Connecticut State
17  Employees Retirement Commission, I
18  had to become familiar with the
19  government accounting standards board
20  requirements.
21      And also the financial
22  accounting standard board
23  requirements applicable to private
24  plans or public employee plans in the

00045
1   field of retiree health benefits.
2      So that I have to be
3   involved also, in the calculation and
4   reviewing the computation of
5   liabilities for retiree health
6   benefits.
7   Q.  You mentioned that you are
8   the actuarial trustee of the
9   Connecticut State Employees
10  Retirement Commission?
11  A.  Yes, I am.

D0036

12    Q.   Are you the only actuarial
13  trustee?
14    A.   There are two actuarial
15  trustees on the commission, a board
16  of 15 members.
17    Q.   The two are actuaries and
18  the others are members of the board.
19  Are they considered trustees as well?
20    A.   They are commissioners or
21  trustees, yes.  But they are not
22  actuaries; they're mostly lawyers.
23    Q.   Who is the other actuary
24  who's on the board?

00046
1    A.   His name is Robert Baus,
2  B-A-U-S, of Buck Consultants, but he
3  is now retired, recently retired.
4    Q.   Is he still active as one
5  of the actuarial trustees?
6    A.   Yes.  Yes, he is.
7    Q.   As a pension actuary, are
8  you well versed with ERISA?
9       MR. MALONE:  Objection to
10  the form of the question.
11       When I do that, you can
12  answer the question if you understand
13  it.
14       THE WITNESS:  Yes.
15       MR. MALONE:  If you don't
16  understand it, then you can ask for
17  clarification.
18       THE WITNESS:  I believe I
19  am.
20  BY MS. YU:
21    Q.   As a pension actuary, are
22  you well versed in regulations of the
23  Code and ERISA?
24       MR. MALONE:  Object to the

00047
1  same, form.
2       THE WITNESS:  Yes.

D0037

3    BY MS. YU:
4       Q.   As a pension actuary, are
5    you well versed in IRS revenue
6    rulings?
7            MR. MALONE:  Same
8    objection.
9            THE WITNESS:  Yes.  This is
10   a very large question.  There have
11   been thousands of revenue rulings
12   over the last 40 years.
13           I don't believe I'm
14   familiar with all of them, but I have
15   been following the revenue rulings
16   and the relevant regulations of ERISA
17   or the IRS Internal Revenue Code over
18   the last 35 years.
19   BY MS. YU:
20      Q.   As a pension actuary, are
21   you well versed in notices issued by
22   the IRS?
23           MR. MALONE:  Object to the
24   form of the question.

00048
1            THE WITNESS:  I tried to
2    become familiar with the IRS notices
3    that deal with my field of expertise.
4    BY MS. YU:
5       Q.   As a pension actuary, are
6    you well versed in court decisions
7    interpreting the Code and ERISA?
8            MR. MALONE:  Object to the
9    form of the question.
10           THE WITNESS:  My answer
11   would be similar to the previous one.
12   There are court decisions every day
13   that affect pension plans.
14           I have been a faithful
15   reader of a publication called Review
16   of National Affairs, Pension Reporter
17   or Employee Benefit Reporter, and I
18   do review the decisions, or at least
19   a summary of the decisions, and I did

D0038

20   over the years.
21        But, again, more related to
22   my field of expertise.  For instance,
23   I am less familiar with multi
24   employer plans so that I have a

00049
1   lesser interest in following the
2   issues of withdrawal liability, for
3   instance.
4        And there have been a
5   number of court cases, court case
6   decisions on this and -- but in
7   the -- in my field, especially when
8   it comes to cash balance plans I --
9   my -- my -- I have a continuous
10  attempt to be familiar with the
11  various decisions affecting my work.
12  BY MS. YU:
13     Q.   How would you describe your
14  field as a pension actuary?
15     A.   My area of expertise is
16  mostly on defined benefit pension
17  plans, mostly private but also
18  public, mostly single employers, but
19  not exclusively.
20     Q.   Mr. Poulin, were you asked
21  to render an opinion in this
22  litigation brought by Mr. Charles and
23  others against the defendants in this
24  case?

00050
1     A.   Yes.
2     Q.   On what areas, what topics
3   were you asked to opine?
4     A.   Specifically I was asked to
5   opine whether there had been a
6   reduction in the accrued benefit
7   under the Conectiv plan and whether
8   there had been a violation of the 133
9   and a third percent rule.
10        Or more generally, the

11    benefit accrual requirements of the
12    plan and whether the conversion
13    resulted in the reduction in the rate
14    of future benefit accrual, that is,
15    the conversion from the traditional
16    defined benefit plan to the cash
17    balance plan design.
18        Q.   Am I correct that you just
19    listed three different topics?
20        A.   I'm sorry?
21        Q.   Did you list three
22    different topics?
23        A.   Did I list?  Yes.  Yes.
24        Q.   The first topic that you

00051
 1    described, whether there had been a
 2    reduction in the accrued benefit.
 3        A.   Yes.
 4        Q.   What was your conclusion
 5    with respect to that topic?
 6        A.   My conclusion was that
 7    there was indeed a reduction in the
 8    accrued benefit from one year to the
 9    subsequent year.
10        Q.   With respect to the benefit
11    accrual requirements, did you come to
12    a conclusion?
13        A.   Yes.
14        Q.   What was your conclusion?
15        A.   My conclusion was -- again,
16    I have to backtrack.  There are three
17    accrued -- benefit accrual
18    requirements or accrued benefit
19    requirements under -- the -- the name
20    is different whether you're under
21    ERISA or the Internal Revenue Code,
22    but they're the same.
23            And the -- one is called
24    the fractional rule, the second one

00052
 1    is the three percent rule, and then

2  there is the 133 and a third percent
3  rule.
4       Cash balance plans are
5  career average plans.  That is, the
6  benefit formula is based on all years
7  of compensation.
8       Therefore, cash balance
9  plans may not avail themselves of the
10  three percent rule and the fractional
11  rule, because these rules are limited
12  to plans that provide benefits based
13  on less or -- on ten years or less of
14  compensation.  Typically final
15  average plans.
16      So this leaves the 133 and
17  a third percent rule, and my
18  conclusion was that the plan, the
19  Conectiv plan after the conversion
20  was violating the 133 and a third
21  percent rule.
22    Q.  Now, you had said that cash
23  balance plans may not avail
24  themselves of the three percent or

00053
1  the fractional rules?
2    A.  That's correct.
3    Q.  Is it your opinion that
4  they are precluded from using those
5  tests?
6       MR. MALONE:  Object to the
7  form of the question, specifically
8  the use of the word opinion.
9       THE WITNESS:
10  Theoretically, no.  It is possible.
11  It might be possible.  I have seen
12  attempts to meet rules other --
13  especially the fractional rule.
14       In practice it is virtually
15  impossible to do it, and the -- I
16  believe that defendant actuarial
17  consultants are reaching the same
18  conclusion from what I've read over

D0041

19  the last two or three years on that
20  particular issue.
21  BY MS. YU:
22      Q.  Again, from a practical
23  standpoint as opposed to whether
24  legally a cash balance plan could

00054
1  attempt to satisfy those other two
2  rules?
3          MR. MALONE:  I have the
4  same objection.  And just so you
5  understand, because he's an actuary,
6  he may need to be familiar with these
7  Code provisions and he's not a
8  lawyer, and so I have a problem with
9  him expressing legal opinions.
10          So just that's the
11  objection to your question so you
12  understand.
13          THE WITNESS:  Could you
14  repeat the question?
15          MR. MALONE:  Could you read
16  the question back for him.
17          (The reporter read back the
18  following testimony:
19          "Q  Again, from a
20  practical standpoint as opposed to
21  whether legally a cash balance plan
22  could attempt to satisfy those other
23  two rules?")
24          MR. MALONE:  Same objection

00055
1  to the question.
2          THE WITNESS:  I heard the
3  question again, but I'm not sure I
4  understand the meaning.
5  BY MS. YU:
6      Q.  Let me try it over.
7      A.  You say on a practical --
8  as a practical matter but then --
9      Q.  I'm just trying to make

10    sure that I understand what your
11    testimony was from, and I used the
12    word practical, and I only used that
13    because I thought that was part of an
14    answer that you provided.
15        That in practicality, the
16    cash balance plan may have a very
17    difficult time passing the three
18    percent rule and a fractional rule,
19    and I think I understand that part of
20    it.
21        I want clarification as to
22    whether you feel that the fractional
23    rule and three percent rule,
24    regardless of whether a cash balance

00056
1    plan actually passes or not, whether
2    they could be applied to a cash
3    balance plan.
4        MR. MALONE:  I just object
5    to the extent you're asking for a
6    legal conclusion.  He can testify to
7    his understanding as an actuary.
8        THE WITNESS:  I believe
9    that it might be theoretically
10    possible.  I have seen -- as I said,
11    I have seen attempts to use these
12    other rules when the 133 and a third
13    percent rule was not met, with no
14    success.
15        It does not mean that it is
16    mathematically impossible, but it has
17    not happened.
18    Q.  And that's what my question
19    was trying to get at, was not will a
20    particular plan, cash balance plan,
21    pass or not, the three percent rule
22    or the fractional rule, but is it
23    permissible for a cash balance plan
24    to attempt to pass the three percent

00057

D0043

1    rule and the fractional rule?
2       MR. MALONE:  Object to the
3    form of the question.
4       THE WITNESS:  I believe
5    that it would be permissible to the
6    extent the three percent and the
7    fractional rule refer to the last ten
8    years of compensation prior to the
9    date of determination.
10       There might be an addition
11   of benefit that would meet the
12   requirement that would only -- where
13   the, the benefit would only be based
14   on the last ten years, but --
15       And I am aware of one plan
16   that attempted to do so, but it
17   created other problems that had not
18   yet been contemplated by the
19   designers of the plan.
20   BY MS. YU:
21      Q.  With respect to whether the
22   conversion resulted in a reduction of
23   the rate of benefit accrual, what was
24   your conclusion?

00058
1       A.  My conclusion was that --
2    my -- my conclusion was not the
3    reduction of the rate benefit
4    accrual.  It was a reduction in the
5    rate of future benefit accrual, and
6    my conclusion was that there was
7    indeed a reduction as a result of the
8    conversion.  There was a reduction in
9    the rate of future benefit accrual
10   under the plan.
11      Q.  Are there any other areas
12   on which you've been asked to render
13   an expert opinion in this case?
14      A.  I do not recall exactly the
15   timing of the Register decision in
16   the Third Circuit.  I may have been
17   asked initially if it was prior to

18  the Register PNC Bank decision to
19  render an opinion on whether there
20  was a reduction in the rate benefit
21  accrual on account of increasing age,
22  but I do not recall.  I did not
23  render an opinion on that issue.
24      Q.  Have you been asked to

00059
 1  render an expert opinion on any other
 2  topics in this case?
 3      A.  Not that I recall, no.
 4      Q.  Have you come to any
 5  conclusions on any other topics with
 6  respect to the cash balance plan at
 7  issue in this case?
 8          MR. MALONE:  Object to the
 9  form of the question.
10          THE WITNESS:  Other than
11  the ones we discussed?
12  BY MS. YU:
13      Q.  Yes.
14      A.  No.
15      Q.  Is it okay if I call the
16  133 and a third percent rule the
17  four-thirds rule?
18      A.  Well, it is okay, yes.
19      Q.  It's just a lot easier for
20  me.
21      A.  Yes.
22      Q.  Thank you.
23      A.  It's a mouthful for me,
24  too.

00060
 1      Q.  With respect to the
 2  application of the four-thirds rule
 3  on cash balance plans, have you been
 4  asked to render an opinion on that
 5  issue in any other case, litigation?
 6      A.  On the four-thirds?  Yes, I
 7  did.  Yes, I was.
 8      Q.  What other cases?

9      A.  I believe the CIGNA case.

10     Q.  Is the plaintiff in that

11  case Amara?

12     A.  Yes.  I don't recall

13  specific cases, but I do recall a

14  number of instances where I was asked

15  to review the application of the

16  plan.

17         And I found that there was

18  a violation of the 133 and a third

19  percent rule, because the rate,

20  the benefit accrual in a year was

21  greater -- many times it was

22  infinity, was greater than 33

23  percent, or was greater than 133

24  percent than the rate in effect in a

00061

1  prior year.

2         I think the Fleet Boston is

3  another instance where it happened.

4      Q.  Were you an expert in the

5  Fleet Boston case?

6      A.  Yes.

7      Q.  You indicated that you

8  concluded that there was a reduction

9  in the accrued benefit.

10     A.  Yes.  There was a reduction

11  in the rate benefit accrual and the

12  accrued benefit, yes.

13     Q.  Let's deal with just the

14  reduction in the accrued benefit,

15  your conclusion with respect to that

16  issue.

17         Have you ever rendered an

18  opinion on that issue in any other

19  litigation?

20     A.  I don't recall

21  specifically, no.

22     Q.  With respect to that topic,

23  are there any relevant ERISA

24  provisions?

D0046

00062
1          MR. MALONE:  That topic
2    being the reduction in the accrued
3    benefit?
4          MS. YU:  Yes.
5          THE WITNESS:  Yes.
6    BY MS. YU:
7      Q.   Which ERISA provision?
8      A.   I believe it's Section 204
9    G of ERISA which says that there may
10   not be a reduction in the accrued
11   benefit.
12         And when I say the word
13   accrued benefit for a defined benefit
14   plan, then the -- I go back to the
15   definition of accrued benefit in the
16   ERISA, which is defined as the
17   annuity payable at normal retirement
18   age.
19         MR. MALONE:  Can I have the
20   question and answer read back.
21         (The reporter read back the
22   following testimony:
23         "Q   Which ERISA provision?
24         "A   I believe it's Section

00063
1    204 G of ERISA which says that there
2    may not be a reduction in the accrued
3    benefit.
4          "And when I say the word
5    accrued benefit for a defined benefit
6    plan, then the -- I go back to the
7    definition of accrued benefit in the
8    ERISA, which is defined as the
9    annuity payable at normal retirement
10   age.")
11   BY MS. YU:
12     Q.   Is there --
13     A.   As opposed to the account
14   balance under the cash balance plan,
15   which is the definition of accrued
16   benefit for a defined contribution

17  plan under ERISA.
18      Q.  Is there a corresponding
19  Code provision?
20      A.  Yes, there is.  I believe
21  it's 411(d)(6), Section 411(d)(6) of
22  the code where a benefit -- an
23  amendment to -- where an amendment to
24  a pension, a defined benefit pension

00064
1  plan, cannot result in the reduction
2  of any accrued benefit.
3      Q.  You had said that you did
4  not recall whether you had made any
5  conclusions on this topic with
6  respect to the accrued benefit in any
7  other litigation.
8          Does that mean that you
9  don't think you have?
10          MR. MALONE:  Object to the
11  form of the question.
12          THE WITNESS:  No.  In many
13  other cases -- what happened is that
14  in many cases the plan in the way it
15  is administered -- in fact, there is
16  a de facto reduction in the accrued
17  benefit when participants terminate
18  in the sense that they receive an
19  amount that is less than the value of
20  their accrued benefit.
21          Even though the plan may
22  have a provision saying that the
23  employee will receive the greater of,
24  but I've seen many cases post facto,

00065
1  if you will, where it was not
2  administered in the way that 204(g)
3  was, in fact, not violated.
4  BY MS. YU:
5      Q.  And are you describing
6  instances in which you were retained
7  as an expert?

8     A.   Yes.
9     Q.   Which cases were those?
10    A.   I believe CIGNA is one of
11   these cases.
12    Q.   Any other cases?
13    A.   And I believe Fleet Boston
14   is one of these cases as well.
15    Q.   Any other litigation?
16    A.   No, not that comes to mind.
17    Q.   Now, with respect to your
18   conclusion with respect to whether
19   the conversion resulted in a
20   reduction of the rate of future
21   benefit accruals, have you been asked
22   to render an expert opinion in any
23   other litigation on that topic?
24    A.   Yes.

00066
1     Q.   Which other litigations?
2     A.   I believe Citigroup, CIGNA,
3    AT&T, I believe Fleet Boston as well,
4    U.S. Bank.  It's hard to remember
5    these cases, the various issues, but
6    I believe that the ones I cited are
7    the -- the -- it resulted -- the
8    conversion resulted in a reduction of
9    the benefit accrual based on my
10   calculations.
11    Q.   Now, is there an ERISA
12   provision that governs this issue?
13    A.   Yes.
14    Q.   What is that provision
15   under ERISA?
16    A.   Well, Section 204(h) of
17   ERISA specifies that if an amendment
18   results in the reduction in the rate
19   of future benefit accrual, a notice
20   must be sent to participants.
21    Q.   Is there a corresponding
22   Code provision?
23    A.   I know that the regulations
24   are under the Internal Revenue Code

D0049

00067

1  but -- 204 would be one, of course,
2  yes.  411(b)(1)(H).  Section
3  411(b)(1)(H) of the Internal Revenue
4  Code.
5        MR. MALONE:  The H is
6  capital in that one; it's not capital
7  in the 204(h).
8        THE WITNESS:  I'm sorry.
9  I'm sorry.  It's the 204(h), we're
10  talking about a different thing.
11        The first part of my
12  response was that the regulations on
13  204(h) are published by the IRS, but
14  I do not recall a section in the
15  Internal Revenue Code that is the
16  counterpart of Section 204(h) of
17  ERISA.
18  BY MS. YU:
19    Q.  How does a cash balance
20  plan use interest rates?
21    A.  I'm sorry?
22    Q.  How does a cash balance
23  plan use interest rates?
24        MR. MALONE:  Object to the

00068

1  form of the question.
2        THE WITNESS:  Cash balance
3  plans use interest rates in various
4  ways.  Initially when a plan -- a
5  traditional defined benefit plan is
6  converted to a cash balance plan, an
7  interest rate is used to determine
8  normally, not always, to determine
9  the size of the opening account
10  balances.
11        And in the operation of the
12  plan an interest rate will be used
13  to -- an interest crediting rate will
14  be used to increase the account
15  balances each year or each quarter,

D0050

16 depending on the provisions of the
17 plan.
18         And an interest rate will
19 also be used at normal retirement age
20 to convert the resulting
21 accumulations of the account balances
22 to age 65, to convert these balances
23 into an annuity payable for life.
24 BY MS. YU:

00069
1    Q.  Is it permissible for a
2 cash balance plan to use a fixed
3 interest rate for these purposes?
4         MR. MALONE:  Object to the
5 form of the question.
6         THE WITNESS:  Is it
7 permissible?  Yes, it is.
8 BY MS. YU:
9    Q.  Is it permissible for a
10 cash balance plan to use an index to
11 set interest rates?
12    A.  Yes, it is.
13    Q.  What are examples of
14 indices that are used for this
15 purpose?
16    A.  Examples are the one-year
17 treasury rate, the 30-year treasury
18 rate, and all the -- all the -- those
19 in the in between, five-year
20 treasury, ten-year treasury rate.
21 That would be examples of indices
22 that might be used.
23    Q.  Are these indices variable
24 in nature?

00070
1         MR. MALONE:  Object to the
2 form of the question.
3         THE WITNESS:  These indices
4 are -- provide for variable interest
5 rates, yes.
6 BY MS. YU:

D0051

7    Q.   And what does that mean?
8         MR. MALONE:  Object to the
9  form of the question.
10        THE WITNESS:  Well, the --
11  to the extent that any actuarial
12  present value is based on a
13  combination of a mortality table and
14  an interest rate, the variation in an
15  interest rate will result in a
16  difference in an actuarial present
17  value.
18        Whether it's the opening
19  account balance or whether it's an
20  accumulation to age 65, or whether
21  it's a conversion of a lump sum into
22  an annuity, there will be variations.
23  BY MS. YU:
24    Q.   And are there typically

00071
1  variations over time associated with
2  these indices?
3    A.   There are.
4        (Exhibit Poulin 1 was
5  marked for identification.)
6  BY MS. YU:
7    Q.   Mr. Poulin, we have marked
8  as Exhibit Poulin 1 Notice 96-8.  Are
9  you familiar with this notice?
10    A.   Yes, I am.
11    Q.   If you look at --
12        MR. MALONE:  For the
13  record, I'm going to assume that this
14  actually is Notice 96-8.  I'm not
15  going to sit here and flyspeck it.
16  I'm going to assume that it
17  accurately reflects what the IRS
18  promulgated and that, you know, it's
19  from a reliable service.
20        MS. YU:  I'm assuming that
21  as well.
22        MR. MALONE:  Okay.
23        MS. YU:  And if there are

D0052

24    any defects with it later on, we will

00072
1    deal with that.
2         MR. MALONE:  I just want to
3    put that out there.
4    BY MS. YU:
5         Q.   If you turn to page 3 of 6.
6    In the last paragraph, five lines up
7    from the bottom, I'm just going to
8    read that section into the record.
9         A.   The last paragraph at the
10   bottom of the page?
11        Q.   Yes.  And it begins,
12   However, if a frontloaded interest
13   credit plan specifies a variable
14   outside index for use in determining
15   the amount of interest credits, the
16   precise dollar amount of an
17   employee's hypothetical account
18   balance as of normal retirement age
19   (including future interest credits to
20   normal retirement age), and thus the
21   precise dollar amount of the
22   employee's accrued benefit as of any
23   date before normal retirement age
24   cannot be calculated prior to normal

00073
1    retirement age.
2         Do you agree with that
3    statement that appears in Notice
4    96-8?
5         A.   This is a difficult
6    question because the -- under a
7    defined benefit plan there is --
8    under the qualification requirements
9    of a defined benefit plan, the
10   benefit must be definitively
11   determinable.
12        When a plan terminates and
13   the PBGC takes over, the benefit to
14   which the employee is entitled

15    expressed as an annuity of normal
16    retirement age, must be determined,
17    because PBGC is not in a position to
18    guarantee benefits for a 30 year old
19    employee that will be really
20    determinable 35 years from age 30 at
21    age 65.  So that a determination will
22    be made.
23         So that in this instance,
24    my opinion is that the accrued

00074
1    benefit under the plan and also to
2    the extent that there are various
3    sections of ERISA and Internal
4    Revenue Code where it's specified
5    that the employee must be notified of
6    his accrued benefit.
7         So that there must be -- I
8    would take this figuratively, this
9    sentence, this particular sentence,
10    and not strictly speaking, because
11    otherwise, if the accrued benefit is
12    not determined, then what is payable
13    to the employee?
14         Since the definition, the
15    basic primary definition of accrued
16    benefit under a defined benefit plan
17    in ERISA is the annuity payable at
18    normal retirement age.
19    Q.  I will be asking you some
20    questions about what you just said,
21    but going back to the question I
22    started with, which was whether you
23    agree with the statement as I read it
24    into the record that appears in 96-8.

00075
1         MR. MALONE:  I'm going to
2    object to the form of the question,
3    because it doesn't embrace the full
4    context in which this statement sits
5    in 96-8.

6        MS. YU:  We could also, if
7   you need to review more of this
8   notice before you want to answer my
9   question, we can certainly allow him
10  to do that.
11        MR. MALONE:  Why don't we
12  take a break and let him read the
13  relevant passage of Notice 96-8 and
14  then we can go back.
15        MS. YU:  Sure.
16        MR. MALONE:  Does that
17  work?
18        MS. YU:  Yes.
19  BY MS. YU:
20    Q.   Before we do, do you feel
21  that there are other provisions of
22  the notice that you need to review
23  before you answer my question with
24  respect to whether you agree with

00076
1   that passage that I read into the
2   record?
3     A.   The -- the title of the
4   rubric is Determination of the
5   Accrued Benefit.  So I would like to
6   review the whole section, subsection.
7     Q.   Absolutely.
8        MR. MALONE:  Thanks.
9        RECESS
10  BY MS. YU:
11    Q.   Mr. Poulin, have you had a
12  chance to review the relevant
13  portions you need to of Notice 96-8
14  to answer the questions we're talking
15  about before the break?
16        MR. MALONE:  Before you
17  start, he did something which we
18  ought to talk about.  He highlighted
19  your exhibit.
20        THE WITNESS:  Oh, sorry.
21        MR. MALONE:  I don't know
22  how you want to handle that, but I

23    just thought I'd tell you that.
24            THE WITNESS:  I'm sorry.

00077
1            MS. YU:  That's fine.
2            MR. MALONE:  Can you read
3    the question back for Mr. Poulin,
4    please.
5            (The court reporter read
6    back the following:
7            "Q  I will be asking you
8    some questions about what you just
9    said, but going back to the question
10    I started with, which was whether you
11    agree with the statement as I read it
12    into the record that appears in
13    96-8.")
14            MR. MALONE:  Specifically
15    the ultimate sentence appearing on
16    page 3 of 6 of what we've marked
17    Poulin 1, which would be here.
18            THE WITNESS:  Yes.
19            MR. MALONE:  And let the
20    record reflect that I am directing
21    the witness's attention to the
22    relevant portion of the exhibit.
23            THE WITNESS:  The answer is
24    yes to your last question, which was

00078
1    did I review, and I did review the
2    rest of the paragraph, Determination
3    of the Accrued Benefit, and also some
4    other sections of Notice 96-8, and
5    the -- my answer is a qualified
6    answer.
7            Because the purpose of
8    Notice 96-8 is to determine the
9    method, if you will, of compliance
10    under Section 417(e)(3) of the
11    Internal Revenue Code for cash
12    balance plans.
13            And in this section the IRS

14   says, in other sections than the one
15   we discussed prior to the break, that
16   the lump sum or cash value, cash
17   amount, must be the actuarial
18   equivalent of the accrued benefit
19   payable at normal retirement age.
20         It says specifically in
21   the -- note the paragraph following
22   the section that we discussed in
23   Calculation of the Present Value of
24   the Employee's Accrued Benefit.

00079
1         It says that a single sum
2   distribution is not less than the
3   present value of the employee's
4   accrued benefit calculated in
5   accordance with the applicable
6   interest rate and mortality table
7   under Section 417(e)(3).
8   BY MS. YU:
9     Q.   Mr. Poulin, can you tell me
10   exactly where you were reading from.
11     A.   Yes.  This is on page 4 of
12   6, paragraph 2, under the general
13   rubric B, Single Sum Distribution
14   from Frontloaded Interest Credit
15   Plans.
16         On page two of the same
17   Notice in the top paragraphs the IRS
18   also gives the example of a cash
19   balance plan where the accrued
20   benefit is determined on the basis of
21   an interest rate -- interest
22   crediting rate of 8 percent and where
23   the Section 417(e) rate, which is the
24   30-year treasury today, was 6.5

00080
1   percent at that time, and the
2   conclusion of the IRS is the plan
3   would satisfy Sections 411(a) and
4   417(e) if the employee received a

5    single sum distribution of 59,524
6    (the present value of the employee's
7    accrued benefit) rather than 45,000.
8         This revenue -- this Notice
9    96-8 is applicable to all cash
10   balance plans, and to the extent that
11   there is a variable interest rate
12   that would be equal to 8 percent and
13   the 30-year treasury would be 6.5
14   percent, the numbers would be the
15   same and the IRS reviewing this plan
16   would -- and by the way, this
17   phenomenon is called the whipsaw
18   phenomenon.
19        The IRS would determine
20   that there is whipsaw and that the
21   lump sum payable to a terminated
22   participant must be equal to the
23   actuarial present value on the date
24   of the determination, or date of

00081
1    termination of the accrued benefit of
2    the participant based on the
3    accumulation of pay credits and
4    interest credits based on the
5    interest crediting rate applicable at
6    that time.
7         So that the accrued benefit
8    is then determined as being the
9    normal retirement benefit payable
10   under the plan at age 65, and this is
11   the accrued benefit under the plan at
12   that time.
13   Q.  And you said "this."  What
14   are you referring to?
15   A.  This benefit payable at
16   normal retirement age under the plan
17   after the accumulation of the account
18   balances plus pay credits from the
19   date of determination, let's say age
20   40 for the employee who is
21   terminating to age 65.

D0058

22        So there would be a 25-year
23    accumulation in order to determine
24    the normal retirement benefit, which

00082
 1    in turn will be discounted at the
 2    417(e) 3 interest rate which is the
 3    30-year treasury today in order to
 4    determine the lump sum.
 5        There is a de facto
 6    determination of accrued benefit
 7    under a plan and this is what this
 8    notice is all about.
 9    Q.   Can we go back to page
10    three.
11    A.   Sure.
12    Q.   Again, take a look at the
13    very bottom of the page at the
14    sentence that begins however in that
15    last paragraph.
16    A.   Yes.
17    Q.   Focusing on that statement
18    that is in this notice, do you agree
19    or disagree with that statement?
20        MR. MALONE:  I'm going to
21    object to the form of the question,
22    because I think that that statement
23    has to be taken in its surrounding
24    context.

00083
 1    BY MS. YU:
 2    Q.   You can answer the
 3    question.
 4    A.   Well, as I said, to the
 5    extent that this -- the purpose of
 6    this notice is to accomplish the
 7    conversion of the accrued benefit
 8    into a lump sum at any point in time
 9    and does so, then I would disagree
10    that the employee's accrued benefit
11    before normal retirement age cannot
12    be calculated in all cases, you know,

D0059

13   before the employee, because it is in
14   fact determined, it is determined
15   based on the procedure of this
16   notice, the procedure stipulated in
17   this notice.
18        (Exhibit Poulin 2 was
19   marked for identification.)
20   BY MS. YU:
21      Q.   Mr. Poulin, you have a
22   document that's been marked as Poulin
23   2.  Do you recognize this document?
24      A.   Yes, I do.

00084
1      Q.   Could you identify the
2    document.
3      A.   This document is the --
4    entitled as Part One Conectiv Cash
5    Balance Sub Plan, Effective January
6    1, 1999, and I believe that this is
7    the document, the pension plan
8    document, after the conversion of the
9    Conectiv plan, final average plan, to
10   the cash balance plan in 1999.
11     Q.   Have you reviewed this
12   document?
13     A.   Yes, I have.
14     Q.   What portions of the
15   document, this document Poulin 2,
16   have you reviewed?
17        MR. MALONE:  At any time?
18   BY MS. YU:
19     Q.   At any time.
20     A.   I reviewed the section in
21   particular -- Article 3 in particular
22   and the definitions at the beginning
23   of the document.
24        I did not review section --

00085
1    Article 6 I believe, which is the
2    section entitled Forms of Payments;
3    Survivor Benefits.

D0060

4          I didn't pay particular
5    attention to the various forms of
6    survivor benefits either
7    preretirement or for post retirement.
8    But I did review the sections
9    pertinent to my analyses.
10       Q.   What is the interest
11   crediting rate used by the Conectiv
12   Cash Balance Sub Plan?
13       A.   This is Section 1.30 of the
14   plan on page 5.  Interest crediting
15   rate means for each plan year the
16   30-year treasury bond rate for the
17   October immediately preceding the
18   beginning of the plan year.
19       Q.   What is the rate that is
20   used to convert to an annuity under
21   the Conectiv Cash Balance Sub Plan?
22       A.   I believe it also was a
23   30-year treasury, but I'll find the
24   specific language.

00086
1          I believe this is in the
2    schedule, yes.  In Schedule A of the
3    pension plan there are the factors to
4    compute actuarial equivalence and it
5    says, Unless otherwise specified
6    below, actuarial equivalence shall be
7    determined by using the applicable
8    interest rate, which is the annual
9    interest rate on 30-year treasury
10   securities as specified by the
11   commissioner of internal revenue for
12   the October preceding the calendar
13   year.
14       Q.   Does the Conectiv Cash
15   Balance Sub Plan use a fixed interest
16   rate?
17       A.   It does not.
18       Q.   Does it use a variable
19   interest rate?
20       A.   Yes, it does.

D0061

21    Q.  Is it permissible for the
22  Conectiv Cash Balance Sub Plan to use
23  a variable interest rate for purposes
24  of interest crediting and for the

00087
1  annuity conversion?
2        MR. MALONE:  I'll object
3  insofar as it calls for a legal
4  conclusion.  You can answer the best
5  way that you can.
6        THE WITNESS:  The answer --
7  the question can be answered two
8  ways.  Is that to the extent that
9  there is no existing prohibition in
10  the Internal Revenue Code or under
11  ERISA to adapt such a provision, then
12  it would be permissible.
13        The second part of the
14  question -- of the answer is that to
15  the extent that doing so does not
16  result in violations of certain
17  sections of ERISA and the Code,
18  because ERISA -- ERISA and the
19  Internal Revenue Code for these
20  particular sections were enacted
21  or -- in 1974.
22        The first cash balance plan
23  was created in 1985.  So that ERISA
24  or the Code could not in 1974

00088
1  prohibit practices for pension plans
2  that did not exist at that time.
3  BY MS. YU:
4    Q.  You said that there were
5  two ways to answer the question.  The
6  first way --
7    A.  Was that the -- the first
8  is that there is no prohibition per
9  se and to the --
10    Q.  Let me clarify.  Are you
11  aware of any such prohibition in the

12  Code or ERISA?
13    A.  I am not.
14    Q.  In your view does the use
15  of a variable interest rate in the
16  Conectiv Cash Balance Sub Plan
17  violate any provision of ERISA or the
18  Code?
19        MR. MALONE:  Objection to
20  the form of the question.
21        THE WITNESS:  In practice
22  it does as I -- as I concluded in my
23  report.
24  BY MS. YU:

00089
1    Q.  Does any cash balance plan
2  that uses a variable interest rate
3  for purposes of interest crediting
4  and for conversion to annuity violate
5  ERISA or the Code?
6    A.  I don't know.
7    Q.  The Conectiv Cash Balance
8  Sub Plan uses the 30-year treasury
9  rate; correct?
10    A.  Yes.
11    Q.  The 30-year treasury
12  fluctuates from year to year; does it
13  not?
14    A.  Yes.
15    Q.  So it can go up or it can
16  go down.
17    A.  Yes.
18    Q.  As that rate for the
19  30-year treasury fluctuates over
20  time, do you consider those
21  fluctuations to be plan amendments?
22        MR. MALONE:  Object to the
23  form of the question.
24        THE WITNESS:  Plan

00090
1  amendments, no.
2        (Exhibit Poulin 3 was

3    marked for identification.)
4    BY MS. YU:
5        Q.  Mr. Poulin, do you
6    recognize the document that has been
7    marked as Poulin 3?
8        A.  I recognize that this is a
9    very small version of what I prepared
10   originally.
11           MS. YU:  And for the
12   record, this is a printout of a
13   portion of one of his spreadsheets
14   that you had produced to me
15   electronically.
16           MR. MALONE:  Okay.
17   BY MS. YU:
18       Q.  Mr. Poulin, there is a
19   column second to the last toward the
20   right-hand side of the page that says
21   Interest Credit.
22       A.  Yes.
23       Q.  Did you populate the
24   information in that column?

00091
1        A.  Did I populate?
2        Q.  Yes.
3        A.  Yes.
4        Q.  For 1999, 5.01 percent is
5    listed.
6        A.  Yes, that's what it says.
7        Q.  How did you make the
8    decision to enter that interest rate
9    in that spot on this spreadsheet?
10       A.  Well, I assume that this
11   was the 30-year treasury rate in
12   effect in October of the prior year,
13   but I think that in October of -- I
14   assume that this is the rate in
15   effect of the prior year.
16           There might be a shift of
17   one year, but in essence, this should
18   be -- each one of these interest
19   crediting rates should represent the

D0064

20   30-year treasury rate in effect in
21   October of the previous year.
22        Until -- until 2007 where
23   the 4.85 percent should represent the
24   rate in effect in October of 2006,

00092
1    and then all subsequent years would
2    be -- the rate shown would be the
3    30-year treasury of October of last
4    year.
5       Q.   And why is that?
6       A.   Why is what?  The interest
7    crediting rate is defined as the
8    30-year treasury rate in effect of
9    October of the previous year.
10      Q.   And so that is why it is
11   shown as the interest crediting rate
12   for 2007; correct?
13      A.   Yes.  And subsequent years.
14   Because not knowing what the rates
15   will be in future years, then the
16   rate in effect the year prior to the
17   determination year, which is 2007, is
18   the -- is the rate used to determine
19   the accumulation of interest credit
20   rates -- interest crediting rates to
21   age 65.
22      Q.   And is the same 30-year
23   treasury used for the annuity
24   conversion?

00093
1       A.   Yes.
2       Q.   Just to clarify.  Today is
3    July 27, 2007; correct?
4       MR. MALONE:  That's what my
5    watch says, so I'm not going to argue
6    with you.
7       THE WITNESS:  Yes.  That's
8    what it says here.
9    BY MS. YU:
10      Q.   And so we do not know

D0065

11  sitting here today what the 30-year
12  treasury rate will be in October of
13  2007?
14     A.  No, we do not.
15        MR. MALONE:  Off the
16  record.
17        (Discussion off the
18  record.)
19  BY MS. YU:
20     Q.  And that is true for all
21  subsequent years?
22     A.  Yes.
23     Q.  So when you populate the
24  column Interest Rate starting in

00094
 1  2008, for example, going forward
 2  using the prior year, because we do
 3  not know what the future interest
 4  rate will be for the 30-year
 5  treasury?
 6     A.  Yes.  Incidentally, this
 7  says the approach that I used here --
 8  but this is the approach that I also
 9  observed in a number of calculations
10  of projections of account balances
11  and pay credits and interest credits
12  to age 65.
13        And for purposes of the --
14  what we discussed before, the whipsaw
15  calculation, then the interest
16  crediting year -- the interest
17  crediting rate of the year in
18  question is used in order to project
19  the account balances to normal
20  retirement age as I did in this
21  exhibit.
22     Q.  Did I hear you correctly
23  that you said that that's not what
24  you did, though, in your

00095
 1  calculations?

