IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES, MAURICE W. WARD, JR., and JOSEPH I. FINK, JR., on behalf of themselves and all others similarly situated, | : : : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | NO. 05-00702 (SLR) |
| | : | |
| PEPCO HOLDINGS, INC., CONECTIV, and PEPCO HOLDINGS RETIRMENT PLAN, | : : : | |
| Defendants. | : : | |

**APPENDIX TO
DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS'
MOTION TO CONTINUE PURSUANT TO FED. R. CIV. P. 56(F) OR FOR A
PRECLUSION ORDER**

M. Duncan Grant (Del Bar No. 2994)
Matthew A. Kaplan (Del. Bar No. 4956)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
302.777.6500

Susan Katz Hoffman, Esquire
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street
Philadelphia, PA  19102
267.402-3015 (telephone)
267.430.7275 (fax)

Larry R. Wood, Jr. (Del Bar No. 3262)
Kay Kyungsun Yu
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215. 981.4000 (telephone)
215.981.4750 (fax)

Dated:  September 18, 2007

Attorneys for Defendants

## TABLE OF CONTENTS

Excerpts from Deposition of Donald Cain                      B001-B005

Excerpts from Deposition of Benjamin Wilkinson               B006-B008

Deposition of Karen Francks and Exhibits Thereto             B009-B160

00001

1     IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2     CIVIL ACTION NO. 05-702(SLR)

3 ---------------------------------
J. MICHAEL CHARLES; MAURICE W.
4 WARD, JR.; and JOSEPH I. FINK, JR.,
on behalf of themselves and all
5 others similarly situated,

6     Plaintiffs,

7  v.

8 PEPCO HOLDINGS, INC.; CONECTIV, and
PEPCO HOLDINGS RETIREMENT PLAN,
9
     Defendants.
10 ---------------------------------

11

12
     Wilmington, Delaware
13     Tuesday, April 17, 2007

14

15
     TRANSCRIPT of testimony of DONALD E.
16
  CAIN, as taken by and before Sean M. Fallon, a
17
  Registered Professional Reporter and Notary Public,
18
  at the offices of PEPPER HAMILTON LLP, Hercules
19
  Plaza, Suite 5100, 1313 Market Street, commencing
20
  at 10:14 o'clock in the forenoon.
21

22

23

24

00002
1 A P P E A R A N C E S:

2    CHIMICLES & TIKELLIS LLP
      BY:  JOSEPH G. SAUDER, ESQ.
3    One Haverford Centre
      361 West Lancaster Avenue
4    Haverford, PA  19041
      (610) 642-8500
5    josephsauder@chimicles.com
      Attorneys for Plaintiffs
6
      PEPPER HAMILTON LLP
7    BY:  BARAK A. BASSMAN, ESQ.
      3000 Two Logan Square
8    Eighteenth and Arch Streets
      Philadelphia, PA  19103-2799
9    (215) 981-4000
      bassmanb@pepperlaw.com
10    Attorneys for Defendants

11    LITTLER MENDELSON
      BY:  SUSAN KATZ HOFFMAN, ESQ.
12    Three Parkway
      1601 Cherry Street, Suite 1400
13    Philadelphia, PA  19102-1321
      (267) 402-3000
14    shoffman@littler.com
      Attorneys for Defendants
15
      BARBARA C. ALEXANDER,
16    ASSISTANT GENERAL COUNSEL
      Pepco Holdings, Inc.
17    P.O. Box 231
      Wilmington, DE  19849-0231
18    (302) 429-3206
      Attorney for Defendants
19

20

21

22

23

24

C$_l$   **B002**      l. 1      **Page 2**

00040

1    A.    Extensive communications.

2    Q.    To explain that there was nothing to

3 be worried about?

4    A.    To explain the details of it.  We

5 would have been in the posture that employees in

6 the end would have to decide for themselves whether

7 it was good or bad for them, as individuals, but we

8 would communicate all that we could about

9 everything that we knew.

10    Q.    Well, the employees who ended up on

11 a Cash Balance Plan did not have a choice, correct?

12    A.    Well, there were some employees who

13 had the -- who had an option.

14    Q.    Who were they?

15    A.    There were some cut-off set.

16    Q.    Grandfathered employees?

17    A.    Yes.

18    Q.    But, beyond that, the other

19 employees did not have a choice, correct?

20    A.    That's correct.

21    Q.    In managing that risk, was it an

22 effort by the company to communicate to the

23 employees that this was not worse than the plan

24 that they were currently in?

00041

1    A.    You know, I don't remember that.

2    Q.    The sentence goes on, "That this

3 risk could be managed in light of the cost savings

4 to be realized from the new program."

5        Do you see that?

6    A.    Yes.

7    Q.    Cost savings to be realized, I

8 assume that's cost savings for the company,

9 correct?

10    A.    From the entire benefit program.

11    Q.    Correct?

12    A.    Yes.

13    Q.    So the company was saving costs,

14 correct?

15    A.    From the entire benefit program.

16    Q.    And the cash balance was a part of

17 that benefit program?

18    A.    But not from that part.

19    Q.    The company wasn't saving money from

20 that?

21    A.    No.

22    Q.    Are you certain of that?

23    A.    Yes.

24    Q.    Why are you so certain of that?

00042

1    A.    Because the one thing that's very

2 clear to me is that, from the very beginning, our

3 direction was that the implementation of the Cash

4 Balance Plan was to be cost neutral to the company.

5    Q.    And that was, I assume, conveyed to

6 the employees?

7    A.    I assume it was -- you are assuming

8 it was.  You can assume that.  I don't know that.

9    Q.    Okay.

10    A.    I believe it would have been.

11    Q.    What do you base that belief on?

12    A.    Just because we had a commitment to

13 communicate facts to employees.

14    Q.    Okay.

15        But, overall, the benefits plan was

16 a cost savings to the company, correct?

17    A.    It may have been.  It says it was.

18 May have been.

19        I don't remember exactly.

20    Q.    Okay.

21    A.    But I know it wasn't in the Cash

22 Balance Plan.

23    Q.    On next page, if you look at the

24 paragraph that starts, "Mr. Wilkinson," it states

00001
1    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
     -------------------------
3  J. MICHAEL CHARLES; MAURICE    CIVIL ACTION
   W. WARD, JR.; and JOSEPH I.
4  FINK, JR.; on behalf of
   themselves and all others
5  similarly situated,

6       Plaintiffs,

7    v.

8  PEPCO HOLDINGS, INC.;
   CONECTIV, and PEPCO HOLDINGS
9  RETIREMENT PLAN,

10      Defendants.      NO. 05-702(SLR)
     ---------------------------
11
         Philadelphia, Pennsylvania
12       Wednesday, April 4, 2007

13       Transcript of testimony of BENJAMIN D.

14  WILKINSON, as taken by and before DENISE M.

15  PITCHFORD, Registered Professional Reporter and

16  Notary Public, at the offices of PEPPER HAMILTON,

17  LLP, 3000 Two Logan Square, 18th & Arch Streets,

18  commencing at 10:11 o'clock in the forenoon.

19

20

21

22

23

24

**B006**                                    **Page 1**

00002

1 A P P E A R A N C E S:

2    CHIMICLES & TIKELLIS, LLP
     BY:  JOSEPH G. SAUDER, ESQ.
3    One Haverford Centre
     361 West Lancaster Avenue
4    Haverford, PA 19041
     (610) 642-8500
5    JosephSauder@Chimicles.com
     Attorneys for Plaintiffs
6

     PEPPER HAMILTON, LLP
7    BY:  KAY KYUNGSUN YU, ESQ.
     3000 Two Logan Square
8    18th & Arch Streets
     Philadelphia, PA 19103-2799
9    (215) 981-4188
     yukay@pepperlaw.com
10    Attorneys for Defendants

11

12 A L S O  P R E S E N T:

13    BARBARA C. ALEXANDER

14

15

16

17

18

19

20

21

22

23

24

00091

1    Q.    And the first one is "Masks cost

2 cutting." Do you see that?

3    A.    Yes.

4    Q.    Okay. And if you go down to the

5 next slide right below that, on the left-hand side,

6 which is titled, "Important Perspectives on

7 Conectiv's New Retirement Program."

8    A.    Yes.

9    Q.    Okay. And the first bullet on that

10 is, "New program not designed to provide cost

11 savings for Conectiv." Do you see that?

12    A.    Yes.

13    Q.    Is that bullet meant to address the

14 concern of masks cost cutting?

15        MS. YU: Objection as to form.

16        THE WITNESS: I think that bullet

17 probably refers to the fact that Conectiv cash

18 balance plan, in the words of Watson Wyatt, was the

19 richest cash balance plan their firm had ever put

20 in place. It was not designed to mask any cost

21 cutting. It was very rich, very generous.

22 BY MR. SAUDER:

23    Q.    And that's one of the points that

24 that bullet is addressing, correct, the bullet that

**B008**                                        **Page 91**

**In The Matter Of:**

*J. Michael Charles, et al*
*v.*
*Pepco Holdings, Inc., et al*

---

*KAREN E. FRANCKS*
*August 27, 2007*
*Volume 1*

---

## REPORTING ASSOCIATES, LLC

*Certified & Registered Professional Reporters*

*Cherry Hill   --   Philadelphia   --   Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

KAREN E. FRANCKS

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 05-702(SLR)

J. MICHAEL CHARLES; MAURICE W.
WARD, JR.; and JOSEPH I. FINK, JR.,
on behalf of themselves and all
others similarly situated,
                    Plaintiffs,

          v.

PEPCO HOLDINGS, INC.; CONECTIV, and
PEPCO HOLDINGS RETIREMENT PLAN,

                    Defendants.

Wilmington, Delaware
Monday, August 27, 2007

TRANSCRIPT of testimony of KAREN E.

FRANCKS, as taken by and before Sean M. Falion, a

Registered Professional Reporter and Notary Public

of the Commonwealth of Pennsylvania, at the offices

of PEPPER HAMILTON LLP, 1313 Market Street,

commencing at 10:12 o'clock in the forenoon.

**Page 2**

1  A P P E A R A N C E S:
2     CHIMICLES & TIKELLIS LLP
      BY: JOSEPH G. SAUDER, ESQ.
3     One Haverford Centre
      361 West Lancaster Avenue
4     Haverford, PA 19041
      (610) 642-8500
5     josephsauder@chimicles.com
      Attorneys for Plaintiffs
6
      PEPPER HAMILTON LLP
7     BY: KAY KYUNGSUN YU, ESQ.
      3000 Two Logan Square
8     Eighteenth and Arch Streets
      Philadelphia, PA 19103-2799
9     (215) 981-4000
      yukay@pepperlaw.com
10    Attorneys for Defendants
11    BARBARA C. ALEXANDER,
      ASSISTANT GENERAL COUNSEL
12    Pepco Holdings, Inc.
      P.O. Box 231
13    Wilmington, DE 19849-0231
      (302) 429-3206
14    Attorney for Defendants
15
16
17
18
19
20
21
22
23
24

**Page 3**

                    I N D E X
WITNESS                                   PAGE
KAREN E. FRANCKS
    By Mr. Sauder                         4,85
    By Ms. Yu                             82
          E X H I B I T S
NUMBER     DESCRIPTION                    PAGE
P-50  Notice of Deposition and Subpoena    7
P-51  Grandfathered FAQ                    38
P-52  Declaration of Karen E. Francks      45
P-53  Pepco Holdings, Inc. Retirement Plan 79
      PHI Sub-Plan

EXHIBITS PREVIOUSLY MARKED AND REFERRED TO
NUMBER     DESCRIPTION                    PAGE
P-3       Facts, MWW0022-0025              40
D-5       Facts                           63

DIRECTIONS TO NOT ANSWER

                    PAGE      LINE

                    17        11
                    47        12
                    48        11

**Page 4**

1          (It is hereby stipulated and agreed
2  by and among counsel that sealing, certification
3  and filing are waived;
4          It is further stipulated and agreed
5  by and among counsel that all objections, except as
6  to the form of the question, are reserved until the
7  time of trial.)
8          KAREN E. FRANCKS, after having been
9  first duly sworn, is examined and testifies as
10 follows:
11 EXAMINATION
12 BY MR. SAUDER:
13    Q.    Good morning.
14    A.    Good morning.
15    Q.    Have you given a deposition previous
16 to this?
17    A.    No.
18    Q.    I just want to go over a couple of
19 ground rules, and I'm sure your attorney has
20 already talked to you generally about what you can
21 expect today, but, if I ask you a question and you
22 don't understand the question, just ask me to
23 rephrase the question, because, if you answer the
24 question, I'll assume you understood it. Okay?

Pages 1 to 4

KAREN E. FRANCKS

5

1    A.    Okay.
2    Q.    If at any point you need a break,
3 just let us know. I just ask that you answer the
4 question, if there is a question pending, before
5 you take the break.
6    A.    Okay.
7    Q.    You understand today you are
8 testifying under oath?
9    A.    Yes.
10    Q.    Let me first ask you if this
11 statement is accurate. "James Kremmel is the only
12 individual currently employed by any of the
13 defendants who has firsthand knowledge of the
14 implementation of the cash balance sub-plan."
15         Is that an accurate statement?
16    A.    I don't know.
17    Q.    Well, do you know of anyone else
18 that's currently working at the company that has
19 firsthand knowledge of the implementation of the
20 cash balance sub-plan?
21    A.    Currently working.
22         MS. YU: Objection as to form.
23         THE WITNESS: I just don't know. I
24 know that there are people that -- I don't know. I

6

1 don't know if they are still working.
2 BY MR. SAUDER:
3    Q.    Do you have firsthand knowledge of
4 the implementation of the cash balance sub-plan?
5    A.    No.
6         MS. YU: Objection as to form.
7 BY MR. SAUDER:
8    Q.    You have no firsthand knowledge?
9    A.    Of the implementation?
10         MS. YU: Joe, can you define what
11 you mean by "implementation"?
12 BY MR. SAUDER:
13    Q.    You said "No." How are you defining
14 implementation?
15    A.    My knowledge is -- I was not
16 involved in the benefits center. All I did was
17 mail out the information, so the implementation --
18 when you say "implementation," I think you mean
19 design and -- rollout and the design.
20         No, I was not involved in the
21 design.
22    Q.    So you have no firsthand knowledge
23 relating to that?
24    A.    Correct.

7

1         MR. SAUDER: I'll show you what
2 we'll mark as Plaintiffs' 50.
3         (Exhibit P-50 is marked for
4 identification.)
5 BY MR. SAUDER:
6    Q.    Before you look at what I've shown
7 you that's been marked as Plaintiffs' 50, if you
8 could -- when was the first time you met with
9 attorneys relating to this case?
10    A.    Friday, August 24th.
11    Q.    When was the first time you spoke to
12 any attorneys relating to this case?
13    A.    I don't know the exact date, but it
14 would have been around the beginning of August.
15    Q.    This year?
16    A.    This August.
17    Q.    Prior to that, had you had any
18 contact at all with any attorneys relating to the
19 case?
20    A.    No.
21    Q.    And when you say August of this year
22 was your first contact, who was the person that
23 contacted you?
24    A.    Barak Bassman.

8

1    Q.    Prior to that date had you had any
2 contact or had you discussed this case with anyone?
3    A.    Attorneys?
4    Q.    Other than attorneys.
5    A.    Well, inside the company we talked
6 about it, sure.
7    Q.    And who did you talk to about it?
8    A.    Co-workers.
9    Q.    Let me just try and narrow down the
10 question.
11         Did you have any discussions
12 relating to this case with regard to you being a
13 potential witness in this case?
14    A.    No.
15    Q.    Never until the attorney contacted
16 you --
17    A.    I had no idea I would have been a
18 potential witness until Barak Bassman called me in
19 early August.
20    Q.    Did you have any conversations with
21 Jim Kremmel relating to this case?
22    A.    Jim Kremmel called me the same day
23 Barak Bassman called me to let me know an attorney
24 would be calling me.

KAREN E. FRANCKS

**9**

1    Q.    What else did he say?

2    A.    That an attorney would be calling me

3  about the cash balance plan due to my role in the

4  service center at the time.  That was it.

5    Q.    Did he get into any more specifics?

6    A.    No.

7    Q.    Did you ask him why an attorney

8  would be calling you?

9    A.    I don't recall.

10    Q.    Well, what did you think your role

11  was at that point when Jim Kremmel called you prior

12  to the attorney contacting you?

13    A.    Well, he told me an attorney would

14  be calling me about the cash balance plan and my

15  role in the service center at the time.

16    Q.    And what did you understand that to

17  mean?

18    A.    That they would be questioning me

19  about the communications to the employees.

20    Q.    Had Jim Kremmel talked to you about

21  this case prior to that?

22    A.    No.

23    Q.    And the first time Jim Kremmel

24  talked to you was August of this year?

**10**

1    A.    Yes.

2    Q.    Had you ever supplied any documents

3  to Jim Kremmel prior to that date?

4    A.    I've never supplied documents to Jim

5  Kremmel.  When -- I have not talked to Jim Kremmel

6  about this case since he called me and let know

7  Barak -- I have been dealing only with attorneys

8  since then.

9    Q.    Have you ever supplied any documents

10  to anyone prior to Jim Kremmel contacting you about

11  this case?

12    A.    No.

13    MS. YU:  Objection as to form.

14  BY MR. SAUDER:

15    Q.    As we sit here today, have you ever

16  supplied any documents relating to this case to

17  anyone?

18    MS. YU:  Joe, can you put a time

19  frame on that just so we are clear?

20  BY MR. SAUDER:

21    Q.    At any point up until today, have

22  you supplied any documents relating to this case to

23  anyone, including attorneys?

24    MS. YU:  Objection to form.

**11**

1  BY MR. SAUDER:

2    Q.    You can answer.

3    A.    In the past ten years --

4    Q.    To anyone relating to this case --

5  let me put it different.

6    A.    No.

7    Q.    This case was filed in September,

8  2005.  From September, 2005 to today, have you

9  supplied documents to anyone relating to this case?

10    A.    Yes.  To Barak Bassman, when he

11  called me.

12    Q.    And what documents did you supply?

13    A.    I take that back.  He sent me

14  documents and asked if I was familiar with them.

15  I did not supply him anything.

16    Q.    So you've never supplied any

17  documents?

18    A.    No.

19    Q.    Between September of 2005 and today,

20  to anyone relating to this case?

21    A.    That's correct.

22    Q.    Do you know what documents he sent

23  you?

24    A.    Yes.  He sent me a Facts -- a copy

**12**

1  of a Facts sheet, F-a-c-t-s, and a copy of the

2  decision kit that went out in May, '98.

3    Q.    And that was supplied from him to

4  you?

5    A.    Correct.

6    Q.    You had never supplied that to him

7  prior to that date?  Either of those documents?

8    A.    Correct.

9    MS. YU:  Joe, can we take a break

10  for just a second?

11    MR. SAUDER:  Okay.

12    (Recess called at 10:21 a.m.)

13    (Resumed at 10:23 a.m.)

14  BY MR. SAUDER:

15    Q.    You've had an opportunity to -- you

16  took a break and had an opportunity to speak with

17  your attorney.

18    Do you have any corrections to make

19  to your testimony as a result?

