IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| J. MICHAEL CHARLES, MAURICE W. WARD, JR., JOSEPH I. FINK, JR., and THOMAS S. TROUP, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civ. No. 05-702-SLR Consolidated with |
| PEPCO HOLDINGS, INC., CONECTIV, and PEPCO HOLDINGS RETIREMENT PLAN, | ) ) ) ) ) | Civ. No. 06-010-SLR |
| Defendants. | ) | |

Pamela S. Tikellis, Esquire, Robert J. Kriner, Esquire and A. Zachary Naylor, Esquire of Chimicles & Tikellis, LLP, Wilmington, Delaware. James R. Malone, Jr., Esquire and Joseph G. Sauder, Esquire. Haverford, Pennsylvania. Counsel for Plaintiffs.

M. Duncan Grant, Esquire and Phillip To. Mellet, Esquire of Pepper Hamilton LLP, Wilmington, Delaware. Larry R. Wood, Jr., Esquire, Kay Kyungsun Yu, Esquire and Barak A. Bassman, Esquire of Pepper Hamilton LLP, Philadelphia, Pennsylvania. Susan K. Hoffman, Esquire and James Boudreau, Esquire of Littler Mendelson PC, Philadelphia, Pennsylvania. Counsel for Defendants.

**MEMORANDUM OPINION**

Dated: September 19, 2007
Wilmington, Delaware

*[signature]*
**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiffs J. Michael Charles ("Charles"), Maurice W. Ward, Jr. ("Ward"), Joseph J. Fink, Jr. ("Fink"), and Thomas S. Troup ("Troup") (collectively, "plaintiffs") brought suit[1] against defendants Pepco Holdings, Inc. ("Pepco"), Conectiv, and Pepco Holdings Retirement Plan (collectively "defendants") asserting violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. More specifically, plaintiffs charged that defendants' conversion of two traditional defined benefit plans to a single cash balance plan[2] violated several statutory provisions of ERISA, namely: ERISA § 204(b)(1), 29 U.S.C. § 1054(b)(1), which prohibits "backloading" of benefits (count I); ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), which prohibits a reduction in a participant's accrued benefit "on account of any increase in his age or service" (count II); ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), which prohibits the cessation or reduction of a participant's benefit

---

[1] Plaintiff Troup filed his complaint against defendants in a separate lawsuit, which lawsuit has been consolidated with the above captioned action. (D.I. 33)

[2] Prior to 1998, plaintiffs were employees of Delmarva Power & Light Company ("Delmarva"), and were beneficiaries of Delmarva's defined benefit pension plan. In 1998, Delmarva merged with Atlantic City Electric Company ("ACEC") to form defendant Conectiv, and the defined benefit pension plans of Delmarva and ACEC were merged and then replaced with the Conectiv Retirement Plan and the Cash Balance Sub-Plan ("the Cash Balance Plan") effective January 1, 1999. On August 1, 2002, Conectiv became a wholly-owned subsidiary of Pepco; thereafter, Pepco merged Pepco's defined benefit pension plan into the Conectiv Retirement Plan (which, the court assumes, includes the Cash Balance Plan) to form the Pepco Holdings Retirement Plan. According to plaintiffs, "[t]he formation of the Pepco Holdings Retirement Plan did not alter the manner in which benefits were expressed for participants in the Conectiv Retirement Plan." (D.I. 93 at 4 fn.3) For purposes of these proceedings, the court will embrace the terminology of the parties and will discuss the dispute at issue in terms of the "Cash Balance Plan."

accrual "because of the attainment of any age" (count III); and ERISA § 204(h), 29 U.S.C. § 1054(h), which requires notice of any amendments that "provide for a significant reduction in the rate of future benefit accrual" (count IV). (D.I. 1) The United States Court of Appeals for the Third Circuit, in <u>Register v. PNC Financial Servs. Group, Inc.</u>, 477 F.3d 56 (3d Cir. 2007) ("<u>Register</u>"), recently concluded that there is nothing age discriminatory about the accrual formula of cash balance plans, thus foreclosing plaintiffs' claim under ERISA § 204(b)(1)(H) (count III).

Before the court presently are plaintiffs' motions for class certification and for partial summary judgment, as well as defendants' motion for summary judgment. The court has jurisdiction to hear these matters pursuant to 28 U.S.C. § 1331.