D0066

file:///J|/JRM/Conectiv/sjreply/5486poulinc072707.txt

2   A.  No.  This is what I did.
3   Q.  This is what you did?
4   A.  This is what I did.
5   Q.  Using that assumption then
6  you could then project a
7  participant's accrued benefit?
8       MR. MALONE:  Object to the
9  form of the question.
10      THE WITNESS:  You can
11  project the account balance that will
12  help you determine the accrued
13  benefit that will be payable at age
14  65.
15      The accrued benefit under a
16  defined benefit plan is the annuity
17  or the pension benefit payable for
18  life starting at age 65 or normal
19  retirement age.
20 BY MS. YU:
21   Q.  And is it possible to
22  project what that will be?
23   A.  Yes.  It is not just
24  possible.  It is required to project

00096
1  what it will be, because as I said,
2  under a defined benefit plan the
3  accrued benefit being the normal
4  retirement benefit payable at age 65
5  and not the account balance, by force
6  there must be a projection of these
7  amounts, including interest credits
8  which was what the Notice 96-8 also
9  was about, is that it requires the
10  projection in order to determine the
11  accrued benefit.
12      But Notice 96-8 went a
13  little bit further and then it said
14  once you determine what the accrued
15  benefit is, then you have to discount
16  it back to the date of determination
17  by using another interest rate in
18  some cases which may -- which is the

D0067

19  30-year treasury.
20      But in the accumulation in
21  some plans it is not the 30-year
22  treasury, so that was -- there was a
23  necessity to clarify this calculation
24  of lump sums.

00097
1      Q.  Is whipsaw an issue in this
2  case?
3      A.  No.
4      Q.  So it is possible to
5  project what a participant's accrued
6  benefit will be at age 65.  We just
7  talked about that; correct?
8      A.  Yes.
9      Q.  When that participant for
10  whom a projection has been made --
11  actually, let's assume that there is
12  someone who's age 50 today that
13  continued to work and then they
14  retire at age 65.
15      A.  Yes.
16      Q.  Will the actual benefit
17  that they receive, the actual accrued
18  benefit that they receive when they
19  retire, is that known to us today?
20      MR. MALONE:  Object to the
21  form of the question.
22      THE WITNESS:  No.
23  BY MS. YU:
24      Q.  What is the frontloaded

00098
1  cash balance plan?
2      MR. MALONE:  Object to the
3  form of the question.
4      THE WITNESS:  I believe the
5  term was coined in Notice 96-8 as
6  representing a cash balance plan
7  where the interest credits are deemed
8  to be accrued benefits before they
9  are in fact credited.

D0068

10          And where the -- you take
11   into account that in the
12   determination of the accrued benefit
13   the interest credits that will be
14   paid from the date of determination
15   to normal retirement age as opposed
16   to a backloaded cash balance plan.
17          Where if, for instance, an
18   employee terminated at age 45, then
19   the interest credits from that age to
20   normal retirement age under the plan
21   would not be computed until that
22   normal retirement age, until age 65.
23          So that it would be
24   determined later in one -- in one

00099
1   lump sum which would automatically
2   disqualify the plan for meeting the
3   benefit accrual requirements of the
4   ERISA and the Internal Revenue Code.
5          Because all these interest
6   credits, instead of being taken into
7   account at the beginning, would be
8   taken into account at the end.  And
9   so that there would be a charge --
10   there would be a large increase in
11   the rate of benefit accrual in that
12   year, which would disqualify the
13   plan.
14          Because then the rate of
15   benefit accrual would automatically
16   exceed not just the four-thirds rule,
17   but also the other two rules, because
18   it would be a large increase relative
19   to previous years' rates of benefit
20   accrual.
21     Q.   Is the Conectiv Cash
22   Balance Sub Plan a frontloaded cash
23   balance plan?
24          MR. MALONE:  Object to the

00100

D0069

1   form of the question.  Go ahead.
2        THE WITNESS:  That's my
3   understanding.
4   BY MS. YU:
5     Q.  Does the use of the 30-year
6   treasury rate by the Conectiv Cash
7   Balance Sub Plan violate any
8   provisions of ERISA or the Code?
9        MR. MALONE:  Object to the
10  form.  Also asked and answered.  Go
11  ahead, you can answer.
12       THE WITNESS:  No, it does
13  not, per se.
14  BY MS. YU:
15    Q.  Okay.
16    A.  I would like to come back
17  to your earlier question, whether the
18  Conectiv plan is a frontloaded plan,
19  and I did say it is my understanding
20  that it is.
21       Although the definition of
22  accrued benefit under the Conectiv
23  plan is -- presents a certain problem
24  that I have not addressed, but that

00101
1   if you asked me the question, then I
2   should -- it says that the accrued
3   benefit is the account balance...
4        MR. MALONE:  Let the record
5   reflect that the witness is examining
6   what was previously marked as Poulin
7   2.
8        THE WITNESS:  It's the
9   payable cash balance converted to an
10  actuarially equivalent single life
11  annuity that is payable as of the
12  determination date.
13       The accrued benefit under a
14  defined benefit plan is not an
15  account balance.  The accrued benefit
16  under a defined benefit plan is not
17  the account balance converted to an

D0070

18   immediate annuity.
19        The accrued benefit under a
20   cash balance plan is the pension
21   benefit payable at normal retirement
22   age resulting from the accumulation
23   of the interest credits and the pay
24   credits and the account balances.

00102
1         So that my understanding is
2    that this plan intends to be a
3    frontloaded interest, a frontloaded
4    interest credit plan, but in the
5    absence of this specificity that the
6    accrued benefit not being defined as
7    the normal retirement benefit payable
8    at age 65 perturbs me, but I did not
9    opine on this question.
10       Q.  Do you have an opinion?
11       A.  No, I don't.
12       Q.  I'm going to go back to the
13   question that Mr. Malone objected to
14   as asked and answered.
15        Going back to you said that
16   there two ways of looking at the
17   issue of whether there was --
18       A.  Two ways of looking at...?
19       Q.  Looking at the issue of
20   whether it is permissible to use a
21   variable interest rate whether there
22   is a specific prohibition under ERISA
23   or the Code, and I believe that your
24   testimony is that you're not aware of

00103
1    any provision in the Code or ERISA
2    that, per se, prohibits this;
3    correct?
4        A.  Correct.
5        Q.  You also said that there
6    was -- another way to look at it to
7    see whether the application of the
8    variable interest rate results in a

D0071

file:///J|/JRM/Conectiv/sjreply/5486poulinc072707.txt

9    violation.
10      A.  Yes.
11      Q.  And I wanted to focus on
12   the latter part, and my question to
13   you is whether or not you believe
14   that the Conectiv Cash Balance Sub
15   Plan in its application of a 30-year
16   treasury rate results in a violation
17   of either ERISA or the Code.
18      A.  And I believe I answered
19   that question by saying yes.
20      Q.  And that was the question I
21   intended to ask the last time, and I
22   thought you said no.  So that's why I
23   wanted to clarify at this point that
24   you feel that there is -- it does

00104
1    result in a violation of ERISA or the
2    Code?
3       A.  Yes.
4       Q.  Could you explain to me the
5    basis for your conclusion.
6       A.  The first one is in the
7    rate benefit, the future benefit
8    accrual, and the rate of benefit
9    accrual measures the increase and the
10   accrued benefit from one year to the
11   next.
12          And if the rate of benefit
13   accrual exceeds four-thirds of the
14   rate in effect in any previous year,
15   it is a violation of the -- of that
16   rule.
17          I did the calculations
18   which showed that in some years the
19   increase in the rate of benefit
20   accrual exceeded 133 and a third
21   percent of the rate in effect in one
22   or several prior years.  And this
23   happened a number of times.  That was
24   number one.

D0072

00105
1        Number two, in some
2    years -- and that's the corollary of
3    the first conclusion.  In some years
4    there was a reduction in the rate of
5    benefit accrual which resulted in a
6    reduction in the accrued benefit
7    determined in the way that I
8    described earlier being the
9    accumulation of the account balances
10   to normal retirement age using the
11   interest crediting rate in effect in
12   that year.
13       So that there also was a
14   reduction in the accrued benefit
15   because the rate of benefit accrual
16   in certain years was negative.
17       (Exhibit Poulin 4 was
18   marked for identification.)
19       MR. MALONE:  As with Notice
20   96-8, I'm going to make the same
21   assumption that this accurately
22   reflects the double revenue
23   regulation which was promulgated
24   several years before I was born.

00106
1        MS. HOFFMAN:  Revenue
2    ruling.
3        MR. MALONE:  Revenue
4    ruling. Excuse me.
5        MS. YU:  Very good.
6    BY MS. YU:
7        Q.  Mr. Poulin, we have just
8    marked revenue ruling 185 as Poulin
9    4.  Have you ever seen this revenue
10   ruling before?
11       A.  I never did.  Even though
12   it's called Poulin 4, I never saw it.
13   I understand it was published in
14   1953.
15       Q.  Do you want to take a few
16   minutes to review the document?

17      MR. MALONE:  Do you want to
18  go off the record and talk about
19  lunch while he reads the document?
20      MS. YU:  Yes.
21      (Discussion off the
22  record.)
23      THE WITNESS:  Yes.
24      MR. MALONE:  Let's go back

00107
 1  on the record.
 2  BY MS. YU:
 3    Q.  Revenue ruling 185 deals
 4  with certain pension plans for
 5  payments under an annuity contract;
 6  correct?
 7    A.  Among other things.  I'm
 8  not sure I have -- I'm not familiar
 9  with the Section 165 of the Internal
10  Revenue Code of 1939, because this is
11  about three, four generations ago,
12  and TRA 86 amended the Internal
13  Revenue Code of 1954, and this
14  revenue ruling of 1953 was probably
15  based on the Internal Revenue Code of
16  1939.
17        And at that time, of
18  course, this is long before ERISA,
19  long before Section 401 and ERISA
20  that provided qualification
21  retirements for pension plans.
22        And I'm not even sure that
23  it's only -- what was then called --
24  was a certain type of annuities --

00108
 1  there were group annuity contracts in
 2  effect at that time.  It may also
 3  apply to defined contribution plans.
 4  So I'm not sure.  I'm not.
 5    Q.  Can you take a look at the
 6  second page of the revenue ruling.
 7  In the last paragraph there's a

D0074

8    reference to in quotes definitely
9    determinable benefits.
10        A.   Yes.
11        Q.   Is that term, definitely
12    determinable benefits, a term that's
13    used currently?
14        A.   It is -- it is used -- it
15    has been used consistently by the IRS
16    as early as 1953 and it was in fact a
17    qualification requirement even before
18    ERISA that I was aware of.  I didn't
19    know how far back it went but it was.
20        Q.   There is also a discussion
21    of the fluctuations up and down of a
22    cost of living index.
23        A.   Yes.
24        Q.   Does it appear to you that

00109
1    revenue ruling 185 recognizes the
2    validity of the use of a cost of
3    living index even if it results in a
4    fluctuation up and down in the
5    annuity amount?
6        MR. MALONE:  Object to the
7    form of the question.
8        THE WITNESS:  Yes, I know,
9    because even under ERISA it took a
10    long time to recognize cost of living
11    adjustments post retirement as being
12    accrued benefits.
13        So that for active
14    employees I believe that it's not
15    before 1990, 1992 that cost of living
16    adjustments were deemed to be part of
17    the accrued benefit.
18        So that what happened in
19    1953 for me is not determinative of
20    what happened later.  It's -- and
21    also, a cost of living improvement
22    does not reduce the benefit.
23        Unless there would be a
24    negative adjustment; it can only

D0075

00110
1   increase the benefit.  So that it is
2   entirely different context of what we
3   are now discussing.  And also it's
4   over -- over half a century.
5       Q.   Just taking the notion of
6   variations that occur based on an
7   index.  In there they were referring
8   to a cost of living index -- let me
9   back up for a moment.
10          What is a cost of living
11  index?
12      A.   I don't know what they
13  meant 50 years ago by cost of living
14  index because -- in 1953 -- but what
15  I would call a cost of living index
16  is what we commonly call the consumer
17  price index.
18          That would be a cost of
19  living index.  It would be an index
20  where benefits would be adjusted
21  according to -- adjusted to mitigate
22  the impact of inflation on the
23  erosion of pension benefits.
24          So that it is an adjustment

00111
1   that is usually upward, not downward.
2   So I don't see how it would be
3   applicable in the context of what we
4   are discussing.
5          And the -- my overriding
6   consideration looking at this is that
7   this is pre ERISA, and ERISA created
8   a host of requirements that did not
9   exist prior to ERISA.
10          For instance, that a
11  pension plan be payable as an
12  annuity.  There were plans before
13  ERISA that provided a lump sum.
14  That's all.  A lump sum, and they
15  were defined plans and they provided

16    a lump sum.
17          And there was no mechanism
18    to convert the lump sum to an
19    annuity.  ERISA prohibited this
20    practice.  And so there are many,
21    many areas where the rules have
22    changed so dramatically that we -- I
23    don't think we can go back to the
24    pre-1974 situation in order to, you

00112
1    know, conclude things today.
2      Q.   My question was really only
3    about not necessarily the
4    applicability of this ruling today,
5    but what is your understanding of
6    what this revenue ruling says.
7      A.   Well, it seems to say that
8    if there is a cost of living index,
9    and by definition inflation also
10    fluctuates, then it will -- if it is
11    set in the group annuity contract,
12    then it will be permissible.  That's
13    the way I read it.
14      Q.   And in the paragraph that
15    is the second paragraph numbered one
16    on the second page, there is a
17    reference to variations as a result
18    of market value.
19      A.   Well, again, ERISA created
20    two types of plans.  Defined benefit
21    plan, defined contribution plan, and
22    a wall between the two.  There are
23    rules applicable to defined benefit
24    plans that are not applicable to

00113
1    defined contribution plans and vice
2    versa.
3          This revenue ruling refers
4    to money purchase, money purchase
5    plan.  A money purchase plan is a
6    defined contribution plan.

D0077

7         In a defined contribution
8   plan, in the context of a defined
9   contribution plan, the account
10  balance is the accrued benefit, but
11  the accrued benefit under a defined
12  benefit plans post ERISA is the
13  annuity payable at age 65.
14        So that a revenue ruling
15  that was applicable to a defined
16  contribution plan and essentially
17  said that the assets will increase
18  and the assets will increase with a
19  cost of living index and then at
20  retirement they will be converted
21  into an annuity, well, this is the --
22  this is more a defined contribution
23  plan method or methodology or
24  approach in order to determine the

00114
1   accrued benefit.
2         And I don't think it's
3   applicable to defined benefit plan in
4   2007 or in 1999.
5     Q.   And that is not my
6   question.  I'm just asking you about
7   this particular revenue ruling and
8   how you would read what this revenue
9   ruling says.  Not as to whether it is
10  applicable today.
11        In the section that deals
12  with the variation in market value,
13  it says, in the third line from the
14  bottom in that paragraph, starting a
15  little past there, With the dollar
16  amount of the benefit payable varying
17  from time to time to the extent of
18  any variation in the market.
19        In this particular revenue
20  ruling, was the determination made
21  that that was an acceptable
22  fluctuation?
23        MR. MALONE:  I'll object to

24  the form of the question, because it

00115
1  misstates what the ruling says.  The
2  ruling says that if those conditions
3  are met, the plan will be recognized
4  as providing for definitely
5  determinable benefits.
6          THE WITNESS:  The section
7  that you cited that's about the
8  market value, the benefit is based on
9  the market value of the assets.
10         A defined benefit plan does
11  not provide benefits based on the
12  market value of assets.  This is a
13  defined contribution plan.
14         Certainly after ERISA so
15  that this -- the fact that there was
16  a cost of living index and that the
17  market value of these assets I assume
18  was going up or down or was going at
19  the -- or the rate of increase from
20  one year to the next may have
21  fluctuated is, for me, it's
22  meaningless, because it does not
23  apply to defined benefit plans.
24         A defined benefit plan,

00116
1  first of all, there must be a benefit
2  formula, and the benefit formula is
3  not based on the assets in the fund
4  which was the case here.
5    Q.  Again, I am not asking you
6  to apply this revenue ruling to any
7  set of circumstances or anything that
8  there -- any other type of plan.  I'm
9  really just asking about what this
10  revenue ruling says.
11         And putting it back into
12  the context that Mr. Malone put it,
13  with respect to whether or not a plan
14  provides for a definitely

D0079

15  determinable benefit, is it
16  permissible under this revenue
17  ruling, do you agree with me that
18  this revenue ruling says that even if
19  there are variations as a result of
20  market value, that it will still be a
21  definitely determinable benefit in
22  accordance with just this revenue
23  ruling?
24      A.  Well, could be.  Could be

00117
1   for a 401(k) plan.  But, again, we're
2   talking about defined benefit plan
3   and it becomes, you know --
4       Q.  I'm really just talking
5   about this revenue ruling.
6       A.  Well, this revenue ruling
7   for me is totally inapplicable,
8   because it doesn't apply.  It doesn't
9   apply to the situation at hand.
10         It applies to -- first of
11  all, it's old, but it applies to
12  situations that existed for defined
13  contribution plans for -- for a plan
14  where the benefit is the result of an
15  individual account.  There is an
16  account.
17         And under ERISA, if there
18  is an account, it's a -- it's a
19  defined contribution plan, and all
20  the rules that we're talking about do
21  not apply to defined contribution
22  plans.  So for me it is irrelevant.
23      Q.  Is it possible for you to
24  answer the question as I'm asking it

00118
1   with respect to just what is stated
2   in this revenue ruling?
3       A.  Well, this revenue ruling
4   does say that the benefit will be
5   definitely determinable based on the

6  parameters that they define.
7       But it is not in the
8  context of a defined benefit plan,
9  and it is not even in the context of
10  ERISA.
11      So I don't see the
12  applicability of this revenue ruling,
13  even though it says what it says, to
14  the situation that we are discussing
15  now.
16      I don't know what else to
17  say.
18      (Luncheon recess at
19  11:54 a.m.)
20      (Testimony resumed at
21  1:03 p.m.)
22      (Exhibit Poulin 5 was
23  marked for identification.)
24      MR. MALONE:  Do you have

00119
1  any extras of that?
2  BY MS. YU:
3     Q.  Mr. Poulin, we have marked
4  a revenue ruling 81-12 as Poulin 5.
5  Have you seen this revenue ruling
6  before?
7     A.  I believe I have seen this
8  when it first came out in 1981.
9     Q.  Take whatever time you need
10  to.
11     A.  Okay.
12     Q.  In revenue ruling 81-12 the
13  very first sentence starts out, it
14  says, In the case of a variable
15  standard for computing actuarial
16  equivalence.
17      Can you tell me what a
18  variable standard for computing
19  actuarial equivalence is?
20      MR. MALONE:  Object to the
21  form of the question.
22      THE WITNESS:  Yeah.  Well,

23   the -- let's take the term for the
24   expression actuarial equivalence

00120
1   first.
2           This is -- and the text
3   explicits what it means by actuarial
4   equivalence is that it is the case of
5   actuarial factors used to compute the
6   early retirement benefits or optional
7   forms of benefits under a plan.
8           And variable standard is
9   that it seems that there was a
10   variable standard which would be an
11   index used to compute the early
12   retirement or optional forms of
13   benefit on an actuarial equivalence
14   basis for a plan.
15          So that the -- especially
16   when you read the two examples, it is
17   the purpose of this revenue ruling in
18   this particular case, this was as a
19   response to a request made by a
20   pension, the administrator of a
21   pension plan.
22          In example two, the early
23   retirement benefits were based on the
24   mortality table specified in the plan

00121
1   and an interest rate equal to fifty
2   percent of the prime rate of a
3   specified bank.
4           Let's assume that -- you
5   know, it could be whatever index.
6   And the fact that this interest rate
7   may vary on this revenue -- based on
8   this revenue ruling is not deemed to
9   be an amendment in the plan, it will
10   reduce accrued benefits.
11          Even though it may result
12   in the reduction in the early
13   retirement benefits payable under

D0082

14  that plan.  It does not say that it
15  may result in the reduction in the
16  accrued benefit payable at normal
17  retirement age.
18  BY MS. YU:
19    Q.   Is the interest crediting
20  rate used in a cash balance plan
21  considered a variable standard for
22  computing actuarial equivalence?
23        MR. MALONE:  Objection to
24  the form of the question.

00122
1        THE WITNESS:  Yes, it is.
2  BY MS. YU:
3    Q.   And would the annuity
4  conversion factor of a cash balance
5  plan be considered a variable
6  standard for computing actuarial
7  equivalence?
8    A.   Yes.
9    Q.   Does 411(d)(6) protect
10  actuarial assumptions for early
11  retirement benefits?
12    A.   As of what date?
13    Q.   As of 1999.
14    A.   411(d) -- originally
15  411(d)(6) protected the accrued
16  benefit.  Then I understand, I
17  believe it's in 1986, that the
18  statute was amended to include early
19  retirement benefits as being
20  protected -- or early retirement
21  benefits were being part as if they
22  were accrued benefits, even though
23  the definition -- basic definition of
24  accrued benefit is at normal

00123
1  retirement age.
2        The distinction here is
3  that the index referred to in this
4  revenue ruling does not change the

D0083

5   accrued benefit.  It has an impact on
6   the optional forms of retirement
7   benefit, including early retirement
8   benefits, not the -- not the accrued
9   benefit directly.
10       MS. YU:  I'm just thinking
11  about the answer that he gave back.
12       Can you read it back?
13       (The reporter read back the
14  following testimony:
15       "A  411(d,) originally
16  411(d)(6) protected the accrued
17  benefit.  Then I understand, I
18  believe it's in 1986, that the
19  statute was amended to include early
20  retirement benefits as being
21  protected -- or early retirement
22  benefits were being part as if they
23  were accrued benefits, even though
24  the definition, basic definition of

00124
1   accrued benefit is at normal
2   retirement age.
3       "The distinction here is
4   that the index referred to in this
5   revenue ruling does not change the
6   accrued benefit.  It has an impact on
7   the optional forms of retirement
8   benefit, including early retirement
9   benefits, not the, not the accrued
10  benefit directly.")
11  BY MS. YU:
12    Q.  The portion of your answer
13  when you referred to the index not
14  changing the accrued benefit, could
15  you explain that for me.
16    A.  Yes.  Perhaps the
17  illustration of example two would
18  answer your question.  That in both
19  examples the normal retirement
20  benefit is not affected by the index.
21       The normal retirement

D0084

22  benefits, i.e., the accrued benefit
23  payable at age 65 is not affected
24  by -- by this revenue.

00125
1          It is the actuarial
2  equivalent of this benefit that may
3  be payable in accordance to an index
4  that will by definition fluctuate.
5          So that the early
6  retirement factors, the surviving
7  spouse benefit factors, other factors
8  that lead to an actuarially
9  equivalent basis, or an actuarially
10  equivalent form of benefit may be
11  affected, but not the accrued
12  benefit, per se, that is, the benefit
13  payable at normal retirement age.
14     Q.   And what is this revenue
15  ruling saying about the fluctuations
16  that are attendant to the use of an
17  index?
18     A.  It says that --
19          MR. MALONE:  Object to the
20  form.  Go ahead and answer.
21          THE WITNESS:  It says that
22  in order to provide optional or early
23  retirement benefits on an actuarially
24  equivalent basis, then it is

00126
1  permissible to use a mortality table,
2  a mortality table specified in the
3  plan, and an interest rate equal to
4  fifty percent of an index.
5          You define an index, which
6  is the prime rate of a specified bank
7  as of the date of separation.  So
8  that it is permissible to compute the
9  early retirement benefits or the
10  optional form of benefits.
11          Now, the term optional form
12  of benefit means other than the

13  accrued benefit payable at normal
14  retirement age.  It might be a lump
15  sum, it might be a benefit payable
16  for what's called a ten-year certain
17  period.
18          So that even if the
19  participant dies within this ten-year
20  period, then the benefit will keep
21  being payable, so it's an optional
22  form of benefit.
23          And what the revenue ruling
24  says, it is permissible to use an

00127
1  index to compute the various or the
2  optional forms of benefits, not
3  the --
4  BY MS. YU:
5     Q.  What is it saying about the
6  actuarial equivalence?  Are they --
7  is this revenue ruling saying that
8  they are actuarially equivalent and
9  it's permissible to use such an
10  index?
11     A.  It is permissible to use an
12  index to determine or to compute the
13  optional forms of benefits other than
14  the benefit payable at normal
15  retirement age, at age 65.
16     Q.  In terms of determining
17  actuarial equivalence; correct?
18     A.  Yes.
19     Q.  Can you take a look at on
20  the first page right underneath Full
21  Text.  And it reads, Advice has been
22  requested as to, number one, what
23  constitutes a change in actuarial
24  factors indirectly affecting, within

00128
1  the meaning of Section
2  1.411(d)-(3)(b) of the Income Tax
3  Regulations, an accrued benefit.

4      Do you read that to mean
5   that this revenue ruling is also
6   seeking guidance with respect to
7   accrued benefits?
8         MR. MALONE:  Object to the
9   form of the question.
10        THE WITNESS:  It does use
11   the term -- it does use the term
12   accrued benefit, but the narrative of
13   the revenue ruling does not refer to
14   accrued benefits.
15        It does refer to -- well,
16   it refers to accrued benefits
17   indirectly, but to the optional forms
18   of benefits, optional forms of
19   payment for that accrued benefit.
20        (Exhibit Poulin 6 was
21   marked for identification.)
22   BY MS. YU:
23     Q.  Mr. Poulin, do you
24   recognize the document that has been

00129
1   marked Poulin 6?
2     A.  Yes, I do.
3     Q.  Would you identify it for
4   the record, please.
5     A.  It is the Declaration that
6   I prepared in this case.
7     Q.  If I could turn your
8   attention to Exhibit D.  Could you
9   explain Exhibit D.
10     A.   Yes.  Exhibit D is an
11   illustration of testing for the 133
12   and a third percent rule for
13   participant -- for plaintiff Jerome
14   Charles using his compensation and
15   his age from 1999 to -- through 2006
16   showing the cash balance account at
17   the beginning of each of these
18   calendar years.
19        The accrued benefit at age
20   65 based on the projection that the

21   cash balance account that we
22   discussed this morning, this is in
23   column five, and in column 6, showing
24   the increase or the reduction in

00130
1   accrued benefit during the calendar
2   year in question.
3           And in column 7, it shows
4   the rate of benefit accrual, which is
5   the ratio of the increase or
6   reduction in accrued benefit in the
7   year to the compensation paid in that
8   year.
9     Q.  Do you know what Mr.
10   Charles' birthday is?
11     A.  I believe it is in 1949.  I
12   don't know exactly when in 1949, but
13   I don't know -- I don't recall the
14   exact date.
15     Q.  Were you provided with his
16   birth date?
17     A.  Yes.  I believe so, yes.  I
18   think it was part of the documents.
19     Q.  The information that is
20   contained in column 3 described as
21   Pay, where did you obtain that
22   information?
23     A.  From the documents that
24   were provided to me for Mr. Charles.

00131
1     Q.  What were those documents?
2     A.  I cannot describe them
3   precisely.  They may have been
4   benefit calculation worksheets or
5   historical data for Mr. Charles, but
6   I don't -- I could not identify them
7   precisely.
8     Q.  Did you receive cash
9   balance statements for Mr. Charles?
10     A.  Yes, I did.  Yes.
11     Q.  Do you recall whether you

D0088

12  obtained his compensation from those
13  statements?
14      A.  Yes.  Yes.  Yes, I did.  I
15  did receive cash balance statements
16  for I believe all the years in
17  question.
18      Q.  Was Mr. Charles previously
19  under the DelMarVa plan or the ACE
20  plan?
21      A.  Mr. Charles was under the
22  ACE plan, Atlantic City.
23      Q.  Where did you obtain the
24  information that is contained in

00132
 1  column four that's labeled Cash
 2  Balance Account BOY?
 3      A.  I believe that this was
 4  included in the benefit statements
 5  for Mr. Charles from 1999 through
 6  2006.
 7      Q.  Did you do any calculations
 8  to derive the numbers that are
 9  contained in column four or did you
10  take that information from the
11  statements?
12      A.  I believe that this
13  information was a given, like the --
14  like the pay information.
15      Q.  What would you do right now
16  to confirm that the age that appears
17  for Mr. Charles is correct on your
18  spreadsheet?
19      A.  Well, I would review a
20  document showing his date of birth.
21      Q.  If Mr. Charles' date of
22  birth was in October of 1949, would
23  age 50 as it appears for him in this
24  chart be correct?

00133
 1      A.  At the beginning of the
 2  year technically his attained age

D0089

3    would have been age 49, but this
4    would not affect the results of my
5    calculations, because what this
6    exhibit does is compare the increase
7    in the accrued benefit each year so
8    that the numbers might -- the numbers
9    might vary somewhat from -- from --
10   if this exhibit showed the same
11   calculations from ages 49 through 56,
12   the numbers would change; the
13   percentages would not.  Or the -- the
14   impact would be the same and my
15   conclusions would be the same.
16       Q.   Did you do a calculation to
17   derive the numbers that are contained
18   in column five?
19       A.   Yes, I did.
20       Q.   Let's just take one year
21   for example in 1999.  How did you
22   derive the number 2,080 that appears
23   as the accrued benefit at age 65 for
24   1999?

00134
1        A.   The calculation is the same
2    for all years and consists of taking
3    the cash balance account and
4    projecting the cash balance account
5    at the interest crediting rate in
6    effect for the year for the number of
7    years from the -- the age of the
8    participant through age 65.
9            And then converting the
10   resulting amount into an annuity at
11   age 65 so that each of these numbers,
12   the 2,080 and the 2,860, represent
13   the accumulation of the account
14   balance to age 65 from the age of the
15   participant -- from the attained age
16   of the participant to age 65, and
17   then converting this into an annuity
18   based on the interest crediting rate.
19       Q.   The interest crediting

D0090

20   rate?
21      A.   The accumulation is based
22   on the interest crediting rate and
23   the conversion is based on the
24   30-year treasury which is the same.

00135
1       Q.   For 1999, what is the
2   particular interest crediting rate
3   that you used in this calculation to
4   produce that number?
5       A.   Well, it would have been --
6   the interest crediting rate would
7   have been the 30-year treasury of
8   October of the prior year.
9       Q.   If you look back to Poulin
10   3, the interest credit for 1999 is
11   listed as 5.01 percent.
12      A.   Yes.
13      Q.   Is that the interest
14   crediting rate that you used to
15   calculate the number that appears for
16   1999 as the accrued benefit at age
17   65?
18      A.   It should be, but as I
19   recall, I thought the rate was higher
20   in 1999.  Exhibit F-1 is what it is,
21   but I thought that it was a little
22   bit higher.
23         But, you know, I don't
24   recall all the -- all the interest

00136
1   rates, but essentially it should
2   represent the interest crediting rate
3   or the 30-year treasury rate in
4   effect in November of each year.
5         And the results reflect the
6   increases or decreases in these rates
7   in these years.
8       Q.   So for the accrued benefit
9   at age 65 for 1999, you used the
10   30-year treasury rate that was in

11  effect in October of '98?
12    A.  Yes.
13    Q.  Did you also use the
14  30-year treasury rate that was in
15  effect in October of '98 as the
16  annuity conversion factor?
17    A.  I believe so.
18    Q.  Then let's take 2000.  The
19  accrued benefit at age 65, which you
20  list as 2,860 for 2000, did you use
21  the interest crediting rate for the
22  30-year treasury that was in effect
23  in October of 1999?
24    A.  I believe so.

00137
 1    Q.  Did you also use the
 2  30-year treasury rate that was in
 3  effect in October of 1999 to
 4  calculate that accrued benefit at age
 5  65?
 6    A.  I believe so, and for the
 7  following years as well.
 8      MR. MALONE:  Can you read
 9  back that answer.  I think you meant
10  to be clear; I'm not sure you're
11  clear.  I don't think your answer is
12  going to be ambiguous when you hear
13  it.
14      (The reporter read back the
15  following testimony:
16      "Q  Then let's take 2000.
17  The accrued benefit at age 65, which
18  you list as 2,860 for 2000, did you
19  use the interest crediting rate for
20  the 30-year treasury that was in
21  effect in October of 1999?
22      "A  I believe so.
23      "Q  Did you also use the
24  30-year treasury rate that was in

00138
 1  effect in October of 1999 to

D0092

2  calculate that accrued benefit at age
3  65?
4        "A   I believe so, and for
5  the following years as well.")
6        THE WITNESS:  This says --
7  the ambiguity is that -- what I meant
8  is the process is the same.  The
9  numbers vary, but the process is the
10  same from one year to the next.
11        So in any given year you
12  look at the rate in effect in October
13  of the prior year.
14  BY MS. YU:
15     Q.   And that is true in your
16  calculations with respect to both the
17  interest crediting rate and the
18  annuity conversion factor?
19     A.  Yes.
20     Q.  If we were to assume that
21  Mr. Charles was reaching normal
22  retirement age in this year in
23  2007 --
24     A.  This year, yes.

00139
1     Q.  -- what interest crediting
2  rate would you use to calculate his
3  accrued benefit at age 65?
4     A.  Assuming that he is now age
5  65?
6     Q.  Yes.
7     A.  Well, at age 65 there is no
8  projection to age 65.  So this
9  eliminates the first part of the
10  equation.
11        So that at that time,
12  assuming that he retires on his
13  attainment of age, the month
14  following the person's attainment of
15  age 65, then the account balance
16  would then be converted into a
17  retirement benefit, a pension, an
18  annuity based on the 30-year treasury

D0093

19  rate and the mortality table
20  specified in the plan.
21    Q.  The 30-year treasury rate
22  from what period of time?
23    A.  In 2007, my understanding
24  would be it would be in October of

00140
1  2006.
2    Q.  Continuing to assume that
3  Mr. Charles were 65 this year, but
4  you were doing the calculation as of
5  let's say the prior year, 2006, and
6  you wanted to calculate his accrued
7  benefit at age 65, what interest
8  crediting rate would you use in 2006?
9    A.  I would use the 30-year
10  treasury rate of October of 2005 in
11  order to determine the accrued
12  benefit in 2006.
13    Q.  What annuity conversion
14  factor would you use?
15    A.  Also the same, assuming the
16  mortality table doesn't change, then
17  I would assume -- I would use the
18  same mortality table and the 30-year
19  treasury rate of October of the
20  previous year.
21    Q.  Can we go back to the Cash
22  Balance Sub Plan which is Poulin 2.
23  Let me adjust the time frame a little
24  bit from the prior question that I

00141
1  asked.
2      Again, assuming that he is
3  65 in 2007, if we were to try to
4  calculate what his accrued benefit
5  was for 2006.
6    A.  I'm sorry.  You said
7  assuming -- you said something
8  assuming what in 2006?
9    Q.  Assuming that we're trying

10  to calculate what his accrued benefit
11  was for 2006.
12    A.  Okay.
13      MR. MALONE:  With the
14  assumption being that he's going to
15  reach normal retirement age in 2007.
16      MS. YU:  In 2007.
17      THE WITNESS:  So he's 64 in
18  2006.
19  BY MS. YU:
20    Q.  Yes.  And we're trying to
21  determine what his accrued benefit
22  was in 2006.  What interest crediting
23  rate would you use?
24    A.  In 2006?  I would use the

00142
1  interest crediting rate in effect for
2  that year, which is the 30-year
3  treasury rate of -- in October of
4  2005.
5    Q.  What annuity conversion
6  factor would you use?
7    A.  Conversion factor would be
8  the mortality table which I believe
9  is GAR 94 and the 30-year treasury in
10  effect in October of the previous
11  year 2005.
12    Q.  Now, if you take a look at
13  what is Schedule A of Cash Balance
14  Sub Plan, and looking at the same
15  paragraph that we reviewed earlier,
16  what again is the definition of the
17  annuity conversion rate to be used to
18  determine actuarial equivalence?
19    A.  It is the annual interest
20  rate on 30-year treasury for the
21  October preceding the calendar year
22  containing the annuity starting date
23  as published, as published in the
24  Internal Revenue Bulletin and then so

00143

1  on.
2     Q.   When it says the 30-year
3  treasury for the October preceding
4  the calendar year containing the
5  annuity starting date, what does
6  containing the annuity starting date
7  mean?
8     A.   The starting date is when
9  the benefit commences.
10    Q.   And for purposes of the
11  hypothetical that we've been talking
12  about today, if we assume that Mr.
13  Charles turns 65 in 2007, when would
14  be the annuity starting date?
15    A.   It would be 2007 if we
16  assume that he retires in 2007, yes.
17    Q.   So in order to determine
18  the accrued benefit, do you always
19  use the annuity conversion factor for
20  the 30-year treasury for October of
21  the preceding calendar year
22  containing the annuity starting date?
23        MR. MALONE:  Object to the
24  form of the question.

00144
1        THE WITNESS:  The answer is
2  yes to the extent it is known.  If
3  the annuity starting date is one,
4  two, or 20 years from the attained
5  age of the participant, it is not
6  known.
7        So the only information
8  known at that time is the interest
9  crediting rate, and in this case, it
10  is a 30-year treasury rate in effect
11  for that year, since it is not known
12  what it will be in future years.
13  BY MS. YU:
14    Q.   So going back again to the
15  assumption that Mr. Charles is
16  retiring in 2007 because he's turning
17  age 65, if we make that assumption,

D0096

18  then the annuity factor is known;
19  correct?
20      MR. MALONE:  Object to the
21  form of the question.  It's
22  ambiguous.
23      THE WITNESS:  Is known
24  when?

00145
1  BY MS. YU:
2      Q.  Well, again, that's why
3  we're assuming that he's turning age
4  65 in 2007.  It doesn't have to be
5  Mr. Charles; it could be anybody
6  who's actually turning 65 in 2007.
7      A.  Yes.  Yes.
8      Q.  We have somebody who's
9  turning 65 and they're retiring in
10  2007.  So even if we're going to look
11  to calculate that participant's
12  accrued benefit at varying points in
13  time, if we assume that they are
14  turning 65 this year and are going to
15  retire at age 65 in this year, then
16  the annuity factor is known; correct?
17      MR. MALONE:  Object to the
18  form of the question.  I think it's
19  ambiguous.
20      THE WITNESS:  The annuity
21  factor that is really on the basis of
22  mortality table and interest rate is
23  known based on the information
24  available at that time, at the date

00146
1  of determination.
2      It is not -- a participant
3  terminating and who has a benefit
4  commencement date or the term annuity
5  starting date more than a few months
6  in the future, then in this case it
7  is not known.
8      But similarly to what we

D0097

9    discussed this morning, since we do
10   not know what the interest crediting
11   rates are in the future, we do not
12   know what the interest rates will be
13   on the annuity starting dates in the
14   future and, therefore, it is not --
15   it is based on the information that
16   we have such as we found in Notice
17   96-8.
18          It has to be projected, and
19   it is projected not on the actual
20   crediting interest rates.  It is
21   projected on the known information of
22   the rate in effect, in this case, in
23   October of the prior year, the
24   previous year.