20    A.    No.

21    Q.    So, I don't know if we got an answer

22  to the last question, but you had never supplied

23  documents to defense counsel?  You had never

24  supplied those two documents to defense counsel,

## KAREN E. FRANCKS

13

1  correct? The Facts and the decision kit.
2      A.    Correct.
3      Q.    When you say you've discussed this
4  case with co-workers, what have you generally
5  discussed relating to this case with co-workers?
6      A.    The fact that there is -- one, that
7  there is a case. I mean, we are all employees,
8  we'd just talk about it. We've heard that there is
9  a case.
10     Q.    Okay.
11         Prior to -- between September, 2005
12 and today, have you talked to Don Cain about this
13 case?
14     A.    No.
15     Q.    Do you stay in touch with Don Cain?
16     A.    I have not talked with Don in almost
17 two years.
18     Q.    Have you ever talked to Don Cain
19 about the implementation of a cash balance plan and
20 what his thoughts were?
21         MS. YU: Objection to the form.
22 BY MR. SAUDER:
23     Q.    Let me withdraw the question.
24         Have you talked to Ben Wilkinson

14

1  since September of 2005 relating in this case?
2      A.    No.
3      Q.    Is that someone you keep in contact
4  with?
5      A.    No.
6      Q.    So, just to be clear, Jim Kremmel,
7  prior to calling you in August, 2007, never came to
8  you and asked you what, if any, role you played in
9  the mailings of any -- anything relating to the
10 cash balance sub-plan?
11         MS. YU: Objection as to form.
12 BY MR. SAUDER:
13     Q.    He never came and talked to you
14 about that prior to August, 2007?
15         MS. YU: Objection to form.
16 BY MR. SAUDER:
17     Q.    You can answer.
18     A.    That's correct.
19     Q.    If you can take a look at what I've
20 marked as Plaintiffs' Exhibit 50, and if you could
21 take a look at that and just let me know if you've
22 seen that document prior to today?
23     A.    Which document? The subpoena?
24     Q.    Well, the entire document. If you

15

1  just flip through it.
2      A.    Yes, I have seen it.
3      Q.    And this is the subpoena for your
4  testimony today also requiring you to bring any
5  relevant documents that you may have, correct?
6      A.    Correct.
7      Q.    It's my understanding that you have
8  no responsive documents to these requests.
9  Correct?
10     A.    That's correct.
11     Q.    You supplied an affidavit in this
12 case, and attached to that affidavit was Exhibit A,
13 which was the Facts Newsletter that you previously
14 discussed, correct?
15     A.    Correct.
16     Q.    And Exhibit B was the decision kit
17 that you talked about earlier, correct?
18     A.    Correct.
19     Q.    And you have no documents or
20 communications reflecting the manner in which those
21 exhibits were disseminated to participants in the
22 ACE plan, the Delmarva plan, or the Conectiv plan,
23 correct?
24     A.    That's correct.

16

1      Q.    And you have no documents,
2  communications or handwritten notes reflecting the
3  date or dates when Conectiv issued those exhibits,
4  correct?
5      A.    That's correct.
6      Q.    And you have no documents relating
7  to the identity of people to whom Conectiv issued
8  those documents, correct?
9      A.    That's correct.
10     Q.    And you said you met with counsel
11 for the first time -- when you spoke first with
12 Barak Bassman, I don't want to know what you
13 discussed, but how long did you talk to him on the
14 phone?
15     A.    Gosh. Less than ten minutes.
16     Q.    And was there anyone else on the
17 phone?
18     A.    No.
19     Q.    And the first time you met with
20 counsel was on Friday?
21     A.    This past Friday.
22     Q.    And who did you meet with?
23     A.    Kay.
24     Q.    Anyone else?

KAREN E. FRANCKS

17

1    A.    No.
2    Q.    Was anyone else present?
3    A.    No.
4    Q.    And how long did you meet with Kay?
5    A.    About an hour.
6    Q.    And did you review any documents?
7    A.    Yes.
8    Q.    How many documents did you review?
9    A.    I don't recall the exact number.
10   Q.    More than ten?
11         MS. YU: I brought the documents,
12   and I'm going to instruct her not to answer with
13   respect to the particular documents that I brought
14   with me.
15   BY MR. SAUDER:
16   Q.    Ask you to go through your
17   educational background after high school.
18   A.    I graduated from Goldey-Beacom
19   College in '78 with an Associate's degree in
20   medical secretarial, I graduated from Goldey-Beacom
21   College in '85 with a Bachelor in business
22   administration, and I graduated from Widener
23   University in 1999 with a Master's in human
24   resources, and I'm SPHR certified. Senior

18

1    Professional Human Resources.
2    Q.    And when did you get that
3    certification?
4    A.    2002, I believe.
5    Q.    And what did that entail?
6    A.    An examination. It's a national
7    certified examination, test.
8    Q.    Did you have to take courses for
9    that?
10   A.    You can, or you can just study for
11   it, or it's based on experience, also.
12   Q.    What is your current address -- home
13   address?
14   A.    200 Forest Drive, Wilmington,
15   Delaware, 19804.
16   Q.    And have you lived there since
17   October of '89?
18   A.    Yes.
19   Q.    What was the date you were first
20   hired by Delmarva?
21   A.    June 29, 1981.
22   Q.    Are you grandfathered in this
23   policy?
24   A.    No, I'm not.

19

1    Q.    Was your husband grandfathered?
2    A.    I do not have a husband. My
3    significant other retired in 1998.
4    Q.    So you are in the cash balance plan?
5    A.    Yes, I am.
6    Q.    And what was your -- if you could
7    take me through your positions at Delmarva.
8    A.    From the beginning?
9    Q.    Yes.
10   A.    I was hired as a secretary. In '86
11   I went into the safety department. In '98, manager
12   of the HR service center. Late '99 I was pulled
13   off into a special project, performance, process
14   and technology, and I was an HR manager for
15   corporate services and manager of organizational
16   effectiveness to my current role, manager of
17   performance, process and technology.
18   Q.    You said you were hired as a
19   secretary in '81 and you held that position until
20   '86?
21   A.    Yes.
22   Q.    And who were you a secretary for?
23   A.    Predominantly -- the first three
24   years in the finance area and the second three

20

1    years in customer service.
2    Q.    And then you went to the safety
3    department. What did you do there? Or what was
4    your title?
5    A.    I started as a secretary in the
6    safety department and then went to a safety
7    analyst -- promoted to a safety analyst, and then
8    promoted to a disability manager, and then safety
9    was part of HR at the time.
10   Q.    And then you were promoted to --
11   A.    Manager of the HR service center.
12   Q.    And who promoted you to that
13   position?
14   A.    Don Cain.
15   Q.    Had you worked with Don Cain prior
16   to that?
17   A.    Yes.
18   Q.    In what capacity?
19   A.    I was in his organization. Not a
20   direct report.
21   Q.    Did you ever directly report to Jim
22   Kremmel?
23   A.    No.
24   Q.    At any point during the time you

Pages 17 to 20

KAREN E. FRANCKS

---

21

1  worked for Delmarva or Conectiv --
2      A.    Never.
3      Q.    When you became manager of the
4  service center, who did you directly report to at
5  that point?
6      A.    Don Cain.
7      Q.    What was his title at the time?
8      A.    Vice-president of -- I'm not exactly
9  sure. I don't know whether it was all
10  administration or just HR. I think he had a couple
11  other areas beside HR. I don't really recall.
12      Q.    Who did you replace in the service
13  center?
14      A.    There was no service center.
15      Q.    This was a newly created position or
16  newly created entity?
17      A.    Correct.
18      Q.    Do you know what month that was that
19  this was created and you --
20      A.    January, 1998.
21      Q.    And when did you first take the
22  position?
23      A.    In January, 1998.
24      Q.    And was this the created -- do you

---

22

1  know why this was created?
2      A.    I believe it was created to put a
3  focus on employees and to deliver the benefits to
4  employees. Not just benefits; HR services.
5      Q.    How do you define that?
6      A.    HR services?
7          If an employee has a question on
8  any -- any benefit, any policy, any procedure
9  around HR, what is their vacation; what is their
10  benefit; I don't have benefits, how do I get
11  benefits? It was like a call center for --
12      Q.    Who handled those types of issues
13  prior to the service center being established?
14      A.    Various people.
15      Q.    Was there -- were there an HR
16  supervisor that was specifically tasked with
17  overseeing those types of issues?
18      A.    Well, prior to January, when there
19  wasn't an HR service center, we were still two
20  companies, Delmarva Power and Atlantic Electric,
21  and the HR world was still separate, so we were
22  starting to come together into a single HR under
23  Don Cain around January, '98, so the two HRs were
24  starting to merge, so I don't know who was doing

---

23

1  the HR services in ACE or I'm not real sure of who
2  was doing them in Delmarva Power.
3      Q.    The merger took place in March of
4  '98, correct?
5      A.    Correct.
6      Q.    So, in January of '98, were you
7  working with ACE HR people already?
8      A.    We were starting to come together,
9  to know each other and do kind of due diligence
10  around how we would approach things, and I was
11  still technically in safety up until then, so I
12  don't --
13      Q.    Up until when?
14      A.    Up until January -- before January,
15  '98.
16      Q.    But, between January and the time of
17  the merger, which was March of '98, you weren't
18  overseeing anything that was happening at ACE with
19  regard to HR issues, were you?
20      A.    We were starting to, because we were
21  pulling together the two HRs, so I was not
22  technically overseeing. I don't recall when the
23  employees actually started reporting to me.
24          It could have been in that time

---

24

1  frame, but I don't have an exact recall of which
2  month some of those employees started reporting to
3  me, but they eventually did.
4      Q.    When you say reporting to you what
5  do you mean by that?
6      A.    They -- there were employees in the
7  ACE HR and the Delmarva HR that were all reassigned
8  and put under different managers, so some of them
9  would have been reporting to me.
10      Q.    So you are talking about
11  specifically HR people?
12      A.    Specifically, yes.
13      Q.    And do you know -- were you the head
14  of the service center?
15      A.    Yes.
16      Q.    And how many supervisors were there
17  in the service center?
18      A.    We started with -- we didn't call
19  them supervisors; we called them program managers,
20  and there were one or two -- we were fluctuating
21  staffing levels as we were designing our model, so
22  we had one or two at any given point.
23      Q.    And they reported to you?
24      A.    Yes.

---

Pages 21 to 24

Reporting Associates, LLC   1-888-795-2323

B015

KAREN E. FRANCKS

25

1    Q.    Can you give me the names of the
2    individuals who were program managers during the
3    time you were there?
4    A.    Lynne Curriden, and then there was a
5    position that many people kind of -- a few people
6    went through and I don't recall the names. I don't
7    recall.
8    Q.    Does Lynne still work at the
9    company?
10    A.    No.
11    Q.    When did she leave the company?
12    A.    Lynne left in -- about two years
13    ago. I don't know the exact date.
14    Q.    Did she have health issues?
15    A.    Yes, she did.
16    Q.    How long did she work in the service
17    center, do you know?
18    A.    She worked in the service center
19    from '98, right after I started, until she
20    disability retired a couple years ago.
21    Q.    And any of the other program
22    managers still work at the company?
23    A.    No.
24    Q.    You are the only supervisor or

26

1    manager that was in the service center in '98
2    that's still at the company, correct?
3    A.    Can I be excused?
4    Q.    Sure.
5    (Discussion is held off the record.)
6    (Pertinent portion of the record is
7    read.)
8    BY MR. SAUDER:
9    Q.    Is that correct? That question?
10    A.    That's correct, still with the
11    company.
12    Q.    Did Jim Kremmel have any role in the
13    service center?
14    A.    No.
15    Q.    Did you have any interaction with
16    Jim Kremmel at that time? When I say "at that
17    time," I mean during the time you were at the
18    service center.
19    A.    I'm sure I did. He was in the HR
20    department.
21    Q.    What was his role?
22    A.    He was in employee relations.
23    Q.    What did that mean to you?
24    A.    That department interfaced with

27

1    managers and employees predominantly on union
2    contractual issues, grievances, arbitrations,
3    investigations.
4    Q.    He was in that role in 1998 and
5    1999, as far as you know?
6    A.    As far as I know, but I can't be
7    exact.
8    Q.    How big was HR during that time,
9    1998, 1999?
10    A.    Well, we were merging two HR
11    functions, so we were large. We were about --
12    about 95 employees, and we would then start
13    reducing, as we consolidated work.
14    Q.    People were being laid off?
15    A.    Right, and people were taking
16    severances.
17    Q.    Voluntary and involuntary?
18    A.    Correct.
19    Q.    And do you know what that eventually
20    pared down to from 95?
21    A.    I don't know.
22    Q.    Did you have any concern that you
23    may lose your job at that time?
24    A.    No.

28

1    Q.    But, fair to say that employees were
2    generally concerned after the merger that they may
3    lose their jobs?
4    A.    I don't know.
5    MS. YU: Objection as to form.
6    BY MR. SAUDER:
7    Q.    How many supervisors were there in
8    HR during that time period, 1998, 1999?
9    MS. YU: Objection as to form.
10    THE WITNESS: I don't know.
11    BY MR. SAUDER:
12    Q.    Roughly?
13    A.    In all of HR?
14    Q.    Correct.
15    A.    Or in my area?
16    Q.    In all of HR.
17    A.    My best guess would be, less than
18    five.
19    Q.    And you were one of them, correct?
20    A.    I was a manager, not a supervisor.
21    Q.    How many managers would there have
22    been?
23    A.    Approximately five.
24    Q.    Managers reported to supervisors?

## KAREN E. FRANCKS

29

1    A.    No. Supervisors reported to
2  managers.
3    Q.    Okay.
4         And all managers reported to Don
5  Cain?
6    A.    Not necessarily. Sometimes a
7  manager can report to a higher level manager, but
8  most did report to Don Cain.
9    Q.    But, I mean, Don Cain was the one
10  who was sort of the head of HR?
11    A.    Yes, he was.
12    Q.    But you had the option, if you
13  needed, for whatever reason, to report to someone
14  over Don Cain?
15    A.    No.
16         MS. YU: Objection.
17  BY MR. SAUDER:
18    Q.    You say another manager or another
19  person, maybe on Don Cain's level, just in a
20  different department? Is that what you were
21  talking about when you said they report to someone
22  other than Don Cain occasionally?
23         MS. YU: Objection.
24         THE WITNESS: I did not say they

30

1  would report to someone other than Don Cain. I
2  said that they could report to another manager. It
3  went supervisor, manager, you could have a senior
4  manager, and then Don Cain.
5  BY MR. SAUDER:
6    Q.    You said there were about five
7  managers at that time, you were one of them.
8         Are any of the other managers
9  currently employed at the company?
10    A.    Yes.
11    Q.    Who?
12    A.    He's now a vice-president, his name
13  is Ernest Jenkins.
14    Q.    What's he vice-president of?
15    A.    People strategy and human resources.
16    Q.    In 1998 and 1999, when he was a
17  manager in HR, what was his position?
18    A.    He was hired externally in January
19  of 1998 to -- brought in to be the manager of
20  organizational effectiveness.
21    Q.    What does that mean?
22    A.    Means organizational consulting.
23    Q.    Did he play any role in the cash
24  balance plan, that you know of?

31

1    A.    Not to my knowledge.
2    Q.    Did he play any role in mailing
3  anything out relating to anything relating to HR?
4    A.    No.
5    Q.    Is there anyone else who is still at
6  the company?
7         MS. YU: In terms of managers?
8  BY MR. SAUDER:
9    Q.    That were managers in HR at the
10  time, 1998, 1999.
11    A.    I don't believe so.
12    Q.    How about supervisors? Any
13  supervisor -- people that were supervisors in 1998
14  or 1999 that are still at the company? Supervisors
15  of HR.
16    A.    Not to my knowledge.
17    Q.    Jim Kremmel, he was a manager?
18    A.    No.
19    Q.    He was a supervisor?
20    A.    No.
21    Q.    He was what, not with --
22    A.    Must have been a staff position, an
23  employee relations specialist. I don't know his
24  exact title, but something like that.

32

1    Q.    So he would have been lower than a
2  manager?
3    A.    Yes.
4    Q.    Lower than a supervisor?
5    A.    Lower meaning?
6    Q.    Meaning he would report to a
7  supervisor or he didn't have as much authority as a
8  supervisor.
9         MS. YU: Objection as to form.
10  BY MR. SAUDER:
11    Q.    You can answer.
12    A.    Similar staff positions are the same
13  grade levels. I wouldn't couch it as less
14  importance, but he reported to a manager.
15    Q.    Do you know who he reported to at
16  that time?
17    A.    He reported to John Zimmerman.
18    Q.    And he's no longer at the company,
19  correct?
20    A.    Correct.
21    Q.    What was John Zimmerman responsible
22  for overseeing?
23    A.    He was a manager of employee
24  relations.

Pages 29 to 32

KAREN E. FRANCKS

33

1    Q.    So the union relationships?
2    A.    Correct.
3    Q.    Union contractual relationships?
4    A.    Correct.
5    Q.    Did you have any interaction with
6    John Zimmerman or Jim Kremmel while you were at the
7    service center relating to any mailings with regard
8    to HR material?
9    A.    I don't believe so.
10   Q.    They didn't oversee that task?
11   A.    No.
12   Q.    Did you play any role in what was
13   called the Total Rewards team?
14   A.    Total Rewards team?
15         I don't recall --
16   Q.    Are you familiar with that term?
17   A.    I'm familiar with the term "Total
18   Rewards." I'm not familiar with the term "Total
19   Rewards team."
20   Q.    What's your understanding of what
21   "Total Rewards" means?
22   A.    It is the value of your compensation
23   and your benefits as a total package.
24   Q.    Is that a phrase that came about at

34

1    or around the time of the merger?
2    A.    I believe so.
3    Q.    Do you know how defense counsel
4    found out that you had potentially relevant
5    information in this case? Do you have any idea?
6    A.    No.
7          MS. YU: Objection.
8    BY MR. SAUDER:
9    Q.    I'm just asking whether you know.
10         Do you have any idea?
11   A.    No.
12   Q.    Subsequent to your call with Jim
13   Kremmel in August of 2007, have you had any other
14   conversations with Jim Kremmel subsequent to that?
15   A.    Subsequent meaning after?
16   Q.    Yes.
17   A.    No.
18   Q.    So that was the one and only time
19   you talked to Jim Kremmel about this case, correct?
20   A.    About this case, correct.
21   Q.    And that was a five-minute
22   conversation?
23         MS. YU: Objection.
24   BY MR. SAUDER:

35

1    Q.    You can answer.
2    A.    Yes, I would say around five
3    minutes. It was just an introductory conversation
4    to let me know someone would be calling me.
5    Q.    Did he call you or meet you?
6    A.    Called me.
7    Q.    And he called you in the office?
8    A.    I don't know where he called me
9    from, but he called my office, yes.
10   Q.    Fair to say that there were a lot of
11   changes taking place in January of '98 when you
12   became the manager of the service center?
13   A.    Yes.
14   Q.    Medical benefits, they were
15   changing?
16   A.    Yes.
17   Q.    Prescription benefits were changing?
18   A.    Yes.
19   Q.    Dental was changing?
20   A.    Yes.
21   Q.    Vision care was changing?
22   A.    Yes.
23   Q.    Life insurance was changing?
24   A.    Yes.