## II. STATEMENT OF FACTS

As noted above, prior to 1998, plaintiffs were employees of Delmarva and were beneficiaries of Delmarva's defined benefit pension plan. As early as October 1997, the employees of newly formed Conectiv were advised that "[a] new pension plan will replace the old 'final pay' plans with individual portable accounts." (D.I. 89 at A-42) In describing "the new pension arrangements," Conectiv advised that, although

> [t]he design of the plan is not yet finalized, . . . we know that it will be what's called a "cash balance" plan. Unlike the companies' current final pay plans that pay a benefit based on a formula applied at the end of your career, the cash balance plan provides each employee with a record keeping account into which the company credits a percentage of pay each year. The account balance will grow based on a set interest rate. At least annually, employees will receive a statement telling them their account balance. The account balance is portable, which means it can be rolled into another employer's plan or an IRA if you leave Conectiv.

(D.I. 89 at A-47)

2

On March 1, 1998, the Conectiv Board of Directors delegated to the Personnel and Compensation Committee ("the Committee") the authority to execute pension plan amendments that did not materially increase the company's pension costs. (D.I. 103 at C-145) At an April 23, 1998 meeting of the Committee, the Committee approved "the Conectiv Cash Balance Pension Plan with respect to Management employees, effective January 1, 1999, in substantially the same form presented in the attachment entitled "Conectiv Compensation and Benefits." (D.I. 89 at A-79) The Committee further "acknowledged the advisability of management having [the] authority" "to make changes in benefit plans and programs from time to time to maintain their competitiveness and respond to business and employee interests, subject to the responsibility of the Committee and the Board of Directors with respect to material amendments to employee benefit plans." (D.I. 89 at A-79) Finally, the Committee resolved that "the Vice President of Human Resources and Performance Improvement be, and hereby is, authorized to negotiate or cause to be negotiated with representatives of IBEW Local Nos. 210, 1238 and 1307 inclusion in any or all of the plans and programs mentioned in the above resolutions and to extend the same or similar terms and conditions of such plans and programs, in whole or in part, to employees represented by such Locals as he deems appropriate."[3] (D.I. 89 at A-79)

---

[3] Plaintiffs argue that the Cash Balance Plan was not officially adopted until December 10, 1999, when Donald E. Cain, Vice President for Human Resources and Productivity Improvement, executed a "certification" that he had approved the adoption of the Conectiv Retirement Plan in the form attached thereto, effective January 1, 1999. The court declines to find that the Cash Balance Plan was not formally adopted until this document was executed, given the previous corporate actions.

3

In May 1998, Conectiv distributed a "Facts" newsletter through the mail. (D.I. 89 at A-57, A-75; D.I. 103 at C-186) Under the heading "New Cash Balance Pension Plan," the newsletter contained an explanation of how the Cash Balance Plan operates and informed employees that the Plan would be effective January 1, 1999. (D.I. 89 at A-39, A-50 to A-53) In its description of company contributions and interest, the newsletter provided that Conectiv would credit each individual account "with interest each year based on the current 30-year U.S. Treasury bond rate. This rate changes based on economic conditions. Currently, it is 6%. Historically, it has averaged about 8%." (D.I. 89 at A-51) On December 21, 1998, Conectiv distributed a letter outlining how the Cash Balance Plan computes benefits. (D.I. 89 at A-39, A-58 to A-62) In this letter, Conectiv once again provided that, under the Cash Balance Plan, individual accounts would be credited with "interest each year based on the current 30-year U.S. Treasury bond rate. This rate changes based on economic conditions. Currently it is 5%. Historically, it has averaged about 8%." (D.I. 89 at A-61) After the Cash Balance Plan went into effect, Conectiv conducted a series of meetings with employees in July 1999 regarding the new pension benefit structure. These meetings were announced through distribution of a newsletter entitled "Mid Week Extra: Cash balance update June 23, 1999." One of the topics discussed at these informational meetings was the criticism directed against cash balance pension plans. (D.I. 89 at A-40, A-63 to A-71)

With respect to the plaintiffs, they have all denied seeing any of the above documents contemporaneously. However, there is evidence of record that Mr. Ward received three *Wall Street Journal* articles via a December 18, 1998 email that detailed critiques of cash balance plans and the legal challenges posed through some class