00147
1    BY MS. YU:
2       Q.  I'm trying to take away the
3    need to project into the future.
4          MR. MALONE:  But that's
5    what's wrong with your question.  It
6    didn't have a date of determination
7    in it and that's why I thought it was
8    ambiguous.
9    BY MS. YU:
10      Q.  Date of determination in
11   2007.
12      A.  Cannot be.  Because we're
13   in 2006.  And in 2006, the only
14   information available is the rate
15   of -- is the rate, the 30-year
16   treasury rate of October 2005.
17          It is only in sometime in
18   December of 2006 that we will find
19   out what the rates will be applicable
20   to the 2007 plan year.
21      Q.  What year are we in right
22   now?
23          MR. MALONE:  We're in
24   2007.  Can you read back the question

D0098

00148
1  and the answer?  I think the question
2  and the answer aren't meshing.  It's
3  probably my fault for putting the
4  date of determination on the table.
5          (The reporter read back the
6  following testimony:
7          "Q   Date of determination
8  in 2007.
9          "A   Cannot be.  Because
10  we're in 2006.  And in 2006, the only
11  information available is the rate
12  of -- is the rate, the 30-year
13  treasury rate of October 2005.  It is
14  only in sometime in December of 2006
15  that we will find out what the rates
16  will be applicable to the 2007 plan
17  year.")
18          THE WITNESS:  Okay.  I
19  misunderstood the question.  I
20  thought that you were back to the
21  situation where you were 64 in 2006.
22          But I believe now that your
23  question was what exactly?  Now, that
24  we are in 2007, then we know that the

00149
1  crediting interest rate this year is
2  the 30-year treasury rate of last
3  October.
4  BY MS. YU:
5     Q.  Can you determine what
6  accrued benefit is attributable to a
7  given year?
8          MR. MALONE:  Under this
9  plan?
10          MS. YU:  Yes.
11          MR. MALONE:  Object to the
12  form of the question.
13          THE WITNESS:  Under which
14  circumstances?  Because the problem
15  that we have here is that we have a
16  statute that defines accrued benefit.

D0099

17        We also have a plan that
18  defines the term accrued benefit and
19  the two definitions do not coincide.
20        The statute says that the
21  accrued benefit is an annuity payable
22  at normal retirement age.  The plan
23  says that the accrued benefit is the
24  account balance.

00150
1        So that the accrued benefit
2  under the plan means the greater of.
3  The participant's payable cash
4  balance converted to an actuarially
5  equivalence single life annuity that
6  is payable as of the determination
7  date, or the participant's minimum
8  benefits stated as a life annuity
9  commencing as of determination date.
10        Now, in both cases this
11  does not meet my -- the ERISA
12  definition of accrued benefit,
13  because the protected benefit under
14  ERISA is not the benefit that starts
15  today if I'm 38 years old.  It's the
16  benefit that will be payable at age
17  65.  It's the normal retirement
18  benefit under the old plan.
19        And similarly, the cash
20  balance account is not the accrued
21  benefit, because the accrued benefit
22  may not be an account balance under a
23  defined benefit plan.
24        And it's also not the

00151
1  actuarial equivalent of that account
2  balance today, because, again, if I'm
3  38 years old, this is not my accrued
4  benefit.
5        My accrued benefit is the
6  benefit payable at normal retirement
7  age.  So that's why -- I don't want

D0100

8    to be casualistic but we have -- the
9    term accrued benefit --
10   BY MS. YU:
11      Q.   We can deal with it this
12   way.  Okay?  When I am asking you
13   questions about accrued benefits, we
14   will use the definition of accrued
15   benefit under ERISA and Code.  Okay?
16          Until I ask a question and
17   I refer you back and I say hold on,
18   we're going to use the definition of
19   accrued benefit in the plan, the
20   questions I am asking you now have to
21   do with the accrued benefit as it is
22   defined by ERISA and the Code.
23          Okay?  So does that clarify
24   that issue?

00152
1       A.   Yes.
2       Q.   So using that definition of
3    accrued benefit --
4       A.   Okay.
5       Q.   -- can you calculate the
6    accrued benefit that is attributable
7    to a particular plan year for a
8    participant?
9          MR. MALONE:  Object to the
10   form of the question.  Do you want it
11   read back?
12         THE WITNESS:  The accrued
13   benefit -- your question said the
14   accrued benefit that is applicable to
15   a particular plan year.
16         Then you -- if you mean the
17   increase in the accrued benefit
18   attributable to what happened in a
19   plan year, yes.  Because the accrued
20   benefit is the sum of all the accrued
21   benefits that have accumulated over
22   the years.
23         So that the accrued benefit
24   is not the result of one plan year.

00153

1  The accrued benefit is the -- is the
2  result of what happened in the past.
3  I have 25 years of service and my
4  accrued benefit is not what accrued
5  this year.  This is the increase in
6  the accrued benefit.
7        My accrued benefit is what
8  I am entitled to now at normal
9  retirement age.  So the question is
10  yes, it is possible to determine it.
11  BY MS. YU:
12    Q.  If we were back in 1999, so
13  we literally do not have knowledge of
14  what's going to happen in the future,
15  we're back in 1999, then would you
16  use the 30-year treasury rates, both
17  the interest crediting rate and the
18  annuity conversion factor for October
19  of '98?
20    A.  Yes.
21    Q.  And that is because we
22  don't know what would happen in the
23  future; correct?
24    A.  Yes.

00154

1    Q.  We are now in 2007.  So
2  let's just magically be here today,
3  and now that we have historical
4  knowledge of what the interest
5  crediting -- I'm sorry -- what the
6  30-year treasury rate was for every
7  year from '98 through 2006, in
8  October of each year, let's put aside
9  the whole not knowing what's going to
10  happen in the future.
11        I realize that in 1999 if
12  we were really back then we would
13  know what's in the future, but now
14  that we're here and we're actually
15  looking at things that occurred in

D0102

16  the past, but let's look at it with
17  the knowledge that we have today as
18  to what the interest rates were for
19  the 30-year treasury for each of
20  those years.
21      A.  Yes.
22      Q.  So if you're doing the
23  calculation in 1999, with someone who
24  is turning 65 in 2007, so what

00155
1  interest rates would you use, given
2  that we know what they all are in
3  that interim period of time, for the
4  interest crediting rate to determine
5  what their accrued benefit as defined
6  by ERISA and the Code would have been
7  in 1999?
8          MR. MALONE:  Object to the
9  form of the question.
10         THE WITNESS:  I believe
11  that this is a variation of your
12  earlier question, which is the
13  30-year treasury rate in October of
14  '98.
15         If we are, -- you know, now
16  we have -- you know, we're in 2007,
17  so we know what happened between
18  1999, but I believe your question is
19  knowing the person were retiring in
20  2007, and we're now in 1999 at the
21  inception of the plan, what interest
22  rate would you use to determine the
23  accrued benefit.
24         Well, this can be answered

00156
1  two ways.  There is the account
2  balance, the opening account balance
3  on January 1, 1999, that is what it
4  is, and you take the interest
5  crediting rate and the age of the
6  participant at that time and you

D0103

7     project this account balance to age
8     65.
9         But there's also a benefit
10    that was existing on the same date
11    for the previous plan, and in many
12    instances it could very well be that
13    the -- the present value of that
14    benefit -- this is also an accrued
15    benefit, and we have --
16        Q.  My question has only to do
17    with the cash balance.
18        MR. MALONE:  In other
19    words, she's assuming that.
20        THE WITNESS:  Well, okay.
21    But in 1999 there was an accrued
22    benefit.  Because, again, the accrued
23    benefit is not what accrues this
24    year; the accrued benefit is -- it's

00157
1     not a dynamic thing.
2         The accrued benefit is the
3     accumulation of various pieces of
4     benefits over the years and in 1999
5     there was an accrued benefit.
6     BY MS. YU:
7         Q.  I'm only asking about how
8     to calculate the accrued benefit
9     under the cash balance plan, though,
10    in this question.
11        A.  Okay.  On January 1, 1999,
12    this is zero.  Because so far there
13    haven't been any pay credits under
14    the plan.  The only thing there is,
15    is the converted value, the opening
16    account balance of the old plan,
17    which is, which is an accrued benefit
18    in itself.
19        So in order to answer your
20    question, that on day one the accrued
21    benefit is still the accrued benefit
22    as it existed on December 31, '98,
23    which is the benefit under the old

24  plan.  And in order to determine --

00158
1      Q.  Let's move forward to 2000.
2      A.  I'm sorry?
3      Q.  Let's move forward to 2000.
4   So you have one year's accumulation
5   of pay credits.  Okay?  In addition
6   to the opening balance, which there
7   was an opening balance that was
8   calculated under this plan; correct?
9      A.  Yes.
10     Q.   So what interest crediting
11  rate would you use in 2000?
12     A.   The 30-year treasury rate
13  in effect in October of 1999.
14     Q.   Then if we knew that there
15  were calculating the accrued benefit
16  as defined by ERISA and the Code to
17  normal retirement age, which we are
18  assuming is going to happen in 2007
19  now.
20     A.  Uh-huh.
21     Q.   And we know all of the
22  30-year treasury rates for all years
23  going up to 2006, October 2006, what
24  would be the annuity conversion

00159
1   factor you would use?
2      A.  When?  When?
3      Q.  To determine --
4      A.  Now that we know it or back
5   in 2000?
6      Q.  Now that we know it.
7      A.  Now that we know it.  In
8   2007?
9      Q.  Yes.
10     A.   The rate in effect in
11  October of 2006.
12     Q.   Is that what you did in
13  your calculations in Exhibit D?
14     A.  No.

15    Q.  Can you describe the
16  process of determining whether a plan
17  satisfies the four-thirds rule.
18    A.  Describe the process?
19    Q.  Yes.
20    A.  Unlike there other two
21  rules, which look at the accrued
22  benefit in its entirety and compare
23  it to the benefit that would be
24  payable at normal retirement age and

00160
1  determine whether this benefit is a
2  proportion, it has to reach a certain
3  level in order to meet the
4  requirement.
5        The four-thirds rule is a
6  year by year calculation.  It does
7  not look at the accrued benefit per
8  se.  It looks at the increase from
9  one year to the next.
10        And the test is that the
11  rate of increase or the benefit
12  accrual rate in any given year may
13  not exceed four-thirds or 133 and a
14  third percent of the rate of a
15  previous year.
16        So that the test is on a
17  year by year -- you have to do a year
18  by year analysis, and this is the
19  test that I've reviewed from a number
20  of actuarial firms that when did this
21  for the 133 and a third percent rule
22  that's what they do.
23        And they show whether the
24  rate in the 20th year is greater or

00161
1  less than 133 and a third percent of
2  the rate in effect in any of the
3  previous 19 years.
4        That's the -- it's a year
5  by year analysis as opposed to

6    looking at the accrued benefit in
7    toto.
8       Q.   You just gave an example
9    comparing the 20th year to any
10   previous year.  Is that what the
11   statutes and regulations say?
12      A.   Well, the statute says that
13   the year in any given -- the rate,
14   the rate of benefit accrual in any
15   year may not exceed the rate of
16   benefit accrual in any prior year.
17          And I believe the
18   definition has been repeated ad
19   nauseam in the Esden case, E-S-D-E-N,
20   and even in the Register case.
21          (Exhibit Poulin 7 was
22   marked for identification.)
23   BY MS. YU:
24      Q.   We're looking at Poulin 7,

00162
1    which is a copy of Code Section
2    411(b).
3          MR. MALONE:  Which I'm
4    going to assume as I have with the
5    others that it's an accurate
6    reflection of that rather than sit
7    here and parse it.
8    BY MS. YU:
9       Q.   On the second page of the
10   exhibit is 411(b)(1)(B), which is the
11   133 and a third percent rule;
12   correct?
13      A.   Yes.
14      Q.   Now, does the statute
15   reference previous or prior years
16   anywhere?
17      A.   Yes.  It says the annual
18   rate at which -- it's convoluted, but
19   the annual rate at which any
20   individual who is or could be a
21   participant can accrue the retirement
22   benefits payable at normal retirement

23    age under the plan for any later plan
24    year is not more than 133 and a third

00163
1    percent of the annual rate at which
2    he can accrue benefits for any plan
3    year beginning on or after such
4    practical plan year and before such
5    later plan year.
6          In other words, the rate in
7    any later plan year cannot be more
8    than 133 and a third percent of the
9    rate in effect for a year before that
10   year.  Any year.
11      Q.   Is this a prospective or
12   retrospective test?
13         MR. MALONE:  Object to the
14   form of the question.
15         THE WITNESS:  It doesn't
16   say prospective or retrospective.  It
17   says that the rate in any year cannot
18   exceed the rate in effect before that
19   year.  So it's -- it's what it is.
20   It is for all years.
21   BY MS. YU:
22      Q.   Do you see where it says
23   under the plan for any plan -- any
24   later plan year?

00164
1       A.   For any later plan year.
2    For any later plan year is not more
3    than 133 and a third percent of the
4    rate, at which it can accrue benefits
5    for any plan year beginning, after,
6    and before such later plan year.
7          So that you look at the
8    plan, you test, and you test whether
9    the rate in a later plan year is
10   greater than 133 and a third percent
11   of the rate of the previous year.
12      Q.   Again, the section says,
13   Under the plan for any later plan

D0108

14    year is not more than 133 and a third
15    percent of the annual rate at which
16    he can accrue benefits for any plan
17    year beginning on or after such
18    particular plan year and before such
19    later plan year.
20        A.  Yes.  What is the question?
21        Q.  You agree that it says
22    that?
23        A.  I'm sorry?
24        Q.  You agree that it says

00165
 1    that?
 2        A.  Yes.  It's that the 133 and
 3    a third percent -- the rate in any
 4    plan year cannot exceed 133 and a
 5    third percent of the rate of any --
 6    it said before such later plan year
 7    so any prior -- before is the same as
 8    prior or previous -- the previous
 9    year.
10        Q.  But what about the fact
11    that that clause comes after the fact
12    that it says under the plan for any
13    later plan year?
14        A.  Yes.  Because it compares
15    the rate of a later plan year to the
16    rate of a previous year.  It is
17    permissible to have a plan that would
18    provide a rate in the previous year,
19    say in the first year $1,000, and
20    then all years after that would be
21    $10 per year.
22            The test is not on the
23    subsequent years; it's on the
24    previous years.  It's the rate in the

00166
 1    future is the rate of the later plan
 2    year compared to the prior plan year.
 3            So that it's not -- it is
 4    permissible to have frontloading, but

5    backloading refers to the fact that
6    I'm looking at the -- at the increase
7    in the accrued benefit this year, or
8    the rate of benefit accrual this
9    year, and it is twice the amount that
10   it was two years ago.
11        So it would be a violation
12   of the test of the rule.  But the
13   benefit this year, or the rate of
14   benefit accrual this year can be
15   twice what it will be in the future.
16        This is permissible, but it
17   cannot be twice the rate it was two
18   years ago.  This is not permissible.
19        So the rate in the later
20   plan year cannot be 133 and a third
21   percent greater than the rate of any
22   previous year, and I believe that
23   this is an accepted definition of the
24   benefit accrual requirements.

00167
1         MS. YU:  Do you mind if we
2    take a break?
3         MR. MALONE:  No.
4         RECESS
5    BY MS. YU:
6      Q.  Mr. Poulin, in Exhibit D of
7    your report --
8         MR. MALONE:  Of Poulin 6?
9         MS. YU:  Yes.
10   BY MS. YU:
11     Q.  Did you hold interest rates
12   constant in running your
13   calculations?
14        MR. MALONE:  Object to the
15   form of the question.
16        THE WITNESS:  No, I did
17   not.
18        (Exhibit Poulin 8 was
19   marked for identification.)
20        MR. MALONE:  I have the
21   same comment that I made on the other

22   ones.  I assume that it accurately
23   reflects the governing provision.
24   BY MS. YU:

00168
 1     Q.   If I can turn your
 2   attention to page 1104, and in the
 3   left-hand column toward the bottom
 4   there is subparagraph capital D.
 5         MR. MALONE:  Let the record
 6   reflect I've directed the witness's
 7   attention to the portion headed
 8   Social Security, etcetera in Italics.
 9         MS. YU:  Yes.  Thank you.
10   BY MS. YU:
11     Q.   That subparagraph or that
12   clause, whatever it is, reads, For
13   purposes of this subparagraph, for
14   any plan year, Social Security
15   benefits and all relevant factors
16   used to compute benefits, e.g.,
17   consumer price index, are treated as
18   remaining constant as of the
19   beginning of the current plan year
20   for all subsequent plan years.
21         Are you familiar with this
22   regulation?
23     A.   I read this paragraph
24   before and I am familiar with the

00169
 1   regulation.
 2     Q.   What does that portion of
 3   the regulation that I read mean to
 4   you?
 5     A.   It says -- that indicates,
 6   for instance, there are plans -- this
 7   was -- I believe this regulation
 8   dates from 1977.
 9         At that time there were a
10   number of plans that were --
11   traditionally that were integrated
12   with Social Security, and what it

D0111

13  says is if there is an increase in
14  Social Security benefit, thus doesn't
15  impact on the accrued benefit, and
16  the answer was and this regulation --
17  the answer was that Social Security
18  benefits and all relevant factors
19  used to compute benefits such as
20  consumer price index are assumed to
21  remain constant.
22     Q.  What are relevant factors
23  used to compute benefits?
24        MR. MALONE:  Object to the

00170
 1  form of the question.
 2        THE WITNESS:  There are a
 3  number of factors used to -- it
 4  depends which context we are.
 5  BY MS. YU:
 6     Q.  Let me ask you this
 7  question.  Is the interest crediting
 8  rate a relevant factor used to
 9  compute benefits?
10     A.  I don't believe that it was
11  when this regulation was promulgated,
12  because at that time there were no
13  cash balance plans, therefore, it was
14  not relevant.
15        The compensation, the
16  employee's compensation, number of
17  years of service, are factors -- the
18  factors used to compute the benefits.
19     Q.  How about the annuity
20  conversion rate?  Is that a relevant
21  factor used to compute benefits?
22        MR. MALONE:  Object to the
23  form of the question.
24        THE WITNESS:  Again, this

00171
 1  regulation was in 1977 where the
 2  purpose was to determine what were
 3  the requirements to compute accrued

4   benefits and the benefit accrual
5   requirements at that time.
6           At that time it was in the
7   context of a traditional defined
8   benefit plan.  The cash balance plans
9   developed were developed about ten
10  years later, and so that I cannot
11  answer the interest crediting rate.
12          Is that a factor in
13  computing benefits?  It is -- in
14  fact, the answer is yes.  The
15  interest crediting rate is a factor
16  in computing or in determining the
17  accrued benefit under a cash balance
18  plan, but it is not --
19          It was not contemplated as
20  being part -- as being included in
21  this paragraph, because this
22  paragraph was written for an entirely
23  different purpose.
24  BY MS. YU:

00172
1      Q.   Is this regulation
2   applicable to the four-thirds test?
3      A.   I'm sorry?
4      Q.   Is this regulation
5   applicable to the four-thirds test?
6      A.   Is this applicable to the
7   four-thirds test?
8      Q.   Yes.  The 133 and a third
9   percent rule.
10     A.   Yes.
11     Q.   Is the four-thirds rule
12  applicable to cash balance plans?
13     A.   Yes.
14     Q.   And that is regardless of
15  the fact that when this regulation of
16  the four-thirds test was promulgated
17  cash balance plans didn't exist?
18     A.   Yes.
19     Q.   Does the IRS treat the
20  interest crediting rate as a relevant

D0113

21  factor in computing benefits?
22      A.  Under cash balance plans?
23      Q.  Yes.
24      A.  Yes.

00173
1       Q.  Does the IRS treat annuity
2   conversion factors as a relevant
3   factor to compute benefits?
4       A.  Probably.
5       Q.  What does e.g. mean?
6       A.  For example.
7       Q.  So when it says e.g.,
8   consumer price index, is that
9   essentially saying for example,
10  consumer price index?
11      A.  Yes.  And if there is a
12  plan providing cost of living
13  adjustments based on a cost of living
14  index, on the consumer price index,
15  then it would be a factor to be
16  considered.
17      Q.  The consumer price index is
18  an example of a relevant factor used
19  to compute benefits; correct?
20      A.  Yes.
21      Q.  But is that an exclusive
22  list?
23          MR. MALONE:  Object to the
24  form.

00174
1           THE WITNESS:  I don't know.
2           (Exhibit Poulin 9 was
3   marked for identification.)
4   BY MS. YU:
5       Q.  Mr. Poulin, are you
6   familiar of the litigation Wheeler
7   versus Pension Value Plan for
8   Employees of the Boeing Company?
9       A.  Not per se.  I -- I think I
10  read a summary of this decision, but
11  I don't think I read the decision.

12     Q.  Were you an expert in this
13  case?
14     A.  No.
15     Q.  Do you understand the
16  conclusions that were drawn in this
17  decision with respect to backloading?
18         MR. MALONE:  Object to the
19  form of the question.  He's already
20  established he hasn't read the
21  decision.
22         THE WITNESS:  No.
23  BY MS. YU:
24     Q.  If you take a look at page

00175
 1  three and the first full paragraph.
 2  It starts, As Boeing points out, in
 3  testing the plan for backloading
 4  Boeing is entitled to assume a
 5  constant rate of interest with
 6  respect to the accrual of interest
 7  credits in a plan participant's CBA.
 8         Do you know what CBA means?
 9     A.  No.  But it probably means
10  cash balance account.
11         No, I don't know what CBA
12  means.
13     Q.  Assuming that it means --
14         MR. KRA:  It's on page one.
15         MS. YU:  Thank you.
16  BY MS. YU:
17     Q.  And you were correct.  It
18  says -- well, not exactly I guess.
19  It's a cash balance design, and it
20  says, Specifically under the Plan's
21  terms, each plan has a credit based
22  account.  That's what CBA means.
23     A.  Okay.
24         MR. MALONE:  You knew it

00176
 1  wasn't collective bargaining
 2  agreement.

3   BY MS. YU:
4      Q.   Okay.  Let's focus in on
5   the statement that, Boeing is
6   entitled to assume a constant rate of
7   interest with respect to the accrual
8   of interest credits.
9           Do you agree or disagree
10  with that statement?
11     A.  I'm sorry.  Which statement
12  did you read?
13     Q.   Boeing is entitled to
14  assume a constant rate of interest
15  with respect to the accrual of
16  interest credits.
17     A.  No.  I disagree with that.
18     Q.   In the third full
19  paragraph, sort of in the middle of
20  the page and middle of the paragraph,
21  it says, As noted, 26 CFR, Section
22  1.411(b)-1 states plainly that
23  factors used to compute benefits will
24  be assumed to be constant even when a

00177
1   plan uses a variable outside index
2   like the consumer price index to
3   compute such benefits.
4           Do you agree with that
5   statement?
6           MR. MALONE:  Object to the
7   form of the question.  Did you ask
8   him if he agrees that that's what the
9   regulation says, or is that what the
10  opinion says, or that's the law?
11          MS. YU:  Does he agree
12  that's the law.
13          MR. MALONE:  I object
14  insofar as it calls for a legal
15  conclusion from a lay witness.
16          MS. YU:  Expert witness.
17          THE WITNESS:  Are you
18  referring to the sentence in the
19  middle of the third paragraph?

20  BY MS. YU:
21     Q.  Yes.  And it starts, As
22  noted, 26 CFR.  Did you find it?
23     A.  Yes.  I'm reading it.
24  That's what it says, but I have

00178
1  viewed numerous analyses made by
2  actuaries which showed that for
3  testing the 133 and a third percent
4  rule where the rate in effect on the
5  year of determination was not used
6  but they used ranges of interest
7  rates to see whether there would have
8  been backloading at some point in the
9  future if interest rates were to
10  change, and in many cases they came
11  to the conclusion that there was
12  backloading.
13       Even though they might not
14  have been backloading the rate in
15  effect that year they could forecast
16  there would be backloading at one
17  point and amend the plan accordingly.
18     Q.  Who are you referring to?
19     A.  In particular in the
20  Citigroup case, Citigroup analyses
21  that were made.
22     Q.  And who did the
23  calculations?
24     A.  I don't know whether it's

00179
1  the plan's current actuary or the
2  former actuary.  He's -- it may have
3  been Towers Perrin, but I am not
4  sure.
5     Q.  Do you believe that this
6  sentence that we read into the record
7  is an appropriate interpretation of
8  that regulation?
9       MR. MALONE:  Object to the
10  form of the question.

D0117

11          THE WITNESS:  It is a
12  sentence.  It is really a citation.
13  It does not -- it does not -- it's
14  not the actual regulation, and I do
15  see a distinction between the actual
16  assumptions that I use at the
17  inception of a plan and then what
18  happens in practice afterwards.
19          And I think Notice 96-8, as
20  we discussed this morning, is a good
21  example of that in the sense that in
22  practice a plan may provide for a
23  benefit that in this application
24  would violate certain rules.

00180
1           And the plan that pays --
2   the cash balance, for instance, when
3   the interest crediting rate
4   exceeds -- at one point in the
5   future, if the interest crediting
6   rate exceeds the 30-year treasury
7   rate, at that time then the plan
8   would violate Section 417(e)(3) of
9   the Code.
10          THE COURT REPORTER:  Off
11  the record.
12          (Off the record.)
13          MS. YU:  We had an event of
14  technical difficulty, and I think the
15  record may reflect that the last
16  answer may have been cut short, but
17  since we can't have it read back at
18  this point, why don't I just start
19  again.
20          MR. MALONE:  Could you do
21  me a favor and read back the last
22  thing that you're able to read back.
23          (The court reporter read
24  back the following:

00181
1           "Q  Do you believe that

2  this sentence that we read into the
3  record is an appropriate
4  interpretation of that regulation?
5      "MR. MALONE:  Object to the
6  form of the question.")
7  BY MS. YU:
8      Q.   So Mr. Poulin, let me ask
9  you this.  Again referring to the
10  sentence that was read into the
11  record that starts, As noted, 26 CFR
12  Section 1.411(b)-1, going on from
13  there, which I won't read again, do
14  you feel that this is a fair
15  characterization of that regulation?
16      MR. MALONE:  Object to the
17  form.
18      THE WITNESS:  I don't know,
19  but if we look at the previous
20  paragraph, and that I had the time to
21  during the technical interruption --
22  I have not reviewed this decision
23  before -- but to look a little bit at
24  the decision, it appears that this --

00182
1  the Boeing plan provided a minimum
2  interest crediting rate of five and a
3  quarter percent, which if you look at
4  the previous paragraph, five and a
5  quarter percent like in this
6  situation might have prevented the --
7  the violation of the 133 and a third
8  percent rule.
9      Because then when the
10  30-year treasury rate is below five
11  and a quarter percent, as it has been
12  for the last several years, then
13  there are no such fluctuations,
14  number one.
15      Number two, as in the first
16  full paragraph of page 4 of 7 that
17  the Court says in essence that
18  fluctuation in the 30-year treasury

D0119

19  rate results in interest credits
20  causing -- this is right in the
21  middle of the first paragraph --
22  causing a plan participant's CBA to
23  grow by more than one-third in a
24  given plan year, this is not

00183
1  actionable as backloading under
2  Notice 96-8.
3        I don't know if the court
4  meant that.  But if it meant that, it
5  grossly misinterpreted the intention
6  of the 133 and a third percent rule,
7  because it isn't the accrued benefit.
8        It's not the account
9  balance that we look at.  It's the
10  increase in the rate of benefit
11  accrual from one year to the next,
12  and there is an implication here that
13  the court might have looked at or
14  might have expected the account
15  balance itself to grow by more than
16  30 in a given plan year on the face
17  of it.
18        So it looks like there may
19  have been a misinterpretation of what
20  the statute is in this case.  I don't
21  know, but -- I don't know.
22    Q.  With respect to holding the
23  interest crediting rate constant, do
24  you agree or disagree with that?

00184
1        MR. MALONE:  Object to the
2  form.  In what context?
3        MS. YU:  In applying the
4  four-thirds rule.
5        THE WITNESS:  I disagree
6  with that.
7  BY MS. YU:
8    Q.  Going back to Exhibit D of
9  your Declaration, with respect to

D0120

10    column 6, does your calculation for
11    each year that appears in column 6
12    reflect pay credits and transition
13    credits that accrued during a given
14    plan year?
15        A.  Yes.
16        Q.  Does column 6 in Exhibit D
17    include interest credits during a
18    given plan year?
19        A.  Among other things, yes.
20        Q.  Does it also include the
21    change in the interest rate from a
22    prior year to that year?
23        A.  Yes.
24        Q.  Does it also --

00185
 1        A.  I would like to -- to
 2    clarify this.  It does not include
 3    it.  It is part of the calculation
 4    that the opening account balance, the
 5    pay credits, the interest credits are
 6    all factors to compute the numbers in
 7    column 6.
 8        Q.  Focusing in on a change in
 9    an interest rate from one year to
10    another, does that affect the accrued
11    benefit at age 65 that appears in
12    your Exhibit D?
13        A.  Yes.
14        Q.  Is that change in interest
15    rate from year to year reflected then
16    in column 6 of Exhibit D?
17        A.  As reflected, yes.
18        Q.  Is the change in the
19    annuity conversion rate from year to
20    year reflected in column 6 of your
21    Exhibit D?
22        A.  Yes.
23        Q.  Let's assume that there is
24    a participant who has a cash balance

00186

1   account that does not work for a
2   particular plan year.  Will that
3   individual's accrued benefit change
4   from the beginning of the year to the
5   beginning of the next year?
6       A.  A terminated participant?
7       Q.  We can assume that it's a
8   terminated participant that decides
9   to leave there, not to take an
10  immediate lump sum, but to leave
11  their cash balance account in the
12  plan.
13          MR. MALONE:  Objection.
14  Incomplete hypothetical.
15          THE WITNESS:  I said
16  earlier this morning that I was
17  perturbed by the definition of
18  accrued benefit under the plan.
19  BY MS. YU:
20      Q.  Let me just stop you here.
21  As we had agreed upon earlier when
22  I -- and I should have clarified --
23  accrued benefit as defined by ERISA
24  and the Code, and I'm sorry, I didn't

00187
1   want to repeat that, but that's what
2   I was intending to mean going
3   forward.
4       A.  And I intend to respect
5   that, but there is -- an additional
6   point here is that whether this plan
7   is in fact a front, a frontloaded
8   interest plan, if that's the case,
9   then the assumption is that even
10  though a participant terminates, say,
11  at the beginning of the year, the
12  interest credits will be credited
13  during the year.
14          So assuming that this is
15  the assumption and then we do the
16  redetermination the following year
17  and then the accrued benefit of the

D0122

18   participant may change or will change
19   as a result of a different
20   calculation, yes.  The answer is yes.
21       Q.   When you say as a result of
22   a different calculation --
23       A.   As a result of a different
24   interest rate.  Nothing changed.

00188
 1   Participant's compensation has not
 2   changed; there is no additional
 3   service.
 4         The only change is the
 5   interest crediting rate and the
 6   participant has not done anything,
 7   has not accrued additional service,
 8   and the calculation would result in
 9   the -- a reduction or an increase or
10   status quo, but the accrued benefit
11   based on that calculation will
12   change.
13       Q.   That change in the accrued
14   benefit under those assumptions, is
15   that attributable to that year's --
16   to that year or is that attributable
17   to the prior year?
18         MR. MALONE:  Object to the
19   form of the question.
20         THE WITNESS:  Is it
21   attributable to the participant
22   increasing in age or service?  And
23   the -- there is a reduction, nothing
24   happened except that the participant

00189
 1   is now one year older and there is a
 2   reduction in the accrued benefit as a
 3   result of a new calculation basis for
 4   his accrued benefits based on the
 5   change in the interest crediting
 6   rate.
 7       Q.   Do you think that's
 8   attributable to age?

9     A.  And/or service.
10    Q.  We just assumed there was
11 no service for that year.
12    A.  Well, then it would be age.
13    Q.  It's not attributable to
14 the change in the 30-year treasury
15 rate?
16        MR. MALONE:  Object.
17        THE WITNESS:  That would be
18 a direct result of a 30-year
19 treasury, but it is -- under this
20 hypothesis, it would be there is a
21 reduction in the accrued benefit
22 resulting from the change in the
23 interest crediting rate from one year
24 to the next.

00190
1 BY MS. YU:
2     Q.  Do you know how interest
3 credits are credited to participants'
4 accounts?
5     A.  This varies from one plan
6 to the next.  In some cases it might
7 be quarterly.  Sometimes it's
8 annually.  Sometimes it doesn't
9 include the pay credits that were
10 paid in previous quarters and in a
11 given plan year.  Sometimes they
12 don't.
13    Q.  Do you know specifically
14 for this plan?
15    A.  I do not recall.  I
16 believe -- I do not recall.
17    Q.  Can you review the plan
18 and --
19        MR. MALONE:  Let the record
20 reflect that the witness is examining
21 what we previously marked as Poulin 2
22 for identification.
23        THE WITNESS:  Interest
24 Credits section 3.4.1.  In General.

D0124

00191
1  As of the end of each plan year,
2  interest credits will be credited to
3  the cash balance account of each
4  participant.
5          Interest credits shall be
6  equal to the interest crediting rate
7  for such plan year multiplied by the
8  amount credited to such account as of
9  January 1 of such plan year.
10 BY MS. YU:
11    Q.  Can you also take a look at
12 Section 3.4.2.  Let me know when
13 you've had a chance to read that.
14    A.  Yes.
15    Q.  Have you reviewed that
16 provision before?
17    A.  I may have but now I have a
18 much better understanding.
19    Q.  What does this paragraph
20 mean to you?
21    A.  Well, the first part of the
22 paragraph says that interest credits
23 shall continue to be credited to the
24 cash balance account of a participant

00192
1  until the earlier to occur of the
2  participant's retirement date or, if
3  applicable, the annuity starting date
4  for survivor benefits; provided,
5  however, that (a) (interest credits
6  shall cease, in the case of a
7  participant who has a severance from
8  employment date prior to reaching
9  normal retirement age, on such
10 participant's attainment of normal
11 retirement age.
12         And (b), interest credits
13 shall continue to be credited to the
14 cash balance account of a participant
15 who is receiving pre-65 disability
16 benefits until such participant's

D0125

17    attainment of normal retirement age.
18      Q.  Does that mean that this is
19    a frontloaded cash balance plan?
20      A.  Yes.
21      Q.  Can you turn to Exhibit E
22    of your Declaration.
23      A.  I'm sorry.  Exhibit E?
24        MR. MALONE:  E as in Edward

00193
 1    of Poulin 6.
 2    BY MS. YU:
 3      Q.  What were you intending to
 4    show on this exhibit?
 5      A.  This exhibit is entitled
 6    Progression of Accrued Benefits Over
 7    Time and it was intended to show that
 8    the accrued benefit increases in some
 9    years and decreases in other years.
10      Q.  Is there a governing ERISA
11    provision that relates to this
12    Exhibit E?
13      A.  Yes.
14      Q.  Which ERISA provision?
15      A.  Provision of ERISA which is
16    the definition of accrued benefit,
17    that's the annuity payable at age 65
18    or normal retirement age.
19      Q.  Do you know what section
20    number it is?
21      A.  It would be Section
22    3(23) -- I'm not sure.  Various
23    definitions.  The very beginning of
24    ERISA.

00194
 1      Q.  Any other ERISA provisions
 2    that relate to this Exhibit E?
 3      A.  There are a number of ERISA
 4    provisions that would pertain to
 5    accrued benefit especially Section
 6    204 of ERISA.
 7      Q.  In your opinion does this

D0126

8  chart show a violation of ERISA?
9     A.  There is -- it shows that
10  there is a reduction in the accrued
11  benefit from one year to the next,
12  from certain years to the next, which
13  is a violation of a section of ERISA
14  that says that the accrued benefit
15  may not reduce -- be reduced as a
16  result of increase in age or service.
17     Q.  Do you know what the ERISA
18  citation is?
19     A.  I believe it's 204(g).
20     Q.  Is there a corresponding
21  Code provision?
22     A.  There may be a -- yes,
23  there is.  It's Section 411, 411(b)
24  of the Code.  I don't know which

00195
1  subsection.
2     Q.  Is there certain
3  information that's contained on
4  Exhibit E of Poulin 6 that is the
5  same as Exhibit D?
6     A.  What was the earlier part
7  of your question?
8     Q.  Are there parts of Exhibit
9  E that are the same as shown on
10  Exhibit D?
11     A.  Yes.
12     Q.  And which portions of the
13  exhibit are the same?
14     A.  I think the first five
15  columns.  Excuse me.  No.  The first
16  five columns appear to be identical
17  and the -- I believe that's your
18  question, which ones are the same.
19  That's it.
20     Q.  So any of the questions and
21  answers that we went through with
22  respect to Exhibit D would apply
23  equally to Exhibit E?
24     A.  Correct.

00196

1    Q.   How did you arrive at the
2    calculation that is contained in
3    column 6 of Exhibit E?
4    A.   This is a ratio, ratio of
5    the number in column five to the
6    previous year in column five,
7    previous year's number in column
8    five.  Minus one.  It is the increase
9    or the reduction.
10       If you divide 2,860 by
11   2,080, the answer would be 137
12   percent.  So you remove the 100
13   percent and the increase itself is
14   37.48.
15   Q.   Did you hold interest rates
16   constant in arriving at the
17   percentages that appear in column 6?
18       MR. MALONE:  Object to the
19   form of the question.
20       THE WITNESS:  No, I did
21   not.
22   BY MS. YU:
23   Q.   Turning to Exhibit F-1 on
24   your Declaration marked as Poulin 6.