36

1    Q.    Health care and dependent care
2    reimbursement accounts were changing?
3    A.    New. We had not had it before.
4    Q.    So that was something else new?
5    A.    Yes.
6    Q.    New to all the employees, both on
7    the Delmarva side and ACE side, as far as you knew?
8    A.    As far as I know.
9    Q.    Pension plan was changing?
10   A.    Yes.
11   Q.    For some people?
12   A.    Yes.
13   Q.    401(k), was that changing?
14   A.    I believe so, but I don't know if it
15   was just the vendor or the match. I can't recall.
16   Q.    But something was changing?
17   A.    Something was changing.
18   Q.    Paid time off, that was changing?
19   A.    I don't remember.
20   Q.    Was there an educational assistance
21   program that was either changing or being
22   implemented?
23   A.    Delmarva had one, but that is my
24   heritage, so I don't -- I don't know about ACE. I

Pages 33 to 36

KAREN E. FRANCKS

37

1   don't know if they had one, but it was probably
2   changing on some level.
3       Q.    As you already said, people were
4   being laid off, correct?
5           MS. YU: Objection.
6           THE WITNESS: We did not use that
7   term.
8   BY MR. SAUDER:
9       Q.    What do you use?
10      A.    We were doing severances.
11      Q.    People were leaving?
12      A.    Um-hum.
13      Q.    And some of them didn't want to
14  leave, correct?
15          MS. YU: Objection.
16          THE WITNESS: I don't know.
17  BY MR. SAUDER:
18      Q.    At the time you were hired in 1981
19  at Delmarva, and then up through January of 1999,
20  you were in the Delmarva pension plan, correct?
21      A.    Correct.
22      Q.    And, when you first were hired at
23  Delmarva, that was the pension plan they had; you
24  didn't have a choice to pick what pension plan you

38

1   wanted, correct?
2       A.    Correct.
3       Q.    And through that time period you
4   didn't have a choice to pick what pension plan you
5   wanted, correct?
6       A.    Correct.
7       Q.    And then -- you are in the cash
8   balance plan, correct?
9       A.    Correct.
10      Q.    And you didn't have a choice to be
11  in the cash balance plan or not, correct?
12      A.    Correct.
13      Q.    They just put you on the cash
14  balance plan?
15      A.    Yes.
16          MR. SAUDER: Mark this Plaintiffs'
17  Exhibit 51, please.
18          (Exhibit P-51 is marked for
19  identification.)
20  BY MR. SAUDER:
21      Q.    If you could just take a look at
22  what's been marked Plaintiffs' Exhibit 51 and let
23  me know once you've had an opportunity to review
24  that document.

39

1       A.    I've glanced at it.
2       Q.    Did you play any role in drafting
3   this document?
4       A.    No.
5       Q.    Did you play any role in overseeing
6   that document in any way?
7       A.    No.
8       Q.    Have you seen that document prior to
9   today?
10      A.    Not to the best of my knowledge.
11  I'm not grandfathered. I don't believe I would
12  have received this.
13      Q.    Is it your understanding that
14  individuals that are grandfathered have a choice
15  between the cash balance plan -- have a choice
16  between taking their benefits from the cash balance
17  plan or taking their benefits from the heritage
18  plan?
19          MS. YU: Objection.
20  BY MR. SAUDER:
21      Q.    Is that what your understanding is?
22          MS. YU: Objection.
23          THE WITNESS: That's what I hear.
24  I'm not grandfathered.

40

1   BY MR. SAUDER:
2       Q.    But that's what you heard, right?
3           MS. YU: Objection.
4   BY MR. SAUDER:
5       Q.    Is that correct?
6       A.    Yes.
7       Q.    You were born September, 1958, is
8   that correct?
9       A.    Correct.
10      Q.    This has been previously marked as
11  Plaintiffs Exhibit 3.
12      A.    Okay.
13      Q.    You've had an opportunity to look at
14  Plaintiffs Exhibit 3?
15      A.    Yes.
16      Q.    Fair to say there is no date on that
17  document?
18      A.    Yes.
19      Q.    Mr. Wilkinson, he was -- what was
20  his position? Ben Wilkinson, what was his position
21  in 1998, 1999?
22      A.    I'm not sure of his exact title, but
23  he was manager of benefits.
24      Q.    And he was brought in from the

Pages 37 to 40

KAREN E. FRANCKS

41

1  outside, correct?

2      A.    That's correct.

3      Q.    I want to read you a portion of what

4  he testified to relating to these Facts documents

5  and ask you if you think that's correct or you

6  agree with that.

7          "Do you know if you played any role

8  in preparing this document?

9          "Answer. Without a date, it's very

10  hard to tell. There were lots of these documents

11  prepared under the heading 'Facts.'

12          "Question. And when you say a lot

13  of documents prepared under the heading Facts, is

14  that there would have been -- they would be -- they

15  would have been prepared under the heading Facts,

16  that would have had nothing to do with the cash

17  balance plan?

18          "Answer. Probably there were --

19  there were different Facts sheets for 401(k) and

20  the health care plan, and all under the same theme

21  about the Facts -- about the benefits.

22          "Question. For all the -- for all

23  the changes that were taking place at that time?

24          "Answer. Yes."

42

1          Do you agree with that, that there

2  were these types of Facts letters that were going

3  out for all different types of benefits that were

4  changing and being implemented at the time?

5          MS. YU: Objection to form.

6          THE WITNESS: Yes.

7  BY MR. SAUDER:

8      Q.    So -- we went through that list

9  before. There would have been Facts letters going

10  out for the medical benefit?

11      A.    There may have been.

12      Q.    And for the prescription benefit?

13      A.    I don't recall, but there may have

14  been.

15      Q.    Dental?

16      A.    Not sure.

17      Q.    But may possibly?

18      A.    Yes.

19      Q.    Vision?

20      A.    Highly unlikely.

21      Q.    Why do you say that?

22      A.    Smaller benefits were usually

23  combined together. We wouldn't have done a full

24  communication on something as small as vision. It

43

1  probably would have been included in a larger

2  communication.

3      Q.    How about life insurance?

4      A.    Not sure.

5      Q.    Possibly?

6      A.    Possibly.

7      Q.    And you would agree that 401(k),

8  there would have been a Facts made by -- or

9  probably that went out for that?

10          MS. YU: Objection.

11          THE WITNESS: There may have been.

12  BY MR. SAUDER:

13      Q.    How about for -- if there were

14  changes in the vacation or any paid time off?

15      A.    Those type of things would have been

16  combined.

17      Q.    And all these changes were taking

18  place in post -- you know, most-merger, which would

19  have been March, 1998, correct?

20      A.    Correct.

21      Q.    Do you know if you received a copy

22  of Plaintiffs Exhibit 3?

23          MS. YU: Objection. Is there a time

24  frame you are asking about?

44

1          MR. SAUDER: Excuse me?

2          MS. YU: Is there a time frame you

3  are asking about?

4          MR. SAUDER: 1998, 1999.

5          THE WITNESS: I don't have specific

6  recall whether I personally received this or not.

7  BY MR. SAUDER:

8      Q.    You don't have a copy of this,

9  correct?

10      A.    I haven't looked to see if I have a

11  copy.

12          I don't know.

13      Q.    Fair to say there is no address on

14  this, P-3?

15      A.    That's correct.

16      Q.    Do you have any indication when this

17  was disseminated?

18      A.    Without a date -- the dates were

19  sometimes in this blackened margin, but something

20  that gives me a hint is that "We are becoming

21  Conectiv" usually was a tag line used before or

22  right after the merger.

23      Q.    Other than that, you have no

24  firsthand knowledge of when this was disseminated,

KAREN E. FRANCKS

45

1  correct?
2  A.    That's correct.
3          MS. YU:  Objection.
4  BY MR. SAUDER:
5      Q.    You have no firsthand knowledge
6  whether this was disseminated, correct?
7          MS. YU:  Objection.
8          THE WITNESS:  That's correct.
9  BY MR. SAUDER:
10     Q.    Fair to say that these types of
11  documents headed Facts, that — you already
12  testified these types of documents went out for all
13  types of benefit changes that were taking place.
14  These types of documents may be laying around the
15  company?
16         MS. YU:  Objection as to form.
17         THE WITNESS:  They could be.
18         MR. SAUDER:  We'll mark this as
19  Plaintiffs' 52.
20         (Exhibit P-52 is marked for
21  identification.)
22         THE WITNESS:  You want me to look at
23  this?
24  BY MR. SAUDER:

46

1      Q.    Yes, please.
2      A.    Okay.
3      Q.    Looking at the first two pages of
4  Plaintiffs' Exhibit 52, is that a declaration that
5  you provided relating to this case?
6      A.    Yes, it is.
7      Q.    And the first time you spoke to
8  anyone — when was the first time you spoke to
9  anyone regarding this declaration?
10     A.    Well, obviously, it would have been
11  right before my signature of July 31st.
12     Q.    And do you know who you spoke with
13  relating to this declaration?
14     A.    I believe it was Barak Bassman.
15     Q.    Is that the conversation you
16  discussed earlier?
17     A.    Yes.
18     Q.    So, do you know, in relation to you
19  signing this on July 31st, 2007, how many days,
20  weeks, months it would have been prior that you
21  spoke with Barak Bassman relating to the
22  declaration?
23     A.    I think my original estimate was
24  that my first discussion with Barak and Jim Kremmel

47

1  was early August.
2          Obviously, I'm off by a week or so,
3  but this would have — the discussion would have
4  happened right before this July 31st date.
5      Q.    So days, maybe?
6      A.    Days.
7      Q.    When you spoke with Barak Bassman
8  for the first time relating to this declaration,
9  did he send you, E-Mail you, fax you, mail you a
10  copy of this declaration as you were having the
11  conversation?
12         MS. YU:  Objection.  The process by
13  which this declaration was prepared is
14  attorney-client privilege and I'm going to instruct
15  her not to answer.
16  BY MR. SAUDER:
17     Q.    Well, were you looking at this
18  declaration the first time you were speaking with
19  Barak Bassman?
20     A.    No, I wasn't.
21     Q.    After your conversation with Barak
22  Bassman, how quickly is it that you first saw a
23  copy of the declaration?
24     A.    I don't know.  My guess would be,

48

1  days.
2      Q.    And how did you receive a copy of
3  it?
4      A.    I believe pdf means.  I believe pdf,
5  E-Mail.
6      Q.    And did you make any changes — so,
7  it was pdf E-Mailed from defense counsel, correct?
8      A.    Correct.
9      Q.    And did you make any changes to the
10  draft that they prepared?
11         MS. YU:  Objection.  The process by
12  which this declaration was prepared is not
13  something that I'll allow her to answer.
14         MR. SAUDER:  She can answer whether
15  she made any corrections to the copy she received,
16  or there were any changes she had to make, if she
17  agreed with anything that was in there.
18         MS. YU:  Focusing on just her
19  review?
20         MR. SAUDER:  Yes.
21         MS. YU:  I think that's a very, very
22  fine line between the process of the
23  attorney-client communication portion of preparing
24  this.

Pages 45 to 48

Reporting Associates, LLC  1-888-795-2323

KAREN E. FRANCKS

49

1    I'm not going to let her answer.
2        MS. SAUDER: Will you let her answer
3    if she made any changes?
4        MS. YU: I don't know how you would
5    disassemble what happened with respect to the
6    portions of the preparation of the declaration that
7    involved the attorney and the communications, and
8    I'm not going to have her answer that question.
9        MR. SAUDER: So you are instructing
10   her not to answer?
11       MS. YU: Yes.
12   BY MR. SAUDER:
13       Q.    What were your -- explain to me what
14   your responsibilities were as manager of the
15   service center in 1998.
16       A.    First and foremost, to staff and
17   create the organization that hadn't existed before
18   January, 1998. Parallel with putting the
19   infrastructure together to be able to solicit and
20   enroll employees in new benefits in July, 1998.
21       Q.    What does that mean?
22       A.    Get the technology in place, get the
23   vendor on board. We were working with Towers
24   Perrin at the time to design a service center,

50

1    since we had never had one before.
2        Q.    And you were working directly with
3    Towers on that -- on those issues, correct?
4        A.    Yes, I was.
5        Q.    And anyone else -- would Don Cain be
6    in on any of those meetings for any reason?
7        A.    In on the meetings, I'm not -- I
8    don't recall Don being in on the meetings, but I
9    have would reported to him.
10       Q.    But you would have been the most
11   senior person at the company in on those meetings?
12       MS. YU: Objection.
13       THE WITNESS: Most likely.
14   BY MR. SAUDER:
15       Q.    Anyone else from the company who
16   would have been in on those meetings?
17       A.    There was a team to design and
18   implement the service center, so, as we staffed up,
19   different people would have been on that team.
20   Technology folks and subject matter experts.
21       Q.    But not necessarily people that were
22   working in the service center?
23       A.    Yes, um-hum.
24       Q.    Okay.

51

1    Yes, they were people that were
2    working in the service center?
3        A.    Yes. As we staffed up, they would
4    have been -- they would have had a role in
5    implementing the service center.
6        Q.    And during that time frame in 1998,
7    what portion of your job responsibilities were
8    devoted to getting this thing up and running?
9        A.    A hundred percent. It was my job to
10   get it up and running.
11       Q.    Would that be during all of 1998?
12       A.    Well, we had to solicit for the new
13   benefits in early May, the benefits went live in
14   July, and then we had to troubleshoot any -- then
15   we had to service the customers after July.
16       So, it was -- it was parallel, there
17   were always issues with a new service center,
18   technology issues or staffing issues, people coming
19   and going, plus we were consolidating HR at the
20   time.
21       Q.    And you were the most senior person
22   in the service center?
23       A.    Yes.
24       Q.    So a hundred percent of your time

52

1    was -- in 1998, dealt with getting this thing up
2    and running, dealing with Towers, dealing with the
3    technology issues, dealing with the vendors and
4    things like that, correct?
5        A.    Yes, and I'm sure there is other
6    things in that hundred percent, too, but that was
7    my responsibility to get that up and running.
8        Q.    When you say you're sure there are
9    other things, what other things?
10       A.    Well, there are -- then answering
11   the questions of the employees, so we were
12   implementing the service center as we were working
13   in the service center.
14       Q.    And you had people there to answer
15   the questions, correct?
16       A.    Correct.
17       Q.    And how many people would have been
18   there to answer questions that employees had?
19       A.    Well, it fluctuated. We would ramp
20   up during an open enrollment and ramp down when it
21   wasn't an open enrollment, so we would staff up
22   sometimes using long-term temps. At probably our
23   height we had -- we had six full-time people on the
24   phones and there was a standing order in HR at the

Pages 49 to 52

Reporting Associates, LLC  1-888-795-2323

KAREN E. FRANCKS

**53**

1    time that, when I raise the flag, if the phones
2    were busy, other people would have to step in and
3    handle the overload. I would sit on the phones, if
4    I had to, to make sure questions were answered.
5        Q.    And is the service center some
6    place, if you needed a benefits form to fill out, a
7    change in benefits, or anything relating to
8    benefits, some type of form, where you could come
9    to the service center and say, "I need a copy of
10   this form so I can fill it out"?
11       A.    You could walk in, but we
12   discouraged it.
13       Q.    Why is that?
14       A.    Because it takes people off the
15   phones. We were trying to change behavior in the
16   organization to get used to coming into a service
17   center, a call center, instead of walking in to
18   your friend that you used to know and get
19   something.
20       Q.    But that's where you would go if you
21   wanted that form?
22       A.    That's correct.
23       Q.    That type of form, you would come to
24   the service center?

**54**

1        A.    You would call an 800 number.
2        Q.    And then they would send it out?
3        A.    Yes.
4        Q.    Or get it to you somehow?
5        A.    Somehow.
6        Q.    In the second paragraph where — or
7    the second sentence, you say, "My responsibility
8    included distribution of all HR publications,
9    notices, newsletters and forms to Conectiv
10   employees," correct?
11       A.    Correct.
12       Q.    And you say your responsibility.
13   When you say your responsibility, was that
14   something that you say was your responsibility
15   because you were the manager of the service center
16   and that's something the service center was
17   supposed to be doing, correct?
18       A.    That's correct. Not my personal
19   responsibility, but, yes, it was our organizational
20   responsibility.
21       Q.    Someone below you was supposed to be
22   doing that type of thing, correct?
23       A.    That's correct.
24       Q.    And who were those people? Do you

**55**

1    know their names?
2        A.    There were various people. A lot of
3    our fulfillment, as we called it, and our
4    distribution, was coordinated by one of our senior
5    consultants. One person that comes to mind is
6    Christine vanVeen.
7        Q.    How do you spell that last name?
8        A.    Small v-a-n capital V-e-e-n.
9        Q.    She was a consultant?
10       A.    She was a — well, it wasn't an
11   external. She was an employee.
12       Q.    Where did she come from, Delmarva or
13   ACE?
14       A.    She was Delmarva heritage.
15       Q.    Is she still with the company?
16       A.    Yes, she is.
17       Q.    What's her role?
18       A.    I believe she's a senior benefits
19   consultant.
20       Q.    And she reported to you at the time?
21       A.    I don't recall whether she was
22   directly or indirectly reporting to me.
23       Q.    Was she in the service center?
24       A.    Yes, she was.

**56**

1        Q.    And what were her responsibilities
2    at that time?
3        A.    Chris' main responsibility — she
4    had probably the most knowledge of all the
5    intricacies of the plans, the health and welfare
6    plans, and she was the one coordinating the
7    knowledge transfer to the newer representatives and
8    was — we had a tiering system. If the Tier 1 call
9    taker could not answer the question, they would
10   bump it up to Tier 2, or I would be Tier 3 for
11   disputes or whatever, and Chris was our consistent
12   Tier 2. Because of her knowledge, she was also
13   involved in a lot of vendor management. If there
14   were vendor issues, if Blue Cross wasn't getting
15   this card to that person. She would work on those
16   more complex issues.
17       Q.    Fair to say you were dealing with a
18   lot of vendors in that position?
19       A.    Yes.
20       Q.    So, who, within the service center,
21   would have had the most firsthand knowledge
22   regarding the distribution of all the HR
23   publications, notices, newsletters and forms to
24   Conectiv employees?

Pages 53 to 56

KAREN E. FRANCKS

57

1          MS. YU: Objection as to form.
2    BY MR. SAUDER:
3          Q.    You can answer.
4          A.    I don't know that there was a single
5    person.
6                I would say, to my knowledge, if we
7    were doing mass complex mailings, Chris would
8    coordinate most of those.
9          Q.    How do you define mass complex
10   mailings?
11         A.    For instance, when decision kits
12   went out, or open enrollment kits they are called
13   now, different -- different parties would get
14   different inserts, depending on whether they were a
15   retiree or a Delmarva heritage or an ACE heritage,
16   so -- because they were carrying forth some of
17   their historical options. The fulfillment of their
18   packages, the -- this group gets these documents,
19   this group gets these documents.
20         Q.    Who would oversee the dissemination
21   of these Facts Newsletters that would go out for
22   all different types of things?
23         A.    To my knowledge, it would depend on
24   whether it was a home mailing or internal mailing.

58

1          Q.    And who would have the most
2    firsthand knowledge relating to home mailings?
3          A.    I would say it would be Chris.
4          Q.    How about internal?
5          A.    I'm not sure.
6          Q.    So, fair to say these Facts
7    Newsletters would, on occasion, be sent out
8    internally, correct?
9          MS. YU: Objection as to form.
10         THE WITNESS: Sometimes.
11   BY MR. SAUDER:
12         Q.    And when you say "internally," what
13   does that mean?
14         A.    We had a couple different labelling
15   systems. If they were going to send something to
16   the home, it would require running labels off our
17   HR system that were -- that would use the preferred
18   Post Office standards of how we address labels.
19               If we were going to mail them
20   internally, we would never put a home address label
21   on something, because it would not -- we would need
22   to put the internal address on the label. The
23   department, the physical building location, but not
24   the home address.

59

1          Q.    If you could just look back at
2    Plaintiffs Exhibit 3, we've already established
3    there is no home address on this, correct?
4          A.    Correct.
5          Q.    And is there a -- some type of
6    indication that this went to a specific building
7    within the company?
8          A.    No.
9          Q.    So it's fair to say that you didn't
10   have firsthand knowledge of the distribution of HR
11   publications, notices, newsletters and forms to
12   Conectiv employees; that was someone else under
13   you, correct?
14         MS. YU: Objection as to form.
15   BY MR. SAUDER:
16         Q.    You can answer.
17         A.    Yes.
18         Q.    That's correct?
19         A.    That's correct.
20               I was not above stuffing envelopes,
21   though, if we needed it.
22         Q.    But, you for the most part, someone
23   else was responsible for that task, correct?
24         MS. YU: Objection.