4

action lawsuits. (D.I. 89 at A-100 to A-113) With respect to Mr. Charles, he has admitted that he formed a belief "from the inception of the cash balance plan that it was unfair." (D.I. 89 at A-114) Mr. Fink likewise has admitted that he was "highly suspicious" in 1999 that the Cash Balance Plan would adversely affect him. (D.I. 89 at A-118) Finally, Mr. Troup attended the July 1999 meetings where the *Wall Street Journal* articles discussing the validity of cash balance plans were identified. (D.I. 89 at A-40, A-97 to A-98) The instant lawsuit challenging the validity of the Cash Balance Plan was filed on September 26, 2005. (D.I. 1)

## III. CROSS MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita,

5

475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## B. Count I: Backloading

Plaintiffs claim that the Cash Balance Plan violates ERISA's anti-backloading requirement contained in ERISA § 204(b)(1). More specifically, plaintiffs argue that the Cash Balance Plan has violated the 133 1/3 percent rule of § 204(b)(1)(B), which standard "requires that the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any particular year by more than 33%." Register, 477 F.3d at 79. In order to test compliance of the Cash Balance Plan with the requirements of § 204(b)(1)(B), plaintiffs determined the "accrued benefits" of Mr. Charles for each plan year and, by their calculations,[4] assert that "in 2004 and 2006, the rates of benefit

---

[4]Plaintiffs contend that the appropriate calculation is accomplished by taking, for each plan year, a plaintiff's account balance and projecting the future interest credits using the 30-year Treasury rate for the prior October, and then converting the projected account value into a single life annuity. "Compliance with Section 204(b)(1)(B) is then measured by examining the pattern of growth in the accrued benefit. The plan will pass the anti-backloading test so long as the value of the benefit accrued in any year does

6

accrual exceeded 133 1/3% of the benefit accrual rates of several previous years.... Similar calculations performed in the case of the other three plaintiffs would show similar overall results while the actual numbers vary." (D.I. 94 at B0557)

Plaintiffs' method of testing the 133 1/3% requirement, that is, taking into account the annual changes in the variable 30-year Treasury rate, invariably results in a participant's accrued benefits increasing in some years and decreasing in others. Therefore, if ERISA § 204(b)(1)(B) is to be applied literally, one could predict that the Cash Balance Plan (and arguably all other similar cash balance plans) periodically would not pass muster. The question for the court is whether plaintiffs' methodology makes any sense.

In matters of statutory interpretation, the Third Circuit has instructed courts to consider "'not only the particular statutory language at issue, but also the structure of the section in which the key language is found, the design of the statute as a whole and its object.'" Register, 477 F.3d at 67 (quoting Alaka v. Attorney General, 456 F.3d 88, 104 (3d Cir. 2006)). In this regard, "'[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.'" Id. (quoting American Tobacco Co. v. Patterson, 456 U.S. 63, 71 (1982)). With these principles in mind, the Third Circuit described ERISA's anti-backloading provision as follows:

> The purpose of the anti-backloading provision is to "prevent an employer from avoiding the vesting requirements [of ERISA] through minimal accrual of benefits in early years of employment, followed by larger benefit accruals as an employee nears retirement." Congress intended by the anti-backloading

---

not 'exceed the value of a benefit accrued in any particular year by more than 33%.'" (D.I. 93 at 8)

7

> provision to prohibit an employer from "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and . . . concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement."

Id. at 71 (citations omitted).  Although the Third Circuit analyzed § 204(b)(1)(B) under a different factual context in Register, nevertheless, the Court's conclusion ultimately was based on practical considerations, to wit, that "the objective of the anti-backloading provisions, to prevent a plan 'from being unfairly weighted against shorter-term employees,' simply is not implicated by the PNC conversion [to a cash balance plan]." Id. at 72 (citations omitted).

This court likewise concludes that the objective of the anti-backloading provisions is not implicated by the Cash Balance Plan at bar.  First, there is no evidence of record, or even any allegation, that the shifts in the rate of benefit growth that result from fluctuating interest rates are unfairly weighted against shorter-term employees.  Second, while not dispositive, the fact that plans such as the Cash Balance Plan at bar satisfy the accrual requirements[5] established by the Internal Revenue Service in IRS Notice 96-8, 1996-1 C.B. 359, indicates that they are consistent with the purpose of the anti-backloading requirements of ERISA § 204(b)(1)(B).