00197

1    What does Exhibit F-1 show?
2    A.   The first five columns also
3    have Exhibit F-1 -- well, first of
4    all, Exhibit F-1 is entitled
5    Comparison of Accrued Benefits at
6    Normal Retirement Age.
7        The first five columns of
8    Exhibit F-1 for years 1999 to 2006
9    are the same as the -- I believe they
10   are the same as they were in Exhibit
11   D.
12       Yes.  Exhibit F-1 continues
13   the analysis until the participant
14   reaches age 65 by assuming that the
15   pay increases in effect from 1999 to

16    2006, would continue until normal
17    retirement age of 65 is attained.
18         And it also computes the
19    pay contribution credits, the
20    transition credits, and the interest
21    credits as stipulated in the plan on
22    the cash balance account.
23         And it computes the accrued
24    benefit in the last column in column

00198
 1    9, the accrued benefit at age 65
 2    based on the cash balance plan in
 3    2014 when the participant reaches age
 4    65 as being $3,952 a month.
 5         At the bottom of the
 6    exhibit, FAC on the left-hand side
 7    means Final Average Compensation, it
 8    is $124,429, which is the average of
 9    the projected compensation for the
10    last 60 months prior to the
11    employee's retirement.
12         And the projected accrued
13    benefit under the prior plan looks at
14    the benefit formula under the -- in
15    this case it's the ACE pension plan
16    in effect prior to 1999 and that
17    covered Mr. Charles.
18         And the benefit that he
19    would have received under the prior
20    plan is $5,858 a month, which is 48
21    percent greater than under the
22    benefit that would have been provided
23    under the cash balance plan.
24         MS. YU:  Do you want to

00199
 1    take a break?
 2         MR. MALONE:  Sure.
 3         RECESS
 4    BY MS. YU:
 5      Q.  I have a question about
 6    Exhibit F-1.

7    A.  Yes.
8    Q.  The cash balance accrued
9  benefit at age 65 for 2014 that you
10  have listed there, which is $3,952,
11  how did you calculate that number?
12    A.  This number is taking the
13  600,262 and converting it to --
14    THE COURT REPORTER:  Off
15  the record.
16    RECESS
17    MR. MALONE:  Let the record
18  reflect that we had another minor
19  technical glitch.
20    Can you, Barbara, tell me
21  where we were before the lights went
22  out this time?
23    THE COURT REPORTER:  I
24  can't.

00200
1    MS. YU:  We'll go from
2  here.
3  BY MS. YU:
4    Q.  Mr. Poulin, we were talking
5  about Exhibit F-1 of your Declaration
6  marked as Poulin 6.
7    A.  Yes.
8    Q.  And we were looking at the
9  Cash Balance Accrued Benefit at age
10  65 for 2014, and I had asked you
11  about how that should be calculated
12  in your spreadsheet.  And would you
13  mind answering that question again?
14    A.  I don't know whether I
15  answered this, but I may have
16  answered that it was the conversion
17  of the balance in column 8, which is
18  a cash balance account of 600,262
19  divided by the conversion factor.
20    Or the annuity purchase
21  rate at age 65 based on the interest
22  crediting rate of, I believe it was
23  4.85 percent, and I think that this

D0130

24  is in -- was shown in Exhibit 3 of

00201
1  this morning.
2    Q.   And speaking of Exhibit 3,
3  what should the annuity factor have
4  been that was used in your
5  calculations?
6    A.   I believe it is 140.1385.
7    Q.   Take a look at these
8  numbers.  Does it appear to be what
9  was used in this calculation?
10    A.   No, it doesn't.  It looks
11  like -- I'm speculating, but it looks
12  like the 3,952 is more the accrued
13  benefit based on the cash balance
14  account beginning of year than end of
15  year based on -- based on the
16  conversion factor of 140.1385.
17    Q.   Is that an error?
18        MR. MALONE:  Object to the
19  form.
20        THE WITNESS:  Mr. Charles
21  attained age 65 in 2014, so that in
22  2014 there wouldn't be an additional
23  year of pay credits and interest
24  credits.

00202
1  BY MS. YU:
2    Q.   Could you repeat that for
3  me?
4        MR. MALONE:  Do you want to
5  repeat that?
6        THE WITNESS:  Yes.  I said
7  that Mr. Charles would reach age 65
8  in 2014 because he was born in 1949,
9  so that when he attains age 65 there
10  wouldn't be an additional year of pay
11  credits and interest credits.
12        But now looking at these
13  numbers it appears that 3,952 would
14  not be based on the 600,262, which is

15    the accumulation of pay credits and
16    transition credits and interest
17    credits beyond age 65, but really the
18    amount -- the amount of 553,830.
19         I don't have a calculator,
20    but it seems to be very close to the
21    conversion factor times the 3,952
22    appears to be equal to 553,000.
23    BY MS. YU:
24       Q.   So that calculation was

00203
 1    what you meant to do then?
 2       A.   What I -- what I meant to
 3    do was to show the benefit at age 65.
 4    Now, if he -- if he -- if his
 5    birthday had been on January 1st, it
 6    would solve the problem, because then
 7    you take the -- the calculation on
 8    the exact attainment of age 65, but
 9    this is not --
10       Q.   If you assume that his
11    birthday was in October of 1949.
12       A.   Yes, that's right.  His
13    birthday was in October of 1949.  So
14    that Mr. Charles would attain age 65
15    in October of 2014, and the
16    calculation should be made as of
17    November 1st of 2014, and it would be
18    an amount that would be slightly
19    greater than the 3,952.
20         If you look at the rate of
21    progression of the -- in column 9,
22    the 3,952 was $132 greater than the
23    previous year, 3,820, which also was
24    about $130 more than the previous

00204
 1    year.
 2         So that if we add 130, or a
 3    similar amount, not quite, because
 4    it's not a full year, then his
 5    accrued benefit at age 65 on the

6  exact attainment of age 65, which is
7  not shown here, would be slightly in
8  excess of 4,000.
9      Q.   How did you determine
10  the -- FAC, what does that stand for?
11      A.   Final average compensation,
12  what is the average of the last five
13  years of compensation as shown in
14  column three.
15      Q.   And why did you take the
16  last five years of compensation and
17  average them?
18      A.   This was a proxy for the
19  last 60 months prior to the
20  attainment of age 65 which, again, if
21  we were to make an exact -- if his
22  birthday had been in the beginning of
23  the year or at the period where it
24  would be an exact -- an exact

00205
1  calculation.
2          Because the age by
3  definition, if it's the age at the
4  beginning of the year, it will vary
5  from the age at the end of the year,
6  but -- so there are -- there is an
7  interpolation calculation involved.
8          But to the same extent, the
9  salary on the date of the attainment
10  of a -- I think the month following
11  the month of the attainment of age
12  65, which would have been November
13  1st, 2014, then you go back 60
14  months.
15          So there is a shift here of
16  one month, but the amount is -- would
17  be slightly different than 124,429 if
18  we were to look at the exact 60
19  months.
20          But the thrust of this
21  calculation is that the benefit would
22  still be substantially greater under

D0133

23  the projected -- the projection, the
24  continuation of the plan in existence

00206
 1  before 1999 than it was under the --
 2  assuming a projection of the account
 3  balance under the cash balance plan.
 4      Q.  In calculating the FAC, was
 5  this based on December 31st, 2014, or
 6  January 1st of 2015?
 7      A.  Well, it really depends on
 8  the -- what the first salary was.
 9  The salary shown here is 56,824.  At
10  this point I do not know whether it
11  was the beginning of 1999, the end of
12  1999, or at some intervening point in
13  during the year.
14          (Exhibit Poulin 10 was
15  marked for identification.)
16  BY MS. YU:
17      Q.  The document that has been
18  marked as Poulin 10 is the cover page
19  of the Atlantic City Electric Company
20  Retirement Plan and a page 4 of the
21  plan.
22          I decided not to kill more
23  trees than necessary and copy the
24  entire plan, but have you reviewed

00207
 1  the definition of compensation that
 2  is contained in this ACE plan?
 3      A.  Yes, I did, and it
 4  didn't -- this -- this is not -- this
 5  seems to be different.  Because I
 6  recall under the Atlantic City
 7  Electric Company Retirement Plan
 8  prior to 1999 there was a 60 month.
 9          And I believe that the
10  benefits formula for employees who
11  had been hired before 1989 was
12  limited to 30 years of service.
13          Whereas for those who -- I

14  mean was not limited to 30 years of
15  service.  Whereas for employees hired
16  after one 1/1/89 it was limited to 30
17  years of service, and I don't see
18  this here.
19      Q.  So this is not the
20  definition that you applied in doing
21  your calculations reflected in
22  Exhibit F-1?
23          MR. MALONE:  Object to the
24  form of the question.  It's possible

00208
 1  that other aspects of the plan
 2  document played a role in
 3  determination of final average
 4  compensation under the plan.
 5          THE WITNESS:  There was a
 6  definition of average compensation.
 7  I think that Exhibit 10 shows a
 8  definition of compensation, not the
 9  final average compensation.
10          Final average compensation
11  is the compensation as defined in
12  here on page 4, but for a certain
13  number of months prior to the
14  determination date, and I don't see
15  this here.
16          And I believe it was in the
17  benefit formula of the Atlantic City
18  Electric Plan that this definition
19  was found.
20          (Exhibit Poulin 11 was
21  marked for identification.)
22  BY MS. YU:
23      Q.  Poulin 11 is on the cover
24  page says Part Three ACE Sub Plan.

00209
 1  Have you seen this document before?
 2      A.  Yes.  The expression Part
 3  Three ACE Sub Plan is not familiar.
 4  This is more -- this -- this is more

5   familiar.  On the other hand, this
6   page is not familiar.
7        On the other hand, page 10
8   of the -- of Exhibit Number 11 is
9   more what I expected.  It refers to
10  the 30-year limitation for employees
11  hired after January 1, 1989.
12       MR. MALONE:  Let the record
13  reflect that the ACE Sub Plan has an
14  effective date of January 1, 1999.
15       MS. YU:  Let's go off the
16  record for a second.
17       RECESS
18  BY MS. YU:
19    Q.  While we're waiting for the
20  plan document to show up, could you
21  explain Exhibit F-2 that is attached
22  to your Declaration.
23    A.  Yes.  Exhibit F-2 is
24  virtually the same as Exhibit F-1

00210
1   except for one component.  It's that
2   in Exhibit F-1 I used the actual
3   salary increases experienced by Mr.
4   Charles from 1999 to 2006.
5        And then I took the average
6   of these increases instead of these
7   compensation increases, and I
8   continued the extrapolation from 2007
9   to 2014.
10       Whereas in Exhibit F-2 it's
11  based on the 4.5 percent pay increase
12  after 1999.  So that it is -- and
13  this -- that's the difference between
14  the two.
15    Q.  Can you tell me for the
16  cash balance accrued benefit at age
17  65 that appears for 2014 how you --
18       MR. MALONE:  On F-2?
19       MS. YU:  On F-2.
20  BY MS. YU:
21    Q.  -- how you came to that

22  number.
23    A.  It's a conversion of the
24  account balance into an annuity using

00211
1  the annuity purchase rate of
2  140.1385, and I assume that it's --
3  it might be the a 516,941.
4      I don't know whether it's
5  the 516,941, which would have been at
6  the beginning of the year, or the
7  557,409 which was at the end of the
8  year.
9    Q.  For all of the --
10    A.  But assuming that it is
11  based on the 516 and that it would
12  have been -- should have been at the
13  later date, then since the difference
14  in the cash balance accrued benefit
15  at age 65 from one year to the next
16  in the immediately preceding years is
17  approximately $100, then the cash
18  balance accrued benefit at age 65
19  would be probably closer to 3,775 or
20  3,800 if it's 557, which would still
21  be below the 4,700 benefit that would
22  have been payable under the prior
23  plan.
24    Q.  If you take, for example,

00212
1  1999, the cash balance accrued
2  benefit at age 65 of 2,080 --
3    A.  Yes.
4    Q.  -- was that based on end of
5  year or beginning of year?
6    A.  I believe it was based on
7  beginning of the year.
8      If we go back to Exhibit D,
9  it would have been based on the
10  beginning of year.
11    Q.  Is that what you intended
12  to do?

D0137

13    A.   Well, the column 9 reads
14  Cash Balance Accrued Benefit at Age
15  65.  Age 65 was neither the age at
16  the beginning of the year nor the end
17  of the year.
18       Mr. Charles attained age 65
19  we know now in October of that year.
20  So this was not the exact calculation
21  that would have been exactly on the
22  date that he would attained age 65.
23  It was a proxy, if you will, to
24  illustrate the difference between the

00213
 1  two amounts.
 2       There might be adjustments
 3  in these amounts based on an exact
 4  calculation on the time that he would
 5  reach age 65 and the adjustment for
 6  the intervening months would not
 7  alter my conclusion.
 8       Because the amount of the
 9  cash balance accrued benefit at age
10  65 shown in column 9 would still be
11  substantially lower than the amount
12  under the -- that would have been
13  accrued under the prior plan.
14    Q.   For the Age column, did you
15  intend that to be the age at the
16  beginning of the year?
17    A.   No.  Nor the end of the
18  year.  It was the age -- it was the
19  age that -- the attained age that Mr.
20  Charles would attain during the year,
21  at one point during the year.
22    Q.   When you created these
23  charts, did you intend for column 9
24  to be based on the cash balance

00214
 1  account at the beginning of the year
 2  or at the end of the year?
 3    A.   It was intended to show the

D0138

4    accrued benefit at age 65, which is
5    neither the beginning of the year,
6    nor the end of the year.
7          So that the accrued benefit
8    at age 65 would be an amount derived
9    not between the cash balance account,
10   the beginning of the year, which was
11   516,941 and the end of the year which
12   was 557,409.
13         The amount at the beginning
14   of the year would slightly understate
15   the accrued benefit, at the end of
16   the year would slightly overstate the
17   benefit.
18         So that the actual exact
19   amount would be in the neighborhood
20   of 3,775.  This is my estimate, 3,775
21   plus or minus $20.
22         But the -- the -- what this
23   intended to illustrate is -- this is
24   for F-2 -- is that even if we don't

00215
1    look at the actual benefit, the
2    actual compensation increases, but
3    assume the 4.5 percent that was
4    included in the Conectiv's 10-K
5    report, 10-K form in 1999, there
6    would still be a reduction in the
7    rate of future benefit accrual.
8          Because the ultimate
9    benefit at age 65 would still have
10   been lower under the cash balance
11   plan, whether it's 3,689 or 3,700, or
12   then it would have been under the --
13   the continuation of the previous
14   version of the plan.
15      Q.  Is there a reason why you
16   did not do these calculations then
17   precisely with respect to his age?
18      A.  Yes.  The reason is for
19   simplicity purposes.  Most -- most
20   exhibits that show these type of

21  calculations are not based on the
22  actual months of attainment of 65.
23      Q.  You also mentioned the 4.5
24  percent assumption.  Where did that

00216
 1  come from?
 2      A.  In fact, it is at the
 3  suggestion of counsel that my first
 4  calculation was based on the actual
 5  pay increases, and the counsel asked
 6  me to perform a calculation at the
 7  4.5 percent, which was based on the
 8  expected salary, or assumed salary
 9  increase that was divulged or
10  disclosed in the 10-K form.
11      Q.  And when you refer to
12  counsel, is that Mr. Malone or
13  somebody from his firm?
14          MR. MALONE:  That's me.
15          THE WITNESS:  Yes, it is.
16  BY MS. YU:
17      Q.  Do you know what year the
18  10-Q was from?
19      A.  I believe it was 1999.
20          MR. MALONE:  I think if you
21  check for the form, the same rate was
22  also used in 1998.
23          THE WITNESS:  Yes.  The '99
24  Form 10-K.

00217
 1          (Exhibit Poulin 12 was
 2  marked for identification.)
 3  BY MS. YU:
 4      Q.  Mr. Poulin, the ACE
 5  Retirement Plan that is dated
 6  Effective January 1st, 1994, is this
 7  a document that you reviewed?
 8      A.  It says the -- yes.  That's
 9  what it says.
10      Q.  Do you recognize the
11  document?

D0140

12    A.  I'm sorry?
13    Q.  Do you recognize the
14  document?
15    A.  Well, it says that it is
16  the Atlantic City Electric Company
17  Retirement Plan Effective January 1,
18  1994.
19        MR. MALONE:  I think he's
20  confused by the ACE Sub Plan.
21        THE WITNESS:  Yes.  And --
22  yes, I am.
23  BY MS. YU:
24    Q.  Why don't we just put that

00218
1  aside for now, the Sub Plan.
2    A.  Okay.
3    Q.  I want to focus on this.
4  At least the 1994 plan appears on
5  your list of documents that you
6  reviewed?
7    A.  Yes.  Yes.
8    Q.  Do you recall reviewing
9  this document?
10    A.  I seem to recall page 9 of
11  this document, Exhibit 12.  I do
12  recall the wording of Article 3
13  Retirement Benefits.
14    Q.  Did you review the
15  definition of Compensation that's
16  been --
17    A.  Yes.  And the Definition of
18  Compensation -- you probably mean the
19  definition of average, Average Annual
20  Compensation as it's defined in the
21  plan for -- for determining benefits.
22        And it is defined as the
23  average annual compensation of the
24  participant for the five consecutive

00219
1  anniversary years in which his
2  compensation was greatest.

3      Q.  I'm sorry.  Could you let
4   us know what page you're on.
5         MR. MALONE:  Page 3.
6         THE WITNESS:  It is page 3,
7   on top of page 3.
8   BY MS. YU:
9      Q.   And you're looking at the
10  definition?
11     A.   There's a definition of
12  Average Annual Compensation.  And I
13  believe that what you handed me
14  before was the definition of
15  Compensation on page 4.
16     Q.   Is the definition of
17  Compensation on page 4 referenced in
18  the definition of Average Annual
19  Compensation?
20     A.   Yes.
21     Q.   So is it necessary to refer
22  to the definition of compensation in
23  order to determine average annual
24  compensation?

00220
1      A.   Yes.
2      Q.   Did you compare the
3   definition of compensation that is
4   contained in the ACE Retirement Plan
5   with the Conectiv Cash Balance Sub
6   Plan?
7      A.   I don't think so.  I don't
8   recall, no.  I may have, but I don't
9   recall.
10     Q.   Do you know whether there
11  is a difference in the definition of
12  compensation between the two plans?
13     A.   No.
14     Q.   Given our discussions on
15  the term accrued benefit, I just
16  wanted to clarify it with you.  When
17  you use the term in your Declaration
18  and including in your exhibits, were
19  you using the definition of accrued

D0142

20   benefit under ERISA and Code?
21      A.  When I used the term
22   accrued benefit in my Declaration?
23      Q.  Yes.
24      A.  Yes.  Unless I say that the

00221
1   definition of accrued benefit under
2   the plan is.  But when I refer to
3   accrued benefit, it is the pension
4   benefit payable at normal retirement
5   age for a defined benefit plan.
6      Q.  Have you rendered an
7   opinion with respect to 204(h) in any
8   other litigation?
9      A.  Yes.
10      Q.  Did that include the Engers
11   matter?
12      A.  It may, yes.  I believe it
13   does, yes.
14      Q.  What was your opinion in
15   that case relating to 204(h)?
16      A.  My opinion was that the
17   rate of future benefit accrual under
18   the cash balance plan was less than
19   the rate of benefit accrual under the
20   prior version of the plan.
21      Q.  Did you use the same
22   methodology in the Engers matter as
23   you have in this case?
24      A.  Yes and no.  The rate of

00222
1   future benefit accrual is the rate.
2   So that if the rate under the prior
3   plan, as was the case in the Conectiv
4   case, the rate is specified at 1.6
5   percent of compensation.
6          And I perform a calculation
7   showing that, say, at age 60 under
8   the plan the rate is 1.2 percent of
9   the compensation, then this means
10   that there is a reduction in the rate

D0143

11  of future benefit accrual, number
12  one.
13        Number two --
14    Q.  Can I stop you there and
15  ask you a question about that.
16    A.  Okay.
17    Q.  Is that reflected on
18  Exhibits F-1 or F-2?
19    A.  No.
20    Q.  Okay.
21    A.  No.  Another way of
22  expressing a reduction in the rate of
23  future benefit accrual in 204(h) --
24  for 204(h) purposes is to project

00223
 1  what the benefit would have been if
 2  the prior version of the plan had
 3  continued in existence to the benefit
 4  that is projected to be payable under
 5  the cash balance plan, and this is
 6  what I've done in this case.
 7    Q.  Why did you not show the
 8  calculations with respect to the
 9  first analysis that you described?
10    A.  Even though I believe it is
11  an accurate analysis, and I also
12  believe that it is demonstrative of a
13  reduction in the rate of future
14  benefit accrual, it -- the regulation
15  refers more to the ultimate benefit
16  that will be payable at age 65.
17        So that even though --
18  if -- if I perform a calculation that
19  shows that the rate of benefit
20  accrual goes from 1.6 percent to 1.3
21  percent, in my opinion as an actuary,
22  I can determine that this is a
23  substantial reduction, and I do not
24  need to demonstrate that it will

00224
 1  result.

D0144

2        But if you accrue future
3   benefits at 1.3 percent as opposed to
4   1.6 percent and use that from the
5   same place, then I think it's obvious
6   for me as an actuary that the
7   ultimate benefit will be lower under
8   the 1.3 -- under the 1.3 percent
9   formula than the 1.6.
10       It may not be obvious to a
11  non-actuary, so that's why I
12  performed this analysis here in the
13  context of -- in my Declaration,
14  which was also in a way a response to
15  the calculations that had been
16  performed by Mr. Kra showing that the
17  cash balance plan's benefit was
18  greater than -- would have been
19  greater than under the prior plan.
20      Q.  Which regulations are you
21  referring to?
22      A.  I believe these are
23  regulations under 204(h) published by
24  the IRS.

00225
1       Q.  Do you have a date?
2       A.  I'm sorry?
3       Q.  Do you have a date for the
4   regs?
5       A.  No.  No.
6       Q.  In Engers litigation, did
7   the court render a decision on the
8   issue relating to 204(h)?
9       A.  Yes, it did.
10      Q.  Have you reviewed that
11  decision?
12      A.  Yes, I did.
13      Q.  Did the decision speak to
14  what you were referring to with
15  respect to the rate of benefit
16  accrual?
17          MR. MALONE:  Objection to
18  the form of the question.

D0145

file:///J|/JRM/Conectiv/sjreply/5486poulinc072707.txt

19     THE WITNESS:  In part.
20  BY MS. YU:
21     Q.  And what did the court say?
22     A.  The court agreed with my
23  calculation that the rate of future
24  benefit accrual was lower, but I may

00226
 1  not have done a good job in
 2  explaining to the court in my
 3  Declaration.
 4         Which incidentally was a
 5  rebuttal Declaration to a Declaration
 6  or an affidavit that had been
 7  prepared by the defendant's actuary
 8  which fixed the benefit payable under
 9  the prior plan to what it was on the
10  date of conversion and comparing it
11  to an increasing benefit under the
12  cash balance plan.
13         And I thought I had said in
14  my calculation that you present
15  things this way, not assuming that
16  the prior plan's benefit formula
17  would continue, but freezing the
18  benefit.
19         In other words, freezing
20  the protective benefit to where it
21  was and comparing this to a benefit
22  that is increasing is not the way to
23  do it.
24         This is what I said in my

00227
 1  Declaration, but it was not
 2  understood.  Because in fact, my --
 3  my Declaration also said that the
 4  benefit that would eventually be paid
 5  at normal retirement age would be
 6  greater than the benefit under the
 7  prior version of the plan than under
 8  the cash balance plan.
 9         But it was -- it was not

D0146

10 understood.  Even though the judge
11 agreed with the fact that my
12 calculations showed that there was a
13 reduction in the rate of future
14 benefit accrual.
15         (Exhibit Poulin 13 was
16 marked for identification.)
17 BY MS. YU:
18     Q.  Mr. Poulin, is this a copy
19 of the decision that we were just
20 talking about?
21     A.  I believe it is.  Although
22 there have been a number of decisions
23 in this case.  Yes.
24     Q.  Can you refer me to the

00228
 1 portion of the decision that you were
 2 just describing where the court
 3 agreed with you with respect to a
 4 part of your opinion.
 5     A.  Yes.  It's on page 4 of 21.
 6     Q.  Okay.
 7     A.  The last paragraph, third
 8 line, Poulin's report concludes that
 9 participants will suffer a reduction
10 in the rate of benefit accrual.
11 That's -- so that's -- and the court
12 agreed with this.
13         But does not demonstrate a
14 reduction in accrued benefits.  And
15 the does not demonstrate a reduction
16 in accrued benefits is that the court
17 related to an exhibit, which is not
18 shown here, that showed -- that
19 showed a prior plan benefit that was
20 static compared to a cash balance
21 plan benefit that was increasing.
22         (Exhibit Poulin 14 was
23 marked for identification.)
24 BY MS. YU:

00229

1    Q.   What we have marked as
2   Exhibit Poulin 14, the affidavit that
3   you provided in the Engers matter?
4    A.   Are you asking me whether
5   this is a copy of the affidavit I
6   prepared?
7    Q.   Yes.
8    A.   Yes.
9    Q.   When you said that the cash
10   balance plan was being compared to a
11   prior plan that was static, what in
12   your view made it static?
13    A.   What?
14    Q.   What in your view made the
15   prior plan static?
16    A.   I believe the description
17   that I just said was in paragraph
18   eight on page 3, and in the middle of
19   the paragraph I stated, In performing
20   his analysis, Mr. Armant, who was the
21   expert for defendant, for AT&T,
22   failed to take into account the rates
23   of future benefit accrual.
24        Instead he compared accrued

00230
1   benefits at age 65 under the cash
2   balance formula increasing as a
3   result of the future annual pay
4   credits and interest credits with an
5   accrued benefit payable at age 65
6   under the Special Update, frozen at
7   the 1997 level without any future
8   benefit accrual.
9        In other words, instead of
10   comparing the rates of future benefit
11   accrual under the two versions of the
12   plan, he compared it frozen or static
13   benefit with the benefit increasing
14   each year.
15        Under his approach, any
16   increase in benefit after 1997,
17   however insignificant, such as one

D0148

18  based on the benefit accrual rate of
19  only one-tenth of one percent of
20  future compensation would have led
21  him to the same conclusion.
22        So that to explain this
23  conclusion here, I was referring to
24  an exhibit that is not shown here

00231
1  that Mr. Armant does with that.
2  Maybe it's shown -- this -- this was
3  done in 2001, so it's a long time
4  ago.  But which showed exactly what I
5  said here.
6    Q.  Can you take a look at
7  Exhibit C-1 to Poulin 14.
8    A.  Yes.  Column 9 showed the
9  benefit under the cash balance
10  formula and column 13 showed the
11  accrued benefit payable at age 65
12  based on the -- on where the plan was
13  just prior to the conversion to cash
14  balance.
15        And the 40 -- I think it's
16  48,677 that would have been payable
17  at age 65 under the prior version of
18  the plan was greater than the benefit
19  payable under the accrued benefit at
20  age 65 under the cash balance plan,
21  but...
22    Q.  Can I stop you there
23  because I have a question of what
24  you're talking about.  You referred

00232
1  to column 13.
2    A.  Yes, I do.
3    Q.  That appears under Special
4  Update.
5    A.  Yes.
6    Q.  And then there are --
7  there's another box next to that and
8  it says Prior Plan Formula.

D0149

9    A.  Yes.

10    Q.  What is difference between

11  those two?

12    A.  Well, the Special Update

13  was the benefit payable -- I have to

14  explain a little bit with the AT&T --

15  the way the AT&T plan functioned, is

16  that until 1980 the AT&T pension plan

17  was a final average plan.

18        In 1980 it was changed to

19  a -- I think it was called -- it was

20  an adjusted career average plan where

21  periodically every three or four

22  years the rate of benefit accrual

23  was -- remained the same, but the

24  compensation level was adjusted to


00233

1  the more recent salary of the

2  participant.

3        So that in 1983 your

4  benefit would have been based on all

5  years of prior service.  And then in

6  1984 the plan would say from one --

7  from January 1, 1984, the benefits

8  formula will be based on your

9  compensation in 1980, '81, '82, and

10  '83, and periodically this -- there

11  was an update of the benefit formula.

12        In 1997 AT&T provided such

13  an update, and I believe that the

14  years of compensation were adjusted I

15  believe from '87 to '91 to -- from

16  '92 to '96 so that there was an

17  increase.

18        And this Special Update of

19  course increased benefits, and then

20  AT&T converted this plan to a cash

21  balance plan.

22        So that the plan existing

23  just prior to the conversion to cash

24  balance plan had already been

1   adjusted for salary increases that
2   took place between 1987 and 1992.
3        And -- but in the
4   terminology that Mr. Armant used and
5   that I used, I used the same
6   terminology, we made a distinction
7   between the prior plan, which was
8   prior to the Special Update.
9        And which -- which should
10  have been called prior -- plan prior
11  to the Special Update, and the
12  Special Update, which was the plan
13  just prior to the conversion.
14        And because of this,
15  this -- this terminology may have
16  been nebulous.  May not have been
17  understood.  And that's where I said
18  that I did the -- you know, it was
19  not clear that the term prior plan
20  did not mean the plan just before
21  conversion; that it meant the plan
22  before that, before 1997, the 1997
23  update.
24        So that the column that

00235

1   should have been looked at is column
2   13 and not the column 15 which would
3   have been more -- which would have
4   been the numbers to look at in 1996,
5   not on the date of conversion.
6     Q.  Do you know what columns
7   the court looked at?
8     A.  I believe that the court
9   when it mentioned prior plan may
10  either have looked at column 15 or
11  there was another exhibit which
12  showed Mr. Armand's exhibit, which
13  showed the prior plan as being
14  static.  I don't know whether it's
15  here.
16        There is an Exhibit E-1

17  which shows the benefit under the
18  Special Update that is static whereas
19  the benefit under the cash balance
20  plan, the was -- by the way, this
21  document was prepared by AT&T, and
22  this is the document that -- that I
23  rebutted.
24          And if you look at column,

00236
 1  the column which is not numbered
 2  under Special Update, the Special
 3  Update benefit, accrued benefit at
 4  age 65, never was increased from 1997
 5  onward.  It was frozen at 23,822.
 6          Whereas the accrued benefit
 7  at age 65 under the cash balance
 8  formula was allowed to increase from
 9  the 26,969 to 44,559.
10     Q.  I'm sorry.  Which -- which
11  exhibit are you looking at?
12     A.  I'm looking at my Exhibit
13  E-1 --
14     Q.  E-1?
15     A.  -- of my Affidavit of 2001.
16          MR. MALONE:  Poulin 14, for
17  the record.
18  BY MS. YU:
19     Q.  So that the reason that you
20  called it static was because the
21  information that's in Exhibit E-1
22  under Special Update accrued benefit
23  at age 65 did not change; is that
24  correct?

00237
 1     A.  Yes.
 2     Q.  Okay.
 3     A.  And if you assume, if
 4  you're making a 204(h) comparison,
 5  obviously you cannot compare a
 6  benefit of 23,822 that remains the
 7  same for 20 years to a benefit that

8   increases each year as a result of
9   additional pay credits and interest
10  credits, and this is what I was
11  alluding to in paragraph eight of my
12  Declaration, my affidavit.
13      Q.  Okay.  If you look at C-1
14  again, your calculations under column
15  13.
16      A.  Yes.
17      Q.  They are not static; right?
18      A.  Nope.  No.  They're not
19  static in this -- no, they're not
20  static.  But I believe, I don't know
21  what the -- what the court looked at.
22          It may have looked at E-1,
23  may have looked at C-1, but my
24  impression is that when the court

00238
1   referred to prior plan formula it
2   referred to the formula not in
3   existence just prior to the
4   conversion to cash balance, but prior
5   to the Special Update.
6           And, therefore, looked at
7   column 15, compared it to column 9,
8   and concluded that the benefit under
9   the AT&T plan would have been lower
10  under the cash balance version, which
11  is not the case.
12      Q.  Should you assume no change
13  in pay after 1998 in your Exhibit
14  C-1?
15      A.  Yes, I do.  So that if
16  there had been pay increases after
17  1998, then it would have been even
18  more conclusive, but because then the
19  benefit payable under the prior
20  version of the plan would have been
21  greater than it would have been under
22  the cash balance plan, which is a
23  career average plan that is never
24  updated.

D0153

00239
1      Q.   But your assumption for
2  Exhibit C-1 was that there was no pay
3  increase?
4      A.   That's right.  And in spite
5  of the fact that there were no pay
6  increases, it still showed that there
7  was an increase in the -- there would
8  have been an increase under the
9  previous version of the plan than
10  under the cash balance plan at age
11  65.
12      Q.   If you could go back to
13  Poulin 6, your Declaration in this
14  matter.
15          MR. MALONE:  For this case.
16  BY MS. YU:
17      Q.   Can you take a look at
18  paragraph 24 that begins on page 8.
19  You refer to whipsaw.
20      A.   Yes.
21      Q.   What was the purpose of
22  including this paragraph in your
23  Declaration in this case?
24      A.   I believe I was making an

00240
1  analogy between this phenomenon of
2  whipsaw and the phenomenon where a
3  change of interest rate may create a
4  problem to a cash balance plan.  Is
5  that whipsaw is not something that
6  happens on day one.
7          Similarly, the 133 and a
8  third percent violation is not
9  something that happens on day one.
10  It's something that happens because
11  interest rates fluctuate.
12          So that a given pension
13  plan may not have a whipsaw problem
14  initially, and then it develops over
15  time and similarly, you may not have

16  a 133 and a third percent rule
17  violation initially, but it may be
18  built up over time.
19      Q.  Again, is there a whipsaw
20  issue with respect to this cash
21  balance plan?
22      A.  No.
23      Q.  And why is that?
24      A.  No.  Because the whipsaw

00241
1  will develop if there is a
2  differential in the interest
3  crediting rate and the rate used to
4  discount the normal retirement
5  benefit to a lump sum according to
6  Section 417(e)(3) of the Internal
7  Revenue Code.
8      Q.  And what rate is used under
9  417(e)(3)?
10      A.  The 30-year treasury rate.
11      Q.  And that is the same that
12  is used by the cash balance plan?
13      A.  Yes, it is.
14      Q.  And the whipsaw phenomenon
15  that occurs when not due to
16  fluctuations within the 30-year
17  treasury rate from year to year, but
18  because a plan may use something
19  other than the 30-year treasury.  I
20  think you said a different interest
21  rate --
22      A.  No.  It may -- well, it
23  may -- it may happen for a number of
24  reasons.  We were reviewing the

00242
1  Boeing plan earlier, and I noted that
2  the Boeing plan had a 5.25 percent
3  minimum interest rate.
4          Well, to answer the first
5  part of your question, then because
6  of the fluctuations in the 30-year

7   treasury rate that in fact was
8   lowered to 5.25 percent in the last
9   five or six years.  Then there would
10  be an automatic whipsaw problem that
11  was not contemplated at the
12  beginning.
13       I don't know when the
14  Boeing plant was -- was converted to
15  cash balance, but as a result of the
16  reducing 30-year treasury rates a
17  whipsaw problem must have developed
18  under that plan that could not be
19  foreseen.
20       So that's why I made this
21  analogy, is that it's something that
22  is there, but it's only the facts and
23  circumstances that will show whether
24  it will happen or not.

00243
1    Q.  But the whipsaw problem
2   that you were just illustrating there
3   with the Boeing plant would arise in
4   a situation where the 30-year
5   treasury rate fell below the floor
6   rate; correct?
7    A.  Correct.  And it did for
8   most of the months in the last 60
9   months.
10    Q.  So that it is because the
11  floor is different from the 30-year
12  treasury rate that caused the whipsaw
13  problem?
14    A.  That's correct.
15    Q.  I want to ask you a
16  question.  Assuming that a
17  participant terminates employment but
18  decides to leave their benefit in the
19  cash balance account.  After
20  termination of employment, does that
21  participant continue to accrue
22  benefits after employment has been
23  terminated?

24        MR. MALONE:  Object to the

00244
1   form of the question.
2        THE WITNESS:  It depends
3   what you mean by continue to accrue
4   benefits.  Participants do not accrue
5   normally pay credits once employment
6   is terminated, but they will accrue
7   interest credits.
8        But interest credits, to
9   the extent that the plan is
10  frontloaded, have already been taken
11  into account on the -- in the year in
12  which, you know, the calculation or
13  the pay credits were made.
14        So that the -- in the
15  determination of the accrued benefit
16  there is an assumption that the
17  interest credits will be in fact
18  credited each year.  So that there is
19  no additional credit after that.
20  BY MS. YU:
21     Q.  Do you think that cash
22  balance plans benefit younger
23  workers?
24        MR. MALONE:  Object to the

00245
1   form of the question.  Incomplete
2   hypothetical.
3        THE WITNESS:  I cannot
4   really answer this question.  As
5   compared to what and it's under what
6   situation, under what benefit
7   formula?
8   BY MS. YU:
9     Q.  Well, let's take the
10  Conectiv cash balance plan.  Does the
11  Conectiv plan favor younger workers
12  over older workers?
13     A.  This is a difficult
14  question, because the Conectiv plan

D0157

15  is a retirement plan, and their
16  retirement plan is designed in order
17  to protect or provide financial
18  income during retirement years.
19        So that the question does
20  it benefit younger workers cannot be
21  answered immediately, because younger
22  workers would eventually also reach
23  retirement age to the extent that
24  the --

00246
 1        If you look at a retirement
 2  plan as a severance plan, which it
 3  shouldn't be, because it should be a
 4  retirement plan, then it may provide
 5  larger benefits to younger workers
 6  than the defined benefit plan.
 7        But over the years as these
 8  younger workers get older, they will
 9  look -- they will, like the currently
10  older, older participants also lose
11  the benefit of the early -- of the
12  defined benefit plan, such as early
13  retirement, subsidies and -- or
14  supplements and so on.
15        So that if a participant
16  intends to terminate in four years,
17  and this participant is now age 23,
18  it could be that the answer is yes.
19        But in this case, because
20  the cash balance plan is more like a
21  401(k) plan, which is in a sense a
22  glorified savings plan, and not a
23  retirement plan, then you may say it
24  benefits younger workers.