60

1          THE WITNESS: Correct.
2    BY MR. SAUDER:
3          Q.    Number 3 says, "It was Conectiv HR's
4    standard practice in 1998 only to affix postage and
5    home addresses to documents that were mailed to
6    employees' homes," is that correct?
7          A.    That's correct.
8          Q.    What do you mean by that? In other
9    words, if it wasn't going in the mail, E-Mailed to
10   someone's home, you didn't put an address on it,
11   correct?
12         A.    Not a home address, correct.
13         Q.    Well, did you address it in any
14   other way that would say this is going to John Doe?
15         MS. YU: Objection.
16   BY MR. SAUDER:
17         Q.    You can answer.
18         A.    Sometimes we would. Sometimes, if
19   things were bulk mailed, there was a practice of
20   the -- I believe the general services area of the
21   company would distribute some newsletters by what
22   was called Pay Master, where the paychecks went to,
23   so, if a Pay Master in one location usually got 35
24   paychecks, they would get 35 newsletters, and the

## KAREN E. FRANCKS

**61**

1   expectation is that they would give out a paycheck
2   and newsletters.
3         Sometimes we would put labels on and
4   label each newsletter to each employee. So, it
5   would depend.
6       Q.   If it was sent out by what you
7   called Pay Master, you said the expectation was
8   that they would distribute it with the paycheck.
9   You have no firsthand knowledge whether they did or
10  they didn't, once it left the service center,
11  correct?
12        MS. YU:  Objection.
13        THE WITNESS:  That's correct.
14  BY MR. SAUDER:
15      Q.   And who would have been -- that
16  was -- the person that was supposed to be doing
17  that in different departments, would they have a
18  specific title?
19      A.   Could be anything from a clerk to a
20  secretary to an analyst.
21      Q.   And when it says "It was Conectiv
22  HR's standard practice in 1998," Conectiv had only
23  become an entity in March of '98, correct? Prior
24  to March of '98, Conectiv didn't exist, is that

**62**

1   fair?
2       A.   That's fair.
3       Q.   And when you say standard practice,
4   was there any -- do you have any -- I think we've
5   already established you have no documents relating
6   to the dissemination of Exhibits A and B, correct?
7         MS. YU:  Objection to the form.
8         THE WITNESS:  Exhibit A and B to --
9   BY MR. SAUDER:
10      Q.   A and B to your declaration, which
11  would be the Facts Newsletter and the decision kit.
12      A.   Can you repeat your question?
13      Q.   You have no documents relating to
14  the dissemination of those documents, correct?
15        MS. YU:  Objection as to form.
16        THE WITNESS:  I'm not sure.
17  BY MR. SAUDER:
18      Q.   I mean, based on what my requests
19  were for documents, you had nothing responsive to
20  those requests, correct?
21      A.   That's correct.
22      Q.   So, fair to say you have no memo
23  that laid out what the practice was for Conectiv to
24  disseminate these types of documents in 1998?

**63**

1         MS. YU:  Objection to form.
2         THE WITNESS:  That's correct.
3         Can I take a break?
4         MR. SAUDER:  Yes, sure.
5         (Recess called at 11:40 a.m.)
6         (Resumed at 11:46 a.m.)
7   BY MR. SAUDER:
8       Q.   This has been previously marked as
9   Defendants' Exhibit 5.
10        You've had an opportunity to review
11  that document?
12      A.   Yes.
13      Q.   Fair to say that that document is a
14  copy of what you've attached as Exhibit A to your
15  declaration?
16      A.   Yes.
17      Q.   And fair to say there is no date on
18  this document?
19      A.   Yes.
20      Q.   Do you have any recollection of
21  receiving this document?
22      A.   Well, ten years ago do I remember
23  the day I got it in the mail?
24        Not exactly.

**64**

1       Q.   Do you remember receiving this
2   document?
3       A.   Yes.
4       Q.   How did you receive it?
5       A.   Received it in the Post Office mail.
6       Q.   To your home?
7       A.   Yes.
8       Q.   You just don't know when, correct?
9       A.   I don't know when.
10      Q.   And did you ever supply a copy of
11  this document to anyone?
12        MS. YU:  Objection to form.
13  BY MR. SAUDER:
14      Q.   In relation to this case.
15      A.   No. In relation to this case? My
16  copy of this document was because, when I was a
17  manager at the service center, everything that we
18  mailed to the home, when people would call and say
19  "I didn't get that" or "I didn't get this" or "Send
20  me this," it was my habit to bring my personal copy
21  of whatever I got at home into the service center
22  and say, "Look, folks, we did get it, I got mine,
23  so they went out."
24        So, that's why you see my copy here.

**Pages 61 to 64**

Reporting Associates, LLC   1-888-795-2323

KAREN E. FRANCKS

---

65

1  I would bring it into the service center kind of as
2  proof that we had seen it.
3      Q.    So you brought your copy in to the
4  service center?
5      A.    Yes.
6      Q.    So that indicates that you received
7  a copy, correct?
8      A.    Yes.
9      Q.    Not necessarily that anyone else
10 received a copy?
11         MS. YU: Objection to form.
12 BY MR. SAUDER:
13     Q.    That's fair? You have no personal
14 knowledge that anyone else received a copy other
15 than yourself, isn't that correct?
16         MS. YU: Objection to form.
17 BY MR. SAUDER:
18     Q.    Is that correct?
19         MS. YU: Objection.
20 BY MR. SAUDER:
21     Q.    You can answer.
22     A.    That's correct.
23     Q.    And do you know whether — was there
24 some file that you had which was your file in the

---

66

1  service center?
2         MS. YU: Objection.
3         THE WITNESS: I had lots of files.
4  I don't know -- I don't know the trail of this
5  particular document over the last ten years. I
6  don't know what file it went into or how it
7  reappeared.
8  BY MR. SAUDER:
9      Q.    But you did not produce it? Someone
10 got it somehow?
11     A.    I did not produce it, correct.
12     Q.    And you don't know where that
13 someone got it, correct?
14     A.    Correct.
15         MS. YU: Objection.
16 BY MR. SAUDER:
17     Q.    You don't know whether it was that
18 file or someplace else, correct?
19         MS. YU: Objection.
20         THE WITNESS: Correct.
21 BY MR. SAUDER:
22     Q.    Did you ever discuss this document
23 with Jim Kremmel?
24     A.    I don't believe so. I don't believe

---

67

1  so. I can't say — I never — I can't say. I
2  really don't know. I don't think so. But my
3  conversation with Jim was very short.
4      Q.    You are talking about your
5  conversation in August, correct?
6      A.    Late July now.
7      Q.    Late July of this year.
8      A.    Um-hum.
9      Q.    But, prior to that, since 2005 up
10 through that conversation, you didn't have any
11 conversation with Jim Kremmel relating to this
12 document or this case, correct?
13     A.    That's absolutely correct.
14     Q.    So, fair to say you have no
15 knowledge that this document, D-5, was ever mailed
16 to Mike Charles, correct?
17         MS. YU: Objection.
18         THE WITNESS: I don't know who Mike
19 Charles is.
20 BY MR. SAUDER:
21     Q.    He's one of the Plaintiffs in this
22 case. I guess that's fair, then —
23     A.    Was he an employee?
24         MS. YU: Objection.

---

68

1  BY MR. SAUDER:
2      Q.    Yes.
3      A.    I have no firsthand knowledge
4  whether he — whether it was mailed or he received
5  it.
6      Q.    No firsthand knowledge whether —
7  I'm going to name three other Plaintiffs in this
8  case who were employees.
9         No firsthand knowledge whether it
10 was ever sent to Joseph Fink, correct?
11         MS. YU: Objection to form.
12         THE WITNESS: That's correct.
13 BY MR. SAUDER:
14     Q.    No firsthand knowledge whether it
15 was ever sent to Thomas Troop, correct?
16         MS. YU: Objection to form.
17         THE WITNESS: Correct.
18 BY MR. SAUDER:
19     Q.    No firsthand knowledge whether it
20 was ever sent to Maury Ward, correct?
21         MS. YU: Objection as to form.
22         THE WITNESS: That's correct.
23 BY MR. SAUDER:
24     Q.    And we've already established you

---

Pages 65 to 68

Reporting Associates, LLC   1-888-795-2323

KAREN E. FRANCKS

69

1  have no list of individuals who it was sent to,
2  correct?
3       MS. YU:  Objection to form.
4       THE WITNESS:  That's correct.
5  BY MR. SAUDER:
6       Q.    And you had no list of addresses
7  that it was sent to, correct?
8       MS. YU:  Objection to form.
9       THE WITNESS:  That's correct.
10  BY MR. SAUDER:
11       Q.    And you have no documentation to
12  show the date it was disseminated, correct?
13       MS. YU:  Objection to form.
14       THE WITNESS:  No documentation other
15  than what's listed in here —
16  BY MR. SAUDER:
17       Q.    Well, there is no date on this
18  document, correct?
19       MS. YU:  Objection.
20       THE WITNESS:  There is no date.
21  BY MR. SAUDER:
22       Q.    Correct?
23       A.    That's correct.
24       Q.    Now, going back to your affidavit,

70

1  which was marked as P-52 —
2       A.    Okay.
3       Q.    — in the beginning, you said
4  essentially that the statements are true and
5  correct to the best of your knowledge and belief,
6  okay? And, based on your testimony, then, with
7  regard to this document anyway, Exhibit A, which
8  has been previously marked as D-5, fair to say that
9  you made that statement, Paragraph Number 4, which
10  says, "Attached as Exhibit A is a Conectiv HR
11  newsletter titled Facts. Conectiv HR mailed this
12  newsletter to its employees' homes in May, 1998"?
13       Fair to say that that statement is
14  based on your belief, not your firsthand knowledge?
15       MS. YU:  Objection.
16  BY MR. SAUDER:
17       Q.    You can answer.
18       A.    That's correct.
19       Q.    You have no firsthand knowledge as
20  it relates to sentence Number 4 in your
21  declaration, correct?
22       MS. YU:  Objection.
23       THE WITNESS:  That's correct.
24  BY MR. SAUDER:

71

1       Q.    And I guess the same can be said for
2  Number 5 in your declaration?
3       MS. YU:  Objection.
4       THE WITNESS:  Can you ask your
5  question again, please?
6  BY MR. SAUDER:
7       Q.    Sure.
8       Fair to say that Number 5 —
9       A.    Um-hum.
10       Q.    — your statement is, "Attached as
11  Exhibit B is a decision kit. This decision kit was
12  mailed to each employee's home after the Conectiv
13  Board of Directors adopted the cash balance formula
14  but before May 18th, 1998."
15       A.    That's correct.
16       Q.    It's correct that that statement is
17  based on your belief and not your firsthand
18  knowledge?
19       MS. YU:  Objection.
20       THE WITNESS:  It's stronger than a
21  belief. These kits went to each person's home.
22  BY MR. SAUDER:
23       Q.    All right.  We'll go through this.
24       A.    Um-hum.

72

1       Q.    Looking at that — your statement in
2  Number 5, where it says, "After the Conectiv Board
3  of Directors adopted the cash balance formula," and
4  I'll tell you that adopted is in dispute in this
5  case, but what's your — do you know when the plan
6  was, quote, unquote, adopted?  Do you know the
7  date?
8       MS. YU:  Objection, form.
9       THE WITNESS:  I believe it was at
10  the April Board of Directors meeting, but I don't
11  know the exact date.
12  BY MR. SAUDER:
13       Q.    On what do you base that belief?
14       A.    Minutes from the April Board of
15  Directors meeting.
16       Q.    Based on a recent review of that
17  document?
18       A.    That's correct.
19       Q.    Within the past month?
20       A.    That is correct.
21       Q.    Okay.
22       Look at Exhibit B.  This does not
23  have your address on it, correct?
24       A.    That's correct.

KAREN E. FRANCKS

73

1  Q.   Do you know how this document was
2  produced?
3      MS. YU: Object to the form.
4      THE WITNESS: No.
5  BY MR. SAUDER:
6  Q.   Well, if you look at the bottom of
7  the document, there is what we call a Bates stamp,
8  which says MWW 00233.
9      Do you see that?
10  A.   Yes.
11  Q.   And that's an indication that this
12  was produced by Maury Ward, who is one of the
13  Plaintiffs in this case. Okay?
14  A.   Okay.
15  Q.   And it's unclear how Mr. Ward
16  received this document. I believe he testified he
17  had some, he got some from other people within the
18  company.
19      So, do you have any recollection of
20  having this document in that file or somewhere with
21  the other document, D-5, that was mailed out?
22      MS. YU: Objection. Joe, are you
23  asking her about literally this particular copy?
24      MR. SAUDER: Yes -- no, no. This

74

1  document. Not this particular copy. I'm saying
2  this document.
3  BY MR. SAUDER:
4  Q.   You don't have a copy of this
5  document with a postmark on it that was mailed out,
6  correct?
7  A.   That's correct.
8  Q.   So, then, fair to say you have no
9  personal knowledge whether this was sent to a
10  plaintiff in this case, Mike Charles, is that
11  correct?
12      MS. YU: Objection.
13      THE WITNESS: That's correct.
14  BY MR. SAUDER:
15  Q.   And you have no firsthand knowledge
16  whether this was sent to Maury Ward, correct?
17      MS. YU: Objection.
18      THE WITNESS: That's correct.
19  BY MR. SAUDER:
20  Q.   And you have no firsthand knowledge
21  whether this was sent to Joseph Fink, correct?
22      MS. YU: Objection, form.
23      THE WITNESS: Correct.
24  BY MR. SAUDER:

75

1  Q.   You have no firsthand knowledge
2  whether this was sent to Thomas Troop, correct?
3      MS. YU: Objection.
4      THE WITNESS: Correct.
5  BY MR. SAUDER:
6  Q.   You have no documentation that has a
7  list of people who this document was sent to,
8  correct?
9      MS. YU: Objection.
10      THE WITNESS: Correct.
11  BY MR. SAUDER:
12  Q.   You have no documentation showing
13  the addresses that this document was sent to,
14  correct?
15      MS. YU: Objection.
16      THE WITNESS: Correct.
17  BY MR. SAUDER:
18  Q.   Going back to your statement in your
19  affidavit as it relates to Paragraph Number 5, fair
20  to say that that statement is based on your belief,
21  not your firsthand knowledge?
22      MS. YU: Objection.
23      THE WITNESS: I still have to say,
24  it's stronger than that. It is a past practice and

76

1  a current practice, and I can't quote if it's the
2  law, but all open enrollments get mailed to the
3  home.
4  BY MR. SAUDER:
5  Q.   But you have no firsthand knowledge
6  whether, in fact, it was mailed to the individuals
7  I just cited off, correct?
8      MS. YU: Objection. The fact that
9  she doesn't know whether or not each of these
10  individuals --
11      MR. SAUDER: You can just object.
12  We don't need a speaking objection.
13      MS. YU: I just want to explain to
14  you --
15      MR. SAUDER: I know. We'll note
16  your objection and we don't need a speaking
17  objection.
18      MS. YU: I can state my objection
19  and the basis for it on the record.
20      MR. SAUDER: If it's the basis and
21  not a speaking objection, I think you can do that,
22  but I don't think we need a full, blown-out
23  statement.
24      MS. YU: Your questions have to do

Pages 73 to 76

Reporting Associates, LLC   1-888-795-2323

KAREN E. FRANCKS

77

1  with particular Plaintiffs, individuals, and
2  whether or not she has any knowledge about whether
3  they were employees at a particular time does not
4  mean that she doesn't have knowledge with respect
5  to how documents were disseminated for which she
6  had responsibility.
7          MR. SAUDER: Your objection is
8  noted.
9  BY MR. SAUDER:
10     Q.    You have no firsthand knowledge of a
11  list of individuals who this was mailed to in 1998,
12  correct?
13         MS. YU: Objection.
14         THE WITNESS: I don't have a list,
15  no.
16  BY MR. SAUDER:
17     Q.    So, I could name 200 more people
18  individually and you would give me the same answer,
19  which is, "I have no firsthand knowledge whether it
20  was mailed to those 200 people," correct?
21         MS. YU: Objection.
22  BY MR. SAUDER:
23     Q.    You can answer.
24         MS. YU: Objection.

78

1          THE WITNESS: Yes.
2  BY MR. SAUDER:
3      Q.    Fair to say, though, your statement
4  in Number 5 is based on your belief and not your
5  firsthand knowledge, correct?
6          MS. YU: Objection. Asked and
7  answered.
8          THE WITNESS: It's stronger than a
9  belief. It's a practice.
10  BY MR. SAUDER:
11     Q.    It's a practice where there is no
12  documentation showing that it was a practice,
13  correct?
14         MS. YU: Objection.
15         THE WITNESS: I don't know that
16  there is not any documentation. I don't have the
17  documentation.
18  BY MR. SAUDER:
19     Q.    Well, that was -- I requested the
20  documentation and you don't have any documentation,
21  correct?
22     A.    That's correct.
23     Q.    And Jim Kremmel hasn't provided any
24  documentation?

79

1          MS. YU: Objection as to form. In
2  addition, she can't testify to what Jim Kremmel has
3  or doesn't have.
4  BY MR. SAUDER:
5      Q.    It's stronger than a belief, but
6  it's less than firsthand knowledge, is that fair?
7          MS. YU: Objection.
8          THE WITNESS: It's a practice, yes.
9  BY MR. SAUDER:
10     Q.    Yes, it's less than firsthand
11  knowledge?
12         MS. YU: Objection.
13         THE WITNESS: Yes, it's less than
14  firsthand knowledge.
15         MR. SAUDER: We'll have this marked
16  as Plaintiffs' 53.
17         (Exhibit P-53 is marked for
18  identification.)
19         THE WITNESS: Okay.
20  BY MR. SAUDER:
21     Q.    Show you what's been marked as
22  Plaintiffs' 53.
23         Have you seen this document before?
24     A.    No.

80

1      Q.    Flip to Page 4, and it's marked at
2  the bottom, Page 4 of 29.
3      A.    Yes.
4      Q.    Do you see that?
5      A.    Yes.
6      Q.    The first sentence, "This booklet
7  briefly describes the Pepco Holding retirement
8  plan-PHI sub-plan and defined benefit pension plan
9  for management, certain designated subsidiaries and
10  Local 1900 employees hired after January 1, 2005 or
11  later."
12         Is it your understanding that new
13  employees to Pepco who would have been in the cash
14  balance plan are now put into this Pepco plan?
15         MS. YU: Objection.
16         THE WITNESS: I have no knowledge of
17  that.
18  BY MR. SAUDER:
19     Q.    You played no role in -- obviously
20  no role in that decision?
21     A.    That's correct.
22     Q.    Had you heard that that was the
23  case?
24         MS. YU: Objection.

KAREN E. FRANCCKS

81

1       THE WITNESS: I don't recall hearing
2  that specific thing, no. I don't know.
3       I've been out of benefits for many
4  years.
5  BY MR. SAUDER:
6       Q.    Do you know what percentage of the
7  workforce was grandfathered?
8       MS. YU: Objection.
9       THE WITNESS: I have heard as an
10 employee; not in a professional capacity, that
11 there are about 700 of us who were not
12 grandfathered, so I can't apply a percentage to the
13 other question that you'd asked.
14 BY MR. SAUDER:
15      Q.    You heard that as an employee
16 talking to other employees?
17      A.    That's correct.
18      Q.    Other employees that were not
19 grandfathered, presumably?
20      A.    That's correct.
21      MR. SAUDER: If we can take ten
22 minutes, I'll go through my notes.
23      (Recess called at 12:08 p.m.)
24      (Resumed at 12:16 p.m.)