---

[5]Such "frontloaded interest credit plans" specify a variable outside index for use in determining the amount of interest credits and include the following provisions:  (1) future interest credits to an employee's hypothetical account balance are not conditioned upon future service; (2) the plan prescribes the method for reflecting future interest credits in the calculation of an employee's accrued benefit; (3) the plan, by its terms, cannot reduce the interest rate or rate of return used for projecting future interest credits; 4) the value of future interest credits cannot be projected using a rate that understates the value of those credits; and (5) the method for reflecting future interest credits must preclude employer discretion.

8

Finally, in calculating whether a plan satisfies the 133 1/3 percent test, "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year." See 26 U.S.C. § 411(b)(1)(B)(iv); 29 U.S.C. § 1054(b)(1)(B)(iv); 26 C.F.R. § 1.411(b) - 1(b)(2)(ii)(D). The court acknowledges that the above language does not specifically direct that interest rates should be kept static to test compliance. The court further acknowledges that factors such as age and service (subject to predictable change) should not be held constant to test compliance. Nevertheless, given that cash balance plans using variable interest rates have been upheld to date, and that factors such as benefits (like interest rates, subject to unpredictable fluctuations) are to be held constant to test compliance, it makes sense to treat interest rates consistent with the above statutory requirements.[6]

For all of the above reasons, the court concludes that the Cash Balance Plan does not violate ERISA's anti-backloading requirement, and that defendants' motion for summary judgment shall be granted in this regard.

### C. Count II: Reduction of Accrued Benefit on Account of any Increase in Age or Service

Plaintiffs' assert in count II that their accrued benefits were reduced in violation of ERISA § 204(b)(1)(G) "because the conversion to an annuity commencing at age sixty-five is sensitive to fluctuations in the thirty year treasury rate." (D.I. 1 at ¶ 41) In its decision denying defendants' motion to dismiss, the court recognized that §

---

[6]Although it seems to the court that a constant interest rate is the more reasonable approach, it is not as clear to the court whether Mr. Kra used the most reasonable rate for his calculations. (See D.I. 93 at 11)

204(b)(1)(G) does not prohibit any decrease in the value of a participant's accrued benefit, just any decrease "on account of any increase in his age or service." Plaintiffs were given the opportunity to demonstrate, through discovery, that the use of a variable interest rate actually caused their accrued benefits to decrease on account of additional age or service. Charles v. Pepco Holdings, Inc., 437 F. Supp. 2d 248, 251 (D. Del. 2006).

In their opposition to defendants' summary judgment motion, plaintiffs again contend as a general matter that the Cash Balance Plan "has a design flaw: Because benefits are based upon growth of a hypothetical account, when the account is converted to an annuity, a participant's accrued benefit can decrease despite additional service." (D.I. 93 at 12-13) Plaintiffs concede, as they must, that they have no evidence that their accrued benefits were reduced because of any factor other than fluctuating interest rates. Clearly, however, all Plan participants may be similarly impacted by the same change in interest rates, regardless of age or service. Therefore, plaintiffs have failed to demonstrate that their accrued benefits were reduced "**on account of** any increase in his age or service." ERISA § 204(b)(1)(G) (emphasis added). See gen. Register, 477 F.3d at 70;[7] Rev. Rul. 81-12, 1981-1 C.B. 228

---

[7]In analyzing ERISA § 204(b)(1)(H), which prohibits a reduction in the rate of an employee's benefit accrual because of the attainment of any age, the Third Circuit discussed the concept of age discrimination as it applies to cash balance plans:

> In applying the anti-discrimination provision in the context of cash balance plans, which defines the benefit in terms of the cash balance account, we are concerned with what PNC puts into an employee's account, not what the employee eventually may obtain from the plan on retirement. In evaluating the plan's inputs, PNC does not reduce contributions (in the form of either earnings or interest credits) to older employees. The circumstance

10

(variations resulting from the fluctuations of a variable interest rate do not constitute a change in participants' accrued benefits). Defendants' motion for summary judgment shall be granted in this regard.