00247
 1        Now, is it used for
 2  retirement?  Studies showed that when
 3  employees terminate before age 50,
 4  the overwhelming majority spend their
 5  accounts and do not roll them over

D0158

6    into an individual retirement
7    account.
8         So that it is not really an
9    actual question, but this is -- I'm
10   trying to -- so it depends on the
11   circumstances of the participant.
12        If it says better, is it
13   defined as retirement?  I don't think
14   so.  If it's defined as severance,
15   perhaps.
16      Q.   So is the answer look at
17   the circumstances of the participants
18   in order to make that determination?
19        MR. MALONE:  Object to the
20   form of the question.
21        THE WITNESS:  In part.  And
22   also look at the objective of this
23   particular plan.  Is the objective to
24   provide retirement income?  Or is

00248
1    there another objective underlying
2    the design of this plan?
3         If it's to provide
4    retirement income, then I believe
5    that it is less beneficial to all
6    participants than the traditional
7    defined benefit plan.
8    BY MS. YU:
9      Q.   Does it also matter the
10   objectives of the individuals, the
11   participants?
12        MR. MALONE:  Object to the
13   form.
14        THE WITNESS:  The question
15   is does it -- does the individual --
16   what is your question again?
17   BY MS. YU:
18      Q.   Well, with respect to the
19   general question of whether cash
20   balance plans or this particular cash
21   balance plan favors younger workers
22   over older workers.

D0159

23          In deciding whether that is
24    the case, do you need to take into

00249
1    account the objectives of the
2    individual participants?
3        A.  I think that it is well
4    recognized that cash balance plans --
5    that traditional defined benefit
6    plans that are converted to cash
7    balance plans shift the benefit of
8    the plans from older workers to
9    younger workers.
10          So that, yes, in that case,
11    but I don't think it's the issue
12    here.
13        Q.  Do you have an opinion as
14    to whether or not cash balance plans
15    are fair?
16          MR. MALONE:  Objection.
17          THE WITNESS:  It's too
18    broad a question of fair.  To whom?
19    Fair compared to what?  Fair -- you
20    have to be -- I think I cannot say
21    that in a vacuum.  I cannot comment
22    on this in a vacuum.
23    BY MS. YU:
24        Q.  What would you need to

00250
1    know?
2        A.  Well, I would define --
3    define fair.  You may have a group of
4    1,000 workers that don't have a
5    pension plan; don't have anything.
6    So is a cash balance plan better than
7    nothing?  Is that fair?  Yes.  Is it
8    fairer than a 401(k) plan.
9          So you have to define the
10    group, you have to define the
11    purpose, you have to define the
12    comparison with.
13          If there is a conversion

D0160

14  that -- that provides across the
15  board higher benefits for most
16  participants and retains, and I've
17  seen such plans, retain, for
18  instance, the early retirement
19  subsidies of the prior version of the
20  plan, then it is more fair than it is more fair than the
21  plan that doesn't do that, yes.
22      Q.  Do you think cash balance
23  plans are illegal?
24          MR. MALONE:  Objection to

00251
1  the form.
2          THE WITNESS:  No.  Not per
3  se.
4  BY MS. YU:
5      Q.  Have you ever been the
6  enrolled actuary for a pension plan?
7      A.  For a pension plan?
8      Q.  Yes.
9      A.  Yes.
10      Q.  How many?
11      A.  Oh, over the last 30 years,
12  maybe 20, 25.
13      Q.  Are you currently an
14  enrolled actuary for any pension
15  plans?
16      A.  Yes.  One.
17      Q.  Which one?
18      A.  The Mail Handlers Pension
19  Plan.
20      Q.  What type of plan is it?
21      A.  It's a final average plan.
22  Typical.
23      Q.  Is it a single employer
24  plan?

00252
1      A.  Yes.
2      Q.  Is it a private employer
3  plan?
4      A.  Yes.

D0161

5    Q.  How long have you been the
6  enrolled actuary for that plan?
7    A.  Perhaps 15 years.
8    Q.  What's the largest number
9  of plans that you've been the
10  enrolled actuary for at any given
11  time?
12    A.  The largest number of
13  plans?
14    Q.  Yes.
15    A.  What is your question?
16  What is it?  I think it was about 15,
17  20.
18    Q.  That you were the enrolled
19  actuary for at one moment?
20    A.  Oh.  In the '80s I was the
21  enrolled actuary of a number of small
22  plans, seven or eight perhaps
23  simultaneously.
24    Q.  Tell me about the process

00253
1  you went through to prepare your
2  Declaration for this case.
3    A.  I reviewed the Complaint.
4  I reviewed the plan.  I reviewed the
5  prior versions of the plan.  I may
6  have reviewed the pertinent
7  provisions of ERISA and the Code and
8  the regulations.
9        And I also reviewed the
10  Declaration of Mr. Kra, which was
11  maybe three -- two or three weeks
12  prior to -- to my own Declaration.
13    Q.  In terms of writing the
14  report, did you do that yourself
15  personally?
16    A.  Yes.
17    Q.  Did anyone assist you in
18  that process?
19    A.  No.  I write my own
20  reports.
21    Q.  Do you hand write them or

22    do you type them in a computer?
23        A.  I type them on a computer.
24        Q.  Did anyone make any edits

00254
 1    for you to your report?
 2        A.  No.  Except the -- well,
 3    no.  There was a suggestion by
 4    counsel to add the Exhibit F-2.  But
 5    edit in the sense of correcting
 6    commas or adding?  No substantial
 7    edit besides the one I mentioned.
 8    And also no -- not substantial like
 9    correcting commas.  I do this myself.
10            MR. MALONE:  Which is a
11    good thing because I'm very good at
12    it.
13    BY MS. YU:
14        Q.  You said that there were
15    three employees of Poulin Associates?
16        A.  Yes.
17        Q.  What are their positions?
18        A.  Well, only one really is
19    the -- in the U.S.?
20        Q.  In the U.S.
21        A.  Only one is the assistant
22    in the actuarial or pension sense.
23    The others are more administrative
24    or -- more administrative.  And this

00255
 1    is Darla Rivi who did the -- Darla
 2    was involved also in the preparation
 3    of the exhibits.
 4        Q.  What was that role in the
 5    preparation of the exhibits?
 6        A.  We would discuss the
 7    exhibits, and as we have seen in the
 8    prior years there is a certain format
 9    for the exhibits and then to discuss
10    the actual assumptions, the mortality
11    table, and the pay credits, the
12    interest credits, the transition

D0163

13  credits, if any, whether in some
14  cases the pay credits are a function
15  of age, age and service as opposed to
16  age only or service only.
17       So that -- and she will
18  help in the -- in preparing the
19  exhibits.  Also on the, I would call
20  it cosmetic aspect of the exhibits,
21  the font and the numbering of the
22  columns and so on.
23    Q.  How were the exhibits
24  prepared?  Did you initially prepare

00256
1  them or did she?
2    A.  It's really a joint effort.
3  There is -- there might be -- in this
4  particular case, I probably
5  established a structure and then she
6  did the calculations, reviewed the
7  calculations.
8    Q.  Did she review your report?
9    A.  She may have, but I'm not
10  sure.
11    Q.  Did anybody else review
12  your report, other than Mr. Malone or
13  anyone associated with his office?
14    A.  She may have, but nobody
15  else.
16    Q.  Have you ever been the
17  enrolled actuary for a cash balance
18  plan?
19    A.  No.
20    Q.  Have you ever participated
21  in the design of a defined benefit
22  pension plan?
23       MR. MALONE:  Object to the
24  form of the question.

00257
1       THE WITNESS:  Yes.  Several
2  times.
3  BY MS. YU:

D0164

4    Q.   What types of plans?

5    A.   What types of plans?

6    Q.   Yes.

7    A.   The small -- some of the

8  small plans, to which I alluded

9  earlier, and I did participate in the

10  design of a number of plans, a large

11  number of plans when I was working at

12  the UAW after ERISA, but I was not

13  the -- I participated in the design.

14  I was not the actual drafter of the

15  language.

16    Q.   Have you ever been involved

17  in a design of a cash balance plan?

18    A.   In the...?

19    Q.   Design.

20       MR. MALONE:  Design.

21       THE WITNESS:  No.

22  BY MS. YU:

23    Q.   What type of work takes up

24  most of your time currently?


00258

1    A.   At this present time it's

2  mostly I believe litigation.

3  Although every month I'm involved in

4  the -- the -- I go to Hartford,

5  Connecticut, every month for the --

6  my role as the trustee, actuarial

7  trustee, on the Retirement

8  Commission, and I was there last

9  week.

10        I also was involved in an

11  arbitration hearing two weeks ago in

12  Stamford, Connecticut, for police

13  officers so -- which is not

14  litigation, but I believe that

15  perhaps 60 percent or 65 percent of

16  my time at the present time is

17  devoted to various aspects of

18  litigation.

19    Q.   Are you compensated for

20  your role as the actuarial trustee in

D0165

21  Connecticut?
22     A.  Yes, I am.
23     Q.  And what is your
24  compensation for that?

00259
 1     A.  It's per diem, and I
 2  believe that it's 4,200 or 4,800 per
 3  day.
 4     Q.  Have you ever been retained
 5  as an expert witness for a pension
 6  plan?
 7        MR. MALONE:  Object to the
 8  form of the question.
 9        THE WITNESS:  Expert
10  witness for a pension plan?
11        MR. MALONE:  I think she's
12  asking if you have ever testified on
13  behalf of a plaintiff sponsored
14  litigation.
15        THE WITNESS:  Well --
16        MS. YU:  For example, we
17  have a plan that's a defendant in
18  this case.
19        MR. MALONE:  That's true.
20        THE WITNESS:  I was
21  involved in a case in -- yes, I
22  believe 15 years ago where I was
23  retained by the plan that was sued
24  by -- sued by outsiders, and I did

00260
 1  work.
 2        I don't think I was deposed
 3  in that day, and I don't recall, but
 4  I did prepare a report.  I believe
 5  that -- I believe that Mercer was
 6  also involved as the -- on the side
 7  of the defendant.
 8  BY MS. YU:
 9     Q.  Other than that engagement?
10     A.  Not that I recall.
11     Q.  Have you ever been retained

D0166

12    as an expert by a plan sponsor?
13        A.  Earlier today I testified
14    on the -- this UAW plan, this
15    situation that happened 20 years ago.
16    UAW may have been the sponsor of that
17    plan, but I'm not sure, but it was
18    certainly a defendant in that
19    litigation.
20        Q.  Other than that instance?
21        A.  I don't recall.
22        Q.  Who typically retains you
23    as an expert?
24            MR. MALONE:  Object to the

00261
1    form.
2            THE WITNESS:  Typically it
3    is the law firm that retains my
4    services.
5    BY MS. YU:
6        Q.  And typically is the law
7    firm -- who do the law firms
8    represent?
9        A.  It would be the plaintiffs.
10        Q.  Are those plaintiffs
11    typically plan participants?
12        A.  Yes.
13        Q.  Have you billed for your
14    time in this case?
15        A.  Yes.
16        Q.  Do you know how much you
17    have billed to date?
18        A.  I don't know the exact
19    amount of billing, but I believe it's
20    close to 80 hours.
21        Q.  And your rate is $425?
22        A.  That's correct.
23        Q.  Are variable annuities in a
24    defined benefit plan permitted under

00262
1    ERISA and the Code?
2            MR. MALONE:  Object to the

3    form of the question.
4        THE WITNESS:  I'm not
5    familiar with variable annuities
6    inside a defined benefit plan.
7    BY MS. YU:
8        Q.  Do you know whether there
9    is any provision under ERISA or the
10   Code for variable annuities in
11   defined benefit plans?
12       A.  There probably is, but I'm
13   not familiar with it.
14       Q.  There probably is but
15   you're not familiar?
16       A.  Correct.
17       MS. YU:  I'm going to take
18   a few minutes.
19       MR. MALONE:  That's fine.
20       RECESS
21   BY MS. YU:
22       Q.  Mr. Poulin, have you ever
23   been disqualified from testifying as
24   an expert witness in any litigation?

00263
1        A.  No.
2        Q.  Has your testimony ever
3    been stricken in any way?
4        A.  I don't think so.
5        MS. YU:  That's all I have.
6        MR. MALONE:  I have a few
7    for you, but I'll try to get you out
8    of here quickly.
9            EXAMINATION
10   BY MR. MALONE:
11       Q.  Let me send you back if I
12   might for a second to Poulin 8, which
13   was the regulation.
14       A.  Yes.
15       Q.  And you were examined
16   earlier with respect to, let me see
17   if I can find it, page 1104 of Poulin
18   8.
19           Do you recall that?

D0168

20    A.  Yes.
21    Q.  Now, we've spent some time
22  talking about parameters that you
23  need to know to calculate benefits as
24  an actuary.

00264
1         Is one of the things you
2  need to know a participant's age if
3  you're trying to calculate their
4  benefits under a plan?
5    A.  Under a cash balance plan,
6  yes.
7    Q.  You need to know their age.
8  How about their service?  Is service
9  important?
10    A.  Service is certainly a --
11  yes, it is important, because you
12  have to -- the benefit is based on
13  the actual number of years of
14  service.
15    Q.  Okay.  Now, let me ask you
16  a question.  If you were evaluating a
17  traditional defined benefit plan to
18  determine whether it was going to
19  pass the 133 and a third percent
20  rule, and you elected to keep the
21  service and the age static in all
22  future plan years, what would that do
23  to the test?
24    A.  The traditional defined

00265
1  benefit plan --
2    Q.  And you're sitting in year
3  one and you're going to test the 133
4  and a third compliance, but I want to
5  you assume that the participant's age
6  never changes and I want you to
7  assume that they accrue no further
8  service.
9    A.  Well, that's a -- the --
10  you don't need to -- you don't need

11  that under a traditionally defined
12  benefit plan, because the benefit
13  formula indirectly will tell you that
14  there is --
15          The way the benefit
16  formula -- the way the benefit is
17  expressed under a traditional defined
18  benefit plan, it is easier to
19  determine the compliance with the 133
20  and a third percent rule.
21          There are IRS examples
22  which showed that the plan, for
23  instance, that provided for a benefit
24  accrual rate of two percent in the

00266
 1  first ten years, one percent in the
 2  subsequent five years, and then 1.5
 3  percent starting on the 15th year
 4  will not meet the rule, because when
 5  you go from 1 to 1.5 you violate the
 6  133 and a third percent rule.
 7          So this is not based on,
 8  you know --
 9     Q.  I asked you a lousy
10  question.  Here's what I'm driving
11  at.
12          Under the ACE predecessor
13  plan, accrued benefits were
14  calculated based on years of
15  compensation, service, and a
16  multiplier.
17     A.  Yes.
18     Q.  Now, if the service never
19  changes, is there going to be a
20  fluctuation in the accrued benefit
21  from one year to the next?
22     A.  No.
23     Q.  So the test would become
24  pointless?

00267
 1     A.  Yes.

D0170

2     Q.  How about age?  Is age
3   relevant?
4     A.  Same thing.
5     Q.  Now, we had talked earlier
6   about various provisions of ERISA and
7   their parallel provisions in the
8   Code.  Are you familiar with Section
9   204(b)(1)(B) of ERISA?
10    A.  Yes.
11    Q.  Do you remember what that
12  is off the top of your head?
13    A.  I think that this is the
14  133 and a third percent rule.
15    Q.  Okay.  And what about
16  204(b)(1)(g)?  Do you remember that
17  one?
18    A.  Yes.
19    Q.  What one is that?
20    A.  It's the reduction on
21  account of increasing age of service,
22  I believe.
23    Q.  I could be wrong.  A couple
24  times today I think you talked about

00268
1   the reduction on account of age of
2   service and mentioned section 204(g)
3   of ERISA.
4     A.  I think I did.
5     Q.  What does Section 204(g) of
6   ERISA provide to the best of your
7   recollection?
8     A.  I think it may refer to an
9   amendment, but at this point -- an
10  amendment reducing the accrued
11  benefits that would be violated.
12    Q.   So it's possible you may
13  have misspoken on one or two
14  occasions?
15    A.  I may have, yes.
16    Q.  Okay.  Now, I think it was
17  Darla that helped you with your work
18  in this case; am I right?

D0171

19    A.  Yes.
20    Q.  Does she have any
21  particular credentials to assist you?
22    A.  Darla is a Certified
23  Employee Benefits Specialist and she
24  has a degree in mathematics and she

00269
 1  had been working for Poulin
 2  Associates for the last 20 years.
 3    Q.  Okay.  Now, we talked about
 4  a Notice 96-8, the distinction that's
 5  drawn in that context between a
 6  backloaded cash balance plan and a
 7  frontloaded cash balance plan.
 8    A.  Yes.
 9    Q.  Do you recall that?
10    A.  Yes.
11    Q.  And is it correct that in
12  Notice 96-8 the IRS characterizes a
13  frontloading cash balance plan as a
14  plan in which future interest credits
15  are not conditioned on rendering
16  future service?
17    A.  Yes.
18    Q.  Now, does that mean that it
19  would be impossible for a
20  frontloading cash balance plan to
21  violate the 133 and a third percent
22  rule?
23    A.  No.
24    Q.  Why not?  Could you give

00270
 1  mean an example of a plan that might
 2  fail?
 3    A.  Yes.  A plan that would
 4  have a pay credit, for instance, of
 5  one percent for the first ten years
 6  and the pay credit would then
 7  increase to ten percent would -- and
 8  assuming that under this plan the
 9  interest credits are payable until

10  age 65.
11      Irrespective of the
12  employment status of the employee,
13  this plan would nevertheless fail the
14  test, because from the time from when
15  it goes from one percent to ten
16  percent, pay credit, it was --
17  because ten percent is much greater
18  than 133 and a third percent of one,
19  and it will automatically fail the
20  test.
21    Q.  All right.  Now, am I
22  correct that what the IRS describes
23  as a backloaded cash balance plan is
24  a situation in which only those

00271
 1  participants who continue to work and
 2  render service for the sponsor get
 3  interest credits?  Is that how Notice
 4  96-8 defines --
 5    A.  Yes.  Or -- or it could
 6  also be defined as the interest rates
 7  are more or less irrelevant and they
 8  only -- it's only at termination or
 9  becoming disabled or at retirement
10  that they will be credited.
11    Q.  Do you know whether it be
12  possible to craft a backloaded cash
13  balance plan, setting aside any
14  forfeiture problem that might exist,
15  could you put together -- would it be
16  mathematically possible to put
17  together a backloaded cash balance
18  plan that could under any set of
19  facts pass the 133 and a third
20  percent?
21    A.  I don't think so.
22      MR. MALONE:  Let me see if
23  I have anything else here.
24  BY MR. MALONE:

00272

D0173

1    Q.  Did you consider the time
2  that you had to work on this case
3  adequate under the circumstances?
4        MS. YU:  I'm sorry.  What
5  was the question?
6  BY MR. MALONE:
7    Q.  Did you consider the time
8  that you had to work on the case
9  adequate under the circumstances?
10    A.  I believe it's adequate.
11    Q.  Okay.
12    A.  But I always would like to
13  have the 80-hour week or 200-hour
14  week.
15    Q.  Well, actuaries and lawyers
16  have something in common.
17        Was there any particular
18  data that you requested from me that
19  I didn't give you?
20    A.  No.
21    Q.  Did I tell you how I wanted
22  you to apply any of the rules and
23  principles of ERISA other than the
24  suggestion that you look at a four

00273
1  and a half percent escalation for
2  compensation?
3    A.  No, you did not.
4    Q.  Okay.  Did I write your
5  report for you?
6    A.  Nope.
7    Q.  Let me send you back to
8  Poulin 6 for a second.  I'm probably
9  belaboring the point, but I just want
10  to make sure I'm clear, and that the
11  record is clear, because I think I'm
12  clear.
13        Poulin 6 is your
14  Declaration in this case.
15    A.  Yes.
16    Q.  Let me send you to Exhibit
17  D, and I just want to walk through so

18    I'm clear how we get from a cash
19    balance account to an accrued
20    benefit.
21         Let's start with 1999.  Is
22    it correct that to calculate the
23    accrued benefit at age 65, based upon
24    the cash balance account at the

00274
1    beginning of the year 1999, you
2    projected the interest credits under
3    the plan to age 65 using the interest
4    crediting rate specified under the
5    plan which is the October 1998
6    30-year treasury and then after
7    accumulating that balance to age 65,
8    discounted it to present value and
9    created an annuity conversion using
10    the -- precisely the same rate?
11    A.  Yes.
12    Q.  Okay.  And in year 2003, is
13    it correct that to calculate the
14    accrued benefit at age 65 for that
15    plan year, you went through the same
16    process and accumulated the cash
17    balance account projecting the
18    interest credit forward using the
19    interest crediting rate under the
20    plan which would have been the
21    30-year treasury for October the
22    prior year?
23    A.  Correct.  Yes.
24    Q.  And then you annuitized

00275
1    that based upon the mortality table
2    and that same 30-year treasury rate?
3    A.  Yes.
4    Q.  Okay.
5         MR. MALONE:  That's all I
6    have for you.
7         MS. YU:  We'll be back in
8    two minutes.

D0175

9          MR. MALONE:  Okay.  I knew
10    that would happen if I asked some
11    questions.
12          RECESS
13    BY MS. YU:
14       Q.  I have a few more
15    questions.
16          MR. MALONE:  Sorry.
17          MS. YU:  We were done.
18    BY MS. YU:
19       Q.  Moving from 1999 forward a
20    year to 2000.
21       A.  I'm sorry?
22       Q.  Moving from 1999 and then
23    moving forward to the 2000 time.
24       A.  Yes.

00276
1       Q.  In order to have an
2    accrual, you would to have a year of
3    service?
4       A.  Yes.
5       Q.  In order to have an
6    accrual, do you need to get one year
7    older?  Put differently, if you die
8    during -- on the first day, would you
9    have an accrual?
10          MR. MALONE:  Object to the
11    form of the question.
12          THE WITNESS:  If you die on
13    January 1st?
14    BY MS. YU:
15       Q.  Yes.
16       A.  There is no accrual beyond
17    January 1st.
18       Q.  So you have to get one year
19    older in order to have the accrual;
20    correct?
21       A.  Well, you have to work.
22    You have to -- the increase in
23    accrual is based on the pay credits.
24    So to the extent that you don't

D0176

00277

1  receive any pay credits, there is no
2  change and there is no increase in
3  the payment accrual.
4      Q.   And because this is a
5  frontloaded cash balance plan, is it
6  true that all of the interest credits
7  are attributable to that prior year?
8      A.   All the -- the interest
9  credits are, to age 65, are deemed to
10  be part of the benefit accrual rate
11  for the increase in accrued benefit
12  for that year, yes.
13     Q.   No, I'm sorry, I was not
14  clear enough.  But the work is
15  occurring from January 1st of 1999
16  through the end of the year in 1999.
17  So all of the interest credits for
18  1999 are attributable to 1999?
19         MR. MALONE:  Object to the
20  form.
21         THE WITNESS:  Well, the
22  interest credits that take place in
23  1999 for what existed at the
24  beginning of the year are

00278

1  attributable to 1999, but not just
2  that.
3          Is that if we -- if they
4  are frontloaded, then the interest
5  credits for subsequent years until
6  you attain the age 65 are, since the
7  plan is frontloaded, are also deemed
8  to take place in 1999 in order to --
9  in order to determine the increase in
10  accrued benefit in that year.
11         So it's not just the -- the
12  pay credit; it is not just the
13  interest credit on that pay credit
14  for 1999.  It's all future pay
15  credits as well that are taken into
16  account.

D0177

17  BY MS. YU:
18      Q.  All future interest credits
19  with respect to the prior year?
20          MR. MALONE:  Object to the
21  form.
22          THE WITNESS:  Not really,
23  no.
24  BY MS. YU:

00279
1      Q.  I'm sorry.  I'm not being
2  clear now.
3          MR. MALONE:  In fairness to
4  you, it's a hard thing to parse out
5  and frame a clear question on.
6          MS. YU:  Let me try again.
7          MR. MALONE:  Okay.
8          MS. YU:  It's the end of a
9  long day.
10  BY MS. YU:
11      Q.  So if you go from 1999 to
12  2000, as we started out, and you
13  have -- you have to have the year too
14  and you have to survive to 2000,
15  correct, in order to accrue a
16  benefit; is that correct?
17      A.  Yes.
18      Q.  Then for that extra year,
19  are those -- are all interest credits
20  attributable built into the prior
21  year's accrual?
22      A.  Well, the cash balance
23  version of that plan started in 1999.
24  So that there were no cash balance

00280
1  accruals prior to 1999.  Prior to
2  1999 there was another type of the
3  same plan in name, but it was another
4  type of plan.
5          So that there were no pay
6  credits before 1999.  What determines
7  the benefit accrual for 1999 is the

8   combination of the pay credit in that
9   year and the associated interest
10  credits to that pay credit forever --
11  well until age 65.
12      So that -- that will
13  determine the rate benefit accrual in
14  that year.
15      Q.  Okay.  For 2000, the same
16  applies then.  You have to have -- in
17  order to accrue a benefit, you have
18  to have another year of service and,
19  again, survive to 2001; correct?
20      A.  Yes.
21      Q.  If there is a change in the
22  interest rate, the 30-year treasury
23  from the prior year to that year, is
24  the change in the interest rate

00281
1   attributable to the extra year's
2   accrual or the prior year?
3       A.  Both.
4       Q.  Would you clarify that?
5       A.  To both.  I'm sorry?
6       Q.  Could you explain how.
7       A.  Is that the interest
8   crediting rate for the year 2000
9   applies to the account balance
10  existing at the end of the year and
11  it also applies to the pay credits
12  that are -- or I assume they're
13  called contribution credits for that
14  year and the interest for this to
15  normal retirement age.
16      MS. YU:  Okay.  That's it.
17      MR. MALONE:  That's it.
18  Thank you.
19      (Testimony concluded at
20  6:26 p.m.)
21
22
23
24

D0179

00282

1          WITNESS CERTIFICATION

2

3          I hereby certify that I

4    have read the foregoing transcript of

5    my deposition testimony, and that my

6    answers to the questions propounded,

7    with the attached corrections or

8    changes, if any, are true and

9    correct.

10

11

12    _____  _____
      DATE        CLAUDE POULIN

13

14

15

16

17    _____
      PRINTED NAME

18

19

20

21

22

23

24

D0180

1      "ROUGH UNEDITED TRANSCRIPT"

2          REPORTER'S NOTE:

3

4          Since this deposition is in rough

5    draft form, please be aware that there is a

6    discrepancy regarding page and line numbers when

7    comparing the realtime screen, the rough draft,

8    rough ASCI, and the final transcript; that the

9    realtime screen and the unedited uncertified rough

10    draft transcript may contain untranslated steno, an

11    occasional *  (reporter's note), a misspelled

12    proper name, and/or nonsensical Englishs word

13    combinations.  All such entries will be corrected

14    on the final certified transcript.

15          It is stipulated that counsel agree

16    not to share, give, copy, scan, fax, or in any way

17    distribute this rough draft in any form (written or

18    computerized) to any party.  However, co-counsel

19    and staff may have limited internal use of same

20    with the understanding that counsel agree to

21    destroy the rough draft and/or any computerized

22    form, if any, and replace it with the final

23    transcript and/or any computerized form, upon its

24    completion.


REPORTING ASSOCIATES, LLC  (215) 564-0675

2


 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2        CIVIL ACTION NO. C.A. NO. 05-702(SLR)

 3    ----------------------------------
      J. MICHAEL CHARLES; MAURICE W.
 4     WARD, JR.; and JOSEPH I. FINK, JR.,
      on behalf of themselves and all
 5    others similarly situated,

 6          Plaintiffs,

 7          v.

 8     PEPCO HOLDINGS, INC.; CONECTIV, and
      PEPCO HOLDINGS RETIREMENT PLAN,
 9
            Defendants.
10    ----------------------------------

11

12
             Wilmington, Delaware

13          Monday, August 27, 2007

14

15          TRANSCRIPT of testimony of KAREN E.

16   FRANCKS, as taken by and before Sean M. Fallon, a

17   Registered Professional Reporter and Notary Public

18   of the Commonwealth of Pennsylvania, at the offices

19   of PEPPER HAMILTON LLP, 1313 Market Street,

20   commencing at 10:12 o'clock in the forenoon.

21

22

23

24



        REPORTING ASSOCIATES, LLC  (215) 564-0675

                              3



1   A P P E A R A N C E S:

2        CHIMICLES & TIKELLIS LLP
         BY:  JOSEPH G. SAUDER, ESQ.
3        One Haverford Centre
         361 West Lancaster Avenue
4        Haverford, PA  19041
         (610) 642-8500
5        josephsauder@chimicles.com
         Attorneys for Plaintiffs

6          PEPPER HAMILTON LLP
7           BY:  KAY KYUNGSUN YU, ESQ.
            3000 Two Logan Square
8           Eighteenth and Arch Streets
            Philadelphia, PA  19103-2799
9           (215) 981-4000
            yukay@pepperlaw.com
10          Attorneys for Defendants

11          BARBARA C. ALEXANDER,
            ASSISTANT GENERAL COUNSEL
12          Pepco Holdings, Inc.
            P.O. Box 231
13          Wilmington, DE  19849-0231
            (302) 429-3206
14          Attorney for Defendants

15

16

17

18

19

20

21

22

23

24


            REPORTING ASSOCIATES, LLC  (215) 564-0675

1            I N D E X

2    WITNESS                    PAGE

3    KAREN E. FRANCKS

4        By Mr. Sauder            4,85

5        By Ms. Yu              82

6            E X H I B I T S

7    NUMBER          DESCRIPTION          PAGE

8    P-50  Notice of Deposition and Subpoena      7

9    P-51  Grandfathered FAQ              38

10    P-52  Declaration of Karen E. Francks      45

11    P-53  Pepco Holdings, Inc. Retirement Plan    79
        PHI Sub-Plan
12

13        EXHIBITS PREVIOUSLY MARKED AND REFERRED TO

14    NUMBER          DESCRIPTION          PAGE

15    P-3      Facts, MWW0022-0025        40

16    D-5      Facts              63

17
    DIRECTIONS NOT TO ANSWER:
18
                  PAGE      LINE
19
                  47      11
20                  48      10

D0185

file:///J|/JRM/Conectiv/sjreply/0827fran.txt

21

22

23

24

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          5

1          (It is hereby stipulated and agreed

2     by and among counsel that sealing, certification

3     and filing are waived;

4          It is further stipulated and agreed

5     by and among counsel that all objections, except as

6     to the form of the question, are reserved until the

7     time of trial.)

8          KAREN E. FRANCKS, after having been

9     first duly sworn, is examined and testifies as

10     follows:

11     ^EXAMINATION

12     BY MR. SAUDER:

13     Q.    Good morning.

D0186

14    A.    Good morning.

15    Q.    Have you given a deposition previous

16    to this?

17    A.    No.

18    Q.    I just want to go over a couple of

19    ground rules and I'm sure your attorney has already

20    talked to you generally about what you can expect

21    today, but, if I ask you a question and you don't

22    understand the question, just ask me to rephrase

23    the question, because, if you answer the question,

24    I'll assume you understood it, okay?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          6


1     A.    Okay.

2     Q.    If at any point you need a break,

3     just let us know.  I just ask that you answer the

4     question, if there is a question pending, before

5     you take the break.

6     A.    Okay.

7       Q.    You understand today you are

8    testifying under oath?

9       A.    Yes.

10      Q.    Let me first ask you if this

11   statement is accurate.  "James Kremmel is the only

12   individual currently employed by any of the

13   defendants who has firsthand knowledge of the

14   implementation of the cash balance sub-plan."

15          Is that an accurate statement?

16      A.    I don't know.

17      Q.    Well, do you know of anyone else

18   that's currently working at the company that has

19   firsthand knowledge of the implementation of the

20   cash balance sub-plan?

21      A.    Currently working.

22          MS. YU:  Objection as to form.

23          THE WITNESS:  I just don't know.  I

24   know that there are people that -- I don't know.  I

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            7

1    don't know if they are still working.

2    BY MR. SAUDER:

3        Q.    Do you have firsthand knowledge of

4    the implementation of the cash balance sub-plan?

5        A.    No.

6            MS. YU:  Objection as to form.

7    BY MR. SAUDER:

8        Q.    You have no firsthand knowledge?

9        A.    Of the implementation?

10            MS. YU:  Joe, can you define what

11    you mean by "implementation"?

12    BY MR. SAUDER:

13        Q.    You said "No."  How are you defining

14    implementation?

15        A.    My knowledge is -- I was not

16    involved in the benefits center.  All I did was

17    mail out the information so the implementation --

18    when you say "implementation," I think you mean

19    design and -- rollout and the design.

20            No, I was not involved in the

21    design.

22        Q.    So you have no firsthand knowledge

23    relating to that?

24        A.    Correct.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            8


1            MR. SAUDER:  I'll show you what

2    we'll mark as Plaintiffs' 50.

3            ^(Exhibit P-50 is marked for

4    identification.)

5    BY MR. SAUDER:

6        Q.    Before you look at what I've shown

7    you that's been marked as Plaintiffs '50, if you

8    could -- when was the first time you met with

9    attorneys relating to this case?

10        A.    Friday, August 24th.

11        Q.    When was the first time you spoke to

12    any attorneys relating to this case?

13        A.    I don't know the exact date, but it

14    would have been around the beginning of August.

15        Q.    This year?

16        A.    This August.

17        Q.    Prior to that, had you had any

18    contact at all with any attorneys relating to the

19    case?

20        A.    No.

21        Q.    And when you say, August of this

22    year was your first contact, who was the person

23    that contacted you?

24        A.    Barak Bassman.



REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              9



1        Q.    Prior to that date had you had any

2    contact or had you discussed this case with anyone?

3        A.    Attorneys?

4        Q.    Other than attorneys.

5        A.    Well, inside the company we talk

6    about it, sure.

7        Q.    And who did you talk to about it?

8        A.    Co-workers.

9        Q.    Let me just dry and narrow down the

10    question.

11              Did you have any discussions

12    relating to this case with regard to you being a

13    potential witness in this case?

14        A.    No.

15        Q.    Never until the attorney contacted

16    you --

17        A.    I had no idea I would have been a

18    potential witness until Barak Bassman called me in

19    early August.

20        Q.    Did you have any conversations with

21    Jim Kremmel relating to this case?

22        A.    Jim Kremmel called my the same day

23    Barak Bassman called me to let Notice know an tone

24    would be calling me.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              10

1    Q.    What else did he say?

2    A.    That an attorney would be calling me

3    about the cash balance plan due to my role in the

4    service center are at the time.  That was it.

5    Q.    Did he get into any more specifics?

6    A.    No.

7    Q.    Did you ask him why an attorney

8    would be calling you?

9    A.    I don't recall.

10    Q.    Well, what did you think your role

11    was at that point when Jim Kremmel called you prior

12    to the attorney contacting you?

13    A.    Well, he told me an attorney would

14    be calling me about the cash balance plan and my

15    role in the service center at the time.

16    Q.    And what did you understand that to

17    mean?

18    A.    That they would be questioning me

19    about the communications to the employees.

20    Q.    Had Jim Kremmel talked to you about

21    this the case prior to that?

22    A.    No.

23        Q.    And the first time Jim Kremmel

24    talked to you was August of this year?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            11


1        A.    Yes.

2        Q.    Had you ever supplied any documents

3    to Jim Kremmel prior to that date?

4        A.    I've never supplied documents to Jim

5    Kremmel.  When -- I have not talked to Jim Kremmel

6    about this case since he called me and let know

7    Barak -- I have been dealing only with attorneys

8    since then.

9        Q.    Have you ever supplied any documents

10    to anyone prior to Jim Kremmel contacting you about

11    this case?

12        A.    No.

13            MS. YU:  Objection as to form.

14    BY MR. SAUDER:

15          Q.    As we sit here today, have I ever

16    supplied any document relating to this case to

17    anyone?

18              MS. YU:  Joe, can you put a time

19    frame on that just so we are clear?

20    BY MR. SAUDER:

21          Q.    At any point up until today, have

22    you supplied any documents relating to this case to

23    anyone including attorneys?

24              MS. YU:  Objection to form.


        REPORTING ASSOCIATES, LLC  (215) 564-0675

            KAREN E. FRANCKS              12


1    BY MR. SAUDER:

2          Q.    You can answer.

3          A.    In the past ten years --

4          Q.    To anyone relating to this case --

5    let me put it different.

6          A.    No.

7          Q.    This case was filed in September,

8    2005. From September, 2005 to today, have you

9    supplied documents to anyone relating to this case?

10        A.    Yes. To Barak Bassman, when he

11    called me.

12        Q.    And what documents did you supply?

13        A.    I take that back. He sent me

14    documents and asked if I was familiar with them.

15            I did not supply him anything.

16        Q.    So you've never supplied any

17    documents?

18        A.    No.

19        Q.    Between September of 2005 and today,

20    to anyone relating to this case?

21        A.    That's correct.

22        Q.    Do you know what documents he sent

23    you?

24        A.    Yes. He sent me a fax -- a copy of


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            13

1     a Facts sheet, F-a-c-t-s, and a copy of the

2     decision kit that went out in May, '98.

3         Q.     And that was supplied from him to

4     you?

5         A.     Correct.

6         Q.     You had never supplied that to him

7     prior to that date?  Either of those documents?

8         A.     Correct.

9             MS. YU:  Joe, can we stake a break

10     for just a second?

11            MR. SAUDER:  Okay.

12            (Recess called at 10:21 a.m.)

13            (Resumed at 10:23 a.m.)

14     BY MR. SAUDER:

15        Q.     You've had an opportunity to -- you

16     took a break and had an opportunity to speak with

17     your attorney.

18            Do you have any corrections to make

19     to your testimony as a result?

20        A.     No.

21        Q.     So I don't know if we got an absence

22    to the last question, but you had never supplied

23    documents to defense counsel?  You had never supply

24    those two documents to defense counsel, correct?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              14


1    The Facts and the deficiency kit.

2        A.    Correct.

3        Q.    When you say you've discussed this

4    case with co-workers, what have you generally

5    discussed relating to this case with co-workers?

6        A.    The fact that there is -- one, that

7    there is a case.  I mean, we are all employees,

8    we'd just talk about it.  We've heard that there is

9    a case.

10       Q.    Okay.

11           Prior to -- between September, 2005

12    and today, have you talked to Don cane about this

13    case?