82

1  BY MR. SAUDER:
2       Q.    We had an opportunity to take a
3  break.
4       Is there anything in your testimony
5  that needs to be corrected based on that break?
6       A.    No.
7       Q.    You mentioned earlier that there was
8  a board minutes -- meeting minutes that you saw
9  relating to the quote, unquote, adoption of the
10 plan, and is it fair to say you saw that document
11 for the first time about a week ago?
12      MS. YU: Objection as to form.
13 BY MR. SAUDER:
14      Q.    You can answer.
15      A.    That is correct.
16      MR. SAUDER: I have no further
17 questions.
18      MS. YU: I have a few questions.
19 EXAMINATION
20 BY MS. YU:
21      Q.    If we can go back and take a look at
22 Plaintiffs' 52 and Exhibit B.
23      A.    Page 10 of 71?
24      Q.    Yes. What is this document?

83

1       A.    This document is the -- well, we
2  call it the decision kit, but in HR we call them
3  open enrollment kits. It is used to give enrollees
4  in any annual benefit enrollment the opportunity to
5  understand the plan changes and also to give them
6  the method for enrollment.
7       Q.    Was there a particular deadline by
8  which employees had to enroll with respect to this
9  particular open enrollment kit?
10      A.    Yes. If you look at Page 13 of 71,
11 there is always deadlines, and in this case the
12 elections are effective July 1 for the year, and
13 they had to enroll between May 18th and midnight,
14 May 31st, 1999.
15      Q.    Was it part of your responsibility
16 as manager of the service center to ensure that
17 this open enrollment kit was sent to all employees
18 of Conectiv?
19      A.    Yes.
20      Q.    Could you describe the process by
21 which you undertook to accomplish that?
22      A.    Once the package was final, it went
23 to our internal repro-graphics or an external
24 house, I'm not sure how we actually got it

84

1  reproduced, and then we set up a process where all
2  groups of employees who got whatever pieces of the
3  packet, and in this case all management employees
4  and union employees would have gotten the same
5  packet because the health and welfare plans were
6  changing for everyone, so we would take over an
7  entire multi-purpose room and set up an assembly
8  line process, and we put all the supporting
9  documents, including -- that are in this decision
10 kit into an envelope, put a label on them, seal
11 them, and put them in a Post Office bin, and
12 general services would come and take them away.
13      Q.    So, the employees who went through
14 the physical task of stuffing envelopes and putting
15 the labels on, were they employees of the service
16 center?
17      A.    Yes, including myself.
18      Q.    Do you recall being involved in
19 stuffing the envelopes personally?
20      A.    Yes, I do. Many a late night.
21      Q.    In terms of the timing of the
22 mailing, when would this decision kit have been
23 sent?
24      A.    Of course I don't recall the exact

## KAREN E. FRANCKS

85

1   day it was sent, but it's our practice to send them
2   out at least a few days up to a week before the
3   open enrollment starts, so that they have time to
4   look at it and ask any questions, to call the
5   service center for any clarifying questions, so my
6   guess -- and it's totally a guess -- would have
7   been very early in May, 1998, this would have gone
8   out.
9       Q.    Were all employees of Conectiv sent
10  a decision kit, this particular one that's attached
11  as Exhibit B to your declaration?
12      A.    To the best of my knowledge.
13      Q.    Was that your intent in setting up
14  the process, to ensure that each employee of
15  Conectiv received this particular kit?
16      A.    Yes.
17          MS. YU: I have no further
18  questions.
19  FURTHER EXAMINATION
20  BY MR. SAUDER:
21      Q.    When you came out, I asked you if
22  you had anything -- based on the break, whether you
23  needed to change anything in your testimony, and
24  you said you didn't. So, just to clarify, you said

86

1   the best of your knowledge.
2           Again, your answers stand, with
3   regard to when we went back and forth about
4   knowledge, belief, it was something less than
5   firsthand knowledge, correct, with regard to this
6   document, Exhibit B?
7           MS. YU: Objection.
8           THE WITNESS: No. I have knowledge
9   of actually designing and participating in the
10  process to mail these out.
11  BY MR. SAUDER:
12      Q.    You have firsthand knowledge that it
13  was mailed out to the individuals that I named?
14      A.    No.
15          MS. YU: Objection.
16  BY MR. SAUDER:
17      Q.    And, if I rattled off a bunch of
18  other names, you would have no firsthand knowledge
19  whether it was mailed off to any of those
20  individuals, correct?
21          MS. YU: Objection.
22          THE WITNESS: That's correct.
23  BY MR. SAUDER:
24      Q.    In fact, if I named the 700

87

1   people -- estimated -- that were not grandfathered,
2   you wouldn't have any firsthand knowledge whether
3   it was mailed out to those 700 people, correct?
4           MS. YU: Objection.
5           THE WITNESS: That's correct, but I
6   don't know how they would have enrolled in benefits
7   without it.
8   BY MR. SAUDER:
9       Q.    Well, you testified earlier that, if
10  someone didn't have a form, and they needed to
11  enroll, they could simply call up the service
12  center and the service center would get them a
13  form, correct?
14          MS. YU: Objection.
15          THE WITNESS: No. Your question was
16  very general about forms in general. You were not
17  speaking about this decision kit.
18  BY MR. SAUDER:
19      Q.    Okay.
20          Well, if someone said, I don't have
21  it, I lost it, I never got it, I need the
22  enrollment form, I need to fill out my enrollment
23  benefits, can you send me the form, someone on the
24  phone -- that answered the phone would send them

88

1   the form, correct?
2           MS. YU: Objection.
3           THE WITNESS: I believe that's
4   correct.
5   BY MR. SAUDER:
6       Q.    So, then, going back, if I rattled
7   off the names of 700 people that were not
8   grandfathered, you would have no firsthand
9   knowledge that those individual 700 people were
10  mailed a copy of this, correct?
11          MS. YU: Objection.
12          THE WITNESS: Of course. Correct.
13  BY MR. SAUDER:
14      Q.    And you said you participated in the
15  process. At that time you were also implementing
16  the service center and getting that up and running,
17  correct?
18      A.    (Witness nods.)
19          MS. YU: Objection.
20  BY MR. SAUDER:
21      Q.    And there were other people under
22  you who were, on a daily basis, dealing with
23  disseminating documents, correct?
24          MS. YU: Objection.

Pages 85 to 88

Reporting Associates, LLC   1-888-795-2323

KAREN E. FRANCKS

89

1        THE WITNESS: Yes.
2   BY MR. SAUDER:
3        Q.    And that was more their
4   responsibility firsthand than it was yours,
5   correct?
6        MS. YU: Objection.
7        THE WITNESS: Correct.
8   BY MR. SAUDER:
9        Q.    You said, if need be, you would sit
10  and stuff envelopes, correct?
11       A.    That's correct.
12       Q.    Do you know what documents you
13  were -- where you were stuffing envelopes?
14       A.    I participated in the fulfillment
15  process for the decision kits.
16       Q.    How about Exhibit A?
17       A.    I have no recall.
18       Q.    And when you say -- what did you
19  say?  You participated in the fulfillment process?
20       A.    That's correct.
21       Q.    What does that mean?
22       A.    Fulfillment is just a term that we
23  use to -- whenever you are stuffing or fulfilling,
24  the end of the process for it to go out.  It's

90

1   called a fulfillment process.
2        Q.    But you said it's your best guess
3   that it was sometime in May, '98?
4        MS. YU: Objection.
5        THE WITNESS: Early May of '98.
6   BY MR. SAUDER:
7        Q.    But that's your best guess, correct?
8        MS. YU: Objection.
9        THE WITNESS: That's correct.
10  BY MR. SAUDER:
11       Q.    And you said the same one would have
12  gone out to management and the union?
13       A.    That's correct.
14       Q.    The union never got the cash balance
15  plan, correct?
16       A.    This has nothing to do with just the
17  cash balance plan.  This is enrolling in the new
18  health and welfare --
19       Q.    No, I understand that, but I'm just
20  saying, it's your understanding the union never got
21  the cash balance plan, correct?
22       A.    It's my understanding.
23       Q.    Did they get a different version of
24  this?

91

1        MS. YU: Objection.
2        THE WITNESS: No.
3   BY MR. SAUDER:
4        Q.    How many versions of this went out?
5   And, when I say "this," I mean Exhibit B to your
6   declaration.
7        MS. YU: Objection.
8        THE WITNESS: How many different
9   versions of this went out?
10       I believe it was just a single
11  version that went to everyone.  I don't think there
12  were separate versions.  If something didn't apply
13  to you, you would just ignore it.
14  BY MR. SAUDER:
15       Q.    When you say general services would
16  take them away, what's general services?
17       A.    Those were people who either
18  delivered the mail or had a relationship with the
19  Post Office and boxed them up and delivered them to
20  the Post Office for delivery.
21       Q.    Fair to say, once it went to general
22  services, you don't know what happened, correct?
23       MS. YU: Objection.
24       THE WITNESS: That's correct.

92

1   BY MR. SAUDER:
2        Q.    There was nothing to sign up for
3   with regard to the cash balance plan, correct?
4        MS. YU: Objection.
5   BY MR. SAUDER:
6        Q.    In other words, you either got it --
7   you either were put into it or you weren't,
8   correct?
9        A.    That's correct.
10       Wish we had a choice.
11       Q.    Why do you say that?
12       A.    I'm not happy being grandfathered.
13       Q.    Not happy not being grandfathered?
14       A.    I'm not happy not being
15  grandfathered.
16       MR. SAUDER: All right.  Thank you.
17       That's all I have.
18       THE WITNESS: You're welcome.
19       MS. YU: No questions.
20       (Discussion is held off the record.)
21  BY MR. SAUDER:
22       Q.    Just a quick follow up.
23       I assume you are saying you are not
24  happy you weren't grandfathered because it's your

**93**

1 belief that your benefit would be better under the
2 old plan than the cash balance plan?
3    A.   That's true.
4    Q.   Do you have a sense of how much
5 better?
6    A.   I've heard rumors.
7    Q.   What's your sense?
8         MS. YU:  Objection.
9         THE WITNESS:  25 percent better.
10 BY MR. SAUDER:
11   Q.   That your benefit would be
12 25 percent better under the old plan as opposed to
13 the cash balance plan?
14        MS. YU:  Objection.
15        THE WITNESS:  That's correct.
16        MR. SAUDER:  Okay.
17        THE WITNESS:  Not based on fact at
18 all.
19 BY MR. SAUDER:
20   Q.   But that's what you've heard?
21   A.   That's correct.
22        MR. SAUDER:  All right.  Thank you.
23        THE WITNESS:  Um-hum. ·
24        (12:29 p.m.)

**95**

JURAT
I, KAREN E. FRANCKS, do hereby
certify that I have read the foregoing transcript
of my testimony taken on August 27, 2007, and have
signed it subject to the following changes:

PAGE LINE          CORRECTION

_____

KAREN E. FRANCKS

DATE _____

Sworn and subscribed to before me this

_____ day of _____, 2007.

_____
NOTARY PUBLIC

**94**

1         CERTIFICATE
2         I, Sean M. Fallon, a Registered
3 Professional Reporter and Notary Public of the
4 Commonwealth of Pennsylvania, do hereby certify
5 that, prior to the commencement of the examination,
6 the witness and/or witnesses were sworn by me to
7 testify to the truth and nothing but the truth.
8         I do further certify that the
9 foregoing is a true and accurate computer-aided
10 transcript of the testimony as taken
11 stenographically by and before me at the time,
12 place and on the date hereinbefore set forth.
13        I do further certify that I am
14 neither of counsel nor attorney for any party in
15 this action and that I am not interested in the
16 event nor outcome of this litigation.
17
18
19
20
21        _____
          Registered Professional Reporter
          XI00840
22        Notary Public of the Commonwealth
          of Pennsylvania
23        My commission expires 12-22-10
24 Dated: _____

Pages 93 to 95

KAREN E. FRANCKS

| A | | | B | |
|---|---|---|---|---|
| **able (1)** 49:19 | **2:11 allow (1)** 48:13 | **areas (1)** 21:11 | **B (11)** 3:6 15:16 62:6 | 7:24 8:18,23 11:10 16:12 |
| **absolutely (1)** 67:13 | **analyst (3)** 20:7,7 61:20 | **asked (5)** 11:14 14:8 78:6 | 62:8,10 71:11 72:22 82:22 | 46:14,21 47:7 47:19,22 |
| **accomplish (1)** 83:21 | **and/or (1)** 94:6 | 81:13 85:21 | 85:11 86:6 91:5 | **Bates (1)** 73:7 |
| **accounts (1)** 36:2 | **annual (1)** 83:4 | **asking (4)** 34:9 43:24 44:3 73:23 | **Bachelor (1)** 17:21 | **becoming (1)** 44:20 |
| **accurate (3)** 5:11,15 94:9 | **answer (30)** 3:17 4:23 5:3 | **assembly (1)** 84:7 | **back (7)** 11:13 59:1 | **beginning (3)** 7:14 19:8 70:3 |
| **ACE (9)** 15:22 23:1,7,18 24:7 36:7,24 55:13 57:15 | 11:2 12:21 14:17 17:12 32:11 35:1 41:9,18,24 47:15 48:13 48:14 49:1,2,8 49:10 52:14 52:18 56:9 57:3 59:16 60:17 65:21 70:17 77:18 77:23 82:14 | **assistance (1)** 36:20 **ASSISTANT ...** 2:11 **Associate's (1)** 17:19 **assume (2)** 4:24 92:23 **Atlantic (1)** 22:20 **attached (5)** 15:12 63:14 70:10 71:10 85:10 | 69:24 75:18 82:21 86:3 88:6 **background (1)** 17:17 **balance (24)** 5:14,20 6:4 9:3 9:14 13:19 14:10 19:4 30:24 38:8,11 38:14 39:15 39:16 41:17 71:13 72:3 80:14 90:14 90:17,21 92:3 93:2,13 | **behalf (1)** 1:4 **behavior (1)** 53:15 **belief (11)** 70:5,14 71:17 71:21 72:13 75:20 78:4,9 79:5 86:4 93:1 **believe (18)** 18:4 22:2 31:11 33:9 34:2 36:14 39:11 46:14 48:4,4 55:18 60:20 66:24,24 72:9 73:16 88:3 91:10 |
| **action (2)** 1:2 94:15 | | | | |
| **addition (1)** 79:2 | | | | |
| **address (12)** 18:12,13 44:13 58:18,20,22 58:24 59:3 60:10,12,13 72:23 | **answered (3)** 53:4 78:7 87:24 **answering (1)** 52:10 **answers (1)** 86:2 | **attorney (11)** 2:14 4:19 8:15 8:23 9:2,7,12 9:13 12:17 49:7 94:14 | **Barak (12)** 7:24 8:18,23 10:7 11:10 16:12 46:14 46:21,24 47:7 47:19,21 | **Ben (2)** 13:24 40:20 **benefit (9)** 22:8,10 42:10 42:12 45:13 80:8 83:4 93:1 93:11 |
| **addresses (3)** 60:5 69:6 75:13 | **anyway (1)** 70:7 | **attorneys (9)** 2:5,10 7:9,12 | **BARBARA (1)** 2:11 | **benefits (24)** 6:16 22:3,4,10 |
| **administratio...** 17:22 21:10 | **apply (2)** 81:11 91:12 | 7:18 8:3,4 10:7,23 | **base (1)** 72:13 | 22:11 33:23 35:14,17 |
| **adopted (4)** 71:13 72:3,4,6 | **approach (1)** 23:10 | **attorney-clie...** 47:14 48:23 | **based (11)** 18:11 62:18 | 39:16,17 40:23 41:21 |
| **adoption (1)** 82:9 | **Approximate...** 28:23 | **August (13)** 1:13 7:10,14,16 | 70:6,14 71:17 72:16 75:20 | 42:3,22 49:20 51:13,13 53:6 |
| **affidavit (4)** 15:11,12 69:24 75:19 | **April (2)** 72:10,14 | 7:21 8:19 9:24 14:7,14 34:13 | 78:4 82:5 85:22 93:17 | 53:7,8 55:18 81:3 87:6,23 |
| **affix (1)** 60:4 | **arbitrations (1)** 27:2 | 47:1 67:5 95:3 | **basis (3)** 76:19,20 88:22 | **best (7)** |
| **ago (4)** 25:13,20 63:22 82:11 | **Arch (1)** 2:8 | **authority (1)** 32:7 | **Bassman (10)** | |
| **agree (3)** 41:6 42:1 43:7 | **area (3)** 19:24 28:15 | **Avenue (1)** 2:3 | | |
| **agreed (3)** 4:1,4 48:17 | 60:20 | **a.m (4)** 12:12,13 63:5,6 | | |
| **ALEXANDE...** | | | | |

KAREN E. FRANCKS

28:17 39:10
70:5 85:12
86:1 90:2,7
**better (4)**
93:1,5,9,12
**big (1)**
27:8
**bin (1)**
84:11
**blackened (1)**
44:19
**blown-out (1)**
76:22
**Blue (1)**
56:14
**board (6)**
49:23 71:13
72:2,10,14
82:8
**booklet (1)**
80:6
**born (1)**
40:7
**bottom (2)**
73:6 80:2
**Box (1)**
2:12
**boxed (1)**
91:19
**break (8)**
5:2,5 12:9,16
63:3 82:3,5
85:22
**briefly (1)**
80:7
**bring (3)**
15:4 64:20 65:1
**brought (5)**
17:11,13 30:19
40:24 65:3
**building (2)**
58:23 59:6
**bulk (1)**
60:19
**bump (1)**
56:10

**bunch (1)**
86:17
**business (1)**
17:21
**busy (1)**
53:2

---

**C**

**C (4)**
2:1,11 94:1,1
**Cain (15)**
13:12,15,18
20:14,15 21:6
22:23 29:5,8,9
29:14,22 30:1
30:4 50:5
**Cain's (1)**
29:19
**call (13)**
22:11 24:18
34:12 35:5
53:17 54:1
56:8 64:18
73:7 83:2,2
85:4 87:11
**called (20)**
8:18,22,23 9:11
10:6 11:11
12:12 24:19
33:13 35:6,7,8
35:9 55:3
57:12 60:22
61:7 63:5
81:23 90:1
**calling (6)**
8:24 9:2,8,14
14:7 35:4
**capacity (2)**
20:18 81:10
**capital (1)**
55:8
**card (1)**
56:15
**care (4)**
35:21 36:1,1
41:20

**carrying (1)**
57:16
**case (38)**
7:9,12,19 8:2
8:12,13,21
9:21 10:6,11
10:16,22 11:4
11:7,9,20 13:4
13:5,7,9,13
14:1 15:12
34:5,19,20
46:5 64:14,15
67:12,22 68:8
72:5 73:13
74:10 80:23
83:11 84:3
**cash (24)**
5:14,20 6:4 9:3
9:14 13:19
14:10 19:4
30:23 38:7,11
38:13 39:15
39:16 41:16
71:13 72:3
80:13 90:14
90:17,21 92:3
93:2,13
**center (51)**
6:16 9:4,15
19:12 20:11
21:4,13,14
22:11,13,19
24:14,17
25:17,18 26:1
26:13,18 33:7
35:12 49:15
49:24 50:18
50:22 51:2,5
51:17,22
52:12,13 53:5
53:9,17,17,24
54:15,16
55:23 56:20
61:10 64:17
64:21 65:1,4
66:1 83:16