### D. Count IV: Notice

Plaintiffs charge in count IV that defendants violated ERISA § 204(h) by failing to provide adequate notice of the amendment establishing the cash balance formula. At the time of the amendment at bar, § 204(h) provided that a plan "may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to . . . each participant in the plan." 29 U.S.C. § 1054(h)(1996).[8] An amendment is subject to the notice requirement "only if it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." 26 C.F.R. § 1.411(d)-6 (Q&A 5)(1999). The regulations

---

> that the same contribution in the form of interest credits may result in a more valuable annuity for a younger employee is not discrimination in whole or in part based on age; rather it is the completely appropriate consequence of the application of an age-neutral principle to an accumulating account of the time value of money.

477 F.3d at 70. The court finds that the neutral application of a variable interest rate, likewise, does not work to reduce a participant's accrued benefit on account of age or service.

[8]Congress amended ERISA in 2002 to provide that an amendment must "be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information . . . to allow applicable individuals to understand the effect of the plan amendment." 29 U.S.C. § 1054(h)(2).

11

provide that this is determined "based on reasonable expectations taking into account the relevant facts and circumstances at the time the amendment is adopted." 26 C.F.R. § 1.411(d)-6 (Q&A 7)(1999). The notice could summarize the amendment, "if the summary [were] written in a manner calculated to be understood by the average plan participant and contains the effective date. The summary need not explain how the individual benefit of each participant . . . will be affected by the amendment." Register, 477 F.3d at 72 (quoting 26 C.F.R. § 1411(d)-6T (1996)).

Both plaintiffs and defendants have submitted competing analyses of whether the amendment establishing the Cash Balance Plan would change the rate of future benefit accrual for plaintiffs under the Plan. Once again, the experts have employed different methodologies to calculate the rate of future benefit accrual. Plaintiffs' expert, using actual salary increases for Mr. Charles from 1999 through 2006 and the same average annual increases from 2007 through attainment of age 65 in 2014, concluded that the projected benefit payable at normal retirement age for Mr. Charles was greater under Conectiv's previous defined benefit plan than under the Cash Balance Plan. (D.I. 94 at B560 to B562, B570 to B571) Defendants' expert looked at the data for each plaintiff as of 1999, the effective date of the amendment, and (consistent with the treasury regulations discussed above) held benefits constant; he concluded that the projected benefit payable at normal retirement age for each plaintiff was greater under the Cash Balance Plan than under the previous defined benefit plan. (D.I. 89 at A-122 to A-124)

Consistent with its conclusions regarding ERISA § 204(b)(1)(B), the court concludes that defendants' expert employed the more appropriate methodology to

determine whether, at the effective date of the amendment (January 1999), plaintiffs' rate of future benefit accrual would be significantly reduced under the Cash Balance Plan.[9] Using defendants' calculations (which have not been challenged for their accuracy), there is no probative evidence of record to support plaintiffs' claim that they were entitled to notice under ERISA § 204(h).[10] Defendants' motion for summary judgment shall be granted in this regard.

## IV. CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted. (D.I. 87) Plaintiffs' cross-motion for partial summary judgment (D.I. 92) is denied, and their motion for class certification (D.I. 67) is denied as moot. An appropriate order shall issue.

---

[9] Plaintiffs' motion to strike defendants' expert's report (D.I. 95) is denied, as the grounds asserted therein have already been addressed (and rejected, for the most part) in the court's analysis above.

[10] Assuming, for purposes of these proceedings, that plaintiffs had demonstrated a significant reduction in their rate of future benefit accrual, the court concludes that the notice papers were distributed and should be deemed received by the participants. It is clear, however, that none of the papers even generally referenced the possibility that the Cash Balance Plan "may affect the future rate of benefit accruals" and "in some instances may reduce the rate of future ... benefit accruals." Register, 477 F.3d at 73. While a notice need not discuss how each participant's benefit might be affected by the amendment, clearly some discussion of the possible adverse effects of the controversial new pension plan would have been in order. Nevertheless, the relief requested by plaintiffs for a violation of § 204(h)'s notice requirement, rescission of the Cash Balance Plan, is inappropriate under the record facts: (1) Plaintiffs did not file suit to rescind the Plan until five years after the amendment took effect; (2) they have failed to persuade the court that the Cash Balance Plan violates any substantive provision of ERISA but for, arguably, the notice provision; and (3) the Cash Balance Plan formula, while applied in a nondiscriminatory manner, may impact participants variably (i.e., many participants are benefitting from the Plan).