14       A.    No.

15    Q.    Do you stay in touch with Don cane?

16    A.    I have not talked with Don in almost

17    two years.

18    Q.    Have you ever talked to Don Cain

19    about the implementation of a cash balance plan and

20    what his thoughts were?

21    MS. YU:  Objection to the form.

22    BY MR. SAUDER:

23    Q.    Let me withdraw the question.

24    Have you talked to Ben Wilkinson


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            15


1    since September of 2005 relating in this case?

2    A.    No.

3    Q.    Is that someone you keep in contact

4    with?

5    A.    No.

6    Q.    So, just to be clear, Jim Kremmel,

7    prior to calling you in August, 2007, never came to

8      you and asked you what, if any, role you played in

9      the mailings of any -- anything relating to the

10     cash balance sub-plan?

11            MS. YU:  Objection as to form.

12     BY MR. SAUDER:

13        Q.    He never came and talked to you

14     about that prior to August, 2007?

15            MS. YU:  Objection to form.

16     BY MR. SAUDER:

17        Q.    You can answer.

18        A.    That's correct.

19        Q.    If you can take a look at what I've

20     marked as Plaintiffs' Exhibit 50, and if you could

21     take a look at that and just let me know if you've

22     seen that document prior to today?

23        A.    Which document?  The subpoena?

24        Q.    Well, the entire document.  If you


                 REPORTING ASSOCIATES, LLC  (215) 564-0675

                    KAREN E. FRANCKS            16

1    just flip through it.

2        A.    Yes, I have seen it.

3        Q.    And this is the subpoena for your

4    testimony today also requiring you to bring any

5    relevant documents that you may have, correct are?

6        A.    Correct.

7        Q.    It's my understanding that you have

8    no responsive documents to these requests.

9    Correct?

10       A.    That's correct.

11       Q.    You supplied an affidavit in this

12   case, and attached to that affidavit was Exhibit A,

13   which was the Facts Newsletter that you previously

14   discussed, correct?

15       A.    Correct.

16       Q.    And Exhibit B was the decision kit

17   that you talked about earlier, correct?

18       A.    Correct.

19       Q.    And you have no documents or

20   communications reflecting the manner in which those

21   exhibits were disseminated to participants in the

22   ACE plan, the Delmarva plan, or the Conectiv plan,

23    correct?

24        A.    That's correct.

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          17

1        Q.    And you have no documents,

2    communications or handwritten notes reflecting the

3    date or dates when Conectiv issued those exhibits,

4    correct?

5        A.    That's correct.

6        Q.    And you have no documents relating

7    to the identity of people to whom Conectiv issued

8    those documents, correct?

9        A.    That's correct.

10       Q.    And you said you met with counsel

11   for the first time -- when you spoke first with

12   Barak Bassman, I don't want to know what you

13   discussed, but how long did you talk to him on the

14   phone?

15       A.    Gosh.  Less than ten minutes.

16     Q.     And was there anyone else on the

17     phone?

18     A.     No.

19     Q.     And the first time you met with

20     counsel was on Friday?

21     A.     This past Friday.

22     Q.     And who did you meet with?

23     A.     Kay.

24     Q.     Anyone else?

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          18

1     A.     No.

2     Q.     Was anyone else present?

3     A.     No.

4     Q.     And how long did you meet with Kay?

5     A.     About an hour.

6     Q.     And did you review any documents?

7     A.     Yes.

8     Q.     How many documents did you review?

9      A.    I don't recall the exact number.

10      Q.    More than ten?

11          MS. YU:  I brought the documents,

12    and I'm going to instruct her not to answer with

13    respect to the particular documents that I brought

14    with me.

15    BY MR. SAUDER:

16      Q.    Ask you go through your educational

17    background after high school?

18      A.    I graduated from Goldey-Beacom

19    College in '78 with an Associate's degree in

20    medical secretarial, I graduated from Goldey-Beacom

21    College in '85 with a Bachelor in business

22    administration, and I graduated from Widener

23    University in 1999 with a Master's in human

24    resources, and I'm SPHR certified.  Senior

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          19

1    professional human resources.

D0204

2      Q.    And when did you get that

3    certification?

4      A.    2002, I believe.

5      Q.    Hand what did that entail?

6      A.    An examination.  It's a national

7    certified examination, test.

8      Q.    Did you have to take courses for

9    that?

10      A.    You can, or you can just study for

11    it, or it's based on experience, also.

12      Q.    What is your current address -- home

13    address?

14      A.    200 Forest, one R, F OR E S T,

15    drive, Wilmington, Delaware, one anyone eight of

16    four.

17      Q.    And have you lived there since

18    October of '89?

19      A.    Yes.

20      Q.    What was the date you were first

21    hired by Delmarva?

22      A.    June 29, 1981.

D0205

23    Q.    Are you grandfathered in this

24    policy?

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              20

1      A.    No, I'm not.

2      Q.    Was your husband grandfathered?

3      A.    I do not have a husband.  My

4    significant other retired in 1998.

5      Q.    So you are in the cash balance plan?

6      A.    Yes, I am.

7      Q.    And what was your -- if you could

8    take me through your positions at Delmarva.

9      A.    From the beginning?

10     Q.    Yes.

11     A.    I was hired as a secretary.  In '86

12    I went into the safety department.  In '98, manager

13    of the HR service center.  Late '99 I was pulled

14    off into a special project, performance, process

15    and technology, and I was in an HR manager for

16    corporate services and manager of organizational

17    effectiveness to my current role, manager of

18    performance, process and technology.

19        Q.    You said you were hired as a

20    secretary in '81 and you held that position until

21    '86?

22        A.    Yes.

23        Q.    And who were a secretary for?

24        A.    Predominantly -- the first three


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            21


1    years in the finance area and the second three

2    years in customer service.

3        Q.    And then you went to the safety

4    department.  What did you do there?  Or what was

5    your title?

6        A.    I started as a secretary in the

7    safety department and then went to a safety

8    analyst -- promoted to a safety analyst, and then

9    promoted to a disability manager, and then safety

10    was part of HR at the time.

11        Q.    And then you were promoted to --

12        A.    Manager of the HR service center.

13        Q.    And who promoted you to that

14    position?

15        A.    Don Cain.

16        Q.    Had you worked with Don Cain prior

17    to that?

18        A.    Yes.

19        Q.    In what capacity?

20        A.    I was in his organization.  Not a

21    direct report.

22        Q.    Did you ever directly report to Jim

23    Kremmel?

24        A.    No.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              22


1        Q.    At any point during the time you

2    worked for Delmarva or Conectiv --

3        A.    Never.

4        Q.    When you became manager of the

5    service center, who did you directly report to at

6    that point?

7        A.    Don Cain.

8        Q.    What was his title at the time?

9        A.    Vice-president of -- I'm not exactly

10   sure.  I don't know whether it was all

11   administration or just HR.  I think he had a couple

12   other areas beside HR.  I don't really report.

13       Q.    Who did you replace in the service

14   center?

15       A.    There was no service center.

16       Q.    This was a newly created position or

17   newly created entity?

18       A.    Correct.

19       Q.    Do you know what month that was that

20   this was created and you --

21       A.    January, 1998.

22       Q.    And when did you first take the

23   position?

24        A.    In January, 1998.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          23


1        Q.    And was this the created -- do you

2    know why this was created?

3        A.    I believe it was created to put a

4    focus on employees and to deliver the benefits to

5    employees.  Not just benefits; HR services.

6        Q.    How do you know define that?

7        A.    HR services?  If an employee has a

8    question on any benefit, any policy, any procedure

9    around L R, what is their vacation, what is their

10    benefit.  I don't have benefits, how do I get about

11    benefits?  It was like a call center for --

12        Q.    Who handled those types of issues

13    prior to the services center being established?

14        A.    Various people.

15        Q.    Was there -- were there an HR

16    supervisor that was specifically tasked with

17    overseeing those times of issues?

18        A.    Well, prior to January when there

19    wasn't an L of service center, we were still two

20    companies, Delmarva Power and Atlantic Electric,

21    and the HR world was still separate, so we were

22    starting to come together into a single HR under

23    Don Cain around January, '98, so the two HRs were

24    starting to merge, so I don't know who was doing

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              24

1    the HR services in ACE or I'm not real sure of who

2    was doing them in Delmarva Power.

3        Q.    The merger took place in March of

4    '98, correct?

5        A.    Correct.

6        Q.    So in January of '98, were you

7    working with ACE HR people already?

8        A.    We were starting to come together to

9    know each other and do kind of due diligence around

10    how we would approach things and I was still

11    technically in safety up until then so I don't --

12        Q.    Up until when?

13        A.    Up until January -- before January,

14    '98.

15        Q.    But, between January and the time of

16    the merger, which was March of '98, you weren't

17    overseeing anything that was happening at ACE with

18    regard to HR issues, were you?

19        A.    We were starting to, because we were

20    pulling together the two HRs, so I was not

21    technically overseeing.  I don't recall whether the

22    employees actually started reporting to me.

23            It could have been in that time

24    frame but I don't have the exact recall of which


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            25


1    month some of those employees started reporting to

2    me but they eventually did.

3      Q.     When you say reporting to you what

4   do you mean by that?

5      A.     They -- there were employees in the

6   ACE HR and the Delmarva HR that were all redesigned

7   and put under different managers, so some of them

8   would have been reporting to me.

9      Q.     So you are talking about

10  specifically HR people?

11     A.     Specifically, yes.

12     Q.     And do you know -- were you the hold

13  of the service center?

14     A.     Yes.

15     Q.     And how many supervisors were there

16  in the service center?

17     A.     We started with -- we didn't call

18  them supervisors; we called them program managers,

19  and there were one or two -- we were fluctuating

20  staffing levels as we were designing our model so

21  we had one or two at any given point.

22     Q.     And they reported to you?

23     A.     Yes.

24         Q.    Can you give me the names of the

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          26

1    individuals who were program managers during the

2    time you were there?

3         A.    Lynne Curriden, and then there was a

4    position that many people kind of -- a few people

5    went through and I don't recall the names.  I don't

6    recall.

7         Q.    Does Lynne still work at the

8    company?

9         A.    No.

10        Q.    When did she leave the company?

11        A.    Lynne left in -- about two years

12   ago.  I don't know the exact date.

13        Q.    Did she have health issues?

14        A.    Yes, she did.

15        Q.    How long did she work in the service

16   center, do you know?

17     A.     She worked in the service center

18     from '98 right after I started until she disability

19     retired a couple years ago.

20     Q.     And any of the other program

21     managers still work at the company?

22     A.     No.

23     Q.     You are the only supervisor or

24     manager that was in the service center in '98

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          27

1     that's still at the company, correct?

2     A.     Can I be excused?

3     Q.     Sure.

4          (Discussion is held off the record.)

5          (Pertinent portion of the record is

6     read.)

7     BY MR. SAUDER:

8     Q.     Is that correct?  That question?

9     A.     That's correct, still with the

10     company.

11         Q.     Did Jim Kremmel have any role in the

12     service center?

13         A.     No.

14         Q.     Did you have any interaction with

15     Jim Kremmel at that time?  When I say at that time,

16     I mean, during the time you were at the service

17     center?

18         A.     I'm sure I did.  He was in the HR

19     department.

20         Q.     What was his role?

21         A.     He was in employee relations.

22         Q.     What did that mean to you?

23         A.     That department interfaced with

24     managers and employees predominantly on union


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS           28


1     contractual issues, grievances, arbitrations,

2     investigations.

D0216

3        Q.     He was in that role in 1998 and

4    1999, as far as you know?

5        A.     As far as I know, but I can't be

6    exact.

7        Q.     How big was HR during that time,

8    1998, 1999?

9        A.     Well, we were merging two HR

10   functions, so we were large, we were about -- about

11   95 employees and we would then start reducing, as

12   we consolidated work.

13       Q.     People were being laid?

14       A.     Right, and people were taking

15   severances.

16       Q.     Voluntary and involuntary?

17       A.     Correct.

18       Q.     And do you know what that eventually

19   pared down to from 95?

20       A.     I don't know.

21       Q.     Did you have any concern that you

22   may lose your job at that time?

23       A.     No.

24       Q.     But fair to say that employees were

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS                29

1     generally concerned after the merger that they may

2     lose their jobs?

3          A.    I don't know.

4                MS. YU:  Objection as to form.

5     BY MR. SAUDER:

6          Q.    How many supervisors were there in

7     HR during that time period, 1998, 1999?

8                MS. YU:  Objection as to form.

9                THE WITNESS:  I don't know.

10     BY MR. SAUDER:

11         Q.    Roughly?

12         A.    In all of HR?

13         Q.    Correct.

14         A.    Or in my area?

15         Q.    In all of HR.

16         A.    My best guess would be, less than

17     five.

18    Q.    And you were one of them, correct?

19    A.    I was a manager, not a supervisor.

20    Q.    How many managers would there have

21    been?

22    A.    Approximately five.

23    Q.    Managers reported to supervisors?

24    A.    No.  Supervisors reported to

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              30

1    managers.

2    Q.    Okay.

3          And all managers reported to Don

4    Cain?

5    A.    Not necessarily.  Sometimes a

6    manager can report to a higher level manager, but

7    most did report to Don Cain.

8    Q.    But I mean, Don Cain was the one who

9    was sort of the head of HR?

10    A.    Yes, he was.

11          Q.    But you had the option, if you

12    needed for whatever reason to report to someone

13    over Don Cain?

14          A.    No.

15                MS. YU:  Objection.

16    BY MR. SAUDER:

17          Q.    You say another manager or another

18    person maybe on Don Cain's level, just in a

19    different department?  Is that what you were

20    talking about when you said they report to someone

21    other than Don Cain occasionally?

22                MS. YU:  Objection.

23                THE WITNESS:  I did not say they

24    would report to someone other than Don Cain.  I


            REPORTING ASSOCIATES, LLC  (215) 564-0675

                KAREN E. FRANCKS            31


1    said that they could report to another manager.  It

2    went supervisor, manager, you could have a senior

3    manager, and then Don Cain.

4      BY MR. SAUDER:

5          Q.    You said there were about five

6      managers at that time, you were one of them.

7               Are any of the other managers

8      currently employed at the company?

9          A.    Yes.

10         Q.    Who?

11         A.    He's now a vice-president, his name

12     is Ernest Jenkins.

13         Q.    What's he vice-president of?

14         A.    People strategy and human resources.

15         Q.    In 1998 and 1999, when he was a

16     manager in HR, what was his position?

17         A.    He was hired externally in January

18     of 1998 to -- brought in to be the manager of

19     organizational effectiveness.

20         Q.    What does that mean?

21         A.    Means organizational consulting.

22         Q.    Did he plan any role in the cash

23     balance plan that you know of?

24         A.    Not to my knowledge.

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          32


1       Q.     Did he play any role in mailing

2    anything out relating to anything relating to HR?

3       A.     No.

4       Q.     Is there anyone else who is still at

5    the company?

6              MS. YU:  In terms of managers?

7    BY MR. SAUDER:

8       Q.     That were managers in HR at the

9    time, 1998, 1999.

10      A.     I don't believe so.

11      Q.     How about supervisors?  Any

12   supervisor -- people that were supervisors in 1998

13   or 1999 that are still at the company?  Supervisors

14   of HR.

15      A.     Not to my knowledge.

16      Q.     Jim Kremmel, he was a manager?

17      A.     No.

18     Q.     He was a supervisor?

19     A.     No.

20     Q.     He was what, not with --

21     A.     Must have been a staff position, an

22     employee relations specialist.  I don't know his

23     exact title, but something like that.

24     Q.     So he would have been lower than a


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              33


1     manager?

2     A.     Yes.

3     Q.     Lower than a supervisor?

4     A.     Lower meaning?

5     Q.     Meaning he would report to a

6     supervisor or he didn't have as much authority as a

7     supervisor?

8             MS. YU:  Objection as to form.

9     BY MR. SAUDER:

10     Q.     You can answer.

file:///J|/JRM/Conectiv/sjreply/0827fran.txt

11      A.      Similar staff positions are the same

12   grade levels.  I wouldn't couch it as less

13   importance, but he reported to a manager.

14      Q.      Do you know who he reported to at

15   that time?

16      A.      He reported to John Zimmerman.

17      Q.      And he's no longer at to company,

18   correct?

19      A.      Correct.

20      Q.      What was John Zimmerman responsible

21   for overseas?

22      A.      He was a manager of employee

23   relations.

24      Q.      So the union relationships?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS           34


1      A.      Correct.

2      Q.      Union contractual relationships?

3      A.      Correct.

4          Q.     Did you have any interaction with

5     John Zimmerman or Jim Kremmel while you were at the

6     service center reading to any mailings with regard

7     to HR material?

8          A.     I don't believe so.

9          Q.     They didn't oversee that task?

10         A.     No.

11         Q.     Did you pray any role on what was

12     called the Total Rewards team?

13         A.     Total awards team?

14              I don't recall --

15         Q.     Are you familiar with that term?

16         A.     I'm familiar with the term "total

17     awards."  I'm not familiar with the term "Total

18     Rewards team."

19         Q.     What's your understanding of what

20     "Total Rewards" means?

21         A.     It is the value of your compensation

22     and your benefits as a total package.

23         Q.     Is that a phrase that came about at

24     or around the time of the merger?

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          35

1       A.    I believe so.

2       Q.    Do you know how defense counsel

3    found out that you had potentially relevant

4    information in this case?  Do you have any idea?

5       A.    No.

6            MS. YU:  Objection.

7    BY MR. SAUDER:

8       Q.    I'm just asking whether you know.

9            Do you have any idea?

10      A.    No.

11      Q.    Subsequent to your call with Jim

12   Kremmel in August of 2007, have you had any other

13   conversations with Jim Kremmel subsequent to that?

14      A.    Subsequent meaning after?

15      Q.    Yes.

16      A.    No.

17      Q.    So that was the one and only time

18   you talked to Jim Kremmel about this case, correct?

19      A.     About this case, correct.

20      Q.     And that was a five-minute

21      conversation?

22          MS. YU:  Objection.

23      BY MR. SAUDER:

24      Q.     You can answer.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          36


1       A.     Yes, I would say around five

2       minutes.  It was just an introductory conversation

3       to let me know someone would be calling me.

4       Q.     Did he call you or meet you?

5       A.     Called me.

6       Q.     And he called you in the office?

7       A.     I don't know where he called me

8       from, but he called my office, yes.

9       Q.     Fair to say that there were a lot of

10      changes taking place in January of '98 when you

11      became the manager of the service center?

12      A.    Yes.

13      Q.    Medical benefits, they were

14    changing?

15      A.    Yes.

16      Q.    Prescription benefits were changing?

17      A.    Yes.

18      Q.    Dental was changing?

19      A.    Yes.

20      Q.    Vision care was changing?

21      A.    Yes.

22      Q.    Life insurance was changing?

23      A.    Yes.

24      Q.    Health care and dependent care


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            37


1    reimbursement accounts were changing?

2      A.    New.  We had not had it before.

3      Q.    So that was something else new?

4      A.    Yes.

5      Q.    New to all the employees, both on

6    the Delmarva side and ACE side, as far as you knew?

7      A.    As far as I know.

8      Q.    Pension plan was changing?

9      A.    Yes.

10     Q.    For some people?

11     A.    Yes.

12     Q.    401(k), was that changing?

13     A.    I believe so, but I don't know if it

14   was just the vendor or the match.  I can't recall.

15     Q.    But something was changing?

16     A.    Something was changing.

17     Q.    Paid time off, that was changing?

18     A.    I don't remember.

19     Q.    Was there an educational assistance

20   program that was either changing or being

21   implemented?

22     A.    Delmarva had one, but that is my

23   heritage, so I don't -- I don't know about ACE.  I

24   don't know if they had one, but it was probably

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          38


1    changing on some level.

2        Q.    As you already said, people were

3    being laid off, correct?

4            MS. YU:  Objection.

5            THE WITNESS:  We did not use that

6    term.

7    BY MR. SAUDER:

8        Q.    What do you use?

9        A.    We were doing severances.

10       Q.    People were leaving?

11       A.    Um-hum.

12       Q.    And some of them didn't want to

13   leave, correct?

14           MS. YU:  Objection.

15           THE WITNESS:  I don't know.

16   BY MR. SAUDER:

17       Q.    At the time you were hired in 1981

18   at Delmarva, and then up through January of 1999,

19    you were in the Delmarva pension plan, correct?

20        A.    Correct.

21        Q.    And, when you first were hired at

22    Delmarva, that was the pension plan they had; you

23    didn't have a choice to pick what pension plan you

24    wanted, correct?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            39


1        A.    Correct.

2        Q.    And through that time period you

3    didn't have a choice to pick what pension plan you

4    wanted, correct?

5        A.    Correct.

6        Q.    And then -- you are in the cash

7    balance plan, correct?

8        A.    Correct.

9        Q.    And you didn't have a choice to be

10    in the cash balance plan or not, correct?

11        A.    Correct.

12       Q.    They just put you on the cash

13    balance plan?

14       A.    Yes.

15          MR. SAUDER:  Mark this Plaintiffs'

16    Exhibit 51, please.

17          ^(Exhibit P-51 is marked for

18    identification.)

19    BY MR. SAUDER:

20       Q.    If you could just take a look at

21    what's been marked Plaintiffs' Exhibit 51 and let

22    me know once you've had an opportunity to review

23    that document.

24       A.    I've glanced at it.


          REPORTING ASSOCIATES, LLC  (215) 564-0675

             KAREN E. FRANCKS          40


1        Q.    Did you play any role in drafting

2    this document?

3        A.    No.

4        Q.    Did you play any role in overseeing

file:///J|/JRM/Conectiv/sjreply/0827fran.txt

5    that document in any way?

6        A.    No.

7        Q.    Have you seen that document prior to

8    today?

9        A.    Not to the best of my knowledge.

10    I'm not grandfathered.  I don't believe I would

11    have received this.

12        Q.    Is it your understanding that

13    individuals that are grandfathered have a choice

14    between the cash balance plan -- have a choice

15    between taking their benefits if the cash balance

16    plan or taking their benefit from the heritage

17    plan?

18            MS. YU:  Objection.

19    BY MR. SAUDER:

20        Q.    Is that what your understanding is?

21            MS. YU:  Objection.

22            THE WITNESS:  That's what I hear.

23    I'm not grandfathered.

24    BY MR. SAUDER:

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          41


1       Q.    But that's what you heard, right?

2             MS. YU:  Objection.

3    BY MR. SAUDER:

4       Q.    Is that correct?

5       A.    Yes.

6       Q.    You were born September, 1958, is

7    that correct?

8       A.    Correct.

9       Q.    ^ this has been previously marked

10   as Plaintiffs Exhibit 3.

11      A.    Okay.

12      Q.    You've had an opportunity to look at

13   Plaintiffs Exhibit 3?

14      A.    Yes.

15      Q.    Fair to say there is no date on that

16   document?

17      A.    Yes.

18      Q.    Mr. Wilkinson, he was -- what was

19   his position?  Ben Wilkinson, what was his position

20    in 1998, 1999?

21        A.    I'm not sure of his exact title, but

22    he was manager of benefits.

23        Q.    And he was brought in from the

24    outside, correct?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              42


1        A.    That's correct.

2        Q.    I want to read you a portion of what

3    he testified to relating to these Facts documents

4    and ask you if you think that's correct or you

5    agree with that.

6            "Do you know if you played any role

7    in preparing this document?

8            "Answer.  Without a date, it's very

9    hard to tell.  There were lots of these documents

10    prepared under the heading "Facts."

11            "Question.  And when you say a lot

12    of documents prepared under the heading Facts, is

13    that there would have been -- they would be --

14    there would have been prepared under the heading

15    Facts, that would have had nothing to do with the

16    cash balance plan?

17         "Answer.  Probably there were --

18    there were different Facts sheets for 401(k) and

19    the health care plan, and all under the same theme

20    about the Facts -- about the benefits.

21         "Question.  For all the -- for all

22    the changes that were taking place at that time?

23         "Answer.  Yes."

24         Do you agree with that, that there


         REPORTING ASSOCIATES, LLC  (215) 564-0675

         KAREN E. FRANCKS            43


1    were these types of Facts letters that were going

2    out for all different types of benefits that were

3    changing and being implemented at the time?

4         MS. YU:  Objection to form.

5         THE WITNESS:  Yes.

D0236

6    BY MR. SAUDER:

7       Q.    So -- we went through that list

8    before.  There would have been Facts letters going

9    out for the medical benefit?

10      A.    There may have been.

11      Q.    And for the prescription benefit?

12      A.    I don't recall, but there may have

13    been.

14      Q.    Dental?

15      A.    Not sure.

16      Q.    But may possibly?

17      A.    Yes.

18      Q.    Vision?

19      A.    Highly unlikely.

20      Q.    Why do you say that?

21      A.    Smaller benefits were usually

22    combined together.  We wouldn't have done a full

23    communication on something as small as vision.  It

24    probably would have been included in a larger

REPORTING ASSOCIATES, LLC  (215) 564-0675

1    communication.

2        Q.    How about life insurance?

3        A.    Not sure.

4        Q.    Possibly?

5        A.    Possibly.

6        Q.    And you would agree that 401(k),

7    there would have been a Facts made by -- or

8    probably that went out for that?

9            MS. YU:  Objection.

10            THE WITNESS:  There may have been.

11    BY MR. SAUDER:

12        Q.    How about for -- if there were

13    changes in the vacation or any paid time off?

14        A.    Those type of things would have been

15    combined.

16        Q.    And all these changes were taking

17    place in post -- you know, most-merger, which would

18    have been March, 1998, correct?

19        A.    Correct.

20      Q.    Do you know if you received a copy

21    of Plaintiffs Exhibit 3?

22          MS. YU:  Objection.  Is there a time

23    frame you are asking about?

24          MR. SAUDER:  Excuse me?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          45


1          MS. YU:  Is there a time frame you

2    are asking about?

3          MR. SAUDER:  1998, 1999.

4          THE WITNESS:  I don't have specific

5    recall whether I personally received this or not.

6    BY MR. SAUDER:

7      Q.    You don't have a copy of this,

8    correct?

9      A.    I haven't looked to see if I have a

10    copy.

11          I don't know.

12      Q.    Fair to say there is no address on

13    this, P-3?

14        A.    That's correct.

15        Q.    Do you have any indication when this

16    was disseminated?

17        A.    Without a date -- the dates were

18    sometimes in this blackened margin, but something

19    gives mea hint is that "We are becoming Conectiv"

20    usually was a tag line used before or right after

21    the merger.

22        Q.    Other than that, you have no

23    firsthand knowledge of when this was disseminated,

24    correct?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              46


1        A.    That's correct.

2            MS. YU:  Objection.

3    BY MR. SAUDER:

4        Q.    You have no firsthand knowledge

5    whether this was disseminated, correct?

6                MS. YU:  Objection.

7                THE WITNESS:  That's correct.

8        BY MR. SAUDER:

9            Q.    Fair to say that these types of

10       documents headed Facts, that -- you already

11       testified these types of documents went out for all

12       types of benefit changes that were taking place,

13       these types of documents may be laying around the

14       company?

15               MS. YU:  Objection as to form.

16               THE WITNESS:  They could be.

17               MR. SAUDER:  We'll mark this as

18       Plaintiffs' 52.

19               ^(Exhibit P-52 is marked for

20       identification.)

21               THE WITNESS:  You want me to look at

22       this?

23       BY MR. SAUDER:

24           Q.    Yes, please.



                 REPORTING ASSOCIATES, LLC  (215) 564-0675

1      A.    Okay.

2      Q.    Looking at the first two pages of

3    Plaintiffs' Exhibit 52, is that a declaration that

4    you provided relating to this case?

5      A.    Yes, it is.

6      Q.    And the first time you spoke to

7    anyone -- when was the first time you spoke to

8    anyone regarding this declaration?

9      A.    Well, obviously, it would have been

10    right before my signature of July 31st.

11      Q.    And do you know who you spoke with

12    relate to this declaration?

13      A.    I believe it was Barak Bassman.

14      Q.    Is that the conversation you

15    discussed earlier?

16      A.    Yes.

17      Q.    So do you know in relation to you

18    signing this on July 30 first, 2007 how many days,

19    weeks, months, it would have been prior that you

20    spoke with Barak Bassman relating to the

21    declaration?

22        A.    I think my original estimate was

23    that my first discussion with Barak and Jim Kremmel

24    was early August.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          48


1            Obviously, I'm off by a week or so,

2    but this would have -- the discussion would have

3    happened right before this July 31st date.

4        Q.    So days, maybe?

5        A.    Days.

6        Q.    When you spoke with Barak Bassman

7    for the first time relating to this declaration,

8    did he send you, E-Mail you, fax you, mail you a

9    copy of this declaration as you were having the

10    conversation?

11            ^ MS. YU:  Objection.  The process

12    by which this declaration was prepared is

13    attorney-client privilege and I'm going to instruct

14    her not to answer.

15    BY MR. SAUDER:

16        Q.    Well, were you looking at this

17    declaration the first time you were speaking with

18    Barak Bassman?

19        A.    No, I wasn't.

20        Q.    After your conversation with Barak

21    Bassman, how quickly is it that you first saw a

22    copy of the declaration?

23        A.    I don't know.  My guess would be,

24    days.


        REPORTING ASSOCIATES, LLC  (215) 564-0675

            KAREN E. FRANCKS              49


1        Q.    And how did you receive a copy of

2    it?

3        A.    I believe pdf means.  I believe pdf,

4    E-Mail.

5        Q.    And did you make any changes -- so,

6    it was pdf E-Mailed from defense counsel, correct?

7        A.    Correct.

8        Q.    And did you make any changes to the

9    draft that they prepared?

10            ^ MS. YU:  Objection.  The process

11    by which this declaration was prepared is not

12    something that I'll allow her to answer.

13            MR. SAUDER:  She can answer whether

14    she made any corrections to the copy she received

15    or there were any changes she had to make, if she

16    agreed with anything that was in there.

17            MS. YU:  Focusing on just her

18    review?

19            MR. SAUDER:  Yes.

20            MS. YU:  I think that's a very, very

21    fine line between the process of the

22    attorney-client communication portion of preparing

23    this.

24            I'm not going to let her answer.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            50

1          MS. SAUDER:  Will you let her answer

2     if she made any changes?

3          MS. YU:  I don't know how you would

4     disassemble what happened with respect to the

5     portions of the preparation of the declaration that

6     involve the attorney and the communications, and

7     I'm not going to have her answer that question.

8          MR. SAUDER:  So you are instructing

9     her not to answer?

10          MS. YU:  Yes.

11     BY MR. SAUDER:

12     Q.    What were your -- explain to me what

13     your responsibilities were as manager of the

14     service center in 1998.

15     A.    First and foremost, to staff and

16     create the organization that hadn't existed before

17     January, 1998.  Parallel with putting the

18     infrastructure together to be able to solicit and

19     enroll employees in new benefits in July, 1998.

20     Q.    What does that mean?

21        A.    Get the technology in place, get the

22    vendor on board.  We were working with Towers

23    Perrin at the time to design a service center,

24    since we had never had one before.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            51


1        Q.    And you were working directly with

2    Towers on that -- on those issues, correct?

3        A.    Yes, I was.

4        Q.    And anyone else -- would Don Cain be

5    in on any of those meetings for any reason?

6        A.    In on the meetings, I'm in order --

7    I don't recall Don being in on the meetings, but I

8    have would reported to him.

9        Q.    But you would have been the most

10    senior person at the company in on those meetings?

11        MS. YU:  Objection.

12        THE WITNESS:  Most likely.

13    BY MR. SAUDER:

14      Q.    Anyone else from the company would

15    have been in on those meetings?

16      A.    There was a team to design and

17    implement the service center, so, as we staffed up,

18    ditch people would have been on that team.

19    Technology folks and subject matter experts.

20      Q.    But not necessarily people that were

21    working in the service center?

22      A.    Yes, um-hum.

23      Q.    Okay.

24        Yes, they were people that were


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          52


1    working in the service center?

2      A.    Yes.  As we staffed up they would

3    have been -- they would have had a role in

4    implementing the service center.

5      Q.    And during that time frame in 1998,

6    what portion of your job responsibilities were

7    devoted to getting this thing up and running?

8        A.    A hundred percent.  It was my job to

9    get it up and running.

10       Q.    Would that be during all of 1998?

11       A.    Well, we had to solicit for the new

12   benefits in early May, the benefits went live in

13   July, and then we had to troubleshoot any -- then

14   we had to service the customers after July.

15            So, it was -- it was parallel, there

16   were always issues with a new service center,

17   technology issues or staffing issues, people coming

18   and going, plus we were consolidating HR at the

19   time.

20       Q.    And you were the most senior person

21   in the service center?

22       A.    Yes.

23       Q.    So a hundred percent of your time

24   was -- in 1998, dealt with getting this thing up


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          53

1    and running, dealing with Towers, dealing with the

2    technology be issues, dealing with the vendors and

3    things like that, correct?

4        A.    Yes, and I'm sure there is other

5    things in that hundred percent, too, but that was

6    my responsibility to get that up and running.

7        Q.    Whether you say sure there are other

8    things, what other things?

9        A.    Well, there are -- then answering

10    the questions of the employees, so we were

11    implementing the service center as we were working

12    in the service center.

13        Q.    And you had people there to answer

14    the questions, correct?

15        A.    Correct.

16        Q.    And how many people would have been

17    there to answer questions that employees had?

18        A.    Well, it fluctuated.  We would ramp

19    up during an open enrollment and ramp down when it

20    wasn't an open enrollment, so we would staff up

21    sometimes using long-term terms.  At probably our

22    height we had -- we had six full time people on the

23    phones and there was a standing order in HR at the

24    time that when I raise the flag if the phones were


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              54


1    business see other people would have to step in and

2    handle the overload.  I would sit on the phones, if

3    I had to, to make sure questions were answered.

4         Q.    And is the service center some

5    place, if you needed a benefits form to fill out, a

6    change in benefits, or anything relating to

7    benefits, some type of form, where you could come

8    to the service center and say, "I need a copy of

9    this form so I can fill it out"?

10        A.    You could walk in, but we

11    discouraged it.

12        Q.    Why is that?

13        A.    Because it takes people off the

14    phones.  We were trying to change behavior in the

15    organization to get used to coming into a service

16    center, a call center instead of walking in to your

17    friend that you used to know and get something.

18        Q.    But these where you would go if I

19    wanted that form?

20        A.    That's correct.

21        Q.    That type of form, you would come to

22    the service center?

23        A.    You would call an 800 number.

24        Q.    And then they would send it out?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          55


1        A.    Yes.

2        Q.    Or get it to you somehow?

3        A.    Somehow.

4        Q.    In the second paragraph where -- or

5    the second sentence you say, "My responsibility

6    included distribution of all HR publications,

7    notices, newsletters and forms to Conectiv

8    employees," correct?

9         A.    Correct.

10        Q.    And you say your responsibility.

11   When you say your responsibility, was that

12   something that you say was your responsibility

13   because you were the manager of the service center

14   and that's something the service center was

15   supposed to be doing, correct?

16        A.    That's correct.  Not my personal

17   responsibility, but, yes, it was our organizational

18   responsibility.

19        Q.    Someone below you was supposed to be

20   doing that type of thing, correct?

21        A.    That's correct.

22        Q.    And who were those people?  Do you

23   know their names?

24        A.    There were various people.  A lot of


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          56

1    our fulfillment, as we called it, and our

2    distribution, was coordinated by one of our senior

3    consultants.  One person that comes to mind is

4    Christine vanVeen.

5       Q.    How do you spell that last name?

6       A.    Small v-a-n capital V-e-e-n.

7       Q.    She was a consultant?

8       A.    She was a -- well, it wasn't an

9    external.  She was an employee.

10      Q.    Where did she come from, Delmarva or

11   ACE?

12      A.    She was Delmarva heritage.

13      Q.    Is she still with the company?

14      A.    Yes, she is.

15      Q.    What's her role?

16      A.    I believe she's a senior benefits

17   consultant.

18      Q.    And she reported to you at the time?

19      A.    I don't recall whether she was

20   directly or indirectly reporting to me.

21      Q.    Was she in the service center?

22        A.    Yes, she was.

23        Q.    And what were her responsibilities

24    at that time?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              57


1        A.    Chris' main responsibility -- she

2    had probably the most knowledge of all the intra

3    case sees of the plans, the health and welfare

4    plans, and she was the one coordinating the

5    knowledge transfer to the newer representatives and

6    was -- we had a tiering system.  If the Tier 1 call

7    taker could not answer the question, they would

8    bump it up to Tier 2 or I would be Tier 3 for

9    disputes or whatever, and Chris was our consistent

10    Tier 2.  Because of her knowledge, she was also

11    involved in a lot of vendor management.  If there

12    were vendor issues, if Blue Cross wasn't getting

13    this card to that person.  She would work on those

14    more complex issues.

15        Q.    Fair to say you were dealing with a

16    lot of vendors in that position?

17        A.    Yes.

18        Q.    So, who, within the service center,

19    would have had the most firsthand knowledge

20    regarding the distribution of all the HR

21    publications, notices, newsletters and forms to

22    Conectiv employees?

23            MS. YU:  Objection as to form.

24    BY MR. SAUDER:


            REPORTING ASSOCIATES, LLC  (215) 564-0675

                KAREN E. FRANCKS            58


1        Q.    You can answer.

2        A.    I don't know that therefore a single

3    person.

4            I would say, to my knowledge, if we

5    were doing mass complex mailings, Chris would

6    coordinate most of those.

7        Q.    How do you define mass complex

8    mailings?

9        A.    For instance, when decision kits

10   went out, or open enrollment kits they are called

11   now, different -- different parties would get

12   different inserts, depending on whether they were a

13   retiree or a Delmarva heritage or an ACE heritage,

14   so -- because they were carrying forth some of

15   their historical options.  The fulfillment of their

16   packages, the -- this group gets these documents,

17   this group gets these documents.

18       Q.    Who would oversee the dissemination

19   of these Facts newsletters that would go out for

20   all different types of things?

21       A.    To my knowledge, it would depend on

22   whether it was a home mailing or internal mailing.