84:16 85:5
87:12,12
88:16
**Centre (1)**
2:3
**certain (1)**
80:9
**certification (2)**
4:2 18:3
**certified (2)**
17:24 18:7
**certify (4)**
94:4,8,13 95:2
**change (3)**
53:7,15 85:23
**changes (11)**
35:11 41:23
43:14,17
45:13 48:6,9
48:16 49:3
83:5 95:3
**changing (15)**
35:15,17,19,21
35:23 36:2,9
36:13,16,17
36:18,21 37:2
42:4 84:6
**Charles (4)**
1:3 67:16,19
74:10
**CHIMICLES...**
2:2
**choice (6)**
37:24 38:4,10
39:14,15
92:10
**Chris (4)**
56:3,11 57:7
58:3
**Christine (1)**
55:6
**cited (1)**
76:7
**CIVIL (1)**
1:2
**clarify (1)**

85:24
**clarifying (1)**
85:5
**clear (2)**
10:19 14:6
**clerk (1)**
61:19
**College (2)**
17:19,21
**combined (2)**
42:23 43:16
**come (6)**
22:22 23:8 53:8
53:23 55:12
84:12
**comes (1)**
55:5
**coming (2)**
51:18 53:16
**commenceme...**
94:5
**commencing ...**
1:20
**commission (1)**
94:23
**Commonweal...**
1:18 94:4,22
**communicati...**
42:24 43:2
48:23
**communicati...**
9:19 15:20 16:2
49:7
**companies (1)**
22:20
**company (18)**
5:18 8:5 25:9
25:11,22 26:2
26:11 30:9
31:6,14 32:18
45:15 50:11
50:15 55:15
59:7 60:21
73:18
**compensation...**
33:22

KAREN E. FRANCCKS

complex (3)
56:16 57:7,9
computer-aid...
94:9
concern (1)
27:22
concerned (1)
28:2
Conectiv (21)
1:8 15:22 16:3
16:7 21:1
44:21 54:9
56:24 59:12
60:3 61:21,22
61:24 62:23
70:10,11
71:12 72:2
83:18 85:9,15
consistent (1)
56:11
consolidated ...
27:13
consolidating...
51:19
consultant (2)
55:9,19
consultants (1)
55:5
consulting (1)
30:22
contact (4)
7:18,22 8:2
14:3
contacted (2)
7:23 8:15
contacting (2)
9:12 10:10
contractual (2)
27:2 33:3
conversation ...
34:22 35:3
46:15 47:11
47:21 67:3,5
67:10,11
conversations...
8:20 34:14

coordinate (1)
57:8
coordinated (1)
55:4
coordinating ...
56:6
copy (23)
11:24 12:1
43:21 44:8,11
47:10,23 48:2
48:15 53:9
63:14 64:10
64:16,20,24
65:3,7,10,14
73:23 74:1,4
88:10
corporate (1)
19:15
correct (187)
6:24 11:21 12:5
12:8 13:1,2
14:18 15:5,6,9
15:10,14,15
15:17,18,23
15:24 16:4,5,8
16:9 21:17
23:4,5 26:2,9
26:10 27:18
28:14,19
32:19,20 33:2
33:4 34:19,20
37:4,14,20,21
38:1,2,5,6,8,9
38:11,12 40:5
40:8,9 41:1,2
41:5 43:19,20
44:9,15 45:1,2
45:6,8 48:7,8
50:3 52:4,15
52:16 53:22
54:10,11,17
54:18,22,23
58:8 59:3,4,13
59:18,19,23
60:1,6,7,11,12
61:11,13,23

62:6,14,20,21
63:2 64:8 65:7
65:15,18,22
66:11,13,14
66:18,20 67:5
67:12,13,16
68:10,12,15
68:17,20,22
69:2,4,7,9,12
69:18,22,23
70:5,18,21,23
71:15,16
72:18,20,23
72:24 74:6,7
74:11,13,16
74:18,21,23
75:2,4,8,10,14
75:16 76:7
77:12,20 78:5
78:13,21,22
80:21 81:17
81:20 82:15
86:5,20,22
87:3,5,13 88:1
88:4,10,12,17
88:23 89:5,7
89:10,11,20
90:7,9,13,15
90:21 91:22
91:24 92:3,8,9
93:15,21
corrected (1)
82:5
CORRECTI...
95:4
corrections (2)
12:18 48:15
couch (1)
32:13
counsel (10)
2:11 4:2,5
12:23,24
16:10,20 34:3
48:7 94:14
couple (4)
4:18 21:10

25:20 58:14
course (2)
84:24 88:12
courses (1)
18:8
COURT (1)
1:1
co-workers (3)
8:8 13:4,5
create (1)
49:17
created (6)
21:15,16,19,24
22:1,2
Cross (1)
56:14
current (3)
18:12 19:16
76:1
currently (4)
5:12,18,21 30:9
Curriden (1)
25:4
customer (1)
20:1
customers (1)
51:15

---
**D**
---

D (1)
3:1
daily (1)
88:22
date (19)
7:13 8:1 10:3
12:7 16:3
18:19 25:13
40:16 41:9
44:18 47:4
63:17 69:12
69:17,20 72:7
72:11 94:12
95:20
Dated (1)
94:24
dates (2)

16:3 44:18
day (4)
8:22 63:23 85:1
95:22
days (5)
46:19 47:5,6
48:1 85:2
DE (1)
2:13
deadline (1)
83:7
deadlines (1)
83:11
dealing (6)
10:7 52:2,2,3
56:17 88:22
dealt (1)
52:1
decision (14)
12:2 13:1 15:16
57:11 62:11
71:11,11
80:20 83:2
84:9,22 85:10
87:17 89:15
declaration (1...
3:10 46:4,9,13
46:22 47:8,10
47:13,18,23
48:12 49:6
62:10 63:15
70:21 71:2
85:11 91:6
defendants (5)
1:9 2:10,14
5:13 63:9
defense (4)
12:23,24 34:3
48:7
define (3)
6:10 22:5 57:9
defined (1)
80:8
defining (1)
6:13
degree (1)

KAREN E. FRANCKS

17:19
**Delaware (2)**
1:12 18:15
**deliver (1)**
22:3
**delivered (2)**
91:18,19
**delivery (1)**
91:20
**Delmarva (15)**
15:22 18:20
  19:7 21:1
  22:20 23:2
  24:7 36:7,23
  37:19,20,23
  55:12,14
  57:15
**Dental (2)**
35:19 42:15
**department (7)**
19:11 20:3,6
  26:20,24
  29:20 58:23
**departments ...**
61:17
**depend (2)**
57:23 61:5
**dependent (1)**
36:1
**depending (1)**
57:14
**deposition (2)**
3:8 4:15
**describe (1)**
83:20
**describes (1)**
80:7
**DESCRIPTI...**
3:7,14
**design (5)**
6:19,19,21
  49:24 50:17
**designated (1)**
80:9
**designing (2)**
24:21 86:9

**devoted (1)**
51:8
**different (14)**
11:5 24:8 29:20
  41:19 42:3
  50:19 57:13
  57:13,14,22
  58:14 61:17
  90:23 91:8
**diligence (1)**
23:9
**direct (1)**
20:20
**DIRECTION...**
3:17
**directly (4)**
20:21 21:4 50:2
  55:22
**Directors (4)**
71:13 72:3,10
  72:15
**disability (2)**
20:8 25:20
**disassemble (1)**
49:5
**discouraged (1)**
53:12
**discuss (1)**
66:22
**discussed (6)**
8:2 13:3,5
  15:14 16:13
  46:16
**discussion (4)**
26:5 46:24 47:3
  92:20
**discussions (1)**
8:11
**dispute (1)**
72:4
**disputes (1)**
56:11
**disseminate (1)**
62:24
**disseminated ...**
15:21 44:17,24

45:6 69:12
  77:5
**disseminating...**
88:23
**dissemination...**
57:20 62:6,14
**distribute (2)**
60:21 61:8
**distribution (4)**
54:8 55:4 56:22
  59:10
**DISTRICT (2)**
1:1,1
**document (38)**
14:22,23,24
  38:24 39:3,6,8
  40:17 41:8
  63:11,13,18
  63:21 64:2,11
  64:16 66:5,22
  67:12,15
  69:18 70:7
  72:17 73:1,7
  73:16,20,21
  74:1,2,5 75:7
  75:13 79:23
  82:10,24 83:1
  86:6
**documentatio...**
69:11,14 75:6
  75:12 78:12
  78:16,17,20
  78:20,24
**documents (41)**
10:2,4,9,16,22
  11:9,12,14,17
  11:22 12:7,23
  12:24 15:5,8
  15:19 16:1,6,8
  17:6,8,11,13
  41:4,10,13
  45:11,12,14
  57:18,19 60:5
  62:5,13,14,19
  62:24 77:5
  84:9 88:23

89:12
**Doe (1)**
60:14
**doing (7)**
22:24 23:2
  37:10 54:17
  54:22 57:7
  61:16
**Don (18)**
13:12,15,16,18
  20:14,15 21:6
  22:23 29:4,8,9
  29:14,19,22
  30:1,4 50:5,8
**draft (1)**
48:10
**drafting (1)**
39:2
**Drive (1)**
18:14
**due (2)**
9:3 23:9
**duly (1)**
4:9
**D-5 (4)**
3:16 67:15 70:8
  73:21

---

**E**

**E (12)**
1:15 2:1,1 3:1,3
  3:6,10 4:8
  94:1,1 95:2,19
**earlier (4)**
15:17 46:16
  82:7 87:9
**early (5)**
8:19 47:1 51:13
  85:7 90:5
**EASTERN (1)**
1:1
**educational (2)**
17:17 36:20
**effective (1)**
83:12
**effectiveness (...**

19:16 30:20
**Eighteenth (1)**
2:8
**either (5)**
12:7 36:21
  91:17 92:6,7
**elections (1)**
83:12
**Electric (1)**
22:20
**employed (2)**
5:12 30:9
**employee (10)**
22:7 26:22
  31:23 32:23
  55:11 61:4
  67:23 81:10
  81:15 85:14
**employees (33)**
9:19 13:7 22:3
  22:4 23:23
  24:2,6 27:1,12
  28:1 36:6
  49:20 52:11
  52:18 54:10
  56:24 59:12
  60:6 68:8
  70:12 77:3
  80:10,13
  81:16,18 83:8
  83:17 84:2,3,4
  84:13,15 85:9
**employee's (1)**
71:12
**enroll (4)**
49:20 83:8,13
  87:11
**enrolled (1)**
87:6
**enrollees (1)**
83:3
**enrolling (1)**
90:17
**enrollment (11)**
52:20,21 57:12
  83:3,4,6,9,17

KAREN E. FRANCKS

| | | | | |
|---|---|---|---|---|
| 85:3 87:22,22 | Excuse (1) | F (1) | fill (3) | fluctuating (1) |
| enrollments (1) | 44:1 | 94:1 | 53:6,10 87:22 | 24:20 |
| 76:2 | excused (1) | fact (5) | final (1) | focus (1) |
| ensure (2) | 26:3 | 13:6 76:6,8 | 83:22 | 22:3 |
| 83:16 85:14 | Exhibit (26) | 86:24 93:17 | finance (1) | Focusing (1) |
| entail (1) | 7:3 14:20 15:12 | Facts (20) | 19:24 | 48:18 |
| 18:5 | 15:16 38:17 | 3:15,16 11:24 | fine (1) | folks (2) |
| entire (2) | 38:18,22 | 12:1 13:1 | 48:22 | 50:20 64:22 |
| 14:24 84:7 | 40:11,14 | 15:13 41:4,11 | Fink (3) | follow (1) |
| entity (2) | 43:22 45:20 | 41:13,15,19 | 1:4 68:10 74:21 | 92:22 |
| 21:16 61:23 | 46:4 59:2 62:8 | 41:21 42:2,9 | first (23) | following (1) |
| envelope (1) | 63:9,14 70:7 | 43:8 45:11 | 4:9 5:10 7:8,11 | 95:3 |
| 84:10 | 70:10 71:11 | 57:21 58:6 | 7:22 9:23 | follows (1) |
| envelopes (5) | 72:22 79:17 | 62:11 70:11 | 16:11,11,19 | 4:10 |
| 59:20 84:14,19 | 82:22 85:11 | fair (25) | 18:19 19:23 | foregoing (2) |
| 89:10,13 | 86:6 89:16 | 28:1 35:10 | 21:21 37:22 | 94:9 95:2 |
| Ernest (1) | 91:5 | 40:16 44:13 | 46:3,7,8,24 | foremost (1) |
| 30:13 | exhibits (4) | 45:10 56:17 | 47:8,18,22 | 49:16 |
| ESQ (2) | 3:13 15:21 16:3 | 58:6 59:9 62:1 | 49:16 80:6 | forenoon (1) |
| 2:2,7 | 62:6 | 62:2,22 63:13 | 82:11 | 1:20 |
| essentially (1) | exist (1) | 63:17 65:13 | firsthand (36) | Forest (1) |
| 70:4 | 61:24 | 67:14,22 70:8 | 5:13,19 6:3,8 | 18:14 |
| established (4) | existed (1) | 70:13 71:8 | 6:22 44:24 | form (43) |
| 22:13 59:2 62:5 | 49:17 | 74:8 75:19 | 45:5 56:21 | 4:6 5:22 6:6 |
| 68:24 | expect (1) | 78:3 79:6 | 58:2 59:10 | 10:13,24 |
| estimate (1) | 4:21 | 82:10 91:21 | 61:9 68:3,6,9 | 13:21 14:11 |
| 46:23 | expectation (2) | Fallon (2) | 68:14,19 | 14:15 28:5,9 |
| estimated (1) | 61:1,7 | 1:16 94:2 | 70:14,19 | 32:9 42:5 |
| 87:1 | experience (1) | familiar (4) | 71:17 74:15 | 45:16 53:6,8 |
| event (1) | 18:11 | 11:14 33:16,17 | 74:20 75:1,21 | 53:10,21,23 |
| 94:16 | experts (1) | 33:18 | 76:5 77:10,19 | 57:1 58:9 |
| eventually (2) | 50:20 | FAQ (1) | 78:5 79:6,10 | 59:14 62:7,15 |
| 24:3 27:19 | expires (1) | 3:9 | 79:14 86:5,12 | 63:1 64:12 |
| exact (9) | 94:23 | far (4) | 86:18 87:2 | 65:11,16 |
| 7:13 17:9 24:1 | explain (2) | 27:5,6 36:7,8 | 88:8 89:4 | 68:11,16,21 |
| 25:13 27:7 | 49:13 76:13 | fax (1) | five (4) | 69:3,8,13 72:8 |
| 31:24 40:22 | external (2) | 47:9 | 28:18,23 30:6 | 73:3 74:22 |
| 72:11 84:24 | 55:11 83:23 | file (5) | 35:2 | 79:1 82:12 |
| exactly (2) | externally (1) | 65:24,24 66:6 | five-minute (1) | 87:10,13,22 |
| 21:8 63:24 | 30:18 | 66:18 73:20 | 34:21 | 87:23 88:1 |
| examination (... | E-Mail (2) | filed (1) | flag (1) | forms (2) |
| 4:11 18:6,7 | 47:9 48:5 | 11:7 | 53:1 | 54:9 56:23 |
| 82:19 85:19 | E-Mailed (2) | files (1) | flip (2) | 59:11 87:16 |
| 94:5 | 48:7 60:9 | 66:3 | 15:1 80:1 | formula (2) |
| examined (1) | | filing (1) | fluctuated (1) | 71:13 72:3 |
| 4:9 | **F** | 4:3 | 52:19 | forth (3) |

KAREN E. FRANCKS

101

57:16 86:3
94:12
**found (1)**
34:4
**frame (5)**
10:19 24:1
43:24 44:2
51:6
**Francks (6)**
1:16 3:3,10 4:8
95:2,19
**Friday (3)**
7:10 16:20,21
**friend (1)**
53:18
**fulfilling (1)**
89:23
**fulfillment (6)**
55:3 57:17
89:14,19,22
90:1
**full (2)**
42:23 76:22
**full-time (1)**
52:23
**functions (1)**
27:11
**further (6)**
4:4 82:16 85:17
85:19 94:8,13
**F-a-c-t-s (1)**
12:1

**G**

**G (1)**
2:2
**general (8)**
2:11 60:20
84:12 87:16
87:16 91:15
91:16,21
**generally (3)**
4:20 13:4 28:2
**getting (4)**
51:8 52:1 56:14
88:16

**give (5)**
25:1 61:1 77:18
83:3,5
**given (2)**
4:15 24:22
**gives (1)**
44:20
**glanced (1)**
39:1
**go (8)**
4:18 17:16
53:20 57:21
71:23 81:22
82:21 89:24
**going (15)**
17:12 42:2,9
47:14 49:1,8
51:19 58:15
58:19 60:9,14
68:7 69:24
75:18 88:6
**Goldey-Beac...**
17:18,20
**Good (2)**
4:13,14
**Gosh (1)**
16:15
**gotten (1)**
84:4
**grade (1)**
32:13
**graduated (3)**
17:18,20,22
**grandfathere...**
3:9 18:22 19:1
39:11,14,24
81:7,12,19
87:1 88:8
92:12,13,15
92:24
**grievances (1)**
27:2
**ground (1)**
4:19
**group (2)**
57:18,19

**groups (1)**
84:2
**guess (8)**
28:17 47:24
67:22 71:1
85:6,6 90:2,7

**H**

**H (1)**
3:6
**habit (1)**
64:20
**HAMILTON...**
1:19 2:6
**handle (1)**
53:3
**handled (1)**
22:12
**handwritten (...**
16:2
**happened (3)**
47:4 49:5 91:22
**happening (1)**
23:18
**happy (4)**
92:12,13,14,24
**hard (1)**
41:10
**Haverford (2)**
2:3,4
**head (2)**
24:13 29:10
**headed (1)**
45:11
**heading (3)**
41:11,13,15
**health (6)**
25:14 36:1
41:20 56:5
84:5 90:18
**hear (1)**
39:23
**heard (7)**
13:8 40:2 80:22
81:9,15 93:6
93:20

**hearing (1)**
81:1
**height (1)**
52:23
**held (3)**
19:19 26:5
92:20
**hereinbefore ...**
94:12
**heritage (5)**
36:24 39:17
55:14 57:15
57:15
**high (1)**
17:17
**higher (1)**
29:7
**Highly (1)**
42:20
**hint (1)**
44:20
**hired (7)**
18:20 19:10,18
30:18 37:18
37:22 80:10
**historical (1)**
57:17
**Holding (1)**
80:7
**Holdings (4)**
1:8,8 2:12 3:11
**home (16)**
18:12 57:24
58:2,16,20,24
59:3 60:5,10
60:12 64:6,18
64:21 71:12
71:21 76:3
**homes (2)**
60:6 70:12
**hour (1)**
17:5
**house (1)**
83:24
**HR (40)**
19:12,14 20:9

**20:11 21:10**
21:11 22:4,6,9
22:15,19,21
22:22 23:1,7
23:19 24:7,7
24:11 26:19
27:8,10 28:8
28:13,16
29:10 30:17
31:3,9,15 33:8
51:19 52:24
54:8 56:22
58:17 59:10
70:10,11 83:2
**HRs (2)**
22:23 23:21
**HR's (2)**
60:3 61:22
**human (3)**
17:23 18:1
30:15
**hundred (3)**
51:9,24 52:6
**husband (2)**
19:1,2