23       Q.    And who would have the most

24   firsthand knowledge relating to home mailings?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              59

1      A.    I would say it would be Chris.

2      Q.    How about internal?

3      A.    I'm not sure.

4      Q.    So, fair to say these Facts

5    newsletters would on occasion be sent out

6    internally, correct?

7           MS. YU:  Objection as to form.

8           THE WITNESS:  Sometimes.

9    BY MR. SAUDER:

10     Q.    And when you say "internally," what

11   does that mean?

12     A.    We had a couple different labelling

13   systems.  If they were going to send something to

14   the home, it would require running labels off our

15   HR system that were -- that would use the preferred

16   Post Office standards of how we address labels.

17          If we were going to mail them

18   internally, we would never put a home address label

19   on something, because it would not -- we would need

20   to put the internal address on the label.  The

21   department, the physical building location, but not

22   the home address.

23      Q.    If you could just look back at

24    Plaintiffs Exhibit 3, we've already established


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              60


1    this is no home address on this, correct be?

2        A.    Correct.

3        Q.    And is there a -- some type of

4    indication that this went to a specific building

5    within the company?

6        A.    No.

7        Q.    So it's fair to say that you didn't

8    have firsthand knowledge of the distribution of HR

9    publications, notices, newsletters and forms to

10    Conectiv employees; that was someone else under

11    you, correct?

12            MS. YU:  Objection as to form.

13    BY MR. SAUDER:

14      Q.    You can answer.

15      A.    Yes.

16    Q.    That's correct?

17    A.    That's correct.

18         I was not above stuffing envelopes,

19    though, if we needed it.

20    Q.    With you for the most part someone

21    else was responsible for that task, correct?

22         MS. YU:  Objection.

23         THE WITNESS:  Correct.

24    BY MR. SAUDER:


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS           61


1    Q.    Number 3 says, "It was Conectiv HR's

2    standard practice in 1998 only to affix postage and

3    home addresses to documents that were mailed to

4    employees' homes," is that correct?

5    A.    That's correct.

6    Q.    What do you mean by that?  In other

7    words, if it wasn't going in the mail, E-Mailed to

8    someone's home, you didn't put an address on it,

9    correct?

10        A.    In order a home address, correct.

11        Q.    Well, did you address it in any

12    other way that would say this is going to John Doe?

13        MS. YU:  Objection.

14    BY MR. SAUDER:

15        Q.    You can answer.

16        A.    Sometimes we would.  Sometimes, if

17    things were bulk mailed, there was a practice of

18    the -- I believe the general services area of the

19    company would distribute some newsletters by what

20    was called Pay Master where the paychecks went to,

21    so, if a Pay Master in one location usually got 35

22    paychecks, they would get 35 newsletters and the

23    expectation is that they would give out a paycheck

24    and newsletters.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          62


1          Sometimes we would put labels on and

2    label each newsletter to each employee.  So, it

3    would depend.

4        Q.    If it was sent out by what you

5    called Pay Master, you said the expectation was

6    that they would distribute it with the paycheck.

7    You have no firsthand knowledge whether they did on

8    they didn't, once it left the service center,

9    correct?

10            MS. YU:  Objection.

11            THE WITNESS:  That's correct.

12   BY MR. SAUDER:

13       Q.    And who would have been -- that

14   was -- the person that was supposed to be doing

15   that in different departments, would they have a

16   specific title?

17       A.    Could be anything from a clerk to a

18   secretary to an analyst.

19       Q.    And when it says "It was Conectiv

20   HR's standard practice in 1998," Conectiv had only

21   become an entity in March of '98, correct?  Prior

22   to March of '98, Conectiv didn't exist, is that

23    fair?

24        A.    That's fair.



REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            63



1        Q.    And when you say standard practice

2    was there any -- do you have any -- I think we've

3    already established you have no documents relating

4    to the dissemination of Exhibits A and B, correct?

5            MS. YU:  Objection to the form.

6            THE WITNESS:  Exhibit A and B to --

7    BY MR. SAUDER:

8        Q.    A and B to your declaration, which

9    would be the Facts Newsletter and the decision kit.

10        A.    Can you repeat your question?

11        Q.    You have no documents relating to

12    the dissemination of those documents, correct?

13            MS. YU:  Objection as to form.

14            THE WITNESS:  I'm not sure.

15    BY MR. SAUDER:

16    Q.    I mean, based on what my requests

17    were for documents, you had nothing responsive to

18    those requests, correct?

19    A.    That's correct.

20    Q.    So, fair to say you have no memo

21    that laid out what the practice was for Conective

22    to disseminate these types of documents in 1998?

23        MS. YU:  Objection to form.

24        THE WITNESS:  That's correct.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          64


1        Can I take a break?

2        MR. SAUDER:  Yes, sure.

3        (Recess called at 11:40 a.m.)

4        (Resumed at 11:46 a.m.)

5    BY MR. SAUDER:

6    Q.    ^  this has been previously marked

7    as Defendants' Exhibit 5.

8        You've had an opportunity to review

D0264

9     that document?

10          A.     Yes.

11          Q.     Fair to say that that document is a

12    copy of what you've attached as Exhibit A to your

13    declaration?

14          A.     Yes.

15          Q.     And fair to say there is no date on

16    this document?

17          A.     Yes.

18          Q.     Do you have any recollection of

19    receiving this document?

20          A.     Well, ten years ago do I remember

21    the day I got it in the mail?

22                 Not exactly.

23          Q.     Do you remember receiving this

24    document?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          65


1          A.     Yes.

2      Q.     How did you receive it?

3      A.     Received it in the Post Office mail.

4      Q.     To your home?

5      A.     Yes.

6      Q.     You just don't know when, correct?

7      A.     I don't know when.

8      Q.     And did you ever supply a copy of

9   this document to anyone?

10          MS. YU:  Objection to form.

11   BY MR. SAUDER:

12      Q.     In relation to this case.

13      A.     No.  In relation to this case?  My

14   copy of this document was because, when I was a

15   manager at the service center, everything that we

16   mailed to the home, when people would call and say

17   "I didn't get that" or "I didn't get this" or "Send

18   me this," it was my habit to bring my personal copy

19   of whatever I got at home into the service center

20   and say, "Look, folks, we did get it, I got mine,

21   so they went out."

22          So, that's why you see my copy here.

23   I would bring it into the service center kind of as

24    proof that we had seen it.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              66


1        Q.    So you brought your copy in to the

2    service center?

3        A.    Yes.

4        Q.    So that indicates that you received

5    a copy, correct?

6        A.    Yes.

7        Q.    Not necessarily that anyone else

8    received a copy?

9            MS. YU:  Objection to form.

10    BY MR. SAUDER:

11        Q.    That's fair?  You have no personal

12    knowledge that anyone else he received a copy other

13    than yourself, isn't that correct?

14            MS. YU:  Objection to form.

15    BY MR. SAUDER:

16        Q.    Is that correct?

17          MS. YU:  Objection.

18     BY MR. SAUDER:

19          Q.     You can answer.

20          A.     That's correct.

21          Q.     And do you know whether -- was there

22     some file that you had which was your file in the

23     service center?

24          MS. YU:  Objection.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS               67


1          THE WITNESS:  I had lots of files.

2     I don't know -- I don't know the trail of this

3     particular document over the last ten years.  I

4     don't know what file it went into or how it

5     reappeared.

6     BY MR. SAUDER:

7          Q.     But you did not produce it?  Someone

8     got it somehow?

9          A.     I did not produce it, correct.

10      Q.    And you don't know where that

11   someone got it, correct?

12      A.    Correct.

13         MS. YU:  Objection.

14   BY MR. SAUDER:

15      Q.    You don't know whether it was that

16   file or someplace else, correct?

17         MS. YU:  Objection.

18         THE WITNESS:  Correct.

19   BY MR. SAUDER:

20      Q.    Did you ever discuss this document

21   with Jim Kremmel?

22      A.    I don't believe so.  I don't believe

23   so.  I can't say -- I never -- I can't say.  I

24   really don't know.  I don't think so.  But my


         REPORTING ASSOCIATES, LLC  (215) 564-0675

            KAREN E. FRANCKS            68


1    conversation with Jim was very short.

2       Q.    You are talking about your

D0269

3     conversation in August, correct?

4          A.     Late July now.

5          Q.     Late July of this year.

6          A.     Um-hum.

7          Q.     But, prior to that, since 2005 up

8     through that conversation, you didn't have any

9     conversation with Jim Kremmel relating to this

10    document or this case, correct?

11         A.     That's absolutely correct.

12         Q.     So, fair to say you have no

13    knowledge that this document, D-5, was ever mailed

14    to Mike Charles, correct?

15              MS. YU:  Objection.

16              THE WITNESS:  I don't know who Mike

17    Charles is.

18    BY MR. SAUDER:

19         Q.     He's one of the Plaintiffs in this

20    case.  I guess that's fair, then --

21         A.     Was he an employee?

22              MS. YU:  Objection.

23    BY MR. SAUDER:

file:///J|/JRM/Conectiv/sjreply/0827fran.txt

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          69

1        A.    I have no firsthand knowledge

2    whether he -- whether it was mailed or he received

3    it.

4        Q.    No firsthand knowledge whether --

5    I'm going to name three other Plaintiffs in this

6    case who were employees.

7            No firsthand knowledge whether it

8    was ever sent to Joseph Fink, correct?

9            MS. YU:  Objection to form.

10           THE WITNESS:  That's correct.

11    BY MR. SAUDER:

12        Q.    No firsthand knowledge whether it

13    was ever sent to Thomas Troop, correct?

14           MS. YU:  Objection to form.

15           THE WITNESS:  Correct.

16    BY MR. SAUDER:

17      Q.    No firsthand knowledge whether it

18    was ever sent to Maury Ward, correct?

19            MS. YU:  Objection as to form.

20            THE WITNESS:  That's correct.

21    BY MR. SAUDER:

22      Q.    And we've already established you

23    have no list of individuals who it was sent to,

24    correct?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            70


1            MS. YU:  Objection to form.

2            THE WITNESS:  That's correct.

3    BY MR. SAUDER:

4      Q.    And you had no list of addresses

5    that it was sent to, correct?

6            MS. YU:  Objection to form.

7            THE WITNESS:  That's correct.

8    BY MR. SAUDER:

9      Q.    And you have no documentation to

10    show the date it was disseminated, correct?

11            MS. YU:  Objection to form.

12            THE WITNESS:  No documentation other

13    than what's listed in here --

14    BY MR. SAUDER:

15        Q.    Well, there is no date on this

16    document, correct?

17            MS. YU:  Objection.

18            THE WITNESS:  There is no date.

19    BY MR. SAUDER:

20        Q.    Correct?

21        A.    That's correct.

22        Q.    Now, going back to your affidavit,

23    which was marked as P-52 --

24        A.    Okay.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          71


1        Q.    -- in the beginning you said

2    essentially that the statements are true and

3     correct to the best of your knowledge and belief,

4     okay?  And, based on your testimony, then, with

5     regard to this document anyway, Exhibit A, which

6     has been previously marked as D-5, fair to say that

7     you made that statement, Paragraph Number 4, which

8     says, "Attached as Exhibit A is a Conectiv HR

9     newsletter titled Facts.  Conectiv HR mailed this

10     newsletter to its employees' homes in May, 1998."

11          Fair to say that that statement is

12     based on your belief, not your firsthand knowledge?

13          MS. YU:  Objection.

14     BY MR. SAUDER:

15     Q.     You can answer.

16     A.     That's correct.

17     Q.     You have no firsthand knowledge as

18     it relates to sentence Number 4 in your

19     declaration, correct?

20          MS. YU:  Objection.

21          THE WITNESS:  That's correct.

22     BY MR. SAUDER:

23     Q.     And I guess the same can be said for

24     Number 5 in your declaration?

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              72


1            MS. YU:  Objection.

2            THE WITNESS:  Can you ask your

3    question again, please?

4    BY MR. SAUDER:

5        Q.    Sure.

6            Fair to say that Number 5 --

7        A.    Um-hum.

8        Q.    -- your statement is, Attached as

9    Exhibit B is a decision kit.  This decision kit was

10    mailed to each employee's home after the Conectiv

11    Board of Directors adopted the cash balance formula

12    but before May 18th, 1998."

13        A.    That's correct.

14        Q.    It's correct that that statement is

15    based on your belief and not your firsthand

16    knowledge?

17            MS. YU:  Objection.

18          THE WITNESS:  It's stronger than a

19    belief.  These kits went to each person's home.

20    BY MR. SAUDER:

21          Q.    All right.  We'll go through this.

22          A.    Um-hum.

23          Q.    Looking at that -- your statement in

24    Number 5, where it says, "After the Conectiv Board


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            73


1    of Directors adopted the cash balance formula," and

2    I'll tell you that adopted is in dispute in this

3    case, but what's your -- do you know when the plan

4    was, quote, unquote, adopted?  Do you know the

5    date?

6          MS. YU:  Objection, form.

7          THE WITNESS:  I believe it was at

8    the April Board of Directors meeting, but I don't

9    know the exact date.

10    BY MR. SAUDER:

D0276

11      Q.    On what do you base that belief?

12      A.    Minutes from the April Board of

13    Directors meeting.

14      Q.    Based on a recent review of that

15    document?

16      A.    That's correct.

17      Q.    Within the past month?

18      A.    That is correct.

19      Q.    Okay.

20            Look at Exhibit B, this does not

21    have your address on it, correct?

22      A.    That's correct.

23      Q.    Do you know how this document was

24    produced?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            74


1            MS. YU:  Object to the form.

2            THE WITNESS:  No.

3    BY MR. SAUDER:

4      Q.    Well, if you look at the bottom of

5    the document, there is what we call a Bates stamp,

6    which says MWW 00233.  Do you see that?

7      A.    Yes.

8      Q.    And that's an indication that this

9    was produced by Maury Ward, who is one of the

10    Plaintiffs in this case.  Okay?

11      A.    Okay.

12      Q.    And it's unclear how Mr. Ward

13    received this document.  I believe he testified he

14    had some, he got some from other people within the

15    company.

16          So, do you have any recollection of

17    having this document in that file or somewhere with

18    the other document, D-5, that was mailed out?

19          MS. YU:  Objection.  Joe, are you

20    asking her about literally this particular copy?

21          MR. SAUDER:  Yes -- no, no.  This

22    document.  Not this particular copy.  I'm saying

23    this document.

24    BY MR. SAUDER:

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          75


1        Q.    You don't have a copy of this

2    document with a postmark on it that was mailed out,

3    correct?

4        A.    That's correct.

5        Q.    So, then, fair to say you have no

6    personal knowledge whether this was sent to a

7    plaintiff in this case, Mike Charles, is that

8    correct?

9              MS. YU:  Objection.

10             THE WITNESS:  That's correct.

11   BY MR. SAUDER:

12       Q.    And you have no firsthand knowledge

13   whether this was sent to Maury Ward, correct?

14             MS. YU:  Objection.

15             THE WITNESS:  That's correct.

16   BY MR. SAUDER:

17       Q.    And you have no firsthand knowledge

18    whether this was sent to Joseph Fink, correct?

19         MS. YU:  Objection, form.

20         THE WITNESS:  Correct.

21    BY MR. SAUDER:

22    Q.    You have no firsthand knowledge

23    whether this was sent to Thomas Troop, correct?

24         MS. YU:  Objection.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          76


1         THE WITNESS:  Correct.

2    BY MR. SAUDER:

3    Q.    You have no documentation that has a

4    list of people who this document was sent to,

5    correct?

6         MS. YU:  Objection.

7         THE WITNESS:  Correct.

8    BY MR. SAUDER:

9    Q.    You have no documentation showing

10    the addresses that this document was sent to,

11    correct?

12            MS. YU:  Objection.

13            THE WITNESS:  Correct.

14    BY MR. SAUDER:

15        Q.    Going back to your statement in your

16    affidavit as it relates to Paragraph Number 5, fair

17    to say that that statement is based on your belief,

18    not your firsthand knowledge?

19            MS. YU:  Objection.

20            THE WITNESS:  I still have to say,

21    it's stronger than that.  It is a past practice and

22    a current practice, and I can't quote if it's the

23    law, but all open enrollments get mailed to the

24    home.


            REPORTING ASSOCIATES, LLC  (215) 564-0675

            KAREN E. FRANCKS            77


1    BY MR. SAUDER:

2        Q.    But you have no firsthand knowledge

3    whether, in fact, it was mailed to the individuals

D0281

4    I just cited off, correct?

5           MS. YU:  Objection.  The fact that

6    she doesn't know whether or not each of these

7    individuals --

8           MR. SAUDER:  You can just object.

9    We don't need a speaking objection.

10          MS. YU:  I just want to explain to

11   you --

12          MR. SAUDER:  I know.  We'll note

13   your objection and we don't need a speaking

14   objection.

15          MS. YU:  I can state my objection

16   and the basis for it on the record.

17          MR. SAUDER:  If it's the basis and

18   not a speaking objection, I think you can do that,

19   but I don't think we need a full, blown out

20   statement.

21          ^ MS. YU:  Your questions have to

22   do with particular Plaintiffs, individuals, and

23   whether or not she has any knowledge about whether

24   they were employees at a particular time does not

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              78

1    mean she doesn't have knowledge with respect to how

2    documents were disseminated for which she was

3    responsibility.

4              MR. SAUDER:  Your objection is

5    noted.

6    BY MR. SAUDER:

7         Q.    You have no firsthand knowledge with

8    a list of individuals who this was mailed to in

9    1998, correct?

10              MS. YU:  Objection.

11              THE WITNESS:  I don't have a list,

12    no.

13    BY MR. SAUDER:

14         Q.    So, I could name 200 more people

15    individually and you would give me the same answer,

16    which is, "I have no firsthand knowledge whether it

17    was mailed to those 200 people," correct?

18              MS. YU:  Objection.

D0283

19    BY MR. SAUDER:

20        Q.    You can answer.

21            MS. YU:  Objection.

22            THE WITNESS:  Yes.

23    BY MR. SAUDER:

24        Q.    Fair to say, though, your statement


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            79


1    in Number 5 is based on your belief and not your

2    firsthand knowledge, correct?

3            MS. YU:  Objection.  Asked and

4    answered.

5            THE WITNESS:  It's stronger than a

6    belief.  It's a practice.

7    BY MR. SAUDER:

8        Q.    It's a practice where there is no

9    documentation showing that it was a practice,

10     correct?

11            MS. YU:  Objection.

12          THE WITNESS:  I don't know that

13    there is not any documentation.  I don't have the

14    documentation.

15    BY MR. SAUDER:

16       Q.    Well, that was -- I requested the

17    documentation and you don't have any documentation,

18    correct?

19       A.    That's correct.

20       Q.    And Jim Kremmel hasn't provided any

21    documentation?

22          MS. YU:  Objection as to form.  In

23    addition, she can't testify to what Jim Kremmel has

24    or doesn't have.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          80


1    BY MR. SAUDER:

2       Q.    It's stronger than a belief, but

3    it's less than firsthand knowledge, is that fair?

4          MS. YU:  Objection.

D0285

5          THE WITNESS:  It's a practice, yes.

6    BY MR. SAUDER:

7        Q.    Yes, it's less than firsthand

8    knowledge?

9          MS. YU:  Objection.

10          THE WITNESS:  Yes, it's less than

11    firsthand knowledge.

12          MR. SAUDER:  We'll have this marked

13    as Plaintiffs' 53.

14          ^(Exhibit P-53 is marked for

15    identification.)

16          THE WITNESS:  Okay.

17    BY MR. SAUDER:

18        Q.    Show you what's been marked as

19    Plaintiffs' 53.

20          Have you seen this document before?

21        A.    No.

22        Q.    Flip to Page 4, and it's marked at

23    the bottom Page 4 of 29.

24        A.    Yes.

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            81

1       Q.     Do you see that?

2       A.     Yes.

3       Q.     The first sentence, "This booklet

4    briefly describes the Pepco Holding retirement

5    plan-PHI sub-plan and defined benefit pension plan

6    for management, certain designated subsidiaries and

7    Local 1900 employees hired after January 1, 2005 or

8    later."

9              Is it your understanding that new

10    employees to Pepco who would have been in the cash

11    balance plan are now put into this Pepco plan?

12             MS. YU:  Objection.

13             THE WITNESS:  I have no knowledge of

14    that.

15    BY MR. SAUDER:

16       Q.     You played no role in -- obviously

17    no role in that decision?

18       A.     That's correct.

D0287

19    Q.    Had you heard that that was the

20    case?

21          MS. YU:  Objection.

22          THE WITNESS:  I don't recall hearing

23    that specific thing, no.  I don't know.

24          I've been out of benefits for many


          REPORTING ASSOCIATES, LLC  (215) 564-0675

          KAREN E. FRANCKS            82


1    years.

2    BY MR. SAUDER:

3          Q.    Do you know what percentage of the

4    workforce was grandfathered?

5          MS. YU:  Objection.

6          THE WITNESS:  I have heard as an

7    employee; not in a professional capacity, that

8    there are about 700 of us who were not

9    grandfathered, so I can't apply a percentage to the

10    other question that you'd asked.

11    BY MR. SAUDER:

12      Q.    You heard that as an employee

13    talking to other employees?

14      A.    That's correct.

15      Q.    Other employees that were not

16    grandfathered, presumably?

17      A.    That's correct.

18            MR. SAUDER:  If we can take ten

19    minutes, I'm go through my notes.

20            (Recess called at 12:08 p.m.)

21            (Resumed at 12:16 p.m.)

22    BY MR. SAUDER:

23      Q.    We had an opportunity to take a

24    break.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            83


1            Is there anything in your testimony

2    that needs to be corrected based on that break?

3      A.    No.

4      Q.    You mentioned earlier that there was

5      a board minutes -- meeting minutes that you saw

6      relating to the quote, unquote, adoption of the

7      plan, and is it fair to say you saw that document

8      for the first time about a week ago?

9              MS. YU:  Objection as to form.

10     BY MR. SAUDER:

11        Q.    You can answer.

12        A.    That is correct.

13            MR. SAUDER:  I have no further

14     questions.

15            MS. YU:  I have a few questions.

16     ^ EXAMINATION

17     BY MS. YU:

18        Q.    If we can go back and take a look at

19     Plaintiffs' 52 and Exhibit B.

20        A.    Page 10 of 71?

21        Q.    Yes.  What is this document?

22        A.    This document is the -- well, we

23     call it the decision kit, but in HR we call them

24     open enrollment kits.  It is used to give enrollees

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          84

1    in any annual benefit enrollment the opportunity to

2    understand the plan changes and also to give them

3    the method for enrollment.

4         Q.    Was there a particular deadline by

5    which employees had to enroll with respect to this

6    particular open enrollment kit?

7         A.    Yes.  If you look at Page 13 of 71,

8    there is always deadlines, and in this case the

9    elections are effective July 1 for the year, and

10   they had to enroll between May 18th and midnight,

11   May 31st, 1999.

12        Q.    Was it part of your responsibility

13   as manager of the service center to ensure that

14   this open enrollment kit was sent to all employees

15   of Conectiv?

16        A.    Yes.

17        Q.    Could you describe the process by

18   which you undertook to accomplish that?

19        A.    Once the package was final, it went

20     to our internal repro-graphics or an external

21     house, I'm not sure how we actually got it

22     reproduced, and then we set up a process where all

23     groups of employees who got whatever pieces of the

24     packet, and in this case all management employees

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS               85

1     and union employees would have gotten the same

2     packet because the health and welfare plans were

3     changing for everyone, so we would take over an

4     entire multi-purpose room and set up an assembly

5     line process and we put all the supporting

6     documents, including -- that are in this decision

7     kit into an envelope, put a label on them, seal

8     them, and put them in a Post Office bin and general

9     services would come and take them away.

10          Q.     So, the employees who went through

11     the physical task of stuffing envelopes and putting

12     the labels on, were they employees of the service

D0292

13     center?

14          A.     Yes, including myself.

15          Q.     Do you recall being involved in

16     stuffing the envelopes personally?

17          A.     Yes, I do.  Many a late night.

18          Q.     In terms of the timing of the

19     mailing, when would this decision kit have been

20     sent?

21          A.     Of course I don't recall the exact

22     day it was sent, but it's our practice to send them

23     out at least a few days up to a week before the

24     open enrollment starts, so that they have time to

REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          86

1     look at it and ask any questions, to call the

2     service center for any clarifying questions, so my

3     guess -- and it's totally a guess -- would have

4     been very early in May, 1998 this would have gone

5     out.

6      Q.    Were all employees of Conectiv sent

7    a decision kit, this particular one that's attached

8    as Exhibit B to your declaration?

9      A.    To the best of my knowledge.

10      Q.    Was that your intent in setting up

11    the process, to ensure that each employee of

12    Conectiv received this particular kit?

13      A.    Yes.

14          MS. YU:  I have no further

15    questions.

16    ^ FURTHER EXAMINATION

17    BY MR. SAUDER:

18      Q.    When you came out, I asked you if

19    you had anything -- based on the break, whether you

20    needed to change anything in your testimony, and

21    you said you didn't.  So, just to clarify, you said

22    the best of your knowledge.

23          Again, your answers stand, with

24    regard to when we went back and forth about

REPORTING ASSOCIATES, LLC  (215) 564-0675

1    knowledge, belief, it was something less than

2    firsthand knowledge, correct, with regard to this

3    document, Exhibit B?

4          MS. YU:  Objection.

5          THE WITNESS:  No.  I have knowledge

6    of actually designing and participating in the

7    process to mail these out.

8    BY MR. SAUDER:

9      Q.    You have firsthand knowledge that it

10   was mailed out to the individuals that I named?

11     A.    No.

12         MS. YU:  Objection.

13   BY MR. SAUDER:

14     Q.    And, if I rattled off a bunch of

15   other names, you would have no firsthand knowledge

16   whether it was mailed off to any of those

17   individuals, correct?

18         MS. YU:  Objection.

19         THE WITNESS:  That's correct.

20    BY MR. SAUDER:

21        Q.    In fact, if I named the 700 people

22    estimated that were not grandfathered, you wouldn't

23    have any firsthand knowledge whether it was mailed

24    out to those 700 people, correct?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            88


1            MS. YU:  Objection.

2            THE WITNESS:  That's correct, but I

3    don't know how they would have enrolled in benefits

4    without it.

5    BY MR. SAUDER:

6        Q.    Well, you testified earlier that, if

7    someone didn't have a form, and they needed to

8    enroll, they could simply call up the service

9    center and the service center would get them a

10     form, correct?

11           MS. YU:  Objection.

12           THE WITNESS:  No.  Your question was

13    very general about forms in general.  You were not

14    speaking about this decision kit.

15    BY MR. SAUDER:

16        Q.    Okay.

17            Well, if someone said, I don't have

18    it, I lost it, I never got it, I need the

19    enrollment form, I need to fill out my enrollment

20    benefits, can you send me the form, someone on the

21    phone that answered the phone would send them the

22    form, correct?

23            MS. YU:  Objection.

24            THE WITNESS:  I believe that's


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS            89


1    correct.

2    BY MR. SAUDER:

3        Q.    So, then, going back, if I rattled

4    off the names of 700 people that were not

5    grandfathered, you would have no firsthand

6    knowledge that those individual 700 people were

7    mailed a copy of this, correct?

8                MS. YU:  Objection.

9                THE WITNESS:  Of course.  Correct.

10   BY MR. SAUDER:

11       Q.    And you said you participated in the

12   process.  At that time you were also implementing

13   the service center and getting that up and running,

14   correct?

15       A.    (Witness nods.)

16                MS. YU:  Objection.

17   BY MR. SAUDER:

18       Q.    And there were other people under

19   you who were, on a daily basis, dealing with

20   disseminating documents, correct?

21                MS. YU:  Objection.

22                THE WITNESS:  Yes.

23   BY MR. SAUDER:

24       Q.    And that was more their

REPORTING ASSOCIATES, LLC  (215) 564-0675

1    responsibility firsthand than it was yours,

2    correct?

3          MS. YU:  Objection.

4          THE WITNESS:  Correct.

5    BY MR. SAUDER:

6          Q.    You said, if need be, you would sit

7    and stuff envelopes, correct?

8          A.    That's correct.

9          Q.    Do you know what documents you

10    were -- where you were stuffing envelopes?

11          A.    I participated in the fulfillment

12    process for the decision kits.

13          Q.    How about Exhibit A?

14          A.    I have no recall.

15          Q.    And when you say -- what did you

16    say?  You participated in the fulfillment process?

17          A.    That's correct.

18          Q.    What does that mean?

19          A.    Fulfillment is just a term that we

20    use to -- whenever you are stuffing or fulfilling,

21    the end of the process for it to go out.  It's

22    called a fulfillment process.

23         Q.    But you said it's your best guess

24    that it was sometime in May, '98?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          91


1              MS. YU:  Objection.

2              THE WITNESS:  Early May of '98.

3    BY MR. SAUDER:

4         Q.    But that's your best guess, correct?

5              MS. YU:  Objection.

6              THE WITNESS:  That's correct.

7    BY MR. SAUDER:

8         Q.    And you said the same one would have

9    gone out to management and the union?

10        A.    That's correct.

11        Q.    The union never got the cash balance

12    plan, correct?

13        A.    This has nothing to do with just the

14     cash balance plan.  This is enrolling in the new

15     health and welfare --

16          Q.     No, I understand that, but I'm just

17     saying, it's your understanding the union never got

18     the cash balance plan, correct?

19          A.     It's my understanding.

20          Q.     Did they get a different version of

21     this?

22               MS. YU:  Objection.

23               THE WITNESS:  No.

24     BY MR. SAUDER:


               REPORTING ASSOCIATES, LLC  (215) 564-0675

               KAREN E. FRANCKS            92


1          Q.     How many versions of this went out?

2     And, when I say "this," I mean Exhibit B to your

3     declaration.

4               MS. YU:  Objection.

5               THE WITNESS:  How many different

6     versions of this went out?

7          I believe it was just a single

8    version that went to everyone.  I don't think there

9    were separate versions.  If something didn't apply

10   to you, you would just ignore it.

11   BY MR. SAUDER:

12       Q.   When you say general services would

13   take them away, what's general services?

14       A.   Those were people who either

15   delivered the mail or had a relationship with the

16   Post Office and boxed them up and delivered them to

17   the Post Office for delivery.

18       Q.   Fair to say, once it went to general

19   services, you don't know what happened, correct?

20          MS. YU:  Objection.

21          THE WITNESS:  That's correct.

22   BY MR. SAUDER:

23       Q.   There was nothing to sign up for

24   with regard to the cash balance plan, correct?


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS          93

D0302

1          MS. YU:  Objection.

2    BY MR. SAUDER:

3      Q.    In other words, you either got it --

4    you either were put into it or you weren't,

5    correct?

6      A.    That's correct.

7            Wish we had a choice.

8      Q.    Why do you say that?

9      A.    I'm not happy being grandfathered.

10     Q.    Not happy not being grandfathered?

11     A.    I'm not happy not being

12    grandfathered.

13          MR. SAUDER:  All right.  Thank you.

14          That's all I have.

15          THE WITNESS:  You're welcome.

16          MS. YU:  No questions.

17          (Discussion is held off the record.)

18    BY MR. SAUDER:

19     Q.    Just a quick follow up.  I assume

20    you are saying you are not happy you weren't

21     grandfathered because it's your belief that your

22     benefit would be better under the old plan than the

23     cash balance plan?

24          A.     That's true.


REPORTING ASSOCIATES, LLC  (215) 564-0675

KAREN E. FRANCKS              94


1          Q.     Do you have a sense of how much

2     better?

3          A.     I've heard rumors.

4          Q.     What's your sense?

5               MS. YU:  Objection.

6               THE WITNESS:  25 percent better.

7     BY MR. SAUDER:

8          Q.     That your benefit would be

9     25 percent better under the old plan as opposed to

10     the cash balance plan?

11               MS. YU:  Objection.

12               THE WITNESS:  That's correct.

13               MR. SAUDER:  Okay.

14          THE WITNESS:  Not based on fact at

15    all.

16    BY MR. SAUDER:

17        Q.    But that's what you've heard?

18        A.    That's correct.

19            MR. SAUDER:  All right.  Thank you.

20            THE WITNESS:  Um-hum.

21            (12:29 p.m.)

22

23

24


REPORTING ASSOCIATES, LLC  (215) 564-0675

95


1            C E R T I F I C A T E

2            I, Sean M. Fallon, a Registered

3    Professional Reporter and Notary Public of the

4    Commonwealth of Pennsylvania, do hereby certify

5    that, prior to the commencement of the examination,

6    the witness and/or witnesses were sworn by me to

7      testify to the truth and nothing but the truth.

8           I do further certify that the

9      foregoing is a true and accurate computer-aided

10     transcript of the testimony as taken

11     stenographically by and before me at the time,

12     place and on the date hereinbefore set forth.

13          I do further certify that I am

14     neither of counsel nor attorney for any party in

15     this action and that I am not interested in the

16     event nor outcome of this litigation.

17

18

19

20

       _____
21        Registered Professional Reporter
       XI00840
22        Notary Public of the Commonwealth
       of Pennsylvania
23        My commission expires 12-22-10

24     Dated: _____


       REPORTING ASSOCIATES, LLC  (215) 564-0675

                            96

D0306

1                    JURAT

2           I, KAREN E. FRANCKS, do hereby
   certify that I have read the foregoing transcript
3    of my testimony taken on August 27, 2007, and have
   signed it subject to the following changes:

4

   PAGE  LINE        CORRECTION
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    _____
        KAREN E. FRANCKS
20
     DATE _____
21

22    Sworn and subscribed to before me this

_____ day of _____, 2007.

23

_____

24    NOTARY PUBLIC


REPORTING ASSOCIATES, LLC  (215) 564-0675

D0308





People Strategy & HR
Benefits

# Pepco Holdings, Inc. Retirement Plan
# PHI Sub-Plan

**Summary Plan Description**

# Table of Contents

*INTRODUCTION* ............................................................................................... *4*

*HIGHLIGHTS OF THE PLAN* ............................................................................. *5*

*ELIGIBILITY AND ENROLLMENT* ..................................................................... *6*

*PLAN COST* ........................................................................................................ *6*

*HOW YOUR SERVICE COUNTS* ...................................................................... *7*

    **Absences from Work** ................................................................................. **7**

    **Part Time Employees** ................................................................................ **7**

*WHEN YOU MAY RETIRE* ................................................................................. *8*

    **Normal Retirement** ................................................................................... **8**

    **Early Retirement** ....................................................................................... **9**

    **Deferred Retirement** ................................................................................. **9**

*NORMAL RETIREMENT BENEFIT* .................................................................... *9*

    **Benefit Formula** ........................................................................................ **9**

    **Your Final Average Earnings** ................................................................. **10**

*EARLY RETIREMENT* ...................................................................................... *11*

*DEFERRED RETIREMENT* ............................................................................... *14*

*FORMS OF RETIREMENT BENEFITS* ............................................................ *14*

    **Life Income Only Annuity** ....................................................................... **14**

    **Automatic Joint and Surviving Spouse Annuity** .................................. **14**

    **Optional Joint and Survivor Annuity** .................................................... **15**

    **Lump Sum Payout** ................................................................................... **16**

*VESTING-YOUR RIGHT TO RIGHT TO A RETIREMENT BENEFIT* ............... *17*

*IF YOU LEAVE THE COMPANY BEFORE RETIREMENT* ............................... *17*

*IF YOUR SERVICE IS INTERRUPTED* ............................................................ *18*

*IF YOU BECOME DISABLED* ........................................................................... *19*

*SURVIVING SPOUSE'S BENEFIT* .................................................................. *19*

*HOW TO APPLY FOR RETIREMENT BENEFITS* ........................................... *20*

*DEFINITIONS* .................................................................................................... *21*

*OTHER IMPORTANT INFORMATION* ............................................................. *23*

    **Summary Plan Description** ..................................................................... **23**

D0310

Qualified Domestic Relations Orders ("QDRO")..........................................................23

Top-Heavy Rules ....................................................................................................23

Rights to Employment .............................................................................................23

Post-Retirement Increases ......................................................................................23

*HOW TO APPEAL A DENIED CLAIM.........................................................................24*

*YOUR RIGHTS IF THE PLAN TERMINATES...............................................................24*

Amendment and Continuation of the Plan .................................................................24

Plan Termination Insurance .....................................................................................25

*ADMINISTRATIVE INFORMATION.............................................................................26*

Trust Information.....................................................................................................27

*ERISA STATEMENT OF RIGHTS................................................................................27*

D0311

## INTRODUCTION

This booklet briefly describes the Pepco Holdings, Inc. Retirement Plan – PHI Sub-Plan, a defined benefit pension plan for Management, certain designated subsidiaries and Local 1900 employees hired January 1, 2005 or later.  The Plan is one part of the retirement benefits offered by PHI and is designed to help provide you with a solid foundation of income after you retire. When you add this income to your Retirement Savings Plan (401k), Social Security and personal savings, you will have a sound program to provide financial security for your retirement.

This summary of your retirement benefits describes the Plan in non-technical, easy-to-understand language. It explains what your benefits are, as well as your rights and responsibilities under the Plan. For the sake of clarity, some legal terms have been translated to everyday language, and some technical details have been left out.  In case of a conflict between the information in this booklet and the formal Plan document, the formal Plan document will control.

The Plan is administered by Vanguard.  If you would like more specific information than this booklet provides, or if you would like to inspect the Plan document, feel free to contact Vanguard on 800-523-1188 or PHI Benefits. Copies of the document are available for a reasonable charge.