**I**

**idea (3)**
8:17 34:5,10
**identification...**
7:4 38:19 45:21
79:18
**identity (1)**
16:7
**ignore (1)**
91:13
**implement (1)**
50:18
**implementati...**
5:14,19 6:4,9
6:11,14,17,18
13:19
**implemented...**
36:22 42:4
**implementing...**
51:5 52:12

KAREN E. FRANCKS

88:15
importance (1)
32:14
included (2)
43:1 54:8
including (3)
10:23 84:9,17
indicates (1)
65:6
indication (3)
44:16 59:6
73:11
indirectly (1)
55:22
individual (2)
5:12 88:9
individually (1)
77:18
individuals (9)
25:2 39:14 69:1
76:6,10 77:1
77:11 86:13
86:20
information (2)
6:17 34:5
infrastructur...
49:19
inserts (1)
57:14
inside (1)
8:5
instance (1)
57:11
instruct (2)
17:12 47:14
instructing (1)
49:9
insurance (2)
35:23 43:3
intent (1)
85:13
interaction (2)
26:15 33:5
interested (1)
94:15
interfaced (1)

26:24
internal (4)
57:24 58:4,22
83:23
internally (3)
58:8,12,20
intricacies (1)
56:5
introductory ...
35:3
investigations...
27:3
involuntary (1)
27:17
involved (5)
6:16,20 49:7
56:13 84:18
issued (2)
16:3,7
issues (12)
22:12,17 23:19
25:14 27:2
50:3 51:17,18
51:18 52:3
56:14,16

_____
**J**
J (1)
1:3
James (1)
5:11
January (13)
21:20,23 22:18
22:23 23:6,14
23:14,16
30:18 35:11
37:19 49:18
80:10
Jenkins (1)
30:13
Jim (24)
8:21,22 9:11,20
9:23 10:3,4,5
10:10 14:6
20:21 26:12
26:16 31:17

33:6 34:12,14
34:19 46:24
66:23 67:3,11
78:23 79:2
job (3)
27:23 51:7,9
jobs (1)
28:3
Joe (4)
6:10 10:18 12:9
73:22
John (4)
32:17,21 33:6
60:14
Joseph (4)
1:4 2:2 68:10
74:21
josephsauder...
2:5
JR (2)
1:4,4
July (9)
46:11,19 47:4
49:20 51:14
51:15 67:6,7
83:12
June (1)
18:21
JURAT (1)
95:1

_____
**K**
Karen (6)
1:15 3:3,10 4:8
95:2,19
Kay (3)
2:7 16:23 17:4
keep (1)
14:3
kind (3)
23:9 25:5 65:1
kit (14)
12:2 13:1 15:16
62:11 71:11
71:11 83:2,9
83:17 84:10

84:22 85:10
85:15 87:17
kits (5)
57:11,12 71:21
83:3 89:15
knew (1)
36:7
know (74)
5:3,16,17,23,24
5:24 6:1 7:13
8:23 10:6
11:22 12:21
14:21 16:12
21:9,18 22:1
22:24 23:9
24:13 25:13
25:17 27:5,6
27:19,21 28:4
28:10 30:24
31:23 32:15
34:3,9 35:4,8
36:8,14,24
37:1,16 38:23
41:7 43:18,21
44:12 46:12
46:18 47:24
49:4 53:18
55:1 57:4 64:8
64:9 65:23
66:4,4,6,12,17
67:2,18 72:5,6
72:11 73:1
76:9,15 78:15
81:2,6 87:6
89:12 91:22
knowledge (55)
5:13,19 6:3,8
6:15,22 31:1
31:16 39:10
44:24 45:5
56:4,7,12,21
57:6,23 58:2
59:10 61:9
65:14 67:15
68:3,6,9,14,19
70:5,14,19

71:18 74:9,15
74:20 75:1,21
76:5 77:2,4,10
77:19 78:5
79:6,11,14
80:16 85:12
86:1,4,5,8,12
86:18 87:2
88:9
Kremmel (24)
5:11 8:21,22
9:11,20,23
10:3,5,5,10
14:6 20:22
26:12,16
31:17 33:6
34:13,14,19
46:24 66:23
67:11 78:23
79:2
KYUNGSUN...
2:7

_____
**L**
label (4)
58:20,22 61:4
84:10
labelling (1)
58:14
labels (4)
58:16,18 61:3
84:15
laid (3)
27:14 37:4
62:23
Lancaster (1)
2:3
large (1)
27:11
larger (1)
43:1
late (4)
19:12 67:6,7
84:20
law (1)
76:2

KAREN E. FRANCKS

laying (1)
45:14
leave (2)
25:11 37:14
leaving (1)
37:11
left (2)
25:12 61:10
letters (2)
42:2,9
level (3)
29:7,19 37:2
levels (2)
24:21 32:13
life (2)
35:23 43:3
line (5)
3:18 44:21
48:22 84:8
95:4
list (6)
42:8 69:1,6
75:7 77:11,14
listed (1)
69:15
literally (1)
73:23
litigation (1)
94:16
live (1)
51:13
lived (1)
18:16
LLP (3)
1:19 2:2,6
Local (1)
80:10
location (2)
58:23 60:23
Logan (1)
2:7
long (3)
16:13 17:4
25:16
longer (1)
32:18

long-term (1)
52:22
look (13)
7:6 14:19,21
38:21 40:13
45:22 59:1
64:22 72:22
73:6 82:21
83:10 85:4
looked (1)
44:10
looking (3)
46:3 47:17 72:1
lose (2)
27:23 28:3
lost (1)
87:21
lot (5)
35:10 41:12
55:2 56:13,18
lots (2)
41:10 66:3
lower (3)
32:1,4,5
Lynne (3)
25:4,8,12
—————
M
M (2)
1:16 94:2
mail (8)
6:17 47:9 58:19
60:9 63:23
64:5 86:10
91:18
mailed (17)
60:5,19 64:18
67:15 68:4
70:11 71:12
73:21 74:5
76:2,6 77:11
77:20 86:13
86:19 87:3
88:10
mailing (4)
31:2 57:24,24

84:22
mailings (5)
14:9 33:7 57:7
57:10 58:2
main (1)
56:3
management ...
56:13 80:9 84:3
90:12
manager (27)
19:11,14,15,16
20:8,11 21:3
26:1 28:20
29:7,7,18 30:2
30:3,4,17,19
31:17 32:2,14
32:23 35:12
40:23 49:14
54:15 64:17
83:16
managers (13)
24:8,19 25:2,22
27:1 28:21,24
29:2,4 30:7,8
31:7,9
manner (1)
15:20
March (5)
23:3,17 43:19
61:23,24
margin (1)
44:19
mark (3)
7:2 38:16 45:18
marked (15)
3:13 7:3,7
14:20 38:18
38:22 40:10
45:20 63:8
70:1,8 79:15
79:17,21 80:1
Market (1)
1:19
mass (2)
57:7,9
Master (3)

60:22,23 61:7
Master's (1)
17:23
match (1)
36:15
material (1)
33:8
matter (1)
50:20
MAURICE (1)
1:3
Maury (3)
68:20 73:12
74:16
mean (16)
6:11,18 9:17
13:7 24:5
26:17,23 29:9
30:21 49:21
58:13 60:8
62:18 77:4
89:21 91:5
meaning (3)
32:5,6 34:15
means (3)
30:22 33:21
48:4
medical (3)
17:20 35:14
42:10
meet (3)
16:22 17:4 35:5
meeting (3)
72:10,15 82:8
meetings (5)
50:6,7,8,11,16
memo (1)
62:22
mentioned (1)
82:7
merge (1)
22:24
merger (5)
23:3,17 28:2
34:1 44:22
merging (1)

27:10
met (3)
7:8 16:10,19
method (1)
83:6
MICHAEL (1)
1:3
midnight (1)
83:13
Mike (3)
67:16,18 74:10
mind (1)
55:5
mine (1)
64:22
minutes (6)
16:15 35:3
72:14 81:22
82:8,8
model (1)
24:21
Monday (1)
1:13
month (3)
21:18 24:2
72:19
months (1)
46:20
morning (2)
4:13,14
most-merger ...
43:18
multi-purpos...
84:7
MWW (1)
73:8
MWW0022-0...
3:15
—————
N
N (2)
2:1 3:1
name (4)
30:12 55:7 68:7
77:17
named (2)

KAREN E. FRANCKS

104

86:13,24
**names (5)**
25:1,6 55:1
86:18 88:7
**narrow (1)**
8:9
**national (1)**
18:6
**necessarily (3)**
29:6 50:21 65:9
**need (9)**
5:2 53:9 58:21
76:12,16,22
87:21,22 89:9
**needed (5)**
29:13 53:6
59:21 85:23
87:10
**needs (1)**
82:5
**neither (1)**
94:14
**never (15)**
8:15 10:4 11:16
12:6,22,23
14:7,13 21:2
50:1 58:20
67:1 87:21
90:14,20
**new (8)**
36:3,4,6 49:20
51:12,17
80:12 90:17
**newer (1)**
56:7
**newly (2)**
21:15,16
**newsletter (5)**
15:13 61:4
62:11 70:11
70:12
**newsletters (8)**
54:9 56:23
57:21 58:7
59:11 60:21
60:24 61:2

**night (1)**
84:20
**nods (1)**
88:18
**Notary (4)**
1:17 94:3,22
95:24
**note (1)**
76:15
**noted (1)**
77:8
**notes (2)**
16:2 81:22
**Notice (1)**
3:8
**notices (3)**
54:9 56:23
59:11
**number (12)**
3:7,14 17:9
54:1 60:3 70:9
70:20 71:2,8
72:2 75:19
78:4

_____

**O**

**oath (1)**
5:8
**object (2)**
73:3 76:11
**objection (103)**
5:22 6:6 10:13
10:24 13:21
14:11,15 28:5
28:9 29:16,23
32:9 34:7,23
37:5,15 39:19
39:22 40:3
42:5 43:10,23
45:3,7,16
47:12 48:11
50:12 57:1
58:9 59:14,24
60:15 61:12
62:7,15 63:1
64:12 65:11

65:16,19 66:2
66:15,19
67:17,24
68:11,16,21
69:3,8,13,19
70:15,22 71:3
71:19 72:8
73:22 74:12
74:17,22 75:3
75:9,15,22
76:8,12,16,17
76:18,21 77:7
77:13,21,24
78:6,14 79:1,7
79:12 80:15
80:24 81:8
82:12 86:7,15
86:21 87:4,14
88:2,11,19,24
89:6 90:4,8
91:1,7,23 92:4
93:8,14
**objections (1)**
4:5
**obviously (3)**
46:10 47:2
80:19
**occasion (1)**
58:7
**occasionally (1)**
29:22
**October (1)**
18:17
**office (7)**
35:7,9 58:18
64:5 84:11
91:19,20
**offices (1)**
1:18
**okay (17)**
4:24 5:1,6
12:11 13:10
29:3 40:12
46:2 50:24
70:2,6 72:21
73:13,14

79:19 87:19
93:16
**old (2)**
93:2,12
**once (4)**
38:23 61:10
83:22 91:21
**open (8)**
52:20,21 57:12
76:2 83:3,9,17
85:3
**opportunity (7)**
12:15,16 38:23
40:13 63:10
82:2 83:4
**opposed (1)**
93:12
**option (1)**
29:12
**options (1)**
57:17
**order (1)**
52:24
**organization ...**
20:19 49:17
53:16
**organizationa...**
19:15 30:20,22
54:19
**original (1)**
46:23
**outcome (1)**
94:16
**outside (1)**
41:1
**overload (1)**
53:3
**oversee (2)**
33:10 57:20
**overseeing (5)**
22:17 23:18,22
32:22 39:5
**o'clock (1)**
1:20

_____

**P**

**P (2)**
2:1,1
**PA (2)**
2:4,8
**package (2)**
33:23 83:22
**packages (1)**
57:18
**packet (2)**
84:3,5
**Page (9)**
3:2,7,14,18
80:1,2 82:23
83:10 95:4
**pages (1)**
46:3
**paid (2)**
36:18 43:14
**paragraph (3)**
54:6 70:9 75:19
**parallel (2)**
49:18 51:16
**pared (1)**
27:20
**part (3)**
20:9 59:22
83:15
**participants (1)**
15:21
**participated (3)**
88:14 89:14,19
**participating ...**
86:9
**particular (10)**
17:13 66:5
73:23 74:1
77:1,3 83:7,9
85:10,15
**parties (1)**
57:13
**party (1)**
94:14
**Pay (3)**
60:22,23 61:7
**paycheck (2)**
61:1,8

KAREN E. FRANCCKS

paychecks (2)
60:22,24
pdf (3)
48:4,4,7
pending (1)
5:4
Pennsylvania...
1:1,18 94:4,22
pension (6)
36:9 37:20,23
37:24 38:4
80:8
people (36)
5:24 16:7 22:14
23:7 24:11
25:5,5 27:14
27:15 30:15
31:13 36:11
37:3,11 50:19
50:21 51:1,18
52:14,17,23
53:2,14 54:24
55:2 64:18
73:17 75:7
77:17,20 87:1
87:3 88:7,9,21
91:17
Pepco (7)
1:8,8 2:12 3:11
80:7,13,14
PEPPER (2)
1:19 2:6
percent (5)
51:9,24 52:6
93:9,12
percentage (2)
81:6,12
performance ...
19:13,17
period (2)
28:8 38:3
Perrin (1)
49:24
person (8)
7:22 29:19
50:11 51:21

55:5 56:15
57:5 61:16
personal (4)
54:18 64:20
65:13 74:9
personally (2)
44:6 84:19
person's (1)
71:21
Pertinent (1)
26:6
PHI (1)
3:11
Philadelphia ...
2:8
phone (4)
16:14,17 87:24
87:24
phones (4)
52:24 53:1,3,15
phrase (1)
33:24
physical (2)
58:23 84:14
pick (2)
37:24 38:4
pieces (1)
84:2
place (8)
23:3 35:11
41:23 43:18
45:13 49:22
53:6 94:12
plaintiff (1)
74:10
Plaintiffs (19)
1:6 2:5 7:2
14:20 38:16
38:22 40:11
40:14 43:22
45:19 46:4
59:2 67:21
68:7 73:13
77:1 79:16,22
82:22
Plaintiffs'50 (1)

7:7
plan (37)
1:8 3:11 9:3,14
13:19 15:22
15:22,22 19:4
30:24 36:9
37:20,23,24
38:4,8,11,14
39:15,17,18
41:17,20 72:5
80:8,14,14
82:10 83:5
90:15,17,21
92:3 93:2,2,12
93:13
plans (3)
56:5,6 84:5
plan-PHI (1)
80:8
play (5)
30:23 31:2
33:12 39:2,5
played (3)
14:8 41:7 80:19
please (3)
38:17 46:1 71:5
plus (1)
51:19
point (6)
5:2 9:11 10:21
20:24 21:5
24:22
policy (2)
18:23 22:8
portion (4)
26:6 41:3 48:23
51:7
portions (1)
49:6
position (10)
19:19 20:13
21:15,22 25:5
30:17 31:22
40:20,20
56:18
positions (2)

19:7 32:12
possibly (3)
42:17 43:5,6
post (6)
43:18 58:18
64:5 84:11
91:19,20
postage (1)
60:4
postmark (1)
74:5
potential (2)
8:13,18
potentially (1)
34:4
Power (2)
22:20 23:2
practice (12)
60:4,19 61:22
62:3,23 75:24
76:1 78:9,11
78:12 79:8
85:1
predominantl...
19:23 27:1
preferred (1)
58:17
preparation (1)
49:6
prepared (6)
41:11,13,15
47:13 48:10
48:12
preparing (2)
41:8 48:23
prescription (2)
35:17 42:12
present (1)
17:2
presumably (1)
81:19
previous (1)
4:15
previously (5)
3:13 15:13
40:10 63:8

70:8
prior (19)
7:17 8:1 9:11
9:21 10:3,10
12:7 13:11
14:7,14,22
20:15 22:13
22:18 39:8
46:20 61:23
67:9 94:5
privilege (1)
47:14
probably (6)
37:1 41:18 43:1
43:9 52:22
56:4
procedure (1)
22:8
process (15)
19:13,17 47:12
48:11,22
83:20 84:1,8
85:14 86:10
88:15 89:15
89:19,24 90:1
produce (2)
66:9,11
produced (2)
73:2,12
professional (5)
1:17 18:1 81:10
94:3,21
program (4)
24:19 25:2,21
36:21
project (1)
19:13
promoted (4)
20:7,8,10,12
proof (1)
65:2
provided (2)
46:5 78:23
Public (4)
1:17 94:3,22
95:24

KAREN E. FRANCCKS

| | | | | |
|---|---|---|---|---|
| publications (3) | 82:17,18 85:4 | 73:16 85:15 | relationship (1) | 17:24 18:1 |
| 54:8 56:23 | 85:5,18 92:19 | receiving (2) | 91:18 | 30:15 |
| 59:11 | quick (1) | 63:21 64:1 | relationships ... | respect (4) |
| pulled (1) | 92:22 | Recess (3) | 33:1,3 | 17:13 49:5 77:4 |
| 19:12 | quickly (1) | 12:12 63:5 | relevant (2) | 83:8 |
| pulling (1) | 47:22 | 81:23 | 15:5 34:4 | responsibiliti... |
| 23:21 | quote (3) | recollection (2) | remember (3) | 49:14 51:7 56:1 |
| put (14) | 72:6 76:1 82:9 | 63:20 73:19 | 36:19 63:22 | responsibility... |
| 10:18 11:5 22:2 | —————— | record (4) | 64:1 | 52:7 54:7,12,13 |
| 24:8 38:13 | **R** | 26:5,6 76:19 | repeat (1) | 54:14,19,20 |
| 58:20,22 | R (2) | 92:20 | 62:12 | 56:3 77:6 |
| 60:10 61:3 | 2:1 94:1 | reducing (1) | rephrase (1) | 83:15 89:4 |
| 80:14 84:8,10 | raise (1) | 27:13 | 4:23 | responsible (2) |
| 84:11 92:7 | 53:1 | REFERRED ... | replace (1) | 32:21 59:23 |
| putting (2) | ramp (2) | 3:13 | 21:12 | responsive (2) |
| 49:18 84:14 | 52:19,20 | reflecting (2) | report (10) | 15:8 62:19 |
| P-3 (2) | rattled (1) | 15:20 16:2 | 20:20,21 21:4 | result (1) |
| 3:15 44:14 | 86:17 88:6 | regard (7) | 29:7,8,13,21 | 12:19 |
| P-50 (2) | read (3) | 8:12 23:19 33:7 | 30:1,2 32:6 | Resumed (3) |
| 3:8 7:3 | 26:7 41:3 95:2 | 70:7 86:3,5 | reported (9) | 12:13 63:6 |
| P-51 (2) | real (1) | 92:3 | 24:23 28:24 | 81:24 |
| 3:9 38:18 | 23:1 | regarding (2) | 29:1,4 32:14 | retired (2) |
| P-52 (3) | really (2) | 46:9 56:22 | 32:15,17 50:9 | 19:3 25:20 |
| 3:10 45:20 70:1 | 21:11 67:2 | Registered (2) | 55:20 | retiree (1) |
| P-53 (2) | reappeared (1) | 1:17 94:2,21 | Reporter (3) | 57:15 |
| 3:11 79:17 | 66:7 | reimburseme... | 1:17 94:3,21 | retirement (3) |
| p.m (3) | reason (2) | 36:2 | reporting (5) | 1:8 3:11 80:7 |
| 81:23,24 93:24 | 29:13 50:6 | relates (2) | 23:23 24:2,4,9 | review (6) |
| P.O (1) | reassigned (1) | 70:20 75:19 | 55:22 | 17:6,8 38:23 |
| 2:12 | 24:7 | relating (29) | representativ... | 48:19 63:10 |
| —————— | recall (17) | 6:23 7:9,12,18 | 56:7 | 72:16 |
| **Q** | 9:9 17:9 21:11 | 8:12,21 10:16 | reproduced (1) | Rewards (5) |
| question (20) | 23:22 24:1 | 10:22 11:4,9 | 84:1 | 33:13,14,18,19 |
| 4:6,21,22,23,24 | 25:6,7 33:15 | 11:20 13:5 | repro-graphi... | 33:21 |
| 5:4,4 8:10 | 36:15 42:13 | 14:1,9 16:6 | 83:23 | right (9) |
| 12:22 13:23 | 44:6 50:8 | 31:3,3 33:7 | requested (1) | 25:19 27:15 |
| 22:7 26:9 | 55:21 81:1 | 41:4 46:5,13 | 78:19 | 40:2 44:22 |
| 41:12,22 49:8 | 84:18,24 | 46:21 47:8 | requests (3) | 46:11 47:4 |
| 56:9 62:12 | 89:17 | 53:7 58:2 62:5 | 15:8 62:18,20 | 71:23 92:16 |
| 71:5 81:13 | receive (2) | 62:13 67:11 | require (1) | 93:22 |
| 87:15 | 48:2 64:4 | 82:9 | 58:16 | role (18) |
| questioning (1) | received (11) | relation (3) | requiring (1) | 9:3,10,15 14:8 |
| 9:18 | 39:12 43:21 | 46:18 64:14,15 | 15:4 | 19:16 26:12 |
| questions (11) | 44:6 48:15 | relations (3) | reserved (1) | 26:21 27:4 |
| 52:11,15,18 | 64:5 65:6,10 | 26:22 31:23 | 4:6 | 30:23 31:2 |
| 53:4 76:24 | 65:14 68:4 | 32:24 | resources (3) | 33:12 39:2,5 |