D0312

## HIGHLIGHTS OF THE PLAN

Below is a summary of your benefits. Be sure to read the following pages for a more detailed description of the Plan. If you have questions, feel free to contact Vanguard on 1-800-523-1188 or PHI Benefits.

|  |  | For Details, see |
|---|---|---|
| Eligibility | Participation (Benefit Service) begins on the first day of the month coincident with or next following employment or the first of the month following your 21st birthday, whichever occurs later. | **ELIGIBILITY** |
| Cost | The Company pays the full cost of this benefit | **PLAN COST** |
| Retirement Age | Normal retirement age is the later of age 65 or 5 years after you become a plan member | **WHEN YOU MAY RETIRE** |
| Early Retirement | You may retire as early as age 55 if you have been a Plan member for 10 years or more | **WHEN YOU MAY RETIRE** |
| Deferred Retirement | You may continue to work to build your retirement benefit past age 65 | **WHEN YOU MAY RETIRE** |
| Benefit Payments | Monthly payments for life, based on your years of participation and on your compensation | **NORMAL RETIREMENT BENEFIT** |
|  | You may arrange for payments to your spouse or another joint annuitant after your death | **FORMS OF RETIREMENT BENEFITS** |
|  | In certain circumstances you may be eligible for a lump sum benefit | **LUMP SUM BENEFITS** |
| Vesting | Vesting Service begins on the first day of the month coincident with or next following employment or the first of the month following your 18th birthday, whichever occurs later.  You are vested--entitled to an age 65 benefit--after five years of service, even if you leave the Company before retirement | **VESTING** |

D0313

## ELIGIBILITY AND ENROLLMENT

### Full-Time Employees

You are eligible to participate in the Plan if:
- You are a full-time employee of the Company
- You are at least 21 years old for Benefit Service
- You are at least 18 years old for Vesting Service

Participation in the PHI Sub Plan will begin on the first day of the month coincident with or next following the later of your date of employment or your 21st birthday. For example, if you came to work for the Company at age 23 in April, 2005, your participation date in the Plan is May 1, 2005.

Using the above example, if you came to work for the Company at age 19 in April, 2005, and your 21st birthday is February 10, 2007 your participation date in the Plan is March 1, 2007.

Full-time temporary employees also are eligible, subject to the same requirements as other employees.

### Part Time Employees

You are considered a "part time employee" if you work for the Company less than a normal workday or a normal workweek, on a regular basis. However, unlike a full-time employee, you must be at least 21 years old **and** have completed one year of service to be eligible for membership in the Plan. For eligibility purposes, you will be credited with one year of service during any calendar year in which you work 1,000 hours or during your first 12 consecutive months of employment, if you work 1,000 hours during that period.

## PLAN COST

The Company pays the entire cost of this Plan, including administrative expenses. There are no deductions from your pay or contributions that you must make.

Contributions made to the Plan by the Company are deposited in a Trust Fund held and managed by a Trustee. This money and the income it earns through investments are used to operate the Plan and to pay benefits. You are not taxed on the Company's contributions to the Plan until you receive retirement benefits.

D0314

## HOW YOUR SERVICE COUNTS TOWARD YOUR RETIREMENT BENEFIT

Your service with the Company affects your retirement benefit in several ways.

- Your **Vesting Service** determines when you will have a nonforfeitable right to a retirement benefit. Once you have five years of Vesting Service, you will have a right to a benefit from this Plan-even if you leave the Company before you retire. If you retire early, your Vesting Service also will be used to determine whether you are entitled to unreduced benefits.

- Your **Benefit Service** helps determine how much you will receive each month after you retire. It also determines your eligibility for early retirement. You may earn up to a maximum of 30 Years of Benefit Service.

  In general, your Vesting Service includes the entire period of your employment with the Company, starting with your first day of work. Your Benefit Service may be shorter than your Vesting Service, depending on your age at date of hire and whether you have a break-in- service. The table below shows how certain periods when you may be away from work will affect your Service.

### How Absences from Work Affect Your Service

| For absence due to: | Vesting Service | Benefit Service |
|---|---|---|
| Period of Authorized Leave, provided you return to work at the end of the authorized leave | yes | yes |
| Military Service, provided you return to the Company while your re-employment rights are protected by law and remain with the Company for one more year | yes | yes |
| Disability, See "If You Become Disabled" | yes | yes |
| Absence of 12 Months or Less For Any Other Reason, See "If Your Service Is Interrupted" | yes | no |

This has been a **general** explanation of Benefit Service and Vesting Service. Some details have been omitted. If you would like to determine your specific years of service, contact Vanguard on 1-800-523-1188.

### Part Time Employees

Special service rules apply to part time employees. As a part time employee, you must work at least 1,000 hours in a calendar year to receive one year of Vesting Service.

D0315

## HOW YOUR SERVICE COUNTS TOWARD YOUR RETIREMENT BENEFIT

Your service with the Company affects your retirement benefit in several ways.

- Your **Vesting Service** determines when you will have a nonforfeitable right to a retirement benefit. Once you have five years of Vesting Service, you will have a right to a benefit from this Plan-even if you leave the Company before you retire. If you retire early, your Vesting Service also will be used to determine whether you are entitled to unreduced benefits.

- Your **Benefit Service** helps determine how much you will receive each month after you retire. It also determines your eligibility for early retirement. You may earn up to a maximum of 30 Years of Benefit Service.

  In general, your Vesting Service includes the entire period of your employment with the Company, starting with your first day of work. Your Benefit Service may be shorter than your Vesting Service, depending on your age at date of hire and whether you have a break-in- service. The table below shows how certain periods when you may be away from work will affect your Service.

**How Absences from Work Affect Your Service**

| For absence due to: | Vesting Service | Benefit Service |
|---|---|---|
| Period of Authorized Leave, provided you return to work at the end of the authorized time | yes | yes |
| Military Service, provided you return to the Company while your re-employment rights are protected by law and remain with the Company for one more year | yes | yes |
| Disability, See "If You Become Disabled" | yes | yes |
| Absence of 12 Months or Less For Any Other Reason, See "If Your Service Is Interrupted" | yes | no |

This has been a **general** explanation of Benefit Service and Vesting Service. Some details have been omitted. If you would like to determine your specific years of service, contact Vanguard on 1-800-523-1188.

**Part Time Employees**

Special service rules apply to part time employees. As a part time employee, you must work at least 1,000 hours in a calendar year to receive one year of Vesting Service.

D0316

Benefit Service is calculated differently. If you work at least 1,000 hours, but fewer than 2,080 hours, your benefit service will be a fraction of a "benefit year." The fraction will be the number of hours you actually worked, divided by 2,080. If you worked 1,040 hours in 2005, for example, you received half a Year of Benefit Service for 2005.

## WHEN YOU MAY RETIRE

Your retirement benefits begin on the retirement date you choose, and they continue for the rest of your life.  There are several options outlined below:

| TYPE OF RETIREMENT | QUALIFICATIONS |
|---|---|
| **NORMAL RETIREMENT** | **Full** monthly pension can begin if you:<br>• are age 65 or over, **AND**<br>• have 5 or more years of service. |
| **EARLY RETIREMENTS:**<br><br>**AGE 55/10 YEARS**<br><br><br><br>**AGE 62/20 YEARS** | **55/10:** **Reduced** monthly pension can begin, if you:<br>• are between ages 55 and 65, **AND**<br>• have at least 10 years of Benefit Service.<br><br>**62/20:** **Full** monthly pension can begin if you:<br>• are age 62 or over, **AND**<br>• have at least 20 years of Vesting Service. |
| **TERMINATED-VESTED**<br><br>(If you leave the Company for any reason other than death, have a vested benefit and do not meet the requirements listed above) | • **Full** monthly pension can begin at age 65.<br>• **Reduced** monthly pension can begin as early as age 55 and will be subject to significant actuarial reduction |

## Normal Retirement

Your Normal Retirement Date is the first day of the month that follows your 65th birthday or the fifth anniversary of the day you became a Plan member,

D0317

whichever is later. Benefits become payable starting on your Normal Retirement Date.

**Early Retirement**

You may retire as early as age 55 and receive a benefit from the Plan, provided you have completed at least 10 Years of Benefit Service. (Remember, your Benefit Service may be shorter than your Vesting Service depending on your age at date of hire and whether you have a break-in-service.) You may retire on the first of any month after you become eligible for early retirement.

Monthly payments can begin immediately or they can be deferred. If you defer payment until age 65, you will receive your full benefit as determined by the benefit formula. If you have your payments begin immediately, they may be reduced.

**Deferred Retirement**

If you continue to work after your Normal Retirement Date, your benefit payments will not begin until you actually retire. Salary increases and the additional service (up to 30 years) you earn after your Normal Retirement Date may increase the benefit you receive at retirement.

**NORMAL RETIREMENT BENEFIT**

**Benefit Formula**

When you retire, terminate your employment, or die, the Company will use the following formula to calculate your age-65 monthly payment (if any):

| Step 1. | 1.3% (.013) of your Final Average Earnings |
| | **times** |
| | your Years of Benefit Service (up to 30 years) |
| Step 2. | Divide the result by 12 |

This formula will determine your monthly retirement benefit.

The amount will be reduced if you retire early (less than age 65 or between age 55 and 62 with less than 20 years of Vesting Service) or if you choose to provide continued benefit payments to your spouse or other joint annuitant after your death. These adjustments are described later in this Summary Plan Description.

The maximum amount you can receive from the Plan is limited by governmental regulation. The Company will notify you if you are affected by this limit when your benefit is determined.

D0318

**Factors That Affect Your Benefit**

Your benefit formula is based on several factors:

- Your Final Average Earnings
- Your Years of Benefit Service

Your <u>Benefit Service</u> was described on page 7. Let's look at the other factor.

**Your Final Average Earnings** are based on your base monthly earnings for your final 60 months of Vesting Service. They do not include any month during which you were absent due to disability or leave of absence. To calculate final average earnings, find the total of your base compensation for those 60 months and divide by five (years).

When you calculate your Final Average Earnings, include only your base compensation. Do not include overtime, premium payments, bonuses, or other special pay. Also, the federal government limits the amount that can be counted as compensation under the Plan. When you elect to retire, you will be notified if this affects you.

If you have less than 60 months of earnings, Final Average Earnings are determined based upon the number of whole calendar months available. Only earnings after the date an Affiliate has joined the Plan are included in calculating Final Average Earnings.

**An Example of a Normal Retirement Benefit**

Let's look at an example of a Normal Retirement benefit. (For simplicity, round numbers have been used in the examples in this booklet. When your benefit is calculated, however, partial years of service will be included.)

Let's assume that Fred came to work for the Company in 2005 at age 35, and he will retire in 2035 at age 65 with:

- 30 years of Vesting Service
- 30 years of Benefit Service
- Final Average Earnings of $65,000

Fred's normal retirement benefit will be

Step 1.    .013 x $65,000 x 30 years =        $25,350.00

Step 2.    $25,350.00 divided by 12 =        $ 2,112.50

D0319

In this example, Fred will receive $ 2,112.50 a month, starting at age 65 and ending in the month of his death. The amount will be reduced if he chooses for a portion of his benefit to continue to his wife or another person after his death (see "Forms of Retirement Benefits").

## EARLY RETIREMENT

You may retire from the Company on the first of any month after you reach age 55, provided you have at least ten years of Benefit Service. Normally, an early retirement benefit will begin on the first of the month after you retire. However, you may choose to have your payments begin at a later date-on the first of any month between your retirement and your 65th birthday.

To calculate your early retirement benefit, follow these steps.

**1. Determine your normal retirement benefit,** following the steps shown earlier. (see "Benefit Formula", page 9).

**2. Apply the reduction factor** (if any). The factor applies only if you have your payments begin before your normal retirement date (age 65) and you are 1) less than 65 years old and have at least 10 years of Benefit Service or 2) you are between age 55 and age 62 and have 20 years of Vesting Service. The amount of the reduction is 1/4 of 1% times the number of full months that Plan benefits are paid before your normal retirement date. This comes to 3% a year, as follows:

In the two tables below, you can see how the reduction factors impact your benefit. The tables reflect full year reductions. The actual reductions will be calculated using the number of full months prior to your normal or unreduced retirement date.

- In the first table, you can see the reduction applied if you have at least 10 years of Benefit Service but are not yet 65 years old.

- The second table reflects the impact of a special rule that allows you to retire without a reduction if you are age 62 with at least 20 years of Vesting Service. Thus, if you have at least 20 years of Vesting Service but retire before age 62, the reductions are calculated from age 62 rather than age 65. The reductions are still 3% per year.

D0320

**Reduction Table:**

**If you are less than age 65 with 10 years of Benefit Service**

| If Your First Pension Payment Begins at Age... | You Will Receive This Percentage Of Your Pension |
|---|---|
| 55 | 70.0% |
| 56 | 73.0% |
| 57 | 76.0% |
| 58 | 79.0% |
| 59 | 82.0% |
| 60 | 85.0% |
| 61 | 88.0% |
| 62 | 91.0% |
| 63 | 94.0% |
| 64 | 97.0% |
| 65 | 100% |

**If you are age 55 but less than 62 with at least 20 years of Vesting Service**

| If Your First Pension Payment Begins at Age... | You Will Receive This Percentage Of Your Pension |
|---|---|
| 55 | 79.0% |
| 56 | 82.0% |
| 57 | 85.0% |
| 58 | 88.0% |
| 59 | 91.0% |
| 60 | 94.0% |
| 61 | 97.0% |
| 62 | 100% |

**Examples of Reduced Early Retirement Benefits**

**1. Age Less Than 65 with 10 or more years of Benefit Service but less than 20 Years of Vesting Service**

Let's assume that Kim retires in 2025 at age 63 with 10 years of Vesting Service, 10 Years of Benefit Service, and Final Average Earnings of $65,000. If payments begin at age 63, they will be reduced 6% (see step 3 below). Kim's

D0321

early retirement benefit will be:

Step 1.     .013 x $65,000 x 10 years = $8,450.00

Step 2.     $8,450.00 divided by 12 =     $ 704.17

Step 3.     $704.17 x .94 =               $ 661.92

## 2. Age 55 but less than 62 with 20 Years of Vesting Service

Let's assume that Kathy retires in 2025 at age 55 with 20 years of Vesting Service, 19 Years of Benefit Service, and Final Average Earnings of $65,000.  If her payments begin at age 55, they will be reduced 21% (see step 3 below). Kathy's early retirement benefit will be:

Step 1.     .013 x $65,000 x 20 years = $16,055.00

Step 2.     $16,900.00 divided by 12 =  $ 1,337.92

Step 3.     $1,408.33 x .79 =            $ 1,056.96

## Example of a Retirement Benefit limited by Age and Service Provisions

Let's assume that James came to work for the Company in 2005 at age 20, and retires in 2040 at age 55 with:

- 35 years of Vesting Service
- 30 years of Benefit Service (James entered the Plan on his 21st Birthday and cannot earn more than 30 years Benefit Service)
- Final Average Earnings of $65,000

James' deferred retirement benefit will be:

Step 1.     .013 x $65,000 x 30 years = $25,350.00

Step 2.     $25,350.00 divided by 12 =  $ 2,112.50

Step 3.     $2,112.50 x .79             $1,668.88

In this example, James will receive $1,668.88 per month until his death. This amount will be reduced if he chooses for a portion of his benefit to continue to his wife or another person after his death (see "Forms of Retirement Benefit").

D0322

## DEFERRED RETIREMENT

You may postpone your retirement past age 65 and retire at a later time. Your Deferred Retirement benefit will be determined under the same benefit formula as your Normal Retirement benefit. However, your Deferred Retirement benefit will be adjusted to take into account your additional compensation and service (up to the limit of 30 years), if applicable, calculated as of your Deferred Retirement Date.

Your Deferred Retirement Date cannot be later than April 1 following the later of 1) the calendar year in which you reach 70-1/2 or 2) the calendar year in which you retire.

## FORMS OF RETIREMENT BENEFITS

You have a choice of several different ways to receive your retirement benefit. Each way includes monthly payments to you during your lifetime. Under the different options, you may choose to have payments continue after your death to your spouse or, in certain cases, another beneficiary.

### Life Income Only Annuity

You will receive equal monthly payments for your lifetime. After your death, payments stop. No further benefits are paid to any survivor. If you are not married (or have been married less than one year) when you retire, and if you do not choose another form of payment, your benefits will be paid in this form automatically.

### Automatic Joint and Surviving Spouse Annuity

If you have been married at least one year when you retire, you must choose this option, unless your spouse consents, in writing, to some other form of payment. The written consent must be either notarized or witnessed by an authorized employee of the Company.

Under this option, you will receive monthly payments for life. After your death, 50% of your monthly benefit will continue to your spouse for his or her lifetime.

Under the Joint and Surviving Spouse Annuity, the monthly payments you receive during your lifetime are smaller than they would be under a Life Income Only Annuity, to account for the possibility that payments may continue beyond your death. The amount of reduction in your benefit depends on your age and the age of your spouse.

If your spouse dies within 36 months after your retirement date, Plan payments under the Automatic Joint and Surviving Spouse Annuity will be cancelled, and

D0323

beginning on the first of the month following your spouse's death, you will receive your Plan benefits in the Life Annuity form described above. If your spouse dies more than 36 months after your retirement date, you will continue to receive your reduced benefits for life.

For example, John retires in March, 2025. If he elects a Life Income Only Annuity he would receive $1,350 per month. Instead, John elects an Automatic Joint and Surviving Spouse Annuity which will provide him with a monthly benefit of $1,217.57 for the rest of his life and a spousal benefit of $608.79 upon his death. If John's spouse dies within the first 36 months after his retirement, John's benefit will increase from $1,217.57 to $1,350 effective the first of the month following his spouse's death. If John's spouse dies more than 36 months after his retirement, but prior to John's death, John's monthly benefit will continue to be $1,217.57.

In no event will a spouse other than the spouse to whom you are married on your retirement date be eligible to receive benefits under this annuity option. For example, Bill retires in 2045 and designates Mary, his wife, as his joint annuitant. Mary dies in 2049 and Bill marries Sue in 2050. Bill dies in 2051. Sue is not eligible for a benefit since she was not Bill's spouse (and designated joint annuitant) on his retirement date.

**Optional Joint and Survivor Annuity**

This option is similar to the Automatic Joint and Surviving Spouse option, with two differences. First, you may name someone other than your spouse (with your spouse's written permission) to receive payments after your death. Second, you may choose 25%, 50%, 75% or 100% as the percentage of your monthly payment that is to continue after your death. For example, you could choose a 25% Joint and Survivor Annuity, with your brother as joint annuitant. You would receive reduced monthly payments for life. After your death, your brother (if still alive) would receive monthly payments for life, equal to 25% of the amount you were receiving.

Your payments under this option will be smaller than under a Life Annuity to reflect the cost of providing payments after your death. The larger the payments to be made after your death, the smaller your payments will be during your lifetime.

As with the Automatic Joint and Surviving Spouse Annuity, if your joint annuitant dies within 36 months after your retirement date, Plan payments under the Optional Joint and Survivor Annuity will be cancelled, and beginning on the first of the month following your joint annuitant's death, you will receive your Plan benefits in the Life Annuity form described above. If your joint annuitant dies more than 36 months after your retirement date, you will continue to receive reduced benefits for life.

D0324

Also, only the person designated as your joint annuitant at the time you retire is eligible for benefit payments after your death under this annuity option.

**Lump Sum Payout**

Under certain limited circumstances you may receive a Lump Sum Payout of your retirement benefit.  There are rules concerning this type of benefit.  You will be informed by Vanguard if they apply to you.  Generally, there are three circumstances that trigger the Lump Sum Payout, one occurs automatically and the others are options that you can elect:

- If the actuarial value of your pension reflected in today's dollars (present value) is less than $1,000, you will automatically receive a Lump Sum Payout.

- If the actuarial value of your pension reflected in today's dollars (present value) is more than $1,000 but less than $5,000 you will have the option to receive a Lump Sum Payout or to roll your benefit into another tax-deferred investment.  If you fail to select an option (roll-over or pay-out), your benefit will automatically be rolled into a Vanguard IRA.

- If the actuarial value of your pension reflected in today's dollars (present value) is $5,000 or more but less than $20,000, you will be offered the Lump-Sum Payment option.

If you receive a Lump-Sum Distribution, no future pension benefits will be paid to you, a spouse or any other beneficiary. The IRS requires the Company to automatically withhold 20% for federal taxes of any Lump-Sum Payment paid directly to you.  You can postpone taxes, if your pay out is directly transferred to an IRA or other qualified plan.  Talk to a tax professional before receiving your Lump-Sum Payment.

**Choosing a Payment Method**

Many factors influence your benefit, so please be sure to contact Vanguard on 800-523-1188 to discuss your retirement and what it will mean to you.

Before you retire, you should contact Vanguard. They will explain the different forms of payment and the effect each option would have upon your retirement benefit amount. They also will describe the time limits within which you may make a choice or change it.

After you receive the notice, you may make a choice, or change it, at any time before your payments begin (subject, if you are married, to your spouse's written consent). **Once your payments have begun, you may not change your form**

D0325

of payment.

**How Your Choice Will Affect Your Monthly Payments**

If you choose an option that provides for payments after your death, your monthly payments will be reduced. The reduction will be based on many factors that relate specifically to you and your joint annuitant (the person you choose to receive payments after your death).

Generally, the greater the value of the survivor's benefit, the greater the reduction in your monthly payments. For example, if you retire at 65 and choose the 50% Joint and Surviving Spouse Option, and if your spouse is the same age as you, your monthly payments will be reduced by about 10%. If you wanted 100% of your monthly payment to continue to your spouse after your death, the reduction in your benefit would be about 20%. Typically, reductions range from about 10% to 30% of your benefit. When you are considering retirement, please contact Vanguard on 800-523-1188. They will outline the specific reductions that apply to your case, and they can estimate how much you would receive under the various options.

## VESTING-YOUR RIGHT TO RIGHT TO A RETIREMENT BENEFIT

Vesting is your right to receive a retirement benefit from the Plan. You become 100% vested on the day you complete five Years of Vesting Service. Once vested, you will be entitled to a retirement benefit, even if you stop working for the Company before you are eligible to retire.

## IF YOU LEAVE THE COMPANY BEFORE RETIREMENT

If you leave the Company before you are vested (before you have completed five Years of Vesting Service), you will not be eligible for a retirement benefit from this Plan.

If you leave the Company for any reason before retirement but after you are vested, you will be entitled to a vested pension benefit. The benefit will be calculated using the normal retirement benefit formula, based on your Benefit Service and Final Average Earnings as of the date your employment ends. If the total present value of your vested benefit is $5,000 or less, your benefit will be paid in a single lump sum (cashed-out) when you leave the Company. Otherwise, payment of a vested benefit normally begins when you reach age 65. However, you may choose to have your payments begin as of the first day of any month after your 55th birthday. In this case, your payments will be actuarially reduced. Your payments will not be reduced by the amount shown in the section titled "Early Retirement," but by a significantly greater amount. For details about how these factors would reduce your monthly payments, contact Vanguard.

D0326

You may receive your vested benefit in any of the ways described in the section entitled "How Your Benefit Will Be Paid." You will receive comparative figures for the alternative methods of payment and will be asked to complete an election form before your payments begin.

If you are rehired before age 65, any payments you are receiving will stop. When you retire-or stop working, they will begin again. They will be adjusted to reflect any further service you earned and the payments you received.

## IF YOUR SERVICE IS INTERRUPTED

The service rules described in this section provide a **general** explanation of what happens to your Vesting Service and Benefit Service if your employment with the Company contains a break-in-service. Some details have been omitted. You should contact Vanguard for specific information regarding your years of service.

If you leave the Company before you are vested, and are later re-employed, you may lose the service you built up during your earlier employment. Whether or not you will lose your previous service will depend on whether you have a "Severance Period" and on how long it lasts. (A "Severance Period" begins on your Severance Date, and ends as soon as you return to work for the Company. A Severance Date will occur on the day you quit, retire, or are discharged. If you leave the Company for any other reason, the Severance Date will not occur until 12 months after your last day of work.)

- **If you are not vested** when you leave the Company, **and if your Severance Period lasts five years** or longer, you will lose the Vesting Service and Benefit Service you built up before the Severance, unless your prior years of Vesting Service exceed your period of Severance.

- **If you are not vested** when you leave the Company, and **if your Severance Period lasts less than five years**, your Vesting Service and Benefit Service will be reinstated after you return to the Company and work for one more year.

- **If you are vested** when you leave the Company, you will not lose any service. Your prior Vesting Service and Benefit Service will be reinstated when you return.

- **If you return to the Company within 12 months** after your last day of active work, you will not have a Severance Period, and you will not lose any service. Also, you will earn Vesting Service for the period of absence, but not Benefit Service.

  If you were not a Plan participant during your first period of employment because you had not met the eligibility requirements, your Plan participation will begin on the first of the month after you meet those

D0327

eligibility requirements (assuming you meet the above criteria).

### Repayment of Cash-Out

When you leave the Company, you may receive a cash-out of your retirement benefit. If you return to the Company within five years, you may repay that money to the Plan. If you do not repay the cash-out, you will lose the Benefit Service on which the payment was based.

### Part Time Employees

If your service is interrupted, rules similar to those for full-time employees will apply. For details, contact Vanguard on 800-523-1188 or PHI Benefits.

## IF YOU BECOME DISABLED

This Plan does not provide disability retirement benefits. If you become disabled, you may be eligible for benefits under one of the Company's Long-Term Disability Plans and/or Social Security.

If the Company determines you are disabled, you may continue to earn Vesting Service and Benefit Service under this Plan. Your Retirement Plan payments can begin anytime after you reach retirement age; however, your benefits must begin no later than your Normal Retirement Date unless you become disabled after age 60 in which case special rules apply. When your retirement payments begin, your long-term disability payments will stop. Be sure to contact Vanguard or PHI Benefits to discuss the advantages and disadvantages of retiring before your disability benefits end.

## IF YOU DIE BEFORE RETIREMENT- SURVIVING SPOUSE'S BENEFIT

The Plan provides automatic survivor coverage to your spouse if you have been married for at least one year and have a vested benefit under the Plan at the time of your death. If you have at least five Years of Vesting Service, your spouse will receive monthly payments for life, as follows:

- **If you die after age 55 with 20 or more Years Of Benefit Service** (but before 65) while employed at the Company, payments will begin the first of the following month. Each payment will equal one-half the amount you would have received if you had retired on the first of the month in which you died and chosen a Life Income Only Annuity. (If your spouse is younger than 50 when payments will begin, they will be reduced slightly.)

- **If you die before age 55 or after age 55 with less than 20 years of Benefit Service**, while employed at the Company, payments will not begin

D0328

until the first of the month after you would have reached age 55 if you had lived. Each payment will equal one half of the amount you would have received at age 55 under an Automatic Joint & Surviving Spouse Annuity. This benefit is based on your Final Average Earnings and Benefit Service as of the date of your death. (Your spouse may request that payments begin at a later date; in that case, each payment will be larger.)

- **If you leave the Company with a vested benefit, but die before payments begin,** your spouse is entitled to a surviving spouse annuity described in the previous paragraph. Payments may begin immediately if you die after age 55; otherwise, they may begin on the first of the month after you would have reached age 55.

- **If you continue to work past your Normal Retirement Date and die while employed at the Company with less than 20 years Vesting Service,** payments to your spouse will begin the first of the following month. Each payment will equal one-half the amount you would have received if you had retired on the first of the month in which you died and chosen the Automatic Joint and Surviving Spouse Annuity.

**If You Are Not Married**

If you do not have a surviving spouse to whom you were married for at least one year before your death, this Plan will pay no benefits.

## HOW TO APPLY FOR RETIREMENT BENEFITS

To formally apply for retirement, you must notify your Supervisor and Vanguard. This notification should be submitted approximately three months before you plan to retire. Vanguard upon receipt of your notification will send to you documents and forms that you must complete and submit to Vanguard in order to receive your retirement income benefits. You will be required to provide proof of your age and the age of your joint annuitant, if any (in most cases, your spouse), and of your marital status (such as a marriage certificate or divorce papers).

Vanguard can explain to you what effect your decisions will have on the retirement benefits you are entitled to receive from Company-sponsored retirement plans. You should also contact the PHI Benefits Center on 866-369-2615 to discuss your Company-sponsored health and welfare benefits. Because the decisions you make at this point will be vitally important to your future and the future of your family, we strongly suggest that you involve your family in the process.

The procedure is the same whether you choose an early, normal, or deferred retirement date.

D0329

**Current Address Required**

If you leave the Company before it is time for your payments to begin, it is up to you to make sure the Company has correct personal information for you. This includes your current address, your beneficiary information, and your marital status. You should contact Vanguard and the PHI Benefits Center:

- If you move

- If you get married

- If you get divorced

- If you need to change your beneficiary

When a benefit becomes payable to you, the Company will send a letter to the last address shown for you in Plan records. If that address is not current, the Company will have no further obligation to look for you. If you do not get in touch with the Company, you will not receive your payments.

<u>DEFINITIONS</u>

| | |
|---|---|
| **Administrative Board** | Three or more employees of the Company who are appointed by the Chairman of the Board to oversee the management and administration of the Plan. |
| **Annuity** | Monthly payment of regular retirement benefits |
| **Beneficiary** | A person (s) named by the employee to receive benefits, if any, payable in the event of the employee's death (See also, Joint Annuitant, below) |
| **Benefit Service** | Employment with the Company used to determine an employee's eligibility for certain benefits and the amount of benefits. You begin to earn benefit service after you become a member of the Plan. |
| **Part Time Employee** | An employee who works on a regular basis, but works less than a normal work-day or work-week |

D0330

| | |
|---|---|
| **Company** | PHI and certain affiliates identified as participants in the Plan |
| **Employer Identification Number** | The number the Company uses for tax returns and other reports to the Federal government |
| **ERISA** | Employee Retirement Income Security Act of 1974 |
| **Investment Committee** | Three or more employees of the Company who are appointed by the Chairman of the Board to oversee the management of the Trust. |
| **Joint Annuitant** | The spouse of a married employee or another person named by the employee to receive a specified percentage of the employee's benefit in the event of the employee's death |
| **Pension Benefit Guaranty Corporation (PBGC)** | A federal insurance organization created under ERISA to provide limited protection against the loss of benefits upon plan termination where plan assets are inadequate |
| **Plan** | The Pepco Holdings, Inc. Retirement Plan – PHI Sub Plan |
| **Plan Administrator** | The PHI Administrative Board who has the authority to administer the provisions of Plan and the Investment Committee who has authority to manage the Trust |
| **Vested Benefits** | Retirement Benefits to which you are entitled regardless of whether you continue employment with the Company |
| **Vesting Service** | Employment with the Company used to determine eligibility for certain benefits. You begin earning vesting service on your first day of work provided you are 18 years old. |

D0331

## OTHER IMPORTANT INFORMATION

### Summary Plan Description

This Summary Plan Description describes the separate Plan Document that sets forth the rules and provisions that govern the Pepco Holdings, Inc. Retirement Plan – PHI Sub Plan. In the event of any conflict between this summary and the Plan Document, the Plan Document will control.

### Qualified Domestic Relations Orders ("QDRO")

Your rights and benefits under the Plan cannot be assigned, sold, transferred and cannot be subject to attachment (or in any other way subject to the claims of creditors); however, pursuant to an appropriate domestic relations order issued by a court, the Company may be required to make payments to a former spouse or other payee.  A QDRO is a decree or order issued by a court that obligates you to pay child support or alimony, or otherwise allocates a portion of your benefits under the Plan to your spouse, former spouse, child or other dependent. You will be notified if a QDRO relating to your benefits is received.  Receipt of a QDRO could allow for an earlier than normal distribution to the persons(s) other than you listed in the order.  You or your beneficiaries may obtain a copy of the Plan's QDRO procedures, without charge, by contacting the Vanguard Group at 1-800-523-1188.

### Top-Heavy Rules

From time to time, as required by the IRS, the Plan is checked to ensure that it does not favor "key" employees.  A plan that does favor key employees is considered *top-heavy*.

The PHI SUB-PLAN is not top-heavy - however, in the event that the Plan becomes top-heavy, you would be notified and minimum benefits and minimum vesting would apply to all active Participants.

### Rights to Employment

Your participation in the Pepco Holdings, Inc. Retirement Plan – PHI Sub Plan may entitle you to receive benefits from the Plan. It does not, however, give you any right to be retained as a Company employee or to receive any other benefits.

### Post-Retirement Increases

The Plan does not provide for automatic increases to your pension. The PHI Board of Directors may, at its discretion, increase your benefits.

D0332

## HOW TO APPEAL A DENIED CLAIM

If you have a question or problem concerning your benefits you should first contact a Vanguard Participant Services Associate.

> Vanguard Participant Services or the 24-hour VOICE™ Network at 1-800-523-1188
>
> (VOICE® is available 24-hours a day.  Representatives are available from 8:30 a.m. to 9 p.m. Eastern Time, Monday through Friday, excluding holidays.  It is a toll-free call and all you need to use it is a touch-tone telephone.)

If the Vanguard Participant Services Associate is unable to satisfy your concern, then you should follow the process below to initiate a formal review of your claim.

If your claim for benefits is denied (completely or partially), you will receive a written explanation as to why the benefit(s) was denied.  If you still are not satisfied that your claim for benefits was properly denied, you may appeal the denial of benefits to the PHI Administrative Board.  You may submit additional information with your request for review. You also have the right to receive pertinent documents.

The PHI Administrative Board has 60 days (after you have requested the review in writing and furnished the necessary information) to review your claim. In special cases requiring a delay, you will receive notice of the final decision no later than 120 days after your request for review is received. They will notify you of their decision in writing, clearly specifying the reasons for their decision.

## YOUR RIGHTS IF THE PLAN TERMINATES

### Amendment and Continuation of the Plan

With respect to employees who are members of Local Union #1900 of the International Brotherhood of Electrical Workers, this Plan is maintained pursuant to a Collective Bargaining Agreement between Pepco and Local Union #1900 of the International Brotherhood of Electrical Workers. Any amendment or termination of the Plan is subject to negotiations as it affects Bargaining Unit employees.

In all other respects, while the Company intends to continue this Plan indefinitely, the Company reserves the right to modify or terminate the Plan at any time. The PHI Board of Directors is empowered to amend the Plan, except that the Administrative Board may amend the Plan as necessary to conform to federal, state and local laws and regulations, and to improve the operational efficiency of

D0333

the Plan. If the Plan were terminated, you would not forfeit the benefits you had accrued up to that point. Furthermore, if you were vested when the Plan terminated, you would be entitled to retirement income based on the contributions that the Company had made to the Plan before termination.

**Plan Termination Insurance**

Your pension benefits under this plan are insured by the Pension Benefit Guaranty Corporation (PBGC), a federal insurance agency. If the plan terminates (ends) without enough money to pay all benefits, the PBGC will step in to pay pension benefits. Most people receive all of the pension benefits they would have received under their plan, but some people may lose certain benefits.

The PBGC guarantee generally covers:

1. normal and early retirement benefits;
2. disability benefits if you become disabled before the plan terminates; and
3. certain benefits for your survivors.

The PBGC guarantee generally does not cover:

1. benefits greater than the maximum guaranteed amount set by law for the year in which the plan terminates;
2. some or all of benefit increases and new benefits based on plan provisions that have been in place for fewer than 5 years at the time the plan terminates;
3. benefits that are not vested because you have not worked long enough for the Company;
4. benefits for which you have not met all of the requirements at the time the plan terminates;
5. certain early retirement payments (such as Increased benefits that stop when you become eligible for Social Security) that result in an early retirement monthly benefit greater than your monthly benefit at the plan's normal retirement age; and
6. non-pension benefits, such as health insurance, life insurance, certain death benefits, vacation pay, and severance pay.

Even if certain of your benefits are not guaranteed, you still may receive some of those benefits from the PBGC depending on how much money your plan has and on how much the PBGC collects from employers.

For more information about the PBGC and the benefits it guarantees, ask your plan administrator or contact the PBGC's Technical Assistance Division, 1200 K Street N.W., Suite 930, Washington, DC 20005-4026 or call 202-326-4000 (not a toll-free number). TTY/TDD users may call the federal relay service toll-free at 800-877-8339 and ask to be connected to 202-326-4000. Additional information

D0334

about the PBGC's pension insurance program is available through the PBGC's website on the Internet at http://www.pbgc.gov.

## ADMINISTRATIVE INFORMATION

| | |
|---|---|
| **Plan Name** | The Pepco Holdings, Inc. Retirement Plan – PHI Sub Plan |
| **Participants** | The Plan provides benefits for Management employees who were hired on or after January 1, 2005 of Pepco Holdings, Inc. Service Company, Pepco, Delmarva Power, Atlantic City Electric, Conectiv Energy and Pepco employees who are members of Local 1900. |
| **Effective Date** | The Plan, as described herein, is effective January 1, 2005 |
| **Name and Address of Employer** | Pepco Holdings, Inc. 701 Ninth Street, NW Washington, D.C. 20068 |
| **Employer Identification Number (EIN)** | 52-2297449 |
| **Plan Number** | 001 |
| **Plan Administrator** | The Plan Administrators are the PHI Administrative Board and the PHI Investment Committee |
| **Agent for Service of Legal Process** | Pepco Holdings, Inc. 701 Ninth Street, NW Washington, D.C. 20068 Attention: Manager Compensation & Benefits 202-331-6481 |

D0335

For disputes arising under the Plan, service of legal process may be made upon the Plan Administrator or the Trustee.

**Trust Information**

| Type of Plan | Pension - Defined Benefit |
| --- | --- |
| | |
| Plan Trustee | Northern Trust<br>50 South La Salle Street<br>Chicago, IL  60603 |
| | |
| Plan Records | The Plan's fiscal records are kept on a plan year which is the 12-month period beginning on January 1 and ending on December 31. |

## ERISA STATEMENT OF RIGHTS

As a participant in the Pepco Holdings, Inc. Retirement Plan – PHI Sub Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

**Receive Information about Your Plan and Benefits**

As a Participant of the Plan, you are entitled to certain rights and protections under ERISA.  You may:

- Examine, without charge, at the Plan Administrator's office and other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts, collective bargaining agreements and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefits Administration.

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Plan Administrator may assess a reasonable charge for the copies.

D0336

- Receive a summary of the Plan's annual financial report. ERISA requires the Plan Administrator to furnish each Participant with a copy of this summary annual report.

- Obtain a statement telling you whether you have a right to a pension benefit at normal retirement age (age 65 or 5 years after you become a plan member whichever is later) and if so, what your benefits would be at normal retirement age if you stop working under the Plan now. If you do not have a right to a pension benefit, the statement will tell you how many more years you have to work to get a right to a pension benefit. This statement must be requested in writing and is not required to be given more than once a year. The Plan must provide the statement free of charge.

**Prudent Actions by Plan Fiduciaries**

In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who administer your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a pension benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may

D0337

order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance with Your Questions**

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, DC 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration at 1-800-998-7542.

D0338