KAREN E. FRANCKS

41:7 51:4
55:17 80:19
80:20
**rollout (1)**
6:19
**room (1)**
84:7
**Roughly (1)**
28:12
**rules (1)**
4:19
**rumors (1)**
93:6
**running (6)**
51:8,10 52:2,7
58:16 88:16

---

**S**

**S (2)**
2:1 3:6
**safety (7)**
19:11 20:2,6,6
20:7,8 23:11
**Sauder (134)**
2:2 3:4 4:12 6:2
6:7,12 7:1,5
10:14,20 11:1
12:11,14
13:22 14:12
14:16 17:15
26:8 28:6,11
29:17 30:5
31:8 32:10
34:8,24 37:8
37:17 38:16
38:20 39:20
40:1,4 42:7
43:12 44:1,4,7
45:4,9,18,24
47:16 48:14
48:20 49:2,9
49:12 50:14
57:2 58:11
59:15 60:2,16
61:14 62:9,17
63:4,7 64:13

65:12,17,20
66:8,16,21
67:20 68:1,13
68:18,23 69:5
69:10,16,21
70:16,24 71:6
71:22 72:12
73:5,24 74:3
74:14,19,24
75:5,11,17
76:4,11,15,20
77:7,9,16,22
78:2,10,18
79:4,9,15,20
80:18 81:5,14
81:21 82:1,13
82:16 85:20
86:11,16,23
87:8,18 88:5
88:13,20 89:2
89:8 90:6,10
91:3,14 92:1,5
92:16,21
93:10,16,19
93:22
**saw (3)**
47:22 82:8,10
**saying (3)**
74:1 90:20
92:23
**says (5)**
60:3 61:21
70:10 72:2
73:8
**school (1)**
17:17
**seal (1)**
84:10
**sealing (1)**
4:2
**Sean (2)**
1:16 94:2
**second (4)**
12:10 19:24
54:6,7
**secretarial (1)**

17:20
**secretary (5)**
19:10,19,22
20:5 61:20
**see (4)**
44:10 64:24
73:9 80:4
**seen (5)**
14:22 15:2 39:8
65:2 79:23
**send (7)**
47:9 54:2 58:15
64:19 85:1
87:23,24
**senior (6)**
17:24 30:3
50:11 51:21
55:4,18
**sense (2)**
93:4,7
**sent (20)**
11:13,22,24
58:7 61:6
68:10,15,20
69:1,7 74:9,16
74:21 75:2,7
75:13 83:17
84:23 85:1,9
**sentence (3)**
54:7 70:20 80:6
**separate (2)**
22:21 91:12
**September (6)**
11:7,8,19 13:11
14:1 40:7
**service (50)**
9:4,15 19:12
20:1,11 21:4
21:12,14
22:13,19
24:14,17
25:16,18 26:1
26:13,18 33:7
35:12 49:15
49:24 50:18
50:22 51:2,5

51:15,17,22
52:12,13 53:5
53:9,16,24
54:15,16
55:23 56:20
61:10 64:17
64:21 65:1,4
66:1 83:16
84:15 85:5
87:11,12
88:16
**services (9)**
19:15 22:4,6
23:1 60:20
84:12 91:15
91:16,22
**set (3)**
84:1,7 94:12
**setting (1)**
85:13
**severances (2)**
27:16 37:10
**sheet (1)**
12:1
**sheets (1)**
41:19
**short (1)**
67:3
**show (3)**
7:1 69:12 79:21
**showing (2)**
75:12 78:12
**shown (1)**
7:6
**side (2)**
36:7,7
**sign (1)**
92:2
**signature (1)**
46:11
**signed (1)**
95:3
**significant (1)**
19:3
**signing (1)**
46:19

**Similar (1)**
32:12
**similarly (1)**
1:5
**simply (1)**
87:11
**single (3)**
22:22 57:4
91:10
**sit (3)**
10:15 53:3 89:9
**situated (1)**
1:5
**six (1)**
52:23
**small (2)**
42:24 55:8
**Smaller (1)**
42:22
**solicit (2)**
49:19 51:12
**someone's (1)**
60:10
**someplace (1)**
66:18
**sort (1)**
29:10
**speak (1)**
12:16
**speaking (5)**
47:18 76:12,16
76:21 87:17
**special (1)**
19:13
**specialist (1)**
31:23
**specific (4)**
44:5 59:6 61:18
81:2
**specifically (3)**
22:16 24:11,12
**specifics (1)**
9:5
**spell (1)**
55:7
**SPHR (1)**

KAREN E. FRANCKS

17:24
spoke (7)
7:11 16:11 46:7
46:8,12,21
47:7
Square (1)
2:7
staff (4)
31:22 32:12
49:16 52:21
staffed (2)
50:18 51:3
staffing (2)
24:21 51:18
stamp (1)
73:7
stand (1)
86:2
standard (3)
60:4 61:22 62:3
standards (1)
58:18
standing (1)
52:24
start (1)
27:12
started (5)
20:5 23:23 24:2
24:18 25:19
starting (4)
22:22,24 23:8
23:20
starts (1)
85:3
state (1)
76:18
statement (11)
5:11,15 70:9,13
71:10,16 72:1
75:18,20
76:23 78:3
statements (1)
70:4
STATES (1)
1:1
stay (1)

13:15
stenographic...
94:11
step (1)
53:2
stipulated (2)
4:1,4
strategy (1)
30:15
Street (1)
1:19
Streets (1)
2:8
stronger (4)
71:20 75:24
78:8 79:5
study (1)
18:10
stuff (1)
89:10
stuffing (5)
59:20 84:14,19
89:13,23
subject (2)
50:20 95:3
subpoena (3)
3:8 14:23 15:3
subscribed (1)
95:21
subsequent (3)
34:12,14,15
subsidiaries (1)
80:9
sub-plan (6)
3:11 5:14,20
6:4 14:10 80:8
supervisor (9)
22:16 25:24
28:20 30:3
31:13,19 32:4
32:7,8
supervisors (8)
24:16,19 28:7
28:24 29:1
31:12,13,14
supplied (12)

10:2,4,9,16,22
11:9,16 12:3,6
12:22,24
15:11
supply (3)
11:12,15 64:10
supporting (1)
84:8
supposed (3)
54:17,21 61:16
sure (17)
4:19 8:6 21:9
23:1 26:4,19
40:22 42:16
43:4 52:5,8
53:4 58:5
62:16 63:4
71:7 83:24
sworn (3)
4:9 94:6 95:21
system (2)
56:8 58:17
systems (1)
58:15

---

**T**

T (3)
3:6 94:1,1
tag (1)
44:21
take (16)
5:5 11:13 12:9
14:19,21 18:8
19:7 21:21
38:21 63:3
81:21 82:2,21
84:6,12 91:16
taken (3)
1:16 94:10 95:3
taker (1)
56:9
takes (1)
53:14
talk (3)
8:7 13:8 16:13
talked (12)

4:20 8:5 9:20
9:24 10:5
13:12,16,18
13:24 14:13
15:17 34:19
talking (4)
24:10 29:21
67:4 81:16
task (3)
33:10 59:23
84:14
tasked (1)
22:16
team (5)
33:13,14,19
50:17,19
technically (2)
23:11,22
technology (6)
19:14,17 49:22
50:20 51:18
52:3
tell (2)
41:10 72:4
temps (1)
52:22
ten (6)
11:3 16:15
17:10 63:22
66:5 81:21
term (5)
33:16,17,18
37:7 89:22
terms (2)
31:7 84:21
test (1)
18:7
testified (4)
41:4 45:12
73:16 87:9
testifies (1)
4:9
testify (2)
79:2 94:7
testifying (1)
5:8

testimony (8)
1:15 12:19 15:4
70:6 82:4
85:23 94:10
95:3
Thank (2)
92:16 93:22
theme (1)
41:20
thing (4)
51:8 52:1 54:22
81:2
things (8)
23:10 43:15
52:4,6,9,9
57:22 60:19
think (11)
6:18 9:10 21:10
41:5 46:23
48:21 62:4
67:2 76:21,22
91:11
Thomas (2)
68:15 75:2
thoughts (1)
13:20
three (3)
19:23,24 68:7
Tier (4)
56:8,10,10,12
tiering (1)
56:8
TIKELLIS (1)
2:2
time (50)
4:7 7:8,11 9:4
9:15,23 10:18
16:11,19 20:9
20:24 21:7
23:16,24 25:3
26:16,17,17
27:8,23 28:8
30:7 31:10
32:16 34:1,18
36:18 37:18
38:3 41:23

KAREN E. FRANCKS

42:4 43:14,23
44:2 46:7,8
47:8,18 49:24
51:6,20,24
53:1 55:20
56:2 77:3
82:11 85:3
88:15 94:11
timing (1)
84:21
title (5)
20:4 21:7 31:24
40:22 61:18
titled (1)
70:11
today (10)
4:21 5:7 10:15
10:21 11:8,19
13:12 14:22
15:4 39:9
told (1)
9:13
total (6)
33:13,14,17,18
33:21,23
totally (1)
85:6
touch (1)
13:15
Towers (3)
49:23 50:3 52:2
trail (1)
66:4
transcript (3)
1:15 94:10 95:2
transfer (1)
56:7
trial (1)
4:7
Troop (2)
68:15 75:2
troubleshoot ...
51:14
true (3)
70:4 93:3 94:9
truth (2)

94:7,7
try (1)
8:9
trying (1)
53:15
two (11)
2:7 12:24 13:17
22:19,23
23:21 24:20
24:22 25:12
27:10 46:3
type (5)
43:15 53:8,23
54:22 59:5
types (10)
22:12,17 42:2,3
45:10,12,13
45:14 57:22
62:24
─────── U ───────
um-hum (6)
37:12 50:23
67:8 71:9,24
93:23
unclear (1)
73:15
understand (5)
4:22 5:7 9:16
83:5 90:19
understandin...
15:7 33:20
39:13,21
80:12 90:20
90:22
understood (1)
4:24
undertook (1)
83:21
union (7)
27:1 33:1,3
84:4 90:12,14
90:20
UNITED (1)
1:1
University (1)

17:23
unquote (2)
72:6 82:9
use (4)
37:6,9 58:17
89:23
usually (3)
42:22 44:21
60:23
─────── V ───────
v (1)
1:7
vacation (2)
22:9 43:14
value (1)
33:22
vanVeen (1)
55:6
various (2)
22:14 55:2
vendor (4)
36:15 49:23
56:13,14
vendors (2)
52:3 56:18
version (2)
90:23 91:11
versions (3)
91:4,9,12
vice-presiden...
21:8 30:12,14
vision (3)
35:21 42:19,24
Voluntary (1)
27:17
v-a-n (1)
55:8
V-e-e-n (1)
55:8
─────── W ───────
W (1)
1:3
waived (1)
4:3

walk (1)
53:11
walking (1)
53:17
want (6)
4:18 16:12
37:13 41:3
45:22 76:13
wanted (3)
38:1,5 53:21
Ward (5)
1:4 68:20 73:12
73:15 74:16
wasn't (6)
22:19 47:20
52:21 55:10
56:14 60:9
way (2)
39:6 60:14
week (3)
47:2 82:11 85:2
weeks (1)
46:20
welcome (1)
92:18
welfare (3)
56:5 84:5 90:18
went (23)
12:2 19:11 20:2
20:6 25:6 30:3
42:8 43:9
45:12 51:13
57:12 59:6
60:22 64:23
66:6 71:21
83:22 84:13
86:3 91:4,9,11
91:21
weren't (3)
23:17 92:7,24
West (1)
2:3
we'll (5)
7:2 45:18 71:23
76:15 79:15
we've (4)

13:8 59:2 62:4
68:24
Widener (1)
17:22
Wilkinson (3)
13:24 40:19,20
Wilmington (3)
1:12 2:13 18:14
Wish (1)
92:10
withdraw (1)
13:23
witness (74)
3:2 5:23 8:13
8:18 28:10
29:24 37:6,16
39:23 42:6
43:11 44:5
45:8,17,22
50:13 58:10
60:1 61:13
62:8,16 63:2
66:3,20 67:18
68:12,17,22
69:4,9,14,20
70:23 71:4,20
72:9 73:4
74:13,18,23
75:4,10,16,23
77:14 78:1,8
78:15 79:8,13
79:19 80:16
81:1,9 86:8,22
87:5,15 88:3
88:12,18 89:1
89:7 90:5,9
91:2,8,24
92:18 93:9,15
93:17,23 94:6
witnesses (1)
94:6
words (2)
60:9 92:6
work (5)
25:8,16,22
27:13 56:15

KAREN E. FRANCKS

worked (3)
20:15 21:1
  25:18
workforce (1)
81:7
working (9)
5:18,21 6:1
  23:7 49:23
  50:2,22 51:2
  52:12
world (1)
22:21
wouldn't (3)
32:13 42:23
  87:2

**X**

X (2)
3:1,6
X100840 (1)
94:21

**Y**

year (5)
7:15,21 9:24
  67:7 83:12
years (9)
11:3 13:17
  19:24 20:1
  25:12,20
  63:22 66:5
  81:4
Yu (117)
2:7 3:5 5:22 6:6
  6:10 10:13,18
  10:24 12:9
  13:21 14:11
  14:15 17:11
  28:5,9 29:16
  29:23 31:7
  32:9 34:7,23
  37:5,15 39:19
  39:22 40:3
  42:5 43:10,23
  44:2 45:3,7,16
  47:12 48:11

48:18,21 49:4
49:11 50:12
57:1 58:9
59:14,24
60:15 61:12
62:7,15 63:1
64:12 65:11
65:16,19 66:2
66:15,19
67:17,24
68:11,16,21
69:3,8,13,19
70:15,22 71:3
71:19 72:8
73:3,22 74:12
74:17,22 75:3
75:9,15,22
76:8,13,18,24
77:13,21,24
78:6,14 79:1,7
79:12 80:15
80:24 81:8
82:12,18,20
85:17 86:7,15
86:21 87:4,14
88:2,11,19,24
89:6 90:4,8
91:1,7,23 92:4
92:19 93:8,14
yukay@pepp...
2:9

**Z**

Zimmerman ...
32:17,21 33:6

**0**

00233 (1)
73:8
05-702(SLR) ...
1:2

**1**

1 (3)
56:8 80:10
  83:12
10 (1)

82:23
10:12 (1)
1:20
10:21 (1)
12:12
10:23 (1)
12:13
11 (2)
3:19,20
11:40 (1)
63:5
11:46 (1)
63:6
12 (1)
3:20
12-22-10 (1)
94:23
12:08 (1)
81:23
12:16 (1)
81:24
12:29 (1)
93:24
13 (1)
83:10
1313 (1)
1:19
17 (1)
3:19
18th (2)
71:14 83:13
1900 (1)
80:10
19041 (1)
2:4
19103-2799 (1)
2:8
1958 (1)
40:7
19804 (1)
18:15
1981 (2)
18:21 37:18
19849-0231 (1)
2:13
1998 (26)

19:3 21:20,23
27:4,9 28:8
30:16,19
31:10,13
40:21 43:19
44:4 49:15,18
49:20 51:6,11
52:1 60:4
61:22 62:24
70:12 71:14
77:11 85:7
1999 (11)
17:23 27:5,9
28:8 30:16
31:10,14
37:19 40:21
44:4 83:14

**2**

2 (2)
56:10,12
200 (3)
18:14 77:17,20
2002 (1)
18:4
2005 (7)
11:8,8,19 13:11
14:1 67:9
80:10
2007 (7)
1:13 14:7,14
34:13 46:19
95:3,22
215 (1)
2:9
231 (1)
2:12
24th (1)
7:10
25 (2)
93:9,12
27 (2)
1:13 95:3
29 (2)
18:21 80:2

**3**

3 (6)
40:11,14 43:22
  56:10 59:2
  60:3
3000 (1)
2:7
302 (1)
2:13
31st (4)
46:11,19 47:4
  83:14
35 (2)
60:23,24
361 (1)
2:3
38 (1)
3:9

**4**

4 (4)
70:9,20 80:1,2
4,85 (1)
3:4
40 (1)
3:15
401(k) (3)
36:13 41:19
  43:7
429-3206 (1)
2:13
45 (1)
3:10
47 (1)
3:20
48 (1)
3:20

**5**

5 (6)
63:9 71:2,8
  72:2 75:19
  78:4
50 (2)
7:2 14:20
51 (2)

KAREN E. FRANCKS

| | |
|---|---|
| 38:17,22 | 22:23 23:4,6 |
| **52 (3)** | 23:15,17 |
| 45:19 46:4 | 25:19 26:1 |
| 82:22 | 35:11 61:23 |
| **53 (2)** | 61:24 90:3,5 |
| 79:16,22 | **981-4000 (1)** |
| | 2:9 |
| **6** | **99 (1)** |
| **610 (1)** | 19:12 |
| 2:4 | |
| **63 (1)** | |
| 3:16 | |
| **642-8500 (1)** | |
| 2:4 | |
| | |
| **7** | |
| **7 (1)** | |
| 3:8 | |
| **700 (5)** | |
| 81:11 86:24 | |
| 87:3 88:7,9 | |
| **71 (2)** | |
| 82:23 83:10 | |
| **78 (1)** | |
| 17:19 | |
| **79 (1)** | |
| 3:11 | |
| | |
| **8** | |
| **800 (1)** | |
| 54:1 | |
| **81 (1)** | |
| 19:19 | |
| **82 (1)** | |
| 3:5 | |
| **85 (1)** | |
| 17:21 | |
| **86 (2)** | |
| 19:10,20 | |
| **89 (1)** | |
| 18:17 | |
| | |
| **9** | |
| **95 (2)** | |
| 27:12,20 | |
| **98 (14)** | |
| 12:2 19:11 | |